UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

FEDERAL HOUSING FINANCE AGENCY,

                    Plaintiff,

        v.

HSBC NORTH AMERICA HOLDINGS, INC., *et al.*,

                Defendants.

11 Civ. 6189 (DLC)

------------------------------------------------------------------ x

FEDERAL HOUSING FINANCE AGENCY,

                    Plaintiff,

        v.

NOMURA HOLDING AMERICA, INC., *et al.*,

                Defendants.

11 Civ. 6201 (DLC)

------------------------------------------------------------------ x

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE STATUTE OF LIMITATIONS

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Philippe Z. Selendy
Jon Corey
Adam M. Abensohn
Andrew R. Dunlap
David B. Schwartz
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing Finance Agency,*
*as Conservator for Fannie Mae and Freddie Mac*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ................................................................................................3

    A.    Defendants' Misrepresentations.................................................................3

    B.    The GSEs Did Not Discover Any Facts Before September 7, 2007
          Revealing That Defendants' Representations Were False .......................4

          1.    The GSEs Reasonably Accepted Defendants' Representations .................5

          2.    General Market Information Could Not Have Led The GSEs To
              Discover That Defendants' Representations Were False Before
              September 7, 2007 .......................................................................6

          3.    The GSEs' Monitoring Of Their PLS Portfolios Could Not Have
              Led Them To Discover That Defendants' Representations Were
              False Before September 7, 2007 ....................................................7

    C.    Procedural History .................................................................................9

ARGUMENT ..................................................................................................10

I.    DEFENDANTS MUST PRESENT EVIDENCE FROM WHICH A JURY
    COULD FIND THAT THE GSES ACTUALLY DISCOVERED, OR A
    REASONABLY DILIGENT PLAINTIFF WOULD HAVE DISCOVERED,
    FACTS SUFFICIENT TO STATE A CLAIM BEFORE SEPTEMBER 7, 2007 ...........11

II.    THERE IS NO EVIDENCE TO PERMIT A FINDING THAT THE GSES
    ACTUALLY DISCOVERED, OR A REASONABLY DILIGENT PLAINTIFF
    WOULD HAVE DISCOVERED, SUFFICIENT FACTS TO PLEAD A
    PLAUSIBLE COMPLAINT PRIOR TO SEPTEMBER 7, 2007 ...................................15

    A.    There Is No Evidence The GSEs Actually Discovered Facts Sufficient To
          State A Claim Before September 7, 2007 ............................................16

    B.    A Reasonable Investor Could Not Have "Discovered" A Basis To Assert
          Claims Through Evidence Untethered From The Certificates ............................20

CONCLUSION ................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Page**

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
  824 F. Supp. 2d 1164 (C.D. Cal. 2011) ...................................................22

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...........................................................................10

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) ...................................................12

*Brecher v. Citigroup Inc.*,
  2011 WL 5525353 (S.D.N.Y. Nov. 14, 2011) ........................................22

*Capital Ventures Int'l v. UBS Sec. LLC*,
  2012 WL 4469101 (D. Mass. Sept. 28, 2012) .......................................22

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011)................................................2, 12, 13, 20

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
  834 F. Supp. 2d 949 (C.D. Cal. 2012) ..................................................22

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
  934 F. Supp. 2d 1219 (C.D. Cal. 2013) ................................................22

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
  2012 WL 1322884 (C.D. Cal. Apr. 16, 2012) .......................................22

*Desclafani v. Pave-Mark Corp.*,
  2008 WL 3914881 (S.D.N.Y. Aug. 22, 2008) .........................................8

*In re Direxion Shares ETF Trust*,
  279 F.R.D. 221 (S.D.N.Y. 2012) .........................................................14

*Doe ex rel. Doe v. Whelan*,
  732 F.3d 151 (2d Cir. 2013)................................................................10

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
  504 U.S. 451 (1992).............................................................................10

*FDIC v. Chase Mortg. Fin. Corp.*,
  2013 WL 5434633 (S.D.N.Y. Sept. 27, 2013).................................11, 22

*FDIC v. Countrywide Fin. Corp.*,
  2012 WL 5900973 (C.D. Cal. Nov. 21, 2012)......................................22

*FDIC v. Giammettei*,
  34 F.3d 51 (2d Cir. 1994)...................................................................10

*FHFA v. Bank of Am. Corp.*,
  2012 WL 6592251 (S.D.N.Y. Dec. 18, 2012) .......................................11

*FHFA v. HSBC N. Am. Holdings Inc.*,
    987 F. Supp. 2d 369 (S.D.N.Y. 2013)..................................................................................13

*FHFA v. HSBC N. Am. Holdings, Inc.*,
    --- F. Supp. 2d ---, 2014 WL 3702587 (S.D.N.Y. July 25, 2014)................................... *passim*

*FHFA v. JPMorgan Chase & Co.*,
    902 F. Supp. 2d 476 (S.D.N.Y. 2012).....................................................................13, 21, 23

*FHFA v. UBS Ams. Inc.*,
    2013 WL 3284118 (S.D.N.Y. June 28, 2013) .........................................................14, 20, 23

*FHFA v. UBS Ams., Inc.*,
    858 F. Supp. 2d 306 (S.D.N.Y. 2012)............................................................................. *passim*

*Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*,
    825 F. Supp. 2d 1082 (D.N.M. 2011) ..................................................................................22

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010)..................................................................................................10

*Hite v. Leeds Weld Equity Partners, IV, LLP*,
    429 F. Supp. 2d 110 (D.D.C. 2006) ......................................................................................11

*Ho v. Duoyuan Global Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012)...................................................................................11

*Holcomb v. Iona Coll.*,
    521 F.3d 130 (2d Cir. 2008)..................................................................................................10

*In re IndyMac Mortg.-Backed Sec. Litig.*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010)...................................................................................22

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*,
    32 F.3d 697 (2d Cir. 1994)....................................................................................................22

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.*,
    318 F.3d 148 (2d Cir. 2003)..................................................................................................14

*Lau v. Mezei*,
    2012 WL 3553092 (S.D.N.Y. Aug. 16, 2012) ......................................................................11

*In re Livent, Inc. Noteholders Sec. Litig.*,
    355 F. Supp. 2d 722 (S.D.N.Y. 2005)...................................................................................10

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
    2013 WL 6577020 (C.D. Cal. Dec. 5, 2013) ........................................................................22

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010).................................................................................................11, 14, 21

*Nat'l City Golf Fin. v. Higher Ground Country Club Mgmt. Co.*,
    2008 WL 904728 (S.D.N.Y. Apr. 3, 2008).............................................................................8

*NCUA v. Morgan Stanley & Co., Inc.*,
  2014 WL 241739 (S.D.N.Y. Jan. 22, 2014) ....................................................................11, 13

*NCUA v. UBS Sec., LLC*,
  2014 WL 2600133 (S.D.N.Y. June 10, 2014) ........................................................................24

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2013)................................................................................................ *passim*

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
  2011 WL 2020260 (S.D.N.Y. May 19, 2011) ........................................................................22

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013)....................................................................................................23

*Newman v. Warnaco Grp., Inc.*,
  335 F.3d 187 (2d Cir. 2003)....................................................................................................24

*Pascal v. JPMorgan Chase Bank, Nat. Ass'n*,
  2013 WL 878588 (S.D.N.Y. Mar. 11, 2013) ...........................................................................8

*Penn. Pub. Sch. Emp. Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012).....................................................................................22

*Pension Trust Fund for Operating Engrs. v. Mortg. Asset Securitization Transactions, Inc.*,
  730 F.3d 263 (3d Cir. 2013)................................................................................................. *passim*

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*,
  714 F. Supp. 2d 475 (S.D.N.Y. 2010).....................................................................................22

*Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
  2011 WL 135821 (S.D.N.Y. Jan. 12, 2011) ...........................................................................22

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008).............................................................................................21, 22

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
  802 F. Supp. 2d 1125 (C.D. Cal. 2011) .................................................................................22

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)...............................................................................21, 22

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
  712 F. Supp. 2d 958 (N.D. Cal. 2010) ...................................................................................22

*Wigand v. Flo-Tek, Inc.*,
  609 F.2d 1028 (2d Cir. 1979)..................................................................................................13

*In re WorldCom Sec. Litig.*,
  346 F. Supp. 2d 628 (S.D.N.Y. 2004).....................................................................................23

*Wright v. Goord*,
  554 F.3d 255 (2d Cir. 2009)....................................................................................................10

**<u>Statutes and Rules</u>**

12 U.S.C. § 4617(b)(12)(A)(ii)(I) .................................................................................11

15 U.S.C. § 77m ...................................................................................1, 3, 11, 12

D.C. Code § 31-5606.05(f)(2)(B) .....................................................1, 3, 11, 25

Va. Code § 13.1-522(D) ....................................................................................3

Fed. R. Civ. P. 56(e) .........................................................................................10

Plaintiff Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), respectfully submits this memorandum of law in support of its Motion for Partial Summary Judgment on Defendants'[1] statute of limitations defense under 15 U.S.C. § 77m ("Section 13") and D.C. Code § 31-5606.05(f)(2)(B).

### PRELIMINARY STATEMENT

In recent summary judgment practice on their knowledge defense, Defendants submitted nearly 80 pages of briefing, over 800 exhibits, and more than 600 separately-numbered assertions of fact, that they claimed could support a jury finding that the GSEs knew that Defendants' representations regarding the Certificates were false.  The Court rejected that argument and held that no rational jury considering this massive body of evidence—drawn from over 19 million pages of documents produced by FHFA—could conclude otherwise.  As the Court held, "Defendants have found no evidence of suspicion concerning the Securities at issue in the above-captioned actions, much less any evidence sufficient to support a finding of actual knowledge that Defendants' specific representations were false."  *FHFA v. HSBC N. Am. Holdings, Inc.*, --- F. Supp. 2d ---, 2014 WL 3702587, at *26 (S.D.N.Y. July 25, 2014).

Defendants' evidence fails to support a statute of limitations defense just as it failed to support a knowledge defense.  In order to prevail on the former, Defendants must demonstrate that before September 7, 2007, the GSEs discovered facts sufficient to state a claim that would survive a motion to dismiss, or that a "reasonably diligent plaintiff" would have done so.  Any suggestion that Defendants can meet this standard is defeated by the Court's recent holding that there is no evidence that the GSEs knew Defendants' representations were false, *id.* at *26.  As the Court has already found, Defendants' evidence is too general to show that the GSEs

---

[1]   As used herein, "Defendants" means all defendants remaining in these two actions (the "Actions").

possessed information revealing that Defendants' representations about the Certificates were false.

Far from discovering the fact that Defendants' representations were false, the undisputed evidence in fact shows that throughout the relevant period the GSEs accepted that Defendants' representations were true—as this Court has held they were entitled to—on the basis that Defendants' diligence made the Supporting Loan Groups collateralizing the Certificates stronger than a group of loans not subject to that diligence.  The GSEs also accepted Defendants' representation that they had created senior, AAA-rated Certificates, positioned at the top of the "waterfall" of cash flows within the Securitizations and buffered against market shocks by layers of junior certificates.  On this record, Defendants cannot defeat summary judgment by proposing that the falsity of their representations and ineffectiveness of their diligence should have been obvious.

Defendants also cannot defeat summary judgment by pointing to what a hypothetical "reasonably diligent plaintiff" would have done to discover that their representations were false. As both the Second and Third Circuits have held, a reasonably diligent Securities Act plaintiff can only "discover" a fact when it "can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss."  *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011); *see also Pension Trust Fund for Operating Engrs. v. Mortg. Asset Securitization Transactions, Inc.* ("*OPERS*"), 730 F.3d 263, 273-75 (3d Cir. 2013) (applying *City of Pontiac* standard to Securities Act claims).  There is no evidence here that an investor of "ordinary intelligence," or any investor for that matter, would have been able to discover the GSEs' claims prior to September 7, 2007.  *FHFA v. UBS Ams., Inc.* ("*UBS I*"), 858 F. Supp. 2d 306, 319 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013).  As the Court concluded in its knowledge decision, Defendants' evidence concerns loan origination practices generally, which is not sufficient to render plausible allegations that Defendants' representations about the specific Certificates were false.

Defendants' inability to marshal evidence in support of a statute of limitations defense reflects a fundamental contradiction in their theory of the case, which this Court recognized when it ruled on knowledge:  Defendants' primary defense is that their representations concerning the loans backing their Securitizations were true, yet Defendants' statute of limitations defense rests on the proposition that their representations were so obviously false that the GSEs could have and should have formulated a viable complaint seven years ago.  While it is acceptable to plead in the alternative, it is impossible for a fully developed evidentiary record, on the eve of trial, to support both of these positions.  There is no evidence that creates a genuine issue of material fact that by the threshold date the GSEs discovered, or would have discovered with reasonable diligence, their specific claims relating to the Certificates.  FHFA therefore respectfully requests that the Court grant it summary judgment on Defendants' statute of limitations defense under Section 13 of the Securities Act, 15 U.S.C. § 77m, and the D.C. Securities Act, D.C. Code § 31-5606.05(f)(2)(B).[2]

## BACKGROUND

Fannie Mae and Freddie Mac purchased 26 Certificates in these two Actions, issued from 24 Securitizations.  Plaintiff's Statement of Undisputed Material Facts ("SUF") ¶ 1.  Defendants offered and sold each Certificate using a Shelf Registration Statement, a Prospectus, a Prospectus Supplement, and one or more of the following: a term sheet, a preliminary prospectus supplement, and a free writing prospectus (the "Offering Materials").  SUF ¶ 2.

### A.    Defendants' Misrepresentations

In the Offering Materials, Defendants made specific representations about the Certificates, and the Mortgage Loans in the SLGs supporting the 26 Certificates, including that: (1) the Mortgage Loans comprising the SLGs were generally underwritten in accordance with applicable underwriting guidelines (SUF ¶¶ 7, 11, 16, 20); (2) the Mortgage Loans had specified loan-to-value ("LTV") and combined-loan-to-value ("CLTV") ratios (SUF ¶¶ 8, 11, 17, 20);

---

[2]  FHFA's Virginia Securities Act claims are subject to a two-year statute of limitations without a discovery period, Va. Code § 13.1-522(D), and thus are not at issue in this motion.

(3) a specified percentage of those loans were secured by owner-occupied residences (SUF ¶¶ 9, 11, 18, 20); and (4) the Certificates deserved investment-grade credit ratings (SUF ¶¶ 10, 11, 19, 20).  Defendants maintain these representations were true.  At trial, FHFA will show that they were false.

**B.**    **The GSEs Did Not Discover Any Facts Before September 7, 2007 Revealing That Defendants' Representations Were False**

In the 16 coordinated actions before this Court (of which only the two instant Actions remain), FHFA and the GSEs produced approximately 19.1 million pages of documents in discovery; the originally-named defendants produced approximately 212.7 million pages; and third parties produced approximately 14.3 million pages.  SUF ¶ 29.  From this massive record, in their opposition to summary judgment on the issue of knowledge,

> Defendants identif[ied] seven categories of information that, they argue[d], constitute circumstantial evidence that the GSEs were "well aware of information FHFA" now claims rendered the Defendants' Offering Documents "misleading":
>
> > (1)    the GSEs' counterparty reviews of Originators;
> >
> > (2)    the GSEs' direct purchases of subprime and Alt-A loans;
> >
> > (3)    the GSEs' awareness of risks associated with low- and no-documentation loans;
> >
> > (4)    the fact that Originators were obligated to repurchase "defective loans";
> >
> > (5)    the GSEs' general knowledge of "the subprime marketplace," which saw declines in RMBS performance, lesser adherence to underwriting standards, and increasing borrower fraud;
> >
> > (6)    the results of Fannie Mae's anti-predatory lending reviews; and
> >
> > (7)    the performance of similar loans from the same Originators or dealers.

*HSBC N. Am. Holdings*, 2014 WL 3702587, at *17.

After examining this evidence, the Court concluded that "Defendants have found *no evidence that the GSEs even mistrusted Defendants' representations about the Mortgage Loans*, let alone any evidence that the GSEs actually knew that any particular representation was

4

false and were content nonetheless to make their purchases blind." *Id.* at \*24 (emphasis added).
This conclusion flowed from the premise that evidence unmoored from the Certificates and
representations in the case provides "no reason [to think] the GSEs would have believed that
Defendants were incapable of identifying defective loans and either eliminating them from the
Supporting Loan Groups or taking their existence into account when composing their
descriptions of the SLGs for the Prospectus Supplements." *Id.* at \*25.  It follows that this
evidence also does not support a reasonable inference that the GSEs discovered facts sufficient to
plead a claim that the Defendants' particular representations were false as to any specific
Certificate before September 7, 2007.

### 1.     *The GSEs Reasonably Accepted Defendants' Representations*

The record demonstrates that the GSEs' employees, who, as the Court has already
determined, had no information indicating that Defendants' representations were false, accepted
that Defendants' diligence would ensure that those representations were true.  Paul Norris, the
head trader in Fannie Mae's PLS group, testified that he relied on "the reps and warrants that
were given to us and the due diligence done by the dealers" and that Fannie Mae "had no reason
to doubt that [Defendants] were[ ] doing what they said they were doing."  SUF ¶ 40.  Ashley
Dyson, another PLS trader at Fannie Mae, testified that "in regard to loans that I purchased,
I relied on the data that was sent to me by the Wall Street firms … and I assumed that the
information that I received was accurate and correct."  SUF ¶ 36.  David Gussmann, Fannie
Mae's Vice President, Capital Markets Strategy-Credit Risk, testified that "it was my
understanding that the aggregators and the dealers and underwriters would perform several
checks on these loans to ensure the veracity of the information that was provided.  …  I also
believe that the dealers that sold us the loans conducted due diligence, an additional layer of due
diligence on the loans that then matched the materials that they would provide to us."  SUF ¶ 42.

Freddie Mac's witnesses also reasonably accepted Defendants' diligence and
representations.  Stacey Kenneweg, a Financial Credit Risk Analysis Manager at Freddie Mac,

5

wrote that aggregators provided "another layer of due diligence that goes into the bonds that [Freddie Mac bought]," and that Freddie Mac "recognize[d] that aggregators can have an effect on the quality and performance of the bonds they structure, through activities including, but not limited to, due diligence reviews, appraisal policy, or servicer selection." SUF ¶ 103. Michael Aneiro, the head of Freddie Mac's PLS desk, testified that he was "dependent on the various parties involved with the sale of the deal that they're making representations that alleviate the risk that I am exposed to by the fact that I'm a[n] AAA investor and don't have access to actually make those determinations myself." SUF ¶ 97. Kevin Palmer, a credit analyst at Freddie Mac with PLS responsibilities, similarly testified that "we relied on the issuer's reps that the information was accurate." SUF ¶ 87. And David Hackney, a Freddie Mac PLS trader, testified that if he had thought that dealers were providing materially inaccurate information regarding potential deals, then he would have stopped doing business with them. SUF ¶ 93.

2.     *General Market Information Could Not Have Led The GSEs To Discover That Defendants' Representations Were False Before September 7, 2007*

Before September 7, 2007, reports concerning general problems in the subprime market provided no indication that Defendants' representations about the Mortgage Loans backing the Certificates were false. As this Court has already held, market reports reflecting a "loosening of credit standards in originators' underwriting guidelines" in general, *HSBC N. Am. Holdings*, 2014 WL 3702587, at *7, provide no basis to infer "that … Defendants would agree to purchase and securitize loans from such Originators, let alone that Defendants would fail to identify and remove defective loans from Supporting Loan Groups or falsely describe the SLGs," *id.* at *28.

For this reason, GSE employees who were aware of generalized problems in the subprime market did not believe that those concerns would affect the specific Certificates in the GSEs' PLS portfolios. For example, Daniel Mudd, Fannie Mae's former CEO, testified that his general concerns regarding occupancy and stated income misrepresentations in the mortgage market from 2005-2007 did not apply to Fannie's PLS portfolio, because "it was a high quality portfolio, highly rated and issued by reputable servicers, reputable underwriters that [Fannie

Mae] had broad business relationships with." SUF ¶ 49. Likewise, Mr. Salahuddin, account manager for mortgage trading at Fannie Mae, testified that "[w]e were given some data, a representation of what the loans would be, we were given assurance that the loans that ended up in our pool were compliant with the stipulations that we had put upon them, and so I wouldn't necessarily draw the -- a direct correlation between what's said in this particular publication and what we would apply to our -- the bonds that Fannie Mae purchased." SUF ¶ 50.

3.     *The GSEs' Monitoring Of Their PLS Portfolios Could Not Have Led Them To Discover That Defendants' Representations Were False Before September 7, 2007*

The GSEs' internal surveillance of their PLS portfolios did not indicate any potential problems with the Certificates in 2007. Fannie Mae's Capital Markets Strategy group maintained a Watch List to "provide an early warning to management about credit quality deterioration of loan pools backing PLS," SUF ¶¶ 77-79, but none of the Fannie Mae Securitizations were listed as having a high risk of loss prior to February 2008. SUF ¶ 85. That same month, Freddie Mac analyzed its Asset-Backed Securities Portfolio, and concluded "that the unrealized losses on [its] ABS portfolio as of December 31, 2007 are principally a result of decreased liquidity and larger risk premiums in the subprime market, and … [no] bonds in the portfolio … are [likely to] … incur[ ] a contractual principal or interest loss." SUF ¶ 119.[3]

The GSEs' post-purchase analyses also did not reveal any problems with the Certificates. While Fannie Mae required that post-purchase anti-predatory lending ("APL") reviews be performed to ensure its APL policies were met, those reviews could not have led it to discover Defendants' representations were false, as they only removed APL exceptions from the SLGs and did not focus on the remaining, compliant loans.[4] APL reviews did not examine the quality

---

[3]   The GSEs also conducted counterparty reviews of various originators to "assess the overall financial strength of the counterparty and its ability to meet . . . [Fannie's] rep and warrant requirements" and to ensure they could honor repurchase obligations, SUF ¶ 74; *see also id.* (Freddie Mac conducted similar reviews to determine which originators had the minimum controls necessary for Freddie Mac "to do business with and to help determine exposure to tolerance").

[4]   Fannie Mae's Legal Department required that a sample of at least 100 loans underlying each pool of subprime PLS "receive a full credit and regulatory compliance review, and the Fannie Mae [APL compliance] Scope." SUF ¶ 69. Fannie Mae also mandated that "[a]ny loans that are found [by the diligence provider] to be in breach of

7

of the loans that Defendants' diligence providers did not flag as exceptions, and thus said nothing about the loans remaining in the SLGs.  Moreover, Fannie Mae's Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts.  *See* SUF ¶ 72 (Fannie Mae Legal Department employee confirming that APL reviews are "not shared with [ ] Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of Fannie Mae's APL guidelines].").

There is also no evidence that incidents of early payment defaults ("EPDs") in remittance reports about the Certificates indicated that Defendants' representations might have been false, let alone led the GSEs to discover their falsity.  Moreover, Defendants themselves offered reassurances in public filings with the SEC that there were no litigations or other proceedings relating to the Certificates.  In filings including Pooling and Servicing Agreements, Servicing Agreements, Form 10-Ks, and remittance reports, Defendants represented that there were no litigations or proceedings against Defendants that would be material to Certificate-holders. SUF Exs. C-Z.[5]  For example, on September 10, 2007—three days *after* the threshold date at issue—HSBC filed a remittance report with the SEC for the HASC 2007-OPT1 Securitization, which reported "None" under the category "Legal Proceedings."  SUF Ex. R.  Similarly, on May 31, 2007, Nomura submitted a Pooling and Servicing Agreement as part of a Form 8-K filed with the SEC for the NHELI 2007-3 Securitization, in which the sponsor and the depositor, both Nomura entities, warranted that "[n]o litigation is pending or, to the best of the Sponsor's knowledge, threatened, against the Sponsor that would materially and adversely affect

---

the Fannie Mae Reps (as evidenced by such due diligence review) must be removed from the Fannie Mae pool pre-settlement."  SUF ¶ 70.  Between 2005 and 2007, Fannie Mae's policy required that a "Fannie Mae Exception Report must be sent by the due diligence provider to the Fannie Mae Legal Department …  90 days after settlement so that it can validate that the loans in the Fannie Mae Pool comply with the Fannie Mae" APL requirements such that "[a]ny loan exceptions that remain in the Fannie Mae Pool . . . are subject to immediate repurchase."  SUF ¶ 71.

[5]   The Court may take judicial notice of statements in SEC filings and consider facts within such filings on summary judgment.  *Nat'l City Golf Fin. v. Higher Ground Country Club Mgmt. Co.*, 2008 WL 904728, at *8 n.8 (S.D.N.Y. Apr. 3, 2008) (Lynch, J.); *Desclafani v. Pave-Mark Corp.*, 2008 WL 3914881, at *5 n.7 (S.D.N.Y. Aug. 22, 2008) (collecting cases); *see also Pascal v. JPMorgan Chase Bank, Nat. Ass'n*, 2013 WL 878588, at *4 n.4 (S.D.N.Y. Mar. 11, 2013) (taking judicial notice of agreement publicly filed on FDIC's website on summary judgment, over hearsay objection).

the execution, delivery or enforceability of this Agreement or the ability of the Sponsor to sell the Mortgage Loans or to perform any of its other obligations under this Agreement in accordance with the terms hereof." SUF Ex. Z; *see also id.* (materially identical language for the depositor).

### C.    Procedural History

FHFA filed its original complaints in these Actions on September 2, 2011, and filed its amended complaints on June 28, 2012. SUF ¶ 23. In the amended complaints, FHFA asserted claims against Defendants for, among other things, violations of Sections 11 and 12 of the Securities Act and related provisions of the Virginia and D.C. Blue Sky laws. SUF ¶ 24.

In November 2012, the Court denied Defendants' motions to dismiss and held that FHFA's claims pertaining to the four categories of alleged misrepresentations are actionable. *FHFA v. HSBC N. Am. Holdings Inc.*, No. 11 Civ. 6189 (DLC), slip op. at 2 (S.D.N.Y. Nov. 28, 2012) Dkt. 171; *FHFA v. Nomura Holding Am., Inc.*, No. 11 Civ. 6201 (DLC), slip op. at 2 (S.D.N.Y. Nov. 27, 2012) Dkt. 165. In their Answers, all Defendants pled that FHFA's claims were barred by the applicable statute of limitations. SUF ¶¶ 27-28. Fact discovery among the parties closed across the Actions on December 6, 2013.[6] SUF ¶ 30.

On July 25, 2014, the Court granted FHFA's motion for partial summary judgment on Defendants' knowledge defense under Section 11 and the absence-of-knowledge element of FHFA's claims under Section 12 and the Blue Sky laws. On a voluminous record, the Court found that "Defendants ha[d] not raised a genuine issue of material fact as to the GSEs' actual knowledge of the specific misrepresentations and omissions alleged by FHFA in the Offering Documents for the" Certificates. *HSBC N. Am. Holdings*, 2014 WL 3702587, at *30. On August 20, this Court authorized FHFA to file this motion. No. 11 Civ. 6189 Dkt. 923.

---

[6]   Although party fact discovery closed on December 6, 2013, certain depositions took place after that date. The deposition of one FHFA witness, Peter Niculescu (former Executive Vice President of Capital Markets at Fannie Mae), was completed on December 10, 2013, and Defendants' Rule 30(b)(6) deposition of FHFA occurred on December 17, 2013. Fact and Rule 30(b)(6) depositions of HSBC and Nomura continued until December 23, 2013, and May 13, 2014, respectively. SUF ¶ 30 n.5.

### ARGUMENT

As this Court recently summarized, on a motion for summary judgment:

> [t]he moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992); *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Nor may a party "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). "A submission in opposition to (or in support of) summary judgment need be considered only to the extent that it would ... be[ ] admissible at trial." *Doe ex rel. Doe v. Whelan*, 732 F.3d 151, 157 (2d Cir. 2013) (citation omitted). Only disputes over material facts—"facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

*HSBC N. Am. Holdings*, 2014 WL 3702587, at *18 (parallel report citations omitted).  As here, "'[w]here a plaintiff uses a summary judgment motion … to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—[it] may satisfy its … burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case.'"  *In re Livent, Inc. Noteholders Sec. Litig.*, 355 F. Supp. 2d 722, 729 (S.D.N.Y. 2005) (quoting *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994)).

I.   **DEFENDANTS MUST PRESENT EVIDENCE FROM WHICH A JURY COULD FIND THAT THE GSES ACTUALLY DISCOVERED, OR A REASONABLY DILIGENT PLAINTIFF WOULD HAVE DISCOVERED, FACTS SUFFICIENT TO STATE A CLAIM BEFORE SEPTEMBER 7, 2007**

FHFA's Securities Act claims are subject to a one-year statute of limitations.  15 U.S.C. § 77m.[7]  HERA extends the time for FHFA to bring suit by three years from the date the GSES

---

[7]   FHFA's D.C. Blue Sky claims are subject to a substantially identical one-year statute of limitations, which also commences upon "the discovery of the untrue statement or omission or after the discovery should have been made by the exercise of reasonable diligence."  D.C. Code § 31-5606.05(f)(2)(B).  This statute is interpreted "in accordance" with Section 13.  *FHFA v. Bank of Am. Corp.*, 2012 WL 6592251, at *7-8 (S.D.N.Y. Dec. 18, 2012) (citing *Hite v. Leeds Weld Equity Partners, IV, LLP*, 429 F. Supp. 2d 110, 114 (D.D.C. 2006)); *NCUA v. Morgan*

are placed into conservatorship, 12 U.S.C. § 4617(b)(12)(A)(ii)(I), which occurred on September 6, 2008, SUF ¶ 22.  Accordingly, FHFA's claims were timely unless Defendants can establish that they could have been asserted before *September 7, 2007*—one year before conservatorship.  *See UBS I*, 858 F. Supp. 2d at 320 ("FHFA's Securities Act claims were open at the time the time the GSEs were placed into conservatorship" in "September 2007").

The limitations period "begins to run upon discovery of, or when 'a reasonably diligent plaintiff would have discovered, the facts constituting the violation.'" *Id.* at 319 (quoting *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010)); *see also OPERS*, 730 F.3d at 273 ("[T]he discovery standard announced by the Supreme Court in *Merck* applies … to the Securities Act's statute of limitations.").[8]  Thus, it is not enough for Defendants to demonstrate that the GSEs were on "inquiry notice" of potential problems with the loans backing the Securitizations; rather, they must show that, as of September 7, 2007, the GSEs "or a reasonably diligent plaintiff in their position, could have 'discovered' [Defendants' misrepresentations] with sufficient particularity to plead a [viable] Securities Act claim." *UBS I*, 858 F. Supp. 2d at 320 (quoting 15 U.S.C. § 77m).  The actual plaintiff or "[a] reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities [ ] violation" under this standard "until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *City of Pontiac*, 637 F.3d at 175.

Defendants can meet this standard only with evidence relating to the specific Certificates at issue, and not based on evidence concerning loan origination or the RMBS industry generally.

---

*Stanley & Co., Inc.*, 2014 WL 241739, at *12-13 (S.D.N.Y. Jan. 22, 2014) (holding that Texas Blue Sky statute of limitations identical to D.C. Securities Act statute of limitations should be analyzed according to precedents construing Section 13).

[8]  When this Court held that it "makes good sense" to apply the *Merck* standard to Section 13—because "[b]oth statutes use the plaintiff's 'discover[y]' of the factual predicate of the claim as the triggering date for the statute of limitations"—it reached the same conclusion as "the majority of district courts that have considered the matter." *UBS I*, 858 F. Supp. 2d at 319 (brackets in original) (collecting cases).  Since then—in addition to the Third Circuit, as discussed in text—several other courts in this District have reached the same conclusion.  *E.g.*, *FDIC v. Chase Mortg. Fin. Corp.*, 2013 WL 5434633, at *3 (S.D.N.Y. Sept. 27, 2013) (Stanton, J.); *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012) (Daniels, J.); *Lau v. Mezei*, 2012 WL 3553092, at *9 (S.D.N.Y. Aug. 16, 2012) (Wood, J.).

*See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746,

765-66 (S.D.N.Y. 2012) ("[A]bsent a decline in the Certificates' ratings (or some other indicator

of a steep decline in the Certificates' value), it is difficult to see how a plaintiff could have

plausibly pled that the epidemic of indiscretions in the MBS industry had infected his or her

Certificates."); *see also UBS I*, 858 F. Supp. 2d at 321 ("[G]eneralized reports" about "loan

originators' dubious underwriting practices say[ ] little about when [the GSEs] discovered the

facts that form the basis of [their] complaint[s]" without something to "connect" this general

information "to the particular securities that the GSEs bought from defendants").

　　　　　Moreover, Defendants must establish their defense on a Certificate-by-Certificate basis.

The Certificates were "issued through [multiple] separate Offerings, each backed by a distinct set

of loans issued by a distinct set of originators," and were often "divided further into two separate

Groups, each of which was backed by a distinct set of loans," and "were divided further into

separate tranches offering various priorities of entitlement to the cash flows from the loans

backing them." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145,

163 (2d Cir. 2013). "[T]o the extent the representations in the Offering Documents were

misleading with respect to one Certificate, they were not necessarily misleading with respect to

others." *Id.* As the Third Circuit recognized, "the statute of limitations would not have begun to

run until [a reasonably diligent plaintiff] discovered the untrue statements or the omissions

concerning her particular Certificates." *OPERS*, 730 F.3d at 277.[9] Consequently, "generalized

reports" cannot, as a matter of law, create a genuine issue of material fact as to when a plaintiff

discovered its claims, unless something "connect[s]" that information to "particular securities

that the GSEs bought from defendants." *UBS I*, 858 F. Supp. 2d at 321.

　　　　　This need for certificate-level specificity negates any argument that evidence regarding

the Securitizations' junior tranches, including evidence of downgrades to those tranches, would

---

[9]　The same decision also makes clear that "generalized" information, in addition to not meeting the discovery standard as a matter of law, means that "there will typically be a larger temporal disparity between the start of the investigation and the discovery of the facts constituting the violation." *OPERS*, 730 F.3d at 275.

have enabled a reasonable investor in the Securitizations' most senior tranches to plead her

claims.  Because junior tranches are intended to "suffer losses first in the event the underlying

mortgages became delinquent or defaulted," there is "little, if any reason to believe that the

downgrade of those [junior] tranches [in the Securitizations] should have led the GSEs to

discover that the underlying mortgages were not simply risky, but so poorly underwritten as to

put at risk even the most senior certificates."  *FHFA v. JPMorgan Chase & Co.*, 902 F. Supp. 2d

476, 500 (S.D.N.Y. 2012).  Evidence of problems in a junior tranche therefore "does not

establish a key requirement for … triggering … the statute of limitations, namely that such

information was sufficient on its own to enable [FHFA] to plead a securities violation [regarding

its AAA tranche] capable of surviving a motion to dismiss."  *Morgan Stanley & Co.*, 2014 WL

241739, at *14.[10]

Even when there are Certificate-specific warnings that might otherwise spur a

"reasonably diligent" plaintiff to begin investigating potential claims, such warnings can, as a

matter of law, be dissipated by an issuers' comforting statements.  The Supreme Court noted in

*Merck* that "terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that

they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin

investigating."  *Merck*, 559 U.S. at 653.  And pre-*Merck* Second Circuit precedent establishes

that "[t]here are occasions when, despite the presence of some ominous indicators, investors may

not be considered to have been placed on inquiry notice because the warning signs are

---

[10]  Moreover, information available *before* the GSEs purchased a Certificate cannot as a matter of law commence the running of the limitations period unless post-purchase information independently triggers a duty to inquire.  *See OPERS*, 730 F.3d at 279 n.10 ("It would be inappropriate to consider UBS's March 2007 SEC filing as a storm warning, since the Operating Engineers did not purchase their Certificates until September 2007.").  Because "the statute of limitations cannot begin to run until a claim has accrued," *City of Pontiac*, 637 F.3d at 176, and the GSEs' claims could not have accrued prior to the issuance of the specific Prospectus Supplements or the GSEs' purchase of each Certificate, information pre-dating those events cannot independently trigger the accrual of those claims.  *See Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1033 n.5 (2d Cir. 1979) ("[T]he limitations period" for a Section 12(a)(2) claim "begins to run only after the sale, because it would be unreasonable to have the limitations period begin to run before the claim accrued, i.e., before the sale occurred."); *FHFA v. HSBC N. Am. Holdings Inc.*, 987 F. Supp. 2d 369, 374, 376 (S.D.N.Y. 2013) (for issuers, directors of issuers, and underwriters, "the date the prospectus supplement is first used (or the date the securities to which it relates are first sold) becomes the new 'effective date' of the registration statement for purposes of Section 11 liability").

accompanied by reliable words of comfort from management." *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.,* 318 F.3d 148, 155 (2d Cir. 2003), *limited by Merck*, 559 U.S. 633.  The Third Circuit similarly has "recognized that reassurances can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns."  *OPERS*, 730 F.3d at 277 (quotation marks omitted).  Accordingly, because investors are legally entitled to believe in the truth of issuers' representations, *FHFA v. UBS Ams. Inc.* ("*UBS III*"), 2013 WL 3284118, at *18 (S.D.N.Y. June 28, 2013), an issuer's reassurances delay the time in which a reasonably diligence investor may be expected to begin *investigating* its claims, to say nothing of actually *discovering* them.

Finally, even undissipated warnings are not probative of when a reasonably diligent investor should have discovered his claims if those warnings would not have been understood by average investors.  Under the pre-*Merck* standard of accrual, "inquiry notice" was triggered only "when 'the circumstances were such as to suggest to a *person of ordinary intelligence* the probability' that she had a cause of action."  *UBS I*, 858 F. Supp. 2d at 319 (bracket omitted) (emphasis added) (quoting *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 701 (2d Cir. 1994), *limited by Merck*, 559 U.S. 633).  After *Merck*, courts continue to hold that a "reasonably diligent plaintiff" is "an investor of ordinary intelligence."  *In re Direxion Shares ETF Trust*, 279 F.R.D. 221, 235 (S.D.N.Y. 2012) (quotation marks omitted).  Thus, Defendants cannot create a genuine issue of material fact by submitting evidence showing what "an investor of more-than-ordinary intelligence" would have done to discover his claims.

## II. THERE IS NO EVIDENCE TO PERMIT A FINDING THAT THE GSES ACTUALLY DISCOVERED, OR A REASONABLY DILIGENT PLAINTIFF WOULD HAVE DISCOVERED, SUFFICIENT FACTS TO PLEAD A PLAUSIBLE COMPLAINT PRIOR TO SEPTEMBER 7, 2007

In its summary judgment decision on the GSEs' knowledge, the Court made an observation that applies equally here:  "[A] contradiction lies at the heart of Defendants' current litigation position," namely that Defendants contend that general evidence "should have made it obvious that each of the pertinent representations in the Offering Documents for [ ] Defendants'

… Securitizations was false[,]" while simultaneously maintaining that "each of these representations was true, and that their due diligence defense will shield them, in part, from liability from any inaccuracy that may have crept into the Offering Documents." *HSBC N. Am. Holdings*, 2014 WL 3702587, at *25. Likewise here, at this late stage of the proceedings—where the detailed factual record makes pleading in the alternative untenable—it is simply not plausible for Defendants to simultaneously argue that their representations were true, but also so obviously false that the GSEs should have discovered their claims seven years ago.

Although there are distinctions between the legal standards governing knowledge and limitation, those distinctions do not make a difference in light of the Court's observation—based on careful consideration of Defendants' seven categories of evidence—that none of Defendants' evidence indicates that the GSEs, when they purchased the Certificates, "even mistrusted Defendants' representations about the Mortgage Loans … let alone [that they] actually knew that any particular representation was false[.]" *Id.* at *24. There is also no evidence that any information arose after purchase and prior to September 7, 2007—a period that was as short as two months in *HSBC* and four months in *Nomura*[11]—that could change this conclusion, as the Court already considered, and rejected, Defendants' argument that post-purchase evidence suggests the GSEs knew the representations were false. *See id.* at *7-8, *26 & n.30. There is also no evidence to support the conclusion that any investor other than the GSEs, much less one of "ordinary intelligence," *UBS I*, 858 F. Supp. 2d at 319 (quotation marks omitted), could have discovered the GSEs' claims using information available prior to September 7, 2007.

Accordingly, the Court's previous conclusion that there is "no reason the GSEs would have believed that Defendants were incapable of identifying defective loans and either eliminating them from the Supporting Loan Groups or taking their existence into account when composing their descriptions of the SLGs for the Prospectus Supplements" is equally correct here. *HSBC N. Am. Holdings*, 2014 WL 3702587, at *25. Trial in these cases should therefore

---

[11]  SUF tbls. 1, 8 (last GSE purchase of a Certificate in *HSBC* was July 3, 2007; last GSE purchase of a Certificate in *Nomura* was April 30, 2007).

be focused on the real dispute—whether Defendants' representations about the loans they selected for inclusion in the SLGs were true—and not on the farfetched theory that the GSEs somehow should have recognized that Defendants' specific representations were in fact false, despite the absence of any information that could have led to that conclusion.

**A.** **There Is No Evidence The GSEs Actually Discovered Facts Sufficient To State A Claim Before September 7, 2007**

In briefing the issue of knowledge, Defendants cited the evidence they believed led or should have led the GSEs to discover the facts underlying their claims during the relevant time period.  This evidence, Defendants argued, "[p]ermitted [i]nferences [a]bout the [l]oans in the [s]upporting [l]oan [g]roups," and showed that "the GSEs should have known … that poorly originated loans would reach the Supporting Loan Groups." *Id.* at *24.  HSBC, for example, emphasized that "in June 2006 Freddie Mac observed that many originators originated an unusually high volume of loans shortly ahead of when more conservative ratings methodologies were implemented" (No. 11 Civ. 6189 Dkt. 838, at 7), that the GSEs "had profound insight in to the general practices of the[ ] specific Originators [of the loans in the SLGs]" (*id.* at 7-8), that the GSEs attempted "to anticipate the extent of likely misrepresentations and loan defects in the Certificates they purchased" (*id.* at 9).  Similarly, Nomura emphasized that "Freddie Mac also was aware by December 2006 that [an originator] Ownit had ceased operations" (No. 11 Civ. 6201 Dkt. 760, at 5), that "Freddie Mac was aware before its April 2007 purchase that ResMAE was in bankruptcy" (*id.* at 6), and that Freddie Mac "had concerns about [WMC's] origination practices" (*id.*).

The Court examined this record and held that "Defendants have found *no evidence that the GSEs even mistrusted Defendants' representations about the Mortgage Loans*, let alone any evidence [of actual knowledge]."  *HSBC N. Am. Holdings*, 2014 WL 3702587, at *24 (emphasis added); *see also id.* at *27 ("[N]o one testified that they believed a material number of defective loans would be present in particular Supporting Loan Groups, or so much as suggested that such an expectation caused them to doubt any of Defendants' representations about specific SLGs");

*id.* at \*30 ("Defendants have identified no evidence that the GSEs mistrusted the Defendants' representations because of their use of sampling").  Defendants' evidence was insufficient because it was too general to cast doubt on the specific representations Defendants made about the particular loans backing the Securitizations.  *E.g.*, *id.* at \*18 ("[G]eneralities about the GSEs' knowledge concerning, among other things, weaknesses in some Originators' underwriting practices and a rise in early payment defaults and foreclosures among loans in the GSEs' PLS originated in 2006 and 2007. ... could not support a finding that[ ]" the GSEs knew the representations were false).  This same defect is dispositive here, because the GSEs could not have submitted generalities to render their specific claims as to the Certificates plausible.  *UBS I*, 858 F. Supp. 2d at 321.

There is also no reason that Defendants' non-Certificate specific evidence would have prompted the GSEs to doubt, and therefore investigate, Defendants' representations before September 7, 2007.  Undisputed evidence shows that GSEs witnesses reasonably accepted Defendants' representations based on Defendants' diligence processes.  SUF ¶¶ 33-46, 86-103.  On this basis, the GSEs did not view problems in the subprime market as potentially affecting the specific SLGs backing their Certificates, SUF ¶¶ 47-54, 104, and their post-purchase monitoring did not reveal cause to be concerned about those Certificates until 2008 at the earliest, SUF ¶¶ 55-88, 105-20.  In short, the GSEs "did not express suspicion of Defendants' representations concerning the [Certificates][,]" *HSBC N. Am. Holdings*, 2014 WL 3702587, at \*21, and no evidence exists that the GSEs' belief in Defendants' representation was unreasonable given the facts the GSEs possessed at the time.

In particular, as the Court found, while the GSEs in some instances possessed facts indicating that they should "Proceed With Caution[ ]" regarding certain originators (SUF ¶ 313 (Freddie Mac AMO April 2004 Review of ResMae); *see HSBC N. Am. Holdings*, 2014 WL 3702587, at \*9), "[t]here is simply no evidence that [the GSEs] actually knew—or even believed—that weaknesses in [those originators'] general origination practices would render false [Defendants'] specific representations about the specific loans in the SLG[s][,]" *id.*

17

at *23.[12]  Information gleaned from the GSEs' Single Family businesses likewise could not have

led the GSEs to discover their claims, because "the GSEs' traders who decided to purchase the

PLS[ ] [ ] did not know which loans populated the SLGs and therefore could not have drawn any

conclusions about the accuracy of the representations in the Offering Document[s], which were

in any event representations about the characteristics of the set of loans that populated the SLGs

and not representations about a single loan."  *Id.* at *32.  None of this evidence is therefore

relevant to the actual claims at issue in this case, which turn on whether "*defendants* failed to act

diligently to ensure that, consistent with the representations in the offering materials, the

originators' questionable practices did not lead to the inclusion of non-conforming loans in the

*particular* securitizations sold to the GSEs."  *UBS I*, 858 F. Supp. 2d at 321; *see also NECA-*

*IBEW*, 693 F.3d at 163.

      Nor is there any evidence that information came to light before September 7, 2007, as a

result of Fannie Mae's APL reviews that  would have permitted the GSEs to discover their

claims.  The Court recognized that the "compliance exceptions found by Fannie Mae's Legal

Department in post-purchase anti-predatory reviews of PLS[ ]" (*id.* at *26 n.30) "do[ ] not

support a finding that the GSEs actually knew that the Defendants' specific representations about

the specific Mortgage Loans underlying the Securities were false."  *Id.* at *26.[13]  That logic

applies equally here, as there is no evidence that the exception reports provided by Defendants'

diligence vendors to Fannie Mae ever addressed the adequacy of the underwriting of the loans

that were compliant with the APL guidelines and were thus not the subject to the exception

reports.  Because the Fannie Mae reviews said nothing about the compliant loans that remained

in the SLGs after the anti-predatory analyses, they are irrelevant to the question of whether the

GSEs could have discovered their claims about those loans prior to September 7, 2007.  *See*

*NECA-IBEW*, 693 F.3d at 163.

---

[12]   As this Court also noted, the GSEs reviews of Defendants, typically referred to as "aggregators," gave these Defendants satisfactory marks or higher based on the information Defendants presented to the GSEs during the relevant time period.  *HSBC N. Am. Holdings*, 2014 WL 3702587, at *23; *see also* SUF ¶¶ 42, 102-03.

[13]   Freddie Mac did not have an equivalent post-purchase anti-predatory lending guideline analysis.  SUF ¶ 73.

Simply put, there is no additional evidence, beyond the hundreds of exhibits the Court has already considered and found wanting, that could support a finding that the GSEs did discovered their claims before September 7, 2007.  Defendants confirmed as much in their August 20, 2014 letter opposing FHFA's request for leave to file this motion (Ex. 204), to which Defendants attached as an exhibit a July 25, 2007, email from a Fannie Mae PLS analyst Caijiao Zhao (Ex. 205).  Defendants asserted that this email, which they characterized as discussing "the extent of appraisal bias for at-issue originators," was "additional evidence that was not before the Court on Defendants' knowledge defenses."  Ex. 204.  In fact, the email *was* before the Court when considering knowledge:  Defendants submitted it as Exhibit 425 (No. 11 Civ. 6189, Dkt. 849-29, at 6-7) and discussed it in their joint opposition brief (No. 11 Civ. 6189, Dkt. 841, at 29), and this Court discussed both Ms. Zhao and appraisal bias in its opinion.  *HSBC N. Am. Holdings*, 2014 WL 3702587, at *14 & n.22.  The Court held that this evidence does not create a genuine issue of fact as to the GSEs' knowledge, because it "bear[s] no relation to the specific representations at issue and thus offer[s] no reason that the GSEs' general Originator and RMBS knowledge would have caused the GSEs to doubt—let alone recognize as false—particular figures."  *Id.* at *25.

This holding also applies to Defendants' statute of limitations defense, which similarly requires Defendants to present evidence specific to the Certificates—evidence demonstrating that the GSEs could have pled their claims with sufficient specificity to withstand a motion to dismiss.  *See NECA-IBEW*, 693 F.3d at 163; *City of Pontiac*, 637 F.3d at 175; *OPERS*, 730 F.3d at 277.  The July 25, 2007, Zhao email on which Defendants rely does not create a genuine dispute under this standard:  it expressly notes that Fannie Mae was *not* looking at data on a "deal-by-deal" basis but was instead attempting "to construct a back test to see what the metrics mean."  Ex. 205 at FHFA00076738.  Just as "[t]here is no reason to think that generalized awareness of an Originator's sloppy underwriting, say, would give the GSEs sufficient information to plead facts in a complaint with this level of specificity," *UBS III*, 2013 WL 3284118, at *21, there is no reason to think that generalized concerns about appraisal bias would

19

give the GSEs sufficient facts to plead that the LTV and CLTV ratios in the Offering Materials were actually inflated—and certainly not before September 7, 2007.

**B.     A Reasonable Investor Could Not Have "Discovered" A Basis To Assert Claims Through Evidence Untethered From The Certificates**

This Court's holding that the GSEs did not mistrust Defendants' specific representations about the particular Certificates, *HSBC N. Am. Holdings*, 2014 WL 3702587, at *24, fully applies to "a reasonably diligent investor" in those Certificates.  The evidence that this Court held did not lead the GSEs to even mistrust the representations also could not have led a hypothetical reasonable investor to actually discover facts adequate to plausibly allege that those same representations were false before September 7, 2007.  Moreover, in light of Defendants' consistent argument that the GSEs must have had knowledge of their claims by dint of their sophistication (*see, e.g.*, No. 11 Civ. 6189 Dkt. 838, at 4-5 (asserting that the GSEs had knowledge of their claims because "the GSEs were sophisticated investors that reviewed and analyzed the data supplied by HSBC to negotiate the purchase of the Certificates")), the lack of evidence showing that the GSEs discovered their claims before the critical date makes finding that a reasonable investor would also not have so discovered its claims a foregone conclusion.

Fundamentally, Defendants' inability to present evidence tied to the "specific representations" they made about the Certificates, *HSBC N. Am. Holdings*, 2014 WL 3702587, at *2, is fatal to their limitations defense because no plaintiff could have pled a plausible complaint based on evidence unlinked to the Certificates.  *UBS I*, 858 F. Supp. 2d at 321; *see also NECA-IBEW*, 693 F.3d at 163 (representations "misleading with respect to one Certificate[ ] … were not necessarily misleading with respect to others").  In particular, evidence concerning "awareness of risks associated with low- and no-documentation loans"; "the fact that Originators were obligated to repurchase 'defective loans'"; and "general knowledge of 'the subprime marketplace'" such as "RMBS performance, lesser adherence to underwriting standards, and increasing borrower fraud," *HSBC N. Am. Holdings*, 2014 WL 3702587, at *17, is as irrelevant to limitations as it is to knowledge.  Also irrelevant are downgrades to junior tranches, because

they, too, would not have allowed a plaintiff to state a plausible claim. *JPMorgan Chase*, 902 F. Supp. 2d at 500; *see also* SUF ¶¶ 55-66, 105-111 (the GSEs investigated exposure from junior tranche downgrades in summer 2007 and concluded that their senior Certificates would not be affected).

Nor can there be any genuine dispute that the evidence Defendants have submitted would not have led a reasonably diligent plaintiff to discover the GSEs' claims before the relevant date. The fact that "an investor of more-than-ordinary intelligence" was on notice of its claims "cannot be used as a bellwether for the adequacy of the 'storm warnings.'" *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 436 (2d Cir. 2008), *overruled in part on other grounds by Merck as stated in In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 371 (S.D.N.Y. 2011). This Court recognized that even sophisticated investors like the GSEs were not placed on notice of their claims by information including the GSEs' counterparty reviews (SUF ¶ 74-76, 112-14); information about the mortgage origination market gleaned from their Single Family business (SUF ¶¶ 121-25); and APL reviews conducted by Fannie Mae (SUF ¶¶ 67-72). *HSBC N. Am. Holdings*, 2014 WL 3702587, at *26 ("Defendants have found no evidence of suspicion concerning the Securities at issue much less any evidence sufficient to support a finding of actual knowledge that Defendants' specific representations were false."). It cannot be the case that a hypothetical reasonable investor would have looked at the very same information and concluded that Defendants' representations were likely false.

In fact, no court of which FHFA is aware has ever held that any plaintiff should have "discovered" securities claims relating to RMBS—or even have been on inquiry notice of such claims—before September 7, 2007.[14] Based on the general information then available, no

---

[14] *See, e.g.*, *FDIC v. Chase Mortgage Fin. Corp.*, 2013 WL 5434633, at *5 (S.D.N.Y. Sept. 27, 2013) (claims not discovered until after August 14, 2008, downgrade of Certificate at issue); *Penn. Pub. Sch. Emp. Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 364-68 (S.D.N.Y. 2012) (constructive notice by August 10, 2010); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 2011 WL 135821, at *8-9 (S.D.N.Y. Jan. 12, 2011) (no inquiry notice as of February 2008); *Brecher v. Citigroup Inc.*, 2011 WL 5525353, at *4 (S.D.N.Y. Nov. 14, 2011) (discovery accrual in November 2007 when issuer's call with analysts disclosed basis for complaint); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2011 WL 2020260, at *5 (S.D.N.Y. May 19, 2011) (no discovery under *Merck* by May 18, 2008, despite evidence of delinquencies, Bear Stearns's collapse, and the relevant securities being placed on ratings watch); *In re Wachovia*, 753 F. Supp. 2d at 371 (no discovery as of

investor, of even the highest degree of sophistication, could have discovered that Defendants, despite their diligence obligations, had misrepresented the loans they selected for inclusion in their Securitizations.  There is thus no reasonable basis for a jury to find that the GSEs should have discovered their claims based on this information, well before any other investor in the country.  *See Staehr*, 547 F.3d at 436 (fact that lawyer who was an expert in insurance law detected subtle storm warnings and filed lawsuit was not sufficient to find that ordinary investors were on notice of potential fraud by defendants).

The only Certificate-specific evidence cited by Defendants during the knowledge briefing involved the GSEs' monitoring of their PLS portfolios, including their receipt of remittance reports that listed EPDs, but none of this is sufficient to create a genuine issue of material fact as to whether the GSEs could have discovered their claims prior to September 7, 2007.  There is no evidence that a reasonable investor in a senior Certificate would have viewed rising EPDs in a relevant SLG as threatening her investment—"it was the purpose of the junior tranches to absorb losses due to downturns in the housing market or in the economy more generally," *JPMorgan Chase*, 902 F. Supp. 2d at 500, and such an investor would have been "entitled to rely on the

---

September 2008); *Pub. Emp. Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 479-80 (S.D.N.Y. 2010) (no notice of claims until at least March 27, 2008); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 505 (S.D.N.Y. 2010) (no inquiry notice as late as May 2008); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1226 (C.D. Cal. 2013) ("The Court cannot hold, given the judicially noticeable materials, that a reasonably diligent investor in mortgage-backed securities could have pled a sufficient complaint as of February 27, 2008."); *Capital Ventures Int'l v. UBS Sec. LLC*, 2012 WL 4469101, at *12 (D. Mass. Sept. 28, 2012) (discovery at the earliest by November 2007); *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1165-67 (D.N.M. 2011) (no notice until after February 27, 2008); *FDIC v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *8 (C.D. Cal. Nov. 21, 2012) (discovery by May 2008); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 834 F. Supp. 2d 949, 961-62 (C.D. Cal. 2012) (inquiry notice by February 2008); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 2012 WL 1322884, at *4 (C.D. Cal. Apr. 16, 2012) (inquiry notice by early 2008); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1179-81 (C.D. Cal. 2011) (discovery by December 27, 2008); *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 966-68 (N.D. Cal. 2010) (inquiry notice by March 27, 2008); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1139 (C.D. Cal. 2011) (discovery by February 14, 2009); *cf. Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2013 WL 6577020, at *2 (C.D. Cal. Dec. 5, 2013) (describing *Luther v. Countrywide Home Loans Servicing LP*,  No. BC 380698, (Super. Ct. L.A. County), initiated on November 14, 2007, as "the first MBS case following the financial crisis.").

representations" made by Defendants that the quality of the Mortgage Loans underlying her top-rated tranche, *UBS III*, 2013 WL 3284118, at *18.[15]

The record shows that a reasonably diligent investor could not have discovered even that its senior certificates were imperiled, much less the falsity of Defendants' representations, until well after September 7, 2007, when the specific Certificates' credit ratings were downgraded below investment grade. *See* SUF ¶¶ 12, 21 (first such downgrade in *HSBC* was on April 17, 2008, for both GSEs; first such downgrade in *Nomura* was on February 4, 2009, for Fannie Mae and September 9, 2008, for Freddie Mac). As this Court recognized, the Certificates being downgraded from investment-grade to near-junk status was an "important event ... that caused the GSEs to discover that the loans included in the securitizations they bought from defendants were not as advertised." *UBS I*, 858 F. Supp. 2d at 320; *see also N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 123 (2d Cir. 2013) (agreeing that credit rating downgrade provides plausibility to claim that specific Certificates were affected by misrepresentations as to originators' compliance with underwriting guidelines); *NCUA v. UBS Sec., LLC*, 2014 WL 2600133, at *7 (S.D.N.Y. June 10, 2014) ("When combined with credit rating downgrades ..., this Court found [the complaint's allegations] sufficient to plausibly assert that the originator disregarded underwriting guidelines."). At bottom, even the Certificate-specific evidence Defendants submitted in opposing FHFA's summary judgment motion on knowledge cannot create a genuine issue of material fact as to what a reasonably diligent investor would have done to discover her claims, because none of it so much as suggested by September 7, 2007, that the senior Certificates at issue would lose value due to Defendants' representations being false.

---

[15] By contrast, Defendants, in their role as underwriters, were supposed be the "first line of defense with respect to material misrepresentations and omissions" in the Offering Documents, and had an "obligation to vet the[ir] accuracy[.]" *UBS I*, 858 F. Supp. 2d at 327. This obligation required Defendants to "look deeper and question more" when confronted with red flags, such as high rates of EPDs. *In re WorldCom Sec. Litig.*, 346 F. Supp. 2d 628, 677 (S.D.N.Y. 2004); *cf.* No. 11 Civ. 6189 Dkt. 830, at 26-30, 51-52 (showing that HSBC failed in this obligation by routinely ignoring or overriding evidence showing high defect rates in the acquisition pools used to populate the SLGs).

Defendants cannot resist this conclusion by pointing to contemporaneous litigations and investigations, because they made statements to the market up through September 7, 2007, reassuring investors that no material legal actions against Defendants were pending.  In *OPERS*, the Third Circuit held that investors in certain MASTR certificates issued by UBS were "reassure[ed]" as a matter of law by UBS's public disclosures that:

> there were no material legal proceedings currently pending against any of UBS Real Estate, MASTR or the MASTR Trust … [and] … that MASTR "knew of no material pending legal proceedings involving Countrywide or IndyMac, other than routine litigation incidental to the duties" of those companies.

*OPERS*, 730 F.3d at 277 (brackets and record cites omitted).  Those assurances are nearly identical to statements made by Defendants here about the Certificates in public filings with the SEC from the issuance of the Prospectus Supplements through September 7, 2007:

> there are no known legal proceedings pending against any party specified in Item 1117 of Regulation AB, or of which any property of the foregoing is subject, or any proceedings known to be contemplated by governmental authorities against any of the foregoing, that are material to security holders.

SUF Ex. C; *see also* SUF Exs. C-Z (listing similar representations for all Certificates at issue). Here, as in *OPERS*, "an investor of ordinary intelligence would reasonably rely on [the issuer's] reassurances that the particular loans underlying its specific Certificates were not afflicted with the common ailment."  *OPERS*, 730 F.3d at 277; *see also Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 194 (2d Cir. 2003) (under "inquiry notice" standard, "[i]t was reasonable for Plaintiffs not to inquire into [defendant's] statements because [defendant] had provided the seemingly benign explanation that it had changed accounting methods").[16]

---

[16]   While some of these filings began, in mid-2007, to report litigation against originators, this Court has already considered and rejected the relevance of this information to a reasonably diligent investor, because the "claim here is not that the *originators* failed to scrutinize loan applicants adequately *in general*; it is that *defendants* failed to act diligently to ensure that, consistent with the representations in the offering materials, the originators' questionable practices did not lead to the inclusion of non-conforming loans in the *particular* securitizations sold to the GSEs." *UBS I*, 858 F. Supp. 2d at 321.  Because Defendants uniformly reported that there were no legal proceedings against *Defendants* prior to September 7, 2007, the scattered reports of problems at individual originators "says little about when" a reasonably diligent investor would have "discovered the facts that form the basis of [the GSEs'] complaint[s]." *Id.*

In sum, there is no genuine issue of material fact showing that the GSEs discovered their claims before September 7, 2007, or that a reasonably diligent plaintiff would have done so. Summary judgment for FHFA is appropriate.

## CONCLUSION

For the reasons stated above, FHFA respectfully requests that the Court grant its motion for partial summary judgment against Defendants with respect to Defendants' limitations defenses under Section 13 and D.C. Code § 31-5606.05(f)(2)(B).

Respectfully submitted,


DATED:  New York, New York
              August 25, 2014

By:  /s/ Philippe Z. Selendy _____
Philippe Z. Selendy
Jon Corey
Adam M. Abensohn
Andrew R. Dunlap
David B. Schwartz
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000


*Attorneys for Plaintiff Federal Housing Finance Agency,
as Conservator for Fannie Mae and Freddie Mac*