# Exhibit 2

```
                                                              Page 1
 1   UNITED STATES DISTRICT COURT
 2   SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------)
     FEDERAL HOUSING FINANCE       )
 4   AGENCY, etc.,                 )
                                   )
 5          Plaintiff,             )
                                   )
 6       v.                        )
                                   )
 7   UBS AMERICAS, INC.,           )11 Civ. 5201 (DLC)
     et al.,                       )
 8   JPMORGAN CHASE & CO.,         )11 Civ. 6188 (DLC)
     et al.,                       )
 9   HSBC NORTH AMERICA            )11 Civ. 6189 (DLC)
     HOLDINGS, INC. et al.,        )
10   BARCLAYS BANK PLC, et al.,    )11 Civ. 6190 (DLC)
     DEUTSCHE BANK AG, et al.,     )11 Civ. 6192 (DLC)
11   FIRST HORIZON NATIONAL        )11 Civ. 6193 (DLC)
     CORP., et al.,                )
12   BANK OF AMERICA CORP., et al.,)11 Civ. 6195 (DLC)
     GOLDMAN, SACHS & CO., et al., )11 Civ. 6198 (DLC)
13   CREDIT SUISSE HOLDINGS (USA), )11 Civ. 6200 (DLC)
     INC., et al.,                 )
14   NOMURA HOLDING AMERICA, INC., )11 Civ. 6201 (DLC)
     et al.,                       )
15   MERRILL LYNCH & CO., INC.,    )11 Civ. 6202 (DLC)
     et al.,                       )
16   SG AMERICAS, INC., et al.,    )11 Civ. 6203 (DLC)
     MORGAN STANLEY, et al.,       )11 Civ. 6739 (DLC)
17   ALLY FINANCIAL INC., et al.,  )11 Civ. 7010 (DLC)
            Defendants.            )
18   ------------------------------)
19                    ADOLPHUS HOTEL
                   1321 Commerce Street
20                  Dallas, Texas 75202
                      Century Room A
21                    June 27, 2013
                        7:11 A.M.
22
                VIDEOTAPED DEPOSITION OF
23                    DAVID HACKNEY
                        Volume 1
24
     REPORTED BY:
25   WILLIAM M. FREDERICKS, CSR FOR THE STATE OF TEXAS
```

Page 2

                    June 27, 2013
        Videotaped deposition of David Hackney, held
at the Adolphus Hotel, 1321 Commerce Street, Dallas,
Texas 75202, Century Room A, before William M.
Fredericks, Certified Shorthand Reporter for the
State of Texas.

Page 51

1    A.   Just some of them -- there could be a lot,
2    but like a limited doc; a NINA; a second home; an
3    investor property.  Those would be some of the
4    categories.  That would not be all-inclusive.
5    Q.   And a "NINA" is a no income/no asset loan?
6    A.   That's correct.
7    Q.   Are those sometimes also called liar loans?
8         MR. OBLAK:  Object to the form.
9    A.   I don't believe at that time they were called
10   a liar loan.
11   Q.   (BY MR. SACCA)  They were at some time called
12   liar loans?
13   A.   I have heard that term.  I don't remember
14   when that term started.
15   Q.   What do you understand it to mean?
16   A.   No income/no asset was used in the
17   qualification of the borrower, but the borrower was
18   fully qualified on the ability to pay that loan.  That
19   was part of the Freddie Mac guidelines.
20   Q.   And how does that mean liar loan?
21        MR. OBLAK:  Objection to form.
22   A.   I did not come up with the term "liar loan,"
23   nor do I remember when it started.
24   Q.   (BY MR. SACCA)  But you understand it to be a
25   loan in which the borrower was fully qualified to pay

Page 52

1  the loan?
2           MR. OBLAK:  Objection to form.
3      A.   To meet Freddie Mac guidelines at that time,
4  that borrower had to be underwritten to be determined
5  that they could afford the property.
6      Q.   (BY MR. SACCA)  So as you understand "liar
7  loan," it's not a pejorative term?
8           MR. OBLAK:  Objection to form.
9      A.   I don't know who came up with "liar loan."  I
10 don't remember ever using the word "liar loan."  In
11 fact, the most amount of time that I've ever heard
12 somebody use "liar loan" is you.
13     Q.   (BY MR. SACCA)  You've worked in the mortgage
14 business consistently since at least your time at
15 Freddie Mac?
16     A.   Probably nine -- 1988.  They were known as
17 NINAs.
18     Q.   During your time at Freddie Mac trading
19 non-agency mortgage-backed securities, how did
20 Freddie Mac come to learn of a security being offered
21 for sale?
22     A.   A dealer would contact our desk and say that
23 they have a pool of loans that they would like to
24 discuss, and they're contemplating coming up with a
25 security and wanted to talk about it.

Page 53

1  Q. And was there a designated person at
2  Freddie Mac to field those calls or could it have been
3  anyone in your group?
4  A. It was generally myself or Mike.
5  Q. And in terms of Freddie Mac's process of
6  considering an investment in a non-agency
7  mortgage-backed security, what was the first step
8  following this phone call?
9  A. It would be twofold. Generally they would
10 come up with some type of preliminary collateral
11 stratification that they could send in to, say, myself
12 or Mike; and some dealers wanted our Mission group to
13 look through the loans to determine which ones met our
14 charter, and some felt comfortable enough that they
15 didn't need to run that pool of loans through to
16 determine whether they met charter. So sometimes they
17 would send the loans in to the Mission group.
18  Q. And when you say to determine whether loans
19 met charter, what -- what did a loan have to do to
20 meet charter?
21  A. It had to be within conforming guidelines.
22  Q. Did it have to help Freddie Mac meet housing
23 goals?
24  A. No.
25         MR. OBLAK: Objection to form.

Page 100

1  say that I was out competing for loans in that way,
2  no.
3       Q.   (BY MR. SACCA)  Were you cognizant of the
4  volume that Fannie Mae was transacting?
5            MR. OBLAK:  Objection to form.
6       A.   I didn't know to -- I couldn't tell you
7  accurately how much volume they had transacted.  Did I
8  know they were in the market?  Yes.
9       Q.   (BY MR. SACCA)  Were there occasions on which
10 you lost deals to Fannie Mae?
11      A.   Yes.
12      Q.   At what stage in your purchase of a
13 non-agency mortgage-backed security would Freddie Mac
14 receive a prospectus supplement?
15      A.   Before the -- before the actual purchase.
16      Q.   And when you say "the actual purchase,"
17 what -- what are you talking about?
18      A.   Where you're actually committing dollars and
19 you do a, what would be considered a live trade.
20      Q.   Is that the settlement date?
21      A.   No.
22      Q.   Is it the trade date?
23      A.   The trade date.
24      Q.   Okay.  And that precedes the settlement date?
25      A.   Yes.

Page 101

1   Q.   Okay.  And who at Freddie Mac would receive a
2   prospectus supplement?
3   A.   I would.
4   Q.   And --
5   A.   Or whoever was doing the -- the trade.  It
6   could be Mike or myself.
7   Q.   Was it a requirement for you to enter into a
8   trade that you had received a prospectus supplement?
9          MR. OBLAK:  Objection to form.
10  A.   Can you repeat that.
11  Q.   (BY MR. SACCA)  Was it a requirement for you
12  to enter into a trade that you have received the
13  prospectus supplement?
14  A.   No.
15  Q.   Okay.  That was your practice?
16         MR. OBLAK:  Objection to form.
17  A.   Practice?  I don't understand the question.
18  Q.   (BY MR. SACCA)  Your personal practice was to
19  receive the prospectus supplement before you committed
20  to a trade?
21         MR. OBLAK:  Objection to form.
22  A.   We would tentatively say we are interested in
23  a transaction based on preliminary information.  We
24  would receive a prospectus -- preliminary prospectus
25  before the trade.  It would be reviewed and compared

Page 102

1  to what was shown to us when we said we would be
2  interested in the trade.  If it was different, I would
3  not be committed to transact.
4      Q.   (BY MR. SACCA)  The preliminary prospectus,
5  are you talking about a free writing prospectus?
6      A.   Define "free writing."
7      Q.   Well, I'd rather have you tell me what --
8  what it was that you got.
9           The preliminary prospectus, describe it
10 for me.
11          MR. OBLAK:  Objection to form.
12     A.   The final prospectus is something that you
13 would receive after the transaction because invariably
14 you may have, if you were on the dealer side, a loan
15 fall out, thereby you need to refresh your information
16 as of that date so it's a final.  So you're going to
17 receive that after.
18          The preliminary or -- and I don't know
19 whether I'm going to misuse the word, but you brought
20 up --
21     Q.   (BY MR. SACCA)  I -- I don't want you to
22 adopt my term.
23     A.   Okay.  I would receive a packet of
24 information that was a reduced version of what the
25 final prospectus would be, but it had a lot of the --

Page 103

1  let's just say the legalese language in there.  It
2  would describe the waterfall structure; it would have
3  the collateral stratification breakouts in that.
4           And from that collateral stratification,
5  that would be reviewed and compared to what -- the
6  initial collateral stratification that was sent by the
7  dealer into our desk, whether that was substantially
8  and materially the same; and if it was not, then there
9  may not be a transaction.
10     Q.   And who was it that made the comparison to
11  determine whether the collateral described in the
12  document you're talking about now was substantially
13  and materially the same as the initial collateral
14  stratification?
15     A.   Generally the person that reviewed the first
16  one.
17     Q.   Okay.  So you or someone else on your desk?
18     A.   (No audible response.)
19              THE REPORTER:  "Yes"?
20     A.   Yes.
21     Q.   (BY MR. SACCA)  How -- this document you're
22  describing that you would receive from a dealer, how
23  thick was it?
24              MR. OBLAK:  Objection to form.
25     A.   I don't remember how many pages it was.  It

Page 304

1   I -- are we looking at the same thing?
2       A.   I don't think so.
3       Q.   3719?
4       A.   I'm looking at this (indicating).
5       Q.   That's 3718.
6       A.   So which one are we --
7       Q.   I went out of order.
8       A.   Oh, 19.  All right.
9       Q.   3719.
10      A.   Okay.
11      Q.   Is an e-mail dated November 6 (sic) with
12  Freddie Mac investment requirements, right?
13      A.   This is the reps.
14      Q.   These are the reps?
15      A.   And that's why it's specific.  It says "Reps"
16  (indicating).
17      Q.   Can you explain a little bit what you mean by
18  "reps"?
19      A.   This is something that we -- we sent out
20  pre-trade that anybody selling to us needed to
21  acknowledge that they received these reps, and this
22  is -- and I don't recognize which part is different,
23  but somebody had the question Goldman wanted slightly
24  different language.  This is where that language would
25  be.

Page 305

1   Q.   Got it.  All right.  And then -- now let's
2  look at 3718.
3   A.   Okay.
4   Q.   And this looks like a -- the top -- top
5  document at least looks -- is a trade ticket, right?
6   A.   Right.
7   Q.   And your name is on it?
8   A.   Uh-huh.
9   Q.   And it says the trade date is November 16,
10 right, 2006?
11  A.   Correct.
12  Q.   Okay.  So all the e-mail traffic that we
13 looked at before in the prior exhibits from -- 3715,
14 16, 3717 and 3719 were from the dates November 15 and
15 16, right?
16  A.   Other than this one was the 16th too
17 (indicating).
18  Q.   Right.  And then the trade ticket indicates
19 that the trade date is November 16, right?
20  A.   Yes.
21  Q.   So most of the activity in this transaction
22 occurred on those two days, November 16 and 15,
23 correct?
24           MR. OBLAK:  Objection to form.
25  A.   No.

Page 306

1     Q.    (BY MR. HARSCH)  What other --
2     A.    That --
3     Q.    -- activity would have occurred?
4     A.    That would be incorrect.  Mission may have
5  received a loan tape prior to this.  The credit
6  approval from the Credit Department is issued on the
7  15th.  I don't know when they started working on it.
8     Q.    Okay.
9     A.    This is just their approval.  They're --
10 they're done with it saying, I've done all my work.
11 I don't know when they started it.
12    Q.    All right.  So the -- the trade date, what
13 occurs on the trade date?
14    A.    The trade date is -- is an actual firm
15 commitment now.  You've committed money.  We have
16 agreed I'm going to pay; you're going to sell.
17    Q.    I see.  And you said that's a firm
18 commitment?
19    A.    Yeah.
20    Q.    And down at the bottom of the -- the trade
21 ticket, it says "Entry Date, November 16th."  So you
22 would enter this on the date of the trade date, right?
23    A.    That's correct.
24    Q.    On the date that Freddie Mac makes the firm
25 commitment, right?

Page 307

1    A.   That's correct.
2    Q.   Okay.  And is it then what you were saying
3  before, when you became less involved in the process
4  and sort of handed it off to the settlement and
5  closing people, that would be after this trade date,
6  right?
7         MR. OBLAK:  Objection to form.
8    A.   That would be after -- after this is entered.
9  So as soon as I entered it, that said this is -- this
10 is the final trade.  There was a couple preliminary
11 steps just before this is -- this is printed that you
12 fill out some things.  But, yeah, as -- as soon as I
13 hit go, yeah.  Then back-office settlement people are
14 involved.
15   Q.   (BY MR. HARSCH)  Okay.  So -- but the go date
16 for purposes of this trade ticket is the November 16,
17 0 -- '06, right?
18   A.   Yeah.
19   Q.   Okay.  And that's the date that the
20 back-office settlement people then would handle the
21 transaction, right?
22   A.   That's when they would --
23         MR. OBLAK:  Objection to form.
24   A.   That's when they would contact Goldman Sachs,
25 for instance, on this trade --

Page 308

1    Q.   (BY MR. HARSCH)  Uh-huh.
2    A.   -- and start confirming all the different
3    settlement dates.
4    Q.   Okay.  But -- but your involvement, unless
5    there was some unusual issue, ceased as of the trade
6    date, generally?
7         MR. OBLAK:  Objection to form.
8    A.   Well, my involvement would be I would own
9    this, so I'm involved until I either no longer work
10   there or the deal matured.
11   Q.   (BY MR. HARSCH)  But by November 16, 2006,
12   you had made a firm commitment to go forward with the
13   trade, right?
14        MR. OBLAK:  Objection to form.
15   A.   Correct.  As of -- as of the time that this
16   is executed, I have committed the firm to spending
17   this dollar amount.
18   Q.   (BY MR. HARSCH)  Okay.  Now, would you go
19   back, please, to 3714.  It's the prospectus
20   supplement.
21   A.   Uh-huh.
22   Q.   The date of this prospectus supplement is
23   December 5, 2006, right?
24   A.   Uh-huh.
25   Q.   So you would have received this after Freddie