# Exhibit 6



# Accounting Policies and the Accounting Policy Manual

### Effective Date:  January 1, 2008

### Policy Identifier:  FIN-0025

### Version 01.05

**Table of Contents**

**Document Change Control Log** ................................................................................................ 3

1. **Documentation** ........................................................................................................ 4
2. **Statement of Purpose** ........................................................................................... 4
3. **Applicability and Scope** ....................................................................................... 4
4. **Roles and Responsibilities** ................................................................................. 4
5. **Requirements** .......................................................................................................... 5
6. **Conflict Resolution and Escalations** .......................................................... 232
7. **Policy Exceptions** ............................................................................................. 232
8. **Policy Review** ..................................................................................................... 232
9. **Definitions** ........................................................................................................... 232

Confidential - Internal Distribution

# Document Change Control Log

This table records any changes made to this document and approvals of the changes.

| Effective Date | Version Number | Nature of Revision | Section/ Page(s) Revised | Revised by Name and Title | Approved by Name and Title |
|---|---|---|---|---|---|
| 12/31/06 | 1.00 | Updated the following sections: C1.9.3 Property, Plant and Equipment, D5.3.3 Stock Based Compensation, D5.3.4 Pension and Postretirement Benefit Plans, G9.1 Accounting Changes | Entire Document | Kelly Colan, Business Analyst, Accounting Policy, Finance | Greg Ramsey, Vice President, Accounting Policy, Finance |
| 11/8/07 | 1.01 | Updated the following sections: C1.5 Allowance for Loan Losses and Reserve for Guaranty Losses, C1.9.5 Corporate-Owned Life Insurance (COLI), C1.10 Income Taxes, C2.2 Derivative Instruments, C2.3 Guaranty Assets and Guaranty Obligations, C2.3.2 Servicing Assets, D5.3.7 Contributions, F8.2 Securitizations, G9.5 Impairment | Entire Document | Kelly Colan, Business Analyst, Accounting Policy, Finance | Greg Ramsey, Vice President, Accounting Policy, Finance |
| 11/8/07 | 1.02 | Technical correction made to the Requirements section | Requirements sections | Kelly Colan, Business Analyst, Accounting Policy, Finance | Greg Ramsey, Vice President, Accounting Policy, Finance |
| 12/31/07 | 01.03 | Updated the Policy to comply with the Corporate Policy Framework | Entire Document | Kelly Colan, Business Analyst, Accounting Policy, Finance | Greg Ramsey, Vice President, Accounting Policy, Finance |
| 1/1/08 | 01.04 | Updated the Policy to include 2008 accounting guidance (FAS 157, FAS 159, FSP FIN 39-1, hedge accounting, guaranty accounting) and updated format | Entire Document | Kelly Colan, Business Analyst, Accounting Policy, Finance | Greg Ramsey, Vice President, Accounting Policy, Finance |
| 1/1/08 | 1.05 | Updated the Change Control Log | Change Control Log | Kelly Colan, Business Analyst, Accounting Policy, Finance | Greg Ramsey, Vice President, Accounting Policy, Finance |

Confidential - Internal Distribution

1. **Documentation**

| | |
|---|---|
| **Policy Name** | Accounting Policies and the Accounting Policy Manual |
| **Version Number** | 01.05 |
| **Policy Identifier** | FIN-0025 |
| **Superseded Policy(ies)** | N/A |
| **Date Approved** | May 29, 2008 |
| **Effective Date** | January 1, 2008 |
| **Policy Author(s)** | Business Analyst, Accounting Policy, Finance |
| **Policy Owner** | Vice President, Accounting Policy, Finance |
| **Policy Approver** | EVP and Chief Financial Officer |
| **Policy Repository** | Corporate Policies and Procedure Repository |
| **Supporting Documentation** | Change Control Log (within document) Accounting Policy memos |
| **Retirement Date** | N/A |

2. **Statement of Purpose**

This policy establishes Fannie Mae's accounting policies and the operating policies related to the development and maintenance of those accounting policies, per the OFHEO Examination Guidance, which is discussed in Section 4.   This policy also identifies roles and responsibilities of the Accounting Policy Group ("APG" or "Accounting Policy") and others regarding the approval and implementation of accounting policies.  The Accounting Policy Manual were developed to provide accounting guidance to Fannie Mae employees for commonly executed transactions and identify situations that require consultation with APG.

3. **Applicability and Scope**

This policy outlines Fannie Mae's financial accounting policies related to its core operations and business activities and applies to all Fannie Mae employees who perform accounting functions within the Company. This policy provides accounting guidance to Fannie Mae employees for commonly executed transactions and arrangements that require accounting and/or disclosure in Fannie Mae's financial statements.

4. **Roles and Responsibilities**

The Vice President of Accounting Policy is owner of this policy and is the person primarily responsible for its maintenance.  The authority to issue this policy was delegated by the Chief Executive Officer to the Chief Financial Officer.

The OFHEO Examination Guidance, issued November 8, 2006, sets forth examination guidance and standards relating to the accounting practices of the Company that is consistent with the safety and soundness responsibilities of OFHEO under the Federal

Confidential - Internal Distribution

CONFIDENTIAL
FHFA13012055

Housing Enterprises Financial Safety and Soundness Act of 1992.  The following summarizes parts of the OFHEO Examination Guidance that are responsibilities of APG.

a) <u>Development of policies and procedures</u>
The Company must establish a formal written procedure for development of accounting policy and create a system for full disclosure to the Board's Audit Committee of these policies and the Company's compliance with regulatory and        GAAP requirements.

b) <u>Policies and procedures to reflect Generally Accepted Accounting Principles (GAAP)</u>
The Company must establish and maintain accounting policies and procedures that properly reflect GAAP.

c) <u>Establishment of accounting guide</u>
The Company should establish and maintain a complete and current accounting guide that lists the Company's accounting policies and procedures.  Notification of    any subsequent revisions to the accounting guide should be submitted to the Chief Accountant.  See Section 5 for the current accounting guide.

d) <u>Periodic review</u>
The Company is responsible for ensuring that accounting policies and procedures    are continuously reviewed and updated to reflect current GAAP requirements, and   has proper procedures and processes in place to ensure compliance.

e) <u>Board Audit Committee oversight</u>
The Board Audit Committee is responsible for ensuring that Fannie Mae's management establishes, implements, and maintains accounting policies and  procedures that are in compliance with applicable laws, regulations, guidance, and     industry standards, including GAAP and other applicable reporting and disclosure    standards.

To comply with the aforementioned OFHEO Examination Guidance, the Accounting Policy Group is responsible for maintaining and executing procedures regarding the development, approval, implementation, and maintenance of accounting policies.

Additionally, APG is responsible for maintaining Accounting Policy Traceability, in which Accounting Policy memos are linked to business unit's documentation, such as business requirements and/or procedure documents.

## 5.  Requirements

The Accounting Policies and related guidance provided in internal memoranda (see memoranda in the Corporate Policies and Procedures Repository) represent Fannie Mae's accounting policies and requirements used for the preparation of financial statements in accordance with GAAP. The Accounting Policy Manual should be used as a reference tool and is not intended to address every financial accounting issue that may arise during the normal course of business or to replace management and staff involvement in ensuring that financial accounting and other business issues are properly addressed. Management and staff are encouraged to ask questions or consult with Accounting Policy for additional explanation or clarification. No business segment or division within Fannie Mae is exempt from the financial accounting policies contained herein.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                5

CONFIDENTIAL                                                                 FHFA13012056

**ACCOUNTING POLICY MANUAL**                                    **TABLE OF CONTENTS**

<u>Topic</u>                                                                        <u>Section</u>

Introduction                                                              A

Schedule of Changes                                                       B

Balance Sheet
    Cash and Cash Equivalents                                    C1.1
    Investment Securities                                        C1.2
    Loans                                                        C1.3
    Premiums, Discounts and Deferred Price Adjustments           C1.4
    Allowance for Loan Losses and Reserve for Guaranty Losses    C1.5
    Securities Commitments                                       C1.6.1
    Loan Commitments                                             C1.6.2
    Real Estate Owned and Other Foreclosed Assets (REO)          C1.8
    Low Income Housing Tax Credits (LIHTC)                       C1.9.1
    Other Investments and Partnerships                           C1.9.2
    Property, Plant and Equipment                                C1.9.3
    Software Development Costs                                    C1.9.3.1
    Intangible Assets                                            C1.9.4
    Corporate-Owned Life Insurance (COLI)                        C1.9.5
    Prepaid Expenses                                             C1.9.6
    Income Taxes                                                 C1.10

    Debt                                                         C2.1
    Derivative Instruments                                       C2.2
    Guaranty Assets and Guaranty Obligations                     C2.3
    Servicing Assets                                             C2.3.2
    Leases                                                       C2.4.1
    Common Stock                                                 C3.1
    Preferred Stock                                              C3.2
    Treasury Stock                                               C3.3
    Comprehensive Income                                         C3.4

CONFIDENTIAL                                                                        FHFA13012057

Income Statement

    Fee and Other Income    D4.4

    Contributions    D4.5

    Credit Enhancements and Insurance Contracts    D5.1

    Compensated Absences    D5.3.2

    Stock-Based Compensation    D5.3.3

    Pension and Postretirement Benefit Plans    D5.3.4

    Severance and Other Postemployment Benefits    D5.3.5

    Corporate Insurance    D5.3.6

    Earnings Per Share    D6.0

Consolidation and Off-Balance Sheet Arrangements

    Consolidation    F8.1

    Securitizations    F8.2

Other Accounting Topics

    Accounting Changes and Corrections of Errors    G9.1

    Business Segments    G9.2

    Contingencies    G9.3

    Fair Value    G9.4

    Impairment    G9.5

    Materiality    G9.6

    Fair Value Option    G9.7

## SCHEDULE OF CHANGES                                                                      B

The following schedule identifies changes to the Accounting Policy Manual that occurred since the Accounting Policy Manual dated December 31, 2007:

| Section | Title | Change | Date |
|---------|-------|--------|------|
| C1.10 | Income Taxes | Technical correction | 5/22/2008 |
| C2.2 | Derivative Instruments | Updated policy to incorporate hedge accounting and the guidance provided by FSP FIN 39-1, *Amendment of FASB Interpretation No. 39*. | 5/22/2008 |
| C2.3 | Guaranty Assets and Guranty Obligations | Updated policy to include new accounting for guaranty obligations in which GO equals total compensation. | 5/22/2008 |
| C2.3.2 | Servicing Assets | Updated policy to include new accounting for guaranty obligations in which GO equals total compensation. | 5/22/2008 |
| F8.1 | Consolidation | Updated policy to include new accounting for guaranty obligations in which GO equals total compensation. | 5/22/2008 |
| G9.4 | Fair Value | Updated policy to incorporate the guidance provided by FAS 157, *Fair Value Measurements*. | 5/22/2008 |
| G9.5 | Impairment | Technical correction made to reflect the scope of EITF 99-20 | 5/22/2008 |
| G9.7 | Fair Value Option | Added policy to incorporate the guidance provided by FAS 159, *The Fair Value Option for Financial Assets and Financial Liabilities - Including an Amendment of FASB Statement No. 115*. | 5/22/2008 |

CONFIDENTIAL                                                        FHFA13012059

**CASH AND CASH EQUIVALENTS**                                                    **C1.1**

## I.   APPLICABILITY

This policy applies to cash maintained with banks, overnight Federal funds sold, repurchase agreements[1], and highly liquid investment instruments.

This policy does not apply to investments funded as part of the Liquid Investment Portfolio (i.e. auction rate preferred stock or other Variable Rate Demand Notes) even if the maturity is less than three months.

This policy is effective as of December 31, 2004.

## II.  POLICY

We consider short term highly liquid investment instruments with an original maturity (measured from the date we acquire the asset) of three months or less that are readily convertible to cash and so near their maturity that they present insignificant risk of changes in the value because of interest rates to be cash and cash equivalents.  Cash and cash equivalents are carried at cost, which approximates fair value. We record items that are specifically funded as part of the Liquid Investment Portfolio as non-mortgage investments (not cash and cash equivalents) as allowed under Paragraph 10 of FAS 95.

### A.  Classification

Generally, only highly liquid investments with original maturities (measured from the date we acquire the asset) of three months or less qualify under the definition of cash and cash equivalents.  Original maturity means original maturity to the entity holding the investment.  For example, both a three-month U.S. Treasury bill and a three-year Treasury note purchased three months from maturity qualify as cash equivalents. However, a Treasury note purchased three years ago does not become a cash equivalent when its remaining maturity is three months.

### B.  Right of Setoff

Unless the right of setoff requirements of FAS Interpretation No. 39, "Offsetting of Amounts Related to Certain Contracts," has been met, bank overdrafts or negative book cash balances should be included among current liabilities and stated separately.

### C.  Restrictions on Use of Cash and Cash Equivalents

We may enter into arrangements that formally or informally restrict the use of funds such as a compensating balance requirement; a compensating balance requires us to maintain a minimum amount of cash on hand to compensate for other banking services or for other reasons.  Common examples of arrangements, which are relevant to us,

---

[1] The AICPA Audit guides (Banking and the Broker Dealer) refer to agreements by seller-borrowers to sell and repurchase securities as repurchase agreements (repos) and agreements by buyer-lenders to purchase and resell securities as reverse repurchase agreements (reverse repos). Savings institutions and credit unions have in the past used the opposite terms, calling a seller-borrower's agreement a reverse repurchase agreement and a buyer-lender's agreement a repurchase agreement.  We follow the methodology used by savings institutions and credit unions.

CONFIDENTIAL                                                                                   FHFA13012060

include balances with the Federal Reserve and Federal Home Loan Banks and Federal funds repurchase agreements.  Additionally, other factors (such as pledging investments) may give rise to restrictions on use of cash and cash equivalents.  Significant amounts of funds that are legally restricted should be segregated and disclosed in the financial statements.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV.  APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 104 | June 1990 | Statement of Cash Flows- Net Reporting of Certain Cash Receipts and Cash Payments and Classification of Cash Flows From Hedging Transactions |
| AICPA Accounting and Auditing Guide | 2006 | Depository and Lending Institution |
| FIN 39 | December 1993 | Offsetting of Amounts Related to Certain Contracts |
| FAS 115, paragraph 11A | December 1993 | Accounting for Certain Investments in Debt and Equity Securities |
| SEC Regulation S-X: Article 5, Rule 5-02 | June 1985 | Balance Sheets, Cash and Cash Items |
| SEC Accounting Disclosure Rules and Practices | August 2001 | Cash and Cash Items |
| FAS 95, paragraph 7-10 | July 1988 | Statement of Cash Flows |
| FAS 107 | December 1992 | Statement o Cash Flows |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                10

CONFIDENTIAL                                                    FHFA13012061

**INVESTMENT SECURITIES**                                                  **C1.2**

## I.  APPLICABILITY

This policy applies to our investment in debt and equity securities in both the mortgage portfolio and the liquid investment portfolio.

A "security" is a share, participation, or other interest in property or in an enterprise of the issuer or an obligation of the issuer that (a) either is represented by an instrument issued in bearer or registered form or, if not represented by an instrument, is registered in books maintained to record transfers by or on behalf of the issuer, (b) is of a type commonly dealt in on securities exchanges or markets or, when represented by an instrument, is commonly recognized in any area in which it is issued or dealt in as a medium for investment, and (c) either is one of a class or series of shares, participations, interests, or obligations.

An "equity security" is any security representing an ownership interest in an enterprise (for example, common, preferred, or other capital stock) or the right to acquire (for example, warrants, rights, and call options) or dispose of (for example, put options) an ownership interest in an enterprise at fixed or determinable prices.  However, the term does not include convertible debt or preferred stock that by its terms either must be redeemed by the issuing enterprise or is redeemable at the option of the investor.

A "debt security" is any security representing a creditor relationship with an enterprise.  It also includes (a) preferred stock that by its terms either must be redeemed by the issuing enterprise or is redeemable at the option of the investor and (b) a collateralized mortgage obligation (CMO) (or other instrument) that is issued in equity form but is required to be accounted for as a non-equity instrument regardless of how that instrument is classified (that is, whether equity or debt) in the issuer's statement of financial position.  However, it excludes option contracts, financial futures contracts, forward contracts, and lease contracts.

Debt securities, including beneficial interests, that we acquire in completion of a transfer on or after January 1, 2005 with (a) evidence of credit deterioration since origination and (b) for which it is probable, at acquisition, that we will be unable to collect all contractually required payments receivable are subject to the accounting provisions of SOP 03-3, *Accounting for Certain Loans or Debt Securities Acquired in a Transfer* ("SOP 03-3").

Thus, the term "debt security" includes, among other items, U.S. Treasury securities, U.S. government agency securities, municipal securities, corporate bonds, convertible debt, commercial paper, all securitized debt instruments, such as CMOs, private-label MBS, real estate mortgage investment conduits (REMICs), asset-backed securities, interest-only strips (IO), and principal-only strips (PO).

This policy is effective as of January 1, 2005.

## II.  POLICY

### A.  Initial recognition

#### 1.  Timing

We recognize regular-way securities trades, for which there is a customary period of time between trade date and settlement date, on trade date.  We recognize all other purchases of securities, including securities purchased from commitments that do not

INTERNAL DOCUMENT
C1.2 – Investment Securities

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae        11

CONFIDENTIAL                                                                 FHFA13012062

qualify as regular-way and from commitments for which there is not an established period of time between trade date and settlement date, on actual settlement date. For example, a purchase of a U.S. Treasury security that settles within 3 business days of the trade date would be accounted for on trade date. Alternatively, a TBA trade for an agency MBS that settles on the next BMA settlement date would be accounted for on settlement date because there is not an established period of time between trade date and settlement date for TBA trades. It is important to note that while a trade for a security that does not yet exist may qualify as regular-way[1], it is not necessarily accounted for on trade date. Trades are only accounted for on trade date when there is an established period of time between trade date and settlement date and the trade settles within that period of time (for example, trade date + 3 days, i.e. "corporate settle")

## 2. Classification

Upon acquisition, which we define as the date that we first recognize a security (i.e. either trade date or settlement date as discussed above) we classify securities as Held-to-Maturity, Available-for-Sale or Trading. We base the classification of our debt securities on our intent with the debt security. We do not transfer securities between classifications.

We DO NOT classify debt securities as Held-to-Maturity.

We classify debt or equity securities as Trading when we purchase them with the intent to hold them for only a short period of time and sell them in the near term. Trading activity generally reflects frequent buying and selling. Trading securities are generally used with the objective of generating profits on short-term differences in price. A "short period of time" is generally measured in hours and days rather than months or years. Nevertheless, we are not precluded from classifying a security as Trading simply because we do not intend to sell it in the near term.

We classify debt and equity securities as Available-for-Sale when we do not classify them as Trading or Held-to-Maturity.

*Evidence of credit deterioration since origination*

Fannie Mae should consider the following when determining whether a debt security has evidence of credit deterioration since origination:

1. Condition of the underlying collateral between the date of issuance of the security as compared to the date of acquisition. For example, if the underlying collateral are loans, if the loans have subsequently been placed on nonperforming status, that would be considered evidence of deterioration in credit of the debt security since origination as the cash flows of the security are derived specifically by the performance of the underlying collateral.

2. Decreases in credit ratings between the date of issuance and date of acquisition. Consistent with Fannie Mae's security impairment policy, a decrease in credit rating by a letter, without considering pluses or minuses, would be viewed as evidence of

---

[1] Refer to the Securities Commitments policy for our policy on regular-way securities trades.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL

FHFA13012063

deterioration in credit that should be considered by Fannie Mae when determining whether a debt security is in the scope of SOP 03-3.[2]

### 3. Measurement

We record all securities at fair value at acquisition.  However, the cost basis of our securities depends upon how we account for the commitment or "trade."  The basis on which we determine the cost of securities is specific identification.  However, for TBA-eligible MBS, the cost of individual pieces of a CUSIP is the weighted average cost of all pieces delivered within that CUSIP on a settlement date.

| Accounting for the Trade | Cost Basis of the Security |
| --- | --- |
| Derivative | Trade price and fair value of the commitment at settlement date |
| Forward contract | Trade price of the commitment on settlement date |
| Security (i.e. trade date accounting) | Trade price of the commitment on trade date |

## B. Subsequent accounting

### 1. Interest Income

We recognize interest income on debt securities on the accrual basis.  Interest income includes amortization or accretion of deferred price adjustments such as premium, discount and other cost basis adjustments[3].

*Debt securities (and purchased beneficial interests) within the scope of SOP 03-3*

Our recognition of interest income on debt securities under SOP 03-3 is dependent upon us having a reasonable expectation of the amount and timing of cash flows expected to be collected.  When the timing and amount of cash flows expected to be collected are reasonably estimable we use those expected cash flows to apply the interest method of income recognition.  If the future cash flows cannot be reliably estimated (this is expected to be very rare), all subsequent coupon interest amounts received should first go to reducing the basis of the security before any further income is recognized. The cost recovery method should be used until it is determined that the amount and timing of cash flows are reasonably estimable.  Our assessment of the amount of cash flows we expect to collect on an SOP 03-3 debt security is evaluated at the end of each reporting period (i.e., on a quarterly basis).

Our accounting for debt securities under SOP 03-3 gives rise to an accretable yield and a non-accretable difference.  The excess of all cash flows we expect to collect at acquisition over our initial investment in the debt security, or the debt security's fair value as of the date of acquisition which forms our new cost basis in the acquired asset, is recognized as accretable yield.   We recognize the accretable yield as interest income on a prospective level yield basis over the contractual or estimated life of the debt security, as appropriate.   The amount of yield to be accreted is not displayed on the face of our

---

[2] Refer to Policy Manual Section G9.5, *Impairments*.
[3] Refer to the Amortization Policy.

INTERNAL DOCUMENT
C1.2 – Investment Securities

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    13

CONFIDENTIAL                                                                                                   FHFA13012064

balance sheet, but is disclosed in the notes to our financial statements.  The excess of the debt security's contractually required payments receivable over the amount of cash flows expected at acquisition of the debt security is the non-accretable difference.  The non-accretable difference is not displayed on the face of the balance sheet, nor recognized as a yield adjustment, a loss accrual or a valuation allowance.

If cash flow estimates increase significantly, we recalculate the amount of accretable yield as the excess of the revised cash flows expected to be collected over the sum of (1) our initial investment less (2) cash collected less (3) other than temporary impairments plus (4) amount of yield accreted to date.  We adjust the amount of accretable yield by reclassifying amounts from the non-accretable difference.  We account for this adjustment to the accretable yield as a change in estimate in conformity with APB 20, *Accounting Changes*, with the amount of periodic accretion adjusted over the remaining life of the loan.

## 2.  Measurement

We measure Trading and Available-for-Sale securities at fair value[4].  We recognize unrealized holding gains and losses on Trading securities in earnings in the period of the change in fair value.  We recognize unrealized holding gains and losses on Available-for-Sale securities in other comprehensive income in the period of the change in fair value.

We measure Held-to-Maturity securities at amortized cost.

## 3.  Impairment

We assess all our investment securities for impairment.  If a decline in fair value is judged to be other than temporary impairment, we adjust the cost basis of the individual security to fair value and include the amount of the adjustment in earnings in the period of the impairment.  We do not increase the cost basis of securities for subsequent recoveries in fair value.[5]

## 4.  Principal Repayments

We record principal payments on a cash basis in the period when we receive the payment.

## 5.  Sale of securities

We may not sell debt securities classified as Held-to-Maturity.  We may sell Available-for-Sale and Trading securities.  When we sell Trading securities, we derecognize the carrying amount of the security, which is the fair value of the security.  When we sell an Available-for-Sale security, we derecognize the carrying amount of the security, which is the fair value of the security and reclassify the accumulated unrealized holding gain or loss from accumulated other comprehensive income into realized gain or loss.[6]

## 6.  Dollar Rolls

---

[4] Refer to the Fair Value Policy.
[5] Refer to the Impairment Policy.
[6] Refer to the Securitizations Policy for a description of when transfers of securities are accounted for as sales.

Page 4 of 6

INTERNAL DOCUMENT
C1.2 – Investment Securities

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                14

CONFIDENTIAL                                                                   FHFA13012065

We may sell TBA-eligible mortgage-backed securities under an agreement to repurchase securities that are substantially the same as the securities we sold.  We account for these transactions as secured financings when they meet all of the following conditions.

- We agree to repurchase securities that are substantially the same as the securities we sold.  We evaluate the similarity of securities sold and repurchased under a dollar roll transaction based upon the trades, not the individual securities that settle the trades.  Securities are substantially the same when they meet the following conditions:

  o Same primary obligor
  o Identical form and type
  o Similar remaining weighted-average maturity that results in approximately the same market yield.
  o Identical contractual interest rates
  o Similar assets as collateral
  o Same aggregate unpaid principal amount

- We are able to repurchase securities on substantially the agreed terms, even in the event of default by the counterparty.  To ensure this, we transact dollar rolls with counterparties who are participants under the rules of the Mortgage-Backed Securities Division of the Fixed Income Clearing Corporation.  Participants in the MBSD post minimum deposits and daily market differential deposits to the Participants Fund.  The Participants Fund serves as collateral for dollar rolls we enter into using the Comparison and Clearing System of the MBSD and is available for the payment of losses in the event a participant becomes insolvent.

- We agree to repurchase the securities before their maturity.

- We enter into the agreement to repurchase the securities concurrently with the transfer of the securities.

- We have securities in our portfolio that meet the criteria of the securities to be delivered under the dollar roll from the trade date of the dollar roll and until the settlement date of the sale (S-Roll).  However, we do not have to have the actual securities that we will deliver on the settlement date during the period from trade date to settlement date.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable.

## IV.  APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| SFAS 115 | January 1, 1994 | Accounting for Certain Investments in Debt and Equity Securities |
| Special Report | December 31, 1995 | A Guide to Implementation of Statement 115 on |

INTERNAL DOCUMENT
C1.2 – Investment Securities

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    15

CONFIDENTIAL                                                                                 FHFA13012066

**INVESTMENT SECURITIES**                                                     **C1.2**

|          |                  | Accounting for Certain Investments in Debt and Equity Securities |
|----------|------------------|-------------------------------------------------------------------|
| SFAS 140 | April 1, 2001    | Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities – a replacement of FASB Statement No. 125 |
| SOP 03-3 | January 1, 2005  | Accounting for Certain Loans or Debt Securities Acquired in a Transfer |

INTERNAL DOCUMENT
C1.2 – Investment Securities

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          16

CONFIDENTIAL                                        FHFA13012067

## I.  APPLICABILITY

The accounting guidance included in this section of the policy manual applies to our accounting for single-family loans (1 to 4 units) and multifamily loans (greater than 4 units) that are:

A) Purchased for portfolio or securitization or sale;
B) Repurchased out of pools in connection with our guaranty ("MBS 4+ loans"); and
C) Acquired in connection with a consolidation event.

This section also covers specialized loan accounting topics, such as our accounting for:

D) Loans acquired at a discount due to credit deterioration such as MBS 4+ loans;
E) Loan modifications, including troubled debt restructurings ("TDR");
F) Reverse mortgages; and
G) Acquisition, Development and Construction Loans ("ADC loans").

This section of the policy will also discuss our policies for recognizing interest income on loans and when a loan is placed on nonaccrual, or the time at which we discontinue the recognition of interest income on loans.  This policy is effective as of January 1, 2005.

## II.  POLICY

### A.  Loans purchased for portfolio or securitization or sale

#### i.   Recognition and measurement

##### 1.   Title transfer and initial investment

We record the purchase of whole loans for cash on our balance sheet at the funding date.  Our initial investment in acquired loans includes the amount paid to the seller, net of any fees paid or received, which can result in the purchase price of a loan exceeding or being less than the unpaid principal balance ("UPB") of an acquired loan.  We classify the excess of the purchase price over UPB as a "premium" and the excess of UPB over the purchase price as a "discount" on the loan.  Premiums, discounts and other deferred price adjustments are treated as "basis adjustments" on the acquired loan that are amortized (premium) or accreted (discount) to interest income on a level yield basis over the contractual life of a loan in accordance with FAS No. 91, *Accounting for Nonrefundable Fees and Costs Associated With Originating or Acquiring Loans and Initial Direct Costs of Leases*. Only those basis adjustments that are amortized or accreted based on the contractual terms of an individual loan are carried forward as part of our recorded investment in an acquired loan.

All other internal costs we incur in connection with acquiring purchased loans or committing to purchase loans are charged to expense as incurred.

##### 2.   Establishment of ability and intent

At the time of acquisition, we classify loans as either held for investment ("HFI") or held for securitization or sale ("HFS") in accordance with FAS No. 65, *Accounting for Certain Mortgage Banking Activities*.  Loans that we have the

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    17

CONFIDENTIAL                                                                           FHFA13012068

intent and ability to hold for the foreseeable future, or until maturity or payoff, are classified as HFI.  Loans that we have the intent to sell or securitize, or for which we do not have the ability to hold at least for the foreseeable future, are classified as HFS.  Although we may sell loans out of the HFI category without calling into question our intent to hold other loans to maturity (i.e., tainting the entire portfolio), we should not establish a recurring pattern of loan sales out of HFI such that sales out of our HFI portfolio are rare.

## ii.  Subsequent measurement

### 1.  Carrying value and impairment

*Loans held for investment*

HFI loans are reported on our balance sheet at outstanding principal (reduced for principal payments received) adjusted for any charge-offs, the allowance for loan losses, and any unamortized premiums, discounts or other basis adjustments at each balance sheet date.  HFI loans are subject to a quarterly impairment assessment in connection with our allowance for loan loss methodology, that is performed in accordance with the provisions of FAS No. 5, *Accounting for Contingencies*, and FAS No. 114, *Accounting by Creditors for Impairment of a Loan*, and other regulatory requirements (SEC and FFIEC) as referenced in our allowance for loan loss policy.[1]

*Loans held for sale*

HFS loans are carried at the lower of the loan's cost (UPB, reduced for any principal payments received, and adjusted for any individual loan level basis adjustments) or fair value ("LOCOM") at each balance sheet date.  Any excess of an HFS loan's cost over its fair value is recognized as a valuation allowance, with changes in the valuation allowance recognized in our consolidated statements of income.  Purchase premiums, discounts and/or other loan basis adjustments on HFS loans are not amortized while a loan is classified as HFS, but are recognized in income at the time of sale or payoff.

We determine any LOCOM adjustment on HFS loans not specifically linked to a security issuance on an aggregate basis by aggregating those loans based on similar risks and characteristics, such as product type and interest rate bands of 50 basis point increments.  We then compare each of these pools of loans to the price of corresponding actively traded MBS with similar risks and characteristics, adjusted for differences in credit quality or the loans and liquidity to measure the market value of each of these pools of loans.  When HFS loans are specifically flagged for delivery into a specific security, we use the price of the security as a proxy measurement of fair value for the pool of loans.  HFS loans are excluded from an impairment assessment under our allowance for loan loss methodology as they are measured at LOCOM.

---

[1] Refer to separate Policy Manual Section C.1.5- *Allowance for Loan Losses and Reserve for Guaranty Losses*.

INTERNAL DOCUMENT
C1.3 – Loans

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                   18

CONFIDENTIAL                                                                   FHFA13012069

When HFS loans are transferred to a trust in a securitization, we LOCOM the loans at the time of securitization and any final LOCOM adjustment on the loans is included as part of the carrying amount of the loans sold when calculating the gain or loss on the sale under FAS 140.[2]

## 2. Income recognition

We recognize interest income on mortgage loans on an accrual basis as it is earned using the interest method.  We place a single-family loan on non-accrual, or discontinue accruing interest, when it is probable that we will not collect principal or interest on a loan, which we have determined to be the earlier of when (i) payment of principal and interest becomes three months or more past due according to the loan's contractual terms or (ii) in management's opinion, collectibility of principal or interest is not reasonably assured.

We place a multifamily loan on non-accrual status at the earlier of when (i) payment is three months or more past due according to the loan's contractual terms or (ii) it is determined that collectibility of all principal or interest is not reasonably assured based on an individual loan level assessment.

When a loan is placed on nonaccrual status, interest previously accrued but not collected is not reversed but instead becomes part of our recorded investment in the loan, such that the loan and the recorded accrued interest are evaluated together for impairment in connection with our allowance for loan loss methodology. We return a loan to accrual status when we determine that the collectibility of principal and interest is reasonably assured, or, when a loan becomes less than three months past due.  While a single or multifamily loan is on nonaccrual and if the accrued interest and related scheduled principal repayments are recovered, payments are applied on a cash basis.  Cash received is first applied to reduce any accrued or purchased interest already recorded then to loan principal.  However, when doubt exists as to the collectibility of Fannie Mae's remaining recorded investment on a loan placed on nonaccrual, any cash payments received are applied to reduce the recorded investment (loan principal) in the loan to the extent necessary to eliminate such doubt.

We discontinue the amortization or accretion of premiums, discounts and other basis adjustments that are amortized or accreted based on the contractual terms of an individual loan when the associated loan is placed on non-accrual status.

## 3. Transfers between categories

*HFI to HFS transfers*

HFI loans that are reclassified to HFS are transferred at LOCOM on the date of transfer, which is contemporaneous with our decision to sell the loan.

---

[2] Refer to separate Policy Manual Sections C.2.3- Guaranteed Obligations and Transfers and Servicing of Financial Assets and F.8.1- Consolidation of Fannie Mae MBS Trusts.

INTERNAL DOCUMENT
C1.3 – Loans

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL

FHFA13012070

- If the difference between the cost basis of the loan at the date of transfer and fair value is due to credit impairment, we record the initial fair value reduction as a write down to our recorded investment and a charge-off through the allowance for loan losses.

- If we can demonstrate the decline is for reasons other than credit (such as changes in interest rates), the difference between the cost basis of the loan at the date of transfer and fair value is recorded as a valuation allowance to the loan with a corresponding charge to non-interest expense.

*HFS to HFI transfers*

HFS loans that are reclassified to HFI are transferred at LOCOM on the date of transfer, which is contemporaneous with our decision to no longer sell the loan. Any LOCOM adjustment recognized upon transfer is recognized in interest income over the life of the loan as an adjustment of yield using the interest method.

**B. Loans repurchased out of pools in connection with our guaranty after 4 consecutive months of non-payment by the borrower ("MBS 4+ loans")**

**i.  Recognition and measurement**

*General*

We have the option under the terms of our trust indenture to purchase a loan, at par, out of an MBS pool after the borrower has missed their fourth consecutive payment. This contingent call option becomes non-contingent after this fourth missed payment by the borrower and at this time we now possess the unilateral ability to repurchase a loan that we have transferred to an MBS trust in a portfolio securitization.  This "removal of account provision" is not a derivative and therefore is not recognized on our balance sheet at fair value.

Title to an MBS 4+ loan transfers to Fannie Mae at the point we reflect the loan attributes in our accounting books and records.   For single-family loans, Fannie Mae has concluded that this date is represented by the "reclassification" of the MBS 4+ loan from "MBS" to "Cash" in the Laser accounting subledger.  For multifamily loans, Fannie Mae records the attributes of the MBS 4+ in the general ledger in the same month of reclassification.

Loans repurchased from trusts in connection with our guaranty are classified as HFI and are subject to our nonaccrual policy.  As MBS 4+ loans evidence at the time of acquisition both (a) deterioration in credit quality since the loan's origination due to the loan's past due status and (b) the probability that we will be unable to collect all contractual principal and interest from the borrower such that the loan is placed on nonaccrual upon acquisition, all MBS 4+ acquisitions on or after January 1, 2005 are subject to the initial measurement, income recognition and impairment provisions of SOP 03-3, *Accounting for Certain Loans or Debt Securities Acquired in a Transfer* ("SOP 03-3").

CONFIDENTIAL                                                                                    FHFA13012071

*Loans repurchased from Lender Swap Trusts*

We record MBS 4+ loans acquired from Lender Swap Trusts at their fair value pursuant to SOP 03-3, and we do not carry over an allowance on loans acquired from trusts in connection with our guaranty.   The excess of the purchase price of the MBS 4+ loan, or par plus interest advanced on behalf of the borrower by the servicer while the loan was nonperforming in a trust, over the MBS 4+ loan's fair value is recognized as a charge to the Reserve for guaranty losses through which we had already recorded incurred credit losses in connection with our guaranty while the loan was in a trust.  Should the fair value of the acquired MBS 4+ loan exceed our recorded investment, we record the loan at its purchase price such that no gain is recognized upon acquisition.

*Loans re-recognized from Portfolio Securitization Trusts*

At the point a borrower misses their fourth consecutive payment on a loan that we transferred to a trust in a portfolio securitization on or after April 2, 2003, we record the loan on our balance sheet at fair value because we now have the unilateral right to acquire the loan as transferor, pursuant to EITF 02-9, *Accounting for Changes That Result in a Transferor Regaining Control of Financial Assets Sold*.   We do not carry over an allowance on these loans that we record at fair value.  The excess of the purchase price of the loan, or par plus interest advanced on behalf of the borrower by the servicer while the loan was nonperforming in a trust, over the loan's fair value is recognized as a charge to the Reserve for guaranty losses through which we had already recorded incurred credit losses in connection with our guaranty while the loan was in a trust.  Should the fair value of the acquired loan exceed our recorded investment, we record the loan at its purchase price such that no gain is recognized upon acquisition.

*Fair value concepts*

The fair value of an MBS 4+ loan is the amount at which these loans could be bought (or incurred) or sold (or settled) in a current transaction between willing parties; that is, other than in a forced or liquidation sale.  Quoted market prices (including appraisals) in active markets are the best evidence of fair value. Quoted market prices are generally not available for credit impaired loans, thus, we estimate fair value using the best information available in the circumstances, including the fair value of the underlying collateral as a practical expedient, prices for similar assets and liabilities and the results of valuation techniques to the extent available in the circumstances.

**ii.  Income recognition**

Our recognition of interest income on MBS 4+ loans under SOP 03-3 is dependent upon us having a reasonable expectation of the amount and timing of cash flows expected to be collected.  When (a) the timing and amount of cash flows expected to be collected are reasonably estimable and (b) the MBS 4+ loan is not on nonaccrual, we use those expected cash flows to apply the interest method of income recognition.  Our assessment of the amount of cash flows we expect to collect on an MBS 4+ loan is evaluated at the end of each reporting period (i.e., on a quarterly basis).

INTERNAL DOCUMENT
C1.3 – Loans

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    21

CONFIDENTIAL                                                                          FHFA13012072

Our accounting for MBS 4+ loans under SOP 03-3 gives rise to an accretable yield and a non-accretable difference. The excess of all cash flows we expect to collect at acquisition over our initial investment in the loan, or the loan's fair value as of the date of acquisition which forms our new cost basis in the acquired loan, is recognized as accretable yield. Cash flows expected at acquisition include all cash flows directly related to the acquired loan, including those expected from the underlying collateral and contractually attached mortgage insurance. We recognize the accretable yield as interest income on a prospective level yield basis over the contractual life of the MBS 4+ loan. The amount of yield to be accreted is not displayed on the face of our balance sheet, but is disclosed in the notes to our financial statements. The excess of the loan's contractually required payments receivable over the amount of cash flows expected at acquisition of the MBS 4+ loan is the non-accretable difference. The non-accretable difference is not displayed on the face of the balance sheet, nor recognized as a yield adjustment, a loss accrual or a valuation allowance for credit losses. If the contractual interest rate on the acquired MBS 4+ loan is variable, our expected cash flows are determined by using the rate in effect as of the acquisition date.

All MBS 4+ loans, and any other loan subject to SOP 03-3, are subject to our nonaccrual policy. When an MBS 4+ loan is placed on nonaccrual at acquisition, no yield is accreted to interest income. Subsequent changes in our cash flow expectation impact the amount of yield to be accreted and impairment to be recognized. Increases in cash flows we expect to collect result in an increase in the yield to be accreted, or our accretable yield. The amount of any increase in accretable yield is accounted for as a change in estimate and recognized as a prospective yield adjustment with the amount of periodic accretion adjusted over the remaining contractual life of the loan. Any subsequent decreases in cash flows expected to be collected results in impairment on the acquired loan. The amount of income to be accreted should not be recognized to the extent that our net investment in the MBS 4+ loan would increase to an amount greater than the loan's payoff amount.

In instances where we are unable to determine the amount and timing of cash flows to be collected for purposes of income recognition, we apply the cost recovery method and we cease recognizing interest income on the loan.

### iii. Subsequent measurement

All MBS 4+ loans are classified as HFI and are reported on our balance sheet at outstanding principal (reduced for principal payments received and our initial cost basis adjustment to record the loan at its fair value pursuant to SOP 03-3) adjusted for any subsequent charge-offs, the allowance for loan losses, and any unamortized premiums, discounts or other basis adjustments at each balance sheet date. Any impairment recognized through a valuation allowance on MBS 4+ loans is measured on an individual loan basis and reflects only those credit losses that we have incurred subsequent to our acquisition of the loan; that is, the present value of all cash flows expected at acquisition that ultimately will not be received or decreases in the fair value of the underlying collateral in accordance with our accounting policy in Section C.1.5, *Allowance for Loan Losses and Reserve for Guaranty Losses*.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    22

CONFIDENTIAL                                                                 FHFA13012073

### C.  Loans acquired in connection with a consolidation event

#### i.  Recognition and measurement

When we determine that we are the primary beneficiary to a trust that is a variable interest entity ("VIE") under FIN 46R, we consolidate the assets (loans) and liabilities of the trust at fair value.  When loans are consolidated under FIN 46R, we perform an evaluation to determine whether the loans show evidence of credit deterioration since origination upon consolidation.  This assessment is performed at an individual loan level, where possible, to determine whether the loans in the trust are 3 months or more past due, and therefore placed on nonaccrual status at the time of consolidation.  If we determine that credit deterioration has occurred such that the loans are placed on nonaccrual status at the time of acquisition, we account for the loans pursuant to SOP 03-3.  When we are unable to determine the timing and amount of cash flows expected to be collected on loans that we consolidate, we apply the cost recovery method of income recognition consistent with the provisions of SOP 03-3.

#### ii.  Subsequent measurement

Loans that are consolidated on our balance sheet for which we were previously the transferor to a trust are classified as HFS.  Loans consolidated on our balance sheet held in a Lender Swap Trust are classified as HFI.

### D.  Accounting for loans acquired at a discount due to credit deterioration

*Loans acquired on or before December 31, 2004*

We apply the income recognition provisions of PB 6 to loans that we acquire at a discount to due credit impairment and for which it is not probable that future cash collections will be sufficient to fully recover the face amount of the loan and all contractual interest.  The following represent circumstances where we could recognize a loan at a discount due to credit impairment:

- Loans repurchased in connection with our guaranty (MBS 4+ loans acquired on or after April 2, 2003 from trusts where we the transferor); and

- Loans consolidated at fair value pursuant to FIN 46.

Under PB 6, we amortize the discount on the acquired loan on a prospective level yield basis to an amount not to exceed our expected undiscounted cash flows on the loan that are both reasonably estimable and probable of receipt.  If our expected cash flows are not reasonably estimable and probable, or if the collectibility of the related acquisition amount of the loan and discount are not probable, we apply the cost recovery method to account for the loan and we discontinue amortization of the discount.

We measure impairment on a PB 6 loan as a result of a decrease in expected undiscounted future cash flows through our allowance for loan loss methodology.  We recognize an allowance on PB 6 loans for the amount by which our allowance estimate exceeds any unamortized fair value discount recognized upon acquisition of the credit-impaired loan.   Loans acquired at a discount due to credit impairment on or before

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    23

CONFIDENTIAL                                                                 FHFA13012074

December 31, 2004 continue to follow this accounting treatment after December 31, 2004.

*Loans acquired on or after January 1, 2005*

We apply the initial measurement, income recognition and impairment provisions of SOP 03-3 to all loans that we acquire through (a) whole loan acquisitions, (b) consolidation events or (c) in connection with our guaranty, with evidence of credit deterioration in credit quality since origination acquired by completion of a transfer for which it is probable, at acquisition, that we will be unable to collect all contractually required payments receivable.  Refer to section B above for a detailed description of how we apply the provisions of SOP 03-3 in the context of our accounting for MBS 4+ loans, concluded to be within the scope of SOP 03-3.

We have identified the following specific loans that are acquired by Fannie Mae in completion of a transfer that are subject to the accounting provisions of SOP 03-3 (not meant to be all-inclusive):

- Loans that we acquire out of trusts when loans become delinquent as to four consecutive months of contractual principal and interest in connection with our guaranty, or MBS 4+ loans.

- Loans that are delinquent as to four consecutive months of contractual principal and interest in MBS trusts to which we were the transferor ("PPS trusts") that we re-recognize on our balance sheet at fair value pursuant to EITF 02-9.

- Loans that are three months or more past due at the time of consolidation of a Fannie Mae MBS trust under FIN 46R, such that the consolidated loan is placed on nonaccrual at the time of consolidation.

## E.  Accounting for loan modifications, including troubled debt restructurings ("TDR")

### i.  General

When the contractual terms of a loan are modified, we first evaluate whether the modification of terms results in a concession we have granted to the borrower that we otherwise would not have considered in order to make the best of the borrower's difficult financial situation.  If we determine a concession has been granted, the restructuring of terms is accounted for as a TDR.  If we determine that a concession has not been granted, a second evaluation is performed to determine whether or not the modification of contractual terms requires recognition of a new loan.

When we restructure a loan more than once, we first evaluate whether the restructuring again resulted in a concession to the borrower.  To make that assessment, we compare the new effective borrowing rate of the borrower based on the new terms to the effective borrowing rate of the previous restructuring.

### ii.  Troubled debt restructurings

#### 1.  Definition of a TDR

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    24

CONFIDENTIAL                                                      FHFA13012075

We consider a restructuring of the contractual terms of a loan to be a TDR if for *economic or* legal reasons we have granted a concession to the borrower that we would not have otherwise considered in order to make the best of a borrower's difficult financial situation.[3]  Therefore, we must have granted a concession and the borrower must be experiencing financial difficulty for a TDR to be present.

A concession has been granted to the borrower if the borrower's effective borrowing rate (our effective yield) on the restructured loan is less than the effective borrowing rate of the old loan immediately prior to the restructuring.  We calculate the effective borrowing rate of the restructured loan by projecting all cash flows under the new terms and solving for the discount rate that equates the present value of the cash flows under the new terms to the current carrying amount of the old loan.  Concessions can also arise through law or court judgments such as Military Indulgence, FHA loan modifications, or "bankruptcy cram-downs."

Examples of modifications that are excluded from TDR recognition and measurement requirements[4] include (a) our delay in taking legal action to collect overdue amounts of interest or principal and (b) modifications or special relief efforts that result in an insignificant delay in contractual payments or where we expect to collect full contractual principal and interest on the loan (specifically, less than a 3 consecutive month delay).

## 2.  Types of TDRs

There are three common types of troubled debt restructurings: *(a)* a transfer of assets (or equity interest) from debtor in full satisfaction of the loan, *(b)* a transfer of assets in partial satisfaction of the loan coupled with a modification of the terms of the remaining loan, and *(c)* a modification in terms of the loan.

### a.  Full satisfaction event

When we receive cash, property or other assets in full satisfaction of a loan, we:

- Record those assets received at their fair value less cost to sell at the time the assets are received.  These types of transactions include pre-foreclosure sales or lender repurchases.
- Derecognize the loan.
- Charge-off the excess of our recorded investment in the loan, over the fair value less cost to sell of the assets, received at the time of the restructuring through the allowance for loan losses.  If our specific allowance relating to the loan is not sufficient, we additionally record a corresponding provision for loan losses for the deficiency.

### b.  Partial satisfaction event

---

[3] SFAS 15, paragraphs 2 and 3.
[4] SFAS 15, paragraph 8.

INTERNAL DOCUMENT
C1.3 – Loans

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL                                                                    FHFA13012076

When we receive cash, property or other assets in partial satisfaction of a loan, we:

- First reduce our recorded investment in the loan by the fair value less, cost to sell of the assets received.
- Evaluate the remaining recorded investment in the loan for impairment in accordance with FAS 114.[5]
- Continue to evaluate the loan as a TDR involving the modification of the original contractual terms of the loan (See below *Modification of Terms* for other considerations).

### c.  Modification of Terms

When we determine that a restructuring of loan qualifies as a TDR, the loan is considered individually impaired under FAS 114.[6] We measure impairment resulting from the TDR based on one of the following three methods:[7]

- Using the present value method, we measure a TDR for impairment based on the present value of the expected future cash inflows based on the restructured terms of the loan discounted at the original effective interest rate.[8] Our expectation of future cash flows on a loan is based on the contractual cash flows specified by the restructured terms of the loan;
- The loan's observable market price; or
- The fair value of the underlying collateral, as a practical expedient, if the loan is considered collateral dependent.

We follow the method that is most consistent with our reasonable expectation for the recovery of our recorded investment in the loan.  The present value method is generally used, since our intent in modifying the loan is to prevent foreclosure and minimize the amount of a loss on a loan.  However, when it becomes probable[9] that we will foreclose on a loan, impairment is measured by comparing our recorded investment in the loan to the fair value less cost to sell of the underlying collateral.[10]

### 3.  TDR- other considerations

### a.  Fees and Costs

Fees on TDRs received are applied as a reduction of the recorded investment in the loan, and all related costs, including direct loan restructuring costs, should be charged to expense as incurred.

---

[5] Measurement of Impairment is discussed in section C1.5 - Allowance for Loan Losses
[6] SFAS 114, paragraph 8.
[7] SFAS 114, paragraph 13.
[8] SFAS 114, paragraph 14.
[9] The use of this term in this memo is consistent with its use in paragraph 8 of SFAS 5.
[10] SFAS 114, paragraph 69.

INTERNAL DOCUMENT
C1.3 – Loans

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                26

CONFIDENTIAL                                                                    FHFA13012077

Fees paid to the servicer by us on behalf of the borrower when a modification is performed that results in a TDR are capitalized to the basis of the restructured loan and, therefore, impact our recorded investment in the modified loan. As we are paying the servicer on the borrower's behalf, this payment represents additional financing to the borrower that we expect to be repaid and is therefore included as part of loan basis when performing the impairment evaluation.

b.  **Interest Income**

We recognize interest income on individually impaired loans based on the restructured note rate of the loan.  Subsequent to the restructuring, on a quarterly basis, we evaluate our expectation of future cash flows on individually impaired loans to determine the adequacy of the valuation allowance established at the time of the restructuring.  Changes in the present value of expected future cash flows used to measure impairment, due either to the passage of time or significant changes in our expectation of future cash flows (e.g., higher or lower than previously projected) are recognized as an adjustment to the valuation allowance through the provision for credit losses.   An example of when the original expectation of cash flows will be reviewed and revised is in the event a restructured loan is subsequently placed on non-accrual status.

If the timing and amount of cash flows received under the restructured terms of the loan are consistent with our initial expectation of cash flows, changes in the valuation allowance are attributable to the passage of time.  Accordingly, the adjustment to the valuation allowance through the re-calculation of impairment approximates the difference between the restructured note rate and the loan's original effective yield when the interest method is applied.

The calculation of a constant effective yield necessary to apply the interest method incorporates the payment terms required under the terms of the restructured loan, and prepayments of principal are not anticipated to shorten the term of the loan.

Interest recognition on the restructured loan begins immediately following the modification; this is because we expect to realize the collection of the revenue under the new contractual terms of the restructured loan, and the restructured cash flows are probable of receipt based on the re-underwriting analysis performed at the time of the modification. Payment of principal and interest is considered probable since the new loan terms were subject to a second, full underwriting process and we have concluded that payment is reasonably assured under the restructured terms of the loan.

c.  **Non-accrual considerations**

TDRs represent troubled loans that most likely were placed on non-accrual status prior to the modification.  Our recorded investment at the time of restructuring includes:

- The loan's unpaid principal balance (UPB);

INTERNAL DOCUMENT
C1.3 – Loans

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                27

- Recorded accrued interest on the loan up to the point the loan was placed on non-accrual status (i.e., 120 days of interest[11]); and
- Any unamortized basis adjustments amortized based on the contractual terms of the individual loan.

The foregone interest that was deferred while the loan was on non-accrual is carried forward as part of the basis of the restructured loan and subsequently amortized to interest income based on the effective yield method pursuant to FAS 91. Similar to our subsequent measurement of the FAS 114 valuation allowance, we do not anticipate prepayments in the amortization model and the basis adjustment is amortized based on the contractual terms of the restructured loan.

### 4. Allowance for loan losses[12]

Once a loan is considered individually impaired and subject to the measurement provisions of FAS 114, including acquired loans subject to SOP 03-3 accounting, the individually impaired loan is not subject to a FAS 5 impairment model, but rather subject to the provisions of FAS 114 as the sole measure of impairment for that loan from that point forward.

## iii. Modifications of terms not in a TDR

### 1. General

Once an analysis has been performed to support a conclusion that a modification is not a TDR, we perform a second assessment to determine whether the new terms are (a) at least as favorable as the terms for comparable loans to other customers with similar collection risks who are not restructuring a loan with us and (b) whether the modification is considered "more than minor." If the original note provided for an interest rate modification in the loan, the change in interest rate is not considered a modification or refinancing and should be accounted for under the interest method. Single-family loans modified in a minor or more than minor modification are evaluated for impairment in connection with our FAS 5 allowance methodology. Multi-family modifications are evaluated for impairment under FAS 5 or FAS 114.

### 2. "At least as favorable" Criteria

The new loan is considered "at least as favorable" if the terms after a modification are at least equal to a comparable loan to a borrower with similar collection risks who is not refinancing or restructuring.

- "At least as favorable" – Account for as a new loan, should more than minor criteria also be met.

---

[11] Since loans pay interest one month in arrears, a loan which is past due 90 days really includes 120 days of interest.
[12] Refer also to Policy Manual Section C1.5, *Allowance for Loan Losses and Reserve for Guaranty Losses*.

INTERNAL DOCUMENT
C1.3 – Loans

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL

FHFA13012079

- Not considered "at least as favorable" – Account for as a continuation of the old loan.

### 3. "More than Minor" Criteria

To determine if the modification is "more than minor", we compare the present value of the cash flows under the terms of the new debt instrument to the present value of the remaining cash flows under the terms of the original agreement, discounted at the original effective interest rate of the original loan.  If the present value of the cash flows under the modified loan term is at least 10% different from the present value of the remaining cash flows under the original loan term, we consider this to be a "more than minor" modification.

- "More than minor"  - Account for as a new loan
- Not "More than minor"  - Account for as a continuation of the old loan

### 4. Recognition and Measurement

#### a. New Loan

If a new loan has been granted, we record any contractually unamortized basis adjustments and prepayment penalties on the old loan as interest income.[13] Our investment in the new loan represents our remaining recorded investment in the old loan, after recognizing any unamortized basis adjustments associated with the old loan recognized in interest income, any additional amounts loaned, and adjusted for the deferral of any new incremental costs or fees involved in the modification.  Foregone interest that was deferred while the loan was on non-accrual is carried forward as part of our basis in the new loan.

#### b. Continuation of the Old Loan

If the refinancing or the restructuring does not constitute a new loan, all unamortized basis adjustments and prepayment penalties are carried forward as part of the basis of the loan, and our recorded investment in the loan is adjusted for the deferral of any new incremental costs or fees involved in the modification.[14]  Foregone interest that was deferred while the loan was on non-accrual is carried forward as part of our basis in the loan continuation.

### F. Special considerations-Reverse mortgages

#### i. General

A Reverse Mortgage is a rising debt loan that permits eligible borrowers to borrow against the equity in their homes by receiving payments from the lender without repaying the loan unless certain events occur (e.g., death, or no longer occupying their home).  There are three different types of payment plans available to borrowers under both Reverse Mortgage products, including: (1) a tenured payment plan (borrower receives equal monthly payments), (2) a line of credit ("LOC"), where a

---

[13] SFAS 91, paragraph 12.
[14] SFAS 91, paragraph 13.

INTERNAL DOCUMENT
C1.3 – Loans

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          29

CONFIDENTIAL                                                                   FHFA13012080

borrower can request an up front lump sum payment at closing, or at anytime during the loan, and (3) a modified tenure plan, which combines a tenure plan with a LOC.

In 1995, we developed our own proprietary program called the Home Keeper Mortgage ("HKM").  Under the HKM program, Fannie Mae provides underwriting guidelines to approved lenders and purchases the loans from those lenders.  HKM loans can potentially be larger than HECM loans because Fannie Mae's maximum lending limit is higher than the FHA lending limit. In general, the debt for an HKM will be called due and payable when the last surviving borrower dies, the borrower sells the property, or the borrower ceases to occupy the property as principal residence. The loan may be accelerated and the debt called due and payable if the borrower defaults under the terms of the existing mortgage.  Defaults under the terms of the mortgage include the borrower's inability or unwillingness to maintain the property, failure to pay taxes or insurance premiums as the come due, or a violation of any other covenant of the loan contract.

## ii.  Recognition and measurement

We report reverse mortgages based on total principal, interest and other charges outstanding. Recognition of effective interest is limited to the extent the net investment in a loan would exceed the amount at which Fannie Mae could settle the obligation.  The difference between the investment income recognized (based on calculated effective yield each accounting period) and the interest capitalized to the outstanding loan balance (based on the original contractual rate) should be accounted for as an adjustment to a valuation allowance on the loans (this is a separate valuation allowance on the loans, not the allowance for loan losses). This valuation allowance would therefore be increased when effective rates decrease from contractual rates and decreased when effective rates increase over contractual rates.

The recognition and measurement of interest income for reverse mortgages depends on whether the reverse mortgage product is insured or uninsured.  On insured loans, interest income is recognized based on the contractual interest income recognition method since these loans are insured to protect Fannie Mae against loss if amounts withdrawn exceed equity when the property is sold.  On uninsured loans, recognition of interest income and the associated valuation allowances require estimates of mortality and future home prices.  The basic approach is to ensure that the estimated future recorded investment does not exceed the future expected net proceeds from the collateral.  As long as this does not occur, recognizing interest based on the contractual interest rate method would be appropriate.  If the future recorded investment exceeds the future net collateral value, Fannie Mae performs a retrospective yield calculation.

Lender repurchases and HUD assignments result in full contract payoff and loan liquidation. Any unamortized premium will be charged to interest income in full.  If a HECM or HKM payoff event occurs and the loan's contractual balance is liquidated, then any related unamortized premium will charge interest income accordingly.

## iii.  Impairment

CONFIDENTIAL                                                                          FHFA13012081

A collective loan impairment reserve is assessed for HECM credit losses that occur as a result of untimely filing of claims, or HUD insurance payments prior to foreclosure sales that do not fully cover the loss. If it is probable that an asset has been impaired and the amount can be estimated, then an allowance for loan losses should be recognized with a corresponding charge to loan loss expense. Since the HECM portfolio is a homogenous and a specific asset may not be identifiable, Fannie Mae will base our loss estimate on historical charge off experience, adjusted for current trends.

In addition to applying the retrospective yield approach to HKM loans it may also be necessary to evaluate specific loans individually for a specific loan loss reserve if it is probable that contractual amounts of principal and accrued interest due are not collectible at the reporting date.  Under the retrospective yield approach, no impairment at expected maturity as the cumulative investment balance or retrospective adjustment renders the recorded investment at the expected proceeds. However, in addition to the cumulative retrospective adjustment, a valuation allowance may be required for incurred losses at the balance sheet date, where the loan's recorded investment is greater than the collateral value adjusted for selling costs.  Therefore a collateral dependent valuation allowance may be necessary if the loan is individually monitored due to contract delinquency.

## G.  Special considerations-ADC loans[15]

### i.  General

Construction lending involves the advancement of funds by us in connection with ACF program, or our guaranty of the construction lending arrangements by other lenders, to finance the construction of a building or the development of raw land.  A specified portion of the loan amount is disbursed at inception of the project and a part is disbursed over time as construction progresses.  Often, both principal and interest are due at maturity.

These ADC arrangements that we may fund or guaranty in connection with our ACF program may have virtually the same risks and potential rewards as those of owners or joint ventures. The following represent characteristics we consider to determine the ADC arrangement is a loan or an investment in real estate.

### ii.  Characteristics of ADC arrangements implying investments in real estate or joint ventures

The following characteristics suggest that the risks and rewards of an ADC arrangement are similar to those associated with an investment in real estate or joint venture:

a.  We agree to provide all or substantially all necessary funds to acquire, develop, or construct the property. The borrower has title to but little or no equity in the underlying property.

---

[15] Guidance obtained from "Practice Bulletin 1 Purpose and Scope of AcSEC Practice Bulletins and Procedures for Their Issuance."

INTERNAL DOCUMENT
C1.3 – Loans

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    31

CONFIDENTIAL                                                                 FHFA13012082

b.   We fund the commitment or origination fees or both by including them in the amount of the loan.

c.   We fund all or substantially all interest and fees during the term of the loan by adding them to the loan balance.

d.   Our only security is the ADC project. We have no recourse to other assets of the borrower, and the borrower does not guaranty the debt.

e.   In order for us to recover the investment in the project, the property must be sold to independent third parties, the borrower must obtain refinancing from another source, or the property must be placed in service and generate sufficient net cash flow to service debt principal and interest.

f.   The arrangement is structured so that foreclosure during the project's development as a result of delinquency is unlikely because the borrower is not required to make any payments until the project is complete, and, therefore, the loan normally cannot become delinquent.

### iii.   Characteristics of ADC arrangements implying loans

The following characteristics suggest that the risks and rewards of an ADC arrangement are similar to those associated with a loan:

a.   We participate in less than a majority of the expected residual profit.

b.   The borrower has an equity investment, substantial to the project, not funded by us. The investment may be in the form of cash payments by the borrower or contribution by the borrower of land (without considering value expected to be added by future development or construction) or other assets. The value attributed to the land or other assets should be net of encumbrances. There may be little value to assets with substantial prior liens that make foreclosure to collect less likely. Recently acquired property generally should be valued at no higher than cost.

c.   We have 1) recourse to substantial tangible, saleable assets of the borrower, with a determinable sales value, other than the ADC project that are not pledged as collateral under other loans; or 2) the borrower has provided an irrevocable letter of credit from a creditworthy, independent third party to the lender for a substantial amount of the loan over the entire term of the loan.

d.   A take-out commitment for the full amount of our loans has been obtained from a creditworthy, independent third party. Take-out commitments often are conditional. If so, the conditions should be reasonable and their attainment probable.

e.   Noncancelable sales contracts or lease commitments from creditworthy, independent third parties are currently in effect that will provide sufficient net cash flow on completion of the project to service normal loan amortization, that is, principal and interest. Any associated conditions should be probable of attainment.

CONFIDENTIAL                                                                 FHFA13012083

f.   Guarantees

- Some ADC arrangements may include guarantees of the borrower and/or a third party by us. The existence of our guaranty alone rarely provides a sufficient basis for concluding that an ADC arrangement should be accounted for as a loan. In instances where the substance of the guaranty and the ability of the guarantor to perform can be reliably measured, and the guaranty covers a substantial amount of the loan, concluding that an ADC arrangement supported by a personal guaranty should be accounted for as a loan may be justified.

We reassess our accounting for ADC loans on a periodic basis to ensure the structure of the arrangement has not changed significantly to warrant a different accounting treatment.  We disclose ADC arrangements considered investments in real estate separately from ADC arrangements considered loans in our consolidated balance sheet.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

**Question 1:**

Are acquired loans that are less than or equal to 3 months past due upon acquisition considered acquired loans with evidence of credit deterioration since origination under SOP 03-3?

**Answer:**

No.  Acquired loans, debt securities and beneficial interests that have experienced credit deterioration since origination and for which it is probable that Fannie Mae will not recover all contractually required payment receivable are subject to the income recognition and impairment provisions of SOP 03-3.  SOP 03-3 states that one example of evidence of credit deterioration is the past due status of an acquired loan.   This would suggest that loans that are as little as one or 2 months past due upon acquisition would meet the attributes of "credit deterioration since origination" under the SOP.

However, SOP 03-3 also carries forward the concept of "insignificant delays in payment" as set forth in FAS 114, *Accounting for Impairment of a Loan*.  Specifically, footnote 3 of SOP 03-3 states that "investors should consider the significance of delays and shortfalls for a loan so the SOP is not applied when such delays and shortfalls are insignificant with regard to the contractually required payments."  SOP 03-3 Technical Practice Aid Question 11 also further clarified how Fannie Mae should assess what is an insignificant delay in payment by stating such "assessment will likely be based on individual facts and circumstances and should be guided by an accounting policy adopted and applied consistently by the investor."

Fannie Mae's accounting policy on loan modifications and the Company's allowance for loan loss policy define an insignificant delay in payment as a delay not to exceed three consecutive months.   Therefore, as a delinquency status of less than or equal to 3 months past due is not considered a significant delay pursuant to Fannie Mae's relevant accounting policies, the acquisition of a loan that is less than or equal to 3 months past due would meet the definition of an insignificant delay in payment and would therefore not be subject to the provisions of SOP 03-3.   Accordingly, when considering past due status as an indicator of credit deterioration

INTERNAL DOCUMENT
C1.3 – Loans

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          33

CONFIDENTIAL                                                          FHFA13012084

since origination, only acquired loans that are in excess of 3 months past due would meet the credit deterioration scoping criterion of SOP 03-3.

However, it is important to note that the Company's accounting policy also identifies other forms of credit deterioration that should be considered in addition to past due status.  Such items include downgrades in FICO score of the borrower and condition of the underlying collateral. For those loans acquired outside of the MBS 4+ program (where evidence of credit deterioration is already established through the past due nature of the loans), where a loan may be acquired that is less 3 months past due, but between 1 and 3 months past due, Fannie Mae's evaluation of credit deterioration should also contemplate these other factors.

**Question 2:**

How do the provisions of SOP 03-3 apply to variable rate loans (i.e., adjustable rate mortgages or ARMs)?

**Answer:**

Paragraph .11 of SOP 03-3 outlines the accounting for variable rate loans under the standard as follows:

> "If a loan's contractual interest rate varies based on subsequent changes in an independent factor, such as an index or rate (for example, the prime rate, the London interbank offered rate, or the US Treasury bill weekly average), that loan's contractually required payments receivable should be calculated based on the factor as it changes over the life of the loan.  Projections of future changes in the factor should not be made for purposes of determining the effective interest rate or estimating cash flows expected to be collected.  At the acquisition date, the amount of cash flows expected to be collected should be based on the index in effect at acquisition. Increases in cash flows expected to be collected should be accounted for according to paragraph .07b or .08b.  Decreases in cash flows expected to be collected resulting directly from a change in the contractual interest rate should be recognized prospectively as a change in estimate in conformity with APB 20 by reducing, for purposes of applying paragraphs. 07a and .08a, all cash flows expected to be collected at acquisition and the accretable yield.  The investor should decrease the amount of accretable yield and the cash flows expected to be collected.  Thus, for decreases in cash flows expected to be collected resulting directly from a change in the contractual interest rate, the effect will be to reduce prospectively the yield recognized rather than recognize a loss."

TPA Question 2130.31 addressed the accounting for variable rate loans under SOP 03-3, clarifying that:

> "If the investor is not able to directly attribute the decrease in expected cash flows to a decrease in the contractual interest rate (for example, because the change in the index or rate has no direct effect on the cash flows available to the borrower to service the loan or because the change in the index or rate had no direct effect on expected cash flows that relate to the value of the collateral) the investor should immediately recognize any decrease in expected cash flows as impairment, not over time as reduced yield."

## IV.  APPLICABLE ACCOUNTING LITERATURE

**Primary Accounting Guidance**

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    34

CONFIDENTIAL                                                                 FHFA13012085

- FAS 65, *Accounting for Certain Mortgage Banking Activities*
- FAS 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases*
- FASB Special Report, *A Guide to Implementation of Statement 91 on Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases: Questions and Answers* ("FAS 91 Q&A")
- FAS 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities*
- SOP 01-6, *Accounting for Certain Entities that Lend or Finance Activities of Others*
- SOP 03-3, *Accounting for Certain Loans or Debt Securities Acquired in a Transfer*

**Other Accounting Guidance**

- FAS 15, *Accounting by Debtors and Creditors for Troubled Debt Restructurings*
- AICPA Practice Bulletin 5, *Income Recognition on Loans to Financially Troubled Countries*
- EITF 01-7, *Creditor's Accounting for a Modification or Exchange of Debt Instruments*
- EITF 02-4, *Determining Whether a Debtor's Modification or Exchange of Debt Instruments is within the Scope of Statement 15*
- EITF 96-19, *Debtor's Accounting for a Modification or Exchange of Debt Instruments*
- FFEIC Guidance for Loans Held for Sale
- FFIEC Instructions for Preparation of Consolidated Reports of Condition and Income (FFIEC 031 and 041) - (September 2005)
- SEC Letter, *Accounting for Reverse Mortgages (letter to Providential Corporation)*
- SEC SAB 104, *Revenue Recognition*
- FAS 5, *Accounting for Loss Contingencies*
- FAS 114, *Accounting by Creditors for the Impairment of a Loan*
- FAS 114 Q&A, *Application of FASB Statements 5 and 114 to a Loan Portfolio*
- FAS 118, *Accounting by Creditors for Impairment of a Loan – Income Recognition and Disclosures*
- SOP 75-2, *Accounting Practices of Real Estate Investment Trusts*
- SOP 93-1, *Financial Accounting and Reporting for High-Yield Debt Securities by Investment Companies*
- FSP No. SOP 94-6-1: *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk*
- *OTS Examination Handbook Section 212, appendix B (covers accounting for reverse mortgages)*

| PREMIUMS, DISCOUNTS, AND DEFERRED PRICE ADJUSTMENTS | C1.4 |
|---|---|

## I.  APPLICABILITY

This policy manual applies to our accounting for premiums, discounts, and other deferred purchase adjustments on loans and securities purchased by us pursuant to SFAS No. 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases*.  Specifically excluded from the discussion herein are price adjustments related to loans or securities that are subject to AICPA Practice Bulletin 6, *Amortization of Discounts on Certain Acquired Loans*, or EITF 99-20, *Recognition of Interest Income and Impairment on Purchased and Retained Beneficial Interests in Securitized Financial Assets*.

We refer to premiums, discounts and other deferred price adjustments as "basis adjustments" to an acquired loan or security.  These basis adjustments may arise at the time of purchase of a loan or security or may arise during the life of a loan or security as a result of certain accounting events.  Specifically, this memo will address our accounting for basis adjustments that result from the following accounting events:

- Purchase of a loan or a pool of loans, including single and multifamily;
- Purchase of a security;
- Transfers of loans between held for sale ("HFS") and held for investment ("HFI") designations under SFAS 65, *Accounting for Certain Mortgage Banking Activities*;
- Transfers of securities between SFAS 115, *Accounting for Certain Investments in Debt and Equity Securities*, designations; and
- Modifications of contractual loan terms that result in the creation of basis adjustments.

This policy is effective as of December 31, 2004.

## II.  POLICY

### A.  Recognition of deferred price adjustments

#### 1.  Acquisition of Loans

The amount we pay to purchase a loan or group of loans frequently differs from the related loans' principal amount at the date of purchase.  This difference (premium or discount) is a basis adjustment and an adjustment to the yield that we recognize in interest income over the life of the loan using the interest method.

Any additional indirect costs we incur in connection with acquiring a loan or committing to purchase a loan are accounted for as an expense, as we incur them.

#### 2.  Acquisition of Securities

The amount we pay to purchase a security frequently differs from the related security's principal amount, or par amount, at the date of purchase.  A discount also arises on investments that do not have a stated rate of interest such as U.S. Treasury Bills, commercial paper and zero coupon bonds.

This difference (premium or discount) is a basis adjustment and an adjustment to the yield that we recognize in investment income over the life of the security using the interest method.

INTERNAL DOCUMENT
C1.4 – Premiums, Discounts, and Deferred Price Adjustments

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          36

CONFIDENTIAL                                                                                    FHFA13012087

We also defer brokerage commissions related to the purchase of a security as a basis adjustment.  Other fees paid to an independent third party or incurred internally for portfolio management or investment advisory services are expenses as we incur them.

## B.  Timing of Recognition for Deferred Pricing Adjustments

<u>Mortgage Loans Held-for-sale (HFS)</u>

We do not amortize or accrete basis adjustments on loans classified as HFS.  We include basis adjustments on HFS loans in the calculation of gain or loss on sale.

Transfers of loans between categories HFS and held for investment ("HFI") also give rise to basis adjustments on our loans.  HFS loans that are reclassified to HFI are transferred at the lower of cost or fair value ("LOCOM") on the date of transfer, which is contemporaneous with our decision to no longer sell the loan.  Any LOCOM adjustment recognized upon transfer is recognized in interest income over the life of the loan as an adjustment of yield using the interest method.

<u>Mortgage Loans Held-for-investment (HFI)</u>

We amortize (accrete) basis adjustments as an adjustment to yield in interest income over the life of the purchased loan(s).

<u>Debt Securities</u>

We defer all premiums, discounts, and other deferred pricing adjustments on our debt securities regardless of whether the security is classified as trading, available for sale or held to maturity.  We amortize (accrete) basis adjustments as an adjustment to yield into interest income over the life of the purchased securities.

## C.  Amortization Methodology

### 1.  General

We use of the interest method to amortize basis adjustments on loans and securities. The objective of the interest method is to arrive at periodic interest income (including recognition of fees and costs) at a constant effective yield on the net investment in the receivable (that is, the principal amount of the receivable adjusted by unamortized fees or costs and purchase premium or discount).  The difference between the constant effective yield and the stated interest on the outstanding principal balance of a loan or security is the amount of periodic amortization of deferred price adjustments.

Estimates of prepayments may be anticipated in certain specified circumstances. Estimates of prepayments can only be applied to **large numbers** of **similar** loans or securities that are **aggregated** where prepayments are probable and the amount and **timing** of prepayments can be reasonably estimated.

We apply either the "contractual" method or the "retrospective" method to amortize basis adjustments.  The method that we apply depends upon whether we aggregate a large number of similar loans or securities and can estimate prepayments for that aggregation.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    37

CONFIDENTIAL                                                                          FHFA13012088

Once we select the method to amortize basis adjustments, we must continue to use that method for the life of the loan or security or group of loans or securities.

## 2.  Contractual method versus retrospective method

### i.  Contractual Method

We calculate an effective yield based on the contractual terms of the loan/security without estimating future prepayments.  We apply the contractual method for individual loans or securities that we do not hold a large number of similar loans or securities or for which we cannot estimate prepayments.

If we purchased a group of loans, we may elect to allocate the total net investment to the individual loans or perform the amortization in the aggregate.  In the latter case, if a portion of the loans prepays or is sold, we will recognize a proportionate amount of the unamortized balance so that the effective yield on the remaining portion of the loans remains unchanged.

### ii.  Retrospective Method

We may aggregate a large number of similar loans and securities for purposes of considering estimates of future principal prepayments and amortizing (or accreting) basis adjustments.

We calculate the constant effective yield amortization using an estimate of prepayments.  Because there will always be a difference between our estimate of prepayments and actual prepayments and because we continually update our estimate of future prepayments, we must recalculate the constant effective yield each reporting period.  Using the recalculated constant effective yield, we adjust our net investment to the amount that would have existed had the new effective yield been applied since acquisition (i.e., the retrospective approach).  We account for the amount of this cumulative adjustment in interest income.

We have determined that a large number of loans is 100.  Similarly, we apply the retrospective method to a security if it is backed by at least 100 similar loans.  We consider a group of loans to be similar if they share the same product type, origination year, implied pass-through rate, and acquisition month/year.  We aggregate Fannie Mae MBS if they share the same coupon band, ticker and origination year.  We aggregate other securities if they share the same coupon band, product type (i.e., use of pool prefix codes to determine similar product types), origination year; and issuer (i.e. Freddie Mac or Ginnie Mae).

Our experience is that prepayments are probable for single-family mortgage loans but not for multi-family loans.

We do not aggregate pieces of a CUSIP for amortization.  We may own two pieces of the same CUSIP that have the same estimate of prepayments; however, we will amortize the basis adjustments of each piece individually.

Once we aggregate a large number of similar loans, we cannot subsequently disaggregate the basis adjustments related to individual loans.

INTERNAL DOCUMENT
C1.4 – Premiums, Discounts, and Deferred Price Adjustments

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    38

CONFIDENTIAL                                                                                   FHFA13012089

PREMIUMS, DISCOUNTS, AND DEFERRED PRICE ADJUSTMENTS                C1.4

### 3. Product Breakdown

The table below shows the amortization methodology that we apply for each major type of loan and security.

**Table V.C.4** - Amortization Methodology Product Breakdown

| Loan / Security Type | Amortization Methodology | Prepayment Estimates | Notes |
|---|---|---|---|
| Fixed rate single-family whole loans | Retrospective | Dealer Median PSAs (Bloomberg) | The company owns millions of single-family mortgage loans (from which groups of similar loans can be created) and prepayments can be reasonably estimated. |
| Agency MBS and REMICs backed by Fixed Rate Collateral | Retrospective | Dealer Median PSAs (Bloomberg) | The company notes these securities are backed by singe-family fixed rate mortgages and that the industry generally estimated prepayments for these securities at a CUSIP level. |
| ARM and Hybrid ARM single-family whole loans | Retrospective | Andrew Davidson and Co. (ADCo) Model | The company owns a significant number of ARM and hybrod ARM loans (from which groups of similar loans can be created) and prepayments can be reasonably estimated. |
| Agency MBS and REMICs backed by ARM Collateral | Retrospective | Andrew Davidson and Co. (ADCo) Model | The company notes these securities are backed by singe-family ARMs and that the industry generally estimated prepayments for these securities at a CUSIP level. |
| Non-agency REMICs | Varies | Dealer Median PSAs (Bloomberg) | See Q&A on Non-agency REMICs |
| Multifamily (MF) whole loans and securities backed by MF loans | Contractual | N/A | Prepayments are significantly lower for Multifamily loans due to various forms of prepayment penalties.  Prepayments are not generally due to external factors like interest rates; difficult to estimate. |
| Mortgage Revenue Bonds | Contractual | N/A | MRBs contain unique and sometimes complex cash flows including mandatory or optional redemptions, prepayment penalties, etc. |
| Securities that do not prepay (e.g. Treasuries, Corporate Bonds) | Contractual | N/A | Securities such as Treasury Notes, T-Bills, corporate bonds, etc. have a stated notional amount that is not subject to prepayments. |

## D. Special Considerations

### 1. Reverse Mortgages

<u>Home Equity Conversion Mortgage (HECM)</u>

We accrue interest income based on the application of the loan's note rate in effect to the loan balance at the beginning of the period, plus current month's disbursements because these loans are guaranteed by HUD.

<u>Home Keeper Mortgage (HKM)</u>

Accounting for HKMs requires estimates of mortality and future home prices in order to recognize interest income and the associated cumulative investment balance.  If the estimated recorded investment does not exceed the projected net proceeds from the collateral disposition under the terms of the contract, then recognizing interest based on the contractual interest rate is appropriate. This approach is appropriate because the retrospective yield would equate to the contractual rate since the terms of the HKM contract do not include an equity participation in the loan above the contractual loan balance at maturity. However, if the estimated loan balance exceeds the projected net collateral value, we will perform a retrospective yield calculation and adjustment, as applicable.  We do not aggregate these loans for the purpose of performing this analysis.

CONFIDENTIAL

FHFA13012090

2. **Adjustable Rate Mortgages**

   We purchase ARMs whose note rate adjusts periodically with an independent factor (e.g. LIBOR + 100bps).  For these loans, we calculate the constant effective yield and amortization schedule by holding the factor constant from inception (or acquisition). Subsequent changes in the independent factor will not result in a change to the amortization schedule.

3. **SF Construction-to-permanent (CtoP) Mortgage Loans**

   We amortize CtoP mortgage loans using the contractual method.  The amortization schedule will include all construction draws and the total premium paid on those draws (representing the total premium of the Construction mortgage).  The amortization schedule will amortize the original fee balances to the contractual maturity date (the combined maturity of the construction and permanent phases).

   If a construction loan does not convert into a permanent loan, any remaining unamortized fees will be recorded to earnings immediately.  If an extension fee is paid to extend the construction phase, then that fee will be added to the remaining, unamortized initial investment, with the remaining UPB amortized to the contractual maturity date.

4. **Energy Loans**

   We purchase unsecured, fixed-rate, home improvement loans that provide homeowners with the ability to finance certain specific energy-related improvements.  We will amortize deferred price adjustments on these loans using a constant effective yield that is based upon the contractual terms of these loans.

5. **Fixed-Rate Convertible Loans**

   We purchase fixed-rate mortgage loans that provide the borrower with an option to adjust the note rate on his/her loan at any time by paying a fee.  We will amortize deferred price adjustments on these loans using a constant effective yield based upon the contractual terms of the loans.  When a borrower converts the mortgage and pays the conversion points, the amount will be added to the remaining unamortized balance with the remaining UPB amortized to the contractual maturity date.  A new amortization schedule will be constructed from the conversion date forward to reflect the new stated rate.

6. **Revolving lines of credit (or similar loan arrangements)**

   For revolving lines of credit (or similar loan arrangements), the net fees or costs are recognized in income on a straight-line basis over the period that the revolving line of credit is active, assuming that borrowings are outstanding for the maximum term provided in the loan contract.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    40

CONFIDENTIAL                                                                            FHFA13012091

**Question 1:   If we consolidate loans/ securities in a Trust under FIN 46R, should we amortize the associated premiums/ discounts in accordance with FAS 91?**

Pursuant to paragraph 18 of FIN 46R, the primary beneficiary of a variable interest entity shall initially measure the assets, liabilities, and non-controlling interests of the newly consolidated entity at their fair values at the date the enterprise first becomes the primary beneficiary. Consequently, when we consolidate a Trust pursuant to FIN 46R, we should initially record the underlying loans/ securities at fair value and replace any previous premium/ discount related to the security with a new premium/ discount. The difference between the fair value of the loan/ security and its UPB on the date of initial measurement represents the new premium/discount.  Also, pursuant to paragraph 22 of FIN 46R as read with ARB 51, we should subsequently account for the consolidated loan/security in the same manner as other loans/securities in our portfolio. Accordingly, the new premium/discount should be subsequently amortized pursuant to FAS 91.

**Question 2:   What is the rate that should be held constant for variable-interest rate securities when calculating the stated interest?**

The inception factor (LIBOR or some other index) that is held constant should be based on the factor at the date that we record the loan/security on our books and not when the loan/security was originated/ issued.

**Question 3:   Are Interest-Only (I/O's) investments that are classified as available-for-sale required to be amortized pursuant to FAS 91?**

No.  I/Os classified as either AFS or trading securities should be amortized using the prospective level yield method pursuant to EITF 99-20.

**Question 4:   Upon the structuring of a MEGA Certificate backed by MBS, should we use the MEGA to project cash flows (i.e. PSA) when estimating prepayments or should the underlying MBS's be used?**

MEGAs that qualify as sales under FAS 140 should be accounted for by considering the MEGA as a security distinct from the underlying MBS.  In such cases, the MEGA is the accounting unit with its own associated premium/discount, if any.  Accordingly, amortization and impairment should be performed at the MEGA level.

MEGAs that do not qualify as sales under FAS 140 are accounted for as if the underlying MBS never left our books.  In such cases, the unit of account is the underlying MBS and accordingly, amortization and impairment should be performed at the underlying MBS level.

**Question 5:   For a dollar roll transaction that is accounted for as a financing, should the projected cash flows (i.e. PSA) of the "rolled-out" CUSIP be used in estimating prepayments or the projected cash flows of the "rolled-in" CUSIP?**

We do not know the actual security that will be "rolled in" until 48 hours prior to the BMA settlement date of the "rolled in" security.  Accordingly, during the period of a dollar roll transaction (the roll period), the projected cash flows of the "rolled out" security should be used for FAS 91 purposes. However, once we can identify the "rolled in" security, the projected cash flows of the 'rolled in' CUSIP should be used to estimate prepayments.  The projected cash flows of the 'rolled in' CUSIP

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    41

CONFIDENTIAL                                                                                              FHFA13012092

should be used because the intent of paragraph 19 of FAS 91 is to record a cumulative adjustment to appropriately adjust an entity's net investment in the security on its books.

**Question 6:  If there are no dealer prepayment speeds available for a particular security may we use the contractual cash flows as our best estimate of future cash flows (i.e. assume no prepayments)?**

Yes.  We use dealer consensus prepayment estimates as our best estimate of future cash flows when those estimates are available.  However, when dealer consensus prepayment estimates are not available, we may use the contractual cash flows as our best estimate of the future cash flows and assume no prepayments.

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 15 | 1/1/1978 | Accounting by Debtors and Creditors for Troubled Debt Restructurings |
| FAS 65 | 1/1/1983 | Accounting for Certain Mortgage Banking Activities |
| FAS 91 | 1/1/1988 | Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases |
| FAS 91 Q&A | 11/1987 | FASB Special Report, A Guide to Implementation of Statement 91 on Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases |
| FAS 114 | 1/1/1995 | Accounting by Creditors for Impairment of a Loan |
| FAS 118 | 1/1/1995 | Accounting by Creditors for Impairment of a Loan- Income Recognition and Disclosures |
| EITF 01-7 | November 2001 | Creditor's Accounting for a Modification or Exchange of Debt Instruments |
| EITF 02-4 | January 2002 | Determining Whether a Debtor's Modification or Exchange of Debt Instruments is within the Scope of Statement 15 |
| SEC letter | 10/1/1992 | Accounting for Reverse Mortgages (letter provided to Providential Corporation) |
| SOP 75-2 | August 1975 | Accounting Practices of Real Estate Investment Trusts |
| SOP 01-6 | 1/1/2002 | Accounting by Certain Entities (Including Entities With Trade Receivables) That Lend to or Finance the Activities of Others |
| AICPA Practice Bulletin 5 | July 1988 | Income Recognition on Loans to Financially Troubled Countries |
| OTS Examination Handbook | Various | Section 212, Appendix B (accounting for reverse mortgages) |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae     42

CONFIDENTIAL                                                        FHFA13012093

**ALLOWANCE FOR LOAN LOSSES AND RESERVE FOR GUARANTY LOSSES**       **C1.5**

## I.  APPLICABILITY

This section of the policy manual addresses our accounting for the allowance for loan losses ("Allowance") on certain loans (single and multifamily) held in our portfolio, including:

- Loans held-for-investment ("HFI");
- Loans underlying MBS, classified as held for investment in our financial statements after having been consolidated into our financial statements pursuant to our FIN 46 consolidation policy governing variable interest entities (lender swap transactions);
- Loans underlying our portfolio private label investments that are consolidated as loans pursuant to our FIN 46 policy;
- Delinquent loans, such as loans purchased out of pools pursuant to our guaranty ("MBS 4+ loans"), that are subject to the accounting provisions of SOP 03-3, *Accounting for Certain Loans and Debt Securities Acquired in a Transfer* ("SOP 03-3");
- Loans in trusts that were securitized from our balance sheet that are re-recognized on our balance sheet after 4 consecutive months of non-payment pursuant to EITF 02-9, *Accounting for Changes That Result in a Transferor Regaining Control of Financial Assets Sold* and are subject to the accounting provisions of SOP 03-3;
- Loans modified in minor or more than minor modification (other than a Troubled Debt Restructuring) that are classified as held-for-investment; and
- Loans acquired in connection with our long-term stand-by commitment program that are classified as held-for-investment.

This section also addresses our accounting for the Reserve for Guaranty Losses ("Guaranty Liability[1]") related to our off-balance sheet exposure on:

- Fannie Mae-guaranteed MBS held by third parties;
- Fannie Mae-guaranteed MBS held by us, issued either through a FIN 45 lender-swap transaction or a portfolio transfer subject to FAS 140 (i.e., cases where we hold less than 100% of the securities in lender swap transaction and 90% or less in portfolio transfers);
- Guarantees of private label securitizations; and,
- Long-term standby commitments, whereby we enter into an agreement to buy loans from a specific pool of mortgages if certain events occur.

This policy does not apply to:

- Loans initially and subsequently measured at fair value or the lower of cost or market. Such loans would include loans classified as held for sale ("HFS") pursuant to FAS 65[2] (which are carried at the lower of cost or market), including loans consolidated on our balance sheet as a result of us owning more than 90% of the securitized assets in a trust for which we were considered the transferor that we classify as HFS.[3]
- Debt securities that we hold for investment and are not subject to our guaranty, as defined by FAS 115. Debt securities are subject to the other-than temporary provisions of FAS 115. See C1.2, *Securities*, for impairment considerations on securities.

---

[1] See Section C2.3 – Guarantee Obligations
[2] Loans held for securitization or sale are carried at LOCOM with a separate "valuation allowance" for loans where the carrying value is less than cost (the market value takes into consideration credit quality concerns as applicable).
[3] FAS 140, Paragraphs 36 and 55.

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          43

CONFIDENTIAL                                                                                              FHFA13012094

**ALLOWANCE FOR LOAN LOSSES AND RESERVE FOR GUARANTY LOSSES**       **C1.5**

This policy is effective as of January 1, 2006.

## II.  POLICY

### A.  Recognition and Measurement

#### 1.    Components of Our Allowance

Our Allowance and Guaranty Liability, reported separately on our balance sheet, consists of two components:

- A component for individual loan impairment recognized and measured pursuant to the provisions of FAS 114 (for only loans held in portfolio) and,

- A component for collective loan impairment recognized pursuant to the provisions of FAS 5 and measured consistently and documented in accordance with relevant authoritative accounting and supervisory literature including SEC Staff Accounting Bulletin (SAB) 102, *Selected Loan Loss Allowance Methodology and Documentation Issues*, and the FFIEC Allowance accounting guidance, *Policy Statement on Allowance for Loan and Lease Losses Methodologies and Documentation for Banks and Savings Institutions*, issued in July 2001.

All portions of our Allowance must be supported by "objectively verifiable" written documentation. Unallocated Allowances without sufficient supporting documentation are not permitted.

Our single-family loans are not individually evaluated for impairment unless (a) the loan is restructured in a troubled debt restructuring or (b) the loan is subject to SOP 03-3 for which impairment is measured pursuant to FAS 114.  Therefore, FAS 114 generally does not apply to single-family mortgage loans.

Our multifamily loans are individually evaluated to determine if they are deemed impaired.   Once a loan (single or multifamily) is considered individually impaired under FAS 114, we are precluded from recognizing additional impairments under a FAS 5 impairment model (i.e., impaired loans are removed from the population of loans subject to FAS 5 collective impairment measurement).[4] However, if we specifically identify a loan for impairment evaluation under FAS 114 and conclude the loan is not impaired, we include it in our FAS 5 assessment if characteristics of the loan indicate it is probable that there would be an incurred loss in a group of loans with those characteristics.[5]

The components of our Allowance are recognized through an increase or decrease to the provision for credit losses account and a corresponding increase or decrease to the Allowance or Guaranty Liability, as applicable.

#### 2.    FAS 114 Individual Loan Impairment

##### a)   Scope

We have identified the following single-family and multifamily loans in our portfolio that are within the scope of FAS 114 and assessed for individual loan impairment:

---

[4] FAS 114 Q&A, Question 12.
[5] FAS 114 Q&A, Question 10

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          44

CONFIDENTIAL                                                                         FHFA13012095

- Multifamily loans that meet the criteria of being individually impaired that are held in our portfolio;

- Loans that are restructured in a troubled debt restructuring (single and multifamily); and

- Single and multifamily loans that show evidence of credit deterioration since origination where it is probable that we will be unable to collect all contractually required payments receivable, that are in the scope of SOP 03-3 and measured for impairment consistent with the provisions of FAS 114, including, but not limited to:

  o  Nonperforming, delinquent loans purchased out of pools in connection with our guaranty, or MBS 4+ loans;
  o  Loans in trusts that were securitized from our balance sheet that are re-recognized on our balance sheet after four consecutive months of nonpayment pursuant to EITF 02-9; and
  o  Loans that we consolidate pursuant to FIN 46R that are placed on nonaccrual at the time of consolidation.

### b)  Recognition

Loans are individually evaluated for impairment under FAS 114 when, based on current information and events, it is probable that we will be unable to collect *all amounts due according to the contractual terms* of the loan agreement.[6]  However, an insignificant delay or insignificant shortfall in amount of payments does not require application of the provisions of FAS 114.[7]

*All amounts due according to the contractual terms* include both contractual principal and interest.  When determining whether we will collect all cash flows on a loan according to the loan's contractual terms we only consider the borrower's ability to pay and do not consider other cash flows (i.e., mortgage insurance or loss sharing) when making a determination as to whether a loan is individually impaired under FAS 114.

### i.  Single-Family Loan Considerations

Single-family loans (a) restructured in a troubled-debt restructuring where we have granted a concession to the borrower or (b) within the scope of SOP 03-3, are subject to the impairment measurement provisions of FAS 114.[8]

### ii.  Multifamily Loan Considerations

### a)  Risk Ratings

As discussed in the Business Overview, multifamily loans (including non-performing multifamily loans purchased out of pools or MBS 4+ multifamily loans that are classified as held for investment are subject to a periodic evaluation whereby individual loans are categorized into risk ratings (single-family loans are not individually risk rated).

---

[6] FAS 114, Paragraph 8 and FAS 114 Q&A, Question 7.
[7] FAS 114, paragraph 8. Fannie Mae has concluded that deferment of payments on a loan no longer than 3 consecutive months qualifies as an insignificant delay.
[8] Refer to Section C1.3 – Loans for further discussion on Accounting for Troubled Debt Restructurings and other loan modifications.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          45

CONFIDENTIAL                                                                          FHFA13012096

The categorization is based on relevant information about the ability of the borrowers to service their debt. Our risk rating of loans includes a classification system that is consistent with the regulatory guidance established in the *Interagency Policy Statement on Classification of Commercial Real Estate Loans*, dated June 1, 1993. These definitions include:[9]

- **Special Mention.** Loans are classified as special mention due to potential weaknesses of the borrower that deserve our close attention. A loan that is identified as a special mention loan is not necessarily individually impaired under FAS 114; rather, certain conditions exist (i.e., delinquency) that would suggest a closer examination of the loan is required to determine whether the loan is individually impaired under FAS 114. Examples of potential weaknesses include poor underwriting on loans or other defects; lack of current financial information about the borrower and related collateral; or current economic or market conditions that, in the future, may affect the borrower's ability to make contractually due principal and interest payments.

- **Substandard.** Characteristics of a substandard classification include loans that are (a) inadequately protected by the paying capacity or underlying collateral, (b) other weakness of the borrower that would jeopardize the liquidation of the loan, and (c) based on the current information obtained, we conclude that there is a distinct possibility that the we will sustain some loss if the deficiencies of the borrower are not addressed or corrected. These loans are specifically identified for impairment, but may not be considered individually impaired under FAS 114 and accordingly, may be subject to a collective loan impairment assessment under FAS 5.[10]

- **Doubtful.** Loans classified as doubtful have all the characteristics of a substandard loan, with an added attribute that the we believe collection of all contractual principal and interest due on the loan is no longer probable. *Probable* is a higher standard than '*possible*' and '*more likely than not*'[11], and we define probable to mean that the probability of not receiving all contractual cash flows of a loan is greater than 75%. Loans that meet this classification have met the impairment criteria under FAS 5 and FAS 114, and are subsequently measured for impairment under the provisions of FAS 114.

- **Loss.** Loans classified as loss are loans that maintain the attributes of a doubtful loan and were evaluated for impairment individually under FAS 114. In addition, loss loans are loans with such little value that their continuance as bankable assets to us is not warranted, the loan is considered worthless and is charged-off. This classification does not mean that the loan has no recovery or salvage value but, rather, the likelihood of collection no longer supports recognizing the asset.

Loans that do not meet these risk categorizations or delinquency trends are stratified among Pass ratings for purposes of measuring collective loan impairment under FAS 5. There is no formal regulatory definition of a "pass" rating and regulatory ratings do not distinguish among pass credits.[12] As it applies to the Allowance calculation, loans receiving a pass rating do not have potential weaknesses which require close monitoring or special attention by us, as is the case with loans classified as special mention, substandard, doubtful, or loss.

---

[9] AICPA 2005 Audit Guide, Depository and Lending Institutions, Sections 9.09 through 9.11.
[10] FAS 114 Q&A, Question 10.
[11] FASB Viewpoints article, "Application of FASB Statements 5 and 114 to a Loan Portfolio", Q&A 8
[12] OCC Comptrollers Handbook – Rating Credit Risk, April 2001

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL

FHFA13012097

### b)      Evaluation for Impairment

Loans having a risk rating of Special Mention or worse are further evaluated to determine whether it meets the definition of an individually impaired loan pursuant to FAS 114.

The impairment evaluation considers, among other things:

- The past due status of the loan;
- The current economic and financial capacity of the borrower to preclude a default (debt service coverage ratios);
- The willingness of the borrower to provide support necessary to preclude a default (including the potential for successful resolution of a potential problem through modification of terms); or
- The borrower's equity position in the underlying collateral based on our best estimate of the fair value of the collateral.

The results of the above review may result in a further downgrade of the loan to substandard, doubtful or loss. Multifamily loans classified as doubtful or loss, maintain attributes that would suggest it is not probable that all contractual principal and interest on loans is collectible. As such, these loans will be measured individually for impairment under FAS 114.[13]

Multifamily loans that are covered by our guaranty are also subject to an individual evaluation for impairment measurement.  Although within the scope of FAS 5, we apply this FAS 114 measurement process to off-balance sheet multifamily loans to ensure we appropriately capture guaranty losses on loans that may be significantly delinquent in trusts where we may not have exercised our option to buy the loan out of the pool.

### c)      Measurement

#### i)      Initial Measurement

We measure impairment on an individually impaired loan based on one of the following two methods:[14]

- The present value of expected cash flows discounted at the loan's original effective interest rate; or
- The fair value of the underlying collateral, as a practical expedient, if the loan is considered collateral dependent.

Our measurement of impairment is based on our single best estimate and not a range of estimates.[15]  We follow the method that is most consistent with our reasonable expectation for the recovery of our recorded investment in the loan.  When a loan is identified as being individually impaired under FAS 114, we measure impairment by comparing our recorded investment in the impaired, nonperforming loan to the fair value less cost to sell of the underlying collateral, unless the loan is restructured in a troubled debt restructuring ("TDR").[16]

---

[13] FAS 114, paragraph 8.
[14] FAS 114, paragraph 13.
[15] FAS 114, paragraph 14.
[16] FAS 114, paragraph 69.

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          47

CONFIDENTIAL                                                                                          FHFA13012098

**ALLOWANCE FOR LOAN LOSSES AND RESERVE FOR GUARANTY LOSSES          C1.5**

When a loan is restructured in a TDR, we apply the present value method to measure impairment.

> **ii)      Present Value Method - Subsequent Evaluation of Future Cash Flows**

At each balance sheet date we evaluate our expectation of future cash flows on individually impaired loans to determine the adequacy of the Allowance established for impaired loans. If at the balance sheet date, (a) there is a significant change (increase or decrease) in the amount or timing of the expected future cash flows of the impaired loan, (b) actual cash flows are significantly different from the cash flows previously projected or (c) when certain circumstances are presented that would suggest we will not recover all expected future cash flows associated with the impaired loan based on the restructured terms (i.e., foreclosure is probable or if the underlying collateral is significantly damaged), we will recalculate the impairment on the loan by applying the present value methodology based on the new expected cash flows or the fair value less costs to sell of the collateral when foreclosure is probable.[17]  When an individually impaired loan is subsequently placed on non-accrual is an example of an event that would significantly impact our expectation of future cash flows on a loan. Changes in our measurement of impairment (both increases and decreases) are accounted for through the provision for credit losses.

> **iii      Loans subject to the accounting provisions of SOP 03-3[18]**

> **a)      Recognition and measurement of impairment**

We initially measure SOP 03-3 loans at their fair value and we do not carry over an allowance on these loans.  The allowance we recognize on these loans reflects credit losses that we have incurred subsequent to acquisition of the loan.

For loans subject to SOP 03-3, we measure impairment on an individual loan basis consistent with the provisions of FAS 114.  When a loan subject to SOP 03-3 goes from non-performing to performing status, any impairment recognized subsequent to acquisition is reversed as we now expect to collect all contractual principal and interest payments on the loan.

> **iv.      Interest Income**

See Policy Manual Section C1.3 – Loans

> **3.    FAS 5 Collective Loan Impairment**

> **a) Scope**

> **i.   On-balance Sheet**

We have identified the following single-family and multifamily mortgage loans in our portfolio that are within the scope of a FAS 5 collective loan impairment:

---

[17] FAS 114, paragraph 16.
[18] Refer to Policy Manual Section C1.3, *Loans*, for further background on the provisions of SOP 03-3.

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          48

CONFIDENTIAL                                                                            FHFA13012099

ALLOWANCE FOR LOAN LOSSES AND RESERVE FOR GUARANTY LOSSES          C1.5

- Large groups of homogenous loans classified as held for investment and leases[19] that are evaluated for impairment collectively based on similar risk attributes.
- A multifamily loan held for investment, which is not considered individually impaired (even if we specifically identified the loan for impairment evaluation under FAS 114, but concluded the loan was not individually impaired), if specific characteristics of the loan indicate that it is probable that there would be an incurred loss in a group of loans with those characteristics.[20]
- Modified loans classified as held for investment not considered troubled debt restructurings.
- Loans underlying MBS securities classified as held for investment in our financial statements after having been consolidated pursuant to FIN 46 (lender swap transactions) that do not have evidence of credit deterioration since origination at the time of consolidation.

### ii.  Off-balance sheet

Loans that are covered by our guaranty and are carried off-balance sheet that are included as part of our collective loan impairment model under the provisions of FAS 5, include the following:

- Loans underlying Fannie Mae-guaranteed MBS held by third parties;
- Loans underlying Fannie Mae-guaranteed MBS held by us, issued either through a FIN 45 lender-swap transaction or a portfolio transfer subject to FAS 140 (i.e., cases where we hold less than 100% of the securities in lender swap transaction and 90% or less in portfolio transfers);
- Loans subject to our guarantees of private label securitizations; and,
- Long-term standby commitments, whereby we enter into an agreement to buy loans from a specific pool of mortgages if certain events occur.

### b)  Recognition

The following discusses when we recognize collective impairment on a loan or a pool of loans and how we measure impairment collectively on a pool of loans.

### i.  General

Losses on loans collectively evaluated for impairment under FAS 5 are accrued by a charge to the provision for credit losses in the income statement when:[21]

- Information available prior to the issuance of the financial statements indicates that it is probable that a loan has been impaired; and
- The amount of the loss can be reasonably estimated.

The objective is to recognize impairment on loans in the period in which impairment occurred and not to provide for future losses. Since we collectively evaluate the loans for impairment, we typically are unable to identify a single distinct event that gives rise to the impairment of an individual loan or pool of loans; rather, we have determined that the accumulation of a series of

---

[20] FAS 114, Q&A, Question 10.
[21] FAS 5, Paragraph 8.

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          49

CONFIDENTIAL

FHFA13012100

**ALLOWANCE FOR LOAN LOSSES AND RESERVE FOR GUARANTY LOSSES        C1.5**

historical events that have occurred over time will result in the recognition of impairment of an individual loan or pool of loans.

Therefore, rather than attempting to identify a specific loss-causing event in order to justify the recognition of impairment, we utilize a concept of loss emergence (referred to as the "loss confirmation period") to estimate incurred losses that exist as of the balance sheet date.

As illustrated below, the loss emergence/confirmation period can be thought of as including two different time frames: the time from loss event to discovery of the event, and the time from discovery of the event to confirmation of the loss through foreclosure and/or charge-off.

$$\text{Event} \longrightarrow \text{Discovery} \longrightarrow \text{Confirmation}$$

In determining our FAS 5 allocation, we look at the average lag between the loss event and the confirmation of that loss. Our basis for estimating the loss confirmation period must be sufficiently documented, consistently applied between periods, and assessed for relevance at each balance sheet date based on changes in observable data or the characteristics of loans evaluated for impairment. For example if our analysis shows that for single-family loans it takes 2 years between the event and confirmation, our Allowance for single-family loans should not have a coverage ratio of 5 years of net charge-offs unless other factors are present that indicate this is appropriate.

### ii. Single-family

Our single-family loans (except for loans restructured in a troubled-debt restructuring or subject to SOP 03-3) are collectively evaluated for impairment pursuant to FAS 5 since we have concluded that our single-family loan portfolio is considered to be a "large group of smaller-balance homogeneous loans" as provided by the exception from analyzing loans individually under FAS 114. Single-family loans that meet the criteria of a troubled debt restructuring are reviewed individually for impairment as discussed in section II.A.2.b.i. above. Single-family loans that are accounted for under SOP 03-3 are also reviewed individually for impairment and discussed in Section II.A.2.c.iii, above.

### iii. Multifamily

Multifamily loans that are not considered individually impaired or are not subject to the requirements of SOP 03-3 are collectively evaluated for impairment pursuant to FAS 5. Multifamily loans are subject to a periodic evaluation whereby individual loans are categorized into risk ratings. These risk ratings are the vehicle for aggregating multifamily loans into similar risk pools for purposes of measuring collective loan impairment under the provisions of FAS 5.

### c)  Measurement

### i.  General

The FAS 5 component of our systematic Allowance methodology includes:

a)        The aggregation of loans based on similar loan characteristics and risks.

CONFIDENTIAL                                                                 FHFA13012101

- Examples include origination year, loan-to-value ratios, risk ratings, and loan type. As economic and business conditions change we may adjust the manner by which loans are aggregated.

b)    The use of observable data, including historical net charge-off experience and other information, adjusted as necessary, to ensure the Allowance recognized is reflective of current trends and conditions.

- Historical loan default and charge-off experience (severity) serve as our primary basis for recognition and measurement of collective impairment for aggregated pools of loans.  The period we use to develop our historical loss or severity rate is long enough to capture sufficient loss data.  In addition, our process includes an assessment of the range of our historical credit losses to ensure that (a) the severity data is sufficient for analytical purposes and (b) is relevant to our current portfolio of loans.
- Primary drivers of adjustments to our historical basis include a variety of quantitative and qualitative factors (see separate discussion below for specific single-family and multifamily considerations). SAB 102 outlines the following factors that we consider in developing loss measurements (i.e. adjustments to observable data)[22]:

    o   Level of and trends in delinquencies and impaired loans;
    o   Level of and trends in charge-offs and recoveries;
    o   Trends in volume and terms of loans;
    o   Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;
    o   National and local economic trends and conditions;
    o   Industry conditions; and
    o   Effects of changes in credit concentrations, including an assessment of certain loan products in portfolio that give rise to a concentration of credit risk or heightened credit risk.  Examples of features that may increase our credit risk include:

        o   Terms that permit principal payment deferral or payments smaller than interest accruals (negative amortization);
        o   A loan with a high loan-to-value ratio;
        o   Multiple loans on the same collateral that when combined result in a high loan-to-value ratio;
        o   Option adjustable-rate mortgages ("option ARMs") or similar products that may expose the borrower to future increases in repayments in excess of increases that result solely from increases in the market rate of interest;
        o   An initial interest rate that is below the market interest rate for the initial period of the loan term and that may increase significantly at the end of that period; and
        o   Interest only loans.

---

[22] SAB 102 lists "Experience, ability and depth of lending management and other relevant staff" as a factor we should consider. Based on the fact that we do not originate loans or serve as the primary servicer, we do not feel this is applicable to us.

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

51

CONFIDENTIAL                                                                      FHFA13012102

- We adjust historical loss experience for unusual matters that existed in the past and are not expected to occur again.
- We also consider estimated proceeds from primary mortgage insurance considered contractually attached to a loan and certain forms of loan level credit enhancement provided by the lender (see section II.J).
- We consider whether there is directional consistency between the increase and decrease in our Allowance and observable data (i.e. delinquencies, underwriting trends, etc).

c) Only those Loan Losses that have been incurred at the balance sheet date, though the losses may not be confirmed at the balance sheet date;

- For example a borrower may become severely delinquent during the current period (which indicates a loss may be probable), but the actual charge-off (confirmation of a loss) may not occur until after the balance sheet date (for example when we foreclose on the collateral).

d) Sufficient documentation (see section II.B.2 of this policy section, which discusses our minimum documentation requirements) to support management's assumptions; and

e) An ongoing validation requirement to ensure the methodology's compliance with authoritative accounting literature and to ensure the techniques employed represent management's best estimate of Loan Losses. This includes the following:

- Review of trends in loan volume, delinquencies, restructurings, concentrations and other observable data;
- Review of previous charge-off and recover history, including an evaluation of the timeliness of the entries to record both charge-offs and recoveries;
- Review by a party that is independent of the loan loss Allowance estimation process, which often includes the independent party reviewing, on a test basis, source documents and underlying assumptions to determine that the established methodology develops reasonable loss estimates;
- An evaluation of the appraisal process of the underlying collateral, which may be accomplished by periodically comparing the appraised value to the actual sales price on selected properties sold;
- A review of the accuracy and completeness of our allocation between the on and off-balance sheet Allowance;
- A review of our aggregation techniques for loans based on similar risk characteristics for accuracy to ensure the risk attributes are relevant to the current book of business; or,
- Utilization of corroborating models to evaluate the reasonableness of the credit loss estimates derived from the primary models.

### ii. Single-family

Primary drivers of changes in the level of default and/or charge-off for single-family loans include:

- Housing prices;

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          52

CONFIDENTIAL                                                                FHFA13012103

- Interest rates (borrowing rates of interest);
- Acquisition volumes and average age of the portfolio;
- Origination FICO Score and ACI Score trends;
- Origination LTV trends;
- Serious delinquency and MBS 4+ acquisition trends and cure rates;
- Charge-off trends;
- Default trends; and,
- Recoveries from primary mortgage insurance and make-whole proceeds, both considered contractually attached to a loan, and certain forms of loan level credit enhancement.

### iii. Multifamily

Primary drivers of changes in the level of default and severity rates for multifamily loans include:

- Risk rating trends;
- Occupancy rates;
- Rental rates;
- Capitalization rates;
- Competitive underwriting forces; and,
- Watch list trends.

## B. SAB 102 Considerations

In addition to our review of all loans and detailed analysis of both single-family and multifamily loan portfolios at each balance sheet date, the provisions of SAB 102 require that our Allowance methodology be well documented, and follow a systematic approach that incorporates our current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process as discussed below.[23]

### 1. Systematic Allowance Methodology

SAB 102 requires that our overall systematic allowance methodology[24]:

- Include a detailed analysis of the loan portfolio, performed on a regular basis;
- Consider all loans;
- Identify loans to be evaluated for impairment on an individual basis under FAS 114 and segment the remainder of the portfolio into groups of loans with similar risk characteristics for evaluation and analysis under FAS 5;
- Consider all known relevant internal and external factors that may affect loan collectibility;
- Be applied consistently but, when appropriate, be modified for new factors affecting collectibility;
- Consider the particular risks inherent in different types of lending;
- Consider current collateral values (less costs to sell) where applicable;
- Require that analyses, estimates, reviews and other credit loss allowance methodology functions be performed by competent and well-trained personnel;

---

[23] SAB 102, Section 2.A
[24] SAB 102, question 1

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae        53

CONFIDENTIAL                                                                                FHFA13012104

**ALLOWANCE FOR LOAN LOSSES AND RESERVE FOR GUARANTY LOSSES**　　**C1.5**

- Be based on current and reliable data;
- Be well documented, in writing, with clear explanations of the supporting analyses and rationale; and
- Include a systematic and logical method to consolidate the loss estimates and ensure the credit loss allowance balance is recorded in accordance with GAAP.

### 2. Documentation

At a minimum we maintain written documentation of the following decisions, strategies, and processes in accordance with SAB 102:

- Detailed description of our systematic methodology, demonstrating our consistency with the accounting policies outlined in this policy;
- Policies and procedures:
  - Over the systems and controls that maintain an appropriate loan loss Allowance, and
  - Over the loan loss allowance methodology.
- Significant assumptions and calculations performed in connection with our loss estimation model as well as the method used to determine loan loss measurements under FAS 5.
- Loan grading system or process;
- Summary or consolidation of the loan loss allowance balance;
- Validation of the loan loss allowance methodology;
- Periodic adjustments to the loan loss allowance process;
- The method for identifying loans to be analyzed individually and how impairment is measured;
- How loans with similar characteristics are grouped when evaluated collectively;
- The technique for developing our loss rates including the period of time over which losses were incurred;
- Descriptions of qualitative factors;
- When a range of loss is determined, maintain documentation to support the identified range and rationale used for determining which estimate is the best estimate within the range of losses; and
- Reconciliation of detailed sub-schedules of loss estimates to the amount recorded in the financial statements.

Examples of documentation we should maintain to support our measurement of impairment on an individual loan under FAS 114 based on the fair value of the underlying collateral includes:[25]

- How the fair value was determined including the use of appraisals, valuation assumptions and other supporting calculations;
- The supporting rationale for adjustments to appraised values, if any;
- The determination of costs to sell, if applicable; and
- Appraisal quality and the expertise and the independence of the appraiser.

### C. Other Projected Risks (OPR)

---

[25] FFIEC 2006 Policy Statement on the Allowance, Question #6.

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL

FHFA13012105

From time to time we may determine that there are credit risks in the portfolio that are better estimated outside the core single-family or multifamily models. This may be the case if:

- The risk profile of the loan product under consideration is deemed to be significantly different from products included in the core model;
- The product is new, growing and has limited default or loss experience warranting separate analysis until such time as it can be appropriately captured within the core model;
- The product is in run-off and its default and/or loss experience is sufficiently unique as to warrant carving the product out from the core portfolio for the remainder of its life; and
- The risk exposure is distinct in nature (e.g., counterparty risk).
- Recent significant events that are not yet reflected in the historical measures (e.g. September 11, 2001 terrorist attacks, Hurricane Katrina, etc).

Examples of OPR's that have been or currently are modeled outside of the core Loan Reserve Model are:

- Title 1 loans;
- Energy Loans;
- Private Label REMICs / Manufactured Housing Wraps;
- Underserved Channel Loans;
- FHA and VA loans;
- Loans impacted by Hurricane Katrina; and
- Reverse Mortgages.

Certain loans that give rise to a concentration of credit risk or heightened credit risk by their nature, including interest-only loans and negative amortization loans, are examples of other loans that may also warrant an OPR evaluation outside of the overall allowance methodology due to their differing credit characteristics from our overall loan portfolio.

### D.  Allocation Between Allowance and Guaranty Liability

We estimate incurred credit losses associated with our off-balance sheet exposures at the same time we estimate incurred losses associated with loans we hold in portfolio. Though loans both on and off-balance sheet are subject to the same segmentation criteria in the Allowance methodology, the credit characteristics of loans on or off-balance sheet can differ at each balance sheet date (i.e., loans on balance sheet are of greater risk due to the MBS 4+ event[26]).

We reflect these differing credit attributes in the financial statements by allocating the FAS 5 Allowance between the Allowance and the Guaranty Liability based on where the greater inherent credit risk exists in our portfolio. That is, a larger portion of our allowance is allocated to the segment of our on or off-balance sheet portfolio where the greater credit risk exists. For example, as we purchase repurchase loans out of trusts after four consecutive months of non-payment, there is a greater likelihood that loans on our balance sheet are more delinquent than loans held off-balance sheet in trusts.  Accordingly, as loans of higher delinquency are more likely to default than current loans, a larger portion of our Allowance is allocated to loans held in

---

[26] See the loan policy, section C1.3 for a definition of a "MBS 4+ event"

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae        55

CONFIDENTIAL

FHFA13012106

portfolio.  In determining where greater credit risk exists, we consider the criteria discussed in section II.A.3.c, above.

### E. Range of Estimated Losses

When our systematic Allowance methodology results in a range of impairment measurement, we accrue the amount within the range that appears at the time to be a better estimate than any other amount within the range. When no amount with in the range is a better estimate than any other amount, the minimum amount of the range is accrued.[27]

### F. Provision for Credit Losses

Additions to or reductions of the Allowance and Guaranty Liability accounts are made through charges or credits to the provision for credit losses account.

### G. Charge-offs

Charge-offs represent the confirmation of a loss and are recorded as a decrease to the loan and Allowance balances. We charge-off a loan in connection with the full satisfaction of our recorded investment in the loan. Such examples include receipt of assets such as residential real estate property at foreclosure, or cash in a pre-foreclosure sale, representing full satisfaction of our recorded investment in a loan pursuant to FAS 15.  The difference between the fair value less selling costs of the asset and our recorded investment in the loan is recognized through a charge to the Allowance is recognized upon the earlier of:

- The loan foreclosure event (i.e., legal title transfer proceedings having taken place); or,
- When we take physical possession of the property (i.e., deed in lieu transaction).

In the context of single-family loans, partial charge-offs would often not occur as we don't charge-off loans until we foreclose. An exception to this policy is when we grant a concession to the borrower (i.e. a trouble debt restructuring) resulting in a forgiveness of principal and/or interest.

For multifamily loans partial charge-offs will occur when we do not expect full repayment of the amounts contractually due.

When we fully or partially charge-off of a specific loan that is uncollectible, we are effectively establishing a new cost basis for the loan. Consequently, once a new cost basis has been established for a loan through a direct charge-off, this cost basis may not be "written up" at a later date. The following formulae detail the components of the charge-off calculation at the time of foreclosure for both single-family and multifamily loans:

---

[27] FIN 14, paragraph 3

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

56

CONFIDENTIAL

FHFA13012107

**Cash Loan**

Loan UPB
+        Any accrued interest recorded in the financial statements prior to the loan being placed on non-accrual
+/-      Basis adjustments amortized on a contractual basis pursuant to FAS 91
-        Estimable and probable investor or lender primary mortgage insurance proceeds treated as a recovery to the loan (capped at estimated loss amount)
+        Estimated selling costs of the foreclosed property acquired (if property is classified as held for sale)
-        Estimated fair value of the property acquired at foreclosure

=        Charge-off (gain)[28] loss

**MBS 4+/Foreclosed Loan Purchased out of Pools**
Loan UPB

-        Initial fair value cost basis adjustment established at acquisition pursuant to SOP 03-3
+        Passed through interest purchased with the loan
+        Any accrued interest recorded on the loan while the loan was performing (placed back on accrual status)
+/-      Basis adjustments amortized on a contractual basis pursuant to FAS 91 (including credit discounts recognized on loans purchased out of PPS pools between April 2, 2003 and December 31, 2004)
-        Estimable and probable investor or lender primary mortgage insurance proceeds treated as a recovery to the loan (capped at estimated loss amount)
+        Estimated selling costs of the foreclosed property acquired (if property is classified as held for sale)
-        Estimated fair value of the property acquired at foreclosure

=        Charge-off (gain)[28] loss

Unamortized basis adjustments on loans that are aggregated for purposes of applying FAS 91 prepayment method of amortization are not included as part of our recorded investment in a loan when calculating the amount of the loan charged-off.

Loans that we acquired at a discount due to credit through December 31, 2004 continue to remain subject to the income recognition and impairment provisions (as amended by SOP 03-3) of PB 6.[29] At each balance sheet, we compare our estimate of a FAS 5 Allowance on these loans to the unamortized PB 6 discount and only an incremental Allowance is recorded should our FAS 5 allowance estimate exceed the unamortized credit discount.

When a loan with a specific Allowance reserve (i.e., TDR impairment on single or multifamily loans, or FAS 114 individual loan impairment on multifamily loans) is foreclosed upon or

---

[28] Should the fair value less costs to sell of the foreclosed property exceed our recorded invest in the loan at foreclosure such excess is applied as a recovery as discussed in the Recovery section of this policy
[29] Refer to Policy Manual Section C1.3, *Loans*, for further background on our accounting under PB 6.

liquidated, the associated loss at foreclosure is recognized as a charge-off of that associated specific FAS 114 Allowance.

### H. Recoveries

Recoveries are accounted for as an increase (credit) to the Allowance. We consider the receipt of assets in full satisfaction of a loan at foreclosure to represent collection of contractual principal and interest on the loan. Accordingly, to the extent that the fair value less cost to sell of the REO property exceeds our recorded investment in the loan at foreclosure, such excess is applied:

- First, as a recovery of any previously charged-off, contractually due principal on the loan;
- Second, as a recovery of any previously charged-off recorded accrued interest on the loan;
- Third, to recover any foregone contractually due interest on the loan, after the loan became 90 days or more delinquent pursuant to our non-accrual accounting policy; and,
- Finally, any unallocated excess is recorded as a credit to foreclosed property expense.

### I. FIN 46 Considerations

When we determine that we are the primary beneficiary to a trust that is a variable interest entity ("VIE") under FIN 46R, we consolidate the assets (loans) and liabilities of the trust at fair value. When loans are consolidated under FIN 46R, we perform an evaluation to determine whether the loans show evidence of credit deterioration since origination upon consolidation. This assessment is performed at an individual loan level, where possible, to determine whether the loans in the trust are 3 months or more past due, and therefore placed on nonaccrual status at the time of consolidation. If we determine that credit deterioration has occurred such that the loans are placed on nonaccrual status at the time of acquisition, we measure impairment on the loans subsequent to acquisition in accordance with the provisions of SOP 03-3 and FAS 114 (see discussion at II.A.2.c.iii).

### J. Other Considerations

#### 1. Credit enhancement considerations [30]

To protect us from the risk of credit losses in the event of borrower default on certain mortgages held in portfolio or underlying an MBS security, we often purchase loans subject to primary mortgage insurance ("PMI") or are provided other credit enhancement vehicles upon purchase of a loan or a pool of loans by a lender. In the allowance calculation, the inclusion, or exclusion, of the cash flows from these credit enhancements as a reduction of the credit loss is dependent upon whether the insurance or credit enhancement is (a) contractually attached to a loan or (b) the lender provided credit enhancement meets all of the following criteria:

---

[30] Refer to separate accounting policy memo *Accounting for single-family credit risk management programs (forms of credit enhancement),* for further detail on our accounting for single-family mortgage insurance and credit enhancement programs.

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL

    (i)    Entered into contemporaneous with the purchase of loans or conveyance of loans to a trust in connection with our guaranty;

    (ii)   The price paid for the loan or the guaranty fee charged was specifically negotiated based on the fact that there was lender provided CE from a creditworthy counterparty; and

    (iii)  Provides credit loss protection at the loan level.

Forms of insurance or lender provided credit enhancement are considered contractually attached to the loan contract when, based on a legal assessment, (a) the insurance was entered into or existed contemporaneous with our purchase of the individual loan, and (b) the insurance is attached to the loan such that the insurance contract is part of and trades with the loan contract, even to a trust.[31]   Accordingly, proceeds from insurance considered contractually attached to an individual loan are treated as a reduction of the charge-off and an asset is established to the extent of the loss if deemed estimable and probable of collection.[32]   Proceeds from insurance contracts and credit enhancements not considered contractually attached to an individual loan, such as pool level insurance, are recognized in foreclosed property expense when received.

Fannie Mae paid pool insurance proceeds are not applied as a recovery as these agreements may not be entered into contemporaneous with a loan purchase or guaranty transaction.

We establish an asset for our expectation of proceeds from lender provided CE, contractually attached or unattached, provided the proceeds are estimable, probable of collection and all contingencies related to recovery of the proceeds have been relieved, up to the extent of the loss recognized.  The asset we recognize for contractually attached insurance and lender provided CE is established at the time of charge off not to exceed the amount of charge-off loss.  Proceeds from the contractually attached insurance and lender provided CE are applied to reduce the charge off.  Any excess contractually attached insurance or lender provided CE is recognized in foreclosed property expense (FPE).  Proceeds for unattached CE are applied to reduce the CE receivable asset established, if any, then to FPE.  If no CE receivable is established due to contingency related issues, or not established at the time of charge off, all proceeds are recognized in FPE unless recovered.

Accordingly, Fannie Mae views any recovery from MI expected in excess of covered losses incurred to represent a gain contingency.  No gains are recognized at the time the MI receivable is established.  Rather, gains from MI proceeds are recognized when realized.

Fannie Mae has concluded that proceeds from claims subject to litigation, a receivable for MI is not established as a rebut table presumption exists that realization of the proceeds is not probable. Likewise, proceeds from make-wholes are not historically estimable at the time of foreclosure and accordingly do not meet the threshold for asset recognition at the time of foreclosure.  Therefore in both cases, MI proceeds are recorded on a cash basis (as received), and are (a) first recorded as a reduction of the amount of UPB charged-off, (b) second as a reduction of the amount of recorded accrued interest charged-off and (c) any excess is then recorded as an offset to foreclosed property expense.

See section D5.1 for further information about credit enhancements.

---

[31] FAS 140, paragraphs 50 and 364.
[32] SOP 96-1, paragraph .140.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                                59

CONFIDENTIAL                                                                                                      FHFA13012110

### 2.  Lender make-wholes [33]

Make-wholes are a form of credit enhancement considered contractually attached to an individual loan and accordingly meet the requirements to allocate proceeds from make-wholes to reduce charge-offs.  We receive make-whole proceeds in connection with a breach of representation or warranty by the seller of the loan to us.  At the time of receipt, proceeds from make-wholes are treated (a) first as a reduction of any UPB charged-off and (b) second as a reduction of any recorded accrued interest receivable charged-off. Any excess collection of lender make-wholes is credited to foreclosed property expense upon receipt. Though make-wholes do not meet the threshold for asset recognition upon foreclosure, we consider recoveries from make-wholes as part of our overall FAS 5 Allowance estimation process.

### 3.  Off-Balance Sheet instruments

Loan Losses incurred that are related to off-balance sheet instruments, such as contingent losses under our guaranty, are accrued and reported separately as liabilities if the conditions of FAS 5 are met (losses are probable and estimable at the balance sheet date). To estimate incurred losses on our off-balance sheet credit exposures, we evaluate the nature of the off-balance sheet transaction that gave rise to the credit exposure. For instance, if the counterparty to an off-balance sheet loan that is subject to our guaranty is a borrower, we may consider the credit risk of the borrower when determining our estimated guaranty liability.  In addition, though the provisions of FAS 114 do not specifically apply, we note that the AICPA Audit Guide on Depository and Lending Institutions acknowledges that the methodology for estimating losses on loans on balance sheet "may equally be useful in evaluating and estimating Loan Losses for off-balance sheet instruments."

### 4.  Subsequent events

EITF D-86, *Issuance of Financial Statements*, and AICPA Standard No. 1, *Subsequent Events* (SAS 1), provide the primary authoritative accounting guidance for our accounting for subsequent events in connection with the issuance of our financial statements.  A subsequent event is an event or transaction that occurs subsequent to the balance sheet date, but prior to the issuance of a company's financial statements, that may a material effect on the financial statements and therefore require adjustment or disclosure in the statements.  SAS 1 establishes two types of subsequent events:

**Type 1**:  Those events that provide additional evidence with respect to conditions that existed at the date of the balance sheet and affect the estimates inherent in the process of preparing financial statements.  SAS 1 requires that all information that becomes available prior to the issuance of the financial statements should be used by us in its evaluation of the conditions on which the estimates were based.  Furthermore, our financial statements should be adjusted for any changes in estimates resulting from the use of such evidence.

**Type 2**:  Those events that provide evidence with respect to conditions that did not exist at the date of the balance sheet being reported on, but arose subsequent to that date.  These events

---

[33] Refer to separate accounting policy memo, *Accounting for single-family credit risk management programs (forms of credit enhancement),* for further detail on our accounting for single-family mortgage insurance and credit enhancement programs.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL                                                                                      FHFA13012111

**ALLOWANCE FOR LOAN LOSSES AND RESERVE FOR GUARANTY LOSSES          C1.5**

do not result in an adjustment to the financial statements; rather disclosure of the Type 2 event(s) is required.

Accordingly, we should evaluate events or activities occurring subsequent to the balance sheet date put prior our financial statement issuance date that provide additional evidence with respect to conditions existing at the balance sheet date that we identified and considered as part of our Allowance estimate to determine whether an adjustment to our Allowance estimate is necessary.

### 5.    Disclosure of concentration of credit risk on certain loans

The terms of certain loan products, such as negative amortization loans or interest only loans, increase our exposure to credit risk and therefore may also result in a concentration of credit risk in our portfolio.  In addition, loans acquired with a high loan-to-value ratio based on anticipated collateral appreciation will also serve to increase our credit exposure and risk of loss should appreciation of the underlying property not materialize due to changing market conditions.

In order to accurately disclose to our investors the extent of this concentration or heightened credit risk, our disclosures include (a) background or a summary on the types of certain loans we invest in with heightened credit risk and (b) the measures we undertake to mitigate our losses on these certain loans.  Our disclosures also include our assessment as to whether our holding of certain loans that give rise to (a) borrowers being subject to significant payment increases over time, (b) negative amortization loans and (c) loans with high loan-to-value ratios constitute a concentration of credit risk.

## III.    QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable.

## IV.    APPLICABLE ACCOUNTING AND REGULATORY LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 5 | 7/1/1975 | *Accounting for Contingencies* |
| FAS 15 | 1/1/1978 | *Accounting by Debtors and Creditors for Troubled Debt Restructurings* |
| FAS 65 | 1/1/1983 | *Accounting for Certain Mortgage Banking Activities* |
| FAS 91 | 1/1/1988 | *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases* |
| FAS 114 | 1/1/1995 | *Accounting by Creditors for Impairment of a Loan* |
| FAS 118 | 1/1/1995 | Accounting by Creditors for Impairment of a Loan - Income Recognition and Disclosures -- An Amendment of FASB Statement No. 114 |
| FAS 114 Q&A | 4/1999 | Application of FASB Statements 5 and 114 to a Loan Portfolio |
| FAS 140 | 3/31/2001 | *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities* |
| FAS 140 Q&A | 2/2001 | *A Guide to Implementation of Statement 140 on Accounting for Transfers and Servicing of Financial* |

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          61

CONFIDENTIAL                                                                          FHFA13012112

**ALLOWANCE FOR LOAN LOSSES AND RESERVE FOR GUARANTY LOSSES        C1.5**

| GAAP Literature | Effective Date | Title |
|---|---|---|
| | | *Assets and Extinguishments of Liabilities* |
| FIN 14 | 1976 | *Reasonable Estimation of the Amount of a Loss* |
| FIN 45 | 1/1/2003 | *Guarantor's Accounting and Disclosure Requirements for Guarantees, including the Indirect Guarantee of Indebtedness of Others* |
| FIN 46R | 1/1/2004 | *Consolidation of Variable Interest Entities, an interpretation of ARB No. 51* |
| PB 6 | 8/1999 | *Amortization of Discounts on Certain Acquired Loans* |
| EITF Topic D-80 | 5/1999 | *Application of FSB Statements No. 5 and No. 114 to a Loan Portfolio* |
| EITF 01-7 | 1/2002 | *Creditor's Accounting for a Modification or Exchange of Debt Instruments* |
| EITF 02-4 | 3/2002 | *Determining Whether a Debtor's Modification or Exchange of Debt Instruments in within the Scope of FASB Statement No. 15* |
| SOP 01-6 | 1/1/2002 | *Accounting by Certain Entities (Including Entities With Trade Receivables) That Lend to or Finance the Activities of Others* |
| SOP 03-3 | 1/1/2005 | Accounting for Certain Loans or debt Securities Acquired in a Transfer |
| AAG | May 2004 | AICPA Audit and Accounting Guide: Depository and Lending Institutions (May 2004) |
| ARA | Various dates | AICPA Depository and Lending Institutions Audit Risk Alerts (issued annually) |
| FSP No. SOP 94-6-1 | 1/1/06 (Question 1) | *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk* |

| Regulatory guidance | Effective Date | Title |
|---|---|---|
| SAB 102 | 7/6/2001 | *Selected Loan Loss Allowance Methodology and Documentation Issues* |
| FFIEC guidance | 6/2001 | FFIEC Policy Statement on Classification of Commercial Resal estate Loans |
| FFIEC guidance | 7/1/2001 and later revised 12/13/2006 | FFIEC Policy Statement on ALLL Methodologies and Documentation for Banks and Savings Institutions |
| FFIEC guidance | 3/1/2004 | *Update on Accounting for Loan and Lease Losses* |
| FFIEC guidance | 12/15/06 | *Interagency Policy Statement on the Allowance for Loan and Lease Losses (2006 Policy Statement)* |

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae        62

CONFIDENTIAL                                                      FHFA13012113

**ALLOWANCE FOR LOAN LOSSES AND RESERVE FOR GUARANTY LOSSES          C1.5**

APPENDIX I - COMPREHENSIVE SUMMARY OF SINGLE-FAMILY LOANS SUBJECT TO THE IMPAIRMENT
PROVISIONS OF **FAS 5** OR **FAS 114**

| Loans subject to FAS 5 (Allowance for credit losses) | Contingent Obligation (MBS guaranty liability) | Loans subject to FAS 114 (Allowance for credit losses) | Loans or assets not subject to FAS 5 or FAS 114 |
|---|---|---|---|
| • Large groups of smaller-balance homogeneous loans (such as loans classified as held for investment under FAS 65) and leases that are evaluated for impairment collectively based on similar risk attributes.<br><br>• A *held for investment* loan specifically identified for impairment evaluation under FAS 114 that is not individually impaired, only if specific characteristics of the loan indicate that it is probable that there would be an incurred loss in a group of loans with those characteristics.<br><br>• Modified loans classified as *held for investment* not considered TDRs, but are evaluated to determine whether the modification is "more than minor" under FAS 91 and EITF 01-7. | • Loans underlying MBS held by third parties, issued either through a lender-swap transaction or a portfolio transfer (unless we own 100% or more than 90% of the certificates, respectively).<br><br>• Loans underlying MBS held by us, issued either through a lender-swap transaction or a portfolio transfer (unless Fannie Mae owns 100% or more than 90% of the certificates, respectively).<br><br>• Other guarantees:<br>  o Private label wraps; and<br>  o Long term stand-by commitments. | • Loans evaluated for impairment on an individual basis (such as loans classified as held for investment under FAS 65).<br><br>• Loans modified whereby a concession is granted to a borrower and the modification results in a *troubled debt restructuring*.<br><br>• Non-performing loans purchased out of pools on or after January 1, 2005 that are subject to the requirements of SOP 03-3. | • Loans measured at fair value.<br><br>• Loans measured at the lower of cost or fair value (i.e., loans classified as held for sale under FAS 65).<br><br>• Debt securities as defined under FAS 115.<br><br>• Loans accounted for pursuant to paragraph 14 of FAS 125 and FAS 140 and EITF 99-20.<br><br>• Loans classified as *held for sale* in our financial statements after having consolidated 90% or more owned pools securitized through portfolio transfers where we are considered the transferor, pursuant to paragraph 36 of FAS 140. |

Page 21 of 22

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          63

CONFIDENTIAL                                                           FHFA13012114

**ALLOWANCE FOR LOAN LOSSES AND RESERVE FOR GUARANTY LOSSES          C1.5**

| Loans subject to FAS 5 (Allowance for credit losses) | Contingent Obligation (MBS guaranty liability) | Loans subject to FAS 114 (Allowance for credit losses) | Loans or assets not subject to FAS 5 or FAS 114 |
|---|---|---|---|
| • Loans classified as *held for investment* in our financial statements after having consolidated 100% owned pools securitized in a lender-swap transaction.<br><br>• Non-performing loans purchased out of MBS pools prior to January 1, 2005. | | | |

INTERNAL DOCUMENT
C1.5 – Allowance for Loan Losses and Reserve for Guaranty Losses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    64

CONFIDENTIAL                                                                                      FHFA13012115

**SECURITIES COMMITMENTS**                                                      **C1.6.1**

## I.   APPLICABILITY

This policy applies to forward purchase and sale commitments for both mortgage-backed and non-mortgage securities.  Forward purchase and sale commitments are the transactions we enter into that settle some period of time after the initiation of the commitment.  The initiation date of the commitment is the "trade" date and the date that the security is actually delivered is the "settlement" date.

Securities commitments include commitments for the following types of securities:

- To-be-announced (TBA), Government and Agency Mortgage-Backed Securities (MBS);
- Mortgage Revenue Bonds (MRB);
- Real Estate Mortgage Investment Conduits (REMIC)
- Non-mortgage:
  - Asset-backed (e.g. credit card, auto loan, and student loan)
  - U.S. Treasury securities
  - Preferred stock

Although there were several changes in the standards that governed the accounting for forward securities commitments during 2001 through 2003, this is the accounting policy in effect at December 31, 2004.

## II.   POLICY

*Securities commitments that are derivatives*

Securities commitments are derivatives if they have the following conditions:

- It specifies the price for the security.
- It specifies the notional amount of the security.  ("Notional amount" is typically the unpaid principal balance of the security.)
- It does not require an initial net investment or an initial net investment that is smaller than the investment in the security itself.
- It either provides for net settlement or the delivery of a security that is readily convertible to cash.

  Pair-offs of TBA commitments are not net settlement because each TBA commitment is a separate contract that requires delivery of securities.  A TBA commitment that "pairs off" another TBA commitment does not actually relieve the rights and obligations of the paired-off commitment.

  "Readily convertible to cash" means that the security is interchangeable with other securities and there are quoted market prices available in an active market that can readily absorb the quantity of securities we hold without significantly affecting price. TBA MBS and REMICs are readily convertible to cash; however, MRBs are not readily convertible to cash.  Most non-mortgage securities held in the Liquid Investment Portfolio are readily convertible to cash.

Securities commitments that are derivatives are accounted for at fair value with changes in fair value included in earnings in the period of the change.  The cost basis of securities acquired from

INTERNAL DOCUMENT
C1.6.1 - Securities Commitments.doc

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          65

CONFIDENTIAL                                                      FHFA13012116

commitments accounted for as derivatives includes the trade price of the commitment and the fair value of the commitment on the settlement date.

*Securities commitments that are regular-way securities trades*

Securities commitments for <u>securities that exist</u> as of the trade date of the commitment that settle within the time period generally established by conventions in the marketplace or exchange in which the transaction is being executed are "regular-way securities trades."

Examples of commitments for securities that exist include specified TBA trades for CUSIPs that exist as of the trade date and secondary trades for REMIC securities, and trades for U.S. Treasury securities.

Securities commitments for <u>securities that do not yet exist</u> as of the trade date of the commitment (for example, generic and stipulated TBA trades, and commitments for the primary issuance of REMIC or other asset-backed securities) are "regular-way securities trades" if the commitment meets the following conditions:

- There is no other way to purchase or sell that security.
- Delivery of that security will occur within the shortest possible period for that type of security.

   For purposes of TBA commitments, the next available BMA settlement date is the shortest possible period for settlement.  For purposes of primary issuance REMICs, the issuance date is the earliest date at which the security is available; therefore the period between trade date of the commitment and the issuance date of the REMIC would be the shortest possible period for settlement.

- It is probable at inception and throughout the term of the commitment that the commitment will not settle net and will result in physical delivery of a security when it is issued.

   To assert that a commitment that meets these three conditions is a regular-way securities trade, we must document our basis for concluding that it is probable that the commitment will not settle net and will result in physical delivery.

*Securities commitments that are not derivatives*

Securities commitments that either: 1) do not meet the definition of a derivative; or 2) are regular-way securities trades that are not accounted for as derivatives.  However, forward contracts that are not accounted for as derivatives must be accounted for as forward contracts and included within investment securities if they meet the following conditions:

- They have a fair value of zero at trade date.
- The securities that we acquire will be accounted for under Statement of Financial Accounting Standards No. 115, *Accounting for Certain Investments and Debt and Equity Securities.*
- They require physical settlement.

Securities commitments that are not derivatives and that meet these three conditions must be designated, at trade date, as held-to-maturity, available-for-sale, or trading and accounted for in a manner that is consistent with that designation.

INTERNAL DOCUMENT
C1.6.1 - Securities Commitments.doc

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          66

CONFIDENTIAL                                                                FHFA13012117

**SECURITIES COMMITMENTS**                                                   **C1.6.1**

- Changes in the fair value of commitments for securities that will be accounted for as held-to-maturity are not recognized.

- Changes in the fair value of commitments for securities that will be accounted for as available-for-sale are recognized in other comprehensive income.

- Changes in the fair value of commitments for securities that will be accounted for as trading are recognized in earnings.

The cost basis of securities acquired from commitments that are not accounted for as derivatives is the trade price of the commitment.

*Trade date accounting*

Trade date accounting is required for commitments that are for existing securities and that settle within the *period of time* that is generally established by conventions in the marketplace or exchange in which the trade takes place.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| SFAS 133 | January 1, 2001 | Accounting for Derivative Instruments and Hedging Activities, as amended and interpreted |
| EITF 96-11 | May 23, 1996 | Accounting for Forward Contracts and Purchased Options to Acquire Securities Covered by FASB Statement No. 115 |
| SOP 01-6 | December 26, 2001 | Accounting by Certain Entities (Including Entities with Trade Receivables) that Lend to or Finance the Activities of Others |

INTERNAL DOCUMENT
C1.6.1 - Securities Commitments.doc

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    67

CONFIDENTIAL                                                                      FHFA13012118

**LOAN COMMITMENTS**                                                                 **C1.6.2**

## I.   APPLICABILITY

This policy applies to commitments to purchase whole loans for delayed-delivery (i.e. future settlement).  Commitments to purchase whole loans include mandatory and best efforts commitments for single-family loans and mandatory commitments for multi-family loans.  This policy is effective as of December 31, 2004.

## II.   POLICY

A commitment to purchase whole loans is a derivative if it meets the following conditions:

- It specifies the price for the loans.
- It specifies the notional amount of the loans.  ("Notional amount" is the unpaid principal balance of the loans.)
- It does not require an initial net investment or an initial net investment that is smaller than the investment in the loans themselves.
- It either provides for net settlement or the delivery of a security that is readily convertible to cash.

    A pair-off of a loan commitment is net settlement if it is provided for in the contractual terms of the commitment itself and if the pair-off relieves the rights and obligations of the paired-off commitment.

    "Readily convertible to cash" means that the loans are interchangeable with other loans and there are quoted market prices available in an active market that can readily absorb them without affecting their price.  Newly originated conforming single-family mortgage loans are readily convertible to cash.  Seasoned or delinquent single-family loans are not readily convertible to cash.  Multifamily loans are not readily convertible to cash.

Although a "best efforts" commitment allows a seller not to deliver a committed loan without paying a pair-off fee, we account for them as derivatives because we are obligated to purchase the loan if and when the seller delivers it to us.

Loan commitments that are accounted for as derivatives are accounted for at fair value with the changes in fair value included in earnings in the period of the change.  The cost basis of loans acquired from commitments that are accounted for as derivatives includes the trade price of the commitment and the fair value of the commitment on the settlement date.

Loan commitments that are not accounted for as derivatives are accounted for at historical cost, which is generally zero.

## III.   QUESTIONS AND INTERPRETIVE RESPONESES

### Question 1:   How do we account for commitments to purchase reverse mortgages?

Commitments to purchase reverse mortgages do not have a contractual net settlement provision (e.g. pair-offs) and the reverse mortgage loans themselves are not readily convertible to cash.  Therefore, commitments to purchase reverse mortgages do not meet the definition of a derivative and they will be accounted at historical cost, which is generally zero.

INTERNAL DOCUMENT
C1.6.2 - Loan Commitments.doc

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                68

CONFIDENTIAL                                                                              FHFA13012119

**LOAN COMMITMENTS**                                                            **C1.6.2**

**Question 2:   How do we account for commitments to purchase Single-Family construction-to-permanent (CtoP) mortgage loans?**

These commitments are Single-Family mandatory purchase commitments.  They establish an amount, price, and settlement date, at the commitment date.  In addition, these CtoP commitments permit pair-offs in the same manner as described above for Single-Family mandatory commitments.  Therefore, the Company has determined that commitments to purchase single-family CtoP loans meet the definition of a derivative and will be accounted for accordingly.

**Question 3:   Is a Long Term Stand-by Commitment ("LTSC") a forward commitment to purchase mortgage loans?**

No.  A LTSC is not a commitment to purchase mortgage loans.  A LTSC is an agreement between us and a counterparty whereby we agree to purchase a subset of loans at a future date depending on certain events and circumstances.  A LTSC does not have an established price or amount at the commitment date.  The Company also determined that a LTSC does not meet the definition of a derivative.

**Question 4:   Is a Master Agreement a derivative?**

No. A master agreement does not specify a price or other underlying; therefore it is not a derivative. Similarly neither a master conversion does not specify a price or other underlying and is, therefore, not a derivative.  A pool purchase contract is not a contract for the purchase of mortgage loans and is not a derivative.  Further, master agreements are not financial instruments for the purpose of disclosure of fair value of financial instruments.

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| SFAS 133 | January 1, 2001 | Accounting for Derivative Instruments and Hedging Activities, as amended and interpreted |
| SFAS 107 | January 1, 1996 | Disclosures About Fair Value of Financial Instruments |

INTERNAL DOCUMENT
C1.6.2 - Loan Commitments.doc

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae        69

CONFIDENTIAL                                             FHFA13012120

| REAL ESTATE OWNED AND OTHER FORECLOSED ASSETS | C1.8 |
|---|---|

## I.  APPLICABILITY

This section of the policy manual applies to all assets received in full or partial satisfaction of a loan in connection with a foreclosure proceeding, including:

- Cash
- Real and personal property;
- Equity interests in corporations, partnerships and joint ventures; and
- Beneficial interests in trusts.

In addition, we may recognize foreclosed assets at the time we have taken physical possession of the collateral, even though legal foreclosure or repossession proceedings have not taken place (i.e., through a deed in lieu transaction).

The accounting guidance included in this section of the policy manual applies to both single-family and multifamily loans, unless specifically differentiated.  A foreclosure, or full or partial satisfaction event, may take place on any of the following loans:

- Loans we purchase and hold in portfolio;
- Loans we purchase out of MBS pools after 4 consecutive months of non-payment by the borrower and hold in portfolio;
- Loans that are liquidated while contained in MBS pools at foreclosure; and
- Loans we consolidate on our balance sheet pursuant to our FIN 46 consolidation policies.

This policy is effective as of December 31, 2004.

## II.  POLICY

### A.  Pre-Foreclosure Sales and Other Non-REO Transactions

In some cases, such as pre-foreclosure sales or third party sales, we may receive cash in lieu of the loan's collateral in full satisfaction of the loan. In other circumstances, in a pre-foreclosure sale or third-party sale, we attempt to reduce our loss by accepting a loan payoff that is less than the total amount owed because we have concluded those proceeds are likely to be greater than if we proceed with foreclosure.

Pre-foreclosure sales and third-party sales are accounted for as a loan collection event resulting in full satisfaction of our recorded investment in a loan.

Any excess of our recorded investment in a loan over the consideration received in the sale is recognized as a charge-off to the allowance for credit losses. A waterfall approach is applied for any excess of the consideration received over our recorded investment in a loan and is applied as follows:

- First, as a recovery of any previously charged-off, contractually due principal on the loan;
- Second, as a recovery of any previously charged-off recorded accrued interest on the loan;

INTERNAL DOCUMENT
C1.8 - Real Estate Owned and Other Foreclosed Assets

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          70

CONFIDENTIAL                                                                    FHFA13012121

- Third, as a recovery of any foregone contractually due interest on the loan, after the loan became three months or more delinquent pursuant to our non-accrual accounting policy; and
- Finally, any unallocated excess is recorded as a gain in foreclosed property expense.

All pre-foreclosure related expenses incurred on the sale are recorded through foreclosed property expense when incurred and are not included as a part of the charge-off.

**B. Foreclosure Transactions (including deed-in-lieu transactions)**

**1. Recognition and Measurement**

We record REO upon the earlier of the following:[1]

- The loan foreclosure event (i.e., legal title transfer proceedings having taken place); or
- Upon taking physical possession of the property (i.e., through a deed in lieu transaction).

If title has transferred to us, but the debtor continues to occupy the property under the protection of state redemption laws, we record the acquisition of the property as REO at the title transfer date.

Upon recognition of the REO property through foreclosure, we classify the REO as held for sale ("HFS") or held for use ("HFU").  REO is classified as HFS if all of the following criteria are met:

- We intend to sell the property;
- The property is being actively marketed; and
- The property is immediately available for sale in its current condition such that the sale is reasonably expected to take place within one year.

REO is classified as HFU if we intend to hold and use or that otherwise do not meet the conditions to be classified as HFS.

REO classified as HFS is initially recorded at fair value less estimated selling costs, which becomes the initial carrying amount of the asset.  REO classified as HFU is initially recorded at fair value, which becomes the initial carrying amount of the asset. The asset is then depreciated on a straight-line basis over the estimated depreciable life of the related asset[2].

*Fair value considerations*

---

[1] Refer to separate policy, C1.5, Allowance for Loan Losses and Guarantee Liability for MBS, for the components of a loan at charge-off and accounting for recoveries.
[2] Refer also to our fixed asset policy that discusses how we depreciate fixed assets such as REO property.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    71

CONFIDENTIAL
FHFA13012122