## REAL ESTATE OWNED AND OTHER FORECLOSED ASSETS                    C1.8

The fair value of the REO property reflects an amount at which the asset could be bought or sold in a current transaction between willing parties; that is, other than in a forced or liquidation sale. Our determination of the gain or loss at foreclosure should represent our best estimate of fair value at that time based on the following:

- Quoted market prices of the REO property in active markets, including third-party appraisals, representing the best evidence of fair value; or

- If quoted market prices of the REO property in active markets are not available at the time of foreclosure, we estimate the fair value of the property based on the best information available at the time the property is acquired, including prices for similar REO properties where third-party appraisals were obtained, existing sales contracts and other information available.

We often will not receive a third party appraisal for an REO property at the time of foreclosure; however, our determination of the gain or loss at foreclosure should represent our best estimate of fair value at that time. Therefore, should we receive a third party appraisal after the foreclosure event but during the quarter in which the foreclosure event took place, the fair value of the REO property is modified to reflect this better estimate of fair value. Accordingly, the amount of the charge to the Allowance for loan losses is established by quarter-end based on our best estimate of fair value, either received from a third party or determined by an internal estimate of fair value by quarter-end. Our estimate of fair value and related charge to the allowance for loan losses is subject to subsequent event procedures to determine whether or not a significant decline or increase in value of the property based on a third party appraisal received after quarter-end should be recorded in the prior quarter's balance sheet.

*Review of appraisals*

We obtain subsequent third party appraisals for REO properties not being actively marketed every six months.

In those circumstances where we obtain more than one full, independent documented appraisal for an REO property during a reporting period, we establish the initial carrying value of the REO property based on the first, full independent appraisal received.

We order third party appraisals for all REO properties acquired through foreclosure. Upon receipt of an independent, third party appraisal, should circumstances warrant, we perform a review of the appraisal to determine the reasonableness of the estimate. For example, the following matters, when present, would suggest that we perform an evaluation of the quality of a third party appraisal:

- A rise or decline in a particular market area not reflected in an appraisal may warrant that additional procedures, or perhaps a new appraisal, be performed; and

INTERNAL DOCUMENT
C1.8 - Real Estate Owned and Other Foreclosed Assets

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    72

CONFIDENTIAL                                                                    FHFA13012123

- The appraisal is not dated contemporaneous with the foreclosure event that would suggest that the appraisal is not representative of market conditions that existed at the time of foreclosure.

## 2. Subsequent Measurement

*REO held for sale*

REO classified as HFS is subsequently carried at the lower of (i) carrying amount or (ii) fair value less estimated selling costs and is not depreciated. Any subsequent decreases in value are recorded through a valuation allowance with an offsetting charge to foreclosed property expense. Any subsequent increases in value are recorded through the valuation allowance with an offsetting charge to foreclosed property expense to the extent that they do not exceed the cumulative loss previously recognized through the valuation allowance.

*REO held for use*

REO classified as HFU is initially recorded at the fair value at the time of foreclosure and is depreciated on a straight-line basis over the estimated depreciable life of the related asset. The carrying amount is assessed for impairment throughout the life of the related asset. If events or circumstances indicate that the carrying amount may no longer be recoverable, we will perform a recoverability test on the asset to determine if an impairment loss should be recognized. The carrying amount is considered not recoverable if it exceeds the sum of the undiscounted future cash flows expected to result from the use and eventual disposition of the property. We recognize an impairment loss for the amount that the carrying amount exceeds its fair value. If an impairment loss is recognized, the adjusted carrying amount of the property represents the new cost basis of the asset. This new cost basis will be depreciated on a prospective basis over the remaining useful life of the asset. Any impairment loss recognized represents a direct write-down of the REO property; therefore, subsequent restoration of a previously recognized impairment loss is prohibited.

## 3. Transfers Between Held for Sale and Held for Use

REO classified as HFS can be reclassified HFU and vice versa based on certain circumstances.

In instances where we intend to no longer market and sell an REO property classified as HFS, we will reclassify the REO property to HFU and re-measure at the lower of (i) the carrying amount before the REO property was classified as held for sale, adjusted for any depreciation expense that would have been recognized had the property been initially classified as HFU or (ii) the fair value at the date of the subsequent decision not to sell. Any adjustment to the carrying amount of the REO establishes a new cost basis measurement for the REO and subsequent restoration of this adjustment is prohibited. Once the property is reclassified to HFU, accounting is commenced as discussed above.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae     73

CONFIDENTIAL       FHFA13012124

In instances where we re-classify an REO property originally classified as HFU and it is ready for sale in its immediate condition, we will reclassify the REO property to HFS and re-measure at the lower of (i) the carrying amount, net of accumulated depreciation or (ii) fair value less cost to sell the related asset.  Any adjustment to the carrying amount of the REO establishes a new cost basis measurement for the REO. Once the property is reclassified to HFS, depreciation is no longer recorded and accounting is commenced as discussed above.

**4. Accounting for Foreclosure Costs**

Whether an REO property is classified as HFS or HFU, all foreclosure costs, such as legal, title transfer, eviction costs, etc., or carrying costs, such as real estate taxes, insurance, etc., should be accrued and recognized in foreclosed property expense in the period incurred. In addition, all significant improvements to the REO, including but not limited to roofing, structural and plumbing enhancements are capitalized costs (to the extent the costs are recoverable by us on the ultimate disposition of the property) as an adjustment to the basis of the REO when the costs:

- Extend the useful life of the property;
- Improve the safety of the REO property; and
- Improve the condition of the property as compared with the condition of the property when originally acquired.

**5. Accounting for Sales of REO**

Upon sale of REO, we will receive consideration for the property.  If the consideration is less than the net carrying amount of the REO, we will record a loss to foreclosed property expense.  If the consideration is greater than the net carrying amount of the REO, we should evaluate the circumstances of the sale to determine whether the gain should be deferred or recorded in the period of sale under the full accrual method. Under the full accrual method, all of the profit or loss on the disposition of real estate should be taken in the period of sale.  Full accrual sales treatment is appropriate if all of the following criteria are met:

- A sale is consummated;
- Both of the buyer's initial and continuing investments are adequate to demonstrate a commitment to pay for the property;
- Our receivable is not subject to subordination; and
- We have transferred the usual risks and rewards of ownership in a transaction that is in substance a sale and we do not have substantial continuing involvement with the property.

In certain cases and specific to multifamily REO transactions, we may enter into transactions with third parties to manage and market the REO pursuant to the Master REO Asset Acquisition, Loan and Security Agreement.  Under this agreement, we may transfer title of the REO to a third-party in exchange for non-recourse notes or other forms of consideration.  For each of these transactions, the full accrual sales treatment criteria discussed above will be assessed.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL                                                            FHFA13012125

If full accrual sales treatment is not met, we should perform a further assessment to determine if the cost recovery or deposit method will be used in this circumstance. Circumstances, that when present would suggest a gain should be deferred include (a) when we provide financing to the buyer of REO or (b) the buyer's initial investment is insufficient to demonstrate a commitment to pay.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

**Question 1:  Often we do not receive a third-party appraisal for an REO property at the time of foreclosure.  What if we receive the third-party appraisal after the foreclosure event, and before our audited financial statements are filed?**

We should change the fair value of the REO property to reflect this better estimate of fair value. that we received prior to the issuance of our audited financial statements consistent with our subsequent event policy.

**Question 2:  What types of costs are included in estimated selling costs?**

All costs that are incremental to the sale of REO, such as broker fees, are considered and included in selling costs.

**Question 3:  Held for sale classification of REO properties is appropriate if at foreclosure, the sale is reasonably expected to occur within one year.  What is the impact if it is determined that the sale is expected to occur beyond one year?**

In general, if we expect to sell a property outside of one year, the REO property will be treated as a held for use asset.

There may be instances, although rare, where we expect to hold an REO property longer than a year, but the property retains its held for sale classification. Such circumstances primarily result from regulatory requirements outside of our control, such as state redemption laws, or statutory time periods during which the mortgagor is allowed to reclaim the property by paying all principal, interest, and fees owed on a foreclosed mortgage. If the sale of an REO property is expected to occur beyond one year, our estimated cost to sell is discounted.  REO properties that remain in our inventory under these circumstances retain the held for sale designation even though the property may not have been sold in a year as (a) our basis for holding the property beyond a year is due to events or circumstances beyond our control and (b) we remain committed to our plan to sell the REO property.

**Question 4:  What is the impact if we determine, subsequent to acquiring an REO property that we initially classified as held for sale, that major improvements are required in order to market the property and the property is not expected to sell within one year?**

This would preclude the held for sale classification since the property is not ready for immediate sale under its present condition.  Accordingly, we would transfer the property from held for sale to held for use and apply the appropriate accounting treatment upon transfer.

INTERNAL DOCUMENT
C1.8 - Real Estate Owned and Other Foreclosed Assets

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                75

CONFIDENTIAL                                                                                          FHFA13012126

**REAL ESTATE OWNED AND OTHER FORECLOSED ASSETS**                        **C1.8**

**Question 5:  What circumstances would suggest that we might not recover the carrying amount of an REO property classified as held for use?**

Circumstances that suggest we may not recover the carrying amount of REO property classified as held for use include the following:

- A significant decrease in the market (appraised) price of the property or similar properties in close proximity to the asset;
- A significant adverse change in the extent or manner in which the property is being used or in its physical condition; or
- A significant adverse change in legal factors or in the business climate that could affect the value of the property, including an adverse action or assessment by a regulator.

**Question 6:  When is the sale of an REO property considered consummated?**

A sale of an REO property is considered consummated when (a) all parties to the transaction are bound by the terms of a contract; (b) all consideration has been exchanged; (c) any permanent financing for which we are responsible for has been arranged; and (d) all conditions precedent to closing have been performed.

**Question 7:  What is the minimum investment necessary to demonstrate a buyer's commitment to pay for the property and to indicate a reasonable likelihood that we will collect the receivable?**

The requisite minimum investment required by a buyer to demonstrate their commitment is 5% of the sales value of the REO property (single-family residential property intended to be the primary residence of the buyer).  The minimum investment for multifamily properties is 10% for properties where cash flow is sufficient to service all indebtedness and 15% for properties in start-up situations or deficiencies in cash flow.  The buyer's initial investment in the REO property in order to demonstrate their commitment to purchase the property includes (a) cash paid as a down payment, (b) forms of financing to the buyer from independent lending institutions, (c) payments by the buyer to third parties to reduce any existing indebtedness on the property and (d) any other amounts paid by the buyer included as part of the sales value of the property.

**Question 8:  If the receivable from the sale is subject to future subordination, what effect does it have on the recognition of profit from the sale?**

To receive full accrual accounting treatment upon sale of an REO property, the receivable from the sale must not be subject to future subordination.  Future subordination does not apply if (a) a receivable is subordinate to a first mortgage on the property existing at the time of sale; or (b) a future loan, including an existing permanent loan commitment, is provided for by the terms of the sale and the proceeds of the loan will be applied first to the payment of our receivable.  If the receivable from the sale is subject to future subordination, the sale shall be recognized by the cost recovery method.

**Question 9:  Is it appropriate to adjust our initial estimate of mortgage insurance proceeds?**

INTERNAL DOCUMENT
C1.8 - Real Estate Owned and Other Foreclosed Assets

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                        76

CONFIDENTIAL                                                                FHFA13012127

## REAL ESTATE OWNED AND OTHER FORECLOSED ASSETS                                    C1.8

Yes.  Our estimate of mortgage insurance proceeds should be adjusted when events become known that would change the initial estimate.  In addition, the estimate of mortgage insurance proceeds is subject to subsequent event procedures to determine whether significant variations between estimated and actual proceeds should be recorded in prior period's financial statements.

## IV.  APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 15 | 1/1/1978 | *Accounting by Debtors and Creditors for Troubled Debt Restructurings* |
| FAS 66 | 1/1/1983 | *Accounting for Sales of Real Estate* |
| FAS 121 | 1/1/1996 (superseded by FAS 144) | *Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed Of* |
| FAS 144 | 1/1/2002 | *Accounting for the Impairment or Disposal of Long-Lived Assets* |
| FSP FAS 144-1 | 12/15/2003 | *Determination of Cost Basis for Foreclosed Assets under FASB Statement No. 15 and the Measurement of Cumulative Losses Previously Recognized under Paragraph 37 of FASB Statement No. 144* |
| SOP 01-6 | 1/1/2002 | *Accounting by Certain Entities (Including Entities With Trade Receivables) That Lend to or Finance the Activities of Others* |

INTERNAL DOCUMENT
C1.8 - Real Estate Owned and Other Foreclosed Assets

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                77

CONFIDENTIAL                                                                  FHFA13012128

## I.  APPLICABILITY

This policy addresses how we account for Low Income Housing Tax Credit ("LIHTC") investments. It is effective as of December 31, 2004.

## II.  POLICY

### A.  Accounting for Investments in Real Estate Ventures (Low Income Housing Tax Credit Partnerships)

We apply the equity method of accounting for our investments in LIHTC partnerships. Under the equity method of accounting we initially record our investment in the partnership at cost, and adjust the carrying amount of the investment to recognize our share of earnings or losses of the partnership after the date of acquisition. See section C1.9.2, Other Investments and Partnerships, for detailed policies regarding the application of the equity method.

However, the equity method of accounting is not used when:

- The limited partners have important rights, such as the right to replace the general partner or partners without cause. If we have these rights, the partnership should be consolidated and accounted for under the principles of accounting that would be applicable for a subsidiary.
- The LIHTC partnerships have to be consolidated under the requirements of FIN 46 (R). The majority[1] of the LIHTC partnerships meet the definition of a variable interest entity; therefore, they have to be evaluated for consolidation under the requirements of that standard.
- The guaranteed investments that meet the requirements for effective yield accounting under EITF 94-1, *Accounting for Tax Benefits Resulting from Investments in Affordable Housing Projects*.

### B.  Application of FIN 46R, Consolidation of Variable Interest Entities

The majority of the LIHTC partnerships meet the definition of a variable interest entity, because the holders of equity investment at risk lack the ability to make decisions that have a significant effect on the success of the entity through voting rights or similar rights. . Therefore, they are subject the consolidation requirements under FIN 46 (R).  It is Fannie Mae's policy to determine if we are the primary beneficiary, the party that consolidates the entity, when we make our initial investment in the partnership or at any subsequent reconsideration event. Reconsideration events are discussed further in the consolidation section of this manual.

On each evaluation date, we are required to perform either a qualitative or a quantitative analysis for each partnership. The specific policies that we are adopting for the evaluation of each segment of the LIHTC portfolio follow:

---

[1] Those partnerships that provide the limited partner with the right to remove the general partner without cause do not meet the definition of a variable interest entity.

INTERNAL DOCUMENT
C1.9.1 – Low Income Housing Tax Credits

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                78

CONFIDENTIAL                                                                FHFA13012129

Private-Label Funds:

Private Label Funds are two tier structures organized and tailored solely for the benefit of Fannie Mae as the sole limited partner. Fannie Mae invests cash into the upper-tier partnership in exchange for its limited partnership interest. The partnership uses the cash from our investment to acquire interests in various "lower tier" or "operating tier partnerships".

We have concluded qualitatively that these partnerships have to be consolidated under the requirements of FIN 46(R), principally because we overwhelmingly absorbed the majority of the partnership's variability in expected losses. Absent a change in the design, economics, or legal structure of this arrangement, future investments in these partnerships will be consolidated. As a part of each quarterly close, we will document the appropriateness of this qualitative conclusion for new private label investments.

Guaranteed Investment Funds:

These investments provide the Fannie Mae with a minimum yield that is guaranteed by a credit worthy entity.

We have previously modeled a sample of these partnerships to support the qualitative conclusion that Fannie Mae is not the primary beneficiary for these investments. Therefore we are not required to consolidate these partnerships. New investments should be qualitatively assessed to determine whether we are the PB.

Multi-Investor Funds:

Multi-investor Funds are two-tier structures similar to private label funds; however, these investments are organized for the benefit of numerous limited partners.

We used a combination of quantitative and qualitative analysis to determine which partnerships require consolidation. For those partnerships in which Fannie Mae is the largest investor, we will continue to perform either a qualitative or a quantitative assessment on each new investment.

Lower-tier and Direct Operating Partnerships:

Fannie Mae may invest in direct operating partnerships. Additionally, when a partnership is consolidated, it establishes a direct reporting relationship between Fannie Mae and the lower tier operating partnerships. These operating partnerships meet the definition of a variable interest entity and are subject to evaluation under the requirements of FIN 46(R), because the holders of equity investment at risk lack the ability to make decisions that have a significant effect on the success of the entity through voting rights or similar rights.

We have previously modeled a sample of these partnerships in this population to support the qualitative conclusion that Fannie Mae is not the primary beneficiary for these investments. New investments should be qualitatively assessed to determine whether we are the PB.

Measurement of Consolidated Assets:

INTERNAL DOCUMENT
C1.9.1 – Low Income Housing Tax Credits

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          79

CONFIDENTIAL                                                        FHFA13012130

See Section 8.1, Consolidation Policy, for detailed guidance on the policies on consolidation.

**C.   Initial Recognition – Deferred Equity Contributions**

We invest in LIHTC partnerships that require the delivery of capital either at inception or over a period of time. Contributions that are required at the inception of the investment are recorded as an investment in the partnership.  Contributions that are required subsequent to the inception of the agreement are referred to as deferred equity contributions.  These obligations are recorded as a liability (with a corresponding investment) when we become legally obligated to fund all or a portion of our commitment.

a.   Recognition of liability and timing of recognition

The recognition of a liability for deferred equity contribution may be appropriate as of the date that we authorize an investment or execute the partnership agreement and become legally obligated to fund future investments.

An assessment, however, has to be made to determine whether the contributions are unconditional and legally binding at that date.  General guidelines are as follows:

1.   For Direct investments, Multi Investor Funds and the Guaranteed Funds for which we cannot approve or reject individual investments, the commitments are considered to be unconditional and legally binding, and liabilities for the full equity commitments are recorded upon execution of the partnership agreement.
2.   For Private Label and certain Guaranteed Fund investments that require a funding commitment, we approve or reject individual investments in Lower Tier partnerships.  Therefore, we are legally obligated to fund equity contributions upon approval of Lower Tier investments.

b.   Measurement of liability

Deferred equity contributions are recorded at their net settlement value, which is equivalent to the undiscounted amount of cash that we are obligated to fund.

c.   Variation in equity contribution

Actual investment funding may differ from the amount originally stipulated in the partnership agreement.  The accounting for the excess or shortfall in contributions is as follows:

1.   If the we understand that total funding will fall short of our total commitment to the partnership, we should make an adjustment equal to the amount of the shortfall, reducing both the investment and the liability when the general partner has released us from any further obligation to fund the shortfall.

2.   If the total funding is in excess of the total commitment to the partnership, upon making the addition commitment (which may be in connection with the final equity call) the liability will be increased along with the asset balance.  If the final equity call

INTERNAL DOCUMENT
C1.9.1 – Low Income Housing Tax Credits

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    80

CONFIDENTIAL                                                                                    FHFA13012131

**LOW INCOME HOUSING TAX CREDITS**                                      C1.9.1

exceeds our legal funding obligation, then no liability shall be established for the excess of the equity call over our legal obligation. Actual cash funding shall first be applied to reduce our commitment obligation, and when the obligation has been funded in full, additional funding shall be recognized as an increase to our investment.

### D. Impairment Assessment

Each investment that is accounted for based on the equity method is subject to an impairment assessment. The impairment assessment involves the comparison of the carrying amount of the investment (including capitalized interest) to the total undiscounted remaining tax credits and other tax benefits to determine whether the equity method LITHC investment is impaired. If the carrying amount of the investment is less than the remaining tax credits and benefits, our investment is written down by an amount equal to the difference[2].

### E. Effective Yield Method of Accounting

The effective yield method of accounting has been adopted for those investments meeting the following requirements:

a. The availability (but not necessarily the realization) of the tax credits allocable to the investor is guaranteed by a creditworthy entity through a letter of credit, a tax indemnity agreement, or another similar arrangement.
b. The investor's projected yield based solely on the cash flows from the guaranteed tax credits is positive (the tax benefits from net operating losses should not be included in the calculation of the investors projected yield).
c. The investor is a limited partner in the affordable housing project for both legal and tax purposes and the investor's liability is limited to its capital investment.

Under the effective yield method, we recognize tax credits as they are allocated and amortize the initial cost of the investment to provide a constant effective yield over the period that tax credits are allocated to the investor. The effective yield is the internal rate of return on the investment, based on the cost of the investment and the guaranteed tax credits allocated to the investor. Any expected residual value of the investment should be excluded from the effective yield calculation. Cash received from operations of the limited partnership or sale of the property, if any, should be included in earnings when realized or realizable.

Under the effective yield method, the tax credits are recognized in the income statement as a component of income taxes attributable to continuing operations.

### F. Capitalization of Interest for Equity Method Investments

---

[2] This policy is in accordance with the guidance in APB 18, *The Equity Method of Accounting for Investments in Common Stock*, as interpreted by EITF 94-1, *Accounting for Tax Benefits Resulting from Investments in Affordable Housing Projects*.

INTERNAL DOCUMENT
C1.9.1 – Low Income Housing Tax Credits

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          81

CONFIDENTIAL
                                                   FHFA13012132

LOW INCOME HOUSING TAX CREDITS                                      C1.9.1

Interest capitalization is required for equity method investments until the Fund's principal operations begin.[3]
We have determined that the principal operations are considered to have begun when the following occurs:

(i)   For Direct and consolidated Lower Tier Investments, the Fund, which is an operating partnership, is considered to have begun operations the date that its property is placed in service.

(ii)  For Upper Tier investments, the Fund is considered to have begun operations when half of the operating partnerships that the Fund invested in have buildings that have been placed in service.

If the Fund is undergoing activities in preparation for its planned principal operations, interest on the equity method investment is calculated using an applicable interest rate (see below) during the capitalization period (defined as the period between initial investment and commencement of operations) to the investment outstanding during that period, and such interest should be capitalized.  See below for appropriate commencement of operations period.  The amount is recorded as an increase to the investment and a decrease to interest expense.

We use our quarterly cost of funds, which is the weighted average interest rate on all outstanding borrowings, for the purposes of capitalizing interest each quarter.

Amortization of basis difference

When interest is capitalized, a basis difference is created between the carrying amount of the equity method investment and the amount of underlying equity in net assets of the Fund.  The difference is allocated to the underlying assets of the Fund as if the Fund were a consolidated subsidiary.  The basis difference is to be amortized over 10 years, as the period that underlying tax credits are earned from qualifying assets is 10 years.

Other differences, if any, between the cost basis of the investment and the underlying equity in net assets of the Fund are amortized into income as the tax credits are earned over a 10-year period.

G.  **Accounting for Tax Credits on Equity Method Investments**

We record the tax credits as a reduction of the taxes payable and our provision for federal income taxes in the income statements when earned.  The net operating losses that are earned on these partnerships should be recorded as a component of operating income. The tax impact of these losses should not be netted directly against our provision for federal income taxes.

III.  **QUESTIONS AND INTERPRETIVE RESPONSES**

Not applicable.

---

[3] As required by FAS 58, Capitalization of Interest Cost in Financial Statements That Include Investments Accounted for by the Equity Method.

INTERNAL DOCUMENT
C1.9.1 – Low Income Housing Tax Credits

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae        82

CONFIDENTIAL                                                    FHFA13012133

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Key Issues Addressed |
|---|---|---|
| FIN 46 (R) | Public entities first reporting period after 12/15/2003 Non-Public entities fiscal periods after 12/15/2004 | • *Consolidation of Variable Interest Entities – an interpretation of ARB No. 51* |
| SOP 78-9 | Fiscal years ending after 12/24/1978 | • *Accounting for Investments in Real Estate Ventures* |
| ARB 51 | 08/1959 | • *Consolidated Financial Statements* |
| APB 18 | Fiscal years ending after 12/31/1971 | The Equity Method of Accounting for Investments in Common Stock |
| FAS 94 | Fiscal years ending after 12/15/1998 | Consolidation of all Majority-Owned Subsidiaries |
| EITF 04-5 | Effective after 06/29/2005 | Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights |
| EITF 96-19 | | Debtors Accounting for a Modification or Exchange of Debt Instruments |
| EITF 99-19 | | Reporting Revenue Gross as a Principal versus Net as an Agent |
| EITF 94-1 | | Accounting for Tax Benefits Resulting from Investments in Affordable Housing Projects |
| FAS 57 | For fiscal years ending after 06/15/1982 | Related Party Disclosures |
| FAS 109 | Effective for fiscal years beginning after 12/15/1992 | Accounting for Income Taxes |
| EITF 03-1 | | The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments |
| FAS 34 | | Capitalization of Interest Cost |
| FAS 58 | | Capitalization of Interest Cost in Financial Statements That Include Investments Accounted for by the Equity Method |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    83

CONFIDENTIAL                                                                                                    FHFA13012134

## I.  APPLICABILITY

This section addresses Fannie Mae's ("Company's") accounting for investments in partnership vehicles and other miscellaneous investments. This policy is effective as of December 31, 2004.

## II.  POLICY

Investments in limited partnerships and other miscellaneous investments must be analyzed to determine whether we need to consolidate the entity in which we have invested.  We must determine if the entity being considered for consolidation is a variable interest entity or a voting interest entity.  Refer to policy F.8.1 *Consolidation* for a discussion of the assessment under, and application of the variable interest entity ("VIE") consolidation model.  If the entity is not a variable interest entity it is considered a voting interest entity.

### A.  Limited Partnerships

Partnerships that are voting interest entities must be evaluated for consolidation. Investments in partnerships that are voting interest entities are consolidated if important rights indicate that the partnership may not be under the control of the general partnership.  If the partnership provides substantive kick-out rights to us as the limited partner, allowing us to remove the general partner without cause if we choose to, we are considered to have control and consolidation of the partnership as a subsidiary is required.

If we are not required to consolidate the limited partnership and we own more than a 3 to 5 percent investment in a limited partnership, we are considered to have the ability to significantly influence the operating and financial policies of the partnership and we account for our investment following the equity method.

If our ownership is less than 3 to 5 percent in a limited partnership we account for our investment following the cost method.

### B.  Other investments

Investments other than partnerships that are voting interest entities are consolidated if our ownership interest is greater than 50 percent.  Non-partnership investments in entities where our ownership is between 20 and 50 percent, or which we have the ability to exercise significant influence over the entity's operations and management functions, are accounted for under the equity method. Non-partnership investments in entities where our ownership is less than 20 percent and we have no ability to exercise significant influence over an entity's operations are accounted for under the cost method.

When we are required to consolidate voting interest entities, all intercompany balances and transactions should be eliminated. As our consolidated statements are based on the assumption that they represent the financial position and operating results of a single business enterprise, such statements should not include gain or loss on transactions among the entities in the group. Accordingly, any intercompany profit or loss on assets remaining within the group should be eliminated.

The amount of intercompany profit or loss to be eliminated is not affected by the existence of a minority interest.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    84

CONFIDENTIAL                                                                                          FHFA13012135

## C.  Accounting Methods

### 1.  Consolidation of Variable Interest Entities

If we are the primary beneficiary of the entity and thus required to consolidate the VIE, we initially measure the assets, liabilities, and non-controlling interests of a newly consolidated VIE at fair value, on the date we became its primary beneficiary. We record goodwill only if the VIE is a business.  If the VIE is not a business, the fair value of the target in excess of the sum of the fair value of the identifiable net assets acquired is recognized as an extraordinary loss.

After the initial measurement, the assets, liabilities, and non-controlling interests of a consolidated VIE shall be accounted for in consolidated financial statements as if the Investee were consolidated based on participating interests.

### 2.  Equity Method

We initially record our investment at cost, and adjust the carrying amount of the investment to recognize our share of the earnings or losses of the Investment after the date of acquisition.  The amount of the adjustment is included in the determination of net income, and such amount reflects adjustments similar to those made in preparing consolidated statements including adjustments to eliminate intercompany gains and losses, and to amortize, if appropriate, any difference between our cost and underlying equity in net assets of the Investment vehicle at the date of investment.  The investment is also adjusted to reflect our share of changes in the Investment vehicles capital.  If dividends are received from an Investment vehicle they reduce the carrying amount of the investment.  A series of operating losses of an Investment vehicle or other factors may indicate that a decrease in value of the investment has occurred which is other than temporary and which should be recognized even though the decrease in value is in excess of what would otherwise be recognized by application of the equity method.  Refer to policy G.9.5 *Impairment* for further discussion of impairment of equity method investments.

For an investment accounted for using the equity method, our share of partnership income or losses is recognized in the income statement as a component of income (or losses) attributable to continuing operations with a corresponding entry to the investment account on our balance sheet.  We record our share of the investment vehicles loss in excess of the carrying amount of its investment if we have guaranteed the obligations of the Investment vehicle or otherwise committed to provide further financial support.  We account for any cash received from these partnerships as a return of investment and reduce the asset balance.

If the Investment vehicle is undergoing activities in preparation for its planned principal operations, interest expense should be capitalized.  We determine an applicable interest rate by calculating the weighted average interest rate on all outstanding borrowings.  The amount of interest to be capitalized is calculated by applying the applicable interest rate during the capitalization period (defined as the period between initial investment and commencement of operations) to the outstanding investment balance during that period.  Refer to SFAS 58 for further clarification.  The amount is recorded as an increase to the investment and a

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                85

CONFIDENTIAL                                                                                    FHFA13012136

decrease to interest expense.  When interest is capitalized, a basis difference is created between the carrying amount of the equity method investment and the amount of underlying equity in net assets of the Fund.  The difference is allocated to the underlying assets of the Investment vehicle as if the vehicle were a consolidated subsidiary.  Fannie Mae has determined that it is appropriate to amortize the basis difference over the period that underlying tax credits are earned from qualifying assets.

Our limited partnership investments often provide tax credits.  We record these tax credits as a reduction in our provision for federal income taxes in the income statements when earned.  For limited partnership investments that meet the criteria for recognizing tax benefits following the effective yield method as discussed in policy C1.9.1 *Low Income Housing Tax Credits*, we recognize tax credits as they are allocated and amortize the initial cost of the investment to provide a constant effective yield over the period that tax credits are allocated to the investor.  Under the effective yield method, tax credits are recognized in the income statement as a component of income taxes attributable to continuing operations.  Any other tax benefits received are accounted for pursuant to FAS 109.

3.  **Cost Method**

For an investment accounted for using the cost method, the excess of the carrying value of the investment over its estimated residual value is amortized during the periods in which tax credits are allocated to us.  Annual amortization is based on the proportion of tax credits received in the current year to total estimated tax credits to be allocated to us.  The estimated residual value used in determining the amount to be amortized is the estimated residual value at the end of the last period in which tax credits are allocated to us.  The amortization of the investment in the limited partnership is recognized in the income statement as a component of income or losses attributable to continuing operations.  Refer to policy G.9.5 *Impairment* for further discussion of impairment of cost method investments.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable.

## IV.  APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Key Issues Addressed |
| --- | --- | --- |
| FIN 46 (R) | January 2004 | Consolidation of Variable Interest Entities – an interpretation of ARB No. 51 |
| SOP 78-9 | January 1978 | Accounting for Investments in Real Estate Ventures |
| ARB 51 | August 1959 | Consolidated Financial Statements |
| APB 18 | January 1972 | The Equity Method of Accounting for Investments in Common Stock |
| FAS 94 | January 1998 | Consolidation of all Majority-Owned Subsidiaries |
| EITF 98-6 | January 1999 | Investor's Accounting for an Investment in a Limited Partnership When the Investor Is the Sole General Partner and the Limited Partners Have Certain Approval or Veto |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                86

CONFIDENTIAL                                                                    FHFA13012137

**OTHER INVESTMENTS AND PARTNERSHIPS**                                                     **C1.9.2**

|  |  | Rights |
|---|---|---|
| EITF 94-1 | July 1995 | Accounting for Tax Benefits Resulting from Investments in Affordable Housing Projects |
| FAS 109 | January 1993 | Accounting for Income Taxes |
| FAS 34 | January 1980 | Capitalization of Interest Cost |
| FAS 58 | July 1982 | Capitalization of Interest Cost in Financial Statements That Include Investments Accounted for by the Equity Method |

CONFIDENTIAL                                                                                      FHFA13012138

**PROPERTY, PLANT AND EQUIPMENT**                                    **C1.9.3**

## I.  APPLICABILITY

This policy addresses the accounting and reporting issues of PP&E:

- The amount at which the assets are recorded
- The rate and pattern to be used to depreciate assets and allocate the cost to future periods.
- The recording of subsequent disposal of the assets
- Periodic assessments for impairment of the assets

See policy section 2.4.1 for the accounting for operating vs. capital leases.

See policy section 1.9.3.1 for Internally Developed Software, and section 1.9.4 for Intangibles.

See policy section 1.8 for Real Estate Owned related to our secondary mortgage business.

This policy does not address the accounting if real estate associated with real estate partnership needs to be consolidated into our PPE.

This policy is effective as of January 1, 2006.

## II.  POLICY

We capitalize (i.e., record as an asset) purchases of PP&E when the acquisition amount exceeds $10,000.  For bulk purchases of identical items that cost less than $10,000 but where the total purchase exceeds $300,000, we treat the purchase as one asset and capitalize it in the fixed asset system. Otherwise, purchases in amounts less than $10,000 (and bulk purchases that do not meet the previous criteria) are expensed in the period incurred.

For purchased software, our capitalization threshold is $300,000. Purchases in amounts less than $300,000 are expensed in the period incurred. In cases where we purchase software/licenses over the $300,000 threshold at a level that exceeds current demand, we record the purchase as a deferred asset and then reduce the deferred asset in the month that the licenses are allocated to business units and placed into service. If the bulk purchase exceeds $300,000 and qualifies for capitalization, then the reduction of the deferred asset is recorded to fixed assets; otherwise, it is recorded to expense.

The basis for recording the cost is addressed in section V.

We depreciate PP&E over their respective useful lives in accordance with their specific asset type classification, which is outlined in section V.

Depreciation begins on the first day of the month following payment.  For building and leasehold improvements, expenses are aggregated in a WIP account until the asset is placed into service, and depreciated.  For bulk software licenses, we begin depreciation in the month following their allocation to business units.

The method of depreciation chosen is that which results in a rational allocation of the cost of the asset (less its residual or salvage value) over the asset's expected useful life.

INTERNAL DOCUMENT
C1.9.3- Property, Plant, & Equipment

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                 88

CONFIDENTIAL                                              FHFA13012139

**PROPERTY, PLANT AND EQUIPMENT**                                    **C1.9.3**

An impairment analysis is performed periodically or when events indicate a potential impairment.  Impairment exists when the carrying amount of an asset is not recoverable and exceeds its fair value.  We measure impairment loss as the amount by which the carrying amount of an asset exceeds its fair value.

### A. Recorded Costs

#### 1. Costs at Acquisition

At acquisition, we record the purchase price of the asset plus any reasonable costs incurred in bringing the asset into a usable condition (such as delivery or installation charges).  The following costs are examples of what would be capitalized:

a.  Sales tax
b.  Freight/delivery cost
c.  Installation/set-up cost
d.  Costs incurred in preparing the asset for use
e.  Construction-period interest for assets that are constructed or otherwise produced for our own use.  For further policy details, please see Accounting Policy 9.7-Capitalization.

#### 2. Costs Subsequent to Acquisition

Costs associated with repairs, maintenance and betterments that are incurred subsequent to the acquisition are treated as follows:

##### a. Expense In the Period Incurred

i.   Ordinary repairs and maintenance to maintain the normal operating condition
ii.  Ordinary repairs and maintenance that do not materially add to the value of the asset
iii. Ordinary repairs and maintenance that do not extend useful life
iv.  Costs incurred for dismantling, crating, shipping, and reinstalling an asset that is relocated.

##### b. Capitalize

Major repairs or maintenance costs that increase the value of the asset or extend the estimated useful life. If this situation occurs, we review the useful life to determine if it should be extended in the fixed asset system. If the revised estimate of remaining useful life is significantly different, the useful life should be revised so that the depreciation charge is adjusted for the current and future periods, but the accumulated depreciation charged in prior periods may not be adjusted.

INTERNAL DOCUMENT
C1.9.3- Property, Plant, & Equipment

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          89

CONFIDENTIAL                                                                      FHFA13012140

**PROPERTY, PLANT AND EQUIPMENT**                                     C1.9.3

### B. Estimated Useful Lives

The estimation of useful life takes into consideration technological change, deterioration, and actual physical usage.  We have adopted the following standard lives:

| Asset Type | Useful Life | Depreciation Method |
|---|---|---|
| Furniture and Equipment | 10 years (5 years for photocopiers) | Double Declining |
| Automobile | 3 years | Straight Line |
| Automated data processing, telecommunications, and personal computer equipment | 3 years | Straight Line |
| Computer Software | Generally 3 years, but in any case not longer than the contract term. | Straight Line |
| Office cabling | 3 years | Straight Line |
| Real property | 30 years (20 years for 3900 building) | Straight Line |
| Leasehold improvements | Over the remaining life of lease, including fixed noncancelable extensions and bargain renewal or penalty option periods that are considered probable<br><br>In the event of early lease termination under FAS 146, measure and recognize liability at fair value and cease depreciating assets | Straight Line |

The following factors will be used in estimating lives:

1. Obsolescence
2. Relationship to other assets – if an addition or improvement is made to a building that does not appreciably extend the building's life, the addition or improvement should be depreciated over the building's remaining life.
3. Plans of the entity – if we decided to relocate facilities in a specified number of years, the facilities, including any interim additions or improvements, depreciation should be accelerated over the remaining expected period.
4. Environmental factors and laws
5. Anticipated use
6. Maintenance policies – an inadequate maintenance program can shorten an asset's estimated life; a good program of maintenance may lengthen the life of an asset, but cannot extend its economic life indefinitely.
7. Other economic or legal factors that impose limits on continued use of the property.

INTERNAL DOCUMENT
C1.9.3- Property, Plant, & Equipment

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          90

CONFIDENTIAL                                                                    FHFA13012141

**PROPERTY, PLANT AND EQUIPMENT**                                          **C1.9.3**

### C. Depreciation

The costs of fixed assets are allocated to the periods that they benefit through depreciation of the acquired cost.  Two types of depreciation methods are acceptable – straight line and accelerated.  An accelerated method, such as declining balance, is selected if evidence indicates that the decline in value of the asset is greater in the earlier years of its life or maintenance costs increase significantly as the asset ages. The method chosen is that which results in a systematic and rational allocation of the cost of the asset over the asset's expected useful life.

### D. Asset Disposals:

When PP&E assets are no longer useful because they are worn out or obsolete, they may be discarded, sold, or traded-in on the purchase of new equipment.   A long-lived asset to be abandoned is written-off when it ceases to be used.  A long-lived asset that is temporarily idle is not accounted for as if it is abandoned. Property classified as held for sale should be measured at the lower of its carrying amount or fair value, less cost to sell.  Finally, a long-lived asset that is exchanged or to be distributed to owners in a spin-off is recorded when the actual exchange or distribution takes place.

PP&E may be disposed of in the following ways:  (1) discarded; (2) sold for cash; (3) exchanged; (4) distributed to owners in a spin-off; or (5) donated.

Regardless of the method of disposal, it is necessary to remove both the cost and the accumulated depreciation of the asset from the accounts. A Gain or Loss on Disposal may result, depending on the facts of the situation.

1. **Recording Discarded PP&E**

    a.  Upon removal, the carrying value and the accumulated depreciation of the asset are removed from the fixed asset system. Any net balance is recorded to gain or loss on disposition, as appropriate.

2. **Recording Sold PP&E**

    a.  Upon sale, the carrying value and the accumulated depreciation of the asset are removed from the fixed asset system. Any difference between the sale amount (less the cost to sell) and the net balance is recorded to gain or loss on disposition, as appropriate.

3. **Recording Exchanges of Assets**

    a.  Accounting for exchanges of assets is similar to accounting for sales of assets for cash.  A gain or loss should be recognized based on the fair values of the assets transferred.

    b.  If monetary consideration is received in an exchange for less than 25% of the fair value of the property exchanged, a gain should be recognized for any monetary consideration that exceeds the proportionate share of the carrying amount of the asset surrendered.

INTERNAL DOCUMENT
C1.9.3- Property, Plant, & Equipment

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae
                                                          91

CONFIDENTIAL
                                                          FHFA13012142

c.   If the monetary consideration is 25% or more of the fair value of the property exchanged, the exchange is considered a monetary transaction.

d.   The cost of a non-monetary asset acquired in exchange for another non-monetary asset is the fair value of the asset surrendered to obtain it, and a gain or loss is recognized on the exchange. The fair value of the asset received is used to measure the cost if it is more clearly evident than the fair value of the asset surrendered. Similarly, a non-monetary asset received in a nonreciprocal transfer is recorded at the fair value of the asset received. A transfer of a non-monetary asset to a stockholder or to another entity in a nonreciprocal transfer is recorded at the fair value of the asset transferred, and a gain or loss is recognized on the disposition of the asset.

4.  **Donation**

a.  When an asset is donated, the amount of the donation should be recorded at the fair market value of the donated asset. If a difference exists between the fair market value recorded and the underlying net carrying value of the asset, a gain or loss should be recognized for that difference.

E.  **Impairment**

Long-lived assets must be periodically evaluated to determine if impairment has occurred. There is no set interval or frequency to perform the recoverability test.  FAS 144 uses "events and circumstances" to determine when and if an asset is evaluated for recoverability.  The following list provides a guide to situations considered to be triggering events that warrant an evaluation of an asset or group of assets for recoverability to determine if an impairment loss must be recognized:

1.  A significant decrease in the market price of a long-lived asset
2.  A significant adverse change in the extent or manner in which a long-lived asset is being used or in its physical condition
3.  A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset, include an adverse action or assessment by a regulator
4.  An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset
5.  A current period operation or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset
6.  A current expectation that, more likely than not, a long-lived asset will be sold or otherwise disposed of significantly before the end of its previously estimated useful life

Impairment is evaluated in a two-step process.  First, recoverability is determined by comparing the carrying amount of the asset on the date it is being evaluated for recoverability, to the sum of the undiscounted cash flows expected to result from its use and eventual disposition.  If the asset is deemed to be impaired, then the impairment loss is measured as the amount by which the carrying amount of a long-lived asset exceeds its fair value.  Estimates of future cash flows used to test the recoverability of assets include (1) the future cash flows that are directly associated with the asset and

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    92

CONFIDENTIAL

FHFA13012143

**PROPERTY, PLANT AND EQUIPMENT**                                    C1.9.3

(2) future cash flows that are expected to arise as a direct result of the use and eventual disposition of the asset.

In the event that an asset is deemed to be impaired, the existing cost and accumulated depreciation are collapsed down to create a new asset with a cost basis that represents the adjusted value, with a loss recorded for the difference between the old and new basis. The new cost basis is depreciated (amortized) over the remaining useful life of that asset.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 144 | December 2001 | Accounting for Impairment or Disposal of Long Lived Assets |
| Statement of Financial Accounting Concepts No. 5 | December 1985 | Recognition and Measurement in Financial Statement of Business Enterprises |
| APB 29 | May 1973 | Accounting for Non-monetary Transactions |
| FAS 153 | June 15, 2005 | Exchanges of Non-Monetary Assets |

INTERNAL DOCUMENT
C1.9.3- Property, Plant, & Equipment

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    93

CONFIDENTIAL                                                                              FHFA13012144

**SOFTWARE DEVELOPMENT COSTS**                                    **C1.9.3.1**

## I.  APPLICABILITY

This policy addresses the requirement for the accounting and reporting related to capitalizing internal expenses that becomes internal use software or software that is to be sold, leased, or otherwise marketed.  See C.1.9.3, *Fixed Assets,* for our policy on purchased software. This policy is effective as of December 31, 2004.

## II.  POLICY

### A.  Software Developed for Internal Use

1.  **Internal Use Software Qualifications:** For software to be considered "for internal use", it must meet the two following qualifications:

    a.  The software is acquired, internally developed, or modified solely to meet our internal needs.
    b.  During the software's development or modification, no substantive plan exists or is being developed to market the software externally.

    If software does not meet the criteria set forth above, the software is classified as "Computer Software to be Leased, Sold, or Otherwise Marketed".

2.  **Stages of Software Development & Capitalization Rules:**  The determination of whether a cost should be capitalized or expensed depends on its development stage. The chart below outlines these stages, examples of the type of activity performed, and whether these costs should be capitalized or expensed.

| Stage | Example of Activities Performed During the Stage | Capitalization vs. Expense |
|---|---|---|
| **Preliminary Project Stage** | • Conceptual formulation of ideas and alternatives<br><br>• Evaluation of alternative<br><br>• Determination of existence of needed technology<br><br>• Final selection of alternatives | Expense costs as incurred. |
| **Application Development Stage** | • Design of path, including software configuration and interfaces<br><br>• Coding<br><br>• Installation of | Capitalization of qualifying costs should begin when both of the following occur:<br><br>(1) The preliminary project phase is complete.<br><br>(2) Management with the relevant authority authorizes and commits to funding a computer software project. |

INTERNAL DOCUMENT
C1.9.3.1 Internally Developed Software Costs

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    94

CONFIDENTIAL                                                      FHFA13012145

**SOFTWARE DEVELOPMENT COSTS**                                    **C1.9.3.1**

| Stage | Example of Activities Performed During the Stage | Capitalization vs. Expense |
|---|---|---|
| | hardware<br><br>• Testing, including parallel processing | The following types of costs incurred during the application development stage <u>are capitalized</u> as internal-use software:<br><br>(a)  External direct costs of materials and services consumed in developing or obtaining internal-use software.<br><br>(b)  Payroll and payroll related costs for employees who are directly associated with and who devote time to the internal-use software project (to the extent of time spend directly on the project).<br><br>(c)  Interest costs incurred in developing software for internal use.<br><br>(d)  Costs to develop or obtain software that allow for access or conversion of old data by new systems.<br><br><br>The following types of costs incurred during the application development stage <u>should be expensed</u> as incurred:<br><br>(a)  Training costs<br><br>(b)  Data conversion costs, except for costs to develop or obtain software that allows for access or conversion of old data |
| **Post-Implementation /Operation Stage** | • Training<br><br>• Application maintenance | Capitalization of assets ends when the computer software project is substantially completed and ready for its intended use.<br><br>These costs should be expensed as incurred. |

**3.  Specific Capitalization Rules Not Covered in Chart Above:**

   a.  **Interest Costs** – Interest costs are capitalized during the development period. The amount of interest cost to be capitalized is intended to be that portion of interest cost incurred during the software development period that theoretically could have been avoided. Interest should be capitalized in accordance with FAS 34 and our capitalization policy (see G9.7).

INTERNAL DOCUMENT
C1.9.3.1 Internally Developed Software Costs

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                95

CONFIDENTIAL                                                                    FHFA13012146

b. **Upgrades and Enhancements** – Routine maintenance costs and unspecific upgrades and enhancements to the software are expensed. Specific upgrades and enhancements that add significant capabilities or functionality that the software was previously incapable of providing should be capitalized in accordance with this policy. The upgrades or enhancement may require the review of the functionality of parts of the original software for amortization or impairment.

4. **Multiple-Element Software Arrangements Included in Purchase Price:** If we purchase internal-use computer software from a third party, and the purchase price includes multiple elements (i.e., training, maintenance fee, data conversion costs, reengineering costs, future upgrades), then the cost is allocated to each of the individual elements. The allocation is based on objective evidence of fair value, and accounted for in accordance with the chart in section V.A.2 of this policy.

5. **Impairment:** Impairment of software (as with other intangible assets subject to amortization) should be reviewed in accordance with FAS 144 by applying the recognition and measurement provisions in paragraphs 7-24. An asset is considered impaired if the carrying value exceeds its fair value. We recognize an impairment loss only when the carrying amount of the asset is not recoverable. Recoverability is determined by comparing the carrying amount of the asset on the date it is being evaluated for recoverability to the sum of the undiscounted cash flows expected to result from its use and eventual disposition.
An intangible asset that is subject to amortization should be tested for impairment annually, or more frequently if events or changes in circumstances indicate that the asset might be impaired. FAS 144 provides guidance on changes that could potentially identify impaired software:

a. Internal use computer software is not expected to provide substantive service potential;
b. A significant change occurs in the extent or manner in which the software is used or expected to be used;
c. A significant change is made or will be made to the software program;
d. Costs of developing or modifying internal use software significantly exceed the amount originally expected to develop or modify the software.

If the software is not expected to provide any future service potential, then we will account for it as if it has been abandoned or held for disposal. When it is no longer probable that the software being developed will be completed and placed in service, the asset should be reported at the lower of the carrying amount or fair value, if any, less costs to sell. (Refer to policy section C1.9.3, *Property, Plant and Equipment*, for the accounting related to assets held for disposal and refer to G9.5, *Impairment*, for further information on our impairment policy)

6. **Amortization**: The capitalized costs of computer software developed or obtained for internal use is amortized on a straight-line basis unless another systematic and rational basis is more representative of the software's use. The review of amortization occurs annually both in general and for specific software applications to determine whether the assigned amortization life remains appropriate and/or whether a change is appropriate or impairment has occurred.

INTERNAL DOCUMENT
C1.9.3.1 Internally Developed Software Costs

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                96

CONFIDENTIAL                                                                          FHFA13012147

**B. Software Developed for External Use**

1. **Stages of Software Development & Capitalization Rules**: The determination of whether a cost should be capitalized or expensed depends on its development stage. There are two stages of software development related to external use software – Research and Development, and Production. The following provides a description of the costs incurred during each stage that are capitalized or expensed.

   a. **Research and Development Costs of Computer Software** - All costs incurred to establish the technological feasibility of a computer software product to be sold, leased, or otherwise marketed are considered research and development costs. These costs are charged to expense when incurred.
   The technological feasibility of a computer software product is established when the enterprise has completed all planning, designing, coding, and testing activities that are necessary to establish the product. At a minimum, the following activities must be performed in either (a) or (b) as evidence that technological feasibility has been established.

      i. If the process of creating the computer software product includes a detail program design:

         • The product design and the detail program have been complete, and the enterprise has established that the necessary skills, hardware, and software technology are available to the enterprise to produce the product.
         • The completeness of the detail program design and its consistency with the product design has been confirmed by documenting and tracing the detail program design to product specifications.
         • The detail program design is reviewed for high-risk development issues (for example, novel, unique, unproven functions and features of technology innovations), and any uncertainties related to identified high-risk development issues have been resolved through coding and testing.

      ii. If the process of creating the computer software product does not include a detail program design with the features identified in (a) above:

         • A product design and a working model of the software product have been completed.
         • The completeness of the working model and its consistency with the product design has been confirmed by testing.

   b. **Production Costs of Computer Software-** The cost of producing product masters incurred after establishing technological feasibility is capitalized. Capitalization of computer software costs will end once the product is available for general release to customers. Cost of maintenance and customer support is charged to expense when related revenue is recognized or when those costs are incurred, whichever occurs first. When the sales price of a product includes customer support for several periods and the price of that supports is not

INTERNAL DOCUMENT
C1.9.3.1 Internally Developed Software Costs

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                97

CONFIDENTIAL

FHFA13012148

**SOFTWARE DEVELOPMENT COSTS**                                    C1.9.3.1

separately stated, the estimated related costs is accrued in the same period that the sales price is recognized.

c. **Inventory Costs-** The costs incurred for duplicating the computer software, documentation, and training materials from the product masters and for physically packaging the product for distribution are capitalized as inventory on a unit-specific basis and charged to cost of sales when revenue for the sale of those units is recognized.

2. **Interest Costs:** Refer to section G9.7 for our policy on capitalization of interest costs.

3. **Amortization:** Capitalized software costs related to external use software are amortized on a product-by-product basis. The annual amortization is the greater of the amount computed using (a) the ratio that current gross revenues for a product bear to the total of current and anticipated future gross revenues for the product or (b) the straight-line method over the remaining estimated economic life of the product including the period being reported on. Amortization starts when the product is available for general release to customers.

4. **Purchased Computer Software:** The cost of purchased computer software to be sold, leased, or otherwise marketed that has no alternative future use is accounted for the same as the costs incurred to develop such software internally. If that purchased software has an alternative future use, the cost is capitalized when the software is acquired and accounted for in accordance with its initial use.

5. **Evaluation of Capitalized Software Costs:** On a regular basis, the unamortized capitalized costs of a computer software product are compared to the net realizable value of that product. The amount by which the unamortized capitalized costs of a computer software product exceed the net realizable value of that asset is written off. The net realizable value is the estimated future gross revenues from that product reduced by the estimated future costs of completing and disposing of that product, including the costs of performing maintenance and customer support required to satisfy our responsibility set forth at the time of sale. The reduced amount of capitalized computer software costs that have been written-down to net realizable value at the close of a fiscal period is considered to be the cost for subsequent accounting purposes, and the amount of the write-down will not be subsequently restored.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| SOP 98-1 | March 1998 | Accounting for the Costs of Computer Software Developed or Obtained for Internal Use |

INTERNAL DOCUMENT
C1.9.3.1 Internally Developed Software Costs

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                98

CONFIDENTIAL                                                           FHFA13012149

**SOFTWARE DEVELOPMENT COSTS**                                          C1.9.3.1

| FAS 86 | December 1998 | Accounting for the Costs of Computer Software to be Sold. Leased, or Otherwise Marketed |
|---|---|---|
| FAS 144 | December 2001 | Accounting for the Impairment or Disposal of Long-Lived Assets |
| FAS 34 | December 1979 | Capitalization of Interest Costs |
| FSP on FAS 86 | December 1998 | Staff Position on Accounting for the Costs of Computer Software to be Sold, Leased, or Otherwise Marketed |

INTERNAL DOCUMENT
C1.9.3.1 Internally Developed Software Costs

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          99

CONFIDENTIAL                                                                   FHFA13012150

**INTANGIBLE ASSETS**          C1.9.4

## I.  APPLICABILITY

This policy addresses the accounting and reporting for intangible assets and goodwill, including:

- Determining the initial carrying amount
- Allocating the carrying amount to the accounting periods benefited by the intangible asset
- Determining whether an intangible asset has a finite or indefinite useful life
- Testing and recognition of impairment

This policy does not address the acquisition of goodwill and other intangible assets in a business combination. For accounting related to software, refer to policy C1.9.3.1, *Software Development Costs*. For accounting related to insurance contracts and other forms of credit enhancements, refer to policy D5.1, *Credit Enhancements*.  This policy is effective as of December 31, 2004.

## II.  POLICY

We account for the acquisition or creation of intangible assets and goodwill in accordance with FAS 142, *Goodwill and Other Intangible Assets*.  We (1) record the carrying amount; (2) amortize the cost over the asset's useful life for those assets with finite lives; and, (3) appropriately evaluate and recognize any impairment of the asset if the carrying value declines substantially and permanently below the fair value.
Intangible assets are recognized and measured based on fair value.
Intangible assets with finite useful lives are amortized over their useful lives. The amount to be amortized is calculated as the amount initially assigned to the asset less any residual value. Intangible assets with an indefinite useful life are not amortized.
We perform an impairment analysis on finite-lived intangibles whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.  An impairment analysis is performed at least annually for those intangibles with indefinite lives. Costs of internally developing, maintaining, or restoring intangible assets that are not specifically identifiable, that have indeterminate lives, or that are inherent in a continuing business and related to an entity as a whole, are recognized as an expense when incurred.

### Intangible Assets Other Than Goodwill

**A.  Initial Recognition and Measurement**
Intangible assets may be created or acquired individually or with a group of other assets, or internally developed. Intangible assets are recognized and measured based on fair value.

**B.  Amortization of Intangible Assets**
The accounting for an intangible asset is based on its useful life.  An intangible asset with a finite useful life is amortized over the best estimate of its useful life. Those with an indefinite useful life are not amortized but are periodically tested for impairment.

    1.  **Intangible Assets Subject to Amortization**

       a.  The useful life of an intangible asset is the period over which the asset is expected to directly or indirectly contribute to our future cash flows.

INTERNAL DOCUMENT
C1.9.4 Intangible Assets

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae     100

CONFIDENTIAL                 FHFA13012151

b.   The estimate of the useful life of an intangible asset to an entity is based on an analysis of all pertinent factors, in particular:

    i.   The expected use of the asset by the entity;

    ii.   The expected useful life of another asset or a group of assets to which the useful life of the intangible asset may relate;

    iii.   Any legal, regulatory, or contractual provisions that may limit the useful life;

    iv.   Any legal, regulatory, or contractual provisions that enable renewal or extension of the asset's legal or contractual life without substantial cost (provided there is evidence to support renewal or extension and renewal or extension can be accomplished without material modifications of the existing terms and conditions);

    v.   The effects of obsolescence, demand, competition, and other economic factors (such as the stability of the industry, known technological advances, legislative action that results in an uncertain or changing regulatory environment, and expected changes in distribution channels);

    vi.   The level of maintenance expenditures required to obtain the expected future cash flows from the asset (for example, a material level of required maintenance in relation to the carrying amount of the asset may suggest a very limited useful life).

c.   If no legal, regulatory, contractual, competitive, economic, or other factors limit the useful life of an intangible asset, the useful life of the asset is considered to be indefinite. Explicit approval of the accounting policy group is required prior to concluding an intangible asset has an indefinite life.

d.   The method of amortization reflects the pattern in which the economic benefits of the intangible asset are consumed or used up.  If the pattern cannot be determined, then a straight-line amortization method should be used.

e.   The amortization amount of the intangible asset is the amount initially assigned to the asset less any residual value.

f.   An evaluation of the remaining useful life of an amortized intangible asset should be performed periodically to determine whether circumstances warrant a revision to the remaining period of amortization.  If the estimated remaining useful life is changed, then the remaining carrying amount shall be amortized prospectively over the revised remaining useful life.

## C.   Recognition and Measurement of an Impairment Loss

### 1.   Intangible Assets Subject to Amortization

Impairment for intangible assets subject to amortization should be reviewed in accordance with FAS 144, *Accounting for Impairment or Disposal of Long-Lived Assets.*   An asset is considered impaired if the carrying amount exceeds its fair value.  We recognize an impairment loss only when the carrying amount of the asset is not recoverable.

Recoverability is determined by comparing the carrying amount of the asset on the date it is being evaluated for recoverability to the sum of the undiscounted cash flows expected to result from its use and eventual disposition.

An intangible asset that is subject to amortization should be tested for impairment annually, or more frequently if events or changes in circumstances indicate that the

INTERNAL DOCUMENT
C1.9.4 Intangible Assets

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                101

CONFIDENTIAL                                                         FHFA13012152

asset might at least be impaired. The following list provides a guide to situations that warrant an evaluation of an asset or group of assets for recoverability to determine if an impairment loss must be recognized:

a.  A significant decrease in the market price of a long-lived asset
b.  A significant adverse change in the extent or manner in which a long-lived asset is being used or in its physical condition
c.  A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset, include an adverse action or assessment by a regulator
d.  An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset
e.  A current period operation or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset
f.  A current expectation that, more likely than not, a long-lived asset will be sold or otherwise disposed of significantly before the end of its previously estimated useful life

If the carrying amount of an intangible asset is not recoverable and its carrying amount exceeds its fair value, we recognize an impairment loss to adjust the carrying amount of the asset to its fair value.  The adjusted carrying amount of the intangible asset becomes its new basis. This policy does not contemplate the tax impacts of FAS 109, *Accounting for Income Taxes,* on recording this transaction.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV.  APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 142 | December 2001 | Goodwill and Other Intangible Assets |
| FAS 144 | December 2001 | Accounting for the Impairment or Disposal of Long-Lived Assets |
| FASB Concept 7 | February 2000 | Using Cash Flow Information and Present Value in Accounting Measurements |

CONFIDENTIAL                                                         FHFA13012153

## I.  APPLICABILITY

This section addresses the accounting for corporate-owned life insurance ("COLI").

Refer to D.5.3.6, *Corporate Insurance*, for the accounting related to other types of corporate insurance such as property and casualty, liability, crime, environmental and business interruption risks, and workers' compensation. This policy is effective as of December 31, 2004.

## II.  POLICY

1.  **Life Insurance Investment Accounting:**  We account for an investment in COLI by recording an expense, on the date of purchase, equal to the difference between the purchase price of the life insurance contracts and its cash surrender value ("CSV") as well as any additional amounts provided by the contractual terms of the insurance policy that are realizable at the balance sheet date ("additional contractual amounts"). The CSV and additional contractual amounts are recorded as an asset.

    Subsequent premium payments are treated similarly, with an expense recorded for the difference between the cash paid and the increase in CSV and additional contractual amounts.

    We record any other change in CSV, additional contractual amounts, or contract value during the period (i.e., from the investment return on the portfolio of invested assets, cost of insurance, and administrative expenses) to income or expense as an adjustment of premiums paid.

2.  **Deferred Taxes:**  For income tax purposes, premiums paid on life insurance contracts under which we are the beneficiary are not deductible, and death benefits are excluded from taxable income.  However, receipts may be taxable if the contract is terminated for reasons other than death of the insured.

3.  **Derivative-Like Provisions:**  Derivative-like provisions in COLI contracts do not meet the definition of embedded derivatives.  We account for our investment in a life insurance contract in its entirety.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV.  APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FTB 85-4 | November 1985 | Accounting for Purchases of Life Insurance |
| DIG Issue B31 | May 2003 | Accounting for Purchases of Life Insurance |
| EITF 88-5 | February 1992 | Recognition of Insurance Death Benefits |
| EITF 06-5 | January 2007 | Accounting for Purchases of Life Insurance - Determining |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    103

CONFIDENTIAL                                                          FHFA13012154

**COLI**                                                                    **C.1.9.5**

| | | the Amount that Could be Realized in Accordance with FASB Technical Bulletin No. 85-4 |
|---|---|---|

INTERNAL DOCUMENT
Confidential and Proprietary - Restricted. Confidential Treatment Requested by Fannie Mae
G9.5  – Corporate-Owned Life Insurance

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          104

CONFIDENTIAL                                                         FHFA13012155

**PREPAID EXPENSES**                                                C1.9.6

## I.  APPLICABILITY

This policy addresses how cash paid in advance for services and/or products are recognized as prepaid expenses. For accounting related to insurance contracts and other forms of credit enhancements, refer to policy D5.1, *Credit Enhancements.* This policy is effective as of December 31, 2004.

## II.  POLICY

We defer and record prepaid expenses as assets in the financial statements.  We expense prepaid assets when the item has been consumed or the service period expired.

Prepaid expenses are recognized as assets on the balance sheet until services are consumed. Prepayments that relate to specific time periods are recognized as an expense in such periods. Prepayments for items that are consumed, such as supplies, are charged to expense as used.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable.

## IV.  APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| ARB 43, Chapter 3 | May 1993 | Working Capital |

INTERNAL DOCUMENT
C1.9.6 – Prepaid Expenses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          105

CONFIDENTIAL                                                FHFA13012156

---

**INCOME TAXES**                                                                    **C1.10**

---

## I.  APPLICABILITY

We are subject to federal income taxes and are required to account for income taxes in our financial statements in accordance with FAS 109, *Accounting for Income Taxes*, FIN 48, *Accounting for Uncertainty in Income Taxes* and FIN 18, *Accounting for Income Taxes in Interim Periods*. We are not subject to state income taxes.

This section of the accounting policy manual addresses the accounting for current, deferred and FIN 48 income taxes in the quarterly and annual financial statements, including the tax effects of gains and losses on transactions recorded in other comprehensive income.

Tax benefits related to low income housing tax credit investments ("LIHTC") and synthetic fuel investments ("Synfuel") are covered in sections C.1.9.1, Low Income Housing Tax Credits, and C.1.9.2, Other Investments.

Non-income related taxes (property, sales and use, etc.) are covered in section 5.3.7, Other Administrative Expenses.

## II. BUSINESS OVERVIEW

We operate solely in the United States. We are subject to U.S. federal income tax but are exempt from state and local taxes. We do pay other forms of non-income related taxes at the state and local level.

Historically, the effective tax rate on our reported income has been lower than the statutory tax rate (which is 35%) due to tax benefits from low-income housing tax credits as well as other tax-exempt income and tax credits.

## III.   POLICY

FAS 109 has a balance sheet orientation and requires that current tax assets and liabilities be recognized as filed in tax returns and that deferred tax assets and liabilities be based on the amounts expected to be realized and obligations expected to be incurred, respectively. FAS 109 uses a concept of "temporary differences," representing differences in the income tax basis and the financial reporting carrying value of assets and liabilities if the reversal of those differences will result in taxable or deductible amounts in future years. "Permanent differences" relate to situations where the differences will never reverse and result in either a taxable or deductible amount.  Additionally, the tax effects of certain transactions such as share-based payment transactions are recognized as part of stockholders' equity in the balance sheet.

FIN 48 provides interpretative guidance on the recognition and measurement of all tax positions accounted for under FAS 109.  The benefits of tax positions taken in tax returns that do not satisfy the recognition and measurement requirements specified in FIN 48 will result in the recording of "unrecognized tax benefits" through either (1) an increase in FIN 48 liability or deferred tax liability, (2) a decrease in FIN 48 asset or deferred tax asset, or (3) an adjustment to stockholders' equity.

In addition, unrecognized tax benefits will also result in the recognition of interest expense payable and/or tax penalty payable as other expenses in the income statement. Thereafter, the

INTERNAL DOCUMENT
Confidential and Proprietary - Restricted. Confidential Treatment Requested by Fannie Mae.
C1.10 – Income Taxes

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          106

CONFIDENTIAL                                                                        FHFA13012157

**INCOME TAXES**                                                    **C1.10**

income tax provision and other expenses are adjusted for subsequent changes in income tax assets and liabilities and the associated interest expense and/or penalty payable, respectively.

Where the tax computation results in deferred tax assets, the assets may need to be reduced by a valuation allowance unless it is "more likely than not" that they will be realized in the future. Therefore, an assessment as to the realization of these assets must be made on a periodic basis.

Income tax expense/ benefit for the year is allocated among continuing operations, discontinued operations, extraordinary items, and items charged or credited directly to shareholders' equity.

## IV.    RECOGNITION AND MEASUREMENT

### A.    Basic Principles

Current tax expense and deferred tax expense/benefit are recognized as follows:

1.  A current income tax liability or asset is recognized for the estimated taxes payable or refundable on tax returns for the current year.

2.  A deferred tax liability or asset is recognized for the estimated tax effects attributable to temporary differences and carryforwards.

3.  The determination of the current and deferred tax liabilities and assets is based on provisions of the enacted tax law; the effects of future changes in tax laws or rates are not anticipated. The effect is included in income from continuing operations for the period that includes the enactment date.

4.  Current and deferred tax assets or liabilities and tax-related component of stockholder equity are adjusted, if applicable, based on the recognition and measurement requirements of tax benefits under FIN 48.

5.  The measurement of current and deferred tax assets is reduced through a valuation allowance, if necessary, by the amount of any tax benefits that, based on available evidence, are not expected to be realized.

6.  Interest and penalties are recorded as appropriate.

### B.    Current Tax Computation

The current portion of the tax provision equals the taxes paid or refundable as shown on our tax return for the year.  Because the current tax provision must be determined before the tax return is filed, we estimate the taxes to be paid based upon financial data available at the financial statement date. We apply the statutory tax rate of 35% to the estimate of taxable income to arrive at the current tax provision reported in the financial statements. The computation of the current provision is broken into the following steps:

Book (Income)/Loss before taxes
+/- Current year permanent differences

INTERNAL DOCUMENT
Confidential and Proprietary - Restricted. Confidential Treatment Requested by Fannie Mae.
C1.10 – Income Taxes

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                     107

CONFIDENTIAL                                                              FHFA13012158

+/- Current year temporary differences
= Taxable (Income)/Loss before Net Operating Losses (NOL)
    Less:  NOL Carryforward
= Taxable (Income)/Loss times the statutory tax rate of 35%.

Because differences arise between the current tax provision shown on the financial statements and the actual taxes on the tax return, a tax provision to tax return reconciliation must be computed. We adjust the current provision for income taxes and the corresponding deferred income tax assets and liabilities in the period that the return for the prior year is filed (generally the third quarter of the subsequent year).

The current tax provision must also be adjusted so that it reflects the result of audits by the Internal Revenue Service (IRS). See section V.2 for further information.

**C.     Deferred Tax Computation**

Temporary differences are the basis of deferred tax calculations.  A temporary difference is any difference between the tax basis of assets or liabilities and their reported amounts in the financial statements that will result in taxable income or deductions upon its reversal at some future date.  If a basis difference will not affect future taxable income, it is not a temporary difference.  The most common types of temporary differences listed in FAS 109 are as follows:

1. Revenues or gains that are taxable after they are recognized in financial income.  An asset (for example, a receivable from an installment sale) may be recognized for revenues or gains that will result in future taxable amounts when the asset is recovered.

2. Expenses or losses that are deductible after they are recognized in financial income.  A liability (for example, a product warranty liability) may be recognized for expenses or losses that will result in future tax deductible amounts when the liability is settled.

3. Revenues or gains that are taxable before they are recognized in financial income.  A liability (for example, subscriptions received in advance) may be recognized for an advance payment for goods or services to be provided in future years.  For tax purposes, the advance payment is included in taxable income upon the receipt of cash.  Future sacrifices to provide goods or services (or future refunds to those who cancel their orders) will result in future deductions for tax when the liability is settled.

4. Expenses or losses that are deductible before they are recognized in financial income.  The cost of an asset (for example, depreciable personal property) may have been deducted for tax purposes faster than it was depreciated for financial reporting.  Amounts received upon future recovery of the amount of the asset from financial reporting will exceed the remaining tax basis of the asset, and the excess will be taxable when the asset is recovered.

Generally, the deferred tax provision is calculated using the following approach:

a. Identify (a) the types and amounts of all temporary differences and (b) the nature and amounts of all operating loss and tax credit carryforwards, including the remaining carryforward period.

INTERNAL DOCUMENT
Confidential and Proprietary - Restricted. Confidential Treatment Requested by Fannie Mae.
C1.10 – Income Taxes

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          108

CONFIDENTIAL                                                          FHFA13012159

**INCOME TAXES**                                                              **C1.10**

b. Estimate the applicable tax rate, which is the enacted tax rates expected to apply to taxable income in the periods in which the deductible or taxable temporary difference is expected to be realized or settled, respectively.  Currently, this is the federal tax rate of 35%.

c. Measure the total deferred tax liability for taxable temporary differences using the applicable tax rate.

d. Measure the total deferred tax asset for deductible temporary differences and tax operating loss carryforwards using the applicable tax rate.

e. Measure deferred tax assets for each type of tax credit carryforward.

D.   **Items Charged or Credited Directly to Equity or Accumulated Other Comprehensive Income/Loss**

1.  Equity

FAS 109 and SOP 76-3 specifically allocate to contributed capital in shareholders' equity the tax effects of the following items:

a. Increases or decreases in contributed capital

b. Increase in tax basis resulting from a taxable pooling to the extent that the tax benefit is recognized (i.e., no valuation allowance is required for the tax asset) at the date of the pooling

c. Expenses for employee stock options recognized differently for financial reporting and tax purposes (FAS 123(R)).

d. Deductible temporary differences and carryforwards that existed, but for which a valuation allowance was required, at the date of a quasi reorganization

Certain tax benefits arising prior to, but first recognized after, SOP 90-7 "fresh start" reporting in a formal reorganization after reducing goodwill and other intangible assets.

2.  Accumulated Other Comprehensive Income

We have securities which are designated as "available-for-sale" in accordance with Financial Accounting Standard No. 115, *Accounting for Certain Investments in Debt and Equity Securities.*  Available-for-sale securities are initially measured at fair value and subsequent unrealized gains and losses are recorded as a component of accumulated other comprehensive income/loss.

The unrealized gains and losses of derivatives qualifying as cash flow hedges are also reported as a separate component of accumulated other comprehensive income/loss in accordance with FAS 133, *Accounting for Derivative Instruments and Hedging Activities.*

Tax effects of gains and losses included in comprehensive income/loss are charged or credited directly to the related item in accumulated other comprehensive income/loss, and

Page 4 of 10

INTERNAL DOCUMENT
Confidential and Proprietary - Restricted. Confidential Treatment Requested by Fannie Mae.
C1.10 – Income Taxes

CONFIDENTIAL                                                           FHFA13012160

corresponding deferred tax assets or liabilities are recorded.  For example, a deferred tax asset/liability relating to unrealized gain/loss of available-for-sale investments would be recognized on the balance sheet, with a corresponding debit/credit for the unrealized gain/loss amount relating to the investments recorded directly in accumulated other comprehensive income/loss.

E.    **Uncertain Tax Positions**

FIN 48 provides guidance on the accounting and disclosures relates to uncertainty in income taxes.  FIN 48 applies to all tax positions accounted for within an enterprise's financial statements, which are tax positions for all open tax years, in all tax jurisdictions, and are accounted for in accordance with FAS 109.  These tax positions either have been included in a previously filed tax return or are expected to be taken on a future tax return.

The tax benefits (1) recognized in current and deferred tax assets or liabilities or (2) charged or credited to equity, as described in the current and deferred tax computation sections, will need to be evaluated and adjusted based on the recognition and measurement requirements in FIN 48.  The primary provisions of FIN 48 include:

1.   <u>Recognition:</u> tax benefits of a tax position is recognized only if it is more-likely-than-not that the tax position will be sustained based on technical merits, upon examination by the taxing authority;

2.   <u>Measurement:</u> if the recognition threshold is met, the tax benefit recognized is measured at the largest amount of tax benefit that is greater than 50% likely of being realized upon settlement with the taxing authority.

As a result of applying the recognition and measurement requirements of FIN 48, the difference in tax benefits recorded in the financial statements and those included in tax returns filed or to be filed, hereafter the "Unrecognized Tax Benefit," will be recognized as either:

- FIN 48 tax liability which will be classified as an other liability
  - FIN 48 tax liabilities arising from taxable temporary differences will offset with a corresponding entry to the related deferred tax liability
  - FIN 48 tax liabilities arising from deductible temporary differences will offset with a corresponding entry to the related deferred tax asset
- FIN 48 adjustment to tax refund receivable which will be classified as an other asset
- FIN 48 adjustment to Additional Paid-In Capital (APIC) if the difference relates to transactions of which the tax effects are recorded in APIC (e.g., share-based payment transactions).

We will recognize the benefit of a tax position that previously failed the recognition threshold in the first interim period in which new information[1] that indicates:

a.   a change in how the taxing authority might view a tax position that leads to the recognition threshold being met by the reporting date
b.   the statue of limitations has expired or

---

[1] the new information is not the same with information obtained from a re-evaluation/re-interpretation of previously available facts and circumstances

Page 5 of 10

INTERNAL DOCUMENT
Confidential and Proprietary - Restricted. Confidential Treatment Requested by Fannie Mae.
C1.10 – Income Taxes

CONFIDENTIAL

**INCOME TAXES**                                              **C1.10**

    c.  the tax matter is "effectively settled" with the taxing authority

A tax position is considered effectively settled with the taxing authority if <u>all</u> of the following conditions have been satisfied as provided in FSP FIN 48-1, *Definition of Settlement in FASB Interpretation No. 48* :

    a.  The taxing authority has completed its examination procedures including all appeals and administrative reviews that the taxing authority is required or expected to perform for the tax position.

    b.  The company does not intend to appeal or litigate any aspect of the tax position included in the completed examination.

    c.  It is remote that the taxing authority would examine or reexamine any aspect of the tax position.  In making this assessment, the company shall consider the taxing authority's policy on reopening closed examinations and the specific facts and circumstances of the tax position.  The company shall presume the taxing authority has full knowledge of all relevant information in making the assessment on whether the taxing authority would reopen a previously closed examination.

The financial statement effect (recognized tax benefits) of a tax position will be derecognized in the first period in which it no longer meets the recognition threshold.  Use of a valuation allowance is not a permitted substitute for derecognizing the benefit of a tax position when the recognition threshold is no longer met.

### F.    **Valuation Allowance**

A valuation allowance is recorded to reduce deferred tax assets if, based on the weight of all available evidence, it is more likely than not (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized.

Future realization of the tax benefit of an existing deductible temporary difference or carryforward ultimately depends on the existence of sufficient taxable income of the appropriate character (i.e., ordinary or capital) within the carryback or carryforward period available under the appropriate tax law.  FAS 109 requires us to consider future taxable income and other available evidence when assessing the need of a valuation allowance.  The following sources of taxable income should be considered:

- Future reversal of existing taxable differences
- Taxable income in carryback years (if carryback is permitted under applicable law)
- Tax planning strategies
- Future taxable income

All sources of taxable income must be considered before a valuation allowance is established.

The effect of a change in the beginning-of-the-year balance of a valuation allowance that results from a change in circumstances that causes a change in judgment about the realizability of the related deferred tax asset in future years ordinarily shall be included in income from continuing operations.

### G.    **Interest and Penalties**

INTERNAL DOCUMENT
Confidential and Proprietary - Restricted. Confidential Treatment Requested by Fannie Mae.
C1.10 – Income Taxes

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae       111

CONFIDENTIAL                                                         FHFA13012162

**INCOME TAXES**                                                                      **C1.10**

When there is an underpayment of tax due to unrecognized tax benefits, we would be required to pay interest on the underpaid tax at the rate specified by the IRS.  We accrue for such interest in the first period the interest would start accruing according to the provisions of the relevant tax law and continuing until the tax positions are settled.  Interest expense recognized is calculated by multiplying the applicable statutory interest rate with the difference between tax benefit recognized for a tax position in accordance with FIN 48 and the amount previously taken or expected to be taken in a tax return.  On the other hand, overpayment of taxes will generate interest income recognition.

In addition, the company will recognize a penalty in the first period in which a tax position that does not meet the minimum statutory threshold was taken or is expected to be taken in the tax return.
Interest expense and penalty will be derecognized in the first interim period in which the recognition threshold is subsequently met, the statue of limitation has expired or the tax matter is effectively settled with the taxing authority.

The company classifies, on a pre-tax basis, the related charges (for interest expense and penalties) as other expenses and the related credits (for interest income) as fee and other income.  In the balance sheet, on a pre-tax basis, the outstanding balance of (1) interest expense is presented as part of accrued interest payable, (2) interest income is presented as part of accrued interest receivable and (3) penalties is presented as part of other liabilities.  Also, the amounts of cash payment and receipt from interest and penalties are presented as part of cash flow from income taxes in the statement of cash flow.

H.   **Intraperiod Allocation**

FAS 109 provides various rules for allocating the total tax expense or benefit for the year to various "categories" of income and other items recognized during the year.  Those categories include ones which are included in net income, e.g., continuing operations, discontinued operations, extraordinary items, and ones which are included in comprehensive income but excluded from net income.

The total tax effects relate to income from continuing operations and other categories of income and other items.  If there is only one item in the current year besides income from continuing operations, the difference between the tax allocated to continuing operations and the total tax expense/benefit for the year is allocated to the other item.

If there are two or more categories other than continuing operations, the tax effect of each item on the total tax expense/benefit is determined.  If the sum of these tax effects does not equal the difference between the tax allocated to continuing operations and total tax expense/benefit for the year, the procedures to allocate the remaining amount to items other than continuing operations are as follows:

1.  Determine the effect on income tax expense or benefit for the year of the total net loss for all net loss items.

2.  Apportion the tax benefit determined in (a) ratably to each net loss item.

INTERNAL DOCUMENT
Confidential and Proprietary - Restricted. Confidential Treatment Requested by Fannie Mae.
C1.10 – Income Taxes

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                112

CONFIDENTIAL                                                    FHFA13012163

3.  Determine the amount that remains, that is, the difference between (1) the amount to be allocated to all items other than continuing operations and (2) the amount allocated to all net loss items.

4.  Apportion the tax expense determined in (c) ratably to each net gain item.

I. **Accounting for Income Taxes in Interim Periods**

We record a provision for income taxes or a tax benefit in the quarterly financial statements. The calculation of the quarterly tax provision/benefit and presentation of income taxes in interim periods encompasses the following:

1.  *Estimated annual effective tax rate*

   We first calculate the "estimated annual effective tax rate," which is an estimate of the tax expense or benefit expected for the fiscal year, stated as a percentage of our estimated "ordinary" income.

   "Ordinary" income (or loss) refers to income (or loss) from continuing operations before income taxes (or benefits) excluding (i) significant unusual or (ii) infrequently occurring items.

   Extraordinary items, discontinued operations, and cumulative effects of changes in accounting principles, are also excluded from "ordinary" income.

   At the end of each interim period, the estimated "ordinary" income includes: (1) the most up-to-date forecast of components of income (or loss) from continuing operations before income taxes (or benefits) for which the company could reliably estimate and (2) the actual year-to-date amount of other components of income (or loss) from continuing operations before income taxes (or benefits) for which the company does not forecast.

2.  *Interim period tax (or benefit) applicable to "ordinary" income*

   The estimated annual effective tax rate is applied to our year-to-date "ordinary" income (or loss) at the end of the interim reporting period to compute year-to-date tax (or benefit) applicable to "ordinary" income.

   The interim period tax (or benefit) related to "ordinary" income (or loss) is the difference between the amount so computed and similar amounts reported for previous interim periods of the fiscal year.

3.  *Tax related to significant unusual, infrequently occurring or extraordinary items*

   The taxes relating to significant unusual, infrequently occurring or extraordinary items are recorded in the period in which they occur.  The income tax on significant unusual or infrequently occurring or extraordinary items is determined by multiplying their balance in the income statement with the statutory tax rate.

4.  *Recognition of the tax benefit of a loss*

INTERNAL DOCUMENT
Confidential and Proprietary - Restricted. Confidential Treatment Requested by Fannie Mae.
C1.10 – Income Taxes

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL

**INCOME TAXES**                                                              **C1.10**

The estimated tax benefit of an "ordinary" loss or a significant unusual, infrequently occurring, or extraordinary loss is recognized only if the tax benefit is expected to be (a) realized during the year or (b) recognizable as a deferred tax asset at the end of the year. Realization would appear to be more likely than not if future taxable income from "ordinary" income during the current year is expected.

5. *Interim financial statement presentation and disclosure*

Extraordinary items and discontinued operations that will be presented net of related tax effects in the financial statements for the fiscal year shall be presented net of related tax effects in the interim financial statements.

Unusual or infrequently occurring items that will be separately disclosed in the financial statements for the fiscal year shall be separately disclosed as a component of pre-tax income from continuing operations, and the tax (or benefit) related to such items shall be included in the tax (or benefit) related to continuing operations.

6. *Change in Judgment from FIN 48 recognition and measurement analysis*

A change in judgment that results in subsequent recognition, derecognition, or change in measurement of tax benefit in a tax position taken <u>in a prior fiscal year</u> (including any related interest and penalties) will be recognized entirely in the interim period in which the change occurs.

A change in judgment that results in subsequent recognition, derecognition, or change in measurement of the tax benefit of a tax position taken in a prior interim period within the same fiscal year will be recognized partially in the interim period in which the change occurs, with the remainder recognized over the remaining interim periods (by being incorporated into the annual estimated effective tax rate) as required by FIN 18, Accounting for Income Taxes in Interim Period and APB Opinion No. 28, Interim Financial Reporting.

Application of the provisions described above may result in a significant variation in the customary relationship between income tax expense and pre-tax accounting income.  The reasons for significant variations in the customary relationship between income tax expense and pre-tax accounting income shall be disclosed if they are not otherwise apparent from the financial statements or from the nature of the business.

## VI.   FINANCIAL STATEMENT PRESENTATION AND DISCLOSURES

Please refer to the most current comprehensive 10-K / 10-Q disclosure checklists for the disclosure and presentation requirements.

## VII.   QUESTIONS AND INTERPRETIVE RESPONSES

See accounting policy memo "FIN 48 Implementation Q&As."

## VIII.   APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective | Title |
| --- | --- | --- |

INTERNAL DOCUMENT
Confidential and Proprietary - Restricted. Confidential Treatment Requested by Fannie Mae.
C1.10 – Income Taxes

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                114

CONFIDENTIAL                                                                 FHFA13012165

**INCOME TAXES**                                            **C1.10**

|  | Date |  |
|---|---|---|
| FAS 109 | Jan 1993 | Accounting for Income Taxes |
| FIN 48 | Jan 2007 | Accounting for Uncertainty in Income Taxes |
| FSP FIN 48-1 | Jan 2007 | Definition of Settlement in FASB Interpretation No. 48 |
| FIN 14 | Jan 1977 | Reasonable Estimation of the Amount of a Loss - an interpretation of FASB Statement No. 5 |
| FAS 104 | Jan 1991 | Statement of Cash Flows |
| APB 28 | Jan 1974 | Interim Financial Reporting |
| FIN 18 | Jan 1977 | Accounting for Income Taxes in Interim Periods |
| FAS 130 | Jan 1998 | Reporting Comprehensive Income |
| EITF Topic D-30 | Jan 1993 | Adjustment Due to Effect of a Change in Tax Laws or Rates |
| FAS Implementation Guides FAS 109 Q&A | Jan 1993 | A Guide to Implementation of Statement 109 on Accounting for Income Taxes: Questions and Answers |

INTERNAL DOCUMENT
Confidential and Proprietary - Restricted. Confidential Treatment Requested by Fannie Mae.
C1.10 – Income Taxes

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          115

CONFIDENTIAL
FHFA13012166

## I.  APPLICABILITY

This policy applies to Fannie Mae's debt transactions and positions.  The areas that this policy addresses are: carrying value, interest expense, extinguishment, modification, and foreign currency debt. This policy is effective as of December 31, 2004.

## II.  POLICY

### A.  Carrying value

We record debt as a liability at issuance (settlement date) in an amount equal to the proceeds we receive (i.e., face amount plus or minus any premium or discount and other deferred price adjustments).  We account for indirect costs associated with issuing debt as expenses in the period in which we incurred them.  Together, we refer to premiums and discounts as "deferred price adjustments." The carrying amount of debt is its amortized cost basis which is the sum of: (1) the face amount of the instrument and (2) any unamortized deferred price adjustments.

Debt securities denominated in a foreign currency are translated into U.S. dollars using foreign exchange spot rates at the balance sheet dates and any gains/losses are reported in current period earnings as a foreign currency transaction gain or loss.

### B.  Interest expense

Interest expense for a given period is the combination of the instrument's (1) interest per the note's coupon rate; and (2) amortization of deferred price adjustments. The sum of these two elements comprises the debt's effective interest expense.  Thus, the effective interest rate on each debt instrument is the internal rate of return that discounts all contractual cash flows to the debt's initial carrying amount, including deferred price adjustments.

We amortize deferred price adjustments under the interest method using the effective interest rate over the contractual term of the debt.  We do not consider call dates or the probability of calling debt but amortize deferred price adjustments to the contractual maturity date of the debt.

### C.  Extinguishment

We consider debt to be extinguished under the following conditions:

- We pay the investor (i.e. bond holder) and are relieved of our obligation to the investor.  This includes exercising our call option on callable debt and repurchasing debt in a market transaction.
- We are legally released from being the primary obligor of the debt, either judicially or by the investor.
- We substantially modify the terms of a debt instrument such that the present value of the future cash flows under the modified debt instrument are at least 10% different from the present value of the remaining cash flows under the

INTERNAL DOCUMENT
C2.1 – Debt

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                116

CONFIDENTIAL                                                                                      FHFA13012167

original debt (see further explanation under the "debt modification" section below).

We recognize gains or losses from the early extinguishment of debt as ordinary income or expense in the period that we extinguish the debt.  The gain or loss is the difference between the carrying amount of the debt and the repurchase price (or the redemption value in the case of callable debt), including the direct costs associated with the repurchase.

### D.  Modification

We can extinguish an existing debt instrument by replacing it with a new debt instrument. When the new and replaced debt instruments have substantially different terms, we extinguish the old debt instrument and account for the issuance of the new debt instrument. "Substantial" is defined as a change in which the present value of the cash flows of the new debt instrument is at least 10% different from the present value of the remaining cash flows under the original terms.

In a debt extinguishment that results from a substantial modification, we initially account for the modified (i.e. "new") debt instrument at fair value.  We also use the fair value of the new debt instrument to determine the debt extinguishment gain or loss and the effective interest rate of the new instrument. We include any fees that we pay to the creditor in connection with an extinguishment in determining the debt extinguishment gain or loss.  Costs paid to third parties should be amortized over the term of the new debt using the interest method in a manner similar to debt issuance costs.

When the changes to the terms of the debt are not "substantial", we do not account for an extinguishment of the modified debt instrument but we determine the new effective interest rate based on the carrying amount of the original debt and the revised cash flows.  Any fees paid by the debtor to the creditor along with any preexisting unamortized premium or discount is amortized as an adjustment to interest expense over the remaining term of the debt using the interest method. Any fees received (e.g., to cancel a debtor's call option) are similarly accounted for. Costs paid to third parties are expensed as incurred.

### E.  Foreign currency debt

1.  **Principal –** We issue debt in foreign currency and account for it on the transaction date at the spot foreign exchange price on that date. At subsequent balance sheet dates we convert the principal balance and unamortized deferred price adjustments into U.S. Dollars using the spot exchange rate.  We account for the difference in the exchange rates between the balance sheet dates as a foreign currency transaction gain or loss.

2.  **Premium or Discount -** We account for the unamortized debt balance in the foreign currency and convert it into US dollars at the spot rate at the balance sheet date.  We calculate the amortization or accretion of deferred price adjustments for the period in the foreign currency and convert it in U.S. Dollars using the weighted average exchange rate for the period.  We

INTERNAL DOCUMENT
C2.1 – Debt

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                117

CONFIDENTIAL                                                                    FHFA13012168

account for the difference in rates arising from the month-end spot exchange rate used to calculate the unamortized debt balance and the weighted average exchange rate used to record the amortization expense as a foreign currency transaction gain or loss for the period.

3. **Interest Accruals/Expense on Debt –** We calculate interest accruals that are denominated in a foreign currency in the foreign currency and then convert them into U.S. Dollars at each balance sheet date using the spot exchange rate.  As we incur interest expense over the month, we translate the expense into U.S. Dollars using the appropriate weighted average exchange rate for each reporting period.  We record the difference in rates arising from the month-end spot exchange rate used to calculate the interest accruals and the weighted average exchange rate used to record the interest expense as a transaction gain or loss for the period.

4. **Debt Issuance Costs –** We incorporate debt issuance costs that we pay in a foreign currency into the basis of our foreign currency debt for the purpose of calculating its effective yield.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

<u>Increasing Rate Debt</u>

**Question 1:  What is the basis of amortization for premiums and discounts on callable debt with step rate increases (i.e., should they be amortized to the contractual maturity of the debt or the estimated life of the debt)?**

We amortize interest cost and debt issuance costs (premiums, discounts and other deferred price adjustments) on step-up, callable debt over the contractual life of the debt instrument using the interest method.

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| SFAS 140 | April 1, 2001 | Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities |
| EITF 96-19 | 1998 | Debtor's Accounting for a Modification or Exchange of Debt Instruments |
| SFAS 52 | January 1, 1983 | Foreign Currency Translation |

CONFIDENTIAL                                                    FHFA13012169

**DERIVATIVE INSTRUMENTS**                                                    **C2.2**

## I.  APPLICABILITY

This policy is effective as of April 15, 2008.

This policy applies to all derivative instruments, including embedded derivatives.  This policy also addresses fair value hedge accounting.

## II.  POLICY

### A.  Identification

1.  <u>Definition of a derivative instrument</u>

A derivative instrument is a financial instrument or other contract with <u>all three</u> of the following characteristics.

a.  It has (1) one or more underlyings <u>and</u> (2) one or more notional amounts or payment provisions or both.  Those terms determine the amount of the settlement or settlements, and, in some cases, whether or not a settlement is required.

b.  It requires no initial net investment or an initial net investment that is smaller than would be required for other types of contracts that would be expected to have a similar response to changes in market factors.

c.  Its terms require or permit net settlement, it can readily be settled net by a means outside the contract, or it provides for delivery of an asset that puts the recipient in a position not substantially different from net settlement.

"Net settlement" means that a contract can be settled at its maturity through an exchange of net cash instead of through the physical delivery of the referenced asset.  A contract may be considered *net-settled* when its settlement provisions meets one of the following criteria.

i.  Neither party is required to deliver an asset that is associated with the underlying or that has a principal amount, stated amount, face value, number of shares, or other denomination that is equal to the notional amount (or the notional amount plus a premium or minus a discount). For example, most interest rate swaps do not require that either party deliver interest-bearing assets with a principal amount equal to the notional amount of the contract.

ii.  One of the parties is required to deliver an asset of the type described above in sub-paragraph a., but there is a market mechanism that facilitates net settlement, for example, an exchange that offers a ready opportunity to sell the contract or to enter into an offsetting contract.

iii.  One of the parties is required to deliver an asset of the type described above in sub-paragraph a., but that asset is readily convertible to cash or is itself a derivative instrument. An example of that type of contract is a forward contract that requires delivery of an exchange-traded equity security.  Even though the number of shares to be delivered is the same as the notional amount of the contract and the price of the shares is the underlying, an exchange-traded security is readily convertible to cash.  Assets are readily convertible to cash when they have interchangeable units and quoted prices

INTERNAL DOCUMENT
C2.2 – Derivative Instruments

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          119

CONFIDENTIAL                                                                 FHFA13012170

**DERIVATIVE INSTRUMENTS**                                                           **C2.2**

available in an active market that can rapidly absorb the quantity without significantly affecting the price.

2. <u>Embedded derivatives</u>

   a. Contracts that do not in their entirety meet the definition of a derivative instrument, including beneficial interests ("BIs") in securitized financial assets (e.g. MBS, REMICs, ABS, certain Interest Only and Principal Only strips, Guaranty Assets and Buy-Ups) acquired, issued or subject to a remeasurement event[1] after December 31, 2006, loans, insurance policies and leases, may contain "embedded" derivative instruments.

   Interest Only (IO) and Principal Only (PO) strips are scoped out of FAS 133, *provided that,* (a) they only represent the right to receive a specified portion of the contractual interest or principal cash flows of a specific debt instrument, and (b) they do not incorporate any terms not present in the original instrument. An allocation of a portion of cash flows to compensate a guarantor or for servicing in excess of adequate compensation would not qualify for this scope exception.  It is expected that very few IOs and POs held by Fannie Mae will meet this scope exception, and therefore, it is expected that most IOs and POs acquired by Fannie Mae *will be* subject to FAS 133 and FAS 155.

   b. An instrument contains an embedded derivative requiring bifurcation only if all of the following criteria are met:

      i. The economic characteristics and risks of the embedded derivative instrument are not clearly and closely related to the economic characteristics and risks of the host contract.[2]
      ii. The contract that embodies both the embedded derivative instrument and the host contract is not re-measured at fair value under otherwise applicable generally accepted accounting principles with changes in fair value reported in earnings as they occur (e.g., instruments classified as Trading securities under FAS 115).
      iii. A separate instrument, with the same terms as the embedded derivative instrument, would be a derivative instrument subject to the requirements of this policy.

   When an instrument acquired, issued or subject to a remeasurement event after December 31, 2006, contains an embedded derivative requiring bifurcation, the entire instrument is recorded at fair value, with changes in fair value recognized in earnings, pursuant to the "fair value election" in FAS 155, unless specifically documented otherwise.

   c. Host contracts (debt vs. equity)

---

[1] Consolidation of a trust is considered a remeasurement event as it relates to the consolidated assets.
[2] Concentrations of credit risk in the form of subordination of one financial instrument to another are not embedded derivatives.

INTERNAL DOCUMENT
C2.2 – Derivative Instruments

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          120

CONFIDENTIAL                                                                FHFA13012171

Host contracts may have characteristics of both debt and equity, and a judgmental analysis needs to be performed to determine the appropriate classification of the host contract.  We judgmentally analyze hybrid contracts and base our accounting for financial instruments having characteristics of both debt and equity on their substance rather than form. The host contract for a BI of a securitized financial asset is a debt instrument.

In determining the substance of an instrument we will consider many factors including the following.

- Is it legally debt or equity?
- What happens in the event of a default in dividend payments?  If the holders of the instrument can seize assets or force bankruptcy, that would indicate debt.  If they cannot, that would indicate a residual interest that was more like equity.
- Are there any other creditor rights?  Are there any other remedies?
- What is the liquidation preference?  If the instrument's liquidation preference is junior to another instrument that is clearly equity, which would indicate that it may be equity.
- Does the instrument provide for collateral or any kind of security interest?  Equity interests normally do not provide for security interests.
- How are interest/dividend payments treated for tax purposes?  If they are deductible, it might indicate that it is a debt instrument.
- Is there a maturity date?  An instrument that was legally debt but was perpetual in nature might be equity.

d.  Debt Hosts

The characteristics of a debt-host contract generally should be based on the stated or implied substantive terms of the hybrid instrument. The typical terms of a debt instrument may include, but are not limited to the following:

- fixed interest rate;
- floating interest rate;
- zero-coupon bullet payment;
- discounts or premiums;
- some combination thereof.

In the absence of stated or implied terms, we will use judgment to determine whether to account for the debt host as a fixed-rate, floating-rate, or zero-coupon bond.  Such judgment is based upon determining the characteristics of the debt host contract as well as the features of the hybrid instrument, the issuer, and the market in which the instrument is issued.

i.  Call and put options embedded in debt hosts

Embedded calls and puts that can accelerate the settlement of a debt instrument are <u>not</u> clearly and closely related to the debt host if <u>both</u> of the following conditions exist.

INTERNAL DOCUMENT
C2.2 – Derivative Instruments

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          121

CONFIDENTIAL                                                                                    FHFA13012172

**DERIVATIVE INSTRUMENTS**                                                    **C2.2**

(a) The debt involves a substantial premium or discount, and
(b) The put or call option is only contingently exercisable, provided the call
    options (or put options) are also considered to be clearly and closely
    related to the debt host contract under the Paragraph 13 Tests.

Additionally, contingently exercisable calls and puts are only considered
clearly and closely related to the host contract if they are indexed solely to
interest rates or credit risk, not some other extraneous event or factor.

We apply the following four-step decision sequence to determine whether
calls and puts that can accelerate the settlement of debt instruments are
clearly and closely related to the debt host contract.

| STEP | Considerations: |
|------|-----------------|
| STEP 1 | • Is the option settlement amount ("payoff") adjusted based on changes in an index or simply being the repayment of principal at par, together with any unpaid accrued interest)?<br>• If yes, continue to Step 2.<br>• If no, continue to Step 3. |
| STEP 2 | • Is the payoff indexed to an underlying other than interest rates or credit risk?<br>• If yes, then that embedded feature is not clearly and closely related to the debt host contract and further analysis under Steps 3 and 4 is not required.<br>• If no, then that embedded feature should be analyzed further under Steps 3 and 4 as well as under the provisions of paragraphs 12, 13, and 61(a) of SFAS 133. |
| STEP 3 | • Does the debt involve a substantial premium (greater than 10%) or discount?<br>• If yes, continue to Step 4.<br>• If no, in accordance with paragraph 61(d), further analysis of the contract under paragraph 13 is required to determine whether the call or put is clearly and closely related to the debt host contract. |
| STEP 4 | • Does a contingently exercisable call or put (i.e. contingent upon the occurrence of some event) accelerate the repayment of the contractual principal amount?<br>• If yes, the call or put is not clearly and closely related to the debt instrument.<br>• If not contingently exercisable, in accordance with paragraph 61(d), further analysis of the contract under paragraph 13 is required to determine whether the call or put is clearly and closely related to the debt host contract. |

ii.   Paragraph 13 Tests

An embedded derivative instrument in which the underlying is an interest rate
or interest rate index that alters net interest payments that otherwise would
be paid or received on an interest-bearing (i.e. debt) host contract is

INTERNAL DOCUMENT
C2.2 – Derivative Instruments

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                122

CONFIDENTIAL                                                           FHFA13012173

considered to be clearly and closely related to the host contract unless <u>either</u> of the following conditions exist.

(a) The hybrid instrument can contractually be settled in such a way that the investor would not recover at least 90% of its initial recorded investment. ("13 (a) test")

(b) The embedded derivative meets both of the following conditions: ("double-double test")

    (1) There is a possible future interest rate scenario (even though remote) under which the embedded derivative would at least double the investor's initial rate of return on the host contract. ("13 b (1) test")

    (2) For each of the possible interest rate scenarios under which the investor's initial rate of return on the host contract would be doubled, the embedded derivative would at the same time result in a rate of return that is at least twice what otherwise would be the then-current market return for a contract that has the same terms as the host contract and that involves a debtor with a credit quality similar to the issuer's credit quality at inception. ("13 b (2) test")

iii.  Scope exception for the "double-double test"

BIs that contain only an embedded derivative that is tied to the prepayment risk of the underlying prepayable financial asset (i.e. underlying loans in an MBS) are exempt from the "double-double test" if they meet the following criteria:

    (1) The right to accelerate the settlement of the BI cannot be controlled by the investor, and

    (2) The BI itself does not contain any other embedded derivative, other than the prepayment option, for which bifurcation would be required.

BIs that are exempt from the "double-double test" are still subject to the "13(a) test".

The following is a step-by-step sequence for applying the Paragraph 13 Tests

| Step 1:  Determine Host Contract | In order to determine whether the embedded features are clearly and closely related to the host contract, first define the host contract in the hybrid instrument. The characteristics of a debt-host contract generally should be based on the stated or implied substantive terms of the hybrid instrument.  In the absence of stated or implied terms, determine whether to account for the debt host as a fixed-rate, floating-rate, or zero-coupon bond."<br><br>Furthermore, host contracts for similar hybrid instruments must be consistently identified. |
|---|---|
| Step 2: 13 a Test | We have defined "substantially all" to mean 90% or more of |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    123

CONFIDENTIAL                                                                                FHFA13012174

**DERIVATIVE INSTRUMENTS** C2.2

| | |
|---|---|
| (Substantially-All Test) "The hybrid instrument can contractually be settled in such a way that the investor (holder) would not recover *substantially all* of its initial recorded investment." | the hybrid instrument's purchase price, including any premium or discount.<br><br>Compare the redemption amount to the initial net investment plus any amounts to be received prior to the earliest redemption date.<br><br>IOs that are not scoped out of FAS 133 fail the 13(a) test because prepayments in the underlying mortgage collateral could increase to such a level that the investor could lose some or all of its initial net investment. Therefore, such IOs not classified as trading under FAS 115 are accounted for under the "fair value election" provided by FAS 155, unless specifically documented otherwise.<br><br>Conversely, POs not scoped out of FAS 133 do not fail this test because they are purchased at a discount and therefore cannot be settled in such a way that the investor would not recover substantially all of its initial recorded investment. |
| Step 3: 13 b (1) Test "There is a possible future interest rate scenario (even though it may be remote) under which the embedded derivative would at least double the investor's initial rate of return on the host contract."<br><br>Bifurcation of call options is not required when the provision is entirely within the issuer's or borrower's control. | Calculate the initial internal rate of return (IRR) of the host contract. The initial IRR is the constant rate at which the discounted present value of future cash flows equals the amount of the initial net investment and results in a net present value of zero. This IRR is the rate of return which an investor would expect if the instrument were held until maturity.<br>Fixed Rate Host<br>For example, if the host is defined as a fixed rate instrument (and is issued at par) then the contractual fixed rate will equal the IRR of the instrument.<br><br>Floating Rate Host<br>To calculate the IRR of a variable rate host instrument, the forward yield curve of the host contract reference index with the applicable tenor will be obtained to determine the IRR.<br><br>Next, a review of the contract terms will be performed and documented to assess if the terms are such that it is clear that the initial IRR of the host contract (calculated at the inception/acquisition of the contract) can be doubled, as a result of the embedded derivative in the hybrid instrument.<br><br>Compare the return of the host contract against the return of the hybrid (including the impact of the embedded derivative on that return). |
| Step 4: 13 b (2) Test " For each of the possible interest rate scenarios under which the investor's | Determine the then-current market rate for a contract with the same terms as the host contract by examining the terms of a contract that is equivalent to the remaining life of the original host contract, at the point in time that the |

INTERNAL DOCUMENT
C2.2 – Derivative Instruments

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae   124

CONFIDENTIAL   FHFA13012175

| | |
|---|---|
| initial rate of return on the host contract would be doubled (as discussed under paragraph 13(b)(1)), the embedded derivative would at the same time result in a rate of return that is at least twice what otherwise would be the then-current market return (under each of those future interest rate scenarios) for a contract that has the same terms as the host contract and that involves a debtor with a credit quality similar to the issuer's credit quality at inception." | embedded derivative feature alters the cash flows of the host contract with similar <u>credit quality</u> (the credit quality of the debtor will be assumed to remain constant throughout the term of the hybrid contract). <br><br>Evaluate the instrument to determine if the IRR of the host contract at the point in time that the embedded derivative feature alters the cash flows is at least twice the then-current market rate (in each of the interest rate scenarios in which the initial IRR is doubled for purposes of the test required by 13 b (1) Test).  The details of this analysis will be specific to each contract. <br><br>. |

If a hybrid instrument contains more than one embedded derivative that would individually require bifurcation, those embedded derivatives must be bundled together as a single, compound embedded derivative instrument that would then be bifurcated.  Therefore, for the purpose of applying the paragraph 13 test, the embedded derivatives identified should be analyzed as a single compound derivative.

e.  Equity hosts

In determining whether a host contract is an equity-host contract, an analysis must be performed to determine (1) whether the host contract encompasses a residual interest in an entity and, if so, (2) whether the residual interest involves the rights of ownership.  When a host contract encompasses a residual interest that involves the rights of ownership, it is an equity host.  Since equity instruments generally have unique risk characteristics and rights, most embedded derivatives in a host contract with equity characteristics would not be clearly and closely related to the host contract and would have to be bifurcated and accounted for separately.

Embedded call and put options in equity hosts need to be carefully analyzed to determine if they require bifurcation. The treatment of the option will depend on whether the option is held by the issuer or the investor; and the treatment will not always be symmetrical.  Call options in equity hosts, held by the issuer, would not require bifurcation.  However, the investor in an equity host with an embedded written call option would not consider the option to be clearly and closely related to the preferred stock.

**B.  Recognition and Measurement**

We account for freestanding derivative instruments on trade date and embedded derivatives requiring bifurcation as of the recognition date of the hybrid instrument.

INTERNAL DOCUMENT
C2.2 – Derivative Instruments

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                125

CONFIDENTIAL                                                                    FHFA13012176

Freestanding derivative instruments and embedded derivatives requiring bifurcation are measured at fair value and include subsequent changes in fair value in earnings in the period of the change.  We include any interest accruals calculated under the terms of interest-related derivatives, such as swaps, in gain or loss on derivatives.

For financial reporting purposes, we net offsetting derivative positions with the same counterparty only if we have the legal right to offset the contracts and the following conditions exist.

1.  Each of two parties owes the other determinable amounts
2.  The reporting party has the right to set off the amount owed with the amount owed by the other party
3.  The reporting party intends to set off
4.  The right of setoff is enforceable at law

Primarily we offset the fair value amounts of multiple derivative contracts executed with the same counterparty under master netting agreements.  For offsetting derivative positions that we net under a master netting arrangement where one party pledges cash collateral, the fair values of both the derivative positions and the cash collateral receivables or payables are netted and presented together.

## C. Fair Value Hedge Accounting

We may designate a derivative as hedging the exposure to changes in the fair value of a recognized asset, liability, or unrecognized firm commitment ("hedged item") attributable to a specifically-identified hedged risk.  The gain or loss on the derivative instrument continues to be reported currently in the income statement.  The offsetting gain or loss on the hedged item attributable to the hedged risk is also reported currently in the income statement.  FAS 133 requires formal documentation of the hedging relationship including the risk management objective and strategy, identification of the hedging instrument, the hedged item, the nature of the risk being hedged, and how hedge effectiveness will be assessed.

At the start of the hedging relationship and periodically, we must demonstrate that the hedging relationship is expected to be highly effective in offsetting changes in fair value attributable to the hedged risk.  We are required to assess effectiveness again at the end of the hedging relationship.  During the term of the hedging relationship, effectiveness assessment must be performed whenever financial statements are released.

To prospectively and retrospectively test whether a hedge relationship has been effective, we use regression analysis covering a minimum of 30 changes in fair value.  In our regression analysis, the change in fair value of the hedged item is the dependent variable and the change in the fair value of the derivative is the independent variable. We consider a hedge to be effective if the correlation coefficient ($R^2$) is greater than or equal to .80; the slope is from -0.8 to -1.25; the t-statistic with a confidence level of 95%; and the f statistic is equal to the square of the t statistic.  The change in the hedged item's fair value attributable to changes in the benchmark interest rate for a specific period is determined as the difference between two present value calculations as of the end of the period that exclude or include, respectively, the effect of the changes in the benchmark interest rate during the period.

INTERNAL DOCUMENT
C2.2 – Derivative Instruments

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                126

CONFIDENTIAL                                                                   FHFA13012177

The hedged item must be identified as the entire instrument, a portion of the entire instrument, or a portfolio of similar instruments.  If similar instruments are hedged as a portfolio, we must demonstrate that each individual instrument within the portfolio shares the same risk exposure that is identified in the hedging relationship.  When hedging a specific portion of the entire instrument, we can designate the portion as a percentage, one or more selected contractual cash flows, or a put or call option embedded in the instrument if that option is not bifurcated and accounted for separately,

The designated hedged risk in the hedged item must present the potential for gains and losses that could affect the Company's financial results.  Only hedged items that meet the following criteria qualify for fair value hedge accounting:
- The hedged item is not currently reported at fair value with changes in fair value reported currently in earnings
- The hedged item is not an equity method investment
- The hedged item is not a minority interest in a consolidated subsidiary
- The hedged item is not an equity investment in a consolidated subsidiary
- The hedged item is not a firm commitment to enter into a business combination or to acquire or dispose of a subsidiary, minority interest, or equity method investee
- The hedged item is not an equity instrument issued by the Company and classified as stockholders' equity in the balance sheet

For hedged items that are financial assets or liabilities, or a recognized loan servicing right, we can designate one or more of the following risks:
- The risk of changes in the overall fair value of the entire hedged item (cannot be combined with any of the risks below)
- The risk of changes in the fair value attributable to changes in the specified benchmark interest rate
- The risk of changes in fair value attributable to changes in foreign currency exchange rates
- The risk of changes in fair value attributable to the obligor's creditworthiness and changes in the spread over the benchmark interest rate with respect to the hedged item's credit sector at inception of the hedge

For a hedged item with changes in fair value recorded in other comprehensive income ("OCI") (such as an AFS security) the changes in fair value of the hedged item attributable to the hedged risk are recognized currently in earnings.

Any adjustments to the carrying value of a hedged asset or liability are accounted for similar to other components that are part of that hedged item.  For interest-bearing financial instruments, the adjustment of the carrying value due to fair value hedge accounting should be amortized into earnings in accordance with the Company's current amortization policies for that instrument.  Amortization should begin no later than when the financial instrument ceases to be in any hedging relationships.

We must discontinue hedge accounting prospectively if any of the following events occurs:
- We fail to meet any of the requirements of FAS 133
- The derivative instrument is terminated
- We choose to stop applying fair value hedge accounting

CONFIDENTIAL FHFA13012178

**DERIVATIVE INSTRUMENTS**                                                    **C2.2**

Once we discontinue a hedging relationship, we can establish a new hedging relationship if all criteria of FAS 133 are met.

Any hedge accounting adjustments we make to the carrying value of the hedged item must be considered in measuring the item for impairment under applicable GAAP for that instrument.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| SFAS 133 | January 1, 2001 | Accounting for Derivative Instruments and Hedging Activities |
| SFAS 155 | January 1, 2007 | Accounting for Certain Hybrid Financial Instruments |
| DIG Issues | Various | Various implementation issues that were 1) written by the FASB staff; 2) discussed at a public meeting of the FASB; and 3) not objected to by the FASB. Particular implementation issues that were significant in our application of SFAS 133 included the following:<ul><li>B39, *Embedded Derivatives: Application of paragraph 13(b) to Call Options that are Exercisable only by the Debtor*</li><li>D1, *Recognition and Measurement of Derivatives: Application of Statement 133 to Beneficial Interests in Securitized Financial Assets*</li><li>B40, *Embedded Derivatives: Application of Paragraph 13(b) to Securitized Interests in Prepayable Financial Assets*</li></ul> |
| FIN 39 | January 1, 1994 | Offsetting of Amounts Related to Certain Contracts |
| FSP FIN 39-1 | January 1, 2008 | An Amendment of FASB Interpretation No. 39 |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                128

CONFIDENTIAL                                                                FHFA13012179

**GUARANTY ASSETS AND GUARANTY OBLIGATIONS**                                    **C2.3**

## I.  APPLICABILITY

This policy is effective as of January 1, 2008.

This policy applies to guaranty contracts that contingently require the guarantor (Fannie Mae) to make payments (either in cash, financial instruments, other assets, shares of its stock, or provision of services) to the guaranteed party (the trust on behalf of certificate holders) based on changes in an underlying that is related to an asset, a liability, or an equity security of the guaranteed party.  Examples of such guaranty contracts include our guaranty to MBS trusts, bond credit enhancements and long-term stand-by commitments.

## II.  POLICY

### A.  Guaranty Related Assets Subject to FAS 133

Guaranty assets and buy-ups represent beneficial interests in a securitization. Therefore, in accordance with SFAS 133, as amended by SFAS 155, Buy-ups ("BUs") and Portfolio Securitization guaranty assets ("PPS GAs") that are entered into after December 31, 2006 **and** that are classified like AFS[1] securities contain an embedded derivative requiring bifurcation because they can contractually be settled in such a way that Fannie Mae would not recover at least 90% of its initial recorded investment.[2] Therefore, for BUs and PPS GAs entered into after December 31, 2006 and classified as AFS securities, the entire BU or PPS GA is to be accounted for at fair value with changes in fair value recorded in earnings, in accordance with the fair value election under SFAS 155.

Lender swap guaranty assets do not contain an embedded derivative requiring bifurcation because they **cannot** be settled in such a way that Fannie Mae could not recover at least 90% of its initial recorded investment.

### B. Accounting for guarantees at issuance and on an ongoing basis

The following table summarizes the accounting for guarantees that arise from both (i) lender swap transactions and (ii) portfolio securitizations at issuance and on an ongoing basis:

---

[1] BUs and PPS GAs that are classified like trading securities are already recorded at fair value with changes recorded in earnings, therefore no change in accounting is required.

[2] Referred to as the "13(a) test". Refer to Policy Manual Section 2.2, "Derivative Instruments" for the definition and qualifying criteria for embedded derivatives requiring bifurcation.

INTERNAL DOCUMENT
C2.3 – Guaranty Assets and Guaranty Obligations

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    129

CONFIDENTIAL                                                                 FHFA13012180

**GUARANTY ASSETS AND GUARANTY OBLIGATIONS**                                         **C2.3**

| | | Lender Swap Transaction | Portfolio Securitization |
|---|---|---|---|
| Guaranty asset ("GA") | At issuance | ▪ Recorded at fair value<br>▪ Fair value is based on the contractual guaranty fee if there is a net BU<br>▪ Fair value is based on contractual guaranty fee adjusted for Buy Down ("BD") (if there is a net BD) | **PPS GAs entered into prior to 1/1/07:**<br>▪ Recorded at allocated cost based on relative fair value (see Section F.8.2, *Securitizations*)<br>**PPS GAs entered into after 12/31/06:**<br>▪ If classified like a trading security:  Recorded at allocated cost based on relative fair value<br><br>▪ If classified like an AFS security: Recorded at fair value, in accordance with the SFAS 155 fair value election |
| | Ongoing | ▪ Recorded at amortized cost<br>▪ Imputed interest income, calculated based on a prospective level-yield, is recorded as "Guaranty fee income"<br>▪ Assessed for impairment under EITF 99-20 (see Section G.9.5, *Impairment*) | **PPS GAs entered into prior to 1/1/07:**<br>▪ Recorded at fair value, with changes in fair value recorded through OCI (if classified like an AFS security) or earnings (if classified like a trading security)<br>**PPS GAs entered into after 12/31/06:**<br>▪ Recorded at fair value, with changes in fair value recorded through earnings<br>**All PPS GAs:**<br>▪ Imputed interest income, calculated based on a prospective level-yield, is recorded as "Guaranty fee income"<br>▪ Assessed for impairment under EITF 99-20 (see Section G.9.5, *Impairment*) |

INTERNAL DOCUMENT
C2.3 – Guaranty Assets and Guaranty Obligations

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                         130

CONFIDENTIAL

FHFA13012181

**GUARANTY ASSETS AND GUARANTY OBLIGATIONS**                                  **C2.3**

| Buy-up ("BU") | At issuance | ▪ Recorded, net of BD in the same MBS trust, at fair value | ▪ Not applicable |
|---|---|---|---|
| | Ongoing | **BUs entered into prior to 1/1/07:**<br>▪ Recorded at fair value, with changes in fair value recorded through OCI (if classified like an AFS security) or earnings (if classified like a trading security)<br>**BUs entered into after to 12/31/06:**<br>▪ Recorded at fair value, with changes in fair value recorded through earnings<br>**All BUs:**<br>▪ Imputed interest income, calculated based on a prospective level-yield, is recorded as "Guaranty fee income"<br>▪ Assessed for impairment under EITF 99-20 (see Section G.9.5, *Impairment*) | ▪ Not applicable |
| Credit enhancements ("CE") | At issuance | ▪ If not attached to the covered loans, as discussed in Section D.5.1, *Credit Enhancements*, recorded at fair value as additional consideration received for the guaranty | ▪ Not applicable |
| | Ongoing | ▪ See Section D.5.1, *Credit Enhancements* | ▪ Not applicable |

INTERNAL DOCUMENT
C2.3 – Guaranty Assets and Guaranty Obligations

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    131

CONFIDENTIAL                                                          FHFA13012182

**GUARANTY ASSETS AND GUARANTY OBLIGATIONS**                                    **C2.3**

| Guaranty obligation ("GO") | At issuance | ▪ Recorded at fair value. For guaranties issued after 12/31/2007, the fair value of the GO is based upon an estimate of the total consideration that Fannie Mae would require to issue the same guaranty in a standalone arm's length transaction with an unrelated party. The fair value of GO therefore will normally equal the total consideration received unless the SFAS 5 incurred losses at the issuance of a guaranty exceeds the fair value of the total consideration received, then the GO will be initially recognized at the amount of the SFAS 5 incurred losses. | |
|---|---|---|---|
| | Ongoing | ▪ Amortized in proportion to any reduction, including impairment, in the corresponding recorded GA<br>▪ Amortization recorded as "Guaranty fee income" | |
| Difference between total consideration received and GO | At issuance | ▪ Prior to 1/1/2008, if total consideration received is greater than GO, the excess amount is deferred profit - an additional component of GO. If total consideration received is less than GO, record the deficit as Losses on Certain Guaranty Contracts". For guaranties issued after 12/31/2007 because the fair value of the GO at the inception is normally equal the total consideration received deferred profit is therefore no longer applicable.<br>▪ Total consideration received includes fair value of contractual/remitted GA + cash received upfront from BD and Risk-Based Pricing Adjustments ("RBPA") + fair value of lender-paid CE + fair value of Master Servicing Asset ("MSA") - fair value of BU - fair value of Master Servicing Liability ("MSL") | ▪ Recorded as a component of the gain (loss) on sale of assets |

INTERNAL DOCUMENT
C2.3 – Guaranty Assets and Guaranty Obligations

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                132

CONFIDENTIAL

FHFA13012183

**GUARANTY ASSETS AND GUARANTY OBLIGATIONS**                              **C2.3**

|  | Ongoing | ▪ Deferred profit is amortized same as GO.  For guaranties issued after 12/31/2007, since there will be no deferred profit recorded at the issuance of a guaranty contract, the subsequent amortization of deferred profit will no longer be applicable. | ▪ Not applicable |
|---|---|---|---|
| Reserve for guaranty losses | At issuance | ▪ Not recorded at issuance | |
| | Ongoing | ▪ Record for estimable and probable incurred losses<br>▪ Amount recorded is independent of the unamortized amount of the GO | |

### C.  Accounting for guarantees upon purchase of Fannie Mae MBS

The accounting for the guaranty arrangement upon purchase of Fannie Mae MBS depends on a legal determination of who is the guaranteed party.

1. For those transactions where our guaranty is best characterized as an obligation to an <u>unconsolidated</u> MBS trust from a legal perspective, the guaranty arrangement is not extinguished and the purchased MBS continue to be recorded as a guaranteed MBS (see Section F.8.1, *Consolidation*, for impact of consolidation on the guaranty arrangement).
2. For those transactions where our guaranty is best characterized as an obligation directly to the security holder from a legal perspective, Fannie Mae must extinguish the guaranty arrangement.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV. APPLICABLE ACCOUNTING LITERATURE

INTERNAL DOCUMENT
C2.3 – Guaranty Assets and Guaranty Obligations

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                              133

CONFIDENTIAL                                                                                          FHFA13012184

**GUARANTY ASSETS AND GUARANTY OBLIGATIONS**                                    **C2.3**

| GAAP Literature | Effective Date | Title |
|---|---|---|
| SFAS 133 | June 15, 2000 | *Accounting for Derivative Instruments and Hedging Activities* |
| SFAS 149 | June 30, 2003 | *Amendment of Statement 133 on Derivative Instruments and Hedging Activities* |
| SFAS 155 | January 1, 2007 | *Accounting for Certain Hybrid Financial Instruments* |
| DIG B40 | January 1, 2007 | *Embedded Derivatives: Application of Paragraph 13(b) to Securitized Interests in Prepayable Financial Assets* |
| SFAS 157 | January 1, 2008 | *Fair Value Measurements* |
| SFAS 140 | March 31, 2001 | *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities a replacement of FASB Statement 125* |
| SFAS 115 | December 15, 1993 | *Accounting for Certain Investments in Debt and Equity Securities* |
| SFAS 5 | July 1, 1985 | *Accounting for Contingencies* |
| FIN 45 | December 31, 2002 | *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others an interpretation of FASB Statements No. 5, 57, and 107 and rescission of FASB interpretation No. 34* |
| EITF 99-20 | March 15, 2001 | *Recognition of Interest Income and Impairment on Purchased and Retained Beneficial Interests in Securitized Financial Assets* |
| EITF 85-20 | 1985 | Recognition of Fees for Guaranteeing a Loan |
| EITF 02-3 | December 15, 2002 | *Issues Involved in Accounting for Derivative Contracts Held for Trading Purposes and Contracts Involved in Energy Trading and Risk Management Activities* |
| EITF D-69 | March 1998 | *Gain Recognition on Transfers of Financial Assets under FASB Statement No. 140* |
| SFAS 140 Implementation Guide | March 31, 2001 | *FASB Special Report, A Guide to Implementation of Statement 140 on Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities: Questions and Answers* |

INTERNAL DOCUMENT
C2.3 – Guaranty Assets and Guaranty Obligations

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                134

CONFIDENTIAL                                                                 FHFA13012185

**SERVICING ASSETS**                                                          **C2.3.2**

## I.  APPLICABILITY

All loans require day-to-day servicing activities that include collection of payments from borrowers, payment of taxes and insurance from borrower escrow accounts, and monitoring of delinquencies ("primary servicing activities").  When loans are securitized, additional servicing activities include maintaining accounting records for certificate holders, calculating the amount of distributions to certificate holders, oversight of the primary servicers, and supplementing pool proceeds in the trust in the event of primary servicer default ("master servicing activities").

This policy addresses the accounting for our role of master servicer for MBS we issue.  This policy is effective as of January 1, 2008.

## II.  POLICY

We are not the primary servicer for any arrangements as of January 1, 2007.

We record a master servicing asset or liability for our obligation to perform master servicing activities upon securitization.  The accounting for master servicing assets ("MSA") and liabilities ("MSL") is performed at the trust level and is summarized in the table below.

| | | MSA | MSL |
|---|---|---|---|
| Definition | | ▪ Exists when fair value of compensation we receive (float) exceeds the fair value of adequate compensation<br>▪ Adequate compensation represents the fair compensation that would be paid to a substitute servicer and therefore includes a market-required profit margin | ▪ Exists when fair value of compensation we receive (float) is less than the fair value of adequate compensation<br>▪ Adequate compensation represents the fair compensation that would be paid to a substitute servicer and therefore includes a market-required profit margin |
| At inception | Lender swap transaction | ▪ Recorded at fair value as part of the total compensation in the guaranty arrangement | ▪ Recorded at fair value as part of the total compensation in the guaranty arrangement |
| | Portfolio securitization | ▪ Recorded at fair value<br>▪ Amount recorded is considered proceeds received in conjunction with the sale of assets, and is considered in the calculation of gain (loss) on sale of assets (see Section F.8.2, *Securitizations*) | ▪ Recorded at fair value<br>▪ Amount recorded as an incurred liability that is considered in the calculation of gain (loss) on sale of assets (see Section F.8.2, *Securitizations*) |

INTERNAL DOCUMENT
C2.3.2 – Servicing Assets

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae
135

CONFIDENTIAL
FHFA13012186

**SERVICING ASSETS**                                                                 **C2.3.2**

| Ongoing | Lender swap transaction<br><br>Portfolio securitization | ▪ Carried at lower of cost or market ("LOCOM")<br>▪ Amortized in proportion to net servicing income for each period (no amortization is recorded in periods of net servicing loss for that asset) | ▪ Carried at amortized cost<br>▪ If fair value exceeds amortized cost, increase recorded amount of MSL via valuation allowance with corresponding amount recorded in earnings<br>▪ Amortized in proportion to net servicing loss for each period (no amortization is recorded in periods of net servicing income for that liability) |
| --- | --- | --- | --- |
| Other-than-temporary Impairment | Lender swap transaction<br><br>Portfolio securitization | ▪ Required to assess the MSA for other-than-temporary impairment (OTTI)<br>▪ Recorded OTTI as a direct write-down to the MSA<br>▪ We have determined there is OTTI when there is a high probability that the fair value of the MSA will not recover within one year | ▪ Not applicable |

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
| --- | --- | --- |
| SFAS 140 | March 31, 2001 | *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities a replacement of FASB Statement 125* |
| SFAS 156 | January 1, 2007 | *Accounting for Servicing of Financial Assets, an Amendment of FASB Statement No. 140* |
| SFAS 157 | January 1, 2008 | *Fair Value Measurements* |
| EITF 02-3 | December 15, 2002 | *Issues Involved in Accounting for Derivative Contracts Held for Trading Purposes and Contracts Involved in Energy Trading and Risk Management Activities* |
| SFAS 140 Implementation Guide | March 31, 2001 | *FASB Special Report, A Guide to Implementation of Statement 140 on Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities: Questions and Answers* |

INTERNAL DOCUMENT
C2.3.2 – Servicing Assets

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    136

CONFIDENTIAL                                                          FHFA13012187

**LEASES**                                                                    **C2.4.1**

## I.  APPLICABILITY

This policy addresses the accounting and reporting for capital and operating leases.  This policy is effective as of December 31, 2004.

## II.  POLICY

In the event that we lease fixed assets, we perform tests to determine if they are operating or capital leases.

### Capital Lease

FAS 13, *Accounting for Leases*, establishes standards of financial accounting and reporting for leases by lessees and lessors.  A capital lease is a lease that transfers substantially all of the benefits and risks inherent in the ownership of property.  The accounting treatment of the capital lease depends on whether we are the lessor or lessee.

#### *Lessee*

There are four primary tests, which are performed as of the date of the lease agreement, to determine if a lease is a capital lease by the lessee.  If the lease meets any one of the following then it is considered to be a capital lease; if it does not, it is considered an operating lease.

1.  The lease transfers ownership of the property to the lessee by the end of the lease term
2.  The lease contains a bargain purchase option.
3.  The lease term is equal to 75% or more of the estimated economic life of the leased property.  However, if the beginning of the lease term falls within the last 25% of the total estimated economic life of the leased property, including earlier years of use, this criterion shall not be used for purposes of classifying the lease.
4.  The present value at the beginning of the lease term of the minimum lease payments, excluding that portion of the payments representing executory costs such as insurance, maintenance, and taxes to be paid by the lessor, including any profit thereon, equals to 90% of the excess of the fair value of the leased property to the lessor at the inception of the lease over any related investment tax credit retained by the lessor and expected to be realized by him/her.  However, if the beginning of the lease term falls within the last 25% of the total estimated economic life of the leased property, including earlier years of use, this criterion shall not be used for purposes of classifying the lease.  A lessor shall compute the present value of the minimum lease payments using the interest rate implicit in the lease.  A lessee shall compute the present value of the minimum lease payments using his incremental borrowing rate, unless (i) it is practicable for him to learn the implicit rate computed by the lessor and (ii) the implicit rate computed by the lessor is less than the lessee's incremental borrowing rate.  If both of those conditions are met, the lessee shall use the implicit rate.

#### *Residual Value Guarantees*

When a lease contains a residual value guarantee, we account for the guarantee based on the stated amount in the contract, rather than the estimated deficiency that we may be required to make up.  Unless we obtain a third-party guarantee, the residual value

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                137

CONFIDENTIAL

FHFA13012188

**LEASES**                                                                    **C2.4.1**

guarantee amount is included in the minimum lease payment analysis as part of the classification test.

Any amounts we pay for third-party guarantees are accounted for as executory costs and not included in the minimum lease payment analysis. The residual value guarantee is depreciated over the assets lease life.

*Bargain Purchase Options*

When a bargain purchase option exists, the present value of the minimum lease payments is increased by the present value of the option price.   Depreciation is calculated based on the economic life of the asset for the bargain purchase option.

We account for capital leases on the balance sheet as the acquisition of an asset and the obligation as a liability at an amount equal to the lesser of present value at the beginning of the lease term of minimum lease payments during the lease term or the fair value of the leased asset.  Executory costs, such as insurance, maintenance, taxes to be paid by the lessor together with any profit thereon are excluded from this calculation. An estimation of these costs will be calculated if these costs are not determinable.  As cash payments are made to the lessor, they are treated as the repayment of a loan, with a portion going to the principal balance and a portion being recognized as interest expense.  If the lease meets requirement (1) and (2) above, the asset is amortized over the life of the asset in accordance with the Company's normal depreciation policy.  If it does not meet either requirement, the asset is depreciated over the lease term.

**Lessor**

If we are the lessor, in addition to having to meet one or more capital lease criteria stated above, it most also meet both of the following criteria:

1.  Collectibility of the payments required from the lessee are reasonable predictable; and
2.  Our performance is substantially complete or future costs are reasonably predictable.

From the standpoint of the lessor, the lease may be classified as one of the following:

1.  Direct financing leases
2.  Sales- type leases
3.  Operating leases

The distinction between a direct financing lease and a sales-type lease is that the sales-type lease involves dealers (manufacturers) profit or loss while the direct financing lease does not.  Sales-type leases arise when manufacturers and dealers serve as lessors to market their products.   Direct financing lease generally result from arrangements with lessors that are primarily engaged in financing operations.  If the lease meets the criteria above and the asset's fair value equals the lessors book value, it is typically a sales-type lease arrangement.  If the lease meets the criteria described above and the asset's fair value does not equal the lessors book value, the lease is considered a direct financing. Leases that are not considered direct financing or sales-type leases are treated as operating leases.

INTERNAL DOCUMENT
C2.4.1 - Leases

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL                                                  FHFA13012189

### Operating Leases

The majority of our rental expense from operating leases relates to leased office space, where we maintain most administrative and partnership functions in leased premises around the United States.  We also periodically enter into leases for equipment that are operating in nature.

Fannie Mae charges rent associated with an operating lease to expense as it becomes payable over the lease term.[1]  However, if the rental payments are not made on a straight-line basis, a rental expense is still recognized on a straight-line basis over the lease term.

Renewal periods are included in the lease term only when it is reasonably assured that we will renew for those periods.

Commencement of rent expense is based on the following:

1. Rent expense for real estate is recorded from the start of the occupancy of the property, which is a date that is included in the lease and should correspond with the start of the lease payments.
2. Lease term for accounting purposes includes all periods in which we have access to and control over leased space, even if those periods precede the term stated in the lease agreement.  For example, is a lease provides time for improvements in advance of occupancy, the term for accounting purposes would begin at the time we are allowed to make improvements.
3. If we occupy the space in advance of the start of rent, we include that period in our rent expense calculation.

### 1.  Leasehold Incentives

We record leasehold incentives that are funded by landlord incentives or allowances as deferred rent and amortize the amounts as reductions of rent over the lease term, or if it is a leasehold improvement, over the useful life of the improvement, whichever is shorter.

---

[1] Lease term is defined as the fixed noncancelable term of the lease plus (i) all periods, if any, covered by bargain renewal options, (ii) all periods, if any, for which failure to renew the lease imposes a penalty on the lessee in such amount that a renewal appears, at the inception of the lease, to be reasonably assured, (iii) all periods, if any, covered by ordinary renewal options during which a guarantee by the lessee of the lessor's debt directly or indirectly related to the leased property is expected to be in effect or a loan from the lessee to the lessor directly or indirectly related to the leased property is expected to be outstanding, (iv) all periods, if any, covered by ordinary renewal options preceding the date as of which a bargain purchase option is exercisable, and (v) all periods, if any, representing renewals or extensions of the lease at the lessor's option; however, in no case shall the lease term be assumed to extend beyond the date a bargain purchase option becomes exercisable. A lease that is cancelable (a) only upon the occurrence of some remote contingency, (b) only with the permission of the lessor, (c) only if the lessee enters into a new lease with the same lessor, or (d) only if the lessee incurs a penalty in such amount that continuation of the lease appears, at inception, reasonably assured shall be considered "noncancelable" for purposes of this definition.

INTERNAL DOCUMENT
C2.4.1 - Leases

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                139

CONFIDENTIAL                                                                    FHFA13012190

Leasehold improvements are reported in the investing section of the Statement of Cash Flows, and cash received from the lessor that is accounted for as a lease incentive is recorded as an operating activity.

## 2. Rent Holidays

We recognize rent holidays in an operating lease on a straight-line basis over the lease term (see Q&A below for example).

## 3. Rent Increases

We recognize the effects of scheduled and specified rent increases on a straight-line basis. Allocation bases that take into consideration factors such as the time value of money, anticipated inflation, or expected future revenues are not used, because they do not relate to the time pattern of the physical usage of the leased property.

If a lease agreement has contingent future increases in rent that cannot be determined at the inception of the lease because they are tied to future conditions or events (for example, an increase tied to a cost-of-living index), the increase is not recognized until the period in which they arise.

If our rent increases under a master lease agreement because we gain access to and control over additional property at the time of the increase, the escalated rents are considered rental expense and recognized in proportion to the additional leased property in the years that we have control over the use of the additional leased property.

## 4. Asset Retirements[2]

We recognize a liability for asset retirement obligations in the period they are incurred when a reasonable estimate of fair value can be made.  We offset the liability by increasing the corresponding asset by the same amount as the liability.

We derive the fair value of the liability from current quoted market prices, or based on the best information available in the circumstances, including prices for similar liabilities and the results of present value techniques.  If we cannot make a reasonable estimate of fair value in the period the asset retirement obligation is incurred, we recognize the liability when a reasonable estimate of fair value can be made.

For more on asset retirements, see Accounting Policy section C1.9.3, Property, Plant and Equipment.

---

[2] This applies to capital leases only and does not apply to leases that meet the definition of either minimum lease payments or contingent rentals in paragraph 5 of FAS 13.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                140

CONFIDENTIAL                                                                        FHFA13012191

### 5.  Revisions or Extensions

When there are lease revisions or extensions to an operating lease agreement, we must distinguish whether the revision or extension results in a new agreement at the date of modification or if it constitutes adjustments to an existing lease agreement.

Any action that extends a lease beyond the expiration of the existing lease term is a new agreement, which should be classified using the revised terms and new assumptions as of the modification date.

*Accounting Treatment when Lease is Considered a New Agreement:*

1.  New Lease is classified as capital – If the provisions of an operating lease are changed in a manner that would have resulted in the operating lease being classified as a capital lease at its inception using the revised terms and original assumptions, the modified agreement is a new lease that should be classified as of the modification date.
    See Policy C.1.9.3 Property Plant and Equipment.
2.  New lease is classified as operating - Rent expense should be recognized on a straight-line basis over the new lease term.  Any existing deferred rent credits recorded on our balance sheet also should be recognized over the new lease term.

    a.  Revisions that result in shortening the lease term and increasing the lease payments over the shortened period are treated prospectively.
    b.  Revisions that represent a termination penalty should be charged to income in the period of the modification.  If the increase in the lease payment represents a termination penalty, the current charge to be recognized is the difference between the modified payment and the original payment over the shortened lease period.  Factors that should be considered in determining whether the modification represents a termination penalty include:

        i.   The term of the modified lease as compared with the remaining term of the original lease. The shorter the term of the modified lease in comparison to the remaining term of the original lease, the more likely it is that the increase in the lease payments represents a termination penalty.
        ii.  The relationship of the modified lease payments to comparable market rents. The closer the modified lease payments are to comparable market rents, the more likely it is that the increase in the lease payments represents a modification of future lease payments.

### 6.  Sub-lease Income

We account for sub-lease income, when applicable, by reducing our estimated liability remaining on the lease in our required financial statement disclosure and recording the income received as a reduction of rental expense.

### 7.  Indexed Rentals

CONFIDENTIAL                                                          FHFA13012192

We regularly enter into operating leases where the increase in rent expense is expressly defined as a fixed dollar amount (and would record the expense as identified above).   However, if we enter into any lease that has indexed rental payments, there is a potential for the existence of an embedded derivative as defined under FAS 133.[3]  Such leases must be reviewed for appropriate treatment to determine if the economic characteristics and risks of the embedded derivative are clearly and closely related to the economic characteristics and risk of the host contract.

*Indexed rentals*

1.  Inflation-indexed rentals: Rentals for the use of leased assets and adjustments for inflation on similar property are considered to be clearly and closely related. Thus, unless a significant leverage factor is involved, the inflation-related derivative embedded in an inflation-indexed lease contract would not be separated from the host contract.
2.  Contingent rentals based on a variable interest rate: The obligation to make future payments for the use of leased assets and the adjustment of those payments to reflect changes in a variable-interest-rate index are considered to be clearly and closely related. Thus, lease contracts that include contingent rentals based on changes in the prime rate would not have the contingent-rental-related embedded derivative separated from the host contract.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

**Question 1: Can a lease term for accounting purposes begin before an initial fixed non-cancelable term stated in a lease agreement?**

Yes. A lease term for accounting purposes includes all periods in which a lessee has access to and control over leased space, even if those periods precede the fixed non-cancelable term stated in the lease agreement. For example, a lease agreement is signed on January 1 but the initial fixed non-cancelable term begins on April 1. The lease allows the lessee to make improvements to the leased space at any time starting after January 1. In this situation, the lease term for accounting purposes starts on January 1.

**Question 2: A lessee has a 120 month lease for $10,000 per month on space owned by a lessor. The lease term for accounting purposes is 120 months. As an incentive to sign the lessee to the lease agreement, the first 6 of those months are rent free. In an operating lease, if a lease term includes a period of free or reduced rent (rent holiday), how does the rent holiday factor into the lessee's recognition of rent expense and the lessor's recognition of rent revenue?**

The lessee should recognize rent expense of $9,500 per month ($10,000*114 months/120 month lease term) for 120 months, which is on a straight-line basis.

---

[3] FAS 133 ¶ 61(b) and 61(j)(1) and (3)

CONFIDENTIAL                                                                          FHFA13012193

**Question 3: A lessee enters into an operating lease in which the lease term for accounting purposes is 10 years. Upon signing the lease, the lessee acquires leasehold improvements that have a useful life of 15 years. Over what period should the lessee amortize/depreciate the leasehold improvements?**

For leasehold improvements contemplated at or near the beginning of an initial lease term, the lessee should amortize/depreciate the leasehold improvements over the shorter of the (a) useful life of the improvements or (b) remaining lease term, which is 10 years in this inquiry. If the leasehold improvements are acquired and placed in service significantly after the inception of a lease the lessee should amortize/depreciate leasehold improvements over the shorter of the useful life of the leasehold assets or a term that includes required lease periods and renewals that are deemed to be reasonably assured at the date the leasehold improvements are acquired.

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 13 | 1/1/1977 | Accounting for Leases |
| FTB 88-1 | 1988 | Issues Relating to Accounting for Leases |
| FTB 85-3 | 11/14/1985 | Accounting for Operating Leases with Scheduled Rent Increases |
| FAS 146 | 12/31/2002 | Accounting for Costs Associated with Exit or Disposal Activities |
| FAS 143 | 6/15/2002 | Accounting for Asset Retirement Obligations |
| EITF 95-17 | 1995 | Accounting for Modifications to an Operating Lease That Do Not Change the Lease Classification |
| FAS 133 | 6/15/2000 | Accounting for Derivative Instruments and Hedging Activities |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                143

CONFIDENTIAL                                                                          FHFA13012194

| COMMON STOCK | C3.1 |
|---|---|

## I.  APPLICABILITY

This policy addresses issued outstanding common stock and is effective as of December 31, 2004.

## II.  POLICY

### A.  Issuance

At issuance, the stated value amount of the stock is credited to the common stock account.  Proceeds in excess of the stated value are credited to the Additional Paid in Capital ("APIC") account.  Incremental direct costs incurred to issue the common shares, such as underwriting, accounting and legal fees, printing costs, and taxes, should be treated as a reduction of the proceeds and are charged to APIC.

If shares are issued to non-employees[1] in exchange for services or property (instead of cash), we record the transaction at the fair value of the services or property received, whichever is more reliably measurable.

### B.  Dividends

We debit retained earnings and record a liability at the time the Board declares the dividend.  We record the payment by reducing cash and offsetting the established liability.

### C.  Stock Splits

A stock split occurs when the Board authorizes a proportional issuance of additional shares to the stockholders of record as of a certain date and the number of common shares distributed is 25% or greater of the total shares outstanding prior to the distribution.  Distributions less than 25% are considered dividends and are accounted for as such.

Stock splits (including reverse splits) are recorded when they are effected. The split is reflected in the current balance sheet and retroactively reflected in earnings per share for all periods presented.

When stock splits occur prior to the balance sheet date but the shares are issued later, the capital stock caption or a note indicates that the issuance has been reflected. When such distributions are authorized before the balance sheet date but recorded after that date, they are disclosed. Disclosure is also made of distributions authorized after the balance sheet date but before release of the financial statements.

If stock splits occur after the balance sheet date but before the release of the financial statements, they are reflected retroactively as of the last balance sheet date and in EPS for all periods presented.

---

[1]  For the accounting related to stock issued to employees in conjunction with our stock compensation plans, see Accounting Policy D5.3.3, *Stock-Based Compensation*.

INTERNAL DOCUMENT
C3.1 - Common Stock

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          144

CONFIDENTIAL

FHFA13012195

**COMMON STOCK**                                                                                    **C3.1**

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
| --- | --- | --- |
| APB 29 | September 30, 1973 | Accounting for Nonmonetary Transactions |
| ARB 43 | June 1953 | Capital Accounts (Chapter 7) |
| CON 6 | December 1985 | Elements of Financial Statements |
| FAS 123(R) | January 2006 | Share-Based Compensation |
| FAS 128 | December 15, 1997 | Earnings Per Share |
| SAB 4C | | Equity Accounts - Change In Capital Structure |
| SAB 5A | | Miscellaneous Accounting Expenses of Offering |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          145

CONFIDENTIAL

| PREFERRED STOCK | C3.2 |
|---|---|

## I.  APPLICABILITY

This policy applies to our preferred stock.  For the accounting related to common stock, treasury stock and earnings per share, see Accounting Policies A3.1, A3.3 and D6.0, respectively.  For the accounting related to the Statement of Cash Flow, see Accounting Policy E7.0.

This policy is effective as of December 31, 2004.

## II.  POLICY

### A.  Derivative Evaluation

Preferred stock is analyzed to determine if there are embedded derivative features, and if so, if those features require bifurcation and derivative accounting should be applied.  For the accounting related to embedded derivatives, see Section C2.2, *Derivative Instruments and Hedging Activities*.

### B.  Classification

Instruments that are mandatorily redeemable embody an obligation to repurchase the shares by transferring assets or embody an obligation to issue a variable number of shares, may require liability classification, as opposed to equity classification.  As such, we perform an analysis on each issuance of preferred stock to determine the proper balance sheet classification.  For preferred stock that does not contain an embedded derivative that requires bifurcation or would otherwise be classified as a liability, the stated value amount is credited to the preferred stock account.  Given the subjective nature of the determining whether preferred stock represents an equity item or a liability, prior to new issuances of preferred stock, consultation with Accounting Policy is recommended.

### C.  Issuance

Proceeds in excess of the stated value are credited to the Additional Paid in Capital ("APIC") account.  Incremental direct costs incurred to issue the common shares, such as underwriting, accounting and legal fees, printing costs, and taxes, are treated as a reduction of APIC.

### D.  Dividends

We reduce retained earnings and record a liability upon the Board of Directors declaration.  We record the payment by reducing cash and offsetting the established liability.

### E.  Conversion

Conversion of preferred stock is recorded through a reclassification from preferred stock to common stock, at carrying value.  Any "premium" paid as an inducement to convert the preferred stock is recorded to retained earnings and affects earnings per share.

INTERNAL DOCUMENT
C3.2 - Preferred Stock

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

146

CONFIDENTIAL

FHFA13012197

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable.

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| CON 6 | December 1985 | Elements of Financial Statements |
| FAS 133 | June 15, 2000 | Accounting for Derivative Instruments and Hedging Activities |
| EITF Topic D-98 | 2001 | Classification and Measurement of Redeemable Securities |
| EITF 00-27 | 2000 | Application of Issue No. 98-5 to Certain Convertible Instruments |
| EITF 98-5 | 1998 | Accounting for Convertible Securities with Beneficial Conversion Features or Contingently Adjustable Conversion Ratios |
| FAS 150 | May 31, 2003 | Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                147

CONFIDENTIAL                                                                                    FHFA13012198

**TREASURY STOCK**                                                                          **C3.3**

## I.  APPLICABILITY

This policy addresses shares of our common stock that we repurchase and thus become treasury stock. This policy is effective as of December 31, 2004.

## II.  POLICY

### A.  Acquisitions of Treasury Stock

We account for treasury stock using the cost method.  Under the cost method, the gross cost of the shares repurchased is recorded in the treasury stock account.  Treasury stock is a contra-equity account, which reduces our net stockholders' equity.  Treasury stock does not reduce the number of shares issued, but does reduce the number of shares outstanding.

Direct costs incurred to acquire treasury stock are treated in a manner similar to stock issue costs and are added to the cost of the treasury stock.
For the accounting for a purchase of treasury shares at a price significantly in excess of the current market price per share, refer to FTB 85-6 for guidance.

### B.  Issuances of Treasury Stock

When shares are issued from treasury, we reduce the treasury stock account for the average cost of the shares.

Where the issuance is in exchange for cash, any proceeds in excess of the average cost are recorded to Additional Paid-in Capital ("APIC"). Any deficiency is first recorded to offset the APIC arising from previous treasury share transactions, and after that portion of APIC is depleted, any excess is charged to retained earnings.

Where the issuance relates to stock-based compensation, the reduction in treasury stock is offset by an increase in APIC.

### C.  Dividends

Treasury shares are not eligible to receive dividends.

### D.  Retirement

Gains and losses on sales of treasury stock are accounted for as adjustments to capital and not as part of income. Gains on sales of treasury stock not previously accounted for as constructively retired should be credited to APIC.  Losses may be charged to APIC to the extent that previous net gains from sales or retirements of the same class of stock are included therein, otherwise, they should be charged against retained earnings.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable.

INTERNAL DOCUMENT
C3.3 - Treasury Stock

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    148

CONFIDENTIAL                                                                          FHFA13012199