## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| CON 6 | December 1985 | Elements of Financial Statements |
| FTB 85-6 | December 31, 1985 | Accounting for a Purchase of Treasury Shares at a Price Significantly in Excess of the Current Market Price of the Shares and the Income Statement Classification of Costs Incurred in Defending against a Takeover Attempt |
| ARB 43 | June 1953 | Restatement and Revision of Accounting Research Bulletins |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          149

CONFIDENTIAL                                                                    FHFA13012200

**COMPREHENSIVE INCOME**                                                          **C3.4**

## I.  APPLICABILITY

This policy addresses the components and reporting of Other Comprehensive Income ("OCI") and Accumulated Other Comprehensive Income ("AOCI"). This policy is effective as of December 31, 2004.

## II.  POLICY

Other comprehensive income is the change in equity, net of tax, resulting from transactions recorded in the consolidated statements of income, plus certain transactions that are recorded directly to stockholders' equity. These other transactions include unrealized gains and losses on Available for Sale ("AFS") securities and commitments accounted for under EITF 96-11, *Accounting for Forward Contracts and Purchased Options to Acquire Securities Covered by FASB Statement No. 115 Abstract,* whose underlying securities are classified as AFS, unrealized gains and losses on guaranteed assets resulting from portfolio transactions and buy-ups resulting from lender swap transactions, deferred hedging gains and losses from cash flow hedges entered into prior to 2001 and changes in our minimum pension liability.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV.  APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 130 | For fiscal years beginning after December 15, 1997 | Reporting Comprehensive Income |

CONFIDENTIAL                                                                  FHFA13012201

## I.  APPLICABILITY

This policy applies to our general accounting framework for fees we receive in connection with general financial services activities and certain miscellaneous fees not addressed elsewhere.

This policy includes our accounting for fees recognized in connection with the following:

1. Arrangements with multiple deliverables (i.e., re-securitization fees);
2. Arrangements that include an upfront fee;
3. Commitments; and
4. Loan origination fees and costs (American Communities Fund specific).

This policy is applicable through December 31, 2004.

## II. POLICY

### A.  General

We recognize revenue when it is realized or realizable and earned.  Specifically, the earnings process must be complete and the amount of revenue (fees) measurable in order to be recognized as revenue.

Revenue is considered realized or realizable and earned when all of the following conditions are met:

- Persuasive evidence of an arrangement exists;
- Delivery has occurred or service have been rendered;
- The seller's price to the buyer is fixed or determinable; and
- Collectibility is reasonably assured.

### B.  Arrangements with multiple deliverables (i.e., re-securitization fees)

Revenue arrangements with multiple deliverables, such as fees we receive in connection with re-securitization services to customers, are divided into separate units of accounting if the following conditions are met:

- The delivered item(s) would have value if it were priced on a stand-alone basis;
- There is objective and reliable evidence of the fair value of the undelivered items(s);
- If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable; and substantially in the control of the vendor.

Deliverables within an arrangement that do not meet the criteria above should be combined and the appropriate recognition of revenue should be determined for that single unit of accounting.  Arrangement consideration is allocated among the separate units of accounting based on their relative fair value.

We apply the residual method when the fair value of the undelivered item(s) is known but there is no objective and reliable evidence of the fair value of the delivered item(s). To the extent that any separate unit of accounting in the arrangement is required under

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                151

CONFIDENTIAL                                                          FHFA13012202

GAAP to be recorded at fair value, the amount allocated to that unit of accounting should be its fair value.

## C.  Arrangements that include an upfront fee

Unless an upfront fee payment is in exchange for the delivery of products or services provided, which represents the culmination of an earnings process, the fee should be deferred and amortized.  Therefore, upfront fees are generally deferred and recognized systematically over the periods that the fees are earned.

The recognition of deferred upfront fee revenue on a straight-line basis is appropriate in those situations where performance is completed systematically over the contract period.  However, if performance is completed (and revenue is earned) on a basis that is other than straight-line, revenue should be recognized on that basis.  Other methods include, but are not limited to:

- Level yield method (SFAS 91); and
- Declining unpaid principal balance ("declining UPB").

## D.  Commitment fees

Loan commitment fees are deferred and, if the commitment is exercised, recognized over the life of the loan as an adjustment of interest income (yield) using the interest method. If the commitment expires unexercised, loan commitment fees should be recognized as service fee income upon expiration of the commitment. However, if the likelihood that a loan commitment will be exercised is remote, the commitment fees should be recognized over the commitment period on a straight-line basis as service fee income. If the commitment is subsequently exercised, the remaining unamortized commitment fee at the time of exercise should be recognized over the life of the acquired loan as an adjustment of interest income.

## E.  Direct loan origination costs and fees (ACF)

We originate certain loans in connection with our ACF program.  Direct costs and fees associated with the origination of a loan are deferred and recognized over the life of the originated loan as an adjustment of yield under the interest method.  Loan origination fees and related direct loan origination costs for a given loan are offset and we only defer and subsequently amortize as a yield adjustment the net amount.

Direct loan origination costs and fees are those that are incremental to a given loan (that is, we would not have charged the fee or incurred the costs had our decision to originate a loan not been made) and directly related to a given loan.  Examples of loan origination activities that meet this criterion, include, but are not limited to:

- Evaluating the borrower's financial condition;
- Evaluating and recording guarantees, collateral, and other security arrangements;
- Negotiating loan terms;
- Preparing and processing loan documents; and
- Closing the transaction.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    152

CONFIDENTIAL                                                                                    FHFA13012203

### F.  Miscellaneous Fees

Below outlines the measurement of revenue for some of the more frequent fees encountered by us in the normal course of business:

#### 1.  Conversion Fees

Conversion fees received by us from a lender when borrowers convert to Fixed Rate Conversion mortgage loans are deferred and amortized using the contractual method as a yield adjustment, using the interest method.  The amount deferred represents a new basis adjustment on the loan that is carried forward as part of our recorded investment in the loan.

#### 2.  Interest Shortfalls

Interest shortfalls received related to adjustments of adjustable rate mortgages are deferred and recorded as a yield adjustment.  The payment terms required by the loan contract is used to calculate the constant effective yield necessary to record the shortfall as a yield adjustment, using the interest method.

#### 3.  Due Diligence Fees

Fees received from loan sellers for due diligence procedures performed in connection with large loan purchases are deferred on successful originations or purchases and recognized over the life of the loan as yield adjustments, using the interest method.

#### 4.  Property Inspection Waiver Fees

Fees received from a borrower in exchange for the waiver of property inspections by the lender at the time of a successful loan origination are deferred as a yield adjustment, using the interest method.

#### 5.  DUS Premium Pricing Fees

We include fees paid, less fees received in the initial investment amount of the loan(s).  The fees are considered a cost basis adjustment to the purchased loan and amortized using the interest method over the life of the loans.  Under the DUS program, lenders sell loans to us at par, a premium, or a discount.  If a premium on a loan exceeds a certain percent over par, we are compensated with a fee from the seller.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          153

CONFIDENTIAL                                          FHFA13012204

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| SAB 104 | 12/17/03 | Revenue Recognition |
| EITF 00-21 | Accounting for Revenue Arrangements with Multiple Deliverables | Accounting for Revenue Arrangements with Multiple Deliverables |

INTERNAL DOCUMENT
D4.4 – Fee and Other Income

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          154

CONFIDENTIAL                                                                                    FHFA13012205

**CONTRIBUTIONS**                                                                 **D.4.5**

## I.  APPLICABILITY

This policy provides the accounting and reporting requirements for contributions made by Fannie Mae.  The policy is effective as of January 1, 2007.

The policy applies to contributions made of cash and other assets, including promises to give.  It does not apply to the following transactions:

- Transfers of assets that are in substance purchases of goods or services - exchange transactions in which each party receives and sacrifices commensurate value.  However, if an entity voluntarily transfers assets to another or performs services for another in exchange for assets of substantially lower value and no unstated rights or privileges are involved, the contribution inherent in that transaction is within the scope of this policy.
- Transfers of assets in which the reporting entity acts as an agent, trustee or intermediary, rather than as a donor or donee.
- Tax exemptions, tax incentives, tax abatements, or transfers from governmental units to businesses.

## II.  POLICY

### A. RECOGNITION

Contributions made will be recognized as contribution expenses in the period made and as offsetting decreases of assets or offsetting increases in liabilities depending on the form of the benefits given.

Communication of intention to give is a communication made by potential donors to potential donees that contains uncertainty regarding amount, timing, frequency and/or donee identity. These uncertainties cause the communication of intention to give to be legally unenforceable and fail to meet the definition of a promise to give.

Communication of intention to give provided to a potential donee should not be recognized as a contribution made if it does not constitute a promise to give.  A communication that does not indicate clearly whether it is a promise is considered an unconditional promise to give if it indicates an unconditional intention to give that is legally enforceable.

A promise to give should be recognized only if:

- There is sufficient evidence in the form of verifiable documentation that a promise was made and received
- The promise is an unconditional promise

A conditional promise to give should be recognized only if:

- There is sufficient evidence in the form of verifiable documentation that a promise was made and received
- The conditions on which the promise depends are substantially met, that is, when the conditional promise becomes unconditional.  A conditional promise to give is considered unconditional if the possibility that the conditions will not be met is remote.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    155

CONFIDENTIAL                                                        FHFA13012206

**CONTRIBUTIONS**                                                                **D.4.5**

A transfer of assets with a conditional promise to give them should be accounted for as a refundable advance until the conditions have been substantially met.

### B. MEASUREMENT

Contributions made should be measured at their fair value.  A major uncertainty about the existence of value may indicate that the contribution should not be recognized.

If the fair value of a contribution is calculated based on the present value of estimated future cash flows, the subsequent accruals of interest should be accounted for as contribution expense.

Unconditional promises to give that are expected to be paid in less than one year may be measured at net realizable value (net settlement value) because that amount results in a reasonable estimate of fair value.

Contributions of services that create or enhance nonfinancial assets may be measured by referring to either the fair value of the services received or the fair value of the asset or of the asset enhancement resulting from the services.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable.

## IV.  APPLICABLE ACCOUNTING LITERATURE

| SFAS 116, *Accounting for Contributions Received and Contributions Made* | Effective January 1, 2007 |
|---|---|

INTERNAL DOCUMENT
D.4.5 - Contributions

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae            156

CONFIDENTIAL                                                         FHFA13012207

**CREDIT ENHANCEMENTS AND INSURANCE CONTRACTS**                                    **D5.1**

## I. APPLICABILITY

This policy addresses the accounting for insurance contracts and other forms of credit enhancements ("CE"), such as lender recourse. It does not cover foreclosures or collections of insurance claims or credit risk.  For the accounting related to foreclosures, including the collection of proceeds from insurance policies, see policy C.1.8, *Real Estate Owned & Other Foreclosed Assets*.  For the accounting related to credit risk, refer to C.1.5, *Allowance for Loan Losses*, and C.2.3, *Guaranty Assets and Guaranty Obligations*. This policy is effective as of December 31, 2004.

## II. POLICY

### A. Derivative Accounting

Insurance contracts and other CE are analyzed to determine if derivative accounting is required.

1. Insurance contracts and other CE that meet the definition of a derivative, as defined in Section C.2.2, *Derivatives*, and do not meet the specific exemptions from derivative accounting, are accounted for at fair value with changes in fair value recorded in earnings.

2. An insurance contract is exempt from derivative accounting if the following criteria are met:

   a. The mortgage insurance contracts provide the insurer with at least one settlement option that limits it's payment to actual losses incurred by the holder of the policy; and
   b. The insurance contract only entitles us to compensation upon an insurable event in which we incur a loss.

   These provisions are typical in most mortgage insurance arrangements.

3. A CE contract that is a financial guarantee is exempt from derivative accounting if it meets the criteria outlined in Section C.2.3, *Guaranty Assets and Guaranty Obligations.*

### B. Insurance contracts

The insurance contracts referred to in this section relate to contracts that we purchased ("investor paid").  The accounting for such contracts is summarized below and is only applicable if the contract is exempt from derivative accounting based on the guidance provided in section II.A, above.

CONFIDENTIAL                                                                FHFA13012208

CREDIT ENHANCEMENTS AND INSURANCE CONTRACTS                                    D5.1

1. Insurance contracts are analyzed to determine if risk has transferred from us, the insured, to the insurer. Contracts that do not sufficiently transfer risk are accounted for as deposits in the following manner:

   a. Premium paid is recorded as an asset
   b. Insurance recoveries reduce the asset recorded

2. Insurance contracts (not deposits) that have transferred risk to the insurer are accounted for as follows:

   a. Premiums paid up-front are amortized as insurance expense over the period in which we obtain the benefit of such coverage.  Insurance contracts that have retrospective adjustment provisions should be discussed with accounting policy to determine the appropriate amortization.
   b. The prepaid asset is subject to impairment in accordance with the accounting policy in Section C1.9.3, *Property Plant and Equipment*.
   c. Proceeds from insurance claims are recorded as income when receipt is estimable, probable and all related contingencies are resolved.

## C. Other credit enhancements

The CE referred to in this section can be categorized as either (i) contractually attached to the covered loans, or (ii) not contractually attached to the covered loans.  Whether or not CE is contractually attached to the covered loans is a legal determination based on the following criteria:

a. CE was entered into contemporaneously with our purchase of the loan; and
b. CE is part of and trades with the loan upon transfer of the loan to a third-party.

The accounting discussed in this section is only applicable if the CE is exempt from derivative accounting based on the guidance provided in section II.A, above.

1. *Credit enhancements attached to covered loans* – This includes borrower paid mortgage insurance ("MI") and lender paid MI.  When a loan is in default, we are entitled to proceeds from the CE.

   a. We record an asset for our best estimate of the proceeds from the CE, provided the proceeds are probable of collection and all contingencies related to recovery of the proceeds have been relieved to the extent of the loss.
   b. The asset we recognize is established at the time of charge off not to exceed the amount of charge-off loss.
   c. An estimate of proceeds from the CE is included in our estimate of severity for purposes of determining the allowance for loan losses, reserve for guaranty losses, and guaranty obligation, as applicable.

2. *Credit enhancements not attached to covered loans and received in connection with a whole loan purchase* - This includes lender recourse or lender paid CE provided to us.  When a loan is in default, we are entitled to proceeds from the CE.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    158

CONFIDENTIAL                                                                              FHFA13012209

**CREDIT ENHANCEMENTS AND INSURANCE CONTRACTS**                              **D5.1**

    a.  We record an asset for our best estimate of the proceeds from the CE, provided the proceeds are probable of collection and all contingencies related to recovery of the proceeds have been relieved to the extent of the loss.

    b.  Proceeds from CE that meet the three criteria for recovery treatment to the allowance for loan losses as defined in Section C1.5 of our Policy Manual, Allowance for Loan Losses and Reserve for Guaranty Losses, are recognized as a recovery (credit) to the allowance.

    c.  If the CE does not meet the criteria for recovery treatment to the allowance, proceeds from CE are recognized in "Foreclosed property expense" when received.

3. *Credit enhancements not attached to covered loans and received as additional compensation for our guaranty* – This includes lender recourse or lender paid CE provided to us.

    a.  An asset is recorded at inception of the guaranty for the estimated fair value of the CE.  We determine the value of the asset to record based on the net present value of the expected cash flows.  This asset is subsequently amortized as insurance expense over the period in which Fannie Mae obtains the benefit of such coverage.

    b.  The recorded asset is subject to impairment in accordance with the accounting policy in Section C1.9.3, *Property Plant and Equipment.*

    c.  The offsetting amount is recorded in accordance with the accounting policy in Section C.2.3, *Guaranty Assets and Guaranty Obligations.*

## III. QUESTIONS AND INTERPRETIVE RESPONSES

**Question 1:  What is the appropriate amortization method and period for prepaid premiums or CE received in connection with a guaranty?**

The following table summarizes, by coverage type, the appropriate amortization method and period to approximate the manner in which we receive the benefit of coverage:

INTERNAL DOCUMENT
D5.1 – Credit Enhancements

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    159

CONFIDENTIAL

FHFA13012210

**CREDIT ENHANCEMENTS AND INSURANCE CONTRACTS**                    **D5.1**

| Coverage Type | Amortization using Declining UPB | Amortization using Straight-Line | Full Amortization When Coverage Limit Is Reached | Full Amortization When Loan Prepaid |
|---|---|---|---|---|
| Life of loan | Yes | No | N/A | Already Incorporated in DUPB |
| Life of loan with coverage limit | Yes | No | Yes | Already Incorporated in DUPB |
| Fixed Period (i.e. 5 years) | No | Yes | N/A | Yes |
| Fixed Period (i.e. 5 years) with coverage limit | No | Yes | Yes | Yes |
| Noncancelable, Annual Payments | No | Yes *(Annual premium is amortized evenly over the year of coverage (straight-line amortization on a monthly basis)* | N/A | Yes |
| Noncancelable, Annual Payments with coverage limit | No | Yes *(Annual premium is amortized evenly over the year of coverage (straight-line amortization on a monthly basis)* | Yes *(If coverage limit has been reached, remaining balance should be fully amortized)* | Yes |

INTERNAL DOCUMENT
D5.1 – Credit Enhancements

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          160

CONFIDENTIAL                                                              FHFA13012211

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| SFAS 133 | June 15, 1999 | *Accounting for Derivative Instruments and Hedging Activities* |
| SFAS 149 | June 30, 2003 | *Amendment on Statement 133 Accounting for Derivative Instruments and Hedging Activities* |
| SFAS 91 | December 15, 1987 | *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases* |
| SFAS 5 | December 1985 | *Recognition and Measurement in Financial Statements of Business Enterprises* |
| SFAS 140 | March 31, 2001 | *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities—a replacement of FASB Statement 125* |
| SFAS 150 | May 31, 2003 | *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity* |
| DIG Issue A1 | June 23, 1999 | *Definition of a Derivative: Initial Net Investment* |
| DIG Issue A23 | 2004 | *Prepaid Interest Rate Swaps* |
| FIN 45 | January 1, 2003 | *Guarantor's Accounting and Disclosure Requirements for Guarantees, including the Indirect Guarantee of Indebtedness of Others* |
| EITF 00-8 | 2001 | *Accounting by a Grantee for an Equity Instrument to Be Received in Conjunction with Providing Goods or Services* |
| SOP 96-1 | December 15, 1996 | *Statement of Position 96-1 Environmental Remediation Liabilities* |
| SOP 98-7 | June 15, 1999 | *Statement of Position 98-7 Deposit Accounting: Accounting for Insurance and Reinsurance Contracts That Do Not Transfer Insurance Risk* |

CONFIDENTIAL                                                                  FHFA13012212

**COMPENSATED ABSENCES**                                                      **D5.3.2**

## I.  APPLICABILITY

This policy addresses the accounting and reporting for our compensated absence benefits in accordance with FAS 43, *Accounting for Compensated Absences*.  It also addresses the accounting when employees donate earned vacation to charity. It is effective as of December 31, 2004.

As we provide benefits for compensated absences, we must recognize our obligation as well as account for our actual cost of benefits. We offer several types of compensated absences that differ in terms of how they (1) originated, (2) are earned, (3) can be purchased, (4) carry-over from one year to the next, and (5) are paid-out each year or upon termination. Certain programs also differ in how we are required to treat them for employees residing in California versus other states. The following summarizes the key types of compensated absences:

A.  **Accrued Vacation Leave** – Our employees are eligible for paid vacation time. Full-time employees receive a vacation advance on the first business day of the beginning of the calendar year, representing the maximum amount of vacation leave that the employee will earn in the new calendar year by working through that calendar year. Employees earn and accrue 1/26th of the full year's advance for each bi-weekly pay period they are employed.

1.  Our company regulations provide that a certain amount of unused vacation time that is not used in the current year along with all reserved[1] and federal reserved[2] vacation can be carried over to the following year.
2.  Outside of California, the regulations define when that vacation must be used or forfeited.  Upon termination, all unused earned vacation for the current year and any reserved or federal reserved vacation will be paid out at the employee's current rate of pay, and all other vacation will be forfeited.
3.  In California, the unused vacation may continue to be carried forward to subsequent years. Upon termination, all unused earned vacation is paid out at the employee's current rate of pay.
4.  Employees are periodically able to donate earned vacation time to a qualified charitable organization in our name. In those situations, we reduce the vacation liability and make a corresponding cash donation.

B.  **Sick Leave –** Our employees are provided with sick leave as needed. There is no set allocation or accrual, and there is no payout upon termination.

C.  **Regular Holidays –** Our employees are provided with a set number of fixed holidays each year. There is no payout for unused holidays upon termination.

---

[1] Reserved Vacation - Prior to 1993, our vacation plan allowed the carryover from year-to-year of any unused vacation. Upon transition to the new plan, employees with balances were grandfathered and permitted to continue carrying this "reserved vacation" forward indefinitely, with payout upon termination.

[2] Federal Reserved Vacation – Employees who transferred to us from the Federal government before May 21, 1970 were credited with "federal reserved vacation" for such leave that accumulated and was unused as of the date they transferred to us. Affected employees are permitted to continue carrying this "federal reserved vacation" forward indefinitely, with payout upon termination.

INTERNAL DOCUMENT
D5.3.2 - Compensated Absences

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    162

CONFIDENTIAL                                                                          FHFA13012213

**D. Floating Holidays** – Our employees are entitled to a set number of days of floating holiday leave as soon as the employee has completed the required number of months of employment. The holidays are earned and granted regardless of when in the calendar year the required employment has been completed.

1. Outside of California, floating holidays that are not used in a calendar year are forfeited at the end of the year or upon termination.
2. In California, unused floating holidays may continue to be carried forward to subsequent years. Upon termination, all unused floating holidays are paid out at the employee's current rate of pay.

**E. Healthy Living Day** – We offer a "healthy living day" of paid time off to our employees who meet eligibility requirements defined by our Health Services.

1. Outside of California, Healthy Living Days that are not used in a calendar year are forfeited at the end of the year or upon termination.
2. In California, Healthy Living Days may continue to be carried forward to subsequent years. Upon termination, all unused Healthy Living Days are paid out at the employee's current rate of pay.

**F. Purchased Vacation Leave** – Our full-time employees are allowed to purchase, through payroll deductions, an additional five days of vacation leave each calendar year. Purchased vacation may not be used until an employee has used all of their advanced regular vacation leave, floating holidays, and healthy living day (if applicable) for the calendar year as well as any reserved and or carry-over leave from prior years.

If the purchased vacation is not used within the calendar year, it may not be carried over. Instead, we reimburse employees (other than directors and officers) at the end of the calendar year for any purchased vacation days not used by the end of November. Directors and officers forfeit any unused purchased vacation days not used by the end of the year.

## II.  Policy

We recognize our obligation for employees' rights to receive compensation for future absences when the obligation meets *all* of the following criteria:

a. Relates to employees' services already rendered
b. Obligation relates to rights that vest[3] or accumulate[4]
c. Is probable of payment, and
d. Is reasonably estimable.

We accrue a liability for vacation, floating holiday and Healthy Living Day benefits in the period the benefits are earned and vested but not yet taken, rather than when they are paid.

---

[3] For purposes of FAS 43, vested rights are those for which we have an obligation to make payment even if an employee terminates; thus, they are not contingent on an employee's future service.

[4] For purposes of FAS 43, accumulate means that earned but unused rights to compensated absences may be carried forward to one or more periods subsequent to that in which they are earned, even though there may be a limit to the amount that can be carried forward.

Page 2 of 4

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                163

**COMPENSATED ABSENCES**                                                        **D5.3.2**

We recognize the costs of sick pay benefits, regular holidays, and similar compensated absences in the period incurred.

We accrue a liability for purchased vacation days as such amounts are withheld from an employee's pay until the vacation is used or the liability is repaid or forfeited.

### A. Accrual

An accrual is recognized each reporting period on the balance sheet as a liability with the offset to compensation expense.

The accrual related to unused vacation, floating holidays, and healthy living days is determined by multiplying the number of days accrued and/or carried over by the employee's hourly rate in effect on the last day of the reporting period. The accrual amount should be reduced by expected forfeitures.

For carry-over vacation, the accrued liability for unpaid leave may be reduced for expected forfeitures, if forfeitures can be reasonably estimated and if material, related to non-California residents.

The accrual related to purchased vacation days is based on the actual amount withheld from the employee's pay. We reimburse employees for unused purchased vacation prior to year-end, therefore, while a liability exists and is recorded for interim periods, no liability exists and no accrual is required at year-end.

We do not discount the compensated absence liability.

### B. Donated Time

In the event that employees elect to donate their earned but unused vacation hours to charity, the cash value of the donation is determined by calculating the number of hours donated by the employee's current hourly wage. Donated amounts are not included in employee's wages, or treated as salary or wage expense for employment tax purposes. We record the donation by reducing the vacation accrual liability and increasing a contribution liability, with a corresponding reclassification from salary/benefits expense to contribution expense. We reduce the contribution liability when the cash is paid to the charity.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

**Question 1:  What is the difference between vesting versus accumulating for the purposes of whether or not to accrue a liability for compensated absences?**

Liabilities are probable future sacrifices of economic benefits stemming from present legal, equitable, or constructive obligations of a particular enterprise to transfer assets or provide services to other entities in the future as a result of past transactions or events affecting the enterprise.

The FASB believes that a liability for amounts to be paid as a result of employees' rights to compensated absences should be accrued, considering anticipated forfeitures, in the year in which earned.  For example, if new employees receive vested rights to two-weeks' paid vacation at the beginning of their second year of employment with no pro rata payment in the event of

INTERNAL DOCUMENT
D5.3.2 Compensated Absences

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                164

CONFIDENTIAL                                                                    FHFA13012215

termination during the first year, the two-weeks' vacation would be considered to be earned by work performed in the first year and an accrual for vacation pay would be required for new employees during their first year of service, allowing for estimated forfeitures due to turnover. Furthermore, the definition of a liability does not limit an employer's liability for compensated absences solely to rights to compensation for those absences that eventually vest.  The definition also encompasses a constructive obligation for reasonably estimable compensation for past services that, based on the employer's past practices, probably will be paid and can be reasonably estimated.  Individual facts and circumstances must be considered in determining when nonvesting rights to compensated absences are earned by services rendered.

The requirement to accrue a liability for nonvesting rights to compensated absences depends on whether the unused rights (a) expire at the end of the year in which earned or (b) accumulate and are carried forward to succeeding years, thereby increasing the benefits that would otherwise be available in those later years.  If the rights expire, the FASB believes that a liability for future absences should not be accrued at year-end because the benefits to be paid in subsequent years would not be attributable to employee services rendered in prior years.  (Jury duty and military leave benefits generally do not accumulate if unused and, unless they accumulate, a liability for those benefits would not be accrued at year-end.) On the other hand, if unused rights do accumulate and increase the benefits otherwise available in subsequent years, the FASB believes a liability should be accrued at year-end to the extent that it is probable that employees will be paid in subsequent years for the increased benefits attributable to the accumulated rights and the amount can be reasonably estimated.

## IV.  APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 43 | December 1980 | Accounting for Compensated Absences |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                165

CONFIDENTIAL                                                                                 FHFA13012216

## I.   APPLICABILITY

This policy addresses all share-based transactions to acquire goods or services by issuing shares, share options, or other equity instruments or by incurring liabilities to an employee or other supplier.  This policy applies to all awards granted, modified, repurchased or cancelled after January 1, 2006.

## II.  POLICY

We award stock-based compensation to certain employees and board members as compensation for services rendered, and the rights to benefits may accumulate or vest as they render service. We measure the cost of all share-based compensation based on the fair value of the award on the grant date, and recognize compensation expense over the requisite service period.

Stock-based compensation is classified as either an equity or liability award.  Compensation cost for an award classified as a liability is based on the change (or portion of the change, depending on the requisite service rendered) in the fair value of the instrument as remeasured each reporting period until settlement.  The compensation cost for an award of share-based compensation classified as equity is recognized over the requisite service period, or "RSP" with a corresponding credit to APIC. The RSP is the period during which an employee is required to provide service in exchange for an award, which often is the vesting period. We estimate our forfeiture rate and reduce our accrual by this estimate. The forfeiture estimate, which must be revised on a periodic basis, must be consistent with the requirement to ensure sufficient expense has been recorded relative to awards that have vested.

If the service period is not defined as an earlier or shorter period, the service period is presumed to be the period from the grant date to the date that the award is vested and its exercisability does not depend on continued employee service. If an award is for past services, the related compensation cost is recognized in the period in which it is granted. If an award requires future service for vesting, we do not define a prior period as the requisite service period.

### 1.  Grant Date

The appropriate grant date for accounting purposes must be determined as this is the date the award's fair value is measured, and cost recognition begins. Grant date is defined as:

A.  The date at which an employer and an employee reach a mutual understanding of the key terms and conditions of a stock-based payment award. A mutual understanding shall be presumed to exist at the date the award is approved in accordance with the relevant corporate governance requirements (that is, by the Board or management with the relevant authority) if both of the following conditions are met:

I.   The award is a unilateral grant and, therefore, the recipient does not have the ability to negotiate the key terms and conditions of the award with the employer.

II.  The key terms and conditions of the award are expected to be communicated to an individual recipient within a relatively short time period[1] from the date of approval.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                166

CONFIDENTIAL                                                                          FHFA13012217

   B. The employer becomes contingently obligated on the grant date to issue equity instruments or transfer assets to an employee who renders the requisite service.

   C. Awards made under an arrangement that is subject to shareholder approval are not deemed to be granted until that approval is obtained unless approval is essentially a formality (or perfunctory), for example, if management and the members of the board of directors control enough votes to approve the arrangement.

   D. Similarly, individual awards that are subject to approval by the board of directors, management, or both are not deemed to be granted until all such approvals are obtained.

   E. The grant date for an award of equity instruments is the date that an employee begins to benefit from, or be adversely affected by, subsequent changes in the price of the employer's equity shares.

We review all the requirements set forth above prior to determining a grant date.

## 2. Service Inception Date

The service inception date (at which we begin to recognize compensation cost) may begin before the grant date if (a) an award is authorized, (b) service begins before a mutual understanding of the key terms and conditions of a share-based payment award is reached, and (c) either (1) a substantive future requisite service requirement does not exist on the grant date or (2) the award contains a market or performance condition that if not satisfied between the service inception date and the grant date results in forfeiture of the award.

## 3. Vesting Conditions

### A. Service Conditions

If the requisite service period of an award is based on a service condition, compensation cost will be recognized only to the extent that the service condition is satisfied.  Compensation cost will not be recognized, and any previously recognized compensation cost is reversed, if the service condition is not satisfied.

### B. Performance Conditions

A condition affecting the vesting, exercisability, exercise price, or other pertinent factors used in determining the fair value of an award that relates to both (a) an employee's rendering service for a specified (either explicitly or implicitly) period of time and (b) achieving a specified performance target that is defined solely by reference to the employer's own operations (or activities).

### C. Market Conditions

Market conditions are considered in the grant-date fair value of share-based payments. As such, for the determination of the fair value of an award with a market condition, an option-pricing model needs to be chosen that takes the market condition into account. In addition, so long as the RSP is fulfilled, compensation expense is not adjusted even if the market condition is not ultimately met.

### D. Multiple Vesting Conditions

INTERNAL DOCUMENT
D5.3.3 – Stock-Based Compensation

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae              167

CONFIDENTIAL                                                              FHFA13012218

**STOCK-BASED COMPENSATION** D5.3.3

Awards may have a combination of several vesting conditions, i.e. service, performance and/or market conditions. The existence of several vesting conditions may affect the requisite service period, the amount of compensation costs recognized and the grant date fair value. As such, we analyze awards with multiple vesting conditions regarding their option-pricing and accounting implications.

## 4. Valuation of Options

We utilize the Black-Scholes-Merton model to value grants of stock options. Our stock options do not contain market conditions; therefore, they do not require the use of a lattice model to derive fair value.

The model takes into consideration six input factors: exercise price, current stock price, risk-free interest rate, expected dividends, expected term of the option, and expected volatility as discussed below.

If we determine a range of estimates for an input assumption and no point within the range is a better estimate than the other points, the average of the range (i.e., the expected value) is used.  SAB 107 provides additional guidance on developing and applying assumptions in practice.

The valuation technique selected should be used consistently and should not be changed unless a different valuation technique is expected to produce a better estimate of fair value. A change in valuation technique would be accounted for as a change in accounting estimate and would be applied prospectively to new awards.

### A. Expected Term

We use a 6 year expected term input for our option grants to employees. This estimate is based on ten years of historical data showing employee exercise behavior.

### B. Expected Volatility

We rely on historical volatility to compute our expected volatility. We utilized five-year historical volatility computed on a weekly basis (i.e., 260 weeks).

### C. Risk-Free Interest Rates

The risk-free interest rate is based on traded zero-coupon U.S. Treasury Bonds with a term equal to the option's expected term. We use the risk-free Treasury Strip yield that equals the expected term (6 years) as the input to the Black-Scholes-Merton model.  The 6-year rate is interpolated from the 5-year and 7-year Treasury Strip rates.

### D. Exercise Price and Current Price

The exercise and current price of the option or share are objective measurements on the date of measurement of the option value, based on the terms of the agreement and information in the marketplace.

### E. Dividend Yield

INTERNAL DOCUMENT
D5.3.3 – Stock-Based Compensation

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          168

CONFIDENTIAL FHFA13012219

Dividend yield is a reduction to the fair value of an option, representing the option holders' forgone return on the underlying stock prior to exercise. The expected dividend yield is based on the past practice of paying dividends, by calculating the average annual dividend payments divided by the stock price on the dates recent dividends were declared. We use our current dividend yield as the static input to the Black-Scholes-Merton model.

## 5. Valuation of Restricted Stock

For restricted stock, we do not use an option-pricing model, as traditionally these are time-based vesting awards, which participate in any dividends paid to our common shareholders.[1]  We measure the compensation cost associated with grants of restricted stock at an amount equal to the grant date fair market value of a non-restricted share of our stock.

We do not record additional compensation expense when dividends are awarded to restricted shareholders, so long as those dividends are consistent with dividends awarded to common shareholders. However, if the restricted stock is ultimately forfeited prior to vesting, any unreturned dividends paid to holders of the forfeited restricted stock is recognized as compensation expense on the date of forfeiture.

## 6. Forfeitures

We estimate future forfeitures by analyzing our actual historical forfeiture and termination information and considering how future termination rates are expected to differ from these historical rates. We also consider whether termination rates differ materially from one employee group (e.g., pay level) to another and, if so, derive different estimated forfeiture assumptions for each employee group.

The forfeiture forecast rate will be divided by 12 to determine the monthly forfeiture rate that will reduce the monthly amortization of the valuation of the option grant. However, we substitute the actual forfeiture rate when it is less than the forecasted rate in order to ensure that the option valuation with forfeiture is not understated. For new and unvested existing grants, the forfeiture forecast will be updated each year based on a rolling 10-year forfeiture history.

## 7. Cost Attribution

The compensation cost for an award of equity instruments to employees shall be recognized over the period(s) in which the related employee services are rendered by a charge to compensation cost and equity if the award is for future service. If the service period is not defined as an earlier or shorter period, we presume the service period to be the period from the grant date to the date that the award is vested and its exercisability does not depend on continued employee service. If an award is for past services, we recognize the related compensation cost in the period in which it is granted.

## A. Awards Subject to Cliff Vesting

---

[1] Exceptions: awards granted to non-employee directors vest based on the occurrence of an event (annual shareholder's meeting), and grants under the Performance Share Plan are forms of restricted stock which vest based on the achievement of performance objectives.

INTERNAL DOCUMENT
D5.3.3 – Stock-Based Compensation

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          169

CONFIDENTIAL                                                               FHFA13012220

Compensation cost for cliff vesting awards (i.e., all awards are received upon full completion of the requisite service) is recognized on a straight-line basis over the requisite service period, generally the vesting period unless an earlier or shorter service period is defined. If performance conditions affect either the exercise price or the exercisability date, we use the service period for attribution purposes that is consistent with the assumptions used in estimating the fair value of the award. If an award is subject to vesting based on service or performance conditions, the award is presumptively for future service.

## B. Awards Subject to Graded Vesting

We estimate the value of awards with graded vesting by treating each vesting tranche as a separate award or valuing the award as a single award. If the fair value is estimated by treating each vesting tranche as a separate award, compensation cost is recognized using an accelerated approach.  If the award is valued as a single award, we may choose to recognize compensation cost on a straight-line basis or use the accelerated approach.

With the exception of the Performance Share Plan (PSP), we estimate the fair value of awards with graded vesting as a single award and recognize compensation cost on a straight-line basis.

As of each reporting date, compensation cost using the straight-line attribution method for awards with graded service vesting must be at least equal to the portion of the grant-date fair value vested at that date. For example, if an award vests 30 percent, 30 percent, 20 percent and 20 percent in years one, two, three, and four, respectively, we would recognize 30 percent of the total measured compensation cost in the first year, not 25 percent as would be calculated by a strict application of the straight-line method.

The PSP is based on performance as well as service conditions, with a market-based cap that limits the number of units granted but which otherwise has no effect on vesting.  We follow the approach set forth in FIN 28 (i.e., the accelerated method).

## 8. Modification of Awards

Modifications of awards are treated as an exchange of the original award for a new award.  We recognize additional compensation to the extent the value of the new award exceeds the value of the old award. The fair value of the old option immediately before the modification is based on current circumstances (i.e., the grant date input assumptions should be revised to reflect current conditions, including the currently estimated expected term). We generally will never recognize less than the grant-date fair value of the original award unless the original award is not expected to vest.

## 9. Settlements

Settlements of outstanding awards are accounted for as the repurchase of an equity instrument, with amounts paid in excess of the fair value on the repurchase date recognized as compensation cost. The fair value of the award immediately before settlement is based on current circumstances (i.e., the grant date input assumptions are revised to reflect current conditions, including the currently estimated expected term). The settlement of an unvested award essentially vests the award, and any unrecognized

INTERNAL DOCUMENT
D5.3.3 – Stock-Based Compensation

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          170

CONFIDENTIAL                                                           FHFA13012221

compensation cost is recognized immediately.

### 10. Awards Issued to the Board of Directors

We issue both options and restricted stock as compensation to members of our board of directors. All members of the board of directors are, by definition, non-employees. Directors elected by shareholders (or are appointed to a board position that will be filled by shareholder election when the current term expires), are treated as employees with respect to stock-based compensation. Board members who are appointed by the President of the United States to fill the "Appointed Member" board positions are not. Any stock-based compensation granted to Appointed Members is accounted for as non-employee compensation and the measurement date for these awards is governed by the provisions of EITF 96-18.

### 11. Employee Share Purchase Plan

A stock purchase plan is non-compensatory if it allows an employee to purchase stock at a small discount from the market, substantially all full-time employees may participate, and the plan incorporates limited option features. Our Employee Stock Purchase Plan contained certain option features, which resulted in the plan being compensatory. As such, these awards are valued and the compensation expense recognized in accordance with options issued as compensation.

### 12. Deferred Tax Asset

A deferred tax asset is established as we recognize compensation costs for equity-classified awards that are expected to result in a tax deduction. An excess tax benefit or shortfall results from the difference between the tax deduction taken upon settlement of an award (measured at intrinsic value) and the book compensation costs (measured at fair value at grant date).

Tax benefits resulting from income tax deductions in excess of recognized compensation cost are recognized in APIC. If the tax benefits are less than the cumulative compensation cost, the write-off of the related excess deferred tax asset first goes to offset identified excess tax benefit credits in the APIC pool at adoption, and then to the income statement.

### 13. Initial Application

Upon adoption of this policy on January 1, 2006, a cumulative-effect adjustment will be recognized in accordance with the modified prospective method as prescribed by FAS 123(R).  Under the modified prospective method, we apply this policy only to awards granted, modified, or settled after December 31, 2005.  The compensation cost for awards that are unvested as of January 1, 2006 will be recognized by applying the same attribution method used in the 2004-2005 financial statements.  There is no change to the estimated fair value of awards granted prior to the adoption date.

We will apply a forfeiture assumption to unvested awards at January 1, 2006 and recognize in income, a cumulative-effect adjustment for the change in accounting principle for the difference between compensation costs previously recognized using actual forfeitures and the compensation cost that would have been recognized using expected forfeitures.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    171

CONFIDENTIAL                                                                                     FHFA13012222

**STOCK-BASED COMPENSATION**                                                    D5.3.3

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 123(R) | Jan 2006 | Share-Based Payment |
| FSP FAS 123(R)-1 | Jan 2006 | Classification and Measurement of Freestanding Financial Instruments Originally Issued in Exchange for Employee Services under FASB Statement No. 123(R) |
| FSP FAS 123(R)-2 | Jan 2006 | Practical Accommodation to the Application of Grant Date as Defined in FASB Statement No. 123(R) |
| FSP FAS 123(R)-3 | Jan 2006 | Transition Election Related to Accounting for the Tax Effects of Share-Based Payment Awards |
| FSP FAS 123(R)-4 | Jan 2006 | Classification of Options and Similar Instruments Issued as Employee Compensation That Allow for Cash Settlement upon the Occurrence of a Contingent Event |
| FAS 148 | Dec 2002 | Accounting for Stock-Based Compensation – Transition and Disclosures |
| SAB 107 | Jan 2006 | Share-Based Payments |
| FIN 44 | Jul 2000 | Accounting for Certain Transactions involving Stock Compensation - an interpretation of APB Opinion No. 25 |

INTERNAL DOCUMENT
D5.3.3 – Stock-Based Compensation

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          172

CONFIDENTIAL                                                    FHFA13012223

## I.   APPLICABILITY

We provide pension and postretirement benefit plans to employees and retirees. Pension and postretirement benefits are part of compensation for services rendered, and the employees' rights to benefits may accumulate or vest as they render service such that the cost of these benefits is recognized over the related period of service.  These plans include:

- Qualified Defined Pension Plan for Non-Civil Service Employees[1]
- Non-qualified Supplemental Pension Plan
- Non-qualified 2003 Bonus based Supplemental Pension Plan
- Non-qualified Executive Pension Plan
- Retiree Medical Plan (includes insured HMO/ and self-insured plans)

For specific details regarding these plans, refer to the respective plan documents, agreements, and/or amendments.

The Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("the Act") expands Medicare to include an outpatient prescription drug benefit. The Act introduces a prescription drug benefit under Medicare (Medicare Part D) as well as a federal subsidy to sponsors of retiree health care plans that provide a benefit that is at least "actuarially equivalent" to Medicare Part D. Our subsidy is equal to 28% of a portion of a Medicare beneficiary's drug costs for covered retirees who do not enroll in a Part D plan.

This policy is effective as of December 31, 2006.

## II.   POLICY

In providing pension and postretirement benefits, some plans are funded in qualified trusts, some plans are funded through Rabbi Trusts, and other plans are unfunded.  For Rabbi Trust, assets contributed to the trust are not presented as the trust's assets but as part of the assets in our consolidated financial statements with an offsetting amount in deferred compensation.

### A.   Accounting for Pension Benefits (FAS 87)

We account for our pension costs and obligations using the plan's benefit formula as the basis for determining the benefits earned and the costs incurred. We recognize gains or losses and prior service costs or credits that arise during the period as a component of other comprehensive income with an offsetting amount in liability for pension benefits.  In subsequent periods, the balance of other comprehensive income is adjusted when the gains or losses, prior service costs or credits, and transition assets or obligations remaining from the initial application of FAS 87 are amortized into net periodic pension cost pursuant to the amortization provisions of FAS 87.. We utilize an attribution

---

[1]   When we were part of the federal government, our employees were subject to the federal Civil Service laws, including the Civil Service Retirement Law. Once we became entirely shareholder-owned, our employees were no longer subject to the Civil Service laws. However, Congress has provided that employees who had accrued service under the Civil Service retirement law and who came directly to us from government service before January 31, 1972, could continue to be covered under the Civil Service retirement law. If an individual made this election, they are covered by the Civil Service Retirement System and are not eligible for membership in our retirement plans.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                173

CONFIDENTIAL                                                                    FHFA13012224

approach as well as explicit assumptions (using the best estimates available of the plan's future experience).

The recognition and measurement for our pension plans are based on our plan's benefit formula, plan amendments, and the basic elements of pension accounting, which include review of assumptions and attribution, net periodic cost, and the PBO.

We determine recognition and measurement based on review of the following: Recognition of Net Periodic Pension Costs; Recognition of Liabilities and Assets – The PBO; Measurement of Costs and Obligations; Measurement of Plan Assets; and Measurement Date.

*Net Periodic Pension Costs.* Our net periodic pension cost is calculated by our actuary for a given year and consists of six components: Service cost, Interest cost on PBO, service cost and expected disbursements, Expected return on plan assets, Amortization of gains or losses, Amortization of prior service costs or credits, and Amortization of net asset or net obligation existing at date of initial application of FAS 87.

Our net periodic pension cost is based on assumptions established at the end of the previous calendar year and the actuarial present value of benefits attributed by the plan's benefit formula. All net periodic pension costs incurred are recognized as expenses over an employee's approximate service period in the income statement.

For pension benefit plans, we use assumptions to determine net periodic benefit cost and accrued liability. A key assumption used in determining net periodic benefit expense is the discount rate used in the annual actuarial valuation of our pension benefit obligations at year-end as the discount rate factors in the time value of money. In determining the discount rate, we examine benchmark yields and asset returns. The development of discount rates is further supported by cash flow matching analysis based on expected cash flows specific to our plan participants. At a minimum, for qualified pension plans, we consider the following factors:

- Plan demographics including participation rates, salary progression, and the probability of payment (turnover, retirement, dependency status, and mortality);
- The discount rate used to determine the actuarial present value of the projected benefit obligation;
- The rate of increase in future compensation levels used in the estimation; and,
- The expected return on plans assets.

For our qualified pension plan, a key assumption that affects the net periodic benefit expense recognized in our financial statements is the long-term rate of return on plan assets.  We base our long-term rate of return on the current investment portfolio mix, actual long-term historical return information, and the estimated future long-term investment returns for each class of assets.

*Recognition.* We recognize liability for pension benefits on the balance sheet if the projected benefit obligation exceeds the fair value of plan assets.  If the fair value of plan assets exceeds the projected benefit obligation, we recognize a prepaid pension asset on the balance sheet.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                          174

CONFIDENTIAL                                                                                   FHFA13012225

*Measurement.* We base the service component of net periodic pension cost and the PBO on an attribution of pension benefits to periods of employee service and on the use of actuarial assumptions to calculate the actuarial present value of those benefits. Actuarial assumptions reflect the time value of money (discount rate) and the probability of payment (assumptions as to mortality, turnover, early retirement, and so forth).

We provide funding for our defined benefit pension plans is in accordance with the requirements of applicable laws and regulations.

Plan assets are held in trust (as is the case for the qualified pension plan) and are not consolidated in our financial statements. Plan assets — usually stocks, bonds, and other investments — are those assets that have been segregated and restricted (in a trust) to be used for pension benefits. The amount of plan assets includes amounts contributed by us and amounts earned from investing the contributions, less benefits paid and in certain cases, expenses of the Plan. Plan assets ordinarily cannot be withdrawn by us except under certain circumstances when a plan has assets in excess of obligations and where we have taken certain steps to satisfy existing obligations or to pay for certain costs associated with the administration of the plan. Assets not segregated in a trust or otherwise effectively so that they cannot be used by us for other purposes are not plan assets, even though it may be intended that such assets be used to provide pensions. Amounts accrued by us but not yet paid to the plan are not plan assets. Securities held by the plan are includable in plan assets provided they are transferable.

Plan investments, whether equity or debt securities, real estate, or other, are measured at their fair value as of the measurement date. The fair value of an investment is the amount that the plan could reasonably expect to receive for it in a current sale between a willing buyer and a willing seller, that is, other than in a forced or liquidation sale. Fair value is measured by the market price if an active market exists for the investment. If no active market exists for an investment but such a market exists for similar investments, selling prices in that market may be helpful in estimating fair value. If a market price is not available, a forecast of expected cash flows may aid in estimating fair value, provided the expected cash flows are discounted at a current rate commensurate with the risk involved.

For determining the expected return on plan assets and accounting for asset gains and losses, a market-related asset value is used. The market-related value of plan assets is can be either the fair value or a calculated value that recognizes changes in fair value in a systematic and rational manner over not more than five years. We use the fair value of assets.

The measurements of plan assets and obligations required are as of the date of the financial statements or, if used consistently from year to year, as of a date not more than three months prior to that date. We use a measurement date as of the date of the financial statements.

Measurements of net periodic pension cost for both interim and annual financial statements are based on the assumptions used for the previous year-end measurements unless more recent measurements of both plan assets and obligations are available or a significant event occurs, such as a plan amendment that would ordinarily call for such measurements.

INTERNAL DOCUMENT
D5.3.4 - Pension and Postretirement Benefit Plans

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                175

CONFIDENTIAL                                                                                    FHFA13012226

### B. Accounting for Postretirement Benefits Other Than Pensions

We account for our postretirement plan using the plan's benefit formula as the basis for determining the benefits earned and the costs incurred. We recognize gains or losses and prior service costs or credits that arise during the period as a component of other comprehensive income with an offsetting amount in liability for postretirement benefits. In subsequent periods, the balance of other comprehensive income is adjusted when the gains or losses, prior service costs or credits, and transition assets or obligations remaining from the initial application of FAS 106 are amortized into net periodic postretirement benefit cost pursuant to the amortization provisions of FAS 106. We utilize an attribution approach as well as explicit assumptions (using the best estimates available of the plan's future experience).

The recognition and measurement for our postretirement plan is based on the plan's benefit formula, plan amendments, and the basic elements of postretirement accounting, which include review of assumptions and attribution, net periodic cost, the Accumulated Postretirement Benefit Obligation ("APBO"), and the Expected Postretirement Benefit Obligation ("EPBO").

Our obligation for postretirement benefits expected to be provided to or for our employees is fully accrued by the date that our employees attain full eligibility for all of the benefits expected to be received by our employees, any beneficiaries, and covered dependents (the full eligibility date), even if our employees are expected to render additional service beyond that date.

We determine recognition and measurement based on review of the following: Recognition of Net Periodic Postretirement Benefit Costs; Measurement of Costs and Obligations; and Measurement Date.

*Net Periodic Postretirement Benefit Costs.* Our net periodic postretirement benefit cost is calculated by our actuary for a given year and consists of six components: Service cost; Interest cost on APBO, service cost and expected disbursements; Expected return on plan assets; Amortization of gains or losses; Amortization of prior service costs or credits; and Amortization of net asset or net obligation existing at date of initial application of FAS 106.

Our net periodic postretirement benefit cost is based on assumptions established at the end of the previous calendar year and actuarial present value of benefits attributed by the plan's benefit formula. All net periodic postretirement benefit costs incurred are recognized as expenses over an employee's approximate service period in the income statement.

For postretirement benefit plans, we use discount rates to determine net periodic benefit cost and accrued liability. A key assumption used in determining net periodic benefit expense is the discount rate used in the annual actuarial valuation of our pension and postretirement benefit obligations at year-end as the discount rate factors in the time value of money. In determining the discount rate at year-end, we examine relevant benchmark yields. The development of discount rates is further supported by cash flow matching analysis based on expected cash flows specific to our plan participants.

For our postretirement benefits, we consider the following factors:

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    176

CONFIDENTIAL                                                                          FHFA13012227

- Plan demographics including participation rates, past and present claims data, incurred claims cost, and the probability of payment (turnover, retirement, dependency status, and mortality)
- Factors affecting the amount and timing of future benefit payments, which for postretirement health care benefits consider past and present per capita claims cost by age, health care cost trend rates, and Medicare reimbursement rates.
- Health care cost trends for the next year to measure the expected cost of postretirement benefits;
- The ultimate trend rate and when the ultimate trend rate is expected to be achieved;

*Recognition.* We recognize liability for postretirement benefits on the balance sheet if the accumulated postretirement benefit obligation exceeds the fair value of plan assets.  If the fair value of plan assets exceeds the accumulated postretirement benefit obligation, we recognize a prepaid postretirement benefit asset on the balance sheet.

*Measurement.* We base the service component of net periodic postretirement benefit cost, the APBO and the EPBO on an attribution of postretirement benefits to periods of employee service and on the use of actuarial assumptions to calculate the actuarial present value of those benefits. Actuarial assumptions reflect the time value of money (discount rate) and the probability of payment (i.e., assumptions as to mortality, turnover, or early retirement).

The measurement of obligations is as of the date of the financial statements or, if used consistently from year to year, as of a date not more than three months prior to that date. We use a measurement date as of the date of the financial statements.

Measurements of net periodic postretirement benefit cost for both interim and annual financial statements generally are based on the assumptions at the beginning of the year (assumptions used for the previous year-end measurements of plan obligations) unless more recent measurements of the APBO are available. For example, if a significant event occurs, such as a plan amendment, settlement, or curtailment, that ordinarily would call for remeasurement, the assumptions used for those later measurements are used to remeasure net periodic postretirement benefit cost from the date of the event to the year-end measurement date.

## C. FSP 106-2

We treat the initial effect of our subsidy on the APBO of our postretirement health care plans as an actuarial gain. The subsidy we receive affects the estimate of service cost in measuring the cost of benefits attributable to current service and has the effect of lowering the APBO and periodic benefit expense.

We treat the initial effect of our subsidy on the accumulated APBO as an actuarial gain. Our subsidy affects the estimate of service cost in measuring the cost of benefits attributable to current service. Our subsidy payments reduce our postretirement health care plans' APBO as well as our related annual expense.

## D. Accounting for Settlements and Curtailments of Defined Benefit Pension Plans (FAS 88)

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    177

CONFIDENTIAL                                                                        FHFA13012228

We recognize gains on settlements and curtailments of defined benefit pension plans immediately when we terminate one plan and establish a successor defined benefit plan. The maximum gain or loss is the unrecognized net gain or loss, plus any remaining unrecognized net asset existing at the date of initial application of FAS 87. The maximum amount includes any gain or loss first measured at the time of settlement. We recognize the maximum amount in earnings if the entire projected benefit obligation is settled. If only part of the projected benefit obligation is settled, we recognize in earnings a pro rata portion of the maximum amount equal to the percentage reduction in the projected benefit obligation.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

**Question 1:  How is the Retiree Medical Plan administered?**

We accrue and pay for the benefits for our postretirement Health Care Plan, which is unfunded, from our general assets.  Our health care benefits are funded by contributions from the retiree and us, with the retiree contributions adjusted periodically. Fannie Mae accrues the cost of providing post-retirement health care benefits over the employees' working life. We determine the estimated obligation and the current year's post-retirement benefit expense. Management periodically reviews the discount rate and health care cost trend rate for the next year used in the actuary's valuation, actual claims experience, and comparative industry data.

**Question 2:  How is our Medical Plan for active employees administered?**

We have a fully insured (not fully funded) medical plan administered by a third-party insurer, and a self-insured medical plan administered by a third party. The differences in how we administer and account for the two types of medical plans are as follows:

For our fully insured medical plan, we pay monthly premiums to the provider for which the provider is responsible for payment of the claims. These premiums represent our contributions to the fully insured medical plan. We remit premiums to the provider, which represents our prepaid expenses and liabilities, to fund current period benefit payments as they become due. For our self-insured medical plan, as claims are submitted to our provider, they invoice us. Based on invoiced amounts, we remit cash via wire or ACH to the provider on a daily, bi-weekly, or monthly basis for reimbursement of claims.  We remit cash via wire of ACH on a monthly basis to pay administrative fees.

**Question 3:  Can we determine a range of discount rates and then arbitrarily select the assumed discount rates from within that range?**

No, we should not select arbitrarily the assumed discount rates from within a range but should select the best estimate of the interest rates at which the pension benefits could be effectively settled at that point in time.

**Question 4:  Should the expected return on future years' contributions to a pension plan be considered in determining the expected long-term rate of return on plan assets?**

No, the expected long-term rate of return on plan assets should reflect long-term earnings expectations only on existing plan assets and those contributions expected to be received during the current year.

INTERNAL DOCUMENT
D5.3.4 - Pension and Postretirement Benefit Plans

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                178

CONFIDENTIAL                                                                        FHFA13012229

**Question 5:  Should the assumptions disclosed be as of the beginning or ending measurement date?**

The disclosed weighted-average assumed discount rate and rate of compensation increase, if applicable, should be as of the year-end measurement date because it is the date for which the projected benefit obligation is presented.

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 87 | 12/15/86 | Employers' Accounting for Pensions |
| FAS 88 | 12/15/86 | Employers' Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefits |
| FAS 106 | 12/15/92 | Employers' Accounting for Postretirement Benefits Other Than Pensions |
| FAS 132(R) | 12/15/03 | Employers' Disclosures about Pensions and Other Postretirement Benefits, An Amendment of FASB Statements No. 87, 88, and 106 |
| FAS 158 | 12/31/2006 | Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans |
| FSP 106-2 | 7/1/04 | Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("FSP 106-2") |
| EITF 97-14 | 3/19/98 | Accounting for Deferred Compensation Arrangement Where Amounts Earned Are Held in a Rabbi Trust and Invested |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                  179

CONFIDENTIAL                                                                    FHFA13012230

**SEVERANCE AND OTHER POSTEMPLOYMENT BENEFITS**        D5.3.5

## I.  APPLICABILITY

This policy addresses the accounting and reporting for postemployment benefits to certain former or inactive[1] employees, their beneficiaries and covered dependents, including severance and termination benefits in connection with their voluntary or involuntary termination of employment, collectively called "postemployment benefits".  Examples of our postemployment (i.e., after employment but before retirement) benefits include:

    A.  Salary continuation
    B.  Lump-sum severance
    C.  Acceleration of vesting of stock-based compensation
    D.  Disability-related benefits (including workers' compensation)
    E.  Outplacement services
    F.  Job training and counseling
    G.  Continuation of benefits (such as health care and life insurance coverage).

This policy is effective as of December 31, 2004.

## II.  POLICY

Postemployment benefits take various forms including lump sum payments, periodic future payments, or both. Benefits may be paid directly from our assets, an existing pension plan, a new employee benefit plan, or a combination of these sources. Postemployment benefits may be either "special termination benefits" offered only for a short period of time or "contractual termination benefits" required by the terms of a plan only if a specified event (such as a layoff) occurs.

We accrue postemployment benefit costs in the period in which (i) the individual is identified, (ii) the amount is probable and reasonably estimated, (iii) the amount is for past performance only, and (iv) the amount vests.

    A.  **Involuntary Severance:** For involuntary severance, we accrue the cost when the employee is identified and the postemployment benefit amount has been determined.

    B.  **Voluntary Severance:** For voluntary severance, we accrue the cost when the employee is identified, the postemployment benefit amount has been determined, and the individual has accepted the separation agreement (i.e., the amount becomes probable).

**Special or Contractual Termination Benefits**

Under FAS 88, we record a liability and a loss for contractual or special termination benefits as follows:

    A.  For "contractual termination benefits" (i.e., required by the terms of a plan only if a specified event occurs), the cost is recorded when it is probable that our employee will be entitled to benefits and the amount can be reasonably estimated.

---

[1]  Inactive employees are those who are not currently rendering service to us and who have not been terminated.  They include those individuals who have been laid off and those on disability leave, regardless of whether they are expected to return to active status.

INTERNAL DOCUMENT
D5.3.5 Severance and Other Post-employment Benefits

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae     180

CONFIDENTIAL                    FHFA13012231

B.  For "special termination benefits" (i.e., offered under a contract only for a short period of time), the cost is recorded when the employee accepts the offer and the amount can be reasonably estimated.

The cost of severance benefits recognized as a liability and a loss includes the amount of any lump-sum payments and the present value of any expected future payments, net of any reimbursements (such as for COBRA) that will be made by the employee.

The use of discounting in measuring postemployment benefit obligations is permitted but not required.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV.  APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 112 | January 1994 | Employer's Accounting for Postemployment Benefits |
| FAS 88 | January 1986 | Employers' Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefits |
| FAS 43 | January 1980 | Accounting for Compensated Absences |
| FAS 146 | January 2003 | Accounting for Costs Associated with Exit or Disposal Activities |
| FAS 5 | July 1975 | Accounting for Contingencies |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae              181

CONFIDENTIAL                                                                 FHFA13012232

---

**CORPORATE INSURANCE** D5.3.6

---

## I.  APPLICABILITY

This policy addresses insurance products and self-insurance structures designed to protect against various property and casualty, liability, crime, environmental, workers' compensation and business interruption risks.

This policy is effective as of December 31, 2004.

## II.  POLICY

There are three elements of corporate insurance that require separate accounting. Those elements are:

- Insurance premiums
- Losses
- Insurance recoveries

**A.  Insurance Premiums:**  The accounting for insurance premiums primarily depends on whether insurance risk has been transferred to the insurer. If risk is not transferred to the insurance company, a deposit asset is recorded and the insurance contract is accounted for under *SOP 98-7, Deposit Accounting*. If risk has been transferred, the accounting for premiums follows the applicable insurance accounting model discussed below.

### Deposit Accounting

At inception, a deposit asset is recognized for insurance contracts accounted for under deposit accounting and is measured based on the consideration paid, less any explicitly identified premiums or fees to be retained by the insurer. The proceeds received from the insurance company upon expiration of the contract remove the deposit asset from the balance sheet, while the net proceeds are recognized as interest income.

### Insurance Accounting

The accounting treatment for insurance premiums depends on key characteristics of the insurance policy and/or coverage type.  As such, we evaluate each insurance policy to identify the relevant characteristics as noted below.

***Occurrence-Basis Policy:*** A policy that covers losses from insurable events that occur during the term of the policy period, regardless of when the actual claim is reported.

***Claims-Made Policy:***  A policy that covers losses from claims reported during the term of the policy, regardless of when the loss event loss occurred.

***Prospective Insurance:*** Insurance that covers losses from insurable events that may occur in the future.

***Retroactive Insurance:*** Insurance that covers losses from insurable events that have occurred in the past.

INTERNAL DOCUMENT
D5.3.6 - Corporate Insurance

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL

FHFA13012233

*Retrospectively Rated Insurance:*  A multiple year contract in which experience in one period creates rights and obligations in another, such as through premium or settlement adjustments or changes in future coverage.

1. **Prospective, Occurrence-Basis Policy-** We account for insurance premiums as follows:

   a. We recognize a prepaid insurance asset equal to the premium paid.
   b. We expense the premium over the period insurance protection is provided (e.g., straight line or ratably).

2. **Claims-Made Policy-** This policy must be reviewed to determine whether it has retroactive provisions, prospective provisions, or both. Retroactive provisions exist if the policy provides coverage for specific, known claims that were reportable prior to the policy period. If a claims-made insurance policy contains a retroactive provision, the retroactive and prospective provisions are accounted for separately, if practicable. If it is not practicable to separate the retroactive and prospective provisions, the claims-made insurance policy is accounted for entirely as a retroactive contract. A claims-made insurance policy that contains no retroactive provisions is accounted for on a prospective basis.

   a. **Retroactive Contract-** We account for insurance premiums as follows:

      1. We immediately expense the premium paid and simultaneously create a receivable for the expected recoveries related to the underlying insured event.
      2. If the receivable established exceeds the amounts paid for the insurance, the resulting gain is deferred.
      3. If the amounts and timing of the insurance recoveries can be reasonably estimated, the deferred gain should be amortized using the interest method over the estimated period over which we expect to recover substantially all amounts due under the terms of the contract. If the amounts and timing of the insurance recoveries cannot be reasonably estimated, then the proportion of actual recoveries to the total estimated recoveries should be used to determine the amount of amortization.

   b. **Prospective Contract-** We account for insurance premiums as follows:

      1. We recognize the premium paid at the beginning of the policy period as a prepaid insurance asset.
      2. At the beginning of the fiscal year, we estimate our incurred but not reported (IBNR) liability as of the end of the fiscal year.
      3. We compute an estimated annual expense as the sum of (1) the premium paid for the claims-made policy, (2) the difference between the beginning IBNR liability and the estimated year-end IBNR liability, and (3) the difference between the beginning insurance recoverable related to the IBNR liability and the estimated ending amount.

   The estimated annual expense is recognized in interim periods based on a methodology that best reflects the manner in which the benefits of the insurance coverage are consumed and the IBNR liability is incurred.

INTERNAL DOCUMENT
D5.3.6 - Corporate Insurance

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    183

CONFIDENTIAL                                                                                            FHFA13012234

3. **Retrospectively Rated Policy-** At the end of each reporting period, the premium will be increased or decreased in order to adjust for the amount of claims during the period. For example, if the amount of claims is less then initially expected, the premium is reduced, or vice versa. As such, we are always subject to additional premium expenses or refunds depending on the actual asserted and unasserted claims.

   a. We recognize the premium paid at the beginning of the policy period as a prepaid insurance asset.
   b. We expense the premium (exclusive of any prepayment) over the policy period based on the contract terms (i.e. straight line or ratably) of the agreement.
   c. Additional premiums or refunds are determined throughout the year, depending on the actual asserted and unasserted claims to date. We recognize a liability to the extent that we have an obligation to pay cash that would not have been required absent experience under the contract. We recognize an asset to the extent that any cash would be due from the insurer based on experience to date under the contract.

B. **Losses:** We accrue a loss contingency through a charge to the income statement when the conditions of FAS 5, *Accounting for Contingencies* are met.

C. **Insurance Recoveries:** We recognize a receivable for expected recoveries related to underlying insured events, when the realization of a claim for recovery is deemed probable and estimable. If the claim is the subject to litigation, a rebuttable presumption exists that realization of the claim is not probable. Fair value is used to measure the amount of a potential recovery.

Amounts receivable under an insurance contract are not offset against the liability unless a right of offset exists.  A right of offset only exists when all of the following conditions are met:

1. Each of the two parties owes the other determinable amounts.
2. We have the right to offset the amount owed with the amount owned by the other party.
3. We intend to offset.
4. The right of offset is enforceable by law.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 5 | March 1975 | Accounting for Contingencies |
| FIN 14 | September 1976 | Reasonable Estimation of the Amount of a Loss |
| FIN 39 | March 1992 | Offsetting Amounts Related to Certain Contracts |

INTERNAL DOCUMENT
D5.3.6 - Corporate Insurance

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                184

CONFIDENTIAL                                                                                          FHFA13012235

| EITF 93-14 | November 1993 | Accounting for Multiple-Year Retrospectively Rated Insurance Contracts by Insurance Enterprises and Other Enterprises |
| EITF 03-8 | November 2003 | Accounting for Claims Made Insurance and Retroactive Insurance Contracts by the Insured Entity |
| SOP 96-1 | December 1996 | Environmental Remediation Liabilities |
| SoP 98-7 | June 1999 | Deposit Accounting:  Accounting for Insurance and Reinsurance Contracts That Do Not Transfer Insurance Risk |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae              185

CONFIDENTIAL                                                                FHFA13012236

**EARNINGS PER SHARE**                                                           **D6.0**

## I. APPLICABILITY

This policy addresses the calculation and reporting of our basic and fully diluted EPS.
For the underlying accounting related to common stock, preferred stock and treasury stock, see Accounting Policies A3.1, A3.2, and A3.3, respectively. For the accounting related to stock-based compensation, see Accounting Policy D5.3.3. This policy is effective as of December 31, 2004.

## II. POLICY

Earnings per share ("EPS") are presented for both basic EPS and diluted EPS. Basic EPS is computed by dividing net income available to common stockholders by the weighted average number of common shares outstanding during the year. Diluted EPS is computed by dividing net income available to common stockholders by the weighted average number of common shares outstanding during the year, plus the dilutive effect of common share equivalents such as convertible securities, stock options, and other performance awards. These common stock equivalents are excluded from the calculation of diluted EPS when the effect of inclusion, assessed individually, would be anti-dilutive.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable.

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 128 | 12/15/1997 | Earnings per Share |
| EITF D-42 | 1994 | The Effect on the Calculation of Earnings per Share for the Redemption or Induced Conversion of Preferred Stock |
| FAS 150 | 2003 | Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity |
| EITF Topic D-98 | 2001 | Classification and Measurement of Redeemable Securities |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae        186

CONFIDENTIAL                              FHFA13012237

## I.  APPLICABILITY

This policy addresses how to identify if an entity is a voting interest entity or a VIE and which consolidation model applies as a result.  This policy also addresses the accounting and reporting for the consolidation of trusts, which represents our most significant consolidation activity.

The accounting policy for determining when to consolidate a LIHTC partnership is addressed in section C1.9.1.  The consolidation procedures for such partnerships are addressed in this section of the policy manual.  This policy is effective as of December 31, 2004.

## II.  POLICY

We must determine if the entity being considered for consolidation is a VIE or a voting interest entity.  If it is a VIE and is not subject to the scope exception of FIN 46R, we must determine if we are required to consolidate the VIE based whether we absorb a majority of the expected losses or residual returns of the entity.

If the entity is not a VIE, we must determine if we have control over the entity and if so, must consolidate the entity based on that control.

### A.  Consolidation accounting models

1. *Applicability of the VIE consolidation model* – The VIE consolidation model applies to entities that meet any of the following criteria:

   a.  Equity at risk is not sufficient to permit the entity to finance its activities without additional subordinated financial support
   b.  As a group, the holders of equity at risk lack decision making ability or are not obligated/entitled to absorb/receive the expected losses/residual returns of the entity
   c.  Voting rights of holders of equity at risk are not proportional to their obligations/rights to absorb/receive the expected losses/residual returns of the entity and substantially all of the entity's activities involve or are conducted on behalf of the investor with disproportionately few voting rights

   Notwithstanding the criteria above, the following circumstances are not subject to the VIE consolidation model:

   a.  We are not required to consolidate a trust deemed to be a qualifying special purpose entity ("QSPE") when we are the transferor of the assets to the trust in a portfolio securitization.
   b.  We are not required to consolidate a trust deemed to be a QSPE when we are an investor in such trusts as long as we do not have the unilateral ability to liquidate the trust.  For Fannie Mae MBS, the unilateral ability to liquidate the trust is only obtained when we own 100% of the MBS.  Should we own 100% of a non-Fannie Mae trust, we evaluate the voting and legal construction of the trust to determine if we have the unilateral ability to liquidate the trust.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    187

CONFIDENTIAL                                                                FHFA13012238

    c. We are not required to consolidate a governmental organization or a financing entity established by a governmental organization. This scope exception applies in most of the MRBs that are held in our mortgage investment portfolio.

    d. We are not required to consolidate a not for profit organization, but we are required to do so for a financing entity established by a not for profit organization.

2. *Determining if we must consolidate under the VIE consolidation model* – We must consolidate a VIE if we are the primary beneficiary, which is the entity that absorbs the majority of the expected losses or expected residual returns.

    a. We determine if we are the primary beneficiary on the date in which we become involved with the VIE. The VIE consolidation model also requires a determination upon the following events, depending on whether we are the primary beneficiary or an other variable interest holder:

| Event or Circumstance Requiring Reassessment | Primary Beneficiary | Other Variable Interest Holder |
|---|---|---|
| Change in the VIEs governing documents or contractual arrangements among the parties involved with the VIE that reallocates expected losses or expected residual returns of the VIE among the parties involved with it | X | X |
| Sale of some or all variable interests to an unrelated party | X | |
| Issuance by the VIE of new variable interests to parties other than the primary beneficiary or its related parties | X | X |
| Acquisition of additional variable interests (either new interests issued by the VIE or from another unrelated variable interest holder) | X | X |
| | | |

    b. We use the "by design" approach to measuring variability in a VIE. This approach considers the purpose for which the VIE was created and the risks it is designed to pass along to interest holders. For example, agency MBS are designed and marketed to investors as instruments that are exposed primarily to prepayment risk and counterparty credit risk as it relates to the guarantor. We use a fair value approach to measuring variability in agency MBS because a fair value approach is the most effective approach for capturing the variability that is associated with credit and prepayment risk.

    c. We discount cash flows using the risk-free interest rate, which is the rate currently available on a zero coupon U.S. Government Issue with a remaining term equal to the term associated with the cash flows being discounted.

    d. We use a top down method for allocating expected losses and expected residual returns to variable interest holders. This approach entails allocating the same cash flows that are used to calculate the expected losses and expected residual returns at the entity level to each variable interest holder based upon the contractual provisions of its interests and the underlying assumptions for each

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          188

CONFIDENTIAL                                                                    FHFA13012239

scenario. The approach requires a determination of which variable interest holder, if any, absorbs a majority of the sum of each variable interest holders' allocated expected losses, not the majority of the total expected losses of the entity.

3. *Applicability of the voting interest consolidation model* – Entities that are not subject to the VIE consolidation model and that are not QSPEs are considered voting interest entities. Consolidation of voting interest entities is required when we control the majority of the voting rights of the entity.

## B. Consolidation and deconsolidation of MBS trusts

The most common example of MBS trusts are trusts created to facilitate a lender swap transaction (sometimes referred to as "dealer trusts"). However, the policies summarized below apply to consolidation of any third-party securitization trust (see Section C below for policies related to trusts created to facilitate a transfer of assets from our portfolio).

1. We consolidate the assets and liabilities of the trust on a fair value basis ("fair value consolidation"). The exception to this general rule is when we must consolidate the trust on the same day the trust is created, in which case we consolidate the assets and liabilities on a carryover basis ("carryover basis consolidation"). See Section D of this policy for the application of fair value consolidation or carryover basis consolidation.

2. If we subsequently sell a portion of our MBS such that consolidation is no longer appropriate (i.e., we no longer have the unilateral ability to liquidate the trust and the MBS trust is a QSPE), we will deconsolidate on a carryover basis as follows:

   a. The net-recorded basis in the consolidated assets and liabilities becomes the basis in our investment in the MBS trust.
   b. A gain (loss) on the sale of the MBS is calculated as the difference between the proceeds received upon sale and carrying amount of the MBS determined through the deconsolidation described above.
   c. The guaranty arrangement, which was previously extinguished upon obtaining the unilateral ability to liquidate the trust, is recorded anew as the obligation is again to a third party. The difference between GA and GO, if any, is recorded in Investment Gain/Loss.

## C. Consolidation and deconsolidation of PPS trusts

The policies summarized below apply to PPS trusts, which are trusts created to facilitate a securitization of assets from our portfolio (sometimes referred to as "proprietary trusts"). This section applies to those instances where we initially achieved sale accounting, but subsequently determined that the PPS trust is no longer a QSPE. For those instances where we did not initially achieve sale accounting, see Section F.8.2, *Securitizations.* Accounting Policy should be consulted when accounting for failed sales and consolidation of PPS trusts in which we are one of many transferors of assets into a PPS trust.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                189

CONFIDENTIAL                                                                                    FHFA13012240

1. PPS trusts must be consolidated when they do not meet the criteria to be a QSPE and we are the primary beneficiary. The table below summarizes the beneficial interest ("BI") ownership thresholds, including the GA which is a BI, which would result in the PPS trust not meeting the QSPE criteria.  Determining the BI ownership thresholds is based on the fair value of our BIs in comparison to the fair value of all BIs in the VIE.

| Date of PPS trust creation | Our BI ownership threshold |
|---|---|
| Prior to January 1, 1997 | 90% (only on or after December 31, 2003) |
| January 1, 1997 – March 31, 2002 | 100% |
| April 1, 2001 – present | 90% |

Simply having an ownership percentage less than the required threshold above does not automatically indicate that the PPS trust is a QSPE.  See Section F.8.2, *Securitizations*, for all other QSPE criteria that must be met.

2. We consolidate the assets and liabilities of the PPS trust on a fair value basis ("fair value consolidation").  The exception to this general rule is when we must consolidate a PPS trust on the same day the PPS trust is created, in which case we consolidate the assets and liabilities on a carryover basis ("carryover basis consolidation").  See Section D of this policy for the application of fair value consolidation or carryover basis consolidation.

3. If we subsequently sell a portion of our MBS such that consolidation is no longer appropriate (i.e., our ownership percentage is lower than the threshold required pursuant to Section C.1 above), we will deconsolidate on a carryover basis as follows:

If we did not obtain the unilateral ability to liquidate the PPS trust:

a. The net-recorded basis in the consolidated assets and liabilities, as well as any net basis in the guaranty arrangement that would be outstanding on our stand-alone financial statements, becomes the basis in our investment in the MBS trust.
b. A gain (loss) on the sale of the MBS is calculated as the difference between the proceeds received and the new carrying amount of the MBS after deconsolidation.
c. The guaranty arrangement is not recorded anew because it was never extinguished on our stand-alone financial statements and is reflected in the carryover basis upon deconsolidation.

If Fannie Mae obtained the unilateral ability to liquidate the  PPS trust:

d. The net recorded basis in the consolidated assets and liabilities becomes the basis in Fannie Mae's investment in the MBS trust.
e. Record the sale of the MBS in accordance with Fannie Mae's accounting policies for transfers of financial assets.
f. The guaranty arrangement, which was previously extinguished on Fannie Mae's stand-alone financial statements upon obtaining the unilateral ability to liquidate

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                190

CONFIDENTIAL                                                                FHFA13012241

the trust, is recorded anew in accordance with Fannie Mae's accounting policies for guarantees issued in connection with portfolio securitizations.

**D. Fair value consolidation versus carryover basis consolidation of MBS trusts and PPS trusts**

1. When performing a fair value consolidation, all assets and liabilities of the trust are recorded on our consolidated balance sheet at fair value.  This will result in extraordinary gain (loss), which is calculated as follows (see Appendix A for an illustrative example of this calculation):

   Fair value of newly consolidated assets
   Minus: Fair value of consideration paid
   Minus: Basis of previously held interests
   Minus: Net recorded basis of guaranty arrangement
   Minus: Net recorded basis of master servicing arrangement
   Minus: Fair value of newly consolidated liabilities to third parties (e.g., MBS liability)

   Any extraordinary gain is reduced by a pro rata adjustment to consolidated non-financial assets (e.g., REO) if they exist.

2. When performing a carryover basis consolidation, the basis in our previously held interests (including the net recorded basis of both the guaranty arrangement and the master servicing arrangement) becomes the basis in the consolidated assets and liabilities.  Any gross-up required because we are consolidating a trust when we own less than 100% of the MBS is recorded at par.

3. Under either basis of consolidation, any recorded credit enhancement ("CE") remains outstanding and will continue to be accounted for in accordance with our accounting policy for such CE.

**E. Consolidation of a LIHTC partnership**

1. *Consolidation at the time a partnership is created* – Most of our investments in a LIHTC partnership are made upon creation of the partnership.  When consolidation is required at this time, the consolidation is recorded at carryover basis.

2. *Consolidation upon a reconsideration event* – If we are required to consolidate a LIHTC partnership subsequent to its creation, consolidation is recorded on a fair value basis as described below.

   a. Record all financial assets and liabilities at fair value.
   b. Record non-financial assets and liabilities as follows:

      ▪ Receivables – record at present value, less allowances for uncollectibility
      ▪ Intangible assets, including favorable contracts – record at fair value (consult with Accounting Policy to determine if there are intangible assets that should be recorded upon consolidation)
      ▪ Real estate – record at appraised value

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    191

CONFIDENTIAL                                                     FHFA13012242

- Liabilities, including long-term debt and unfavorable contracts – record at present value

c. If the carrying amount of our investment is less than the values initially established as described in 1 and 2 above, the value of the non-financial assets is reduced on a pro rata basis until the allocated amount equals our investment.

d. If the carrying amount of our investment is greater than the values initially established as described in 1 and 2 above, any excess is recorded as described below.

- As goodwill if the VIE is a business as defined by FIN 46R.  A business is a self-sustaining set of activities established for the purpose of providing a return to investors and consists of inputs, processes applied to those inputs, and resulting outputs that provide the entity to sustain a revenue stream.  It is anticipated that most VIEs we are analyzing will not meet the definition of a business.
- As extraordinary loss if the VIE is not a business as defined by FIN 46R.

**F. Accounting for consolidated assets and liabilities**

1. We must account for the consolidated assets and liabilities in accordance with our accounting policies for such assets and liabilities (e.g., consolidated loans are subject to our loan accounting policies and consolidated debt is subject to our debt accounting policies).

   a. Loans are classified as held for investment upon consolidation of MBS trusts
   b. Loans are classified as held for sale upon consolidation of PPS trusts

2. Intercompany eliminations will be recorded such that, on a consolidated basis, we are reporting the effect of the consolidated assets and liabilities in its consolidated financial statements.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 125 | January 1997 | Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities |
| FAS 140 | April 2001 | Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities |
| FAS 141 | July 2001 | Business Combinations |
| FIN 46R | February 2003 (new SPEs) December 2003 (all SPEs) | Consolidation of Variable Interest Entities |
| ARB 51 | August 1959 | Consolidated Financial Statements |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                192

CONFIDENTIAL                                                                    FHFA13012243

**Appendix A – Illustrative example of extraordinary gain (loss) upon consolidation**

Fact Pattern:

- Fannie Mae purchased 100% of an MBS on 3/1/04 at par ($1,000,000).
- Fannie Mae will consolidate the MBS because it has the unilateral ability to liquidate the trust and is determined to be the primary beneficiary under the VIE consolidation model.
- At the date of consolidation, Fannie Mae had the following amounts recorded on its financial statements as it relates to the MBS (the fair values at the date of consolidation are also presented):
  - Guaranty asset = $8,000 (Fair value = $9,000)
  - Buy-up = $2,000 (Fair value = $1,250)
  - Guaranty obligation = $4,800 (Fair value = $6,000)
  - Deferred profit related to GA/GO = $3,700
  - Master servicing asset (MSA)= $200 (Fair value = $125)
  - Deferred profit related to MSA = $200
- At the date of consolidation, the fair value of the consolidated loans is estimated at $1,004,375.

Illustrative extraordinary gain (loss) calculation:

| | |
|---|---:|
| Fair value of newly consolidated assets | $1,004,375 |
| Minus: Fair value of consideration paid | -- |
| Minus: Basis of previously held interests (carrying amount of MBS) | 1,000,000 |
| Minus: Net recorded basis of guaranty arrangement (GA + BU – GO – related DP) | 1,500 |
| Minus: Net recorded basis of master servicing arrangement | -- |
| Minus: Fair value of newly consolidated liabilities to third parties (e.g., MBS liability) | -- |
| Extraordinary gain | $2,875 |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    193

CONFIDENTIAL                                                                    FHFA13012244

## I.  APPLICABILITY

This section applies to the accounting for portfolio securitizations (Fannie Mae is the "transferor"), which involve the transfer of mortgage loans or mortgage-related securities from our balance sheet to a trust (an SPE), to create MBS, REMICs, or other types of beneficial interests.

This section also provides guidance as to whether portfolio securitizations as well as "lender swap" or "dealer swap" securitizations (Fannie Mae is not the "transferor") in which mortgage loans or mortgage-related securities are provided by a lender or dealer as collateral in a Fannie Mae securitization trust, meet the requirements of a qualifying SPE ("QSPE").  Whether the QSPE requirements are met impact our evaluation of whether Fannie Mae should consolidate a trust or other entity.

We separately account for our beneficial interests in the "lender" or "dealer" swap securitizations depending on the nature of our contractual rights and obligations.  Our primary roles in lender swap transactions are that of the guarantor and the master servicer.  Our policies as it relates to our role as guarantor and master servicer are discussed in policies C.2.3 Guarantee Assets and Guarantee Obligations and C.2.3.2 Servicing Assets, respectively.  This policy is effective as of January 1, 2007.

## II.  POLICY

### A.  Portfolio Securitizations

1.  Transfers that Qualify for Sale Accounting

    We account for portfolio securitizations in accordance with SFAS 140, which requires that we evaluate a transfer of financial assets to determine whether such transfer qualifies for sale accounting.  A transfer of mortgage loans or mortgage related securities qualifies as a sale to the extent that consideration other than beneficial interests in the transferred asset is received, if all of the following items are performed:

    a.  We obtain and review a legal isolation opinion from counsel to ensure the Company has met the requirement outlined in paragraph 9(a) of FAS 140.  Consult with Accounting Policy to determine if a legal opinion is required to support sale accounting.  Legal opinions must comply with the guidance provided in the AICPA Auditing Standards Board Interpretation AU Section 9336, *Interpretation of AU Section 336, Using the Work of a Specialist.*

    b.  We evaluate each transfer to determine if each transferee is free to pledge or exchange the transferred assets and no condition both constrains the transferee from taking advantage of its right to pledge or exchange the assets and provides more than a trivial benefit to the transferor.  If the transferee is a trust that is contractually restricted from freely pledging or exchanging the transferred assets, the trust issues beneficial interests in the transferred assets to certificateholders, and the transferor has continuing involvement (i.e. as servicer or guarantor), then the trust must be a QSPE to comply with this requirement.  See section ⊠ below for the QSPE requirements.  If the trust is a QSPE, this requirement applies to the holders of its beneficial interests.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    194

CONFIDENTIAL                                                                                   FHFA13012245

c.  We ensure that no provisions exist in the securitization legal documents that permit the transferor to unilaterally repurchase or redeem the transferred assets before maturity or cause the holder to return specific transferred assets. The exception to this is a cleanup call which allows the transferor to repurchase assets if the amount of outstanding assets or beneficial interests falls to a level at which the cost of servicing becomes burdensome in relation to benefits of servicing.

In May 2002, Fannie Mae's MBS Indentures were amended to relinquish the cleanup call right. Prior to adding a cleanup call provision, consultation with Accounting Policy is recommended.

2.  Sale Accounting
Upon completion of a transfer that qualifies as a sale, we de-recognize the assets transferred. The previous carrying amount of the transferred assets is allocated between the assets sold and the retained interests, if any, in proportion to their relative fair values at the date of transfer. A gain or loss is recorded as a component of "Investment gains (losses), net", which represents the difference between the allocated carrying amount of the assets sold and the proceeds from the sale, net of any liabilities incurred, which may include a recourse obligation (guaranty obligation) for our financial guaranty or a master servicing asset. We record the sales transaction, including the assets obtained and the liabilities incurred, based on the following considerations:

- The sale of securities should be accounted for on their settlement date.
- New assets and liabilities are recognized at fair value, and any retained interests not accounted for under the fair value election pursuant to FAS 155 are reflected on the balance sheet at allocated previous carrying values based on the relative fair values of the assets sold versus retained at the time of the transfer. Retained interests containing an embedded derivative requiring bifurcation are to be accounted for under the fair value election under FAS 155, unless specifically documented otherwise, and therefore are to be reflected on the balance sheet at fair value.[1]
- Fair values to be used to record the new assets and liabilities and retained interests should be based on "the amount at which that asset (or liability) could be bought (or incurred) or sold (or settled) in a current transaction between willing parties, that is, other than a forced or liquidation sale" on the date of transfer (i.e., settlement date). Fair value on trade date or commitment date, as indicated in a commitment letter between Fannie Mae and a dealer, is not appropriate.
- When we receive beneficial interests issued by a QSPE backed by commingled financial assets transferred by us and other transferors, the amount of such beneficial interests should be allocated proportionally based on the collateral contributed. It is recommended that Accounting Policy be consulted when a proportional allocation is required.
- The gain or loss calculation for each sale is affected by the determination of silos within a QSPE. A silo is a segment of a trust for which the segregated assets (e.g. collateral pool) represents the only source of payment for the corresponding certificates. If a silo exists in a trust that is a QSPE, and the QSPE is effectively

---

[1] Refer to Section C2.2 "Derivative Instruments" and Section C2.3 "Guarantee Assets and Guarantee Obligations" for application of and qualifying criteria for the fair value election under FAS 155.

INTERNAL DOCUMENT
F8.2 – Securitizations

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          195

CONFIDENTIAL                                                                    FHFA13012246

a master QSPE with multiple QSPEs within it, we perform a gain or loss on sale calculation independent of other transferors if we are the only transferor to a silo. Accounting Policy should be consulted to confirm that the gain or loss calculation by silo is appropriate.

- REMIC residual classes, whether held by us or not, represent a tax liability with negative fair value. We treat the dealer's assumption of this tax obligation as a reduction of proceeds from the sale.
- If the guarantee in a resecuritization is not considered substantive (i.e. if the collateral being securitized is already fully guaranteed), then the guarantee asset and guarantee obligation from resecuritization are not considered for purposes of calculating the gain or loss on sale.
- Master servicing rights are not considered retained interests; therefore, any master servicing asset to be recognized is considered proceeds of the sale. Any master servicing liability including fees on structured transactions represents a new liability and reduces the proceeds from the sale.
- Any related transaction costs we incur are expensed in the period that the sale takes place, which reduces (increases) any gain (loss) on sale.
- Proceeds that are placed in a cash reserve account are considered retained interests.

See Appendix A for a sample of Sale Accounting Entry.

3. Secured Borrowing Accounting

Transfers of mortgage loans or mortgage related securities that do not meet the requirements for sale accounting are accounted for as secured borrowings. As such, we continue to record the transferred collateral on our balance sheet. To the extent beneficial interests are sold to third parties, we record cash received with a corresponding liability representing the Company's payable to the trust for the benefit of the certificate holders.

4. Subsequent Fail of Sale Accounting

Circumstances may change resulting in the Company regaining control of assets previously accounted for as having been sold. After that change:

- Financial assets originally sold that remain outstanding should be "re-recognized" at fair value. We will recognize a liability for the certificates that are held by third parties at fair value, therefore, no gain or loss should be recognized with respect to the loans "re-recognized".
- The fair value of loans that are re-recognized would not include the fair value of the GA or the master servicing asset that were recorded upon the initial transfer. These assets remain outstanding.
- It is expected that the re-recognition and consolidation of the related Fannie Mae trust, if appropriate under the requirements of FIN 46, will occur simultaneously. As such, please refer to policy F.8.1 Consolidation policy for further discuss of re-recognition.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                196

CONFIDENTIAL

**B.  Qualifying Special Purpose Entity**

Consult with Accounting Policy to determine if criteria for a QSPE have been met for all non-homogenous, unique or complex securitizations.   Below are conditions set forth under SFAS 140 for a QSPE:

1.  Demonstrably distinct from the transferor:
    A QSPE is demonstrably distinct from the transferor only if it cannot be <u>unilaterally dissolved</u> by any transferor, its affiliates, or its agents AND either:

    a.  At least 10 percent of the fair value of its beneficial interests, which includes guarantees, is held by entities other than the transferor, its affiliates or its agents (10% test is performed for each silo), or
    b.  The transfer is a "guaranteed mortgage securitization" which is defined as a securitization of mortgage loans within the scope of FAS 65, *Accounting for Certain Mortgage Banking Activities*, as amended, that includes a substantive guarantee by a third party.

    The ability to unilaterally dissolve a trust can take many forms, including (but not limited to) holding sufficient beneficial interests to be able to direct the trustee to dissolve the trust, the right to call all the assets transferred to the trust, or a right to call or prepay all the trust's beneficial interests held by parties other than the transferor, its affiliates or its agents.

    *Absent a call provision, we would not have the unilateral right to dissolve the trusts that we have issued unless we own 100% of the certificates that are outstanding, which would have to include the non-economic residual, if applicable.*

2.  A QSPE's permitted activities:

    a.  Are significantly limited,
    b.  Were entirely specified in the legal documents that created the trust or its beneficial interests (i.e. trust agreements, servicing agreements, applicable servicing guides, etc), and
    c.  May be **significantly changed** only with the approval of at least a majority of certificateholders, excluding any transferor, its affiliates, and agents.   We define "significant" changes as those that would:

        (1)  Allow the transferor to regain control of the transferred assets;
        (2)  Adversely affect the interest of third-party beneficial interest holders;
        (3)  Result in an MBS trust no longer meeting the QSPE requirements; or
        (4)  Positively affect certificateholders in a matter that would be viewed as significant by a reasonable person[2].

    This criterion is often met via the exclusion of the transferor, its affiliates and agents from the population that can consent to amend each trust.

3.  A QSPE may hold only:

---

[2] This was addressed in our letter to the SEC, dated September 27, 2005.

INTERNAL DOCUMENT
F8.2 – Securitizations

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          197

CONFIDENTIAL                                                                    FHFA13012248

a. Passive financial assets transferred to it.  A financial asset is passive only if holding the asset or instrument does not involve its holder making decisions other than the decisions inherent in servicing.  For example, an equity instrument is not passive if the QSPE can exercise voting rights and is permitted to choose how to vote.

b. A passive derivative financial instrument has the following characteristics

   (1) It pertains to beneficial interests owned by parties other than the transferor, its affiliates or its agents.  In a market-making activity, a transferor may, for a short period of time, own some of the beneficial interest issued to outside parties if they are classified as trading securities, as defined in SFAS 115, *Accounting for Certain Investments in Debt and Equity Securities,*

   (2) It is entered into at inception or when a passive derivative financial instrument needs to be replaced upon occurrence of an event specified in the legal documents that established the trust,

   (3) It has a notional amount that does not initially exceed the amount of those beneficial interests and is not expected to exceed them subsequently, and

   (4) It has characteristics that relate to, and partly or fully but not excessively counteract, some risk associated with those beneficial interest or the related transferred assets,

*A derivative is passive only if holding it does not involve the trust in making decisions.  A derivative is not passive if, for example, its terms allow the trust a choice, such as an option to call or put other financial instruments.  Some derivatives are passive; for example, interest rate caps, floors and swaps (since they payoff automatically when they are in the money).  Forward contracts are passive if they do not allow a choice in the settlement mechanism.*

*Compliance with criterion #1 is achieved via representations obtained from the transferor. Our policy is to obtain a commitment letter from the lender that requires the transferor to represent that they will sell, at the inception of the trust, the certificates that receive the benefit of the derivative to third parties[3]. Additionally, we also obtain a representation that the transferor will only repurchase such beneficial interests if it is in the capacity of a market maker and such certificates are held temporarily in the transferor's trading portfolio.*

c. Financial assets such as guarantee policies (either from Fannie Mae or a third party) or other rights of reimbursement for inadequate servicing by others or defaults or delinquencies on its assets provided such agreements were entered into when the trust was established, when assets were transferred to it, or when securities were issued by it,

d. Servicing rights related to assets that the trust holds,

e. Temporarily, nonfinancial assets obtained in the process of foreclosure or repossession.  For example, a QSPE could temporarily hold REO property that resulted from process of collection.  However, a QSPE cannot receive from a transferor significant secured financial assets likely to default with the expectation that it will foreclose on and profitably manage the securing nonfinancial assets, and

f. Cash and temporary investments pending distribution to security holders that are

---

[3] Third parties is defined as parties other than a) the other transferors to the trust b) a transferor's affiliates and/or agents.

INTERNAL DOCUMENT
F8.2 – Securitizations

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                                198

CONFIDENTIAL                                                                                    FHFA13012249

appropriate for that purpose (that is, money market or other relatively risk-free instruments without options and with maturities no later than the expected distribution date). We view "relatively risk-free" to be synonymous to high credit quality[4]. That is S&P or Moody's ratings within one of its two highest rating categories (i.e. S&P rating of AA or better and a Moody's rating of Aa or better) for long-term debt securities and highest rating for short-term debt securities (i.e. a S&P rating of A-1 or a Moody's rating of P-1). In addition, principal received from transferred assets has to remain segregated in custodial accounts. The cash cannot be commingled by Fannie Mae's direct servicers with their operating cash.

4. A QSPE can only dispose of assets in automatic response to one of the following events:

   a. Occurrence of an event that:

      (1) Is specified in the applicable legal documents,
      (2) Is outside the control of the transferor, its affiliates, or its agents, and
      (3) Causes or is expected to cause the fair value of those assets to decline by a specified degree below their fair value when the trust obtained them.

      *Examples of **acceptable** triggering events to sell, exchange, put or distribute (referred to collectively as dispose of) noncash financial assets:*

      *(1) Servicing failures that jeopardize a third-party guarantee,*
      *(2) Obligor default,*
      *(3) Rating downgrades below a specified minimum rating, and*
      *(4) A specified decline in the fair value of the transferred assets below their values at the transfer date.*

   b. Exercise of a put option by a third-party beneficial interest holder in exchange for:

      (1)   A full or partial distribution of assets,
      (2)   Cash (which may require that the trust dispose of assets or issue beneficial interests to generate cash to fund the settlement of the put), or
      (3)   New beneficial interests in those asset,

      *If a party other than the transferor, its affiliates, or its agents holds a call option, that right is a beneficial interest, and is the economic equivalent of a "put" option that enables the holder to put their beneficial interest back in exchange for a partial distribution of assets from the trust.  To apply this interpretation, the following criteria have to be met:*

      *(1) The call option must be created at the time of the securitization,*
      *(2) The strike price on the option has to be equal to the carrying amount of transferred financial assets plus accrued interest, and*

---

[4] Our position is consistent with the views of the SEC Staff given in the Speech on December 11, 2003 at the AICPA National Conference, and definition under EITF Topic No. D-36, *"Selection of Discount Rates Used for Measuring Defined Benefit Pension Obligations and Obligations of Postretirement Benefit Plans Other Than Pensions"*.

INTERNAL DOCUMENT
F8.2 – Securitizations

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae            199

CONFIDENTIAL                                                                      FHFA13012250

**SECURITIZATIONS**                                                                                                    **F8.2**

(3) The option must be physically settled (i.e., the option cannot be net cash settled).

c. Exercise by the transferor of a call option or removal of accounts provision[5] specified in the applicable legal documents, or

d. Termination of the trust or maturity of the beneficial interests on a fixed or determinable date that is specified at inception.

For example: If a trust is required to dispose of long-term mortgage loans and terminate itself at the earlier of:
(a) the specified maturity of beneficial interests in those mortgage loans or
(b) the date of prepayment of a specified amount of the transferred mortgage loans,
The disposal option would represent a fixed or determinable date that was specified at inception.

In contrast, if that trust has the power to dispose of transferred assets on two specified dates and the trust can decide which transferred assets to sell on each date, the termination date is not a fixed or determinable date that was specified at inception.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not Applicable.

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 140 | April 2001 | Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities |
| FAS 140 Q&A | April 2001 | A Guide to Implementation of Statement 140 on Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities |
| EITF 02-9 | April 2003 | Accounting for Changes That Result in a Transferor Regaining Control of Financial Assets Sold |
| SFAS 155 | January 1, 2007 | Accounting for Certain Hybrid Financial Instruments |
| SFAS 156 | January 1, 2007 | Accounting for Servicing of Financial Assets – An Amendment to FASB Statement No. 140 |

**APPENDIX A – Sale Accounting Entry**

Fact Pattern

---

[5] A removal of accounts provision is a right held by the transferor that allows them to reclaim assets subject to certain restrictions

INTERNAL DOCUMENT
F8.2 – Securitizations

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    200

CONFIDENTIAL                                                                                      FHFA13012251

**SECURITIZATIONS**                                                                 **F8.2**

- On 1/1/2004, Fannie Mae transfers mortgage loans with carrying value of $900,000 and a fair value of $1,000,000 to Trust P (a QSPE) in return for 85% of the MBS issued by Trust P and $150,000 cash.
- The fair values of the GA, GO and MSA initially are $8,000, $4,800, and $1,000 respectively.  For the purposes of this example the GA does not contain an embedded derivative requiring bifurcation and amortization of the GA and GO is ignored.
- Fannie Mae classifies the MBS as available-for-sale securities under the provisions of SFAS 115.

Calculation of Allocated Cost

|              | Fair Value | % allocation | Allocated Cost |
|--------------|-----------:|-------------:|---------------:|
| Loans sold   | 151,000[6] | 15.0%        | 135,000        |
| GA           | 8,000      | 0.8%         | 7,200          |
| Retained Int.| 850,000    | 84.2%        | 757,800        |
| Total        | $ 1,009,000| 100%         | $    900,000   |

| Cash          | 150,000   |
|---------------|----------:|
| MSA           | 1,000     |
| GO            | (4,800)   |
| Net Proceeds  | 146,200   |
| Loans Sold    | (135,000) |
| Gain on Sale  | $   11,200|

Illustrative Journal Entry (Debit/(Credit))

| Cash                    | 150,000   |
|-------------------------|----------:|
| GA                      | 7,200     |
| MSA                     | 1,000     |
| MBS                     | 757,800   |
| Loans                   | (900,000) |
| GO                      | (4,800)   |
| Gain on Sale of Loans   | (11,200)  |

*Record sale of loans and establishment of GA, MSA and GO*

---

[6] The fair value of the loans sold includes both the $150,000 fair value of the existing loans sold and the $1,000 fair value of the existing right to service those loans (the MSA).

INTERNAL DOCUMENT
F8.2 – Securitizations

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    201

CONFIDENTIAL                                                                          FHFA13012252

## I.   APPLICABILITY

This policy covers the requirements for the accounting and reporting related to accounting changes and error corrections as defined in SFAS 154, *Accounting Changes and Error Corrections*.  This policy is effective as of January 1, 2006.

Below is the definition of accounting changes or accounting error, and when they would occur during the course of business.

**A.   Change in Accounting Principle**- Represents a change from one generally accepted accounting principle to another generally accepted accounting principle when there are two or more generally accepted accounting principles that apply or when the accounting principle formerly used is no longer generally accepted.  A change in the *method* of applying an accounting principle is also considered a change in accounting principle.

**B.   Change in Accounting Estimate**- Represents a change that has the effect of adjusting the carrying amount of an existing asset or liability or altering the subsequent accounting for existing or future assets or liabilities.  Changes in accounting estimates result from updated information.  Examples of items for which estimates are necessary are uncollectible receivables, salvage values of depreciable assets, or allowance for loan losses.

**C.   Change in Accounting Estimate Effected by a Change in Accounting Principle** – Represents a change in accounting estimate that is inseparable from the effect of a related change in accounting principle.  An example of a change in accounting estimate effected by a change in accounting principle is a change in the method of depreciation, amortization, or depletion for long-lived, non-financial assets.

**D.   Change in the Reporting Entity-** Represents a change that results in financial statements that, in effect, are those of a different reporting entity.  Neither a business combination accounted for by the purchase method nor the consolidation of variable interest entity pursuant to FASB Interpretation No. 46, *Consolidation of Variable Interest Entities*, is a change in reporting entity.

**E.   Error in Previously Issued Financial Statements-** Represents an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse of facts that existed at the time the financial statements were prepared.  A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error.

## II.  POLICY

Accounting changes and error corrections are reported in the financial statements either through retrospective application or through prospective application.

**Retrospective Application**- Requires the cumulative effect of the accounting change, or of the error correction, on periods prior to those presented be reflected in the carrying amount of assets and liabilities as of the beginning of the first period presented with an offsetting adjustment, if any, be made to the opening balance of retained earnings (or other appropriate components of equity) for that period.  Financial statements for each individual

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    202

CONFIDENTIAL                                                                                      FHFA13012253

prior period presented will also be adjusted to reflect the period-specific effects of applying the accounting change or error correction.

Retrospective application for accounting change only includes the direct effects of the change, including any related income tax effects; indirect effects are not included in retrospective application.  To the extent that indirect effects are actually incurred, they are recognized in the period in which the accounting change is made.

**Prospective Application**- Requires that the change be made in the period of change if the change affects that period only or the period of change and future periods if the change affects both.  Financial statements of prior periods are not retrospectively adjusted.

## A. Change in Accounting Principle

1. **General:** Once we adopt an accounting principle, we apply it consistently to account for similar events and transactions.  We change an accounting principle only if we can justify that the use of an allowable alternative accounting principle is preferable.  A change in accounting principle usually is the result of the issuance of a new pronouncement that (i) requires the use of a new accounting principle, (ii) interprets an existing principle, (iii) expresses a preference for an accounting principle, or (iv) rejects a specific principle. The issuance of such a pronouncement constitutes sufficient support for making a change in accounting principle provided that the hierarchy established for GAAP is followed.

2. **Recognition:** A change in accounting principle is reported through retrospective application of the new accounting principle, unless it is impracticable to do so.  In addition, when retrospective application to pre-change interim periods is impracticable, the desired change in accounting principle is only be made at the beginning of a subsequent fiscal year.

   If the cumulative effect of applying a change in accounting principle to all other prior periods can be determined, but it is impracticable to determine the period-specific effects of that change on all prior periods presented, the cumulative effect of the change is applied to the carrying amounts of assets and liabilities as of the beginning of the earliest period to which the new accounting principle can be applied. An offsetting adjustment, if any, is made to the opening balance of retained earnings or other appropriate components of equity for that period.

   If it is impracticable to determine the cumulative effect of applying a change in accounting principle to any prior period, the new accounting principle is applied as if the change was made prospectively as of the earliest date practicable.

   The effects of a change in accounting principle retrospectively are deemed impracticable to apply only if any of the following conditions exist:
   - After making every reasonable effort to do so, we are unable to apply the requirements.
   - Retrospective application requires assumptions about management's intent in a prior period that cannot be independently substantiated.
   - Retrospective application requires significant estimates of amounts, and it is impossible to distinguish objectively information about those estimates that (i)

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          203

CONFIDENTIAL                                                                 FHFA13012254

provides evidence of circumstances that existed on the date(s) at which those amounts would be recognized, measured, or disclosed under retrospective application and (ii) would have been available when the financial statements for that prior period were issued.

3. **Disclosures:** Required disclosures for a change in accounting principle include:
   - The nature of and reason for the change in accounting principle, including an explanation of why the newly adopted accounting principle is preferable. If a change in accounting principle has no material effect in the period of change but is reasonably certain to have a material effect in later periods, this disclosure will also be required whenever the financial statements of the period of change are presented.
   - The method of applying the change and a description of the prior-period information that has been retrospectively adjusted, if any.
   - The effect of the change on income from continuing operations, net income and any other affected financial statement line item, and any affected per-share amounts for the current period and any prior periods retrospectively adjusted.
   - The cumulative effect of the change on retained earnings or other components of equity as of the beginning of the earliest period presented.
   - If retrospective application to all prior periods is impracticable, disclosure of the reasons and a description of the alternative method used to report the change.
   - A description of the indirect effects of a change in accounting principle, including the amounts that have been recognized in the current period, and the related per-share amounts, if applicable.
   - Unless impracticable, the amount of the total recognized indirect effects of the accounting change and the related per-share amounts, if applicable, that are attributable to each prior period presented.
   - In the fiscal year in which a new accounting principle is adopted, financial information reported for interim periods after the date of adoption will disclose the effect of the change on income from continuing operations, net income and related per-share amounts, if applicable, for those post-change interim periods.

## B. Change in Accounting Estimate or Change in Accounting Estimate Effected by a Change in Accounting Principle

1. **Recognition:** A change in accounting estimate or a change in accounting estimate effected by a change in accounting principle is reported through prospective application of the change. Like other changes in accounting principle, a change in accounting estimate effected by a change in accounting principle may be made only if the new accounting principle is justifiable on the basis that it is preferable.

2. **Disclosures:** Required disclosures for a change in accounting estimate and a change in accounting estimate effected by a change in accounting principle include:
   - The effect on income from continuing operations, net income and any related per-share amounts of the current period will be disclosed for a change in estimate that affects several future periods, such as a change in service life of depreciable assets.

INTERNAL DOCUMENT
G9.1 - Accounting Changes and Corrections of Errors

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                          204

CONFIDENTIAL                                                              FHFA13012255

ACCOUNTING CHANGES AND CORRECTIONS OF ERRORS                    G9.1

- For a change in accounting estimate effected by a change in accounting principle, the disclosures for a change in accounting principles as described above are also required.
- If a change in accounting estimate has no material effect in the period of change but is reasonably certain to have a material effect in later periods, a description of the change in accounting estimate will also be required whenever the financial statements of the period of change are presented.

### C. Change in the Reporting Entity

1. **Recognition:** A change in reporting entity is reported through retrospective application of the change.  However, the amount of interest cost previously capitalized through application of SFAS 58, *Capitalization of Interest Cost in Financial Statements that Include Investments Accounted for by the Equity Method,* is not adjusted by retrospective application.

2. **Disclosures:**  Required disclosures for a change in the reporting entity include:
   - The nature of and reason for the change in the reporting entity.  If a change in the reporting entity has no material effect in the period of change but is reasonably certain to have a material effect in later periods, this disclosure is required whenever financial statements of the period of change are presented
   - The effect on income before extraordinary items, net income, other comprehensive income and any related per-share amounts will be disclosed for all periods presented.

### D. Correction of an Error in Previously Issued Financial Statements

1. **Recognition:** Correction of an error in previously issued financial statements is reported by *restating* the prior-period financial statements through retrospective application of the error correction.

2. **Disclosures:**  Required disclosures for correction of an error in previously issued financial statements include:
   - Disclose that the previously issued financial statements have been restated along with a description of the nature of the error.
   - The effect of the correction on each financial statement line item and any per-share amounts affected for each prior period presented.
   - The cumulative effect of the change on retained earnings or other appropriate components of equity as of the beginning of the earliest period presented.
   - The resulting effects (both gross and net of applicable income tax) on the net income and the related income tax for each of the prior periods presented.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable.

## IV. APPLICABLE ACCOUNTING LITERATURE

| SFAS 154, Accounting Changes and Error Corrections | Effective January 1, 2006 |

INTERNAL DOCUMENT
G9.1 - Accounting Changes and Corrections of Errors

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    205

CONFIDENTIAL                                                                              FHFA13012256

**BUSINESS SEGMENTS**                                                                       **G9.2**

## I.  APPLICABILITY

This policy addresses our accounting and disclosure for business segments pursuant to FAS 131, *Disclosures about Segments of an Enterprise and Related Information,* including the specific criteria for identifying and aggregating operating segments, and sets forth the standards for determining reportable business segments. This policy also details the financial statement disclosures that are made for reportable business segments.

This policy is effective as of December 31, 2004.

## II.  POLICY

We periodically evaluate our business operations and the information used by our "chief operating decision maker " (CODM) to assess performance and allocate resources to our lines of business. We have determined that our Chief Executive Officer is our CODM. From this, we determine our reportable operating segments under FAS 131.

As of December 31, 2004, based on an analysis of the aggregation criteria and quantitative thresholds of FAS 131, we have concluded that the Portfolio Investment (Capital Markets), Single-Family Credit Guaranty, and HCD businesses represented our three reportable segments.

To determine our reportable operating segments for financial reporting purposes, we go through the following steps:

  A.  We identify our operating segments;
  B.  We perform an analysis of whether two or more identified operating segments can be aggregated into a single operating segment;
  C.  We perform an analysis of whether identified segments meet quantitative thresholds to qualify as reportable segments under FAS 131;
  D.  We evaluate whether we can/should aggregate other operating segments that do not meet the quantitative thresholds but which we combine for internal reporting purposes; and,
  E.  We confirm that we have achieved the required threshold under which the revenues attributable to the reportable segments represent at least 75% of total consolidated revenues.

We determine our reportable business segments by following the diagram below from Appendix B of FAS 131, which are further explained after the diagram:

INTERNAL DOCUMENT
G9.2 – Business Segments

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    206

CONFIDENTIAL                                                                             FHFA13012257



## A. Step 1: Operating Segments

We first determine our operating segments pursuant to FAS 131 requirements. FAS 131 defines an operating segment as a component of an enterprise:

1. That engages in business activities from which it may earn revenues and incur expenses

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                207

CONFIDENTIAL                                                        FHFA13012258

2. Whose operating results are regularly reviewed by the company's chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance
3. For which discrete financial information is available.[1]

All of the above criteria must be met to meet the definition of an operating segment.

## B. Step 2: Aggregation Criteria

Next, pursuant to FAS 131, we determine whether two or more of our operating segments can be combined for reporting purposes even though they may be individually material if all of the following six conditions are met:

1. Aggregation is consistent with the objective and basic principles of FAS 131;
2. The operating segments have similar economic characteristics (e.g. comparable long-term average gross margin or other measures that management/CODM use to evaluate performance);
3. The nature of the products and services;
4. The nature of the production processes;
5. The type or class of customer for their products and services; and
6. The methods used to distribute their products or provide their services

All of the above criteria must be met for aggregation. In addition, if applicable, the nature of the regulatory environment related to each segment should be considered.[2]  When segments are aggregated, disclosure of this is required in the financial statements.[3]

## C. Step 3: Quantitative Thresholds

Under FAS 131, we separately report information about an operating segment that meets any of the following quantitative thresholds. These tests can be applied to either a single operating segments or to two or more operating segments that have been aggregated for purposes of determining reportable segments.[4]

1. Reported revenue, including both sales to external customers and intersegment sales or transfers, is 10% or more of the combined revenue, internal and external, of all operating segments.
2. The absolute amount of reported profit or loss is 10% or more of the greater, in absolute amount, of (a) the combined reported profit of all operating segments that did not report a loss or (b) the combined reported loss of all operating segments that did report a loss.
3. Assets are 10% or more of the combined assets of all operating segments.

Operating segments that do not meet any of the quantitative thresholds may be considered "reportable," and separately disclosed, if our management believes that information about the segment would be useful to readers of the financial statements.

---

1 FAS 131, paragraphs 10-15.

2 FAS 131, paragraph 17.

3 PwC Assurance and Business Advisory Services, *SEC Volume 1,* SEC Financial Statement Requirements – Accounting and Disclosure Matters Unique to SEC Filings – SEC 4220.1272.

4 FAS 131, paragraph 18.

INTERNAL DOCUMENT
G9.2 – Business Segments

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    208

CONFIDENTIAL                                                        FHFA13012259

### D. Step 4: Aggregating Operating Segments that Do Not Meet Quantitative Thresholds

After we have determined whether a single operating segment or aggregated segment meets the quantitative thresholds, we decide how to report the remaining segments. Two or more operating segments that do not meet the quantitative thresholds may be combined to produce a reportable segment only if:

1. Combining the information is consistent with the underlying objective and principles of FAS 131;
2. The segments have comparable economic characteristics, and
3. The operating segments share more than half of the aggregation criteria.

We cannot, however, combine operating segments that <u>do not meet</u> the quantitative thresholds with segments that <u>do meet</u> the quantitative threshold only if a majority of the aggregation criteria are met. In this case, *<u>all of the aggregation criteria</u>* must be met in order to combine the two segments.[5]

### E. Step 5: Meeting the "75 Percent" of Consolidated Revenue Test

Once we have identified our reportable segments, we make sure the revenues attributable to the reportable segments represent at least 75% of total consolidated revenues. If this condition is not met, additional operating segments will need to be identified as reportable segments until this test is met.[6]

### F. Step 6: Disclosure of Reportable Segments

After performing each of the preceding tests, we are able to determine the specific segments that are disclosed in our financial statements.

## III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable.

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 131 | Jan 1998 | *Disclosures about Segments of an Enterprise and Related Information* |
| EITF 04-10 | Dec 2006 | *Applying Paragraph 19 of FASB Statement No. 131, Disclosures about Segments of an Enterprise and Related Information, in Determining Whether to Aggregate Operating Segments That Do Not Meet Quantitative Thresholds* |
| SEC Release No. 33-8176 | Jan 2003 | *Conditions for Use of Non-GAAP Financial Measures, and Frequently Asked Questions Regarding the Use of Non-GAAP Measures* |

---

5 FAS 131, paragraph 19.
6 FAS 131, paragraph 20.

INTERNAL DOCUMENT
G9.2 – Business Segments

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          209

CONFIDENTIAL
                                                    FHFA13012260

**CONTINGENCIES** | **G9.3**

## I.  APPLICABILITY

At any given time, we may be exposed to various legal and operational matters that could result in potential of losses (or gains). These matters include, but are not limited to litigation matters, impairment of assets, or exposure to events that will give rise to a liability where it must evaluate the asset for collectibility or the exposure for loss.

This policy is effective as of December 31, 2004.

## II.  POLICY

Our policy of financial accounting and reporting for loss contingencies and gain contingencies follows FAS 5, *Accounting for Contingencies.*

### A.  Recording Accruals

For accounts where we are exposed to collection risk or in circumstances when it is subject to potential exposure, we accrue the estimated loss where *both* of the following conditions are met:

1.  information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements and that it is probable that one or more future events will occur confirming the fact of the loss, and
2.  the amount of loss can be reasonably estimated.

We individually examine the probability of all potential exposures based on facts and circumstances to determine whether the "probable" threshold has been met.

SAB 92 is considered when determining the appropriate presentation and disclosure of any material loss contingency. A claim for recovery is not recognized unless it is probable that it will be realized. The SEC staff believes that there is a rebuttable presumption that no asset should be recognized for a claim for recovery from a party that is asserting that it is not liable to indemnify the registrant. If we overcome that presumption we disclose the amount of recorded recoveries that are being contested and discuss the reasons for concluding that the amounts are probable of recovery. In cases where recovery requires litigation, such recovery constitutes a gain contingency and, therefore, an asset is not recognized until realized (or until it becomes reasonably assured of realization) even if successful litigation is probable.

When some amount within the range of loss is a better estimate than any other amount within the range, that amount is accrued. When no amount within the range is a better estimate than any other amount, the minimum amount in the range is accrued.[1] The amount of the contingent liability is estimated and evaluated independently from any claim for recovery.[2]  We do not offset assets and liabilities except where the right of offset exists.[3]  When we manage risk by transferring risk we generally still have the primary obligation with respect to any losses. Therefore, we accrue the gross amount of

---

[1] FIN 14 ¶3
[2] SOP 96-1 ¶140
[3] FIN 39

INTERNAL DOCUMENT
G.9.3 – Contingencies

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae

CONFIDENTIAL | FHFA13012261

a loss even if we have purchased the right to transfer such risk, and to cover the loss. We record a liability for any unpaid claims in accordance with the guidance in SFAS 5.

We generally do not record gain contingencies, as it is usually inappropriate to recognize such gains prior to realization.

## B. Disclosure

If no accrual is made for a loss contingency because one or both of the conditions noted above are not met, or if an exposure to loss exists in excess of the amount accrued, disclosure of the contingency is made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure indicates the nature of the contingency and gives an estimate of the possible loss or range of loss or state that such an estimate cannot be made. [4]

Disclosures regarding an estimate is made when information is known and available prior to issuance of the financial statements and indicates that (1) it is reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events, and (2) the effect of the change would be material to the financial statements.[5]

Additionally, for loss contingencies that are reasonably possible (but not probable), the SEC staff has emphasized disclosures regarding the nature of the contingency and the possible range of amounts, and that the recording of a material accrual for a contingent liability related to a historical event should not be the first disclosure regarding the contingency.

Disclosure of remote contingencies is not required, except in the case of guarantees within the scope of FIN 45.  For remote contingencies that are outside the scope of FIN 45, disclosure are considered where the potential loss is very material; for example, when occurrence of the loss would threaten our continued existence.

Adequate disclosure is made of contingencies that result in gains, but care is exercised to avoid misleading implications as to the likelihood of realization.

## C. Subsequent Events

If it is probably that a loss has occurred All information that becomes available prior to the issuance of the financial statements should be considered in evaluating the conditions on which the estimates were based. The financial statements should be adjusted for any changes in estimates resulting from the use of such evidence. [6]

# III. QUESTIONS AND INTERPRETIVE RESPONSES

Not applicable.

---

[4] SFAS 5 ¶10
[5] SOP 94-6
[6] EITF D-86

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                211

CONFIDENTIAL                                                                      FHFA13012262

**CONTINGENCIES**                                                                             **G9.3**

## IV. APPLICABLE ACCOUNTING LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 5 | July 1975 | Accounting for Contingencies |
| FIN 14 | October 1976 | Reasonable Estimation of the Amount of Loss |
| SOP 94-6 | December 1994 | Disclosure of Certain Significant Risks and Uncertainties |
| FIN 39 | December 1993 | Offsetting of Amounts Related to Certain Contracts |
| EITF D-86 | January 2000 | Issuance of Financial Statements |
| AU 560 | November 1972 | Subsequent Events |
| SAB 92 | June 1993 | Accounting and Disclosures Relating to Loss Contingencies |

CONFIDENTIAL                                                          FHFA13012263

## I.  APPLICABILITY

This policy applies when other policies require fair value measurements. It is effective as of January 1, 2008.

## II.  POLICY

We estimate fair value using an exit price notion.  Fair value is the price in an orderly transaction[1] between market participants that would be received to sell an asset or paid to transfer a liability in our principal or most advantageous market.

Fair value is measured by using a quoted market price, when available. If a quoted market price is not available, the estimate of fair value considers prices for similar assets or similar liabilities and the results of valuation techniques to the extent available in the circumstances.  Valuation techniques incorporate assumptions that market participants would use in their estimates of values.  In developing such assumptions, specific market participants do not need to be identified; however, general market participants should be distinguished based on the asset or liability being measured, the principal or most advantageous market for the asset or liability, as well as those counterparties with whom we would transact within that market.

**1. Determining the Principal and Most Advantageous Markets**
The principal market is that market in which we would sell the asset or liability with the greatest volume and greatest level of activity. The most advantageous market is the market which maximizes the amount received for an asset or minimizes the amount paid to transfer a liability, considering transaction costs in the respective market. While the determination of the most advantageous market includes transaction costs, the price used for determining fair value does not include transaction costs.

If both a principal and most advantageous market exist for a given asset or liability, the principal market shall be used to determine fair value, even if the price in a different market is more advantageous or more observable.

**2.  Determining Fair Value of Assets**
The fair value of an asset should be measured under the valuation premise (either in-use or in-exchange) that represents the highest and best use of the asset by market participants.  The highest and best use refers to the use of an asset by market participants that would maximize the value of the asset.  The appropriate valuation premise should be based on the appropriate exit market from Fannie Mae's perspective, or the market participant's perspective, in the absence of an observable market, as well as the exit market in which Fannie Mae would seek to dispose of the asset. Determining the valuation premise should be performed in conjunction with determining the principal or most advantageous market.

Valuation Premises:
- Under the in-use valuation premise, the asset provides maximum value to participants through its use with other assets as a group.  This valuation premise is applicable to items that trade in pools of relatively homogeneous pools (i.e. the securitization price, adjusted appropriately, may be used to value a mortgage loan if such loans are

---

[1] An orderly transaction is a hypothetical transaction at the measurement date and assumes exposure to the market for period prior to the measurement date that is usual and customary.

INTERNAL DOCUMENT
G9.4 – Fair Value - 2008

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          213

CONFIDENTIAL                                                                  FHFA13012264

frequently disposed of through the securitization market or if the highest and best use of the loan is in combination with other loans).
- Under the in-exchange premise, the asset provides maximum value to market participants on a stand-alone basis.


### 3.  Fair Value at Initial Recognition

While the transaction, or purchase price, may equal the exit price, and therefore equal fair value at inception, the transaction price may not represent fair value if any of the following occur:
- The transaction is between related parties
- The transaction occurs under duress or the seller is forced to accept the price due to urgency
- The unit of account represented by the transaction is different from the unit of account for the asset or liability measured at fair value.  This may be the case if the transaction price includes transaction costs.
- The market in which the transaction occurs is different than the principal or most advantageous market in which we would sell the asset or transfer the liability.


### 4. Pricing Conventions

In determining the fair value of a financial instrument, it is necessary to determine whether a bid, ask, mid or some other price would be received or paid in the transaction between market participants where there exists a bid/ask spread.  Our policy conclusions for pricing conventions, which must be consistently applied, are as follows:

- For financial asset holdings a bid price will be used when there is an existing or implied bid/ask spread.  This conclusion is based on the theory that as the holder of an asset that it would like to sell, we are most often in a position to accept market-place bids versus being in a position to command our asking price.  This conclusion is also consistent with the way that many market participants price their asset (long) positions.

- For debt obligations issued by us and other financial liability positions, an ask price will be used when there is an existing bid/ask spread in the secondary market for Fannie Mae debt. This conclusion is based on the theory that as the obligor of the debt instrument or holder of the liability position, we are in a position to accept only what other market participants are asking to receive from us in order for them to relieve Fannie Mae from its obligation.  This conclusion is also consistent with the way that many market participants price their liability (short) positions.

- For derivative instruments (excluding commitments), entered into by us, such instruments will be initially valued at a mid price because observable market inputs are reflective of a mid price.  This conclusion is also consistent with the way that many market participants price their derivative holdings.

- Purchase commitments are valued at a bid price and sale commitments are valued at an ask price where there is an existing bid/ask spread in the secondary market.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    214

CONFIDENTIAL                                                                                     FHFA13012265

## 5. Valuation Adjustments

In estimating fair value, a valuation adjustment for an asset or liability may be required in order to ensure its fair value is representative of an exit price.  When estimating the fair value of a financial instrument, the follow items should be considered:

- **Counterparty Credit Risk:**  We will record valuation adjustments for counterparty credit risk when it is determined that such an adjustment is not already reflected in the quoted or modeled value, and is necessary to bring the value of the derivative contract to a fair value that would be recognized after consideration of available collateral.

- **Fannie Mae's Creditworthiness:** The fair value measurement of a liability should consider the impact of our own nonperformance risk (including credit risk) and changes in our credit spread.

- **Bid/Ask Spread:**  Adjustments will be applied to the fair value estimate to be closer to the bid or ask value where the proprietary value is at a mid market price and we believe that such a price could not be obtained in a current transaction between market participants.

- **Concentration:**  We do not apply valuation adjustments for concentrations (i.e., block discounts).  As of any valuation date, fair value measurements are to be determined without regard to the magnitude of sales, issuances or assumptions that might occur in the future.

- **Model Error:**  We do not apply adjustments for unknown or anticipated model errors. Models are subject to the review and oversight of the Chief Risk Officer.

- **Transaction Costs:**  Transaction costs will not be considered in the determination of an instrument's fair value.  Transaction costs will be deferred or expensed when incurred in accordance with our respective accounting policies for such costs.

## 6. Fair Value Hierarchy

Each asset and liability measured at fair value on the Balance Sheet on either a recurring or nonrecurring basis is mapped to Level 1, 2 or 3 in the fair value hierarchy. The fair value hierarchy prioritizes inputs used in fair value measurements.  If the inputs used to measure fair value for a given asset or liability fall in different levels of the fair value hierarchy, the asset or liability should be mapped to the lowest level input that is significant to its fair value measurement.

The levels in the fair value hierarchy are defined as follows:

| Level | Inputs used to measure fair value | Example |
|---|---|---|
| 1 | - Quoted, unadjusted prices for *identical* asset or liabilities in *active*[2] markets that the Company has the ability to access at the measurement date. | - Common stock or exchange-traded futures or options contracts actively traded and quoted on an exchange. |

---

[2] An active market is one in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis.

Page 3 of 4

CONFIDENTIAL                                                                                      FHFA13012266

| 2 | • Quoted prices for similar assets or liabilities in active markets<br>• Quoted prices for identical assets or liabilities that are not in active markets<br>• *Observable inputs*, other than Level 1 quoted prices, and unobservable inputs that are corroborated by observable market data by correlation or other means. | • Interest rate swap whose value is based on LIBOR forward interest rate curves, *provided that* the curves are observable at commonly quoted intervals.<br>• A receive-fixed, pay-variable interest rate swap that is based on a specific bank's prime rate, whose value is based on the bank's prime rate, which is derived through extrapolation.  This input qualifies as a Level 2 provided that the extrapolated values are corroborated by observable market data by being highly correlated to an interest rate that is observable over substantially the full term of the interest rate swap. |
|---|---|---|
| 3 | • *Unobservable inputs* that are not corroborated by market data. These inputs are used when there is little to no market activity for the asset or liability at measurement date. | • Basis swaps whose value is based on a non-market spread curve created by the reporting entity (e.g., Disco/LIBOR swap).<br>• A derivative whose forward price curve that is used in a valuation model is not directly observable or correlated with observable market data. |

## 7. General Reserves

We do not record general reserves in the valuation process.  Any general reserve will be recorded, if necessary, outside of our valuation process and in accordance with the Company's policy G.9.3 Contingencies.

## III.  QUESTIONS AND INTERPRETIVE RESPONSES

Not Applicable

## IV.  APPLICABLE ACCOUNTING AND REGULATORY LITERATURE

| GAAP Literature | Effective Date | Title |
|---|---|---|
| FAS 157 | 01/01/2008 | *Fair Value Measurements* |
| FAS 140 | 03/31/01 | *Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities* |
| FAS 155 | 01/01/2007 | *Accounting for Certain Hybrid Financial Instruments* |
| FAS 149 | 07/01/2003 | *Amendment of Statement 133 on Derivative Instruments and Hedging Activities* |
| FAS 133 | 01/01/2001 | *Accounting for Derivative Instruments and Hedging Activities* |
| FAS 115 | 01/01/1994 | *Accounting for certain Investments in Debt and Equity Securities* |
| FAS 107 | 01/01/1992 | *Disclosures about Fair Value of Financial Statements* |
| CON 7 | 02/2000 | *Using Cash Flow Information and present value in Accounting Measurements* |

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae 216

CONFIDENTIAL

FHFA13012267

## I. APPLICABILITY

This policy applies to investments that are:

- securities within the scope of FAS 115;
- accounted for under the cost method of accounting;
- accounted for under the equity method of accounting;
- securities within the scope of SOP 03-3 with evidence of deterioration in credit quality since origination acquired by completion of a transfer for which it is probable, at acquisition, that we will be unable to collect all contractually required payments receivable; or,
- within the scope of EITF 99-20.

This policy is effective as of January 1, 2006.

## II. POLICY

An investment within the scope of FAS 115 and SOP 03-3 is impaired if its estimated fair value is less than its carrying amount.  When an investment is impaired, we evaluate whether that impairment is other than temporary.  An other- than-temporary decline in fair value is generally considered to have occurred if it is probable that we will be unable to collect all amounts due according to the contractual terms of the security.

When we determine that impairment is other than temporary, ("OTTI"), we adjust the cost basis of the security to fair value, and recognize the amount of that impairment adjustment (i.e. "write-down") as an impairment loss in earnings in the period it occurs.  Once we have recognized an OTTI, we do not adjust the carrying value of the investment for any subsequent increases in fair value. However, we would continue to evaluate any further decreases in fair value for OTTI.

### A. Investments[1] within the scope of FAS 115 and SOP 03-3, including purchased beneficial interests, that are not subject to EITF 99-20

#### 1. Determining if an investment is impaired

We assess individual investments for impairment.  To determine whether an investment is impaired, we first compare the fair value of the security to its carrying amount. If the fair value is more than its carrying amount, we perform no further evaluation.  If the carrying amount is more than the fair value, we evaluate the investment to determine if the impairment is OTTI.

If an equity-method investment does not have a readily determinable fair value we consider we will be able to recover its carrying amount.  If the discounted estimated cash flows are less than its carrying amount, the investment is considered impaired.

#### 2. Determining if impairment is other than temporary

---

[1] Securities classified as trading are not within the scope of FAS 115 and SOP 03-3 impairment guidance, because changes in fair value are recorded in earnings.

INTERNAL DOCUMENT
C9.5 – Impairment

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                217

CONFIDENTIAL                                                                        FHFA13012268

When we have concluded that an investment is impaired, we evaluated the impairment to determine whether it is OTTI. We base our analysis of OTTI upon the premise that a write-down may be required; therefore, we consider all available evidence to evaluate the realizable value of our investments. Although we may conclude in one quarter that an investment is not other-than-temporarily impaired, we continue to evaluate whether it is other than temporarily impaired in each subsequent quarter.

### a. Factors to consider

The following (along with some related impairment indicators) are only a few examples of the factors which, individually or in combination, indicate that a decline is other than temporary and that a write-down of the carrying value is required:

1. The length of time and the extent to which the fair value has been less than cost.

   - Fair value is significantly below cost.
   - The decline in fair value has existed for an extended period of time

2. The financial condition and near-term prospects of the issuer, including any specific events which may influence the operations of the issuer such as changes in technology that may impair the earnings potential of the investment or the discontinuance of a segment of the business that may affect the future earnings potential.

   - A debt security has been downgraded by a rating agency or adverse action by a regulator.
   - The financial condition of the issuer has deteriorated.
   - The decline in fair value is attributable to specific adverse conditions affecting a particular investment.
   - The decline in fair value is attributable to specific conditions, such as conditions in an industry or in a geographic area.
   - Dividends have been reduced or eliminated, or scheduled interest payments have not been made.

3. Our intent and ability to retain our investment in the issuer for a period of time sufficient to allow for any anticipated recovery in fair value.

   - Since the typical equity security does not have a contractual cash flow at maturity on which to rely, our intent and ability to hold an equity security for a reasonable period of time should be analyzed differently than a typical debt security. The ability to hold an equity security indefinitely would not, by itself, allow us to avoid an OTTI.
   - Whether our cash or working-capital requirements and contractual or regulatory obligations indicate that the securities need to be sold prior to the projected recovery in fair value.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae          218

CONFIDENTIAL                                                                                    FHFA13012269

- Whether we have granted a third-party investment advisor total discretion to make investment decisions and execute investment transactions, thereby restricting our ability and intent to hold to recovery or maturity. We make our own investment decisions so this factor is typically not applicable.
- Whether the time frame that we have projected for the recovery of the security's fair value is reasonable. (In enforcement releases, the SEC has indicated that practical limitations may restrict management's ability to make forecasts about periods that lie beyond a reasonable time frame. As the forecasted recovery period lengthens, the uncertainties inherent in the assumptions underlying the projected recovery will lengthen as well.)
- An investment that is impaired for a minor length of time (duration) or to a minor extent (severity) may indicate that we would need to retain the investment for a shorter period of time in order for its fair value to recover. A minor duration or severity of impairment may be indicative of normal interest rate or market fluctuations that may be temporary.  As duration and severity increase, forecasting a recovery becomes more difficult, and the likelihood that we may need to hold the investment for a longer period of time, or even to maturity, before the investment will recover in value, becomes more likely.
- Whether the security has been sold prior to the release of the financial statements.
- Whether we have a history of selling similar underwater securities which we have asserted would be held until recovery or maturity from its AFS portfolio.

### b.  Evaluating the factors

We deem an impairment to be other than temporary unless positive evidence indicating that the investment's carrying value is recoverable within a reasonable period of time outweighs negative evidence to the contrary.

We consider all available evidence, both positive and negative, to determine whether, based on the weight of that evidence, the carrying amount of the investment is recoverable within a reasonable period of time.  Evidence that is objectively determinable and verifiable is given greater weight than evidence that is subjective and/or not verifiable, and the significance of each factor will vary on a case-by-case basis.

1.  Positive Evidence

If an investment's fair value declines below cost, we shall determine whether there is adequate evidence to overcome the presumption that the decline is other than temporary.  Such evidence may include:

- Recoveries in fair value subsequent to the balance sheet date;
- The investee's financial performance and near-term prospects (as indicated by factors such as earnings trends, dividend payments, asset quality and specific events);
- A upgrade of the investee's or the security's debt rating;

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    219

CONFIDENTIAL                                                                    FHFA13012270

- The investee's or the security's debt rating, although downgraded, is still "investment grade;"
- The dividend amount is the same as before there was an impairment indicator;
- Existence of guarantees or other credit enhancements;
- The financial condition and prospects for the investee's geographic region and industry;
- Our positive intent and ability to hold the security until recovery or maturity.

2. Negative Evidence

The positive factors must be weighed against any negative evidence that is gathered about the security. Such negative evidence may include:

- A prolonged period during which the fair value of the security remains at a level substantially below the investor's cost; (Although we consider four consecutive quarters to be "prolonged", we do not consider that that length of time definitively indicates other than temporary impairment.)
- A downgrading of the investee's or the security's debt rating;
- Severe losses sustained by the investee in the current year or in both current and prior years;
- The investee's deteriorating financial condition and a decrease in the quality of the investee's assets, without positive near-term prospects:
  - adverse changes in key ratios and/or factors, such as the current ratio, quick ratio, debt/equity, the ratio of stockholders' equity to assets, return on sales, assets or equity;
  - adverse changes may include a large increase in nonperforming loans, repossessed property, and loan charge-offs, and
  - adverse changes in default or recovery rates;
- The investee's level of earnings or the quality of its assets is below that of the investee's peers;
- A reduction or cessation in the investee's dividend payments;
- A change in the economic or technological environment in which the investee operates that is expected to adversely affect the investee's ability to achieve profitability in its operations;
- Suspension of trading in the security;
- A qualification in the accountant's report on the investee because of the investee's liquidity or due to problems that jeopardize the investee's ability to continue as a going concern;
- The investee's announcement of adverse changes or events, such as changes in senior management, salary reductions and/or freezes, elimination of positions, sale of assets or problems with equity investments;
- A weakening of the general market condition of the geographic area or industry in which the investee operates, with no immediate prospect of recovery;
- Factors, such as an order or action by a regulator, that (1) requires an investee to (a) reduce or scale back operations or (b) dispose of

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    220

CONFIDENTIAL                                                                          FHFA13012271

significant assets or (2) impair the investee's ability to recover the carrying amount of assets.

### c.  Manufactured housing and aircraft lease receivables-backed securities

For manufactured housing mortgage-backed securities and aircraft lease receivables-backed securities we apply a four-step process for assessing OTTI.

The process is described as follows:

**Step 1 –** Does the cash flow modeling (using discounted cash flows) during the quarter as part of our credit review, forecast a loss of contractual principal or interest <u>or</u>, if an OTTI write down was previously recorded, do cash flow tests performed during the quarter indicate an increase in credit losses to an amount greater than the amount of previous OTTI write down(s)?

**If yes:** Impairment is other than temporary – write security down to fair value
**If no:** Proceed to Step 2

**Step 2 –** Has the debt security been downgraded from BBB (or above) to BB (or lower) during the quarter (and the rating is BB or lower at quarter-end) <u>or</u>, if rating was already BB or lower in a previous quarter, has the security been downgraded a full letter grade[2] since the most recent OTTI write down was taken?

**If yes:** Impairment is other than temporary – write security down to fair value
**If no:** Proceed to Step 3

**Step 3 –** Is the debt security rated BBB or lower at quarter-end <u>and</u> does it have a fair value less than 90% of its carrying value?

**If yes:** Impairment is other than temporary – write security down to fair value
**If no:** Proceed to Step 4

**Step 4 –** Does the debt security have a fair value less than 80% of its carrying value?

**If yes:** Impairment is other than temporary – write security down to fair value
**If no:** Impairment is **not** other than temporary.  Continue to record changes in fair value as prescribed by FAS 115 based on the classification of the security (i.e. held-to-maturity, available-for-sale, or trading).

### d.  Sales of securities at a loss after the balance sheet date

If we sell a security at a loss subsequent to the end of a reporting period but prior to the issuance of our financial statements, we evaluate whether the security was OTTI as of the balance sheet date.  In determining whether the OTTI should be

---

[2] A full letter downgrade is defined as from one category to another, disregarding pluses or minuses or any other numerical or other subcategory. For example, a downgrade from BB- to B+ is considered a full letter downgrade.

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae        221

CONFIDENTIAL                                                                    FHFA13012272

recorded before or after the balance sheet date, we evaluate the security to determine whether there was an event that gave rise to the decline in fair value and when that event occurred even if discovery of the event occurred after the balance sheet date.

When we have decided to sell an impaired security and we do not expect the fair value of the security to fully recover prior to the expected time of sale, the security shall be deemed other-than-temporarily impaired in the period in which the decision to sell is made.

**e.   Income recognition subsequent to recognition of OTTI**

In periods subsequent to the recognition of an OTTI loss, the accretion method or the cost recovery method will be used for income recognition for securities where an OTTI charge is taken. It is expected that we will generally be able to estimate cash flows and will use the accretion method of accounting for most securities, including securities acquired that are impaired at the time of acquisition and subject to the accounting provisions of SOP 03-3.

Regardless of which method is used, the investment will continue to be subject to our process for identifying further OTTIs based on continual evaluation of new impairment indicators.

We continue to estimate cash flows and assess the collectibility throughout the life of the investment.  If the cost recovery method is initially used and we are subsequently able to estimate probable collections, the accretion method should be used going forward.  Similarly, when the accretion method is used and upon subsequent evaluation, our estimate of total probable collections significantly increases, the amount of the discount to be amortized should be adjusted accordingly.  These adjustments are to be accounted for prospectively as a change in estimate.

1.   Accretion Method

Recognition of income under the accretion method is appropriate when we have a reasonable expectation about the timing and amount of cash flows expected to be collected.  The accretion method allows us to accrete the new cost basis of the security up to the expected principal amount to be recovered over the remaining period to maturity. The yield for accretion purposes is determined as the rate of return necessary to accrete the carrying value to the expected principal amount to be received over the life of the security.

If we believe that we will receive all the contractual principal and interest payments remaining to maturity (*i.e.*, if OTTI was recorded due to changes in interest rates without an increase in credit risk), the accretion rate will equal the implied market yield on the security.  The market yield is determined as the interest rate necessary to discount the contractual cash flows to the new cost basis (current fair value) of the instrument.

If cash flow estimates increase significantly, we will recalculate the accretion rate equal to the interest rate necessary to discount the revised cash flows

Confidential and Proprietary - Confidential Treatment Requested by Fannie Mae                    222

CONFIDENTIAL                                                                    FHFA13012273