# Exhibit 7

## Business Engineering 103 – Non-Agency ABS Loan Level Data, Charter Review and Legal Documents Collection Procedure

**Purpose:** This procedure describes the process controls and methods by which I&CM Ops Business Engineering (i) collects and transfers loan level collateral files in an "as is" format for processing by the Mission Oversight & Development ("Mission" or "MOD") for goals counting and (ii) performs certain Charter compliance reviews, executes procedures that improve the efficiency of the data collection and supports the charter compliance review process by Mission. This procedure also describes how certain legal documents are collected and stored on the Portfolio Investments LAN (described below).

**Tools needed:**

- **Non-Agency Collateral LAN ("Collateral LAN")**: Located at Non agency collateral/ABS Loan Analysis-hq4\resources\hq4cluster1-hq4p2v3. The loan level files saved on the Collateral LAN contain personal information on borrowers. Access to this LAN is restricted to Business Engineering Personnel.
- **Portfolio Investments LAN**: Located on Portfolio Investments on he2cluster1-he21p2v1-server\he21p2v1). Access to this LAN must be requested, and is generally limited to IC&M, Legal, Mission and Enterprise Risk Oversight. This contains the "Non-Agency Deal Database" at Portfolio Investments\Current Database\NonAgencyDealDatabase.
- **ABS Loan Level LAN for Mission**: Located on HE2cluster2-he22p2v7 this is the area that I&CM OPS BE posts loan files for Mission to process. Mission has read only access to this area.
- **ABSDATA Mailbox** (ABSDATA@freddiemac.com)
- **ABSDOCS Mailbox** (abs_docs@freddiemac.com)
- **Microsoft Excel**
- **Microsoft Access**
- **Aladdin**

**Timing:** Ongoing

| Settlement Loan Level Data Verification | Collection and analysis of Loan Level Files for each ABS transaction |
|---|---|

| STEP | ACTION | ACCOUNTABLE |
|---|---|---|
| 1. | On S+1, counterparties (primarily dealers but in some cases originators) are instructed to send loan level files to the **ABS_Docs** mailbox or the ABS Monitor secure internet site within 30 days of security settlement.  If not received in 15 days, the analyst should follow up with the counterparty in accordance with the "Dealer Follow up Procedures" below, unless a valid reason for delay has previously been given by counterparty. | BE Analyst |
| 2. | Identify each deal and who sent it to ensure we are receiving data for the correct deal and log it into the Non Agency database and perform the | BE Analyst |

FHFA00535902

| | | |
|---|---|---|
| | following steps:<br>• Confirm all required Loan Level fields as specified in the most recent Freddie Mac Investment Requirements are included in the file;<br>• Ensure the sum of the loan group UPB's match the value in the Non agency database from the prospectus supplement and Bloomberg.<br>• If all required loan level fields are not included in the file or the file has errors, follow up with the counter-party in writing to request new file to be delivered immediately with correct information.<br>• Note in the *Reject Notes* field of the Non Agency database of the date of this review. | |
| 3. | Based on units, state and lien, confirm original loan amounts meet the current applicable Charter loan limits (equal to or lower than). Use the sort and filter functions within Microsoft Excel on the original Loan Amount and Units fields to perform the following review in accordance with charter driven stipulations based on the security settlement date (for post-settlement fundings, based on the date the loans are identified to the trust):<br>• <u>First Liens</u>: Original principal balance of each first lien does not exceed applicable Charter loan limits<br>• <u>Subordinate Liens</u>: Original principal balance of each Subordinate lien does not exceed one-half the amount of the first lien 1-unit Charter limit<br>• <u>Combination of First and Subordinate Liens:</u> Aggregate original principal balance of the first and subordinate lien on a property cannot exceed the applicable Charter limit for the first lien for state and number of units.<br>• <u>Subordinate Liens can only be on principal residences</u>.<br>• <u>Manufactured housing units</u> can only be on principal residences (or on real property under state law). If it is not on a principal residence, notify the Legal Division that the deal documents must be checked to confirm they are classified as real property under applicable state law from the operative documents. | BE Analyst |
| 4. | **Non-Compliant Loans**: Loans that exceed the | BE Analyst/Manager/ |

FHFA00535903

| | | Director |
|---|---|---|
| | Charter limits or violate other Charter requirements must be removed from the pool, typically through repurchase in accordance with the related governing documents. | |

Charter limits or violate other Charter requirements must be removed from the pool, typically through repurchase in accordance with the related governing documents.

If a potential non-compliant loan is discovered, the analyst should immediately contact the counterparty to verify the data accuracy of the non-compliant findings. Upon confirmation of non-compliant data, the analyst should notify his/her supervisor, Legal and Compliance division in writing. The non-compliance loan should also be logged in the Non Agency Database for monitoring purpose.

Once it is confirmed that the loan is in violation of Charter, I&CM OPS BE analyst should perform the following:

    a. Draft a formal request (buy back template) to have the loan repurchased by the dealer within a specific timeframe and submit to Director for review.

    b. Submit signed document via email to Senior Director for signoff.

    c. Scan signed document into PDF and submit to counterparty via email.

    d. Notify the following parties through email of the nature of the repurchase including the shelf, loan numbers, the reason of non-compliance, etc:
- VP Non Agency desk,
- SVP Mortgage Investments and Structuring,
- VP of Strategy Execution
- VP of Corporate Compliance,
- VP of Legal Legislative and
- Regulatory Affairs VP of Strategy, Planning & Reporting in the Mission division.)

    e. Monitor the progress of the repurchase to ensure transaction was executed timely; escalate if necessary.

    f. Store all data and correspondence related to the buyback (i.e. All versions of buyback letter, copy of email to counterparty, servicing documents, proof of buyback, etc.) in the Portfolio Investments LAN under Loan Buybacks folder.

FHFA00535904

| | | |
|---|---|---|
| | *Note: Per guidance from HUD, Freddie Mac must provide HUD with a written explanation of the action taken, the reason for the action, the number of mortgages/units associated with the purchases(s) and any other information that HUD may request.  The Legal Division coordinates with Mission the formal communication to HUD. | |
| 5. | Move approved loan level files "as is" unaltered file to appropriate folder in the **ABS Loan Level LAN for Mission** (ie. *ABS Files Approved For Processing* or *ABS Data Files Rejected)*. Mission has read access to this area to pick up the approved files for goals counting. This area is set up with a folder for each dealer. If the loan level file is moved to the *ABS Files Approved For Processing* folder, then put a check in the *Accepted* box of the Document Tracking page of the ABS database.<br><br>*Note: When saving loan level files, no existing files should be overwritten. | BE Analyst |
| 6. | Save file to the Collateral LAN for I&CM OPS BE.   This LAN contains two folders: "**Good Files**" and "**Bad Returned**."  Each of these folders contains a sub folder for each dealer we do business with.  Save the files to the appropriate dealer subfolder in either the **Good Files** or **Bad Returned** folder.<br><br>*Note: When saving loan level files, no existing files should be overwritten. | BE Analyst |
| 7. | Mission accesses the **ABS Loan Level LAN** and edits the file for charter compliance and conversion (extract, transfer and load).  In addition, a separate area in Mission performs quality control function on the files:<br>1. Sorting through Excel similar to I&CM OPS BE process<br>2. Via custom Conversion program manually edits for conforming loan limit compliance for firsts and subordinates based on units, state and lien position.<br>3. Data is written to Offline file which is added to GSE reporting system.  This process has automated edits for loan limit compliance (same as step 2 above)<br><br>Mission processes each file in the *ABS Files Approved for Processing* mail folder into the | MOD Analyst |

FHFA00535905

| | | | |
|---|---|---|---|
| | | AHI database.  If Mission identifies noncompliant loans, they should transfer file to *ABS Data Files Rejected* on ABS Loan Level LAN for Mission.<br><br>Note:  A Service Level Agreement has been established for income (but needs to be formalized and documented to establish the meaning of good vs. bad files) between BE and Mission with regard to timely approval and processing of Non-Agency ABS loan files. According to this agreement: (i)  BE will analyze and approve /deny all files coming into the **ABS Loan Level LAN for Mission** and (ii) all approved files in the **ABS Loan Level LAN for Mission** will be processed by Mission within 15 days of receipt by Mission. | |
| 8. | | BE receives a weekly report from Mission on Affordable Housing Goal performance and number of files loaded in the AHI database year to date.<br>Representatives of Mission and BE meet bi-weekly to discuss loan level processing results, cross-divisional strategies, and special initiatives and to reconcile YTD results (at a minimum monthly). | BE Analyst and MOD Analyst |

FHFA00535906

| **Update Non-Agency Deal Database with Loan Level Files** | The Non-Agency Deal Database is used to track the receipt and confirmation of Loan Level files. |
|---|---|

| STEP | ACTION | ACCOUNTABLE |
|---|---|---|
| 1. | Upon the purchase of a new bond the Portfolio Director will input the new deal name into the Non-Agency Deal Database. | Non-Agency Portfolio Director |
| 2. | Use the Document Tracking system in the Non-Agency Deal Database to track the receipt of all loan level files. Add notes regarding status of outstanding files. Include details of why files were rejected, expected receipt dates, special contact names, etc. | BE Analyst |

| **Legal Document Collection** | Dealers are required to submit a Prospectus Supplement and governing documents for each deal purchased. |
|---|---|

| STEP | ACTION | ACCOUNTABLE |
|---|---|---|
| 1. | Per Freddie Mac's Investor Requirements (Attachment A), dealers are instructed to send the Prospectus Supplement for each deal 2 business days prior to settlement but in no case later than settlement to the **ABSDOCS** mailbox. | BE Analyst |
| 2. | Upon receipt, Prospectus Supplements should be saved to the Legal LAN. | BE Analyst |
| 3. | Each prospectus supplement must be checked for compliance with certain deal and bond specific details (representations and cash flows as described in the Investor Requirements), as set forth in the Non-Agency Deal Database by the Legal Division.  Review is recorded by Legal in the Non-Agency Deal Database. Any omissions or discrepancies found during the prospectus supplement review will be elevated to either the Portfolio Manager or Credit Policy and Portfolio Management, as applicable. These issues do not relate to charter but are terms of trade that do not match.  For example subordination percentage or the size of the overcollateralization. | BE Analyst |
| 4. | A report is generated at the end of each month to confirm that each prospectus supplement was so reviewed. | BE Analyst |

FHFA00535907

| 5. | Per Freddie Mac's Investor Requirements (Attachment A), dealers are instructed to send the governing documents for each deal within 45 business days of settlement to the **ABSDOCS** mailbox.<br><br>Governing docs can come in the form of Pooling and Servicing Agreements (PSA), Mortgage Loan Purchase Agreements (MLPA), Indentures and other legal docs, etc.  When these are received they should be saved by Legal to the Portfolio Investments LAN. Legal then conducts a review (i) of the cash flows for compliance with our Charter and (ii) against our required representations. Legal then updates the Non-Agency Deal Database. | BE Analyst |

**Dealer Follow-up (Daily)**          Counterparties are obligated to deliver loan level files in a timely manner.

| STEP | ACTION | ACCOUNTABLE |
|------|--------|-------------|
| 1. | On S+1, counterparties (primarily dealers but in some cases originators) are instructed to send loan level files to the **ABS_Docs** mailbox or the ABS Monitor secure internet site within 30 days of security settlement.   If not received in 15 days, the analyst should follow up with the counterparty unless a valid reason for delay has previously been given by counterparty. | BE Analyst |
| 2. | If the file has not yet been received after 20 days, the analyst should follow up with the counterparty by phone unless a valid reason for delay has previously been given by counterparty. | BE Analyst |
| 3. | If the file has not yet been received after 25 days, the analyst should follow up with the counterparty with a 2nd phone call unless a valid reason for delay has previously been given by counterparty. | BE Analyst |
| 4. | In the event that a counterparty fails to deliver a loan file in a timely manner (i.e. within 30 days), the analyst should follow up with the counterparty on a daily basis by phone until the file is received. | BE Analyst |
| 5. | Loan files that have been outstanding for longer than 45 days should be referred to a Director of the Non-Agency Portfolio. | BE Analyst/Director Non-Agency Portfolio |
| 6. | Once received, loan files should be reviewed and (1) returned to the counterparty if data discrepancies are discovered or (2) submitted to Mission if no data discrepancies exist, within 1 | BE Analyst |

FHFA00535908

| | | |
|---|---|---|
| | business day. | |
| 7. | In the event that a loan file is returned due to data discrepancies, the analyst should follow up with the counterparty by phone within 1 business day, and daily thereafter until revised file is received unless a valid reason for delay has previously been given by counterparty. | BE Analyst |
| 8. | Deficient loan files that have been outstanding for longer than 15 days should be referred to a Director of the Non-Agency Portfolio. | BE Analyst/Director Non-Agency Portfolio |

**Dealer Follow-up (Weekly)**       A weekly report is sent to each dealer detailing outstanding loan files and legal docs.

| STEP | ACTION | ACCOUNTABLE |
|---|---|---|
| 1. | The Docs Outstanding report is generated from the Non-Agency Deal Database.  This will generate a report of loan level and legal documents outstanding by dealer. | BE Analyst |
| 2. | Create separate dealer files and send Outstanding Reports to each.   Save each file on the Collateral LAN at :\Non agency collateral\ABS Loan Analysis\Dealer Outstandings | BE Analyst |
| 3. | The BE Analyst will communicate as needed with the dealer to obtain late or missing prospectus supplements and other legal documents. | BE Analyst |
| 4. | Escalation:<br>Prospectus Supplement:  With respect to any deal for which no prospectus supplement has been received by the settlement of that deal, the BE Analyst will report this to the VP or the Non-Agency Portfolio, with a copy of such report to Compliance.<br><br>Loan Repurchases - see Step 4 under Settlement Loan Level Data Verification<br><br>Other Legal Documents: With respect to any deal for which other legal documents are not received 30 days or more past their due date the BE Analyst will report this to the VP of the Non-Agency Mortgage Portfolio, with a copy of such report to Compliance. | BE Analyst |

**Approval signatures:** The following table includes the signatures of individuals approving this procedure.

_____
Business Engineering Director

_____
Senior Director, Derivatives Operations

CONFIDENTIAL

## Appendix

**Lotus Notes Mailbox – ABS_Documents@freddiemac.com**

The owner of the Lotus Notes group that controls access to/mail agent of the ABS Documents has the responsibility to add and remove users to and from this group.

The owner must always modify this group in the FHLMC's Address Book (a.k.a. Freddie Mac Address Book, Domino Directory or NAB) on the HUB server.  Follow the steps to do so:

**To access the NAB on the HUB Server in Lotus Notes:**
    File > Database > Open
    Server field **= NOTES-HUB/SERVERS/FHLMC**
    Select **FHLMC's Address Book**
    Groups (All) > **Mtg_Invest_Struct_editors**
    Edit Group > **Members** field
    Click '**Sort Member List**' button
    Save and Close
    Wait for server replication and reindexing to occur
    User access effective

**NOTE:**  When you edit this group to add people, you must do so in the Freddie Mac Address Book on the **NOTES-HUB/SERVERS/FHLMC** server.  Also, if you cannot see the db/group modifications immediately, try again in 30 minutes, giving Notes replication time to propagate the change in question.

CONFIDENTIAL

# April 2006 Freddie Mac Investment Requirements

### FREDDIE MAC CONTACTS

**Michael Aneiro**
Vice-President Non-Agency
Portfolio Management
Mortgage Investments and Structuring
Investments and Capital Markets
571-382-4705
michael_aneiro@freddiemac.com

**Thomas Flynn**
Strategy Execution Director
Investments and Capital Markets
571-382-3017
thomas_flynn@freddiemac.com

**Ibraham Diallo**
Debt and Derivatives Director
Investments and Capital Markets - Ops
571-382-3217
ibraham_diallo@freddiemac.com

***Lenore Kelly***
Assistant General Counsel
Legal Division
703-903-3366
*lenore_kelly@freddiemac.com*

***Geraldine Idrizi***
Assistant General Counsel
Legal Division
703-903-2526
geraldine_idrizi@freddiemac.com

CONFIDENTIAL

FHFA00535912

A.  **Required Representations and Covenants**.  The governing documents for any securities Freddie Mac purchases from a dealer **("Securities")** must include each of the following representations and covenants.

These representations and covenants must either appear in the pooling and servicing agreement or other operative document; or be passed through to the trust from any related mortgage loan purchase agreement, mortgage loan sales agreement, or other operative document.   Freddie Mac's legal counsel must approve any substantive variation in the wording of the required representations and covenants.

1. **Compliance with Laws.**  Each mortgage loan in the trust at the time it was made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, all applicable predatory, abusive and fair lending laws.

2. **HOEPA.**  No mortgage loan in the trust is covered by the Home Ownership and Equity Protection Act of 1994 ("HOEPA").

3. **Mortgage Premises Located in Georgia.**  There is no mortgage loan in the trust that was originated on or after October 1, 2002 and before March 7, 2003, which is secured by property located in the State of Georgia.   There is no mortgage loan in the trust that was originated on or after March 7, 2003, which is a "high cost home loan" as defined under the Georgia Fair Lending Act.

4. **No High Cost Loans.**  *Either representation may be provided:*

   (a) No mortgage loan in the trust is a "high cost home," "covered" (excluding home loans defined as "covered home loans" in the New Jersey Home Ownership Security Act of 2002 that were originated between November 26, 2003 and July 7, 2004), "high risk home" or "predatory" loan under any applicable state, federal or local law (or a similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees).

   <strong><u>OR</u></strong>

   (b) (i)   No mortgage loan in the trust is a High Cost Loan or Covered Loan, as applicable (as such terms are defined in then current Standard & Poor's LEVELS® Glossary which is now Version 5.6(d) Revised, Appendix E); and

   (ii)   There is no mortgage loan in the trust that was originated on or after January 1, 2005, which is a "high cost home loan" as defined under the Indiana Home Loan Practices Act (I.C. 24-9).

5. **Credit Insurance.**  With respect to each mortgage loan underlying the Security, no borrower obtained a prepaid single-premium credit-life, credit disability, credit unemployment or credit property insurance policy in connection with the origination of the mortgage loan.

CONFIDENTIAL

6. **Prepayment Penalties.**   With respect to any mortgage loan underlying the Security that contains a provision permitting imposition of a penalty upon a prepayment prior to maturity: (a) the mortgage loan provides some benefit to the borrower (*e.g.*, a rate or fee reduction) in exchange for accepting such prepayment penalty; (b) the mortgage loan's originator had a written policy of offering the borrower, or requiring third-party brokers to offer the borrower, the option of obtaining a mortgage loan that did not require payment of such a penalty; (c) the prepayment penalty was adequately disclosed to the borrower pursuant to applicable state and federal law; (d) no subprime loan originated on or after October 1, 2002 underlying the Security will provide for prepayment penalties for a term in excess of three years and any loans originated prior to such date, and any non-subprime loans, will not provide for prepayment penalties for a term in excess of five years; in each case unless the loan was modified to reduce the prepayment period to no more than three years from the date of the note and the borrower was notified in writing of such reduction in prepayment period; and (e) such prepayment penalty shall not be imposed in any instance where the mortgage loan is accelerated or paid off in connection with the workout of a delinquent mortgage or due to the borrower's default, notwithstanding that the terms of the mortgage loan or state or federal law might permit the imposition of such penalty.

7. **Credit Reporting (past practice).**   The servicer for each mortgage loan underlying the Security has fully furnished, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis.

8. **Credit Reporting (future covenant).** The servicer for each mortgage loan underlying the Security will fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis.

9. **Eligible Products.**   With respect to each mortgage loan underlying the Security, the borrower was not encouraged or required to select a mortgage loan product offered by the mortgage loan's originator which is a higher cost product designed for less creditworthy borrowers, taking into account such facts as, without limitation, the mortgage loan's requirements and the borrower's credit history, income, assets and liabilities.   For a borrower who seeks financing through a mortgage loan originator's higher-priced subprime lending channel, the borrower should be directed towards or offered the mortgage loan originator's standard mortgage line if the borrower is able to qualify for one of the standard products.

10. **Borrower's Ability to Repay.**   The methodology used in underwriting the extension of credit for each mortgage loan in the trust did not rely on the extent

of the borrower's equity in the collateral as the principal determining factor in approving such extension of credit. The methodology employed objective criteria that related such facts as, without limitation, the borrower's credit history, income, assets or liabilities, to the proposed mortgage payment and, based on such methodology, the mortgage loan's originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the mortgage loan.

11. **Points and Fees.** No borrower under a mortgage loan in the trust was charged "points and fees" in an amount greater than (a) $1,000 or (b) 5% of the principal amount of such mortgage loan, whichever is greater. For purposes of this representation, "points and fees" (x) include origination, underwriting, broker and finder's fees and charges that the lender imposed as a condition of making the mortgage loan, whether they are paid to the lender or a third party; and (y) exclude bona fide discount points, fees paid for actual services rendered in connection with the origination of the mortgage (such as attorneys' fees, notaries fees and fees paid for property appraisals, credit reports, surveys, title examinations and extracts, flood and tax certifications, and home inspections); the cost of mortgage insurance or credit-risk price adjustments; the costs of title, hazard, and flood insurance policies; state and local transfer taxes or fees; escrow deposits for the future payment of taxes and insurance premiums; and other miscellaneous fees and charges that, in total, do not exceed 0.25 percent of the loan amount.

12. **No Arbitration Provision.** With respect to any mortgage loan originated on or after August 1, 2004 and underlying the Security, neither the related mortgage nor the related mortgage note requires the borrower to submit to arbitration to resolve any dispute arising out of or relating in any way to the mortgage loan transaction.

13. **Manufactured Housing.** *Provide the appropriate representation:*

  (a) No manufactured housing units underlie the Security.

OR

  (b) With respect to any mortgage loans underlying the Security that are on manufactured housing, upon the origination of each such mortgage loan the manufactured housing unit either: (i) will be the principal residence of the borrower or (ii) will be classified as real property under applicable state law.

14. **Loan Limits.** The original principal balance of each mortgage loan underlying our Security must be within Freddie Mac's dollar amount limits for conforming one- to four-family mortgage loans. The current limits (effective for mortgage loans underlying Securities settled 1/01/06 through 12/31/06) are as follows:

| Number | Maximum Original Loan | Maximum Original Loan |
|--------|----------------------|----------------------|

FHFA00535915

| of Units | Amount of First Lien Mortgage | | Amount of Subordinate Lien Mortgage | |
|---|---|---|---|---|
| | Continental United States or Puerto Rico | Alaska, Guam, Hawaii or Virgin Islands | Continental United States or Puerto Rico | Alaska, Guam, Hawaii or Virgin Islands |
| 1 | $417,000 | $625,500 | $208,500 | $312,750 |
| 2 | $533,850 | $800,775 | $208,500 | $312,750 |
| 3 | $645,300 | $967,950 | $208,500 | $312,750 |
| 4 | $801,950 | $1,202,925 | $208,500 | $312,750 |

If a deal is to be pre-funded, the loan limits to be applied to the pre-funded mortgage loans will be those in effect at the time of delivery of the mortgage loans to the trust. For example, if a deal settles in November 2006, with pre-funding allowed through January 2007, any mortgage loans delivered to the related trust in January 2007 will be subject to the 2007 loan limits.

(a)     **First Lien Mortgage Loans**:  The following representation must be given as to any first lien mortgage loans underlying the Security:

No first lien mortgage loan underlying the Security has an original principal balance that exceeds the applicable Freddie Mac loan limit (as set out in the table above).

(b)     **Subordinate Lien Mortgage Loans**: If subordinate lien mortgage loans underlie our Security, the following additional representations must be given:

(i)   With respect to any subordinate lien mortgage loan underlying the Security, such lien is on a one- to four-family residence that is the principal residence of the borrower;

(ii)  No subordinate lien mortgage loan underlying the Security has an original principal balance that exceeds one-half of the one-unit limitation for first lien mortgage loans, or $208,500 (in Alaska, Guam, Hawaii or Virgin Islands: $312,750), without regard to the number of units; and

(iii) The original principal balance of the first lien mortgage loan plus the original principal balance of any subordinate lien mortgage loans relating to the same mortgaged property does not exceed the applicable Freddie Mac loan limit for first lien mortgage loans for that property type (as set out in the table above).

These representations only need to be made as to subordinate lien mortgage loans that underlie our Security and their relationship to their corresponding first lien mortgage loan, whether or not the first lien mortgage loan underlies our Security. When only the first lien mortgage loan underlies the Security, these representations do not need to be made as to any subordinate lien mortgage loans that the borrower may

currently have (but that do not underlie our Security) or any subordinate lien mortgage loan that the borrower may later obtain.

The amount of any mortgage loan is determined at origination, regardless of its unpaid balance at any subsequent date.   However, when measuring the original principal balance of a home-equity line of credit (a HELOC), measure the total maximum principal amount allowed to be drawn on the HELOC, not the amount drawn down at the time of origination or purchase.

For purposes of these representations, the applicable loan limit <u>and</u> the aggregate loan limit for the first and subordinate lien mortgage loan is the limit that is in place at the time each such mortgage loan is <u>delivered</u> to the trust.

Examples:

(A) If the original principal balance of the first lien mortgage loan for a one-family residence is $300,000, the original principal balance of subordinate lien mortgage loans for that residence cannot exceed $117,000, because the aggregate original principal balance of the first lien mortgage loan and any subordinate lien mortgage loans cannot exceed $417,000.

(B) If the original principal balance of the first lien mortgage loan for a three-family residence is $436,800, the original principal balance of subordinate lien mortgage loans for that residence may reach the maximum loan limit for subordinate lien mortgage loans—$208,500—for an aggregate original principal balance of $645,300, the maximum original principal loan amount for a three-unit property.

(C) If a first lien mortgage loan for a one family residence was originated in 2005 with an original principal balance of $417,000, that mortgage loan would not have been eligible for purchase in 2005; however, if such mortgage loan were delivered to the trust in 2006, the new 2006 loan limit would apply and such mortgage loan could underlie the Security.

(D) If the first lien mortgage loan for a one family residence was originated in 2005, the related subordinate lien mortgage loan was originated in 2006 and the subordinate lien mortgage loan was delivered to the trust in 2006, the original principal balance of the subordinate lien mortgage could not exceed $208,500 (one-half of the <u>one-unit</u> limitation for first lien mortgage loans in 2006) and the <u>aggregate</u> original principal balance of the two mortgage loans could not exceed $417,000 (the 2006 limitation for first lien mortgage loans).

15. <u>**Recycling Representation for Seasoned Loans**</u>. *The seller, originator, aggregator, dealer or other party, as applicable (called the "Seller" below)* <u>*must*</u> *provide the appropriate representation:*

(a) No mortgage loan underlying the Security is "seasoned" (a seasoned mortgage loan is one where the date of the mortgage note is more than 1 year before the date of issuance of the related Security).

CONFIDENTIAL

## OR

(b) If any of the mortgage loans underlying the Security are "seasoned" (a seasoned mortgage loan is one where the date of the mortgage note is more than 1 year before the date of issuance of the related Security) the Seller:

    (i) Represents that it currently operates or actively participates in an on-going and active program or business (A) to originate mortgages, and/or (B) to make periodic purchases of mortgage loans from originators or other sellers, and/or (C) to issue and/or purchase securities or bonds supported by the mortgages, with a portion of the proceeds generated by such program or business being used to purchase or originate mortgages made to borrowers who are:

        (x) low-income families (families with incomes of 80% or less of area median income) living in low-income areas (a census tract or block numbering area in which the median income does not exceed 80 percent of the area median income) and/or

        (y) very low-income families (families with incomes of 60% or less of area median income); and

    (ii) Agrees that Freddie Mac for a period of two (2) years following the date of the agreement may contact the Seller to confirm that it continues to operate or actively participate in the mortgage program or business and to obtain other nonproprietary information about the Seller's activities that may assist Freddie Mac in completing its regulatory reporting requirements. The Seller will make reasonable efforts to provide such information to Freddie Mac.

**B. Repurchase Requirement.**  The governing documents for any Securities Freddie Mac purchases must include a provision to the effect that a breach of any one of the representations set forth herein will be deemed to materially and adversely affect the interests of the securityholders and shall require a repurchase, substitution or, to the extent applicable, a cure of the affected mortgage loan(s), all as provided in the related agreement.

**C. Requirement for Private Placements.**  If the Security is not registered with the Securities and Exchange Commission and is being offered to us through a private placement, that Security must be issued through either The Depository Trust Company or NASDAQ's P.O.R.T.A.L. system.

**D. Conforming Cashflows and Structure.**  Security structures that include one or more groups of conforming balance mortgage loans intended for sale to Freddie Mac (each a "Freddie Mac Group"), and one or more groups of non-conforming (or jumbo)

CONFIDENTIAL

mortgage loans, or conforming loans not intended for sale to Freddie Mac (each a "Non-Freddie Mac Group"), are referred to herein as "Directed Pay Structures". Any Securities purchased by Freddie Mac <u>must</u> receive their interest and principal—in the first instance—only from Freddie Mac Groups.

**Any variation of the above requires review and approval by Freddie Mac's legal counsel before Freddie Mac can purchase the Security.**

**E. <u>Required Disclosure in Cross-Collateralization Cashflows and Structure</u>.** Some Directed Pay Structures provide for cross-collateralization between the Freddie Mac Group (the "Freddie Mac Side") and the Non-Freddie Mac Group (the "Non-Freddie Mac Side"). These are referred to as "Y-Structures." In Y-Structures, the disclosure document <u>must</u> include language substantially similar to the following:

   1.   The [Freddie Mac] Securities represent interests primarily in the [Freddie Mac] Group.

   2.   Payments of interest and principal to the [Freddie Mac] Securities will be made first from payments relating to the [Freddie Mac] Group.

**F. <u>Acceptable Payment Rules</u>.** The payment rules for the Securities in a Y-Structure <u>must</u> conform to the following:

   1.   First, the Securities issued from the Freddie Mac Side will receive principal and interest on each distribution date <u>only</u> from the Freddie Mac Group. The Securities issued from the Non-Freddie Mac Side will receive their principal and interest only from the Non-Freddie Mac Group.

   2.   After the principal and interest is distributed on each distribution date, the cash from the two groups may be commingled and used for credit enhancement purposes, as illustrated below.

**Any variation of the above requires review and approval by Freddie Mac's legal counsel before Freddie Mac can purchase the Security.**

Following are examples of structures acceptable to Freddie Mac where the Securities receive payments from the Non-Freddie Mac Side as Credit Enhancement:

**Credit Enhancement Scenario 1**

Cashflows can be commingled and used to pay the senior classes of one group that have not received their required principal and interest for that distribution date, after the senior classes of the other group have been paid their required principal and interest on that distribution date (regardless of whether any subordinate classes have been paid on that date).
      <u>Example</u>:

CONFIDENTIAL

On each distribution date, after the Freddie Mac Side available funds for that date have been paid to the Freddie Mac class, if that class is entitled to more principal and/or interest on that date, it may be paid from the Non-Freddie Mac Side available funds remaining after the other senior classes have received their required principal and interest for that date.

### Credit Enhancement Scenario 2

Cashflows can be commingled and used to pay the other senior classes of one group after the senior classes of the other group are reduced to zero.

<u>Example</u>:

If on any distribution date, all of the senior certificates of one group are no longer outstanding, the pro rata portion of the principal amount otherwise allocable to that group will be allocated to the other group, in accordance with the payment priorities described above, in reduction of the certificate principal balances thereof.

### Credit Enhancement Scenario 3

**Cashflows can be commingled and used to build overcollateralization in the deal.**

<u>Example</u>:

On each distribution date, after the related available funds for that date have been paid to the senior classes of each group, excess cashflow from each of the groups is combined and then allocated as principal to the senior classes from the Freddie Mac Side and the Non-Freddie Mac Side to build or maintain overcollateralization. The excess is allocated based on [the amount of principal received from each loan group] or [the reduction in the balance of the related senior classes on that date before the overcollateralization].

**G.  Receipt of Documentation**.  Dealers <u>must</u> provide Freddie Mac with copies of all the applicable disclosure and governing documents related to a specific Security.  Such documentation <u>must</u> be in electronic form and include:

1.          the Prospectus and Prospectus Supplement (<u>2</u> days before settlement but not later than settlement date); and

2.          the pooling and servicing agreement, the related mortgage loan purchase/sale agreements (if they contain the loan-level representations Freddie Mac requires), or other operative document(s), (within <u>45</u> days of settlement).

CONFIDENTIAL

These documents should be sent to Freddie Mac at abs_docs@freddiemac.com.

CONFIDENTIAL

**H. <u>Loan Level Data Elements</u>.**  Freddie Mac requires the submission of loan level data ("Data") in order to fulfill its statutory and regulatory obligations.  Freddie Mac uses the Data for reporting purposes in connection with its quarterly and annual affordable housing goals submission to the U.S. Department of Housing and Urban Development (HUD) and for statutory and regulatory compliance purposes.  Data access is restricted to staff responsible for fulfilling these purposes. The Data are  not disclosed to individuals in Freddie Mac's retained portfolio responsible for purchasing and selling non-agency securities, nor is the Data used in connection with any sale of bonds already purchased or with the purchase of any additional bonds.   If required, confidentiality agreements can be executed.

*Data must be sent via secure website to https://www.freddiemac.com/ABSupload or via email to absdata@freddiemac.com **within 30 days of settlement of a deal**.  For pre-funded deals, Data for all the relevant loans (including pre-funded loans) must be sent within 30 days after the deal is fully funded or pre-funding closes—whichever occurs first.*

- Data should be provided <u>only</u> for the mortgage loans underlying the Security(ies) purchased by Freddie Mac.

- Data must be provided in an Excel or CSV file format (see table below).

- Data should not contain any functions such as sums, filters or totals of the data.

CONFIDENTIAL

| LOAN LEVEL DATA ELEMENTS | |
|---|---|
| **DATA ELEMENT** | **INFORMATION** |
| • DEAL | • DEAL NAME  (XYZ 04-01) |
| • GROUP # | • WHICH LOAN GROUP THIS LOAN APPLES TO IN THE DEAL |
| • ORIGINATOR | • LENDER FOR EACH LOAN |
| • LOAN NUMBER | • UNIQUE IDENTIFIER THAT ENABLES IDENTIFICATION OF LOAN. |
| • ORIGINAL LOAN AMOUNT<br>• CURRENT LOAN BALANCE<br>• NOTE INTEREST RATE<br>• NOTE ORIGINATION DATE<br>• LOAN TO VALUE RATIO | • THE ORIGINAL LOAN AMOUNT IS REQUIRED TO DETERMINE IF THE LOAN IS CONFORMING.  THE NOTE DATE IS USED TO DETERMINE THE APPROPRIATE MEDIAN FAMILY INCOME NEEDED TO IDENTIFY LOW/MOD AND SPECIAL AFFORDABLE UNITS |
| • PURPOSE OF LOAN | • DIFFERENTIATES OWNER/INVESTOR PROPERTIES AND PURCHASE/REFINANCE. SEE BELOW.  SINGLE FAMILY DETACHED, CONDO, MANUFACTURED, ETC. SEE BELOW FOR CODES USED BY FREDDIE MAC.<br>• VALID CODES:<br>1. O/O PURCHASE<br>2. O/O REFINANCE<br>3. NOO PURCHASE<br>4. SECOND HOME<br>5. NOO REFINANCE<br>6. SECOND MORTGAGE, CASH EQUITY<br>7. HOME ENERGY IMPROVEMENT<br>8. PURCHASE MONEY SECOND MORTGAGE<br>9. DEBT CONSOLIDATION |
| • PROPERTY TYPE | • CONDO<br>• LEASEHOLD<br>• PUD<br>• MANUFACTURED HOUSING<br>• SINGLE FAMILY FEE SIMPLE<br>• COOP |
| • PROPERTY STREET ADDRESS<br>• PROPERTY CITY<br>• PROPERTY STATE<br>• PROPERTY ZIP CODE | • NEEDED FOR GEOCODING TO IDENTIFY UNDERSERVED AREA AND SPECIAL AFFORDABLE LOANS AND TO DETERMINE THE APPROPRIATE MFI |
| • BORROWERS' MONTHLY INCOME | • NEEDED TO IDENTIFY LOW/MOD AND SPECIAL AFFORDABLE LOANS. PLEASE ENSURE THAT ***MONTHLY,*** |

CONFIDENTIAL

| | NOT ANNUAL, INCOME IS PROVIDED |
|---|---|
| • NUMBER OF DWELLING UNITS IN PROPERTY | • HUD MEASURED IN UNITS, ONE ASSUMED UNLESS OTHERWISE SPECIFIED (UP TO 4 ALLOWED). ALSO USED TO EDIT FOR NON-CONFORMING LOANS (AKA "JUMBO LOANS") |
| • LOAN PRODUCT | • FIXED RATE, ARM, BALLOON, GPM/GEM, ETC.  IF CODES ARE USED TO IDENTIFY PRODUCTS, THE FILE DOCUMENTATION SHOULD EXPLAIN THE MEANING OF THE CODES |
| • ORIGINAL TERM | • LOAN TERM IN MONTHS |
| • MATURITY DATE | • MATURITY DATE OF THE LOAN |
| • MONTHLY P&I | • BASIC LOAN DATA |
| • FIRST TIME HOME BUYER FLAG | • FOR O/O PURCHASE MONEY MORTGAGES, "Y" IF FIRST TIME HOME BUYER, "N" IF NOT.  BLANK SPACE FOR REFINANCES AND INVESTMENT PROPERTY MORTGAGES. |
| • O/O – NOO– SECOND HOME INDICATOR | • TO DETERMINE IF PROPERTY IS OWNER OCCUPIED, INVESTMENT, OR A SECOND *HOME* (E.G. VACATION PROPERTY) (FLAGS ARE OO, NOO AND 2ND) |
| • PRIMARY BORROWER & CO-BORROWER RACE  (NOTE:  HISPANIC BORROWERS AND CO-BORROWERS ARE IDENTIFIED THROUGH THE ETHNICITY CRITERIA SET FORTH BELOW.) | • AMERICAN INDIAN OR ALASKA NATIVE<br>• ASIAN<br>• BLACK OR AFRICAN AMERICAN<br>• NATIVE HAWAIIAN OR OTHER PACIFIC ISLANDER<br>• WHITE<br>• INFORMATION NOT PROVIDED BY APPLICANT IN MAIL, INTERNET OR PHONE APPLICATION)<br>• NOT APPLICABLE (BORROWER OR CO-BORROWER IS AN ENTITY INSTEAD OF AN INDIVIDUAL)<br>• NO CO-BORROWER (APPLICABLE ONLY FOR CO-BORROWER RACE FIELD)<br><br>❑ HUD AFFORDABLE REPORTING CRITERIA.  NOTE: FREDDIE MAC ADHERES TO THE RACE REPORTING STANDARDS SPECIFIED BY THE FFIEC FOR HMDA REPORTING.  THE FFIEC INSTITUED NEW REPORING REQIREMENTS FOR RACE AND ETHNICITY EFFECTIVE JANUARY 1, 2004.  A BORROWER OR CO-BORROWER MAY IDENTIFY THEMSELVES AS BELONGING TO ONE OR MORE OF THE RACE CATEGORIES LISTED ABOVE.  PLEASE GO TO THE FFIEC WEB SITE: HTTP://WWW.FFIEC.GOV/HMDA/GUIDE.HTM<br><br>CLICK ON "2004 A GUIDE TO HMDA REPORTING PDF FILE" AND REFER TO APPENDICES A AND B FOR MORE INFORMATION.  THE SITE ALSO CONTAINS RULES FOR |

CONFIDENTIAL

FHFA00535924

| | |
|---|---|
| | CONVERTING THE RACE CODES IN EFFECT PRIOR TO 2004 TO THE CURRENT VALUES.  FREDDIE MAC EXPECTS THE 2004 CODES, REGARDLESS OF WHEN THE LOAN WAS ORIGINATED. |
| • PRIMARY BORROWER & CO-BORROWER ETHNICITY | • HISPANIC OR LATINO<br><br>• NOT HISPANIC OR LATINO<br><br>• INFORMATION NOT PROVIDED BY APPLICANT IN MAIL, INTERNET OR TELEPHONE APPLICATION<br><br>• **not applicable (borrower or co-borrower is an entity instead of an individual)**<br><br>• NO CO-BORROWER (APPLICABLE ONLY FOR CO-BORROWER RACE FIELD)<br><br>❑ HUD AFFORDABLE REPORTING CRITERIA.   NOTE: A BORROWER OR CO-BORROWER MAY IDENTIFY THEMSELVES AS HISPANIC IN ADDITION TO BELONGONG TO ONE OR MORE OF THE RACE CATEGORIES LISTED ABOVE.  PLEASE GO TO THE FFIEC WEB SITE PLEASE GO TO THE FFIEC WEB SITE: HTTP://WWW.FFIEC.GOV/HMDA/GUIDE.HTM<br><br>CLICK ON "2004 A GUIDE TO HMDA REPORTING PDF FILE" AND REFER TO APPENDICES A AND B FOR MORE INFORMATION.  THE SITE ALSO CONTAINS RULES FOR CONVERTING THE RACE CODES IN EFFECT PRIOR TO 2004 TO THE CURRENT VALUES.  FREDDIE MAC EXPECTS THE 2004 CODES, REGARDLESS OF WHEN THE LOAN WAS ORIGINATED. |
| • LIEN POSITION | • 1ST, 2ND, ETC. |

THE FOLLOWING DATA ELEMENTS ARE SUPPLEMENTARY, AND USED TO AGGREGATE THE DATA INTO VARIOUS CLASSES REQUESTED BY HUD.  FREDDIE MAC APPRECIATES RECEIVING THESE DATA WHENEVER AVAILABLE:

| SUPPLEMENTAL LOAN LEVEL DATA ELEMENTS | |
|---|---|
| THE FOLLOWING DATA ELEMENTS ARE USED TO AGGREGATE LOANS INTO CATEGORIES REQUESTED BY HUD.  FREDDIE MAC APPRECIATES RECEIVING ANY OF THESE DATA THAT ARE READILY AVAILABLE. | |
| **DATA ELEMENT** | **INFORMATION** |
| • MONTHLY HOUSING EXPENSE<br><br>• MONTHLY DEBT PAYMENT | • BASIC LOAN DATA<br><br>• BASIC LOAN DATA |

FHFA00535925

| | |
|---|---|
| • BORROWER GENDER & CO BORROWER GENDER | • GENDER CODES:<br>  1. MALE<br>  2. FEMALE<br>  3. BY APPLICANT IN MAIL, INTERNET OR TELEPHONE APPLICATION<br>  4. NOT APPLICABLE (BORROWER OR COBORROWER IS AN ENTITY INSTEAD OF AN INDIVIDUAL). |
| • COOPERATIVE CODE | • 1 FOR YES AND 2 FOR NO |

CONFIDENTIAL

attachment 1
BuyBack Template

[Freddie Letterhead]

*LOAN REPURCHASE REQUEST NOTICE*

[Date]

[Addresses of Dealer, Trustee, Issuer]

Re: [Deal Name]

Ladies and Gentlemen:

Upon review of the loan level files for the above-referenced deal, we discovered that each of the following loans that back the securities we purchased: *[Insert all that apply]:*

- [have an original principal balance above our applicable conforming loan limits in effect at the time we purchased the security;]
- [is a second lien that is not on a one- to four-family residence that is the principal residence of the borrower;]
- [is a second lien that has an original principal balance that exceeds one-half of the <u>one-unit</u> conforming loan limit for first lien mortgage loans without regard to the number of units, in effect at the time we purchased the security;]
- [is a second lien, and the original principal balance of the related first lien mortgage loan plus the original principal balance of the subject second lien mortgage loan relating to the same mortgaged property exceeds the applicable conforming loan limit for first lien mortgage loans for that property type, in effect at the time we purchased the security]

***[If different loans have different problems, can list the related problem(s) in the table below under "Issue."]***

| Deal | Security CUSIP # | Loan ID Number | **Issue** |
|------|------------------|----------------|-----------|
|      |                  |                |           |

Pursuant to the governing documents issuing the Security, we are hereby requesting that you repurchase the above-identified loans from the trust as soon as possible. ***[Depending on the trustee, we may be required to state which rep is breached and that we are adversely affected, or some other facts.]***

Once the loan is removed from the trust, please send us evidence of such removal (a receipt, trade ticket, or other suitable documentation).

Please acknowledge your receipt and understanding of this notice in the space provided below.

Sincerely,

CONFIDENTIAL

_____
Name:
Title:


ACKNOWLEDGED:


_____
By:
Name:
Title:

CONFIDENTIAL