(II) 12 and (B) a fraction, the numerator of which is 360, and the denominator of which is the actual number of days which have elapsed in the immediately preceding Interest Accrual Period.

With respect to any distribution date and the Group II Certificates, a per annum rate equal to the product of (A) the product of (I)(a) a fraction, expressed as a percentage, the numerator of which is the related Optimal Interest Remittance Amount for such distribution date and the denominator of which is the aggregate Stated Principal Balance of the Group II Mortgage Loans for the immediately preceding distribution date, minus (b) the sum of (1) the Group II Allocation Percentage of the Net Swap Payment payable to the Swap Provider on such distribution date, divided by the outstanding Stated Principal Balance of the Group II Mortgage Loans for the immediately preceding distribution date, and (2) the Group II Allocation Percentage of any Swap Termination Payment (unless such payment is the result of a Swap Provider Trigger Event and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement swap agreement that may be entered into by the Supplemental Interest Trust Trustee) payable to the Swap Provider on such distribution date, divided by the outstanding aggregate Stated Principal Balance of the Group II Mortgage Loans for the immediately preceding distribution date and (II) 12 and (B) a fraction, the numerator of which is 360, and the denominator of which is the actual number of days which have elapsed in the immediately preceding Interest Accrual Period.

With respect to the Subordinate Certificates, a per annum rate equal to the weighted average (weighted on the basis of the results of subtracting from the aggregate Stated Principal Balance of each loan group the current aggregate Certificate Principal Balance of the related Senior Certificates) of the Net Funds Cap for the Group I Certificates and the Net Funds Cap for the Group II Certificates.

In each case, the Net Funds Cap will be adjusted to an effective rate reflecting the accrual of interest on an actual/360 basis.

"Net Interest Shortfalls" means Interest Shortfalls net of payments by the servicers or master servicer in respect of Compensating Interest.

"Net Liquidation Proceeds" with respect to a Mortgage Loan are Liquidation Proceeds net of unreimbursed advances and fees by the related servicer and advances and expenses incurred by the related servicer in connection with the liquidation of such Mortgage Loan and the related Mortgaged Property.

"Net Mortgage Rate" with respect to any Mortgage Loan, the interest rate set forth in the related mortgage note minus the sum of the Servicing Fee Rate, the rate at which the fee payable to the master servicer is calculated and the rate at which the fee payable to any provider of lender paid mortgage insurance is calculated, if applicable.

"One-Month LIBOR" means a per annum rate based on the London interbank offered rate for one month dollar deposits and calculated as described under "—Calculation of One-Month LIBOR" in this free writing prospectus.

"Optimal Interest Remittance Amount" with respect to any distribution date and (A) the Senior Certificates, will be equal to the excess of (i) the product of (1)(x) the weighted average Net Mortgage Rates of the Mortgage Loans in the related loan group as of the first day of the related Due Period divided by (y) 12 and (2) the Aggregate Loan Balance of the Mortgage Loans in the related loan group for the immediately preceding distribution date, over (ii) any expenses that reduce

CONFIDENTIAL

the Interest Remittance Amount that did not arise as a result of a default or delinquency of the Mortgage Loans in the related loan group or were not taken into account in computing the expense fee rate, and (B) the Subordinate Certificates, will be equal to the excess of (i) the product of (1)(x) the weighted average Net Mortgage Rates of the Mortgage Loans as of the first day of the related Due Period divided by (y) 12 and (2) the Aggregate Loan Balance of the Mortgage Loans for the immediately preceding distribution date, over (ii) any expenses that reduce the Interest Remittance Amount that did not arise as a result of a default or delinquency of the Mortgage Loans or were not taken into account in computing the expense fee rate.

"Overcollateralization Amount" with respect to any distribution date, the excess, if any, of (a) the Aggregate Loan Balance for such distribution date over (b) the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates on such distribution date (after taking into account the payment of 100% of the Principal Remittance Amount on such distribution date).

"Overcollateralization Deficiency Amount" with respect to any distribution date, will be equal to the amount, if any, by which (x) the Targeted Overcollateralization Amount for such distribution date exceeds (y) the Overcollateralization Amount for such distribution date, calculated for this purpose after giving effect to the reduction on such distribution date of the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates resulting from the payment of the Principal Remittance Amount on such distribution date, but prior to allocation of any Applied Loss Amount on such distribution date.

"Overcollateralization Release Amount" with respect to any distribution date, will be equal to the lesser of (x) the Principal Remittance Amount for such distribution date and (y) the amount, if any, by which (1) the Overcollateralization Amount for such date, exceeds (2) the Targeted Overcollateralization Amount for such distribution date.

"Pass-Through Rate" with respect to the Senior Certificates and the Subordinate Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus the applicable Certificate Margin and (ii) the applicable Net Funds Cap.

"Payahead" any scheduled payment intended by the related mortgagor to be applied in a Due Period subsequent to the Due Period in which such payment was received.

"Prepayment Period" with respect to any distribution date and (i) Ocwen Loan Servicing, LLC, the 16th day of the immediately preceding calendar month (or with respect to the first Prepayment Period, the Closing Date) through the 15th day of the calendar month in which such distribution date occurs with respect to prepayments in full and the calendar month immediately preceding the calendar month in which such distribution date occurs with respect to prepayments in part and (ii) Wells Fargo Bank, N.A., the calendar month preceding the calendar month in which such distribution date occurs.

"Principal Payment Amount" with respect to any distribution date will be equal to the Principal Remittance Amount for such distribution date minus the Overcollateralization Release Amount, if any, for such distribution date.

"Principal Remittance Amount" with respect to each distribution date and each loan group, is equal to the sum of (i) the scheduled principal payments on the Mortgage Loans due during the related Due Period, whether or not received on or prior to the related determination date; (ii) the

CONFIDENTIAL

FHFA01041609

principal portion of all proceeds received in respect of the repurchase of a Mortgage Loan (or, in the case of a substitution, certain amounts representing a principal adjustment as required by the pooling and servicing agreement) during the related Prepayment Period; (iii) the principal portion of all other unscheduled collections (other than Payaheads), including Insurance Proceeds, condemnation proceeds, Liquidation Proceeds, Subsequent Recoveries and all full and partial principal prepayments, received during the related Prepayment Period, to the extent applied as recoveries of principal on the Mortgage Loans; (iv) the principal portion of Payaheads previously received on the Mortgage Loans and intended for application in the related Due Period, less (v) amounts payable or reimbursable to the servicer, the master servicers, the securities administrator, the trustee, the custodian or the credit risk manager as provided in the pooling and servicing agreement and the servicing agreement to the extent not paid or reimbursed from the Interest Remittance Amount.

"Realized Loss" is (a) for any defaulted Mortgage Loan, the excess of the Stated Principal Balance of such defaulted Mortgage Loan over the Net Liquidation Proceeds with respect thereto, (b) for any Mortgage Loan that has become the subject of a Deficient Valuation, the excess of the Stated Principal Balance of such Mortgage Loan over the principal amount as reduced in connection with the proceedings resulting in the Deficient Valuation; or (c) for any Mortgage Loan that has become the subject of a Debt Service Reduction, the present value of all monthly Debt Service Reductions on such Mortgage Loan, assuming that the mortgagor pays each scheduled monthly payment on the applicable due date and that no principal prepayments are received on such Mortgage Loan, discounted monthly at the applicable Mortgage Rate. To the extent the related servicer receives Subsequent Recoveries with respect to any Mortgage Loan, the amount of the Realized Loss with respect to that Mortgage Loan will be reduced to the extent that such Subsequent Recoveries are applied to reduce the Certificate Principal Balance of any class of certificates on any distribution date.

"Relief Act" means the Servicemembers Civil Relief Act of 2003 or any similar state or local law.

"Senior Enhancement Percentage" with respect to any distribution date will be the fraction, expressed as a percentage, the numerator of which is the sum of the aggregate Certificate Principal Balance of the Subordinate Certificates and the Overcollateralization Amount, in each case after giving effect to payments on such distribution date, and the denominator of which is the Aggregate Loan Balance for such distribution date.

"Senior Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the Certificate Principal Balances of the Senior Certificates immediately prior to such distribution date exceed (y) the lesser of (A) the product of (i) approximately 50.70% and (ii) the Aggregate Loan Balance for such distribution date and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Servicer Remittance Date" will be (a) with respect to Ocwen, the 23rd day of each month, and if the 23rd day is not a business day, the business day immediately preceding such 23rd day and (b) with respect to Wells Fargo Bank, the 18th day of each month, and if the 18th day is not a business day, the business day immediately following such 18th day.

CONFIDENTIAL

FHFA01041610

"Stated Principal Balance" of any Mortgage Loan means, with respect to any distribution date, the Cut-off Date principal balance thereof minus the sum of

(i)     the principal portion of all scheduled monthly payments due from the borrower with respect to such Mortgage Loan during the Due Periods ending prior to such distribution date (and irrespective of any delinquency in such payments);

(ii)    all prepayments of principal with respect to such Mortgage Loan received prior to or during the related Prepayment Period, and all Liquidation Proceeds to the extent applied by the related servicer as recoveries of principal in accordance with the pooling and servicing agreement or the servicing agreement, as applicable, that were received by the related servicer as of the close of business on the last day of the Prepayment Period related to such distribution date; and

(iii)   any Realized Loss thereon incurred prior to or during the related Prepayment Period.

The Stated Principal Balance of any liquidated Mortgage Loan is zero.

"Stepdown Date" will be the later to occur of (x) the distribution date in September 2009 and (y) the first distribution date on which the Senior Enhancement Percentage (calculated for this purpose only after taking into account distributions of principal on the Mortgage Loans, but prior to any distributions to the holders of the Senior Certificates and Subordinate Certificates then entitled to distributions of principal on such distribution date) is greater than or equal to approximately 49.30%.

"Subsequent Recoveries" means the amounts recovered by the related servicer (net of reimbursable expenses) with respect to a defaulted Mortgage Loan with respect to which a Realized Loss was incurred, after the liquidation or disposition of such Mortgage Loan.

"Swap Provider Trigger Event" means the occurrence of an event of default (under the Interest Rate Swap Agreement) with respect to which the Swap Provider is a defaulting party, a Termination Event (under the Interest Rate Swap Agreement) with respect to which the Swap Provider is the sole affected party or an additional termination event (under the Interest Rate Swap Agreement) with respect to which the Swap Provider is the sole affected party.

"Swap Termination Payment" means the payment to be made by the Supplemental Interest Trust to the Swap Provider, or by the Swap Provider to the Supplemental Interest Trust, as applicable, pursuant to the terms of the Interest Rate Swap Agreement upon the occurrence of an early termination.

"Targeted Overcollateralization Amount" with respect to any distribution date prior to the Stepdown Date, approximately 2.95% of the Aggregate Loan Balance as of the Cut-off Date; with respect to any distribution date on or after the Stepdown Date and with respect to which a Trigger Event is not in effect, the greater of (a) 5.90% of the Aggregate Loan Balance for such distribution date, or (b) 0.50% of the Aggregate Loan Balance as of the Cut-off Date; with respect to any distribution date on or after the Stepdown Date with respect to which a Trigger Event is in effect, the Targeted Overcollateralization Amount for such distribution date will be equal to the Targeted Overcollateralization Amount for the distribution date immediately preceding such distribution date.

CONFIDENTIAL                                                                        FHFA01041611

"Trigger Event" a Trigger Event will occur for any distribution date if either (i) the Delinquency Rate as of the last day of the related Due Period exceeds 32.45% of the Senior Enhancement Percentage for such distribution date or (ii) the cumulative Realized Losses as a percentage of the original Aggregate Loan Balance on the Closing Date for such distribution date is greater than the percentage set forth in the following table:

| Range of Distribution Dates | Cumulative Loss Percentage |
| --- | --- |
| September 2008 – August 2009 | 1.50% |
| September 2009 – August 2010 | 3.35% |
| September 2010 – August 2011 | 5.25% |
| September 2011 – August 2012 | 6.75% |
| September 2012 – August 2013 | 7.55% |
| September 2013 and thereafter | 7.60% |

*The cumulative loss percentages set forth above are applicable to the first distribution date in the corresponding range of distribution dates. The cumulative loss percentage for each succeeding distribution date in a range increases incrementally by 1/12 of the positive difference between the percentage applicable to the first distribution date in that range and the percentage applicable to the first distribution date in the succeeding range.

**Distributions of Interest**

The amount of interest payable on each distribution date in respect of each class of Senior Certificates and Subordinate Certificates will equal the sum of (1) Current Interest for such class and date, (2) any Carryforward Interest for such class and date and (3) such class's pro rata share of any Net Swap Payments received by the securities administrator from the Swap Provider on such distribution date, as necessary to cover shortfalls, less (b) such class's pro rata share of any Net Swap Payments or Swap Termination Payments not due to a Swap Provider Trigger Event payable to the Swap Provider and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee. All calculations of interest will be made on the basis of a 360-day year and the actual number of days elapsed in each Interest Accrual Period.

With respect to each distribution date, to the extent that a Basis Risk Shortfall exists for any class of Senior Certificates and Subordinate Certificates, such class will be entitled to the amount of such Basis Risk Shortfall. Such classes will be entitled to receive the amount of any Basis Risk Shortfall in accordance with the priority of payments described in this free writing prospectus under "—Credit Enhancement—Overcollateralization" and from available amounts on deposit in a reserve fund (the "Basis Risk Shortfall Reserve Fund"), if applicable. The source of funds on deposit in the Basis Risk Shortfall Reserve Fund will be limited to amounts in respect of Monthly Excess Cashflow that would otherwise be paid to the Class X Certificates.

On each distribution date, the Interest Remittance Amount for such distribution date, to the extent of funds in the Distribution Account, will be paid in the following order of priority:

(1)     from the Interest Remittance Amount for loan group I and loan group II, the Group I Allocation Percentage and the Group II Allocation Percentage, as applicable, of any Net Swap Payment and any Swap Termination Payment paid to the Supplemental Interest Trust and owed to the Swap Provider (unless the Swap Provider is a Defaulting Party or the sole Affected Party

CONFIDENTIAL

FHFA01041612

(as defined in the ISDA Master Agreement) and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee);

(2)     from the Interest Remittance Amount for loan group I and loan group II to the Senior Certificates, pro rata based on amounts due, Current Interest and any Carryforward Interest for each such class and such distribution date applied in accordance with the allocation rules set forth below;

(3)     first, from the Interest Remittance Amount for loan group II and then from the Interest Remittance Amount for loan group I, to the Class M-1 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(4)     first, from the Interest Remittance Amount for loan group II and then from the Interest Remittance Amount for loan group I, to the Class M-2 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(5)     first, from the Interest Remittance Amount for loan group II and then from the Interest Remittance Amount for loan group I, to the Class M-3 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(6)     first, from the Interest Remittance Amount for loan group II and then from the Interest Remittance Amount for loan group I, to the Class M-4 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(7)     first, from the Interest Remittance Amount for loan group II and then from the Interest Remittance Amount for loan group I, to the Class M-5 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(8)     first, from the Interest Remittance Amount for loan group II and then from the Interest Remittance Amount for loan group I, to the Class M-6 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(9)     first, from the Interest Remittance Amount for loan group II and then from the Interest Remittance Amount for loan group I, to the Class M-7 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(10)     first, from the Interest Remittance Amount for loan group II and then from the Interest Remittance Amount for loan group I, to the Class M-8 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(11)     first, from the Interest Remittance Amount for loan group II and then from the Interest Remittance Amount for loan group I, to the Class M-9 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(12)     first, from the Interest Remittance Amount for loan group II and then from the Interest Remittance Amount for loan group I, to the Class B-1 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

CONFIDENTIAL                                                                                          FHFA01041613

(13)     first, from the Interest Remittance Amount for loan group II and then from the Interest Remittance Amount for loan group I, to the Class B-2 Certificates, Current Interest and Carryforward Interest for such class and distribution date; and

(14)     for application as part of Monthly Excess Cashflow for such distribution date, as described under "—Credit Enhancement—Overcollateralization" below, any such Interest Remittance Amount remaining after application pursuant to clauses (1) through (13) above (such amount, "Monthly Excess Interest") for such distribution date.

The remaining Interest Remittance Amount for loan group I and loan group II distributed pursuant to clause (2) above will be applied to the Senior Certificates as follows:

(a)     the Interest Remittance Amount for loan group I will be distributed in the following order of priority: (x) first, to the Class I-A-1 Certificates, Current Interest and any Carryforward Interest for such class for such distribution date; and then (y) concurrently, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, Current Interest and Carryforward Interest for each such class for such distribution date, on a pro rata basis based on the entitlement of each such class, after taking into account the distribution of the Interest Remittance Amount for loan group II on such distribution date; and

(b)     the Interest Remittance Amount for loan group II will be distributed in the following order of priority: (x) first, concurrently, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, Current Interest and any Carryforward Interest for each such class for such distribution date, on a pro rata basis based on the entitlement of each such class; and then (y) to the Class I-A-1 Certificates, Current Interest and any Carryforward Interest for such class for such distribution date, after taking into account the distribution of the Interest Remittance Amount for loan group I on such distribution date.

**Distributions of Principal**

The Principal Payment Amount will be paid on each distribution date as follows:

I.     On each distribution date (x) prior to the Stepdown Date or (y) with respect to which a Trigger Event is in effect, the Principal Payment Amount will be paid in the following order of priority:

(A)     to the Supplemental Interest Trust from the Principal Payment Amount derived from the Group I Mortgage Loans and the Group II Mortgage Loans, the Group I Allocation Percentage and the Group II Allocation Percentage, as applicable, of any Net Swap Payment and any Swap Termination Payment owed to the Swap Provider (unless the Swap Provider is a Defaulting Party or the sole Affected Party (as defined in the ISDA Master Agreement and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee)) to the extent not paid from the Interest Remittance Amounts on such distribution date;

(B)     (i)     from the Principal Payment Amount derived from the Group I Mortgage Loans remaining after payments pursuant to clause (A) above, to

CONFIDENTIAL                                                                                          FHFA01041614

the Class I-A-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(ii)     from the Principal Payment Amount derived from the Group II Mortgage Loans remaining after payments pursuant to clause (A) above, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, until the Certificate Principal Balance of each such class has been reduced to zero;

(C)     (i)     from the Principal Payment Amount derived from the Group I Mortgage Loans remaining after payments pursuant to clause (A) above and after the Certificate Principal Balance of the Class I-A-1 Certificates has been reduced to zero, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, after taking into account payments pursuant to clause I(B)(ii) above, until the Certificate Principal Balance of each such class has been reduced to zero;

(ii)     from the Principal Payment Amount derived from the Group II Mortgage Loans remaining after payments pursuant to clause (A) above and after the Certificate Principal Balances of the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates have been reduced to zero, to the Class I-A-1 Certificates, after taking into account payments pursuant to clause I(B)(i) above, until its Certificate Principal Balance has been reduced to zero;

(D)     to the Class M-1 Certificates, until its Certificate Principal Balance has been reduced to zero;

(E)     to the Class M-2 Certificates, until its Certificate Principal Balance has been reduced to zero;

(F)     to the Class M-3 Certificates, until its Certificate Principal Balance has been reduced to zero;

(G)     to the Class M-4 Certificates, until its Certificate Principal Balance has been reduced to zero;

(H)     to the Class M-5 Certificates, until its Certificate Principal Balance has been reduced to zero;

(I)     to the Class M-6 Certificates, until its Certificate Principal Balance has been reduced to zero;

(J)     to the Class M-7 Certificates, until its Certificate Principal Balance has been reduced to zero;

(K)     to the Class M-8 Certificates, until its Certificate Principal Balance has been reduced to zero;

(L)     to the Class M-9 Certificates, until its Certificate Principal Balance has been reduced to zero;

S-106

CONFIDENTIAL

FHFA01041615

(M)     to the Class B-1 Certificates, until its Certificate Principal Balance has been reduced to zero;

(N)     to the Class B-2 Certificates, until its Certificate Principal Balance has been reduced to zero; and

(O)     for application as part of Monthly Excess Cashflow for such distribution date, as described under "—Credit Enhancement—Overcollateralization" below, any such Principal Payment Amount remaining after application pursuant to clauses I(A) through (N) above.

II.     On each distribution date (x) on or after the Stepdown Date and (y) with respect to which a Trigger Event is not in effect, the Principal Payment Amount will be paid in the following order of priority:

(A)     to the Supplemental Interest Trust from the Principal Payment Amount derived from the Group I Mortgage Loans and the Group II Mortgage Loans, the Group I Allocation Percentage and the Group II Allocation Percentage, as applicable, of any Net Swap Payment and any Swap Termination Payment owed to the Swap Provider (unless the Swap Provider is a Defaulting Party or the sole Affected Party (as defined in the ISDA Master Agreement and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee)) remaining unpaid after the distribution of the Interest Remittance Amounts on such distribution date;

(B)     (i)     from the Group I Allocation Amount, to the Class I-A-1 Certificates, until its Certificate Principal Balance has been reduced to zero;

(ii)     from the Group II Allocation Amount, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, until the Certificate Principal Balance of each such class has been reduced to zero;

(C)     (i)     from the Group I Allocation Amount remaining after the Certificate Principal Balance of the Class I-A-1 Certificates has been reduced to zero, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, after taking into account payments pursuant to clause II(B)(ii) above, until the Certificate Principal Balance of each such class has been reduced to zero;

(ii)     from the Group II Allocation Amount remaining after the Certificate Principal Balances of the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates have been reduced to zero, to the Class I-A-1 Certificates, after taking into account payments pursuant to clause II(B)(i) above, until its Certificate Principal Balance has been reduced to zero;

(D)     to the Class M-1 Certificates, the Class M-1 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

CONFIDENTIAL                                                    FHFA01041616

(E)     to the Class M-2 Certificates, the Class M-2 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(F)     to the Class M-3 Certificates, the Class M-3 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(G)     to the Class M-4 Certificates, the Class M-4 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(H)     to the Class M-5 Certificates, the Class M-5 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(I)     to the Class M-6 Certificates, the Class M-6 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(J)     to the Class M-7 Certificates, the Class M-7 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(K)     to the Class M-8 Certificates, the Class M-8 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(L)     to the Class M-9 Certificates, the Class M-9 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(M)     to the Class B-1 Certificates, the Class B-1 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(N)     to the Class B-2 Certificates, the Class B-2 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero; and

(O)     for application as part of Monthly Excess Cashflow for such distribution date, as described under "—Credit Enhancement—Overcollateralization" below, any such Principal Payment Amount remaining after application pursuant to clauses II(A) through (N) above.

The foregoing notwithstanding, on and after the distribution date on which the aggregate Certificate Principal Balance of each class of Subordinate Certificates has been reduced to zero, distributions to the Group II Certificates will be allocated to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, on a pro rata basis based on the Certificate Principal

CONFIDENTIAL                                                                    FHFA01041617

Balance of each such class, until the Certificate Principal Balance of each such class has been reduced to zero.

**Credit Enhancement**

Credit enhancement for each class of certificates consists of the subordination of certain classes of Subordinate Certificates and the priority of application of Realized Losses and overcollateralization, in each case as described below.

*Subordination*

The rights of holders of the Subordinate Certificates to receive payments with respect to the Mortgage Loans and the Interest Rate Swap Agreement will be subordinated to such rights of holders of the Senior Certificates, and the rights of the holders of each class of Subordinate Certificates to receive payments with respect to the Mortgage Loans and the Interest Rate Swap Agreement will be subordinated to such rights of holders of each class of certificates having a higher priority of payment, as described in this free writing prospectus under "—Distributions of Interest" and "—Distributions of Principal". This subordination is intended to enhance the likelihood of regular receipt by holders of certificates having a higher priority of payment of the full amount of interest and principal distributable thereon, and to afford such certificateholders limited protection against Realized Losses incurred with respect to the Mortgage Loans.

The limited protection afforded to holders of classes of certificates with a higher priority of payment by means of the subordination of certain classes of certificates having a lower priority of payment will be accomplished by the preferential right of holders of such classes of certificates with a higher priority of payment to receive distributions of interest or principal on any distribution date prior to classes with a lower priority of payment.

*Application of Realized Losses*

Realized Losses on the Mortgage Loans will have the effect of reducing amounts payable in respect of the Class X Certificates (both through the application of Monthly Excess Interest to fund such deficiency and through a reduction in the Overcollateralization Amount for the related distribution date).

If on any distribution date, after giving effect to all Realized Losses incurred with respect to the Mortgage Loans during the Due Period for such distribution date and payments of principal on such distribution date, the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates exceeds the Aggregate Loan Balance for such distribution date (such excess, an "Applied Loss Amount"), such amount will be allocated in reduction of the Certificate Principal Balance of first, the Class B-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; second, the Class B-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; third the Class M-9 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; fourth, the Class M-8 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; fifth, the Class M-7 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; sixth, the Class M-6 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; seventh, the Class M-5 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; eighth, the Class M-4 Certificates, until the Certificate Principal Balance thereof has been reduced to

CONFIDENTIAL                                                           FHFA01041618

zero; ninth, the Class M-3 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; tenth, the Class M-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and eleventh, the Class M-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero. In no event will the Certificate Principal Balances of the Senior Certificates be reduced by any Applied Loss Amount.

Holders of the Subordinate Certificates will not receive any payments in respect of Applied Loss Amounts, except to the extent of available Monthly Excess Cashflow as described below.

*Overcollateralization*

The weighted average Net Mortgage Rate of the Mortgage Loans is generally expected to be higher than the weighted average of the pass-through rates of the Senior Certificates and Subordinate Certificates plus certain expenses of the trust, thus generating certain excess interest collections. Monthly Excess Interest will be applied in reduction of the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates. In addition, amounts paid by the Swap Provider under the Interest Rate Swap Agreement may also be paid as principal (to the extent of realized losses on the Mortgage Loans) to the Senior Certificates and Subordinate Certificates. Such application of interest collections and amounts paid under the Interest Rate Swap Agreement as payments of principal will cause the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates to amortize more rapidly than the Aggregate Loan Balance, thus creating and maintaining overcollateralization. However, Realized Losses on the Mortgage Loans will reduce overcollateralization, and could result in an Overcollateralization Deficiency Amount.

On each distribution date, the Monthly Excess Cashflow will be distributed in the following order of priority:

(2)    (A)    until the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates equals the Aggregate Loan Balance for such distribution date minus the Targeted Overcollateralization Amount for such date, on each distribution date (a) prior to the Stepdown Date or (b) with respect to which a Trigger Event is in effect, to the extent of Monthly Excess Interest for such distribution date, to the Senior Certificates and Subordinate Certificates, in the following order of priority:

(i)    (a)    the Group I Excess Interest Amount in the following order of priority: (x) first, to the Class I-A-1 Certificates, until its Certificate Principal Balance has been reduced to zero, and then (y) sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, after taking into account the distribution of the Group II Excess Interest Amount, until the Certificate Principal Balance of each such class has been reduced to zero;

(b)    the Group II Excess Interest Amount in the following order of priority: (x) first, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, until the

S-110

Certificate Principal Balance of each such class has been reduced to zero, and then (y) to the Class I-A-1 Certificates, after taking into account the distribution of the Group I Excess Interest Amount, until its Certificate Principal Balance has been reduced to zero;

(ii)     to the Class M-1 Certificates, until its Certificate Principal Balance has been reduced to zero;

(iii)     to the Class M-2 Certificates, until its Certificate Principal Balance has been reduced to zero;

(iv)     to the Class M-3 Certificates, until its Certificate Principal Balance has been reduced to zero;

(v)     to the Class M-4 Certificates, until its Certificate Principal Balance has been reduced to zero;

(vi)     to the Class M-5 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(vii)     to the Class M-6 Certificates, until its Certificate Principal Balance has been reduced to zero;

(viii)    to the Class M-7 Certificates, until its Certificate Principal Balance has been reduced to zero;

(ix)     to the Class M-8 Certificates, until its Certificate Principal Balance has been reduced to zero;

(x)     to the Class M-9 Certificates, until its Certificate Principal Balance has been reduced to zero;

(xi)     to the Class B-1 Certificates, until its Certificate Principal Balance has been reduced to zero; and

(xii)     to the Class B-2 Certificates, until its Certificate Principal Balance has been reduced to zero;

(B)     on each distribution date on or after the Stepdown Date and with respect to which a Trigger Event is not in effect, to fund any principal distributions required to be made on such distribution date set forth above in subclause II under "—Distributions of Principal", after giving effect to the distribution of the Principal Payment Amount for such date, in accordance with the priorities set forth therein;

(3)     to the Class M-1 Certificates, any Deferred Amount for such class;

(4)     to the Class M-2 Certificates, any Deferred Amount for such class;

(5)     to the Class M-3 Certificates, any Deferred Amount for such class;

S-111

                                              FHFA01041620

(6)     to the Class M-4 Certificates, any Deferred Amount for such class;

(7)     to the Class M-5 Certificates, any Deferred Amount for such class;

(8)     to the Class M-6 Certificates, any Deferred Amount for such class;

(9)     to the Class M-7 Certificates, any Deferred Amount for such class;

(10)    to the Class M-8 Certificates, any Deferred Amount for such class;

(11)    to the Class M-9 Certificates, any Deferred Amount for such class;

(12)    to the Class B-1 Certificates, any Deferred Amount for such class;

(13)    to the Class B-2 Certificates, any Deferred Amount for such class;

(14)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class I-A-1, Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, concurrently, any Basis Risk Shortfall for each such class, on a pro rata basis based on the entitlement of each such class;

(15)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-1 Certificates, any Basis Risk Shortfall for such class;

(16)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-2 Certificates, any Basis Risk Shortfall for such class;

(17)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-3 Certificates, any Basis Risk Shortfall for such class;

(18)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-4 Certificates, any Basis Risk Shortfall for such class;

(19)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-5 Certificates, any Basis Risk Shortfall for such class;

(20)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-6 Certificates, any Basis Risk Shortfall for such class;

(21)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-7 Certificates, any Basis Risk Shortfall for such class;

CONFIDENTIAL

FHFA01041621

(22)     to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-8 Certificates, any Basis Risk Shortfall for such class;

(23)     to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-9 Certificates, any Basis Risk Shortfall for such class;

(24)     to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class B-1 Certificates, any Basis Risk Shortfall for such class;

(25)     to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class B-2 Certificates, any Basis Risk Shortfall for such class;

(26)     to the Supplemental Interest Trust, any Swap Termination Payment owed to the Swap Provider in the event of a Swap Provider Trigger Event and the Swap Provider is a Defaulting Party or the sole Affected Party (as defined in the ISDA Master Agreement) not paid on prior distribution dates and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee;

(27)     to the Class X Certificates, the amount distributable to such class pursuant to the pooling and servicing agreement; and

(28)     to the Class R Certificates, any remaining amount. It is not anticipated that any amounts will be distributed to the Class R Certificates under this clause (28).

Notwithstanding the foregoing, distributions pursuant to subparagraphs (2) through (25) above on any distribution date will be made after giving effect to payments received pursuant to the Interest Rate Swap Agreement.

**The Class P Certificates**

On each distribution date, all amounts representing Prepayment Charges in respect of the Mortgage Loans received during the related Prepayment Period will be withdrawn from the Distribution Account and distributed to the Class P Certificates and shall not be available for distribution to the holders of any other class of certificates. The payment of such Prepayment Charges shall not reduce the Certificate Principal Balance of the Class P Certificates.

On the distribution date in September 2011, the securities administrator shall make a payment of principal to the Class P Certificates in reduction of the Certificate Principal Balance thereof from amounts on deposit in a separate reserve account established and maintained by the securities administrator for the exclusive benefit of the Class P Certificateholders.

S-113

**Table of Fees and Expenses**

The following table indicates the fees and expenses to be paid from the cash flows from the Mortgage Loans and other assets of the trust fund, while the Offered Certificates are outstanding.

All fees are expressed in basis points, at an annualized rate, applied to the outstanding aggregate principal balance of the Mortgage Loans.

| Item | Fee or Expense | Paid To | Paid From | Frequency |
|---|---|---|---|---|
| Master Servicing Fee[1][2] | 0.0110% per annum of the Stated Principal Balance of each Mortgage Loan | master servicer | Mortgage Loan Interest Collections | Monthly |
| Servicer Fee[3] | 0.5000% per annum of the Stated Principal Balance of each Mortgage Loan | related servicer | Mortgage Loan interest collections | Monthly |
| P&I Advances and Servicing Advances | To the extent of funds available, the amount of any advances and servicing advances | related servicer or master servicer, as applicable | With respect to each Mortgage Loan, late recoveries of the payments of the costs and expenses, liquidation proceeds, Subsequent Recoveries, purchase proceeds or repurchase proceeds for that Mortgage Loan | Time to Time |
| Nonrecoverable Advances and Servicing Advances | The amount of any advances and servicing advances deemed nonrecovreable | related servicer or master servicer, as applicable | All collections on the Mortgage Loans | Time to Time |
| Reimbursement for certain expenses, costs and liabilities incurred by the related servicer, the master servicer, the sponsor or the depositor in connection with any legal action relating to the pooling and servicing agreement or the certificates[2] | The amount of the expenses, costs and liabilities incurred | related servicer, master servicer, sponsor or depositor, as applicable | All collections on the Mortgage Loans | Time to Time |
| Indemnification expenses | Amounts for which the related servicer, the master servicer, the securities administrator, the custodian, the trustee and the depositor are entitled to indemnification[4] | related servicer, master servicer, securities administrator, custodian, trustee, sponsor or depositor, as applicable | All collections on the Mortgage Loans | Time to Time |

CONFIDENTIAL

FHFA01041623

| Item | Fee or Expense | Paid To | Paid From | Frequency |
|------|----------------|---------|-----------|-----------|
| Reimbursement for any expenses incurred by the trustee or securities administrator in connection with a tax audit of the trust | The amount incurred by the trustee or securities administrator in connection with a tax audit of the trust | trustee or securities administrator | All collections on the Mortgage Loans | Time to Time |

---

[1]   The master servicing fee including securities administrator, paying agent, certificate registrar and credit risk manager fees. The master servicer compensation consists of the master servicing fee and any interest or other income earned on funds held in the Distribution Account. Wells Fargo Bank, N.A. performs the functions of securities administrator, paying agent, certificate registrar and credit risk manager and this compensation covers the performance of each of these functions.

[2]   The master servicer pays trustee fees and custodian fees out of its compensation.

[3]   The master servicing fee and the servicing fee payable to each servicer are paid on a first priority basis from collections allocable to interest on the Mortgage Loans prior to distributions to the related certificateholders.

[4]   See *"The Master Servicer, Securities Administrator and Custodian"* and *"The Pooling and Servicing Agreement – The Trustee"* in this free writing prospectus.

## Calculation of One-Month LIBOR

On the second LIBOR business day preceding the commencement of each Interest Accrual Period (other than the first Interest Accrual Period) for the Senior Certificates and the Subordinate Certificates, which date we refer to as an interest determination date, the securities administrator will determine One-Month LIBOR for such Interest Accrual Period on the basis of such rate as it appears on Telerate Screen Page 3750, as of 11:00 a.m. London time on such interest determination date or an equivalent information system. If such rate does not appear on such page, or such other page as may replace that page on that service, or if such service is no longer offered, such other service for displaying LIBOR or comparable rates as may be reasonably selected by the securities administrator, One-Month LIBOR for the applicable Interest Accrual Period will be the Reference Bank Rate. If no such quotations can be obtained and no Reference Bank Rate is available, One-Month LIBOR will be the One-Month LIBOR applicable to the preceding Interest Accrual Period. With respect to the first Interest Accrual Period, One-Month LIBOR will be determined two business days prior to the Closing Date.

The Reference Bank Rate with respect to any Interest Accrual Period, means the arithmetic mean, rounded upwards, if necessary, to the nearest whole multiple of 0.03125%, of the offered rates for United States dollar deposits for one month that are quoted by the Reference Banks, as described below, as of 11:00 a.m., New York City time, on the related interest determination date to prime banks in the London interbank market for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the Senior Certificates and the Subordinate Certificates for such Interest Accrual Period, provided that at least two such Reference Banks provide such rate. If fewer than two offered rates appear, the Reference Bank Rate will be the arithmetic mean, rounded upwards, if necessary, to the nearest whole multiple of 0.03125%, of the rates quoted by one or more major banks in New York City, selected by the securities administrator, as of 11:00 a.m., New York City time, on such date for loans in U.S. dollars to leading European banks for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the related Certificates for such Interest Accrual Period. As used in this section, LIBOR business day means any day other than a Saturday or a Sunday or a day on which banking institutions in the State of New York or in the city of London, England are required or authorized by law to be closed;

S-115

CONFIDENTIAL

FHFA01041624

and "Reference Banks" means leading banks selected by the securities administrator and engaged in transactions in Eurodollar deposits in the international Eurocurrency market

- with an established place of business in London,

- which have been designated as such by the securities administrator, and

- which are not controlling, controlled by, or under common control with, the depositor or the sponsor.

The establishment of One-Month LIBOR on each interest determination date by the securities administrator and the securities administrator's calculation of the rate of interest applicable to the Senior Certificates and Subordinate Certificates for the related Interest Accrual Period shall, in the absence of manifest error, be final and binding.

**Reports to Certificateholders**

The securities administrator will make available to each certificateholder, the servicers and the depositor a statement generally setting forth the following information:

1. the Interest Accrual Periods and general distribution dates;

2. with respect to the Mortgage Loans, the total cash flows received and the general sources thereof;

3. the amount, if any, of fees or expenses accrued and paid, with an identification of the payee and the general purpose of such fees;

4. the amount of the related distribution to holders of the certificates (by class) allocable to principal, separately identifying (A) the aggregate amount of any principal prepayments included therein and (B) the aggregate of all scheduled payments of principal included therein;

5. the amount of such distribution to holders of the certificates (by class) allocable to interest;

6. the Interest Carry Forward Amounts and any Net WAC Rate Carryover Amounts for the certificates (if any);

7. the Certificate Principal Balance of the certificates before and after giving effect to the distribution of principal and allocation of Realized Losses on such distribution date;

8. the number and aggregate Scheduled Principal Balance of all the Mortgage Loans for the following distribution date;

9. the Pass-Through Rate for each class of certificates for such distribution date;

10. the aggregate amount of P&I advances included in the distributions on the distribution date, the aggregate amount of unreimbursed advances at the close

CONFIDENTIAL

of business on the distribution date, and the general source of funds for reimbursements;

11.  the number and aggregate principal balance of any Mortgage Loans that were (A) delinquent (exclusive of Mortgage Loans in foreclosure) using the "OTS" method (not including any Liquidated Mortgage Loans as of the end of the related Prepayment Period) (1) one scheduled payment is delinquent, (2) two scheduled payments are delinquent, (3) three or more scheduled payments are delinquent and (4) foreclosure proceedings have been commenced, and loss information for the period; the number and aggregate principal balance of any Mortgage Loans in respect of which (A) one scheduled payment is delinquent, (B) two scheduled payments are delinquent, (C) three or more scheduled payments are delinquent and (D) foreclosure proceedings have been commenced, and loss information for the period;

12.  the amount, if any, of Monthly Excess Cashflow or and the application of such Monthly Excess Cashflow;

13.  the amounts paid by the Swap Provider pursuant to the Swap Agreement in respect of the certificates;

14.  with respect to any Mortgage Loan that was liquidated during the preceding calendar month, the loan number and scheduled principal balance of, and Realized Loss on, such Mortgage Loan as of the end of the related Prepayment Period;

15.  whether any performance triggers as more completely described in this free writing prospectus are in effect;

16.  the total number and principal balance of any real estate owned, or REO, properties as of the end of the related Prepayment Period;

17.  the cumulative Realized Losses for the Mortgage Pool through the end of the preceding month;

18.  the three-month rolling average of the percent equivalent of a fraction, the numerator of which is the aggregate scheduled principal balance of the Mortgage Loans that are 60 days or more delinquent or are in bankruptcy or foreclosure or are REO properties, and the denominator of which is the scheduled principal balances of all of the Mortgage Loans; and

19.  the amount of the Prepayment Charges remitted by the servicers.

On each distribution date, the securities administrator will make the monthly statement and, at the securities administrator's option, any additional files containing the same information in an alternative format, available each month to certificateholders via the securities administrator's internet website. Assistance in using the website service can be obtained by calling the securities administrator's customer service desk at (301) 815-6600. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The securities administrator may change the

S-117

way monthly statements are distributed in order to make such distributions more convenient or more accessible to the above parties.

The annual reports on Form 10-K, the distribution reports on Form 10-D, the current reports on Form 8-K and amendments to those reports filed by the securities administrator or furnished by the securities administrator with respect to the trust pursuant to section 13(a) or 15(d) of the Exchange Act will be made available on the website of the securities administrator as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission.

In addition, within a reasonable period of time after the end of each calendar year, the securities administrator will prepare and deliver, upon request, to each certificateholder of record during the previous calendar year a statement containing information necessary to enable certificateholders to prepare their tax returns. Such statements will not have been examined and reported upon by an independent public accountant.

The depositor makes no representation, and does not guarantee that, the securities administrator will provide such statements to the certificateholders as described above.

## THE INTEREST RATE SWAP AGREEMENT AND THE SWAP PROVIDER

HSBC Bank USA, National Association as trustee (the "Supplemental Interest Trust Trustee") on behalf of a separate trust created under the pooling and servicing agreement (the "Supplemental Interest Trust") will enter into an interest rate swap agreement (the "Interest Rate Swap Agreement") with Swiss Re Financial Products Corporation (the "Swap Provider"). The Interest Rate Swap Agreement will be held in the Supplemental Interest Trust. The Supplemental Interest Trust Trustee will appoint the securities administrator to receive and distribute funds with regards to the Interest Rate Swap Agreement on behalf of the Supplemental Interest Trust. On each distribution date, the securities administrator will deposit into an account held in the Supplemental Interest Trust (the "Derivative Account"), certain amounts, if any, received from the Swap Provider. For the avoidance of doubt, the Supplemental Interest Trust, the Interest Rate Swap Agreement, and the Derivative Account will not be assets of any REMIC.

Pursuant to the Interest Rate Swap Agreement, two business days prior to each distribution date commencing on the distribution date occurring in September 2006 and terminating immediately following the distribution date in August 2011 (i) the securities administrator (on behalf of the Supplemental Interest Trust and from funds of such trust) will be obligated to pay to the Swap Provider, a fixed amount equal to the product of (x) a fixed rate equal to 5.375% per annum, (y) the Swap Notional Amount (as defined below) for that distribution date and (z) a fraction, the numerator of which is 30 (or, for the first distribution date, the number of days elapsed from and including the effective date (as defined in the Interest Rate Swap Agreement) to but excluding the first distribution date, determined on a 30/360 basis) and the denominator of which is 360, and (ii) the Swap Provider will be obligated to pay to the Supplemental Interest Trust for the benefit of the holders of the Offered Certificates and Class B Certificates, a floating amount equal to the product of (x) One-Month LIBOR, as determined pursuant to the Interest Rate Swap Agreement, for the related calculation period (as defined in the Interest Rate Swap Agreement), (y) the Swap Notional Amount for that distribution date, and (z) a fraction, the numerator of which is equal to the actual number of days in the related calculation period and the denominator of which is 360. A net payment will be required to be made on each distribution date (each such net payment, a "Net Swap Payment") (a) by

CONFIDENTIAL

FHFA01041627

the securities administrator to the Swap Provider, to the extent that the fixed amount exceeds the corresponding floating amount, or (b) by the Swap Provider to the securities administrator, to the extent that the floating amount exceeds the corresponding fixed amount. For each distribution date in respect of which the securities administrator is required to make a Net Swap Payment to the Swap Provider, the trust will be required to make a payment to the securities administrator in the same amount.

The Swap Notional Amount for each distribution date will be equal to the lesser of (x) the aggregate Certificate Principal Balance of the Senior Certificates and the Subordinate Certificates on the day immediately preceding such distribution date and (y) the amount set forth below for such distribution date (such lesser amount, the "Swap Scheduled Notional Amount"). The Interest Rate Swap Agreement will terminate immediately following the distribution date in Augsut 2011, unless terminated earlier upon the occurrence of a Swap Event of Default, a Swap Termination Event or a Swap Additional Termination Event (each as defined below).

| Distribution Date | Swap Scheduled Notional Amount ($) |
|---|---|
| September 2006 | 1,026,200,000 |
| October 2006 | 1,007,457,000 |
| November 2006 | 987,116,000 |
| December 2006 | 965,250,000 |
| January 2007 | 941,937,000 |
| February 2007 | 917,290,000 |
| March 2007 | 891,402,000 |
| April 2007 | 864,995,000 |
| May 2007 | 839,200,000 |
| June 2007 | 814,146,000 |
| July 2007 | 789,815,000 |
| August 2007 | 766,184,000 |
| September 2007 | 743,233,000 |
| October 2007 | 720,944,000 |
| November 2007 | 699,251,000 |
| December 2007 | 678,134,000 |
| January 2008 | 657,447,000 |
| February 2008 | 637,372,000 |
| March 2008 | 611,369,000 |
| April 2008 | 187,543,000 |
| May 2008 | 180,177,000 |
| June 2008 | 173,176,000 |
| July 2008 | 166,514,000 |
| August 2008 | 160,281,000 |
| September 2008 | 154,672,000 |
| October 2008 | 150,311,000 |
| November 2008 | 146,081,000 |
| December 2008 | 141,973,000 |
| January 2009 | 137,984,000 |
| February 2009 | 134,110,000 |
| March 2009 | 130,347,000 |
| April 2009 | 93,504,000 |

CONFIDENTIAL                                                                                    FHFA01041628

| Distribution Date | Swap Scheduled Notional Amount ($) |
|---|---|
| May 2009 | 91,143,000 |
| June 2009 | 88,842,000 |
| July 2009 | 86,599,000 |
| August 2009 | 84,413,000 |
| September 2009 | 82,282,000 |
| October 2009 | 80,205,000 |
| November 2009 | 78,181,000 |
| December 2009 | 76,207,000 |
| January 2010 | 74,284,000 |
| February 2010 | 72,409,000 |
| March 2010 | 70,581,000 |
| April 2010 | 68,800,000 |
| May 2010 | 67,063,000 |
| June 2010 | 65,370,000 |
| July 2010 | 63,720,000 |
| August 2010 | 62,112,000 |
| September 2010 | 60,544,000 |
| October 2010 | 59,016,000 |
| November 2010 | 57,526,000 |
| December 2010 | 56,074,000 |
| January 2011 | 54,658,000 |
| February 2011 | 53,277,000 |
| March 2011 | 51,929,000 |
| April 2011 | 48,106,000 |
| May 2011 | 46,915,000 |
| June 2011 | 45,754,000 |
| July 2011 | 44,621,000 |
| August 2011 | 43,515,000 |

The respective obligations of the Swap Provider and the Supplemental Interest Trust to pay specified amounts due under the Interest Rate Swap Agreement (other than Swap Termination Payments (as defined below)) will be subject to the following conditions precedent: (1) no Swap Event of Default or event that with the giving of notice or lapse of time or both would become a Swap Event of Default, shall have occurred and be continuing with respect to the Interest Rate Swap Agreement and (2) no "Early Termination Date" (as defined in the Interest Rate Swap Agreement) has occurred or been effectively designated with respect to the Interest Rate Swap Agreement.

Events of default under the Interest Rate Swap Agreement (each a "Swap Event of Default") include the following:

- failure to make a payment due under the Interest Rate Swap Agreement after notice of such failure is received and expiration of a specified grace period,

- certain insolvency or bankruptcy events, and

- a merger by the Swap Provider without an assumption of its obligations under the Interest Rate Swap Agreement,

CONFIDENTIAL                                                                                                        FHFA01041629

each as further described in the Interest Rate Swap Agreement.

Termination events under the Interest Rate Swap Agreement (each a "Swap Termination Event") include the following:

- illegality (which generally relates to changes in law causing it to become unlawful for either party to perform its obligations under the Interest Rate Swap Agreement),

- tax event (which generally relates to either party to the Interest Rate Swap Agreement receiving a payment under the Interest Rate Swap Agreement from which an amount has been deducted or withheld for or on account of taxes or paying an additional amount on account of an indemnifiable tax, as defined in the Interest Rate Swap Agreement, in either case as a result of a change in tax law) and

- tax event upon merger (which generally relates to either party to the Interest Rate Swap Agreement receiving a payment under the Interest Rate Swap Agreement from which an amount has been deducted or withheld for or on account of an indemnifiable tax or paying an additional amount on account of an indemnifiable tax, in either case as a result of a merger or similar transaction),

each as further described in the Interest Rate Swap Agreement.

Additional termination events under the Interest Rate Swap Agreement (each a "Swap Additional Termination Event"), include the following:

- failure of the Swap Provider to comply with the Swap Downgrade Provisions,

- failure of the Swap Provider to comply with the Regulation AB provisions of the Interest Rate Swap Agreement,

- occurrence of an optional termination of the securitization pursuant to the terms of the pooling and servicing agreement, and

- amendment of the pooling and servicing agreement in a manner that may materially adversely affect the Swap Provider without the prior written consent of the Swap Provider,

each as further described in the Interest Rate Swap Agreement.

If the Swap Provider's credit ratings are withdrawn or reduced below the levels specified in the Interest Rate Swap Agreement, then, unless each rating agency has reconfirmed the ratings which were in effect immediately prior to such withdrawal or reduction for all securities the ratings for which are supported by the Interest Rate Swap Agreement, the Swap Provider will be required, at its own expense, either (1) to obtain a substitute swap provider which will assume the obligations of the Swap Provider under the Interest Rate Swap Agreement and which meets all rating agency requirements and any third party consent requirements provided therein or in any related documentation, or (2) to establish any other arrangement specified in the Interest Rate Swap

CONFIDENTIAL

Agreement that meets all rating agency requirements and any third party consent requirements provided therein or in any related documentation (collectively, the "Swap Downgrade Provisions").

Upon the occurrence of a Swap Event of Default, the non-defaulting party will have the right to designate an early termination date (an "Early Termination Date"). Upon the occurrence of a Swap Termination Event or a Swap Additional Termination Event, an Early Termination Date may be designated by one of the parties as specified in the Interest Rate Swap Agreement, and will occur only upon notice and, in some circumstances, after any affected party has used reasonable efforts to transfer its rights and obligations under the Interest Rate Swap Agreement to a related entity within a specified period after notice has been given of the Swap Termination Event, all as set forth in the Interest Rate Swap Agreement. The occurrence of an Early Termination Date under the Interest Rate Swap Agreement will constitute a "Swap Early Termination."

Upon a Swap Early Termination, the securities administrator or the Swap Provider may be liable to make a swap termination payment (the "Swap Termination Payment") to the other, regardless, if applicable, of which of the parties has caused the termination. The Swap Termination Payment will be based on the value of the Interest Rate Swap Agreement computed in accordance with the procedures set forth in the Interest Rate Swap Agreement. In the event that the securities administrator is required to make a Swap Termination Payment to the Swap Provider, the trust will be required to make a payment to the securities administrator in the same amount (to the extent such Swap Termination Payment has not been paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee). In the case of a Swap Termination Payment not triggered by a Swap Provider Trigger Event (as defined in this free writing prospectus), the trust will be required to make such payment on the related distribution date, and on any subsequent Distribution Dates until paid in full, prior to distributions to certificateholders. In the case of a Swap Termination Payment triggered by a Swap Provider Trigger Event, the trust's obligation to make such payment generally will be subordinated to distributions to the holders of the Offered Certificates to the extent described in the pooling and servicing agreement.

Upon a Swap Early Termination other than in connection with the optional termination with respect to the Mortgage Loans, the securities administrator shall, at the direction of the depositor, appoint a successor swap provider. If the securities administrator receives a Swap Termination Payment from the Swap Provider in connection with such Swap Early Termination, the securities administrator will apply such Swap Termination Payment to any upfront payment required to appoint the successor swap provider. If the securities administrator is required to pay a Swap Termination Payment to the Swap Provider in connection with such Swap Early Termination, the securities administrator will apply any upfront payment received from the successor swap provider to pay such Swap Termination Payment. If the securities administrator is unable to appoint a successor swap provider within 30 days of the Swap Early Termination, then the securities administrator will deposit any Swap Termination Payment received from the original Swap Provider into a separate, non-interest bearing reserve account and will, on each subsequent distribution date, withdraw from the amount then remaining on deposit in such reserve account an amount equal to the Net Swap Payment, if any, that would have been paid to the securities administrator by the original Swap Provider calculated in accordance with the terms of the original Interest Rate Swap Agreement, and distribute such amount in accordance with the terms of the pooling and servicing agreement.

Upon a Swap Early Termination in connection with the optional termination of the trust, if the securities administrator is required to make a Swap Termination Payment to the Swap

CONFIDENTIAL

FHFA01041631

Provider, the party exercising such optional termination with respect to the Mortgage Loans will be required to include in its payment an amount equal to such Swap Termination Payment, as described in this free writing prospectus. If the securities administrator receives a Swap Termination Payment from the Swap Provider in connection with such Swap Early Termination, such Swap Termination Payment generally will not be available to certificateholders; rather, the securities administrator will distribute such Swap Termination Payment in accordance with the terms of the pooling and servicing agreement.

A "Swap Provider Trigger Event" will mean: (i) a Swap Event of Default under the Interest Rate Swap Agreement with respect to which the Swap Provider is a Defaulting Party (as defined in the Interest Rate Swap Agreement), (ii) a Swap Termination Event under the Interest Rate Swap Agreement with respect to which the Swap Provider is the sole Affected Party (as defined in the Interest Rate Swap Agreement) or (iii) a Swap Additional Termination Event under the Interest Rate Swap Agreement with respect to which the Swap Provider is the sole Affected Party.

The significance percentage of the Interest Rate Swap Agreement, as calculated in accordance with Item 1115 of Regulation AB, is less than 10%. The Interest Rate Swap Agreement will provide that the Swap Provider may be replaced in certain circumstances, including if the significance percentage of the Interest Rate Swap Agreement is equal to or greater than 10%.

Any Net Swap Payment payable to the securities administrator on behalf of the Supplemental Interest Trust by the Swap Provider will be distributed on the related distribution date as follows (after taking into account distributions of interest described in this free writing prospectus):

> (i)     to the Senior Certificates, pro rata based on amounts due, Current Interest and any Carryforward Interest for each such class and distribution date, after giving effect to distributions of such amounts as described under "—Distributions of Interest";

> (ii)    to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates, in that order, Current Interest and any Carryforward Interest for each such class and distribution date, after giving effect to distributions of such amounts as described under "—Distributions of Interest";

> (iii)   to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates, in that order, any applicable Deferred Amounts, with interest thereon at the applicable pass-through rate, prior to giving effect to amounts available to be paid in respect of Deferred Amounts as described under "—Credit Enhancement—Overcollateralization" on such distribution date;

> (iv)    to the holders of the class or classes of Senior Certificates and Subordinate Certificates then entitled to receive distributions in respect of principal, in an amount necessary to maintain or restore the Targeted Overcollateralization Amount after taking into account distributions made pursuant to clause (1) under "—Credit Enhancement—Overcollateralization";

> (v)     to the Senior Certificates, on a pro rata basis, and then to the Subordinate Certificates, on a sequential basis, any applicable Basis Risk Shortfalls, prior to

CONFIDENTIAL                                                                                     FHFA01041632

giving effect to any withdrawals from the Basis Risk Shortfall Reserve Fund or from amounts available to be paid in respect of Basis Risk Shortfalls as described in this free writing prospectus under "—Credit Enhancement—Overcollateralization" on such distribution date; and

(vi)   to the Class X Certificates, any remaining amounts.

Notwithstanding the foregoing, in no instance will such payments (other than payments made under clause (vi) above) be made other than to the extent of losses and Basis Risk Shortfalls.

Amounts payable by the trust to the securities administrator in respect of Net Swap Payments and Swap Termination Payments other than  Swap Termination Payments resulting from a Swap Provider Trigger Event (and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) will be deducted from related available funds before distributions to the holders of the Senior Certificates and Subordinate Certificates. On or before each distribution date, such amounts will be distributed by the trust to the securities administrator, and paid by the securities administrator to the Swap Provider as follows:

(i)   first to make any Net Swap Payment owed to the Swap Provider pursuant to the Interest Rate Swap Agreement for such distribution date, and

(ii)   second to make any  Swap Termination Payment not due to a Swap Provider Trigger Event owed to the Swap Provider pursuant to the Interest Rate Swap Agreement (to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the securities administrator).

The Interest Rate Swap Agreement will be governed by and construed in accordance with the laws of the State of New York. The obligations of the Swap Provider are limited to those specifically set forth in the Interest Rate Swap Agreement.

Swiss Re Financial Products Corporation ("SRFP") is a Delaware corporation incorporated on May 23, 1995.  In the course of conducting its business, SRFP trades in over-the-counter derivative products and structures and advises on a variety of financial transactions that transfer insurance, market or credit risk to or from capital markets.  SRFP's headquarters are located at 55 East 52nd Street, New York, New York 10055.  SRFP currently has a long-term counterparty credit rating of "AA-" and a short-term debt rating of "A-1+" from Standard & Poor's.

SRFP is an indirect, wholly owned subsidiary of Swiss Reinsurance Company ("Swiss Re"), a Swiss corporation.   The obligations of SRFP under the Interest Rate Swap Agreement are fully and unconditionally guaranteed under a guaranty by Swiss Re.  Swiss Re was founded in Zurich, Switzerland, in 1863 and since then has become one of the world's leading reinsurers.  Swiss Re and its reinsurance subsidiaries have over 70 offices in more than 30 countries.  Swiss Re's headquarters are located at Mythenquai 50/60, CH-8022, Zurich, Switzerland.  On June 12, 2006, Swiss Re announced that it completed its acquisition of GE Insurance Solutions (excluding its US life and health business) from General Electric.

CONFIDENTIAL                                                                                     FHFA01041633

Swiss Re currently has (i) from Standard & Poor's: long-term counterparty credit, financial strength and senior unsecured debt ratings of "AA-" and a short-term counterparty credit rating of "A-1+," (ii) from Moody's: insurance financial strength and senior debt ratings of "Aa2" (negative outlook), and a short-term rating of "P-1" and (iii) from Fitch: insurer financial strength rating (Fitch initiated) and long-term issuer rating (Fitch initiated) of "AA-".

Various regulatory authorities, including the U.S. Securities and Exchange Commission and State Attorneys General in the United States, including the New York State Attorney General's office, State Insurance Departments in the United States and the U.K. Financial Services Authority, as well as law enforcement agencies, are conducting investigations on various aspects of the insurance industry, including the use of non-traditional, or loss mitigation insurance, products. Swiss Re is among the companies that have received subpoenas to produce documents relating to "non-traditional" products as part of these investigations. Swiss Re has announced that it is cooperating fully with all requests for documents addressed to Swiss Re.  It is unclear at this point what the ultimate scope of the investigations will be, in terms of the products, parties or practices under review, particularly given the potentially broad range of products that could be characterized as "non-traditional."  It is therefore also unclear what the direct or indirect consequences of such investigations will be, and Swiss Re is not currently in a position to give any assurances as to the consequences for it or the insurance and reinsurance industries of the foregoing investigations or related developments. Any of the foregoing could adversely affect its business, results of operations and financial condition.

The information contained in the preceding four paragraphs has been provided by SRFP and Swiss Re for use in this free writing prospectus.  Neither SRFP nor Swiss Re undertakes any obligation to update such information.  SRFP and Swiss Re have not been involved in the preparation of, and do not accept responsibility for, this free writing prospectus as a whole or the accompanying prospectus.

## YIELD, PREPAYMENT AND MATURITY CONSIDERATIONS

### General

The weighted average life of, and the yield to maturity on, each class of Offered Certificates generally will be directly related to the rate of payment of principal, including prepayments, of the Mortgage Loans in the related loan group. The actual rate of principal prepayments on pools of mortgage loans is influenced by a variety of economic, tax, geographic, demographic, social, legal and other factors and has fluctuated considerably in recent years. In addition, the rate of principal prepayments may differ among pools of mortgage loans at any time because of specific factors relating to the mortgage loans in the particular pool, including, among other things, the age of the mortgage loans, the geographic locations of the properties securing the mortgage loans, the extent of the borrowers' equity in such properties, and changes in the borrowers' housing needs, job transfers and employment status. If prevailing interest rates fall significantly below the Mortgage Rates on the Mortgage Loans, the Mortgage Loans (and the applicable Offered Certificates) are likely to be subject to a higher incidence of prepayment than if prevailing rates remain at or above the Mortgage Rates on the Mortgage Loans. Conversely, if prevailing interest rates rise significantly above the Mortgage Rates on the Mortgage Loans, the Mortgage Loans (and the applicable Offered Certificates) are likely to be subject to a lower incidence of prepayment than if prevailing rates remain at or below the Mortgage Rates on the Mortgage Loans. Prepayments on the

CONFIDENTIAL

FHFA01041634

adjustable-rate Mortgage Loans may differ as they approach their respective first Adjustment Dates. No assurance can be given as to the level of prepayment that the Mortgage Loans will experience.

Although the Mortgage Rates on approximately 82.80% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date, are subject to adjustment, such Mortgage Rates adjust less frequently than the pass-through rates on the Offered Certificates and adjust by reference to Six-Month LIBOR. With respect to the Offered Certificates, changes in One-Month LIBOR may not correlate with changes in Six-Month LIBOR and also may not correlate with prevailing interest rates. It is possible that an increased level of One-Month LIBOR could occur simultaneously with a lower level of prevailing interest rates which would be expected to result in faster prepayments, thereby reducing the weighted average lives of the Offered Certificates. The Mortgage Rate applicable to the adjustable-rate Mortgage Loans and any Adjustment Date will be based on Six-Month LIBOR most recently announced generally as of a date either 45 days prior to, or the first business day of the month immediately preceding the month of, such Adjustment Date. Thus, if Six-Month LIBOR rises, the lag in time before the corresponding Mortgage Rate increases, will, all other things being equal, slow the upward adjustment of the pass-through rate or rate cap, as applicable, on the Offered Certificates. In addition, substantially all of the adjustable-rate Mortgage Loans have Mortgage Rates which will not adjust for a substantial period of time after origination. See "The Mortgage Pool" in this free writing prospectus.

The rate of principal prepayments may also be affected by whether the Mortgage Loan documents provide for prepayment charges. Approximately 77.29%, 81.17% and 78.97% of the Group I Mortgage Loans, Group II Mortgage Loans and the Mortgage Loans in the aggregate, respectively, in each case by the related aggregate principal balance as of the Cut-off Date, provide for the payment by the borrower of a Prepayment Charge on voluntary prepayments typically made within up to five years from the date of the execution of the related Mortgage Note. These Prepayment Charges, if still applicable and if enforced by the servicer would typically discourage prepayments on the related Mortgage Loans. There can be no assurance that the Prepayment Charges will have any effect on the prepayment performance of the Mortgage Loans. Investors should conduct their own analysis of the effect, if any, that the Prepayment Charges may have on the prepayment performance of the Mortgage Loans.

The timing of changes in the rate of prepayments may significantly affect the actual yield to investors who purchase the offered certificates at prices other than par, even if the average rate of principal prepayments is consistent with the expectations of investors. In general, the earlier the payment of principal of the mortgage loans in the related loan group the greater the effect on an investor's yield to maturity. As a result, the effect on an investor's yield of principal prepayments occurring at a rate higher or lower than the rate anticipated by the investor during the period immediately following the issuance of the Offered Certificates may not be offset by a subsequent like reduction or increase in the rate of principal prepayments.

The Mortgage Loans were underwritten in accordance with the underwriting standards described in this free writing prospectus under "The Mortgage Pool—The Originators", "—Underwriting Standards of the Sponsor" and "—Modified Standards" and may or may not conform to Fannie Mae or Freddie Mac underwriting guidelines for "A" credit borrowers. Accordingly, the Mortgage Loans may experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines. Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to maturity of the Offered Certificates.

CONFIDENTIAL

FHFA01041635

The weighted average life and yield to maturity of each class of Offered Certificates will also be influenced by the amount of Monthly Excess Interest generated by the Mortgage Loans and applied in reduction of the Certificate Principal Balances of the Offered Certificates. The amount of Monthly Excess Interest available on any distribution date to be applied in reduction of the Certificate Principal Balances of the Offered Certificates will be influenced by, among other factors,

- the overcollateralization level of the Mortgage Loans in the Mortgage Pool at such time, i.e., the extent to which interest on the Mortgage Loans is accruing on a higher Stated Principal Balance than the Certificate Principal Balance of the Offered Certificates;

- the delinquency and default experience of the Mortgage Loans; and

- the provisions of the pooling and servicing agreement that permit principal collections to be distributed to the Class X Certificates and the Class R Certificates in each case as provided in the pooling and servicing agreement when the Targeted Overcollateralization Amount has been met.

To the extent that greater amounts of Monthly Excess Interest are distributed in reduction of the Certificate Principal Balance of a class of Offered Certificates, the weighted average life of such class can be expected to shorten. No assurance, however, can be given as to the amount of Monthly Excess Interest to be distributed at any time or in the aggregate.

We refer you to "Description of the Certificates—Credit Enhancement" in this free writing prospectus.

The yields to maturity of the Offered Certificates and, in particular the Mezzanine Certificates, in the order of payment priority, will be progressively more sensitive to the rate, timing and severity of Realized Losses on the Mortgage Loans. If a Realized Loss is allocated to any class of Mezzanine Certificates, the Certificate Principal Balance thereof will be reduced by the amount of such Realized Loss and such class will thereafter accrue interest on a reduced Certificate Principal Balance.

**Yield Considerations for the Subordinate Certificates**

The rate of payment of principal, the aggregate amount of distributions and the yield to maturity of the Subordinate Certificates will be affected by the rate of prepayments on the related Mortgage Loans, as well as the rate of borrower defaults resulting in Realized Losses, by the severity of those losses and by the timing thereof. See "Description of the Certificates—Credit Enhancement" in this free writing prospectus for a description of the manner in which Realized Losses may be allocated to the Subordinate Certificates. If the purchaser of a Subordinate Certificate calculates its anticipated yield based on an assumed rate of default and amount of Realized Losses that is lower than the default rate and the amount of Realized Losses actually incurred, its actual yield to maturity will be lower than that so calculated. The timing of defaults and losses will also affect an investor's actual yield to maturity, even if the average rate of defaults and severity of losses are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater is the effect on an investor's yield to maturity. There can be no assurance as to the delinquency, foreclosure or loss experience with respect to the Mortgage Loans.

CONFIDENTIAL

FHFA01041636

**Prepayments and Yields of Offered Certificates**

The extent to which the yield to maturity of an Offered Certificate may vary from the anticipated yield will depend upon the degree to which it is purchased at a discount or premium and, correspondingly, the degree to which the timing of payments thereon is sensitive to prepayments, liquidations and purchases of the Mortgage Loans. In particular, in the case of an Offered Certificate purchased at a discount, an investor should consider the risk that a slower than anticipated rate of principal payments, liquidations and purchases of the Mortgage Loans could result in an actual yield to such investor that is lower than the anticipated yield and, in the case of an Offered Certificate purchased at a premium, the risk that a faster than anticipated rate of principal payments, liquidations and purchases of such Mortgage Loans could result in an actual yield to such investor that is lower than the anticipated yield.

The "last scheduled distribution date" for each class of Offered Certificates is the distribution date in July 2036. The actual final distribution date with respect to each class of certificates could occur significantly earlier than its last scheduled distribution date because

- prepayments are likely to occur which will be applied to the payment of the Certificate Principal Balances thereof;

- Monthly Excess Interest to the extent available will be applied as an accelerated payment of principal on the Offered Certificates to the extent required to restore or maintain the Targeted Overcollateralization Amount as described in this free writing prospectus; and

- the master servicer may exercise its option to purchase all the assets of the trust as described under "– Optional Termination" in this free writing prospectus.

Prepayments on mortgage loans are commonly measured relative to a prepayment standard or model (the "Prepayment Assumption"). The model used in this free writing prospectus, which we refer to as the prepayment model, is a prepayment assumption which represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of mortgage loans for the life of such mortgage loans. A 100% prepayment assumption assumes that the outstanding principal balance of a pool of adjustable-rate Mortgage Loans prepays at a constant prepayment rate ("CPR") of 10% in the first month of the life of such pool, such rate increasing by an additional approximate 1.82% CPR (precisely 20%/11) each month thereafter through the twelfth month of the life of such pool; 30% CPR from month 13 through and including month 23; 55% CPR from month 24 through and including month 28; and 35% CPR from month 29 and thereafter; and this assumes that the outstanding principal balance of a pool of fixed-rate Mortgage Loans prepays at a constant prepayment rate ("CPR") of 5% in the first month of the life of such pool, such rate increasing by an additional approximate 1.82% CPR (precisely 20%/11) each month thereafter through the twelfth month of the life of such pool, and 25% CPR thereafter.

There is no assurance, however, that prepayments on the Mortgage Loans will conform to any level of the prepayment model, and no representation is made that the Mortgage Loans will prepay at the prepayment rates shown or any other prepayment rate. The rate of principal payments on pools of mortgage loans is influenced by a variety of economic, geographic, social and other factors, including the level of interest rates. Other factors affecting prepayment of mortgage

S-128

loans include changes in borrowers' housing needs, job transfers and unemployment. In the case of mortgage loans in general, if prevailing interest rates fall significantly below the interest rates on such mortgage loans, the mortgage loans are likely to be subject to higher prepayment rates than if prevailing interest rates remain at or above the rates borne by such mortgage loans. Conversely, if prevailing interest rates rise above the interest rates on such mortgage loans, the rate of prepayment would be expected to decrease.

The following tables have been prepared on the basis of the following assumptions, which we refer to, collectively, as modeling assumptions:

- the Mortgage Pool consists of 26 group I mortgage loans and 23 group II mortgage loans with the characteristics set forth in the tables set forth below;

- distributions on the Offered Certificates are received, in cash, on the 25th day of each month, commencing in September 2006;

- the Mortgage Loans prepay at the percentages of the Prepayment Assumption indicated;

- no defaults or delinquencies in, or modifications, waivers or amendments respecting, the payment by the borrowers of principal and interest on the Mortgage Loans occur;

- except with respect to footnote (2) on each of the following tables, none of the depositor, the servicers or any other person purchases from the trust fund any Mortgage Loan under any obligation or option under the pooling and servicing agreement;

- scheduled payments are assumed to be received on the first day of each month commencing in September 2006, there are no shortfalls in the payment of interest to certificateholders and prepayments represent payment in full of individual Mortgage Loans and are assumed to be received on the last day of each month, commencing in August 2006, and include 30 days' interest thereon;

- scheduled payments of principal and interest on the Mortgage Loans are calculated on their respective principal balances (prior to giving effect to prepayments received thereon during the preceding calendar month), mortgage rate and remaining amortization terms to maturity such that the Mortgage Loans will fully amortize by their remaining amortization terms (taking into account any remaining interest only periods);

- the administrative fees total 0.5085%;

- the certificates are purchased on August 31, 2006;

- the level of One-Month LIBOR remains constant at 5.368% per annum;

- the level of Six-Month LIBOR remains constant at 5.490% per annum;

S-129

- the Certificate Principal Balance of the Class P Certificates is assumed to be zero; and

- the Interest Rate Swap Agreement is not subject to early termination.

CONFIDENTIAL

FHFA01041639

CONFIDENTIAL

GROUP I

| Principal Balance ($) | Gross Mortgage Rate (%) | Net Mortgage Rate (%) | Remaining Term to Maturity (Months) | Amortization Remaining Term* | Age (Months) | Original Interest Only (Months) | Index Type | Gross Margin (%) | Maximum Mortgage Rate (%) | Minimum Mortgage Rate (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Months to Next Rate Adjustment | Adjustment Rate Frequency (Months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 282,517,794.68 | 8.4375 | 7.9290 | 355 | 355 | 5 | N/A | 6 mo. LIBOR | 6.018 | 14.565 | 7.609 | 2.997 | 1.052 | 19 | 6 |
| 62,674,790.01 | 8.0342 | 7.5257 | 355 | 475 | 5 | N/A | 6 mo. LIBOR | 6.079 | 14.144 | 7.391 | 2.986 | 1.067 | 19 | 6 |
| 229,249.29 | 8.2000 | 7.6915 | 355 | 360 | 5 | 120 | 6 mo. LIBOR | 5.500 | 14.200 | 8.200 | 3.000 | 1.000 | 19 | 6 |
| 1,334,000.00 | 6.7793 | 6.2708 | 352 | 336 | 8 | 24 | 6 mo. LIBOR | 6.451 | 12.779 | 6.893 | 3.000 | 1.000 | 16 | 6 |
| 56,409,513.69 | 7.7149 | 7.2064 | 355 | 300 | 5 | 60 | 6 mo. LIBOR | 6.329 | 14.215 | 7.300 | 2.802 | 1.107 | 19 | 6 |
| 2,505,474.87 | 7.5186 | 7.0101 | 353 | 240 | 7 | 120 | 6 mo. LIBOR | 6.265 | 13.718 | 6.507 | 3.000 | 1.000 | 17 | 6 |
| 48,720,780.27 | 8.8855 | 8.3770 | 356 | 356 | 4 | N/A | 6 mo. LIBOR | 6.960 | 15.691 | 8.433 | 2.841 | 1.403 | 32 | 6 |
| 10,625,704.66 | 8.2045 | 7.6960 | 356 | 476 | 4 | N/A | 6 mo. LIBOR | 6.748 | 14.666 | 8.037 | 3.000 | 1.231 | 32 | 6 |
| 1,130,623.15 | 7.1305 | 6.6220 | 352 | 324 | 8 | 36 | 6 mo. LIBOR | 6.554 | 13.707 | 7.130 | 3.000 | 1.288 | 28 | 6 |
| 9,847,198.07 | 7.7942 | 7.2857 | 355 | 300 | 5 | 60 | 6 mo. LIBOR | 6.577 | 14.470 | 7.163 | 2.635 | 1.284 | 31 | 6 |
| 2,485,199.41 | 8.1368 | 7.6283 | 354 | 354 | 6 | N/A | 6 mo. LIBOR | 6.403 | 14.328 | 7.332 | 2.920 | 1.041 | 54 | 6 |
| 6,392,896.16 | 7.6789 | 7.1704 | 355 | 475 | 5 | N/A | 6 mo. LIBOR | 5.875 | 13.629 | 6.604 | 3.147 | 1.000 | 55 | 6 |
| 824,348.10 | 7.8033 | 7.2948 | 356 | 300 | 4 | 60 | 6 mo. LIBOR | 5.797 | 14.560 | 7.803 | 2.243 | 1.000 | 56 | 6 |
| 74,612.67 | 7.6250 | 7.1165 | 173 | 353 | 7 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 2,808,628.91 | 8.2481 | 7.7396 | 355 | 475 | 5 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 169,102.14 | 7.6250 | 7.1165 | 352 | 532 | 8 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 3,438,794.02 | 7.9550 | 7.4465 | 175 | 175 | 5 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 1,120,345.79 | 8.4087 | 7.9002 | 235 | 235 | 5 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 91,822,121.86 | 7.9363 | 7.4278 | 355 | 355 | 5 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 897,699.96 | 6.1519 | 5.6434 | 353 | 300 | 7 | 60 | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 483,650.00 | 7.4487 | 6.9402 | 353 | 240 | 7 | 120 | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 8,367,087.53 | 11.5005 | 10.9920 | 176 | 356 | 4 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 162,880.82 | 11.2500 | 10.7415 | 170 | 300 | 10 | 60 | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 70,359.07 | 10.9774 | 10.4689 | 171 | 171 | 9 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 438,609.50 | 10.7247 | 10.2162 | 235 | 235 | 5 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 3,254,444.11 | 10.6696 | 10.1611 | 353 | 353 | 7 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

FHFA01041640

CONFIDENTIAL

GROUP II

| Principal Balance ($) | Gross Mortgage Rate (%) | Net Mortgage Rate (%) | Remaining Term to Maturity (Months) | Amortization Remaining Term* | Age (Months) | Original Interest Only (Months) | Index Type | Gross Margin (%) | Maximum Mortgage Rate (%) | Minimum Mortgage Rate (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Months to Next Rate Adjustment | Adjustment Rate Frequency (Months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 166,980,960.88 | 8.2812 | 7.7727 | 354 | 354 | 6 | N/A | 6 mo. LIBOR | 5.899 | 14.516 | 6.991 | 2.990 | 1.040 | 18 | 6 |
| 71,540,180.83 | 7.9230 | 7.4145 | 355 | 475 | 5 | N/A | 6 mo. LIBOR | 6.025 | 14.061 | 7.079 | 3.000 | 1.071 | 19 | 6 |
| 3,134,837.02 | 7.1686 | 6.6601 | 352 | 336 | 8 | 24 | 6 mo. LIBOR | 6.955 | 13.169 | 7.140 | 3.000 | 1.000 | 16 | 6 |
| 106,445,859.11 | 7.4945 | 6.9860 | 354 | 300 | 6 | 60 | 6 mo. LIBOR | 6.047 | 13.926 | 6.821 | 2.882 | 1.094 | 18 | 6 |
| 2,240,433.18 | 7.0099 | 6.5014 | 351 | 240 | 9 | 120 | 6 mo. LIBOR | 6.194 | 13.010 | 6.235 | 3.483 | 1.161 | 15 | 6 |
| 13,072,646.46 | 8.5260 | 8.0175 | 356 | 356 | 4 | N/A | 6 mo. LIBOR | 7.018 | 15.362 | 8.168 | 2.960 | 1.399 | 32 | 6 |
| 6,824,717.80 | 7.4792 | 6.9707 | 354 | 474 | 6 | N/A | 6 mo. LIBOR | 6.553 | 13.865 | 7.111 | 3.000 | 1.174 | 30 | 6 |
| 1,897,634.80 | 6.1892 | 5.6807 | 350 | 324 | 10 | 36 | 6 mo. LIBOR | 5.950 | 12.429 | 6.189 | 3.000 | 1.120 | 26 | 6 |
| 8,954,896.60 | 7.6843 | 7.1758 | 355 | 300 | 5 | 60 | 6 mo. LIBOR | 6.775 | 14.393 | 7.576 | 2.950 | 1.308 | 31 | 6 |
| 2,379,846.94 | 7.4328 | 6.9243 | 355 | 355 | 5 | N/A | 6 mo. LIBOR | 5.727 | 13.433 | 6.784 | 2.791 | 1.000 | 55 | 6 |
| 3,187,563.85 | 7.0261 | 6.5176 | 355 | 475 | 5 | N/A | 6 mo. LIBOR | 5.780 | 13.026 | 6.190 | 3.399 | 1.000 | 55 | 6 |
| 2,801,989.68 | 7.7903 | 7.2818 | 355 | 300 | 5 | 60 | 6 mo. LIBOR | 6.074 | 14.615 | 7.790 | 2.339 | 1.000 | 55 | 6 |
| 403,750.00 | 7.1250 | 6.6165 | 357 | 276 | 3 | 84 | 6 mo. LIBOR | 6.875 | 14.125 | 7.125 | 3.000 | 1.500 | 57 | 6 |
| 2,171,577.95 | 7.1777 | 6.6692 | 353 | 473 | 7 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 319,335.99 | 7.4372 | 6.9287 | 175 | 175 | 5 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 331,755.75 | 8.5354 | 8.0269 | 235 | 235 | 5 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 37,054,429.44 | 7.2766 | 6.7681 | 354 | 354 | 6 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 4,826,802.09 | 6.2832 | 5.7747 | 352 | 300 | 8 | 60 | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 674,960.53 | 6.8189 | 6.3104 | 353 | 240 | 7 | 120 | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 17,394,854.76 | 11.3837 | 10.8752 | 175 | 355 | 5 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 99,984.98 | 12.1689 | 11.6604 | 175 | 175 | 5 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 297,369.85 | 11.2156 | 10.7071 | 235 | 235 | 5 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 5,557,454.78 | 10.6831 | 10.1746 | 352 | 352 | 8 | N/A | Fixed Rate | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

*Remaining amortization term for Interest Only Loans will begin after the remaining interest only period.

FHFA01041641

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| | Class I-A-1 | | | | |
|---|---|---|---|---|---|
| **Distribution Date** | **60%** | **80%** | **100%** | **120%** | **140%** |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007 | 79 | 72 | 65 | 58 | 51 |
| August 25, 2008 | 53 | 39 | 27 | 15 | 4 |
| August 25, 2009 | 35 | 20 | 7 | 0 | 0 |
| August 25, 2010 | 28 | 20 | 7 | 0 | 0 |
| August 25, 2011 | 22 | 15 | 7 | 0 | 0 |
| August 25, 2012 | 18 | 11 | 7 | 0 | 0 |
| August 25, 2013 | 14 | 8 | 5 | 0 | 0 |
| August 25, 2014 | 11 | 6 | 3 | 0 | 0 |
| August 25, 2015 | 9 | 5 | 2 | 0 | 0 |
| August 25, 2016 | 7 | 3 | 2 | 0 | 0 |
| August 25, 2017 | 6 | 3 | 1 | 0 | 0 |
| August 25, 2018 | 5 | 2 | 1 | 0 | 0 |
| August 1, 2019 | 4 | 2 | * | 0 | 0 |
| August 25, 2020 | 3 | 1 | 0 | 0 | 0 |
| August 25, 2021 | 2 | 1 | 0 | 0 | 0 |
| August 25, 2022 | 2 | * | 0 | 0 | 0 |
| August 25, 2023 | 2 | 0 | 0 | 0 | 0 |
| August 25, 2024 | 1 | 0 | 0 | 0 | 0 |
| August 25, 2025 | 1 | 0 | 0 | 0 | 0 |
| August 25, 2026 | 1 | 0 | 0 | 0 | 0 |
| August 25, 2027 | * | 0 | 0 | 0 | 0 |
| August 25, 2028 | * | 0 | 0 | 0 | 0 |
| August 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| August 1, 2035 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 3.56 | 2.61 | 1.88 | 1.26 | 1.08 |
| Weighted Average Life (in years)[1][2] | 3.27 | 2.38 | 1.69 | 1.26 | 1.08 |

*If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

S-133

FHFA01041642

## Percent of the Initial Certificate Principal Balance
## at the Respective Percentages of the Prepayment Assumption

| Distribution Date | Class II-A-1 | | | | |
| --- | --- | --- | --- | --- | --- |
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007 | 69 | 59 | 49 | 39 | 28 |
| August 25, 2008 | 31 | 12 | 0 | 0 | 0 |
| August 25, 2009 | 7 | 0 | 0 | 0 | 0 |
| August 25, 2010 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2011 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2012 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2013 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2014 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2015 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2016 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2017 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2018 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2019 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2020 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2021 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2022 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2023 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2024 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2025 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2026 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2027 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 1.59 | 1.21 | 1.00 | 0.86 | 0.74 |
| Weighted Average Life (in years)[1][2] | 1.59 | 1.21 | 1.00 | 0.86 | 0.74 |

\*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)     The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)     Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

S-134

CONFIDENTIAL

FHFA01041643

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class II-A-2 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage .................................. | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007.................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2008.................................... | 100 | 100 | 38 | 0 | 0 |
| August 25, 2009.................................... | 100 | 0 | 0 | 0 | 0 |
| August 25, 2010.................................... | 62 | 0 | 0 | 0 | 0 |
| August 25, 2011.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2012.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2013.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2014.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2015.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2016.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2017.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2018.................................... | 0 | 0 | 0 | 0 | 0 |
| August 1, 2019.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2020.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2021.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2022.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2023.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2024.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2025.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2026.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2027.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2035.................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036.................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 4.18 | 2.62 | 2.00 | 1.70 | 1.54 |
| Weighted Average Life (in years)[1][2] | 4.18 | 2.62 | 2.00 | 1.70 | 1.54 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

CONFIDENTIAL

FHFA01041644

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class II-A-3 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ..................................... | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007..................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2008..................................... | 100 | 100 | 100 | 53 | 0 |
| August 25, 2009..................................... | 100 | 81 | 14 | 0 | 0 |
| August 25, 2010..................................... | 100 | 81 | 14 | 0 | 0 |
| August 25, 2011..................................... | 94 | 54 | 14 | 0 | 0 |
| August 25, 2012..................................... | 71 | 35 | 11 | 0 | 0 |
| August 25, 2013..................................... | 53 | 20 | 1 | 0 | 0 |
| August 25, 2014..................................... | 38 | 10 | 0 | 0 | 0 |
| August 25, 2015..................................... | 27 | 2 | 0 | 0 | 0 |
| August 25, 2016..................................... | 17 | 0 | 0 | 0 | 0 |
| August 25, 2017..................................... | 10 | 0 | 0 | 0 | 0 |
| August 25, 2018..................................... | 4 | 0 | 0 | 0 | 0 |
| August 1, 2019..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2020..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2021..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2022..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2023..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2024..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2025..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2026..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2027..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2035..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036..................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.67 | 5.41 | 3.09 | 2.08 | 1.76 |
| Weighted Average Life (in years)[1][2] | 7.48 | 5.28 | 3.00 | 2.08 | 1.76 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

CONFIDENTIAL

FHFA01041645

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class II-A-4 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ...................................... | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007...................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2008...................................... | 100 | 100 | 100 | 100 | 77 |
| August 25, 2009...................................... | 100 | 100 | 100 | 0 | 0 |
| August 25, 2010...................................... | 100 | 100 | 100 | 0 | 0 |
| August 25, 2011...................................... | 100 | 100 | 100 | 0 | 0 |
| August 25, 2012...................................... | 100 | 100 | 100 | 0 | 0 |
| August 25, 2013...................................... | 100 | 100 | 100 | 0 | 0 |
| August 25, 2014...................................... | 100 | 100 | 67 | 0 | 0 |
| August 25, 2015...................................... | 100 | 100 | 40 | 0 | 0 |
| August 25, 2016...................................... | 100 | 81 | 22 | 0 | 0 |
| August 25, 2017...................................... | 100 | 56 | 10 | 0 | 0 |
| August 25, 2018...................................... | 100 | 39 | 0 | 0 | 0 |
| August 1, 2019...................................... | 97 | 26 | 0 | 0 | 0 |
| August 25, 2020...................................... | 76 | 16 | 0 | 0 | 0 |
| August 25, 2021...................................... | 52 | 5 | 0 | 0 | 0 |
| August 25, 2022...................................... | 39 | 0 | 0 | 0 | 0 |
| August 25, 2023...................................... | 29 | 0 | 0 | 0 | 0 |
| August 25, 2024...................................... | 21 | 0 | 0 | 0 | 0 |
| August 25, 2025...................................... | 15 | 0 | 0 | 0 | 0 |
| August 25, 2026...................................... | 7 | 0 | 0 | 0 | 0 |
| August 25, 2027...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2035...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036...................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 15.89 | 11.76 | 8.92 | 2.62 | 2.07 |
| Weighted Average Life (in years)[1][2] | 10.24 | 7.49 | 5.74 | 2.62 | 2.07 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)    The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)    Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option. See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

CONFIDENTIAL

FHFA01041646

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-1 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007 | 100 | 100 | 100 | 100 | 100 |
| August 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| August 25, 2009 | 100 | 100 | 100 | 23 | 0 |
| August 25, 2010 | 81 | 58 | 100 | 23 | 0 |
| August 25, 2011 | 65 | 42 | 71 | 23 | 0 |
| August 25, 2012 | 52 | 31 | 18 | 23 | 0 |
| August 25, 2013 | 41 | 23 | 12 | 23 | 0 |
| August 25, 2014 | 33 | 17 | 8 | 23 | 0 |
| August 25, 2015 | 26 | 12 | 6 | 18 | 0 |
| August 25, 2016 | 21 | 9 | 4 | 7 | 0 |
| August 25, 2017 | 17 | 7 | 3 | 0 | 0 |
| August 25, 2018 | 13 | 5 | 0 | 0 | 0 |
| August 1, 2019 | 10 | 4 | 0 | 0 | 0 |
| August 25, 2020 | 8 | 3 | 0 | 0 | 0 |
| August 25, 2021 | 6 | 0 | 0 | 0 | 0 |
| August 25, 2022 | 5 | 0 | 0 | 0 | 0 |
| August 25, 2023 | 4 | 0 | 0 | 0 | 0 |
| August 25, 2024 | 3 | 0 | 0 | 0 | 0 |
| August 25, 2025 | 2 | 0 | 0 | 0 | 0 |
| August 25, 2026 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2027 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.38 | 5.76 | 5.76 | 4.43 | 2.34 |
| Weighted Average Life (in years)[1][2] | 6.65 | 5.18 | 5.30 | 3.27 | 2.34 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)     The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)     Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

CONFIDENTIAL

FHFA01041647

## Percent of the Initial Certificate Principal Balance
## at the Respective Percentages of the Prepayment Assumption

| Distribution Date | Class M-2 | | | | |
| | 60% | 80% | 100% | 120% | 140% |
|---|---|---|---|---|---|
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007 | 100 | 100 | 100 | 100 | 100 |
| August 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| August 25, 2009 | 100 | 100 | 100 | 100 | 0 |
| August 25, 2010 | 81 | 58 | 100 | 100 | 0 |
| August 25, 2011 | 65 | 42 | 27 | 100 | 0 |
| August 25, 2012 | 52 | 31 | 18 | 63 | 0 |
| August 25, 2013 | 41 | 23 | 12 | 30 | 0 |
| August 25, 2014 | 33 | 17 | 8 | 9 | 0 |
| August 25, 2015 | 26 | 12 | 6 | 0 | 0 |
| August 25, 2016 | 21 | 9 | 4 | 0 | 0 |
| August 25, 2017 | 17 | 7 | 1 | 0 | 0 |
| August 25, 2018 | 13 | 5 | 0 | 0 | 0 |
| August 25, 2019 | 10 | 4 | 0 | 0 | 0 |
| August 25, 2020 | 8 | 1 | 0 | 0 | 0 |
| August 25, 2021 | 6 | 0 | 0 | 0 | 0 |
| August 25, 2022 | 5 | 0 | 0 | 0 | 0 |
| August 25, 2023 | 4 | 0 | 0 | 0 | 0 |
| August 25, 2024 | 3 | 0 | 0 | 0 | 0 |
| August 25, 2025 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2026 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2027 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.36 | 5.65 | 5.19 | 6.56 | 2.65 |
| Weighted Average Life (in years)[1][2] | 6.65 | 5.09 | 4.74 | 4.57 | 2.65 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1) The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2) Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option. See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

CONFIDENTIAL

FHFA01041648

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-3 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007 | 100 | 100 | 100 | 100 | 100 |
| August 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| August 25, 2009 | 100 | 100 | 100 | 100 | 15 |
| August 25, 2010 | 81 | 58 | 56 | 100 | 15 |
| August 25, 2011 | 65 | 42 | 27 | 45 | 15 |
| August 25, 2012 | 52 | 31 | 18 | 10 | 15 |
| August 25, 2013 | 41 | 23 | 12 | 6 | 15 |
| August 25, 2014 | 33 | 17 | 8 | 4 | 15 |
| August 25, 2015 | 26 | 12 | 6 | 0 | * |
| August 25, 2016 | 21 | 9 | 4 | 0 | 0 |
| August 25, 2017 | 17 | 7 | 0 | 0 | 0 |
| August 25, 2018 | 13 | 5 | 0 | 0 | 0 |
| August 1, 2019 | 10 | 4 | 0 | 0 | 0 |
| August 25, 2020 | 8 | 0 | 0 | 0 | 0 |
| August 25, 2021 | 6 | 0 | 0 | 0 | 0 |
| August 25, 2022 | 5 | 0 | 0 | 0 | 0 |
| August 25, 2023 | 4 | 0 | 0 | 0 | 0 |
| August 25, 2024 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2025 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2026 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2027 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| August 1, 2035 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.34 | 5.59 | 4.93 | 5.22 | 3.75 |
| Weighted Average Life (in years)[1][2] | 6.65 | 5.05 | 4.49 | 4.57 | 3.04 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

CONFIDENTIAL                                                                                       FHFA01041649

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-4 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007 | 100 | 100 | 100 | 100 | 100 |
| August 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| August 25, 2009 | 100 | 100 | 100 | 100 | 100 |
| August 25, 2010 | 81 | 58 | 40 | 100 | 100 |
| August 25, 2011 | 65 | 42 | 27 | 16 | 100 |
| August 25, 2012 | 52 | 31 | 18 | 10 | 80 |
| August 25, 2013 | 41 | 23 | 12 | 6 | 32 |
| August 25, 2014 | 33 | 17 | 8 | 3 | 1 |
| August 25, 2015 | 26 | 12 | 6 | 0 | 0 |
| August 25, 2016 | 21 | 9 | 3 | 0 | 0 |
| August 25, 2017 | 17 | 7 | 0 | 0 | 0 |
| August 25, 2018 | 13 | 5 | 0 | 0 | 0 |
| August 25, 2019 | 10 | 2 | 0 | 0 | 0 |
| August 25, 2020 | 8 | 0 | 0 | 0 | 0 |
| August 25, 2021 | 6 | 0 | 0 | 0 | 0 |
| August 25, 2022 | 5 | 0 | 0 | 0 | 0 |
| August 25, 2023 | 2 | 0 | 0 | 0 | 0 |
| August 25, 2024 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2025 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2026 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2027 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.32 | 5.55 | 4.79 | 4.78 | 6.70 |
| Weighted Average Life (in years)[1][2] | 6.65 | 5.02 | 4.37 | 4.44 | 3.74 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

[1]    The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

[2]    Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

CONFIDENTIAL

FHFA01041650

## Percent of the Initial Certificate Principal Balance
## at the Respective Percentages of the Prepayment Assumption

| Distribution Date | Class M-5 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ..................................... | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007....................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2008....................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2009....................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2010....................................... | 81 | 58 | 40 | 72 | 100 |
| August 25, 2011....................................... | 65 | 42 | 27 | 16 | 68 |
| August 25, 2012....................................... | 52 | 31 | 18 | 10 | 5 |
| August 25, 2013....................................... | 41 | 23 | 12 | 6 | 0 |
| August 25, 2014....................................... | 33 | 17 | 8 | 0 | 0 |
| August 25, 2015....................................... | 26 | 12 | 6 | 0 | 0 |
| August 25, 2016....................................... | 21 | 9 | 0 | 0 | 0 |
| August 25, 2017....................................... | 17 | 7 | 0 | 0 | 0 |
| August 25, 2018....................................... | 13 | 5 | 0 | 0 | 0 |
| August 25, 2019....................................... | 10 | 0 | 0 | 0 | 0 |
| August 25, 2020....................................... | 8 | 0 | 0 | 0 | 0 |
| August 25, 2021....................................... | 6 | 0 | 0 | 0 | 0 |
| August 25, 2022....................................... | 5 | 0 | 0 | 0 | 0 |
| August 25, 2023....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2024....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2025....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2026....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2027....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2035....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036....................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.30 | 5.51 | 4.69 | 4.51 | 5.26 |
| Weighted Average Life (in years)[1][2] | 6.65 | 5.00 | 4.28 | 4.18 | 3.74 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1) The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2) Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option. See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

CONFIDENTIAL

FHFA01041651

**Percent of the Initial Certificate Principal Balance**
**at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-6 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ..................................... | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007....................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2008....................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2009....................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2010....................................... | 81 | 58 | 40 | 26 | 100 |
| August 25, 2011....................................... | 65 | 42 | 27 | 16 | 9 |
| August 25, 2012....................................... | 52 | 31 | 18 | 10 | 3 |
| August 25, 2013....................................... | 41 | 23 | 12 | 6 | 0 |
| August 25, 2014....................................... | 33 | 17 | 8 | 0 | 0 |
| August 25, 2015....................................... | 26 | 12 | 6 | 0 | 0 |
| August 25, 2016....................................... | 21 | 9 | 0 | 0 | 0 |
| August 25, 2017....................................... | 17 | 7 | 0 | 0 | 0 |
| August 25, 2018....................................... | 13 | 2 | 0 | 0 | 0 |
| August 25, 2019....................................... | 10 | 0 | 0 | 0 | 0 |
| August 25, 2020....................................... | 8 | 0 | 0 | 0 | 0 |
| August 25, 2021....................................... | 6 | 0 | 0 | 0 | 0 |
| August 25, 2022....................................... | 1 | 0 | 0 | 0 | 0 |
| August 25, 2023....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2024....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2025....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2026....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2027....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2035....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036....................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.27 | 5.47 | 4.61 | 4.31 | 4.62 |
| Weighted Average Life (in years)[1][2] | 6.65 | 4.98 | 4.22 | 4.00 | 3.74 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

CONFIDENTIAL                                        FHFA01041652

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-7 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ..................................... | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007....................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2008....................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2009....................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2010....................................... | 81 | 58 | 40 | 26 | 69 |
| August 25, 2011....................................... | 65 | 42 | 27 | 16 | 9 |
| August 25, 2012....................................... | 52 | 31 | 18 | 10 | 0 |
| August 25, 2013....................................... | 41 | 23 | 12 | 3 | 0 |
| August 25, 2014....................................... | 33 | 17 | 8 | 0 | 0 |
| August 25, 2015....................................... | 26 | 12 | * | 0 | 0 |
| August 25, 2016....................................... | 21 | 9 | 0 | 0 | 0 |
| August 25, 2017....................................... | 17 | 7 | 0 | 0 | 0 |
| August 25, 2018....................................... | 13 | 0 | 0 | 0 | 0 |
| August 25, 2019....................................... | 10 | 0 | 0 | 0 | 0 |
| August 25, 2020....................................... | 8 | 0 | 0 | 0 | 0 |
| August 25, 2021....................................... | 3 | 0 | 0 | 0 | 0 |
| August 25, 2022....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2023....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2024....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2025....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2026....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2027....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2035....................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036....................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.22 | 5.43 | 4.53 | 4.16 | 4.25 |
| Weighted Average Life (in years)[1][2] | 6.65 | 4.98 | 4.17 | 3.87 | 3.74 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

CONFIDENTIAL

FHFA01041653

**Percent of the Initial Certificate Principal Balance**
**at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-8 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ..................................... | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007...................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2008...................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2009...................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2010...................................... | 81 | 58 | 40 | 26 | 16 |
| August 25, 2011...................................... | 65 | 42 | 27 | 16 | 9 |
| August 25, 2012...................................... | 52 | 31 | 18 | 10 | 0 |
| August 25, 2013...................................... | 41 | 23 | 12 | 0 | 0 |
| August 25, 2014...................................... | 33 | 17 | 8 | 0 | 0 |
| August 25, 2015...................................... | 26 | 12 | 0 | 0 | 0 |
| August 25, 2016...................................... | 21 | 9 | 0 | 0 | 0 |
| August 25, 2017...................................... | 17 | 0 | 0 | 0 | 0 |
| August 25, 2018...................................... | 13 | 0 | 0 | 0 | 0 |
| August 25, 2019...................................... | 10 | 0 | 0 | 0 | 0 |
| August 25, 2020...................................... | 8 | 0 | 0 | 0 | 0 |
| August 25, 2021...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2022...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2023...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2024...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2025...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2026...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2027...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2035...................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036...................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.18 | 5.37 | 4.46 | 4.04 | 3.99 |
| Weighted Average Life (in years)[1][2] | 6.65 | 4.96 | 4.14 | 3.78 | 3.73 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

CONFIDENTIAL                                                                                    FHFA01041654

**Percent of the Initial Certificate Principal Balance**
**at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-9 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ..................................... | 100% | 100% | 100% | 100% | 100% |
| August 25, 2007..................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2008..................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2009..................................... | 100 | 100 | 100 | 100 | 100 |
| August 25, 2010..................................... | 81 | 58 | 40 | 26 | 16 |
| August 25, 2011..................................... | 65 | 42 | 27 | 16 | 5 |
| August 25, 2012..................................... | 52 | 31 | 18 | 9 | 0 |
| August 25, 2013..................................... | 41 | 23 | 12 | 0 | 0 |
| August 25, 2014..................................... | 33 | 17 | 0 | 0 | 0 |
| August 25, 2015..................................... | 26 | 12 | 0 | 0 | 0 |
| August 25, 2016..................................... | 21 | 5 | 0 | 0 | 0 |
| August 25, 2017..................................... | 17 | 0 | 0 | 0 | 0 |
| August 25, 2018..................................... | 13 | 0 | 0 | 0 | 0 |
| August 25, 2019..................................... | 10 | 0 | 0 | 0 | 0 |
| August 25, 2020..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2021..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2022..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2023..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2024..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2025..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2026..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2027..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2028..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2029..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2030..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2031..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2032..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2033..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2034..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2035..................................... | 0 | 0 | 0 | 0 | 0 |
| August 25, 2036..................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.11 | 5.31 | 4.38 | 3.93 | 3.81 |
| Weighted Average Life (in years)[1][2] | 6.65 | 4.96 | 4.10 | 3.71 | 3.63 |

*If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)     The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)     Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this free writing prospectus.

CONFIDENTIAL

FHFA01041655

## THE SPONSOR

Nomura Credit & Capital, Inc., the sponsor, is a Delaware corporation whose principal offices are located in New York, New York. The sponsor has a book value of approximately $73.67 million as of March 31, 2006, is a subsidiary of Nomura Holding America Inc., and an indirect subsidiary of Nomura Holdings, Inc., a global investment banking and securities firm having a market capitalization of approximately $40.40 billion. The sponsor is a HUD approved mortgagee primarily engaged in the business of originating, purchasing and selling commercial mortgage loans, purchasing and selling residential mortgage loans and engaging in various asset backed warehouse and repurchase financings of non-securities. The sponsor is also an affiliate of Nomura Securities International, Inc., one of the underwriters for this transaction and Nomura Home Equity Loan, Inc., the depositor for this transaction. The sponsor was incorporated in the State of Delaware on June 24, 1998. The sponsor maintains its principal office at Two World Financial Center, Building B, New York, New York 10281. Its telephone number is (212) 667-9300.

Since 2002 the sponsor has been purchasing residential mortgage loans, comprised primarily of newly originated, conforming and non-conforming balance, Alt-A, first-lien, fixed and adjustable rate mortgages, as well as second-lien and subprime mortgages, in excess of $25.364 billion as of June 30, 2006. The sponsor is responsible for pooling the mortgage loans to be securitized by the depositor, negotiating the principal securitization transaction documents and participating with the underwriter in the structuring of such transactions. The sponsor also sells residential mortgage loans and related servicing rights to third-party investors.

The sponsor has been actively securitizing residential mortgage loans since April 2003. The following table describes the size (at issuance), composition and growth of the sponsor's total portfolio of assets it has publicly securitized as of the dates indicated. As of the date of this free writing prospectus, none of the securitization transactions sponsored by the sponsor through July 2006 and involving the depositor have defaulted or experienced a trigger event.

| | Year ended December 31, 2003 | | Year ended December 31, 2004 | | Year ended December 31, 2005 | | Month ended July 31, 2006 | |
|---|---|---|---|---|---|---|---|---|
| Loan Type | Number | Total Portfolio of Loans | Number | Total Portfolio of Loans | Number | Total Portfolio of Loans | Number | Total Portfolio of Loans |
| Alt-A ARM............. | N/A | N/A | 6,360 | $1,595,220,173 | 11,166 | $3,096,819,467 | 5.968 | $1,839,229,480 |
| Alt-A Fixed............ | 3,268 | $687,573,876 | 3,823 | $ 773,581,361 | 6,798 | $1,387,201,153 | 3,430 | $ 855,809,997 |
| Seconds................. | N/A | N/A | N/A | N/A | 12,142 | $ 685,450,460 | 0 | N/A |
| SubPrime ............... | N/A | N/A | N/A | N/A | 10,278 | $2,080,121,500 | 17,714 | $3,280,360,860 |

## STATIC POOL INFORMATION

Static pool information material to this offering may be found at http://www.nomuradeals.com/NHEL2006HE3.

Information provided through the Internet address above will not be deemed to be a part of this prospectus or the registration statement for the securities offered hereby if it relates to any prior securities pool or vintage formed before January 1, 2006, or with respect to any mortgage pool (if applicable) acquired before January 1, 2006.

S-147

CONFIDENTIAL

FHFA01041656

## ISSUING ENTITY

Nomura Home Equity Loan, Inc., Home Equity Loan Trust Series 2006-HE3 is a common law trust formed under the laws of the State of New York pursuant to the pooling and servicing agreement between the depositor, Ocwen Loan Servicing, LLC, as a servicer, the master servicer, the securities administrator and the trustee, dated as of August 1, 2006 (the "Pooling and Servicing Agreement"). The Pooling and Servicing Agreement constitutes the "governing instrument" under the laws of the State of New York. After its formation, the Issuing Entity will not engage in any activity other than (i) acquiring and holding the Mortgage Loans and the other assets of the trust and proceeds therefrom, (ii) issuing the certificates, (iii) making payments on the certificates and (iv) engaging in other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith. The foregoing restrictions are contained in the Pooling and Servicing Agreement. These restrictions cannot be amended without the consent of holders of certificates evidencing at least 51% of the voting rights. For a description of other provisions relating to amending the Pooling and Servicing Agreement, please see *"Description of the Agreements — Amendment"* in the prospectus.

The assets of the Issuing Entity will consist of the Mortgage Loans and certain related assets.

The Issuing Entity's fiscal year end is December 31.

## THE DEPOSITOR

Nomura Home Equity Loan, Inc., the depositor, is a special purpose corporation incorporated in the State of Delaware on April 26, 2005. The principal executive offices of the depositor are located at Two World Financial Center, Building B, New York, New York 10281. Its telephone number is (212) 667-9300. The depositor does not have, nor is it expected in the future to have, any significant assets.

The limited purposes of the depositor are, in general, to acquire, own and sell mortgage loans and financial assets; to issue, acquire, own, hold and sell securities and notes secured by or representing ownership interests in mortgage loans and other financial assets, collections on the mortgage loans and related assets; and to engage in any acts that are incidental to, or necessary, suitable or convenient to accomplish, these purposes.

The depositor has been actively serving as a private secondary mortgage market conduit for residential mortgage loans since its inception. Since that time it has been involved in the issuance of public securities backed by residential mortgage loans in excess of $5.2 billion as of July 31, 2006.

After issuance and registration of the securities contemplated in this free writing prospectus, the depositor will have no duties or responsibilities with respect to the pool assets or securities.

All of the shares of capital stock of the depositor are held by Nomura Asset Capital Corporation, a Delaware corporation.

CONFIDENTIAL

FHFA01041657

## SERVICING

Primary servicing of approximately 0.77% of the Mortgage Loans (the "Wells Fargo Mortgage Loans" ), by aggregate principal balance as of the Cut-off Date, will be provided by Wells Fargo Bank, N.A. ("Wells Fargo Bank") pursuant to the Seller's Warranties and Servicing Agreement, dated as of March 1, 2006, between Wells Fargo Bank and the sponsor, Nomura Credit & Capital, Inc., as modified by the Assignment, Assumption and Recognition Agreement, dated as of August 1, 2006, among Wells Fargo Bank, the sponsor, the depositor, the master servicer and the trustee (together, the "Servicing Agreement" ). Wells Fargo Bank will continue to service the Wells Fargo Mortgage Loans until it is terminated under the Servicing Agreement.

Primary servicing of approximately 99.23% of the Mortgage Loans (the "Ocwen Mortgage Loans"), by aggregate principal balance as of the Cut-off Date, will be provided by Ocwen Loan Servicing, LLC ("Ocwen") pursuant to the Pooling and Servicing Agreement. Ocwen will continue to service the Ocwen Mortgage Loans until it is terminated under the Pooling and Servicing Agreement. The information set forth in the following paragraphs has been provided by Ocwen because Ocwen is servicing in excess of 20% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date.

### Ocwen Loan Servicing, LLC

Ocwen Loan Servicing, LLC ("Ocwen"), a Delaware limited liability company, has its primary servicing operations in Orlando, Florida and its corporate offices in West Palm Beach, Florida. Ocwen is a wholly owned subsidiary of Ocwen Financial Corporation, a public financial services holding company ("OCN") headquartered in West Palm Beach, Florida. OCN's primary businesses are the servicing, special servicing and resolution of nonconforming, subperforming and nonperforming residential and commercial mortgage loans for third parties, as well as providing loan servicing technology and business-to-business e-commerce solutions for the mortgage and real estate industries.

As of March 31, 2006, OCN had approximately $1.554 billion in assets, including $183.8 million of cash, approximately $1.188 billion in liabilities and approximately $366 million in equity. For the quarter ended March 31, 2006, OCN's pre-tax income was approximately $21.5 million, as compared to approximately $2.5 million reported for the quarter ended December 31, 2005.

Ocwen is rated as a "Strong" residential subprime servicer and residential special servicer by Standard & Poor's and has an "RPS2" rating as a subprime servicer and an "RSS2" rating as special servicer from Fitch Ratings. Ocwen is also rated "SQ2-" ("Above Average") as a primary servicer of subprime loans and "SQ2" ("Above Average") as a special servicer by Moody's Investors Service, Inc. On April 23, 2004, Standard & Poor's placed its "Strong" residential subprime servicer and residential special servicer ratings assigned to Ocwen on "Credit Watch with negative implications." Ocwen is an approved Freddie Mac and Fannie Mae seller/servicer.

Ocwen, as successor in interest to Ocwen Federal Bank, and OCN are defendants in several potential class action lawsuits challenging Ocwen's mortgage servicing practices. To date, no such lawsuit has been certified by any court as a class action. On April 13, 2004, these lawsuits were consolidated in a single proceeding in the United States District Court for the District of Illinois under caption styled: Ocwen Federal Bank FSB Mortgage Servicing Litigation, MDL Docket No.

CONFIDENTIAL

1604. Ocwen believes that its servicing practices comply with legal requirements and is vigorously defending against such lawsuits. Ocwen is also subject to various other routine pending litigation in the ordinary course of its business. While the outcome of litigation is always uncertain, Ocwen's management is of the opinion that the resolution of any of these claims and lawsuits will not have a material adverse effect on the results of its operations or financial condition or its ability to service the mortgage loans.

On February 9, 2006, a trial court in Galveston, Texas entered judgment in the amount of $1.8 million in compensatory and statutory damages and attorneys' fees against Ocwen in favor of a plaintiff borrower whose mortgage loan was serviced by Ocwen. The plaintiff brought the claims under the Texas Deceptive Trade Practices Act and other state statutes and common law generally alleging that Ocwen engaged in improper loan servicing practices. Ocwen believes that the judgment is against the weight of evidence and contrary to law and that the attorneys' fees award, which comprises $1.1 million of the judgment should be reduced as impermissibly excessive. Ocwen appealed the decision and will continue to vigorously defend this matter.

Ocwen, including its predecessors, has significant experience in servicing residential and commercial mortgage loans and has been servicing residential mortgage loans since 1988, and non-prime mortgage loans since 1994. Ocwen is one of the largest third-party subprime mortgage loan servicers in the United States. OCN and its related companies currently employ more than 3,500 people worldwide with domestic residential mortgage loan servicing and processing centers in Orlando, Florida and Chicago, Illinois and related international offices in Bangalore and Mumbai, India. Ocwen specializes in the management of sub-performing and non-performing assets, including severely delinquent and labor-intensive mortgage loans and REO assets. Ocwen's servicing experience generally includes collection, loss mitigation, default reporting, bankruptcy, foreclosure and REO property management.

As of March 31, 2006, Ocwen provided servicing for residential mortgage loans with an aggregate unpaid principal balance of approximately $42.9 billion, substantially all of which are being serviced for third parties, including loans in over 250 securitizations. The table below sets forth the aggregate unpaid principal balance of the subprime mortgage loans serviced by Ocwen at the end of each of the indicated periods.

## Ocwen
## Subprime Servicing Portfolio
### (Dollars in Thousands)

| Aggregate Principal Balance as of December 31, 2002 | Aggregate Principal Balance as of December 31, 2003 | Aggregate Principal Balance as of December 31, 2004 | Aggregate Principal Balance as of December 31, 2005 | Aggregate Principal Balance as of March 31, 2006 |
|---|---|---|---|---|
| $26,356,007 | $30,551,242 | $28,367,753 | $37,424,696 | $33,845,396 |

*Ocwen's Delinquency and Foreclosure Experience*

The following tables set forth, for the subprime mortgage loan servicing portfolio serviced by Ocwen, certain information relating to the delinquency, foreclosure, REO and loss experience with respect to such mortgage loans (including loans in foreclosure in Ocwen's servicing

CONFIDENTIAL

FHFA01041659

portfolio (which portfolio does not include mortgage loans that are subserviced by others)) at the end of the indicated periods. The indicated periods of delinquency are based on the number of days past due on a contractual basis. No mortgage loan is considered delinquent for these purposes until it is one month past due on a contractual basis. Ocwen's portfolio may differ significantly from the mortgage loans in the mortgage loan pool in terms of interest rates, principal balances, geographic distribution, types of properties, lien priority, origination and underwriting criteria, prior servicer performance and other possibly relevant characteristics. There can be no assurance, and no representation is made, that the delinquency and foreclosure experience with respect to the mortgage loans in the mortgage loan pool will be similar to that reflected in the table below, nor is any representation made as to the rate at which losses may be experienced on liquidation of defaulted mortgage loans in the mortgage loan pool. The actual delinquency experience with respect to the mortgage loans in the mortgage loan pool will depend, among other things, upon the value of the real estate securing such mortgage loans in the mortgage loan pool and the ability of the related borrower to make required payments. It should be noted that if the residential real estate market should experience an overall decline in property values, the actual rates of delinquencies and foreclosures could be higher than those previously experienced by Ocwen. In addition, adverse economic conditions may affect the timely payment by borrowers of scheduled payments of principal and interest on the mortgage loans in the mortgage loan pool and, accordingly, the actual rates of delinquencies and foreclosures with respect to the mortgage loan pool. Finally, the statistics shown below represent the delinquency experience for Ocwen's mortgage servicing portfolio only for the periods presented, whereas the aggregate delinquency experience with respect to the mortgage loans comprising the mortgage loan pool will depend on the results obtained over the life of the mortgage loan pool.

## Ocwen
## Delinquencies and Foreclosures
### (Dollars in Thousands)

| | As of December 31, 2003 | | | | As of December 31, 2004 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | By No. Of Loans | By Dollar Amount | Percent by No. of Loans | Percent by Dollar Amount | By No. Of Loans | By Dollar Amount | Percent by No. of Loans | Percent by Dollar Amount |
| Total Portfolio | 256,891 | $30,551,242 | 100.00% | 100.00% | 237,985 | $28,367,753 | 100.00% | 100.00% |
| Period of Delinquency[1] | | | | | | | | |
| 30-59 days | 10,662 | $ 1,117,125 | 4.15% | 3.66% | 11,251 | $ 1,127,427 | 4.73% | 3.97% |
| 60-89 days | 4,595 | $ 488,900 | 1.79% | 1.60% | 5,066 | $ 515,826 | 2.13% | 1.82% |
| 90 days or more | 24,050 | $ 2,341,837 | 9.36% | 7.67% | 26,459 | $ 2,545,313 | 11.12% | 8.97% |
| Total Delinquent Loans | 39,307 | $ 3,947,862 | 15.30% | 12.92% | 42,776 | $ 4,188,566 | 17.97% | 14.77% |
| Loans in Foreclosure[2] | 9,800 | $ 1,057,710 | 3.81% | 3.46% | 9,599 | $ 975,961 | 4.03% | 3.44% |

CONFIDENTIAL

FHFA01041660

| | As of December 31, 2005 | | | | As of March 31, 2006 | | | |
|---|---|---|---|---|---|---|---|---|
| | By No. Of Loans | By Dollar Amount | Percent by No. of Loans | Percent by Dollar Amount | By No. Of Loans | By Dollar Amount | Percent by No. of Loans | Percent by Dollar Amount |
| Total Portfolio | 304,153 | $37,424,696 | 100.00% | 100.00% | 277,553 | $33,845,396 | 100.00% | 100.00% |
| Period of Delinquency[1] | | | | | | | | |
| 30-59 days | 15,854 | $ 1,678,284 | 5.21% | 4.48% | 12,602 | $ 1,368,721 | 4.54% | 4.04% |
| 60-89 days | 7,701 | $ 773,139 | 2.53% | 2.07% | 6,655 | $ 731,436 | 2.40% | 2.16% |
| 90 days or more | 34,669 | $ 3,336,423 | 11.40% | 8.92% | 35,801 | $ 3,594,265 | 12.90% | 10.62% |
| Total Delinquent Loans | 58,224 | $ 5,787,845 | 19.14% | 15.47% | 55,058 | $ 5,694,422 | 19.84% | 16.82% |
| Loans in Foreclosure[2] | 9,057 | $ 924,118 | 2.98% | 2.47% | 12,072 | $ 1,384,050 | 4.35% | 4.09% |

[1]   Includes 25,142 loans totaling $2,359,272 for March 31, 2006, which were delinquent at the time of transfer to Ocwen.

[2]   Loans in foreclosure are also included under the heading "Total Delinquent Loans."

## Ocwen
## Real Estate Owned
## (Dollars in Thousands)

| | As of December 31, 2003 | | As of December 31, 2004 | | As of December 31, 2005 | | As of March 31, 2006 | |
|---|---|---|---|---|---|---|---|---|
| | By No. of Loans | By Dollar Amount | By No. of Loans | By Dollar Amount | By No. of Loans | By Dollar Amount | By No. of Loans | By Dollar Amount |
| Total Portfolio | 256,891 | $30,551,242 | 237,985 | $28,367,753 | 304,153 | $37,424,696 | 277,553 | $33,845,396 |
| Foreclosed Loans[1] | 4,849 | $ 437,510 | 4,858 | $ 439,890 | 4,475 | $ 390,412 | 4,597 | $ 412,841 |
| Foreclosure Ratio[2] | 1.89% | 1.43% | 2.04% | 1.55% | 1.47% | 1.04% | 1.66% | 1.22% |

[1]   For the purpose of these tables, "Foreclosed Loans" means the principal balance of mortgage loans secured by mortgaged properties the title to which has been acquired by Ocwen.

[2]   The "Foreclosure Ratio" is equal to the aggregate principal balance or number of Foreclosed Loans divided by the aggregate principal balance, or number, as applicable, of mortgage loans in the Total Portfolio at the end of the indicated period.

CONFIDENTIAL

FHFA01041661

**Ocwen**
**Loan Gain/(Loss) Experience**
**(Dollars in Thousands)**

| | As of December 31, 2003 | As of December 31, 2004 | As of December 31, 2005 | As of March 31, 2006 |
|---|---|---|---|---|
| Total Portfolio[1] | $ 30,551,242 | $28,367,753 | $37,424,696 | $33,845,396 |
| Net Gains/(Losses)[2][3] | $ (249,516) | $ (348,145) | $ (406,451) | $ (403,902) |
| Net Gains/(Losses) as a Percentage of Total Portfolio | (0.82)% | (1.23)% | (1.09)% | (1.19)% |

[1]     "Total Portfolio" on the date stated above, is the principal balance of the mortgage loans outstanding on the last day of the period.

[2]     "Net Gains/(Losses)" are actual gains or losses incurred on liquidated properties and shortfall payoffs for the preceding one year period. Gains or losses on liquidated properties are calculated as net sales proceeds less unpaid principal at the time of payoff. Shortfall payoffs are calculated as the difference between the principal payoff amount and unpaid principal at the time of payoff.

[3]     Includes ($128,885) as of March 31, 2006 of losses attributable to loans, which were delinquent at the time of transfer to Ocwen.

*Prior Securitizations*

        In the past three years, Ocwen has not been terminated as a servicer in a residential mortgage backed securities transaction due to a servicer default or application of a servicing performance test or trigger.  In the past three years, Ocwen has not failed to make any required advance with respect to any issuance of residential mortgage backed securities transactions.

*Ocwen's Policies and Procedures*

        Upon boarding a mortgage loan, various types of information are automatically loaded into Ocwen's mortgage loan servicing system ("REALServicing").  Ocwen then makes all reasonable efforts to collect the contractual mortgage loan payments that are due by the borrower pursuant to the applicable mortgage loan documents and, consistent with the applicable servicing agreement, will follow such collection procedures that are customary with respect to comparable mortgage loans.

        Ocwen's collection policy seeks to identify payment problems at the early stage of delinquency and, if necessary, to address such delinquency in order to preserve the equity of a pre-foreclosure mortgage property.  Ocwen uses a consistent application, a proactive consulting approach, defined call strategies, and enhanced payment methods to assist the collection process.  On a monthly basis, borrowers are mailed their monthly statement in advance of the due date.  All borrowers can obtain loan information and make payments via web access (www.ocwen.com), as well as direct dial customer service.

        Ocwen utilizes multiple strategies in order to identify payment problems while working with borrowers to make their monthly payment in a timely manner.  The potential for losses is mitigated using internal proprietary models to project performance and required advances and to assist in identifying workout options.  On a monthly basis the delinquency status is determined for each mortgage loan.  A collector then calls the borrower to make payment arrangements.  If

CONFIDENTIAL                                                                                 FHFA01041662

payments have not been collected by the date a late charge becomes effective, a standard reminder letter is mailed to the borrower.

Subject to the limitations set forth in the applicable servicing agreement, Ocwen, in its discretion, may waive any assumption fees, late payment charges, or other charges in connection with the underlying mortgage loans, modify any term of a mortgage loan, consent to the postponement of strict compliance with any such terms, or grant indulgence to any borrower.

If a loan becomes non-performing, projections are conducted on a monthly basis using proprietary cash-flow models that help determine the recoverability of losses and the preservation of equity. Various marketing scenarios are analyzed using an updated broker price opinion and appraisals to assist in projecting property cash flow. If the projected loss severity reaches or exceeds 100% (proceeds less expenses) then future advances on the mortgage loan are deemed non-recoverable and a recommendation is then made to stop making such advances. A more in-depth analysis is conducted to determine if charge-off is appropriate.

If reasonable collection efforts have not been successful, Ocwen will determine whether a foreclosure proceeding is appropriate. Additional proprietary models are used to project future costs that may occur while completing foreclosure and ultimately liquidating the loan.

Ocwen complies with standard servicing practices in utilizing customary external vendors for such functions as obtaining property appraisals, broker price opinions, property preservation functions and legal counsel. These functions are monitored and reviewed by Ocwen.

Over the past three years, there has been no material changes in Ocwen's servicing policies and procedures.

**Servicing and Other Compensation and Payment of Expenses**

Each servicer will provide the servicing functions with respect to the related Mortgage Loans serviced by such servicer as set forth in the Pooling and Servicing Agreement or the Servicing Agreement, as applicable. Among other things, each servicer will be obligated, except under certain circumstances described in this free writing prospectus, to make P&I Advances with respect to the Mortgage Loans serviced by such servicer. In managing the liquidation of defaulted Mortgage Loans, each servicer will have sole discretion to take such action in maximizing recoveries to the certificateholders including, without limitation, selling defaulted Mortgage Loans and REO Properties as described in the Pooling and Servicing Agreement or the Servicing Agreement, as applicable. Pursuant to the terms of the Pooling and Servicing Agreement or the Servicing Agreement, as applicable, the related servicer will be entitled to reimbursement for P&I Advances, servicing advances, servicing fees and applicable expenses on a priority basis from, among other things, late recoveries of principal and/or interest, Liquidation Proceeds and Insurance Proceeds from the Mortgage Loans. The master servicer will be required to monitor the performance of Ocwen under the Pooling and Servicing Agreement and Wells Fargo Bank under the Servicing Agreement.

The principal compensation to be paid to each servicer in respect of the servicing activities performed by it with respect to the Mortgage Loans will be 0.50% per annum (the "Servicing Fee Rate") on the Stated Principal Balance of each Mortgage Loan (the "Servicing Fee"). As additional servicing compensation, each servicer is entitled to retain all assumption fees, late payment charges, and other miscellaneous servicing fees in respect of the Mortgage Loans serviced by such servicer to the extent collected from the borrowers, together with any interest or other

CONFIDENTIAL
FHFA01041663

income earned on funds held in the related Custodial Account (as defined in this free writing prospectus) maintained by such servicer and any escrow accounts. In addition, Ocwen is entitled to prepayment interest excess (as defined in the Pooling and Servicing Agreement).

In general, each servicer will be obligated to offset any Prepayment Interest Shortfall relating to voluntary prepayments in full on any distribution date with Compensating Interest on such distribution date as described in the definition of Compensating Interest under "Description of the Certificates—Glossary of Terms" in this free writing prospectus; *provided however* that the obligation of the related servicer with respect to the payment of Compensating Interest will be limited to the Servicing Fee payable to such servicer for such month. Each servicer is obligated to pay insurance premiums and other ongoing expenses associated with the Mortgage Loans serviced by such servicer incurred by it in connection with its responsibilities under the Pooling and Servicing Agreement or the Servicing Agreement, as applicable, and is entitled to reimbursement for these expenses as provided in the Pooling and Servicing Agreement or the Servicing Agreement, as applicable.

**Payments on Mortgage Loans; Deposits to Custodial Accounts**

Each servicer shall establish and maintain or cause to be maintained a separate trust account (each, a "Custodial Account") for the Mortgage Loans serviced by such servicer for the benefit of the certificateholders. The Custodial Accounts will be Eligible Accounts (as defined in the Pooling and Servicing Agreement or the Servicing Agreement, as applicable). Within two (2) business days of receipt by a servicer of amounts in respect of the Mortgage Loans (excluding amounts representing the Servicing Fee or other servicing compensation, reimbursement for P&I Advances and servicing advances and Insurance Proceeds to be applied to the restoration or repair of a related Mortgaged Property or similar items), such servicer will deposit such amounts in the related Custodial Account. Amounts so deposited may be invested in Permitted Investments maturing no later than one Business Day prior to the Servicer Remittance Date. All investment income on funds in a Custodial Account shall be for the benefit of related servicer.

Any one or more of the following obligations or securities held in the name of the trustee for the benefit of the related certificateholders will be considered a Permitted Investment (each a "Permitted Investment"):

(i)     obligations of the United States or any agency thereof, provided such obligations are backed by the full faith and credit of the United States;

(ii)     general obligations of or obligations guaranteed by any state of the United States or the District of Columbia receiving the highest long-term debt rating of each rating agency, or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the certificates by each rating agency, as evidenced in writing;

(iii)     commercial or finance company paper which is then receiving the highest commercial or finance company paper rating of each rating agency, or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the certificates by each rating agency, as evidenced in writing;

(iv)     certificates of deposit, demand or time deposits, or bankers' acceptances issued by any Depository institution or trust company incorporated under the laws of the United States or of any state thereof and subject to supervision and examination by federal and/or state

S-155

FHFA01041664

banking authorities (including the trustee in its commercial banking capacity), provided that the commercial paper and/or long term unsecured debt obligations of such Depository institution or trust company are then rated one of the two highest long-term and the highest short-term ratings of each such rating agency for such securities, or such lower ratings as will not result in the downgrading or withdrawal of the rating then assigned to the certificates by any rating agency, as evidenced in writing;

      (v)    guaranteed reinvestment agreements issued by any bank, insurance company or other corporation containing, at the time of the issuance of such agreements, such terms and conditions as will not result in the downgrading or withdrawal of the rating then assigned to the certificates by each rating agency, as evidenced in writing;

      (vi)    repurchase obligations with respect to any security described in clauses (i) and (ii) above, in either case entered into with a Depository institution or trust company (acting as principal) described in clause (v) above;

      (vii)    securities (other than stripped bonds, stripped coupons or instruments sold at a purchase price in excess of 115% of the face amount thereof) bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States or any state thereof which, at the time of such investment, have one of the two highest short term ratings of each rating agency (except if the rating agency is Moody's, such rating will be the highest commercial paper rating of Moody's for any such securities), or such lower rating as will not result in the downgrading or withdrawal of the rating then assigned to the certificates by each rating agency, as evidenced by a signed writing delivered by each rating agency;

      (viii)    interests in any money market fund (including any such fund managed or advised by the trustee or any affiliate thereof) which at the date of acquisition of the interests in such fund and throughout the time such interests are held in such fund has the highest applicable short term rating by each rating agency or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the certificates by each rating agency, as evidenced in writing;

      (ix)    short term investment funds sponsored by any trust company or banking association incorporated under the laws of the United States or any state thereof (including any such fund managed or advised by the trustee or the master servicer or any affiliate thereof) which on the date of acquisition has been rated by each rating agency in their respective highest applicable rating category or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the certificates by each rating agency, as evidenced in writing; and

      (x)    such other investments having a specified stated maturity and bearing interest or sold at a discount acceptable to each rating agency and as will not result in the downgrading or withdrawal of the rating then assigned to the certificates by any rating agency, as evidenced by a signed writing delivered by each rating agency.

**Prepayment Interest Shortfalls and Compensating Interest**

      When a principal prepayment in full is made on a Mortgage Loan, the mortgagor is charged interest only for the period from the Due Date of the preceding monthly payment up to the date of the prepayment, instead of for a full month. When a partial principal prepayment is made on a Mortgage Loan, the mortgagor is not charged interest on the amount of the prepayment for the month

CONFIDENTIAL

FHFA01041665

in which the prepayment is made. In addition, the application of the Servicemembers Civil Relief Act (the "Relief Act") and similar state or local laws to any Mortgage Loan could adversely affect, for an indeterminate period of time, the ability of the related servicer to collect full amounts of interest on such Mortgage Loans.

Each servicer will be obligated to pay from its own funds only those interest shortfalls attributable to voluntary principal prepayments in full by the mortgagors on the Mortgage Loans serviced by such servicer and received (i) with respect to Ocwen, during the period occurring from the 16th day of the month prior to the month of the related distribution date to the last day of such prior month and (ii) with respect to Wells Fargo Bank, during the related Prepayment Period; provided, however that the obligation of a servicer to remit the amount of any shortfall in interest resulting from a voluntary principal prepayment in full on Mortgage Loans serviced by such servicer and shall be limited to the Servicing Fee payable to such servicer for such month. No servicer will remit any shortfalls in interest attributable to the application of the Relief Act or any similar state or local laws. Any interest shortfalls attributable to voluntary principal prepayments required to be funded but not funded by the related servicer are required to be paid by the master servicer, but only to the extent that such amount does not exceed the aggregate master servicing compensation payable to the master servicer for the applicable distribution date. Accordingly, the effect of interest shortfalls resulting from principal prepayments in full or in part on the Mortgage Loans (each, a "Prepayment Interest Shortfall") to the extent that they exceed any payments in respect of Compensating Interest by the master servicer or the related servicer or any shortfalls resulting from the application of the Relief Act or similar state or local laws, will be to reduce the aggregate amount of interest collected that is available for distribution to the certificateholders. Any such shortfalls will be allocated among the certificates as provided under "Description of the Certificates—Credit Enhancement" in this free writing prospectus. See "Certain Legal Aspects of the Mortgage Loans—Servicemembers Civil Relief Act" in the prospectus.

## P&I Advances

Subject to the limitations set forth in the following paragraph, if a scheduled payment on a Mortgage Loan which was due on a related due date and is delinquent (other than as a result of application of the Relief Act), the related servicer will be required to remit to the securities administrator for deposit in the Distribution Account (as defined in this free writing prospectus) from its own funds or from funds available in the related Custodial Account relating to a subsequent due date, or some combination of its own funds and such amounts on the Servicer Remittance Date, an amount equal to such delinquency, net of the Servicing Fee (any such remittance, a "P&I Advance").

P&I Advances are required to be made only to the extent they are deemed by the related servicer to be recoverable from related late collections, Insurance Proceeds or Liquidation Proceeds from the Mortgage Loan as to which the unreimbursed P&I Advance was made. In addition, any P&I Advances previously made in respect of any Mortgage Loan that are deemed by the related servicer to be nonrecoverable from related late collections, Insurance Proceeds or Liquidation Proceeds may be reimbursed to the servicer out of any funds in the related Custodial Account prior to distributions on the related certificates. The purpose of making the P&I Advances is to maintain a regular cash flow to the certificateholders, rather than to guarantee or insure against losses. No servicer will be required to make any P&I Advances with respect to reductions in the amount of the monthly payments on the related Mortgage Loans due to bankruptcy proceedings or the application of the Relief Act.

S-157

Failure of a servicer to make any required P&I Advance, which failure goes unremedied for the days specified in the Pooling and Servicing Agreement or the Servicing Agreement, as applicable, would constitute an event of default under the Pooling and Servicing Agreement or the Servicing Agreement, as applicable. Such event of default would obligate the master servicer, with respect to a default by Ocwen, or the trustee, with respect to a default by Wells Fargo Bank, in its capacity as a servicer, as successor servicer, or any other successor servicer appointed by the master servicer or the trustee, as applicable, to make such P&I Advance subject to its determination of recoverability from related late collections, Insurance Proceeds or Liquidation Proceeds from the related Mortgage Loan.

The Pooling and Servicing Agreement also provides that Ocwen (or any successor thereto) may enter into a facility with any person which provides that such person may fund P&I Advances or servicing advances, although no such facility shall reduce or otherwise affect the obligations of Ocwen (or any successor thereto) to fund such P&I Advances or servicing advances. Any P&I Advances or servicing advances funded by an advancing person will be reimbursed to the advancing person in the same manner as reimbursements would be made to Ocwen (or any successor thereto).

**Modifications**

In instances in which a Mortgage Loan is in default or if default is reasonably foreseeable, and if determined by the related servicer to be in the best interest of the certificateholders, such servicer may permit servicing modifications of the Mortgage Loan rather than proceeding with foreclosure. However, the related servicer's ability to perform servicing modifications will be subject to some limitations, including but not limited to the following. Any amounts added to the principal balance of the Mortgage Loan, or capitalized amounts added to the Mortgage Loan, will be required to be fully amortized over the remaining term, or the extended term, of the Mortgage Loan. All capitalizations are to be implemented in accordance with the related servicer's standards and may be implemented only by such servicer for that purpose. The final maturity of any Mortgage Loan will not be extended beyond the assumed final distribution date. No servicing modification with respect to a Mortgage Loan will have the effect of reducing the mortgage rate below one half of the mortgage rate as in effect on the Cut off Date, but not less than the servicing fee rate. Further, the aggregate current principal balance of all Mortgage Loans subject to modifications can be no more than five percent (5%) of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date, but this limit may increase from time to time with the consent of the rating agencies.

Any advances made on any Mortgage Loan will be reduced to reflect any related servicing modifications previously made. The mortgage rate and net mortgage rate as to any Mortgage Loan will be deemed not reduced by any servicing modification, so that the calculation of the amount of current interest payable on the Offered Certificates as described in this free writing prospectus will not be affected by the servicing modification.

**Evidence as to Compliance**

The Pooling and Servicing Agreement and the Servicing Agreement will provide that not later than March 15 of each year, beginning with the first year after the year in which the Cut-off Date occurs, each party responsible for the servicing function will provide to the depositor, the master servicer and the trustee a report on an assessment of compliance with the minimum servicing

CONFIDENTIAL

criteria established in Item 1122(d) of Regulation AB (the "AB Servicing Criteria"). The AB Servicing Criteria include specific criteria relating to the following areas: general servicing considerations, cash collection and administration, investor remittances and reporting, and pool asset administration. Such report will indicate that the AB Servicing Criteria were used to test compliance on a platform level basis and will set out any material instances of noncompliance.

The Pooling and Servicing Agreement and the Servicing Agreement will also provide that each party responsible for the servicing function will deliver along with its report on assessment of compliance, an attestation report from a firm of independent public accountants on the assessment of compliance with the AB Servicing Criteria.

The Pooling and Servicing Agreement and the Servicing Agreement will also provide for delivery to the master servicer, the securities administrator and the trustee, not later than March 15 of each year, of a separate annual statement of compliance from each entity responsible for the servicing function to the effect that, to the best knowledge of the signing officer, the related servicer has fulfilled in all material respects its obligations under the Pooling and Servicing Agreement or the Servicing Agreement, as applicable, throughout the preceding year or, if there has been a material failure in the fulfillment of any obligation, the statement shall specify such failure and the nature and status thereof. This statement may be provided as a single form making the required statements as to more than one pooling and servicing agreement or servicing agreement, as applicable.

Copies of the annual reports of assessment of compliance, attestation reports, and statements of compliance may be obtained by certificateholders without charge upon written request to the master servicer at the address of the master servicer set forth under "The Master Servicer, Securities Administrator and Custodian" in this free writing prospectus. These items will be filed with the issuing entity's annual report on Form 10-K, to the extent required under Regulation AB.

## THE MASTER SERVICER, SECURITIES ADMINISTRATOR AND CUSTODIAN

**General**

The information set forth in the following paragraph has been provided by the master servicer.

Wells Fargo Bank, N.A. ("Wells Fargo Bank") will act as master servicer and securities administrator under the Pooling and Servicing Agreement and as custodian under the Custodial Agreement. Wells Fargo Bank is a national banking association and a wholly-owned subsidiary of Wells Fargo & Company. A diversified financial services company with approximately $482 billion in assets, 23 million customers and 153,000+ employees as of December 31, 2005, Wells Fargo & Company is a U.S. bank holding company providing banking, insurance, trust, mortgage and consumer finance services throughout the United States and internationally. Wells Fargo Bank provides retail and commercial banking services and corporate trust, custody, securities lending, securities transfer, cash management, investment management and other financial and fiduciary services. The depositor, the sponsor and the servicers may maintain banking and other commercial relationships with Wells Fargo Bank and its affiliates. Wells Fargo Bank maintains principal corporate trust offices located at 9062 Old Annapolis Road, Columbia, Maryland 21045-1951, (among other locations), and its office for certificate transfer services is located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479.

CONFIDENTIAL                                                                                     FHFA01041668

Wells Fargo Bank serves or may have served within the past two years as loan file custodian for various mortgage loans owned by the sponsor or an affiliate of the sponsor and anticipates that one or more of those mortgage loans may be included in the trust. The terms of any custodial agreement under which those services are provided by Wells Fargo Bank are customary for the mortgage backed securitization industry and provide for the delivery, receipt, review and safekeeping of mortgage files.

*Master Servicer.* Wells Fargo Bank acts as master servicer pursuant to the Pooling and Servicing Agreement. The master servicer is responsible for the aggregation of monthly servicer reports and remittances and for the oversight of the performance of the servicer under the terms of the Pooling and Servicing Agreement or the Servicing Agreements, as applicable. In particular, the master servicer independently calculates monthly loan balances based on servicer data, compares its results to servicer loan-level reports and reconciles any discrepancies with the servicer. The master servicer also reviews the servicing of defaulted loans for compliance with the terms of the Pooling and Servicing Agreement. In addition, upon the occurrence of certain servicer events of default under the terms of the Pooling and Servicing Agreement or the Servicing Agreement, as applicable, the master servicer may be required to enforce certain remedies on behalf of the trust against such defaulting servicer. Wells Fargo Bank has been engaged in the business of master servicing since June 30, 1995. As of June 30, 2006, Wells Fargo Bank was acting as master servicer for approximately 1,253 series of residential mortgage-backed securities with an aggregate outstanding principal balance of approximately $651,189,990,090.

*Securities Administrator.* Under the terms of the Pooling and Servicing Agreement, Wells Fargo Bank is also responsible for securities administration, which includes pool performance calculations, distribution calculations and the preparation of monthly distribution reports. As securities administrator, Wells Fargo Bank is responsible for the preparation and filing of all REMIC tax returns on behalf of the trust REMICs and the preparation of monthly reports on Form 10-D, current reports on Form 8-K and annual reports on Form 10-K that are required to be filed with the Securities and Exchange Commission on behalf of the trust. Wells Fargo Bank has been engaged in the business of securities administration since June 30, 1995. As of June 30, 2006, Wells Fargo Bank was acting as securities administrator with respect to more than $894,773,136,436 of outstanding residential mortgage-backed securities.

*Custodian.* Wells Fargo Bank is acting as custodian of the mortgage loan files pursuant to the custodial agreement to be entered into among HSBC Bank USA, National Association, as trustee, Wells Fargo Bank, N.A., as custodian, Ocwen, as a servicer and Wells Fargo Bank, N.A., as a servicer. In that capacity, Wells Fargo Bank is responsible to hold and safeguard the mortgage notes and other contents of the mortgage files on behalf of the trustee and the certificateholders. Wells Fargo Bank maintains each mortgage loan file in a separate file folder marked with a unique bar code to assure loan-level file integrity and to assist in inventory management. Files are segregated by transaction or investor. Wells Fargo Bank has been engaged in the mortgage document custody business for more than 25 years. Wells Fargo Bank maintains document custody facilities in its Minneapolis, Minnesota headquarters and in three regional offices located in Richfield, Minnesota, Irvine, California, and Salt Lake City, Utah. As of June 30, 2006, Wells Fargo Bank maintains mortgage custody vaults in each of those locations with an aggregate capacity of over eleven million files.

CONFIDENTIAL                                          FHFA01041669

**Master Servicing and Other Compensation and Payment of Expenses**

The principal compensation to be paid to the master servicer in respect of its master servicing activities for the certificates will be a master servicing fee equal to one-twelfth of the product of 0.0100% multiplied by the Stated Principal Balance of the Mortgage Loans as of the Due Date in the preceding calendar month. In addition, the master servicer will be entitled to any interest or other income earned on funds held in the Distribution Account (together, the "Master Servicing Compensation"), as set forth in the Pooling and Servicing Agreement. The master servicing fee includes securities administrator, paying agent, certificate registrar and credit risk manager fees.

The monthly fee payable to the custodian for the performance of its obligations under the custodial agreement and the monthly fee payable to the trustee for the performance of its obligations under the Pooling and Servicing Agreement will be paid by the master servicer from its compensation. The expenses of the custodian and the trustee will be paid out of the trust fund prior to making payments to the certificateholders.

In the event that a servicer fails to pay the amount of any Compensating Interest required to be paid on any distribution date, the master servicer shall pay such amount up to the aggregate master servicing compensation payable to the master servicer on such distribution date.

The master servicer shall not resign except upon a determination that the master servicer's duties are no longer permissible under applicable law.  The master servicer may sell and assign its rights and delegate its duties and obligations subject to the conditions set forth in the Pooling and Servicing Agreement.

**The Distribution Account**

The securities administrator will establish a non-interest bearing trust account (the "Distribution Account") into which will be deposited amounts remitted to it by the servicers for distribution to the certificateholders on each distribution date and payment of certain fees and expenses of the trust. The Distribution Account will be an Eligible Account (as defined in the Pooling and Servicing Agreement). Amounts on deposit therein may be invested in Permitted Investments (as defined under "Servicing – Payments on Mortgage Loans; Deposits to Custodial Accounts" in this free writing prospectus) maturing on or before the business day prior to the related distribution date unless such Permitted Investments are invested in investments managed or advised by the securities administrator or an affiliate thereof, in which case such Permitted Investments may mature on the related distribution date.  All investment income on funds in the Distribution Account shall be for the benefit of the master servicer.  Any losses resulting from such investments are required to be reimbursed to the Distribution Account by the master servicer out of its own funds.

**Transfer of Master Servicing**

The master servicer may sell and assign its rights and delegate its duties and obligations in its entirety as master servicer under the Pooling and Servicing Agreement; provided, however, that: (i) the purchaser or transferee accept in writing such assignment and delegation and assume the obligations of the master servicer under the Pooling and Servicing Agreement (a) shall have a net worth of not less than $15,000,000 (unless otherwise approved by each rating agency pursuant to clause (ii) below); (b) shall be reasonably satisfactory to the trustee (as evidenced in a writing signed by the trustee); and (c) shall execute and deliver to the trustee an agreement, in form

CONFIDENTIAL

FHFA01041670

and substance reasonably satisfactory to the trustee, which contains an assumption by such Person of the due and punctual performance and observance of each covenant and condition to be performed or observed by it as master servicer under the Pooling and Servicing Agreement; (ii) each rating agency shall be given prior written notice of the identity of the proposed successor to the master servicer and each rating agency's rating of the certificates in effect immediately prior to such assignment, sale and delegation will not be downgraded, qualified or withdrawn as a result of such assignment, sale and delegation, as evidenced by a letter to such effect delivered to the master servicer and the trustee; and (iii) the master servicer assigning and selling the master servicing shall deliver to the trustee an officer's certificate and an opinion of independent counsel, each stating that all conditions precedent to such action under the Pooling and Servicing Agreement have been completed and such action is permitted by and complies with the terms of the Pooling and Servicing Agreement. No such assignment or delegation shall affect any liability of the master servicer arising out of acts or omissions prior to the effective date thereof.

## POOLING AND SERVICING AGREEMENT

**General**

The certificates will be issued under the Pooling and Servicing Agreement, a form of which is filed as an exhibit to the registration statement. A Current Report on Form 8-K relating to the certificates containing a copy of the Pooling and Servicing Agreement as executed will be filed by the depositor with the Securities and Exchange Commission ("SEC") following the initial issuance of the certificates. The trust fund created under the Pooling and Servicing Agreement will consist of (i) all of the depositor's right, title and interest in the Mortgage Loans, the related Mortgage Notes, mortgages and other related documents; (ii) all payments on or collections in respect of the Mortgage Loans due after the Cut-off Date, together with any proceeds of the Mortgage Loans; (iii) any Mortgaged Properties acquired on behalf of certificateholders by foreclosure or by deed in lieu of foreclosure, and any revenues received on these Mortgaged Properties; (iv) the rights of the trustee under all insurance policies required to be maintained under the Pooling and Servicing Agreement and (v) the rights of the depositor under the mortgage loan purchase agreement and the Servicing Agreement. Reference is made to the prospectus for important information in addition to that set forth in this free writing prospectus regarding the trust fund, the terms and conditions of the Pooling and Servicing Agreement, the Servicing Agreement and the Offered Certificates. The depositor will provide to a prospective or actual certificateholder without charge, on written request, a copy, without exhibits, of the Pooling and Servicing Agreement. Requests should be addressed to Nomura Home Equity Loan, Inc., Two World Financial Center, Building B, 21st Floor, New York, New York 10281.

On the Closing Date, the depositor will transfer to the trust all of its right, title and interest in and to each Mortgage Loan (other than the servicing rights with respect to the Mortgage Loans which shall be retained by (i) the servicer who owns the servicing rights on the Mortgage Loans or (ii) the sponsor, in the event the sponsor comes into ownership of any such servicing rights), the related Mortgage Note, mortgage, assignment of mortgage in recordable form to the trustee and other related documents (collectively, the "Related Documents"), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date. The trustee, concurrently with such transfer, will deliver the certificates to the depositor. Each Mortgage Loan transferred to the trust will be identified on a schedule (the "Mortgage Loan Schedule") delivered to the trustee pursuant to the Pooling and Servicing Agreement. The Mortgage Loan Schedule will

S-162

include information such as the outstanding principal balance of each Mortgage Loan as of the Cut-off Date, its Mortgage Rate as well as other information with respect to each Mortgage Loan.

The Pooling and Servicing Agreement will require that, within the time period specified therein, the depositor will deliver or cause to be delivered to the trustee (or a custodian, as the trustee's agent for such purpose) the Mortgage Notes endorsed to the trustee on behalf of the certificateholders and the Related Documents. In lieu of delivery of original mortgages or Mortgage Notes, if such original is not available or lost, the depositor may deliver or cause to be delivered true and correct copies thereof, or, with respect to a lost Mortgage Note, a lost note affidavit. The assignments of mortgage are generally required to be recorded by or on behalf of the depositor in the appropriate offices for real property records, except (i) in states as to which an opinion of counsel is delivered to the effect that such recording is not required to protect the trustee's interest in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or the sponsor, or (ii) with respect to any Mortgage Loan electronically registered through the Mortgage Electronic Registration Systems, Inc.

On or prior to the Closing Date, the custodian on behalf of the trustee will review the Mortgage Loans and the Related Documents pursuant to the custodial agreement to be entered into among the custodian, the servicers and the trustee, and if any Mortgage Loan or Related Document is found to be defective in any material respect and such defect is not cured by the sponsor within 90 days following notification thereof to the sponsor by the custodian or the related servicer, the sponsor will be obligated to either (i) substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan (as defined below); however, such substitution is permitted only within two years of the Closing Date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs (as defined in the Pooling and Servicing Agreement) as a REMIC or result in a prohibited transaction tax under the Internal Revenue Code or (ii) purchase such Mortgage Loan at a price (the "Purchase Price") equal to the outstanding principal balance of such Mortgage Loan as of the date of purchase, plus 30 days' accrued interest thereon and all costs and damages incurred by the trust in connection with any violation by such Mortgage Loan of any predatory or abusive lending law prior to such purchase, computed at the Mortgage Rate through the end of the calendar month in which the purchase is effected, plus the amount of any unreimbursed P&I Advances and servicing advances made by the related servicer or the master servicer. The Purchase Price will be required to be remitted to the related servicer for deposit in the related Custodial Account on or prior to the next succeeding determination date after such obligation arises. The obligation of the sponsor to repurchase or substitute for a Deleted Mortgage Loan (as defined below) is the sole remedy regarding any defects in the Mortgage Loans and Related Documents available to the certificateholders.

In connection with the substitution of a Qualified Substitute Mortgage Loan, the sponsor will be required to remit to the related servicer for deposit in the related Custodial Account on or prior to the next succeeding determination date after such obligation arises an amount (the "Substitution Shortfall Amount") equal to the excess of the outstanding principal balance of the related Deleted Mortgage Loan over the outstanding principal balance of such Qualified Substitute Mortgage Loan.

A "Qualified Substitute Mortgage Loan" is a mortgage loan substituted for a Deleted Mortgage Loan which must, on the date of such substitution, (i) have an outstanding principal balance (or in the case of a substitution of more than one mortgage loan for a Deleted Mortgage Loan, an aggregate outstanding principal balance), not in excess of the outstanding principal balance

CONFIDENTIAL

FHFA01041672

of the Deleted Mortgage Loan; (ii) have a Mortgage Rate not less than the Mortgage Rate of the Deleted Mortgage Loan and not more than 1% in excess of the Mortgage Rate of such Deleted Mortgage Loan; (iii) have the same due date as the Deleted Mortgage Loan; (iv) have a remaining term to maturity not more than one year earlier and not later than the remaining term to maturity of the Deleted Mortgage Loan; (v) comply with each representation and warranty as to the Mortgage Loans set forth in the mortgage loan purchase agreement (deemed to be made as of the date of substitution); (vi) be of the same or better credit quality as the Mortgage Loan being replaced; (vii) have the same lien priority on the related mortgaged property as the Mortgage Loan being replaced; and (viii) satisfy certain other conditions specified in the Pooling and Servicing Agreement.

The sponsor will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the trustee with respect to each Mortgage Loan. In addition, the sponsor will represent and warrant, as of the Closing Date, that, among other things: (i) at the time of transfer to the depositor, the sponsor has transferred or assigned all of its right, title and interest in each Mortgage Loan and the Related Documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws; (iii) the Mortgage Loans are not subject to the requirements of the Home Ownership and Equity Protection Act of 1994 and no Mortgage Loan is classified and/or defined as a "high cost", "covered" or "predatory" loan under any other federal, state or local law or ordinance or regulation including, but not limited to, the States of Georgia or North Carolina, or the City of New York; (iv) no proceeds from any Mortgage Loan were used to purchase single premium credit insurance policies as part of the origination of, or as a condition to closing, such Mortgage Loan; (v) no Mortgage Loan has a Prepayment Charge longer than five years after its date of origination; and (vi) to the best of the sponsor's knowledge, the related servicer has accurately and fully reported its borrower credit files to each of the credit repositories in a timely manner. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the related Mortgage Loan and Related Documents, the sponsor will have a period of 90 days after the earlier of discovery or receipt of written notice of the breach to effect a cure; provided, however that any breach of the representations and warranties set forth in clauses (ii), (iii), (iv), (v) and (vi) above with respect to any Mortgage Loan shall be deemed to materially and adversely affect the interests of the certificateholders in the related Mortgage Loan. If the breach cannot be cured within the 90-day period, the sponsor will be obligated to (i) substitute for such Deleted Mortgage Loan a Qualified Substitute Mortgage Loan or (ii) purchase such Deleted Mortgage Loan from the trust. The same procedure and limitations that are set forth above for the substitution or purchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or purchase of a Deleted Mortgage Loan as a result of a breach of a representation or warranty in the mortgage loan purchase agreement that materially and adversely affects the interests of the certificateholders. The depositor will file the mortgage loan purchase agreement as an exhibit to the Pooling and Servicing Agreement with the Securities and Exchange Commission in a Current Report on Form 8-K.

Mortgage Loans required to be transferred to the sponsor as described in the preceding paragraphs are referred to as "Deleted Mortgage Loans."

**Amendment**

The Pooling and Servicing Agreement may be amended by the sponsor, the depositor, the master servicer, the securities administrator, Ocwen (or any successor servicer under

CONFIDENTIAL

FHFA01041673

the Pooling and Servicing Agreement) and the trustee, with the consent of the Swap Provider (such consent not to be unreasonably withheld) without the consent of certificateholders,

- to cure any ambiguity,

- to correct or supplement any provision therein,

- to make any revisions with respect to the provisions relating to the requirements of Regulation AB, or

- to make any other revisions with respect to matters or questions arising under the Pooling and Servicing Agreement which are not inconsistent with the provisions thereof,

provided that such action will not adversely affect in any material respect the interests of any certificateholder. An amendment will be deemed not to adversely affect in any material respect the interests of the certificateholders if the person requesting such amendment obtains a letter from each rating agency stating that such amendment will not result in the downgrading or withdrawal of the respective ratings then assigned to any class of certificates.

In addition, the Pooling and Servicing Agreement may be amended without the consent of certificateholders to modify, eliminate or add to any of its provisions to such extent as may be necessary to maintain the qualification of the trust fund's REMIC elections, provided that the trustee has received an opinion of counsel to the effect that such action is necessary or helpful to maintain such qualification. In addition, the Pooling and Servicing Agreement may be amended by the sponsor, the depositor, the master servicer, Ocwen (or any successor servicer under the Pooling and Servicing Agreement), the securities administrator and the trustee with the consent of the holders of a majority in interest of each class of certificates affected thereby for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Pooling and Servicing Agreement or of modifying in any manner the rights of the certificateholders; provided, however, that no such amendment may

- reduce in any manner the amount of, or delay the timing of, payments required to be distributed on any certificate without the consent of the holder of such certificate;

- cause any trust fund REMIC to fail to qualify as a REMIC for federal tax purposes;

- reduce the percentage of the holders of the certificates the affected class which are required to consent to any such amendment, without the consent of the holders of all certificates of such class.

The trustee will not be required to consent to any amendment to the Pooling and Servicing Agreement without having first received an opinion of counsel to the effect that such amendment is permitted under the terms of the Pooling and Servicing Agreement and will not cause the trust fund's REMIC elections to fail to qualify as REMICs for federal tax purposes.

CONFIDENTIAL

FHFA01041674

**Voting Rights**

As of any date of determination,

- holders of the certificates, other than the Class X, Class P and Class R Certificates, will be allocated 98.00% of all voting rights, allocated among such certificates in proportion to their respective outstanding Certificate Principal Balances;

- holders of the Class X Certificates and Class P Certificates will each be allocated 1% of all voting rights; and

- holders of the Class R Certificates will not be allocated any voting rights.

Voting rights will be allocated among the certificates of each such class in accordance with their respective percentage interests. The initial owner of the Residual Certificates will be Nomura Securities International, Inc.

**Optional Purchase of Certain Loans**

As to any Mortgage Loan which is delinquent in payment by 91 days or more, the sponsor may, at its option, purchase such Mortgage Loan at a price equal to the sum of (i) 100% of the Stated Principal Balance thereof as of the date of such purchase plus (ii) 30 days' accrued interest thereon at the applicable Net Mortgage Rate, plus any portion of the Servicing Fee, the fee payable to the master servicer, servicing advances and P&I Advances payable to the related servicer or the master servicer, as applicable, of the Mortgage Loan, plus (iii) any costs and damages of the trust incurred in connection with any violation by such Mortgage Loan of any abusive or predatory lending law, including any expenses incurred by the trustee with respect to such Mortgage Loan prior to the purchase thereof.

In addition, the sponsor will, at its option, purchase any Mortgage Loan from the trust if the first or second scheduled payment due subsequent to the Cut-off Date is not made within thirty (30) days of the related due date. Such purchase will be made at a price equal to the purchase price described in the prior paragraph.

**Optional Termination**

The master servicer will have the right to purchase all remaining Mortgage Loans and related REO Properties and thereby effect early retirement of all of the certificates on any distribution date if on such distribution date the aggregate Stated Principal Balance of the Mortgage Loans and related REO Properties remaining in the trust fund is reduced to less than or equal to 10% of the aggregate outstanding principal balance of the Mortgage Loans as of the Cut-off Date. If the master servicer fails to exercise such option, Ocwen (each of the master servicer and Ocwen, the "Terminator") will have the right to purchase all remaining Mortgage Loans and related REO Properties and thereby effect early retirement of all of the certificates on any distribution date if on such distribution date the aggregate Stated Principal Balance of the Mortgage Loans and related REO Properties remaining in the trust fund is reduced to less than or equal to 5% of the aggregate outstanding principal balance of the Mortgage Loans as of the Cut-off Date. In the event that the Terminator exercises such option it will effect such purchase at a price equal to the sum of

S-166

- 100% of the Stated Principal Balance of each Mortgage Loan, other than in respect of any related REO Property, plus 30 days' accrued interest thereon at the applicable Mortgage Rate,

- the appraised value of any related REO Property, up to the Stated Principal Balance of the Mortgage Loan, plus accrued interest thereon at the applicable Mortgage Rate, and

- any unreimbursed costs and expenses of the trustee, securities administrator, the custodian, the servicers and the master servicer and the principal portion of any unreimbursed advances previously incurred by the servicers or the master servicer in the performance of their servicing obligations and any Swap Termination Payment payable to the Swap Provider not due to a Swap Provider Trigger Event pursuant to the Interest Rate Swap Agreement and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee.

Proceeds from such purchase will be distributed to the certificateholders in the priority described in this free writing prospectus under "Description of the Certificates— Distributions." The proceeds from any such distribution may not be sufficient to distribute the full amount to which each class of certificates is entitled if the purchase price is based in part on the appraised value of any related REO Property and such appraised value is less than the Stated Principal Balance of the related Mortgage Loan. Any purchase of the Mortgage Loans and related REO Properties will result in an early retirement of the certificates.

The securities administrator will be required to give notice of any termination to the certificateholders, upon which the certificateholders shall surrender their certificates to the securities administrator for payment of the final distribution and cancellation. Such notice shall be given by letter, mailed not earlier than the 15th day and not later than the 25th day of the month next preceding the month of such final distribution, and shall specify (i) the distribution date upon which final payment of the related certificates will be made upon presentation and surrender of such certificates at the office of the securities administrator therein designated, (ii) the amount of any such final payment and (iii) that the record date otherwise applicable to such distribution date is not applicable, payments being made only upon presentation and surrender of the certificates at the office of the securities administrator therein specified.

In the event such notice is given in connection with the purchase of all of the Mortgage Loans by the Terminator, the Terminator will be required to deliver to the securities administrator for deposit in the Distribution Account not later than the business day prior to the distribution date on which the final distribution on the certificates an amount in immediately available funds equal to the termination price described above. The securities administrator will be required to remit to the servicers, the master servicer, the trustee and the custodian from such funds deposited in the Distribution Account (i) any amounts which the servicers or the master servicer would be permitted to withdraw and retain from the related Custodial Account or the Distribution Account, as applicable, as if such funds had been deposited therein (including all unpaid Servicing Fees, master servicing fees and all outstanding P&I Advances and Servicing Advances), (ii) any other amounts otherwise payable by the securities administrator to the master servicer, the trustee, the custodian and the servicer from amounts on deposit in the Distribution Account pursuant to the

S-167

terms of the Pooling and Servicing Agreement and (iii) any Swap Termination Payment payable to the Swap Provider not due to a Swap Provider Trigger Event pursuant to the Interest Rate Swap Agreement and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee prior to making any final distributions. Upon certification to the trustee by the securities administrator of the making of such final deposit, the trustee will be required to promptly release or cause to be released to the Terminator the Mortgage Files for the Mortgage Loans and the trustee will surrender all assignments, endorsements and other instruments delivered to it and necessary to effectuate such transfer.

Upon presentation of the certificates by the certificateholders on the final distribution date, the securities administrator will be required to distribute to each certificateholder so presenting and surrendering its certificates the amount otherwise distributable on such distribution date in respect of the certificates so presented and surrendered. Any funds not distributed to any certificateholder(s) being retired on such distribution date because of the failure of such certificateholders to tender their certificates shall, on such date, be set aside and held in trust and credited to the account of the appropriate non-tendering certificateholders. If any certificates as to which notice has been given shall not have been surrendered for cancellation within six months after the time specified in such notice, the securities administrator shall mail a second notice to the remaining non-tendering certificateholders to surrender their certificates for cancellation in order to receive the final distribution with respect thereto. If within one year after the second notice all such certificates shall not have been surrendered for cancellation, the securities administrator shall, directly or through an agent, mail a final notice to the remaining non-tendering certificateholders concerning surrender of their certificates. The costs and expenses of maintaining the funds in trust and of contacting such certificateholders shall be paid out of the assets remaining in the trust funds. If within one (1) year after the final notice any such certificates shall not have been surrendered for cancellation, the securities administrator shall pay to the depositor all such amounts, and all rights of non-tendering certificateholders in or to such amounts shall thereupon cease. No interest shall accrue or be payable to any certificateholder on any amount held in trust by the securities administrator as a result of such certificateholder's failure to surrender its certificate(s) on the related final distribution date for final payment thereof. Any such amounts held in trust by the securities administrator shall be held uninvested in an Eligible Account.

In the event that the Terminator purchases all the Mortgage Loans or the final payment on or other liquidation of the last Mortgage Loan, the trust fund will be terminated in accordance with the following additional requirements:

(i)      The securities administrator shall specify the first day in the 90-day liquidation period in a statement attached to each Trust REMIC's final Tax Return pursuant to Treasury regulation Section 1.860F-1 and shall satisfy all requirements of a qualified liquidation under Section 860F of the Code and any regulations thereunder, as evidenced by an opinion of counsel obtained by and at the expense of the Terminator;

(ii)      During such 90-day liquidation period and, at or prior to the time of making of the final payment on the outstanding certificates, the trustee shall sell all of the assets of the related REMIC to the Terminator for cash; and

(iii)      At the time of the making of the final payment on the outstanding certificates, the securities administrator shall distribute or credit, or cause to be distributed or credited, to

CONFIDENTIAL

FHFA01041677

the holders of the residual certificates all cash on hand in the trust fund (other than cash retained to meet claims), and the trust fund shall terminate at that time.

At the expense of the Terminator (or, if the trust fund is being terminated as a result of the last scheduled distribution date, at the expense of the trust fund), the Terminator shall prepare or cause to be prepared the documentation required in connection with the adoption of a plan of liquidation of each related REMIC.

By their acceptance of certificates, the holders thereof hereby agree to authorize the securities administrator to specify the 90-day liquidation period for each REMIC, which authorization shall be binding upon all successor certificateholders.

### Events of Default

Events of default with respect to a servicer under the Pooling and Servicing Agreement or the Servicing Agreement include, without limitation:

- any failure by such servicer (or any successor servicer) to remit to the securities administrator any payment, including an advance required to be made by the servicer under the terms of the Pooling and Servicing Agreement or the Servicing Agreement, as applicable, which continues unremedied for two business days after the day on which written notice of such failure is given by the master servicer;

- any failure by such servicer (or any successor servicer) to observe or perform in any material respect any other of its covenants or agreements, the breach of which has a material adverse effect and which continues unremedied for thirty days after the giving of written notice of such failure to such servicer (or any successor servicer) by the trustee or the depositor, or to such servicer (or any successor servicer) and the trustee by the holders of certificates evidencing not less than 25% of the voting rights evidenced by the certificates;

- such servicer (or any successor servicer) shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, made an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations;

- a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs, shall have been entered against such servicer and such decree or order shall have remained in force undischarged or unstayed for a period of sixty days; or

- such servicer fails to deliver the annual compliance statements and accountant's report as required pursuant to the Pooling and Servicing

S-169

Agreement or the Servicing Agreement, as applicable and such failure continues unremedied for ten days.

Events of default with respect to the master servicer under the Pooling and Servicing Agreement include, without limitation:

- any failure on the part of the master servicer to observe or perform in any material respect any of the covenants or agreements on the part of the master servicer contained in this Pooling and Servicing Agreement, or the breach by the master servicer of any representation and warranty contained in the pooling and servicing agreement, which continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the master servicer by the depositor or the trustee or to the master servicer, the depositor and the trustee by the holders of certificates entitled to at least twenty-five percent (25%) of the voting rights evidenced by the certificates; or

- a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceeding, or for the winding-up or liquidation of its affairs, shall have been entered against the master servicer and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

- the master servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to it or of or relating to all or substantially all of its property; or

- the master servicer fails to deliver the any statements or reports with respect to the requirements of Regulation AB as required pursuant to the Pooling and Servicing Agreement; or

- the master servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations.

**Rights Upon Event of Default**

Upon the occurrence and continuance of an event of default with respect to the payment obligations of Ocwen under the Pooling and Servicing Agreement, the master servicer shall terminate all the rights and obligations of such servicer under the Pooling and Servicing Agreement, and in and to the related Mortgage Loans. Upon the occurrence and continuance of an event of default with respect to the payment obligations of Wells Fargo Bank under the Servicing Agreement, the trustee will be required to terminate all the rights and obligations of Wells Fargo Bank under the Servicing Agreement, and in and to the related Mortgage Loans. In addition,

CONFIDENTIAL

FHFA01041679

upon the occurrence and continuance of any other event of default with respect to Ocwen under the Pooling and Servicing Agreement, the master servicer may, and at the direction of the holders of certificates representing not less than 25% of the voting rights shall, terminate all the rights and obligations of such servicer under the Pooling and Servicing Agreement and in and to the related Mortgage Loans. Upon the occurrence and continuance of any other event of default with respect to Wells Fargo Bank under the Servicing Agreement, the trustee may, and at the direction of the holders of certificates representing not less than 25% of the voting rights will be required to, terminate all the rights and obligations of Wells Fargo Bank under the Servicing Agreement, and in and to the related Mortgage Loans. Upon the termination of a servicer under the Pooling and Servicing Agreement or the Servicing Agreement, as applicable, the master servicer or the trustee, as applicable, shall succeed to all of the responsibilities and duties of the terminated servicer under the Pooling and Servicing Agreement or the Servicing Agreement, as applicable, including the obligation to make any P&I Advance required to be made by the terminated servicer on the distribution date immediately following the occurrence of such event of default with respect to the terminated servicer subject to the master servicer's or the trustee's determination of recoverability thereof; *provided, however*, that neither the master servicer nor the trustee shall have any obligation whatsoever with respect to any liability incurred by the terminated servicer at or prior to the termination of such servicer with respect to any default, and there will be a period of transition, not to exceed 90 days, before the servicing functions can be transferred to a successor servicer. As compensation therefor, the master servicer or the trustee, as applicable, shall be entitled to all funds relating to the Mortgage Loans which the terminated servicer would have been entitled to retain if the terminated servicer had continued to act as such, except for those amounts due the terminated servicer as reimbursement for advances previously made or expenses previously incurred. Notwithstanding the above, the master servicer may, if it shall be unwilling so to act, or shall, if it is legally unable so to act, appoint, or petition a court of competent jurisdiction to appoint, any established housing and home finance institution which is a Fannie Mae or Freddie Mac approved servicer as the successor to the terminated servicer under the Pooling and Servicing Agreement or the Servicing Agreement, as applicable, in the assumption of all or any part of the responsibilities, duties or liabilities of the terminated servicer under the Pooling and Servicing Agreement or the Servicing Agreement, as applicable. Pending appointment of a successor to the terminated servicer under the Pooling and Servicing Agreement or the Servicing Agreement, as applicable, the master servicer or the trustee, as applicable, shall act in such capacity as provided under the Pooling and Servicing Agreement or the Servicing Agreement, as applicable. In connection with such appointment and assumption, the master servicer or the trustee, as applicable, may make such arrangements for the compensation of such successor out of payments on the related Mortgage Loans as it and such successor shall agree; *provided, however*, that no such compensation shall be in excess of the Servicing Fee payable to such servicer. No assurance can be given that termination of the rights and obligations of the terminated servicer under the Pooling and Servicing Agreement or the Servicing Agreement, as applicable, would not adversely affect the servicing of the related Mortgage Loans, including the delinquency experience of the related Mortgage Loans. The costs and expenses of the trustee and the master servicer in connection with the termination of the terminated servicer, appointment of a successor servicer and the transfer of servicing, if applicable, to the extent not paid by the terminated servicer, will be paid by the trust fund from amounts available in the Distribution Account as provided in the Pooling and Servicing Agreement.

Upon the occurrence and continuance of an event of default with respect to the master servicer, the depositor or the trustee may, and at the written direction of the holders of certificates evidencing ownership of not less than 51% of the trust, the trustee shall terminate all of the rights and obligations of the master servicer in its capacity as master servicer under the Pooling and Servicing

CONFIDENTIAL

Agreement, to the extent permitted by law, and in and to the Mortgage Loans and the proceeds thereof. The trustee shall automatically succeed to all of the responsibilities and duties of the master servicer under the Pooling and Servicing Agreement. Notwithstanding the foregoing, the trustee may, if it shall be unwilling so to act, or shall, if it is legally unable so to act, appoint, or petition a court of competent jurisdiction to appoint, a successor master servicer in accordance with the Pooling and Servicing Agreement. The costs and expenses of the trustee in connection with the termination of the terminated master servicer, will be paid by the trust fund from amount available in the Distribution Account as provided in the Pooling and Servicing Agreement.

No certificateholder, solely by virtue of such holder's status as a certificateholder, will have any right under the Pooling and Servicing Agreement to institute any proceeding with respect thereto, unless such holder previously has given to the trustee written notice of the continuation of an event of default and unless the holders of certificates having not less than 25% of the voting rights evidenced by the certificates have made written request to the trustee to institute such proceeding in its own name as trustee thereunder and have offered to the trustee indemnity satisfactory to it and the trustee for 60 days has neglected or refused to institute any such proceeding.

The Pooling and Servicing Agreement provides that Ocwen may pledge its servicing rights under the Pooling and Servicing Agreement to one or more lenders. No such pledge will reduce or otherwise affect Ocwen's servicing obligations under the Pooling and Servicing Agreement. Upon a servicer default by Ocwen under the Pooling and Servicing Agreement, the master servicer may remove Ocwen as the servicer of the related Mortgage Loans and the master servicer will, or under certain circumstances Ocwen or its designee may, appoint a successor servicer. In any event, the successor servicer must meet the requirements for successor servicers under the Pooling and Servicing Agreement. In the event Ocwen is removed as the servicer of the related Mortgage Loans under the Pooling and Servicing Agreement, its servicing rights will be transferred to any successor servicer, and none of the trust, the depositor, the master servicer, the trustee or the securities administrator will have any right or claim to the portion of Ocwen's servicing rights pledged, or to any unreimbursed P&I Advances or Servicing Advances of Ocwen that were pledged.

**The Trustee**

HSBC Bank USA, National Association, a national banking association, will be the trustee under the Pooling and Servicing Agreement. The depositor, the servicers, the master servicer and securities administrator may maintain other banking relationships in the ordinary course of business with the trustee. The trustee's corporate trust office is located at 452 Fifth Avenue, New York, New York 10018, Attention: NHEL 2006-HE3 or at such other address as the trustee may designate from time to time. The Trustee can be contacted by telephone at (212) 525-1367.

As of June 30, 2006, the trustee is acting as trustee for approximately 400 asset-backed securities transactions involving similar pool assets to those found in this transaction.

The trustee, prior to the occurrence of an Event of Default with respect to the master servicer and after the curing or waiver of all Events of Default with respect to the master servicer which may have occurred will undertake to perform such duties and only such duties as are specifically set forth in the Pooling and Servicing Agreement as duties of the trustee, including:

S-172

CONFIDENTIAL

FHFA01041681

1.  Upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments which are specifically required to be furnished to the trustee pursuant to the Pooling and Servicing Agreement, the trustee (or its custodian, if applicable) shall examine them to determine whether they are in the required form; provided, however, that the trustee shall not be responsible for the accuracy or content of any resolution, certificate, statement, opinion, report, document, order or other instrument furnished hereunder; provided, further, that the trustee shall not be responsible for the accuracy or verification of any calculation provided to it pursuant to the Pooling and Servicing Agreement.

2.  The trustee shall promptly remit to the servicer any complaint, claim, demand, notice or other document (collectively, the "Notices") delivered to the trustee as a consequence of the assignment of any Mortgage Loan hereunder and relating to the servicing of the Mortgage Loans; provided than any such notice (i) is delivered to the trustee at its corporate trust office, (ii) contains information sufficient to permit the trustee to make a determination that the real property to which such document relates is a Mortgaged Property (as defined in the Pooling and Servicing Agreement). The trustee shall have no duty hereunder with respect to any notice it may receive or which may be alleged to have been delivered to or served upon it unless such notice is delivered to it or served upon it at its corporate trust office and such notice contains the information required pursuant to clause (ii) of the preceding sentence.

3.  Except for those actions that the trustee is required to take under the Pooling and Servicing Agreement, the trustee shall not have any obligation or liability to take any action or to refrain from taking any action in the absence of written direction as provided in the Pooling and Servicing Agreement.

If an Event of Default with respect to the master servicer has occurred and has not been cured or waived, the trustee shall exercise such of the rights and powers vested in it by the Pooling and Servicing Agreement, using the same degree of care and skill in their exercise, as a prudent person would exercise under the circumstances in the conduct of his own affairs.  Such rights and powers may include:

1.  Execute and deliver, on behalf of the master servicer as attorney-in-fact or otherwise, any and all documents and other instruments and to do or accomplish all other acts or things necessary or appropriate to effect the termination of the master servicer, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise.

2.  The trustee shall automatically become the successor in all respects to the master servicer after the master servicer is terminated and shall thereafter be subject to all the responsibilities, duties, liabilities and limitations on liabilities relating thereto placed on the master servicer by the terms and provisions of the Pooling and Servicing Agreement.  Notwithstanding the foregoing, the trustee may, if it shall be unwilling so to act, or shall, if it is

CONFIDENTIAL                                                                 FHFA01041682

legally unable so to act, appoint, or petition a court of competent jurisdiction to appoint, a successor master servicer in accordance with the Pooling and Servicing Agreement.

3.      Upon any termination or appointment of a successor to the master servicer, the trustee shall give prompt written notice thereof to certificateholders at their respective addresses appearing in the certificate register and to the rating agencies.

For further discussion of the duties of the trustee, please see *"Description of the Agreements—Material Terms of the Pooling and Servicing Agreements and Underlying Servicing Agreements—Duties of the Trustee"* in the prospectus.

The master servicer will pay the trustee the trustee's fee in respect of its obligations under the Pooling and Servicing Agreement. The Pooling and Servicing Agreement will provide that the trustee and any director, officer, employee or agent of the trustee will be indemnified by the trust and will be held harmless against any loss, liability, expense or cost including, without limitation, attorneys fees and expenses (not including expenses and disbursements incurred or made by the trustee in the ordinary course of the trustee's performance in accordance with the provisions of the Pooling and Servicing Agreement) incurred by the trustee in connection with any pending or threatened legal action or arising out of or in connection with the acceptance or administration of its obligations and duties under the Pooling and Servicing Agreement, the certificates or the Custodial Agreement, other than any loss, liability or expense (i) resulting from a breach of the obligations and duties of a servicer under the Pooling and Servicing Agreement or the Servicing Agreement (for which the trustee receives indemnity from the servicer) or (ii) incurred by reason of willful misfeasance, bad faith or negligence in the performance of the trustee's duties under the Pooling and Servicing Agreement, the certificates or the Custodial Agreement or by reason of reckless disregard, of the trustee's obligations and duties under the Pooling and Servicing Agreement, the certificates or the Custodial Agreement.

## THE CREDIT RISK MANAGER

Wells Fargo Bank, N.A. will act as credit risk manager for the trust (the "Credit Risk Manager"). As Credit Risk Manager, Wells Fargo Bank, N.A. will monitor the performance of and make recommendations to the servicers regarding certain delinquent and defaulted Mortgage Loans and will report on the performance of such Mortgage Loans pursuant to a Credit Risk Management Agreement to be entered into by the depositor, the Credit Risk Manager and each of the servicers on or prior to the Closing Date. The Credit Risk Manager will rely upon Mortgage Loan data that is provided to it by the servicers and the master servicer in performing its advisory and monitoring functions. The fee payable to the Credit Risk Manager is included in the master servicing fee.

## USE OF PROCEEDS

After deducting expenses of approximately $1,315,546, the depositor will apply the net proceeds of the sale of the Offered Certificates against the purchase price of the Mortgage Loans.

CONFIDENTIAL

FHFA01041683

## FEDERAL INCOME TAX CONSEQUENCES

In the opinion of Thacher Proffitt & Wood LLP, counsel to the depositor, assuming compliance with the provisions of the Pooling and Servicing Agreement, for federal income tax purposes, each of the REMICs established under the Pooling and Servicing Agreement will qualify as a REMIC under the Code.

For federal income tax purposes (i) the Class R Certificates will represent the sole class of "residual interests" in each REMIC elected by the trust and (ii) the Senior Certificates and Subordinate Certificates (exclusive of any right of the holders of the Senior Certificates and Subordinate Certificates to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of Basis Risk Shortfalls and the obligation to make payments to the Supplemental Interest Trust), the Class P Certificates and Class X Certificates will represent the "regular interests" in, and will be treated as debt instruments of, a REMIC. See "Federal Income Tax Consequences–REMICs" in the prospectus.

For federal income tax purposes, the Offered Certificates may be treated as having been issued with original issue discount. The prepayment assumption that will be used in determining the rate of accrual of original issue discount, market discount and premium, if any, for federal income tax purposes will be based on the assumption that, subsequent to the date of any determination the Group I Mortgage Loans and Group II Mortgage Loans will prepay at a rate equal to 100.00% of the prepayment assumption described in this free writing prospectus. No representation is made that the Mortgage Loans will prepay at that rate or at any other rate. See "Federal Income Tax Consequences–General" and "–REMICs–Sales of REMIC Certificates" in the prospectus.

The holders of the Offered Certificates will be required to include in income interest on their certificates in accordance with the accrual method of accounting.

The Internal Revenue Service (the "IRS") has issued original issue discount regulations (the "OID Regulations") under sections 1271 to 1275 of the Code that address the treatment of debt instruments issued with original issue discount, Purchasers of the Offered Certificates should be aware that the OID Regulations do not adequately address certain issues relevant to, or are not applicable to, prepayable securities such as the Offered Certificates. In addition, there is considerable uncertainty concerning the application of the OID Regulations to REMIC Regular Certificates that provide for payments based on an adjustable rate such as the Offered Certificates. Because of the uncertainty concerning the application of Section 1272(a)(6) of the Code to such certificates and because the rules of the OID Regulations relating to debt instruments having an adjustable rate of interest are limited in their application in ways that could preclude their application to such certificates even in the absence of Section 1272(a)(6) of the Code, the IRS could assert that the Offered Certificates should be treated as issued with original issue discount or should be governed by the rules applicable to debt instruments having contingent payments or by some other method not yet set forth in regulations. Prospective purchasers of the Offered Certificates are advised to consult their tax advisors concerning the tax treatment of such certificates.

In certain circumstances the OID Regulations permit the holder of a debt instrument to recognize original issue discount under a method that differs from that used by the issuer. Accordingly, the holder of an offered certificate may be able to select a method for recognizing

S-175

original issue discount that differs from that used by the Trust in preparing reports to the certificateholders and the IRS.

If the method for computing original issue discount described above results in a negative amount for any period with respect to a certificateholder, the amount of original issue discount allocable to that period would be zero and the certificateholder will be permitted to offset that negative amount only against future original issue discount, if any, attributable to those certificates.

Certain of the certificates may be treated for federal income tax purposes as having been issued at a premium. Whether any holder of a certificate will be treated as holding such certificate with amortizable bond premium will depend on such certificateholders purchase price and the distributions remaining to be made on such certificate at the time of its acquisition by such certificateholder. Holders of such certificates should consult their own tax advisors regarding the possibility of making an election to amortize such premium. See "Federal Income Tax Consequences– REMICs" in the prospectus.

Each holder of a Senior Certificate or Subordinate Certificate is deemed to own an undivided beneficial ownership interest in a REMIC regular interest and the right to receive payments from either the Basis Risk Shortfall Reserve Fund or the Supplemental Interest Trust in respect of any Basis Risk Shortfall or the obligation to make payments to the Supplemental Interest Trust. The Basis Risk Shortfall Reserve Fund, the Interest Rate Swap Agreement and the Supplemental Interest Trust are not assets of any REMIC. The REMIC regular interest corresponding to a Senior Certificate or a Subordinate Certificate will be entitled to receive interest and principal payments at the times and in the amounts equal to those made on the certificate to which it corresponds, except that (i) the maximum interest rate of that REMIC regular interest will equal the Net Funds Cap computed for this purpose by limiting the Base Calculation Amount of the Interest Rate Interest Rate Swap Agreement to the aggregate principal balance of the Mortgage Loans and (ii) any Swap Termination Payment will be treated as being payable solely from Net Monthly Excess Cashflow. As a result of the foregoing, the amount of distributions on the REMIC regular interest corresponding to a Senior Certificate or a Subordinate Certificate may exceed the actual amount of distributions on a Senior Certificate or a Subordinate Certificate.

The treatment of amounts received by a holder of a Senior Certificate or a Subordinate Certificate under such holder's right to receive any Basis Risk Shortfall, will depend on the portion, if any, of such holder's purchase price allocable thereto. Under the REMIC Regulations, each holder of a Senior Certificate or Subordinate Certificate must allocate its purchase price for the Senior Certificate or Subordinate Certificate among its undivided interest in the regular interest of the related REMIC and its undivided interest in the right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of any Basis Risk Shortfall in accordance with the relative fair market values of each property right. The securities administrator will, as required, treat payments made to the holders of the Senior Certificates and Subordinate Certificates with respect to any Basis Risk Shortfall, as includible in income based on the regulations relating to notional principal contracts (the "Notional Principal Contract Regulations"). The OID Regulations provide that the Trust's allocation of the issue price is binding on all holders unless the holder explicitly discloses on its tax return that its allocation is different from the Trust's allocation. For tax reporting purposes, the right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of Basis Risk Shortfalls with respect to the Senior Certificates and Subordinate Certificates may be treated as having more than a *de minimis* value as

S-176

provided in the pooling and servicing agreement.  Upon request, the securities administrator will make available information regarding such amounts as has been provided to it.  Under the REMIC Regulations, the Securities Administrator is required to account for the REMIC regular interest, the right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of any Basis Risk Shortfall as discrete property rights.  Holders of the Senior Certificates and Subordinate Certificates are advised to consult their own tax advisors regarding the allocation of issue price, timing, character and source of income and deductions resulting from the ownership of such Certificates.  Treasury regulations have been promulgated under Section 1275 of the Code generally providing for the integration of a "qualifying debt instrument" with a hedge if the combined cash flows of the components are substantially equivalent to the cash flows on a variable rate debt instrument.  However, such regulations specifically disallow integration of debt instruments subject to Section 1272(a)(6) of the Code.  Therefore, holders of the Senior Certificates and Subordinate Certificates will be unable to use the integration method provided for under such regulations with respect to those Certificates.  If the Securities Administrator's treatment of payments of any Basis Risk Shortfall is respected, ownership of the right to any Basis Risk Shortfall will entitle the owner to amortize the price paid for the right to any Basis Risk Shortfall under the Notional Principal Contract Regulations.

Any payments made to a beneficial owner of an Senior Certificate or a Subordinate Certificate in excess of the amounts payable on the corresponding REMIC regular interest will be treated as having been received as a payment on a notional principal contract. To the extent the sum of such periodic payments for any year exceeds that year's amortized cost of any Basis Risk Shortfalls, such excess represents net income for that year. Conversely, to the extent that the amount of that year's amortized cost exceeds the sum of the periodic payments, such excess will represent a net deduction for that year. In addition, any amounts payable on such REMIC regular interest in excess of the amount of payments on the Senior Certificate or Subordinate Certificate to which it relates will be treated as having been received by the beneficial owners of such Certificates and then paid by such owners to the Supplemental Interest Trust pursuant to the Swap Administration Agreement, and such excess should be treated as a periodic payment on a notional principal contract that is made by the beneficial owner during the applicable taxable year and that is taken into account in determining the beneficial owner's net income or net deduction with respect to any Basis Risk Shortfalls for such taxable year. Although not clear, net income or a net deduction with respect to any Basis Risk Shortfall should be treated as ordinary income or as an ordinary deduction. Holders of the Senior Certificates and Subordinate Certificates are advised to consult their own tax advisors regarding the tax characterization and timing issues relating to a Swap Termination Payment.

Because a beneficial owner of any Basis Risk Shortfalls will be required to include in income the amount deemed to have been paid by such owner, but may not be able to deduct that amount from income, a beneficial owner of an Senior Certificate or a Subordinate Certificate may have income that exceeds cash distributions on the Senior Certificate or Subordinate Certificate, in any period and over the term of the Senior Certificate or Subordinate Certificate. As a result, the Senior Certificates and Subordinate Certificates may not be a suitable investment for any taxpayer whose net deduction with respect to any Basis Risk Shortfalls would be subject to the limitations described above.

Upon the sale of a Senior Certificate or a Subordinate Certificate, the amount of the sale allocated to the selling certificateholder's right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of any Basis Risk Shortfall would be considered a "termination payment" under the Notional Principal Contract Regulations allocable to

CONFIDENTIAL

FHFA01041686

the related Senior Certificate or Subordinate Certificate, as the case may be. A holder of a Senior Certificate or a Subordinate Certificate will have gain or loss from such a termination of the right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of any Basis Risk Shortfall equal to (i) any termination payment it received or is deemed to have received minus (ii) the unamortized portion of any amount paid (or deemed paid) by the certificateholder upon entering into or acquiring its interest in the right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of any Basis Risk Shortfall.

Gain or loss realized upon the termination of the right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of any Basis Risk Shortfalls will generally be treated as capital gain or loss. Moreover, in the case of a bank or thrift institution, Code Section 582(c) would likely not apply to treat such gain or loss as ordinary.

It is possible that the right to receive payments in respect of any Basis Risk Shortfalls could be treated as a partnership among the holders of all of the Certificates, in which case holders of such Certificates potentially would be subject to different timing of income and foreign holders of such Certificates could be subject to withholding in respect of any related Basis Risk Shortfall. Holders of the Offered Certificates and Class B Certificates are advised to consult their own tax advisors regarding the allocation of issue price, timing, character and source of income and deductions resulting from the ownership of their Certificates.

The REMIC regular interest component of each Senior Certificate and Subordinate Certificate will be treated as assets described in Section 7701(a)(19)(C) of the Code, and as "real estate assets" under Section 856(c)(5)(B) of the Code, generally, in the same proportion that the assets of the Trust, exclusive of the assets not included in any REMIC, would be so treated. In addition, the interest derived from the REMIC regular interest component of each Senior Certificate and Subordinate Certificate will be interest on obligations secured by interests in real property for purposes of section 856(c)(3) of the Code, subject to the same limitation in the preceding sentence. The Notional Principal Contract component of each Regular Certificate will not qualify, however, as an asset described in Section 7701(a)(19)(C) of the Code, as a real estate asset under Section 856(c)(5)(B) of the Code or as a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code. As a result, the Regular Certificates generally may not be a suitable investment for a REMIC, a real estate investment trust or an entity intending to qualify under Section 7701(a)(19)(C) of the Code.

Because any Basis Risk Shortfall is treated as separate rights of the Senior Certificates and Subordinate Certificates not payable by any REMIC elected by the Trust, such rights will not be treated as qualifying assets for any certificateholder that is a mutual savings bank, domestic building and loan association, real estate investment trust, or REMIC. In addition, any amounts received from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust will not be qualifying real estate income for real estate investment trusts or qualifying income for REMICs.

For further information regarding federal income tax consequences of investing in the Offered Certificates, see "Federal Income Tax Consequences—REMICs" in the prospectus.

CONFIDENTIAL

FHFA01041687

## ERISA CONSIDERATIONS

A fiduciary of any employee benefit plan or other plan or arrangement subject to ERISA or Section 4975 of the Code (a "Plan"), or any insurance company, whether through its general or separate accounts, or any other person investing plan assets of a Plan, should carefully review with its legal advisors whether the purchase or holding of Offered Certificates could give rise to a transaction prohibited or not otherwise permissible under ERISA or Section 4975 of the Code. The purchase or holding of the Offered Certificates by or on behalf of, or with Plan assets of, a Plan may qualify for exemptive relief under the Underwriters' Exemption, as currently in effect and as described under "ERISA Considerations" in the prospectus if certain conditions are satisfied. The Underwriters' Exemption relevant to the Offered Certificates was granted by the Department of Labor as Prohibited Transaction Exemption ("PTE") 93-32, as amended by PTE 97-34 at 62 F.R. 39021, PTE 2000-58 at 65 F.R. 67765 and PTE 2002-41 at 67 F.R. 54487. The Underwriters' Exemption was amended by PTE 2002-41 to permit a trustee to be affiliated with an underwriter despite the restriction in PTE 2000-58 to the contrary. However, the Underwriters' Exemption contains a number of conditions which must be met for the exemption to apply, including the requirements that the Offered Certificates be rated at least "BBB-" (or its equivalent) by Fitch Ratings, Moody's or S&P at the time of the Plan's purchase and that the investing Plan must be an "accredited investor" as defined in Rule 501(a)(1) of Regulation D under the Securities Act. A fiduciary of a Plan contemplating purchasing an offered certificate must make its own determination that the conditions set forth in the Underwriters' Exemption will be satisfied with respect to the Offered Certificates.

For so long as the holder of an Offered Certificate also holds an interest in the Supplemental Interest Trust, the holder will be deemed to have acquired and be holding the Offered Certificate without the right to receive payments from the Supplemental Interest Trust and, separately, the right to receive payments from the Supplemental Interest Trust. The Exemption is not applicable to the acquisition, holding and transfer of an interest in the Supplemental Interest Trust. In addition, while the Supplemental Interest Trust is in existence, it is possible that not all of the requirements for the Exemption to apply to the acquisition, holding and transfer of Offered Certificates will be satisfied. However, if the Exemption is not available, there may be other exemptions that may apply. Accordingly, no Plan or other person using assets of a Plan may acquire or hold an Offered Certificate while the Supplemental Interest Trust is in existence, unless (1) such Plan is an accredited investor within the meaning of the Exemption and (2) such acquisition or holding is eligible for the exemptive relief available under PTCE 84-14 (for transactions by independent "qualified professional asset managers"), 91-38 (for transactions by bank collective investment funds), 90-1 (for transactions by insurance company pooled separate accounts), 95-60 (for transactions by insurance company general accounts) or 96-23 (for transactions effected by "in-house asset managers"). For so long as the Supplemental Interest Trust is in existence, each beneficial owner of an Offered Certificate or any interest therein, shall be deemed to have represented, by virtue of its acquisition or holding of the Offered Certificate, or interest therein, that either (i) it is not a Plan or (ii) (A) it is an accredited investor within the meaning of the Exemption and (B) the acquisition and holding of such Offered Certificate and the separate right to receive payments from the Supplemental Interest Trust are eligible for the exemptive relief available under one of the five prohibited transaction class exemptions enumerated above.

Each beneficial owner of a Subordinate Certificate or interest therein that is acquired after termination of the Supplemental Interest Trust (which holds the Interest Rate Swap Agreement) shall be deemed to have represented, by virtue of its acquisition or holding of that certificate or

CONFIDENTIAL

FHFA01041688

interest therein, that either (i) it is not a plan investor, (ii) it has acquired and is holding such subordinated certificates in reliance on the Underwriters' Exemption, and that it understands that there are certain conditions to the availability of the Underwriters' Exemption, including that the subordinated certificates must be rated, at the time of purchase, not lower than "BBB-" (or its equivalent) by Fitch Ratings, Moody's or S&P, or (iii) (1) it is an insurance company, (2) the source of funds used to acquire or hold the certificate or interest therein is an "insurance company general account," as such term is defined in PTE 95-60, and (3) the conditions in Sections I and III of PTE 95-60 have been satisfied.

If any Certificate or any interest therein is acquired or held in violation of the conditions described in this section, the next preceding permitted beneficial owner will be treated as the beneficial owner of that Certificate, retroactive to the date of transfer to the purported beneficial owner. Any purported beneficial owner whose acquisition or holding of any such certificate or interest therein was effected in violation of the conditions described in this section shall indemnify and hold harmless the depositor, the securities administrator, the trustee, the master servicer, the servicers and the trust fund from and against any and all liabilities, claims, costs or expenses incurred by those parties as a result of that acquisition or holding.

Any fiduciary or other investor of Plan assets that proposes to acquire or hold the Offered Certificates on behalf of or with Plan assets of any Plan should consult with its counsel with respect to: (i) whether, with respect to the Offered Certificates, the specific and general conditions and the other requirements in the Underwriters' Exemption would be satisfied and (ii) the potential applicability of the general fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of the Internal Revenue Code to the proposed investment. See *"ERISA Considerations"* in the prospectus.

The sale of any of the Offered Certificates to a Plan is in no respect a representation by the depositor or the underwriter that an investment in the Offered Certificates meets all relevant legal requirements relating to investments by Plans generally or any particular Plan, or that an investment in the Offered Certificates is appropriate for Plans generally or any particular Plan.

## LEGAL INVESTMENT

The Offered Certificates will not constitute "mortgage related securities" for purposes of SMMEA.

Institutions whose investment activities are subject to review by certain regulatory authorities hereafter may be or may become subject to restrictions on investment in the certificates, and such restrictions may be retroactively imposed. The Federal Financial Institutions Examination Council, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Office of Thrift Supervision, or OTS, and the National Credit Union Administration, or NCUA, have adopted guidelines, and have proposed policies, regarding the suitability of investments in various types of derivative mortgage-backed securities, including securities such as the certificates.

For example, on April 23, 1998, the Federal Financial Institutions Examination Council issued a revised supervisory policy statement, referred to as the 1998 Policy Statement, applicable to all Depository institutions, setting forth guidelines for investments in "high-risk mortgage securities." The 1998 Policy Statement has been adopted by the Federal Reserve Board, the

CONFIDENTIAL

FHFA01041689

Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the NCUA and the OTS. The 1998 Policy Statement rescinds a 1992 policy statement that had required, prior to purchase, a Depository institution to determine whether a mortgage derivative product that it is considering acquiring is high-risk, and, if so, that the proposed acquisition would reduce the institution's overall interest rate risk. In addition, the 1998 Policy Statement eliminates former constraints on investing in certain "high-risk" mortgage derivative products and substitutes broader guidelines for evaluating and monitoring investment risk. In addition, the NCUA has issued regulations governing federal credit union investments which prohibit investment in certain specified types of securities, which may include the certificates. The NCUA has indicated that its regulations will take precedence over the 1998 Policy Statement. Similar policy statements and regulations have been issued by other regulators having jurisdiction over other types of Depository institutions.

The OTS has issued Thrift Bulletin 73a, or TB 73a, entitled "Investing in Complex Securities", effective December 18, 2001 which applies to savings associations regulated by the OTS, and Thrift Bulletin 13a, or TB 13a, entitled "Management of Interest Rate Risk, Investment Securities, and Derivatives Activities", effective December 1, 1998, which is applicable to thrift institutions regulated by the OTS.

TB 73a requires savings associations, prior to taking any investment position, to determine that the investment position meets applicable regulatory and policy requirements and internal guidelines, is suitable for the institution, and is safe and sound. The OTS recommends, with respect to purchases of specific securities, additional analysis, including, among others, analysis of repayment terms, legal structure, expected performance of the issuing entity and any underlying assets as well as analysis of the effects of payment priority, with respect to a security which is divided into separate tranches with unequal payments, and collateral investment parameters, with respect to a security that is prefunded or involves a revolving period. TB 73a reiterates the OTS's due diligence requirements for investing in all securities and warns that if a savings association makes an investment that does not meet the applicable regulatory requirements, the savings association's investment practices will be subject to criticism, and the OTS may require divestiture of such securities. The OTS also recommends, with respect to an investment in any "complex securities," that savings associations should take into account quality and suitability, interest rate risk, and classification factors. For the purposes of each of TB 73a and TB 13a, "complex security" includes, among other things, any collateralized mortgage obligation or real estate mortgage investment conduit security, other than any "plain vanilla" mortgage pass-through security (that is, securities that are part of a single class of securities in the related pool that are non-callable and do not have any special features). Accordingly, all classes of Offered Certificates would likely be viewed as "complex securities." With respect to quality and suitability factors, TB 73a warns (i) that a savings association's sole reliance on outside ratings for material purchases of complex securities is an unsafe and unsound practice, (ii) that a savings association should only use ratings and analyses from nationally recognized rating agencies in conjunction with, and in validation of, its own underwriting processes, and (iii) that it should not use ratings as a substitute for its own thorough underwriting analyses. With respect the interest rate risk factor, TB 73a recommends that savings associations should follow the guidance set forth in TB 13a.

TB 13a requires thrift institutions, prior to taking any investment position, to (i) conduct a pre-purchase portfolio sensitivity analysis for any "significant transaction" involving securities or financial derivatives, and (ii) conduct a pre-purchase price sensitivity analysis of any "complex security" or financial derivative. The OTS recommends that while a thrift institution should conduct its own in-house pre-acquisition analysis, it may rely on an analysis conducted by an

CONFIDENTIAL

FHFA01041690

independent third-party as long as management understands the analysis and its key assumptions. Further, TB 13a recommends that the use of "complex securities with high price sensitivity" be limited to transactions and strategies that lower a thrift institution's portfolio interest rate risk. TB 13a warns that investment in complex securities by thrift institutions that do not have adequate risk measurement, monitoring and control systems may be viewed by OTS examiners as an unsafe and unsound practice.

There may be other restrictions on the ability of some investors either to purchase some classes of securities or to purchase any class of securities representing more than a specified percentage of the investors' assets. The depositor will make no representations as to the proper characterization of any class of securities for legal investment or other purposes, or as to the ability of particular investors to purchase any class of securities under applicable legal investment restrictions. These uncertainties may adversely affect the liquidity of any class of securities. Accordingly, all investors whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities are encouraged to consult with their own legal advisors in determining whether and to what extent the securities of any class constitute legal investments or are subject to investment, capital or other restrictions.

## METHOD OF DISTRIBUTION

Subject to the terms and conditions set forth in the amended and restated underwriting agreement dated as of June 1, 2006 between Nomura Home Equity Loan, Inc., as depositor and Nomura Securities International, Inc., as representative of the underwriters (the "Representative"), and the terms agreement to be entered into between the depositor, the Representative and Greenwich Capital Markets, Inc. (together, with the Representative, the "Underwriters") on or prior to the Closing Date (collectively, the "Underwriting Agreement"), the depositor has agreed to sell to the Underwriters, and the Underwriters have agreed to purchase from the depositor, the portion of the Offered Certificates each Underwriter places.   Any Offered Certificates which are not placed will be purchased by the Representative.

Distribution of the Offered Certificates will be made from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale.  The Underwriters' commission will be any positive difference between the price they pay to the depositor for the Offered Certificates and the amount they receive from the sale of the Offered Certificates to the public.  In connection with the purchase and sale of the Offered Certificates, the Underwriters may be deemed to have received compensation from the depositor in the form of underwriting discounts.

Until the distribution of the Offered Certificates is completed, rules of the SEC may limit the ability of the Underwriters and certain selling group members to bid for and purchase the Offered Certificates.  As an exception to these rules, the Underwriters are permitted to engage in certain transactions that stabilize the price of the Offered Certificates.  Such transactions consist of bids or purchases for the purpose of pegging, fixing or maintaining the price of the Offered Certificates.

In general, purchases of a security for the purpose of stabilization or to reduce a short position could cause the price of the security to be higher than it might be in the absence of such purchases.

S-182

None of the depositor nor any Underwriter makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the prices of the Offered Certificates. In addition, none of the depositor nor any Underwriter makes any representation that the Underwriters will engage in such transactions or that such transactions, once commenced, will not be discontinued without notice.

The depositor has been advised by the Underwriters that they intend to make a market in the Offered Certificates but the Underwriters have no obligation to do so. There can be no assurance that a secondary market for the Offered Certificates will develop or, if it does develop, that it will continue.

The depositor has agreed to indemnify the Underwriters against, or make contributions to the Underwriters with respect to, certain liabilities, including liabilities under the Securities Act of 1933, as amended. The Representative is an affiliate of the depositor and the sponsor.

## LEGAL MATTERS

The validity of the certificates, including certain federal income tax consequences with respect hereto, will be passed upon for the depositor by Thacher Proffitt & Wood LLP, New York, New York. Thacher Proffitt & Wood LLP, New York, New York, will also pass upon certain legal matters on behalf of the depositor and the Representative.

## RATINGS

It is a condition of the issuance of the Offered Certificates that each class of Offered Certificates be assigned at least the ratings designated below by Standard & Poor's, Moody's, DBRS and Fitch.

| Class | Standard & Poor's | Moody's | DBRS | Fitch |
|-------|-------------------|---------|------|-------|
| I-A-1 | AAA | Aaa | AAA | AAA |
| II-A-1 | AAA | Aaa | AAA | AAA |
| II-A-2 | AAA | Aaa | AAA | AAA |
| II-A-3 | AAA | Aaa | AAA | AAA |
| II-A-4 | AAA | Aaa | AAA | AAA |
| M-1 | AA+ | Aa1 | AA (high) | AA+ |
| M-2 | AA | Aa2 | AA | AA |
| M-3 | AA | Aa3 | AA (low) | AA |
| M-4 | AA- | A1 | A (high) | AA- |
| M-5 | A+ | A2 | A (high) | A+ |
| M-6 | A | A3 | A | A |
| M-7 | A- | Baa1 | A (low) | A- |
| M-8 | BBB+ | Baa2 | BBB (high) | BBB+ |
| M-9 | BBB | Baa3 | BBB | BBB |

The security ratings assigned to the Offered Certificates should be evaluated independently from similar ratings on other types of securities. A security rating is not a

CONFIDENTIAL

FHFA01041692

recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the respective rating agency. The ratings on the Offered Certificates do not, however, constitute statements regarding the likelihood or frequency of prepayments on the Mortgage Loans or the anticipated yields in light of prepayments. In addition, the ratings on the Offered Certificates do not address the likelihood of receipt by the holders of such certificates of any amounts in respect of Basis Risk Shortfalls.

The depositor has not requested ratings of the Offered Certificates by any rating agency other than Standard & Poor's, Moody's, DBRS and Fitch. However, there can be no assurance as to whether any other rating agency will rate the Offered Certificates or, if it does, what ratings would be assigned by such other rating agency. The ratings assigned by such other rating agency to the Offered Certificates could be lower than the respective ratings assigned by the rating agencies.

## LEGAL PROCEEDINGS

There are no material legal proceedings pending against the sponsor, the depositor, the trustee, the issuing entity, the master servicer, Ocwen Loan Servicing, LLC, the securities administrator, the custodian or People's Choice Home Loan, Inc., or with respect to which the property of any of the foregoing transaction parties is subject, that are material to the certificateholders. No legal proceedings against any of the foregoing transaction parties is known to be contemplated by governmental authorities, that are material to the certificateholders.

## AFFILIATIONS, RELATIONSHIPS AND RELATED TRANSACTIONS

There are no affiliations between the sponsor, the depositor or the issuing entity and any of the master servicer, the securities administrator, the custodian, the trustee, Ocwen Loan Servicing, LLC or People's Choice Home Loan, Inc. There are no affiliations among the master servicer, the securities administrator or the custodian and the trustee, Ocwen Loan Servicing, LLC and People's Choice Home Loan, Inc. There are no affiliations among the trustee and Ocwen Loan Servicing, LLC or People's Choice Home Loan, Inc. There are no affiliations between Ocwen Loan Servicing, LLC and People's Choice Home Loan, Inc. There are currently no business relationships, agreements, arrangements, transactions or understandings between (a) the sponsor, the depositor or the issuing entity and (b) any of the parties referred to in the second sentence hereof, or any of their respective affiliates, that were entered into outside the normal course of business or that contain terms other than would be obtained in an arm's length transaction with an unrelated third party and that are material to the investor's understanding of the certificates, or that relate to the certificates or the pooled assets. No such business relationship, agreement, arrangement, transaction or understanding has existed during the past two years.

## AVAILABLE INFORMATION

The depositor is subject to the informational requirements of the Exchange Act and in accordance therewith files reports and other information with the Securities and Exchange Commission. Reports and other information filed by the depositor can be inspected and copied at the Public Reference Room maintained by the Commission at 100 F Street NE, Washington, DC 20549, and its Regional Offices located as follows: Chicago Regional Office, 500 West Madison, 14th Floor, Chicago, Illinois 60661; New York Regional Office, 233 Broadway, New York, New York 10279.

CONFIDENTIAL

FHFA01041693

Copies of the material can also be obtained from the Public Reference Section of the Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549, at prescribed rates and electronically through the Commission's Electronic Data Gathering, Analysis and Retrieval system at the Securities and Exchange Commission's Website (http://www.sec.gov). Information about the operation of the Public Reference Room may be obtained by calling the Securities and Exchange Commission at (800) SEC-0330. Exchange Act reports as to any series filed with the Securities and Exchange Commission will be filed under the issuing entity's name. The depositor does not intend to send any financial reports to certificateholders.

The issuing entity's annual reports on Form 10-K (including reports of assessment of compliance with the AB Servicing Criteria, attestation reports, and statements of compliance, discussed in "Description of the Certificates — Reports to Certificateholders" and "Servicing — Evidence as to Compliance", required to be filed under Regulation AB), periodic distribution reports on Form 10-D, current reports on Form 8-K and amendments to those reports, together with such other reports to certificateholders or information about the securities as will have been filed by the securities administrator with the Securities and Exchange Commission will be posted on the securities administrator's internet web site as soon as reasonably practicable after it has been electronically filed with, or furnished to, the Securities and Exchange Commission. The address of the website is: http://www.ctslink.com.

## REPORTS TO CERTIFICATEHOLDERS

So long as the issuing entity is required to file reports under the Exchange Act, those reports will be made available as described above under "Available Information".

If the issuing entity is no longer required to file reports under the Exchange Act, periodic distribution reports will be posted on the Security Administrator's website referenced above under "Available Information" as soon as practicable. Annual reports of assessment of compliance with the AB Servicing Criteria, attestation reports, and statements of compliance will be provided to registered holders of the related securities upon request free of charge. See *"Servicing — Evidence as to Compliance"* and *"Description of the Certificates—Reports to Certficateholders"* in this free writing prospectus.

## INCORPORATION OF INFORMATION BY REFERENCE

There are incorporated into this free writing prospectus by reference all documents, including but not limited to the financial statements and reports filed or caused to be filed or incorporated by reference by the depositor with respect to the trust fund pursuant to the requirements of Sections 13(a) or 15(d) of the Exchange Act, prior to the termination of the offering of the Offered Certificates. All documents subsequently filed by the depositor pursuant to Sections 13(a) or 15(d) of the Exchange Act in respect of the offering prior to the termination of the offering of the Offered Certificates will also be deemed incorporated by reference into this free writing prospectus.

The depositor will provide or cause to be provided without charge to each person to whom this free writing prospectus is delivered in connection with the offering of one or more classes of Offered Certificates, upon written or oral request of the person, a copy of any or all the reports incorporated in this free writing prospectus by reference, in each case to the extent the reports relate to one or more of such classes of the Offered Certificates, other than the exhibits to the documents, unless the exhibits are specifically incorporated by reference in the documents. Requests should be

CONFIDENTIAL

FHFA01041694

directed in writing to Nomura Home Equity Loan, Inc., Two World Financial Center, Building B, New York, New York, 10281, or by telephone at (212) 667-9300. The depositor has determined that its financial statements will not be material to the offering of any Offered Certificates.

CONFIDENTIAL

FHFA01041695

## INDEX OF DEFINED TERMS

AB Servicing Criteria ................................ 162
Adjustment Date ......................................... 37
Aggregate Loan Balance.............................. 93
Aggregate Loan Group Balance................... 93
Applied Loss Amount................................ 111
Basis Risk Shortfall.................................... 93
Basis Risk Shortfall Reserve Fund ........... 105
Carryforward Interest.................................. 93
Certificate Margin....................................... 93
Certificate Principal Balance ...................... 94
Class B-1 Principal Payment Amount ......... 94
Class B-2 Principal Payment Amount ......... 94
Class M-1 Principal Payment Amount......... 95
Class M-2 Principal Payment Amount......... 95
Class M-3 Principal Payment Amount......... 95
Class M-4 Principal Payment Amount......... 95
Class M-5 Principal Payment Amount......... 95
Class M-6 Principal Payment Amount......... 96
Class M-7 Principal Payment Amount......... 96
Class M-8 Principal Payment Amount......... 96
Class M-9 Principal Payment Amount......... 96
Clearstream ................................................. 88
Compensating Interest ................................ 97
CPR ........................................................... 130
Credit Risk Manager.................................. 177
Credit Risk Manager's Fee ........................ 177
Credit Scores............................................... 86
CSSF ........................................................... 90
Current Interest ........................................... 97
Custodial Account...................................... 158
DBRS .......................................................... 10
Deferred Amount ........................................ 97
Delinquency Rate........................................ 97
Derivative Account ................................... 120
Distribution Account................................. 164
DTC............................................................. 88
Due Date ..................................................... 37
Due Period .................................................. 97
Early Termination Date.............................. 124
ERISA ........................................................... 9
Euroclear..................................................... 88
FHA............................................................. 84
Financial Intermediary ............................... 88
Fitch ............................................................ 10
Fixed Swap Payment..................................... 7
Floating Swap Payment ................................ 7

Foreign National Loans................................ 86
Global Securities .......................................... 1
Gross Margin............................................... 37
Group I Allocation Amount......................... 97
Group I Allocation Percentage.................... 97
Group I Certificates................................3, 87
Group I Excess Interest Amount ................. 97
Group I Servicing Fee ............................... 157
Group I Servicing Fee Rate ....................... 157
Group II Allocation Amount ....................... 98
Group II Allocation Percentage................... 98
Group II Certificates..............................3, 87
Group II Excess Interest Amount................ 98
Index........................................................... 37
Insurance Proceeds...................................... 98
Interest Accrual Period................................ 98
Interest Only Loans ..................................... 36
Interest Rate Swap Agreement ..............6, 120
Interest Remittance Amount........................ 98
Interest Shortfall ......................................... 99
IRS ............................................................ 178
ISDA Master Agreement.............................. 99
Liquidated Loan.......................................... 99
Liquidation Proceeds................................... 99
Master Servicing Compensation................ 164
Maximum Interest Rate ............................... 99
Maximum Mortgage Rate............................ 37
Minimum Mortgage Rate ............................ 37
Monthly Excess Cashflow.......................... 100
Monthly Excess Interest ............................ 106
Moody's....................................................... 10
Mortgage Loan Schedule........................... 165
Mortgage Loans......................................2, 36
Mortgage Pool ............................................ 36
Mortgage Rate ............................................ 37
Net Funds Cap .......................................... 100
Net Interest Shortfalls............................... 101
Net Liquidation Proceeds.......................... 101
Net Mortgage Rate .................................... 101
Net Swap Payment .................................... 120
Notices....................................................... 176
Notional Principal Contract Regulations.... 180
Ocwen....................................................... 152
Ocwen Mortgage Loans ............................ 152
Offered Certificates .................................... 88
OID Regulations........................................ 178

CONFIDENTIAL

FHFA01041696

One-Month LIBOR .................................... 101
Optimal Interest Remittance Amount ........ 101
Overcollateralization Amount.................... 101
Overcollateralization Deficiency Amount . 101
Overcollateralization Release Amount ...... 101
P&I Advance............................................. 160
Parity Act ................................................... 38
Pass-Through Rate .................................... 102
Payahead ................................................... 102
Periodic Rate Cap ...................................... 37
Permitted Investment ................................ 158
Plan ................................................... 9, 182
Pooling and Servicing Agreement ............. 151
Prepayment Assumption ............................ 130
Prepayment Charge..................................... 38
Prepayment Interest Shortfall ................... 160
Prepayment Period .................................... 102
Principal Payment Amount........................ 102
Principal Remittance Amount.................... 102
PTE ........................................................... 182
Purchase Price........................................... 166
Qualified Substitute Mortgage Loan.......... 166
Realized Loss............................................ 102
Related Documents .................................... 165
Relevant Implementation Date ..................... v
Relevant Member State................................. v
Relief Act............................................ 103, 159
Representative............................................ 185
Rules .......................................................... 88
SEC ........................................................... 165

Senior Certificates ...................................... 87
Senior Enhancement Percentage ............... 103
Senior Principal Payment Amount............ 103
Servicer Remittance Date .......................... 103
Servicing Agreement.................................. 152
SMMEA ......................................................9
SRFP......................................................... 126
Standard & Poor's ...................................... 10
Stated Principal Balance............................ 103
Stepdown Date........................................... 103
Subsequent Recoveries.............................. 104
Substitution Shortfall Amount................... 166
Supplemental Interest Trust....................... 120
Supplemental Interest Trust Trustee........... 120
Swap Additional Termination Event.......... 123
Swap Downgrade Provisions...................... 124
Swap Event of Default................................ 122
Swap Notional Amount .............................. 121
Swap Provider Trigger Event ............. 104, 125
Swap Termination Event............................ 123
Swap Termination Payment ............... 104, 124
Swiss Re .................................................... 126
Targeted Overcollateralization Amount ..... 104
Trigger Event............................................. 104
Underwriters..........................................i, 185
Underwriting Agreement............................ 185
VA...............................................................84
Wells Fargo Bank...................................... 162
Wells Fargo Mortgage Loans .................... 152

CONFIDENTIAL

FHFA01041697

ANNEX I

## GLOBAL CLEARANCE, SETTLEMENT AND TAX DOCUMENTATION PROCEDURES

Except under limited circumstances, the globally offered Nomura Home Equity Loan, Inc., Asset Backed Certificates, Series 2006-HE3 (the "Global Securities") will be available only in book- entry form. Investors in the Global Securities may hold the Global Securities through any of DTC, Euroclear or Clearstream. The Global Securities will be tradable as home market instruments in both the European and U.S. domestic markets. Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors holding Global Securities through Euroclear and Clearstream will be conducted in the ordinary way in accordance with their normal rules and operating procedures and in accordance with conventional eurobond practice (i.e., seven calendar day settlement).

Secondary market trading between investors holding Global Securities through DTC will be conducted according to the rules and procedures applicable to U.S. corporate debt obligations and prior Asset-Backed Certificates issues.

Secondary cross-market trading between Euroclear or Clearstream and DTC participants holding Certificates will be effected on a delivery-against-payment basis through the respective depositaries of Euroclear and Clearstream and as DTC participants.

Non-U.S. holders (as described below) of Global Securities will be subject to U.S. withholding taxes unless the holders meet established requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their participants.

### Initial Settlement

All Global Securities will be held in book-entry form by DTC in the name of Cede & Co. as nominee of DTC. Investors' interests in the Global Securities will be represented through financial institutions acting on their behalf as direct and indirect participants in DTC. As a result, Euroclear and Clearstream will hold positions on behalf of their participants through their respective depositaries, which in turn will hold the positions in accounts as DTC participants.

Investors electing to hold their Global Securities through DTC will follow the settlement practices applicable to prior Asset-Backed Certificates issues. Investor securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their Global Securities through Euroclear or Clearstream accounts will follow the settlement procedures applicable to conventional eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period. Global Securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

I-1

**Secondary Market Trading**

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

*Trading between DTC Participants.* Secondary market trading between DTC participants will be settled using the procedures applicable to prior Asset-Backed Certificates issues in same day funds.

*Trading between Euroclear and/or Clearstream Participants.* Secondary market trading between Euroclear participants or Clearstream participants will be settled using the procedures applicable to conventional eurobonds in same-day funds.

*Trading between DTC seller and Euroclear or Clearstream Purchaser.* When Global Securities are to be transferred from the account of a DTC participant to the account of a Euroclear participant or a Clearstream participant, the purchaser will send instructions to Euroclear or Clearstream through a Euroclear participant or Clearstream participant at least one business day prior to settlement. Euroclear or Clearstream will instruct the respective depositary, as the case may be, to receive the Global Securities against payment. Payment will include interest accrued on the Global Securities from and including the last coupon payment date to and excluding the settlement date, on the basis of either the actual number of days in the accrual period and a year assumed to consist of 360 days or a 360-day year of 12 30-day months as applicable to the related class of Global Securities. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. Payment will then be made by the respective depositary of the DTC participant's account against delivery of the Global Securities. After settlement has been completed, the Global Securities will be credited to the respective clearing system and by the clearing system, in accordance with its usual procedures, to the Euroclear participant's or Clearstream participant's account. The securities credit will appear the next day (European time) and the cash debt will be back-valued to, and the interest on the Global Securities will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (i.e., the trade fails), the Euroclear or Clearstream cash debt will be valued instead as of the actual settlement date.

Euroclear participants and Clearstream participants will need to make available to the respective clearing systems the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement, either from cash on hand or existing lines of credit, as they would for any settlement occurring within Euroclear or Clearstream. Under this approach, they may take on credit exposure to Euroclear or Clearstream until the Global Securities are credited to their accounts one day later.

As an alternative, if Euroclear or Clearstream has extended a line of credit to them, Euroclear participants or Clearstream participants can elect not to preposition funds and allow that credit line to be drawn upon the finance settlement. Under this procedure, Euroclear participants or Clearstream participants purchasing Global Securities would incur overdraft charges for one day, assuming they cleared the overdraft when the Global Securities were credited to their accounts. However, interest on the Global Securities would accrue from the value date. Therefore, in many cases the investment income on the Global Securities earned during that one-day period may

substantially reduce or offset the amount of the overdraft charges, although this result will depend on each Euroclear participant's or Clearstream participant's particular cost of funds.

Since the settlement is taking place during New York business hours, DTC participants can employ their usual procedures for sending Global Securities to the respective European depositary for the benefit of Euroclear participants or Clearstream participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC participants a crossmarket transaction will settle no differently than a trade between two DTC participants.

Trading between Euroclear or Clearstream seller and DTC Purchaser. Due to time zone differences in their favor, Euroclear participants and Clearstream participants may employ their customary procedures for transactions in which Global Securities are to be transferred by the respective clearing system, through the respective depositary, to a DTC participant. The seller will send instructions to Euroclear or Clearstream through a Euroclear participant or Clearstream participant at least one business day prior to settlement. In these cases Euroclear or Clearstream will instruct the respective depositary, as appropriate, to deliver the Global Securities to the DTC participant's account against payment. Payment will include interest accrued on the Global Securities from and including the last coupon payment to and excluding the settlement date on the basis of either the actual number of days in the accrual period and a year assumed to consist of 360 days or a 360-day year of 12 30-day months as applicable to the related class of Global Securities. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. The payment will then be reflected in the account of the Euroclear participant or Clearstream participant the following day, and receipt of the cash proceeds in the Euroclear participant's or Clearstream participant's account would be back-valued to the value date (which would be the preceding day, when settlement occurred in New York). Should the Euroclear participant or Clearstream participant have a line of credit with its respective clearing system and elect to be in debt in anticipation of receipt of the sale proceeds in its account, the back-valuation will extinguish any overdraft incurred over that one-day period. If settlement is not completed on the intended value date (i.e., the trade fails), receipt of the cash proceeds in the Euroclear participant's or Clearstream participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Euroclear or Clearstream and that purchase Global Securities from DTC participants for delivery to Euroclear participants or Clearstream participants should note that these trades would automatically fail on the sale side unless affirmative action were taken. At least three techniques should be readily available to eliminate this potential problem:

(a)     borrowing through Euroclear or Clearstream for one day (until the purchase side of the day trade is reflected in their Euroclear or Clearstream accounts) in accordance with the clearing system's customary procedures;

(b)     borrowing the Global Securities in the U.S. from a DTC participant no later than one day prior to settlement, which would give the Global Securities sufficient time to be reflected in their Euroclear or Clearstream account in order to settle the sale side of the trade; or

(c)     staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC participant is at least one day prior to the value date for the sale to the Euroclear participant or Clearstream participant.

FHFA01041700

**U.S. Federal Income Tax Documentation Requirements**

A beneficial owner of Global Securities holding securities through Clearstream or Euroclear (or through DTC if the holder has an address outside the U.S.) will be subject to the 30% (or in some cases 31% ) U.S. withholding tax that generally applies to payments of interest on registered debt issued by U.S. persons, unless (1) each clearing system, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between the beneficial owner and the U.S. entity required to withhold tax complies with applicable certification requirements and (2) the beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate:

*Exemption for non-U.S. persons (Form W-8 BEN).* Beneficial owners of Global Securities that are non-U.S. persons can obtain a complete exemption from the withholding tax by filing a signed Form W-8 BEN. If the information shown on Form W-8 BEN changes, a new Form W-8 BEN must be filed within 30 days of the change.

*Exemption for non-U.S. persons with effectively connected income (Form W-8ECI).* A non- U.S. person, including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the United States, can obtain an exemption from the withholding tax by filing Form W-8ECI.

*Exemption or reduced rate for non-U.S. persons resident in treaty countries (Form W-8 BEN).* Non-U.S. persons that are beneficial owners residing in a country that has a tax treaty with the United States can obtain an exemption or reduced tax rate (depending on the treaty terms) by filing Form W-8 BEN.

*Exemption for U.S. persons (Form W-9).* U.S. persons can obtain a complete exemption from the withholding tax by filing Form W-9.

*U.S. Federal Income Tax Reporting Procedure.* The Global Securities holder files by submitting the appropriate form to the person through whom he holds (e.g., the clearing agency, in the case of persons holding directly on the books of the clearing agency). Forms W-8 BEN and W-8ECI are generally effective for three calendar years.

- U.S. Person. As used herein the term "U.S. person" means a beneficial owner of a Certificate that is for United States federal income tax purposes

- a citizen or resident of the United States,

- a corporation or partnership created or organized in or under the laws of the United States or of any State thereof or the District of Columbia,

- an estate the income of which is subject to United States federal income taxation regardless of its source, or

- a trust if a court within the United States is able to exercise primary supervision of the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust.

As used herein, the term "non-U.S. person" means a beneficial owner of a Certificate that is not a U.S. person.

This summary does not deal with all aspects of U.S. Federal income tax withholding that may be relevant to foreign holders of the Global Securities or with the application of the extensive withholding regulations that are generally effective with respect to payments made after December 31, 2000 which have detailed rules regarding the determination of beneficial ownership. Investors are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of the Global Securities.

CONFIDENTIAL

The date of this prospectus is April 18, 2006.

## PROSPECTUS

### Asset Backed Certificates

### Asset Backed Notes
### (Issuable in Series)

# Nomura Home Equity Loan, Inc.
Depositor

The Trust Funds:

Each trust fund will be established to hold assets transferred to it by Nomura Home Equity Loan, Inc. The assets in each trust fund will generally consist of one or more of the following:

- loans secured by first and/or subordinate liens on one- to four-family residential properties, including manufactured housing that is permanently affixed and treated as real property under local law, or security interests in shares issued by cooperative housing corporations,

- loans secured by first and/or subordinate liens on small multifamily residential properties, such as rental apartment buildings or projects containing five to fifty residential units,

- loans secured by first and/or subordinate liens on mixed residential and commercial properties (mixed-use loans),

- closed-end second-lien loans, secured in whole or in part by subordinate liens on one- to four-family residential properties,

- home equity line of credit loans or specified balances thereof, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties,

- loans secured in whole or in part by first and/or subordinate liens on improved land that is generally suitable for one- to four-family residential dwellings (lot loans),

- home improvement installment sale contracts and installment loan agreements that are secured by first or subordinate liens on one- to four-family residential properties, or

- mortgage-backed securities or collateralized mortgage obligations backed by loans secured by first and/or subordinate liens on one- to four-family residential properties, by lot loans or by participations in these types of loans.

The assets in your trust fund are specified in the prospectus supplement for that particular trust fund, while the types of assets that may be included in a trust fund, whether or not in your trust fund, are described in greater detail in this prospectus.

CONFIDENTIAL

> **Please carefully consider our discussion of some of the risks of investing in the securities under "risk factors" beginning on page 4.**

**The Securities:**

Nomura Home Equity Loan, Inc. will sell the securities pursuant to a prospectus supplement. The securities will be grouped into one or more series, each having is own distinct designation. Each series will be issued in one or more classes and will evidence beneficial ownership of, or be secured by, the assets in the trust fund that the series relates to. A prospectus supplement for a series will specify all of the terms of the series and of each of the classes in the series.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

CONFIDENTIAL

# TABLE OF CONTENTS

Risk Factors ........................................................................................................................ 4
Description of the Trust Funds ......................................................................................... 27
Cash Flow Agreements ..................................................................................................... 45
Use of Proceeds ................................................................................................................ 45
Yield and Prepayment Considerations .............................................................................. 46
Static Pool Information ..................................................................................................... 49
Description of the Securities ............................................................................................. 49
Description of the Agreements .......................................................................................... 71
Description of Credit Support ........................................................................................... 99
Derivatives Related To The Securities ............................................................................ 104
Certain Legal Aspects of the Loans ................................................................................ 105
Federal Income Tax Consequences ................................................................................. 123
ERISA Considerations .................................................................................................... 156
Legal Investment ............................................................................................................. 165
Method of Distribution ................................................................................................... 166
Additional Information .................................................................................................... 167
Incorporation of Certain Documents by Reference ........................................................ 168
Legal Matters .................................................................................................................. 169
Financial Information ...................................................................................................... 169
Rating ............................................................................................................................. 169
Reports To Securityholders ............................................................................................ 169
Index of Defined Terms .................................................................................................. 171

## IMPORTANT NOTICE ABOUT INFORMATION IN THIS PROSPECTUS AND EACH ACCOMPANYING PROSPECTUS SUPPLEMENT

Information about each series of securities is contained in two separate documents:

- this prospectus, which provides general information, some of which may not apply to a particular series; and

- the accompanying prospectus supplement for a particular series, which describes the specific terms of the securities of that series.

- The prospectus supplement will contain information about a particular series that supplements the information contained in this prospectus, and you should rely on that supplementary information in the prospectus supplement.

You should rely only on the information in this prospectus and the accompanying prospectus supplement. We have not authorized anyone to provide you with information that is different from that contained in this prospectus and the accompanying prospectus supplement.

––––––––––––––––––––

- 3 -

CONFIDENTIAL

If you require additional information, the mailing address of our principal executive offices is Nomura Home Equity Loan, Inc., Two World Financial Center, Building B, 21st Floor, New York, New York 10281 and the telephone number is 212-667-9300. For other means of acquiring additional information about us or a series of securities, see "The Trust Fund–Incorporation of Certain Documents by Reference" beginning on page 36.

## Risk Factors

You should carefully consider the following information because it identifies significant risks associated with an investment in the securities.

**Limited Liquidity** ............................................. No market for the securities of any series will exist before those securities are issued. We cannot assure you that a secondary market will develop. Even if a secondary market develops, we cannot assure you that it will provide you with liquidity of investment or that it will continue for the life of the securities of that series.

**Limited Source of Payments –**
**No Recourse To Sellers, Depositor**
**Or Servicer** ...................................................... The applicable prospectus supplement may provide that securities will be payable from trust funds other than their associated trust fund, but if it does not, they will be payable solely from their associated trust fund. If the trust fund does not have enough assets to distribute the full amount due to you as a securityholder, your yield will be impaired, and the return of your principal may be impaired, without you having recourse to anyone else. Furthermore, at the times specified in the applicable prospectus supplement, certain assets of the trust fund and/or any balance remaining in the security account immediately after making all payments due on the securities of that series, may be released and paid out to other persons, such as the depositor, a servicer, a credit enhancement provider, or any other person entitled to payments from the trust fund. Those assets will no longer be available to make payments to you. Those payments are generally made only after other specified payments that may be described in the applicable prospectus supplement have been made.

You will not have any recourse against the depositor, any seller or any servicer if you do not receive a required distribution on the securities. You

- 4 -

FHFA01041706

will also not have recourse against the assets of the trust fund of any other series of securities.

The securities will not represent an interest in the depositor, any servicer, any seller to the depositor, or anyone else except the trust fund. The only obligation of the depositor to a trust fund will come from certain representations and warranties made by it about assets transferred to the trust fund. If these representations and warranties are untrue, the depositor may be required to repurchase some of the transferred assets. Nomura Home Equity Loan, Inc., which is the depositor, does not have significant assets and is unlikely to have significant assets in the future. If the depositor were required to repurchase a loan because of a breach of a representation, its only sources of funds for the repurchase would be:

- funds obtained from the enforcement of a corresponding obligation of a seller or originator of the loan or

- funds from a reserve account or similar credit enhancement established to pay for loan repurchases.

The only obligations of the servicer to a trust fund (other than its servicing obligations) will come from certain representations and warranties made by it in connection with its loan servicing activities. If these representations and warranties turn out to be untrue, the servicer may be required to repurchase or substitute for some of the loans. However, the servicer may not have the financial ability to make the required repurchase or substitution.

The only obligations to a trust fund of a seller of loans to the depositor will come from certain representations and warranties made by it in connection with its sale of the loans and certain document delivery requirements. If these representations and warranties turn out to be untrue, or the seller fails to deliver required documents, it may be required to repurchase or substitute for some of the loans. However, the seller may not have the financial ability to make the required repurchase or substitution.

- 5 -

As described in this prospectus, a servicer may be obligated to enforce the sellers' obligations. However, the servicer will not be obligated to purchase or replace any loan if a seller defaults on its obligation or for any other reason.

**Credit Enhancement May Not Be Sufficient to Protect You From Losses**............................................

Credit enhancement is intended to reduce the effect of loan losses. But credit enhancements may benefit only some classes of a series of securities, and the amount of any credit enhancement will be limited as described in the applicable prospectus supplement. Furthermore, the amount of a particular form of credit enhancement may decline over time pursuant to a schedule or formula or otherwise, and could be depleted from payments or for other reasons before the securities covered by the credit enhancement are paid in full. In addition, the credit enhancement applicable to a series of securities may not cover all potential sources of loss. For example, credit enhancement may or may not cover fraud or negligence by a loan originator or other parties. Also, the trustee may be permitted to reduce, substitute for or even eliminate all or a portion of a credit enhancement as long as the trustee's actions would not cause the rating agencies that have rated the securities at the request of the depositor to change adversely their ratings of the securities. Consequently, securityholders may suffer losses even though a credit enhancement exists and its provider does not default.

**Prepayment and Yield Considerations**

**Your Yield Will Be Affected By Prepayments and By the Allocation of Distributions To the Securities**.......................................

The timing of principal payments on the securities of a series will be affected by a number of factors, including:

• the extent of prepayments on the loans in the related trust fund,

• how payments of principal are allocated among the classes of securities of a series as specified in the related prospectus supplement,

- 6 -

CONFIDENTIAL