## Periodic Cap of the Mortgage Loans - ARM Loans

| Periodic Cap (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1.000 - 1.499 | 2,746 | $601,423,456 | 85.38% | 8.082% | 631 | 82.22% | 356 | 54.47% |
| 1.500 - 1.999 | 436 | 102,751,730 | 14.59 | 8.272 | 631 | 79.63 | 353 | 47.69 |
| 2.000 - 2.499 | 1 | 205,265 | 0.03 | 8.540 | 562 | 80.00 | 342 | 0.00 |
| Total/Weighted Average: | 3,183 | $704,380,451 | 100.00% | 8.110% | 631 | 81.84% | 356 | 53.47% |

## Next Rate Adjustment Date of the Mortgage Loans - ARM Loans

| Next Rate Adjustment Date | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| May 2007 | 1 | $ 75,500 | 0.01% | 8.500% | 565 | 94.97% | 340 | 100.00% |
| June 2007 | 2 | 361,701 | 0.05 | 7.449 | 602 | 81.59 | 341 | 0.00 |
| July 2007 | 2 | 253,365 | 0.04 | 8.400 | 581 | 76.38 | 342 | 18.98 |
| August 2007 | 1 | 129,373 | 0.02 | 7.250 | 685 | 80.00 | 343 | 0.00 |
| September 2007 | 5 | 575,193 | 0.08 | 7.688 | 585 | 83.24 | 344 | 62.71 |
| October 2007 | 4 | 927,045 | 0.13 | 6.723 | 658 | 78.75 | 345 | 76.03 |
| November 2007 | 9 | 1,928,606 | 0.27 | 7.757 | 621 | 84.63 | 346 | 64.75 |
| December 2007 | 19 | 4,669,202 | 0.66 | 7.522 | 620 | 81.38 | 347 | 67.62 |
| January 2008 | 43 | 7,517,068 | 1.07 | 8.039 | 611 | 87.26 | 348 | 80.70 |
| February 2008 | 26 | 5,899,148 | 0.84 | 8.013 | 604 | 81.96 | 349 | 65.71 |
| March 2008 | 38 | 9,186,080 | 1.30 | 8.291 | 629 | 80.12 | 350 | 40.64 |
| April 2008 | 31 | 9,668,096 | 1.37 | 8.499 | 612 | 82.40 | 351 | 31.80 |
| May 2008 | 95 | 25,048,461 | 3.56 | 8.630 | 629 | 81.00 | 352 | 23.92 |
| June 2008 | 240 | 57,426,219 | 8.15 | 8.383 | 628 | 81.33 | 353 | 39.65 |
| July 2008 | 288 | 66,690,307 | 9.47 | 8.215 | 629 | 80.95 | 354 | 45.16 |
| August 2008 | 248 | 56,692,418 | 8.05 | 8.242 | 620 | 81.10 | 355 | 53.06 |
| September 2008 | 306 | 65,956,847 | 9.36 | 8.283 | 622 | 83.07 | 356 | 54.31 |
| October 2008 | 75 | 19,021,751 | 2.70 | 8.372 | 614 | 83.43 | 357 | 69.07 |
| November 2008 | 541 | 127,000,223 | 18.03 | 7.785 | 642 | 81.21 | 358 | 55.70 |
| December 2008 | 457 | 98,736,558 | 14.02 | 7.859 | 639 | 81.65 | 359 | 61.88 |
| January 2009 | 1 | 54,534 | 0.01 | 9.125 | 657 | 90.00 | 348 | 100.00 |
| March 2009 | 6 | 1,352,293 | 0.19 | 7.593 | 634 | 75.82 | 350 | 83.00 |
| April 2009 | 9 | 1,362,534 | 0.19 | 8.629 | 614 | 80.61 | 351 | 60.45 |
| May 2009 | 56 | 7,712,546 | 1.09 | 9.149 | 629 | 80.37 | 352 | 64.21 |
| June 2009 | 32 | 6,922,731 | 0.98 | 8.651 | 627 | 87.95 | 353 | 35.78 |
| July 2009 | 156 | 35,846,993 | 5.09 | 8.457 | 629 | 84.50 | 354 | 45.66 |
| August 2009 | 56 | 11,466,639 | 1.63 | 8.334 | 622 | 78.92 | 355 | 47.06 |
| September 2009 | 30 | 6,328,540 | 0.90 | 8.072 | 641 | 85.16 | 356 | 64.83 |
| October 2009 | 19 | 4,654,545 | 0.66 | 8.256 | 643 | 85.65 | 357 | 59.61 |
| November 2009 | 175 | 28,896,995 | 4.10 | 7.915 | 633 | 82.22 | 358 | 67.83 |
| December 2009 | 135 | 22,711,364 | 3.22 | 8.013 | 629 | 82.50 | 359 | 71.49 |
| November 2010 | 1 | 191,767 | 0.03 | 8.500 | 681 | 80.00 | 358 | 0.00 |
| December 2010 | 1 | 235,055 | 0.03 | 6.875 | 593 | 42.14 | 347 | 0.00 |
| February 2011 | 1 | 117,662 | 0.02 | 8.500 | 575 | 85.00 | 349 | 0.00 |
| March 2011 | 1 | 478,319 | 0.07 | 7.440 | 654 | 78.69 | 350 | 0.00 |
| April 2011 | 1 | 286,000 | 0.04 | 6.500 | 641 | 52.00 | 351 | 0.00 |
| May 2011 | 2 | 862,800 | 0.12 | 7.700 | 584 | 82.14 | 352 | 100.00 |
| June 2011 | 7 | 2,806,691 | 0.40 | 8.061 | 669 | 83.83 | 353 | 31.42 |
| July 2011 | 8 | 1,560,976 | 0.22 | 7.907 | 640 | 68.71 | 354 | 16.28 |
| August 2011 | 3 | 947,930 | 0.13 | 7.199 | 653 | 78.61 | 355 | 72.31 |
| September 2011 | 5 | 1,524,399 | 0.22 | 7.403 | 679 | 80.94 | 356 | 43.71 |
| October 2011 | 4 | 606,271 | 0.09 | 7.423 | 637 | 82.49 | 357 | 88.09 |
| November 2011 | 15 | 3,646,504 | 0.52 | 7.578 | 671 | 83.03 | 358 | 60.55 |
| December 2011 | 28 | 6,043,204 | 0.86 | 7.161 | 675 | 80.91 | 359 | 74.76 |
| Total/Weighted Average: | 3,183 | $ 704,380,451 | 100.00% | 8.110% | 631 | 81.84% | 356 | 53.47% |

CONFIDENTIAL

NOM-FHFA_05591410

**The Indices on the Mortgage Loans**

*Six-Month LIBOR.* Approximately 68.52% of the Mortgage Loans (by aggregate principal balance as of the Cut-off Date) will adjust semi-annually based on Six-Month LIBOR. Six-Month LIBOR will be a per annum rate equal to the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market based on quotations of major banks as published in The Wall Street Journal and are most recently available as of the time specified in the related mortgage note.

Listed below are historical values of certain average yields, which are related to Six-Month LIBOR. The monthly averages shown are intended only to provide an historical summary of the movements in Six-Month LIBOR and may not be indicative of future rates. The values shown below have been obtained from Bloomberg L.P. and may not be identical to Six-Month LIBOR as published by a different source for the same period.

| | Six-Month LIBOR | | | | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| January | 5.26250% | 2.03375% | 1.34875% | 1.21375% | 2.96000% | 4.81000% |
| February | 4.90750 | 2.03000 | 1.34000 | 1.17000 | 3.16000 | 4.99000 |
| March | 4.71000 | 2.33000 | 1.23125 | 1.16000 | 3.40000 | 5.14000 |
| April | 4.30250 | 2.12000 | 1.29000 | 1.38000 | 3.40875 | 5.22000 |
| May | 3.98000 | 2.08000 | 1.21375 | 1.57750 | 3.53750 | 5.33000 |
| June | 3.90875 | 1.95625 | 1.11938 | 1.94000 | 3.71000 | 5.58938 |
| July | 3.68875 | 1.87000 | 1.14625 | 1.98000 | 3.92375 | 5.51000 |
| August | 3.45250 | 1.79500 | 1.19750 | 1.99000 | 4.05500 | 5.43125 |
| September | 2.52250 | 1.71000 | 1.18000 | 2.19625 | 4.23063 | 5.37000 |
| October | 2.14625 | 1.60000 | 1.23000 | 2.31250 | 4.46625 | 5.38750 |
| November | 2.03000 | 1.46875 | 1.25875 | 2.63500 | 4.60063 | 5.34688 |
| December | 1.98125 | 1.38000 | 1.22000 | 2.78063 | 4.70000 | 5.37000 |

*One-Year LIBOR.* Approximately 7.17% of the Mortgage Loans (by aggregate principal balance as of the Cut-off Date) will adjust annually based on One-Year LIBOR. One-Year LIBOR will be a per annum rate equal to the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market based on quotations of major banks as published in The Wall Street Journal and are most recently available as of the time specified in the related mortgage note.

Listed below are historical values of certain average yields, which are related to One-Year LIBOR. The monthly averages shown are intended only to provide an historical summary of the movements in One-Year LIBOR and may not be indicative of future rates. The values shown below have been obtained from Bloomberg L.P. and may not be identical to One-Year LIBOR as published by a different source for the same period.

S-82

CONFIDENTIAL

NOM-FHFA_05591411

| | **One-Year LIBOR** | | | | | |
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| January | 5.17375% | 2.49125% | 1.45000% | 1.47625% | 3.26125% | 4.94000% |
| February | 4.88375 | 2.43000 | 1.38125 | 1.36750 | 3.53000 | 5.15000 |
| March | 4.66750 | 3.00250 | 1.28000 | 1.35125 | 3.84500 | 5.28750 |
| April | 4.44125 | 2.63375 | 1.35750 | 1.83000 | 3.68625 | 5.33063 |
| May | 4.24250 | 2.59125 | 1.21125 | 2.05750 | 3.78000 | 5.42625 |
| June | 4.18375 | 2.28625 | 1.19000 | 2.46250 | 3.88000 | 5.69313 |
| July | 3.82000 | 2.09000 | 1.26625 | 2.43375 | 4.16250 | 5.53938 |
| August | 3.56375 | 1.89625 | 1.43000 | 2.30000 | 4.24000 | 5.41000 |
| September | 2.64250 | 1.72500 | 1.30000 | 2.48250 | 4.44000 | 5.29750 |
| October | 2.27188 | 1.63625 | 1.48000 | 2.54625 | 4.72000 | 5.34125 |
| November | 2.38625 | 1.72750 | 1.56250 | 2.98000 | 4.79000 | 5.24000 |
| December | 2.44250 | 1.44938 | 1.45688 | 3.10000 | 4.83875 | 5.32938 |

In the event that the Index specified in a mortgage note is no longer available, an index that is based on comparable information will be selected by the related servicer, to the extent that it is permissible under the terms of the related Mortgage and mortgage note.

**The Originators**

The principal originators of the Mortgage Loans are (i) Ownit Mortgage Solutions, Inc. with respect to approximately 42.38% of the Mortgage Loans by aggregate principal balance as of the Cut-off Date and (ii) First NLC Financial Services, LLC with respect to approximately 11.56% of the Mortgage Loans, in each case by aggregate principal balance of the Mortgage Loans as of the Cut-off Date. The remainder of the Mortgage Loans were originated by various originators, none of which have originated 10% or more of the Mortgage Loans, by aggregate outstanding principal balance as of the Cut-off Date.

None of the originators are affiliated with the depositor, the sponsor or the underwriters. The processes employed by, capabilities, personnel, resources and other applicable characteristics vary substantively among the originators, and except as otherwise set forth herein, the depositor makes no statements as to the originators with respect to the foregoing. The depositor and its affiliates may have other business relationships with some or all of the originators and from time to time the depositor and its affiliates may conduct additional business with or may cease conducting any or all business with some or all of the originators.

The information set forth below under "Ownit Mortgage Solutions, Inc." has been included in this prospectus supplement because over 20% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date, were originated by Ownit Mortgage Solutions, Inc. Investors should note that such information was previously filed by Ownit Mortgage Solutions, Inc. in the prospectus supplement dated September 8, 2006 and filed with the Securities and Exchange Commission in connection with Ownit Mortgage Loan Trust, Series 2006-7, and has not been updated by Ownit Mortgage Solutions, Inc. because Ownit Mortgage Solutions, Inc. closed its business in December 2006.

CONFIDENTIAL

NOM-FHFA_05591412

**Ownit Mortgage Solutions, Inc.**

Ownit Mortgage Solutions, Inc. ("Ownit") is a California corporation whose address is 27349 Agoura Road, Suite 100, Agoura Hills, California 91301. The following is a general summary of the Ownit underwriting guidelines. This summary does not purport to be a complete description of the underwriting standards of Ownit. Ownit (headquartered in Agoura Hills, California) is a wholesale consumer finance company that originates non-conforming mortgage loans. Ownit has been engaged in the business of originating non-conforming mortgage loans since 1994. Ownit is the originator of the "RightLoan", a proprietary loan product that focuses on purchase, owner occupied, full documentation loans. Ownit provides loans to borrowers not only for the purpose of purchasing homes, but also for debt consolidation and refinancing existing mortgages in accordance with the RightLoan Underwriting Guidelines. Ownit risk-base prices each loan by combining the credit score and loan-to-value price to price the loan.

Ownit originated $1,030,171,017 in mortgages for the twelve months ending December 31, 2003; $3,670,102,202 in mortgages for the twelve months ending December 31, 2004; $8,348,292,536 in mortgages for the twelve months ending December 31, 2005; and $8,249,850,135 in mortgages for the first nine months of 2006.

The Underwriting Guidelines and Credit Matrices of the RightLoan are designed to be used as a guide in determining the credit worthiness of the borrower and his/her ability to repay. The guidelines, a reasonable loan amount and the RightLoan itself offer a solution that also facilitates making logical exceptions to those guides. Exceptions to the guidelines will be made if the loan meets the primary criteria of the RightLoan and offers supported compensating factors when a deviation occurs. In all cases, the exception(s) and compensating factor(s) are clearly documented in the file and require branch manager approval and a second signature from the corporate underwriter.

Using the three components, capacity, credit and collateral, the underwriter analyzes the loan profile. Capacity, which is the borrower's ability to repay, is determined by cash flow. It must be clearly shown that the borrower has a proven, historical cash flow, which will support the requested loan amount. This approach anticipates that the loan is going to be repaid from the borrower's recurring cash inflows, not from the sale of the collateral. Job stability and length of time in current residence are also strong factors in determining a borrower's capacity. Continuity of employment is a strong factor in establishing the income used as a basis for repayment. Credit is the borrower's willingness to repay his or her debts according to the contractual agreements. The most valuable resource in determining the borrower's ability to repay is the credit report. Ownit underwriters will use the credit report and credit explanation letter when supplied in determining willingness. Ownit uses the credit score as a primary factor in determining the borrower's willingness to repay his or her debts. Collateral is defined as the asset pledged by the borrower to the lender. Collateral is a secondary source of repayment; cash flow is the primary source of repayment. Ownit will evaluate the property by reviewing uniform residential real estate appraisal reports, along with other data sources, to determine whether the collateral is sufficient to secure the mortgage.

The underwriter's objective is to analyze an application individually with the understanding that no single characteristic will approve or deny a loan. The underwriter must utilize the credit report, loan application, asset verifications, appraisal and all other supporting documents in determining credit worthiness and risk. Credit risk can be defined as, but is not restricted to, limited liquid assets or reserves, and derogatory credit history. The overall situation and profile of a borrower, including compensating factors, which may offset negative characteristics, must be taken

S-84

NOM-FHFA_05591413

into consideration in determining if the borrower is creditworthy. Credit worthiness is determined by the borrower's ability and willingness to repay his or her contractual debt and the value of the property securing the loan. A sufficient property value gives Ownit the ability to recover its investment if the loan defaults.

The equal treatment of all credit applicants, without regard to race, sex, sexual orientation, color, national origin, religion, age, marital status, disability, or any other prohibited basis, is an integral part of the fundamental mission of providing quality financial services to existing and prospective customers. Ownit is committed to the principle that every applicant for credit receives fair and equal treatment throughout the credit application and approval process. This principle is embodied in the Equal Credit Opportunity Act and Fair Housing Act, and applies to every lending subsidiary of Ownit.

*Capacity.* Several aspects are considered in determining the borrower's capacity or ability to repay the loan. The key factors are employment documentation, history and amount of income used to derive the debt to income ratios. Ownit offers three income documentation options: Full documentation includes traditional employment verification such as pay stubs, W2s or/and tax returns. A copy of the borrower's personal or business bank statements for the most recent 12 month period also constitutes full income documentation. Limited Income Verification (LIV) represents an average of 6 months bank statement averages. No Income Verification (NIV) uses the income stated by the borrower on the 1003 loan application to qualify. Satisfactory employment history is established with 2 years at the same job or similar, related field. Verbal employment verification is performed prior to funding for all documentation types and good probability of continuance is required. The actual method of calculating and documenting employment history and income depends on the borrower's credit score and LTV. Higher LTVs and lower credit scores require a longer period in which income must be verified. Base debt to income ratios are set at 45% or 50% depending on credit score, LTV, documentation type and if the borrower is a first time home buyer. In some cases the maximum debt ratio may increase to 55% based on meeting a minimum disposable income requirement.

*Credit.* A satisfactory credit history is the most reliable criterion in determining a borrower's credit worthiness. Ownit relies on the scoring models developed by the national credit bureaus: Experian, TransUnion and Equifax for much of that decision process. Using a credit score methodology that requires a 2 repository merged in file score, the Brokers' credit report and score is used for qualification purposes. Ownit will run a back up report to audit the Brokers' report for material variances such as social security number, fingerprint or depth. The score used for qualification purposes is the middle of three or lower of two scores provided by the national bureaus for the primary wage earner. The primary wage earner is defined as the borrower earning 51% of the total income. A minimum trade history is required for all loan documentation types with certain accounts not considered valid trade lines. The minimum credit score for all programs is 540.

Certain events may restrict LTV and loan amount options available to a borrower. Bankruptcy and Foreclosure history is considered, as well as charge off, collections, judgments and liens. Liens that affect title must be paid off or subordinated. Other delinquent accounts must be paid off depending on the aggregate balance or seasoning; credit events that occurred over 24 months or have a balance less than $4,000 are not required to be paid. The mortgage history is viewed with respect to the payoff/demand statement. A prior mortgage history may not be greater than 59 days delinquent at closing or contractually 30 days late at closing.

CONFIDENTIAL

NOM-FHFA_05591414

*Collateral.* The collateral value and amount of equity in the subject property are important factors in assessing the risk of a particular loan. All properties must conform to the neighborhood and be in average or better condition. Acceptable property type includes: 1-2 family, 3-4 family, condominiums, planned unit developments (PUDs), modular homes and leasehold properties. Emphasis is placed on property type, location and occupancy to determine risk associated with specific LTV and credit score. Maximum financing is not available for rural properties, neighborhoods with declining values, oversupply of housing and/or marketing time over 6 months, or properties at the low or high end of value range with no comparable sales in the immediate area. Maximum financing is also not available on transactions involving a gift of equity. All appraisals should conform to the Uniform Standards of Professional Appraisal Practices. Ownit requires the underwriter to review all appraisals for content and accuracy, pulling additional data if available or warranted. Certain types of transactions require an enhanced desk or field review. Loan amounts in excess of $650,000 require a second full appraisal. The minimum square footage is 700 and deferred maintenance must be cosmetic in nature, not resulting in a health or safety hazard and should not exceed $3,500 cost to cure.

**Underwriting Standards of the Sponsor**

All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section.

All of the Mortgage Loans are "conventional mortgage loans" (i.e., loans which are not insured by the Federal Housing Authority ("FHA") or partially guaranteed by the Department of Veteran Affairs ("VA")).

The underwriting standards applicable to the Mortgage Loans typically differ from, and are, with respect to a substantial number of Mortgage Loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, credit score, required documentation, interest rates, borrower occupancy of the mortgaged property, and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the Mortgage Loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower.

Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources. With respect to mortgaged properties consisting of vacation or

CONFIDENTIAL

NOM-FHFA_05591415

second homes, no income derived from the property generally will have been considered for underwriting purposes.  In the case of certain borrowers with acceptable compensating factors, income and/or assets may not be required to be stated (or verified) in connection with the loan application.

Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage not in excess of 60% of the prospective borrower's gross income. The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria, including, without limitation, the loan-to-value ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the borrower after origination.

Approximately 35.46% of the first lien Mortgage Loans, by aggregate principal balance as of the Cut-off Date, had loan-to-value ratios at origination in excess of 80% and do not have mortgage insurance. Generally, no such mortgage insurance policy will be required with respect to any such Mortgage Loan after the date on which the related loan-to-value ratio decreases to 80% or less or, based upon a new appraised value. All of the insurers that have issued mortgage insurance policies with respect to the Mortgage Loans meet Fannie Mae or Freddie Mac standards or are otherwise acceptable to the Rating Agencies.

The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure standards established by the originator. The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the Mortgaged Property and to verify whether the Mortgaged Property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property.

**Modified Standards**

In comparison to the "general" underwriting standards described above, the underwriting standards applicable to mortgage loans under an "alternative" mortgage loan underwriting program permit different underwriting criteria, additional types of mortgaged properties or categories of borrowers such as "foreign nationals" without a credit score who hold certain types of visas and have acceptable credit references (such Mortgage Loans, "Foreign National Loans"), and include certain other less restrictive parameters. Generally, relative to the "general" underwriting standards, these standards include higher loan amounts, higher maximum loan-to-value ratios, higher maximum "combined" loan-to-value ratios (in each case, relative to mortgage loans with otherwise

S-87

NOM-FHFA_05591416

similar characteristics) in cases of simultaneous primary and secondary financings, less restrictive requirements for "equity take out" refinancings, the removal of limitations on the number of permissible mortgage loans that may be extended to one borrower and the ability to originate mortgage loans with loan-to-value ratios in excess of 80% without the requirement to obtain mortgage insurance if such loans are secured by investment properties. Under a program available to eligible borrowers who meet certain underwriting criteria and for which program a minimum down payment of only 3.00% is required, mortgage loans may be originated with loan-to-value ratios between 95.01% and 97.00% with the application of less restrictive maximum qualifying ratios of borrower monthly housing debt or total monthly debt obligations to borrower monthly income and reduced minimum requirements for mortgage insurance coverage. In addition, under a program available to eligible borrowers who meet certain underwriting criteria, mortgage loans may be originated with loan-to-value ratios of up to 100% with no down payment or a nominal down payment.

Certain of the Mortgage Loans have been originated under reduced documentation, no-documentation or no-ratio programs, which require less documentation and verification than do traditional full documentation programs. Generally, under a reduced documentation program, verification of either a borrower's income or assets, but not both, is undertaken by the originator. Under a no-ratio program, certain borrowers with acceptable compensating factors will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a no-documentation program, no verification of a borrower's income or assets is undertaken by the originator. The underwriting for such Mortgage Loans may be based primarily or entirely on an appraisal of the Mortgaged Property, the loan-to-value ratio at origination and/or the borrower's credit score.

Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans.

**Credit Scores**

Credit scores are obtained by many lenders in connection with mortgage loan applications to help them assess a borrower's creditworthiness (the "Credit Scores"). Credit Scores are generated by models developed by a third party which analyzed data on consumers in order to establish patterns which are believed to be indicative of the borrower's probability of default. The Credit Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit, and bankruptcy experience. Credit Scores range from approximately 450 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. However, a Credit Score purports only to be a measurement of the relative degree of risk a borrower represents to a lender, i.e., a borrower with a higher score is statistically expected to be less likely to default in payment than a borrower with a lower score. Lenders have varying ways of analyzing Credit Scores and, as a result, the analysis of Credit Scores across the industry is not consistent. In addition, it should be noted that Credit Scores were developed to indicate a level of default probability over a two year period, which does not correspond to the life of a mortgage loan. Furthermore, Credit Scores were not developed specifically for use in connection with mortgage loans, but for consumer loans in general, and assess only the borrower's

CONFIDENTIAL                                                                NOM-FHFA_05591417

past credit history.  Therefore, a Credit Score does not take into consideration the effect of mortgage loan characteristics (which may differ from consumer loan characteristics) on the probability of repayment by the borrower.  There can be no assurance that the Credit Scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans.

**Additional Information Concerning the Mortgage Loans**

The description in this prospectus supplement of the Mortgage Pool and the Mortgaged Properties is based upon the Mortgage Pool as constituted as of the close of business on the Cut-off Date, as adjusted for the scheduled principal payments due on or before such date. Prior to the issuance of the certificates, Mortgage Loans may be removed from the Mortgage Pool as a result of incomplete documentation or otherwise if the depositor deems the removal necessary or desirable, and may be prepaid at any time. A limited number of other mortgage loans may be included in the Mortgage Pool prior to the issuance of the certificates unless including these mortgage loans would materially alter the characteristics of the Mortgage Pool as described in this prospectus supplement.  The depositor believes that the information set forth in this prospectus supplement will be representative of the characteristics of the Mortgage Pool as it will be constituted at the time the certificates are issued, although the range of Mortgage Rates and maturities and other characteristics of the Mortgage Loans may vary.  If, as of the Closing Date, any material pool characteristic differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8-K.

## DESCRIPTION OF THE CERTIFICATES

**General**

The trust will issue the certificates pursuant to the pooling and servicing agreement. The certificates consist of (i) the Class I-A-1 Certificates (also referred to in this prospectus supplement as the "Group I Certificates"), (ii) the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates (also referred to collectively in this prospectus supplement as the "Group II Certificates"), (iii) the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates (collectively, the "Mezzanine Certificates"), (iv) the Class B-1 Certificates, (v) the Class P Certificates, (vi) the Class X Certificates and (vii) the Residual Certificates.  The Group I Certificates and Group II Certificates are also referred to together in this prospectus supplement as the "Senior Certificates".  The Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class B-1 Certificates are also collectively referred to in this prospectus supplement as the "Subordinate Certificates". The Senior Certificates and the Mezzanine Certificates are also referred to collectively in this prospectus supplement as the "Offered Certificates".

The Class P Certificates will have an initial certificate principal balance of $100 and will be entitled to all Prepayment Charges received in respect of the Mortgage Loans.

The trust will issue the Senior Certificates and Subordinate Certificates in book-entry form as described below, in minimum dollar denominations of $25,000 and integral multiples of $1 in excess thereof, except that one certificate of each class may be issued in the remainder of the class.

S-89

NOM-FHFA_05591418

**Book-Entry Registration**

The Senior Certificates and Subordinate Certificates will be issued in book-entry form. Persons acquiring beneficial ownership interests in the book-entry securities will hold their securities through The Depository Trust Company in the United States and through Clearstream, Luxembourg or the Euroclear System in Europe, if they are participants of any of such systems, or indirectly through organizations which are participants. The Depository Trust Company is referred to as "DTC". Clearstream, Luxembourg is referred to as "Clearstream". The Euroclear System is referred to as "Euroclear". The book-entry securities will be issued in one or more certificates that equal the aggregate principal balance of the applicable class or classes of securities and will initially be registered in the name of Cede & Co., the nominee of DTC. Clearstream and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream's and Euroclear's names on the books of their respective depositaries that in turn will hold such positions in customers' securities accounts in the depositaries' names on the books of DTC. Citibank N.A. will act as the relevant depositary for Clearstream and JPMorgan Chase Bank, N.A. will act as the relevant depositary for Euroclear. Except as described below, no person acquiring a book-entry security will be entitled to receive a physical certificate representing such security. Unless and until physical securities are issued, it is anticipated that the only "securityholder" with respect to a book-entry security will be Cede & Co., as nominee of DTC. Beneficial owners are only permitted to exercise their rights indirectly through participants and DTC.

An Owner's ownership of a book-entry security will be recorded on the records of the brokerage firm, bank, thrift institution or other financial intermediary (each, a "Financial Intermediary") that maintains the beneficial owner's account for such purpose. In turn, the Financial Intermediary's ownership of such book-entry security will be recorded on the records of DTC (or of a DTC participant that acts as agent for the Financial Intermediary, whose interest will in turn be recorded on the records of DTC, if the beneficial owner's Financial Intermediary is not a DTC participant and on the records of Clearstream or Euroclear, as appropriate).

Beneficial owners will receive all distributions allocable to principal and interest with respect to the book-entry securities from the securities administrator through DTC and DTC participants. While the book-entry securities are outstanding (except under the circumstances described below), under the rules, regulations and procedures creating, governing and affecting DTC and its operations (the "Rules"), DTC is required to make book-entry transfers among participants on whose behalf it acts with respect to the securities. DTC is required to receive and transmit distributions allocable to principal and interest with respect to the securities. Participants and Financial Intermediaries with whom beneficial owners have accounts with respect to securities are similarly required to make book-entry transfers and receive and transmit such distributions on behalf of their respective beneficial owners. Accordingly, although beneficial owners will not possess physical certificates, the Rules provide a mechanism by which beneficial owners will receive distributions and will be able to transfer their beneficial ownership interests in the securities.

Beneficial owners will not receive or be entitled to receive Definitive Securities, except under the limited circumstances described below. Unless and until Definitive Securities are issued, beneficial owners who are not participants may transfer ownership of securities only through participants and Financial Intermediaries by instructing such participants and Financial Intermediaries to transfer beneficial ownership interests in the securities by book-entry transfer through DTC for the account of the purchasers of such securities, which account is maintained with their respective participants or Financial Intermediaries. Under the Rules and in accordance with

S-90

DTC's normal procedures, transfers of ownership of securities will be executed through DTC and the accounts of the respective participants at DTC will be debited and credited. Similarly, the participants and Financial Intermediaries will make debits or credits, as the case may be, on their records on behalf of the selling and purchasing beneficial owners.

Because of time zone differences, credits of securities received in Clearstream or Euroclear as a result of a transaction with a participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Such credits or any transactions in such securities settled during such processing will be reported to the relevant Euroclear or Clearstream participants on such business day. Cash received in Clearstream or Euroclear as a result of sales of securities by or through a Clearstream participant or Euroclear participant to a DTC participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream or Euroclear cash account only as of the business day following settlement in DTC.

Transfers between DTC participants will occur in accordance with DTC rules. Transfers between Clearstream participants and Euroclear participants will occur in accordance with their respective rules and operating procedures.

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream participants or Euroclear participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by the relevant depositary; however, such cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in such system in accordance with its rules and procedures and within its established deadlines (European time). The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to the relevant depositary to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC. Clearstream participants and Euroclear participants may not deliver instructions directly to the relevant depositaries.

DTC is a New York-chartered limited purpose trust company that performs services for its participants, some of which (and/or their representatives) own DTC. In accordance with its normal procedures, DTC is expected to record the positions held by each DTC participant in the book-entry securities, whether held for its own account or as a nominee for another person. In general, beneficial ownership of book-entry securities will be subject to the Rules as in effect from time to time.

Clearstream has advised that it is incorporated under the laws of the Grand Duchy of Luxembourg as a professional depository. Clearstream holds securities for its participating organizations or participants. Clearstream facilitates the clearance and settlement of securities transactions between Clearstream participants through electronic book-entry changes in account of Clearstream participants, eliminating the need for physical movement of securities.

Clearstream provides to Clearstream participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream interfaces with domestic markets in several countries. As a professional depository, Clearstream is subject to regulation by the Luxembourg Commission

S-91

for the Supervision of the Financial Sector (the "CSSF"). Clearstream participants are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. Indirect access to Clearstream is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Clearstream participant, either directly or indirectly.

Distributions, to the extent received by the Relevant Depository for Clearstream, with respect to the securities held beneficially through Clearstream will be credited to cash accounts of Clearstream participants in accordance with its rules and procedures.

Euroclear was created in 1968 to hold securities for its participants and to clear and settle transactions between Euroclear participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for movement of physical securities and any risk from lack of simultaneous transfers of securities and cash. Transactions may be settled in any of 32 currencies, including United States dollars. Euroclear provides various other services, including securities lending and borrowing and interfaces with domestic markets in several countries generally similar to the arrangements for cross-market transfers with DTC described above. Euroclear is operated by Euroclear Bank S.A./NV under contract with Euroclear Clearance Systems S.C., a Belgian cooperative corporation. Euroclear Bank S.A./NV conducts all operations. All Euroclear securities clearance accounts and Euroclear cash accounts are accounts with Euroclear Bank S.A./NV, not Euroclear Clearance Systems S.C. Euroclear Clearance Systems S.C. establishes policy for Euroclear on behalf of Euroclear participants. Euroclear participants include banks (including central banks), securities brokers and dealers and other professional financial intermediaries. Indirect access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear participant, either directly or indirectly.

Euroclear Bank S.A./NV has advised us that it is licensed by the Belgian Banking and Finance Commission to carry out banking activities on a global basis. As a Belgian bank, it is regulated and examined by the Belgian Banking Commission.

Securities clearance accounts and cash accounts with Euroclear Bank S.A./NV are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System and applicable Belgian law. These terms and conditions, operating procedures and laws govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. Euroclear Bank S.A./NV acts under the Terms and Conditions only on behalf of Euroclear participants, and has no record of or relationship with persons holding through Euroclear participants.

The securities administrator will make distributions on the book-entry securities on each distribution date to DTC. DTC will be responsible for crediting the amount of such payments to the accounts of the applicable DTC participants in accordance with DTC's normal procedures. Each DTC participant will be responsible for disbursing such payments to the beneficial owners that it represents and to each Financial Intermediary for which it acts as agent. Each such Financial Intermediary will be responsible for disbursing funds to the beneficial owners that it represents.

Under a book-entry format, beneficial owners may experience some delay in their receipt of payments, since the securities administrator will forward such payments to Cede & Co.

S-92

Distributions with respect to securities held through Clearstream or Euroclear will be credited to the cash accounts of Clearstream participants or Euroclear participants in accordance with the relevant system's rules and procedures, to the extent received by the relevant depositary. Such distributions will be subject to tax reporting in accordance with relevant United States tax laws and regulations. Because DTC can only act on behalf of DTC participants that in turn can only act on behalf of Financial Intermediaries, the ability of an Owner to pledge book-entry securities to persons or entities that do not participate in the DTC system, or otherwise take actions in respect of such book-entry securities, may be limited due to the lack of physical certificates for such book-entry securities. In addition, issuance of the book-entry securities in book-entry form may reduce the liquidity of such securities in the secondary market since certain potential investors may be unwilling to purchase securities for which they cannot obtain physical certificates.

Monthly and annual reports on the trust fund will be provided to Cede & Co., as nominee of DTC, and Cede & Co. may make such reports available to beneficial owners upon request, in accordance with the Rules, and to the DTC participants to whose DTC accounts the book-entry securities of such beneficial owners are credited directly or are credited indirectly through Financial Intermediaries.

DTC has advised the securities administrator that, unless and until Definitive Securities are issued, DTC will take any action permitted to be taken by the holders of the book-entry securities under the pooling and servicing agreement only at the direction of one or more DTC participants to whose DTC accounts the book-entry securities are credited, to the extent that such actions are taken on behalf of such participants whose holdings include such book-entry securities. Clearstream or Euroclear Bank S.A./NV, as the case may be, will take any other action permitted to be taken by a holder under the pooling and servicing agreement on behalf of a Clearstream participant or Euroclear participant only in accordance with its relevant rules and procedures and subject to the ability of the relevant depositary to effect such actions on its behalf through DTC. DTC may take actions, at the direction of the related participants, with respect to some securities which conflict with actions taken with respect to other securities.

Except with respect to certain certificates not being offered by this prospectus supplement, physical certificates representing a security will be issued to beneficial owners only upon the events specified in the pooling and servicing agreement. Such events may include the following:

- we advise the securities administrator in writing that DTC is no longer willing or able properly to discharge its responsibilities as depository with respect to the securities, and that we or the trustee is unable to locate a qualified successor,

- at our option, we elect to terminate the book-entry system through DTC, or

- after the occurrence of an event of default, securityholders representing not less than 50% of the aggregate certificate principal balance of the applicable securities advise the trustee and DTC through participants in writing that the continuation of a book-entry system through DTC (or a successor thereto) is no longer in the best interest of the securityholders.

Upon the occurrence of any of the events specified in the pooling and servicing agreement, DTC will be required to notify all participants of the availability through DTC of physical

S-93

                                                                 NOM-FHFA_05591422

certificates. Upon surrender by DTC of the certificates representing the securities and instruction for re-registration, the securities administrator will issue the securities in the form of physical certificates, and thereafter the securities administrator will recognize the holders of such physical certificates as securityholders. Thereafter, payments of principal of and interest on the securities will be made by the securities administrator directly to securityholders in accordance with the procedures listed in this prospectus supplement and in the pooling and servicing agreement. The final distribution of any security (whether physical certificates or securities registered in the name of Cede & Co.), however, will be made only upon presentation and surrender of such securities on the final distribution date at such office or agency as is specified in the notice of final payment to securityholders.

Although DTC, Clearstream and Euroclear have agreed to the foregoing procedures to facilitate transfers of securities among participants of DTC, Clearstream and Euroclear, they are under no obligation to perform or continue to perform such procedures and such procedures may be discontinued at any time.

Neither the trust nor the securities administrator will have any responsibility for any aspect of the records relating to or payments made on account of beneficial ownership interests of the book-entry securities held by Cede & Co., as nominee for DTC, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests or transfers thereof.

## Distributions

*General.* On each distribution date, the securities administrator will make distributions on the certificates to the persons in whose names such certificates are registered on the related record date. For definitions of capitalized terms used in this section, see "—Glossary of Terms" in this prospectus supplement.

The securities administrator will make distributions on each distribution date by wire transfer in immediately available funds to the account of a certificateholder at a bank or other depository institution having appropriate wire transfer facilities as instructed by a certificateholder in writing in accordance with the pooling and servicing agreement. If no such instructions are given to the securities administrator, then the securities administrator will make such distributions by check mailed to the address of the person entitled thereto as it appears on the certificate register; provided, however, that the final distribution in retirement of the certificates will be made only upon presentation and surrender of such certificates at the offices of the securities administrator designated for such purposes. As of the Closing Date, the securities administrator designates its offices located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479, Attention: Nomura Home Equity Loan, Inc., Series 2007-2, for purposes of surrender, transfer and exchange. On each distribution date, a holder of a certificate will receive such holder's percentage interest of the amounts required to be distributed with respect to the applicable class of certificates. The percentage interest evidenced by a certificate will equal the percentage derived by dividing the denomination of such certificate by the aggregate denominations of all certificates of the applicable class.

## Glossary of Terms

"Aggregate Loan Balance" with respect to the Mortgage Loans and any distribution date, will be equal to the aggregate of the Stated Principal Balances of the Mortgage Loans as of the last day of the related Due Period.

S-94

 NOM-FHFA_05591423

"Aggregate Loan Group Balance" with respect to either loan group I or loan group II and any distribution date, the aggregate of the Stated Principal Balances of the Mortgage Loans in the related loan group as of the last day of the related Due Period.

"Basis Risk Shortfall" with respect to any class of Senior Certificates and Subordinate Certificates and any distribution date, the sum of:

(1)     the excess, if any, of the related Current Interest (calculated without regard to the Net Funds Cap) over the related Current Interest (as it may have been limited by the Net Funds Cap) for the applicable distribution date;

(2)     any amount described in clause (1) remaining unpaid from prior distribution dates; and

(3)     interest on the amount in clause (2) for the related Interest Accrual Period calculated on the basis of the lesser of (x) One-Month LIBOR plus the applicable Certificate Margin and (y) the Maximum Interest Rate.

"Carryforward Interest" with respect to any class of Senior Certificates and the Subordinate Certificates and any distribution date, the sum of (1) the amount, if any, by which (x) the sum of (A) Current Interest for that class of certificates for the immediately preceding distribution date and (B) any unpaid Carryforward Interest for such class from previous distribution dates exceeds (y) the actual amount distributed to such class in respect of interest on the immediately preceding distribution date and (2) interest on such amount for the related Interest Accrual Period at the applicable Pass-Through Rate.

"Certificate Margin" with respect to each distribution date on or prior to the first possible optional termination date, the Certificate Margins for the Class I-A-1, Class II-A-1, Class II-A-2, Class II-A-3, Class II-A-4, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class B-1 Certificates are 0.150%, 0.080%, 0.140%, 0.190%, 0.280%, 0.310%, 0.320%, 0.340%, 0.420%, 0.450%, 0.500%, 1.750%, 2.250%, 2.250% and 2.250%, respectively. With respect to each distribution date following the first possible optional termination date, the Certificate Margins for the Class I-A-1, Class II-A-1, Class II-A-2, Class II-A-3, Class II-A-4, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class B-1 Certificates are 0.300%, 0.160%, 0.280%, 0.380%, 0.560%, 0.465%, 0.480%, 0.510%, 0.630%, 0.675%, 0.750%, 2.625%, 3.375%, 3.375% and 3.375%, respectively.

"Certificate Principal Balance" with respect to any class of Senior Certificates and Subordinate Certificates and any distribution date, is the original certificate principal balance of such class set forth on the cover of this prospectus supplement with respect to the Offered Certificates and approximately $13,028,000 with respect to the Class B-1 Certificates less the sum of (i) all amounts in respect of principal distributed to such class on previous distribution dates and (ii) Applied Loss Amounts (as defined under "—Credit Enhancement" in this prospectus supplement) previously allocated to that class; provided, however, that the Certificate Principal Balance of the Subordinate Certificates (including any such class of certificates for which the Certificate Principal Balance has been reduced to zero) will be increased in an aggregate amount equal to Subsequent Recoveries received with respect to all of the Mortgage Loans on any distribution date in the following order: to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class B-1 Certificates, in each case up to the related amount of Applied Loss

S-95

Amounts but only to the extent that the Certificate Principal Balance has not been previously increased due to other Subsequent Recoveries and that any such Applied Loss Amount has not been paid to any class of certificates as a Deferred Amount with Monthly Excess Cashflow as described under "—Credit Enhancement—Overcollateralization" in this prospectus supplement or a Net Swap Payment paid by the Swap Provider or a cap payment paid by the Interest Rate Cap Provider and available for this purpose as described in this prospectus supplement under "The Interest Rate Swap Agreement" and "The Rate Interest Cap Agreement". The Certificate Principal Balance of the Class X Certificates as of any date of determination is equal to the excess, if any, of (i) the then aggregate principal balance of the Mortgage Loans over (ii) the then aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates.

"Class B-1 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates and the Mezzanine Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class B-1 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 92.50% and (ii) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-1 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-1 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 57.50% and (ii) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-2 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates and Class M-1 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-2 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i)

S-96

NOM-FHFA_05591425

approximately 65.20% and (ii) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-3 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1 and Class M-2 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-3 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 69.90% and (ii) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-4 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1, Class M-2 and Class M-3 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-4 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 74.10% and (ii) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-5 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1, Class M-2, Class M-3 and Class M-4 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-5 Certificates immediately prior to such distribution date exceeds (y) the

S-97

NOM-FHFA_05591426

lesser of (A) the product of (i) approximately 77.90% and (ii) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-6 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-6 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 81.30% and (ii) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-7 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5 and Class M-6 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-7 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 84.40% and (ii) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-8 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class

CONFIDENTIAL

M-6 and Class M-7 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-8 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 87.30% and (ii) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-9 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-9 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 89.70% and (ii) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Compensating Interest" with respect to any distribution date and (i) Ocwen Loan Servicing, LLC ("Ocwen"), an amount equal to the lesser of (a) the aggregate amount of the Interest Shortfalls resulting from voluntary prepayments in full on the Mortgage Loans serviced by such servicer for such distribution date and received during the portion of the Prepayment Period occurring from the 16th day of the month prior to the month in which the related distribution date occurs and ending on the last day of such month, and (b) the aggregate Servicing Fee due Ocwen on the Mortgage Loans serviced by Ocwen for such distribution date, (ii) Equity One, Inc. ("Equity One"), an amount equal to the lesser of (a) the aggregate of the Interest Shortfalls on the Mortgage Loans serviced by Equity One for the related distribution date pursuant to items (a) and (b) of the definition of Interest Shortfalls set forth below and (b) the aggregate Servicing Fees due Equity One for such distribution date, (iii) Wells Fargo Bank, N.A. in its capacity as a servicer, the aggregate amount of Interest Shortfalls resulting from prepayments in full on the Mortgage Loans serviced by such servicer for such distribution date and received during the related Prepayment Period, (iv) Select Portfolio Servicing, Inc. ("SPS"), an amount equal to the lesser of (a) the aggregate amount of the Interest Shortfalls resulting from prepayments in full on the Mortgage Loans serviced by such servicer for such distribution date and received during the portion of the Prepayment Period occurring from the 15th day of the month prior to the month in which the related distribution date occurs and ending on the last day of such month, and (b) the aggregate Servicing Fee due SPS on the Mortgage Loans serviced by SPS for such distribution date, or (v) the master servicer, will be an

CONFIDENTIAL

NOM-FHFA_05591428

amount equal to any Interest Shortfalls required to be funded by the related servicer pursuant to clauses (i), (ii), (iii) or (iv) above and not funded, up to the aggregate master servicing fee (exclusive of the portion of such fee payable to the credit risk manager) for such distribution date.

"Current Interest" with respect to any class of Senior Certificates and Subordinate Certificates and any distribution date, the amount of interest accruing at the applicable Pass-Through Rate on the related Certificate Principal Balance during the related Interest Accrual Period; provided, that as to each class of Senior Certificates and Subordinate Certificates, the Current Interest will be reduced by a pro rata portion of any related Net Interest Shortfalls to the extent not covered by excess interest.

"Debt Service Reduction" is any reduction in the amount which a mortgagor is obligated to pay on a monthly basis with respect to a Mortgage Loan as a result of any proceeding initiated under the United States Bankruptcy Code, other than a reduction attributable to Deficient Valuation or any reduction that results in permanent forgiveness of principal.

"Deficient Valuation" with respect to any Mortgage Loan, is a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the outstanding indebtedness under the Mortgage Loan, or any reduction in the amount of principal to be paid in connection with any scheduled payment that results in a permanent forgiveness of principal, which valuation results from a proceeding initiated under the United States Bankruptcy Code.

"Deferred Amount" with respect to any class of Subordinate Certificates and any distribution date, will equal the amount by which (x) the aggregate of the Applied Loss Amounts previously applied in reduction of the Certificate Principal Balance thereof exceeds (y) the aggregate of amounts previously paid in reimbursement thereof and the amount by which the Certificate Principal Balance of any such class has been increased due to the collection of Subsequent Recoveries.  No interest will be paid on Deferred Amounts.

"Delinquency Rate" with respect to any calendar month will be, generally, the fraction, expressed as a percentage, the numerator of which is the Aggregate Loan Balance of all Mortgage Loans 60 or more days delinquent (including all Mortgage Loans in bankruptcy or foreclosure and all REO Properties) as of the close of business on the last day of such month, and the denominator of which is the Aggregate Loan Balance of all Mortgage Loans as of the close of business on the last day of such month.

"Due Period" with respect to any distribution date, is the period commencing on the second day of the month preceding the calendar month in which such distribution date occurs and ending at the close of business on the first day of the month in which such distribution date occurs.

"Expense Fee Rate" with respect to each Mortgage Loan, the aggregate amount, calculated on a weighted average basis, of the annual rate at which the fee to the related servicer, the master servicer and the rate at which the fee payable to any provider of lender paid mortgage insurance, if any, is calculated.

"Group I Allocation Amount" with respect to any distribution date, the product of the Senior Principal Payment Amount for that distribution date and a fraction the numerator of which is the Principal Remittance Amount derived from the Group I Mortgage Loans and the denominator of which is the Principal Remittance Amount, in each case for that distribution date.

S-100

NOM-FHFA_05591429

"Group I Allocation Percentage" with respect to any distribution date, the Aggregate Loan Group Balance of the Group I Mortgage Loans divided by the Aggregate Loan Balance of the Mortgage Loans, in each case as of the first day of the related Due Period.

"Group I Excess Interest Amount" with respect to any distribution date, the product of the Monthly Excess Interest required to be distributed on that distribution date pursuant to subclause (1)(A) under "Description of the Certificates—Credit Enhancement— Overcollateralization" in this prospectus supplement and a fraction the numerator of which is the Principal Remittance Amount derived from the Group I Mortgage Loans and the denominator of which is the Principal Remittance Amount, in each case for that distribution date.

"Group II Allocation Amount" with respect to any distribution date, the product of the Senior Principal Payment Amount for that distribution date and a fraction the numerator of which is the Principal Remittance Amount derived from the Group II Mortgage Loans and the denominator of which is the Principal Remittance Amount, in each case for that distribution date.

"Group II Allocation Percentage" with respect to any distribution date, the Aggregate Loan Group Balance of the Group II Mortgage Loans divided by the Aggregate Loan Balance of the Mortgage Loans, in each case as of the first day of the related Due Period.

"Group II Excess Interest Amount" with respect to any distribution date, the product of the Monthly Excess Interest required to be distributed on that distribution date pursuant to subclause (1)(A) under "Description of the Certificates—Credit Enhancement— Overcollateralization" in this prospectus supplement and a fraction the numerator of which is the Principal Remittance Amount derived from the Group II Mortgage Loans and the denominator of which is the Principal Remittance Amount, in each case for that distribution date.

"Insurance Proceeds" are all proceeds of any insurance policies, including any mortgage insurance policy, to the extent such proceeds are not applied to the restoration of the Mortgaged Property or released to the borrower in accordance with the related servicer's normal servicing procedures, other than proceeds that represent reimbursement of the related servicer's costs and expenses incurred in connection with presenting claims under the related insurance policies.

"Interest Accrual Period" with respect to the Senior Certificates and Subordinate Certificates and any distribution date, the period commencing on the immediately preceding distribution date (or, with respect to the first Interest Accrual Period, the Closing Date) and ending on the day immediately preceding the related distribution date.  The first Interest Accrual Period will be 25 days.

"Interest Remittance Amount" with respect to any distribution date and each loan group an amount generally equal to the sum, without duplication, of

- scheduled interest payments (other than Payaheads) and advances on the related Mortgage Loans,

- the interest portion of Payaheads with respect to the related Mortgage Loans previously received and intended for application in the related Due Period,

S-101

NOM-FHFA_05591430

- the interest portion of all prepayments in full (other than any prepayment interest excess payable to the servicers, if any) and partial prepayments received on the related Mortgage Loans during the related Prepayment Period,

- all Compensating Interest allocable to that loan group,

- the portion of any substitution adjustment amount and purchase price paid in connection with a repurchase of any related Mortgage Loan allocable to interest or the exercise of the optional termination, up to the amount of the interest portion of the par value of the related Mortgage Loans, and

- Liquidation Proceeds and Subsequent Recoveries (net of unreimbursed advances, servicing advances and other expenses, to the extent allocable to interest, and unpaid expense fees) collected with respect to the related Mortgage Loans during the related Due Period, to the extent allocable to interest, minus

- amounts reimbursable to the servicers, the master servicer, the securities administrator, the trustee, the custodian and the credit risk manager, allocated to the respective loan group as provided in the pooling and servicing agreement.

"Interest Shortfall" with respect to any distribution date, means the aggregate shortfall, if any, in collections of interest (adjusted to the related Net Mortgage Rates) on the Mortgage Loans resulting from (a) prepayments in full received during the related Prepayment Period, (b) partial prepayments received during the related Prepayment Period to the extent applied prior to the Due Date in the month of the distribution date and (c) interest payments on certain of the Mortgage Loans being limited pursuant to the provisions of the Relief Act.

"ISDA Master Agreement" is the ISDA Master Agreement dated as of the Closing Date, as amended and supplemented from time to time, between the Swap Provider and the Supplemental Interest Trust Trustee.

"Liquidated Mortgage Loan" means a defaulted Mortgage Loan as to which the related servicer has determined that all amounts which it expects to recover from or on account of such Mortgage Loan have been recovered.

"Liquidation Proceeds" means all proceeds, other than Insurance Proceeds, received in connection with the partial or complete liquidation of a Mortgage Loan, whether through trustee's sale, foreclosure sale or otherwise, or in connection with any condemnation or partial release of the related Mortgaged Property, together with the net proceeds received with respect to any Mortgaged Property acquired by the related servicer by foreclosure or deed-in-lieu of foreclosure in connection with a defaulted Mortgage Loan, other than the amount of such net proceeds representing any profit realized by the related servicer in connection with the disposition of any such Mortgaged Property.

"Maximum Interest Rate" with respect to any distribution date and the related Interest Accrual Period, an annual rate equal to the weighted average of the Maximum Mortgage Rates of the adjustable rate Mortgage Loans and the Mortgage Rates of the fixed rate Mortgage Loans in the related loan groups as stated in the related mortgage notes minus the weighted average Expense Fee Rate of the Mortgage Loans in the related loan groups. The calculation of the Maximum Interest Rate

CONFIDENTIAL

NOM-FHFA_05591431

will be based on a 360-day year and the actual number of days elapsed during the related accrual period.

"Monthly Excess Cashflow" with respect to any distribution date, the Monthly Excess Interest for such distribution date, plus amounts applied pursuant to clauses I(N) and II(N) under "—Distributions of Principal" in this prospectus supplement.

"Net Funds Cap" with respect to any distribution date and the Senior Certificates and Subordinate Certificates, a per annum rate equal to the product of (I)(a) a fraction, expressed as a percentage, the numerator of which is the Optimal Interest Remittance Amount for such distribution date and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans for the immediately preceding distribution date, minus (b) the sum of (1) any Net Swap Payment payable to the Swap Provider on such distribution date, and (2) any Swap Termination Payment (unless such payment is the result of a Swap Provider Trigger Event and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement swap agreement that may be entered into by the Supplemental Interest Trust Trustee) payable to the Swap Provider on such distribution date, divided by the outstanding aggregate Stated Principal Balance of the Mortgage Loans for the immediately preceding distribution date and (II) 12. The Net Funds Cap will be adjusted to an effective rate reflecting the accrual of interest on an actual/360 basis.

"Net Interest Shortfalls" means Interest Shortfalls net of payments by the servicers or master servicer in respect of Compensating Interest.

"Net Liquidation Proceeds" with respect to a Mortgage Loan are Liquidation Proceeds net of unreimbursed advances and fees by the related servicer and advances and expenses incurred by the related servicer in connection with the liquidation of such Mortgage Loan and the related Mortgaged Property.

"Net Mortgage Rate" with respect to any Mortgage Loan, the interest rate set forth in the related mortgage note minus the Expense Fee Rate.

"One-Month LIBOR" means a per annum rate based on the London interbank offered rate for one month dollar deposits and calculated as described under "—Calculation of One-Month LIBOR" in this prospectus supplement.

"Optimal Interest Remittance Amount" with respect to any distribution date, will be equal to the excess of (i) the product of (1)(x) the weighted average Net Mortgage Rates of the Mortgage Loans as of the first day of the related Due Period divided by (y) 12 and (2) the Aggregate Loan Balance for the immediately preceding distribution date, over (ii) any expenses that reduce the Interest Remittance Amount that did not arise as a result of a default or delinquency of the Mortgage Loans in the related loan group or were not taken into account in computing the Expense Fee Rate.

"Overcollateralization Amount" with respect to any distribution date, the excess, if any, of (a) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) over (b) the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates

S-103

NOM-FHFA_05591432

on such distribution date (after taking into account the payment of 100% of the Principal Remittance Amount on such distribution date).

"Overcollateralization Deficiency Amount" with respect to any distribution date, will be equal to the amount, if any, by which (x) the Targeted Overcollateralization Amount for such distribution date exceeds (y) the Overcollateralization Amount for such distribution date, calculated for this purpose after giving effect to the reduction on such distribution date of the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates resulting from the payment of the Principal Remittance Amount on such distribution date, but prior to allocation of any Applied Loss Amount on such distribution date.

"Overcollateralization Release Amount" with respect to any distribution date, will be equal to the lesser of (x) the Principal Remittance Amount for such distribution date and (y) the amount, if any, by which (1) the Overcollateralization Amount for such date, exceeds (2) the Targeted Overcollateralization Amount for such distribution date.

"Pass-Through Rate" with respect to the Senior Certificates and the Subordinate Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus the applicable Certificate Margin and (ii) the Net Funds Cap.

"Payahead" means any scheduled payment intended by the related mortgagor to be applied in a Due Period subsequent to the Due Period in which such payment was received.

"Prepayment Period" with respect to any distribution date, and (i) Ocwen, the 16th day of the immediately preceding calendar month (or with respect to the first Prepayment Period, the Closing Date) through the 15th day of the calendar month in which such distribution date occurs with respect to prepayments in full and the calendar month immediately preceding the calendar month in which such distribution date occurs with respect to prepayments in part, (ii) Equity One, the 16th of the immediately preceding calendar month (or with respect to the first Prepayment Period, the Closing Date) through the 15th day of the month in which the distribution date occurs, (iii) Wells Fargo Bank, the calendar month preceding the calendar month in which such distribution date occurs and (iv) SPS, the 16th day of the immediately preceding calendar month (or with respect to the first Prepayment Period, the Closing Date) through the 15th day of the month in which the distribution date occurs with respect to prepayments in full and the related Due Period with respect to prepayments in part.

"Principal Payment Amount" with respect to any distribution date and the Group I Mortgage Loans and Group II Mortgage Loans will be equal to the Principal Remittance Amount for such distribution date minus the Overcollateralization Release Amount, if any, for such distribution date, pro rata based on the Principal Remittance Amount derived from the related Mortgage Loans.

"Principal Remittance Amount" with respect to each distribution date and each loan group, is equal to the sum of (i) the scheduled principal payments on the related Mortgage Loans due during the related Due Period, whether or not received on or prior to the related determination date; (ii) the principal portion of all proceeds received in respect of the repurchase of a Mortgage Loan in the related loan group (or, in the case of a substitution, certain amounts representing a principal adjustment as required by the pooling and servicing agreement) during the related Prepayment Period; (iii) the principal portion of all other unscheduled collections (other than Payaheads), including Insurance Proceeds, condemnation proceeds, Liquidation Proceeds, Subsequent Recoveries

S-104

and all full and partial principal prepayments, received during the related Prepayment Period, to the extent applied as recoveries of principal on the related Mortgage Loans; (iv) the principal portion of Payaheads previously received on the related Mortgage Loans and intended for application in the related Due Period, less (v) amounts payable or reimbursable to the servicers, the master servicer, the securities administrator, the trustee, the custodian or the credit risk manager as provided in the pooling and servicing agreement and the servicing agreement to the extent not paid or reimbursed from the Interest Remittance Amount.

"Realized Loss" is (a) for any defaulted Mortgage Loan, the excess of the Stated Principal Balance of such defaulted Mortgage Loan over the Net Liquidation Proceeds with respect thereto, (b) for any Mortgage Loan that has become the subject of a Deficient Valuation, the excess of the Stated Principal Balance of such Mortgage Loan over the principal amount as reduced in connection with the proceedings resulting in the Deficient Valuation; or (c) for any Mortgage Loan that has become the subject of a Debt Service Reduction, the present value of all monthly Debt Service Reductions on such Mortgage Loan, assuming that the mortgagor pays each scheduled monthly payment on the applicable due date and that no principal prepayments are received on such Mortgage Loan, discounted monthly at the applicable Mortgage Rate. To the extent the servicer receives Subsequent Recoveries with respect to any Mortgage Loan, the amount of the Realized Loss with respect to that Mortgage Loan will be reduced to the extent that such Subsequent Recoveries are applied to reduce the Certificate Principal Balance of any class of certificates on any distribution date.

"Relief Act" means the Servicemembers Civil Relief Act of 2003, as amended, or any similar state or local law.

"Senior Enhancement Percentage" with respect to any distribution date will be the fraction, expressed as a percentage, the numerator of which is the sum of the aggregate Certificate Principal Balance of the Subordinate Certificates and the Overcollateralization Amount, in each case after giving effect to payments on such distribution date, and the denominator of which is the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period).

"Senior Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the aggregate Certificate Principal Balance of the Senior Certificates immediately prior to such distribution date exceed (y) the lesser of (A) the product of (i) approximately 49.00% and (ii) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

CONFIDENTIAL

NOM-FHFA_05591434

"Servicer Remittance Date" will be (a) with respect to Ocwen, Equity One and SPS, the 23rd day of each month, and if the 23rd day is not a business day, the business day immediately preceding such 23rd day, and (b) with respect to Wells Fargo Bank, the 18th day of each month, and if the 18th day is not a business day, the business day immediately following such 18th day.

"Stated Principal Balance" of any Mortgage Loan means, with respect to any distribution date, the Cut-off Date principal balance thereof minus the sum of

> (i)     the principal portion of all scheduled monthly payments due from the borrower with respect to such Mortgage Loan during the Due Periods ending prior to such distribution date (and irrespective of any delinquency in such payments);

> (ii)     all prepayments of principal with respect to such Mortgage Loan received prior to or during the related Prepayment Period, and all Liquidation Proceeds to the extent applied by the related servicer as recoveries of principal in accordance with the pooling and servicing agreement or the servicing agreement, as applicable, that were received by the related servicer as of the close of business on the last day of the Prepayment Period related to such distribution date; and

> (iii)     any Realized Loss thereon incurred prior to or during the related Prepayment Period.

The Stated Principal Balance of any Liquidated Mortgage Loan is zero.

"Stepdown Date" will be the later to occur of (x) the distribution date in February 2010 and (y) the first distribution date on which the Senior Enhancement Percentage (calculated for this purpose only after taking into account distributions of principal on the Mortgage Loans, but prior to any distributions to the holders of the Senior Certificates and Subordinate  Certificates then entitled to distributions of principal on such distribution date) is greater than or equal to approximately 51.00%.

"Subsequent Recoveries" means the amounts recovered by the related servicer (net of reimbursable expenses) with respect to a defaulted Mortgage Loan with respect to which a Realized Loss was incurred, after the liquidation or disposition of such Mortgage Loan.

"Swap Provider Trigger Event" means the occurrence of an event of default (under the Interest Rate Swap Agreement) with respect to which the Swap Provider is a defaulting party, a Termination Event (under the Interest Rate Swap Agreement) with respect to which the Swap Provider is the sole affected party or an additional termination event (under the Interest Rate Swap Agreement) with respect to which the Swap Provider is the sole affected party.

"Swap Termination Payment"  means the payment to be made by the Supplemental Interest Trust to the Swap Provider, or by the Swap Provider to the Supplemental Interest Trust, as applicable, pursuant to the terms of the Interest Rate Swap Agreement upon the occurrence of an early termination.

"Targeted Overcollateralization Amount" with respect to any distribution date prior to the Stepdown Date, approximately 3.75% of the Aggregate Loan Balance as of the Cut-off Date; with respect to any distribution date on or after the Stepdown Date and with respect to which a

CONFIDENTIAL

NOM-FHFA_05591435

Trigger Event is not in effect, the greater of (a) approximately 7.50% of the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period), or (b) 0.50% of the Aggregate Loan Balance as of the Cut-off Date; with respect to any distribution date on or after the Stepdown Date with respect to which a Trigger Event is in effect, the Targeted Overcollateralization Amount for such distribution date will be equal to the Targeted Overcollateralization Amount for the distribution date immediately preceding such distribution date.

"Trigger Event" a Trigger Event will occur for any distribution date if either (i) the Delinquency Rate as of the last day of the related Due Period exceeds 31.37% of the Senior Enhancement Percentage for such distribution date or (ii) the cumulative Realized Losses as a percentage of the original Aggregate Loan Balance on the Closing Date for such distribution date is greater than the percentage set forth in the following table:

| Range of Distribution Dates | Cumulative Loss Percentage |
|---|---|
| February 2010 – January 2011 | 3.80%* |
| February 2011 – January 2012 | 5.95%* |
| February 2012 – January 2013 | 7.70%* |
| February 2013 – January 2014 | 8.65%* |
| February 2014 and thereafter | 8.70% |

*The cumulative loss percentages set forth above are applicable to the first distribution date in the corresponding range of distribution dates. The cumulative loss percentage for each succeeding distribution date in a range increases incrementally by 1/12 of the positive difference between the percentage applicable to the first distribution date in that range and the percentage applicable to the first distribution date in the succeeding range.

**Distributions of Interest**

The amount of interest payable on each distribution date in respect of each class of Senior Certificates and Subordinate Certificates will equal the sum of (1) Current Interest for such class and date and (2) any Carryforward Interest for such class and date. All calculations of interest will be made on the basis of a 360-day year and the actual number of days elapsed in each Interest Accrual Period.

With respect to each distribution date, to the extent that a Basis Risk Shortfall exists for any class of Senior Certificates and Subordinate Certificates, such class will be entitled to the amount of such Basis Risk Shortfall. Such classes will be entitled to receive the amount of any Basis Risk Shortfall in accordance with the priority of payments described in this prospectus supplement under "—Credit Enhancement—Overcollateralization" and from available amounts on deposit in a reserve fund (the "Basis Risk Shortfall Reserve Fund"), if applicable and from payments deposited in the Supplemental Interest Trust in respect of the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement and available for this purpose. The source of funds on deposit in the Basis Risk Shortfall Reserve Fund will be limited to amounts in respect of Monthly Excess Cashflow that would otherwise be paid to the Class X Certificates.

S-107

NOM-FHFA_05591436

On each distribution date, the Interest Remittance Amount for such distribution date, to the extent of funds in the Distribution Account, will be paid in the following order of priority:

(1)     from the Interest Remittance Amount derived from the Group I Mortgage Loans and the Group II Mortgage Loans, the Group I Allocation Percentage and the Group II Allocation Percentage, as applicable, of any Net Swap Payment and any Swap Termination Payment paid to the Supplemental Interest Trust and owed to the Swap Provider (unless the Swap Provider is a Defaulting Party or the sole Affected Party (as defined in the ISDA Master Agreement) and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee);

(2)     from the Interest Remittance Amount derived from the Group I Mortgage Loans and the Group II Mortgage Loans remaining after payments pursuant to clause (1) above to the Senior Certificates, pro rata based on amounts due, Current Interest and any Carryforward Interest for each such class and such distribution date, provided that:

(a)     the Interest Remittance Amount derived from the Group I Mortgage Loans will be distributed in the following order of priority: (x) first, to the Class I-A-1 Certificates, Current Interest and any Carryforward Interest for such class for such distribution date; and then (y) concurrently, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, Current Interest and Carryforward Interest for each such class for such distribution date, on a pro rata basis based on the entitlement of each such class, after taking into account the distribution of the Interest Remittance Amount derived from the Group II Mortgage Loans on such distribution date; and

(b)     the Interest Remittance Amount derived from the Group II Mortgage Loans will be distributed in the following order of priority: (x) first, concurrently to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, Current Interest and any Carryforward Interest for each such class for such distribution date, on a pro rata basis based on the entitlement of each such class; and then (y) to the Class I-A-1 Certificates, Current Interest and any Carryforward Interest for such class for such distribution date, after taking into account the distribution of the Interest Remittance Amount derived from the Group I Mortgage Loans on such distribution date.

(3)     from the remaining Interest Remittance Amount to the Class M-1 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(4)     from the remaining Interest Remittance Amount to the Class M-2 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(5)     from the remaining Interest Remittance Amount to the Class M-3 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(6)     from the remaining Interest Remittance Amount to the Class M-4 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(7)     from the remaining Interest Remittance Amount to the Class M-5 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

CONFIDENTIAL

NOM-FHFA_05591437

(8) from the remaining Interest Remittance Amount to the Class M-6 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(9) from the remaining Interest Remittance Amount to the Class M-7 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(10) from the remaining Interest Remittance Amount to the Class M-8 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(11) from the remaining Interest Remittance Amount to the Class M-9 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(12) from the remaining Interest Remittance Amount to the Class B-1 Certificates, Current Interest and Carryforward Interest for such class and distribution date; and

(13) for application as part of Monthly Excess Cashflow for such distribution date, as described under "—Credit Enhancement—Overcollateralization" below, any such Interest Remittance Amount remaining after application pursuant to clauses (1) through (12) above (such amount, "Monthly Excess Interest") for such distribution date.

## Distributions of Principal

The Principal Payment Amount will be paid on each distribution date as follows:

I. On each distribution date (x) prior to the Stepdown Date or (y) with respect to which a Trigger Event is in effect, the Principal Payment Amount will be paid in the following order of priority:

(A) to the Supplemental Interest Trust from the Principal Payment Amount derived from the Group I Mortgage Loans and the Group II Mortgage Loans, the Group I Allocation Percentage and the Group II Allocation Percentage, as applicable, of any Net Swap Payment and any Swap Termination Payment owed to the Swap Provider (unless the Swap Provider is a Defaulting Party or the sole Affected Party (as defined in the ISDA Master Agreement) and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) to the extent not paid from the Interest Remittance Amounts on such distribution date;

(B) (i) from the Principal Payment Amount derived from the Group I Mortgage Loans remaining after payments pursuant to clause (A) above, to the Class I-A-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(ii) from the Principal Payment Amount derived from the Group II Mortgage Loans remaining after payments pursuant to clause (A) above, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, until the Certificate Principal Balance of each such class has been reduced to zero;

S-109

(C)   (i)   from the Principal Payment Amount derived from the Group I Mortgage Loans remaining after payments pursuant to clauses (A) and (B) above and after the Certificate Principal Balance of the Class I-A-1 Certificates has been reduced to zero, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, after taking into account payments pursuant to clause I(B)(ii) above, until the Certificate Principal Balance of each such class has been reduced to zero;

(ii)   from the Principal Payment Amount derived from the Group II Mortgage Loans remaining after payments pursuant to clauses (A) and (B) above and after the Certificate Principal Balances of the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates have been reduced to zero, to the Class I-A-1 Certificates, after taking into account payments pursuant to clause I(B)(i) above, until its Certificate Principal Balance has been reduced to zero;

(D)   to the Class M-1 Certificates, until its Certificate Principal Balance has been reduced to zero;

(E)   to the Class M-2 Certificates, until its Certificate Principal Balance has been reduced to zero;

(F)   to the Class M-3 Certificates, until its Certificate Principal Balance has been reduced to zero;

(G)   to the Class M-4 Certificates, until its Certificate Principal Balance has been reduced to zero;

(H)   to the Class M-5 Certificates, until its Certificate Principal Balance has been reduced to zero;

(I)   to the Class M-6 Certificates, until its Certificate Principal Balance has been reduced to zero;

(J)   to the Class M-7 Certificates, until its Certificate Principal Balance has been reduced to zero;

(K)   to the Class M-8 Certificates, until its Certificate Principal Balance has been reduced to zero;

(L)   to the Class M-9 Certificates, until its Certificate Principal Balance has been reduced to zero;

(M)   to the Class B-1 Certificates, until its Certificate Principal Balance has been reduced to zero; and

(N)   for application as part of Monthly Excess Cashflow for such distribution date, as described under "—Credit Enhancement—Overcollateralization" below, any such Principal Payment Amount remaining after application pursuant to clauses I(A) through (M) above.

S-110

II.    On each distribution date (x) on or after the Stepdown Date and (y) with respect to which a Trigger Event is not in effect, the Principal Payment Amount will be paid in the following order of priority:

(A)    to the Supplemental Interest Trust from the Principal Payment Amount derived from the Group I Mortgage Loans and the Group II Mortgage Loans, the Group I Allocation Percentage and the Group II Allocation Percentage, as applicable, of any Net Swap Payment and any Swap Termination Payment owed to the Swap Provider (unless the Swap Provider is a Defaulting Party or the sole Affected Party (as defined in the ISDA Master Agreement) and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) remaining unpaid after the distribution of the Interest Remittance Amounts on such distribution date;

(B)    (i)    from the Principal Payment Amount derived from the Group I Mortgage Loans remaining after payments pursuant to clause (A) above, to the Class I-A-1 Certificates, the Group I Allocation Amount until its Certificate Principal Balance has been reduced to zero;

(ii)    from the Principal Payment Amount derived from the Group II Mortgage Loans remaining after payments pursuant to clause (A) above, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, the Group II Allocation Amount until the Certificate Principal Balance of each such class has been reduced to zero;

(C)    (i)    from the Principal Payment Amount derived from the Group I Mortgage Loans remaining after payments pursuant to clauses (A) and (B) above and after the Certificate Principal Balance of the Class I-A-1 Certificates has been reduced to zero, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, up to the Group II Allocation Amount remaining unpaid, after taking into account payments pursuant to clause II(B)(ii) above, until the Certificate Principal Balance of each such class has been reduced to zero;

(ii)    from the Principal Payment Amount derived from the Group II Mortgage Loans remaining after payments pursuant to clauses (A) and (B) above and after the Certificate Principal Balances of the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates have been reduced to zero, to the Class I-A-1 Certificates, up to the Group I Allocation Amount remaining unpaid, after taking into account payments pursuant to clause II(B)(i) above, until its Certificate Principal Balance has been reduced to zero;

(D)    to the Class M-1 Certificates, the Class M-1 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

S-111

NOM-FHFA_05591440

(E)     to the Class M-2 Certificates, the Class M-2 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(F)     to the Class M-3 Certificates, the Class M-3 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(G)     to the Class M-4 Certificates, the Class M-4 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(H)     to the Class M-5 Certificates, the Class M-5 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(I)     to the Class M-6 Certificates, the Class M-6 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(J)     to the Class M-7 Certificates, the Class M-7 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(K)     to the Class M-8 Certificates, the Class M-8 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(L)     to the Class M-9 Certificates, the Class M-9 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(M)     to the Class B-1 Certificates, the Class B-1 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero; and

(N)     for application as part of Monthly Excess Cashflow for such distribution date, as described under "—Credit Enhancement—Overcollateralization" below, any such Principal Payment Amount remaining after application pursuant to clauses II(A) through (M) above.

The foregoing notwithstanding, on and after the distribution date on which the aggregate Certificate Principal Balance of each class of Subordinate Certificates has been reduced to zero, distributions to the Group II Certificates will be allocated to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, on a pro rata basis based on the Certificate Principal Balance of each such class, until the Certificate Principal Balance of each such class has been reduced to zero.

CONFIDENTIAL

NOM-FHFA_05591441

**Credit Enhancement**

Credit enhancement for each class of certificates consists of the cross-collateralization described above, subordination of certain classes of Subordinate Certificates and the priority of application of Realized Losses and overcollateralization, in each case as described below.

*Subordination*

The rights of holders of the Subordinate Certificates to receive payments with respect to the Mortgage Loans, the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement will be subordinated to such rights of holders of the Senior Certificates, and the rights of the holders of each class of Subordinate Certificates to receive payments with respect to the Mortgage Loans, the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement will be subordinated to such rights of holders of each class of certificates having a higher priority of payment, as described in this prospectus supplement under "—Distributions of Interest" and "—Distributions of Principal". This subordination is intended to enhance the likelihood of regular receipt by holders of certificates having a higher priority of payment of the full amount of interest and principal distributable thereon, and to afford such certificateholders limited protection against Realized Losses incurred with respect to the Mortgage Loans.

The limited protection afforded to holders of classes of certificates with a higher priority of payment by means of the subordination of certain classes of certificates having a lower priority of payment will be accomplished by the preferential right of holders of such classes of certificates with a higher priority of payment to receive distributions of interest or principal on any distribution date prior to classes with a lower priority of payment.

*Application of Realized Losses*

Realized Losses on the Mortgage Loans will have the effect of reducing amounts payable in respect of the Class X Certificates (both through the application of Monthly Excess Interest to fund such deficiency and through a reduction in the Overcollateralization Amount for the related distribution date).

If on any distribution date, after giving effect to all Realized Losses incurred with respect to the Mortgage Loans during the Due Period for such distribution date and all unscheduled collections received during the Prepayment Period for such distribution date and payments of principal on such distribution date, the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates exceeds the Aggregate Loan Balance for such distribution date (such excess, an "Applied Loss Amount"), such amount will be allocated in reduction of the Certificate Principal Balance of first, the Class B-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; second the Class M-9 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; third, the Class M-8 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; fourth, the Class M-7 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; fifth, the Class M-6 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; sixth, the Class M-5 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; seventh, the Class M-4 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; eighth, the Class M-3 Certificates, until the Certificate Principal Balance thereof has been reduced to

S-113

NOM-FHFA_05591442

zero; ninth, the Class M-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and tenth, the Class M-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero.  In no event will the Certificate Principal Balances of the Senior Certificates be reduced by any Applied Loss Amount.

Holders of the Subordinate Certificates will not receive any payments in respect of Applied Loss Amounts, except to the extent of available Monthly Excess Cashflow as described below and amounts paid under the Interest Rate Swap Agreement and the Interest Rate Cap Agreement as described in this prospectus supplement.

*Overcollateralization*

The weighted average Net Mortgage Rate of the Mortgage Loans is generally expected to be higher than the weighted average of the Pass-Through Rates of the Senior Certificates and Subordinate Certificates plus certain expenses of the trust and the Supplemental Interest Trust, thus generating certain excess interest collections. Monthly Excess Interest will be applied in reduction of the aggregate Certificate Principal Balance of the Senior Certificate and Subordinate Certificates to the extent necessary to restore or maintain the Targeted Overcollateralization Amount. In addition, available amounts paid by the Swap Provider under the Interest Rate Swap Agreement and by the Interest Rate Cap Provider under the Interest Rate Cap Agreement may also be paid as principal (to the extent of Realized Losses on the Mortgage Loans) to the Senior Certificates and Subordinate Certificates in order to restore or maintain the required level of overcollateralization. Such application of interest collections and amounts paid under the Interest Rate Swap Agreement and the Interest Rate Cap Agreement as payments of principal will cause the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates to amortize more rapidly than the Aggregate Loan Balance, thus creating and maintaining overcollateralization. However, Realized Losses on the Mortgage Loans will reduce overcollateralization, and could result in an Overcollateralization Deficiency Amount.

On each distribution date, the Monthly Excess Cashflow will be distributed in the following order of priority:

(2) (A) until the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates equals the Aggregate Loan Balance for such distribution date (after giving effect to scheduled payments of principal due during the related Due Period to the extent received or advanced, unscheduled collections of principal received during the related Prepayment Period and after reduction for Realized Losses on the Mortgage Loans incurred during the related Due Period) minus the Targeted Overcollateralization Amount for such date, on each distribution date (a) prior to the Stepdown Date or (b) with respect to which a Trigger Event is in effect, to the extent of Monthly Excess Interest for such distribution date, to the Senior Certificates and Subordinate Certificates, in the following order of priority:

(i) (a) the Group I Excess Interest Amount in the following order of priority: (x) first, to the Class I-A-1 Certificates, until its Certificate Principal Balance has been reduced to zero, and then (y) sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class

S-114

NOM-FHFA_05591443

II-A-4 Certificates, in that order, after taking into account the distribution of the Group II Excess Interest Amount, until the Certificate Principal Balance of each such class has been reduced to zero;

(b)      the Group II Excess Interest Amount in the following order of priority: (x) first, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, until the Certificate Principal Balance of each such class has been reduced to zero, and then (y) to the Class I-A-1 Certificates, after taking into account the distribution of the Group I Excess Interest Amount, until its Certificate Principal Balance has been reduced to zero;

(ii)      to the Class M-1 Certificates, until its Certificate Principal Balance has been reduced to zero;

(iii)      to the Class M-2 Certificates, until its Certificate Principal Balance has been reduced to zero;

(iv)      to the Class M-3 Certificates, until its Certificate Principal Balance has been reduced to zero;

(v)      to the Class M-4 Certificates, until its Certificate Principal Balance has been reduced to zero;

(vi)      to the Class M-5 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(vii)      to the Class M-6 Certificates, until its Certificate Principal Balance has been reduced to zero;

(viii)      to the Class M-7 Certificates, until its Certificate Principal Balance has been reduced to zero;

(ix)      to the Class M-8 Certificates, until its Certificate Principal Balance has been reduced to zero;

(x)      to the Class M-9 Certificates, until its Certificate Principal Balance has been reduced to zero; and

(xi)      to the Class B-1 Certificates, until its Certificate Principal Balance has been reduced to zero;

(B)      on each distribution date on or after the Stepdown Date and with respect to which a Trigger Event is not in effect, to fund any principal distributions required to be made on such distribution date set forth above in subclause II under "—Distributions of Principal", after giving effect to the distribution of the Principal Payment Amount for such date, in accordance with the priorities set forth therein;

S-115

NOM-FHFA_05591444

(3)     to the Class M-1 Certificates, any Deferred Amount for such class;

(4)     to the Class M-2 Certificates, any Deferred Amount for such class;

(5)     to the Class M-3 Certificates, any Deferred Amount for such class;

(6)     to the Class M-4 Certificates, any Deferred Amount for such class;

(7)     to the Class M-5 Certificates, any Deferred Amount for such class;

(8)     to the Class M-6 Certificates, any Deferred Amount for such class;

(9)     to the Class M-7 Certificates, any Deferred Amount for such class;

(10)    to the Class M-8 Certificates, any Deferred Amount for such class;

(11)    to the Class M-9 Certificates, any Deferred Amount for such class;

(12)    to the Class B-1 Certificates, any Deferred Amount for such class;

(13)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class I-A-1, Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, concurrently, any Basis Risk Shortfall for each such class, on a pro rata basis based on the entitlement of each such class;

(14)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-1 Certificates, any Basis Risk Shortfall for such class;

(15)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-2 Certificates, any Basis Risk Shortfall for such class;

(16)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-3 Certificates, any Basis Risk Shortfall for such class;

(17)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-4 Certificates, any Basis Risk Shortfall for such class;

(18)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-5 Certificates, any Basis Risk Shortfall for such class;

(19)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-6 Certificates, any Basis Risk Shortfall for such class;

CONFIDENTIAL

NOM-FHFA_05591445

(20)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-7 Certificates, any Basis Risk Shortfall for such class;

(21)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-8 Certificates, any Basis Risk Shortfall for such class;

(22)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-9 Certificates, any Basis Risk Shortfall for such class;

(23)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class B-1 Certificates, any Basis Risk Shortfall for such class;

(24)    to the Supplemental Interest Trust, any Swap Termination Payment owed to the Swap Provider in the event of a Swap Provider Trigger Event and the Swap Provider is a Defaulting Party or the sole Affected Party (as defined in the ISDA Master Agreement) not paid on prior distribution dates and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee;

(25)    to the Class X Certificates, the amount distributable to such class pursuant to the pooling and servicing agreement; and

(26)    to the Residual Certificates, any remaining amount. It is not anticipated that any amounts will be distributed to the Residual Certificates under this clause (25).

Notwithstanding the foregoing, distributions pursuant to subparagraphs (2) through (22) above on any distribution date will be made after giving effect to payments received pursuant to the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement.

**The Class P Certificates**

On each distribution date, all amounts representing Prepayment Charges in respect of the Mortgage Loans received during the related Prepayment Period will be withdrawn from the Distribution Account and distributed to the Class P Certificates and shall not be available for distribution to the holders of any other class of certificates. The payment of such Prepayment Charges shall not reduce the Certificate Principal Balance of the Class P Certificates.

On the distribution date in January 2012, the securities administrator shall make a payment of principal to the Class P Certificates in reduction of the Certificate Principal Balance thereof from amounts on deposit in a separate reserve account established and maintained by the securities administrator for the exclusive benefit of the Class P Certificateholders.

S-117

**Table of Fees and Expenses**

The following table indicates the fees and expenses to be paid from the cash flows from the Mortgage Loans and other assets of the trust fund, while the Offered Certificates are outstanding.

All fees are expressed in percentages, at an annualized rate, applied to the outstanding aggregate principal balance of the Mortgage Loans.

| Item | Fee or Expense | Paid To | Paid From | Frequency |
|------|----------------|---------|-----------|-----------|
| Master Servicing Fee[(1)(2)(3)] | 0.0140% per annum of the Stated Principal Balance of each Mortgage Loan | master servicer | Mortgage Loan interest collections | Monthly |
| Servicing Fee[(3)] | 0.5000% per annum of the Stated Principal Balance of each Mortgage Loan | related servicer | Mortgage Loan interest collections | Monthly |
| P&I Advances and Servicing Advances | To the extent of funds available, the amount of any advances and servicing advances | related servicer or master servicer, as applicable | With respect to each Mortgage Loan, funds held for future distribution, late recoveries of the payments of the costs and expenses, liquidation proceeds, Subsequent Recoveries, purchase proceeds or repurchase proceeds for that Mortgage Loan | Time to Time |
| Nonrecoverable Advances and Servicing Advances | The amount of any advances and servicing advances deemed nonrecovreable | related servicer or master servicer, as applicable | All collections on the Mortgage Loans | Time to Time |
| Reimbursement for certain expenses, costs and liabilities incurred by the related servicer, the master servicer, the sponsor or the depositor in connection with any legal action relating to the pooling and servicing agreement or the certificates[(2)] | The amount of the expenses, costs and liabilities incurred | related servicer, master servicer, sponsor or depositor, as applicable | All collections on the Mortgage Loans | Time to Time |

CONFIDENTIAL

NOM-FHFA_05591447

| Item | Fee or Expense | Paid To | Paid From | Frequency |
|---|---|---|---|---|
| Indemnification expenses | Amounts for which the related servicer, the master servicer, the securities administrator, the custodian, the trustee and the depositor are entitled to indemnification [4] | related servicer, master servicer, securities administrator, custodian, trustee, sponsor or depositor, as applicable | All collections on the Mortgage Loans | Time to Time |
| Reimbursement for any expenses incurred by the trustee or securities administrator in connection with a tax audit of the trust | The amount incurred by the trustee or securities administrator in connection with a tax audit of the trust | trustee or securities administrator | All collections on the Mortgage Loans | Time to Time |

---

[1]   The master servicing fee including securities administrator, paying agent, certificate registrar and credit risk manager fees. The master servicer compensation consists of the master servicing fee and any interest or other income earned on funds held in the Distribution Account. Wells Fargo Bank, N.A. performs the functions of securities administrator, paying agent, certificate registrar, custodian and credit risk manager and this compensation covers the performance of each of these functions.

[2]   The master servicer pays trustee fees and custodian fees out of its compensation.

[3]   The master servicing fee payable to the master servicer and the servicing fee payable to each servicer are paid on a first priority basis from collections allocable to interest on the Mortgage Loans prior to distributions to the certificateholders.

[4]   See "*The Master Servicer, Securities Administrator and Custodian*" and "*The Pooling and Servicing Agreement – The Trustee*" in this prospectus supplement.

## Calculation of One-Month LIBOR

On the second LIBOR business day preceding the commencement of each Interest Accrual Period (other than the first Interest Accrual Period) for the Senior Certificates and the Subordinate Certificates, which date we refer to as an interest determination date, the securities administrator will determine One-Month LIBOR for such Interest Accrual Period on the basis of such rate as it appears on Telerate Screen Page 3750, as of 11:00 a.m. London time on such interest determination date or an equivalent information system. If such rate does not appear on such page, or such other page as may replace that page on that service, or if such service is no longer offered, such other service for displaying LIBOR or comparable rates as may be reasonably selected by the securities administrator, One-Month LIBOR for the applicable Interest Accrual Period will be the Reference Bank Rate. If no such quotations can be obtained and no Reference Bank Rate is available, One-Month LIBOR will be the One-Month LIBOR applicable to the preceding Interest Accrual Period. With respect to the first Interest Accrual Period, One-Month LIBOR will be determined two business days prior to the Closing Date.

The Reference Bank Rate with respect to any Interest Accrual Period, means the arithmetic mean, rounded upwards, if necessary, to the nearest whole multiple of 0.03125%, of the offered rates for United States dollar deposits for one month that are quoted by the Reference Banks, as described below, as of 11:00 a.m., New York City time, on the related interest determination date to prime banks in the London interbank market for a period of one month in amounts approximately

S-119

NOM-FHFA_05591448

equal to the aggregate Certificate Principal Balance of the Senior Certificates and the Subordinate Certificates for such Interest Accrual Period, provided that at least two such Reference Banks provide such rate. If fewer than two offered rates appear, the Reference Bank Rate will be the arithmetic mean, rounded upwards, if necessary, to the nearest whole multiple of 0.03125%, of the rates quoted by one or more major banks in New York City, selected by the securities administrator, as of 11:00 a.m., New York City time, on such date for loans in U.S. dollars to leading European banks for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the related Certificates for such Interest Accrual Period. As used in this section, LIBOR business day means any day other than a Saturday or a Sunday or a day on which banking institutions in the State of New York or in the city of London, England are required or authorized by law to be closed; and "Reference Banks" means leading banks selected by the securities administrator and engaged in transactions in Eurodollar deposits in the international Eurocurrency market

- with an established place of business in London,

- which have been designated as such by the securities administrator, and

- which are not controlling, controlled by, or under common control with, the depositor or the sponsor.

The establishment of One-Month LIBOR on each interest determination date by the securities administrator and the securities administrator's calculation of the rate of interest applicable to the Senior Certificates and Subordinate Certificates for the related Interest Accrual Period shall, in the absence of manifest error, be final and binding.

**Reports to Certificateholders**

The securities administrator will make available to each certificateholder, the servicers and the depositor a monthly statement generally setting forth the following information:

1. the Interest Accrual Period and distribution date;

2. with respect to the Mortgage Loans, the total cash flows received and the general sources thereof;

3. the amount, if any, of fees or expenses accrued and paid, with an identification of the payee and the general purpose of such fees;

4. the amount of the related distribution to holders of the certificates (by class) allocable to principal, separately identifying (A) the aggregate amount of any principal prepayments included therein and (B) the aggregate of all scheduled payments of principal included therein;

5. the amount of such distribution to holders of the certificates (by class) allocable to interest;

6. the Interest Carry Forward Amounts and any Basis Risk Shortfalls for the certificates (if any);

S-120

NOM-FHFA_05591449

7.  the Certificate Principal Balance of the certificates before and after giving effect to the distribution of principal and allocation of Realized Losses on such distribution date;

8.  the number and aggregate Stated Principal Balance of all the Mortgage Loans for the following distribution date;

9.  the Pass-Through Rate for each class of certificates for such distribution date;

10. the aggregate amount of P&I Advances included in the distributions on the distribution date, the aggregate amount of unreimbursed advances at the close of business on the distribution date, to the extent such information is provided by the servicers;

11. the number and aggregate principal balance of any Mortgage Loans that were (A) delinquent (exclusive of Mortgage Loans in foreclosure) using the "OTS" method (not including any Liquidated Mortgage Loans as of the end of the related Prepayment Period) (1) one scheduled payment is delinquent, (2) two scheduled payments are delinquent, (3) three or more scheduled payments are delinquent and (4) foreclosure proceedings have been commenced, and loss information for the period; the number and aggregate principal balance of any Mortgage Loans in respect of which (A) one scheduled payment is delinquent, (B) two scheduled payments are delinquent, (C) three or more scheduled payments are delinquent and (D) foreclosure proceedings have been commenced, and loss information for the period;

12. the amount, if any, of Monthly Excess Cashflow or and the application of such Monthly Excess Cashflow;

13. the amounts paid by the Basis Risk Cap Provider pursuant to the Basis Risk Cap Agreement in respect of the certificates;

14. the amounts paid by the Swap Provider pursuant to the Interest Rate Swap Agreement in respect of the certificates;

15. the amounts paid by the Interest Rate Cap Provider pursuant to the Interest Rate Cap Agreement in respect of the certificates;

16. with respect to any Mortgage Loan that was liquidated during the preceding calendar month, the loan number and scheduled principal balance of, and Realized Loss on, such Mortgage Loan as of the end of the related Prepayment Period;

17. whether any performance, delinquency or loss triggers as more completely described in this prospectus supplement are in effect;

18. the total number and principal balance of any real estate owned, or REO, properties as of the end of the related Prepayment Period;

S-121

NOM-FHFA_05591450

19.      the cumulative Realized Losses for the Mortgage Pool through the end of the preceding month;

20.      the three-month rolling average of the percent equivalent of a fraction, the numerator of which is the aggregate scheduled principal balance of the Mortgage Loans that are 60 days or more delinquent or are in bankruptcy or foreclosure or are REO properties, and the denominator of which is the scheduled principal balances of all of the Mortgage Loans; and

21.      the amount of the Prepayment Charges remitted by the servicers.

On each distribution date, the securities administrator will make the monthly statement and, at the securities administrator's option, any additional files containing the same information in an alternative format, available each month to certificateholders via the securities administrator's internet website. Assistance in using the website service can be obtained by calling the securities administrator's customer service desk at (301) 815-6600. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The securities administrator may change the way monthly statements are distributed in order to make such distributions more convenient or more accessible to the above parties.

The annual reports on Form 10-K, the distribution reports on Form 10-D, the current reports on Form 8-K and amendments to those reports filed by the securities administrator or furnished by the securities administrator with respect to the trust pursuant to section 13(a) or 15(d) of the Exchange Act will be made available on the website of the securities administrator as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission.

In addition, within a reasonable period of time after the end of each calendar year, the securities administrator will prepare and deliver, upon request, to each certificateholder of record during the previous calendar year a statement containing information necessary to enable certificateholders to prepare their tax returns. Such statements will not have been examined and reported upon by an independent public accountant.

The depositor makes no representation, and does not guarantee that, the securities administrator will provide such statements to the certificateholders as described above.

## THE BASIS RISK CAP AGREEMENT

The Senior Certificates and Subordinate Certificates will have the benefit of a Basis Risk Cap Agreement provided by HSBC Bank USA, National Association (the "Basis Risk Cap Provider"). HSBC Bank USA, National Association as trustee (the "Supplemental Interest Trust Trustee") on behalf of a separate trust created under the pooling and servicing agreement (the "Supplemental Interest Trust") will enter into the Basis Risk Cap Agreement with the Basis Risk Cap Provider. The Basis Risk Cap Agreement will be held in the Supplemental Interest Trust. The Supplemental Interest Trust Trustee will appoint the securities administrator to receive and distribute funds with regards to the Basis Risk Cap Agreement on behalf of the Supplemental Interest Trust. On or before each distribution date, the securities administrator will deposit into an account held in the Supplemental Interest Trust (the "Derivative Account") all amounts received under the Basis Risk

S-122

NOM-FHFA_05591451

Cap Agreement. For the avoidance of doubt, the Supplemental Interest Trust, the Basis Risk Cap Agreement and the Derivative Account will not be assets of any REMIC. Pursuant to the Basis Risk Cap Agreement, the Basis Risk Cap Provider will agree to pay to the trust two business days prior to each distribution date commencing with the distribution date in February 2007 and ending with the distribution date in July 2007, a monthly payment in an amount equal to the product of: (1) the excess, if any, of one-month LIBOR (as set forth in the Basis Risk Cap Agreement) over the applicable strike rate (as set forth below) for the distribution dates set forth below, up to a maximum rate of 10.50% per annum; (2) the Scheduled Notional Amount set forth below for the related distribution date; and (3) a fraction, the numerator of which is the actual number of days in the related calculation period (as defined in the Basis Risk Cap Agreement), and the denominator of which is 360.

| Distribution Date | Scheduled Notional Amount ($) | Strike Rate (%) |
|---|---|---|
| February 2007 | 895,725,000 | 9.368380 |
| March 2007 | 881,160,477 | 8.364660 |
| April 2007 | 865,176,776 | 7.555210 |
| May 2007 | 847,828,485 | 7.807070 |
| June 2007 | 829,176,277 | 7.555250 |
| July 2007 | 809,310,194 | 7.807140 |
| August 2007 and thereafter | 0 | N/A |

On each distribution date, amounts in the Supplemental Interest Trust in respect of the Basis Risk Cap Agreement will be distributed to the Senior Certificates and Subordinate Certificates in respect of Basis Risk Shortfalls for each such class for such distribution date in the order of priority set forth under "—Credit Enhancement—Overcollateralization" prior to giving effect to any amounts deposited in the Basis Risk Shortfall Reserve Fund from Monthly Excess Cashflow on such distribution date.

The obligation of the Basis Risk Cap Provider to pay specified amounts due under the Basis Risk Cap Agreement (other than Basis Risk Cap Agreement Termination Payments (as defined below)) generally will be subject to the following conditions precedent: (1) no Basis Risk Cap Agreement Event of Default or event that with the giving of notice or lapse of time or both would become a Basis Risk Cap Agreement Event of Default will have occurred and be continuing and (2) no "early termination date" (as defined in the Basis Risk Cap Agreement) has occurred or been effectively designated.

Events of default under the Basis Rick Cap Agreement (each a "Basis Risk Cap Agreement Event of Default") include the following:

- failure to make a payment due under the Basis Risk Cap Agreement, after notice of such failure is received and expiration of a specified grace period,

- failure by the Basis Risk Cap Provider to comply with or perform certain agreements or obligations required under the Basis Risk Cap Agreement after notice of such failure is received and expiration of a specified grace period,

S-123

CONFIDENTIAL

- failure by the Basis Risk Cap Provider to comply with or perform the second rating trigger collateral posting requirements of the Basis Risk Cap Agreement if a second rating trigger downgrade has occurred and been continuing for 30 or more business days and after notice of such failure is received and expiration of a specified grace period,

- certain representations by the Basis Risk Cap Provider or its credit support provider prove to have been incorrect or misleading in any material respect,

- repudiation or certain defaults by the Basis Risk Cap Provider or its credit support provider in respect of any derivative or similar transactions entered into between the Supplemental Interest Trust and the Basis Risk Cap Provider and specified for this purpose in the Basis Risk Cap Agreement,

- cross-default by the Basis Risk Cap Provider or its credit support provider relating generally to its obligations in respect of borrowed money in excess of a threshold specified in the Basis Risk Cap Agreement,

- certain insolvency or bankruptcy events, and

- a merger by the Basis Risk Cap Provider without an assumption of its obligations under the Basis Risk Cap Agreement,

each as further described in the Basis Risk Cap Agreement.

Termination events under the Basis Risk Cap Agreement (each a "Basis Risk Cap Agreement Termination Event") include the following:

- illegality (which generally relates to changes in law causing it to become unlawful for either party to perform its obligations under the Basis Risk Cap Agreement),

- tax event (which generally relates to the application of certain withholding taxes to amounts payable under the Basis Risk Cap Agreement, as a result of a change in tax law or in certain circumstances solely with respect to the trust, certain similar events), and

- tax event upon merger (which generally relates to the application of certain withholding taxes to amounts payable under the Basis Risk Cap Agreement as a result of a merger or similar transaction),

each as further described in the Basis Risk Cap Agreement.

Additional termination events" under the Basis Risk Cap Agreement (each a "Basis Risk Cap Agreement Additional Termination Event") include the following:

- failure of the Basis Risk Cap Provider to comply with the first rating trigger collateral posting requirements of the Basis Risk Cap Agreement,

CONFIDENTIAL

NOM-FHFA_05591453

- if a second rating trigger downgrade has occurred and been continuing for 30 or more business days and a firm offer from a replacement cap provider remains capable of acceptance by the offeree,

- failure of the Basis Risk Cap Provider to comply with the Regulation AB provisions of the Basis Risk Cap Agreement (including, if applicable, the provisions of any additional agreement incorporated by reference into the Basis Risk Cap Agreement), and

- occurrence of an optional termination of the securitization pursuant to the terms of the pooling and servicing agreement,

- each as further described in the Basis Risk Cap Agreement.

If the Basis Risk Cap Provider's credit ratings are withdrawn or reduced below the first ratings threshold specified in the Basis Risk Cap Agreement, and within 30 days the Basis Risk Cap Provider fails either to transfer such Basis Risk Cap Agreement at its sole cost and expense, in whole, but not in part, to a counterparty that satisfies the first ratings threshold or to obtain a guarantee from an entity that satisfies the first ratings threshold, the Basis Risk Cap Provider will be required, at its own expense, to post collateral in accordance with the Basis Risk Cap Agreement.

If the Basis Risk Cap Provider's credit ratings are withdrawn or reduced below the second ratings threshold specified in the Basis Risk Cap Agreement, the Basis Risk Cap Provider will be required, at its own expense, either (1) to obtain a substitute basis risk cap provider which will assume the obligations of the Basis Risk Cap Provider under the Basis Risk Cap Agreement and which meets all eligibility requirements provided therein or in any related documentation, or (2) to obtain a guarantor which will provide a guarantee of the obligations of the Basis Risk Cap Provider under the Basis Risk Cap Agreement that meets all eligibility requirements provided therein or in any related documentation.

Upon the occurrence of a Basis Risk Cap Agreement Event of Default, the non-defaulting party will have the right to designate an early termination date (an "Early Termination Date"). Upon the occurrence of a Basis Risk Cap Agreement Termination Event or a Basis Risk Cap Agreement Additional Termination Event, an Early Termination Date may be designated by one of the parties (as specified in the Basis Risk Cap Agreement) and will occur only upon notice and, in some circumstances, after any affected party has used reasonable efforts to transfer its rights and obligations under the Basis Risk Cap Agreement to a related entity within a specified period after notice has been given of the Basis Risk Cap Agreement Termination Event, and, in the case of downgrade below the second ratings threshold, only if a firm offer from a replacement basis risk cap provider remains capable of acceptance by the offeree, all as set forth in the Basis Risk Cap Agreement. The occurrence of an Early Termination Date under the Basis Risk Cap Agreement will constitute a "Basis Risk Cap Agreement Early Termination."

Upon a Basis Risk Cap Agreement Early Termination, the Basis Risk Cap Provider may be liable to make a termination payment (the "Basis Risk Cap Agreement Termination Payment") to the securities administrator (regardless, if applicable, of which of the parties has caused the termination). The Basis Risk Cap Agreement Termination Payment will be based on the value of the Basis Risk Cap Agreement computed in accordance with the procedures set forth in the Basis Risk Cap Agreement.

S-125

Upon a Basis Risk Cap Agreement Early Termination other than in connection with the optional termination of the trust, the depositor will use reasonable efforts to appoint a successor basis risk cap provider to enter into a new basis risk cap agreement on terms substantially similar to the Basis Risk Cap Agreement, with a successor basis risk cap provider meeting all applicable eligibility requirements. The securities administrator will apply any Basis Risk Cap Agreement Termination Payment received from the original Basis Risk Cap Provider in connection with such Basis Risk Cap Agreement Early Termination to the upfront payment required to appoint the successor basis risk cap provider. If the depositor is unable to appoint a successor basis risk cap provider within 30 days of the Basis Risk Cap Agreement Early Termination, then the securities administrator will deposit any Basis Risk Cap Termination Payment received from the original Basis Risk Cap Provider into a separate, non-interest bearing reserve account and will, on each subsequent distribution date, withdraw from the amount then remaining on deposit in such reserve account an amount equal to the payment, if any, that would have been paid to the securities administrator by the original Basis risk Cap Provider calculated in accordance with the terms of the original Basis Risk Cap Agreement, and distribute such amount in accordance with the terms of the pooling and servicing agreement.

Upon a Basis Risk Cap Agreement Early Termination in connection with the optional termination of the trust, if the securities administrator receives a Basis Risk Cap Agreement Termination Payment from the Basis Risk Cap Provider, such Basis Risk Cap Agreement Termination Payment generally will not be available to holders of the Senior Certificates and Subordinate Certificates; rather, the securities administrator will distribute such Basis Risk Cap Agreement Termination Payment in accordance with the terms of the pooling and servicing agreement.

The Basis Risk Cap Agreement will be governed by and construed in accordance with the laws of the State of New York. The obligations of the Basis Risk Cap Provider are limited to those specifically set forth in the Basis Risk Cap Agreement.

The significance percentage of the Basis Risk Cap Agreement, the Interest Rate Swap Agreement (as defined in this prospectus supplement) and the Interest Rate Cap Agreement (as defined in this prospectus supplement), individually and in combination, as calculated in accordance with Item 1115 of Regulation AB, is less than 10%. The Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement will provide that the Basis Risk Cap Provider, the Swap Provider (as defined in this prospectus supplement) and the Interest Rate Cap Provider (as defined in this prospectus supplement) may be replaced in certain circumstances, including if the significance percentage of the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement, individually or in combination, is equal to or greater than 10%.

## THE INTEREST RATE SWAP AGREEMENT

The Supplemental Interest Trust Trustee (on behalf of the Supplemental Interest Trust) will enter into the Interest Rate Swap Agreement with HSBC Bank USA, National Association (the "Swap Provider"). The Interest Rate Swap Agreement will be held in the Supplemental Interest Trust. The Supplemental Interest Trust Trustee will appoint the securities administrator to receive and distribute funds with regards to the Interest Rate Swap Agreement on behalf of the Supplemental Interest Trust. On each distribution date, the securities administrator will deposit into the Derivative

S-126

NOM-FHFA_05591455

Account, certain amounts, if any, received from the Swap Provider.  For the avoidance of doubt, the Interest Rate Swap Agreement will not be an asset of any REMIC.

Pursuant to the Interest Rate Swap Agreement, on each distribution date commencing on the distribution date occurring in August 2007 and ending with the distribution date in January 2012 (i) the securities administrator (on behalf of the Supplemental Interest Trust and from funds of such trust) will be obligated to pay to the Swap Provider, a fixed amount for that distribution date, or the "Fixed Swap Payment" equal to the product of (x) a fixed rate equal to 5.30% per annum, (y) the Swap Notional Amount (set forth below) for that distribution date and (z) a fraction, the numerator of which is 30 and the denominator of which is 360, and the Swap Provider will be obligated to pay to the securities administrator (on behalf of the Supplemental Interest Trust) a floating amount for that distribution date, or the Floating Swap Payment, equal to the product of (x) One-Month LIBOR, as determined pursuant to the Interest Rate Swap Agreement, for the related calculation period (as defined in the Interest Rate Swap Agreement), (y) the Swap Notional Amount for that distribution date, and (z) a fraction, the numerator of which is equal to the actual number of days in the related calculation period and the denominator of which is 360.  A net payment, referred to as a "Net Swap Payment", will be required to be made on or before each applicable distribution date (a) by the securities administrator to the Swap Provider, if the Fixed Swap Payment for such distribution date exceeds the Floating Swap Payment for such distribution date, or (b) by the Swap Provider to the securities administrator, if the Floating Swap Payment exceeds the Fixed Swap Payment for such distribution date. For each distribution date in respect of which the securities administrator is required to make a Net Swap Payment to the Swap Provider, the Supplemental Interest Trust will be required to make a payment to the securities administrator in the same amount prior to distributions to certificateholders.

The "Swap Notional Amount" for each distribution date will be equal to the amount set forth below for such distribution date. The Interest Rate Swap Agreement will terminate with the distribution date in January 2012, unless terminated earlier upon the occurrence of a Swap Event of Default, a Swap Termination Event or a Swap Additional Termination Event (each as defined below).

| Distribution Date | Scheduled Swap Notional Amount ($) |
|---|---|
| August 2007 | 735,838,000 |
| September 2007 | 704,527,000 |
| October 2007 | 673,488,000 |
| November 2007 | 642,956,000 |
| December 2007 | 612,989,000 |
| January 2008 | 584,192,000 |
| February 2008 | 556,629,000 |
| March 2008 | 530,294,000 |
| April 2008 | 505,095,000 |
| May 2008 | 481,050,000 |
| June 2008 | 457,578,000 |
| July 2008 | 432,707,000 |
| August 2008 | 377,933,000 |
| September 2008 | 286,161,000 |
| October 2008 | 256,646,000 |

S-127

NOM-FHFA_05591456

| Distribution Date | Scheduled Swap Notional Amount ($) |
|---|---|
| November 2008 | 239,998,000 |
| December 2008 | 159,803,000 |
| January 2009 | 141,158,000 |
| February 2009 | 133,697,000 |
| March 2009 | 126,960,000 |
| April 2009 | 120,765,000 |
| May 2009 | 115,420,000 |
| June 2009 | 110,212,000 |
| July 2009 | 105,227,000 |
| August 2009 | 96,463,000 |
| September 2009 | 86,543,000 |
| October 2009 | 81,417,000 |
| November 2009 | 77,422,000 |
| December 2009 | 71,054,000 |
| January 2010 | 66,762,000 |
| February 2010 | 64,216,000 |
| March 2010 | 61,768,000 |
| April 2010 | 59,414,000 |
| May 2010 | 57,150,000 |
| June 2010 | 54,973,000 |
| July 2010 | 52,879,000 |
| August 2010 | 50,866,000 |
| September 2010 | 48,929,000 |
| October 2010 | 47,067,000 |
| November 2010 | 45,276,000 |
| December 2010 | 43,540,000 |
| January 2011 | 41,884,000 |
| February 2011 | 40,291,000 |
| March 2011 | 38,736,000 |
| April 2011 | 37,264,000 |
| May 2011 | 35,848,000 |
| June 2011 | 34,439,000 |
| July 2011 | 33,070,000 |
| August 2011 | 31,809,000 |
| September 2011 | 30,463,000 |
| October 2011 | 29,268,000 |
| November 2011 | 28,120,000 |
| December 2011 | 26,818,000 |
| January 2012 | 25,749,000 |
| February 2012 and thereafter | 0 |

The respective obligations of the Swap Provider and the Supplemental Interest Trust to pay specified amounts due under the Interest Rate Swap Agreement (other than Swap Termination Payments (as defined below)) will generally be subject to the following conditions precedent: (1) no

S-128

NOM-FHFA_05591457

Swap Event of Default or event that with the giving of notice or lapse of time or both would become a Swap Event of Default, will have occurred and be continuing with respect to the other party and (2) no "Early Termination Date" (as defined in the Interest Rate Swap Agreement) has occurred or been effectively designated.

Events of default under the Interest Rate Swap Agreement (each a "Swap Event of Default") include the following:

- failure to make a payment due under the Interest Rate Swap Agreement after notice of such failure is received and expiration of a specified grace period,

- failure by the Swap Provider to comply with or perform certain agreements or obligations required under the Interest Rate Swap Agreement after notice of such failure is received and expiration of a specified grace period,

- failure by the Swap Provider to comply with or perform the second rating trigger collateral posting requirements of the Interest Rate Swap Agreement if a second rating trigger downgrade has occurred and been continuing for 30 or more business days and after notice of such failure is received and expiration of a specified grace period,

- certain representations by the Swap Provider or its credit support provider prove to have been incorrect or misleading in any material respect,

- repudiation or certain defaults by the Swap Provider or its credit support provider in respect of any derivative or similar transactions entered into between the Supplemental Interest Trust and the Swap Provider and specified for this purpose in the Interest Rate Swap Agreement, or cross-default by the Swap Provider or its credit support provider relating generally to its obligations in respect of borrowed money in excess of a threshold specified in the Interest Rate Swap Agreement,

- certain insolvency or bankruptcy events, and

- a merger by a party to the Interest Rate Swap Agreement without an assumption of such party's obligations under the Interest Rate Swap Agreement,

each as further described in the Interest Rate Swap Agreement.

Termination events under the Interest Rate Swap Agreement (each a "Swap Termination Event") include the following:

- illegality (which generally relates to changes in law causing it to become unlawful for either party to perform its obligations under the Interest Rate Swap Agreement),

- tax event (which generally relates to the application of certain withholding taxes to amounts payable under the Interest Rate Swap Agreement, as a result of a change in tax law or, in certain circumstances solely with respect to the Supplemental Interest Trust Trustee, certain similar events) and

CONFIDENTIAL

NOM-FHFA_05591458

- tax event upon merger (which generally relates to the application of certain withholding taxes to amounts payable under the Interest Rate Swap Agreement as a result of a merger or similar transaction);

each as further described in the Interest Rate Swap Agreement.

- Additional termination events under the Interest Rate Swap Agreement (each a "Swap Additional Termination Event"), include the following:

- failure of the Swap Provider to comply with the first rating trigger collateral posting requirements of the Interest Rate Swap Agreement,

- if a second rating trigger downgrade has occurred and been continuing for 30 or more business days and a firm offer from a replacement swap provider remains capable of acceptance by the offeree,

- failure of the Swap Provider to comply with the Regulation AB provisions of the Interest Rate Swap Agreement (including, if applicable, the provisions of any additional agreement incorporated by reference into the Interest Rate Swap Agreement),

- occurrence of an optional termination of the securitization pursuant to the terms of the pooling and servicing agreement, and

- amendment of the pooling and servicing agreement in a manner contrary to the requirements of the Interest Rate Swap Agreement,

each as further described in the Interest Rate Swap Agreement.

If the Swap Provider's credit ratings are withdrawn or reduced below the first ratings threshold specified in the Interest Rate Swap Agreement, and within 30 days the Swap Provider fails either to transfer the Interest Rate Swap Agreement at its sole cost and expense, in whole, but not in part, to a counterparty that satisfies the first ratings threshold or to obtain a guarantee from an entity that satisfies the first ratings threshold, the Swap Provider will be required, at its own expense, to post collateral in accordance with the Interest Rate Swap Agreement.

If the Swap Provider's credit ratings are withdrawn or reduced below the second ratings threshold specified in the Interest Rate Swap Agreement, the Swap Provider will be required, at its own expense, either (1) to obtain a substitute swap provider which will assume the obligations of the Swap Provider under the Interest Rate Swap Agreement and which meets all eligibility requirements provided therein or in any related documentation, or (2) to obtain a guarantor which will provide a guarantee of the obligations of the Swap Provider under the Interest Rate Swap Agreement that meets all eligibility requirements provided therein or in any related documentation.

Upon the occurrence of a Swap Event of Default, the non-defaulting party will have the right to designate an early termination date (an "Early Termination Date"). Upon the occurrence of a Swap Termination Event or a Swap Additional Termination Event, an Early Termination Date may be designated by one of the parties as specified in the Interest Rate Swap Agreement, and will occur only upon notice (including, in some circumstances, notice to the rating agencies) and, in some circumstances, after any affected party has used reasonable efforts to transfer its rights and

S-130

obligations under the Interest Rate Swap Agreement to a related entity within a specified period after notice has been given of the Swap Termination Event, and, in the case of downgrade below the second ratings threshold, only if a firm offer from a replacement swap provider remains capable of acceptance by the offeree, all as set forth in the Interest Rate Swap Agreement. The occurrence of an Early Termination Date under the Interest Rate Swap Agreement will constitute a "Swap Early Termination."

Upon a Swap Early Termination, the securities administrator or the Swap Provider may be liable to make a swap termination payment (the "Swap Termination Payment") to the other, regardless, if applicable, of which of the parties has caused the termination. The Swap Termination Payment will be based on the value of the Interest Rate Swap Agreement computed in accordance with the procedures set forth in the Interest Rate Swap Agreement. In the event that the securities administrator is required to make a Swap Termination Payment to a Swap Provider, the Supplemental Interest Trust will be required to make a payment to the securities administrator in the same amount (to the extent such Swap Termination Payment has not been paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee). In the case of a Swap Termination Payment not triggered by a Swap Provider Trigger Event (as defined in this prospectus supplement), the Supplemental Interest Trust will be required to make such payment on the related distribution date, and on any subsequent distribution dates until paid in full, prior to distributions to certificateholders. In the case of a Swap Termination Payment triggered by a Swap Provider Trigger Event, the Supplemental Interest Trust's obligation to make such payment generally will be subordinated to distributions to the holders of the Senior Certificates and Subordinate Certificates to the extent described in the pooling and servicing agreement.

Upon a Swap Early Termination other than in connection with the optional termination of the trust, the Supplemental Interest Trust trustee shall, pursuant to the pooling and servicing agreement, use reasonable efforts to enter into a new interest rate swap agreement on terms substantially similar to the Interest Rate Swap Agreement, with a successor swap provider meeting all applicable eligibility requirements to enter into a new interest rate swap agreement on terms substantially similar to the Interest Rate Swap Agreement. If the securities administrator receives a Swap Termination Payment from the Swap Provider in connection with such Swap Early Termination, the securities administrator will apply such Swap Termination Payment to any upfront payment required to appoint the successor swap provider. If the securities administrator is required to pay a Swap Termination Payment to the Swap Provider in connection with such Swap Early Termination, the securities administrator will apply any upfront payment received from the successor swap provider to pay such Swap Termination Payment. If the Supplemental Interest Trust Trustee is unable to appoint a successor swap provider within 30 days of the Swap Early Termination, then the securities administrator will deposit any Swap Termination Payment received from the original Swap Provider into a separate, non-interest bearing reserve account and will, on each subsequent distribution date, withdraw from the amount then remaining on deposit in such reserve account an amount equal to the Net Swap Payment, if any, that would have been paid to the securities administrator by the original Swap Provider calculated in accordance with the terms of the original Interest Rate Swap Agreement, and distribute such amount in accordance with the terms of the pooling and servicing agreement.

Upon a Swap Early Termination in connection with the optional termination of the trust, if the securities administrator is required to make a Swap Termination Payment to the Swap Provider, the party exercising such optional termination of the trust will be required to include in its

S-131

payment an amount equal to such Swap Termination Payment, as described in this prospectus supplement. If the securities administrator receives a Swap Termination Payment from the Swap Provider in connection with such Swap Early Termination, such Swap Termination Payment generally will not be available to certificateholders; rather, the securities administrator will distribute such Swap Termination Payment in accordance with the terms of the pooling and servicing agreement.

A "Swap Provider Trigger Event" will mean: (i) a Swap Event of Default under the Interest Rate Swap Agreement with respect to which the Swap Provider is a Defaulting Party (as defined in the Interest Rate Swap Agreement), (ii) a Swap Termination Event under the Interest Rate Swap Agreement with respect to which the Swap Provider is the sole Affected Party (as defined in the Interest Rate Swap Agreement) or (iii) a Swap Additional Termination Event under the Interest Rate Swap Agreement with respect to which the Swap Provider is the sole Affected Party.

The significance percentage of the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement (as defined in this prospectus supplement), individually and in combination, as calculated in accordance with Item 1115 of Regulation AB, is less than 10%. The Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement will provide that the Basis Risk Cap Provider, the Swap Provider and the Interest Rate Cap Provider (as defined in this prospectus supplement) may be replaced in certain circumstances, including if the significance percentage of the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement, individually or in combination, is equal to or greater than 10%.

Any Net Swap Payment payable to the securities administrator on behalf of the Supplemental Interest Trust by the Swap Provider will be distributed on the related distribution date as follows:

(i)      concurrently, to the Senior Certificates, pro rata based on amounts due, Current Interest and any Carryforward Interest for each such class and distribution date, after giving effect to distributions of such amounts as described under "Description of the Certificates—Distributions of Interest".

(ii)      sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class B-1 Certificates, in that order, Current Interest and any Carryforward Interest for each such class and distribution date, after giving effect to distributions of such amounts as described under "Description of the Certificates—Distributions of Interest."

(iii)      sequentially to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class B-1 Certificates, in that order, any applicable Deferred Amounts, prior to giving effect to amounts available to be paid in respect of Deferred Amounts as described under "Description of the Certificates—Credit Enhancement—Overcollateralization" on such distribution date;

(iv)      to the holders of the class or classes of Senior Certificates and Subordinate Certificates then entitled to receive distributions in respect of principal, in an amount necessary to maintain or restore the Targeted Overcollateralization Amount after taking into account distributions made pursuant to clause (1) under "Description of

CONFIDENTIAL

NOM-FHFA_05591461

the Certificates—Credit Enhancement—Overcollateralization" in the manner and order of priority set forth in clause (1) under "Description of the Certificates—Credit Enhancement—Overcollateralization";

(v)     concurrently, to the Senior Certificates, on a pro rata basis, based on the entitlement of each such class and then, sequentially to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class B-1 Certificates, in that order, any applicable Basis Risk Shortfalls, prior to giving effect to any withdrawals from the Basis Risk Shortfall Reserve Fund or from amounts available to be paid in respect of Basis Risk Shortfalls as described in this prospectus supplement under "Description of the Certificates—Credit Enhancement—Overcollateralization" on such distribution date; and

(vi)    to the Class X Certificates, any remaining amounts.

Notwithstanding the foregoing, in no instance will such payments (other than payments made under clause (vi) above) be made other than to the extent of Realized Losses and Basis Risk Shortfalls.

Amounts payable by the Supplemental Interest Trust to the securities administrator in respect of Net Swap Payments and Swap Termination Payments other than Swap Termination Payments resulting from a Swap Provider Trigger Event (and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) will be deducted from related available funds before distributions to the holders of the Senior Certificates and Subordinate Certificates. On or before each distribution date, such amounts will be distributed by the trust to the securities administrator, and paid by the securities administrator to the Swap Provider as follows:

(i)     first to make any Net Swap Payment owed to the Swap Provider pursuant to the Interest Rate Swap Agreement for such distribution date, and

(ii)    second to make any  Swap Termination Payment not due to a Swap Provider Trigger Event owed to the Swap Provider pursuant to the Interest Rate Swap Agreement (to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the securities administrator).

The Interest Rate Swap Agreement will be governed by and construed in accordance with the laws of the State of New York. The obligations of the Swap Provider are limited to those specifically set forth in the Interest Rate Swap Agreement.

## THE INTEREST RATE CAP AGREEMENT

The Senior Certificates and Subordinate Certificates will have the benefit of the Interest Rate Cap Agreement provided by HSBC Bank USA, National Association (the "Interest Rate Cap Provider"). The Supplemental Interest Trust Trustee will enter into the Interest Rate Cap Agreement with the Interest Rate Cap Provider. The Interest Rate Cap Agreement will be held in the Supplemental Interest Trust.  The Supplemental Interest Trust Trustee will appoint the securities

CONFIDENTIAL

NOM-FHFA_05591462

administrator to receive and distribute funds with regards to the Interest Rate Cap Agreement on behalf of the Supplemental Interest Trust. On or before each distribution date, the securities administrator will deposit into the Derivative Account all amounts received under the Interest Rate Cap Agreement.  For the avoidance of doubt, the Interest Rate Cap Agreement will not be an asset of any REMIC.

Two business days prior to each distribution date beginning with the distribution date in August 2008 through and including the distribution date in January 2012, the Interest Rate Cap Provider will agree to pay to the securities administrator on behalf of the Supplemental Interest Trust a monthly payment in an amount equal to the product of (1) the excess, if any, of One-Month LIBOR (as determined pursuant to the Interest Rate Cap Agreement and subject to a maximum of 9.50% per annum) over 5.30% per annum; (2) the scheduled cap notional amount (the "Scheduled Cap Notional Amount") for the related distribution date as set forth below; and (3) a fraction, the numerator of which is the actual number of days in the related Calculation Period (as defined in the Interest Rate Cap Agreement), and the denominator of which is 360.

The "Scheduled Cap Notional Amount" for each distribution date will be equal to the amount set forth below for such distribution date. The Interest Rate Cap Agreement will terminate with the distribution date in January 2012, unless terminated earlier upon the occurrence of an Interest Rate Cap Agreement Event of Default, an Interest Rate Cap Termination Event or an Interest Rate Cap Agreement Additional Termination Event (each as defined below).

| Distribution Date | Scheduled Cap Notional Amount ($) |
|---|---|
| August 2008 | 27,325,000 |
| September 2008 | 86,217,000 |
| October 2008 | 84,411,000 |
| November 2008 | 72,590,000 |
| December 2008 | 121,704,000 |
| January 2009 | 113,263,000 |
| February 2009 | 99,826,000 |
| March 2009 | 88,297,000 |
| April 2009 | 78,014,000 |
| May 2009 | 71,140,000 |
| June 2009 | 65,371,000 |
| July 2009 | 59,943,000 |
| August 2009 | 58,830,000 |
| September 2009 | 59,380,000 |
| October 2009 | 55,617,000 |
| November 2009 | 51,178,000 |
| December 2009 | 49,542,000 |
| January 2010 | 46,238,000 |
| February 2010 | 41,575,000 |
| March 2010 | 44,023,000 |
| April 2010 | 46,377,000 |
| May 2010 | 48,641,000 |
| June 2010 | 50,818,000 |
| July 2010 | 48,647,000 |

CONFIDENTIAL

| Distribution Date | Scheduled Cap Notional Amount ($) |
|---|---|
| August 2010 | 45,773,000 |
| September 2010 | 43,068,000 |
| October 2010 | 40,520,000 |
| November 2010 | 38,122,000 |
| December 2010 | 35,877,000 |
| January 2011 | 33,751,000 |
| February 2011 | 31,749,000 |
| March 2011 | 29,888,000 |
| April 2011 | 28,112,000 |
| May 2011 | 26,441,000 |
| June 2011 | 24,915,000 |
| July 2011 | 23,426,000 |
| August 2011 | 21,818,000 |
| September 2011 | 20,434,000 |
| October 2011 | 19,032,000 |
| November 2011 | 17,708,000 |
| December 2011 | 16,660,000 |
| January 2012 | 15,492,000 |
| February 2012 and thereafter | 0 |

The obligation of the Interest Rate Cap Provider to pay specified amounts due under the Interest Rate Cap Agreement (other than Interest Rate Cap Agreement Termination Payments (as defined below)) generally will be subject to the following conditions precedent: (1) no Interest Rate Cap Agreement Event of Default or event that with the giving of notice or lapse of time or both would become an Interest Rate Cap Agreement Event of Default will have occurred and be continuing and (2) no "early termination date" (as defined in the Interest Rate Cap Agreement) has occurred or been effectively designated.

Events of default under the Interest Rate Cap Agreement (each a "Interest Rate Cap Agreement Event of Default") include the following:

- failure to make a payment due under the Interest Rate Cap Agreement, after notice of such failure is received and expiration of a specified grace period,

- failure by the Interest Rate Cap Provider to comply with or perform certain agreements or obligations required under the Interest Rate Cap Agreement after notice of such failure is received and expiration of a specified grace period,

- failure by the Interest Rate Cap Provider to comply with or perform the second rating trigger collateral posting requirements of the Interest Rate Cap Agreement if a second rating trigger downgrade has occurred and been continuing for 30 or more business days and after notice of such failure is received and expiration of a specified grace period,

- certain representations by the Interest Rate Cap Provider or its credit support provider prove to have been incorrect or misleading in any material respect,

S-135

NOM-FHFA_05591464

- repudiation or certain defaults by the Interest Rate Cap Provider or its credit support provider in respect of any derivative or similar transactions entered into between the Supplemental Interest Trust and the Interest Rate Cap Provider and specified for this purpose in the Interest Rate Cap Agreement,

- cross-default by the Interest Rate Cap Provider or its credit support provider relating generally to its obligations in respect of borrowed money in excess of a threshold specified in the Interest Rate Cap Agreement,

- certain insolvency or bankruptcy events, and

- a merger by the Interest Rate Cap Provider without an assumption of its obligations under the Interest Rate Cap Agreement,

each as further described in the Interest Rate Cap Agreement.

Termination events under the Interest Rate Cap Agreement (each a "Interest Rate Cap Agreement Termination Event") include the following:

- illegality (which generally relates to changes in law causing it to become unlawful for either party to perform its obligations under the Interest Rate Cap Agreement),

- tax event (which generally relates to the application of certain withholding taxes to amounts payable under the Interest Rate Cap Agreement, as a result of a change in tax law or in certain circumstances solely with respect to the trust, certain similar events), and

- tax event upon merger (which generally relates to the application of certain withholding taxes to amounts payable under the Interest Rate Cap Agreement as a result of a merger or similar transaction),

each as further described in the Interest Rate Cap Agreement.

Additional termination events" under the Interest Rate Cap Agreement (each a "Interest Rate Cap Agreement Additional Termination Event") include the following:

- failure of the Interest Rate Cap Provider to comply with the first rating trigger collateral posting requirements of the Interest Rate Cap Agreement,

- if a second rating trigger downgrade has occurred and been continuing for 30 or more business days and a firm offer from a replacement cap provider remains capable of acceptance by the offeree,

- failure of the Interest Rate Cap Provider to comply with the Regulation AB provisions of the Interest Rate Cap Agreement (including, if applicable, the provisions of any additional agreement incorporated by reference into the Interest Rate Cap Agreement), and

S-136

NOM-FHFA_05591465

- occurrence of an optional termination of the securitization pursuant to the terms of the pooling and servicing agreement,

- each as further described in the Interest Rate Cap Agreement.

If the Interest Rate Cap Provider's credit ratings are withdrawn or reduced below the first ratings threshold specified in the Interest Rate Cap Agreement, and within 30 days the Interest Rate Cap Provider fails either to transfer such Interest Rate Cap Agreement at its sole cost and expense, in whole, but not in part, to a counterparty that satisfies the first ratings threshold or to obtain a guarantee from an entity that satisfies the first ratings threshold, the Interest Rate Cap Provider will be required, at its own expense, to post collateral in accordance with the Interest Rate Cap Agreement.

If the Interest Rate Cap Provider's credit ratings are withdrawn or reduced below the second ratings threshold specified in the Interest Rate Cap Agreement, the Interest Rate Cap Provider will be required, at its own expense, either (1) to obtain a substitute interest rate cap provider which will assume the obligations of the Interest Rate Cap Provider under the Interest Rate Cap Agreement and which meets all eligibility requirements provided therein or in any related documentation, or (2) to obtain a guarantor which will provide a guarantee of the obligations of the Interest Rate Cap Provider under the Interest Rate Cap Agreement that meets all eligibility requirements provided therein or in any related documentation.

Upon the occurrence of an Interest Rate Cap Agreement Event of Default, the non-defaulting party will have the right to designate an early termination date (an "Early Termination Date"). Upon the occurrence of an Interest Rate Cap Agreement Termination Event or an Interest Rate Cap Agreement Additional Termination Event, an Early Termination Date may be designated by one of the parties (as specified in the Interest Rate Cap Agreement) and will occur only upon notice and, in some circumstances, after any affected party has used reasonable efforts to transfer its rights and obligations under the Interest Rate Cap Agreement to a related entity within a specified period after notice has been given of the Interest Rate Cap Agreement Termination Event, and, in the case of downgrade below the second ratings threshold, only if a firm offer from a replacement interest rate cap provider remains capable of acceptance by the offeree, all as set forth in the Interest Rate Cap Agreement. The occurrence of an Early Termination Date under the Interest Rate Cap Agreement will constitute a "Interest Rate Cap Agreement Early Termination."

Upon an Interest Rate Cap Agreement Early Termination, the Interest Rate Cap Provider may be liable to make a termination payment (the "Interest Rate Cap Agreement Termination Payment") to the securities administrator (regardless, if applicable, of which of the parties has caused the termination). The Interest Rate Cap Agreement Termination Payment will be based on the value of the Interest Rate Cap Agreement computed in accordance with the procedures set forth in the Interest Rate Cap Agreement.

Upon an Interest Rate Cap Agreement Early Termination other than in connection with the optional termination of the trust, the depositor will use reasonable efforts to appoint a successor interest rate cap provider to enter into a new interest rate cap agreement on terms substantially similar to the Interest Rate Cap Agreement, with a successor interest rate cap provider meeting all applicable eligibility requirements. The securities administrator will apply any Interest Rate Cap Agreement Termination Payment received from the original Interest Rate Cap Provider in connection with such Interest Rate Cap Agreement Early Termination to the upfront payment

S-137

required to appoint the successor interest rate cap provider. If the depositor is unable to appoint a successor interest rate cap provider within 30 days of the Interest Rate Cap Agreement Early Termination, then the securities administrator will deposit any Interest Rate Cap Termination Payment received from the original Interest Rate Cap Provider into a separate, non-interest bearing reserve account and will, on each subsequent distribution date, withdraw from the amount then remaining on deposit in such reserve account an amount equal to the payment, if any, that would have been paid to the securities administrator by the original Interest Rate Cap Provider calculated in accordance with the terms of the original Interest Rate Cap Agreement, and distribute such amount in accordance with the terms of the pooling and servicing agreement.

Upon an Interest Rate Cap Agreement Early Termination in connection with the optional termination of the trust, if the securities administrator receives an Interest Rate Cap Agreement Termination Payment from the Interest Rate Cap Provider, such Interest Rate Cap Agreement Termination Payment generally will not be available to holders of the Senior Certificates and Subordinate Certificates; rather, the securities administrator will distribute such Interest Rate Cap Agreement Termination Payment in accordance with the terms of the pooling and servicing agreement.

The significance percentage of the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement, individually and in combination, as calculated in accordance with Item 1115 of Regulation AB, is less than 10%. The Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement will provide that the Basis Risk Cap Provider, the Swap Provider and the Interest Rate Cap Provider may be replaced in certain circumstances, including if the significance percentage of the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement, individually or in combination, is equal to or greater than 10%.

Any amounts received and deposited into the Supplement Interest Trust in respect of the Interest Rate Cap Agreement will be distributed on the related distribution date as follows:

(i)      concurrently, to the Senior Certificates, pro rata based on amounts due, Current Interest and any Carryforward Interest for each such class and distribution date, after giving effect to distributions of such amounts as described under "— Distributions of Interest" and clause (i) under "The Interest Rate Swap Agreement";

(ii)     sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class B-1 Certificates, in that order, Current Interest and any Carryforward Interest for each such class and distribution date, after giving effect to distributions of such amounts as described under "— Distributions of Interest" and clause (ii) under "The Interest Rate Swap Agreement";

(iii)    sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class B-1 Certificates, in that order, any applicable Deferred Amounts, prior to giving effect to amounts available to be paid in respect of Deferred Amounts as described under "—Credit Enhancement— Overcollateralization" on such distribution date and after giving effect to distributions made pursuant to clause (iii) under "The Interest Rate Swap Agreement";

CONFIDENTIAL

NOM-FHFA_05591467

(iv)    to the holders of the class or classes of Senior Certificates and Subordinate Certificates then entitled to receive distributions in respect of principal, in an amount necessary to maintain or restore the Targeted Overcollateralization Amount after taking into account distributions made pursuant to clause (1) under "—Credit Enhancement—Overcollateralization" and after giving effect to distributions made pursuant to clause (iv) under "The Interest Rate Swap Agreement";

(v)    to the Senior Certificates, on a pro rata basis, and then to the Subordinate Certificates, on a sequential basis, any applicable Basis Risk Shortfalls, prior to giving effect to any withdrawals from the Basis Risk Shortfall Reserve Fund or from amounts available to be paid in respect of Basis Risk Shortfalls as described in this prospectus supplement under "—Credit Enhancement—Overcollateralization" on such distribution date and after giving effect to distributions made pursuant to clause (v) under "The Interest Rate Swap Agreement"; and

(vi)    to the Class X Certificates, any remaining amounts.

Notwithstanding the foregoing, in no instance will such payments (other than payments made under clause (vi) above) be made other than to the extent of Realized Losses and Basis Risk Shortfalls.

## THE BASIS RISK CAP PROVIDER, THE SWAP PROVIDER AND THE INTEREST RATE CAP PROVIDER

HSBC Bank USA, National Association is the Basis Risk Cap Provider, the Swap Provider and the Interest Rate Cap Provider.

HSBC Bank USA, National Association (the "Bank") is a member of the HSBC Group, one of the world's largest banking and financial services groups. The HSBC Group is an international commercial and investment banking and financial services organization with some 9,800 offices in 77 countries and territories in Europe, the Asia-Pacific region, the Americas, the Middle East and Africa. HSBC Holdings plc, the ultimate parent company in the HSBC Group, is headquartered in London.

The Bank is chartered as a national banking association under the laws of the United States and, as such, is regulated primarily by the OCC. The Bank's deposits are insured by the FDIC up to applicable limits. The Bank's domestic operations are primarily in New York State. The Bank also has banking branch offices and/or representative offices in Florida, California, New Jersey, Delaware, Pennsylvania, Washington, Oregon, Massachusetts and Washington, D.C. In addition to its domestic offices, the Bank maintains foreign branch offices, subsidiaries and/or representative offices in the Caribbean, Europe, Panama, Asia, Latin America, Australia and Canada.

The Bank is the principal subsidiary of HSBC USA Inc., an indirectly-held, wholly-owned subsidiary of HSBC North America Holdings Inc., one of the nation's top 10 bank holding companies by assets and an indirectly-held, wholly-owned subsidiary of HSBC Holdings plc. At December 31, 2005, the Bank represented approximately 98% of the consolidated assets of HSBC USA Inc. and had assets of approximately $151 billion. The Bank had outstanding approximately $139 billion of obligations, including deposits totaling $95 billion and $25 billion of long-term debt. It had total shareholders' equity of $12 billion.

S-139

NOM-FHFA_05591468

As of the date hereof, the long-term debt of the Bank has been assigned a rating of AA by Standard & Poor's and Aa2 by Moody's Investors Services. As of the date hereof, the short-term debt of the Bank has been assigned a rating of A-1+ by Standard & Poor's and P-1 by Moody's Investors Services.

Additional information about the Bank and HSBC USA Inc. may be obtained by contacting the Manager of Investor Relations and Government Affairs at HSBC, 452 Fifth Avenue, New York, New York 10018, tel. (212) 525-6191.

Each of the Basis Risk Cap Agreement, the Swap Agreement and the Interest Rate Cap Agreement will be governed by and construed in accordance with the laws of the State of New York. The obligations of the Basis Risk Cap Provider, the Swap Provider and the Interest Rate Cap Provider are limited to those specifically set forth in the Basis Risk Cap Agreement, the Swap Agreement and the Interest Rate Swap Agreement, respectively.

## YIELD, PREPAYMENT AND MATURITY CONSIDERATIONS

### General

The weighted average life of, and the yield to maturity on, each class of Offered Certificates generally will be directly related to the rate of payment of principal, including prepayments, of the Mortgage Loans in the related loan group or loan groups. The actual rate of principal prepayments on pools of mortgage loans is influenced by a variety of economic, tax, geographic, demographic, social, legal and other factors and has fluctuated considerably in recent years. In addition, the rate of principal prepayments may differ among pools of mortgage loans at any time because of specific factors relating to the mortgage loans in the particular pool, including, among other things, the age of the mortgage loans, the geographic locations of the properties securing the mortgage loans, the extent of the borrowers' equity in such properties, and changes in the borrowers' housing needs, job transfers and employment status. If prevailing interest rates fall significantly below the Mortgage Rates on the Mortgage Loans, the Mortgage Loans (and the applicable Offered Certificates) are likely to be subject to a higher incidence of prepayment than if prevailing rates remain at or above the Mortgage Rates on the Mortgage Loans. Conversely, if prevailing interest rates rise significantly above the Mortgage Rates on the Mortgage Loans, the Mortgage Loans (and the applicable Offered Certificates) are likely to be subject to a lower incidence of prepayment than if prevailing rates remain at or below the Mortgage Rates on the Mortgage Loans. Prepayments on the adjustable-rate Mortgage Loans may differ as they approach their respective first Adjustment Dates. No assurance can be given as to the level of prepayment that the Mortgage Loans will experience.

Although the Mortgage Rates on approximately 75.69% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date, are subject to adjustment, such Mortgage Rates adjust less frequently than the pass-through rates on the Offered Certificates and adjust by reference to Six-Month LIBOR or One-Year LIBOR, as applicable. With respect to the Offered Certificates, changes in One-Month LIBOR may not correlate with changes in Six-Month LIBOR or One-Year LIBOR and also may not correlate with prevailing interest rates. It is possible that an increased level of One-Month LIBOR could occur simultaneously with a lower level of prevailing interest rates which would be expected to result in faster prepayments, thereby reducing the weighted average lives of the Offered Certificates. The Mortgage Rate applicable to the adjustable-rate Mortgage Loans and any Adjustment Date will be based on Six-Month LIBOR or One-Year LIBOR most recently

CONFIDENTIAL

NOM-FHFA_05591469