**SULLIVAN & CROMWELL LLP**

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588

WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*
_____

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

October 16, 2014

Via ECF

Hon. Denise L. Cote,
    United States District Judge,
        Daniel Patrick Moynihan United States Courthouse,
            500 Pearl Street, Room 1610,
                New York, New York 10007-1312.

            Re:    *FHFA* v. *Nomura Holding America, Inc. et al.*, 11 Civ. 6201 (S.D.N.Y.)

Dear Judge Cote:

        Plaintiff's October 6 Motion *in Limine* No. 1, which seeks to exclude evidence concerning the principal and interest payments received by Freddie Mac and Fannie Mae for the Certificates since the filing of this action on September 2, 2011 ("Post-Claim Payments"), is meritless.[1] Post-Claim Payments are relevant to the calculation of any damages under both Sections 11 and 12, and to the issue of loss causation. Indeed, any remedy under Section 12 is for the jury—not the Court—to determine.

I. **EVIDENCE OF POST-CLAIM PAYMENTS IS RELEVANT TO DAMAGES, LOSS CAUSATION AND, POTENTIALLY, LIABILITY.**

    A.    **Post-Claim Payments Are Relevant to Damages Under Sections 11 and 12.**

        It is undisputed that Post-Claim Payments are relevant to calculating any damages "under Section 12 and the State Blue Sky provisions." (October 6, 2014 Motion *in Limine* ("Motion") at 3.) Such evidence is also relevant to the "value" of the Certificates as of the date of suit, September 2, 2011, under Section 11(e), and to damages calculations under Section 11. There is no basis for plaintiff's argument that all such evidence should be kept from the jury.

        1.    **Post-Claim Payments Are Relevant to Assessing the Proper "Value" of the Certificates as of September 2, 2011.**

        Value, not price, is the touchstone of Section 11 damages. Although the original 1933 text of the statute measured damages based on "purchase price," *see* 48 Stat. 74, 83 (1933); *see also* H.R. Rep. No. 73–85, at 9; S. Rep. No. 73–47, at 5 (1933)), the following year, Congress amended Section 11 to provide, in relevant part, for measuring damages as "the difference between the amount paid for the security" and the "value thereof as of the time such suit was brought." 15 U.S.C. § 77k(e) (1934); *In re Initial Pub. Offering Sec. Litig.*, 241 F.

---

[1] This opposition is being filed on behalf of all defendants in the above-captioned action.

Supp. 2d 281, 349-50 (S.D.N.Y. 2003).  "Congress' use of the term 'value,' as distinguished from the terms 'amount paid' and 'price' indicates that, under certain circumstances, the market price may not adequately reflect the security's value." *McMahan & Co.* v. *Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1048-49 (2d Cir. 1995) (citations omitted).  "Thus, under § 11, the key is not . . . market price; the key is value." *NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co.*, 693 F.3d 145, 165-66 (2d Cir. 2012), *cert. denied,* 133 S. Ct. 1624 (2013).

   Plaintiff's proffered damages expert, James K. Finkel, creates values for the Certificates as of September 2, 2011 by estimating "the projected collateral performance (*i.e.*, cash flows generated by the mortgage pool) to the tranche" and then "discounting . . . these tranche cash flows to arrive at a present value (as of the date of valuation)." (Ex. A (Expert Report of James K. Finkel, dated July 9, 2014 ("Finkel Report") ¶ 63).)  Defendants' expert Dr. Timothy Riddiough, whose report will be served on November 10, will show that Mr. Finkel estimated the cash flows incorrectly and discounted them at an inappropriate rate.  Post-Claim Payments are relevant to both of these analyses.

   First, Dr. Riddiough will show that Mr. Finkel's calculation of expected cash flows violates basic valuation principles by assuming that important determinants of expected cash flow—expectations about rates at which borrowers would prepay their loans or default, as well as the losses in case of default—would be fixed indefinitely at the rates experienced during the three months before September 2, 2011.  (*Id.* ¶ 78.)  Using correct valuation principles, Dr. Riddiough will show that the cash flows expected for the Certificates on September 2, 2011 were higher than those estimated by Mr. Finkel.  Although Dr. Riddiough's model uses only information available as of September 2, 2011, he will show that the default rates predicted by his model far more accurately reflect the actual default rates and, accordingly, Post-Claim Payments than do Mr. Finkel's predictions.  This is an important cross-check that the jury is entitled to consider in evaluating what weight to give to each expert's valuation.  Any concern about jury confusion can be dealt with by an instruction from the Court that explains the purpose for which this evidence may be considered.

   Second, Mr. Finkel discounts the cash flows he claims were expected on September 2, 2011 based on his incorrect opinion that "[t]he market for PLS was active in the months surrounding the date of claim, showed signs of liquidity, and was not dislocated." (*Id.* ¶ 58.)  Dr. Riddiough will show that the market for residential mortgage-backed securities was highly illiquid and dislocated in September 2011, and that Mr. Finkel therefore undervalues the Certificates.  Evidence supporting this opinion will include the Post-Claim Payments made on the Certificates, which are used to support the current valuations of the Certificates, and which shows that there was severe market dislocation in September 2011.

   Plaintiff cites *In re Worldcom, Inc. Securities Litigation,* 2005 WL 517331, at *1 (S.D.N.Y. Mar. 4, 2005), for the proposition that Post-Claim Payments are irrelevant to "the amount of FHFA's damages under Section 11" (Motion at 3), but the decision says nothing of the sort.  In *Worldcom*, this Court denied a motion *in limine* to preclude plaintiffs from presenting evidence of the aggregate damages suffered by class members.  *Worldcom*, 2005 WL 517331, at *1.  In doing so, the Court merely remarked that "[n]o party is advocating that the events following June 25, 2002, and the effect of those events on the market price for WorldCom bonds, should be presented to the jury in order for it to determine the materiality of the alleged

misstatements and omissions, whether negative causation has been established, or to compute the damages that flow from a finding of liability." *Id.* at *3. The issue was simply not before the Court in *Worldcom*.

### 2. Post-Claim Payments Are Otherwise Relevant to Calculating Section 11 Damages.

In its motion *in limine*, plaintiff contends that the Court should not reduce damages by the principal and interest payments Freddie Mac and Fannie Mae received on the Certificates after September 2, 2011. (*See* Motion at 2-3.) It cites no support for this position other than cases holding that damages will not be reduced based on "post-suit market increases" in the price of a security. *Beecher* v. *Able*, 435 F. Supp. 397, 410 (S.D.N.Y. 1977); *Ross* v. *Warner*, 1980 WL 1474, at *9 (S.D.N.Y. Dec. 11, 1980); *McMahan*, 65 F.3d at 1048. Those decisions do not address the question here, where after suit was commenced, plaintiff continued to receive contractually-mandated principal and interest payments that represent a recovery of its investment. Those payments reduce plaintiff's "damages" because, "to the degree that [plaintiff] recovers its principal, its injuries are necessarily reduced." *Robertson* v. *White*, 81 F.3d 752, 758 (8th Cir. 1996) (bankruptcy distributions offset against damages on federal and blue sky securities fraud claims).

Although the text of Section 11 does not explicitly address how to account for principal and interest payments on a debt security after a lawsuit has been filed, it does provide that if, after bringing suit, a plaintiff sells a security at a price higher than the value on the date of suit, damages are "the difference between the amount paid for the security" and "the price at which such security shall have been disposed of after suit but before judgment." 15 U.S.C. § 77k(e). This makes clear that Section 11 does not allow a plaintiff to obtain a windfall to the extent it actually recovers on its investment after filing suit. Evidence of Post-Claim Payments must therefore be presented to the jury.

### B. Post-Claim Payments Are Also Relevant to Defendants' Loss Causation Defense, Which Is Available Under Both Sections 11 and 12.

Defendants can reduce or eliminate their liability under Sections 11 and 12 by showing that any damages sustained by plaintiff are the result of a factor or factors other than the alleged misrepresentations, such as macroeconomic changes. 15 U.S.C. §§ 77k(e), 77*l*(b).[2] Post-Claim Payments are relevant to that defense.[3] As shown above, Mr. Finkel bases his

---

[2] Defendants respectfully disagree with this Court's holding that a loss causation defense is not available for plaintiff's blue sky claims. (Ex. B (12/16/13 Order, Doc. No. 569).)

[3] Plaintiff defines "Post-Claim Payments" to refer only to "principal and interest payments on the at-issue Certificates after the filing of this action on September 2, 2011." (Motion at 1.) With respect to loss causation, however, plaintiff criticizes defendants' experts' reliance on other evidence concerning (i) fair values and unpaid principal balances for the Certificates through 2012 (relied on by Dr. Stephen G. Ryan), and (ii) expected dollar losses to loans backing a Certificate as of December 2013 (relied on by Dr. Kerry Vandell). (*Id.* at 1-2.) Because plaintiff's motion seeks only to exclude evidence of "Post-Claim Payments" as defined, evidence

valuation of the Certificates as of September 2, 2011 on his opinions of expected cash flows as of that date.  Dr. Riddiough will rely on actual cash flows from the Certificates after September 2011 to illustrate that the alleged misrepresentations did not, and could not have, caused the reduction in value that Mr. Finkel estimates.

Plaintiff has offered no basis to exclude evidence of Post-Claim Payments for loss causation purposes other than the general assertion that such evidence is irrelevant because loss causation "is akin to 'proximate cause' . . . and thus concerned with events *before* the time of loss, not after it." (Motion at 3 (citation omitted).)  But it is well established that post-injury evidence can be relevant to show the proximate cause of an injury.  *See Zerega Ave. Realty Corp.* v. *Hanover Ins. Co.*, 2006 WL 1343643, at *4 (S.D.N.Y. May 17, 2006) (permitting expert testimony about causation and damages based on pre- and post-injury observations); *Trzeciak* v. *Apple Computers*, *Inc.*, 1995 WL 20329, at *1 n.1 (S.D.N.Y. Jan. 19, 1995).  Consistent with this authority, none of the three cases cited by plaintiff (Motion at 3) restricts the evidence that can be used to prove a loss causation defense to pre-claim evidence.

### C. If Plaintiff Introduces Evidence of Certificate Performance to Show Liability, It Will Open the Door to Other Evidence of Post-Claim Payments.

Although plaintiff now argues that "[e]vidence of Post-Claim Payments is irrelevant to" its burden to prove misrepresentations (Motion at 2), plaintiff has previously relied on the performance of the Certificates, including "payments to the trusts," for that very purpose.  (Ex. C (Amended Compl.) ¶¶ 126, 133.)  Defendants dispute that the performance of the Certificates is probative of plaintiff's claims, but to the extent plaintiff introduces evidence concerning performance at trial, plaintiff will have opened the door to evidence that the Certificates have yielded payments for which Fannie Mae and Freddie Mac bargained—including Post-Claim Payments.

### II. DEFENDANTS HAVE A CONSTITUTIONAL RIGHT TO A JURY TRIAL ON ANY SECTION 12 REMEDY.

Faced with the indisputable proposition that Section 12 and blue sky remedies depend on Post-Claim Payments, plaintiff asserts that those remedies must be determined by the Court because they are "solely a matter of equity." (Motion at 3.)  Again, plaintiff is incorrect.

Defendants have a constitutional right under the Seventh Amendment to have any Section 12 remedy determined by a jury.  That right adheres whenever, as here, a remedy is not strictly equitable.  *Cavallari* v. *Office of the Comptroller of the Currency*, 57 F.3d 137, 145 (2d Cir. 1995) ("Th[e] right [to a jury trial] attaches in all cases involving legal rather than equitable claims.").  In 2012, this Court—after recognizing that "a Securities Act plaintiff's right to rescission does not spring from the inherent discretion of the court to fashion equitable remedies" but rather from a statute—analogized the Section 12 rescission remedy to a "'legal remedy'" when it ruled that "delay-based defenses to rescission" could not be asserted in opposition to

---

concerning post-claim valuations and loan performance is not at issue.  On a motion directed at that evidence, defendants would show its relevance to loss causation.

Hon. Denise L. Cote -5-

such a claim. *Federal Housing Finance Agency* v. *Merrill Lynch & Co.*, 903 F. Supp. 2d 274, 281 (S.D.N.Y. 2012) (quoting 3 William Blackstone, *Commentaries*). The legal nature of the Section 12 remedy is made especially clear by the statutory loss causation defense, which results in compensation only for damages "resulting from" the alleged misrepresentation. 15 U.S.C. § 77*l*(b). Equitable rescission, in contrast, would restore a "plaintiff to his position prior to the fraud," without regard to causation. *Randall* v. *Loftsgaarden*, 478 U.S. 647, 659 (1986). Indeed, in seeking a ruling that there is no loss causation defense to blue sky claims, plaintiff argued that the defense "is inconsistent with" equitable rescission. (Ex. D (Memo. of Law, Sept. 27, 2013), at 6.) Further, "loss causation determinations involve assessments that are peculiarly ones for the trier of fact because they require drawing inferences . . . from a given set of facts." *Miller* v. *Thane Int'l, Inc.*, 615 F.3d 1095, 1104 (9th Cir. 2010) (quotations and citation omitted); *In re Flag Telecom Holdings*, 574 F.3d at 37 (holding that on a Section 11 claim, "it will be necessary for a jury to determine the extent of harm caused by each misstatement . . . .") (quotations, citation and alteration omitted); *In re Worldcom, Inc. Sec. Litig.*, 2005 WL 517331, at *3 (recognizing that "the jury will be asked to determine" the issue of negative causation).[4]

Second, even if Section 12 were construed as affording purely equitable relief, the Section 12 and Section 11 loss causation defenses are interconnected, and thus they must both be determined by the jury. "When an action involves both legal and equitable claims that have common issues of fact, and a jury trial has been properly demanded with respect to the legal claims, the parties have a right under the Seventh Amendment to have the legal claims tried to a jury." *Wade* v. *Orange County Sheriff's Office*, 844 F.2d 951, 954 (2d Cir. 1988) (citations omitted); *State of N.Y.* v. *Lashins Arcade Co.*, 888 F. Supp. 27, 28 (S.D.N.Y. 1995) (citing *Dairy Queen, Inc.* v. *Wood,* 369 U.S. 469, 470 (1962)) ("The right to a jury trial under the Seventh Amendment is not lost when legal and equitable issues are mixed . . . .").[5] It would violate defendants' constitutional right to a jury trial to have the Court determine the Section 12 remedy.

Respectfully submitted,

/s/ David B. Tulchin

David B. Tulchin

cc:   Counsel of Record

---

[4] Plaintiff is incorrect that *Royal American Managers, Inc.* v. *IRC Holding Corp.*, 885 F.2d 1011, 1019 n.4 (2d Cir. 1989), applies here. (Motion at 3.) That case was decided before Congress amended Section 12 in 1995 explicitly to include a loss causation defense, 15 U.S.C. § 77*l*(b), and its principal holding was that the right to jury trial right had in that case been waived. *Id.* at 1019. The court then remarked in dictum that "an equitable claim such as rescission is for the court, not the jury, to decide." *Id.* at 1019 n.4.

[5] Further, plaintiff is wrong that leaving the Section 12 and blue sky remedies to the Court would prevent the jury from hearing evidence of Post-Claim Payments. Such evidence must in all events be presented to the jury in connection with the Section 11 claims. *See* pp. 1-4, *supra*.