**SULLIVAN & CROMWELL LLP**

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

October 17, 2014

By E-mail and ECF

The Honorable Denise L. Cote,
    United States District Judge,
        Daniel Patrick Moynihan United States Court House,
            500 Pearl Street, Room 1610,
                New York, New York 10007-1312.

> Re:   *FHFA* v. *Nomura Holding America, Inc., et al.*, 11 Civ. 6201 (S.D.N.Y.)

Dear Judge Cote:

Defendants respectfully submit this opposition to plaintiff's October 7, 2014 Motion *in Limine* No. 2, which seeks to exclude evidence of due diligence performed by Freddie Mac and Fannie Mae on their own loan acquisitions and securitizations of subprime and Alt-A loans ("Motion"). Plaintiff's motion should be denied.

## BACKGROUND

Both Freddie Mac and Fannie Mae purchased Alt-A and subprime loans during 2004-2007 in order to enter the rapidly-expanding market for those loans. (*See, e.g.*, Ex. A at FHFA02344967-68; Ex. B, at FHFA11843884.) In the same period, Freddie Mac and Fannie Mae each purchased pools of loans in bulk and each performed due diligence on the pools of loans they purchased. Although Fannie Mae held the loans it purchased for investment, Freddie Mac packaged some of its acquired loans into securitizations it called "T-Deals," for which Freddie Mac guaranteed payments. (Ex. A, at FHFA02344971.) Because Freddie Mac guaranteed its T-Deals and took the first-loss position on those deals, and because Fannie Mae held its bulk purchase loans on its books, both Freddie Mac and Fannie Mae retained substantial credit risk from their bulk purchases of subprime and Alt-A loans. (Ex. C (Deposition of Ronald Feigles, dated June 12-13, 2013 ("Feigles Tr.")), at 423:12-19, 428:21-429:23.)

*Freddie Mac.* Freddie Mac's T-Deals were backed by loans of the same character and quality as those backing private label securities it purchased. Freddie Mac performed pre-funding due diligence on those loans and represented in its offering documents that the securitized loans "were originated generally in accordance with [the Originator's] Underwriting Guidelines." (Ex. D, at 28; *see* Ex. C (Feigles Tr.), at 432:6-18, 436:19-437:13, 593:15-594:19.) There were more than $30 billion in T-Deal securitizations backed by Alt-A loans issued between 2004 and 2007. (Ex. E, at FHFA12469142-43; Ex. C (Feigles Tr.), at 432:6-18.) There were also four subprime T-Deals between July 2007 and January 2008, totaling more than $300 million. (Ex. E, at FHFA12469143.)

Freddie Mac used substantially the same due diligence processes on its T-Deals as defendants used when they bought loans for private label securities. Freddie Mac, for example, used the due diligence firm, Clayton (which Nomura used as well), to perform loan-file due diligence to verify whether loans being included in T-Deals met originator underwriting guidelines, among other things. (Ex. C (Feigles Tr.), at 433:7-434:16, 467:16-468:7, 593:15-594:19.) It also used methods such as random and adverse sampling, and considered compensating factors where certain loans did not strictly meet originator underwriting guidelines or due diligence parameters. (*See* Ex. C (Feigles Tr.), at 481:6–15, 494:18–495:22, 513:7–514:5; *see also* Ex. F, at FHFA02465063.) In other words, Freddie Mac and defendants did the very same things.

*Fannie Mae.* Through its "New Business Initiative," which was sometimes called its "Subprime Initiative," Fannie Mae also purchased subprime loans in bulk that were underwritten to originator underwriting guidelines. (Ex. G (Deposition of Karen Pallotta before the Securities and Exchange Commission ("Pallotta Tr."), dated June 3-4, 2009), at 19:14-23, 21:7-24:2, 27:18-28:13, 117:10-14.) Like Freddie Mac, Fannie Mae purchased subprime loans in bulk that were of the same type and quality as loans that served as collateral for private label securities purchased by Fannie Mae. Indeed, loans Fannie Mae considered purchasing in bulk were sometimes "already earmarked for a security." (Ex. H, at FHFA00183642.) Fannie Mae purchased at least 35 pools of subprime whole loans totaling more than $8 billion. (Ex. I, at FHFA00060536-38.) As with Freddie Mac and Nomura, Fannie Mae used Clayton to perform loan-file due diligence. (Ex. J, at FHFA01439997-98.)

## ARGUMENT

**I.     Freddie Mac and Fannie Mae's Due Diligence on Loan Acquisitions Is Highly Relevant.**

Plaintiff argues that evidence of Freddie Mac and Fannie Mae's due diligence is irrelevant as a matter of law. Under Fed. R. Evid. 401, however, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fannie Mae and Freddie Mac's due diligence bears directly on central elements and defenses at issue in the Action, including (a) the statutory due diligence defenses in the Securities Act of 1933 and the Virginia and D.C. blue sky laws, (b) plaintiff's reunderwriting expert's opinions, and (c) defendants' statute of limitations defenses.

**A.     Freddie Mac and Fannie Mae's Due Diligence Is Relevant to Defendants' Statutory Due Diligence Defenses.**

Defendants are entitled to present a due diligence defense—*i.e.*, to show the jury that "after reasonable investigation," they had "reasonable ground to believe and did believe, at the time such part of the registration statement became effective that the statements therein were true.'" *Fed. Hous. Fin. Agency* v. *UBS Ams. Inc.*, 2013 U.S. Dist. LEXIS 92081, *47-48 (S.D.N.Y. June 28, 2013).[1] As the Court has explained, the standard is "sort of a reasonable man's standard," and— importantly—that standard is "***informed by industry practice***." (Ex. K (Dec. 17, 2012 Hr'g Tr.), at

---

[1] "Section 12(a)(2) similarly creates a defense if a defendant 'sustain[s] the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission.'" *Fed. Hous. Fin. Agency* v. *UBS Ams. Inc.,* 2013 U.S. Dist. LEXIS 92081, *47-48 (S.D.N.Y. June 28, 2013). The D.C. and Virginia blue sky statutes also provide for a due diligence defense. VA. CODE ANN. § 13.1-522(A); D.C. CODE § 31-5606.05(a)(1)(B).

84 (emphasis added)); *see also Sears, Roebuck and Co.* v. *Midcap*, 893 A.2d 542, 554 (Del. 2006) (under the "reasonably prudent" person standard, "custom or practice in a particular industry is probative of what conduct is reasonable under the circumstances"); *c.f. Spancrete Northeast, Inc.* v. *Occupational Safety and Health Review Com'n*, 905 F.2d 589, 593-94 (2d Cir. 1990) (holding that OSHA's reasonable person definition of "appropriateness" was "based on what a reasonable man familiar with industry practices would have done"). Indeed, Courts have held that a party asserting a Securities Act due diligence defense "[s]hould not be held to a standard higher than that recognized in their profession." *See Escott* v. *BarChris Constr. Corp.*, 283 F. Supp. 643, 703 (S.D.N.Y. 1968). In addition, evidence that a party asserting a due diligence defense "amply conformed with, if not exceeded, the industry standards" establishes the defense. *In re Int'l Rectifier Sec. Litig.*, 1997 WL 529600, at *6-11 (C.D. Cal. Mar. 31, 1997) (granting summary judgment for defendants on due diligence defense). The jury cannot determine the adequacy of defendants' due diligence in a vacuum; it must compare defendants' practices to those of others in the industry. Freddie Mac and Fannie Mae's due diligence is evidence of the practices of two of the largest and most sophisticated residential mortgage industry participants in the country, which is thus entirely relevant to the standard articulated by this Court.

Based on discovery plaintiff has pursued and positions taken in other cases, plaintiff apparently intends to call into question the adequacy of defendants' due diligence practices by, among other things, criticizing defendants' use of Clayton, the adequacy of defendants' sampling methods and sample sizes, their alleged failure to conduct additional reviews outside of the samples based on due diligence results, and decisions to "waive" in loans, among other practices. The fact that Freddie Mac and Fannie Mae used the same third-party due diligence vendors, employed the same sampling techniques, did not review loans outside the samples and had comparable (and sometimes higher) waiver rates, is relevant to rebut those criticisms. To the extent plaintiff may claim that there were differences in the due diligence Freddie Mac and Fannie Mae conducted, such arguments go to the weight of the evidence, not admissibility. At a minimum, at this pre-trial stage, it would be premature to issue a blanket order precluding, sight unseen, any evidence of Freddie Mac and Fannie Mae's due diligence practices without any context, such as the nature of the due diligence at issue, the arguments advanced by plaintiff at trial, and the purposes for which the evidence is offered.

Moreover, Plaintiff's motion is based on unsupported assertions of facts that are in vigorous dispute and indeed are incorrect. Plaintiff argues, for example, that Freddie Mac and Fannie Mae "applied different requirements to their whole-loan purchases compared to their PLS purchases." (Motion at 4.) Freddie Mac's T-Deal loans, however, were underwritten to originator underwriting guidelines, and so were Fannie Mae's whole loan purchases. (Ex. C (Feigles Tr.), at 593:15-594:19; Ex. D, at 28; Ex. G (Pallotta Tr.), at 19:14-23, 21:7-24:2, 27:18-28:13.) Plaintiff argues that Freddie Mac and Fannie Mae's "due diligence was not for securitization purposes" (Motion at 4), but there is ample evidence that Freddie Mac performed due diligence on loans it acquired as part of bulk purchases for the purpose of offering T-deal securitizations to the public. (Ex. C (Feigles Tr.), at 428:21-429:21.) And the fact that both Freddie Mac and Fannie Mae maintained credit risk for their bulk purchases makes their due diligence more relevant, not less: the standard for adequate due diligence is that of "a prudent man in the management of his own property." 15 U.S.C. § 77k(b)(3), (c); 15 U.S.C. § 77l(a)(2). Moreover, both Freddie Mac and Fannie Mae conducted due diligence to assess whether the loans conformed to originators' guidelines, which is the same issue arising from plaintiff's claim that defendants' representations were false.

In any event, even if plaintiff were correct that Freddie Mac and Fannie Mae used different due diligence methods, that difference would also bear on the adequacy of defendants' due diligence. As noted above, it is for the jury to weigh whether any differences from practices used by other market participants, including Freddie Mac and Fannie Mae, made it more or less likely that defendants' due diligence was adequate. Such differences are no basis to foreclose the jury from considering evidence of industry practice. As shown above, "industry practice" is highly relevant to the "reasonable man" standard that the jury will be asked to apply.

Plaintiff also argues that, as part of its due diligence discovery rulings, "the Court found '[t]here are simply too many differences' for the GSEs' Single Family diligence to be 'helpful, probative or productive' for the issues in this case," and that such evidence is thus irrelevant and inadmissible. (Motion at 2 (quoting Feb. 21, 2013 Hr'g Tr., at 70:19-21).) The Court did not go that far. In fact, the Court expressly noted in its ruling, "I have not been using a standard of admissibility or relevance." Ex. L (Dec. 9, 2013 Hr'g Tr.), at 106.) The Court added that its rulings were not "about weight" or "how powerful the argument will appear to a jury." (*Id.*)

  **B.**  **Freddie Mac and Fannie Mae's Due Diligence Is Relevant to Plaintiff's Expert's Reunderwriting Opinions.**

Freddie Mac and Fannie Mae's due diligence is also relevant because it undermines the opinions of plaintiff's reunderwriting expert. Fannie Mae's average "kick-out" rate for its subprime bulk purchases was an "acceptable 12%" (Ex. M, at FHFA01283398)—not the 80% defect rate plaintiff's expert has claimed to find in comparable loans at issue in this Action. Evidence of Freddie Mac and Fannie Mae's single family due diligence provides examples of ways in which plaintiff's reunderwriting expert has inflated his defect rate. For example, plaintiff's reunderwriting expert applies a set of purported "minimum industry standards" that Freddie Mac did not apply when it reviewed loans. (Ex. C, (Feigles Tr.) at 595:17–596:24.) He also counted loan files with missing documents as materially defective when Freddie Mac typically could cure such purported defects, or sometimes waived them in. (Ex. N, at FHFA02465406–09; *see also* Ex. C (Feigles Tr.), at 504:6–505:15, 505:10–24; Ex. O, at FHFA02475585–87.) Moreover, plaintiff's reunderwriting expert has applied a more stringent materiality standard by, for example, counting loans with even the smallest departure from debt-to-income ratio ("DTI") as materially defective, when Freddie Mac accepted loans with DTI variances. (Ex. O, at FHFA02475228–30; Ex. C (Feigles Tr.), at 558:2–23.) Freddie Mac and Fannie Mae's own conduct therefore contradicts its expert's reunderwriting analysis.

  **C.**  **Information Gleaned from Due Diligence Is Relevant to Defendants' Statute of Limitations Defense.**

Plaintiff argues that "[a]ny information about loan originators the GSEs' Single Family business may have acquired through their diligence has no bearing on the information available to the GSEs' PLS traders about the loans supporting the certificates." (Motion at 3.) As an initial matter, there is no legal basis to limit statute of limitations knowledge to the knowledge of Freddie Mac and Fannie Mae's traders. For statute of limitations purposes, it is irrelevant whether the person with knowledge was a trader: "Organizations are treated as possessing the collective knowledge of their employees and other agents, when that knowledge is material to the agents' duties, however the organization may have configured itself or its internal practices for transmission of information." RESTATEMENT (THIRD) OF AGENCY § 5.03 cmt. c (2006).

Hon. Denise L. Cote -5-

Moreover, issues that Freddie Mac and Fannie Mae encountered during their due diligence of loans from the same originators that made the loans underlying the securities at issue in this case are relevant to whether Freddie Mac and Fannie Mae had sufficient information to have pled their claims before the September 2007 statute of limitations date. Indeed, in 2006 and 2007, Freddie Mac and Fannie Mae learned many of the facts about originators that they used to plead their claims years later. For example, Freddie Mac's T-Deal due diligence alerted it to recurring issues in loans from particular originators, including credit violations, missing or incomplete documents, missing payment histories, and borrower asset problems. (*See*, *e.g.*, Ex. J, at FHFA01439997-98; *see also* Ex. P, at FHFA01303358 (reviewing loans from originator for "appraisal bias"); Ex. Q, at ML-OPUS-00171719 (noting that loans "kicked out" of sample population through due diligence process would be reviewed for "[c]redit or [a]ppraisal reasons").) A jury should be allowed to consider evidence of what Freddie Mac and Fannie Mae knew before September 2007 when it determines whether they could have pled their claims before September 2007.

II. **Plaintiff Has Failed to Show that the Probative Value of the Evidence It Seeks to Exclude Is Substantially Outweighed by Any of the Factors in Rule 403**.

Plaintiff alternatively argues that even if relevant, evidence pertaining to Freddie Mac and Fannie Mae's own due diligence should be excluded under Fed. R. Evid. 403. That rule, however, provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Plaintiff does not explain why any of the listed factors in Rule 403 apply, let alone how those factors substantially outweigh the probative value of the evidence. Indeed, as explained above, due diligence evidence is highly probative of (a) industry due diligence practices, (b) flaws in plaintiff's reunderwriting expert's opinions, and (c) the information available to Freddie Mac and Fannie Mae to plead their claims before September 2007. Moreover, the Court should "consider the possible effectiveness of a jury instruction and the availability of other means of proof in making a Rule 403 determination." *United States* v. *Dupree*, 706 F.3d 131, 138 (2d Cir. 2013). Plaintiff fails to address either point. Its motion should be denied.

Sincerely,

/s/ David B. Tulchin

David B. Tulchin

cc: All Counsel