# Exhibit B

## Exhibit List

| Number | Name | Number of Pages |
|---|---|---|
| 1 | Credit Finance Memo on model fees and losses | 7 |
| 2 | Outer Boundary Grids (OB Grids) | 1 |
| 3 | Inner Boundary Grids (IB Grids) | 1 |
| 4 | Common Alt A Underwriting Exceptions to Fannie Mae Guidelines | 1 |
| 5 | Proposed Guidance for Underwriting Variances | 2 |
| 6 | Projected Income Statement for Incremental Volume | 3 |
| 7 | Underwriting differences between Sub prime and Alt A | 2 |
| 8 | Private Label vs. Fannie Mae Issuances and Delinquency for 2003 - 2005 | 2 |
| 9 | Credit Works Model Fees and Losses for Sample Portfolio | 1 |
| 10 | Full Documentation Loan Performance Analysis | 2 |
| 11 | OB Grid vs. Current Flow Matrix | 3 |
| 12 | Counterparty Requirements Memo | 3 |
| 13 | Alt A FICO/LTV Comparison Between Lenders | 4 |
| 14 | IB Grid vs. Current Flow Matrix | 3 |
| 15 | Alt A Servicing Best Practices | 1 |
| 16 | Sample Report – Loan Level Detail | 1 |
| 17 | Sample Report – Summary Report | 1 |
| 18 | Credit Enhancement Proposal | 6 |
| 19 | Phase 1 Targeted Lender List | 1 |
| 20 | Phase 1 High Level Overview | 2 |
| 21 | Industry Overview: Alt A | 17 |
| 22 | Acquisitions Profile of Business Apr 2003 - Dec 2005 | 5 |
| 23 | Early Warning Reports | 12 |
| 24 | Later Warning Reports | 3 |
| 25 | Alt A Monitoring Report | 43 |
| 26 | PRISM Report | 3 |

CONFIDENTIAL

**Exhibit 1**

FannieMae
FannieMae

Fannie Mae Confidential & Proprietary - Internal Use Only
For Alt A Transformation Credit Committee Memo

CONFIDENTIAL FHFA11843884



Fannie Mae Confidential & Proprietary - Internal Use Only
For Alt A Transformation Credit Committee Memo

CONFIDENTIAL FHFA11843885



Fannie Mae Confidential & Proprietary - Internal Use Only
For Alt A Transformation Credit Committee Memo



Fannie Mae Confidential & Proprietary - Internal Use Only
For Alt A Transformation Credit Committee Memo

CONFIDENTIAL FHFA11843887



Fannie Mae Confidential & Proprietary - Internal Use Only
For Alt A Transformation Credit Committee Memo

CONFIDENTIAL FHFA11843888



Fannie Mae Confidential & Proprietary - Internal Use Only
For Alt A Transformation Credit Committee Memo

CONFIDENTIAL FHFA11843889



Fannie Mae Confidential & Proprietary - Internal Use Only
For Alt A Transformation Credit Committee Memo

CONFIDENTIAL FHFA11843890

# Exhibit 4

## Common Alt A Underwriting Exceptions to Fannie Mae Guidelines

| General Alt A Underwriting Exceptions | |
|---|---|
| Borrower Eligibility | |
| | Income Reasonableness Test |
| | NINA for salaried and retired borrowers |
| | Non-occupant co-borrowers |
| | Inter Vivos Trust |
| | Non-permanent resident aliens with non-traditional credit |
| | Foreign nationals with non-traditional credit and group savings |
| | Multiple loans to 1 borrower - Ranges from 10 Inv, 10 2nd home up to $1M, 19 (1-4) + 4 N/O/O up to $2M (GreenPoint), 20 (SunTrust) |
| | Representative credit score – primary wage earner only |
| | No Disclosure loans – (No Income, No Asset, No Disclosure – NINAND) (i.e. True Alt A No doc loans) |
| Property/Appraisal | |
| | <800 sq feet properties |
| | C to P loans:<br>▪FM one time close – use of appraised value on unseasoned properties<br>▪Owner construction without documented construction costs |
| | 1031 Exchanges |
| | No lien seasoning on refi's & use of current appraised value (SISA) |

| Alt A Full Doc Underwriting Exceptions | |
|---|---|
| Borrower Eligibility | |
| | Invalid Credit Scores |
| | Inaccurately stated income – ie- Borrower states that they have income of 10,000/month and direct deposits show substantially different |
| | Risk not commensurate with product |
| Property/Appraisal | |
| | Unique property or limited marketability |
| | Mod/Pre-fabricated housing (excluding mobile homes) |
| | Manufactured housing (SunTrust) |
| | No acreage limitations (over 35% value) |
| | Non-warrantable condos |
| | Condotels (CHL to 80% & 660 credit score – O/O, SH, Investor) |

**Exhibit 5**

## Proposed Guidance for Underwriting Variances

A number of eligibility and underwriting variables could significantly impact the amount of incremental business we are able to buy. The list below provides a summary of common Alt-eligibility and underwriting requirements that differ materially from Fannie Mae's Standard Selling Guide requirements. In many cases we don't have the performance data to fully evaluate the incremental risk nor do we have a good sense of how often the variances are used in the market.

| Eligibility/Underwriting | Market/FANNIE MAE | Recommendation |
|---|---|---|
| **Margin** | Margins in Alt-A vary widely; FANNIE MAE typically caps margins at 3%-3.5% | Propose limit of 4.0% on all ARM types; Will seek to develop margin/cap framework that allows for greater flexibility. |
| **Prepayment Penalties** | Alt-a prepays often don't have hardship language and can exceed 3 yrs. FANNIE MAE prefers hardship language and a max prepay term of 3 years. | Accept prepay penalties that do not have hardship language, however limit prepay penalties to <=3 years and <=fixed period on an ARM. |
| **Mortgage Insurance** | Some Alt-a business is originated without primary MI. | Accept no MI product based on the availability of other charter compliant credit enhancement. |
| **Cash-out Refinance Definition** | Many Alt-a sellers have not followed our new COR definition | Continue to allow for old COR definition with adjustment to price based on Deal Factory methodology[2] |
| **Non traditional credit borrowers** | Some Alt-a products allow for borrowers with non traditional credit; FANNIE MAE has not accepted alt-a loans from non traditional borrowers | Accept full doc loans with non-traditional credit parameters that are similar to the parameters outlined in the Fannie Mae Selling Guide. With decision to accept these loans based on review of lender guidelines and practices. |
| **Primary Wage Earner Credit Score** | Many Alt-a sellers determine eligible credit score based on primary wage earner; FANNIE MAE uses lower of 2 borrowers | Continue to allow for primary wage earner credit score usage. Credit Finance staff have indicated that this approach does not produce significant large scale differences. |
| **Multiple Loans to One Borrower** | Alt-a market sometimes limits this to 5; FANNIE MAE guide requires a 10 loan limit for prime loans | Limit loans to individual investor to 5 properties or less to control for concentration risk. |
| **DTI** | Many Alt-a lenders use the same DTI limit for IO/non-IO | Require lower DTI on loans with payment shock such as intermediate ARMs and IO ARMs with <=5 year IO term. |

[2] If seller uses old COR definition DF assumes % of LCOR are COR under our new definition. This is commonplace for alt-a shops that sell much of their production to the street.

**Exhibit 5 Cont.**

| Eligibility/Underwriting | Market/FANNIE MAE | Recommendation |
|---|---|---|
| **Form 4506** | Many Alt-a products do not require a 4506 Fannie Mae has historically deferred to the lender's guidelines in cases where the lender has satisfactory experience originating Alt-a products. Fannie Mae has generally required a 4506 on Stated Income loans delivered under the Fannie Mae Flow Alt-a variance. | Continue to accept stated income loans with no 4506 based on lender's guidelines for experienced originators. Continue to require the 4506 on loans delivered under the Standard Fannie Mae Flow Alt-A variance. |
| **True "No Doc Products"** | Some Alt-a lenders originate what are know as true "No Doc" products that do not require the borrower to state employment, income, or assets. | Fannie Mae has not generally accepted delivery of loans originated under No Doc products. Recommend not accepting these products as part of the Alt-a expansion. |
| **Interested Party Contributions - Investors** | Standard contribution cap for Investors is 3%, FANNIE MAE allows for 2% | Continue to allow 3% contribution cap for investors. |
| **Interested Party Contributions – Owner Occupied (O/O)** | Standard for >90 LTV O/O is 3%+, FANNIE MAE allows for 3% | Allow up to 6% on case by case basis and monitor sellers appraisal bias values |
| **Appraisal** | Market Alt-a may use exterior only or AVM; FANNIE MAE requires interior/exterior on all Alt-a loans | Allow exterior only appraisals based on counterparty strength. (Requirements - TBD). Recommend updating the AVM Variance Framework to allow low/no documentation loans. With the analysis and decisions on AVM requests based upon the procedures outlined in Framework. |
| **Coops** | Coops are permitted under many Alt-a products. | Accept Coop deliveries from approved Coop lenders. |
| **Non-warrantable Condos** | Non-warrantable condos are prevalent in Private Label; FANNIE MAE only accepts non-warrantable condos from a few sellers | Accept non-warrantable condos following established project variance analysis process based upon a review of the seller's guidelines, project review expertise, and counterparty strength (requirements –TBD).<br>Exclude Condotels |
| **Manufactured Housing** | MH not permitted on Alt-a products. | Do not accept MH deliveries as part of Alt-a expansion |

* Analysis includes full doc Alt-a as well as low documentation

Draft

**Exhibit 7**

**If deal has 2 or more underwriting practices per group, then it should be considered Sub-prime credit. A higher number group represents an increased significance for evaluation.**

| | Underwriting Practice | Alt – A | Sub Prime |
|---|---|---|---|
| Group 1 | Lookback period for mortgage history Note: most Alt-A guidelines require overall credit history to be established for at least 24 mos with at least 2-3 tradelines. However, most Alt-A guidelines look at past 12 mos history on mortgage/rental payments. | 24 or more | Less than 24 |
| | Lookback period for credit events (Credit BK/Fcl/NOD) | 24 or more | Less than 24 |
| | Use of Rolling Lates | No | Yes |
| | Is MI used over 80% LTV? | Typcially yes but some lenders offer no MI programs | No |
| Group 2 | FICO score for Primary Wage Earner only | Yes (very common in Alt-A) | Yes |
| | Adverse Payment History in CB credit | Not Ignored | Ignored, FICO incorporates |
| | Adverse credit events (collection/ suit/ repo/ judgment) in CB credit history | Not Ignored | Ignored, FICO incorporates |
| | Definition of Full Doc for Income / Asset documentation | Can be non-Fannie definition | Non-Fannie definition |
| Group 3 | Points and Fees | | Typically greater than 3.5% |
| | Mandatory Arbitration | No | Yes |
| | Single Premium Insurance (Life, disability, unemployment, etc.) | No | Yes |
| | Balloons | | Under 15 years |
| | Ability to Pay | No Formal Process | Formal Process Established |
| | Pre-pays | Yes | Yes (typically pools have greater than 50% of loans) |
| | In ARM products can Floor Rate be lower than Start Rate | Yes | No |
| Group 4 | FICO Floor | Typically >=620 | Under 620 |
| | DTI Limit | NA for No Ratio and NINA loans. Stated Income: typically <=55% but some lenders allow higher ratio with lower LTV and.or higher FICO | >= 50% |

| | | | |
|---|---|---|---|
| | % Stated/Low [question: how would this apply to flow business where we are reviewing a lender's program as opposed to a specific pool of loans?] | Overall market is around 60% low doc; however ths can vary widely deal to deal – some deals may be 100% full doc because they are packages of all investor or all cash out loans being marketed as Alt-A for pricing purposes | 40% or more |
| | Credit Spread on start rate | | Over 1.5% |
| | Margin/Plan | | 5% or more/Cap over 5% |
| | Maximum Lates:<br>Mortgage / Rental Lates | Max 1x30 in past 12 mos OR 0x60 past 24 mos | Over 60 |
| | Bankruptcy History | Varies: min standard is none within past 24 mos and no lates or derogatory credit past 24 mos | |
| | Foreclosure History | Typcially none in past 3 years and must re-establish credit | |
| | Collections / Charge-offs | Must be paid off before closing except for $1000 max | |

**Exhibit 12**

Date: May 17, 2006

To: Chuck Rumfola
Tim Judge
Brenda Bishop

From: Lesia Bates Moss
Susan Ernest, Operational Review and Compliance Manager
Greg Johnson, Senior Business Manager

CC: Pamela Johnson

Subject: ALT-A Expansion Recommendation

We have been asked to provide feedback on potential counterparty implications regarding the ALT-A Expansion, and specifically as Alt-A relates to Lender Channel flow business. Below are some important considerations and recommendations from the SF Counterparty Risk team. Please feel free to contact Susan and/or Greg as they have been working with Tim and Brenda on this important initiative.

Enhanced Alt-A Product Features

Issue: "No Ratio" loans represent a "layered" form of risk. In our view, the No Ratio component coupled with reduced (or No Doc) type product, result in heightened credit risk (low credit scores or credit attributes indicate stress the overall credit component of the loan). We believe the absence of key credit attributes set the stage for heightened credit risk and potential losses in the early stages of the loan payment process as it will be difficult to verify true representation of a borrower's income.

**Recommendation:** Consider limiting the % of enhanced ALT-A product of overall portfolio acquisitions, and aggressively track the approval and performance, particularly in the early months of the origination of the loan.

Background: Efforts to mitigate the risk exposures of this product have not been very effective. The "reduced or no documentation" requirement to obtain an executed IRS 4506 form in order to process through the IRS and receive the reported income of the borrower(s) was done originally to determine which borrowers were overstating their income (misrepresentation). This has become a "paper tiger" basically, and the inevitability of the results usually does not provide a form of evidence that would allow Fannie Mae to obtain repurchase from the lender. The "Mortgage Industry" has virtually accepted the fact that these loan products are not a true representation of

the borrower's income. The income is overstated, when stated, and difficult at best to determine the reasonableness test based on industry, job title, etc.

Issue: Review and identify appropriate repurchase criteria resulting from potential difficulties surrounding property valuations and borrower credit.

**Recommendation:** Variance criteria ***should*** emphasize AVM requirements, confirm that comparables are closed, and require the most conservative sales comparables in the valuation of the property. In addition, we propose that the lender be required to run all ALT-A products through aggressive valuation methodology and through Social Security screening to ensure the value of the property is reasonable and the credit is solid based on the representation of the borrower(s).

- The lenders should be prepared to identify and manage the ALT-A book aggressively (High Risk servicing) in default at a minimum.

- Based on charts and graphs that they provided to us regarding different aspects of the current book of business Fannie Mae has obtained through the Investor Channel, bulk transactions it is clear the combination of 75-85 % LTVs with FICOs of 620 through 679 reflect the highest level of losses. This should be weighed in the pricing and variance parameters to structure a disincentive for lenders to "load Fannie Mae" with this slice of the volume.

Counterparty Review/Approval Recommendation

Given the heightened risk of the enhanced Alt-A as outlined above, we highly recommend that the Counterparty team – Ops Review and Credit Analysis – be engaged to work closely with the CATeam when pursuing enhanced Alt-A:

1. Counterparty Ops Reviews should be performed to assess operational capacity to service these loans to comply with Fannie Mae's requirements. Based on the target lenders (refer to Attachment A), we believe that such reviews can be performed ***subsequent*** to the acquisition of the loans as these financial institutions are existing approved FM lenders.

2. Establish minimum financial eligibility requirements for Alt-A lenders (Refer to Attachment A. In our view, the financial eligibility requirements should follow the more aggressive path of the Sub-Prime initiative if the ALT-A lender is requesting approval to deliver both products either in isolation (ALT-A Prime, or Sub-Prime full doc) or in conjunction with each other (ALT-A with Sub-Prime on the same loan).

   Additional consideration may be granted to lenders that have delivered ALT-A product that have acceptable performance and/or the overall percentage of the ALT-A product is minimal based on their overall origination and servicing book of business.

ATTACHMENT A

Target Lender List
SunTrust
Wachovia/AmNet
Bank of America
Ohio Savings Bank – forward commitment is in place
Regions Bank
Chase Bank
ResCap – GMAC/RFC
PHH
HSBC
Irwin
M&T
Citi Mortgage
First Horizon
Flagstar
New Century – Home123
Opteum
CTX

The proposed financial eligibility requirements are as follows:

1. Minimum adjusted net worth ($5 million)
2. Acceptable liquidity (e.g. current ratio > 1.0)
3. Leverage ratio (debt to equity < 10:1)
4. Net interest margin (greater than 50 bps)
5. Acceptable rating for parent ("BBB" rating or better)
6. Regulated entity (Y)
7. # of years operating (5+)
8. Headline risk
9. Above average results from an on-site operational review
10. External servicer ratings
11. Lender's asset backed securities performance

We hope this information is helpful. Please let us know if you have additional questions regarding this information.

Fannie Mae Confidential & Proprietary - Internal Use Only
For Alt A Transformation Credit Committee Memo

CONFIDENTIAL

Exhibit 15

**Alternative-A Flow Servicing Variance Approvals**

**NSO Servicing Best Practices**

When a lender requests a variance to deliver flow Alt-A product, the account team will determine the lender's servicing solution and engage the NSO Portfolio Manager and/or NSO Servicing Consultant for approval of the servicing solution.

Approval is tacit, unless the PM or SC know of any specific reason why the solution is impractical or not in Fannie Mae's best interest. However, the PM and/or SC should use the approval process as a means of being notified of pending Alt A servicing, and prepare either the lender (if they are servicing the loans) or the PM and/or SC for the ultimate servicer, that Alt A loans are being added to the portfolio.

The PM and/or SC should use the opportunity to:

- Assess the Servicer's current capabilities for servicing high-risk loans,
- Prepare the servicer for the product by providing counsel on best practices for high risk loans,
- Advise the servicer that transfers of servicing will require that they flag the Alt A loans and that they find a way to code their systems to identify Alt A loans, and,
- Determine whether the servicer is best served by segregating the servicing into a specific branch number, and communicating such action to the account team to affect delivery.

Servicers will service the Alt A loans using the RP score, or, if they do not use RP, the Medium Risk work rules defined in the Servicing Guide.

**Exhibit 18**

**MEMORANDUM**

**Date**: May 15, 2006

**To**: Pam Johnson
Tom Lund
SF Credit Committee

**From**: Rob Schaefer

**Subject**: **Proposed New Framework for Credit Enhancement and Management of SF Credit Portfolio**

Among our highest priority goals this year is to transform and streamline our Investor Channel process for acquiring Alt-A business and acquire Alt-A on a flow basis through the Lender Channel, so that we ease the operational bid/delivery requirements and improve our competitiveness, while maintaining a strong risk management framework for managing the business. A key component of this effort must address our strategy for credit enhancing this business. Within the past few weeks, the CRO, based upon the authority granted to him under the Investor Channel Delegation, waived the CE requirement for Alt-A Investor Channel transactions, with the exception of deals including negam product. This document herein will propose a new approach for Credit Enhancement (CE) that – if approved – would define a strategy for utilizing credit enhancement for managing our credit risk portfolio and supersede current CE requirements for Alt-A Investor Channel deliveries. Essentially, the approach would focus our CE objectives at limiting expected loss and economic capital (driven by stress loss) for the entire outstanding credit book, and additional limits for the Alt-A and Option ARM subcomponents of our book of business. These portfolio limits would be set based upon direction given and approved by the EVP, SF Business and the Chief Risk Officer. Strategy for adhering to the risk limits would be executed by the Investor Channel based upon a monthly review of Credit Portfolio Metrics as adjusted by acquisitions and credit enhancements done since the last risk analysis of the outstanding credit portfolio. This approach leverages existing and enhanced analysis of the outstanding credit portfolio, including the beneficial impact of all credit enhancements, as measured by the Credit Portfolio Metrics reports, now done by Credit Finance.

## Background

Since 2001, back-end credit enhancement has been utilized for two functions:

- Risk management as prescribed by the Investor Channel Delegation CE Grid
- A discretionary Buy/Sell of credit risk to other market players, to leverage their price for certain layers of risk so that we can provide a competitive bid to our customers and achieve a more attractive rate of return for the layers of risk that we retain.

**CE Required by the IC Delegation**: The Investor Channel Delegation (updated October 2005) utilizes credit enhancement to address our uncertainty in modeling certain risks, and requires

certain levels of credit enhancement for specific loan characteristics as defined by the Credit Enhancement (CE) Grid. Depending upon their loan characteristics (e.g. NINA with FICO<620) a loan will be required to have credit enhancement to a AA or BBB sizing, as measured by S&P licensed model LEVELS, or no credit enhancement at all. Within the past few weeks, the CRO used his authority to waive these credit enhancement requirements.

**Discretionary Buy/Sell of Credit Risk**: Additionally, credit enhancement is used by the Investor Channel as a means to leverage the price other market players (i.e. mortgage insurance companies) charge for certain layers of credit risk so that we can provide an improved and more competitive price to our customers while achieving a better rate of return (or improved gap) for the layers of risk that we retain. Typically, for higher risk product, we have found value in laying-off risk above expected loss (i.e. at a *B* attachment point) up to a *BBB->A* stoploss. The MI's sometimes price these risk layers more cheaply than us because of

- Different assumptions for expected and stress loss
- Lower return targets
- Different collateral prepayment assumptions

**Weaknesses with our Current CE Approach:** The CE strategy previously required under the Investor Channell Delegation allowed us to enter and gain a strong foothold in the Alt-A market, prudently manage our riskiest product segments, and achieve an attractive Gap for the IC book of business. However, our credit enhancement requirement needs updating for the following reasons:

- The CE Grid itself, while originally defining areas of model uncertainty, has changed little since introduced in 2001 despite the experience gained from the purchase of over $200 billion of Alt-A product.
- The Delegation typically imposed a deal by deal assessment of credit enhancement needs, with little leeway for not covering nearly 100% of designated loans.
- The approach does not take into account that our model uncertainty has bounds. For example, if our model estimates a fee of 75 bps, it is likely that the "right" fee is within ± 50%. In fact, pursuant to our CE requirement, we secure coverage for a finite layer of risk as defined by LEVELS (e.g. the risk between the B and BBB sizing) that could be priced to a *worst* case scenario (i.e. near exhaustion of coverage) dependent only upon our assumption for prepayment.

  For example, under the current Delegation, we may be required to secure credit enhancement to cover the risk layer from first loss to a AA sizing. Let's assume for a given pool that layer extends from 0% loss and stops at 3.00% loss: a 300 bp risk layer. Even though we may have model uncertainty for how to value the risk of this pool, if we start from the premise at best we only get 300 bps of protection, we know how to put an upper limit on the price for that layer. That is, if our price/yield relationship were 4:1, it would be unreasonable to ever price that AA risk layer above 75 bps (i.e. 300/4). And if an MI charged that, we should be unwilling to ever buy the coverage, because there would be little or no insurance value. So, in this sense, we may have model uncertainty, but if we are willing to buy-in to a methodology that defines a stop-loss for our credit enhancement, we should also be able to estimate a range for what our uncertainty is.

- The CE requirement only applied to Investor Channel deliveries. Over the past several years, we have allowed more Alt-A product into the Lender Channel, although have constrained eligibility to those products with more favorable risk characteristics and less risk-layering. Going forward, we want to move most product that has been eligible only in the IC to the LC for customer ease and faster turnaround. As such, the quality of product in both channels would become more similar, and would be appropriate to apply a consistent risk management CE strategy to both delivery channels.
- The CE requirement sometimes required us to secure coverage up to nearly a AA coverage, even though most MIs do not price efficiently above an A sizing.
- Most importantly, the CE requirement was defined by the delivery of individual *loans* without any regard for how much total risk the loans pose to our *overall* book of risk. As an extreme example, if our $2 trillion book contained only $100 million of typical Alt-A product, an unexpected loss scenario could be absorbed in the context of revenue earned from the rest of the book. In fact, as a result of many years of high home appreciation, our book stands now at a 53 MTM LTV with little expected loss. Our current book profile gives us an opportunity to accept higher levels of risk on new acquisitions if we can devise a framework for measuring, limiting, and managing the book risk.

## PROPOSAL

We propose a revision to our CE approach that replaces the IC CE requirement with a risk management strategy that is focused on both the expected and stress losses for the Credit Portfolio. This will be discussed in more depth below. We want to retain our flexibility to utilize CE as a buy/sell mechanism for credit risk, so that we can leverage the MI market for maintaining price competitiveness and managing gap.

Key to addressing the weaknesses in our required CE strategy is a move to managing the overall level of risk on our Credit Portfolio. This would allow us target a certain amount of coverage (specified in dollars of exposure) that we look to secure, but would give us the discretion to choose the loans for which we want coverage. We would likely be focused on covering the highest risk loans, because enhancement of those loans would provide the best and most efficient opportunity for laying-off risk.

We would leverage the Credit Finance reporting infrastructure that is under the umbrella of "Credit Metrics". Credit Metrics is used quarterly to assess – among other things - the PV of expected losses in our credit book, stress losses, economic capital, and the sensitivity of our credit book to a home price shock (i.e. an immediate 5 percent reduction of home prices across the board). Some of these statistics are/were included in our voluntary disclosures agreed upon with OFHEO. Current plans envision the metrics to be enhanced for restatement purposes, with the frequency of analysis moving to monthly.

Additionally, we propose accounting for model uncertainty by ***adjusting*** the expected and stress losses for certain segments of our book (e.g. high risk Alt-A or Option ARM) by an Uncertainty Factor recommended by Credit Finance. The expected and stress losses for that segment would then be increased by this factor, and the adjusted losses would be used to determine overall book risk for the purpose of managing overall exposure and CE requirements

### High Level Overview

Specifically, we propose a strategy that does the following:

**Set Limits for Expected Loss and Economic Capital (driven by Stress Loss)**

- Target a maximum *adjusted* Expected Loss for the adjusted book
- Target a maximum *adjusted* Economic Capital for the adjusted book.
- Target a maximum *adjusted* Expected Loss for the Alt-A (excluding Option ARM), Alt-A/Option ARM, and subcomponents as a percentage of the limit for the entire Credit Book:
- Target a maximum *adjusted* Economic Capital for the Alt-A (excluding Option ARM), Alt-A/Option ARM, and subcomponents as a percentage of the economic capital for the entire Credit Book.

**Build-out Credit Metrics infrastructure to Measure Expected Loss and Economic Capital Monthly, and adjust for Model Uncertainty for Alt-A segment**

- Enhance existing processes to perform monthly
- Enhance existing processes to analyze the Alt-A book
- Define an model uncertainty factor for the Alt-A book to adjust upward our estimates for expected and stress loss

**Assign responsibility for Managing the Credit Portfolio within the Prescribed Limits, and Execute with Available Credit Enhancement Tools**

- Authorize Investor Channel Execution authority to manage to the Prescribed Credit Portfolio Limits and to enter into Credit Enhancement Buy/Sell Transactions
- Determine whether Credit Enhancement (including MI, lender recourse, or other mechanisms) is needed to re-balance the credit portfolio, or whether the profile of new acquisitions might sufficiently adjust the book.
- Determine, for individual deals or for the book, whether to enter into credit Buy/Sell to manage net spread vs. gap tradeoffs.
- Identify loans for CE
  - From Investor Channel deals
  - From a sweep of recent deliveries of Lender Channel and Investor Channel deals not already allocated to credit enhancement
- Execute CE
- Review by Senior Management on at least a Monthly Basis

If this proposal were implemented, we anticipate being in credit buy/sell on at least a regular/monthly basis for some segment of our credit book for the following reasons:

- To optimize gap (or gap efficiency) and/or return on capital, leveraging the MI's credit pricing
- To provide market feedback for segments of our credit book as a means of comparison for our own models
- To provide current market pricing for our ongoing estimation of the cost of re-balancing our portfolio.

**Proposal in more Depth:**

- **Target a maximum *adjusted* Expected Loss for the credit book of 18 bps, approximately 25% of PV(Remitted Guaranty Fee) + PV(Float). This is approximately 50% higher than current levels.**
  - **Phase-in over two years, such that by the end of 2006, adjusted Expected Losses are allowed to increase by approximately 25% over current levels (to approximately 15 bps), and the limit would be allowed to rise an additional 20% (to approximately 18 bps) by the end of 2007.**

Based upon the latest Credit Metrics analysis of our 4Q05 book, the (unadjusted) PV Net Loss (expected) is about 10.7 bps. For the sake of example, assume that after adjusting for model uncertainty of the Alt-A and Option ARM books, the adjusted PV Net Loss (expected) of the book were 12.0 bps. Even with model uncertainty, in an expected economic scenario, losses would unlikely be greater than 2.0-2.5 bps in a given year ($400m - $500m of losses on a $2.0 trillion book). A reasonable limit for acceptable losses on our book might be 3.0 – 3.5 bps/year ($600m - $700m on a $2.0 trillion book), which might lead us to accept expected PV Net Loss of 18 bps. 4Q05 Credit Metrics estimates PV(Guaranty Fee) + PV(Float) at 71.1.

- **Target a maximum *adjusted* Economic Capital for the adjusted book equal to 45 bps, or approximately 100% of core regulatory capital (excluding our 30% surcharge).**
  - **Phase-in over two years, such that by the end of 2006, adjusted Economic Capital is allowed to increase by approximately 25% over current levels (to approximately 38 bps), and the limit would be allowed to rise an additional 20% (to approximately 45 bps) by the end of 2007.**

For example, based upon the latest Credit Metrics analysis of our 4Q05 book, the estimate for required Economic Capital (for the Enhanced Book) was approximately 19.7 bps. This analysis analyzed the outstanding credit book, enhanced by some additional quarters of expected acquisitions required of us by our outstanding agreements with lenders. Additionally, it assumes a 99.5th percentile stress loss event resulting in 93.4 bps of PV loss, and nets this stress loss by components for Gfee revenue, float, earnings on capital, and adds to our losses expenses for admin and tax:

| | |
|---|---|
| Discounted Stress Loss | 93.4 bps |
| Gfee Revenue | (77.7 bps) |
| Float | (11.2 bps) |
| Admin | 19.8 bps |
| Earnings on Capital | 8.2 bps |
| Tax | 3.7 bps |
| | |
| Net Required Economic Capital | 19.66 bps |

For the sake of example, assume that after adjusting for model uncertainty of the Alt-A and Option ARM books, the adjusted Discounted Stress Loss were 104 bps. The adjusted economic capital would then be 30.26 bps. Given that our regulatory core capital requirement for our credit book is 45 bps (without our 30% add-on during the current supervisory environment), we have additional capital set aside that could economically

support additional business. We should target an adjusted economic capital that is much closer to our core capital requirement; otherwise we hold excess capital that could be supporting new business.

- **Target a maximum *adjusted* Expected Loss for the Alt-A (excluding Option ARM), Alt-A/Option ARM, and subprime subcomponents as a percentage of the limit for the entire Credit Book**
  We have no Credit Metrics data for just the Alt-A book, and would need to enhance Credit Metrics to provide this breakout. But, once we are able to measure, we might want to limit losses from this subcomponent to a percentage of the expected loss for the overall book. For example, if we set a limit of 18 bps for expected PV Net Loss, we might want to limit losses due to the Alt-A (exluding Option ARM) book at 20% of that amount, or 3.6 bps PV across the whole book, and have separate limits for the Alt-A/Option ARM and subprime books. These limits must await derivation of the current state.

- **Target a maximum *adjusted* Economic Capital for the Alt-A Alt-A (excluding Option ARM), Alt-A/Option ARM, and subcomponents as a percentage of the economic capital for the entire Credit Book.**

  Again, we have no Credit Metrics data for just the Alt-A book, and would need to enhance Credit Metrics to provide this breakout. But, once we are able to measure, we might want to limit the allocated economic capital to some percentage (e.g. let's say 20%) of the amount (in dollars) allocated for the entire Credit Book. So, if we target a maximum of 45 bps of *adjusted* economic capital for the entire Credit Book, we might want to limit the amount of *adjusted* economic capital for the Alt-A (excluding Option ARMs) book to be 20% of that. For a $2.0 trillion book, that would translate into $7.6 billion of adjusted economic capital supporting the entire credit book and $1.5 billion supporting the Alt-A/no-OptARM book alone. Limits for the book subcomponents need to await the derivation of the current state.

**Exhibit 20**

**Phase I: "FAST FORWARD" (Flow forward process)**

Timeframe: May – Aug

Lenders: 20-30 key lenders who will be initial targets for flow Alt-A

| **"FLOW" FORWARD PROCESS** |
|---|
| **Lender / Guideline Review** |
| 1. Location RM evaluates lender and lender's underwriting guidelines per SF Credit established guidance. RM evaluates any potential required variances. RM makes approval recommendation, specifying if entire guidelines are approved or if there are any restrictions. |
| 2. Location Risk approves lender for Alt-A flow program. If necessary, location RM sends exceptions to SF Credit for approval (expect most approvals will be able to take place completely at location level). |
| 3. If required (by virtue of dollar amount or other considerations), RM takes approval through RIC process. |
| **Profile & Pricing** |
| 1. Lender sends representative profile tape, or IC pulls tape based on recent lender deals |
| 2. IC reviews profile tape and recommends charge fee:<br>• Pricing structure will incorporate base fee plus LLPAs.<br>• Will be based on a defined target profitability range.<br>• Will develop profile stipulations as needed for contract. |
| 3. CAM reviews proposed pricing and adjusts as needed<br>• Adjustments may only be made to base fee and certain custom LLPAs. Standard national LLPAs (e.g., Investor Property, Cash-out, etc) may not be adjusted. |
| 4. Location & LC/IC determine volume and target share commitment. |
| 5. Proposal approved via LC Delegation approval process. |
| 6. Location prepares proposal for customer and negotiates commitment. |
| **Contracts** |
| 1. Add Expanded Flow Alt-A Variance to Master Agreement. Will contain fees, profile requirements, and volume/share commitment. Will include 90-day repricing option whereby Fannie Mae can reprice based on material profile shift and/or market movement. |
| 2. Create MBS Contract – **Using V and X (Investor Channel) contract series.** (Note: still determining if we will have cash capabilities in Phase I). |
| 3. Account team sends contract numbers to IC, who maintains master list. |
| **Delivery** |
| 1. Lender delivers loans throughout month based on eligibility and pricing outlined in contract. |
| 2. Standard IC Delivery Edits applied. |
| 3. At the end of the month, Lender send supplemental data file to IC containing Doc Types and Combined LTVs for reconciliation purposes.<br>• If lender demonstrates less than 5% data error rate for 3 consecutive months, they will be allowed to discontinue sending supplemental tape. |
| **Post-Delivery Review** |
| 1. IC: Pull monthly monitoring report through RMart to review:<br>• actual model fees and profitability are within expected range<br>• profile meets contract requirements and is materially in line with expectations<br>• if model fees have shifted, analyze risk buckets to determine key drivers of change<br>• as needed, adjust pricing in contract to reflect profile shift |
| 2. Risk: Risk Manager pulls monthly eligibility and profile report from RMart to validate: |

| |
|---|
| • loans are within eligibility bounds<br>• all loans in contract had an Alt-A special feature code<br>• profile meets contract requirements and is materially in line with expectations |
| 3. Data Comparison: IC CTA group processes lender supplemental data file and compares doc type and CLTV to acquisitions data. CTA forwards to PASS QA Team for reconciliation and follow-up. |
| **Credit Enhancement – *ONLY NEEDED UNTIL BOOK-LEVEL CE IN PLACE** |
| 1. IC / CTA group generates loan-level file of all loans delivered under expanded Alt-A contracts. CTA pulls loan-level report into Deal Factory, runs services, create SPLI and BEMI files and sends to CPS. |
| 2. Receive delivery files and aggregate for credit enhancement. Note: will need to change aggregation limits to accommodate increased volume |
| 3. Aggregate loans and obtain CE coverage |
| 4. Send BEMI file to Credit Ops for setup purposes |

**Exhibit 22**

## *ACQUISITIONS PROFILE OF BUSINESS APR 2003 - DEC 2005*

| *Source: Fannie Mae LPP* | *Top 10 ALT A Lenders* | | *NATIONAL* |
|---|---|---|---|
| # Loans | 976,553 | | 13,254,967 |
| Volume ($000) | 169,516,914 | | 2,091,949,471 |
| Delivery GAP | 3.07 | | -0.57 |
| WTD AVG AQSN LTV | 73.08 | | 69.78 |
| WTD AVG Credit Score | 717 | | 717 |
| *Business Channel* | | | |
| eChannel | 0 | | 1.21 |
| Investor | 96.23 | | 14.68 |
| Lender | 3.77 | | 83.96 |
| Underserved | | | 0.14 |
| *Product Distribution* | | | |
| FRM | 56.74 | _ | 82.22 |
| *15 YR* | *13.19* | | *22* |
| *20 YR* | *1.46* | | *4.15* |
| *25 YR* | *0.36* | | *0.97* |
| *30 YR* | *84.76* | | *71.95* |
| *40 YR* | *0* | | *0.02* |
| *Balloons* | *0.24* | | *0.82* |
| ARM | 43.26 | _ | 15.79 |
| *Trad. ARM <= 1 YR* | *0.37* | | *1.47* |
| *3/1 ARM - 30 YR* | *17.29* | | *20.47* |
| *3/1 ARM 40 YR* | *0* | | *0* |
| *5/1 ARM - 30YR* | *54.15* | | *44.88* |
| *5/1 ARM - 40YR* | *0* | | *0* |
| *7/1 ARM - 30 YR* | *6.33* | | *13.6* |
| *7/1 ARM - 40 YR* | *0* | | *0* |
| *10/1 ARM - 30 YR* | *2.21* | | *3* |
| *10/1 ARM - 40 YR* | *0* | | *0* |
| *Negam 30* | *12.14* | | *10.68* |
| *Negam 40* | *0.78* | | *0.19* |
| *Other ARMs* | *21.83* | | *5.88* |
| Seconds | | | 0.01 |
| Government | | | 1.21 |
| Reverse | | | 0.78 |

Fannie Mae Confidential & Proprietary - Internal Use Only
For Alt A Transformation Credit Committee Memo

| | | |
|---|---|---|
| *AQSN LTV Distribution* | | |
| 0-60 | 17.58 | 25.48 |
| 60-70 | 13.82 | 17.06 |
| 70-75 | 10.39 | 9.86 |
| 75-80 | 43.46 | 30.45 |
| 80-85 | 1.45 | 2.07 |
| 85-90 | 7.57 | 5.54 |
| 90-95 | 4.75 | 4.03 |
| 95-97 | 0.08 | 0.74 |
| 97-100 | 0.88 | 2.68 |
| LTV > 100 | 0.02 | 0.1 |
| Missing | 0 | 1.99 |
| *Credit Score* | | |
| CS < 520 | 0.04 | 0.59 |
| 520-0580 | 0.23 | 1.72 |
| 580 - 620 | 0.88 | 3.76 |
| 620 - 640 | 3.32 | 4.38 |
| 640 - 660 | 5.23 | 6.05 |
| 660 - 680 | 11.19 | 8.14 |
| 680 - 700 | 14.66 | 10.02 |
| 700 - 720 | 16.07 | 11.37 |
| 720 - 740 | 14.58 | 11.76 |
| CS > 740 | 33.66 | 41.06 |
| Missing | 0.12 | 1.15 |
| *Property* | | |
| SF Detached | 70.92 | 78.62 |
| Condo | 11.12 | 8.02 |
| Coop | 0.02 | 0.29 |
| PUD | 17.94 | 13.08 |
| *Seasoning* | | |
| Current | 97.96 | 97.58 |
| 0-6 months | 98.47 | [illegible] |
| 7-12 months | 1.53 | 1.48 |
| Seasoned | 2.04 | 2.42 |
| 13-35 months | 24.57 | 57.69 |
| 36 months + | 75.43 | 42.31 |
| *Occupancy* | | |
| Investor | 16.18 | 5.12 |
| Principal | 79.25 | 91.18 |
| Second/ Vacation | 4.57 | 3.7 |

| | | | |
|---|---|---|---|
| *Unit* | | | |
| 1 unit | 91.49 | | 96.25 |
| 2-unit | 5.2 | | 2.59 |
| 3-unit | 1.57 | | 0.61 |
| 4-unit | 1.74 | | 0.56 |
| *Refinance* | | | |
| NonRefi: PMM | 49.94 | | 35.72 |
| Refinance | 50.06 | | 64.28 |
| *Refi: Cash-out* | *30.85* | | *31.35* |
| *Refi: Non-Cash -out* | *19.21* | | *32.94* |
| *Subordinated Financing* | | | |
| No Sub Fin | 89.33 | | 91.46 |
| 80/10/10 | 3.19 | | 3.62 |
| 75/20/5 | 0.17 | | 0.24 |
| 80/15/5 | 2.57 | | 2.32 |
| 90/5/5 | 0.01 | | 0.03 |
| 80/20/0 | 0.05 | | 0.59 |
| Other Sub Fin | 4.68 | | 1.74 |
| *Broker* | | | |
| Non TPO | 49.65 | | 48.58 |
| TPO | 50.35 | | 51.42 |
| *TPO Correspondent* | *50.17* | | *60.05* |
| *TPO Broker* | *49.83* | | *39.85* |
| *TPO Undesignated* | *0* | | *0.09* |
| *Housing Initiatives* | | | |
| Non Housing Initiatives | | | 72.67 |
| Community Lending Housing Initiatives | 0.08 | - | 1.1 |
| SF Business Initiatives | 99.92 | - | 26.23 |
| *DU* | | | |
| Not DU | 68.49 | | 40.93 |
| DU 6.0 Pilot | 0 | | 0.01 |
| DU | 31.51 | | 0.01 |
| *CW Premium* | | | |
| CP <= 50 | 24.41 | | 81.58 |
| 50 < CP < 100 | 2.19 | | 2.25 |
| 100 < CP < 150 | 0.42 | | 0.64 |
| 150 <= CP | 0.09 | | 0.17 |
| Missing | 72.89 | | 15.35 |

| | | |
|---|---|---|
| *MI Company* | | |
| Non Mi | 84.41 | 85.74 |
| GEMICO | 1.35 | 2.05 |
| MGIC | 3.31 | 3.18 |
| PMI | 2.79 | 2.47 |
| UGC | 1.61 | 2.09 |
| RMIC | 1.45 | 1.59 |
| Radian | 3.84 | 1.98 |
| Triad | 1.16 | 0.59 |
| Other MI | 0.02 | 0.29 |
| *MI Coverage* | | |
| LTV to 60 | 16.39 | 24.94 |
| 60-70 | 14.00 | 17.04 |
| 70-75 | 10.68 | 9.91 |
| 75-80 | 43.98 | 30.76 |
| 80-85 | 1.46 | 2.09 |
| 85-90 | 7.70 | 5.59 |
| 90-95 | 4.80 | 4.08 |
| 95-97 | 0.08 | 0.77 |
| 97-100 | 0.88 | 2.74 |
| LTV > 100 | 0.02 | 0.10 |
| Missing | 0.00 | 1.99 |
| *Recourse* | | |
| No Recourse | 74.95 | 93.02 |
| Other Recourse | 1.28 | 3.04 |
| Pool Policy | 23.73 | 2.67 |
| SMC | 0.04 | 1.27 |
| *ACI* | | |
| 525-560 | 0.16 | 0.61 |
| 560-580 | 0.4 | 0.61 |
| 580-600 | 1.39 | 1.15 |
| 600-620 | 4.56 | 2.38 |
| 620-640 | 10.39 | 4.69 |
| 640-660 | 15.58 | 7.67 |
| 660-680 | 16.97 | 10.91 |
| 680-700 | 12.67 | 13.76 |
| 700-720 | 7.37 | 16.5 |
| 720-740 | 3.55 | 17.47 |
| 740-760 | 105 | 11.62 |
| 760-780 | 0.43 | 5.2 |
| 780+ | 0.05 | 0.96 |
| Missing ACI | 25.42 | 6.47 |

| *Top 10 States* | | | |
|---|---|---|---|
| CA | 26.59 | CA | 20.31 |
| FL | 8.39 | FL | 6.57 |
| NY | 4.91 | IL | 4.8 |
| AZ | 4.37 | MA | 3.85 |
| IL | 3.84 | MI | 3.63 |
| NJ | 3.73 | AZ | 2.82 |
| CO | 3.73 | MD | 2.79 |
| NV | 3.45 | GA | 2.62 |
| TX | 3.24 | CO | 2.6 |
| WA | 3.15 | MN | 1.97 |

Fannie Mae Confidential & Proprietary - Internal Use Only
For Alt A Transformation Credit Committee Memo

CONFIDENTIAL FHFA11843912