# Exhibit C

# In The Matter Of:

*FEDERAL HOUSING FINANCE AGENCY, etc.*
*v.*
*UBS AMERICAS, INC., et al.*

_____

## *RONALD FEIGLES - Vol. 2*
### *June 13, 2013*

_____

**MERRILL CORPORATION**
LegaLink, Inc.

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

RONALD FEIGLES - 6/13/2013

```
              UNITED STATES DISTRICT COURT

            SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------x

FEDERAL HOUSING FINANCE            :

AGENCY, etc.                       :

     Plaintiff,                    :

     vs.                           : 11 Civ. 5201

UBS AMERICAS, INC., et al.,        : (DLC)

     Defendants.                   :

-----------------------------------------x

FEDERAL HOUSING FINANCE AGENCY, etc.   :

     Plaintiff,                    :

     vs.                           : 11 Civ. 6188

JPMORGAN CHASE & CO., et al.       : (DLC)

     Defendants.                   :

-----------------------------------------x

FEDERAL HOUSING FINANCE AGENCY, etc.,  :

     Plaintiff,                    :

     vs.                           : 11 Civ. 6189

HSBC NORTH AMERICA HOLDINGS, INC., et  :  (DLC)

al.,                               :

     Defendants.                   :

-----------------------------------------x
```

```
 1    ---------------------------------------x
 2    FEDERAL HOUSING FINANCE AGENCY, etc.,    :
 3         Plaintiff                          :
 4       vs.                                   : 11 Civ. 6190
 5    BARCLAYS BANK PLC, et al.,               : (DLC)
 6       Defendants.                           :
 7    ---------------------------------------x
 8    FEDERAL HOUSING FINANCE AGENCY, etc.,    :
 9         Plaintiff,                         :
10       vs.                                   : 11 Civ. 6192
11    DEUTSCHE BANK AG, et al.,                : (DLC)
12       Defendants.                           :
13    ---------------------------------------x
14    FEDERAL HOUSING FINANCE AGENCY, etc.,    :
15         Plaintiff,                         :
16       vs.                                   : 11 Civ. 6193
17    FIRST HORIZON NATIONAL CORP., et al.,    : (DLC)
18       Defendants.                           :
19    ---------------------------------------x
20    FEDERAL HOUSING FINANCE AGENCY, etc.,    :
21         Plaintiff,                         :
22       vs.                                   : 11 Civ. 6195
23    BANK OF AMERICA CORP., et al.            :
24       Defendants.                           :
25    ---------------------------------------x
```

RONALD FEIGLES - 6/13/2013

```
 1   ----------------------------------------x
 2   FEDERAL HOUSING FINANCE AGENCY, etc.,    :
 3        Plaintiff,                          :
 4        vs.                                 : 11 Civ. 6198
 5   GOLDMAN, SACHS & CO., et al.,            : (DLC)
 6        Defendants.                         :
 7   ----------------------------------------x
 8   FEDERAL HOUSING FINANCE AGENCY, etc.,    :
 9        Plaintiff,                          :
10        vs.                                 : 11 Civ. 6200
11   CREDIT SUISSE HOLDINGS (USA), INC.,      : (DLC)
12   et al.,                                  :
13        Defendants.                         :
14   ----------------------------------------x
15   FEDERAL HOUSING FINANCE AGENCY, etc.,    :
16        Plaintiff,                          :
17        vs.                                 : 11 Civ. 6201
18   NOMURA HOLDING AMERICA, INC., et al.,    : (DLC)
19        Defendants.                         :
20   ----------------------------------------x
21   FEDERAL HOUSING FINANCE AGENCY, etc.,    :
22        Plaintiff,                          :
23        vs.                                 : 11 Civ. 6202
24   MERRILL LYNCH & CO., INC., et al.,       : (DLC)
25        Defendants.                         :
```

RONALD FEIGLES - 6/13/2013

```
 1    ----------------------------------------x
 2    FEDERAL HOUSING FINANCE AGENCY, etc.,     :
 3         Plaintiff,                           :
 4         vs.                                  : 11 Civ. 6203
 5    SG AMERICAS, INC., et al.,                : (DLC)
 6         Defendants.                          :
 7    ----------------------------------------x
 8    FEDERAL HOUSING FINANCE AGENCY, etc.,     :
 9         Plaintiff,                           :
10         vs.                                  : 11 Civ. 6739
11    MORGAN STANLEY, et al                     : (DLC)
12         Defendants.                          :
13    ----------------------------------------x
14
15
16
17
18
19
20
21
22
23
24
25
```

RONALD FEIGLES - 6/13/2013

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   DISTRICT OF CONNECTICUT

 3      ----------------------------------x

 4    FEDERAL HOUSING FINANCE AGENCY,      :

 5    etc.,                                :

 6         Plaintiff,                      :

 7         vs.                             : Case No.

 8    THE ROYAL BANK OF SCOTLAND GROUP     : 3:11-cv-01383-AWT

 9    PLC, et al.,                         :

10         Defendants.                     :

11      ----------------------------------x

12

13

14                      VOLUME II

15          Videotaped Deposition of Ronald Feigles

16                   Washington, D.C.

17                   June 13, 2013

18                     9:27 a.m.

19

20

21

22

23    Job No. 22-234640

24    Pages 394 -

25    Reported by:  Bonnie L. Russo
```

```
 1                    RONALD FEIGLES
 2                 P R O C E E D I N G S
 3
 4            THE VIDEOGRAPHER:  Here begins Tape
 5      No. 1, Volume II in the deposition of Ronald
 6      Feigles.  Today's date is June 13th, 2013.
 7                 I would like to remind the witness
 8      that he is still worn in from yesterday.
 9                 You may begin.
10      RONALD FEIGLES,
11      was called for examination by counsel and,
12      after having been duly sworn by the Notary, was
13      examined and testified as follows:
14          EXAMINATION BY COUNSEL FOR DEFENDANT
15                 GOLDMAN, SACHS & CO.
16              BY MR. HARSCH:
17          Q.   Mr. Feigles, my name is Brad Harsch
18      from the Sullivan & Cromwell law firm.  I
19      represent Goldman Sachs.  I'm going to ask you
20      some questions on behalf of all the defendants
21      todays.
22                 Do you understand that?
23          A.   Yes.
24          Q.   And you understand you're still
25      under oath in this continued deposition?
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2        A.    Yes.
 3        Q.    I want to ask you about some of the
 4   bulk purchases that you testified about
 5   yesterday.
 6              Did -- did Freddie Mac purchase
 7   loans in bulk that were subprime and Alt-A?
 8        A.    I believe so.
 9        Q.    Were you involved in due diligence
10   on some of those bulk purchases?
11        A.    Yes.
12        Q.    And can you estimate, approximately,
13   how many bulk purchases of subprime and Alt-A
14   loans Freddie Mac conducted?
15        A.    10 to 15.
16        Q.    And what period did that -- during
17   what period did that occur?
18        A.    While I was there, 2006 to 2000 --
19   January maybe 2008.
20        Q.    And do you remember which
21   originators Freddie Mac bulk purchased these
22   Alt-A and subprime loans from?
23        A.    Primarily Washington Mutual, Wells
24   Fargo, Barclays, Equifirst, CitiMortgage, MIT
25   Deutsche Bank.  Those are the ones I recall.
```

RONALD FEIGLES - 6/13/2013

```
 1                      RONALD FEIGLES

 2          Q.    Do you recall that Freddie Mac

 3     purchased loans in bulk from GreenPoint?

 4               Let me put it this way:  That had

 5     been originated by GreenPoint?

 6               MR. OBLAK:  Objection to the form.

 7               THE WITNESS:  I do not recall that,

 8     at least under my purview.

 9               BY MR. HARSCH:

10          Q.    What about Ameriquest?

11          A.    Also not under my purview.

12          Q.    New Century?

13          A.    No.

14          Q.    First Franklin?

15          A.    First Franklin, I'm a little hazy

16     on.  Maybe we did a bulk for them.  I don't

17     recall.

18          Q.    And if bulk purchases were done

19     under someone's purview other than yourself,

20     whose purview would they have been done under?

21          A.    So I only did the reviews that were

22     assigned to me.  So in the 2006 to 2008 time

23     frame, only if someone external to my group

24     decided that they wanted pre-funding due

25     diligence was I involved.  So they may have
```

RONALD FEIGLES - 6/13/2013

Page 425

```
 1                    RONALD FEIGLES

 2      done a lot of bulk purchases or some bulk

 3      purchases or no bulk purchases that it was

 4      determined no pre-funding due diligence was

 5      required.  I had no insight to how many bulk

 6      purchases they were buying that it was

 7      determined no pre-funding due diligence was

 8      required.  I only saw those loans that somebody

 9      determined pre-funding due diligence was a

10      prerequisite.

11           Q.    And who made that determination?

12           A.    I don't know.

13           Q.    Who would -- to whom would you

14      report the results of your due diligence on

15      these reviews of subprime and Alt-A bulk

16      purchases?

17           A.    We had a standard group e-mail that

18      we utilized.  It's pretty lengthy.  Probably a

19      lot of the people that we talked or saw on the

20      one group e-mail looked at yesterday.

21           Q.    Would Kevin Palmer been among those

22      people?

23           A.    Probably.

24           Q.    Don Bisenius?

25           A.    Yes.
```

```
 1                      RONALD FEIGLES

 2          Q.    Why would -- why would either of

 3    those two individuals have been involved?

 4          A.    Why would they have been involved?

 5          Q.    Yes.

 6          A.    Well, in the time when we were doing

 7    at least the -- the subprime, which would have

 8    been late 2007, Don was in charge of the

 9    subprime initiative.  Kevin, what his

10    involvement was with bulk purchases or T deals,

11    I don't really know.

12          Q.    And explain briefly, please, what

13    the subprime initiative is?

14          A.    So, in 2007, Freddie Mac decided

15    that they were going to put out an offering

16    where they would establish guidelines for the

17    purchase of subprime loans.  That would be the

18    subprime initiative.  Called Home Steps.

19          Q.    Home Steps?

20                And --

21          A.    I'm not sure what it was -- I don't

22    think Home Steps was actually the right answer.

23    I don't recall.

24          Q.    Was there a program called Safe

25    Steps?
```

RONALD FEIGLES - 6/13/2013

```
 1                     RONALD FEIGLES

 2           A.    Safe Steps.

 3           Q.    Okay.

 4           A.    Yes.

 5           Q.    And, as part of Safe Steps, Freddie

 6      Mac was going to purchase subprime loans

 7      directly from originators?

 8           A.    I think that was the intent.

 9           Q.    Did that occur?

10           A.    I'm not sure that we ever did it in

11      any fashion other than bulk.

12           Q.    Do you know whether Freddie Mac

13      competed with other entities to purchase these

14      subprime bulk loans?

15           A.    Specifically, no.

16           Q.    What about generally?

17           A.    Probably.  I don't know.

18           Q.    Do you know whose -- who was Freddie

19      Mac's competition for purchasing such Alt-A and

20      subprime bulk loans?

21                 MR. OBLAK:  Objection to the form.

22                 THE WITNESS:  I don't know other

23      company's practices.  I understand the Wall

24      Street firms bought subprime loans.

25                 BY MR. HARSCH:
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2        Q.    Was it your understanding that

 3   Freddie Mac competed Wall Street firms to buy

 4   subprime loans in bulk?

 5             MR. OBLAK:  Objection to the form.

 6             THE WITNESS:  Probably they did.

 7   Again, specifically I don't know who competed

 8   for our subprime loans.

 9             BY MR. HARSCH:

10        Q.    But was it your understanding that

11   Freddie Mac was competing with Wall Street to

12   buy these subprime loans?

13             MR. OBLAK:  Objection to the form.

14             THE WITNESS:  I don't know if it was

15   my understanding.  It was probably my

16   assumption that that was what was occurring.

17             BY MR. HARSCH:

18        Q.    Did Freddie Mac bid on these loans?

19        A.    I don't know.  I don't know the

20   process for purchasing the bulk purchases.

21        Q.    You mentioned the T deals.

22             Are you familiar with the general

23   structure of a T deal?

24        A.    Generally I am.

25        Q.    Can you just tell me what that
```

```
 1                    RONALD FEIGLES

 2      general structure is?

 3          A.    It would be where a -- essentially,

 4      a bulk of loans were -- were bought and pooled

 5      into a security in which we guarantee.

 6          Q.    And in a T deal, which entity bore

 7      the risk if the collateral failed to perform?

 8               MR. OBLAK:  Objection to the form.

 9               THE WITNESS:  To the extent that we

10      had a guarantee RAP on the entire pool, Freddie

11      Mac.

12               BY MR. HARSCH:

13          Q.    And was it typically the case that

14      Freddie Mac had a guarantee RAP on the entire

15      pool on a T deal?

16          A.    Specifically to all T deals, I don't

17      know.  My understanding was generally yes.

18          Q.    And was that part of the reason that

19      you were doing due diligence on the bulk

20      purchases because Freddie Mac bore the risk of

21      non-performance of that collateral?

22               MR. OBLAK:  Objection to the form.

23               THE WITNESS:  Probably so.

24               BY MR. HARSCH:

25          Q.    Was that your assumption?
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2            MR. OBLAK:  Objection to the form.

 3            THE WITNESS:  Again, I didn't have

 4    an assumption.  I was asked to perform a

 5    function to do pre-funding due diligence on

 6    pools of loans, and it hadn't been decided

 7    to which pools or -- or really the reasons why.

 8            BY MR. HARSCH:

 9       Q.   Was it your -- was it your belief

10    that one of the reasons you were doing due

11    diligence on these bulk purchases of subprime

12    and Alt-A loans was because Freddie Mac bore

13    the risk of nonperformance?

14            MR. OBLAK:  Objection to the form.

15            THE WITNESS:  My understanding was

16    that we did pre-funding due diligence because

17    these were different loan types that Freddie

18    Mac had not previously had a whole loan or

19    first loss position on.  These were different

20    structures, Alt-A subprime.

21            BY MR. HARSCH:

22       Q.   What effect did that have, the fact

23    that they were different kinds of loans that

24    Freddie Mac was buying?

25            MR. OBLAK:  Objection to the form.
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2          BY MR. HARSCH:

 3          Q.    Isn't the reason that -- isn't the

 4     fact that they were different loans that

 5     Freddie typically bought, isn't that -- doesn't

 6     that speak to an extra degree of risk for

 7     Freddie Mac?

 8               MR. OBLAK:  Objection to the form.

 9               THE WITNESS:  Which is why I think

10     we did pre-funding due diligence.

11               BY MR. HARSCH:

12          Q.    So -- so Freddie Mac decided to do

13     pre-funding due diligence as opposed to

14     post-funding due diligence because these loans

15     were unfamiliar to Freddie Mac?

16               MR. OBLAK:  Objection to the form.

17               THE WITNESS:  It doesn't preclude

18     doing post-funding due diligence, but I think

19     that was -- it's my understanding that was the

20     reason why we did pre- funding due diligence.

21               BY MR. HARSCH:

22          Q.    Because there is a perceived

23     increased risk from these products?

24               MR. OBLAK:  Objection to the form.

25               THE WITNESS:  I think to gain a
```

RONALD FEIGLES - 6/13/2013

Page 432

```
 1                    RONALD FEIGLES

 2       better understanding of what we were buying.

 3                 BY MR. HARSCH:

 4            Q.    In terms of pre-funding due

 5       diligence -- did -- let me withdraw that.

 6                 Did Freddie Mac perform pre-funding

 7       due diligence on bulk purchase of loans other

 8       than this -- as part of the subprime

 9       initiative?

10            A.    Yes.

11            Q.    And in what context did those occur?

12            A.    Option ARMs.  Alt-A loans.

13            Q.    Are Option ARMs the same thing as

14       Alt-A loans?

15            A.    It would certainly be -- Option ARMs

16       would be in the family of Alt-A loans.

17            Q.    So all Option ARMs are Alt-A loans?

18            A.    I would say so, yes.

19            Q.    How did Freddie Mac determine what

20       kinds of due diligence procedures or processes

21       it would put in place in performing pre-

22       funding due diligence of these subprime and

23       Alt-A bulk purchases?

24            A.    Whenever I arrived in Freddie Mac in

25       February of 2006, I think they had done two or
```

```
 1                      RONALD FEIGLES

 2       three previous pre-funding due diligence

 3       reviews.  There was general guidelines.

 4       Followup to establish a process to formalize

 5       the process for performing pre-funding due

 6       diligence.

 7            Q.    Did Freddie Mac look to any models

 8       or examples outside of Freddie Mac itself in

 9       determining what kind of pre- funding due

10       diligence to perform on subprime and Alt-A bulk

11       purchases?

12            A.    So my recollection is that I had

13       conversations with people that did pre-funding

14       due diligence.  I looked at what I was able to

15       find in some of our previous aggregator

16       reviews, how -- how it was structured, and we

17       built off of that and the existing process at

18       Freddie Mac.

19            Q.    So you -- you consulted existing

20       aggregator reviews, in part, to determine the

21       processes by which Freddie Mac was going to

22       perform pre- funding due diligence on bulk

23       purchases?

24            A.    Specifically, I don't recall that.

25       I believe that would have been the process we
```

 1                    RONALD FEIGLES

 2      would have followed.  Specifically, I don't

 3      recall how we arrived at our process.  I know

 4      it was an iterative process that we put

 5      together over several months to come up with

 6      the process that we were comfortable with.

 7          Q.   Why did you look at the aggregator

 8      reviews as part of that process?

 9          A.   Again, I don't recall specifically

10      looking at them.  My assumption is that that

11      was probably part of the process.

12          Q.   Why?

13              MR. OBLAK:  Objection to the form.

14              THE WITNESS:  They may have had

15      information that would have given us some

16      insight to processes.

17              BY MR. HARSCH:

18          Q.   Did you feel that Freddie Mac ended

19      up with a process that was similar to the

20      process that you learned of through these

21      aggregator reviews?

22              MR. OBLAK:  Objection to the form.

23              THE WITNESS:  I thought our process

24      was more robust.

25              BY MR. HARSCH:

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2          Q.    How is that?

 3          A.    Well, for one, we always went on

 4     site with our due diligence provider, so -- so

 5     we -- we were there with them.  We gave them, I

 6     think, more detailed specific instructions of

 7     what we expected of them.  We -- when -- when

 8     provided a pool, we instituted a process where

 9     we did additional upfront risk checks, fraud

10     checks, collateral checks to determine loans

11     that potentially could have been high risk.

12     Our sampling was -- my understanding, was all

13     adverse.  We -- any loan that hit our -- that

14     we determined that hit some of the risk

15     indicators, the risk tools that we utilized

16     upfront, we looked at irrespective of the due

17     diligence provider's findings.  So while they

18     may have found the loan completely acceptable,

19     we would have looked at that loan to evaluate

20     it and make sure we were comfortable with the

21     purchase of that particular loan.

22          Q.    By the time the majority of these --

23     did Freddie Mac institute these -- around what

24     time period did Freddie Mac institute these

25     pre-funding due diligence procedures?
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2          A.   Well, to the best of my knowledge,
 3      the first pre- funding due diligence was done
 4      in the fall or winter of 2005.
 5          Q.   And they continued through at least
 6      to 2008?
 7          A.   I think January of 2008 might have
 8      been our last one.
 9          Q.   You felt pretty confident in the due
10      diligence processes that Freddie Mac
11      instituted, correct?
12               MR. OBLAK:  Objection to the form.
13               THE WITNESS:  I felt good in my
14      process, yes.
15               BY MR. HARSCH:
16          Q.   And you felt that they were
17      reliable?
18          A.   All the loans we looked at I did.
19          Q.   Now, were the loans that Freddie Mac
20      purchased -- were the subprime an Alt-A loans
21      that Freddie Mac purchased as part of its bulk
22      purchase program underwritten at least in part
23      to lenders' guidelines?
24               MR. OBLAK:  Objection to the form.
25               THE WITNESS:  Probably most of them.
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2      Not necessarily all of them.  I don't recall

 3      specifically.  I think some of the subprime

 4      loans may have been underwritten specifically

 5      to the Safe Steps program.

 6              BY MR. HARSCH:

 7          Q.   But your recollection is that most

 8      of these loans were under written to lenders'

 9      guidelines, correct?

10              MR. OBLAK:  Objection to the form.

11              THE WITNESS:  My recollection is

12      that most of the loans were underwritten to the

13      lenders' guidelines with specific carve-outs.

14              BY MR. HARSCH:

15          Q.   And what were the specific

16      carve-outs?

17          A.   It would vary from pool to pool.

18      Certain types of loans or certain loan

19      characteristics that we would have purchased.

20          Q.   And were these carve-outs as a

21      result of the Safe Steps program?

22          A.   Could be.

23          Q.   I'm just trying to understand how --

24      how the Safe Steps program worked.  What sort

25      of criteria did it impose on these -- on these
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2      loans?
 3               Do you understand the question?
 4               MR. OBLAK:  Objection to the form.
 5               THE WITNESS:  Well, there were
 6      guidelines.  There were Safe Step guidelines.
 7      So did they meet the guidelines or not?  I
 8      wasn't the credit manager, so we got defined
 9      credit terms and we applied them.
10               BY MR. HARSCH:
11          Q.   So Safe Steps would impose certain
12      credit limitations in terms of the loans that
13      Freddie Mac could purchase?
14          A.   I wasn't involved in the decision
15      process of what the credit box that we were
16      going to underwrite to.
17          Q.   Who was involved in the -- in that
18      process?
19          A.   Specifically, I don't know.  I'm
20      sure Bob Skinner, who -- who is a director in
21      our credit department, would have been involved
22      in that process.  Probably other parties as
23      well.
24          Q.   Do you have a sense of approximately
25      how many loans would be excluded from a
```

```
 1                    RONALD FEIGLES

 2      purchase based on Safe Steps that Freddie

 3      might, you know, otherwise purchase if Safe

 4      Step hadn't been part of the criteria for --

 5      for the purchase?

 6              MR. OBLAK:  Objection to the form.

 7              THE WITNESS:  Can you repeat that?

 8      I'm sorry.

 9              BY MR. HARSCH:

10          Q.    Do you have a sense of approximately

11      how many loans might be excluded based on Safe

12      Step?

13          A.    No sense.

14          Q.    When you said -- you mentioned

15      something about Freddie Mac being in the first

16      loss position with these T deals.

17              Can you explain what that is?  What

18      you mean by that?

19          A.    That if there was a -- a loss

20      occurred, that is, if a mortgage defaulted and

21      there was a loss, we guaranteed the loss.  So

22      we would absorb the loss.

23          Q.    After Freddie Mac purchased these

24      subprime and Alt-A loans in bulk, did Freddie

25      Mac conduct any repurchase claims or make any
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2        of me and render a decision on the
 3        acceptability of those 500 or 200 or a thousand
 4        loans that we were reviewing for review.
 5               BY MR. HARSCH:
 6          Q.    What percentages of the pool did
 7        Freddie Mac typically sample in conducting due
 8        diligence of Alt-A or subprime bulk purchases?
 9               MR. OBLAK:  Objection to the form.
10               THE WITNESS:  I don't know.
11               BY MR. HARSCH:
12          Q.    25 percent?
13               MR. OBLAK:  Same objection.
14               THE WITNESS:  I use that as a -- as
15        an assumption in -- in a previous document, but
16        I don't know specifically what our sampling
17        methodology was or our sampling structure was.
18        I do know it was adverse.  But more than that,
19        I don't know.
20               BY MR. HARSCH:
21          Q.    So using 25 percent as an
22        assumption -- as the assumption, that would
23        leave 75 percent of the pool unsampled, right?
24          A.    If that was the assumption, yes, it
25        would.
```

```
 1                      RONALD FEIGLES

 2          Q.    And do you think that in identifying

 3     the samples to be reviewed, Freddie Mac managed

 4     to identify only the loans that had material

 5     defects?

 6          A.    Can you repeat that?

 7          Q.    Do you think that in identifying the

 8     sample to be reviewed, Freddie Mac managed to

 9     identify only the loans in the pool that would

10     have had material defects?

11               MR. OBLAK:  Objection to the form.

12               THE WITNESS:  Given it was a sample,

13     one could reasonably assume there were other

14     loans that had defects.

15               BY MR. HARSCH:

16          Q.    Right.

17               So one could reasonably assume that

18     in the unsampled portion of the pool, there

19     were material defects, correct?

20               MR. OBLAK:  Objection to the form.

21               THE WITNESS:  Yes.

22               BY MR. HARSCH:

23          Q.    All right.  Did that give you

24     concern as someone who is involved in the

25     process of these bulk purchases, that there
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2       were potentially material defects in the
 3       unsampled portions of these pools?
 4              MR. OBLAK:  Objection to the form.
 5              THE WITNESS:  At this point in time,
 6       in 2006, 2007, did that give me concern?
 7              BY MR. HARSCH:
 8       Q.   Yes.
 9       A.   No, because any -- any pool of loans
10       that Freddie Mac bought, whether they were
11       subprime or prime, if you look at enough you're
12       going to find some loans that don't meet some
13       requirement or some guidelines.  So there was
14       an understanding that in any group of loans,
15       there would be some loans that are ineligible.
16       Q.   You said that Freddie Mac used
17       Clayton to conduct the diligence on the bulk
18       purchases, correct?
19       A.   I did.
20       Q.   Did you think they did good work?
21       A.   I thought they did okay.
22       Q.   Did you feel that their -- the
23       results of their work were reliable?
24       A.   Depending on the reviews, some more
25       than others.
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2          Q.   You wouldn't -- you continued to use
 3     Clayton throughout the whole process, correct?
 4          A.   Right.
 5          Q.   And you never stopped using them,
 6     right?
 7          A.   Correct.
 8          Q.   So if you thought that they didn't
 9     do work that was reliable -- if you thought
10     they didn't do work that was at least adequate,
11     you wouldn't have used them, correct?
12          A.   We put more oversight on them, I
13     believe, in 2000 -- late 2007 than we did in
14     2006.
15          Q.   Why is that?
16          A.   2006 we had a recurring
17     transactions -- again, as I had mentioned with
18     Washington Mutual, we had the same individuals
19     month in and month out.  We knew them.  We had
20     a comfort level with the -- the work they were
21     doing for us.  In 2007, we did fewer bulk
22     purchases.  They were, I think, scattered
23     throughout the United States.  A lot of
24     different individuals.  I put more resources on
25     double-checking their work.
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2         Q.    Did you continue to believe that
 3    their work was reliable in 2007?
 4         A.    As I recall, the last time we used
 5    them, which was the Equifirst deal, I had a lot
 6    of concerns with the work that was being done.
 7         Q.    And how did you -- did you voice
 8    those concerns with somebody?
 9         A.    With Clayton.
10         Q.    And what were the concerns?
11         A.    The level review that they stated
12    that they were doing or their processes -- the
13    concerns were, I guess in a nutshell, I don't
14    believe they were following their processes.
15         Q.    Who did you raise that concern with?
16         A.    Specifically inside of Clayton, I
17    don't recall.  And specifically inside of
18    Freddie Mac, I don't recall.
19         Q.    Let me show you another exhibit.
20    I'm going to show you a document whose Bates
21    number begins at FHFA 03238396.
22              (Deposition Exhibit 5437 was
23    marked for identification.)
24              BY MR. HARSCH:
25         Q.    That exhibit has been marked 5437.
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2     And this seems -- this is a -- looks like a
 3     meeting invite dated March 7, 2007, it says:
 4     "In line with the subprime initiative, we were
 5     working on understanding the costing and
 6     pricing of subprime given what we need" --
 7     "what we read each day, we know that pricing is
 8     heavily dependent upon who is originating the
 9     loan.  We would like to get some feedback on
10     the underwriting of some of the large subprime
11     originators; Wells, HSBC, Chase, WAMU,
12     Countrywide, and also look at some of the
13     originators that are currently facing serious
14     financial issues on the off chance that we
15     might want to bid discounted loans from these
16     distressed counterparties, New Century and
17     Fremont."
18             Do you recall this meeting invite
19     which you received?
20          A.   No.
21          Q.   It's from someone named Kevin.  Who
22     would the Kevin be?
23          A.   Kevin Palmer.
24          Q.   Do you have an understanding of why
25     he would be calling for a meeting such as this?
```

RONALD FEIGLES - 6/13/2013

```
  1                    RONALD FEIGLES

  2      be a little hard to check as we sit here.  Do

  3      you know whether you printed out all of the

  4      attachments?

  5              MR. HARSCH:  It should be.

  6              MS. BRADLEY:  It's our understanding

  7      that is the whole family.

  8              MR. OBLAK:  Okay.

  9              THE WITNESS:  Generally speaking, it

 10      looks to be -- well, the e-mail is us telling

 11      Sally this will be the final list of loans that

 12      we have rejected.

 13              BY MR. HARSCH:

 14         Q.    From a certain T deal?

 15         A.    From a certain T deal.

 16         Q.    That's the T deal that -- whose

 17      offering circular we just looked at, right, the

 18      Wells Fargo T-74?  If you look at the subject

 19      line for the first attachment?  Wells T-74

 20      write-up final?

 21         A.    Yes, probably so, yeah.  Yes.

 22         Q.    Did the binders in your office

 23      contain materials like this?

 24         A.    Yes.

 25         Q.    Can we turn first then to the first
```

```
 1                    RONALD FEIGLES

 2      attachment, please, the Bates number ends in

 3      5054.

 4                MR. OBLAK:  I will just note for the

 5      record that it doesn't appear initially that it

 6      is consecutive, and the attachment begins at

 7      054 and the e-mail ends at 043, so unless the

 8      attachments are out of order, it would appear

 9      there are attachments missing within the Bates

10      ranges, and I note that objection on a

11      completeness basis to this exhibit.

12                BY MR. HARSCH:

13           Q.   Are you there?

14           A.   I am.

15           Q.   Is this a summary of the due

16      diligence review that was conducted in

17      connection with these Wells Fargo loans?

18           A.    This is a summary review of T-74, it

19      looks like, yes.

20           Q.   And you note in the second -- do you

21      know who wrote this summary?

22           A.    More than likely, I did.

23           Q.   So you write in the second paragraph

24      that:  "This was the first subprime due

25      diligence completed between Wells Fargo and
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2      Freddie Mac."

 3                So these are subprime loans,

 4      correct?

 5           A.    Yep.

 6           Q.    And you write at the end of the

 7      third paragraph:  "Throughout the review, the

 8      randomly-selected loans showed significantly

 9      better results with fewer loans with material

10      exceptions than the targeted loan sample."

11                Can you explain what that means?

12           A.    So what that would mean is that in

13      this sample of loans, there was two

14      populations, one that was adversely-selected

15      and one that was randomly-selected.

16           Q.    And the randomly-selected portion

17      did -- showed significantly better results and

18      fewer loans with material exceptions than the

19      adversely-selected, right?

20           A.    That's what it says here.

21           Q.    You used the phrase "material

22      exceptions."  How did you determine what is a

23      material exception?

24           A.    Sitting here today, I don't recall.

25           Q.    In determining whether an exception
```

RONALD FEIGLES - 6/13/2013

```
 1                     RONALD FEIGLES

 2      was material, did you use your judgment?

 3               MR. OBLAK:  Objection to form.

 4               THE WITNESS:  Generally that would

 5      have been the process, yes.

 6               BY MR. HARSCH:

 7          Q.    It is not a matter of objective

 8      fact, though, is it?

 9               MR. OBLAK:  Objection to form.

10               BY MR. HARSCH:

11          Q.    Whether an exception is material?

12               MR. OBLAK:  Objection to form.

13               THE WITNESS:  It's an objective fact

14      that it's an exception.

15               BY MR. HARSCH:

16          Q.    As to whether --

17          A.    Apparently, we were using judgment

18      to -- whether or not it was material or not.

19          Q.    And that can be a matter of opinion

20      and people could differ on whether an exception

21      is material, correct?

22               MR. OBLAK:  Objection to form.

23               THE WITNESS:  Again, I'm not trying

24      to speak to this document -- I mean, or this

25      review.
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2              BY MR. HARSCH:

 3         Q.    Isn't it true that the judgment as

 4      to whether a given exception is material is a

 5      matter of opinion and people could differ on

 6      that judgment, correct?

 7              MR. OBLAK:  Objection to form.

 8              THE WITNESS:  We determined that

 9      these were material exceptions.  That was our

10      determination.

11              BY MR. HARSCH:

12         Q.    Freddie Mac's determination?

13         A.    Yes.

14         Q.    And this would include exceptions to

15      both Wells Fargo's guidelines and to the

16      Freddie Mac guidelines, correct?

17         A.    Again, specifically, I don't recall.

18      Probably not.

19         Q.    Didn't you just read the pro sup

20      that said that the loans were underwritten in

21      accordance with Wells Fargo's guidelines and

22      Freddie Mac's guidelines?

23              MR. OBLAK:  Objection to form.

24              THE WITNESS:  I did.

25              BY MR. HARSCH:
```

RONALD FEIGLES - 6/13/2013

Page 492

```
 1                    RONALD FEIGLES
 2         Q.    Now, there is a summary there then
 3    in words for the random pool and it says under
 4    credit comments on the second -- I don't know
 5    what you call those things, arrows?
 6         A.    Sure.
 7         Q.    "Credit rejections are 29 loans for
 8    11 percent of the random sample."
 9              Can you explain what that means?
10         A.    Well, whatever the random sample
11    was, it looks like maybe it was 300-ish loans.
12    11 percent of that were credit rejections.
13         Q.    Would those be rejections based
14    either on the Wells' guidelines or Freddie
15    guidelines?
16         A.    It would be credit rejections.
17         Q.    What do you mean by "credit
18    rejections?"
19         A.    Well, specifically, looking at this
20    eight years later, seven years later, some type
21    of an exception or something made the loan
22    ineligible.
23         Q.    So I just want to understand sort of
24    the package as a whole.
25              In these two charts, the review
```

```
 1                      RONALD FEIGLES

 2      results, where loans are marked as 3s with

 3      material exceptions noted, those are the loans

 4      that Freddie would not buy, right?

 5              MR. OBLAK:  Objection to form.

 6              THE WITNESS:  Yes, 3s, 3 Cs, we

 7      didn't buy.

 8              BY MR. HARSCH:

 9          Q.    So then if we look to the next

10      attachment that begins 5059, this is a list of

11      -- it says:  "An individual asset summary

12      report," and it says:  "The loan cart count is

13      83," and if you look at the credit events, they

14      are all 3s and then there's a few 2 Ws in

15      there, but they all seem to be either credit or

16      compliance 3s.

17              So would this be the collection of

18      loans that were rejected from the pool?

19              MR. OBLAK:  Objection to form.

20              There are 1s here in the credit

21      event, too.

22              BY MR. HARSCH:

23          Q.    Well, what I'm saying is -- I'm

24      sorry.

25              So each loan seems to either have a
```

RONALD FEIGLES - 6/13/2013

```
 1                     RONALD FEIGLES
 2     Credit 3 or a Compliance 3.
 3          A.    That's right.
 4          Q.    So this collection would be the
 5     loans that were rejected, right?
 6                MR. OBLAK:  Objection to form.
 7                THE WITNESS:  No, not necessarily.
 8                So these reports are run at a point
 9     in time.  I got these reports every day or
10     close to every day, so it was a very much
11     moving population of loans.
12                So on this day, these were the loans
13     that were ineligible for purchase.
14                BY MR. HARSCH:
15          Q.    And things could change, though, if
16     something was cured or --
17          A.    Yes.
18          Q.    Okay.  And can we then turn to the
19     next page -- I'm sorry, the page whose Bates
20     number ends in 5061, and this is called:  "An
21     individual asset summary report."
22                Is this a report on a specific loan
23     that was in this pool?
24          A.    Yes.  This is the format that
25     Clayton captured data.  So it would be -- this
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2      would be one loan's data.
 3           Q.    And were you personally involved in
 4      reviewing some of these loans during the bulk
 5      purchase due diligence?
 6           A.    Yes.
 7           Q.    And now on the first page, it says:
 8      "Review summary of credit event grade, Clayton
 9      3 final 3."
10                 That would indicate the grade that
11      the loan was given, correct?
12           A.    Yes.
13           Q.    All right.  On the next page ending
14      in 5062, there is a section called:  "Material
15      exceptions," and here it says:  "Credit, seller
16      contributions exceed guideline," and there is a
17      parenthetical:  "(U.06)."
18                 What does that refer to?
19           A.    I don't know.
20           Q.    There is a section on the next page,
21      5063, for compensating factors.
22           A.    I see that.
23           Q.    What -- who determined the
24      compensation factors?
25           A.    Clayton filled all these sheets out.
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2        Q.    Did Freddie provide any instructions

 3   to Clayton on what would constitute a

 4   compensating factor?

 5        A.    I don't recall.

 6        Q.    Did you -- in reviewing these loans,

 7   did you take into consideration these

 8   compensating factors?

 9             MR. OBLAK:  Objection to form.

10             THE WITNESS:  We may have.

11             BY MR. HARSCH:

12        Q.    In what context?

13        A.    I don't specifically recall this

14   pool.  So in -- to that context, I don't know

15   what we would have or wouldn't have considered.

16        Q.    The next section is marked:

17   "Nonmaterial exceptions."

18             Who determined whether an exception

19   was nonmaterial?

20        A.    So that would be joint with Clayton

21   and Freddie Mac, so the certain criteria, we

22   would tell them upfront that we viewed certain

23   things nonmaterial so, for example, if an ARM

24   disclosure wasn't provided, we probably told

25   them from our perspective, that is a
```

RONALD FEIGLES - 6/13/2013

```
 1                      RONALD FEIGLES
 2       nonmaterial event.
 3            Q.    So as part of the scripts given to
 4       Clayton, Freddie Mac would provide instructions
 5       as to what exceptions would -- it would deem
 6       nonmaterial?
 7                 MR. OBLAK:  Objection to form.
 8                 THE WITNESS:  Upfront, no.  What we
 9       would do is we would see a lot of loans so, for
10       example, the ARM disclosure missing.
11                 If after seeing that on what might
12       be a lot of loans, we may say from our
13       perspective, this is one we view as
14       nonmaterial.
15                 BY MR. HARSCH:
16            Q.    So that would -- that determination
17       or that instruction from Freddie Mac to Clayton
18       about exceptions it viewed as nonmaterial would
19       come during the course of the due diligence,
20       rather than as part of the script?
21            A.    I think so.
22            Q.    And would that include also
23       determinations by Freddie Mac as to which
24       exceptions from the Wells Fargo guidelines were
25       deemed nonmaterial?
```

RONALD FEIGLES - 6/13/2013

```
 1                   RONALD FEIGLES
 2      whose Bates number ends in 5380.
 3              This is a different set of these
 4      individual asset summary reports.
 5          A.   When you say a different set, what
 6      do you mean?
 7          Q.   Well, it is separated out from the
 8      other ones.
 9              The first set had mostly -- as I
10      said, had 3s either in credit or compliance,
11      and these seem to have 1s or 2 Ws?
12          A.   Okay.
13          Q.   And it says the loan -- it states:
14      "The loan count is 328."  The prior set had 83.
15      If you add those together, that is 411 and that
16      is your sample size.
17          A.   Okay.
18          Q.   All right?
19              MR. OBLAK:  Objection to form.
20              BY MR. HARSCH:
21          Q.   So is this set of loans the loans
22      that -- at least at this stage in the process,
23      had been deemed acceptable?
24              MR. OBLAK:  Objection to form.
25              THE WITNESS:  No.
```

RONALD FEIGLES - 6/13/2013

```
 1                     RONALD FEIGLES

 2              BY MR. HARSCH:

 3         Q.    So what is it?  Why is it set off

 4    from the other set?

 5         A.    I don't know.  I just noticed that

 6    there is a Compliance Grade 3 and a Credit

 7    Grade 3, so it doesn't look acceptable looking

 8    at this page that you pointed me to.

 9              Could be that this is the random and

10    the targeted pools were separate.  I don't

11    know.

12         Q.    Are you looking at the page whose

13    Bates number ends in 5380?

14         A.    No, I'm not.  5080, sorry.

15              Okay.  I'm sorry.  I'm on the right

16    page I think.

17         Q.    All right.  So now, is this the set

18    of loans, at this stage in the process, had

19    been deemed acceptable?

20              MR. OBLAK:  Objection to form.

21              THE WITNESS:  Yes, it appears so.

22              BY MR. HARSCH:

23         Q.    Let me direct you then to page --

24    Bates number ends in 5406.

25              This is an individual asset summary
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2      report from a borrower named Andre Thomatis or
 3      Thomatis.
 4              You see the cover page for it?
 5          A.   I do.
 6          Q.   And now let's turn to the last page
 7      of the individual summary report, the Bates
 8      number ends in 504 -- 5409, sorry.
 9              This is on the section waived or
10      satisfied exceptions, it says:  "Unexecuted
11      note satisfied."  It notes a missing signature
12      page, Page 3, and then cites the lender
13      response:  "Lender provided a copy of the
14      signed note, issue cleared."
15              Do you have an understanding of what
16      that would refer to?
17          A.   Yeah.  So the loan file we got was
18      incomplete.  It was missing the signature page
19      of the note and the lender provided it.
20          Q.   Okay.  Now this loan was initially
21      marked by Clayton as a 3, right?
22          A.   Yes.
23          Q.   And the grade was changed to 2 W,
24      right?
25          A.   Yes.
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2         Q.   And the reason it was changed to 2 W

 3    is because an issue was satisfied.  There was a

 4    missing document and it was supplied by the

 5    lender, right?

 6              MR. OBLAK:  Objection to form.

 7              THE WITNESS:  Well, that's one of

 8    the reasons.

 9              BY MR. HARSCH:

10         Q.   All right.  But just in terms of

11    this exception, there was a missing document

12    flagged and then the lender was able to provide

13    it, right?

14         A.   Yes, in terms of this specific one,

15    right.

16         Q.   Was it often the case that

17    exceptions were found based on missing

18    documents that the lender was then able to

19    provide?

20              MR. OBLAK:  Objection to form.

21              THE WITNESS:  It happens.

22              BY MR. HARSCH:

23         Q.   It is not unusual, right?

24         A.   Not unusual.

25         Q.   And the fact that Clayton initially
```

RONALD FEIGLES - 6/13/2013

```
 1                     RONALD FEIGLES
 2       marked this as a 3 and Freddie later accepted
 3       it, doesn't mean that anything was wrong with
 4       the loan, correct?
 5               MR. OBLAK:  Objection to form.
 6               THE WITNESS:  It met the criteria
 7       that it had a signed -- yes, it would appear
 8       so.
 9               BY MR. HARSCH:
10          Q.    Nothing was wrong with it?
11               MR. OBLAK:  Objection to form.
12               THE WITNESS:  Again, I'm looking at
13       this loan seven years later looking at three
14       pages.  We accepted it.  They accepted it.
15               BY MR. HARSCH:
16          Q.    But from Freddie's perspective,
17       nothing was wrong with the loan and they bought
18       it, right?
19               MR. OBLAK:  Same objection.  Asked
20       and answered.
21               THE WITNESS:  Yeah.  I assume we
22       bought it.
23               MR. OBLAK:  Rob, are we good to take
24       a break here?  It's about an hour and a half.
25               MR. HARSCH:  Yes.  Let me -- can I
```

RONALD FEIGLES - 6/13/2013

```
 1                     RONALD FEIGLES
 2        ask two quick questions on this?
 3                 MR. OBLAK:  Okay.
 4                 BY MR. HARSCH:
 5            Q.    On that same -- on that same detail
 6        report under:  "Waive satisfied exceptions,"
 7        there is a parenthetical:  "(FHLM.02)."
 8            A.    Yep.
 9            Q.    Do you know what that refers to?
10            A.    So you recall back when I said I
11        could flag loans that I wanted to look at no
12        matter what?
13                 This appears to be one of the loans
14        that we flagged that we said the HVE difference
15        exceeds the 15 percent threshold, so Clayton,
16        again by the limitations of their system, were
17        able to capture what -- captured as material
18        exceptions, even though nobody looked at the
19        loan yet.  That is what happened here.
20                 We told them that we would run a
21        model HVE and it could -- a value variance of
22        -- I guess greater than 15 percent, so we asked
23        them, please flag this loan so that we can see
24        it.  We want to see this loan regardless of
25        whether you think it's acceptable or not.
```

RONALD FEIGLES - 6/13/2013

```
 1                      RONALD FEIGLES

 2          Q.    So the collateral check that you

 3      mentioned that's making the process robust was

 4      a check of the appraisal values against an HVE

 5      tool?

 6                MR. OBLAK:  Objection to form.

 7                THE WITNESS:  The stated appraisal

 8      values, yes, against the HVE tool.

 9                BY MR. HARSCH:

10          Q.    What's the HVE tool?

11          A.    Home Value Explorer.

12          Q.    What is that?

13          A.    It's an internal AVM that is run by

14      Freddie Mac.

15          Q.    Did Freddie Mac sometimes use

16      CoreLogic's AVM?

17                MR. OBLAK:  Objection to form.

18                THE WITNESS:  Yes.

19                BY MR. HARSCH:

20          Q.    Is there any reason to believe that

21      CoreLogic's AVMs were any less robust than

22      Freddie Mac's?

23          A.    No.

24          Q.    And you felt that running the

25      appraisal values against Freddie Mac's AVM made
```

RONALD FEIGLES - 6/13/2013

```
 1                     RONALD FEIGLES
 2         the diligence process robust, right?
 3                 MR. OBLAK:  Objection to form.
 4                 THE WITNESS:  Among other things.
 5                 BY MR. HARSCH:
 6             Q.    You mentioned something about a
 7         fraud review?
 8             A.    Yes.
 9             Q.    And would you explain what the fraud
10         review entailed?
11             A.    Well, you mentioned CoreLogic.  We
12         also used CoreLogic and they provided a --
13         fraud review is probably not the best term, but
14         it's a risk score that certainly took into --
15         among other things, some type of a fraud
16         analysis and they provided a score back that we
17         also used to flag loans.
18             Q.    Freddie didn't always use a fraud
19         review in its bulk purchases, though, correct?
20                 MR. OBLAK:  Objection to form.
21                 THE WITNESS:  Right.
22                 BY MR. HARSCH:
23             Q.    And I think one of the things you
24         said that made Freddie's process -- due
25         diligence process particularly robust was the
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2       use of only adverse samples?
 3              MR. OBLAK:  Objection to form.
 4              THE WITNESS:  Initially, I believed
 5       they were adverse samples.
 6              BY MR. HARSCH:
 7          Q.   We just looked at a due diligence
 8       review indicating there is both an adverse and
 9       a random sample, correct?
10          A.   That's right, we did.
11          Q.   So Freddie didn't always just use
12       adverse samples, correct?
13          A.   Right.  It appears in this instance
14       we used both.
15          Q.   And did you still feel that the due
16       diligence process Freddie conducted on these
17       Wells Fargo's loans that we've been looking at
18       was robust?
19              MR. OBLAK:  Objection to form.
20              THE WITNESS:  As I said, I don't
21       really recall this review specifically.
22              BY MR. HARSCH:
23          Q.   Well, looking at it now, having
24       looked at the review, do you feel that the
25       process was robust?
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2            MR. OBLAK:  Objection to form.

 3            THE WITNESS:  I have read a couple

 4     of pages of five loans.  We will certainly

 5     stand by our write-up that we covered.

 6            BY MR. HARSCH:

 7       Q.   You mentioned something about

 8     occasions on which a guideline would be silent.

 9     I want to understand a little bit more how

10     loans that had some kind of a characteristic on

11     which the guides were silent affected Freddie's

12     decision-making in these bulk purchases.  Can

13     you explain?

14            MR. OBLAK:  Objection to form.

15            THE WITNESS:  I really can't.  I

16     don't recall specific instances or what a

17     guideline might be silent or cover or not

18     cover.

19            BY MR. HARSCH:

20       Q.   But there might be particular issues

21     on which a guideline is silent, but Freddie Mac

22     in its own discretion may decide not to take a

23     loan?

24            MR. OBLAK:  Objection to form.

25            THE WITNESS:  Can you repeat that?
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2              BY MR. HARSCH:

 3         Q.    There might be particular issues

 4    with a loan -- there might be -- withdraw it.

 5              There might be issues with a loan

 6    and the guidelines are silent on that issue,

 7    but Freddie Mac nonetheless would decide to not

 8    take the loan, correct?

 9              MR. OBLAK:  Objection to form.

10              THE WITNESS:  Possibly.

11              BY MR. HARSCH:

12         Q.    And it would use its own discretion

13    in making that decision, correct?

14              MR. OBLAK:  Objection to form.

15              THE WITNESS:  Use its own

16    discretion.

17              Could -- so are we talking in

18    context of these reviews or Freddie Mac in

19    general?

20              BY MR. HARSCH:

21         Q.    The bulk purchases that you were on.

22         A.    The bulk purchases we were on.

23              Could have been Freddie Mac.  It

24    could have been Clayton.

25         Q.    Could you look now please at the
```

```
 1                   RONALD FEIGLES

 2      individual asset summary report whose Bates

 3      number ends at 5426.

 4                   This is a report for a borrower

 5      named Gregg Rasmussen.

 6                   If you look at the front page, the

 7      review summary indicates that the initial grade

 8      was a 3, and then the final grade was a 2 W; is

 9      that right?

10          A.    Yes, it is.

11          Q.    Now on the -- know what I'm going to

12      do?  I'm going to start going the page numbers

13      on the top right hand of the reports

14      themselves, if that is okay with you?

15          A.    That's fine.

16          Q.    So if you look at Page 41 in the

17      section called:  "Nonmaterial exceptions for

18      credit," it says:  "Does not meet nonprimary

19      guidelines FLM.06."

20                   Do you know what that means by

21      nonprimary guidelines?

22          A.    Specifically, FMFHLM06, no, I don't

23      specifically know what that means.

24          Q.    Do you know what is being referred

25      to as nonprimary guidelines?
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2             BY MR. HARSCH:

 3        Q.    Right.  And you applied your

 4   judgment to say that that compensating factor

 5   made the stated income exception --

 6        A.    I don't know --

 7        Q.    -- acceptable, correct?

 8        A.    -- specifically what I applied or

 9   didn't apply.  It looks like I agreed to buy it

10   as a 29 percent loan-to-value loan.

11        Q.    Let's look at Page 161.  This is an

12   asset summary report for Loretta Cisneros.

13   Initially graded a 3, final grade is a 2 W.

14             Do you see that?

15        A.    I do.

16        Q.    Now look at Page 163.

17             Actually, look at Page 164, please.

18   Under the section:  "Waived, satisfied

19   exceptions," Clayton says stated income not

20   reasonable.  "Stated income unreasonable.

21   Borrower states income of 7950 as facilities

22   tech for five years."

23             And then the next entry is:  "Status

24   change issue waived by client," correct?

25        A.    I see that.
```

RONALD FEIGLES - 6/13/2013

```
 1                      RONALD FEIGLES
 2           Q.    And on other comments on Page 163,
 3      it says value -- "Comments, Freddie Mac, value
 4      supported at the time of closing, income is
 5      overstated," so Freddie Mac agreed that the
 6      income is overstated, correct?
 7                MR. OBLAK:  Objection to form.
 8                THE WITNESS:  Looks likes it.
 9                BY MR. HARSCH:
10           Q.    "And borrower never late on any
11      account, in house ten years, LTV 80, some
12      savings, 20K, letting this loan slide," right?
13           A.    I see that.
14           Q.    And that's your entry, right, RF?
15           A.    Yes.
16           Q.    So you said you're going to let this
17      loan slide?
18                MR. OBLAK:  Objection to form.
19                THE WITNESS:  That's what I wrote.
20                BY MR. HARSCH:
21           Q.    Even though you agreed the stated
22      income is unreasonable, right?
23                MR. OBLAK:  Objection to form.
24                THE WITNESS:  I wrote that.
25                BY MR. HARSCH:
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2        Q.    Would you turn now to Page 221.
 3   That is a summary report for Stephanie Chan.
 4   Initially graded by Clayton as a 3, and then
 5   changed to a grade of 2 W.
 6              If you look at Page 223, there is a
 7   section:  "Waived, satisfied exceptions."  One
 8   of the waived or satisfied exceptions is:
 9   "Debt ratio exception greater than five percent
10   and less than ten percent," and the entry says:
11   "43.6 percent, DTI exceeds 38 percent max
12   allowable.  SIVA product loan approved, DTI
13   40.60 percent."
14              Do you understand what all that
15   means?
16        A.    I think so.
17        Q.    Can you explain it, please?
18        A.    That the -- apparently, the
19   allowable DTI was 38 percent and the actual DTI
20   calculated was 43.6.
21        Q.    Okay.  And that issue was waived by
22   Freddie Mac, correct?
23        A.    Looks like that it was.
24        Q.    And under:  "Other comments," it
25   says:  "Discussed value with RF and feel value
```

RONALD FEIGLES - 6/13/2013

```
 1                      RONALD FEIGLES

 2         is supported."

 3                      I'm sorry.  That's referring to an

 4         appraisal.

 5                      Now would you look at Page 248.

 6         It's an asset summary report for a borrower

 7         whose name is Gary Pommerenck, I suppose.

 8         Initially graded as a 3 and then changed to 2

 9         W.

10                      Are you there?

11              A.     I am.

12              Q.     So if we look at Page 251 --

13         actually, let's look at Page 250.

14                      There is a comment there:  "9-29-07,

15         okay 2 W, appraised value overstated.  However,

16         LTV is 64 percent.  True LTV closer to 80.

17         Income acceptable.  Borrower executive director

18         at university who owns multiple properties,

19         excellent credit, RF."

20                      That RF is you, right?

21              A.     It is.

22              Q.     And you found that the appraised

23         value was overstated, right?

24              A.     That's what I wrote.

25              Q.     And you deemed the loan to be
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2     acceptable and you waived it in, correct?
 3          A.    Yes, except that I don't believe
 4     Clayton cited it as a value, so Clayton also
 5     accepted it.
 6          Q.    But you found the appraisal to be
 7     overstated, right?
 8          A.    That's what I wrote.
 9          Q.    And you accepted the loan?
10          A.    I did.
11          Q.    Would you look now on Page 409,
12     please.
13                This is an asset summary report for
14     Steven Podolinski, graded a 3, changed to a 2
15     W.
16                On Page 411 under:  "Credit," it
17     says:  "Income docs do not meet guidelines for
18     grade.doc type."  It says:  "It is waived.
19     Full income documentation loan required two
20     years W-2, only 2006 W-2 provided."
21                Do you see that?
22          A.    I see that.
23          Q.    Can you explain what that means?
24          A.    Well, it appears that there were two
25     years of W-2 that were required and they only
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2            MR. OBLAK:  Objection to form.

 3            THE WITNESS:  Not in the totality of

 4       all the deals put together, I can't say it was

 5       unusually some.

 6            BY MR. HARSCH:

 7       Q.    I will show you this exhibit.

 8            (Deposition Exhibit 5446 was

 9       marked for identification.)

10            BY MR. HARSCH:

11       Q.    So this is an e-mail between Bruce

12       Wood and Ray Romano initially and then -- I'm

13       sorry, this document begins FHFA 04626981.

14            On Page 6983, there is an e-mail

15       from Robert Skinner and he says:  "Just a few

16       comments.  We wrote up the deal as Safe Steps

17       match.  Where Safe Steps was silent, it would

18       revert to the guide.  As with most deals we

19       review in the bulk world, we review the

20       seller's guidelines and look for those items

21       out of the norm, but rarely, do we have time to

22       complete a side-by-side comparison to the

23       seller's entire guidelines to the guide.  After

24       all, we do have the data file for review which

25       may include refreshed FICOs and the use of HVE,
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2        calibrator, ACE, market-to-market model, right?
 3             A.    Yes.
 4             Q.    Doesn't that indicate that most of
 5        the reviews or deals done in the bulk world are
 6        -- involved loans underwritten to the seller's
 7        guidelines?
 8                   MR. OBLAK:  Objection to form.
 9                   THE WITNESS:  Can you repeat the
10        question?  I'm sorry.
11                   BY MR. HARSCH:
12             Q.    Doesn't this indicate -- this e-mail
13        from Mr. Skinner, indicate that most of the
14        deals reviewed in the bulk world are --
15        involved loans underwritten to the seller's
16        guidelines?
17                   MR. OBLAK:  Objection to form.
18                   THE WITNESS:  Well, I would say that
19        most of the deals underwritten in the bulk
20        world pertain to loans that would be normally
21        eligible to Freddie Mac under our guides.
22                   BY MR. HARSCH:
23             Q.    But that are also underwritten to
24        the lender's guidelines, right, as indicated in
25        the offering circulars we reviewed?
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2              MR. OBLAK:  Objection to form.
 3              THE WITNESS:  No.  Those loans that
 4         I think you are referring to generally meet the
 5         guide or bulk would not be what generally is
 6         referred to in those offering circulars.
 7              BY MR. HARSCH:
 8         Q.    I'm a little confused on this.  So
 9         you have -- you are doing subprime and Alt-A
10         loans, right, through these T deals in bulk
11         purchases, right?
12              MR. OBLAK:  Objection to form.
13              THE WITNESS:  Right.
14              BY MR. HARSCH:
15         Q.    Many of these T deals involve bulk
16         purchases of loans that were underwritten to
17         seller's guidelines and then sometimes had an
18         overlay from Freddie Mac, correct?
19              MR. OBLAK:  Objection to form.
20              THE WITNESS:  I think so.
21              BY MR. HARSCH:
22         Q.    So when Freddie Mac instructed
23         Clayton on due diligence to be performed for
24         those Alt-A and subprime loans, part of its
25         instructions to Clayton was to review those
```

RONALD FEIGLES - 6/13/2013

```
 1                      RONALD FEIGLES
 2     loans for -- whether they complied with the
 3     lender's guidelines, correct?
 4               MR. OBLAK:  Objection to form.
 5               THE WITNESS:  Well, again, I think
 6     we are re-covering ground we have already
 7     covered, but it would have been -- ensure
 8     compliance with the guidelines that we have
 9     agreed to purchase these loans.  It could be
10     the lender's guidelines.  It could be our
11     guidelines.  It could be a mix of the two.
12               BY MR. HARSCH:
13         Q.   When Clayton would review loans and
14     mark them as 3 for further review, sometimes it
15     did that because there was an exception to the
16     lender's guidelines, right?
17         A.   Could be.
18         Q.   That was sometimes the case, right?
19         A.   Yes.
20         Q.   All right.
21               I'm sorry.  So you just said when
22     Clayton would mark loans as material
23     exceptions, sometimes it marked loans because
24     they violated the lender's underwriting
25     guidelines, right?
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES

 2              MR. OBLAK:  Objection to form.

 3              THE WITNESS:  Well, they violated

 4         somebody's guidelines.

 5              BY MR. HARSCH:

 6         Q.    Sometimes that was the lender's

 7         guidelines, correct?

 8              MR. OBLAK:  Objection to form.

 9              THE WITNESS:  Could have been any

10         reason.

11              BY MR. HARSCH:

12         Q.    Did Freddie -- Freddie Mac ever

13         instruct Clayton to review subprime or Alt-A

14         loans for whether they conformed to general

15         industry standards?

16         A.    Can you repeat that?  I'm sorry.

17         Q.    Did Freddie Mac ever instruct

18         Clayton to review bulk subprime and Alt-A loans

19         for whether they conformed to minimum industry

20         standards?

21              MR. OBLAK:  Objection to form.

22              THE WITNESS:  Specifically, I don't

23         recall.

24              BY MR. HARSCH:

25         Q.    Is that something you would recall
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2       if you had been part of issuing such an
 3       instruction to Clayton?
 4              MR. OBLAK:  Objection to form.
 5              THE WITNESS:  There was one giant
 6       bulk purchase that we did and I don't recall
 7       the specifics of the direction given to
 8       Clayton, so outside of that one, I would say
 9       no.  Inside of that particular transaction, I
10       don't recall.
11              BY MR. HARSCH:
12         Q.    So outside of that particular
13       transaction, Freddie didn't instruct Clayton to
14       review loans for whether they conformed with
15       minimum industry standards?
16              MR. OBLAK:  Objection to form.
17              THE WITNESS:  Well, as I said
18       before, I don't recall that, no.
19              BY MR. HARSCH:
20         Q.    That is something you would recall,
21       right?
22              MR. OBLAK:  Objection to form.
23       Asked and answered.
24              THE WITNESS:  I don't know.
25              BY MR. HARSCH:
```

RONALD FEIGLES - 6/13/2013

```
 1                        RONALD FEIGLES

 2           Q.    Did you ever ask Clayton to review a

 3      loan for whether the originator had obtained

 4      explanations for inquiries on a credit report

 5      that was in the loan file?

 6           A.    I don't recall.

 7           Q.    If that kind of instruction was

 8      given to Clayton, would that be reflected in

 9      the scripts that were given to Clayton?

10                MR. OBLAK:  Objection to form.

11                THE WITNESS:  If we gave scripts to

12      Clayton, I think we gave them guidelines.  I

13      don't know if we would have given them that

14      specific of a direction or not.  We may have.

15      I don't know.

16                BY MR. HARSCH:

17           Q.    Have you ever heard of an industry

18      standard by which originators have to obtain

19      explanations for inquiries on a credit report?

20                MR. OBLAK:  Objection to form.

21                THE WITNESS:  Sure, I think that is

22      in some lender's guidelines.

23                BY MR. HARSCH:

24           Q.    And not others?

25                MR. OBLAK:  Objection to form.
```

RONALD FEIGLES - 6/13/2013

```
 1                    RONALD FEIGLES
 2            THE WITNESS:  Possibly not others.
 3            BY MR. HARSCH:
 4       Q.   So if there was such a requirement,
 5       it would be in lender's guideline, right?
 6            MR. OBLAK:  Objection to form.
 7            THE WITNESS:  Could be in a lender's
 8       guidelines.  It could be in Freddie Mac's
 9       guidelines.
10            BY MR. HARSCH:
11       Q.   And have you ever heard of a general
12       industry standard to the effect?
13            MR. OBLAK:  Objection to form.
14            THE WITNESS:  I have heard that it's
15       something that people do.
16            BY MR. HARSCH:
17       Q.   But not all people, right?
18       A.   Not all.
19            MR. OBLAK:  Want to break for lunch
20       soon, Brad?
21            MR. HARSCH:  Yeah, let's break for
22       lunch.
23            THE VIDEOGRAPHER:  Going off the
24       record.
25            The time is 12:45 p.m..
```