# Exhibit D

**Offering Circular Supplement**
**(To Offering Circular**
**Dated February 1, 2007)**

**$26,235,464**
**(Approximate)**



# Freddie Mac

**Structured Pass-Through Certificates**
**(SPCs), Series T-079**

| | |
|---|---|
| **Offered Classes:** | Classes of SPCs shown below |
| **Underlying Classes:** | Each Class of SPCs represents a pass-through interest in a separate class of securities issued by the Underlying Trust |
| **Underlying Trust:** | Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-6 |
| **Mortgages:** | Nonprime fixed-rate and adjustable-rate mortgages |
| **Underlying Depositor:** | Merrill Lynch Mortgage Investors, Inc. |
| **Underlying Sponsor:** | First Franklin Financial Corporation |
| **Underlying Servicer:** | Home Loan Services, Inc. |
| **Underlying Trustee:** | LaSalle Bank National Association |
| **Payment Dates:** | Monthly beginning in January 2008 |
| **Optional Termination:** | The Underlying Trust is subject to a 10% clean-up call described in this Supplement |
| **Form of SPCs:** | Book-entry on DTC System |
| **Offering Terms:** | Merrill Lynch, Pierce, Fenner & Smith Incorporated is acquiring the SPCs upon issuance for resale to us |
| **Closing Date:** | December 21, 2007 |

| Class | Original Balance(1) | Class Coupon | CUSIP Number | Final Payment Date |
|---|---|---|---|---|
| 1A1 .................................... | $ 2,585,314 | (2) | 31397PQ52 | December 25, 2037 |
| 2A1 .................................... | 6,816,092 | (2) | 31397PQ60 | December 25, 2037 |
| 3A1 .................................... | 4,893,356 | (2) | 31397PQ78 | December 25, 2037 |
| 4A1 .................................... | 11,940,702 | (2) | 31397PQ86 | January 25, 2038 |

(1) Approximate. May vary by up to ±10%.
(2) See *Terms Sheet — Interest.*

---

The SPCs may not be suitable investments for you. You should not purchase SPCs unless you have carefully considered and are able to bear the associated prepayment, interest rate, yield and market risks of investing in them. *Certain Risk Considerations* on page S-2 highlights some of these risks.

You should purchase SPCs only if you have read and understood this Supplement, the attached Offering Circular and the documents listed under *Available Information.*

We guarantee principal and interest payments on the SPCs. These payments are not guaranteed by and are not debts or obligations of the United States or any federal agency or instrumentality other than Freddie Mac. The SPCs are not tax-exempt. Because of applicable securities law exemptions, we have not registered the SPCs with any federal or state securities commission. No securities commission has reviewed this Supplement.

---

**December 18, 2007**

## CERTAIN RISK CONSIDERATIONS

Although we guarantee the payments on the SPCs, and so bear the associated credit risk, as an investor you will bear the other risks of owning mortgage securities. This section highlights some of these risks. You should also read *Risk Factors* and *Prepayment, Yield and Suitability Considerations* in the Offering Circular and *Risk Factors* in the Information Circular for further discussions of these risks.

**SPCs May Not be Suitable Investments for You.** The SPCs are complex securities. You should not purchase SPCs unless you are able to understand and bear the associated prepayment, redemption, interest rate, yield and market risks.

**Prepayments Can Reduce Your Yield.** Your yield could be lower than you expect if:

- You buy your SPCs at a premium over their principal amount and prepayments on the related Mortgages are faster than you expect.

- You buy your SPCs at a discount to their principal amount and prepayments on the related Mortgages are slower than you expect.

**The Class Coupons on the SPCs Will Vary.** The Class Coupon of each Class adjusts monthly and equals the **Net WAC Rate** of its related Mortgages. The Mortgages underlying 1A1 and 2A1 are fixed-rate Mortgages. The Mortgages underlying 3A1 and 4A1 are adjustable-rate Mortgages that are subject to periodic rate caps and lifetime rate ceilings. Disproportionately fast prepayments on the related Mortgages with relatively high interest rates could reduce the Class Coupon of any Class to a lower rate than it would otherwise have. Any resulting interest shortfalls may or may not be made up in later periods.

**Index Levels Can Reduce the Yields of Your SPCs.** In the case of 3A1 and 4A1, if the levels of the indices used to adjust the interest rates of the related Mortgages are lower than you expect, the yields on your SPCs could be lower than you expect. All of the Mortgages that back 3A1 and 4A1 adjust their interest rates on the basis of **Six-Month LIBOR**.

**The SPCs are Subject to Redemption Risk.** If the Underlying Trust is terminated or the SPCs are redeemed, the effect on the SPCs will be similar to a full prepayment of all the Mortgages.

**The SPCs are Subject to Market Risks.** You will bear all of the market risks of your investment. The market value of your SPCs will vary over time, primarily in response to changes in prevailing interest rates. If you sell your SPCs when their market value is low, you may experience significant losses.

**TERMS SHEET**

**This Terms Sheet contains selected information about this Series. You should refer to the remainder of this Supplement and to the attached documents for further information.**

Our Giant and Other Pass-Through Certificates Offering Circular dated February 1, 2007 (the **"Offering Circular"**), attached to this Supplement, defines many of the terms we use in this Supplement. The Depositor's Information Circular dated the same date as this Supplement (the **"Information Circular"**), also attached to this Supplement, defines terms that appear in **bold type** on their first use and are not defined in this Supplement or the Offering Circular.

*In this Supplement we sometimes refer to Classes of SPCs only by their number and letter designations. For example, "1A1" refers to the 1A1 Class of this Series.*

**General**

Each Class of SPCs represents the entire interest in a separate pass-through pool. Each pass-through pool consists of an entire class of securities (the **"Underlying Class"**) issued by the Underlying Trust. Each Underlying Class has a similar designation as its corresponding Class of SPCs and receives payments primarily from one specified group of Mortgages. The Mortgages are divided into four groups, **Loan Group 1**, **Loan Group 2**, **Loan Group 3** and **Loan Group 4**, which back 1A1, 2A1, 3A1 and 4A1, respectively. The Mortgages held consist of fixed-rate loans (in the case of Loan Groups 1 and 2) and adjustable-rate loans which are subject to periodic rate caps and lifetime rate ceilings (in the case of Loan Groups 3 and 4). The Mortgages in Loan Groups 2 and 4 provide for prepayment penalties.

**Interest**

The Class Coupon of each Class will be a variable per annum rate equal to the Net WAC Rate of the related Loan Group. The Net WAC Rate of each Loan Group is based on the weighted average of the interest rates of the related Mortgages, less the sum of the **Servicing Fee Rate,** the **Trustee Fee Rate,** the **Credit Risk Management Fee Rate** and, if applicable, the **PMI Insurer Fee Rate.** The Class Coupons for the first Payment Date will be approximately 8.611580% (1A1), 7.930191% (2A1), 7.993865% (3A1) and 7.621883% (4A1).

See *Payments — Interest* in this Supplement and *Description of the Mortgage Loans — Index* and *Description of the Certificates — Priority of Distributions on the Class A Certificates* in the Information Circular.

**Principal**

On each Payment Date, we pay principal on each Class of SPCs in an amount equal to the principal required to be paid on that Payment Date on its corresponding Underlying Class.

See *Payments — Principal* and *Prepayment and Yield Analysis* in this Supplement and *Description of the Certificates — Priority of Distributions on the Class A Certificates* in the Information Circular.

**Federal Income Taxes**

If you own a Class of SPCs, you will be treated for federal income tax purposes as owning an undivided interest in the related Underlying Class. Each Underlying Class represents ownership in a grantor trust.

See *Certain Federal Income Tax Consequences* in this Supplement and in the Offering Circular and *Certain Material Federal Income Tax Consequences* in the Information Circular.

**Weighted Average Lives and Yields**

The Information Circular shows weighted average lives and declining principal balances for each Underlying Class, based on certain assumptions described in the Information Circular. The weighted average lives and declining principal balances of each Class of SPCs would be the same as those shown in the Information Circular for its corresponding Underlying Class, based on the same assumptions. These assumptions are likely to differ from actual experience in many cases.

See *Prepayment and Yield Considerations, Appendix B* and *Appendix C* in the Information Circular.

## AVAILABLE INFORMATION

You should purchase SPCs only if you have read and understood:

- This Supplement.

- The Offering Circular.

- The Underlying Depositor's Information Circular.

- Our Information Statement dated March 23, 2007 and any subsequent Information Statement and Information Statement Supplements published through the time of purchase (together, the **"Information Statement"**).

This Supplement incorporates the Information Statement by reference. You should rely only on the most current information provided or incorporated by reference in this Supplement.

You can obtain the Information Statement, the Pass-Through Agreement and current information concerning the SPCs from our Investor Inquiry Department or our Internet web-site as described on page 4 of the Offering Circular.

**The Underlying Depositor has prepared the Information Circular in connection with its sale of the Underlying Classes to us. The Underlying Depositor is responsible for the accuracy and completeness of the Information Circular, and we do not make any representations that it is accurate or complete.**

## GENERAL INFORMATION

**Pass-Through Agreement**

We will create the SPCs under the Pass-Through Certificates Agreement dated February 1, 2007 and a Terms Supplement dated the Closing Date (together, the **"Pass-Through Agreement"**).

You should refer to the Pass-Through Agreement for a complete description of your rights and obligations and those of Freddie Mac. You will acquire your SPCs subject to the terms and conditions of the Pass-Through Agreement, including the Terms Supplement.

**Form of SPCs**

The SPCs are issued, held and transferable on the DTC System. DTC or its nominee is the Holder of each Class. As an investor in SPCs, you are not the Holder. See *Description of Pass-Through Certificates — Form of Pass-Through Certificates, Holders and Payment Procedures* in the Offering Circular.

**Denominations of SPCs**

Each Class will be issued, and may be held and transferred, in minimum original principal amounts of $1,000 and additional increments of $1.

**Structure of Transaction**

*General*

Each Class of SPCs represents the entire interest in a pass-through pool consisting of its corresponding Underlying Class. Each Underlying Class represents an interest in the Underlying Trust formed by the Underlying Depositor. The Underlying Trust consists primarily of the Mortgages described under *Description of the Mortgage Loans* in the Information Circular. LaSalle Bank National Association is the trustee (the **"Underlying Trustee"**) for the Underlying Trust. Each Class of SPCs receives the payments of principal and interest that are made on its corresponding Underlying Class. The **Pooling and Servicing Agreement** for the Underlying Trust governs the Underlying Classes.

Each Underlying Class will bear interest at the same rate, and at all times will have the same principal balance, as its corresponding Class of SPCs. On the Closing Date, we will acquire the Underlying Classes from the Underlying Depositor. We will hold the Underlying Classes in certificated form on behalf of investors in the SPCs.

See *Description of Pass-Through Certificates — Structured Pass-Through Certificates* in the Offering Circular.

**The Mortgages**

The mortgages in the Underlying Trust (the **"Mortgages"**) are nonprime, fixed-rate and adjustable-rate, monthly pay, one- to two-family, condo and planned unit development, first lien residential mortgage loans. Loan Groups 1 and 2 consist of fixed-rate loans and Loan Groups 3 and 4 consist of adjustable-rate loans in the Underlying Trust. The Mortgages in Loan Groups 2 and 4 provide for prepayment penalties.

*Description of the Mortgage Loans* and *Appendix A* in the Information Circular further describe the Mortgages.

## PAYMENTS

**Payment Dates; Record Dates**

We make payments of principal and interest on the SPCs on each Payment Date, beginning in January 2008. A **"Payment Date"** is the 25th of each month or, if the 25th is not a **Business Day**, the next Business Day.

On each Payment Date, DTC credits payments to the DTC Participants that were owners of record at the close of business on the last Business Day of the related Accrual Period.

**Method of Payment**

The Registrar makes payments to DTC in immediately available funds. DTC credits payments to the accounts of DTC Participants in accordance with its normal procedures. Each DTC Participant, and each other financial intermediary, is responsible for remitting payments to its customers.

**Interest**

*General*

We pay interest on each Payment Date on each Class of SPCs. The Classes bear interest as shown under *Terms Sheet — Interest*. You can obtain the Class Coupons on the SPCs for the current and all preceding Accrual Periods from our Investor Inquiry Department or our Internet web-site as shown on page 4 of the Offering Circular.

*Accrual Period*

The **"Accrual Period"** for each Payment Date is the preceding calendar month.

We calculate interest based on a 360-day year of twelve 30-day months.

**Principal**

We pay principal on each Payment Date on each Class of Certificates in an amount equal to the principal payable on its corresponding Underlying Class. Investors receive principal payments on a pro rata basis among the SPCs of their Class.

See *Terms Sheet — Principal* in this Supplement and *Description of the Certificates — Priority of Distributions on the Class A Certificates* in the Information Circular.

**Class Factors**

*General*

We make Class Factors for the Classes of SPCs available at least two Business Days before each Payment Date. See *Description of Pass-Through Certificates — Payments — Class Factors* in the Offering Circular.

*Use of Factors*

You can calculate principal and interest payments by using the Class Factors.

For example, the reduction in the balance of a Class in February will equal its original balance times the difference between its January and February Class Factors. The amount of interest to be paid on a Class in February will equal interest at its Class Coupon, accrued during the related Accrual Period, on its balance determined by its January Class Factor.

**Guarantees**

We guarantee to the Holder of each Class of SPCs the timely payment of interest at its Class Coupon, including the amount of any interest shortfall as a result of the **Relief Act** or Mortgage prepayments. We also guarantee the payment of the principal amount of each Class as described in the Information Circular and not later than its Final Payment Date. See *Description of Pass-Through Certificates — Guarantees* in the Offering Circular and *Description of the Certificates — Freddie Mac Guarantee* in the Information Circular.

**Optional Termination; Redemption**

The Underlying Servicer will have the option to purchase the Mortgages and other trust property in the Underlying Trust and terminate the Underlying Trust on or after the first Payment

Date after the Payment Date on which the aggregate unpaid principal balance of the Mortgages is reduced to 10% or less of their aggregate unpaid principal balance as of December 1, 2007. The Underlying Servicer will have the option to purchase the Mortgages in the Underlying Trust even if the unpaid principal balance of the related Mortgages in any particular Loan Group of the Underlying Trust is greater than 10% of its aggregate unpaid principal balance as of December 1, 2007. See *The Pooling and Servicing Agreement — Optional Termination of the Trust* in the Information Circular.

If a termination of the Trust occurs, each outstanding Class of SPCs will receive its unpaid principal amount plus interest for the related Accrual Period. We will give notice of termination to the affected Holders not later than the fifth Business Day of the month in which the termination will occur, and each Class Factor we publish in that month will equal zero.

In addition, we will have the right to redeem the SPCs on any Payment Date when their aggregate remaining balance would be less than 1% of their aggregate original balance. We will give notice of any exercise of this right to the affected Holders 30 to 60 days before the redemption date. We will pay a redemption price equal to the unpaid principal amount of the Classes redeemed plus interest for the related Accrual Period.

## PREPAYMENT AND YIELD ANALYSIS

**Mortgage Prepayments**

The rates of principal payments on the Classes will depend primarily on the rates of principal payments, including prepayments, on the related Mortgages. The Mortgages are subject to prepayment at any time, subject to any applicable prepayment penalty in the case of Loan Groups 2 and 4. Mortgage prepayment rates fluctuate continuously and, in some market conditions, substantially.

See *Prepayment, Yield and Suitability Considerations — Prepayments* in the Offering Circular for a discussion of mortgage prepayment considerations and risks. *Risk Factors* and *Prepayment and Yield Considerations* in the Information Circular discuss prepayment considerations for the Underlying Classes.

**Yield**

As an investor in SPCs, your yield will depend on:

- Your purchase price.
- The rate of principal payments on the related underlying Mortgages.
- Whether an optional termination of the Underlying Trust occurs or the SPCs are redeemed.
- The actual characteristics of the related underlying Mortgages.
- In the case of 3A1 and 4A1, the levels of Six-Month LIBOR.
- In the case of 3A1 and 4A1, the effect of periodic rate caps and lifetime rate ceilings on the interest rates of the related Mortgages and the frequency with which adjustments are made.

S-8

- Whether the Class Coupon of your SPCs is reduced because the weighted average interest rate of the related Mortgages declines.

- The delay between each Accrual Period and the related Payment Date.

See *Prepayment, Yield and Suitability Considerations — Yields* in the Offering Circular for a discussion of yield considerations and risks.

**Suitability**

The SPCs may not be suitable investments for you. See *Prepayment, Yield and Suitability Considerations — Suitability* in the Offering Circular for a discussion of suitability considerations and risks.

## FINAL PAYMENT DATES

The Final Payment Date for each Class of SPCs is the latest date by which it will be paid in full and will retire. We calculate each Final Payment Date using highly conservative assumptions, and the actual retirement of each Class may occur earlier than its Final Payment Date.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**General**

Any discussion of tax matters herein and in the Offering Circular was not intended or written to be used, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed on such person. Such discussion was written to support the promotion and marketing of the SPCs. Investors should consult their own independent tax advisors regarding the SPCs and each investor's particular circumstances.

The following is a general discussion of federal income tax consequences of the purchase, ownership and disposition of the Classes of SPCs. It does not address all federal income tax consequences that may apply to particular categories of investors, some of which may be subject to special rules. The tax laws and other authorities for this discussion are subject to change or differing interpretations, and any change or interpretation could apply retroactively. You should consult your tax advisor to determine the federal, state, local and any other tax consequences that may be relevant to you.

Neither the SPCs nor the income derived from them is exempt from federal income, estate or gift taxes under the Code by virtue of the status of Freddie Mac as a government-sponsored enterprise. Neither the Code nor the Freddie Mac Act contains an exemption from taxation of the SPCs or the income derived from them by any state, any possession of the United States or any local taxing authority.

**Classification of Investment Arrangement**

The arrangement under which each Class of SPCs is created and sold and the related pass-through pool is administered will be classified as a grantor trust under subpart E, part I of subchapter J of the Code. As an investor in SPCs, you will be treated for federal income tax purposes as the owner of a pro rata undivided interest in the related Underlying Class.

**Status of Classes**

Upon the issuance of the Underlying Classes, Dechert LLP, counsel for the Underlying Depositor, will deliver its opinion generally to the effect that, assuming compliance with all the provisions of the Pooling and Servicing Agreement and certain other documents:

- The Underlying Trust will qualify as a grantor trust under the Code.

- Each Underlying Class will represent ownership of an undivided beneficial interest in the applicable assets of the Underlying Trust.

Accordingly, an investor in a Class of SPCs will be treated as owning an undivided beneficial interest in the applicable assets of the Underlying Trust.

For information regarding the federal income tax consequences of investing in an Underlying Class, see *Certain Material Federal Income Tax Consequences* in the Information Circular.

**Information Reporting**

We will provide the Holder of each Class, within a reasonable time after the end of each calendar year, information to assist beneficial owners in preparing their federal income tax returns, or to enable the Holder to make such information available to investors or financial intermediaries for which the Holder holds the SPCs as nominee.

## LEGAL INVESTMENT CONSIDERATIONS

You should consult your legal advisor to determine whether the SPCs are a legal investment for you and whether you can use the SPCs as collateral for borrowings. See *Legal Investment Considerations* in the Offering Circular.

## ERISA CONSIDERATIONS

A U.S. Department of Labor regulation provides that, if an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974 (**"ERISA"**) acquires a "guaranteed governmental mortgage pool certificate," then, for purposes of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code, the plan's assets include the certificate and all of its rights in the certificate, but do not, solely by reason of the plan's holding of the certificate, include any of the assets underlying the certificate. Under this regulation, the term "guaranteed governmental mortgage pool certificate" includes a certificate "backed by, or evidencing an interest in, specified mortgages or participation interests therein" if Freddie Mac guarantees the interest and principal payable on the certificate.

The regulation makes it clear that Freddie Mac and other persons, in providing services for the assets in the pool, would not be subject to the fiduciary responsibility provisions of Title I of ERISA,

or the prohibited transaction provisions of Section 406 of ERISA or Code Section 4975, merely by reason of the plan's investment in a certificate.

The SPCs should qualify as "guaranteed governmental mortgage pool certificates."

## PLAN OF DISTRIBUTION

Merrill Lynch, Pierce, Fenner & Smith Incorporated is acquiring the SPCs upon issuance for resale to us.

## LEGAL MATTERS

Our General Counsel (or one of our Deputy General Counsels) will render an opinion on the legality of the SPCs. Dechert LLP is representing the Underlying Depositor on legal matters concerning the Underlying Classes.



# Freddie Mac
## Giant and Other Pass-Through Certificates

**Giant Certificates**
**Stripped Giant Certificates**
**Stripped Interest Certificates**
**Callable Pass-Through Certificates**
**Structured Pass-Through Certificates**

### The Pass-Through Certificates

Freddie Mac issues and guarantees several types of Pass-Though Certificates. Pass-Through Certificates are securities that represent interests in pools of assets that are backed by residential mortgages.

### Freddie Mac's Guarantee

We guarantee the payment of interest and principal on the Pass-Through Certificates as described in this Offering Circular. We alone are responsible for making payments on our guarantee. Principal and interest payments on the Pass-Through Certificates are not guaranteed by and are not debts or obligations of the United States or any federal agency or instrumentality other than Freddie Mac.

### Freddie Mac Will Provide More Information for Each Offering

This Offering Circular describes the general characteristics of Pass-Through Certificates. For each offering of Pass-Through Certificates, we prepare an offering circular supplement. The supplement will describe more specifically the particular Pass-Through Certificates included in that offering.

### Tax Status and Securities Law Exemptions

The Pass-Through Certificates are not tax-exempt. Because of applicable securities law exemptions, we have not registered the Pass-Through Certificates with any federal or state securities commission. No securities commission has reviewed this Offering Circular.

---

**Pass-Through Certificates may not be suitable investments for you. You should consider carefully the risks of investing in Pass-Through Certificates. The *Risk Factors* section on pages 8 and 9 highlights some of these risks.**

---

**Offering Circular dated February 1, 2007**

If you intend to purchase Pass-Through Certificates, you should rely on the information in this Offering Circular and in the related supplement for those Pass-Through Certificates, including the information in any disclosure documents that we incorporate by reference.  We have not authorized anyone to provide you with different information.

We are not offering the Pass-Through Certificates in any jurisdiction that prohibits their offer.

This Offering Circular, the related supplement and any incorporated documents may not be correct after their dates.

## TABLE OF CONTENTS

| Description | Page |
|---|---|
| Freddie Mac | 3 |
| Additional Information | 4 |
| Summary | 5 |
| Risk Factors | 8 |
| Description of Pass-Through Certificates | 9 |
| General | 9 |
| Giant Certificates | 10 |
| Stripped Giant Certificates | 10 |
| Stripped Interest Certificates | 11 |
| Callable Pass-Through Certificates | 12 |
| Structured Pass-Through Certificates | 12 |
| Categories of Classes | 13 |
| Pass-Through Pool Assets | 14 |
| Payments | 16 |
| Guarantees | 20 |
| Form of Pass-Through Certificates, Holders and Payment Procedures | 21 |
| Prepayment, Yield and Suitability Considerations | 22 |
| Prepayments | 22 |
| Yields | 23 |
| Suitability | 26 |
| Tabular Information in Supplements | 26 |
| The Pass-Through Agreement | 28 |
| Various Matters Regarding Freddie Mac | 28 |

| Description | Page |
|---|---|
| Events of Default | 29 |
| Rights Upon Event of Default | 29 |
| Voting Under Any PC or REMIC Agreement | 29 |
| Amendment | 30 |
| Governing Law | 30 |
| Certain Federal Income Tax Consequences | 30 |
| General | 30 |
| Giant Certificates | 32 |
| Strips | 35 |
| SPCs | 38 |
| CPCs | 38 |
| Exchange Transactions | 41 |
| Backup Withholding, Foreign Withholding and Information Reporting | 41 |
| Accounting Considerations | 43 |
| Legal Investment Considerations | 43 |
| Distribution Arrangements | 43 |
| Increase in Size | 44 |
| Appendix I — Index of Terms | I-1 |
| Appendix II — Exchange Procedures for Stripped Giant Certificates | II-1 |
| Appendix III — Examples of MACS Exchanges | III-1 |
| Appendix IV — Redemption and Exchange Procedures for CPCs | IV-1 |

The *Index of Terms* (Appendix I) shows where definitions of capitalized terms appear.

## FREDDIE MAC

Freddie Mac is a stockholder-owned company chartered by Congress in 1970 under the Federal Home Loan Mortgage Corporation Act (the **"Freddie Mac Act"**) to stabilize the nation's residential mortgage markets and expand opportunities for homeownership and affordable rental housing. We are one of the largest purchasers of mortgage loans in the U.S. We bring innovation and efficiency to the mortgage lending process.

Our mission is to provide liquidity, stability and affordability to the U.S. housing market. We fulfill our mission by purchasing residential mortgages and mortgage-related securities in the secondary mortgage market. We purchase mortgages that meet our underwriting and product standards, then bundle them into mortgage-related securities that can be sold to investors. We can use the proceeds to purchase additional mortgages from primary market mortgage lenders, thus providing them with a continuous flow of funds. We also purchase mortgage loans and mortgage-related securities for our investment portfolio, which we finance primarily by issuing a variety of debt instruments in the capital markets.

Though we are chartered by Congress, our business is funded completely with private capital. We are responsible for making payments on our securities. Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities and other obligations.

Our statutory purposes, as stated in our charter, are:

- To provide stability in the secondary market for residential mortgages;

- To respond appropriately to the private capital market;

- To provide ongoing assistance to the secondary market for residential mortgages (including activities related to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return received on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and

- To promote access to mortgage credit throughout the U.S. (including central cities, rural areas and other underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing.

## ADDITIONAL INFORMATION

We prepare annual Information Statements that describe our business and operations, and contain our audited financial statements. We also prepare Information Statement Supplements from time to time. As of any given date, this Offering Circular incorporates by reference the most recent Information Statement and any subsequent Information Statement Supplements. You should rely only on the most recent information provided or incorporated by reference in this Offering Circular and any applicable supplement.

You can obtain any of these documents, as well as the disclosure documents for our Pass-Through Certificates and other securities, from:

> **Freddie Mac — Investor Inquiry**
> **1551 Park Run Drive, Mailstop D5N**
> **McLean, Virginia 22102-3110**
> **Telephone: 1-800-336-3672**
> **(571-382-4000 within the Washington, D.C. area)**
> **E-mail: Investor Inquiry@freddiemac.com***

We also make these documents available on our Internet web-site at this address:

**Internet web-site: www.freddiemac.com***

* We are providing this Internet address solely for the information of prospective investors. We do not intend this Internet address to be an active link and we are not using reference to this address to incorporate additional information into this Offering Circular or any supplement, except as specifically stated in this Offering Circular.

4

# SUMMARY

This summary highlights selected information about the Pass-Through Certificates. Before buying Pass-Through Certificates, you should read the remainder of this Offering Circular and the supplement for the particular offering. You should rely on the information in the supplement if it is different from the information in this Offering Circular.

| | |
|---|---|
| **Issuer and Guarantor** . . . . . . . | Federal Home Loan Mortgage Corporation, or **"Freddie Mac,"** a shareholder-owned government-sponsored enterprise. |
| **Pass-Through Certificates** . . . | **"Pass-Through Certificates"** represent beneficial ownership interests in pass-through pools, which are pools of assets that we form. |
| **Assets and Mortgages** . . . . . . . | The assets in each pass-through pool include Freddie Mac PCs, GNMA Certificates, Pass-Through Certificates, other securities backed by residential mortgages that we have purchased or other mortgage-related assets. The mortgages underlying the assets (the **"Mortgages"**) may be secured by single-family or multifamily residential properties, and have either a fixed or an adjustable interest rate. |

**Types of Pass-Through Certificates:**

| | |
|---|---|
| • **Giant Certificates** . . . . . . . | Giant Certificates are single-class securities that receive principal and interest from their underlying assets. They may have either a fixed or an adjustable interest rate, called a class coupon, depending on the underlying Mortgages. |
| •• **Giant PCs** . . . . . . . . . . | Giant PCs are Giant Certificates whose underlying assets are Freddie Mac PCs or other Giant PCs. |
| •• **Giant Securities** . . . . . | Giant Securities are Giant Certificates whose underlying assets are GNMA Certificates or other Giant Securities. |
| • **Stripped Giant Certificates** . . . . . . . . . . . . | Stripped Giant Certificates are issued in series consisting of two or more classes that receive principal only, interest only or both principal and interest from their underlying asset. Each series is backed by a single Giant Certificate. If you own proportionate amounts of each of the classes from the same series, you may exchange them for an equivalent amount of the underlying asset, and vice versa. |
| •• **Modifiable And Combinable Securities (MACS)** . . | MACS are Stripped Giant Certificates issued in series consisting of a fixed rate interest only class, a principal only class and multiple fixed rate classes that receive both principal and interest with different class coupons, ranging from deep discount to high premium coupons. A series of MACS also may include multiple floating rate and inverse floating rate classes, some of which |

5

receive both principal and interest and some of which are interest only classes. If you own appropriate amounts of MACS classes, you may exchange them for other classes of the same series with different class coupons or interest rate formulas, or for an equivalent amount of the underlying asset, and vice versa.

- **Stripped Interest Certificates** . . . . . . . . . . . . Stripped Interest Certificates are issued in series consisting of one or more classes that receive interest payments from one or more assets. Each series is backed by a portion of interest payments from Mortgages included in various pools that back Freddie Mac PCs.

- **Callable Pass-Through Certificates (CPCs)** . . . . CPCs are issued in series consisting of pairs of callable and call classes, and are backed by Giant Certificates. The callable class receives principal and interest from the underlying assets. The call class receives no principal or interest, but has the right to call the related callable class for redemption and to receive the underlying securities.

- **Structured Pass-Through Certificates (SPCs)** . . . . . SPCs are issued in series consisting of one or more classes. Each class receives payments from one or more assets. The assets usually are REMIC classes issued by Freddie Mac or another party.

**Payments** . . . . . . . . . . . . . . . . . Freddie Mac passes through any payment of principal and interest due on a Pass-Through Certificate monthly on the applicable Payment Date. As described in more detail later, Payment Dates fall on or about:

- The 15th of each month, for classes backed by PCs.

- The 17th or 20th of each month, as applicable, for classes backed by GNMA Certificates.

- **Interest** . . . . . . . . . . . . . . . Freddie Mac pays interest on each class of Pass-Through Certificates at its class coupon. Interest payable on a Payment Date accrues during the monthly accrual period specified in this Offering Circular or the applicable supplement.

- **Principal** . . . . . . . . . . . . . . Pass-Through Certificates receive principal payments in the same amounts and the same periods as their underlying assets. Holders of a class of Pass-Through Certificates entitled to principal receive principal payments proportionately with each other, based on the principal amounts of their Pass-Through Certificates.

**Accounting Considerations** . . . Various factors may influence the accounting treatment applicable to various types of Pass-Through Certificates. You should consult your own accountant regarding the appropriate accounting treat-

ment for Pass-Through Certificates or an exchange of Pass-Through Certificates.

**Form of Pass-Through
  Certificates** . . . . . . . . . . . . . .   Pass-Through Certificates that are backed by PCs or GNMA Certificates in most cases will be issued, held and transferable on the book-entry system of the Federal Reserve Banks (the **"Fed System"**).

In some cases, Pass-Through Certificates may be issued, held and transferable on the book-entry system (the **"DTC System"**) of The Depository Trust Company or its successor (**"DTC"**).

Some classes, including call classes, will be issued in registered, certificated form. They will be transferable at our office, in our capacity as registrar, or at the office of any successor registrar we designate (the **"Registrar"**).

**Holders** . . . . . . . . . . . . . . . . . .   As an investor in Pass-Through Certificates, you are not necessarily the Holder of those Pass-Through Certificates. You will ordinarily hold your Pass-Through Certificates through one or more financial intermediaries. Your rights as an investor may be exercised only through the Holder of your Pass-Through Certificates, and Freddie Mac may treat the Holder as the absolute owner of your Pass-Through Certificates. The term **"Holder"** means:

- For a class held on the Fed System, any entity that appears on the records of a Federal Reserve Bank as a holder of that class.

- For a class held on the DTC System, DTC or its nominee.

- For a certificated class, any entity or individual that appears on the records of the Registrar as a registered holder of that class.

## RISK FACTORS

Although Freddie Mac guarantees the payments on Pass-Through Certificates, and so bears the associated credit risk, as an investor you will bear the other risks of owning mortgage securities. This section highlights some of these risks. *Prepayment, Yield and Suitability Considerations* discusses them in more detail.

**Pass-Through Certificates May Not be Suitable Investments for You.**   Pass-Through Certificates are complex securities. You need to understand the risks of your investment, and you need to be able to analyze the information in the related offering documents as well as the economic and other factors that may affect your investment. If you require a definite payment stream, or a single payment on a specific date, Pass-Through Certificates are not suitable investments for you. If you purchase Pass-Through Certificates, you need to have enough financial resources to bear all of the risks related to your Pass-Through Certificates.

**Principal Payment Rates are Uncertain.**  Principal payment rates on the Pass-Through Certificates will depend on the rates of principal payments on the underlying Mortgages. Mortgage principal payments include scheduled payments and prepayments. Prepayment rates fluctuate continuously and (in some market conditions) substantially. In general, prepayments tend to increase when current interest rates decline, as more borrowers choose to refinance their existing Mortgages. As current interest rates increase, refinancings and prepayments generally decline.

**Prepayments Can Reduce Your Yield.**   Your yield on a class of Pass-Through Certificates will depend on its price, the rate of prepayments on its underlying Mortgages and the actual characteristics of those Mortgages. The Mortgages may be prepaid at any time, in most cases without penalty. The yield on your class of Pass-Through Certificates could be lower than you expect if either:

- You buy your class at a discount to its principal amount and principal payments are slower than you expect.

- You buy your class at a premium over its principal amount and principal payments are faster than you expect.

If you purchase an interest only class (including a class of Stripped Interest Certificates) or any other class at a significant premium and prepayments are very fast, you may not even recover your investment.

**Index Levels Can Reduce Your Yield if You Own a Floating Rate or Inverse Floating Rate Class.**   The yield on your class could be lower than you expect if:

- You own a floating rate class and the levels of the applicable index are lower than you expect.

- You own an inverse floating rate class and the levels of the applicable index are higher than you expect.

If you buy an interest only floating rate class, you may not even recover your investment if the level of the applicable index is low or prepayments are fast. If you buy an interest only inverse floating rate class, you may not even recover your investment if the level of the applicable index is high or prepayments are fast.

**Reinvestment of Principal Payments May Produce Lower Yields.**   Mortgages tend to prepay fastest when current interest rates are low. When you receive principal payments in a low interest rate environment, you may not be able to reinvest them in comparable securities with as high a yield as your Pass-Through Certificates.

**Index Levels Will Affect Yields of Your Adjustable Rate Pass-Through Certificates.**   If your Pass-Through Certificates are backed by adjustable-rate Mortgages, and the index level used to adjust the interest rates on those Mortgages is lower than you expect, the yield on your investment could be lower than you expect, especially if prepayments are slow. Even if the index level is high but prepayments are fast, your yield could be lower than you expect.

**Pass-Through Certificates are Subject to Market Risks.**   The market values of your Pass-Through Certificates will vary over time, primarily in response to changes in prevailing interest rates. If you sell your Pass-Through Certificates when their market values are low, you may experience significant losses. A secondary market for some types of Pass-Through Certificates may not develop. Even if a market does develop, it may not be liquid enough to allow you to sell your Pass-Through Certificates easily or at your desired price.

**The Pass-Through Certificates are Complex Financial Instruments.**   Before investing, you should have sufficient knowledge and experience to evaluate, either alone or with the help of a financial, legal, accounting or tax advisor, (1) the merits and risks of the Pass-Through Certificates and the information contained in this Offering Circular, the applicable supplement and the documents incorporated by reference, (2) the economic, interest rate and other factors that may affect your investment and (3) the terms of the Pass-Through Certificates and any investment restrictions that may apply to you. Because each investor has different investment needs and different risk tolerances, you should consult your own financial, legal, accounting and tax advisors to determine if the Pass-Through Certificates are suitable investments for you.

**You May Not be Allowed to Buy Some Pass-Through Certificates.**   If you are subject to legal investment laws and regulations or to review by regulatory authorities, you may not be allowed to invest in some types of Pass-Through Certificates. See *Legal Investment Considerations.*

## DESCRIPTION OF PASS-THROUGH CERTIFICATES

### GENERAL

We combine mortgage-related securities and other mortgage-related assets into pass-through pools and issue Pass-Through Certificates representing interests in those pools. Each pass-through pool has its own identification number. The securities in the pass-through pools are backed by Mortgages that we have purchased.

A pass-through pool usually includes a single type of asset. These assets are typically:

- Freddie Mac PCs or Giant PCs.

- GNMA Certificates or Freddie Mac Giant Securities.

- Securities that represent "regular interests" in a Real Estate Mortgage Investment Conduit (**"REMIC"**).

- Other Pass-Through Certificates offered under this Offering Circular.

- Other mortgage-related assets identified in the related supplement.

- Other securities identified as assets in the related supplement.

We hold the assets in each pass-through pool for the benefit of the investors in the related Pass-Through Certificates. Below we describe more specifically the types of Pass-Though Certificates and the characteristics of their underlying assets. In addition, if we issue any other type of Pass-Through Certificates, we will describe them in the related supplement.

## GIANT CERTIFICATES

**"Giant Certificates"** are single-class securities entitled to payments of both principal and interest received on the related assets. When we issue Giant Certificates, we form a pass-through pool that typically consists of PCs or GNMA Certificates. If the assets are PCs, the Giant Certificates we issue are **"Giant PCs."** If the assets are GNMA Certificates, the Giant Certificates we issue are **"Giant Securities."** A pass-through pool for Giant Certificates also may include other Giant Certificates of the same type.

Giant Certificates may bear interest at a fixed rate or an adjustable rate. The assets underlying fixed-rate Giant Certificates usually have the same fixed interest rate as the related Giant Certificates. However, we sometimes issue fixed-rate Giant Certificates with an interest rate that is higher or lower than the rate payable on the related assets by retaining a portion of the principal or interest payments on the assets.

The interest rate of an adjustable rate Giant Certificate adjusts each month based on the weighted average of the interest rates of the related assets. The interest rates on all of the adjustable rate Mortgages (**"ARMs"**) backing an adjustable rate Giant Certificate adjust based on the same index and using the same means of adjustment, but do not necessarily adjust on the same date.

The minimum original principal balance of a pass-through pool backing Giant Certificates is $1 million.

## STRIPPED GIANT CERTIFICATES

**"Stripped Giant Certificates"** are issued in series, each consisting of two or more classes. These classes receive unequal proportions of the principal and interest paid on a single underlying asset. When the underlying asset is a Giant PC, the Stripped Giant Certificates we issue are **"Stripped Giant PCs."** When the underlying asset is a Giant Security, the Stripped Giant Certificates we issue are **"Stripped Giant Securities."**

Stripped Giant Certificates include interest only classes (**"Interest Only Classes"** or **"IO Classes"**), principal only classes (**"Principal Only Classes"** or **"PO Classes"**) and interest/principal classes (**"IP Classes"**). IO Classes receive all or a portion of the interest payments from the underlying asset and no principal. PO Classes receive all or a portion of the principal payments from the underlying asset and no interest. IP Classes receive a portion of both the principal and interest payments from the underlying asset.

IO and IP Classes may bear interest at a fixed, adjustable, floating or inverse floating rate.

In order to calculate the interest due each month, we assign a notional principal amount to each IO Class. The original notional principal amount will equal the original principal amount of the underlying asset, and will decline proportionately with the principal amount of that asset.

10

The minimum original principal balance of a pass-through pool backing Stripped Giant Certificates is $1 million.

Stripped Giant Certificates include a feature that permits you to exchange them for their underlying asset. To exchange your Stripped Giant Certificates for an equivalent amount of the underlying Giant Certificate, you must own proportionate interests in the principal and notional principal amounts of all classes of the same series. Similarly, if you own a Giant Certificate that has been reconstituted by an exchange, you may exchange it for equivalent interests in the related Stripped Giant Certificates. Stripped Giant Certificates may be recombined and restripped in this manner repeatedly.

We may charge you a fee for an exchange. We have described the procedures for exchanging Stripped Giant Certificates in Appendix II.

**"Modifiable And Combinable Securities"** or **"MACS"** are Stripped Giant Certificates that are issued in a range of possible class coupons or class coupon formulas and that are exchangeable for other classes of the same series having different class coupons or class coupon formulas. Each series of MACS is backed by a single fixed-rate Giant PC or Giant Security.

A series of MACS typically includes a fixed rate IO Class, a PO Class and multiple fixed rate IP Classes with class coupons ranging in 50 basis point increments from 0.5% to as high as 24.0%. We designate the IP classes of each series by their class coupons, calling a class with a class coupon of 0.5% the "0.5 Class," a class with a class coupon of 24.0% the "24.0 Class" and so forth. A series of MACS also may include multiple floating rate and inverse floating rate classes, some of which are IP Classes and some of which are IO Classes.

We offer MACS classes in *maximum* original principal or notional principal amounts. The maximum amount for each class is considered individually for that class and without regard to the amounts of the other classes. It represents the largest amount of the class that the underlying asset could support.

You can exchange classes of MACS for one or more different classes of the same series. You can also exchange one or more classes of MACS for a portion of the underlying Giant Certificate, and vice versa. To make any of these exchanges, follow the procedures in Appendix II. Appendix III shows examples of exchanges involving MACS.

The classes of a series of MACS that are outstanding at any given time will depend upon which classes were issued initially and upon any exchanges that have occurred. The aggregate outstanding principal amount of all classes, not including the notional principal amounts of IO Classes, will equal the remaining principal amount of the underlying asset at all times. Similarly, the outstanding classes will receive interest payments, in the aggregate, equal to the interest payments made on the underlying asset.

## STRIPPED INTEREST CERTIFICATES

**"Stripped Interest Certificates"** or **"SCs"** are issued in series, each consisting of one or more classes. These classes receive interest paid on their underlying assets. The underlying assets may consist of certain interest amounts payable on Mortgages that have been included in Freddie Mac PCs.

11

SCs consist of IO Classes that receive a portion of the interest payments from the related Mortgages and no principal. IO Classes may bear interest at a fixed rate, an adjustable rate or a weighted average rate.

In order to calculate the interest due each month, we assign a notional principal amount to each IO Class. The original notional principal amount will equal or be derived from the original principal amount of the underlying asset, and will decline proportionately with the principal amount of that asset or as otherwise described in the related supplement.

## CALLABLE PASS-THROUGH CERTIFICATES

**"Callable Pass-Through Certificates"** or **"CPCs"** represent interests in a pass-through pool that contains a single Giant PC or a Giant Security as its primary asset. Classes of CPCs are issued in pairs of **"Callable Classes"** and **"Call Classes."** If you own a Callable Class, you will receive all of the interest and principal payments made on the asset. If you own a Call Class, you will not receive any payments of principal or interest because the Call Class does not represent an ownership interest in the underlying asset.

There can be only one Holder at a time of a Call Class. If you are the Holder of a Call Class, you will have the right (the **"Call Right"**):

1. To direct Freddie Mac to redeem the related Callable Class on any Payment Date during the period specified in the applicable supplement.

2. To exchange your Call Class for the related Callable Assets.

The **"Callable Assets"** will be:

- If the related pass-through pool contains a Giant PC, that Giant PC.

- If the related pass-through pool contains a Giant Security, the GNMA Certificates (and any Giant Securities) underlying that Giant Security.

You must pay a Call Fee and a Call Payment to exercise the Call Right. Appendix IV describes the procedures for exercising the Call Right.

## STRUCTURED PASS-THROUGH CERTIFICATES

**"Structured Pass-Through Certificates"** or **"SPCs"** represent interests in pass-through pools that contain one or more of the following:

- REMIC classes issued by Freddie Mac or a third party.

- Pass-Through Certificates.

- Freddie Mac debt instruments.

- Other securities described in the related supplement.

The pass-through pools typically contain, and the related SPCs represent interests in, separate classes or types of assets. The supplement for each series of SPCs will provide information on the assets for that series. A series of SPCs typically contains two or more classes, and each class of SPCs is backed by its own pass-through pool.

## CATEGORIES OF CLASSES

For purposes of principal and interest payments, we categorize the classes of Pass-Through Certificates as shown below.

The following chart identifies and generally defines most categories of classes. The first column of the chart shows our standard abbreviation for each category. Each supplement will identify the categories of classes of the related series by means of one or more of these abbreviations.

### Principal Types

| Freddie Mac Standard Abbreviation | Category of Class | Definition |
|---|---|---|
| NTL | Notional | Classes having only a notional principal amount. A notional principal amount is the amount used as a reference to calculate the amount of interest due on an Interest Only Class. We indicate parenthetically the type of class with which a Notional Class will reduce. |
| PT | Pass-Through | Classes that receive all or a specified portion of the principal payments on the underlying Giant PC or other pass-through pool assets. |

### Interest Types

| Freddie Mac Standard Abbreviation | Category of Class | Definition |
|---|---|---|
| FIX | Fixed Rate | Classes with class coupons that are fixed throughout the life of the class. |
| FLT | Floating Rate | Classes with class coupons that are reset periodically based on an index and that vary directly with changes in the index. |
| INV | Inverse Floating Rate | Classes with class coupons that are reset periodically based on an index and that vary inversely with changes in the index. |
| IO | Interest Only | Classes that receive some or all of the interest payments made on the underlying Giant PC or other pass-through pool assets and no principal. Interest Only Classes have a notional principal amount. |
| PO | Principal Only | Classes that do not receive any interest. |
| S | Structured Formula | Floating Rate and Inverse Floating Rate Classes with class coupons that are periodically reset using a formula other than an index (without any multiplier) plus a constant, in the case of Floating Rate Classes, or a constant minus an index (without any multiplier), in the case of Inverse Floating Rate Classes, and which are not designated as Toggle Classes. |

13

| Freddie Mac Standard Abbreviation | Category of Class | Definition |
|---|---|---|
| T | Toggle | Floating Rate, Inverse Floating Rate and Weighted Average Coupon Classes with Class Coupons that change significantly as a result of very small changes in the applicable index. The change in Class Coupon may not be a continuous function of changes in the index; rather, a change in the index may result in a "shift" from a predetermined rate or formula to a different predetermined rate or formula. |
| W | WAC (or Weighted Average Coupon) | Classes whose class coupons represent a blended interest rate that may change from period to period. WAC Classes may consist of components with different interest rates or may be backed by assets with different interest rates. |

## PASS-THROUGH POOL ASSETS

### General

Each Pass-Through Pool will contain one or more assets. This section describes the general characteristics of PCs and GNMA Certificates, which directly or indirectly back most of our Pass-Through Certificates. Pass-Through Pools can also contain Giant Certificates, REMIC classes, other Pass-Through Certificates or any other securities or mortgage-related assets that are purchased by Freddie Mac and identified as assets in the related supplement.

### PCs

Freddie Mac Mortgage Participation Certificates, or **"PCs,"** are single-class securities, guaranteed by Freddie Mac, that represent undivided interests in pools of residential Mortgages. Nearly all Mortgages that back PCs are conventional mortgages, which means that neither the United States nor any federal agency or instrumentality guarantees or insures them.

If the underlying Mortgages have a fixed rate of interest, the PCs may be either **"Gold PCs"** or **"Original PCs."** If the underlying Mortgages are ARMs, the related PCs are called **"ARM PCs."**

For Gold PCs, there is a delay of approximately 45 days between the time interest begins to accrue and the time the PC investor receives his interest payment. This time period is a **"Payment Delay."** For ARM PCs and Original PCs there is a Payment Delay of approximately 75 days.

Giant PCs have names — **"Gold Giant PCs," "Original Giant PCs"** and **"ARM Giant PCs"** — that identify their underlying assets. Thus, if you invest in a Giant PC, the name of the Giant PC will identify for you the type of underlying PC and the applicable Payment Delay.

Some PCs represent interests in special types of Mortgages, such as relocation Mortgages, cooperative share Mortgages or extended buydown Mortgages. These types of Mortgages may prepay differently than standard Mortgages. If any one of these types of PCs represents more than 10%, or if any combination of them represents more than 15%, of the original principal balance of a pass-through pool, the applicable supplement will disclose this.

Some PCs represent interests in other special types of Mortgages, such as initial interest Mortgages, reduced servicing fee Mortgages, biweekly Mortgages, assumable Mortgages or prepay-

ment protection Mortgages. If any of these types of PCs are included in a pass-through pool, the applicable supplement will disclose this.

See the PC Offering Circular and our Internet web-site for information on how PC pool numbers and prefixes indicate the general type of Mortgages backing a PC.

We may issue Giant PCs backed by Gold PCs issued under our cash and multilender swap programs. In forming such Giant PCs, we will deposit Mortgages purchased under those programs into PC pools and contribute the resulting Gold PCs to the Giant pass-through pool.

Under our cash program, we purchase Mortgages for cash and contribute them to PC pools. Under our multilender swap program, a mortgage seller can sell Mortgages to us in exchange for the same principal amount of Gold PCs backed by the Mortgages transferred by that mortgage seller and/or by other mortgage sellers.

We prepare a **"PC Offering Circular"** which describes the characteristics of the various types of PCs. Supplements for Pass-Through Certificates backed by PCs will incorporate by reference the current PC Offering Circular.

### GNMA Certificates

**"GNMA Certificates"** are mortgage-backed securities that the Government National Mortgage Association (**"GNMA"**) guarantees. GNMA is a corporate instrumentality of the United States within the Department of Housing and Urban Development (**"HUD"**). GNMA guarantees the timely payment of principal and interest on certificates that are backed by pools of mortgages insured or guaranteed by the Federal Housing Administration, the Department of Veterans Affairs, the Rural Housing Service or HUD.

Investors in GNMA Certificates receive monthly payments of interest and scheduled principal, even if the borrowers on the underlying mortgages have not made their monthly payments. GNMA's guarantee obligations, unlike Freddie Mac's, are backed by the full faith and credit of the United States.

Mortgage banking companies and other financial concerns approved by GNMA issue and service GNMA Certificates. GNMA guarantees securities under its GNMA I program (**"GNMA I Certificates"**) and GNMA II program (**"GNMA II Certificates"**). Holders of GNMA I Certificates and GNMA II Certificates have substantially similar rights, although a few differences do exist.

Under the GNMA I program, a single GNMA issuer assembles a pool of mortgages and issues and markets GNMA I Certificates that are backed by that pool. The origination date of mortgages in the pool must be within two years of the date that the related GNMA I Certificates are issued. All mortgages underlying a particular GNMA I Certificate must be of the same type (for example, all single-family, level payment mortgages) and have the same fixed interest rate. The pass-through rate on each GNMA I Certificate is 50 basis points less than the interest rate on the mortgages included in the pool. Holders of GNMA I Certificates receive payments on or about the 15th of each month. GNMA I Certificates have a Payment Delay of approximately 45 days.

Under the GNMA II program, a pool may consist of mortgages submitted by more than one GNMA issuer. The resulting pool backs a single issue of GNMA II Certificates, which each participating issuer markets to the extent that it contributed mortgages to the pool. Each GNMA II

Certificate issued from a multiple issuer pool, however, represents an interest in the entire pool, not just mortgages contributed to the pool by a particular GNMA issuer. GNMA II Certificates also may be backed by a custom pool of fixed-rate mortgages formed by a single issuer. Holders of GNMA II Certificates receive payments on or about the 20th of each month. GNMA II Certificates have a Payment Delay of approximately 50 days.

Each GNMA II Certificate pool consists entirely of fixed-rate mortgages or entirely of ARMs. Fixed-rate mortgages underlying any particular GNMA II Certificate must be of the same type, but may have annual interest rates that vary from each other by up to 100 basis points. The pass-through rate on each fixed-rate GNMA II Certificate will be 50 to 150 basis points per annum, in the case of GNMA II Certificates issued prior to July 1, 2003, and 25 to 75 basis points per annum, in the case of GNMA II Certificates issued on or after July 1, 2003, less than the highest per annum interest rate on any mortgage included in the pool.

ARMs underlying any particular GNMA II Certificate will have interest rates that adjust annually based on the one-year U.S. Department of the Treasury (the **"Treasury"**) index. GNMA pooling specifications require that all ARMs in a given pool have an identical first adjustment date, annual interest adjustment date, first payment adjustment date, index reference date and means of adjustment. All of the ARMs underlying a particular GNMA II Certificate issued prior to July 1, 2003 must have interest rates that are 50 to 150 basis points per annum above the interest rate of the GNMA II Certificate. In addition, the mortgage margin for those ARMs must be 50 to 150 basis points per annum greater than the margin for the related GNMA II Certificate. All of the ARMs underlying a particular GNMA II Certificate issued on or after July 1, 2003 must have interest rates that are 25 to 75 basis points per annum above the interest rate of the related GNMA II Certificate. In addition, the mortgage margin with respect to those ARMs must be 25 to 75 basis points per annum greater than the margin for the related GNMA II Certificate. The ARMs and GNMA II Certificates have an annual adjustment cap of $\pm 1\%$ and lifetime cap of $\pm 5\%$ above or below the initial interest rate; provided however, that with respect to GNMA II Certificates issued on or after October 1, 2003 and backed by 7-year and 10-year hybrid ARMs, these GNMA II Certificates and the related mortgage loans will be subject to an annual adjustment cap of $\pm 2\%$ and a lifetime cap of $\pm 6\%$ above or below the initial interest rate. Thirty days after each annual interest adjustment date, the payment amount of an ARM resets so that its remaining principal balance would fully amortize in equal monthly payments over its remaining term to maturity, assuming its interest rate were to remain constant at the new rate.

Under its "Platinum" program, GNMA guarantees certificates that represent ownership interests in pools of GNMA I Certificates or GNMA II Certificates. The terms "GNMA I Certificates" and "GNMA II Certificates" include certificates guaranteed under the Platinum program.

## PAYMENTS

### Class Factors

*General*

For each month, we calculate and make available (including on our Internet web-site) the Class Factor for each class of Pass-Through Certificates having a principal amount.

The **"Class Factor"** for any class for any month is a truncated eight-digit decimal which, when multiplied by the original principal amount of a Pass-Through Certificate of that class, will equal its remaining principal amount. The Class Factor for any month reflects payments of principal to be made on the Payment Date:

- In the same month, for classes backed by Gold PCs or GNMA Certificates.

- In the following month, for classes backed by Original PCs or ARM PCs.

Class Factors will be available on or about:

- The fifth Business Day (as defined below) of each month, for classes backed by Gold PCs, ARM PCs or Original PCs.

- The tenth Business Day of each month, for classes backed by GNMA Certificates.

A Class Factor for a class that has a notional principal amount will reflect the remaining notional principal amount of a Pass-Through Certificate of that class in the same manner.

Each class of Stripped Giant Certificates has the same Class Factor as its underlying Giant Certificate. The Class Factor for a class of Stripped Giant Certificates may not reflect the outstanding amount of the class as a whole, because that amount may decrease or increase due to exchanges.

The Class Factor for each class for the month of issuance is 1.0000000.

*Class Factors for GNMA Certificates*

We calculate Class Factors for classes backed by GNMA Certificates by using GNMA Certificate factors reported each month. Currently, the reported factors that we use are preliminary and subject to revision. In addition, there may not be reported factors for some GNMA Certificates. If a factor has not been reported, we will estimate it on the basis of assumed mortgage amortization schedules. Our estimate will reflect payment factor information previously reported and estimated subsequent scheduled amortization (but not prepayments) on the related mortgages.

Because GNMA factors may be preliminary, and we must estimate factors when reported factors are not available, there may be variances between the principal payments we receive on the GNMA Certificates in any month and the amounts we pay on the related Pass-Through Certificates, as reflected by their Class Factors for that month. However, the Class Factor for any month will reconcile any variances that occurred in the preceding month. Our determination of the Class Factors in the manner described above will be final.

**Payment Dates**

We will make payments to the Holders of Pass-Through Certificates on each applicable Payment Date. The **"Payment Date"** will be:

- For classes backed by PCs, the 15th of each month or, if the 15th is not a Business Day, the next Business Day.

- For classes backed entirely by GNMA I Certificates, the 17th of each month or, if the 17th is not a Business Day, the next Business Day.

- For classes backed entirely or partly by GNMA II Certificates, the 20th of each month or, if the 20th is not a Business Day, the next Business Day after the 20th.

For this purpose, **"Business Day"** means a day other than:

- A Saturday or Sunday.

- A day when Freddie Mac is closed.

- For Pass-Through Certificates on the Fed System, a day when the Federal Reserve Bank of New York (or other agent acting as Freddie Mac's fiscal agent) is closed or, as to any Holder, a day when the Federal Reserve Bank that maintains the Holder's account is closed.

- For any Pass-Through Certificates on the DTC System, a day when DTC is closed.

### Payments of Principal

On each Payment Date, we will pay principal to the Holders of each class on which principal is then due. The Holders of Pass-Through Certificates of any class will receive principal payments on a pro rata basis.

Holders of IO Classes and Call Classes of CPCs will not receive principal payments.

For any Payment Date, you can calculate the amount of principal to be paid on a Pass-Through Certificate by multiplying its original principal amount by:

- The difference between its Class Factors for the preceding and current months, for a class backed by Gold PCs or GNMA Certificates.

- The difference between its Class Factors for the two preceding months, for a class backed by Original PCs or ARM PCs.

### Payments of Interest

Interest will accrue on each Pass-Through Certificate during each Accrual Period at the class coupon described in the related supplement. In the case of a fixed-rate Pass-Through Certificate, the class coupon is set at the time of issuance and does not change. In the case of an adjustable rate Pass-Through Certificate, the class coupon adjusts monthly based on the interest rate, or the weighted average of the interest rates, of the assets or as otherwise described in the applicable supplement. Generally, we compute interest on the basis of a 360-day year of twelve 30-day months.

Floating Rate and Inverse Floating Rate Classes bear interest using interest formulas shown in the applicable supplements. Unless otherwise provided, their class coupons are based on LIBOR. **"LIBOR"** is the arithmetic mean of the London interbank offered quotations for Eurodollar deposits with a maturity of one month.

We calculate the class coupons of LIBOR-based Floating Rate and Inverse Floating Rate Classes for each Accrual Period (after the first) on the second business day before the Accrual Period begins (an **"Adjustment Date"**). For this purpose, a "business day" is a day on which banks are open for dealing in foreign currency and exchange in London, New York City and Washington, D.C. We determine LIBOR by using the "Interest Settlement Rate" for one-month U.S. dollar

deposits set by the British Bankers' Association (the **"BBA"**) as of 11:00 a.m. (London time) on the Adjustment Date.

The BBA's Interest Settlement Rates are currently displayed on the Moneyline Telerate Service page 3750. That page, or any other page that may replace page 3750 on that service or any other service the BBA nominates as the information vendor to display the BBA's Interest Settlement Rates for deposits in U.S. dollars, is a **"Designated Telerate Page."** Reuters Monitor Money Rates Service page "LIBOR01" and Bloomberg L.P. page "BBAM" also currently display the BBA's Interest Settlement Rates. The BBA's Interest Settlement Rates currently are rounded to five decimal places.

If the BBA's Interest Settlement Rate does not appear on the Designated Telerate Page as of 11:00 a.m. (London time) on an Adjustment Date, or if the Designated Telerate Page is not then available, we will obtain the Interest Settlement Rate from Reuters' or Bloomberg's page. If neither of those two pages publishes the Interest Settlement Rate for the Adjustment Date, LIBOR for that date will be the most recently published Interest Settlement Rate. If the BBA no longer sets an Interest Settlement Rate, we will designate an alternative index that has performed, or that we expect to perform, in a manner substantially similar to the BBA's Interest Settlement Rate. We will select an alternative index only if tax counsel advises us that the alternative index will not cause the related pass-through pool to lose its classification as a fixed investment trust.

Absent clear error, our determination of the applicable LIBOR levels and our calculation of the class coupons for the Floating Rate and Inverse Floating Rate Classes for each Accrual Period will be final and binding. You can get the class coupons for the current and all preceding Accrual Periods from our Internet web-site or from Investor Inquiry at Freddie Mac. Our method for determining LIBOR is subject to modification as necessary to reflect technological and market changes.

Holders of PO Classes and Call Classes of CPCs will not receive interest payments.

Interest will accrue on the principal or notional principal amount of a Pass-Through Certificate as determined by its Class Factor for:

- The month preceding the Payment Date, for a class backed by Gold PCs or GNMA Certificates.

- The second month preceding the Payment Date, for a class backed by Original PCs or ARM PCs.

Unless otherwise provided in the applicable supplement, the **"Accrual Period"** relating to any Payment Date will be:

- The calendar month preceding the month of the Payment Date, for a Fixed Rate Class backed by Gold PCs or GNMA Certificates.

- The 15th of the preceding month to the 15th of the month of that Payment Date, for a Floating Rate or Inverse Floating Rate Class.

- The second calendar month preceding the month of the related Payment Date, for a class backed by Original PCs or ARM PCs.

The class coupon for Pass-Through Certificates backed by ARMs adjusts as of the first day of each Accrual Period and will equal the weighted average of the interest rates of the assets as of the

same date, truncated at the third decimal place. Investors can obtain the class coupons for the current Accrual Period on our Internet web-site or by contacting Investor Inquiry at Freddie Mac.

### Record Dates

We pass through payments on each Payment Date to Holders as of the related Record Date. The **"Record Date"** for any Payment Date is the close of business on the last day of:

- The preceding month, for a class backed by Gold PCs or GNMA Certificates.

- The second preceding month, for a class backed by Original PCs or ARM PCs.

### Final Payment Date

The **"Final Payment Date"** for each class of Pass-Through Certificates usually reflects the latest final payment date of the underlying PCs, GNMA Certificates or other assets. The final payment dates of the assets are determined by various methods depending upon their type and date of issuance, as described in the applicable offering materials. The actual final payment on any class of Pass-Through Certificates could occur significantly earlier than its Final Payment Date.

You will receive the final payment on your Pass-Through Certificates on or before the Payment Date that falls (a) in the same month as the applicable Final Payment Date, for Gold Pass-Through PCs and Pass-Through Securities, and (b) in the month after the applicable Final Payment Date, for Original Pass-Through PCs and ARM Pass-Through PCs.

### GUARANTEES

We guarantee to each Holder of a Pass-Through Certificate:

- The timely payment of interest at its class coupon.

- The payment of principal as principal payments are made on the underlying assets.

- The final payment of its entire principal amount by the Payment Date that falls (a) in the month of its Final Payment Date, for Gold Pass-Through PCs and Pass-Through Securities, and (b) in the month after its Final Payment Date, for Original Pass-Through PCs and ARM Pass-Through PCs.

- In the case of the Holder of a Call Class of CPCs, all proceeds due to the Holder upon exercise of its Call Right.

We also guarantee:

- For all PCs, the timely payment of interest and the full and final payment of principal on the underlying Mortgages.

- For Gold PCs only, the timely payment of scheduled principal on the underlying Mortgages, calculated as described in the applicable PC Offering Circular.

- For other assets issued by Freddie Mac, the payment of interest and principal as described in the applicable offering materials.

## FORM OF PASS-THROUGH CERTIFICATES, HOLDERS AND PAYMENT PROCEDURES

### Form and Denominations

*Fed System.*   Investors who own Pass-Through Certificates held on the Fed System typically are not the Holders of those Pass-Through Certificates. Only banks and other entities eligible to maintain book-entry accounts with a Federal Reserve Bank (**"Fed Participants"**) may be Holders of Pass-Through Certificates held on the Fed System.

Pass-Through Certificates held on the Fed System are subject to the HUD regulations governing Freddie Mac's book-entry securities (24 C.F.R. Part 81, Subpart H) and any procedures that Freddie Mac and a Federal Reserve Bank may agree to. These regulations and procedures relate to the issuance and recordation of, and transfers of interests (including security interests) in, all of Freddie Mac's book-entry securities held on the Fed System, regardless of when the securities were issued. Fed Participants' individual accounts are governed by operating circulars and letters of the Federal Reserve Banks.

*DTC System.*   DTC is a New York-chartered limited purpose trust company that performs services for its participants (**"DTC Participants"**), mostly brokerage firms and other financial institutions. Pass-Through Certificates held on the DTC System will be represented by certificates registered in the name of the DTC or its nominee. Therefore, DTC or its nominee is the Holder of Pass-Through Certificates held on the DTC System.

*Certificated Classes.*   Certificated classes will be transferable only at the office of the Registrar. A Holder may have to pay a service charge to the Registrar for any registration of transfer of a certificated class, and will have to pay any transfer taxes or other governmental charges. Each Call Class will be issued as a single certificate in an original notional principal amount equal to the original principal amount of its related Callable Class and will be held and transferable only as a single certificate.

*CUSIP Number.*   Each class of Pass-Through Certificates will have a unique nine-character designation, known as a **"CUSIP Number,"** used to identify that class.

*Denominations.*   Holders on the Fed System or the DTC System must hold and transfer their Pass-Through Certificates in minimum original principal or notional principal amounts of $100,000 (for IO, PO, Inverse Floating Rate, Structured Formula and Toggle Classes) or $1,000 (for other Classes) and additional increments of $1. A Holder may not transfer a Pass-Through Certificate if, as a result of the transfer, the Holder would have remaining in its account Pass-Through Certificates of any class having an original principal or notional principal amount of less than $100,000 or $1,000, as applicable. A Holder of Pass-Through Certificates on the Fed System will also have to comply with any Federal Reserve Bank minimum wire transfer requirements.

### Holders

A Holder of a Pass-Through Certificate is not necessarily its beneficial owner. Beneficial owners ordinarily will hold classes through one or more financial intermediaries, such as banks, brokerage firms and securities clearing organizations. For example, as an investor, you may hold a class through a brokerage firm which, in turn, holds through a Fed Participant. In that case, you would be the beneficial owner and the participant would be the Holder.

21

If your class is held on the DTC System, your ownership will be recorded on the records of the brokerage firm, bank or other financial intermediary where you maintain an account for that purpose. In turn, the financial intermediary's interest in the class will be recorded on the records of DTC (or of a DTC Participant that acts as agent for the financial intermediary, if the intermediary is not itself a DTC Participant).

A Holder that is not also the beneficial owner of a Pass-Through Certificate, and each other financial intermediary in the chain between the Holder and the beneficial owner, will be responsible for establishing and maintaining accounts for their customers. Freddie Mac and any Federal Reserve Bank will not have a direct obligation to a beneficial owner of a Pass-Through Certificate that is not also the Holder. A Federal Reserve Bank or DTC will act only upon the instructions of the Fed Participant or DTC Participant, as applicable, in recording transfers of a class.

Freddie Mac, the Registrar, the Federal Reserve Banks and DTC may treat the Holder as the absolute owner of a Pass-Through Certificate for the purpose of receiving payments and for all other purposes, regardless of any notice to the contrary. Your rights as a beneficial owner of a Pass-Through Certificate may be exercised only through the Holder.

**Payment Procedures**

Federal Reserve Banks will credit payments on classes held on the Fed System to the appropriate Fed Participants.

We or, in some cases, the Registrar will make payments on classes held on the DTC System in immediately available funds to DTC. DTC will be responsible for crediting the payment to the accounts of the appropriate DTC Participants in accordance with its normal procedures.

The Registrar will make payments on a certificated class by check mailed to the addresses of the Holders shown on the Registrar's records or, if the related supplement provides, by wire transfer to the Holders. However, a Holder will receive the final payment on a certificated class only upon presentation and surrender of the Holder's certificate to the Registrar.

Each Holder and each other financial intermediary will be responsible for remitting payments to the beneficial owners of a class that it represents.

The Pass-Through Agreement provides that if a principal or interest payment error occurs, we may correct it by adjusting payments to be made on future Payment Dates or in any other manner we consider appropriate.

## PREPAYMENT, YIELD AND SUITABILITY CONSIDERATIONS

### PREPAYMENTS

The rates of principal payments on the assets and the Pass-Through Certificates will depend on the rates of principal payments on the related Mortgages. Mortgage principal payments may be in the form of scheduled amortization or partial or full prepayments. Prepayments include:

- Prepayments by the borrower.

- Liquidations resulting from default, casualty or condemnation.

22

- Payments made by Freddie Mac or GNMA under their guarantees of principal (other than payments of scheduled amortization).

The Mortgages may be prepaid at any time, in most cases without penalty. Freddie Mac cannot make any representation regarding the likely prepayment experience of the Mortgages underlying any pass-through pool.

Mortgage prepayment rates are likely to fluctuate significantly over time. Prepayment rates are influenced by many factors, especially mortgage interest rates. In general, as mortgage interest rates decline, borrowers tend to refinance their current mortgages, which results in faster prepayment rates on a mortgage pool. On the other hand, as mortgage interest rates increase, borrowers tend not to refinance their mortgages, which results in slower prepayment rates on a mortgage pool. Either of these scenarios can affect the yield of your investment in a Pass-Through Certificate, as discussed in more detail below.

The characteristics of particular Mortgages may also influence their principal payment rates. For example, ARMs tend to have higher default rates than fixed-rate Mortgages. In addition, the rate of principal payments on Pass-Through Certificates backed by ARMs may be affected by changes in scheduled amortization resulting from adjustments in the interest rates and monthly payment amounts of the underlying ARMs.

Transfers of mortgaged properties also influence prepayment rates. The Mortgages underlying fixed-rate PCs generally include "due-on-transfer" clauses which provide that the holder of the Mortgage may demand full payment of the Mortgage upon the transfer of the mortgaged property. Freddie Mac, in most cases, requires mortgage servicers to enforce these clauses where permitted by applicable law. PC Offering Circulars discuss this further. ARMs and Mortgages underlying GNMA Certificates generally do not include due-on-transfer clauses.

If you are purchasing a Pass-Through Certificate backed by PCs, you should review the discussion of prepayments and yields in the PC Offering Circular.

## YIELDS

### General

In general, your yield on any class of Pass-Through Certificates will depend on several variables, including:

- The price you paid for that class.

- The rate of principal prepayments on the underlying Mortgages.

- The actual characteristics of the underlying Mortgages.

- In the case of adjustable rate Pass-Through Certificates, the levels of the interest rates on the underlying ARMS, as adjusted from time to time.

You should carefully consider the yield risks associated with Pass-Through Certificates, including these:

- If you purchase a class at a discount to its principal amount and the rate of principal payments on the underlying Mortgages is slower than you expect, you will receive

23

payments over a longer period than you expect, so the yield on your investment will be lower than you expect. This is especially true for a PO Class.

- If you purchase a class at a premium over its principal amount and the rate of principal payments on the underlying Mortgages is faster than you expect, you will receive payments over a shorter period than you expect, so the yield on your investment will be lower than you expect.

- If you purchase an IO Class or any other class at a significant premium over its principal amount and there are fast principal payments on the underlying Mortgages, you may not even recover your investment in that class.

- In general, the rate of Mortgage prepayments early in your investment has the greatest effect on your yield to maturity. As a result, a negative effect on your yield produced by principal prepayments at a higher (or lower) rate than you expect in the period immediately following your purchase of a Pass-Through Certificate is not likely to be offset by an equivalent reduction (or increase) in that rate in later periods.

- Mortgages tend to prepay fastest when prevailing interest rates are low. When this happens, you may not be able to reinvest your principal payments in comparable securities at as high a yield.

**Yields of Floating Rate and Inverse Floating Rate Classes**

If you invest in a Floating Rate or Inverse Floating Rate Class, you should consider the following additional risks:

- If you own a Floating Rate Class, index levels lower than you expect could result in yields lower than you expected, especially if the class coupon varies based on a multiple of the index. Also, the class coupon of your class can never be higher than its stated maximum rate, regardless of the level of the index. If you own an Interest Only Floating Rate Class, you may not even recover your investment if the level of the applicable index is low or Mortgage prepayments are fast.

- If you own an Inverse Floating Rate Class, index levels higher than you expect could result in yields lower than you expected, especially if the class coupon varies based on a multiple of the index. The class coupons of most Inverse Floating Rate Classes can fall as low as 0%. If you own an Interest Only Inverse Floating Rate Class, you may not even recover your investment if the level of the applicable index is high or Mortgage prepayment rates are fast.

- When mortgage interest rates are generally low, which usually results in faster prepayments, the applicable index value may be high. On the other hand, when mortgage interest rates are generally high, which usually results in slower prepayments, the applicable index value could be low. Either of these scenarios could result in a lower than expected yield on your Pass-Through Certificates.

- No index will remain constant at any value. Even if the average value of an index is consistent with what you expect, the timing of any changes in that value may affect your actual yield. In general, the earlier a change in the value of the applicable index, the greater the effect on your yield. As a result, a negative effect on your yield produced by

24

an index value that is higher (or lower) than you expect early in your investment is not likely to be offset by an equivalent reduction (or increase) in that value in later periods.

**Yields of ARM Pass-Through Certificates**

If you invest in adjustable rate Pass-Through Certificates, you should consider the following additional risks:

- If the index levels used to adjust the underlying ARMs are lower than you expect, the yield on your investment could be lower than you expect.

- The interest rates on ARMs are subject to limits on the amount they can adjust on each adjustment date. The total amount that an ARM can adjust may also be limited by lifetime ceilings and, in some cases, lifetime floors.

- Class coupons for adjustable rate Pass-Through Certificates generally adjust monthly, based on a weighted average of the interest rates on the underlying ARMs. The interest rates on the underlying ARMs may adjust monthly, semi-annually, annually or at other intervals. As a result, the class coupon of your Pass-Through Certificates may not fully reflect current interest rates.

- Disproportionate principal payments, including prepayments, on ARMs that have relatively low and high interest rates compared to the other ARMs in the same pool will affect the level of the class coupons for the related Pass-Through Certificates, even if the interest rates on those ARMs remain unchanged.

- When mortgage interest rates are generally low, which usually results in faster prepayments, the index value may be high. On the other hand, when mortgage interest rates are generally high, which usually results in slower prepayments, the index value could be low. Either of these scenarios could result in a lower than expected yield on adjustable rate Pass-Through Certificates.

- No index will remain constant at any value. Even if the average value of an index is consistent with what you expect, the timing of any changes in that value may affect your actual yield. In general, the earlier a change in the value of the applicable index, the greater the effect on your yield. As a result, a negative effect on your yield produced by an index value that is higher (or lower) than you expect early in your investment is not likely to be offset by an equivalent reduction (or increase) in that value in later periods.

**Payment Delay**

The effective yield on any interest-bearing Pass-Through Certificate with a Payment Delay will be less than the yield that its class coupon and purchase price would otherwise produce, because:

- On its first Payment Date, 30 days' interest will be payable on the Pass-Through Certificate even though interest began to accrue approximately 45 to 75 days earlier, depending on its Payment Delay.

- On each Payment Date after the first, the interest payable on the Pass-Through Certificate will accrue during its Accrual Period, which will end approximately 15 to 45 days before that Payment Date, depending on its Payment Delay.

**SUITABILITY**

Pass-Through Certificates may not be suitable investments for you.  You should consider the following before you invest in Pass-Through Certificates.

- Pass-Through Certificates are not appropriate investments if you require a single lump sum payment on a date certain, or if you require an otherwise definite payment stream.

- A market may not develop for the sale of some types of Pass-Through Certificates after their initial issuance. Even if a market develops, it may not continue.  As a result, you may not be able to sell your Pass-Through Certificates easily or at prices that will allow you to realize your desired yield.

- The market values of your Pass-Through Certificates are likely to fluctuate, primarily in response to changes in prevailing interest rates. Such fluctuations may result in significant losses to you.

- The secondary markets for mortgage-related securities have experienced periods of illiquidity in the past, and can be expected to do so in the future. Illiquidity can have a severely negative effect on the prices of Pass-Through Certificates, especially those that are particularly sensitive to prepayment, redemption or interest rate risk or that have been structured to meet the investment needs of limited categories of investors.

- The Pass-Through Certificates of some classes may not be eligible to back Freddie Mac REMIC classes or other Freddie Mac structured transactions. This may impair the liquidity of those classes.

- Pass-Through Certificates are complex securities. Before investing in a Pass-Through Certificate, you should be able, either alone or with a financial advisor, to evaluate the information contained and incorporated in this Offering Circular and in the related supplement. You should evaluate the information in the context of your personal financial situation and your views on possible and likely interest rate and economic scenarios.

This Offering Circular does not describe all the possible risks of an investment in Pass-Through Certificates that may result from your particular circumstances, nor does it project how Pass-Through Certificates will perform under all possible interest rate and economic scenarios. You should purchase Pass-Through Certificates only if you understand and can bear the prepayment, redemption, yield, liquidity and market risks associated with your investment under a variety of interest rate and economic scenarios. If you purchase Pass-Through Certificates, you need to have enough financial resources to bear all the risks related to your Pass-Through Certificates.

**TABULAR INFORMATION IN SUPPLEMENTS**

In order to illustrate the effect of prepayments on classes of Pass-Through Certificates, the related supplements may include tables that show the following information, in each case under various prepayment and/or index scenarios:

- Pre-tax yields to maturity.

- Weighted average lives.

26

- Cash flows.

- Declining principal balances.

All of the tables shown in a supplement will be based on assumptions about the underlying Mortgages. Because the Mortgages will have characteristics that differ from those assumed in preparing any table, the actual weighted average lives, pre-tax yields, cash flows and declining principal balances are likely to differ from those shown, even in the unlikely event that all the underlying Mortgages were to prepay at the assumed rates.

### Yield Calculations

We calculate pre-tax yields by:

1. Determining the monthly discount rates (whether positive or negative) that, when applied to the assumed stream of cash flows to be paid on a class, would cause the discounted present value of those cash flows to equal the assumed purchase price of the class.

2. Converting the monthly rates to corporate bond equivalent (semiannual payment) rates.

These yield calculations do not take into account any variations in the interest rates at which you might reinvest payments that you receive. Consequently, they will not reflect the return on any investment when those reinvestment rates are considered.

### Weighted Average Lives

The weighted average life of a security refers to the average amount of time that will elapse from the date of its issuance until each dollar of principal has been repaid to the investor. The weighted average lives of the classes of Pass-Through Certificates will depend primarily on the rate at which principal is paid on the Mortgages. We calculate weighted average lives by:

1. Multiplying the assumed reduction, if any, in the principal amount on each Payment Date by the number of years from the date of issuance to that Payment Date.

2. Summing the results.

3. Dividing the sum by the aggregate amount of the assumed reductions in principal amount.

### Prepayment Models

Prepayments on pools of Mortgages can be measured based on a variety of prepayment models. The models typically used in supplements for Pass-Through Certificates will be The Securities Industry and Financial Markets Association's standard prepayment (or **"PSA"**) model and the constant prepayment rate (or **"CPR"**) model.

27

The PSA model assumes that:

- Mortgages will prepay at an annual rate of 0.2% in the first month after origination.

- The prepayment rate will increase by an annual rate of 0.2% per month up to the 30th month after origination.

- The monthly prepayment rate will be constant at 6% per annum in the 30th and later months.

This assumption is called "100% PSA." For example, at 100% PSA, mortgages with a loan age of three months (mortgages in their fourth month after origination) are assumed to prepay at an annual rate of 0.8%. "0% PSA" assumes no prepayments; "50% PSA" assumes prepayment rates equal to 0.50 times 100% PSA; "200% PSA" assumes prepayment rates equal to 2.00 times 100% PSA; and so forth.

The CPR model assumes an annual constant mortgage prepayment rate each month relative to the then outstanding principal balance of a pool of mortgages for the life of that pool. For example, at 6% CPR, the CPR model assumes that the monthly prepayment rate will be constant at 6% per annum. (For mortgages in their 30th and later months, 6% CPR corresponds to 100% PSA.)

Neither the PSA nor the CPR model describes historical prepayment experience or can predict the prepayment rate of any actual mortgage pool.

Even though the tables in a supplement will use assumed Mortgage prepayment rates, the underlying Mortgages will not prepay at a constant rate until maturity, nor will all of those Mortgages prepay at the same rate. You must make an independent decision regarding the appropriate principal prepayment scenarios to use in deciding whether to purchase Pass-Through Certificates.

## THE PASS-THROUGH AGREEMENT

We create Pass-Through Certificates under a Pass-Through Certificates Agreement dated the same date as this Offering Circular. We prepare a **"Terms Supplement"** for each offering of Pass-Through Certificates. For any particular offering, the Pass-Through Agreement and the applicable Terms Supplement together constitute the **"Pass-Through Agreement."**

The following summary describes various provisions of the Pass-Through Agreement. This summary is not complete. You should refer to the Pass-Through Agreement if you would like further information about its provisions. You can obtain copies of the Pass-Through Agreement, including any Terms Supplements, from Investor Inquiry at Freddie Mac. Your receipt and acceptance of a Pass-Through Certificate constitutes your unconditional acceptance of all the terms of the Pass-Through Agreement.

## VARIOUS MATTERS REGARDING FREDDIE MAC

Freddie Mac and its directors, officers, employees and agents will not be liable to Holders for any action taken or omitted in good faith or for errors in judgment. However, they will not be protected against any liability that results from their willful misfeasance, bad faith, gross negligence or reckless disregard of their obligations.

28

The Pass-Through Agreement requires Freddie Mac to hold and administer pass-through pool assets using the same standards as for similar assets that it owns. Holders will not be able to direct or control Freddie Mac's actions under the Pass-Through Agreement, unless an Event of Default occurs.

Except with regard to its guarantee obligations or other payment obligations, Freddie Mac will not be liable for any Holder's direct damages unless Freddie Mac has failed to exercise the same degree of ordinary care that it exercises in the conduct of its own affairs. Freddie Mac will not be liable for any Holder's consequential damages.

In addition, Freddie Mac need not appear in any legal action that is not incidental to its responsibilities under the Pass-Through Agreement and that we believe may result in any expense or liability. However, Freddie Mac may undertake any legal action that we believe is necessary or desirable in the interests of the Holders. Freddie Mac will bear the legal costs of any such action.

Freddie Mac may acquire all or part of the Pass-Through Certificates of any class. Pass-Through Certificates we hold will be treated the same as Pass-Through Certificates of the same class held by other Holders.

The Pass-Through Agreement will be binding upon any successor to Freddie Mac.

## EVENTS OF DEFAULT

**"Events of Default"** under the Pass-Through Agreement are:

- Any failure by Freddie Mac to pay principal or interest that lasts for 30 days.

- Any failure by Freddie Mac to perform in any material way any other obligation under the Pass-Through Agreement, if the failure lasts for 60 days after Freddie Mac receives notice from the Holders of at least 60% of the outstanding principal or notional principal amount of an affected class.

- Specified events of bankruptcy, insolvency or similar proceedings involving Freddie Mac (but not including the appointment of a conservator or similar official for Freddie Mac).

## RIGHTS UPON EVENT OF DEFAULT

If an Event of Default under the Pass-Through Agreement is not remedied, the Holders of at least 50% of the outstanding principal or notional principal amount of any affected class of Pass-Through Certificates may remove Freddie Mac and nominate a successor to Freddie Mac, except as to its guarantee obligations. That nominee will replace Freddie Mac unless Freddie Mac objects within ten days after the nomination. In that event, either Freddie Mac or anyone who has been a bona fide Holder of an affected class for at least six months may ask a court to appoint a successor. The court may then appoint a successor to Freddie Mac except as to its guarantee obligations.

## VOTING UNDER ANY PC OR REMIC AGREEMENT

Holders of PCs and Freddie Mac REMIC classes have various rights under the agreements governing their securities. For example, if an "event of default" occurs under one of these agreements, holders of a specified percentage of the affected PCs or REMIC classes may seek to remove Freddie Mac under that agreement. Freddie Mac itself holds the PCs and REMIC classes that back Pass-Through Certificates. However, the Pass-Through Agreement generally allows the

Holders of the Pass-Through Certificates, rather than Freddie Mac, to act if an event of default occurs under the related PC or REMIC agreement. For this purpose, the Holders of Pass-Through Certificates will be treated as the holders of the affected PC or REMIC class in proportion to the outstanding principal amounts of their Pass-Through Certificates.

Holders of PCs and Freddie Mac REMIC classes also have the right to consent to amendments to their governing agreements. The Pass-Through Agreement provides that, as the holder of a PC or REMIC class that backs Pass-Through Certificates, Freddie Mac may consent to such an amendment. However, if the amendment would adversely affect in any material way the interests of the Holders of Pass-Through Certificates, Freddie Mac may not agree to it unless Holders of at least 50% of the outstanding principal or notional principal amount of each affected class consent in writing. Despite this rule, Freddie Mac may amend a PC agreement, without the consent of Holders, if the amendment changes Freddie Mac's procedures for calculating payments or passing through prepayments on PCs that back pass-through pools formed after September 1, 1995. See the PC Offering Circular for information about payments on PCs.

## AMENDMENT

Freddie Mac may amend the Pass-Through Agreement without the consent of any Holders to:

- Cure any ambiguity or to correct or add to any provision in the Pass-Through Agreement, if the amendment does not adversely affect Holders in any material way.

- Maintain the qualification of any pass-through pool as a fixed investment trust under the Internal Revenue Code of 1986 (the **"Code"**).

- Avoid the imposition of any state or federal tax on a pass-through pool.

With the consent of the Holders of at least 50% of the outstanding principal or notional principal amount of any affected class, Freddie Mac also may amend the Pass-Through Agreement in any other way. However, unless each affected Holder consents, Freddie Mac may not amend the Pass-Through Agreement to impair the rights of Holders to receive payments (including guarantee payments) when due or to sue for any payment that is overdue.

## GOVERNING LAW

The Pass-Through Agreement is to be interpreted in accordance with federal law. If there is no applicable federal precedent and if the application of New York law would not frustrate the purposes of the Freddie Mac Act, the Pass-Through Agreement or any Pass-Through Certificate transaction, then New York law will be deemed to reflect federal law.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### GENERAL

**Any discussion of tax matters in this Offering Circular and any applicable supplement was not intended or written to be used, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed on such person. Such discussion was written to support the promotion and marketing of the Pass-Through Certificates. Investors should consult their own independent tax advisors regarding the Pass-Through Certificates and each investor's particular circumstances.**

The following is a general discussion of the material federal income tax consequences relating to the purchase, ownership and transfer of Pass-Through Certificates. It does not address all the federal income tax consequences that may apply to particular categories of investors. Some investors may be subject to special rules. **The tax laws and other authorities for this discussion are subject to change or differing interpretations, and any change or interpretation may apply retroactively. You should consult your own tax advisors to determine the federal, state, local and any other tax consequences that may be relevant to you.**

Although Freddie Mac is a government-sponsored enterprise, neither the Pass-Through Certificates nor the income received from them is exempt from federal income, estate or gift taxes under the Code. Further, neither the Code nor the Freddie Mac Act exempts the Pass-Through Certificates or income on them from taxation by any state, any United States possession or any local taxing authority.

If you exchange assets for Pass-Through Certificates (or for Pass-Through Certificates and cash) you may be required to recognize gain or loss on the exchange. If you enter into such an exchange, you should consult your own tax advisors about this matter.

We will report income on the Pass-Through Certificates to the Internal Revenue Service (the **"Service"**) and to Holders of Pass-Through Certificates based, in part, on the final Treasury Regulations under Sections 1271-1275 of the Code (the **"OID Regulations"**).

The federal income tax treatment of some classes of Pass-Through Certificates depends on the treatment of those classes under the "stripped bond" rules of Section 1286 of the Code. Debt instruments can be characterized in various ways under the stripped bond rules, including the possible application of the regulations governing contingent payment obligations. Because of this uncertainty and the relationship between the stripped bond rules and the contingent payment obligation rules, you should consult your own tax advisors regarding the proper tax treatment of these Pass-Through Certificates. The tax information we will provide for Pass-Through Certificates will assume that the contingent payment obligation rules are not applicable.

We will treat Stripped Giant Certificates and Stripped Interest Certificates (each, for tax purposes, a **"Strip"**) according to the rules discussed below under *Strips.* Also, if a class of Strips backs a Pass-Through Certificate, the same rules may apply indirectly to that Pass-Through Certificate. We will describe this in the applicable supplement.

The arrangements under which Giant Certificates, Strips, SPCs and CPCs are created and sold and the related pass-through pools are administered will be classified as fixed investment trusts under subpart E, part I of subchapter J of the Code and not as associations taxable as corporations.

If you own a Giant Certificate or a SPC, you will be treated for federal income tax purposes as the owner of a pro rata undivided interest in each of the assets of the related pass-through pool, subject to the discussion below under *Giant Certificates — Application of the Stripped Bond Rules.*

If you own a Strip, you will be treated for federal income tax purposes as the owner of the right to receive payments of principal and/or interest, as applicable, on the assets in the related pass-through pool.

**Tax Status**

Giant Certificates will be considered to represent "loans . . . secured by an interest in real property" within the meaning of Section 7701(a)(19)(C)(v) of the Code and generally will be considered to represent "real estate assets" within the meaning of Section 856(c)(5)(B) of the Code. Interest income from the Giant Certificates generally will be considered to represent "interest on obligations secured by mortgages on real property" within the meaning of Section 856(c)(3)(B) of the Code. In the event that any Mortgage has a loan to value ratio (**"LTV"**) in excess of 100 percent (that is, the amount of any Mortgage exceeds the fair market value of the real property securing the Mortgage), the interest income on the excess portion of the Mortgage will not be "interest on obligations secured by mortgages on real property" within the meaning of Section 856(c)(3)(B) of the Code and such excess portion of the Mortgage will not be a "real estate asset" within the meaning of Section 856(c)(5)(B) of the Code. The excess portion should represent a "Government security" within the meaning of Section 856(c)(4)(A) of the Code. If a Giant Certificate contains a Mortgage with an LTV in excess of 100 percent, a holder that is a real estate investment trust should consult its tax advisor concerning the appropriate tax treatment of such excess portion.

Although there is no specific precedent and the characterization of the Strips is not entirely free from doubt, the Strips should be considered to represent "loans . . . secured by an interest in real property" within the meaning of Section 7701(a)(19)(C)(v) of the Code and generally should be considered to represent "real estate assets" within the meaning of Section 856(c)(5)(B) of the Code, and original issue discount and interest from the Strips generally should be considered to represent "interest on obligations secured by mortgages on real property" within the meaning of Section 856(c)(3)(B) of the Code. In the event that some portion of a Strip is backed by a Mortgage with an LTV in excess of 100 percent, a portion of the interest income on the Strip that is attributable to that Mortgage will not be "interest on obligations secured by mortgages on real property" within the meaning of Section 856(c)(3)(B) of the Code and a portion of the Strip that is attributable to a Mortgage with an LTV in excess of 100 percent will not be a "real estate asset" within the meaning of Section 856(c)(5)(B) of the Code. The portion of a Strip that does not qualify as a "real estate asset" within the meaning of Section 856(c)(5)(B) of the Code should represent a "Government security" within the meaning of Section 856(c)(4)(A) of the Code. If a Strip is backed by a Mortgage with an LTV in excess of 100 percent, a holder that is a real estate investment trust should consult its tax advisor concerning the appropriate tax treatment of such excess portion.

## GIANT CERTIFICATES

### General

If you own Giant Certificates, you must report on your federal income tax return your pro rata share of the entire income from the Mortgages underlying the assets in the related pass-through pool, in accordance with your method of accounting. Income will include gross interest income at the interest rates on the Mortgages and incidental fees, if any.

You generally will be able to deduct, under Section 162 or 212 of the Code, your pro rata share of servicers' fees or any Freddie Mac or GNMA guarantee fees, including incidental fees paid by the borrowers and retained by the servicers, Freddie Mac or GNMA, and all administrative and other

expenses of the pass-through pool in accordance with your method of accounting. The Code limits the deductions for these miscellaneous itemized deductions for some investors.

**Discount and Premium**

If you purchase a Giant Certificate, you will be treated as purchasing an interest in each of the underlying Mortgages at a price determined by allocating the purchase price paid for that Giant Certificate among the Mortgages in proportion to their fair market values at the time of purchase. To the extent that the portion of the purchase price allocated to a Mortgage is less than or greater than the portion of the principal balance of the Mortgage allocated to the Giant Certificate, the interest in the Mortgage will be deemed to have been acquired with discount or premium, respectively. The treatment of any discount will depend on whether the discount represents original issue discount or market discount.

You should consult your own tax advisors to determine whether Section 1272(a)(6) of the Code, as expanded by the Taxpayer Reform Act of 1997, could affect the accrual of discount or amortization of premium on your Giant Certificates or otherwise affect the tax accounting for your Giant Certificates.

If you recognize gain or loss attributable to discount or premium that is not characterized as original issue discount, market discount or amortizable bond premium (described below), your gain or loss will be treated as capital gain or loss if the Giant Certificate is held as a capital asset.

*Original Issue Discount.*   You will be required to report as ordinary income your pro rata share of any original issue discount related to the Mortgages underlying the Giant Certificate pursuant to Sections 1271-1273 and 1275 of the Code. Original issue discount may arise as a result of initial incentive or "teaser" interest rates on ARMs or points charged at origination. You will be required to accrue original issue discount into current income only if it exceeds a *de minimis* amount. The Mortgages also would be subject to the original issue discount rules if, as discussed below, the "stripped bond" provisions of the Code were determined to be applicable.

Freddie Mac intends to treat any negative amortization on an ARM underlying a Giant Certificate as original issue discount. You will be required to include any resulting deferred interest in income in the period in which it accrues.

*Market Discount.*   The market discount rules of Sections 1276-1278 of the Code will apply to treat market discount in excess of a *de minimis* amount as ordinary income. You must recognize accrued market discount to the extent of gain realized on disposition or to the extent of principal payments that you receive. The market discount rules provide that:

- Market discount will be considered to accrue under a straight-line method unless you elect to calculate it under a constant interest method.

- Interest that you paid or that accrues on indebtedness that you incurred or continued to purchase or carry Mortgages acquired at a market discount will be allowed as a deduction only to the extent that such interest, reduced by the interest on the Mortgages includible in income, including original issue discount, is greater than the market discount that accrued but was not taken into account during the taxable year such interest was paid or accrued. Any such interest expense that is deferred will, in general, be allowed as a deduction when the related market discount income is recognized.

33

- Alternatively, you may elect to include market discount in income currently, under either a straight-line method or a constant interest method, on all market discount obligations you hold except those acquired in taxable years before the year of the election. An election to include market discount as income currently can be revoked only with the Service's consent. In this event, the rules about ordinary income on disposition and interest deferral discussed above will not apply.

The exact application of the market discount rules is not clear.

*Premium.*   If you have purchased your interest in any Mortgage at a premium, the premium may be amortizable under a constant interest method at your election under Section 171 of the Code. The premium is treated as an offset to interest income includable with respect to the Mortgage. An election to amortize premium will apply to all debt instruments you hold at the beginning of the tax year for which you make the election and to all such instruments acquired after the election. An election to amortize premium can be revoked only with the Service's consent.

*Constant Yield Method.*   You may elect to include in gross income all interest that accrues on a Mortgage by using the constant yield method. For purposes of this election, interest would include stated interest, *de minimis* original issue discount, original issue discount, *de minimis* market discount and market discount, as adjusted by any premium. You should consider the relationship between this election and the elections described above under *Market Discount* and *Premium.*

### Sale or Exchange of a Giant Certificate

If you sell a Giant Certificate, you will recognize gain or loss equal to the difference between your adjusted tax basis in the Giant Certificate and the amount you realized in the sale (not including amounts attributable to accrued and unpaid interest, which will be treated as ordinary interest income).

In general, your adjusted tax basis in the Giant Certificate will equal what you paid for the Giant Certificate, plus the amount of any discount income you previously reported on the Giant Certificate, less the amount of any premium you previously offset against interest income on the Giant Certificate and the amount of any principal payments you received on it.

You must report accrued but unrecognized market discount as ordinary income, but your gain or loss otherwise will be a capital gain or loss if you held the Giant Certificate as a capital asset. The capital gain or loss will be long-term or short-term, depending on whether you owned the Giant Certificate for the long-term capital gain holding period (currently more than one year).

### Application of the Stripped Bond Rules

When we issue a class of Giant Certificates, Revenue Ruling 71-399, 1971-2 C.B. 433, issued to us by the Service, indicates that any difference between interest payable at the mortgage interest rate and the sum of (a) interest payable at the class coupon plus (b) fees applicable to the Mortgages (servicers' fees or any Freddie Mac or GNMA guarantee fees) should be accounted for as discount income or premium expense. If such sum exceeds the mortgage interest rate, the difference is characterized as "discount" and considered additional gross income. If such sum is less than the mortgage interest rate, the net difference is characterized as "premium expense."

34

In Revenue Ruling 71-399, the Service ruled that discount income is to be included as ordinary income in accordance with the beneficial owner's method of accounting, and that premium expense may be deductible in accordance with applicable rules. The Service, however, may contend that by reason of enactment of the stripped bond rules of Section 1286 of the Code (or its predecessor, Section 1232B), Revenue Ruling 71-399 is no longer applicable in characterizing such difference.

The Service has issued guidance taking the position that, when mortgages are sold and the servicer is entitled to receive amounts that exceed reasonable compensation for the mortgage servicing to be performed, the Mortgages are treated as stripped bonds within the meaning of Section 1286 of the Code. If this treatment applies, you would not be treated as having a pro rata undivided interest in the underlying Mortgages, but rather you would be treated as owning "stripped bonds" to the extent of your share of principal payments and "stripped coupons" to the extent of the class coupon plus reasonable servicing fees and guarantee fees. The consequences of this characterization are described below under *Strips*.

The Service has also issued guidance providing that a purchaser of a mortgage that is a stripped bond must treat it as a market discount bond if the amount of original issue discount on the stripped bond is considered to be zero after application of the *de minimis* rule of Section 1273(a)(3) of the Code or if the annual stated rate of interest payable on the stripped bond is 100 basis points or less below the annual stated rate of interest payable on the mortgage. These conditions apparently are based on the premise that the interest payments which remain associated with the stripped bond are treated, for purposes of the original issue and market discount provisions of the Code, as stated interest payable with respect to the stripped bond. If these conditions are met, you would be required to account for any market discount in accordance with the rules for market discount as described above under *Discount and Premium*.

It is unclear whether the position taken by the Service in the guidance would be upheld if challenged.

## STRIPS

### General

Under Section 1286 of the Code, "stripped bonds" are created as a result of the separation of the ownership of the right to receive some or all interest payments on an obligation from the right to receive some or all of the principal payments.  If you own a Strip, you will be considered to own the following:

- Stripped bonds, to the extent of your share of principal payments on the underlying assets.

- Stripped coupons, to the extent of your share of interest payments on the underlying assets.

Section 1286 treats a stripped bond or a stripped coupon, for purposes of applying the original issue discount rules, as a debt instrument issued with original issue discount on the date that you purchase the stripped interest. While it is unclear whether the original issue discount calculations described below should be done separately for each principal and/or interest payment on a Strip, or by treating all such payments as if they were made on a single debt instrument, we intend to treat a Strip as a single debt instrument for purposes of information reporting.

35

**Determination of Income on Strips**

You must include original issue discount on each Strip in your ordinary income for federal income tax purposes as it accrues, which may be prior to receipt of the cash attributable to such income. You must include this in accordance with a constant interest method that takes into account the compounding of interest. Although not free from doubt (see *Possible Alternative Characterizations*), the amount of original issue discount you are required to include in your income in any taxable year likely will be computed as described below. This computation will:

- Use the prepayment rate assumed in pricing the transaction as stated in the applicable supplement (the **"Pricing Speed"**).

- With respect to certain Strips that are Floating Rate or Inverse Floating Rate Classes, project a level of future payments by assuming that the variable rate is a fixed rate equal to the value of the variable rate as of the date of the applicable supplement. The supplement will identify those Strips as to which this assumption applies. In the case of other Strips that include rights to variable interest payments, however, these rules will apply by assuming that the variable rate is a fixed rate that reflects the overall yield that is reasonably expected for the relevant Strip (which in many instances will also equal the value of the variable rate as of the date of the applicable supplement).

- Require periodic adjustments to take into account actual prepayment experience.

Generally, if you own a Strip, you must include in your gross income the sum of the "daily portions," as defined below, of the original issue discount on the Strip for each day that you own it, including the date you purchased it, but not including the date you dispose of it.

You can determine the daily portions of original issue discount as follows:

1. Calculate the original issue discount that accrues during each month or, if applicable, the shorter period from the date of purchase to the end of the first month. For each period, you do this by:

   - Adding:

     - •• the present values at the end of the month of any payments to be received in future months, using the Pricing Speed (by using as a discount rate the yield to maturity of the Strip, as described below), and

     - •• any payments included in the stated redemption price of the Strip received during such month.

   - Subtracting from the above sum the "adjusted issue price" of the Strip at the beginning of the month.

     - •• The adjusted issue price of a Strip at the beginning of the first month, or shorter period, is its issue price.

     - •• The adjusted issue price of a Strip at the beginning of a month following the first month or shorter period is the adjusted issue price at the beginning of the immediately preceding month *plus* the amount of original issue discount allocable to that preceding month and *minus* the amount of any payment included in the stated redemption price made at the end of or during that

36

preceding month and the amount of any loss recognized at the end of that preceding month.

2. Divide the original issue discount accruing during that month, or shorter period, by the number of days in the period.

The yield used in making these calculations should be the monthly rate (assuming monthly compounding) determined as of the date of purchase that, if used in discounting the remaining payments on the portion of the underlying Mortgages allocable to the Strip, would cause the present value of those payments to equal your purchase price of the Strip.

It is not clear whether the Pricing Speed would be determined at the time you purchase the Strip or at the time the Strips are created and first sold. The Pricing Speed that we will use for purposes of information reporting will be the same for each class of Strips backed by the same pass-through pool, and will be determined based upon conditions at the time of the initial creation and sale of the related Strips.

Under the method for calculating the accrual of original issue discount described above, the rate at which you recognize original issue discount on a Strip and, in the case of an IO Class, the amount of such original issue discount depend on the actual rate of prepayment of the underlying Mortgages and the relative amount of principal and interest on each Mortgage represented by the Strip.

If the method for computing income for any particular month results in a negative amount, you may be entitled to deduct such amount as a loss only against future income from the Strip. However, you should be entitled to deduct a loss to the extent that your remaining basis would otherwise exceed the maximum amount of future payments which you are entitled to receive (determined by assuming that no future prepayments will occur on the underlying Mortgages).

### Treatment of Servicing Fee for Federal Income Tax Purposes

For purposes of tax reporting, either of the following amounts will be allocated to related classes of Strips, based on relative amounts of original issue discount accrued during each accrual period on each class:

- The excess of the interest paid on the Mortgages over the aggregate interest payable on the related Strips.
- The portion of that excess that represents reasonable servicing fees, as described above under *Giant Certificates — Application of the Stripped Bond Rules.*

If you own a Strip, you will be entitled to deduct each year, in accordance with your method of accounting, the amount of the servicing fee allocated to you to the same extent as if you paid the amount of the servicing fee directly. The Code limits the deductions for such servicing fees for some investors.

### Sale of a Strip

If you sell a Strip, you will recognize a gain or loss equal to the difference, if any, between the amount realized and your adjusted basis in the Strip. The gain or loss will be a capital gain or loss if you held the Strip as a capital asset. The capital gain or loss will be long-term or short-term, depending on whether you owned the Strip for the long-term capital gain holding period (currently

37

more than one year). In general, your adjusted basis in the Strip will equal the amount you paid for the Strip, plus the amount of original issue discount you previously reported on the Strip, minus the amount of any payments included in the stated redemption price of the Strip received by you and the amount of any losses previously recognized by you with respect to the Strip.

**Possible Alternative Characterizations**

The Service could assert that you must use a method other than the one described above to determine the accrual of original issue discount on a Strip. For example, the Service might require that original issue discount for a month be calculated under the method described above except that both the yield and the remaining payments should be determined by assuming no further prepayments of the Mortgages.

Further, the characterizations of Strips discussed above are not the only possible interpretations of the applicable Code provisions. For example, if you own a Strip, you may be treated as the owner of:

- One installment obligation consisting of the Strip's pro rata share of the payments attributable to principal on each Mortgage and a second installment obligation consisting of the Strip's pro rata share of the payments attributable to interest on each Mortgage.

- As many stripped bonds or stripped coupons as there are scheduled payments of principal and/or interest on each Mortgage.

- A separate installment obligation for each Mortgage, representing the Strip's pro rata share of payments of principal and/or interest to be made on that Mortgage.

Alternatively, if you own Strips, you may be treated as owning (a) a pro rata fractional undivided interest in each Mortgage to the extent that the Strip represents the same pro rata portion of principal and interest on each Mortgage and (b) a stripped bond or stripped coupon, as applicable, to the extent of any disproportionate principal or interest.

In addition, the Service might assert that the contingent payment rules mentioned above under *General* should apply to certain Strips.

**Purchase of More Than One Class of Strips**

Although the matter is not free from doubt, if you purchase more than one class of Strips issued from the same pass-through pool at the same time or in the same series of transactions, you should be treated for federal income tax purposes as having made a single purchase. If you purchase more than one class of Strips issued from the same pass-through pool in different transactions, it is unclear whether the federal income tax treatment of the Strips should be determined by treating each class separately or as described in the previous sentence.

## SPCs

If you own an SPC, you should review the applicable supplement for a description of the related assets, and the offering documents applicable to the assets for a description of the federal income tax consequences of owning the assets.

38

**CPCs**

### Status of the CPC Classes

*The Callable Class.*   If you own a Callable Class, you will be treated as:

1. Owning an undivided interest in the underlying Callable Assets; and

2. Having written a call option on your interest in the underlying Callable Assets. The call option is represented by a proportionate part of the Call Right. You will be treated as having written the call option in exchange for an option premium equal to an amount computed under the rules described below.

Special considerations may apply to thrifts, REMICs, real estate investment trusts and regulated investment companies investing in a Callable Class.

*The Call Class.*   If you own a Call Class, you will be treated as having purchased a call option on all the Callable Assets underlying the related Callable Class for an option premium equal to the price you paid for the Call Class.

If you own a Call Class and acquire an interest in the related Callable Class, the call option probably would be extinguished, to the extent of that interest, for at least as long as you held such interest, and you would be treated as holding a proportionate share of the underlying Callable Assets.

### Taxation of the CPC Classes

#### *The Callable Class*

*Allocations.*   If you own a Callable Class, you will be required, for federal income tax purposes, to account separately for the underlying Callable Assets and the call option you are deemed to have written. You must allocate your purchase price for the Callable Class between the Callable Assets and the call option based on the relative fair market values of each on the date of purchase. The (positive) amount that you allocate to the Callable Assets is your basis in the Callable Assets and the (negative) amount that you allocate to the call option is the option premium you are deemed to have received for writing the call option. Accordingly, your basis in the underlying Callable Assets will be *greater* than the amount you paid for the Callable Class.

Upon the sale, exchange or other disposition of the Callable Class, you must again allocate amounts between the underlying Callable Assets and the call option you were deemed to have written. This allocation is based on the relative fair market values of the Callable Assets and the call option on the date of sale. The (positive) amount that you allocate to the underlying Callable Assets is your amount realized with respect to the Callable Assets and the (negative) amount you allocate to the call option is the amount you are deemed to have paid to be relieved from your obligations under the call option. The amount realized with respect to the underlying Callable Assets will be *greater* than the amount actually received.

*Taxation of Underlying Callable Assets.*   Except as described below under *Application of the Straddle Rules,* the anticipated material federal income tax consequences to you of purchasing, owning and disposing of your interest in the underlying Callable Assets will be as described in the offering materials for the Callable Assets.

39

*Taxation of Call Option Premium.*   If you own a Callable Class, you will not be required to immediately include in your income the option premium that you were deemed to have received when you purchased the Callable Class. Rather, you need to take such premium into account only when the Call Right lapses, is exercised, or is otherwise terminated. As described above, an amount equal to that option premium is included in your basis in the Callable Assets. Your recovery of such basis will not occur at the same rate as the option premium is included in your income.

As the owner of a Callable Class, you will include the option premium in income as short-term capital gain when the Call Right lapses. Typically, the principal amount of the Callable Assets subject to the Call Right will be reduced over time due to principal payments. It is not entirely clear whether the Call Right would thus be deemed to lapse as the Callable Assets are paid down, and if so, at what rate. However, Freddie Mac intends to assume that the Call Right lapses, and you would recognize the related premium, proportionately as principal is paid on the Callable Assets (whether as scheduled principal payments or prepayments) after the first date on which the Call Right may be exercised. The Service may or may not agree with this method of determining income from the lapse of the Call Right.

If you own a Callable Class and the Call Right is exercised, you will add an amount equal to the unamortized portion of the option premium to the amount realized from the sale of the underlying Callable Assets. If you transfer your interest in a Callable Class, the transfer will be treated as a "closing transaction" with respect to the option you were deemed to have written. Accordingly, you will recognize a short-term capital gain or loss equal to the difference between the unamortized amount of option premium and the amount you are deemed to pay, under the rules discussed above, to be relieved from such your obligation under the option.

*Taxation of Income from GIFC.*   If a Callable Class is redeemed, the amount received by the pass-through pool from the Call Class Holder and not immediately payable to the Holders of the Callable Class will be invested by Freddie Mac in a Guaranteed Investment and Fee Contract (**"GIFC"**). The GIFC allows Freddie Mac to invest these amounts for the period from the date received to the date paid to Holders, and it provides for payment of a fee to Freddie Mac. If you own a redeemed Callable Class, you should treat your proportionate share of any accrued interest for the month of redemption as income earned under the GIFC for that period.

### The Call Class

Since the purchase price paid by the investor in a Call Class will be treated as an option premium for the Call Right, it will be:

> 1. Added to the purchase price of the Callable Assets (in addition to any fee for the exchange) if the Callable Assets are purchased upon exercise of the Call Right.

> 2. Treated as a loss as the Call Right lapses.

For a discussion of when the Call Right may be deemed to lapse, see *The Callable Class — Taxation of Call Option Premium* above. Assuming that the underlying Callable Assets, if acquired, would be capital assets, then loss recognized on such lapse will be treated as a capital loss.

**Application of the Straddle Rules**

If you own a Callable Class, the Service might take the position that your interest in the underlying Callable Assets and the call option constitute positions in a straddle. If this were correct, the straddle rules of Section 1092 of the Code would apply, with the following consequences:

- If you sell your Callable Class, you will be treated as selling your interest in the underlying Callable Assets at a gain or loss, which would be short-term because your holding period would be tolled. As discussed above, your gain or loss with respect to the option premium always will be short-term under the option rules, regardless of the application of the straddle rules.

- The straddle rules might require you to capitalize, rather than deduct, a portion of any interest and carrying charges allocable to your interest in a Callable Class.

- If the Service were to take the position that your interest in the underlying Callable Assets and the call option constitute a "conversion transaction" as well as a straddle, then a portion of the gain with respect to the underlying Callable Assets or the call option might be characterized as ordinary income.

**Tax-Exempt Organizations**

In general, income or gain from the CPC classes will not be subject to the tax on unrelated business taxable income for a tax-exempt organization, if the CPC classes do not constitute "debt-financed property."

## EXCHANGE TRANSACTIONS

If you surrender classes of Strips in return for an equivalent principal amount of the underlying Giant Certificate, or vice versa, you will not recognize gain or loss as a result. After the exchange, you will be treated as continuing to own the interests that you owned immediately prior to the exchange.

If you surrender MACS for other MACS or for an interest in the underlying assets, or vice versa, you will not recognize gain or loss as a result. After the exchange, you will be treated as continuing to own the interests that you owned immediately prior to the exchange.

## BACKUP WITHHOLDING, FOREIGN WITHHOLDING AND INFORMATION REPORTING

If you are a U.S. Person, you may be subject to federal backup withholding tax under Section 3406 of the Code on payments on your Pass-Through Certificate, unless you comply with applicable information reporting procedures or are an exempt recipient. Any such amounts withheld would be allowed as a credit against your federal income tax liability.

Payments made to an investor who is an individual, a corporation, an estate or a trust that is not a U.S. Person, or to a Holder on behalf of such an investor, generally will not be subject to federal income or withholding tax if:

- The Mortgages underlying the investor's Pass-Through Certificates all were originated after July 18, 1984;

41

- The Pass-Through Certificate is not held by the investor in connection with a trade or business in the United States (or if an income tax treaty applies, is not attributable to a U.S. permanent establishment);

- The investor is not with respect to the United States a corporation that accumulates earnings in order to avoid United States federal income tax;

- The investor is not a U.S. expatriate or former U.S. resident who is taxable in the manner provided in Section 877(b) of the Code; and

- The investor provides a statement (on Internal Revenue Service Form W-8BEN or a similar substitute form) signed under penalties of perjury that includes its name and address and certifies that it is not a U.S. Person in accordance with applicable requirements.

Payments to an investor who is not a U.S. Person that represent interest on Mortgages originated before July 19, 1984 may be subject to federal withholding tax at the rate of 30 percent or any lower rate provided by an applicable tax treaty.

Regardless of the date of origination of the Mortgages, federal backup withholding tax will not apply to payments on a Pass-Through Certificate made to an investor who is not a U.S. Person if the investor furnishes an appropriate statement of non-U.S. status.

In general, an investor in a CPC will not be subject to federal withholding tax on amounts received or deemed received with respect to the option associated with the CPC.

We will make available to each Holder of a Pass-Through Certificate, within a reasonable time after the end of each calendar year, information to assist Holders and investors in preparing their federal income tax returns. The information made available to you may not be correct for your particular circumstances.

For these purposes, the term "**U.S. Person**" means one of the following:

- An individual who, for federal income tax purposes, is a citizen or resident of the United States.

- A corporation (or other business entity treated as a corporation for federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia.

- An estate whose income is subject to federal income tax, regardless of its source.

- A trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust.

- To the extent provided in Treasury regulations, certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, that elect to be treated as U.S. Persons.

If a partnership (or other entity treated as a partnership for federal income tax purposes) holds Pass-Through Certificates, the treatment of a partner will generally depend upon the status of the particular partner and the activities of the partnership. If you are a partner in such a partnership, you should consult your own tax advisors.

42

## ACCOUNTING CONSIDERATIONS

Various factors may influence the accounting treatment applicable to an investor's acquisition and holding of mortgage-related securities. Accounting standards, and the application and interpretation of such standards, are subject to change from time to time. Before making an investment in the Pass-Through Certificates or exchanging the Pass-Through Certificates, investors are encouraged to consult their own accountant for advice on the appropriate accounting treatment for their series of Pass-Through Certificates.

## LEGAL INVESTMENT CONSIDERATIONS

You should consult your own legal advisors to determine whether Pass-Through Certificates are legal investments for you and whether you can use Pass-Through Certificates as collateral for borrowings. In addition, financial institutions should consult their legal advisors or regulators to determine the appropriate treatment of Pass-Through Certificates under risk-based capital and similar rules.

If you are subject to legal investment laws and regulations or to review by regulatory authorities, you may be subject to restrictions on investing in some types of Pass-Through Certificates or in Pass-Through Certificates generally. Institutions regulated by the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the National Credit Union Administration, the Treasury or any other federal or state agency with similar authority should review applicable regulations, policy statements and guidelines before purchasing or pledging Pass-Through Certificates.

## DISTRIBUTION ARRANGEMENTS

Freddie Mac generally purchases assets from dealers and other customers, forms a pass-through pool consisting of those assets and sells the related Pass-Through Certificates through the same dealers (each, a **"Dealer"**) or customers. Dealers and their affiliates may enter into other transactions with and provide other services to Freddie Mac in the ordinary course of business. Freddie Mac, the Dealers or other parties may receive compensation, trading gain or other benefits in connection with transactions in Pass-Through Certificates. We typically receive a fee from the Dealers and other customers for each offering.

Each offering may be made and the Pass-Through Certificates may be offered or sold only where it is legal to do so. This Offering Circular and any applicable supplement do not constitute an offer to sell or buy or a solicitation of an offer to buy or sell any securities other than the Pass-Through Certificates or an offer to sell or buy or a solicitation of an offer to buy or sell Pass-Through Certificates in any jurisdiction or in any other circumstance in which such an offer or solicitation is unlawful or not authorized.

Freddie Mac may retain or repurchase Pass-Through Certificates for its own portfolio, and may offer or re-offer such Pass-Through Certificates from time to time. These transactions may affect the market prices of Pass-Through Certificates.

Certain Dealers may buy, sell and make a market in Pass-Through Certificates. The secondary market for Pass-Through Certificates may be limited. If a Dealer sells a Pass-Through Certificate, the Dealer is required to confirm the sale, notify the purchaser of the settlement date, purchase

price, concessions and fees and deliver a copy of this Offering Circular and the applicable supplement to the purchaser.

## INCREASE IN SIZE

Before the settlement date for any offering of Pass-Through Certificates, Freddie Mac and any Dealers or other customers may agree to increase the size of the offering. In that event, the Pass-Through Certificates will have the same characteristics as described in the applicable supplement, except that the original principal or notional principal amount of each class receiving payment from the same pass-through pool will increase by the same proportion.

Appendix I

# INDEX OF TERMS

The following is a list of defined terms used in this Offering Circular and the pages where their definitions appear.

| | |
|---|---|
| Accrual Period | 19 |
| Adjustment Date | 18 |
| Annual Interest Amount | III-1 |
| ARMs | 10 |
| ARM Giant PCs | 14 |
| ARM PCs | 14 |
| BBA | 19 |
| Business Day | 18 |
| Call Classes | 12 |
| Call Fee | IV-1 |
| Call Payment | IV-1 |
| Call Right | 12 |
| Callable Assets | 12 |
| Callable Classes | 12 |
| Callable Pass-Through Certificates | 12 |
| Class Factor | 17 |
| Code | 30 |
| CPCs | 12 |
| CPR | 27 |
| CUSIP Number | 21 |
| Dealer | 43 |
| Designated Telerate Page | 19 |
| DTC | 7 |
| DTC Participants | 21 |
| DTC System | 7 |
| Events of Default | 29 |
| Exchange Date | IV-2 |
| Fed Participants | 21 |
| Fed System | 7 |
| Final Call Payment | IV-1 |
| Final Payment Date | 20 |
| Fixed Rate Class | 13 |
| Floating Rate Class | 13 |
| Freddie Mac | 5 |
| Freddie Mac Act | 3 |
| Giant Certificates | 10 |
| Giant PCs | 10 |
| Giant Securities | 10 |
| GIFC | 40 |
| GNMA | 15 |
| GNMA Certificates | 15 |
| GNMA I Certificates | 15 |
| GNMA II Certificates | 15 |
| Gold Giant PCs | 14 |
| Gold PCs | 14 |
| Holder | 7 |
| HUD | 15 |

| | |
|---|---|
| IO Classes | 10 |
| Initial Call Payment | IV-1 |
| Interest Only Classes | 10 |
| Inverse Floating Rate Class | 13 |
| IP Classes | 10 |
| LIBOR | 18 |
| LTV | 32 |
| MACS | 11 |
| Modifiable And Combinable Securities | 11 |
| Mortgages | 5 |
| New MACS | III-1 |
| Notional Class | 13 |
| OID Regulations | 31 |
| Old MACS | III-1 |
| Original Giant PCs | 14 |
| Original PCs | 14 |
| Pass-Through Class | 13 |
| Pass-Through Agreement | 28 |
| Pass-Through Certificates | 5 |
| Payment Date | 17 |
| Payment Delay | 14 |
| PC Offering Circular | 15 |
| PCs | 14 |
| PO Classes | 10 |
| Pricing Speed | 36 |
| Principal Only Classes | 10 |
| PSA | 27 |
| Record Date | 20 |
| Redemption Date | IV-1 |
| Redemption Price | IV-1 |
| Registrar | 7 |
| REMIC | 9 |
| SCs | 11 |
| Service | 31 |
| SPCs | 12 |
| Strip | 31 |
| Stripped Giant Certificates | 10 |
| Stripped Giant PCs | 10 |
| Stripped Giant Securities | 10 |
| Stripped Interest Certificates | 11 |
| Structured Formula Class | 13 |
| Structured Pass-Through Certificates | 12 |
| Terms Supplement | 28 |
| Toggle Class | 14 |
| Treasury | 16 |
| U.S. Person | 42 |
| WAC Class | 14 |

## Appendix II
## EXCHANGE PROCEDURES FOR STRIPPED GIANT CERTIFICATES

**Information About Securities Eligible for Exchange**

You can obtain the balances of classes of Pass-Through Certificates that are subject to exchange either from Freddie Mac's Internet web-site or from Investor Inquiry at Freddie Mac.

**Notice**

- If you want to enter into an exchange involving Stripped Giant Certificates (including MACS), you must notify Freddie Mac's Mortgage Funding and Investor Relations Department through a Dealer that belongs to Freddie Mac's REMIC dealer group. The Dealer must notify Freddie Mac by telephone (571-382-3767 or 866-903-2767) or by fax (571-382-4277).

- The notice must be received at least one business day before the proposed exchange date, and must include:
    - •• The outstanding principal or notional principal amounts of the securities to be exchanged and received.
    - •• The proposed exchange date, which is subject to Freddie Mac's approval.

- Your notice becomes irrevocable on the business day before the proposed exchange date.

**Exchange Fee**

- We may charge an exchange fee. If so, it will be calculated as described in the applicable supplement.

- Promptly after receiving your notice, Freddie Mac will call the Dealer to give instructions for delivering the collateral. Freddie Mac will collect any exchange fee on a delivery versus payment basis.

**Payments Following an Exchange**

- Freddie Mac will make the first payment on the securities issued in an exchange in either the first or second month after their issuance, as determined by their Payment Delay.

- Freddie Mac will make the last payment on the securities surrendered in an exchange in either the month of the exchange or the following month, as determined by their Payment Delay.

**Limitations on Ability to Exchange Classes**

- You must own the right classes in the right proportions in order to enter into an exchange. The principal amount of the securities received in an exchange must equal the principal amount of the securities exchanged, and interest must be payable on the securities received in the same amount as would have been payable on the securities exchanged.

- If you do not own the right classes, you may not be able to obtain them because:
    - •• The owner of a class that you need for an exchange may refuse or be unable to sell that class to you at a reasonable price or at any price.
    - •• Some classes may be unavailable because they have been placed into other financial structures, such as a REMIC.
    - •• Principal payments and prepayments over time will decrease the amounts available for exchange.

Appendix III

# EXAMPLES OF MACS EXCHANGES

You may exchange one or more classes of a series of MACS (the **"Old MACS"**) for one or more different classes of MACS of the same series (the **"New MACS"**).

Freddie Mac will allow any exchange of MACS, so long as:

- The aggregate outstanding principal amount of the New MACS (rounded to whole dollars) immediately after the exchange equals that of the Old MACS immediately before the exchange. In this calculation, the outstanding principal amount of the IO Class always equals $0.

- The aggregate Annual Interest Amount of the New MACS (rounded to whole dollars) equals that of the Old MACS. The **"Annual Interest Amount"** for any class equals its outstanding principal or notional principal amount times its class coupon. If an exchange includes one or more Floating Rate or Inverse Floating Rate Classes, the Annual Interest Amount for the classes received and the classes surrendered must be equal at all levels of the applicable index.

- If Floating Rate and/or Inverse Floating Rate Classes are being exchanged for other Floating Rate and/or Inverse Floating Rate Classes, the Classes being surrendered are first exchanged for corresponding amounts of the IO and/or PO Classes.

Exchanges that include both Floating Rate or Inverse Floating Rate Classes and Fixed Rate or Principal Only Classes are permitted only from the 15th through the last day of a month. Exchanges involving only Fixed Rate and Principal Only Classes and exchanges involving only Floating Rate and Inverse Floating Rate Classes are permitted at any time.

The following examples illustrate some of the possible exchanges of Old MACS for New MACS involving Fixed Rate and PO Classes. Assume that your Old MACS have the following characteristics. Also assume that the class coupon of the underlying Giant Certificate, and therefore that of the IO Class, is 8.5%.

*Old MACS*

| Outstanding Principal Amount | Class | Class Coupon | Annual Interest Amount |
|---|---|---|---|
| $10,000,000 | 4.0 | 4.0% | $ 400,000 |
| 10,000,000 | 8.0 | 8.0 | 800,000 |
| 10,000,000 | 18.0 | 18.0 | 1,800,000 |
| $30,000,000 | | | $3,000,000 |

*New MACS*

*Example 1:*   You can receive New MACS consisting entirely of the 10.0 Class:

| Outstanding Principal Amount | Class | Class Coupon | Annual Interest Amount |
|---|---|---|---|
| $30,000,000 | 10.0 | 10.0% | $3,000,000 |

III-1

*Example 2:*   You can receive New MACS consisting of the PO and IO Classes:

| Outstanding Principal Amount | Class | Class Coupon | Annual Interest Amount |
|---|---|---|---|
| $30,000,000 | PO | 0.0% | $ 0 |
| 35,294,118 (notional) | IO | 8.5 | 3,000,000 |
| $30,000,000 | | | $3,000,000 |

*Example 3:*   You can receive New MACS consisting of the 6.0, 9.0 and IO Classes:

| Outstanding Principal Amount | Class | Class Coupon | Annual Interest Amount |
|---|---|---|---|
| $20,000,000 | 6.0 | 6.0% | $1,200,000 |
| 10,000,000 | 9.0 | 9.0 | 900,000 |
| 10,588,236 (notional) | IO | 8.5 | 900,000 |
| $30,000,000 | | | $3,000,000 |

*Example 4:*   You can receive New MACS consisting of the PO, 6.0, 9.0, and 20.0 Classes:

| Outstanding Principal Amount | Class | Class Coupon | Annual Interest Amount |
|---|---|---|---|
| $ 500,000 | PO | 0.0% | $ 0 |
| 5,000,000 | 6.0 | 6.0 | 300,000 |
| 20,000,000 | 9.0 | 9.0 | 1,800,000 |
| 4,500,000 | 20.0 | 20.0 | 900,000 |
| $30,000,000 | | | $3,000,000 |

You also may exchange your Old MACS for an equivalent part of the underlying Giant Certificate. Continuing with the above examples, you could exchange $10,000,000 of the 4.0 Class, $10,000,000 of the 8.0 Class and $5,263,158 of the 18.0 Class for $25,263,158 of the underlying Giant Certificate, and vice versa. Such exchanges may occur repeatedly.

Other possible exchanges of MACS may involve Floating Rate and Inverse Floating Rate Classes. The applicable supplement will describe MACS exchanges of this type and may include additional examples.

III-2

**Appendix IV**

**REDEMPTION AND EXCHANGE PROCEDURES FOR CPCs**

**Notice**

- If you own a Call Class and want to call the related Callable Class on any permitted Payment Date (the **"Redemption Date"**), you must notify Freddie Mac at least five business days (if the underlying asset is a Giant PC) or three business days (if the underlying asset is a Giant Security) before the related Record Date.

- You must notify Freddie Mac through a Dealer that belongs to Freddie Mac's REMIC dealer group. The Dealer must notify Freddie Mac by telephone (571-382-3767 or 866-903-2767), followed by written confirmation (which may be by fax at 571-382-4277) on the same day in a form specified by Freddie Mac.

**Related Fees and Payments**

- The **"Initial Call Payment"** will equal:

    1. 5% of the principal amount of the Callable Class being redeemed, based on its Class Factor for the month preceding the Redemption Date, plus

    2. the amount of interest that would accrue on the Callable Class for the actual number of days from the first day of the month of redemption to the Redemption Date, calculated on the basis of its Class Factor for the month preceding the Redemption Date.

    *Example:* If the Redemption Date falls on the 15th of a month, the Initial Call Payment would include 14 days of accrued interest. If it falls on the 16th of a month (because the 15th was not a Business Day), the Initial Call Payment would include 15 days of accrued interest. In each case, interest is based on a 360-day year.

- The **"Final Call Payment"** will equal 95% of the principal amount of the Callable Class being redeemed, based on its Class Factor that was published in the month preceding the Redemption Date.

- The **"Call Payment"** will equal the Initial Call Payment plus the Final Call Payment.

- The **"Redemption Price"** of a Callable Class will equal:

    1. 100% of the outstanding principal amount of the Callable Class, based on its Class Factor for the month preceding the redemption, plus

    2. accrued interest at its class coupon for the related Accrual Period on its outstanding principal amount, plus

    3. additional accrued interest at its class coupon for the actual number of days from the first day of the month of redemption to the Redemption Date, calculated on a reduced principal amount determined by the Class Factor that would have been published in the month of redemption were no redemption to occur.

- The **"Call Fee"** equals 1/32 of 1% of the outstanding principal amount of the Callable Class being redeemed (but not less than $7,500).

**Deposit of Initial Call Payment; Pledge**

• You must deposit the Initial Call Payment with Freddie Mac at the time that you notify Freddie Mac that you want to redeem the Callable Class.

• At the same time, you must pledge all of your interest in the underlying Giant Certificate to Freddie Mac as security for your obligation to pay the Final Call Payment and Call Fee. You must sign a pledge agreement prepared by Freddie Mac for this purpose.

**Effect of Notice**

• Your notice of redemption and your pledge will become irrevocable when you deposit the Initial Call Payment.

• By the Record Date relating to the Redemption Date, Freddie Mac will post a notice on the Fed System that the Callable Class will be redeemed.

• In the month of redemption, Freddie Mac will reduce the Class Factors of both the Callable Class and the Call Class to zero to reflect the redemption that will occur in that month.

**Exchange of Callable Assets**

• On the first Business Day of the month of redemption (the **"Exchange Date"**), Freddie Mac will transfer the related Callable Assets to you in exchange for:

  •• The Call Class.

  •• The Call Fee.

  •• The Final Call Payment.

• Freddie Mac will give you instructions for delivery of the Call Class, Call Fee and Final Call Payment.

• Principal and interest on the Callable Assets received in the exchange will be payable to you in the month following the exchange.

**Redemption of Callable Class**

• On the Redemption Date, Freddie Mac will redeem the Callable Class by paying its Holders, on a pro rata basis, the Redemption Price.

• Freddie Mac will not make any other payment on the Callable Class.

• Once redeemed, a Callable Class and its related Call Class will not be reissued.

**Payment to Call Class Holder**

On the Redemption Date, Freddie Mac will pay to you:

• The excess of (a) the Call Payment plus payments received on the underlying Callable Assets in the month of redemption over (b) the Redemption Price.

• Interest on the Initial Call Payment and Final Call Payment from the dates you paid them to the Redemption Date. Freddie Mac will calculate interest at the prevailing federal funds rate determined daily as of the close of business, less 25 basis points.

**Defaulting Call Class Holder**

If you fail to deliver the Call Class, Final Call Payment and Call Fee on the Exchange Date, then:

• On the next Business Day, Freddie Mac will liquidate the related Giant Certificate, in accordance with your pledge, in a commercially reasonable manner.

• Freddie Mac will charge you a liquidation fee in an amount equal to 1/2 of 1% of the proceeds of liquidation.

• Freddie Mac will apply the net proceeds of the liquidation, as necessary, to redeem the Callable Class.

• On the Redemption Date, Freddie Mac will pay to you the excess, if any, of:

    1. the Initial Call Payment, plus

    2. payments received on the underlying Callable Assets in the month of redemption, plus

    3. net proceeds to Freddie Mac from the liquidation of the Giant Certificate

<em>over</em>

    1. the Redemption Price for the related Callable Class, plus

    2. the liquidation fee.

• You will have no further right to or interest in the Call Class or the related Callable Asset.

**Limitations**

Freddie Mac will permit the redemption of a Callable Class only if the underlying Giant Certificate has at least the market value specified in the related supplement.

• Freddie Mac will determine market value upon request of the Dealer providing the redemption notice. The Dealer must make the request at the same time as it gives the redemption notice by telephone.

• Freddie Mac will determine the market value based on bid quotations available at the time of the request.

• Freddie Mac's determination of the market value will be final and binding.

INFORMATION CIRCULAR

# Merrill Lynch Mortgage Investors, Inc.
Depositor

# First Franklin Financial Corporation
Sponsor

# Home Loan Services, Inc.
Servicer

# Federal Home Loan Mortgage Corporation
Guarantor

# Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-6
Issuing Entity

# $26,235,464
(Approximate)

# Mortgage Loan Asset-Backed Certificates
Principal and interest payable monthly, commencing in January 2008

---

**You should carefully consider the risk factors beginning on page 12 of this information circular.**

Except for the guarantee described herein, neither the offered certificates nor the underlying mortgage loans are insured or guaranteed by any governmental agency or instrumentality or any other entity.

The certificates represent interests in the assets deposited with the issuing entity only and will not represent interests in or obligations of the depositor, the sponsor or any other entity.

---

**The Issuing Entity Will Issue—**

- Four classes of Class A Certificates.

- One Class P Certificate.

The classes of offered certificates are listed and their sizes and basic payment characteristics are described under the heading "Class—Offered Certificates" in the table on page 5.

**The Assets of the Issuing Entity Will Include—** Four loan groups of first lien residential mortgage loans. The mortgage loans will consist of nonprime, fixed rate and adjustable rate mortgage loans. Certain of the mortgage loans will require only payments of interest for a term specified in the related mortgage note.

**Credit Enhancement Will Consist Of—** A guarantee provided by Federal Home Loan Mortgage Corporation ("Freddie Mac") as described in this information circular. The guarantee is a condition to the issuance of the certificates. The obligations of Freddie Mac under this guarantee are with respect to the Class A Certificates only and are solely the obligations of Freddie Mac. The guarantee does not apply to the Class P Certificate.

A primary mortgage insurance policy as described in this information circular under "Description of the Certificates—The PMI Policy" will cover some losses on certain of the mortgage loans.

**THE CERTIFICATES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY JURISDICTION.**

**It is a condition to the issuance of the Certificates that they be purchased and guaranteed by Freddie Mac as described in this information circular. The obligations of Freddie Mac under its guarantee with respect to the Class A Certificates are obligations of Freddie Mac only. Income on the Class A Certificates has no exemption under federal law from federal, state or local taxation. It is expected that delivery of the Class A Certificates in the form of physical certificates will be made to Freddie Mac against payment therefor on or about December 21, 2007.**

The date of this information circular is December 18, 2007.

The depositor has prepared this information circular solely in connection with the offering of the Class A Certificates to Freddie Mac.

No person has been authorized to give any information or to make any representations other than those contained in this information circular and, if given or made, such information or representations must not be relied upon. The delivery of this information circular at any time does not imply that the information herein is correct as of any time subsequent to its date.

This information circular contains substantial information concerning the mortgage loans and the obligations of the servicer and others with respect thereto. Potential investors are urged to review this information circular in its entirety. The obligations of the parties with respect to the transactions contemplated herein are set forth in and will be governed by certain documents described herein, and all of the statements and information herein are qualified in their entirety by reference to such documents.

**Notwithstanding anything to the contrary contained in this information circular, all persons may disclose to any and all persons, without limitation of any kind, the federal, state and local tax treatment of the Class A Certificates, any fact relevant to understanding the federal, state and local tax treatment of the Class A Certificates, and all materials of any kind (including opinions or other tax analyses) relating to such federal, state and local tax treatment, other than the identity of the issuing entity and information that would permit the identification of the issuing entity.**

**PROSPECTIVE PURCHASERS ARE NOT TO CONSTRUE THE CONTENTS OF THIS INFORMATION CIRCULAR OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE SPONSOR, THE DEPOSITOR, THE SERVICER, THE GUARANTOR OR THE TRUSTEE OR ANY OF THEIR OFFICERS, EMPLOYEES OR AGENTS AS INVESTMENT, LEGAL OR TAX ADVICE. PRIOR TO INVESTING IN THE CLASS A CERTIFICATES A PROSPECTIVE PURCHASER SHOULD CONSULT WITH ITS ATTORNEY AND ITS INVESTMENT, ACCOUNTING, REGULATORY AND TAX ADVISORS TO DETERMINE THE CONSEQUENCES OF AN INVESTMENT IN THE CERTIFICATES AND ARRIVE AT AN INDEPENDENT EVALUATION OF SUCH INVESTMENT.**

### IRS CIRCULAR 230 NOTICE

**The discussion contained in this information circular is not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. federal, state or local tax penalties. This discussion is written and provided by Merrill Lynch Mortgage Investors, Inc. in connection with the promotion or marketing by Merrill Lynch Mortgage Investors, Inc. of the transactions or matters addressed in this information circular. You should seek advice based on your particular circumstances from an independent tax advisor.**

**TABLE OF CONTENTS**

Page

SUMMARY INFORMATION.....................................6
RISK FACTORS .......................................12
   Risks Associated with the Certificates.................12
   Risks Associated with the Mortgage Loans.........16
FORWARD LOOKING STATEMENTS .............23
THE SPONSOR .......................................23
THE DEPOSITOR .....................................24
THE ISSUING ENTITY ................................24
THE TRUSTEE/CUSTODIAN...........................25
THE SERVICER ......................................26
THE GUARANTOR ....................................28
THE CREDIT RISK MANAGER ........................28
UNDERWRITING GUIDELINES ........................28
AFFILIATES AND RELATED
   TRANSACTIONS ...................................32
DESCRIPTION OF THE CERTIFICATES...........32
   General.............................................32
   Available Funds ....................................33
   Priority of Distributions on the Class A
      Certificates ......................................34
   Distributions on the Class P Certificate ..............35
   Allocation of Realized Losses..........................36
   Advances in Respect of Delinquencies.................36
   Pass-Through Rates ...................................37
   Freddie Mac Guarantee................................37
   The PMI Policy......................................38
   Definitive Form......................................39
DESCRIPTION OF THE MORTGAGE LOANS...40
   General.............................................40
   Index ..............................................43
   Mortgage Loan Data Appearing in Appendix A
      .................................................44
   Mandatory Repurchase or Substitution of
      Mortgage Loans ..................................44
   Optional Purchase of Mortgage Loans................44
CERTAIN LEGAL ASPECTS OF THE
   MORTGAGE LOANS...............................44
   General.............................................44
   Types of Mortgage Instruments ........................45
   Interest in Real Property .............................45
   Condominiums.......................................45
   Two-Family Units ...................................45
   Foreclosure .........................................46
   Anti-Deficiency Legislation, the Bankruptcy
      Code and Other Limitations on Lenders .........48
   Forfeiture for Drug, RICO and Money
      Laundering Violations.............................50
   Servicemembers Civil Relief Act .....................50
   Environmental Considerations..........................50
   "Due-on-Sale" Clauses ...............................52
   Prepayment Penalties .................................53
   Subordinate Financing ................................53

Page

Applicability of Usury Laws..................................54
Enforceability of Certain Provisions...................54
Alternative Mortgage Instrument.......................54
PREPAYMENT AND YIELD
   CONSIDERATIONS...............................55
   Scheduled Delays in Distributions.....................58
   Weighted Average Life of the Offered
      Certificates ......................................58
   Structuring Assumptions...............................59
THE POOLING AND SERVICING
   AGREEMENT ......................................60
   General.............................................60
   Assignment of Mortgage Loans;
      Representations and Warranties;
      Repurchases .....................................60
   Collection Account, Certificate Account and
      Related Accounts ................................64
   Realization Upon Defaulted Mortgage Loans;
      Servicing Advances..............................67
   Hazard Insurance Policies.............................68
   Primary Mortgage Insurance Policies .................69
   Fidelity Bonds and Errors and Omissions
      Insurance .......................................69
   Due-on-Sale Provisions ...............................69
   Evidence as to Compliance ...........................70
   The Servicer ........................................70
   Compensation and Payment of Expenses of the
      Servicer, Trustee, Credit Risk Manager and
      PMI Insurer .....................................72
   Voting Interests.......................................73
   Events of Default under the Pooling and
      Servicing Agreement.............................73
   Rights Upon Event of Default under the
      Agreements .....................................73
   Amendment.........................................74
   The Trustee .........................................74
   Reports to Certificateholders .........................75
   Reports to Freddie Mac and the Credit Risk
      Manager ........................................77
   Optional Termination of the Issuing Entity .........77
CERTAIN MATERIAL FEDERAL INCOME
   TAX CONSEQUENCES...........................78
   General.............................................78
   Characterization of the Issuing Entity.................78
   Tax Status of the Offered Certificates.................79
   Application of the Original Issue Discount,
      Stripped Bond and Market Discount or
      Premium Rules ..................................79
   Sales of Offered Certificates..........................83
   Backup Withholding with Respect to Offered
      Certificates ......................................83
   Foreign Investors ....................................83

Withholding Regulations ......................................84

STATE AND OTHER TAX CONSEQUENCES ...84

ACCOUNTING CONSIDERATIONS ...................84

LEGAL MATTERS .................................................84

PLAN OF DISTRIBUTION....................................84

INDEX OF DEFINED TERMS ..............................85

Appendix A – Mortgage Loan Data .....................A-1

Appendix B – Assumed Mortgage Loans..............B-1

Appendix C – Decrement Tables..........................C-1

**MERRILL LYNCH FIRST FRANKLIN MORTGAGE LOAN TRUST, SERIES 2007-6
MORTGAGE LOAN ASSET-BACKED CERTIFICATES**

| Class | Initial Certificate Principal Balance(1) | Pass-Through Rate | Principal Type | Interest Type | Minimum Denomination | Incremental Denomination | Final Scheduled Distribution Date(2) |
|---|---|---|---|---|---|---|---|
| **Offered Certificates** | | | | | | | |
| Class 1-A-1 | $2,585,314 | (3) | Pass-Through | Variable Rate | $1,000,000 | $1 | December 25, 2037 |
| Class 2-A-1 | $6,816,092 | (4) | Pass-Through | Variable Rate | $1,000,000 | $1 | December 25, 2037 |
| Class 3-A-1 | $4,893,356 | (5) | Pass-Through | Variable Rate | $1,000,000 | $1 | December 25, 2037 |
| Class 4-A-1 | $11,940,702 | (6) | Pass-Through | Variable Rate | $1,000,000 | $1 | January 25, 2038 |
| **Non-Offered Certificate** | | | | | | | |
| Class P | (7) | (7) | N/A | N/A | N/A | N/A | N/A |

(1)   Approximate.  The initial certificate principal balances are subject to adjustment up to plus or minus 10% as described in this information circular.

(2)   The final scheduled distribution date represents the distribution date in the month following the latest maturity date of any mortgage loan in the related loan group.  The actual final payment on your certificates could occur earlier or later than the final scheduled distribution date.

(3)   The pass-through rate with respect to each distribution date will be a per annum rate equal to the net WAC rate of the mortgage loans in loan group 1.  For the initial distribution date in January 2008, this rate is expected to be approximately 8.611580% per annum.

(4)   The pass-through rate with respect to each distribution date will be a per annum rate equal to the net WAC rate of the mortgage loans in loan group 2.  For the initial distribution date in January 2008, this rate is expected to be approximately 7.930191% per annum.

(5)   The pass-through rate with respect to each distribution date will be a per annum rate equal to the net WAC rate of the mortgage loans in loan group 3.  For the initial distribution date in January 2008, this rate is expected to be approximately 7.993865% per annum.

(6)   The pass-through rate with respect to each distribution date will be a per annum rate equal to the net WAC rate of the mortgage loans in loan group 4.  For the initial distribution date in January 2008, this rate is expected to be approximately 7.621883% per annum.

(7)   The class P certificate has no certificate principal balance or pass-through rate and is entitled to distributions of prepayment penalties and certain other amounts not constituting principal or interest on the mortgage loans in loan group 2 and in loan group 4, as specified in this information circular and the pooling and servicing agreement.

## SUMMARY INFORMATION

This summary highlights selected information from this document, but does not contain all of the information that you should consider in making your investment decision. Please read this entire information circular carefully for additional detailed information about the offered certificates.

### RELEVANT PARTIES

**Sponsor**

First Franklin Financial Corporation.

**Depositor**

Merrill Lynch Mortgage Investors, Inc.

**Guarantor**

Federal Home Loan Mortgage Corporation.

**Servicer**

Home Loan Services, Inc.

**Issuing Entity**

Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-6, a New York common law trust.

**Trustee/Custodian**

LaSalle Bank National Association.

**Credit Risk Manager**

Clayton Fixed Income Services Inc.

**PMI Insurer**

Mortgage Guaranty Insurance Corporation.

### AFFILIATIONS

First Franklin Financial Corporation, as sponsor, Merrill Lynch Mortgage Investors, Inc., as depositor, and Home Loan Services, Inc., as servicer, are all affiliates of each other. There are no relationships, agreements or arrangements outside of this transaction among the affiliated parties that are material to an understanding of the offered certificates. See "Affiliates and Related Transactions."

### CUT-OFF DATE

December 1, 2007.

### CLOSING DATE

On or about December 21, 2007.

### DISTRIBUTION DATES

The 25th day of each month, or the following business day if the 25th day is not a business day, commencing in January 2008.

### DETERMINATION DATES

With respect to each distribution date, the 15th day of each month or if such day is not a business day, the preceding business day.

### THE TRANSACTION PARTIES

The sponsor originated the mortgage loans. On the closing date, the sponsor will sell the mortgage loans to the depositor, who will in turn deposit them into a newly-formed, common law trust, which is the issuing entity. The issuing entity will be formed by a pooling and servicing agreement, to be dated as of the cut-off date, among the depositor, the guarantor, the servicer, the credit risk manager, the sponsor, the custodian and the trustee. The guarantor will guarantee the timely distribution of interest and the distribution of principal on the class A certificates as described herein. The credit risk manager will provide reports or recommendations to the servicer and the guarantor concerning the mortgage loans pursuant to the credit risk management agreement. The servicer will service the mortgage loans in accordance with the pooling and servicing agreement. The trustee will calculate distributions and other information regarding the certificates, will, in its capacity as custodian, hold the mortgage files and will have other administrative duties under the pooling and servicing agreement.

### DESCRIPTION OF CERTIFICATES

A summary chart of the initial certificate principal balances, pass-through rates, principal types, interest types, denominations and final scheduled distribution

dates of the certificates is set forth in the table on page 5.

The certificates consist of:

- four classes of class A certificates. The class A certificates will be divided into four certificate groups. Each certificate group will consist of one class of class A certificates, each designated by the numerals "1," "2," "3" and "4" respectively; and

- the class P certificate.

The class A certificates in each certificate group will represent interests in the mortgage loans in the related loan group. The class P certificate represents the right to prepayment penalties on the mortgage loans in loan group 2 and loan group 4.

Only the class A certificates are being offered by this information circular. The class P certificate is included solely to aid your understanding of the offered certificates.

See the table on page 5 for more information with respect to each class of certificates.

**Certificate Principal Balance of the Certificates**

The classes of class A certificates will have the approximate initial certificate principal balances set forth in the table on page 5. Any difference between the certificate principal balance of a class of certificates as of the date of issuance of such class and the approximate initial certificate principal balance of such class as of the date of this information circular will not exceed 10% of the initial certificate principal balance of such class.

**Form of Certificates; Denominations**

The certificates will be issued initially in definitive form and in the minimum denominations and the incremental denominations set forth in the table on page 5. The offered certificates are not intended to be directly or indirectly held or beneficially owned by anyone in amounts lower than such minimum denominations.

**Distributions—General**

Distributions will be made on each distribution date and will generally include scheduled payments due on the mortgage loans during the related due period,

prepayments (including liquidation proceeds) received by the servicer during the related prepayment period and any advances by the servicer with respect to such distribution date. The due period for any distribution date is the period from the second day of the calendar month preceding the month in which the distribution date occurs through the first day of the calendar month in which the distribution date occurs. The prepayment period for any distribution date is the preceding calendar month.

The amount available for distribution to certificateholders will not include amounts used to pay the servicing fee, the trustee fee, the credit risk management fee, the PMI premium and expenses payable to the transaction parties as described in the pooling and servicing agreement. The servicing fee, the trustee fee, the credit risk management fee and the PMI premium will be paid on each distribution date from interest payments received on the mortgage loans prior to any distributions on the certificates.

See "The Pooling and Servicing Agreement— Compensation and Payment of Expenses of the Servicer, Trustee, Credit Risk Manager and PMI Insurer" in this information circular for a description of the servicing fee, trustee fee, credit risk management fee and PMI premium.

**Interest Distributions**

On each distribution date and for any class of class A certificates, interest will be distributed from available funds of the related loan group, as described under "Description of the Certificates—Priority of Distributions on the Class A Certificates" herein.

On each distribution date, each class of class A certificates will be entitled to interest in an amount equal to one-twelfth of the product of (i) the pass-through rate for such class of certificates and (ii) the certificate principal balance of such class of certificates immediately prior to such distribution date.

Interest will be calculated for such offered certificates on the basis of a 360-day year consisting of twelve 30-day months.

See "Description of the Certificates—Priority of Distributions on the Class A Certificates" in this information circular.

**Pass-Through Rates**

Interest will accrue on the class A certificates at the per annum rate for each such class equal to the rate set forth and described in the table on page 5.  For any distribution date, there may be a shortfall of interest received on the mortgage loans that is available to pay the class A certificates as a result of the timing of prepayments on the mortgage loans not covered by compensating interest and the application of the Servicemembers Civil Relief Act and comparable state laws.  Any such shortfalls will be covered by the guarantee.

See "Description of the Certificates—Pass-Through Rates" in this information circular.

**Principal Distributions**

On each distribution date, and for any class of class A certificates, principal will be distributed from available funds of the related loan group remaining after distributions of interest, as described under "Description of the Certificates—Priority of Distributions on the Class A Certificates" in this information circular.

**MORTGAGE POOL**

The assets of the issuing entity are expected to consist of mortgage loans divided into four loan groups consisting of approximately 21 mortgage loans in loan group 1 with an aggregate unpaid principal balance as of the cut-off date of approximately $2,585,315, approximately 51 mortgage loans in loan group 2 with an aggregate unpaid principal balance as of the cut-off date of approximately $6,816,093, approximately 27 mortgage loans in loan group 3 with an aggregate unpaid principal balance as of the cut-off date of approximately $4,893,357 and approximately 62 mortgage loans in loan group 4 with an aggregate unpaid principal balance as of the cut-off date of approximately $11,940,703.  The mortgage loans, which are the primary source of distributions to holders of the certificates, will consist of nonprime, monthly pay, one- to two-family, condo and planned unit development, residential first lien mortgage loans.  Certain of the mortgage loans are balloon loans.  The mortgage loans in loan group 1 and loan group 2 are fixed rate mortgage loans and the mortgage loans in loan group 3 and loan group 4 are adjustable rate mortgage loans.  The mortgage loans in loan group 2 and loan group 4 provide for prepayment penalties.

The mortgage loans in each loan group will be the primary source of distributions to the class A certificates of the related certificate group.

The mortgage loans with adjustable interest rates provide for a fixed interest rate during an initial period of five years from origination of the mortgage loan and thereafter provide for adjustments to that interest rate on a semi-annual basis.  The interest rate of each adjustable rate mortgage loan will adjust to equal the sum of an index and a gross margin.  Interest rate adjustments will be subject to certain limitations stated in the related mortgage note on increases and decreases for any adjustment date.   In addition, interest rate adjustments will be subject to a maximum mortgage rate and a minimum mortgage rate, which will generally be the initial interest rate or the gross margin on the mortgage loan.  The index applicable to the mortgage loans is described under "Description of the Mortgage Loans—Index" in this information circular.

Certain of the mortgage loans will require only payments of interest for a term specified in the related mortgage note.

See "Description of the Mortgage Loans" and "Appendix A" in this information circular.

**Changes to Mortgage Pool**

The depositor may remove mortgage loans from a loan group, or may make substitutions for certain mortgage loans, in advance of the closing date.

After the issuance of the certificates, Freddie Mac may purchase mortgage loans from a loan group that have become 120 or more days delinquent. In addition, the sponsor will be required to repurchase or, at its election, if during the two year period following the closing date, substitute for, mortgage loans as a result of certain breaches of representations or warranties or as a result of defective documentation.  If the sponsor does not fulfill its obligation to repurchase or substitute such mortgage loans, Merrill Lynch Bank & Trust Co., FSB has agreed to perform such obligations pursuant to a guarantee, the rights and benefits of which have been assigned to the issuing entity.

See "Description of the Mortgage Loans—Mandatory Repurchase or Substitution of Mortgage Loans," "—Optional Purchase of Mortgage Loans" and "The Pooling and Servicing Agreement—Assignment of Mortgage Loans; Representations and Warranties; Repurchases" in this information circular.

Information regarding repurchases of the mortgage loans after the closing date will be available on the trustee's monthly distribution reports. See "The Pooling and Servicing Agreement—Reports to Certificateholders" in this information circular.

## CREDIT ENHANCEMENT

Credit enhancement increases the likelihood that holders of certificates will receive the distributions to which they are entitled. Credit enhancement can reduce the effect of shortfalls in payments received on the mortgage loans on the class A certificates. This transaction employs the following form of credit enhancement.

The class A certificates will have the benefit of credit enhancement from the guarantee. Freddie Mac will guarantee to the holders of the class A certificates the timely distribution of interest on such certificates and the distribution of principal on such certificates as described herein. The class P certificate will not have the benefit of the guarantee.

See "Description of the Certificates—Freddie Mac Guarantee" in this information circular.

In addition to the foregoing, approximately 29.21% of the mortgage loans will be insured by an insurance policy issued by Mortgage Guaranty Insurance Corporation, as the PMI insurer. However, such policy will provide only limited protection against losses on covered mortgage loans that default.

See "Description of the Certificates—The PMI Policy" in this information circular.

## EFFECTS OF PREPAYMENTS ON YOUR INVESTMENT EXPECTATIONS

The rate of prepayments on the mortgage loans will affect the investment performance of the offered certificates.

The offered certificates were structured assuming, among other things, prepayments on the mortgage loans occur based on the prepayment rates described in this information circular under "Prepayment and Yield Considerations." However, no one can predict the actual rate of prepayment of principal on the mortgage loans.

**In deciding whether to purchase any of the offered certificates, you should make an independent decision as to the appropriate prepayment** **assumptions to use.** If prepayments on the mortgage loans are higher or lower than you anticipate, the investment performance of the offered certificates may vary materially and adversely from your investment expectations.

Factors affecting the rate of prepayment on the mortgage loans in a loan group are discussed in this information circular under "Description of the Certificates—Priority of Distributions on the Class A Certificates" and "Prepayment and Yield Considerations."

The actual yield on your certificates may not be equal to the yield you anticipated at the time of purchase. In addition, even if the actual yield is equal to the yield you anticipated at the time of purchase, the total return on investment you expected or the expected weighted average life of your certificates may not be realized. These effects are summarized below.

**Yield**

The actual yield on your certificates depends on the:

- pass-through rate on the certificates;

- price paid for the certificates;

- absence or occurrence of principal losses on the mortgage loans;

- rate and timing of principal prepayments on the mortgage loans;

- differing rates at which mortgage loans with higher and lower interest rates may prepay;

- exercise by Freddie Mac of its optional purchase right of certain delinquent mortgage loans;

- obligation of the sponsor to repurchase mortgage loans that experience early payment default; and

- exercise by the servicer of its optional termination right.

If you purchase offered certificates, your yield, absent shortfalls or losses, will primarily be a function of the price paid and the rate and timing of prepayments on the mortgage loans.

If you pay less or more than the certificate principal balance of your certificate—that is, buy the certificate at a "discount" or "premium," respectively—then

your effective yield will be higher or lower, respectively, than the pass-through rate on the certificate, because such discount or premium will be amortized over the life of the certificate.

Any deviation in the actual rate of prepayments on the mortgage loans from the rate you assumed will affect the period of time over which, or the rate at which, any discount or premium will be amortized and, consequently, will cause your actual yield to differ from that which you anticipated on the certificates you purchase at a "discount," "premium" or "par."

**If you are purchasing offered certificates at a discount, you should consider the risk that a slower than anticipated rate of principal payments on the mortgage loans in the related loan group may have a negative effect on the yield to maturity of your certificates. In considering the rate of principal payments on the mortgage loans, you should consider that certain of the mortgage loans are interest-only mortgage loans. With respect to an interest-only mortgage loan, no scheduled payments of principal will be made by the mortgagor or advanced by the servicer during the ten year interest-only period.**

**If you are purchasing offered certificates at a premium, you should consider the risk that a faster than anticipated rate of principal payments on the mortgage loans in the related loan group may have a negative effect on the yield to maturity of your certificates and that a rapid rate of principal payments on the mortgage loans in the related loan group could result in the loss of all or part of your initial investment.**

**Reinvestment Risk**

The total return on your investment will be reduced if principal distributions received on your certificates cannot be reinvested at a rate as high as the applicable pass-through rate.

You should consider the risk that rapid rates of prepayments on the mortgage loans may coincide with periods of low prevailing market interest rates. During periods of low prevailing market interest rates, mortgagors may be expected to prepay or refinance mortgage loans that carry interest rates significantly higher than the then-currently available interest rates for mortgage loans. Consequently, the amount of principal distributions available to you for reinvestment at such low prevailing interest rates may be relatively large.

Moreover, holders of the class 3-A-1 and class 4-A-1 certificates should note that some mortgagors who prefer the certainty provided by fixed rate mortgage loans may nevertheless obtain adjustable rate mortgage loans at a time when they regard the mortgage rates (and, therefore, the payments) on fixed rate mortgage loans as unacceptably high. These mortgagors may be induced to refinance adjustable rate mortgage loans when the mortgage rates and monthly payments on comparable fixed rate mortgage loans decline to levels which these mortgagors regard as acceptable, even if such mortgage rates and monthly payments may be significantly higher than current mortgage rates and monthly payments on the mortgagors' adjustable rate mortgage loans.

Conversely, slow rates of prepayments on the mortgage loans may coincide with periods of high prevailing market interest rates. During such periods, it is less likely that mortgagors will elect to prepay or refinance mortgage loans and, therefore, the amount of principal distributions available to you for reinvestment at such high prevailing interest rates may be relatively small.

**Weighted Average Life Volatility**

One indication of the impact of varying prepayment speeds on a certificate is the change in its weighted average life.

The "weighted average life" of an offered certificate is the average amount of time that will elapse between the date of issuance of the certificate and the date on which each dollar in reduction of the certificate principal balance of the certificate is distributed to such certificateholder.

Low rates of prepayment on the mortgage loans in the related loan group may result in the extension of the weighted average life of a certificate. High rates of prepayment may result in the shortening of the weighted average life of a certificate.

In general, if you purchase your certificates at par and the weighted average life of your certificates is extended beyond your anticipated time period, the market value of your certificates may be adversely affected even though the yield to maturity on your certificates is unaffected.

The sensitivities of the weighted average lives of the offered certificates to prepayments are illustrated in the tables appearing in Appendix C. **These illustrations are based on prepayment and other assumptions which are unlikely to match the**

**actual experience on the mortgage loans. Therefore, your results will vary.**

See "Risk Factors—Risks Associated with the Certificates—Prepayments May Adversely Affect Yield," "—Risks Associated with the Mortgage Loans—Interest-Only Mortgage Loans May Have Higher Risk of Default or Rates of Prepayment" and "Prepayment and Yield Considerations" in this information circular.

**OPTIONAL TERMINATION**

The servicer, may, at its option, on or after the first distribution date following the distribution date on which the aggregate unpaid principal balance of the mortgage loans is reduced to 10% or less of the aggregate unpaid principal balance of the mortgage loans as of the cut-off date, purchase all the mortgage loans and any properties that the issuing entity acquired in satisfaction of any of the mortgage loans and thereby effect early retirement of the certificates. See "The Pooling and Servicing Agreement—Optional Termination of the Issuing Entity" in this information circular.

**FEDERAL INCOME TAX STATUS**

The issuing entity will be classified as a grantor trust under subpart E of part I of subchapter J of chapter 1 of the Internal Revenue Code and not as a corporation or an association which is taxable as a corporation. Each certificateholder will be treated for federal income tax purposes as the owner of an undivided beneficial interest in the applicable assets of the issuing entity.

For further information regarding the federal income tax consequences of investing in the certificates, see "Certain Material Federal Income Tax Consequences" in this information circular.

## RISK FACTORS

**The following information, which you should carefully consider, identifies certain significant sources of risk associated with an investment in the certificates.**

**Risks Associated with the Certificates**

### The Certificates May Not Be Liquid

The liquidity of your certificates may be limited.  You should consider that:

- a secondary market for the certificates may not develop, or if it does, it may not provide you with liquidity of investment, or it may not continue for the life of the certificates; and

- the certificates will not be listed on any securities exchange.

Recently, the mortgage-backed securities market has experienced reduced liquidity which has resulted primarily from investor concerns arising from increased delinquencies and foreclosures on nonprime mortgage loans and the failure of several nonprime and "Alternative A" mortgage lenders. Accordingly, it is possible that for some period of time investors who desire to sell their certificates in the secondary market may find fewer potential purchasers and experience lower resale prices than may have been available previously.

### Limited Assets For Payment of Certificates

The mortgage loans will be the primary source of payments on the certificates.  The certificates do not represent an interest in or obligation of the depositor, the sponsor, the servicer, the trustee or any of their affiliates, except for (i) the sponsor's limited obligations with respect to certain breaches of its representations and warranties and its obligations with respect to mortgage loans that experience early payment default, (ii) the guarantee of the sponsor's obligations provided by Merrill Lynch Bank & Trust Co., FSB and (iii) limited obligations of the servicer with respect to its servicing obligations.  Except for the guarantee provided by the guarantor, neither the certificates nor the mortgage loans will be guaranteed or insured by any governmental agency or instrumentality, the depositor, the sponsor, any servicer, the trustee, any of their affiliates or any other person.

Consequently, in the event that payments on the mortgage loans are insufficient or otherwise unavailable to make all payments required on your certificates and the guarantor fails to make payments required by the guarantee, there will be no recourse to the depositor, the sponsor, the servicer or the trustee.

### Prepayments May Adversely Affect Yield

The rate of distributions of principal and the yield to maturity on your certificates will be directly related to the rate of payments of principal on the mortgage loans in the related loan group and absent the guarantee, the amount and timing of mortgagor defaults resulting from realized losses.  Mortgagors are permitted to prepay the mortgage loans, in whole or in part, at any time.  The principal payments on the mortgage loans may be in the form of scheduled principal payments or principal prepayments (for this purpose, the term "principal prepayment" includes prepayments and any other recovery of principal in advance of the scheduled due date, including repurchases and liquidations due to default, casualty, condemnation and similar events).  Any of these prepayments will result in distributions to you of amounts that would otherwise be distributed over the remaining term of the mortgage loans.

The rate of principal payments on the mortgage loans will be affected by, among other things:

- prepayment penalties on the mortgage loans in loan group 2 and loan group 4, which may discourage mortgagors from prepaying their mortgage loans during the applicable period;

- the amortization schedules of the mortgage loans;

- local and national economic conditions;

- the ability of the mortgagor to obtain refinancing; the rate of principal prepayments (including partial prepayments and those resulting from refinancing) thereon by mortgagors;

- the differing rates at which mortgage loans with higher and lower interest rates may prepay;

- liquidations of defaulted mortgage loans;

- repurchases of mortgage loans by the sponsor (a) as a result of defective documentation or certain breaches of representations and warranties or (b) as a result of a mortgagor defaulting on any scheduled payment that is due in December 2007 or January 2008 and that is not received prior to January 31, 2008;

- optional purchases by Freddie Mac of delinquent mortgage loans;

- the optional purchase by the servicer of all of the mortgage loans in connection with the optional termination of the issuing entity; and

- general solicitations for refinancing by mortgage originators (including the sponsor and the servicer; however, neither the sponsor nor the servicer may intentionally target the mortgage loans in the issuing entity or segregate mortgage loans in its own portfolio from those in the issuing entity for different treatment in terms of refinance, advertising, offer or purchase).

Prepayment penalty information with respect to the mortgage loans in loan group 2 and loan group 4 is set forth in the related tables appearing in Appendix A hereto.

The rate of payments (including prepayments) on the mortgage loans is influenced by a variety of economic, geographic and social factors and will depend greatly on the level of mortgage rates:

- If prevailing rates for similar mortgage loans fall below the mortgage rates on the mortgage loans, the rate of prepayment would generally be expected to increase.

- Conversely, if interest rates on similar mortgage loans rise above the mortgage rates on the mortgage loans, the rate of prepayment would generally be expected to decrease.

- The prepayment behavior of the fixed rate mortgage loans (which are contained in loan group 1 and loan group 2) and of the adjustable rate mortgage loans (which are contained in loan group 3 and loan group 4) may respond to different factors, or may respond differently to the same factors.

- Adjustable rate mortgage loans may also suffer an increase in defaults and liquidations following upward adjustments of their interest rates, especially following their initial adjustments.

If you are purchasing any of the offered certificates at a discount, you should consider the risk that if principal payments on the mortgage loans in the related loan group occur at a rate slower than you expected, there may be a negative effect on the yield to maturity of your certificates.  In considering the rate of principal payments on the mortgage loans, you should consider that certain of the mortgage loans in each loan group are interest-only mortgage loans.  With respect to an interest-only mortgage loan, no scheduled payments of principal will be made by the mortgagor during the applicable interest- only period.

If you are purchasing any of the offered certificates at a premium, you should consider the risk that if principal payments on the mortgage loans in the related loan group occur at a rate faster than you expected, there may be a negative effect on the yield to maturity of your certificates and that a rapid rate of principal payments on the mortgage loans could result in a loss of all or part of your initial investment.

You must make your own decisions as to the appropriate prepayment assumptions to be used in deciding whether to purchase the offered certificates.

The timing of changes in the rate of prepayments may significantly affect the actual yield to you, even if the average rate of principal prepayments is consistent with your expectations.  In general, the earlier the payment of principal of the mortgage loans in the related loan group occur, the greater the effect on your yield to maturity for certificates purchased at a price other than par.

See "Risks Associated with the Mortgage Loans—Interest-Only Mortgage Loans May Have Higher Risk of Default or Rates of Prepayment" below and "Summary Information—Effects of Prepayments on Your Investment Expectations" and "Prepayment and Yield Considerations" for descriptions of factors that may influence the rate and timing of prepayments on the mortgage loans.

### There is a Risk That Interest Payments on the Mortgage Loans May Be Insufficient to Pay Interest on Your Certificates

When a mortgage loan is prepaid in full, the mortgagor is charged interest only up to the date on which payment is made, rather than for an entire month.  When a mortgagor makes a partial principal prepayment on a mortgage loan, the mortgagor is not charged interest on the prepayment for the month in which it is received.  This may result in a shortfall in interest collections available for payment on the next distribution date.  The servicer is required to cover a portion of the shortfall in interest collections that are attributable to prepayments in full and in part on the mortgage loans, but only up to the servicing fee.

In addition, the servicer will not cover shortfalls in interest collections arising from the application of the Servicemembers Civil Relief Act or similar state laws.

Absent the Freddie Mac guarantee, any prepayment interest shortfalls resulting from prepayments in excess of compensating interest and any shortfalls arising from the application of the Servicemembers Civil Relief Act or similar state laws may be borne by the certificates.

### Effects of Mortgage Rates and Other Factors on the Pass-Through Rates of the Offered Certificates

The yields to maturity on the class 3-A-1 or class 4-A-1 certificates may be affected by the resetting of the mortgage rates on the adjustable rate mortgage loans of loan group 3 and loan group 4 on their related adjustment dates due to the factors set forth below.  The mortgage rates on the adjustable rate mortgage loans of loan group 3 and loan group 4 are based on six-month LIBOR and do not adjust for a period of five years after the dates of their origination and adjust every six months thereafter.  The pass-through rates of the offered certificates are equal to the weighted average of the net mortgage rates of the mortgage loans of the related loan group.  Therefore, the pass-through rate of the class 3-A-1 or class 4-A-1 certificates will be reduced if the mortgage rate on the related adjustable rate mortgage loans adjust downward.  In addition, the pass-through rate of any offered certificate will be reduced if any of the mortgage loans in the related loan group with relatively high mortgage rates prepay at a faster rate than other mortgage loans in such loan group with relatively low mortgage rates.

### Potential Inadequacy of Credit Enhancement Provided by the Freddie Mac Guarantee

The guarantor provides credit enhancement to the certificates through a guarantee intended to increase the likelihood that holders of the certificates will receive regular distributions of interest and the distribution of principal as described herein.  The certificates, including interest thereon, are not guaranteed by the United States and do not constitute debts or obligations of the United States or any agency or instrumentality of the United States other than the guarantor.  If the guarantor were to experience significant financial difficulties, the credit enhancement provided by the guarantor may be insufficient and the holders of applicable certificates may suffer losses as a result of losses on the related mortgage loans.  See "Description of the Certificates—Freddie Mac Guarantee" in this information circular.

***Coverage Under the PMI Policy Will Be Lost if the Premium is not Paid***

All of the mortgage loans in each loan group with loan-to-value ratios (as of the closing date) over 80% are covered by a PMI policy. This policy was acquired by the issuing entity. Specifically, loan-level PMI coverage has been acquired on behalf of the issuing entity from the PMI insurer with respect to approximately 27.87% of the mortgage loans in loan group 1, approximately 10.33% of the mortgage loans in loan group 2, approximately 49.56% of the mortgage loans in loan group 3 and approximately 31.94% of the mortgage loans in loan group 4, in each case, by aggregate unpaid principal balance of the related loan group as of the cut-off date. Such coverage will provide only limited protection against losses on defaulted covered mortgage loans. Unlike a financial guaranty policy, coverage under the mortgage insurance policy is subject to certain limitations and exclusions. As a result, coverage may be denied or limited on the covered mortgage loans. In addition, since the amount of coverage depends on the loan-to-value ratio at the inception of the policy, a decline in the value of the mortgaged property will not result in increased coverage, and the issuing entity may still suffer a loss on a covered mortgage loan. Any such loss will be guaranteed by the Freddie Mac Guarantee. The PMI insurer also may affect the timing and conduct of foreclosure proceedings and other servicing decisions regarding defaulted mortgage loans covered by the policy.

The trustee, on behalf of the issuing entity, and from available funds in the certificate account, will be obligated to pay the premiums on the PMI policy as provided in the pooling and servicing agreement. In the event the trustee does not make the premium payments on the PMI policy when due and such non-payment is not caused by insufficient funds in the certificate account or any other reason provided for in the pooling and servicing agreement, then the terms of the pooling and servicing agreement will permit the guarantor to remove the trustee and to appoint a successor trustee whereupon the guarantor would ensure that such successor trustee resume premium payments on the PMI policy.

***Servicing Transfer Following Event of Default May Result in Payment Delays or Losses***

Following the occurrence of an event of default under the pooling and servicing agreement, the trustee may (in its discretion with the consent of the guarantor (such consent shall not be unreasonably withheld), or at the direction of the guarantor), remove the defaulting servicer and succeed to its responsibilities, or appoint a successor servicer. Subject to the pooling and servicing agreement, the trustee and the successor servicer will be entitled to reimbursement of its costs of effecting the servicing transfer from the predecessor servicer, or from the assets of the issuing entity if the predecessor fails to pay. In the event that reimbursement to the trustee or the successor servicer is made from assets of the issuing entity, absent the guarantee, the resulting shortfall will be borne by holders of the offered certificates. In addition, during the pendency of a servicing transfer or for some time thereafter, mortgagors of the related mortgage loans may delay making their monthly payments or may inadvertently continue making payments to the predecessor servicer, potentially resulting in delays in distributions on the related certificates.

***Decrement Tables are Based Upon Assumptions and Models***

The decrement tables set forth in Appendix C have been prepared on the basis of the structuring assumptions described under "Prepayment and Yield Considerations" and the characteristics of the assumed mortgage loans set forth in the table appearing in Appendix B. There will likely be discrepancies between the characteristics of the actual mortgage loans included in each loan group and the characteristics of the assumed mortgage loans used in preparing the decrement tables. Any such discrepancy may have an effect upon the percentages of initial certificate principal balances outstanding set forth in the decrement tables (and the weighted average lives of the offered certificates). In addition, to the extent that the mortgage loans that actually are included in a loan group have characteristics that differ from those assumed in preparing the decrement tables, the certificate principal balance of a class of offered certificates of the related certificate group could be reduced to zero earlier or later than indicated by the decrement tables.

The models used in this information circular for prepayments also do not purport to be a historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of mortgage loans, including the mortgage loans contained in the issuing entity. It is highly unlikely that the mortgage loans in a loan group will prepay at any of the rates specified. The assumed percentages of the applicable prepayment assumptions shown in the Appendices are for illustrative purposes only. For a description of the prepayment assumptions, see "Prepayment and Yield Considerations" in this information circular. The actual rates of prepayment of the mortgage loans in a loan group may not correspond to any of the assumptions made in this information circular. For these

reasons, the weighted average lives of the offered certificates may differ from the weighted average lives shown in the tables appearing in Appendix C.

### Insolvency of the Depositor May Delay or Reduce Collections on Mortgage Loans

Neither the United States Bankruptcy Code nor similar applicable state laws prohibit the depositor from filing a voluntary application for relief under these laws.  However, the transaction contemplated by this information circular is structured so that the voluntary or involuntary application for relief under the bankruptcy laws by the depositor is unlikely.  The depositor is a separate, limited purpose corporation, the certificate of incorporation of which contains limitations on the nature of the depositor's business, including the ability to incur debt other than debt associated with the transaction contemplated by this information circular, and restrictions on the ability of the depositor to commence voluntary or involuntary cases or proceedings under bankruptcy laws without the prior unanimous affirmative vote of all its directors (who are required to consider the interests of the depositor's creditors, in addition to the depositor's stockholders in connection with the filing of a voluntary application for relief under applicable insolvency laws).  Further, the transfer of the mortgage loans to the issuing entity is intended to constitute a sale of the mortgage loans and will be structured so that the trustee has no recourse to the depositor or the sponsor, other than for breaches of representations and warranties about the mortgage loans.

If the depositor were to become the subject of a proceeding under the bankruptcy laws, a court could conclude that the transfer of the mortgage loans from the depositor to the issuing entity should not be characterized as an absolute transfer, and accordingly, that the mortgage loans should be included as part of the depositor's estate.  Under these circumstances, the bankruptcy proceeding could delay or reduce distributions on the certificates.  In addition, a bankruptcy proceeding could result in the temporary disruption of distributions on the certificates.  The guarantor (as defined herein) will cover interest shortfalls on each distribution date resulting from such disruption of distributions on the offered certificates.

### Combination or "Layering" of Multiple Risk Factors May Significantly Increase Your Risk of Loss

Although the various risks discussed in this information circular are generally described separately, prospective investors in the offered certificates should consider the potential effects on those certificates of the interplay of multiple risk factors. Where more than one significant risk factor is present, the risk of loss to an investor may be significantly increased. For example, a particular loan group may include loans that not only have relatively high loan-to-value ratios but also were originated concurrently with second lien loans not included in the issuing entity. Many of these mortgage loans may also have been originated in regions that are experiencing home price depreciation. There are many other circumstances in which layering of multiple risks with respect to an asset pool and the related certificates may magnify the effect of those risks. In considering the potential effects of layered risks, prospective investors should carefully review the descriptions of the mortgage loans and the offered certificates.

## Risks Associated with the Mortgage Loans

### Mortgage Loans Originated Under the Underwriting Guidelines Used in Connection With Origination of the Mortgage Loans in the Issuing Entity Carry a Risk of Higher Delinquencies

The underwriting guidelines used by the sponsor in connection with the origination of the mortgage loans in the issuing entity (i) consider the credit quality of a mortgagor and the value of the mortgaged property and (ii) do not prohibit a mortgagor from obtaining secondary financing on the mortgaged property.  Secondary financing would reduce the mortgagor's equity in the related mortgaged property.

Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the mortgage loans than on mortgage loans originated in a more traditional manner.  Similarly, an overall general decline in residential real estate values could cause a particularly severe decline in the value of the mortgaged properties relating to mortgage loans in the issuing entity.  We cannot provide any assurance that the mortgaged properties will not experience an overall decline in value.

16

### *Implementation of More Conservative Underwriting Criteria May Hinder Refinancing and Increase Risk of Loss*

In recent months, in response to increased delinquencies and losses with respect to nonprime mortgage loans, many mortgage loan originators, including the sponsor, have implemented more conservative underwriting criteria for nonprime loans.  This may result in reduced availability of financing alternatives for mortgagors seeking to refinance their mortgage loans.  The reduced availability of refinancing options for a mortgagor may result in higher rates of delinquencies and losses on the mortgage loans, particularly mortgagors with adjustable rate mortgage loans that experience significant increases in their monthly payments following the adjustment date, mortgagors with interest-only mortgage loans that experience significant increases in their monthly payments following the end of the interest-only period and mortgagors with balloon loans.

### *General Economic Conditions Affect Mortgage Loan Performance*

General economic conditions have an impact on the ability of mortgagors to repay mortgage loans.  Loss of earnings, illness and other similar factors may lead to an increase in delinquencies and bankruptcy filings by mortgagors.  In the event of personal bankruptcy of a mortgagor under a mortgage loan, it is possible that the holders of the related certificates could experience a loss with respect to such mortgagor's mortgage loan.  In conjunction with a mortgagor's bankruptcy, a bankruptcy court may suspend or reduce the payments of principal and interest to be paid with respect to such mortgage loan, thus delaying the amount received by the holders of the certificates with respect to such mortgage loan.  Moreover, if a bankruptcy court prevents the transfer of the related mortgaged property to the issuing entity, any remaining balance on such mortgage loan may not be recoverable.  However, any losses or reductions in payments to the related certificateholders will be covered by the guarantee.

### *Decline in Residential Real Estate Values May Increase Risk of Loss and Adversely Affect Your Investment*

In recent months, delinquencies and losses with respect to residential mortgage loans generally have increased and may continue to increase, particularly in the nonprime sector.  In addition, in recent months the value of mortgaged properties in many regions has declined or remained stable, after extended periods of appreciation.  A continued decline, or lack of increase, in property values where the outstanding balances of the mortgage loans and any secondary financing on the related mortgaged properties are close to or exceed the value of the mortgaged properties may result in delinquencies, foreclosures and losses that are higher than you anticipated.  Another factor that may have contributed to, and may in the future result in, higher delinquency rates is the increase in monthly payments on adjustable rate mortgage loans and the increased prevalence of interest-only mortgage loans.  Any increase in prevailing market interest rates may result in increased payments for mortgagors who have adjustable rate mortgage loans.  Similarly, mortgagors whose mortgage loans provide for the payment of interest only during an initial period may experience increased monthly payments regardless of changes in prevailing market interest rates.  Borrowers seeking to avoid these increased monthly payments by refinancing their mortgage loans may no longer be able to find available replacement loans at comparably low interest rates.  A decline in housing prices may also leave mortgagors with insufficient equity in their homes to permit them to refinance.  In addition, many mortgage loans have prepayment penalties that inhibit refinancing.  A mortgagor's ability to refinance may also be limited by the reduction in the number of nonprime originators as a result of the failure of their businesses or industry consolidation and by the recent imposition of more restrictive underwriting criteria by many other originators.  Furthermore, mortgagors who intend to sell their homes on or before the expiration of the fixed rate periods on their mortgage loans may find that they cannot sell their properties for an amount equal to or greater than the unpaid principal balance of their mortgage loans.  These events, alone or in combination, may contribute to higher rates of delinquencies and losses on the mortgage loans.

In addition, adverse economic conditions and other factors (which may or may not affect real property values) may affect the mortgagors' timely payment of principal and/or interest on the mortgage loans and, accordingly, the actual rates of delinquencies, foreclosures and losses with respect to the mortgage pool.  These other factors could include excessive building resulting in an oversupply of housing in a particular area or a decrease in employment reducing the demand for housing in an area or zoning or environmental restrictions preventing additions to the housing supply in an area.  Absent the guarantee, such losses may adversely impact the yield on the offered certificates.

***Geographic Concentration May Increase Risk of Loss Because of Adverse Economic Conditions or Natural Disasters***

The geographic concentration of the mortgaged properties securing the mortgage loans may expose the mortgage loans to increased losses due to risks associated with certain regions. Certain regions of the United States from time to time will experience weaker economic conditions or might experience weaker housing markets or inflated housing prices and, consequently, will experience higher rates of loss and delinquency than on mortgage loans generally. Any concentration of the mortgage loans in such a region may present risk considerations in addition to those generally present for similar mortgage loan asset-backed securities without such concentration. In addition, certain regions have experienced or may experience natural disasters, including earthquakes, fires, floods, hurricanes and tornadoes, which may adversely affect property values. Although mortgaged properties located in certain identified flood zones will be required to be covered by flood insurance for the maximum amount available, such maximum amount will generally be significantly smaller than the unpaid principal balance of the related mortgage loan. In addition, no mortgaged properties will otherwise be required to be insured against earthquake damage or any other loss not covered by standard hazard insurance policies. The following states have a concentration of mortgaged properties in excess of 10% (by aggregate unpaid principal balance as of the cut-off date) of the applicable loan group:

| Loan Group 1 | Loan Group 2 | Loan Group 3 | Loan Group 4 |
|---|---|---|---|
| Georgia | New York | Illinois | California |
| Alabama | California | Massachusetts | Washington |
| | Florida | Maryland | New York |
| | | New York | Utah |
| | | New Jersey | |

Any deterioration in housing prices in the regions in which there is a significant concentration of mortgaged properties, as well as the other regions in which the mortgaged properties are located, and any deterioration of economic conditions in such regions which adversely affects the ability of mortgagors to make payments on the mortgage loans, may increase the likelihood of delinquencies and losses on the mortgage loans. Absent the guarantee, such delinquencies and losses, if they occur, may have an adverse effect on the yield to maturity of your certificates. Conversely, any increase in the market value of properties located in the regions in which the mortgaged properties are located, would reduce the loan-to-value ratios and could, therefore, make alternative sources of financing available to the mortgagors at lower interest rates, which could result in an increased rate of prepayment of the mortgage loans.

The concentrations of mortgaged properties by state and geographic areas in each loan group are identified in Appendix A.

***Delinquencies and Losses on the Mortgage Loans May Adversely Affect Your Yield***

Delinquencies on the mortgage loans in a loan group that are not advanced by the servicer (because the servicer has determined that these amounts, if advanced, would be nonrecoverable) will, absent the guarantee, adversely affect the yield on the certificates in the related certificate group. The servicer will determine that a proposed advance is nonrecoverable when, in the good faith exercise of its servicing judgment, it believes the proposed advance would not be ultimately recoverable from the related mortgagor, related liquidation proceeds, or other recoveries in respect of the mortgage loan. The servicer will be entitled to recover from amounts on deposit in the collection account any advances previously made which it subsequently determines to be nonrecoverable prior to any distribution on the certificates.

In addition, absent the guarantee, interest shortfalls will adversely affect the yields on the offered certificates.

***There Are Risks Relating to Second Lien Mortgage Loans***

Mortgage loans that have been originated simultaneously with a second lien mortgage loan may or may not be included in the issuing entity.  With respect to mortgage loans that have second lien mortgage loans encumbering the same mortgaged property, foreclosure frequency may be increased relative to mortgage loans that do not have second lien mortgage loans behind them because mortgagors have less equity in the mortgaged property.  Investors should also note that any mortgagor may obtain second lien mortgage loans at any time subsequent to the date of origination of their first lien mortgage loan from the originator or from any other lender.  See the table with the heading "Original Combined Loan-To-Value Ratios" in Appendix A of this information circular.

***Credit Scores May Not Accurately Predict the Likelihood of Default***

Investors should be aware that credit scores are based on past payment history of the mortgagor. Investors are encouraged not to rely on credit scores as an indicator of future mortgagor performance. The credit score used for the purpose of this information circular is the FICO score. The FICO score is a statistical ranking of likely future credit performance developed by Fair, Isaac & Company and the three national credit repositories-Equifax, Trans Union and Experian. The FICO scores available from the three national credit repositories are calculated by the assignment of weightings to the most predictive data collected by the credit repositories and range from the 300's to 900's. Although FICO scores are based solely on the information at the particular credit repository, FICO scores have been calibrated to indicate the same level of credit risk regardless of which credit repository is used.

***High Loan-to-Value Ratios Increase Risk of Loss***

Mortgage loans with high loan-to-value ratios leave the mortgagor with little or no equity in the related mortgaged property.  Approximately 27.87% of the mortgage loans in loan group 1, approximately 10.33% of the mortgage loans in loan group 2, approximately 49.56% of the mortgage loans in loan group 3 and approximately 31.94% of the mortgage loans in loan group 4 (in each case, by aggregate unpaid principal balance as of the cut-off date) had loan-to-value ratios at origination in excess of 80.00%. No mortgage loan had an original loan-to-value ratio exceeding 95.00%. An overall decline in the residential real estate market, a rise in interest rates over a period of time and the general condition of a mortgaged property, as well as other factors, may have the effect of reducing the value of such mortgaged property from the appraised value at the time the mortgage loan was originated.  If there is a reduction in value of the mortgaged property, the loan-to-value ratio may increase over what it was at the time of origination.  Such an increase may reduce the likelihood that liquidation proceeds or other proceeds will be sufficient to pay off the mortgage loan fully.  There can be no assurance that the loan-to-value ratio of any mortgage loan determined at any time after origination is less than or equal to its original loan-to-value ratio.  Additionally, the sponsor's determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the mortgage loans may differ from the appraised value of such mortgaged property or the actual value of such mortgaged property.  Information with respect to loan-to-value ratios is set forth in the tables appearing in Appendix A hereto.

***There Are Risks Relating to Balloon Loans***

Approximately 34.81% of the mortgage loans in loan group 1, approximately 32.62% of the mortgage loans in loan group 2, approximately 57.77% of the mortgage loans in loan group 3 and approximately 62.00% of the mortgage loans in loan group 4 (in each case, by aggregate unpaid principal balance as of the cut-off date) are balloon loans. Balloon loans pose a risk because a mortgagor must make a large lump sum payment of principal at the end of the loan term which may represent a substantial percentage of the original principal balance of the mortgage loan.  If the mortgagor is unable to pay the lump sum or refinance such amount, a loss on the mortgage loan will occur.  The ability of a mortgagor to refinance a balloon loan may be limited because many of the mortgagors are "nonprime" mortgagors who may not have many acceptable refinancing options available.  In addition, the servicer will not make advances with respect to the unpaid principal balance remaining at maturity of a balloon loan.

Because mortgagors under this type of balloon mortgage loan are required to make a relatively large single payment upon maturity, it is possible that the default risk associated with such mortgage loans is greater than that associated with fully-amortizing mortgage loans.  The ability of a mortgagor on this type of mortgage loan to repay the mortgage loan upon maturity frequently depends upon the mortgagor's ability:

19

- to refinance the mortgage loan, which will be affected by a number of factors, including, without limitation, the level of mortgage rates available in the primary mortgage market at the time, the mortgagor's equity in the related mortgaged property, the financial condition of the mortgagor, the condition of the mortgaged property, tax law, general economic conditions and the general willingness of financial institutions and primary mortgage bankers to extend credit;

- or to sell the related mortgaged property at a price sufficient to permit the mortgagor to make the lump-sum payment.

Information relating to balloon loans is set forth in Appendix A.

### *Interest-Only Mortgage Loans May Have Higher Risk of Default or Rates of Prepayment*

None of the mortgage loans in loan group 1 and loan group 2, approximately 4.41% of the mortgage loans in loan group 3 and approximately 3.11% of the mortgage loans in loan group 4 (in each case, by aggregate unpaid principal balance as of the cut-off date) are interest-only mortgage loans which require only the payment of interest for a term specified in the related mortgage note.  At the end of the interest-only term, the payments on each such mortgage loan will be recalculated to fully amortize its unpaid principal balance over the remaining life of such mortgage loan and the mortgagor will be required to make payments of both principal and interest.  The required payment of principal will increase the burden on the mortgagor and may increase the risk of default under such mortgage loan.

For interest-only mortgage loans that are adjustable rate mortgage loans, the increase in the mortgagor's monthly payment attributable to principal may occur when the mortgagor's monthly interest payment is increasing as a result of an increase in the mortgage rate on the related adjustment date.  The combination of these two factors occurring simultaneously may significantly increase the risk of default of such mortgage loan.

In addition, the increase in the monthly payment to be made by a mortgagor may induce the mortgagor to refinance such mortgage loan which would result in a prepayment of such mortgage loan.

Information relating to interest-only mortgage loans is set forth in Appendix A.

### *Mortgage Loans Secured by Two-Family Units May Experience Greater Rates of Delinquency and Foreclosure*

None of the mortgage loans in loan group 1, approximately 10.19% of the mortgage loans in loan group 2, approximately 17.33% of the mortgage loans in loan group 3 and approximately 12.16% of the mortgage loans in loan group 4 (in each case, by aggregate unpaid principal balance as of the cut-off date) are secured by two-family units. The ability of a mortgagor to repay a loan secured by an income-producing property typically is dependent upon the successful operation of such property rather than upon the existence of independent income or assets of the mortgagor; thus, the value of an income-producing property typically is directly related to the net operating income derived from such property.  If the net operating income of the property is reduced (for example, if rental or occupancy rates decline or real estate tax rates or other operating expenses increase), the mortgagor's ability to repay the loan may be impaired. In addition, the concentration of default, foreclosure and loss risk for a pool of mortgage loans secured by two-family units may be greater than for a pool of mortgage loans secured by single family properties of comparable aggregate principal balance because the pool of mortgage loans secured by two-family units is likely to consist of a smaller number of higher balance loans.

### *Alternatives to Foreclosure May Adversely Affect Yield*

Certain mortgage loans may become delinquent after the closing date.  The servicer may either foreclose on any such asset or work out an agreement with the mortgagor if the delinquency is not cured, which may involve waiving or modifying certain terms of the asset.  If the servicer extends the payment period or accepts a lesser amount than stated in the note or contract in satisfaction of the note or contract, the amount available for distribution to the certificates from the mortgage loan will be reduced and, absent the guarantee, may adversely affect the yield on the

related offered certificates.  In addition, because the offered certificates bear interest at the net WAC rate of the related loan group, any reduction in the interest rate on a mortgage loan as a result of a modification will reduce the yield of the related certificates.

### *Defaulted Mortgage Loans May Experience Delays in Liquidation and Liquidation Proceeds May Be Less Than the Outstanding Principal Balance of the Mortgage Loans*

Even assuming the mortgaged properties provide adequate security for the mortgage loans, substantial delays could result in connection with the liquidation of defaulted mortgage loans.  This could result in corresponding delays in the receipt of the related proceeds by the issuing entity.  Further, liquidation expenses such as legal fees, real estate taxes and maintenance and preservation expenses will reduce the portion of liquidation proceeds available for distribution on the certificates.  If the guarantor fails to make payments required by the guarantee and the applicable mortgaged property fails to provide adequate security for the asset, you will incur a loss on your investment.  See "Certain Legal Aspects of the Mortgage Loans—Foreclosure," "—Foreclosure—Rights of Redemption" and "—Anti-Deficiency Legislation, the Bankruptcy Code and Other Limitations on Lenders" in this information circular.

### *Liquidation Expenses May be Disproportionate*

Liquidation expenses with respect to defaulted mortgage loans do not vary directly with the outstanding principal balance of the mortgage loans at the time of default.  Therefore, assuming that the servicer took the same steps in realizing upon a defaulted mortgage loans having a small remaining principal balance as it would in the case of a defaulted mortgage loan having a large remaining principal balance, the amount realized after expenses of liquidation would be smaller as a percentage of the outstanding principal balance of the small mortgage loan than would be the case with the defaulted mortgage loan having a large remaining principal balance.

### *The Recording of the Mortgages in the Name of MERS May Affect the Yield on the Certificates*

The mortgages or assignments of mortgage for some of the mortgage loans have been recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, solely as nominee for the originator and its successors and assigns, including the issuing entity.  Subsequent assignments of those mortgages are registered electronically through the MERS system.  However, if MERS discontinues the MERS system and it becomes necessary to record an assignment of mortgage to the trustee, any related expenses will be paid by the issuing entity and will reduce the amount available from the mortgage loans to make distributions on the certificates.

The recording of mortgages in the name of MERS is a relatively new practice in the mortgage lending industry.  Public recording officers and others may have limited, if any, experience with lenders seeking to foreclose mortgages, assignments of which are registered with MERS.  Accordingly, delays and additional costs in commencing, prosecuting and completing foreclosure proceedings and conducting foreclosure sales of the mortgaged properties could result.  Those delays and the additional costs could in turn delay the distribution of liquidation proceeds to certificateholders and increase the amount of losses on the mortgage loans.  In that regard, a Florida court recently ruled that MERS lacked standing to pursue foreclosure proceedings on behalf of the beneficial owners of several mortgage notes who were not named parties to the proceedings.

### *Violations of Federal, State and Local Laws May Adversely Affect Ability to Collect on Loans*

The mortgage loans may also be subject to federal, state and local laws, including:

- the Federal Truth in Lending Act and Regulation Z promulgated under that act, which require certain disclosures to the mortgagors regarding the terms of the residential loans;

- the Equal Credit Opportunity Act and Regulation B promulgated under that act, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit;

- the Fair Credit Reporting Act, which regulates the use and reporting of information related to the mortgagor's credit experience; and

- the Home Equity Loan Consumer Protection Act of 1988, which requires additional disclosures, limits changes that may be made to the loan documents without the mortgagor's consent. This act also restricts a lender's ability to declare a default or to suspend or reduce a mortgagor's credit limit to certain enumerated events.

Violations or alleged violations of federal, state or local laws could result in a reduction in the amount available from the related mortgage loan for distributions on the certificates. In the past few years, a number of legislative proposals have been introduced at the federal, state and local level that are designed to discourage predatory lending practices. Some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in mortgage loans that have mortgage rates or origination costs in excess of prescribed levels, and require that mortgagors be given certain disclosures prior to the consummation of such mortgage loans. In some cases, state law imposes requirements and restrictions greater than those in the Home Ownership and Equity Protection Act of 1994, as amended. Lawsuits have been brought in various states making claims against assignees of high cost loans for violations of state law. Named defendants in these cases include numerous participants within the secondary mortgage market, including some securitization trusts. The sponsor will make representations and warranties with respect to each mortgage loan relating to compliance with federal, state and local laws at the time of origination, that none of the mortgage loans is subject to the Home Ownership and Equity Protection Act of 1994, as amended, and that none of the mortgage loans is a "high cost" loan within the meaning of such federal, state and local laws. In the event of a breach of any such representations, the sponsor will be required to cure such breach or repurchase or replace the affected mortgage loan. In addition, the sponsor will be required to pay the issuing entity and the guarantor for any damages or costs incurred by the issuing entity as a result of a breach of the representation as to compliance with federal, state and local laws. If the sponsor is unable to fulfill this reimbursement obligation to the issuing entity for financial or other reasons, shortfalls in the distributions due on the certificates could occur if the guarantor fails to make payments required under the guarantee. In the event that the sponsor fails to perform such repurchase or substitution obligations, Merrill Lynch Bank & Trust Co., FSB, the parent of the sponsor, has agreed to perform such obligations pursuant to a guarantee, the rights and benefits of which have been assigned to the issuing entity. See "The Pooling and Servicing Agreement—Assignment of the Mortgage Loans; Representations and Warranties; Repurchases" and see "Certain Legal Aspects of the Mortgage Loans" in this information circular for other limitations on the enforceability of mortgage loans.

### Terrorist Attacks and Military Action

The Servicemembers Civil Relief Act and comparable state laws provide relief to mortgagors who enter active military service and to mortgagors in reserve status who are called to active duty after the origination of their mortgage loans. Certain state laws provide relief similar to that of the Servicemembers Civil Relief Act and may permit the mortgagor to delay or forego certain interest and principal payments. The response of the United States to the terrorist attacks on September 11, 2001 and to the current situation in Iraq and Afghanistan has involved military operations that have placed a substantial number of citizens on active duty status, including persons in reserve status or in the National Guard who have been called or will be called to active duty. It is possible that the number of reservists and members of the National Guard placed on active duty status in the near future may increase. The Servicemembers Civil Relief Act provides generally that a mortgagor who is covered by the Servicemembers Civil Relief Act may not be charged interest on a mortgage loan in excess of 6% per annum during the period of the mortgagor's active duty. These shortfalls are not required to be paid by the mortgagor at any future time. The servicer will not advance these shortfalls as delinquent payments and such shortfalls are not covered by any form of credit enhancement on the certificates. Shortfalls on the mortgage loans due to the application of the Servicemembers Civil Relief Act or similar state laws or regulations will reduce the amount of collections available for distribution on the offered certificates.

The Servicemembers Civil Relief Act and comparable state laws also limit the ability of the servicer to foreclose on a mortgage loan during the mortgagor's period of active duty and, in some cases, during an additional three-month period thereafter. As a result, there may be delays in payment and increased losses on the mortgage loans. Those delays and increased losses would be borne by the related class of certificates absent the Freddie Mac guarantee.

We do not know how many mortgage loans have been or may be affected by the application of the Servicemembers Civil Relief Act or any similar state laws.  If the guarantor does not make payments under the guarantee, this may result in interest shortfalls on the mortgage loans in a loan group, which will be borne by the offered certificates of the related certificate group.  None of the depositor, the sponsor, the servicer or any other party has taken any action to determine whether any of the mortgage loans would be affected by such interest rate limitation.  See "Description of the Certificates—Priority of Distributions on the Class A Certificates" and "Certain Legal Aspects of the Mortgage Loans—Servicemembers Civil Relief Act" in this information circular.

### *Governmental Action May Affect Foreclosures*

In addition to the limitations on foreclosure described herein, legislative or regulatory initiatives by federal, state or local legislative bodies or administrative agencies, if enacted or adopted, could delay foreclosure, provide new defenses to foreclosure or otherwise impair the ability of a servicer to foreclose on a defaulted mortgage loan.  Various jurisdictions have considered or are currently considering such actions and we cannot predict the nature or extent of limitations on foreclosure that may be enacted.  Any such governmental actions that interfere with the foreclosure process could affect yields on the offered certificates.  See "Certain Legal Aspects of the Mortgage Loans—Foreclosure" in this information circular.

## FORWARD LOOKING STATEMENTS

This information circular contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended.  Such forward-looking statements, together with related qualifying language and assumptions, are found in the material, including each of the tables, set forth under "Risk Factors" and "Prepayment and Yield Considerations" and in the Appendices.  Forward-looking statements are also found elsewhere in this information circular, and may be identified by, among other things, accompanying language including the words "expects," "intends," "anticipates," "estimates" or analogous expressions, or by qualifying language or assumptions.  Such statements involve known and unknown risks, uncertainties and other important factors that could cause the actual results or performance to differ materially from such forward-looking statements.  Such risks, uncertainties and other factors include, among others, general economic and business conditions, competition, changes in political, social and economic conditions, regulatory initiatives and compliance with government regulations, customer preference and various other matters, many of which are beyond the Depositor's control.  These forward-looking statements speak only as of the date of this information circular.  The Depositor expressly disclaims any obligation or undertaking to disseminate any updates or revisions to such forward-looking statements to reflect any change in the Depositor's expectations with regard thereto or any change in events, conditions or circumstances on which any forward-looking statement is based.

## THE SPONSOR

The Sponsor is First Franklin Financial Corporation ("**First Franklin Financial**" or the "**Sponsor**"), a Delaware corporation. First Franklin Financial is an affiliate of the Depositor and the Servicer and a direct, wholly-owned operating subsidiary of Merrill Lynch Bank & Trust Co., FSB.  The executive offices of First Franklin Financial are located at 2150 North First Street, San Jose, California 95131, telephone number (800) 464-8203.

Since its founding in 1981, First Franklin Financial has grown from a small mortgage broker to a full service mortgage lender with a wide variety of products.  Merrill Lynch Bank & Trust Co., FSB acquired First Franklin Financial, Home Loan Services, Inc., and the affiliated business unit NationPoint from National City Bank on December 30, 2006.  Simultaneously with the closing of such acquisition, the non-conforming mortgage loan origination business formerly maintained in its First Franklin division was transferred by National City Bank to First Franklin Financial.  Therefore, as of such date, the non-conforming mortgage loan origination business of National City Bank and First Franklin Financial was acquired by Merrill Lynch Bank & Trust Co., FSB.

In its capacity as sponsor, First Franklin Financial originates mortgage loans and initiates their securitization by transferring the mortgage loans to the Depositor or another entity that acts in a similar capacity as the Depositor, which mortgage loans will ultimately be transferred to the issuing entity for the related securitization.  In coordination

with the Depositor, First Franklin Financial works with rating agencies, mortgage loan sellers and servicers in structuring the securitization transaction.

First Franklin Financial does not currently service mortgage loans.  First Franklin Financial contracts with Home Loan Services, Inc. for servicing the mortgage loans that it originates and acquires from third parties.

First Franklin Financial has been the originator or acquirer of mortgage loans included in securitizations since 1997.  The following table sets forth the approximate aggregate initial principal amount of nonprime mortgage loans originated or acquired by First Franklin Financial and included in securitizations since 2003:

| Year | Approximate Initial Certificate Principal Balance of Certificates |
| --- | --- |
| 2003 | $6,900,000,000 |
| 2004 | $18,500,000,000 |
| 2005 | $18,000,000,000 |
| 2006 | $25,500,000,000 |
| January 1, 2007 through September 30, 2007 | $12,980,000,000 |

## THE DEPOSITOR

Merrill Lynch Mortgage Investors, Inc. (the "**Depositor**") is a Delaware corporation whose offices are located at 250 Vesey Street, 4 World Financial Center, 10th Floor, New York, New York, 10080 and whose telephone number is (212) 449-0357.  The Depositor is an affiliate of the Servicer and First Franklin Financial.

The Depositor has been engaged since its incorporation in 1986 in the securitization of mortgage loans and other asset types included within the description of the Issuing Entity assets in this information circular.  The Depositor is engaged in the business of acting as depositor of trusts that issue series of notes that are secured by, or certificates that represent interests in, the assets of the trust.  The Depositor acquires assets specifically for inclusion in a securitization from various sellers in privately negotiated transactions.

The certificate of incorporation of the Depositor limits its activities to those necessary or convenient to carry out its securitization activities.  The Depositor will have limited obligations with respect to a series of securities.  The Depositor will obtain the Mortgage Loans from the Sponsor and may also assign to the Trustee certain rights of the Sponsor with respect to the Mortgage Loans.  In addition, after the issuance of a series of securities, the Depositor may have limited obligations with respect to that series which may include appointing a successor trustee if the Trustee resigns or is otherwise removed and preparing certain reports filed under the Securities Exchange Act of 1934.

## THE ISSUING ENTITY

Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-6, the Issuing Entity, will be formed on the Closing Date pursuant to the Pooling and Servicing Agreement by and among the Depositor, the Trustee, the Servicer and the Guarantor.  The issuing entity will be a New York common law trust (the "**Issuing Entity**") with no officers or directors and no continuing duties other than to hold the Mortgage Loans and related assets and issue the Certificates.  The fiscal year end for the Issuing Entity will be December 31, commencing with December 31, 2007.

The Trust will be administered by the Trustee pursuant to the terms of the Pooling and Servicing Agreement.

## THE TRUSTEE/CUSTODIAN

LaSalle Bank National Association ("**LaSalle**") will be the trustee (the "**Trustee**") and custodian under the Pooling and Servicing Agreement.  LaSalle Bank National Association is a national banking association formed under the federal laws of the United States of America.

Effective October 1, 2007, Bank of America Corporation, parent corporation of Bank of America, N.A. and Banc of America Securities LLC, acquired ABN AMRO North America Holding Company, parent company of LaSalle Bank Corporation and LaSalle Bank National Association, from ABN AMRO Bank N.V.  The acquisition included all parts of the Global Securities and Trust Services Group within LaSalle Bank National Association engaged in the business of acting as trustee, securities administrator, master servicer, custodian, collateral administrator, securities intermediary, fiscal agent and issuing and paying agent in connection with securitization transactions.

LaSalle has extensive experience serving as trustee on securitizations of residential mortgage loans.  Since January 1994, LaSalle has served as trustee, securities administrator or paying agent on over 680 residential mortgage-backed security transactions involving assets similar to the Mortgage Loans.  As of September 30, 2007 LaSalle serves as trustee, securities administrator or paying agent on over 600 residential mortgage-backed security transactions.  The Depositor, Sponsor and Servicer may maintain other banking relationships in the ordinary course of business with the Trustee.  The Trustee's corporate trust office is located at 135 South LaSalle Street, Suite 1511, Chicago, Illinois, 60603.  Attention: Global Securities and Trust Services--FFMER 2007-6 or at such other address as the Trustee may designate from time to time.

In its capacity as custodian, LaSalle will hold the mortgage loan files exclusively for the use and benefit of the Issuing Entity.  LaSalle will not have any duty or obligation to inspect, review or examine any of the documents, instruments, certificates or other papers relating to the Mortgage Loans delivered to it to determine that the same are valid.  The disposition of the mortgage loan files will be governed by the Pooling and Servicing Agreement.  LaSalle provides custodial services on over 1100 residential, commercial and asset-backed securitization transactions and maintains almost 3.0 million custodial files in its two vault locations in Elk Grove, Illinois and Irvine, California.  LaSalle's two vault locations can maintain a total of approximately 6 million custody files.  All custody files are segregated and maintained in secure and fire resistant facilities in compliance with customary industry standards.  The vault construction complies with Freddie Mac guidelines applicable to document custodians.  LaSalle maintains disaster recovery protocols to ensure the preservation of custody files in the event of force majeure and maintains, in full force and effect, such fidelity bonds and/or insurance policies as are customarily maintained by banks which act as custodians.  LaSalle uses unique tracking numbers for each custody file to ensure segregation of collateral files and proper filing of the contents therein and accurate file labeling is maintained through a monthly reconciliation process.  LaSalle uses a proprietary collateral review system to track and monitor the receipt and movement internally or externally of custody files and any release or reinstatement of collateral.

Using information set forth in this information circular, the Trustee will develop the cashflow model for the Issuing Entity.  Based on the monthly loan information provided by the Servicer, the Trustee will calculate the amount of principal and interest to be paid to each class of Certificates on each Distribution Date.  In accordance with the cashflow model and based on the monthly loan information provided by the Servicer, the Trustee will perform distribution calculations, remit distributions on the Distribution Date to certificateholders and prepare a monthly statement to certificateholders detailing the payments received and the activity on the Mortgage Loans during the due period.  In performing these obligations, the Trustee will be able to conclusively rely on the information provided to it by the Servicer, and the Trustee will not be required to recompute, recalculate or verify the information provided to it by the Servicer.

LaSalle Bank National Association and the Sponsor are parties to a custodial agreement whereby LaSalle, for consideration, provides custodial services to the Sponsor for certain residential mortgage loans purchased by it.  Pursuant to this custodial agreement, LaSalle is currently providing custodial services for all of the Mortgage Loans to be sold by the Sponsor to the Depositor in connection with this securitization.  The terms of the custodial agreement are customary for the residential mortgage-backed securitization industry providing for the delivery, receipts, review and safekeeping of mortgage loan files.

25

For information describing the Trustee's duties and responsibilities regarding the Certificates under the Pooling and Servicing Agreement, limitations on the Trustee's liability, and any other indemnification to which it will be entitled from the assets of the Issuing Entity and certain other matters see "The Pooling and Servicing Agreement—The Trustee" in this information circular.

## THE SERVICER

### *General*

Home Loan Services, Inc. ("**HLS**") will act as Servicer (the "**Servicer**") of the Mortgage Loans.  The Servicer will be required to service the Mortgage Loans in accordance with the terms of the Pooling and Servicing Agreement.

The Servicer is a Delaware corporation and a wholly-owned operating subsidiary of Merrill Lynch Bank & Trust Co., FSB.  The Servicer is a full-service, non-prime mortgage servicing company headquartered in Pittsburgh, Pennsylvania. The loan servicing portfolio is serviced at offices located in Pittsburgh, Pennsylvania and Upper St. Clair, Pennsylvania.  The Servicer has been servicing non-prime mortgage loans for approximately 16 years under various corporate names: American Financial Corporation, Altegra Credit Company and, between 2002 and 2006, under the corporate name of National City Home Loan Services, Inc.  The Servicer currently ranks as the seventh (7th) largest U.S. non-prime residential mortgage servicer.  The Servicer is an affiliate of the Depositor and First Franklin Financial.

Currently, substantially all of the Servicer's servicing portfolio consists of non-prime mortgage loans and variable rate home equity lines of credit, consisting of fixed-rate and adjustable-rate first lien and fixed rate second lien amortizing and balloon payment mortgage loans and variable rate home equity lines of credit.  Prior to January 1, 2005, the closed-end first and second mortgage loans in the Servicer's servicing portfolio were originated or acquired by First Franklin Financial and loans originated thereafter were generally acquired by First Franklin Financial from National City Bank and other third-party lenders.  The following table reflects the size and composition of the Servicer's servicing portfolio of non-prime mortgage loans as of the end of each indicated period.

**Home Loan Services, Inc.**
**Non-prime Servicing Portfolio**
**(Dollars in Thousands)**

| Aggregate Principal Balance as of December 31, 2003 | Aggregate Principal Balance as of December 31, 2004 | Aggregate Principal Balance as of December 31, 2005 | Aggregate Principal Balance as of December 31, 2006 | Aggregate Principal Balance as of September 30, 2007 |
|---|---|---|---|---|
| $18,751,589 | $23,049,992 | $37,591,777 | $49,545,071 | $53,070,838 |

The Servicer began interim servicing for First Franklin Financial and its investor base in August 2002.  In December, 2004, the Servicer began to retain servicing for First Franklin Financial's investors on a permanent basis.  As of September 30, 2007, the Servicer serviced approximately 280,063 loans with an aggregate unpaid principal balance of approximately $44 billion included in 51 outstanding securitizations.

The Servicer is rated "Above Average" as a residential non-prime mortgage servicer and alternative residential mortgage servicer by S&P.  The Servicer has an "RPS2" rating as a primary servicer of residential nonprime and Alt-A products and an "RSS2-" rating as a special servicer from Fitch.  The Servicer is also rated "SQ1-" as a primary servicer of nonprime loans, SQ2 as a primary servicer of second lien loans and "SQ2+" as a special servicer by Moody's.

Merrill Lynch Bank & Trust Co., FSB acquired First Franklin Financial, Home Loan Services, Inc., and the affiliated business unit NationPoint on December 30, 2006.

26

*Servicer's Delinquency and Foreclosure Experience*

The Servicer's portfolio may differ significantly from the Mortgage Loans in the Issuing Entity in terms of interest rates, principal balances, geographic distribution, types of properties, lien priority, origination and underwriting criteria, prior servicer performance and other possibly relevant characteristics.  There can be no assurance, and no representation is made, that the delinquency and foreclosure experience with respect to the Mortgage Loans included in the Issuing Entity will be similar to that reflected in the Servicer's overall servicing portfolio, nor is any representation made as to the rate at which losses may be experienced on liquidation of defaulted Mortgage Loans.  The actual delinquency experience on the Mortgage Loans will depend, among other things, upon the value of the real estate securing such Mortgage Loans and the ability of the related mortgagor to make required payments.  It should be noted that if the residential real estate market should experience an overall decline in property values, the actual rates of delinquencies and foreclosures could be higher than those previously experienced by the Servicer.  In addition, adverse economic conditions may affect the timely payment by mortgagors of scheduled payments of principal and interest on the Mortgage Loans and, accordingly, the actual rates of delinquencies and foreclosures with respect to the Mortgage Loan Pool.  The Servicer's delinquency results are calculated utilizing MBA methodology.

Accordingly, there can be no assurance that the delinquency and foreclosure experience of the Mortgage Loans in the Issuing Entity in the future will correspond to the future delinquency and foreclosure experience of the Servicer's one-to-two family conventional residential mortgage loan servicing portfolio.

*Servicer's Policies and Procedures*

The Servicer has established standard policies for the servicing and collection of mortgage loans.  The Servicer's procedures for the servicing and collection functions, include the following:

- collecting, aggregating and remitting mortgage loan payments;

- accounting for principal and interest;

- holding escrow (impound) funds for payment of taxes and insurance;

- making inspections as required of the mortgaged properties;

- supervision of delinquent mortgage loans;

- loss mitigation efforts;

- foreclosure proceedings and, if applicable, the disposition of mortgaged properties; and

- generally administering the mortgage loans, for which it receives servicing fees.

The Servicer's collection operation is a high touch unit that utilizes the Early Indicator scoring model, the Avaya autodialer (the "dialer"), and manual calling campaigns.  Individual ownership is key to the Servicer's collection philosophy.  The purpose of the dialer and the early indicator model is to quickly and efficiently reduce the delinquency so that collectors can manually work their individual portfolios.  In managing the liquidation of defaulted mortgage loans, the Servicer generally will have sole discretion subject to the Pooling and Servicing Agreement to take such action in maximizing recoveries to certificateholders, including selling defaulted mortgage loans and real estate owned properties.  The bankruptcy unit's primary responsibilities are to protect the asset while a mortgage loan is going through the bankruptcy process. This responsibility is fulfilled by ensuring that mortgagors make payments as required under the Bankruptcy Code. If this cannot be accomplished, the Servicer will seek relief through the bankruptcy court, including filing a motion from relief from the automatic stay, to enable the Servicer to commence foreclosure, as necessary. After a mortgage loan has been charged off, the Servicer's recovery team performs all aspects of the collection-related activity, including, but not limited to, mortgagor contact, credit bureau maintenance and tax reporting, which may result in recovery of the charged-off amount.

*Prior Securitizations*

During the three years preceding the date of this information circular, the Servicer has not been notified and is not aware that any of the residential mortgage loan securitization pools serviced by the Servicer have experienced servicing events of default, termination triggers or early amortization events because of servicing by the Servicer, and the Servicer has not been terminated as a servicer in a residential mortgage loan securitization due to a servicing default or application of a servicing performance test or trigger.  During such time, the Servicer also neither has failed to make any required advance with respect to any issuance of residential mortgage backed securities nor disclosed material non-compliance with the servicing criteria applicable to any such securitization.

## THE GUARANTOR

Federal Home Loan Mortgage Corporation ("**Freddie Mac**"), a corporate instrumentality of the United States created and existing under Title III of the Emergency Home Finance Act of 1970, as amended, or any successor thereto will act as guarantor (the "**Guarantor**").

It is a condition to the issuance of the Offered Certificates that they be purchased by Freddie Mac and that Freddie Mac guarantee the timely distribution of interest due on the Offered Certificates and the distribution of principal on the Offered Certificates as described herein.

## THE CREDIT RISK MANAGER

Clayton Fixed Income Services Inc., as credit risk manager for the Issuing Entity (the "**Credit Risk Manager**"), will monitor the performance of the Servicer and make recommendations to the Servicer regarding certain Delinquent and defaulted Mortgage Loans and will report to the Guarantor on the performance of such Mortgage Loans, pursuant to a Credit Risk Management Agreement (the "**Credit Risk Management Agreement**") to be entered into by the Credit Risk Manager and the Servicer on or prior to the Closing Date. The Credit Risk Manager will rely upon mortgage loan data that is provided to it by the Servicer in performing its advisory and monitoring functions. The Credit Risk Manager will be entitled to receive a "**Credit Risk Management Fee**" until the earliest of (1) at the option of the Guarantor, and upon 30 days written notice to the Credit Risk Manager, at any time following the Distribution Date occurring in December 2011, (2) the termination of the Issuing Entity, or (3) upon the prior written consent of the Guarantor and by certificateholders evidencing, in aggregate, not less than 66 2/3% of the aggregate percentage interest of all classes of Offered Certificates in the exercise of its or their sole discretion; and upon receipt of such notice, the Trustee shall provide written notice to the Credit Risk Manager of its removal, which shall be effective upon receipt of such notice by the Credit Risk Manger.

Subject to certain limitations set forth in the Pooling and Servicing Agreement, the Credit Risk Manager and any director or officer or employee or agent of the Credit Risk Manager will be indemnified by the Issuing Entity and held harmless against any loss, liability or expense incurred in connection with the performance of its duties and obligations and any legal action relating to the Pooling and Servicing Agreement other than any loss, liability or expense incurred by reason of its willful malfeasance, bad faith, or negligence in the performance of its duties under the Pooling and Servicing Agreement or by reason of its reckless disregard of its obligations and duties under the Pooling and Servicing Agreement or under the Credit Risk Management Agreement.

## UNDERWRITING GUIDELINES

All of the Mortgage Loans to be acquired by the Issuing Entity from the Depositor were originated generally in accordance with First Franklin Financial's Underwriting Guidelines.

### General

Generally, First Franklin Financial originates fixed and adjustable rate closed-end first lien mortgage loans and fixed rate closed-end second lien mortgage loans.  First Franklin Financial's loan programs include balloon payment features and interest-only payment periods.

### First Franklin Financial's Underwriting Guidelines

All of the Mortgage Loans were required to meet certain aspects of the underwriting criteria described in this information circular.

First Franklin Financial's underwriting standards are primarily intended to assess the ability and willingness of the mortgagor to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The standards established by First Franklin Financial require that the mortgage loans of a type similar to the Mortgage Loans be underwritten by First Franklin Financial with a view toward the resale of the mortgage loans in the secondary mortgage market. In accordance with First Franklin Financial's underwriting guidelines, First Franklin Financial considers, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio ("**Debt Ratio**"), as well as the value, type and use of the mortgaged property. The Mortgage Loans generally bear higher rates of interest than mortgage loans that are originated in accordance with Freddie Mac standards, and may experience rates of delinquencies and foreclosures that are higher, and that may be substantially higher, than those experienced by portfolios of mortgage loans underwritten in a more conservative manner. Unless prohibited by applicable law or otherwise waived by First Franklin Financial upon the payment by the related mortgagor of higher origination fees and a higher mortgage rate, a majority of the Mortgage Loans provide for the payment by the mortgagor of a prepayment penalty on certain full Principal Prepayments made within one to three years from the date of origination of the related Mortgage Loan.

*Wholesale Origination.* A significant majority of the Mortgage Loans were originated by First Franklin Financial based on loan application packages submitted to First Franklin Financial by mortgage brokers that do not fund the mortgage loans themselves.  These mortgage brokers must meet minimum standards set by First Franklin Financial and, once approved, the mortgage brokers are eligible to submit loan application packages in compliance with the terms of their mortgage broker agreement.

The mortgage brokers must meet minimum standards set by First Franklin Financial, based on guidelines that require an analysis of the following information submitted with an application for approval: any applicable state lending license (in good standing), satisfactory credit report only if no federal income tax identification number, signed broker agreement, signed W-9 and signed broker authorization. Once approved as a mortgage broker, these companies are eligible to submit loan packages for origination by First Franklin Financial in compliance with the terms of a signed mortgage broker agreement.

*Retail Originations.*  First Franklin Financial originates mortgage loans in its retail channel based on loan applications submitted directly by mortgagors to its operation located in Lake Forest, California.  The retail operation acquires customers primarily through online lead aggregators, but also relies to a small extent on direct mail and phone contact to solicit mortgagors.

*CORE Program.*  All of the Mortgage Loans were originated by First Franklin Financial under an underwriting program called the CORE Program (the "**CORE Program**").  Within the CORE Program, there are four documentation programs, the Full Documentation Program, the Limited Income Verification Program, the Stated Plus Program and the Stated Income Verification Program.  In addition, under the Blended Access Program, in the case of mortgage loans with two or more mortgagors, if one of those mortgagors with more than 50% of the total qualifying income is underwritten under a full documentation program, then the other mortgagor or mortgagors may be underwritten under a stated documentation program.  While each underwriting program is intended to assess the risk of default, the CORE Program makes use of credit bureau risk scores (the "**Credit Bureau Risk Score**"). The Credit Bureau Risk Score is a statistical ranking of likely future credit performance developed by Fair, Isaac & Company ("**Fair, Isaac**") and the three national credit repositories Equifax, Trans Union and Experian. The Credit Bureau Risk Scores available from the three national credit repositories are calculated by the assignment of weightings to the most predictive data collected by the credit repositories and range from the 300's to 900's. Although the Credit Bureau Risk

29

Scores are based solely on the information at the particular credit repository, such Credit Bureau Risk Scores have been calibrated to indicate the same level of credit risk regardless of which credit repository is used. The Credit Bureau Risk Score is used as an aid to, not a substitute for, the underwriter's judgment.

The CORE Program was developed to simplify the origination process. In contrast to assignment of credit grades according to traditional non-agency credit assessment methods, i.e., mortgage and other credit delinquencies, the CORE Program relies upon a mortgagor's Credit Bureau Risk Score initially to determine a mortgagor's likely future credit performance.  First Franklin Financial is able to access Credit Bureau Risk Scores at the initial phases of the loan application process and use the score to determine a mortgagor's interest rate.  First Franklin Financial's guidelines require that the Mortgage Loan be approved using the CORE Program risk-based pricing matrix.

In accordance with First Franklin Financial's guidelines, under the CORE Program, First Franklin Financial requires that the Credit Bureau Risk Score be used to determine program eligibility. Credit Bureau Risk Scores must be obtained from at least two national credit repositories, with the lower of the two scores being utilized in program eligibility determination. If Credit Bureau Risk Scores are obtained from three credit repositories, the middle of the three scores can be utilized. In all cases, a mortgagor's complete credit history must be detailed in the credit report that produces a given Credit Bureau Risk Score or the mortgagor is not eligible for the CORE Program. Generally, the minimum Credit Bureau Risk Score allowed under the CORE Program is 540.

The Credit Bureau Risk Score, along with the loan-to-value ratio, is an important tool in assessing the creditworthiness of a mortgagor in the CORE Program. However, these two factors are not the only considerations in underwriting a CORE Program mortgage loan. First Franklin Financial requires a review of each CORE Program mortgage loan to determine whether First Franklin Financial's guidelines for income, assets, employment and collateral are met.

In accordance with First Franklin Financial's guidelines, all of the Mortgage Loans were required to be underwritten by underwriters having the appropriate signature authority. Each underwriter is granted a level of authority commensurate with his or her proven judgment, maturity and credit skills. On a case by case basis, an underwriter may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is expected that a limited portion of the Mortgage Loans may represent such underwriting exceptions.

In accordance with First Franklin Financial's guidelines, the underwriters are required to verify the income of each applicant under various documentation programs as follows: under the Full Documentation Program, applicants are generally required to submit verification of stable income for the periods of six months to two years preceding the application dependent on credit score range; under the Limited Income Verification Program, the mortgagor is qualified based on six months of bank statements and applicants are generally required to submit verification of adequate cash flow to meet credit obligations for the six month period preceding the application; the Stated Plus Program allows income to be stated, but requires mortgagors to provide verification of liquid assets equaling three months of income stated on the mortgage application; under the Stated Income Program, applicants are qualified based on monthly income as stated on the mortgage application and the underwriter will determine that the stated income is reasonable and realistic when compared to mortgagor's employment type, assets and credit history. For CORE Program first lien mortgage loans from self-employed or 1099 mortgagors with a credit score greater than or equal to 540 and not originated in conjunction with a second lien mortgage, bank statements (for 12 months) are acceptable as full documentation. For CORE Program first lien mortgage loans from self-employed or 1099 mortgagors with credit scores greater than or equal to 620, regardless of being originated with a corresponding second lien mortgage, twelve months of bank statements are acceptable as full documentation. In all cases, the income stated must be reasonable and customary for the applicant's line of work. Although the income is not verified under the Stated Income Program, a preclosing verbal verification of business ownership and history or for salaried mortgagors, verification of type and length of employment is required.  Verification is performed through phone contact to the place of business, and in the case of self employment, obtaining a valid business license, CPA/Enrolled Agent letter or through Dun and Bradstreet Information Services.  With all document types a verbal verification of the type and length of employment is performed.

The applicant generally must have a sufficiently established credit history to qualify for the appropriate Credit Bureau Risk Score range under the CORE Program. This credit history is substantiated by a minimum of two repository merged reports prepared by an independent credit report agency. The report typically summarizes the applicant's entire credit history, and generally includes a seven year public record search for each address where the applicant has lived during the two years prior to the issuance of the credit report and contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. Under specific limited programs, mortgagors with a minimal credit history are eligible for financing under the CORE Program.

First Franklin Financial originates mortgage loans secured by one-to-four unit residential properties made to eligible mortgagors with a vested fee simple (or in some cases a leasehold) interest in the property. In accordance with its underwriting guidelines, First Franklin Financial is required to comply with applicable federal and state laws and regulations and generally requires an appraisal of the mortgaged property which conforms to Freddie Mac standards; and if appropriate, a review appraisal. Generally, appraisals are provided by appraisers approved by First Franklin Financial, but all review appraisals may only be provided by appraisers approved by First Franklin Financial. In some cases, First Franklin Financial may rely on a statistical appraisal methodology provided by a third party.

Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where such insurance is required to be approved to do business with First Franklin Financial. Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be an enhanced desk, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises. The review appraisal may be waived by a duly delegated underwriter.

In accordance with its guidelines, First Franklin Financial requires title insurance on all mortgage loans secured by liens on real property. First Franklin Financial also requires that fire and extended coverage casualty insurance be maintained on the secured property in an amount at least equal to the principal balance of the related residential loan or the replacement cost of the property, whichever is less.

First Franklin Financial conducts a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of mortgage loans to assure asset quality. Under the asset quality audit, all mortgage loans are required to be reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, First Franklin Financial reviews a random selection of each month's originations.

The loan review is required to confirm the existence and accuracy of credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is sent monthly to each branch for response. The audit findings and branch responses must then be reviewed by the third party originator's senior management. Adverse findings are to be tracked monthly and over a rolling six month period. This review procedure allows First Franklin Financial to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training.

Under the CORE Program, various risk categories are used to assess the likelihood that the applicant will satisfy the repayment conditions of the loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the applicant's credit history and Debt Ratio. In general, higher credit risk mortgage loans are graded in categories which permit higher Debt Ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however these loan programs establish lower maximum loan-to-value ratios and lower maximum loan amounts.

*"Rate and Term Refinance"* transactions are defined as those instances where the mortgagor receives the lesser of 2% of the new loan amount or $2,000 cash in hand. Funds used for debt consolidation are not included in this amount.

*"RapidRefi"* is designed to streamline the loan process for mortgagors who have demonstrated that their current mortgage has been paid as agreed for at least the prior 18 months.  It requires the property to be an owner-occupied primary residence.

First Franklin Financial's underwriting guidelines under the CORE Program generally have the following criteria for mortgagor eligibility for the specified Credit Bureau Risk Score range.  The Debt Ratio generally may not exceed 50.49% for all credit scores on full documentation and LIV loans. Loans meeting the residual income requirements may have a maximum Debt Ratio of 55.49%. The Debt Ratio for Stated Income loans may not exceed 50.49%.

Generally, First Franklin Financial's guidelines require that all liens affecting title must be paid at closing. Collections, charge-offs, judgments and liens not affecting title may remain open.

### Pending Proceedings

There are no material legal or governmental proceedings currently pending or known to be contemplated against First Franklin Financial. To the best of First Franklin Financial's knowledge, there are no material legal or governmental proceedings currently pending or known to be contemplated against First Franklin Financial, which if ultimately decided adversely to First Franklin Financial, would have a material adverse effect on the validity of the Mortgage Loans.

## AFFILIATES AND RELATED TRANSACTIONS

The Depositor, the Servicer and First Franklin Financial are all affiliates of each other and are all direct or indirect subsidiaries of Merrill Lynch, Pierce, Fenner & Smith Incorporated.

The Servicer and First Franklin Financial are affiliates of each other through common parent ownership. Merrill Lynch Bank & Trust Co., FSB acquired First Franklin Financial, the Servicer, and the affiliated business unit NationPoint on December 30, 2006.

## DESCRIPTION OF THE CERTIFICATES

### General

The Issuing Entity will offer four Classes of certificates, consisting of the Class 1-A-1 Certificates ("**Class 1-A-1 Certificates**"), the Class 2-A-1 Certificates (the "**Class 2-A-1 Certificates**"), the Class 3-A-1 Certificates (the "**Class 3-A-1 Certificates**") and the Class 4-A-1 Certificates (the "**Class 4-A-1 Certificates**" and, collectively with the Class 1-A-1, Class 2-A-1 and Class 3-A-1 Certificates, the "**Class A Certificates**" or the "**Offered Certificates**"). In addition, the Issuing Entity will issue the Class P Certificate (the "**Class P Certificate**").  The Class A Certificates and the Class P Certificate are collectively referred to herein as the "**Certificates**."  Only the Class A Certificates are offered hereby.

The Class 1-A-1 Certificates are entitled to receive all amounts received in respect of the Group 1 Mortgage Loans.  The Class 2-A-1 Certificates are entitled to receive all amounts (other than Prepayment Penalties) received in respect of the Group 2 Mortgage Loans.  The Class 3-A-1 Certificates are entitled to receive all amounts received in respect of the Group 3 Mortgage Loans.  The Class 4-A-1 Certificates are entitled to receive all amounts (other than Prepayment Penalties) received in respect of the Group 4 Mortgage Loans.

The Classes of Offered Certificates will have the approximate initial Certificate Principal Balances specified in the table on page 5 hereof.  Any difference between the Certificate Principal Balance of a Class of Offered Certificates as of the date of issuance of the Certificates and the approximate initial Certificate Principal Balance of such Class of Certificates as of the date of this information circular will not exceed 10% of the initial Certificate Principal Balance of such Class of Certificates.  The Offered Certificates will be issued initially in the denominations set forth in the table on page 5.

Distributions on the Certificates will be made by the Trustee on the 25th day of each month, or if such day is not a business day, on the first business day thereafter, commencing in January 2008 (each, a "**Distribution Date**"), to the persons in whose names such Certificates are registered at the close of business on the applicable Record Date. The "**Record Date**" with respect to each Distribution Date and the Offered Certificates will be the last business day of the preceding month.  The "**Determination Date**" with respect to any Distribution Date will be the 15th day of each month or if such day is not a business day, the preceding business day.  Payments (other than the final distribution in retirement of the applicable Certificates) will be made by wire transfer in immediately available funds provided that the Trustee is furnished with appropriate wiring instructions not less than seven business days prior to the related Distribution Date.  If the Trustee is not furnished with appropriate wire instructions not less than seven business days prior to the related Distribution Date, then payments will be made by check mailed to the address of the person entitled thereto as it appears on the Certificate Register.  The final distribution in respect of each Class of Certificates will be made only upon presentation and surrender of the related Certificates at the office or agency appointed by the Trustee specified in the notice of final distribution with respect to the related Class.  All distributions with respect to each Class of Certificates on each Distribution Date will be allocated pro rata among the outstanding certificateholders in such Class.

**Available Funds**

Distributions to holders of each Class of Class A Certificates will be made on each Distribution Date from Available Funds for such Loan Group.  "**Available Funds**" for each Loan Group will be equal to the sum of the following amounts with respect to the Mortgage Loans of such Loan Group, net of amounts reimbursable or payable to the Servicer, including amounts in respect of indemnification of the Servicer, the Servicing Fee and any accrued and unpaid Servicing Fee, amounts reimbursable or payable to the Trustee, including amounts in respect of indemnification of the Trustee, the Trustee Fee, any accrued and unpaid Trustee Fee, amounts reimbursable or payable to the Credit Risk Manager, including amounts in respect of indemnification of the Credit Risk Manager, the Credit Risk Management Fee and any accrued and unpaid Credit Risk Management Fee, the premium for the PMI Policy to the PMI Insurer  (the "**PMI Premium**") and amounts payable to the Guarantor in respect of certain expenses and indemnification:

(i)     the aggregate amount of Scheduled Payments on the Mortgage Loans due during the related Due Period and received by the Servicer on or prior to the related Determination Date;

(ii)     certain unscheduled payments in respect of the Mortgage Loans, including prepayments (but excluding any Prepayment Penalties), proceeds paid in respect of a Mortgage Loan or the related Mortgaged Property pursuant to the PMI Policy or any other insurance policy covering such Mortgage Loan or Mortgaged Property, to the extent such proceeds are payable to the mortgagee under the Mortgage, the Servicer or the Trustee under the deed of trust and are not applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures that the Servicer would follow in servicing mortgage loans held for its own account, in each case other than any amount included in such Insurance Proceeds in respect of insured expenses (collectively, "**Insurance Proceeds**"), condemnation proceeds, Subsequent Recoveries, amounts received in respect of REO Property and all other amounts received and retained in connection with the liquidation of Mortgage Loans in default in the Issuing Entity ("**Liquidation Proceeds**"), net of certain expenses, received during the related Prepayment Period;

(iii)     payments from the Servicer (or the Trustee to the extent not made by the Servicer) in connection with Advances and payments from the Servicer in connection with Compensating Interest for such Distribution Date;

(iv)     the Purchase Price for any repurchased Mortgage Loan deposited to the Certificate Account during the related Prepayment Period;

(v)     any Substitution Adjustment Amounts deposited in the Certificate Account during the related Prepayment Period;

(vi)     any Reimbursement Amount deposited to the Certificate Account during the related Prepayment Period; and

(vii)   on the Distribution Date on which the Issuing Entity is to be terminated in accordance with the Pooling and Servicing Agreement, the Termination Price.

Available Funds exclude any Prepayment Penalties received by the Servicer with respect to the Mortgage Loans.  Any such Prepayment Penalties will be distributed to the holder of the Class P Certificate and no other Class of Certificates will have any entitlement to receive such amounts under any circumstances.  See "—Distributions on the Class P Certificate."

The "**Due Period**" with respect to any Distribution Date means the period from the second day of the calendar month preceding the month in which such Distribution Date occurs through the first day of the month in which such Distribution Date occurs.

The "**Prepayment Period**" with respect to Distribution Date is the one month period ending on the last day of the calendar month preceding the month in which the applicable Distribution Date occurs (the "**Prior Month Receipt Period**").

"**Subsequent Recovery**" means any amount (net of amounts reimbursed to the Servicer related to Liquidated Loans) received on a Mortgage Loan subsequent to such Mortgage Loan being determined to be a Liquidated Loan that resulted in a Realized Loss in a prior month.

Available Funds will be distributed among the Certificates on each Distribution Date, and accordingly will be released from the Issuing Entity and will not be available for any future distributions.

**Priority of Distributions on the Class A Certificates**

On each Distribution Date, the Trustee will distribute the Available Funds with respect to each Loan Group in the following order of priority to the extent available:

(i)         concurrently, as follows:

(A)   with respect to the Class 1-A-1 Certificates, to the extent of the Available Funds for Loan Group 1:

*first,* to the Class 1-A-1 Certificates, Accrued Certificate Interest thereon for such Distribution Date; and

*second,* to the Class 1-A-1 Certificates in reduction of the Certificate Principal Balance thereof, any remaining Available Funds for Loan Group 1 for such Distribution Date, until the Certificate Principal Balance of the Class 1-A-1 Certificates is reduced to zero;

(B)   with respect to the Class 2-A-1 Certificates, to the extent of the Available Funds for Loan Group 2:

*first,* to the Class 2-A-1 Certificates, Accrued Certificate Interest thereon for such Distribution Date; and

*second,* to the Class 2-A-1 Certificates in reduction of the Certificate Principal Balance thereof, any remaining Available Funds for Loan Group 2 for such Distribution Date, until the Certificate Principal Balance of the Class 2-A-1 Certificates is reduced to zero;

(C)   with respect to the Class 3-A-1 Certificates, to the extent of the Available Funds for Loan Group 3:

*first,* to the Class 3-A-1 Certificates, Accrued Certificate Interest thereon for such Distribution Date; and

*second,* to the Class 3-A-1 Certificates in reduction of the Certificate Principal Balance thereof, any remaining Available Funds for Loan Group 3 for such Distribution Date, until the Certificate Principal Balance of the Class 3-A-1 Certificates is reduced to zero; and

(D)      with respect to the Class 4-A-1 Certificates, to the extent of the Available Funds for Loan Group 4:

*first,* to the Class 4-A-1 Certificates, Accrued Certificate Interest thereon for such Distribution Date; and

*second,* to the Class 4-A-1 Certificates in reduction of the Certificate Principal Balance thereof, any remaining Available Funds for Loan Group 4 for such Distribution Date, until the Certificate Principal Balance of the Class 4-A-1 Certificates is reduced to zero; and

(ii)      to the Guarantor, any Guarantor Reimbursement Amounts and any other amounts owed to the Guarantor pursuant to the Pooling and Servicing Agreement, in each case with respect to all of the Mortgage Loans, regardless of Loan Group.

When mortgagors prepay principal, or when principal is recovered through foreclosure sales or other liquidations of defaulted Mortgage Loans, or when other unscheduled principal payments are received, a full month's interest for the month of payment or recovery may not be paid or recovered, resulting in interest shortfalls to the extent that such payment or recovery is not included in the distribution to certificateholders made in the month in which it is received.  Such interest shortfalls are referred to herein as "**Prepayment Interest Shortfalls**."  The Servicer will be obligated, on or before each Servicer Remittance Date, to pay to the Trustee for the benefit of certificateholders an amount (such amount, "**Compensating Interest**") equal to the lesser of (i) the aggregate Prepayment Interest Shortfall attributable to prepayments with respect to such Distribution Date and (ii) the Servicing Fee for such Distribution Date.

Any Relief Act Shortfalls and any Prepayment Interest Shortfalls, to the extent not covered by Compensating Interest paid by the Servicer, will be payable by the Guarantor pursuant to the Guarantee.  To the extent the Guarantor fails to make the payments required pursuant to the Guarantee, such interest shortfalls will result in a reduction of the amount payable to the Class A Certificates.

"**Relief Act Shortfalls**" are any interest shortfalls arising as a result of the reduction in the amount of monthly interest payments on any Mortgage Loans as a result of the application of the Relief Act or similar state laws.

The "**Certificate Principal Balance**" with respect to any Class of Class A Certificates and any Distribution Date, will equal the certificate principal balance of such Class on the date of the initial issuance of the Certificates as reduced, but not below zero, by:

- all amounts distributed on previous Distribution Dates on such Class on account of principal, including, without duplication, any Guarantor Payments representing payments of principal; and

- absent a Guarantee payment, any Realized Losses with respect to the related Loan Group allocated to such Class for previous Distribution Dates.

The "**Guarantor Reimbursement Amount**" is, with respect to any Distribution Date, the sum of all amounts paid by the Guarantor in respect of Deficiency Amounts on all prior Distribution Dates to the extent not previously reimbursed, with interest thereon at the prime rate announced plus 2.00%.

**Distributions on the Class P Certificate**

The Class P Certificate represents an entitlement to receive on each Distribution Date any Prepayment Penalties payable in connection with certain principal prepayments on the Group 2 Mortgage Loans and Group 4 Mortgage Loans, unless such Prepayment Penalties are waived and are not otherwise required to be paid by the Servicer in accordance with the Pooling and Servicing Agreement.  Under certain circumstances, the Servicer will be obligated to waive Prepayment Penalties and will not be required to make any payment in respect of such waived Prepayment Penalties.

"**Prepayment Penalty**" means, with respect to any Prepayment Period, any prepayment penalty, premium or charge collected by the Servicer from a mortgagor in connection with any voluntary principal prepayment in full

pursuant to the terms of the related Mortgage Note as from time to time held as a part of the Issuing Entity, the Prepayment Penalties so held being determined in accordance with the guidelines for Prepayment Penalty provisions set forth in the underwriting standards of First Franklin Financial.

Generally, each Prepayment Penalty is only applicable to certain prepayments on a Group 2 or Group 4 Mortgage Loan and only remains applicable with respect to such Mortgage Loan for the limited time periods specified in the terms of the related Mortgage Note.

Only the Group 2 and Group 4 Mortgage Loans require the payment of a Prepayment Penalty.  Prepayment Penalty information with respect to the Mortgage Loans is set forth in the table with the heading "Original Prepayment Penalty Term" appearing in Appendix A to this information circular.

**Allocation of Realized Losses**

In the event that the Trustee receives notice from the Guarantor that any amount of a Guarantor Payment with respect to any Class of Class A Certificates remains unpaid on any Distribution Date, the Trustee will allocate Realized Losses with respect to the Mortgage Loans in the related Loan Group to the extent of such unpaid amount as of such Distribution Date to the related Class of Class A Certificates.  Realized Losses will not be allocated to the Class P Certificate.

A "**Realized Loss**" is:

- as to any Liquidated Loan, the amount, if any, by which the stated principal balance and accrued interest thereon at the Net Mortgage Rate at the time such Mortgage Loan became a Liquidated Loan exceeds the amount actually recovered by the Servicer with respect thereto (net of reimbursement of Advances and Servicing Advances); and

- as to any Mortgage Loan, any amount of principal that the mortgagor is no longer legally required to pay (except for the extinguishment of debt that results from the exercise of remedies due to default by the mortgagor), including a Deficient Valuation, a Debt Service Reduction or a reduction of the unpaid principal balance resulting from a modification of such Mortgage Loan by the Servicer.

A "**Liquidated Loan**" is any defaulted Mortgage Loan as to which the Servicer has determined that all amounts which it expects to recover from or on account of such Mortgage Loan have been recovered.

A Realized Loss may result from the personal bankruptcy of a mortgagor if the bankruptcy court establishes the value of the Mortgaged Property at an amount less than the then unpaid principal balance of the Mortgage Loan secured by such Mortgaged Property and reduces the secured debt to such value.  In such case, the Issuing Entity, as the holder of such Mortgage Loan, would become an unsecured creditor to the extent of the difference between the unpaid principal balance of such mortgage loan and such reduced secured debt (such difference, a "**Deficient Valuation**").  In addition, a Realized Loss may result from certain other modifications of the terms of a Mortgage Loan in a bankruptcy proceeding, including the reduction (a "**Debt Service Reduction**") of the amount of the Scheduled Payment on the related Mortgage Loan.

**Advances in Respect of Delinquencies**

Subject to the following limitations, the Servicer will be obligated to advance or cause to be advanced prior to each Distribution Date from its own funds, or (subject to certain restrictions set forth in the Pooling and Servicing Agreement) funds in the Collection Account that are not included in the Available Funds for such Distribution Date, or a combination of both, an amount equal to the aggregate of all payments of principal (other than any balloon payment) and interest, net of the Servicing Fee, that were due during the related Due Period on the Mortgage Loans and that were not received by the related Determination Date (any such advance, an "**Advance**").

Advances with respect to Mortgage Loans are required to be made only to the extent the Servicer deems them to be recoverable from related late collections, Insurance Proceeds, condemnation proceeds or Liquidation Proceeds.

The purpose of making such Advances is to maintain a regular cash flow to the certificateholders, rather than to guarantee or insure against losses.  The Servicer will not be required, however, to make any Advances with respect to reductions in the amount of the monthly payments on the Mortgage Loans due to bankruptcy proceedings or the application of the Relief Act or similar state laws.  Subject to the recoverability standard above, the Servicer's obligation to make Advances as to any Mortgage Loan will continue until the earliest of the time such Mortgage Loan is paid in full by the mortgagor, the Mortgage Loan is disposed of by the Issuing Entity or the Issuing Entity acquires the related Mortgaged Property.  With respect to any Mortgage Loan that has been converted to an REO Property, the obligation to make Advances shall be to payments of principal and interest (subject to the exceptions described above and net of the related Servicing Fee), to be calculated after taking into account rental income.

All Advances will be reimbursable to the Servicer from late collections, Insurance Proceeds, condemnation proceeds and Liquidation Proceeds from the Mortgage Loan as to which such unreimbursed Advance was made.  In addition, any Advances previously made in respect of any Mortgage Loan that the Servicer deems to be nonrecoverable from related late collections, Insurance Proceeds, condemnation proceeds or Liquidation Proceeds may be reimbursed to the Servicer out of general funds in the Collection Account or Certificate Account prior to the distributions on the Certificates.  In addition, the Servicer may withdraw from the Collection Account funds that were not included in Available Funds for the preceding Distribution Date to reimburse itself for Advances previously made if such Advances are deemed nonrecoverable.  In the event the Servicer fails in its obligation to make any such Advance, the Trustee, in its capacity as successor servicer, will be obligated to make any such Advance, to the extent required in the Pooling and Servicing Agreement and as described herein.

**Pass-Through Rates**

Interest for each Distribution Date on each Class of Class A Certificates will be equal to the Accrued Certificate Interest for such Certificate for such Distribution Date.  Interest on each Class of Certificates will be calculated on the basis of a 360-day year consisting of twelve 30-day months.

"**Accrued Certificate Interest**" with respect to each Distribution Date for each Class of Class A Certificates is equal to one-twelfth of the product of (i) the Pass-Through Rate for such Class of Certificates and (ii) the Certificate Principal Balance of such Class of Certificates immediately prior to such Distribution Date.

The "**Pass-Through Rate**" for each Distribution Date for each Class of Class A Certificates will be equal to the Net WAC Rate on the related Loan Group.

The "**Net WAC Rate**" for any Loan Group and Distribution Date will equal a per annum rate equal to the weighted average of the Net Mortgage Rates of the Mortgage Loans in such Loan Group (based on the unpaid principal balances of the Mortgage Loans of such Loan Group in accordance with their amortization schedules on the first day of the related Due Period).

The "**Net Mortgage Rate**" for each Mortgage Loan and for each Distribution Date is the applicable Mortgage Rate minus the sum of (a) the Servicing Fee Rate, (b) the Trustee Fee Rate, (c) the Credit Risk Management Fee Rate and (d) the PMI Premium Rate, if applicable, for such Distribution Date.

**Freddie Mac Guarantee**

It is a condition to the issuance of the Certificates that Freddie Mac purchase the Class A Certificates and that it guarantee (the "**Guarantee**"):  (i) the timely distribution of interest due on the Class A Certificates and (ii) the distribution of principal on the Class A Certificates as described herein.  Under the Guarantee, the entire outstanding Certificate Principal Balance of each Class of Class A Certificates will be paid not later than the related Final Scheduled Distribution Date.  The Guarantee will cover interest shortfalls on each Distribution Date resulting from Relief Act Shortfalls and any Prepayment Interest Shortfalls to the extent not covered by Compensating Interest paid by the Servicer.

On any applicable Distribution Date, Freddie Mac will make payments in respect of the Guarantee directly to the holders of the Certificates entitled thereto.

The Pooling and Servicing Agreement requires Freddie Mac to pay the Deficiency Amount on each Distribution Date.  The "**Deficiency Amount**" with respect to any Distribution Date and any Class of Class A Certificates is equal to the sum of:

    (i)     the amount, if any, by which the Accrued Certificate Interest on such Class of Certificates exceeds the amount on deposit in the Certificate Account available to be distributed therefor on such Distribution Date;

    (ii)    the amount, if any, by which the Certificate Principal Balance of such Class of Certificates (after giving effect to all amounts distributable and allocable to principal to such Class of Certificates on such Distribution Date) exceeds the aggregate unpaid principal balance of the Mortgage Loans in the related Loan Group as of the immediately preceding Due Date; and

    (iii)    on the Final Scheduled Distribution Date, the Certificate Principal Balance of such Class of Certificates on such Final Scheduled Distribution Date (after giving effect to all amounts distributable and allocable to principal on such Class of Certificates but prior to giving effect to any Guarantor Payment for such Class of Certificates on such Final Scheduled Distribution Date).

A "**Guarantor Payment**" is any payment made by the Guarantor in respect of a Deficiency Amount.

The determination of the amount due from Freddie Mac on any Distribution Date for any Class of Class A Certificates in respect of the Guarantee will be based on the information provided by the Servicer and the Trustee to Freddie Mac in connection with each Distribution Date.  The Guarantee is not backed by the full faith and credit of the United States.  If Freddie Mac were unable to pay under the Guarantee, the Certificates could be subject to losses.

**The PMI Policy**

Mortgage Guaranty Insurance Corporation (the "**PMI Insurer**"), a Wisconsin corporation, is the PMI Insurer.

Approximately 27.87% of the Group 1 Mortgage Loans, approximately 10.33% of the Group 2 Mortgage Loans, approximately 49.56% of the Group 3 Mortgage Loans and approximately 31.94% of the Group 4 Mortgage Loans (in each case by aggregate principal balance of the related Loan Group as of the Cut-off Date) will be insured by the PMI Insurer, pursuant to a primary mortgage insurance policy (the "**PMI Policy**" and the Mortgage Loans covered by such policy, the "**PMI Mortgage Loans**"). The amount of coverage provided by the PMI Policy (the "**Insured Percentage of the Claim**") varies on a loan-by-loan basis based upon the original loan-to-value ratio of the Mortgage Loan, with the actual coverage amounts ranging from 6% to 16%.

The PMI Policy is required to remain in force with respect to each PMI Mortgage Loan until (i) the principal balance of the PMI Mortgage Loan is paid in full or (ii) any event specified in the PMI Policy occurs that allows for the termination of the PMI Policy by the PMI Insurer.

The PMI Policy may not be assigned or transferred without the prior written consent of the PMI Insurer, provided, however that the PMI Insurer has previously provided written consent to the assignment of coverage on individual PMI Mortgage Loans from the Trustee to the Sponsor in connection with any Mortgage Loan repurchased or substituted for by the Sponsor.

The PMI Policy generally requires that delinquencies on any PMI Mortgage Loan must be reported to the PMI Insurer within four months of default, and appropriate proceedings to obtain title to the property securing the PMI Mortgage Loan must be commenced within six months of default. The PMI Policy contains provisions substantially as follows: (i) for the insured to present a claim, the insured must have acquired, and tendered to the PMI Insurer, good and merchantable title to the property securing the PMI Mortgage Loan, free and clear of all liens and encumbrances, including, but not limited to, any right of redemption by the mortgagor unless such acquisition of good and merchantable title is excused under the terms of the PMI Policy; (ii) a claim generally includes unpaid principal, accrued interest to the date of such tender to the PMI Insurer by the insured, and certain expenses; (iii) when a claim is presented, the PMI

Insurer will have the option of either (A) paying the claim in full, taking title to the property securing the PMI Mortgage Loan, and arranging for its sale or (B) paying the Insured Percentage of the Claim, with the insured retaining title to the property securing the PMI Mortgage Loan; (iv) claims generally must be filed within 60 days after the insured has acquired good and merchantable title to the property securing the PMI Mortgage Loan and (v) a claim generally must be paid within 60 days after the claim is filed by the insured.

No payment for a loss will be made under the PMI Policy unless the property securing the PMI Mortgage Loan is in the same physical condition as when the PMI Mortgage Loan was originally insured, except for reasonable wear and tear and unless premiums on the standard homeowner's insurance policy, real estate taxes and foreclosure protection and preservation expenses have been advanced by or on behalf of the insured. In addition, the Servicer will be required to reimburse the Issuing Entity for any losses not covered under the PMI Policy as a result of any denial or curtailment of claims by the PMI Insurer due to the Servicer's error or negligence.

Unless approved in writing by the PMI Insurer and subject to the Pooling and Servicing Agreement, the insured under the PMI Policy may not make any change in the terms of a PMI Mortgage Loan, including the borrowed amount, interest rate, term or amortization schedule of the PMI Mortgage Loan, except as specifically permitted by terms of the PMI Mortgage Loan; nor make any change in the property or other collateral securing the PMI Mortgage Loan; nor release any mortgagor under the PMI Mortgage Loan from liability. If a PMI Mortgage Loan is assumed with the insured's approval, the PMI Insurer's liability for coverage of the PMI Mortgage Loan under the PMI Policy generally will terminate as of the date of such assumption, unless the PMI Insurer approves the assumption in writing.

The PMI Policy specifically excludes coverage of (i) any claim resulting from a default existing at the inception of coverage or occurring after lapse or cancellation of coverage; (ii) certain claims where there is an environmental condition which existed on the property securing the PMI Mortgage Loan, whether or not known by the person or persons submitting an application for coverage of the PMI Mortgage Loan, as of the effective date of coverage; (iii) any claim involving a PMI Mortgage Loan which is for the purchase of the Mortgaged Property, and for which the mortgagor did not make a down payment as described in the application for coverage; (iv) any claim, if the mortgage, deed of trust or other similar instrument did not provide the insured at origination with a first lien on the property securing the PMI Mortgage Loan; (v) certain claims involving or arising out of any breach by the insured of its obligations under, or its failure to comply with the terms of, the PMI Policy or of its obligations as imposed by operation of law and (vi) any claim arising from the failure of the mortgagor under a PMI Mortgage Loan to make any balloon payment, if applicable, under the PMI Mortgage Loan.

In issuing the PMI Policy, the PMI Insurer has relied upon certain information and data regarding the PMI Mortgage Loans furnished to the PMI Insurer by the Sponsor and the Depositor. The PMI Policy will not insure against a loss sustained by reason of a default arising from or involving certain matters, including (i) fraud or negligence in origination or servicing of the PMI Mortgage Loans, including, but not limited to, misrepresentation by the mortgagor, lender or other persons involved in the origination of the PMI Mortgage Loan or the application for insurance; (ii) failure to construct a property securing a PMI Mortgage Loan in accordance with specified plans or (iii) physical damage to a property securing a PMI Mortgage Loan.

Upon the receipt of written direction from Freddie Mac and at the expense of the Issuing Entity, the Trustee will replace the PMI Insurer with an insurer included in such written direction, in the event that the claims paying ability of the PMI Insurer ceases to be a Freddie Mac-approved insurer or if the PMI Insurer assigns its obligations under the PMI Policy without the consent of Freddie Mac.

The preceding description of the PMI Policy is only a brief outline and does not purport to summarize or describe all of the provisions, terms and conditions of the PMI Policy. For a more complete description of these provisions, terms and conditions, reference is made to the PMI Policy, a copy of which is available upon request from the Trustee.

**Definitive Form**

The Offered Certificates will be issued in fully registered, certificated form ("**Definitive Certificates**"). Distributions of principal of, and interest on, the Definitive Certificates will be made directly to holders of Definitive Certificates in accordance with the procedures set forth in the Pooling and Servicing Agreement. The Definitive

39

Certificates will be transferable and exchangeable at the office or agency maintained by the Trustee.  No service charge will be made for any transfer or exchange of Definitive Certificates, but the Trustee or such other entity may require payment of a sum sufficient to cover any tax or other governmental charge in connection with such transfer or exchange.

**DESCRIPTION OF THE MORTGAGE LOANS**

**General**

The information on the Mortgage Loans presented herein is based on a mortgage pool consisting of 161 conventional Mortgage Loans evidenced by promissory notes having an aggregate principal balance of approximately $26,235,467 as of the Cut-off Date.

The mortgage loans to be included in the Issuing Entity will be nonprime, fixed rate and adjustable rate, monthly pay, one- to two-family, condo and planned unit development, residential first lien mortgage loans (the "**Mortgage Loans**").  The Mortgage Loans will be divided into four loan groups ("**Loan Group 1**," "**Loan Group 2**," "**Loan Group 3**" and "**Loan Group 4**," respectively, and each, a "**Loan Group**").  The Mortgage Loans in Loan Group 1 (the "**Group 1 Mortgage Loans**") are Fixed Rate Mortgage Loans which do not require the payment of a Prepayment Penalty upon a voluntary principal prepayment in full.  The Mortgage Loans in Loan Group 2 (the "**Group 2 Mortgage Loans**") are Fixed Rate Mortgage Loans which require the payment of a Prepayment Penalty upon a voluntary principal prepayment in full.  The Mortgage Loans in Loan Group 3 (the "**Group 3 Mortgage Loans**") are Adjustable Rate Mortgage Loans which do not require the payment of a Prepayment Penalty upon a voluntary principal prepayment in full.  The Mortgage Loans in Loan Group 4 (the "**Group 4 Mortgage Loans**") are Adjustable Rate Mortgage Loans which require the payment of a Prepayment Penalty upon a voluntary principal prepayment in full.  The Mortgage Loans will have original terms to maturity of approximately 30 years.

The Class 1-A-1 Certificates will represent interests in the Group 1 Mortgage Loans.  On each Distribution Date, principal and interest received with respect to the Group 1 Mortgage Loans will be applied to pay principal and interest with respect to the Class 1-A-1 Certificates.  The Class 2-A-1 Certificates will represent interests in the Group 2 Mortgage Loans.  On each Distribution Date, principal and interest received with respect to the Group 2 Mortgage Loans will be applied to pay principal and interest with respect to the Class 2-A-1 Certificates.  The Class 3-A-1 Certificates will represent interests in the Group 3 Mortgage Loans.  On each Distribution Date, principal and interest received with respect to the Group 3 Mortgage Loans will be applied to pay principal and interest with respect to the Class 3-A-1 Certificates.  The Class 4-A-1 Certificates will represent interests in the Group 4 Mortgage Loans.  On each Distribution Date, principal and interest received with respect to the Group 4 Mortgage Loans will be applied to pay principal and interest with respect to the Class 4-A-1 Certificates.

All of the Mortgage Loans were originated by First Franklin Financial substantially in accordance with certain provisions of the underwriting criteria for nonprime mortgage loans described herein under "Underwriting Guidelines."  Nonprime mortgage loans are generally mortgage loans made to mortgagors who do not qualify for financing under conventional underwriting criteria due to prior credit difficulties, the inability to satisfy conventional documentation standards and/or conventional debt-to-income ratios. All of the Mortgage Loans were originated under an underwriting program called the CORE Program.  Within the CORE Program, there are four documentation programs, the Full Documentation Program, the Limited Income Verification Program, the Stated Plus Program and the Stated Income Verification Program.  See "Underwriting Guidelines" in this information circular.

All of the Mortgage Loans will be transferred and assigned to the Depositor on the Closing Date. All of the Mortgage Loans were originated in 2007.  All of the Mortgage Loans are currently serviced by HLS.

The Mortgage Loans are evidenced by promissory notes (the "**Mortgage Notes**") secured by either mortgages or deeds of trust or instruments creating first liens (the "**Mortgages**") on one- to two-family residential properties (the "**Mortgaged Properties**"), depending upon the prevailing practice in the state in which the underlying property is located.  A mortgage creates a lien upon the real property described in the mortgage.  There are two parties to a mortgage: the mortgagor, who is the mortgagor (or, in the case of a Mortgage Loan secured by a property that has been conveyed to an *inter vivos* revocable trust, the settlor of such trust); and the mortgagee, who is the lender.  In a mortgage instrument state, the mortgagor delivers to the mortgagee a note or bond evidencing the loan and the

mortgage.  Although a deed of trust is similar to a mortgage, a deed of trust has three parties: a mortgagor called the trustor (similar to a mortgagor), a lender called the beneficiary (similar to a mortgagee), and a third-party grantee called the trustee.  Under a deed of trust, the mortgagor grants the property, irrevocably until the debt is paid, in trust, generally with a power of sale, to the trustee to secure payment of the loan.  The trustee's authority under a deed of trust and the mortgagee's authority under a mortgage are governed by the express provisions of the deed of trust or mortgage, applicable law, and, in some cases, with respect to the deed of trust, the directions of the beneficiary.

All of the Mortgage Loans will provide for payments of principal, interest or both, on Due Dates that occur monthly.  Each Mortgage Loan provides for accrual of interest thereon at an interest rate (a "**Mortgage Rate**") that is fixed over its term or that adjusts from time to time.  Each Mortgage Loan will be fully amortizing or require a balloon payment due on its stated maturity date, in each case as described below.  Certain Mortgage Loans require payment of a Prepayment Penalty as described below and in "Description of the Certificates—Distributions on the Class P Certificate" in this information circular.

Scheduled Payments either earlier or later than the scheduled Due Dates on the Mortgage Loans will not affect the amortization schedule or the relative application of these payments to principal and interest.  Any Mortgage Loan may be prepaid in full or in part at any time; however, all of the Mortgage Loans in Loan Group 2 and Loan Group 4 provided at origination for the payment by the mortgagor of a prepayment penalty in limited circumstances on full or partial Principal Prepayments made during the prepayment penalty term.  The weighted average prepayment penalty term at origination is approximately 29 months with respect to the Mortgage Loans in Loan Group 2 and 31 months with respect to Loan Group 4.  In general, the related Mortgage Note will provide that a prepayment penalty will apply if, during the prepayment penalty term, the mortgagor prepays the mortgage loan in full or in part.  The enforceability of prepayment penalties is regulated under the laws of many states.  Prepayment penalties will not be available for distribution to Holders of the Class A Certificates.  See "Certain Legal Aspects of the Mortgage Loans" in the information circular.

All of the Mortgage Loans in Loan Group 1 and Loan Group 2 as of the Cut-off Date are Fixed Rate Mortgage Loans.  A "**Fixed Rate Mortgage Loan**" is a Mortgage Loan with a fixed interest rate, providing monthly payments of principal and interest and terms at origination or modification of not more than 30 years.  All of the Mortgage Loans in Loan Group 3 and Loan Group 4 as of the Cut-off Date are Adjustable Rate Mortgage Loans. An "**Adjustable Rate Mortgage Loan**" is a Mortgage Loan with an adjustable interest rate, having an original or modified term to maturity of not more than 30 years with a related Mortgage Rate which adjusts at five years subsequent to the initial Due Date and thereafter at six month intervals (each such date, an "**Adjustment Date**") over the term of the Mortgage Loan.  On each Adjustment Date, the Mortgage Rate for such Mortgage Loan will adjust to the sum of the Index and the number of basis points specified in the related Mortgage Note (the "**Gross Margin**"), rounded to the nearest one-eighth of one percent, subject to the limitation that with respect to each Adjustment Date, the interest rate after such adjustment may not vary from the Mortgage Rate in effect prior to such adjustment by more than the amount specified in the Mortgage Note (the "**Periodic Rate Cap**") except for the initial adjustment which is subject only to the initial cap.  In addition, adjustments to the interest rate for each Mortgage Loan are subject to a lifetime rate ceiling (the "**Maximum Mortgage Rate**").  Appendix A contains a table of the Maximum Mortgage Rates for the Adjustable Rate Mortgage Loans.  Generally, the minimum mortgage rate for a Mortgage Loan will be such Mortgage Loan's initial Mortgage Rate.  In accordance with a notice sent by the Servicer to each mortgagor with a Gross Margin in excess of 4.500%, the Gross Margin was capped at 4.500% per annum for each such Mortgage Loan.  Some of the Mortgage Loans will require only payments of interest for a term specified in the related Mortgage Note (the "**Interest-Only Mortgage Loans**").  Approximately 2.24% of the Mortgage Loans as of the Cut-off Date are Interest-Only Mortgage Loans.  None of the Group 1 Mortgage Loans or Group 2 Mortgage Loans as of the Cut-off Date are Interest-Only Mortgage Loans.  Approximately 4.41% of the Group 3 Mortgage Loans as of the Cut-off Date are Interest-Only Mortgage Loans.  Approximately 3.11% of the Group 4 Mortgage Loans as of the Cut-off Date are Interest-Only Mortgage Loans.  With respect to Interest-Only Mortgage Loans that are Adjustable Rate Mortgage Loans, on the first Due Date following each Adjustment Date for each such Mortgage Loan beginning with the Adjustment Date at the end of the interest-only period, the monthly payment for such Mortgage Loan will be adjusted, if necessary, to an amount that will fully amortize such Mortgage Loan at the then-current Mortgage Rate over its remaining scheduled term to maturity.  With respect to the Interest-Only Mortgage Loans that are Fixed Rate Mortgage Loans, at the end of the interest-only period, the monthly payment will be adjusted to provide for the payment of interest and principal.

If a mortgagor of an Interest-Only Mortgage Loan makes a partial principal prepayment during the interest-only period, the monthly payment of such Mortgage Loan will be reduced to equal the amount of interest at the current Mortgage Rate owed on the reduced principal balance.

Approximately 50.90% of the Mortgage Loans as of the Cut-off Date will not fully amortize by their respective maturity dates (each, a "**Balloon Loan**").  Approximately 34.81% of the Group 1 Mortgage Loans as of the Cut-off Date are Balloon Loans.  Approximately 32.62% of the Group 2 Mortgage Loans as of the Cut-off Date are Balloon Loans.  Approximately 57.77% of the Group 3 Mortgage Loans as of the Cut-off Date are Balloon Loans. Approximately 62.00% of the Group 4 Mortgage Loans as of the Cut-off Date are Balloon Loans.  The Scheduled Payment for each Balloon Loan is based on an amortization schedule of 480 or 600 months, except for the final payment (the "**Balloon Payment**") which is due and payable on the 360th month following origination of such Mortgage Loan.  The amount of the Balloon Payment on each Balloon Loan is substantially in excess of the amount of the Scheduled Payment for such Mortgage Loan and may represent a substantial portion of the original principal balance of such Mortgage Loan.  The Mortgage Pool includes both fixed rate and adjustable rate Balloon Loans.  The Servicer will not make any advances with respect to the unpaid principal balance of a Balloon Loan remaining at maturity.  See "Description of the Certificates—Advances in Respect of Delinquencies" in this information circular. Appendix A contains information relating to the amount of Balloon Loans.

The weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 80.08%.  The weighted average original Loan-to-Value Ratio of the Group 1 Mortgage Loans was approximately 81.43%.  The weighted average original Loan-to-Value Ratio of the Group 2 Mortgage Loans was approximately 76.29%.  The weighted average original Loan-to-Value Ratio of the Group 3 Mortgage Loans was approximately 83.06%.  The weighted average original Loan-to-Value Ratio of the Group 4 Mortgage Loans was approximately 80.74%.  The "**Loan-to-Value Ratio**" of a Mortgage Loan is calculated using the lesser of (i) the appraised value of the related Mortgaged Property based on an appraisal made for the Sponsor by an independent fee appraiser at the time of the origination of the related Mortgage Loan and (ii) the sale price for such Mortgaged Property at the time of origination. For the purpose of calculating the Loan-to-Value Ratio of any Mortgage Loan that is the result of the refinancing (including a refinancing for "equity take out" purposes) of an existing mortgage loan, the appraised value of the related Mortgaged Property is generally determined by reference to an appraisal.  There can be no assurance that such appraisal, which is based on the independent judgment of an appraiser and not an arms-length sales transaction, is an accurate representation of the market value of a Mortgaged Property.  See "Description of the Mortgage Loans" in this information circular.  No assurance can be given that the values of the Mortgaged Properties securing the Mortgage Loans have remained or will remain at the levels used in calculating the Loan-to-Value Ratios shown in Appendix A. Neither the Depositor nor the Sponsor has taken any action to establish the current value of any Mortgaged Property. See "Risk Factors—Risks Associated with the Mortgage Loans—Geographic Concentration May Increase Rates of Loss Because of Adverse Economic Conditions or Natural Disasters" in this information circular.

The weighted average Credit Score of the Mortgage Loans as of the Cut-off Date was approximately 630. The weighted average Credit Score of the Group 1 Mortgage Loans as of the Cut-off Date was approximately 613. The weighted average Credit Score of the Group 2 Mortgage Loans as of the Cut-off Date was approximately 620. The weighted average Credit Score of the Group 3 Mortgage Loans as of the Cut-off Date was approximately 639. The weighted average Credit Score of the Group 4 Mortgage Loans as of the Cut-off Date was approximately 636. The Credit Scores (the "**Credit Scores**") are generated by models developed by a third party and are made available to lenders through three national credit bureaus.  The models were derived by analyzing data on consumers in order to establish patterns which are believed to be indicative of the mortgagor's probability of default.  The Credit Score is based on a mortgagor's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit, and bankruptcy experience. Credit Scores range from approximately 350 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score.  However, a Credit Score purports only to be a measurement of the relative degree of risk a mortgagor represents to a lender, i.e., that a mortgagor with a higher score is statistically expected to be less likely to default in payment than a mortgagor with a lower score.  In addition, it should be noted that Credit Scores were developed to indicate a level of default probability over a two-year period which does not correspond to the life of a mortgage loan.  Furthermore, Credit Scores were not developed specifically for use in connection with mortgage loans, but for consumer loans in general.  Therefore, a Credit Score does not take into consideration the effect of mortgage loan characteristics on the probability of prepayment by the mortgagor. None of the Depositor, First Franklin Financial or the Servicer makes any representations or warranties as to the actual

performance of any Mortgage Loan or that a particular Credit Score should be relied upon as a basis for an expectation that the mortgagor will repay the Mortgage Loan according to its terms.

As used herein, the Credit Score of a Mortgage Loan is generally equal to the lower of two credit scores or the middle of three credit scores for two file and three file credit reports, respectively.  For all of the Mortgage Loans, the credit report and the related Credit Score are generated during the underwriting of the Mortgage Loans by the originator and generally within forty-five (45) days of the origination date.

**Index**

The index for all of the Adjustable Rate Mortgage Loans will be Six-Month LIBOR (the "**Index**"). "**Six-Month LIBOR**" is defined as the average of interbank offered rates for six-month U.S. dollar deposits in the London market, as published in *The Wall Street Journal* and most recently available as of the first day of the calendar month prior to the applicable Adjustment Date.  In the event that the Index is no longer available, the Servicer will select a substitute index in accordance with the terms of the related mortgage note and in compliance with federal and state law.

Listed below are historical averages of the Index for the months and years shown.  The monthly averages shown are intended only to provide a historical summary of the movements in yields on the Index and may not be indicative of future rates.  The source of the daily values of the Index used in determining the monthly averages shown below is *Bloomberg Professional Services®*.

| | Year | | | | | |
|---|---|---|---|---|---|---|
| **Month** | **2007** | **2006** | **2005** | **2004** | **2003** | **2002** |
| January | 5.38% | 4.73% | 2.89% | 1.19% | 1.37% | 1.93% |
| February | 5.39 | 4.92 | 3.05 | 1.19 | 1.34 | 2.04 |
| March | 5.32 | 5.05 | 3.28 | 1.16 | 1.26 | 2.24 |
| April | 5.35 | 5.20 | 3.38 | 1.28 | 1.28 | 2.21 |
| May | 5.37 | 5.29 | 3.49 | 1.52 | 1.23 | 2.10 |
| June | 5.39 | 5.49 | 3.61 | 1.81 | 1.08 | 2.00 |
| July | 5.38 | 5.58 | 3.83 | 1.89 | 1.12 | 1.91 |
| August | 5.37 | 5.48 | 4.02 | 1.94 | 1.20 | 1.76 |
| September | 5.37 | 5.41 | 4.05 | 2.09 | 1.19 | 1.78 |
| October | 5.06 | 5.39 | 4.35 | 2.23 | 1.20 | 1.74 |
| November | 4.83 | 5.37 | 4.55 | 2.50 | 1.24 | 1.46 |
| December | | 5.35 | 4.67 | 2.71 | 1.24 | 1.42 |

Interest on the Mortgage Loans is calculated based on a 360-day year of twelve 30-day months.  When a full prepayment of principal is made on a Mortgage Loan during a month, the mortgagor is charged interest only on the days of the month actually elapsed up to the date of such prepayment, at a daily interest rate that is applied to the principal amount of such prepaid mortgage loan.  When a partial prepayment of principal is made on a Mortgage Loan during a month, the mortgagor generally is not charged interest on the amount of the partial prepayment during the month in which such prepayment is made.

As of the Cut-off Date, none of the Mortgage Loans were Delinquent and none of the Adjustable Rate Mortgage Loans had Mortgage Rates that may be converted to fixed Mortgage Rates at the option of the related mortgagor.  A Mortgage Loan is considered "**Delinquent**" if the scheduled monthly payment of principal and interest on such Mortgage Loan that is payable by the related mortgagor under the related Mortgage Note (the "**Scheduled Payment**") due on a Due Date is not paid by the close of business on the last day of the month in which such payment was due.  Thus, a Mortgage Loan for which the mortgagor failed to make the Scheduled Payment due on the first day of a month will be reported as Delinquent on the first day of the following month if the payment is not made by the close of business on the previous day.

All of the Mortgage Loans have a Scheduled Payment due date (each, a "**Due Date**") on the first day of each month.  Any Scheduled Payments due on the Mortgage Loans after the Cut-off Date will be part of the Issuing Entity.

Each of the Mortgage Loans is subject to a due-on-sale clause. See "Certain Legal Aspects of the Mortgage Loans—'Due-on-Sale' Clauses" and "The Pooling and Servicing Agreement—Due-on-Sale Provisions" in this information circular.

**Mortgage Loan Data Appearing in Appendix A**

Appendix A contains tables setting forth certain characteristics of the Mortgage Loans. References herein to percentages of Mortgage Loans refer in each case to the percentage of the aggregate principal balance of all of the Mortgage Loans in the Issuing Entity as of the Cut-off Date, based on the aggregate outstanding principal balance of approximately $26,235,467, after giving effect to Scheduled Payments due on or prior to the Cut-off Date, whether or not received. References to percentages of Mortgaged Properties refer, in each case, to the percentages of aggregate unpaid principal balances of the related Mortgage Loans (determined as described in the preceding sentence). The sum of the columns set forth in such tables may not equal the total indicated due to rounding.

**Mandatory Repurchase or Substitution of Mortgage Loans**

The Sponsor is required, with respect to Mortgage Loans that are found to have defective or missing documentation, or in respect of which the Sponsor has breached a representation or warranty, either to repurchase such Mortgage Loans or, if within two years of the date of initial issuance of the Certificates, to substitute new Mortgage Loans therefore; provided however that with respect to the breach of certain representations and warranties deemed to materially and adversely affect certificateholders, the Sponsor will automatically be required to repurchase such Mortgage Loan or substitute a new Mortgage Loan therefor. See "Prepayment and Yield Considerations" and "The Pooling and Servicing Agreement—Assignment of Mortgage Loans; Representations and Warranties; Repurchases" in this information circular.

**Optional Purchase of Mortgage Loans**

The Guarantor may, at its option, and subject to certain requirements set forth in the Pooling and Servicing Agreement, purchase for the Purchase Price any Mortgage Loan that becomes 120 days or more Delinquent.

## CERTAIN LEGAL ASPECTS OF THE MORTGAGE LOANS

The following discussion contains summaries, which are general in nature, of certain state law legal aspects of loans secured by single-family residential properties. Because such legal aspects are governed primarily by the applicable laws of the state in which the related Mortgaged Property is located (which laws may differ substantially), the summaries do not purport to be complete nor to reflect the laws of any particular state, nor to encompass the laws of all states in which the security for the Mortgage Loans is situated. The summaries are qualified in their entirety by reference to the applicable federal and state laws governing the Mortgage Loans.

**General**

All of the Mortgage Loans are loans evidenced by a note or bond and secured by instruments granting a security interest in real property which may be mortgages, deeds of trust, security deeds or deeds to secure debt, depending upon the prevailing practice and law in the state in which the mortgaged property is located. Mortgages, deeds of trust and deeds to secure debt are herein collectively referred to as "mortgages." Any of the foregoing types of mortgages will create a lien upon, or grant a title interest in, the subject property, the priority of which will depend on the terms of the particular security instrument, as well as separate, recorded, contractual arrangements with others holding interests in the mortgaged property, the knowledge of the parties to such instrument as well as the order of recordation of the instrument in the appropriate public recording office. However, recording does not generally establish priority over governmental claims for real estate taxes and assessments and other charges imposed under governmental police powers.

**Types of Mortgage Instruments**

A mortgage either creates a lien against or constitutes a conveyance of real property between two parties--a mortgagor (the mortgagor and usually the owner of the subject property) and a mortgagee (the lender). In contrast, a deed of trust is a three-party instrument, among a trustor (the equivalent of a mortgagor), a trustee to whom the mortgaged property is conveyed, and a beneficiary (the lender) for whose benefit the conveyance is made. As used in this information circular, unless the context otherwise requires, "mortgagor" includes the trustor under a deed of trust and a grantor under a security deed or a deed to secure debt. Under a deed of trust, the mortgagor grants the property, irrevocably until the debt is paid, in trust, generally with a power of sale as security for the indebtedness evidenced by the related note. A deed to secure debt typically has two parties. By executing a deed to secure debt, the grantor conveys title to, as opposed to merely creating a lien upon, the subject property to the grantee until such time as the underlying debt is repaid, generally with a power of sale as security for the indebtedness evidenced by the related mortgage note. In case the mortgagor under a mortgage is a land trust, there would be an additional party because legal title to the property is held by a land trustee under a land trust agreement for the benefit of the mortgagor. At origination of a mortgage loan involving a land trust, the mortgagor executes a separate undertaking to make payments on the mortgage note. The mortgagee's authority under a mortgage, the trustee's authority under a deed of trust and the grantee's authority under a deed to secure debt are governed by the express provisions of the mortgage, the law of the state in which the real property is located, certain federal laws (including, without limitation, the Relief Act) and, in some cases, of deed of trust transactions, the directions of the beneficiary.

**Interest in Real Property**

The real property covered by a mortgage, deed of trust, security deed or deed to secure debt is most often the fee estate in land and improvements. However, such an instrument may encumber other interests in real property such as a tenant's interest in a lease of land or improvements, or both, and the leasehold estate created by such lease. An instrument covering an interest in real property other than the fee estate requires special provisions in the instrument creating such interest or in the mortgage, deed of trust, security deed or deed to secure debt, to protect the mortgagee against termination of such interest before the mortgage, deed of trust, security deed or deed to secure debt is paid.

**Condominiums**

Certain of the Mortgage Loans are loans secured by condominium units.  The condominium building may be a multi-unit building or buildings, or a group of buildings whether or not attached to each other, located on property subject to condominium ownership.  Condominium ownership is a form of ownership of real property as to which each owner is entitled to the exclusive ownership and possession of his or her individual condominium unit.  The owner also owns a proportionate undivided interest in all parts of the condominium building (other than the other individual condominium units) and all areas or facilities, if any, for the common use of the condominium units.   The condominium unit owners appoint or elect the condominium association to govern the affairs of the condominium.

**Two-Family Units**

Mortgages that encumber two-family units may contain an assignment of rents and leases, pursuant to which the mortgagor assigns to the lender the mortgagor's right, title and interest as landlord under each lease and the income derived therefrom, while retaining a revocable license to collect the rents for so long as there is no default.  If the mortgagor defaults, the license terminates and the lender is entitled to collect the rents.  Local law may require that the lender take possession of the property and/or obtain a court-appointed receiver before becoming entitled to collect the rents.

**Foreclosure**

*General*

      Foreclosure is a legal procedure that allows the mortgagee to recover its mortgage debt by enforcing its rights and available legal remedies under the mortgage. If the mortgagor defaults in payment or performance of its obligations under the note or mortgage, the mortgagee has the right to institute foreclosure proceedings to sell the mortgaged property at public auction to satisfy the indebtedness.

      Foreclosure procedures with respect to the enforcement of a mortgage vary from state to state. Two primary methods of foreclosing a mortgage are judicial foreclosure and non-judicial foreclosure pursuant to a power of sale granted in the mortgage instrument. There are several other foreclosure procedures available in some states that are either infrequently used or available only in certain limited circumstances, such as strict foreclosure.

*Judicial Foreclosure*

      A judicial foreclosure proceeding is conducted in a court having jurisdiction over the mortgaged property. Generally, the action is initiated by the service of legal pleadings upon all parties having an interest of record in the real property. Delays in completion of the foreclosure may occasionally result from difficulties in locating defendants. When the lender's right to foreclose is contested, the legal proceedings can be time-consuming. Upon successful completion of a judicial foreclosure proceeding, the court generally issues a judgment of foreclosure and appoints a referee or other officer to conduct a public sale of the mortgaged property, the proceeds of which are used to satisfy the judgment. Such sales are made in accordance with procedures that vary from state to state.

*Equitable Limitations on Enforceability of Certain Provisions*

      United States courts have traditionally imposed general equitable principles to limit the remedies available to a mortgagee in connection with foreclosure. These equitable principles are generally designed to relieve the mortgagor from the legal effect of mortgage defaults, to the extent that such effect is perceived as harsh or unfair. Relying on such principles, a court may alter the specific terms of a loan to the extent it considers necessary to prevent or remedy an injustice, undue oppression or overreaching, or may require the lender to undertake affirmative and expensive actions to determine the cause of the mortgagor's default and the likelihood that the mortgagor will be able to reinstate the loan. In some cases, courts have substituted their judgment for the lender's and have required that lenders reinstate loans or recast payment schedules in order to accommodate mortgagors who are suffering from a temporary financial disability. In other cases, courts have limited the right of the lender to foreclose if the default under the mortgage is not monetary, e.g., the mortgagor failed to maintain the mortgaged property adequately or the mortgagor executed a junior mortgage on the mortgaged property. The exercise by the court of its equity powers will depend on the individual circumstances of each case presented to it. Finally, some courts have been faced with the issue of whether federal or state constitutional provisions reflecting due process concerns for adequate notice require that a mortgagor receive notice in addition to statutorily-prescribed minimum notice. For the most part, these cases have upheld the reasonableness of the notice provisions or have found that a public sale under a mortgage providing for a power of sale does not involve sufficient state action to afford constitutional protections to the mortgagor.

*Non-Judicial Foreclosure/Power of Sale*

      Foreclosure of a deed of trust is generally accomplished by a non-judicial trustee's sale pursuant to the power of sale granted in the deed of trust. A power of sale is typically granted in a deed of trust. It may also be contained in any other type of mortgage instrument. A power of sale allows a non-judicial public sale to be conducted generally following a request from the beneficiary/lender to the trustee to sell the property upon any default by the mortgagor under the terms of the mortgage note or the mortgage instrument and after notice of sale is given in accordance with the terms of the mortgage instrument, as well as applicable state law. In some states, prior to such sale, the trustee under a deed of trust must record a notice of default and notice of sale and send a copy to the mortgagor and to any other party who has recorded a request for a copy of a notice of default and notice of sale. In addition, in some states the trustee must provide notice to any other party having an interest of record in the real property, including junior lienholders. A notice of sale must be posted in a public place and, in most states, published for a specified period of time in one or more newspapers. The mortgagor or junior lienholder may then have the right, during a reinstatement

46

period required in some states, to cure the default by paying the entire actual amount in arrears (without acceleration) plus the expenses incurred in enforcing the obligation. In other states, the mortgagor or the junior lienholder is not provided a period to reinstate the loan, but has only the right to pay off the entire debt to prevent the foreclosure sale. Generally, the procedure for public sale, the parties entitled to notice, the method of giving notice and the applicable time periods are governed by state law and vary among the states. Foreclosure of a deed to secure debt is also generally accomplished by a non-judicial sale similar to that required by a deed of trust, except that the lender or its agent, rather than a trustee, is typically empowered to perform the sale in accordance with the terms of the deed to secure debt and applicable law.

*Public Sale*

A third party may be unwilling to purchase a mortgaged property at a public sale because of the difficulty in determining the value of such property at the time of sale, due to, among other things, redemption rights which may exist and the possibility of physical deterioration of the property during the foreclosure proceedings. For these reasons, it is common for the lender to purchase the mortgaged property for an amount equal to or less than the underlying debt and accrued and unpaid interest plus the expenses of foreclosure. Generally, state law controls the amount of foreclosure costs and expenses which may be recovered by a lender. Thereafter, subject to the mortgagor's right in some states to remain in possession during a redemption period, if applicable, the lender will become the owner of the property and have both the benefits and burdens of ownership of the mortgaged property. For example, the lender will become obligated to pay taxes, obtain casualty insurance and to make such repairs at its own expense as are necessary to render the property suitable for sale. The lender will commonly obtain the services of a real estate broker and pay the broker's commission in connection with the sale of the property. Depending upon market conditions, the ultimate proceeds of the sale of the property may not equal the lender's investment in the property. Moreover, a lender commonly incurs substantial legal fees and court costs in acquiring a mortgaged property through contested foreclosure and/or bankruptcy proceedings. Generally, state law controls the amount of foreclosure expenses and costs, including attorneys' fees, that may be recovered by a lender.

A junior mortgagee may not foreclose on the property securing the junior mortgage unless it forecloses subject to senior mortgages and any other prior liens, in which case it may be obliged to make payments on the senior mortgages to avoid their foreclosure. In addition, in the event that the foreclosure of a junior mortgage triggers the enforcement of a "due-on-sale" clause contained in a senior mortgage, the junior mortgagee may be required to pay the full amount of the senior mortgage to avoid its foreclosure. Accordingly, with respect to those Mortgage Loans, if any, that are junior mortgage loans, if the lender purchases the property the lender's title will be subject to all senior mortgages, prior liens and certain governmental liens.

The proceeds received by the referee or trustee from the sale are applied first to the costs, fees and expenses of sale and then in satisfaction of the indebtedness secured by the mortgage under which the sale was conducted. Any proceeds remaining after satisfaction of senior mortgage debt are generally payable to the holders of junior mortgages and other liens and claims in order of their priority, whether or not the mortgagor is in default. Any additional proceeds are generally payable to the mortgagor. The payment of the proceeds to the holders of junior mortgages may occur in the foreclosure action of the senior mortgage or a subsequent ancillary proceeding or may require the institution of separate legal proceedings by such holders.

*Rights of Redemption*

The purposes of a foreclosure action are to enable the mortgagee to realize upon its security and to bar the mortgagor, and all persons who have an interest in the property which is subordinate to the mortgage being foreclosed, from exercise of their "equity of redemption." The doctrine of equity of redemption provides that, until the property covered by a mortgage has been sold in accordance with a properly conducted foreclosure and foreclosure sale, those having an interest which is subordinate to that of the foreclosing mortgagee have an equity of redemption and may redeem the property by paying the entire debt with interest. In addition, in some states, when a foreclosure action has been commenced, the redeeming party must pay certain costs of such action. Those having an equity of redemption must generally be made parties and joined in the foreclosure proceeding in order for their equity of redemption to be cut off and terminated.

47

The equity of redemption is a common law (non-statutory) right which exists prior to completion of the foreclosure, is not waivable by the mortgagor, must be exercised prior to foreclosure sale and should be distinguished from the post-sale statutory rights of redemption. In some states, after sale pursuant to a deed of trust or foreclosure of a mortgage, the mortgagor and foreclosed junior lienors are given a statutory period in which to redeem the property from the foreclosure sale. In some states, statutory redemption may occur only upon payment of the foreclosure sale price. In other states, redemption may be authorized if the former mortgagor pays only a portion of the sums due. The effect of a statutory right of redemption is to diminish the ability of the lender to sell the foreclosed property. The exercise of a right of redemption would defeat the title of any purchaser from a foreclosure sale or sale under a deed of trust. Consequently, the practical effect of the redemption right is to force the lender to maintain the property and pay the expenses of ownership until the redemption period has expired. In some states, a post-sale statutory right of redemption may exist following a judicial foreclosure, but not following a trustee's sale under a deed of trust.

**Anti-Deficiency Legislation, the Bankruptcy Code and Other Limitations on Lenders**

Statutes in some states limit the right of a beneficiary under a deed of trust or a mortgagee under a mortgage to obtain a deficiency judgment against the mortgagor following foreclosure or sale under a deed of trust. A deficiency judgment would be a personal judgment against the former mortgagor equal to the difference between the net amount realized upon the public sale of the real property and the amount due to the lender. Some states require the lender to exhaust the security afforded under a mortgage by foreclosure in an attempt to satisfy the full debt before bringing a personal action against the mortgagor. In certain other states, the lender has the option of bringing a personal action against the mortgagor on the debt without first exhausting such security; however, in some of these states, the lender, following judgment on such personal action, may be deemed to have elected a remedy and may be precluded from exercising remedies with respect to the security. In some cases, a lender will be precluded from exercising any additional rights under the note or mortgage if it has taken any prior enforcement action. Consequently, the practical effect of the election requirement, in those states permitting such election, is that lenders will usually proceed against the security first rather than bringing a personal action against the mortgagor. Finally, other statutory provisions limit any deficiency judgment against the former mortgagor following a judicial sale to the excess of the outstanding debt over the fair market value of the property at the time of the public sale. The purpose of these statutes is generally to prevent a lender from obtaining a large deficiency judgment against the former mortgagor as a result of low or no bids at the judicial sale.

In addition to laws limiting or prohibiting deficiency judgments, numerous other federal and state statutory provisions, including the federal bankruptcy laws and state laws affording relief to debtors, may interfere with or affect the ability of the secured mortgage lender to realize upon collateral or enforce a deficiency judgment. For example, under the Bankruptcy Code, virtually all actions (including foreclosure actions and deficiency judgment proceedings) are automatically stayed upon the filing of a bankruptcy petition, and, usually, no interest or principal payments are made during the course of the bankruptcy case. Foreclosure of an interest in real property of a debtor in a case under the Bankruptcy Code can typically occur only if the bankruptcy court vacates the stay, an action, the court may be reluctant to take, particularly if the debtor has the prospect of restructuring his or her debts and the mortgage collateral is not deteriorating in value. The delay and the consequences thereof caused by such automatic stay can be significant. Also, under the Bankruptcy Code, the filing of a petition in bankruptcy by or on behalf of a junior lienor (a subordinate lender secured by a mortgage on the property) may stay a senior lender from taking action to foreclose.

A homeowner may file for relief under the Bankruptcy Code under any of three different chapters of the Bankruptcy Code. Under Chapter 7, the assets of the debtor are liquidated and a lender secured by a lien may "bid in" (*i.e.,* bid up to the amount of the debt) at the sale of the asset. See "—Foreclosure" above. A homeowner may also file for relief under Chapter 11 of the Bankruptcy Code and reorganize his or her debts through his or her reorganization plan. Alternatively, a homeowner may file for relief under Chapter 13 of the Bankruptcy Code and address his or her debts in a rehabilitation plan. (Chapter 13 is often referred to as the "wage earner chapter" or "consumer chapter" because most individuals seeking to restructure their debts file for relief under Chapter 13 rather than Chapter 11).

The Bankruptcy Code permits a mortgage loan that is secured by property that does not consist solely of the debtor's principal residence to be modified without the consent of the lender provided certain substantive and procedural safeguards are met. Under the Bankruptcy Code, the lender's security interest may be reduced to the then-current value of the property as determined by the court if the value is less than the amount due on the loan, thereby leaving the lender as a general unsecured creditor for the difference between the value of the collateral and the

48

outstanding balance of the mortgage loan.  A mortgagor's unsecured indebtedness will typically be discharged in full upon payment of a substantially reduced amount.  Other modifications to a mortgage loan may include a reduction in the amount of each scheduled payment, which reduction may result from a reduction in the rate of interest, an alteration of the repayment schedule, an extension of the final maturity date, and/or a reduction in the outstanding balance of the secured portion of the loan.  In certain circumstances, subject to the court's approval, a debtor in a case under Chapter 11 of the Bankruptcy Code may have the power to grant liens senior to the lien of a mortgage.

A reorganization plan under Chapter 11 and a rehabilitation plan under Chapter 13 of the Bankruptcy Code may each allow a debtor to cure a default with respect to a mortgage loan on such debtor's residence by paying arrearages over a period of time and to decelerate and reinstate the original mortgage loan payment schedule, even though the lender accelerated the loan and a final judgment of foreclosure had been entered in state court (provided no sale of the property had yet occurred) prior to the filing of the debtor's petition under the Bankruptcy Code. Under a Chapter 13 plan, curing of defaults must be accomplished within the five year maximum term permitted for repayment plans, such term commencing when repayment plan becomes effective, while defaults may be cured over a longer period of time under a Chapter 11 plan of reorganization.

Generally, a repayment plan in a case under Chapter 13 and a plan of reorganization under Chapter 11 may not modify the claim of a mortgage lender if the mortgagor elects to retain the property, the property is the mortgagor's principal residence and the property is the lender's only collateral.  Certain courts have allowed modifications when the mortgage loan is secured both by the debtor's principal residence and by collateral that is not "inextricably bound" to the real property, such as appliances, machinery, or furniture.

The general protection for mortgages secured only by the debtor's principal residence is not applicable in a case under Chapter 13 if the last payment on the original payment schedule is due before the final date for payment under the debtor's Chapter 13 plan (which date could be up to five years after the debtor emerges from bankruptcy). Under several recently decided cases, the terms of such a loan can be modified in the manner described above. While these decisions are contrary to the holding in a prior case by a senior appellate court, it is possible that the later decisions will become the accepted interpretation in view of the language of the applicable statutory provision. If this interpretation is adopted by a court considering the treatment in a Chapter 13 repayment plan of a Mortgage Loan, it is possible that the Mortgage Loan could be modified.

State statutes and general principles of equity may also provide a mortgagor with means to halt a foreclosure proceeding or sale and to force a restructuring of a mortgage loan on terms a lender would not otherwise accept.

In a bankruptcy or similar proceeding of a mortgagor, action may be taken seeking the recovery, as a preferential transfer or on other grounds, of any payments made by the mortgagor under the related mortgage loan prior to the bankruptcy or similar proceeding.  Payments on long-term debt may be protected from recovery as preferences if they are payments in the ordinary course of business made on debts incurred in the ordinary course of business or if the value of the collateral exceeds the debt at the time of payment.  Whether any particular payment would be protected depends upon the facts specific to a particular transaction.

A trustee in bankruptcy, in some cases, may be entitled to collect its costs and expenses in preserving or selling the mortgaged property ahead of a payment to the lender.  Moreover, the laws of certain states also give priority to certain tax and mechanics liens over the lien of a mortgage.  Under the Bankruptcy Code, if the court finds that actions of the mortgagee have been unreasonable and inequitable, the lien of the related mortgage may be subordinated to the claims of unsecured creditors.

The Code provides priority to certain tax liens over the lien of the mortgage.   In addition, substantive requirements are imposed upon mortgage lenders in connection with the origination and the servicing of mortgage loans by numerous federal and some state consumer protection laws.  These laws include the federal Truth-in-Lending Act, Real Estate Settlement Procedures Act, Equal Credit Opportunity Act, Fair Credit Billing Act, Fair Credit Reporting Act, and related statutes.  These federal laws impose specific statutory liabilities upon lenders who originate mortgage loans and who fail to comply with the provisions of the applicable laws.  In some cases, this liability may affect assignees of the Mortgage Loans.

**Forfeiture for Drug, RICO and Money Laundering Violations**

Federal law provides that property purchased or improved with assets derived from criminal activity or otherwise tainted, or used in the commission of certain offenses, can be seized and ordered forfeited to the United States of America. The offenses which can trigger such a seizure and forfeiture include, among others, violations of the Racketeer Influenced and Corrupt Organizations Act, the Bank Secrecy Act, the anti-money laundering laws and regulations, including the USA Patriot Act of 2001 and the regulations issued thereunder, as well as the narcotic drug laws. In many instances, the United States may seize the property even before a conviction occurs.

In the event of a forfeiture proceeding, a lender may be able to establish its interest in the property by proving that (i) its mortgage was executed and recorded before the commission of the illegal conduct from which the assets used to purchase or improve the property were derived or before the commission of any other crime upon which the forfeiture is based, or (2) the lender, at the time of the execution of the mortgage, "did not know or was reasonably without cause to believe that the property was subject to forfeiture." However, there can be no assurance that such a defense will be successful.

**Servicemembers Civil Relief Act**

Generally, under the terms of the Servicemembers Civil Relief Act (the "**Relief Act**"), a mortgagor who enters military service after the origination of such mortgagor's Mortgage Loan (including a mortgagor who is a member of the National Guard or is in reserve status at the time of the origination of the Mortgage Loan and is later called to active duty) may not be charged interest, including fees and charges, above an annual rate of 6% during the period of such mortgagor's active duty status. In addition to adjusting the interest, the lender must forgive any such interest in excess of 6% per annum, unless a court or administrative agency orders otherwise upon application of the lender. It is possible that such action could have an effect, for an indeterminate period of time, on the ability of the Servicer to collect full amounts of interest on certain of the Mortgage Loans in the Issuing Entity. Any shortfall in interest collections resulting from the application of the Relief Act or any amendment thereto could result in losses to the holders of the Certificates if the Guarantor fails to make the payments required pursuant to the Guarantee. Further, the Relief Act imposes limitations which would impair the ability of the Servicer to foreclose on an affected Mortgage Loan during the mortgagor's period of active duty status. Thus, in the event that such a Mortgage Loan goes into default, there may be delays and losses occasioned by the inability to realize upon the mortgaged property in a timely fashion. In addition, the Relief Act provides broad discretion for a court to modify a Mortgage Loan upon application of the mortgagor. Certain states have enacted comparable legislation which may lead to the modification of a Mortgage Loan or interfere with or affect the ability of the Servicer to timely collect payments of principal and interest on, or to foreclose on, Mortgage Loans of mortgagors in such states who are active or reserve members of the armed services or the national guard. For example, California has enacted legislation providing protection substantially similar to that provided by the Relief Act to California national guard members called up for active service by the Governor or President and to reservists called to active duty.

**Environmental Considerations**

A lender may be subject to unforeseen environmental risks when taking a security interest in real or personal property. Property subject to such a security interest may be subject to federal, state, and local laws and regulations relating to environmental protection. Such laws may regulate, among other things: emissions of air pollutants; discharges of wastewater or storm water; generation, transport, storage or disposal of hazardous waste or hazardous substances; operation, closure and removal of underground storage tanks; removal and disposal of asbestos-containing materials; management of electrical or other equipment containing polychlorinated biphenyls ("**PCBs**"). Failure to comply with such laws and regulations may result in significant penalties, including civil and criminal fines. Under the laws of certain states, environmental contamination on a property may give rise to a lien on the property to ensure the availability and/or reimbursement of cleanup costs. Generally all subsequent liens on such property are subordinated to such a lien and, in some states, even prior recorded liens are subordinated to such liens ("**Superliens**"). In the latter states, the security interest of the Trustee in a property that is subject to such a Superlien could be adversely affected.

Under the federal Comprehensive Environmental Response, Compensation and Liability Act, as amended ("**CERCLA**"), and under state law in certain states, a secured party which takes a deed in lieu of foreclosure,

purchases a mortgaged property at a foreclosure sale, operates a mortgaged property or undertakes certain types of activities that may constitute management of the mortgaged property may become liable in certain circumstances for the costs of remedial action ("**Cleanup Costs**") if hazardous wastes or hazardous substances have been released or disposed of on the property.  Such Cleanup Costs may be substantial and could exceed the value of the property and the aggregate assets of the owner or operator.  CERCLA imposes strict, as well as joint and several liability for environmental remediation and/or damage costs on several classes of "potentially responsible parties," including current "owners and/or operators" of property, irrespective of whether those owners or operators caused or contributed to contamination on the property.  In addition, owners and operators of properties that generate hazardous substances that are disposed of at other "off-site" locations may be held strictly, jointly and severally liable for environmental remediation and/or damages at those off-site locations.  Many states also have laws that are similar to CERCLA. Liability under CERCLA or under similar state law could exceed the value of the property itself as well as the aggregate assets of the property owner.

The law is unclear as to whether and under what precise circumstances cleanup costs, or the obligation to take remedial actions, could be imposed on a secured lender.  Under the laws of some states and under CERCLA, a lender may be liable as an "owner or operator" for costs of addressing releases or threatened releases of hazardous substances on a mortgaged property if such lender or its agents or employees have "participated in the management" of the operations of the mortgagor, even though the environmental damage or threat was caused by a prior owner or current owner or operator or other third party. Excluded from CERCLA's definition of "owner or operator," is a person "who without participating in the management of . . . [the] facility, holds indicia of ownership primarily to protect his security interest" (the "**secured-creditor exemption**"). This exemption for holders of a security interest such as a secured lender applies only to the extent that a lender seeks to protect its security interest in the contaminated facility or property.  Thus, if a lender's activities begin to encroach on the actual management of such facility or property, the lender faces potential liability as an "owner or operator" under CERCLA.  Similarly, when a lender forecloses and takes title to a contaminated facility or property, the lender may incur potential CERCLA liability in various circumstances including, among others, when it holds the facility or property as an investment (including leasing the facility or property to a third party), fails to market the property in a timely fashion or fails to properly address environmental conditions at the property or facility.

The Resource Conservation and Recovery Act, as amended ("**RCRA**"), contains a similar secured-creditor exemption for those lenders who hold a security interest in a petroleum underground storage tank ("**UST**") or in real estate containing a UST, or that acquire title to a petroleum UST or facility or property on which such a UST is located. As under CERCLA, a lender may lose its secured-creditor exemption and be held liable under RCRA as a UST owner or operator if such lender or its employees or agents participate in the management of the UST. In addition, if the lender takes title to or possession of the UST or the real estate containing the UST, under certain circumstances the secured-creditor exemption may be deemed to be unavailable.

A decision in May 1990 of the United States Court of Appeals for the Eleventh Circuit in *United States v. Fleet Factors Corp.* very narrowly construed CERCLA's secured-creditor exemption.  The court's opinion suggested that a lender need not have involved itself in the day-to-day operations of the facility or participated in decisions relating to hazardous waste to be liable under CERCLA, rather, liability could attach to a lender if its involvement with the management of the facility were broad enough to support the inference that the lender had the capacity to influence the mortgagor's treatment of hazardous waste.  The court added that a lender's capacity to influence such decisions could be inferred from the extent of its involvement in the facility's financial management.  A subsequent decision by the United States Court of Appeals for the Ninth Circuit in *In re Bergsoe Metal Corp.*, apparently disagreeing with, but not expressly contradicting, the *Fleet Factors* court, held that a secured lender had no liability absent "some actual management of the facility" on the part of the lender.

Court decisions have taken varying views of the scope of the secured-creditor exemption, leading to administrative and legislative efforts to provide guidance to lenders on the scope of activities that would trigger CERCLA and/or RCRA liability.  Until recently, these efforts have failed to provide substantial guidance.

On September 30, 1996, however, the President signed into law the Asset Conservation Lender Liability and Deposit Insurance Protection Act of 1996 (the "**Asset Conservation Act**"). The Asset Conservation Act was intended to clarify the scope of the secured-creditor exemption under both CERCLA and RCRA.  The Asset Conservation Act more explicitly defined the kinds of "participation in management" that would trigger liability under CERCLA and

specified certain activities that would not constitute "participation in management" or otherwise result in a forfeiture of the secured-creditor exemption prior to foreclosure or during a workout period. The Asset Conservation Act also clarified the extent of protection against liability under CERCLA in the event of foreclosure and authorized certain regulatory clarifications of the scope of the secured-creditor exemption for purposes of RCRA, similar to the statutory protections under CERCLA. However, since the courts have not yet had the opportunity to interpret the new statutory provisions, the scope of the additional protections offered by the Asset Conservation Act is not fully defined.  It also is important to note that the Asset Conservation Act does not offer complete protection to lenders and that the risk of liability remains.

If a secured lender does become liable, it may be entitled to bring an action for contribution against the owner or operator who created the environmental contamination or against some other liable party, but that person or entity may be bankrupt or otherwise judgment-proof.  It is therefore possible that cleanup or other environmental liability costs could become a liability of the Issuing Entity and occasion a loss to the Issuing Entity and to certificateholders in certain circumstances.  The secured creditor amendments to CERCLA, also, would not necessarily affect the potential for liability in actions by either a state or a private party under other federal or state laws which may impose liability on "owners or operators" but do not incorporate the secured-creditor exemption.

Traditionally, residential mortgage lenders have not taken steps to evaluate whether hazardous wastes or hazardous substances are present with respect to any mortgaged property prior to the origination of the mortgage loan or prior to foreclosure or accepting a deed-in-lieu of foreclosure. Accordingly, the Sponsor has not made such evaluations prior to the origination of the Mortgage Loans.  Neither the Depositor nor the Servicer is required to undertake any such evaluations prior to foreclosure or accepting a deed-in-lieu of foreclosure.  Neither the Depositor nor the Servicer makes any representations or warranties or assumes any liability with respect to: the environmental condition of such mortgaged property; the absence, presence or effect of hazardous wastes or hazardous substances on any mortgaged property; any casualty resulting from the presence or effect of hazardous wastes or hazardous substances on, near or emanating from such mortgaged property; the impact on certificateholders of any environmental condition or presence of any substance on or near such mortgaged property; or the compliance of any mortgaged property with any environmental laws, nor is any agent, person or entity otherwise affiliated with the Depositor authorized or able to make any such representation, warranty or assumption of liability relative to any such mortgaged property.  See "The Pooling and Servicing Agreement— Assignment of Mortgage Loans; Representations and Warranties; Repurchases," "—Realization Upon Defaulted Mortgage Loans; Servicing Advances" and "—Due-on-Sale Provisions" herein.

**"Due-on-Sale" Clauses**

The forms of note, mortgage and deed of trust relating to conventional mortgage loans may contain a "due-on-sale" clause permitting acceleration of the maturity of a loan if the mortgagor transfers its interest in the property.  Some court decisions and legislative actions placed substantial restrictions on the right of lenders to enforce such clauses in many states.  However, effective October 15, 1982, Congress enacted the Garn-St Germain Depository Institutions Act of 1982 (the "**Garn Act**") which purports to preempt state laws which prohibit the enforcement of "due-on-sale" clauses by providing among other matters, that "due-on-sale" clauses in certain loans (which loans may include the Mortgage Loans) made after the effective date of the Garn Act are enforceable, within certain limitations as set forth in the Garn Act and the regulations promulgated thereunder. "Due-on-sale" clauses contained in mortgage loans originated by federal savings and loan associations or federal savings banks are fully enforceable pursuant to regulations of the Office of Thrift Supervision ("**OTS**"), as successor to the Federal Home Loan Bank Board ("**FHLBB**"), which preempt state law restrictions on the enforcement of such clauses. Similarly, "due-on-sale" clauses in mortgage loans made by national banks and federal credit unions are now fully enforceable pursuant to preemptive regulations of the Comptroller of the Currency and the National Credit Union Administration, respectively.

The Garn Act created a limited exemption from its general rule of enforceability for "due-on-sale" clauses in certain mortgage loans ("**Window Period Loans**") which were originated by non-federal lenders and made or assumed in certain states ("**Window Period States**") during the period, prior to October 15, 1982, in which that state prohibited the enforcement of "due-on-sale" clauses by constitutional provision, statute or statewide court decision (the "**Window Period**"). Though neither the Garn Act nor the OTS regulations actually names the Window Period States, Freddie Mac has taken the position, in prescribing mortgage loan servicing standards with respect to mortgage

loans which it has purchased, that the Window Period States were: Arizona, Arkansas, California, Colorado, Georgia, Iowa, Michigan, Minnesota, New Mexico, Utah and Washington.  Under the Garn Act, unless a Window Period State took action by October 15, 1985, the end of the Window Period, to further regulate enforcement of "due-on-sale" clauses in Window Period Loans, "due-on-sale" clauses would become enforceable even in Window Period Loans. Five of the Window Period States (Arizona, Minnesota, Michigan, New Mexico and Utah) have taken actions which restrict the enforceability of "due-on-sale" clauses in Window Period Loans beyond October 15, 1985. The actions taken vary among such states.

By virtue of the Garn Act, the Servicer may generally be permitted to accelerate any conventional Mortgage Loan which contains a "due-on-sale" clause upon transfer of an interest in the property subject to the mortgage or deed of trust. With respect to any Mortgage Loan secured by a residence occupied or to be occupied by the mortgagor, this ability to accelerate will not apply to certain types of transfers, including (i) the granting of a leasehold interest which has a term of three years or less and which does not contain an option to purchase, (ii) a transfer to a relative resulting from the death of a mortgagor, or a transfer where the spouse or children become an owner of the property in each case where the transferee(s) will occupy the property, (iii) a transfer resulting from a decree of dissolution of marriage, legal separation agreement or from an incidental property settlement agreement by which the spouse becomes an owner of the property, (iv) the creation of a lien or other encumbrance subordinate to the lender's security instrument which does not relate to a transfer of rights of occupancy in the property (provided that such lien or encumbrance is not created pursuant to a contract for deed),  (v) a transfer by devise, descent or operation of law on the death of a joint tenant or tenant by the entirety, (vi) a transfer into an *inter vivos* trust in which the mortgagor is the beneficiary and which does not relate to a transfer of rights of occupancy; and (vii) other transfers as set forth in the Garn Act and the regulations thereunder. Regulations promulgated under the Garn Act also prohibit the imposition of a prepayment penalty upon the acceleration of a loan pursuant to a due-on-sale clause.  The extent of the effect of the Garn Act on the average lives and delinquency rates of the Mortgage Loans cannot be predicted.  See "Prepayment and Yield Considerations."

**Prepayment Penalties**

Some state laws restrict the imposition of prepayment penalties and late fees even when the mortgage loans expressly provide for the collection of those charges.  Although the Alternative Mortgage Transaction Parity Act of 1982 (the "**Parity Act**") permits the collection of Prepayment Penalties and late fees in connection with some types of eligible mortgage loans preempting any contrary state law prohibitions, some states may not recognize the preemptive authority of the Parity Act or have formally opted out of the Parity Act. As a result, it is possible that Prepayment Penalties and late fees may not be collected even on loans that provide for the payment of those charges. The OTS, the agency that administers the Parity Act for unregulated, non-federally chartered housing creditors, withdrew its favorable Parity Act regulations and Chief Counsel Opinions that previously authorized state-chartered housing creditors to charge prepayment penalties and late fees in certain circumstances notwithstanding contrary state law, effective with respect to mortgage loans originated on or after July 1, 2003. However, the OTS's ruling does not retroactively affect mortgage loans originated by such entities before July 1, 2003.

**Subordinate Financing**

Where a mortgagor encumbers mortgaged property with one or more junior liens, the senior lender is subjected to additional risk.  First, the mortgagor may have difficulty servicing and repaying multiple loans.  In addition, if the junior loan permits recourse to the mortgagor (as junior loans often do) and the senior loan does not, a mortgagor may be more likely to repay sums due on the junior loan than those on the senior loan.  Second, acts of the senior lender that prejudice the junior lender or impair the junior lender's security may create a superior equity in favor of the junior lender.  For example, if the mortgagor and the senior lender agree to an increase in the principal amount of or the interest rate payable on the senior loan, the senior lender may lose its priority to the extent any existing junior lender is harmed or the mortgagor is additionally burdened.  Third, if the mortgagor defaults on the senior loan and/or any junior loan or loans, the existence of junior loans and actions taken by junior lenders can impair the security available to the senior lender and can interfere with or delay the taking of action by the senior lender. Moreover, the bankruptcy of a junior lender may operate to stay foreclosure or similar proceedings by the senior lender.

**Applicability of Usury Laws**

Title V of the Depository Institutions Deregulation and Monetary Control Act of 1980, enacted in March 1980 ("**Title V**"), provides that state usury limitations shall not apply to certain types of residential first mortgage loans originated by certain lenders after March 31, 1980.  The OTS as successor to the FHLBB is authorized to issue rules and regulations and to publish interpretations governing implementation of Title V.  The statute authorized any state to reimpose interest rate limits by adopting before April 1, 1983, a law or constitutional provision which expressly rejects application of the federal law.  Fifteen states have adopted laws reimposing or reserving the right to reimpose interest rate limits.  In addition, even where Title V is not so rejected, any state is authorized to adopt a provision limiting certain other loan charges.

The Sponsor will represent and warrant in the Mortgage Loan Purchase Agreement to the Depositor, which will assign such representations and warranties in the Pooling and Servicing Agreement to the Trustee for the benefit of certificateholders and the Guarantor that all Mortgage Loans have been originated in full compliance with applicable state laws, including usury laws.  See "The Pooling and Servicing Agreement—Assignment of Mortgage Loans; Representations and Warranties; Repurchases."

**Enforceability of Certain Provisions**

Standard forms of note, mortgage and deed of trust generally contain provisions obligating the mortgagor to pay a late charge if payments are not timely made and in some circumstances may provide for prepayment fees or penalties if the obligation is paid prior to maturity.  In certain states, there are or may be specific limitations upon late charges which a lender may collect from a mortgagor for delinquent payments. Certain states also limit the amounts that a lender may collect from a mortgagor as an additional charge if the loan is prepaid.

Courts have imposed general equitable principles upon foreclosure.  These equitable principles are generally designed to relieve the mortgagor from the legal effect of defaults under the loan documents.  Examples of judicial remedies that may be fashioned include judicial requirements that the lender undertake affirmative and expensive actions to determine the causes for the mortgagor's default and the likelihood that the mortgagor will be able to reinstate the loan.  In some cases, courts have substituted their judgment for the lender's judgment and have required lenders to reinstate loans or recast payment schedules to accommodate mortgagors who are suffering from temporary financial disability.  In some cases, courts have limited the right of lenders to foreclose if the default under the mortgage instrument is not monetary, such as the mortgagor failing to adequately maintain the property or the mortgagor executing a second mortgage or deed of trust affecting the property.  In other cases, some courts have been faced with the issue of whether federal or state constitutional provisions reflecting due process concerns for adequate notice require that mortgagors under the deeds of trust receive notices in addition to the statutorily-prescribed minimum requirements.  For the most part, these cases have upheld the notice provisions as being reasonable or have found that the sale by a trustee under a deed of trust or under a mortgage having a power of sale does not involve sufficient state action to afford constitutional protections to the mortgagor.

**Alternative Mortgage Instrument**

Alternative mortgage instruments, including adjustable rate mortgage loans and early ownership mortgage loans, originated by non-federally chartered lenders have historically been subject to a variety of restrictions. Such restrictions differed from state to state, resulting in difficulties in determining whether a particular alternative mortgage instrument originated by a state-chartered lender was in compliance with applicable law. These difficulties were alleviated substantially as a result of the enactment of Title VIII of the Garn-St Germain Act ("Title VIII"). Title VIII provides that, notwithstanding any state law to the contrary, state-chartered banks may originate alternative mortgage instruments in accordance with regulations promulgated by the Comptroller of the Currency with respect to origination of alternative mortgage instruments by national banks; state-chartered credit unions may originate alternative mortgage instruments in accordance with regulations promulgated by the National Credit Union Administration with respect to origination of alternative mortgage instruments by federal credit unions; and all other non-federally chartered housing creditors, including state-chartered savings and loan associations, state-chartered savings banks and mutual savings banks and mortgage banking companies, may originate alternative mortgage instruments in accordance with the regulations promulgated by the Federal Home Loan Bank Board, predecessor to the Office of Thrift Supervision, with respect to origination of alternative mortgage instruments by federal savings and

54

loan associations. Title VIII provides that any state may reject applicability of the provisions of Title VIII by adopting, prior to October 15, 1985, a law or constitutional provision expressly rejecting the applicability of such provisions. Certain states have taken such action.

<b>PREPAYMENT AND YIELD CONSIDERATIONS</b>

The yields to maturity and weighted average lives of the Offered Certificates will depend upon, among other things, the price at which such Offered Certificates are purchased, the amount and timing of principal payments on the Mortgage Loans and the amount and timing of mortgagor delinquencies and defaults on the Mortgage Loans.

The rate of distributions in reduction of the Certificate Principal Balance of any Class of the Offered Certificates, the aggregate amount of distributions on any Class of the Offered Certificates and the Weighted Average Life and yield to maturity of any Class of the Offered Certificates purchased at a discount or premium will be directly related to the rate of payments of principal on the applicable Mortgage Loans in the related Loan Group. Prepayments (which, as used herein, include all unscheduled payments of principal, including payments as the result of liquidations, purchases and repurchases) of the Mortgage Loans in a Loan Group will result in distributions to certificateholders then entitled to distributions in respect of principal in respect of such Mortgage Loans of amounts which would otherwise be distributed over the remaining terms of such Mortgage Loans. Since the rate of prepayment on the Mortgage Loans will depend on future events and a variety of factors (as described more fully below), no assurance can be given as to such rate or the rate of principal payments or yield on, or Weighted Average Life of, any Class of the Offered Certificates or the aggregate amount of distributions on any Class of the Offered Certificates.

The rate of principal payments on the Mortgage Loans will be affected by the amortization schedules of the Mortgage Loans, the rate of principal prepayments (including partial prepayments and those resulting from refinancing) thereon by mortgagors, liquidations of defaulted Mortgage Loans, repurchases by the Sponsor of Mortgage Loans as a result of defective documentation or certain breaches of representations and warranties and, under certain circumstances, the optional purchase by the Guarantor of certain defaulted Mortgaged Loans and the optional purchase of all of the Mortgage Loans in connection with the termination of the Issuing Entity. See "The Pooling and Servicing Agreement—Assignment of Mortgage Loans; Representations and Warranties; Repurchases" and "—Optional Termination of the Issuing Entity" and "Description of the Mortgage Loans—Optional Purchase of the Mortgage Loans" in this information circular. Because all of the Mortgage Loans in Loan Group 2 and Loan Group 4 contain Prepayment Penalties, the rate of principal payments on such Mortgage Loans may be less than the rate of principal payments for mortgage loans which do not have Prepayment Penalties; however, the Prepayment Penalties may be waived as provided in the Pooling and Servicing Agreement. If prevailing rates for similar mortgage loans fall below the Mortgage Rates on the Mortgage Loans, the rate of prepayment would generally be expected to increase. Conversely, if interest rates on similar mortgage loans rise above the Mortgage Rates on the Mortgage Loans, the rate of prepayment would generally be expected to decrease.

In addition, if the Guarantor fails to make payments required by the Guarantee, the yield to maturity and weighted average lives of the Offered Certificates will depend on the rate of liquidations and the amount and timing of mortgagor defaults resulting in Realized Losses on the Mortgage Loans. If a holder of an Offered Certificate calculates its anticipated yield based on an assumed rate of default and amount of Realized Losses that is lower than the default rate and amount of losses actually incurred, its actual yield to maturity will be lower than that so calculated. The timing of Realized Losses will also affect a certificateholder's actual yield to maturity, even if the average rate of defaults and severity of losses are consistent with a certificateholder's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. There can be no assurance as to the delinquency, foreclosure or loss experience with respect to the Mortgage Loans. The Mortgage Loans may have a greater risk of future defaults and delinquencies, as compared to newly originated, high quality one- to two-family residential mortgage loans of comparable size and geographic concentration because the Mortgage Loans are of nonprime credit quality. See "Risk Factors—Risks Associated with the Mortgage Loans—Nonprime Mortgage Loans May Experience Greater Rates of Delinquency and Foreclosure Due to Underwriting Standards" in this information circular.

The Interest-Only Mortgage Loans require only the payment of interest for a term specified in the related Mortgage Note. On the first Due Date following the end of the interest-only period, the payments on each Interest-Only Mortgage Loan will be recalculated to fully amortize its unpaid principal balance over the remaining life

of such loan and the mortgagor will be required to make payments of both principal and interest, which may increase the burden on the mortgagor and may increase the risk of default under such Mortgage Loan.

The Mortgage Rates on the Adjustable Rate Mortgage Loans (which are included in Loan Group 3 and Loan Group 4) will be fixed for a five-year period, after origination and will adjust semi-annually thereafter and may vary significantly over time.  When a Mortgage Loan begins its adjustable period, increases and decreases in the Mortgage Rate on that Mortgage Loan will be based on the Index in effect as of the first day of the calendar month prior to the related Adjustment Date plus the applicable Gross Margin and will be limited by the applicable Periodic Rate Cap, the Maximum Mortgage Rate and the initial rate cap for the first Adjustment Date.  The Index may not rise and fall consistently with mortgage rates.  As a result, the Mortgage Rates on the Mortgage Loans at any time may not equal the prevailing mortgage rates for similar adjustable rate mortgage loans, and accordingly the prepayment rate may be lower or higher than would otherwise be anticipated.  Moreover, some mortgagors who prefer the certainty provided by fixed rate mortgage loans may nevertheless obtain adjustable rate mortgage loans at a time when they regard the mortgage rates (and, therefore, the payments) on fixed rate mortgage loans as unacceptably high.  These mortgagors may be induced to refinance adjustable rate mortgage loans when the mortgage rates and monthly payments on comparable fixed rate mortgage loans decline to levels which these mortgagors regard as acceptable, even though such mortgage rates and monthly payments may be significantly higher than the current Mortgage Rates and monthly payments on the mortgagors' Adjustable Rate Mortgage Loans.  The Adjustable Rate Mortgage Loans may also be subject to greater rates of prepayments as they approach their initial Adjustment Dates even if market interest rates are only slightly higher or lower than the Mortgage Rates on such Adjustable Rate Mortgage Loans as mortgagors seek to avoid changes in their monthly payments.  In addition, the delinquency and loss experience of the Adjustable Rate Mortgage Loans may differ from that on the Fixed Rate Mortgage Loans because the amount of the monthly payments on the Adjustable Rate Mortgage Loans are subject to adjustment on each Adjustment Date.  The ability to refinance a mortgage loan will depend on a number of factors prevailing at the time refinancing is desired, including, without limitation, real estate values, the mortgagor's financial situation, prevailing mortgage rates, the mortgagor's equity in the related mortgaged property, tax laws and prevailing general economic conditions.

Due to the operation of the Maximum Mortgage Rates, the Periodic Rate Caps and the initial rate cap for the first Adjustment Date, once the Mortgage Rates on the Adjustable Rate Mortgage Loans begin to adjust, the Pass-Through Rate on the Class 3-A-1 and Class 4-A-1 Certificates may be reduced, notwithstanding increases in the Index, if the Mortgage Rate on any Adjustable Rate Mortgage Loan cannot increase due to a Maximum Mortgage Rate limitation or a Periodic Rate Cap and the yield on such Certificates could be adversely affected.  In addition, because the Pass-Through Rate on each Class A Certificate will be based on the Net WAC Rate of the Mortgage Loans in the related Loan Group, disproportionate principal payments on the Mortgage Loans in the related Loan Group having Net Mortgage Rates higher or lower than the then-current Pass-Through Rates on a Class of Certificates may affect the Pass-Through Rates for such Certificates for future periods and the yield on such Certificates.

Other factors affecting prepayment of mortgage loans include changes in mortgagors' housing needs, job transfers, unemployment or substantial fluctuations in income, significant declines in real estate values and adverse economic conditions either generally or in particular geographic areas, mortgagors' equity in mortgaged properties, including the use of the properties as second or vacation homes, and servicing decisions, such as, without limitation, the decision as to whether to foreclose on a mortgage loan or to modify the terms of the related mortgage note and decisions as to the timing of any foreclosure.  Furthermore, certain characteristics of mortgage loans are thought by some in the mortgage industry to be more likely to affect prepayments.  These characteristics include, but are not limited to, unpaid principal balance, loan-to-value ratio, credit quality of mortgagors and a current mortgage rate higher than prevailing interest rates.  No representation is made as to the rate of prepayment on the Mortgage Loans included in a Loan Group having any particular characteristic.  In addition, all of the Mortgage Loans contain due-on-sale clauses which will generally be exercised upon the sale of the related Mortgaged Properties. Consequently, acceleration of mortgage payments as a result of any such sale will affect the level of prepayments on the Mortgage Loans in a Loan Group.  The extent to which defaulted Mortgage Loans are assumed by transferees of the related Mortgaged Properties or are refinanced will also affect the rate of principal payments.  The rate of prepayment and, therefore, the yield to maturity of the Offered Certificates will be affected by the extent to which (i) the Sponsor elects to repurchase, rather than substitute for, Mortgage Loans which are found by the Trustee to have defective documentation or with respect to which the Sponsor has breached a representation or warranty or (ii) a substitute Mortgage Loan has an unpaid principal balance less than the Mortgage Loan for which it is substituted.  In addition, the Servicer, subject to the Pooling and Servicing Agreement, may take certain actions to mitigate losses on

a defaulted Mortgage Loan which may include, but are not limited to, selling the Mortgaged Property of such Mortgage Loan for less than its unpaid principal balance or modifying the payment terms of a Mortgage Note. Such action by the Servicer could result in an allocation of Realized Losses on the Offered Certificates if the Guarantor fails to make payments required by the Guarantee. See "The Pooling and Servicing Agreement—Assignment of Mortgage Loans; Representations and Warranties; Repurchases" and "—Realization Upon Defaulted Mortgage Loans; Servicing Advances" and "—Due on Sale Provisions" in this information circular.

In addition, the Sponsor will be required to repurchase from the Issuing Entity any Mortgage Loan for which the mortgagor fails to make any Scheduled Payment that is due in December 2007 or January 2008 and that is not made prior to January 31, 2008.

**The yield to maturity of the Offered Certificates will be sensitive in varying degrees to the rate and timing of principal payments (including prepayments) on the Mortgage Loans in the related Loan Group. Investors in the Offered Certificates should consider the associated risks, including, in the case of Offered Certificates purchased at a discount, the risk that a slower than anticipated rate of payments in respect of principal (including prepayments) on the Mortgage Loans in the related Loan Group may have a negative effect on the yield to maturity of such Certificates and, in the case of Offered Certificates purchased at a premium, the risk that a faster than anticipated rate of payments in respect of principal (including prepayments) on the Mortgage Loans in the related Loan Group may have a negative effect on the yield to maturity of such Certificates. Investors purchasing Offered Certificates at a premium should also consider the risk that a rapid rate of payments in respect of principal (including prepayments) on the Mortgage Loans in the related Loan Group could result in the failure of such investors to fully recover their initial investments.**

An investor is urged to make an investment decision with respect to any Class of Offered Certificates based on the anticipated yield to maturity of such Class resulting from its purchase price and such investor's own determination as to the anticipated Mortgage Loan prepayment rates under a variety of scenarios. In considering the rate of principal payments on the Mortgage Loans, investors should consider that certain of the Mortgage Loans are Interest-Only Mortgage Loans. With respect to an Interest-Only Mortgage Loan, no scheduled payments of principal will be made by the mortgagor during the applicable interest-only period.

The timing of changes in the rate of prepayment on the Mortgage Loans in a Loan Group may significantly affect the actual yield to maturity experienced by a holder of an Offered Certificate in the related Loan Group at a price other than par, even if the average rate of principal payments experienced over time is consistent with such certificateholder's expectation. In general, the earlier a prepayment of principal on the underlying Mortgage Loans in such Loan Group, the greater the effect on such certificateholder's yield to maturity. As a result, the effect on such certificateholder's yield of principal payments occurring at a rate higher (or lower) than the rate anticipated by the certificateholder during the period immediately following the issuance of the Offered Certificates would not be fully offset by a subsequent like reduction (or increase) in the rate of principal payments.

The yield to maturity on the Offered Certificates may be affected by the geographic concentration of the Mortgaged Properties securing the Mortgage Loans in the related Loan Group. Certain regions in the United States have experienced or may experience significant fluctuations in housing prices. In addition, certain regions have experienced or may experience natural disasters, including earthquakes, fires, floods, hurricanes and tornadoes, which may adversely affect property values. See "Certain Legal Aspects of the Mortgage Loans" herein. Any deterioration in housing prices in the regions in which there is a significant concentration of Mortgaged Properties, as well as other regions in which the Mortgaged Properties are located, and any deterioration of economic conditions in such regions which adversely affects the ability of mortgagors to make payments on the Mortgage Loans, may increase the likelihood of delinquencies and losses on the Mortgage Loans. Such delinquencies and losses, if they occur, may have an adverse effect on the yield to maturity of the Offered Certificates if the Guarantor fails to make payments required under the Guarantee.

As to Mortgaged Properties in regions that have recently experienced natural disasters, none of the Sponsor, the Depositor or the Servicer has undertaken the physical inspection of such Mortgaged Properties. As a result, there can be no assurance that material damage to any Mortgaged Property in an affected region has not occurred. In the mortgage loan purchase agreement, between the Sponsor and the Depositor, dated as of the Cut-Off Date (the "**Mortgage Loan Purchase Agreement**"), the Sponsor will represent and warrant that, as of the date of issuance of

the Certificates, each Mortgaged Property is undamaged by water, fire, earthquake, earth movement other than earthquake, windstorm, flood, tornado or similar casualty so as to affect adversely the value of the Mortgaged Property as security for the Mortgage Loan or the use for which such premises was intended and to the best of the Sponsor's knowledge, there is no proceeding pending or threatened for the total or partial condemnation of the Mortgaged Property.  In the event of a breach of such representation with respect to a Mortgaged Property which materially and adversely affects the interests of certificateholders in the related Mortgage Loan, the Sponsor will be obligated to repurchase or substitute for such Mortgage Loan, as described under "The Pooling and Servicing Agreement—Assignment of Mortgage Loans; Representations and Warranties; Repurchases" in this information circular.  Repurchase of any such Mortgage Loan will affect in varying degrees the yields and Weighted Average Lives of the related Classes of Offered Certificates and could adversely affect the yield of any related Offered Certificates purchased at a premium.

No representation is made as to the rate of principal payments on the Mortgage Loans or as to the yield to maturity of any Class of Offered Certificates.

**Scheduled Delays in Distributions**

The effective yield to certificateholders will be below the yield otherwise produced by the applicable Pass-Through Rate because the distribution of principal and interest which is due on each Due Date will not be made until the 25th day (or, if such day is not a business day, the first business day following the 25th day) of the month in which such Due Date occurs.

**Weighted Average Life of the Offered Certificates**

The "**Weighted Average Life**" of any Class of Offered Certificates is the average amount of time that will elapse from the Closing Date, until each dollar of principal is distributed to the certificateholders in such Class of Offered Certificates.  Because it is expected that there will be prepayments and defaults on the Mortgage Loans of a Loan Group, the actual Weighted Average Lives of the Classes of Offered Certificates are expected to vary substantially from the weighted average remaining terms to stated maturity of the Mortgage Loans as set forth in the tables appearing in Appendix A.

Prepayments on mortgage loans are commonly measured relative to a prepayment model or standard.  The prepayment model used in this information circular, the Constant Prepayment Rate ("**CPR**"), represents a constant assumed rate of principal prepayment each month relative to the then-outstanding unpaid principal balance of a pool of mortgage loans for the life of such mortgage loans.  A prepayment assumption of 10% CPR assumes constant prepayment rates of 10% per annum of the then-outstanding unpaid principal balance of such mortgage loans.  Correspondingly, 30% CPR assumes constant prepayment rates of 30% per annum of the then-outstanding unpaid principal balance of such mortgage loans, and so forth.  CPR does not purport to be a historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of mortgage loans, including the Mortgage Loans.

There is no assurance that prepayment of the Mortgage Loans of a Loan Group underlying the related Offered Certificates will conform to any level of the prepayment model.  A number of factors, including but not limited to homeowner mobility, economic conditions, natural disasters, changes in mortgagors' housing needs, job transfers, unemployment or, in the case of mortgagors relying on commission income and self-employed mortgagors, significant fluctuations in income or adverse economic conditions, mortgagors' net equity in the properties securing the mortgage loans, including the use of second or "home equity" mortgage loans by mortgagors or the use of the properties as second or vacation homes, servicing decisions, enforceability of due-on-sale clauses, mortgage market interest rates, mortgage recording taxes, competition among mortgage loan originators resulting in reduced refinancing costs, reduction in documentation requirements and willingness to accept higher Loan-to-Value Ratios, and the availability of mortgage funds, may affect prepayment experience.  In general, however, if prevailing mortgage rates fall below the Mortgage Rates borne by the Mortgage Loans of a Loan Group underlying the related Certificates, the prepayment rates of such Mortgage Loans are likely to be higher than if prevailing rates remain at or above the rates borne by such Mortgage Loans.  Conversely, if prevailing mortgage rates rise above the Mortgage Rates borne by the Mortgage Loans, the Mortgage Loans are likely to experience a lower prepayment rate than if prevailing rates remain at or below such Mortgage Rates.  However, there can be no assurance that prepayments will rise or fall according to such changes

58

in mortgage rates. It should be noted that the Certificates may evidence an interest in a Loan Group with different Mortgage Rates. Accordingly, the prepayment experience of such Certificates will to some extent be a function of the mix of interest rates of the related Mortgage Loans. The amount of equity in a Mortgaged Property may also affect the rate of prepayments because as the amount of equity in the Mortgaged Property increases, the related mortgagor is more likely to enter into a "cash-out" refinancing of the Mortgaged Property, which will result in a prepayment in full of the Mortgage Loan. In addition, the terms of the Pooling and Servicing Agreement will require the Servicer to enforce any due-on-sale clause to the extent it has knowledge of the conveyance or the proposed conveyance of the underlying Mortgaged Property unless, in the reasonable belief of the Servicer, the due-on-sale clause is not enforceable under applicable law; provided, however, that subject to the conditions set forth in the Pooling and Servicing Agreement, the Servicer may permit the assumption of the related Mortgage Loan.

Prepayments on the Mortgage Loans are also affected by the obligation or right of the Guarantor or the Sponsor to purchase or repurchase certain or all of the Mortgage Loans under certain circumstances. Such purchase or repurchase will have the same effect as a prepayment in full of the related Mortgage Loan. See "The Pooling and Servicing Agreement—Assignment of Mortgage Loans; Representations and Warranties; Repurchases" and "Description of the Mortgage Loans—Optional Purchase of the Mortgage Loans." The Servicer will have the option to purchase all, but not less than all, of the Mortgage Loans under the limited conditions specified herein under "The Pooling and Servicing Agreement—Optional Termination of the Issuing Entity."

## Structuring Assumptions

Appendix C sets forth the decrement tables for the Offered Certificates.

The tables appearing in Appendix C have been prepared assuming, among other things, the following (the "**Structuring Assumptions**"):

(i)     the Issuing Entity consists of the "**Assumed Mortgage Loans**" set forth in the table appearing in Appendix B;

(ii)    the Scheduled Payment in each month for each Assumed Mortgage Loan has been based on its unpaid principal balance as of the first day of the month preceding the month of such payment, its Mortgage Rate and its remaining term to stated maturity (beginning with the Scheduled Payment after the interest-only period in the case of the Assumed Mortgage Loans with Original Interest-Only Months greater than zero), so that such Scheduled Payments would amortize the remaining balance over its remaining term to maturity;

(iii)   scheduled monthly payments of principal (including any Balloon Payments) and interest on the Assumed Mortgage Loans will be timely received on the first day of each month (with no defaults), commencing in January 2008;

(iv)    neither the Guarantor nor the Depositor purchases any of the Assumed Mortgage Loans and no optional termination right is exercised (except with respect to the entries identified by the row heading "Weighted Average Life to Optional Termination Date (years)" in the tables appearing in Appendix C);

(v)     principal payments on the Assumed Mortgage Loans representing principal prepayments in full of individual mortgage loans will be received on the last day of each month commencing in December 2007 at the respective constant percentages of CPR set forth in the tables and there are no partial prepayments, Prepayment Interest Shortfalls or Relief Act Shortfalls;

(vi)    prepayments on the Assumed Mortgage Loans include 30 days of interest at the applicable Mortgage Rate;

(vii)   the Certificates will be issued on December 21, 2007;

(viii)  distributions on the Certificates are made on the 25th day of each month, commencing in January 2008;

(ix)    with respect to the adjustable rate Assumed Mortgage Loans, the Six-Month LIBOR Index is equal to 5.064%;

(x)    the adjustable rate Assumed Mortgage Loans that adjust based on the Index adjust on the first Adjustment Date and semi-annually thereafter;

(xi)    the initial Certificate Principal Balance of each Class of Certificates will be as set forth in the table on page 5 of this information circular;

(xii)    the Pass-Through Rates for the Certificates are calculated as described above under "Description of the Certificates—Pass-Through Rates"; and

(xiii)    the PMI Premium Rate is 1.35% per annum, the Servicing Fee Rate is 0.500% per annum, the Trustee Fee Rate is 0.060% per annum and the Credit Risk Management Fee Rate is 0.014% per annum.

*It is highly unlikely that the Mortgage Loans in a Loan Group will prepay at any constant rate, that all of the Mortgage Loans in a Loan Group will prepay at the same rate or that the Mortgage Loans in a Loan Group will not experience any losses.* In addition, there will be differences between the characteristics of the Mortgage Loans in each Loan Group ultimately included in the Issuing Entity and the characteristics which are assumed in preparing the tables, as described above.  Any difference may have an effect upon the actual percentages of initial Certificate Principal Balances of the Classes of Certificates outstanding, the actual Weighted Average Lives of the Classes of Certificates and the date on which the Certificate Principal Balance of any Class of Certificates is reduced to zero.

Based upon the foregoing assumptions, the tables appearing in Appendix C indicate the Weighted Average Life of each Class of Offered Certificates to maturity and to the Optional Termination Date, and set forth the percentages of the initial Certificate Principal Balance of each such Class of Offered Certificates that would be outstanding after each of the dates shown at the constant percentages of CPR presented.

## THE POOLING AND SERVICING AGREEMENT

**General**

The Certificates will be issued pursuant to the Pooling and Servicing Agreement, to be dated as of the Closing Date (the "**Pooling and Servicing Agreement**"), among the Depositor, the Servicer, the Guarantor, the Trustee, the Custodian, the Sponsor and the Credit Risk Manager.  Set forth below are summaries of the specific terms and provisions pursuant to which the Offered Certificates will be issued.

The Issuing Entity created under the Pooling and Servicing Agreement will consist of (i) the Mortgage Loans and all interest and principal received on or with respect thereto on and after the Cut-off Date to the extent not applied in computing the Cut-off Date Principal Balance thereof, exclusive of interest not required to be deposited in the Collection Account, (ii) the Collection Account and the Certificate Account and all amounts deposited therein pursuant to the applicable provisions of the Pooling and Servicing Agreement, (iii) property that secured a Mortgage Loan and has been acquired by foreclosure, deed in lieu of foreclosure or otherwise, (iv) rights under any insurance policies or the PMI Policy with respect to the Mortgage Loans and/or the related Mortgaged Properties; (v) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or other liquid property;  (vi) the obligations of Freddie Mac pursuant to the Guarantee and (vii) rights to require repurchase of the Mortgage Loans by the Sponsor for breach of any representation or warranty and rights to enforce the guarantee of Merrill Lynch Bank & Trust Co., FSB thereof.

**Assignment of Mortgage Loans; Representations and Warranties; Repurchases**

The Depositor will have acquired the Mortgage Loans included in the Issuing Entity from the Sponsor pursuant to the Mortgage Loan Purchase Agreement.  In connection with the conveyance of the Mortgage Loans to the Depositor, the Sponsor will (i) agree to deliver to the Depositor all of the documents which the Depositor is required to deliver to the Trustee; (ii) make certain representations and warranties to the Depositor which will be assigned by the

Depositor to the Trustee; and (iii) agree to repurchase or substitute for any Mortgage Loan for which any document is not delivered or is found to be defective in any material respect, or which Mortgage Loan is discovered at any time not to be in conformance with any representation and warranty the Sponsor has made to the Depositor if the Sponsor cannot deliver such document or cure such defect or breach within 30 days after notice thereof.  In the event of a breach of a representation or warranty, generally there is no obligation to repurchase the affected Mortgage Loan or substitute a new mortgage loan therefor unless the breach materially and adversely affects the interests of the certificateholders in the related Mortgage Loan; provided that any breach of certain representations, including the representations set forth in clauses (i) and (iv) through (xiii) below, will be deemed to materially and adversely affect the interests of the certificateholders in the related Mortgage Loan.  Such agreement will inure to the benefit of the Trustee and is intended to help ensure the Sponsor's performance of its limited obligation to repurchase, cure or substitute for Mortgage Loans.  In addition, in the case of a breach of its representations and warranties that a Mortgage Loan at the time of origination complied with any applicable federal, state or local predatory or abusive lending laws, the Sponsor will be required to pay the Depositor any amount that the Depositor is required to pay under the Pooling and Servicing Agreement due to any costs or damages incurred by the Issuing Entity or the Guarantor as a result of a breach of such representation and warranty.

To the extent that any Mortgage Loan as to which a representation or warranty has been breached is not purchased by the Sponsor, and a Realized Loss occurs with respect to that Mortgage Loan, holders of the Offered Certificates may incur a loss.  See "Risk Factors—Violations of Federal, State and Local Laws May Adversely Affect Ability to Collect on Loans."  However, in the event that the Sponsor fails to perform such cure, repurchase or substitution obligations, Merrill Lynch Bank & Trust Co., FSB has agreed to perform such obligations pursuant to a guarantee, the rights and benefits of which have been assigned to the Issuing Entity.

At the time of issuance of the Certificates, the Depositor will assign (or cause to be assigned) the Mortgage Loans to the Issuing Entity, together with all principal and interest received on or with respect to such Mortgage Loans after the Cut-off Date, other than principal and interest due on or before the Cut-off Date.  The Trustee or such party's authenticating agent will, concurrently with such assignment, authenticate and deliver the Certificates to the Depositor in exchange for the Mortgage Loans and the other assets comprising the Issuing Entity.  Each Mortgage Loan will be identified in a schedule (the "**Mortgage Loan Schedule**") delivered pursuant to the Pooling and Servicing Agreement.  Such Mortgage Loan Schedule will include, among other things, the unpaid principal balance as of the close of business on the Cut-off Date, the maturity date and the Mortgage Rate for each Mortgage Loan in the Issuing Entity.

In addition, with respect to each Mortgage Loan in the Issuing Entity, the mortgage or other promissory note or a lost note affidavit executed by the Servicer, any assumption, consolidation, modification agreement, power of attorney and a mortgage assignment in recordable form (or other documents as are required under applicable law to create perfected security interest in the Mortgaged Property in favor of the Trustee) (collectively, the "**Related Documents**") will be delivered to the Trustee .  Assignments of the Mortgage Loans to the Trustee (or its nominee) will not be recorded in any jurisdiction, but will be delivered to the Servicer in recordable form, so that they can be recorded in the event recordation is necessary in connection with the servicing of a Mortgage Loan.

Notwithstanding the preceding paragraph, with respect to any Mortgage Loan which has been recorded in the name of Mortgage Electronic Registration Systems, Inc. ("**MERS**") or its designee, no mortgage assignment in favor of the Trustee will be required to be prepared or delivered.  Instead, the Servicer will be required to take all actions as are necessary to cause the Issuing Entity to be shown as the owner of the related Mortgage Loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

The Trustee (or its custodian) will hold all Related Documents delivered to it in trust for the benefit of certificateholders and will review such documents within 30 days of the Closing Date.  In the event that the Trustee discovers any materially defective or missing document with respect to any Mortgage Loans, the Trustee will notify the Depositor, the Credit Risk Manager, the Guarantor and the Servicer of such defect within 15 days of discovery.  If any document is not delivered or is found to be defective in any material respect, or if the Sponsor is in breach of any of its representations and warranties, and such breach materially and adversely affects the interests of the certificateholders in a Mortgage Loan (provided that any breach of certain representations, including the representations set forth in clauses (i) and (iv) through (xiii) below, will be deemed to materially and adversely affect the interests of certificateholders in the Mortgage Loans), and the Sponsor cannot deliver such document or cure such defect or breach within 30 days after written notice thereof, the Sponsor will, within 30 days of such notice, either

repurchase the related Mortgage Loan or REO Property from the Trustee at a price (the "**Purchase Price**") equal to the sum of (i) 100% of the unpaid principal balance of the Mortgage Loan as of the date of such purchase together with any unreimbursed Advances or Servicing Advances, (ii) accrued interest thereon at the applicable Mortgage Rate from (a) the date through which interest was last paid by the mortgagor to (b) the Due Date in the month in which the Purchase Price is to be distributed to certificateholders and (iii) any unreimbursed Servicing Advances and any unpaid Servicing Fees allocable to such Mortgage Loan or REO Property, (iv) any amounts previously withdrawn from the Collection Account in respect of such Mortgage Loan or REO Property in connection with the disposition of such REO Property and (v) in the case of a Mortgage Loan required to be repurchased, expenses reasonably incurred or to be incurred by the Servicer, the Guarantor or the Trustee in respect of the breach or defect giving rise to the purchase obligation, or substitute for such Mortgage Loan a new mortgage loan having characteristics such that the representations and warranties of the Sponsor made pursuant to the Mortgage Loan Purchase Agreement (except for representations and warranties as to the correctness of the Mortgage Loan Schedule) would not have been incorrect had such substitute Mortgage Loan originally been a Mortgage Loan. In the case of a repurchased Mortgage Loan, the Purchase Price will be deposited by the Sponsor in the Certificate Account. In the case of a substitute Mortgage Loan, the mortgage file relating thereto will be delivered to the Trustee and the Sponsor will be required to deposit in the Certificate Account an amount (the "**Substitution Adjustment Amount**") equal to the excess of (i) the unpaid principal balance of the Mortgage Loan which is substituted for, over (ii) the unpaid principal balance of the substitute Mortgage Loan, together with interest on such excess at the Mortgage Rate to the next scheduled Due Date of the Mortgage Loan which is being substituted for. In no event will any substitute Mortgage Loan have an unpaid principal balance greater than the unpaid principal balance of the Mortgage Loan for which it is substituted (after giving effect to the scheduled principal payment due in the month of substitution on the Mortgage Loan substituted for), or a term greater than, a Mortgage Rate less than or a Loan-to-Value Ratio greater than, the Mortgage Loan for which it is substituted. If substitution is to be made for an adjustable rate Mortgage Loan, the substitute Mortgage Loan will be required to have a minimum interest rate and a rate ceiling not less than that of the Mortgage Loan for which it is substituted, and will bear interest based on the same index, gross margin and frequency of adjustment as the substituted Mortgage Loan. The repurchase obligation and the mortgage substitution referred to above will constitute the sole remedies available to the certificateholders or the Trustee with respect to missing or defective documents or breach of the Sponsor's representations and warranties. However, the Sponsor may be required to pay additional amounts to the Issuing Entity and the Guarantor upon the breach of its representations and warranties.

In connection with the transfers of the Mortgage Loans by the Sponsor to the Depositor and the Depositor to the Issuing Entity, the Sponsor will make certain representations and warranties as of the Closing Date regarding the Mortgage Loans. Such representations and warranties include, among other things, the following with respect to the Mortgage Loans, or each Mortgage Loan, as the case may be:

(i)     Each Mortgage Loan at origination complied with applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity, anti-predatory and abusive lending laws, real estate settlement procedures, Fair Credit Reporting Act and applicable regulations, truth-in-lending and disclosure laws, and consummation of the transactions contemplated hereby will not involve the violation of any such laws;

(ii)     Each Mortgaged Property is improved by a one- to two-family residential dwelling, condominium units and dwelling units in PUDs, which, does not constitute other than real property under state law;

(iii)     None of the loans are secured by manufactured housing;

(iv)     No refinance or purchase Mortgage Loan has an APR or total points and fees that exceed the thresholds established by the Home Ownership and Equity Protection Act of 1994, as amended, and its implementing regulations;

(v)     No Mortgage Loan originated between October 1, 2002 and March 7, 2003 is subject to the Georgia Fair Lending Act, as amended. There is no Mortgage Loan in the Issuing Entity that was originated on or after March 7, 2003, which is a "high cost home loan" as defined under the Georgia Fair Lending Act;

(vi)     With respect to Mortgage Loans that impose a Prepayment Penalty, the Sponsor hereby represents that (a) none of the Mortgage Loans imposes a Prepayment Penalty in excess of three years from the date of

origination of such Mortgage Loan; (b) the Mortgage Loan provides some benefits to the mortgagor (e.g., rate or fee reduction) in exchange for accepting such Prepayment Penalty; (c) prior to the Mortgage Loan's origination, the mortgagor was offered the option of obtaining a mortgage loan that did not require the payment of such a penalty; (d) the Prepayment Penalty was adequately disclosed to the mortgagor pursuant to applicable state and federal law; (e) the Seller will not impose a Prepayment Penalty in the event of a prepayment made on a defaulted Mortgage Loan or in the event of an acceleration of a related Mortgage Note by the note holder or the Servicer; and (f) each Prepayment Penalty with respect to a Mortgage Loan is permissible, enforceable and collectible under applicable federal, state and local law;

(vii)   No mortgagor was required to purchase any single premium credit insurance policy (e.g., life, disability, accident, unemployment, or health insurance product) or debt cancellation agreement as a condition of obtaining the extension of credit in connection with the origination of the related Mortgage Loan; no mortgagor obtained a prepaid single-premium credit insurance policy (e.g., life, disability, accident, unemployment, mortgage or health insurance) in connection with the origination of the related Mortgage Loan; no proceeds from any Mortgage Loan were used to purchase single premium credit insurance policies or debt cancellation agreements as part of the origination or, or as a condition to closing, such Mortgage Loan;

(viii)   None of the Mortgage Loans were originated with "points and fees" (whether or not financed) in an amount greater than 5% of the principal amount of such loan or a maximum dollar amount of $1000.  For purposes of this representation, "points and fees" (a) include origination, underwriting, broker and finder's fees and other charges that the lender imposed as a condition of making the loan, whether they are paid to the lender or a third party, and (b) exclude bona fide discount points, fees paid for actual services rendered in connection with the origination of the mortgage (such as attorneys' fees, notaries fees and fees paid for property appraisals, credit reports, surveys, title examinations and extracts, flood and tax certifications, and home inspections); the cost of mortgage insurance or credit-risk price adjustments; the costs of title, hazard, and flood insurance policies; state and local transfer taxes or fees; escrow deposits for the future payment of taxes and insurance premiums; and other miscellaneous fees and charges that, in total, do not exceed 0.25 percent of the loan amount;

(ix)   No Mortgage Loan has an original principal balance (as determined at origination, regardless of its unpaid principal balance at any subsequent date) that exceeds the following Freddie Mac dollar amount limit for conforming one- to two- family mortgage loans applicable as of the Closing Date: (a) for first lien mortgage loans originated in the continental United States or Puerto Rico, a maximum original loan amount of $417,000 for one-family properties and $533,850 for two-family units and (b) for first lien mortgage loans originated in Alaska, Guam, Hawaii or the United States Virgin Island, a maximum original loan amount of $625,500 for one-family properties and $800,775 for two-family units;

(x)   With respect to all of the Mortgage Loans originated from August 1, 2004 through April 30, 2005, if the related Mortgage Loan or the related Mortgage Note, or any document relating to the loan transaction, contains a mandatory arbitration clause (that is, a clause that requires the mortgagor to submit to arbitration to resolve any dispute arising out of or relating in any way to the mortgage loan transaction), the Seller will (i) notify the related mortgagor in writing within 60 days after the Closing Date that none of the related seller, the related servicer or any subsequent party that acquires an interest in the Mortgage Loan or services the Mortgage Loan will enforce the arbitration clause against the mortgagor, but that the mortgagor will continue to have the right to submit a dispute to arbitration, and (ii) place a copy of that notice in the Mortgage File. With respect to all of the Mortgage Loans originated on or after May 1, 2005, neither the related Mortgage nor the related Mortgage Note requires the mortgagor to submit to arbitration to resolve any dispute arising out of or relating in any way to the mortgage loan transaction;

(xi)   With respect to each Mortgage Loan, the mortgagor was not encouraged or required by the Mortgage Loan's originator to select a mortgage loan product offered by the Mortgage Loan's originator which is a higher cost product designed for less creditworthy mortgagors, taking into account such factors as, without limitation, the Mortgage Loan's requirements and the mortgagor's credit history, income, assets and liabilities. For a mortgagor who seeks financing through a mortgage loan originator's higher-priced nonprime

lending channel, the Company has directed the mortgagor towards or offered the mortgage loan originator's standard mortgage line if the mortgagor is able to qualify for one of the standard products;

(xii)   The methodology used in underwriting the extension of credit for each Mortgage Loan did not rely on the extent of the mortgagor's equity in the collateral as the principal determining factor in approving such extension of credit. The methodology employed objective criteria that related such facts as, without limitation, the mortgagor's credit history, income, assets or liabilities, to the proposed mortgage payment and, based on such methodology, the Mortgage Loan's originator made a reasonable determination that at the time of origination the mortgagor had the ability to make timely payments on the Mortgage Loan; and

(xiii)  Each Mortgage Loan is "principally secured by an interest in real property" within the meaning of Section 860G(a)(3) of the Code and Treasury Regulations Section 1.860G-2(a)(1).

In addition to the foregoing, if a breach of any of its representations occurs, the Sponsor will be obligated to reimburse the Issuing Entity and the Guarantor for all costs or damages incurred by the Issuing Entity and the Guarantor as a result of the violation of such representation (such amount, the "**Reimbursement Amount**").

**Collection Account, Certificate Account and Related Accounts**

*General*

The Servicer will establish and maintain or cause to be maintained a separate trust account (the "**Collection Account**") for the benefit of the holders of the Certificates.  Funds on deposit in the Collection Account may be invested in certain investments ("**Eligible Investments**") maturing in general not later than the business day preceding the day the funds are required to be remitted to the Trustee unless such Eligible Investments are invested in investments managed or advised by the Servicer or an affiliate thereof, in which case such Eligible Investments may mature on day the funds are required to be remitted to the Trustee.  All income and gain realized from any such investment in the Collection Account will be for the account of the Servicer as compensation and all losses from any such investment will be deposited by the Servicer out of its own funds to the Collection Account immediately as realized.

Within one day of receipt by the Servicer of amounts in respect of the Mortgage Loans (excluding amounts representing the Servicing Fee or other servicing compensation, reimbursement for Advances, Servicing Advances, Insurance Proceeds to be applied to the restoration or repair of a Mortgaged Property or similar items), the Servicer will be required to deposit such amounts in the Collection Account.  Amounts so deposited may be invested in Eligible Investments maturing no later than one business day prior to the Servicer Remittance Date.  Any interest or other income earned on funds in the Collection Account will be paid to the Servicer or its designee as additional servicing compensation.  The "**Servicer Remittance Date**" with respect to any Distribution Date will be the later of (x) the date that is two (2) Business Days after the 15th day of the month in which such Distribution Date occurs and (y) the 18th day (or if such day is not a Business Day, the immediately succeeding Business Day) of the month in which such Distribution Date occurs.

The Trustee will establish an account (the "**Certificate Account**") into which the Servicer will deposit, on or prior to the applicable Servicer Remittance Date, amounts withdrawn from the Collection Account for distribution to certificateholders on such Distribution Date.  The Certificate Account will be an Eligible Account.  Funds on deposit in the Certificate Account may be invested in Eligible Investments maturing in general not later than the business day preceding the next Distribution Date unless such Eligible Investments are invested in investments managed or advised by the Trustee or an affiliate thereof, in which case such Eligible Investments may mature on the related Distribution Date.  All income and gain realized from any such investment in the Certificate Account will be for the account of the Trustee as compensation and all losses from any such investment will be deposited by the Trustee out of its own funds to the Certificate Account immediately as realized.

An "**Eligible Account**" is an account that is (i) a segregated account maintained with a federal or state chartered depository institution (A) the short-term obligations of which are rated A-1 or better by S&P and P-1 by Moody's at the time of any deposit therein or (B) the long term unsecured debt obligations of which are rated at least

"AA-" by S&P and "A+" by Fitch if the deposits are to be held in the account more than 30 days; following a downgrade, withdrawal, or suspension of such institution's rating, each account should promptly (and in any case within not more than 10 calendar days) be moved to a qualifying institution or to one or more segregated trust accounts in the trust department of such institution, if permitted or (ii) a segregated trust account or accounts maintained with the trust department of a federal or state chartered depository institution, national banking association or trust company with trust powers acting in its fiduciary capacity.  Eligible Accounts may bear interest, and may include, if otherwise qualified under this definition, accounts maintained with the Trustee or the Servicer.

*Deposits*

The Servicer will deposit or cause to be deposited in the Collection Account, within one business day of receipt, the following payments and collections received by the Servicer (other than (a) payments due on or before the Cut-off Date, (b) amounts held for future distribution, (c) amounts representing certain expenses reimbursable to the Servicer (d) amounts representing reimbursement for Advances made by the Servicer and (e) other amounts permitted to be retained by the Servicer pursuant to the Pooling and Servicing Agreement):

(i)    all payments on account of principal, including principal prepayments, on the Mortgage Loans;

(ii)    all payments on account of interest on the Mortgage Loans, in each case net of any portion thereof retained by a Servicer as its servicing compensation;

(iii)    net Liquidation Proceeds, Insurance Proceeds (other than proceeds applied to the restoration or repair of the Mortgaged Property or released to the mortgagor in accordance with the Servicer's normal servicing procedures, the loan documents or applicable law) and Subsequent Recoveries;

(iv)    all condemnation proceeds affecting any Mortgaged Property which are not released to the mortgagor in accordance with the Servicer's normal servicing procedures, the loan documents or applicable law;

(v)    any amounts required to be deposited by the Servicer in connection with any REO Property pursuant to the Pooling and Servicing Agreement;

(vi)    all Prepayment Penalties collected by the Servicer in connection with the voluntary principal prepayment in full of any of the Mortgage Loans;

(vii)    all amounts required to be deposited by the Servicer regarding the repurchase and substitution of the Mortgage Loans and

(viii)    all other amounts required to be deposited pursuant to the Pooling and Servicing Agreement.

The Servicer will deliver or cause to be delivered to the Trustee for deposit into the Certificate Account, on the Servicer Remittance Date the following payments and collections received, or Advances or Servicing Advances made, by the Servicer:

(i)    the portion of Available Funds on deposit in the Collection Account;

(ii)    all Prepayment Penalties collected by the Servicer in connection with the voluntary principal prepayment in full of any of the Mortgage Loans then on deposit in the Collection Account; and

(iii)    amounts reimbursable or payable to the Trustee.

In addition, the Servicer will deliver to the Trustee from time to time for deposit into the Certificate Account, the following:

(i)    any Advance required pursuant to the Pooling and Servicing Agreement;

(ii)     any stayed funds, as soon as permitted by the federal bankruptcy court having jurisdiction in such matters;

(iii)    any amounts required to be deposited by the Servicer in connection with the deductible clause in any lender-placed hazard insurance policy, such deposit being made from the Servicer's own funds, without reimbursement therefor; and

(iv)    any other amounts required to be deposited in the Certificate Account, as provided in the Pooling and Servicing Agreement.

*Withdrawals*

The Trustee may, from time to time, make withdrawals from the Certificate Account for the Issuing Entity for any of the following purposes:

(i)     to make distributions to certificateholders on each Distribution Date;

(ii)    to pay to the Trustee any amounts owed to the Trustee;

(iii)   to pay to the Trustee as compensation the Trustee Fee and any interest earned on funds in the Certificate Account (all such interest to be withdrawn monthly on each Distribution Date);

(iv)    to pay to the Credit Risk Manager as compensation the Credit Risk Management Fee;

(v)     to pay the PMI Premium for the PMI Policy; and

(vi)    to clear and terminate the Certificate Account at the termination of the Issuing Entity.

*Collection and Other Servicing Obligations*

The Servicer will be required by the Pooling and Servicing Agreement to diligently collect all payments called for under the Mortgage Loans and, consistent with the Pooling and Servicing Agreement to follow such collection procedures as it follows with respect to mortgage loans serviced by it for its own account that are comparable to the Mortgage Loans.  Consistent with the above, the Servicer may, in its discretion, (i) waive any late payment charge or penalty interest in respect of a late payment on a Mortgage Loan and (ii) arrange with a mortgagor a schedule for the liquidation of deficiencies running for a period conforming to acceptable servicing practices (or such shorter period provided by the Pooling and Servicing Agreement).

The Servicer will be obligated to advance certain amounts which are not timely paid by the mortgagors, to the extent that it determines, in good faith, that they will be recoverable out of insurance proceeds, liquidation proceeds, or otherwise.  The Servicer will not waive any prepayment penalty or portion thereof unless, (i) the enforceability thereof shall have been limited by bankruptcy, insolvency, moratorium, receivership or other similar laws relating to creditors' rights generally or is otherwise prohibited by law, or (ii) the collectability thereof shall have been limited due to acceleration in connection with a foreclosure or other involuntary payment, or (iii) in the Servicer's reasonable judgment as described in the Pooling and Servicing Agreement, (x) such waiver relates to a default or a reasonably foreseeable default, (y) such waiver would maximize recovery of total proceeds taking into account the value of such prepayment penalty and related Mortgage Loan and (z) doing so is standard and customary in servicing similar Mortgage Loans (including any waiver of a prepayment penalty in connection with a refinancing of a Mortgage Loan that is related to a default or a reasonably foreseeable default), or (iv) the collection of the prepayment penalty or of a similar type of prepayment premium would be considered "predatory" or "illegal" pursuant to written guidance published by any applicable federal, state or local regulatory authority having jurisdiction over such matters or has been challenged by any such authority, or (v) there is a certified class action in which a similar type of prepayment premium is being challenged. Except as provided in the preceding sentence, in no event will the Servicer waive a prepayment penalty in connection with a refinancing of a Mortgage Loan that is not related to a default or a reasonably foreseeable default.

66

**Realization Upon Defaulted Mortgage Loans; Servicing Advances**

The Pooling and Servicing Agreement requires the Servicer to take such action with respect to defaulted Mortgage Loans as the Servicer deems to be in the best interest of the certificateholders. While this may involve foreclosure, the Servicer is also authorized, subject to the standards for servicing defaulted Mortgage Loans set forth in the Pooling and Servicing Agreement, to enter into repayment plans or forbearance plans with mortgagors or to arrange for the assumption of the defaulted Mortgage Loan by a new mortgagor who meets the Servicer's normal underwriting guidelines. In addition, subject to the standards set forth in the Pooling and Servicing Agreement, the Servicer may modify the payment terms of Mortgage Loans that are in default, or as to which default is reasonably foreseeable. Any such modification will be made only upon the determination by the Servicer that such modification is likely to increase the proceeds of such Mortgage Loan over the amount expected to be collected pursuant to foreclosure.

In the case of foreclosure or of damage to a Mortgaged Property, the Servicer will not be required to expend its own funds to foreclose or restore any damaged property, unless it determines (i) that such foreclosure and/or restoration will increase the proceeds of liquidation of the Mortgage Loan after reimbursement to the Servicer for its expenses and (ii) that such expenses will be recoverable to it through Liquidation Proceeds or any applicable insurance policy in respect of such Mortgage Loan. In the event that the Servicer has expended its own funds for foreclosure or to restore damaged property, it will be entitled to be reimbursed from the Collection Account an amount equal to all costs and expenses incurred by it.

The Servicer will not be obligated to foreclose on any Mortgaged Property which it believes may be contaminated with or affected by hazardous wastes or hazardous substances. See "Certain Legal Aspects of Mortgage Loans—Environmental Considerations" in this information circular. If the Guarantor fails to make a payment required pursuant to the Guarantee and the Servicer does not foreclose on a contaminated Mortgaged Property, the certificateholders may experience a loss on the related Mortgage Loan. The Servicer will not be liable to the certificateholders if it fails to foreclose on a Mortgaged Property which it believes may be so contaminated or affected, even if such Mortgaged Property is, in fact, not so contaminated or affected. Conversely, the Servicer will not be liable to the certificateholders if, based on its belief that no such contamination or effect exists, the Servicer, with Freddie Mac's consent, forecloses on a Mortgaged Property and takes title to such Mortgaged Property, and thereafter such Mortgaged Property is determined to be so contaminated or affected.

The Servicer may foreclose against property securing a defaulted Mortgage Loan either by foreclosure, by sale or by strict foreclosure and in the event a deficiency judgment is available against the mortgagor or other person may proceed for the deficiency. It is anticipated that in most cases the Servicer will not seek deficiency judgments and will not be required to seek deficiency judgments. In lieu of foreclosure, the Servicer may arrange for the sale by the mortgagor of the Mortgaged Property related to a defaulted Mortgage Loan to a third party, rather than foreclosing upon and selling such Mortgaged Property.

The limitations imposed by the Pooling and Servicing Agreement on the ownership and management of any Mortgaged Property acquired on behalf of the Issuing Entity may result in the recovery of an amount less than the amount that would otherwise be recovered. See "Certain Legal Aspects of Mortgage Loans—Foreclosure" in this information circular.

The Servicer will be entitled to withdraw or cause to be withdrawn from the Collection Account out of the Liquidation Proceeds recovered on any defaulted Mortgage Loan, prior to the distribution of such Liquidation Proceeds to certificateholders, amounts representing its normal servicing compensation on the Mortgage Loan, unreimbursed Servicing Advances incurred with respect to the Mortgage Loan, any unreimbursed Advances of delinquent payments made with respect to the Mortgage Loan. If the proceeds of any liquidation of the property securing the defaulted Mortgage Loan exceed the outstanding principal balance thereof plus accrued interest thereon at the applicable interest rate ("**Liquidation Profits**"), the Servicer may retain such excess as additional servicing compensation.

In the course of performing its servicing obligations, the Servicer will pay all reasonable and customary "out-of-pocket" costs and expenses incurred in the performance of its servicing obligations, including, but not limited to, the cost of (i) the preservation, inspection, restoration and protection of a Mortgaged Property, including without

67

limitation advances in respect of prior liens, real estate taxes and assessments, (ii) any collection, enforcement or judicial proceedings, including without limitation foreclosures, collections and liquidations, (iii) the conservation, management, sale and liquidation of any REO Property, (iv) recording instruments of satisfaction, deeds of reconveyance, substitutions of trustees on deeds of trust or assignments of mortgage to the extent not otherwise recovered from the related mortgagors or payable under the Pooling and Servicing Agreement, (v) the amount of any deductible under a lender-placed policy on any individual Mortgaged Property and (vi) compliance with the obligations under Sections 3.01 and 3.10 of the Pooling and Servicing Agreement.  Each such expenditure will constitute a "**Servicing Advance**."

The Servicer's right to reimbursement for Servicing Advances is limited to late collections on the related Mortgage Loan, including Liquidation Proceeds, released Mortgaged Property proceeds, Insurance Proceeds, condemnation proceeds and such other amounts the Servicer may collect from the related mortgagor or otherwise relating to the Mortgage Loan in respect of which such unreimbursed amounts are owed, unless such amounts are deemed to be nonrecoverable by the Servicer, in which event reimbursement will be made to the Servicer from general funds in the Collection Account.

## Hazard Insurance Policies

The Pooling and Servicing Agreement requires the Servicer to cause to be maintained for each Mortgage Loan a hazard insurance policy issued by a generally acceptable insurer insuring the improvements on the Mortgaged Property underlying such Mortgage Loan against loss by fire, with extended coverage.  Such coverage will be in an amount at least equal to the lesser of 100% of the insurable value of the improvements on the Mortgaged Property or the principal balance of such Mortgage Loan; provided, however, that such insurance may not be less than the minimum amount required to fully compensate for any damage or loss on a replacement cost basis.  The Servicer will also maintain on property acquired upon foreclosure, or deed in lieu of foreclosure, of any Mortgage Loan, a hazard insurance policy in an amount that is at least equal to the lesser of 100% of the insurable value of the improvements which are a part of such property or the principal balance of such Mortgage Loan; provided, however, that such insurance may not be less than the minimum amount required to fully compensate for any damage or loss on a replacement cost basis.  All amounts collected by the Servicer under any such policy (except for amounts to be applied to the restoration or repair of the Mortgaged Property or released to the mortgagor in accordance with the Servicer's normal servicing procedures, subject to the terms and conditions of the related Mortgage and Mortgage Note) will be deposited in the Collection Account.

In general, the standard form of fire and extended coverage policy covers physical damage to or destruction of the improvements of the property by fire, lightning, explosion, smoke, windstorm, hail, riot, strike and civil commotion, subject to the conditions and exclusions specified in each policy.  Because the policies relating to such Mortgage Loans will be underwritten by different insurers and will cover Mortgaged Properties located in various states, such policies will not contain identical terms and conditions.  The most significant terms thereof, however, generally will be determined by state law and generally will be similar.  Most such policies typically will not cover any physical damage resulting from the following: war, revolution, governmental actions, floods and other water-related causes, earth movement (including earthquakes, landslides and mudflows), nuclear reaction, wet or dry rot, vermin, rodents, insects or domestic animals, hazardous wastes or hazardous substances, theft and, in certain cases, vandalism. The foregoing list is merely indicative of certain kinds of uninsured risks and is not all-inclusive.

In general, if the improvements on a Mortgaged Property are located in an area identified by the Federal Emergency Management Agency regulations as an area having special flood hazards (and such flood insurance has been made available) Pooling and Servicing Agreement will require the Servicer to cause to be maintained a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration with a generally acceptable insurance carrier.  The Pooling and Servicing Agreement will require that such flood insurance be in an amount not less than the least of (i) the principal balance of the Mortgage Loan, (ii) minimum amount required to compensate for damage or loss on a replacement cost basis, or (iii) the maximum amount of insurance which is available under the Flood Disaster Protection Act of 1973, as amended.  The Sponsor does not provide financing for flood zone properties located in communities not participating in the National Flood Insurance Program or if available insurance coverage is, in its judgment, unrealistically low.

As described more fully in the Pooling and Servicing Agreement, in the event of a lapse in any required borrower-placed policy, the Servicer will maintain a lender-placed blanket policy insuring against hazard losses on all of the Mortgaged Properties and will maintain a lender-placed blanket policy insuring against special hazards on the Mortgaged Properties.  Pursuant to the Pooling and Servicing Agreement, however, the Servicer will promptly obtain lender-placed policies insuring against hazard losses and flood insurance on individual Mortgaged Properties upon its discovery that required borrower-placed policies have lapsed.  The Servicer will advance the amounts of any deductibles under such lender-placed policies on any individual Mortgaged Properties.  Such advances shall be deemed to be Servicing Advances.

Under the terms of the Mortgage Loans, mortgagors will generally be required to present claims to insurers under hazard insurance policies maintained on the related Mortgaged Properties.  The Servicer, on behalf of the Trustee and certificateholders, is obligated to present or cause to be presented claims under any lender-placed insurance policy insuring against hazard losses on Mortgaged Properties securing the Mortgage Loans.  However, the ability of the Servicer to present or cause to be presented such claims is dependent upon the extent to which information in this regard is furnished to the Servicer by mortgagors.

If the Guarantor fails to make payments required pursuant to the Guarantee, any losses incurred with respect to Mortgage Loans due to uninsured risks (including earthquakes, mudflows, floods and hazardous wastes or hazardous substances) or insufficient hazard insurance proceeds will adversely affect distributions to the Offered certificateholders.

**Primary Mortgage Insurance Policies**

The Trustee, on behalf of the Issuing Entity, will maintain or cause to be maintained, as the case may be, in full force and effect, primary mortgage insurance policies, including the policy issued by the PMI Insurer, with regard to Mortgage Loans with Loan-to-Value Ratios over 80% as of the Closing Date.  Primary mortgage insurance policies reimburse certain losses sustained by reason of defaults in payments by mortgagors.  The Trustee, on behalf of the Issuing Entity, will not cancel or refuse to renew any such primary mortgage insurance policy in effect at the time of the initial issuance of the Certificates that is required to be kept in force under the Pooling and Servicing Agreement unless the replacement primary mortgage insurance policy for such cancelled or non-renewed policy is maintained with an insurer whose claims paying ability is in accord with the requirements of the Pooling and Servicing Agreement.

**Fidelity Bonds and Errors and Omissions Insurance**

The Pooling and Servicing Agreement will require that the Servicer obtain and maintain in effect a fidelity bond or similar form of insurance coverage (which may provide blanket coverage) or any combination thereof insuring against loss occasioned by fraud, theft or other intentional misconduct of the officers, employees and agents of the Servicer.

**Due-on-Sale Provisions**

With respect to each Mortgage Loan, the Pooling and Servicing Agreement provides that, when any Mortgaged Property is about to be conveyed by the mortgagor, the Servicer will, to the extent it has knowledge of such prospective conveyance, exercise its rights to accelerate the maturity of such Mortgage Loan under the "due-on-sale" clause applicable thereto, if any, unless, in the reasonable belief of the Servicer, such exercise is not enforceable under applicable law.  In any case, the Servicer is authorized to take or enter into an assumption and modification agreement from or with the person to whom such Mortgaged Property has been or is about to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and, unless prohibited by applicable state law, the mortgagor remains liable thereon; provided that such assumption and modification does not result in a "significant modification" of the Mortgage Loans within the meaning of Code section 1001.  The Servicer will also be authorized and the primary mortgage insurer, if any, to enter into a substitution of liability agreement with such person, pursuant to which the original mortgagor is released from liability and such person is substituted as mortgagor and becomes liable under the Mortgage Note; provided that such substitution does not result in a "significant modification" of the Mortgage Loan within the meaning of Code section 1001.

**Evidence as to Compliance**

The Servicer will deliver annually to the Trustee and the Guarantor, in accordance with the Pooling and Servicing Agreement, on or before the date specified in the Pooling and Servicing Agreement, an officer's certificate stating that (i) a review of the activities of the Servicer during the preceding calendar year and of performance under the Pooling and Servicing Agreement has been made under the supervision of such officer, and (ii) to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under the Pooling and Servicing Agreement in all material respects throughout such year, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status of the failure.

In addition, the Servicer will deliver annually to the Trustee and the Guarantor, a report that assesses compliance by that party, on a "servicing platform" level, with the servicing criteria set forth in Item 1122(d) of Regulation AB (17 C.F.R. 229.1122) (an "**Assessment of Compliance**") and such Assessment of Compliance will contain the following:

- a statement of the Servicer's responsibility for assessing compliance with the servicing criteria applicable to it;

- a statement that the Servicer used the criteria in Item 1122(d) of Regulation AB to assess compliance with the applicable servicing criteria;

- the Servicer's Assessment of Compliance for and as of the end of the prior calendar year, setting forth any material instance of noncompliance identified by the party; and

- a statement that a registered public accounting firm has issued an attestation report on the Servicer's Assessment of Compliance for and as of the end of the prior calendar year.

The Servicer will also be required to simultaneously deliver an attestation report of a registered public accounting firm, prepared in accordance with the standards for attestation engagements issued or adopted by the Public Company Accounting Oversight Board, that expresses an opinion, or states that an opinion cannot be expressed, concerning the party's Assessment of Compliance.

**The Servicer**

*General*

The duties to be performed by the Servicer include collection and remittance of principal and interest payments on the Mortgage Loans, administration of mortgage escrow accounts, collection of insurance claims, foreclosure procedures, and, if necessary, the advance of funds to the extent certain payments are not made by the mortgagor and have not been determined by the Servicer to be not recoverable under the applicable insurance policies, from proceeds of liquidation of such Mortgage Loans or otherwise. The Servicer also will provide such accounting and reporting services as are necessary to provide required information to the Trustee with respect to the Mortgage Loans included in the Issuing Entity. Any of the servicing obligations of a Servicer may be delegated to another person who meets the requirements set forth in the Pooling and Servicing Agreement and agrees to conduct such duties in accordance with the Pooling and Servicing Agreement.

The Trustee or a successor servicer is entitled to be reimbursed for its costs in effecting a servicing transfer from the predecessor servicer. In the event that the predecessor servicer fails to reimburse the Trustee or successor servicer, the Trustee or successor servicer will be entitled to reimbursement from the assets of the Issuing Entity.

The Pooling and Servicing Agreement provides that the Servicer may resign from its obligations and duties thereunder only (i) upon a determination that its duties under the Pooling and Servicing Agreement are no longer permissible under applicable law or are in material conflict by reason of applicable law with any other activities carried on by it, the other activities of the Servicer so causing such a conflict being of a type and nature carried on by

the Servicer at the date of the Pooling and Servicing Agreement or (ii) upon satisfaction of the condition that the Servicer has proposed a successor servicer to the Trustee and the Guarantor in writing and such proposed successor servicer is acceptable to the Trustee and the Guarantor.  No such resignation will become effective until the Trustee or a successor servicer has assumed the Servicer's obligations and duties under the Pooling and Servicing Agreement.

The Pooling and Servicing Agreement will also provide that neither the Servicer nor any director, officer, employee or agent of the Servicer, will be under any liability to the Issuing Entity or the certificateholders, for the taking of any action or for refraining from the taking of any action in good faith pursuant to the Pooling and Servicing Agreement, or for errors in judgment; provided, however, that neither the Servicer, any subcontractor, nor any such person will be protected against any liability that would otherwise be imposed by reason of willful malfeasance, bad faith or negligence in the performance of his or its duties or by reason of reckless disregard of his or its obligations and duties thereunder.  The Pooling and Servicing Agreement will further provide that, subject to certain limitations, the Servicer, and any director, officer, employee or agent of the Servicer will be entitled to indemnification by the Issuing Entity and will be held harmless against any loss, liability or expense incurred in connection with the performance of its duties and obligations and any legal action relating to the Pooling and Servicing Agreement or the Certificates, other than any loss, liability or expense incurred by reason of willful malfeasance, bad faith or negligence in the performance of his or its duties thereunder or by reason of reckless disregard of his or its obligations and duties thereunder.  In addition, the Pooling and Servicing Agreement will provide, subject to the limitations set forth therein, that the Servicer will not be under any obligation to appear in, prosecute or defend any legal action unless such action is related to its duties under the Pooling and Servicing Agreement and that in its opinion may involve it in any expense or liability; provided, however, that the Servicer may in its discretion undertake any action, with the consent of the Guarantor, related to its obligations under the Pooling and Servicing Agreement that it may deem necessary or desirable with respect to the Pooling and Servicing Agreement and the rights and duties of the parties under the Pooling and Servicing Agreement and the interests of the certificateholders.  The Servicer may, however, in its discretion, undertake any such action deemed by it necessary or desirable with respect to the Pooling and Servicing Agreement and the rights and duties of the parties thereto and the interests of the certificateholders thereunder.  In such event, the legal expenses and costs of such action and any liability resulting therefrom will be expenses, costs and liabilities of the Issuing Entity and the Servicer will be entitled to be reimbursed therefor out of the Certificate Account.

Notwithstanding anything to the contrary in the Pooling and Servicing Agreement, neither the Trustee nor the Custodian will be entitled to any amount of indemnification expenses from the Issuing Entity pursuant to Section 8.05 or any other Section of the Pooling and Servicing Agreement to the extent that such indemnification expenses exceed in the aggregate $150,000 per annum (with respect to such parties in the aggregate "**Trustee Aggregate Annual Cap**"); provided, that any amounts in excess of such Trustee Aggregate Annual Cap shall be paid, to the extent funds are available, in the subsequent year or years (subject to the Trustee Aggregate Annual Cap for such subsequent year or years) until paid in full.

Any person into which the Servicer may be merged or consolidated, or any person resulting from any merger, conversion or consolidation to which the Servicer is a party, or any organization succeeding to the business through the transfer of substantially all of its assets or all assets relating to such business, or otherwise, of the Servicer will be the successor of the Servicer under the Pooling and Servicing Agreement provided that such successor or resulting entity has a net worth of not less than $15,000,000 and meets other requirements set forth in the Pooling and Servicing Agreement.

The Servicer also has the right to assign its rights and delegate its duties and obligations under the Pooling and Servicing Agreement; provided that, if the Servicer desires to be released from its obligations under the Pooling and Servicing Agreement, the assignee is reasonably satisfactory to the Trustee and the Guarantor and executes and delivers to the Trustee an agreement, in form and substance reasonably satisfactory to the Trustee, which contains an assumption by such purchaser or transferee of the due and punctual performance and observance of each covenant and condition to be performed or observed by the Servicer under the Pooling and Servicing Agreement from and after the date of such agreement.  The Servicer will be released from its obligations under the Pooling and Servicing Agreement upon any such assignment and delegation, except that the Servicer will remain liable for all liabilities and obligations incurred by it prior to the time that the condition for resignation above is met.

**Compensation and Payment of Expenses of the Servicer, Trustee, Credit Risk Manager and PMI Insurer**

The primary compensation payable to the Servicer is the aggregate of the Servicing Fees applicable to the Mortgage Loans.  The Servicer will be entitled to a "**Servicing Fee**" payable monthly which will accrue at a rate equal to one-twelfth of the Servicing Fee Rate.  The Servicing Fee Rate (the "**Servicing Fee Rate**") is 0.500% per annum.  The primary compensation payable to the Trustee is the aggregate of the Trustee Fees applicable to the Mortgage Loans.  The Trustee will be entitled to a "**Trustee Fee**" payable monthly which will accrue at a rate equal to one-twelfth of the Trustee Fee Rate.  The Trustee Fee Rate (the "**Trustee Fee Rate**") is 0.060% per annum.  The compensation payable to the Credit Risk Manager is the aggregate of the Credit Risk Management Fees applicable to the Mortgage Loans.  The Credit Risk Manager will be entitled to a Credit Risk Management Fee payable monthly which will accrue at a rate equal the Credit Risk Management Fee Rate.  The "**Credit Risk Management Fee Rate**" is 0.014% per annum.  The Servicing Fee will accrue on the unpaid principal balance of the Mortgage Loans as of the first day of the preceding month.  The Trustee Fee and the Credit Risk Management Fee will accrue on the unpaid principal balance of the Mortgage Loans as of the opening of business on the first day of the related Due Period.  The PMI Insurer will be entitled to the PMI Premium payable monthly which will accrue on the unpaid principal balance of the applicable Mortgage Loans at a rate equal the PMI Premium Rate.  The "**PMI Premium Rate**" is 1.35% per annum.

The Servicing Fee Rate, Trustee Fee Rate, the Credit Risk Management Fee Rate and the PMI Premium Rate are as set forth in the table below:

### Fees Payable From the Issuing Entity

| Servicing Fee Rate | Trustee Fee Rate | Credit Risk Management Fee Rate | PMI Premium Rate |
|---|---|---|---|
| 0.500% per annum (1) | 0.060% per annum | 0.014% per annum | 1.35% per annum |

_____

(1)  The Servicing Fee Rate may not be changed without the consent of certificateholders if such change adversely affects the interest of certificateholders.

The Servicing Fee, Trustee Fee, the Credit Risk Management Fee and the PMI Premium for each (in the case of the PMI Premium, for each applicable) Mortgage Loan are payable out of the interest payments on the Mortgage Loans, prior to any payments to certificateholders.

As additional servicing compensation, the Servicer is entitled to retain all service-related fees, including assumption fees, modification fees, extension fees, bad check fees and late payment charges, to the extent collected from mortgagors, together with any interest or other income earned on funds held in the Collection Account and any escrow accounts and any Liquidation Profits.  The Servicer is obligated to pay certain insurance premiums and certain ongoing expenses associated with the Mortgage Pool and incurred by the Servicer in connection with its responsibilities under the Pooling and Servicing Agreement and is entitled to reimbursement therefor as provided in the Pooling and Servicing Agreement.  The Servicer will also be entitled to reimburse itself a fee from the Issuing Entity from amounts on deposit in the Collection Account for the costs associated with modifying defaulted Mortgage Loans in amounts specified in the Pooling and Servicing Agreement.

In the event that the Trustee succeeds to the role of the Servicer, it will be entitled to compensation for such duties not to exceed the compensation received by the predecessor servicer.  In addition, if the Trustee appoints a successor servicer under the Pooling and Servicing Agreement, the Trustee may make arrangements for the compensation of such successor servicer, such compensation not to exceed the compensation received by the predecessor servicer.  All costs of a transfer of servicing will be reimbursed to the party who incurred such costs as described herein.

The Trustee will pay certain administrative expenses incurred in connection with its responsibilities under the Pooling and Servicing Agreement.  Some of these expenses of the Trustee are subject to rights of reimbursement as described under "—The Trustee" below.  The Trustee is also entitled to any interest or other income earned on funds held in the Certificate Account.

72

**Voting Interests**

With respect to any provisions of the Pooling and Servicing Agreement providing for the action, consent or approval of the holders of all Certificates evidencing specified Voting Interests in the Issuing Entity, each Class of Class A Certificates will be entitled to a pro rata portion of the Voting Interest based on the outstanding Certificate Principal Balance of such Class.  The Class P Certificate will not be entitled to any Voting Interests.  Each certificateholder of a Class of Class A Certificates will have a Voting Interest equal to the product of the Voting Interest to which such Class is collectively entitled and the percentage interest in such Class represented by such holder's Certificates.  With respect to any provisions of the Pooling and Servicing Agreement providing for action, consent or approval of each Class of Certificates or specified Classes of Certificates, each certificateholder of a Class of Class A Certificates will have a Voting Interest in such Class equal to such holder's percentage interest in such Class.

**Events of Default under the Pooling and Servicing Agreement**

The "**Events of Default**" under the Pooling and Servicing Agreement will include (i) any failure by the Servicer to make (a) any Advance or to pay Compensating Interest which continues unremedied for one business day following receipt of written notice of such failure or (b) a required deposit which continues unremedied for one business day after the giving of written notice of such failure to the Servicer; (ii) any failure by the Servicer duly to observe or perform in any material respect any other of its covenants, obligations or agreements in the Pooling and Servicing Agreement, which continues unremedied for 30 days after (a) the giving of written notice of such failure to the Servicer by the Trustee or the holders of Certificates aggregating not less than 51% of the Voting Interests, or to the Servicer and the Trustee by the Guarantor or (b) actual knowledge of such failure by the Servicer; provided however, that if the Servicer is unable, with the exercise of reasonable diligence, to remedy such failure within such 30 day period, such period shall be extended for an additional 30 days, (iii) certain bankruptcy events of the Servicer, (iv) the Servicer or any subservicer appointed by it ceases to be approved by Freddie Mac and (v) the occurrence of the fourth Delivery Event.

If, with respect to any Distribution Date, the Servicer does not deliver the supplemental remittance report to the Guarantor as required each month under the Pooling and Servicing Agreement or the information in the supplemental remittance report delivered by the Servicer with respect to such month is not correct or complete in any material respect, such failure shall constitute a "**Delivery Event**" with respect to such Distribution Date and the Servicer shall be subject to the following penalties: (i) the Servicer shall pay Freddie Mac an amount equal to $1,000 upon the occurrence of the first Delivery Event; provided, however, that the Servicer shall not be required to make any such payment upon the first such Delivery Event during each consecutive two year period unless two consecutive monthly Delivery Events occur; (ii) the Servicer shall pay Freddie Mac an amount equal to $2,000 upon the occurrence of the second Delivery Event; (iii) the Servicer shall pay Freddie Mac an amount equal to $3,000 upon the occurrence of the third Delivery Event and (iv) as provided for above and in the Pooling and Servicing Agreement, the occurrence of a fourth Delivery Event shall result in an Event of Default.

**Rights Upon Event of Default under the Agreements**

So long as an Event of Default described in clause (i)(a) of the definition thereof remains unremedied for one business day following written notice of the failure to make an Advance or to pay Compensating Interest, with the consent of the Guarantor, the Trustee may, or upon the direction of, the Guarantor the Trustee will, terminate all of the rights and obligations of the Servicer under the Pooling and Servicing Agreement and in and to the Mortgage Loans. In addition, so long as an Event of Default (other than an Event of Default discussed in the immediately preceding sentence) remains unremedied under the Pooling and Servicing Agreement, the Trustee, at the direction of the Guarantor or certificateholders evidencing not less than 51% of the Voting Interests in the Issuing Entity, will terminate all of the rights and obligations of the Servicer under the Pooling and Servicing Agreement and in and to the Mortgage Loans.  Upon termination, the Servicer retains its right to recovery of the aggregate Servicing Fees due prior to the date of termination, and other expenses and amounts advanced pursuant to the terms of the Pooling and Servicing Agreement, which rights the Servicer will retain under all circumstances.  Upon termination, the Trustee will succeed to (or the Trustee will appoint a successor servicer to assume) all of the responsibilities, duties and liabilities of the Servicer under the Pooling and Servicing Agreement and will be entitled to similar compensation arrangements.  In the event that the Trustee is unwilling or unable to act, the Trustee may select, pursuant to the

73

procedure described in the Pooling and Servicing Agreement, or petition a court of competent jurisdiction to appoint, a housing and home finance institution, bank or mortgage servicing institution with a net worth of at least $50,000,000 to act as successor to the Servicer under the provisions of the Pooling and Servicing Agreement; provided however, that until such a successor Servicer is appointed and has assumed the responsibilities, duties and liabilities of the Servicer under the Pooling and Servicing Agreement, the Trustee shall act as successor Servicer.

During the continuance of any Event of Default under the Pooling and Servicing Agreement, the Trustee will have the right to take action to enforce its rights and remedies and to protect and enforce the rights and remedies of the certificateholders, and holders of Certificates evidencing not less than 25% of the Voting Interests may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee. However, the Trustee will not be under any obligation to pursue any such remedy or to exercise any of such trusts or powers unless such certificateholders have offered the Trustee reasonable security or indemnity against the cost, expenses and liabilities which may be incurred by the Trustee thereby. Also, the Trustee may decline to follow any such direction if the Trustee determines that the action or proceeding so directed may not lawfully be taken or would involve it in personal liability or be unjustly prejudicial to the non-assenting certificateholders.

No certificateholder, solely by virtue of such holder's status as a certificateholder, will have any right under the Pooling and Servicing Agreement to institute any proceeding with respect to the Pooling and Servicing Agreement, unless such holder previously has given to the Trustee written notice of default and continuance thereof and unless the holders of Certificates evidencing not less than 25% of the Voting Interests have made written request upon the Trustee to institute such proceeding in its own name as Trustee thereunder and have offered to the Trustee reasonable indemnity and the Trustee for 60 days has neglected or refused to institute any such proceeding.

**Amendment**

The Pooling and Servicing Agreement may be amended by the parties thereto, without the consent of any certificateholders (i) to cure any ambiguity or correct any mistake, (ii) to correct, modify or supplement any provision therein which may be inconsistent with any other provision therein or with this information circular, (iii) to make any other provisions with respect to matters or questions arising under the Pooling and Servicing Agreement which are not materially inconsistent with the provisions thereof or of this information circular or (iv) to comply with any requirements imposed by the Code; provided that, in the case of clause (iii) and (iv), such amendment will not adversely affect in any material respect the interests of any certificateholders as evidenced by an opinion of counsel to such effect delivered to the Trustee, the Guarantor and the Servicer. Each Agreement may also be amended by the parties thereto with the consent of the holders of Certificates evidencing interests aggregating not less than 51% of the Voting Interests evidenced by the Certificates affected thereby, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Pooling and Servicing Agreement or of modifying in any manner the rights of the certificateholders; provided, however, that no such amendment may (i) reduce in any manner the amount of, or delay the timing of, any payments received on or with respect to Mortgage Loans that are required to be distributed on any Certificates, without the consent of the holder of such Certificate, (ii) adversely affect in any material respect the interests of the holders of a Class of Certificates in a manner other than that set forth in (i) above without the consent of the holders of Certificates aggregating not less than 66 2/3% of the Voting Interests evidenced by such Class, or (iii) reduce the aforesaid percentage of Certificates of any Class, the holders of which are required to consent to such amendment, without the consent of the holders of all Certificates of such Class affected then outstanding.

**The Trustee**

The Trustee may have normal banking relationships with the Depositor or any of its affiliates. The Trustee may resign at any time, in which event the Depositor will be obligated to appoint a successor trustee. The Depositor or the Servicer with the consent of the Guarantor (which consent shall not be unreasonably withheld) may also remove the Trustee if the Trustee ceases to be eligible to act in its capacity under the Pooling and Servicing Agreement or if the Trustee becomes insolvent or is legally unable to act. Upon becoming aware of such circumstances, the Depositor or the Servicer with the consent of the Guarantor (which consent shall not be unreasonably withheld) may remove the Trustee and will become obligated to appoint a successor trustee. The Trustee may also be removed at any time by the Guarantor, with cause, or by the holders of Certificates evidencing not less than 51% of the Voting Interests in the

Issuing Entity, except that, any Certificate registered in the name of the Depositor, the Servicer or the Trustee or any affiliate thereof (of any other parties specified in the Pooling and Servicing Agreement) will not be taken into account in determining whether the requisite Voting Interests in the Issuing Entity necessary to effect any such removal has been obtained.  Any resignation and removal of the Trustee, and the appointment of a successor, will not become effective until acceptance of such appointment by the successor trustee.  The Trustee and any successor is required to have a combined capital and surplus of at least $50,000,000, or will be a member of a bank holding system, the aggregate combined capital and surplus of which is at least $50,000,000, provided that the Trustee's and any such successor trustee's separate capital and surplus shall at all times be at least the amount specified in Section 310(a)(2) of the Trust Indenture Act of 1939, have the ratings specified in the Pooling and Servicing Agreement, be subject to supervision or examination by federal or state authority and be reasonably acceptable to Freddie Mac.

The Pooling and Servicing Agreement will also provide that none of the Trustee nor any subcontractor, nor any partner, director, officer, employee or agent of either of them, will be under any liability to the Issuing Entity or the certificateholders, for the taking of any action or for refraining from the taking of any action in good faith pursuant to the Pooling and Servicing Agreement, or for errors in judgment; provided, however, that none of the Trustee, any subcontractor, nor any such person will be protected against any liability that would otherwise be imposed by reason of willful malfeasance, bad faith or negligence in the performance of his or its duties or by reason of reckless disregard of his or its obligations and duties thereunder.  The Pooling and Servicing Agreement will further provide that, subject to certain limitations, the Trustee, any subcontractor, and any director, officer, employee or agent of either of them shall be entitled to indemnification by the Issuing Entity and will be held harmless against any loss, liability or expense incurred in connection with the performance of their duties and obligations and any legal action relating to the Pooling and Servicing Agreement or the Certificates, other than any loss, liability or expense incurred by reason of willful malfeasance, bad faith or negligence in the performance of his or its duties thereunder or by reason of reckless disregard of his or its obligations and duties thereunder.

All costs associated with the appointment of a successor trustee shall be paid by the predecessor trustee; provided however, that if the predecessor trustee has been removed by certificateholders, all reasonable expenses will be reimbursed by the Issuing Entity.  Without limiting the predecessor trustee's obligation, if the predecessor trustee fails to pay such costs, such costs shall be reimbursed by the Issuing Entity.

**Reports to Certificateholders**

The Trustee will prepare and make available to the Depositor, the certificateholders, the Guarantor and the Credit Risk Manager on its website at www.etrustee.net, a statement setting forth the following information:

(i)     the amount of the distribution made on such Distribution Date to the certificateholders allocable to principal;

(ii)     the aggregate amount of servicing compensation received by the Servicer during the related Due Period;

(iii)     the aggregate amount of Advances and Servicing Advances for the related Due Period, cumulative unreimbursed Advances and Servicing Advances and cumulative advances deemed nonrecoverable, in good faith, by the Servicer;

(iv)     the aggregate stated principal balance of the Mortgage Loans in each Loan Group, at the close of business at the end of the related Due Period;

(v)     with respect to each Loan Group, the number, weighted average remaining term to maturity and weighted average Mortgage Rate of the Mortgage Loans in such Loan Group as of the related Due Date;

(vi)     with respect to each Loan Group, the number and aggregate principal balances of the Mortgage Loans (A) Delinquent (exclusive of Mortgage Loans in foreclosure or bankruptcy), grouping such Delinquent Mortgage Loans in 30 day increments, up to 180 days Delinquent, (B) in foreclosure, as of the close of business on the last day of the calendar month preceding the Distribution Date and (C) in bankruptcy

as of the close of business on the last day of the calendar month preceding the Distribution Date, in accordance with the MBA methodology for measuring delinquencies;

(vii)     with respect to any Mortgage Loan that became an REO Property during the preceding calendar month, the loan number of such Mortgage Loan, the unpaid principal balance of the REO Property as of the close of business on the last Business Day of such calendar month and the principal balance of such Mortgage Loan as of the date it became an REO Property;

(viii)    the book value of any REO Property as of the close of business on the last Business Day of the calendar month preceding the Distribution Date, and, cumulatively, the total number and cumulative principal balance of all REO Properties as of the close of business of the last day of the preceding Due Period;

(ix)      the aggregate amount of principal prepayments made during the related Prepayment Period;

(x)       the aggregate amount of Realized Losses incurred during the related Due Period and the cumulative amount of Realized Losses since the Cut-off Date;

(xi)      the Certificate Principal Balance of each Class of Class A Certificates, after giving effect to the distributions;

(xii)     the Accrued Certificate Interest in respect of each Class of Class A Certificates for such Distribution Date, and the respective portions thereof, if any, remaining unpaid following the distributions made in respect of such Certificates on such Distribution Date;

(xiii)    the aggregate amount of any Prepayment Interest Shortfalls and any Compensating Interest for such Distribution Date, to the extent not covered by payments by the Servicer;

(xiv)     the Available Funds with respect to each Loan Group;

(xv)      the Pass-Through Rate for each Class of Class A Certificates for such Distribution Date;

(xvi)     the information contained in the report with respect to Liquidated Loans for such Distribution Date;

(xvii)    the aggregate principal balance of Mortgage Loans purchased by the Servicer or the Depositor during the related Prepayment Period;

(xviii)   the amount of the Trustee Fee, the Credit Risk Management Fee and the PMI Premium paid;

(xix)     the Guarantor Reimbursement Amount and the Deficiency Amount for such Distribution Date;

(xx)      the aggregate Prepayment Penalty collected;

(xxi)     the pool factors for such Distribution Date;

(xxii)    the amount of Subsequent Recoveries received during the related Prepayment Period;

(xxiii)   any expenses or indemnification amounts paid by the Issuing Entity, the specific purpose of each payment and the parties to whom these payments are made;

(xxiv)    the applicable Determination Date, the Record Date and the actual Distribution Date for the distribution;

(xxv)     any material modifications, extensions or waivers to Mortgage Loan terms, fees, penalties or payments since the previous Distribution Date;

(xxvi)   any material breaches of representations and warranties relating to the Mortgage Loans or material breaches of transaction covenants or representations and warranties;

(xxvii)   any other customary information as is required to enable certificateholders to prepare their tax returns; and

(xxviii)   to the extent that the Trustee possesses such information, any information required by the Code and such other information as the Guarantor may reasonably request.

**Reports to Freddie Mac and the Credit Risk Manager**

No later than the tenth calendar day of each month, the Servicer shall, in accordance with the terms in the Pooling and Servicing Agreement, prepare and deliver to the Guarantor and the Credit Risk Manager a Servicer REO monthly tracking report in electronic format, with respect to such Distribution Date.  No later than five Business Days prior to each Distribution Date, the Servicer shall, in accordance with the terms in the Pooling and Servicing Agreement, prepare and deliver to the Guarantor and the Credit Risk Manager (i) a supplemental remittance report with respect to such Distribution Date and (ii) a loan modification report with respect to the Prepayment Period relating to such Distribution Date; provided, however, that the Servicer shall not be required to deliver a loan modification report if there are no loan modifications during the related Prepayment Period.

No later than five business days prior to each Distribution Date, the Trustee will prepare and distribute to Freddie Mac and the Credit Risk Manager a certificate report, a supplemental certificate report and any other reports required pursuant to the Pooling and Servicing Agreement.

**Optional Termination of the Issuing Entity**

The Servicer will have the right to purchase all outstanding Mortgage Loans in the Issuing Entity and thereby effect early retirement of the Certificates on or after the first Distribution Date following the Distribution Date on which the aggregate unpaid principal balance of the Mortgage Loans is reduced to 10% or less of the aggregate unpaid principal balance of the Mortgage Loans as of the Cut-off Date (such Distribution Date, the "**Optional Termination Date**").  In the event that the option is exercised, the purchase will be made at a price (the "**Termination Price**") generally equal to the sum of (a) the then aggregate outstanding principal balance of the Mortgage Loans (or for any Mortgaged Property, title to which had been acquired by the Issuing Entity ("**REO Property**")), the fair market value of such REO Property), plus accrued interest thereon at the applicable Mortgage Rate through the Due Date in the month in which the proceeds of the optional termination will be distributed on the Certificates, (b) any unreimbursed fees, indemnity amounts and out-of-pocket costs and expenses owed to the Trustee or the Servicer and all unreimbursed Advances and Servicing Advances, in each case incurred by such party in the performance of its obligations, (c) any unreimbursed costs, penalties and/or damages incurred by the Guarantor or the Issuing Entity in connection with any violation relating to any of the Mortgage Loans of any predatory or abusive lending law.  In addition, no option may be exercised until any due and unpaid Reimbursement Amounts have been paid to the Guarantor or the Issuing Entity and certain other amounts have been paid to the Guarantor.  Proceeds from such purchase will be included in Available Funds and will be distributed to the certificateholders in accordance with the Pooling and Servicing Agreement.

The exercise of this option will be in the sole discretion of the Servicer.  Without limitation, the Servicer may enter into agreements with third parties to (i) exercise such option at the direction of a third party or (ii) forebear from the exercise of such option.  Any such purchase of the Mortgage Loans and REO Properties will result in the early retirement of the Certificates.

In addition, the obligations created by the Pooling and Servicing Agreement will terminate upon the payment to certificateholders all amounts held in the Certificate Account or by the Servicer and required to be paid to them pursuant to the Pooling and Servicing Agreement following the earlier of (i) the final payment or other liquidation of the last Mortgage Loan subject thereto or the disposition of all property acquired upon foreclosure of any Mortgage Loan subject thereto and (ii) the purchase of the assets of the Issuing Entity by the Servicer, under the circumstances and in the manner set forth above.  In no event, however, will the Issuing Entity continue beyond the expiration of 21

years from the death of the last survivor of certain persons named in the Pooling and Servicing Agreement.  Written notice of termination of the Pooling and Servicing Agreement will be given to each certificateholder, and the final distribution will be made only upon presentation and surrender of the Certificates at the location to be specified in the notice of termination.

## CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES

**General**

IRS Circular 230 Notice: The discussion contained in this information circular is not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. federal, state or local tax penalties.  This discussion is written and provided by the Depositor in connection with the promotion or marketing by the Depositor of the transactions or matters addressed in this information circular.  You should seek advice based on your particular circumstances from an independent tax advisor.

The following is a discussion of the material, and certain other, federal income tax consequences of the purchase, ownership and disposition of the Offered Certificates.  This discussion is intended as an explanatory discussion of the consequences of holding the Offered Certificates generally and does not purport to furnish information with the level of detail that would be expected to be provided by an investor's own tax advisor, or with consideration of an investor's specific tax circumstances.  Accordingly, it is recommended that each prospective investor consult with its own tax advisor regarding the application of United States federal income tax laws, as well as any state, local, foreign or other tax laws, to their particular situation.  Prospective investors should be further aware that no rulings have been sought from the Internal Revenue Service (the "**IRS**") and that legal opinions are not binding on the IRS or the courts.  Accordingly, there can be no assurance that the IRS or the courts will agree with the opinions of the Depositor's counsel.  If the Issuing Entity were characterized or treated as a corporation for federal income tax purposes, among other consequences, the Issuing Entity would be subject to federal income tax and similar state income or franchise taxes on its income and distributions to holders of the Offered Certificates could be impaired.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "**Code**")) as well as Treasury regulations and administrative and judicial rulings and practice.  Legislative, judicial and administrative changes may occur, possibly with retroactive effect, that could alter or modify the continued validity of the statements and conclusions set forth in this Information Circular.  This summary does not purport to address all federal income tax matters that may be relevant to holders of the Offered Certificates.  This summary generally is addressed only to original purchasers of the Offered Certificates that are United States investors, deals only with securities held as capital assets within the meaning of Section 1221 of the Code, and does not address all the tax consequences to holders that may be relevant to investors subject to special rules, such as non-U.S. investors, banks, insurance companies, tax-exempt organizations, electing large partnerships, dealers in securities or currencies, mutual funds, REITs, S corporations, estates and trusts, investors that hold the Offered Certificates as part of a hedge, straddle, integrated or conversion transaction, or holders whose "functional currency" is not the United States dollar.  Further, it does not address alternative minimum tax consequences or the indirect effects on the holders of equity interests in any entity that is a beneficial owner of the Offered Certificates.  Further, this discussion does not address the state or local tax consequences of the purchase, ownership and disposition of the Offered Certificates.  It is recommended that investors consult their own tax advisors in determining the federal, state, local or other tax consequences to them of the purchase, ownership and disposition of the Offered Certificates.  For the purposes of the discussion under this section entitled "Certain Material Federal Income Tax Consequences," "**Certificateholder**" means the beneficial owner of an Offered Certificate.

Regulations specifically addressing certain of the issues discussed in this Information Circular have not been issued or have been issued only in proposed form and this discussion is based in part on regulations that do not adequately address some issues relevant to, and in some instances provide that they are not applicable to, securities similar to the Offered Certificates.

**Characterization of the Issuing Entity**

Upon the issuance of the Offered Certificates, Dechert LLP will deliver its opinion that under then existing law and assuming compliance by the Sponsor, the Servicer and the Trustee with all of the provisions of the Pooling

and Servicing Agreement, for federal income tax purposes, the Issuing Entity issuing the Certificates will be classified as a grantor trust under subpart E of part I of subchapter J of chapter 1 of the Code and not as a corporation or an association which is taxable as a corporation.  Each Certificateholder will be treated for federal income tax purposes as the owner of an undivided beneficial interest in (i) the related Loan Group and (ii) related assets of the Issuing Entity.  As further described below, each Certificateholder will be required to report on its federal income tax return its allocable share of the gross income from the portion of the assets of the Issuing Entity that is related to such Offered Certificate and may deduct its share of the expenses paid by the Issuing Entity that are allocable to such Offered Certificate, at the same time and to the same extent as those items would have been reported by that holder if it had purchased and held directly the interest in the related Loan Group and related assets represented by that Offered Certificate, received directly its share of the payments from the related Loan Group and related assets and paid directly its share of the expenses paid from the related Loan Group and related assets when those amounts were received and paid by the Issuing Entity.  A Certificateholder who is an individual will be allowed deductions for those expenses only to the extent that the sum of those expenses and certain other of the Certificateholder's miscellaneous itemized deductions exceeds 2% of that individual's adjusted gross income.  In addition, the amount of itemized deductions otherwise allowable for the taxable year of an individual whose adjusted gross income exceeds certain thresholds will be reduced.

To the extent that any of the Mortgage Loans owned by the Issuing Entity were originated under circumstances giving rise to original issue discount, the holders of Offered Certificates will be required to report annually an amount of additional interest income attributable to the discount in those Mortgage Loans prior to receipt of cash related to the discount.  Similarly, Code provisions concerning market discount and amortizable premium will apply to the Mortgage Loans owned by the Issuing Entity.

**Tax Status of the Offered Certificates**

In general, each class of Offered Certificates, other than as discussed below, will be "real estate assets" within the meaning of Section 856(c)(4)(A) of the Code and assets described in Section 7701(a)(19)(C) of the Code to the extent the assets of the Issuing Entity qualify under those sections of the Code.  In addition, Offered Certificates acquired by a REMIC in accordance with the requirements of Section 860G(a)(3)(C) or Section 860G(a)(4)(B) of the Code will be treated as "qualified mortgages" for purposes of Code Section 860D(a)(4) to the extent that the assets of the Issuing Entity continue to be "qualified mortgages" for such purposes.  Any amount includible in gross income with respect to the Offered Certificates will be treated as "interest on obligations secured by mortgages on real property or on interests in real property" within the meaning of Section 856(c)(3)(B) of the Code to the extent the income on the assets of the Issuing Entity qualifies under that Code section.

**Application of the Original Issue Discount, Stripped Bond and Market Discount or Premium Rules**

The treatment of the Offered Certificates under the "original issue discount" (or "**OID**"), stripped bond and market discount or premium rules of the Code is uncertain.  Because the Servicing Fee on the Mortgage Loans exceeds the "safe harbor" percentage prescribed by the IRS, the Mortgage Loans may represent "stripped bonds" for purposes of Section 1286 of the Code (the "**Stripped Bond Rules**").  Further, the IRS might require that the Offered Certificates be subdivided into pieces (one piece subject to the OID Rules, one piece subject to the Market Discount or Premium Rules (each as described below)) with each piece allocated a separate portion of the purchase price for the Offered Certificates and treated under the rules applicable to that piece.  Alternatively, the IRS might require that the Offered Certificates in their entirety be treated as subject to one of (a) the OID Rules, (b) the Market Discount or Premium Rules or (c) the Stripped Bond Rules, as applicable.  Although the treatments that are discussed below appear to be the most likely ones, other treatments are possible.  Investors are urged to consult their tax advisors concerning the proper treatment of the Offered Certificates under the OID Rules, the Market Discount or Premium Rules and the Stripped Bond Rules, as applicable.

*Taxation of Grantor Trust Certificates under the Original Issue Discount Rules*

The IRS might require that all or a portion of each Offered Certificate be treated as issued with OID within the meaning of Section 1273(a) of the Code.  Under the rules provided by Sections 1272 to 1275 of the Code, (the "**OID Rules**"), any holders of Offered Certificates treated as issued with original issue discount typically will be required to include original issue discount in income as it accrues in advance of the receipt of the cash attributable to

that income.  In addition, Section 1272(a)(6) of the Code provides special rules applicable to instruments that are subject to prepayment based on prepayments with respect to assets underlying those instruments and that are issued with original issue discount.  Regulations have not been issued under that section.  Those special rules under Section 1272(a)(6) may be applicable to the Offered Certificates.

The rules under Section 1272(a)(6) require that a prepayment assumption be used with respect to an instrument backed by a pool of mortgage collateral in computing the accrual of original issue discount on that instrument, and that adjustments be made in the amount and rate of accrual of the discount to reflect differences between the actual prepayment rate and the prepayment assumption.  The prepayment assumption is to be determined in a manner prescribed in Treasury regulations; as noted above, those regulations have not been issued.  The conference committee report accompanying the Tax Reform Act of 1986 indicates that the regulations will provide that the prepayment assumption used with respect to an instrument must be the same as that used in pricing the initial offering of the instrument.  No representation is made that the Mortgage Loans will in fact prepay at a rate conforming to a specific prepayment assumption or at any other rate.

The original issue discount, if any, on an Offered Certificate or a portion thereof will be the excess of its stated redemption price at maturity over its issue price.  Although the IRS might assert that original issue discount for an Offered Certificate be determined based on a determination of the issue price at origination of each loan underlying the Offered Certificates and an analysis of each loan's stated redemption price at maturity, the inherent complexity of that approach and the difficulty of assembling the loan level information necessary to carry it out appears to render such a method impractical.  The remainder of this discussion will assume that any Offered Certificate or portion thereof treated as issued with original issue discount will be analyzed using a method that looks at the aggregate characteristics of the entire Loan Group underlying that Offered Certificate or portion thereof and that determines the issue price for purposes of the application of the OID Rules on the basis of the issue price of the Offered Certificate or the portion of that issue price allocable to the portion of the Offered Certificate being treated as issued with original issue discount.  In the remainder of this discussion of original issue discount, the term "Offered Certificate" should be read to refer either to an Offered Certificate in its entirety or a portion of an Offered Certificate, whichever is being treated as having been issued with original issue discount.  Under that aggregate method, the issue price of a particular class of Offered Certificates will be the first cash price at which a substantial amount of Offered Certificates of that class is sold, excluding sales to bond houses, brokers and underwriters.  If less than a substantial amount of a particular class of Offered Certificates is sold for cash on or prior to the date of their initial issuance, or the closing date, the issue price for that class will be treated as the fair market value of the Class on the Closing Date.  Under the OID Rules, the stated redemption price of an Offered Certificate is equal to the total of all payments to be made on that Offered Certificate other than "qualified stated interest."  Qualified stated interest includes interest that is unconditionally payable at least annually at a single fixed rate, or in the case of a variable rate debt instrument, at a "qualified floating rate," an "objective rate," a combination of a single fixed rate and one or more "qualified floating rates" or one "qualified inverse floating rate," or a combination of "qualified floating rates" that generally does not operate in a manner that accelerates or defers interest payments on an Offered Certificate.  To the extent that loans underlying an Offered Certificate provide for the deferral of interest payments in a manner that might cause those amounts not to be paid within one year from the time at which they accrued, some or all of the interest on those loans would not be treated as qualified stated interest and would be required to be included in the stated redemption price at maturity.

Notwithstanding the general definition of original issue discount, original issue discount on an Offered Certificate or portion thereof will be considered to be de minimis if it is less than 0.25% of the stated redemption price of the Offered Certificate multiplied by its weighted average life.  For this purpose, the weighted average life of the Offered Certificate is computed as the sum of the amounts determined, as to each payment included in the stated redemption price of the Offered Certificate, by multiplying (i) the number of complete years, rounding down for partial years, from the issue date until the payment is expected to be made, presumably taking into account the prepayment assumption, by (ii) a fraction, the numerator of which is the amount of the payment, and the denominator of which is the stated redemption price at maturity of the Offered Certificate.  Under the OID Rules, original issue discount of only a de minimis amount, other than de minimis original issue discount attributable to a so-called "teaser" interest rate or an initial interest holiday, will be included in income as each payment of stated principal is made, based on the product of the total remaining amount of the de minimis original issue discount and a fraction, the numerator of which is the amount of the principal payment, and the denominator of which is the outstanding stated principal amount of the Offered Certificate.  The OID Rules also would permit a holder of an Offered Certificate to elect to accrue de

minimis original issue discount into income currently based on a constant yield method.  See "—Market Discount" below for a description of that election under the OID Rules.

If original issue discount on an Offered Certificate is in excess of a de minimis amount, the holder of the Offered Certificate must include in ordinary gross income the sum of the "daily portions" of original issue discount for each day during its taxable year on which it held the Offered Certificate, including the purchase date but excluding the disposition date.

A subsequent purchaser of an Offered Certificate that purchases the Offered Certificate at a cost, excluding any portion of that cost attributable to accrued qualified stated interest, less than its remaining stated redemption price will also be required to include in gross income the daily portions of any original issue discount with respect to that Offered Certificate.  However, each daily portion will be reduced, if the cost is in excess of its "adjusted issue price," in proportion to the ratio that excess bears to the aggregate original issue discount remaining to be accrued on the Offered Certificate.  The adjusted issue price of an Offered Certificate on any given day equals (i) the adjusted issue price or, in the case of the first accrual period, the issue price, of the Offered Certificate at the beginning of the accrual period which includes that day, plus (ii) the daily portions of original issue discount for all days during the accrual period prior to that day minus (iii) any payments of amounts included in the stated redemption price at maturity of the Offered Certificate made during the accrual period prior to that day with respect to the Offered Certificate.

*Market Discount*

If a Certificateholder is treated as acquiring any portion of an Offered Certificate at a market discount (a "**Market Discount Certificate**"), that Certificateholder will recognize gain upon receipt of each distribution representing stated principal.  In particular, under Section 1276 of the Code, the Certificateholder, in most cases, will be required to allocate the portion of each distribution representing principal first to accrued market discount not previously included in income, and to recognize ordinary income to that extent.

A Certificateholder may elect to include market discount in income currently as it accrues rather than including it on a deferred basis in accordance with the foregoing.  If made, the election will apply to all market discount bonds acquired by the Certificateholder on or after the first day of the first taxable year to which the election applies.  In addition, the OID Rules permit a Certificateholder to elect to accrue all interest, discount (including de minimis market or original issue discount) and premium in income as interest, based on a constant yield method.  If this election were made for a Market Discount Certificate with market discount, the Certificateholder would be deemed to have made an election to include currently market discount in income for all other debt instruments having market discount that the Certificateholder acquires during the taxable year of the election or after that year, and possibly previously acquired instruments.  Similarly, a Certificateholder that made this election for a Market Discount Certificate that is acquired at a premium would be deemed to have made an election to amortize bond premium for all debt instruments having amortizable bond premium that the Certificateholder owns or acquires.  See "Premium" below.  Each of these elections to accrue interest, discount and premium for a Market Discount Certificate on a constant yield method would be irrevocable.

Market discount for a Market Discount Certificate will be considered to be de minimis for purposes of Section 1276 of the Code if the market discount is less than 0.25% of the remaining principal amount of the Market Discount Certificate multiplied by the number of complete years to maturity remaining after the date of its purchase.  In interpreting a similar rule for original issue discount on obligations payable in installments, the OID Rules refer to the weighted average maturity of obligations, and it is likely that the same rule will be applied for market discount, possibly taking into account a prepayment assumption.  If market discount is treated as de minimis under this rule, it appears that the actual discount will be treated in a manner similar to original issue discount of a de minimis amount.

Section 1276(b)(3) of the Code specifically authorizes the Treasury Department to issue regulations providing for the method for accruing market discount on debt instruments, the principal of which is payable in more than one installment.  Until regulations are issued by the Treasury Department, some rules described in the legislative history to Section 1276 of the Code, or the Committee Report, apply.  The Committee Report indicates that in each accrual period market discount on Market Discount Certificates should accrue, at the Certificateholder's option:  (1) on the basis of a constant yield method, (2) in the case of a Market Discount Certificate issued without original issue discount, in an amount that bears the same ratio to the total remaining market discount as the stated interest paid in the

81

accrual period bears to the total amount of stated interest remaining to be paid on the Market Discount Certificate as of the beginning of the accrual period or (3) in the case of a Market Discount Certificate issued with original issue discount, in an amount that bears the same ratio to the total remaining market discount as the original issue discount accrued with respect to that accrual period bears to the total amount of unaccrued original issue discount on the Market Discount Certificate as of the beginning of the accrual period.  Moreover, any prepayment assumption used in calculating the accrual of original issue discount is also used in calculating the accrual of market discount.  Because the regulations referred to in this paragraph have not been issued, it is not possible to predict what effect these regulations might have on the tax treatment of a Market Discount Certificate purchased at a discount in the secondary market.  Further, it is uncertain whether a prepayment assumption would be required to be used for the Market Discount Certificates if they were issued without original issue discount.

To the extent that Market Discount Certificates provide for monthly or other periodic distributions throughout their term, the effect of these rules may be to require market discount to be includible in income at a rate that is not significantly slower than the rate at which the discount would accrue if it were original issue discount.  Moreover, in any event a holder of a Market Discount Certificate typically will be required to treat a portion of any gain on the sale or exchange of the Market Discount Certificate as ordinary income to the extent of the market discount accrued to the date of disposition under one of the foregoing methods, less any accrued market discount previously reported as ordinary income.

Further, under Section 1277 of the Code, a holder of a Market Discount Certificate may be required to defer a portion of its interest deductions for the taxable year attributable to any indebtedness incurred or continued to purchase or carry a Market Discount Certificate purchased with market discount.  For these purposes, the market discount de minimis rule described above would apply.  Any deferred interest expense would not exceed the market discount that accrues during that taxable year and is, in most cases, allowed as a deduction not later than the year in which the market discount is includible in income.  If the holder elects to include market discount in income currently as it accrues on all market discount instruments acquired by that holder in that taxable year or after that year, the interest deferral rule described above will not apply.

*Premium*

With respect to any portion of an Offered Certificate that a Certificateholder is treated as acquiring at a premium (i.e., the Certificateholder's purchase price allocable to that portion of the Offered Certificate is an amount greater than its remaining principal amount or adjusted issue price, as applicable) (a "**Premium Certificate**"), the holder will be considered to have purchased the Premium Certificate with amortizable bond premium, and may elect to amortize the premium using a constant yield method over the remaining term of the Premium Certificate and to offset interest otherwise required to be included in income relating to that Premium Certificate by the premium amortized in that taxable year.  If this election is made, it will apply to all debt instruments having amortizable bond premium that the holder owns or subsequently acquires.  The OID Rules also permit Certificateholders to elect to include all interest, discount and premium in income based on a constant yield method.  See "—Market Discount" above.  The Committee Report states that the same rules that apply to accrual of market discount, which rules may require use of a prepayment assumption in accruing market discount for Premium Certificates without regard to whether the Premium Certificates have original issue discount, would also apply in amortizing bond premium under Section 171 of the Code.

*Stripped Bonds*

Pursuant to the Stripped Bond Rules, the separation of ownership of the right to receive some or all of the principal payments on an obligation from ownership of the right to receive some or all of the interest payments results in the creation of "stripped bonds" with respect to principal payments and "stripped coupons" with respect to interest payments.  The Offered Certificates could be subject to the Stripped Bond Rules because the Servicing Fee exceeds the "safe harbor" percentage prescribed by the IRS.  It is not clear whether the Stripped Bond Rules will apply to the Offered Certificates and, if such rules do apply, how all aspects of the purchase, holding and disposition of the Offered Certificates would be treated under the Stripped Bond Rules.  Certificateholders are urged to consult their own tax advisors regarding the Stripped Bond Rules and any proper treatment of the Offered Certificates for federal income tax purposes.

**Sales of Offered Certificates**

Upon the sale or exchange of an Offered Certificate, a Certificateholder will recognize gain or loss equal to the difference between the amount realized in the sale and its aggregate adjusted basis in the assets of the related Loan Group and related assets represented by the Offered Certificate.  Generally, the aggregate adjusted basis will equal the Certificateholder's cost for the Offered Certificate increased by the amount of any previously reported original issue discount, market discount or gain with respect to the Offered Certificate and decreased by the amount of any losses previously reported with respect to the Offered Certificate and the amount of any distributions received on that Offered Certificate of principal or other amounts included in its stated redemption price at maturity.  Except as provided above with respect to the OID Rules and market discount rules, any gain or loss would be capital gain or loss if the Offered Certificate were held as a capital asset.

**Backup Withholding with Respect to Offered Certificates**

Payments of interest and principal, as well as payments of proceeds from the sale of Offered Certificates, may be subject to the "backup withholding tax" under Section 3406 of the Code, if recipients of payments fail to furnish to the payor certain information, including their taxpayer identification numbers, or otherwise fail to establish an exemption from the tax.  Any amounts deducted and withheld from a distribution to a recipient would be allowed as a credit against the recipient's federal income tax.  Furthermore, penalties may be imposed by the IRS on a recipient of payments that is required to supply information but that does not do so in the proper manner.

**Foreign Investors**

Generally, interest or original issue discount paid to or accruing for the benefit of a Certificateholder who is not a United States person will be treated as "portfolio interest" and therefore will be exempt from the 30% withholding tax.  That Certificateholder will be entitled to receive interest payments and original issue discount on its Offered Certificates free of United States federal income tax, provided that the Certificateholder periodically provides the trustee, or other person who would otherwise be required to withhold tax, with a statement certifying under penalty of perjury that the Certificateholder is not a United States person and providing the name and address of the Certificateholder.  For these purposes, United States person means:

- a citizen or resident of the United States;

- a corporation, partnership or other entity created or organized in, or under the laws of, the United States, any state thereof or the District of Columbia, except, in the case of a partnership, to the extent provided in regulations;

- an estate whose income is subject to United States federal income tax regardless of its source; or

- a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust.  To the extent prescribed in regulations by the Secretary of the Treasury, which regulations have not yet been issued, a trust which was in existence on August 20, 1996, other than a trust treated as

owned by the grantor under subpart E of part I of subchapter J of chapter 1 of the Code, and which was treated as a United States person on August 19, 1996, may elect to continue to be treated as a United States person.

If the holder does not qualify for exemption, distributions of interest, including distributions of accrued original issue discount, to the holder may be subject to a tax rate of 30%, subject to reduction under any applicable tax treaty.

Special rules apply to partnerships, estates and trusts, and in certain circumstances certifications as to foreign status and other matters may be required to be provided by partners and beneficiaries thereof.  In addition, the foregoing rules will not apply to exempt a United States shareholder of a controlled foreign corporation from taxation on the United States shareholder's allocable portion of the interest income received by the controlled foreign corporation.

Further, it appears that an Offered Certificate would not be included in the estate of a non-resident alien individual and would not be subject to United States estate taxes.  Certificateholders who are non-resident alien individuals should consult their tax advisors concerning this question.

**Withholding Regulations**

The Treasury Department has issued final regulations which revise procedures for complying with, or obtaining exemptions under, the withholding, backup withholding and information reporting rules described above. Prospective investors are urged to consult their tax advisors regarding the procedures for obtaining an exemption from withholding under these regulations.

## STATE AND OTHER TAX CONSEQUENCES

In addition to the federal income tax consequences described above, potential investors should consider the state and local tax consequences of the acquisition, ownership, and disposition of the Offered Certificates offered hereunder. State tax law may differ substantially from the corresponding federal tax law, and the discussion above does not purport to describe any aspect of the tax laws of any state or other jurisdiction.  Therefore, prospective investors should consult their own tax advisors with respect to the various tax consequences of investments in the Offered Certificates offered hereunder.

## ACCOUNTING CONSIDERATIONS

Various factors may influence the accounting treatment applicable to an investor's acquisition and holding of mortgage-backed securities.  Accounting standards, and the application and interpretation of such standards, are subject to change from time to time.  Investors are encouraged to consult their own accountants for advice as to the appropriate accounting treatment for the Certificates.

## LEGAL MATTERS

The legality of the Offered Certificates and certain tax matters will be passed upon for the Depositor by Dechert LLP, New York, New York.

## PLAN OF DISTRIBUTION

In accordance with the terms and conditions of a purchase agreement between the Depositor and Freddie Mac, the Depositor has agreed to sell the Offered Certificates to Freddie Mac, and Freddie Mac has agreed to purchase the Offered Certificates from the Depositor.

## INDEX OF DEFINED TERMS

Accrued Certificate Interest ..................37
Adjustable Rate Mortgage Loan ..............41
Adjustment Date ................................41
Advance .........................................37
Assessment of Compliance ....................70
Assumed Mortgage Loans .....................59
Available Funds ................................33
Balloon Loan ...................................42
Balloon Payment ...............................42
Certificate Account .............................65
Certificate Principal Balance ..................35
Certificateholder ...............................79
Certificates .....................................32
Class 1-A-1 Certificates .......................32
Class 2-A-1 Certificates .......................32
Class 3-A-1 Certificates .......................32
Class 4-A-1 Certificates .......................32
Class A Certificates ............................32
Class P Certificate .............................32
Code .............................................78
Collection Account .............................64
Compensating Interest .........................35
CORE Program .................................29
CPR .............................................58
Credit Bureau Risk Score ......................29
Credit Risk Management Agreement .........28
Credit Risk Management Fee ..................28
Credit Risk Management Fee Rate ............72
Credit Risk Manager ...........................28
Credit Scores ...................................43
Debt Ratio ......................................29
Debt Service Reduction ........................36
Deficiency Amount .............................38
Deficient Valuation ............................36
Definitive Certificates .........................40
Delinquent ......................................44
Delivery Event .................................73
Depositor .......................................24
Determination Date ............................33
Distribution Date ...............................33
Due Date ........................................44
Due Period ......................................34
Eligible Account ................................65
Eligible Investments ...........................64
Events of Default ...............................73
Fair, Isaac ......................................29
First Franklin Financial ........................23
Fixed Rate Mortgage Loan ....................41
Freddie Mac ....................................28
Gross Margin ...................................41
Group 1 Mortgage Loans ......................40
Group 2 Mortgage Loans ......................40
Group 3 Mortgage Loans ......................40
Group 4 Mortgage Loans ......................40

Guarantee .......................................37
Guarantor .......................................28
Guarantor Payment .............................38
Guarantor Reimbursement Amount ...........35
HLS .............................................26
Index ............................................43
Insurance Proceeds .............................33
Insured Percentage of the Claim ..............38
Interest-Only Mortgage Loans .................42
IRS ..............................................78
Issuing Entity ...................................24
LaSalle ..........................................25
Liquidated Loan ................................36
Liquidation Proceeds ...........................33
Liquidation Profits .............................68
Loan Group 1 ...................................40
Loan Group 2 ...................................40
Loan Group 3 ...................................40
Loan Group 4 ...................................40
Loan-to-Value Ratio ...........................42
Market Discount Certificate ...................81
Maximum Mortgage Rate ......................41
MERS ...........................................61
Mortgage Loan Purchase Agreement .........58
Mortgage Loan Schedule .......................61
Mortgage Notes .................................41
Mortgage Rate ..................................41
Mortgaged Properties ...........................41
Mortgages .......................................41
Net Mortgage Rate .............................37
Net WAC Rate ..................................37
Offered Certificates ............................32
OID .............................................79
OID Rules .......................................80
Optional Termination Date .....................77
Pass-Through Rate ..............................37
Periodic Rate Cap ..............................41
PMI Insurer .....................................38
PMI Mortgage Loans ...........................38
PMI Policy ......................................38
PMI Premium ...................................33
PMI Premium Rate .............................72
Pooling and Servicing Agreement .............60
Premium Certificate ............................82
Prepayment Interest Shortfalls ................35
Prepayment Penalty ............................36
Prepayment Period .............................34
Prior Month Receipt Period ...................34
Purchase Price ..................................62
Realized Loss ...................................36
Record Date .....................................33
Reimbursement Amount ........................64
Related Documents .............................61
Relief Act Shortfalls ...........................35

**REO Property** .....................................................77

**Scheduled Payment**........................................44

**Servicer** .............................................................26

**Servicer Remittance Date**............................64

**Servicing Advance** .........................................68

**Servicing Fee** ...................................................72

**Servicing Fee Rate** .........................................72

**Six-Month LIBOR** ...........................................43

**Sponsor** .............................................................23

**Stripped Bond Rules**......................................80

**Structuring Assumptions** ...........................59

**Subsequent Recovery** ..................................34

**Substitution Adjustment Amount** .........62

**Termination Price**..........................................77

**Trustee** ..............................................................25

**Trustee Aggregate Annual Cap**...............71

**Trustee Fee** ......................................................72

**Trustee Fee Rate** ...........................................72

**Weighted Average Life**................................58

APPENDIX A

MORTGAGE LOAN DATA

## The Group 1 Mortgage Loans

## Mortgage Rates for the Group 1 Mortgage Loans

| Range of Mortgage Rates | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 7.501% to 8.000% ................ | 1 | $ 99,821 | 3.86% | 7.650% | 679 | $ 99,821 | 80.00% | 18.00% | 100.00% | 0.00% |
| 8.001% to 8.500% ................ | 2 | 234,678 | 9.08 | 8.278 | 651 | 117,339 | 79.67 | 43.99 | 100.00 | 0.00 |
| 8.501% to 9.000% ................ | 4 | 604,789 | 23.39 | 8.770 | 606 | 151,197 | 77.56 | 47.57 | 100.00 | 0.00 |
| 9.001% to 9.500% ................ | 5 | 634,769 | 24.55 | 9.337 | 631 | 126,954 | 83.33 | 38.93 | 57.21 | 0.00 |
| 9.501% to 10.000% .............. | 3 | 320,583 | 12.40 | 9.774 | 591 | 106,861 | 76.13 | 32.91 | 51.08 | 0.00 |
| 10.001% to 10.500% ............ | 2 | 331,097 | 12.81 | 10.239 | 586 | 165,548 | 83.72 | 39.74 | 100.00 | 0.00 |
| 10.501% to 11.000% ............ | 1 | 63,929 | 2.47 | 10.900 | 566 | 63,929 | 80.00 | 44.00 | 100.00 | 0.00 |
| 11.501% to 12.000% ............ | 1 | 148,320 | 5.74 | 11.800 | 580 | 148,320 | 90.00 | 37.00 | 100.00 | 0.00 |
| 12.001% to 12.500% ............ | 2 | 147,329 | 5.70 | 12.299 | 614 | 73,665 | 91.31 | 37.97 | 100.00 | 0.00 |
| Total...................................... | 21 | $2,585,315 | 100.00% | 9.561% | 613 | $123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

As of the Cut-off Date, Mortgage Rates borne by the Group 1 Mortgage Loans ranged from 7.650% per annum to 12.350% per annum and the weighted average Mortgage Rate of the Group 1 Mortgage Loans was approximately 9.561% per annum.

## Remaining Months to Stated Maturity for the Group 1 Mortgage Loans

| Range of Remaining Terms (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 349 to 360 ............................. | 21 | $2,585,315 | 100.00% | 9.561% | 613 | $123,110 | 81.43% | 39.92% | 83.43% | 0.00% |
| Total...................................... | 21 | $2,585,315 | 100.00% | 9.561% | 613 | $123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

As of the Cut-off Date, the remaining term to stated maturity of the Group 1 Mortgage Loans ranged from 355 months to 359 months and the weighted average remaining term to stated maturity of the Group 1 Mortgage Loans was approximately 357 months.

## Original Mortgage Loan Principal Balances for the Group 1 Mortgage Loans

| Range of Original Mortgage Loan Principal Balances | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| $50,001 to $100,000 .............. | 9 | $ 737,246 | 28.52% | 10.119% | 608 | $ 81,916 | 79.82% | 34.19% | 78.73% | 0.00% |
| $100,001 to $150,000 ............ | 8 | 1,040,954 | 40.26 | 9.241 | 622 | 130,119 | 81.14 | 43.08 | 73.90 | 0.00 |
| $150,001 to $200,000 ............ | 2 | 342,189 | 13.24 | 9.494 | 619 | 171,095 | 87.82 | 34.26 | 100.00 | 0.00 |
| $200,001 to $250,000 ............ | 2 | 464,926 | 17.98 | 9.445 | 596 | 232,463 | 79.94 | 46.11 | 100.00 | 0.00 |
| Total...................................... | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

As of the Cut-off Date, the outstanding principal balances of the Group 1 Mortgage Loans ranged from approximately $50,534 to approximately $246,446 and the average outstanding principal balance of the Group 1 Mortgage Loans was approximately $123,110.

A-1

## Product Types for the Group 1 Mortgage Loans

| Product Types | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 30 Year Fixed Loans | 14 | $ 1,685,483 | 65.19% | 9.698% | 608 | $120,392 | 79.88% | 40.50% | 74.58% | 0.00% |
| 30/40 Balloon Loans | 4 | 419,522 | 16.23 | 9.300 | 637 | 104,881 | 86.89 | 31.90 | 100.00 | 0.00 |
| 30/50 Balloon Loans | 3 | 480,309 | 18.58 | 9.312 | 607 | 160,103 | 82.11 | 44.89 | 100.00 | 0.00 |
| Total | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

## Amortization Type for the Group 1 Mortgage Loans

| Amortization Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Fully Amortizing | 14 | $ 1,685,483 | 65.19% | 9.698% | 608 | $120,392 | 79.88% | 40.50% | 74.58% | 0.00% |
| Balloon | 7 | 899,832 | 34.81 | 9.306 | 621 | 128,547 | 84.34 | 38.84 | 100.00 | 0.00 |
| Total | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

## Adjustment Type for the Group 1 Mortgage Loans

| Adjustment Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Fixed Rate | 21 | $2,585,315 | 100.00% | 9.561% | 613 | $123,110 | 81.43% | 39.92% | 83.43% | 0.00% |
| Total | 21 | $2,585,315 | 100.00% | 9.561% | 613 | $123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

## Geographic Distributions of Mortgaged Properties for the Group 1 Mortgage Loans

| Geographic Distributions | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 2 | $ 336,447 | 13.01% | 8.703% | 604 | $168,223 | 75.61% | 53.70% | 100.00% | 0.00% |
| Georgia | 6 | 745,006 | 28.82 | 9.602 | 615 | 124,168 | 81.99 | 34.72 | 72.65 | 0.00 |
| Illinois | 1 | 84,885 | 3.28 | 9.950 | 564 | 84,885 | 65.39 | 33.00 | 0.00 | 0.00 |
| Iowa | 2 | 154,671 | 5.98 | 10.020 | 587 | 77,336 | 80.00 | 35.20 | 100.00 | 0.00 |
| Kansas | 1 | 139,854 | 5.41 | 9.250 | 654 | 139,854 | 80.00 | 47.00 | 0.00 | 0.00 |
| Minnesota | 1 | 118,781 | 4.59 | 8.500 | 644 | 118,781 | 79.34 | 43.00 | 100.00 | 0.00 |
| North Carolina | 2 | 181,447 | 7.02 | 11.487 | 606 | 90,723 | 88.00 | 39.00 | 100.00 | 0.00 |
| Ohio | 1 | 115,897 | 4.48 | 8.050 | 658 | 115,897 | 80.00 | 45.00 | 100.00 | 0.00 |
| Rhode Island | 1 | 246,446 | 9.53 | 10.150 | 587 | 246,446 | 85.00 | 40.00 | 100.00 | 0.00 |
| South Carolina | 2 | 228,959 | 8.86 | 9.979 | 633 | 114,480 | 92.63 | 39.12 | 100.00 | 0.00 |
| Texas | 2 | 232,922 | 9.01 | 9.172 | 602 | 116,461 | 77.59 | 35.39 | 100.00 | 0.00 |
| Total | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

As of the Cut-off Date, no more than approximately 9.53% of the Group 1 Mortgage Loans will be secured by mortgaged properties located in any one zip code.

A-2

## Original Loan-To-Value Ratios for the Group 1 Mortgage Loans

| Range of Original Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 65.01% to 70.00% ................ | 1 | $ 84,885 | 3.28% | 9.950% | 564 | $ 84,885 | 65.39% | 33.00% | 0.00% | 0.00% |
| 70.01% to 75.00% ................ | 2 | 312,434 | 12.08 | 8.906 | 605 | 156,217 | 74.17 | 46.99 | 100.00 | 0.00 |
| 75.01% to 80.00% ................ | 13 | 1,467,476 | 56.76 | 9.104 | 621 | 112,883 | 79.80 | 39.29 | 76.59 | 0.00 |
| 80.01% to 85.00% ................ | 2 | 296,979 | 11.49 | 10.499 | 588 | 148,490 | 84.87 | 39.32 | 100.00 | 0.00 |
| 85.01% to 90.00% ................ | 1 | 148,320 | 5.74 | 11.800 | 580 | 148,320 | 90.00 | 37.00 | 100.00 | 0.00 |
| 90.01% to 95.00% ................ | 2 | 275,221 | 10.65 | 10.405 | 639 | 137,611 | 95.00 | 39.65 | 100.00 | 0.00 |
| Total.......................................... | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

At origination, the Original Loan-to-Value Ratios of the Group 1 Mortgage Loans ranged from 65.39% to 95.00% and the weighted average Original Loan-to-Value Ratio for Group 1 Mortgage Loans was approximately 81.43%.

## Combined Loan-To-Value Ratios for the Group 1 Mortgage Loans

| Range of Combined Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 65.01% to 70.00% ................ | 1 | $ 84,885 | 3.28% | 9.950% | 564 | $ 84,885 | 65.39% | 33.00% | 0.00% | 0.00% |
| 70.01% to 75.00% ................ | 2 | 312,434 | 12.08 | 8.906 | 605 | 156,217 | 74.17 | 46.99 | 100.00 | 0.00 |
| 75.01% to 80.00% ................ | 12 | 1,351,579 | 52.28 | 9.195 | 618 | 112,632 | 79.78 | 38.80 | 74.58 | 0.00 |
| 80.01% to 85.00% ................ | 2 | 296,979 | 11.49 | 10.499 | 588 | 148,490 | 84.87 | 39.32 | 100.00 | 0.00 |
| 85.01% to 90.00% ................ | 1 | 148,320 | 5.74 | 11.800 | 580 | 148,320 | 90.00 | 37.00 | 100.00 | 0.00 |
| 90.01% to 95.00% ................ | 3 | 391,118 | 15.13 | 9.707 | 644 | 130,373 | 90.56 | 41.23 | 100.00 | 0.00 |
| Total.......................................... | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

At origination, the Combined Loan-to-Value Ratios of the Group 1 Mortgage Loans ranged from 65.39% to 95.00% and the weighted average Combined Loan-to-Value Ratio for Group 1 Mortgage Loans was approximately 81.96%.  This table was calculated using the Combined Loan-to-Value Ratio for Group 1 Mortgage Loans that are in a second lien position and for Group 1 Mortgage Loans that are in a first lien position with subordinate financing. Approximately 4.48% of the Group 1 Mortgage Loans are in a first lien position with subordinate financing and the weighted average Combined Loan-to-Value Ratio for such Group 1 Mortgage Loans was approximately 91.73%.

## Debt-to-Income Ratios for the Group 1 Mortgage Loans

| Range of Debt-to-Income Ratios | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 20.00% or less ............... | 1 | $    99,821 | 3.86% | 7.650% | 679 | $    99,821 | 80.00% | 18.00% | 100.00% | 0.00% |
| 25.01% to 30.00% ................ | 2 | 254,506 | 9.84 | 9.561 | 594 | 127,253 | 80.00 | 28.36 | 100.00 | 0.00 |
| 30.01% to 35.00% ................ | 2 | 178,839 | 6.92 | 9.714 | 585 | 89,419 | 69.92 | 33.00 | 52.54 | 0.00 |
| 35.01% to 40.00% ................ | 8 | 1,075,932 | 41.62 | 10.301 | 606 | 134,492 | 86.56 | 38.84 | 87.75 | 0.00 |
| 40.01% to 45.00% ................ | 5 | 499,916 | 19.34 | 8.962 | 628 | 99,983 | 79.84 | 43.74 | 85.61 | 0.00 |
| 45.01% to 50.00% ................ | 1 | 139,854 | 5.41 | 9.250 | 654 | 139,854 | 80.00 | 47.00 | 0.00 | 0.00 |
| 50.01% to 55.00% ................ | 2 | 336,447 | 13.01 | 8.703 | 604 | 168,223 | 75.61 | 53.70 | 100.00 | 0.00 |
| Total....................................... | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

At origination, the Debt-to-Income Ratios of the Group 1 Mortgage Loans ranged from 18.00% to 55.00% and the weighted average Debt-to-Income Ratio for Group 1 Mortgage Loans with Debt-to-Income Ratios was approximately 39.92%.

## Loan Purpose for the Group 1 Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Refinance - Cashout ............. | 10 | $ 1,281,956 | 49.59% | 9.402% | 613 | $ 128,196 | 81.41% | 40.57% | 76.86% | 0.00% |
| Purchase................................... | 8 | 942,370 | 36.45 | 10.135 | 602 | 117,796 | 82.01 | 40.94 | 100.00 | 0.00 |
| Refinance - Rate Term .......... | 3 | 360,989 | 13.96 | 8.628 | 639 | 120,330 | 80.00 | 34.99 | 63.49 | 0.00 |
| Total:....................................... | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

## Types of Mortgaged Properties for the Group 1 Mortgage Loans

| Property Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Single Family................................ | 19 | $ 2,243,126 | 86.76% | 9.572% | 612 | $ 118,059 | 80.46% | 40.79% | 80.90% | 0.00% |
| Planned Unit Development .... | 2 | 342,189 | 13.24 | 9.494 | 619 | 171,095 | 87.82 | 34.26 | 100.00 | 0.00 |
| Total................................ | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

A-4

## Documentation Summary for the Group 1 Mortgage Loans

| Documentation | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Full Documentation ............... | 17 | $ 2,156,849 | 83.43% | 9.576% | 611 | $ 126,873 | 82.29% | 39.60% | 100.00% | 0.00% |
| Rapid....................................... | 4 | 428,466 | 16.57 | 9.489 | 624 | 107,117 | 77.11 | 41.57 | 0.00 | 0.00 |
| Total......................................... | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

## Occupancy Types for the Group 1 Mortgage Loans

| Occupancy | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Primary .................................. | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |
| Total....................................... | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

The information set forth above with respect to occupancy is based upon representations of the related mortgagors at the time of origination.

## Mortgage Loan Age Summary for the Group 1 Mortgage Loans

| Mortgage Loan Age (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 ............................................. | 1 | $ 93,954 | 3.63% | 9.500% | 604 | $ 93,954 | 74.02% | 33.00% | 100.00% | 0.00% |
| 2 ............................................. | 2 | 211,788 | 8.19 | 9.454 | 645 | 105,894 | 80.00 | 45.98 | 0.00 | 0.00 |
| 3 ............................................. | 11 | 1,190,559 | 46.05 | 9.237 | 610 | 108,233 | 78.89 | 36.97 | 81.80 | 0.00 |
| 4 ............................................. | 5 | 794,692 | 30.74 | 10.351 | 595 | 158,938 | 83.66 | 42.79 | 100.00 | 0.00 |
| 5 ............................................. | 2 | 294,322 | 11.38 | 8.838 | 650 | 147,161 | 89.09 | 41.97 | 100.00 | 0.00 |
| Total....................................... | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

As of the Cut-off Date, the weighted average age of the Group 1 Mortgage Loans was approximately 3 months.

**Original Prepayment Penalty Term for the Group 1 Mortgage Loans**

| Original Prepayment Penalty Term | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| None | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |
| Total: | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

The weighted average prepayment penalty term at origination with respect to the Group 1 Mortgage Loans having prepayment penalties is approximately 0 months.

**Credit Scores for the Group 1 Mortgage Loans**

| Range of Credit Scores | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 1 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 551 to 575 | 2 | $ 148,814 | 5.76% | 10.358% | 565 | $ 74,407 | 71.67% | 37.73% | 42.96% | 0.00% |
| 576 to 600 | 6 | 811,681 | 31.40 | 10.319 | 588 | 135,280 | 83.34 | 38.86 | 100.00 | 0.00 |
| 601 to 625 | 5 | 671,518 | 25.97 | 8.952 | 606 | 134,304 | 77.29 | 41.72 | 100.00 | 0.00 |
| 626 to 650 | 5 | 597,729 | 23.12 | 9.705 | 636 | 119,546 | 86.78 | 40.92 | 65.92 | 0.00 |
| 651 to 675 | 2 | 255,751 | 9.89 | 8.706 | 656 | 127,876 | 80.00 | 46.09 | 45.32 | 0.00 |
| 676 to 700 | 1 | 99,821 | 3.86 | 7.650 | 679 | 99,821 | 80.00 | 18.00 | 100.00 | 0.00 |
| Total | 21 | $ 2,585,315 | 100.00% | 9.561% | 613 | $ 123,110 | 81.43% | 39.92% | 83.43% | 0.00% |

The Credit Scores of the Group 1 Mortgage Loans that were scored at origination ranged from 564 to 679 and the weighted average Credit Score of the Group 1 Mortgage Loans that were scored at origination was approximately 613.

A-6

## The Group 2 Mortgage Loans

### Mortgage Rates for the Group 2 Mortgage Loans

| Range of Mortgage Rates | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 7.001% to 7.500% ................ | 2 | $ 782,278 | 11.48% | 7.307% | 666 | $ 391,139 | 68.28% | 53.43% | 100.00% | 0.00% |
| 7.501% to 8.000% ................ | 5 | 1,090,711 | 16.00 | 7.683 | 630 | 218,142 | 75.94 | 45.67 | 100.00 | 0.00 |
| 8.001% to 8.500% ................ | 11 | 1,574,249 | 23.10 | 8.247 | 627 | 143,114 | 75.41 | 48.93 | 94.58 | 0.00 |
| 8.501% to 9.000% ................ | 10 | 1,232,531 | 18.08 | 8.787 | 598 | 123,253 | 75.73 | 40.67 | 71.78 | 0.00 |
| 9.001% to 9.500% ................ | 10 | 1,214,969 | 17.83 | 9.233 | 601 | 121,497 | 76.44 | 45.29 | 83.97 | 0.00 |
| 9.501% to 10.000% .............. | 5 | 357,598 | 5.25 | 9.838 | 625 | 71,520 | 83.14 | 35.59 | 100.00 | 0.00 |
| 10.001% to 10.500% ............ | 2 | 169,592 | 2.49 | 10.420 | 617 | 84,796 | 86.04 | 45.56 | 100.00 | 0.00 |
| 10.501% to 11.000% ............ | 2 | 131,827 | 1.93 | 10.706 | 570 | 65,913 | 80.00 | 47.91 | 100.00 | 0.00 |
| 11.001% to 11.500% ............ | 2 | 132,195 | 1.94 | 11.306 | 620 | 66,098 | 92.66 | 37.35 | 100.00 | 0.00 |
| 12.001% to 12.500% ............ | 2 | 130,144 | 1.91 | 12.279 | 611 | 65,072 | 90.11 | 40.00 | 100.00 | 0.00 |
| Total:................................. | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

As of the Cut-off Date, Mortgage Rates borne by the Group 2 Mortgage Loans ranged from 7.050% per annum to 12.450% per annum and the weighted average Mortgage Rate of the Group 2 Mortgage Loans was approximately 8.644% per annum.

### Remaining Months to Stated Maturity for the Group 2 Mortgage Loans

| Range of Remaining Terms (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 349 to 360 ............................ | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |
| Total............................... | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

As of the Cut-off Date, the remaining term to stated maturity of the Group 2 Mortgage Loans ranged from 354 months to 359 months and the weighted average remaining term to stated maturity of the Group 2 Mortgage Loans was approximately 357 months.

### Original Mortgage Loan Principal Balances for the Group 2 Mortgage Loans

| Range of Original Mortgage Loan Principal Balances | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| $50,000 or less...................... | 1 | $ 49,922 | 0.73% | 9.300% | 704 | $ 49,922 | 86.96% | 29.00% | 100.00% | 0.00% |
| $50,001 to $100,000 ............. | 28 | 2,137,982 | 31.37 | 9.420 | 616 | 76,357 | 80.26 | 39.65 | 84.59 | 0.00 |
| $100,001 to $150,000 ........... | 10 | 1,271,491 | 18.65 | 8.881 | 621 | 127,149 | 77.89 | 47.88 | 91.60 | 0.00 |
| $150,001 to $200,000 ........... | 4 | 746,191 | 10.95 | 8.376 | 608 | 186,548 | 75.21 | 53.23 | 74.31 | 0.00 |
| $200,001 to $250,000 ........... | 2 | 446,340 | 6.55 | 7.910 | 639 | 223,170 | 78.46 | 45.96 | 100.00 | 0.00 |
| $250,001 to $300,000 ........... | 1 | 299,908 | 4.40 | 7.750 | 610 | 299,908 | 73.18 | 55.00 | 100.00 | 0.00 |
| $300,001 to $350,000 ........... | 2 | 658,651 | 9.66 | 7.911 | 610 | 329,326 | 72.45 | 45.15 | 100.00 | 0.00 |
| $350,001 to $400,000 ........... | 1 | 354,711 | 5.20 | 7.550 | 667 | 354,711 | 79.00 | 34.00 | 100.00 | 0.00 |
| $400,001 to $450,000 ........... | 2 | 850,895 | 12.48 | 8.259 | 617 | 425,447 | 66.07 | 53.00 | 100.00 | 0.00 |
| Total:................................. | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

As of the Cut-off Date, the outstanding principal balances of the Group 2 Mortgage Loans ranged from approximately $49,922 to approximately $447,495 and the average outstanding principal balance of the Group 2 Mortgage Loans was approximately $133,649.

A-7

### Product Types for the Group 2 Mortgage Loans

| Product Types | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 30 Year Fixed Loans ............. | 39 | $ 4,592,891 | 67.38% | 8.781% | 623 | $ 117,766 | 76.88% | 42.87% | 90.57% | 0.00% |
| 30/40 Balloon Loans ............. | 7 | 1,098,346 | 16.11 | 8.294 | 632 | 156,907 | 78.14 | 50.83 | 100.00 | 0.00 |
| 30/50 Balloon Loans ............. | 5 | 1,124,855 | 16.50 | 8.424 | 597 | 224,971 | 72.09 | 51.56 | 82.69 | 0.00 |
| Total:........................................ | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

### Amortization Type for the Group 2 Mortgage Loans

| Amortization Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Fully Amortizing ................... | 39 | $ 4,592,891 | 67.38% | 8.781% | 623 | $ 117,766 | 76.88% | 42.87% | 90.57% | 0.00% |
| Balloon.................................... | 12 | 2,223,201 | 32.62 | 8.360 | 614 | 185,267 | 75.08 | 51.19 | 91.24 | 0.00 |
| Total:........................................ | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

### Adjustment Type for the Group 2 Mortgage Loans

| Adjustment Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Fixed Rate.............................. | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |
| Total:........................................ | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

A-8

## Geographic Distributions of Mortgaged Properties for the Group 2 Mortgage Loans

| Geographic Distributions | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Arizona | 1 | $ 149,963 | 2.20% | 8.550% | 614 | $ 149,963 | 76.93% | 53.00% | 100.00% | 0.00% |
| Arkansas | 1 | 60,602 | 0.89 | 9.650 | 694 | 60,602 | 80.00 | 27.00 | 100.00 | 0.00 |
| California | 3 | 781,123 | 11.46 | 7.541 | 649 | 260,374 | 75.98 | 49.41 | 100.00 | 0.00 |
| Florida | 6 | 716,696 | 10.51 | 8.363 | 623 | 119,449 | 74.21 | 44.29 | 88.10 | 0.00 |
| Indiana | 7 | 508,118 | 7.45 | 8.736 | 646 | 72,588 | 80.53 | 40.45 | 86.64 | 0.00 |
| Kentucky | 2 | 271,628 | 3.99 | 8.857 | 611 | 135,814 | 78.88 | 46.17 | 29.44 | 0.00 |
| Michigan | 5 | 468,046 | 6.87 | 9.722 | 578 | 93,609 | 77.21 | 47.62 | 77.19 | 0.00 |
| Missouri | 1 | 88,292 | 1.30 | 8.700 | 606 | 88,292 | 76.30 | 45.00 | 0.00 | 0.00 |
| Nevada | 1 | 191,916 | 2.82 | 8.400 | 550 | 191,916 | 80.00 | 55.00 | 100.00 | 0.00 |
| New York | 10 | 1,816,037 | 26.64 | 8.855 | 605 | 181,604 | 71.01 | 46.42 | 100.00 | 0.00 |
| Ohio | 3 | 239,286 | 3.51 | 9.398 | 622 | 79,762 | 83.49 | 36.44 | 100.00 | 0.00 |
| Oregon | 1 | 354,711 | 5.20 | 7.550 | 667 | 354,711 | 79.00 | 34.00 | 100.00 | 0.00 |
| Tennessee | 6 | 615,221 | 9.03 | 9.249 | 631 | 102,537 | 82.84 | 44.58 | 85.70 | 0.00 |
| Texas | 2 | 161,095 | 2.36 | 9.384 | 607 | 80,547 | 75.90 | 53.53 | 100.00 | 0.00 |
| Washington | 1 | 299,908 | 4.40 | 7.750 | 610 | 299,908 | 73.18 | 55.00 | 100.00 | 0.00 |
| Wisconsin | 1 | 93,450 | 1.37 | 9.150 | 663 | 93,450 | 90.00 | 35.00 | 100.00 | 0.00 |
| Total: | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

As of the Cut-off Date, no more than approximately 6.57% of the Group 2 Mortgage Loans will be secured by mortgaged properties located in any one zip code.

## Original Loan-To-Value Ratios for the Group 2 Mortgage Loans

| Range of Original Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 60.01% to 65.00% | 2 | $ 632,374 | 9.28% | 7.675% | 658 | $ 316,187 | 63.73% | 53.29% | 100.00% | 0.00% |
| 65.01% to 70.00% | 5 | 838,618 | 12.30 | 8.837 | 578 | 167,724 | 66.90 | 47.61 | 87.27 | 0.00 |
| 70.01% to 75.00% | 6 | 1,229,647 | 18.04 | 7.999 | 609 | 204,941 | 72.99 | 46.47 | 93.07 | 0.00 |
| 75.01% to 80.00% | 29 | 3,411,242 | 50.05 | 8.639 | 621 | 117,629 | 79.23 | 44.47 | 87.22 | 0.00 |
| 80.01% to 85.00% | 1 | 63,696 | 0.93 | 12.100 | 612 | 63,696 | 85.00 | 40.00 | 100.00 | 0.00 |
| 85.01% to 90.00% | 6 | 503,819 | 7.39 | 9.822 | 663 | 83,970 | 89.70 | 38.75 | 100.00 | 0.00 |
| 90.01% to 95.00% | 2 | 136,697 | 2.01 | 11.910 | 613 | 68,349 | 95.00 | 45.14 | 100.00 | 0.00 |
| Total: | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

At origination, the Original Loan-to-Value Ratios of the Group 2 Mortgage Loans ranged from 60.66% to 95.00% and the weighted average Original Loan-to-Value Ratio for Group 2 Mortgage Loans was approximately 76.29%.

### Combined Loan-To-Value Ratios for the Group 2 Mortgage Loans

| Range of Combined Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 60.01% to 65.00% | 2 | $ 632,374 | 9.28% | 7.675% | 658 | $ 316,187 | 63.73% | 53.29% | 100.00% | 0.00% |
| 65.01% to 70.00% | 5 | 838,618 | 12.30 | 8.837 | 578 | 167,724 | 66.90 | 47.61 | 87.27 | 0.00 |
| 70.01% to 75.00% | 6 | 1,229,647 | 18.04 | 7.999 | 609 | 204,941 | 72.99 | 46.47 | 93.07 | 0.00 |
| 75.01% to 80.00% | 29 | 3,411,242 | 50.05 | 8.639 | 621 | 117,629 | 79.23 | 44.47 | 87.22 | 0.00 |
| 80.01% to 85.00% | 1 | 63,696 | 0.93 | 12.100 | 612 | 63,696 | 85.00 | 40.00 | 100.00 | 0.00 |
| 85.01% to 90.00% | 6 | 503,819 | 7.39 | 9.822 | 663 | 83,970 | 89.70 | 38.75 | 100.00 | 0.00 |
| 90.01% to 95.00% | 2 | 136,697 | 2.01 | 11.910 | 613 | 68,349 | 95.00 | 45.14 | 100.00 | 0.00 |
| Total: | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

At origination, the Combined Loan-to-Value Ratios of the Group 2 Mortgage Loans ranged from 60.66% to 95.00% and the weighted average Combined Loan-to-Value Ratio for Group 2 Mortgage Loans was approximately 76.29%.

### Debt-to-Income Ratios for the Group 2 Mortgage Loans

| Range of Debt-to-Income Ratios | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 20.00% or less | 1 | $ 55,836 | 0.82% | 9.050% | 637 | $ 55,836 | 80.00% | 18.00% | 100.00% | 0.00% |
| 20.01% to 25.00% | 3 | 217,452 | 3.19 | 9.847 | 611 | 72,484 | 82.74 | 24.43 | 100.00 | 0.00 |
| 25.01% to 30.00% | 4 | 278,511 | 4.09 | 8.906 | 636 | 69,628 | 75.65 | 27.96 | 69.38 | 0.00 |
| 30.01% to 35.00% | 3 | 520,928 | 7.64 | 8.158 | 655 | 173,643 | 81.11 | 33.90 | 100.00 | 0.00 |
| 35.01% to 40.00% | 9 | 978,857 | 14.36 | 9.424 | 584 | 108,762 | 76.61 | 37.11 | 89.09 | 0.00 |
| 40.01% to 45.00% | 7 | 748,759 | 10.99 | 8.875 | 647 | 106,966 | 81.94 | 43.97 | 88.21 | 0.00 |
| 45.01% to 50.00% | 9 | 1,111,060 | 16.30 | 8.723 | 628 | 123,451 | 79.47 | 48.80 | 68.72 | 0.00 |
| 50.01% to 55.00% | 15 | 2,904,690 | 42.62 | 8.254 | 615 | 193,646 | 72.15 | 53.53 | 100.00 | 0.00 |
| Total: | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

At origination, the Debt-to-Income Ratios of the Group 2 Mortgage Loans ranged from 18.00% to 55.00% and the weighted average Debt-to-Income Ratio for Group 2 Mortgage Loans with Debt-to-Income Ratios was approximately 45.59%.

### Loan Purpose for the Group 2 Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Refinance – Cashout | 29 | $ 3,943,179 | 57.85% | 8.541% | 617 | $ 135,972 | 76.03% | 46.89% | 86.78% | 0.00% |
| Purchase | 15 | 1,755,894 | 25.76 | 9.011 | 631 | 117,060 | 77.36 | 47.54 | 100.00 | 0.00 |
| Refinance - Rate Term | 7 | 1,117,020 | 16.39 | 8.429 | 614 | 159,574 | 75.53 | 37.90 | 90.44 | 0.00 |
| Total: | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

### Types of Mortgaged Properties for the Group 2 Mortgage Loans

| Property Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Single Family............................ | 44 | $ 5,346,656 | 78.44% | 8.866% | 608 | $ 121,515 | 76.65% | 45.22% | 88.26% | 0.00% |
| 2-4 Family................................. | 4 | 694,758 | 10.19 | 8.303 | 666 | 173,690 | 74.40 | 49.19 | 100.00 | 0.00 |
| Planned Unit Development .... | 2 | 439,896 | 6.45 | 7.695 | 660 | 219,948 | 77.69 | 37.87 | 100.00 | 0.00 |
| Condominium ........................... | 1 | 334,782 | 4.91 | 7.050 | 663 | 334,782 | 72.67 | 54.00 | 100.00 | 0.00 |
| Total:........................................ | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

### Documentation Summary for the Group 2 Mortgage Loans

| Documentation | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Full Documentation ............... | 45 | $ 6,188,217 | 90.79% | 8.618% | 621 | $ 137,516 | 76.25% | 45.83% | 100.00% | 0.00% |
| Rapid....................................... | 6 | 627,875 | 9.21 | 8.894 | 612 | 104,646 | 76.71 | 43.18 | 0.00 | 0.00 |
| Total:....................................... | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

### Occupancy Types for the Group 2 Mortgage Loans

| Occupancy | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Primary .................................... | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |
| Total:....................................... | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

The information set forth above with respect to occupancy is based upon representations of the related mortgagors at the time of origination.

A-11

## Mortgage Loan Age Summary for the Group 2 Mortgage Loans

| Mortgage Loan Age (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7 | $ 1,017,166 | 14.92% | 8.293% | 625 | $ 145,309 | 73.72% | 50.62% | 100.00% | 0.00% |
| 2 | 2 | 208,053 | 3.05 | 9.486 | 636 | 104,027 | 85.29 | 37.43 | 100.00 | 0.00 |
| 3 | 35 | 4,653,896 | 68.28 | 8.656 | 629 | 132,968 | 76.84 | 45.57 | 88.41 | 0.00 |
| 4 | 4 | 431,931 | 6.34 | 9.011 | 567 | 107,983 | 79.24 | 47.15 | 79.56 | 0.00 |
| 6 | 3 | 505,046 | 7.41 | 8.576 | 562 | 168,349 | 70.14 | 37.61 | 100.00 | 0.00 |
| Total: | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

As of the Cut-off Date, the weighted average age of the Group 2 Mortgage Loans was approximately 3 months.

## Original Prepayment Penalty Term for the Group 2 Mortgage Loans

| Original Prepayment Penalty Term | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 12 Months | 10 | $ 1,816,037 | 26.64% | 8.855% | 605 | $ 181,604 | 71.01% | 46.42% | 100.00% | 0.00% |
| 24 Months | 3 | 255,281 | 3.75 | 9.661 | 618 | 85,094 | 83.27 | 44.05 | 100.00 | 0.00 |
| 36 Months | 38 | 4,744,775 | 69.61 | 8.508 | 626 | 124,862 | 77.94 | 45.35 | 86.77 | 0.00 |
| Total: | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

The weighted average prepayment penalty term at origination with respect to the Group 2 Mortgage Loans having prepayment penalties is approximately 29 months.

## Credit Scores for the Group 2 Mortgage Loans

| Range of Credit Scores | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 2 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 526 to 550 | 1 | $ 191,916 | 2.82% | 8.400% | 550 | $ 191,916 | 80.00% | 55.00% | 100.00% | 0.00% |
| 551 to 575 | 5 | 977,458 | 14.34 | 8.989 | 561 | 195,492 | 70.80 | 44.91 | 100.00 | 0.00 |
| 576 to 600 | 10 | 855,912 | 12.56 | 9.565 | 583 | 85,591 | 76.57 | 42.00 | 87.52 | 0.00 |
| 601 to 625 | 12 | 1,565,164 | 22.96 | 8.722 | 613 | 130,430 | 78.71 | 46.54 | 76.66 | 0.00 |
| 626 to 650 | 11 | 1,159,272 | 17.01 | 8.741 | 636 | 105,388 | 75.64 | 45.54 | 92.41 | 0.00 |
| 651 to 675 | 9 | 1,872,283 | 27.47 | 7.873 | 663 | 208,031 | 76.01 | 46.96 | 96.37 | 0.00 |
| 676 to 700 | 1 | 60,602 | 0.89 | 9.650 | 694 | 60,602 | 80.00 | 27.00 | 100.00 | 0.00 |
| 701 to 725 | 2 | 133,486 | 1.96 | 9.143 | 702 | 66,743 | 88.86 | 38.39 | 100.00 | 0.00 |
| Total: | 51 | $ 6,816,093 | 100.00% | 8.644% | 620 | $ 133,649 | 76.29% | 45.59% | 90.79% | 0.00% |

The Credit Scores of the Group 2 Mortgage Loans that were scored at origination ranged from 550 to 704 and the weighted average Credit Score of the Group 2 Mortgage Loans that were scored at origination was approximately 620.

A-12

## The Group 3 Mortgage Loans

## Mortgage Rates for the Group 3 Mortgage Loans

| Range of Mortgage Rates | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 7.501% to 8.000% ............... | 1 | $ 280,250 | 5.73% | 7.850% | 676 | $280,250 | 85.00% | 48.00% | 100.00% | 0.00% |
| 8.001% to 8.500% ............... | 5 | 755,077 | 15.43 | 8.305 | 633 | 151,015 | 68.49 | 50.13 | 58.49 | 28.61 |
| 8.501% to 9.000% ............... | 6 | 950,431 | 19.42 | 8.884 | 626 | 158,405 | 79.93 | 45.86 | 29.95 | 0.00 |
| 9.001% to 9.500% ............... | 4 | 1,032,878 | 21.11 | 9.194 | 661 | 258,220 | 83.61 | 45.66 | 42.68 | 0.00 |
| 9.501% to 10.000% ............. | 7 | 1,394,374 | 28.50 | 9.769 | 627 | 199,196 | 89.37 | 49.89 | 91.69 | 0.00 |
| 10.001% to 10.500% ........... | 2 | 217,246 | 4.44 | 10.329 | 649 | 108,623 | 91.83 | 36.17 | 100.00 | 0.00 |
| 10.501% to 11.000% ........... | 1 | 67,821 | 1.39 | 10.850 | 650 | 67,821 | 95.00 | 17.00 | 100.00 | 0.00 |
| 11.001% to 11.500% ........... | 1 | 195,278 | 3.99 | 11.200 | 631 | 195,278 | 90.00 | 53.00 | 100.00 | 0.00 |
| Total...................................... | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

As of the Cut-off Date, Mortgage Rates borne by the Group 3 Mortgage Loans ranged from 7.850% per annum to 11.200% per annum and the weighted average Mortgage Rate of the Group 3 Mortgage Loans was approximately 9.237% per annum.

## Remaining Months to Stated Maturity for the Group 3 Mortgage Loans

| Range of Remaining Terms (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 349 to 360 ............................... | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |
| Total...................................... | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

As of the Cut-off Date, the remaining term to stated maturity of the Group 3 Mortgage Loans ranged from 356 months to 359 months and the weighted average remaining term to stated maturity of the Group 3 Mortgage Loans was approximately 357 months.

A-13

## Original Mortgage Loan Principal Balances for the Group 3 Mortgage Loans

| Range of Original Mortgage Loan Principal Balances | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| $50,001 to $100,000 | 5 | $ 382,219 | 7.81% | 9.270% | 638 | $ 76,444 | 76.41% | 40.40% | 74.51% | 0.00% |
| $100,001 to $150,000 | 9 | 1,171,737 | 23.95 | 9.199 | 618 | 130,193 | 79.92 | 44.49 | 59.72 | 0.00 |
| $150,001 to $200,000 | 4 | 753,497 | 15.40 | 9.960 | 642 | 188,374 | 86.33 | 47.81 | 76.01 | 0.00 |
| $200,001 to $250,000 | 5 | 1,148,932 | 23.48 | 8.864 | 632 | 229,786 | 77.32 | 48.02 | 18.45 | 18.80 |
| $250,001 to $300,000 | 1 | 280,250 | 5.73 | 7.850 | 676 | 280,250 | 85.00 | 48.00 | 100.00 | 0.00 |
| $350,001 to $400,000 | 2 | 715,907 | 14.63 | 9.776 | 626 | 357,953 | 92.49 | 52.51 | 100.00 | 0.00 |
| $400,001 to $450,000 | 1 | 440,814 | 9.01 | 9.050 | 704 | 440,814 | 90.00 | 48.00 | 100.00 | 0.00 |
| Total | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

As of the Cut-off Date, the outstanding principal balances of the Group 3 Mortgage Loans ranged from approximately $54,793 to approximately $440,814 and the average outstanding principal balance of the Group 3 Mortgage Loans was approximately $181,235.

## Product Types for the Group 3 Mortgage Loans

| Product Types | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| ARM - 5 Year/6 Month (50 due in 30) | 5 | $1,040,587 | 21.27% | 10.027% | 623 | $208,117 | 88.04% | 50.63% | 89.63% | 0.00% |
| ARM - 5 Year/6 Month (30-year term) | 15 | 2,066,575 | 42.23 | 9.171 | 635 | 137,772 | 80.33 | 45.16 | 40.39 | 10.45 |
| ARM - 5 Year/6 Month (40 due in 30) | 7 | 1,786,194 | 36.50 | 8.853 | 653 | 255,171 | 83.32 | 47.57 | 80.56 | 0.00 |
| Total | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

## Amortization Type for the Group 3 Mortgage Loans

| Amortization Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Fully Amortizing | 14 | $1,850,575 | 37.82% | 9.255% | 631 | $132,184 | 80.36% | 44.01% | 45.10% | 0.00% |
| Balloon | 12 | 2,826,781 | 57.77 | 9.285 | 642 | 235,565 | 85.06 | 48.70 | 83.90 | 0.00 |
| 120 Month Interest-Only | 1 | 216,000 | 4.41 | 8.450 | 662 | 216,000 | 80.00 | 55.00 | 0.00 | 100.00 |
| Total | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

## Adjustment Type for the Group 3 Mortgage Loans

| Adjustment Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| ARM | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |
| Total | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

## Geographic Distributions of Mortgaged Properties for the Group 3 Mortgage Loans

| Geographic Distributions | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Florida | 1 | $ 180,750 | 3.69% | 8.950% | 663 | $180,750 | 79.99% | 46.00% | 0.00% | 0.00% |
| Illinois | 8 | 1,340,863 | 27.40 | 8.805 | 645 | 167,608 | 80.66 | 49.23 | 50.46 | 16.11 |
| Maryland | 3 | 744,943 | 15.22 | 9.385 | 611 | 248,314 | 84.75 | 49.12 | 67.60 | 0.00 |
| Massachusetts | 4 | 908,432 | 18.56 | 9.865 | 644 | 227,108 | 87.37 | 47.19 | 60.68 | 0.00 |
| New Jersey | 3 | 496,719 | 10.15 | 8.891 | 621 | 165,573 | 72.48 | 44.08 | 100.00 | 0.00 |
| New Mexico | 2 | 248,892 | 5.09 | 8.978 | 590 | 124,446 | 80.00 | 49.70 | 56.64 | 0.00 |
| New York | 3 | 577,960 | 11.81 | 9.259 | 688 | 192,653 | 89.74 | 46.81 | 100.00 | 0.00 |
| Rhode Island | 1 | 191,216 | 3.91 | 9.950 | 605 | 191,216 | 85.00 | 45.00 | 100.00 | 0.00 |
| Texas | 1 | 135,761 | 2.77 | 8.700 | 663 | 135,761 | 80.00 | 45.00 | 0.00 | 0.00 |
| Wisconsin | 1 | 67,821 | 1.39 | 10.850 | 650 | 67,821 | 95.00 | 17.00 | 100.00 | 0.00 |
| Total | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

As of the Cut-off Date, no more than approximately 9.01% of the Group 3 Mortgage Loans will be secured by mortgaged properties located in any one zip code.

## Original Loan-To-Value Ratios for the Group 3 Mortgage Loans

| Range of Original Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 50.00% or less | 1 | $ 79,841 | 1.63% | 8.100% | 640 | $ 79,841 | 34.79% | 49.00% | 100.00% | 0.00% |
| 60.01% to 65.00% | 1 | 149,883 | 3.06 | 8.350 | 592 | 149,883 | 62.50 | 48.00 | 100.00 | 0.00 |
| 65.01% to 70.00% | 1 | 211,944 | 4.33 | 8.250 | 630 | 211,944 | 68.39 | 49.00 | 100.00 | 0.00 |
| 75.01% to 80.00% | 13 | 2,026,588 | 41.42 | 8.994 | 631 | 155,891 | 79.63 | 46.15 | 16.75 | 10.66 |
| 80.01% to 85.00% | 2 | 471,466 | 9.63 | 8.702 | 647 | 235,733 | 85.00 | 46.78 | 100.00 | 0.00 |
| 85.01% to 90.00% | 6 | 1,447,468 | 29.58 | 9.839 | 649 | 241,245 | 90.00 | 49.34 | 100.00 | 0.00 |
| 90.01% to 95.00% | 3 | 506,167 | 10.34 | 9.841 | 651 | 168,722 | 94.97 | 44.44 | 100.00 | 0.00 |
| Total | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

At origination, the Original Loan-to-Value Ratios of the Group 3 Mortgage Loans ranged from 34.79% to 95.00% and the weighted average Original Loan-to-Value Ratio for Group 3 Mortgage Loans was approximately 83.06%.

## Combined Loan-To-Value Ratios for the Group 3 Mortgage Loans

| Range of Combined Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 50.00% or less | 1 | $ 79,841 | 1.63% | 8.100% | 640 | $ 79,841 | 34.79% | 49.00% | 100.00% | 0.00% |
| 60.01% to 65.00% | 1 | 149,883 | 3.06 | 8.350 | 592 | 149,883 | 62.50 | 48.00 | 100.00 | 0.00 |
| 65.01% to 70.00% | 1 | 211,944 | 4.33 | 8.250 | 630 | 211,944 | 68.39 | 49.00 | 100.00 | 0.00 |
| 75.01% to 80.00% | 13 | 2,026,588 | 41.42 | 8.994 | 631 | 155,891 | 79.63 | 46.15 | 16.75 | 10.66 |
| 80.01% to 85.00% | 2 | 471,466 | 9.63 | 8.702 | 647 | 235,733 | 85.00 | 46.78 | 100.00 | 0.00 |
| 85.01% to 90.00% | 6 | 1,447,468 | 29.58 | 9.839 | 649 | 241,245 | 90.00 | 49.34 | 100.00 | 0.00 |
| 90.01% to 95.00% | 3 | 506,167 | 10.34 | 9.841 | 651 | 168,722 | 94.97 | 44.44 | 100.00 | 0.00 |
| Total | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

At origination, the Combined Loan-to-Value Ratios of the Group 3 Mortgage Loans ranged from 34.79% to 95.00% and the weighted average Combined Loan-to-Value Ratio for Group 3 Mortgage Loans was approximately 83.06%.

A-15

## Debt-to-Income Ratios for the Group 3 Mortgage Loans

| Range of Debt-to-Income Ratios | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 20.00% or less ............. | 1 | $ 67,821 | 1.39% | 10.850% | 650 | $ 67,821 | 95.00% | 17.00% | 100.00% | 0.00% |
| 30.01% to 35.00% ................ | 2 | 247,300 | 5.05 | 10.000 | 643 | 123,650 | 85.23 | 32.45 | 54.55 | 0.00 |
| 40.01% to 45.00% ................ | 8 | 1,209,794 | 24.72 | 9.320 | 631 | 151,224 | 81.30 | 44.34 | 39.02 | 0.00 |
| 45.01% to 50.00% ................ | 11 | 2,325,966 | 47.53 | 8.849 | 653 | 211,451 | 81.82 | 48.11 | 73.30 | 0.00 |
| 50.01% to 55.00% ................ | 5 | 1,042,475 | 21.30 | 9.720 | 615 | 208,495 | 86.58 | 53.96 | 79.28 | 20.72 |
| Total.................................. | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

At origination, the Debt-to-Income Ratios of the Group 3 Mortgage Loans ranged from 17.00% to 55.00% and the weighted average Debt-to-Income Ratio for Group 3 Mortgage Loans with Debt-to-Income Ratios was approximately 47.20%.

## Loan Purpose for the Group 3 Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Refinance - Cashout ............. | 19 | $3,886,619 | 79.43% | 9.098% | 643 | $204,559 | 83.10% | 48.00% | 61.24% | 5.56% |
| Purchase............................ | 8 | 1,006,738 | 20.57 | 9.773 | 625 | 125,842 | 82.90 | 44.12 | 82.05 | 0.00 |
| Total.................................. | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

## Types of Mortgaged Properties for the Group 3 Mortgage Loans

| Property Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Single Family.................... | 18 | $2,905,696 | 59.38% | 9.144% | 635 | $161,428 | 82.62% | 46.34% | 68.77% | 7.43% |
| Two- to Four-Family ............ | 3 | 848,036 | 17.33 | 9.345 | 669 | 282,679 | 84.60 | 49.40 | 100.00 | 0.00 |
| Planned Unit Development ... | 3 | 676,425 | 13.82 | 9.432 | 632 | 225,475 | 85.32 | 50.59 | 53.21 | 0.00 |
| Condominium .................... | 3 | 463,201 | 9.47 | 9.336 | 624 | 154,400 | 79.71 | 43.61 | 0.00 | 0.00 |
| Total.................................. | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

A-16

## Documentation Summary for the Group 3 Mortgage Loans

| Documentation | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Full Documentation.............. | 17 | $3,206,225 | 65.52% | 9.365% | 639 | $188,601 | 84.88% | 47.78% | 100.00% | 0.00% |
| Rapid ..................................... | 9 | 1,574,724 | 32.18 | 8.965 | 639 | 174,969 | 79.60 | 47.05 | 0.00 | 13.72 |
| Stated Income...................... | 1 | 112,408 | 2.30 | 9.400 | 646 | 112,408 | 79.51 | 33.00 | 0.00 | 0.00 |
| Total ................................. | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

## Occupancy Types for the Group 3 Mortgage Loans

| Occupancy | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Primary ................................. | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |
| Total................................. | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

The information set forth above with respect to occupancy is based upon representations of the related mortgagors at the time of origination.

## Mortgage Loan Age Summary for the Group 3 Mortgage Loans

| Mortgage Loan Age (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 ............................................ | 1 | $ 211,944 | 4.33% | 8.250% | 630 | $211,944 | 68.39% | 49.00% | 100.00% | 0.00% |
| 2 ............................................ | 8 | 1,873,583 | 38.29 | 9.048 | 657 | 234,198 | 83.49 | 45.56 | 45.69 | 0.00 |
| 3 ............................................ | 14 | 1,941,748 | 39.68 | 9.237 | 626 | 138,696 | 79.86 | 47.86 | 65.52 | 11.12 |
| 4 ............................................ | 4 | 866,081 | 17.70 | 9.886 | 632 | 216,520 | 92.91 | 48.83 | 100.00 | 0.00 |
| Total................................. | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

As of the Cut-off Date, the weighted average age of the Group 3 Mortgage Loans was approximately 3 months.

## Original Prepayment Penalty Term for the Group 3 Mortgage Loans

| Original Prepayment Penalty Term | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| None........................................ | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |
| Total................................. | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

The weighted average prepayment penalty term at origination with respect to the Group 3 Mortgage Loans having prepayment penalties is approximately 0 months.

A-17

## Credit Scores for the Group 3 Mortgage Loans

| Range of Credit Scores | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 551 to 575 .......................... | 1 | $ 140,967 | 2.88% | 9.000% | 564 | $140,967 | 80.00% | 51.00% | 100.00% | 0.00% |
| 576 to 600 .......................... | 3 | 334,992 | 6.85 | 9.124 | 594 | 111,664 | 76.06 | 49.52 | 100.00 | 0.00 |
| 601 to 625 .......................... | 6 | 1,278,988 | 26.14 | 9.390 | 610 | 213,165 | 83.45 | 48.20 | 54.33 | 0.00 |
| 626 to 650 .......................... | 10 | 1,616,229 | 33.03 | 9.545 | 641 | 161,623 | 81.85 | 44.76 | 64.70 | 0.00 |
| 651 to 675 .......................... | 5 | 801,118 | 16.37 | 9.049 | 665 | 160,224 | 83.85 | 48.18 | 33.53 | 26.96 |
| 676 to 700 .......................... | 1 | 280,250 | 5.73 | 7.850 | 676 | 280,250 | 85.00 | 48.00 | 100.00 | 0.00 |
| 701 to 725 .......................... | 1 | 440,814 | 9.01 | 9.050 | 704 | 440,814 | 90.00 | 48.00 | 100.00 | 0.00 |
| Total.......................... | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

The Credit Scores of the Group 3 Mortgage Loans that were scored at origination ranged from 564 to 704 and the weighted average Credit Score of the Group 3 Mortgage Loans that were scored at origination was approximately 639.

## Gross Margins for the Group 3 Mortgage Loans
### (Excludes Fixed Rate  Mortgage Loans)

| Range of Gross Margins | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 2.501% to 3.000% ................. | 1 | $ 211,944 | 4.33% | 8.250% | 630 | $211,944 | 68.39% | 49.00% | 100.00% | 0.00% |
| 3.501% to 4.000% ................. | 4 | 961,888 | 19.66 | 9.523 | 625 | 240,472 | 83.18 | 48.49 | 37.42 | 0.00 |
| 4.001% to 4.500% ................. | 22 | 3,719,525 | 76.01 | 9.219 | 643 | 169,069 | 83.87 | 46.77 | 70.83 | 5.81 |
| Total.......................... | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

As of the Cut-off Date, the Gross Margin for the Group 3 Adjustable Rate Mortgage Loans ranged from 2.750% per annum to 4.500% per annum and the weighted average Gross Margin of the Group 3 Adjustable Rate Mortgage Loans was approximately 4.273% per annum.

## Maximum Mortgage Rates for the Group 3 Mortgage Loans
### (Excludes Fixed Rate  Mortgage Loans)

| Range of Maximum Mortgage Rates | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 13.501% to 14.000% ............. | 1 | $ 280,250 | 5.73% | 7.850% | 676 | $280,250 | 85.00% | 48.00% | 100.00% | 0.00% |
| 14.001% to 14.500% ............. | 5 | 755,077 | 15.43 | 8.305 | 633 | 151,015 | 68.49 | 50.13 | 58.49 | 28.61 |
| 14.501% to 15.000% ............. | 6 | 950,431 | 19.42 | 8.884 | 626 | 158,405 | 79.93 | 45.86 | 29.95 | 0.00 |
| 15.001% to 15.500% ............. | 4 | 1,032,878 | 21.11 | 9.194 | 661 | 258,220 | 83.61 | 45.66 | 42.68 | 0.00 |
| 15.501% to 16.000% ............. | 7 | 1,394,374 | 28.50 | 9.769 | 627 | 199,196 | 89.37 | 49.89 | 91.69 | 0.00 |
| 16.001% to 16.500% ............. | 2 | 217,246 | 4.44 | 10.329 | 649 | 108,623 | 91.83 | 36.17 | 100.00 | 0.00 |
| 16.501% to 17.000% ............. | 1 | 67,821 | 1.39 | 10.850 | 650 | 67,821 | 95.00 | 17.00 | 100.00 | 0.00 |
| 17.001% to 17.500% ............. | 1 | 195,278 | 3.99 | 11.200 | 631 | 195,278 | 90.00 | 53.00 | 100.00 | 0.00 |
| Total.......................... | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

As of the Cut-off Date, the Maximum Mortgage Rates for the Group 3 Adjustable Rate Mortgage Loans ranged from 13.850% per annum to 17.200%  per annum and the weighted average Maximum Mortgage Rate of the Group 3 Adjustable Rate  Mortgage Loans was approximately 15.237% per annum.

### Next Rate Adjustment Date for the Group 3 Mortgage Loans
### (Excludes Fixed Rate Mortgage Loans)

| Next Rate Adjustment Date | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 3 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| August 2012 | 4 | $ 866,081 | 17.70% | 9.886% | 632 | $216,520 | 92.91% | 48.83% | 100.00% | 0.00% |
| September 2012 | 14 | 1,941,748 | 39.68 | 9.237 | 626 | 138,696 | 79.86 | 47.86 | 65.52 | 11.12 |
| October 2012 | 8 | 1,873,583 | 38.29 | 9.048 | 657 | 234,198 | 83.49 | 45.56 | 45.69 | 0.00 |
| November 2012 | 1 | 211,944 | 4.33 | 8.250 | 630 | 211,944 | 68.39 | 49.00 | 100.00 | 0.00 |
| Total | 27 | $4,893,357 | 100.00% | 9.237% | 639 | $181,235 | 83.06% | 47.20% | 65.52% | 4.41% |

A-19

### The Group 4 Mortgage Loans

### Mortgage Rates for the Group 4 Mortgage Loans

| Range of Mortgage Rates | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 5.501% to 6.000% | 1 | $ 111,722 | 0.94% | 5.550% | 717 | $111,722 | 80.00% | 51.00% | 100.00% | 0.00% |
| 7.001% to 7.500% | 6 | 1,591,095 | 13.32 | 7.257 | 654 | 265,183 | 75.05 | 48.33 | 75.30 | 0.00 |
| 7.501% to 8.000% | 12 | 2,506,520 | 20.99 | 7.870 | 632 | 208,877 | 75.10 | 43.83 | 65.83 | 10.40 |
| 8.001% to 8.500% | 12 | 2,798,574 | 23.44 | 8.323 | 650 | 233,215 | 81.26 | 44.29 | 74.75 | 0.00 |
| 8.501% to 9.000% | 5 | 1,010,573 | 8.46 | 8.862 | 609 | 202,115 | 80.01 | 50.64 | 78.24 | 0.00 |
| 9.001% to 9.500% | 11 | 1,467,576 | 12.29 | 9.258 | 613 | 133,416 | 82.69 | 42.47 | 90.74 | 7.54 |
| 9.501% to 10.000% | 7 | 1,135,512 | 9.51 | 9.764 | 650 | 162,216 | 87.81 | 48.76 | 94.23 | 0.00 |
| 10.001% to 10.500% | 2 | 463,417 | 3.88 | 10.483 | 622 | 231,708 | 90.00 | 48.98 | 100.00 | 0.00 |
| 10.501% to 11.000% | 3 | 594,543 | 4.98 | 10.715 | 612 | 198,181 | 87.57 | 41.08 | 100.00 | 0.00 |
| 11.001% to 11.500% | 2 | 200,875 | 1.68 | 11.267 | 653 | 100,438 | 92.76 | 55.00 | 100.00 | 0.00 |
| 11.501% to 12.000% | 1 | 60,296 | 0.50 | 11.650 | 646 | 60,296 | 95.00 | 50.00 | 100.00 | 0.00 |
| Total | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

As of the Cut-off Date, Mortgage Rates borne by the Group 4 Mortgage Loans ranged from 5.550% per annum to 11.650% per annum and the weighted average Mortgage Rate of the Group 4 Mortgage Loans was approximately 8.627% per annum.

### Remaining Months to Stated Maturity for the Group 4 Mortgage Loans

| Range of Remaining Terms (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 349 to 360 | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |
| Total | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

As of the Cut-off Date, the remaining term to stated maturity of the Group 4 Mortgage Loans ranged from 356 months to 360 months and the weighted average term to stated maturity of the Group 4 Mortgage Loans was approximately 357 months.

### Original Mortgage Loan Principal Balances for the Group 4 Mortgage Loans

| Range of Original Mortgage Loan Principal Balances | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| $50,001 to $100,000 | 12 | $ 952,233 | 7.97% | 9.740% | 616 | $ 79,353 | 84.87% | 38.15% | 93.12% | 0.00% |
| $100,001 to $150,000 | 13 | 1,625,278 | 13.61 | 8.510 | 655 | 125,021 | 82.58 | 44.61 | 58.82 | 6.81 |
| $150,001 to $200,000 | 11 | 1,938,022 | 16.23 | 8.729 | 623 | 176,184 | 78.45 | 43.96 | 82.86 | 0.00 |
| $200,001 to $250,000 | 11 | 2,466,294 | 20.65 | 8.356 | 635 | 224,209 | 79.67 | 44.71 | 80.97 | 0.00 |
| $250,001 to $300,000 | 9 | 2,534,336 | 21.22 | 8.333 | 632 | 281,593 | 77.48 | 47.96 | 66.82 | 10.29 |
| $300,001 to $350,000 | 2 | 647,241 | 5.42 | 9.999 | 638 | 323,620 | 88.70 | 50.00 | 100.00 | 0.00 |
| $350,001 to $400,000 | 2 | 736,731 | 6.17 | 8.212 | 605 | 368,366 | 79.68 | 52.91 | 100.00 | 0.00 |
| $500,001 to $550,000 | 2 | 1,040,568 | 8.71 | 8.399 | 686 | 520,284 | 84.56 | 47.32 | 100.00 | 0.00 |
| Total | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

As of the Cut-off Date, the outstanding principal balances of the Group 4 Mortgage Loans ranged from approximately $60,296 to approximately $532,731 and the average outstanding principal balance of the Group 4 Mortgage Loans was approximately $192,592.

A-20

## Product Types for the Group 4 Mortgage Loans

| Product Types | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| ARM - 5 Year/6 Month (50 due in 30).................... | 23 | $ 5,069,228 | 42.45% | 8.327% | 625 | $220,401 | 79.67% | 48.66% | 80.56% | 0.00% |
| ARM - 5 Year/6 Month (30-year term).................... | 28 | 4,537,814 | 38.00 | 8.697 | 648 | 162,065 | 80.82 | 41.26 | 78.93 | 8.19 |
| ARM - 5 Year/6 Month (40 due in 30).................... | 11 | 2,333,661 | 19.54 | 9.142 | 639 | 212,151 | 82.88 | 48.24 | 81.33 | 0.00 |
| Total........................................... | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

## Amortization Type for the Group 4 Mortgage Loans

| Amortization Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Fully Amortizing .................. | 26 | $ 4,166,314 | 34.89% | 8.747% | 648 | $160,243 | 80.63% | 41.58% | 77.05% | 0.00% |
| Balloon.............................. | 34 | 7,402,889 | 62.00 | 8.584 | 629 | 217,732 | 80.68 | 48.53 | 80.80 | 0.00 |
| 120 Month Interest-Only ....... | 2 | 371,500 | 3.11 | 8.137 | 646 | 185,750 | 82.98 | 37.62 | 100.00 | 100.00 |
| Total........................................... | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

## Adjustment Type for the Group 4 Mortgage Loans

| Adjustment Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| ARM ............................... | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |
| Total........................................... | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

A-21

### Geographic Distributions of Mortgaged Properties for the Group 4 Mortgage Loans

| Geographic Distributions | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Arizona | 2 | $ 408,367 | 3.42% | 8.346% | 653 | $204,184 | 81.23% | 42.89% | 100.00% | 63.86% |
| California | 8 | 2,142,060 | 17.94 | 8.292 | 625 | 267,757 | 73.01 | 47.82 | 66.47 | 0.00 |
| Florida | 7 | 1,164,583 | 9.75 | 8.240 | 639 | 166,369 | 78.58 | 46.03 | 30.01 | 0.00 |
| Illinois | 1 | 157,500 | 1.32 | 10.450 | 624 | 157,500 | 90.00 | 47.00 | 100.00 | 0.00 |
| Indiana | 5 | 573,545 | 4.80 | 10.805 | 629 | 114,709 | 90.38 | 45.60 | 100.00 | 0.00 |
| Kentucky | 1 | 74,899 | 0.63 | 9.950 | 649 | 74,899 | 82.42 | 39.00 | 100.00 | 0.00 |
| Michigan | 1 | 275,289 | 2.31 | 8.250 | 585 | 275,289 | 80.00 | 52.00 | 0.00 | 0.00 |
| Missouri | 1 | 111,722 | 0.94 | 5.550 | 717 | 111,722 | 80.00 | 51.00 | 100.00 | 0.00 |
| Montana | 1 | 139,624 | 1.17 | 8.050 | 581 | 139,624 | 79.10 | 50.00 | 0.00 | 0.00 |
| Nevada | 1 | 188,903 | 1.58 | 8.400 | 606 | 188,903 | 78.75 | 45.00 | 100.00 | 0.00 |
| New York | 7 | 1,545,400 | 12.94 | 8.838 | 670 | 220,771 | 85.56 | 45.32 | 95.76 | 7.16 |
| Oregon | 5 | 1,143,147 | 9.57 | 8.047 | 632 | 228,629 | 79.46 | 45.05 | 80.76 | 0.00 |
| Pennsylvania | 4 | 539,558 | 4.52 | 9.772 | 610 | 134,890 | 84.15 | 39.90 | 100.00 | 0.00 |
| Tennessee | 1 | 114,094 | 0.96 | 9.800 | 623 | 114,094 | 89.22 | 49.00 | 100.00 | 0.00 |
| Texas | 1 | 80,878 | 0.68 | 9.450 | 642 | 80,878 | 90.00 | 50.00 | 100.00 | 0.00 |
| Utah | 7 | 1,362,433 | 11.41 | 8.369 | 642 | 194,633 | 82.60 | 48.33 | 89.46 | 0.00 |
| Washington | 7 | 1,710,099 | 14.32 | 8.712 | 636 | 244,300 | 81.27 | 44.37 | 100.00 | 0.00 |
| Wisconsin | 2 | 208,602 | 1.75 | 8.349 | 632 | 104,301 | 78.89 | 31.19 | 100.00 | 0.00 |
| Total | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

As of the Cut-off Date, no more than approximately 4.46% of the Group 4 Mortgage Loans will be secured by mortgaged properties located in any one zip code.

A-22

## Original Loan-To-Value Ratios for the Group 4 Mortgage Loans

| Range of Original Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 50.00% or less ....................... | 1 | $    152,575 | 1.28% | 7.800% | 573 | $152,575 | 34.62% | 29.00% | 0.00% | 0.00% |
| 60.01% to 65.00% ................ | 1 | 299,760 | 2.51 | 7.125 | 711 | 299,760 | 60.61 | 52.00 | 100.00 | 0.00 |
| 65.01% to 70.00% ................ | 2 | 505,089 | 4.23 | 7.869 | 601 | 252,544 | 68.93 | 44.71 | 40.66 | 0.00 |
| 70.01% to 75.00% ................ | 3 | 740,090 | 6.20 | 7.805 | 634 | 246,697 | 74.28 | 52.21 | 30.38 | 0.00 |
| 75.01% to 80.00% ................ | 33 | 6,428,788 | 53.84 | 8.236 | 625 | 194,812 | 79.69 | 45.05 | 78.07 | 4.06 |
| 80.01% to 85.00% ................ | 6 | 737,222 | 6.17 | 9.773 | 625 | 122,870 | 84.42 | 44.16 | 100.00 | 0.00 |
| 85.01% to 90.00% ................ | 14 | 2,905,886 | 24.34 | 9.580 | 664 | 207,563 | 89.48 | 46.08 | 100.00 | 3.81 |
| 90.01% to 95.00% ................ | 2 | 171,292 | 1.43 | 11.358 | 675 | 85,646 | 95.00 | 53.24 | 100.00 | 0.00 |
| Total....................................... | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

At origination, the Original Loan-to-Value Ratios of the Group 4 Mortgage Loans ranged from 34.62% to 95.00% and the weighted average Original Loan-to-Value Ratio for Group 4 Mortgage Loans was approximately 80.74%.

## Combined Loan-To-Value Ratios for the Group 4 Mortgage Loans

| Range of Combined Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 50.00% or less ....................... | 1 | $    152,575 | 1.28% | 7.800% | 573 | $152,575 | 34.62% | 29.00% | 0.00% | 0.00% |
| 60.01% to 65.00% ................ | 1 | 299,760 | 2.51 | 7.125 | 711 | 299,760 | 60.61 | 52.00 | 100.00 | 0.00 |
| 65.01% to 70.00% ................ | 2 | 505,089 | 4.23 | 7.869 | 601 | 252,544 | 68.93 | 44.71 | 40.66 | 0.00 |
| 70.01% to 75.00% ................ | 3 | 740,090 | 6.20 | 7.805 | 634 | 246,697 | 74.28 | 52.21 | 30.38 | 0.00 |
| 75.01% to 80.00% ................ | 33 | 6,428,788 | 53.84 | 8.236 | 625 | 194,812 | 79.69 | 45.05 | 78.07 | 4.06 |
| 80.01% to 85.00% ................ | 6 | 737,222 | 6.17 | 9.773 | 625 | 122,870 | 84.42 | 44.16 | 100.00 | 0.00 |
| 85.01% to 90.00% ................ | 14 | 2,905,886 | 24.34 | 9.580 | 664 | 207,563 | 89.48 | 46.08 | 100.00 | 3.81 |
| 90.01% to 95.00% ................ | 2 | 171,292 | 1.43 | 11.358 | 675 | 85,646 | 95.00 | 53.24 | 100.00 | 0.00 |
| Total....................................... | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

At origination, the Combined Loan-to-Value Ratios of the Group 4 Mortgage Loans ranged from 34.62% to 95.00% and the weighted average Combined Loan-to-Value Ratio for Group 4 Mortgage Loans was approximately 80.74%.

## Debt-to-Income Ratios for the Group 4 Mortgage Loans

| Range of Debt-to-Income Ratios | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 20.01% to 25.00% .............. | 2 | $ 275,865 | 2.31% | 8.228% | 637 | $137,933 | 81.38% | 22.11% | 100.00% | 0.00% |
| 25.01% to 30.00% .............. | 7 | 684,985 | 5.74 | 8.995 | 609 | 97,855 | 70.93 | 28.02 | 51.82 | 0.00 |
| 30.01% to 35.00% .............. | 4 | 633,597 | 5.31 | 7.781 | 652 | 158,399 | 81.47 | 33.52 | 100.00 | 17.47 |
| 35.01% to 40.00% .............. | 6 | 1,598,421 | 13.39 | 8.352 | 659 | 266,403 | 81.79 | 38.93 | 100.00 | 16.32 |
| 40.01% to 45.00% .............. | 9 | 1,686,595 | 14.12 | 8.955 | 637 | 187,399 | 81.97 | 43.82 | 59.73 | 0.00 |
| 45.01% to 50.00% .............. | 16 | 3,119,170 | 26.12 | 9.071 | 636 | 194,948 | 84.11 | 49.13 | 85.91 | 0.00 |
| 50.01% to 55.00% .............. | 18 | 3,942,070 | 33.01 | 8.346 | 629 | 219,004 | 78.65 | 53.41 | 76.44 | 0.00 |
| Total...................................... | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

At origination, the Debt-to-Income Ratios of the Group 4 Mortgage Loans ranged from 21.00% to 55.00% and the weighted average Debt-to-Income Ratio for Group 4 Mortgage Loans with Debt-to-Income Ratios was approximately 45.76%.

## Loan Purpose for the Group 4 Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Refinance – Cashout............ | 40 | $ 8,182,737 | 68.53% | 8.381% | 631 | $204,568 | 78.63% | 46.37% | 73.50% | 0.00% |
| Purchase............................... | 19 | 3,164,608 | 26.50 | 9.417 | 647 | 166,558 | 86.39 | 44.88 | 97.93 | 3.50 |
| Refinance - Rate Term ........ | 3 | 593,357 | 4.97 | 7.812 | 649 | 197,786 | 79.60 | 42.08 | 75.79 | 43.95 |
| Total...................................... | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

## Types of Mortgaged Properties for the Group 4 Mortgage Loans

| Property Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Single Family........................ | 47 | $ 8,873,104 | 74.31% | 8.642% | 629 | $188,789 | 79.96% | 45.69% | 80.34% | 0.00% |
| Two- to Four-Family ............. | 6 | 1,451,506 | 12.16 | 8.664 | 679 | 241,918 | 85.18 | 44.56 | 95.49 | 7.63 |
| Planned Unit Development ... | 6 | 1,189,045 | 9.96 | 8.052 | 640 | 198,174 | 79.29 | 47.19 | 67.41 | 21.93 |
| Condominium ........................ | 3 | 427,047 | 3.58 | 9.798 | 630 | 142,349 | 85.79 | 47.42 | 57.93 | 0.00 |
| Total...................................... | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

A-24

## Documentation Summary for the Group 4 Mortgage Loans

| Documentation | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Full Documentation ............. | 49 | $ 9,563,397 | 80.09% | 8.760% | 638 | $195,171 | 82.34% | 45.58% | 100.00% | 3.88% |
| Rapid...................................... | 12 | 2,311,802 | 19.36 | 8.050 | 631 | 192,650 | 74.12 | 47.02 | 0.00 | 0.00 |
| Stated Income ....................... | 1 | 65,503 | 0.55 | 9.550 | 647 | 65,503 | 80.00 | 28.00 | 0.00 | 0.00 |
| Total................................. | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

## Occupancy Types for the Group 4 Mortgage Loans

| Occupancy | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Primary ................................. | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |
| Total................................. | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

The information set forth above with respect to occupancy is based upon representations of the related mortgagors at the time of origination.

## Mortgage Loan Age Summary for the Group 4 Mortgage Loans

| Mortgage Loan Age (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 ........................................... | 1 | $ 157,500 | 1.32% | 10.450% | 624 | $157,500 | 90.00% | 47.00% | 100.00% | 0.00% |
| 1 ........................................... | 2 | 641,084 | 5.37 | 8.416 | 680 | 320,542 | 74.95 | 50.94 | 100.00 | 0.00 |
| 2 ........................................... | 9 | 2,183,963 | 18.29 | 9.303 | 663 | 242,663 | 87.43 | 45.06 | 93.78 | 5.07 |
| 3 ........................................... | 42 | 7,899,958 | 66.16 | 8.356 | 626 | 188,094 | 78.50 | 45.10 | 76.88 | 3.30 |
| 4 ........................................... | 8 | 1,058,198 | 8.86 | 9.112 | 633 | 132,275 | 85.71 | 48.86 | 60.79 | 0.00 |
| Total................................. | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

As of the Cut-off Date, the weighted average age of the Group 4 Mortgage Loans was approximately 3 months.

A-25

### Original Prepayment Penalty Term for the Group 4 Mortgage Loans

| Original Prepayment Penalty Term | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 12 Months | 8 | $ 1,705,198 | 14.28% | 9.466% | 632 | $213,150 | 83.97% | 48.37% | 100.00% | 6.49% |
| 24 Months | 7 | 1,574,464 | 13.19 | 8.728 | 605 | 224,923 | 81.73 | 49.82 | 73.65 | 0.00 |
| 36 Months | 47 | 8,661,041 | 72.53 | 8.443 | 643 | 184,277 | 79.92 | 44.51 | 77.34 | 3.01 |
| Total | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

The weighted average prepayment penalty term at origination with respect to the Group 4 Mortgage Loans having prepayment penalties is approximately 31 months.

### Credit Scores for the Group 4 Mortgage Loans

| Range of Credit Scores | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 551 to 575 | 3 | $ 486,185 | 4.07% | 8.880% | 571 | $162,062 | 65.28% | 33.27% | 68.62% | 0.00% |
| 576 to 600 | 10 | 1,792,904 | 15.02 | 8.581 | 585 | 179,290 | 78.56 | 46.62 | 76.86 | 0.00 |
| 601 to 625 | 18 | 3,822,974 | 32.02 | 8.940 | 616 | 212,387 | 81.81 | 48.94 | 85.20 | 2.90 |
| 626 to 650 | 12 | 1,921,800 | 16.09 | 8.454 | 639 | 160,150 | 80.39 | 43.20 | 67.19 | 0.00 |
| 651 to 675 | 8 | 1,715,904 | 14.37 | 8.970 | 657 | 214,488 | 83.78 | 47.19 | 87.18 | 15.20 |
| 676 to 700 | 6 | 926,187 | 7.76 | 8.221 | 688 | 154,364 | 83.51 | 42.31 | 69.57 | 0.00 |
| 701 to 725 | 4 | 742,017 | 6.21 | 7.315 | 708 | 185,504 | 75.11 | 47.34 | 84.91 | 0.00 |
| 726 to 750 | 1 | 532,731 | 4.46 | 8.350 | 745 | 532,731 | 88.90 | 40.00 | 100.00 | 0.00 |
| Total | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

The Credit Scores of the Group 4 Mortgage Loans that were scored at origination ranged from 561 to 745 and the weighted average Credit Score of the Group 4 Mortgage Loans that were scored at origination was approximately 636.

### Gross Margins for the Group 4 Mortgage Loans
### (Excludes Fixed Rate Mortgage Loans)

| Range of Gross Margins | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 2.501% to 3.000% | 1 | $ 299,760 | 2.51% | 7.125% | 711 | $299,760 | 60.61% | 52.00% | 100.00% | 0.00% |
| 3.001% to 3.500% | 1 | 157,500 | 1.32 | 10.450 | 624 | 157,500 | 90.00 | 47.00 | 100.00 | 0.00 |
| 3.501% to 4.000% | 2 | 324,848 | 2.72 | 8.714 | 620 | 162,424 | 79.27 | 45.00 | 58.15 | 0.00 |
| 4.001% to 4.500% | 58 | 11,158,595 | 93.45 | 8.639 | 635 | 192,390 | 81.19 | 45.60 | 79.91 | 3.33 |
| Total | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

As of the Cut-off Date, the Gross Margin for the Group 4 Adjustable Rate Mortgage Loans ranged from 2.750% per annum to 4.500% per annum and the weighted average Gross Margin of the Group 4 Adjustable Rate Mortgage Loans was approximately 4.380% per annum.

### Maximum Mortgage Rates for the Group 4 Mortgage Loans
### (Excludes Fixed Rate  Mortgage Loans)

| Range of Maximum Mortgage Rates | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 11.501% to 12.000% ............. | 1 | $   111,722 | 0.94% | 5.550% | 717 | $111,722 | 80.00% | 51.00% | 100.00% | 0.00% |
| 13.001% to 13.500% ............. | 6 | 1,591,095 | 13.32 | 7.257 | 654 | 265,183 | 75.05 | 48.33 | 75.30 | 0.00 |
| 13.501% to 14.000% ............. | 12 | 2,506,520 | 20.99 | 7.870 | 632 | 208,877 | 75.10 | 43.83 | 65.83 | 10.40 |
| 14.001% to 14.500% ............. | 12 | 2,798,574 | 23.44 | 8.323 | 650 | 233,215 | 81.26 | 44.29 | 74.75 | 0.00 |
| 14.501% to 15.000% ............. | 5 | 1,010,573 | 8.46 | 8.862 | 609 | 202,115 | 80.01 | 50.64 | 78.24 | 0.00 |
| 15.001% to 15.500% ............. | 11 | 1,467,576 | 12.29 | 9.258 | 613 | 133,416 | 82.69 | 42.47 | 90.74 | 7.54 |
| 15.501% to 16.000% ............. | 7 | 1,135,512 | 9.51 | 9.764 | 650 | 162,216 | 87.81 | 48.76 | 94.23 | 0.00 |
| 16.001% to 16.500% ............. | 2 | 463,417 | 3.88 | 10.483 | 622 | 231,708 | 90.00 | 48.98 | 100.00 | 0.00 |
| 16.501% to 17.000% ............. | 3 | 594,543 | 4.98 | 10.715 | 612 | 198,181 | 87.57 | 41.08 | 100.00 | 0.00 |
| 17.001% to 17.500% ............. | 2 | 200,875 | 1.68 | 11.267 | 653 | 100,438 | 92.76 | 55.00 | 100.00 | 0.00 |
| 17.501% to 18.000% ............. | 1 | 60,296 | 0.50 | 11.650 | 646 | 60,296 | 95.00 | 50.00 | 100.00 | 0.00 |
| Total..................................... | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

As of the Cut-off Date, the Maximum Mortgage Rates for the Group 4 Adjustable Rate Mortgage Loans ranged from 11.550% per annum to 17.650% per annum and the weighted average Maximum Mortgage Rate of the Group 4 Adjustable Rate Mortgage Loans was approximately 14.627% per annum.

### Next Rate Adjustment Date for the Group 4 Mortgage Loans
### (Excludes Fixed Rate Mortgage Loans)

| Next Rate Adjustment Date | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Loan Group 4 | Weighted Average Coupon | Weighted Average Credit Score | Average Principal Balance Outstanding | Weighted Average Original LTV | Weighted Average Debt-to-Income | Percent Full Doc | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| August 2012........................ | 8 | $ 1,058,198 | 8.86% | 9.112% | 633 | $132,275 | 85.71% | 48.86% | 60.79% | 0.00% |
| September 2012................... | 42 | 7,899,958 | 66.16 | 8.356 | 626 | 188,094 | 78.50 | 45.10 | 76.88 | 3.30 |
| October 2012 ...................... | 9 | 2,183,963 | 18.29 | 9.303 | 663 | 242,663 | 87.43 | 45.06 | 93.78 | 5.07 |
| November 2012.................... | 2 | 641,084 | 5.37 | 8.416 | 680 | 320,542 | 74.95 | 50.94 | 100.00 | 0.00 |
| December 2012.................... | 1 | 157,500 | 1.32 | 10.450 | 624 | 157,500 | 90.00 | 47.00 | 100.00 | 0.00 |
| Total..................................... | 62 | $11,940,703 | 100.00% | 8.627% | 636 | $192,592 | 80.74% | 45.76% | 80.09% | 3.11% |

APPENDIX B

## ASSUMED MORTGAGE LOANS

### Group 1 Mortgage Loans

| Current Balance ($) | Mortgage Rate(%) | Net Mortgage Rate(%) | Original Stated Term (months) | Remaining Stated Term (months) | Original Amortization Term | Remaining Amortization Term | Original Interest-Only Term (months) | Remaining Interest-Only Term (months) | Original Months to Prepayment Penalty Expiration |
|---|---|---|---|---|---|---|---|---|---|
| 419,522.45 | 9.300 | 7.989 | 360 | 356 | 480 | 476 | 0 | 0 | 0 |
| 480,309.49 | 9.312 | 8.045 | 360 | 356 | 600 | 596 | 0 | 0 | 0 |
| 1,685,482.95 | 9.698 | 8.928 | 360 | 357 | 360 | 357 | 0 | 0 | 0 |

### Group 2 Mortgage Loans

| Current Balance ($) | Mortgage Rate(%) | Net Mortgage Rate(%) | Original Stated Term (months) | Remaining Stated Term (months) | Original Amortization Term | Remaining Amortization Term | Original Interest-Only Term (months) | Remaining Interest-Only Term (months) | Original Months to Prepayment Penalty Expiration |
|---|---|---|---|---|---|---|---|---|---|
| 1,098,346.43 | 8.294 | 7.582 | 360 | 358 | 480 | 478 | 0 | 0 | 36 |
| 403,399.47 | 9.100 | 8.526 | 360 | 357 | 600 | 597 | 0 | 0 | 12 |
| 721,455.43 | 8.046 | 7.472 | 360 | 357 | 600 | 597 | 0 | 0 | 36 |
| 1,412,637.57 | 8.785 | 7.960 | 360 | 356 | 360 | 356 | 0 | 0 | 12 |
| 255,280.64 | 9.661 | 8.645 | 360 | 357 | 360 | 357 | 0 | 0 | 24 |
| 2,924,972.97 | 8.702 | 8.015 | 360 | 357 | 360 | 357 | 0 | 0 | 36 |

Group 3 Mortgage Loans

| Current Balance ($) | Mortgage Rate(%) | Net Mortgage Rate(%) | Original Stated Term (months) | Remaining Stated Term (months) | Original Amortization Term (Less IO Term) (months) | Remaining Amortization Term (Less IO Term) (months) | Original Interest-Only Term (months) | Remaining Interest-Only Term (months) | Gross Margin(%) |
|---|---|---|---|---|---|---|---|---|---|
| 1,850,575.12 | 9.255 | 8.378 | 360 | 357 | 360 | 357 | 0 | 0 | 4.256 |
| 216,000.00 | 8.450 | 7.876 | 360 | 360 | 240 | 240 | 120 | 117 | 4.500 |
| 1,786,194.13 | 8.853 | 7.465 | 360 | 358 | 480 | 478 | 0 | 0 | 4.231 |
| 1,040,587.34 | 10.027 | 8.243 | 360 | 357 | 600 | 597 | 0 | 0 | 4.327 |

| Current Balance ($) | Initial Periodic Cap(%) | Periodic Cap(%) | Maximum Rate(%) | Minimum Rate(%) | Rate Change Frequency (months) | Number of Months Until Next Rate Adjustment Date | Index | Original Months to Prepayment Penalty Expiration |
|---|---|---|---|---|---|---|---|---|
| 1,850,575.12 | 3.000 | 1.000 | 15.255 | 9.255 | 6 | 57 | 6M LIBOR | 0 |
| 216,000.00 | 3.000 | 1.000 | 14.450 | 8.450 | 6 | 57 | 6M LIBOR | 0 |
| 1,786,194.13 | 3.000 | 1.000 | 14.853 | 8.853 | 6 | 58 | 6M LIBOR | 0 |
| 1,040,587.34 | 2.308 | 1.000 | 16.027 | 10.027 | 6 | 57 | 6M LIBOR | 0 |

## Group 4 Mortgage Loans

| Current Balance ($) | Mortgage Rate(%) | Net Mortgage Rate(%) | Original Stated Term (months) | Remaining Stated Term (months) | Original Amortization Term (Less IO Term) (months) | Remaining Amortization Term (Less IO Term) (months) | Original Interest-Only Term (months) | Remaining Interest-Only Term (months) | Gross Margin(%) |
|---|---|---|---|---|---|---|---|---|---|
| 572,916.93 | 10.327 | 8.601 | 360 | 357 | 360 | 357 | 0 | 0 | 4.374 |
| 110,700.00 | 9.050 | 7.126 | 360 | 358 | 240 | 240 | 120 | 118 | 4.250 |
| 620,264.98 | 8.039 | 7.465 | 360 | 356 | 360 | 356 | 0 | 0 | 4.500 |
| 2,973,132.12 | 8.590 | 7.368 | 360 | 357 | 360 | 357 | 0 | 0 | 4.279 |
| 260,800.00 | 7.750 | 7.176 | 360 | 357 | 240 | 240 | 120 | 117 | 4.500 |
| 513,743.74 | 9.600 | 8.267 | 360 | 358 | 480 | 478 | 0 | 0 | 4.359 |
| 305,916.58 | 10.500 | 8.576 | 360 | 358 | 480 | 478 | 0 | 0 | 4.250 |
| 1,514,000.20 | 8.712 | 7.445 | 360 | 358 | 480 | 478 | 0 | 0 | 4.153 |
| 507,837.19 | 8.450 | 7.876 | 360 | 357 | 600 | 597 | 0 | 0 | 4.500 |
| 648,282.08 | 8.551 | 7.593 | 360 | 357 | 600 | 597 | 0 | 0 | 4.500 |
| 3,913,108.85 | 8.274 | 7.621 | 360 | 357 | 600 | 597 | 0 | 0 | 4.500 |

| Current Balance ($) | Initial Periodic Cap(%) | Periodic Cap(%) | Maximum Rate(%) | Minimum Rate(%) | Rate Change Frequency (months) | Number of Months Until Next Rate Adjustment Date | Index | Original Months to Prepayment Penalty Expiration |
|---|---|---|---|---|---|---|---|---|
| 572,916.93 | 3.000 | 1.000 | 16.327 | 10.327 | 6 | 57 | 6M LIBOR | 12 |
| 110,700.00 | 3.000 | 1.000 | 15.050 | 9.050 | 6 | 58 | 6M LIBOR | 12 |
| 620,264.98 | 3.000 | 1.000 | 14.039 | 8.039 | 6 | 56 | 6M LIBOR | 24 |
| 2,973,132.12 | 3.000 | 1.000 | 14.590 | 8.590 | 6 | 57 | 6M LIBOR | 36 |
| 260,800.00 | 3.000 | 1.000 | 13.750 | 7.750 | 6 | 57 | 6M LIBOR | 36 |
| 513,743.74 | 3.000 | 1.000 | 15.600 | 9.600 | 6 | 58 | 6M LIBOR | 12 |
| 305,916.58 | 3.000 | 1.000 | 16.500 | 10.500 | 6 | 58 | 6M LIBOR | 24 |
| 1,514,000.20 | 3.000 | 1.000 | 14.712 | 8.712 | 6 | 58 | 6M LIBOR | 36 |
| 507,837.19 | 3.000 | 1.000 | 14.450 | 8.450 | 6 | 57 | 6M LIBOR | 12 |
| 648,282.08 | 3.000 | 1.000 | 14.551 | 8.551 | 6 | 57 | 6M LIBOR | 24 |
| 3,913,108.85 | 3.000 | 1.000 | 14.274 | 8.274 | 6 | 57 | 6M LIBOR | 36 |

APPENDIX C

DECREMENT TABLES

**Percentage of Initial Certificate Principal Balance Outstanding
at the Respective Percentages of CPR**

| | Class 1-A-1 | | | | | | |
|---|---|---|---|---|---|---|---|
| Distribution Date | 0% | 10% | 20% | 30% | 50% | 60% | 75% |
| Initial........................ | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2008 .. | 100 | 90 | 80 | 70 | 50 | 40 | 25 |
| December 25, 2009 .. | 99 | 80 | 63 | 49 | 25 | 16 | 6 |
| December 25, 2010 .. | 98 | 72 | 50 | 34 | 12 | 6 | 2 |
| December 25, 2011 .. | 98 | 64 | 40 | 24 | 6 | 3 | * |
| December 25, 2012 .. | 97 | 57 | 32 | 16 | 3 | 1 | * |
| December 25, 2013 .. | 96 | 51 | 25 | 11 | 2 | * | * |
| December 25, 2014 .. | 96 | 46 | 20 | 8 | 1 | * | * |
| December 25, 2015 .. | 95 | 41 | 16 | 5 | * | * | * |
| December 25, 2016 .. | 94 | 36 | 13 | 4 | * | * | * |
| December 25, 2017 .. | 93 | 32 | 10 | 3 | * | * | * |
| December 25, 2018 .. | 92 | 29 | 8 | 2 | * | * | * |
| December 25, 2019 .. | 90 | 25 | 6 | 1 | * | * | * |
| December 25, 2020 .. | 89 | 23 | 5 | 1 | * | * | * |
| December 25, 2021 .. | 87 | 20 | 4 | 1 | * | * | * |
| December 25, 2022 .. | 85 | 18 | 3 | * | * | * | 0 |
| December 25, 2023 .. | 84 | 15 | 2 | * | * | * | 0 |
| December 25, 2024 .. | 81 | 14 | 2 | * | * | * | 0 |
| December 25, 2025 .. | 79 | 12 | 1 | * | * | * | 0 |
| December 25, 2026 .. | 77 | 10 | 1 | * | * | * | 0 |
| December 25, 2027 .. | 74 | 9 | 1 | * | * | * | 0 |
| December 25, 2028 .. | 71 | 8 | 1 | * | * | * | 0 |
| December 25, 2029 .. | 67 | 7 | * | * | * | 0 | 0 |
| December 25, 2030 .. | 63 | 6 | * | * | * | 0 | 0 |
| December 25, 2031 .. | 59 | 5 | * | * | * | 0 | 0 |
| December 25, 2032 .. | 55 | 4 | * | * | * | 0 | 0 |
| December 25, 2033 .. | 50 | 3 | * | * | * | 0 | 0 |
| December 25, 2034 .. | 44 | 3 | * | * | * | 0 | 0 |
| December 25, 2035 .. | 38 | 2 | * | * | 0 | 0 | 0 |
| December 25, 2036 .. | 31 | 1 | * | * | 0 | 0 | 0 |
| December 25, 2037 .. | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years) ...................... | 23.39 | 8.37 | 4.38 | 2.81 | 1.49 | 1.14 | 0.77 |
| Weighted Average Life to Optional Termination Date (years) | 23.39 | 7.91 | 3.99 | 2.55 | 1.35 | 1.04 | 0.71 |

*Less than 0.5% but greater than 0.0%

C-1

**Percentage of Initial Certificate Principal Balance Outstanding
at the Respective Percentages of the CPR**

| | Class 2-A-1 | | | | | | |
|---|---|---|---|---|---|---|---|
| Distribution Date | 0% | 10% | 20% | 30% | 50% | 60% | 75% |
| Initial........................ | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2008 .. | 99 | 89 | 80 | 70 | 50 | 40 | 25 |
| December 25, 2009 .. | 99 | 80 | 63 | 48 | 25 | 16 | 6 |
| December 25, 2010 .. | 98 | 72 | 50 | 34 | 12 | 6 | 2 |
| December 25, 2011 .. | 97 | 64 | 40 | 23 | 6 | 2 | * |
| December 25, 2012 .. | 97 | 57 | 32 | 16 | 3 | 1 | * |
| December 25, 2013 .. | 96 | 51 | 25 | 11 | 1 | * | * |
| December 25, 2014 .. | 95 | 45 | 20 | 8 | 1 | * | * |
| December 25, 2015 .. | 94 | 40 | 16 | 5 | * | * | * |
| December 25, 2016 .. | 93 | 36 | 12 | 4 | * | * | * |
| December 25, 2017 .. | 91 | 32 | 10 | 3 | * | * | * |
| December 25, 2018 .. | 90 | 28 | 8 | 2 | * | * | * |
| December 25, 2019 .. | 88 | 25 | 6 | 1 | * | * | * |
| December 25, 2020 .. | 87 | 22 | 5 | 1 | * | * | * |
| December 25, 2021 .. | 85 | 19 | 4 | 1 | * | * | * |
| December 25, 2022 .. | 83 | 17 | 3 | * | * | * | * |
| December 25, 2023 .. | 81 | 15 | 2 | * | * | * | 0 |
| December 25, 2024 .. | 79 | 13 | 2 | * | * | * | 0 |
| December 25, 2025 .. | 76 | 11 | 1 | * | * | * | 0 |
| December 25, 2026 .. | 74 | 10 | 1 | * | * | * | 0 |
| December 25, 2027 .. | 71 | 9 | 1 | * | * | * | 0 |
| December 25, 2028 .. | 67 | 7 | 1 | * | * | * | 0 |
| December 25, 2029 .. | 64 | 6 | * | * | * | * | 0 |
| December 25, 2030 .. | 60 | 5 | * | * | * | 0 | 0 |
| December 25, 2031 .. | 56 | 4 | * | * | * | 0 | 0 |
| December 25, 2032 .. | 51 | 4 | * | * | * | 0 | 0 |
| December 25, 2033 .. | 46 | 3 | * | * | * | 0 | 0 |
| December 25, 2034 .. | 41 | 2 | * | * | * | 0 | 0 |
| December 25, 2035 .. | 35 | 2 | * | * | * | 0 | 0 |
| December 25, 2036 .. | 28 | 1 | * | * | 0 | 0 | 0 |
| December 25, 2037 .. | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years) ..................... | 22.80 | 8.26 | 4.36 | 2.80 | 1.48 | 1.14 | 0.77 |
| Weighted Average Life to Optional Termination Date (years) | 22.80 | 7.83 | 3.97 | 2.54 | 1.35 | 1.04 | 0.71 |

*Less than 0.5% but greater than 0.0%

**Percentage of Initial Certificate Principal Balance Outstanding
at the Respective Percentages of the CPR**

| Distribution Date | Class 3-A-1 | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0% | 10% | 20% | 30% | 50% | 60% | 75% |
| Initial ....................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2008 .. | 100 | 90 | 80 | 70 | 50 | 40 | 25 |
| December 25, 2009 .. | 99 | 80 | 64 | 49 | 25 | 16 | 6 |
| December 25, 2010 .. | 99 | 72 | 51 | 34 | 12 | 6 | 2 |
| December 25, 2011 .. | 98 | 64 | 40 | 24 | 6 | 3 | * |
| December 25, 2012 .. | 98 | 58 | 32 | 16 | 3 | 1 | * |
| December 25, 2013 .. | 97 | 52 | 25 | 11 | 2 | * | * |
| December 25, 2014 .. | 97 | 46 | 20 | 8 | 1 | * | * |
| December 25, 2015 .. | 96 | 41 | 16 | 6 | * | * | * |
| December 25, 2016 .. | 95 | 37 | 13 | 4 | * | * | * |
| December 25, 2017 .. | 94 | 33 | 10 | 3 | * | * | * |
| December 25, 2018 .. | 93 | 29 | 8 | 2 | * | * | * |
| December 25, 2019 .. | 92 | 26 | 6 | 1 | * | * | * |
| December 25, 2020 .. | 91 | 23 | 5 | 1 | * | * | * |
| December 25, 2021 .. | 90 | 21 | 4 | 1 | * | * | * |
| December 25, 2022 .. | 88 | 18 | 3 | * | * | * | 0 |
| December 25, 2023 .. | 87 | 16 | 2 | * | * | * | 0 |
| December 25, 2024 .. | 85 | 14 | 2 | * | * | * | 0 |
| December 25, 2025 .. | 83 | 12 | 1 | * | * | * | 0 |
| December 25, 2026 .. | 81 | 11 | 1 | * | * | * | 0 |
| December 25, 2027 .. | 79 | 10 | 1 | * | * | * | 0 |
| December 25, 2028 .. | 76 | 8 | 1 | * | * | * | 0 |
| December 25, 2029 .. | 74 | 7 | 1 | * | * | * | 0 |
| December 25, 2030 .. | 71 | 6 | * | * | * | 0 | 0 |
| December 25, 2031 .. | 67 | 5 | * | * | * | 0 | 0 |
| December 25, 2032 .. | 64 | 5 | * | * | * | 0 | 0 |
| December 25, 2033 .. | 60 | 4 | * | * | * | 0 | 0 |
| December 25, 2034 .. | 55 | 3 | * | * | * | 0 | 0 |
| December 25, 2035 .. | 51 | 3 | * | * | * | 0 | 0 |
| December 25, 2036 .. | 45 | 2 | * | * | 0 | 0 | 0 |
| December 25, 2037 .. | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years) ...................... | 24.72 | 8.52 | 4.41 | 2.82 | 1.49 | 1.14 | 0.77 |
| Weighted Average Life to Optional Termination Date (years) | 24.72 | 8.00 | 4.01 | 2.55 | 1.35 | 1.04 | 0.71 |

*Less than 0.5% but greater than 0.0%

C-3

**Percentage of Initial Certificate Principal Balance Outstanding
at the Respective Percentages of the CPR**

| Distribution Date | Class 4-A-1 | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0% | 10% | 20% | 30% | 50% | 60% | 75% |
| Initial ....................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2008 .. | 100 | 90 | 80 | 70 | 50 | 40 | 25 |
| December 25, 2009 .. | 99 | 80 | 64 | 49 | 25 | 16 | 6 |
| December 25, 2010 .. | 99 | 72 | 51 | 34 | 12 | 6 | 2 |
| December 25, 2011 .. | 98 | 64 | 40 | 24 | 6 | 3 | * |
| December 25, 2012 .. | 98 | 58 | 32 | 16 | 3 | 1 | * |
| December 25, 2013 .. | 97 | 52 | 26 | 11 | 2 | * | * |
| December 25, 2014 .. | 97 | 46 | 20 | 8 | 1 | * | * |
| December 25, 2015 .. | 96 | 41 | 16 | 6 | * | * | * |
| December 25, 2016 .. | 96 | 37 | 13 | 4 | * | * | * |
| December 25, 2017 .. | 95 | 33 | 10 | 3 | * | * | * |
| December 25, 2018 .. | 94 | 29 | 8 | 2 | * | * | * |
| December 25, 2019 .. | 93 | 26 | 6 | 1 | * | * | * |
| December 25, 2020 .. | 92 | 23 | 5 | 1 | * | * | * |
| December 25, 2021 .. | 91 | 21 | 4 | 1 | * | * | * |
| December 25, 2022 .. | 90 | 18 | 3 | * | * | * | * |
| December 25, 2023 .. | 88 | 16 | 2 | * | * | * | 0 |
| December 25, 2024 .. | 87 | 14 | 2 | * | * | * | 0 |
| December 25, 2025 .. | 85 | 13 | 2 | * | * | * | 0 |
| December 25, 2026 .. | 83 | 11 | 1 | * | * | * | 0 |
| December 25, 2027 .. | 82 | 10 | 1 | * | * | * | 0 |
| December 25, 2028 .. | 79 | 9 | 1 | * | * | * | 0 |
| December 25, 2029 .. | 77 | 8 | 1 | * | * | * | 0 |
| December 25, 2030 .. | 74 | 7 | * | * | * | * | 0 |
| December 25, 2031 .. | 72 | 6 | * | * | * | 0 | 0 |
| December 25, 2032 .. | 68 | 5 | * | * | * | 0 | 0 |
| December 25, 2033 .. | 65 | 4 | * | * | * | 0 | 0 |
| December 25, 2034 .. | 61 | 4 | * | * | * | 0 | 0 |
| December 25, 2035 .. | 57 | 3 | * | * | * | 0 | 0 |
| December 25, 2036 .. | 52 | 2 | * | * | * | 0 | 0 |
| December 25, 2037 .. | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years) ..................... | 25.32 | 8.59 | 4.42 | 2.82 | 1.49 | 1.14 | 0.77 |
| Weighted Average Life to Optional Termination Date (years) | 25.32 | 8.03 | 4.01 | 2.55 | 1.35 | 1.04 | 0.71 |

*Less than 0.5% but greater than 0.0%

C-4

**If you intend to purchase SPCs, you should rely only on the information in this Supplement, the Offering Circular and the Information Circular, including the information in the disclosure documents that we have incorporated by reference. We have not authorized anyone to provide you with different information.**

**This Supplement, the Offering Circular, the Information Circular and the incorporated documents may not be correct after their dates.**

**We are not offering the SPCs in any jurisdiction that prohibits their offer.**

## TABLE OF CONTENTS

| Description | Page |
|---|---|
| **Offering Circular Supplement** | |
| Certain Risk Considerations | S-2 |
| Terms Sheet | S-3 |
| Available Information | S-5 |
| General Information | S-5 |
|   Pass-Through Agreement | S-5 |
|   Form of SPCs | S-5 |
|   Denominations of SPCs | S-5 |
|   Structure of Transaction | S-6 |
|   The Mortgages | S-6 |
| Payments | S-6 |
|   Payment Dates; Record Dates | S-6 |
|   Method of Payment | S-6 |
|   Interest | S-7 |
|   Principal | S-7 |
|   Class Factors | S-7 |
|   Guarantees | S-7 |
|   Optional Termination; Redemption | S-7 |
| Prepayment and Yield Analysis | S-8 |
|   Mortgage Prepayments | S-8 |
|   Yield | S-8 |
|   Suitability | S-9 |
| Final Payment Dates | S-9 |
| Certain Federal Income Tax Consequences | S-9 |
|   General | S-9 |
|   Classification of Investment Arrangement | S-9 |
|   Status of Classes | S-10 |
|   Information Reporting | S-10 |
| Legal Investment Considerations | S-10 |
| ERISA Considerations | S-10 |
| Plan of Distribution | S-11 |
| Legal Matters | S-11 |
| **Offering Circular** | |
| Freddie Mac | 3 |
| Additional Information | 4 |
| Summary | 5 |
| Risk Factors | 8 |
| Description of Pass-Through Certificates | 9 |
| Prepayment, Yield and Suitability Considerations | 22 |
| The Pass-Through Agreement | 28 |
| Certain Federal Income Tax Consequences | 30 |
| Accounting Considerations | 43 |
| Legal Investment Considerations | 43 |
| Distribution Arrangements | 43 |
| Increase in Size | 44 |
| Appendix I — Index of Terms | I-1 |
| Appendix II — Exchange Procedures for Stripped Giant Certificates | II-1 |
| Appendix III — Examples of MACS Exchanges | III-1 |
| Appendix IV — Redemption and Exchange Procedures for CPCs | IV-1 |
| **Information Circular** | |
| Summary Information | 6 |
| Risk Factors | 12 |
| Forward Looking Statements | 23 |
| The Sponsor | 23 |
| The Depositor | 24 |
| The Issuing Entity | 24 |
| The Trustee/Custodian | 25 |
| The Servicer | 26 |
| The Guarantor | 28 |
| The Credit Risk Manager | 28 |
| Underwriting Guidelines | 28 |
| Affiliates and Related Transactions | 32 |
| Description of the Certificates | 32 |
| Description of the Mortgage Loans | 40 |
| Certain Legal Aspects of the Mortgage Loans | 44 |
| Prepayment and Yield Considerations | 55 |
| The Pooling and Servicing Agreement | 60 |
| Certain Material Federal Income Tax Consequences | 78 |
| State and Other Tax Consequences | 84 |
| Accounting Considerations | 84 |
| Legal Matters | 84 |
| Plan of Distribution | 84 |
| Index of Defined Terms | 85 |
| Appendix A: Mortgage Loan Data | A-1 |
| Appendix B: Assumed Mortgage Loans | B-1 |
| Appendix C: Decrement Tables | C-1 |

**$26,235,464**
**(Approximate)**

# Freddie Mac

**Structured**
**Pass-Through**
**Certificates (SPCs),**
**Series T-079**



**December 18, 2007**