# Exhibit K

```
                                                          1
      CchWfedC
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------x  11 CV 5201 (DLC)
 2                                           11 CV 6188 (DLC)
 3    FEDERAL HOUSING FINANCE AGENCY,        11 CV 6189 (DLC)
 3                                           11 CV 6190 (DLC)
 4                  Plaintiff,               11 CV 6192 (DLC)
 4                                           11 CV 6193 (DLC)
 5            v.                             11 CV 6195 (DLC)
 5                                           11 CV 6196 (DLC)
 6    UBS AMERICAS, INC., et al.,            11 CV 6198 (DLC)
 6                                           11 CV 6200 (DLC)
 7                  Defendants;             11 CV 6201 (DLC)
 7                                           11 CV 6202 (DLC)
 8                                           11 CV 6739 (DLC)
 8                                           11 CV 6203 (DLC)
 9    And other FHFA cases.                  11 CV 6739 (DLC)
 9                                           11 CV 7010 (DLC)
10                                           11 CV 7048 (DLC)
10    ------------------------------------x
11
11                                           New York, N.Y.
12                                           December 17, 2012
12                                           2:30 p.m.
13
13    Before:
14
14                        HON. DENISE COTE,
15
15                                           District Judge
16
17
18
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
        CchWfedC
1                           APPEARANCES
1       HUGHES HUBBARD & REED LLP
2            Attorneys for FDIC
2       BY:  SCOTT CHRISTENSEN (telephonic)
3            KATHLEEN FONES (telephonic)
3            -and-
4       NOSSAMAN LLP
4       BY:  AMBER GRAYHORSE (telephonic)
5
5       BOIES, SCHILLER & FLEXNER LLP
6            Attorneys for One West
6       BY:  HAMISH P.M. HUME (telephonic)
7
8       QUINN EMANUEL URQUHART & SULLIVAN LLP
8            Attorneys for Plaintiff
9            Federal Housing Finance Agency
9       BY:  MOLLY STEPHENS
10           MANISHA M. SHETH
10           ANDREW R. DUNLAP
11           CHRISTINE H. CHUNG
11           RICHARD SCHIRTZER (telephonic)
12           ERICA P. TAGGART
12           -and-
13      KASOWITZ BENSON TORRES & FRIEDMAN LLP
13      BY:  KANCHANA WANGKEO LEUNG
14
14      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
15           Attorneys for Defendants UBS Americas, Inc.,
15           SG Americas, Inc., and
16           affiliated entities and individuals
16      BY:  JAY KASNER
17           SCOTT MUSOFF
17           ROBERT A. FUMERTON
18           -and-
18      SPEARS & IMES LLP
19      BY:  DAVID SPEARS
19           CHARLITA MAYS
20           MONICA FOLCH
20
21      SULLIVAN & CROMWELL LLP
21           Attorneys for Defendant JP Morgan Chase
22           and affiliated entities, and certain individuals
22      BY:  PENNY SHANE
23
24
25
```

3

```
CchWfedC
 1                        APPEARANCES (cont'd)
 2
 2     SULLIVAN & CROMWELL LLP
 3          Attorneys for Defendant Goldman Sachs
 3          and affiliated entities and individuals
 4     BY:  RICHARD H. KLAPPER
 4          -and-
 5     COHEN & GRESSER LLP
 5     BY:  NATHANIEL READ (telephonic)
 6
 6     SULLIVAN & CROMWELL LLP
 7          Attorneys for Defendant Barclays Bank
 7          and affiliated entities and individuals
 8     BY:  BRIAN T. FRAWLEY
 8          JEFFREY T. SCOTT
 9
 9     SULLIVAN & CROMWELL LLP
10          Attorneys for Defendant First Horizon,
10          Nomura Holding, and affiliated entities
11     BY:  BRUCE E. CLARK
11          AMANDA F. DAVIDOFF
12
12     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
13          Attorneys for Defendant Citigroup
13          and affiliated entities and individuals
14     BY:  SUSANNA M. BUERGEL
14          CAITLIN E. GRUSAUSKAS
15
15     CRAVATH, SWAINE & MOORE LLP
16          Attorneys for Defendant Credit Suisse
16          and affiliated entities and individuals
17     BY:  RICHARD CLARY
17          MICHAEL T. REYNOLDS
18          LAUREN A. MOSKOWITZ
18
19     SIMPSON THACHER & BARTLETT LLP
19          Attorneys for Defendants RBS Securities,
20          Deutsche Bank, and affiliated entities
20     BY:  DAVID J. WOLL
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

4

CchWfedC

```
 1                    APPEARANCES (cont'd)
 2   MAYER BROWN LLP
 2        Attorneys for Defendant HSBC North America Holdings
 3        and affiliated entities and individuals
 3   BY:  JOHN M. CONLON
 4        MICHAEL O. WARE
 4
 5   MAYER BROWN LLP
 5        Attorneys for Defendants Ally Financial
 6        and GMAC Mortgage Group, Inc.
 6   BY:  REGINALD R. GOEKE
 7        MICHAEL O. WARE
 7        CATHERINE A. BERNARD
 8
 8   KIRKLAND & ELLIS LLP
 9        Attorneys for Defendant Ally Securities
 9   BY:  ROBERT J. KOPECKY (telephonic)
10        DEVON M. LARGIO (telephonic)
10
11   WILLIAMS & CONNOLLY, LLP
11        Attorneys for Defendants Bank of America Corporation,
12        Merrill Lynch, and affiliated entities
12   BY:  EDWARD J. BENNETT
13        BETH A. STEWART
13        JESSE T. SMALLWOOD
14        STEVEN M. CADY (telephonic)
14
15   DAVIS POLK & WARDWELL LLP
15        Attorneys for Defendant Morgan Stanley
16        and affiliated entities and individuals
16   BY:  JAMES P. ROUHANDEH
17        BRIAN S. WEINSTEIN
17        DANIEL J. SCHWARTZ
18
18   WEIL, GOTSHAL & MANGES LLP
19        Attorneys for Defendant General Electric
19        and affiliated entities
20   BY:  VERNON S. BRODERICK
20        SETH GOODCHILD
21
22
23
24
25
```

5

CchWfedC

```
 1                      APPEARANCES (cont'd)
 2   RICHARDS KIBBE & ORBE, LLP
 2        Attorneys for Numerous Individual Defendants
 3   BY:  NEIL S. BINDER
 3
 4   GREENBERG TRAURIG, LLP
 4        Attorneys for Defendant Mayer
 5   BY:  CANDACE MARIE CAMARATA
 5
 6   ALLEN & OVERY LLP
 6        Attorneys for Defendant Molinaro
 7   BY:  JOSEPHINE A. CHEATHAM
 7
 8   MORRISON & FOERSTER LLP
 8        Attorneys for Defendants Marano & Nierenberg
 9   BY:  JOEL HAIMS
 9
10   SNR DENTON US LLP
10        Attorneys for Defendant Perkins
11   BY:  PATRICK E. FITZMAURICE
11
12   KRAMER LEVIN NAFTALIS & FRANKEL, LLP
12        Attorneys for Defendant Verschleiser
13   BY:  DANI R. JAMES
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CchWfedC

```
 1                (Case called)
 2                THE COURT:  We're beginning the conference call in the
 3    FHFA matter.  We'll take appearances on this issue which has to
 4    do with a protective order to be entered in several of the
 5    cases in this action.
 6                Taking appearances first for the FHFA.
 7                MS. STEPHENS:  Molly Stephens, of Quinn Emanuel.
 8                MS. CHUNG:  Good afternoon, your Honor.  In the
 9    courtroom you have from Quinn Emanuel Christine Chung, Manisha
10    Sheth, Andrew Dunlap, and on the phone Molly Stephens.
11                MS. LEUNG:  Kanchana Leung, Kasowitz Benson Torres &
12    Friedman, also for FHFA.
13                THE COURT:  For UBS Americas and SG Americas.
14                MS. MAYS:  Yes.
15                THE COURT:  Is there anyone making an appearance?
16                MS. MAYS:  In the courtroom, Charlita Mays, David
17    Spears, Monica Folch.
18                MR. FUMERTON:  Robert Fumerton, for UBS as well.  Ms.
19    Mays and Mr. Spears will be addressing this.  They're
20    prosecuting the subpoenas on behalf of UBS.
21                THE COURT:  For J.P. Morgan Chase.
22                MS. SHANE:  Good afternoon, your Honor.  Penny Shane,
23    from Sullivan & Cromwell.
24                THE COURT:  For Bank of America Corporation and
25    Merrill Lynch.
```

7

CchWfedC

```
 1              MR. CADY:  Steve Cady, from Williams & Connolly, on
 2    the phone.
 3              THE COURT:  Goldman Sachs.
 4              MR. READ:  Nathaniel Read, from Cohen & Gresser, by
 5    telephone.
 6              THE COURT:  In the courtroom.
 7              MR. KLAPPER:  Richard Klapper, Sullivan & Cromwell.
 8              THE COURT:  For Credit Suisse Securities.
 9              MR. CLARY:  Richard Clary from Cravath.
10              THE COURT:  Mr. Clary, in the courtroom.
11              MS. BERGIN:  Also, your Honor, Keara Bergin.
12              THE COURT:  Keara Bergin is also in the courtroom.
13              For Ally Financial and GMAC.
14              MR. WARE:  Michael Ware, Mayer Brown, in the
15    courtroom, your Honor.
16              THE COURT:  I'm sorry.  Michael who?
17              MR. WARE:  Ware.
18              THE COURT:  Thank you, Mr. Ware.
19              For Ally Securities.
20              MS. LARGIO:  Devon Largio and Robert Kopecky, on the
21    phone.
22              THE COURT:  For RBS and Deutsche Bank.  No one
23    responding.
24              For Citigroup.
25              MS. GRUSAUSKAS:  Cait Grusauskas, from Paul Weiss.
```

8

CchWfedC

```
 1              THE COURT:  In the courtroom is Ms. Grusauskas.
 2              For GE.
 3              MR. GOODCHILD:  Seth Goodchild, from Weil Gotshal, by
 4      telephone.
 5              THE COURT:  For the individual defendant Perkins.  No
 6      one responding.
 7              For FDIC.
 8              MR. CHRISTENSEN:  Good afternoon, your Honor.  Scott
 9      Christensen, Huges, Hubbard & Reed, and with me is my colleague
10      Kathleen Fones, on behalf of the FDIC.
11              THE COURT:  Is there anyone appearing on behalf of One
12      West?
13              MR. HUME:  Hamish Hume, from Boies, Schiller &
14      Flexner, for One West.
15              THE COURT:  Thank you so much.
16              Is there anyone appearing on this matter who has not
17      placed their appearance on the record?
18              MS. MAYS:  Yes, your Honor.  Charlita Mays, for Morgan
19      Stanley, in the courtroom.
20              MR. GOEKE:  Reginald Goeke of Mayer Brown, appearing
21      on behalf of Ally Financial and GMAC.
22              MS. GRAYHORSE:  Amber Grayhorse, Nossaman LLP,
23      appearing on behalf of the FDIC receiver.
24              MR. WARE:  Michael Ware, in the courtroom, for the
25      HSBC defendants.
```

CchWfedC

```
 1              THE COURT:  Thank you so much.  The FDIC appearance, I
 2    believe it was for the FDIC receiver, could you please state
 3    your name again.
 4              MS. GRAYHORSE:  Amber Grayhorse with Nossaman LLP.
 5              THE COURT:  Thank you so much.
 6              I have correspondence with respect to the issue of the
 7    protective order that will cover the documents to be produced
 8    by FDIC and One West.  They include various letters from Spears
 9    & Imes, dated December 13 and 14th, a letter of December 13
10    from Scott Christensen, and a letter of December 17 from the
11    plaintiff FHFA, signed by Christine Chung, among others.  We
12    have a protective order in the FHFA litigation which was filed
13    May 30, and I want to make sure that both the FDIC and One West
14    have had an opportunity to look at the protective order filed
15    in these 16 actions.
16              Mr. Christensen, have you been provided with a copy of
17    it?
18              MR. CHRISTENSEN:  Yes, your Honor, and the FDIC has
19    reviewed it.
20              THE COURT:  Thank you so much.  I'm sorry.  I didn't
21    write down the whole name.  Is it Mr. Hume?
22              MR. HUME:  That's correct, your Honor.  For One West,
23    and we also have a copy of it.
24              THE COURT:  Thank you.  I have attached to the
25    December 14 letter from Spears & Imes two documents as Exhibits
```

10

CchWfedC

1 and 2, which I believe are proposed protective orders for One
West and FDIC, at least in a form that was relevant as of the
date December 14.

I have a letter, as I mentioned, of today's date, from
Ms. Chung, which purports to identify areas that remain of
concern between the FDIC and One West and at least the FHFA in
this action, and I don't know if there are other issues that
either Mr. Christensen or Mr. Hume wish to raise, but those are
the documents that I have before me.

Mr. Christensen, why don't I start with you and give
you an opportunity to be heard.

MR. CHRISTENSEN:  Thank you, your Honor.

Your Honor, by way of very quick background, the FDIC
has been asked to produce a very large volume of highly
sensitive information of third-party consumers who are not
represented in this litigation except by those such as the FDIC
that have the duty to advocate for the protection of their
highly sensitive information.  The FDIC, when faced with
numerous subpoenas, such as those in this case, concluded that
it would be unwieldy and burdensome on all parties to produce
documents in the manner traditionally produced in these
circumstances, which would be to redact the documents and
produce them to the requesting party.  The redactions of loan
files in particular would be phenomenally expensive and time
consuming, and so as an alternative to redacting documents, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CchWfedC

1    FDIC, across multiple cases, has agreed to produce documents in
2    unredacted form that contain the highly sensitive consumer
3    information contained in these documents.  But subject to
4    heightened protections that would require receiving parties to
5    protect the highly sensitive information in the same manner
6    that banks and the FDIC would be required to protect them,
7    limitations on who may review the highly sensitive information,
8    and supplemental orders that would shift the burden to the
9    receiving parties to redact the highly sensitive information,
10   if the documents are ever used in court.
11           This protocol, your Honor, has been applied by the
12   FDIC across numerous cases and in the Southern District of New
13   York, for example, Judge Kaplan has entered the supplemental
14   protective orders that you mentioned as Exhibits 1 and 2 in two
15   cases pending before him, one, the In Re IndyMac
16   Mortgage-backed Securities Litigation, which is a class action
17   pending in the Southern District, as well as the Serratelli v.
18   Residential Asset Securitization Trust, a 2006 case, and
19   similar orders have been entered in the Eastern District of New
20   York and in other courts in order to protect the highly
21   sensitive private information of third-party borrowers who do
22   not know that their information is being provided to a whole
23   host of other parties in litigation.
24           The FDIC, in conjunction with One West, provided
25   examples of copies to any of the parties that requested them

12

CchWfedC
1   when documents were sought in this case, and we've proceeded to
2   discuss the protections in these orders culminating in the
3   correspondence that you saw at the end of last week and the
4   conference we had earlier this morning.
5            The correspondence that you have, your Honor, from
6   this morning, December 17, certainly articulates FHFA's view
7   but does not complete the picture with what the FDIC was
8   willing to agree to following this morning's meet-and-confer
9   because we concluded with the promise to return to our clients
10  to see if we could reach a compromise and make this conference
11  unnecessary.  And as a result, the FDIC is certainly willing to
12  modify the supplemental protective orders to allow documents to
13  be produced as highly confidential under the terms of the May
14  30, 2012, protective order that already exists in this case,
15  and the FDIC will forgo the request to review the redactions of
16  documents before they are lodged on the public record so long
17  as the FDIC can have the opportunity to request additional
18  redactions, if parties' redactions are not sufficient.
19           There are two other matters that the FDIC believes
20  that the supplemental protective order is already sufficient
21  and addressed in the December 17 letter that I'd like to touch
22  on very briefly.
23           THE COURT:  Mr. Christensen, what are the issues then
24  as far as you're concerned that remain in dispute?
25           MR. CHRISTENSEN:  Three issues remain in dispute, your
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

13

CchWfedC
```
 1   Honor, as far as I can see.
 2              One, in paragraph three of Exhibit 1 of the
 3   supplemental protective order, the FDIC has asked that
 4   receiving parties comply with any state or federal privacy laws
 5   that a bank or the FDIC would be required to comply with in
 6   order to protect the nonpublic personal information of
 7   third-party borrowers.  The FDIC still believes that that
 8   should be an obligation on receiving parties to protect that
 9   information, under federal and state privacy law, and
10   understands that that is resisted by at least some of the
11   requesting parties in this case.
12              Second, your Honor, in paragraph seven of Exhibit 1 of
13   the proposed supplemental protective order, the FDIC has
14   requested that borrowers not be contacted as a result only of
15   the information contained in the loan files produced.  If
16   requesting parties know the identity of borrowers through means
17   other than the loan files, there is no prohibition on
18   contacting those borrowers.  The FDIC is concerned that the
19   loan files would be used as a means to contact borrowers, and,
20   second, that borrowers will learn that their highly sensitive
21   information has been given to numerous other parties and that
22   it would drastically increase the likelihood of the FDIC and
23   others being sued for having disclosed their highly sensitive
24   information.
25              The third area of disagreement, your Honor, is with
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CchWfedC
```
 1   respect to the separate order in Exhibit 2 for clawing back
 2   documents produced from the FDIC that may potentially be
 3   privileged.  The FDIC has collected documents out of IndyMac
 4   Bank in electronic form that parties had requested access to in
 5   subpoenas.  The FDIC has been very cooperative in allowing
 6   parties to provide search terms that the FDIC will run across
 7   an electronic database and post those documents with minimal
 8   privilege review on the FDIC's part to allow requesting parties
 9   to review those documents.
10           In exchange for providing that really extraordinary
11   access, the FDIC has asked to be allowed to claw back any
12   intentionally produced document that the FDIC subsequently
13   discovers is privileged, and so has asked to have the
14   opportunity to review documents that before they're being used
15   in the litigation, the FDIC has requested to review those
16   documents 21 days before they're filed with the Court.  The
17   FDIC is willing to reduce that time to 14 days, but we'd still
18   like the opportunity to review documents before they are filed
19   with the Court in order to decide whether they are privileged
20   and ought to be clawed back.
21           THE COURT:  Thank you.
22           Before I turn to Ms. Chung, Mr. Hume, did you want to
23   add to the list of issues that you don't think there's
24   agreement on yet?
25           MR. HUME:  Thank you, your Honor.
```

CchWfedC

```
 1              I think Mr. Christensen has adequately and correctly
 2      summarized what the issues are, and I would only add one or two
 3      things to make sure they're clear.  I agree with everything he
 4      said.  I think it's accurate, and our position is the same as
 5      the FDIC's.  I think on the issue of our original request, that
 6      redacted filings be subject to a 21-day period under seal when
 7      One West and the FDIC could review them for the accuracy of the
 8      redaction, we have agreed to drop that.  And just to be clear,
 9      what we think the provision should say is that it is the
10      responsibility of the parties, the filing party, whether it be
11      UBS or FHFA, that they do the redactions properly.  And that's
12      what we understood FHFA's lawyers to say to us this morning.
13      It's their job to do it correctly, not our job, and we would
14      simply reserve the right, but not the obligation, to notify the
15      party or the Court at any time if it came to our attention that
16      the redactions were inadequate.  So that's what we think the
17      supplemental protective order should say, and, as we understood
18      the call this morning, FHFA would be agreeable to that.
19              Our only concern, my client's only concern is that
20      nothing that we do here in this production exposes them to
21      liability.  It's really that simple.  And it's getting from
22      where we are to that point to some comfort level that is
23      driving all of this.
24              The only other point I would make, your Honor, is
25      Mr. Christensen mentioned on the provision of paragraph seven
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CchWfedC

1    of our proposed protective order about the restrictions on the
2    ability of counsel to contact the borrowers and the provision
3    that they could do so only if they knew of their information
4    independently of our production.  The reason for that is not to
5    create alarm or confusion on the part of borrowers and increase
6    risk of litigation.  I just want to emphasize any such
7    litigation, we believe, would be meritless because we believe
8    we've done everything possible, both the FDIC and One West, to
9    ensure that all confidential information of these borrowers is
10   totally protected.  I just want to make that clear.
11           With that, I think Mr. Christensen has identified the
12   open issues.
13           THE COURT:  Thank you, Mr. Hume.
14           I have a question for you, Mr. Christensen.  With
15   respect to your first point about the need to comply adequately
16   with state and any other laws that might be in issue here, why
17   isn't court-ordered production pursuant to the terms of the
18   protective order issued in May and in the FHFA litigation
19   sufficient?
20           MR. CHRISTENSEN:  I'm not sure that the court-ordered
21   production applies or addresses the question of how the files
22   are maintained once they are produced.
23           THE COURT:  If they're maintained pursuant to the
24   court-ordered protective order, which is the structure that
25   binds all the parties here, why isn't that sufficient

17
CchWfedC
1    protection?
2              MR. CHRISTENSEN:  I suppose it would be sufficient
3    protection if the parties are maintaining the documents in the
4    manner that is required by the protective order, but there are,
5    in every state and there are separate laws governing how the
6    electronic files of this highly sensitive information is to be
7    maintained, and it was the FDIC's desire to make sure that
8    files be maintained in the same manner that any bank or the
9    FDIC would be required to maintain them in order to protect
10   them.
11             THE COURT:  Yes.
12             MR. CHRISTENSEN:  If your Honor were to order that the
13   order is sufficient, then that would be the case.
14             THE COURT:  Thank you.
15             So I am going to ask Ms. Chung if you could respond
16   then to the second point raised by Mr. Christensen and adopted
17   by Mr. Hume, and that is the restriction on contacting
18   borrowers.
19             MS. CHUNG:  Your Honor, the reason that we objected to
20   that provision is, as I think you've heard in the presentations
21   that were made, there is no legal basis for such a restriction.
22   It's possible that at some point the parties will wish to
23   subpoena or contact borrowers.  Borrowers themselves when they
24   signed loan applications specified conditions under which they
25   can be contacted.

18

CchWfedC

```
 1              Now, what the producing parties are concerned about is
 2      the possibility that when borrowers get contacted, because of
 3      things that are going on in litigation, maybe even through
 4      court process, through subpoenas, that the borrowers will be
 5      annoyed that they were contacted because somehow they've
 6      divined that this information came from FDIC.  As you heard
 7      Mr. Hume say, any such suit would be meritless because anybody
 8      who produces borrower information pursuant to court process as
 9      the producing parties are here have an exception under at least
10      the laws that we're aware of that enable them to turn over that
11      information.  And so that prohibition is not something that the
12      parties, and, your Honor, I know some of your Honor's questions
13      have referenced this.  All of the parties here are extremely
14      sophisticated in dealing with this information.
15              FHFA and all the defendants negotiated at some length
16      this confidentiality order that has quite restrictive
17      provisions on how to use and handle this information.
18      Effectively, what we're concerned about, and your Honor's
19      questioning does go to this point, I want to acknowledge that,
20      we have a producing party here who alone, among dozens of
21      producing parties, is now effectively asking for another layer
22      of procedures on top of the ones we already have.  Just to give
23      your Honor an example, when the producing parties here on the
24      phone say, Well, we would like to designate borrower
25      information as highly confidential, the parties here have
```

CchWfedC
```
 1   usually been designating that information as confidential.
 2             THE COURT:  Yes.  That's not at issue anymore.
 3             MS. CHUNG:  All right.
 4             THE COURT:  As I understand it.
 5             MS. CHUNG:  All right, your Honor.
 6             I think what they've offered to do, and I'm sorry
 7   because the letter that they wrote came in at 1:00, so one of
 8   the reasons that Ms. Stephens is on the line is I did not have
 9   a chance to review in great detail the letter that they sent
10   just around 12:30 or one.
11             THE COURT:  I have not seen that letter.
12             MS. CHUNG:  No.  Your Honor.  It was to us.
13             THE COURT:  Okay.
14             MS. CHUNG:  It was to us as a result of the
15   meet-and-confer.
16             So I know there's been a little movement as a result
17   of the meet-and-confer this morning.  And Ms. Stephens is
18   probably better situated being on the phone and still having
19   access to e-mail to address those.  But I did not understand
20   the producing parties to be agreeing to designate the borrower
21   information as confidential as opposed to highly confidential.
22   If they are going to highly confidential, that's a whole
23   different bucket of restrictions than are in our protective
24   order.
25             THE COURT:  I did not understand Mr. Christensen to
```

20

CchWfedC

1  say that that was still in dispute.  He itemized three issues
2  that he understands are still in dispute, so that's what we're
3  dealing with now.
4          So returning to the second issue he identified, which
5  is the restriction on contacting borrowers and the information
6  comes from the loan file and no independent source.
7          MR. HUME:  Your Honor, I'm sorry interrupt, this is
8  Mr. Hume, if I may.
9          I think there may be some confusion here.
10  Mr. Christensen and I said we believe based on the
11  meet-and-confer call no dispute about the designation of this
12  borrower information because of this.  Counsel for FHFA told us
13  this morning, and to be fair, they said they might be willing
14  to compromise by saying if we could agree to the highly
15  confidential provisions in the existing protective order, would
16  we agree that's sufficient.  That's what Mr. Christensen and I
17  have said.  We think the borrower information should be highly
18  confidential, but the restrictions on who can see the highly
19  confidential information should be the restriction in the
20  existing court order of May 30, not the tighter, more stringent
21  restrictions we had originally proposed.  I just wanted to make
22  sure that was clear.
23          THE COURT:  Excuse me one second.  I'm looking at the
24  May 30 protective order.
25          Ms. Chung, under the May 30 protective order, and I'm

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CchWfedC
1   looking at Section 2.8, where nonparty borrower information is
2   defined.  Then where do I find how that is treated in terms of
3   confidential versus highly confidential in other sections of
4   the order?
5           MS. CHUNG:  Your Honor, if I might, I think
6   Ms. Stephens might be able to address this better also because
7   the potential compromise that Mr. Hume was just describing had
8   multiple parts to it.  We did not agree to the compromise on
9   the phone this morning, but Ms. Stephens also has the lay of
10  the land of which parts have now been updated since we started
11  coming to court, so she may be able to address your Honor's
12  questions to this more precisely.
13          MS. STEPHENS:  Your Honor, this is Molly Stephens.
14          THE COURT:  Ms. Stephens, if you could, identify for
15  me the issues that you believe are still in dispute between the
16  parties.
17          MS. STEPHENS:  Our position is that nonparty borrower
18  information is a separate category from highly confidential
19  material, and highly confidential material is defined in
20  paragraph 2.7 as either trade secret or other information that
21  a party reasonably believes would result in competitive,
22  commercial, or financial harm; or, two, material that a
23  producing party believes in good faith would not otherwise be
24  adequately protected under the procedures set forth for
25  confidential material.  And then nonparty borrower information

CchWfedC

1  is defined in paragraph 2.8 separately, not as highly
2  confidential information.
3          The procedures that we have throughout the protective
4  order in designating in bulk material that is highly
5  confidential or confidential do deal with nonparty borrower
6  information.  It is true that there is no provision in the
7  protective order providing that nonparty borrower information
8  is always confidential.  However, our experience with the
9  hundreds of third parties that are producing loan files, they
10 are designating that information as confidential because it
11 isn't a trade secret and there's no reason why the current
12 provisions in the protective order do not protect that
13 information.
14         In terms of where in the protective order you have
15 access to the information, that's in paragraph seven, and
16 paragraph 7.3 indicates who you can disclose confidential
17 information to, and that includes not only counsel but also
18 former officers and directors of the parties, experts, etc.
19         Then paragraph 7.4 limits those people for highly
20 confidential, although there is a carve-out for certain FHFA
21 employees.  We've continued to maintain that nonparty borrower
22 information contained in a loan file should be confidential
23 because it needs to be disclosed or very well in this
24 litigation could be disclosed to employees for the parties that
25 it could not be disclosed to as highly confidential.  We think

CchWfedC

1  there is no justification for it as a trade secret or that we
2  need special protection under the protective order.
3          We did ask the FDIC and One West if they would be
4  willing, if the Court decides to allow them to mark this as
5  highly confidential, which we disagree with, at least can we
6  resolve our dispute over who gets highly confidential
7  information because FDIC and One West wanted to limit the
8  people who received highly confidential information beyond what
9  was in paragraph 7.4.  That is where there is agreement, that
10 if the information is designated highly confidential, then it
11 can be disclosed to everyone who is identified in this
12 paragraph 7.4.  So there is no dispute over that.
13         We do continue to have a dispute over this paragraph
14 three.
15         THE COURT:  Excuse me one second, Ms. Stephens.
16         So FHFA's position is the borrower information in
17 these loan files shouldn't be classified under the terms of the
18 May 30 order -- well, that it isn't, under the May 30 order,
19 classified as either confidential or highly confidential, but
20 it is treated in the context of these 16 cases as confidential.
21         MS. STEPHENS:  That's correct, and we do not believe
22 it satisfies the standard for highly confidential in this
23 protective order.
24         THE COURT:  And you understand that the FDIC and One
25 West are seeking that it be classified as highly confidential

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CchWfedC

1   and if I decide it should be, then they are agreeing that they
2   will accept that determination in terms of the disclosure
3   provisions contained in the May 30 order; that is, it can be
4   disclosed to all of the persons identified in Section 7.4?
5           MS. STEPHENS:  Correct.
6           THE COURT:  Is there any other area, Ms. Stephens,
7   that you believe is still in dispute?
8           MS. STEPHENS:  So FDIC and One West identified
9   paragraph three and paragraph seven of Exhibit 1, and we agree
10  those are in dispute.  In addition, for Exhibit 2 --
11          THE COURT:  Are those things that are different than
12  what we've already talked about this afternoon on the phone?
13          MS. STEPHENS:  No, they aren't.
14          THE COURT:  Okay.
15          MS. STEPHENS:  Paragraph three is --
16          THE COURT:  That's fine then.
17          MS. STEPHENS:  Exhibit 2, we actually have a
18  disagreement on how -- this is to deal with privileged,
19  inadvertently produced privileged information of One West and
20  FDIC.
21          THE COURT:  Is that the claw-back provision, the third
22  point?
23          MS. STEPHENS:  It is, but we have a broader dispute
24  here.  This is really those paragraphs, Section 4A and 4B of
25  the order.  They have focused on paragraph 4B in terms of

25
CchWfedC
1   filing the information with the Court, being able to object to
2   that.  But 4A also provides that if any of this information is
3   to be disclosed to parties other than those authorized to
4   receive highly confidential information, we have to notify the
5   FDIC and One West of our intention to disclose that information
6   and the identity of the information to be disclosed, and then
7   we have to give them 14 days to object to that disclosure as
8   well.  So it's not just the filing provision that we object to,
9   which is in Section 4B.  It's also the disclosure provision in
10  Section 4A.
11              Ultimately what we see is that, what we anticipate is
12  that the FDIC and One West may designate the entire, all of
13  these documents as confidential, potentially privileged, and
14  it's going to slow down the litigation a great deal that we
15  can't disclose this information to anyone other than highly
16  confidential recipients without getting their approval.  And
17  then we also have to get their approval for filing, and they've
18  got a right to insist on withdrawing that filing as well.  We
19  believe that a claw-back provision looks at the ethical
20  obligations of the parties and if you do receive inadvertently
21  produced privileged material, you then have an obligation to
22  tell the other side that it appears to be inadvertently
23  produced.  That's when they review it, or perhaps the producing
24  party happens upon, learns that they inadvertently produced
25  information.  But the bulk designation of an entire database
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

26

CchWfedC

```
 1   and then a right to review whenever you want to disclose or
 2   then file doesn't make a lot of sense to us and appears to slow
 3   down the litigation a great deal.
 4              THE COURT:  Thank you.
 5         So let's take these four issues one by one and see if
 6   we can address each of the concerns.
 7              With respect to the first issue, the production here
 8   by FDIC and One West is going to be a court-ordered production
 9   pursuant to the subpoenas and the status and the parameters of
10   the protective order that I issued in May, and I think that
11   adequately protects any producing party with respect to
12   potential liability for failure to comply with the laws of this
13   country at whatever level of jurisdiction.
14              Let's go to the second issue, and that is when
15   borrowers may be contacted.  Obviously there's a full and
16   complete answer to any complaint, and I don't think anyone is
17   suggesting otherwise, should a borrower be contacted and be
18   unhappy about that happening.  No one expects that either FDIC
19   or any producing party among the hundreds in the course of this
20   litigation that have been required to produce documents because
21   of the litigation would be liable for the act of production.
22   This is a massive set of litigations with many parties, and
23   we're moving as swiftly as we can towards a series of 16
24   trials, the first to occur a year from this coming January.
25   And so we can't have a situation in which the parties don't
```

CchWfedC

1    have the flexibility to reach out pursuant to all the
2    requirements of law, I admit, the Federal Rules of Civil
3    Procedure, any protective orders I've issued in this case, to
4    reach out and get discovery materials and prepare for trial
5    adequately.  And so I think a restriction that would single out
6    these sets of loan files and impose upon the parties in the 16
7    cases or at least the subset of several cases in which these
8    files are important, to have another layer of review and
9    concern before reaching out to borrowers, I think, would be
10   extraordinarily burdensome and not legally necessary.
11           Let's talk about the claw-back provision a little bit.
12   I think we have, as everyone would admit in this case, many
13   highly sophisticated parties who came up with a very heavily
14   negotiated protective order.  To some extent, I had to resolve
15   disputes among the parties in order for the final document to
16   be produced, and in the course of that protective order in the
17   FHFA litigation, the parties negotiated claw-back provisions.
18   Now, admittedly, they have the benefit of knowing what my
19   individual practices provide with respect to filings in federal
20   court of any documents so that the parties understand as a
21   result of my individual practices that documents can be filed
22   in the public record in redacted form, and there's a procedure
23   set out in my individual practices for getting review of those
24   redactions and making sure that everyone has an opportunity to
25   be heard carefully before any of the redacted information is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

CchWfedC
1    thrown into the public record.
2            I don't have any problem with giving either One West
3    or FDIC an opportunity to review the material filed in redacted
4    form -- the unredacted filings it would be filed under seal --
5    when redacted filings are made in federal court in this
6    litigation and have an opportunity to be heard, that's fairly
7    customary, before the sealed material is placed in the public
8    record.  But, again, that suggests if this is actually material
9    from loan files or taken out of the productions here that
10   really aren't the separate documents of the FDIC or One West,
11   and I don't understand that to be an issue here, but only
12   production of loan files, that FDIC or One West want to impose
13   that burden on themselves.
14           I think, much as I believe Mr. Hume recognized, it
15   would be probably be better from their point of view that they
16   always have the right to look but not a sense of an obligation
17   to look, so that if they failed to do a careful review that
18   they're somehow responsible.  I think that it would make much
19   more sense and I think they're legally protected if they leave
20   it to the parties in this case to do that careful review so
21   that private information is not revealed in the public record
22   unless it is appropriate to do so after careful review by the
23   Court.
24           We have, in fact, in this district, and I think it's
25   true in many, many districts around the country, automatic
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

CchWfedC
```
 1   redaction protocol for much private financial information that
 2   goes far beyond Social Security numbers.  And so that's
 3   something we live with day in and day out to protect against
 4   all kinds of fraud and identity theft and unnecessary
 5   disclosure of personal or private information.  And so I think
 6   that should be enough to protect both producing parties in this
 7   case.
 8           Now, with respect to the other issue which
 9   Ms. Stephens said might still be in dispute about a claw-back
10   provision with respect to materials shared with others or
11   discussed with others but not filed in court, I'm not sure how
12   that would work, other than again imposing an extraordinary
13   burden on the parties in this case for these sets of documents,
14   which, as massive as the productions might be, are a minuscule
15   portion of the productions made of loan files in these
16   litigations.  And to impose that additional claw-back burden
17   when it's really third-party information in the hands of One
18   West and the FDIC, I don't see the necessity for that.
19           With respect to the treatment of these documents as
20   either highly confidential under the protocol in the May 30
21   order or as simply confidential documents as the parties have
22   treated it in the May 30 order, it seems to me this comes down
23   to again the issues that I've just addressed, and that is with
24   whom may the parties in this litigation share the information,
25   and do we need the restrictions imposed on the highly
```

CchWfedC

```
 1   confidential information, or are the restrictions imposed on
 2   the class of documents that the parties have defined as
 3   confidential sufficient to protect not just the interests of
 4   One West and FDIC but, of course, the interests ultimately of
 5   each of the borrowers in this case.  And I know that One West
 6   and FDIC's counsel are reflecting the concerns both of their
 7   immediate clients and their desire to comply with all legal
 8   requirements in every jurisdiction, but also speaking on behalf
 9   of the interests of these borrowers in wanting to get the
10   proper level of protection for them.  But I think that is
11   encompassed by the confidentiality order, and it's an order
12   governed by the contempt sanctions of this Court, should there
13   be a violation.  And again, because of the sealing protocol
14   that's in place, I think we have a great deal of confidence
15   that no private information will be placed on the public record
16   and available publicly without full scrutiny by the Court to
17   make sure that that is appropriate.
18            I want to thank you, Mr. Christensen and Ms. Grayhorse
19   and Mr. Hume, for participating in today's conference call with
20   the Court and also I want to commend you for your careful
21   thought about these important issues and making sure that the
22   interests of your clients and the borrowers are protected.
23            MR. CHRISTENSEN:  Thank you, your Honor.
24            MR. HUME:  Thank you, your Honor.
25            THE COURT:  Thank you very much.  And with that, we'll
```

CchWfedC

1   accept these documents covered by the protection of the May 30
2   protective order.  Thank you much.
3           MS. GRAYHORSE:  Your Honor, may I be heard on one
4   issue.
5           THE COURT:  Ms. Grayhorse.
6           MS. GRAYHORSE:  With respect to the second claw-back
7   provision in the privileged protective order, not the NPPI
8   protective order, I just wanted to clarify that that order is
9   intended to govern the production of documents other than those
10  filed.  So as Mr. Christensen earlier referred to, when IndyMac
11  closed and the FDIC became the receiver of IndyMac, it
12  collected a lot of records of IndyMac and it has those records
13  as of today, and the way that we produce those records to
14  requesting parties pursuant to subpoenas is we make them
15  available pursuant to search terms and other areas where we
16  come to agreement with the parties.  But what we do is it would
17  be extraordinarily burdensome and expensive for us to review
18  those documents for privilege before producing them or making
19  them available on this database to the requesting parties.  And
20  so that's where the claw-back provision in that order is
21  important for the FDIC to have an opportunity to go back and
22  review documents that the requesting parties have actually
23  selected for production out of the database.
24          THE COURT:  So that I understand, Ms. Grayhorse, you
25  want to produce promptly, and for that I thank you.  But you

CchWfedC
```
 1  want a chance to review them after production to identify any
 2  documents that should be clawed back as privileged.
 3          MS. GRAYHORSE:  Correct, and when we produce those
 4  documents, we produce them through the FDIC's electronic
 5  database so the FDIC still has control over those documents.
 6  To the extent that the requesting parties then make a selection
 7  of documents and say, Okay, now we want to produce these
 8  outside of the work space so we can use for whatever purpose we
 9  see fit, we want an opportunity to review that selection of
10  documents for privilege.  That's where paragraphs 4A, 4B of the
11  other protective order refer to.
12          THE COURT:  I don't have a problem as long as you
13  would let them use them, give you notice that they've made
14  their selection, they will go ahead and use them, and you would
15  have the right thereafter to review.  And if you sought, and we
16  could talk about a time frame here, to identify any as
17  privileged, you could, within that time frame, give them
18  notice.  But I don't want them to have a limitation on their
19  use in advance.
20          MS. GRAYHORSE:  Okay.
21          THE COURT:  And so how many weeks would you like after
22  notice of the selection, for your own review, to identify
23  privileged documents?
24          MS. GRAYHORSE:  I think it would depend on the scope
25  of the production.  To the extent they're requesting a couple
```

CchWfedC

1   of hundred documents, something like 14 days or 21 days would
2   be sufficient.  To the extent they're requesting the production
3   of thousands of documents, I think we would need more time.  So
4   perhaps if we could leave a provision to the effect, and we
5   could negotiate this with the parties, to the effect of within
6   a reasonable amount of time given the scope to be negotiated by
7   the parties and if necessary, if there's a dispute, we could
8   come to you.
9           THE COURT:  Yes.  I think I like your suggestion.
10  Could I make a modification and suggest that it be within three
11  weeks, 21 days, subject to an extension at the request of the
12  FDIC.
13          MS. GRAYHORSE:  Okay.  Thank you.
14          THE COURT:  Good.
15          MR. CHRISTENSEN:  Your Honor, this is Mr. Christensen
16  with just one point of clarification, a question, really, for
17  your Honor.
18          The loan files, does the Court have any instruction
19  for the parties about whether the loan files are to be produced
20  as confidential or as highly confidential per the discussion
21  that we had with FHFA's counsel earlier today?
22          THE COURT:  They will be produced as confidential
23  documents, not as highly confidential.
24          MR. CHRISTENSEN:  I understand, your Honor.
25          THE COURT:  Thank you so much.  Thank you, all.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

34

CchWfedC

1              We're going to turn now to another conference call, I
2    believe, with its own separate numbers, so we're going to end
3    this conference call.  Oh.  We're going to keep this line open,
4    I guess, but more parties may join us on this line.
5              Thank you so much, counsel.
6              (Continued on next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CchWfedC

```
 1              THE COURT:  Counsel, we're going to commence the
 2     conference in the FHFA conference which is a continuation of
 3     Friday conference of December 14th.  We will take appearances
 4     in this case.  And I should note for the record that this is a
 5     telephone conference, that is that certain participants in the
 6     conference are in this courtroom and certain participants in
 7     the conference are hearing by telephone.
 8              (Appearances noted)
 9              THE COURT:  Thank you.  So nice to see everyone again
10     and glad we can accommodate some folks by telephone.
11              We're going to take a break no later than 4:30 for ten
12     minutes no matter where we are and then we'll just continue.  I
13     don't know how late we'll go.  We'll see around five o'clock
14     how much we've accomplished and make a decision.
15              Let's start with the UBS files -- always a wonderful
16     place to start -- and the issue of cracking.  I noticed in one
17     of the letters they wanted UBS to start cracking or get
18     cracking.  So I have to say, I think -- well, let me -- I
19     should start by saying I've received two more letters with
20     respect to this issue, a letter of December 17th from
21     Mr. Fumerton and a letter of December 17th from Ms. Sheth.
22              There are so many things in this case that I am happy
23     counsel are doing and I'm not.  One of them is figuring out the
24     most efficient way to crack a file.  But I have to say I can't
25     believe, I can't believe that it needs anything like what is
```

CchWfedC
```
 1  described in the submission of Mr. Brunner, B-r-u-n-n-e-r.
 2  Now, I know he would -- I don't want to guess why he would make
 3  the suggestion he does with respect to the length of the
 4  process or the cost.  I just think that counsel need to get
 5  ahold of this issue and figure out cooperatively how to do it
 6  efficiently.  And I am confident -- I am not going to volunteer
 7  my time on this -- but I am confident if we sat in a room
 8  together and we looked at what the project actually entailed
 9  and how it could be done we could figure out a cost effective
10  efficient way to do it promptly.  And it has been something
11  that I ordered weeks ago.  It should have been done by now.
12          It seems to me since and it appears that UBS did not
13  do it for two principle reasons.
14          One, in reliance on FHFA's statement or hope that
15  there would be a way to look at the loan tapes or other
16  information produced or given by the producing party that would
17  make the cracking project unnecessary and I can understand that
18  no one wants to undertake the project if they don't have to,
19  absolutely.
20          Two, I think if they didn't start, though they should
21  have by now, because they continue to want to come back to me
22  and argue over and over and over again about who bears the
23  cost.
24          If UBS wants to formally brief the cost issue and you
25  might want to project the cost associated with briefing the
```

CchWfedC

1   cost issue, then I think we should de-link these things.  The
2   project has to be done.  It should be done as quickly as
3   possible and for the least amount of money.  The plaintiff FHFA
4   seems to have a better handle on how to do that than the
5   consultant working with UBS.
6           UBS wants FHFA to share the cost.  So no matter what,
7   either UBS is paying for all of it or there's a shared cost
8   here.  So the parties should cooperate with respect to which
9   consultant is going to do this in the process so that it costs
10  as little as possible and is done as quickly as possible.
11          Mr. Fumerton, do you have any disagreement with that
12  principle?
13          MR. FUMERTON:  Not at all, your Honor.
14          THE COURT:  OK.
15          MR. FUMERTON:  If I may be heard on the issue briefly
16  your Honor?
17          UBS did get cracking right away even after Friday's
18  conference.  The first thing we did was get on phone with our
19  expert consultants FTI, obviously, one of the most reputable
20  consulting firms in the world.  Your Honor, we're not experts
21  in the area of cracking loan files and making this
22  determination but we did spend hours Friday, Saturday and
23  Sunday working with Mr. Brunner and his team to outline what
24  this process entails.
25          And just to give your Honor a brief description of how
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

CchWfedC

1  complex it is.  These loan files are produced, there is not
2  even dividers all the time, so you can't tell when one loan
3  file starts and another one ends.  There may be documents from
4  multiple loan files in a specific file so you think, ah-ha,
5  I've got this file.  I can match it up using a name or address.
6  And all of a sudden you see another document that's from a
7  different file in that same file.
8          And, your Honor, these documents, unfortunately, these
9  documents, these loans were originated in some cases more than
10  seven years ago which, obviously, causes many of the problems
11  here.
12          THE COURT:  So, Mr. Fumerton, as you will know, we
13  have a long, long, long list of issues still to address.  And
14  you know, if you have agreement with my proposal I think we can
15  just move ahead.  But is there some particular point you wanted
16  to make?
17          MR. FUMERTON:  Your Honor, we very much appreciate the
18  opportunity to brief the cost sharing issue and we would like
19  to do that.  Your Honor, we did suggest as an alternative to
20  having to crack these files and undertake this process which we
21  understand could cost upwards of $1.8 million, could take as
22  long as eight to ten weeks with a team of 20 people which,
23  obviously, threatens to wreak havoc on the schedule.  As your
24  Honor recognizes, the alternative would be to take Paragraph
25  Four of the expert re-underwriting order.  There's a provision

CchWfedC

1    already there that if the files are missing -- and we know
2    there are a loft missing filings her, your Honor -- plaintiff
3    has itself has said of 2200 loans in the UBS sample we know
4    right now we are not going to be able to find, approximately, a
5    hundred because they're from defunct originators.
6            Plaintiff has informed us we're going to select new
7    loans for our sample.  And we would request that your Honor
8    order them to do so as promptly as possible so we know what the
9    sample is, the final sample that we're dealing with here.  But
10   the alternative to having each party have to or having somebody
11   have to undertake this exercise and then brief the cost issue
12   would be to allow FHFA to essentially redraw its sample from
13   different loans for the loans that it can't fine as a result of
14   this analysis that needs to be undertaken.
15           So we lay that out in our letter as an alternative.
16   Obviously, your Honor, as we've spent a lot of time last week,
17   we don't think it's our burden.  We think this is an analysis
18   essentially of documents wholly from third parties not within
19   our possession, custody or control.
20           And your Honor it's important to recognize this also
21   involves judgment, so it is not a clerical task.  Sometimes
22   you'll have to look at a file and actually make a judgment to
23   see whether it's part of loan file X or loan file Y.  It's,
24   essentially, akin to work product, your Honor.  And having us
25   do it and having UBS do it raises all sorts of concerns if the

CchWfedC
```
 1   work is incorrect or somebody disagrees with a judgment.
 2          Your Honor, again, we did present a sworn declaration
 3   from Mr. Brunner.  All we have from FHFA is counsel's
 4   representation.  This morning they told us that ten legal
 5   assistants, ten paralegals could do this in a week.  Your
 6   Honor, respectful, if ten legal assistants could do it in a
 7   week, that's terrific.  While reserving all rights and
 8   reserving all right on cost sharing we would propose a FHFA's
 9   counsel undertake that and we'll decide who pays.  But the
10   expert --
11          THE COURT:  Well, in the fist instance, you are going
12   to pay but you are will brief, absolutely, the sharing of the
13   costs.
14          MR. FUMERTON:  Thank you, your Honor.
15          So if they have information that FTI doesn't and our
16   experts, we're all for it.  Maybe Quinn ^ee pan well can open
17   up a shop to compete with FTI.  But all we're looking for is
18   the most efficient way to proceed here.  If they can do it
19   within a week, that's terrific.  So we, absolutely, welcome
20   your Honor's invitation to brief the issue.  And, again, we
21   will meet and confer but the experts -- all we can do is go to
22   our experts and this is what our experts told us.
23          THE COURT:  Great.  So is it, Ms. Sheth, are you going
24   to address this issue?
25          MS. SHETH:  Yes, your Honor.
```

CchWfedC
```
 1              THE COURT:  OK.  So can you work with Mr. Fumerton to
 2   get this done within a week or so and you UBS will pay for it?
 3              Now, UBS and Mr. Fumerton and Ms. Sheth, you should
 4   talk about a briefing schedule and get me a proposed order
 5   for -- proposed stipulation for me to so order on a briefing
 6   schedule on this issue of who will pay the costs.
 7              MR. FUMERTON:  Thank you, your Honor.
 8              Just to clarify, UBS does reserve all rights as to
 9   this issue.  But in terms of how to start the cracking, again,
10   if we turn this over to FTI as we propose, this their
11   proposal -- obviously estimates can be under or overestimated
12   but they estimate it will take this amount of time.  Again,
13   what we would respectfully request is if counsel for FHFA
14   thinks they have a way to do it within a week that either FHFA
15   do that and we would pay the cost subject to our reservations
16   or they tell us what we're missing.  But we would,
17   respectfully, request that FHFA's counsel go ahead and do that
18   exercise.
19              THE COURT:  Great.  Great.  So you'll consult
20   immediately, Ms. Sheth and Mr. Fumerton.  You'll make a
21   decision with respect to which shop is going to do this and
22   under what parameters UBS will pay.  You'll agree with respect
23   to briefing schedule and get it to me so we can get it so
24   ordered.
25              MR. FUMERTON:  Thank you, your Honor.
```

42

CchWfedC

1           MS. SHETH:  Your Honor, we're happy to do that.  Just
2     very quickly.  One issue that has come up in terms of dispute
3     when the parties is the meet and confer process which will
4     pertain to whether the loan files and guidelines can be
5     matched.
6           THE COURT:  Yes.  Separate issue.
7           MS. SHETH:  I can address that when your Honor would
8     like.
9           As to the first issue with regard to timing, in our
10    recent submission FHFA has proposed, after discussing with its
11    vendor, that the first batch of approximately 7400 loan
12    files --
13          THE COURT:  Excuse me one second.  I was looking at
14    something and not listening.  Could you please begin again.
15          MS. SHETH:  With regard to the 7400 loan files that we
16    know need to be cracked or manually reviewed, FHFA based on its
17    conversations with its vendor, believes that we can accomplish
18    this within two weeks, so within ten days and that accounts for
19    the Christmas holidays, so we did factor that in.  So in our
20    proposed scheduling order to the Court we proposed December 28
21    for those 7400 loan files.
22          With regard to the 80, approximately, 8400 or 8600
23    loan filings where we're still in discussions was Ocwen
24    regarding those loan files, we hope to get final resolution
25    from Ocwen by December 21 and if we then start the process of
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

CchWfedC
```
 1  cracking open those loan files, we expect that we can complete
 2  that process by January 4.
 3             So we would propose that -- you know one of the
 4  troubling factors about all of this is that UBS's proposal,
 5  basically, asked this Court to allow them to wait until January
 6  7 so that's three weeks from now to even start this process.
 7  And we find that very troubling.  There is no reason --
 8             THE COURT:  We're passed that.
 9             MS. SHETH:  Can't be started now.
10             THE COURT:  We're passed that.  OK.
11             MS. SHETH:  OK, your Honor.
12             THE COURT:  So, Ms. Sheth, get a proposed order with
13  these dates then.  I would say after your meet and confer with
14  Mr. Fumerton so he has some confidence with respect to the
15  process.
16             MS. SHETH:  Yes, your Honor.
17             THE COURT:  OK.  And you're right.  You did raise in
18  the letter today a second separate issue which is one I wanted
19  to raise with respect to Merrill Lynch also cause I think we
20  left that hanging last Friday, but let's deal with it first in
21  the UBS case.  But I know, Mr. Bennett, you are going to listen
22  carefully here.
23             With respect to the matching or the discussions about
24  when do we have a reasonably complete loan file, one that we
25  have a sufficient confidence in to begin a re-underwriting
```

44

CchWfedC

```
 1   process and I don't mean to replace or change the terms of the
 2   expert scheduling order.  I know I am not precisely capturing
 3   that language and I don't mean by anything I say to change the
 4   terms of the order.  But the meet and confer process that the
 5   parties have to undertake to arrive at that judgment that we
 6   have the best we're going to have based on reasonable efforts
 7   at this point in time of a recreation of an historical loan
 8   file that was used in the original underwriting process and the
 9   guidelines that apply to that loan file.  That has to be an
10   ongoing meet and confer process.  It can't wait until one side
11   thinks they have a complete set.  It has to be something that's
12   discussed each week where you identify which files you think
13   are fairly complete and which files you have to continue to
14   serve subpoenas and gather additional guidelines or look at
15   additional sources for the files.
16           So I want the parties, if you are not already doing it
17   and UBS and in Merrill Lynch and I have the impression that it
18   is being done in Chase, that you will meet at least weekly in a
19   nonbinding way to say to each other, these are the sample loan
20   files where we still don't have our guidelines and we still
21   don't have a complete enough file to engage in this stipulation
22   process and what are we doing?  Where are we going to try to
23   get that comfort level?
24           I was very heartened last Friday to learn that Merrill
25   Lynch wants to engage in this re-underwriting process but we
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CchWfedC
```
 1   have had months now of serving subpoenas and gathering
 2   documents.  We should be in clean-up mode in terms of having a
 3   comfort level.  So meet weekly at least and if there is any
 4   difficulty in getting full cooperation in that process I am
 5   available.
 6            MR. BENNETT:  Your Honor ordered us to meet.  May we
 7   do that virtually since we are in D.C. and they are in New York
 8   and Los Angeles?
 9            THE COURT:  I am sure that that would be just fine.
10            MR. BENNETT:  Thank you, your Honor.
11            MR. FUMERTON:  Your Honor, we have a proposed order
12   which sets forth exactly what your Honor has just directed but
13   we hope to meet and confer at least weekly.  We have been
14   requesting one daily for the last five days.  We sent it over
15   to plaintiff this morning.  So, your Honor, if I may approach I
16   can hand you a proposed order which we believe captures your
17   Honor's guidance.
18            THE COURT:  Absolutely.  Hand it to my clerk.  I may
19   not read it this moment.
20            MR. FUMERTON:  Sure.
21            THE COURT:  But thank you very much.
22            (Pause)
23            MR. FUMERTON:  Thank you, your Honor.
24            MS. SHETH]:  Your Honor, one of our concerns with
25   UBS's proposed order is that it does not contain any actual
```

CchWfedC
1   deadline but rather an ongoing meet and confer process without
2   an end in sight.
3           THE COURT:  So you're going to give them a counter
4   proposed order and see if there's agreement.
5           MS. SHETH]:  Yes, your Honor.
6           The second certain we have is UBS's position that they
7   are not going to be able to identify which underwriting
8   guideline applies to a given loan until, one, all of loan files
9   or the loan files for that particular loan has been produced in
10  full.
11          And two, all versions of the guidelines have been
12  produced in full.
13          And FHFA has issue, takes issue with that approach
14  because we believe it is possible to identify which guideline
15  applies based on information in the loan tape which would
16  contain the product type the documentation program and date of
17  funding.
18          THE COURT:  Well, let me give you a quick reaction to
19  that and see if I can shortcut some of the -- or short circuit
20  some of the discussion.
21          I can understand why either side might like to see
22  both a guideline loan file at roughly the same point in time
23  before they say, yes, this is the loan file and its related
24  guideline.  I mean I think you should in these meet and confer
25  processes be saying, this looks like the right guideline when

CchWfedC
```
 1   we get the loan file.  We hope when we look at the loan file
 2   they'll line up and we won't be surprised, so we think we're
 3   there.  But I can understand not having an agreement until you
 4   have both documents.  But that doesn't mean again that you
 5   can't have the conversation.
 6           Now, with respect to not stipulating until you have a
 7   full set of guidelines including those that clearly don't apply
 8   to the loan file, I'm confused about that.
 9           Mr. Fumerton is that the UBS position?
10           MR. FUMERTON:  Not at all, your Honor.  As to the
11   contrary as we expressed in the meet and confer, we want to
12   make sure we have the right guidelines.  Sometimes have you to
13   go to the file cause it'll reference it by serial number.
14   Sometimes it'll say this isn't the right guideline.  But, your
15   Honor, we absolutely embrace your invitation to meet and confer
16   with plaintiff.  Everything should be on the table.  We will
17   tell them every single guideline we have.  Hope to get the same
18   from them.  But, obviously, your Honor, having the right
19   guideline is I think more important to defendants because it's
20   easier to show the loan didn't comply with the guideline if you
21   have a guideline that's mismatched or did not apply.
22           THE COURT:  That seems likely.
23           MR. FUMERTON:  Thank you, your Honor.
24           THE COURT:  OK.  So I think that takes us back to
25   where we ended on Friday which is the FHFA's December 13th
```

CchWfedC
1    letter and we were working through those issues.  I think we
2    were up to the second RFP number 12 and we had talked about the
3    hedging data.  I made a suggestion and the parties were going
4    to meet and confer and see if there were traders or trading
5    desks that were charged with responsibility for doing the
6    hedging activity of portfolios that would, perhaps, encompass
7    the kinds of investments that our securitizations fall into and
8    so we might have more concrete understanding of what hedging
9    activity was involved.
10            So I think we're going to move on to the issue and I
11   think the next open issue then was with respect to Goldman.
12   Some of these may have disappeared in the interim and that has
13   to do with creating a privilege log for lost reserve documents
14   for which Goldman is claiming the privilege.  And I don't know
15   if that dispute has been resolved or if it's still ripe.
16            Ms. Chung.
17            MS. CHUNG:  Your Honor, there is still a live dispute
18   as to repurchase related documents -- sorry -- repurchased
19   reserve related documents as a whole and it's possible to deal
20   with the objections of the various defendants together.  So I
21   would propose to do that.  The logging is one aspect but to be
22   fair there are other objections that have been raised.
23            I can say with that where respect to the last item in
24   our letter which successor liability issues, we are still
25   discussing those with J.P. Morgan and with Bank of America and
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

CchWfedC
```
 1   so we don't expect to have to address that separately today.
 2            On the matter repurchase reserves, so these are lost
 3   reserves that defendants have taken and I can say that because
 4   we've examined the financial statements.  And there are a
 5   number of defendants who have taken lost reserves in their
 6   public filings that relate to repurchase requests on RMBS.
 7   These can be contractually designated remedies where they're
 8   seeking repurchases of the type of loans that are at issue in
 9   these cases.
10            In the objections that we've gotten and there are a
11   number of defendants who have objected to producing any of this
12   information, one objection is that the information may be
13   privileged and that because FHFA has claimed privilege with
14   respect to some of its repurchased related information that the
15   defendant should be excused from producing this information.
16   In our view, that's not a valid objection.  FHFA has not
17   blanket claimed privilege, nor has it said that it's not going
18   to look for those documents on its side.
19            The GSEs did to the take reserves on RMBS but we have
20   at issue and other document requests repurchase related
21   documents.  But we're looking for all the responsive documents
22   and we plan to log our documents if it turns out that privilege
23   does apply.
24            And, your Honor, it's not a foregone conclusion that
25   repurchase related claims are privilege because it depends on
```

CchWfedC
```
 1   whether it's very standard analysis whether the repurchases
 2   were done as part of an ongoing business process or actually in
 3   anticipation with litigation and with outside counsel.  And so
 4   there are to various factors and, in fact, there is case law in
 5   which courts have found either way depending on what the facts
 6   and circumstances show.
 7             The defendants would also -- the relevance of this
 8   information, much like the information that we discussed on
 9   hedging, if there are pools of loans out there that are RMBS
10   that share characteristics with the loans that are at issue in
11   these cases, effectively, when the defendants take these
12   reserves they're valuing that collateral and other risks well.
13   But we've asked for the accounting and financial records that
14   would show how those numbers are built up.  And effectively --
15   and this goes back to a comment that was made at the last
16   conference about which sides ever the mouth are being talked
17   out of -- if the defendants are talking about certain
18   characteristics being materially detective is because if
19   they're saying we need to take a lost reserve for this they're
20   saying we think that these pools may not be what they're
21   represented to be.  There are characteristics in them that a
22   have turned out to be materially defective because it's their
23   view that the loans have been to materially defective in order
24   for these reps -- to have been violated.
25             At the same time that when these loans were sold with
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CchWfedC
```
 1   similar characteristics, the same characteristics were sold
 2   into the securitization, they were not saying these are not
 3   material defects.  They're going to be benign.  It is low FICO,
 4   subprime.  If it's loans from certain areas, that these are
 5   actually benign characteristics that will not be an obstacle to
 6   the loan pool performing as its been represented to perform.
 7            So the objection has been made similar to the
 8   objections with respect to the hedging where we only want to
 9   produce repurchase lost reserve related information it's
10   related lated specifically to the loans at issue in this case
11   and specifically with respect to the securitization.  I won't
12   repeat the argument there.
13            Another objection that's been made is that the request
14   hasn't been made.  And, your Honor, the request that was made
15   by FHFA and this is part of its Exhibit C, again, the table
16   that lists what the requests were, this is on page three of the
17   exhibit and this has a bit of history to it, your Honor.
18   Initially, the request that the FHFA made was for all financial
19   statements of defendants from 2005 to the present whether
20   audited or not, including without limitation balance sheets.
21   And the defendants responded to a person by saying that this
22   request was overbroad.  They couldn't possibly answer it, that
23   it was vague and unduly burdensome because we were requesting
24   all kinds of financial statements audited or not.
25            And included in those requests were -- included in
```

CchWfedC
```
 1   those objections were objections that we were seeking
 2   privileged documents, that these were documents that could be
 3   obtained from other sources and so in accommodation of those
 4   objections, FHFA narrowed its requests here to the three
 5   categories including accounting for financial records of
 6   trading and RMBS investments, reflecting valuation of interests
 7   and securitization and then relating to lost reserves for
 8   purchase and RMBS.
 9            So in our view the objection that we haven't requested
10   this information we actually started with a much broader
11   request and in light of the defendants' objections narrowed
12   requests and then heard at the 11th hour -- well, actually,
13   your request is too specific.  It doesn't encompass those
14   documents that have been asked for.  So that is our position
15   opposition, your Honor, and I'll stop there.
16            THE COURT:  I understood from your letter that the
17   objections were coming only from a subset of the defendants.
18   Am I wrong?
19            MS. CHUNG:  Your Honor, I was being careful because I
20   can't say that we've reached impasse as to all of the
21   defendants but I would say that this is an objection that's
22   shared by many of the defendants.
23            THE COURT:  So, Ms. Chung, why would you want lost
24   reserve information beyond the securitizations that are at
25   issue?
```

53

CchWfedC

1          MS. CHUNG:  Your Honor, it's for the reason that I
2     described.  First of all this lost reserve information, one, we
3     don't know whether it was take on a securitization by
4     securitization basis or not.  And if it was done for a
5     repurchase reserves it likely not to be.  It's probably a built
6     up number.  In addition, your Honor, there's an important
7     aspect of --
8          THE COURT:  I am sorry to interrupt but if it's -- if
9     the securitizations are just a part of what's supported by the
10    lost reserve it would still be produced.  But if the lost
11    reserve is not connected in any way to a securitization why
12    should you have discovery of it?
13         MS. CHUNG:  Your Honor, I think if that was what
14    defendants are offering to produce we might not have a dispute
15    because the idea is, yes, the mortgage loans will be from the
16    securitizations may be interspersed throughout these lost
17    figures.  And because of these shared characteristics and the
18    predictive nature of it it's hard to weed back out.  If you
19    weed back out the actual mortgage loans, the actual
20    securitizations the number is previously bereft of meaning or
21    at the aggregate number has meaning and how that number was
22    built up.  But that's not what the defendants have offered.
23    They've said if we have anything that is specific to the
24    mortgage loans or specific to the securitizations we'll give it
25    to you but otherwise no.  And so that's where we're having the

54
CchWfedC

1    impasse.
2             THE COURT:  OK.  So I am happy to hear from
3    Mr. Klapper or anyone else who wants to address this issue.
4    But what I would be interested in is if there were a loss
5    reserve that related in whole or in part to one of the
6    securitizations at issue here, why should that information not
7    be produced or at least listed on a privilege log?
8             MR. KLAPPER:  I don't think there's any dispute that
9    if the reserve relates to the securitization at issue here of
10   the loan pools underneath these securitizations that we'll
11   produce them.  The dispute that we have is really the narrow
12   one that Ms. Chung mentioned which is the original requests
13   asked for financial statements.  We're perfectly willing to
14   produce the reserve.  In our case, in Goldman Sacks' case the
15   current reserve is $38 million which is not a lot of money at
16   all.  The issue is essentially the work behind it to build up
17   to that number which currently is publicly disclosed.  And what
18   we've said is your original request was for a financial
19   statements.  We're willing to give you things that are in
20   financial statements but now you're asking for, essentially,
21   the work papers which is necessarily something in conjunction
22   with legal input because of the nature of how you build up a
23   lost reserve.
24            I will say that Ms. Chung is absolutely right that she
25   is arguing on the relevance of these issues, exactly the same

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CchWfedC
```
 1   thing that we argue in the requests that I've made in my
 2   December 12 letter.  And I do think that there is something to
 3   the notion that if there is non privileged material with
 4   respect to what is a material defect in the loan that that has
 5   relevance in this case for a number of reasons but they didn't
 6   ask for that originally and now they are coming and they're
 7   saying give us your work papers.  We haven't done the analysis
 8   of the work papers to tell how much of it is privileged.  I
 9   would expect some of it at least will be privileged but this is
10   something different than what they asked for originally.
11           THE COURT:  OK.  I think I have a better understanding
12   of the issue.
13           So, Ms. Chung, looking back at the document requests
14   that produced this dispute, it did ask for financial
15   statements.  And now the request is for a portion of the
16   financial statements, the lost reserves that might be reflected
17   in them and the supporting documentation, the work papers
18   behind that lost reserve figure, why is that not a separate
19   request?
20           And by the way, counsel, this arises in the context of
21   other issues that we will get to hopefully this afternoon.
22           Why can't you just serve another document request or
23   do you have an agreement, no more document requests?
24           MS. CHUNG:  We do have that agreement, your Honor.
25           THE COURT:  Good.  Well --
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CchWfedC

```
 1              MS. CHUNG:  Your Honor, the only -- it is the argument
 2     that -- it is a circumstance that I described before.  When the
 3     request was first served no one took it to me.  We didn't
 4     intend it to mean limited to just the public filing.  That
 5     would not be a very rational way to read the requests.  And the
 6     defendants didn't take that it way either.  They made very full
 7     objections about how it was vague and burdensome and it was
 8     calling for a privilege document.  We thought we were on the
 9     same page about, well, you've asked for the financial and
10     accounting records in addition to the financial statements that
11     are the public statements.  So it was very late in the game
12     when it was said to us, well, now this is actually a much
13     more -- in fact, they sort of flipped around and said, well,
14     this is a narrow request that doesn't cover this.  So it just
15     has that negotiating history to it and our intention was to
16     capture the broader scope of documents that that was the way
17     everybody seemed to be interpreting it.  So we played along
18     with that and narrowed it.  But now we're being sort of whipped
19     into this position of, well, this is actually too arrow now to
20     encompass what you had originally asked for.
21              THE COURT:  OK.  So there may be some horse trading
22     available to the parties here.  I don't think the work papers
23     are normally called the financial statement.  And so to the
24     extent there's a loss reserve figure that would show up in a
25     financial statement that is tethered to the securitizations at
```

CchWfedC

1   issue here it must be produced.  The work papers that would
2   actually give meaning to the number were not called for in the
3   document requests and are beyond the scope.  I think that ends
4   the issue raised by the December 13th letter from plaintiffs
5   knowing that successor liability is still under discussion.
6           I am turning to the letter of December 12th from
7   Mr. Klapper.  I have a letter of December 14 from Mr. Schirtzer
8   and Ms. Leung.  I have exhibits to the defendants' letter.  I
9   have a December 17th letter from Mr. Klapper with additional
10  exhibits.  And I've just been handed and have not read a
11  December 17 letter from Mr. Schirtzer and Ms. Leung and I may
12  read this most recent December 17th letter during the break
13  we're going to take in a few minutes when we get to the OFEO
14  issue.
15          So, Mr. Klapper, do we still have four separate issues
16  alive and well?
17          MR. KLAPPER:  That's correct, your Honor.
18          THE COURT:  Good.  Let's start and maybe we'll do one
19  of them and then take a break and I'll read that new letter and
20  then we'll come on and March through the rest to the extent
21  possible.
22          So the first one you raise is documents sufficient to
23  show pull-through defect and waiver rates.
24          MR. KLAPPER:  Yes, your Honor.  May I use the podium?
25  I want to make sure Mr. Schirtzer can hear me out in Los

CchWfedC
```
 1   Angeles.
 2              THE COURT:  Thank you.
 3              MR. KLAPPER:  Thank you, your Honor.
 4              And I believe I am in the same position as the Court
 5   with respect to that last letter.  Maybe I missed it but in the
 6   flurry of letters but if a copy can be provided, I'll take a
 7   look at it well during the break
 8              MS. CHUNG:  Certainly, your Honor.
 9              THE COURT:  Excuse me.  Counsel, do you need my copy?
10              MR. SCHIRTZER:  Your Honor, this is Richard Schirtzer.
11   The letter that I think you are referring to actually does not
12   address Mr. Klapper's issues.  It addresses the mortgage fraud
13   reporting issue and is responsive to Mr. Bennett's letter of
14   this morning.
15              MR. KLAPPER:  That one I've seen.
16              THE COURT:  Good.  Thank you.
17              MR. KLAPPER:  Your Honor, it's important to keep in
18   mind for all of these four requests that they're not -- they're
19   relevance is not dependent upon whether the private side
20   traders knew of this information.  Instead, they're relevant to
21   other issues, one of which is materiality which is an objective
22   standard as your Honor has noted.  But the actions of the two
23   by far and largest purchasers of loans, residential mortgage
24   loans is, certainly, relevant to what is a material defect in a
25   loan and is as well an admission to the extent that they
```

59

CchWfedC

1    purchased loans with the same defects and then securitized
2    them.
3          It's also relevant to the adequacy of due diligence.
4    Again, these are the two largest purchases of residential
5    mortgage loans as well as the largest securitizers or
6    residential mortgage loans in the United States by a long shot
7    and industry standards are in this and other ways set by
8    Freddie and Fannie.
9          It's relevant to whether the originators at issue
10   abandoned their loan underwriting standards.  It's at issue for
11   that factor because Freddie and Fannie purchased loans from the
12   very same or many of the very same originators as are accused
13   of having completely abandoned their loan origination
14   standards.  And it's not alleged that they did it selectively.
15   It's alleged that they did it for all of the loans that they
16   originated and it's relevant to lost causation because Freddie
17   and Fannie to the extent that they analyzed why their own
18   securities failed and they did and we put in as an example a
19   special litigation committee report recounting the testimony or
20   accounting the interviews of executives as -- for the failure
21   so all of these things bear upon all of these requests.
22         Now, I think we caused some confusion on Friday.
23   That's why I sent the Court the letter that I sent this morning
24   and the confusion is between conforming, so-called conforming
25   loans by Freddie and Fannie and nonconforming loans.  The

60

CchWfedC

1    business of Fannie Mae and Freddie Mac was in large part to
2    purchase mortgage loans.  They had standards as to what those
3    mortgage loans had to meet before Freddie and Fannie would buy
4    them.  Those are so-called conforming loans.  But in the period
5    2005 and thereafter Fannie Mae and Freddie Mac started buying
6    enormous numbers of nonconforming loans whether subprime or Alt
7    A but loans that didn't meet their standards.  They had an
8    actual priority not to lose market share but going and buying
9    the very same mortgage loans that my client and other
10   defendants were purchasing.
11          So when we said in that prospective supplement your
12   Honor pointed to that the standards of these originators are
13   below those of Fannie and Freddie, that was referring to the
14   normal conforming of Fannie and Freddie.  But Fannie and
15   Freddie, in fact, bought loans of much lower credit quality and
16   we put in a memorandum from, I think it was Freddie as Exhibit
17   B to my original letter, that you talked about a purchase loans
18   from New Century and goes through all the diligence that was
19   done.
20          THE COURT:  I'm sorry, Mr. Klapper.  You said they
21   bought loans that were much poorer in quality than what, than
22   the conforming loans?
23          MR. KLAPPER:  Correct.
24          THE COURT:  Are you saying that they bought loans that
25   were much poorer in quality than those in the securitizations?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CchWfedC
```
 1              MR. KLAPPER:  I can't say that.  I don't have that
 2   information.
 3              THE COURT:  I just wanted to know what the comparison
 4   was.
 5              MR. KLAPPER:  We did do a comparison between the loans
 6   that Freddie bought as reflected in Exhibit B, a memo from
 7   Freddie from New Century, a subprime originator and standards
 8   that were disclosed in a couple of our prospectus supplements
 9   for a New Century deal.  And if you just take look at that
10   very, very small comparison it's about the same.  So they were
11   buying the same sorts of subprime loans.  They used the same
12   firms, Clayton and others to do the due diligence.  They had
13   the same process of looking at loans that Clayton had
14   designated as three which is generally interpreted, I don't
15   think correctly but generally interpreted to mean loans that
16   you should consider dropping and not buying.  And how many of
17   those threes ended up in the pool being purchased by Freddie
18   and Fannie.
19              And with respect to Freddie Mac, Exhibit C shows --
20   this is a Clayton document -- shows Freddie Mac purchasing 60
21   percent of the threes as designated by Clayton as opposed to
22   for example Goldman Sacks' 30 percent.  So all these things are
23   relevant to the questions of materiality of due diligence and
24   lost cause and the like.
25              Now, what we've asked for in this first request is a
```

CchWfedC
```
 1   much narrower request than what we asked for originally and we
 2   understand the position where that original request was denied.
 3   But what we ask for is the pull-through information, what that
 4   means, what percentage of pool presented to you by the
 5   originator did you buy?  Did you buy 95 percent of the loans
 6   and drop five percent?  Did you buy the 90 percent and the like
 7   which demonstrates as compared to our pull-through rates
 8   demonstrates whether or not they were operating on more or the
 9   less the same rate that we were purchasing loans and
10   identifying defects.
11           The waiver rate --
12           THE COURT:  Then how do you know that the pool for the
13   pull-through is sufficiently similar to have that figure have
14   any relevance or probative value?
15           MR. KLAPPER:  Well, if you know who the originator is
16   and the request was by originator.  Now, I should make it an
17   important point at this time.  At no point did FHFA engage us
18   on burden, although, we invited that.  In other words, they
19   didn't tell us we don't have this information.  There is some
20   less difficult information to get and the like.  They just said
21   "no".  It doesn't have to do with the silent business at
22   purchase, the security at issue in this case and therefore we
23   were not entitled to it.  So we don't sit here knowing anything
24   about burden.  But if they do have available, for example, take
25   New Century, the pull-through rate for New Century we know that
```

CchWfedC
```
 1   that's an originator that they alleged completely abandoned --
 2   yet, they do due diligence with Clayton and they discovered
 3   whatever they discovered and purchased 90 percent of the loans
 4   if that's the case.
 5           THE COURT:  When they purchased them did they hold
 6   them or did they securitize them?
 7           MR. KLAPPER:  And they -- some of what we submitted
 8   today, especially, the financial crisis inquiry commission
 9   material contains statistics about the growth in that business
10   of Fannie and Freddie from 2005 to 22008.
11           THE COURT:  That business being the securitization
12   business or the purchase of the subprime?
13           MR. KLAPPER:  Nonconforming which would be subprime.
14   And I will also say that in this case they sued my client on
15   subprime deals, all day deals and at least one prime deal.  So
16   we're not talking just subprime in this case.
17           So what we're asking for is documents sufficient to
18   show the pull-through rate.  The defect rate is really the
19   opposite of the pull-through rates of 90 percent pull-through
20   is ten percent defect and the waiver rate which will counter
21   the arguments that they've made and they made not just to your
22   Honor but people have made these in other courts that somehow
23   waiving threes is an indication that you knew there were
24   defective loans and you still let them in.  We argue that it
25   doesn't say anything of the sort but the fact that they did
```

CchWfedC

1   twice as much of that as we did is powerful evidence and we got
2   more evidence by the originator of that same sort it would
3   blunt that aspect of their proof or their supposed proof that
4   we were letting bad loans into these deals.
5           THE COURT:  So, Mr. Klapper, to return to my question,
6   then we'll going to take my break then, then we'll hear from
7   Mr. Schirtzer, your view that the pool came from the same
8   originator and it's the same general class subprime or Alt A
9   that are at stake with respect to your securitizations that
10  that is sufficient to have probative value here?
11          MR. KLAPPER:  Yes.  Now we also would dearly love to
12  have a lot more than that.  We realize that we've already
13  passed that issue and so we're just trying to get narrowly
14  drafted not burdensome requests that admittedly aren't as good
15  as if we can see some of the loan files and some of the e-mails
16  and people who were dealing with these originators.  But at
17  least it shows that we were buying the same pull-through
18  percentage.  They were waiving much more than we were waiving
19  using the same due diligence vendors that we were using.
20          THE COURT:  Thank you.
21          And, Mr. Schirtzer, are you still on the line?
22          MR. sCHIRTZER:  I am, your Honor.  Thank you.
23          THE COURT:  Great.  We are going to take a ten minute
24  recess and then we'll come back and I'll hear from you,
25  Mr. Schirtzer.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CchWfedC
```
 1              MR. SCHIRTZER:  Thank you, your Honor.
 2              (Recess)
 3              (Continued on next page)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

66

CchWfed3

1                THE COURT:  Please be seated.
2                Resuming our conference, Mr. Schirtzer.
3                MR. SCHIRTZER:  Yes, your Honor.  Thank you very much.
4        If you have any difficulty hearing me or if your reporter has
5        any difficulty hearing me, please let me know.
6                Your Honor, I'd like to start where Mr. Klapper ended,
7        with his statement that they endeavored to provide narrowly
8        drafted, not burdensome requests, and, frankly, nothing could
9        be further from the truth, both with respect to the requests we
10       are talking about now and with respect to the requests, all of
11       the requests, in Mr. Klapper's December 3 letter.
12               Your Honor, essentially months after the deadline for
13       promulgating document requests had passed, we received this
14       letter from Mr. Klapper with no advance discussion of these
15       particular topics, asking for a set of documents that
16       essentially would take us back to where we were before the July
17       31 hearing.  These document requests are in no way targeted to
18       specific requests of the kind that your Honor informed
19       defendants we were going to be limited to at the November 6
20       hearing.
21               The requests, if granted, would require us to redo our
22       custodian lists.  There would be a substantial number of
23       additional custodians who would be necessary to satisfy this
24       and the other requests.  It would require a very significant
25       new collection of documents and new review of documents, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CchWfed3
1    all in service of the premise that everything that the GSEs
2    learned in operating their single-family businesses is relevant
3    to defendants' defenses.
4            With respect to the particular requests pull-through,
5    waiver, and defect rate, it might be instructive to go to
6    Mr. Klapper's actual letter, to my parter Adam Davison, dated
7    on December 3, 2012, which is attached as Exhibit A to his
8    letter to the Court.
9            THE COURT:  And I see no two-page limit.
10           MR. SCHIRTZER:  There was no two pages in the letter
11   from Mr. Klapper to my partner, that is correct.
12           Request No. 2 asks FHFA to produce with respect to the
13   GSE's purchases of residential mortgage loans during the years
14   2005 to 2008.  So let me stop there.  Residential mortgage
15   loans are in no way limited to subprime, to alt. A.  They
16   include any type of loan purchased by the GSEs, whether they
17   were purchased for securitization, whether they were purchased
18   as individual home loans, whether they were purchased in bulk.
19   And then it asks documents sufficient to show the pull-through
20   rate with respect to all the originators at issue in this
21   litigation, the defect rate for pools of loans which the GSE
22   purchased -- again, every pool of loans that they purchased
23   over that three-year period -- and the extent to which the GSEs
24   waived in loans, again with respect to every loan purchased on
25   the single-family side over the three-year period.

68
      CchWfed3
 1            That is very much like the type of discovery that
 2    defendants have been seeking all along and your Honor has
 3    decided would be too burdensome and not sufficiently relevant
 4    to the claims and defenses in this case.
 5            Now, Mr. Klapper said he invited us to engage them on
 6    burden and that is partially true.  But, instead, what he
 7    invited us to do, and that's in the first paragraph of the
 8    letter, and I'll quote, "to the extent that FHFA claims that
 9    complying with these requests nonetheless would impose an undue
10    burden, defendants would be willing to discuss alternative
11    formulations."  So, in essence, months after the deadline for
12    document requests, he invited me to reformulate his document
13    request so that rather than what he asked for we would give him
14    something less burdensome.  We did, your Honor, decline that
15    invitation.
16            With respect to the exhibits that were submitted
17    today, I have had very little time to review those exhibits and
18    to determine if and how they are relevant to the requests.  I
19    would note that it would probably be better practice for those
20    sorts of exhibits to be exchanged well before the morning of
21    the hearing, but I can clearly represent to your Honor that to
22    comply with this request at this stage of the litigation would
23    be a massive undertaking on the part of the GSEs.  I don't want
24    to repeat myself, but it would certainly require us to greatly
25    expand the 112-plus custodians that we have already agreed to,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

69

CchWfed3

1  including many, several on the single-family side, at
2  defendants' request, and at the end of the day, it would not be
3  apples to apple, which I think was the gist of your Honor's
4  questions.
5          I appreciate Mr. Klapper submitting one chart
6  purporting to show a comparison of underwriting guidelines on
7  one transaction, but there are many transactions involved and
8  being requested here.  There's no evidence, and I don't believe
9  it would be the case, that in each instance the underwriting
10 guidelines would be the same.  Of course, on the single-family
11 side, in contrast to the PLS side, the single-family folks get
12 to review loan files and make determinations about what's in
13 those loan files.  On the PLS side, as your Honor well knows,
14 the traders never get to see that information.
15         Your Honor, that's all I have on the specific subject
16 of waiver, defects, and pull through.
17         THE COURT:  So if I understand, Mr. Schirtzer, your
18 principal argument is this isn't a targeted request; it instead
19 asks for an enormous amount of information that would require
20 the substantial increase in the number of custodians and impose
21 a burden.  You're not really relying so much on a relevance
22 argument.
23         MR. SCHIRTZER:  No, your Honor, I wouldn't say that
24 because if we take the issues that are germane to the claims
25 and defenses one by one, and I think this is quite clear in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CchWfed3

```
 1    your Honor's November 6 hearing, when you were discussing the
 2    motions to compel the defendants tried to bring without
 3    permission, and, frankly, many of which many of those topics
 4    are comprised in this letter, so with respect to the
 5    materiality, your Honor has clearly said that materiality is
 6    going to be an objective standard and it doesn't make a
 7    difference what the GSEs thought was material.
 8             With respect to due diligence, the issue is going to
 9    be did the defendant perform adequate due diligence, not what
10    diligence did the plaintiffs perform.
11             With respect to loss causation, this is a mountain of
12    evidence trying to show that, as I understand it from the
13    citations from the FDIC report, but the argument is that if we
14    made any statement that any of our securitizations were
15    affected by market impact, that means that those same market
16    effects caused the losses on the securitization to the board
17    report, that is a parallel I certainly would take issue with.
18             THE COURT:  We're going to, on point three, get to the
19    due diligence issue more directly, but I just want to note at
20    this time that even though due diligence has an objective
21    standard, I expect at trial there will be testimony about
22    industry practice and, therefore, perhaps a very strong
23    argument to be made by the defendants that that standard upon a
24    reasonable inquiry would be, would be informed to some extent
25    by the practices of major player in the industry, like either
```

CchWfed3

1    Fannie Mae or Freddie Mac.  But I want to put that to the side
2    and address it more directly in connection with point three in
3    Mr. Klapper's letter.
4            Mr. Klapper, briefly, and I'm going to rule and then
5    we'll move to the next point.
6            MR. KLAPPER:  Thank you, your Honor.  Let me be brief
7    but touch upon some of these points.
8            Of course, Freddie and Fannie are their parts, FHFA is
9    suing as conservator for them and sits in their shoes and their
10   statements are admissions, the same way as if a bankruptcy
11   trustee sues on behalf of the bankrupt estate and therefore not
12   only is industry practice relevant but admissions are relevant
13   on each of these, and to the extent that people at Fannie and
14   Freddie said something about diligence, something about
15   materiality, something about loss causation, those are all
16   potentially at least admissions if the usual standards can be
17   met.
18           With respect to burden, which seems to be
19   Mr. Schirtzer's main problem, as I say, he never engaged on
20   burden.  Just some of the things he talked about were things
21   that easily could be dealt with.  If he has problems because of
22   burden and complains because of relevance of providing this
23   information with respect to so-called conforming loans, we can
24   easily eliminate those from the inquiry.  But I don't know
25   whether that makes this harder or easier to do it that way.

CchWfed3

1    Frankly, I don't know what his records show.  These requests
2    largely, in our minds, are ones that would be available through
3    databases at Fannie and Freddie.  If that's not true, then he
4    should tell us that, but to the extent you have databases like
5    that, you can construct this kind of information.  I'm not a
6    technologist, so I can't really say easily, but one would think
7    that this is something that you don't have to resort to e-mail
8    custodians.
9              We at no point made in any of these requests a request
10   that he add custodians or engage in e-mail searches.  If that's
11   necessary for any of these, then we would have to have a
12   discussion about whether or not that truly does create a
13   burden, because that's not what these are intended to do, to
14   ask for.
15             Mr. Schirtzer focuses on knowledge, and I tried to say
16   at the outset, I believe I did say at the outset, that the
17   relevance here doesn't depend upon whether this information,
18   what the side of the business doing single family, buying
19   single-family loans, what they found out, it doesn't depend
20   upon that getting to the traders, on the private label side.
21   It goes to materiality.  It goes to due diligence.  It goes to
22   whether or not these originators completely abandoned their
23   origination standards.
24             The comparison is stark.  In this complaint, FHFA
25   consistently says, based apparently on hindsight, partisan

CchWfed3
```
 1  review of loan files, that upwards of 90 percent of the loans
 2  had material defects, and yet, if you take a look at their
 3  pull-through rate or waiver rate, as far as we've seen little
 4  bits and pieces, they're pulling through 90 percent and Freddie
 5  at least is waiving Clayton's threes at a rate of 60 percent.
 6  They clearly were not applying the same standard back then.
 7  These are people who had access to loan files, the people on
 8  the single-family side, and they clearly are applying a much
 9  different standard than the experts employed by FHFA apparently
10  are applying here.  And that and that alone, just from the law
11  statistics, pull-through rates way back then with defect rates
12  today is so stark as to be unexplainable.
13            In terms of the loans being the same, what we're
14  saying is that in at least part of their business, they were
15  seeing loan pools.  In many cases, these were pools put out to
16  bid where Fannie, Freddie, Goldman Sachs, Deutsche Bank, UBS,
17  and other defendants had an opportunity to bid for the very
18  same pool.  So, can we, based upon what we know, say this due
19  diligence that was done was done on loans with exactly the same
20  characteristics?  No.  But we can say that Fannie and Freddie,
21  during this period of time, were in the business of bidding on
22  the same pools of loans as these defendants.  It doesn't
23  necessarily prove our entire case.  We would like more if we
24  were in a position to get it, but this is narrow and to the
25  extent that he's got problems of burden, we have always stood
```

74

CchWfed3

```
 1   ready to talk about that with them.
 2            Thank you.
 3            THE COURT:  The request as drafted is not targeted.
 4   It would create too great a burden, as Mr. Klapper admits, and
 5   the idea that we would at this point be seeking a massive
 6   increase in the number of custodians for searches is just not
 7   in the cards.  I don't understand the admissions argument.  I
 8   don't think there would be any admission with respect to the
 9   claims in this case.  There may be some data about business
10   practice, but we're not talking about an admission when you are
11   a trader buying a security based upon statements in a
12   prospectus supplement, and so I don't understand that argument.
13            Mr. Schirtzer, are the documents that are sought in
14   request No. 1 here in the December 3 letter contained on a
15   database?
16            MR. SCHIRTZER:  Your Honor, I don't believe so, but I
17   don't want to make a definitive representation about that.  I
18   could certainly go back to the client and find out whether
19   there's some portion of this, and this has been a moving target
20   in the course of this conference, but whether some portion of
21   the documents requested are available on a database not
22   requiring additional custodians or any additional document
23   collection.
24            THE COURT:  Good.  If you could get back to
25   Mr. Klapper on that with respect to the subprime and alt. A
```

CchWfed3

```
 1  loan pools and you don't need to make any inquiry with respect
 2  to conforming loans.
 3          MR. SCHIRTZER:  Understood, your Honor.
 4          THE COURT:  Let's go to item No. 2.
 5          MR. KLAPPER:  Your Honor, I do believe that the
 6  question of whether the actions are admissions of Fannie and
 7  Freddie is an important point.  Would the Court be open to
 8  submissions on that point?  Because I wouldn't want to get too
 9  far down the road and have a misunderstanding as to what the
10  state of the law is.  I mean, you can have an admission by act,
11  and it's certainly true that FHFA, as conservator of Freddie
12  and Fannie, stands in their shoes and can be bound by
13  admissions that they made, or at least that's my understanding
14  of the law.
15          THE COURT:  I'd like you to have a comfort level that
16  I'm familiar with the rules of evidence with respect to
17  admissions.  And I don't think we need to separately brief that
18  point.
19          MR. KLAPPER:  Thank you.
20          THE COURT:  Yes.  Okay.  So there may be lots of
21  litigation at the motions in limine stage, and I don't want
22  anything I say here to restrict the parties' freedom to make
23  motions in limine.
24          Second point, FHFA's analyses of the causes of its
25  claimed losses.
```

CchWfed3

```
 1              Mr. Klapper.
 2              MR. KLAPPER:  Thank you, your Honor.
 3              This is also, to our view, very straightforward.
 4              THE COURT:  You know what, Mr. Klapper.  I think my
 5    last comment may have sounded unfair to you, and I regret that.
 6    When I said I didn't understand the admissions argument, I
 7    meant that it wasn't that I didn't understand that a statement
 8    by the plaintiff could be an admission of Fannie Mae or Freddie
 9    Mac or vice versa.
10              MR. KLAPPER:  Okay.
11              THE COURT:  That's not the point.
12              MR. KLAPPER:  Right.
13              THE COURT:  The issue is different, how anything in
14    the documents that you're seeking in paragraph numbered one
15    here of the December 3 letter would be an admission with
16    respect to any issue of fact that I can imagine arising with
17    respect to the strict liability claims in this case.
18              MR. KLAPPER:  I understand the Court's position.
19              THE COURT:  Okay.  Item No. 2, FHFA's analyses of the
20    causes of its claimed losses.
21              MR. KLAPPER:  Now, this, in our view, is clearly an
22    admission issue.  And to our minds, the only real issue is the
23    question of what would it take, how far would they have to go
24    in order to find what might exist.  And again, we're not
25    talking about e-mail searches or custodians, and things like
```

77

CchWfed3

1   that.  But there are, we know, certain documents like their own
2   court papers, which we annexed to our letter, and the special
3   litigation committee report that outlines what executives said
4   that are very relevant.  To the extent that there are other
5   reports of that sort, they also would be relevant to what
6   caused these loans not to perform, what caused these
7   securitizations to perform very poorly, and this could be board
8   reports.  These could be reports of audit or risk committees.
9            There are places to look for these sorts of things
10  that would not be the least bit burdensome, and it's the type
11  of discussion we've had numerous times with FHFA, the
12  difference between readily accessible places to look, which is
13  not generally burdensome, as long as there aren't too many of
14  them, and elaborate e-mail searches, which are very burdensome.
15  So what we're looking for is simply a reasonable search of
16  readily accessible places to see whether there are any
17  additional reports of this sort, which, if they're similar to
18  what they alleged in public filings, would be a strong, would
19  be strong evidence that what caused their losses was not
20  anything having to do with misrepresentation but rather having
21  to do with unprecedented events in the housing and economic
22  markets.
23            Thank you.
24            THE COURT:  Thank you.
25            Mr. Schirtzer.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

CchWfed3
```
 1              MR. SCHIRTZER:  Again, your Honor, that isn't what
 2      Mr. Klapper requested of us on December 3.
 3              On December 3, he requested for the period of 2005 to
 4      2011, reports, memoranda, and analyses concerning the causes of
 5      poor performance or defaults of pools of mortgage loans or
 6      residential mortgage loans generally that were issued during
 7      the period of 2005 to 2008, and then, secondly, poor
 8      performance of securities issued by the GSEs during the period
 9      of 2005 to 2008 that were backed by residential mortgage loans.
10      So, in essence, any report, any memoranda, any analysis of why
11      pools of mortgage loans or GSE's own securitizations might have
12      performed poorly.
13              That is the exact opposite of a targeted request.
14      When we sat down with clients to try to determine how we would
15      go about gathering that, as much, if not more so than the
16      previous request, this would require a very significant
17      increase in custodians, very significant new document
18      collection, and document review in support of what I would
19      submit, your Honor, are tangential documents.  The defendants
20      have been quite active in gathering statements like the FDIC
21      report and other things that have been submitted to you in
22      which people talk about how the market turn affected the
23      mortgage business generally.  I have no doubt that they will
24      press that issue in deposition, and so forth.  But to try to
25      find what is in fact requested by Mr. Klapper would be a
```

CchWfed3
```
 1   monumental task well after the deadline for promulgating
 2   discovery requests.
 3            MR. KLAPPER:  Your Honor, if I could.
 4            THE COURT:  Mr. Klapper.
 5            MR. KLAPPER:  If I could make one point, we requested
 6   these documents a long, long, long time ago, but we requested
 7   them in a way that probably would have called for a number of
 8   custodians, and the like.  We don't even know for a fact that
 9   to the extent that FHFA did agree to custodians who were
10   sitting on the single-family side, if they identified documents
11   on these topics, our understanding is they haven't produced
12   them.  But we were left in a position to try to be targeted, to
13   try to just get high-level memoranda, reports, and the like,
14   and that's what we narrowed our request to.  But this idea on
15   either the prior request or this request that we had not made
16   the request before is just plain wrong.  We're trying to narrow
17   previous, much broader requests where our requests on broad
18   scale had been denied.
19            MR. SCHIRTZER:  Your Honor, let me answer the question
20   of what we had told them we were going to produce on this topic
21   because I think we have been fairly clear.  If we have any
22   document that relates to our belief regarding causes of a loss
23   on the securitizations, we're going to produce that document,
24   and, for that matter, we've told them that if there is a
25   document that covers both areas -- that is, talks about the
```

CchWfed3

```
 1   losses on the securitizations and simultaneously talks about
 2   the losses on other instruments -- then we're going to produce
 3   that as well.  But we're not going to do, what would be
 4   extraordinarily difficult for us to do, is to comply with what
 5   they in fact requested this time around which, frankly, is no
 6   more narrow than what they requested the first time around.
 7             THE COURT:  Let me understand, Mr. Schirtzer.  When
 8   you say you are already producing documents in which the GSEs
 9   identify the causes or what they believe the causes of the
10   losses on the securitizations were due to, when you say
11   securitizations, are you talking about the private label
12   securitizations of the kind at issue here?  Or are you talking
13   about any securitization, both those sold by the GSEs and also
14   those purchased by the GSEs?
15             MR. SCHIRTZER:  No, your Honor.  I'm referring to
16   securitizations with a capital S to mean the securitizations at
17   issue in this case.
18             THE COURT:  And you believe that the searches you've
19   undertaken would already have located and you would have or
20   would be producing those documents?
21             MR. SCHIRTZER:  That is correct, your Honor.
22             THE COURT:  And you're saying that if such searches
23   uncovered a document that analyzed loss for the securitizations
24   on the private label side and discussed as well losses due to
25   securitizations on the whole loan side that you would have
```

CchWfed3
1    produced that document in unredacted form?
2            MR. SCHIRTZER:  That would be the instructions, your
3    Honor.  And I'm happy to go back and confirm that, in fact,
4    those instructions are being implemented and carried through.
5            THE COURT:  Thank you.  If you would so confirm that,
6    thank you.
7            MR. KLAPPER:  Your Honor.
8            THE COURT:  Mr. Klapper, briefly.
9            MR. KLAPPER:  I just wanted to be clear that what
10   Mr. Schirtzer, as I understand it, is not producing, even if it
11   was in the documents of an e-mail custodian that was part of
12   what he's already done, is an analysis of why securitizations
13   could be subprime or alt. A, with loans from the same
14   originators at issue here, why those failed, he would not
15   produce it because it doesn't relate in whole or in part to the
16   private label securitization, capital S.  So that's what we're
17   not getting, and that's one of the things we seek.  And at this
18   point we seek it not through e-mail searches but from readily
19   accessible places.
20           THE COURT:  Part of this discussion, I think, may be a
21   fight about nothing.  And why do I say that?  I can't believe
22   that an organization of the size and complexity of either the
23   GSEs wouldn't have had at some point in time a committee or
24   group of people assigned to analyze the reason for the loss on
25   securitizations, and on the securitizations at issue in this

CchWfed3
```
 1   case, and I can't believe that that wouldn't have been, in the
 2   course of doing that, drawn on information more broadly
 3   available within the GSE, and I'm talking about a high-level
 4   committee.  And so maybe I'm wrong, and, Mr. Schirtzer, will
 5   tell me if I'm wrong.  But as a result, the searches you have
 6   done are going to cause that kind of analysis to be produced.
 7   Am I right?
 8           MR. SCHIRTZER:  Your Honor, I can't make a
 9   representation about specific documents, but you're absolutely
10   right that with respect to any document that talks about the
11   causes of losses on the securitization, we're going to be
12   capturing that document and it is entirely likely that that
13   same document may have something to say about the issue in
14   which Mr. Klapper is so interested.
15           MR. KLAPPER:  But what he is not representing he's
16   producing is if there are reports done by the people on the
17   single-family side about why their securitizations and their
18   whole loans that they held, purchased from the same
19   originators, in some cases, as those underlying the
20   securitizations, capital S, why they performed so poorly.  And
21   we just don't see how it's possible for them to say that that's
22   irrelevant.  Commentators, including the people on the
23   financial crisis inquiry commission, and certainly one of the
24   dissents have made the point that these were the biggest
25   players in the markets to buy residential loans and that they
```

CchWfed3
1    made a very clear strategic decision around 2005, if not
2    earlier, to be big players in the same lower credit,
3    nonconforming loans that perform the basis for the pools in
4    most of these securitizations.
5              I understand burden.  I understand that completely.
6    But effectively what FHFA has submitted to us and I believe to
7    your Honor, they want to put a cone of silence over that
8    business, that whether it's relevant or not, it's somehow a
9    different business, and that's why I stress, this isn't a
10   question of information going over a wall.  It's a question of
11   relevance for other issues, loss causation being one of them.
12             THE COURT:  I cannot believe, it sounds to me like you
13   already have available to you documents that talk about the
14   losses experienced by the GSEs at a very high level with
15   respect to both sets of securitizations, on the whole loan
16   side, or when FHFA is purchasing a loan and selling itself,
17   securitizing those loans itself, and also on the private label
18   side, when they're buying the securitizations.  And what we're
19   not doing though is going to require a separate search at a
20   lower point in the organization where there may have been
21   discussions solely about the FHFA securitizations.  So let's
22   move on to due diligence practices.
23             Now let me just move directly to Mr. Schirtzer here
24   because this is an area in which I think it's almost like
25   having expert testimony from the FHFA, but I think the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

CchWfed3
1    defendants are entitled in some way to get access to what the
2    due diligence practices were in this market by the GSEs in a
3    nonburdensome way, and maybe it's not a document production,
4    but --
5              I'm sorry.  I can't get the feedback distance quite
6    right here.
7              Mr. Schirtzer, can you hear me?
8              MR. SCHIRTZER:  I hear you just fine, your Honor.
9              THE COURT:  This is sort of a reasonable man's
10   standard with respect to due diligence, an objective standard,
11   but it's informed by industry practice.  The GSEs are a big
12   player in the industry.  I would think that the industry
13   standard is, in part, shaped by their perception of what due
14   diligence requires.  And how to give the defendants access to
15   that in a meaningful way that is nonburdensome, I think, would
16   be important.  And maybe all I need to say is that much and
17   have you meet and confer about that topic to design a
18   production or an identification of personnel or something that
19   would be responsive.
20             Mr. Schirtzer.
21             MR. SCHIRTZER:  Yes, your Honor.  I was actually going
22   to make the same suggestion as you were when sharing your
23   thoughts with us.
24             Obviously the request as structured in the December 3
25   letter goes quite a ways further than that, but I certainly
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

CchWfed3

```
 1    understand what your Honor has in mind, and I'm happy to meet
 2    and confer with Mr. Klapper and figure out if we can figure out
 3    a way of producing, whether by document production or
 4    otherwise, something that shows the due diligence procedures
 5    that the GSEs were using on subprime loan purchases or
 6    essentially apples-to-apples purchases, to the extent there are
 7    apples-to-apples purchases, between the GSEs and defendants at
 8    issue.
 9              THE COURT:  Mr. Klapper, would you be willing to
10    engage in those discussions with Mr. Schirtzer?
11              MR. KLAPPER:  Absolutely.  I would note again the
12    securitizations they sue on contain subprime, alt. A, and
13    prime.  So when you talk about apples to apples in terms of
14    policies, you'll get each of them because we had due diligence
15    policies which I believe were true throughout the industry for
16    prime loans as compared to subprime loans.  But we're certainly
17    willing to meet and confer on that.
18              THE COURT:  Okay.  I don't want, and I know no one in
19    this room wants it because of the burden that it would entail
20    to distract ourselves with the prime mortgage industry, the
21    conforming loan industry unless we absolutely have to.
22              MR. KLAPPER:  We would be pleased if they dropped our
23    prime deal in the case.  That would solve the problem.
24              THE COURT:  Good.
25              Last topic.  Documents sufficient to show volume of
```

CchWfed3
1   business with originators.
2            So talk to me, Mr. Schirtzer, about burden here.
3            MR. SCHIRTZER:  Yes, your Honor.
4            This is easily as burdensome as the other requests.
5   Obviously we do lots of different types of business with these
6   various originators, but let's assume that what the defendants
7   really meant to ask was the volume, the dollar volume of
8   business done in the subprime and alt. A categories of loans
9   over the three-year period, 2005 to 2008.  And I presume they
10  want the major originators and not each and every minor
11  originator involved in the case.
12           I will certainly be happy to ask the client whether
13  there are again databases or some readily accessible area that
14  would allow us to provide those statistical answers.  I don't
15  believe that there are, but I don't want to make that
16  representation until I have really run that down with the
17  client.  I would want to shift the subject from burden to
18  relevance because it's truly unclear to me how the volume of
19  business we did with originator X, Y, or Z could ever be
20  relevant to the defenses in this case, materiality, diligence,
21  notice, and the like.
22           THE COURT:  Yes, complex issues.  Whoever presides
23  over the trial is going to have a lot of hard thinking to do
24  about these issues.  But since we're right at discovery right
25  now, I thank you for your offer, Mr. Schirtzer, to inquire

CchWfed3

1    about the burden, and what I'm thinking about is a quarterly or
2    annual report that would give in a single document by
3    originator the volume, maybe number of loans, dollar component,
4    whatever it is, with respect to, and you are right, the major
5    originators, if we got the top 40 as opposed to all 60, or
6    whatever.
7              MR. KLAPPER:  There are a lot more than 60, but you're
8    absolutely right.  We would focus on the top ones, and I don't
9    believe we're that far apart because Mr. Schirtzer asks the
10   volume of what business.  What we asked for was purchases of
11   residential mortgage loans, so I think we're talking about the
12   same thing.
13             THE COURT:  Again, I don't understand this case to be
14   driven by the conforming loan business.
15             MR. KLAPPER:  I would agree.
16             THE COURT:  Thank you, Mr. Schirtzer, and I'll count
17   on you and Mr. Klapper to discuss that further then.
18             MR. SCHIRTZER:  I understand what your Honor is asking
19   and I will speak with my client and then with Mr. Klapper.
20             THE COURT:  Thank you very much.
21             Counsel, it's roughly 5:30.  I have here three more
22   sets of documents.  We're not going to go past 6:00, no matter
23   what.  I'm happy to stop now and continue this tomorrow,
24   expecting we could do it on a conference call, since I think
25   we're down to just three issues.  We're going off the record

CchWfed3
```
 1   for a moment while I take guidance from counsel.
 2              (Discussion off the record)
 3              THE COURT:  I think counsel would like to push on
 4   through.  They know I'm going to stop at six for sure.
 5              We're moving to the issue that I understand
 6   Mr. Schirtzer will be involved with.
 7              MR. SCHIRTZER:  Your Honor, are you waiting for me to
 8   speak now?
 9              THE COURT:  I was just trying to make sure I have the
10   right set of documents here.  I have a letter of December 17
11   from Mr. Bennett that concerns in its first paragraph mortgage
12   fraud reports.  And I have a December 17 letter from you,
13   Mr. Schirtzer, on MFINs.
14              Is that the set of correspondence?
15              (Continued on next page)
16
17
18
19
20
21
22
23
24
25
```

CCHAAFHF3                    Argument
1          MR. BENNETT:  Those are the most recent, your Honor,.
2     There were letters on December 7th as well one from Ms. Shane
3     and one from I believe Mr. Schirtzer but the operative ones are
4     the ones you cited.
5          MR. SCHIRTZER:  Your Honor, just to put this in
6     context as you'll recall, on Friday we did have argument on the
7     portion of the two prior letters related to mortgage fraud
8     reporting.  Your Honor held that you were not going to require
9     production of those documents.  Mr. Bennett had a document in
10    the courtroom that he said showed that these mortgage fraud
11    reports involved PLS and the submissions that he made this
12    morning and to which IS responded IS the document that he was
13    holding in his hand on Friday.  I suspect it nothing to do with
14    PLS.
15         MR. BENNETT:  I'd be happy to address it.
16         THE COURT:  Excuse me one second, Mr. Schirtzer.
17    Everyone in the courtroom can tell that I am searching for a
18    document.
19         (Pause)
20         THE COURT:  I'm ready.  I have before me the December
21    7th letter from Ms. Shane that has attached as Exhibit G the
22    policy guidance on the subject of the examination of mortgage
23    fraud reporting.
24         MR. BENNETT:  May I approach the podium, your Honor?
25         THE COURT:  Please.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

90
CCHAAFHF3                    Argument
1                 MR. BENNETT:  Thank you.
2                 Good afternoon, your Honor.  Ted Bennett, for Merrill
3     Lynch and Bank of America.  Unlike many of the other issues
4     we've talked about today, there is no claim of burden regarding
5     these reports.  There are a discrete set of documents, it
6     appears from what we know, were held in a localized repository
7     within the GSE's.  In fact, they're required by statute to be
8     maintained they're required by.  So there's no question of
9     burden, no question of having to dig for them.  It's really a
10    question of relevance raised by FHFA.
11                And just to set table, your Honor, there's a statutory
12    requirement by law that the FHFA if it suspects mortgage fraud
13    and mortgage fraud is described by the statute, defined by the
14    statute as being exactly the kind of things that are alleged in
15    these complaints.  If it suspects mortgage fraud effecting the
16    purchase or safe of whole loans or RMBS, mortgage fraud
17    affecting the purchase or sale of RMBS it's got to report it.
18    it can't decline to purchase RMBS.  If it can't seek repurchase
19    of RMBS it already holds without making such a report to a
20    OFEO.  So it clearly relates to the very types of securities
21    here clearly relates to the very types of fraud that are
22    alleged in these complaints, particularly, those alleging fraud
23    as in the case of my client, Merrill Lynch.  So because of the
24    statutory framework there is no question that these are
25    relevant.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CCHAAFHF3                    Argument
1          Now, it's interesting we were able to come up in the
2     document production with a single exemplar of one of those
3     reports because we wanted to see what we were talking about and
4     this was the one we could find.  It was attached to
5     correspondence to the Court of this morning, my letter of this
6     morning.  And it's --
7          THE COURT:  I've read it.
8          MR. BENNETT:  Thank you, your Honor.
9          It is a document that on its face appears to be one of
10    these reports.  And it mentions several of the defendants.  It
11    mentions that there were a suspicion of fraud that was in the
12    words of Fannie Mae self-reported by one of the group of
13    lenders including several defendants.  On its face it goes to
14    several of the custodians the -- has identified, including two
15    Julie Shaw and Debra Bates Moss who -- I am sorry Lisa Bates
16    Moss who we see from other documents had approval authority
17    over certain of the purchases of the securities at issue in the
18    case.
19         So there's not a wall issue here.  It clearly goes to
20    people who are involved in RMBS.  Clearly, governs the purchase
21    and repurchase relating to RMBS, right within the heartland.
22    If there were a wall issue it is relevant to several of the
23    defenses even if it never got to anybody on the PLS side.  Just
24    for example, a document here, the one we have -- and, again,
25    we're forced to work with what we have.  This is the only one
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

CCHAAFHF3                    Argument
1   we could find.  It describes self-reporting of fraud by the
2   very parties that FIFA is alleges were committing fraud so IT
3   directly defeats scienter in that regard.
4              THE COURT:  Well, if you reported fraud you are going
5   to have records of that.  If you report -- so, I mean that's
6   not news to you.
7              Anything else, Mr. Bennett?
8              MR. BENNETT:  Certainly, your Honor.
9              It goes to the falsity allegations.  It goes to lost
10   causation.  It goes to the due diligence and reasonable care.
11   Looking back at the World Com decision your Honor was very
12   clear on the factual nature of those.  One of the things
13   considered is what would you find out if you conducted
14   additional diligence or additional looking into the mortgage
15   loans.  These kinds of reports touch on that.
16              And, your Honor, one of the things I think that's
17   interesting about the letter that FIFA submitted this morning
18   or this afternoon, actually, is what it doesn't say.  It says
19   that there were no such reports related to these securitization
20   in the period 2005/2007.  It doesn't mention that in order for
21   it to file this case and seek repurchase relating to these
22   securitizations they would have had to file reports relating to
23   these very claims.  So at the very least we're entitled to
24   fraud reporting to the related to defendants at issue in this
25   case.  We're entitled to fraud reporting related to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CCHAAFHF3                    Argument
1    originators at issue in this case.
2              And finally, your Honor, if there are appraisals that
3    FIFA believes were fraudulent and appraisers who FIFA believes
4    committed fraud, it would have to report on those as well.  So,
5    we would be entitled to any of these reports that touch on the
6    appraisals done in this case.  Now, we'd be happy to limit that
7    to the appraisers whose appraisals are at issue in the sample
8    loans.  And we would be, I am sure from FIFA's -- I am sure
9    Fannie and Freddie's record keeping that those could be
10   searched for quite readily in their database of fraud
11   reporting.  We think there is not a burden argument here there
12   is overwhelming relevance, certainly, at this point when we're
13   just talking about discovery, not arguing motions in limine.
14   We're entitled to build at least the record where we could make
15   arguments on motion in limine.  If we don't get these documents
16   in discovery, your Honor, we'd never get to that point.  We
17   could never build that part of our defense and we can't prepare
18   our experts or prepare to cross theirs.  So I think at this
19   point given that this is discovery that these documents, at
20   least the one we could find touched directly on the defendants
21   at issue here and many of the same issues that there is really
22   no question of relevance or burden and we should get these.
23             THE COURT:  Mr. Schirtzer.
24             MR. SCHIRTZER:  Your Honor, respectfully to
25   Mr. Bennett, everything he said was clear is, in fact, clearly
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

94

CCHAAFHF3                    Argument
1   false.  You'll recall we heard argument on this issue on
2   Friday.  You made a determination.  Mr. Bennett said he had
3   proof that these documents went to PLS.  I had made the
4   representation on Friday that if these reports were made
5   regarding the securitizations that we would produce them
6   subject to some of them may be privileged but we would
7   otherwise produce them.  I repeat that representation.  Any of
8   the mortgage fraud reports that relate to the securitizations
9   or the loans in the securitizations, we will produce them
10  unless they're privileged.
11          What the secret document that Mr. Bennett brought out
12  over the weekend shows is quite the opposite.  This is a
13  appraiser operating in Georgia over an 11 year period,
14  appraising, perhaps, 27 loans on the single family side.  None
15  of those loans went into the PLS portfolio.  Indeed, we don't
16  even know if this particular appraiser ever appraised a single
17  loan that went into any of the securitizations.
18          Mr. Bennett misreads the statutory requirement.  We
19  had no ability at the time that we were making these
20  securitization purchases to even file a mortgage fraud report
21  because we did not have the underlying loan files that would be
22  necessary to know that a particular appraiser was engaging in
23  this sort of mortgage fraud.  And as I said, that information
24  became available to us at a later time and relates to the PLS
25  portfolio and we will produce it subject to privilege.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

95

CCHAAFHF3                    Argument

1           When he said these reports clearly relate to the very
2   type of securities at issue, again, we will produce them if, in
3   fact, they do.  This one does not.
4           Let me talk about the wall issue and the custodian
5   issue.  There are three custodians who received this document.
6   That's undoubtedly why it was produced.  Each of those three
7   custodians is in essence a single family custodian but that
8   does not mean that the wall policies were not adhered to.
9   Indeed, none of those custodians under the wall policies could
10  have provided a level of information in this mortgage fraud
11  report to a PLS trader because that would have been providing
12  material nonpublic information to PLS traders.  As we talked
13  about on Friday that could not be done and that was not done.
14          And then finally, Mr. Bennett suggested that it would
15  be easy for us to figure out who the appraiser was.  In fact,
16  it's not true unless and until we have loan files and opened
17  each loan file, we don't no know who the appraisers are on
18  particular loan files, unlike defendants who, certainly, know
19  who their appraisers were on the loans that they securitized.
20          THE COURT:  I'm not going to change my ruling from
21  Friday.  Let's move on to the last topic and that is, I think a
22  letter of December 7th from Mr. Bennett about source metadata.
23  I have a letter of December 12th from FHFA's counsel including
24  Mr. Schirtzer and, Mr. Cylindi and Ms. Chung, among others and
25  a letter of December 17th from Mr. Bennett.

96
CCHAAFHF3                     Argument

1            Who is going to address this for FHFA?
2            MS. CHUNG:  I will, your Honor.
3            THE COURT:  Ms. Chung.
4            MS. CHUNG:  So, your Honor, I guess I'll stay here.
5    Mr. Bennett has through sheer doggedness gotten me to agree to
6    produce many forms of metadata including the ones that he
7    raised in his December 7 letter.  However, we are now at an
8    impasse on one issue.  And none of the forms of metadata that
9    we have agreed to produce are, in fact, required to be produce
10   under the electron stipulation.
11           So, your Honor, in the December 7th letter -- Well,
12   let me put it in context this way.  Just before Thanksgiving
13   when we had the phone conference Mr. Bennett first raised the
14   issue of metadata and we resolved that issue which was metadata
15   for identifying the custodians of documents that the parties
16   did produce.  Two additional requests then were made by
17   Mr. Bennett.  One was for custodian metadata of documents that
18   were not produced but were de-duplicated from the parties'
19   productions because DDSI stipulation allows that.  That's the
20   issue that remains alive.
21           The third issue was about entity information, entity
22   metadata.  So for us Freddie Mac/Fannie May, for them Bank of
23   America versus Merrill and we've resolved that issue since Mr.
24   Bennett wrote to the Court.
25           So the one that we have left is the custodian metadata
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

CCHAAFHF3                    Argument
1   for documents that were de-duplicated.  The ESI stip plainly
2   provides, and Mr. Bennett does not dispute that de-duplication
3   is permitted.  The parties back when we negotiated this a year
4   ago made their judgments about how much they wanted to give and
5   how much they wanted receive and there was enough value to
6   de-duplicating including the review that's involved in
7   reviewing things that are not de-duplicating that the parties
8   agreed to permit the de-duplication.
9           So, Mr. Bennett is hanging his hat on two provisions
10  in the ESI stip, neither ever which talks about retaining
11  metadata for de-duplicated documents.  Paragraph 4B says you
12  can de-duplicate, end of story, for exact duplicates.  And then
13  paragraph 3B which he also cites talks about producing metadata
14  for load files.  And load files are by definition produced
15  data, so produced documents.
16          So the parties are not required to keep metadata for
17  de-duplicated documents.  And when Mr. Bennett says, well, I am
18  assuming that you can generate this at a touch of a button.
19  What's problem?  The assumption is wrong.  One of the reasons
20  the parties decided that they would allow de-duplication is not
21  to have to have these burdens.  And FHFA with respect to e-mail
22  documents which is really the issue, the documents at issue
23  now, we have equal ability.  He has equal ability as we do to
24  search the two -- this literally comes down to who, which other
25  custodians had the document?  And the way you tell that with
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

98

CCHAAFHF3                    Argument

1   e-mails is you search the metadata for "to", "from", "CC" and
2   "BCC" and then you've got it.
3           In the one instance that Mr. Bennett cites he wrote a
4   letter today saying, well, you did this for this man
5   Salahoudin, OK.  We generated a list of custodian data in the
6   Salahoudin case.  That related actually to the first issue
7   which was produced documents, there were 14,000 produced
8   documents for Salahoudin.  We readily were able to come up with
9   the custodian data for that.  Mr. Bennett is confusing the
10  first issue with the second issue when he points to this
11  purported example information of how easy it is to generate the
12  information.  It would take him and I the exact same amount of
13  time to search the metadata we already have the "to", the
14  "from", the "CC" and the, BCC," to generate this information.
15  For us to do it alone, for him is it would require us to divert
16  ourselves from other things that we are doing in our
17  productions, etc., that we don't want to take the time to do
18  and that we believe the stip clearly contemplates that we
19  clearly have the right to forgo.  So, while we have been able
20  to agree with him and find ways to get him the metadata that he
21  wants and has admitted pretty freely in his letter he wants it
22  so he can prepare for depositions, we really are at an impasse
23  as to this last category where the only reason really that the
24  reason is that we are equally situated to generate the same
25  information.  Thank you, your Honor.

CCHAAFHF3                    Argument

 1             THE COURT:  Mr. Bennett.
 2             MR. BENNETT:  Your Honor, there are really four
 3    reasons why this information should be produced.  The first is
 4    that it's called for in the stipulation.  In fact, every party
 5    in this room except FIFA is producing this exact information,
 6    those who are de-duplicating and those who are not.  Everybody
 7    is producing.  Metadata reveals where every document was found
 8    in somebody's electronic repository.  The ones who are not
 9    de-duping are doing -- other folks who are de-duping are doing
10    it with metadata overlay.  And the overlay is called for in the
11    paragraph Ms. Chung cited, 3A, which lists all the metadata
12    that's to be produced in this case.
13             Now, she's quite right that the stip allows parties to
14    de-duplicate.  That is you can remove identical parts of
15    documents from the production and you have to produce only one
16    version.  What picks up the metadata is in the fields that are
17    required to be produced there's a field for source.  In the
18    source field agreed to by FHFA many months ago reads:  Person
19    shared drive or other source from whom the files were
20    collected.  Not from whom they were produced as Ms. Chung would
21    try to convince the Court, who they were collected from.  So
22    that way when an e-mail goes to 12 custodians and it's produced
23    only once because it's de-duplicated the metadata is required
24    to be produced with it shows from who else was it collecting.
25    So it's called for in stip.

CCHAAFHF3                    Argument

1           The second reason it's required it is just required by
2      the federal rules.  It's the law in the federal rules that
3      metadata is part of the document.  So you can't de-duplicate
4      out metadata, in the same way you couldn't de-duplicate out
5      page two of a document you didn't like.  It's part of the
6      document.  There are many opinions on this.  The recent one
7      from Judge Scheindlin in the national Day Laborer's Association
8      is quite clear on it and says it's beyond dispute that metadata
9      is part of the document.  When FHFA stripped out the metadata
10     from these documents so that when we searched for
11     Mr. Salahoudin we find 12 documents.  When they searched for
12     them they find 14,000.  They were taking out part of the
13     document is actually part of the document.  It's no different
14     than if they cut text out of the document.
15          The third reason, your Honor, is a straight up Rule
16     One issue, the sufficiency of this case.  We're getting ready
17     for depositions now.  We're going to prepare to depose
18     Mr. Salahoudin.  We need to be able to find those documents.
19     The way it's done right now if he had a document on his hard
20     drive and also found on the hard drive of six other custodians
21     we only get it once and we don't know if he had it.  If they
22     sheer off the metadata that shows his.  So how can we prepare
23     for his deposition now?  We can try to run some kind of
24     analytics, try to guess around but we are never going to know
25     for sure and we're never going to be able to confront him with
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

CCHAAFHF3                    Argument

1   the document.  I believe, your Honor, it puts us on equal
2   footing.  FHFA has data.  It is clear if your Honor looks lack
3   back at the attachment to my letter it has this data in its
4   database.  They're withholding it from us.  They should push it
5   across to us the same way every defendant in this room has
6   pushed its data to them.  It's just fair, your Honor.
7            THE COURT:  Thank you, Mr. Bennett.
8            Mr. Bennett, I am going to impose on your good your
9   patience and ask you to speak with Ms. Chung about this because
10  I understood her to say that for her to produce it it would
11  require to the same effort that it would for you to get it and
12  produce it for yourself and that seems to me that's either
13  right or wrong and I'd like you to talk with each other.  And
14  if you don't have -- and if she is right on that score I am not
15  going to require her to produce it.  But I want you to talk
16  about it with each other first.
17           MR. BENNETT:  Glad to do that, your Honor.  She done
18  assert that with respect to the E-documents.  She asserts that
19  with respect to e-mail where there's no from "CC", "BC".  But
20  the example I use of the -- I don't think that's in dispute
21  that we can't do that.
22           MS. CHUNG:  Your Honor, we are talking about e-mails.
23  It's fine.  We can limit at this time to that.  I do want to
24  leave unanswered this idea that every defendant is producing
25  this information.  Again, Mr. Bennett confusing the first issue

CCHAAFHF3                    Argument

1    which we resolved which is metadata produced documents versus
2    de-duping.  We have the account of what defendants are
3    providing information and they are not providing this
4    information from de-duplicated documents.  Mr. Bennett is also
5    misreading the stipulation but I will reserve that and speak to
6    him.
7              I do think one of the issues we are having is he keeps
8    insisting that it must be easier for us and I've told him on
9    numerous occasions that's just not the case.  I'm happy to make
10   another effort but I do think in some sense I do have the
11   information -- we do not maintain the information the way that
12   he believes we did.
13             THE COURT:  OK.  And if that is so, I am not going to
14   order it.
15             Counsel, it's late.  I want to thank you for your
16   patience.  But last Friday we left with you asking me to
17   explain the basis for some rulings I've made recently.  And
18   those rulings largely, not entirely, but largely related to the
19   requests for discovery of files from FHFA's whole loan side of
20   the business.  And, of course, as you know, I've already
21   described on several prior occasions the legal framework that's
22   guided by rulings on the scope of discovery in this action and
23   I'll refer you to just two of the transcripts from July 31 and
24   November 6.
25             And on those occasions I talked about the Federal
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

CCHAAFHF3                    Argument
1    Rules of Civil Procedure and my analysis of the role of the
2    strict liability claims in the 16 actions in contrast of the
3    fraud claims and the six actions and I've described the
4    elements of the claims and defenses and you have my rulings on
5    the legal standards that will govern much of that.
6            In general when discovery only relevant to the issues
7    related to fraud claims that discovery will have to, in my
8    mind, meet a higher threshold of relevance when it is
9    burdensome to produce.  As I've noted on several occasions in
10   the past without contradiction from counsel, I do not expect
11   any defendant faced with a fraud claim to proceed to trial
12   unless it believes it can defeat the strict liability claims.
13   In contrast, parties will find it easier to obtain discovery
14   consistent with considerations of, among other things, burden,
15   fairness, relevance and proportionality when it pertains to the
16   strict liability claims and the defenses against those claims.
17           Turning to the requests for discovery from FHFA's
18   whole loan business, the defendants have made repeated requests
19   for this discovery.  Most of them are broad requests that would
20   place a great burden on both the producing party and the
21   reviewing parties.  I've denied those requests that are not
22   targeted or would be unduly burdensome for several reasons,
23   including the following:
24           The defendants have had fulsome discovery from FHFA.
25   This includes exhausted discovery from the PLS side of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

CCHAAFHF3                    Argument
1    business and the risk committees in which various units
2    including the single family business participate.  This is the
3    discovery that is material to this case and it will be most
4    pertinent to the claims and defenses in this litigation.
5             Secondly, the whole loan side of the business of FHFA
6    is a different business.  The decisions about purchasing loans
7    for that side of the business are based on different criteria
8    than the criteria used by the PLS side of business largely.
9    And that's true even when it's of loans that will be
10   securitized.  Some loans rejected by the FHFA on the whole loan
11   side no doubt ended up in the supporting loan groups for the
12   securitizations purchased by the FHFA.  But for many reasons
13   the FHFA PLS traders would not have known which of the loans in
14   the supporting loan groups had previously been rejected by the
15   FHFA whole loan business or the reasons for those rejections.
16            In any event, as I've already mentioned, the standards
17   for purchasing a whole loan and for including a loan in a
18   supporting loan group backing a PLS securitization are
19   different.  This fact was explicitly acknowledged in prospectus
20   supplements for securitizations.  One such prospectus
21   supplement warned, the underwriting guidelines are less
22   stringent than the standards, generally, acceptable to Fannie
23   Mae and Freddie Mac with regard to the mortgagors credit
24   standing, debt ratios documentation programs and certain other
25   respects.  Mortgagors who qualify under the underwriting

CCHAAFHF3                    Argument
1   guidelines may have payment histories and debt ratios that
2   would not satisfy Fannie Mae and Freddie Mac underwriting
3   guidelines.  It may have a record of major derogatory credit
4   writing such as outstanding judgments or prior bankruptcy.
5   Thus, even if it were possible to trace the decision making for
6   the rejection of an individual loan by FHFA's whole loan
7   purchase program, that decision making would have at best only
8   a tangential relevance to the issues to be tried here and the
9   task of tracing that decision making would be herculean and
10  extraordinarily expensive.
11          There even more reasons why the effort that would be
12  required to produce documents relating to loans rejected by
13  FHFA that found their way into supporting loan groups for at
14  securitizations is not worth a candle.
15          The defendants argue, for instance, that it might be
16  relevant to the issue of materiality to know that the FHFA was
17  not concerned when it rejected a loan that the loan failed to
18  meet certain criteria but that the FHFA is now contending in
19  the context of these actions that the failure to meet the very
20  same criteria is the evidence tending to show there was a
21  material misstatement in the prospective supplement for the
22  securitizations.
23          But the suggestion that the FHFA may have taken
24  inconsistent positions is based on pure speculation.  These are
25  not loans that FHFA once decided to purchase because it
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

106

CCHAAFHF3                     Argument

1    considered the defects to be immaterial.  They are loans that
2    the FHFA rejected and rejected under a program that had
3    different standards.
4             Moreover, the materiality assessment at trial will be
5    addressed to statements and prospective supplements that
6    describe the characteristics of an entire supporting loan
7    group.  While the falsity of the statements in the prospective
8    supplements may largely be shown through an identification of
9    defects in the sample line files and the aggregation of those
10   defects, the materiality questions arises in the context of a
11   description of a class of assets.  My point is that these are
12   distinct inquiries even if related ones.
13            To have any probative value concerning materiality the
14   defendants would have to show, among other things, that the
15   admittedly different standards in two very different purchasing
16   programs made no difference to the materiality judgment that
17   the FHFA was required to record defects when it rejected a loan
18   and that FHFA was required to record every material defect when
19   it rejected a loan as opposed to only as many as were necessary
20   to support a rejection decision and that we know with a
21   sufficient degree of certainty precisely what documents FHFA
22   had and did not have at the time it reject the loan.  That
23   latter task may not be a simple one.  The parties are
24   struggling now to identify all documents related to the
25   plaintiff's sample loans that comprised the loan origination

CCHAAFHF3                    Argument

1    files and all underwriting guidelines applicable to such loans.
2              While these issues are not issues of admissibility but
3    only of discovery it is, nonetheless, useful to reflect on the
4    lessons learned from the ordinary and daily application of
5    Federal Rule of Evidence 404(b) and 403.  The longer the chain
6    of inference and the less similar the acts, the greater the
7    danger the jury will be confused and its time wasted by
8    evidence of acts other than those at issue at trial.
9              Let me turn to another issue.
10             Many of the defendants' requests for discovery from
11   the non PLS side have been -- requests requiring broad
12   productions and extremely expensive.
13             Next, the defendants' justification for these requests
14   have shifted time and again have frequently been contradictory
15   and have been largely based on speculation.  They are what is
16   commonly known as a fishing expedition.  But, when the requests
17   are targeted, sufficiently justified and not unduly burdensome,
18   I will grant them.  Two examples will suffice from Friday and
19   there were more from today.
20             Counsel, thank you for your attention.  It's six o'
21   clock.  We'll adjourn.
22             MS. CHUNG:  Your Honor, if I may, I am sorry to say
23   this.  There was one issue that raised in one of Mr. Klapper's
24   letters from December 13 about their requests on the GSE or
25   some compensated related information.  We think the two issues

CCHAAFHF3                    Argument

1   they raised are crisply presented in the papers.  We are
2   completely willing to waive any argument on them and to make
3   ruling.
4           THE COURT:  I thought we dealt with compensation on
5   Friday.
6           MR. KLAPPER:  No, your Honor.  That was discipline and
7   I think I probably confused things.
8           THE COURT:  I think for compensation I relied in
9   preparing for last Friday on some prior transcript discussions.
10          MS. CHUNG:  I think we might be still be confusing --
11  Mr. Klapper made a request on FHFA.  He is essentially moving
12  to compel.  I wasn't meaning to go back --
13          THE COURT:  Yes.  This is the high level executives
14  compensation of the high level executes at FHFA.
15          MR. KLAPPER:  Well, it's compensation but it includes
16  high level executives, yes.  And I believe the main objection
17  that the plaintiffs had was to say that our request was
18  specific enough to call for individual people's compensation.
19  That is where we ended up on Friday when we were talking about
20  hedging that, do we go beyond the literal language?
21          THE COURT:  Yes.  This was the practice and policies
22  requests, yes.  And this is what I was thinking of earlier
23  today when I said there might be some horse trading.
24          MR. KLAPPER:  As was I.
25          THE COURT:  OK.  So good.  I don't find it encompassed

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

109
CCHAAFHF3                  Argument
1    by the request made by the defendants.  So it's beyond the
2    scope of the request, actually, made by the defendants.
3              Now, counsel, let's -- we can go off the record.
4              (Discussion held)
5              THE COURT:  Back on the record.
6              Ms. Chung, I don't want you -- I am going to designate
7    you because just I want a human being to be in charge of this.
8    I don't want to lose track of setting a date in the spring time
9    for the defendants' disclosure of alternate sets broadly
10   defined in the event that they choose not to engage in the
11   re-underwriting process.
12             MS. CHUNG:  We understand, your Honor.
13             THE COURT:  OK.  Off the record.
14                         (Adjourned)
15
16
17
18
19
20
21
22
23
24
25