# Exhibit L

```
                                                        1
        DC9MFHA1
  1     UNITED STATES DISTRICT COURT
  1     SOUTHERN DISTRICT OF NEW YORK
  2     ------------------------------------x  11 CV 5201 (DLC)
  2                                            11 CV 6188 (DLC)
  3     FEDERAL HOUSING FINANCE AGENCY,        11 CV 6189 (DLC)
  3                                            11 CV 6190 (DLC)
  4                   Plaintiff,               11 CV 6192 (DLC)
  4                                            11 CV 6193 (DLC)
  5              v.                            11 CV 6195 (DLC)
  5                                            11 CV 6196 (DLC)
  6     UBS AMERICAS, INC., et al.,            11 CV 6198 (DLC)
  6                                            11 CV 6200 (DLC)
  7                   Defendants;              11 CV 6201 (DLC)
  7                                            11 CV 6202 (DLC)
  8                                            11 CV 6739 (DLC)
  8                                            11 CV 6203 (DLC)
  9     And other FHFA cases.                  11 CV 6739 (DLC)
  9                                            11 CV 7010 (DLC)
 10                                            11 CV 7048 (DLC)
 10     ------------------------------------x
 11
 11                                            New York, N.Y.
 12                                            December 9, 2013
 12                                            2:35 p.m.
 13
 13     Before:
 14
 14                       HON. DENISE COTE,
 15
 15                                            District Judge
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
                      SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
DC9MFHA1
```

APPEARANCES

FEDERAL HOUSING FINANCE AGENCY
BY:  STEPHEN HART

QUINN EMANUEL URQUHART & SULLIVAN LLP
        Attorneys for Plaintiff
        Federal Housing Finance Agency
BY:  PHILIPPE Z. SELENDY
        RICHARD SCHIRTZER
        MANISHA M. SHETH
        ANDREW DUNLAP
        SASCHA RAND
        CHRISTINE H. CHUNG
        -and-
KASOWITZ BENSON TORRES & FRIEDMAN LLP
BY:  KANCHANA LEUNG


SULLIVAN & CROMWELL LLP
        Attorneys for Defendant Goldman Sachs
        and affiliated entities and individuals
BY:  RICHARD H. KLAPPER
        THEODORE EDELMAN
        BRADLEY A. HARSCH

SULLIVAN & CROMWELL LLP
        Attorneys for Defendant Barclays Bank
        and affiliated entities and individuals
BY:  THOMAS WHITE

SULLIVAN & CROMWELL LLP
        Attorneys for Defendant First Horizon,
        Nomura Holding, and affiliated entities
BY:  AMANDA F. DAVIDOFF

CRAVATH, SWAINE & MOORE LLP
        Attorneys for Defendant Credit Suisse
        and affiliated entities and individuals
BY:  LAUREN A. MOSKOWITZ
        OMID NASAD

SIMPSON THACHER & BARTLETT LLP
        Attorneys for Defendants RBS Securities,
        Deutsche Bank, and affiliated entities
BY:  DAVID J. WOLL
        ANDREW T. FRANKEL

```
                                                      3
         DC9MFHA1
 1                        APPEARANCES (cont'd)
 2  WILLIAMS & CONNOLLY, LLP
 2       Attorneys for Defendants Bank of America Corporation,
 3       Merrill Lynch, and affiliated entities
 3  BY:  EDWARD J. BENNETT
 4       BETH STEWART
 4       MAHMOOD AHMAD
 5       ERIC BLANKENSTEIN
 5
 6  DAVIS POLK & WARDWELL LLP
 6       Attorneys for Defendant Morgan Stanley
 7       and affiliated entities and individuals
 7  BY:  BRIAN WEINSTEIN
 8       NICHOLAS GEORGE
 8
 9  RICHARDS KIBBE & ORBE, LLP
 9       Attorneys for Numerous Individual Defendants
10  BY:  H. ROWAN GAITHER
10       KATHERINE HARRINGTON
11
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DC9MFHA1

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Counsel for the plaintiffs, please
 3   state your names for the record.
 4              MR. SELENDY:  Good afternoon, your Honor, Philippe
 5   Selendy for FHFA.  With me at counsel table from Quinn Emanuel
 6   are Richard Schirtzer, Christine Chung, Sascha Rand and Manisha
 7   Sheth.
 8              MR. HART:  Stephen Hart, deputy general counsel for
 9   FHFA.
10              MS. LEUNG:  Kanchana Leung from Kasowitz Benson on
11   behalf of FHFA.
12              THE DEPUTY CLERK:  For defendant Goldman Sachs.
13              MR. KLAPPER:  Good afternoon, your Honor, Richard
14   Klapper of Sullivan & Cromwell for Goldman Sachs.  With me are
15   Bradley Harsch and Theodore Edelman.
16              THE DEPUTY CLERK:  For Barclays Bank.
17              MR. WHITE:  Good afternoon, your Honor, Thomas White
18   from Sullivan & Cromwell.
19              THE DEPUTY CLERK:  For First Horizon National
20   Corporation and Nomura.
21              MS. DAVIDOFF:  Good afternoon, Amanda Davidoff from
22   Sullivan & Cromwell.
23              THE DEPUTY CLERK:  For Credit Suisse.
24              MS. MOSKOWITZ:  Good afternoon, your Honor, Laura
25   Moskowitz from Cravath Swain & Moore.
```

DC9MFHA1

```
 1                THE COURT:  And you are with someone, Ms. Moskowitz?
 2                MS. MOSKOWITZ:  Yes, your Honor.  He's not on the
 3    appearance sheet.  One of our associates, Omid Nasad.
 4                THE DEPUTY CLERK:  For RBS Securities and Deutsche
 5    Bank.
 6                MR. WOLL:  Good afternoon, your Honor, David Woll and
 7    Andy Frankel.
 8                THE DEPUTY CLERK:  For HSBC.
 9                MR. CONLON:  Good afternoon, your Honor, John Conlon
10    and Michael Ware from Mayer Brown.
11                THE DEPUTY CLERK:  For Bank of America and Merrill
12    Lynch.
13                THE COURT:  We missed Ally Financial.
14                No appearance for Ally Financial and no appearance for
15    Ally Securities
16                MR. WARE:  We are gone.
17                THE COURT:  You are here, but you are gone.
18    Congratulations, and thank you for appearing.
19                THE DEPUTY CLERK:  For defendants Bank of America and
20    Merrill Lynch.
21                MR. BENNETT:  Good afternoon, your Honor, Ted Bennett,
22    Beth Stewart, Mahmood Ahmad, and Eric Blankenstein from
23    Williams & Connolly for Bank of America and Merrill Lynch.
24                THE DEPUTY CLERK:  For Morgan Stanley.
25                MR. WEINSTEIN:  Good afternoon, your Honor, Brian
```

6

DC9MFHA1

```
 1   Weinstein and Nicholas George from Davis Polk.
 2             THE DEPUTY CLERK:  For SG Americas.
 3             THE COURT:  No appearance.
 4             THE DEPUTY CLERK:  For the individual defendants,
 5   George Carp and others.
 6             MR. GAITHER:  H. Rowan Gaither with Richards Kibbe &
 7   Orbe, LLP.
 8             With me this afternoon is my colleague Katherine
 9   Harrington.
10             THE COURT:  Is there any other individual defendant
11   who has an appearance to place on the record?
12             Is there any other defendant who has an appearance to
13   place on the record?
14             Thank you, all.
15             I have received, as I was walking on the bench, a set
16   of charts and I appreciate that, Mr. Klapper.  Thank you.
17             We are having a conference because of a series of
18   letters that I received.  They were three letters dated
19   November 15.  One letter was sort of addressed to the
20   timeliness of the request generally and one letter had to do
21   with requests for further discovery from the GSEs and FHFA
22   concerning bulk purchases, and another letter had to do with
23   purchases by the GSEs through the flow process.
24             And in response I received letters, two letters of
25   December 6 from the FHFA.  Now, there are other letters that
```

7

DC9MFHA1

 1  preceded these.  And, in particular, with respect to bulk
 2  purchases, I reviewed Quinn Emanuel's letter of November 22.
 3  And with respect to flow purchases, I reviewed letters of
 4  October 4 and November 6 from Quinn Emanuel.
 5          The issue of discovery from the plaintiff has resulted
 6  in many conferences and an opinion of June 28 of this year and
 7  other rulings of the Court.  So I think that's all we need in
 8  sort of setting the stage for today's conference.
 9          I thought it might be helpful to break it down into
10  those separate discovery requests of discovery requests
11  associated with a program of purchasing whole loans as part of
12  the continuous stream or flow and the separately negotiated
13  purchases, the bulk purchase program.
14          Let's start with flow purchases.  And I suggest we
15  start with them because I understand that that program was the
16  larger program within the GSEs.  I understand that they made
17  approximately 80 percent of their whole loan purchases as part
18  of the flow program or lender channel as it's also referred to.
19  I don't believe they made any subprime purchases, but they made
20  some Alt A loan purchases.  And I know someone is going to tell
21  me at some point and remind me what percentage of the
22  supporting loan groups in our securitizations are Alt A versus
23  subprime, but my recollection was that the Alt A was very much
24  a minority position in the supporting loan groups for the
25  securitizations that are at issue in this litigation.

8

DC9MFHA1

1          But the earlier letters from October and November from
2    FHFA described in detail what FHFA was able to determine about
3    the extent to which the originators' guidelines might have
4    played a role in the acceptance into the flow channel of
5    purchase of an Alt A mortgage, and it differed a little bit,
6    depending on whether you're talking about Fannie Mae or Freddie
7    Mac.  Alt A loans or mortgages, as I understand it, were a
8    minuscule portion of the Fannie Mae purchases, fewer than, I
9    think, 2 percent a year.
10          With respect to Freddie Mac, Alt A purchases through
11   the flow program constituted a somewhat larger proportion,
12   somewhere, depending on the year, between 3 and 10 percent,
13   looking at the years 2005 to 2007, which are important years
14   for us.
15          And we will or won't need to get into more exhaustive
16   analysis of the information conveyed to me in the October 4 and
17   November 6 letters, but I think that sort of sets the stage a
18   little bit for the consideration of the requests made by the
19   defendants in connection with mortgages, whole loan mortgages
20   purchased through the flow program.
21          This is fundamentally your request, Mr. Klapper, so I
22   thought it might be helpful to start with you.  And I hope you
23   think it's helpful, also, to split it between the two different
24   programs.
25          MR. KLAPPER:  I do, your Honor.  May I use the podium,

9

DC9MFHA1
1  please?
2              THE COURT:  You may.
3              MR. KLAPPER:  Where I would like to start is a
4  definitional problem, and that is that the definition that
5  Fannie and Freddie use of subprime is unusual, as I understand
6  it, it's only loans purchased from subprime originators.  And
7  that's the subject of the SEC's lawsuit against the former
8  executives of Fannie and Freddie where the SEC says that that
9  was fraudulent.
10             The reason they say that is because Fannie and Freddie
11 purchased a lot more subprime loans under a more normal
12 definition than they disclosed under this definition.  That's
13 the first two charts of the demonstratives that I handed up.
14             These are taken from the dissenting report of
15 Commission Peter Wallison from the Financial Crisis Inquiry
16 Commission, and he in turn gets his numbers from work done by
17 Edward Pinto, who is a former chief credit officer of Fannie
18 Mae and is now at the American Enterprise Institute.  And what
19 Mr. Pinto did is to use the office of controller of currency
20 definition of subprime, which is FICO or credit scores of 660
21 or below.  That's the OCC definition.
22             And if you use that definition and a standard
23 definition of Alt A loans, which are basically loans with
24 various features that are different from the normal conforming
25 Fannie and Freddie loans, what you find is that as of June 30,
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

DC9MFHA1

```
 1    2008, right before the financial crisis, Fannie and Freddie
 2    alone held 12 million Alt A and subprime loans with an unpaid
 3    principal amount of 1.8 trillion.  That's a pretty big number
 4    by anybody's estimate.
 5              All private parties, including securitization trusts,
 6    held 7.8 million in number of Alt A and subprime loans and 1.9
 7    trillion in unpaid principal amount.  So what this demonstrates
 8    is applying a definition that the OCC believes in and looking
 9    through the loans that Freddie and Fannie held, they held an
10    enormous amount of Alt A and subprime loans.
11              If you look the at next chart --
12              THE COURT:  Since I'm just looking at this for the
13    first time and want to make sure I understand, can we pause
14    here one second?
15              MR. KLAPPER:  Certainly.
16              THE COURT:  In that category which is labeled other,
17    what does PMBS mean?
18              MR. KLAPPER:  That's Mr. Wallison's term for what we
19    call private label securities.  They are private residential
20    mortgage-backed securities.  They are the ones that are issued
21    here.
22              That other category would be loans held by large
23    originators that they didn't securitize, people like Goldman
24    Sachs and Merrill Lynch who bought whole loans and had them in
25    inventory.  It's any private party's holding of subprime and
```

DC9MFHA1

```
 1   Alt A loans.
 2            THE COURT:  But not the purchaser of a securitization?
 3            MR. KLAPPER:  Well, in a securitization it would be in
 4   the securitization trust.  So this would include all the loans
 5   that were in the securitization trust that Freddie and Fannie
 6   and lots of other people purchased certificates in.
 7            THE COURT:  Let us say one of our certificates, if
 8   there is a certificate in this case where the supporting loan
 9   group had subprime or Alt A mortgages, or a combination of
10   both, and it was purchased by one of the GSEs.  Is it counted
11   in other?
12            MR. KLAPPER:  It would be in the subprime Alt A PMBS,
13   so it is in that other category.
14            Now, Freddie and Fannie, to be sure, also held
15   probably an even more enormous number of so-called conforming
16   prime loans.  But these numbers demonstrate that at least by
17   June, end of June 2008, Fannie and Freddie held more subprime
18   and Alt A loans by number by a lot than all private parties
19   taken together and held slightly less than the -- the unpaid
20   principal amount than all private parties taken together.
21            THE COURT:  Thank you.  I'm ready to turn to next
22   page.
23            MR. KLAPPER:  The next page is purchases.
24            I think we can pretty much disregard the earlier years
25   part because they are not at issue but in part because he had
```

DC9MFHA1

1  to do some estimation for those earlier years.  But what you
2  have here is subprime PMBS.  That would be the private label
3  securities that we are talking about here, purchases by year,
4  subprime loan purchases.  Again, the definition used is credit
5  score below 660, Alt A private label securities and Alt A
6  loans.
7              And what you can see from this is that Fannie and
8  Freddie purchased in general couple of years that are
9  exceptions, but in general they purchased more subprime loans
10 by a lot than they purchased subprime, probably, securities.
11 And, similarly, they purchased more Alt A loans than Alt A
12 private label securities.
13             THE COURT:  What years would you like me to focus on?
14 It will just take me a minute, but I would like to focus where
15 you would like to focus me on.
16             MR. KLAPPER:  I think we should focus on 2005, 2006,
17 and 2007.
18             THE COURT:  Give me a second.
19             I've looked at these three columns in these rows.
20             Mr. Klapper, can you make your point again that you
21 would like me to focus on.
22             MR. KLAPPER:  Yes.  The point is that Fannie and
23 Freddie purchased enormous amounts of subprime and Alt A loans,
24 as defined by the regulator, by the office of the controller of
25 the currency.  It's not the very small part of their business

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9MFHA1

1  that their own definition would say.  And I would say that the
2  most recent letters from FHFA have been careful to say that
3  they have been using the definitions that Freddie and Fannie
4  use.  I understand that.
5          But if you use a more normal definition of subprime,
6  they were a very, very large purchaser of subprime loans in
7  most years, but not all, a greater amount of subprime loans
8  than certificates in private label securitizations.  So it's an
9  important part of their business, and we have said repeatedly,
10 and I know your Honor has agreed with us entirely at least, to
11 date, but it's an important part of their business that does
12 the same thing that defendants do.
13          Flow and bulk, that's a somewhat different issue
14 because I think there is agreement now that what they did with
15 bulk purchases is pretty much the same as what we, the
16 defendants, did.  They did diligence on them to the
17 originators, guidelines.  They had, as we had, an overlay of
18 other things that they wanted diligence provided to flag for
19 them.  But it's pretty much the same process as when Goldman
20 Sachs or others purchased loans that Alt did due diligence on
21 and then securitized from.  The flow is different --
22          THE COURT:  Just before you move to flow, I am not
23 sure that they agree with you, at least, we will hear in a
24 moment.  I think it depends upon the longevity of the process
25 that you are saying they were doing the same things that the

14

DC9MFHA1

1    defendants were doing in this case.  I don't understand them to
2    be saying that their securitization process was the same in the
3    bulk purchases if that's what you are trying to tell me.
4              MR. KLAPPER:  I am not sure I understand.  Maybe I
5    have not been clear.  They purchased pools of loans.  They did.
6              THE COURT:  So I don't want to mislead you.  If you
7    are just talking about the underwriting process or the due
8    diligence process, if that's all you're focusing on.
9              MR. KLAPPER:  I'm focusing on that for now, although
10   it is true that for Freddie, at least, in their T deals, that
11   they did securitize at least some amount of those loans.  But
12   from the due diligence perspective, from the perspective of the
13   work that Clayton was doing, you heard Mr. Rothenberg,
14   Clayton's lawyer, in court saying that they did pretty much the
15   same thing for Freddie and Fannie that they did for the other
16   clients of theirs, which was a combination of looking at
17   guidelines and also flagging certain things that the client
18   wanted to look at.
19             From Goldman Sachs' perspective, we wanted them to
20   flag all condominium loans.  We wanted them to flag all
21   manufactured housing loans.  We wanted them to flag all loans
22   with a debt income of 50 percent or more, even if the
23   originator's guidelines were 55 or 60.  We wanted them to flag
24   all loans that had cash out over a certain minimal level.
25   Should we get discovery of Clayton and a Freddie and Fannie, I

DC9MFHA1

 1  believe we will see somewhat of a similar process, so it's not
 2  apples and oranges; it's apples and apples.
 3          The flow I would see is somewhat different.
 4  Understand, we are at a disadvantage here because we have not
 5  gotten discovery.  So we know what we have been told, we know
 6  what we have heard from some witnesses.  We know what we have
 7  been able to glean from documents.  And Mr. Harsch and a whole
 8  lot of other people have spent a lot of time trying to find in
 9  this large production those things that relate to single family
10  and it's been very, very difficult.
11          But we know something about their process.  We know
12  that they have quality control reviews, we know that they had
13  reviews of loans that didn't perform, as part of a process of
14  putting them back to the originators of the loans.  We know
15  that they had processes in place so that they didn't just
16  originate them through the flow process.  They did some of this
17  checking and they found what could be called defects and
18  sometimes they said that's fine, they are not defects or they
19  are not material, and sometimes they said they were material.
20  That is of great importance to us because that's what this case
21  is about at this point in the process, underwriting and
22  deciding what's material and what's not material in terms of a
23  defect.
24          We also know that they had -- this goes back to those
25  letters that your Honor referenced from FHFA in October and

DC9MFHA1

```
 1   November -- that they had either waivers or --
 2            THE COURT:  Variances.
 3            MR. KLAPPER:  Variances, yes -- that they permitted
 4   the originators to have.  And, again, we don't have many of
 5   them because we just have a few of these contracts, but those
 6   waivers and variances permitted the originator to produce loans
 7   that certainly didn't meet the standard Freddie or Fannie
 8   guidelines.  We also know that when they had loans that they
 9   purchased from originators, they not only wanted them to meet
10   their Freddie and Fannie guidelines with waivers and variances,
11   but they also wanted them to meet the originator's guidelines.
12            So they would review the originator's process and
13   guidelines before they would go ahead and purchase loans from
14   the originator.  So we have many of the same originators, we
15   have many of the same guidelines, we do have the Fannie Freddie
16   guidelines, although Goldman Sachs had a similar set of
17   guidelines itself.  Generally speaking, it set out what loans
18   that met the originator's guidelines, Goldman Sachs, would
19   purchase.
20            So we have a process that, again, as far as we can
21   see, without discovery, that is in many respects similar.  It's
22   different in the sense that there is not a prepurchase due
23   diligence process.  They did do some amount of sampling,
24   generally, after the purchase.  But they didn't do what we did
25   or what they did in the bulk area, which is to do the due
```

DC9MFHA1

1  diligence before you bought the pool of loans.
2            So what we have requested --
3            THE COURT:  We are still now on the flow.
4            MR. KLAPPER:  We are on the flow.  What we have
5  requested is information that relates to the work that they do.
6  We have tried to be narrow.  I know that FHFA doesn't agree
7  with our assessment of whether we are narrow, but we have
8  tried.
9            And the things that we have asked for, which are
10 Exhibit A on our letter on flow, first off, the documents that
11 they looked at to reach the conclusions that they reached in
12 their letters, so this would be the agreements with the
13 originators and the various amendments and the like that
14 reflect variances and waivers, so that we are able to see the
15 same thing that they see and either confirm or not their
16 conclusions.
17           We have identified some people who were involved with
18 the flow and pre and postpurchase reviews of these loans.  And
19 we are certainly willing and think it would be a good idea to
20 talk about how to make that review as targeted as possible.
21 These are the people who are doing reviews of these loans, both
22 pre and post purchase.  There is a group site called Alt A
23 transformation, e-mail alias, which was the Fannie Mae e-mail
24 that Alt A variations were sent.  I have no idea how much
25 material went into that.

DC9MFHA1

```
 1               Certainly, again, we would be willing to discuss
 2      burden, if there is a burden there.  Documents sufficient to
 3      show the variances or waivers.  If there is some place where
 4      you can get documents that lay out these variances and waivers,
 5      we would like to see those, and documents sufficient to
 6      identify exceptions or defects that they identified in their
 7      loans, and then documents sufficient to show the performance.
 8               So we are not requesting a wholesale production on
 9      their part.  I think we have gotten to this point rather late
10      in the game, in part because it's been difficult for us to
11      understand how exactly they did the flow business from the
12      outside.  We are more knowledgeable about it now, thanks to
13      their letters, some testimony, some documents.  But even now we
14      are seeking discovery in part to test the hypothesis that what
15      they did in the flow area was different.  And I do think that
16      one of the ways we got to where we are is, there has been a
17      fair amount of argument on both sides that I would classify as
18      going to the weight rather than discoverability.  There has a
19      lot of been of, these loans are different than your loans.
20      That's a discussion.  That's an argument you make at trial,
21      assuming that we get discovery and assuming that we believe
22      that there is some weight to evidence coming from the bulk or
23      the flow documents.  And then we put them in.  And then they
24      can argue that this is apples and oranges.  It's not, I
25      believe, a proper reason to deny discovery.  Burden might be.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9MFHA1

1   But to deny discovery on the grounds that they assert that this
2   is apples and oranges is really taking a question of weight and
3   using it to decide discovery, and we don't think that that's
4   appropriate.
5           We have also pointed out, and this is the remainder of
6   my demonstrative, we have also tried to point out a little bit
7   of how we got here.  We don't have it in the demonstrative, but
8   your Honor recalls that we had a hearing in front of your Honor
9   back in July of 2012.  Among the topics was discoverability of
10  the single family side.  Your Honor held that you would not
11  order that.  I think it was subsequent.  But perhaps it was at
12  that conference.  You said that you would consider more
13  targeted requests.  So as we moved into the fall we did make
14  some targeted requests.  We don't have it here, but Ms. Shane,
15  who somehow is here today in the back was the first --
16          THE COURT:  Welcome, Ms. Shane.
17          MR. KLAPPER:  She had a letter, I believe, it was
18  December 7, which looked for some due diligence material.  I
19  had a letter December 12, 2012, which is, there is a pullout
20  from that letter on the third slide of the demonstrative.  And
21  we talk about, in particular, a Fannie Mae bulk purchase of
22  subprime loans, and we sought various information on
23  pull-through rates and waivers and things like that.
24          They responded that on December 14 that the requested
25  documents relate to loans other than those in the

20

DC9MFHA1

```
 1   securitizations collateral pools.  That much I think we can
 2   agree on.  The loans in the collateral pools are unsettled
 3   loans, at least ones that they are purchasing are not literally
 4   the same loans.  Having different characteristics, we would not
 5   agree with that, made to different borrowers.  Well, I don't
 6   know that we can actually say that.  One would expect that they
 7   are different borrowers, unless borrowers bought several
 8   properties.  And unwritten to different guidelines.  That,
 9   also, certainly on the bulk side has turned out not to be true.
10           THE COURT:  All of this is complex and nuanced.
11           MR. KLAPPER:  It is indeed, your Honor.  But, for
12   example, and take just --
13           THE COURT:  To stick with the flow, I'm just trying to
14   understand the argument and the context.  And let's deal with
15   all the flow issues with care and then we will go to the bulk
16   issues and deal with those in care.  I am just trying to
17   understand in a very general sense.  I think I understand your
18   first point, which is that those figures that I started with,
19   that there are no subprime loans in that flow program, which is
20   about 80 percent of the whole loan purchases.  And there were
21   Alt A loans purchased and trying to put some numbers on those,
22   that that may not be reliable.  Because if you use the OCC
23   definition with this 660 or below score as the cutoff, that the
24   numbers may be very different and there might be subprime and
25   more Alt A within the flow category.
```

DC9MFHA1

```
 1                Do I understand that first point?
 2           MR. KLAPPER:  Yes, you do, your Honor.
 3           THE COURT:  We have then this continuous stream of
 4    purchases with a larger component of subprime in Alt A as the
 5    defendant's fear might be present there, using the OCC
 6    definition.  And, yet, as I understand it, the flow is a
 7    continuous program because the GSEs have put out there the
 8    guidelines or guides that will govern that program.  And if
 9    your loan meets that set of guides, again, this is subject to
10    distinctions we will get to, but the starting point is, then
11    they might qualify for admission into the program, right?
12           MR. KLAPPER:  Yes.  Although then we get to the world
13    of variances and waivers.
14           THE COURT:  That's right.
15           MR. KLAPPER:  And the disagreement that we have with
16    FHFA as to whether those variances and waivers, as we see it in
17    documents that we have been able to identify, effectively
18    permitted the originator to originate in accordance with its
19    guidelines or whether, as FHFA would have it, that the
20    variances and waivers had to do with other things.  And we are,
21    again, at a disadvantage because while we have a few of these
22    agreements and amendments with the waivers and variances, we
23    don't have what they have and have looked through.  But we do
24    have documents, and they are in Mr. Harsch's declaration, that
25    make the statement that for people like Countrywide and others,
```

22

DC9MFHA1

1  they were in the Alt A world, underwriting to their guidelines
2  and that there were waivers --
3           THE COURT:  I'm sorry.  When you use they, they were
4  underwriting to their guidelines?
5           MR. KLAPPER:  Correct.
6           THE COURT:  I just want to make sure I'm understanding
7  who the they is.
8           MR. KLAPPER:  Countrywide.
9           THE COURT:  Countrywide was underwriting to its
10 guidelines.
11          MR. KLAPPER:  Its Alt A clients guideline.  There were
12 these credit boxes called various things, so that we in some
13 evidence of these, example or two.  And what they would do is
14 circumscribe that universe in some way that Freddie or Fannie
15 were comfortable with, as would Goldman Sachs on occasion
16 certainly with its conduit program.
17          (Continued on next page)
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

Dc9efhf2

```
 1              MR. KLAPPER:  So what you have is underwritten to the
 2     guides, but sometimes the guides with the waivers and the like
 3     don't completely match up, so that they won't end up being
 4     exactly the same.
 5              Now, what we've done is we've looked at the loans
 6     underlying our pools and see whether or not they can fit within
 7     that credit box, if you will, the requirements from the types
 8     of loans that Fannie and Freddie would buy.  And for the
 9     all-day-longs, if I've got my numbers right -- Mr. Harsch will
10     correct me -- it's something like 70 percent.  So what we're
11     talking about are loans that are underwritten in the initial
12     instance to the originator's guidelines, limitations put on by
13     Fannie and Freddie, but ones that the loans underlying our
14     securitizations would fit within those parameters.
15              So we're not talking again of apples and oranges.
16     We're talking about loans that could have been sold to Fannie
17     and Freddy, and sometimes they bid on the same pool, some of
18     which they bought whole loan and some of which they had put
19     into a private labeled securitization which they then purchased
20     it.  So you are talking about the same kinds of loans.
21              Now, they make this point that the guidelines are
22     different, which is a little bit odd to me that they would make
23     this, given the enormous amount of effort that they and we have
24     all had to try to find the applicable guidelines for the
25     originators for the loans that went into the securitizations at
```

Dc9efhf2

```
 1   issue in this case.  It's not like there's a single guideline
 2   anywhere that, you know, is the be all or end all.  They have
 3   their guidelines, we have our guidelines, Countrywide has its
 4   guidelines.  Everybody's got different guidelines, and they
 5   seem to change every other week.
 6            The important point is that they were underwritten to
 7   those guidelines in the flow business sometimes pre, mostly
 8   post.  They reviewed both by sampling to try to have quality
 9   control and targeted, when loans didn't perform -- and they
10   checked and said, well, you know, were those representations
11   about the characteristics of those loans, were they correct?
12   Were there compensating factors?  Was this defect material?
13   And partly did that so he could do put-back claims, but in part
14   just quality control.  And that's important, because that gave
15   them knowledge of whether or not these originators in the same
16   types of loans, sometimes in the same pools, where they bought
17   some of the pool and they had another part of the pool go to a
18   securitization, whether those originators were actually
19   underwriting to their guidelines, whether there were defects,
20   whether those defects were material and whether they were a lot
21   of them or a little of them.
22            And so this information would give us insight into how
23   they treated defects or not; how they determined compensating
24   factors.  There's an example in Mr. Harsch's declaration of an
25   instance where Clayton identified the loan as being --
```

Dc9efhf2

1           THE COURT:  Clayton, that wouldn't be in flow; that
2  would be in bulk.
3           MR. KLAPPER:  But they did the same sort of thing in
4  flow for the loans that didn't perform well.  And on a sample
5  basis --
6           THE COURT:  You know, I know that you've been deeply
7  immersed in this for a long time, but for me, it's going to be
8  simpler if we can stay on one side and then move to the other.
9           MR. KLAPPER:  I understand, your Honor.
10          THE COURT:  Okay.
11          MR. KLAPPER:  So the on the flow side, they did
12  reviews; some prepurchase, largely postpurchase.  Some of those
13  reviews were just samples, literally samples, that they would
14  do to see whether or not the loans they were buying in this
15  flow program, whether they were what they were representing to
16  me.  Some of them were targeted, especially with respect to the
17  loans that hadn't performed.  But they did do these reviews.
18  And one of the things they were looking at in these reviews,
19  especially the ones targeted towards the loans that didn't
20  perform, was to determine whether or not there had been a
21  material misrepresentation, you know, a material flaw in the
22  loan; whether it's that the stated income was not believable,
23  whether other things were not reliable.  So they did do this
24  work on the flow side.  It's not just on the bulk side.
25          THE COURT:  And give me that last point again.  I

26

Dc9efhf2
1   think I have your first point, is to get an understanding of
2   the GSE's knowledge of the originators' underwriting, to the
3   extent it met the originators' guidelines.
4             MR. KLAPPER:  Right.
5             THE COURT:  Your second point was, as I understood
6   it --
7             MR. KLAPPER:  Materiality.
8             THE COURT:  -- how did the GSEs treat defects that
9   they uncovered through their reviews?
10             MR. KLAPPER:  Correct.  That --
11             THE COURT:  And your third point --
12             MR. KLAPPER:  Well, I would say the second point goes
13   to materiality.
14             And then the third point is, of course, diligence,
15   reasonableness of our diligence; what they did in terms of
16   loans they were buying which went into securitizations but also
17   went on the books.  And they pointed out that they retained the
18   risk in the securitizations.
19             So given all this risk that they were undertaking,
20   what did they think was adequate care?  What did they think --
21   what did they do in practice to try to ensure that they were
22   buying loans that were what they thought they were?  And you
23   know, the knowledge point, I know we've had a lot of discussion
24   over the last couple years about knowledge.  The one part of
25   the knowledge point that I do hope is not debatable is if
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

Dc9efhf2

1   Freddie or Fannie had knowledge that an originator's -- an
2   originator was not following its guidelines and was buying
3   whole loans and was buying securities and securitizations with
4   the same kinds of loans from the same originators, that that
5   would at a minimum start the clock running for inquiry notice.
6          I know your Honor has said that -- and said about this
7   point that if the loans are different, the fact that an
8   originator is not working to its guidelines and loans, that
9   you're buying whole loans might not necessarily trigger notice
10   about what are the loans in the securitizations that you're
11   buying.
12          But we have had testimony since that point that makes
13   the point that Fannie and Freddie thought the loans they were
14   buying were better quality loans than the ones that went into
15   the securitizations from the same originators.  So, you know,
16   take the example of that credit matrix, that they thought that
17   the loans that they weren't buying in whole loan form were not
18   as good credit quality as the loans that they were buying in
19   whole loan form.  So, you know, at trial or in a motion, you
20   know, it may be that FHFA will argue, and it may be that
21   they'll convince your Honor, that there isn't a close enough
22   tie between what they were seeing on their whole loan flow side
23   and what was going on, what went into the private label
24   securities.
25          But, again, that's a question of at this point weight,

28

Dc9efhf2

1  not discoverability.  At this point we've been relegated to
2  kind of picking the crumbs off the floor, rather than getting
3  the real meat of the information about this diligence, about
4  these waivers and variances, the sorts of things where we think
5  we've made a pretty good showing.  But it's been a hard
6  process, and we think there's a lot more information there that
7  we're entitled to.
8       And at the end of the day, they're still going to have
9  the argument that it's different.  At the end of the day, I
10  could easily see Mr. Selendy getting up there and arguing to
11  the jury, or maybe at admissibility stage arguing to your
12  Honor, you know, these are too difficult, and here are my
13  facts.  And they should be excluded, or the jury shouldn't
14  believe that we should have been on notice or shouldn't believe
15  that there is -- that this is evidence of materiality.  But
16  that's an argument he can and should make down the road, not an
17  argument to prevent us from getting discovery.
18       THE COURT:  So I appreciate that, Mr. Klapper, but, I
19  mean, I do want to just to put this in context.  Not only is
20  document discovery over by a long time; deposition discovery of
21  the parties is over.  So there's still some third-party
22  deposition discovery going on.
23       This was to be my first trial, UBS trial.  Right now
24  my first trial in this litigation is the Merrill Lynch trial in
25  June.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Dc9efhf2
```
 1              And by the way, I forgot to let everyone know, I have
 2     two colleagues who have made themselves available for the fall
 3     trials.  There are six cases slated for trial in the fall,
 4     three with three backups.  So there are three of us committed
 5     also for the trial program in the fall.
 6              So another preliminary point.  There was a lot of
 7     discovery taken of the GSEs.  I'm not just going to regurgitate
 8     my opinion from June 28th.  And so I don't think characterizing
 9     it as crumbs is necessarily an accurate term.  But what we're
10     talking about is whether at this stage, and meeting the
11     standards set forth in the June 28th opinion, late targeted
12     discovery of additional documents is or isn't appropriate.
13              So coming back to the flow side, just before I let
14     FHFA be heard, just so I can make sure I understand your point,
15     in the November 6th letter they describe a review of all the
16     master agreements, amendments and associated variances and
17     waivers, depending on whether you're talking about Fannie or
18     Freddie, for all the loans originated, as I understand it, by
19     an originator who was responsible for at least 2 percent of the
20     alt A loans supporting our supporting loan groups.  So anybody
21     who did any -- I don't want to say substantial.  The cut-off is
22     far below that.  And for Fannie there were 60 master
23     agreements, 1,350 amendments, 730 variances.  And of those 730
24     variances, 30 mentioned lender guidelines.  And the figures for
25     Freddie, as I understood it, were 16 master agreements, 90
```

30

Dc9efhf2

1    amendments, 370 variances, and 10 of those 370 mentioned lender
2    guidelines.
3            So just stepping back again in the flow program -- and
4    I think you're in agreement with this in the way you're
5    describing it -- is that the purchases through the flow program
6    were principally pursuant to the standard set forth in the GSE
7    guides.  Then there were variances and waivers of those.  And
8    then a minuscule portion of those variances and waivers made
9    some sort of reference to the lenders, the originators'
10   guidelines.  And then you have a description of the more
11   detailed study of that subset.  And your argument that further
12   discovery is essential is because the GSE's purchases through
13   their flow programs would have given them particular insight
14   into the extent to which these loans conformed or did not with
15   the originators' guidelines.
16           MR. KLAPPER:  That's right.
17           THE COURT:  Good.  I just want to make sure I
18   understood that.
19           MR. KLAPPER:  Let me remark on that point that your
20   Honor referenced.  Just because a waiver or variance doesn't
21   mention the originators' guideline doesn't mean that the waiver
22   or variance was intended -- was not intended to make the
23   originators' guidelines fit within the Freddie/Fannie
24   standards.  Again, we don't have all these documents, but I
25   could easily see that somebody's alt A program has certain ways

Dc9efhf2

 1   in which it doesn't quite match up with the Freddie/Fannie
 2   program.  They come in and say, would you waive, would you vary
 3   your guidelines so that we can just sell you our alt A loans
 4   according to this program or that program, without having to
 5   worry about the mismatch at a certain point.
 6           Now, that wouldn't require -- at least theoretically,
 7   and about all I can do at this point is theorize -- that
 8   wouldn't require that it said these loans will be underwritten
 9   to X originators' guidelines.  It could simply say, our
10   guidelines are varied in the following ways.  We have stated
11   income loans.  We reduce the loan to value slightly or the debt
12   to income slightly so that it would match up.  And what we do
13   know is that there are documents in the documents that we have
14   got that talk about waivers and variances in order to permit
15   loans underwritten to X originators' guidelines to be purchased
16   by Freddie and Fannie.
17           So the fact that they've reviewed these waivers and
18   variances and haven't seen explicit references to the
19   originators' guidelines I don't think ends the inquiry.  And
20   that's one reason why we believe we're entitled to discovery of
21   what they looked at and to see whether or not what they're
22   saying is right.  I mean, it may be literally right, but it may
23   not be substantively what we're looking for.  What we're
24   looking for is to see were there are variances and waivers that
25   made it possible for a Countrywide or Wells Fargo or whomever

32

Dc9efhf2

1   to sell their alt A loans to Fannie and Freddie in the flow
2   program by just applying their own guidelines for a particular
3   program.
4           So I just want to be clear that I don't think that
5   what they've said gets the job entirely done.  All it does is
6   say there weren't explicit references that say Countrywide's
7   guidelines control, but it could very well be that effectively
8   that worked because of the adjustments in the waivers or
9   variances.
10          THE COURT:  So your concern is, though a particular
11  variance or waiver did not identify any particular aspect of
12  the originators' guidelines, it may nonetheless have been
13  consistent with, or indeed, adopted an originator's guideline
14  in a particular aspect?
15          MR. KLAPPER:  Yes.  And what I do know is from Goldman
16  Sachs, in its so-called conduit program, which is more or less
17  like a flow program except that Goldman Sachs' diligence stole
18  those indeed in the conduit program -- but if an originator --
19  and so Goldman Sachs had its own guidelines that you were
20  supposed to meet.  If an originator's guidelines were
21  immaterially different than the Goldman guidelines, they would
22  tweak the guidelines and let them originate to their own
23  guidelines.  And I could easily imagine the same thing
24  happening for Freddie or Fannie, because, understand -- and
25  Mr. Harsch's declaration points this out -- you can't divorce

Dc9efhf2

1  our assessment of this from the record evidence that
2  demonstrates that Fannie and Freddie were extremely anxious to
3  be able to participate more in the alt A and subprime markets.
4  They were very anxious to do that.
5          And so one could easily see -- I mean, the whole alt A
6  and subprime purchases by Freddie and Fannie were different
7  from its conforming prime loan purchases.  And they themselves
8  were worried that they were following the market down in terms
9  of credit standards.  And so you could easily see, if some big
10 originator comes in and says, you know, I'm willing to do this,
11 I'm willing to sell you loans in the flow program but I've got
12 a problem because you're just a little off where my guidelines
13 are, if you can modify them, then I can just, you know, do what
14 I do selling loans to anyone else, I'll sell them to you.
15         That's one of the problems we see which, again, we
16 don't know it to be the case, but I can easily see it being the
17 case.  And it's more consistent with the documents that we do
18 see, which talks about changing, modifying the guidelines to
19 conform to the originator's guidelines.  And I could easily see
20 that happening without saying originator's guidelines control,
21 which is apparently what they were looking for.
22         THE COURT:  Thank you.  And I'll turn to FHFA, but I
23 just want to make two other observations so that I can
24 completely respond to some other aspects of Mr. Klapper's
25 presentation.

34

Dc9efhf2

1           You know, it would be far easier for a court to say
2   just yes to any discovery request and overrule any objections
3   to discovery.  And I know no party would want me to proceed
4   that way; that there are standards for discovery, and it's not
5   just the wild, wild west under the Federal Rules of Civil
6   Procedure, and every party bearing the burden of litigating in
7   America must have open file discovery without any limitation.
8           So the standard certainly is not at one extreme
9   whether it's admissible in court and could be brought to the
10  jury's attention appropriately in a summation.  That would be
11  far too restrictive, and I don't think anyone is suggesting
12  that an admissibility standard has been the standard I've
13  applied here.  At the other extreme would be no limitations
14  whatsoever, and you just serve your document demands and get
15  anything you list there.
16          So there is some middle ground, which I've tried to
17  explain over and over again what my standards are and what I'm
18  trying to do here.  And my starting point, but only my starting
19  point, is understanding the burdens that the parties will face
20  at trial and what they need in order to prepare their claims or
21  defenses for trial.  That's just so I understand in a general
22  way what relevance is.
23          And then we go beyond that to put you in a position to
24  prepare for trial and analyze the strengths and weaknesses of
25  your case.  And with respect to single-family side production

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Dc9efhf2
```
 1   of documents regarding originators, I described that document
 2   production.  It's already been ordered in this case in the
 3   June 28th opinion, and I won't repeat that now.
 4              MR. KLAPPER:  I understand, your Honor.
 5              I do with some trepidation make the point that there
 6   is another case involving FHFA in Los Angeles.  It's in the
 7   Countrywide multidistrict, where Judge Pfaelzer has ordered
 8   FHFA to produce documents relating to the single-family side.
 9   I'm not in that case so I have no idea what the contours are of
10   that production, but one of the things we're all very attuned
11   to is burden.  And to the extent that they're already doing it,
12   one would think that the incremental burden would not be
13   significant, although I also would have said that I think about
14   the Clayton reports, which I believe are so clearly relevant
15   here, and Clayton was willing to hand them over without any
16   assertion of burden.
17              And finally, unless you want me to move to the bulk
18   side, you know, it is unfortunate that we're standing here now.
19   Depositions of parties have concluded.  Document production of
20   the stragglers has concluded with respect to the parties.
21   Nonparties are going forward.  But this is a big, big, big
22   case.  People have paid billions of dollars to resolve this
23   case.  And I think it would be a mistake.  It would not be in
24   accord with Rule 1, which your Honor likes to cite to us, which
25   is important to us.
```

Dc9efhf2

```
 1              And so we have to manage with where we are.  I'm not
 2    suggesting we can turn back the clock to July of 2012, but on
 3    the other hand, we've gotten to where we've gotten as, we
 4    pointed out, perhaps by some missteps along the way by us.
 5    We've pointed out some things that FHFA said that we believe
 6    have turned out not to be accurate or completely accurate, some
 7    of which your Honor relied on.  And we have some of these in
 8    our demonstratives.
 9              THE COURT:  Well, you know, if there's anything that
10    you think has misled me and that I've relied on, we should deal
11    with that with laser-like intensity.  I don't want to just let
12    that reference pass and not address it.
13              MR. KLAPPER:  Yes.  Now, we've been very careful, or
14    at least I have tried to be very careful, to speak of
15    misstatements rather than anything intentional, because I don't
16    have a basis to conclude that anybody on either side here
17    intentionally did anything to mislead the Court.  But, you
18    know, you take, for example, we have a slide on this at page 8,
19    representation made to the Court, kind of diligence that was
20    being done by Clayton was basically comparing the loan table to
21    the loan file.  This is at the Valentine's day hearing.
22              THE COURT:  Sounds like the Valentine's day something
23    other...
24              MR. KLAPPER:  Your Honor, and all of us would have
25    been rather doing something else.  But you know that --
```

Dc9efhf2

```
 1              THE COURT:  Excuse me one second.
 2              (Pause)
 3              MR. KLAPPER:  We pointed out that at least with
 4     respect to the Clayton work that we're familiar with, that
 5     that's not true.  And Mr. Rothenberg said the same thing.  I
 6     don't know where that came from, but it gave the impression
 7     that Clayton was not doing the same thing for Freddie and
 8     Fannie as it was for us.
 9              THE COURT:  Now, I'm trying to read the page number.
10              MR. KLAPPER:  They're a little light.
11              THE COURT:  Yes.
12              MR. KLAPPER:  This is page eight.
13              THE COURT:  No, no, no, no.  On the transcript of the
14     February 14th hearing.
15              MR. KLAPPER:  82, I'm told.
16              THE COURT:  Thank you.  That's Mr. Kasner speaking?
17              MR. HARSCH:  62.
18              MR. KLAPPER:  62 I'm told.  I'm sorry.
19              THE COURT:  Ms. Chung, you're front and center, page
20     62.
21              MS. CHUNG:  I have it, your Honor.
22              THE COURT:  Good.  So let me just put it in context.
23     Give me a moment.  (Pause)
24              Okay.  I've read the passage at page 62, and I'm happy
25     to hear you, Mr. Klapper.
```

Dc9efhf2

```
 1              MR. KLAPPER:  It's now clear -- we thought it was
 2    clear at the time based upon what we saw.  This is more on the
 3    bulk -- this is on the bulk side of things -- that Clayton and
 4    others, when they did due diligence for Freddie and Fannie, did
 5    more or less the same thing that they did for us, which is they
 6    didn't simply compare what was in the loan file to the loan
 7    table.  They also went and checked on things, like the
 8    reasonableness of stated income, if it was a stated income
 9    loan; of the representation of debt to income; employment, is
10    the person still employed.  They also checked it against the
11    originators' underwriting guidelines.  And we've gotten --
12    Mr. Harsch's declaration contains this, confirmation of that in
13    testimony from people at Freddie and Fannie.  And
14    Mr. Rothenberg also confirmed it.
15              So, you know, that statement, which may have been the
16    basis for the Court thinking that the third-party vendors --
17    well, it's on page ten, where your Honor observed in your
18    June 28 opinion that diligence of the type performed by
19    third-party vendors involved simply comparing loan tape with
20    information contained in the loan file.  Well, that's not
21    right.  And it's part of the misimpression I think that what
22    Fannie and Freddie were doing was materially different.  The
23    same slide at page ten talks about --
24              THE COURT:  Okay.  We're involved, I think, with the
25    task of trying to understand if any of my discovery rulings or
```

39

Dc9efhf2

1    any other ruling -- I'm happy to have it be any ruling -- was
2    based on a misunderstanding because of a misdescription of
3    something.  And so page 62 of the February 14th transcript you
4    contend is a misdescription.
5              MR. KLAPPER:  Correct.
6              THE COURT:  -- of the process that Clayton performed.
7              And now I'd like you to point me to what you think I
8    did in reliance on that that you would argue was an error and
9    should be changed.
10             MR. KLAPPER:  Well, the most direct statement that
11   relies on that statement in court is on our page ten of the
12   demonstrative.  This is from your June 28, 2013, opinion.  And
13   this is the middle quotation, where it says diligence of the
14   type performed by third-party vendors involved simply comparing
15   the loan tape with information contained in the loan file.
16             THE COURT:  Excuse me just one second.  I have a
17   WestLaw version with me, and I'll try to find that passage and
18   then look at the context.
19             MR. KLAPPER:  I mean, the context is we had a couple
20   other quotes here, is that this goes to the apples and oranges
21   points that we spent so much time talking about in prior
22   sessions.  And that is was what Fannie and Freddie were doing,
23   was that different in some material way from what the
24   defendants were doing?  And one of the distinctions is this
25   idea that the third-party vendor diligence was different.

Dc9efhf2

```
 1              THE COURT:  Well, I just want to pause for a moment,
 2    because looking at page 62 seems to be a discussion about
 3    something completely different.  It's talking about the
 4    reunderwriting process that involved -- that counsel know
 5    better than I involved an enormous effort.  And I think
 6    everyone would agree that the reunderwriting process that
 7    you're -- you have undertaken in the context of this litigation
 8    is different than the due diligence process that anybody
 9    performed, GSEs or defendants, at the time of the
10    securitizations.
11              MR. KLAPPER:  No, we would not agree that it was
12    different.  The work that Clayton and other due diligence
13    vendors did on the loans that they were told to do due
14    diligence on by Freddie and Fannie or by the defendants was to
15    look at those loans and compare them to loan underwriting
16    standards.
17              It is also the case, it is true what FHFA has said
18    that in addition to comparing the loans to the standards, the
19    underwriting standards, there were particular types of loans
20    with certain characteristics that apparently Freddie and
21    Fannie, and definitely Goldman Sachs and other defendants, told
22    the Claytons of the world to call -- label a three.  This is
23    what I talked about before.  There are certain types of
24    loans -- it's not that they're bad loans, but we wanted to look
25    at those loans, even though they were consistent with the
```

Dc9efhf2
1    standards.  And that's a bit of an extra, an add-on, if you
2    will, to the basic job of, were these underwritten in
3    conformity with the underwriting standards, including the
4    notion of whether or not there were sufficient compensated
5    factors if the loan didn't literally meet every one of the
6    guidelines.
7              The underwriting, reunderwriting process is the same
8    type of thing.  FHFA claims, well, the Claytons of the world
9    didn't go beyond the loan file.  Well, that's just not
10   consistent with the evidence.  They did go and try to check on
11   occupancy on occasion.  They did try to check on employment.
12   They did check on the reasonableness of stated income.  And
13   that's exactly why, in order to demonstrate that point for
14   Freddie and Fannie, as well as our own diligence, why the
15   Clayton materials are so relevant, and the advantage that the
16   Clayton materials have, and for that matter, the Freddie and
17   Fannie overrides in consideration of whether it overrides --
18             THE COURT:  I do think -- yes, maybe it's impossible
19   to stick with one topic, but we definitely are now into bulk
20   purchases.  And I do want to hear from you in detail, but I'm
21   afraid I'm not going to be able to analyze things with care if
22   we just keep switching around.
23             MR. KLAPPER:  Whatever your Honor wants to do, I just
24   was following up on this point about Clayton.
25             THE COURT:  Okay.  So I have it that the misstatement

Dc9efhf2

```
 1   is a February 14th transcript at 62.  We'll try to flag the
 2   passage that you believe erroneously relied on it.  We may have
 3   it.
 4              So, I know all of you have copies of the June 28th
 5   opinion at your fingertips, but the passage that Mr. Klapper is
 6   referring to I believe is in the -- not the analysis section
 7   but the historical section, laying out the evolution of the
 8   arguments before me.  And this is talking about the
 9   February 14th conference.  And it's picking up on what FHFA
10   stated at that conference.
11              So we'll come back to this, and hopefully before the
12   end of the day, when I can put in context how it may or may not
13   have affected some ruling I made in discovery.  I can't link it
14   up right now, but maybe counsel can help me later.
15              MR. KLAPPER:  Understood.
16              THE COURT:  Thank you very much.
17              A couple observations:  That this is a big case.  I'm
18   very conscious of that and have tried to devote the resources
19   of the court, in accordance with the size of the case and the
20   importance to all the parties, the plaintiff and certainly the
21   defendants.  And the fact that Clayton could easily turn over
22   reports and no doubt would like to in this litigation isn't the
23   beginning and end of a burden analysis.
24              As counsel well know, with every document produced,
25   there is an enormous quantity of lawyer and paralegal time
```

Dc9efhf2

1    devoted to the analysis and consideration of the documents.  So
2    burden is a complex issue in and of itself.  Sometimes a
3    third-party's production burden can be enormous; sometimes not.
4    In almost every instance, the burden on the parties who receive
5    the documents can be quite significant.  So I have to consider
6    it from that point of view also.
7           In terms of the discovery ordered in the California
8    action, I don't have access to that -- I mean, I do, I'm sure,
9    as a theoretical matter.  I don't know precisely what you're
10   referring to there, but I think you said that the California
11   court allowed discovery of the single-family side of the
12   business, but I have, too.  There have been a host of
13   categories of production from the single-family side of the
14   business, a host of targeted searches that I ordered FHFA to do
15   or they agreed to do one or the other.  So I think I'm ready to
16   hear on the flow side of the house from FHFA.
17           MR. KLAPPER:  Thank you, your Honor.
18           THE COURT:  Yes.
19           MR. SCHIRTZER:  Good afternoon, your Honor.
20           I'm going to try to respond to much of what
21   Mr. Klapper has said but not necessarily in the sequence in
22   which he said it, because I don't want us to lose the big
23   picture for some of the minutiae.
24           I do want to ask your Honor, because I'm tempted to
25   start with the purported misrepresentation about Clayton,

44

Dc9efhf2

1   whether you'd like to hold that off for bulk, because it really
2   has nothing to do with flow, or whether you'd like me to
3   address that now.
4           THE COURT:  I think it would help me to address it in
5   context of bulk, because that's where I understand the Clayton
6   due diligence analogy and actions may arise.
7           MR. KLAPPER:  Has entirely to do with bulk and nothing
8   to do with flow, so I'm happy to do that, your Honor.
9           There was, as you surmised, a lot of bleeding together
10  of Mr. Klapper's presentation between flow and bulk.  I'll try
11  as best I can to separate out those two issues entirely and
12  only address the ones that pertain to flow.
13          I will say start with one item, and that is the
14  demonstrative that was first introduced today, and particularly
15  the first two pages purporting to show the volume of subprime
16  and all-day purchases by the GSEs over a various period of time
17  and in comparison to other purchasers.
18          (Continued on next page)
19
20
21
22
23
24
25

THE COURT: Excuse me, Mr. Schirtzer. I shouldn't do this, but I need to interrupt. Mr. Klapper, it's important that we have a copy of this in the record and I'm holding up the series of charts. Could you just send me a one-line cover letter and attach them and then I can get them docketed?

MR. KLAPPER: Certainly, your Honor.

THE COURT: Thank you very much.

MR. SCHIRTZER: Your Honor, I saw this first at 11:30 this morning. I'm not really in a position to talk about the substance of the numerical calculations. I will say a couple of things.

Mr. Klapper said several times that these numbers are derived using an OCC definition. I hope it's clear to the Court that the OCC had nothing to do with these calculations. In fact, these calculations, as I understood it, were put together by the American Enterprise Institute. That's an industry group with a lot of bank support. So whether in fact the application of the OCC definition to Freddie and Fannie's holdings was correctly calculated or not is something I can't opine on.

I will note that the OCC definition of subprime is not necessarily the same as the bank's own definitions of subprime. I'm not an expert in this side of the case, but I'm told that at least Credit Suisse and probably other banks use a different definition of subprime with lower FICA scores and higher LTVs

DC9MFHA3

 1    than the one that is used by OCC.
 2              Having addressed that point, let me come back to what
 3    I think is the big picture.  We heard almost an hour and a half
 4    presentation regarding mostly flow.  And what it really amounts
 5    to at the end of the day is a full-on assault of the
 6    single-family discovery protocol that your Honor established
 7    back in July of 2012.  Because I did not hear a single
 8    suggestion that any of the discovery now being sought on the
 9    flow side would fall inside the lines of the types of
10    single-family discovery that we promise to produce and the
11    types of single family discovery that your Honor said were
12    important to produce.
13              As you well know, we offered to produce and have
14    produced any single-family documents which were considered in
15    connection with PLS purchase, was in the custody of custodians
16    who were required to share that information with PLS traders or
17    that went to the GAC risk committee with supervisory
18    responsibility for PLS.  If any of these documents that are
19    being requested today fell into that category, they would have
20    been produced, and most likely many of them have been because
21    you've got a voluminous declaration from Mr. Harsch with many
22    exhibits produced by FHFA, and in many cases produced as far as
23    back as August of 2012.
24              As your Honor also notes, for the senior risk
25    custodians, they got any single-family document if they

DC9MFHA3

1  discussed the risks associated with an originator or an
2  originator's underwriting guidelines or an originator's
3  adherence to guidelines.  And there are many, many senior risk
4  custodians who we have designated and whose files we have
5  produced on that basis.
6          The same is true or same argument could be made for
7  the new custodians that are being requested in connection with
8  this application, many of whom, by the way, your Honor, were
9  never previously requested until this point in time and who had
10  exclusive single-family responsibilities.  And on the flow side
11  it's probably instructive to focus on Mr. Klapper's Exhibit A,
12  which is titled targeted request, although anything but.
13          Let's talk about number 2, which is documents
14  concerning GAC flow purchases of Alt A levels from the files of
15  individuals responsible for or involved with performing or
16  overseeing pre and post purchase reviews of these loans and
17  assessing whether those loans conformed to underwriting
18  guidelines.  And then they list five custodians, only one of
19  whom was ever requested previously and that was Tracy Mooney.
20  Tracy Mooney was requested, I believe, around early July of
21  2012 and Tracy Mooney was not even somebody they thought
22  important enough to elevate up to the level of discussion at
23  our July 31 conference.
24          Now, from a big picture standpoint, as the Court said
25  the last time we were here, there is a benefit to not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

DC9MFHA3

```
 1    revisiting the rules every time.  And, yet, that's exactly what
 2    the flow application and, for that matter, the bulk application
 3    seek to do, revisit the rules for discovery that has either
 4    been requested previously and denied or, in several instances,
 5    both in the flow and bulk categories, discovery that is now
 6    being requested for the first time with very little
 7    justification for the -- I can't even call it an 11th hour
 8    request because it's so close to the 12th hour.
 9            Of course, the requested discovery ignores the very
10    substantial volume of single-family discovery that we have
11    already produced.  The requested discovery in many instances,
12    as I said, has previously been presented, argued, and rejected.
13    And in terms of the purported basis for reconsideration, they
14    are two.  One, defendants contend that now that they have seen
15    our reunderwriting expert report, they know that we are
16    focusing on underwriting defects that weren't apparent to them
17    before.  And so that has opened a door that allows them to come
18    in at this hour and ask for the vast volume of flow discovery
19    being sought in this Exhibit A.  And that is simply not true.
20    They have known for some time now, there has been a quite of
21    lot discussion at court hearings about the general --
22    guidelines is not the right word -- the general aspects of our
23    reunderwriting approach, what we were focusing on.  We have had
24    discussions with Daubert motions.  We have had many discussions
25    with respect to what would go into reunderwriting and the
```

49

DC9MFHA3

1  notion that the service of the reunderwriting report now
2  reopens the door for entirely new discovery requests.  I don't
3  really understand that argument, your Honor.
4          The second one which Mr. Klapper actually never got
5  around to is that we have somehow intentionally or
6  unintentionally, I think he said unintentionally, misled the
7  Court with respect to the applicable guidelines for flow loans,
8  and that our correction letters of October the 4th and November
9  the 6th now warrant a reconsideration of the Court's prior
10 rulings.
11         As your Honor seemed to understand from what I heard
12 you say, we were very, very careful in looking at the analysis
13 that went into the October 4 and November 6 letters.  And
14 really it's a question that I posed in the first instance
15 internally and to the client.  If there are a some small number
16 of guidelines or small number of variances in waivers that make
17 reference to originator guidelines, can we say that,
18 nevertheless, even within that small subset the loans were
19 originated pursuant to GSA guidelines as opposed to lender
20 guidelines.
21         And so we went through a painstaking analysis to try
22 to understand both the scope of the issue and then to look at
23 the actual answer to the question.  And the scope of the issue
24 involved three things.  In the first instance it involved
25 looking to see how many variances there were for Alt A, and

50

DC9MFHA3

1     there were none for subprime because the GSEs didn't buy
2     anything through the flow channel that they considered to be
3     subprime.  Of course, there is no variance or waiver in
4     connection with subprime, so we did that calculation.  Then we
5     looked to see how many of those, that subset, were
6     credit-related variances, and most of them had nothing to do
7     with credit.  And then we looked at those to see how many of
8     those credit-related variances actually incorporated some
9     portion of lender guidelines, and the small number that your
10    Honor has already indicated during today's discussion.
11            And then we looked further at those specific
12    guidelines to see what was really going on in the context of
13    those guidelines.  Were they simply adopting lender guidelines
14    whole hog, if you will, or were they putting limitations and
15    requirements on those guidelines.  And that is what we have
16    reported to your Honor in the October 4 and November 6 letters,
17    very painstakingly and without cherry picking, your Honor, I
18    promise you.  If there was something that we thought might be
19    of interest to the Court, we made sure to bring it to the
20    Court's attention and we come up with a list of a handful of
21    variances and waivers, frankly, mostly Countrywide variances
22    and waivers in which there is an incorporation by reference of
23    lender guidelines.  And it isn't clear from the eligibility
24    grid that, in fact, we are closer to a GSE standard loan than a
25    lender standard loan.

DC9MFHA3

```
 1              And so I stand here confident that that exercise
 2    certainly does not warrant this Exhibit A, which now requests
 3    not just the work product that we put into the process of
 4    making that determination, which is their category 1, but
 5    categories of things which were never previously requested, and
 6    that could be category 2, 3, 4, 5, and 6.  These are categories
 7    that have never come up in previous hearings.  You would have
 8    to strain to look back at their document requests and find
 9    these categories, but I certainly recall no correspondence
10    between the defendants and FHFA that gets to the level of
11    specificity requesting the documents that are now being
12    requested here.
13              THE COURT:  I agree in terms of my own recollection
14    that this is essentially, these are new names and new material.
15    But because we are always trying together to get to the merits
16    and the whole understanding of the issue, you heard Mr. Klapper
17    say, okay, very few variances or waivers mention the
18    originator's guidelines.  But maybe the process of the creation
19    of a variance or waiver was taken into account in the
20    originator's guideline in trying to get acceptance of the whole
21    loan through the flow program to the GSEs by creating a
22    variance or waiver that would bring the GSE's criteria more in
23    line with the originator's guidelines.
24              MR. SCHIRTZER:  That's not what we saw in our review
25    of the originator's guidelines.  These eligibility grids that
```

52

DC9MFHA3

1   the defendants don't seem to adequately credit fairly
2   consistently impose what we think are fairly described as
3   Fannie or Freddie limitations on the loans and the variances
4   and waivers.  Frankly, the more likely process is that lenders
5   were adjusting their standards to get closer to GSE standards
6   so that their loans would be GSE sale eligible.
7         THE COURT:  When it sold to a GSE, would you explain
8   the guarantee system to me.
9         MR. SCHIRTZER:  Your Honor, I wish I could, but I'm
10  not the right person to do that.  Maybe somebody else here can
11  answer that question.
12        THE COURT:  So a loan is purchased through the loan
13  program into the GSE system.  I am trying to understand from a
14  defendant's point of view the argument for how this -- of
15  course, I'm not beginning to deal with burden or the timing or
16  any of that.  But just to understand, from a substantive point
17  of view, the connection between that process of applying the
18  GSE's criteria which the prospectus supplements said was a
19  higher criteria than those that were applied generally to the
20  originators, that produced the loans in the supporting loan
21  groups.  What's the connection?
22        MR. SCHIRTZER:  It's a great question, your Honor.
23  And I don't really understand the connection because by
24  definition we are talking about loans that never made it to the
25  PLS traders, never made it -- or information about loans that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9MFHA3
1  never made it to PLS traders, their supervisors, the senior
2  risk custodians.  Because if it did, it would have been
3  produced and indeed has been produced.  So you're talking
4  about -- and this is so clear from your June 28 decision.  When
5  you start talking about the legal standards that apply to the
6  claims and defenses, you're talking about a completely
7  different set of loans, a vast set of loans, no doubt, on which
8  the defendants want to open the door into discovery to see what
9  was going on in that pool of loans, even though it's completely
10 different loans than the loans in the supporting loan groups.
11         To paraphrase your Honor, it's never going to
12 establish knowledge because it is by definition a different set
13 of loans.  It's never going to establish inquiry notice,
14 because, again, it's a different set of loans.
15         And, of course, in the flow context, as your Honor
16 notes on several occasions in your June 28 decision, we are
17 talking about decisions being made on individual loans, not
18 pools of loans.  And we are talking about decisions being made
19 in the context where you have repurchase rights to put the
20 loans back after they come in the door as opposed to being a
21 PLS investor.  There is a very significant difference --
22         THE COURT:  I'm sorry to interrupt, but did the Fannie
23 Mae and Freddie Mac flow program always involve a repurchase
24 contractual arrangement?
25         MR. SCHIRTZER:  I believe so, your Honor.  I can't say
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DC9MFHA3

```
 1    that with absolute certainty, but to the best of my knowledge,
 2    yes.
 3             THE COURT:  I think Mr. Klapper's first point was that
 4    understanding the flow program would have given the GSEs
 5    knowledge of whether the originators were actually underwriting
 6    it in conformity with their own guidelines.  That was his first
 7    point.
 8             MR. SCHIRTZER:  Right.  Your Honor has dealt with that
 9    very squarely in the June 28 decision.  Unless you want me to
10    elaborate on that, I think it's quite clear, to use the analogy
11    that's been used before, we cannot be talking apples and apples
12    when we are talking about a different set of loans.
13             THE COURT:  And different guidelines.
14             MR. SCHIRTZER:  And different guidelines.
15             THE COURT:  Different standards.
16             MR. SCHIRTZER:  Correct.
17             THE COURT:  Used for a different purpose.
18             MR. SCHIRTZER:  Yes.  In almost every instance except
19    the subset of the subset of the subset that I was trying to
20    describe for you where I think there could be a very reasonable
21    debate about the guideline.
22             THE COURT:  The second point that Mr. Klapper pointed
23    out was, could we learn something useful about how the GSEs
24    treated defects when they located them in this body of loans
25    purchased through the flow program to which the GSEs applied
```

55
DC9MFHA3
1   some programs of due diligence or review.
2            MR. SCHIRTZER:  Mr. Klapper buried the lead there,
3   unfortunately.  The lead is that the GSEs did not do
4   prepurchase due diligence on their flow channel purchases.
5   They did some postpurchase due diligence, consistent with a
6   party who had the contractual right to put back loans, and
7   that's where the diligence was done.  And I assume if they
8   found defects, they either decided whether to waive those
9   defects or to put back the loan, but they were not in a similar
10  posture as the defendants here, doing prepurchase diligence
11  before deciding to purchase the securitized loans.
12           THE COURT:  First of all, that review process, was it
13  made to see whether or not the loan conformed with the
14  eligibility grid or the standards set forth, generally
15  speaking, in the GSE guides, or was it applying some other
16  standard?  Do you know?
17           MR. SCHIRTZER:  As I understand it, your Honor, it is
18  the former.  The process was to determine whether it complied
19  with the GSE guidelines as modified in some cases by a variance
20  or a waiver.  That's what our folks were looking at.
21           Now we come back to the subset of the subset of the
22  subset.  If hypothetically there was some postreview in which
23  part of a variance was partial inclusion of part of their
24  guidelines, would that be looked at as well?  I imagine so, but
25  I don't know.  But as a general matter, the answer is clear,

56

DC9MFHA3

```
 1    they are looking at GSE guidelines.  And if there is a variance
 2    or waiver they would look at that, too, to make sure they
 3    complied with the variance waiver because that becomes part of
 4    the contract between the GSE and the seller in connection with
 5    the flow purchase.
 6              THE COURT:  So if the GSE found a defect in that
 7    review process and decided to shrug its shoulders and not care
 8    about that discrepancy, the issue is, what does that tell us,
 9    if anything, about, I take it, materiality of a defect found
10    when a bank performs a presecuritization due diligence review
11    comparing the loan and the supporting loan group to an
12    originator's guidelines across a universe of loans that will
13    support that certificate and about which the underwriting will
14    make a generalized statement in a prospectus supplement
15    describing conformity across the pool.
16              MR. SCHIRTZER:  That's exactly right, your Honor.
17    There are multiple levels of difference, including the fact
18    that you're talking about different loans.  Materials, as
19    you've said, is an objective standard.  At the end of the day
20    you have a representation in the prospectuses that the
21    defendants have looked at the pool of loans and winnowed out
22    the bad loans.
23              THE COURT:  The third thing that Mr. Klapper
24    mentioned, at least as I have in my notes, of potential
25    interest may sort of overlap with the second and that is the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

57

DC9MFHA3

1  extent of which the GSEs felt compelled to do any diligence at
2  all to ensure that loans -- the loans were as they were
3  represented to be.  But, I guess, again, because you had that
4  contractual right to put the loan back to the originator,
5  again, that's a very different kind of due diligence function
6  or review function in the first place.
7           MR. SCHIRTZER:  I don't see how informative that is if
8  a postpurchase due diligence subject to a purchase right
9  compared to the prepurchase due diligence that the defendants
10 were doing in connection with the securitizations.
11          THE COURT:  Is there anything else you wanted to say
12 on flow?
13          MR. SCHIRTZER:  Let me look quickly at my notes,
14 please.
15          One point I would make, and this goes to the
16 timeliness of the request, is that with respect to at least
17 some of these defendants, they have known as much about the
18 variances that are now the springboard for this discovery as we
19 have and for as long -- Mr. Harsch's declaration at paragraph
20 40 mentions Countrywide, Bank of America, and JP Morgan as all
21 parties who had variances.  Variances is a contract or a
22 modification to a contract.  There are two sides to it.  And at
23 least some of those defendants have had those variances all
24 along and never thought it was justification for the
25 broad-scale flow discovery that they seek here today.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

58

DC9MFHA3

```
 1              Your Honor, the last point I would like to make is
 2   burden because we are constantly being told that their requests
 3   are targeted.  But we actually went back to our clients to try
 4   to determine what would be involved in pulling this stuff out.
 5              And for Freddie Mac, Freddie Mac doesn't even use Alt
 6   A as an identifier in its electronic system.  So we would have
 7   to search for what would appropriately be characterized as Alt
 8   A purchases.  And then we would have to manually review the
 9   ones that have been designated as Alt A, pull documents out of
10   storage.  It would be a spectacular undertaking.
11              And similarly, for Fannie Mae, particularly for
12   categories 4, 5, and 3, again, it's a manual reconstruction.
13   And I shouldn't have left out category 1 because despite
14   defendant's belief that there is some tracking system that
15   allows us to pull up all of the master agreements and the
16   variances, in fact, just the opposite is true.  It took us
17   weeks and weeks of people manually going to files to try to
18   assemble just the subset of master agreements and variances.
19   It's a pretty substantial subset that we reviewed in connection
20   with our November 6 letter.  I basically turned the place
21   upside down to get that material.
22              To actually go back and look for all of them, which is
23   what defendants are requesting, would take months and months
24   and essentially require the cooperation of vast swaths of
25   single-family employees to go back and try to recreate who had
```

DC9MFHA3

1  variances, who had waivers, who had master agreements and where
2  they might be.
3             THE COURT:  Thank you.
4             Mr. Klapper, let's turn to bulk.
5             MR. KLAPPER:  Before I get there, just a few points.
6             On the definition of subprime, Mr. Lockhart, former
7  head of FHFA, testified subprime is less than 660.  This is
8  something FHFA, through its former director, understood,
9  requests having never been made before.  We made very broad
10 requests initially and tried to negotiate with FHFA.  On single
11 family we were precluded with the exceptions that have been
12 discussed.
13            What we have been trying to do here, and this is why
14 we talk about these reports, is to be very specific.  And, no,
15 we have not focused on some of these reports because, frankly,
16 we hadn't been at the point to understand what they really
17 were.  And in terms of focused requests we thought that
18 focusing on specific reports made sense.
19            The Harsch affidavit, paragraph 134, gives a bunch of
20 reports that Fannie Mae prepared on a regular basis, monthly,
21 apparently, which include lender exception reports and
22 exception summary reports, which are exceptions from the
23 originator's guidelines, not from the Fannie guidelines.
24            And, lastly, this idea that these are completely
25 separate loans.  Yes, they are not the loans underlying the

60

DC9MFHA3

1    securitizations, but, as I mentioned before, we presented
2    evidence that they are buying from the same originators, the
3    same types of loans to the same credit standards.  These are
4    similar loans.
5               THE COURT:  Mr. Klapper, I don't want to keep
6    interrupting, but every phrase you use, every reference to
7    something in an affidavit or a statement that these are the
8    same standards, I mean, I want to take everything you say
9    seriously, and there is a lot here.  It's very dense,
10   everything you say.  And you're entitled to have my full
11   attention.  And I don't want to keep interrupting, but you have
12   said several things here which don't sound completely right to
13   me or I don't understand.  And I would want to make sure that I
14   was responding with the care that you deserve.
15              If there is some reference to a report in an affidavit
16   that you want me to focus on, if you want to go back on flow.
17   I thought we were moving on to bulk, and reconsider any
18   particular issue, if you want me to focus on that, I will.  But
19   I am really ready to move on to bulk unless there is something
20   you care about significantly here.
21              MR. KLAPPER:  There is quite a bit, but let me focus
22   on paragraph 134 of Mr. Harsch's declaration.
23              THE COURT:  I have it.
24              MR. KLAPPER:  So this is Fannie Mae.
25              THE COURT:  Are we back on flow or are we moving to

DC9MFHA3
1   bulk?
2           MR. KLAPPER:  This is, I believe, flow.  This is
3   Fannie Mae doing the sort of review for compliance of
4   individual loans, compliance with underwriting standards.  This
5   is something that they did after purchase, as I understand it,
6   as part of the monitoring of the Alt A products, including
7   performance trends and exceptions to eligibility guidelines.
8           And then there is this table 6 that's part of
9   paragraph 134, and these are monthly reports.  So the first
10  one, the lender exception report for the top 20 lenders, loan
11  level deliveries that were outside lender's underwriting
12  guidelines.  The second one is exception summary report, again,
13  outside of lender guidelines.  Then they have other reports
14  which are with respect to the Fannie Mae guidelines.  But it's
15  just not true that they completely disregarded the lender
16  guidelines, although they definitely also looked at their own
17  outer boundary and inner boundary guidelines.  So I didn't want
18  to let it pass that these were entirely Freddie and Fannie
19  guidelines and that they had no review process to see whether
20  or not these flow loans corresponded to the originator's
21  guidelines.
22          THE COURT:  So you have pointed me to paragraph 134 in
23  order to underscore the importance of two kind of reports that
24  you believe are created in connection with the GSEs reviews of
25  loans purchased through the flow program in which the GSEs,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

62

DC9MFHA3

1    after the fact, are doing a review of the individual loans to
2    determine whether or not those loans were actually in
3    conformity with the originator's guidelines.
4              MR. KLAPPER:  That's correct, your Honor.
5              THE COURT:  And you're interested, in particular, in
6    the lender exception report and the exception summary report.
7    And is that what's captured in part by your paragraph 5
8    request?
9              MR. KLAPPER:  That's correct, your Honor.
10             THE COURT:  So I guess we will take this as one last
11   item on the flow side before we turn to bulk.
12             MR. SCHIRTZER:  Your Honor, I don't know where this
13   particular chart came from.  I don't know whether, in fact,
14   these reports were prepared on a monthly basis and, if so, for
15   what period of time.  I do know, and if I can share this
16   without waiving privilege, I just spoke the other day to
17   someone who works at Fannie's national underwriting center and
18   he said he had no idea what a lender exception report or an
19   exception summary report was.  And, consequently, it clearly is
20   not something that is being maintained on a regular basis, as
21   paragraph 134 would suggest.
22             THE COURT:  Well, we are fortunate that there are two
23   exhibits, I don't have them in front of me, Exhibits 16 and 17
24   to the affidavit.  So at least that's what it would reflect in
25   the affidavit's chart.  So we will put this to the side and we

DC9MFHA3

```
 1  will see -- we will make a schedule at the end of the session.
 2  I would ask FHFA to look at Exhibits 16 and 17, see whether
 3  they are for the flow side of business and Fannie Mae or
 4  Freddie Mac, and respond to that request for those monthly
 5  reports.
 6          MR. SCHIRTZER:  We will be happy to do that, your
 7  Honor.
 8          THE COURT:  Mr. Klapper.
 9          MR. KLAPPER:  Your Honor, just point of clarification,
10  the exhibits, Mr. Harsch's declaration is 108.  The reference
11  to exhibits in this table, which was taken from Exhibit 108,
12  were exhibits to the document that is Exhibit 108, and we need
13  to determine whether Exhibit 108 to the Harsch declaration has
14  these exhibits attached to it.
15          THE COURT:  Great.  So, Mr. Klapper, you'll get
16  Mr. Schirtzer the right documents that are the two examples.
17          MR. KLAPPER:  Yes, your Honor.
18          THE COURT:  Thank you so much.
19          Mr. Klapper, bulk.
20          MR. KLAPPER:  Bulk.  We don't seem to be in as much
21  disagreement on the bulk side as on the flow side.
22          THE COURT:  I actually don't think there is much
23  disagreement on the flow side when we get down to the
24  specifics.  At least I'm not able to identify them or
25  understand what they are, but let's move to the bulk side.
```

DC9MFHA3

```
 1              MR. KLAPPER:  So on the bulk side it's clear that both
 2    Fannie and Freddie purchased loans in bulk for many of the same
 3    originator's loans whose loans are in the securitizations at
 4    issue in this case, that they used outside vendors such as
 5    Clayton, that Clayton applied standards similar to those that
 6    applied to the defendants when the defendants had Clayton do
 7    similar diligence for them.
 8              To the extent that there are differences, that those
 9    differences would be ones that this Court and the defendants,
10    possibly FHFA, wouldn't really know without obtaining the
11    documents relating to these bulk purchases.  Those could be the
12    Clayton documents, those could be due diligence files for the
13    particular pools.  We have produced certainly a great number of
14    due diligence files from the pools underlying the
15    securitizations.  We don't at this point know how Fannie and
16    Freddie kept their diligence files.
17              We do know that there are certain files identified by
18    witnesses.  Feigles identified hard-capped binders that he kept
19    that contained information relating to the due diligence of the
20    pools at issue.  If we are correct as to the number of pools,
21    they are not that many, at least in the context of this case.
22    Apparently, we are talking about something a little shy of 50.
23    And all of this, as we demonstrate in Mr. Harsch's declaration,
24    results in a record of identification of potential issues,
25    consideration by Clayton, consideration of those issues, and
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

65

DC9MFHA3

1   resolution of those issues, either to drop the loan, include
2   the loan.
3           These bulk purchases are very much the same business
4   conducted in the same manner as the defendants conducted their
5   business.  It goes directly to materiality, it goes to the
6   reunderwriting process.  And I didn't mention the
7   reunderwriting reports, but the thing that has come out about
8   the reunderwriting reports, more than anything, is a reliance
9   on supposed industry standards, which has struck me at least as
10  being a little odd, considering I don't know who the industry
11  is other than Freddie, Fannie, and the defendants.  It would
12  seem to cover the waterfront.
13          And if all the defendants apparently didn't follow the
14  industry standards and if it turns out that Freddie and Fannie
15  didn't follow the industry standards, I don't know what
16  industry this is pointing to, but it's apparently a fairly
17  significant number of the supposed material defects.  And we
18  are entitled to discovery that would enable us to show that
19  what the experts now claim with the benefit of hindsight was an
20  industry standard, was not something that Fannie and Freddie
21  followed and it's not something that anyone else in the
22  industry followed.
23          There is also the issue --
24          THE COURT:  Now, when we are talking about the
25  industry standard, we are talking about it in the context of

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

66

DC9MFHA3

1    the industry standard for conducting due diligence to support a
2    securitization and representations made in a securitized
3    offering.  And in terms of this portion of our conference we
4    are not now talking about bulk conferences.  I don't know, but
5    I think it's true that Freddie securitized some of its bulk
6    purchases.
7              Is that your representation, Mr. Klapper?
8              MR. KLAPPER:  Yes.
9              THE COURT:  Are you contending that Fannie securitized
10   some of its bulk purchases?
11             MR. KLAPPER:  Yes.  Sorry.  Freddie, yes.  Fannie, no.
12             THE COURT:  So how many of Freddie's bulk purchases
13   were securitized?
14             MR. KLAPPER:  I don't know that we have the documents
15   sufficient to go one to one from the purchase of the pool of
16   loans to the securitization, but there were these so-called T
17   deals and I gather there were 14 of them.  There is a typo in
18   Mr. Harsch's declaration.  He said the declaration with a total
19   original principal amount of 300 billion.  It's really 30
20   billion.  But these are still fairly large deals, so they
21   average a little over 2 billion a deal.  We have documents that
22   say that certain of these loans, the bulk purchases went into
23   thee deals, but I don't know that we have sufficient documents
24   to line up with any kind of precision how much of the bulk
25   purchases went into the T deals.

67

DC9MFHA3

1            THE COURT:  I'm remembering that way back when, but
2      definitely 2012, I can't tell you if it was in the summer or in
3      the fall, at one of our conferences I ruled that the GSEs
4      should provide some discovery with respect to their due
5      diligence practices and that I asked the parties to meet and
6      confer with respect to that issue.
7            Am I remembering that correctly?
8            MR. KLAPPER:  I don't myself have that recollection.
9      I do know that this subject has been before your Honor, I think
10     at the February 14, 2013 session.
11           THE COURT:  I'm sort of remembering one of the
12     December conferences.  It was in the context of talking about
13     industry standards.
14           MR. KLAPPER:  Right.
15           THE COURT:  And I asked the parties to meet and confer
16     with respect to targeted discovery from the GSEs that could be
17     helpful to the defendants on that score, and I don't think I
18     ever heard back that there was a problem on that issue.
19           MR. SCHIRTZER:  Your Honor, can I interrupt and
20     explain?
21           THE COURT:  Yes.
22           MR. SCHIRTZER:  At the time you were contemplating the
23     possibility that the GSEs, by virtue of the volume of the
24     diligence they were having Clayton do, might have some bearing
25     on the industry standard.  You also asked us to look for

68

DC9MFHA3

1    centralized files and there were none.
2            We then came back in the February conference and
3    Ms. Chung explained to you that the amount of diligence of this
4    sort that we had Clayton do was infinitesimally small compared
5    to just the amount of diligence that Goldman did, which is when
6    you came to the determination that we were not involved in
7    setting the industry standard.
8            THE COURT:  Thank you.
9            Mr. Klapper.
10           MR. KLAPPER:  Leaving aside whether they are
11   responsible for industry standards, we also discussed how their
12   actions would be an admission by act as to what appropriate
13   diligence was as to materiality.  The fact that, for example,
14   they at least in our limited documentation with respect to the
15   bulk purchases, they did not follow the supposed industry
16   standard of following up on every inquiry in a credit report,
17   that's one of these supposed industry standards, the fact that
18   they, in assessing compensating factors, assessed loans in a
19   way that's a lot different than their reunderwriting reports
20   tend to.
21           With respect to missing documents, they don't seem to
22   be taking quite the same approach as their reunderwriting
23   expert.  All of this goes to both our due diligence defense and
24   the analogue under the state blue sky laws of reasonable care,
25   and it goes to the materiality, what really is a material

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC9MFHA3
1    defect.
2           Can it really be said that it's a material defect when
3    historically at the time Fannie and Freddie didn't consider it
4    a material defect?  This is a loan-by-loan review.  That's the
5    reunderwriting review and that's what the due diligence on
6    these bulk purchases were.  And, as I said earlier, you can
7    easily conceive that Mr. Selendy or another member of his team
8    at trial saying, oh, no, they are different, here is why they
9    are different.  We had a different overlay, different bunch of
10   things that we wanted the due diligence provider to tell us.
11   Your efforts to compare things or cross our expert using this
12   information really is not persuasive.  But all of those things
13   go to weight.  And understand, although we are far along in the
14   process here, we still have experts coming.
15          The reunderwriting reports are the prototype of
16   after-the-fact, with hindsight, litigation-driven assessments.
17   Even if there aren't a large number of these bulk purchases,
18   and even if they don't define industry standards, we can and
19   should have access to what they did in the same business that
20   we were in, in order to demonstrate that what their experts are
21   doing today, is simply not consistent with what they did
22   historically.
23          What we are asking for we believe should be relatively
24   easy in the context of this case to find.  Something as simple
25   as the Feigles notebooks, unless he is mistaken, they are
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DC9MFHA3

1   presumably notebooks and notebooks are not e-mails.  So they
2   are things that can't be that voluminous.
3          The due diligence files and reports are the analogue
4   of what we have produced in significant volume.  We have listed
5   the deals.  We are talking about centralized files.
6   Mr. Schirtzer claims that somehow they don't have them.  We
7   find that a little difficult to believe.  And then we have a
8   list, including Mr. Feigles and some other witnesses, of people
9   who we would propose to search to determine what information
10  they have on bulk purchases and the T deals.
11         It's important to understand that in the T deals there
12  were disclosures about underwriting standards of the
13  originators and those disclosures are extremely similar to the
14  defendant's disclosures on loan underwriting standards.  So
15  they apparently thought that they were saying something
16  truthful about conformity with those underwriting standards and
17  had a basis for it, in the same way that we believe that we had
18  a basis for the statements that we made.  We think that this is
19  in the mainstream of what we should be permitted to get
20  discovery of and what will not be burdensome for them to do.
21         One thing I would say, since we discussed a little bit
22  the statements, besides the statement about Clayton just
23  comparing the loans, the loan tapes to the loan files, they
24  also have, this is on page 7, and maybe this was just a slip of
25  the tongue --

71
DC9MFHA3
```
 1              THE COURT:  Page 7 of?
 2              MR. KLAPPER:  Of the demonstrative.  That is their
 3    letter on February 6.
 4              THE COURT:  I need the February 6 letter, February 6,
 5    2013 letter.  I am not going to have that in my fingertips as I
 6    sit here.
 7              MR. KLAPPER:  I think I may.
 8              THE COURT:  Yes.
 9              MR. KLAPPER:  So we have taken out from this letter a
10    few of the statements.  The first is another instance of the
11    statement about Clayton that the Clayton work was confined to a
12    review of the loan files and comparison of the data in the loan
13    files to the loan tapes.
14              (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25
```

72

Dc9efhc4

1          THE COURT:  Yes.  I find that on page one about ten
2   lines up from the bottom.
3          MR. KLAPPER:  Right.  And similarly -- just trying to
4   match up what's in the demonstrative.
5          On the second page, the second full paragraph,
6   starting with the fourth line down, they say this argument
7   fails because its single-family businesses did not conduct the
8   same type of review as defendants are applying, the same
9   standards when they talked about this.  I believe what they say
10  now is that this refers to flow loans, although my February 4th
11  letter related to bulk loans, but it's certainly not true with
12  respect to bulk loans.
13         They then go on a few lines later to say Clayton
14  categorized certain such loans as material exceptions solely to
15  ensure that they would be reviewed further, not because the
16  loans were determined to have been originated in violation of
17  underwriting guidelines.  That may have been an inartful way of
18  putting it, but if the implication is that the only thing
19  Clayton did was to mark loans as material exceptions solely to
20  ensure that they would be reviewed further, not because the
21  loans were determined to have been originated in violation of
22  underwriting guidelines, that's wrong.  I mean, some loans may
23  very well have been designated solely because they were flagged
24  as something that Freddie or Fannie wanted to review.
25         But that's not the only reason.  In our review of the

Dc9efhc4

```
 1    little we have, that's not the majority reason.  The majority
 2    reason is failure to follow underwriting guidelines.  And then
 3    they make the assertion -- I don't know what they base this on,
 4    but that the waiver of defects thus results in aggregate waiver
 5    rates that cannot meaningfully be compared to those defendants
 6    who employed different standards and procedures to identify
 7    exceptions.  And that, to me, is a prototypical argument about
 8    weight.
 9            We as well had the types of loans we wanted flagged.
10    Whether we had more of them or less of them than Freddie and
11    Fannie, we really can't say without getting the documents and
12    be able to make that argument.
13            Now, to the extent that they're going to say and use
14    as evidence at trial some of the studies by Clayton of defect
15    rates and waiver rates, you know, we should be in a position to
16    point out, based upon evidence, that they waived in a lot more
17    than we did.  They did waive in more than we did; according to
18    the Clayton reports, at least more than Goldman Sachs, Freddie
19    did.  But we don't know whether that's because they had a lot
20    more things that they wanted Clayton to designate as threes
21    that nonetheless met the underwriting standards or because they
22    just waived in more than we did.  We don't have the discovery
23    in order to make that argument, which is crucial to our
24    defense, especially if they're going to be relying on the
25    waiver rates and exceptions, and in particular, the Clayton
```

Dc9efhc4

```
 1   report about them.
 2            So we look at this as the prototypical instance where
 3   this is highly relevant material.  It would put us at a severe
 4   disadvantage, especially if they start talking about Clayton
 5   and waiver rates and the like, but we're entitled to show that
 6   they viewed the world, if anything, more leniently than we did
 7   as to what was material and what were compensating factors.
 8   And we think what little we have seen demonstrates that that's
 9   the case.
10            THE COURT:  And that is why you would like this
11   additional discovery on the bulk program?
12            MR. KLAPPER:  Right.  And what I've just read you,
13   however it came to be presented, went to the conclusion that
14   your Honor drew both at the hearing and at -- and in your
15   opinion, that somehow this really was apples and oranges.
16            Now, maybe, as they seem to be arguing today, they
17   were really making these statements about the flow purchases
18   and not the bulk purchases.  We think, as applied to the bulk
19   purchases, these statements are not accurate as to the facts
20   that we're aware of, and we're entitled to discovery in order
21   to determine whether or not we're right.  What we have
22   demonstrates to the contrary, that what they did was the same
23   process, used the same standards of compensating factors and
24   the like; was, if anything, more lenient and resulted in a lot
25   more waivers for these pools that they bought than for Goldman
```

75

Dc9efhc4
```
 1    Sachs and I believe a number of the other defendants.
 2            THE COURT:  So to just make sure I understand the
 3    context, I ruled at different points in time, but certainly I
 4    think in February with respect to certain discovery requests
 5    about the single-family side of the business.  There's an
 6    argument being made now that with respect to the discovery
 7    rulings concerning the bulk loan purchases and the due
 8    diligence associated with them, including third-party due
 9    diligence by Clayton, my rulings may have been ill-informed,
10    because there were inaccurate statements made to me and,
11    therefore, I should revisit those rulings.
12            Secondly, an argument is being made to me that the
13    bulk purchases that were made by the GSEs involved the same
14    process, the same standards and more waivers.
15            Then there is a second function for Freddie Mac.  Some
16    of the bulk purchases were securitized, or some of the loans
17    purchased through the bulk purchase program ended up in
18    securitizations.  And there may have been -- and the defendants
19    may be making the argument that the due diligence associated
20    with those securitizations by Freddie Mac involve the same
21    process, the same standards and more waivers.  I'm not quite
22    sure if you're making that argument for the securitizations as
23    well.
24            MR. KLAPPER:  There was diligence on the
25    securitizations.  I think we know less about that, but we
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

76

Dc9efhc4

```
 1   certainly would like to have that information.
 2            And I should say the overriding sum of what your Honor
 3   quite correctly summarized is the arguments that they are
 4   making against this discovery are, again, arguments about
 5   weight.  They're arguments where they say, no, no, no, these
 6   things are different.  Your effort to show that they're the
 7   same is ill taken.  And we're at a disadvantage because while
 8   we have some of these diligence summaries and the like, we
 9   don't have the rest of them.  And so we can say, based upon
10   what we've seen, it seems clear to us that the process was the
11   same, and we can legitimately argue at trial as to weight that
12   it's the same.  But without the discovery, it may be that
13   they're right, but we don't know.
14            THE COURT:  I think that the defendants are arguing,
15   but I want to just confirm it to you, Mr. Klapper, you're not
16   arguing that Fannie Mae and Freddie Mac were significant users
17   of Clayton's services compared to the defendant's?
18            MR. KLAPPER:  I don't believe that they were, based
19   upon what little we have from Clayton, and because they only
20   used Clayton for the bulk purchases.
21            THE COURT:  And so when you talk about industry
22   standards being reflected in the work done by the GSEs, are you
23   talking about the way they used Clayton, the third-party due
24   diligence firm?  What function are you saying that the GSEs did
25   on the bulk purchase side that helped create an industry
```

Dc9efhc4
1   standard?
2           MR. KLAPPER:  We're not saying that it created an
3   industry standard.  What we're saying is that, as evidence of
4   the industry standards, since they're a member of the industry,
5   even though they use Clayton less, that what they did is an
6   indication of what the industry standard was and is also an
7   admission by act as to what was an appropriate way to
8   diligence.
9           THE COURT:  And are you talking -- again, I'm just
10  trying to focus on what function of the GSEs you're addressing
11  that argument to.  Is it the use of Clayton?
12          MR. KLAPPER:  It's in the reunderwriting.  It's the
13  use of Clayton and their response to Clayton.  So Clayton
14  prepares these reports as it does its due diligence, and there
15  was apparently, between Clayton and Freddie and Fannie, a
16  dialogue, as there was with my client and other defendants when
17  they used Clayton.  And Clayton would say, this is a three, and
18  there would be a reaction to that.  And it would eventually
19  result in the loan being kept in the pool or the loan being out
20  of the pool.
21          So it's not just Clayton's work; it's the work of
22  Fannie and Freddie in interacting and responding to Clayton.
23          THE COURT:  Okay.  So it's the use of Clayton to
24  perform due diligence with respect to pools of loans that were
25  purchased through the bulk process?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Dc9efhc4

```
 1              MR. KLAPPER:  I would say -- I mean, we mentioned
 2     Clayton.  There are other due diligence providers who did
 3     similar -- performed similar diligence.  We don't know whether
 4     they used any of these other diligence providers, but I would
 5     view any of them that they used as being the same as Clayton.
 6              And then to the extent that they used outside AVM
 7     services -- that's the automated valuation model, so that's
 8     valuation due diligence -- we would want to see what they did
 9     and how they reacted to the results of that diligence.
10              THE COURT:  So the AVM model is not -- that's a
11     process that you use internally, or are you saying a
12     third-party vendor applies that to the bulk purchase program?
13              MR. KLAPPER:  I don't know how Freddie and Fannie did
14     it, but for Goldman Sachs, we used outside vendors to provide
15     the information to them.  They would come back with results of
16     the AVM model that they had.
17              THE COURT:  So basically what you are seeking to learn
18     from this tranche of your discovery is the way that Fannie or
19     Freddie used third-party vendors to do due diligence, and to
20     make an argument from that that their use of due diligence as
21     they purchased loans through this bulk purchase program sheds
22     light on what they thought were the appropriate industry
23     standards for due diligence programs?
24              MR. KLAPPER:  Right.  Right.  And, you know, it is
25     very much the core of where this case is heading, because where
```

Dc9efhc4

```
 1   we're heading, where we have headed, is from this all
 2   originators have totally abandoned their origination standards
 3   to the loan by loan reunderwriting part of the case.  And
 4   that's very detailed, and it's very much dependent, I
 5   believe -- we'll see -- on subjective judgments.
 6           And how it was done, you know, what the reaction was
 7   to let's say Clayton saying, we think that this person has
 8   overstated his income, what the reaction was to that, all of
 9   that goes to the question of due diligence but also the
10   question of loan origination; because, after all, the diligence
11   is just a second look at the decisions that were made by the
12   originator of the loan at the time they made the loan.  So if
13   the originator of the loan thought that this was a good
14   candidate for a loan and relied on the candidate's
15   representation that he made $6,000 a month, this is a redo of
16   that by the diligence firm and then between them and the client
17   of the diligence firm, a determination, even if you don't
18   believe you think he overstates his income, it is nonetheless a
19   good loan.
20           THE COURT:  Well, good enough to purchase through the
21   bulk loan program.
22           MR. KLAPPER:  Yes.
23           THE COURT:  As opposed to for the defendants, good
24   enough to include within the supporting loan group.
25           MR. KLAPPER:  I think it's the same thing.
```

Dc9efhc4

```
 1                THE COURT:  Okay.
 2                MR. KLAPPER:  They're buying the same loans --
 3                THE COURT:  I think, actually, it's very different.
 4    When you have a supporting loan group, you are making
 5    representations covered by the securities laws to the public
 6    about the quality of the contents of the supporting loan group.
 7    When you are buying a loan for yourself, you're making a
 8    judgment for yourself about the risk you want to take having
 9    looked at that loan with whatever level of care you do.  But in
10    any event, I think I understand the task that you've set before
11    me.
12                Now, looking at your Exhibit A, defendant's targeted
13    requests, you have in paragraph one due diligence files and
14    reports for identified purchases and securitizations.  In two,
15    you have Mr. Feigles', F-E-I-G-L-E-S, binders.  In three you
16    have further production from four custodians.  In four you have
17    ten new custodians.  In five you have performance data.
18                MR. KLAPPER:  Yes.
19                THE COURT:  Good.
20                MR. KLAPPER:  We are willing, obviously, as we always
21    are, to talk burden with the FHFA, but this is a key area.  We
22    think we have done this before with FHFA; that if you have for
23    the new custodians, if you have rather limited search terms and
24    effective search terms, it can be a very targeted exercise.
25    Burden is always an issue that we're willing to discuss.
```

Dc9efhc4

```
 1              THE COURT:  Thank you very much, Mr. Klapper.
 2              MR. SCHIRTZER:  Your Honor, again, I want to respond
 3    not necessarily in the same sequence, but I will start with
 4    something that we talked about at the end, which is that you
 5    are talking about two very different exercises.  In the context
 6    of the GSE's bulk purchases, we're talking about a contractual
 7    purchase subject, again, to a repurchase obligation, the right
 8    to put back those loans.  This is not a securities law question
 9    in terms of the amount of diligence that is reasonable to
10    perform before making representations and offering prospectuses
11    settled, two fundamentally different exercises.
12              As I'm sure is apparent, your Honor, there's a very
13    substantial difference between the requests that are contained
14    in items one through five of Exhibit A and the Clayton due
15    diligence material, which at some point Mr. Klapper suggested
16    that's what he was really after, but I'll try to address both
17    in turn.
18              This is about the umpteenth request for the Clayton
19    due diligence material, whether it resides in the files of
20    Clayton or resides in the files of the GSE.  And your Honor has
21    devoted an extraordinary amount of time previously to
22    considering that issue.  And your Honor ultimately made the
23    determination, which I do not hear defendants now disputing,
24    that because the GSEs did not set any industry standard in
25    terms of how they used Clayton for performing this sort of bulk
```

Dc9efhc4

1    due diligence, that there was no reason to go into discovery of
2    an entirely different set of loans, which by definition are not
3    the set of loans in the supporting loan group.
4            I do want to address the purported misrepresentation
5    or misleading suggestions in connection with Clayton because
6    they simply do not hold water.  And I will start off by
7    pointing your Honor to the February 6, 2013, letter from my
8    firm, and specifically, from Mr. Selendy, myself and Ms. Chung,
9    among others, talking about this Clayton due diligence issue.
10           In connection with that letter, we actually produced
11   to your Honor, or actually pointed out to your Honor, that as
12   attachments to Mr. Klapper's letter to which this responded
13   were Exhibits F, H and J.  And those exhibits were the very
14   Clayton reports showing that the files were reviewed and the
15   extent to which files were rereviewed, and then going on to
16   discuss the instructions that we gave to Clayton and how those
17   instructions may have differed from the instructions that
18   Clayton received from the defendant.
19           So there was no suggestion -- there was no attempt to
20   in any way hide the ball in terms of what Clayton was doing for
21   the GSEs.  In that same letter we go on to say -- and this is
22   in the second paragraph of page one, five lines down.  The
23   contemporaneous Clayton type diligence of a sample of
24   single-family loans was confined to a review of loan files -- a
25   review of loan files, and -- not or, or not in connection

Dc9efhc4

```
 1   with -- and a comparison of the data in the files to the loan
 2   tapes.
 3          So they reviewed loan files and they reviewed loan
 4   tapes.  And on occasion they did some element of verification
 5   of what was in the loan files.  We never pretended otherwise.
 6   The reports say, in fact, that they did sell.  But the point
 7   that was being made at the February 14th hearing -- and this is
 8   why context is everything -- is the issue that was being
 9   addressed when Ms. Chung made the comment about comparison of
10   loan tape to loan file was the defendants' argument to the
11   following effect:  In connection with your complaint, you say
12   that 90 percent of the loans are defective, but if you look at
13   the Clayton reports, they say only 15 percent of the loans are
14   defective.  And it cannot possibly be the case if you were
15   relying on Clayton at the time to do this due diligence on bulk
16   files, it cannot possibly be the case now that there's a
17   90 percent defect rate and we're entitled to this information
18   to prove that point.
19          And the point Ms. Chung was making, which we stand by,
20   is that there's no comparison, then or now, to the sort of
21   effort that is being undertaken or was undertaken in connection
22   with the reunderwriting that was done in this case, the amount
23   of time spent, the level of effort put into it compared to what
24   Clayton had the opportunity to do and was asked to do.  They
25   are truly apples and oranges, maybe not even in the same fruit
```

84

Dc9efhc4
```
 1    category.
 2               And consequently, Ms. Chung was trying to point out
 3    that even if you got these Clayton documents with respect to
 4    the special instructions that the GSEs gave to Clayton, and it
 5    got defect rates, you would not be comparing apples to apples
 6    if you were trying to understand how it is we get to defect
 7    rates of 90 percent in connection with the reunderwriting.  And
 8    your Honor understood that point, and your Honor basically
 9    adopts that point in the June 28th hearing -- I'm sorry,
10    June 28th decision.
11               So there is no suggestion in the June 28th decision
12    that your Honor was misled in connection with a decision
13    regarding Clayton due diligence.  You adopted the ruling you
14    did for the two reasons I've articulated:  The GSEs don't set
15    the industry standard in connection with use of Clayton type
16    due diligence and what Clayton did for the GSEs, subject to
17    special instructions on scattering of bulk transactions, is not
18    going to be informative of whether the reunderwriting effort
19    taken in connection with these complaints and these actions is
20    or is not supportable.
21               So then let's move on to the balance of -- unless you
22    have questions about any of that.  Okay.
23               Let's move on to the balance of what is now being
24    requested in bulk, because --
25               THE COURT:  Are you going to address the misstatements
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

Dc9efhc4

1  on page two, the alleged misstatements on page two of the
2  February 6th letter?
3          MR. SCHIRTZER:  I was just talking about the
4  February 6th letter.
5          THE COURT:  I know you focused on page one.  I'm sorry
6  if I didn't hear or understand what you were saying about the
7  second page, the paragraph that starts, nor is there an
8  apples-to-apples comparison.  There are three sentences there
9  that Mr. Klapper wanted me to focus on.  The sentence that
10 begins, this argument fails because the single-family business
11 did not.
12         MR. SCHIRTZER:  Right.
13         THE COURT:  And the sentence, Clayton categorized
14 certain such loans as material exceptions.  And then the very
15 last sentence in the paragraph, the waiver of such fee affects
16 those results.
17         MR. SCHIRTZER:  Yes, your Honor, I'm happy to address
18 each of those.  And the representations that were made in
19 connection with that letter are absolutely accurate.  And in
20 fact, your Honor has previously, in connection with
21 reconsideration, looked at this very question and decided that
22 the representations that were made in this connection were
23 accurate.
24         There's no dispute, as far as I know, that Freddie Mac
25 identified loans that it wished to have reviewed for further

86

Dc9efhc4

```
 1   reasons that were entirely unrelated to compliance with
 2   underwriting guidelines, and that that pumped up the defect
 3   rate and consequently would pump up the waiver rate when those
 4   loans, upon further review, were found to comply with
 5   underwriting guidelines.
 6           And consequently, when Ms. Chung said that you
 7   wouldn't have a meaningful comparison as a result, it's because
 8   of those special instructions.  And although I heard
 9   Mr. Klapper say that not every identified defect was a special
10   instruction, I did not hear him deny that, in fact, we did give
11   special instructions, that they were different than the
12   instructions that were provided by his clients or other
13   defendants.  And so consequently, when you are dealing with
14   different engagements done pursuant to different instructions,
15   it would not be terribly informative to try to compare the
16   defect or waiver rates, or at least it would require
17   extraordinary effort to put into context -- we'd have a
18   subtrial on something that has nothing to do with the
19   securitizations -- to put into context the comparison of defect
20   rates and waiver rates and what they were doing in connection
21   with their due diligence and what we were doing in connection
22   with our due diligence.
23           THE COURT:  And when the Clayton counsel was here not
24   too long ago it, confirmed that each appointment or engagement
25   had its own standards and done its own specialized review, as
```

87

Dc9efhc4

1    far as from Clayton's point of view.
2              MR. SCHIRTZER:  And I haven't heard defendants deny
3    that either.
4              So now we come to the portions of Exhibit A to
5    Mr. Klapper's letter of the 15th that don't relate to Clayton,
6    or at least don't necessarily relate to Clayton.
7              Category one is -- I have counted them up, it's 59
8    separate bulk transactions, none of which, obviously, have
9    anything to do with the supporting loan groups because they
10   were entirely separate transactions.
11             Category two is the Feigles binder, which I'll come
12   back to in a second.
13             Category three is documents relating to the GSE's alt
14   A and subprime bulk purchases and alt A flow purchases that
15   were previously withheld from the e-mail production of FHFA
16   custodians on the grounds that they were not provided to or
17   accessible to PSL traders, their supervisors or senior risk
18   custodians.  So in other words, that's a full assault on the
19   protocol that has informed single-family discovery since July
20   of 2012.  But ironically, the four people listed in this group
21   are Mr. Feigles, Ray Romano, Mr. Delvecchia and Pam Johnson.
22   And because the last three of those people are all senior risk
23   custodians, they've essentially gotten what they're asking for
24   because we didn't draw the same lines with respect to senior
25   risk custodians, but instead, as I mentioned to your Honor

88

Dc9efhc4
1   previously, for senior risk custodian, they got anything that
2   discussed single-family risks associated with an originator or
3   the originators' underwriting guidelines or adherence to
4   underwriting guidelines.
5           Then category four is ten I believe new custodians.
6   And I think virtually all of them have never been requested.
7           And category five is documents sufficient to show the
8   performance of bulk purchases of subprime or alt A loans.  And
9   that, too, has never been requested.  And there's no real
10  explanation as to why these requests should be made for the
11  first time now, other than the defendants are curious about
12  this information and would like to have it.
13          So let's try to understand the bulk purchase program a
14  little better, to the extent that it's informative to these
15  requests.  On some level we have never disputed for a second
16  that underwriter guidelines -- I'm sorry, lender guidelines are
17  the starting point for the loans that are purchased in bulk
18  pools, because if you think about the process, that's
19  necessarily the case.  They get originated by a lender.  The
20  lender doesn't necessarily know who they're going to, so they
21  are originated pursuant to lender guidelines.  And we've never
22  said otherwise.
23          And, in fact, we took great pains at the February 14th
24  conference, and other places as well, to distinguish between
25  flow and bulk for this exact purpose; flow pursuant to our
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

Dc9efhc4

```
 1   guidelines, bulk not by the nature of the beast.
 2            However, there have always been -- and we've made this
 3   clear throughout -- an overlay that is imposed by both Freddie
 4   Mac and Fannie Mae in connection with the bulk purchases that
 5   overlay could be the imposition of the same types of
 6   eligibility groups that we saw in variances and waivers that we
 7   presented to the Court in connection with the November 6th
 8   letter.  In connection with Freddie Mac, they actually had
 9   something called Freddie Mac safe steps, which was a series of
10   requirements that needed to be met before bulk purchases would
11   be made by Freddie Mac based on loans originated pursuant to
12   guidelines.
13            And with respect to -- I should add, just so we have a
14   complete record, with respect to bulk alt A purchases, those
15   were done by Fannie Mae solely in connection with variances.
16   And consequently, you would have individual contracts for any
17   bulk purchase that you got for Fannie Mae.  And those
18   contracts, as we've seen from the variance analysis that we
19   present to the Court, could have different requirements in
20   different cases, but generally towards Fannie Mae's guidelines.
21            And so although it is true that lender guidelines are
22   a starting point for bulk, it's not the finish line.  And
23   consequently, if we were to go down this road, there would be
24   and extraordinary amount of effort to try to determine exactly
25   where there are similarities and exactly where there are
```

Dc9efhc4
```
 1    differences between these pools of loans, none of which by
 2    definition wound up into the supporting loan groups.
 3              Just to circle back and touch base on some of the
 4    points that Mr. Klapper made, he said he was not -- he said
 5    that these documents that were being requested would be an
 6    indication of industry standard, even though he seemed to
 7    acknowledge that the GSEs were not setting the industry
 8    standard with respect to the purchase of these loans.  And he
 9    also said it would be an admission by act, and, your Honor, I
10    specifically previously rejected the admission by act argument.
11              Sorry, I promised to come back to the Feigles
12    notebooks because it's the one category on Exhibit A that I
13    didn't talk about.  As I understand it, Feigles notebooks are
14    some haphazard notes of diligence performed on some deals.
15    They are incomplete.  And to the extent that those notes
16    related to the diligence performed on any PLS transaction, we
17    have already produced those documents.
18              And in fact, your Honor may recall also on the subject
19    of T deals, which is related, we had previous discussion about
20    the relevance of T deals.  And I represented to your Honor that
21    there was, in fact, one and only one T deal that was done based
22    on loans that were in a supporting loan group that had some
23    bearing on the securitizations.  And we promised to produce the
24    documents relating to that T deal, and we did produce the
25    documents relating to that T deal.  The line that we drew at
```

Dc9efhc4

```
 1   the time and that your Honor endorsed at the time was that T
 2   deals having nothing to do with PLS purchases were beyond the
 3   scope and need not be produced.  So that is yet another thing
 4   being revisited here today.
 5             And the same is true of the Feigles notebooks.  So
 6   diligence on deals that had nothing to do with PLS, and by
 7   definition nothing to do with the supporting loan groups, are
 8   documents that we have not produced.  And if we did, we'd have
 9   another side show because it's not just a matter of producing
10   Mr. Feigles' notes, but it would be a matter of producing
11   everything that would be needed to supply the context to
12   interpret Mr. Feigles' notes so that defendants don't take
13   stray sentences out of Mr. Feigles' notebooks and say, you see,
14   this shows X, Y or Z because, in fact, what we'd have to do is
15   do an entire analysis of the diligence program on each of those
16   transactions to put Mr. Feigles' notes into context.
17             That's exactly the line you have not been inclined to
18   cross until now, based on the appropriate consideration of Rule
19   26 and Rule 1, but that's exactly the line that defendants are
20   asking you to cross to, in essence, ask that we have a trial
21   within a trial about transactions that have no bearing at the
22   end of the day on securitizations, by definition loans that
23   were not part of the supporting loan groups and did at least in
24   part involve different standards, that did at least in part
25   involve different levels of due diligence.  And for that reason
```

Dc9efhc4

1    there's no reason for your Honor to revisit the prior rulings
2    that have been made on this precise subject on multiple
3    occasions.
4              (Continued on next page)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

93

DC9MFHA5

 1            THE COURT:  Give me a moment to just look more
 2  carefully at the February 14 transcript to understand the
 3  context of the statement at page 62.
 4            MR. SCHIRTZER:  Your Honor, than can I respectfully
 5  suggest that you look at 63 as well.  There is a carryover.
 6            THE COURT:  Thank you.
 7            I think that it's correct to understand the context of
 8  each of these arguments and each of the references, and I want
 9  to thank counsel for their patience today and helping me
10  understand as clearly as I can what's really at stake from
11  their points of view.
12            I don't want to oversimplify this, but I think a lot
13  of what's underneath the defendants' requests here is a desire
14  to be able to show at trial that Fannie Mae and Freddie Mac
15  were very much on notice that there were problems with the
16  origination of mortgage loans in America during this period of
17  time, that originators were not following their guidelines, are
18  not being careful in doing so, and that Fannie Mae and Freddie
19  Mac were on as much notice as the banks were that this product
20  came with a lot of red flags.
21            So Fannie Mae and Freddie Mac were sophisticated
22  buyers.  They were sophisticated parties in this market.  They
23  understood the risks they were taking when they bought private
24  labels security.  And for them now to come into court and
25  resort to the securities laws in a way they are is

DC9MFHA5

1   fundamentally unfair.  And so to the extent that there are
2   legal issues about burdens of proof at trial and the impact of
3   the strict liability statute, like Section 11 is, the defenses
4   that are available to the defendants in that context, as
5   opposed to a fraud claims, where it is a very different
6   circumstance that both plaintiff and defendants are facing,
7   that's all been very important to understand as this plays out
8   in discovery.
9           But because I've understood that the defendants have
10  wanted to make that argument about the plaintiff's knowledge
11  and appreciation of the quality of origination, I have
12  permitted discovery about the GSE's knowledge about
13  originators.  We have attacked it in a number of ways and there
14  have been a number of kinds of documents that have had to be
15  produced.  So those arguments could be made effectively at
16  trial, and I won't summarize them.  By and large, they are
17  captured in the June 28 opinion.  It doesn't presume to be an
18  exhaustive list by any means, but it summarizes some key
19  categories.
20          There is a fundamental problem with these requests
21  that are being made, the attachments to these two letters, and
22  that is that they are not limited.  They are not targeted.
23  They are definitely untimely.  To the extent that they are
24  appropriate to be made, they should have been made months ago,
25  a year ago.  There is no way, actually, to, in a few words,

95

DC9MFHA5

1   describe the burden that would be imposed upon one and all of
2   reopening document discovery to provide the material demanded
3   here.  There is the burden of production which in some cases is
4   extensive.
5           But then there is the burden of review and analysis
6   and the requests for more material and more depositions and
7   more work by experts, et cetera, et cetera.  So that's why
8   discovery has limits and that's why it's sequenced.  Everyone
9   knows that litigation of this sort is a mammoth, expensive
10  undertaking that puts enormous demands on your clients,
11  enormous demand on the resources of your firms.  And that's why
12  we try to limit it by time and number and a variety of ways so
13  that litigation provides you with the critical information you
14  need and, yet, is not so expensive and burdensome that you
15  really can't litigate, that you can't pursue the truth.
16          And, fundamentally, the job of a court is to try to
17  understand the problems from each side's point of view well
18  enough that you can be making reasoned, reasonable judgment
19  calls about where to draw those lines.  No one is perfect.  I
20  don't claim to be perfect.  All I can do is try my best.  And
21  if I made an error, I want to correct it, if the defendants
22  have identified something now that they either forgot to ask
23  about earlier or did ask about and I misunderstood something
24  and I drew the line in the wrong place, or maybe I didn't
25  misunderstand anything.  Maybe based on the argument that was

96

DC9MFHA5

1    made to me then, I drew the line as a reasonable judge might.
2    But things have changed and I should revisit.
3              As you get closer to trial and closer to the actual
4    end of discovery, you just have, as a party, a greater burden
5    to bear in asking the Court to revisit and asking the parties
6    to undertake this additional burden of discovery.
7              And so the question is, have the defendants shown
8    either their error or my error, no error?  Have they shown that
9    now we should revisit any of these issues?  Because justice
10   demands it.  Ultimately, we want the trial to be a search for
11   the truth.  Does the jury need this evidence or would it be
12   helpful to a party in preparing for trial to have available to
13   them this evidence to help shape an argument?  You know, at the
14   beginning of a discovery process you can cast a wider net.  Now
15   we are at the end of a discovery process and you really have to
16   make a stronger showing that it really is going to help in the
17   truth-finding process at trial because the burden is going to
18   be, at this point, enormous.
19             So perhaps I shouldn't, in managing this litigation,
20   allow an issue to be revisited over and over and over again.  I
21   certainly have allowed that.  And you could all fault me for
22   that.  You could all be quite tired seeing the insides of this
23   courtroom.  But the issues are critical to you and I want to
24   get it right.  And if I have not gotten right before, I want to
25   get it right now.

97

DC9MFHA5

```
 1              I don't even see a close call on the flow issue.  This
 2     is such a different program with such minimal relevance to
 3     anything that's going to be tried here.  And I think this
 4     afternoon's argument was a good example, that it is hard to
 5     come up with a coherent presentation about how loans through
 6     this continuous flow, pursuant to what at least is a starting
 7     point, are the internal agency guidelines, or guides, by Fannie
 8     Mae and Freddie Mac so that the marketplace knows, Fannie and
 9     Freddie Mac will purchase loans if they meet these standards,
10     and so it's very clear.  And if you want a variance from those
11     standards, you come in and negotiate it.  But that's what it
12     is.  It has to be a variance from Fannie Mae's or Freddie Mac's
13     standards.  It's not being sold to them because we can
14     represent this meets our own personal originator's guidelines
15     100 percent.  It's a different kind of program.
16              And Fannie Mae and Freddie Mac, through counsel and
17     client working together, have made a very forceful presentation
18     about the minuscule potential that there is anything relevant
19     to an analysis of an underwriter's guidelines and adherence to
20     those, if we look at the flow program and reopen discovery in
21     the way requested.
22              Let me turn, instead, to analysis of the bulk program.
23     And this is where defense counsel begin by saying, well, your
24     Honor, you may have made your prior rulings because you
25     misunderstood, through no fault of anyone, but through a
```

98

DC9MFHA5

1  misdescription about the bulk purchase programs, what was going
2  on at Fannie Mae and Freddie Mac.  And there is a statement
3  made at page 62, one sentence at page 62 of the February 14
4  transcript, in a context of pages of description given by
5  plaintiff's counsel.  And there are four statements identified
6  in a February 6 letter from plaintiff's counsel.
7           So at the February 14 conference Mr. Klapper began
8  speaking at page 51, and this was a debate about the
9  defendant's rights to additional discovery about the 90 percent
10 figure contained in the plaintiff's forensic review as reported
11 by their amended complaint.  And there was an argument being
12 made about a systemic disregard of loan underwriting standards
13 by all originators, and that 90 percent figure.
14          And then Mr. Klapper developed an argument over
15 several pages.  And then Ms. Chung, at page 58, responded or
16 began her response.  And at page 62 is the statement that's
17 been identified, and then Ms. Chung's argument continues for
18 some time.  And because there had been these letters in
19 advance, counsel were aware in general terms, and probably from
20 your descriptions with each other, of the issues.  And so you
21 were trying to educate me.  After all, you're confined, very
22 arbitrarily, to a two-page limit in a letter.  And I prefer to
23 learn from you orally the detail.  Even though I assure you, I
24 read your two-page letters and your attachments with care.  But
25 I prefer to make sure that I have a chance to hear from you

99

DC9MFHA5

1  orally and ask my questions to make sure I understand.
2          And I think it is fair to say that Ms. Chung at that
3  point, on page 62, was making a comparison about the kind of
4  review done by Clayton and the kind of review, the forensic
5  review done that resulted in the 90 percent figure.  And that's
6  what it looks like to me today and it's very hard for me to
7  remember what I was thinking at the moment.  I heard the
8  material on page 62.  But that's what it looks like to me, and
9  I expect that's how I heard it then, too.
10          With respect to the February 6 letter, it is true that
11  the sentence on page 1 did not capture the fact that Clayton
12  may on occasion do some review or due diligence beyond an
13  examination of the loan files and the loan tapes, but, again,
14  the context of that statement was a comparison with the
15  reviews, the forensic review undertaken in the complaint and
16  that creation of a 90 percent figure, and an examination of
17  what Clayton did and waiver rates or exception rates in that
18  context.  So context is everything.
19          With respect to the statements on the second page, the
20  three statements on the second page, I don't think there is any
21  disagreement today, factually, with any of those statements.
22  And indeed I think the attorney from Clayton, with his client
23  sitting right beside him, in this courtroom made the same
24  representations.
25          Now, I've asked FHFA to examine the documents that

DC9MFHA5
1  reflect two kinds of reports that were identified on the
2  exhibit in which the defendants are making requests related to
3  the flow program.  Those reports may refer to flow loans, they
4  may refer to bulk purchase loans, I have no idea.  But they
5  will undertake that examination as soon as the defendants
6  identify the correct exhibits to them.  They will have a meet
7  and confer process.  They will agree, they will disagree.  If
8  they disagree, I'll hear you.
9              Let's turn to the bulk purchase and the substance of
10 it.  So it's easy to rule or analyze something or much easier,
11 at least, if you stay at a 10,000 foot level.  It's just more
12 important, though, to get down closer to the ground, whether
13 it's a legal issue, like admissions by act, or a factual issue
14 of, well, what actually was Clayton doing for the bulk loan
15 purchases and how does that relate to the tasks it was doing
16 for the defendants?  And when I say Clayton, I mean any
17 third-party due diligence firm.  I'm not suggesting here that
18 the ruling would be confined to Clayton.  If it's appropriate
19 to get these documents, it would be appropriate to get them for
20 any third-party due diligence firm that Fannie Mae or Freddie
21 Mac used in their bulk purchase program.
22             So as I understand it, I am just going to state it
23 because if I've got it wrong, then counsel, please, correct me.
24 What we are focusing on right now in connection with the bulk
25 purchase is that there were purchases that were negotiated
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DC9MFHA5

1  between Fannie Mae and Freddie Mac of pools of loans.  And
2  these were originated with respect to the guidelines that were
3  in place by the originator who was directly or indirectly
4  offering the loans for sale.  And Fannie Mae and Freddie Mac
5  had their own standards that they would apply and they didn't
6  simply ask, did it meet the originator's originating
7  guidelines.
8          That wasn't the beginning and end of the issue as
9  Fannie or Freddie were purchasing these pools of mortgages.
10 And in connection with these purchase decisions there were
11 occasions on which Fannie Mae -- I'm sorry.  I don't know if
12 both entities used due diligence firms, outside due diligence
13 firms.  Did they both?  I know Freddie did.
14         MR. KLAPPER:  Yes, your Honor.
15         THE COURT:  So there were occasions in which both
16 Fannie Mae and Freddie Mac used outside due diligence firms,
17 and they would design with those due diligence firms, as was
18 customary, and as the banks did, independently the ways in
19 which they wanted those outside due diligence firms to look at
20 the pool of mortgages and analyze whether or not they conformed
21 or didn't conform with the standards.  And then they would,
22 after getting these reports, decide whether or not to actually
23 waive into the pool and actually purchased a loan that may not
24 have conformed to the parameters that were used or given to the
25 third-party due diligence firm.  When Fannie Mae or Freddie Mac

DC9MFHA5
```
 1   took those loans, they were taking them pursuant to contracts
 2   that, by and large, gave them the right to require repurchase.
 3             The defendants used third-party due diligence firms to
 4   help them perform their due diligence function in connection
 5   with securitizations.  And here the task, perhaps varied, but
 6   included specifically identifying whether or not the loans
 7   conformed with the originator's underwriting guidelines so that
 8   a representation could be made in a prospectus supplement about
 9   the extent to which the group of loans for the supporting loan
10   group did or did not generally comply with the originator's
11   underwriting guidelines.
12             The GSEs made very little use of third-party due
13   diligence firms when one compares the use of those firms by the
14   defendants.  Again, I'm stating this.  So if I'm wrong, you'll
15   correct me.
16             MR. KLAPPER:  Your Honor, the only thing that is in
17   the record that I know about is Clayton.  I have no idea what
18   Freddie, Fannie did with Opus and other third-party -- I would
19   like to correct two points which I think are not accurate.  One
20   is, Goldman Sachs, and I believe a number of the other
21   defendants, performed due diligence when it purchased loans
22   because it did not originate loans except in extremely small
23   amounts.  And it purchased those loans with the same kinds of
24   representations and warranties and put back rights that Fannie
25   and Freddie are talking about here.
```

DC9MFHA5

```
 1              So, in fact, we diligenced pools of loan before we
 2   bought them as we had rights if there was a breach of the
 3   representation of warranty to put loans back to the person we
 4   bought it from.  And just to correct something, maybe a
 5   misimpression here about Clayton and the other third-party
 6   diligence providers, we had an overlay, Freddie had an overlay,
 7   Fannie had an overlay.  We don't know without discovery whether
 8   our overlay was much different than their overlay, whether
 9   Clayton was identifying the same things for us as they were for
10   them.  I don't think it's accurate to assume that these
11   overlays were different in any material way.  They may have
12   been.  But, again, without the discovery, we can't know.
13              What we do know is that the primary job of Clayton and
14   of the third parties was to diligence the loans as against the
15   originator's underwriting standards.  The rest of the job, the
16   identifying additional things was part of the job, but it was
17   in addition to checking the underwriting standards.  So I just
18   wanted to correct those points.
19              THE COURT:  Thank you very much, Mr. Klapper.
20              Let us say that a defendant such as Goldman Sachs did
21   the due diligence when they purchased the loans, and then they
22   decided to put those loans.  And were you purchasing them to
23   put them into a securitization or were you purchasing them for
24   some other purpose?
25              MR. KLAPPER:  Generally for securitizations, but not
```

DC9MFHA5
```
 1   always.
 2              THE COURT:  When you put them in the securitization,
 3   did you, again, do a different kind of due diligence, or not?
 4              MR. KLAPPER:  No.  The diligence was done at the time
 5   of the purchase of the loans.  They were put into a
 6   securitization.  Generally, that would be between one to three
 7   months after the purchase.  There would be additional work that
 8   would be done to identify the loans that were delinquent or the
 9   like.  But the primary diligence was at the stage of purchase
10   of the pool of loans.  That's for those transactions where
11   Goldman Sachs was the sponsor and the depositor.  Where it was
12   just underwriting, it diligenced at the time of the
13   underwriting.
14              THE COURT:  And did you wait one to three months
15   because that was the exhaustion point of the put-back rights?
16              MR. KLAPPER:  No.
17              THE COURT:  So were you waiting to see if they
18   defaulted within that one to three months?  I don't know why
19   you wouldn't do due diligence then.
20              MR. KLAPPER:  Purely mechanical.  If you buy a pool of
21   loans and intend to securitize them, sometimes you have to buy
22   multiple pools, you have to draft the documents, you have to do
23   a lot of work.  When I say one to three months, that tended to
24   be the period that it took between when you bought the pool of
25   loans and when you securitized them.  If the loan went
```

DC9MFHA5

1    delinquent before the securitization, in general, Goldman
2    Sachs, at least, did not include it in the securitization, so
3    it may have had an early payment default put back right.  If it
4    got into the securitization and then went delinquent, the
5    securitization itself would have a put-back right.  And the
6    early payment default put-back rights are just one of the
7    representations and warranties.  And it gets complicated as to
8    who exactly has the right to put back.  But there certainly
9    were loan purchase agreements with representations and
10   warranties by the seller and the right to put back loans if
11   there was a material misrepresentation.
12             THE COURT:  So the due diligence that, at least in the
13   example you have given of Goldman Sachs, was done once and for
14   the purpose or with the intention that that would be the due
15   diligence done for the securitization?
16             MR. KLAPPER:  It was for the purpose of determining
17   whether or not the loans that were about to be purchased met
18   the underwriting guidelines and with the thought that, in
19   general, there would be a securitization.  Securitization would
20   say the loans were originated in general in accordance with the
21   underwriting guidelines, so it served a dual purpose.
22             THE COURT:  Again, just that statement, two different
23   purchases for these programs.  Now, as I understand it, there
24   has already been discovery produced, I think it was by Freddie
25   Mac, in connection with bulk purchase loans that came from a

DC9MFHA5

1    same pool that ended up producing loans that went into one of
2    the supporting loan groups.
3                Do I understand that correctly, Mr. Schirtzer, the
4    overlap?
5                MR. SCHIRTZER:  Freddie did a T deal off of one of the
6    securitizations.  I believe it was all within securitization
7    and, yes, we produced documents in connection with that.
8                THE COURT:  So the requests made for the bulk
9    discovery are just massive and I appreciate that Mr. Klapper
10   says that you're happy to narrow the requests in some way.  I
11   don't know in what way.  I would have hoped in advance of
12   today's conference you would have presented that narrowing.
13   But the idea that we would have 10 new custodians about this
14   very different program, that's not going to happen.
15               I know that Mr. Klapper has referred over and over
16   again to the fact that any decision I make with respect to
17   discovery shouldn't be about weight.  I shouldn't be assessing
18   how powerful the argument will appear to a jury, but that's not
19   the standard I've been using.  I have not been using a standard
20   of admissibility or relevance.  I've started from the
21   standpoint of trying to understand relevance because that, I
22   believe, should always be the starting point for discovery
23   requests.  How is it related.  Why do you need it.  But that
24   doesn't confine or describe what's discoverable.  That's just a
25   starting point.  And this is an enormous request, far too late

107

DC9MFHA5
1    in the day, with no persuasive description to me of why this
2    request is being made now, as opposed to last July or last
3    February, to the plaintiffs.
4            I am going to take a brief recess and reflect on
5    whether there is anything more I need to say.  Thank you.
6            (Recess)
7            (Continued on next page)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DC9MFHA5

```
 1              THE COURT:  So, Mr. Schirtzer, I'd like to give you
 2    one more thing then, please, for Mr. Klapper.
 3              Besides looking at these two exhibits and figuring out
 4    if they reflect monthly reports and whether or not those may or
 5    may not be relevant in the way that is broadly appropriate here
 6    for discovery purposes, and how burdensome it would be to
 7    produce them at this late date, I'd like you to investigate and
 8    report to defense counsel the extent to which the GSEs relied
 9    in their bulk purchase program on third-party due diligence
10    firms.  So there have been representations made about the use
11    of Clayton, but if the GSEs were using other due diligence
12    firms in a significant way, then maybe Clayton isn't the
13    appropriate benchmark to understand the role that these
14    third-party due diligence providers played with respect to the
15    GSEs in this market.
16              MR. SCHIRTZER:  Your Honor, we will do that, but I
17    think Ms. Chung actually has something to add on this subject,
18    if she can.
19              MS. CHUNG:  Yes, your Honor.  I was going to say
20    earlier -- I should have said it before -- the figures that
21    we've given the Court in the past about the extent to which
22    Clayton type diligence was done were always based not just on
23    Clayton, but on Clayton type firms.
24              So, for example, in the February 6th letter that we've
25    discussed a lot today, one of the sentences we have is the
```

Dc9efhc6
1    summaries defendants seek are of due diligence conducted by
2    third-party firms like Clayton.  And then there's a footnote
3    that describes the extent to which this kind of diligence was
4    done.  I know that there are other places and other letters
5    where we've made similar representations.  We've always
6    included Clayton and other third-party firms.
7             But we can -- we will look into it again, your Honor,
8    just to make sure.
9             THE COURT:  I hate to invite anything more, but I
10   really have nothing more to say.
11            Good.  I've kept you too long.  Thank you very much.
12            (Adjourned)
13
14
15
16
17
18
19
20
21
22
23
24
25