UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
                                     :
 FEDERAL HOUSING FINANCE AGENCY,     :        11cv6201 (DLC)
                                     :
                  Plaintiff,         :        OPINION & ORDER
                                     :
        -v-                          :
                                     :
                                     :
 NOMURA HOLDING AMERICA, INC., et al., :
                                     :
                  Defendants.        :
                                     :
-------------------------------------X

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
Jon Corey
Adam M. Abensohn
Andrew R. Dunlap
David B. Schwartz
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For defendants Nomura Holding America Inc., Nomura Asset
Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities International, Inc., David
Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N.
Dante LaRocca:

David B. Tulchin
Steven L. Holley
Bruce E. Clark
Bradley A. Harsch
Katherine Stoller
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

Amanda F. Davidoff
Elizabeth A. Cassady
SULLIVAN & CROMWELL LLP

1700 New York Ave., NW, Ste. 700
Washington, DC 20006

For defendant RBS Securities Inc.:

Thomas C. Rice
David J. Woll
Andrew T. Frankel
Alan Turner
Craig S. Waldman
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together, the Government-Sponsored Enterprises or "GSEs"), brought this action against financial institutions involved in the packaging, marketing, and sale of residential mortgage-backed securities ("RMBS") purchased by the GSEs between 2005 and 2007, alleging among other things that defendants[1] made materially false statements in offering documents for the RMBS (the "Offering Documents").  FHFA has moved for partial summary judgment on the Defendants' statute of limitations defense under Section 13 of the Securities Act of

---

[1] The defendants are Nomura Holding America, Inc.; Nomura Asset Acceptance Corp.; Nomura Home Equity Loan, Inc. ("NHELI"); Nomura Credit & Capital, Inc.; Nomura Securities International, Inc.; David Findlay; John McCarthy; John P. Graham; Nathan Gorin; and N. Dante LaRocca ("Nomura") and RBS Securities Inc. ("RBS") (collectively, "Defendants").

1933 (the "Securities Act"), 15 U.S.C. § 77m, and the D.C. Securities Act ("D.C. Blue Sky Law"), D.C. Code § 31-5606.05(f)(2)(B).

On July 25, 2014, the Court granted FHFA's motion for partial summary judgment on the element and affirmative defense concerning the GSEs' knowledge in this and two related actions, holding that no reasonable jury could find that the GSEs knew of the alleged misrepresentations at issue at the times the securities were purchased, between late 2005 and mid-2007.[2] FHFA v. HSBC N. Am. Holdings Inc., --- F. Supp. 2d ---, 11cv6189 (DLC), 2014 WL 3702587 (S.D.N.Y. July 25, 2014) ("HSBC"). As the Court explained, "Defendants have found no evidence that the GSEs even mistrusted the Defendants' representations about the Mortgage Loans, let alone any evidence that the GSEs actually knew that any particular representation was false and were content nonetheless to make their purchases blind." Id. at *24.

The instant motion turns on whether a reasonably diligent investor in the GSEs' position would have investigated and discovered the alleged misrepresentations at issue on or before September 7, 2007, which is roughly four months after their last

---

[2] The GSEs purchased the securities at issue here between the following dates: with respect to Nomura, from November 30, 2005 to April 30, 2007; and with respect to RBS, from August 31, 2006 to January 31, 2007.

purchase.[3]  The parties agree that if the relevant statutes of
limitations had not begun to run by September 7, 2007, FHFA's
claims are timely.[4]  For the reasons that follow, FHFA's motion
is granted.

As an initial matter, Defendants' continued insistence that
the GSEs should have discovered these claims on or before
September 7, 2007 is remarkable.  At this late date in the
litigation -- nearly one year after fact discovery closed on
December 6, 2013, and just days before the close of expert
discovery, on November 26, 2014 -- Defendants maintain that no
misrepresentations were made in the Offering Documents.  Today,
Defendants have the benefit of a great deal of information that
post-dates September 7, 2007, including the downgrading of these
securities' credit ratings in 2008 through 2011, the delinquency
or default of more than half of the loans in some of these
securities, the results of a bevy of governmental investigations
into mortgage-loan originator and aggregators' practices, and
the parties' experts' reunderwriting of statistically valid
samples of the loan files at issue.  Yet, Defendants insist that

---

[3] Defendants have offered no evidence to support a finding that
the GSEs did, in fact, discover the alleged misrepresentations
on or before September 7, 2007.

[4] Defendants maintain that FHFA's claims are also time-barred by
the relevant statutes of repose.  That argument was rejected in
an August 28, 2014 Opinion.  FHFA v. HSBC N. Am. Holdings Inc.,
11cv6189 (DLC), 2014 WL 4276420 (S.D.N.Y. Aug. 28, 2014).

far less information, far less suggestive (if at all) of misrepresentations, should have alerted the GSEs to a probability of misrepresentations, caused them to investigate and discover the alleged (but non-existent) misrepresentations, and then brought suit.

In opposing this motion, Defendants contend that the GSEs should have brought this action on or before September 7, 2007 to obtain damages from their purchase of AAA-rated securities. But, at that time, the securities were still rated AAA, were not under a negative credit watch, and the GSEs did not believe they would suffer any losses.  Moreover, Defendants strenuously argued, in support of their motion to dismiss FHFA's Complaint filed in September 2011, that a great deal more information than the GSEs possessed in 2007 -- including the credit rating downgrades of the GSEs' securities in subsequent years, the substantially degraded performance of those securities, and the many governmental investigations referenced above -- was insufficient to plausibly allege the misrepresentations pleaded in this action.  Despite their argument that FHFA had failed to state a claim in 2011, Defendants now urge that the GSEs had, back in September 2007, more than enough information with which to plausibly allege misrepresentations that Defendants insist do not exist.  Defendants' position is audacious, to say the least.

Defendants also attempt to avoid summary judgment by arguing that there are "hot disputes" as to whether the information available to the GSEs would have caused "a reasonably diligent plaintiff in their position to investigate its potential claims."  In fact, the parties raise only minor, and ultimately immaterial, factual disputes concerning what information the GSEs had.  Accordingly, summary judgment is appropriate.  Cf. Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 427 (2d Cir. 2008) (The existence of inquiry notice is an "objective determination [that] can be resolved as a matter of law -- it need not be made by a trier of fact.").

On this record, viewed in the light most favorable to Defendants, a reasonably diligent investor would not have believed it probable on or before September 7, 2007 that the Defendants' Offering Documents contained the categories of misrepresentations that underlie this action and would not have undertaken an investigation that uncovered the alleged misrepresentations in time to plead them before that date.  The RMBS purchased by the GSEs from the Defendants provided a stream of payments from subprime and Alt-A mortgages.[5]  The record shows that, as the appreciation of housing prices stalled and then

---

[5] Mortgage loans are often divided, by credit risk, into three classes.  In order of ascending risk, they are "prime" loans, "Alt-A" loans, and "subprime" loans.

reversed in late 2006 and 2007, the performance of subprime and
Alt-A loans originated in 2006 and 2007 suffered.  Originators
of mortgages closed and declared bankruptcy; one was ordered to
stop operations by the Federal Deposit Insurance Corporation
("FDIC") after a finding of, among other things, inadequate
underwriting practices.  Indicators of loose underwriting by
originators and borrower fraud abounded.  Yet, even after the
closure and bankruptcy of two originators, Ownit and Residential
Mortgage Assurance Enterprise, LLC ("ResMAE"), the Defendants
offered securities that included their loans and the GSEs agreed
to purchase private-label securitizations ("PLS") from Nomura
backed chiefly by mortgages originated by Ownit and ResMAE,
citing the strength of Nomura's due diligence process and its
willingness to make its own representations and warranties
concerning the quality of the underlying loans.  Defendants have
cited no news reports or other information from the relevant
period calling into question Defendants' own diligence
practices.

　　　By the summer of 2007, monthly reports sent to the GSEs
showed rising delinquencies and early payment defaults in the
loans backing the seven Nomura securities at issue (the "Nomura
Certificates" or "Certificates," purchased in the seven "Nomura
Securitizations" or "Securitizations") -- performance consistent
with declining housing prices.  The GSEs had sophisticated

processes for detecting and analyzing underperforming PLS.  One of the seven Nomura Certificates appeared on a Fannie Mae "PLS Watch List" in the spring of 2007, but after subsequent investigation Fannie Mae determined the risk of loss was remote. Otherwise, Defendants have cited no evidence that the GSEs were concerned about the Nomura Securitizations, in particular, on or before September 7, 2007.

In mid-July and August 2007, credit rating agencies downgraded hundreds of RMBS, including tranches of four of the Nomura Securitizations that were junior to those in which the GSEs participated.  After a thorough examination of these Securitizations, the rating agencies did not downgrade the senior tranches supporting the Nomura Certificates, or even place them on a negative rating watch.  It was not until 2008 -- and in some cases, 2009 or 2011 -- that the rating agencies downgraded the Certificates at issue here.

Throughout this period, the GSEs acted to protect their rights concerning the Nomura Certificates.  The GSEs monitored their PLS, including the Nomura Certificates, investigated when they found it necessary, and uncovered no reason to believe that Defendants' diligence was inadequate or that the Nomura Certificates' performance indicated that misrepresentations in the Offering Documents concerning the underlying loans' quality

8

were probable.  A reasonably diligent investor in the GSEs'
position would have done no more.

BACKGROUND

Sixteen related actions brought by FHFA alleging
misstatements in the Offering Documents for certain RMBS
certificates purchased by the GSEs between 2005 and 2007 have
been litigated before this Court.  All but one of these actions
have settled.  The remaining action concerns the seven
Certificates that were part of the seven residential mortgage-
backed Securitizations created by Nomura,[6] some of which were
underwritten by RBS.[7]  The GSEs purchased the Nomura Certificates
for more than $2 billion.

The statute of limitations that governs the federal
securities claims in these actions is contained in the
Securities Act and in a statute extending the period in which
FHFA may file suit.  Section 13 of the Securities Act contains a
one-year statute of limitations that governs FHFA's claims

---

[6] Fannie Mae purchased one Certificate in a senior tranche of
Nomura Securitization NAA 2005-AR6 ("2005-AR6").  Freddie Mac
purchased Certificates in senior tranches of the six other
Nomura Securitizations: NHELI 2006-FM1 ("2006-FM1"), NHELI 2006-
FM2 ("2006-FM2"), NHELI 2006-HE3 ("2006-HE3"), NHELI 2007-1
("2007-1"), NHELI 2007-2 ("2007-2"), and NHELI 2007-3 ("2007-
3").  The Certificates were each guaranteed to be awarded the
highest credit rating from each of four prominent credit rating
agencies.

[7] RBS was then conducting business under the name "Greenwich
Capital Markets, Inc."

brought under Sections 11 and 12.  See 15 U.S.C. § 77m.  A one-
year statute of limitations also applies to FHFA's claim under
the D.C. Blue Sky Law.  See D.C. Code § 31-5606.05(f)(2)(B).

In 2008, in the aftermath of the financial crisis, Congress
created the FHFA, authorized it to act as conservator for the
GSEs, and passed a statute extending FHFA's time to bring any
action on their behalf.  The Housing and Economic Recovery Act
of 2008 ("HERA") creates a new "statute of limitations with
regard to any action brought by the [FHFA] as conservator or
receiver."  12 U.S.C. § 4617(b)(12)(A).  In the case of any
"tort claim," "the applicable statute of limitations" is the
longer of (1) the three-year period beginning on the date FHFA
is appointed as conservator or receiver; (2) the three-year
period beginning on the date on which the cause of action
accrues; and (3) the period applicable under state law.  Id. at
§ 4617(b)(12).  In addition, HERA provides for the revival of
tort claims "for which the statute of limitations applicable
under State law . . . has expired not more than 5 years before
the appointment of the [FHFA]."  Id. at § 4617(b)(13)(A).  HERA
defines "tort claim" to mean "a claim arising from fraud,
intentional misconduct resulting in unjust enrichment, or

intentional misconduct resulting in substantial loss to the regulated entity."   Id. at § 4617(b)(13)(B).[8]

The GSEs were placed into conservatorship by FHFA on September 6, 2008, and FHFA filed this action within three years of that date.  Accordingly, FHFA's claims are timely if the relevant one-year statutes of limitations had not yet begun to run one year prior to the conservatorship, that is, on September 7, 2007.[9]

The Defendants raise arguments based on the GSEs' knowledge prior to September 7, 2007 of turmoil in the RMBS market, the closure and bankruptcy of mortgage originators, rising delinquencies and early payment defaults in the loan groups supporting the Nomura Certificates, and credit rating downgrades of hundreds of RMBS, including junior tranches of four Nomura Securitizations.  Below are the principal facts cited in Defendants' major arguments, as well as needed context for those facts.  All factual disputes are resolved in Defendants' favor,

---

[8] This provision, subparagraph (13)(B), contains a typographical error, as it refers to "[a] tort claim referred to under clause (i)."  The words "tort claim" appear in clause (ii), not clause (i).  Immediately preceding subparagraph (13)(B) is subparagraph (13)(A), which refers to "any tort claim described under clause (ii)."  Accordingly, it is clear that (13)(B) defines "tort claim" as used in clause (12)(A)(ii).

[9] FHFA has not raised in these motion papers the HERA provision reviving state tort claims that expired within five years of the appointment of FHFA as conservator.  See 12 U.S.C. § 4617(b)(13)(A).

and all reasonable inferences are drawn in Defendants' favor, as non-movants.  Where Defendants offered a litany of similar examples, the Court has attempted to select the strongest or most illustrative.[10]

## I.   RMBS, in Brief

RMBS are securities entitling the holder to income payments from pools of residential mortgage loans ("Supporting Loan Groups" or "SLGs") held by a trust.  Each of the mortgage loans underlying the Securities at issue (the "Mortgage Loans") began as a loan application approved by a financial institution, known as the loan's originator (the "Originator").[11]  Nomura acted as an "aggregator" here, purchasing Alt-A and subprime mortgage loans and then pooling them together, on the basis of credit or other characteristics.  The loans selected for a given Securitization were transferred to a trust created specifically for that private-label securitization, or PLS.

Within a given Securitization, the loans were placed into one or more Supporting Loan Groups.  For example, Nomura's NHELI

---

[10] Because Defendants cite some of the same evidence in this briefing and in the prior briefing on the GSEs' knowledge, some passages below are borrowed from the <u>HSBC</u> Opinion concerning the GSEs' knowledge.

[11] The Originators in these cases, none of which are parties to the actions, include Aegis, Alliance, EquiFirst, First NLC, Fremont, Funding America, Mandalay, Novastar, Ownit, People's Choice, ResMAE, and Silver State.

2006-FM1 Securitization, offered through a Prospectus Supplement of October 31, 2006, was composed of fourteen classes of certificates, or "tranches," and two supporting loan groups with an aggregated stated principal balance of over $1.1 billion. Nomura represented that the original principal balances of the loans in Group I "conform[ed] to Freddie Mac loan limits," and made no such guarantee about the loans in Group II.

The trust then issued certificates and underwriters sold the certificates to investors like Freddie Mac.  These certificates entitled the holder to a stream of income from borrowers' payments on the loans in a particular SLG.  Thus, a certificate's value depended on the ability of mortgagors to repay the loan principal and interest and the adequacy of the collateral in the event of default.

The certificates were linked to tranches of varying seniority.  Generally, holders of the most senior certificates for a given SLG were paid first, after which holders of the next-most-senior certificates received payment, and so on. Thus, should some borrowers in an SLG default on their loans, certificates in the junior-most tranche would absorb all or most of the shortfall before payments to more senior certificates were affected.  Accordingly, the most senior certificates were subject to less risk than were more junior certificates.  By apportioning risk in this way, Defendants were able to create

13

AAA-rated securities from Alt-A and subprime loans.  The GSEs purchased senior Certificates -- often only the most senior -- with the highest credit ratings.

For instance, in Nomura Securitization 2006-FM1, Freddie Mac purchased a Certificate linked to the senior-most tranche, class I-A-1, which was supported by Group I loans.  That tranche had an initial principal balance of approximately $525 million; the nine subordinated ("mezzanine") tranches below had a total principal balance of approximately $223 million.  All realized losses on Group I loans were to be allocated to the nine mezzanine tranches, until their $223 million principal balance was reduced to zero.[12]  This subordination, in addition to certain other credit enhancements,[13] protected Freddie Mac's senior Certificate from loss, even in the face of substantial defaults (and limited recovery through foreclosure).  Accordingly, Freddie Mac's senior Certificate was awarded a AAA credit rating and its equivalent by four principal credit rating agencies, and this credit rating was not downgraded -- despite general turmoil in the RMBS market and a rise in early payment

---

[12] The mezzanine tranches were also subordinate to the senior tranches backed by Group II loans, and would absorb realized losses from those loans as well.

[13] Other credit enhancements noted in the Offering Documents include overcollateralization, a basis risk cap agreement, an interest rate cap agreement, and an interest rate swap agreement, which served to hedge basis and interest-rate risk.

defaults in Group I loans in the summer of 2007 -- until
September 23, 2011.

## II.  The Life of a Mortgage Loan

The process that created a private-label security, whether
followed faithfully or not, generally worked as follows.

### A.  Underwriting

A loan file that contained the documents assembled by an
originator for a given mortgage loan was reviewed in a process
called "underwriting" at one or more times before the loan was
placed in a securitization.  In the first instance, the
originator underwrote each loan it approved, confirming that it
met applicable underwriting guidelines, was valued reasonably
and accurately, and was not fraudulent.  Originators sometimes
made case-by-case exceptions to their underwriting guidelines
when a loan application failed to meet a certain guideline but
appeared to nonetheless qualify for a mortgage program based on
compensating factors.

So-called "aggregators" of the mortgage loans, like Nomura,
acquired loans from originators in order to pool them into
supporting loan groups that would be tied to securities.  Before
purchasing these loans and issuing securities backed by them,
the GSEs understood that the aggregator -- or third-party
vendors on the aggregator's behalf -- conducted due diligence
review of the loan pools to confirm that the loans met the

relevant underwriting guidelines, as well as to confirm other characteristics of the loans that were described in the prospectus supplements that accompanied each securitization, such as the loans' loan-to-value ("LTV") ratios[14] and combined loan-to-value ("CLTV") ratios[15] and the owner-occupancy rates for the properties underlying the loans.  Based on these reviews, aggregators refused to purchase some loans.

**B.   Sampling**

As the Defendants described their due diligence practices to one or both GSEs, when Defendants conducted due diligence review of a pool of loans, they often reunderwrote a sample of the loans.  A Freddie Mac report on Nomura's diligence practices in March 2006 found that Nomura conducted property and compliance due diligence on 100% of loans, and credit due diligence on 100% of loans in pools with amounts less than $25 million, and on 20% of loans in pools with greater amounts.[16]

---

[14] The loan-to-value ratio is the ratio of the loan amount to the appraised value of the property securing the loan.  80% was a common benchmark used to divide lower- and higher-risk loans.

[15] The combined loan-to-value ratio applies to properties securing more than one loan.  It is the ratio of the sum of all loans secured by the property to the appraised value of the property.

[16] "Compliance" generally refers to a loan's compliance with statutory and regulatory requirements governing asset-backed securities.

Fannie Mae reported in a 2006 review that RBS's "typical sample size" for non-prime loans was 25%, "predominantly adversely selected."  For prime and Alt-A loans, "sampling size [wa]s determined by a statistical calculation intended to obtain a 95 percent confidence interval, a less than 10 percent error rate, and precision of five percent or greater."  RBS "require[d] additional adverse selection for compliance [red flags], high loan balance, low FICO [credit] score, seasoning, or other abnormal loan characteristics."

**C.  Defendants' Representations to Purchasers**

In the Offering Documents for each security, Defendants made representations to purchasers, like the GSEs, concerning the mortgage loans' adherence to applicable guidelines and the loans' characteristics.  The Offering Documents included a Shelf Registration Statement filed with the Securities and Exchange Commission ("SEC"), as well as the relevant Prospectus and Prospectus Supplements.[17]

---

[17] The representations at issue in these actions appear in the Securities' Prospectus Supplements.  Nomura issued the seven Securitizations pursuant to Shelf Registration Statements and Prospectus Supplements.

For instance, with respect to Supporting Loan Group I in Nomura's Securitization 2006-FM2,[18] an SLG that backed a senior Certificate purchased by Freddie Mac, Nomura represented that:

(1) "[a]ll of the mortgage loans were originated or acquired by [originator] Fremont, generally in accordance with the underwriting guidelines described in this section";

(2) 57.5% of the loans (or 68.4% of the pool by principal balance) had an LTV ratio of 80% or lower, and 17.8% of the loans (or 20.0% of the pool by principal balance) had a CLTV ratio of 80% or lower;

(3) 93.2% of the underlying properties were owner occupied; and

(4) the most senior class, I-A-1 would be given the highest credit rating by Standard & Poor's, Moody's, Fitch, and DBRS.

### D. Repurchase Obligations

Many of the Offering Documents for the Securities at issue included a repurchase provision requiring Originators or Nomura as sponsor to buy back a "defective" loan in certain circumstances. In many cases, the Originator or sponsor was obligated to repurchase a loan if it was originated as a result of fraud, negligence, or a misrepresentation or omission. For example, with respect to 2006-FM2, Nomura, as sponsor, was required to "repurchase [a defective] Mortgage Loan or provide the trustee with a substitute Mortgage Loan," should the trustee

---

[18] Supporting Loan Group I had the greatest principal amount issued (over $525 million) of any of the relevant Nomura SLGs.

learn that any loan "is defective on its face due to a breach of the representations and warranties with respect to that Mortgage Loan made in the transaction agreements."

## III. The GSEs' Participation in the RMBS Market

Fannie Mae and Freddie Mac are government-sponsored enterprises created to ensure liquidity in the mortgage market. Fannie Mae was established in 1938, Freddie Mac in 1970.  Their primary business is to purchase mortgage loans from originators that conform to the GSEs' standards ("conforming loans") and then either hold those loans on their own books or securitize them for offer to the public.  This side of their business is known as the "Single Family" side.  In their Single Family businesses, the GSEs review and analyze loans before purchasing them in bulk; the GSEs also monitor loans after purchasing them.

In 2000, the GSEs began to purchase quantities of Alt-A and subprime loans as well and to securitize some of those purchases.  Office of Policy Development and Research, U.S. Department of Housing and Urban Development, Fannie Mae and Freddie Mac: Past, Present and Future (2009), in 11 Cityscape: J. Pol'y Dev. & Res. 231, 236-37 (2009).  During this period, some portion of the Alt-A and subprime loans the GSEs purchased were non-conforming loans -- that is, they were underwritten to the seller's guidelines (with certain modifications), not the GSEs'.

Each GSE also conducts a second business, purchasing and holding PLS.  This is a substantially smaller portion of their activities.  It is the PLS that the GSEs purchased from the Defendants that prompt the claims in this lawsuit.  The GSEs held approximately $100 billion in PLS in 2002, with roughly $35 billion in subprime and $3 billion in Alt-A PLS; at their peak, in 2005, the GSEs' PLS holdings had grown to approximately $350 billion, with roughly $145 billion in subprime and $40 billion in Alt-A PLS.  Cong. Budget Office, Fannie Mae, Freddie Mac, and the Federal Role in the Secondary Mortgage Market 10 (Dec. 2010);[19] Nat'l Comm'n on the Causes of the Fin. & Econ. Crisis in the U.S., The Financial Crisis Inquiry Report 124 fig. 7.3 (2011) ("Financial Crisis Inquiry Report").[20]  In the two years prior to September 7, 2007, the GSEs purchased more than $251 billion in PLS, approximately 8% of the $3 trillion in PLS issued in those years.

## IV.  The GSEs' Originator and Aggregator Reviews

### A.  Originator Reviews

The GSEs' Single Family businesses investigated and approved originators before purchasing mortgage loans from them. The PLS operations at the GSEs relied on those reviews, or the

---

[19] Available at http://www.cbo.gov/publication/21992 (last visited November 18, 2014).

[20] Available at http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf (last visited November 18, 2014).

results of those reviews, from the Single Family operations in making their trading decisions.

As of August 2006, Fannie Mae required PLS traders to confirm, among other things, that any originator of more than 10% of the underlying mortgage loans in the relevant SLG was on a list of Fannie Mae approved originators.  Its Single Family Counterparty Risk Management Group ("SFCPRM") was tasked with approving originators.  SFCPRM reviews, some of which included on-site visits, primarily assessed "[c]ounterparty risk" for Fannie Mae's Single Family business, which was "the risk of financial loss to Fannie Mae resulting from [the counterparty]'s failure to meet its contractual obligation[s]," including inability to meet repurchase obligations.  SFCPRM also examined originators' underwriting protocols, appraisal practices, and fraud detection.  In some instances SFCPRM, itself or through a third-party vendor, conducted loan-level reviews of a sample of the originators' loans.

The Single Family Non-Traditional Lending Group ("NTLG") within SFCPRM also conducted "desk reviews" of originators, employing questionnaires submitted to originators as well as public information, industry publications, and internal reports from Fannie Mae account teams and the Legal Department.  Issues the NTLG identified were cataloged in its "NSO Deficiency Tracking Database."

Pre-approval from Freddie Mac's Alternative Market
Operations Group ("AMO") was required for any originator that
originated loans constituting more than 1% of the unpaid
principal balance of Freddie's PLS portfolio.  AMO was part of
Freddie's Single Family business.  AMO's counterparty reviews of
originators examined, among other things, the originator's
adherence to its underwriting guidelines and its appraisal
protocols.  AMO originator reviews typically included on-site
visits and reunderwriting of fifty loan files.  While it appears
that Fannie Mae's traders were only given a list of approved
originators, PLS traders at Freddie Mac had access to AMO's
originator reviews.

Freddie Mac's AMO reviewed ResMAE in April 2004 and gave it
an overall rating of "Marginal," recommending that Freddie Mac
"Proceed With Caution."  ResMAE originated more than 75% of the
loans in one of the Nomura Certificates at issue, which Freddie
Mac purchased on April 30, 2007 following ResMAE's bankruptcy.
In 2004, AMO had found that ResMAE's "credit philosophy is
marginal, and closely resembles the traditional 'story loan'
approach formerly used in subprime," which approves loans based
"more on the borrower's individual story than . . . on objective
lending criteria."  AMO had also found that "[q]uality control
is inadequate, as it relies entirely on investor due diligence."

One of the most extreme examples is AMO's review of First
NLC Mortgage Corporation ("First NLC"), which was an Originator
of a small portion of loans in one of the Nomura
Securitizations.  AMO's review, conducted on January 31 and
February 1, 2005, awarded First NLC an overall rating of "Poor."
AMO found that First NLC "allow[ed] almost any borrower with a
FICO [credit score] of 500 or greater to obtain a mortgage" and
determined that "weaknesses in First NLC's processes and
controls lead to high levels of risk layering," which was
"particularly evident in their treatment of credit scores, which
combines a bad business practice with poor execution."  AMO
warned that "[t]his results in loans with credit attributes that
would be greatly misrepresented on a pricing tape."

Following events in 2007 described below, Fannie Mae
removed certain originators from its list of approved
counterparties.  For example, as of April 26, 2007, Fannie Mae's
"PLS Counterparty Approval Report" shows that Fremont had been
"suspended" after entering a cease-and-desist order with the
FDIC.

**B.   Aggregator Reviews**

The GSEs reviewed and approved aggregators as well as
originators.  Their reviews of Nomura and RBS reflect the
following assessments.

### 1. Nomura

Freddie Mac's AMO issued an aggregator operational review of Nomura on March 14, 2006.  "Based upon the combination of good due diligence methodologies, reasonable valuation processes and sound controls, AMO rate[d] Nomura subprime as Satisfactory overall."  AMO found that "Nomura's due diligence program is well managed," and "found no issues with Nomura['s] appraisal process, which is solid."  AMO noted that "Nomura takes the property evaluation process seriously and places a high priority on collateral valuation."

### 2. RBS

Fannie Mae issued an aggregator review of RBS Greenwich Capital in November 2006.[21]  The review notes that RBS employed Clayton, the Capital Group, and Watterson-Prime to "conduct loan level due diligence on its acquisitions."  RBS reviewed loans "pursuant to seller's guidelines," and "stated that its program to monitor seller lending matrices [in connection with their guidelines] [wa]s robust," although Fannie Mae was not provided "in-depth detail regarding this program."  RBS was found to "perform[ ] credit reviews through a process designed to determine that the loans generally comply with the lender's

---

[21] Although RBS has settled FHFA's claims against it in the related Ally Action, it has not settled the claims against it in this action, where RBS was an underwriter for four of the Securitizations.

underwriting guidelines through a check of borrower income and asset documentation, review of credit reports and credit scores, and recalculation of debt to income ratios."  Fannie Mae understood that RBS employed the sampling methodology described above.

## V.   The GSEs' Awareness of Certain Risks

### A.   Knowledge of the Risks of Low- and No-Documentation Loans

Because of disclosures made in documents provided to the GSEs prior to their purchase of PLS, they were informed that many of the SLGs contained low- and no-documentation mortgage loans, and thus, stated-income stated-asset ("SISA") loans and no-income no-asset ("NINA") loans.  The GSEs understood that low- and no-documentation loans posed heightened risks of borrower fraud, and considered the percentage of these loans in the Supporting Loan Groups when making PLS purchase decisions.

### B.   Appraisal Bias

The GSEs were generally aware of the risk of appraisal bias, which, if uncorrected, can distort reported LTV and CLTV ratios.  For example, Gary Kain ("Kain"), the Vice President of Freddie Mac's Mortgage Investments and Strategy Group responsible for overseeing both Single Family and PLS activities, was asked if he became concerned in 2006 and 2007 about the risk of appraisal bias in PLS.  He testified that "at some point in this process" he "became . . . aware" that "there

was potentially an issue with appraisal bias." In an August 2005 memorandum, the Vice President of Mortgage Credit Risk Management at Fannie Mae, Shelley Poland, listed as a "risk factor[] and practice[] prevalent in today's mortgage credit environment" the "general degrading of appraisal quality as well as the proliferation of automated appraisal valuations." In early 2007, a publicly reported survey found that 90% of appraisers had felt "pressure" to inflate valuations; on June 20, 2007, Bloomberg reported that the New York Attorney General had begun to investigate pressure on appraisers.

In July and September 2007, Fannie Mae used its Retrospective Property Valuation System ("RPS"), a proprietary automated valuation model ("AVM"), to test the appraised property values in three prospective PLS deals, none of which is at issue in this action. To run an RPS test, Fannie Mae needed to have, among other data, the street addresses for the mortgage properties. An AVM can offer insight into the risk of appraisal bias in a given loan. David Gussman, a Fannie Mae Vice President in the Capital Markets Strategy division, testified that Fannie Mae "ran [RPS] sort of on an ad hoc basis on a couple of deals" in or around September 2007 and was "investigating" whether to use it "on all PLS deals going forward" but never did so "because we never got that data we're talking about" for enough deals. In August 2007, Fannie Mae

analysts asked that "all new deals . . . be analyzed for appraisal bias."

Although Freddie Mac received loan tapes for the Nomura Certificates sixty days after each purchase, and these tapes included property address information for the underlying loans, this data was used to identify underserved areas in connection with goals set for the GSEs by the U.S. Department of Housing and Urban Development, and it was Freddie Mac's policy that the data was "not disclosed to individuals responsible for purchasing or selling [PLS], nor [wa]s the Data used in connection with any sale of bonds already purchased or with the purchase of any additional bonds."  There is no evidence the GSEs ran an AVM on the SLGs at issue in this action on or before September 7, 2007.

## VI. Developments in the RMBS Market, 2006-2007

### A.  The GSEs Monitored the RMBS Market.

The GSEs closely monitored trends in the RMBS market.  At Freddie Mac, the Credit Risk Subcommittee and Enterprise Risk Management Committee watched the market for changes that would impact Freddie Mac's risk profile; at Fannie Mae, the Counterparty Risk Management division and Private Label Advisory Team ("PLAT") did the same.  The GSEs' PLS traders also read industry publications, analyst reports, and dealer research to

remain current.  Fannie Mae's traders circulated "Subprime Weekly Updates" digesting news in the subprime RMBS market.

**B.   Trends in the RMBS Market**

The GSEs were aware, in 2006 and 2007, of stalling and then declining housing prices across the nation; indicators of weakness in the subprime market; flawed underwriting by originators; appraisal inflation; and a rise in borrower fraud. Housing prices peaked nationwide in April 2006 and began a decline in the third quarter of 2006 that continued throughout 2007.  See Financial Crisis Inquiry Report at 214-15.  In January 2007, a director in Freddie Mac's Counterparty Credit Risk Management Group reported "a significant increase in delinquencies and misrepresentation/fraud beg[inning] to emerge during the first half of 2006."  In February of 2007, the senior vice president of Freddie Mac's Credit Risk Oversight Group noted "weaknesses in subprime underwriting standards . . . reflected in: Spiking delinquency rates on recent books; Subprime originator failures; Increased repurchases of recent originations; Volatility in the subprime synthetic credit indexes."

Two Fannie Mae traders, in a parody of the "'Twas the Night Before Christmas" circulated on December 29, 2006, noted "slumping" housing prices; "[q]uestionable lending practices"; "[i]ncreased [early payment defaults]"; and originator closures.

Not all was bleak, however: the traders opined that "it seems the market has learned" its lesson; that originators had "vow[ed] to . . . improv[e] performance and root[] out fraud, [a]nd fix[] their underwriting wherever it's flawed"; and that "although 2006 vintages sadly have suffered, AAA buyers are all surely buffered."

In the late summer and fall of 2006, the GSEs saw an increase in early payment defaults ("EPDs"), including in the PLS they held.  On August 25, 2006, a Fannie Mae weekly email sent by PLS trader Shayan Salahuddin ("Salahuddin") concerning news in the subprime market noted that H&R Block, the parent of Option One Mortgage ("Option One"), took losses "due to an increase in early payment defaults on Option One originations." Salahuddin continued:

> Investors should carefully consider how this affects their view of origination standards and quality control in the subprime sector, as Option One has long been considered on[e] of the better originators. However, from a purely economic perspective, this issue is more poignant to originators than to investors as originators are required to repurchase loans that default within the first couple of payment cycles.

Salahuddin testified that "in late 2006 . . . the increase in defaults in deals in general was . . . concerning."  A December 15, 2006 email from Kin Chung ("Chung"), Fannie Mae's Director of PLS Surveillance, noted, based on preliminary data, that "our 2006 vintage [of PLS] is showing much faster ramping in

delinquencies than previous vintages" and that "the 2006Q2 [second-quarter 2006] vintage is performing significantly worse than the 2006Q1 vintage."

In November 2006, an internal Freddie Mac document titled "Summary of Freddie Non-Agency Portfolio and the Subprime Market" reported, with respect to the "2006 Vintage" of loans, that "2006 60+ day delinquencies ('DQ') [i.e., loans where monthly payments are more than 60 days past due] are greater than all other vintages at comparable seasoning, including 2000 which was the worst vintage of this decade."  In particular, the summary notes that the 60+ day DQ rate was equivalent to 90 basis points ("bps") for the 2003 vintage, 160 bps for the 2005 vintage, and 240 bps for the 2006 vintage.  It also reports that "more leveraged 2nd liens and high LTV loans have performed worse in 2006 relative to any other vintage," that there is a "significant incidence of foreclosure in the 2006 vintage at such an early stage," and that "there has been a noticeable decline in underwriting standards (higher CLTVs, lower FICOs)." The summary states that "[u]nderwriting is a major concern as originators are stretching for volume."  With respect to EPDs in particular, the summary reported that "[e]arly payment defaults are up significantly, especially for loans with piggyback seconds [second mortgages]."

Freddie Mac's December 2006 "MABS [Mortgage Asset Backed Securities] Industry Review" reported "a pervasive loosening of credit standards in originators' underwriting guidelines."  It determined that "the combination of lower HPA [home price appreciation] and aggressive underwriting practices ha[d] begun to show up in delinquency and EPD figures."  The review noted that Fitch projected that "2006 vintage subprime mortgages will perform substantially worse in 2007, with cumulative lifetime losses ultimately reaching 7%, the worst collateral losses of any vintage to date," and that "[s]erious subprime delinquencies ha[d] increased almost 50% year-over-year."

These trends continued in 2007.  For example, a June 8, 2007 Fannie Mae "PLS Credit Trend Report" for the month of May noted that "Fannie Mae 2006 investments continue to demonstrate [a] higher delinquency rate as well as cumulative losses than other vintages at the same age," that "Fannie Mae 2007 subprime investments are tracking the 2006 vintage in 60+ days delinquency rate," and that "Fannie Mae 2007 Alt-A acquisitions perform worse than the 2006 vintage at the same age."  The report also found that "Fannie Mae 2006 and 2005 investments have significantly higher Foreclosure rate and REO[22] percentage

---

[22] "REO," or "Real Estate Owned," refers to properties that have been foreclosed upon and are owned by the mortgage holder.

compared to other vintages at the same age.  This is consistent
with the looser underwriting standards during that period."

It was not until mid- to late 2008, however, that this
downturn in the RMBS market matured into the financial crisis,
and the breadth and depth of its effects were known.  It was not
until March 2008 -- six months after September 7, 2007 -- that
Bear Stearns failed and was purchased by JPMorgan Chase & Co.
("JP Morgan").  Financial Crisis Inquiry at 289-90.  And it was
not until September 2008 -- a year after September 7, 2007 --
that Lehman Brothers filed for bankruptcy.  Id. at 339.  In
retrospect, the events of the summer of 2007 appear as clear
warning signs; but at the time, few commentators forecasted the
scope of the disruption to come, and some continued to forecast
a quick return to a bull market.  See Ken Fisher, "Insight:
History Teaches This Is Just a Bull Market Correction,"
Financial Times, Aug. 22, 2007 ("This is just an archetypal bull
market correction," and "the bull market will resume.").[23]

### C.   Originator Closures and Bankruptcies

The vast majority of the loans supporting the seven Nomura
Certificates were originated by one of six Originators:
Alliance, Fremont, Ownit, People's Choice, ResMAE, and Silver

---

[23]  Available at http://www.ft.com (last visited November 18,
2014).

State.[24]  In late 2006 and early to mid-2007, Silver State

closed; Ownit, ResMAE, People's Choice, and Alliance declared

bankruptcy; and Fremont was subject to a cease-and-desist order

from the FDIC charging Fremont with "[in]effective risk

management policies," "inadequate underwriting criteria,"

"unsatisfactory lending practices," and "inadequate debt-to-

income analyses that do not properly consider borrowers' ability

to meet their overall level of indebtedness."  The GSEs

recognized that, all things being equal, an originator's closure

or bankruptcy increased the probability that loans it had

recently originated would be fraudulent or would default.

Notably, the GSEs' purchases of Certificates backed by

loans originated by Ownit and ResMAE occurred after Ownit's

closure and ResMAE's bankruptcy.  On December 22, 2006, Freddie

Mac's Credit Risk Management Group ("CRM") approved the purchase

of a Certificate in Nomura Securitization 2007-2 despite the

fact that "[t]his deal contains 40% exposure to Ownit originated

collateral, who recently went out of business," and that "11% of

the collateral was originated by First NLC, who is a marginal

counterparty."  Two factors were cited: the "credit support

level" provided by the junior tranches allows the senior tranche

---

[24] The other Originators disclosed to the GSEs, each of which
contributed less than 15% of the loans to a Supporting Loan
Group, were Aegis, EquiFirst, Funding America, First NLC,
Mandalay, and Novastar.

to "withstand unanticipated volatility due to these marginal originators"; and "approval [was] contingent that all the rep[resentations] and warrant[ies] for Ownit [concerning the quality of the loans] are made directly with Nomura," who was "rated . . . Satisfactory by . . . AMO."

On April 26, 2007, Freddie Mac's CRM approved the purchase of a Certificate in Nomura Securitization 2007-3 despite the fact that more than 75% of the loans underlying the Certificate were originated by ResMAE, which had entered bankruptcy on February 12, 2007, noting "Reps being covered by Nomura." The Credit Risk Management notification email had listed three "mitigating factors":

- Wells Fargo will serve as the Master Servicer and Credit Risk Manager

- The bond is being structured on Nomura's shelf, so it will be subject to Nomura's due diligence controls; Nomura received a Satisfactory operational review from AMO

- Nomura is providing all reps and warrant[ie]s on the deal.

**VII. Performance of the Nomura Securitizations**

    **A.   GSEs' Tools for Monitoring PLS Performance**

After purchasing PLS, the GSEs monitored the performance of their Securities. They received monthly "trustee reports" or "remittance reports" that reflected delinquencies, EPDs, and

foreclosures in the underlying Mortgage Loans, as well as compilations of those reports.

For the five Nomura Securitizations for which Wells Fargo served as credit risk manager, the GSEs also received monthly reports from Wells Fargo.  These reports also identified, among other things, delinquencies and EPDs; in addition, they reported "negative property variances."  Negative property variances occurred when the servicer for a Securitization requested broker price opinions or second appraisals for some of the supporting loans, and the new opinion or appraisal was lower than the original.  Wells Fargo's reports identified loans for which the last appraisal was lower than the original appraisal by 20% or more.  A substantial difference between the two might indicate that the property had lost value in the time since the first appraisal, or it might indicate that the initial appraisal was inflated.

The GSEs compiled this information into a number of regular internal reports.  For instance, Freddie Mac's Mortgage Investment & Structuring Department compiled a "Mortgage ABS Portfolio Performance Report" that tracked delinquency rates by loan type in Freddie Mac's PLS portfolio.  Freddie Mac also compiled reports for its Investments and Capital Markets Department's Credit Committee, which included a "Weakest Deals Report" listing bonds that Freddie Mac believed "could

potentially take either a principal writedown or interest shortfall."

Similarly, Fannie Mae's PLAT managed PLS risk.  Its "Surveillance team" monitored PLS performance and created "PLS Credit Trend Reports" as well as a "PLS Watch List."  The PLS Watch List identified securities held by Fannie Mae at "risk of rating downgrade" and others that, as a result of diminishing credit support, required close monitoring.  Securities placed on the Watch List were classified as "green," "yellow," or "red." Green indicated no concerns; yellow indicated that a certain trigger based on the security's principal support had been hit; and red indicated that a more serious trigger had been hit.[25]

### B.  Negative Property Variances

On August 27, 2007, the GSEs received monthly reports from Wells Fargo for the five of the Securitizations for which Wells

---

[25] A security was classified as "yellow" if either (1) the current percentage of principal support was less than the original percentage of principal support, or (2) all three of the following were true: (a) current principal support was less than half of the original principal support; (b) the current percentage of principal support was less than four times the percentage of original principal support; and (c) the current support was greater than assumed stress losses, which were the three-month average of deal delinquency, modified by a certain multiplier.  A classification of "red" meant a security's credit rating had been downgraded or the percentage of principal support was less than 50% of the original percentage of principal support.

Fargo served as the Credit Risk Manager.[26]  As noted above, these reports listed negative property variances greater than or equal to 20%.

For a handful of loans, the negative variance was as much as 80% or 90%.  But, these were the exception.  The Securitization with the greatest percentage of loans with a negative property variance was the oldest: 2006-HE3, which had issued eleven months before.  Approximately 5% of the loans had a negative property variance of 20% or more; 1% had a variance of 40% or more.  Next was 2006-FM2, issued nine months before, with 2% of loans with a negative variance of 20% or more, and half of one percent with a variance of 40% or more.  For the other three Securitizations, Wells Fargo reported that fewer than 2% of loans had a negative variance of 20% or more.  For the most recent Nomura Securitization, 2007-3, issued three months prior, Wells Fargo reported that one-third of one percent of loans had a negative property variance of 20% or more, and no loans had a variance of 40% or more.

### C.   Rising EPDs

Early payment defaults or EPDs are delinquencies shortly after the issuance of a loan.  The GSEs understood that a large

---

[26] The Wells Fargo reports only identify negative property variances by Securitization; they do not break down these numbers among supporting loan groups.

percentage of EPDs in a Securitization could suggest poor underwriting practices or borrower misrepresentations.  The GSEs noted that EPDs for subprime loans originated in 2006 were substantially higher than they had been for loans originated in prior years.

On July 25, 2007, the GSEs received monthly trustee reports for the Nomura Securitizations that indicated, among other things, the percentage (by unpaid principal balance) of loans sixty or more days delinquent in the SLGs underlying the GSEs' Certificates: for 2006-HE3, 16.8%; for 2006-FM1, 19.8%; for 2006-FM2, 15.9%; for 2007-1, 5.5%; for 2007-2, 7.4%; and for 2007-3, 1.6%.[27]  On August 27, the GSEs received reports for the month of August showing delinquencies had increased: for 2006-HE3, to 18.5%; for 2006-FM1, to 21.2%; for 2006-FM2, to 18.0%; for 2007-1, to 6.8%; for 2007-2, to 9.7%; and for 2007-3, to 2.8%.

Yet, only a small fraction of these delinquencies were identified by Wells Fargo as EPDs.  The highest reported rates of early payment defaults for the five Securitizations for which Wells Fargo served as Credit Risk Manager are as follows: for 2006-HE3, 1.5%; for 2006-FM2, 3.1%; for 2007-1, 1.8%; for 2007-

---

[27] These delinquency figures include bankruptcies, foreclosures, and real-estate owned properties.

2, 1.6%; and for 2007-3, 0.4%.[28]  Jim Callahan ("Callahan"), an
employee of Fannie Mae's consultant Pentalpha, testified that an
EPD rate above 0.75% was "unacceptable" and a "red flag" for
Pentalpha that he would discuss with clients.  The excerpted
testimony does not establish whether this "red flag" was simply
an indicator of poor performance, or if Callahan believed it
suggested fraud.  Callahan noted that he had not discussed the
appropriate "red flag" threshold rate with his clients and that
rates above 0.75% "had . . . been happening."

### D.   Watch Lists and Weakest Deals Reports

One of the Nomura Securitizations, 2005-AR6, appeared on
Fannie Mae's monthly PLS Watch Lists in 2007: in January 2007 it
was classified as "yellow"; it was elevated to "Green Under
Watch" status in February; it was listed as "yellow" again in
March 2007 and again elevated to "Green Under Watch" in April;
and finally it fell to "yellow" in April 2007 and was again
raised to "Green Under Watch" in May. "Green Under Watch" meant
that the bond's risks were "of limited concern based on further
analysis."  In April 2007, Fannie Mae noted that "[t]he
cumulative net loss on this deal was only . . . 0.06% of
original collateral balance" and "it would require 46% of the

---

[28] The Wells Fargo reports do not identify the criteria used to
determine an EPD.  It does not appear to be based solely on the
length of a delinquency.

deal balance to default with 50% of loss severity in order for
[Fannie Mae's Certificate class] to take any losses.  We believe
this is highly unlikely to happen."  In May 2007, Fannie Mae
noted that "[a]ccording to our stochastic[29] analysis, we do not
project any losses to our holdings over life of the deal[]."
2005-AR6 retained its "Green Under Watch" status between May and
September 7, 2007.

No Nomura Certificate appeared in Freddie Mac's "Weakest
Deals Reports" on or before September 7, 2007, and Defendants
proffer no evidence that Freddie Mac was particularly concerned
about the performance of the Nomura Certificates before that
date.[30]  Indeed, months later, in a February 2008 report, Freddie

---

[29] "Stochastic modeling, also known as 'Monte Carlo' modeling,
involves estimating probability distributions of potential
outcomes by generating simulations reflecting random variation
in one or more inputs over time."  Ruppert v. Alliant Energy
Cash Balance Pension Plan, 716 F. Supp. 2d 801, 815 (W.D. Wis.
2010).  Faced with a complex problem where the outcome --
default rates, for instance -- is determined by an array of
factors, an analyst generates a large number of possible
scenarios.  In each scenario, the analyst randomly selects an
input for each factor, based on a range and distribution of
possible values.  The analyst can then examine the distribution
of outcomes generated -- noting, for example, the mean or median
outcome, or how likely certain worst-case outcomes are.  Here, a
Fannie Mae analyst might note how likely it is that loans would
default at such a rate that Fannie Mae would take losses in its
senior tranche.

[30] Defendants proffer a Freddie Mac "Weakest Deals Report"
indicating that one of the Nomura Securitizations, 2006-FM2, had
an expected loss of 11% within two years and an expected
delinquency rate of 13%.  But, although this report is dated
April 30, 2007, it is apparent that the report is in fact for

Mac analyzed its portfolio and concluded that "the unrealized losses on [its] [Asset-Backed Securities] portfolio as of December 31, 2007 are principally a result of decreased liquidity and larger risk premiums in the subprime market, and [Freddie Mac] has not identified any bonds in the portfolio that are [likely to] incur[] a contractual principal or interest loss."  Thus, apart from the brief period during which 2005-AR6 appeared on Fannie Mae's PLS Watch List, Defendants have identified no evidence that the GSEs were concerned about the performance of the Nomura Securitizations, in particular, prior to September 7, 2007.

> **E.    Credit Ratings of Junior Tranches Are Downgraded**

In July and August 2007, rating agencies downgraded the junior tranches of many subprime and Alt-A PLS, including the junior tranches of four of the Nomura Securitizations.  On August 2, 2007, Moody's increased its loss expectations for PLS generally.  The rating agencies did not downgrade, or place on negative watch, any of the senior tranches in which the GSEs had invested, until 2008.

On July 10, 2007, Moody's downgraded junior tranches of Nomura Securitizations 2006-FM1 and 2006-FM2.  Moody's press release states that these downgrades were the result of

---

the week of April 30, 2008, as the presentation is for the month of April 2008 and includes data up through May 12, 2008.

"rigorous examination of all 2006 subprime RMBS deals" after "a persistent negative trend in severe delinquencies for first lien subprime mortgage loans securitized in 2006."  Moody's stated that "first lien subprime mortgage loans securitized in 2006 . . . were originated in [an] environment of aggressive underwriting," and at a July 12 press conference noted that some of the poor performance was due to "certain misrepresentations called by the industry soft fraud like occupancy or stated income and appraisal inflation."

Moody's did not downgrade, or place under watch for future downgrade, the senior tranches of 2006-FM1 and 2006-FM2, in which Freddie Mac had invested.  The senior tranches of 2006-FM1 and 2006-FM2 were not downgraded until September 23, 2011 and September 9, 2008, respectively.

Standard & Poor's ("S&P") also acted on July 10, 2007, placing hundreds of RMBS -- but not the Nomura Securitizations -- on negative rating watch.  S&P noted "further evidence of lower underwriting standards and misrepresentations in the mortgage market."  S&P explained that "[w]eakness in the property markets continues to exacerbate losses" and that "ongoing weakness in both national and regional property markets will exacerbate losses," as S&P's chief economist projected that, by the first quarter of 2008, property values would have declined 8% from 2006 levels.  S&P also noted that "[d]ata

quality concerning some of the borrower and loan characteristics provided during the rating process has also come under question."

"Going forward," S&P announced, "there will be a higher degree of correlation between the rating actions on [tranches] located sequentially in the capital structure.  A [tranche] will have to demonstrate a higher level of relative protection to maintain its rating when the class immediately subordinate to it is being downgraded."

On August 17, 2007, S&P downgraded two junior tranches of 2005-AR6, but took no action with respect to Fannie Mae's senior tranches through September 7, 2007.  The senior tranche of 2005-AR6 in which Fannie Mae invested was not downgraded until February 4, 2009.

On July 12, 2007, Fitch placed hundreds of RMBS "Under Analysis" and downgraded most of those on August 1.  On August 3, Fitch downgraded junior tranches of 2006-FM2 and 2006-HE3.  It did not downgrade, or place on negative watch, any of the GSEs' Certificates.  The senior tranches of 2006-FM2 and 2006-HE3 in which Freddie Mac invested were not downgraded until September 9, 2008 and August 4, 2009, respectively.

Thus, it was not until more than a year after September 7, 2007 that the credit rating agencies first downgraded one of the Nomura Certificates' ratings.  As noted above, on September 9,

2008, 2006-FM2 was downgraded.  In October 2008, 2007-1 was downgraded; in January and February 2009, 2005-AR6 and 2007-3 were downgraded.  Of the remaining three Certificates, 2006-HE3 and 2007-2 were downgraded in August 2009 -- two years after the July and August 2007 junior tranche downgrades Defendants cite -- and 2006-FM1 was not downgraded until September 2011, four years after.

F.   **Responses to Junior Tranche Downgrades**

In July and August 2007, the ABX index, a synthetic index meant to reflect the performance of subprime RMBS, fell sharply. On August 17, a Fannie Mae trader circulated to his colleagues a short eulogy for the subprime RMBS market, noting its "abrupt, but not entirely unexpected, death" following "early payment defaults, negative home price appreciation, and credit risk layering."

The GSEs examined their portfolios following these ratings actions to determine the credit support underlying their senior positions in affected Securitizations.  For instance, on July 10, Fannie Mae's Zhao sought to "figure out whether [Fannie Mae] own[s] any bond in any of the deals just downgraded by S&P." The GSEs recognized that, generally, downgrades to junior tranches increased the risk of a future downgrade to the GSEs' senior tranches.  They also recognized that rating downgrades could be a "lagging indicator of loan performance" and that

professional investors might reach the same conclusions earlier. There is no evidence, however, that the junior tranche downgrades caused the GSEs particular concern about the performance of any of the Nomura Certificates at any time on or before September 7, 2007.

## VIII.    FHFA's Complaint in <u>Nomura</u>

On September 2, 2011, FHFA brought this action on behalf of the GSEs.  The September 2 Complaint ("Complaint") alleges misstatements and omissions in the Offering Documents concerning four attributes of the Securities: (1) the Originators' adherence to applicable underwriting guidelines in originating the loans in the SLGs; (2) the LTV ratios and CLTV ratios of those loans; (3) the owner-occupancy rates of the properties securing those loans; and (4) the credit ratings of the purchased Certificates.  FHFA brought its claims for these alleged misstatements and omissions under Sections 11 and 12(a)(2) of the Securities Act as well under substantially identical provisions of the D.C. and Virginia Blue Sky Laws.

In support of these claims, FHFA alleged facts including the following:

- FHFA's loan-level review (not using loan files) of 1,000 randomly selected loans from each Supporting Loan Group showed that owner-occupancy and LTV ratios

stated in the Offering Documents were materially false;[31]

- credit rating downgrades between 2008 and 2011 lowered the Certificates' ratings from the highest investment-grade to speculative- and junk-bond grade;

- from one-third to more than one-half of the loans in the Supporting Loan Groups were delinquent, in default, or had been foreclosed upon by July 2011;

- Clayton Trending Reports produced in 2010 showed that more than 37% of the loans Nomura submitted to Clayton for review were rejected by Clayton as outside underwriter guidelines, yet 58% of these rejected loans were subsequently waived in by Nomura for securitization, including the Securitizations at issue;

- the National Credit Union Administration Board brought suit against NHELI, responsible for six of the seven Securitizations at issue, in June 2011 for misrepresentations made in connection with securitizations including 2007-1; and

- a March 13, 2008 report by the President's Working Group on Financial Markets found "a significant

---

[31] The FHFA loan-level review of an owner-occupancy representation included a comparison of information given by a borrower with data showing the address to which the borrower's tax bill had been mailed months after the loan closed, with the borrower's claimed tax exemption, and with addresses on the borrower's credit reports (the "Owner-Occupancy Investigations").  The loan-level review of the LTV ratios utilized the application of an AVM or automated valuation model to the property address for each loan in a sample (the "AVM Investigations").  Using the AVM, the Complaint concluded that "independent" appraisals would not have systematically generated the significant deviations in appraisal value uncovered by its study.  It added that the 2011 findings from the Financial Crisis Inquiry Commission concerning the pervasive problem of inflated appraisals during the period of the Securitizations "confirmed" its findings.  Both the Owner-Occupancy Investigations and the AVM Investigations relied on property addresses for the sample loans identified in loan tapes given to the GSEs sixty days after purchase of a Certificate.

> erosion of market discipline by those involved in the
> securitization process, including . . . underwriters,
> and credit rating agencies, related in part to
> failures to provide or obtain adequate risk
> disclosures."

FHFA filed an Amended Complaint on June 28, 2012, and on August 17, Defendants moved to dismiss it.  On November 27, 2012, Defendants' motion to dismiss was granted as to FHFA's Virginia Securities Act claims against Nomura but otherwise denied.[32]  The November 27, 2012 Order adopted by reference the May 4, 2012 Opinion denying in part UBS Americas, Inc.'s ("UBS") motion to dismiss in the lead case in this coordinated litigation.  FHFA v. UBS Americas, 858 F. Supp. 2d 306, 320 (S.D.N.Y. 2012) ("UBS I").  UBS I held that FHFA's securities claims were adequately pled, relying chiefly on FHFA's loan-level examination (including review of underlying loan files), supported by "investigations by government and private agencies," and, "ultimately, the surge in defaults on the underlying mortgages and collapse of the certificates' credit ratings."  Id. at 328 (LTV), 330 (owner-occupancy); 332

---

[32] The Virginia Securities Act creates liability for those who "sell[] a security by means of an untrue statement of a material fact," but -- unlike the federal Securities Act -- not for those who "offer" a security.  V.A. Code § 13.1-522(A)(ii).  Thus, this provision of the Virginia Securities Act "[r]equir[es] contractual privity between plaintiff and defendant," and actions against a depositor like Nomura's NHELI will not lie. See FHFA v. Barclays Bank PLC, 11cv6190 (DLC), 2012 WL 5844189, at *4 (S.D.N.Y. Nov. 19, 2012).

(compliance with underwriting guidelines).  Earlier that month, in an Opinion concerning another motion to dismiss in a coordinated action, the Court explained that FHFA's securities claims against JP Morgan were adequately pled despite the fact that (as in the Nomura Action) FHFA had not reviewed any underlying loan files, as "[t]he linkage to individual certificates is provided by . . . the loan performance and credit-rating histories of the certificates."  FHFA v. JPMorgan Chase & Co., 902 F. Supp. 2d 476, 488 (S.D.N.Y. 2012).

## DISCUSSION

Before setting out the principles of law that govern this motion, it is useful to once again place the motion in context. In resisting this motion, the Defendants essentially argue that a reasonably diligent investor like the GSEs would have undertaken an investigation of the Nomura Securitizations in 2007 and filed a lawsuit by September 7, 2007 making the same four claims that appear in FHFA's 2011 Complaint.  It is undisputed, however, that in 2007 (1) the GSEs still relied on the strength of Defendants' diligence and their willingness to make the representations themselves to shield the GSEs from defective subprime and Alt-A loans; (2) the rates of negative price variation, delinquencies, and EPDs were consistent with a response to the nationwide decline in housing prices -- indeed, the GSEs monitored and analyzed their PLS for troubling

performance indicators, but (with one minor exception) were not particularly concerned about the Nomura Certificates; and (3) in July and August 2007 the credit rating agencies closely examined RMBS and took action on four of the Securitizations, but elected not to change the credit ratings of the Nomura Certificates until more than a year (and in some cases, four years) later. As of September 7, 2007, each of the seven Certificates bore a AAA rating or its equivalent.

Moreover, none of the principal events upon which FHFA relied in 2011 as a basis for bringing its claims that the Offering Documents contained four categories of material misrepresentations occurred before September 7, 2007.  The Defendants counter that the GSEs could have performed the same loan-level reviews that FHFA later did or that they had information that was "equivalent" to that on which FHFA later relied.  But, Defendants' argument that the GSEs could have performed the Owner-Occupancy and AVM Investigations before September 7, 2007 is irrelevant; the question is whether a reasonably diligent investor in the GSEs' position would have done so, and then discovered the alleged misrepresentations before that date.  As explained below, a reasonably diligent investor in the GSEs' position would have trusted Defendants' diligence practices, as the GSEs did, and would not have believed that misrepresentations were probable, as opposed to

49

merely possible, where the Nomura Certificates' performance was
consistent with the realization of an expected risk -- a rise in
defaults in response to falling housing prices -- and indeed was
judged by the credit rating agencies not to threaten the
Certificates' credit quality.

Again, Defendants continue to maintain, at the close of
discovery, that they made no misrepresentations in the Offering
Documents.  Yet, they argue that the GSEs should have
investigated and discovered the alleged (but non-existent)
misrepresentations on or before September 7, 2007, before the
credit rating downgrades of the Certificates, before
substantially more severe delinquency and default rates, and
before the published results of a number of governmental
investigations into originator and aggregator practices.  At
that time, Defendants had not -- and to this day, have not --
cast doubt on the adequacy of their diligence or their
confidence in the accuracy of their representations in the
Offering Documents.  Nor have Defendants pointed to any other
lawsuit filed as of September 7, 2007 concerning Defendants'
diligence or these representations.  Despite all this,
Defendants insist the GSEs should have investigated and brought
suit on or before September 7, 2007 concerning Certificates that
were still AAA-rated and not expected to suffer losses.  A

reasonably diligent investor in the GSEs' position would not have done so.

## I.    Summary Judgment Standard

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  Nor may a party "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

"A submission in opposition to (or in support of) summary judgment need be considered only to the extent that it would . . . be[] admissible at trial."  <u>Doe ex rel. Doe v. Whelan</u>, 732 F.3d 151, 157 (2d Cir. 2013) (citation omitted).  Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

## II.  Statute of Limitations

Section 13 of the Securities Act provides, in relevant part:

> No action shall be maintained to enforce any liability created under section 77k or 77<u>l</u>(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, <u>or after such discovery should have been made by the exercise of reasonable diligence</u> . . . .

15 U.S.C. § 77m (emphasis added).[33]  The one-year limitations period begins to run "(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, the facts constituting the violation -- whichever

---

[33] FHFA's claims under the D.C. Blue Sky Law are subject to a substantially identical one-year statute of limitations that begins to run upon "the discovery of the untrue statement or omission or after the discovery should have been made by the exercise of reasonable diligence."  D.C. Code § 31-5606.05(f)(2)(B).  That statute is to be interpreted "in accordance" with Section 13.  <u>See</u> <u>FHFA v. Bank of Am. Corp.</u>, 11cv6198 (DLC), 2012 WL 6592251, at *7 n.8 (S.D.N.Y. Dec. 18, 2012) (collecting cases).

comes first." Merck & Co., Inc. v. Reynolds, 559 U.S. 633, 637

(2010) (citation omitted) (construing 28 US.C. § 1658(b)(1) of

the Exchange Act); UBS I, 858 F. Supp. 2d at 320 (holding Merck

applies to Section 13 of the Securities Act).[34]  Thus, "the

limitations period commences not when a reasonable investor

would have begun investigating, but when such a reasonable

investor conducting such a timely investigation would have

uncovered the facts constituting [the] violation," City of

Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 174

(2d Cir. 2011), "irrespective of whether the actual plaintiff

undertook a reasonably diligent investigation," Merck, 559 U.S.

at 653.  A fact is "discovered," for these purposes, when "a

reasonably diligent plaintiff would have sufficient information

about that fact to adequately plead it in a complaint" that

would "survive a motion to dismiss." City of Pontiac, 637 F.3d

---

[34] Defendants argue that Merck does not apply to Securities Act
claims and that the Second Circuit's opinion in Koch v.
Christie's Int'l PLC, 699 F.3d 141 (2d Cir. 2012), indicates
that this Court's decision to the contrary in UBS I was
erroneous.  Defendants are incorrect.  Koch merely held that
Merck did not disturb the discovery accrual rule applicable
where the governing statute of repose does not address accrual.
699 F.3d at 150.  Koch teaches that Merck held Section 1658(b)
of the Securities Act to be a "statutory exception" to the
default court-made rule because the statute specifies that
"discovery of the facts constituting the violation" triggers
accrual. Id. at 149-50.  Section 13 is a similar statutory
exception, as it provides that accrual is triggered by "the
discovery of the untrue statement or omission" -- which
constitutes the violation, as Sections 11 and 12(a)(2) impose
strict liability for material misrepresentations.

at 175.  As the Court has held in these actions, to plausibly
allege the misrepresentations at issue, "descriptions . . . of
government and private investigations are insufficient,
[standing] alone."  JPMorgan, 902 F. Supp. 2d at 488.  In
addition to allegations concerning marketplace trends, a
plaintiff must plead a "linkage to individual certificates."
Id.

Pre-Merck law governs the determination of when a
reasonably diligent investor would begin an investigation that
would have led to discovery of actionable misrepresentations.
See Pension Trust Fund for Operating Engineers v. Mortgage Asset
Securitization Transactions, Inc., 730 F.3d 263, 276-77 (3d Cir.
2013).  Under that law, a reasonably diligent investor would
begin to investigate when information is "specific enough to
provide [that] investor with indications of the probability (not
just the possibility)" of misrepresentations.[35]  Staehr, 547 F.3d
at 430 (citation omitted).  In order for information to trigger
the duty of inquiry, it must "relate[] directly to the
misrepresentations and omissions the Plaintiffs allege in their

---

[35] The parties dispute whether the GSEs' extraordinary
sophistication should be attributed to the reasonably diligent
investor in the GSEs' position.  The Court need not reach this
question, as FHFA is entitled to partial summary judgment on the
statutes of limitations, even assuming, arguendo, that the GSEs
are to be held to this higher standard due to their
sophistication, as well as that the ordinary purchaser of PLS
like the Certificates is a sophisticated investor.

action against the defendants." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 168 (2d Cir. 2005) (citation omitted). In the securities fraud context, the Second Circuit has taught that such

> "[s]torm warnings" need not detail every aspect of the alleged fraudulent scheme: An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice. Rather, a totality-of-the-circumstances analysis applies. Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct.

Staehr, 547 F.3d at 427 (citation omitted). "[T]he specificity of storm warnings bears directly on the determination of whether, under the totality of the circumstances, a plaintiff should be charged with a duty to inquire." Id. at 428.

That the misconduct ultimately alleged "must be probable, not merely possible," means just that: information that does not, on its face, indicate the misconduct, and that is consistent with a perfectly likely innocent explanation, is unlikely to trigger a duty of inquiry. Newman v. Warnaco Grp., Inc., 335 F.3d 187, 193 (2d Cir. 2003). Cf. Lentell, 396 F.3d at 170-71 (holding that information showing "opportunities for fraud" does not, itself, "evidence fraud," and that such information, together with "stray and indiscriminate" evidence of false statements, was "insufficient to put plaintiffs on inquiry notice of the specific frauds alleged"); Newman, 335

F.3d at 194-95 ("It was reasonable for Plaintiffs not to inquire into [defendant]'s [financial] statements because [defendant] had provided [a] seemingly benign explanation" and because the price of Plaintiffs' securities did not decline after the statements were filed.).  Courts have held that a duty of inquiry was triggered when, for example, a corporation took "a series of three charges in substantial and increasing amounts for the same purpose within four years" that "should alert any reasonable investor that something is seriously wrong," LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 155 (2d Cir. 2003), and when a news article "specifically describ[ed]," with a high "degree of specificity," the misconduct alleged in the plaintiff's complaint, Shah v. Meeker, 435 F.3d 244, 251 (2d Cir. 2006).

Where a securities claim, like those here, accrues following a transaction, the statute of limitations cannot begin to run until after that transaction.  City of Pontiac, 637 F.3d at 176.[36]  Nonetheless, once a duty of inquiry is triggered, the

---

[36] The parties also dispute whether Defendants bear the burden of proving untimeliness, as the statute of limitations is an affirmative defense.  See Fed. R. Civ. P. 8(c)(1).  The Court need not reach this issue, as FHFA has carried any burden it bears: it has shown that the GSEs had not discovered the alleged misrepresentations on or before September 7, 2007, and that a reasonably diligent investor in the GSEs' position would not have discovered them before that time.

investor has a duty to consider relevant information that arose in the period before the purchase.

## III. Prior Ruling on Statute of Limitations Defense

This Court has previously discussed the application of Section 13's limitations period to the PLS at issue in this coordinated litigation.  On November 27, 2012, the Court dismissed in relevant part the Nomura and RBS Defendants' motions to dismiss, adopting by reference its analysis in its May 4, 2012 Opinion denying in relevant part the UBS Defendants' motion to dismiss for untimeliness.  That analysis remains relevant:

> The truth of the matter is that when the GSEs learned of the loan originators' dubious underwriting practices says little about when they discovered the facts that form the basis of this complaint.  FHFA's claim here is not that the originators failed to scrutinize loan applicants adequately in general; it is that defendants failed to act diligently to ensure that, consistent with the representations in the offering materials, the originators' questionable practices did not lead to the inclusion of non-conforming loans in the particular securitizations sold to the GSEs.  The downgrade of the securities' credit ratings and the results of the loan audit that FHFA undertook in response to that action are crucial to the Agency's claim in this regard, since they are the only facts that connect the originators' general practices to particular securities that the GSEs bought from defendants. . . .
>
> The 2007 reports, lawsuits and investigations regarding loan origination practices cited by defendants may have signaled a potential for problems in the RMBS market generally -- and may, as plaintiff suggests, have triggered a duty on the part of defendants to scrutinize the loans included in their securitizations more closely -- but such reports were

insufficient to trigger the Securities Act's statute of limitations.  Until such time they did or with diligence should have "discovered" otherwise, the GSEs were entitled to rely on defendants' assertion that the loans that underlay these particular securities complied with the guidelines set out in the offering materials. . . .  Whatever questions the GSEs might have harbored in 2007 about the quality of the securitizations they bought from defendants, it cannot be said that they should have "discovered" that those securitizations in fact contained loans that failed to meet the standards set out in the offering materials until they were alerted to this possibility by the rating agencies in early 2008.

UBS I, 858 F. Supp. 2d at 321-22.

## IV.  Reasonable Diligence Would Not Have Led to the Discovery of the Alleged Misrepresentations By September 7, 2007.

The Defendants have relied on general developments in the RMBS market as well as information specific to the seven Securitizations to argue that a diligent, sophisticated investor would have uncovered sufficient facts to assert claims associated with each of the four misrepresentations alleged in this action on or before September 7, 2007.  While the Defendants continue to maintain that the Offering Documents contained no material misrepresentations, they argue that the GSEs had available to them "sufficient information" to plead those claims before September 7.  The general market developments and information about the specific Securitizations will be addressed separately.

## A.   Developments in the Market

The Defendants emphasize the following general trends in the economy and RMBS market in late 2006 and the first half of 2007 as events that required the GSEs to make further inquiry regarding the reliability of the representations that the Defendants made in their Offering Documents for the Securitizations:  It is undisputed that the GSEs saw major upheaval in the RMBS market in the end of 2006 and the first eight months of 2007, after a national housing bubble burst and a lengthy period of appreciation of housing prices reversed itself.  Borrower defaults rose, Originators closed or entered bankruptcy, and credit rating agencies downgraded hundreds of junior tranches in RMBS.  Originators, including many of the principal Originators of the loans at issue here, were publicly accused of irresponsibly aggressive origination practices.  Yet, none of these general market trends had led Nomura or RBS to cease their securitization of RMBS or to stop acquiring mortgage loans from the Originators.  Moreover, none of these trends indicated to the GSEs that Defendants' diligence had been inadequate or that the particular loans the Defendants selected to populate the Supporting Loan Groups for the GSEs' seven Certificates had been materially misrepresented by them in the Offering Documents in the manner alleged in the Complaint.

"[T]he GSEs were entitled to rely on the representations made in the offering documents and to believe that the work done by defendants and their diligence firms made the resulting Supporting Loan Group stronger than the general set of loans being sold by a particular Originator" or by the average originator in the market.  HSBC, 2014 WL 3702587, at *20 (quoting FHFA v. UBS America Inc., 11cv5201 (DLC), 2013 WL 3284118, at *18 (S.D.N.Y. June 28, 2013) ("UBS II")).  Thus, there was "no necessary connection between an Originator's general way of doing business," or general market trends in the performance of PLS, "and the characteristics of a particular group of loans that have been examined and assembled into a securitization by a defendant entity."  Id. (quoting UBS II at *19).  Similarly, such general market information would not lead a reasonably diligent investor in the GSEs' position to believe it was now probable (not merely possible) that the Defendants had ignored the troubling disclosures about Originators and were materially misrepresenting the quality of the loans they placed in the seven Supporting Loan Groups.

Indeed, Freddie Mac purchased two of the seven Certificates from Nomura after the bankruptcy of the principal Originators, relying on the strength of Nomura's diligence.  A contemporaneous purchase approval email indicates that Freddie Mac purchased Nomura Securitization 2007-3 despite the fact that

more than 75% of the underlying loans had been originated by
ResMAE, which had recently declared bankruptcy, because of its
confidence in "Nomura's due diligence controls" and because
Nomura had itself agreed to make "all rep[resentations] and
warrant[ies]" concerning the loans' quality.  The GSEs' reliance
on the Defendants' diligence in these circumstances was
reasonable as matter of law, and a reasonably diligent investor
in the GSEs' position would not have investigated the
representations at issue here on the basis of these developments
in the market.

        **B.    Certificate-Specific Information**

        Nor would the Certificate-specific information cited by
Defendants have caused a reasonably diligent investor in the
GSEs' position to investigate possible misrepresentations in the
Offering Documents.  Defendants cite three categories of such
information: (1) negative property variances; (2) a high level
of delinquencies and EPDs; and (3) credit rating downgrades of
junior tranches in four of the Nomura Securitizations.  None of
these, singly or together, suggest anything more than that the
disclosed credit risks of subprime and Alt-A loans were realized
after the national housing bubble burst.  Where the GSEs, after
analyzing this information, were not particularly concerned
about the Nomura Certificates' performance, and where the credit
rating agencies, after investigating these very securitizations,

stood by the credit ratings they had awarded those tranches, a reasonably diligent investor in the GSEs' position would not have believed misrepresentations concerning the loans' quality were probable, rather than simply possible, and would not have undertaken further investigation of the representations in the Offering Documents, including the Owner-Occupancy and AVM Investigations.

### 1.   Negative Property Variances

Defendants point to an August 27, 2007 report of negative property variances in five of the Securitizations.  For a handful of the thousands of loans, the negative variance reached as high as 80% or 90%.  But, these loans were outliers.  For the oldest Securitization, 2006-HE3, even eleven months after issue -- during a period of nationwide depreciation in home prices -- only 1% of loans had a variance of 40% or more, and only 5% had a variance of 20% or more.  For each of the other four Securitizations, fewer than 2% of the loans had a variance of 20% or more.  The most recent Securitization, 2007-3, issued three months prior to the August report, had no loans with a variance of 40% or more, and only one-third of one percent of loans with a variance of 20% or more.  Defendants have offered no evidence from which to find that, in the midst of the depreciation in housing prices, these variances indicated a material amount of borrower fraud or appraisal inflation.

Accordingly, these reports would not have caused a reasonably diligent investor in the GSEs' position to investigate these Securitizations for borrower fraud, appraisal inflation, or other alleged misrepresentations.

Moreover, the only reports of negative property variances in the Securitizations cited by Defendants are dated August 27, 2007 -- just eleven days before September 7, 2007.  Defendants proffer no evidence to support a finding that, in eleven days, the GSEs could have investigated the representations at issue here and discovered, with sufficient evidence to adequately plead these facts, that Defendants had misrepresented the true characteristics of the relevant Supporting Loan Groups. Defendants urge that the GSEs could have conducted the AVM Investigations before September 7, 2007, but offer no evidence that the loan tapes could have been gathered, the sampling performed, the AVM run on each sampled loan, and the results analyzed to reveal material appraisal bias, in less than two weeks.

## 2.   Delinquencies and EPDs

Nor would the reports in the summer of 2007 of delinquencies and EPDs in the relevant SLGs have indicated, to a reasonably diligent investor in the GSEs position, the probability that misrepresentations had been made in the Offering Documents.  Defendants have cited delinquency figures

-- reaching as high as 21.2% in August for 2006-FM1, but lower
than 10% for the three most recent Certificates -- but offer no
evidence of a benchmark against which to judge these figures.[37]
Given months of housing depreciation, it would be pure
speculation to find that these sixty-day delinquency figures in
a group of subprime and Alt-A loans would cause a reasonably
diligent investor in the GSEs' position to investigate the
representations at issue.

The rate of EPDs was much lower: the highest was 3.1%, for
2006-FM2; each of the other four Certificates for which Wells
Fargo made a report had EPDs below 2%.  Defendants offer
testimony from Callahan, a Pentalpha employee, that an EPD rate
above 0.75% was considered, by Pentalpha, a "red flag."  But,
Callahan's testimony does not establish that such a rate would
indicate anything more than poor performance expected among
subprime and Alt-A loans -- even if the originator's,
aggregator's, and underwriter's diligence had been impeccable --
during a period of depreciating housing prices.

In any event, the GSEs did not merely sit on their hands.
Both GSEs had sophisticated processes in place for monitoring
PLS and identifying for further analysis underperforming
securities.  Fannie Mae monitored its PLS and maintained a PLS

---

[37] In the Complaint, the cited delinquency figures ranged from
one-third of an SLG to more than one-half.

Watch List identifying PLS it had placed under special scrutiny. Freddie Mac made regular reports on its "[w]eakest" PLS, tracking performance and utilizing stochastic modeling to determine whether losses were expected.  Defendants have not suggested -- let alone proffered evidence showing -- that these monitoring processes were deficient in any way.

Instead, Defendants emphasize the fact that a single Certificate, for the 2005-AR6 Securitization, appeared on Fannie Mae's PLS Watch List in 2007.  2005-AR6 appeared on the January 2007 Watch List with a "yellow" rating and then bounced between "Green Under Watch" and "yellow" status until May 2007.  In May, 2005-AR6 was again elevated to "Green Under Watch" -- meaning its risks were "of limited concern based on further analysis" -- a status it retained through September 7, 2007.

During the time 2005-AR6 was rated "yellow," Fannie Mae closely analyzed the Securitization.  Fannie Mae found, in April 2007, that "[t]he cumulative net loss on this deal was only . . . 0.06% of original collateral balance" and that "it would require 46% of the deal balance to default with 50% of loss severity in order for [Fannie Mae's Certificate class] to take any losses.  We believe this is highly unlikely to happen."  In May 2007, Fannie Mae noted that "[a]ccording to our stochastic analysis, we do not project any losses to our holdings over life of the deal[]."  There is no evidence that, prior to September

7, 2007, Fannie Mae ever suspected -- let alone believed probable -- that the quality of the loans underlying the 2005-AR6 Certificate had been materially misrepresented.

Apart from a Freddie Mac "Weakest Deals Report" from 2008, Defendants have proffered no evidence that the GSEs -- despite their sophisticated tools for identifying underperforming PLS -- were particularly concerned by their Nomura Certificates' monthly performance reports, including the negative property variances, delinquencies, and EPDs discussed above.  Defendants do not suggest that these reports, themselves or in combination with anything else, caused the GSEs to believe that Defendants' due diligence processes might in fact have been inadequate, or that the representations in the Offering Documents now at issue might have been materially false.  Indeed, Defendants continue to insist that there were no misrepresentations, and accordingly that misrepresentations could not have caused negative performance.  It is odd that Defendants now argue that this performance, which was in fact (according to Defendants) the result of a realization of disclosed risks, should have caused the GSEs to believe undisclosed risks were probable.

Defendants are incorrect.  These performance figures, which appeared consistent with the realization of a disclosed risk -- home price depreciation -- would not have caused a reasonably diligent investor in the GSEs' position to believe

66

misrepresentations in the Offering Documents were probable or to undertake an investigation that would have revealed the misrepresentations now alleged.

### 3. Downgrading of Junior Tranches

Finally, Defendants point to the fact that junior tranches in four of the Nomura Securitizations were downgraded by credit rating agencies in mid-July and August 2007. Yet, after Moody's "rigorous examination of all 2006 subprime RMBS deals," and after S&P announced that a senior tranche would have to "demonstrate a higher level of relative protection to maintain its rating when the class immediately subordinate to it is being downgraded," the rating agencies did not downgrade, or even place on negative watch, any of the senior Nomura tranches in which the GSEs had invested, through September 7, 2007. The rating agencies agreed with the GSEs' internal analyses: even with the turbulence in the RMBS market and depreciation in housing prices, the GSEs' Certificates had so much credit protection that the risk of loss was remote and their credit quality remained unchanged.[38]   Although the rating agencies spoke

---

[38] This is not to suggest that storm warnings indicating misrepresentations require a risk of loss; it is possible that misrepresentations are revealed yet do not sufficiently undermine a senior tranche's credit protection to cause losses. Here, Defendants argue that a reasonably diligent investor would have responded to the negative performance of the Certificates and the resulting downgrades of junior tranches and undertaken an investigation into possible misrepresentations in the

generally about loose origination standards and possible fraud, no agency specifically linked those general phenomena to the negative performance of those four Nomura Securitizations, or suggested they were inconsistent with a response to falling housing prices.

And again, these rating actions in mid-July and August 2007 were just weeks before September 7, 2007.  Defendants have offered no evidence of the length of time it took the GSEs to investigate its claims here, or of how long it would take a reasonably diligent investor in the GSEs' position to investigate the claims such that it could adequately plead them.

In sum, this record supports only one conclusion as a matter of law.  The GSEs acted diligently with respect to their rights concerning the Nomura Securitizations.  Given the nationwide downturn in housing prices, an increase in subprime and Alt-A mortgage defaults was to be expected.  Both GSEs had sophisticated processes in place for detecting and analyzing underperforming PLS.  When Fannie Mae was briefly concerned about its Nomura Certificate, it closely analyzed the

_____

Offering Documents.  Where that reasonably diligent investor has paid a premium for credit enhancement that protects the Certificates from a certain level of defaults -- believing that that level of credit enhancement is appropriate, to guard against the realization of known risks -- a level of default substantially below that, that does not threaten loss to the investor, is likely to be consistent with the realization of those known risks.

Securitization and determined there was little cause to be concerned about its performance.  When the rating agencies closely examined 2006 and 2007 RMBS in July and August 2007 -- just weeks before September 7, 2007 -- they stood by their ratings of the senior tranches at issue.  Indeed, even when rating agencies took action with respect to four of the Securitizations and downgraded junior tranches, they did not downgrade, or even place on watch, the senior tranches.  This confirmed that the performance of the Nomura Certificates was consistent with the realization of a known risk -- not an aberration that would indicate an unknown risk hidden by misrepresentations.

None of this information, when considered as a whole, would cause a reasonably diligent investor in the GSEs' position to believe that misrepresentations in the Offering Documents for the Nomura Certificates were probable (not merely possible) and consequently undertake an investigation that would have uncovered the alleged misrepresentations on or before September 7, 2007.  Accordingly, FHFA is entitled to summary judgment on Defendants' statute of limitations defense.

**CONCLUSION**

FHFA's August 25, 2014 motion for summary judgment on

Defendants' statute of limitations defense is granted.


SO ORDERED:

Dated:     New York, New York
           November 18, 2014

_____
              DENISE COTE
       United States District Judge