SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588

WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

October 24, 2014

By E-mail and ECF

The Honorable Denise L. Cote,
    United States District Judge,
        Daniel Patrick Moynihan United States Court House,
            500 Pearl Street, Room 1610,
                New York, New York 10007-1312.

Re:   *FHFA* v. *Nomura Holding America, Inc., et al.*, 11 Civ. 6201 (S.D.N.Y.)

Dear Judge Cote:

Defendants respectfully submit this opposition to plaintiff's Motion *in Limine* No. 3 ("Motion"), which seeks to exclude evidence relating to the housing goals set for Freddie Mac and Fannie Mae by the Department of Housing and Urban Development ("HUD"). The motion should be denied.

## BACKGROUND

Freddie Mac and Fannie Mae were chartered by Congress to provide stability and liquidity in the secondary mortgage markets and to support affordability, "including [through] activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities." *See* Federal Home Loan Mortgage Corporation Act, Pub.L. 91-351, as amended Pub.L. 101-73, Title VII, § 731(a), Aug. 9, 1989, 103 Stat. 429; Pub.L. 102-550, Title XIII, § 1382(a), Oct. 28, 1992, 106 Stat. 4002; Federal National Mortgage Association Charter Act, 12 U.S.C. § 1716(3). HUD accordingly set annual affordable housing goals that Freddie Mac and Fannie Mae were required to meet. (*See* Motion at 1-2.)

Among the required housing goals were three primary sub-goals, which were in effect during the period 2005 to 2008: (i) the "Low and Moderate-Income" subgoal, which required lending to households with incomes below the median; (ii) the "Underserved Areas" subgoal, which required lending to defined areas, including areas with "minority concentrations"; and (iii) the "Special Affordable" subgoal, which required lending to households with incomes less than or equal to 60 percent of median income or less than or equal to 80 percent of median income and located in low-income areas. 24 C.F.R. §§ 81.11 - 81.14, 81.2 (2004). As Freddie Mac and Fannie Mae routinely disclosed in their SEC filings, failing to meet these goals could have serious consequences, including severe sanctions. (Ex. A (Fannie Mae 2005 10-K) at 25; Ex. B (Freddie Mac 2006 Annual Report), at 6-7; Ex. C (Lockhart Tr.), at 275:12-277:9.) The CEOs of both entities were concerned they would suffer the "wrath" of Congress, and potentially lose their protected status, if they failed to meet those goals. (*Id.* at 275-278.) Indeed, the compensation of Freddie Mac's and Fannie Mae's

Hon. Denise L. Cote                                                                                          -2-

CEOs (tens of millions of dollars a year) and other executives were tied, in part, to meeting housing goals.  (Ex. D (Mudd Tr.), at 223:20-225:12; Ex. E (Syron Tr.), at 237:21-241:24, 244:13-245:18.)

        Freddie Mac and Fannie Mae met these goals in part through the purchase of private label securities backed by loans that met the goals set by HUD.[1]  To enable Freddie Mac and Fannie Mae to meet HUD's requirements, broker-dealers provided them with loan-level information about the pools of loans from which private label securitizations were to be created.  As Fannie Mae's Paul Norris explained, "the whole collateral pool was ours to carve out."  (Ex. H (Norris Tr.), at 129:12-13.)  In selecting the loans that would be included in the loan groups supporting tranches they intended to purchase, Freddie Mac and Fannie Mae carefully analyzed loan-level data, including property addresses, to ensure that the loan pools underlying their certificates included as many goal-qualifying loans as possible.[2]  For example, Freddie Mac specifically "[t]arget[ed] Low Mod Sub Goal" loans for securitizations at issue in this action, as shown in the trade ticket for each deal.  (Ex. P, at FHFA00999462-463 (2006-HE3); Ex. Q, at FHFA13013605 (2006-FM1); Ex. R, at FHFA04588001-002 (2006-FM2); Ex. S, at FHFA01003633 (2007-1); Ex. T, at FHFA16863768 (2007-2); Ex. U, at FHFA01002835, 842-3, 845-6 (2007-3).[3]  In addition to using loan-level data to score housing goals, Fannie Mae used that loan-level data to run automated valuation models ("AVMs") on some of the loans backing private label securities it purchased.  (Ex. Y, at FHFA01660951-952; *see also*, *e.g.*, Ex. Z (collecting loan-level data for purposes of analyzing appraisal bias).)

        Freddie Mac and Fannie Mae understood that goal-qualifying loans were riskier than other loans and were more likely to default.  As Freddie Mac's Gary Kain testified, because such loans "tended to be low to moderate income, . . . most people would agree that lower income borrowers tend to be, you know, end up being more risky loans."  (Ex. G (Kain Tr.), at 692:4-10; *id.* at 664:4-16 (noting that Freddie Mac would accept greater risk and lower returns on its investment to meet housing goals).)  Freddie Mac's corporate representative Donna Corley testified that (i) "[t]here could be higher risk characteristics" for goal-qualifying loans (Ex. I (Corley Tr.), at 348:12-25); (ii) "[h]igher risk mortgages disproportionately tend to be goal-qualified" (*id.* at 352:11-25); (iii) lower household income "correlates with various risk factors, such as less wealth, less employment stability, higher loan-to-value ratios, and lower credit scores," which made the loans higher risk (*id.* at 405:23-406:12, 407:17-408:15); and (iv) goal-qualifying whole loans accounted for a disproportionate share of Freddie Mac's 2008 realized losses and that goal-qualifying loans in

---

[1]  *See* Ex. F, at FHFA13307777 ("[H]ere's the bottom line: we operate under stringent affordable housing goals set by HUD.  Without doubt, had we not participated in this segment of the market [PLS] we would have missed our housing goals and would have been subject to sanctions—including a mandated housing plan—by HUD."); Ex. G (Kain Tr.), at 663:14-23 ("Q. With respect to the PLS side of it, would it be fair to say that the PLS purchases were a critical component of Freddie's efforts to meet its housing goals during the 2005 through 2007 time period? A. I believe they were a very important element."); Ex. C (Lockhart Tr.), at 334:18-21 ("Th[e GSEs] needed [to buy PLS] to meet their affordable housing goals and they certainly wanted the added profitability they expected from it.").

[2]  Ex. I (Corley Tr.), at 327-31; Ex. J (2006-FM1); Ex. K (2006-FM2); Ex. L (2006-HE3); Ex. M (2007-3); Ex. N (2007-2); *see also* Ex. O (Salahuddin Tr.), at 443:9-14 (Q. You would keep the loans that were goal accretive in the pool, cutting the loans that were not goal accretive? A. We would cut the loans that were not goal accretive and we would select other loans that met our other stips.").

[3]  Plaintiff protests that evidence regarding housing goals is irrelevant to the Fannie-purchased deal at issue because there is no evidence that it was "scored" for housing goals.  (Motion at n.1.)  In fact, although plaintiff failed to locate or produce the pre-purchase analysis for that deal (Ex. V (June 28, 2013 Letter), at 1), other evidence shows that Fannie Mae's Alt-A purchases did target housing goals.  (*See* Ex. W; Ex. X, at FHFA-5863812-813.)

private label securities were "likely similar" (*id*. at 422:19-425:15).[4]  The risks associated with purchasing goal-qualifying loans were discussed at the highest levels,[5] yet Freddie Mac and Fannie Mae actively sought out these loans—including through purchases of private label securities—and routinely made exceptions to their investment requirements to purchase private label securities that were backed by goal-qualifying loans.[6]

As has been widely documented, the drive to meet housing goals led, in part, to Freddie Mac and Fannie Mae's large losses and ultimate conservatorship.  Mr. Lockhart, the Director of plaintiff's predecessor agency during the period 2006-2008, conceded in testimony that Freddie Mac's and Fannie Mae's purchases of private label securities "to increase market share, raise revenue and meet housing goals" contributed to their losses and eventual conservatorship.[7]  Likewise, Freddie Mac and Fannie Mae themselves have attributed their "impairment and trading losses from 2006 subprime" to their "goals sourcing efforts."  (Ex. X, at FHFA05863812-813.)

## ARGUMENT

A court "has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds . . . .  Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context."  *Viada* v. *Osaka Health Spa, Inc.*, 2005 WL 3435111, at *1 (S.D.N.Y. Dec. 12, 2005) (internal citations omitted); *see also United States* v. *Paredes*, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001); *Nat'l Union Fire Ins. Co.* v. *L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996).

If this motion *in limine* is granted, plaintiff will succeed in misleading the jury into thinking that Freddie Mac and Fannie Mae were ordinary investors (no different than any commercial entity).  Such an impression would be false—and would foster the misimpression that

---

[4]  *See also* Ex. E (Syron Tr.), at 232:6-233:9 (agreeing that "in order to make more progress with your affordable housing goal, you had to [buy] riskier mortgages"); Ex. AA (Romano Tr.), at 317:16-318:6 ("[T]here is a potential for portions of [goals-qualifying] loans to have a higher probability of default.").

[5]  *See* Ex. BB, at FHFA06123086, FHFA06123090 (Freddie Mac Board of Directors presentation, "Cost of Freddie Mac's Affordable Housing Mission," noting that "[h]igher credit risk mortgages disproportionately tend to be goal-qualifying" and that "[t]argeted affordable loans are those that [Freddie Mac] likely would not purchase in the absence of housing goals"); *see also* Ex. I (Corley Tr.), at 352:11-25.

[6]  *See, e.g.*, Ex. CC (Dec. 12, 2006 memo from Kevin Palmer to Ray Romano and Donald Bisenius seeking a credit exception for Freddie to purchase sub-AAA bonds to meet housing goals); Ex. DD (FHFA11516379) (Nov. 18, 2005 message from Kevin Palmer to Aaron Pas "look[ing] for an exception" "for the benefit of the housing goals."); Ex. EE, at FHFA12076779-780 (Oct. 30, 2006 email from Ashley Dyson noting that Fannie Mae was "making certain exceptions to our subprime stips to purchase pools that are rich in goals as we approach year-end.").

[7]  *See, e.g.*, Ex. C (Lockhart Tr.), at 281:25-282:10 ("A. What I have said about the housing goals were they were excessive and certainly they were one of the causes for the ultimate conservatorship, one of the many causes. Q. Did that include the fact that the goals were being met through purchases of private label securities? A. Yes."); *id*. at 224:23-226:16 (acknowledging that "[t]he decisions of the board of directors and senior management prior to 2007 to acquire Alt-A loans and other high risk loan products is a principal contributor to Fannie Mae's current earnings losses and deteriorated financial position" and confirming that "[t]hese would have included the reasons for Fannie Mae's purchases of [private label securities] during the '05 to '07 time period, namely to increase market share, raise revenue and meet housing goals."); Ex. FF (Lockhart FCIC Tr.), at 6 ("I believe that high affordable housing goals and the resulting political pressure compounded by the Enterprises' drive for market share and short-term profitability were major reasons why they lowered their underwriting standards.").

plaintiff seeks to impart to the jury about the identities and purposes of Freddie Mac and Fannie Mae and their reasons for purchasing the securities at issue. These facts about Freddie Mac and Fannie Mae are critically important to the jury's consideration of loss causation, materiality and other issues. A fair trial requires that the jury not be deprived of this fundamental information about Freddie Mac and Fannie Mae.

## I.     EVIDENCE CONCERNING HOUSING GOALS IS RELEVANT TO LOSS CAUSATION.

Evidence regarding housing goals is relevant to defendants' loss causation defense, because it demonstrates that plaintiff's losses are attributable to factors other than the alleged misrepresentations. 15 U.S.C. §§ 77k(e), 77l(b). By systematically selecting loans that met housing goals for the seven certificates at issue in this action, including housing subgoals targeting low and moderate-income borrowers, Freddie Mac and Fannie Mae chose to create certificates backed disproportionately by more risky loans. *See* pp. 1-3, *supra*. When the economic downturn took hold, the goal-qualifying loans were the most likely to default because their performance was "correlate[d] with various risk factors, such as less wealth, less employment stability, higher loan-to-value ratios, and lower credit scores" (Ex. I (Corley Tr.), at 405:23-406:8, 407:17-408:15)—factors that the jury is entitled to consider in evaluating whether and to what extent the economic downturn and collapse of the housing market are what caused Freddie Mac and Fannie Mae's losses, rather than any alleged misrepresentation in the offering documents.

Moreover, the evidence shows that Freddie Mac's and Fannie Mae's losses were attributed by their own regulator, at least in part, to their pursuit of housing goals. *See* p. 3, n.7, *supra*. The evidence also shows that Freddie Mac's Board of Directors contemporaneously acknowledged that a disproportionate share of Freddie Mac's 2008 realized losses was from goal-qualifying loans. (Ex. I (Corley Tr.), at 422:19-425:15.) To exclude evidence that Freddie Mac and Fannie Mae sought to comply with housing goals, rather than to make investment decisions solely based on economic considerations, would deprive the jury of key evidence that goes to the heart of plaintiff's claims.

## II.     EVIDENCE CONCERNING HOUSING GOALS IS RELEVANT TO MATERIALITY.

Evidence concerning housing goals is also relevant to materiality. The standard for materiality is "[w]hether the defendants' misrepresentations, taken together and in context, would have misled a reasonable investor." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (internal citations omitted). Materiality is a "fact-intensive inquiry . . . '[that] necessarily depends on all relevant circumstances of the particular case.'" *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 653 (S.D.N.Y. 2012). Here, given Freddie Mac's and Fannie Mae's unique mission and goals, they were by definition the only "investors" in the market for securities backed by housing-goals eligible loans. They were also the only investors with the unique federally mandated missions of supporting liquidity and affordability the housing market, unlike any other purely private RMBS investor. Thus, in assessing the materiality of the alleged misstatements and omissions, the jury is entitled to hear evidence of Freddie Mac's and Fannie Mae's investment objectives, including the need to meet HUD goals through securities purchases. Materiality should also be assessed from the perspective of a reasonable investor in the plaintiff's position, *i.e.*, a government sponsored enterprise with broad public missions to support liquidity and affordability to the market. Even if the relevant market is broader, institutional goals or requirements that informed their investment decisions—here, housing goals—are relevant to what a "reasonable investor" would

Hon. Denise L. Cote                                                                                      -5-

have considered important in context.  Indeed, given their role as among the largest purchasers of residential mortgage-backed securities, Freddie Mac and Fannie Mae set the standard for reasonable investors.  Finally, where a plaintiff purchases securities for a specific purpose—here, to meet federally mandated housing goals—that purpose must be considered by the jury in assessing materiality.  *See Sable* v. *Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 335 (S.D.N.Y. 1993) ("The conceded purpose for which plaintiffs invested was tax losses; that reason undercuts their current claims. Purchase price, interest rates, and profits to affiliates are of little material interest to a party whose goal is to maximize tax losses in exchange for a limited partnership investment.").[8]

## III.    EVIDENCE CONCERNING HOUSING GOALS IS RELEVANT TO STATUTE OF LIMITATIONS.

Evidence regarding housing goals also explains why Freddie Mac and Fannie Mae continued to purchase private label securities notwithstanding the fact that by September 2007, they were on notice of their potential claims.  Moreover, Freddie Mac's and Fannie Mae's receipt of loan tapes with property addresses for housing goal analysis further supports defendants' claim that Freddie Mac and Fannie Mae could have pled these claims prior to September 7, 2007, including by running AVMs on the loans they purchased as part of private label securitizations (as Fannie Mae actually did).  *See* pp. 1-2, *supra*.

## IV.    EVIDENCE CONCERNING HOUSING GOALS PROVIDES NECESSARY CONTEXT AND POSES NO RISK OF JURY CONFUSION.

Evidence concerning housing goals also provides important and necessary background and context about the creation and structuring of the securities at issue in this case, the reasons Freddie Mac and Fannie Mae purchased those securities, the known heightened risks associated with goal-qualifying loans, and other issues that the jury will need to understand.  The Court may not properly exclude evidence that provides such critical background and context for the claims and defenses in this case.  *See SEC* v. *Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013); *Perez* v. *Consol. Edison Corp. of N.Y.*, 2008 WL 194615, at *1 (S.D.N.Y. Jan. 23, 2008); *see also Rivera* v. *Inc. Vill. of Farmingdale*, 2013 WL 6888385, at *5 (E.D.N.Y. Dec. 31, 2013).[9]  Plaintiff's arguments that evidence related to housing goals poses "a significant risk" of jury confusion or may lead a jury to believe that reliance is an element of the claims at issue (Mot. at 4) is frivolous.  Far from confusing the jury, evidence regarding Freddie Mac's and Fannie Mae's pursuit of private label securities backed by goal-qualifying loans provides critical context.  A fair trial requires that the jury understand the unique position of Freddie Mac and Fannie Mae and what factors drove their purchases.  Any concerns regarding confusion can easily be remedied by an instruction from the Court.  *See TVT Records* v. *Island Def Jam Music Grp.*, 250 F. Supp. 2d  341, 346 (S.D.N.Y. 2003).  Plaintiff's motion should be denied.

---

[8]  Defendants recognize that the Court has rejected the ruling in *APA Excelsior III* v. *Premiere Techs., Inc.*, 476 F.3d 1261 (11th Cir. 2007), that Section 11 creates only a rebuttable presumption of reliance.  Defendants preserve their objection to that ruling and note that the evidence at issue would be relevant to rebutting a presumption of reliance.

[9]  Plaintiff may attempt to cast doubt on Defendants' knowledge defense by questioning why Freddie Mac and Fannie Mae would have gone forward with purchases if they had been aware of the alleged misrepresentations, and the jury could also assess defendants' evidence on that basis.  The fact that Freddie Mac and Fannie Mae were willing to go forward with purchases that they have acknowledged they would not otherwise make in order to meet their housing goals even in the face of such knowledge is thus strong evidence supporting the knowledge defense, just as it supports statute of limitations. The jury should not be precluded from considering this type of contextual evidence.

Hon. Denise L. Cote                                                                    -6-

Respectfully submitted,

/s/ David B. Tulchin

David B. Tulchin


cc:     All Counsel