# Exhibit B



**2006** Annual Report



Freddie
Mac

We make home possible®



## Freddie Mac Facts

- Since 1970, Freddie Mac has made home possible more than 50 million times.

- More than half of all Freddie Mac mortgage purchases support housing for low- to moderate-income families. More than 90% of all the apartment units financed by Freddie Mac are for low- to moderate-income families.

- ***Corporate Responsibility Officer Magazine*** has named Freddie Mac to its list of "100 Best Corporate Citizens" for 2007, putting our company near the top of America's corporations based on environmental responsibility, corporate governance and ethics, fairness toward employees, accountability to local community, providing responsible products and service to customers and maintaining a healthy rate of return for investors.

- Since December 2003, we have increased the dividend on our common stock by 92%.

- Freddie Mac Foundation celebrated its 15th anniversary last year.

- Freddie Mac's annual *Hoops for the Homeless* event raised more than $900,000 for homeless families in 2006.

- Freddie Mac 2006 workplace awards:

    ***Fortune Magazine***
    "Best Companies for Minorities"

    ***Latina Style Magazine***
    "Best Places for Women—Honorary"

    ***Hispanic Business Inc.***
    "Top Companies for Diversity"

    ***Business Ethics Magazine***
    "100 Best Corporate Citizens"

    ***Washington Business Journal***
    "Top Local Corporate Philanthropists"

# Company Overview

Congress chartered Freddie Mac in 1970 with the mission of bringing liquidity, stability and affordability to the nation's mortgage markets and expanding homeownership and affordable rental housing opportunities. Since then, Freddie Mac has made home possible more than 50 million times.

As one of the largest purchasers of mortgage loans in the United States, Freddie Mac provides a vital link between mortgage lenders and investors. We don't make mortgage loans directly to homebuyers. Rather, we benefit consumers by providing lenders across the country with a steady flow of low-cost mortgage funding in good times and bad. Because Freddie Mac also provides assistance for affordable rental housing, we've helped make home possible for more than 4 million renters.

Our mission of expanding affordable housing opportunities is the foundation of our business. It forms the framework for our business activities, shapes the products we bring to market and drives the services we provide to the nation's housing and mortgage industry. Everything we do comes back to making America's mortgage markets liquid and stable and increasing opportunities for homeownership and affordable rental housing across America. ■



## A Message from the Chairman

2006 was a challenging year in the U.S. housing and mortgage markets, and Freddie Mac shared in those challenges. But even though housing weakened last year, Freddie Mac gained some strength.

Housing starts tumbled by 13 percent in 2006. Home purchases fell 10 percent. Mortgage originations dropped and home prices began to decline in a number of local markets. And the possibility of further weakness in the sector remains a leading concern for economic growth in 2007—particularly if accompanied by widespread loan defaults or a severe tightening of credit standards.

At this writing, defaults and late payments have remained relatively low on prime mortgages, which are made to lower-risk borrowers and account for the lion's share of home loans. But late payments have risen swiftly over the past year on subprime mortgages, those made to borrowers having spottier credit histories and posing higher risks.

Yet despite last year's many challenges—which included reduced housing affordability, rising mission demands, tight spreads, intense competition and voluntary limits on our retained portfolio—Freddie Mac made continued progress. We increased our earnings, served our vital public mission and strengthened our franchise.

We did not meet all our 2006 objectives, particularly as to financial reporting and internal controls. This was very disappointing to me and to your entire management team. But we have implemented a sound, comprehensive plan to make the needed improvements and are moving ahead briskly. The timing of this annual report is itself one small sign of progress. Our plan should allow us to resume quarterly reporting in the second half of 2007.

## Key Accomplishments

### *Building Shareholder Value*

I'll begin by summarizing Freddie Mac's improved business and financial performance. Our net income grew last year to approximately $2.2 billion, up roughly 4 percent from 2005. Return on common equity was 8.6 percent, up from 7.7 percent for 2005. Fair value, another very important measure of our performance, grew before capital transactions by approximately $2.5 billion last year, compared to a $1.0 billion increase in 2005. Fair value return on equity was approximately 9.5 percent, rebounding from 3.7 percent the previous year.

This improved performance was based on several factors. For starters, we achieved strong growth of 10.6 percent in our credit guarantee portfolio—slightly outpacing the overall market. By earning high marks for customer satisfaction and purchasing a broader range of loans, we were able to buy not only a larger volume but also a more representative mix of mortgages in 2006. This performance reflected the company's enhanced responsiveness and the efforts of our sales force. We ended the year with a total of $1.5 trillion in mortgage securities issued—up from less than $1 trillion in 2001.

Another key to Freddie Mac's success in 2006 was our disciplined management of interest-rate risk. One of the many reasons was our extensive use of callable debt—which we use more than most mortgage investors and believe gives us a real comparative advantage in managing risk. As a result, we came through a challenging year well positioned to deal with a broad range of interest-rate conditions, and with the value of our shareholders' equity well protected from interest rate swings.

On the credit risk side, Freddie Mac's exposures remained well controlled and our total single-family 90-day delinquencies actually declined during the year. At year's end, only 6 percent of our total mortgage portfolio was in nontraditional mortgages and the portfolio's average loan-to-value ratio was 57 percent. Experience and recent market developments tell us to be careful, however, and we are keeping a watchful eye on our 2006 book of business. While we are in better position than many, we have set aside increased loan loss reserves, as our credit portfolio remains vulnerable to significant declines in house prices.

Low funding costs were another building block of our success in 2006, with improvements across the yield curve. As an example, our funding cost advantage relative to LIBOR for our 10-year Reference Notes® securities increased in 2005 and 2006 by almost 20 basis points. We've said before that when spreads are tight, we may lose some return on the asset side, but we can often make up ground on the debt side. That is exactly what we did last year, by capitalizing on our improved funding costs.

Capital management remains a priority for us. Freddie Mac increased our common dividend again in 2006 to $2.00 per share annually, bringing the total increase in our dividend to 92 percent since the end of 2003. Moreover, we returned $2 billion to our common shareholders in a preferred-for-common restructuring. All told, we returned some $3.3 billion to common shareholders last year—the most in Freddie Mac history.

Going forward, Freddie Mac remains strongly capitalized. With a strong balance sheet, our estimated regulatory core capital grew in 2006 to over $36 billion. As we complete our financial reporting and internal controls remediation, I hope we will be in a better position to return some of the capital in excess of our statutory minimum that we have accumulated over the past several years. And I'm pleased to report that, consistent with discussions with our regulator, our board has approved an additional $1 billion in common repurchases and preferred offerings this year.

### Serving Our Mission

As a government-sponsored enterprise (GSE), Freddie Mac faced mounting mission challenges in 2006:  reduced affordability, rising concerns about credit quality and predatory lending, a housing sector losing momentum, and HUD affordable housing goals of unprecedented difficulty. Despite these challenges, we served our mission well—providing liquidity, affordability and stability to the housing finance market, and to a broader economy hoping to see a "soft landing" for housing.

I am proud that Freddie Mac's affordable performance in 2006 was among our strongest ever. We believe we met the most demanding affordable housing goals in the company's history, pending determination by the U.S. Department of Housing and Urban Development. Of the nearly 3.3 million homes we financed last year, almost 56 percent were affordable to low- or moderate-income families. We served 300,000 first-time homebuyers. And in another record year for our growing multifamily business, we financed almost half a million affordable apartment homes.

We also believe we achieved two of our three subgoals, although we reported to HUD that we just missed one of the extremely challenging subgoals by less than 700 loans out of more than 900,000 eligible mortgage purchases. The difficulty of this challenge was magnified by market forces affecting the entire housing sector that made the average home less affordable in 2006. It also highlighted the GSEs' need to strike a balance between striving to achieve demanding housing goals and ensuring that we do not encourage imprudent lending.

When Hurricane Katrina riveted the nation's attention in 2005, Freddie Mac was there to help. In 2006, long after most television cameras were gone, Freddie Mac stayed actively involved in rebuilding the Gulf Coast region. After the hurricanes struck, we pledged to

buy $1 billion in mortgage revenue bonds (MRBs) from state and local housing finance agencies in the Gulf. We fully met that commitment in 2006, less than 12 months later. The MRBs we have purchased will provide low-cost financing for more than 10,000 families. In addition, Freddie Mac provided well over $700 million in mortgage funding last year for multifamily properties along the Gulf Coast.

Freddie Mac acted last year to ease the increasing strains on housing affordability. We supported our lenders by introducing an innovative 40-year product that combines the advantages of a fixed-rate loan with lower monthly costs. And we expanded our special workforce housing initiative to include military families, as well as police, firefighters, teachers and nurses. Those who defend us from harm, teach our children and care for our sick should be able to live in the communities they serve.

This February, in order to protect consumers and raise underwriting standards, Freddie Mac took the lead in announcing that after September 1, we will not buy subprime mortgages that pose an unacceptable risk of excessive payment shock and possible foreclosure. As a GSE, we feel a responsibility not only to help families *buy* their own homes, but to help them *keep* their homes, as well.

Freddie Mac also exerted responsible leadership in 2006 by addressing concerns about credit quality and practices in the housing finance market. For instance, we developed and instituted workout policies that can significantly reduce the odds of home loss through foreclosure. We also continued educating consumers on how to avoid predatory practices, and maintained our pioneering policies that led the industry in recent years to reject abusive loans that limit consumers' rights.

### Strengthening Our Team

We strengthened Freddie Mac last year by building out the company's executive team in several areas vital to our success. Of great interest to our investors is the addition of Buddy Piszel as Chief Financial Officer. Buddy brings experience and zeal to the task of making Freddie Mac's financials more transparent, accessible and useful to investors. Other key additions included our new head of Enterprise Operational Risk, Gareth Davies; General Auditor, Kirk Die; Corporate Controller, Jim Egan; Chief Information Officer, Jim Hughes; Senior Vice President for Market Risk Oversight, Manoj Singh; and Vice President for Internal Controls, Jim Larkin, among others.

Of course, the strength of our team goes far beyond its executives. Freddie Mac's greatest asset is its skilled and dedicated employees, and their efforts are critical to our success. So we were gratified by our enhanced employee engagement in 2006, and we thank all our employees for their hard work.

## Challenges to be Addressed

While Freddie Mac reached many of our goals last year, some major challenges remained unmet. Foremost among them was the essential task of getting current in our financials and strengthening our internal controls. There's no question this has taken longer than any of us expected.

Fortunately, we have developed and are carrying out a comprehensive plan that embodies our detailed blueprint for completing this job. We have first-rate teams and project leaders implementing this plan and they are making good progress. Our goal is to return to quarterly financial reporting this year. And we are working assiduously to improve our internal controls systems and infrastructure. As I said in last year's letter to stockholders, Freddie Mac must become the standard of excellence not only for managing mortgage risk, but for the accounting and internal controls associated with it.

The highly competitive, tight-spread environment we faced last year is another ongoing challenge for us in 2007. Our improved funding costs are part of the answer, as I mentioned. More broadly, we must continue to take other steps going forward—as with our expanded use of structured securities, for example—to generate acceptable returns in spite of tight margins.

Freddie Mac worked hard to hold its own in market share last year. While last year's 43 percent share was marginally below our 2005 figure, we consciously turned away some business that would not have served our mission or return objectives, rather than pursue additional share for share's sake. Looking ahead, we are focused on pricing issues as well as strong customer relationships.

Senior management is also keenly focused on Freddie Mac's expenses. Although these rose modestly last year—mostly in professional services related to our financial remediation—their rate of growth still was exceeded by the rate of growth in our business. This was in keeping with our long-term goal of managing administrative expenses to be a decreasing percentage of our mortgage portfolio, subject to the near-term imperative that we complete our needed investments in financial reporting and internal controls.

Building a stronger future for this company includes building support for the GSE model. Freddie Mac continues to strongly support an appropriate legislative solution that would strengthen our oversight and enable us to fulfill our vital housing mission. And we are playing a constructive role toward that end. Throughout 2006, we worked closely with our regulators at OFHEO and HUD, with the Administration and with Congress, to achieve balanced legislative and regulatory solutions that address the concerns of the past but are consistent with the growing demands of the future. This will remain a focus for me, and for this company, until the job is done.

Our guiding principle in this is that we support an independent regulatory structure modeled on that for banks. Once legislation is enacted, it is likely to remain in place for a very long time. Accordingly, we feel we have a responsibility to housing, our shareholders and the country at large to make our views known.

That's why I have explained publicly how the GSEs will become even more important in the years to come. And that, in turn, is why I have asked decision-makers not to unduly hamper the GSEs, just as the nation is about to need us most.

**Conclusion**

Looking at 2006 as a whole—from our growing guarantee volumes and earnings, to our vital housing mission, to our internal and external progress—one overarching fact emerges. While we did not accomplish everything we wanted to, Freddie Mac ended the year in a stronger position than we began it.

Our challenge is to put enough years like that back to back and become a high performer. All my experience makes me confident that this is what is happening at Freddie Mac—and our trajectory is clear.

However, it is *your* confidence in this company that truly matters. For it is what allows us to make home possible for America's families; to exert responsible leadership; and to lower costs for homeowners and renters alike. The congressional genius in designing the GSEs was to accomplish a public mission not with federal expenditures, but using private capital.

So thank you for your confidence in this franchise. It is what makes the GSE model work. And our aim every day is to earn it. ■

Sincerely,

Richard F. Syron
**Chairman and Chief Executive Officer**

# 2006 Annual Report to Stockholders

# INFORMATION STATEMENT
### AND
# ANNUAL REPORT TO STOCKHOLDERS
**For the fiscal year ended December 31, 2006**

This Information Statement contains important financial and other information about Freddie Mac. We will supplement this Information Statement periodically. You should read all available supplements together with this Information Statement. We also provide information about the securities we issue in the Offering Circular for each securities program and any supplement for each particular offering. You can obtain copies of the Information Statement, Offering Circulars, all available supplements, financial reports and other similar information by visiting our Internet website (www.freddiemac.com) or by writing or calling us at:

**Freddie Mac**
**Investor Relations Department**
**Mailstop 486**
**8200 Jones Branch Drive**
**McLean, Virginia 22102-3110**
**Telephone: 571-382-4732 or 1-800-FREDDIE (800-373-3343)**
**shareholder@freddiemac.com**

Our principal offices are located at 8200 Jones Branch Drive, McLean, Virginia 22102 (telephone: 703-903-2000).

**THIS INFORMATION STATEMENT IS DATED MARCH 23, 2007**

**TABLE OF CONTENTS**

Page

BUSINESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
REGULATION AND SUPERVISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
RISK FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
MARKET FOR THE COMPANY'S COMMON EQUITY, RELATED STOCKHOLDER
  MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
FORWARD-LOOKING STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
SELECTED FINANCIAL DATA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
  CONDITION AND RESULTS OF OPERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    CONSOLIDATED RESULTS OF OPERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    CONSOLIDATED BALANCE SHEETS ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    CONSOLIDATED FAIR VALUE BALANCE SHEETS ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    LIQUIDITY AND CAPITAL RESOURCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    RISK MANAGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
      Operational Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
      Interest-Rate Risk and Other Market Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
      Credit Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
    OFF-BALANCE SHEET ARRANGEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
    CRITICAL ACCOUNTING POLICIES AND ESTIMATES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
    PORTFOLIO BALANCES AND ACTIVITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
    QUARTERLY SELECTED FINANCIAL DATA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
    RISK MANAGEMENT AND DISCLOSURE COMMITMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA . . . . . . . . . . . . . . . . . . 94
PROPERTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
LEGAL PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
  FINANCIAL DISCLOSURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
CONTROLS AND PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE . . . . . . . . . . . . . . . . . . . . . 153
EXECUTIVE COMPENSATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND
  RELATED STOCKHOLDER MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR
  INDEPENDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
PRINCIPAL ACCOUNTANT FEES AND SERVICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
CERTIFICATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155
RATIOS OF EARNINGS TO FIXED CHARGES AND EARNINGS TO COMBINED FIXED CHARGES
  AND PREFERRED STOCK DIVIDENDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156
ADDITIONAL FINANCIAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156
INDEX OF ACRONYMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

*This Information Statement and Annual Report includes forward-looking statements, which may include expectations and objectives for our operating results, financial condition, business, remediation of internal controls and trends and other matters that could affect our business. You should not unduly rely on our forward-looking statements. Actual results might differ significantly from our forecasts and expectations due to several factors that involve risks and uncertainties, including those described in "BUSINESS," "RISK FACTORS," "FORWARD-LOOKING STATEMENTS" and "MANAGE-MENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS," or MD&A. These forward-looking statements are made as of the date of this Information Statement and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Information Statement, or to reflect the occurrence of unanticipated events.*

## BUSINESS

### Overview

Freddie Mac is a stockholder-owned company chartered by Congress in 1970 to stabilize the nation's residential mortgage markets and expand opportunities for homeownership and affordable rental housing. Our mission is to provide liquidity, stability and affordability to the U.S. housing market. We fulfill our mission by purchasing residential mortgages and mortgage-related securities in the secondary mortgage market. We are one of the largest purchasers of mortgage loans in the U.S. We purchase mortgages and bundle them into mortgage-related securities that can be sold to investors. We can use the proceeds to purchase additional mortgages from primary market mortgage lenders, thus providing them with a continuous flow of funds. We also purchase mortgage loans and mortgage-related securities for our investments portfolio. We finance our purchases for our investments portfolio and manage associated interest-rate and other market risks primarily by issuing a variety of debt instruments and entering into derivative contracts in the capital markets.

Though we are chartered by Congress, our business is funded completely with private capital. We are responsible for making payments on our securities. Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities and other obligations.

### Our Charter and Mission

The Federal Home Loan Mortgage Corporation Act, which we refer to as our charter, forms the framework for our business activities, shapes the products we bring to market and drives the services we provide to the nation's residential housing and mortgage industries. Our charter also determines the types of mortgage loans that we are permitted to purchase, as described in "Business Activities — *Types of Mortgages We Purchase*."

Our mission is defined in our charter:

- to provide stability in the secondary market for residential mortgages;
- to respond appropriately to the private capital market;
- to provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and
- to promote access to mortgage credit throughout the U.S. (including central cities, rural areas and other underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing.

To facilitate our mission, our charter provides us with special attributes including:

- exemption from the registration and reporting requirements of the Securities Act of 1933, or the Securities Act, and the Securities Exchange Act of 1934, or the Exchange Act. We are, however, subject to the general antifraud provisions of the federal securities laws and have committed to the voluntary registration of our common stock with the Securities and Exchange Commission under the Exchange Act;
- favorable treatment of our securities under various investment laws and other regulations;
- discretionary authority of the Secretary of the Treasury to purchase up to $2.25 billion of our securities; and
- exemption from state and local taxes, except for taxes on real property that we own.

Our activities in the secondary mortgage market benefit consumers by providing lenders a steady flow of low-cost mortgage funding. This flow of funds helps moderate cyclical swings in the housing market, equalizes the flow of mortgage funds regionally throughout the U.S. and makes mortgage funds available in a variety of economic conditions. In addition, the supply of cash made available to lenders through this process reduces mortgage rates on loans within the dollar limits

set in accordance with our charter. These lower rates help make home ownership affordable for more families and individuals than would be possible without our participation in the secondary mortgage market.

**Residential Mortgage Debt Market**

We compete in the large and growing U.S. residential mortgage debt market. This market consists of a primary mortgage market that links homebuyers and lenders and a secondary mortgage market that links lenders and investors. At December 31, 2006, our Total mortgage portfolio was $1.8 trillion, while the total U.S. residential mortgage debt outstanding was estimated to be approximately $10.9 trillion.

Growth in the U.S. residential mortgage debt market is affected by several factors, including changes in interest rates, employment rates in various regions of the country, home ownership rates, home price appreciation, lender preferences regarding credit risk and borrower preferences regarding mortgage debt. The amount of residential mortgage debt available for us to purchase and the mix of available loan products are also affected by several factors, including the volume of single-family mortgages meeting the requirements of our charter and the purchase and securitization activity of other financial institutions. See "RISK FACTORS."

Following several years of substantial growth in the residential mortgage market, driven by historically low interest rates and a strong housing market with record home sales and significant home price appreciation, the residential mortgage market slowed in 2006. Home sales declined, inventories of homes for sale increased and the rate of home price appreciation slowed. However, mortgage rates remained low by historical standards and continued to contribute to demand in the residential mortgage market.

Home price appreciation is an important market indicator for us because it represents the general trend in value associated with the single-family mortgage loans underlying our Mortgage Participation Certificates, or PCs, and Structured Securities. As home prices appreciate, the risk of borrower defaults generally declines and the severity of credit losses also declines. Estimates of nationwide home price appreciation varied for 2006, with some indicating a slight overall decline in home prices and others indicating moderate growth. However, by any measure, the nationwide rate of home price appreciation is well below that seen in recent years and we expect that it will continue to weaken in the near term. Despite the slowdown in the housing market, total residential mortgage debt outstanding in the U.S. grew by an estimated 9 percent in 2006 as compared with 14 percent in 2005. We expect that the amount of total residential mortgage debt outstanding will continue to rise in 2007, though at a slower rate than in the past few years. Table 1 includes some important indicators for the U.S. residential mortgage market.

**Table 1 — Mortgage Market Indicators**

| | Year-Ended December 31, | | |
| --- | --- | --- | --- |
| | **2006** | **2005** | **2004** |
| Home sale units (in thousands)[1] | 6,737 | 7,463 | 7,161 |
| Home price appreciation[2] | 6% | 13% | 12% |
| Single-family mortgage originations (in billions) | $ 3,000 | $ 3,257 | $2,906 |
| Refinancing share of single-family mortgage originations | 43% | 44% | 46% |
| U.S. residential mortgage debt outstanding (in billions)[3] | $10,921 | $10,046 | $8,847 |

(1) Includes sales of new and existing detached single-family homes in the U.S. and excludes condos/co-ops. Sources: National Association of Realtors news release dated February 27, 2007 (sales of existing homes) and U.S. Census Bureau news release dated February 28, 2007 (sales of new homes).
(2) Source: Freddie Mac's Conventional Mortgage Home Price Index release dated March 5, 2007.
(3) U.S. residential mortgage debt outstanding as of December 31 for 2006, 2005 and 2004. Source: Federal Reserve Flow of Funds Accounts of the United States dated March 8, 2007.

*Primary Mortgage Market — Our Customers*

Our customers are predominantly lenders in the primary mortgage market that originate mortgages for homebuyers. These lenders include mortgage banking companies, commercial banks, savings banks, community banks, credit unions, state and local housing finance agencies and savings and loan associations. A lender that originates a mortgage can hold the mortgage in its own portfolio, securitize the mortgage or sell the mortgage to a secondary mortgage market investor, such as Freddie Mac.

We acquire a significant portion of our single-family mortgages from several large lenders. In 2006, three mortgage lenders each accounted for 10 percent or more of our single-family mortgage purchase volume. These lenders collectively accounted for approximately 51 percent of this volume. In addition, in 2006, our top ten lenders represented approximately 76 percent of our single-family mortgage purchase volume. These top lenders are among the largest mortgage loan originators in the U.S. We have contracts with a number of mortgage lenders that include a commitment by the lender to sell us a minimum percentage or dollar amount of its mortgage origination volume. These contracts typically last for one year. If a mortgage lender fails to meet its contractual commitment, we have a variety of contractual remedies, including the right to assess certain fees. As the mortgage industry has been consolidating, we, as well as our competitors, have been seeking

increased business from a decreasing number of key lenders. We are continuing to work to diversify our customer base and thus reduce the risk and impact of losing a key customer. See "RISK FACTORS — Competitive and Market Risks."

### Secondary Mortgage Market

We participate in the secondary mortgage market generally by buying whole loans (*i.e.*, mortgage loans that have not been securitized) and mortgage-related securities for our Retained portfolio and by issuing guaranteed mortgage-related securities. We do not lend money directly to homebuyers. Our principal competitors are the Federal National Mortgage Association, or Fannie Mae, a similarly chartered government-sponsored enterprise, or GSE, the Federal Home Loan Banks and other financial institutions that retain or securitize mortgages, such as commercial and investment banks, dealers and thrift institutions. We compete on the basis of price, products, structure and service.

## Business Activities

We generate income primarily through two business activities — portfolio investment activities and credit guarantee activities — operating as one business segment. For a summary and description of our financial performance and financial condition, see "MD&A" and "CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA" and the accompanying notes to our consolidated financial statements. At December 31, 2006, we had total assets of $813.1 billion and total stockholders' equity of $28.3 billion, and for the year ended December 31, 2006, we reported net income of $2.2 billion. At February 28, 2007, we had 5,400 full-time and 135 part-time employees. Our principal offices are located in McLean, Virginia.

### Types of Mortgages We Purchase

Our charter establishes general parameters for the terms and principal amounts of the mortgages we may purchase, as described below. We also purchase mortgage-related securities that are backed by single-family or multifamily mortgages. Within our charter parameters, the residential mortgage loans we purchase or that underlie mortgage-related securities we purchase generally fall into one of two categories:

- *Single-Family Mortgages*.   Single-family mortgages are secured by one- to four-family properties. The types of single-family mortgages we purchase include 40-year, 30-year, 20-year, 15-year and 10-year fixed-rate mortgages, interest-only mortgages, adjustable-rate mortgages, or ARMs, and balloon/reset mortgages.
- *Multifamily Mortgages*.   Multifamily mortgages are secured by properties with five or more residential rental units. These mortgages have terms generally ranging from five to thirty years. Our multifamily mortgage products, services and initiatives are designed primarily to finance affordable rental housing for low- and moderate-income families.

*Conforming Loan Limits.*   Our charter places a dollar amount cap, called the "conforming loan limit," on the size of the original principal balance of single-family mortgage loans we purchase. This limit is determined annually using a methodology that is based on changes in the national average price of a one-family residence, as surveyed by the Federal Housing Finance Board, or FHFB, each October. For 2007 and 2006, the conforming loan limit for a one-family residence was set at $417,000; for 2005, the limit was set at $359,650; and for 2004, the limit was set at $333,700. Higher limits apply to two- to four-family residences. The conforming loan limits are also 50 percent higher for mortgages secured by properties in Alaska, Guam, Hawaii and the U.S. Virgin Islands. No comparable limits apply to our purchases of multifamily mortgages.

*Loan-to-Value Ratios and Mortgage Insurance.*   Under our charter, mortgages that are not guaranteed or insured by any agency or instrumentality of the U.S. government are referred to as "conventional mortgages." Our charter requires that we obtain additional credit protection if the unpaid principal balance of a conventional single-family mortgage that we purchase exceeds 80 percent of the value of the property securing the mortgage. See "MD&A — RISK MANAGE-MENT — Credit Risks — *Mortgage Credit Risk — Credit Enhancements*" for more information regarding the credit enhancements and other credit protections we obtain.

*Loan Quality.*   Under our charter, our mortgage purchases are limited, so far as practicable, to mortgages we deem to be of a quality, type and class that generally meet the purchase standards of private institutional mortgage investors. To manage credit risks with respect to our mortgage purchases, we have developed internal credit policies and appraisal, underwriting and other purchase policies and guidelines. We design mortgage loan underwriting guidelines to enable primary mortgage market lenders to assess the creditworthiness of the borrower and the borrower's capacity to fulfill the obligations of the mortgage. We review these guidelines in an effort to ensure their effectiveness and to address the needs of the changing marketplace — including the needs of minorities, low- and moderate-income borrowers and other borrowers who are underserved by the traditional housing finance system. In many cases, underwriting standards are tailored under contracts with individual customers. We have also been expanding the share of mortgages we purchase that were underwritten by our seller/servicers using alternative automated underwriting systems or agreed-upon underwriting

standards that differ from our systems or guidelines. See "MD&A — RISK MANAGEMENT — Credit Risks — *Mortgage Credit Risk — Underwriting Requirements and Quality Control Standards"* for additional information regarding our underwriting standards.

### Investment and Funding Activities

We purchase mortgage loans and mortgage-related securities and hold them in our Retained portfolio for investment purposes. We invest in mortgage-related securities issued by GSEs or government agencies, referred to as agency securities. We also invest in non-agency mortgage-related securities. Our portfolio purchases replenish the capital available for mortgage lending. We face competition from other financial institutions that buy mortgage-related securities issued by the GSEs and non-agency issuers.

We manage our Retained portfolio through a strategy of long-term capital deployment. We apply our expertise in mortgage markets and mortgage assets to identify attractive asset purchase opportunities while managing our interest-rate risk. Our asset selection process may contemplate restructuring activities to improve our investment returns and fair value results. We may purchase mortgage loans and mortgage-related securities with less attractive investment returns as part of our efforts to achieve our affordable housing goals and subgoals.

In response to a request by the Office of Federal Housing Enterprise Oversight, or OFHEO, we announced on August 1, 2006 that we would voluntarily limit the growth of our Retained portfolio to no more than 2.0 percent annually (and 0.5 percent quarterly on a cumulative basis), based on its carrying value as contained in our minimum capital report to OFHEO filed on July 28, 2006, which was $710.3 billion. We expect to keep the limit, which was effective as of July 1, 2006, in place until we return to producing and publicly releasing quarterly financial statements prepared in conformity with U.S. generally accepted accounting principles, or GAAP. Changes in the carrying value of our Retained portfolio are affected by several factors, including purchases, sales, prepayments on mortgage-related investments and changes in fair value primarily related to changes in interest rates. As market interest rates change, we may adjust our purchase and/or sale decisions in order to remain within the limit.

We issue short-, medium- and long-term debt securities, subordinated debt securities and preferred stock to finance purchases of mortgages and mortgage-related securities and other business activities. Our debt funding program is designed to offer liquid securities to the global capital markets in a transparent and predictable manner. By diversifying our investor base and the types of debt securities we offer, we believe we enhance our ability to maintain continuous access to the debt markets under a variety of conditions. We manage our debt funding costs by issuing debt of various maturities that is either callable (*i.e.*, redeemable at our option at one or more times before its scheduled maturity) or non-callable. Our funding mix also helps us manage our interest-rate risk by closely matching the interest obligations on our debt with the expected cash inflows from our mortgage-related investments. To further manage interest-rate risks, we use a variety of derivatives. We also use Structured Securities, described below, to restructure cash flows from mortgage-related securities, retaining a portion of these restructured cash flows. See "MD&A — RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks" for more information.

Because of our GSE status and the special attributes granted to us under our charter, our debt securities and those of other GSE issuers trade in the so-called "agency sector" of the debt markets. This highly liquid market segment exhibits its own yield curve reflecting our ability to borrow at lower rates than many other corporate debt issuers. As a result, we mainly compete for funds in the debt issuance markets with Fannie Mae and the Federal Home Loan Banks, which issue debt securities of comparable quality and ratings. However, we also compete for funding with other debt issuers. The demand for, and liquidity of, our debt securities, and those of other GSEs, benefit from their status as permitted investments for banks, investment companies and other financial institutions under their statutory and regulatory framework. Competition for funding can vary with economic, financial market and regulatory environments.

For additional information about our debt securities, see "MD&A — LIQUIDITY AND CAPITAL RE-SOURCES — Liquidity — *Debt Securities.*"

### Credit Guarantee Activities

We guarantee the payment of principal and interest on mortgage-related securities in exchange for a fee, which we refer to as a guarantee fee. The types of mortgage-related securities we guarantee include the following:

• PCs we issue;

• single-class and multi-class Structured Securities we issue; and

• securities related to tax-exempt multifamily housing revenue bonds.

We enhance our ability to attract a representative mix of mortgage debt outstanding by diversifying our seller base, expanding new product capabilities and improving customer service. Through investor and dealer outreach programs,

securitization product development and improvements to liquidity, transparency and predictability, we attract a broad array of investors. Our efforts to improve the supply of, and demand for, our products are critical to their liquidity and support our mission.

The securitization market is extremely competitive and we have reduced our guarantee fees on new business in order to maintain our market share. At the same time, the expected future credit costs associated with our new credit guarantee business have increased. We make trade-offs in our pricing in order to support liquidity in various segments of the residential mortgage market, to support the liquidity and price performance of our PCs and to acquire business in pursuit of our affordable housing goals and subgoals. In addition, we seek to maintain our share of the total residential mortgage securitization market and our share of the GSE securitization market by improving customer service, and expanding our customer base, the types of mortgages we guarantee and the products we offer.

Because the price performance of, and demand for, our PCs have generally been less than Fannie Mae's securities, we may use market-adjusted pricing for our guarantees through which we provide guarantee fee or other transaction fee price adjustments to partially offset weaknesses in prevailing security prices. We believe these price-adjustments increase the competitiveness of our credit guarantee business. The use of such market-adjusted pricing reduces the profitability of our new credit guarantee business over its life.

*Guarantees of PCs.*   We issue single-class mortgage-related securities that represent undivided interests in pools of mortgages we have purchased. We refer to these mortgage-related securities as PCs. We guarantee the payment of principal and interest to the holders of our PCs. We issue most of our PCs in transactions in which our customers sell us mortgage loans in exchange for PCs. Other PC investors may include pension funds, insurance companies, securities dealers, money managers, foreign central banks and other fixed-income investors. Investors may choose to hold these PCs in their portfolios or sell them to others. Our guarantee increases the marketability of our PCs, providing additional liquidity to the mortgage market.

*Guarantees of Structured Securities.*   We also issue securities representing beneficial interests in pools of PCs and certain other types of mortgage-related assets. We refer to these mortgage-related securities as Structured Securities. We guarantee the payment of principal and interest on most of the Structured Securities we issue. By issuing Structured Securities, we seek to provide liquidity to alternative segments of the mortgage market. We issue many of our Structured Securities in transactions in which securities dealers or investors sell us the mortgage-related assets underlying the Structured Securities in exchange for the Structured Securities. We also sell Structured Securities to securities dealers or investors in exchange for cash.

We issue single-class Structured Securities and multi-class Structured Securities. Single-class Structured Securities pass through the cash flows on the underlying mortgage-related assets. Multi-class Structured Securities divide the cash flows of the underlying mortgage-related assets into two or more classes that meet the investment criteria and portfolio needs of different investors. Our principal multi-class Structured Securities qualify for tax treatment as Real Estate Mortgage Investment Conduits, or REMICs. For purposes of this Information Statement, multi-class Structured Securities include Structured Securities backed by non-agency mortgage-related securities.

*Guarantees Related to Tax-Exempt Multifamily Housing Revenue Bonds.*   We guarantee the payment of principal and interest on tax-exempt multifamily housing revenue bonds that support pass-through certificates issued by third parties. These housing revenue bonds are collateralized by mortgage loans on low- and moderate-income multifamily housing projects. In addition, we guarantee the payment of principal and interest related to low- and moderate-income multifamily mortgage loans underlying tax-exempt multifamily housing revenue bonds.

*PC and Structured Securities Support Activities.*   We support the liquidity and depth of the market for PCs through a variety of activities, including educating dealers and investors about the merits of trading and investing in PCs, enhancing disclosure related to the collateral underlying our securities and introducing new mortgage-related securities products and initiatives. We support the price performance of our PCs through a variety of strategies, including the issuance of Structured Securities and the purchase and sale by our Retained portfolio of PCs and other agency securities, including Fannie Mae securities. While some purchases of PCs may result in expected returns that are substantially below our normal thresholds, this strategy is not expected to have a material effect on our long-term economic returns. Depending upon market conditions, including the relative prices, supply of and demand for PCs and comparable Fannie Mae securities, as well as other factors, such as the voluntary limit on the growth of our Retained portfolio, there may be substantial variability in any period in the total amount of securities we purchase or sell for our Retained portfolio in accordance with this strategy. We may increase, reduce or discontinue these or other related activities at any time, which could affect the liquidity and depth of the market for PCs.

*The To Be Announced Market.*   In connection with our credit guarantee activities, we issue PCs that represent pools of mortgages with similar characteristics. Because these PCs are homogeneous and are issued in high volume, they are highly

liquid and trade with similar securities on a "generic" basis, also referred to as trading in the To Be Announced, or TBA, market. A TBA trade in Freddie Mac securities represents a contract for the purchase or sale of PCs to be delivered at a future date; however, the specific PCs that will be delivered to fulfill the trade obligation, and thus the specific characteristics of the mortgages underlying those PCs, are not known (*i.e.*, "announced") at the time of the trade, but only shortly before the trade is settled. The Securities Industry and Financial Markets Association publishes guidelines pertaining to the types of mortgages that are eligible for TBA trades.

The use of the TBA market increases the liquidity of mortgage investments and improves the distribution of investment capital available for residential mortgage financing, thereby helping us to accomplish our statutory mission. During 2006, we issued approximately $264.7 billion of PCs backed by single-family mortgage loans that were eligible to be delivered to settle TBA trades, representing approximately 74 percent of our total guaranteed PCs and Structured Securities issuances.

### Available Information

Our Information Statements, Supplements and other financial disclosure documents are available free of charge on our website at www.freddiemac.com. (We do not intend this internet address to be an active link and are not using references to this internet address here or elsewhere in this Information Statement to incorporate additional information into this Information Statement.) Our corporate governance guidelines, Codes of Conduct for employees and members of the board of directors (and any amendments or waivers that would be required to be disclosed) and the charters of the board's five standing committees (the Audit; Finance and Capital Deployment; Mission, Sourcing and Technology; Governance, Nominating and Risk Oversight; and Compensation and Human Resources Committees) are also available on our website at www.freddiemac.com. Printed copies of these documents may be obtained upon request from our Investor Relations department.

## REGULATION AND SUPERVISION

### Department of Housing and Urban Development

The U.S. Department of Housing and Urban Development, or HUD, has general regulatory power over Freddie Mac, including power over new programs, affordable housing goals and fair lending. HUD periodically conducts reviews of our activities to ensure conformity with our charter and other regulatory obligations. For example, HUD is currently reviewing certain of our investments and other assets and liabilities.

#### *Housing Goals*

We are subject to affordable housing goals set by HUD. The goals, which are set as a percentage of the total number of dwelling units underlying our total mortgage purchases, have risen steadily since they became permanent in 1995. The goals are intended to expand housing opportunities for low- and moderate-income families, low-income families living in low-income areas, very low-income families and families living in HUD-defined underserved areas. The goal relating to low-income families living in low-income areas and very low-income families is referred to as the "special affordable" housing goal. This special affordable housing goal also includes a multifamily subgoal that sets an annual minimum dollar volume of qualifying multifamily mortgage purchases. In addition, HUD has established three subgoals that are expressed as percentages of the total number of mortgages we purchased that finance the purchase of single-family, owner-occupied properties located in metropolitan areas.

The HUD goals and subgoals are summarized in Table 2 below. Our performance with respect to the goals and subgoals, as reported to HUD, is set forth in Table 3.

### Table 2 — Housing Goals and Home Purchase Subgoals for 2006 through 2008[1]

| | Housing Goals | | |
| --- | --- | --- | --- |
| | **2008** | **2007** | **2006** |
| Low- and moderate-income goal | 56% | 55% | 53% |
| Underserved areas goal | 39 | 38 | 38 |
| Special affordable goal | 27 | 25 | 23 |
| Multifamily special affordable volume target (dollars in billions) | $3.92 | $3.92 | $3.92 |

| | Home Purchase Subgoals | | |
| --- | --- | --- | --- |
| | **2008** | **2007** | **2006** |
| Low- and moderate-income subgoal | 47% | 47% | 46% |
| Underserved areas subgoal | 34 | 33 | 33 |
| Special affordable subgoal | 18 | 18 | 17 |

(1) An individual mortgage may qualify for more than one of the goals or subgoals. Each of the goal and subgoal percentages will be determined independently and cannot be aggregated to determine a percentage of total purchases that qualifies for these goals or subgoals.

**Table 3 — Housing Goals and Home Purchase Subgoals and Reported Results**[1]

*Housing Goals and Reported Results*

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2006** | | **2005** | | **2004** | |
| | Goal | Result | Goal | Result | Goal | Result |
| Low- and moderate-income goal ................................................. | 53% | 55.9% | 52% | 54.1% | 50% | 51.6% |
| Underserved areas goal ....................................................... | 38 | 42.6 | 37 | 42.2 | 31 | 32.3 |
| Special affordable goal....................................................... | 23 | 26.5 | 22 | 24.5 | 20 | 22.7 |
| Multifamily special affordable volume target (dollars in billions) ................... | $3.92 | $14.01 | $3.92 | $11.41 | $2.11 | $7.77 |

*Home Purchase Subgoals and Reported Results*

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2006** | | **2005** | |
| | Subgoal | Result | Subgoal | Result |
| Low- and moderate-income subgoal ........................................................ | 46% | 46.9% | 45% | 46.9% |
| Underserved areas subgoal ................................................................. | 33 | 33.7 | 32 | 35.4 |
| Special affordable subgoal.................................................................. | 17 | 16.9 | 17 | 17.8 |

(1) An individual mortgage may qualify for more than one of the goals or subgoals. Each of the goal and subgoal percentages and each of our percentage results is determined independently and cannot be aggregated to determine a percentage of total purchases that qualifies for these goals or subgoals.

Meeting our affordable housing goals and subgoals is increasingly challenging and there can be no assurance that we will do so. See "RISK FACTORS — Legal and Regulatory Risks." However, we view the purchase of mortgage loans that count toward our affordable housing goals to be a principal part of our mission and business and we are committed to facilitating the financing of affordable housing for low- and moderate-income families.

We reported to HUD that we met our three affordable housing goals and the multifamily special affordable volume target subgoal for 2006. With respect to the home purchase subgoals, we reported that we met the low- and moderate-income subgoal and the underserved areas subgoal. However, our result for the special-affordable subgoal was 16.9 percent as compared with the subgoal of 17.0 percent. HUD has determined that we met the goals and subgoals for 2005 and 2004, and will evaluate our performance with respect to 2006.

We are engaged in ongoing discussions with HUD regarding interpretive issues relating to the purchase and counting of mortgages for purposes of housing goals and subgoals performance for 2006. If the Secretary of HUD finds that we failed to meet a housing goal established under section 1332, 1333, or 1334 of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, or the GSE Act, and that achievement of the housing goal was feasible, the GSE Act states that the Secretary shall require the submission of a housing plan with respect to the housing goal for approval by the Secretary. The housing plan must describe the actions we would take to achieve the unmet goal in the future. HUD has the authority to take enforcement actions against us, including issuing a cease and desist order or assessing civil money penalties, if we: (a) fail to submit a required housing plan or fail to make a good faith effort to comply with a plan approved by HUD; or (b) fail to submit certain data relating to our mortgage purchases, information or reports as required by law. See "RISK FACTORS — Legal and Regulatory Risks." While the GSE Act is silent, HUD has indicated that it has authority under the GSE Act to establish and enforce a separate specific subgoal within the special affordable housing goal.

### Fair Lending

Our mortgage purchase activities are subject to federal anti-discrimination laws. In addition, the GSE Act prohibits discriminatory practices in our mortgage purchase activities, requires us to submit data to HUD to assist in its fair lending investigations of primary market lenders and requires us to undertake remedial actions against lenders found to have engaged in discriminatory lending practices. In addition, HUD periodically reviews and comments on our underwriting and appraisal guidelines for consistency with the Fair Housing Act and the GSE Act.

### Predatory Lending

A core component of our mission is to facilitate the financing of affordable housing for low- and moderate-income families. Predatory lending practices include the origination of loans with excessive interest rates or financing costs. Such practices are in direct opposition to our mission, our goals and our practices. Since 2000, we have taken a number of voluntary steps to combat predatory lending and support responsible lending. We have instituted anti-predatory lending policies intended to prevent the purchase or assignment of mortgage loans with unacceptable terms or conditions or resulting from unacceptable practices. In addition to the purchase policies we have instituted, we promote consumer education and financial literacy efforts to help borrowers avoid abusive lending practices and we provide competitive mortgage products to reputable mortgage originators so that borrowers have a greater choice of financing options.

### New Program Approval

We are required under our charter and the GSE Act to obtain the approval of the Secretary of HUD for any new program for the purchasing, servicing, selling, lending on the security of, or otherwise dealing in, conventional mortgages that is significantly different from programs that have been approved by HUD or that were approved or engaged in before the date the GSE Act was enacted in 1992; or that represents an expansion of programs above limits expressly contained in any prior approval regarding the dollar volume or number of mortgages or securities involved. HUD must approve any new program unless the Secretary determines that the new program is not authorized under our charter or that the program is not in the public interest.

### Office of Federal Housing Enterprise Oversight

OFHEO is the safety and soundness regulator for Freddie Mac and Fannie Mae. The GSE Act established OFHEO as a separate office within HUD, substantially independent of the HUD Secretary. OFHEO is headed by a Director who is appointed by the President and confirmed by the Senate. The OFHEO Director is responsible for ensuring that Freddie Mac and Fannie Mae are adequately capitalized and operating safely in accordance with the GSE Act. OFHEO's authority with regard to Freddie Mac and Fannie Mae includes authority to:

- issue regulations to carry out its responsibilities;
- conduct examinations;
- require reports of financial condition and operation;
- develop and apply critical, minimum and risk-based capital standards, including classifying the capital levels not less than quarterly;
- prohibit excessive executive compensation under prescribed standards; and
- impose temporary and final cease-and-desist orders and civil money penalties, provided certain conditions are met.

From time to time, OFHEO also has adopted examination guidance on a number of different topics, including accounting practices, corporate governance and compensation practices.

OFHEO also has exclusive administrative enforcement authority that is generally similar to that of other federal financial institutions regulatory agencies. That authority can be exercised in the event we fail to meet regulatory capital requirements; violate our charter, the GSE Act, OFHEO regulations, a written agreement with or order issued by OFHEO; or engage in conduct that significantly threatens our Core capital. Core capital consists of the par value of outstanding common stock (common stock issued less common stock held in treasury), the par value of outstanding non-cumulative, perpetual preferred stock, additional paid-in capital and retained earnings, as determined in accordance with GAAP.

### Consent Order

On December 9, 2003, we entered into a consent order and settlement with OFHEO that concluded its special investigation of the company related to our restatement. Under the terms of the consent order, we agreed to undertake certain remedial actions related to governance, corporate culture, internal controls, accounting practices, disclosure and oversight. We have taken actions to comply with the terms of the consent order and OFHEO continues to monitor our progress.

### Nontraditional Mortgage Product Risks

In December 2006, OFHEO notified us that it expects us to take action consistent with the Interagency Guidance on Nontraditional Mortgage Product Risks adopted in October 2006 by the federal financial institutions regulatory agencies. The Interagency Guidance clarifies how financial institutions should offer nontraditional mortgage products in a safe and sound manner and in a way that clearly discloses the risks that borrowers may assume. We have submitted a report to OFHEO describing the actions we propose to take consistent with the Interagency Guidance. Our proposed actions include measures to consistently apply the principles of the Interagency Guidance to all of our mortgage purchases. It is possible that implementation of the Interagency Guidance and the actions we propose to take will reduce the number of mortgages available to us for purchase and increase the difficulty we face in meeting our affordable housing goals and subgoals. See "RISK FACTORS — Legal and Regulatory Risks."

### Capital Standards

OFHEO's oversight of our safety and soundness includes the implementation, monitoring and enforcement of capital standards. OFHEO's regulatory capital requirements include ratio-based minimum and critical capital requirements and a risk-based capital requirement designed to ensure that we maintain sufficient capital to survive a sustained severe downturn in the economic environment. The GSE Act requires OFHEO to classify our capital adequacy at least quarterly. OFHEO has always classified us as "adequately capitalized," the highest possible classification.

If we were classified as less than adequately capitalized, our ability to pay dividends on common or preferred stock could be restricted. Also, if a dividend payment on our common or preferred stock would cause us to fail to meet our minimum capital or risk-based capital requirements, we would not be able to make the payment without prior written approval from OFHEO. For additional information about our regulatory capital requirements, see "NOTE 10: REGULATORY CAPITAL" to our consolidated financial statements.

In a letter dated January 28, 2004, OFHEO created a framework for monitoring our capital due to our higher operational risk, including our inability to produce timely financial statements in conformity with GAAP. The letter directed that we maintain a mandatory target capital surplus of 30 percent over our minimum capital requirement, subject to certain conditions and variations; that we submit weekly reports concerning our capital levels; and that we obtain prior approval of certain capital transactions including common stock repurchases, redemption of any preferred stock or payment of dividends on preferred stock above stated contractual rates. For additional information about the OFHEO mandatory target capital surplus framework, see "NOTE 10: REGULATORY CAPITAL" to our consolidated financial statements. Also, see "RISK FACTORS — Legal and Regulatory Risks — *Developments affecting our legislative and regulatory environment could materially harm our business prospects or competitive position*" for more information.

### Department of the Treasury

Under our charter, the Secretary of the Treasury has approval authority over our issuances of notes, debentures and substantially identical types of unsecured debt obligations (including the interest rates and maturities of these securities), as well as new types of mortgage-related securities issued subsequent to the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989. The Secretary of the Treasury has performed this debt securities approval function by coordinating GSE debt offerings with Treasury funding activities. The Treasury Department is reviewing its process for approving our debt offerings.

### Securities and Exchange Commission

While we are exempt from Securities Act and Exchange Act registration and reporting requirements, we are dedicated to fulfilling our commitment to register our common stock under the Exchange Act. We plan to begin the process of registering our common stock with the SEC after resuming timely quarterly financial reporting. Once this process is complete, we will be subject to the financial reporting requirements applicable to registrants under the Exchange Act, including the requirement to file with the SEC annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K. In addition, OFHEO issued a supplemental disclosure regulation that will obligate us to submit proxy statements and insider transaction reports to the SEC in accordance with rules promulgated under the Exchange Act. After our common stock is registered under the Exchange Act, our securities will continue to be exempt from the securities offering registration requirements of the Securities Act and certain other provisions of the federal securities laws.

### GSE Regulatory Oversight Legislation

We face a highly uncertain regulatory environment in light of GSE regulatory oversight legislation currently under consideration in Congress. During 2005, the House of Representatives and the Senate Committee on Banking, Housing, and Urban Affairs each passed a bill that would have resulted in significant changes in the existing GSE regulatory oversight structure. Congressional consideration of those bills ended with the expiration of the 109th Congress in December 2006.

A new session of Congress began in January 2007. Legislation has been introduced in the House of Representatives, containing provisions that would substantially alter the current regulatory framework under our charter and the GSE Act. The bill that was introduced includes provisions that would:

- give our regulator substantial authority to regulate the amount and composition of our portfolio investments and to require substantial reductions in those investments;
- increase the regulator's authority to require us to maintain higher minimum and risk-based capital levels and to approve new products;
- modify our affordable housing goals; and
- for 2007 through 2011, require us to make an annual contribution to an affordable housing fund in an amount equal to 1.2 basis points of our average total mortgage portfolio.

While new GSE oversight legislation has yet to be introduced in the Senate, we believe the Senate is likely to consider legislation that poses similar issues, but may also include provisions that differ materially from any bill considered in the House. Provisions of the bill introduced in the House or any other bill considered by the House or Senate, individually and in certain combinations, could have a material adverse effect on our ability to fulfill our mission, future earnings, stock price and stockholder returns, the rate of growth in our fair value and our ability to recruit qualified officers and directors.

We believe appropriate GSE regulatory oversight legislation would strengthen market confidence and promote our mission. We cannot predict the prospects for the enactment, timing or content of any final legislation.

## RISK FACTORS

Before you invest in our securities, you should know that making such an investment involves risks, including the risks described below and in "BUSINESS," "FORWARD-LOOKING STATEMENTS," "MD&A" and elsewhere in this Information Statement. The risks that we have highlighted here are not the only ones that we face. These risks could lead to circumstances where our business, financial condition and/or results of operations could be adversely affected. In that case, the trading price of our securities could decline and you may lose all or part of your investment. Some of these risks are managed under our risk management framework, as described in "MD&A — RISK MANAGEMENT." We may also encounter risks of which we are currently not aware or that we currently deem immaterial. These risks also may impair our business operations, financial results or your investment in our securities.

### Business and Operational Risks

*Material weaknesses and other deficiencies related to internal control over financial reporting could result in errors, affect operating results and cause investors to lose confidence in our reported results.*

Effective internal control over financial reporting and effective disclosure controls and procedures are essential to management's ability to produce reliable and timely financial statements and other disclosures and to prevent fraud. While we have not completed our evaluation of our internal control over financial reporting, we have identified, and may in the future identify, material weaknesses and significant deficiencies in our internal controls that impair our ability to produce reliable and timely financial reports. Because of the material weaknesses, management concluded that our internal control over financial reporting was not effective as of December 31, 2006. A "material weakness" is a significant deficiency or combination of significant deficiencies that results in a more than remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. A "significant deficiency" is a control deficiency or combination of control deficiencies that adversely affects a company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with GAAP such that there is a more than remote likelihood that a misstatement of our annual or interim financial statements that is more than inconsequential will not be prevented or detected. For a description of our existing material weaknesses and certain of our significant deficiencies and our efforts to mitigate and remediate them, see "MD&A — RISK MANAGEMENT — Operational Risks — *Internal Control Over Financial Reporting.*"

We face continuing challenges because of the deficiencies in our accounting infrastructure and the operational complexities of our business. We have not made sufficient progress remediating our material weaknesses and significant deficiencies to return to regular, timely reporting and we have been unable to provide investors with timely quarterly financial reports.

In order to devote the resources needed to complete the remediation of our internal control environment, we decided to limit the number of systems and business related initiatives we undertook in 2006 and will undertake in 2007. Because of delays in some of our systems initiatives, lower priority systems initiatives continue to be deferred until we progress further with the remediation of our internal control deficiencies. As a result, our flexibility to deploy new products for business and credit-risk management purposes in response to competitive market forces and changing trends has been limited. Additional delays or limits on our ability to implement new initiatives may arise in connection with our remediation activities and could further constrain our ability to introduce new products or execute new business strategies. Such constraints may adversely impact our business and results of operations.

Although we have implemented a comprehensive plan to remediate our internal control deficiencies and return to quarterly financial reporting, there are a number of factors that may impede our efforts to remediate our internal control weaknesses and deficiencies, including: the complexity associated with the interdependent nature of the remediation activities; uncertainty regarding the quality and sustainability of newly established controls; and potentially ineffective compensating controls. We cannot be certain that our efforts to improve our internal control over financial reporting will be successful.

Controls and procedures, no matter how well designed and operated, provide only reasonable assurance of achieving the desired control objectives. A failure to establish and maintain effective internal control over financial reporting could result in a material error in our reported financial results and additional delays in our financial reporting timeline. Depending on the nature of a failure and any required remediation, ineffective controls could have a material adverse effect on our business. Failure to effectively and timely implement the remediation plan we have undertaken to correct the identified deficiencies in our internal control over financial reporting could similarly adversely affect our business. Further, OFHEO could require us to take additional remedial actions.

Delays in meeting our financial reporting obligations could affect our ability to maintain the listing of our securities on the New York Stock Exchange, or NYSE. Ineffective controls could also cause investors to lose confidence in our reported financial information, which may have an adverse effect on the trading price of our securities.

***We rely on internal models for financial accounting and reporting purposes, to make business decisions, and to manage risks, and our business could be adversely affected if those models fail to produce reliable results.***

We make significant use of business and financial models for financial accounting and reporting purposes and to manage risk. For example, we use models in determining the fair value of financial instruments for which independent price quotations are not available or reliable or to extrapolate third-party values to our portfolio. We also use models to measure and monitor our exposures to interest-rate and other market risks and credit risk. The information provided by these models is also used in making business decisions relating to strategies, initiatives, transactions and products.

Models are inherently imperfect predictors of actual results because they are based on assumptions about future performance. Our models could produce unreliable results for a number of reasons, including invalid or incorrect assumptions underlying the models or incorrect data being used by the models. The valuations, risk metrics, amortization results and loan loss reserve estimations produced by our internal models may be different from actual results, which could adversely affect our business results, cash flows, fair value of net assets, business prospects and future earnings. Changes in any of our models or in any of the assumptions, judgments or estimates used in the models may cause the results generated by the model to be materially different. The different results could cause a revision of previously reported financial condition or results of operations, depending on when the change to the model, judgment or assumption is implemented. Any such changes may also cause difficulties in comparisons of the financial condition or results of operations of prior or future periods. If our models are not reliable we could also make poor business decisions, including loan purchase decisions, guarantee fee pricing decisions, asset and liability management decisions, or other decisions, which could result in an adverse financial impact. Furthermore, any strategies we employ to attempt to manage the risks associated with our use of models may not be effective. See "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES — Valuation of Financial Instruments" and "MD&A — RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks" for more information on our use of models.

***Changes in our accounting policies, as well as estimates we make, could materially affect how we report our financial condition or results of operations.***

Our accounting policies are fundamental to understanding our financial condition and results of operations. We have identified certain accounting policies and estimates as being "critical" to the presentation of our financial condition and results of operations because they require management to make particularly subjective or complex judgments about matters that are inherently uncertain and for which materially different amounts could be recorded using different assumptions or estimates. For a description of our critical accounting policies, see "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES." As new information becomes available and we update the assumptions underlying our estimates, we could be required to revise previously reported financial results if our results for accounting periods remain subject to change as a result of delays in the release of financial statements.

From time to time, the Financial Accounting Standards Board, or FASB, and the SEC can change the financial accounting and reporting standards that govern the preparation of our financial statements. These changes are beyond our control, can be difficult to predict and could materially impact how we report our financial condition and results of operations. We could be required to apply a new or revised standard retroactively, which may result in the restatement of prior period financial statements by material amounts.

***A failure in our operational systems or infrastructure, or those of third parties, could impair our liquidity, disrupt our business, damage our reputation and cause losses.***

Shortcomings or failures in our internal processes, people or systems could lead to impairment of our liquidity, financial loss, disruption of our business, liability to customers, legislative or regulatory intervention or reputational damage. For example, our business is highly dependent on our ability to process a large number of transactions on a daily basis. The transactions we process have become increasingly complex and are subject to various legal and regulatory standards. Our financial, accounting, data processing or other operating systems and facilities may fail to operate properly or become disabled, adversely affecting our ability to process these transactions. The inability of our systems to accommodate an increasing volume of transactions or new types of transactions or products could constrain our ability to pursue new business initiatives.

We also face the risk of operational failure or termination of any of the clearing agents, exchanges, clearing houses or other financial intermediaries we use to facilitate our securities and derivatives transactions. Any such failure or termination could adversely affect our ability to effect transactions, service our customers and manage our exposure to risk.

Most of our key business activities are conducted in our principal offices located in McLean, Virginia. Despite the contingency plans and facilities we have in place, our ability to conduct business may be adversely impacted by a disruption in the infrastructure that supports our business and the communities in which we are located. Potential disruptions may include those involving electrical, communications, transportation or other services we use or that are provided to us. If a disruption occurs and our employees are unable to occupy our offices or communicate with or travel to other locations, our ability to service and interact with our customers or counterparties may suffer and we may not be able to successfully implement contingency plans that depend on communication or travel.

Our operations rely on the secure processing, storage and transmission of confidential and other information in our computer systems and networks. Although we take protective measures and endeavor to modify them as circumstances warrant, our computer systems, software and networks may be vulnerable to unauthorized access, computer viruses or other malicious code and other events that could have a security impact. If one or more of such events occur, this potentially could jeopardize confidential and other information, including nonpublic personal information and sensitive business data, processed and stored in, and transmitted through, our computer systems and networks, or otherwise cause interruptions or malfunctions in our operations or the operations of our customers or counterparties, which could result in significant losses or reputational damage. We may be required to expend significant additional resources to modify our protective measures or to investigate and remediate vulnerabilities or other exposures, and we may be subject to litigation and financial losses that are not fully insured. For a discussion of our material weaknesses related to our information technology and systems and our plans to remediate such weaknesses, see "MD&A — RISK MANAGEMENT — Operational Risks — *Internal Control Over Financial Reporting.*"

> *We rely on third parties for certain functions that are critical to financial reporting, our Retained portfolio activity and mortgage loan underwriting. Any failures by those vendors could disrupt our business operations.*

We outsource certain key functions to external parties, including but not limited to (a) processing functions for trade capture, market risk management analytics, and asset valuation, (b) custody and recordkeeping for our investments portfolios, and (c) processing functions for mortgage loan underwriting. We may enter into other key outsourcing relationships in the future. If one or more of these key external parties were not able to perform their functions for a period of time, at an acceptable service level, or for increased volumes, our business operations could be constrained, disrupted or otherwise negatively impacted. Our use of vendors also exposes us to the risk of a loss of intellectual property or of confidential information or other harm. Financial or operational difficulties of an outside vendor could also hurt our operations if those difficulties interfere with the vendor's ability to provide services to us.

> *Our risk management efforts may not effectively mitigate the risks we seek to manage.*

We could incur substantial losses and our business operations could be disrupted if we are unable to effectively identify, manage, monitor and mitigate operational risks, interest-rate and other market risks and credit risks related to our business. We have devoted significant resources to develop an enterprise risk management framework establishing governance over certain risks we face. However, our risk management policies, procedures and techniques may not be sufficient to mitigate the risks we have identified or to appropriately identify additional risks to which we are subject. See "MD&A — RISK MANAGEMENT" for a discussion of our approach to managing the risks we face.

> *Our ability to hire, train and retain qualified employees affects our business and operations.*

Our continued success depends, in large part, on our ability to hire and retain highly qualified people. Our business is complex and many of our positions require specific skills. Undesirable voluntary employee turnover strains existing resources and contributes to increased operational risk. Although voluntary employee turnover improved in 2006, if we experience turnover rates at or above the level experienced in 2005 or are unable to attract, train and retain talented people, our business and operations could be impaired or disrupted. Competition for highly qualified personnel is intense and there can be no assurances that we will retain our key personnel or that we will be successful in attracting, training or retaining other highly qualified personnel in the future. Furthermore, there is a risk that we may not have sufficient personnel or personnel with sufficient training in key roles. See "MD&A — RISK MANAGEMENT — Operational Risks" for a description of the impact of our staffing and turnover.

## Legal and Regulatory Risks

> *Developments affecting our legislative and regulatory environment could materially harm our business prospects or competitive position.*

Various developments or factors may affect our applicable legislative or regulatory environment, including any changes or developments affecting our charter, affordable housing goals, or regulatory capital requirements (including the 30 percent mandatory target capital surplus OFHEO imposed on us in January 2004); the interpretation of these requirements by our regulators; the adequacy of internal systems, controls and processes related to these requirements; the exercise or assertion of

regulatory or administrative authority beyond current practice; the imposition of additional remedial measures; voluntary agreements with our regulators; or the enactment of proposed legislation. In August 2006, we announced that we would voluntarily limit the growth of our Retained portfolio, as described in "BUSINESS — Business Activities — *Investment and Funding Activities.*" HUD is reviewing certain of our investments and other assets and liabilities to ensure conformity with our public purpose, charter authorities and investment guidelines. In addition, the Treasury Department is reviewing its process for approving our debt offerings. We cannot predict the outcomes of these reviews or whether our business activities will be restricted as a result of these or other reviews.

We are also exposed to the risk that weaknesses in our internal systems, controls and processes could affect the accuracy or timing of the data we provide to HUD or OFHEO or our compliance with legal requirements, and could ultimately lead to regulatory actions (by HUD, OFHEO or both) or other adverse impacts on our business (including our ability or intent to retain investments). Any assertions of non-compliance with existing or new statutory or regulatory requirements could result in fines, penalties, litigation and damage to our reputation.

Furthermore, we could be required, or may find it advisable, to change the nature or extent of our business activities if our various exemptions and special attributes were modified or eliminated, new or additional fees or substantive regulation of our business activities were imposed, our relationship to the federal government were altered or eliminated, or our charter, the GSE Act, or other federal legislation affecting us were significantly amended. Any of these changes could have a material adverse effect on the scope of our activities, financial condition and results of operations. For example, such changes could (a) reduce the supply of mortgages available to us, (b) limit a significant revenue source by imposing restrictions on the size of our Retained portfolio, (c) make us less competitive by otherwise limiting our business activities or our ability to create new products, (d) increase our capital requirements, or (e) require us to make an annual contribution to an affordable housing fund equal to a specified percentage of our average total mortgage portfolio. We cannot predict when or whether any potential legislation will be enacted or regulation will be promulgated.

Any of the developments or factors described above could materially adversely affect: our ability to fulfill our mission; our ability to meet our affordable housing goals; our ability or intent to retain investments; the size and growth of our mortgage portfolios; our future earnings, stock price and stockholder returns; the value of our assets; the rate of growth of the fair value of our assets; or our ability to recruit qualified officers and directors.

*We are making certain changes to our business to meet HUD's housing goals and subgoals, which may adversely affect our profitability.*

We are making significant adjustments to our mortgage sourcing and purchase strategies in an effort to meet our housing goals and subgoals, including changes to our underwriting guidelines and the expanded use of targeted initiatives to reach underserved populations. For example, we are purchasing loans and mortgage-related securities that offer lower expected returns on our investment and increase our exposure to credit losses. In addition, in order to meet future housing goals and subgoals, our purchases of goal-eligible loans need to increase as a percentage of total new mortgage purchases, which is causing us to forego other purchase opportunities that we would expect to be more profitable. If our current efforts to meet the goals and subgoals prove to be insufficient, we may need to take additional steps that could lead to a further reduction of service to portions of the conventional conforming mortgage market, and also a reduction in our profitability. In fact, for 2006, we reported to HUD that we did not meet one of the three home purchase subgoals. See "REGULATION AND SUPERVISION — Department of Housing and Urban Development" for additional information about HUD's regulation of our business.

*We are involved in legal proceedings that could result in the payment of substantial damages or otherwise harm our business.*

We are a party to various legal actions. In addition, certain of our former directors, officers and employees are involved in legal proceedings for which they may be entitled to reimbursement by us for costs and expenses of the proceedings. The defense of these or any future claims or proceedings could divert management's attention and resources from the needs of the business. We may be required to make substantial payments in the event of adverse judgments or settlements of any such claims, investigations or proceedings. Any legal proceeding, even if resolved in our favor, could result in negative publicity or cause us to incur significant legal and other expenses. Furthermore, developments in, outcomes of, impacts of, and costs, expenses, settlements and judgments related to these legal proceedings may differ from our expectations and exceed any amounts for which we have reserved or require adjustments to such reserves. See "NOTE 13: LEGAL CONTINGEN-CIES" to our consolidated financial statements for information about our pending legal proceedings and related reserves.

*Legislation or regulation affecting the financial services industry generally may adversely affect our business activities.*

Our business activities may be affected by a variety of legislative and regulatory actions related to the activities of banks, savings institutions, insurance companies, securities dealers and other regulated entities that comprise a significant part of our customer base. Legislative or regulatory provisions that create or remove incentives for these entities either to sell

mortgage loans to us or to purchase our securities could have a material adverse effect on our business results. Among the legislative and regulatory provisions applicable to these entities are capital requirements for federally insured depository institutions and regulated bank holding companies.

For example, the Basel Committee on Banking Supervision, composed of representatives of certain central banks and bank supervisors, has developed a proposed set of risk-based capital standards for banking organizations. The U.S. banking regulators have proposed new capital standards for certain banking organizations that would incorporate the Basel Committee's proposed risk-based capital standards into existing requirements. If final rules adopted by the U.S. banking regulators revise the capital treatment of mortgage assets, decisions by U.S. banking organizations about whether to hold or sell such assets could be affected. However, the contents and timing of any final rules remain uncertain, as does the manner in which U.S. banking organizations may respond to them.

The actions we expect to take in connection with the Interagency Guidance on Nontraditional Mortgage Product Risks are described in "REGULATION AND SUPERVISION — Office of Federal Housing Enterprise Oversight — *Nontraditional Mortgage Product Risks.*" On March 2, 2007, the federal financial institutions regulatory agencies issued for public comment a "statement" on subprime mortgage lending. If adopted, the statement would instruct lenders to apply underwriting standards similar to those in the Interagency Guidance on non-traditional products to hybrid ARMs. In addition, on February 27, 2007, we announced that we would implement stricter investment standards for certain subprime ARMs originated after September 1, 2007 and develop new mortgage products providing lenders with more choices to offer subprime borrowers. This initiative could reduce the number of subprime mortgages available to us for purchase, potentially reducing our profitability, and is likely to make it more difficult for us to achieve our housing goals and subgoals.

In addition, our business could also be adversely affected by any modification, reduction or repeal of the federal income tax deductibility of mortgage interest payments.

**Competitive and Market Risks**

### *Changes in general business and economic conditions may adversely affect our business and earnings.*

Our business and earnings may be adversely affected by changes in general business and economic conditions, including changes in the markets for our portfolio investments or our mortgage-related and debt securities. These conditions include employment rates, fluctuations in both debt and equity capital markets, the value of the U.S. dollar as compared to foreign currencies, and the strength of the U.S. economy and the local economies in which we conduct business. An economic downturn or increase in the unemployment rate could result in fewer mortgages for us to purchase, an increase in mortgage delinquencies or defaults and a higher level of credit-related losses than we estimated, which could reduce our earnings or reduce the fair value of our net assets. Various factors could cause the economy to slow down or even decline, including higher energy costs, higher interest rates, pressure on housing prices, reduced consumer or corporate spending, natural disasters such as hurricanes, terrorist activities, military conflicts and the normal cyclical nature of the economy.

### *A general decline in U.S. housing prices or changes in the U.S. housing market could negatively impact our business and earnings.*

The rate of home price appreciation in the U.S. declined in 2006 as the housing market slowed. This decline follows a decade of strong appreciation and particularly dramatic price increases in the past few years. Home price appreciation generally has increased the values of properties underlying the mortgages in our portfolio. A continued reversal of this strong home price appreciation in any of the geographic markets we serve could result in an increase in delinquencies or defaults and a higher level of credit-related losses, which could reduce our earnings. For more information, see "MD&A — RISK MANAGEMENT — Credit Risks."

If the conforming loan limits are decreased as a result of a decline in the index upon which such limits are based, we may face operational and legal challenges associated with changing our mortgage purchase commitments to conform with the lower limits and there could be fewer loans available for us to purchase. In October 2006, the FHFB reported that the national average price of a one-family residence had declined slightly, the first time this has occurred since its 1992-1993 survey. OFHEO announced that the conforming loan limits would be maintained at the 2006 limits for 2007 and deferred the decrease for one year.

In addition, our business volumes are closely tied to the rate of growth in total outstanding U.S. residential mortgage debt and the size of the U.S. residential mortgage market. The rate of growth in total residential mortgage debt declined to 9 percent in 2006 from 14 percent in 2005. If the rate of growth in total outstanding U.S. residential mortgage debt were to continue to decline, there could be fewer mortgage loans available for us to purchase. A decline in the volume of loans available for us to purchase could reduce our earnings and margins, as we could face more competition to purchase a smaller number of loans.

***Competition from banking and non-banking companies may harm our business.***

We operate in a highly competitive environment and we expect competition to increase as financial services companies continue to consolidate to produce larger companies that are able to offer similar mortgage-related products at competitive prices. Increased competition in the secondary mortgage market and a decreased rate of growth in residential mortgage debt outstanding may make it more difficult for us to purchase mortgages to meet our mission objectives while providing favorable returns for our business. Furthermore, competitive pricing pressures may make our products less attractive in the market and negatively impact our profitability.

We also compete for low-cost debt funding with Fannie Mae, the Federal Home Loan Banks and other institutions that hold mortgage portfolios. Competition for debt funding from these entities can vary with changes in economic, financial market and regulatory environments. Increased competition for low-cost debt funding may result in a higher cost to finance our business, which could decrease our net income.

***We may face limited availability of financing, variation in our funding costs and uncertainty in our securitization financing.***

The amount, type and cost of our funding, including financing from other financial institutions and the capital markets, directly impacts our interest expense and results of operations and can therefore affect our ability to grow our assets. A number of factors could make such financing more difficult to obtain, more expensive or unavailable on any terms, both domestically and internationally (where funding transactions may be on terms more or less favorable than in the U.S.), including:

- adverse business or financial results or other adverse changes to our financial condition;
- specific events that adversely impact our reputation;
- changes in the activities of our business partners;
- disruptions in the capital markets;
- specific events that adversely impact the financial services industry;
- counterparty availability;
- changes in the preferences of the holders of our securities;
- changes in the breadth of our investor base;
- changes affecting the fair value of our assets;
- interest-rate fluctuations, or rating agency actions;
- changes in our charter or regulatory oversight;
- changes to or developments in the legal, regulatory, accounting and tax environments governing our funding transactions, including the outcome of the Treasury Department's review of its process for approving our debt offerings;
- the general state of the U.S., Asian and other world economies, and factors affecting those economies; and
- public perception of any of the foregoing.

Foreign investors, particularly in Asia, hold a significant portion of our debt securities and are an important source of funding for our business. Foreign investors' willingness to purchase and hold our debt securities can be influenced by many factors, including changes in the world economies, changes in foreign currency exchange rates, regulatory and political factors, as well as the availability of and preferences for other investments. If foreign investors were to divest their holdings or reduce their purchases of our debt securities, our funding costs may increase. The willingness of foreign investors to purchase or hold our debt securities, and any changes to such willingness, may materially affect our liquidity, our business and results of operations. Foreign investors are also significant purchasers of mortgage-related securities and changes in the strength and stability of foreign demand for mortgage-related securities could affect the overall market for those securities and the returns available to us on our portfolio investments.

Other GSEs also issue significant amounts of agency debt, which may negatively impact the prices we are able to obtain for our debt securities. An inability to issue debt securities at attractive rates in amounts sufficient to fund our business activities and meet our obligations could have an adverse effect on our liquidity, financial condition and results of operations. See "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Debt Securities*" for a more detailed description of our debt issuance programs.

We maintain secured intraday lines of credit to provide additional intraday liquidity to fund our activities through the Fedwire system. These lines of credit may require us to post collateral to third parties. In certain limited circumstances, these secured counterparties may be able to repledge the collateral underlying our financing without our consent. In addition, because these secured intraday lines of credit are uncommitted, we may not be able to continue to draw on them if and when needed.

Our PCs and Structured Securities are also an integral part of our mortgage purchase program and any decline in the price performance of or demand for our PCs could have an adverse effect on the profitability of our securitization financing activities. There is a risk that our PC and Structured Securities support activities may not be sufficient to support the liquidity and depth of the market for PCs.

### A reduction in our credit ratings could adversely affect our liquidity.

Nationally recognized statistical rating organizations play an important role in determining, by means of the ratings they assign to issuers and their debt, the availability and cost of debt funding. We currently receive ratings from three nationally recognized statistical rating organizations for our unsecured borrowings. Our credit ratings are important to our liquidity. Actions by governmental entities or others could adversely affect our credit ratings. A reduction in our credit ratings could adversely affect our liquidity, competitive position, or the supply or cost of equity capital or debt financing available to us. A significant increase in our borrowing costs could cause us to sustain losses and impair our liquidity by requiring us to find other sources of financing.

### Fluctuations in interest rates could negatively impact our reported net interest income, earnings and fair value of net assets.

Our portfolio investment activities and credit guarantee activities expose us to interest-rate and other market risks and credit risks. Changes in interest rates — up or down — could adversely affect our net interest yield. Although the yield we earn on our assets and our funding costs tend to move in the same direction in response to changes in interest rates, either can rise or fall faster than the other, causing our net interest yield to expand or compress. For example, when interest rates rise, our funding costs may rise faster than the yield we earn on our assets, causing our net interest yield to compress until the effect of the increase is fully reflected in asset yields. Changes in the slope of the yield curve could also reduce our net interest yield.

Changes in interest rates could reduce our GAAP net income materially, especially if actual conditions vary considerably from our expectations. For example, if interest rates rise or fall faster than estimated or the slope of the yield curve varies other than expected, we may incur significant losses. Changes in interest rates may also affect prepayment assumptions thus potentially impacting the fair value of our assets, including investments in our Retained portfolio, our derivative portfolio and our Guarantee asset. When interest rates fall, borrowers are more likely to prepay their mortgage loans by refinancing them at a lower rate. An increased likelihood of prepayment on the mortgages underlying our mortgage-related securities may adversely impact the performance of these securities. An increased likelihood of prepayment on the mortgage loans we hold may also negatively impact the performance of our Retained portfolio. Interest rates can fluctuate for a number of reasons, including changes in the fiscal and monetary policies of the federal government and its agencies, such as the Federal Reserve. Federal Reserve policies directly and indirectly influence the yield on our interest-earning assets and the cost of our interest-bearing liabilities. The availability of derivative financial instruments (such as options and interest-rate and foreign-currency swaps) from acceptable counterparties of the types and in the quantities needed could also affect our ability to effectively manage the risks related to our investment funding. Our strategies and efforts to manage our exposures to these risks may not be as effective as they have been in the past. See "MD&A — RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks" for a description of the types of market risks to which we are exposed and how we manage those risks.

### Higher credit losses and increased expected future credit costs could adversely affect our financial condition and/or results of operations.

There can be no assurances that our risk management strategies will be effective to manage our credit risks or that our credit losses will not be higher than expected. Higher credit losses on our guarantees could require us to increase our allowances for credit losses through charges to earnings. Other credit exposures could also result in financial losses. Although we regularly review credit exposures to specific customers and counterparties, default risk may arise from events or circumstances that are difficult to detect or foresee. In addition, concerns about, or default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions. This risk may also adversely affect financial intermediaries, such as clearing agencies, clearinghouses, banks, securities firms and exchanges with which we interact. These potential risks could ultimately cause liquidity problems or losses for us as well.

Changes in the mortgage credit environment also affect our credit guarantee activities through the valuation of our Guarantee obligation. If expected future credit costs increase and we are not able to increase our guarantee fees due to competitive pressures or other factors, then the overall profitability of our new business would be lower and could result in losses on guarantees at their inception. Moreover, an increase in expected future credit costs generally increases the fair value of our existing Guarantee obligation.

*The loss of business volume from one or more key lenders could result in a decline in our market share and revenues.*

Our business depends on our ability to acquire a steady flow of mortgage loans from the originators of those loans. We purchase a significant percentage of our single-family mortgages from several large mortgage originators. The mortgage industry has been consolidating and a decreasing number of large lenders originate most single-family mortgages. We could lose significant business volume and may be unable to replace it if one or more of our key lenders significantly reduces the volume of mortgages it delivers to us or is acquired or otherwise ceases to exist. The loss of business from any one of our key lenders could adversely affect our market share, our revenues and the performance of our mortgage-related securities.

*Negative publicity causing damage to our reputation could adversely affect our business prospects, earnings or capital.*

Reputation risk, or the risk to our earnings and capital from negative public opinion, is inherent in our business. Negative public opinion could adversely affect our ability to keep and attract customers or otherwise impair our customer relationships, adversely affect our ability to obtain financing, impede our ability to hire and retain qualified personnel, hinder our business prospects or adversely impact the trading price of our securities. Perceptions regarding the practices of our competitors or our industry as a whole may also adversely impact our reputation. Adverse reputation impacts on third parties with whom we have important relationships may impair market confidence or investor confidence in our business operations as well. In addition, negative publicity could expose us to adverse legal and regulatory consequences, including greater regulatory scrutiny or adverse regulatory or legislative changes. These adverse consequences could result from our actual or alleged action or failure to act in any number of activities, including corporate governance, regulatory compliance, financial reporting and disclosure, purchases of products perceived to be predatory, safeguarding or using nonpublic personal information, or from actions taken by government regulators and community organizations in response to our actual or alleged conduct. Negative public opinion associated with our accounting restatement and material weaknesses in our internal control over financial reporting and related problems could continue to have adverse consequences.

# MARKET FOR THE COMPANY'S
# COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND
# ISSUER PURCHASES OF EQUITY SECURITIES

## Market Information

Our common stock, par value $0.21 per share, is listed on the NYSE under the symbol "FRE." From time to time, our common stock may be admitted to unlisted trading status on other national securities exchanges. Put and call options on our common stock are traded on U.S. options exchanges. At February 28, 2007, there were 661,430,516 shares outstanding of our common stock.

On December 14, 2006, we announced our intent to withdraw our common stock from listing on NYSE Arca, Inc., formerly the Pacific Exchange. The decision to voluntarily withdraw listing from NYSE Arca was made to eliminate duplicative administrative requirements inherent with dual listings as a result of the NYSE Group's recent merger with Archipelago Holdings, the parent company of NYSE Arca. NYSE Arca will continue trading our common stock on an unlisted trading privilege basis.

Table 4 sets forth the high and low sale prices of our common stock for the periods indicated.

## Table 4 — Quarterly Common Stock Information

| | Sale Prices[1] | |
| --- | --- | --- |
| | High | Low |
| **2006 Quarter Ended** | | |
| December 31 | $71.92 | $64.80 |
| September 30 | 66.47 | 55.64 |
| June 30 | 63.99 | 56.50 |
| March 31 | 68.75 | 60.64 |
| **2005 Quarter Ended** | | |
| December 31 | $67.49 | $54.85 |
| September 30 | 66.91 | 54.50 |
| June 30 | 67.87 | 58.51 |
| March 31 | 73.91 | 59.74 |

(1) The principal market is the NYSE and prices are based on the Composite Tape.

At February 28, 2007, the closing price for our common stock was $64.13 per share.

**Holders**

As of February 28, 2007, we had 2,201 common stockholders of record.

**Dividends**

Table 5 sets forth the cash dividend per common share that we have declared for the periods indicated.

**Table 5 — Dividends Per Common Share**

|  | Regular Cash Dividend Per Share |
|---|---|
| **2007 Quarter Ended** | |
| March 31 | $0.50 |
| **2006 Quarter Ended** | |
| December 31 | $0.50 |
| September 30 | 0.47 |
| June 30 | 0.47 |
| March 31 | 0.47 |
| **2005 Quarter Ended** | |
| December 31 | $0.47 |
| September 30 | 0.35 |
| June 30 | 0.35 |
| March 31 | 0.35 |

We have historically paid dividends to our stockholders in each quarter. Our board of directors will determine the amount of dividends, if any, declared and paid in any quarter after considering our capital position and earnings and growth prospects, among other factors. See "NOTE 10: REGULATORY CAPITAL" to our consolidated financial statements for additional information regarding dividend payments and potential restrictions on such payments and "NOTE 9: STOCKHOLDERS' EQUITY" to our consolidated financial statements for additional information regarding our preferred stock dividend rates.

**Stock Performance Graph**

The following graph compares the five-year cumulative total stockholder return on our common stock with that of the Standard and Poor's, or S&P, 500 Financial Sector Index and the S&P 500 Index. On January 1, 2002, the composition of the S&P 500 Financial Sector Index was modified. Historical data has been recalculated to reflect this change. The graph assumes $100 invested in each of our common stock, the S&P 500 Financial Sector Index and the S&P 500 Index on December 31, 2001. Total return calculations assume annual dividend reinvestment. The graph does not forecast performance of our common stock.

**Comparative Cumulative Total Stockholder Return**
**(in dollars)**



|  | At December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Freddie Mac | $100 | $92 | $92 | $118 | $107 | $115 |
| S&P 500 Financials | 100 | 86 | 112 | 124 | 131 | 156 |
| S&P 500 | 100 | 78 | 100 | 111 | 116 | 134 |

**Issuer Purchases of Equity Securities**

Table 6 sets forth our common share repurchase activity during 2006. See "MD&A — LIQUIDITY AND CAPITAL RESOURCES" for additional information.

**Table 6 — Common Share Repurchase Activity in 2006**

| Period | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of a Publicly Announced Program[1] | Approximate Dollar Value of Shares That May Yet be Purchased Under the Program |
|---|---|---|---|---|
|  | (in millions) |  | (in millions) | (in millions) |
| January - May | — | $   — | — | $2,000 |
| June | 8.6 | 58.05 | 8.6 | 1,500 |
| July | 4.1 | 57.47 | 4.1 | 1,263 |
| August | 12.2 | 59.56 | 12.2 | 540 |
| September | 0.6 | 63.99 | 0.6 | 501 |
| October | 2.9 | 68.74 | 2.9 | 299 |
| November | 4.3 | 69.06 | 4.3 | — |
| December | — | — | — | — |
| Total | 32.7 | 61.06 | 32.7 | |

(1) On October 5, 2005, we announced our board of directors authorized us to repurchase up to $2 billion of outstanding shares of common stock. The repurchase program was completed in November 2006.

*Freddie Mac*

**Recent Sales of Unregistered Securities**

The securities we issue are "exempted securities" under the Securities Act and the Exchange Act. As a result, we do not file registration statements with the SEC with respect to offerings of our securities.

During 2006, we completed two preferred stock offerings, underwritten by syndicates of dealers headed by (a) Bear Stearns & Co. Inc. and UBS Securities LLC and (b) Lehman Brothers and Merrill Lynch, for aggregate offering proceeds of $1.5 billion and an aggregate underwriting discount of $15 million. See "NOTE 9: STOCKHOLDERS' EQUITY" to our consolidated financial statements for more information.

We regularly provide stock compensation to our employees and members of our board of directors. We have three stock-based compensation plans under which grants are currently being made: (a) the Employee Stock Purchase Plan, or ESPP; (b) the 2004 Stock Compensation Plan, or 2004 Employee Plan; and (c) the 1995 Directors' Stock Compensation Plan, as amended and restated, or Directors' Plan. Prior to the stockholder approval of the 2004 Employee Plan, employee stock-based compensation was awarded in accordance with the terms of the 1995 Stock Compensation Plan, or 1995 Employee Plan. Although grants are no longer made under the 1995 Employee Plan, we currently have awards outstanding under this plan. We collectively refer to the 2004 Employee Plan and 1995 Employee Plan as the Employee Plans.

During the year ended December 31, 2006, 914,368 stock options were exercised and 423,294 stock options were granted under our Employee Plans and Directors' Plan. Under our ESPP, 222,703 options to purchase stock were exercised and 226,266 options to purchase stock were granted. Further, for the year ended December 31, 2006, under the Employee Plans and Directors' Plan, 1,486,080 restricted stock units were granted and restrictions lapsed on 384,649 and 28,542 restricted stock units and restricted stock awards, respectively. See "NOTE 11: STOCK-BASED COMPENSA-TION" to our consolidated financial statements for more information.

**Transfer Agent and Registrar**

Computershare Trust Company, N.A.
P.O. Box 43078
Providence, RI 02940-3078
Telephone: 781-575-2879
http://www.computershare.com

**NYSE Corporate Governance Listing Standards**

On October 9, 2006, our Chief Executive Officer submitted to the NYSE the certification required by Section 303A.12(a) of the NYSE Listed Company Manual regarding our compliance with the NYSE's corporate governance listing standards.

## FORWARD-LOOKING STATEMENTS

We regularly communicate information concerning our business activities to investors, securities analysts, the news media and others as part of our normal operations. Some of these communications, including this Information Statement, contain "forward-looking statements" pertaining to our current expectations and objectives for financial reporting, remediation efforts, future business plans, results of operations, financial condition and market trends and developments. Forward-looking statements are often accompanied by, and identified with, terms such as "predict," "ability," "intent," "indicator," "trend," "efforts," "assumptions," "judgments," "models," "developments," "estimates," "continue," "promote," "affect," "consider," "enable," "currently," "priorities," "remain," "anticipate," "initiative," "ongoing," "believe," "expect," "plan," "targeted," "depend," "proposed," "projections," "until," "attempt," "forecasts," "outlook," "over time," "future," "seek," "potential," "objective," "long-term," "ultimately," "goal," "will," "may," "might," "should," "can," "could," "would," "likely," "if," "typically," "generally," "new," "uncertain" and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, estimates and projections. Forward-looking statements involve known and unknown risks, uncertainties and other factors, some of which are beyond our control. You should be careful about relying on any forward-looking statements and should also consider all risks, uncertainties and other factors described in this Information Statement in considering any forward-looking statements. Actual results may differ materially from those discussed as a result of various factors, including those factors described in the "RISK FACTORS" section of this Information Statement. Factors that could cause actual results to differ materially from the expectations expressed in these and other forward-looking statements by management include, among others:

- our ability to effectively and timely implement the remediation plan undertaken as a result of the restatement of our consolidated financial statements and the consent order entered into with OFHEO, including particular initiatives relating to technical infrastructure and controls over financial reporting;

- changes in applicable legislative or regulatory requirements, including enactment of GSE oversight legislation, changes to our charter, affordable housing goals, regulatory capital requirements, the exercise or assertion of regulatory or administrative authority beyond historical practice, or regulation of the subprime market;

- our ability to effectively implement our business strategies and manage the risks in our business, including our efforts to improve the supply and liquidity of, and demand for, our products;

- changes in our assumptions or estimates regarding rates of growth in our business, spreads we expect to earn, required capital levels, the timing and impact of capital transactions;

- our ability to effectively manage and implement changes, developments or impacts of accounting or tax standards and interpretations;

- the availability of debt financing and equity capital in sufficient quantity and at attractive rates to support growth in our Retained portfolio, to refinance maturing debt and to meet regulatory capital requirements;

- changes in pricing or valuation methodologies, models, assumptions, estimates and/or other measurement techniques;

- volatility of reported results due to changes in fair value of certain instruments or assets;

- changes in general economic conditions;

- the rate of growth in total outstanding U.S. residential mortgage debt and the size of the U.S. residential mortgage market;

- preferences of originators in selling into the secondary market;

- borrower preferences for fixed-rate mortgages or ARMs;

- investor preferences for mortgage loans and mortgage-related and debt securities versus other investments;

- the occurrence of a major natural or other disaster in geographic areas in which portions of our Total mortgage portfolio are concentrated;

- other factors and assumptions described in this Information Statement, including in the sections titled "BUSINESS," "RISK FACTORS" and "MD&A;"

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing.

We undertake no obligation to update forward-looking statements we make to reflect events or circumstances after the date of this Information Statement or to reflect the occurrence of unanticipated events.

*Freddie Mac*

# SELECTED FINANCIAL DATA[1]

| | At or for the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2003 | 2002 |
| | (dollars in millions, except share-related amounts) | | | | |
| **Income Statement Data** | | | | | |
| Net interest income | $ 4,235 | $ 5,370 | $ 9,137 | $ 9,498 | $ 9,525 |
| Non-interest income (loss) | 915 | 199 | (3,039) | (244) | 7,154 |
| Net income before cumulative effect of changes in accounting principles | 2,211 | 2,189 | 2,937 | 4,816 | 10,090 |
| Cumulative effect of changes in accounting principles, net of taxes | — | (59) | — | — | — |
| Net income | 2,211 | 2,130 | 2,937 | 4,816 | 10,090 |
| Net income available to common stockholders | $ 1,936 | $ 1,907 | $ 2,727 | $ 4,600 | $ 9,851 |
| Earnings per common share before cumulative effect of changes in accounting principles: | | | | | |
| Basic | $ 2.84 | $ 2.84 | $ 3.96 | $ 6.69 | $ 14.22 |
| Diluted | 2.84 | 2.83 | 3.94 | 6.68 | 14.17 |
| Earnings per common share after cumulative effect of changes in accounting principles: | | | | | |
| Basic | $ 2.84 | $ 2.76 | $ 3.96 | $ 6.69 | $ 14.22 |
| Diluted | 2.84 | 2.75 | 3.94 | 6.68 | 14.17 |
| Dividends per common share | $ 1.91 | $ 1.52 | $ 1.20 | $ 1.04 | $ 0.88 |
| Weighted average common shares outstanding (in thousands): | | | | | |
| Basic | 680,856 | 691,582 | 689,282 | 687,094 | 692,727 |
| Diluted | 682,664 | 693,511 | 691,521 | 688,675 | 695,116 |
| **Balance Sheet Data** | | | | | |
| Total assets | $ 813,081 | $ 806,222 | $ 795,284 | $ 803,449 | $ 752,249 |
| Senior debt due within one year | 294,861 | 288,532 | 282,303 | 295,262 | 244,429 |
| Senior debt due after one year | 452,677 | 454,627 | 443,772 | 438,738 | 415,662 |
| Subordinated debt due after one year | 6,400 | 5,633 | 5,622 | 5,613 | 5,605 |
| Miscellaneous liabilities[2] | 30,326 | 29,290 | 30,662 | 30,420 | 52,914 |
| Minority interests in consolidated subsidiaries | 516 | 949 | 1,509 | 1,929 | 2,309 |
| Stockholders' equity | 28,301 | 27,191 | 31,416 | 31,487 | 31,330 |
| **Portfolio Balances**[3] | | | | | |
| Retained portfolio (unpaid principal balances)[4] | $ 703,959 | $ 710,346 | $ 653,261 | $ 645,767 | $ 567,366 |
| Total Guaranteed PCs and Structured Securities issued (unpaid principal balances)[5] | 1,477,023 | 1,335,524 | 1,208,968 | 1,162,068 | 1,090,624 |
| Total mortgage portfolio (unpaid principal balances) | 1,826,720 | 1,684,546 | 1,505,531 | 1,414,700 | 1,316,703 |
| **Ratios** | | | | | |
| Return on average assets[6] | 0.3% | 0.3% | 0.4% | 0.6% | 1.4% |
| Return on common equity[7] | 8.6 | 7.7 | 10.2 | 17.2 | 47.2 |
| Return on total equity[8] | 8.0 | 7.3 | 9.3 | 15.3 | 39.6 |
| Dividend payout ratio on common stock[9] | 67.7 | 56.4 | 30.7 | 15.6 | 6.2 |
| Equity to assets ratio[10] | 3.4 | 3.7 | 3.9 | 4.0 | 3.7 |

(1) Effective January 1, 2006, we adopted the provisions of Statement of Financial Accounting Standards, or SFAS, No. 123(R), "Share-based Payment" and also changed our method of estimating prepayments for the purpose of amortizing premiums, discounts and deferred fees related to mortgage revenue bonds and commercial mortgage-backed securities held in the Retained portfolio. Effective December 31, 2006, we adopted the provisions of SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106 and 132(R)," or SFAS 158. Effective January 1, 2005, we changed our method of accounting for interest expense related to callable debt instruments to recognize interest expense using an effective interest method over the contractual life of the debt and changed our method for determining gains and losses upon the re-sale of PCs and Structured Securities related to deferred items recognized in connection with our guarantee of those securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to our consolidated financial statements for more information regarding these accounting changes. Effective January 1, 2003, we adopted the provisions of FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, an interpretation of FASB Statements No. 5, 57 and 107 and rescission of FASB Interpretation No. 34," or FIN 45, and FASB Staff Position FIN 45-2, "Whether FASB Interpretation No. 45 Provides Support for Subsequently Accounting for a Guarantor's Liability at Fair Value."

(2) Includes (a) Due to Participation Certificate investors, (b) Accrued interest payable, (c) Guarantee obligation, (d) Derivative liabilities, at fair value, (e) Reserve for guarantee losses on Participation Certificates and (f) Other liabilities, as presented on our consolidated balance sheets.

(3) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4) The Retained portfolio presented on our consolidated balance sheets differs from the Retained portfolio in this table because the consolidated balance sheet caption includes valuation adjustments and deferred balances. See "MD&A — CONSOLIDATED BALANCE SHEETS ANALYSIS — Table 19 — Characteristics of Mortgage Loans and Mortgage-Related Securities in the Retained Portfolio" for more information.

(5) Excludes Structured Securities where we have resecuritized PCs and other previously issued Structured Securities. These excluded Structured Securities do not increase our credit-related exposure and consist of single-class Structured Securities backed by PCs, REMICs and principal-only strips. The notional balances of interest-only strips are excluded because this line item is based on unpaid principal balance. Also excluded from this line item are modifiable and combinable REMIC tranches and interest and principal classes where the holder has the option to exchange the security tranches for other pre-defined security tranches.

(6) Ratio computed as Net income divided by the simple average of beginning and ending Total assets.

(7) Ratio computed as Net income available to common stockholders divided by the simple average of beginning and ending Stockholders' equity, net of Preferred stock, at redemption value.

(8) Ratio computed as Net income divided by the simple average of beginning and ending Stockholders' equity.

(9) Ratio computed as Common stock dividends declared divided by Net income available to common stockholders.

(10) Ratio computed as the simple average of beginning and ending Stockholders' equity divided by the simple average of beginning and ending Total assets.

**MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
EXECUTIVE SUMMARY**

**Our Business**

To achieve our objective for long-term growth of the fair value of our net assets, we focus on three long-term business drivers — the profitability of new investment and guarantee business, growth in our investment and total credit guarantee portfolios and market share. Competition, other market factors, our housing mission under our charter and the HUD affordable housing goals and subgoals require that we make trade-offs in our business that affect each of these drivers. Our purchases of mortgage loans benefiting low- and moderate-income families and neighborhoods are an integral part of our mission and business, and we are committed to fulfilling the needs of these borrowers and markets.

*Retained portfolio activities*

Through our Retained portfolio investment activities, we seek to produce long-term growth of the fair value of our net assets primarily by opportunistically purchasing mortgage assets that offer attractive investment returns while meeting the requirements of our charter and supporting the affordable housing goals and subgoals set for us by HUD. We estimate our expected investment returns using an option-adjusted spread approach. We select our investments based on these expected returns and our market expertise, regardless of the timing of the recognition of these returns in net income.

During 2006, the unpaid principal balance of our Retained portfolio declined by 1 percent as relatively tight mortgage-to-debt option-adjusted spreads limited attractive investment opportunities and resulted in lower expected investment returns on new business. Also, as discussed in "BUSINESS — Business Activities — *Investment and Funding Activities*," we began managing our Retained portfolio under a voluntary temporary growth limit effective July 1, 2006. We will keep this limit in place until we return to producing and publicly releasing quarterly financial statements prepared in conformity with GAAP. While operating under this limit, we continue to be selective about the new investments we make in order to achieve acceptable investment returns.

Over the last several years, there has been a particularly strong demand for mortgage assets by investors. This demand was driven in part by the steep yield curve evident up until the second half of 2005. When short-term interest rates are low relative to mortgage interest rates, initial returns on mortgage-related investments are relatively high. A significant portion of our current Retained portfolio was acquired at attractive spreads when the slope of the yield curve was steep compared to historical levels. As a result, the initial net interest yields on our fixed-rate mortgage-related investments were relatively high. However, over the last three years, the net interest yield on those assets declined as our initial medium-term funding matured and was replaced with higher-coupon funding as the yield curve flattened. In addition, throughout 2006 and 2005, new fixed-rate mortgage investments were acquired at lower initial net interest yields, which adversely affected the overall net interest yield of the Retained portfolio.

While the natural decline of net interest yields of our fixed-rate mortgage investments is a driver of the decline in our net interest yield over the last three years, other factors have also contributed to the decline. For example, the increase of our issuances of callable debt put downward pressure on net interest yield in the near term; however, we expect this funding to reduce future rebalancing requirements and related costs over time. In addition, during 2006 and the latter part of 2005, while the yield curve was flattening, we retired debt in order to take advantage of favorable funding spreads on our new debt issuances. While improving the spreads on our Retained portfolio had a positive impact on the fair value of our net assets, these debt retirements adversely impacted our net interest yields because retired lower-coupon debt was replaced at higher interest rates. During 2006, our average funding levels remained significantly below the London Interbank Offered Rate, or LIBOR, with spreads relative to LIBOR for our Reference Notes® securities improving by 2 to 5 basis points along the interest-rate curve. Also, in 2005 and 2004, we increased our purchases of variable-rate non-agency mortgage-related securities, taking advantage of attractive spreads. While the net interest yields on variable-rate securities are less sensitive to changes in the yield curve, they generally have lower initial net interest yields than fixed-rate investments.

*Credit guarantee activities*

We seek to generate fair value growth through our credit guarantee activities by issuing guarantees that offer attractive long-term returns relative to anticipated credit costs. The securitization market is increasingly competitive and we have reduced our guarantee fees on new business in an effort to maintain our market share. In addition, during 2006, the residential mortgage market weakened and the rate of home price appreciation slowed.

During 2006 and 2005, increases in the expected future credit costs associated with our credit guarantee activities increased the fair value of our Guarantee obligation, adversely impacting the fair value of our net assets. Also, as a result of the increase in expected future credit costs and competitive pressure on our guarantee fees, some of our new credit guarantee business was acquired below our normal expected return thresholds and we realized increased losses on certain

guarantees at their inception. These trends have also contributed to a decline in the overall expected returns on our credit guarantee activities.

During 2006, 2005 and 2004, the growth rates of our credit guarantee portfolio were 10.6 percent, 10.5 percent and 4.0 percent, respectively. For 2006, we estimate that our share of the total residential mortgage securitization market declined slightly due, in part, to lower purchase volumes of non-agency mortgage-related securities into our Retained portfolio. Also, our share of the GSE securitization market declined to approximately 43 percent in 2006 from approximately 45 percent in 2005 due to competitive pressures.

The credit quality of our guarantee portfolio remains strong, with a weighted average current loan-to-value ratio of approximately 57 percent as of the end of 2006 as compared with 56 percent at the end of 2005, and the portfolio remains geographically well diversified. In addition, our guarantee portfolio has benefited from several years of strong home price appreciation. However, as discussed in "BUSINESS," the mortgages added to our portfolio in recent years do not have the benefit of significant home price appreciation and, in some markets, recent values of the properties underlying the mortgages have declined. As recently acquired credit guarantee business matures and enters its peak default years, we anticipate that default rates and loss severities will trend higher.

As the residential mortgage market continues to grow, competition among loan originators and other market factors, such as relatively low interest rates and generally high home prices, have led to a higher proportion of variable-rate mortgage products and the proliferation of new mortgage products that offer borrowers a variety of payment options. We increased our purchases of these variable-rate and non-traditional mortgage products as they became more prevalent in the market. However, at December 31, 2006, long-term, fixed-rate mortgages comprised more than 80 percent of our credit guarantee portfolio. During 2006, interest-only mortgages comprised approximately 16 percent of our purchases and, at December 31, 2006, comprised approximately 5 percent of the total credit guarantee portfolio. Mortgages with optional payment terms, referred to as "option ARMs," comprised approximately 2 percent of purchases and approximately 1 percent of our total credit guarantee portfolio. We generally seek higher compensation for the additional credit risk inherent in these products; however, our ability to do so has been limited due to competition for this business.

### Summary of 2006 Financial Results

*GAAP Results*

Net income was $2.2 billion in 2006, up 4 percent compared to $2.1 billion in 2005. In 2006, diluted earnings per common share increased by $0.09 reflecting the increase in net income and the reduction in the diluted weighted average number of common shares outstanding, arising from our repurchase of approximately 32.7 million common shares during the year, partially offset by an increase in preferred dividends associated with our issuance of $1.5 billion in new preferred stock. Pre-tax income declined by $0.5 billion to $2.1 billion in 2006 from $2.6 billion in 2005.

Net interest income declined to $4.2 billion in 2006 from $5.4 billion in 2005. While our Retained portfolio declined slightly year-over-year, the average balance of our interest-earning assets increased, as did the related average yields. Notwithstanding this improvement, net interest income declined as we replaced, at higher contractual interest rates, approximately $129 billion in long-term debt, which either matured or was repurchased during 2006.

Derivative gains (losses), a component of non-interest income, includes another component of our investment returns; interest received or paid on interest rate swaps. In 2006, we recognized $92 million of interest income, as compared to $337 million of interest expense in 2005, an improvement of $429 million. This change primarily resulted from the impact of rising short-term interest rates, and partially offset the reduction in net interest income discussed above.

Management and guarantee income increased to $1.7 billion in 2006 from $1.5 billion in 2005; however, our contractual guarantee fee rate declined modestly as the average balance of outstanding PCs increased by approximately 15 percent during 2006.

Total non-interest expenses were unchanged year over year at $3.0 billion. Administrative expenses increased slightly to $1.6 billion in 2006 from $1.5 billion in 2005, primarily due to higher professional services costs related to improving technology and our internal control over financial reporting. Our administrative expenses declined as a percent of the average total mortgage portfolio to 9.3 basis points from 9.7 basis points in 2005.

In 2006 and 2005, our provision for credit losses was $215 million and $251 million, respectively. The provision for credit losses in 2005 included $128 million related to properties affected by Hurricane Katrina, of which we reversed $82 million in 2006 because the related payment and delinquency experience on affected properties was better than expected. Absent the adjustments related to Hurricane Katrina in both years, from 2005 to 2006 our provision for credit losses increased by $174 million due to credit deterioration in our single-family credit guarantee portfolio as more loans transitioned through delinquency to foreclosure and the expected severity of losses on a per-property basis increased, driven

in part by slower home price appreciation in certain areas. Consistent with this trend, our REO expenses increased to $60 million in 2006 from $40 million in 2005.

Net charge-offs for 2006 increased to $147 million, representing approximately 1.0 basis point of our average credit guarantee portfolio, compared with $109 million for 2005, representing approximately 0.8 basis points. The increase in net charge-offs primarily relates to a regional economic downturn affecting properties in the North Central region of the U.S.

We reported an income tax benefit for 2006 of $108 million as compared with income tax expense of $367 million in 2005. In 2006, we reduced our tax reserves by $174 million as a result of a favorable U.S. Tax Court decision and a separate Internal Revenue Service settlement. Our negative effective tax rate in 2006, and the decrease in our effective tax rate over the past three years, also resulted from declines in pre-tax income, year-over-year increases in tax credits related to our investments in low-income housing tax credit partnerships and interest earned on tax-exempt housing related securities.

*Capital Management*

Our primary objective in managing capital is preserving our safety and soundness. We also seek to have sufficient capital to support our business and mission. As appropriate, we will consider opportunities to return excess capital to stockholders and to optimize our capital structure. At December 31, 2006, our estimated regulatory core capital was $36.2 billion, with an estimated regulatory minimum capital surplus of $10.3 billion, and an estimated $2.6 billion in excess of the 30 percent mandatory target capital surplus.

During 2006, we repurchased $2.0 billion of outstanding shares of common stock and issued $1.5 billion of non-cumulative, perpetual preferred stock in connection with a plan to replace $2.0 billion of common stock with an equal amount of preferred stock. During the first quarter of 2007, we issued $1.1 billion of non-cumulative, perpetual preferred stock, including $500 million to complete the planned issuance described above and $600 million to replace higher-cost preferred stock that we redeemed in 2007. Also, during the first quarter of 2007 we received approval from OFHEO and our board of directors to repurchase up to an additional $1 billion in common stock in conjunction with the issuance of up to $1 billion in preferred stock.

Our board of directors approved a dividend per common share of $0.50 for the fourth quarter of 2006, an increase of 6 percent over the $0.47 per share common dividend paid for the first three quarters of 2006. On March 2, 2007, our board of directors declared a dividend per common share of $0.50 for the first quarter of 2007.

*Fair Value Results*

We believe fair value measures provide an important view of our business economics and risks because fair value takes a consistent approach to the representation of substantially all financial assets and liabilities, rather than an approach that combines historical cost and fair value measurements, as is the case with our GAAP-based consolidated financial statements. We use estimates of fair value on a routine basis to make decisions about our business activities. Our consolidated fair value measurements are an important component of our risk management processes, as we use daily estimates of the changes in fair value to calculate our Portfolio Market Value Sensitivity, or PMVS, and duration gap measures. For information about how we estimate the fair value of financial instruments, see "NOTE 16: FAIR VALUE DISCLOSURES" to our consolidated financial statements. In addition, we use fair value derived performance measures to establish corporate objectives and as a factor in determining management compensation.

In 2006, the fair value of net assets attributable to common stockholders, before capital transactions, increased by $2.5 billion, resulting in a return on the average fair value of net assets attributable to common stockholders of approximately 9.5 percent, compared to a $1.0 billion increase, or 3.7 percent return, in 2005. In addition, the payment of common dividends and the repurchase of common shares reduced total fair value by $3.3 billion. The fair value of net assets attributable to common stockholders as of December 31, 2006 was $26.0 billion, compared to $26.8 billion as of December 31, 2005.

Our attribution of changes in the fair value of net assets relies on models, assumptions, and other measurement techniques that will evolve over time. The following attribution of changes in fair value is our current estimate of the items presented (on a pre-tax basis) and excludes the effect of returns on capital and administrative expenses.

Our investment activities contributed to the increase in fair value by an estimated $1.3 billion in 2006. This estimate includes reductions in fair value of approximately $0.9 billion attributable to the net widening of mortgage-to-debt option-adjusted spreads, or OAS. In 2006, asset-liability management returns and other market conditions did not meaningfully add to fair value results on the Retained portfolio, which remained generally consistent with 2005 levels.

Our investment activities increased fair value by an estimated $0.5 billion in 2005. This estimate includes reductions in fair value of approximately $2.7 billion attributable to the net widening of OAS. In 2005, asset-liability management returns and other market conditions added significantly to core spread results.

Our credit guarantee activities increased fair value by an estimated $1.9 billion in 2006, including a $0.3 billion increase attributable to reduced estimates of the impact of Hurricane Katrina. During 2005, our credit guarantee activities increased fair value by an estimated $1.1 billion, which included a reduction in fair value of approximately $1.2 billion related to the change in valuation methodology on our Guarantee asset and Guarantee obligation and a $0.4 billion decrease attributable to 2005 estimates of the impact of Hurricane Katrina.

During 2006, we recognized a more significant mark-to-market decline in our existing credit guarantee portfolio due to the effect of credit deterioration and increased market risk premiums on our Guarantee obligation. In addition, we estimate that the fair value of new business entered into during 2006 was lower than the fair value of new business entered into during 2005.

We revised the method we previously used to report the impact that changes in OAS have on fair value results. This methodology change had no impact on the actual change in the fair value of net assets, only our attribution of that change. This change was made in order to more closely align the process we use to report the impact of changes in OAS with the interest-rate risk management framework of our investment activities. See "CONSOLIDATED FAIR VALUE BAL-ANCE SHEETS ANALYSIS — Discussion of Fair Value Results — *How we estimate the impact of changes in mortgage-to-debt OAS on fair value results,*" for additional information about this change.

## Business Outlook

### *Portfolio Growth and Credit*

We expect that the amount of U.S. residential mortgage debt outstanding will continue to rise in 2007, at a rate more in line with an expected long-term growth projection of 7.0 to 9.5 percent. While our Total mortgage portfolio should benefit from continued growth in mortgage debt outstanding, we expect that our GSE and total securitization market shares will be under pressure in 2007 as our primary competitors bid for mortgages and there is continued consolidation in the mortgage lending business. We will manage the Retained portfolio in accordance with the voluntary temporary growth limit until we resume producing and publicly releasing quarterly financial statements prepared in conformity with GAAP.

We expect near-term credit losses to rise while still remaining below longer-term historical levels, as home price appreciation slows.

### *Fair Value Returns*

We expect to achieve long-term returns, before capital transactions, on the average fair value of net assets attributable to common stockholders in the low-to mid-teens, although period-to-period returns may fluctuate substantially due to market conditions. These long-term expectations are based on assumptions regarding rates of growth in our business, spreads that we expect to earn and a return over a period of years to capital levels consistent with current statutory requirements, among other factors. Our assumptions do not contemplate that the challenging market conditions and competitive pressures we are currently experiencing will continue through the next several years. We have also made no assumptions regarding any potential impact of pending legislation or regulatory actions, discussed more extensively in "Legislative and Regulatory Matters." Our actual results may differ materially from these expectations.

### *Capital Management*

Management expects to initiate a common stock repurchase in conjunction with the issuance of preferred stock under the new $1 billion authorization from time to time depending on market conditions.

### *Financial Reporting*

An important milestone for our return to quarterly reporting will be the progress achieved in the remediation of internal controls and implementation of new accounting systems. Throughout 2007, we will evaluate our remediation progress each quarter to determine whether we have reduced the risk of a material misstatement. It is our objective to resume quarterly financial reporting in the second half of 2007. See "RISK MANAGEMENT — Operational Risks — *Internal Control Over Financial Reporting*" and "RISK FACTORS — Business and Operational Risks."

## Risk Management

Our portfolio investment and credit guarantee activities expose us to three broad categories of risk: (a) operational risks, (b) interest-rate and other market risks, and (c) credit risks. Risk management is a critical aspect of our business. Effectively managing risk enables us to accomplish our mission and generate revenue and long-term value.

### *Operational Risks — Internal Control Over Financial Reporting*

In 2006, we continued working on initiatives to improve our financial reporting infrastructure and remediate material weaknesses and other deficiencies in our internal controls. Although we have made substantial progress on our plan, we

continue to have a significant number of material weaknesses and other internal control deficiencies that have not been fully remediated and considerable challenges remain.

*Interest-Rate Risk*

Our interest-rate risk remains low. For 2006, PMVS-L and duration gap averaged 1 percent and zero months, respectively.

*Credit Risk*

See "RISK MANAGEMENT — Credit Risks" for information about our credit risks and our strategies for managing them.

**Legislative and Regulatory Matters**

We face a highly uncertain regulatory environment in light of GSE regulatory oversight legislation currently under consideration in Congress. We generate a significant portion of our net income through our Retained portfolio. Currently, we have in place a voluntary temporary growth limit on our Retained portfolio. GSE regulatory oversight legislation under consideration in the House of Representatives would give our regulator substantial authority to regulate the amount and composition of our portfolio investments and to require substantial reductions in those investments. This legislation also includes provisions that would increase the regulator's authority to require us to maintain higher minimum and risk-based capital levels and, for 2007 through 2011, require us to make an annual contribution to an affordable housing fund in an amount equal to 1.2 basis points of our average total mortgage portfolio. See "REGULATION AND SUPERVISION — GSE Regulatory Oversight Legislation" for more information regarding this bill. We cannot predict the prospects for the enactment, timing or content of any final legislation. The provisions of this legislation, individually and in certain combinations, could have a material adverse effect on our ability to fulfill our mission, future earnings, stock price and stockholder returns, the rate of growth in our fair value, and our ability to recruit qualified officers and directors.

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for more information concerning the most significant accounting policies and estimates applied in determining our reported financial position and results of operations.

**Table 7 — Summary Consolidated Statements of Income**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004** |
|  | (in millions) | | |
| Net interest income | $4,235 | $5,370 | $9,137 |
| Non-interest income (loss): |  |  |  |
| Management and guarantee income | 1,672 | 1,450 | 1,382 |
| Gains (losses) on Guarantee asset | (800) | (1,064) | (1,135) |
| Income on Guarantee obligation | 867 | 920 | 732 |
| Derivative gains (losses) | (1,164) | (1,357) | (4,475) |
| Hedge accounting gains (losses) | 2 | 22 | 743 |
| Gains (losses) on investment activity | (474) | (127) | (348) |
| Gains (losses) on debt retirement | 466 | 206 | (327) |
| Other | 346 | 149 | 389 |
| Non-interest income (loss) | 915 | 199 | (3,039) |
| Non-interest expense: |  |  |  |
| Administrative expenses | (1,641) | (1,535) | (1,550) |
| Other | (1,406) | (1,478) | (821) |
| Non-interest expense | (3,047) | (3,013) | (2,371) |
| Income before income tax expense and cumulative effect of change in accounting principle | 2,103 | 2,556 | 3,727 |
| Income tax benefit (expense) | 108 | (367) | (790) |
| Net income before cumulative effect of change in accounting principle, net of taxes | 2,211 | 2,189 | 2,937 |
| Cumulative effect of change in accounting principle, net of tax | — | (59) | — |
| Net income | $2,211 | $2,130 | $2,937 |

## Net Interest Income

Table 8 summarizes our Net interest income and net interest yield and provides an attribution of changes in annual results to changes in interest rates or changes in volumes of our interest-earning assets and interest-bearing liabilities. Average balance sheet information is presented because we believe end-of-period balances are not representative of activity throughout the periods presented. For most components of the average balances, a daily weighted average balance was calculated for the period. When daily weighted average balance information was not available, a simple monthly average balance was calculated.

## Table 8 — Average Balance, Net Interest Income and Rate/Volume Analysis

Year Ended December 31,

| | 2006 | | | 2005 | | | 2004 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate |
| | | | | (dollars in millions) | | | | | |
| **Interest-earning assets:** | | | | | | | | | |
| Mortgage loans[3][4] | $ 63,870 | $ 4,152 | 6.50% | $ 61,248 | $ 4,037 | 6.59% | $ 61,576 | $ 4,007 | 6.51% |
| Mortgage-related securities | 650,059 | 34,673 | 5.33 | 611,452 | 29,684 | 4.85 | 590,213 | 28,460 | 4.82 |
| Total Retained portfolio | 713,929 | 38,825 | 5.44 | 672,700 | 33,721 | 5.01 | 651,789 | 32,467 | 4.98 |
| Investments[5] | 57,705 | 2,789 | 4.83 | 53,252 | 1,773 | 3.33 | 81,833 | 2,716 | 3.32 |
| Securities purchased under agreements to resell and Federal funds sold | 28,577 | 1,473 | 5.15 | 25,344 | 833 | 3.28 | 29,996 | 420 | 1.40 |
| Total interest-earning assets | $800,211 | $ 43,087 | 5.38 | $751,296 | $ 36,327 | 4.83 | $763,618 | $ 35,603 | 4.66 |
| **Interest-bearing liabilities:** | | | | | | | | | |
| Short-term debt | $179,882 | $ (8,665) | (4.82) | $192,497 | $ (6,102) | (3.17) | $205,072 | $ (2,908) | (1.42) |
| Long-term debt[6] | 587,978 | (28,218) | (4.80) | 524,270 | (23,246) | (4.43) | 530,816 | (22,950) | (4.32) |
| Total debt securities | 767,860 | (36,883) | (4.80) | 716,767 | (29,348) | (4.09) | 735,888 | (25,858) | (3.51) |
| Due to Participation Certificate investors | 7,475 | (387) | (5.18) | 10,399 | (551) | (5.30) | 12,401 | (708) | (5.71) |
| Total interest-bearing liabilities | 775,335 | (37,270) | (4.81) | 727,166 | (29,899) | (4.11) | 748,289 | (26,566) | (3.55) |
| Income (expense) related to derivatives | | (1,582) | (0.20) | | (1,058) | (0.15) | | 100 | 0.01 |
| Impact of net non-interest-bearing funding | 24,876 | — | 0.16 | 24,130 | — | 0.14 | 15,329 | — | 0.07 |
| Total funding of interest-earning assets | $800,211 | $(38,852) | (4.85) | $751,296 | $(30,957) | (4.12) | $763,618 | $(26,466) | (3.47) |
| Net interest income/yield | | $ 4,235 | 0.53 | | $ 5,370 | 0.71 | | $ 9,137 | 1.20 |
| Fully taxable-equivalent adjustments[7] | | 392 | 0.05 | | 339 | 0.05 | | 267 | 0.03 |
| Net interest income/yield (fully taxable-equivalent basis) | | $ 4,627 | 0.58% | | $ 5,709 | 0.76% | | $ 9,404 | 1.23% |

| | 2006 vs. 2005 Variance Due to | | | 2005 vs. 2004 Variance Due to | | |
|---|---|---|---|---|---|---|
| | Rate[8] | Volume[8] | Total Change | Rate[8] | Volume[8] | Total Change |
| | | | (in millions) | | | |
| **Interest-earning assets:** | | | | | | |
| Mortgage loans | $ (56) | $ 171 | $ 115 | $ 51 | $ (21) | $ 30 |
| Mortgage-related securities | 3,042 | 1,947 | 4,989 | 194 | 1,030 | 1,224 |
| Total Retained portfolio | 2,986 | 2,118 | 5,104 | 245 | 1,009 | 1,254 |
| Investments | 857 | 159 | 1,016 | 9 | (952) | (943) |
| Securities purchased under agreements to resell and Federal funds sold | 523 | 117 | 640 | 487 | (74) | 413 |
| Total interest-earning assets | $ 4,366 | $ 2,394 | $ 6,760 | $ 741 | $ (17) | $ 724 |
| **Interest-bearing liabilities:** | | | | | | |
| Short-term debt | $(2,986) | $ 423 | $(2,563) | $(3,383) | $ 189 | $(3,194) |
| Long-term debt | (2,008) | (2,964) | (4,972) | (581) | 285 | (296) |
| Total debt securities | (4,994) | (2,541) | (7,535) | (3,964) | 474 | (3,490) |
| Due to Participation Certificate investors | 12 | 152 | 164 | 48 | 109 | 157 |
| Total interest-bearing liabilities | (4,982) | (2,389) | (7,371) | (3,916) | 583 | (3,333) |
| Income (expense) related to derivatives | (524) | — | (524) | (1,158) | — | (1,158) |
| Total funding of interest-earning assets | $(5,506) | $(2,389) | $(7,895) | $(5,074) | $ 583 | $(4,491) |
| Net interest income | $(1,140) | $ 5 | $(1,135) | $(4,333) | $ 566 | $(3,767) |
| Fully taxable-equivalent adjustments | 30 | 23 | 53 | 76 | (4) | 72 |
| Net interest income (fully taxable-equivalent basis) | $(1,110) | $ 28 | $(1,082) | $(4,257) | $ 562 | $(3,695) |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) For securities classified as available-for-sale, we calculated average balances based on their unpaid principal balance plus their associated deferred fees and costs (e.g., premiums and discounts), but excluded the effects of mark-to-fair-value changes. For securities in the Retained portfolio classified as trading, we calculated average balances excluding their mark-to-fair-value adjustments. For securities in the Cash and investments portfolio classified as trading during 2004, we calculated average balances based on their fair values.
(3) Non-accrual loans are included in average balances.
(4) Loan fees included in mortgage loan interest income were $280 million, $371 million and $223 million for the years ended December 31, 2006, 2005 and 2004, respectively.
(5) For 2006 and 2005, Investments consisted of Cash and cash equivalents and non-mortgage-related securities. For 2004, Investments also included Mortgage-related securities held in the Cash and investments portfolio.
(6) Includes current portion of long-term debt. See "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS" to our consolidated financial statements for a reconciliation of Senior debt, due within one year on our consolidated balance sheets.
(7) The determination of Net interest income/yield (fully taxable-equivalent basis), which reflects fully taxable-equivalent adjustments to interest income, involves the conversion of tax-exempt sources of interest income to the equivalent amounts of interest income that would be necessary to derive the same net return if the investments had been subject to income taxes using our statutory tax rate of 35 percent.
(8) Rate and volume changes are calculated on the individual financial statement line item level. Combined rate/volume changes were allocated to the individual rate and volume change based on their relative size.

Table 9 summarizes components of our Net interest income.

**Table 9 — Net Interest Income**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2006** | **2005**[1] | **2004**[1] |
| | | (in millions) | |
| Contractual amounts of Net interest income ................................................ | $ 8,059 | $ 8,897 | $11,735 |
| Amortization expense, net:[2] | | | |
| Asset-related amortization expense, net ........................................ | (639) | (1,023) | (1,397) |
| Debt-related amortization expense, net ........................................ | (1,603) | (1,446) | (1,301) |
| Total amortization expense, net ........................................ | (2,242) | (2,469) | (2,698) |
| Income (expense) related to derivatives: | | | |
| Amortization of deferred balances in Accumulated other comprehensive income[3] ................ | (1,620) | (1,966) | (1,814) |
| Accrual of periodic settlements of derivatives:[4] | | | |
| Pay-fixed swaps ........................................ | — | — | (427) |
| Receive-fixed swaps[5] ........................................ | 502 | 1,185 | 1,968 |
| Foreign-currency swaps ........................................ | (464) | (277) | 376 |
| Other ........................................ | — | — | (3) |
| Total accrual of periodic settlements of derivatives ........................................ | 38 | 908 | 1,914 |
| Total income (expense) related to derivatives ........................................ | (1,582) | (1,058) | 100 |
| Net interest income ........................................ | 4,235 | 5,370 | 9,137 |
| Fully taxable-equivalent adjustments ........................................ | 392 | 339 | 267 |
| Net interest income (fully taxable-equivalent basis) ........................................ | $ 4,627 | $ 5,709 | $ 9,404 |

(1) Certain amounts for 2005 and 2004 have been revised to conform with the 2006 presentation.
(2) Represents amortization related to premiums, discounts, deferred fees and other adjustments to the carrying value of our financial instruments and the reclassification of previously deferred balances from Accumulated other comprehensive income, or AOCI, for certain derivatives in cash flow hedge relationships related to individual debt issuances and mortgage purchase transactions.
(3) Represents changes in fair value of derivatives in cash flow hedge relationships that were previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt and mortgage purchase transactions affect earnings.
(4) Reflects the accrual of periodic cash settlements of all derivatives in qualifying hedge accounting relationships.
(5) The accrual of periodic settlements of Receive-fixed swaps includes imputed interest on zero-coupon swaps.

*2006 versus 2005*

Net interest income and net interest yield on a fully taxable-equivalent basis decreased in 2006 as spreads on fixed-rate investments continued to narrow, driven by increases in long- and medium-term interest rates. The increase in our long-term debt interest costs reflects the turnover of medium-term debt that we issued during the past few years to fund our investments in fixed-rate mortgage-related investments when the yield curve was steep (*i.e.* short- and medium-term interest rates were low as compared to long-term interest rates). As the yield curve flattened during 2005 and 2006, we experienced increased funding costs associated with replacing maturing lower-cost debt used to fund existing fixed-rate mortgage investments. During 2006, net interest margins declined as a result of changes in interest rates on variable-rate assets acquired in 2004 and 2005 impacted our results. Also, we adjusted our funding mix in 2006 by increasing the proportion of callable debt outstanding, which we use to manage prepayment risk associated with our mortgage-related investments, and which generally has a higher interest cost than non-callable debt. In 2006, we considered the issuance of callable debt to be more cost effective than alternative interest-rate risk management strategies, primarily the issuance of non-callable bullet debt combined with the use of derivatives. We also reduced the balance of our short-term debt securities to approximately 23 percent of total outstanding debt as of December 31, 2006, from approximately 26 percent at the beginning of the year, to take advantage of the attractive funding spreads relative to LIBOR on our long-term debt. The impact of rising short-term rates on our short-term debt was largely offset by the impact of rising rates on our variable-rate assets in our Retained portfolio and our Cash and investments portfolio.

Net interest income for 2006 also reflected lower net interest income on derivatives in qualifying hedge accounting relationships. Net interest income associated with the accrual of periodic settlements declined as the benchmark LIBOR and the Euro Interbank Offered Rate, or Euribor, interest rates increased during the year, adversely affecting net settlements on our receive-fixed swaps and foreign-currency swaps (primarily Euro-denominated). Net interest income was also affected by our decisions in March and December 2006 to discontinue hedge accounting treatment for a significant amount of our receive-fixed swaps and foreign-currency swaps, as discussed in "NOTE 12: DERIVATIVES" to our consolidated financial statements. The net interest expense related to these swaps is no longer a component of Net interest income, after hedge accounting was discontinued, but instead is recognized as a component of Derivative gains (losses). By the end of 2006, nearly all of our derivatives were not in hedge accounting relationships.

Effective January 1, 2006, we enhanced our process for forecasting interest rates and estimating prepayments used to amortize discounts, premiums and deferred fees for assets held in the Retained portfolio. This change in estimate resulted in a $93 million pre-tax reduction in Net interest income on mortgage-related securities.

Enhancements to certain models used to estimate prepayment speeds on mortgage-related securities and our approach for estimating uncollectible interest on single-family mortgages greater than 90 days delinquent resulted in a net decrease in Retained portfolio interest income of $166 million (pre-tax) during the first quarter of 2005.

*2005 versus 2004*

Net interest income and net interest yield on a fully taxable-equivalent basis decreased in 2005 due to narrowing spreads on fixed-rate assets as the yield curve flattened and the composition of our Retained portfolio changed toward a greater percentage of lower-yielding, variable-rate assets.

The decline in Net interest income for 2005 also reflected higher interest expense on derivatives in qualifying hedge accounting relationships. Net interest income associated with the accrual of periodic settlements related to our receive-fixed swaps and foreign-currency swaps declined as the benchmark LIBOR interest rate increased. Net interest income was also affected by our decision in 2004 to discontinue hedge accounting treatment for a significant amount of our pay-fixed swaps and receive-fixed swaps, as discussed in "NOTE 12: DERIVATIVES" to our consolidated financial statements. The net interest expense related to these swaps was no longer a component of Net interest income after hedge accounting was discontinued, but was recognized as a component of Non-interest income (loss) in Derivative gains (losses).

Another factor in the decline in Net interest income for 2005 was our decision to cease the PC market-making and support activities conducted through our Securities Sales and Trading Group, or SS&TG, business unit and our external Money Manager program during the fourth quarter of 2004. By the end of 2004, we divested the trading portfolios related to our SS&TG business unit and our external Money Manager program in the Investments portfolio. This divestiture reduced the interest expense for funding the Investments portfolio as well as the hedging costs associated with it, which were reflected in Gains (losses) on investment activity. Our investments in mortgage-related securities held by our SS&TG business unit and external Money Manager program were generally hedged by entering into forward sales of mortgage-related securities. For 2004, the valuation difference between the trading securities and the related forward sale commitments resulted in a loss of $1,101 million in Gains (losses) on investment activity that was offset by Net interest income on the held position.

## Non-Interest Income (Loss)

### Management and Guarantee Income

Table 10 provides summary information about Management and guarantee income. Management and guarantee income consists of contractual amounts due to us related to our management and guarantee fee as well as amortization of certain pre-2003 deferred fees, including credit and buy-down fees. Other guarantee-related revenue is deferred and recognized over time as a component of Income on Guarantee obligation.

**Table 10 — Management and Guarantee Income[1]**

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2006 | | 2005 | | 2004 | |
| | Amount | Rate | Amount | Rate | Amount | Rate |
| | (dollars in millions, rate in basis points) | | | | | |
| Contractual management and guarantee fees | $1,613 | 15.4 | $1,431 | 15.7 | $1,303 | 16.5 |
| Amortization of credit and buy-down fees included in Other liabilities[2] | 59 | 0.6 | 19 | 0.2 | 79 | 1.0 |
| Total management and guarantee income | $1,672 | 16.0 | $1,450 | 15.9 | $1,382 | 17.5 |
| Unamortized balance of credit and buy-down fees included in Other liabilities, at period end | $ 136 | | $ 186 | | $ 323 | |

(1) Excludes amounts related to PCs we hold in our Retained portfolio, which are reported in Net interest income.
(2) A change in estimate resulted in a net pre-tax increase (decrease) in the Amortization of credit and buy down fees of $18 million and $(17) million for 2006 and 2005, respectively. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to our consolidated financial statements for further information.

Management and guarantee income increased in both 2006 and 2005, primarily reflecting increases in the average outstanding PC balances of 15 percent in each year. The average contractual management and guarantee fee rate decreased in both years from the prior years, reflecting lower guarantee fee rates on new business and the liquidation of existing business with relatively higher guarantee fee rates. The continued decline in guarantee fee rates on new business is the result of competitive pricing pressures. Management and guarantee income includes the amortization of pre-2003 deferred credit fees and buy-down fees on our outstanding PCs. However, similar fees received after January 1, 2003 are primarily deferred and recognized over time as a component of Income on Guarantee obligation.

### Gains (Losses) on Guarantee Asset

Upon issuance of a guarantee of securitized assets, we may record a Guarantee asset on our consolidated balance sheets representing the fair value of the guarantee fees we expect to receive over the life of the related PCs and Structured

Securities. Subsequent changes in the fair value of the Guarantee asset are reported in current period income as Gains (losses) on Guarantee asset.

The change in fair value of the Guarantee asset reflects:

- reductions related to the contractual guarantee fees due that are considered a return of our recorded investment in the Guarantee asset; and
- changes in the fair value of expected future guarantee fees we expect to receive over the life of the related PC or Structured Security.

As shown on "Table 11 — Attribution of Change — Gains (Losses) on Guarantee Asset," contractual guarantee fees due represent Management and guarantee income realized in the current period related to PCs and Structured Securities held by third parties with an established Guarantee asset. A portion of contractual guarantee fees due is attributed to imputed interest income on the Guarantee asset.

The fair value of expected future cash flows is driven by changes in the expected interest and related discount rates that affect the estimated life of the mortgages underlying the outstanding PCs and Structured Securities and other economic factors that influence the amount and timing of the future cash flows. Our valuation methodology for the Guarantee asset, first implemented for 2005, uses market-based information to determine the fair value of future cash flows associated with the Guarantee asset. Changes in the fair value of the Guarantee asset, which are recorded in current period earnings through Gains (losses) on Guarantee asset, reflect the volatility associated with the market-based inputs used in our valuation. Changes in the estimated lives of the underlying mortgages also affect the fair value of the Guarantee asset. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Table 25 — Changes in Guarantee Asset" for additional information about the Guarantee asset.

### Table 11 — Attribution of Change — Gains (Losses) on Guarantee Asset

|  | Year Ended December 31, | | |
|  | 2006 | 2005 | 2004 |
| --- | --- | --- | --- |
|  | | (in millions) | |
| Contractual guarantee fees due | $(1,475) | $(1,270) | $(1,086) |
| Portion of contractual guarantee fees due related to imputed interest income | 466 | 371 | 257 |
| Return of investment on Guarantee asset | (1,009) | (899) | (829) |
| Change in fair value of future cash flows | 169 | (138) | (306) |
| Change in estimate[1] | 40 | (27) | — |
| Gains (losses) on Guarantee asset | $ (800) | $(1,064) | $(1,135) |

(1) Represents a change in estimate resulting from enhancing our approach for determining the fair value of the Guarantee asset. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to our consolidated financial statements for further information.

The reduction in our Guarantee asset attributable to the Return of investment on Guarantee asset increased during 2006, 2005 and 2004. The Return of investment on Guarantee asset increased as the outstanding PCs and Structured Securities have grown each year.

Losses on the Guarantee asset decreased in 2006 as compared with 2005, due to increases in the fair value of the Guarantee asset consistent with the increase in mortgage interest rates during the year, which generally extends the life of the Guarantee asset. Losses on the Guarantee asset decreased in 2005 as compared with 2004, reflecting the increase in mortgage interest rates during the year offset by the effect of the change in our valuation method.

#### Income on Guarantee Obligation

Upon issuance of a guarantee of securitized assets, we record a Guarantee obligation on our consolidated balance sheets representing the fair value of our obligation to perform under the terms of the guarantee. The Guarantee obligation consists of the following:

- performance and other related costs, which consist of: estimated default costs, including the unrecoverable principal and interest that will be incurred over the expected life of the underlying mortgages; estimated foreclosure-related costs; and estimated administrative and other costs related to our guarantee; and
- deferred guarantee income on newly-issued Guarantor Swap transactions, which represents the excess of compensation received on issued guarantees and the fair value of the related Guarantee asset, as compared to the fair value of the corresponding Guarantee obligation. Compensation received includes cash, credit and buy-down fees received at the time of securitization. Credit fees vary with the relative credit quality of the underlying mortgages and buydown fees vary based on customer compensation payment preferences.

The Guarantee obligation is amortized into income in relation to the decline in the unpaid principal balance on the mortgage loans underlying the PCs and Structured Securities.

Table 12 provides information about the components of Income on Guarantee obligation.

**Table 12 — Income on Guarantee Obligation**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| | (in millions) | | |
| Amortization income related to: | | | |
| Performance and other related costs .................................................... | $ 584 | $ 616 | $ 537 |
| Deferred guarantee income .............................................................. | 283 | 304 | 195 |
| Income on Guarantee obligation[1] ...................................................... | $ 867 | $ 920 | $ 732 |
| Components of the Guarantee obligation, at period end: | | | |
| Unamortized balance of performance and other related costs ............................ | $4,869 | $3,743 | $2,738 |
| Unamortized balance of deferred guarantee income .................................... | 2,248 | 1,798 | 1,327 |
| Ending Guarantee obligation[2] .......................................................... | $7,117 | $5,541 | $4,065 |
| Liquidation rate for outstanding PCs and Structured Securities ........................... | 17% | 24% | 29% |

(1) Includes $170 million, $197 million and $128 million of amortization related to deferred credit and buydown fees received from counterparties in Guarantor Swap and similar transactions, or "upfront fees," at December 31, 2006, 2005 and 2004, respectively.
(2) Includes $1,391 million, $1,167 million and $940 million of unamortized upfront fees at December 31, 2006, 2005 and 2004, respectively.

In 2006, Income on Guarantee obligation decreased as increasing mortgage interest rates resulted in lower liquidation rates on outstanding PCs and Structured Securities and lower rates of amortization. In 2005, Income on Guarantee obligation increased as compared with 2004 as the additions to the Guarantee obligation from new business more than offset the impact of lower PC and Structured Security liquidation rates caused by increases in mortgage interest rates. During 2006 and 2005, the growth in unamortized balances reflects the increase in our portfolio of outstanding PCs and Structured Securities and increased expected credit costs associated with newly-issued guarantees.

### Derivative Overview

Table 13 presents the notional amount for each of our hedge accounting classifications and the corresponding impact of those positions on our consolidated financial statements.

**Table 13 — Summary of the Effect of Derivatives on Selected Consolidated Financial Statement Captions**

| | Consolidated Balance Sheets | | | | | |
|---|---|---|---|---|---|---|
| | **December 31, 2006** | | | **December 31, 2005** | | |
| **Description** | Notional Amount | Fair Value (Pre-Tax)[1] | AOCI (Net of Taxes)[2] | Notional Amount | Fair Value (Pre-Tax)[1] | AOCI (Net of Taxes)[2] |
| | (in millions) | | | | | |
| Fair value hedges-open ................... | $ — | $ — | $ — | $115,146 | $3,402 | $ — |
| Cash flow hedges-open..................... | 70 | — | — | 668 | (26) | 4 |
| No hedge designation...................... | 757,127 | 7,729 | — | 567,558 | 3,131 | — |
| Subtotal ................................ | 757,197 | 7,729 | — | 683,372 | 6,507 | 4 |
| Balance related to closed cash flow hedges .... | — | — | (5,033) | — | — | (6,291) |
| Total.................................... | $757,197 | $7,729 | $(5,033) | $683,372 | $6,507 | $(6,287) |

| | Consolidated Statements of Income | | | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | | |
| | **2006** | | **2005** | | **2004** | |
| **Description** | Derivative Gains (Losses) | Hedge Accounting Gains (Losses)[3] | Derivative Gains (Losses) | Hedge Accounting Gains (Losses)[3] | Derivative Gains (Losses) | Hedge Accounting Gains (Losses)[3] |
| | (in millions) | | | | | |
| Fair value hedges-open[4] ................ | $ — | $ 2 | $ — | $22 | $ — | $742 |
| Cash flow hedges-open[4][5] ................ | — | — | (25) | — | 2 | 1 |
| No hedge designation...................... | (1,164) | — | (1,332) | — | (4,477) | — |
| Total.................................... | $(1,164) | $ 2 | $(1,357) | $22 | $(4,475) | $743 |

(1) The fair values of derivatives (netted by counterparty) are presented as Derivative assets, at fair value, and Derivative liabilities, at fair value, on our consolidated balance sheets.
(2) Derivatives that meet specific criteria may be accounted for as cash flow hedges. Changes in the fair value of the effective portion of these open derivatives contracts are recorded in AOCI, net of taxes. Net deferred gains and losses on closed cash flow hedges (i.e., where the derivative is either terminated or redesignated) are also included in AOCI, net of taxes, until the related forecasted transaction affects earnings or is determined to be probable of not occurring.
(3) Hedge accounting gains (losses) arise when the fair value change of a derivative does not exactly offset the fair value change of the hedged item attributable to the hedged risk. For further information, see "Hedge Accounting Gains (Losses)" below and "NOTE 12: DERIVATIVES" to our consolidated financial statements.
(4) For all derivatives in qualifying hedge accounting relationships, the accrual of periodic cash settlements is recorded in Net interest income on our consolidated statements of income and those amounts are not included in the table. For derivatives not in qualifying hedge accounting relationships, the accrual of periodic cash settlements is recorded in Derivative gains (losses) on our consolidated statements of income.
(5) Derivative gains (losses) in each period include gains or losses reclassified from AOCI, net of taxes, as a result of the termination of cash flow hedge designations because we determined that the related forecasted transaction is probable of not occurring.

Over the course of 2006, 2005 and 2004, we discontinued nearly all of our cash flow hedge and fair value hedge accounting relationships. At December 31, 2006, the only derivatives in hedge accounting relationships were certain commitments to forward sell mortgage-related securities, which were designated in cash flow hedge relationships. See "NOTE 12: DERIVATIVES" to our consolidated financial statements for additional information on our discontinuation of hedge accounting treatment. Derivatives that are not in qualifying hedge accounting relationships generally increase the volatility of reported Non-interest income (loss) because the fair value gains and losses on the derivatives are recognized in earnings without the offsetting recognition in earnings of the change in value of the economically hedged exposures.

For derivatives designated in cash flow hedge accounting relationships during 2006 and in prior years, the effective portion of the change in fair value of the derivative asset or derivative liability is presented in the stockholders' equity section of our consolidated balance sheets in AOCI, net of taxes.

At December 31, 2006 and 2005, the net cumulative change in the fair value of all derivatives designated in cash flow hedge relationships for which the forecasted transactions had not yet affected earnings (net of amounts previously reclassified to earnings through each year end) was a loss of approximately $5.0 billion and $6.3 billion, respectively, on an after-tax basis. These amounts relate almost entirely to net deferred losses on closed cash flow hedges. The majority of the closed cash flow hedges relate to hedging the variability of cash flows from forecasted issuances of debt. Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI, net of taxes, relating to closed cash flow hedges. The deferred amounts related to closed cash flow hedges will be recognized into earnings as the hedged forecasted transactions affect earnings, unless it becomes probable that the forecasted transactions will not occur. If it is probable that the forecasted transactions will not occur, then the deferred amount associated with the forecasted transactions will be reclassified into earnings immediately.

At December 31, 2006, over 70 percent and 90 percent of the $5.0 billion net deferred losses in AOCI, net of taxes, relating to cash flow hedges were linked to forecasted transactions occurring in the next 5 and 10 years, respectively. Over the next 10 years, the forecasted debt issuance needs associated with these hedges range from approximately $21.5 billion to $104.7 billion in any one quarter, with an average of $66.2 billion per quarter.

Table 14 presents the scheduled amortization of the net deferred losses in AOCI at December 31, 2006, related to closed cash flow hedges. The scheduled amortization is based on a number of assumptions. Actual amortization will differ from the scheduled amortization, perhaps materially, as we make decisions on debt funding levels or as changes in market conditions occur that differ from these assumptions. For example, for the scheduled amortization for cash flow hedges related to future debt issuances, we assume that we will not repurchase the related debt and that no other factors affecting debt issuance probabilities will change.

**Table 14 — Scheduled Amortization to Income of Net Deferred Losses in AOCI Related to Closed Cash Flow Hedge Relationships**

| Period of Scheduled Amortization to Income | December 31, 2006 | |
|---|---|---|
| | Amount (Pre-tax) | Amount (After-tax) |
| | (in millions) | |
| 2007 | $(1,466) | $  (953) |
| 2008 | (1,334) | (867) |
| 2009 | (1,109) | (721) |
| 2010 | (914) | (594) |
| 2011 | (723) | (470) |
| 2012 to 2016 | (1,562) | (1,016) |
| Thereafter | (635) | (412) |
| Total net deferred losses in AOCI related to closed cash flow hedge relationships | $(7,743) | $(5,033) |

**Derivative Gains (Losses)**

Table 15 provides a summary of the period-end notional amounts and the gains and losses related to derivatives that we used to manage interest-rate risk, but that were not accounted for in hedge accounting relationships.

**Table 15 — Derivatives Not in Hedge Accounting Relationships**

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2006 | | 2005 | | 2004 | |
| | Notional or Contractual Amount | Derivative Gains (Losses) | Notional or Contractual Amount | Derivative Gains (Losses) | Notional or Contractual Amount | Derivative Gains (Losses) |
| | (in millions) | | | | | |
| Call swaptions | $194,200 | $(1,128) | $146,615 | $ (402) | $189,945 | $ 386 |
| Put swaptions | 29,725 | (100) | 34,675 | 202 | 25,175 | (1,423) |
| Receive-fixed swaps | 222,631 | (290) | 81,185 | (1,535) | 25,572 | (396) |
| Pay-fixed swaps | 217,565 | 649 | 181,562 | 612 | 95,043 | (793) |
| Futures | 22,400 | (248) | 86,252 | 63 | 129,110 | (213) |
| Other[1] | 70,606 | (139) | 37,269 | 40 | 157,618 | (320) |
| Subtotal | 757,127 | (1,256) | 567,558 | (1,020) | 622,463 | (2,759) |
| Accrual of periodic settlements: | | | | | | |
|   Receive-fixed swaps[2] | | (418) | | 426 | | 104 |
|   Pay-fixed swaps | | 541 | | (763) | | (1,826) |
|   Other | | (31) | | — | | 6 |
| Total accrual of periodic settlements | | 92 | | (337) | | (1,716) |
| Total | $757,127 | $(1,164) | $567,558 | $(1,357) | $622,463 | $(4,475) |

(1) Consisted of basis swaps, certain option-based contracts, foreign-currency swaps, interest-rate caps, forward purchase and sale commitments, credit derivatives and swap guarantee derivatives not accounted for in hedge accounting relationships. 2004 and 2005 also included a prepayment management agreement which was terminated effective December 31, 2005.
(2) The accrual of periodic settlements of Receive-fixed swaps includes imputed interest on zero-coupon swaps.

Derivative gains (losses) reflect the change in the fair value of and the accrual of periodic settlements of all derivatives not in hedge accounting relationships. From 2004 through 2006, we experienced significant periodic income volatility due to changes in the fair values of our derivatives and changes in the composition of our portfolio of derivatives not in hedge accounting relationships.

A receive-fixed swap results in our receipt of a fixed interest-rate payment from our counterparty in exchange for a variable-rate payment to our counterparty. Conversely, a pay-fixed swap requires us to make a fixed interest-rate payment to our counterparty in exchange for a variable-rate payment from our counterparty. We use receive- and pay-fixed swaps to adjust the interest rate characteristics of our debt funding in order to more closely match changes in the interest-rate characteristics of our mortgage assets. Call and put swaptions are options to enter into receive- and pay-fixed swaps, respectively. We use swaptions and other option-based derivatives to adjust the characteristics of our debt in response to changes in the expected lives of mortgage-related assets in the Retained portfolio. Generally, receive-fixed swaps increase in value and pay-fixed swaps decrease in value when interest rates decrease (with the opposite being true when interest rates increase). The fair values of call and put swaptions are sensitive to changes in interest rates and are also driven by the market's expectation of potential changes in future interest rates (referred to as "implied volatility"). Purchased swaptions generally become more valuable as implied volatility increases and less valuable as implied volatility decreases. Recognized losses on purchased options in any given period are limited to the premium paid to purchase the option plus any unrealized gains previously recorded. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Derivative Assets and Liabilities, at Fair Value" for information about changes in the notional amounts and the fair value of our derivatives.

During 2006, fair value losses on our swaptions increased as implied volatility declined and both long-term and short-term swap interest rates increased. During 2006 and 2005, fair value changes of our pay-fixed and receive-fixed swaps were primarily driven by increases in long-term swap interest rates. An increase in the notional balance of our receive-fixed swaps not in qualifying hedge accounting relationships as a result of our discontinuation of hedge accounting treatment, combined with fluctuations in swap interest rates throughout the year, reduced fair value losses recognized on our receive-fixed swaps during 2006. See "NOTE 12: DERIVATIVES" to our consolidated financial statements for additional information on our discontinuation of hedge accounting treatment.

During 2004, losses on our put swaptions resulted from changes in swap interest rates and a decline in implied volatility of interest rates. Additionally, in 2004, a large portion of our pay-fixed swaps that were not in hedge accounting relationships was scheduled to begin on a future date. The net loss on our pay-fixed swaps in 2004 resulted from the overall decline in forward swap interest rates.

The accrual of periodic settlements for derivatives not in qualifying hedge accounting relationships increased during 2006 compared to 2005 as short-term interest rates increased and the net income due to the receive variable-rate leg of our pay-fixed swaps was only partly offset by the net expense due to the pay variable-rate leg of our receive-fixed swaps.

The expense associated with accrual of periodic settlements for derivatives not in qualifying hedge accounting relationships declined during 2005 compared to 2004 because interest accruals related to our pay-fixed and receive-fixed swaps largely offset one another during 2005, but only did so for the later part of 2004, following the discontinuation of hedge accounting for certain receive-fixed swaps in November 2004.

### Hedge Accounting Gains (Losses)

Hedge accounting gains (losses) represent the extent to which differences in the characteristics or terms of a derivative in a hedge accounting relationship and the hedged item result in fair value or cash flow changes that are not exactly offset. Our net hedge ineffectiveness gains in 2006 and 2005 were not significant. Net hedge ineffectiveness gains in 2004 related primarily to fair value hedge accounting relationships where the derivative was valued using forward rates while the hedged debt was valued using spot rates. As discussed in "NOTE 12: DERIVATIVES" to our consolidated financial statements, a substantial portion of our derivatives in fair value hedge accounting relationships was reclassified to no hedge designation during 2004 and 2006.

### Gains (Losses) on Investment Activity

Table 16 summarizes the components of Gains (losses) on investment activity.

**Table 16 — Gains (Losses) on Investment Activity**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
|  | (in millions) | | |
| Gains (losses) on trading securities | $ (3) | $(289) | $(1,071) |
| Gains (losses) on PC residuals, at fair value | (19) | (95) | 58 |
| Gains (losses) on sale of mortgage loans[1] | 86 | 92 | 209 |
| Gains (losses) on sale of available-for-sale securities | 22 | 546 | 584 |
| Security impairments: |  |  |  |
| Interest-only security impairments | (147) | (71) | (66) |
| Other security impairments | (393) | (300) | (60) |
| Total security impairments | (540) | (371) | (126) |
| Lower-of-cost-or-market adjustments | (20) | (10) | (2) |
| Total gains (losses) on investment activity | $(474) | $(127) | $ (348) |

(1) Represents mortgage loans sold in connection with securitization transactions.

*Gains (losses) on trading securities*

In 2006 and 2005, the increases in long-term interest rates resulted in losses on mortgage-related securities classified as trading. However, these losses were significantly lower in 2006 than in 2005 as interest rates increased less in 2006 than in 2005. The losses in both years were partly offset by gains on interest-only mortgage-related securities classified as trading, which generally increased in fair value as interest rates rose.

Prior to 2005, our trading positions related primarily to our SS&TG business unit and external Money Manager program, both of which ceased operations in the fourth quarter of 2004. The trading activities of our SS&TG business unit resulted in valuation differences, recorded as trading losses, that totaled $1,101 million in 2004, which were offset by net interest income on the trading securities held. Absent the SS&TG business unit, our trading gains (losses) netted to a $30 million gain in 2004.

*Gains (losses) on PC residuals, at fair value*

Gains (losses) on PC residuals relate to certain PCs and Structured Securities we hold in our Retained portfolio and represent the net fair value of the future cash inflows and cash outflows related to our guarantee of these securities. The fair value of PC residuals is affected by several factors including: (a) changes in interest rates, which affects the expected lives of the related PCs and Structured Securities; (b) default experience and loss severity trends related to our guarantees and (c) third party information with respect to fair value.

The decrease in net losses on PC residuals in 2006 as compared to 2005 resulted from increasing interest rates in 2006 which increased the expected lives of related PCs and Structured Securities. In 2005, net losses on PC residuals included the effect of changes in the approach we used to estimate the fair values of our guarantee-related assets and liabilities, which resulted in net pre-tax losses of $78 million in the first quarter of 2005. In 2004, expected default costs declined due to continued home price appreciation and generated gains, partially offset by declines in mortgage interest rates which reduced the estimated fair value of future contractual guarantee fees related to securities we hold.

*Gains (losses) on sale of available-for-sale securities*

In 2006, gains on sales of available-for-sale securities included net gains of $188 million related to the sale of certain commercial mortgage-backed securities as discussed in "*Total security impairments.*" These gains were partly offset by net losses due primarily to the increase in interest rates during the year. In 2005, gains on sales of available-for-sale securities declined as the impact of rising interest rates was partly offset by an increase in the volume of resecuritization activity.

*Total security impairments*

Total security impairments in 2006, 2005 and 2004 included:

- $147 million, $71 million and $66 million, respectively, related to mortgage-related interest-only securities, primarily due to periodic declines in mortgage interest rates experienced during those years;

- $332 million, $115 million and $60 million, respectively, related to mortgage-related securities where we determined that a decline in fair value below amortized cost was other-than-temporary due to the deterioration of the credit quality of the underlying mortgage loans or because the impairment was interest-rate related and we did not have the intent to hold the security until the loss would be recovered; and

- $61 million, $185 million and $— million, respectively, related to impairments of certain commercial mortgage-backed securities which involved cash flows from mixed pools of multifamily and non-residential commercial mortgages. In December 2005, HUD determined that these mixed-pool investments were not authorized under our charter and OFHEO subsequently directed us to divest these investments, which we did in 2006.

**Gains (Losses) on Debt Retirement**

We repurchase or call our outstanding debt securities from time to time to help support the liquidity and predictability of the market for our debt securities and to manage our mix of assets and liabilities. When we repurchase outstanding debt, we recognize a gain or loss related to the difference between its fair value and its carrying value, including any remaining unamortized deferred items (*e.g.*, premiums, discounts, issuance costs and hedging-related basis adjustments). When we exercise a call option on our callable debt, we recognize a gain or loss related to the difference between its call price and its carrying value, including any remaining unamortized deferred items.

In 2006 and 2005, we recognized net gains on debt retirements due primarily to the repurchases of outstanding debt trading at attractive prices to take advantage of favorable funding spreads relative to LIBOR on our new debt issuances. In 2004, we recognized net losses on debt retirements due primarily to the repurchase of outstanding debt to help preserve the liquidity and price performance of our debt securities as market interest rates declined, particularly in the early part of the year.

**Other Income**

Other income increased in 2006 as we recognized net foreign-currency gains on foreign-currency denominated debt as the U.S. dollar strengthened relative to the Euro during December 2006. We actively manage the foreign-currency risk associated with our foreign-currency denominated debt using derivatives, which were designated in fair value hedge accounting relationships until we voluntarily discontinued hedge accounting for those derivatives on December 1, 2006. After that date, we continued to manage our foreign-currency risk; however, translation gains and losses on our foreign-currency denominated debt were recorded in Other income and were substantially offset by net losses we recorded in Derivative gains (losses). In 2005, Other income included approximately $80 million of expense, net, related to certain errors not material to our consolidated financial statements with respect to income in previously reported periods.

## Non-Interest Expense

Table 17 summarizes the components of Non-interest expense.

### Table 17 — Non-Interest Expense

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| | (in millions) | | |
| Administrative Expenses: | | | |
| Salaries and employee benefits | $ 830 | $ 805 | $ 758 |
| Professional services | 460 | 386 | 588 |
| Occupancy expense | 61 | 58 | 60 |
| Other administrative expenses | 290 | 286 | 144 |
| Total administrative expenses | 1,641 | 1,535 | 1,550 |
| Provision for credit losses | 215 | 251 | 143 |
| REO operations (income) expense | 60 | 40 | (3) |
| Losses on certain credit guarantees | 476 | 234 | 33 |
| Housing tax credit partnerships | 407 | 320 | 281 |
| Minority interests in earnings of consolidated subsidiaries | 58 | 96 | 129 |
| Other expenses | 190 | 537 | 238 |
| Total Non-interest expense | $3,047 | $3,013 | $2,371 |

### Administrative Expenses

Salaries and employee benefits increased during each of the past three years primarily because we hired additional employees in support of our financial reporting and infrastructure-related activities. In an effort to recruit new talent and retain existing employees, we continued to experience increases in employee incentive compensation costs, such as employee stock compensation, special incentive awards and annual employee bonuses. The cessation of our SS&TG business unit and external Money Manager program activities during the fourth quarter of 2004 and related employee terminations partially offset other increases in Salaries and employee benefits during 2005.

In 2006, professional services expense increased as we progressed with various initiatives to improve our financial accounting systems and continued our remediation activities. Professional services expense declined during 2005 in part because we were able to replace consultants with employees, increasing our Salaries and employee benefits expense as a consequence.

Other administrative expenses are presented net of certain expenses that we defer related to software development activities. The net effect of these capitalized software costs, including the write-off of previously capitalized amounts, was an increase (reduction) to Other administrative expenses totaling $15 million, $29 million and $(94) million in 2006, 2005 and 2004, respectively. In addition, Other administrative expenses increased in 2006 and 2005 compared to 2004 as a result of higher OFHEO regulatory assessments associated with its oversight responsibilities and charitable contributions, particularly associated with Hurricane Katrina.

### Provision for Credit Losses

The provision for credit losses declined in 2006 as compared with 2005, which included an additional provision of $128 million for our estimate of incurred losses for loans affected by Hurricane Katrina. In 2006, we reversed $82 million of the provision for credit losses recorded in 2005 associated with Hurricane Katrina because the related payment and delinquency experience on affected properties was more favorable than expected. Absent the adjustments related to Hurricane Katrina, the provision for credit losses would have been $297 million, $123 million and $143 million in 2006, 2005 and 2004, respectively. We recorded additional reserves in 2006 related to our single-family portfolio reflecting:

- increased estimates of incurred losses with respect to delinquent loans that are expected to experience higher default rates based on their year of origination;
- an observed increase in the transition rates of loans through delinquency to foreclosure and corresponding increases in the number of properties that we acquired as real estate owned; and
- increases in the expected severity of losses on a per-property basis, driven in part by the expectation of low or slower home price appreciation in certain areas.

We expect that near-term credit losses, which include net charge-offs and REO expenses, will rise while still remaining below longer-term historical levels, as home price appreciation continues to slow significantly.

### Losses on Certain Credit Guarantees

Losses on certain credit guarantees includes (a) losses recognized upon the issuance of PCs in Guarantor Swap transactions and (b) losses on non-performing loans repurchased from PC loan pools.

We negotiate contracts with our customers in Guarantor Swap transactions based upon our view of the overall economics of the transaction, considering the volume and types of mortgage loans to be delivered to us and our estimates of the net present value of related future guarantee fees, credit costs and other associated cash flows. However, the accounting for our guarantee-related assets and liabilities is not determined at the contract level, rather it is determined separately for each PC-related loan pool. We determine the initial fair value of the pool-level guarantee-related assets and liabilities using methodologies that employ direct market-based information that may differ from the estimates we use to negotiate the guarantee fee we charge customers. While our guarantee fees are subject to competitive pressure and we may enter into transactions for which our expectations of economic returns are below our normal return thresholds (*e.g.*, to achieve our affordable housing goals or maintain our market share), we expect the vast majority of our Guarantor Swap transactions will generate positive economic returns over the lives of the related PCs.

For each loan pool created, we compare the initial fair value of the related Guarantee obligation to the initial fair value of the related Guarantee asset and credit enhancement-related assets. If the Guarantee obligation is greater than the Guarantee asset, we immediately recognize a loss equal to the difference with respect to that pool. If the Guarantee obligation is less than the Guarantee asset, no initial gain is recorded; rather, guarantee income equal to the difference is deferred as an addition to the Guarantee obligation and is recognized as that liability is amortized. Accordingly, a Guarantor Swap transaction may result in some loan pools for which a loss is recognized immediately in earnings and other loan pools where guarantee income is deferred. We record these losses as Losses on certain credit guarantees.

In 2006 and 2005, we realized losses of $350 million and $234 million, respectively, on certain Guarantor Swap transactions entered into during those years. The increase in these losses was driven by a combination of higher expected future credit costs and competitive pressure on guarantee fees. In addition, our Guarantee asset associated with certain non-traditional mortgage products, including interest-only loans and option ARMs, is subject to a lower market valuation than traditional mortgage products due to the lower liquidity or corresponding lack of observable market prices for the associated cash flows.

Losses on non-performing loans repurchased from the mortgage loan pools underlying PCs and Structured Securities held by third parties occur when the carrying value of the repurchased loan, net of any allocated loan loss reserve, exceeds the estimated fair value of the loan. Increases in market interest rates and declining market values for delinquent loans led to the recognition of losses of $126 million in 2006.

Losses on certain credit guarantees increased during 2005 when compared to 2004, as a result of the initial application of our approach for determining the fair values of our guarantee-related assets and liabilities at inception. This approach uses more market-based information and is discussed in "NOTE 2: TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS" to our consolidated financial statements. We also realized losses in 2005 and to a lesser extent in 2006, as a result of our efforts to acquire business at competitive prices in order to meet the affordable housing goals and subgoals established by HUD.

### Housing Tax Credit Partnerships

Operating losses of our housing tax credit partnerships, which are recorded as a component of Non-interest expense, have increased over the last three years as our investments in these partnerships have increased. The increased investment in housing tax credit partnerships generated related tax benefits, which consisted of tax credits and tax deductible operating losses. Tax benefits associated with our investments in housing tax credit partnerships reduced Income tax expense by $603 million, $476 million and $378 million for 2006, 2005 and 2004, respectively. See "Income Tax Expense (Benefit)" for additional information about the impact of these investments on our income tax expense.

### Other Expenses

In April 2006, we reached an agreement in principle to settle the securities class action and shareholder derivative lawsuits relating to our restatement. The settlement became final in November 2006. In 2005, we recorded expenses of $339 million to increase our reserves for legal settlements, including this settlement, net of expected insurance proceeds. See "NOTE 13: LEGAL CONTINGENCIES" to our consolidated financial statements for more information.

### Income Tax Expense (Benefit)

For 2006, 2005 and 2004, our effective tax rates were (5.1) percent, 14.4 percent and 21.2 percent, respectively. The decrease in the effective tax rate over the past three years is primarily due to the decline in pre-tax income, the year-over-year increases in tax credits related to our investments in low-income housing tax credit partnerships and interest earned on tax-exempt housing-related securities. We expect tax credits resulting from our investments in housing tax credit partnerships to grow in the future. However, our ability to use all of the tax credits generated by existing or future investments in housing tax credit partnerships to reduce our federal income tax liability may be limited.

Our effective tax rate for 2006 and 2004 also benefited from reductions to our tax reserves of $174 million and $94 million, respectively, due predominantly to a favorable U.S. Tax Court decision in 2006 and separate settlements with the Internal Revenue Service in both years. For additional information, see "NOTE 14: INCOME TAXES" to our consolidated financial statements.

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for more information concerning our significant accounting policies.

### Table 18 — Summary Consolidated Balance Sheets

| | December 31, | |
|---|---|---|
| | 2006 | 2005 |
| | (in millions) | |
| Assets: | | |
| Retained portfolio | $700,543 | $709,384 |
| Cash and investments | 79,973 | 67,792 |
| Derivative assets, at fair value | 7,908 | 7,097 |
| Guarantee asset, at fair value | 6,070 | 5,083 |
| Other | 18,587 | 16,866 |
| Total assets | $813,081 | $806,222 |
| Liabilities and stockholders' equity: | | |
| Liabilities: | | |
| Total debt securities, net | $753,938 | $748,792 |
| Guarantee obligation | 7,117 | 5,541 |
| Derivative liabilities, at fair value | 179 | 590 |
| Other | 23,030 | 23,159 |
| Total liabilities | 784,264 | 778,082 |
| Minority interests in consolidated subsidiaries | 516 | 949 |
| Stockholders' equity: | | |
| Preferred stock, at redemption value | 6,109 | 4,609 |
| Common stock | 152 | 152 |
| Additional paid-in capital | 962 | 924 |
| Retained earnings | 32,177 | 31,559 |
| AOCI, net of taxes: | | |
| Available-for-sale securities | (2,749) | (2,485) |
| Cash flow hedge relationships | (5,033) | (6,287) |
| Defined benefit plans | (87) | (1) |
| Total AOCI, net of taxes | (7,869) | (8,773) |
| Treasury stock, at cost | (3,230) | (1,280) |
| Total stockholders' equity | 28,301 | 27,191 |
| Total liabilities and stockholders' equity | $813,081 | $806,222 |

## Retained Portfolio

As discussed in "BUSINESS — Business Activities — *Investment and Funding Activities*," beginning July 1, 2006, we voluntarily limited the annual growth of our Retained portfolio. At December 31, 2006, the carrying value of the Retained portfolio was $700.5 billion, which was below the voluntary limit of $717.4 billion.

Table 19 provides detail regarding the mortgage loans and mortgage-related securities in our Retained portfolio.

**Table 19 — Characteristics of Mortgage Loans and Mortgage-Related Securities in the Retained Portfolio**

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2006** | | | **2005**[1] | | |
| | Fixed Rate | Variable Rate[2] | Total | Fixed Rate | Variable Rate[2] | Total |
| | (in millions) | | | | | |
| Mortgage loans | $ 61,273 | $ 4,574 | $ 65,847 | $ 56,458 | $ 5,023 | $ 61,481 |
| Guaranteed PCs and Structured Securities:[3] | | | | | | |
| Single-family | 282,052 | 71,828 | 353,880 | 299,167 | 61,766 | 360,933 |
| Multifamily | 241 | 141 | 382 | 247 | 144 | 391 |
| Total Guaranteed PCs and Structured Securities | 282,293 | 71,969 | 354,262 | 299,414 | 61,910 | 361,324 |
| Non-Freddie Mac mortgage-related securities: | | | | | | |
| Agency mortgage-related securities:[4] | | | | | | |
| Fannie Mae: | | | | | | |
| Single-family | 25,805 | 17,640 | 43,445 | 28,818 | 13,180 | 41,998 |
| Multifamily | 987 | 2 | 989 | 1,294 | 41 | 1,335 |
| Ginnie Mae: | | | | | | |
| Single-family | 707 | 231 | 938 | 1,045 | 218 | 1,263 |
| Multifamily | 13 | — | 13 | 30 | — | 30 |
| Total agency mortgage-related securities | 27,512 | 17,873 | 45,385 | 31,187 | 13,439 | 44,626 |
| Non-agency mortgage-related securities: | | | | | | |
| Single-family | 4,280 | 174,081 | 178,361 | 4,749 | 181,678 | 186,427 |
| Commercial mortgage-backed securities | 23,768 | 20,992 | 44,760 | 34,533 | 8,954 | 43,487 |
| Mortgage revenue bonds[5] | 13,760 | 74 | 13,834 | 11,229 | 92 | 11,321 |
| Manufactured housing[6] | 1,381 | 129 | 1,510 | 1,508 | 172 | 1,680 |
| Total non-agency mortgage-related securities[7] | 43,189 | 195,276 | 238,465 | 52,019 | 190,896 | 242,915 |
| Total unpaid principal balance of Retained portfolio | $414,267 | $289,692 | 703,959 | $439,078 | $271,268 | 710,346 |
| Premiums, discounts, deferred fees, impairments of unpaid principal balances and other basis adjustments | | | 103 | | | 2,111 |
| Net unrealized gains (losses) on mortgage-related securities, pre-tax | | | (4,046) | | | (3,551) |
| Participation Certificate residuals, at fair value | | | 597 | | | 597 |
| Reserve for losses on mortgage loans held-for-investment | | | (70) | | | (119) |
| Total Retained portfolio per consolidated balance sheets | | | $700,543 | | | $709,384 |

(1) Certain amounts for 2005 have been revised to conform with the 2006 presentation.
(2) Variable-rate mortgage loans and mortgage-related securities include those with a contractual coupon rate that, prior to contractual maturity, is either scheduled to change or subject to change based on changes to the composition of the underlying collateral. Mortgage loans also include mortgages with balloon/reset provisions.
(3) For Guaranteed PCs and Structured Securities we issue, we are subject to the credit risk associated with the underlying mortgage loan collateral.
(4) Agency mortgage-related securities are generally not separately rated by nationally recognized statistical rating organizations, but are viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities rated AAA or equivalent.
(5) Consists of obligations of states and political subdivisions. Approximately 67 percent and 66 percent of these securities were AAA-rated at December 31, 2006 and 2005, respectively.
(6) At December 31, 2006 and 2005, 38 percent and 51 percent, respectively, of mortgage-related securities backed by manufactured housing were rated BBB− or above. For the same dates, 97 percent of these securities were supported by third-party credit enhancements (e.g., bond insurance) or other credit enhancements (e.g., deal structure through subordination). Approximately 30 percent and 33 percent of these securities were AAA-rated at December 31, 2006 and 2005, respectively.
(7) Credit ratings for most non-agency mortgage-related securities are designated by at least two nationally recognized statistical rating organizations. At December 31, 2006 and 2005, approximately 96 percent and 98 percent, respectively, of total non-agency mortgage-related securities were AAA-rated.

*Freddie Mac*

Table 20 provides additional detail regarding the fair value of mortgage-related securities in the Retained portfolio.

**Table 20 — Fair Value of Available-For-Sale and Trading Mortgage-Related Securities in the Retained Portfolio**

| | December 31, | | |
| --- | --- | --- | --- |
| | **2006** | **2005** | **2004** |
| | | **(in millions)** | |
| Available-for-sale securities: | | | |
| Mortgage-related securities issued by: | | | |
| Freddie Mac | $344,088 | $351,447 | $352,102 |
| Fannie Mae | 43,886 | 43,306 | 59,519 |
| Ginnie Mae | 733 | 1,115 | 1,762 |
| Other | 224,099 | 231,356 | 168,058 |
| Obligations of states and political subdivisions | 13,925 | 11,241 | 9,020 |
| Total available-for-sale mortgage-related securities | 626,731 | 638,465 | 590,461 |
| Trading securities: | | | |
| Mortgage-related securities issued by: | | | |
| Freddie Mac | 6,573 | 8,156 | 11,398 |
| Fannie Mae | 802 | 534 | 385 |
| Ginnie Mae | 222 | 204 | 59 |
| Total trading mortgage-related securities | 7,597 | 8,894 | 11,842 |
| Total fair value of available-for-sale and trading mortgage-related securities | $634,328 | $647,359 | $602,303 |

**Issuers Greater than 10 Percent of Stockholders' Equity**

We held Fannie Mae securities in our Retained portfolio with a fair value of $44.7 billion, which represented 158 percent of Total stockholders' equity of $28.3 billion at December 31, 2006. In addition, we held at the individual trust level in our Retained portfolio securities issued by Countrywide Home Equity Loan Trust with a fair value of $3.3 billion, which represented 11.5 percent of Total stockholders' equity at December 31, 2006. No other individual issuer at the individual trust level exceeded 10 percent of Total stockholders' equity at December 31, 2006.

**Cash and Investments**

Table 21 provides additional detail regarding the non-mortgage-related securities in our Cash and investments portfolio.

**Table 21 — Cash and Investments**

| | December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2006** | | **2005** | | **2004** | |
| | **Fair Value** | **Average Maturity (Months)** | **Fair Value** | **Average Maturity (Months)** | **Fair Value** | **Average Maturity (Months)** |
| | | | **(dollars in millions)** | | | |
| Cash and cash equivalents | $11,359 | <3 | $10,468 | <3 | $35,253 | <3 |
| Investments: | | | | | | |
| Available-for-sale securities: | | | | | | |
| Non-mortgage-related securities: | | | | | | |
| Asset-backed securities[1] | 32,122 | N/A | 30,578 | N/A | 21,733 | N/A |
| Obligations of state and political subdivisions[1] | 2,273 | 363 | 5,823 | 282 | 8,097 | 303 |
| Commercial paper | 11,191 | <3 | 5,764 | <3 | — | |
| Total available-for-sale non-mortgage-related securities[2] | 45,586 | | 42,165 | | 29,830 | |
| Federal funds sold and Eurodollars | 19,778 | <3 | 9,909 | <3 | 18,647 | <3 |
| Securities purchased under agreements to resell | 3,250 | <3 | 5,250 | <3 | 13,550 | <3 |
| Subtotal | 23,028 | | 15,159 | | 32,197 | |
| Total investments | 68,614 | | 57,324 | | 62,027 | |
| Total Cash and investments per consolidated balance sheets | $79,973 | | $67,792 | | $97,280 | |

(1) Consists primarily of securities that can be prepaid prior to their contractual maturity without penalty.
(2) Credit ratings for most securities are designated by at least two nationally recognized statistical rating organizations. At December 31, 2006 and 2005, all of our available-for-sale non-mortgage-related securities were rated A or better. At December 31, 2004, 99.9% of these securities were rated A or better.

The increase in the Cash and investments portfolio during 2006 compared to 2005 was in part driven by our decision to maintain higher levels of liquid investments to ensure that we could appropriately service our outstanding debt and PCs and Structured Securities while operating under the Federal Reserve Board's intraday overdraft policy, which was revised effective July 2006. The revised policy restricts the GSEs, among others, from maintaining intraday overdraft positions at the Federal Reserve.

**Derivative Assets and Liabilities, at Fair Value**

Table 22 summarizes the notional or contractual amounts and related fair value of our total derivative portfolio by product type.

**Table 22 — Total Derivative Portfolio**

| | December 31, | | | |
| | 2006 | | 2005 | |
| | Notional or Contractual Amount[1] | Fair Value[2] | Notional or Contractual Amount[1] | Fair Value[2] |
|---|---|---|---|---|
| | (in millions) | | | |
| Interest-rate swaps: | | | | |
| Receive-fixed | $222,631 | $   (334) | $159,212 | $   756 |
| Pay-fixed | 217,565 | (1,352) | 181,562 | (991) |
| Basis (floating to floating) | 683 | — | 234 | — |
| Total interest-rate swaps | 440,879 | (1,686) | 341,008 | (235) |
| Option-based: | | | | |
| Call swaptions | 194,200 | 4,034 | 146,615 | 3,453 |
| Put swaptions | 29,725 | 958 | 34,675 | 1,200 |
| Other option-based derivatives[3] | 27,185 | (15) | 11,814 | (7) |
| Total option-based | 251,110 | 4,977 | 193,104 | 4,646 |
| Futures | 22,400 | 28 | 86,252 | 19 |
| Foreign-currency swaps | 29,234 | 4,399 | 37,850 | 2,124 |
| Interest-rate caps | — | — | 45 | — |
| Subtotal | 743,623 | 7,718 | 658,259 | 6,554 |
| Forward purchase and sale commitments | 10,012 | 15 | 21,961 | (44) |
| Credit derivatives | 2,605 | (1) | 2,414 | (1) |
| Swap guarantee derivatives | 957 | (3) | 738 | (2) |
| Total derivative portfolio | $757,197 | $ 7,729 | $683,372 | $6,507 |

(1) Notional or contractual amounts are used to calculate the periodic amounts to be received and paid and generally do not represent actual amounts to be exchanged or directly reflect our exposure to institutional credit risk. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.

(2) The fair value by derivative type presented in this table is shown prior to netting by counterparty. The fair value of derivatives presented on our consolidated balance sheets, however, is netted by counterparty, and is reported in the Derivative assets, at fair value and Derivative liabilities, at fair value captions. The total fair value of the derivative portfolio presented in this table equals the difference between the fair value of the derivative assets and derivative liabilities presented on our consolidated balance sheets. The fair value for futures are directly derived from quoted market prices. Fair values of other derivatives are derived primarily from valuation models using market data inputs.

(3) Primarily represents written options, including guarantees of stated final maturity of issued Structured Securities and written call options on PCs we issued.

The carrying value of our derivative assets and liabilities on our consolidated balance sheets is equal to their fair value. The composition of our derivative portfolio will change from period to period as a result of derivative purchases, terminations or assignments prior to contractual maturity and expiration of the derivatives at their contractual maturity. We record changes in fair values of our derivatives in current income or, to the extent our accounting hedge relationships are effective, we defer those changes in AOCI or offset them with basis adjustments to the related hedged item. As a result, the increases or decreases in fair value by derivative categories will not correspond directly to Derivative gains (losses) or Hedge accounting gains (losses) on our consolidated statements of income.

The fair value of the total derivative portfolio increased in 2006 due primarily to the increase in the fair value of foreign-currency swaps we use to economically hedge Euro-denominated debt as the U.S. dollar weakened relative to the Euro.

Several factors contributed to the change in the composition of our derivative portfolio during 2006. We entered into additional pay-fixed swaps with relatively short maturities to offset our yield curve exposure in response to the continued flattening of the yield curve and generally higher interest rates in 2006. We entered into additional receive-fixed swaps as a result of economic hedging activities related to our callable debt securities outstanding, which increased as a proportion of our total debt portfolio during 2006. We employ receive-fixed swaps to protect against a decline in interest rates until the specified call date and between specified call dates of our callable debt. We increased the notional balance of our call swaptions to manage the risk of further declines in market interest rates following the declines observed in the second half of the year. The notional balance of our futures declined in 2006 primarily because we continued to reduce our position in Eurodollar future contracts held for risk management purposes in response to movements in short-term rates. The notional balance of our foreign-currency swaps declined due to maturities of such swaps throughout 2006 that were not replaced by new contracts as the balance of our Euro-denominated debt securities declined during the year.

Table 23 summarizes the changes in derivative fair values.

**Table 23 — Changes in Derivative Fair Values**

|  | 2006 | 2005 |
|---|---|---|
|  | (in millions) | |
| Beginning balance, at January 1 — Net asset (liability) | $ 6,507 | $15,031 |
| Net change in: | | |
| Forward purchase and sale commitments | 59 | (35) |
| Credit derivatives | — | 1 |
| Swap guarantee derivatives | (1) | (1) |
| Other derivatives:[1] | | |
| Changes in fair value | 2,008 | (8,417) |
| Fair value of new contracts entered into during the period[2] | 2,577 | 2,522 |
| Contracts realized or otherwise settled during the period | (3,421) | (2,594) |
| Ending balance, at December 31 — Net asset (liability) | $ 7,729 | $ 6,507 |

(1) Includes fair value changes for interest-rate swaps, option-based derivatives, futures, foreign-currency swaps and interest-rate caps.
(2) Consists primarily of cash premiums paid or received on options and the initial value of interest-rate swaps after we have exercised related swaptions. Option premiums paid were $2,784 million and $2,248 million during 2006 and 2005, respectively.

Table 24 shows the fair value for each derivative type and the maturity profile of our derivative positions. A positive fair value in Table 24 for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if we terminated the derivatives of that type. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if we terminated the derivatives of that type. See "Table 36 — Derivative Counterparty Credit Exposure" under "RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks" for additional information regarding derivative counterparty credit exposure. Table 24 also provides the weighted average fixed rate of our pay-fixed and receive-fixed swaps.

**Table 24 — Derivative Fair Values and Maturities**

|  | December 31, 2006 | | | | |
|---|---|---|---|---|---|
|  | Fair Value[1] | | | | |
|  | Total Fair Value | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
|  | (dollars in millions) | | | | |
| Interest-rate swaps: | | | | | |
| Receive-fixed: | | | | | |
| Swaps | $ (373) | $(149) | $ (285) | $ 106 | $ (45) |
| Weighted average fixed rate[2] | | 4.64% | 4.81% | 5.01% | 5.33% |
| Forward-starting swaps[3] | 39 | — | — | — | 39 |
| Weighted average fixed rate | | — | — | — | 5.47% |
| Total receive-fixed | (334) | (149) | (285) | 106 | (6) |
| Pay-fixed: | | | | | |
| Swaps | 419 | 93 | 90 | 3 | 233 |
| Weighted average fixed rate[2] | | 4.22% | 5.07% | 5.08% | 5.09% |
| Forward-starting swaps[3] | (1,771) | — | — | — | (1,771) |
| Weighted average fixed rate | | — | — | — | 5.77% |
| Total pay-fixed | (1,352) | 93 | 90 | 3 | (1,538) |
| Total interest-rate swaps | (1,686) | (56) | (195) | 109 | (1,544) |
| Option-based: | | | | | |
| Call swaptions | 4,034 | 12 | 703 | 1,647 | 1,672 |
| Put swaptions | 958 | — | — | 219 | 739 |
| Other option-based derivatives | (15) | (5) | — | (1) | (9) |
| Total option-based | 4,977 | 7 | 703 | 1,865 | 2,402 |
| Futures | 28 | 28 | — | — | — |
| Foreign-currency swaps | 4,399 | 788 | 747 | 1,788 | 1,076 |
| Forward purchase and sale commitments | 15 | 15 | — | — | — |
| Swap guarantee derivatives | (3) | — | — | — | (3) |
| Subtotal | 7,730 | $ 782 | $1,255 | $3,762 | $ 1,931 |
| Credit derivatives | (1) | | | | |
| Total | $ 7,729 | | | | |

(1) Fair value is categorized based on the period from December 31, 2006 until the contractual maturity of the derivative.
(2) Represents the notional weighted average rate for the fixed leg of the swaps.
(3) Represents interest-rate swap agreements that are scheduled to begin on future dates which range from less than one year to ten years.

**Guarantee Asset**

See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — Gains (Losses) on Guarantee Asset" for a description of the Guarantee asset. Table 25 summarizes changes in the Guarantee asset balance.

**Table 25 — Changes in Guarantee Asset**

|  | December 31, | |
| --- | --- | --- |
|  | 2006 | 2005 |
|  | (in millions) | |
| Beginning balance | $5,083 | $4,516 |
| Additions, net of repurchases | 1,787 | 1,631 |
| Return of investment on Guarantee asset | (1,009) | (899) |
| Changes in fair value of future cash flows | 209 | (165) |
| Gains (losses) on Guarantee asset | (800) | (1,064) |
| Ending balance | $6,070 | $5,083 |

In 2006 and 2005, the primary drivers affecting the net increase in our Guarantee asset balance were our business volumes and changes in mortgage interest rates. Additions, net of repurchases, increased in 2006 primarily because net repurchases of PCs and Structured Securities into the Retained portfolio declined. When a PC or Structured Security is repurchased into the Retained portfolio, any related Guarantee asset becomes a component of the associated PC residual, therefore such repurchases reduce the balance of the Guarantee asset. Losses on Guarantee asset decreased as mortgage interest rates increased during 2006, which extended the expected lives of the PCs and Structured Securities and increased the fair value of the Guarantee asset.

**Total Debt Securities, Net**

Table 26 reconciles the par value of our debt securities to the amounts shown on our consolidated balance sheets. See "LIQUIDITY AND CAPITAL RESOURCES" for further discussion of our debt management activities.

**Table 26 — Reconciliation of the Par Value of Total Debt Securities to Our Consolidated Balance Sheets**

|  | December 31, | |
| --- | --- | --- |
|  | 2006 | 2005 |
|  | (in millions) | |
| Total debt securities: | | |
| Par value[1] | $787,970 | $780,382 |
| Unamortized balance of discounts and premiums[2] | (41,769) | (39,338) |
| Foreign-currency-related and hedging-related basis adjustments[3] | 7,737 | 7,748 |
| Total debt securities, net | $753,938 | $748,792 |

(1) Includes securities sold under agreements to repurchase and Federal funds purchased and swap collateral obligations.
(2) Primarily represents unamortized discounts on zero-coupon debt securities. Also, includes accrued interest payable on swap collateral obligations.
(3) Primarily represents deferrals related to the translation gain (loss) on foreign-currency denominated debt that was in hedge accounting relationships.

Table 27 summarizes our Senior debt, due within one year.

**Table 27 — Senior Debt, Due Within One Year**

| | 2006 | | | | |
| | December 31, | | Average Outstanding During the Year | | Maximum Balance, Net Outstanding at Any Month End |
| | Balance, Net[1] | Weighted Average Effective Rate[2] | Balance, Net[3] | Weighted Average Effective Rate[4] | |
| | (dollars in millions) | | | | |
| Reference Bills® securities and discount notes | $157,553 | 5.14% | $165,270 | 4.76% | $182,946 |
| Medium-term Notes | 9,832 | 5.16 | 4,850 | 4.82 | 9,832 |
| Securities sold under agreements to repurchase and Federal funds purchased | — | — | 81 | 5.48 | 2,200 |
| Swap collateral obligations | 9,597 | 5.17 | 9,705 | 5.07 | 11,528 |
| Hedging-related basis adjustments | — | N/A | | | |
| Short-term debt securities | 176,982 | 5.14 | | | |
| Current portion of long-term debt | 117,879 | 4.10 | | | |
| Senior debt, due within one year | $294,861 | 4.73 | | | |

| | 2005 | | | | |
| | December 31, | | Average Outstanding During the Year | | Maximum Balance, Net Outstanding at Any Month End |
| | Balance, Net[1] | Weighted Average Effective Rate[2] | Balance, Net[3] | Weighted Average Effective Rate[4] | |
| | (dollars in millions) | | | | |
| Reference Bills® securities and discount notes | $181,468 | 4.00% | $181,878 | 3.11% | $194,578 |
| Medium-term Notes | 2,032 | 4.17 | 850 | 3.35 | 2,032 |
| Securities sold under agreements to repurchase and Federal funds purchased | 450 | 4.25 | 267 | 3.08 | 1,000 |
| Swap collateral obligations | 8,768 | 4.09 | 10,374 | 3.14 | 13,533 |
| Hedging-related basis adjustments | (5) | N/A | | | |
| Short-term debt securities | 192,713 | 4.01 | | | |
| Current portion of long-term debt | 95,819 | 3.42 | | | |
| Senior debt, due within one year | $288,532 | 3.81 | | | |

| | 2004 | | | | |
| | December 31, | | Average Outstanding During the Year | | Maximum Balance, Net Outstanding at Any Month End |
| | Balance, Net[1] | Weighted Average Effective Rate[2] | Balance, Net[3] | Weighted Average Effective Rate[4] | |
| | (dollars in millions) | | | | |
| Reference Bills® securities and discount notes | $180,198 | 2.04% | $184,834 | 1.40% | $212,715 |
| Medium-term Notes | 162 | 2.51 | 4,289 | 1.31 | 5,320 |
| Securities sold under agreements to repurchase and Federal funds purchased | — | — | 801 | 1.37 | 3,046 |
| Swap collateral obligations | 16,279 | 2.24 | 13,549 | 1.36 | 16,279 |
| Short-term debt securities | 196,639 | 2.05 | | | |
| Current portion of long-term debt | 85,664 | 3.33 | | | |
| Senior debt, due within one year | $282,303 | 2.44 | | | |

(1) Represents par value, net of associated discounts, premiums and foreign-currency-related and hedging-related basis adjustments. Swap collateral obligations include the related accrued interest payable.
(2) Represents the approximate weighted average effective rate for each instrument outstanding at the end of the period, which includes the amortization of discounts or premiums and issuance costs, but excludes the amortization of hedging-related basis adjustments.
(3) Includes unamortized discounts or premiums and issuance costs. Issuance costs are reported in the Other assets caption on our consolidated balance sheets.
(4) Represents the approximate weighted average effective rate during the period, which includes the amortization of discounts or premiums and issuance costs, but excludes the amortization of hedging-related basis adjustments.

**Guarantee Obligation**

See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — Income on Guarantee Obligation" for a description of the components of the Guarantee obligation. Table 28 summarizes the changes in the Guarantee obligation balance.

**Table 28 — Changes in Guarantee Obligation**

| | December 31, | |
| | 2006 | 2005 |
|---|---|---|
| | (in millions) | |
| Beginning balance | $5,541 | $4,065 |
| Transfer-out to the loan loss reserve[1] | (9) | (10) |
| Additions, net of repurchases: | | |
| Fair value of performance and other related costs of newly-issued guarantees | 1,719 | 1,629 |
| Deferred guarantee income of newly-issued guarantees | 733 | 777 |
| Amortization income related to: | | |
| Performance and other related costs | (584) | (616) |
| Deferred guarantee income | (283) | (304) |
| Income on Guarantee obligation | (867) | (920) |
| Ending balance | $7,117 | $5,541 |
| Components of the Guarantee obligation, at period end: | | |
| Unamortized balance of performance and other related costs | $4,869 | $3,743 |
| Unamortized balance of deferred guarantee income | 2,248 | 1,798 |
| Ending Guarantee obligation | $7,117 | $5,541 |

(1) Represents portions of the Guarantee obligation recognized through Guarantor Swap transactions or upon the sale of PCs and Structured Securities that correspond to incurred credit losses reclassified to Reserve for guarantee losses on Participation Certificates at initial recognition of a Guarantee obligation.

The Guarantee obligation increased in 2006 due to business volume and a decline in the rate of amortization. Generally increasing mortgage interest rates resulted in lower liquidation rates on outstanding PCs and Structured Securities.

**Total Stockholders' Equity**

The balance of Total stockholders' equity increased in 2006 primarily as a result of Net income, partially offset by preferred and common stock dividends declared during 2006. During 2006, we repurchased $2.0 billion of outstanding shares of common stock and issued $1.5 billion of non-cumulative, perpetual preferred stock in connection with a plan to replace $2.0 billion of common stock with an equal amount of preferred stock. The repurchase of outstanding shares of common stock and the issuance of non-cumulative, perpetual preferred stock during 2006 resulted in a net reduction of $0.5 billion to the balance of Total stockholders' equity. During the first quarter of 2007, we issued $1.1 billion of non-cumulative, perpetual preferred stock, including $500 million to complete the planned issuance described above and $600 million to replace higher-cost preferred stock that we redeemed in 2007. See "LIQUIDITY AND CAPITAL RESOURCES — Capital Resources — *Core Capital*" for additional information.

The balance of AOCI at December 31, 2006 was a net loss of approximately $7.9 billion, net of taxes, compared to a net loss of $8.8 billion, net of taxes, at December 31, 2005. The reduction in the net loss in AOCI was primarily the result of the amortization of deferred losses in Net interest income related to closed cash flow hedge relationships, partially offset by an increase in unrealized losses on available-for-sale securities primarily driven by the increase in interest rates during 2006.

**CONSOLIDATED FAIR VALUE BALANCE SHEETS ANALYSIS**

Our consolidated fair value balance sheets include the estimated fair values of financial instruments recorded on our consolidated balance sheets prepared in accordance with GAAP, as well as off-balance sheet financial instruments that represent our assets or liabilities that are not recorded on our GAAP consolidated balance sheets. These off-balance sheet items predominantly consist of: (a) the unrecognized Guarantee asset and Guarantee obligation associated with our PCs issued through our Guarantor Swap program prior to the implementation of FIN 45, (b) certain commitments to purchase mortgage loans and (c) certain credit enhancements on manufactured housing asset-backed securities. The fair value balance sheets also include certain assets and liabilities that are not financial instruments (such as property and equipment and real estate owned, which are included in Other assets) at their carrying value in accordance with GAAP. During 2006 and 2005, our fair value results were impacted by several improvements in our approach for estimating the fair value of certain financial instruments. See "OFF-BALANCE SHEET ARRANGEMENTS" and "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" as well as "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 16: FAIR VALUE DISCLOSURES" to our consolidated financial statements for more information on fair values.

In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models. See "RISK MANAGEMENT — Operational Risks" and "RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks" for information concerning the risks associated with these models.

**Table 29 — Summary Consolidated Fair Value Balance Sheets[1]**

| | December 31, | | | |
| | 2006 | | 2005 | |
| | Carrying Amount[2] | Fair Value | Carrying Amount[2] | Fair Value |
| | (in billions) | | | |
|---|---|---|---|---|
| Total assets ................................................. | $813.1 | $811.3 | $806.2 | $805.2 |
| Total liabilities and minority interests ................................................. | $784.8 | $779.5 | $779.0 | $774.3 |
| Net assets attributable to stockholders: | | | | |
| Preferred stockholders ................................................. | 6.1 | 5.8 | 4.6 | 4.1 |
| Common stockholders ................................................. | 22.2 | 26.0 | 22.6 | 26.8 |
| Total net assets ................................................. | 28.3 | 31.8 | 27.2 | 30.9 |
| Total liabilities and net assets ................................................. | $813.1 | $811.3 | $806.2 | $805.2 |

(1) The summary consolidated fair value balance sheets do not purport to present our net realizable, liquidation or market value as a whole. Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.
(2) Carrying amounts equal the amounts reported on our GAAP consolidated balance sheets.

**Key Components of Changes in Fair Value of Net Assets**

Changes in the fair value of net assets from period to period result from returns (measured on a fair value basis) and capital transactions and are primarily attributable to changes in a number of key components:

*Core spread income*

Core spread income on the Retained portfolio is a fair value estimate of the net current period accrual of income from the spread between mortgage-related investments and debt, calculated on an option-adjusted basis. OAS is an estimate of the yield spread between a given financial instrument and a benchmark (LIBOR, agency or Treasury) yield curve, after consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

*Changes in mortgage-to-debt OAS*

The fair value of our net assets can be significantly affected from period to period by changes in the net OAS between the mortgage and agency debt sectors. The fair value impact of changes in OAS for a given period represents an estimate of the net unrealized increase or decrease in fair value of net assets arising from net fluctuations in OAS during that period. We do not attempt to hedge or actively manage the basis risk represented by the impact of changes in mortgage-to-debt OAS because we generally hold a substantial portion of our mortgage assets for the long term and we do not believe that periodic increases or decreases in the fair value of net assets arising from fluctuations in OAS will significantly affect the long-term value of the Retained portfolio. Our estimate of the effect of changes in OAS excludes the impact of other market risk factors we actively manage, or economically hedge, to keep interest-rate risk exposure within prescribed limits.

*Asset-liability management return*

Asset-liability management return represents the estimated net increase or decrease in the fair value of net assets resulting from net exposures related to the market risks we actively manage. We do not hedge all of the interest-rate risk that exists at the time a mortgage is purchased or that arises over its life. The market risks to which we are exposed as a result of our Retained portfolio activities that we actively manage include duration and convexity risks, yield curve risk and volatility risk. We seek to manage these risk exposures within prescribed limits as part of our overall portfolio management strategy. Taking these risk positions and managing them within prudent limits is an integral part of our strategy to optimize the risk/reward profile of our investment activity and produce fair value growth. We expect that the residual risk positions we take and manage under our integrated risk management framework will produce fair value returns that contribute to meeting our fair value growth objectives, although those positions may result in a net increase or decrease in fair value for a given period. During 2006, our duration and convexity risk level as measured by our PMVS was below the risk limits set by management and the board of directors. See "RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks" for more information.

*Core guarantee fees, net*

Core guarantee fees, net represents a fair value estimate of the annual income of the credit guarantee portfolio, based on current portfolio characteristics and market conditions. This estimate considers both contractual guarantee fees collected

over the life of the credit guarantee portfolio and credit-related delivery fees collected up-front when pools are formed, and associated costs and obligations, which include default costs.

*Change in the fair value of the credit guarantee portfolio*

Change in the fair value of the credit guarantee portfolio represents the estimated impact on the fair value of the credit guarantee business resulting from additions to the portfolio (net difference between the fair values of the Guarantee asset and Guarantee obligation recorded when pools are formed) plus the effect of changes in interest rates, projections of the future credit outlook and other market factors (*e.g.*, impact of the passage of time on cash flow discounting). In 2005, we changed our method for estimating the fair values of the Guarantee asset and Guarantee obligation. See "NOTE 2: TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS" to our consolidated financial statements for additional information.

We generally do not hedge changes in the fair value of our existing credit guarantee portfolio, with two exceptions discussed below. While periodic changes in the fair value of the credit guarantee portfolio may have a significant impact on the fair value of net assets, we believe that changes in the fair value of our existing credit guarantee portfolio are not the best indication of long-term fair value expectations because such changes do not reflect our expectation that, over time, replacement business will largely replenish guarantee fee income lost because of prepayments. However, to the extent that projections of the future credit outlook are realized our fair value results may be affected.

We hedge interest-rate exposure related to net buy-ups (up-front payments we made that increase the guarantee fee that we will receive over the life of the pool) and float (expected gains or losses resulting from our mortgage security program remittance cycles). These value changes are excluded from our estimate of the changes in fair value of the credit guarantee portfolio, so that it reflects only the impact of changes in interest rates and other market factors on the unhedged portion of the projected cash flows from the credit guarantee business. The fair value changes associated with net buy-ups and float are considered in asset-liability management return (described above) because they relate to hedged positions.

*Fee income*

Fee income includes miscellaneous fees, such as resecuritization fees, fees generated by our automated underwriting service and delivery fees on some mortgage purchases.

**Discussion of Fair Value Results**

In 2006, the fair value of net assets attributable to common stockholders, before capital transactions, increased by $2.5 billion, resulting in a return on the average fair value of net assets attributable to common stockholders of approximately 9.5 percent, compared to a $1.0 billion increase, or 3.7 percent return, in 2005. In addition, the payment of common dividends and the repurchase of common shares reduced total fair value by $3.3 billion. The fair value of net assets attributable to common stockholders as of December 31, 2006 was $26.0 billion, compared to $26.8 billion as of December 31, 2005.

*Estimated impact of changes in mortgage-to-debt OAS on fair value results*

For the years ended December 31, 2006 and 2005, we estimate that on a pre-tax basis the increases in the fair value of net assets attributable to common stockholders, before capital transactions, included decreases of approximately $0.9 billion and $2.7 billion, respectively, due to a net widening of mortgage-to-debt OAS.

We believe disclosing the estimated impact of changes in mortgage-to-debt OAS on the fair value of net assets is helpful to understanding our current period fair value results in the context of our long-term fair value return expectation. Our long-term expectation is to generate returns, before capital transactions, over time on the average fair value of net assets attributable to common stockholders in the low- to mid-teens. However, period-to-period returns may fluctuate substantially due to market conditions. These market conditions include changes in interest rates and other market factors that affect certain components of our fair value changes, including those which we do not attempt to hedge or actively manage, specifically, the change in mortgage-to-debt OAS with respect to our Retained portfolio and the change in the fair value of the single-family guarantee portfolio.

Our estimate of the periodic increases or decreases in the fair value of net assets associated with fluctuations in option-adjusted spreads provides insight into a component of our fair value results that we do not believe will significantly affect the long-term fair value of the Retained portfolio. This belief is based on our expectation that differences between the prepayments forecasted by our models and the actual prepayments we will experience are not likely to be significant.

*How we estimate the impact of changes in mortgage-to-debt OAS on fair value results*

The impact of changes in OAS on fair value should be understood as an estimate rather than a precise measurement. To estimate the impact of OAS changes, we use models that involve the forecast of interest rates and prepayment behavior and other inputs. We also make assumptions about a variety of factors, including macroeconomic and security-specific data,

interest-rate paths, cash flows and prepayment rates. We use these models and assumptions in running our business, and we rely on many of the models in producing our financial statements and measuring, managing and reporting interest-rate and other market risks. The use of different estimation methods or the application of different assumptions could result in a materially different estimate of OAS impact.

We revised the method we previously used to report the impact that changes in OAS have on our fair value results. This methodology change had no impact on the actual change in the fair value of net assets, only our attribution of that change. This change was made in order to more closely align the process we use to report the impact of changes in OAS with the interest rate risk management framework of our investment activities.

An integral part this framework includes the attribution of fair value changes to assess the performance of our investment activities. On a daily basis, all interest rate sensitive assets, liabilities and derivatives are modeled using our proprietary prepayment and interest rate models. Management uses interest-rate risk statistics generated from this process, along with daily market movements, coupon accruals and price changes, to estimate and attribute returns into various risk factors commonly used in the fixed income industry to quantify and understand sources of fair value return. One important risk factor is the change in fair value due to changes in mortgage-to-debt OAS.

The method previously used to estimate the impact of mortgage-to-debt OAS changes on fair value was performed on a monthly basis and excluded certain portions of the investment portfolio. The new methodology estimates the impact of mortgage-to-debt OAS changes on fair value on a daily basis and includes all financial instruments.

On a pre-tax basis for 2006 and 2005, the reported OAS impacts using our new methodology were reductions in fair value of $0.9 billion and $2.7 billion, respectively. Using our previous methodology, the OAS impacts were pre-tax reductions in fair value of $0.6 billion and $2.0 billion, respectively.

*Understanding our estimate of the impact of changes in mortgage-to-debt OAS on fair value results*

A number of important qualifications apply to our disclosed estimates. The estimated impact of the change in option-adjusted spreads on the fair value of our net assets in any given period does not depend on other components of the change in fair value. Although the fair values of our financial instruments will generally move toward their par values as the instruments approach maturity, investors should not expect that the effect of past changes in OAS will necessarily reverse through future changes in OAS. To the extent that actual prepayment or interest rate distributions differ from the forecasts contemplated in our models, changes in values reflected in mortgage-to-debt OAS may not be recovered in fair value returns at a later date.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other things being equal. However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset. The reverse is true when the OAS on a given asset tightens — current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. Although a widening of OAS is generally accompanied by lower current period fair values, it can also provide us with greater opportunity to purchase new assets for our Retained portfolio at the wider mortgage-to-debt OAS.

For these reasons, our estimate of the impact of the change in OAS provides information regarding one component of the change in fair value for the particular period being evaluated. However, results for a single period should not be used to extrapolate long-term fair value returns. We believe the potential fair value return of our business over the long term depends primarily on our ability to add new assets at attractive mortgage-to-debt OAS and to effectively manage over time the risks associated with these assets, as well as the risks of our existing portfolio to ensure that we realize anticipated returns on our business. In other words, to capture the fair value returns we expect, we have to apply accurate estimates of future prepayment rates and other performance characteristics at the time we purchase assets, and then manage successfully the range of market risks associated with a debt-funded mortgage portfolio over the life of these assets.

## LIQUIDITY AND CAPITAL RESOURCES

### Liquidity

Our business activities require that we maintain adequate liquidity to make payments upon the maturity or repurchase of our debt securities, purchase mortgage loans, mortgage-related securities and other investments, make payments of principal and interest on our debt securities and on our guaranteed PCs and Structured Securities, make net payments on derivative instruments, fund our general operations and pay dividends on our preferred and common stock.

We fund our cash requirements primarily by issuing short-term and long-term debt. Other sources of cash include:

- receipts of principal and interest payments on securities we hold or mortgage loans we have securitized and sold;
- sales of securities we hold;

- borrowings against mortgage-related securities and other investment securities we hold;
- other cash flows from operating activities, including guarantee activities; and
- issuances of common and preferred stock.

We measure our cash position on a daily basis, netting uses of cash with sources of cash. We manage the net cash position over a rolling forecasted 120-day period, with the goal of providing the amount of debt funding needed to cover expected net cash outflows without adversely affecting our overall funding levels. We maintain alternative sources of liquidity to allow normal operations for 120 days without relying upon the issuance of unsecured debt consistent with industry practices of sound liquidity management. Our daily liquidity management activities are consistent with the liquidity component of our commitment with OFHEO to maintain alternative sources of liquidity to allow normal operations for 90 days without relying upon issuance of unsecured debt. See "RISK MANAGEMENT AND DISCLOSURE COMMIT-MENTS" for further information.

The Federal Reserve Board revised its payments system risk policy, effective in July 2006, to restrict or eliminate daylight overdrafts by GSEs in connection with their use of the Fedwire system. The revised policy also includes a requirement that the GSEs fully fund their accounts in the system to the extent necessary to cover payments on their debt and mortgage-related securities each day, before the Federal Reserve Bank of New York, acting as fiscal agent for the GSEs, will initiate such payments. We have taken actions to fully fund our account as necessary, such as opening lines of credit with third parties. Certain of these lines of credit require that we post collateral that, in certain limited circumstances, the secured party has the right to repledge to other third parties, including the Federal Reserve Bank. As of December 31, 2006, we pledged approximately $20.2 billion of securities to these secured parties. These lines of credit, which provide additional intraday liquidity to fund our activities through the Fedwire system, are uncommitted intraday loan facilities. As a result, while we expect to continue to use these facilities, we may not be able to draw on them if and when needed. See "NOTE 5: RETAINED PORTFOLIO AND CASH AND INVESTMENTS PORTFOLIO" to our consolidated financial statements for further information. We believe that the revisions to the Federal Reserve Board's policies will not have a material adverse effect on our liquidity.

To fund our business activities, we depend on the continuing willingness of investors to purchase our debt securities. Any change in applicable legislative or regulatory exemptions, including those described in "REGULATION AND SUPERVISION," could adversely affect our access to some debt investors, thereby potentially increasing our debt funding costs. However, because of our financial performance and our regular and significant participation as an issuer in the capital markets, our sources of liquidity have remained adequate to meet our needs and we anticipate that they will continue to be so.

Under our charter, the Secretary of the Treasury has discretionary authority to purchase our obligations up to a maximum of $2.25 billion principal balance outstanding at any one time. However, we do not rely on this authority as a source of liquidity to meet our obligations.

Depending on market conditions and the mix of derivatives we employ in connection with our ongoing risk management activities, our derivative portfolio can be either a net source or a net use of cash. For example, depending on the prevailing interest-rate environment, interest-rate swap agreements could cause us either to make interest payments to counterparties or to receive interest payments from counterparties. Purchased options require us to pay a premium while written options allow us to receive a premium.

We are required to pledge collateral to third parties in connection with secured financing and daily trade activities. In accordance with contracts with certain derivative counterparties, we post collateral to those counterparties for derivatives in a net loss position, after netting by counterparty, above agreed-upon posting thresholds. See "NOTE 5: RETAINED PORTFOLIO AND CASH AND INVESTMENTS PORTFOLIO" to our consolidated financial statements for information about assets we pledge as collateral.

We are involved in various legal proceedings, including those discussed in "NOTE 13: LEGAL CONTINGENCIES" to our consolidated financial statements, which may result in a use of cash.

### Debt Securities

We fund our operating cash needs and finance our purchases of mortgage loans, mortgage-related securities and non-mortgage-related securities held in our Retained portfolio and Cash and investments portfolio primarily through the issuance of short-term and long-term debt. Table 30 summarizes the par value of the debt securities we issued, based on settlement dates, during 2006 and 2005. We seek to maintain a variety of consistent, active funding programs that promote high-quality coverage by market makers and reach a broad group of institutional and retail investors. By diversifying our investor base and the types of debt securities we offer, we believe we enhance our ability to maintain continuous access to the debt markets under a variety of market conditions.

**Table 30 — Debt Security Issuances by Product, at Par Value[1]**

| | Year Ended December 31, | |
| | 2006 | 2005 |
| | (in millions) | |
|---|---|---|
| Short-term debt: | | |
| Reference Bills® securities and discount notes | $593,444 | $826,253 |
| Medium-term Notes — Callable | 8,532 | 1,745 |
| Medium-term Notes — Non-callable | 1,550 | 360 |
| Total short-term debt | 603,526 | 828,358 |
| Long-term debt: | | |
| Medium-term Notes — Callable[2] | 106,777 | 87,047 |
| Medium-term Notes — Non-callable[3] | 17,721 | 33,624 |
| U.S. dollar Reference Notes® securities — Non-callable[4] | 55,000 | 48,146 |
| Freddie SUBS® securities[5] | 3,299 | — |
| Total long-term debt | 182,797 | 168,817 |
| Total debt securities issued | $786,323 | $997,175 |

(1) Excludes securities sold under agreements to repurchase and Federal funds purchased, swap collateral obligations and securities sold but not yet purchased.
(2) Includes $100 million and $— million of Medium-term Notes — Callable issued for the years ended December 31, 2006 and 2005, respectively, which were accounted for as debt exchanges.
(3) Includes $1,000 million and $— million of Medium-term Notes — Non-callable issued for the years ended December 31, 2006 and 2005, respectively, which were accounted for as debt exchanges.
(4) Includes $— million and $3,396 million of U.S. dollar Reference Notes® securities issued for the years ended December 31, 2006 and 2005, respectively, which were accounted for as debt exchanges.
(5) Includes $1,549 million of Freddie SUBS® securities issued for the year ended December 31, 2006, which were accounted for as debt exchanges.

**Short-Term Debt.**  We fund our operating cash needs primarily by issuing Reference Bills® securities and other discount notes, which are short-term instruments with maturities of one year or less that are sold on a discounted basis, paying only principal at maturity. Our Reference Bills® securities program consists of large issues of short-term debt that we auction to dealers on a regular schedule. We issue discount notes with maturities ranging from one day to one year in response to investor demand and our cash needs. Short-term debt also includes certain Medium-term Notes that have original maturities of one year or less.

**Long-Term Debt.**  We issue long-term debt primarily through our Medium-term Notes program and our Reference Notes® securities program.

**Medium-term Notes.**  We issue a variety of fixed- and variable-rate Medium-term Notes, including callable and non-callable fixed-rate securities, zero-coupon securities and variable-rate securities, with various maturities ranging up to 30 years. Medium-term Notes with original maturities of one year or less are classified as short-term debt. Medium-term Notes typically contain call provisions, effective as early as three months or as distant as 10 years after the securities are issued.

**Reference Notes® Securities.**  Through our Reference Notes® securities program, we sell large issues of long-term debt that provide investors worldwide with a high-quality, liquid investment vehicle. Reference Notes® securities are regularly issued, non-callable fixed-rate securities, which we currently issue with original maturities ranging from two through ten years. We primarily issue securities denominated in U.S. dollars. We have also issued €Reference Notes® securities denominated in Euros, but did not issue any such securities in 2006 or 2005. We hedge our exposure to changes in foreign-currency exchange rates by entering into swap transactions that convert foreign-currency denominated obligations to U.S. dollar-denominated obligations. See "RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks — *Sources of Interest-Rate Risk and Other Market Risks*" for more information.

The investor base for our debt is predominantly institutional. However, we also conduct weekly offerings of FreddieNotes® securities, a Medium-term Notes program designed to meet the investment needs of retail investors.

**Subordinated Debt.**  In December 2006, we issued approximately $2.0 billion of Freddie SUBS® securities, including approximately $1.5 billion issued in exchange for previously issued Freddie SUBS® securities. In addition, we called approximately $1.0 billion of previously issued Freddie SUBS® securities in August 2006 and issued approximately $1.25 billion of Freddie SUBS® securities in June 2006. We did not issue, call or repurchase any Freddie SUBS® securities during 2005 and 2004. Our issuance of subordinated debt in the form of Freddie SUBS® securities supports our risk management and disclosure commitments with OFHEO (described in "RISK MANAGEMENT AND DISCLOSURE COMMITMENTS").

**Debt Retirement Activities.**  We repurchase or call our outstanding debt securities from time to time to help support the liquidity and predictability of the market for our debt securities and to manage interest rate risk associated with our assets and liabilities. When our debt securities become seasoned or European call options on our debt securities expire, they may become less liquid, which could cause their price to decline. By repurchasing debt securities, we help preserve the

liquidity of our debt securities and improve their price performance, which helps to reduce our funding costs over the long-term. Our repurchase activities also help us manage the funding mismatch, or duration gap, created by changes in interest rates. For example, when interest rates decline, the expected lives of the mortgage-related securities held in our Retained portfolio decrease, reducing the need for long-term debt. We use a number of different means to shorten the effective weighted average lives of our outstanding debt securities and thereby manage the duration gap, including retiring long-term debt through repurchases or calls; changing our debt funding mix between short- and long-term debt; or using derivative instruments, such as entering into receive-fixed swaps or terminating or assigning pay-fixed swaps. From time to time, we may also enter into transactions in which we exchange newly issued debt securities for similar outstanding debt securities held by investors. These transactions are accounted for as debt exchanges. See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — Gains (Losses) on Debt Retirement" for more information.

Table 31 provides the par value, based on settlement dates, of debt securities we repurchased, called and exchanged during 2006 and 2005.

### Table 31 — Debt Security Repurchases, Calls and Exchanges

| | Year Ended December 31, | |
|---|---|---|
| | 2006 | 2005 |
| | (in millions) | |
| Repurchases of outstanding €Reference Notes® securities | $ 5,210 | $ — |
| Repurchases of outstanding Medium-term Notes | 28,560 | 11,663 |
| Calls of callable Medium-term Notes | 26,559 | 36,236 |
| Calls of callable Freddie SUBS® securities | 1,000 | — |
| Exchanges of U.S. dollar Reference Notes® securities and Medium-term Notes | 1,074 | 3,043 |
| Exchanges of Freddie SUBS® securities | 1,480 | — |

**Credit Ratings.**   Our ability to access the capital markets and other sources of funding, as well as our cost of funds, are highly dependent upon our credit ratings. Table 32 indicates our credit ratings at March 1, 2007.

### Table 32 — Freddie Mac Credit Ratings

| | Nationally Recognized Statistical Rating Organization | | |
|---|---|---|---|
| | Standard & Poor's | Moody's | Fitch |
| Senior long-term debt[1] | AAA | Aaa | AAA |
| Short-term debt[2] | A-1+ | P-1 | F-1+ |
| Subordinated debt | AA− | Aa2 | AA− |
| Preferred stock | AA− | Aa3 | AA− |

(1) Includes Medium-term Notes, U.S. dollar Reference Notes® securities and €Reference Notes® securities.
(2) Includes Reference Bills® securities and discount notes.

In addition to the ratings described in Table 32, S&P provides a "Risk-To-The-Government" rating that measures our ability to meet our debt obligations and the value of our franchise in the absence of any implied government support. Our "Risk-To-The-Government" rating was AA− at March 1, 2007. Moody's also provides a "Bank Financial Strength" rating that represents Moody's opinion of our intrinsic safety and soundness and, as such, excludes certain external credit risks and credit support elements. Ratings under this measure range from A, the highest, to E. Our "Bank Financial Strength" rating was A− at March 1, 2007.

*Equity Securities*

See "Capital Resources — *Core Capital*" and "MARKET FOR THE COMPANY'S COMMON EQUITY, RE-LATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES" for information about issuances and repurchases of our equity securities.

*Cash and Investments Portfolio*

We maintain a cash and investments portfolio that is important to our financial management and our ability to provide liquidity and stability to the mortgage market. At December 31, 2006, the investments in this portfolio consisted of liquid non-mortgage-related securities that we could sell or finance to provide us with an additional source of liquidity to fund our business operations. We also use the portfolio to help manage recurring cash flows and meet our other cash management needs. In addition, we use the portfolio to hold capital on a temporary basis until we can deploy it into Retained portfolio investments or credit guarantee opportunities. We may also sell or finance the securities in this portfolio to maintain capital reserves to meet mortgage funding needs, provide diverse sources of liquidity or help manage the interest-rate risk inherent in mortgage-related assets.

The non-mortgage-related securities in the Cash and investments portfolio consist principally of asset-backed securities and other marketable assets that can be readily converted to cash. For additional information on our Cash and investments portfolio, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Investments." The non-mortgage-

related investments in this portfolio may expose us to institutional credit risk and the risk that the investments could decline in value due to market-driven events such as credit downgrades or changes in interest rates and other market conditions. See "RISK MANAGEMENT — Credit Risks — *Institutional Credit Risk*" for more information.

**Contractual Obligations**

Table 33 provides aggregated information about the listed categories of our contractual obligations. These contractual obligations affect our short- and long-term liquidity and capital resource needs. The table includes information about undiscounted future cash payments due under these contractual obligations, aggregated by type of contractual obligation, including the contractual maturity profile of our debt securities and other liabilities reported on our consolidated balance sheet and our operating leases at December 31, 2006. The timing of actual future payments may differ from those presented due to a number of factors, including discretionary debt repurchases. Our contractual obligations include other purchase obligations that are enforceable and legally binding. For purposes of this table, purchase obligations are included through the termination date specified in the respective agreements, even if the contract is renewable. Many of our purchase agreements for goods or services include clauses that would allow us to cancel the agreement prior to the expiration of the contract within a specified notice period; however, this table includes such obligations without regard to such termination clauses (unless we have provided the counterparty with actual notice of our intention to terminate the agreement).

In addition, in Table 33, the amounts of future interest payments on debt securities outstanding at December 31, 2006 are based on the contractual terms of our debt securities at that date. These amounts were determined using the key assumptions that (a) variable-rate debt continues to accrue interest at the contractual rates in effect at December 31, 2006 until maturity and (b) callable debt continues to accrue interest until its contractual maturity. The amounts of future interest payments on debt securities presented do not reflect certain factors that will change the amounts of interest payments on our debt securities after December 31, 2006, such as (a) changes in interest rates, (b) the call or retirement of any debt securities, (c) the issuance of new debt securities and (d) other factors. Accordingly, the amounts presented in the table do not represent a forecast of our future cash interest payments or interest expense.

Table 33 excludes the following items:

- future payments related to our Guarantee obligation, because the amount and timing of such payments are generally contingent upon the occurrence of future events and are therefore uncertain;

- future contributions to our Pension Plan, as we have not yet determined whether a contribution is required for 2007. See "NOTE 15: EMPLOYEE BENEFITS" to our consolidated financial statements for additional information about contributions to our Pension Plan;

- future cash settlements on derivative agreements not yet accrued, because the amount and timing of such payments are dependent upon changes in the underlying financial instruments and are therefore uncertain; and

- future dividends on the preferred stock we issued, because dividends on these securities are non-cumulative. In addition, the classes of preferred stock issued by our two consolidated real estate investment trust, or REIT, subsidiaries pay dividends and are cumulative. However, dividends on the REIT preferred stock are excluded because the timing of these payments is dependent upon declaration by the boards of the REITs.

**Table 33 — Contractual Obligations by Year at December 31, 2006**

| | Total | 2007 | 2008 | 2009 | 2010 | 2011 | Thereafter |
|---|---|---|---|---|---|---|---|
| | | | (in millions) | | | | |
| Long-term debt securities[1] ............................... | $609,083 | $117,972 | $ 98,313 | $63,231 | $46,681 | $55,208 | $227,678 |
| Short-term debt securities[1] .............................. | 178,887 | 178,887 | — | — | — | — | — |
| Interest payable[2] ..................................... | 140,167 | 26,095 | 20,878 | 17,029 | 14,516 | 11,589 | 50,060 |
| Other liabilities reflected on our consolidated balance sheet: | | | | | | | |
| Due to Participation Certificate investors .................. | 11,123 | 11,123 | — | — | — | — | — |
| Other contractual liabilities[3][4] ......................... | 2,704 | 1,711 | 556 | 178 | 78 | 41 | 140 |
| Purchase obligations: | | | | | | | |
| Purchase commitments[5] ............................. | 9,856 | 9,856 | — | — | — | — | — |
| Other purchase obligations ............................ | 418 | 247 | 82 | 35 | 19 | 14 | 21 |
| Operating lease obligations .............................. | 114 | 18 | 16 | 13 | 12 | 7 | 48 |
| Total specified contractual obligations ..................... | $952,352 | $345,909 | $119,845 | $80,486 | $61,306 | $66,859 | $277,947 |

(1) Represents par value. Callable debt is included in this table at its contractual maturity. For additional information about our debt securities, see "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS" to our consolidated financial statements.

(2) Includes estimated future interest payments on our short-term and long-term debt securities. Also includes accrued interest payable recorded on our consolidated balance sheet, which consists primarily of the accrual of interest on short-term and long-term debt as well as the accrual of periodic cash settlements of derivatives, netted by counterparty.

(3) Other contractual liabilities primarily represents future cash payments due under our contractual obligations to make delayed equity contributions to low-income housing tax credit partnerships that are unconditional and legally binding.

(4) Accrued obligations related to our defined benefit plans, defined contribution plans and executive deferred compensation plan are included in the Total and 2007 columns. However, the timing of payments due under these obligations is uncertain. See "NOTE 15: EMPLOYEE BENEFITS" to our consolidated financial statements for additional information.

(5) Purchase commitments represents our obligations to purchase mortgage loans and mortgage-related securities from third parties. The majority of purchase commitments included in this caption are accounted for as derivatives in accordance with SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," or SFAS 133.

## Capital Resources

### Capital Management

Our primary objective in managing capital is preserving our safety and soundness. We also seek to have sufficient capital to support our business and mission at attractive long-term returns. See "NOTE 10: REGULATORY CAPITAL" to our consolidated financial statements for more information regarding our regulatory capital requirements and OFHEO's capital monitoring framework. As appropriate, we will consider opportunities to return excess capital to shareholders (through dividends and share repurchases) and optimize our capital structure to lower our cost of capital.

We assess and project our capital adequacy relative to our regulatory requirements as well as our economic risks. This includes targeting a level of additional capital above each of our capital requirements to help support ongoing compliance and to accommodate future uncertainties. We evaluate the adequacy of our targeted additional capital in light of changes in our business and risk exposures.

We develop an annual capital plan that is approved by our board of directors and updated periodically. This plan provides projections of capital adequacy, taking into consideration our business plans, forecasted earnings, economic risks and regulatory requirements.

### Capital Adequacy

We estimate as of December 31, 2006 that we exceeded each of our regulatory capital requirements, including the 30 percent mandatory target capital surplus, based on our most recent submissions to OFHEO. See "NOTE 10: REGULATORY CAPITAL" to our consolidated financial statements for further information regarding our regulatory capital requirements and OFHEO's capital monitoring framework.

### Core Capital

During 2006 and 2005, we added approximately $0.2 billion and $1.0 billion, respectively, to Core capital primarily from Net income of $2.2 billion and $2.1 billion, respectively, partly offset by the payment of common and preferred stock dividends totaling $1.6 billion and $1.3 billion, respectively. In addition, during 2006, we repurchased $2.0 billion of outstanding shares of common stock and issued $1.5 billion of non-cumulative, perpetual preferred stock in connection with a plan to replace $2.0 billion of common stock with an equal amount of preferred stock. During the first quarter of 2007, we issued $1.1 billion of non-cumulative, perpetual preferred stock, including $500 million to complete the planned issuance described above and $600 million to replace higher-cost preferred stock that we redeemed in 2007. In accordance with OFHEO's capital monitoring framework, we obtained OFHEO's approval for both the common stock repurchases and preferred stock redemption described above. Also, during the first quarter of 2007, we received approval from OFHEO and our board of directors to repurchase up to an additional $1 billion in common stock in conjunction with the issuance of up to $1 billion in preferred stock.

Our board of directors approved a dividend per common share of $0.50 for the fourth quarter of 2006 and the first quarter of 2007, an increase over the $0.47 per share common dividend that was paid for each of the first three quarters of 2006 and the fourth quarter of 2005. Our common dividend per share was $0.35 for each of the first three quarters of 2005 and $0.30 for the fourth quarter of 2004. Our board of directors will determine the amount of future dividends, if any, after considering factors such as our capital position, and our earnings and growth prospects.

For the fourth quarter of 2004 through the first quarter of 2007, our board of directors also approved quarterly preferred stock dividends that were consistent with the contractual rates and terms of the preferred stock. See "NOTE 9: STOCKHOLDERS' EQUITY" to our consolidated financial statements for information regarding our outstanding issuances of preferred stock.

## RISK MANAGEMENT

We are exposed to risks that include interest-rate and other market risks, operational risks and credit risks, among others, including those described in "RISK FACTORS." We manage risk through a framework, approved by our board of directors, that recognizes primary risk ownership and management by our business areas. Within this framework, our executive management committees and divisions responsible for independent risk oversight, which include Enterprise Risk Oversight, Corporate Compliance and Internal Audit, monitor performance against our risk management strategies and established risk limits, identify and assess potential issues, and provide oversight regarding changes in business processes and activities. Oversight of risk management is also provided by our board of directors and its committees. Together, these groups assess the adequacy and effectiveness of the risk management functions across the company.

While we consider both our day-to-day and long-term management of interest-rate and other market risks and credit risks to be satisfactory, we identified weaknesses in prior years in our overall risk governance framework. We created an executive management enterprise risk committee in June 2006 to provide a company-wide view of risk and have formed five subcommittees to focus on credit, market, models, operational and regulatory risks. Our board of directors has also assigned primary responsibility for oversight of enterprise risk management to the Governance, Nominating and Risk Oversight Committee of the board of directors. We have taken steps to strengthen our capacity in four important areas: risk governance, risk identification, risk measurement and assessment and related education and communication. Accordingly, we believe we have reduced the severity of the deficiencies in our risk governance framework so that they no longer represent a significant deficiency in our internal control over financial reporting.

### Operational Risks

Operational risks are inherent in all of our business activities and can become apparent in various ways, including accounting or operational errors, business interruptions, fraud, failures of the technology used to support our business activities and other operational challenges from failed or inadequate internal controls. We face a number of significant operational risks, including material weaknesses and other significant deficiencies in our internal control over financial reporting. These operational risks may expose us to financial loss, may delay or interfere with our ability to return to and sustain timely financial reporting, or may result in other adverse consequences. Governance over the management of our operational risks takes place through the enterprise risk management framework described above. Business areas retain primary responsibility for identifying, assessing and reporting their operational risks.

Our business processes are highly dependent on our use of technology and business and financial models. We face challenges in the areas of system security, change management and information technology application and general controls. See "*Internal Control Over Financial Reporting*" for more information concerning material weaknesses related to our systems. In recent years, we have strengthened our processes to validate model assumptions, code, theory and the system applications that utilize our models. We are currently improving our model oversight processes and enhancing our staffing both within the business areas and in our risk oversight functions.

We continue to make significant investments to build new financial reporting systems and move to more effective and efficient business processing systems. Until those systems are implemented, we continue to remain more reliant on end-user computing systems than is desirable and we are challenged to effectively and timely deliver integrated production systems. Reliance on certain of these end-user computing systems increases the risk of errors in some of our core operational processes and increases our dependency on monitoring controls. In the near term, we are mitigating this risk by improving our documentation and controls over these systems and placing certain key end-user systems into a change management process controlled by our information technology group.

Our efforts to develop and deploy new financial reporting and business process systems have limited our flexibility to release new products and other business initiatives in response to competitive market forces. We manage this risk through a management committee that monitors key projects and allocates resources to development efforts.

We outsource certain key functions to external parties, including (a) processing functions for trade capture, market risk management analytics and asset valuation, (b) custody and recordkeeping and (c) processing functions for mortgage loan underwriting. In addition, we use a process of delegated underwriting for the single-family mortgages we purchase or securitize. We also expect to implement a process of delegated underwriting for certain multifamily mortgages we purchase or securitize. See "Credit Risks — *Mortgage Credit Risk — Underwriting Requirements and Quality Control Standards*" for information about how we mitigate the risks associated with delegated underwriting. We mitigate the risk from our use of external parties by engaging in active vendor management, such as establishing detailed vendor requirements, reviewing business continuity plans, monitoring quality assurance processes and using third party reviews of our vendors.

In recognition of the importance of the accuracy and reliability of our valuation of financial instruments, we engage in an ongoing internal review of our valuations. We perform analysis of internal valuations on a monthly basis to confirm the reasonableness of the valuations. This analysis is performed by a group that is independent of the business area responsible for valuing the positions. Our verification and validation procedures depend on the nature of the security and valuation methodology being reviewed and may include: comparisons with external pricing sources, comparisons with observed trades, independent verification of key valuation model inputs and independent security modeling. Results of the monthly verification process, as well as any changes in our valuation methodologies, are reported to a management committee that is responsible for reviewing and approving the approaches used in our valuations to ensure that they are well controlled and effective, and result in reasonable fair values.

We are also exposed to the risk that our business processes could be adversely affected by inadequate staffing, which strains existing resources and increases the risk that an error or fraud will not be detected. This risk is of particular concern for us because of high voluntary employee turnover rates experienced in 2005, critical vacancies and recent changes in our senior management. During 2006, we filled some important vacancies such as Chief Financial Officer, General Counsel, General Auditor, Corporate Controller and Principal Accounting Officer and Chief Information Officer. While we have made progress in our efforts to reduce voluntary employee turnover rates and to build a strong management team by filling several senior positions, we need to continue to recruit additional qualified people into key positions across the organization in order to achieve our remediation objectives. See "*Internal Control Over Financial Reporting*" for more information concerning staffing adequacy risk related to financial reporting.

In addition to the particular risks and challenges we are facing, we experience ongoing risks that are similar to those of other large financial institutions. For example, we are exposed to the risk that a catastrophic event, such as a terrorist event or natural disaster, could result in a significant business disruption and an inability to process transactions through normal business processes. To mitigate this risk, we maintain and test business continuity plans and have established backup facilities for critical business processes and systems away from, although in the same metropolitan area as, our main offices. In 2006, we established out-of-region capabilities for clearing and treasury services. However, we can make no assurances that these measures will be sufficient to respond to the full range of catastrophic events that might occur.

### Internal Control Over Financial Reporting

Improving internal control over financial reporting and mitigating the risks presented by material weaknesses and significant deficiencies in our financial reporting processes continue to be top corporate priorities. During 2006, we developed a comprehensive plan for returning to quarterly financial reporting. The comprehensive plan includes mitigation and remediation of identified material weaknesses and significant deficiencies; strengthening of our financial close process; implementation of critical systems initiatives; and completion of a review of our system of internal controls related to the processing and recording of financial transactions.

We have made progress implementing changes to our accounting, financial reporting and operational infrastructure that have improved our internal control environment, including outsourcing the custody and recordkeeping functions for our Retained portfolio and Cash and investments portfolio, implementing a new accounting sub-ledger for our Cash and investments portfolio and upgrading our general ledger system. However, certain key initiatives, including the implementation of a new sub-ledger for our Retained portfolio, were not completed by year-end as originally planned and will continue to be part of our remediation efforts in 2007.

As a result of our efforts, we made significant progress toward the remediation of our material weaknesses, as described below. However, each of the material weaknesses identified in prior years persisted throughout 2006 and they continue to present challenges for us in 2007.

We also made progress in the remediation of the significant deficiencies in our internal control and we have mitigated some of them so that they have been reduced to control deficiencies in our internal control over financial reporting. For example, we enhanced our risk governance framework thereby reducing the severity of the weaknesses that existed in this area. We also improved our processes for identifying security impairments and the governance of and change management

processes related to the amortization of deferred premiums, discounts and deferred fees for assets held in our Retained portfolio.

While we have made progress in our remediation efforts, our material weaknesses and remaining significant deficiencies will continue to pose significant risks to our financial reporting processes until adequately remediated. The material weaknesses that affected us through December 31, 2006 and continue to present challenges for us, as well as our related remediation activities, are described below:

*Integration among our systems, business units and external service providers.*   Our systems and processes related to our operational and financial accounting systems, business units and external service providers are not adequately integrated. This inadequate integration increases the risk of error in our financial reporting due to: (a) the potential failure to correctly pass information between systems and processes; (b) incompatibility of data between systems; (c) incompatible systems; or (d) a lack of clarity in process ownership. To compensate for this weakness, we have implemented mitigating controls, including extensive manual procedures to perform data validation and financial analytics. We have also enhanced the communication and coordination between our business units.

Our remediation efforts are targeted to address risks posed by (a) the hand-off of data between systems, business units and various data owners, (b) the reliance on end-user computing solutions or (c) reliance on simplifying assumptions in the applications of our accounting policies. We have also formalized internal guidance for controls over the hand-off of data at all stages of our financial close processes, end-user computing solutions and the use of simplifying assumptions in our accounting policies. Our remediation plans include identifying areas that require attention, evaluating our application of the new internal guidance for the hand-off of data and remediating any control deficiencies identified. We have also undertaken an initiative to more clearly link the application of our accounting policies to our systems and our end-user computing solutions.

We have undertaken an initiative to redesign our financial close process to make timely financial reporting possible. Our remediation efforts currently focus on implementing enhancements to our current financial close process, while addressing our objective of long-term sustainability in our processes. We have defined and begun monitoring performance metrics to evaluate our progress in achieving close targets, with a focus on accuracy and timeliness.

*Information technology general controls as they relate to change management.*   Our controls over managing the introduction of program and data changes need improvement. Weaknesses in these controls include a lack of consistent standards and inadequate testing of changes prior to deployment; an environment and processes that increase the difficulties of establishing and maintaining internal control; and issues arising from inherent system limitations.

We are implementing new change management processes so that changes to our system applications and new system implementations are properly designed and approved, fully tested and meet the requirements of the business. We are also focused on promoting an environment of accountability for adhering to change management processes and providing our staff with the tools and training to implement system changes appropriately.

*Information technology general controls as they relate to security administration, management and technology.*   Our controls over information systems security administration and management functions need to improve in the following areas: (a) granting and revoking user access rights; (b) segregation of duties; (c) monitoring user access rights; and (d) periodic review of the appropriateness of access rights. Weaknesses in these controls could allow unauthorized users to access, enter, delete or change data in these systems, as well as increase the possibility that entries could be duplicated or omitted inadvertently.

Our remediation efforts include reviewing the design of our existing controls against industry standards, establishing new procedures to secure data and restrict access to appropriate users, and the development of new tools to monitor access to data and the types of access granted to specific users. We are also centralizing the responsibility for granting user access to key system applications and enhancing our automation of controls designed to prevent unauthorized or inappropriate levels of system access.

*Monitoring of results within financial operations and reporting functions.*   The controls we use to monitor the results of our financial reporting process, such as the performance of financial analytics and account reconciliations, failed to identify certain issues that required adjustments to our financial results prior to our reporting them.

Our remediation efforts have included a detailed evaluation and redesign of our financial analytics and reconciliation procedures, and the implementation of regular, structured reviews of monthly financial results and accounting matters. We are continuing to identify additional financial analytics improvements that we need to make. Additionally, we need to continue to execute the new controls for a period of time in order to assess their effectiveness.

*Staffing adequacy.*   During 2006, we made progress in our efforts to build a strong management team by filling several key senior management positions. However, we must continue to recruit additional qualified people into leadership and key

staff positions in targeted functions within the company to achieve our objectives for the remediation of our internal control deficiencies. Our employee voluntary turnover rate was higher in 2005 than prior years, but voluntary turnover in 2006 was significantly lower than 2005. Undesirable voluntary turnover strains existing resources and contributes to increased operational risk. Furthermore, our standards of performance need to be enforced in order to create a more effective culture of accountability.

Our remediation activities are focused on addressing staffing issues in targeted areas across the company by identifying and filling critical vacancies, addressing staff development and training needs, and eliminating key person dependencies in critical roles. Additionally, we are taking steps to build a culture of accountability that supports operational risk management decision-making and promotes the urgency to identify and address deficiencies in our internal controls. For example, risk management accountability has been formally included as a performance objective for all our employees. We are also reinforcing accountability through staff training that raises the awareness of risks in our business and highlights the importance of maintaining effective internal controls.

*Management risk and control self-assessment process.*   We do not currently have a self-assessment process for our internal control over financial reporting in order to reliably enable management to identify deficiencies in our internal control, evaluate the effectiveness of internal control or modify our control procedures in response to changes in risk in a timely manner.

Our remediation activities are focused on an in-depth assessment of the design of internal control over financial reporting in our existing business processes and the development of a self-assessment process that will provide management with a more timely and reliable tool to identify changes to our processes, risks, and controls in order to identify and remediate control deficiencies. The new management self-assessment process will be implemented under an enhanced risk governance structure designed to identify and escalate risk issues and control deficiencies in a timely manner. Our objective for this new process is to allow us to assess the design and effectiveness of our internal control over financial reporting in a manner consistent with the requirements of the Sarbanes-Oxley Act of 2002.

In addition to these material weaknesses, we identified a number of significant deficiencies in our internal control over financial reporting that, although not determined to be material weaknesses as of the end of the year, still present risks of error in our financial statements and disclosures. These significant deficiencies include:

- deficiencies in our processes related to the valuation of our guarantee-related assets and liabilities;

- deficiencies in our controls over the accuracy and completeness of data received from external counterparties or passed between our business processes and used in our transaction processing and financial reporting systems;

- over-reliance on end-user computing solutions with insufficient development, documentation and change controls;

- deficiencies in our new product implementation process; and

- deficiencies in our procedures for monitoring our use of simplifying assumptions in the application of our accounting policies, and our excessive reliance on such assumptions. The excessive use of simplifying assumptions increases the risk that insignificant differences, when compared to a stricter application of our accounting policies, could become consequential over time and result in errors that are not detected (*e.g.*, if the underlying transaction volume affected by a simplifying assumption increases).

As we continue our remediation activities, we may identify additional material weaknesses, significant deficiencies or other operational issues in our internal controls or conclude that significant deficiencies we have already identified should be regarded as material weaknesses, either individually or in the aggregate. Improvements to the processes and controls we put in place to remediate our control deficiencies need to operate for a period of time to enable us to evaluate their effectiveness.

The material weaknesses and significant deficiencies in our internal control over financial reporting adversely affect our ability to record, process, summarize and report financial data in a timely manner. Based on the continued existence of material weaknesses at December 31, 2006, our Chief Executive Officer and Chief Financial Officer have concluded that our internal control over financial reporting was not effective at December 31, 2006. In order to compensate for the material weaknesses and other deficiencies in our internal controls, we continue to perform extensive verification and validation procedures to provide reasonable assurance that our consolidated financial statements are prepared in accordance with GAAP. Therefore, in view of the additional procedures we performed, we believe that these weaknesses do not prevent us from preparing and issuing our consolidated financial statements in conformity with GAAP.

Our resumption of interim financial reporting will depend on continued progress with our remediation efforts; however, our objective is to return to quarterly reporting during the second half of 2007. We will begin the process of registering our common stock with the SEC after resuming timely quarterly reporting.

*Disclosure Controls and Procedures*

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information required to be disclosed by a company in its financial reports is accumulated and communicated to its senior management team as appropriate to allow timely decisions regarding required disclosure. Full evaluation of our disclosure controls and procedures has been delayed as our resources are focused on the remediation of our internal control over financial reporting.

## Interest-Rate Risk and Other Market Risks

Our interest-rate risk management objective is to serve our housing mission by protecting shareholder value in all interest-rate environments. Our disciplined approach to interest-rate risk management is essential to maintaining a strong and durable capital base and uninterrupted access to debt and equity capital markets.

*Sources of Interest-Rate Risk and Other Market Risks*

Our Retained portfolio activities expose us to interest-rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage-related securities held in the Retained portfolio, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows on our assets versus the timing of our obligation to make payments on our liabilities. For the vast majority of our mortgage-related investments, the mortgage borrower has the option to make unscheduled payments of additional principal or to completely pay off a mortgage loan at any time before its scheduled maturity date (without having to pay a prepayment penalty) or to hold the mortgage loan to its stated maturity.

Our credit guarantee activities also expose us to interest-rate risk because changes in interest rates can cause fluctuations in the fair value of our existing credit guarantee portfolio. We generally do not hedge these changes in fair value except for interest-rate exposure related to net buy-ups and float. Float, which arises from timing differences between when the borrower pays us and when we reduce the PC balance, can lead to significant interest expense if the interest rate paid to a PC investor is higher than the reinvestment rate we earn on payments received from mortgage borrowers.

The types of interest-rate risk and other market risks to which we are exposed are described below.

**Duration Risk and Convexity Risk.**   Duration is a measure of a financial instrument's price sensitivity to changes in interest rates. Convexity is a measure of how much a financial instrument's duration changes as interest rates change. Our convexity risk primarily results from prepayment risk. We actively manage duration risk and convexity risk through asset selection and structuring (that is, by identifying or structuring mortgage-related securities with attractive prepayment and other characteristics), by issuing a broad range of both callable and non-callable debt instruments and by using interest-rate derivatives. Managing the impact of duration risk and convexity risk is the principal focus of our daily market risk management activities. These risks are encompassed in our PMVS and duration gap risk measures, discussed in greater detail below. We use prepayment models to determine the estimated duration and convexity of mortgage assets for our PMVS and duration gap measures. Expected results can be affected by differences between prepayments forecasted by the models and actual prepayments.

**Yield Curve Risk.**   Yield curve risk is the risk that non-parallel shifts in the yield curve (such as a flattening or steepening) will adversely affect shareholder value. Because changes in the shape, or slope, of the yield curve often arise due to changes in the market's expectation of future interest rates at different points along the yield curve, we evaluate our exposure to yield curve risk by examining potential reshaping scenarios at various points along the yield curve. Our yield curve risk under a specified yield curve scenario is reflected in our PMVS-Yield Curve, or PMVS-YC, disclosure.

**Volatility Risk.**   Volatility risk is the risk that changes in the market's expectation of the magnitude of future variations in interest rates will adversely affect shareholder value. Implied volatility is a key determinant of the value of an interest-rate option. Since mortgage assets generally include the borrower's option to prepay a loan without penalty, changes in implied volatility affect the value of mortgage assets. We manage volatility risk through asset selection and by maintaining a consistently high percentage of option-embedded liabilities relative to our mortgage assets. We monitor volatility risk by measuring exposure levels on a daily basis and we maintain internal limits on the amount of volatility risk exposure that is acceptable to us.

**Basis Risk.**   Basis risk is the risk that interest rates in different market sectors will not move in tandem and will adversely affect shareholder value. This risk arises principally because we generally hedge mortgage-related investments with debt securities. We do not actively manage the basis risk arising from funding Retained portfolio investments with our debt securities, also referred to as mortgage-to-debt option-adjusted spread risk. See "CONSOLIDATED FAIR VALUE BALANCE SHEETS ANALYSIS — Key Components of Changes in Fair Value of Net Assets — *Changes in mortgage-to-debt OAS* " for additional information. We also incur basis risk when we use LIBOR- or Treasury-based instruments in our risk management activities.

**Foreign-Currency Risk.**   Foreign-currency risk is the risk that fluctuations in currency exchange rates (*e.g.*, foreign currencies to the U.S. dollar) will adversely affect shareholder value. We are exposed to foreign-currency risk because we have debt denominated in currencies other than the U.S. dollar, our functional currency. We eliminate virtually all of our foreign-currency risk by entering into swap transactions that effectively convert foreign-currency denominated obligations into U.S. dollar-denominated obligations.

### Portfolio Market Value Sensitivity and Measurement of Interest-Rate Risk

We employ a risk management strategy that seeks to substantially match the duration characteristics of our assets and liabilities. To accomplish this, we employ an integrated strategy encompassing asset selection and structuring and asset and liability management.

Through our asset selection process, we seek to purchase mortgage assets with desirable prepayment expectations based on our evaluation of their yield-to-maturity, option-adjusted spreads and credit characteristics. Through this selection process and the restructuring of mortgage assets, we seek to retain cash flows with more stable risk and investment return characteristics while selling off the cash flows that do not meet our investment profile.

Through our asset and liability management process, we mitigate interest-rate risk by issuing a wide variety of debt products. The prepayment option held by mortgage borrowers drives the fair value of our mortgage assets such that the combined fair value of our mortgage assets and non-callable debt will decline if interest rates move significantly in either direction. We mitigate much of our exposure to changes in interest rates by funding a significant portion of our mortgage portfolio with callable debt. When interest rates change, our option to redeem this debt offsets a large portion of the fair value change driven by the mortgage prepayment option. At December 31, 2006, approximately 50 percent of our fixed-rate mortgage assets were funded and economically hedged with callable debt. However, because the mortgage prepayment option is not fully hedged by callable debt, the combined fair value of our mortgage assets and debt will be affected by changes in interest rates.

To further reduce our exposure to changes in interest rates, we hedge a significant portion of the remaining prepayment risk with option-based derivatives. These derivatives primarily consist of call swaptions, which tend to increase in value as interest rates decline, and put swaptions, which tend to increase in value as interest rates increase. With the addition of these option-based derivatives, the fair value of net assets becomes relatively stable over a wide range of interest rates because a greater portion of our prepayment risk has been hedged. The fair value of net assets is further stabilized by our ongoing portfolio rebalancing, primarily involving interest-rate swaps. Although we do not hedge all of our exposure to changes in interest rates, these exposures are generally well understood, are subject to established limits, and are monitored and controlled through our disciplined risk management process. See "CONSOLIDATED FAIR VALUE BALANCE SHEETS ANALYSIS — Key Components of Changes in Fair Value of Net Assets — *Changes in mortgage-to-debt OAS*" for further information.

We measure our exposure to key interest-rate risks every day against both internal management limits and limits set by our board of directors. Throughout 2006, our interest-rate risk remained low and well below management and board limits.

**PMVS and Duration Gap.**   Our primary interest-rate risk measures are PMVS and duration gap. PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value (as defined below) to parallel moves in interest rates (PMVS-L) and the other to nonparallel movements (PMVS-YC).

Our PMVS and duration gap estimates are determined using models that involve our best judgment of interest-rate and prepayment assumptions. In addition, in the case of PMVS, daily calculations are based on an estimate of the fair value of our net assets attributable to common stockholders. Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements.

While PMVS and duration gap estimate the exposure of the fair value of net assets attributable to common stockholders (measured as the fair value of total net assets less the fair value of preferred stock) to changes in interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis, prepayment model, mortgage-to-debt option-adjusted spreads and foreign-currency risk. The impact of these other market risks can be significant. See "*Sources of Interest-Rate Risk and Other Market Risks*" discussed above and "CONSOLIDATED FAIR VALUE BALANCE SHEETS ANALYSIS — Key Components of Changes in Fair Value of Net Assets — *Changes in mortgage-to-debt OAS* " for further information.

- PMVS-L shows the estimated loss in pre-tax portfolio market value, expressed as a percentage of our after-tax fair value of net assets attributable to common stockholders, from an immediate adverse 50 basis point parallel shift in the level of LIBOR rates (*i.e.*, when the yield at each point on the LIBOR yield curve increases or decreases by 50 basis points).

- PMVS-YC shows the estimated loss in pre-tax portfolio market value, expressed as a percentage of our after-tax fair value of net assets attributable to common stockholders, from an immediate adverse 25 basis point change in the slope (up and down) of the LIBOR yield curve. The 25 basis point change in slope for the PMVS-YC measure is obtained by shifting the two-year and ten-year LIBOR rates by an equal amount (12.5 basis points), but in opposite directions. LIBOR rate shifts between the two-year and ten-year points are interpolated.

- Duration gap estimates the net sensitivity of the fair value of our financial instruments to movements in interest rates. Duration gap is presented in units expressed as months. A duration gap of zero implies that the change in value of assets from an instantaneous rate move will be accompanied by an equal and offsetting move in the value of debt and derivatives thus leaving the net fair value of equity unchanged. However, because duration does not capture convexity exposure (the amount by which duration itself changes as rates move), actual changes in fair value from interest-rate changes may differ from those implied by duration gap alone. For that reason, we believe duration gap is most useful when used in conjunction with PMVS.

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures represent events that are expected to have an approximately 5 percent probability of occurring over a one-month time horizon. We believe that our PMVS measures represent conservative measures of interest-rate risk because these assumed scenarios are unlikely, and because the scenarios assume instantaneous shocks, therefore these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically take to reduce our risk exposure.

The expected loss in portfolio market value, which is the numerator in the fraction used to calculate the PMVS percentages, is an estimate of the sensitivity to changes in interest rates of the fair value of all interest-earning assets and interest-bearing liabilities and derivatives on a pre-tax basis. When we calculate the expected loss in portfolio market value and duration gap, we also take into account the cash flows related to certain credit guarantee-related items, including net buy-ups and expected gains or losses due to net interest from float. In making these calculations, we do not consider the sensitivity to interest-rate changes of the following assets and liabilities:

- *Credit guarantee portfolio.* We do not consider the sensitivity of the fair value of the credit guarantee portfolio to changes in interest rates except for the guarantee-related items mentioned above (*i.e.*, net buy-ups and float), because we believe the expected benefits from replacement business provide an adequate hedge against interest-rate changes.

- *Other assets with minimal interest-rate sensitivity.* We do not include other assets, primarily non-financial instruments such as fixed assets and REO, because of the minimal impact they would have on both PMVS and duration gap.

These two categories of assets and liabilities are included in our estimate of the after-tax fair value of net assets attributable to common stockholders, which is the denominator of the fraction used to calculate the PMVS-L and PMVS-YC percentages.

*PMVS Results.* Table 34 provides estimated point-in-time PMVS-L and PMVS-YC results at December 31, 2006 and 2005. Table 34 also provides PMVS-L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve. Because we do not hedge all prepayment option risk, the duration of our mortgage assets changes more rapidly as changes in interest rates increase. Accordingly, as shown in Table 34, the PMVS-L results based on a 100 basis point shift in the LIBOR curve are disproportionately higher than the PMVS-L results based on a 50 basis point shift in the LIBOR curve.

**Table 34 — Portfolio Market Value Sensitivity Assuming Shifts of the LIBOR Yield Curve**

| | Portfolio Market Value Sensitivity | | | Potential Pre-Tax Loss in Portfolio Market Value (in millions) | | |
|---|---|---|---|---|---|---|
| | PMVS-YC | PMVS-L | | PMVS-YC | PMVS-L | |
| | 25 bps | 50 bps | 100 bps | 25 bps | 50 bps | 100 bps |
| At: | | | | | | |
| December 31, 2006 ........................................ | —% | 1% | 2% | $27 | $146 | $560 |
| December 31, 2005 ........................................ | —% | 1% | 3% | $26 | $236 | $798 |

Derivatives have enabled us to keep our interest-rate risk exposure at consistently low levels in a wide range of interest-rate environments. By keeping PMVS-L and PMVS-YC low, we have been able to reduce the exposure of the fair value of our stockholders' equity to adverse changes in interest rates.

Table 35 shows that the low PMVS-L risk levels for the periods presented would generally have been higher if we had not used derivatives to manage our interest-rate risk exposure.

**Table 35 — Derivative Impact on Portfolio Market Value Sensitivity**

| | Before Derivatives | After Derivatives | Effect of Derivatives |
|---|---|---|---|
| **At December 31, 2006** | | | |
| PMVS-L (50 bps) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2% | 1% | (1)% |
| **At December 31, 2005** | | | |
| PMVS-L (50 bps) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2% | 1% | (1)% |

*Duration Gap Results.* Our estimated average duration gap for the months of December 2006 and 2005 was zero months.

The disclosure in our Monthly Volume Summary reports, which are available on our website at www.freddiemac.com, reflects the average of the daily PMVS-L, PMVS-YC and duration gap estimates for a given reporting period (a month, quarter or year).

### Use of Derivatives and Interest-Rate Risk Management

**Use of Derivatives.** We use derivatives primarily to:

- hedge forecasted issuances of debt and synthetically create callable and non-callable funding;
- regularly adjust or rebalance our funding mix in order to more closely match changes in the interest-rate characteristics of our mortgage assets; and
- hedge foreign-currency exposure (see "*Sources of Interest-Rate Risk and Other Market Risks* — Foreign-Currency Risk.")

*Hedge Forecasted Debt Issuances and Create Synthetic Funding.* We typically commit to purchase mortgage investments on an opportunistic basis for a future settlement, typically ranging from two weeks to three months after the date of the commitment. To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest-rate derivatives to economically hedge the interest-rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued. We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short-term debt issuances over a defined longer-term period and a pay-fixed swap with the same maturity as the last issuance is the substantive economic equivalent of a long-term fixed-rate debt instrument of comparable maturity. Similarly, the combination of non-callable debt and a call swaption, or option to enter into a receive-fixed swap, with the same maturity as the non-callable debt, is the substantive economic equivalent of callable debt. These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

*Adjust Funding Mix.* We generally use interest-rate swaps to mitigate contractual funding mismatches between our assets and liabilities. We also use swaptions and other option-based derivatives to adjust the contractual funding of our debt in response to changes in the expected lives of mortgage-related assets in the Retained portfolio. As market conditions dictate, we take rebalancing actions to keep our interest-rate risk exposure within management-set limits. In a declining interest-rate environment, we typically enter into receive-fixed swaps or purchase Treasury-based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets. In a rising interest-rate environment, we typically enter into pay-fixed swaps or sell Treasury-based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

**Types of Derivatives.** The derivatives we use to hedge interest-rate and foreign-currency risk are common in the financial markets. We principally use the following types of derivatives:

- LIBOR- and Euribor-based interest-rate swaps;
- LIBOR- and Treasury-based exchange-traded futures;
- LIBOR- and Treasury-based options (including swaptions); and
- Foreign-currency swaps.

In addition to swaps, futures and options, our derivative positions include the following:

*Forward Purchase and Sale Commitments.* We routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. Most of these commitments are derivatives subject to the requirements of SFAS 133.

*Swap Guarantee Derivatives.* We guarantee the payment of principal and interest on (a) multifamily mortgage loans that are originated and held by state and municipal housing finance agencies to support tax-exempt multifamily housing revenue bonds, (b) tax-exempt multifamily housing revenue bonds that support pass-through certificates issued by third parties and (c) Freddie Mac pass-through certificates which are backed by tax-exempt multifamily housing revenue bonds and related taxable bonds and/or loans. In connection with some of these guarantees, we may also guarantee the sponsor's or

the borrower's performance as a counterparty on any related interest-rate swaps used to mitigate interest-rate risk. Guarantees of these interest-rate swaps entered into after June 30, 2003 are treated as derivatives and are reported as swap guarantee derivatives.

*Credit Derivatives.*   See "Credit Risks — *Mortgage Credit Risk — Mortgage Credit Risk Management Strategies*" for more information.

### Derivative-Related Risks

Our use of derivatives exposes us to derivative market liquidity risk and counterparty credit risk.

**Derivative Market Liquidity Risk.**   Derivative market liquidity risk is the risk that we may not be able to enter into or exit out of derivative transactions at a reasonable cost. A lack of sufficient capacity or liquidity in the derivatives market could limit our risk management activities, increasing our exposure to interest-rate risk. To help maintain continuous access to derivative markets, we use a variety of products and transact with many different derivative counterparties. In addition to over-the-counter, or OTC, derivatives, we also use exchange-traded derivatives, asset securitization activities, callable debt and short-term debt to rebalance our portfolio.

We limit our duration and convexity exposure to each counterparty. At December 31, 2006, the largest single uncollateralized exposure of our 27 approved OTC counterparties listed in "Table 36 — Derivative Counterparty Credit Exposure" was related to a AAA-rated counterparty, constituting $403 million, or 60 percent, of the total uncollateralized exposure of our OTC interest-rate swaps, option-based derivatives and foreign-currency swaps.

**Derivative Counterparty Credit Risk.**   Counterparty credit risk arises from the possibility that the derivative counterparty will not be able to meet its contractual obligations. Exchange-traded derivatives, such as futures contracts, do not measurably increase our counterparty credit risk because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. OTC derivatives, however, expose us to counterparty credit risk because transactions are executed and settled between us and the counterparty. When an OTC derivative has a market value above zero at a given date (*i.e.*, it is an asset reported as Derivative assets, at fair value on our consolidated balance sheets), then the counterparty could potentially be obligated to deliver cash, securities or a combination of both having that market value to satisfy its obligation to us under the derivative.

We actively manage our exposure to counterparty credit risk using several tools, including:

- review of external rating analyses;
- strict standards for approving new derivative counterparties;
- ongoing monitoring of our positions with each counterparty;
- master netting agreements and collateral agreements; and
- stress-testing to evaluate potential exposure under possible adverse market scenarios.

On an ongoing basis, we review the credit fundamentals of all of our derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or events affecting an individual counterparty occur.

*Derivative Counterparties.*   Our use of OTC interest-rate swaps, option-based derivatives and foreign-currency swaps is subject to rigorous internal credit and legal reviews. Our derivative counterparties carry external credit ratings among the highest available from major rating agencies. All of these counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

*Master Netting and Collateral Agreements.*   We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives and foreign-currency swaps. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" to our consolidated financial statements for additional information.

Table 36 summarizes our exposure to counterparty credit risk in our derivatives, which represents the net positive fair value of derivative contracts and related accrued interest after netting by counterparty as applicable (*i.e.*, net amounts due to us under derivative contracts). This table is useful in understanding the counterparty credit risk related to our derivative portfolio.

*Freddie Mac*

**Table 36 — Derivative Counterparty Credit Exposure**

| Rating[1] | Number of Counterparties[2] | Notional Amount | Total Exposure at Fair Value[3] | Exposure, Net of Collateral[4] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold |
|---|---|---|---|---|---|---|
| | | | **December 31, 2006** | | | |
| | | | (dollars in millions) | | | |
| AAA | 2 | $ 3,408 | $ 411 | $411 | 1.6 | Mutually agreed upon |
| AA | 8 | 269,126 | 2,134 | 92 | 4.7 | $10 million or less |
| AA− | 12 | 278,993 | 6,264 | 161 | 5.2 | $10 million or less |
| A+ | 4 | 142,332 | 1,393 | 7 | 6.1 | $1 million or less |
| A− | 1 | 210 | 1 | 1 | 5.0 | $1 million or less |
| Subtotal[5] | 27 | 694,069 | 10,203 | 672 | 5.2 | |
| Other derivatives[6] | | 49,554 | — | — | | |
| Forward purchase and sale commitments | | 10,012 | 24 | 24 | | |
| Credit derivatives | | 2,605 | — | — | | |
| Swap guarantee derivatives | | 957 | — | — | | |
| Total derivatives | | $757,197 | $10,227 | $696 | | |

| Rating[1] | Number of Counterparties[2] | Notional Amount | Total Exposure at Fair Value[3] | Exposure, Net of Collateral[4] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold |
|---|---|---|---|---|---|---|
| | | | **December 31, 2005** | | | |
| | | | (dollars in millions) | | | |
| AAA | 2 | $ 3,102 | $ 93 | $ 93 | 2.7 | Mutually agreed upon |
| AA | 7 | 148,135 | 619 | 16 | 4.3 | $10 million or less |
| AA− | 8 | 156,058 | 2,499 | 73 | 5.8 | $10 million or less |
| A+ | 5 | 227,842 | 5,297 | 2 | 5.8 | $1 million or less |
| A | 2 | 24,879 | 364 | 5 | 4.0 | $1 million or less |
| A− | 1 | 210 | 3 | 1 | 6.0 | $1 million or less |
| Subtotal[5] | 25 | 560,226 | 8,875 | 190 | 5.3 | |
| Other derivatives[6] | | 98,033 | — | — | | |
| Forward purchase and sale commitments | | 21,961 | 35 | 35 | | |
| Credit derivative | | 2,414 | — | — | | |
| Swap guarantee derivatives | | 738 | — | — | | |
| Total derivatives | | $683,372 | $8,910 | $225 | | |

(1) We use the lower of S&P and Moody's ratings to manage collateral requirements. In this table, the rating of the legal entity is stated in terms of the S&P equivalent.
(2) Based on legal entities. Affiliated legal entities are reported separately.
(3) For each counterparty, this amount includes derivatives with a net positive fair value (recorded as Derivative assets, at fair value), including the related accrued interest receivable/payable (net) (recorded in Accounts and other receivables, net or Accrued interest payable).
(4) Total Exposure at Fair Value less collateral held as determined at the counterparty level.
(5) Consists of OTC derivative agreements for interest-rate swaps, option-based derivatives (excluding written options), foreign-currency swaps and purchased interest-rate caps. Written options do not present counterparty credit exposure, because we receive a one-time up-front premium in exchange for giving the holder the right to execute a contract under specified terms, which generally puts us in a liability position.
(6) Consists primarily of exchange-traded contracts and written options.

Over time, our exposure to individual counterparties for OTC interest-rate swaps, option-based derivatives and foreign-currency swaps varies depending on changes in fair values, which are affected by changes in period-end interest rates, the implied volatility of interest rates, foreign-currency exchange rates and the amount of derivatives held. Our uncollateralized exposure to counterparties for these derivatives, after applying netting agreements and collateral, increased to $672 million at December 31, 2006 from $190 million at December 31, 2005. This increase was primarily due to a significant increase in uncollateralized exposure to AAA-rated counterparties, which typically are not required to post collateral given their low risk profile.

At December 31, 2006, the uncollateralized exposure to non-AAA-rated counterparties was primarily due to uncollateralized exposure below the applicable counterparty collateral posting threshold as well as market movements during the time period between when a derivative was marked to fair value and the date we received the related collateral. Collateral is typically transferred within one business day based on the values of the related derivatives.

As indicated in Table 36, approximately 93 percent of our counterparty credit exposure for OTC interest-rate swaps, option-based derivatives and foreign-currency swaps was collateralized at December 31, 2006. If all of our counterparties for these derivatives had defaulted simultaneously on December 31, 2006, our maximum loss for accounting purposes would have been approximately $672 million. Our economic loss, as measured by our potential additional uncollateralized exposure, may be higher than the uncollateralized exposure of our derivatives if we were not able to replace the defaulted derivatives in a timely fashion. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives and foreign-currency swaps will increase under certain adverse market

conditions by performing daily market stress tests. These tests evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties assuming changes in the level and implied volatility of interest rates and changes in foreign-currency exchange rates over a brief time period.

To date, we have not incurred any credit losses on OTC derivative counterparties or set aside specific reserves for institutional credit risk exposure. We do not believe such reserves are necessary, given our counterparty credit risk management policies and collateral requirements.

*OTC Forward Purchase and Sale Commitments Treated as Derivatives.*   Because the typical maturity of our OTC commitments is less than one year, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of our OTC commitments counterparties on an ongoing basis to ensure that they continue to meet our internal risk-management standards. As indicated in Table 36, the exposure to OTC commitments counterparties of $24 million and $35 million at December 31, 2006 and 2005, respectively, was uncollateralized.

## Credit Risks

Our credit guarantee portfolio is subject primarily to two types of credit risk: mortgage credit risk and institutional credit risk. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage or security we own or guarantee. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations. See "PORTFOLIO BALANCES AND ACTIVITIES — Table 47 — Total Mortgage Portfolio and Total Guaranteed PCs and Structured Securities Issued Based on Unpaid Principal Balances" for more information on the composition of our Total mortgage portfolio.

### Mortgage Credit Risk

*Mortgage Credit Risk Management Strategies.*   Mortgage credit risk is primarily influenced by the credit profile of the borrower on the mortgage, the features of the mortgage itself, the type of property securing the mortgage and the general economy. To manage our mortgage credit risk, we focus on three key areas: underwriting requirements and quality control standards; portfolio diversification; and portfolio management activities, including loss mitigation and the use of credit enhancements. While we have historically focused on obtaining credit enhancements at the time of mortgage purchase, we are continuing to expand our capabilities in this area to allow more active and ongoing credit portfolio rebalancing and risk transfers.

*Underwriting Requirements and Quality Control Standards.*   All mortgages that we purchase for our Retained portfolio or guarantee have an inherent risk of default. We seek to manage the underlying risk by adequately pricing for the risk we assume using our underwriting and quality control processes.

We use a process of delegated underwriting for the single-family mortgages we purchase or securitize. In this process, we provide originators with a series of mortgage underwriting standards and the originators represent and warrant to us that the mortgages sold to us meet these requirements. We subsequently review a sample of these loans and, if we determine that any loan is not in compliance with our contractual standards, we may require the seller/servicer to repurchase that mortgage or make us whole in the event of a default. We provide originators with written standards and/or automated underwriting software tools, such as Loan Prospector® and other quantitative credit risk management tools that are designed to evaluate single-family mortgages and monitor the related mortgage credit risk for loans we may purchase. Loan Prospector® generates a credit risk classification by evaluating information on significant indicators of mortgage default risk, such as loan-to-value ratios, credit scores and other mortgage and borrower characteristics. These statistically-based risk assessment tools increase our ability to distinguish among single-family loans based on their expected risk, return and importance to our mission. In many cases, underwriting standards are tailored under contracts with individual customers. We have been expanding the share of mortgages we purchase that were underwritten by our seller/servicers using alternative automated underwriting systems or agreed-upon underwriting standards that differ from our system or guidelines. We regularly monitor the performance of mortgages purchased using these systems and standards, and if they underperform mortgages originated using Loan Prospector®, we may seek additional guarantee fee compensation for future purchases of similar mortgages.

The percentage of our single-family mortgage purchase volume evaluated using Loan Prospector® prior to purchase has declined over the last three years. As part of our post-purchase quality control review process, we use Loan Prospector® to evaluate the credit quality of virtually all single-family mortgages that were not evaluated by Loan Prospector® prior to purchase. Loan Prospector® risk classifications influence both the price we charge to guarantee loans and the loans we review in quality control.

For multifamily mortgage loans, we use an intensive pre-purchase underwriting process for the mortgages we purchase, unless the mortgage loans have significant credit enhancements. Our underwriting process includes assessments of the local

market, the borrower, the property manager, the property's historical and projected financial performance and the property's physical condition, which may include a physical inspection of the property. In addition to our own inspections, we rely on third-party appraisals and environmental and engineering reports. Beginning in 2007, we also expect to begin a program of delegated underwriting for certain multifamily mortgages we purchase or securitize.

***Credit Enhancements.***   Our charter requires that single-family mortgages with loan-to-value ratios above 80 percent at the time of purchase must be covered by one or more of the following: (a) primary mortgage insurance; (b) a seller's agreement to repurchase or replace any mortgage in default (for such period and under such circumstances as we may require); or (c) retention by the seller of at least a 10 percent participation interest in the mortgages. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements. In many cases, the lender's or third party's risk is limited to a specific level of losses at the time the credit enhancement becomes effective.

At December 31, 2006 and 2005, credit-enhanced single-family mortgages and mortgage-related securities represented approximately 16 percent and 17 percent of the $1,541 billion and $1,395 billion, respectively, unpaid principal balance of the Total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of issued Structured Securities that is backed by Ginnie Mae Certificates. We exclude non-Freddie Mac mortgage-related securities because they expose us primarily to institutional credit risk. We exclude that portion of Structured Securities backed by Ginnie Mae Certificates because the incremental credit risk to which we are exposed is considered de minimis. See "CONSOLI-DATED BALANCE SHEETS ANALYSIS — Table 19 — Characteristics of Mortgage Loans and Mortgage-Related Securities in the Retained Portfolio" for additional information about our non-Freddie Mac mortgage-related securities. Our ability and desire to expand or reduce the portion of our Total mortgage portfolio with credit enhancements will depend on our evaluation of the credit quality of new business purchase opportunities, the risk profile of our portfolio and the future availability of effective credit enhancements at prices that permit an attractive return. While the use of credit enhancements reduces our exposure to mortgage credit risk, it increases our exposure to institutional credit risk.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our Total mortgage portfolio and is typically provided on a loan-level basis for certain single-family mortgages. Primary mortgage insurance transfers varying portions of the credit risk associated with a mortgage to a third-party insurer. The amount of insurance we obtain on any mortgage depends on our requirements and on our assessment of risk. We may from time to time agree with the insurer to reduce the amount of coverage that is in excess of our charter's minimum requirement and may also furnish certain services to the insurer in exchange for fees paid by the insurer. As is the case with credit enhancement agreements generally, these agreements often improve the overall value of purchased mortgages and thus may allow us to offer lower guarantee fees to sellers.

The second most prevalent type of credit enhancement that we use is pool insurance. Pool insurance provides insurance on a pool of loans up to a stated aggregate loss limit. In addition to a pool-level loss coverage limit, some pool insurance contracts may have limits on coverage at the loan level. For pool insurance contracts that expire before the completion of the contractual term of the mortgage loan, we seek to ensure that the contracts cover the period of time during which we believe the mortgage loans are most likely to default.

As of December 31, 2006 and 2005, in connection with PCs and Structured Securities backed by single-family mortgage loans, we had maximum coverage totaling $30.7 billion and $27.5 billion, respectively, in primary mortgage insurance. Other forms of credit enhancements on single-family mortgage loans include indemnification agreements (under which we may require a lender to reimburse us for credit losses realized on mortgages), government guarantees, collateral (including cash or high-quality marketable securities) pledged by a lender, excess interest and subordinated security structures. As of December 31, 2006 and 2005, in connection with PCs and Structured Securities backed by single-family mortgage loans, we had maximum coverage totaling $8.9 billion and $5.6 billion, respectively, in recourse to lenders and $3.2 billion and $3.4 billion, respectively, in other credit enhancements.

We occasionally use credit enhancements to mitigate risk on multifamily mortgages. The types of credit enhancements used for multifamily mortgage loans include recourse, third-party guarantees or letters of credit, cash escrows, subordinated participations in mortgage loans or structured pools, sharing of losses with sellers, and cross-default and cross-collateralization provisions. Cross-default and cross-collateralization provisions typically work in tandem. With a cross-default provision, if the loan on a property goes into default, we have the right to declare specified other mortgage loans of the same borrower or certain of its affiliates to be in default and to foreclose those other mortgages. In cases where the borrower agrees to cross-collateralization, we have the additional right to apply excess proceeds from the foreclosure of one mortgage to amounts owed to us by the same borrower or its specified affiliates relating to other multifamily mortgage loans we own. We also receive similar credit enhancements for multifamily PC Guarantor Swaps; for tax-exempt multifamily housing revenue bonds that support pass-through certificates issued by third parties for which we provide our guarantee of the

payment of principal and interest; for Freddie Mac pass-through certificates that are backed by tax-exempt multifamily housing revenue bonds and related taxable bonds and/or loans; and for multifamily mortgage loans that are originated and held by state and municipal agencies to support tax-exempt multifamily housing revenue bonds for which we provide our guarantee of the payment of principal and interest.

   ***Portfolio Diversification.***   A key characteristic of our credit risk portfolio is diversification along a number of critical risk dimensions. We continually monitor a variety of mortgage loan characteristics such as product mix, loan-to-value ratios and geographic concentrations, which may affect the default experience on our overall mortgage portfolio. As part of our risk management practices, we have adopted a set of limits on our purchases and holdings of certain types of newer nontraditional mortgage products that are deemed to have higher risks or lack sufficient historical experience to confidently forecast performance expectations over a full housing cycle. These newer loan products include interest-only loans and option ARMs, loans with high loan-to-value ratios, and mortgages originated with limited or no underwriting documentation.

   To improve our ability to fulfill our mission, we have increased our participation in nontraditional mortgage market products. To that end, we issue Structured Securities backed by mortgage loans or mortgage-related securities using collateral pools transferred to trusts that were specifically created for the purpose of issuing the securities. These trusts issue various senior interests, subordinated interests or both. We purchase senior interests of the trusts and simultaneously issue and guarantee Structured Securities backed by these interests. We refer to these Structured Securities as Structured Transactions. Although Structured Transactions generally have underlying mortgage loans with higher risk characteristics, they may afford us credit protection from losses due to the structure employed and other credit enhancement features.

   Product mix affects the credit risk profile of our Total mortgage portfolio. In general, 15-year amortizing fixed-rate mortgages exhibit the lowest default rate among the types of mortgage loans we securitize and purchase, due to the accelerated rate of principal amortization on these mortgages and the credit profiles of borrowers who seek and qualify for them. The next lowest rate of default is associated with 30-year amortizing fixed-rate mortgages. In a rising interest environment, balloon/reset mortgages and ARMs typically default at a higher rate than fixed-rate mortgages, although default rates for different types of ARMs may vary. In the low interest rate environment experienced during 2006, 2005 and 2004, this trend was reversed with ARMs exhibiting lower default rates than fixed-rate mortgages. Table 37 provides the distribution of our Total mortgage portfolio.

## Table 37 — Product Distribution[1][2]

| | December 31, | |
|---|---|---|
| | **2006** | **2005** |
| | (dollars in millions) | |
| **Unpaid Principal Balances related to:** | | |
| Guaranteed PCs and Structured Securities: | | |
| Single-family | $1,442,306 | $1,294,521 |
| Multifamily | 8,415 | 14,503 |
| Structured Securities backed by non-Freddie Mac mortgage-related securities | 26,302 | 26,500 |
| Mortgage loans in the Retained portfolio: | | |
| Single-Family | 20,640 | 20,396 |
| Multifamily | 45,207 | 41,085 |
| Total Unpaid Principal Balance | $1,542,870 | $1,397,005 |
| **Product Distribution** | | |
| *Single-family* | | |
| 30-year amortizing fixed-rate[3] | 63% | 59% |
| 15-year amortizing fixed-rate | 19 | 23 |
| ARMs/Variable-rate | 7 | 8 |
| Option ARMs | 1 | 1 |
| Interest Only | 5 | 2 |
| Balloon/Resets | 1 | 2 |
| Other | 1 | 1 |
| Total single-family | 97% | 96% |
| *Multifamily* | | |
| Conventional[4] | 3% | 4% |
| Total multifamily | 3% | 4% |
| **Total** | 100% | 100% |

(1) Based on unpaid principal balances.
(2) Excludes non-Freddie Mac mortgage-related securities held in our Retained portfolio other than those that underlie Freddie Mac Structured Securities.
(3) Includes 40-year and 20-year fixed-rate mortgages.
(4) Also includes Structured Transactions backed by multifamily collateral.

During the past several years, there was a rapid proliferation of nontraditional mortgage product types designed to address a variety of borrower and lender needs, including issues of affordability and reduced income documentation requirements. While features of these products have been on the market for some time, their prevalence in the market and our Total mortgage portfolio increased in 2006 and 2005. See "REGULATION AND SUPERVISION — Office of Federal Housing Enterprise Oversight — *Nontraditional Mortgage Product Risks*" and "RISK FACTORS — Legal and Regulatory Risks." We expect each of these products to default more often than traditional products and we consider this when determining our credit and guarantee fees. Our purchases of interest-only and option ARM mortgage products increased in 2006, representing approximately 18 percent of our Total mortgage portfolio purchases as compared to 11 percent in 2005. Despite this recent increase in purchases, these products represent a small percentage of the unpaid principal balance of our Total mortgage portfolio. At December 31, 2006 and 2005, interest-only and option ARMs collectively represented approximately 6 percent and 3 percent, respectively, of the unpaid principal balance of the Total mortgage portfolio. We will continue to monitor the growth of these products in our portfolio and, if appropriate, may seek credit enhancements to further manage the incremental risk.

**Interest-only and option ARM loans.**   These mortgages are designed to allow borrowers to have flexibility in their payment terms. Interest-only mortgages allow the borrower to pay only interest for a fixed period of time before the loan begins to amortize. Option ARM loans permit a variety of repayment options, which include minimum, interest only, fully amortizing 30-year and fully amortizing 15-year payments. Minimum payment option loans allow the borrower to make monthly payments that are less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance. The amount of option ARM mortgages within our Total mortgage portfolio was 1 percent for both 2006 and 2005 and the amount of related negative amortization in both years was not material.

We also hold securities issued by third parties where the underlying collateral may include interest-only and option ARM mortgage products. Delinquencies on total interest-only and option ARM products increased to 0.41 percent in 2006 from 0.08 percent in 2005. Mortgages generally have a lower rate of delinquency in the year in which they are originated. We generally mitigate credit risk inherent in these securities through a guarantee from the third party issuer or the underlying structure of the security. For additional information about the credit quality and credit risk management of non-Freddie Mac securities we hold see "*Institutional Credit Risk* — Non-Freddie Mac Mortgage-Related Securities" and "CONSOLIDATED BALANCE SHEETS ANALYSIS — Retained Portfolio."

**Subprime loans.**   Participants in the mortgage market often characterize loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include a combination of high loan-to-value ratios, low FICO scores or originations using lower underwriting standards such as limited or no documentation of a borrower's income. The subprime market helps certain borrowers by increasing the availability of mortgage credit.

While we do not characterize the single-family loans underlying the PCs and Structured Securities in our credit guarantee portfolio as either prime or subprime, we believe that, based on lender-type, underwriting practice and product structure, the number of loans underlying these securities that are subprime is not significant. Also included in our credit guarantee portfolio are Structured Securities backed by non-agency mortgage-related securities where the underlying collateral was identified as being subprime by the original issuer. At December 31, 2006 and 2005, the Structured Securities backed by subprime mortgages constituted approximately 0.1 percent and 0.2 percent, respectively of our credit guarantee portfolio.

With respect to our Retained portfolio, we do not believe that any meaningful amount of the agency securities we hold is backed by subprime mortgages. However, at December 31, 2006 and 2005, we held approximately $124 billion and $139 billion, respectively, of non-agency mortgage-related securities backed by subprime loans. These securities include significant credit enhancement based on their structure and more than 99.9 percent of these securities were rated AAA at December 31, 2006.

We announced on February 27, 2007 that we would implement stricter investment standards for certain subprime ARMs with short adjustment periods originated after September 1, 2007. First, we will only buy ARMs, and mortgage-related securities backed by those loans, for which borrowers have been qualified at the fully-indexed and fully-amortizing rate in order to help protect these borrowers from the payment shock that could occur when the interest rates on their ARMs increase. Second, we will limit the use of low-documentation underwriting for these types of mortgages to help ensure that borrowers have the income necessary to afford their homes.

**Table 38 — Characteristics of Single-Family Total Mortgage Portfolio[1]**

| | Purchases During the Year Ended December 31, | | | Ending Balance December 31, | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| **Original Loan-to-Value, or LTV, Ratio Range[2]** | | | | | | |
| Less than 60%................................ | 19% | 21% | 23% | 24% | 25% | 26% |
| Above 60% to 70%............................ | 14 | 16 | 16 | 16 | 17 | 17 |
| Above 70% to 80%............................ | 54 | 50 | 46 | 46 | 44 | 42 |
| Above 80% to 90%............................ | 7 | 7 | 8 | 7 | 8 | 9 |
| Above 90% to 100%........................... | 6 | 6 | 7 | 7 | 6 | 6 |
| Total....................................... | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original loan-to-value ratio......... | 73% | 71% | 71% | 70% | 70% | 70% |
| **Estimated Current LTV Ratio Range[3][4]** | | | | | | |
| Less than 60%................................ | | | | 53% | 56% | 52% |
| Above 60% to 70%............................ | | | | 17 | 18 | 19 |
| Above 70% to 80%............................ | | | | 18 | 18 | 18 |
| Above 80% to 90%............................ | | | | 8 | 6 | 7 |
| Above 90% to 100%........................... | | | | 3 | 2 | 3 |
| Above 100%.................................. | | | | 1 | — | 1 |
| Total....................................... | | | | 100% | 100% | 100% |
| Weighted average estimated current LTV ratio....... | | | | 57% | 56% | 58% |
| **Credit Score[5]** | | | | | | |
| 740 and above................................ | 42% | 44% | 41% | 45% | 45% | 44% |
| 700 to 739................................... | 24 | 23 | 24 | 23 | 23 | 23 |
| 660 to 699................................... | 19 | 19 | 20 | 18 | 18 | 18 |
| 620 to 659................................... | 10 | 10 | 11 | 9 | 9 | 9 |
| Less than 620................................ | 5 | 4 | 4 | 4 | 4 | 4 |
| Not Available................................ | — | — | — | 1 | 1 | 2 |
| Total....................................... | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score.................... | 720 | 722 | 719 | 725 | 725 | 723 |
| **Loan Purpose** | | | | | | |
| Purchase.................................... | 53% | 44% | 40% | 37% | 32% | 28% |
| Cash-out refinance............................ | 32 | 35 | 27 | 29 | 29 | 27 |
| Other refinance.............................. | 15 | 21 | 33 | 34 | 39 | 45 |
| Total....................................... | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| 1 unit...................................... | 97% | 97% | 97% | 97% | 97% | 97% |
| 2-4 units................................... | 3 | 3 | 3 | 3 | 3 | 3 |
| Total....................................... | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | | | |
| Primary residence............................ | 89% | 91% | 92% | 92% | 93% | 94% |
| Second/vacation home......................... | 6 | 5 | 4 | 5 | 4 | 3 |
| Investment.................................. | 5 | 4 | 4 | 3 | 3 | 3 |
| Total....................................... | 100% | 100% | 100% | 100% | 100% | 100% |

(1) Purchases and ending balances are based on the unpaid principal balance of the single-family mortgage portfolio (excluding certain Structured Securities that are backed by non-Freddie Mac mortgage-related securities). Such purchases included in the data totaled $358 billion, $396 billion and $360 billion at December 31, 2006, 2005 and 2004, respectively. Such ending balances included in the data totaled $1,482 billion, $1,333 billion and $1,203 billion at December 31, 2006, 2005 and 2004, respectively.
(2) Our charter requires that mortgage loans purchased with loan-to-value ratios above 80 percent be covered by mortgage insurance or other credit enhancements.
(3) Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes since origination. Estimated current LTV excludes Structured Transactions and option ARMs. Estimated current LTV ratio range is not applicable to purchases made during the year.
(4) 2005 and 2004 ratios have been revised to conform to the current year presentation.
(5) Credit score data are as of mortgage loan origination.

*Loan-to-Value Ratios.* An important safeguard against credit losses for mortgage loans in our single-family, non-credit-enhanced portfolio is provided by the borrowers' equity in the underlying properties. Mortgage loans with higher loan-to-value ratios (and therefore lower levels of borrower equity) at the time of purchase are also protected by credit enhancements, because our charter requires that loans with loan-to-value ratios above 80 percent at the time of purchase be covered by mortgage insurance or certain other credit protections.

The likelihood of single-family mortgage default depends not only on the initial credit quality of the loan, but also on events that occur after origination. Accordingly, we monitor changes in home prices across the country and the impact of

these home price changes on the underlying loan-to-value ratio of mortgages in our portfolio. While home prices rose significantly over the previous 10 years, this growth has slowed significantly in 2006 and home prices have declined in some parts of the United States. Home price appreciation over the past several years has increased the values of properties underlying the mortgages in our portfolio. We monitor regional geographic markets for changes in these trends, particularly with respect to new loans originated in regional markets that have had significant home price appreciation, and we may seek to reinsure a portion of this risk should we determine that the possibility of such changes warrants action. Historical experience has shown that defaults are less likely to occur on mortgages with lower estimated current loan-to-value ratios. In the event of a default, lower loan-to-value ratios generally reduce the total amount of loss, thereby mitigating credit losses.

*Credit Score.*   Credit scores are a useful measure for assessing the credit quality of a borrower. Credit scores are numbers reported by credit repositories, based on statistical models, that summarize an individual's credit record and predict the likelihood that a borrower will repay future obligations as expected. FICO® scores, developed by Fair, Isaac and Co., Inc., are the most commonly used credit scores today. FICO® scores are ranked on a scale of approximately 300 to 850 points. Statistically, consumers with higher credit scores are more likely to repay their debts as expected than those with lower scores. At December 31, 2006, 2005 and 2004, the weighted average credit score for the Total mortgage portfolio (based on the credit score at origination) remained high at 725, 725 and 723, respectively, indicating borrowers with strong credit quality.

*Loan Purpose.*   Mortgage loan purpose indicates how the borrower intends to use the funds from a mortgage loan. The three general categories are: purchase, cash-out refinance and other refinance. In a purchase transaction, funds are used to acquire a property. In a cash-out refinance transaction, in addition to paying off an existing first mortgage lien, the borrower obtains additional funds that may be used for other purposes, including paying off subordinate mortgage liens and providing unrestricted cash proceeds to the borrower. In other refinance transactions, the funds are used to pay off an existing first mortgage lien and may be used in limited amounts for certain specified purposes; such refinances are generally referred to as "no cash-out" or "rate and term" refinances. Other refinance transactions also include refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction. The portion of our single-family mortgage purchases that were refinance-related declined in 2006 as interest rates increased during the year. Given similar loan characteristics (*e.g.*, loan-to-value ratios), purchase transactions have the lowest likelihood of default followed by no cash-out refinances and then cash-out refinances. As a practical matter, however, no cash-out refinances tend to have lower loan-to-value ratios, borrowers with higher credit scores and better overall performance than purchase transactions.

*Property Type.*   Single-family mortgage loans are defined as mortgages secured by housing with up to four living units. Mortgages on one-unit properties tend to have lower credit risk than mortgages on multiple-unit properties.

*Occupancy Type.*   Borrowers may purchase a home as a primary residence, second/vacation home or investment property that is typically a rental property. Mortgage loans on properties occupied by the borrower as a primary or secondary residence tend to have a lower credit risk than mortgages on investment properties.

*Geographic Concentration.*   Because our business involves purchasing mortgages from every geographic region in the U.S., we maintain a geographically diverse mortgage portfolio. This diversification generally mitigates credit risks arising from changing local economic conditions. Our Total mortgage portfolio's geographic distribution was relatively stable from 2004 to 2006, and remains broadly diversified across these regions. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" to our consolidated financial statements for more information concerning the distribution of our Total mortgage portfolio by geographic region.

***Loss Mitigation Activities.***   Loss mitigation activities are a key component of our strategy for managing and resolving troubled assets and lowering credit losses. Our single-family loss mitigation strategy emphasizes early intervention in delinquent mortgages and providing alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and support fulfillment of our mission by assisting borrowers in retaining home ownership. Foreclosure alternatives are intended to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by eliminating a portion of the costs related to foreclosed properties and avoiding the credit loss in REO. Repayment plans, the most common type of foreclosure alternative, mitigate our credit losses because they assist borrowers in returning to compliance with the original terms of their mortgages. Forbearance agreements, the second most common type of foreclosure alternative, provide a temporary suspension of the foreclosure process to allow additional time for the borrower to return to compliance with the original terms of the borrower's mortgage or to implement another foreclosure alternative. Loan modifications, the third most common type of foreclosure alternative, involve changing the terms of a mortgage, such as the loan term. The total number of loans with foreclosure alternatives was approximately 59,100, 60,000 and 48,300 for the years ended December 31, 2006, 2005 and 2004, respectively. In 2005, the total number of

*Freddie Mac*

loans with foreclosure alternatives increased as forbearance agreements were extended to single-family borrowers affected by Hurricane Katrina in an effort to mitigate the risk of default and foreclosure and assist impacted borrowers. In 2006, the number of loans with foreclosure alternatives declined slightly as loans previously subject to forbearance either resumed payments, paid-off or defaulted. However, the number of loans with foreclosure alternatives in the North Central region of the U.S., which has been adversely affected by a downturn in the automotive industry, increased.

We require multifamily seller/servicers to closely manage mortgage loans they have sold us in order to mitigate potential losses. For loans over $1 million, servicers must generally submit an annual assessment of the mortgaged property to us based on the servicer's analysis of financial and other information about the property and, except for certain higher performing loans, an inspection of the property. We evaluate these assessments internally and may direct the servicer to take specific actions to reduce the likelihood of delinquency or default. If a loan defaults despite this intervention, we may offer a foreclosure alternative to the borrower. For example, we may modify the terms of a multifamily mortgage loan, which gives the borrower an opportunity to bring the loan current and retain ownership of the property. Because multifamily seller/servicers are an important part of our loss mitigation process, we rate their performance regularly and conduct on-site reviews of their servicing operations to confirm compliance with our standards.

Within our Total mortgage portfolio, our pricing reflects our expectation that some mortgage loans will become non-performing due to changes in general economic conditions, the financial status of individual borrowers or other factors. Table 39 summarizes our non-performing assets.

**Table 39 — Non-Performing Assets**

| | Based on unpaid principal balance | | | | |
| | December 31, | | | | |
| | 2006 | 2005 | 2004 | 2003 | 2002 |
| | (in millions) | | | | |
| Troubled debt restructuring: | | | | | |
| Reperforming or less than 90 days delinquent[1] | $2,633 | $2,108 | $1,807 | $ 1,874 | $1,776 |
| Serious delinquencies[2] | 470 | 497 | 490 | 496 | 388 |
| Total troubled debt restructuring | 3,103 | 2,605 | 2,297 | 2,370 | 2,164 |
| Other serious delinquencies[3] | 5,700 | 6,438 | 6,318 | 7,470 | 6,830 |
| Non-accrual multifamily loans[4] | — | 1 | 27 | 21 | 47 |
| Subtotal[5] | 8,803 | 9,044 | 8,642 | 9,861 | 9,041 |
| REO, net[6] | 743 | 629 | 741 | 795 | 594 |
| Total | $9,546 | $9,673 | $9,383 | $10,656 | $9,635 |
| Detail of other serious delinquencies:[7] | | | | | |
| Retained and repurchased mortgage loans[2] | $2,982 | $2,889 | | | |
| Loans underlying outstanding PCs and Structured Securities[8] | 1,721 | 2,100 | | | |
| Loans underlying outstanding Structured Transactions[9] | 997 | 1,449 | | | |
| Total serious delinquencies[3] | $5,700 | $6,438 | | | |

(1) Includes previously delinquent loans whose terms have been modified.
(2) Includes single-family loans 90 days or more delinquent. We fully reserve current period accruals for mortgages greater than 120 days delinquent. For serious delinquencies in restructurings, we also fully reserve all uncollected interest after a mortgage becomes 90 days delinquent.
(3) Includes single-family loans 90 days or more delinquent and not in troubled debt restructurings. For multifamily loans, the population includes all loans 60 days or more delinquent but less than 90 days delinquent. Also included are multifamily loans greater than 90 days past due but where principal and interest are being paid to us under the terms of a credit enhancement agreement. For more information about delinquency rates, see "Table 6.3 — Delinquency Performance" in "NOTE 6: LOAN LOSS RESERVES" to our consolidated financial statements.
(4) Non-accrual mortgage loans are loans for which interest income is recognized only on a cash basis and only include multifamily loans that are 90 days or more delinquent. No single-family mortgage loans in our Retained portfolio are classified as non-accrual, since we generally begin establishing reserves for current accruals after 90 days delinquency.
(5) For the year ended December 31, 2006, $481 million was included in Net interest income and Management and guarantee income related to these mortgage loans. The amount of forgone net interest income and additional management and guarantee income that we would have recorded had these loans been current is $34 million for the year ended December 31, 2006.
(6) For more information about REO balances, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 7: REAL ESTATE OWNED" to our consolidated financial statements.
(7) Detail of other serious delinquencies is not available for 2004, 2003 and 2002.
(8) Includes mortgages greater than 90 days, but generally less than 120 days, delinquent. Once a loan is delinquent for 120 days it is generally repurchased out of the security and becomes part of our Retained portfolio.
(9) Consists of mortgages 90 days or more delinquent that underlie the non-agency securities that back our Structured Transactions.

Total non-performing assets declined during 2006 as many of the mortgages affected by Hurricane Katrina in 2005 have resumed payments following the forbearance period we offered and others were modified from their original terms to help borrowers avoid foreclosure. Many of these loans were reported as serious delinquencies at the end of 2005, but have been reclassified to troubled debt restructuring in 2006, as a result of loss mitigation activities. In addition, the increase in the REO balance is attributable to lower turnover caused by slower disposition of properties in the North Central region as well as an increase in market values of the new REO inventory due to appreciation in all regions over the last few years. The increase in troubled debt restructurings and serious delinquencies from 2004 to 2005 was in part a result of the effects of Hurricane Katrina as well as increases in the North Central region.

*Freddie Mac*

*Other Credit Risk Management Activities.*   To compensate us for unusual levels of risk in some mortgage products, we may charge incremental fees above a base guarantee fee calculated based on credit risk factors such as the mortgage product type, loan purpose, loan-to-value ratio, and other loan or borrower attributes. In addition, we occasionally use financial incentives and credit derivatives, as described below, in situations where we believe they will benefit our credit risk management strategy. These arrangements are intended to reduce our credit-related expenses, thereby improving our overall returns.

In some cases, we provide financial incentives in the form of lump sum payments to selected seller/servicers if they deliver a specified volume or percentage of mortgage loans meeting specified credit risk standards over a defined period of time. These financial incentives may also take the form of a fee payable to us by the seller if the mortgages delivered to us do not meet certain credit standards.

We have also entered into credit derivatives, including risk-sharing agreements. Under these risk-sharing agreements, default losses on specific mortgage loans delivered by sellers are compared to default losses on reference pools of mortgage loans with similar characteristics. Based upon the results of that comparison, we remit or receive payments based upon the default performance of the specified mortgage loans. These agreements are accounted for as credit derivatives rather than financial guarantees, in part, because we may make payments to the seller/servicer under these agreements (depending upon actual default experience over the lives of the mortgages). The total notional amount of mortgage loans subject to these agreements was approximately $1.9 billion and $2.4 billion at December 31, 2006 and 2005, respectively. In addition, the total notional amount of mortgage loans in other credit derivatives was approximately $0.7 billion and $— billion at December 31, 2006 and 2005, respectively. All credit derivatives were classified as no hedge designation. The fair value of these credit derivatives was not material at either December 31, 2006 or 2005.

Although these arrangements are part of our overall credit risk management strategy, we have not treated them as credit enhancements for purposes of describing our Total mortgage portfolio characteristics because the risk-sharing and credit derivative agreements may result in us making payments to the seller/servicer.

*Delinquencies.*   We report single-family delinquency information based on the number of single-family mortgages that are 90 days or more past due or in foreclosure. For multifamily loans, we report the delinquency when payment is 60 days or more past due. Delinquencies on mortgage loans underlying Structured Transactions may be categorized as delinquent on a different schedule than other mortgage loans due to variances in industry practice. We include all the single-family loans that we own and those that are collateral for our PCs and Structured Securities, including those with significant credit enhancement, in the calculation of delinquency information; however, we exclude that portion of Structured Securities that is backed by Ginnie Mae Certificates and certain Structured Transactions where delinquency data on the underlying mortgage-related securities is not available. The Structured Transactions we have excluded represented 0.06 percent, 0.04 percent and 0.07 percent of our Total mortgage portfolio at December 31, 2006, 2005 and 2004, respectively, and these securities were shadow rated AAA at the initial securitization. Shadow ratings are credit assessments performed by a rating agency at time of origination, but are not published nor subsequently monitored. Multifamily delinquencies may include mortgage loans where the borrowers are not paying as agreed, but principal and interest are being paid to us under the terms of a credit enhancement agreement. Table 40 presents delinquency information for the single-family loans underlying our Total mortgage portfolio.

## Table 40 — Single-Family — Delinquency Rates — By Region[1]

| | December 31, | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| Northeast[2] .................................................................................... | 0.24% | 0.22% | 0.24% |
| Southeast[2] .................................................................................... | 0.30 | 0.38 | 0.31 |
| North Central[2] ............................................................................... | 0.32 | 0.30 | 0.27 |
| Southwest[2] ................................................................................... | 0.26 | 0.64 | 0.26 |
| West[2] ........................................................................................ | 0.12 | 0.11 | 0.15 |
| Total non-credit-enhanced — all regions[3] .................................................. | 0.25 | 0.30 | 0.24 |
| Total credit-enhanced — all regions[3] ...................................................... | 1.86 | 2.46 | 2.75 |
| Total credit-enhanced and non-credit-enhanced — all regions[3] .............................. | 0.53% | 0.69% | 0.73% |

(1) Region Designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY). Beginning in 2005, Puerto Rico and Virgin Islands were reclassified from Northeast to Southeast.
(2) Based on mortgage loans in the Retained portfolio and Total Guaranteed PCs and Structured Securities Issued, excluding that portion of Structured Securities that is backed by Ginnie Mae Certificates and Structured Transactions.
(3) Based on mortgage loans in the Retained portfolio and Total Guaranteed PCs and Structured Securities Issued, excluding that portion of Structured Securities that is backed by Ginnie Mae Certificates.

Our total single-family delinquency rate has declined over the past three years, with some regional variation, reflecting generally strong economic conditions and strong, but recently slowing, home price appreciation.

Both our total credit-enhanced and total non-credit-enhanced delinquency rates improved in 2006. Many of the loans in the Southwest and Southeast regions that were affected by Hurricane Katrina, and were delinquent at the end of 2005, resumed payments following the forbearance period we offered and others were modified from their original terms to help borrowers avoid foreclosure. Excluding the loans affected by Hurricane Katrina, our total non-credit-enhanced delinquency rate at December 31, 2006 was unchanged from December 31, 2005. However, the total non-credit-enhanced delinquency rate for the North Central region rose in 2006, primarily due to a regional economic downturn.

In addition to the improvement attributable to loans affected by Hurricane Katrina, our total credit-enhanced delinquency rate declined as the number of loans added to the portfolio increased. The delinquency rates on new loans are generally lower than more seasoned loans and we expect that delinquency rates for these loans will increase as they age.

Our multifamily delinquency rate remained very low at 0.05 percent, zero percent and 0.06 percent at the end of 2006, 2005 and 2004, respectively. Hurricane Katrina has not affected our reported multifamily delinquency rate because the contractual terms of certain affected mortgage loans, with unpaid principal balances totaling $149 million at December 31, 2006, were modified.

**Table 41 — Single-Family Mortgages By Year of Origination — Percentage of Mortgage Portfolio and Non-Credit-Enhanced Delinquency Rates[1]**

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2006 | | 2005 | | 2004 | |
| Year of Origination | Percent of Single-Family UPB Balance | Non-Credit-Enhanced Delinquency Rate | Percent of Single-Family UPB Balance | Non-Credit-Enhanced Delinquency Rate | Percent of Single-Family UPB Balance | Non-Credit-Enhanced Delinquency Rate |
| Pre-1999 | 3% | 0.57% | 5% | 0.70% | 7% | 0.61% |
| 1999 | 1 | 0.67 | 1 | 0.89 | 2 | 0.78 |
| 2000 | <1 | 1.83 | <1 | 2.09 | 1 | 1.94 |
| 2001 | 3 | 0.60 | 4 | 0.75 | 6 | 0.59 |
| 2002 | 9 | 0.32 | 11 | 0.38 | 16 | 0.26 |
| 2003 | 26 | 0.15 | 34 | 0.17 | 44 | 0.06 |
| 2004 | 16 | 0.22 | 21 | 0.21 | 24 | 0.03 |
| 2005 | 23 | 0.19 | 24 | 0.08 | — | — |
| 2006 | 19 | 0.09 | — | — | — | — |
| At December 31, | 100% | 0.25% | 100% | 0.30% | 100% | 0.24% |

(1) Excludes Structured Transactions.

Our single-family portfolio was affected by heavy refinance volumes in recent years. At December 31, 2006, approximately 58 percent of our single-family mortgage portfolio consisted of mortgage loans originated in 2006, 2005 or 2004. Mortgage loans originated in 2003 and earlier, which represent approximately 42 percent of our single-family mortgage portfolio, have delinquency rates that are generally higher than the overall portfolio delinquency rate due to the natural aging of the loans and, in some instances, the weaker credit quality of these loans. The first year delinquency rate associated with new originations increased in each of the last three years due to a number of factors, including the expansion of credit terms under which loans are underwritten and an increase in our purchases of variable-rate and non-traditional mortgage products that have higher inherent credit risk than traditional fixed-rate mortgage products.

**Table 42 — Single-Family — Delinquency Rates — By Product**

| | Non-Credit-Enhanced, December 31, | | | | | |
| | 2006 | | 2005 | | 2004 | |
| | Percent of Number of Single-Family Loans | Delinquency Rate | Percent of Number of Single-Family Loans | Delinquency Rate | Percent of Number of Single-Family Loans | Delinquency Rate |
|---|---|---|---|---|---|---|
| Conventional: | | | | | | |
| 30-year amortizing fixed rate[1] | 55% | 0.31% | 52% | 0.40% | 49% | 0.36% |
| 15-year amortizing fixed rate | 34 | 0.14% | 38 | 0.19% | 42 | 0.12% |
| ARMs/Variable rate | 6 | 0.26% | 6 | 0.23% | 7 | 0.17% |
| Interest Only | 3 | 0.30% | 1 | 0.04% | — | — |
| Balloon/Resets | 1 | 0.19% | 2 | 0.19% | 2 | 0.12% |
| Total Mortgage Loans, PCs and Structured Securities | 99 | 0.25% | 99 | 0.30% | 100 | 0.24% |
| Structured Transactions | 1 | 0.26% | 1 | 0.08% | — | — |
| Total Mortgage Portfolio | 100% | 0.25% | 100% | 0.30% | 100% | 0.24% |
| Number of single-family loans (in millions) | 9.22 | | 8.67 | | 8.19 | |

| | Credit-Enhanced[2], December 31, | | | | | |
| | 2006 | | 2005 | | 2004 | |
| | Percent of Number of Single-Family Loans | Delinquency Rate | Percent of Number of Single-Family Loans | Delinquency Rate | Percent of Number of Single-Family Loans | Delinquency Rate |
|---|---|---|---|---|---|---|
| Conventional: | | | | | | |
| 30-year amortizing fixed rate[1] | 76% | 1.32% | 73% | 1.74% | 71% | 1.69% |
| 15-year amortizing fixed rate | 7 | 0.64% | 9 | 0.81% | 11 | 0.53% |
| ARMs/Variable rate | 6 | 1.24% | 7 | 1.08% | 7 | 0.81% |
| Interest Only | 3 | 1.05% | 2 | 0.23% | — | — |
| Balloon/Resets | 1 | 0.98% | 1 | 0.91% | 1 | 0.63% |
| FHA/VA | 2 | 2.99% | 2 | 4.03% | 2 | 3.88% |
| Rural Housing Service and other federally guaranteed loans | 1 | 2.65% | 1 | 3.34% | 1 | 3.20% |
| Total Mortgage Loans, PCs and Structured Securities | 96 | 1.30% | 95 | 1.61% | 93 | 1.53% |
| Structured Transactions[3] | 4 | 14.82% | 5 | 19.19% | 7 | 19.24% |
| Total Mortgage Portfolio | 100% | 1.86% | 100% | 2.46% | 100% | 2.75% |
| Number of single-family loans (in millions) | 1.94 | | 1.91 | | 1.99 | |

| | Total, December 31, | | | | | |
| | 2006 | | 2005 | | 2004 | |
| | Percent of Number of Single-Family Loans | Delinquency Rate | Percent of Number of Single-Family Loans | Delinquency Rate | Percent of Number of Single-Family Loans | Delinquency Rate |
|---|---|---|---|---|---|---|
| Conventional: | | | | | | |
| 30-year amortizing fixed rate[1] | 60% | 0.54% | 56% | 0.72% | 53% | 0.71% |
| 15-year amortizing fixed rate | 29 | 0.16% | 33 | 0.22% | 36 | 0.15% |
| ARMs/Variable rate | 6 | 0.44% | 6 | 0.40% | 7 | 0.31% |
| Interest Only | 3 | 0.44% | 1 | 0.10% | — | — |
| Balloon/Resets | 1 | 0.25% | 2 | 0.25% | 2 | 0.17% |
| FHA/VA | < 1 | 2.99% | < 1 | 4.03% | < 1 | 3.88% |
| Rural Housing Service and other federally guaranteed loans | < 1 | 2.65% | < 1 | 3.34% | < 1 | 3.20% |
| Total Mortgage Loans, PCs and Structured Securities | 99 | 0.42% | 98 | 0.53% | 98 | 0.48% |
| Structured Transactions[3] | 1 | 7.71% | 2 | 10.79% | 2 | 16.01% |
| Total Mortgage Portfolio | 100% | 0.53% | 100% | 0.69% | 100% | 0.73% |
| Number of single-family loans (in millions) | 11.16 | | 10.58 | | 10.18 | |
| Net Charge-offs (dollars in millions) | | | | | | |
| Mortgage Loans, PCs and Structured Securities | $ 141 | | $ 101 | | $ 140 | |
| Structured Transactions[3] | 1 | | — | | — | |
| Total Mortgage Portfolio | $ 142 | | $ 101 | | $ 140 | |

(1) Includes 40-year and 20-year fixed-rate mortgages.
(2) Credit-enhanced loans are primarily those mortgage loans for which a third party has primary default risk. The total credit-enhanced unpaid principal balance as of December 31, 2006, 2005 and 2004 was $266 billion, $253 billion and $248 billion, respectively, for which the maximum coverage of third party primary liability was $58 billion, $53 billion and $52 billion, respectively.
(3) Structured Transactions generally have underlying mortgage loans with higher risk characteristics but provide inherent credit protection from losses due to the structure employed, including subordination, excess interest, overcollateralization and other features.

*Credit Loss Performance.*   Table 43 provides detail on our credit loss performance, including REO activity, charge-offs and credit losses.

**Table 43 — Credit Loss Performance**

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2006** | | **2005** | | **2004** |
| | | (dollars in millions) | | | | |
| **REO** | | | | | | |
| REO balances: | | | | | | |
| Single-family | $ | 734 | $ | 611 | $ | 740 |
| Multifamily | | 9 | | 18 | | 1 |
| Total | $ | 743 | $ | 629 | $ | 741 |
| REO activity (number of properties):[1] | | | | | | |
| Beginning property inventory, at January 1 | | 8,070 | | 9,604 | | 9,170 |
| Properties acquired | | 16,387 | | 15,861 | | 18,489 |
| Properties disposed | | (15,672) | | (17,395) | | (18,055) |
| Ending property inventory, at December 31 | | 8,785 | | 8,070 | | 9,604 |
| Average holding period (in days)[2] | | 175 | | 186 | | 177 |
| REO operations income (expense): | | | | | | |
| Single-family | $ | (61) | $ | (40) | $ | (1) |
| Multifamily | | 1 | | — | | 4 |
| Total | $ | (60) | $ | (40) | $ | 3 |
| **CHARGE-OFFS** | | | | | | |
| **Single-family:** | | | | | | |
| Foreclosure alternatives, gross | $ | (50) | $ | (44) | $ | (47) |
| Recoveries[3] | | 11 | | 23 | | 21 |
| Foreclosure alternatives, net | | (39) | | (21) | | (26) |
| REO acquisitions, gross | | (258) | | (242) | | (253) |
| Recoveries[3] | | 155 | | 162 | | 139 |
| REO acquisitions, net | | (103) | | (80) | | (114) |
| Single-family totals: | | | | | | |
| Charge-offs, gross | | (308) | | (286) | | (300) |
| Recoveries[3] | | 166 | | 185 | | 160 |
| **Single-family charge-offs, net** | | (142) | | (101) | | (140) |
| **Multifamily:** | | | | | | |
| Charge-offs, gross | | (5) | | (8) | | — |
| Recoveries[3] | | — | | — | | — |
| **Multifamily charge-offs, net** | | (5) | | (8) | | — |
| **Total Charge-offs:** | | | | | | |
| Charge-offs, gross | | (313) | | (294) | | (300) |
| **Recoveries:** | | | | | | |
| Related to primary mortgage insurance | | 112 | | 119 | | 85 |
| Not related to primary mortgage insurance | | 54 | | 66 | | 75 |
| **Total recoveries**[3] | | 166 | | 185 | | 160 |
| **Charge-offs, net** | $ | (147) | $ | (109) | $ | (140) |
| **CREDIT LOSSES**[4] | | | | | | |
| Single-family | $ | (203) | $ | (141) | $ | (141) |
| Multifamily | | (4) | | (8) | | 4 |
| **Total** | $ | (207) | $ | (149) | $ | (137) |
| In basis points:[5] | | | | | | |
| Single-family | | (1.4) | | (1.1) | | (1.1) |
| Multifamily | | — | | — | | — |
| **Total** | | (1.4) | | (1.1) | | (1.1) |

(1) Includes single-family and multifamily REO properties.
(2) Represents weighted average holding period for single-family and multifamily properties based on number of REO properties disposed.
(3) Includes recoveries of charge-offs primarily resulting from foreclosure alternatives and REO acquisitions on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements. Recoveries of charge-offs through credit enhancements are limited in some instances to amounts less than the full amount of the loss.
(4) Equal to REO operations income (expense) plus Charge-offs, net.
(5) Calculated as credit losses divided by the average Total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of Structured Securities that is backed by Ginnie Mae Certificates.

Table 44 and Table 45 provide detail by region for two credit performance statistics, REO activity and charge-offs. Regional REO acquisition and charge-off trends generally follow a pattern that is similar to, but lags, that of regional delinquency trends. Increases in the volume of REO properties in the North Central region were driven by impacts to borrowers affected by an economic downturn and weakening housing markets within the region.

**Table 44 — REO Activity By Region**[1]

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (number of properties) | | |
| **REO Inventory** | | | |
| Beginning property inventory | 8,070 | 9,604 | 9,170 |
| Properties acquired by region: | | | |
| Northeast | 1,253 | 1,306 | 1,500 |
| Southeast | 3,970 | 4,504 | 5,499 |
| North Central | 7,237 | 5,790 | 5,787 |
| Southwest | 3,497 | 3,412 | 3,926 |
| West | 430 | 849 | 1,777 |
| Total properties acquired | 16,387 | 15,861 | 18,489 |
| Properties disposed by region: | | | |
| Northeast | (1,260) | (1,384) | (1,562) |
| Southeast | (4,132) | (5,221) | (5,596) |
| North Central | (6,294) | (5,715) | (5,111) |
| Southwest | (3,441) | (3,820) | (3,605) |
| West | (545) | (1,255) | (2,181) |
| Total properties disposed | (15,672) | (17,395) | (18,055) |
| Ending property inventory | 8,785 | 8,070 | 9,604 |

(1) See "Table 40 — Single-Family — Delinquency Rates — By Region" for a description of these regions.

**Table 45 — Single-Family Charge-offs and Recoveries By Region**[1][2]

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | | 2005 | | | 2004 | | |
| | Charge-offs, gross | Recoveries | Charge-offs, net | Charge-offs, gross | Recoveries | Charge-offs, net | Charge-offs, gross | Recoveries | Charge-offs, net |
| | | | | | (in millions) | | | | |
| Northeast | $ 22 | $ (9) | $ 13 | $ 21 | $ (10) | $ 11 | $ 24 | $ (10) | $ 14 |
| Southeast | 72 | (42) | 30 | 76 | (54) | 22 | 84 | (49) | 35 |
| North Central | 133 | (66) | 67 | 102 | (66) | 36 | 92 | (49) | 43 |
| Southwest | 73 | (44) | 29 | 68 | (44) | 24 | 66 | (35) | 31 |
| West | 8 | (5) | 3 | 19 | (11) | 8 | 34 | (17) | 17 |
| Total | $308 | $(166) | $142 | $286 | $(185) | $101 | $300 | $(160) | $140 |

(1) See "Table 40 — Single-Family — Delinquency Rates — By Region" for a description of these regions.
(2) Includes recoveries of charge-offs primarily resulting from foreclosure alternatives and REO acquisitions on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements. Recoveries of charge-offs through credit enhancements are limited in some instances to amounts less than the full amount of the loss.

Single-family charge-offs, gross, increased in 2006 primarily due to a modest increase in the volume of REO properties acquired at foreclosure, as noted in Table 44.

We maintain two loan loss reserves — Reserve for losses on mortgage loans held-for-investment and Reserve for guarantee losses on Participation Certificates — at levels we deem adequate to absorb probable incurred losses on mortgage loans held-for-investment in the Retained portfolio and certain mortgages underlying PCs held by third parties. See "CRITICAL ACCOUNTING POLICIES AND ESTIMATES — Credit Losses," "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 6: LOAN LOSS RESERVES" to our consolidated financial statements for further information. Table 46 summarizes our loan loss reserves activity for both of our reserves in total.

**Table 46 — Loan Loss Reserves Activity**

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2003 | 2002 |
| | (dollars in millions) | | | | |
| **Total loan loss reserves:**[1] | | | | | |
| Beginning balance ....................................... | $ 414 | $ 264 | $ 299 | $ 265 | $ 224 |
| Provision (benefit) for credit losses ........................... | 215 | 251 | 143 | (5) | 122 |
| Charge-offs, gross.......................................... | (313) | (294) | (300) | (224) | (171) |
| Recoveries[2]............................................. | 166 | 185 | 160 | 145 | 99 |
| Charge-offs, net ............................................. | (147) | (109) | (140) | (79) | (72) |
| Adjustment for change in accounting[3] ........................ | — | — | — | 110 | — |
| Transfers-out.............................................. | (71) | (11) | (20) | (11) | (9) |
| Other transfers, net[4] ....................................... | 9 | 19 | (18) | 19 | — |
| Ending balance............................................. | $ 420 | $ 414 | $ 264 | $ 299 | $ 265 |
| Charge-offs, net to Total mortgage portfolio[5] .................... | 1.0 bps | 0.8 bps | 1.1 bps | 0.7 bps | 0.7 bps |
| Coverage ratio (reserves to charge-offs, net) ...................... | 2.9 | 3.8 | 1.9 | 3.8 | 3.7 |

(1) Includes Reserves for loans held-for-investment in the Retained portfolio and Reserves for guarantee losses on Participation Certificates.
(2) Includes recoveries of charge-offs primarily resulting from foreclosure alternatives and REO acquisitions on loans where a share of default risk has been assumed by mortgage insurers, servicers or third parties through credit enhancements. Recoveries of charge-offs through credit enhancements are limited in some instances to amounts less than the full amount of the loss.
(3) On January 1, 2003, $110 million of recognized Guarantee obligation attributable to estimated incurred losses on outstanding PCs or Structured Securities was reclassified to Reserve for guarantee losses on Participation Certificates.
(4) Represents the portion of the Guarantee obligation recognized through Guarantor Swap transactions or upon the sale of PCs and Structured Securities that corresponds to incurred credit losses reclassified to Reserve for guarantee losses on Participation Certificates upon initial recognition of a Guarantee obligation. In addition, the amount includes an increase (reduction) of loan loss reserves of $9 million and $(31) million in 2005 and 2004, respectively, related to prior period adjustments for which the related income was recorded in Other income.
(5) Calculated using the average Total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of Structured Securities that is backed by Ginnie Mae Certificates.

Our total loan loss reserves increased in 2006 as additional reserves we recorded to reflect incurred losses related to our single-family portfolio were partly offset by the reversal of $82 million of the Provision for credit losses recorded in 2005 associated with Hurricane Katrina. The increase in loan loss reserves during 2005 was primarily related to our estimate of incurred losses associated with Hurricane Katrina which was $128 million at December 31, 2005. See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Expense — Provision for Credit Losses," for additional information.

*Credit Risk Sensitivity.* Our credit risk sensitivity analysis assesses the assumed increase in the present value of expected single-family mortgage portfolio credit losses over ten years as the result of an estimated immediate 5 percent decline in home prices nationwide, followed by a return to more normal growth in home prices based on historical experience. We use an internally developed Monte Carlo simulation-based model to generate our credit risk sensitivity analyses. The Monte Carlo model uses a simulation program to generate numerous potential interest-rate paths that, in conjunction with a prepayment model, are used to estimate mortgage cash flows along each path. In the credit risk sensitivity analysis, we adjust the home-price assumption used in the base case to estimate the level and sensitivity of potential credit costs resulting from a sudden decline in home prices. Our credit risk sensitivity results are presented in "RISK MANAGEMENT AND DISCLOSURE COMMITMENTS."

### Institutional Credit Risk

Our primary institutional credit risk exposure, other than counterparty credit risk exposure relating to derivatives, arises from agreements with the following entities: mortgage loan insurers; mortgage seller/servicers; issuers, guarantors or third party providers of credit enhancements on non-Freddie Mac mortgage-related securities held in our Retained portfolio; mortgage investors and originators; and issuers, guarantors and insurers of investments held in our Cash and investments portfolio. See "RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks — *Use of Derivatives and Interest-Rate Risk Management*" for information concerning counterparty credit risk exposure relating to derivatives.

**Mortgage Loan Insurers.** We have institutional credit risk relating to the potential insolvency or non-performance of mortgage insurers that insure mortgages we purchase or guarantee. We manage this risk by establishing eligibility standards for mortgage insurers and by regularly monitoring our exposure to individual mortgage insurers. We also monitor the mortgage insurers' credit ratings, as provided by nationally recognized statistical rating organizations, and we periodically review the methods used by the nationally recognized statistical rating organizations. We also perform periodic on-site reviews of mortgage insurers to confirm compliance with our eligibility requirements and to evaluate their management and control practices. In addition, state insurance authorities regulate mortgage insurers. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" to our consolidated financial statements for additional information.

**Mortgage Seller/Servicers.** We are exposed to institutional credit risk arising from the insolvency of or non-performance by our mortgage seller/servicers, including non-performance of their repurchase obligations arising from the representations and warranties made to us for loans they underwrote and sold to us. The servicing fee charged by mortgage

servicers varies by mortgage product. We generally require our single-family servicers to retain a minimum percentage fee for mortgages serviced on our behalf, typically 0.25 percent of the unpaid principal balance of the mortgage loans. However, on an exception basis, we allow a lower or no minimum servicing amount. The credit risk associated with servicing fees relates to whether we could transfer the applicable servicing rights to a successor servicer and recover amounts owed to us by the defaulting servicer in the event the current servicer is unable to fulfill its responsibilities.

In order to manage the credit risk associated with our mortgage seller/servicers, we require them to meet minimum financial capacity standards, insurance and other eligibility requirements. We do not believe we have any significant exposure to seller/servicers identified as primarily subprime lenders that are not currently in compliance with our financial monitoring standards. We institute remedial actions against seller/servicers that fail to comply with our standards. These actions may include transferring mortgage servicing to other qualified servicers or terminating our relationship with the seller/servicer. We conduct periodic operational reviews of our single-family mortgage seller/servicers to help us better understand their control environment and its impact on the quality of loans sold to us. We use this information to determine the terms of business we conduct with a particular seller/servicer.

We manage the credit risk associated with our multifamily seller/servicers by establishing eligibility requirements for participation in our multifamily programs. These seller/servicers must also meet our standards for originating and servicing multifamily loans. We conduct regular quality control reviews of our multifamily mortgage seller/servicers to determine whether they remain in compliance with our standards.

**Non-Freddie Mac Mortgage-Related Securities.**   Investments for our Retained portfolio expose us to institutional credit risk on non-Freddie Mac mortgage-related securities to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Table 19 — Characteristics of Mortgage Loans and Mortgage-Related Securities in the Retained Portfolio" for more information concerning our Retained portfolio.

Our non-Freddie Mac mortgage-related securities portfolio consists of both agency and non-agency mortgage-related securities. Agency mortgage-related securities, which are securities issued or guaranteed by Fannie Mae or Ginnie Mae, present minimal institutional credit risk due to the high credit quality of Fannie Mae and Ginnie Mae. Agency mortgage-related securities are generally not separately rated by nationally recognized statistical rating organizations, but are viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities rated AAA (based on the S&P rating scale or an equivalent rating from other nationally recognized statistical rating organizations). At December 31, 2006, we held approximately $45 billion of agency securities, representing approximately 2 percent of our Total mortgage portfolio.

Non-agency mortgage-related securities expose us to institutional credit risk if the nature of the credit enhancement relies on a third party to cover potential losses. However, most of our non-agency mortgage-related securities rely primarily on subordinated tranches to provide credit loss protection and therefore expose us to limited counterparty risk. In those instances where we desire further protection, we may choose to mitigate our exposure with bond insurance or by purchasing additional subordination. Bond insurance exposes us to the risks related to the bond insurer's ability to satisfy claims. At December 31, 2006, a significant portion of the bond insurers providing coverage for non-agency mortgage-related securities held by us were rated AAA or equivalent by at least one nationally recognized statistical rating organization. At December 31, 2006, we held approximately $238 billion of non-agency mortgage-related securities. Of this amount, 96.2 percent was rated AAA or equivalent.

We manage institutional credit risk on non-Freddie Mac mortgage-related securities by only purchasing securities that meet our investment guidelines and performing ongoing analysis to evaluate the creditworthiness of the issuers and servicers of these securities and the bond insurers that guarantee them. To assess the creditworthiness of these entities, we may perform additional analysis, including on-site visits, verification of loan documentation, review of underwriting or servicing processes and similar due diligence measures. In addition, we regularly evaluate our investments to determine if any impairment in fair value requires an impairment loss recognition in earnings, warrants divestiture or requires a combination of both. See "RISK FACTORS — Legal and Regulatory Risks" for more information.

**Mortgage Investors and Originators.**   We are exposed to pre-settlement risk through the purchase, sale and financing of mortgage loans and mortgage-related securities with mortgage investors and originators. The probability of such a default is generally remote over the short time horizon between the trade and settlement date. We manage this risk by evaluating the creditworthiness of our counterparties and monitoring and managing our exposures. In some instances, we may require these counterparties to post collateral.

**Cash and Investments Portfolio.**   Institutional credit risk also arises from the potential insolvency or non-performance of issuers or guarantors of investments held in our Cash and investments portfolio. Instruments in this portfolio are investment grade at the time of purchase and primarily short-term in nature, thereby substantially mitigating institutional

credit risk in this portfolio. We regularly evaluate these investments to determine if any impairment in fair value requires an impairment loss recognition in earnings, warrants divestiture or requires a combination of both.

## OFF-BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction. Most of these arrangements relate to our financial guarantee and securitization activity for which we record guarantee-related assets and obligations, but the related securitized assets are owned by third parties. See "CRITICAL ACCOUNTING POLICIES AND ESTIMATES — Issuances and Transfers of PCs and Structured Securities" for more discussion of off-balance sheet arrangements. These off-balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets.

### Guarantee of PCs and Structured Securities

As discussed in "BUSINESS — Business Activities — *Credit Guarantee Activities*," we guarantee the payment of principal and interest on issued PCs or Structured Securities. Mortgage-related assets that back PCs and Structured Securities held by third parties are not reflected as our assets, unless we retained or repurchased an interest in the PCs that back Structured Securities that were issued and sold to third parties.

We manage the risks of our credit guarantee activity carefully, sharing the risk in some cases with third parties through the use of primary loan-level mortgage insurance, pool insurance and other credit enhancements. "NOTE 4: FINANCIAL GUARANTEES" of our consolidated financial statements provides information about our guarantees, including details related to credit protections and maximum coverages that we obtain through credit enhancements. Also, see "RISK MANAGEMENT — Credit Risks" for more information.

Credit guarantee activity also occurs through the Guarantor Swap program in the form of mortgage swap transactions. In a mortgage swap transaction, a mortgage lender delivers mortgages to us in exchange for our guaranteed PCs that represent undivided interests in those same mortgages. We receive various forms of consideration in exchange for providing our guarantee on issued PCs, including (a) the contractual right to receive a management and guarantee fee, (b) delivery or credit fees for higher-risk mortgages and (c) other forms of credit enhancements received from counterparties or mortgage loan insurers.

Credit guarantee activity also occurs through our Cash Window and our MultiLender Swap program. Single-family mortgage loans we purchase for cash through the Cash Window are typically either retained by us in our Retained portfolio or pooled together with other single-family mortgage loans we purchase in connection with PC swap-based transactions in our MultiLender Program executed with various lenders. We may issue such PCs to these lenders in exchange for the mortgage loans we purchase from them or, to the extent these loans are pooled with loans purchased for cash, we may sell them to third parties for cash consideration through an auction.

In addition to the issuance and transfer of PCs to third parties, we also sell PCs from our Retained portfolio in resecuritized form. We issue single- and multi-class Structured Securities that are backed by securities held in our Retained portfolio and subsequently transfer such Structured Securities to third parties in exchange for cash, PCs or other mortgage-related securities. We generally earn resecuritization fees in connection with the creation of Structured Securities and can earn an ongoing management and guarantee fee for certain issued Structured Securities. Our principal credit risk exposure on Structured Securities relates only to that portion of resecuritized assets that consists of non-Freddie Mac mortgage-related securities. For information about our purchase, securitization and resecuritization activities, see "PORTFOLIO BALANCES AND ACTIVITIES."

Our maximum potential exposure to credit losses relating to our outstanding guaranteed mortgage-related securities held by third parties is primarily represented by the unpaid principal balance of those securities, which was $1,123 billion as of December 31, 2006. Based on our historical credit losses, which in 2006 averaged approximately 1.4 basis points of the balance of guaranteed securities outstanding (including those owned in our Retained portfolio), we do not believe that the maximum exposure is representative of our actual exposure on these guarantees. The maximum exposure does not take into consideration the recovery we would receive through exercising our rights to the collateral backing the underlying loans nor the available credit enhancements, which includes recourse and primary insurance with third parties.

The accounting policies and fair value estimation methodologies we apply to our credit guarantee activities significantly affect the volatility of our reported earnings. See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss)" for an analysis of the effects on our consolidated statements of income related to our credit guarantee activities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS" for a description of our Guarantee asset and Guarantee obligation. The accounting for our securitization transactions and the significant assumptions used to determine

the gains or losses from such transfers that are accounted for as sales are discussed in "NOTE 2: TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS" to our consolidated financial statements.

**Other**

We extend other guarantees and provide indemnification to counterparties for breaches of standard representations and warranties in contracts entered into in the normal course of business based on an assessment that the risk of loss would be remote. See "NOTE 4: FINANCIAL GUARANTEES" to our consolidated financial statements for additional information.

We are a party to numerous entities that are considered to be variable interest entities, or VIEs, in accordance with FASB Interpretation No. 46 (Revised December 2003), "Consolidation of Variable Interest Entities (revised December 2003), an interpretation of APB No. 51," or FIN 46(R). These variable interest entities include low-income multifamily housing tax credit partnerships, certain Structured Transactions and certain asset-backed investment trusts. See "NOTE 3: VARIABLE INTEREST ENTITIES" to our consolidated financial statements for additional information related to our significant variable interests in these VIEs.

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. Some of these commitments are accounted for as derivatives with their fair values reported as either Derivative assets, at fair value or Derivative liabilities, at fair value on our consolidated balance sheets. See "RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks" for further information. Certain non-derivative commitments are related to commitments arising from mortgage swap transactions and commitments to purchase certain multifamily mortgage loans that will be classified as held-for-investment. These non-derivative commitments totaled $264.4 billion and $178.8 billion at December 31, 2006 and 2005, respectively. Such commitments are not accounted for as derivatives and are not recorded on our consolidated balance sheets.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in accordance with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts of our assets, liabilities, income, and expenses. Certain of our accounting policies, as well as estimates we make, are critical to the presentation of our financial condition and results of operations. They often require management to make difficult, complex or subjective judgments and estimates, at times, regarding matters that are inherently uncertain. The accounting policies discussed in this section are particularly critical to understanding our consolidated financial statements. Actual results could differ from our estimates and different judgments and assumptions related to these policies and estimates could have a material impact on the consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) valuation of financial instruments; (b) issuances and transfers of PCs and Structured Securities; (c) derivative instruments and hedging activities; (d) credit losses; (e) amortization of cost basis adjustments using the effective interest method; and (f) impairment recognition on investments in securities. For additional information about these and other significant accounting policies, including recently issued accounting pronouncements, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to our consolidated financial statements.

**Valuation of Financial Instruments**

A significant portion of our assets and liabilities are financial instruments that are recorded on our consolidated financial statements at estimated fair value. The estimation of fair value applies to instruments that are complex in nature and requires significant management judgments and assumptions. These judgments and assumptions, as well as changes in market conditions, may have a material effect on our GAAP consolidated balance sheets and statements of income as well as our consolidated fair value balance sheets.

Fair value is defined as the amount at which an asset or liability could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale. The selection of a method to estimate fair value for each type of financial instrument depends on both the reliability and availability of relevant market data. The amount of judgment involved in estimating the fair value of a financial instrument is affected by a number of factors, such as the type of

instrument, the liquidity of the markets for the instrument and the contractual characteristics of the instrument. We estimate fair value according to the following hierarchy of sources:

- quoted market prices for identical and similar instruments;
- industry standard models that consider market inputs such as yield curves, duration, volatility factors and prepayment speeds; and
- internally developed models that consider inputs based on management's judgment of market-based assumptions.

We use quoted market prices when they are available and reliable. Financial instruments with active markets and readily available market prices are valued based on independent price quotations obtained from third party sources, such as pricing services, dealer marks or direct market observations. Independent price quotations obtained from pricing services are valuations estimated by a service provider using market information. Dealer marks are prices obtained from dealers that generally make markets in the relevant products and are an indication of the price at which the dealer would consider transacting in normal market conditions. Market observable prices are prices that are retrieved from sources in which market trades are executed, such as electronic trading platforms. When quoted market prices are not readily available, we utilize models, including industry-standard models and internally developed models. These models use market inputs such as interest rate curves, market volatilities and pricing spreads. We maximize the use of market inputs to the extent available. Certain complex financial instruments have significant data inputs that cannot be validated by reference to the market. These instruments are typically illiquid or unique in nature and require the use of management's judgment of market-based assumptions. The use of different pricing models or assumptions could produce materially different estimates of fair value.

Fair value affects our statement of income in the following ways:

- For certain financial instruments that are recorded in the GAAP consolidated balance sheets at fair value, changes in fair value are recognized in current period earnings. These include:
  — securities and PC residuals classified as trading, which are recorded in Gains (losses) on investment activity;
  — derivatives in a fair value hedge accounting relationship and the related adjustments to the hedged items, which are recorded in Hedge accounting gains (losses);
  — derivatives with no hedge designation, which are recorded in Derivative gains (losses); and
  — the Guarantee asset, which is recorded in Gains (losses) on Guarantee asset.
- For other financial instruments that are recorded in the GAAP consolidated balance sheets at fair value, changes in fair value are deferred, net of tax, in AOCI. These include:
  — securities and PC residuals classified as available-for-sale, which are initially measured at fair value with deferred gains and losses recognized in AOCI. These deferred gains and losses affect earnings over time through amortization, sale or impairment recognition; and
  — changes in derivatives that are designated in cash flow hedge accounting relationships.
- Our Guarantee obligation is initially measured at fair value, but is not remeasured at fair value on a periodic basis. This obligation affects earnings over time through amortization to Income on Guarantee obligation.
- Mortgage loans that are held-for-sale are recorded at the lower-of-cost-or-market with changes in fair value recorded through earnings in Gains (losses) on investment activity.

We periodically evaluate our valuation methodologies and may change them to improve our fair value estimates, to accommodate market developments or to compensate for changes in data availability and reliability or other operational constraints.

At December 31, 2006 and 2005, the fair values for approximately 99 percent of our mortgage-related securities were based on prices obtained from third parties or were determined using models with significant market inputs. The fair values for the remainder of our mortgage-related securities are obtained from internal models with few or no market inputs. The majority of the fair values for our non-mortgage-related securities are based on prices obtained from third parties. For some of these securities, where the interest rates frequently reset, the carrying value is presumed to be a reasonable approximation of fair value. The majority of our derivative positions are valued using internally developed models that use market inputs because few of the derivative contracts we use are listed on exchanges. At December 31, 2006 and 2005, approximately 65 percent and 68 percent, respectively, of the gross fair value of our derivatives portfolio related to interest-rate and foreign-currency swaps that did not have embedded options. These derivatives were valued using a discounted cash flow model that projects future cash flows and discounts them at the spot rate related to each cash flow. The remaining 35 percent and 32 percent, respectively, of our derivatives portfolio was valued based on prices obtained from third parties or using models with significant market inputs. The fair values for all of our debt securities are based on prices obtained from third parties or are determined using models with significant market inputs.

See "RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks" for discussion of market risks and our interest-rate sensitivity measures, PMVS and duration gap.

### Issuances and Transfers of PCs and Structured Securities

We issue PCs and Structured Securities to third parties in several different ways. In general, we account for such transfers as sales of financial assets or as financial guarantee transactions. We evaluate whether transfers of PCs or Structured Securities qualify as sales based upon the requirements of SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, a replacement of FASB Statement No. 125," or SFAS 140. If a transfer of PCs or Structured Securities qualifies as a sale, we recognize a gain or loss on the sale immediately in earnings. The gain or loss is calculated as cash received less the recognized carrying value of interests sold and the fair value of liabilities incurred upon sale.

If we determine that a transfer of PCs or Structured Securities does not qualify as a sale, we account for the transfer as a secured borrowing pursuant to SFAS 140 or as a financial guarantee transaction pursuant to the provisions of FIN 45. Many of the transfers of PCs and Structured Securities that we make are accounted for as financial guarantee transactions pursuant to FIN 45. For such transactions, we recognize a Guarantee obligation at the inception of an executed guarantee. We also recognize the fair value of any consideration received in such transactions.

For transfers of PCs and Structured Securities to third parties, the fair value measurements involve our best estimate with respect to key assumptions. These key assumptions include expected credit losses, exposure to credit losses that could be greater than expected, prepayment rates, forward yield curves and discount rates. We believe that these assumptions are comparable to those used by other market participants. The use of different pricing models or assumptions could produce materially different results. See "NOTE 2: TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS" to our consolidated financial statements for further discussion of the approach we use to determine fair values.

### Derivative Instruments and Hedging Activities

The determination of whether a derivative qualifies for hedge accounting requires significant judgment and has a significant impact on how such instruments are accounted for in our consolidated financial statements. As described more fully in "NOTE 12: DERIVATIVES" to our consolidated financial statements, by December 31, 2006 we had discontinued substantially all of our hedge accounting relationships.

We report the change in fair value of derivatives that are not designated in hedge accounting relationships on our consolidated statements of income in the period in which the change in value occurs. We record the change in fair value of derivatives that are in cash flow hedge accounting relationships, to the extent these relationships are effective, as a separate component of AOCI and reclassify this amount into earnings when the hedged item or forecasted transaction affects earnings. We record the change in fair value of derivatives in fair value hedge relationships each period in earnings along with the change in fair value of the hedged item attributable to the hedged risk.

The determination of whether a derivative qualifies for hedge accounting requires judgment about the application of SFAS 133, as amended by SFAS No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities, an amendment of FASB Statement No. 133," and SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities," collectively referred to as SFAS 133. SFAS 133 requires contemporaneous documentation of our hedge relationships, including identification of the hedged item, the hedging instrument, the nature of the hedged risk and the method used to assess the effectiveness of the hedge relationship.

Derivatives previously designated as cash flow hedges generally have hedged interest-rate risk related to the forecasted issuances of debt. For these hedging relationships to qualify for hedge accounting both at inception and over the life of the derivative, we must estimate the probable future level of certain types of debt issuances. These estimates are based on our expectation of future funding needs and the future mix of debt issuances. Our expectations about future funding are based upon projected growth and historical activity. If these estimates had been lower, a smaller notional amount of the derivatives would have been eligible for designation as cash flow hedges and potentially material amounts that were deferred and reported in AOCI would have been reported as Derivative gains (losses) on our consolidated statements of income in the period in which they occurred. If estimated future fundings do not occur, or are probable of not occurring, potentially material amounts that were deferred and reported in AOCI would be immediately recognized in Derivative gains (losses) on our consolidated statements of income.

We believe that the forecasted issuances of debt previously hedged in cash flow hedging relationships are probable of occurring, therefore we may continue to include previously deferred amounts in AOCI. For a more detailed description of our use of derivatives and summaries of derivative positions, see "CONSOLIDATED RESULTS OF OPERATIONS — Derivative Overview" and "NOTE 12: DERIVATIVES" to our consolidated financial statements.

**Credit Losses**

We maintain a Reserve for losses on mortgage loans held-for-investment to provide for incurred credit losses from our mortgage loan portfolio. We also maintain a Reserve for guarantee losses on Participation Certificates to provide for losses incurred on mortgages underlying PCs or Structured Securities held by third parties that we guarantee. We use the same methodology to determine our Reserve for losses on mortgage loans held-for-investment and our Reserve for guarantee losses on Participation Certificates, as the relevant factors affecting credit risk are the same. The Reserve for losses on mortgage loans held-for-investment and the Reserve for guarantee losses on Participation Certificates are collectively referred to as the loan loss reserves.

To calculate the loan loss reserves for the single-family loan portfolio, we aggregate homogenous loans into pools based on common underlying characteristics, using statistically based models to evaluate relevant factors affecting loan collectibility, and determine the best estimate of loss. To calculate loan loss reserves for the multifamily loan portfolio, we use models, evaluate certain larger loans for impairment, and review repayment prospects and collateral values underlying individual loans.

We regularly evaluate the underlying estimates and models we use when determining the loan loss reserves and update our assumptions to reflect our own historical experience and our current view of overall economic conditions and other relevant factors.

Determining the adequacy of the loan loss reserves is a complex process that is subject to numerous estimates and assumptions requiring judgment. Key estimates and assumptions that impact our loan loss reserves include:

- loss severity trends;
- default experience;
- expected proceeds from credit enhancements;
- collateral valuation; and
- identification and impact assessment of macroeconomic factors.

No single statistic or measurement determines the adequacy of the loan loss reserves. We exercise a significant amount of judgment in selecting the above factors. Changes in one or more of the estimates or assumptions used to calculate the loan loss reserves could have a material impact on the loan loss reserves and provisions for credit losses.

We believe the level of our loan loss reserves is reasonable based on internal reviews of the factors and methodologies used. An independent management group reviews the level of loan loss reserves, as well as the factors and methodologies that give rise to the estimate, and submits the best point estimate for review by senior management. This review process provides consistent implementation and disclosure.

Loan loss reserves associated with Hurricane Katrina in 2005 were established based on preliminary estimates that were higher than current estimates. We have revised these estimates based on additional information about property damage and recoveries. During 2006, our revised estimates of incurred losses related to Hurricane Katrina resulted in a reduction of $82 million in the loan loss reserves originally recorded in 2005 for loans affected by the hurricane.

**Amortization of Cost Basis Adjustments Using the Effective Interest Method**

We recognize interest income on certain mortgage-related and non-mortgage-related investments, using the retrospective effective interest method in accordance with SFAS No. 91, "Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases, an amendment of FASB Statements No. 13, 60, and 65 and a rescission of FASB Statement No. 17," or SFAS 91. Deferred items, including premiums, discounts and other basis adjustments, are amortized into interest income over the estimated lives of the securities using the retrospective effective interest method. SFAS 91 allows estimates of principal prepayments for pools of assets containing similar characteristics where prepayments are probable and the timing and amount of prepayments can be reasonably estimated. Most of our mortgage-related and non-mortgage-related investments meet this requirement. Therefore, we recalculate the constant effective yield at each period end using our current estimate of principal prepayments. Adjustments that result from applying the updated effective yield as if it had been in effect since the acquisition of the securities are recognized through interest income.

For certain other investments in mortgage-related securities classified as available-for-sale, interest income is recognized using the prospective effective interest method in accordance with Emerging Issues Task Force Issue No. 99-20, "Recognition of Interest Income and Impairment on Purchased Beneficial Interests and Beneficial Interests That Continue to Be Held by a Transferor in Securitized Financial Assets," or EITF 99-20. Under this method, changes in the effective yield due to changes in estimated lives are recognized as adjustments to interest income in future periods rather than as

catch up adjustments in the current period. We specifically apply such guidance to beneficial interests (including undivided interests which are similar to beneficial interests) in securitized financial assets that:

- can contractually be prepaid or otherwise settled in such a way that we may not recover substantially all of our recorded investment (such as interest-only securities); or
- were not of high credit quality at the date that we acquired them.

Determination of the effective yield requires significant judgment in estimating expected prepayment behavior, which is inherently uncertain. Estimates of future prepayments are derived from market sources and our internal prepayment models. Judgment is involved in making initial determinations about prepayment expectations and in changing those expectations over time in response to changes in market conditions, such as interest rates and other macroeconomic factors. The effects of future changes in market conditions may be material. We believe that the above assumptions are comparable to those used by other market participants. However, the use of different assumptions in our prepayment models could have resulted in materially different income recognition results. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to our consolidated financial statements for more information on interest income recognition on securities.

**Impairment Recognition on Investments in Securities**

We recognize impairment losses on available-for-sale securities through the income statement when we have concluded that a decrease in the fair value of a security is not temporary. For securities accounted for under EITF 99-20, an impairment loss is recognized when there is both a decline in fair value below the carrying amount and an adverse change in expected cash flows. Determination of whether an adverse change has occurred involves judgment about expected prepayments and credit events. We review securities not accounted for under EITF 99-20 for potential impairment whenever the security's fair value is less than its amortized cost. This review considers a number of factors, including the severity of the decline in fair value, credit ratings, the length of time the investment has been in an unrealized loss position, and the likelihood of sale in the near term. We recognize impairment losses when quantitative and qualitative factors indicate that it is likely that we will not fully recover the unrealized loss. One of the factors we consider is our intent and ability to hold the investment until a point in time at which recovery can be reasonably expected to occur. We apply significant judgment in determining whether impairment loss recognition is appropriate. We believe our judgments are reasonable. However, different judgments could have resulted in materially different impairment loss recognition. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to our consolidated financial statements for more information on impairment recognition on securities.

**Accounting Changes and Recently Issued Accounting Pronouncements**

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" to our consolidated financial statements for more information concerning our accounting policies and recently issued accounting pronouncements, including those that we have not yet adopted, that will likely affect our consolidated financial statements.

## PORTFOLIO BALANCES AND ACTIVITIES

**Total Mortgage Portfolio**

Our Total mortgage portfolio includes the unpaid principal balances of mortgage loans and mortgage-related securities held in our Retained portfolio and the unpaid principal balances of guaranteed PCs and Structured Securities held by third parties. Guaranteed PCs and Structured Securities held by third parties are considered outstanding and are not included on our consolidated balance sheets.

Table 47 provides information about our Total mortgage portfolio at December 31, 2006 and 2005.

**Table 47 — Total Mortgage Portfolio and Total Guaranteed PCs and Structured Securities Issued Based on Unpaid Principal Balances**[(1)(2)]

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2006 | | 2005 | |
| | Amounts | % of Total Mortgage Portfolio | Amounts | % of Total Mortgage Portfolio |
| | (dollars in millions) | | (dollars in millions) | |
| Outstanding Guaranteed PCs and Structured Securities[(3)] | $1,122,761 | 61% | $ 974,200 | 58% |
| Retained portfolio: | | | | |
| PCs and Structured Securities | 354,262 | 19 | 361,324 | 21 |
| Non-Freddie Mac mortgage-related securities | 283,850 | 16 | 287,541 | 17 |
| Mortgage loans | 65,847 | 4 | 61,481 | 4 |
| Total Retained portfolio[(4)] | 703,959 | 39 | 710,346 | 42 |
| Total mortgage portfolio | $1,826,720 | 100% | $1,684,546 | 100% |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) The 2006 amounts exclude the effect of credit-related impairments on mortgage-related securities in our Retained portfolio. The 2005 amounts have been revised to conform with the current year presentation.
(3) Represents Guaranteed PCs and Structured Securities held by third parties.
(4) The Retained portfolio presented in this table differs from the Retained portfolio presented on our consolidated balance sheets because the amounts presented on our consolidated balance sheets include valuation adjustments and deferred balances. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Table 19 — Characteristics of Mortgage Loans and Mortgage-Related Securities in the Retained Portfolio" for a reconciliation of the Retained portfolio amounts shown in this table to the amounts shown under such caption on our consolidated balance sheets.

See "Table 50 — Guaranteed PCs and Structured Securities Issued and Outstanding" for more information concerning outstanding guaranteed PCs and Structured securities. Also see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Table 19 — Characteristics of Mortgage Loans and Mortgage-Related Securities in the Retained Portfolio" for more information concerning the non-Freddie Mac mortgage-related securities in our Retained portfolio.

Table 48 presents the distribution of unsecuritized mortgage loans held in our Retained portfolio.

**Table 48 — Mortgage Loans Held in the Retained Portfolio**[(1)]

| | December 31, | |
| --- | --- | --- |
| | 2006 | 2005 |
| | (in millions) | |
| **Single-family:** | | |
| Conventional | | |
| Fixed-rate | $18,427 | $18,532 |
| Variable-rate | 1,233 | 903 |
| Total conventional | 19,660 | 19,435 |
| FHA/VA — Fixed-rate | 196 | 255 |
| Rural Housing Service and other federally guaranteed loans | 784 | 706 |
| Total single-family | 20,640 | 20,396 |
| **Multifamily:** | | |
| Conventional | | |
| Fixed-rate | 41,863 | 36,961 |
| Variable-rate | 3,341 | 4,121 |
| Total conventional | 45,204 | 41,082 |
| Rural Housing Service | 3 | 3 |
| Total multifamily | 45,207 | 41,085 |
| **Total mortgages** | $65,847 | $61,481 |

(1) Based on unpaid principal balances. Excludes mortgage loans traded, but not yet settled.

Table 49 summarizes purchases into our Total mortgage portfolio.

**Table 49 — Total Mortgage Portfolio Activity Detail[1]**

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2006** | | **2005** | | **2004** | |
| | Amounts | % of Purchase Amounts | Amounts | % of Purchase Amounts | Amounts | % of Purchase Amounts |
| | (dollars in millions) | | | | | |
| **New business purchases:[2]** | | | | | | |
| Single-family mortgage purchases: | | | | | | |
| Conventional: | | | | | | |
| 30-year amortizing fixed-rate[3] | $251,143 | 67% | $272,702 | 67% | $220,867 | 59% |
| 15-year amortizing fixed-rate | 21,556 | 6 | 40,963 | 10 | 72,754 | 19 |
| ARMs/Variable-rate[4] | 18,854 | 5 | 35,677 | 9 | 50,187 | 14 |
| Interest Only[5] | 58,176 | 16 | 26,516 | 7 | 818 | — |
| Option ARMs[6] | — | — | 3,918 | 1 | — | — |
| Balloon/Resets[7] | 419 | — | 1,720 | — | 9,658 | 3 |
| FHA/VA[8] | 946 | — | — | — | 319 | — |
| Rural Housing Service and other federally guaranteed loans | 176 | — | 177 | — | 209 | — |
| *Total single-family* | 351,270 | 94 | 381,673 | 94 | 354,812 | 95 |
| Multifamily: | | | | | | |
| Conventional | 13,031 | 4 | 11,172 | 3 | 12,712 | 3 |
| *Total multifamily* | 13,031 | 4 | 11,172 | 3 | 12,712 | 3 |
| *Total mortgage purchases* | 364,301 | 98 | 392,845 | 97 | 367,524 | 98 |
| **Non-Freddie Mac mortgage-related securities purchased for Structured Securities:** | | | | | | |
| Ginnie Mae Certificates | 48 | — | 37 | — | 85 | — |
| Structured Transactions[9] | 8,592 | 2 | 14,331 | 3 | 7,205 | 2 |
| *Total Non-Freddie Mac mortgage-related securities purchased for Structured Securities* | 8,640 | 2 | 14,368 | 3 | 7,290 | 2 |
| *Total single-family and multifamily mortgage purchases and total non-Freddie Mac mortgage-related securities purchased for Structured Securities* | $372,941 | 100% | $407,213 | 100% | $374,814 | 100% |
| **Non-Freddie Mac mortgage-related securities purchased into the Retained portfolio:** | | | | | | |
| *Agency securities:* | | | | | | |
| *Fannie Mae:* | | | | | | |
| Single-family: | | | | | | |
| Fixed-rate | $ 4,259 | | $ 2,854 | | $ 756 | |
| Variable-rate | 8,014 | | 3,368 | | 3,282 | |
| *Total Fannie Mae* | 12,273 | | 6,222 | | 4,038 | |
| *Ginnie Mae:* | | | | | | |
| Single-family: | | | | | | |
| Fixed-rate | — | | 64 | | — | |
| *Total Ginnie Mae* | — | | 64 | | — | |
| *Total agency mortgage-related securities* | 12,273 | | 6,286 | | 4,038 | |
| **Non-agency securities:** | | | | | | |
| *Single-family* | | | | | | |
| Single-family: | | | | | | |
| Fixed-rate | 718 | | 2,154 | | 1,294 | |
| Variable-rate | 96,906 | | 148,600 | | 101,620 | |
| *Total single-family* | 97,624 | | 150,754 | | 102,914 | |
| *Commercial mortgage-backed securities:* | | | | | | |
| Fixed-rate | 2,534 | | 10,343 | | 8,841 | |
| Variable-rate | 13,432 | | 4,497 | | 2,037 | |
| *Total commercial mortgage-backed securities* | 15,966 | | 14,840 | | 10,878 | |
| *Mortgage revenue bonds:* | | | | | | |
| Single-family: | | | | | | |
| Fixed-rate | 3,062 | | 2,374 | | 1,499 | |
| Variable-rate | — | | 27 | | — | |
| Multifamily: | | | | | | |
| Fixed-rate | 116 | | 434 | | 414 | |
| Variable-rate | — | | 5 | | 31 | |
| *Total mortgage revenue bonds* | 3,178 | | 2,840 | | 1,944 | |
| *Total non-agency mortgage-related securities* | 116,768 | | 168,434 | | 115,736 | |
| *Total non-Freddie Mac mortgage-related securities purchased into the Retained portfolio* | 129,041 | | 174,720 | | 119,774 | |
| **Total new business purchases** | $501,982 | | $581,933 | | $494,588 | |
| Mortgage purchases with credit enhancements | | 17% | | 17% | | 19% |
| Mortgage liquidations[10] | $339,814 | | $384,674 | | $401,029 | |
| Mortgage liquidations rate[10] | | 20% | | 26% | | 28% |
| Freddie Mac securities repurchased into the Retained portfolio: | | | | | | |
| Single-family: | | | | | | |
| Fixed-rate | $ 76,378 | | $106,682 | | $ 72,147 | |
| Variable-rate | 27,146 | | 29,805 | | 23,942 | |
| Multifamily: | | | | | | |
| Variable-rate | — | | — | | 146 | |
| *Total Freddie Mac securities repurchased into the Retained portfolio* | $103,524 | | $136,487 | | $ 96,235 | |

(1) Based on unpaid principal balances. Excludes mortgage loans and mortgage-related securities traded but not yet settled.
(2) 2004 data includes certain mortgage-related securities that have been transferred from the Investments caption to the Retained portfolio caption on our consolidated balance sheets.
(3) Includes 40-year and 20-year fixed-rate mortgages.
(4) Includes ARMs with 1-, 3-, 5-, 7- and 10-year initial fixed-rate periods.
(5) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments.

(6) Includes mortgage loans we purchased that underlie whole-loan REMICs except for $83 million of mortgage loan purchases that collateralize the non-guaranteed portion of whole-loan REMICs.
(7) Mortgages whose terms require lump sum principal payments on contractually determined future dates unless the borrower qualifies for and elects an extension of the maturity date at an adjusted interest rate.
(8) Excludes FHA/VA loans that back Structured Transactions.
(9) Includes $6,908 million, $14,331 million and $5,653 million at December 31, 2006, 2005 and 2004, respectively, of option ARM loans.
(10) Based on total mortgage portfolio. Excludes the effect of sales of non-Freddie Mac mortgage-related securities.

Our new business purchases consist of mortgage loans and non-Freddie Mac mortgage-related securities that are purchased for our Retained portfolio and serve as collateral for our issued PCs and Structured Securities. We generate a significant portion of our mortgage purchase volume through several key mortgage lenders that have entered into unique business arrangements with us. See "BUSINESS — Business Activities — *Credit Guarantee Activities*" for information about these relationships and consequent risks. During 2006 and 2005, we increased purchases of adjustable-rate (*i.e.*, ARMs/Variable-rate and option ARMs) and interest-only mortgage loans and non-Freddie Mac mortgage-related securities because these products generally offered more attractive option-adjusted spreads than fixed-rate products.

**Guaranteed PCs and Structured Securities**

Guaranteed PCs and Structured Securities Issued represent the unpaid principal balances of the mortgage-related securities we issue or otherwise guarantee. Table 50 presents the distribution of underlying mortgage assets for total PCs and Structured Securities issued and outstanding.

**Table 50 — Guaranteed PCs and Structured Securities Issued and Outstanding**

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2006 | | 2005 | |
| | Total Issued PCs and Structured Securities[1] | Outstanding PCs and Structured Securities[2] | Total Issued PCs and Structured Securities[1] | Outstanding PCs and Structured Securities[2] |
| | (in millions) | | | |
| PCs and Structured Securities | | | | |
| Single-family: | | | | |
| Conventional: | | | | |
| 30-year fixed-rate[3] | $ 956,842 | $ 763,563 | $ 810,897 | $614,112 |
| 15-year fixed-rate | 290,314 | 202,747 | 321,176 | 220,225 |
| ARMs/Variable-rate | 169,254 | 116,910 | 131,294 | 88,898 |
| Option ARMs | 2,808 | 303 | 3,830 | 414 |
| Balloons/Resets | 21,551 | 20,508 | 26,321 | 24,973 |
| FHA/VA[4] | 1,398 | 1,267 | 849 | 823 |
| Rural Housing Service and other federally guaranteed loans | 139 | 139 | 154 | 154 |
| Total single-family | 1,442,306 | 1,105,437 | 1,294,521 | 949,599 |
| Multifamily: | | | | |
| Conventional: | | | | |
| Fixed-rate | 3,449 | 3,208 | 10,149 | 9,902 |
| Variable-rate | 4,966 | 4,825 | 4,354 | 4,210 |
| Total multifamily | 8,415 | 8,033 | 14,503 | 14,112 |
| Structured Securities backed by non-Freddie Mac mortgage-related securities: | | | | |
| Ginnie Mae Certificates[5] | 1,510 | 1,481 | 2,021 | 1,900 |
| Structured Transactions[6] | 24,792 | 7,810 | 24,479 | 8,589 |
| Total Structured Securities backed by non-Freddie Mac mortgage-related securities | 26,302 | 9,291 | 26,500 | 10,489 |
| Total | $1,477,023 | $1,122,761 | $1,335,524 | $974,200 |

(1) Based on unpaid principal balances. Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Represents PCs and Structured Securities held by third parties.
(3) Issued balances include $42 million and $— million of 40-year fixed-rate mortgages at December 31, 2006 and 2005, respectively; and $66,779 million and $67,937 million of 20-year fixed-rate mortgages at December 31, 2006 and 2005, respectively.
(4) Excludes FHA and VA loans that are collateral for Structured Transactions.
(5) Represents Ginnie Mae Certificates that are backed by FHA/VA loans.
(6) Represents Structured Securities backed by non-agency securities that include $1,122 million and $1,520 million of fixed-rate, $4,019 million and $3,472 million of ARMs/variable-rate, $2,648 million and $3,566 million of FHA/VA, $9 million and $12 million of the Rural Housing Service and other federally guaranteed loans and $12 million and $19 million of second mortgages, which are mortgage loans that are subordinate to a superior mortgage lien on the property, at December 31, 2006 and 2005, respectively.

*Freddie Mac*

Table 51 provides further detail regarding both issued and outstanding Guaranteed PCs and Structured Securities.

**Table 51 — Single-Class and Multi-Class PCs and Other Structured Securities Based on Unpaid Principal Balances[1]**

| December 31, 2006 | PCs and Structured Securities in Retained Portfolio | PCs and Structured Securities Outstanding (held by third parties) | Total Guaranteed PCs and Structured Securities Issued |
|---|---|---|---|
| | | (in millions) | |
| PCs and Structured Securities: | | | |
| Single-class[2] | $194,057 | $ 624,383 | $ 818,440 |
| Multi-class[3][4] | 160,205 | 491,696 | 651,901 |
| Other[5] | — | 6,682 | 6,682 |
| Total PCs and Structured Securities[6] | $354,262 | $1,122,761 | $1,477,023 |
| **December 31, 2005** | | | |
| PCs and Structured Securities: | | | |
| Single-class[2] | $202,970 | $529,901 | $ 732,871 |
| Multi-class[3][4] | 158,354 | 437,668 | 596,022 |
| Other[5] | — | 6,631 | 6,631 |
| Total PCs and Structured Securities[6] | $361,324 | $974,200 | $1,335,524 |

(1) Excludes Freddie Mac mortgage-related securities traded, but not yet settled.
(2) Includes PCs not backing Structured Securities and single-class Structured Securities backed by PCs and Ginnie Mae Certificates.
(3) Includes that portion of multi-class Structured Securities that are backed by PCs and non-agency mortgage-related securities. Also includes multi-class Structured Securities backed by Ginnie Mae Certificates.
(4) Principal-only strips backed by Freddie Mac mortgage-related Securities held in the Retained portfolio are classified as multi-class for the purpose of this table.
(5) See "NOTE 4: FINANCIAL GUARANTEES" to our consolidated financial statements for a discussion of our guarantees of principal and interest related to these securities.
(6) PCs and Structured Securities Issued exclude $1,240,221 million and $961,777 million at December 31, 2006 and 2005, respectively, of Structured Securities backed by resecuritized PCs and other previously issued Structured Securities. These excluded Structured Securities, which do not increase our credit related exposure, consist of single-class Structured Securities backed by PCs, REMICs, and principal-only strips. The notional balances of interest-only strips are excluded because this table is based on unpaid principal balances. Also excluded are modifiable and combinable REMIC tranches and interest and principal classes, where the holder has the option to exchange the security tranches for other pre-defined security tranches.

Table 52 provides settlement detail for the mortgage-related securities that we issued during the past three years.

**Table 52 — Total Guaranteed PCs and Structured Securities Issued**[1]

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| | | (in millions) | |
| Total Guaranteed PCs and Structured Securities Issuance Detail: | | | |
| Single-family: | | | |
| Conventional:[2] | | | |
| 30-year amortizing fixed-rate[3] | $250,616 | $272,910 | $220,137 |
| 15-year amortizing fixed-rate | 21,542 | 41,037 | 72,358 |
| ARMs/Variable-Rate | 18,819 | 35,666 | 50,226 |
| Interest Only | 58,112 | 26,487 | 818 |
| Option ARMs | — | 3,918 | — |
| Balloon/Resets | 410 | 1,817 | 9,737 |
| FHA/VA | 946 | — | 319 |
| Rural Housing Service and other federally guaranteed loans | 8 | 10 | 48 |
| *Total single-family* | 350,453 | 381,845 | 353,643 |
| Multifamily: | | | |
| Conventional | 930 | 1,654 | 4,175 |
| *Total multifamily* | 930 | 1,654 | 4,175 |
| Non-Freddie Mac mortgage-related securities purchased for Structured Securities: | | | |
| Ginnie Mae Certificates | 48 | 37 | 85 |
| Structured Transactions[4] | 8,592 | 14,331 | 7,205 |
| *Total Non-Freddie Mac mortgage-related securities purchased for Structured Securities* | 8,640 | 14,368 | 7,290 |
| Total Guaranteed PCs and Structured Securities Issued | $360,023 | $397,867 | $365,108 |
| Resecuritization Activity: | | | |
| Multi-class | $169,396 | 208,450 | $215,506 |
| Single-class | 219,493 | 204,984 | 72,686 |
| Total activity | $388,889 | $413,434 | $288,192 |

(1) Based on unpaid principal balances. Excludes Freddie Mac mortgage-related securities traded, but not yet settled.
(2) The single-family product detail in this table does not agree to similar detail in "Table 49 — Total Mortgage Portfolio Activity Detail" due to timing differences associated with mortgage loan purchases into the Retained portfolio and sales from the Retained portfolio. Specifically, we report mortgage loans in Table 49 when we purchase them into the Retained portfolio whereas we report mortgage loans in Table 52 when we sell them from the Retained portfolio to create PCs and Structured Securities.
(3) Includes 40-year and 20-year fixed-rate mortgages.
(4) Represents Structured Securities backed by non-agency securities that are backed by a mixture of prime, FHA/VA and subprime mortgage loans, including $6,908 million, $14,331 million and $5,653 million at December 31, 2006, 2005 and 2004, respectively, of Option ARMs.

*Freddie Mac*

## QUARTERLY SELECTED FINANCIAL DATA

In our opinion, financial data for each quarter and full-year 2006 and 2005 reflects all adjustments, consisting of normal recurring adjustments, necessary for a fair statement of the results of operations for such periods. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Estimates" and "— Changes in Accounting Principles" for more information concerning some of these adjustments.

| | 2006 | | | | |
|---|---|---|---|---|---|
| | 1Q | 2Q | 3Q | 4Q | Full-Year |
| | (in millions, except share-related amounts) | | | | |
| Net interest income | $1,131 | $1,172 | $ 959 | $ 973 | $ 4,235 |
| Non-interest income (loss) | 1,347 | 979 | (868) | (543) | 915 |
| Non-interest expense | (584) | (714) | (827) | (922) | (3,047) |
| Income tax benefit (expense) | 115 | (40) | 21 | 12 | 108 |
| Net income (loss) | $2,009 | $1,397 | $ (715) | $ (480) | $ 2,211 |
| Earnings (loss) per common share: | | | | | |
| Basic[1] | $ 2.81 | $ 1.93 | $(1.17) | $(0.85) | $ 2.84 |
| Diluted[1] | $ 2.80 | $ 1.93 | $(1.17) | $(0.85) | $ 2.84 |

| | 2005 | | | | |
|---|---|---|---|---|---|
| | 1Q | 2Q | 3Q | 4Q | Full-Year |
| | (in millions, except share-related amounts) | | | | |
| Net interest income | $1,501 | $1,269 | $ 1,363 | $1,237 | $ 5,370 |
| Non-interest income (loss) | (292) | (278) | 423 | 346 | 199 |
| Non-interest expense | (940) | (583) | (729) | (761) | (3,013) |
| Income tax benefit (expense) | 16 | (68) | (177) | (138) | (367) |
| Net income before cumulative effect of change in accounting principle | 285 | 340 | 880 | 684 | 2,189 |
| Cumulative effect of change in accounting principle, net of taxes | (59) | — | — | — | (59) |
| Net income | $ 226 | $ 340 | $ 880 | $ 684 | $ 2,130 |
| Earnings per common share before cumulative effect of change in accounting principle: | | | | | |
| Basic[1] | $ 0.34 | $ 0.41 | $ 1.19 | $ 0.90 | $ 2.84 |
| Diluted[1] | $ 0.33 | $ 0.41 | $ 1.19 | $ 0.90 | $ 2.83 |
| Earnings per common share after cumulative effect of change in accounting principle: | | | | | |
| Basic[1] | $ 0.25 | $ 0.41 | $ 1.19 | $ 0.90 | $ 2.76 |
| Diluted[1] | $ 0.25 | $ 0.41 | $ 1.19 | $ 0.90 | $ 2.75 |

(1) Earnings (loss) per share is computed independently for each of the quarters presented. Due to the use of weighted average common shares outstanding when calculating earnings (loss) per share, the sum of the four quarters may not equal the full-year amount. Earnings (loss) per share amounts may not recalculate using the amounts in this table due to rounding.

## RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our voluntary adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with OFHEO that updated these commitments and set forth a process for implementing them. The letters between the company and OFHEO dated September 1, 2005 constituting the written agreement are available on the Investor Relations page of our website at www.freddiemac.com/investors/reports.html#commit. As noted in these letters, disclosures may be affected by situations where current financial statements are not available. The status of our commitments at December 31, 2006 follows:

| Description | Status |
|---|---|
| 1. *Periodic Issuance of Subordinated Debt:*<br>• We will issue Freddie SUBS® securities for public secondary market trading that are rated by no less than two nationally recognized statistical rating organizations.<br>• Freddie SUBS® securities will be issued in an amount such that the sum of Total capital (Core capital plus general allowance for losses) and the outstanding balance of "Qualifying subordinated debt" will equal or exceed the sum of 0.45 percent of outstanding PCs and Structured Securities we guaranteed and 4 percent of total on-balance sheet assets. Qualifying subordinated debt is discounted by one-fifth each year during the instrument's last five years before maturity; when the remaining maturity is less than one year, the instrument is entirely excluded. We will take reasonable steps to maintain outstanding subordinated debt of sufficient size to promote liquidity and reliable market quotes on market values.<br>• Each quarter we will submit to OFHEO calculations of the quantity of qualifying Freddie SUBS® securities and Total capital as part of our quarterly capital report.<br>• Every six months, we will submit to OFHEO a subordinated debt management plan that includes any issuance plans for the six months following the date of the plan. | • Consistent with promoting the liquidity of our securities, in December 2006 we issued approximately $2.0 billion of Freddie SUBS® securities, including approximately $1.5 billion issued in exchange for previously issued Freddie SUBS® securities. In addition, we called approximately $1.0 billion of previously issued Freddie SUBS® securities in August 2006 and issued approximately $1.25 billion of Freddie SUBS® securities in June 2006. We did not issue, call or repurchase any Freddie SUBS® securities during 2005 and 2004. Our ability to issue additional subordinated debt may be limited until we return to regular financial reporting.<br>• All Freddie SUBS® securities issued in 2006 were rated by no less than two nationally recognized statistical rating organizations.<br>• We reported to OFHEO that at December 31, 2006, we had $42.6 billion in Total capital plus qualifying subordinated debt, resulting in a surplus of $5.0 billion. During 2006, we submitted our quarterly Total capital plus qualifying subordinated debt reports to OFHEO.<br>• We have submitted our semi-annual subordinated debt management plans to OFHEO. |
| 2. *Liquidity Management and Contingency Planning:*<br>• We will maintain a contingency plan providing for at least three months' liquidity without relying upon the issuance of unsecured debt. We will also periodically test the contingency plan in consultation with OFHEO. | • We have in place a liquidity contingency plan, upon which we report to OFHEO on a weekly basis. We periodically test this plan in accordance with our agreement with OFHEO. |
| 3. *Interest-Rate Risk Disclosures:*<br>• We will provide public disclosure of our duration gap, PMVS-L and PMVS-YC interest-rate risk sensitivity results on a monthly basis. See "RISK MANAGEMENT — Interest-Rate Risk and Other Market Risks — *Portfolio Market Value Sensitivity and Measurement of Interest-Rate Risk*" for a description of these metrics. | • For the twelve months ended December 31, 2006, our duration gap averaged zero month, PMVS-L averaged 1 percent and PMVS-YC averaged zero percent. Our 2006 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary which is available on our website, www.freddiemac.com/investors/volsum. |

| Description | Status |
|---|---|
| **4. *Credit Risk Disclosures:*** <br> • We will make quarterly assessments of the impact on expected credit losses from an immediate 5 percent decline in single-family home prices for the entire U.S. We will disclose the impact in present value terms and measure our losses both before and after receipt of private mortgage insurance claims and other credit enhancements. | • Our quarterly credit risk sensitivity estimates are as follows: |

| | Before Receipt of Credit Enhancements[1] | | After Receipt of Credit Enhancements[2] | |
|---|---|---|---|---|
| | Net Present Value, or NPV[3] (dollars in millions) | NPV Ratio[4] | Net Present Value, or NPV[3] (dollars in millions) | NPV Ratio[4] |
| As of: | | | | |
| 12/31/06 | $1,128 | 7.6 bps | $770 | 5.2 bps |
| 09/30/06 | $1,071 | 7.4 bps | $724 | 5.0 bps |
| 06/30/06 | $1,018 | 7.2 bps | $686 | 4.9 bps |
| 03/31/06 | $ 915 | 6.6 bps | $598 | 4.3 bps |
| 12/31/05 | $ 873 | 6.5 bps | $564 | 4.2 bps |

(1) Assumes that none of the credit enhancements currently covering our mortgage loans has any mitigating impact on our credit losses.

(2) Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty default rates.

(3) Based on single-family Total mortgage portfolio, excluding Structured Securities backed by Ginnie Mae Certificates.

(4) Calculated as the ratio of net present value of increase in credit losses to the single-family Total mortgage portfolio, defined in footnote (3) above.

| Description | Status |
|---|---|
| **5. *Public Disclosure of Risk Rating:*** <br> • We will seek to obtain a rating, that will be continuously monitored by at least one nationally recognized statistical rating organization, assessing "risk-to-the-government" or independent financial strength. | • At March 1, 2007, our "risk-to-the-government" rating from S&P was "AA—" and Moody's Bank Financial Strength Rating for us was "A—". |

**CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**REPORT OF INDEPENDENT AUDITORS**

To the Board of Directors and Stockholders of Freddie Mac:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, of cash flows, and of stockholders' equity present fairly, in all material respects, the financial position of Freddie Mac, a stockholder-owned government-sponsored enterprise (the "company"), and its subsidiaries at December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

We have also audited in accordance with auditing standards generally accepted in the United States of America the supplemental consolidated fair value balance sheets of the company as of December 31, 2006 and 2005. As described in "NOTE 16: FAIR VALUE DISCLOSURES," the supplemental consolidated fair value balance sheets have been prepared by management to present relevant financial information that is not provided by the historical-cost consolidated balance sheets and is not intended to be a presentation in conformity with generally accepted accounting principles. In addition, the supplemental consolidated fair value balance sheets do not purport to present the net realizable, liquidation, or market value of the company as a whole. Furthermore, amounts ultimately realized by the company from the disposal of assets or amounts required to settle obligations may vary significantly from the fair values presented. In our opinion, the supplemental consolidated fair value balance sheets referred to above present fairly, in all material respects, the information set forth therein as described in "NOTE 16: FAIR VALUE DISCLOSURES."

As discussed in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," the company changed its method of accounting for defined benefit plans as of December 31, 2006, its method of accounting for interest expense related to callable debt instruments as of January 1, 2005, and its method for determining gains and losses on sales of certain guaranteed securities as of October 1, 2005.

*PricewaterhouseCoopers LLP*

McLean, Virginia
March 20, 2007

## FREDDIE MAC
## CONSOLIDATED STATEMENTS OF INCOME

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| | (dollars in millions, except share-related amounts) | | |
| **Interest income** | | | |
| Mortgage loans | $ 4,152 | $ 4,037 | $ 4,007 |
| Mortgage-related securities in the Retained portfolio | 34,673 | 29,684 | 28,460 |
| Cash and investments | 4,262 | 2,606 | 3,136 |
| Total interest income | 43,087 | 36,327 | 35,603 |
| **Interest expense** | | | |
| Short-term debt | (8,665) | (6,102) | (2,908) |
| Long-term debt | (28,218) | (23,246) | (22,950) |
| Total interest expense on debt securities | (36,883) | (29,348) | (25,858) |
| Due to Participation Certificate investors | (387) | (551) | (708) |
| Total interest expense | (37,270) | (29,899) | (26,566) |
| Income (expense) related to derivatives | (1,582) | (1,058) | 100 |
| *Net interest income* | 4,235 | 5,370 | 9,137 |
| **Non-interest income (loss)** | | | |
| Management and guarantee income (includes interest on Guarantee asset of $466, $371 and $257) | 1,672 | 1,450 | 1,382 |
| Gains (losses) on Guarantee asset | (800) | (1,064) | (1,135) |
| Income on Guarantee obligation | 867 | 920 | 732 |
| Derivative gains (losses) | (1,164) | (1,357) | (4,475) |
| Hedge accounting gains (losses) | 2 | 22 | 743 |
| Gains (losses) on investment activity | (474) | (127) | (348) |
| Gains (losses) on debt retirement | 466 | 206 | (327) |
| Resecuritization fees | 129 | 125 | 159 |
| Other income | 217 | 24 | 230 |
| *Non-interest income (loss)* | 915 | 199 | (3,039) |
| **Non-interest expense** | | | |
| Salaries and employee benefits | (830) | (805) | (758) |
| Professional services | (460) | (386) | (588) |
| Occupancy expense | (61) | (58) | (60) |
| Other administrative expenses | (290) | (286) | (144) |
| Total administrative expenses | (1,641) | (1,535) | (1,550) |
| Provision for credit losses | (215) | (251) | (143) |
| Real estate owned, or REO, operations income (expense) | (60) | (40) | 3 |
| Losses on certain credit guarantees | (476) | (234) | (33) |
| Housing tax credit partnerships | (407) | (320) | (281) |
| Minority interests in earnings of consolidated subsidiaries | (58) | (96) | (129) |
| Other expenses | (190) | (537) | (238) |
| *Non-interest expense* | (3,047) | (3,013) | (2,371) |
| Income before income tax expense and cumulative effect of change in accounting principle | 2,103 | 2,556 | 3,727 |
| Income tax benefit (expense) | 108 | (367) | (790) |
| Net income before cumulative effect of change in accounting principle | 2,211 | 2,189 | 2,937 |
| Cumulative effect of change in accounting principle, net of tax benefit of $32 | — | (59) | — |
| *Net income* | $ 2,211 | $ 2,130 | $ 2,937 |
| Preferred stock dividends | (270) | (223) | (210) |
| Amount allocated to participating stock option holders | (5) | — | — |
| *Net income available to common stockholders* | $ 1,936 | $ 1,907 | $ 2,727 |
| **Basic earnings per common share:** | | | |
| Earnings before cumulative effect of change in accounting principle | $ 2.84 | $ 2.84 | $ 3.96 |
| Cumulative effect of change in accounting principle, net of taxes | $ — | $ (0.09) | $ — |
| Basic earnings per common share | $ 2.84 | $ 2.76 | $ 3.96 |
| **Diluted earnings per common share:** | | | |
| Earnings before cumulative effect of change in accounting principle | $ 2.84 | $ 2.83 | $ 3.94 |
| Cumulative effect of change in accounting principle, net of taxes | $ — | $ (0.08) | $ — |
| Diluted earnings per common share | $ 2.84 | $ 2.75 | $ 3.94 |
| **Weighted average common shares outstanding (in thousands)** | | | |
| Basic | 680,856 | 691,582 | 689,282 |
| Diluted | 682,664 | 693,511 | 691,521 |
| Dividends per common share | $ 1.91 | $ 1.52 | $ 1.20 |

*The accompanying notes are an integral part of these financial statements.*

# FREDDIE MAC
## CONSOLIDATED BALANCE SHEETS

| | December 31, | |
|---|---|---|
| | **2006** | **2005** |
| | (in millions, except share-related amounts) | |

**Assets**

*Retained portfolio*

Mortgage loans:

| | | |
|---|---|---|
| Held-for-investment, at amortized cost | $ 63,780 | $ 60,009 |
| Reserve for losses on mortgage loans held-for-investment | (70) | (119) |
| Held-for-sale, at lower-of-cost-or-market | 1,908 | 1,538 |
| Mortgage loans, net of reserve | 65,618 | 61,428 |

Mortgage-related securities:

| | | |
|---|---|---|
| Available-for-sale, at fair value (includes $20,463 and $168, respectively, pledged as collateral that may be repledged) | 626,731 | 638,465 |
| Trading, at fair value | 7,597 | 8,894 |
| Participation Certificate residuals, at fair value | 597 | 597 |
| Total mortgage-related securities | 634,925 | 647,956 |
| *Retained portfolio* | 700,543 | 709,384 |

*Cash and investments*

| | | |
|---|---|---|
| Cash and cash equivalents | 11,359 | 10,468 |

Investments:

Non-mortgage-related securities:

| | | |
|---|---|---|
| Available-for-sale, at fair value | 45,586 | 42,165 |
| Securities purchased under agreements to resell and Federal funds sold | 23,028 | 15,159 |
| *Cash and investments* | 79,973 | 67,792 |

| | | |
|---|---|---|
| Accounts and other receivables, net | 7,461 | 6,373 |
| Derivative assets, at fair value | 7,908 | 7,097 |
| Guarantee asset, at fair value | 6,070 | 5,083 |
| Real estate owned, net | 743 | 629 |
| Other assets | 10,383 | 9,864 |
| *Total assets* | $813,081 | $806,222 |

**Liabilities and stockholders' equity**

*Debt securities, net*

Senior debt:

| | | |
|---|---|---|
| Due within one year | $294,861 | $288,532 |
| Due after one year | 452,677 | 454,627 |
| Subordinated debt, due after one year | 6,400 | 5,633 |
| *Total debt securities, net* | 753,938 | 748,792 |

| | | |
|---|---|---|
| Due to Participation Certificate investors | 11,123 | 10,607 |
| Accrued interest payable | 8,345 | 7,611 |
| Guarantee obligation | 7,117 | 5,541 |
| Derivative liabilities, at fair value | 179 | 590 |
| Reserve for guarantee losses on Participation Certificates | 350 | 295 |
| Other liabilities | 3,212 | 4,646 |
| *Total liabilities* | 784,264 | 778,082 |

Commitments and contingencies (Notes 1, 3, 4, 13 and 14)

| | | |
|---|---|---|
| *Minority interests in consolidated subsidiaries* | 516 | 949 |

*Stockholders' equity*

| | | |
|---|---|---|
| Preferred stock, at redemption value | 6,109 | 4,609 |
| Common stock, $0.21 par value, 726,000,000 shares authorized, 725,863,886 shares and 725,882,280 shares issued, respectively, and 661,254,178 shares and 692,717,422 shares outstanding, respectively | 152 | 152 |
| Additional paid-in capital | 962 | 924 |
| Retained earnings | 32,177 | 31,559 |

Accumulated other comprehensive income (loss), or AOCI, net of taxes, related to:

| | | |
|---|---|---|
| Available-for-sale securities | (2,749) | (2,485) |
| Cash flow hedge relationships | (5,033) | (6,287) |
| Defined benefit plans | (87) | (1) |
| Total AOCI, net of taxes | (7,869) | (8,773) |
| Treasury stock, at cost, 64,609,708 shares and 33,164,858 shares, respectively | (3,230) | (1,280) |
| *Total stockholders' equity* | 28,301 | 27,191 |
| *Total liabilities and stockholders' equity* | $813,081 | $806,222 |

*The accompanying notes are an integral part of these financial statements.*

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2006 | | 2005 | | 2004 | |
| | Shares | Amount | Shares | Amount | Shares | Amount |
| | | | | (in millions) | | |
| *Preferred stock, at redemption value* | | | | | | |
| Balance, beginning of year | 92 | $ 4,609 | 92 | $ 4,609 | 92 | $ 4,609 |
| Preferred stock issuances | 40 | 1,500 | — | — | — | — |
| *Preferred stock, end of year* | 132 | 6,109 | 92 | 4,609 | 92 | 4,609 |
| *Common stock, par value* | | | | | | |
| Balance, beginning of year | 726 | 152 | 726 | 152 | 726 | 152 |
| *Common stock, end of year* | 726 | 152 | 726 | 152 | 726 | 152 |
| *Additional paid-in capital* | | | | | | |
| Balance, beginning of year | | 924 | | 873 | | 814 |
| Stock-based compensation | | 60 | | 67 | | 56 |
| Income tax benefit from employee stock option exercises | | 9 | | 6 | | 20 |
| Preferred stock issuance costs | | (15) | | — | | — |
| Common stock issuances | | (15) | | (13) | | (17) |
| Real Estate Investment Trust, or REIT, preferred stock repurchase | | (1) | | (9) | | — |
| *Additional paid-in capital, end of year* | | 962 | | 924 | | 873 |
| *Retained earnings* | | | | | | |
| Balance, beginning of year | | 31,559 | | 30,728 | | 28,837 |
| Cumulative effect of change in accounting principle, net of taxes | | (13) | | — | | — |
| Balance, beginning of year, as adjusted | | 31,546 | | 30,728 | | 28,837 |
| Net income | | 2,211 | | 2,130 | | 2,937 |
| Preferred stock dividends declared | | (270) | | (223) | | (210) |
| Common stock dividends declared | | (1,310) | | (1,076) | | (836) |
| *Retained earnings, end of year* | | 32,177 | | 31,559 | | 30,728 |
| *AOCI, net of taxes* | | | | | | |
| Balance, beginning of year | | (8,773) | | (3,593) | | (1,498) |
| Changes in unrealized gains (losses) related to available-for-sale securities, net of reclassification adjustments | | (264) | | (6,824) | | (2,010) |
| Changes in unrealized gains (losses) related to cash flow hedge relationships, net of reclassification adjustments | | 1,254 | | 1,637 | | (87) |
| Changes in minimum pension liability | | (2) | | 7 | | 2 |
| Changes in other comprehensive income, net of taxes, net of reclassification adjustments | | 988 | | (5,180) | | (2,095) |
| Adjustment to initially apply Statement of Financial Accounting Standard, or SFAS, No. 158, net of tax | | (84) | | — | | — |
| *AOCI, net of taxes, end of year* | | (7,869) | | (8,773) | | (3,593) |
| *Treasury stock, at cost* | | | | | | |
| Balance, beginning of year | 33 | (1,280) | 35 | (1,353) | 37 | (1,427) |
| Common stock issuances | (1) | 50 | (2) | 73 | (2) | 74 |
| Common stock repurchases | 33 | (2,000) | — | — | — | — |
| *Treasury stock, end of year* | 65 | (3,230) | 33 | (1,280) | 35 | (1,353) |
| *Total stockholders' equity* | | $28,301 | | $27,191 | | $31,416 |
| *Comprehensive income (loss)* | | | | | | |
| Net income | | $ 2,211 | | $ 2,130 | | $ 2,937 |
| Changes in other comprehensive income, net of taxes, net of reclassification adjustments | | 988 | | (5,180) | | (2,095) |
| *Total comprehensive income (loss)* | | $ 3,199 | | $(3,050) | | $   842 |

*The accompanying notes are an integral part of these financial statements.*

# FREDDIE MAC
## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (in millions) | | |
| **Cash flows from operating activities** | | | |
| Net income | $ 2,211 | $ 2,130 | $ 2,937 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Cumulative effect of change in accounting principle, net | — | 59 | — |
| Hedge accounting gains | (2) | (22) | (743) |
| Unrealized losses (gains) on derivatives not in hedge accounting relationships, net | 1,253 | 1,014 | 2,758 |
| Asset related amortization — premiums, discounts and hedging basis adjustments | 26 | 791 | 1,302 |
| Debt related amortization — premiums and discounts on certain debt securities and hedging basis adjustments | 11,176 | 9,129 | 5,748 |
| Net discounts paid on retirements of debt | (7,430) | (5,207) | (3,085) |
| (Gains) losses on debt retirement | (466) | (206) | 327 |
| Provision for credit losses | 215 | 260 | 143 |
| Housing tax credit partnership losses | 407 | 320 | 281 |
| Losses on investment activity | 494 | 343 | 738 |
| Decrease in deferred income taxes | (1,074) | (1,452) | (346) |
| Purchases of held-for-sale mortgages | (18,352) | (26,763) | (31,698) |
| Sales of held-for-sale mortgages | 18,722 | 23,662 | 30,965 |
| Repayments of held-for-sale mortgages | 104 | 118 | 162 |
| Net proceeds of trading securities | 1,085 | 2,598 | 38,672 |
| Change in accounts and other receivables, net | (1,040) | 661 | 1,870 |
| Change in amounts due to Participation Certificate investors, net | 434 | (3,077) | 529 |
| Change in accrued interest payable | 734 | 282 | (235) |
| Change in income taxes payable | (282) | 607 | 773 |
| Change in Guarantee asset | (987) | (567) | (830) |
| Change in Guarantee obligation | 1,540 | 1,413 | 1,173 |
| Change in Participation Certificate residuals, at fair value | 6 | 112 | (170) |
| Other, net | 446 | 42 | (19) |
| Net cash provided by operating activities | 9,220 | 6,247 | 51,252 |
| **Cash flows from investing activities** | | | |
| Purchases of available-for-sale securities | (386,394) | (414,063) | (276,573) |
| Proceeds from sales of available-for-sale securities | 86,745 | 94,961 | 85,583 |
| Proceeds from maturities of available-for-sale securities | 305,317 | 249,857 | 176,432 |
| Purchases of held-for-investment mortgages | (15,410) | (12,826) | (12,270) |
| Repayments of held-for-investment mortgages | 10,466 | 11,897 | 11,256 |
| Proceeds from sales of REO | 1,212 | 1,380 | 1,552 |
| Net (increase) decrease in securities purchased under agreements to resell and Federal funds sold | (7,869) | 17,038 | (11,615) |
| Derivative premiums and terminations, net | (97) | 932 | (193) |
| Investments in housing tax credit partnerships | (161) | (127) | (69) |
| Net cash used for investing activities | (6,191) | (50,951) | (25,897) |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of short-term debt | 750,201 | 857,361 | 826,020 |
| Repayments of short-term debt | (766,598) | (862,176) | (841,638) |
| Proceeds from issuance of long-term debt | 177,361 | 153,504 | 187,779 |
| Repayments of long-term debt | (159,204) | (125,959) | (183,541) |
| Repayments of minority interest in consolidated subsidiaries | (469) | (436) | (405) |
| Repurchase of REIT preferred stock | (27) | (142) | — |
| Proceeds from the issuance of preferred stock | 1,485 | — | — |
| Proceeds from issuance of common stock | 35 | 60 | 57 |
| Repurchases of common stock | (2,000) | — | — |
| Payment of cash dividends on preferred stock and common stock | (1,580) | (1,299) | (1,046) |
| Tax benefit from the exercise of stock-based awards | 4 | — | — |
| Payments of housing tax credit partnerships notes payable | (1,382) | (940) | (498) |
| Increase (decrease) in cash overdraft | 36 | (54) | 28 |
| Net cash (used for) provided by financing activities | (2,138) | 19,919 | (13,244) |
| Net increase (decrease) in cash and cash equivalents | 891 | (24,785) | 12,111 |
| Cash and cash equivalents at beginning of year | 10,468 | 35,253 | 23,142 |
| Cash and cash equivalents at end of year | $ 11,359 | $ 10,468 | $ 35,253 |
| **Supplemental cash flow information** | | | |
| Cash paid (received) for: | | | |
| Interest | $ 34,399 | $ 26,797 | $ 23,902 |
| Derivative interest carry, net | 325 | (590) | 325 |
| Income taxes | 1,250 | 1,212 | 363 |
| Non-cash investing and financing activities: | | | |
| Held-for-sale mortgages securitized and retained as available-for-sale securities | 13 | 175 | 272 |
| Transfers from mortgage loans to REO | 1,603 | 1,517 | 1,733 |
| Investments in housing tax credit partnerships financed by notes payable | 324 | 1,095 | 1,184 |
| Transfers from held-for-sale mortgages to held-for-investment mortgages | 123 | 291 | 198 |
| Transfers from held-for-investment mortgages to held-for-sale mortgages | 950 | — | — |
| Transfers from Retained portfolio PCs to held-for-investment mortgages | 1,316 | 1,372 | 1,716 |

*The accompanying notes are an integral part of these financial statements.*

*Freddie Mac*

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

We are a stockholder-owned government-sponsored enterprise, or GSE, established by Congress in 1970 to provide a continuous flow of funds for residential mortgages. Our obligations are ours alone and are not insured or guaranteed by the U.S. government, or any other agency or instrumentality of the U.S. We play a fundamental role in the U.S. housing finance system, linking the domestic mortgage market and the global capital markets. Our participation in the secondary mortgage market includes providing our credit guarantee for residential mortgages originated by mortgage lenders and investing in mortgage loans and mortgage-related securities that we hold in our Retained portfolio. Through our credit guarantee activities, we securitize mortgage loans by issuing Mortgage Participation Certificates, or PCs, to third-party investors. We also resecuritize mortgage-related securities that are issued by us or the Government National Mortgage Association, or Ginnie Mae, as well as non-agency entities. We also guarantee multifamily mortgage loans that support housing revenue bonds issued by third parties and we guarantee other mortgage loans held by third parties. Securitized mortgage-related assets that back PCs and Structured Securities that are held by third parties are not reflected as our assets. In return for providing our guarantee on issued PCs and Structured Securities, we may earn a management and guarantee fee that is paid to us over the life of the related PCs and Structured Securities. Our obligation to guarantee the payment of principal and interest on issued PCs and Structured Securities usually results in the recognition of a Guarantee asset and Guarantee obligation.

Our financial reporting and accounting policies conform to U.S. generally accepted accounting principles, or GAAP. Certain amounts in prior periods have been reclassified to conform to the current presentation. We evaluate the materiality of identified errors in the financial statements using both an income statement, or "rollover," and a balance sheet, or "iron-curtain," approach, based on relevant quantitative and qualitative factors. Our approach is consistent with the Securities and Exchange Commission's Staff Accounting Bulletin No. 108, "Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements," or SAB 108, which is effective for the year ended December 31, 2006.

**Estimates**

The preparation of financial statements requires us to make estimates and assumptions that affect (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period. Actual results could differ from those estimates.

Our estimates and judgments include the following:

- estimating fair value for financial instruments (See "NOTE 16: FAIR VALUE DISCLOSURES" for a discussion of our fair value estimates);
- determining the expected future cash flows (including the timing and amounts of prepayments) of mortgage-related assets in the Retained portfolio for the purpose of amortizing deferred amounts and assessing when securities are other-than-temporarily impaired;
- assessing the reserves for credit losses on mortgage loans and guarantee losses on PCs;
- assessing our legal and tax contingencies;
- estimating the expected timing and amounts of future issuances of non-callable debt; and
- determining other matters that affect the reported amounts and disclosure of contingencies in the financial statements.

Net income for 2006 was increased by approximately $8 million (after-tax), or $0.01 per diluted common share, due primarily to changes in estimates related to the amortization of discounts, premiums and deferred fees for assets held in the Retained portfolio and enhancements to our approach for certain valuations including the Guarantee asset and Guarantee obligation.

Effective January 1, 2006, we enhanced our process for forecasting interest rates and estimating prepayments used to amortize discounts, premiums and deferred fees for assets held in the Retained portfolio. This change resulted in a $49 million (after-tax) reduction in Net income for 2006, including the effect of the amortization of deferred credit fees.

Also, effective January 1, 2006, we enhanced our approach for Guarantee asset and Guarantee obligation valuations primarily with respect to applying dealer prices in estimating the fair value of our guarantee-related assets. We also enhanced our approach for applying loan characteristics in the valuation of our Guarantee obligation. These changes resulted in a $57 million (after-tax) increase in Net income for 2006.

In 2005, Net income was reduced by approximately $206 million (after-tax), or $0.30 per diluted common share, related to the implementation of enhancements to our approach for Guarantee asset and Guarantee obligation valuations, the

estimation of reserves for uncollectible interest, and models used to estimate prepayment behavior of mortgage assets, all of which were recorded as changes in accounting estimates.

In 2004, Net income was decreased by approximately $56 million (after-tax), or $0.08 per diluted common share, as the result of a change in estimate related to enhancements to certain assumptions and calculations in the amortization process for deferred fees recorded as basis adjustments on assets in our Retained portfolio.

Table 1.1 shows the pre-tax impact of the changes in estimates in our consolidated statements of income:

**Table 1.1 — Summary of Change in Estimates (Pre-Tax)**

| | Year ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | | (in millions) | |
| Interest income | $(93) | $(166) | $(86) |
| *Non-interest income (loss)* | | | |
| Management and guarantee income | 18 | (17) | — |
| Gains (losses) on Guarantee asset | 40 | (27) | — |
| Gains (losses) on investment activity | 47 | (78) | — |
| Other income | — | (27) | — |
| Total Non-interest income (loss) | 105 | (149) | — |
| Total pre-tax impact of changes in estimates | $ 12 | $(315) | $(86) |

## Changes in Accounting Principles

At December 31, 2006, we adopted Statement of Financial Accounting Standards, or SFAS, No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106, and 132(R)," or SFAS 158, which requires the recognition of our pension and other postretirement plans' overfunded or underfunded status in the statement of financial position beginning December 31, 2006. See "Recently Adopted Accounting Standards" for additional information. Table 1.2 summarizes the incremental effect of applying SFAS 158 on individual line items on our consolidated balance sheets.

**Table 1.2 — Change in Accounting for Defined Benefit Plans — Impact on Financial Statements**

| | December 31, 2006 | | |
|---|---|---|---|
| | Prior to Adoption of SFAS 158 | Effect of Adopting SFAS 158 | As Reported |
| | | (in millions) | |
| Consolidated Balance Sheet Line Items[1] | | | |
| Assets: | | | |
| Other assets | $ 10,432 | $(49) | $ 10,383 |
| Total assets | 813,130 | (49) | 813,081 |
| Liabilities and stockholders' equity: | | | |
| Other liabilities | 3,177 | 35 | 3,212 |
| AOCI, net of taxes: | | | |
| Defined benefit plans | (3) | (84) | (87) |
| Total liabilities and stockholders' equity | 813,130 | (49) | 813,081 |

(1) Allocation between Other assets and Other liabilities on our consolidated balance sheets depends upon whether the defined benefit plans are either overfunded (impacting Other assets) or underfunded (impacting Other liabilities). Included in the Other assets line on our consolidated balance sheets is a Deferred tax asset of $45 million based on the amount reclassified into AOCI, net of taxes at December 31, 2006.

Effective January 1, 2006, we made a change to our method of amortization for certain types of non-agency securities resulting in a $13 million (after-tax) reduction to the opening balance of retained earnings.

Effective January 1, 2005, we changed our method of accounting for interest expense related to callable debt instruments to recognize interest expense using an effective interest method over the contractual life of the debt. For periods prior to 2005, we amortized premiums, discounts, deferred issuance costs and other basis adjustments into interest expense using an effective interest method over the estimated life of the debt. We implemented this change in accounting method to facilitate improved financial reporting, particularly to promote the comparability of our financial reporting with that of our primary competitor. The change in accounting method also reduced the operational complexity associated with determining the estimated life of callable debt. The cumulative effect of this change was a $59 million (after-tax) reduction in net income for 2005.

Table 1.3 summarizes the pro forma net income and related basic and diluted earnings per common share, had the amortization of premiums, discounts, deferred issuance costs and other basis adjustments related to callable debt based on the contractual maturity been in effect for the year ended December 31, 2004.

**Table 1.3 — Pro Forma Information — Change in Accounting for Interest Expense Related to Callable Debt**

| | Year Ended December 31, 2004 |
|---|---|
| | (in millions, except share-related amounts) |
| As reported: | |
| Net income | $2,937 |
| Basic earnings per common share | $ 3.96 |
| Diluted earnings per common share | $ 3.94 |
| Pro forma: | |
| Net income | $2,910 |
| Basic earnings per common share | $ 3.92 |
| Diluted earnings per common share | $ 3.90 |

Beginning October 1, 2005, we changed our method for determining gains and losses upon the resale of PCs and Structured Securities related to deferred items recognized in connection with our guarantee of those securities. This change in accounting principle was facilitated by system changes that now allow us to apply and track these deferred items relative to the specific portions of the purchased PCs and Structured Securities. The lack of certain historical data precluded us from calculating the cumulative effect of the change. We were not able to determine the pro forma effects of applying the new method retroactively. See "NOTE 2: TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS" for additional information.

**Consolidation and Equity Method of Accounting**

The consolidated financial statements include our accounts and those of our subsidiaries. All material intercompany transactions have been eliminated in consolidation. For each entity with which we are involved, we determine whether the entity should be considered our subsidiary and included in our consolidated financial statements. We consolidate (a) all variable interest entities, or VIEs, in which we are the primary beneficiary and (b) entities in which we hold more than 50 percent of the voting rights or have the ability to exercise control over the entity.

We are considered the primary beneficiary and must consolidate a VIE when we absorb a majority of expected losses or expected residual returns, or both. In addition to the VIEs that are consolidated, we have significant variable interest in certain other VIEs that are not consolidated because we are not the primary beneficiary. See "NOTE 3: VARIABLE INTEREST ENTITIES" for more information.

We consolidate entities when we hold more than 50 percent of the voting rights or have the ability to exercise control over the entity. Accordingly, we consolidate our two majority-owned REITs, Home Ownership Funding Corporation and Home Ownership Funding Corporation II. The equity and net earnings attributable to the minority shareholder interests in our consolidated subsidiaries are reported separately on our consolidated balance sheets as Minority interests in consolidated subsidiaries and in the consolidated statements of income as Minority interests in earnings of consolidated subsidiaries.

We use the equity method of accounting for VIEs when we are not the primary beneficiary and for entities that are not VIEs over which we have the ability to exercise significant influence, but not control. Under the equity method of accounting, we report our recorded investment as part of Other assets on our consolidated balance sheets and recognize our share of the entity's net income or losses in the consolidated statements of income as Non-interest income/expense, with an offset to the recorded investment on our consolidated balance sheets. Losses are recognized up to the amount of investment recorded.

We regularly invest as a limited partner in qualified low-income housing tax credit, or LIHTC, partnerships that are eligible for federal tax credits. Most of these are VIEs. We are the primary beneficiary and consolidate certain of these partnerships as described further in "NOTE 3: VARIABLE INTEREST ENTITIES." Our recorded investment in those partnerships that are not consolidated is accounted for under the equity method and reported as part of Other assets on our consolidated balance sheets. Our share of partnership income or loss is reported in our consolidated statements of income as Non-interest expense — Housing tax credit partnerships. Our obligations to make delayed equity contributions that are unconditional and legally binding are recorded at their present value in Other liabilities on the consolidated balance sheets. To the extent our cost basis in qualified LIHTC partnerships differs from the book basis reflected at the partnership level, the difference is amortized over the life of the tax credits and included in our share of earnings (losses) from housing tax credit partnerships. We periodically review these investments for impairment and adjust them to fair value when a decline in market value below the recorded investment is deemed to be other-than-temporary. Impairment losses are included in our consolidated statements of income as part of Non-interest expense — Housing tax credit partnerships.

**Cash and Cash Equivalents and Statements of Cash Flows**

Highly liquid investment securities that have an original maturity of three months or less and are used for cash management purposes are accounted for as cash equivalents. In addition, cash collateral we obtained from counterparties to

derivative contracts where we are in a net unrealized gain position is recorded as Cash and cash equivalents. The vast majority of the Cash and cash equivalents balance is interest-bearing in nature.

In the consolidated statements of cash flows, cash flows related to the acquisition and termination of derivatives other than forward commitments are generally classified in investing activities, without regard to whether the derivatives are designated as a hedge of another item. Cash flows from commitments accounted for as derivatives that result in the acquisition or sale of mortgage securities or mortgage loans are classified in either: (a) operating activities for trading securities or mortgage loans classified as held-for-sale, or (b) investing activities for available-for-sale securities or mortgage loans classified as held-for-investment. Cash flows related to mortgage loans classified as held-for-sale are classified in operating activities until the loans have been securitized and retained as available-for-sale PCs, at which time the cash flows are classified as investing activities. Cash flows related to guarantee fees, including buy-up and buy-down payments, are classified as operating activities, along with the cash flows related to the collection and distribution of payments on the mortgage loans underlying PCs. Buy-up and buy-down payments are discussed further below in "Swap-Based Issuances of PCs and Structured Securities."

**Transfers of PCs and Structured Securities that Qualify as Sales**

Upon completion of a transfer of a financial asset that qualifies as a sale under SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities, a replacement of FASB Statement No. 125," or SFAS 140, we de-recognize all assets sold and recognize all assets obtained and liabilities incurred. Upon sale, we recognize the fair value of our obligation to guarantee the payment of principal and interest of PCs and Structured Securities transferred in sale transactions. The portion of such obligation that relates to our non-contingent obligation to stand ready to perform under our guarantee is recognized as a Guarantee obligation, while the portion of the obligation that relates to estimated incurred losses on securitized assets is recognized for consolidated balance sheet purposes as Reserve for guarantee losses on Participation Certificates. The resulting gain (loss) on sale of transferred PCs and Structured Securities is reflected in our consolidated statements of income as a component of Gains (losses) on investment activity.

In recording a sales transaction, we also continue to carry on our consolidated balance sheets any retained interests in securitized financial assets. Such retained interests include our right to receive management and guarantee fees on PCs or Structured Securities, which is classified on our consolidated balance sheets as a Guarantee asset. The carrying amount of all such retained interests is determined by allocating the previous carrying amount of the transferred assets between assets sold and the retained interests based upon their relative fair values at the date of transfer. Other retained interests include PCs or Structured Securities that are not transferred to third parties upon the completion of a securitization or resecuritization transaction.

**Swap-Based Issuances of PCs and Structured Securities**

We issue PCs and Structured Securities through cash-based sales transactions and through various swap-based exchanges. In the case of PC-based swaps, we issue such securities to third parties through Guarantor and MultiLender Swap transactions. Guarantor Swaps are transactions in which financial institutions transfer mortgage loans to us in exchange for PCs we issue that are backed by such mortgage loans. MultiLender Swaps are similar to Guarantor Swaps, except that formed pools include loans that are contributed by more than one other party or by us. In Guarantor and MultiLender Swaps, as in sales transactions, in return for providing our guarantee, we earn a guarantee fee that is paid to us over the life of an issued PC. It is also common for buy-up or buy-down payments to be exchanged between our counterparties and us upon the issuance of a PC. Buy-ups are upfront payments made by us that increase the guarantee fee we will receive over the life of the PC. Buy-downs are upfront payments that are made to us that decrease (*i.e.*, partially prepay) the guarantee fee we will receive over the life of the PC. We may also receive upfront, cash-based payments as additional compensation for our guarantee of mortgage loans, referred to as credit fees. As additional consideration received on swap-based exchanges, we may receive various types of seller-provided credit enhancements related to the underlying mortgage loans. We also issue and transfer Structured Securities to third parties in exchange for PCs and non-Freddie Mac mortgage-related securities.

We recognize the fair value of our contractual right to receive guarantee fees as a Guarantee asset at the inception of an executed guarantee. Additionally, at inception of an executed guarantee, we recognize a Guarantee obligation at the greater of (a) fair value or (b) the contingent liability amount required by SFAS No. 5, "Accounting for Contingencies," or SFAS 5. Similar to transfers of PCs and Structured Securities that qualify as sales, that portion of our estimated guarantee liability that relates to our non-contingent obligation to stand ready to perform under a PC guarantee is recognized as Guarantee obligation, while that portion of such estimated guarantee liability that relates to our contingent obligation to make payments under our guarantee is recognized on our consolidated balance sheets as Reserve for guarantee losses on Participation Certificates. Credit enhancements received in connection with Guarantor Swaps and other similar exchange transactions of PCs are measured at fair value and recognized as follows: (a) pool insurance is recognized as an Other asset; (b) recourse and/or indemnifications that are provided by counterparties to Guarantor Swap transactions are recognized as

Other assets; and (c) primary mortgage insurance is recognized at inception as a component of the recognized Guarantee obligation.

Because Guarantee asset, Guarantee obligation and credit enhancement-related assets that are recognized at the inception of an executed Guarantor Swap are valued independently of each other, net differences between these recognized assets and liabilities may exist at inception. If the amount of the Guarantee asset plus the credit enhancement-related assets is greater than the total amount of the Guarantee obligation, the difference between such amounts is deferred on our consolidated balance sheets as a component of Guarantee obligation and referred to as deferred guarantee income. If the amount of the Guarantee asset and the credit enhancement-related assets is less than the total amount of the Guarantee obligation, the difference between such amounts is expensed immediately to earnings as a component of Non-interest expense — Other expenses. Additionally, cash payments that are made or received in connection with buy-ups and buy-downs are recognized as adjustments of recognized deferred guarantee income. Likewise, credit fees that we receive at inception are also recognized as adjustments of recognized deferred guarantee income.

We account for a portion of PCs that we issue through our MultiLender Swap Program in the same manner as transfers that are accounted for as sales. The remaining portion of such PC issuances is accounted for in a manner consistent with the accounting for PCs issued through the Guarantor Swap program.

For Structured Securities that we issue to third parties in exchange for PCs and non- Freddie Mac mortgage-related securities, we generally do not recognize any incremental Guarantee asset or Guarantee obligation. Rather, we defer and amortize into income on a straight-line basis that portion of the transaction fee that we receive that relates to the estimated fair value of our future administrative responsibilities for issued Structured Securities. In cases where we retain portions of Structured Securities issued in such transactions, a portion of the received transaction fee is deferred as a carrying value adjustment of retained Structured Securities. The balance of transaction fees received, which relates to compensation earned in connection with structuring-related services we rendered to third parties, is recognized immediately in earnings as Non-interest income — Resecuritization fees.

### Purchases of PCs or Structured Securities

The purchase of a PC or Structured Security prompts the extinguishment of the corresponding, recognized Guarantee obligation. We de-recognize an extinguished Guarantee obligation against earnings as a component of Gains (losses) on investment activity. Correspondingly, the recognized Guarantee asset is reclassified on our consolidated balance sheets as a component of PC residuals. PC residuals are remeasured at fair value, including the fair value of the inherent credit obligation associated with the purchased PC or Structured Security. The unamortized balance of deferred guarantee income is extinguished as a basis adjustment to the recognized value of purchased PCs. Such basis adjustments are subsequently amortized into earnings as Interest income pursuant to the requirements of SFAS No. 91, "Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases, an amendment of FASB Statements No. 13, 60 and 65 and a rescission of FASB Statement No. 17," or SFAS 91, using the effective interest method.

### Subsequent Measurement of Recognized Guarantee-Related Assets and Liabilities

*Deferred Guarantee Income*

Deferred guarantee income is amortized into earnings at a rate that is commensurate with the observed rate of decline in the unpaid principal balance of securitized mortgage loans. Periodic amortization of recognized deferred guarantee income is reflected in earnings as a component of Income on Guarantee obligation.

*Recognized Guarantee Asset*

We generally account for a Guarantee asset like a debt instrument classified as trading under SFAS 115, "Accounting for Certain Investments in Debt and Equity Securities," or SFAS 115. Changes in the fair value of the recognized Guarantee asset are reflected in earnings as a component of Gains (losses) on Guarantee asset. Cash collections of our contractual guarantee fee reduce the value of the Guarantee asset. All guarantee-related compensation that is received over the life of the loan in cash is reflected in earnings as a component of Management and guarantee income.

*Recognized Guarantee Obligation*

We amortize the recognized Guarantee obligation into earnings commensurate with the observed decline in the unpaid principal balance of securitized mortgage loans. Periodic amortization of a recognized Guarantee obligation is reflected in earnings as a component of Income on Guarantee obligation. Separately, the subsequent measurement of our contingent obligation to make guarantee payments is further discussed below in "Reserves for Losses on Mortgage Loans Held-for-Investment and Losses on PCs."

*Freddie Mac*

*Recognized Credit Enhancements*

Credit enhancements that are separately recognized as Other assets are amortized into earnings as Non-interest expense. Such assets are amortized over related contract terms at the greater of amounts calculated by amortizing recognized credit enhancements (a) commensurate with the observed decline in the unpaid principal balance of covered mortgage loans or (b) on a straight-line basis over a credit enhancement's contract term. Recurring insurance premiums are recorded at the amount paid and amortized over their contractual life and, if provided quarterly, then the amortization period is three months.

*PC Residuals*

PC residuals relate to certain PCs or Structured Securities that we hold as investments and represent the fair value of the expected future cash flows associated with the guarantee contracts (including cash flows related to Management and guarantee fees and our Guarantee obligation) that are inherent within such securities.

We recognize a PC residual in connection with PCs or Structured Securities that we hold that (a) were previously transferred to third parties as part of transactions that were accounted for either as sales or in a manner described above for Guarantor Swap transactions (such that a Guarantee asset and Guarantee obligation were previously established for held PCs or Structured Securities), or (b) were formed from mortgage loans purchased through our Cash Window, referred to as "Cash Window Purchases," and that were never transferred to third parties.

Similar to our recognized Guarantee asset, a PC residual is accounted for like a debt security and is classified as either available-for-sale or trading under SFAS 115. PC residuals relating to PCs or Structured Securities that were transferred to third parties and for which a Guarantee asset and Guarantee obligation was recognized are accounted for like debt securities that are classified as trading. PC residuals relating to PCs held in portfolio that were formed from Cash Window Purchases and that were never transferred to third parties are generally accounted for like debt securities that are classified as available-for-sale.

PC residuals are subsequently carried at fair value considering the future inherent credit obligation. All changes in the fair value of PC residuals that are designated as trading are reflected in earnings as a component of Gains (losses) on investment activity. All changes in the fair value of PC residuals that are accounted for as available-for-sale are reflected as a component of Accumulated other comprehensive income (loss), net of taxes, or AOCI, a component of Stockholders' equity. All cash received over the life of the underlying loans with respect to the Guarantee asset component of the PC residuals is reflected in earnings as a component of Net interest income.

**Due to Participation Certificate Investors**

Timing differences between our receipt of scheduled and unscheduled principal and interest payments from seller/servicers on mortgages underlying PCs and the subsequent pass through of those payments on PCs owned by third-party investors result in the liability Due to Participation Certificate investors. In those cases, the PC balance is not reduced for payments of principal received from seller/servicers in a given month until the first day of the next month and we do not release the cash received (principal and interest) to the PC investor until the fifteenth day of that next month. We generally invest the principal and interest amounts we receive in short-term investments from the time the cash is received until the time we pay the PC investor. Interest income resulting from investment of principal and interest payments from seller/servicers is reported in interest income.

For unscheduled principal prepayments, these timing differences result in an expense accrual upon prepayment of the underlying mortgage. This is because the related PCs continue to bear interest due to the PC investor at the PC coupon rate from the date of prepayment until the date the PC security balance is reduced, while generally no interest is received from the mortgage on that prepayment amount during that period. The expense recognized upon prepayment is reported in Interest expense — Due to Participation Certificate investors. We report PC coupon interest amounts relating to our investment in PCs consistent with GAAP applied by third party investors in PCs. Accordingly, the PC coupon interest on prepayments of a mortgage pending remittance on PCs held by us is reported as both Interest Income — Mortgage-related securities in the Retained portfolio and Interest expense — Due to Participation Certificate investors. Scheduled and unscheduled principal payments received by us that relate to our investment in PCs are reported as a reduction to our investment in PCs on our consolidated balance sheets.

**Mortgage Loans**

Mortgage loans that we intend to sell are classified as held-for-sale. If we decide to retain a loan, the loan is transferred to the held-for-investment portfolio. Loans transferred to the held-for-investment portfolio are transferred at lower of cost or market. Lower-of-cost-or-market valuation adjustments relating to these loans are treated as basis adjustments and are subsequently amortized into interest income over the estimated lives of the mortgages using the effective interest method.

We recognize interest on mortgage loans on an accrual basis, except when we believe the collection of principal or interest is doubtful. See "Non-Performing Loans" for additional information.

Held-for-sale mortgages are reported at lower-of-cost-or-market, on a portfolio basis, with gains and losses reported in Gains (losses) on investment activity. Premiums and discounts on loans classified as held-for-sale are not amortized during the period that such loans are classified as held-for-sale. For a description of how we determine the fair value of our held-for-sale mortgage loans, see "NOTE 16: FAIR VALUE DISCLOSURES."

Mortgage loans that we have the ability and intent to hold for the foreseeable future or to maturity are classified as held-for-investment. These mortgage loans are reported at their outstanding principal balances, net of deferred fees (including premiums and discounts). These deferred items are amortized into interest income over the estimated lives of the mortgages using the effective interest method. We use actual prepayment experience and estimates of future prepayments to determine the constant yield needed to apply the effective interest method. For purposes of estimating future prepayments, the mortgages are aggregated by similar characteristics such as origination date, coupon and maturity.

**Reserves for Losses on Mortgage Loans Held-for-Investment and Losses on PCs**

We maintain a reserve for losses on mortgage loans held-for-investment to provide for credit losses inherent in that portfolio. We also maintain a reserve for guarantee losses on PCs to provide for credit losses inherent in mortgages underlying PCs or Structured Securities held by third parties. The reserve for losses on mortgage loans held-for-investment and the reserve for guarantee losses on PCs and Structured Securities held by third parties are collectively referred to as "loan loss reserves." Increases in loan loss reserves are reflected in earnings as a component of the Provision for credit losses. Decreases in loan loss reserves are reflected through (a) charging-off such balances (net of recoveries) when realized losses are recorded or (b) a reduction in the Provision for credit losses.

Upon sale of PCs or Structured Securities, we re-establish a Guarantee obligation, which includes the consideration of inherent credit losses. Also, upon sale, we recognize incurred losses as a component of Gains (losses) on investment activity.

*Single-family loan portfolio* — We estimate credit losses on homogeneous pools of single-family loans using statistically-based models that evaluate a variety of factors. The homogeneous pools of single-family mortgage loans are determined based on common underlying characteristics, including year of origination, loan-to-value ratio and geographic region. In determining the loan loss reserves for impaired single-family loans at the balance sheet date, we evaluate factors including:

- the year of loan origination;
- geographic location;
- actual and estimated amounts for loss severity trends for similar loans;
- default experience;
- expected proceeds from credit enhancements;
- pre-foreclosure real estate taxes and insurance; and
- estimated costs should the underlying property ultimately be foreclosed upon and sold.

Our best estimate of each of these factors is used to estimate the amount of our probable loss at the balance sheet date. Favorable trends in these factors decrease our estimate of probable losses, while negative trends increase our estimate.

We frequently validate and update the models and factors to capture changes in actual loss experience, as well as changes in underwriting practices and in our loss mitigation strategies. We also consider macroeconomic and other factors including regional housing trends, applicable home price indices, unemployment and employment dislocation trends, consumer credit statistics, recent changes in credit underwriting practices, the extent of third party insurance, and other measurable factors that influence the quality of the portfolio at the balance sheet date. We then adjust the loan loss reserves to the level required based on our best assessment of these factors.

*Multifamily loan portfolio* — We estimate credit losses on the multifamily loan portfolio based on all available evidence, including adequacy of third-party credit enhancements, evaluation of the repayment prospects, and fair value of collateral underlying the individual loans. The review of the repayment prospects and value of collateral underlying individual loans is based on property-specific and market-level risk characteristics including apartment vacancy rates, apartment rental rates, and property sales information. Loans individually evaluated for impairment include loans that become 60 days past due for principal and interest, certain loans with observable collateral deficiencies and loans whose contractual terms were modified due to credit concerns. When loan loss reserves for individual loans are established, consideration is given to all available evidence, such as the present value of discounted expected future cash flows, fair value of collateral, and credit enhancements.

*Freddie Mac*

**Non-Performing Loans**

Non-performing loans consist of: (a) loans whose terms have been modified due to previous delinquency or risk of delinquency and, therefore, are now considered part of our impaired loan population, referred to as "troubled debt restructurings," (b) serious delinquencies and (c) non-accrual loans. Serious delinquencies are those single-family loans that are 90 days or more past due or in foreclosure, and multifamily loans that are more than 60 days but less than 90 days past due. This category also includes multifamily loans that are 90 days or more past due but where principal and interest are being paid to us under the terms of a credit enhancement agreement. Non-performing loans generally accrue interest in accordance with their contractual terms unless they are in non-accrual status. Non-accrual loans are loans where interest income is recognized on a cash basis, and only include multifamily loans 90 days or more past due. For non-accrual loans, any existing accruals are reversed against interest income unless they are both well secured and in the process of collection. For single-family retained and repurchased mortgage loans, interest income is accrued; however, we begin to fully reserve for accrued interest on these loans after a mortgage becomes 90 days past due. For single-family loans underlying outstanding PCs and Structured Securities held by third parties, we reserve for lost interest using a statistically based model.

Impaired loans include single-family loans, both performing and non-performing, that are troubled debt restructurings and delinquent loans purchased from PC pools whose fair value was less than acquisition cost at the date of purchase. Multifamily impaired loans are defined as performing and non-performing troubled debt restructurings, loans 60 days or more past due (except for certain credit-enhanced loans) and certain mortgage loans with real estate collateral values less than the outstanding unpaid principal balances. See "Table 6.2 — Impaired Loans" in "NOTE 6: LOAN LOSS RESERVES" for further discussion.

We have the option to purchase mortgage loans out of PC pools under certain circumstances, such as to resolve an existing or impending delinquency or default. Our general practice is to purchase the mortgage loans out of pools after the loans are 120 days delinquent. Loans that are purchased from PC pools held by third parties are recorded on our consolidated balance sheets at fair value at the date of purchase and are subsequently carried at amortized cost. Loans purchased out of PC pools held in the Retained portfolio are recorded on our consolidated balance sheets at the adjusted cost basis. Increases in market interest rates and declining market values for delinquent loans resulted in all loans purchased out of PC pools during 2006 being classified as impaired loans. We record realized losses on certain guaranteed loans when the fair value is less than the unpaid principal balance, net of related reserves, as of the date of our repurchase. For loans that later re-perform, a portion of the valuation discount applied when the loan was repurchased will be accreted back into income over the estimated life of the loan.

**Charge-Offs**

The loan loss reserves are reduced for charge-offs when a loss is specifically identified. For both single-family and multifamily mortgages where the original terms of the mortgage loan agreement are modified for economic or legal reasons related to the borrower's financial difficulties, losses are recorded at the time of modification and the loans are subsequently accounted for as troubled debt restructurings. For mortgages that are foreclosed upon and thus transferred to Real estate owned, net, or REO, or are involved in a pre-foreclosure sale, losses at the time of transfer or pre-foreclosure sale are charged-off against Reserve for losses on mortgage loans held-for-investment. For transfers to REO, losses arise when the carrying basis of the loan (including accrued interest) exceeds the fair value of the foreclosed property (after deduction for estimated selling costs and consideration of third-party insurance or other credit enhancements). REO gains arise and are recognized immediately in earnings when the fair market value of the acquired asset (after deduction for estimated disposition costs) exceeds the carrying value of the mortgage (including accrued interest). REO gains and losses subsequent to foreclosure are included in REO operations income (expense).

**Investments in Securities**

Investments in securities consist primarily of mortgage-related securities. We classify securities as "available-for-sale" or "trading." We currently do not classify any securities as "held-to-maturity" although we may elect to do so in the future. Securities classified as available-for-sale and trading are reported at fair value with changes in fair value included in AOCI and Gains (losses) on investment activity, respectively. See "NOTE 16: FAIR VALUE DISCLOSURES" for more information on how we determine the fair value of securities.

We record forward purchases and sales of securities that are specifically exempt from the requirements of SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," or SFAS 133, on a trade date basis. Securities underlying forward purchases and sales contracts that are not exempt from the requirements of SFAS 133 are recorded on the contractual settlement date with a corresponding commitment recorded on the trade date.

*Freddie Mac*

We often retain Structured Securities created through resecuritizations of mortgage-related securities held by us. The new Structured Securities we acquire in these transactions are classified as available-for-sale or trading based upon the predominant classification of the mortgage-related security collateral we contributed.

For most of our investments in securities, interest income is recognized using the retrospective effective interest method. Deferred items, including premiums, discounts and other basis adjustments, are amortized into interest income over the estimated lives of the securities. We use actual prepayment experience and estimates of future prepayments to determine the constant yield needed to apply the effective interest method. We recalculate the constant effective yield based on changes in estimated prepayments as a result of changes in interest rates and other factors. When the constant effective yield changes, an adjustment to interest income is made for the amount of amortization that would have been recorded if the new effective yield had been applied since the mortgage assets were acquired.

For certain securities investments, interest income is recognized using the prospective effective interest method. We specifically apply this accounting to beneficial interests in securitized financial assets that (a) can contractually be prepaid or otherwise settled in such a way that we may not recover substantially all of our recorded investment (such as interest-only strips) or (b) are not of high credit quality at the acquisition date. We recognize as interest income (over the life of these securities) the excess of all estimated cash flows attributable to these interests over their principal amount using the effective yield method. We update our estimates of expected cash flows periodically and recognize changes in calculated effective yield on a prospective basis.

We review securities for potential impairment on an ongoing basis. We consider a number of factors, including the severity of the decline in fair value, credit ratings, the length of time the investment has been in an unrealized loss position and the likelihood of sale in the near term. We also recognize impairment when qualitative factors indicate that it is likely we will not recover the unrealized loss. When evaluating these factors, we consider our intent and ability to hold the investment until a point in time at which recovery of the unrealized loss can be reasonably expected to occur. Impairment losses on manufactured housing securities exclude the effects of separate financial guarantee contracts that are not embedded in the securities because the benefits of such contracts are not recognized until claims become probable of recovery under the contracts. We resecuritize securities held in the Retained portfolio and we typically retain the majority of the cash flows from resecuritization transactions in the form of Structured Securities. Certain securities in the Retained portfolio have a high probability of being resecuritized and therefore, for those in an unrealized loss position, we may not have the intent to hold for a period of time sufficient to recover those unrealized losses. In that case, the impairment is deemed other-than-temporary. For certain securities meeting the criteria of (a) or (b) in the preceding paragraph, other-than-temporary impairment is defined as occurring whenever there is an adverse change in estimated future cash flows coupled with a decline in fair value below the amortized cost basis. When a security is deemed to be other-than-temporarily impaired, the cost basis of the security is written down to fair value, with the loss recorded to Gains (losses) on investment activity. Based on the new cost basis, the adjusted deferred amounts related to the impaired security are amortized over the security's remaining life in a manner consistent with the amount and timing of the future estimated cash flows. The security cost basis is not changed for subsequent recoveries in fair value.

Gains and losses on the sale of securities are included in Gains (losses) on investment activity, including those gains (losses) reclassified into earnings from AOCI. We use the specific identification method for determining the cost of a security in computing the gain or loss.

### Repurchase and Resale Agreements

We enter into repurchase and resale agreements primarily as an investor or to finance our security positions. Such transactions are accounted for as purchases and sales when the transferor relinquishes control over transferred securities and as secured financings when the transferor does not relinquish control. Our policy is to take possession of securities purchased under agreements to resell and reverse dollar roll transactions.

### Debt Securities Issued

Debt securities that we issue are classified as either due within one year or due after one year, based on their remaining contractual maturity. The classification of interest expense on debt securities as either short-term or long-term is based on the original contractual maturity of the debt security. Deferred items, including premiums, discounts, issuance costs and hedging-related basis adjustments, are amortized and reported through interest expense using the effective interest method over the contractual life of the related indebtedness. The balance of deferred items remaining when debt is extinguished prior to its contractual maturity is reflected in earnings in the period of extinguishment as a component of Gains (losses) on debt retirement. Prior to 2005, for callable debt, deferred items were amortized over the period during which the related indebtedness was expected to be outstanding and changes in the expected life were reflected prospectively as an adjustment

to the effective yield on the debt. Amortization of hedging-related basis adjustments is initiated upon the termination of the related hedge relationship. Amortization of premiums, discounts and issuance costs begins at the time of debt issuance.

Premiums, discounts and hedging-related basis adjustments are reported as a component of Debt securities, net. Issuance costs are reported as a component of Other assets. Debt securities denominated in a foreign currency are translated into U.S. dollars using foreign exchange spot rates at the balance sheet dates and any translation gains or losses are reported in Non-interest income (loss) — Other income.

Contemporaneous transfers of cash between us and a creditor in connection with the issuance of a new debt obligation and satisfaction of an existing debt obligation are accounted for as extinguishments, with recognition of any gains or losses in earnings if the debt instruments have substantially different terms. If the debt instruments do not have substantially different terms, the transaction is accounted for as an exchange rather than an extinguishment and the fees associated with the new debt obligation, along with the existing unamortized premium or discount, concession fees and hedge gains and losses on the existing debt obligation, are considered a basis adjustment on the new debt obligation and are amortized as an adjustment of interest expense over the remaining term of the new debt obligation.

**Derivatives**

Derivatives are reported at their fair value on our consolidated balance sheets. The fair value of derivatives is generally reported net by counterparty, provided that a legally enforceable master netting agreement exists. Derivatives in a net unrealized gain position are reported as Derivative assets, at fair value. Similarly, derivatives in a net unrealized loss position are reported as Derivative liabilities, at fair value.

At December 31, 2006 nearly all of our derivatives were not designated in hedge accounting relationships. For those derivatives not designated as an accounting hedge, fair value gains and losses are reported as Derivative gains (losses) in the consolidated statements of income. For purchase and sale commitments of securities classified as trading, fair value gains and losses are reported as Gains (losses) on investment activity on our consolidated statements of income.

Subject to certain qualifying conditions, we may designate a derivative as either a hedge of the cash flows of a variable-rate instrument or forecasted transaction, referred to as a cash flow hedge; a hedge of the fair value of a fixed-rate instrument, referred to as a fair value hedge; or a foreign-currency fair value or cash flow hedge, referred to as a foreign-currency hedge. In order to be designated as an accounting hedge, the derivative must be expected to be highly effective in offsetting the changes in cash flows or fair value of the hedged item resulting from the hedged risk. In addition, the documentation of the hedging designation must include identification of the hedged item, the hedging instrument, the risk exposure and corresponding risk management objective, how effectiveness will be assessed and how ineffectiveness will be measured.

For a derivative accounted for as a cash flow hedge, we report changes in the fair value of these instruments in AOCI to the extent the hedge is effective. The remaining ineffective portion is reported as Hedge accounting gains (losses). In general, we recognize the associated amounts reported in AOCI as Net interest income during the period or periods in which the hedged item affects earnings. Deferred amounts linked to interest payments on long-term debt are recorded as long-term debt interest expense and amounts not linked to interest payments on long-term debt are recorded in Income (expense) related to derivatives. Amounts reported in AOCI related to changes in the fair value of commitments to purchase or sell securities that are designated as cash flow hedges are recognized as basis adjustments to the assets held which are amortized in earnings as interest income using the effective interest method and, for assets sold, as Gains (losses) on investment activity.

If the hedged item in a cash flow hedge is the forecasted issuance of debt and the occurrence of the forecasted transaction becomes probable of not occurring, the amount in AOCI is reclassified to earnings immediately. If we expect at any time that continued reporting of a net loss in AOCI would lead to recognizing a net loss on the combination of a hedging instrument and the hedged transaction (and related asset acquired or liability incurred) in one or more future periods, the loss is reclassified immediately into earnings for the amount that is not expected to be recovered.

For a derivative accounted for as a fair value hedge, we report changes in the fair value of the derivative as Hedge accounting gains (losses) along with the changes in the fair value of the hedged item attributable to the risk being hedged. Any difference between these two amounts results in ineffectiveness recognized in the income statement. When the hedge is terminated or redesignated, the fair value adjustment to the carrying amount of the hedged asset or liability is amortized to earnings as a component of the hedged item's interest income or expense over the remaining life of the hedged item using the effective interest method. If a derivative no longer qualifies as a cash flow or fair value hedge, or if we voluntarily terminate the hedging relationship, we discontinue hedge accounting prospectively. We continue to carry the derivative on our consolidated balance sheets at fair value and record further fair value gains and losses as Derivative gains (losses) in our consolidated statements of income until the derivative is terminated or redesignated.

The periodic interest cash flows related to derivative contracts currently accrued, which are derived primarily from interest-rate swap contracts and include imputed interest on zero-coupon swaps, are classified as Income (expense) related to derivatives for derivatives in hedge relationships and as Derivative gains (losses) for derivatives not in hedge accounting relationships.

**Real Estate Owned**

REO is initially recorded at fair value, net of estimated disposition costs and is subsequently carried at the lower-of-cost-or-market. Amounts we expect to receive from third-party insurance or other credit enhancements are recorded when the asset is acquired. The receivable is adjusted when the actual claim is filed, and is a component of Accounts and other receivables, net on our consolidated balance sheets. Material development and improvement costs relating to REO are capitalized. Operating expenses on the properties, net of any rental or other income, are included in REO operations income (expense). Estimated declines in REO fair value that result from ongoing valuation of the properties are provided for and charged to REO operations income (expense) when identified. Any gains and losses on REO dispositions are included in REO operations income (expense).

**Income Taxes**

We use the asset and liability method of accounting for income taxes pursuant to SFAS No. 109, "Accounting for Income Taxes." Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates. To the extent tax laws change, deferred tax assets and liabilities are adjusted, when necessary, in the period that the tax change is enacted. Valuation allowances are recorded to reduce deferred tax assets when it is more likely than not that a tax benefit will not be realized. For all periods presented, no such valuation allowance was deemed necessary by our management. Reserves are recorded for income tax contingencies and related contingent interest where the potential for loss is probable and reasonably estimable in accordance with SFAS 5.

Income tax expense includes (a) deferred tax expense, which represents the net change in the deferred tax asset or liability balance during the year plus any change in a valuation allowance and (b) current tax expense, which represents the amount of tax currently payable to or receivable from a tax authority plus amounts accrued for expected tax deficiencies (including tax and related interest and penalties). Income tax expense excludes the tax effects related to adjustments recorded to equity as well as the tax effects of the cumulative effect of changes in accounting principles.

**Stock-Based Compensation**

We record compensation expense for stock-based compensation awards based on the grant-date fair value of the award and expected forfeitures. Compensation expense is recognized over the period during which an employee is required to provide service in exchange for the stock-based compensation award. The recorded compensation expense is accompanied by an adjustment to Additional paid-in capital on our consolidated balance sheets. The vesting period for stock-based compensation awards is generally three to five years for options, restricted stock and restricted stock units. The vesting period for the option to purchase stock under the Employee Stock Purchase Plan, or ESPP, is three months. See "NOTE 11: STOCK-BASED COMPENSATION" for additional information.

The fair value of options to purchase shares of our common stock, including options issued pursuant to the ESPP, is estimated using a Black-Scholes option pricing model, taking into account the exercise price and an estimate of the expected life of the option, the market value of the underlying stock, expected volatility, expected dividend yield, and the risk-free interest rate for the expected life of the option. The fair value of restricted stock and restricted stock unit awards is based on the fair value of our common stock on the grant date.

Incremental compensation expense related to the modification of awards is based on a comparison of the fair value of the modified award with the fair value of the original award before modification. We generally expect to settle our stock-based compensation awards in shares. In limited cases, an award may be cash-settled upon a contingent event such as involuntary termination. These awards are accounted for as an equity award until the contingency becomes probable of occurring, when the award is reclassified from equity to a liability. We initially measure the cost of employee service received in exchange for a stock-based compensation award of liability instruments based on the fair value of the award at the grant date. The fair value of that award is remeasured subsequently at each reporting date through the settlement date. Changes in the fair value during the service period are recognized as compensation cost over that period.

Excess tax benefits are recognized in Additional paid-in capital. Cash retained as a result of the excess tax benefits is presented in the consolidated statements of cash flows as financing cash inflows. The write-off of deferred tax assets relating to unrealized tax benefits associated with recognized compensation costs reduces Additional paid-in capital to the extent there are excess tax benefits from previous stock-based awards remaining in Additional paid-in capital, with any remainder reported as part of income tax expense.

**Earnings Per Common Share**

Because we have participating securities, we use the "two-class" method of computing earnings per common share. The "two-class" method is an earnings allocation formula that determines earnings per share for common stock and participating securities based on dividends declared and participation rights in undistributed earnings. Our participating securities consist of vested options to purchase common stock that earn dividend equivalents at the same rate when and as declared on common stock.

Basic earnings per common share is computed as net income available to common stockholders divided by the weighted average common shares outstanding for the period. Diluted earnings per common share is determined using the weighted average number of common shares during the period, adjusted for the dilutive effect of common stock equivalents. Dilutive common stock equivalents reflect the assumed net issuance of additional common shares pursuant to certain of our stock-based compensation plans that could potentially dilute earnings per common share.

**Comprehensive Income**

Comprehensive income is the change in equity, on a net of tax basis, resulting from transactions and other events and circumstances from non-owner sources during a period. It includes all changes in equity during a period, except those resulting from investments by stockholders. We define comprehensive income as consisting of net income plus changes in the unrealized gains and losses on available-for-sale securities, the effective portion of derivatives accounted for as cash flow hedge relationships, changes in the minimum pension liability, and changes in components of pension liability that receive deferred expense recognition.

**Reportable Segments**

We have one business segment for financial reporting purposes under SFAS No. 131, "Disclosures About Segments of an Enterprise and Related Information," or SFAS 131, for all periods presented on our consolidated financial statements.

**Recently Adopted Accounting Standards**

*Accounting for Stock-Based Compensation* — Effective January 1, 2006, we adopted SFAS 123(R), "Share-Based Payment," or SFAS 123(R), which requires compensation expense for stock options and other share-based payments to be measured based on the instruments' grant-date fair value, and for the expense to be recorded based on the fair value reduced by expected forfeitures. We adopted this standard by using the modified prospective method of transition which requires the provisions of SFAS 123(R) to be applied to new awards as well as awards modified, repurchased or cancelled after the effective date. In adopting SFAS 123(R), we recognized compensation expense for stock-based compensation awards net of estimated forfeitures. Previously, the effects of forfeitures were recorded as they occurred. The effect of adopting SFAS 123(R) did not have a material impact on our consolidated financial statements.

*Accounting Changes and Error Corrections* — On January 1, 2006, we adopted SFAS No. 154, "Accounting Changes and Error Corrections, a replacement of APB Opinion No. 20 and FASB Statement No. 3," or SFAS 154. SFAS 154 changes the requirements for the accounting for and reporting of a change in accounting principle. It applies to all voluntary changes in accounting principle and changes required by an accounting pronouncement in the instance that the pronouncement does not include specific transition provisions. APB Opinion No. 20, "Accounting Changes," or APB 20, requires that the cumulative effect of most voluntary changes in accounting principles be included in net income in the period of adoption. The new statement requires retrospective application to prior periods' financial statements of a voluntary change in accounting principle, unless it is impracticable to determine either period-specific effects or the cumulative effect of the change. SFAS 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. Our adoption of SFAS 154 did not have a material impact on our consolidated financial statements.

*Accounting for Employers' Defined Benefit Pension and Other Postretirement Plans* — On December 31, 2006, we adopted SFAS 158. In accordance with this standard, on December 31, 2006, we recorded the funded status of each of our defined benefit pension and postretirement plans as an asset or liability on our consolidated balance sheet with a corresponding offset, net of taxes, recorded in AOCI within Stockholders' Equity. See "Table 1.2 — Change in Accounting for Defined Benefit Plans — Impact on Financial Statements."

Effective December 31, 2008, SFAS 158 also requires our defined benefit plan assets and obligations to be measured as of the date of our consolidated balance sheet. We expect that the effect of implementing the change in measurement date from September 30 to December 31 will not be material to our financial condition or results of operations.

*Determining Variability in Applying FASB Interpretation No. 46(R)* — Effective July 1, 2006, we adopted FASB Staff Position No. FIN 46(R)-6, "Determining the Variability to Be Considered in Applying FASB Interpretation No. 46(R)," or FSP FIN 46(R)-6. The adoption of FSP FIN 46(R)-6 was not material to our financial condition or results of operations.

*Freddie Mac*

**Recently Issued Accounting Standards, Not Yet Adopted**

*Accounting for Certain Hybrid Instruments* — In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments, an amendment of FASB Statements No. 133 and 140," or SFAS 155, with further guidance provided in Derivatives Implementation Group (DIG) Issue B-40 "Embedded Derivatives: Application of Paragraph 13(b) to Securitized Interests in Prepayable Financial Assets," or DIG B-40. These statements amend SFAS 133 and SFAS 140. The objective of these statements is to simplify the accounting for certain hybrid financial instruments, permitting fair value measurement for any hybrid financial instrument with an embedded derivative that otherwise would require bifurcation. In addition, these statements establish a requirement to evaluate interests in securitized financial assets to identify instruments that are freestanding derivatives or that are hybrid financial instruments that contain an embedded derivative requiring bifurcation. SFAS 155 is effective for all financial instruments acquired or issued after the beginning of an entity's first fiscal year that begins after September 15, 2006. Because SFAS 155 is to be adopted prospectively, it will not result in a cumulative effect of a change in accounting principle. In connection with the adoption of this accounting standard, we will elect to measure, at fair value, newly acquired interests in securitized financial assets that contain embedded derivatives requiring bifurcation with periodic market adjustments reflected in the income statement. We expect the amount of our securities that will be impacted by SFAS 155 will be minimal.

*Fair Value Measurements* — In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements," or SFAS 157. This statement defines fair value, establishes a framework for measuring fair value in GAAP and expands disclosures about fair value measurements. SFAS 157 applies under other accounting pronouncements that require or permit fair value measurements but does not change existing guidance as to whether or not a financial asset or liability is carried at fair value. SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007 with earlier adoption permitted. We do not plan to elect early adoption and are currently evaluating the effect of SFAS 157 on our financial position and results of operations. We do not believe the implementation will likely result in a material difference to our fair value measurements.

*The Fair Value Option for Financial Assets and Financial Liabilities* — In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities, Including an amendment of FASB Statement No. 115," or SFAS 159. This statement permits companies to choose to measure certain financial assets and liabilities at fair value with changes in fair value recognized in earnings as they occur. The objective is to improve financial reporting by providing entities with the opportunity to measure both assets and liabilities at fair value without having to apply complex hedge accounting provisions. SFAS 159 is effective as of the beginning of an entity's first fiscal year beginning after November 15, 2007, with earlier adoption permitted. We do not plan to elect early adoption and are still evaluating how we will adopt SFAS 159. We have not yet determined the impact, if any, on our consolidated financial statements of adopting this standard.

*Accounting for Uncertainty in Income Taxes* — In June 2006, the Financial Accounting Standards Board, or FASB, issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109," or FIN 48. FIN 48 provides a single model to address accounting for uncertainty in tax positions and clarifies the accounting for income taxes by prescribing a minimum recognition threshold a tax position is required to meet before being recognized in the financial statements. FIN 48 also provides guidance on derecognition, measurement, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for fiscal years beginning after December 15, 2006. We will adopt FIN 48 as of January 1, 2007, as required. The cumulative effect of adopting FIN 48 will be recorded to retained earnings. We do not anticipate this interpretation will have a material impact on our retained earnings. We have determined that adoption of FIN 48 will result in an overall increase to our retained earnings primarily as a result of a gain contingency for which we have not recognized a financial statement benefit.

## NOTE 2: TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS

**Securitization Transactions We Executed**

As discussed in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," we issue two types of mortgage-related securities: PCs and Structured Securities.

Table 2.1 below presents the unpaid principal balances of issued PCs and Structured Securities.

### Table 2.1 — Guaranteed PCs and Structured Securities Issued Based on Unpaid Principal Balances[1]

| | December 31, | |
| --- | --- | --- |
| | **2006** | **2005** |
| | **(in millions)** | |
| Guaranteed PCs and Structured Securities Issued: | | |
| Held by third parties | $1,122,761 | $ 974,200 |
| Held in the Retained portfolio | 354,262 | 361,324 |
| Total Guaranteed PCs and Structured Securities issued[2] | $1,477,023 | $1,335,524 |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled. Due to timing differences in our receipt of principal and interest payments from mortgage servicers and subsequent pass-through of payments to PC investors, the unpaid principal balances of the underlying mortgage loans do not equal the unpaid principal balances of issued PCs and Structured Securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Due to Participation Certificate Investors" for more information.

(2) As further discussed in "NOTE 4: FINANCIAL GUARANTEES," we guarantee certain mortgage-related securities issued by third parties. Guaranteed PCs and Structured Securities exclude $1,240.2 billion and $961.8 billion at December 31, 2006 and 2005, respectively, of Structured Securities backed by resecuritized PCs and other previously issued Structured Securities. These excluded Structured Securities do not increase our credit-related exposure and consist of single-class and multi-class Structured Securities backed by PCs, Real Estate Mortgage Investment Conduits, or REMICs, and principal-only strips. The notional balance of interest-only strips is excluded because this table is based on unpaid principal balances. Also excluded are modifiable and combinable REMIC tranches and interest and principal classes where the holder has the option to exchange the security tranches for other pre-defined security tranches.

At December 31, 2006 and 2005, approximately 94 percent and 92 percent, respectively, of issued PCs and Structured Securities (excluding securities we issued that are backed by Ginnie Mae Certificates) had a corresponding Guarantee asset, Guarantee obligation or PC residual recognized on our consolidated balance sheets. With respect to such securities held by third parties at December 31, 2006 and 2005, 95 percent and 93 percent, respectively, had a related Guarantee asset and Guarantee obligation established.

Of those issued PCs and Structured Securities that had a corresponding Guarantee asset, Guarantee obligation or PC residual at December 31, 2006 and 2005, 57 percent and 50 percent, respectively, were issued in financial guarantee transactions, while the rest of those securities were issued as a result of sales or secured borrowing transactions.

### Gains and Losses on Transfers of PCs and Structured Securities that are Accounted for as Sales

We recognized net pre-tax gains of approximately $86 million, $364 million and $356 million for the years ended December 31, 2006, 2005 and 2004, respectively, on transfers of PCs and Structured Securities that were accounted for as sales under SFAS 140.

In connection with the derivation of such gains (losses) upon sale prior to October 1, 2005, we had consistently applied a methodology for determining the order in which to record extinguishments of unamortized deferred guarantee income, buy-down fees and credit fees as adjustments to the carrying value of the repurchased securities. Beginning October 1, 2005, we changed our methodology for determining gains (losses) upon the re-sale of PCs and Structured Securities related to unamortized deferred guarantee income, buy-down fees and credit fees. Our methodology now applies a specific identification method of associating the extinguished deferred guarantee income, buy-down fees and credit fees to the specific portions of purchased PCs and Structured Securities and relieves those carrying value adjustments through gains (losses) when the specific portion of the PC or Structured Security is re-sold. This change in accounting principle was facilitated by system changes that allow us to apply and track the carrying value adjustments to the specific portions of the purchased PCs and Structured Securities.

**Valuation of Recognized Guarantee Asset, Guarantee Obligation and PC Residuals**

*Recognized Guarantee asset*

Our approach for estimating the fair value of the Guarantee asset makes use of third-party market data as practicable. For approximately 75 percent of the fair value of the Guarantee asset, the valuation approach involves obtaining dealer quotes on proxy securities with collateral similar to aggregated characteristics of our portfolio, effectively equating the Guarantee asset with current, or "spot," market values for excess servicing interest-only, or IO, securities, which trade at a discount to trust IO security prices. We consider excess servicing securities to be comparable to the Guarantee asset, in that they represent an IO-like income stream, have less liquidity than trust IO securities and do not have matching principal-only securities. The remaining 25 percent of the fair value of the Guarantee asset related to underlying loan products for which comparable market prices were not readily available. This portion of the Guarantee asset was valued using an expected

*Freddie Mac*

cash flow approach with market input assumptions extracted from the dealer quotes provided on the more liquid products, reduced by an estimated liquidity discount.

For 2004, we calculated the Guarantee asset fair value using an expected cash flow approach. Specifically, Monte Carlo projections were used to forecast Guarantee asset-related future cash flows. The forecasted cash flows were then discounted using factors that were derived from modeled forward interest rates for each scenario path, to which we then applied a trailing average option-adjusted spread of up to 24 months that was based on trust IO security prices.

*Recognized Guarantee obligation*

Our approach for estimating the fair value of the Guarantee obligation makes use of third-party market data as practicable. We divided the credit aspects of our Guarantee obligation portfolio into three primary components: performing loans, non-performing loans and manufactured housing. For each component, we developed a specific valuation approach for capturing its unique characteristics.

For performing loans, we use capital markets information and rating agency models to estimate subordination levels and dealer price quotes on proxy securities with collateral characteristics matched to our portfolio to value the expected credit losses and the risk premium for unexpected losses related to our guarantee portfolio. We segmented the portfolio into distinct loan cohorts to differentiate between product types, coupon rate, seasoning, and interests retained by us versus those held by third parties.

Because typical structured securitizations of single-family collateral only include performing loans, we utilize a separate method for estimating the fair value of the Guarantee obligation for non-performing loans. For loans that are extremely delinquent and have been purchased out of pools, we obtained dealer indications that reflect their non-performing status. To value delinquent loans remaining in PCs, we started with the market driven performing loan and non-performing whole loan values and used empirically observed delinquency transition rates to interpolate the appropriate values in each phase of delinquency (*i.e.*, 30 days, 60 days, 90 days).

We evaluated market sources to determine the appropriate credit costs associated with the Guarantee obligation for the manufactured housing portfolio, approximately 1 percent of our total guarantee portfolio and 19 percent of the fair value of the Guarantee obligation, and determined that there is not sufficiently reliable market data. As a result, we used our judgment to develop an alternative approach for estimating the incremental credit costs associated with the manufactured housing portfolio. Specifically, we calculated the ratio of realized credit losses for performing loans and manufactured housing loans to determine a loss history ratio. We then applied the loss history ratio to market implied performing loan Guarantee obligation fair value estimates to calculate the implied credit costs for the manufactured housing portfolio. This approach grounded the Guarantee obligation related to manufactured housing in performing loan market prices, while adjusting for the loss history reflected in empirical data. We undertook a similar process for estimating the fair value of seriously delinquent manufactured housing loans.

The components of the Guarantee obligation associated with administering the collection and distribution of payments on the mortgage loans underlying a PC are estimated based upon amounts we believe other market participants would charge. Finally, we use our models to estimate the present value of net cash flows related to security program cycles. This estimate is included in the Guarantee obligation valuation.

For 2004, the Guarantee obligation fair value was calculated using internal models to estimate future cash flows using a Monte Carlo simulation. The components of estimated cash flows associated with the Guarantee obligation included estimates of expected future credit losses using statistically based models that were benchmarked periodically to the non-conforming loan, or jumbo, securitization market. For all periods our estimates included costs to administer the collection and distribution of payments on the mortgage loans underlying a PC and considered net cash flows due to security program cycles.

*Recognized PC residuals*

The fair value of recognized PC residuals is determined in a manner that is consistent with the approach described above for the recognized Guarantee asset and Guarantee obligation.

*Key assumptions used in the valuation of the Guarantee asset*

Table 2.2 summarizes the key assumptions associated with the fair value measurements of the recognized Guarantee asset. The assumptions included in this table for 2004 relate to those used in our internal models. For 2006 and 2005, the fair values at the time of securitization and the subsequent fair value measurements were estimated using third party information. However, the assumptions included in this table for those years are those implied by our fair value estimates, with the Internal Rates of Return, or IRRs, adjusted where necessary to align our internal models with estimated fair values determined using third party information. Prepayment rates are presented as implied by our internal models which are benchmarked periodically to market prepayment estimates.

At December 31, 2006, our Guarantee asset totaled $6,070 million on our consolidated balance sheets and of that amount, approximately $5,905 million (or approximately 97 percent), related to PCs and Structured Securities backed by single-family mortgage loans. The key assumptions utilized in fair value measurements of the Guarantee asset presented in Table 2.2 and the sensitivity analysis presented in Table 2.3 and Table 2.4 relate solely to the Guarantee asset associated with PCs and Structured Securities backed by single-family mortgage loans.

**Table 2.2 — Key Assumptions Utilized in Fair Value Measurements of the Guarantee Asset**

| | 2006 | | 2005 | | 2004 | |
|---|---|---|---|---|---|---|
| Valuation Assumptions for the Guarantee Asset | Range[3] | Mean[4] | Range[3] | Mean[4] | Range[3] | Mean[4] |
| Internal rates of return[1] | 2.3% - 13.5% | 8.4% | 1.8% - 13.8% | 8.7% | (1.4)% - 13.6% | 6.7% |
| Prepayment rates[2] | 7.4% - 57.8% | 15.7% | 7.6% - 59.8% | 17.2% | 6.9% - 58.6% | 19.1% |

(1) The IRRs reported above represent an unpaid principal balance weighted average of the discount rates inherent in the fair value of the recognized Guarantee asset.
(2) Average Prepayment rates are simulated on a monthly frequency, although rates reported above represent an unpaid principal balance weighted average of annualized values of such Prepayment rates.
(3) The lowest value in each presented range represents the first percentile IRRs and prepayment rates throughout 2006, 2005 and 2004. Likewise, the highest value in each range represents the 99th percentile IRRs and prepayment rates throughout 2006, 2005 and 2004.
(4) Reported values represent the weighted average value of all IRRs and prepayment rates throughout the 2006, 2005 and 2004 periods.

Weighted average lives of the Guarantee asset during 2006, 2005 and 2004 ranged between 1.7 and 9.0 years, 1.6 and 8.9 years, and 1.2 and 8.7 years, respectively, while the derived weighted average lives of the Guarantee asset for the same periods were 5.5, 5.1 and 5.3 years, respectively. Such derived weighted average lives are reflective of prepayment speed assumptions cited in Table 2.2 above.

At December 31, 2006 and 2005, the fair value of the recognized Guarantee asset was based upon a valuation approach that incorporates market-based information. In order to report the hypothetical sensitivity of the carrying value of the Guarantee asset to changes in key assumptions, we used internal models to approximate their reported carrying values. We then measured the hypothetical impact of changes in key assumptions using our models to estimate the potential view of fair value the market might have in response to those changes. In our models, the assumed Internal Rates of Return were adjusted to calibrate our model results with the reported carrying value. However, the weighted average prepayment rate assumption used in this hypothetical sensitivity was based on our internal model which is benchmarked periodically to market prepayment estimates. The sensitivity analysis in Table 2.3 illustrates hypothetical adverse changes in the fair value of the Guarantee asset for changes in key assumptions.

**Table 2.3 — Sensitivity Analysis of the Guarantee Asset**

| | December 31, 2006 |
|---|---|
| | Guarantee Asset |
| | (dollars in millions) |
| Fair value[1] | $5,905 |
| Weighted average IRR assumptions: | 7.0% |
| Impact on fair value of 100 bps upward change | $ (224) |
| Impact on fair value of 200 bps upward change | $ (431) |
| Weighted average prepayment rate assumptions: | 18.4% |
| Impact on fair value of 10% upward change | $ (298) |
| Impact on fair value of 20% upward change | $ (565) |

(1) At December 31, 2006, our Guarantee asset totaled $6,070 million on our consolidated balance sheet and of that amount, approximately $165 million (or approximately 3 percent), related to PCs backed by multifamily mortgage loans. The sensitivity analysis presented in Table 2.3 relates solely to the Guarantee asset associated with PCs backed by single-family mortgage loans.

**Valuation of Other Retained Interests**

Other retained interests include securities that were issued by us as part of a resecuritization transaction which was recorded as a sale. The majority of these securities are classified as available-for-sale. The fair value of Other retained interests is generally based on independent price quotations obtained from third-party pricing services or dealer marks.

To report the hypothetical sensitivity of the carrying value of Other retained interests, we used internal models calibrated to the fair values. The sensitivity analysis in Table 2.4 illustrates hypothetical adverse changes in the fair value of Other retained interests for changes in key assumptions based on these models.

**Table 2.4 — Sensitivity Analysis of Other Retained Interests**

|  | December 31, 2006 |
|---|---|
|  | Other Retained Interests[1] |
|  | (dollars in millions) |
| Fair value | $127,490 |
| Weighted average IRR assumptions: | 5.6% |
| Impact on fair value of 100 bps upward change | $  (4,551) |
| Impact on fair value of 200 bps upward change | $  (8,813) |
| Weighted average prepayment rate assumptions: | 11.0% |
| Impact on fair value of 10% upward change | $       (66) |
| Impact on fair value of 20% upward change | $     (132) |

(1) The fair value of Other retained interests includes accrued interest. The sensitivity analysis presented in Table 2.4 includes only Other retained interests whose fair value is impacted as a result of changes in IRR and prepayment rate assumptions. At December 31, 2006, the fair value of Other retained interests not impacted due to IRR and prepayment assumptions was $51 million.

### Cash Flows on Transfers of Securitized Interests and Corresponding Retained Interests

Table 2.5 below summarizes cash flows on retained interests.

**Table 2.5 — Details of Cash Flows**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
|  | (in millions) | | |
| Cash flows from: |  |  |  |
| Transfers of Freddie Mac securities that were accounted for as sales | $63,613 | $74,005 | $138,541 |
| Cash flows received on the Guarantee asset[1] | 1,475 | 1,270 | 1,086 |
| Other Retained Interests principal and interest[2] | 24,784 | 25,611 | 28,439 |
| Purchases of delinquent or foreclosed loans[3] | (4,748) | (4,373) | (4,931) |

(1) Represents contractual guarantee-related cash flows received by us in connection with the recognized Guarantee asset.
(2) Excludes cash flows related to retained interests held in the portfolio of our Securities Sales and Trading Group, or SS&TG, business unit which ceased operations in the fourth quarter of 2004. Such cash flows were not material.
(3) Represents delinquent mortgage loans purchased out of securitized pools that back issued PCs or Structured Securities.

### NOTE 3: VARIABLE INTEREST ENTITIES

We are a party to numerous entities that are considered to be variable interest entities, or VIEs. A VIE is an entity (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support from other entities or (b) where the group of equity holders does not have the ability to make significant decisions about the entity's activities, or obligation to absorb the entity's expected losses or right to receive the entity's expected residual returns, or both. Our investments in VIEs include LIHTC partnerships, certain Structured Securities transactions and a mortgage reinsurance entity. In addition, we buy the highly-rated senior securities in certain securitization trusts that are VIEs. Highly-rated senior securities issued by these securitization trusts are not designed to absorb a significant portion of the variability created by the assets/collateral in the trusts. Therefore, our investments in these securities do not represent a significant variable interest in the securitization trusts and we do not consolidate them. Further, we invest in securitization entities that are qualifying special purpose entities, which are not subject to consolidation because of our inability to unilaterally liquidate or change the qualifying special purpose entity. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Consolidation and Equity Method of Accounting" for further information regarding the consolidation practices of our VIEs.

### Low-Income Housing Tax Credit Partnerships

We invest as a limited partner in LIHTC partnerships formed for the purpose of providing funding for affordable multifamily rental properties. These LIHTC partnerships invest directly in limited partnerships that develop or rehabilitate multifamily rental properties. Completed properties are rented to qualified low-income tenants, allowing the properties to be eligible for federal tax credits. Most of these LIHTC partnerships are VIEs. A general partner operates the partnership, identifying investments and obtaining debt financing as needed to finance partnership activities. Although these partnerships generate operating losses, we realize a return on our investment through reductions in income tax expense that result from tax credits and the deductibility of the operating losses of these partnerships. The partnership agreements are typically structured to meet a required 15-year period of occupancy by qualified low-income tenants. These investments were made between 1989 and 2006. At December 31, 2006 and 2005, we did not guarantee any obligations of these partnerships and our exposure was limited to the amount of our investments. At December 31, 2006 and 2005, we were the primary beneficiary of investments in six LIHTC partnerships and we consolidated these investments. The investors in the obligations of the consolidated LIHTC partnerships have recourse only to the assets of those VIEs and do not have recourse to us.

**Consolidated VIEs**

Table 3.1 represents the carrying amounts and classification of consolidated assets that are collateral for the consolidated VIEs.

**Table 3.1 — Assets of Consolidated VIEs**

| | December 31, | |
| | 2006 | 2005 |
| Consolidated Balance Sheets Line Item | | |
| | (in millions) | |
| --- | --- | --- |
| Cash and cash equivalents ........................................................................... | $ 44 | $ 45 |
| Accounts and other receivables, net ................................................................... | 173 | 167 |
| Total assets of consolidated VIEs ................................................................. | $217 | $212 |

## VIEs Not Consolidated

### Low-Income Housing Tax Credit Partnerships

At December 31, 2006 and 2005, we had unconsolidated investments in 179 and 168 LIHTC partnerships, respectively, in which we had a significant variable interest. The size of these partnerships at December 31, 2006 and 2005, as measured in total assets, was $8.9 billion and $8.1 billion, respectively. These partnerships are accounted for using the equity method, as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES." As a limited partner, our maximum exposure to loss equals the undiscounted book value of our equity investment. At December 31, 2006 and 2005, our maximum exposure to loss on unconsolidated LIHTC partnerships, in which we had a significant variable interest, was $3.7 billion and $3.7 billion, respectively.

### Asset-Backed Investment Trusts

We invest in a variety of non-mortgage-related, asset-backed investment trusts. These investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically credit card receivables, auto loans or student loans. These trusts act as vehicles to allow originators to securitize assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. At December 31, 2006 and 2005, we did not have a significant variable interest in and were not the primary beneficiary of any asset-backed investment trusts.

### Structured Transactions

We issue securities in Structured Transactions, which are backed by mortgage loans or mortgage-related securities using collateral pools transferred to a trust specifically created for the purpose of issuing securities. These trusts issue various senior interests, subordinated interests or both. We purchase certain senior interests of the trusts and simultaneously issue and guarantee Structured securities backed by these interests. The subordinated interests are generally either held by the seller or other party or sold in the capital markets. Generally, the structure of the transactions and the trusts as qualifying special purpose entities exempts them from the scope of FASB Interpretation No. 46 (Revised December 2003), "Consolidation of Variable Interest Entities," or FIN 46(R). However, at both December 31, 2006 and 2005, we had investments or guarantees related to two Structured Transactions that did not fall within this scope exception and in which we had a significant variable interest. At December 31, 2006 and 2005, we were not the primary beneficiary of any such transactions.

Our involvement in the two Structured Transactions, mentioned above, began in 1996 and 2002, respectively. The size of these two transactions at December 31, 2006 and 2005, as measured in total assets, was $67 million and $105 million, respectively. At December 31, 2006 and 2005, our maximum exposure to loss on these transactions, in which we had a significant variable interest, was $55 million and $88 million, respectively, consisting of the book value of our investments plus incremental guarantees of the senior interests that are held by third parties.

## NOTE 4: FINANCIAL GUARANTEES

**Principal and Interest Guarantees of PCs and Structured Securities**

We guarantee the payment of principal and interest on the PCs and Structured Securities we issue that are held by third parties. At December 31, 2006 and 2005, the maximum potential amount of future payments under these guarantees approximates the total unpaid principal balance of our PCs and Structured Securities held by third parties, which was $1,123 billion and $974 billion, respectively. However, the actual amount of future payments under these guarantees will be determined by the performance of the mortgage loans that underlie these PCs and Structured Securities.

During 2006 and 2005, we guaranteed $360.0 billion and $397.9 billion, respectively, of PCs and Structured Securities to third parties. Upon completion of the transfer of PCs or Structured Securities to third parties, we recognize the initial fair value of our obligation to make guarantee payments. The accounting methods for our guarantees of PCs and Structured Securities are further discussed in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES." At December 31, 2006 and 2005, we had a recognized Guarantee obligation on our consolidated balance sheets of $7.1 billion and $5.5 billion, respectively, which included $2.2 billion and $1.8 billion, respectively, of deferred guarantee income. In addition, we have a Reserve for guarantee losses on Participation Certificates that totaled $350 million and $295 million at December 31, 2006 and 2005, respectively, for incurred credit losses that were recognized in conjunction with PCs and Structured Securities held by third parties. The balance of PCs and Structured Securities held by third parties also included securities and loans issued by third parties that we guarantee totaling $6.7 billion and $6.6 billion at December 31, 2006 and 2005, respectively. Details of these guarantees are as follows:

- *Multifamily:* We guaranteed multifamily housing revenue bonds totaling $6.0 billion and $5.8 billion at December 31, 2006 and 2005, respectively, via two principal forms. First, we provide a guarantee of the payment of principal and interest on tax-exempt (and related taxable) multifamily housing revenue bonds that support pass-through certificates issued by third parties. These housing revenue bonds are collateralized by mortgage loans on low- and moderate-income multifamily housing projects. Second, we provide a guarantee of principal and interest on multifamily mortgage loans that are originated and held by state and municipal housing finance agencies to support tax-exempt (and related taxable) multifamily housing revenue bonds.

- *Single-family:* We guaranteed single-family mortgage loans held by third parties totaling $0.7 billion and $0.8 billion at December 31, 2006 and 2005, respectively.

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided a commitment to advance funds, commonly referred to as "liquidity guarantees," totaling $5.8 billion and $5.7 billion at December 31, 2006 and 2005, respectively. These guarantees enable the repurchase by others of tendered tax-exempt (and related taxable) pass-through certificates and housing revenue bonds that are unable to be remarketed. Any repurchased securities would be pledged to us to secure such funding until such time as the securities could be remarketed. We have not made any payments to date under these liquidity guarantees.

Generally, the contractual terms of our guarantees on PCs and Structured Securities are 15 to 30 years. However, the actual term of each guarantee may be significantly less than the contractual term due to the prepayment characteristics of the mortgage-related assets that back PCs and Structured Securities. We generally purchase a defaulted mortgage when it has been delinquent for 120 consecutive days, we do not expect the maximum potential interest payments we would be required to make associated with these guarantees to significantly exceed 120 days of interest at the certificate rate.

At December 31, 2006 and 2005, in connection with PCs or Structured Securities backed by single-family mortgage loans, we had maximum coverage totaling $30.7 billion and $27.5 billion, respectively, in primary mortgage insurance, $3.2 billion and $3.4 billion, respectively, in pool insurance and other credit enhancements and $8.9 billion and $5.6 billion, respectively, in recourse to lenders. The coverage does not include credit enhancements related to the outstanding Structured Transactions which had unpaid principal balances that totaled $7.8 billion and $8.6 billion, at December 31, 2006 and 2005, respectively. In addition, at December 31, 2006 and 2005, $1.5 billion and $1.9 billion, respectively, of outstanding Structured Securities related to Ginnie Mae Certificates, which are backed by the full faith and credit of the U.S. government. With respect to PCs and Structured Securities backed by multifamily mortgage loans, we had maximum combined credit enhancements totaling $1.2 billion and $7.3 billion at December 31, 2006 and 2005, respectively. At December 31, 2006 and 2005, our recorded balance of credit enhancements on our consolidated balance sheets was $466 million and $420 million, respectively.

**Guarantees of Stated Final Maturity of Issued Structured Securities**

We commonly issue Structured Securities with stated final maturities that are shorter than the stated maturity of the underlying mortgage loans. If the assets that back such Structured Securities have not been purchased by a third party or fully matured as of the stated final maturity date of such securities, we may sponsor an auction of the underlying assets. To

the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due to investors in such Structured Securities, we are obligated to fund such principal. Such guarantees of stated final maturity are accounted for as derivative instruments.

At December 31, 2006 and 2005, the maximum potential amount of payments we could be required to make under guarantees of stated final maturity of issued Structured Securities was $22.7 billion and $11.7 billion, respectively, which represents the outstanding unpaid principal balance of the underlying mortgage loans. At December 31, 2006 and 2005, the total fair value of recognized liabilities concerning such guarantees was $6 million and $2 million, respectively.

**Indemnifications**

In connection with various business transactions, we sometimes provide indemnification to counterparties for breaches of certain obligations (*e.g.,* those arising from representations and warrantees) in contracts entered into in the normal course of business. It is difficult to estimate our maximum exposure under these indemnification arrangements because in many cases there are no stated or notional amounts included in the indemnification clauses. At December 31, 2006, our assessment is that the risk of any material loss from such a claim for indemnification is remote. Such indemnification provisions pertain to matters such as hold harmless clauses, adverse changes in tax laws, breaches of confidentiality, misconduct and potential claims from third parties related to items such as actual or alleged infringement of intellectual property. We have not recorded any liabilities related to these indemnifications on our consolidated balance sheets at December 31, 2006 and 2005 because there are no reasonably probable and estimable losses associated with these contracts.

**Other Guarantees**

We have guaranteed the performance of interest-rate swap contracts in three circumstances. First, as part of a resecuritization transaction, we transferred certain swaps and related assets to a third party. We guaranteed that interest income generated from the assets would be sufficient to cover the required payments under the interest-rate swap contracts. Second, we guaranteed that a borrower would perform under an interest-rate swap contract linked to a customer's variable-rate mortgage. And third, in connection with certain Structured Securities, we guaranteed that the sponsor of the securitized multifamily housing revenue bonds would perform under the interest-rate swap contract linked to the variable-rate certificates we issued, which are backed by the bonds. The maximum remaining terms of any of these guarantees at December 31, 2006 and 2005 were 28 years and 29 years, respectively; however, the actual terms may be significantly less than the contractual terms because the mortgage loans underlying the swaps are prepayable. The maximum potential amount of future undiscounted payments under the guarantees was $779 million and $717 million at December 31, 2006 and 2005, respectively. At December 31, 2006 and 2005, the total fair value of recognized liabilities concerning such guarantees was $3 million and $2 million, respectively.

We provide guarantees to reimburse servicers for premiums paid to acquire servicing in situations where the original seller is unable to perform under its separate servicing agreement. Our servicing-related premium guarantees are payable according to a vesting schedule for up to five years from the date of purchase of servicing rights. The maximum potential amount of future payments under these servicing-related premium guarantees was $44 million and $54 million at December 31, 2006 and 2005, respectively. We have not established a liability on our consolidated balance sheets at December 31, 2006 and 2005 because we do not expect material amounts to be paid under these arrangements.

### NOTE 5: RETAINED PORTFOLIO AND CASH AND INVESTMENTS PORTFOLIO

Table 5.1 summarizes amortized cost, estimated fair values and corresponding gross unrealized gains and gross unrealized losses by major security type for available-for-sale securities.

**Table 5.1 — Available-For-Sale Securities**

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | (in millions) | | |
| **December 31, 2006** | | | | |
| *Retained portfolio:* | | | | |
| Mortgage-related securities issued by: | | | | |
| Freddie Mac | $347,700 | $1,753 | $(5,365) | $344,088 |
| Fannie Mae | 44,223 | 323 | (660) | 43,886 |
| Ginnie Mae | 720 | 17 | (4) | 733 |
| Other | 224,642 | 553 | (1,096) | 224,099 |
| Obligations of states and political subdivisions | 13,622 | 334 | (31) | 13,925 |
| Total mortgage-related securities | 630,907 | 2,980 | (7,156) | 626,731 |
| *Cash and investments portfolio:* | | | | |
| Non-mortgage-related securities: | | | | |
| Asset-backed securities | 32,179 | 23 | (80) | 32,122 |
| Obligations of states and political subdivisions | 2,273 | — | — | 2,273 |
| Commercial paper | 11,191 | — | — | 11,191 |
| Total non-mortgage-related securities | 45,643 | 23 | (80) | 45,586 |
| Total available-for-sale securities | $676,550 | $3,003 | $(7,236) | $672,317 |
| **December 31, 2005** | | | | |
| *Retained portfolio:* | | | | |
| Mortgage-related securities issued by: | | | | |
| Freddie Mac | $354,573 | $1,848 | $(4,974) | $351,447 |
| Fannie Mae | 43,784 | 389 | (867) | 43,306 |
| Ginnie Mae | 1,085 | 33 | (3) | 1,115 |
| Other | 231,693 | 692 | (1,029) | 231,356 |
| Obligations of states and political subdivisions | 11,022 | 272 | (53) | 11,241 |
| Total mortgage-related securities | 642,157 | 3,234 | (6,926) | 638,465 |
| *Cash and investments portfolio:* | | | | |
| Non-mortgage-related securities: | | | | |
| Asset-backed securities | 30,712 | 22 | (156) | 30,578 |
| Obligations of states and political subdivisions | 5,835 | — | (12) | 5,823 |
| Commercial paper | 5,764 | — | — | 5,764 |
| Total non-mortgage-related securities | 42,311 | 22 | (168) | 42,165 |
| Total available-for-sale securities | $684,468 | $3,256 | $(7,094) | $680,630 |

Table 5.2 shows the fair value of available-for-sale securities in a gross unrealized loss position and whether they have been in that position less than 12 months or 12 months or greater.

**Table 5.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position**

| | Less than 12 months | | 12 months or Greater | | Total | |
|---|---|---|---|---|---|---|
| **December 31, 2006** | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses |
| | | | (in millions) | | | |
| *Retained portfolio:* | | | | | | |
| Mortgage-related securities issued by: | | | | | | |
| Freddie Mac | $38,386 | $(262) | $190,504 | $(5,103) | $228,890 | $(5,365) |
| Fannie Mae | 5,604 | (69) | 22,567 | (591) | 28,171 | (660) |
| Ginnie Mae | 146 | — | 99 | (4) | 245 | (4) |
| Other | 35,228 | (110) | 36,072 | (986) | 71,300 | (1,096) |
| Obligations of states and political subdivisions | 959 | (7) | 1,245 | (24) | 2,204 | (31) |
| Total mortgage-related securities | 80,323 | (448) | 250,487 | (6,708) | 330,810 | (7,156) |
| *Cash and investments portfolio:* | | | | | | |
| Non-mortgage-related securities: | | | | | | |
| Asset-backed securities | 6,402 | (7) | 9,141 | (73) | 15,543 | (80) |
| Total non-mortgage-related securities | 6,402 | (7) | 9,141 | (73) | 15,543 | (80) |
| Total available-for-sale securities in a gross unrealized loss position | $86,725 | $(455) | $259,628 | $(6,781) | $346,353 | $(7,236) |

At December 31, 2006, gross unrealized losses on available-for-sale securities were $7,236 million, or approximately 2 percent of the fair value of such securities in an unrealized loss position, as noted in Table 5.2. The gross unrealized losses relate to approximately 84 thousand individual lots representing approximately 16 thousand separate securities. We routinely purchase multiple lots of individual securities at different times and at different costs. We determine gross unrealized gains and gross unrealized losses by specifically identifying investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security are in an unrealized loss position, depending upon the amortized cost of the specific lot.

We have the ability and intent to hold the available-for-sale securities in an unrealized loss position for a period of time sufficient to recover all unrealized losses. Based on our ability and intent to hold these available-for-sale securities and our consideration of other factors described below, we have concluded that the impairment of these securities is temporary.

- **Freddie Mac securities.**   The unrealized losses on our securities are primarily a result of movements in interest rates. Because we guarantee the payment of principal and interest on these securities, we review the estimated credit exposure of the mortgages underlying these securities in evaluating potential impairment. The extent and duration of the decline in fair value relative to the amortized cost have met our criteria that are used to indicate that the impairment of these securities is temporary.

- **Federal National Mortgage Association, or Fannie Mae, securities and Obligations of states and political subdivisions.**   The unrealized losses on Fannie Mae securities and Obligations of states and political subdivisions are primarily a result of movements in interest rates. The extent and duration of the decline in fair value relative to the amortized cost have met our criteria that are used to indicate that the impairment of these securities is temporary and no other facts or circumstances existed to suggest that the decline was not temporary. The issuer guarantees related to these securities have led us to conclude that any credit risk is minimal.

- **Other securities in the Retained portfolio and Asset-backed securities in the Cash and investments portfolio.**   The unrealized losses on mortgage-related securities included in Other and Asset-backed securities are principally a result of movements in interest rates. The extent and duration of the decline in fair value relative to the amortized cost have met our criteria that are used to indicate that the impairment of these securities is temporary. Most of these securities are investment grade (*i.e.*, rated BBB– or better on a Standard & Poor's, or S&P, or equivalent scale).

Table 5.3 below illustrates the gross realized gains and gross realized losses received from the sale of available-for-sale securities.

**Table 5.3 — Gross Realized Gains and Gross Realized Losses on Available-For-Sale Securities**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
|  | (in millions) | | |
| Gross realized gains | $ 440 | $ 891 | $ 787 |
| Gross realized (losses) | (418) | (345) | (203) |
| Net realized gains | $  22 | $ 546 | $ 584 |

For the years ended December 31, 2006, 2005 and 2004, we recorded impairments related to investments in securities of $540 million, $371 million and $126 million, respectively.

Table 5.4 summarizes, by major security type, the remaining contractual maturities and weighted average yield of available-for-sale securities.

### Table 5.4 — Maturities and Weighted Average Yield of Available-For-Sale Securities

| December 31, 2006 | Amortized Cost | Fair Value | Weighted Average Yield[1] |
|---|---|---|---|
| | | (dollars in millions) | |
| *Retained portfolio:* | | | |
| Total mortgage-related securities[2] | | | |
| Due 1 year or less | $ 128 | $ 127 | 4.06% |
| Due after 1 through 5 years | 2,848 | 2,847 | 5.41 |
| Due after 5 through 10 years | 14,508 | 14,550 | 5.62 |
| Due after 10 years | 613,423 | 609,207 | 5.32 |
| Total | $630,907 | $626,731 | 5.33 |
| *Cash and investments portfolio:* | | | |
| Non-mortgage-related securities: | | | |
| Asset-backed securities[2] | | | |
| Due 1 year or less | $ 8 | $ 8 | 2.09 |
| Due after 1 through 5 years | 20,919 | 20,866 | 4.94 |
| Due after 5 through 10 years | 9,201 | 9,197 | 5.27 |
| Due after 10 years | 2,051 | 2,051 | 5.39 |
| Total | 32,179 | 32,122 | 5.07 |
| Obligations of states and political subdivisions[2] | | | |
| Due 1 year or less | 12 | 12 | 3.01 |
| Due after 1 through 5 years | 183 | 183 | 4.74 |
| Due after 5 through 10 years | 32 | 32 | 5.27 |
| Due after 10 years | 2,046 | 2,046 | 5.31 |
| Total | 2,273 | 2,273 | 5.25 |
| Commercial paper | | | |
| Due 1 year or less | 11,191 | 11,191 | 5.25 |
| Due after 1 through 5 years | — | — | — |
| Due after 5 through 10 years | — | — | — |
| Due after 10 years | — | — | — |
| Total | 11,191 | 11,191 | 5.25 |
| Total non-mortgage-related securities | | | |
| Due 1 year or less | 11,211 | 11,211 | 5.24 |
| Due after 1 through 5 years | 21,102 | 21,049 | 4.94 |
| Due after 5 through 10 years | 9,233 | 9,229 | 5.27 |
| Due after 10 years | 4,097 | 4,097 | 5.35 |
| Total | $ 45,643 | $ 45,586 | 5.12 |
| *Total available-for-sale securities for Retained portfolio and Cash and investments portfolio:* | | | |
| Due 1 year or less | $ 11,339 | $ 11,338 | 5.23 |
| Due after 1 through 5 years | 23,950 | 23,896 | 5.00 |
| Due after 5 through 10 years | 23,741 | 23,779 | 5.48 |
| Due after 10 years | 617,520 | 613,304 | 5.32 |
| Total | $676,550 | $672,317 | 5.32 |

(1) The weighted average yield is calculated based on a yield for each individual lot held at the balance sheet date. The numerator for the individual lot yield consists of the sum of (a) the year-end interest coupon rate multiplied by the year-end unpaid principal balance and (b) the annualized amortization income or expense calculated for December 2006 (excluding any adjustments recorded for changes in the effective rate). The denominator for the individual lot yield consists of the year-end amortized cost of the lot excluding effects of other-than-temporary impairments on the unpaid principal balances of impaired lots.

(2) Maturity information provided is based on contractual maturities, which may not represent expected life, as obligations underlying these securities may be prepaid at any time without penalty.

Table 5.5 presents the changes in AOCI, net of taxes, related to available-for-sale securities. The Net unrealized holding (losses), net of tax, represents the net fair value adjustments recorded on available-for-sale securities throughout the year, after the effects of our statutory tax rate of 35 percent. The Net reclassification adjustment for net realized losses (gains), net of tax, represents the amount of those fair value adjustments, after the effects of our statutory tax rate of 35 percent, that have been recognized in earnings due to a sale of an available-for-sale security or the recognition of an impairment loss. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information regarding the component of AOCI related to available-for-sale securities.

**Table 5.5 — AOCI, Net of Taxes, Related to Available-For-Sale Securities**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | | (in millions) | |
| Beginning balance | $(2,485) | $ 4,339 | $ 6,349 |
| Net unrealized holding (losses), net of tax[1] | (525) | (6,707) | (1,709) |
| Net reclassification adjustment for net realized losses (gains), net of tax[2][3] | 261 | (117) | (301) |
| Ending balance | $(2,749) | $(2,485) | $ 4,339 |

(1) Net of tax (benefit) of $(282) million, $(3,611) million and $(920) million for the years ended December 31, 2006, 2005 and 2004, respectively.
(2) Net of tax benefit (expense) of $139 million, $(63) million and $(162) million for the years ended December 31, 2006, 2005 and 2004, respectively.
(3) Includes the reversal of previously recorded unrealized losses that have been recognized as impairment losses on available-for-sale securities of $281 million, $234 million and $72 million, net of taxes, for the years ended December 31, 2006, 2005 and 2004, respectively.

Table 5.6 summarizes the estimated fair values by major security type for trading securities held in our Retained portfolio.

**Table 5.6 — Trading Securities in the Retained Portfolio**

| | December 31, | |
|---|---|---|
| | 2006 | 2005 |
| | (in millions) | |
| Mortgage-related securities issued by: | | |
| Freddie Mac | $6,573 | $ 8,156 |
| Fannie Mae | 802 | 534 |
| Ginnie Mae | 222 | 204 |
| Total trading securities in the Retained portfolio | $7,597 | $ 8,894 |

For the years ended December 31, 2006, 2005 and 2004 we recorded net unrealized losses on trading securities held at December 31, 2006, 2005 and 2004 of $11 million, $261 million and $240 million, respectively.

**Retained Portfolio Voluntary Growth Limit**

Effective as of July 1, 2006, we voluntarily limited the growth of our Retained portfolio to no more than 2.0 percent annually (and 0.5 percent quarterly on a cumulative basis) based on its carrying value as reported in our minimum capital report to OFHEO filed on July 28, 2006, which was $710.3 billion. This voluntary, temporary growth limit was made in response to a request from OFHEO. At December 31, 2006, the carrying value of the Retained portfolio as reported on our consolidated balance sheets was $700.5 billion, below the voluntary limit of $717.4 billion at that time.

**Collateral Pledged**

*Collateral Pledged to Freddie Mac*

Our counterparties are required to pledge collateral for reverse repurchase transactions and most interest-rate swap agreements, after giving consideration to collateral posting thresholds generally related to a counterparty's credit rating. Even though it is our practice not to repledge assets held as collateral, based on master agreements a portion of the collateral may be repledged. At December 31, 2006 and 2005, we did not have collateral in the form of securities pledged to and held by us under secured lending transactions and interest-rate swap agreements.

*Collateral Pledged by Freddie Mac*

We are also required to pledge collateral for margin requirements with third-party custodians in connection with secured financings, interest-rate swap agreements, futures and daily trade activities with some counterparties. In 2006, we opened three uncommitted intraday lines of credit with third-parties, two of which are secured, in connection with the Federal Reserve Board's revised payments system risk policy, which restricts or eliminates daylight overdrafts by GSEs, including us, in connection with our use of the Fedwire system. In certain limited circumstances, the line of credit agreements give the secured parties the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank. We pledge collateral to meet these requirements upon a demand by the respective counterparty.

*Freddie Mac*

Table 5.7 summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged.

**Table 5.7 — Collateral in the Form of Securities Pledged**

| | December 31, | |
| --- | --- | --- |
| | 2006 | 2005 |
| | (in millions) | |
| Securities pledged with ability for secured party to repledge (parenthetically disclosed on our consolidated balance sheets) | | |
| Available-for-sale ........................................................................................................... | $20,463 | $168 |
| Securities pledged without ability for secured party to repledge | | |
| Available-for-sale ........................................................................................................... | 225 | 161 |
| Total securities pledged .................................................................................................... | $20,688 | $329 |

## NOTE 6: LOAN LOSS RESERVES

We maintain separate loan loss reserves for mortgage loans in the Retained portfolio that we classify as held-for-investment and for credit-related losses associated with certain mortgage loans that underlie guaranteed PCs and Structured Securities held by third parties.

Table 6.1 summarizes loan loss reserve activity:

**Table 6.1 — Detail of Loan Loss Reserves**

| | Year-Ended December 31, | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 | | | 2005 | | | 2004 | | |
| | Reserves related to: | | Total Loan Loss Reserves | Reserves related to: | | Total Loan Loss Reserves | Reserves related to: | | Total Loan Loss Reserves |
| | Retained Mortgages | PCs Outstanding | | Retained Mortgages | PCs Outstanding | | Retained Mortgages | PCs Outstanding | |
| | (in millions) | | | | | | | | |
| Beginning balance ......................... | $ 119 | $295 | $ 414 | $ 114 | $150 | $ 264 | $ 174 | $125 | $ 299 |
| Provision for credit losses ................. | 98 | 117 | 215 | 106 | 145 | 251 | 111 | 32 | 143 |
| Charge-offs[1] .............................. | (313) | — | (313) | (294) | — | (294) | (300) | — | (300) |
| Recoveries[1] .............................. | 166 | — | 166 | 185 | — | 185 | 160 | — | 160 |
| Transfers-out.............................. | — | (71) | (71) | — | (11) | (11) | — | (20) | (20) |
| Other transfers, net[2] ..................... | — | 9 | 9 | 8 | 11 | 19 | (31) | 13 | (18) |
| Ending balance ............................ | $ 70 | $350 | $ 420 | $ 119 | $295 | $ 414 | $ 114 | $150 | $ 264 |

(1) It is our practice to purchase mortgage loans from the pools that underlie PCs principally at the point the mortgage loan is identified as being 120 days past due. Because all credit losses related to off-balance sheet PCs are preceded by the purchase of a delinquent mortgage loan from the PC pool, all charge-offs or recoveries are presented in the Retained Mortgages columns above.
(2) Represents the portion of the Guarantee obligation recognized through Guarantor Swap transactions or upon the sale of PCs and Structured Securities that corresponds to incurred credit losses reclassified to reserve for guarantee losses on Participation Certificates upon initial recognition of a Guarantee obligation. In addition, the amount includes an increase (reduction) of loan loss reserves of $9 million and $(31) million in 2005 and 2004, respectively, related to prior period adjustments for which the related income was recorded in Other income.

### Impaired Loans

Total loan loss reserves, as presented in "Table 6.1 — Detail of Loan Loss Reserves," consists of a specific valuation allowance related to impaired loans, which is presented in Table 6.2, and an additional reserve for other probable incurred losses, which totaled $414 million, $398 million and $261 million at December 31, 2006, 2005 and 2004, respectively. Our recorded investment in impaired loans and the related valuation allowance are summarized in Table 6.2.

**Table 6.2 — Impaired Loans[1]**

| | December 31, | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 | | | 2005 | | | 2004 | | |
| | Recorded Investment[2] | Specific Reserve | Net Investment | Recorded Investment[2] | Specific Reserve | Net Investment | Recorded Investment[2] | Specific Reserve | Net Investment |
| | (in millions) | | | | | | | | |
| Impaired loans having: | | | | | | | | | |
| Related-valuation allowance ........................... | $ 86 | $(6) | $ 80 | $ 54 | $(16) | $ 38 | $ 46 | $(3) | $ 43 |
| No related-valuation allowance[3] .................... | 5,869 | — | 5,869 | 2,536 | — | 2,536 | 2,261 | — | 2,261 |
| Total ............................................. | $5,955 | $(6) | $5,949 | $2,590 | $(16) | $2,574 | $2,307 | $(3) | $2,304 |

(1) Single-family impaired loans include performing and non-performing troubled debt restructurings. Also, in 2006, all loans purchased out of PC pools that were 120 days delinquent were impaired. Multifamily impaired loans are defined as performing and non-performing troubled debt restructurings, loans that are 60 days or more delinquent, except for certain credit-enhanced loans, and certain mortgage loans with real estate collateral values less than the outstanding unpaid principal balances. For more details on multifamily impaired loans, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."
(2) Recorded Investment includes the unpaid principal balance of mortgage loans plus other amortized basis adjustments, which are modifications to their carrying value.
(3) Impaired loans with no related valuation allowance primarily represent performing single-family troubled debt restructuring loans and impaired loans purchased out of PC pools.

For the years ended December 31, 2006, 2005 and 2004, the average recorded investment in impaired loans was $4,215 million, $2,601 million and $2,311 million, respectively. The increase in impaired loans in 2006 relates to impaired loans purchased out of PC pools at 120 days of delinquency. In 2006, we purchased approximately $4,833 million of such impaired loans out of PC pools. At December 31, 2006, the carrying value of such loans was approximately $3,160 million, net of a related discount of $227 million, a portion of which will be accreted to income if the related loans re-perform. In addition, impaired loans includes additions related to an economic downturn affecting the North Central region in 2006 and Hurricane Katrina in 2005.

Interest income on multifamily impaired loans is recognized on an accrual basis for loans performing under the original or restructured terms and on a cash basis for non-performing loans, which collectively totaled approximately $25 million, $24 million and $13 million for the years ended December 31, 2006, 2005 and 2004, respectively. For single-family performing and non-performing loans, we recognize interest income on an accrual basis and establish reserves for estimated accrued but uncollectible interest for these loans at the consolidated balance sheet dates. Gross interest income on impaired troubled debt restructuring single-family loans totaled $177 million, $149 million and $157 million for the years ended December 31, 2006, 2005 and 2004, respectively.

**Delinquency Rates**

Table 6.3 summarizes the delinquency rates for our Total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of Structured Securities that is backed by Ginnie Mae Certificates.

**Table 6.3 — Delinquency Performance[1]**

| | December 31, | | |
| --- | --- | --- | --- |
| | 2006 | 2005 | 2004 |
| Delinquencies, end of period: | | | |
| Single-family:[2] | | | |
| Non-credit-enhanced portfolio: | | | |
| Delinquency rate | 0.25% | 0.30% | 0.24% |
| Total number of delinquent loans | 22,854 | 26,037 | 19,691 |
| Credit-enhanced portfolio: | | | |
| Delinquency rate | 1.86% | 2.46% | 2.75% |
| Total number of delinquent loans | 36,008 | 47,000 | 54,913 |
| Total portfolio: | | | |
| Delinquency rate | 0.53% | 0.69% | 0.73% |
| Total number of delinquent loans | 58,862 | 73,037 | 74,604 |
| Multifamily:[3] | | | |
| Total portfolio: | | | |
| Delinquency rate | 0.05% | —% | 0.06% |
| Net carrying value of delinquent loans (in millions) | $ 30 | $ 2 | $ 35 |

(1) Based on mortgage loans in the Retained portfolio and Total Guaranteed PCs and Structured Securities Issued, excluding that portion of Structured Securities that is backed by Ginnie Mae Certificates and certain Structured Transactions where delinquency data on the underlying mortgage-related securities is not available. The Structured Transactions we have excluded represented 0.06 percent, 0.04 percent and 0.07 percent of our Total mortgage portfolio at December 31, 2006, 2005 and 2004, respectively.

(2) Based on the number of mortgage loans 90 days or more delinquent or in foreclosure.

(3) Based on net carrying value of mortgage loans 60 days or more delinquent.

## NOTE 7: REAL ESTATE OWNED

We obtain REO properties when we are the highest bidder at foreclosure sales of properties that collateralize non-performing single-family and multifamily mortgage loans owned by us. Upon acquiring single-family properties, we establish a marketing plan to sell the property as soon as practicable by either listing it with a sales broker or by other means, such as arranging a real estate auction. Upon acquiring multifamily properties, we may operate them with third-party property-management firms for a period to stabilize value and then sell the properties through commercial real estate brokers. For each of the years ended December 31, 2006 and 2005, the weighted average holding period for our disposed REO properties was less than one year. Table 7.1 provides a summary of our REO activity.

**Table 7.1 — Real Estate Owned**

| | REO, Gross | Valuation Allowance | REO, Net |
| --- | --- | --- | --- |
| | | (in millions) | |
| Balance, December 31, 2004 | $ 867 | $(126) | $ 741 |
| Additions | 1,390 | (78) | 1,312 |
| Dispositions and write-downs | (1,513) | 89 | (1,424) |
| Balance, December 31, 2005 | 744 | (115) | 629 |
| Additions | 1,484 | (85) | 1,399 |
| Dispositions and write-downs | (1,357) | 72 | (1,285) |
| Balance, December 31, 2006 | $ 871 | $(128) | $ 743 |

We recognized net losses of $59 million, $67 million and $67 million on REO dispositions for the years ended December 31, 2006, 2005 and 2004, respectively, which are included in REO operations income (expense).

## NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities are classified as either due within one year or due after one year based on their remaining contractual maturity. Table 8.1 summarizes the balances and effective interest rates for debt securities, as well as subordinated borrowings.

### Table 8.1 — Total Debt Securities, Net

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2006 | | 2005 | |
| | Balance, Net[1] | Effective Rate[2] | Balance, Net[1] | Effective Rate[2] |
| | | (dollars in millions) | | |
| Senior debt, due within one year: | | | | |
| Short-term debt securities | $176,982 | 5.14% | $192,713 | 4.01% |
| Current portion of long-term debt | 117,879 | 4.10 | 95,819 | 3.42 |
| Senior debt, due within one year | 294,861 | 4.73 | 288,532 | 3.81 |
| | | | | |
| Senior debt, due after one year | 452,677 | 5.08 | 454,627 | 4.64 |
| Subordinated debt, due after one year | 6,400 | 5.86 | 5,633 | 6.15 |
| Senior and subordinated debt, due after one year | 459,077 | 5.09 | 460,260 | 4.66 |
| Total debt securities, net | $753,938 | | $748,792 | |

(1) Includes unamortized discounts and premiums, and foreign-currency-related and hedging-related basis adjustments.
(2) Represents the weighted average effective rate at the end of the period, which includes the amortization of discounts or premiums and issuance costs, but excludes the amortization of hedging-related basis adjustments.

### Senior Debt, Due Within One Year

As indicated in Table 8.2, a majority of Senior debt, due within one year (excluding current portion of long-term debt) consisted of Reference Bills® securities and discount notes, paying only principal at maturity. Reference Bills® securities, discount notes and Medium-term Notes are unsecured general corporate obligations. Certain Medium-term Notes that have original maturities of one year or less are classified as Short-term debt securities. Securities sold under agreements to repurchase are effectively collateralized borrowing transactions where we sell securities with an agreement to repurchase such securities. These agreements require the underlying securities to be delivered to the dealers who arranged the transactions. Federal funds purchased are unsecuritized borrowings from commercial banks that are members of the Federal Reserve System.

Table 8.2 provides additional information related to our debt securities due within one year.

### Table 8.2 — Senior Debt, Due Within One Year

| | December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2006 | | | 2005 | | |
| | Par Value | Balance, Net[1] | Effective Rate | Par Value | Balance, Net[1] | Effective Rate |
| | | | (dollars in millions) | | | |
| Reference Bills® securities and discount notes[2] | $159,503 | $157,553 | 5.14% | $183,357 | $181,468 | 4.00% |
| Medium-term Notes[2] | 9,832 | 9,832 | 5.16 | 2,035 | 2,032 | 4.17 |
| Securities sold under agreements to repurchase and Federal funds purchased[3] | — | — | — | 450 | 450 | 4.25 |
| Swap collateral obligations[3] | 9,552 | 9,597 | 5.17 | 8,736 | 8,768 | 4.09 |
| Hedging-related basis adjustments | N/A | — | N/A | N/A | (5) | N/A |
| Short-term debt securities | 178,887 | 176,982 | 5.14 | 194,578 | 192,713 | 4.01 |
| Current portion of long-term debt | 117,972 | 117,879 | 4.10 | 95,596 | 95,819 | 3.42 |
| Senior debt, due within one year | $296,859 | $294,861 | 4.73 | $290,174 | $288,532 | 3.81 |

(1) Represents par value, net of associated discounts, premiums and foreign-currency-related and hedging-related basis adjustments. Swap collateral obligations include the related accrued interest payable.
(2) Represents the approximate weighted average effective rate for each instrument outstanding at the end of the period, which includes the amortization of discounts or premiums and issuance costs, but excludes the amortization of hedging-related basis adjustments.
(3) Represents the weighted average effective rate for each instrument outstanding at the end of the period.

**Senior and Subordinated Debt, Due After One Year**

Table 8.3 summarizes our senior and subordinated debt, due after one year.

**Table 8.3 — Senior and Subordinated Debt, Due After One Year**

| | Contractual Maturity[1] | 2006 | | | 2005 | | |
|---|---|---|---|---|---|---|---|
| | | Par Value | Balance, Net[2] | Interest Rates | Par Value | Balance, Net[2] | Interest Rates |
| | | | | *(dollars in millions)* | | | |
| Senior debt, due after one year:[3] | | | | | | | |
| Fixed-rate: | | | | | | | |
| Medium-term Notes — Callable[4] | 2008-2037 | $183,611 | $183,532 | 2.57% - 7.50% | $182,251 | $182,173 | 2.00% - 7.91% |
| Medium-term Notes — Non-callable | 2008-2028 | 5,764 | 5,798 | 1.00% - 10.27% | 19,927 | 19,936 | 1.00% - 7.69% |
| U.S. dollar Reference Notes® securities — Non-callable | 2008-2032 | 195,289 | 194,772 | 2.75% - 7.00% | 172,551 | 171,962 | 2.38% - 7.00% |
| €Reference Notes® securities — Non-callable | 2008-2014 | 16,912 | 16,878 | 3.50% - 5.75% | 25,528 | 25,478 | 3.50% - 5.75% |
| Variable-rate: | | | | | | | |
| Medium-term Notes — Callable[5] | 2008-2030 | 28,617 | 28,616 | Various | 28,709 | 28,709 | Various |
| Medium-term Notes — Non-callable[6] | 2008-2026 | 421 | 460 | Various | 5,809 | 5,858 | Various |
| Zero-coupon: | | | | | | | |
| Medium-term Notes — Callable[7] | 2014-2036 | 43,248 | 8,610 | —% | 39,939 | 7,675 | —% |
| Medium-term Notes — Non-callable[8] | 2008-2034 | 10,535 | 6,204 | —% | 9,598 | 5,287 | —% |
| Foreign-currency-related and hedging-related basis adjustments | | N/A | 7,807 | | N/A | 7,549 | |
| Total senior debt, due after one year | | 484,397 | 452,677 | | 484,312 | 454,627 | |
| Subordinated debt, due after one year: | | | | | | | |
| Fixed-rate[9] | 2011-2018 | 6,382 | 6,309 | 5.00% - 8.25% | 5,564 | 5,550 | 5.25% - 8.25% |
| Zero-coupon[10] | 2019 | 332 | 91 | —% | 332 | 83 | —% |
| Total subordinated debt, due after one year | | 6,714 | 6,400 | | 5,896 | 5,633 | |
| Total senior and subordinated debt, due after one year | | $491,111 | $459,077 | | $490,208 | $460,260 | |

(1)  Represents contractual maturities at December 31, 2006.
(2)  Represents par value of long-term debt securities and subordinated borrowings, net of associated discounts or premiums.
(3)  For debt denominated in a currency other than the U.S. dollar, the outstanding balance is based on the exchange rate at the date of the debt issuance. Subsequent changes in exchange rates are reflected in Foreign-currency-related and hedging-related basis adjustments.
(4)  Includes callable Estate Notes[SM] securities and FreddieNotes® securities of $12,951 million and $11,805 million at December 31, 2006 and 2005, respectively. These debt instruments represent Medium-term Notes that permit persons acting on behalf of deceased beneficial owners to require us to repay principal prior to the contractual maturity date.
(5)  Includes callable Estate Notes[SM] securities and FreddieNotes® securities of $7,800 million and $6,987 million at December 31, 2006 and 2005, respectively.
(6)  Includes Medium-term Notes of $— million and $800 million at December 31, 2006 and 2005, which are repayable in whole or in part at the option of the beneficial owner, acting through the holder, on or after November 22, 2002 and prior to November 20, 2007 at 100 percent of the principal amount plus accrued interest.
(7)  The effective rates for Zero-coupon Medium-term Notes — Callable ranged from 5.57% - 7.17% and 3.53% - 7.12% at December 31, 2006 and 2005, respectively.
(8)  The effective rates for Zero-coupon Medium-term Notes — Non-callable ranged from 2.65% - 10.68% and 2.56% - 10.68% at December 31, 2006 and 2005, respectively.
(9)  Balance, Net includes callable subordinated debt of $1,928 million and $3,493 million at December 31, 2006 and 2005, respectively.
(10)  The effective rates for Subordinated Debt, due after one year Zero-coupon were 10.20% and 10.20% at December 31, 2006 and 2005, respectively.

A portion of our long-term debt is callable. Callable debt gives us the option to redeem the debt security at par on one or more specified call dates or at any time on or after a specified call date.

Table 8.4 summarizes the contractual maturities of long-term debt securities (including current portion of long-term debt) and subordinated borrowings outstanding at December 31, 2006, assuming callable debt is paid at contractual maturity.

**Table 8.4 — Senior and Subordinated Debt, Due After One Year (including current portion of long-term debt)**

| Annual Maturities | Contractual Maturity[1][2] |
|---|---|
| | *(in millions)* |
| 2007 | $117,972 |
| 2008 | 98,313 |
| 2009 | 63,231 |
| 2010 | 46,681 |
| 2011 | 55,208 |
| Thereafter | 227,678 |
| Total[1] | 609,083 |
| Net discounts, premiums and foreign-currency-related and hedging-related basis adjustments[2] | (32,127) |
| Senior and subordinated debt, due after one year, including current portion of long-term debt | $576,956 |

(1)  Represents par value of long-term debt securities and subordinated borrowings.
(2)  For debt denominated in a currency other than the U.S. dollar, the par value is based on the exchange rate at the date of the debt issuance. Subsequent changes in exchange rates are reflected in Net discounts, premiums and foreign-currency-related and hedging-related basis adjustments.

*Freddie Mac*

## Lines of Credit

We opened intraday lines of credit with third-parties to provide additional liquidity to fund our intraday activities through the Fedwire system in connection with the Federal Reserve Board's revised payments system risk policy, which restricts or eliminates daylight overdrafts by GSEs, including us. At December 31, 2006, we had three uncommitted lines of credit of which $20.0 billion is secured and $1.0 billion is unsecured. No amounts were drawn on these lines of credit at December 31, 2006. We expect to continue to use these facilities from time to time to satisfy our intraday financing needs; however, since the lines are uncommitted, we may not be able to draw on them if and when needed.

## NOTE 9: STOCKHOLDERS' EQUITY

### Preferred Stock

During 2006, we completed two preferred stock offerings consisting of three classes. We had no preferred stock offerings during 2005. All 20 classes of preferred stock outstanding at December 31, 2006 have a par value of $1 per share. We have the option to redeem these shares, on specified dates, at their redemption price plus dividends accrued through the redemption date. In addition, all 20 classes of preferred stock are perpetual and non-cumulative, and carry no significant voting rights or rights to purchase additional Freddie Mac stock or securities. Costs incurred in connection with the issuance of preferred stock are charged to Additional paid-in capital.

Table 9.1 provides a summary of our preferred stock outstanding at December 31, 2006.

### Table 9.1 — Preferred Stock

| | Issue Date | Shares Authorized | Shares Outstanding | Total Par Value | Redemption Price per Share | Total Outstanding Balance[1] | Redeemable On or After[2] | NYSE Symbol[3] |
|---|---|---|---|---|---|---|---|---|
| | | | | (in millions, except redemption price per share) | | | | |
| 1996 Variable-rate[4] . . . | April 26, 1996 | 5.00 | 5.00 | $ 5.00 | $50.00 | $ 250 | June 30, 2001 | FRE.prB |
| 6.14% . . . . . . . . . . . . . . . | June 3, 1997 | 12.00 | 12.00 | 12.00 | 50.00 | 600 | June 30, 2002 | FRE.prD |
| 5.81% . . . . . . . . . . . . . . . | October 27, 1997 | 3.00 | 3.00 | 3.00 | 50.00 | 150 | October 27, 1998 | (5) |
| 5% . . . . . . . . . . . . . . . . . | March 23, 1998 | 8.00 | 8.00 | 8.00 | 50.00 | 400 | March 31, 2003 | FRE.prF |
| 1998 Variable-rate[6] . . . | September 23 and 29, 1998 | 4.40 | 4.40 | 4.40 | 50.00 | 220 | September 30, 2003 | FRE.prG |
| 5.1% . . . . . . . . . . . . . . . . | September 23, 1998 | 8.00 | 8.00 | 8.00 | 50.00 | 400 | September 30, 2003 | FRE.prH |
| 5.3% . . . . . . . . . . . . . . . . | October 28, 1998 | 4.00 | 4.00 | 4.00 | 50.00 | 200 | October 30, 2000 | (5) |
| 5.1% . . . . . . . . . . . . . . . . | March 19, 1999 | 3.00 | 3.00 | 3.00 | 50.00 | 150 | March 31, 2004 | (5) |
| 5.79% . . . . . . . . . . . . . . . | July 21, 1999 | 5.00 | 5.00 | 5.00 | 50.00 | 250 | June 30, 2009 | FRE.prK |
| 1999 Variable-rate[7] . . . | November 5, 1999 | 5.75 | 5.75 | 5.75 | 50.00 | 287 | December 31, 2004 | FRE.prL |
| 2001 Variable-rate[8] . . . | January 26, 2001 | 6.50 | 6.50 | 6.50 | 50.00 | 325 | March 31, 2003 | FRE.prM |
| 2001 Variable-rate[9] . . . | March 23, 2001 | 4.60 | 4.60 | 4.60 | 50.00 | 230 | March 31, 2003 | FRE.prN |
| 5.81% . . . . . . . . . . . . . . . | March 23, 2001 | 3.45 | 3.45 | 3.45 | 50.00 | 173 | March 31, 2011 | FRE.prO |
| 6% . . . . . . . . . . . . . . . . . | May 30, 2001 | 3.45 | 3.45 | 3.45 | 50.00 | 173 | June 30, 2006 | FRE.prP |
| 2001 Variable-rate[10] . . . | May 30, 2001 | 4.02 | 4.02 | 4.02 | 50.00 | 201 | June 30, 2003 | FRE.prQ |
| 5.7% . . . . . . . . . . . . . . . . | October 30, 2001 | 6.00 | 6.00 | 6.00 | 50.00 | 300 | December 31, 2006 | FRE.prR |
| 5.81% . . . . . . . . . . . . . . . | January 29, 2002 | 6.00 | 6.00 | 6.00 | 50.00 | 300 | March 31, 2007 | (5) |
| 2006 Variable-rate[11] . . . | July 17, 2006 | 15.00 | 15.00 | 15.00 | 50.00 | 750 | June 30, 2011 | FRE.prS |
| 6.42% . . . . . . . . . . . . . . . | July 17, 2006 | 5.00 | 5.00 | 5.00 | 50.00 | 250 | June 30, 2011 | FRE.prT |
| 5.9% . . . . . . . . . . . . . . . . | October 16, 2006 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | September 30, 2011 | FRE.prU |
| Total . . . . . . . . . . . . . . . | | 132.17 | 132.17 | $132.17 | | $6,109 | | |

(1) Amounts stated at redemption value.
(2) As long as the capital monitoring framework established by the Office of Federal Housing Enterprise Oversight, or OFHEO, in January 2004 remains in effect, any preferred stock redemption will require prior approval by OFHEO. See "NOTE 10: REGULATORY CAPITAL" for more information.
(3) Preferred stock is listed on the New York Stock Exchange, or NYSE, unless otherwise noted.
(4) Dividend rate resets quarterly and is equal to the sum of three-month London Interbank Offered Rate, or LIBOR, plus 1 percent divided by 1.377, and is capped at 9.00 percent.
(5) Not listed on any exchange.
(6) Dividend rate resets quarterly and is equal to the sum of three-month LIBOR plus 1 percent divided by 1.377, and is capped at 7.50 percent.
(7) Dividend rate resets on January 1 every five years after January 1, 2005 based on a five-year Constant Maturity Treasury, or CMT, rate, and is capped at 11.00 percent. Optional redemption on December 31, 2004 and on December 31 every five years thereafter.
(8) Dividend rate resets on April 1 every two years after April 1, 2003 based on the two-year CMT rate plus 0.10 percent, and is capped at 11.00 percent. Optional redemption on March 31, 2003 and on March 31 every two years thereafter.
(9) Dividend rate resets on April 1 every year based on 12-month LIBOR minus 0.20 percent, and is capped at 11.00 percent. Optional redemption on March 31, 2003 and on March 31 every year thereafter.
(10) Dividend rate resets on July 1 every two years after July 1, 2003 based on the two-year CMT rate plus 0.20 percent, and is capped at 11.00 percent. Optional redemption on June 30, 2003 and on June 30 every two years thereafter.
(11) Dividend rate resets quarterly and is equal to the sum of three-month LIBOR plus 0.50 percent but not less than 4.00 percent.

### Stock Repurchase and Issuance Programs

During 2006, we repurchased $2.0 billion of outstanding shares of common stock and issued $1.5 billion of non-cumulative, perpetual preferred stock in connection with a plan to replace $2.0 billion of common stock with an equal amount of preferred stock. During the first quarter of 2007, we issued $1.1 billion of non-cumulative, perpetual preferred stock, including $500 million to complete the planned issuance described above and $600 million to replace higher-cost preferred stock that we redeemed in 2007. In accordance with OFHEO's capital monitoring framework, we obtained

OFHEO's approval for the common stock repurchases and the preferred stock redemption. We did not repurchase any outstanding shares of common stock in 2005.

**Common Stock Dividends Declared**

Common stock dividends declared per share were $1.91, $1.52 and $1.20 for 2006, 2005 and 2004, respectively.

**Dividends Declared During the First Quarter of 2007**

On March 2, 2007, our board of directors declared a quarterly dividend on our common stock of $0.50 per share and dividends on our preferred stock consistent with the contractual rates and terms shown in "Table 9.1 — Preferred Stock."

## NOTE 10: REGULATORY CAPITAL

**Regulatory Capital Standards**

The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, or GSE Act, established minimum, critical and risk-based capital standards for us.

Those standards determine the amounts of Core capital and Total capital that we must maintain to meet regulatory capital requirements. Core capital consists of the par value of outstanding common stock (common stock issued less common stock held in treasury), the par value of outstanding non-cumulative, perpetual preferred stock, additional paid-in capital and retained earnings, as determined in accordance with GAAP. Total capital includes Core capital and general reserves for mortgage and foreclosure losses and any other amounts available to absorb losses that OFHEO includes by regulation.

*Minimum Capital*

The minimum capital standard requires us to hold an amount of Core capital that is generally equal to the sum of 2.50 percent of aggregate on-balance sheet assets and approximately 0.45 percent of the sum of outstanding mortgage-related securities we guaranteed and other aggregate off-balance sheet obligations. As discussed below, in 2004 OFHEO implemented a framework for monitoring our capital adequacy, which includes a mandatory target capital surplus of 30 percent over the minimum capital requirement.

*Critical Capital*

The critical capital standard requires us to hold an amount of Core capital that is generally equal to the sum of 1.25 percent of aggregate on-balance sheet assets and approximately 0.25 percent of the sum of outstanding mortgage-related securities we guaranteed and other aggregate off-balance sheet obligations.

*Risk-Based Capital*

The risk-based capital standard requires the application of a stress test to determine the amount of Total capital that we must hold to absorb projected losses resulting from adverse interest-rate and credit-risk conditions specified by the GSE Act and adds 30 percent additional capital to provide for management and operations risk. The adverse interest-rate conditions prescribed by the GSE Act include one scenario in which 10-year Treasury yields rise by as much as 75 percent (up-rate scenario) and one in which they fall by as much as 50 percent (down-rate scenario). The credit risk component of the stress tests simulates the performance of our mortgage portfolio based on loss rates for a benchmark region. The criteria for the benchmark region are established by the GSE Act and are intended to capture the credit-loss experience of the region that experienced the highest historical rates of default and severity of mortgage losses for two consecutive origination years.

**Classification**

OFHEO monitors our performance with respect to the three regulatory capital standards by classifying our capital adequacy not less than quarterly.

To be classified as "adequately capitalized," we must meet both the risk-based and minimum capital standards. If we fail to meet the risk-based capital standard, we cannot be classified higher than "undercapitalized." If we fail to meet the minimum capital requirement but exceed the critical capital requirement, we cannot be classified higher than "significantly undercapitalized." If we fail to meet the critical capital standard, we must be classified as "critically undercapitalized." In addition, OFHEO has discretion to reduce our capital classification by one level if OFHEO determines that we are engaging in conduct OFHEO did not approve that could result in a rapid depletion of Core capital or determines that the value of property subject to mortgage loans we hold or guarantee has decreased significantly.

When we are classified as adequately capitalized, we generally can pay a dividend on our common or preferred stock or make other capital distributions (which includes common stock repurchases and preferred stock redemptions) without prior OFHEO approval so long as the payment would not decrease Total capital to an amount less than our risk-based capital requirement and would not decrease our Core capital to an amount less than our minimum capital requirement. However, because we are currently subject to the regulatory capital monitoring framework described below, we are required to obtain

OFHEO's prior approval of certain capital transactions, including common stock repurchases, redemption of any preferred stock or payment of dividends on preferred stock above stated contractual rates.

If we were classified as undercapitalized, we would be prohibited from making a capital distribution that would reduce our Core capital to an amount less than our minimum capital requirement. We also would be required to submit a capital restoration plan for OFHEO approval, which could adversely affect our ability to make capital distributions.

If we were classified as significantly undercapitalized, we would be prohibited from making any capital distribution that would reduce our Core capital to less than the critical capital level. We would otherwise be able to make a capital distribution only if OFHEO determined that the distribution would: (a) enhance our ability to meet the risk-based capital standard and the minimum capital standard promptly; (b) contribute to our long-term financial safety and soundness; or (c) otherwise be in the public interest. Also under this classification, OFHEO could take action to limit our growth, require us to acquire new capital or restrict us from activities that create excessive risk. We also would be required to submit a capital restoration plan for OFHEO approval, which could adversely affect our ability to make capital distributions.

If we were classified as critically undercapitalized, OFHEO would be required to appoint a conservator for us, unless OFHEO made a written finding that it should not do so and the Secretary of the Treasury concurred in that determination. We would be able to make a capital distribution only if OFHEO determined that the distribution would: (a) enhance our ability to meet the risk-based capital standard and the minimum capital standard promptly; (b) contribute to our long-term financial safety and soundness; or (c) otherwise be in the public interest.

**Performance Against Regulatory Capital Standards**

OFHEO has never classified us as other than "adequately capitalized," the highest possible classification, reflecting our consistent compliance with the minimum, critical and risk-based capital requirements.

Table 10.1 summarizes our regulatory capital requirements and surpluses.

**Table 10.1 — Regulatory Capital Requirements[1]**

|  | December 31, | |
|  | 2006 | 2005 |
|  | (in millions) | |
| Minimum capital requirement[2] | $25,844 | $25,010 |
| Core capital[2] | 36,170 | 35,964 |
| Minimum capital surplus[2] | 10,326 | 10,954 |
| Critical capital requirement[2] | $13,237 | $12,782 |
| Core capital[2] | 36,170 | 35,964 |
| Critical capital surplus[2] | 22,933 | 23,182 |
| Risk-based capital requirement[3] | N/A | $11,282 |
| Total capital[3] | N/A | 36,781 |
| Risk-based capital surplus[3] | N/A | 25,499 |

(1) OFHEO is the authoritative source of the capital calculations that underlie our capital classifications.
(2) Amounts for 2006 are based on amended reports we submitted to OFHEO in March 2007.
(3) OFHEO determines the amounts reported with respect to our risk-based capital requirement. Amounts for 2006 are not yet available.

Factors that could adversely affect the adequacy of our regulatory capital for future periods include declines in GAAP income; increases in our risk profile; changes in the economic environment, such as large interest-rate or implied volatility moves or home-price declines; changes in option-adjusted spreads; legislative or regulatory action that could increase capital requirements or changes in or adoption of new accounting standards. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Issued Accounting Standards, Not Yet Adopted" for more information. In particular, interest-rate levels or implied volatility can affect the amount of our Core capital, even if we were economically well hedged against interest-rate changes, because certain gains or losses are recognized through GAAP earnings while other offsetting gains or losses may not be. Changes in option-adjusted spreads can also affect the amount of our Core capital, because option-adjusted spreads are a factor in the valuation of our guaranteed mortgage portfolio.

**Subordinated Debt Commitment**

In October 2000, we announced our voluntary adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with OFHEO that updated those commitments and set forth a process for implementing them. Under the terms of this agreement, we committed to issue qualifying subordinated debt for public secondary market trading and rated by no less than two nationally recognized statistical rating organizations in a quantity such that the sum of Total capital plus the outstanding balance of qualifying subordinated debt will equal or exceed the sum of 0.45 percent of outstanding guaranteed PCs and Structured Securities and 4 percent of on-balance sheet assets at the end of each quarter. Qualifying subordinated debt is defined as subordinated debt that contains a deferral of interest payments for up to five years if our Core capital falls below 125 percent of our

critical capital requirement or our Core capital falls below our minimum capital requirement and pursuant to our request, the Secretary of the Treasury exercises discretionary authority to purchase our obligations under Section 306(c) of our charter. Qualifying subordinated debt will be discounted for the purposes of this commitment as it approaches maturity with one-fifth of the outstanding amount excluded each year during the instrument's last five years before maturity. When the remaining maturity is less than one year, the instrument is entirely excluded.

Table 10.2 summarizes our compliance with our subordinated debt commitment.

**Table 10.2 — Subordinated Debt Commitment**

| | December 31, | |
| --- | --- | --- |
| | 2006 | 2005 |
| | (in millions) | |
| Total on-balance sheet assets and guaranteed PCs and Structured Securities outstanding target[1][2] | $37,576 | $36,633 |
| Total capital plus qualifying subordinated debt[2] | 42,602 | 41,831 |
| Surplus[2] | 5,026 | 5,198 |

(1) Equals the sum of 0.45 percent of outstanding guaranteed PCs and Structured Securities and 4 percent of on-balance sheet assets.
(2) Amounts for 2006 are based on amended reports we submitted to OFHEO in March 2007.

**Regulatory Capital Monitoring Framework**

In a letter dated January 28, 2004, OFHEO created a framework for monitoring our capital due to our higher operational risk, including our inability to produce timely financial statements in accordance with GAAP. The letter directed that we maintain a mandatory target capital surplus of 30 percent over our minimum capital requirement, subject to certain conditions and variations; that we submit weekly reports concerning our capital levels; and that we obtain prior approval of certain capital transactions.

Our failure to meet the mandatory target capital surplus would result in an OFHEO inquiry regarding the reason for such failure. If OFHEO were to determine that we had acted unreasonably regarding our compliance with the framework, as set forth in OFHEO's letter, OFHEO could seek to require us to submit a remedial plan or take other remedial steps.

In addition, under this framework, we are required to obtain prior written approval from the Director of OFHEO before engaging in certain capital transactions, as described above. We must also submit a written report to the Director of OFHEO after the declaration, but before the payment, of any dividend on our common stock. The report must contain certain information on the amount of the dividend, the rationale for the payment and the impact on our capital surplus.

This framework will remain in effect until the Director of OFHEO determines that it should be modified or expire. OFHEO's letter indicated that this determination would consider our resumption of timely financial and regulatory reporting that complies with GAAP, among other factors.

Table 10.3 summarizes our compliance with the mandatory target capital surplus portion of OFHEO's capital monitoring framework.

**Table 10.3 — Mandatory Target Capital Surplus**

| | December 31, | |
| --- | --- | --- |
| | 2006 | 2005 |
| | (in millions) | |
| Minimum capital requirement plus 30% add-on[1] | $33,597 | $32,513 |
| Core capital[1] | 36,170 | 35,964 |
| Surplus[1] | 2,573 | 3,451 |

(1) Amounts for 2006 are based on amended reports we submitted to OFHEO in March 2007.

### NOTE 11: STOCK-BASED COMPENSATION

We have three stock-based compensation plans under which grants are being made: (a) the ESPP; (b) the 2004 Stock Compensation Plan, or 2004 Employee Plan; and (c) the 1995 Directors' Stock Compensation Plan, as amended and restated, or Directors' Plan. Prior to the stockholder approval of the 2004 Employee Plan, employee stock-based compensation was awarded in accordance with the terms of the 1995 Stock Compensation Plan, or 1995 Employee Plan. Although grants are no longer made under the 1995 Employee Plan, we currently have awards outstanding under this plan. We collectively refer to the 2004 Employee Plan and 1995 Employee Plan as the Employee Plans.

Common stock delivered under these plans may consist of authorized but previously unissued shares, treasury stock or shares acquired in market transactions on behalf of the participants. During 2006, stock-based awards we granted consisted of stock options and restricted stock units. Such awards, discussed below, are generally forfeitable for at least one year after the grant date, with vesting provisions contingent upon service requirements.

*Stock options*

Stock options granted allow for the purchase of our common stock at an exercise price equal to the fair market value of our common stock on the grant date. During 2006, the 2004 Employee Plan was amended to change the definition of fair market value to the closing sales price of a share of common stock from the average of the high and low sales prices, effective for all grants after December 6, 2006. Options generally may be exercised for a period of 10 years from the grant date, subject to a vesting schedule commencing on the grant date.

Stock options that we previously granted included dividend equivalent rights. Depending on the terms of the grant, the dividend equivalents may be paid when and as dividends on our common stock are declared. Alternatively, dividend equivalents may be paid upon exercise or expiration of the stock option. Subsequent to November 30, 2005, dividend equivalent rights were no longer granted in connection with awards of stock options to grantees to address Internal Revenue Code Section 409A.

*Restricted stock units*

A restricted stock unit entitles the grantee to receive one share of common stock at a specified future date. Restricted stock units do not have voting rights, but do have dividend equivalent rights, which are (a) paid to restricted stock unit holders who are employees as and when dividends on common stock are declared or (b) accrued as additional restricted stock units for non-employee members of our board of directors.

*Restricted stock*

Restricted stock entitles participants to all the rights of a stockholder, including dividends, except that the shares awarded are subject to a risk of forfeiture and may not be disposed of by the participant until the end of the restriction period established at the time of grant.

The following is a description of each of our stock-based compensation plans under which grants are currently being made.

**ESPP:**  We have an ESPP that is qualified under Internal Revenue Code Section 423. Under the ESPP, substantially all full-time and part-time employees that choose to participate in the ESPP have the option to purchase shares of common stock at specified dates, with an annual maximum market value of $20,000 per employee as determined on the grant date. The purchase price is equal to 85 percent of the lower of the average price (average of the daily high and low prices) of the stock on the grant date or the average price of the stock on the purchase (exercise) date.

At December 31, 2006, the maximum number of shares of common stock authorized for grant to employees totaled 6.8 million shares, of which approximately 0.4 million shares had been issued and approximately 6.4 million shares remained available for grant. At December 31, 2006, no options to purchase stock were exercisable under the ESPP, as the options to purchase stock outstanding at year-end become exercisable subsequent to year-end, and are exercised or forfeited during the subsequent year.

**2004 Employee Plan**: Under the 2004 Employee Plan, we may grant employees stock-based awards, including stock options, restricted stock units and restricted stock. In addition, we have the right to impose performance conditions with respect to these awards. Employees may also be granted stock appreciation rights; however, at December 31, 2006, no stock appreciation rights had been granted under the 2004 Employee Plan. At December 31, 2006, the maximum number of shares of common stock authorized for grant to employees in accordance with the 2004 Employee Plan totaled 14.3 million shares, of which approximately 3.4 million shares had been issued and approximately 10.9 million shares remained available for grant.

**Directors' Plan:**  Under the Directors' Plan, we are permitted to grant stock options, restricted stock units and restricted stock to non-employee members of our board of directors. At December 31, 2006, the maximum number of shares of common stock authorized for grant to members of our board of directors in accordance with the Directors' Plan totaled 2.4 million shares, of which approximately 0.9 million shares had been issued and approximately 1.5 million shares remained available for grant.

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," for a description of the accounting treatment for stock-based compensation, including grants under the ESPP, Employee Plans and Directors' Plan.

Estimates used to determine the assumptions noted in the table below are determined as follows:

(a) the expected volatility is based on the historical volatility of the stock over a time period equal to the expected life;

(b) the weighted average volatility is the weighted average of the expected volatility;

(c) the weighted average expected dividend yield is based on the most recent dividend announcement relative to the grant date and the stock price at the grant date;

(d) the weighted average expected life is based on historical option exercise experience; and

(e) the weighted average risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of the grant.

Changes in the assumptions used to calculate the fair value of stock options could result in materially different fair value estimates. The actual value of stock options will depend on the market value of our common stock when the stock options are exercised.

Table 11.1 summarizes the assumptions used in determining the fair values of options granted under our stock-based compensation plans using a Black-Scholes option-pricing model as well as the weighted average grant-date fair value of options granted and the total intrinsic value of options exercised.

**Table 11.1 — Assumptions and Valuations**

| | Employee Stock Purchase Plan | | | Employee Plans and Directors' Plan | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006 | 2005[1] | 2004 |
| | (dollars in millions, except share-related amounts) | | | | | |
| **Assumptions:** | | | | | | |
| Expected volatility . . . . . . . . . . . . | 11.2% to 18.7% | 16.8% to 21.1% | 15.4% to 20.4% | 27.8% to 28.9% | 18.4% to 30.3% | 30.5% to 32.0% |
| Weighted average: | | | | | | |
| Volatility . . . . . . . . . . . . . . . . . . | 15.7% | 19.7% | 17.8% | 28.7% | 30.0% | 31.5% |
| Expected dividend yield . . . . . . | 2.98% | 2.15% | 1.85% | 3.09% | — | — |
| Expected life . . . . . . . . . . . . . . | 3 months | 3 months | 3 months | 7.1 years | 7.4 years | 7.0 years |
| Risk-free interest rate . . . . . . . . | 4.82% | 3.20% | 1.33% | 4.91% | 4.23% | 3.55% |
| **Valuations:** | | | | | | |
| Weighted average grant-date fair value of options granted . . . . . . | $11.20 | $11.56 | $11.23 | $16.78 | $26.84 | $25.04 |
| Total intrinsic value of options exercised . . . . . . . . . . . . . . . . . . | $3 | $2 | $3 | $20 | $32 | $66 |

(1) The value of the dividend equivalent feature of options for the Employee Plans and Directors' Plan was incorporated into the Black-Scholes model by using an expected dividend yield of zero percent. To account for a modification of stock options on November 30, 2005, the dividend equivalent feature of affected stock options for the Employee Plans and Directors' Plan was valued separately. Other assumptions used to value the affected stock options were as follows: (a) expected volatility of 25.4 percent, (b) expected dividend yield of 2.96 percent, (c) expected life of 5.1 years, and (d) risk-free interest rate of 4.34 percent. Subsequent to November 30, 2005, dividend equivalent rights are no longer granted in connection with new awards of stock options to grantees.

Table 11.2 provides a summary of activity under the ESPP for the year ended December 31, 2006, and those options to purchase stock that are exercisable at December 31, 2006.

**Table 11.2 — ESPP Activity**

| | Options to Purchase Stock | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| | (dollars in millions, except share-related amounts) | | | |
| Outstanding at January 1, 2006[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61,584 | $52.16 | | |
| Granted[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 226,266 | 53.73 | | |
| Exercised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (222,703) | 50.51 | | |
| Forfeited or expired . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (12,249) | 51.67 | | |
| Outstanding at December 31, 2006[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52,898 | 58.09 | 1 month | $1 |
| Exercisable at December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — |

(1) Weighted average exercise price noted for options to purchase stock granted under the ESPP is calculated based on the average price on the grant date.

Table 11.3 provides a summary of option activity under the Employee Plans and Directors' Plan for the year ended December 31, 2006, and options exercisable at December 31, 2006.

**Table 11.3 — Employee Plans and Directors' Plan Option Activity**

| | Stock Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| | (dollars in millions, except share-related amounts) | | | |
| Outstanding at January 1, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,693,684 | $56.20 | | |
| Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 423,294 | 60.66 | | |
| Exercised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (914,368) | 42.02 | | |
| Forfeited or expired . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (350,685) | 61.38 | | |
| Outstanding at December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,851,925 | 58.43 | 5.76 years | $55 |
| Exercisable at December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,706,396 | 57.17 | 4.61 years | $40 |

We received cash of $35 million from the exercise of stock options under the Employee Plans and the Directors' Plan during 2006. We realized a tax benefit of $7 million as a result of tax deductions available to us upon the exercise of stock options under the Employee Plans and the Directors' Plan during 2006. During 2006, we did not pay cash to settle share-

based liability awards granted under share-based payment arrangements associated with Employee Plans and the Directors' Plan. During 2005 and 2004, we paid $1 million and $1 million, respectively, to settle share-based awards.

Table 11.4 provides a summary of activity related to restricted stock units and restricted stock under the Employee Plans and the Directors' Plan.

**Table 11.4 — Employee Plans and Directors' Plan Restricted Stock Units and Restricted Stock Activity**

| | Year Ended December 31, 2006 | | | |
|---|---|---|---|---|
| | Restricted Stock Units | Weighted Average Grant-Date Fair Value | Restricted Stock | Weighted Average Grant-Date Fair Value |
| Outstanding at January 1, 2006 | 1,474,183 | $61.28 | 69,702 | $63.57 |
| Granted[1] | 1,486,080 | 64.96 | — | — |
| Lapse of restrictions | (384,649) | 61.79 | (28,542) | 67.64 |
| Forfeited | (171,039) | 62.95 | — | — |
| Outstanding at December 31, 2006 | 2,404,575 | 63.35 | 41,160 | 60.75 |

(1) During 2006, restricted stock units granted under the Employee Plans and the Directors' Plan were 1,469,047 and 17,033, respectively.

The total fair value of restricted stock units vested during 2006, 2005 and 2004 was $24 million, $42 million and $10 million, respectively. The total fair value of restricted stock vested during 2006, 2005 and 2004 was $2 million, $5 million and $15 million, respectively. We realized a tax benefit of $9 million as a result of tax deductions available to us upon the lapse of restrictions on restricted stock units and restricted stock under the Employee Plans and the Directors' Plan during 2006.

Table 11.5 provides information on compensation expense related to stock-based compensation plans.

**Table 11.5 — Compensation Expense Related to Stock-based Compensation**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (in millions) | | |
| Stock-based compensation expense recorded on our consolidated statements of stockholders' equity | $60 | $67 | $56 |
| Other stock-based compensation expense[1] | 3 | 2 | 3 |
| Total stock-based compensation expense[2] | $63 | $69 | $59 |
| Tax benefit related to compensation expense recognized on our consolidated statements of income | $21 | $23 | $19 |
| Compensation expense capitalized within Other assets on our consolidated balance sheets | 5 | 5 | 6 |

(1) For 2006, primarily comprised of dividend equivalents paid on stock options and restricted stock units that have been or are expected to be forfeited. Also included expense related to share-based liability awards granted under share-based payment arrangements.
(2) Component of Salaries and employee benefits expense as recorded on our consolidated statements of income.

As of December 31, 2006, $127 million of compensation expense related to non-vested awards had not yet been recognized in earnings. This amount is expected to be recognized in earnings over the next four years. During 2006, the modification of individual awards, which provided for continued or accelerated vesting, was made to fewer than 20 employees and resulted in incremental compensation expense of $0.1 million.

## NOTE 12: DERIVATIVES

We use derivatives to conduct our risk management activities. We principally use the following types of derivatives:

- LIBOR- and the Euro Interbank Offered Rate, or Euribor-, based interest-rate swaps;

- LIBOR- and Treasury-based options (including swaptions);

- LIBOR- and Treasury-based exchange-traded futures; and

- Foreign-currency swaps.

Our derivative portfolio also includes certain forward purchase and sale commitments and other contractual agreements, including credit derivatives and swap guarantee derivatives in which we guarantee the sponsor's or the borrower's performance as a counterparty on certain interest-rate swaps.

**Hedging Activity**

Derivative instruments are reported at their fair value and generally netted by counterparty (provided that a legally enforceable master netting agreement exists), as either Derivative assets, at fair value, or Derivative liabilities, at fair value, on our consolidated balance sheets. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties.

*No Hedge Designation*

At December 31, 2006, 2005 and 2004, most of our derivative portfolio was not designated in hedge accounting relationships. We record changes in the fair value of derivatives not in hedge accounting relationships as Derivative gains (losses) on our consolidated statements of income. Any associated interest received or paid is recognized on an accrual basis and also recorded in Derivative gains (losses) on our consolidated statements of income.

At the beginning of the second quarter of 2004, we determined that substantially all pay-fixed swaps and other derivatives that previously had been in cash flow hedge accounting relationships no longer met the hedged item shared risk exposure requirement and hedge effectiveness assessment as required by SFAS 133. Consequently, we discontinued hedge accounting treatment for these relationships, resulting in the movement of pay-fixed swaps with a notional balance of approximately $108 billion from the cash flow hedge designation to no hedge designation. We also voluntarily discontinued hedge accounting treatment for a significant amount of our receive-fixed swaps effective November 1, 2004, resulting in the movement of receive-fixed swaps with a notional balance of approximately $50 billion from the fair value hedge designation to no hedge designation. At the beginning of the second quarter of 2005, we voluntarily discontinued hedge accounting treatment for all new forward purchase commitments and the majority of our new commitments to forward sell mortgage-related securities. In addition, effective March 31, 2006, we discontinued hedge accounting treatment for all derivatives, with the exception of certain derivatives related to foreign-currency debt issuances and certain commitments to forward sell mortgage-related securities. The discontinuation resulted in the movement of receive-fixed swaps with a notional amount of approximately $58.8 billion from the fair value hedge designation to no hedge designation and the movement of foreign-currency swaps with a notional amount of approximately $550 million from the cash flow hedge designation to no hedge designation. Hedge accounting treatment for the remaining derivatives related to foreign-currency debt issuances was voluntarily discontinued on December 1, 2006, resulting in a movement of receive-fixed swaps and foreign-currency swaps with a notional amount of approximately $56 billion from the fair value hedge designation to no hedge designation. We believe that our voluntary discontinuation of hedge accounting treatment for these derivatives assists us in addressing the operational complexity and related control remediation efforts that would otherwise be needed to ensure ongoing compliance with the requirements for obtaining and maintaining hedge accounting treatment. We may consider implementing new hedge accounting strategies in the future.

*Fair Value Hedges*

Fair value hedges represented hedges of exposure to foreign-currency fluctuations and changes in the fair value of a recognized liability. We primarily used interest-rate swaps and foreign-currency swaps to hedge against the changes in fair value of fixed-rate debt due to changes in benchmark interest rates (either LIBOR or Euribor), or foreign-currency fluctuations, or a combination of both.

For a derivative accounted for in a fair value hedge relationship, we reported changes in the fair value of the derivative as Hedge accounting gains (losses) on our consolidated statements of income along with the offsetting changes in the fair value of the hedged item attributable to the risk being hedged. Any differences arising from fair value changes that were not exactly offset resulted in hedge ineffectiveness. Hedge accounting gains (losses) varied from period to period based on the notional amount of derivatives accounted for in hedge accounting relationships and the extent of hedge ineffectiveness.

Table 12.1 summarizes certain gains (losses) recognized related to our hedge accounting categories.

### Table 12.1 — Hedge Accounting Categories Information

| | Year Ended December 31, | | |
| | 2006 | 2005 | 2004 |
| | | (in millions) | |
|---|---|---|---|
| **Fair value hedges** | | | |
| Hedge ineffectiveness recognized in Hedge accounting gains (losses) — pre-tax[1] | $ 2 | $ 22 | $742 |
| **Cash flow hedges** | | | |
| Hedge ineffectiveness recognized in Hedge accounting gains (losses) — pre-tax[1] | — | — | 1 |
| Net pre-tax gains (losses) resulting from the determination that it was probable that forecasted transactions would not occur | — | (25) | 2 |

(1) No amounts have been excluded from the assessment of effectiveness.

*Cash Flow Hedges*

Cash flow hedges represent hedges of exposure to the variability in the cash flows of a variable-rate or foreign-currency denominated instrument or related to a forecasted transaction. We used interest-rate swaps, foreign-currency swaps and forward purchase and sale commitments to hedge the changes in cash flows associated with the forecasted issuances of debt, forecasted purchase or sale of mortgage-related assets, and foreign-currency fluctuations. At December 31, 2006, the only derivatives accounted for as cash flow hedges were certain commitments to forward sell mortgage-related securities with a total notional amount of $70 million.

For a derivative accounted for as a cash flow hedge, changes in fair value are reported in AOCI, net of taxes, on our consolidated balance sheets to the extent the hedge is effective. The remaining ineffective portion of changes in fair value is reported as Hedge accounting gains (losses) on our consolidated statements of income. As shown in Table 12.2 below, the total AOCI, net of taxes, related to cash flow hedge relationships was a loss of $5,033 million at December 31, 2006, primarily composed of deferred net losses on closed cash flow hedges. Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges. Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges.

Over the 12 months beginning January 1, 2007, we estimate that approximately $953 million of deferred losses in AOCI, net of taxes, will be reclassified into earnings. The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily interest payments on forecasted debt issuances, is 27 years. However, over 70 percent and 90 percent of the AOCI, net of taxes, balance relating to cash flow hedges at December 31, 2006 is linked to forecasted transactions occurring in the next 5 and 10 years, respectively. The occurrence of forecasted transactions may be satisfied by either periodic issuances of short-term debt over the required time period or longer-term debt, such as Reference Notes® securities.

Table 12.2 presents the changes in AOCI, net of taxes, related to derivatives designated as cash flow hedges. Net change in fair value related to cash flow hedging activities, net of tax, represents the net change in the fair value of the derivatives that were designated as cash flow hedges, after the effects of our statutory tax rate of 35 percent, to the extent the hedges were effective. Net reclassifications of losses to earnings, net of tax, represents the AOCI amount, after the effects of our statutory tax rate of 35 percent, that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur. If it is probable that the forecasted transaction will not occur, then the entire deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately.

### Table 12.2 — AOCI, Net of Taxes, Related to Cash Flow Hedge Relationships

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2006 | 2005 | 2004 |
| | | (in millions) | |
| Beginning balance[1] | $(6,287) | $(7,924) | $(7,837) |
| Net change in fair value related to cash flow hedging activities, net of tax (benefit) expense of $(5), $27 and $(1,089), respectively | (9) | 50 | (2,021) |
| Net reclassifications of losses to earnings, net of tax benefit of $680, $855 and $1,042, respectively | 1,263 | 1,587 | 1,934 |
| Ending balance[1] | $(5,033) | $(6,287) | $(7,924) |

(1) Represents the effective portion of the fair value of open derivative contracts (*i.e.*, net unrealized gains and losses) and net deferred gains and losses on closed (*i.e.*, terminated or redesignated) cash flow hedges.

### NOTE 13: LEGAL CONTINGENCIES

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business. We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits typically involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions.

We are subject to various other legal proceedings, including regulatory investigations and administrative and civil litigation, arising from the restatement of our previously issued consolidated financial statements for the years 2000 and 2001 and the first three quarters of 2002 and the revision of fourth quarter and full-year consolidated financial statements for 2002 (collectively referred to as the "restatement"). In the first quarter of 2005, we recorded a $339 million expense related to our litigation reserves for legal settlements, including our settlement of the securities class action lawsuits, the shareholder derivative lawsuits and the Federal Election Commission, or FEC, investigation, discussed below. We maintain reserves for the amount of the estimated probable loss in connection with the remaining legal proceedings related to the restatement. As of the first quarter of 2006, we recorded a $25 million reduction in our reserves for this loss contingency. Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. Any additional losses that might result from the adverse resolution of any of the remaining legal proceedings could be greater than our current reserves.

**SEC Investigation.**   In June 2003, the SEC initiated a formal investigation of Freddie Mac in connection with the restatement. On August 18, 2004, we announced that we had received a "Wells Notice" from the staff of the SEC. The Wells Notice advised us that the SEC staff is considering recommending that the SEC initiate a civil injunctive action against us for possible violations of federal securities laws, including Section 10(b) of the Securities Exchange Act of 1934 and the SEC's Rule 10b-5, as well as Sections 17(a)(1), (2) and (3) of the Securities Act of 1933. The Wells Notice also indicated that the SEC staff may seek a permanent injunction and a civil money penalty in connection with the contemplated action. We continue to cooperate fully with the SEC's investigation.

**Securities Class Action Lawsuits.**   In June 2003 and thereafter, securities class action lawsuits were brought in against us and certain former executive officers in connection with the restatement and eventually in the U.S. District Court for the Southern District of New York. The plaintiffs claimed that the defendants improperly managed earnings to create a misleading impression of steady earnings by Freddie Mac, that they engaged in a number of improper transactions that violated GAAP and that they made false and misleading statements regarding the same. On October 26, 2006, the court approved a settlement of the securities class action lawsuits, as well as the shareholder derivative actions described below. The settlement of these actions included a cash payment of $410 million. The settlement does not include any admission of wrongdoing by the company.

**Shareholder Derivative Lawsuits.**   Two shareholder derivative lawsuits were filed during 2003 against certain former and current executives and, in one of the suits, certain former and current members of the board of directors and five counterparties. The plaintiffs alleged claims for breach of fiduciary duties, indemnification, waste of corporate assets, unjust enrichment and aiding and abetting breach of fiduciary duties in connection with the restatement. Both cases were ultimately assigned to the same judge in New York who handled the securities class action lawsuits described above. As described above, on October 26, 2006, the court approved a settlement of both shareholder derivative actions, as well as the securities class action lawsuits. The settlement of these cases was based in part on corporate governance reforms we instituted under our current management.

**ERISA Lawsuits.**   Two class action lawsuits were filed in 2003 in the U.S. District Court for the Southern District of Ohio against us, certain former executives, a former member of our board of directors, and our Retirement Committee alleging violations of the Employee Retirement Income Security Act, or ERISA. On March 1, 2007, the court approved a settlement of the ERISA lawsuits, which resulted in the closure of the Department of Labor investigation described below. The settlement of these actions includes a payment of $4.65 million, which will be fully covered by insurance, and certain non-monetary relief, including an agreement to appoint an independent fiduciary to oversee the Freddie Mac Stock Fund, one of the investment options under our Thrift/401(k) Savings Plan. The settlement does not include any admission of wrongdoing by the company.

**Department of Labor Investigation.**   In July 2003, the Department of Labor began an investigation of our Thrift/401(k) Savings Plan in relation to the restatement. We announced on August 21, 2006, that in anticipation of the proposed settlement of the ERISA litigation, the Labor Department informed the company that it closed its investigation of the Thrift/401(k) Savings Plan.

**OFHEO Proceedings.**   In December 2003, OFHEO filed administrative notices of charges against us and Messrs. Brendsel and Clarke, two of our former executive officers. In its charge against us, OFHEO sought to have us take certain actions in connection with these individuals' salaries and compensation as well as their termination status with the company. On September 9, 2005, we entered into a stipulated consent order with OFHEO to settle the administrative notice of charges against us. Under the terms of the consent order, we agreed to produce certain documents and make available any current employees that OFHEO requests to interview in connection with its ongoing administrative actions against Messrs. Brendsel and Clarke, and to take certain additional steps following the administrative actions against the former officers in accordance with any final order resulting in those actions. The text of this consent order and a related production agreement are available on OFHEO's website at www.ofheo.gov. In agreeing to the consent order, we made no admission regarding any wrongdoing by the company. Based on the consent order, OFHEO has dismissed the administrative notice of charges against us and we have produced certain documents for OFHEO's review and made numerous current employees available for interviews at OFHEO's request.

**U.S. Attorney's Investigation.**   In June 2003, the U.S. Attorney's Office in Alexandria, Virginia commenced an investigation of us related to the restatement. At present, we do not believe that the U.S. Attorney's Office will take any adverse action against the company related to the restatement given the passage of time and the fact that no action has been taken to date. It is the policy of the U.S. Attorney's Office not to comment on investigations or announce when an investigation is closed without action. Accordingly, we cannot make any assurances that this matter has been resolved.

**Antitrust Lawsuits.**   Consolidated lawsuits were filed against Fannie Mae and us in the U.S. District Court for the District of Columbia, originally filed on January 10, 2005, alleging that both companies conspired to establish and maintain

artificially high guarantee fees. The complaint covers the period January 1, 2001 to the present and asserts a variety of claims under federal and state antitrust laws, as well as claims under consumer-protection and similar state laws. The plaintiffs seek injunctive relief, unspecified damages (including treble damages with respect to the antitrust claims and punitive damages with respect to some of the state claims) and other forms of relief. We filed a motion to dismiss the action and are awaiting a ruling from the court. At present, it is not possible for us to predict the probable outcome of the consolidated lawsuit or any potential impact on our business, financial condition or results of operations.

**Other Inquiries.**   We receive inquiries from the Internal Revenue Service, or IRS, in connection with its regular audits of our tax returns for prior years, some of which relate to matters connected with the restatement. We continue to respond to these inquiries. See "NOTE 14: INCOME TAXES" for more information.

**FEC Investigation.**   In March 2004, we provided certain information to the FEC concerning compliance with federal election laws. The FEC conducted an investigation into this matter and, on April 18, 2006, we announced that we had entered into a conciliation agreement with the FEC. Under the terms of the conciliation agreement, we agreed to pay a civil penalty of $3.8 million and to cease and desist from engaging in activities that violate specified provisions of the Federal Election Campaign Act relating to prohibitions on the use of corporate resources for political fundraising.

## NOTE 14: INCOME TAXES

We are exempt from state and local income taxes. Table 14.1 presents the components of our provision for income taxes.

### Table 14.1 — Provision for Income Taxes

| | Year Ended December 31, | | |
| | 2006 | 2005 | 2004 |
| --- | --- | --- | --- |
| | (in millions) | | |
| Current tax provision (benefit) | $ 966 | $ 1,819 | $1,136 |
| Deferred tax provision (benefit) | (1,074) | (1,452) | (346) |
| Total provision (benefit) for income taxes[1] | $ (108) | $ 367 | $ 790 |

(1) Does not reflect (a) the deferred tax effects of unrealized (gains) losses on available-for-sale securities, net (gains) losses related to the effective portion of derivatives designated in cash flow hedge relationships, and certain changes in our defined benefit plans which are reported as part of AOCI, (b) certain stock-based compensation tax effects reported as part of additional paid-in capital, and (c) the tax effect of cumulative effect of change in accounting principles.

Table 14.2 summarizes our deferred tax assets and liabilities.

### Table 14.2 — Deferred Tax Assets and (Liabilities)

| | December 31, | |
| | 2006 | 2005 |
| --- | --- | --- |
| | (in millions) | |
| Deferred tax assets: | | |
| Deferred fees related to securitizations | $ 1,870 | $ 1,779 |
| Credit related items and reserve for loan losses | 108 | 61 |
| Employee compensation and benefit plans | 148 | 171 |
| Cash flow hedge deferrals and unrealized (gains) losses related to available-for-sale securities | 4,237 | 4,724 |
| Other items, net | — | 36 |
| Total deferred tax assets | 6,363 | 6,771 |
| Deferred tax liabilities: | | |
| Premium and discount amortization | (1,320) | (1,426) |
| Basis differences related to assets held-for-investment | (357) | (560) |
| Basis differences related to derivative instruments | (1,034) | (1,779) |
| Other items, net | (52) | — |
| Total deferred tax liabilities | (2,763) | (3,765) |
| Net deferred tax assets and (liabilities)[1] | $ 3,600 | $ 3,006 |

(1) Included in Other assets on our consolidated balance sheets.

Table 14.3 reconciles the statutory federal tax rate to the effective tax rate.

**Table 14.3 — Reconciliation of Statutory to Effective Tax Rate**

| | Year Ended December 31, | | |
| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Statutory corporate rate | 35.0% | 35.0% | 35.0% |
| Tax-exempt interest | (12.2) | (8.7) | (4.7) |
| Tax credits | (21.9) | (14.3) | (7.3) |
| Provision related to tax contingencies | (6.4) | 1.9 | (2.0) |
| Penalties | — | 0.1 | — |
| Other | 0.4 | 0.4 | 0.2 |
| Effective rate | (5.1)% | 14.4% | 21.2% |

Our negative effective tax rate in 2006 and the decrease in our effective tax rate over the past three years is primarily due to the decline in pre-tax income, the year-over-year increases in tax credits related to our investments in low-income housing tax credit partnerships and interest earned on tax-exempt housing-related securities. In 2006, our negative effective tax rate also reflects reductions in our tax reserves as discussed above.

**Impact of tax issues.**   The IRS has a policy to examine the income tax returns of large corporate taxpayers, including us, generally every year. We believe that an adequate provision has been made for contingencies related to all income taxes and related interest and potential penalties in accordance with SFAS 5. However, making a provision for such contingencies requires significant judgment. The ultimate outcome of these tax contingencies is subject to uncertainties, difficult to predict and could result in a tax benefit or tax provision that could be material to our quarterly or annual results of operations. We do not believe that liabilities arising from these matters, if any, will have a material adverse effect on our consolidated financial condition.

**Tax Years 1985 through 1997.**   We are in litigation in the U.S. Tax Court, or Court, to contest income tax deficiencies asserted by the IRS for years 1985 through 1997. The principal matters in controversy in the case involve questions of tax law as applied to our transition from non-taxable to taxable status in 1985 and primarily involve the amortization of two types of intangible assets:

- *Favorable Financing.*   A number of financing arrangements where the contract rates of interest were less than the market rates of interest as of January 1, 1985 due to an increase in interest rates since the date on which we had entered into the respective arrangements; and,

- *Customer Relationships.*   Our business relationships with a substantial number of mortgage originating institutions that sold mortgages to us on a regular basis.

In July 2006, the Court ruled favorably for Freddie Mac on the questions of value and useful life of Favorable Financing. In response to this decision, we recorded a $108 million reduction in our tax contingency reserves as of first quarter 2006. The Court's rulings to date in the case are subject to appeal by the parties upon final resolution by the Court. If the IRS were to appeal the July 2006 or any prior Court decisions and any adverse rulings resulted, we may reconsider our reserves.

We are in discussions with the IRS regarding settlement of the Customer Relationships controversy. The favorable resolution of this controversy would represent a gain contingency which we have not recorded.

In November 2006, Freddie Mac entered into a settlement with the IRS that included resolution of several other controversies in the case, including a controversy regarding the timing for recognition of certain Management and guarantee fees. In view of the settlement, we recorded a $50 million reduction in our tax contingency reserves as of first quarter 2006.

**Tax Years 1998 through 2005.**   The IRS has completed its regular examination of our 1998 through 2002 tax returns, but could raise additional issues. As a result of the regular examination, the principal matter in controversy involves questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. We believe the risk of loss due to the assertion of penalties by the IRS related to our tax accounting methods is remote. As to the questions of timing, we believe that an adequate provision in accordance with SFAS 5 has been made for contingencies related to income taxes and related interest as described under "Impact of tax issues" above.

The tax years 2003 to 2005 are being examined by the IRS.

## NOTE 15: EMPLOYEE BENEFITS

### Defined Benefit Plans

We maintain a tax-qualified, funded defined benefit pension plan, or Pension Plan, covering substantially all of our employees. Pension Plan benefits are based on an employee's years of service and highest average compensation, up to legal plan limits, over any consecutive 36 months of employment. Pension Plan assets are held in trust and the investments consist

primarily of funds comprised of listed stocks and corporate bonds. In addition to our Pension Plan, we maintain a nonqualified, unfunded defined benefit pension plan for our officers, referred to as our Supplemental Executive Retirement Plan, or SERP. The related retirement benefits for our SERP are paid from our general assets. Our qualified and nonqualified defined benefit pension plans are collectively referred to as defined benefit pension plans.

We maintain a defined benefit postretirement health care plan, or Retiree Health Plan, that generally provides postretirement health care benefits on a contributory basis to retired employees age 55 or older who rendered at least 10 years of service (five years of service if the employee is eligible to retire prior to March 1, 2007) and who, upon separation or termination, immediately elected to commence benefits under the Pension Plan in the form of an annuity. Our Retiree Health Plan is currently unfunded and the benefits are paid from our general assets. This plan and our defined benefit pension plans are collectively referred to as defined benefit plans.

For financial reporting purposes, we use a September 30 valuation measurement date for all of our defined benefit plans. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information regarding the pending change to our measurement date.

We are required to accrue the estimated cost of retiree benefits as employees render the services necessary to earn their pension and postretirement health benefits. Our pension and postretirement health care costs related to these defined benefit plans for 2006, 2005 and 2004 presented in the following tables were calculated using assumptions as of September 30, 2005, 2004 and 2003, respectively. The funded status of our defined benefit plans for 2006, 2005 and 2004 presented in the following tables was calculated using assumptions as of September 30, 2006, 2005 and 2004, respectively.

Table 15.1 below shows the changes in our benefit obligations and fair value of plan assets using a September 30 valuation measurement date for amounts recognized on our consolidated balance sheets at December 31, 2006 and 2005, respectively.

**Table 15.1 — Obligation and Funded Status of our Defined Benefit Plans**

| | Pension Benefits | | Postretirement Health Benefits | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| | | (in millions) | | |
| Change in benefit obligation: | | | | |
| Benefit obligation at October 1 (prior year) | $457 | $ 385 | $ 110 | $ 102 |
| Service cost | 31 | 27 | 9 | 9 |
| Interest cost | 26 | 22 | 6 | 6 |
| Net actuarial loss (gain) | (1) | 28 | (3) | (6) |
| Benefits paid | (9) | (5) | (1) | (1) |
| Benefit obligation at September 30 | 504 | 457 | 121 | 110 |
| Change in plan assets: | | | | |
| Fair value of plan assets at October 1 (prior year) | $333 | $ 260 | | |
| Actual return on plan assets | 31 | 29 | | |
| Employer contributions | 146 | 49 | | |
| Benefits paid | (9) | (5) | | |
| Fair value of plan assets at September 30 | 501 | 333 | | |
| Funded status at September 30 | $ (3) | $(124) | $(121) | $(110) |
| Amounts recognized on our consolidated balance sheets at December 31: | | | | |
| Other assets | $ 42 | $ 29 | $ — | $ — |
| Other liabilities | (45) | (28) | (121) | (84) |
| AOCI, net of taxes related to defined benefit plans: | | | | |
| Net actuarial loss | $ 72 | $ 1 | $ 17 | $ — |
| Prior service cost (credit) | 1 | — | (3) | — |
| Total AOCI, net of taxes[1] | $ 73 | $ 1 | $ 14 | $ — |

(1) These amounts represent a reduction to AOCI.

The amount included in AOCI, net of taxes, arising from a change in the minimum pension liability was a loss of $2 million for the year ended December 31, 2006, and a gain of $7 million for the year ended December 31, 2005.

The accumulated benefit obligation for all defined benefit pension plans was $362 million and $316 million at September 30, 2006 and 2005, respectively. The accumulated benefit obligation represents the actuarial present value of future expected benefits attributed to employee service rendered before the measurement date and based on employee service and compensation prior to that date.

Table 15.2 provides additional information for our defined benefit pension plans. The aggregate accumulated benefit obligation and fair value of plan assets are disclosed as of September 30, 2006, with the projected benefit obligation included for illustrative purposes.

## Table 15.2 — Additional Information for Defined Benefit Pension Plans

| | 2006 | | | 2005 | | |
|---|---|---|---|---|---|---|
| | Pension Plan | SERP | Total | Pension Plan | SERP | Total |
| | | | (in millions) | | | |
| Projected benefit obligation | $458 | $ 46 | $504 | $416 | $ 41 | $457 |
| Fair value of plan assets | $501 | $ — | $501 | $333 | $ — | $333 |
| Accumulated benefit obligation | 329 | 33 | 362 | 288 | 28 | 316 |
| Fair value of plan assets over (under) accumulated benefit obligation | $172 | $(33) | $139 | $ 45 | $(28) | $ 17 |

The measurement of our benefit obligations includes assumptions about the rate of future compensation increases included in Table 15.3 below. For the 2006 and 2005 plan years for our defined benefit pension plans, we refined our assumptions related to the rate of future compensation increase used to determine our benefit obligations to include assumptions that designate different compensation rate increases for participants based on their age.

## Table 15.3 — Weighted Average Assumptions Used to Determine Projected and Accumulated Benefit Obligations

| | Pension Benefits | | Postretirement Health Benefits | |
|---|---|---|---|---|
| | September 30, | | September 30, | |
| | 2006 | 2005 | 2006 | 2005 |
| Discount rate | 6.00% | 5.75% | 6.00% | 5.75% |
| Rate of future compensation increase | 5.10% to 6.50% | 5.10% to 6.50% | — | — |

Table 15.4 presents the components of the net periodic benefit cost with respect to pension and postretirement health care benefits for the years ended December 31, 2006, 2005 and 2004. Net periodic benefit cost is included in Salaries and employee benefits on our consolidated statements of income.

## Table 15.4 — Net Periodic Benefit Cost Detail

| | Pension Benefits | | | Postretirement Health Benefits | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| | | | (in millions) | | | |
| Net periodic benefit cost detail: | | | | | | |
| Service cost | $ 31 | $ 27 | $ 24 | $ 9 | $ 9 | $10 |
| Interest cost on benefit obligation | 26 | 22 | 20 | 6 | 6 | 6 |
| Expected return on plan assets | (24) | (18) | (16) | — | — | — |
| Recognized net (gain) loss | 6 | 5 | 7 | 2 | 3 | 5 |
| Recognized prior service cost (credit) | — | 1 | — | (1) | (1) | (1) |
| Net periodic benefit cost | $ 39 | $ 37 | $ 35 | $16 | $17 | $20 |

Table 15.5 presents the changes in AOCI, net of taxes, related to our defined benefit plans recorded to AOCI throughout the year, after the effects of our statutory tax rate of 35 percent.

## Table 15.5 — AOCI, Net of Taxes, Related to Defined Benefit Plans

| | Year Ended December 31, 2006 |
|---|---|
| | (in millions) |
| Defined benefit plans: | |
| Minimum pension liability: | |
| Balance, at December 31, 2005 | $ (1) |
| 2006 activity[1] | (2) |
| Adjustment to initially apply SFAS 158[2] | (84) |
| Defined benefit plans, at December 31, 2006 | $(87) |

(1) Net of tax (benefit) of $(1) million for the year ended December 31, 2006.
(2) Net of tax (benefit) of $(45) million for the year ended December 31, 2006.

Table 15.6 below includes the assumptions used in the measurement of our net periodic benefit cost.

**Table 15.6 — Weighted Average Assumptions Used to Determine Net Periodic Benefit Cost**

| | Pension Benefits | | | Postretirement Health Benefits | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | **2006** | **2005** | **2004** | **2006** | **2005** | **2004** |
| Discount rate | 5.75% | 5.75% | 6.00% | 5.75% | 5.75% | 6.00% |
| Rate of future compensation increase | 5.10% to 6.50% | 4.50% | 4.50% | — | — | — |
| Expected long-term rate of return on plan assets | 7.25% | 7.00% | 7.00% | — | — | — |

For the 2006 and 2005 benefit obligations, we determined the discount rate using a yield curve consisting of spot interest rates at half-year increments for each of the next 30 years, developed with pricing and yield information from high-quality bonds. The future benefit plan cash flows were then matched to the appropriate spot rates and discounted back to the measurement date. Finally, a single equivalent discount rate was calculated that, when applied to the same cash flows, results in the same present value of the cash flows as of the measurement date. For 2004, we used the Moody's Aa Corporate Bond Rate Index as a basis for selecting the discount rate shown above.

The expected long-term rate of return on plan assets was estimated using a portfolio return calculator model. The model considered the historical returns and the future expectations of returns for each asset class in our defined benefit plans in conjunction with our target investment allocation to arrive at the expected rate of return.

The assumed health care cost trend rates used in measuring the accumulated postretirement benefit obligation as of September 30, 2006 are 10 percent in 2007, gradually declining to an ultimate rate of 5 percent in 2011 and remaining at that level thereafter.

Table 15.7 sets forth the effect on the accumulated postretirement benefit obligation for health care benefits as of September 30, 2006, and the effect of the service cost and interest cost components of the net periodic postretirement health benefit cost that would result from a 1 percent increase or decrease in the assumed health care cost trend rate.

**Table 15.7 — Selected Data Regarding our Retiree Medical Plan**

| | One Percent Increase | One Percent Decrease |
|---|---|---|
| | (in millions) | |
| Effect on the accumulated postretirement benefit obligation for health care benefits | $28 | $(22) |
| Effect on the service and interest cost components of the net periodic postretirement health benefit cost | 4 | (3) |

**Plan Assets**

Table 15.8 sets forth our Pension Plan asset allocations, based on fair value, at September 30, 2006 and 2005, and target allocation by asset category.

**Table 15.8 — Pension Plan Assets by Category**

| Asset Category | Target Allocation | Plan Assets at September 30, | |
|---|---|---|---|
| | | **2006** | **2005** |
| Equity securities | 65.0% | 49.6% | 55.9% |
| Debt securities | 35.0 | 25.9 | 29.4 |
| Other[1] | — | 24.5 | 14.7 |
| Total | 100.0% | 100.0% | 100.0% |

(1) Consists of cash contributions made on September 29, 2006 and September 30, 2005, respectively, which were not fully invested by September 30th of that year.

The Pension Plan's retirement investment committee has fiduciary responsibility for establishing and overseeing the investment policies and objectives of our Pension Plan. The Pension Plan's retirement investment committee reviews the appropriateness of our Pension Plan's investment strategy on an ongoing basis. Our Pension Plan employs a total return investment approach whereby a diversified blend of equities and fixed income investments is used to maximize the long-term return of plan assets for a prudent level of risk. Risk tolerance is established through careful consideration of plan characteristics, such as business and financial characteristics, demographics, and actuarial and company funding policies. Furthermore, equity investments are diversified across U.S. and non-U.S. listed companies with small and large capitalizations. Derivatives may be used to gain market exposure in an efficient and timely manner; however, derivatives may not be used to leverage the portfolio beyond the market value of the underlying investments. Investment risk is measured

and monitored on an ongoing basis through quarterly investment portfolio reviews, annual liability measurements and periodic asset and liability studies.

Our Pension Plan assets did not include any direct ownership of our securities at September 30, 2006 and 2005.

**Cash Flows Related to Defined Benefit Plans**

Our general practice is to contribute to our Pension Plan an amount equal to at least the minimum required contribution, if any, but no more than the maximum amount deductible for federal income tax purposes each year. During 2006, we made two contributions totaling $143 million to our Pension Plan compared to one contribution totaling $48 million during 2005. The increase in contributions made to our Pension Plan was in response to the increase in tax-deductible contributions allowed under the Pension Protection Act passed in August 2006. We have not yet determined whether a contribution to our Pension Plan is required for 2007.

In addition to the Pension Plan contributions noted above, we paid $3 million during 2006 and $1 million during 2005 in benefits under our SERP. Allocations under our SERP, as well as our Retiree Health Plan, are in the form of benefit payments, as these plans are required to be unfunded.

Table 15.9 sets forth estimated future benefit payments expected to be paid for our defined benefit plans. The expected benefits are based on the same assumptions used to measure our benefit obligation at September 30, 2006.

**Table 15.9 — Estimated Future Benefit Payments**

|  | Pension Benefits | Postretirement Health Benefits |
|---|---|---|
|  | (in millions) | |
| 2007 | $ 7 | $ 2 |
| 2008 | 8 | 2 |
| 2009 | 9 | 2 |
| 2010 | 11 | 3 |
| 2011 | 12 | 3 |
| Years 2012-2016 | 108 | 25 |

**Defined Contribution Plans**

Our Thrift/401(k) Savings Plan, or Savings Plan, is a tax-qualified defined contribution pension plan offered to all eligible employees. Employees are permitted to contribute from 1 percent to 25 percent of their eligible compensation to the Savings Plan, subject to limits set by the Internal Revenue Code. We match employees' contributions up to 6 percent of their eligible compensation per pay period; the percentage matched depends upon the employee's length of service. Employee contributions and our matching contributions are immediately vested. We also have discretionary authority to make additional contributions to our Savings Plan that are allocated to each eligible employee, based on the employee's eligible compensation. Employees become vested in our discretionary contributions after 5 years of service. In addition to our Savings Plan, we maintain a non-qualified defined contribution plan for our officers, designed to make up for benefits lost due to limitations on eligible compensation imposed by the Internal Revenue Code and to make up for deferrals of eligible compensation under our Executive Deferred Compensation Plan. We incurred costs of $34 million, $31 million and $29 million for the years ended December 31, 2006, 2005 and 2004, respectively, related to these plans. These expenses were included in Salaries and employee benefits on our consolidated statements of income.

**Executive Deferred Compensation Plan**

Our Executive Deferred Compensation Plan is an unfunded, non-qualified plan that allows certain key employees to elect to defer substantially all or a portion of their annual salary and cash bonus, and certain key management employees to defer the settlement of restricted stock units received from us, as well as substantially all or a portion of their annual salary and cash bonus, for any number of years specified by the employee, but under no circumstances may the period elected exceed his or her life expectancy. During 2005, we amended the plan to modify certain provisions to address Internal Revenue Code Section 409A as a result of the issuance of proposed regulations and other guidance. Distributions are paid from our general assets. We record a liability equal to the accumulated deferred salary, cash bonus and accrued interest as set forth in the plan, net of any related distributions made to plan participants. We recognize expense equal to the interest accrued on deferred salary and bonus throughout the year. Expense associated with unvested deferred restricted stock units is recognized as part of stock-based compensation.

## NOTE 16: FAIR VALUE DISCLOSURES

The supplemental consolidated fair value balance sheets in Table 16.1 present our estimates of the fair value of our recorded financial assets and liabilities and off-balance sheet financial instruments at December 31, 2006 and 2005. Our consolidated fair value balance sheets include the estimated fair values of financial instruments recorded on our consolidated balance sheets prepared in accordance with GAAP, as well as off-balance sheet financial instruments that

represent our assets or liabilities that are not recorded on our GAAP consolidated balance sheets. These off-balance sheet items predominantly consist of: (a) the unrecognized Guarantee asset and Guarantee obligation associated with our PCs issued through our Guarantor Swap program prior to the implementation of FIN 45, (b) certain commitments to purchase mortgage loans and (c) certain credit enhancements on manufactured housing asset-backed securities. The fair value balance sheets also include certain assets and liabilities that are not financial instruments (such as property and equipment and real estate owned, which are included in Other assets) at their carrying value in accordance with GAAP. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with GAAP fair value guidelines prescribed by SFAS No. 107, "Disclosures about Fair Value of Financial Instruments," and other relevant pronouncements.

### Table 16.1 — Consolidated Fair Value Balance Sheets[1]

| | December 31, | | | |
| | 2006 | | 2005 | |
| | Carrying Amount[2] | Fair Value | Carrying Amount[2] | Fair Value |
| | (in billions) | | | |
| **Assets** | | | | |
| Mortgage loans | $ 65.6 | $ 65.4 | $ 61.4 | $ 62.3 |
| Mortgage-related securities excluding PC residuals | 634.3 | 634.3 | 647.4 | 647.4 |
| PC residuals | 0.6 | 0.6 | 0.6 | 0.6 |
| Retained portfolio | 700.5 | 700.3 | 709.4 | 710.3 |
| Cash and cash equivalents | 11.4 | 11.4 | 10.5 | 10.5 |
| Investments | 45.6 | 45.6 | 42.2 | 42.2 |
| Securities purchased under agreements to resell and Federal funds sold | 23.0 | 23.0 | 15.2 | 15.2 |
| Derivative assets | 7.9 | 7.9 | 7.1 | 7.1 |
| Guarantee asset[3] | 6.1 | 6.4 | 5.1 | 5.6 |
| Other assets[4] | 18.6 | 16.7 | 16.7 | 14.3 |
| Total assets | $813.1 | $811.3 | $806.2 | $805.2 |
| **Liabilities and minority interests** | | | | |
| Total debt securities, net | $753.9 | $752.3 | $748.8 | $747.0 |
| Guarantee obligation | 7.1 | 4.7 | 5.5 | 3.7 |
| Derivative liabilities | 0.2 | 0.2 | 0.6 | 0.6 |
| Reserve for guarantee losses on PCs | 0.4 | — | 0.3 | — |
| Other liabilities | 22.7 | 21.8 | 22.9 | 22.0 |
| Minority interests in consolidated subsidiaries | 0.5 | 0.5 | 0.9 | 1.0 |
| Total liabilities and minority interests | 784.8 | 779.5 | 779.0 | 774.3 |
| **Net assets attributable to stockholders** | | | | |
| Preferred stockholders | 6.1 | 5.8 | 4.6 | 4.1 |
| Common stockholders | 22.2 | 26.0 | 22.6 | 26.8 |
| Total net assets | 28.3 | 31.8 | 27.2 | 30.9 |
| Total liabilities and net assets | $813.1 | $811.3 | $806.2 | $805.2 |

(1) The consolidated fair value balance sheets do not purport to present our net realizable, liquidation or market value as a whole. Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

(2) Carrying amounts equal the amounts reported on our GAAP consolidated balance sheets.

(3) The fair value of the Guarantee asset reported exceeds the carrying value primarily because the fair value includes the Guarantee asset related to some PCs held by third parties that are not recognized on our GAAP consolidated balance sheets because such PCs were issued prior to the implementation of FIN 45 in 2003.

(4) Fair values include estimated income taxes calculated using the 35 percent statutory rate on the difference between the consolidated fair value balance sheets net assets, including deferred taxes from our GAAP consolidated balance sheets, and the GAAP consolidated balance sheets equity attributable to common stockholders.

### Limitations

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios. For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur. In addition, our consolidated fair value balance sheets do not capture the value associated with future growth opportunities in our investment and securitization portfolios. Thus, the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation or market value as a whole.

We report certain assets and liabilities that are not financial instruments (such as property and equipment and real estate owned), as well as certain financial instruments that are not covered by the SFAS 107 disclosure requirements (such as pension liabilities) at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets. We believe these items do not have a significant impact on our overall fair value results. Other non-financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred credit fees. Cash receipts and payments related to

these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets.

**Valuation Methods and Assumptions**

Fair value is generally based on independent price quotations obtained from third-party pricing services, dealer marks or direct market observations, where available. However, certain financial instruments are less actively traded and, therefore, are not always able to be valued based on prices obtained from third parties. If quoted prices or market data are not available, fair value is based on internal valuation models using market data inputs or internally developed assumptions, where appropriate.

During 2006 and 2005, our fair value results were impacted by several improvements in our approach for estimating the fair value of certain financial instruments. In the first quarter of 2006, we enhanced our approach for estimating the fair value of certain financial instruments resulting in (a) an increase in the fair value of Total net assets of approximately $0.2 billion (after-tax) related to our guarantee-related assets and liabilities and (b) a net decrease in the fair value of Total net assets of approximately $0.1 billion (after-tax) related to other financial instruments. In the first quarter of 2005, we improved our approach for estimating the fair values of certain financial instruments resulting in (a) a decrease in the fair value of Total net assets of approximately $0.8 billion (after-tax) related to our guarantee-related assets and liabilities and (b) an increase in the fair value of Total net assets of approximately $0.3 billion (after-tax) related to our multifamily whole loans, the minority interests in our consolidated REIT subsidiaries and other financial instruments. Also, in the second quarter of 2005, we improved our approach for estimating the fair values of certain securities we hold, which increased the fair value of Total net assets by approximately $0.1 billion. The changes in our approach for estimating the fair values of these financial instruments are described below.

The following methods and assumptions were used to estimate the fair value of assets and liabilities at December 31, 2006 and 2005.

*Mortgage loans*

Mortgage loans represent single-family and multifamily whole loans held in our Retained portfolio. For GAAP purposes, we must determine the fair value of these mortgage loans to calculate lower-of-cost-or-market adjustments for mortgages classified as held-for-sale. For fair value balance sheet purposes, we used this same approach when determining the fair value of whole loans, including those held-for-investment.

We determine the fair value of mortgage loans, excluding delinquent single-family loans purchased out of pools, based on comparisons to actively traded mortgage-related securities with similar characteristics, with adjustments for yield, credit and liquidity differences. Specifically, we aggregate mortgage loans into pools by product type, coupon and maturity and then convert the pools into notional mortgage-related securities based on their specific characteristics. We then calculate fair values for these notional mortgage-related securities as described below in "*Mortgage-related securities, excluding PC residuals.*"

Part of the adjustments for yield, credit and liquidity differences represent an implied guarantee fee. To accomplish this, the fair value of the single-family whole loans, excluding delinquent single-family loans purchased out of pools, includes an adjustment representing the estimated present value of the additional cash flows on the mortgage coupon in excess of the coupon expected on the notional mortgage-related securities. For multifamily whole loans, the fair value adjustment is estimated by calculating the net present value of guarantee fees we expect to retain. This retained guarantee fee is estimated by subtracting the expected cost of funding and securitizing a multifamily whole loan of a comparable maturity and credit rating from the coupon on the whole loan at the time of purchase.

The implied guarantee fee for both single-family and multifamily whole loans is also net of the related credit and other components inherent in our Guarantee obligation. For single-family whole loans, the process for estimating the related credit and other Guarantee obligation components is described in the "*Guarantee obligation*" section. For multifamily whole loans, the related credit and other Guarantee obligation components were estimated by extracting the credit risk premium that multifamily whole loan investors require from market prices on similar securities. This credit risk premium is net of expected funding, liquidity and other risk premiums that are embedded in the market price of the reference securities.

Beginning in 2005, we refined the fair value estimates of multifamily whole loans by incorporating additional information and guidance from active market participants into the pricing of notional mortgage-related securities. In addition, beginning in 2005, for single-family whole loans that are extremely delinquent and have been purchased out of pools, we obtained dealer indications on aggregated groups of similar loans that reflect their current performance status. These market price indications reflect the estimated present value of all cash flows related to the whole loans, including expected credit losses and recoveries.

*Mortgage-related securities, excluding PC residuals*

Mortgage-related securities represent pass-throughs and other mortgage-related securities classified as available-for-sale and trading, which are already reflected at fair value on our GAAP consolidated balance sheets. Mortgage-related securities consist of securities issued by us, Fannie Mae and Ginnie Mae, as well as non-agency mortgage-related securities.

The fair value of securities with readily available third-party market prices is generally based on market prices obtained from broker/dealers or reliable third-party pricing service providers. Fair value may be estimated by using third-party quotes for similar instruments, adjusted for differences in contractual terms. For other securities, a market option-adjusted spread approach based on observable market parameters is used to estimate fair value. Option-adjusted spreads for certain securities are estimated by deriving the option-adjusted spread for the most closely comparable security with an available market price, using proprietary interest-rate and prepayment models. If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security. Fair values for these securities are then estimated by using the estimated option-adjusted spread as an input to the interest-rate and prepayment models, and estimating the net present value of the projected cash flows. The remaining instruments are priced using other modeling techniques or by using other securities as proxies.

*PC residuals*

PC residuals are reported at fair value on our GAAP consolidated balance sheets. Fair value for PC residuals is estimated in the same manner as described for the Guarantee asset and the Guarantee obligation for PCs below.

*Cash and cash equivalents*

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash collateral posted by our derivative counterparties. Given that these assets are short-term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

*Investments*

At December 31, 2006 and 2005, Investments consists solely of non-mortgage-related securities, which are reported at fair value on our GAAP consolidated balance sheets. The fair values of Investments were estimated using the methods described above in "*Mortgage-related securities, excluding PC residuals.*"

*Securities purchased under agreements to resell and Federal funds sold*

Securities purchased under agreements to resell and Federal funds sold principally consists of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities, Federal funds sold and Eurodollar time deposits. Given that these assets are short-term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

*Derivative assets*

Derivative assets, at fair value largely consists of interest-rate swaps, option-based derivatives, futures, and forward purchase and sale commitments that we account for as derivatives, which are reflected at fair value on our GAAP consolidated balance sheets. The fair values of interest-rate swaps are determined by using the appropriate yield curves to calculate and discount the expected cash flows for both the fixed-rate and variable-rate components of the swap contracts. Option-based derivatives, which principally include call and put swaptions, are valued using an option-pricing model. This model uses market interest rates and market-implied option volatilities, where available, to calculate the option's fair value. Market-implied option volatilities are based on information obtained from broker/dealers. The fair value of exchange-traded futures is based on end-of-day closing prices obtained from third-party pricing services. Derivative forward purchase and sale commitments are valued using the methods described for mortgage-related securities valuation above.

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. Our fair value of derivatives is not adjusted for expected credit losses because we obtain collateral from most counterparties typically within one business day of the daily market value calculation and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A— or above.

*Guarantee asset*

At December 31, 2006 and 2005, we had a Guarantee asset on our GAAP consolidated balance sheets for approximately 95 percent and 93 percent, respectively, of PCs and Structured Securities held by third parties. For more information regarding the accounting for the Guarantee asset related to PCs and Structured Securities, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

For fair value balance sheet purposes, the Guarantee asset is reflected for all PCs and Structured Securities held by third parties and is valued using the same method as used for GAAP fair value purposes. For a description of how we determine the fair value of our Guarantee asset, see "NOTE 2: TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS."

*Other assets*

Other assets consists of accrued interest and other receivables, investments in qualified LIHTC partnerships that are eligible for federal tax credits, credit enhancement contracts related to PCs and Structured Securities (pool insurance and recourse and/or indemnification agreements), financial guarantee contracts for additional credit enhancements on certain manufactured housing asset-backed securities, REO, property and equipment, and other miscellaneous assets.

The receivables are financial instruments and are required to be measured at fair value for disclosure purposes pursuant to SFAS 107. Because these receivables are short-term in nature, we believe the carrying amount on our GAAP consolidated balance sheets is a reasonable approximation of their fair values. Our investments in LIHTC partnerships, reported as consolidated entities or equity method investments in the GAAP financial statements, are not within the scope of SFAS 107 disclosure requirements. However, we present the fair value of these investments in Other assets. For the LIHTC partnerships, the fair value of expected tax benefits is estimated using expected cash flows discounted at a market-based yield.

For the credit enhancement contracts related to PCs and Structured Securities (pool insurance and recourse and/or indemnification agreements), fair value is estimated using an expected cash flow approach, and is intended to reflect the estimated amount that a third party would be willing to pay for the contracts. On our consolidated fair value balance sheets, these contracts are reported at fair value at each balance sheet date based on current market conditions. On our GAAP consolidated balance sheets, these contracts are initially recorded at fair value at inception, then amortized to expense.

For the credit enhancements on manufactured housing asset-backed securities, the fair value is based on the difference between the market price of non-credit-impaired manufactured housing securities and credit-impaired manufactured housing securities that are likely to produce future credit losses, as adjusted for our estimate of a risk premium attributable to the financial guarantee contracts. The value of the contracts, over time, will be determined by the actual credit-related losses incurred and, therefore, may have a value that is higher or lower than our market-based estimate. On our GAAP consolidated financial statements, these contracts are recognized as realized.

The other categories of assets that comprise Other assets are not financial instruments required to be valued at fair value under SFAS 107, such as REO and property and equipment. For the majority of these non-financial assets in Other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets, and any change in their fair value would not be a meaningful part of our fair value of net assets business results. Certain non-financial assets in Other assets on our GAAP consolidated balance sheets are assigned a zero value on our consolidated fair value balance sheets. This treatment is applied to deferred items such as deferred debt issuance costs.

We adjust the GAAP-basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders. To the extent the adjusted deferred taxes are a net asset, this amount is included in Other assets. If the adjusted deferred taxes are a net liability, this amount is included in Other liabilities.

*Total debt securities, net*

Total debt securities, net represents short-term and long-term debt used to finance our assets and, on our consolidated GAAP balance sheets, debt securities are reported at amortized cost, which is net of deferred items, including premiums, discounts and hedging-related basis adjustments. This item includes both non-callable and callable debt as well as short-term zero-coupon discount notes. The fair value of the short-term zero-coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities is generally based on market prices obtained from broker/dealers, reliable third-party pricing service providers or direct market observations.

*Guarantee obligation*

We did not establish a Guarantee obligation for GAAP purposes for PCs and Structured Securities held by third parties that were issued through our Guarantor Swap program prior to adoption of FIN 45. In addition, after it is initially recorded at fair value the Guarantee obligation is not subsequently carried at fair value for GAAP purposes. On our consolidated fair value balance sheets, the Guarantee obligation reflects the fair value of our Guarantee obligation on all PCs held by third parties. Additionally, for fair value balance sheet purposes, the Guarantee obligation is valued using the same method as used for GAAP to determine its initial fair value. Because Guarantee asset, Guarantee obligation and credit enhancement-related

assets that are recognized at the inception of an executed Guarantor Swap are valued independently of each other, net differences between these recognized assets and liabilities may exist at inception. If the amount of the Guarantee asset plus the credit enhancement-related assets is greater than the amount of the Guarantee obligation, the difference between such amounts is deferred on our GAAP consolidated balance sheets as a component of the Guarantee obligation. This component of the Guarantee obligation is not recorded on the consolidated fair value balance sheets. The difference between the fair value and carrying value of the Guarantee obligation shown in Table 16.1 reflects the different basis of accounting for this liability. For example, the fair value of the Guarantee obligation does not include the unamortized balance of deferred guarantee income that is a component of its carrying value on the GAAP consolidated balance sheets. For information concerning our valuation approach and accounting policies related to guarantee-related credit losses, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 2: TRANSFERS OF SECURITIZED INTERESTS IN MORTGAGE-RELATED ASSETS."

*Derivative liabilities*

See discussion under "*Derivative assets*" above.

*Reserve for guarantee losses on PCs*

The carrying amount of the Reserve for guarantee losses on PCs on our GAAP consolidated balance sheets represents loan loss reserves for off-balance sheet PCs in accordance with GAAP that are not already accounted for under SFAS 140. This line item has no basis on our consolidated fair value balance sheets, because the estimated fair value of all expected default losses is included in the Guarantee obligation reported on our consolidated fair value balance sheets.

*Other liabilities*

Other liabilities principally consists of amounts due to PC investors (*i.e.*, principal and interest), funding liabilities associated with investments in LIHTC partnerships, accrued interest payable on debt securities and other miscellaneous obligations of less than one year. We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for funding liabilities associated with investments in LIHTC partnerships, for which fair value is estimated using expected cash flows discounted at a market-based yield. Furthermore, certain deferred items reported as Other liabilities on our GAAP consolidated balance sheets are assigned zero value on our consolidated fair value balance sheets, such as deferred credit fees. Also, as discussed in "*Other assets*," Other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes.

*Minority interests in consolidated subsidiaries*

Minority interests in consolidated subsidiaries primarily represent preferred stock interests that third parties hold in our two majority-owned REIT subsidiaries. In accordance with GAAP, we consolidated the REITs. The preferred stock interests are not within the scope of SFAS 107 disclosure requirements. However, we present the fair value of these interests on our consolidated fair value balance sheets. The fair value of the third-party minority interests in these REITs was based on the estimated value of the underlying REIT preferred stock we determined based on a valuation model. In 2005, we improved our fair value estimates to reflect observed market activity.

*Net assets attributable to preferred stockholders*

To determine the preferred stock fair value, we use a market-based approach incorporating quoted dealer prices.

*Net assets attributable to common stockholders*

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and the sum of total liabilities and minority interests reported on our consolidated fair value balance sheets, less the fair value of net assets attributable to preferred stockholders.

## NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS

**Mortgages and Mortgage-Related Securities**

Table 17.1 summarizes the geographical concentration of mortgages and mortgage-related securities that are held by us or that are collateral for PCs and Structured Securities, excluding:

- $1,510 million and $2,021 million of mortgage-related securities issued by Ginnie Mae that back Structured Securities at December 31, 2006 and 2005, respectively, because these securities do not expose us to meaningful amounts of credit risk;

- $45,385 million and $44,626 million of agency mortgage-related securities at December 31, 2006 and 2005, respectively, because these securities do not expose us to meaningful amounts of credit risk; and

- $238,465 million and $242,915 million of non-agency mortgage-related securities held in the Retained portfolio at December 31, 2006 and 2005, respectively, because geographic information regarding these securities is not available. With respect to these securities, we look to third party credit enhancements (*e.g.*, bond insurance) or other credit enhancements resulting from the securitization structure supporting such securities (*e.g.*, subordination levels) as a primary means of managing credit risk.

See "NOTE 5: RETAINED PORTFOLIO AND CASH AND INVESTMENTS PORTFOLIO" for more information about the securities we hold.

**Table 17.1 — Concentration of Credit Risk**

| | December 31, | | | |
| | 2006 | | 2005 | |
| | Amount[1] | Percentage | Amount[2] | Percentage |
| | (dollars in millions) | | | |
| **By Region[3]** | | | | |
| Northeast | $ 375,844 | 24% | $ 340,821 | 24% |
| West | 366,492 | 24 | 327,029 | 23 |
| North Central | 324,255 | 21 | 304,288 | 22 |
| Southeast | 279,984 | 18 | 247,484 | 18 |
| Southwest | 194,785 | 13 | 175,362 | 13 |
| | $1,541,360 | 100% | $1,394,984 | 100% |
| **By State** | | | | |
| California | $ 195,964 | 13% | $ 182,267 | 13% |
| Florida | 101,901 | 7 | 86,916 | 6 |
| Illinois | 80,130 | 5 | 72,952 | 5 |
| New York | 77,614 | 5 | 71,961 | 5 |
| All Others | 1,085,751 | 70 | 980,888 | 71 |
| | $1,541,360 | 100% | $1,394,984 | 100% |

(1) Calculated as Total mortgage portfolio less Structured Securities backed by Ginnie Mae Certificates and agency and non-agency mortgage-related securities held in the Retained portfolio.
(2) 2005 data has been revised to conform to the current year presentation.
(3) Region Designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

**Mortgage Lenders and Insurers**

A significant portion of our single-family mortgage purchase volume is generated from several key mortgage lenders that have entered into business arrangements with us. These arrangements generally involve a lender's commitment to sell a high proportion of its conforming mortgage origination volume to us. During 2006, three mortgage lenders each accounted for 10 percent or more of our mortgage purchase volume. These lenders collectively accounted for approximately 51 percent of this volume. In addition, in 2006, our top ten lenders represented approximately 76 percent of our mortgage purchase volume. These top lenders are among the largest mortgage loan originators in the U.S. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated or modified without replacement from other lenders.

We have institutional credit risk relating to the potential insolvency or non-performance of mortgage insurers that insure mortgages we purchase or guarantee. Approximately 99 percent of all mortgage insurers providing primary mortgage insurance and pool insurance coverage on single-family mortgages we purchased during 2006 were rated "AA" or better by S&P. Excluding insurers of our non-agency mortgage-related securities portfolio at December 31, 2006, there were seven mortgage insurers that each provided more than 7 percent of our total mortgage insurance coverage (including primary mortgage insurance and pool insurance) and together accounted for approximately 99 percent of our overall coverage. In February 2007, two of these mortgage insurance companies announced an agreement to merge, with one acquiring the other.

At December 31, 2006, these two companies together represented approximately 52 percent of our total mortgage insurance coverage.

### Derivative Portfolio

On an ongoing basis, we review the credit fundamentals of all of our derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or events affecting an individual counterparty occur.

*Derivative Counterparties.*  Our use of derivatives exposes us to counterparty credit risk, which arises from the possibility that the derivative counterparty will not be able to meet its contractual obligations. Exchange-traded derivatives, such as futures contracts, do not measurably increase our counterparty credit risk because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. Over-the-counter, or OTC, derivatives, however, expose us to counterparty credit risk because transactions are executed and settled between us and the counterparty. Our use of OTC interest-rate swaps, option-based derivatives and foreign-currency swaps is subject to rigorous internal credit and legal reviews. Our derivative counterparties carry external credit ratings among the highest available from major rating agencies. All of these counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

*Master Netting and Collateral Agreements.*  We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives and foreign-currency swaps. Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted. Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold. Bilateral collateral agreements are in place for the majority of our counterparties. Collateral posting thresholds are tied to a counterparty's credit rating. Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes. Collateral is typically transferred within one business day based on the values of the related derivatives. This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties.

Collateral posted by a derivative counterparty is typically in the form of cash, U.S. Treasury securities, our PCs and Structured Securities or our debt securities. In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non-cash collateral, to sale the collateral and transfer the proceeds to us.

Our uncollateralized exposure to counterparties for OTC interest-rate swaps, option-based derivatives and foreign-currency swaps, after applying netting agreements and collateral, was $672 million and $190 million at December 31, 2006 and 2005, respectively. In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on December 31, 2006, our maximum loss for accounting purposes would have been approximately $672 million.

Our exposure to counterparties for OTC forward purchase and sale commitments treated as derivatives was $24 million and $35 million at December 31, 2006 and 2005, respectively. Because the typical maturity for our OTC commitments is less than one year, we do not require master netting and collateral agreements for the counterparties of these commitments. Therefore, the exposure to our OTC commitments counterparties is uncollateralized. Similar to counterparties for our OTC interest-rate swaps, option-based derivatives and foreign-currency swaps, we monitor the credit fundamentals of our OTC commitments counterparties on an ongoing basis to ensure that they continue to meet our internal risk-management standards.

### NOTE 18: MINORITY INTERESTS

The equity and net earnings attributable to the minority stockholder interests in consolidated subsidiaries are reported on our consolidated balance sheets as Minority interests in consolidated subsidiaries and on our consolidated statements of income as Minority interests in earnings of consolidated subsidiaries. The majority of the balances in these accounts relate to our two majority-owned REITs.

In February 1997, we formed two majority-owned REIT subsidiaries funded through the issuance of common stock (99.9 percent of which is held by us) and a total of $4.0 billion of perpetual, step-down preferred stock issued to outside investors. The dividend rate on the step-down preferred stock was 13.3 percent from initial issuance through December 2006 (the initial term). Beginning in 2007, the dividend rate will step-down to 1.0 percent. Dividends on this preferred stock

accrue in arrears. The balance of the two step-down preferred stock issuances as recorded within Minority interests in consolidated subsidiaries on our consolidated balance sheets totaled $503 million and $934 million at December 31, 2006 and 2005, respectively.

On November 10, 2005, we offered to purchase for cash any and all of the outstanding shares of the outstanding step-down preferred stock, of which $142 million was purchased between the offer date and December 31, 2005. During 2006, we purchased an additional $27 million of the preferred stock. The preferred stock continues to be redeemable by the REITs under certain circumstances described in the preferred stock offering documents as a "tax event redemption."

## NOTE 19: EARNINGS PER COMMON SHARE

Because we have participating securities, we use the "two-class" method of computing earnings per share. Basic earnings per common share are computed by dividing Net income available to common stockholders by Weighted average common shares outstanding-basic for the period. Diluted earnings per common share are computed as Net income available to common stockholders divided by Weighted average common shares outstanding-diluted for the period, which consider the effect of dilutive common equivalent shares outstanding. The effect of dilutive common equivalent shares outstanding includes: (a) the weighted average shares related to stock options (including the ESPP) that have an exercise price lower than the average market price during the period; (b) the weighted average of non-vested restricted shares; and (c) all restricted stock units. Such items are excluded from Weighted average common shares outstanding — basic. See "NOTE 11: STOCK-BASED COMPENSATION" for additional information. For the years ended December 31, 2006, 2005 and 2004, there were approximately 1,808,000, 1,929,000 and 2,239,000 of dilutive common equivalent shares outstanding that could potentially dilute earnings per common share.

Options to purchase 1.9 million, 2.3 million and 2.4 million shares of common stock were excluded from the computation of Diluted earnings per common share at December 31, 2006, 2005 and 2004, respectively, because the options' exercise price exceeded the average market price of the common stock for the years ended December 31, 2006, 2005 and 2004, respectively.

### END OF CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

*Freddie Mac*

## PROPERTIES

We own a 75 percent interest in a limited partnership that owns our principal offices, consisting of four office buildings in McLean, Virginia, that comprise approximately 1.3 million square feet. We occupy this headquarters complex under a long-term lease from the partnership.

## LEGAL PROCEEDINGS

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business.

Furthermore, we are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. We also are involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits generally involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for them to indemnify us against liability arising from their wrongful actions.

We are also subject to various legal proceedings, including regulatory investigations and administrative and civil litigation, arising from the restatement of our 2002 and prior consolidated financial statements. In addition, we have been named in multiple lawsuits alleging violations of federal and state antitrust laws and state consumer protection laws in connection with the setting of our guarantee fees.

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. For additional information on our legal proceedings, see "NOTE 13: LEGAL CONTINGENCIES" and "NOTE 14: INCOME TAXES" to our consolidated financial statements.

## SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

The following matters were presented for stockholder vote at our annual meeting of stockholders held on September 8, 2006: (a) election of 13 members to our board of directors, each for a term expiring on the date of our next annual meeting of stockholders; (b) ratification of the appointment of PricewaterhouseCoopers LLP as our independent auditors for 2006; and (c) a stockholder proposal concerning charitable contributions. As shown in Table 53 below, the following persons were elected to our board of directors at the meeting by the respective votes indicated:

**Table 53 — Election of Directors**

| | Votes For | Votes Withheld |
|---|---|---|
| Barbara T. Alexander | 596,345,274 | 7,932,999 |
| Geoffrey T. Boisi | 598,396,467 | 5,881,806 |
| Michelle Engler | 598,900,945 | 5,377,328 |
| Robert R. Glauber | 599,045,153 | 5,233,120 |
| Richard Karl Goeltz | 599,036,707 | 5,241,566 |
| Thomas S. Johnson | 565,811,704 | 38,466,569 |
| William M. Lewis, Jr. | 598,961,629 | 5,316,644 |
| Eugene M. McQuade | 599,202,215 | 5,076,058 |
| Shaun F. O'Malley | 575,195,153 | 29,083,120 |
| Jeffrey M. Peek | 598,987,195 | 5,291,078 |
| Ronald F. Poe | 594,482,272 | 9,796,001 |
| Stephen A. Ross | 575,283,117 | 28,995,156 |
| Richard F. Syron | 594,431,345 | 9,846,928 |

The appointment of PricewaterhouseCoopers LLP was ratified at the meeting by the following votes:

| Votes for | Votes Against | Abstentions |
|---|---|---|
| 596,289,143 | 4,496,273 | 3,492,857 |

The stockholder proposal concerning charitable contributions was not adopted and received the following votes:

| Votes for | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|
| 24,166,819 | 439,759,549 | 49,290,127 | 91,061,778 |

## CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## CONTROLS AND PROCEDURES

See "MD&A — RISK MANAGEMENT — Operational Risks — *Internal Control Over Financial Reporting*" for a description of our material weaknesses and other control deficiencies.

## DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE
## Our Board of Directors (as of March 15, 2007)[1]

**Richard F. Syron**
*Chairman and Chief Executive Officer*
Freddie Mac
McLean, Virginia

**Barbara T. Alexander**[C, E]
*Independent Consultant*
Monarch Beach, California

**Geoffrey T. Boisi**[B, D, E]
*Chairman and Senior Partner*
Roundtable Investment Partners LLC
A private investment management firm
New York, New York

**Michelle Engler**[B, E]
*Trustee*
JNL Investor Series Trust and JNL Series Trust
and *Member of Board of Managers*
JNL/NY Variable Funds
Each an investment company
Lansing, Michigan

**Robert R. Glauber**[A, C]
*Retired Chairman and Chief Executive Officer*
National Association of Securities Dealers, Inc.
A private-sector regulator of the securities industry
Washington, District of Columbia

**Richard Karl Goeltz**[A, C, D]
*Retired Vice Chairman and Chief Financial Officer*
American Express Company
A financial services company
New York, New York

**Thomas S. Johnson**[A, B]
*Retired Chairman and Chief Executive Officer*
GreenPoint Financial Corporation
A financial services company
New York, New York

**William M. Lewis, Jr.**[C, E]
*Managing Director and Co-Chairman
of Investment Banking*
Lazard Ltd.
An investment banking company
New York, New York

**Eugene M. McQuade**
*President and Chief Operating Officer*
Freddie Mac
McLean, Virginia

**Shaun F. O'Malley** (Lead Director)[A, B, D]
*Chairman Emeritus*
Price Waterhouse LLP
An accounting and consulting firm
Philadelphia, Pennsylvania

**Jeffrey M. Peek**[C, E]
*Chairman and Chief Executive Officer*
CIT Group, Inc.
A global commercial and consumer finance company
New York, New York

**Ronald F. Poe**[B, D, E]
*President*
Ronald F. Poe & Associates
A private real estate investment firm
White Plains, New York

**Stephen A. Ross**[A, C, D]
*Franco Modigliani Professor of Financial Economics*
Massachusetts Institute of Technology
Cambridge, Massachusetts

Committees    A Audit
              B Compensation and Human Resources
              C Finance and Capital Deployment
              D Governance, Nominating and Risk Oversight
              E Mission, Sourcing and Technology

---

(1) Our enabling legislation establishes the membership of the board of directors at 18 directors: 13 directors elected by the stockholders and 5 directors appointed by the President of the United States. Prior to our March 31, 2004 Annual Meeting, the Office of Counsel to the President informed us that the President did not intend to reappoint any of his then-current presidential appointees. Consequently, each of their terms as presidential appointees ended on the date of that annual meeting. No new appointees have been named by the President as of March 15, 2007.

Additional information regarding our directors and executive officers is set forth in our proxy statement for our annual meeting of stockholders to be held on June 8, 2007, and is incorporated herein by reference. Additional information concerning our Audit Committee may be found in our proxy statement. We also provide information regarding beneficial ownership reporting compliance in our proxy statement, incorporated herein by reference.

We have adopted a Code of Conduct for employees which is available on our website at www.freddiemac.com. Printed copies of the Code of Conduct may be obtained free of charge upon request from our Investor Relations department. We intend to disclose any amendments to, or waivers from, the employee Code of Conduct on behalf of the chief executive officer, chief financial officer, controller and persons performing similar functions on our website.

## EXECUTIVE COMPENSATION

Information regarding executive compensation is set forth in our proxy statement and is incorporated by reference into this Information Statement. Information regarding compensation of our board of directors and information concerning members of the Compensation and Human Resources Committee is set forth in our proxy statement and is incorporated here by reference.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

### Securities Authorized for Issuance under Equity Compensation Plans

Information about our common stock that may be issued upon the exercise of options, warrants and rights under our existing equity compensation plans at December 31, 2006 is set forth in our proxy statement and is incorporated here by reference.

### Security Ownership of Management

Information regarding the beneficial ownership of our common stock by each of our directors, each director nominee, certain executive officers and by all directors and executive officers as a group is set forth in our proxy statement and is incorporated here by reference.

### Security Ownership of Certain Beneficial Owners

Information regarding the beneficial ownership of our common stock by certain beneficial owners is set forth in our proxy statement and is incorporated here by reference.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE

Information regarding director independence, certain relationships and related transactions is set forth in our proxy statement and is incorporated here by reference.

## PRINCIPAL ACCOUNTANT FEES AND SERVICES

Information regarding principal accountant fees and services is set forth in our proxy statement and is incorporated here by reference.

## CERTIFICATION*

I, Richard F. Syron, certify that:

1. I have reviewed this Information Statement of Freddie Mac;

2. Based on my knowledge, this Information Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Information Statement; and

3. Based on my knowledge, the consolidated financial statements, and other financial information included in this Information Statement, fairly present in all material respects the financial condition, results of operations and cash flows of Freddie Mac as of, and for, the periods presented in this Information Statement.

Date: March 23, 2007

Richard F. Syron
Chairman and Chief Executive Officer

## CERTIFICATION*

I, Anthony S. Piszel, certify that:

1. I have reviewed this Information Statement of Freddie Mac;

2. Based on my knowledge, this Information Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Information Statement; and

3. Based on my knowledge, the consolidated financial statements, and other financial information included in this Information Statement, fairly present in all material respects the financial condition, results of operations and cash flows of Freddie Mac as of, and for, the periods presented in this Information Statement.

Date: March 23, 2007

Anthony S. Piszel
Executive Vice President and Chief Financial Officer

---

* For a discussion of our progress with respect to our internal control over financial reporting and disclosure controls and procedures, see "MD&A — RISK MANAGEMENT — Operational Risks — *Internal Control Over Financial Reporting.*"

## RATIO OF EARNINGS TO FIXED CHARGES

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2006** | **2005** | **2004** | **2003** | **2002** |
| | | | (dollars in millions) | | |
| Net income before cumulative effect of changes in accounting principles | $ 2,211 | $ 2,189 | $ 2,937 | $ 4,816 | $10,090 |
| Add: | | | | | |
| Income tax expense (benefit) | (108) | 367 | 790 | 2,202 | 4,713 |
| Minority interests in earnings of consolidated subsidiaries | 58 | 96 | 129 | 157 | 184 |
| Total interest expense | 37,270 | 29,899 | 26,566 | 26,509 | 26,876 |
| Interest factor in rental expenses | 6 | 6 | 6 | 5 | 5 |
| Capitalized interest | — | — | 1 | — | 1 |
| Earnings, as adjusted | $39,437 | $32,557 | $30,429 | $33,689 | $41,869 |
| Fixed charges: | | | | | |
| Total interest expense | $37,270 | $29,899 | $26,566 | $26,509 | $26,876 |
| Interest factor in rental expenses | 6 | 6 | 6 | 5 | 5 |
| Capitalized interest | — | — | 1 | — | 1 |
| Total fixed charges | $37,276 | $29,905 | $26,573 | $26,514 | $26,882 |
| Ratio of earnings to fixed charges[1] | 1.06 | 1.09 | 1.15 | 1.27 | 1.56 |

(1) Ratio of earnings to fixed charges is computed by dividing Earnings, as adjusted by Total fixed charges.

## RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2006** | **2005** | **2004** | **2003** | **2002** |
| | | | (dollars in millions) | | |
| Net income before cumulative effect of changes in accounting principles | $ 2,211 | $ 2,189 | $ 2,937 | $ 4,816 | $10,090 |
| Add: | | | | | |
| Income tax expense (benefit) | (108) | 367 | 790 | 2,202 | 4,713 |
| Minority interests in earnings of consolidated subsidiaries | 58 | 96 | 129 | 157 | 184 |
| Total interest expense | 37,270 | 29,899 | 26,566 | 26,509 | 26,876 |
| Interest factor in rental expenses | 6 | 6 | 6 | 5 | 5 |
| Capitalized interest | — | — | 1 | — | 1 |
| Earnings, as adjusted | $39,437 | $32,557 | $30,429 | $33,689 | $41,869 |
| Fixed charges: | | | | | |
| Total interest expense | $37,270 | $29,899 | $26,566 | $26,509 | $26,876 |
| Interest factor in rental expenses | 6 | 6 | 6 | 5 | 5 |
| Capitalized interest | — | — | 1 | — | 1 |
| Preferred stock dividends[1] | 270 | 261 | 266 | 315 | 351 |
| Total fixed charges including preferred stock dividends | $37,546 | $30,166 | $26,839 | $26,829 | $27,233 |
| Ratio of earnings to combined fixed charges and preferred stock dividends[2] | 1.05 | 1.08 | 1.13 | 1.26 | 1.54 |

(1) Preferred stock dividends represent pre-tax earnings required to cover any preferred stock dividend requirements using our effective tax rate for the relevant periods.
(2) Ratio of earnings to combined fixed charges and preferred stock dividends is computed by dividing Earnings, as adjusted by Total fixed charges including preferred stock dividends.

## ADDITIONAL FINANCIAL INFORMATION

### ANNUAL MEETING

The annual meeting of Freddie Mac's stockholders will be held:

June 8, 2007
8000 Jones Branch Drive
McLean, Virginia 22102

Proxy materials will be mailed to stockholders of record in accordance with Freddie Mac's bylaws and New York Stock Exchange requirements.

### DIVIDEND PAYMENTS

Approved by Freddie Mac's board of directors, dividends on the company's common stock and non-cumulative, preferred stock in 2006 and the first three months of 2007 were or are expected to be paid on:

March 31, 2006
June 30, 2006
September 29, 2006
December 29, 2006
March 30, 2007

Subject to approval by Freddie Mac's board of directors, dividends on the company's common stock and non-cumulative, preferred stock in the remaining nine months of 2007 are expected to be paid on or about:

June 29, 2007
September 28, 2007
December 28, 2007

## INDEX OF ACRONYMS

We are providing this index of acronyms used in this Information Statement for the convenience of the reader. All of the acronyms listed below are defined at their first use in this document.

| | |
|---|---|
| AOCI | Accumulated other comprehensive income (loss), net of taxes |
| ARM | Adjustable-rate mortgage |
| CMT | Constant Maturity Treasury |
| EITF | Emerging Issues Task Force |
| ERISA | Employee Retirement Income Security Act |
| ESPP | Employee Stock Purchase Plan |
| Euribor | Euro Interbank Offered Rate |
| Fannie Mae | Federal National Mortgage Association |
| FASB | Financial Accounting Standards Board |
| FEC | Federal Election Commission |
| FHA | Federal Housing Administration |
| FHFB | Federal Housing Finance Board |
| FICO | Credit scores initially developed by Fair, Isaac and Co., Inc. |
| FIN | Financial Accounting Standards Board Interpretation |
| FSP | Financial Accounting Standards Board Staff Position |
| GAAP | U.S. generally accepted accounting principles |
| Ginnie Mae | Government National Mortgage Association |
| GSE | Government-sponsored enterprise |
| GSE Act | The Federal Housing Enterprises Financial Safety and Soundness Act of 1992 |
| HUD | Department of Housing and Urban Development |
| IRS | Internal Revenue Service |
| LIBOR | London Interbank Offered Rate |
| LIHTC | Low-Income Housing Tax Credit |
| LTV | Loan-to-Value |
| MD&A | Management's Discussion and Analysis of Financial Condition and Results of Operations |
| NYSE | New York Stock Exchange |
| OAS | Option-Adjusted Spread |
| OFHEO | Office of Federal Housing Enterprise Oversight |
| OTC | Over-the-Counter |
| PC | Mortgage Participation Certificate |
| PMVS | Portfolio Market Value Sensitivity |
| PMVS-L | Portfolio Market Value Sensitivity-Level |
| PMVS-YC | Portfolio Market Value Sensitivity-Yield Curve |
| REIT | Real Estate Investment Trust |
| REMIC | Real Estate Mortgage Investment Conduit |
| REO | Real Estate Owned |
| S&P | Standard & Poor's |
| SEC | Securities and Exchange Commission |
| SFAS | Statement of Financial Accounting Standards |
| SS&TG | Securities Sales and Trading Group |
| TBA | To Be Announced |
| VIE | Variable interest entity |

*Freddie Mac*



8200 Jones Branch Drive, McLean, Virginia  22102   ▪   FreddieMac.com