# Exhibit C

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   --------------------------------x
     FEDERAL HOUSING FINANCE AGENCY, etc.,
 4              Plaintiff,
        - against -
 5
     HSBC NORTH AMERICA HOLDINGS, et al.,
 6   11 CIV. 6189 (DLC)
     BARCLAYS BANK PLC, et al.,
 7   11 CIV. 6190 (DLC)
     DEUTSCHE BANK AG, et al.,
 8   11 CIV. 6192 (DLC)
     FIRST HORIZON NATIONAL CORP., et al.,
 9   11 CIV. 6193 (DLC)
     BANK OF AMERICA CORP., et al.,
10   11 CIV. 6195 (DLC)
     GOLDMAN, SACHS & CO., et al.,
11   11 CIV. 6198 (DLC)
     CREDIT SUISSE HOLDINGS (USA), INC., et al.,
12   11 CIV. 6200 (DLC)
     NOMURA HOLDING AMERICA, INC., et al.,
13   11 CIV. 6201 (DLC)
     MERRILL LYNCH & CO., INC., et al.,
14   11 CIV. 6202 (DLC)
     SG AMERICAS, INC., et al.,
15   11 CIV. 6203 (DLC)
     MORGAN STANLEY, et al.,
16   11 CIV. 6739 (DLC)
     ALLY FINANCIAL INC., et al.,
17   11 CIV. 7010 (DLC)
                Defendants.
18   --------------------------------x
19   (Caption continued on following page)
20
21        VIDEOTAPED DEPOSITION
22               OF
23        JAMES LOCKHART
24        November 20, 2013
25            9:12 A.M.
```

1

2  UNITED STATES DISTRICT COURT

3  DISTRICT OF CONNECTICUT

4  Case No. 3:11-cv-01383-AWT

5  ----------------------------------x

6  FEDERAL HOUSING FINANCE AGENCY, etc.,

7                 Plaintiff,

8

9      - against -

10

11  THE ROYAL BANK OF SCOTLAND GROUP PLC,

12  et al.,

13                 Defendants.

14  ----------------------------------x

15        SIMPSON THACHER & BARTLETT LLP

16  425 Lexington Avenue, New York, New York

17             November 20, 2013

18               9:12 A.M.

19          VIDEOTAPED DEPOSITION

20                  OF

21             JAMES LOCKHART

22

23  REPORTED BY:

24  JINEEN PAVESI, RMR, RPR, CRR

25

Page 3

1

2                    November 20, 2013

3

4            Videotaped Deposition of JAMES

5    LOCKHART, pursuant to Notice, held at the

6    offices of Simpson Thacher & Bartlett LLP,

7    425 Lexington Avenue, New York, New York,

8    before Jineen Pavesi, a Registered

9    Professional Reporter, Registered Merit

10   Reporter, Certified Realtime Reporter and

11   Notary Public of the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    LOCKHART
 2  concern, specifically noting that the
 3  quantity of credit risk was high and
 4  rising.  It notes the 2007 examination
 5  found that many of the weaknesses that had
 6  been widespread during previous years were
 7  beginning to be corrected; however, these
 8  improvements have been too slow in coming
 9  and the harm from the previous years'
10  significant shortcomings was done.  The
11  enterprise had significantly increased
12  exposure to subprime and other risky
13  alternative loan products without adequate
14  modeling or analysis tools to permit
15  proper management of the inherent risks of
16  such products."
17            Does that accurately reflect
18  the state of affairs in 2007?
19       A.      Yes, the report was actually
20  written in the spring of 2008, but --
21       Q.      I understand that, that's
22  describing the situation in 2007.
23       A.      Right.
24       Q.      The discussion of the credit
25  risk and understanding the quantity of
```

```
 1                    LOCKHART
 2  credit risk, would that have also included
 3  the credit risk arising from the purchase
 4  of private label securities?
 5            MR. COREY:  Objection, form.
 6       A.       By the time this report was
 7  written, yes, in September of '08.
 8            When in 2007 that happened, it
 9  became a bigger issue, I am not quite
10  sure, but certainly in 2007, by the end of
11  2007 there were significant concern about
12  the private label securities.
13       Q.       When it says "The enterprise
14  had significantly increased its exposure
15  to subprime and other risky alternative
16  loan products without adequate modeling or
17  analysis tools to permit proper management
18  of the inherent risk of such products,"
19  that includes increased risk of exposure
20  to subprime and other risky alternative
21  products through the purchase of private
22  label securities, right?
23            MR. COREY:  Same objection.
24       A.       I am not sure if Chris was
25  including that or not, I just can't tell
```

Page 224

```
 1              LOCKHART
 2   from this writing whether he is including
 3   that or not.
 4      Q.      Sitting here today, you
 5   understand that Fannie Mae in 2007 was
 6   increasing its exposure to subprime and
 7   other risky products at least in part
 8   through its purchase of private label
 9   securities, right?
10              MR. COREY:  Same objection.
11      A.      Again, I don't know what they
12   bought in '07 versus what they had, they
13   may have actually had some rolled off and
14   they may not have actually been overall
15   increasing their exposure, I just don't
16   know.
17      Q.      Take a look at page 12, there
18   is a discussion of the current status of
19   the enterprise and this would have been as
20   of September 6, 2008, right, when it says
21   the current status?
22      A.      Correct.
23      Q.      The bottom paragraph, "The
24   decisions of the board of directors and
25   senior management prior to 2007 to acquire
```

Page 225

1                      LOCKHART
2     Alt-A loans and other high risk loan
3     products is a principal contributer to
4     Fannie Mae's current earnings losses and
5     deteriorated financial position.  Members
6     of the executive management team made
7     imprudent decisions to increase market
8     share and enter into higher risk products
9     with outdated models and without all the
10    necessary information or reports to
11    evaluate the risks of its decisions."
12              Did that accurately reflect the
13    current state of Fannie Mae?
14         A.      Yes.
15         Q.      At that time.
16              And certainly by that time the
17    imprudent decisions that you were
18    referring to would have included decisions
19    to purchase private label securities?
20         A.      Yes.
21         Q.      Turn the page, 13, at the top,
22    the first full sentence says, "Senior
23    management and the board of directors made
24    these decisions to increase market share,
25    raise revenue and meet housing goals."

```
 1              LOCKHART
 2          Do you see that?
 3     A.     Yes.
 4     Q.     And that would have included
 5  the reasons --  that would have included
 6  PLS purchases in the '05 to  '07 time
 7  period?
 8          MR. COREY:  Objection, form.
 9     Q.     Let me rephrase it.
10          These would have included the
11  reasons for Fannie Mae's purchases of
12  private label securities during the '05 to
13  '07 time period, namely to increase market
14  share, raise revenue and meet housing
15  goals?
16     A.     Yes.
17     Q.     The next paragraph begins
18  "Until recently models used to guide
19  credit decisions were deficient, have been
20  developed based on the characteristics of
21  borrowers who were much more credit-worthy
22  and did not fully account for the Alt-A
23  and other nontraditional loans that had
24  new product features and layering of
25  risk."
```

Page 227

1              LOCKHART
2              Do you see that?
3      A.      Yes.
4      Q.      That was one of the problems,
5  that Fannie Mae was relying on models that
6  didn't have an accurate picture of the
7  credit cycle involved in subprime and
8  Alt-A products, right?
9              MR. COREY:  Same objection.
10     A.      That's correct.
11     Q.      And those models were used in
12  connection with their private label
13  securities purchases as well, right?
14     A.      I am not sure about that, they
15  were definitely used for their flow and
16  bulk, but I do not know which models --
17  you have to remember that they had a
18  credit group that looked over their flow
19  and bulk and then it is really the
20  investment group that was buying the
21  mortgage-backed securities.
22              And so I do not know if they
23  used the same models or not.
24     Q.      Do you know whether they used
25  any models in the investment group of

1                    LOCKHART

2    Fannie Mae that was involved in buying

3    PLS?

4        A.        Good question; I don't know.

5        Q.        Turn to page 14 and, I'm sorry,

6    this is a discussion of governance issues,

7    back on 13, are you with me?

8        A.        I am on 13, yes.

9        Q.        It continues on to page 14 and

10   the first full paragraph, "Despite clear

11   signs in the latter half of 2006 and 2007

12   of growing problems in the economy,

13   management continued activity in riskier

14   programs and maintained its higher

15   eligibility program for Alt-A loans

16   without establishing limits on the

17   enterprise's total Alt-A position."

18                 Did I read that correctly?

19       A.        Yes.

20       Q.        The next paragraph says, "Until

21   recently, many credit decisions were

22   driven by market share, distorting some

23   credit decisions and allowing for an

24   infrastructure that did not properly

25   control or fully take into account pricing

```
 1                    LOCKHART
 2   their level of sophistication compared to
 3   other investors.
 4             I just want to follow up on
 5   some of those issues.
 6             They certainly had greater
 7   knowledge about the mortgage market than
 8   most other investors as a general matter,
 9   right, during the '05 to '07 time period?
10             MR. COREY:  Objection, form.
11        A.    The Fannie and Freddie
12   certainly had more data and more knowledge
13   about the mortgage market than probably
14   anybody else, yes.
15        Q.    Huge databases of information
16   about the performance of mortgage loans?
17             MR. COREY:  Objection, form.
18        A.    They had databases, yes, and
19   one of the issues of course was no one had
20   seen a cycle like this, so they had no
21   data around what was about ready to
22   happen.
23        Q.    That was one of the problem
24   with the models they were using, right?
25        A.    Yes.
```

1              LOCKHART

2      Q.         And they had direct firsthand

3  knowledge of underwriting practices of

4  many of the largest originators?

5              MR. COREY:  Objection to form.

6      Q.         Right?

7      A.         As I understand it, they

8  certainly had worked with many of the

9  major originators on a direct basis, yes.

10     Q.         And they had teams of people at

11  both the enterprises that were reviewing

12  originators as part of their counterparty

13  risk management operations, right?

14              MR. COREY:  Same objection.

15     A.         Yes.

16     Q.         They had -- did they, like

17  OFHEO, have teams of economists and Ph.D.s

18  at their disposal that were studied issues

19  relating to the mortgage market?

20     A.         Yes.

21     Q.         Economists?

22     A.         Yes.

23     Q.         And they were able to draw on

24  the expertise of your office, right, in

25  that regard?

Page 272

1                        LOCKHART

2        A.        Yes, and vice versa.

3        Q.        They had a lot of political

4    capital, we touched on that earlier?

5                  MR. COREY:  Objection, form.

6        A.        Yes, they did, they were

7    well-known to have political capital.

8        Q.        And there was an implicit

9    government guarantee that enabled them to

10   issue enormous amounts of debt at low cost

11   compared to other investors, right?

12       A.        Well, there was always a big

13   debate what that meant.

14                 But certainly as it turned out,

15   it turned to be more than implicit.

16       Q.        Right.

17       A.        But at the time it was an issue

18   that everybody thought the government was

19   going to back them up and it turned out

20   they did.

21       Q.        Your work at WL Ross, you're in

22   the investment business today, right?

23       A.        That's correct.

24       Q.        You certainly wouldn't consider

25   the GSEs to be ordinary investors, would

Page 273

```
 1                      LOCKHART
 2   you?
 3              MR. COREY:  Objection to form.
 4      A.      What do you mean by ordinary
 5   investors; we invest in companies, they
 6   don't invest in companies.
 7      Q.      In terms of the level of
 8   sophistication, information at their
 9   disposal, access to capital, public
10   mission, in all those respects they are
11   very different from other investors --
12      A.      They had a very, very different
13   structure because they were public/private
14   and that was one of the big problems.
15              MR. FRANKEL:  I am told we're
16   about to run out of time on the tape, we
17   have to change the tape.
18              THE VIDEO TECHNICIAN:  Off the
19   record, time is 2:58.
20              (Recess taken.)
21              THE VIDEO TECHNICIAN:  We are
22   back on the record, the time is 3:14.
23              This begins tape 4.
24              MR. COREY:  Just a second.
25              FHFA is clawing back document
```

Page 274

LOCKHART

1
2  FHFA 16933859, I made the representation
3  this was subject to a claw-back letter, I
4  had understood at the time that it was
5  included within the scope of a letter that
6  was sent to defendants on either Friday or
7  Monday, I can't remember which.
8          I was subsequently informed
9  that it was not, so we're clawing it back
10 now.
11 BY MR. FRANKEL:
12   Q.      Mr. Lockhart, we touched on HUD
13 affordable housing goals a couple of times
14 during the course of your testimony.
15          Can you just explain during the
16 2005 to 2007 time period what are HUD
17 goals, housing goals?
18   A.      One of the three missions of
19 Fannie and Freddie was affordability and
20 so the mission regulator, HUD, set up a
21 series of goals related to the income of
22 people getting mortgages and relating them
23 to the median income of the areas that
24 they lived in.
25          And there was a whole series of

1                    LOCKHART

2    goals related to that, the biggest one,

3    the most encompassing one was people below

4    the median income and then there were I

5    think 20, 30 percent below and a series of

6    other goals.

7                    And the idea was to encourage

8    Fannie and Freddie or require Fannie and

9    Freddie to use their balance sheets and

10   their securities to help people that were

11   lower income get mortgages.

12        Q.        What were the consequences to

13   Fannie and Freddie if they didn't meet

14   their housing goals?

15                  MR. COREY:  Objection, form.

16        A.        HUD had the ability to put them

17   in their consent agreement and require all

18   sorts of other actions potentially.

19        Q.        Sanctions and penalties?

20        A.        Yes.

21        Q.        Is it true that the GSEs were

22   very fearful of failing to meet their

23   housing goals?

24                  MR. COREY:  Objection, form.

25        A.        The GSEs took their housing

1                    LOCKHART

2  goals extremely seriously, did want to

3  meet them.

4                It certainly made some members

5  of Congress very happy when they met them.

6      Q.       You recall the CEOs expressing

7  to you in words or substance that one of

8  their worst fears was missing affordable

9  housing goals?

10     A.       Yes, I have said that, yes.

11     Q.       And they did in fact convey

12 that to you?

13     A.       Yes.

14     Q.       Did they say why one of their

15 worst fears was missing housing goals?

16              MR. COREY:  You can answer that

17 yes or no.

18     A.       Yes.

19     Q.       What's your understanding as to

20 why it was the CEOs worst fears, one of

21 the worst fears, of missing --

22     A.       One of the worst fears.

23     Q.       Right.

24     A.       Simply that the consent

25 agreement and bad publicity that would

```
 1                  LOCKHART
 2  come with it.
 3      Q.      Did you also have an
 4  understanding from the CEO standpoint they
 5  would have incurred the wrath of Congress
 6  if they didn't meet their housing goals?
 7      A.      That was always the assumption,
 8  although, again, it is only part of
 9  Congress.
10      Q.      HUD ultimately gave the GSEs
11  credit for their housing goals from
12  mortgages that were in the collateral for
13  their private label securities purchases,
14  is that right?
15      A.      That's correct.
16      Q.      You didn't agree with that, did
17  you, with the decision, when I say that --
18      A.      Well, the decision was made
19  before I was there, but I questioned that
20  decision, yes.
21      Q.      Why did you question whether
22  that was an appropriate decision?
23      A.      Because they were only
24  indirectly making the mortgages, they were
25  not directly buying the mortgages as they
```

```
 1                    LOCKHART
 2   were in the other part of their business.
 3             So I thought it should be only
 4   when in multi or single family.
 5      Q.      In fact PLS purchases was one
 6   of the principal ways that both GSEs met
 7   their housing goals during the 2005 to
 8   2007 time period?
 9             MR. COREY:  Objection, form.
10      A.      Yes, in particular Freddie.
11      Q.      Was it your sense the GSEs had
12   difficulty meeting their housing goals
13   throughout 2006 and 2007?
14      A.      It was not easy; they
15   occasionally did a transaction at year-end
16   to help them meet their goals, mainly on
17   the multifamily side.
18      Q.      And they occasionally did
19   transactions at year-end, including
20   purchases of residential mortgage-backed
21   securities to meet housing goals as well,
22   right?
23             MR. COREY:  Objection to form.
24      A.      I'm not sure that they did any
25   special purchases at year-end, I just
```

Page 279

```
 1                   LOCKHART
 2    don't remember.
 3                They did it throughout the
 4    year.
 5       Q.        Would you agree that the GSE
 6    sacrificed their credit standards in order
 7    to make those purchases?
 8                MR. COREY:  Object to form.
 9       A.        Which purchases?
10       Q.        PLS purchases that were made to
11    meet housing goals.
12       A.        Again, they were buying triple
13    A securities, so you could argue that they
14    were buying triple A credit, at least
15    that's what they would argue.
16                I think you could argue on the
17    other side of the business that
18    potentially they had to lower their credit
19    standards to meet the goals, especially as
20    they kept creeping up every year to the
21    point that at the end 55 percent of their
22    mortgages had to be below the median
23    income.
24       Q.        From your perspective, the GSEs
25    were sacrificing their credit standards in
```

Page 280

```
 1                   LOCKHART
 2   connection with their effort to meet
 3   affordable housing goals through PLS
 4   purchases?
 5             MR. COREY:  Objection, form.
 6       A.        Well, what they were doing is
 7   they had three different missions and one
 8   of their missions was affordability and so
 9   from that standpoint they were stressing
10   the ability to meet those affordable
11   housing goals, which were pushed in
12   retrospect much too high.
13             Again, it is hard to say the
14   credit standards around private label
15   securities because they were triple A at
16   the time, but certainty some of those
17   underlying mortgages they would not have
18   made directly.
19       Q.        Overall OFHEO was concerned
20   about the effect of housing goals on the
21   GSEs' credit risk?
22       A.        That's correct; in fact, that
23   was one of the things we asked for in
24   legislative reform, was to become the
25   mission as well as the safety and
```

1              LOCKHART

2   soundness regulator and in facg we did get

3   that when FHFA was created.

4      Q.      After FHFA obtained that

5   authority, they lowered the GSEs' housing

6   goals, is that true?

7      A.      Well, we took over from HUD

8   that group that did that, we brought them

9   in-house at FHFA, we had a deputy in

10  charge with just that area and we found

11  the goals were just unsustainable in the

12  present marketplace so we changed,

13  suspended, did a variety of things to the

14  goals.

15     Q.      Can you pull out Exhibit 35914,

16  the transcript.

17              (Pause. )

18     Q.      You can put that aside, we're

19  looking for another exhibit.

20              In the meantime, did you ever

21  say in words or substance that you viewed

22  the HUD housing goals as ultimately

23  destabilizing, do you recall ever saying

24  that?

25     A.      What I have said about the

Page 282

                    LOCKHART
1
2   housing goals were they were excessive and
3   certainly they were one of the causes for
4   the ultimate conservatorship, one of the
5   many causes.
6       Q.      Did that include the fact that
7   the goals were being met through purchases
8   of private label securities?
9               MR. COREY:  Objection, form.
10      A.      Yes.
11      Q.      I show you as our next exhibit
12  35918, testimony dated September 25, 2008,
13  before the Committee on Financial Services
14  of the U.S. House of Representatives, and
15  ask if you can take a look at that.
16      A.      Thank you.
17              ( Exhibit 35918, testimony
18  dated September 25, 2008, before the
19  Committee on Financial Services of the
20  U.S. House of Representatives, was marked
21  for identification, as of this date.)
22      Q.      Without reading the whole
23  thing, can you tell me if you recall
24  giving testimony before the committee on
25  financial services?

```
 1                    LOCKHART
 2      A.        Yes, right after
 3  conservatorship.
 4      Q.        If you can turn to page 19.
 5                You have to admit having
 6  testified before Congress on multiple
 7  occasions that our questions are a lot
 8  shorter and more direct.
 9      A.        Exactly, but you're not live on
10  television either.
11      Q.        Fair enough.
12                Mr. Royce again is asking you
13  some questions, you see a little bit less
14  than halfway down the page, and what I am
15  interested in is your answer, "Certainly
16  what was happening in the mortgage market
17  in late 2005, 2006, and 2007, there was
18  really a feeding frenzy on lower quality
19  loans.  Wall Street was packaging them
20  together, putting them into these many
21  tranch securities, either subprime or
22  Alt-A, and Fannie and Freddie, to meet
23  their housing goals and for other reasons,
24  purchased those securities."
25                Did I read that correctly?
```

```
1                    LOCKHART
2       A.       Yes, you did.
3       Q.       Was that --  did that
4  accurately reflect your view at the time
5  of this hearing in September 2008?
6       A.       Yes.
7       Q.       Did you testify that you
8  believe, overall you believe the HUD goals
9  were too high?
10      A.       Yes.
11      Q.       Some of the subgoals, the
12 affordability goals, I think you have
13 testified in other contexts were almost
14 mathematically impossible, is that true?
15               MR. COREY:  Objection to form.
16      A.       Yes, I have said that.
17      Q.       Which of the goals or subgoals
18 was mathematically impossible, do you
19 recall?
20      A.       I said they could be
21 mathematically impossible.
22               The one I just mentioned is an
23 example, where 55 percent of the mortgages
24 had to be below the median income and yet
25 30 percent of the people in the country
```

```
 1              LOCKHART
 2   felt that that protection would insulate
 3   them from much of the risk that they were
 4   taking on by investing in securities
 5   backed by Alt-A and subprime mortgages, is
 6   that right?
 7              MR. COREY:  Objection, form.
 8       A.      That was their assumption, yes.
 9       Q.      I know you gave some testimony
10   earlier today on the subject of why did
11   the GSEs, Fannie Mae and Freddie Mac,
12   invest in PLS backed by Alt-A and subprime
13   mortgages.
14       A.      Yes.
15       Q.      I believe one of the principal
16   reasons was to meet affordable housing
17   goals set by HUD, is that right?
18       A.      That was one of the three major
19   reasons; market share and profitability
20   were probably the other two, yes.
21       Q.      So the three major reasons were
22   satisfying affordable housing goals,
23   achieving market share, and profitability,
24   is that right?
25       A.      Yes.
```

1               LOCKHART

2       Q.        You testified a bit earlier

3   about a consent agreement that HUD could

4   have imposed if either of the GSEs did not

5   meet their housing goals, do you recall

6   that?

7       A.        Yes.

8       Q.        What kind of consent agreement

9   would that be?

10      A.        I am not really sure what they

11  could have done, they could have

12  constrained their business going forward.

13               I don't know if they could have

14  fined them, but probably that was an

15  ability they had, they could have forced

16  them to do more in that space.

17               They had very significant power

18  and they also, as I said before, the black

19  eye of that would have been very

20  troublesome to both enterprises.

21      Q.        On a profit point, is it

22  accurate to say that Fannie Mae and

23  Freddie Mac made more money on PLS

24  investments than they would have made on

25  other investments?

1              LOCKHART

2              MR. COREY:  Objection, form.

3      A.        Their major other investment

4  was their own securities and certainly PLS

5  had higher yields than their own

6  securities.

7      Q.        Which is to say the return on

8  their investment that they expected to get

9  on PLS was better?

10     A.        They expected; obviously as it

11 turned out, they did not get a return,

12 but, yes, their expected return, yes.

13     Q.        In fact the GSEs, they really

14 wanted to buy the PLS that they were

15 buying, right?

16              MR. COREY:  Objection, form.

17     A.        I am not sure what want means

18 in this, but they needed to do it to meet

19 their affordable housing goals and they

20 certainly wanted the added profitability

21 they expected from it.

22     Q.        And they also wanted to

23 increase their market share?

24     A.        Right.

25     Q.        And over the course of 2006 and

```
                              LOCKHART
 1
 2    first half of 2007, the GSEs, Fannie Mae
 3    and Freddie Mac, poured billions of
 4    dollars into purchasing private label
 5    securities backed by Alt-A and subprime
 6    mortgages, right?
 7        A.        Billions, yes.
 8        Q.        And they were certainly among
 9    the biggest buyers of PLS in that time
10    frame?
11        A.        Yes.
12        Q.        In effect, they, Freddie Mac
13    and Fannie Mae, constituted a big portion
14    of the demand for private label securities
15    in that time frame, right?
16               MR. COREY:  Objection, form.
17        A.        Yes, I would have to go back to
18    verify that, but that was my assumption at
19    the time.
20               But there was a lot of demand
21    for the lower tranches too, and so by
22    having Fannie and Freddie buy the triple A
23    tranches, that allowed other investors
24    that were looking for significantly more
25    yield to buy those lower tranches.
```

1                      LOCKHART

2       Q.        Why was there so much demand
3   for the lower tranches?

4       A.        We were in a field of excess
5   liquidity and people were ignoring risk.

6       Q.        So people were looking for high
7   yielding, relatively high yielding
8   investments at the time, is that right?

9       A.        That's correct.

10      Q.        And the private label
11  securities backed by Alt-A and subprime
12  mortgages were that kind of security?

13      A.        In the lower tranches, yes; in
14  the triple A, the difference wasn't that
15  significant, but certainly in the lower
16  tranches, yes.

17      Q.        But even in the triple A that
18  was a better yield, as you testified --

19      A.        Than Fannie and Freddie, yes.

20      Q.        Than Fannie and Freddie
21  securities.

22      A.        Yes.

23      Q.        With all the demand at the time
24  in 2006, 2007, for securities of this
25  type, is it any surprise to you that the