# Exhibit F

| | |
|---|---|
| **From:** | David R Palombi <David_Palombi@freddiemac.com> |
| **Sent:** | Friday, May 02, 2008 2:26 PM |
| **To:** | Dick Syron; Hollis McLoughlin; Timothy J McBride |
| **Subject:** | New York Times |
| **Attachments:** | New York Times Questions.doc |

As you know, we've been in on-again, off-again discussions with Charles Duhigg of the New York Times for a month about the piece he is writing on Freddie and Fannie. Both Gary Kain and Don Bisenius spent significant time with him last week in the course of his reporting. In discussions a few minutes ago he indicated he is wrapping up and the story will run no later than Tuesday -- perhaps on Tuesday as a curtain raiser to Fannie's earnings release and the upcoming markup. Sunday, however, is also a possibility.

Duhigg says he has incorporated a lot of what we sent him in the 14-page attachment below into his story, but we'll have to wait and see. He has our cell numbers and e-mail if he needs to reach anyone in the PR team over the weekend.

I'll keep you posted.



New York Times Questions.doc

1



EXHIBIT Kain
2o444
11-7-13

CONFIDENTIAL                                                                                                   FHFA13307773

\* It is my understanding that this quarter, Fannie and Freddie together are expected to purchase or guarantee about 80 percent of all U.S. home loans, and forecasts indicate the firms will buy or guarantee mortgages worth about $2 trillion in total this year. Is that accurate?

**The approximate 80% figure is correct. Some context around this current market-share number is important, however. During the past year, the GSE share of the US mortgage market has increased rapidly – in part because of our stepped up efforts, but also largely because so many private label participants have either completely abandoned the market or significantly curtailed their activity. I think this is a clear example of why the GSEs were created in the first place and continue to serve this country so well: to provide stability and liquidity to the market at all times, good and bad. Clearly, this high GSE market share cannot last forever, and we have no doubt that other competitors will return to the market once the turbulence ebbs. We agree with comments that Fannie Mae's Dan Mudd made on Tuesday in Baltimore at a business writers' conference: strong competition to the GSEs will be back.**

**To illustrate the point, here is where GSE single-family mortgage market share has been during the past several years:**

**2004: 40.3%**
**2005: 35.1%**
**2006: 35.8%**
**2007: 48.6%**

**We have not issued wide-ranging guidance on expected business volumes for the year; we will provide updates on key business issues during our investor/analyst conference call on May 14, reviewing our first quarter 2008 financial results. During our investor/analyst conference in New York on March 12, CFO Buddy Piszel noted that we expect our credit guarantee business to grow by about 10% this year.**

**We continue to see strong business volumes. Our monthly volume summary for March 2008, issued April 25, reported that, year to date, our credit guarantee business grew at an annualized rate of 10.4% for the first three months of 2008. This is a clear demonstration of the vital role that Freddie Mac is playing by providing liquidity and stability to the market.**

**While our retained portfolio contracted during the first three months of the year, at an annualized rate of -4.6%, the company reported a sharp increase in mortgage purchase and sales agreements for the portfolio: $43.4 billion in March, up from $14.8 billion in February. The retained portfolio grew at an annualized rate of 5.0% in March, following February's 12.4% annualized decline. The increase resulted from a higher volume of retained purchases mostly in fixed-rate Freddie**

CONFIDENTIAL

Mac PCs and hybrid ARM products, reflecting the removal of the portfolio growth cap and reduction in capital surplus requirements that both became effective in March, as well as favorable purchase opportunities on agency securities as a result of wider spreads.

\* It is my understanding that, during the housing boom over the past five years, Freddie found itself exposed to new competition that had the potential to impact the firm's profits. Additionally, the company was under pressure from Congress to work with more low-income and first time home buyers. By holding and guaranteeing large amounts of subprime and Alt-A mortgages during this period, the company was able to increase profits and help low-income borrowers. By the end of last year, Freddie Mac had invested in or guaranteed $351.4 billion of subprime and Alt-A loans. Is that accurate? What was the company's subprime and Alt-A exposure in 2000?

**Freddie Mac has provided liquidity to the subprime and Alt-A markets in two ways: through the purchase of ABS for our retained portfolio and through our credit guarantee business.**

**At December 31, 2007, we had $101 billion in ABS backed by subprime loans in our retained portfolio, and $51 billion in Alt-A backed securities.**

**At December 31, 2007, in our single family guarantee business, Freddie Mac guaranteed approximately $154 billion in Alt-A loans. We also guaranteed $6 billion in subprime loans underlying structured transactions.**

**I think it's very important to understand why and how Freddie Mac has provided liquidity to the subprime and Alt-A markets. Here's what Gary Kain said about our ABS portfolio, which is part of our retained portfolio, in his presentation during our March investor/analyst conference:**

"Why do we have this portfolio in the first place? I get that question a lot.
First, our affordable housing goals mandate that a high percentage of our purchases are targeted toward borrowers represented in the non prime sector. Secondly, we were not comfortable with the risk of buying or guaranteeing these loans outright. Lastly, we believe that purchasing securities backed by these loans at the AAA level with substantial credit enhancements would produce reasonable returns in the least risky way possible.

Let me say this another way, we had two choices: we could buy AAA ABS or we could have bought and guaranteed more affordable rich whole loans, and taken the majority of the credit risk. Had we guaranteed loans, we would have less ABS exposure, but we would have a much larger whole loan exposure comprised of Alt-A, CRA, or subprime loans."

CONFIDENTIAL

Gary added a few other critical points about our ABS portfolio:

"Now, let me pause for a moment to talk about a few important points about the ABS portfolio. As others have mentioned earlier today, Freddie Mac has no CDO exposure, which is a key distinction relative to other participants that have taken substantial write-downs. All of Freddie Mac's ABS holdings are senior pass-through securities backed by whole mortgage loans. At the time of purchase, approximately 99.8% of Freddie Mac's ABS portfolio was originally rated AAA. As of our earnings release, 85.7% was rated AAA, while just under 30% was on negative watch. Second, as discussed in more detail in the white paper, our subprime securities are considerably shorter than those backing the ABX index and therefore materially safer. Third, essentially all of Freddie Mac's ABS securities are classified "as available for sale." This is another key distinction. As a result, changes in the mark-to-market values do not impact GAAP net income or regulatory capital unless we deem these securities to be "other than temporarily impaired." Freddie Mac has not recorded any impairment on its portfolio of ABS securities in 2007."

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

So, here's the bottom line: we operate under stringent affordable housing goals set by HUD. Without doubt, had we not participated in this segment of the market, we would have missed our housing goals and would have been subject to sanctions – including a mandated housing plan – by HUD. We chose, however, to participate in this market in what we believed was the most prudent manner.

I don't have similar data for 2000 – chiefly because the market for subprime and Alt-A was fairly nascent at that time.

\* It is my understanding that in September, Fannie and Freddie agreed to purchase tens of billions of dollars of subprime mortgages over the next several years, in an attempt to stabilize the marketplace. Simultaneously, and in return for that pledge, OFHEO agreed to increase the size of the firms' allowed portfolios. Is that accurate? It is also my understanding that last month, OFHEO gave both firms an additional $200 billion in purchasing power, in exchange for a promise that they both would raise additional capital within the year. Is that accurate? Finally, it is also my understanding that the companies recently agreed to expand their loan guarantees in exchange for Congress raising the cap on mortgages the companies can purchase from $417,000 to almost $730,000. Is that accurate?

No, this is not accurate. Let me walk you through some key events of the past year, and address your specific questions.

Q: It is my understanding that in September, Fannie and Freddie agreed to purchase tens of billions of dollars of subprime mortgages over the next several years, in an attempt to

CONFIDENTIAL

stabilize the marketplace. Simultaneously, and in return for that pledge, OFHEO agreed to increase the size of the firms' allowed portfolios. Is that accurate?

**A: Not quite. We did make a commitment to purchase subprime mortgages to help stabilize the market, but that happened on April 18, 2007, not in September. On that day in April 2007, Dick Syron pledged to purchase $20 billion in fixed and adjustable rate subprime mortgages at a Homeownership Summit convened by Senate Banking Committee chairman Christopher Dodd (D-CT). Specifically, we pledged to buy a model subprime product we developed-- called SafeStep Mortgages -- or similar mortgages that also provided payment shock-limiting features like reduced adjustable rate margins, longer fixed-rate terms, and longer reset periods.**

**We exceeded our $20 billion subprime purchase goal in 2007. In fact, altogether, we financed $43 billion worth of conforming, conventional mortgages made to borrowers with subprime credit profiles last year.**

**The statement above on the removal of the retained portfolio cap is incorrect. The voluntary growth limit on our retained portfolio was lifted by OFHEO in March in response to our return to timely financial reporting on February 28.**

Q: It is also my understanding that the companies recently agreed to expand their loan guarantees in exchange for Congress raising the cap on mortgages the companies can purchase from $417,000 to almost $730,000. Is that accurate?

**A: No. The Economic Stimulus Act of 2008 Congress and President Bush developed lifted the GSE maximum mortgage amount from $417,000 to $729,750 -- but only in high cost markets where 125% of the media home price exceeds $417,000 and only through December 31. 2008. Congress and the Bush Administration did this so the GSEs could provide support to a collapsed jumbo market and help borrowers in high-cost markets find financing. The only thing we agreed to do was to use this new authority to purchase jumbo mortgages that meet our credit requirements. We are now doing this.**

**We are already seeing the benefits of our involvement in this segment of the market, as spreads on jumbo-conforming spreads have dropped significantly in the markets we are entering.**

\* As you know, there are some criticisms of Fannie and Freddie. As you know, earlier this year, William Poole warned that GSEs are "at the top of my list of sources of potentially serious trouble." A report released this month by OFHEO warned that both pose "significant supervisory concerns" and that Freddie Mac suffers "internal control weaknesses." Ben Bernanke has told bankers and Congress that the companies are in dire need of closer supervision.

CONFIDENTIAL

FHFA13307778

Further, some regulators say that the companies' margins of safety are growing far too thin, and that unexpected events — like the crisis that toppled investment bank Bear Stearns within days — could snowball into a taxpayer-financed rescue.

Would you like to respond to any of those concerns?


**All mortgage firms are suffering losses to various degrees, due in large part to looser underwriting standards and depreciating house prices. In fact, Freddie Mac's losses remain below industry averages. However, losses in and of themselves are not evidence of systemic risk, particularly if a firm has capital and can access the capital markets.**

**Systemic risk measures must be applied on a systemic basis, not one firm at a time. Other financial institutions are not regulated for systemic risk, and the House voted 338-36 in favor of a provision in H.R. 1427 that the new regulator should only regulate the companies on the safety and soundness risks to themselves, not the potential systemic risks of the broader market. Freddie Mac would be supportive of Congress adopting an interagency regulatory task force that looked at systemic risk across all financial institutions.**

**It is ironic that one of the justifications for reducing the GSE portfolios was that the financial system would be safer if mortgage risk were more widely dispersed. That's what happened in the subprime market: mortgage risk was widely dispersed, but lax credit standards, fragmented regulatory oversight, and a lack of investor transparency have given rise to a crisis in confidence in the markets and an impending foreclosure crisis in many of our communities.**

**[Background: I think it's important to understand that Mr. Poole has been a long-time critic of the GSEs, and not simply on safety and soundness issues. I think it's fair to say that he is philosophically opposed, in general, to government sponsorship of housing.]**

**I would point out that Freddie Mac has long been considered a premiere manager of risk. Even Chairman Greenspan – a staunch critic of the GSEs – conceded this point.**

**Finally, while I don't have any specific comments on the OFHEO annual report to Congress, it must be fairly said that Freddie Mac has been highly transparent over the past five years about weaknesses in our controls over financial reporting and the steps we have taken – and are taking – to remediate those material weaknesses. Each year, our annual report, along with other disclosures, provides exhaustive discussions of these issues. For example, see the discussion that begins on page 182 of our 2007 annual report. What follows is a highly detailed, five-page discussion on controls, procedures and remediation.**

CONFIDENTIAL

FHFA13307779

\* My story will likely note that executives at both Fannie and Freddie say they are responsibly managing risks and accommodating legislative and regulatory demands and shareholders interests.

The story will likely point out that the latest regulatory filings show Freddie had a capital cushion of $37.9 billion— over $3.5 more than required by OFHEO and statutes. Freddie has promised to raise more money this year. And although Freddie expects to loose as much as $2.2 billion this year from bad loans (or 15 basis points), the company has sufficient financial reserves to whether those blows.

Are there any other perspectives you would like to offer?

**Let me underscore a few important points on these questions, and then let me give you some additional background that I think is helpful.**

**In an earlier conversation, you noted that some observers have said that any fresh capital we will raise – and any excess capital we have on hand – will be used in the future solely or largely for the purposes of covering mounting credit expenses and losses. We disagree.**

**First, this assumption does not take into account the fact that Freddie Mac generates significant amounts of revenue, which offsets credit-related and administrative expenses. For full-year 2007, revenues from our underlying investment and credit guarantee activities totaled $5.6 billion. Our total credit losses, consisting of net charge-offs plus REO operations expenses, for full-year 2007 were $499 million. We also believe that we have been prudent in our provisions for expected future credit losses.**

**It's important to note that Freddie Mac increased credit guarantee and delivery fees four times last year, along with more stringent underwriting standards, with phased-in implementation into mid-2008. We believe these actions will have a material impact on returns in our credit guarantee business.**

**As you know, our financial statements are subject to significant volatility related to mark-to-market items. For full-year 2007, these uneconomic marks reduced our GAAP results by over $4 billion pre-tax, or close to $2.6 billion after tax. To address these issues, we made several accounting policy changes, which we discussed in detail on our Feb. 28 conference call and during our March investor/analyst conference.**

CONFIDENTIAL

FHFA13307780

Finally, we have been clear that we intend to deploy capital in a way that serves our mission *and* builds durable shareholder value. One way we can do that is by purchasing assets for our retained portfolio if conditions warrant and investment opportunities present attractive ROEs. We're seeing that today. Case in point is the increase in mortgage purchase and sales agreements for the retained portfolio we reported for March 2008: $43.4 billion in March, up from $14.8 billion in February. We've said our aim is to deploy capital prudently to grow, enhance and strengthen the business – and we are doing that today.

Here's some additional background:

We discussed our capital account in our fourth quarter 2007 financial results press release, issued February 28, and we will provide an update in our first quarter 2008 financial results press release, which will be issued on May 14. Here is what we said in the Feb. 28 press release:

<u>Core Capital</u>

Estimated regulatory core capital was $37.9 billion at December 31, 2007, which represented an estimated $11.4 billion in excess of the company's regulatory minimum capital requirement, and an estimated $3.5 billion in excess of the 30 percent mandatory target capital surplus directed by the Office of Federal Housing Enterprise Oversight (OFHEO).

In order to manage to the 30 percent mandatory target capital surplus and improve business flexibility, during the fourth quarter of 2007, the company issued $6.0 billion of non-cumulative, perpetual preferred stock, reduced its common dividend by 50 percent and reduced the size of its cash and investments portfolio.

As a result of adopting SFAS 159, the company recognized a $1.0 billion after-tax increase to its beginning retained earnings, and estimated regulatory core capital, at January 1, 2008, above the estimated regulatory core capital it reported at December 31, 2007.

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

I would also point to these remarks that Buddy Piszel made during our March investor/analyst conference:

"So, where do we stand on capital? Well, for starters, on January 2nd, after adopting the fair value option, our capital stood at approximately $39 billion with an estimated surplus over the 30% of $4.5 billion.

I might add that this is twice the surplus we had over the 30% starting out in '07, and it is about $12.4 billion over the minimum capital requirement. So we started out the year approximately where we thought we would be and that is really good

CONFIDENTIAL

news given the degree to which declining long-term interests rates hurt our fourth quarter GAAP results."

\* It is my understanding that Freddie's promise to raise more capital has drawn complaints from shareholders, who complain that further fundraising may force down the firm's stock prices. Can you please provide me with your perspective on these concerns?

In a March conference call with investors, Freddie Mac's chairman, Richard Syron, said that the company will put shareholders' interests first. Will you please explain how you believe it is possible to appease both regulators and shareholders?

**During our March investor/analyst conference (it was a live meeting in New York, at the Hudson Theater, not a conference call), Dick Syron spoke about Freddie Mac's public mission and the company's fiduciary responsibility to shareholders. Dick's point was this: our company has a responsibility to both the public *and* our shareholders. At the conference, Dick said:**

**"I think there is an important point that has to be remembered when we look at why do we have these things and what are they supposed to do, and what are the economic realities given the way that they are structured. I think it sort of goes like this: first, you have to decide if you want GSEs or not. I would submit that in the current situation we have decided as a country that we want GSEs.**

**Second, you have to decide if you want the GSEs to be privately funded entities with shareholders, with that shareholder capital that is very substantial, serving as a buffer between the taxpayers or do you want to have them to be part of the government. Okay? If you decide that you want to have them held by shareholders, there are laws of economics that you can't repeal, and it means that there are trade-offs.**

**If we are going to be shareholder-held, and I think we will be, we, as the management of the Company, have as our first responsibility a responsibility to you to over time to deliver an adequate return on equity. That return on equity, in our case, is the result of a pretty simple formula. It is return -- ROE. The return, in our case, is heavily driven by price. Right? We have increased prices substantially. That was necessary. Why? It is the appropriate thing to do.**

**But one has to factor in the denominator of the equation, if you want to make the equation work and you want to have these big privately funded entities. The more you raise that ROE -- the more you raise equity -- the more you have got to raise price, because price is primarily what defines what our return is going to be. Now that may not be a popular equation, but it is reality. Neither I nor anyone else should try to repeal the laws of economics or ignore the realities of arithmetic. It is**

CONFIDENTIAL

just something that is there and we have got to work -- work this out. I am confident we will be able to work it out."

Buddy Piszel made the following comments at that same event:

"So given this, let me turn to the real question, do we have enough capital? Well, assuming market conditions don't get significantly worse, from our current cautious outlook, we have sufficient capital to continue to grow the guarantee and the multifamily businesses. On the retained portfolio side, we are able to replace the $10 billion to $15 billion of monthly run-off and accordingly benefit from today's wider spreads. So overall, I would say from a defensive position, we feel okay.

So despite the headlines, there is no dilutive capital raise plan. Let me repeat, there is no dilutive capital raise plan. So, how about on the offensive side? Well, we are doing a lot already. We are growing the g-fee and the multifamily businesses. We have committed to help the jumbo market and we have the capital to do that, and all of this is being done in a profitable way. We are actively buying in the retained portfolio at attractive spreads, but nonetheless, liquidity challenges in the mortgage market persists and spreads remain high."

* A report released earlier this month by OFHEO noted that although Freddie Mac had $15.1 billion of "unrealized losses" on mortgage-related investments, the company judged those impairments to be temporary, which is permitted by accounting rules, but difficult for outsiders to accurately verify. Some worry that categorization is overly optimistic. What are your thoughts on this issue?

We have been very transparent about our accounting treatment of our ABS portfolio. Earlier, I sent you our white paper, "Analysis of Freddie Mac's Asset-Based Securities Portfolio," issued on February 28 along with our 2007 financial results. We're not aware of any other mortgage investor who has issued this amount or level of detailed disclosure on subprime and Alt-A holdings.

On page 24 of the white paper, we begin a discussion of accounting and financial reporting implications of our ABS portfolio. On the following page, there is a detailed discussion of impairment issues. Here's the text of that passage:

ii. Impairment Considerations

FAS 115 requires individual securities classified as available-for-sale be evaluated to determine whether a decline in fair value below book value is other than temporary. If the decline in fair value is judged to be other than temporary, Freddie Mac will impair a FAS 115 security and the book value of the individual security will be written down to fair value. There are a number of factors that management

CONFIDENTIAL

FHFA13307783

considers in such an evaluation and their significance varies based on relevant facts and circumstances. Some of these factors considered by Freddie Mac include the length of time and the extent to which the market value has been less than amortized cost, the financial condition of the underlying assets, the estimated cash flows of the underlying assets, the extent to which the assets have been credit enhanced, the financial condition of the issuer or the assets behind the credit enhancement, and the intent and ability of Freddie Mac to retain its investment for a period of time sufficient to allow for any anticipated recovery in fair value.

Freddie Mac evaluates all securities where the market value has dropped below book value for possible impairment. Securities that have suffered significant or prolonged market value declines or are currently rated below investment grade are subjected to greater scrutiny and analysis. While dollar prices and rating agency actions are factors that are considered in the impairment analysis, cash flow analysis based on company-generated default and prepayment assumptions serves as an important factor in determining if the impairment is other than temporary. Overall impairment decisions and security specific cash flow analysis are documented and reviewed by business area management, Enterprise Risk Oversight, and Finance. If an impairment were recognized, Freddie Mac would write down the impaired security to its current market price. This write down could be substantially greater than the loss projections the company ultimately believes to be probable.

\* Moreover, both companies have recently changed their policies regarding delinquent loans. Previously, loans were recorded as impaired when borrowers were 120 days late in repayment. Now, some overdue loans can go two years before the company categorizes them as impaired — and as a result, your books reflect those losses much more slowly. What are your thoughts on this issue?

**I don't have anything more to add beyond what we said in our December 2007 press release:**

**Freddie Mac believes that the historical practice of purchasing loans from PC pools at 120 days does not reflect the pattern of recovery for most delinquent loans, which more often cure or prepay rather than result in foreclosure. Allowing the loans to remain in PC pools will provide a presentation of its financial results that better reflects Freddie Mac's expectations for future credit losses. Taking this action will also have the effect of reducing the company's capital costs. The expected reduction in capital costs will be partially offset by, but is expected to outweigh, greater expenses associated with delinquent loans.**

\* Additionally, the OFHEO report noted that Freddie Mac used accounting principles that gave the company an immediate $1 billion boost in its capital. While those and other

CONFIDENTIAL

FHFA13307784

tactics are technically permitted, said the regulator, they deserve scrutiny. What are your perspectives on this issue?

We discuss our adoption of SFAS 159 on page 128 of our 2007 annual report (issued February 28 and available on our website.) Here's what we said:

The Fair Value Option for Financial Assets and Financial Liabilities

In February 2007, the FASB issued SFAS No. 159, "*The Fair Value Option for Financial Assets and Financial Liabilities, Including an amendment of FASB Statement No. 115,*" or SFAS 159. This statement permits companies to choose to measure certain financial assets and liabilities at fair value with changes in fair value recognized in earnings as they occur. The objective is to improve financial reporting by providing entities with the opportunity to measure both assets and liabilities at fair value without having to apply complex hedge accounting provisions. SFAS 159 is effective as of the beginning of an entity's first fiscal year beginning after November 15, 2007.

We adopted SFAS 159 on January 1, 2008 and elected the fair value option for certain available-for-sale mortgage-related securities that were identified as economic offsets to the changes in fair value of the guarantee asset, foreign-currency denominated debt, and investments in securities classified as available-for-sale securities and identified as within the scope of Emerging Issues Task Force Issue No. 99-20, "*Recognition of Interest Income and Impairment on Purchased Beneficial Interests and Beneficial Interests That Continue to Be Held by a Transferor in Securitized Financial Assets,*" or EITF 99-20. As a result of the adoption, we recognized a $1.0 billion after-tax increase to our beginning retained earnings at January 1, 2008, representing the effect of changing our measurement basis to fair value for the above items with the fair value option elected.

Our election of the fair value option for the items discussed above was made in an effort to better reflect, in the financial statements, the economic offsets that exist related to items that were not previously recognized as changes in fair value through the income statement.

We elected the fair value option for certain other available-for-sale securities held in the retained portfolio to better reflect the natural offset these securities provide to fair value changes recorded on the guarantee asset. We record fair value changes on our guarantee asset through the income statement. However, we historically classified virtually all of our securities as available-for-sale and recorded those fair value changes in AOCI. The securities selected for the fair value option include principal only strips and certain pass-through and Structured Securities that contain positive duration features that provide offset to the negative duration associated with our guarantee asset. We will continually evaluate new security purchases to identify the appropriate security mix to classify as trading to

CONFIDENTIAL

match the changing duration features of the guarantee asset and the securities that provide offset.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

I would add this about our adoption of SFAS 159:

- We implemented the fair value option at 1/1/2008 in accordance with GAAP
- Our election of the fair value option for the items discussed above was made in an effort to better reflect, in the financial statements, the economic offsets that exist related to items that were not previously recognized as changes in fair value through the income statement. This will reduce volatility in earnings. We elected use of the fair value option was for the following items:
  - Certain available-for-sale ("AFS") mortgage-related securities that were identified as economic offsets to the changes in fair value of the guarantee asset ("GA")
  - Foreign-currency denominated debt
  - Investments in securities classified as AFS securities and identified as within the scope of EITF 99-20, *Recognition of Interest Income and Impairment on Purchased Beneficial Interests and Beneficial Interests That Continue to Be Held by a Transferor in Securitized Financial Assets*
- We believe our implementation of the fair value option met the spirit of the OFHEO requirements and that we will also meet the requirements prospectively.
- We will continue to evaluate use of the fair value option as a tool to reduce volatility in earnings and increase transparency in the financial statements where appropriate.
- We intend to continue providing the fair value balance sheet in our financial statements as we have done in the past.


\* Some analysts say that they believe the biggest risk facing both companies is that they are forecasting an over-speedy housing market revival. It is my understanding that Freddie has forecasted that the national housing market will bottom out in 2009. Is this correct? If home price declines last longer, what would happen to Freddie Mac? If the capital Freddie Mac anticipates soon raising proves insufficient, what would occur?

I strongly disagree with the characterization that we are predicting an "over-speedy" recovery for housing. Quite the contrary. As you know, Dick Syron is an economist by training and a long-time former regulator. He has been a self-described "bear" on his housing outlook for some time. For example, last September Dick was featured in the *Financial Times*' "View From The Top" profile column, warning about a strong chance for a US recession, long before many economists were sounding alarms. Additionally, we think we have made very stark – and realistic – projections for house-price declines through this current cycle.

Here's what Dick said at the beginning of our investor/analyst conference in March:

CONFIDENTIAL

FHFA13307786

"We are not pretending the housing downturn has come to a bottom or is anywhere near it. To the contrary, we are assuming that housing prices have fallen only about a third as much of the total peak-to-trough decline we expect. We expect just on a technical note, a peak-to-trough decline of 15%, but that's by a certain measure. There are more measures of housing price changes than you can shake the stick at. The measure we use is the measure that is appropriate for the area we do business in, in other words, the conventional conforming market. It would be a much, much higher number if you were to translate it, for example, to the Case-Shiller index which is for 20 metropolitan areas, largely on the coast of the country.

Having said that we expect that -- that we have seen only about a third of the housing price decline that we expect. In our financials, we have absorbed already a little bit more than half of what we think our ultimate realization will be. Now, this approach may seem pessimistic to you and you know it is -- I will have to admit, it is at least a little cautious. But, I think cautious is where you should, as shareholders, want us to be right now."


* It is my understanding that in November, Freddie Mac's capital reserves fell below mandated levels. The firm was able to stem the decline by issuing $6 billion in preferred stock. But analysts say they are concerned the company would be unable to raise sufficient funds if another large, unexpected loss occurred. What are your thoughts?

As a result of two consecutive quarters of GAAP net losses on our regulatory core capital, we did not meet the 30% mandatory target capital surplus at the end of November 2007. This led to the issuance of $6.0 billion of preferred stock, a 50% reduction in our common stock dividend and a significant reduction in retained portfolio purchases in November 2007.

We are confident we have continued access to the capital markets.

I'm not sure which "analysts" say they are concerned the company would be unable to raise sufficient funds. I think that if you speak to the equity analysts who cover this company, you will find agreement that Freddie Mac has had – and continues to have – access to the global capital markets. I think the proof of that is our successful preferred offering late last year, and our day-in and day-out ability to sell tens of billions of dollars of debt and mortgage-backed securities to investors around the world.

In November, we went to the market to raise $6 billion in nonconvertible preferred stock: that deal was substantially oversubscribed, and priced more favorably than many other capital raises around that time period by other U.S. financial institutions.

* Congressional staffers say that Freddie Mac has tried to kill outright some of the reform bills under debate in Congress? Can you provide me with your perspective on this issues? What types of legislative reform do you support?

**Freddie Mac has long advocated for the process of GSE reform, and we support the passage of reform legislation that strengthens, not undermines, the role of the GSEs in the housing finance system. In fact, we helped whip the House GSE bill out of committee and off the House floor.**

**That said, we have also been consistent in making the point that given today's challenging housing market, it's more important than ever to get legislation right. Freddie Mac and Fannie Mae together represent 80 percent of mortgage lending, so it's critical that capital provisions not constrict the only functioning mortgage markets. We should build on that success, not unnecessarily constrain our ability to help. Capital provisions that do not tie capital to the real risk profiles of the companies would serve to undermine the role of the GSEs. Also, our role would be undermined by specific loan purchase goals that are so artificially high they risk distorting markets or fueling the origination of mortgages that would be unsustainable in times of economic strain.**

==Finally, I would just add this: Freddie is a unique institution, and it should be regulated as such. Some would have us regulated like a bank, especially with regard to capital, but we are a very different entity. We invest only in residential mortgages, and our capital levels need to be consistent with that.==

It would be impossible for us to provide the same support to the housing market if capital levels are not tied appropriately to risk. We must simultaneously operate safely and soundly, fulfill our mission, and provide a reasonable and competitive return to the shareholders whose money makes our mission possible.

Regulation needs to strike the difficult balance among these objectives. This is a complex task that needs to be done carefully. Done wrong, it could do more harm than good.

CONFIDENTIAL

FHFA13307788