# Exhibit H

# In The Matter Of:

## FEDERAL HOUSING FINANCE AGENCY, ETC.

_____

## JOSEPH PAUL NORRIS - Vol. 1
### July 10, 2013

_____

**MERRILL CORPORATION**
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
FEDERAL HOUSING FINANCE AGENCY, etc.,

          Plaintiff,
     vs.              11 Civ. 5201 (DLC)

UBS AMERICAS, INC., et al.,

          Defendants.
-----------------------------------x
FEDERAL HOUSING FINANCE AGENCY, etc.,

          Plaintiff,
     vs.              11 Civ. 6188 (DLC)

JPMORGAN CHASE & CO., et al.,

          Defendants.
-----------------------------------x
FEDERAL HOUSING FINANCE AGENCY, etc.,

          Plaintiff,

     vs.              11 Civ. 6189 (DLC)

HSBC NORTH AMERICA HOLDINGS,
INC., et al.,

          Defendants.
-----------------------------------x
FEDERAL HOUSING FINANCE AGENCY, etc.,

          Plaintiff,

     vs.              11 Civ. 6190 (DLC)

BARCLAYS BANK PLC, et al.,
          Defendants.
-----------------------------------x
```

WITNESS: JOSEPH PAUL NORRIS

DATE: July 10, 2013

```
 1
 2      ------------------------------------x
        FEDERAL HOUSING FINANCE AGENCY, etc.,
 3
                   Plaintiff,
 4
             vs.              11 Civ. 6192 (DLC)
 5
        DEUTSCHE BANK AG, et al.,
 6
                   Defendants.
 7      ------------------------------------x
        FEDERAL HOUSING FINANCE AGENCY, etc.,
 8
                   Plaintiff,
 9
             vs.              11 Civ. 6193 (DLC)
10
        FIRST HORIZON NATIONAL CORP., et al.,
11
                   Defendants.
12      ------------------------------------x
        FEDERAL HOUSING FINANCE AGENCY, etc.
13
                   Plaintiff,
14
             vs.              11 Civ. 6195 (DLC)
15
        BANK OF AMERICA CORP., et al.,
16
                   Defendants.
17      ------------------------------------x
        FEDERAL HOUSING FINANCE AGENCY, etc.,
18
                   Plaintiff,
19
             vs.              11 Civ. 6198 (DLC)
20
        GOLDMAN, SACHS & CO., et al.,
21
                   Defendants.
22      ------------------------------------x
        FEDERAL HOUSING FINANCE AGENCY, etc.,
23                 Plaintiff,
             vs.              11 Civ. 6200 (DLC)
24      CREDIT SUISSE HOLDINGS (USA), INC.,
        et al.,
25                 Defendants.
```

```
 1

 2    ------------------------------------x
      FEDERAL HOUSING FINANCE AGENCY, etc.,
 3
                Plaintiff,
 4
           vs.              11 Civ. 6201 (DLC)
 5
      NOMURA HOLDING AMERICA,
 6    INC., et al.,

 7              Defendants.
      ------------------------------------x
 8    FEDERAL HOUSING FINANCE AGENCY, etc.,

 9              Plaintiff,

10         Vs.              11 Civ. 6202 (DLC)

11    MERRILL LYNCH & CO., INC., et al.,

12              Defendants.
      ------------------------------------x
13    FEDERAL HOUSING FINANCE AGENCY, etc.,

14              Plaintiff,

15         vs.              11 Civ. 6203 (DLC)

16    SG AMERICAS, INC., et al.,

17              Defendants.
      ------------------------------------x
18    FEDERAL HOUSING FINANCE AGENCY, etc.,
                Plaintiff,
19
           vs.              11 Civ. 6739 (DLC)
20
      MORGAN STANLEY, et al.,
21
                Defendants.
22    ------------------------------------x

23

24

25
```

JOSEPH PAUL NORRIS - 7/10/2013

Page 4

```
 1
 2     IN THE UNITED STATES DISTRICT COURT
 3     DISTRICT OF CONNECTICUT
       ---------------------------------x
 4     FEDERAL HOUSING FINANCE AGENCY, etc.,
 5             Plaintiff,
                                 Case No.
 6        vs.                    3:11-cv-01383-AWT
       THE ROYAL BANK OF SCOTLAND
 7     GROUP PLC, et al.,
 8             Defendants.
       ---------------------------------x
 9
10               VOLUME 1
11
12
13               July 10, 2013
14
15               9:16 a.m.
16
17
18         Videotaped deposition of JOSEPH
19     PAUL NORRIS, pursuant to notice, held at
20     the offices of Skadden Arps Slate Meagher
21     & Flom LLP, Four Times Square, New York,
22     New York, before Gail F. Schorr, a
23     Certified Shorthand Reporter, Certified
24     Realtime Reporter and Notary Public
25     within and for the State of New York.
```

```
 1                JOSEPH PAUL NORRIS
 2      could access?
 3           A.    It did.
 4           Q.    And do you recall what any of
 5      those were?
 6           A.    Certainly I do, but none of
 7      them applied to Fannie Mae.
 8           Q.    Would you expect for any
 9      particular deal if Fannie Mae used or
10      relied on a Bloomberg calculation in
11      deciding to buy a deal that the Bloomberg
12      calculation would be reflected somewhere
13      in the deal file?
14                MR. COREY:  Objection; form.
15           A.    Generally I would assume that,
16      yes.
17           Q.    The collateral sheet that's
18      described in here, is that what you
19      described earlier as the 12 or so page
20      document from the dealer?
21           A.    Yes.
22           Q.    And then what are the
23      computational materials-marketing
24      materials described here?
25           A.    To me, they're all synonymous.
```

```
 1                JOSEPH PAUL NORRIS
 2      Different dealers called them different
 3      things.  And materials were not always
 4      the same.
 5           Q.   But this is information
 6      received from dealers?
 7           A.   That is correct.
 8           Q.   And was any of it generated
 9      internally at Fannie Mae?
10           A.   No.
11           Q.   Step 4.1.11 says "The
12      nonagency mortgage trader negotiates
13      trade terms with the proposed dealer
14      including an acceptable pricing level for
15      the transaction."
16                In addition to pricing, what
17      trade terms would Fannie Mae typically
18      negotiate with dealers?
19           A.   We briefly talked about
20      structure and credit enhancement, as well
21      as loans backing the pool.  Those would
22      be important things that we would
23      negotiate with the dealer.
24           Q.   Let's talk about negotiating
25      loans backing the pool.  What was Fannie
```

```
 1                JOSEPH PAUL NORRIS
 2     Mae looking for when it was negotiating
 3     which loans would be in the collateral
 4     pool supporting its certificate?
 5              MR. COREY:  Objection; form.
 6         A.   We were looking for the best
 7     quality loans at the best possible price
 8     with the highest concentration of housing
 9     goals that would prepay the fastest.
10         Q.   So would you at times ask for
11     loans to be added to the collateral pool?
12         A.   No.  I mean we had the whole
13     collateral pool was ours to carve out.
14         Q.   So you would ask for loans
15     that you didn't like to be eliminated
16     from the pool?
17         A.   Never individual loans.
18     Again, we couldn't see individual loans.
19     What we could see is a cross-section of
20     characteristics that we wanted removed
21     from the pool.  For example, if we said
22     that the concentration in the pool had
23     too many cash-out refis with high FICO
24     second liens, we would want 10 percent of
25     that removed, and that's how we would
```

```
 1                JOSEPH PAUL NORRIS
 2      determine it.  And that would be
 3      determined through the computational
 4      materials.  So we'd look at the
 5      computational materials, and I'd probably
 6      circle in there things that I liked or
 7      didn't like and then asked them to remove
 8      that percentage of the pool that was
 9      backed by these loans.  These like say
10      three characteristics.
11           Q.    Then was your understanding
12      that those loans would go into collateral
13      pools backing other pieces of the bond?
14                MR. COREY:  Objection; form.
15           A.    Yes.
16           Q.    So how did you determine which
17      loans you would want removed because they
18      were detrimental to housing goals?
19                MR. COREY:  Same objection.
20           A.    Say that again.
21           Q.    I think you testified earlier
22      that you would ask for loans that were
23      negative to housing goals to be excluded
24      from the collateral pool backing the
25      Fannie Mae certificates, correct?
```

```
 1                JOSEPH PAUL NORRIS
 2        A.   That's correct.
 3        Q.   How did you determine which
 4   loans those were?
 5        A.   Those were, again, run by the
 6   data warehouse on the single family side
 7   of the business.
 8        Q.   So they would present to you a
 9   report identifying the loans that you
10   should ask to have kicked out?
11        A.   Never the loans.  They would,
12   they would communicate with the dealer
13   and send the tape back to them is my
14   recollection.
15        Q.   Who was it on the single
16   family side who dealt with dealers on
17   this, do you know?
18        A.   I don't recall.
19        Q.   Did you have guidelines that
20   you followed regarding, for example, the
21   minimum number of, or minimum percentage
22   of accretive, goals accretive loans that
23   should be in each pool?
24        A.   No.
25        Q.   Your job was to just maximize
```