# Exhibit I

# In The Matter Of:

## *(C-"FHFA-ALL") FEDERAL HOUSING FINANCE AGENCY, ETC.*

_____

## *DONNA CORLEY 30(b)(6) - Vol. 3*
### *July 15, 2013*

_____

**MERRILL CORPORATION**
**LegaLink, Inc.**

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

DONNA CORLEY 30(b)(6) - 7/15/2013

Page 286

```
            UNITED STATES DISTRICT COURT

          SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

FEDERAL HOUSING FINANCE AGENCY, etc.    :

     Plaintiff,                         :

     vs.                                : 11 Civ. 5201

UBS AMERICAS, INC., et al.,             : (DLC)

     Defendants.                        :

----------------------------------------x

FEDERAL HOUSING FINANCE AGENCY, etc.    :

     Plaintiff,                         :

     vs.                                : 11 Civ. 6188

JPMORGAN CHASE & CO., et al.            : (DLC)

     Defendants.                        :

----------------------------------------x

FEDERAL HOUSING FINANCE AGENCY, etc.,   :

     Plaintiff,                         :

     vs.                                : 11 Civ. 6189

HSBC NORTH AMERICA HOLDINGS, INC., et   : (DLC)

al.,                                    :

     Defendants.                        :

----------------------------------------x
```

```
 1   --------------------------------------x
 2   FEDERAL HOUSING FINANCE AGENCY, etc.,    :
 3        Plaintiff                           :
 4   vs.                                      : 11 Civ. 6190
 5   BARCLAYS BANK PLC, et al.,               : (DLC)
 6        Defendants.                         :
 7   --------------------------------------x
 8   FEDERAL HOUSING FINANCE AGENCY, etc.,    :
 9        Plaintiff,                          :
10   vs.                                      : 11 Civ. 6192
11   DEUTSCHE BANK AG, et al.,                : (DLC)
12        Defendants.                         :
13   --------------------------------------x
14   FEDERAL HOUSING FINANCE AGENCY, etc.,    :
15        Plaintiff,                          :
16   vs.                                      : 11 Civ. 6193
17   FIRST HORIZON NATIONAL CORP., et al.,    : (DLC)
18        Defendants.                         :
19   --------------------------------------x
20   FEDERAL HOUSING FINANCE AGENCY, etc.,    :
21        Plaintiff,                          :
22   vs.                                      : 11 Civ. 6195
23   BANK OF AMERICA CORP., et al.            :
24        Defendants.                         :
25   --------------------------------------x
```

```
 1    ----------------------------------------x
 2    FEDERAL HOUSING FINANCE AGENCY, etc.,    :
 3         Plaintiff,                          :
 4         vs.                                 : 11 Civ. 6198
 5    GOLDMAN, SACHS & CO., et al.,            : (DLC)
 6          Defendants.                        :
 7    ----------------------------------------x
 8    FEDERAL HOUSING FINANCE AGENCY, etc.,    :
 9         Plaintiff,                          :
10         vs.                                 : 11 Civ. 6200
11    CREDIT SUISSE HOLDINGS (USA), INC.,      : (DLC)
12    et al.,                                  :
13         Defendants.                         :
14    ----------------------------------------x
15    FEDERAL HOUSING FINANCE AGENCY, etc.,    :
16         Plaintiff,                          :
17          vs.                                : 11 Civ. 6201
18    NOMURA HOLDING AMERICA, INC., et al.,    : (DLC)
19         Defendants.                         :
20    ----------------------------------------x
21    FEDERAL HOUSING FINANCE AGENCY, etc.,    :
22         Plaintiff,                          :
23         vs.                                 : 11 Civ. 6202
24    MERRILL LYNCH & CO., INC., et al.,       : (DLC)
25          Defendants.                        :
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1    ---------------------------------------x
 2    FEDERAL HOUSING FINANCE AGENCY, etc.,    :
 3         Plaintiff,                          :
 4         vs.                                 : 11 Civ. 6203
 5    SG AMERICAS, INC., et al.,               : (DLC)
 6         Defendants.                         :
 7    ---------------------------------------x
 8    FEDERAL HOUSING FINANCE AGENCY, etc.,    :
 9         Plaintiff,                          :
10         vs.                                 : 11 Civ. 6739
11    MORGAN STANLEY, et al.,                  : (DLC)
12         Defendants.                         :
13    ---------------------------------------x
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    - - - - - - - - - - - - - - - - - - - x

 2    FEDERAL HOUSING FINANCE AGENCY,          :

 3    AS CONSERVATOR FOR THE FEDERAL HOME      :

 4    LOAN MORTGAGE CORPORATION                :

 5         Plaintiff,                          :

 6         vs.                                 : 11 Civ. 7010

 7    ALLY FINANCIAL, INC., GMAC MORTGAGE      : (DLC)

 8    GROUP, INC., ALLY SECURITIES, LLC        :

 9    J.P. MORGAN SECURITIES, LLC              :

10    f/k/a J.P. MORGAN SECURITIES, INC.,      :

11    and as successor-in-interest to          :

12    BEAR, STEARNS & CO., INC.,               :

13    CREDIT SUISSE SECURITIES (USA) LLC,      :

14    f/k/a CREDIT SUISSE FIRST BOSTON, LLC,   :

15    RBS SECURITIES, INC., f/k/a GREENWICH    :

16    CAPITAL MARKETS, INC., CITIGROUP         :

17    GLOBAL MARKETS, INC., BARCLAYS           :

18    CAPITAL INC., UBS SECURITIES LLC,        :

19    and GOLDMAN, SACHS & CO.                 :

20         Defendants                          :

21    ---------------------------------------x

22

23

24

25
```

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   DISTRICT OF CONNECTICUT

 3      --------------------------------x

 4    FEDERAL HOUSING FINANCE AGENCY,      :

 5    etc.,                                :

 6        Plaintiff,                       :

 7        vs.                              : Case No.

 8    THE ROYAL BANK OF SCOTLAND GROUP     : 3:11-cv-01383-AWT

 9    PLC, et al.,                         :

10        Defendants.                      :

11      --------------------------------x

12

13

14

15                    Volume III

16          Videotaped 30(b)(6) Deposition of

17                    Freddie Mac

18        through the testimony of Donna Corley

19                  Washington, D.C.

20                  July 15, 2013

21                    1:41 p.m.

22

23    Job No. 235819

24    Pages 286 - 429

25    Reported by:  Bonnie L. Russo
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                         DONNA CORLEY
 2      went to -- back to the middleman in terms of
 3      the strategy execution team and then onto the
 4      portfolio managers, or if the summary
 5      information went right to the portfolio
 6      managers.  More detailed information would go
 7      back to the broker-dealers.
 8           Q.    And why would detailed information
 9      go back to the broker-dealers?
10           A.    It was showing how the different
11      loans, as part of the potential transaction,
12      got classified into.
13           Q.    Were the broker-dealers expected to
14      use that information?
15                 MR. OBLAK:  Objection to form and
16      scope.
17                 THE WITNESS:  At different points in
18      time, potentially, yes.
19                 BY MR. BATHAEE:
20           Q.    And how were they supposed to use
21      that information?
22                 MR. OBLAK:  Objection to the form
23      and scope.
24                 THE WITNESS:  At different points in
25      time, some of the -- the loans with certain
```

```
 1                    DONNA CORLEY

 2      characteristics would be put into a -- I guess

 3      into what they call a wide shape structure.  We

 4      would receive the principal and interest off of

 5      the goal-rich and goal-neutral loans.

 6               BY MR. BATHAEE:

 7          Q.    So the data that went back to the

 8      dealers, was that used to select the collateral

 9      that went to that Y-shaped structure?

10               MR. OBLAK:  Objection to the form

11      and scope.

12               THE WITNESS:  There were -- I guess

13      my understanding is appeared to have been some

14      best efforts stips put on the trades looking to

15      distinguish some of the collateral in certain

16      instances.

17               BY MR. BATHAEE:

18          Q.    So from the period of 2005 to the

19      middle of 2006 --

20          A.    Uh-huh.

21          Q.    -- when mission ran the output and

22      went back to the dealers in a very specific

23      form, the dealers would then use that

24      information to select the collateral in the

25      deals; is that fair?
```

```
 1                    DONNA CORLEY

 2               MR. OBLAK:  Objection to the form

 3      and scope.

 4               THE WITNESS:  It would have been one

 5      piece of information that they would have,

 6      again, given -- I guess their best efforts on

 7      certain trades to take into account.  It was

 8      not a -- something considered on every single

 9      deal then.

10               BY MR. BATHAEE:

11         Q.    Is it fair to say they used that

12      data to make their best efforts to ensure as

13      many housing goals qualifying loans were

14      included in the deal as possible?

15               MR. OBLAK:  Objection to the form.

16               BY MR. BATHAEE:

17         Q.    Under the circumstances, same

18      objection.

19               THE WITNESS:  In certain

20      circumstances, I will note there are also

21      completely neutral loans that would have been

22      in those population as well.  So not all loans

23      would have been goal-qualifying loans.

24               BY MR. BATHAEE:

25         Q.    But the purpose of mission running
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                        DONNA CORLEY
 2       the loans was to determine which ones were
 3       goal-qualified, correct?
 4            A.    As well as neutral, correct.
 5            Q.    And that data was provided in order
 6       to ensure that as many goal-qualifying loans
 7       would be included in the securitization as
 8       possible, right?
 9                  MR. OBLAK:  Objection to the form.
10                  THE WITNESS:  Potentially.
11                  BY MR. BATHAEE:
12            Q.    And that was a matter of practice
13       between 2005 and the middle of 2006?
14                  MR. OBLAK:  Objection to the form.
15                  THE WITNESS:  For certain products,
16       correct.
17                  BY MR. BATHAEE:
18            Q.    And how did that -- how did that
19       practice change after 2006?
20                  MR. OBLAK:  Objection to the form.
21                  BY MR. BATHAEE:
22            Q.    In terms of after the scoring
23       occurred?  What happened would happen as a
24       result of the scoring after the middle of 2006?
25                  MR. OBLAK:  Objection to the form.
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                    DONNA CORLEY

 2             THE WITNESS:  Talk about our

 3     internal practice was -- rather than mission

 4     being in the process of running the tool either

 5     though the business execution area or the

 6     broker-dealers themselves could run the

 7     analytics directly.

 8             BY MR. BATHAEE:

 9        Q.   And would they then send the results

10     of those analytics to the dealers during the

11     period -- middle of 2006 to 2008?

12             MR. OBLAK:  Objection to the form.

13             THE WITNESS:  Would the dealers send

14     it to themselves?

15             BY MR. BATHAEE:

16        Q.   I'm sorry.  Would the -- I'm sorry.

17             I might have done --  mangled that

18     question.

19             Would the people who ran those

20     analytics ultimately at Freddie Mac send the

21     results to dealers?

22        A.   That's my understanding of the

23     practice, yeah.

24        Q.   From middle of 2006 to 2008, right?

25             MR. OBLAK:  Objection to the form.
```

```
 1                    DONNA CORLEY

 2            THE WITNESS:  Roughly in that time

 3       span, yeah.

 4            BY MR. BATHAEE:

 5       Q.    And the dealers would use that data

 6       for the same purpose?

 7            MR. OBLAK:  Objection to the form.

 8            BY MR. BATHAEE:

 9       Q.    Right?

10            As in 2005 to the middle of 2006?

11            MR. OBLAK:  Same objection.

12            THE WITNESS:  Yeah, the -- any given

13       time, the exact use of it may vary, so -- but,

14       in general, it was to provide the

15       identification of the loans based on affordable

16       characteristics.

17            BY MR. BATHAEE:

18       Q.    And the iden -- the identification

19       of the loans for affordable characteristics,

20       that was also done for Freddie Mac's purposes,

21       right?

22            MR. OBLAK:  Objection to the form.

23            BY MR. BATHAEE:

24       Q.    Internal purposes, I should say?

25       A.    Freddie Mac was required to submit
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                      DONNA CORLEY
 2      HUD goals every year and so we needed to be
 3      able to collect information to be able to
 4      report on what our goal count was, so that data
 5      was essential.
 6           Q.   And this process of asking or
 7      returning the data to the dealers about
 8      which -- which were goals qualifying and which
 9      were goals neutral, that was for PLS?
10           MR. OBLAK:  Objection to the form.
11           THE WITNESS:  Correct.
12           BY MR. BATHAEE:
13           Q.   And you said certain products
14      earlier.  What other products would that
15      include, that process applied to?
16           MR. OBLAK:  Objection.
17           THE WITNESS:  PLS is the acronym I
18      use to say Private Label Securities, which
19      encompasses a lot of different types of
20      products.  So there's subprime, there's home
21      equities, there's Alt-A, MTA, so lots of
22      different types of collateral filed within PLS.
23           BY MR. BATHAEE:
24           Q.   Can you think of any products to
25      which that procedure would not apply to?
```

```
 1                    DONNA CORLEY
 2             MR. OBLAK:  Objection.
 3             THE WITNESS:  The practice of
 4    separating out some of these characteristics, I
 5    do not think was a common occurrence in Alt-A
 6    ARMs, which is the products that I had been
 7    involved in.
 8             BY MR. BATHAEE:
 9        Q.    And why is that?
10        A.    I'm not sure.
11        Q.    Well, what was the procedure that
12    applied to Alt-A ARMs?
13             MR. OBLAK:  Objection to the form.
14             THE WITNESS:  It was the same
15    policies and procedures that governed all PLS
16    for Freddie Mac's retained portfolio.
17             BY MR. BATHAEE:
18        Q.    What practices?
19        A.    The practice was that there were no
20    stips on the trades that were done in trying to
21    separate goals in this manner on a regular
22    basis.
23        Q.    Was it because Freddie Mac was not
24    seeking goals of accretive loans in Alt-A ARMs?
25             MR. OBLAK:  Objection to the form.
```

```
 1                    DONNA CORLEY

 2        Scope.

 3                THE WITNESS:  Can you say that one

 4        more time?

 5                BY MR. BATHAEE:

 6        Q.    Sure.

 7                Was it because Freddie Mac was not

 8        seeking goals of accretive loans in Alt-A

 9        environments?  A-C-C-R-E-T-I-V-E?

10                MR. OBLAK:  Same objection.

11                THE WITNESS:  I would say there

12        wasn't any type of targeted approach done for

13        certain goal-qualifying populations as a

14        regular practice.

15                BY MR. BATHAEE:

16        Q.    You mean the same kind of targeted

17        approach that was used for other products such

18        as PLS, generally?

19                MR. OBLAK:  Objection to the form.

20                BY MR. BATHAEE:

21        Q.    Right?

22        A.    From time to time.

23        Q.    And when you say, "from time to

24        time," what do you mean by that?

25        A.    At different time intervals, there
```

```
 1                          DONNA CORLEY
 2      housing goals?
 3              MR. OBLAK:  Same objection.
 4              THE WITNESS:  I can't is speak to
 5      his level of detail of everything, but I would
 6      understand he would have a general knowledge of
 7      all of these topics.
 8              BY MR. BATHAEE:
 9         Q.   You would certainly hope so, right?
10              MR. OBLAK:  Objection to the form.
11              THE WITNESS:  He was a CEO.
12              BY MR. BATHAEE:
13         Q.   Okay.  And if you go look at Page 44
14      -- oh, I'm sorry.  Different page number.  No,
15      it is 44.
16              MR. OBLAK:  Are you using the
17      transcript page?
18              BY MR. BATHAEE:  Yeah, that's right.
19              BY MR. BATHAEE:
20         Q.   Transcript pagination 44.  It's the
21      only pagination on the page other than Bates --
22      well, actually, you raise a good point.  I may
23      have the wrong pagination here.  Yeah, you're
24      right.  That's right.  I'm sorry.  It's -- it's
25      FHFA 08387844.  That's the Page 140 of the
```

 1                    DONNA CORLEY

 2         transcript.

 3                    Thank you.

 4                    So do you see where it says on Page

 5         140, at the top, it says:  "What about outside

 6         the set off site, do you have any concept of

 7         the Home Possible while you were at Freddie Mac

 8         that the Home Possible product was a higher

 9         risk product?"

10                    And the answer is:  "I would expect

11         it to be."

12                    And the question is:  "Why is that?"

13                    Answer:  "Because it was given to"

14         -- if you look at the hit rates on the, for

15         example, loan mod" -- I think he means low

16         mod -- "and sub goal eligible, right, the hit

17         rates are pretty good and an unfortunate fact

18         of life is that as hit rates went up, loans

19         were often risky."

20                    And then he's asked the question:

21         "What is a hit rate?"

22                    The answer is:  "Whatever it meets"

23         -- "whether it meets one of the goals."

24                    Do you see that?

25                    A.   I do see it.

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                      DONNA CORLEY
 2          Q.   Would you agree that as hit rates
 3    for housing goals went up the loans were often
 4    risky?
 5               MR. OBLAK:  Objection to the scope.
 6               THE WITNESS:  Sorry.  I see his --
 7    his comments here.
 8               BY MR. BATHAEE:
 9          Q.   No.  I have a question pending.
10          A.   I'm sorry.  What's the question
11    pending?  I'm sorry.
12          Q.   Would you agree that as hit rates
13    for housing goals went up --
14          A.   Uh-huh.
15          Q.   -- the loans were often risky?
16               MR. OBLAK:  Objection to the form
17    and scope.
18               THE WITNESS:  That's what this is
19    saying, correct?
20               BY MR. BATHAEE:
21          Q.   I'm asking would you agree?
22               MR. OBLAK:  Same objection.
23               THE WITNESS:  There could be higher
24    risk characteristics in some of those loans,
25    yes.
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                        DONNA CORLEY

 2              BY MR. BATHAEE:

 3         Q.    Now, are you aware of any specific

 4    PLS trade during the period 2005 to 2008 in

 5    which Freddie Mac was not trying to further its

 6    mission to provide affordable housing goals --

 7    affordable housing by meeting housing goals?

 8              MR. OBLAK:  Objection to the form

 9    and scope.

10              THE WITNESS:  Any trade in 2 -- I'm

11    sorry.  Repeat one more time.

12              BY MR. BATHAEE:

13         Q.    Sure.

14              Are you aware of any specific PLS

15    trade during the period 2005 to 2008 in which

16    Freddie Mac was not trying to further its

17    mission providing affordable housing by meeting

18    housing goals?

19              MR. OBLAK:  Same objections.

20              THE WITNESS:  Although goals were

21    always one of many characteristics that -- or

22    one of many factors that were considered in

23    making PLS trades, it was not necessarily a

24    targeted objective for certain asset classes

25    like I described before.  Alt-A, PLS, for
```

```
 1                      DONNA CORLEY

 2      example, would have been one of them.

 3              BY MR. BATHAEE:

 4          Q.   So is the answer to my question,

 5      yes, though, that for all of those deals 2005,

 6      2008, Freddie Mac sought to further its mission

 7      by providing -- performing -- providing

 8      affording housing by meeting housing goals?

 9              MR. OBLAK:  Same objections.

10              THE WITNESS:  We were targeting the

11      mission, the broader mission of providing

12      liquidity to the housing market.  Not all trade

13      was targeted for affordable goals.

14              BY MR. BATHAEE:

15          Q.   All right.  And I think you can set

16      aside the transcript I just handed you.  We can

17      reduce that clutter.

18              I'm going to hand you this now.

19              (Deposition Exhibit No. 1847 was

20      marked for identification.)

21              BY MR. BATHAEE:

22          Q.   Handing you what has been marked as

23      Exhibit 1847, and the document is entitled

24      "Cost of Freddie Mac's Affordable Housing

25      Mission," dated June 4th, 2009, Bates No. FHFA
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                    DONNA CORLEY
 2     06123085, and it appears likely it was either
 3     prepared for the business and risk committee
 4     board of directors.
 5               Do you know what that refers to?
 6               MR. OBLAK:  Objection to the form.
 7               THE WITNESS:  I do.
 8               BY MR. BATHAEE:
 9        Q.    What is that?
10        A.    One of the committees of the board
11     of directors.
12        Q.    And do you know who is -- who is on
13     that committee?
14               MR. OBLAK:  Objection to the scope.
15               THE WITNESS:  Not at that given
16     time, although I'm sure it's a matter of public
17     record.
18               BY MR. BATHAEE:
19        Q.    Did you see this document before?
20        A.    Not that I recall.
21        Q.    So let's start with the beginning of
22     the document.  On Bates number pending 86, it
23     says "Summary" at the top.
24               Do you see that, first page?
25        A.    Oh.
```

```
 1                     DONNA CORLEY

 2          Q.   86.

 3               So just so there's no confusion -- I

 4     got confused when I first saw this.  There's a

 5     number at the very bottom.  You see the 83?

 6          A.   Yes, I do.

 7          Q.   Just ignore that.  I care about the

 8     FHFA number.

 9          A.   FHFA?

10          Q.   Yes.  So I'll be using that one.

11               And it says -- if you look at the

12     third bullet, it says:  "Higher risk mortgages

13     disproportionately tend to be goal-qualified."

14               Do you see that?

15          A.   I do.

16          Q.   Do you agree with that statement?

17               MR. OBLAK:  Objection to the form

18     and scope.

19               THE WITNESS:  I think that was the

20     same point that we were talking about earlier.

21     It's consistent with that.

22               BY MR. BATHAEE:

23          Q.   So the answer is yes?

24               MR. OBLAK:  Same objections.

25               THE WITNESS:  Yes.
```

```
 1                      DONNA CORLEY

 2            BY MR. BATHAEE:

 3       Q.    And then underneath it, it says:

 4   "Targeted affordable lending generally requires

 5   accepting substantial higher credit risk."

 6            Is that the case?

 7            MR. OBLAK:  Objection to the form

 8   and scope.

 9            THE WITNESS:  This is talking about

10   the single-family line of business, the flow

11   guarantee business.

12            BY MR. BATHAEE:

13       Q.    Well, we'll see that that's not the

14   case as we go through the document, but --

15       A.    Okay.

16       Q.    -- let me -- let me -- let me ask a

17   more specific question.

18       A.    Okay.

19            MR. OBLAK:  Object to that statement

20   on the record.

21            BY MR. BATHAEE:

22       Q.    What does "targeted affordable

23   housing" mean?

24            MR. OBLAK:  Objection to the form

25   and scope.
```

```
 1                    DONNA CORLEY

 2            THE WITNESS:  I'm not sure exactly

 3      how they're using the phrase here, other than

 4      general terms of trying to look for affordable

 5      qualifying loans.

 6            BY MR. BATHAEE:

 7        Q.    Okay.  And when they refer to

 8      single-family loans here, you understand that

 9      to mean the single-family division or loans

10      that are single fam -- for single-family

11      houses?

12            MR. OBLAK:  Objection to the form

13      and scope.

14            THE WITNESS:  The third bullet where

15      it talks about we charge more for targeted

16      affordable single-family loans --

17            BY MR. BATHAEE:

18        Q.    Yes?

19        A.    -- but not enough to fully offset

20      their higher incremental risk, that I refer to

21      be the single-family loans in the single-family

22      flow business.

23        Q.    And what makes you think it excludes

24      PLS?

25        A.    Because the pricing for PLS was
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                      DONNA CORLEY
 2      understanding.
 3              BY MR. BATHAEE:
 4         Q.    So did Freddie Mac have to compete
 5      with Fannie Mae to get loans that met
 6      characteristics to match goals and sub goals?
 7              MR. OBLAK:  Same objection.
 8              THE WITNESS:  As we compete for all
 9      mortgages, yes.
10              BY MR. BATHAEE:
11         Q.    And if Freddie Mac could have gotten
12      more loans that met goals and sub goals, it
13      would certainly try to do so, right?
14              MR. OBLAK:  Same objection.
15              THE WITNESS:  To the extent it still
16      met our risk return objectives, yes.
17              BY MR. BATHAEE:
18         Q.    And sometimes those risk return
19      objectives were negative, correct?
20              MR. OBLAK:  Same objections.
21              THE WITNESS:  There's a difference
22      between negative and below cost.
23              BY MR. BATHAEE:
24         Q.    Fair enough.  Let me try it again.
25         A.    Uh-huh.
```

```
 1                          DONNA CORLEY
 2          Q.    Sometimes risk return objectives
 3     reflected returns below the cost of capital
 4     adjusted on a risk basis, correct?
 5                MR. OBLAK:  Objection to the form
 6     and scope.
 7                THE WITNESS:  My understanding is
 8     that it was exceptionally rare in PLS base; a
 9     little bit more common in a single-family
10     space.
11                BY MR. BATHAEE:
12          Q.    So the answer is yes?
13                MR. OBLAK:  Objection to the form.
14                THE WITNESS:  Again, very limited so
15     in PLS.
16                BY MR. BATHAEE:
17          Q.    But yes?
18                MR. OBLAK:  Objection to the form.
19                BY MR. BATHAEE:
20          Q.    Just want a clear record.
21                MR. OBLAK:  She's answered the
22     question.
23                THE WITNESS:  Very limited instances
24     in PLS.
25                BY MR. BATHAEE:
```

```
 1                          DONNA CORLEY
 2          Q.    Let's move back to page -- let me
 3     see.  I don't want to recover grounds we have
 4     been to earlier.  Let's look at Page 91.
 5               Now, it says at the bullet:
 6     "Goals-qualifying loans tend to be higher
 7     risk."
 8               Do you see the first sub bullet that
 9     says:  "Housing goals and sub goals target
10     lower income borrowers in areas"?
11          A.    Yes, I see it.
12          Q.    Is that one of the reasons why
13     goals-qualifying loans tend to be higher risk?
14               MR. OBLAK:  Objection to the form
15     and scope.
16               THE WITNESS:  I think the next
17     bullet tries to explain it more.
18               BY MR. BATHAEE:
19          Q.    Sure.
20               And how does it explain it?
21          A.    Talking about how it correlated with
22     other factors.
23          Q.    So you would agree that lower
24     household income correlates with various risk
25     factors, such as less wealth, less employment
```

```
 1                       DONNA CORLEY

 2      stability, higher loan-to-value ratios, and

 3      lower credit scores?

 4              MR. OBLAK:  Objection to the form

 5      and scope.

 6              THE WITNESS:  I would say that's --

 7      that's what this says.  I have no reason to

 8      think it's not true.

 9              BY MR. BATHAEE:

10      Q.    So you don't disagree with the

11      statement?

12      A.    I don't.

13      Q.    And would you agree that lower

14      income areas may exhibit greater house price

15      volatility?

16              MR. OBLAK:  Objection to the form

17      and scope.

18              THE WITNESS:  I don't know why that

19      would be the case.  I'm not -- I'm not familiar

20      with that.

21              BY MR. BATHAEE:

22      Q.    Do you have any reason to doubt that

23      it's correct?

24              MR. OBLAK:  Same objection.

25              THE WITNESS:  I don't have any
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                    DONNA CORLEY

 2      reason to doubt it.  I just don't -- I'm not

 3      aware of what -- the first time I have ever

 4      seen that --

 5               BY MR. BATHAEE:

 6          Q.    Fair enough.

 7          A.    -- statement, so no reason to

 8      believe it's not true.  I just --

 9          Q.    I suppose my question is a little

10      different; that is, do you have any basis to

11      think that it's incorrect?

12               MR. OBLAK:  Objection to the form

13      and scope.

14               THE WITNESS:  I don't have any

15      information that would say it's incorrect.

16               BY MR. BATHAEE:

17          Q.    And, you know, just so I'm clear, in

18      this board presentation, goal-qualifying loans

19      tend to be higher risk because of the

20      correlation between lower household incomes and

21      some of these factors listed here, correct?

22               MR. OBLAK:  Objection to the form,

23      scope.

24               THE WITNESS:  That's my

25      understanding.
```

```
 1                    DONNA CORLEY

 2              BY MR. BATHAEE:

 3         Q.    And do you have any reason to think

 4      this is incorrect?

 5              MR. OBLAK:  Same objection.

 6              THE WITNESS:  Sorry.

 7              How is that different than the prior

 8      question?

 9              BY MR. BATHAEE:

10         Q.    I'm talking about the entire bullet

11      and sub bullets, generally.

12              MR. OBLAK:  Same objections.

13              THE WITNESS:  When controlling for

14      all other features of the loans, with the

15      exception of these, these could be higher risk.

16              BY MR. BATHAEE:

17         Q.    And in the top bullet, it says,

18      "goal-qualifying loans."  Is this referring to

19      neutral loans, too?

20              MR. OBLAK:  Objection to the form

21      and scope.

22              THE WITNESS:  I would not think so.

23              BY MR. BATHAEE:

24         Q.    Why is that?

25         A.    Because to qualify for counting
```

```
 1                     DONNA CORLEY

 2      towards the goal you either have to be

 3      accretive or decretive.

 4          Q.    So this is -- could this be saying

 5      goal-qualifying loans tend to be higher risk

 6      than goal-neutral loans?

 7              MR. OBLAK:  Objection to the form.

 8              THE WITNESS:  It could be.

 9              BY MR. BATHAEE:

10          Q.    Okay.  Let's go to 92.  Actually,

11      you know what?  Let's go back to 97.  So in 97

12      where it says exact same phrase,

13      goal-qualifying," your testimony is that means

14      something different here?

15              MR. OBLAK:  Objection to the form

16      and scope.

17              THE WITNESS:  No.  My comment was

18      about the specially designed ABS.

19              BY MR. BATHAEE:

20          Q.    Right.

21              But with respect to goal-qualifying,

22      that excludes neutral loans, correct?

23              MR. OBLAK:  Objection to the form.

24              BY MR. BATHAEE:

25          Q.    As used here on this page?
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                    DONNA CORLEY
 2          MR. OBLAK:  Objection to the form
 3     and scope.
 4            THE WITNESS:  No.  The specially
 5     designed ABS included the exceptional
 6     goal-qualifying collateral that's written here
 7     and the neutral loans.  So the special design
 8     included two parts.
 9            BY MR. BATHAEE:
10        Q.    But were they specially designed to
11     include goal-qualifying collateral, as it's
12     written here?  Would that imply that it was
13     designed to include neutral loans?
14          MR. OBLAK:  Objection to the form
15     and scope.
16            THE WITNESS:  I would have worded it
17     the inverse to say it was specially designed to
18     exclude the dilutive loans.
19            BY MR. BATHAEE:
20        Q.    Setting aside how you would have
21     worded it, how it's worded here doesn't seem to
22     include goal or neutral loans, right?
23          MR. OBLAK:  Objection to the form
24     and scope.
25            THE WITNESS:  The whole purpose of
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                     DONNA CORLEY
 2      similar to the entire industry, I don't think
 3      there was a black and white Webster's
 4      dictionary definition.
 5              BY MR. BATHAEE:
 6          Q.    So, generally, how would Freddie Mac
 7      define subprime?
 8              MR. OBLAK:  Same objections.
 9              THE WITNESS:  So within the trading
10      desk, we used it to refer to the assets that
11      were shown to us that were being described as
12      subprime deals.
13              BY MR. BATHAEE:
14          Q.    How did Freddie Mac define subprime?
15              MR. OBLAK:  Objection to the form
16      and scope.
17              THE WITNESS:  I'm answering the
18      question.  We defined it -- we reused the same
19      definition that was given to us.
20              BY MR. BATHAEE:
21          Q.    What loan characteristics were
22      associated with the definition of subprime that
23      you used at Freddie Mac?
24              MR. OBLAK:  Same objection.
25              THE WITNESS:  So for the deals
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                    DONNA CORLEY
 2      classified as subprime, PLS had FICO scores
 3      that tend to be lower than other asset classes
 4      that we looked at and purchased.
 5              BY MR. BATHAEE:
 6         Q.    Around what FICO score, do you
 7      remember?
 8              MR. OBLAK:  Same objections.
 9              THE WITNESS:  I don't recall.  I
10      believe it was in the 600s.  I don't recall.
11              BY MR. BATHAEE:
12         Q.    So if we move on to 96, it says:
13      "Goal-qualifying single-family loans accounted
14      for the disproportionate share of our 2008
15      realized losses that was predicted by our
16      models."
17              Would you disagree with that
18      statement?
19              MR. OBLAK:  Objection to the form
20      and scope.
21              THE WITNESS:  Let me read this.  I'm
22      sorry.
23              Okay.  I'm sorry.  Repeat the
24      question.
25              BY MR. BATHAEE:
```

```
 1                      DONNA CORLEY

 2           Q.    Sure.

 3                 "Goal-qualifying single-family loans

 4      accounted for the disproportionate of our 2008

 5      realized losses that was predicted by our

 6      models."

 7                 Would you disagree with that

 8      statement?

 9                 MR. OBLAK:  Same objection.

10                 THE WITNESS:  I have no basis to

11      disagree with what's written there.

12                 BY MR. BATHAEE:

13           Q.    I'll ask you a quick question:  Did

14      Freddie Mac create or file any reports,

15      statements, compilations on housing goal hit

16      rates for PLS on a deal-by-deal basis?

17                 MR. OBLAK:  Objection to the form

18      and scope.

19                 THE WITNESS:  So our post-deal

20      process did have us getting the -- or getting

21      the business execution area would collect the

22      tape, provide it to mission for the loans that

23      ended up in our deal so that it could be

24      counted towards the goals.

25                 BY MR. BATHAEE:
```

```
 1                      DONNA CORLEY

 2         Q.     So does that mean that for each deal

 3    mission prepared a report to, perhaps, a

 4    regulator stating which loans that deal met

 5    housing goals?

 6              MR. OBLAK:   Objection to the form

 7    and scope.

 8              THE WITNESS:   I don't know if the

 9    report they viewed the regulator was

10    transaction by transaction.   More likely rolled

11    up to show aggregate hit rates for the month or

12    for the quarter.

13              BY MR. BATHAEE:

14         Q.     Did mission prepare any

15    transaction-by-transaction reports that reflect

16    housing goal hit rates?

17              MR. OBLAK:   Same objections.

18              THE WITNESS:   My understanding is

19    that there was a period of time where they

20    would compare what the hit rates were versus

21    what we thought the hit rates were going to be

22    from the pre-bid process.

23              BY MR. BATHAEE:

24         Q.     And that was done in some kind of

25    report?
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                         DONNA CORLEY
 2              MR. OBLAK:  Objection to the form.
 3              THE WITNESS:  Correct.
 4              BY MR. BATHAEE:
 5         Q.    And do you know who would have been
 6    responsible for preparing that report?
 7         A.    I believe that -- actually, I
 8    believe that -- well, actually, I believe that
 9    transitioned similar to the whole process
10    overall.  It may have started with mission and
11    then went to the -- the business execution
12    area.
13         Q.    Okay.  Let's go back to 96.
14              Is this saying that single-family
15    loans -- what does that refer to?
16              MR. OBLAK:  Objection to the form
17    and scope.
18              BY MR. BATHAEE:
19         Q.    At the top, it says:
20    "Goals-qualifying single-family loans" -- or,
21    it says, "SF," I should say -- "account for the
22    disproportionate share of our 2008 realized
23    losses as predicted by our models."
24              What does that mean?
25              MR. OBLAK:  Same objection.
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                    DONNA CORLEY

 2          THE WITNESS:  It means

 3     single-family.  We usually use it in that

 4     context to refer to the flow guaranteed

 5     business.

 6          BY MR. BATHAEE:

 7     Q.   And does this imply that loans

 8     purchased through that business that met

 9     housing goals had a higher rate of default?

10          MR. OBLAK:  Same objections.

11          THE WITNESS:  It says, "realized

12     losses," so whether that's default or severity

13     or some combination thereof...

14          BY MR. BATHAEE:

15     Q.   And is there any reason why loans

16     backing PLS that met housing goals would be any

17     different in terms of losses?

18          MR. OBLAK:  Same objections.

19          THE WITNESS:  Yes, a couple of

20     different ways.

21          BY MR. BATHAEE:

22     Q.   Can you tell me what those

23     differences would be?

24     A.   Well, first off, it was credit

25     enhancement, so --
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                         DONNA CORLEY

 2               MR. OBLAK:  Let her finish her

 3      answer, please.

 4               MR. BATHAEE:  I want to clarify my

 5      question.

 6               MR. OBLAK:  Let her finish her

 7      answers before you interrupt her.

 8               BY MR. BATHAEE:

 9         Q.    You can finish your answer, of

10      course, but I -- I do have a clarifying

11      question.

12         A.    So, in terms of credit enhancement,

13      you don't obviously realize any losses until

14      all the credit enhancement is gone.

15               The other important distinction with

16      how these deals are structured is whether or

17      not our bond was backed by the goal-qualifying,

18      goal-neutral or those that are decretive.  It

19      was all cross-collateralized.  So the credit

20      enhancement included all of those loans.  So

21      whether or not we kept in decretive loans or

22      moved them to the other tranche of the deal,

23      had no bearing on the credit losses that could

24      eventually ever -- or could potentially end up

25      hitting the structuring various scenarios.
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                    DONNA CORLEY
 2          Q.    Are you done with your answer?
 3          A.    Yes.
 4          Q.    For the underlying loans, their
 5    probability of default, is there any reason to
 6    believe that those loans would have defaulted
 7    any differently from the ones that met housing
 8    goals than the ones purchase through this
 9    business, single-family business that you
10    referred to?
11               MR. OBLAK:  Objection to the form
12    and scope.
13               THE WITNESS:  Most likely be
14    similar, which is why the credit enhancement
15    structure was in place.
16               MR. BATHAEE:  All right.  We have
17    three minutes left on the videotape, so we can
18    stop.
19               MR. OBLAK:  I think we only have two
20    minutes left in the -- in the day.
21               MR. BATHAEE:  Let's go off the
22    record and get the run time.
23               THE VIDEOGRAPHER:  Going off the
24    record.  The time is 3:49 p.m..
25               (Whereupon, the proceeding was
```

DONNA CORLEY 30(b)(6) - 7/15/2013

```
 1                        DONNA CORLEY

 2          concluded at 3:49 p.m.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```