# Exhibit FF

## TESTIMONY OF
## JAMES B. LOCKHART
## FINANCIAL CRISIS INQUIRY COMMISSION
### April 9, 2010

Thank you Chairman Angelides, Vice Chairman Thomas and Commission Members for inviting me to testify about Fannie Mae and Freddie Mac, the housing Government Sponsored Enterprises (GSEs or Enterprises). I look forward to expanding your understanding of their role in the housing market and the financial crisis, the flaws in the regulatory structure and the actions we took prior to the conservatorships.

I was nominated and made Acting Director of the Office of Federal Housing Enterprise Oversight (OFHEO) in May 2006 by President Bush after serving as Deputy Director and Chief Operating Officer of the Social Security Administration for over four years. Social Security's mission is to ensure the economic security of the nation's people. Although OFHEO was tiny compared to Social Security, OFHEO had a very important mission as well of promoting "housing and a strong national housing finance system by ensuring the safety and soundness of Fannie Mae and Freddie Mac."

The Enterprises' mission is to provide stability, liquidity and affordability to the housing market. They are enormous and with FHA/VA/GNMA they are the secondary mortgage market today. When I joined OFHEO their debt and MBS of $4.3 trillion well exceeded the publicly held debt of the US of $4.0 trillion. On July 30, 2008 when President Bush signed the Housing and Economic Recovery Act (HERA), which was the belated GSE reform legislation, I became the first Director of the Federal Housing Finance Agency (FHFA) and Chairman of its Oversight Board whose other members were the Treasury and HUD Secretaries and the SEC Chairman. I was at FHFA through August of 2009. I also served as the Executive Director of the Pension

- 1 -



PLF/DEF
EXHIBIT 35909
DATE _____ RPTR _____
Jineen Pavesi, RPR, RMR, CRR

Benefit Guaranty Corporation from 1989-1993 and so I had a lot of experience dealing with troubled companies.

When I joined OFHEO in May of 2006, both Fannie Mae and Freddie Mac were very troubled as they were recovering from their accounting scandals. They were unable to produce timely financial statements and had serious deficiencies in systems, risk management and internal controls.

Just as I joined OFHEO was finalizing its report of its Special Examination of Fannie Mae. We published the report on May 23rd and negotiated a tough and extensive consent agreement. The agreement imposed a $400 million fine and had over 80 action items to create a top to bottom remediation. Very importantly, we froze the growth of Fannie Mae's mortgage portfolio at December 31, 2005 levels and continued the extra 30% minimum capital requirement imposed by my predecessor on both Enterprises because of their accounting irregularities.

On June 6th, two days before my Senate confirmation hearing, I testified to the House Financial Services Committee about the examination. I quoted from the Special Examination Report an email from then Fannie Mae COO, Dan Mudd, to its CEO, Franklin Raines. He was discussing the need to reform. He wrote "The old political reality was that we always won, we took no prisoners…we used to…be able to write, or have written rules that worked for us." That was the key flaw as the legislation that created OFHEO's regulatory oversight of the Enterprises in 1992 was a product of "the old political reality."

I endorsed strongly in all three Congressional hearings I had that June, three key recommendations from the Special Examination:

- Matters identified for remediation by Fannie Mae should be considered for Freddie Mac.

- OFHEO should continue to support legislation to provide the powers essential to meeting its mission of assuring safe and sound operations at Fannie Mae and Freddie Mac.

- OFHEO needs to continue to strengthen and expand its regulatory infrastructure and regular examination programs.

Freddie Mac agreeing to Fannie Mae remediation standards

Working on the first recommendation I met with the Freddie Mac Board in June. Due to our limited regulatory powers and the fact that Freddie Mac had already agreed to a less rigorous Consent Agreement, I asked them to voluntarily agree to freeze their portfolios at levels similar to Fannie Mae's agreement. The Enterprises' portfolios had been a major target of advocates of GSE reform including Federal Reserve Board Chairman Greenspan primarily because of the interest rate and mortgage prepayment (convexity) risk that required extensive use of derivatives to manage, which greatly increased counterparty risk. The Enterprises could borrow so cheaply and at unlimited amounts to fund their portfolios because their lenders and rating agencies applied no market discipline. Their portfolios were a major source of income even though half of the portfolios were their own mortgage-backed securities (MBS). The other half compounded their credit risk. Fannie Mae's and Freddie Mac's non-GSE MBS portfolios were quite different. Freddie Mac had much more AAA private label securities (PLS) than Fannie Mae while Fannie Mae had much more unsecuritized whole loans. As it turned out, that difference meant that Freddie's losses were more front-loaded than Fannie's losses. However, with a bigger book Fannie Mae's losses will turn out to be larger.

At the Freddie Mac Board meeting I went through a long list of issues to convince the Board that it would be prudent to cap their portfolios. I mentioned growing credit risk. The pushback from the Board was quite intense as they and most Americans in the summer of 2006, despite the growing housing bubble, were in denial. In July, Freddie Mac's Board did agree to the freeze. In retrospect capping the growth in portfolios prevented tens of billions of dollars of more losses. The Enterprises' market share of mortgage originations given OFHEO's constraints and

- 3 -

competition from the private label mortgage backed securities, dropped from 57% in 2003 to 37% in 2006.

GSE Reform Legislation

President Bush had been pushing for GSE reform for many years before I joined OFHEO. The need for legislation was obvious as OFHEO was regulating two of the largest and most systematically important US financial institutions and yet its powers were much weaker than bank or even state insurance regulators.  Unfortunately, it took Congress, especially the Senate much too long to pass the legislation. It only happened 38 days before we had to place the Enterprises into conservatorship.

In every testimony and the many speeches I gave, I called for GSE reform legislation. OFHEO did not have all the necessary powers to deal with these giant housing Enterprises.  It was clear as I said in one of my first speeches in July 2006 that the enterprises presented major systemic risks.  At the time that statement was very controversial, but it was a critical point to make.  This systemic risk as the largest component of the secondary mortgage market was increased by their GSE status which allowed them to borrow cheaply and take on legally massive amounts of leverage.  The situation required a regulator with extraordinary powers and we had just the opposite.  The key components we asked for and finally got in HERA two years later were:

- Capital.  Both minimum capital and risk-based capital requirements were very weak and inflexibly written into the 1992 law.  Having co-founded a risk management firm it was very frustrating to see how ineffective and outdated the risk-based capital model was. The minimum capital standards were extremely low as in total they allowed the Enterprises to be leveraged at unbelievable levels of 100 to 1.  Only 45 basis points of

capital was required to support their MBS and 2.5% for their portfolios. The definition of capital was also inflexible, which further compounded the problem. It was a GAAP capital measure except it excluded the losses in Accumulated Other Comprehensive Income, which in the case of Freddie Mac included $5 billion in old hedging losses. Deferred Tax Assets were fully counted unlike the large haircuts the banking regulators used. Just one month before the conservatorships, both Fannie Mae and Freddie Mac published quarterly financial statements that showed that they were well in excess of the minimum and risk-based capital standards. As that second quarter of 2008 was the first time Freddie Mac had become an SEC registrant, the numbers had been well scrubbed. At that time I was quoted as saying that the Enterprises were legally "adequately capitalized", which was true based on their financial statements. However, I was also making it clear that the law was inadequate as it allowed the Enterprises to be too highly leveraged. I had been using a chart regularly that showed their massive leverage which showed on a fair value basis Freddie Mac's capital was negative.

- Portfolios. As mentioned, the mortgage portfolios compounded the mortgage credit risk and introduced large interest rate and counterparty risks through the use of derivatives. OFHEO was only able to control the size of portfolios through Fannie Mae's Consent Agreement and Freddie Mac's voluntary agreement. Many people believed that derivatives were the downfall of the Enterprises. They actually did a reasonably good job of tightly managing their interest rate risk from an economic standpoint, but as they lost the ability to do hedge accounting the financials often showed quarterly large losses or gains. However, there was no mission related reason why the Enterprises needed portfolios that totaled $1.5 trillion.

- <u>Mission Authority</u>.  HUD was the Enterprises' mission regulator.  In particular, HUD had
  the authority to set affordable housing goals and approve new products.  This bifurcation
  of the safety and soundness and the mission regulators was troublesome.  In retrospect, it
  is easy to see that HUD pushed the housing goals too high.  At the end, requiring that
  55% of their mortgages were made to below median income households was
  mathematically difficult and a mistake as was allowing them credit for the underlying
  mortgages in those subprime and other private label MBS.  Both CEO's told me that one
  of their worst fears was missing their affordable housing goals, which they ended up
  doing in 2008.  HUD had the power to require a consent agreement if they did miss their
  goals.  Probably worse from the CEO's standpoint it would have incurred the wrath of
  their Congressional supporters.  I believe that high affordable housing goals and the
  resulting political pressure compounded by the Enterprises' drive for market share and
  short-term profitability were major reasons why they lowered their underwriting
  standards.  I should point out that their standards remained higher than the general
  markets. In fact, if you look at Fannie Mae's acquisitions from 2001 to 2007 its percent
  of below 660 FICO mortgages (a common measure of subprime mortgages, but not
  Fannie Mae's) remained remarkably steady even though the subprime market grew
  rapidly to almost a third of the market during this period. In 2001, the subprime share was
  18% falling to 14% in the refinancing boom year of 2003. It rose again to 18% in 2004
  and then fell to 16% in 2005 and 17% in 2006 before hitting 18% again in 2007.  In 2008
  the subprime share plunged to 9%. However, they indirectly encouraged those lower
  standards by purchasing private label securities.  They also encouraged lower standards
  by not aggressively pursuing the obligations of originators to repurchase mortgages if
  they did not comply with the Enterprises' underwriting requirements.  Despite OFHEO's

- 6 -

pressure, they were lax in forcing repurchases for fear of offending major customers such as Countrywide.

- <u>Independent Budget Authority</u>. As OFHEO's budget was subject to the Congressional process and the Enterprises had a strong relationship with Congress, OFHEO's early growth was constrained which may have helped contribute to the earlier accounting scandals at the Enterprises. Funding was less of an issue when I was the Director although the annual freezes at the start of the new budget years made it nearly impossible to ever reach full staffing levels.

- <u>Independent Litigating Authority</u>. Without independent litigating authority, OFHEO had to go through the Justice Department. This was cumbersome and lessened OFHEO's power over the Enterprises.

- <u>Oversight of Federal Home Loan Banks</u>. The single regulator over the housing Enterprises created by HERA gave FHFA a broader view of the housing market and, frankly, more clout in Washington. However, despite asking several times and even trying to get it into HERA, FHFA is still not a member of the Federal Financial Institutions Examination Council.

- <u>Receivership</u>. OFHEO only had conservatorship power unlike bank regulators which can put banks into receivership. HERA created a good/bad bank receivership structure. In the end for legal and market confidence reasons we decided that conservatorship was the best approach as it was critically important to keep the Enterprises running to prevent a total collapse in the mortgage market. The irony is that it wasn't until the last few weeks prior to legislation that the ability for Treasury to fund a conservatorship/receivership was placed into HERA. Without that authority, it is my belief that a conservatorship would

have failed as there was no way to support their debt and MBS. Without the Senior

Preferred Stock Facility, the financial crisis would have been much worse.

It is impossible to say whether an earlier passage of HERA would have prevented the

mortgage crisis and the housing bubble, but it certainly would have lessened the damage. It

is very possible to say that the companies' opposition to the legislation for so long was a

major mistake and extremely costly to their shareholders. It always surprised me that the

Enterprises' Board of Directors felt their sole fiduciary obligation was to shareholders and

maximizing profitability. In the end they failed. Whatever new model replaces the

Enterprises, it must clearly delineate the private sector and public sector roles to never allow

again the private sector getting the profits for many years with the taxpayers ultimately eating

the losses.


Strengthening the Regulatory Framework

The third goal I mentioned was that OFHEO needed to strengthen its regulatory oversight.

That was a critical focus especially given the weak regulatory powers that OFHEO had. We had

large teams at Fannie Mae and Freddie Mac at all times. We continued to add skilled examiners

throughout the period. I met at least weekly with the teams. I also met monthly with the

Enterprises' CEO's during which I let them know what problems the examiners were finding.

The exam teams regularly undertook examinations which contained many recommendations –

Matter Requiring Attention. Key issues addressed included systems, credit models, risk

management and the ongoing needs to restore the accounting infrastructure.

OFHEO sent an annual report to Congress on the Enterprises. These reports detailed the

many problems that the Enterprises had and their efforts to remediate their problems. Actually

by the time of the conservatorships they had fixed their accounting problems and many of their

internal control and risk management issues. However, as those reports detail there were many other challenges. In the report for 2006, we lowered their rating to "significant supervisory concern". Prior to publishing the Report, we met with the Boards to discuss our exam findings and remedial actions required. We also met at other times with the Boards or their committees as significant issues arose. We kept the "significant supervisory concern" rating until our unpublished mid-year review in 2008 when we lowered the rating to the lowest category. We also met regularly with the Enterprises on their capital position and forecasts.

Although the Enterprises never violated the capital requirements including OFHEO's extra 30% during this period, as the market began to deteriorate they hit triggers in OFHEO's prompt corrective actions regulation. OFHEO made escalating requests to conserve capital including detailed capital plans, dividend constraints, increased capital requests.

Mortgage fraud was a significant contributor to the housing finance crisis. Whether criminals or those thinking they would harmlessly "fudge" some numbers in an up market, the result of fraud was to inflate values, lead to further pressure on aspiring homeowners to seek non-traditional mortgages to get into a home and ultimately to the rapid depreciation in home values. OFHEO created the first government regulation that I am aware of that focused solely on mortgage fraud. Working with the FBI, the Department of Justice and the Financial Crimes Enforcement Network, OFHEO deployed a rule that required training, reporting of mortgage fraud information to the Enterprise Boards, active mortgage fraud prevention and detection programs and reporting to OFHEO of suspected mortgage fraud. As the Enterprises are not covered by the Bank Secrecy Act, we filed the Suspicious Activity Report with FinCEN. The FBI has informed FHFA that several reports by the Enterprises have been integral to successful prosecutions.

OFHEO adopted a new non-CAMEL rating scheme in 2008, called GSEER, which stands for Governance, Solvency (capital), Earnings and Enterprise Risks (market, credit, operational and model). We also organized the examination teams around that structure so that, for instance, the credit team reviewed both Enterprises.

On the governance side, OFHEO did have some compensation authority to ensure that senior management pay was not out of line with comparable companies. As compensation was very high at the comparables, that did not provide us with much power. However, we did pressure the Boards for moderation, especially, in the case of a one year extension of Freddie Mac's CEO's contract. I believe that one of the problems at Freddie Mac was that their CEO was spread much too thin. The Board repeatedly stonewalled me on appointing the required non-executive Chairman and was slow to hire a replacement COO.

Both firms have very broad performance metrics for bonuses, which because of their accounting scandals de-emphasized earnings. As it turned out, because a major portion of compensation was in options and warrants their ultimate compensation was much lower than reported.


What Went Wrong?

The Enterprises' management and the models they relied on failed to identify how badly the mortgage market was deteriorating. Unfortunately, many others including bankers, investors, realtors, brokers, homebuyers and regulators failed to understand how bad the toxic mix was: booming and then falling house prices, abysmally low underwriting standards that encouraged originator and buyer fraud, plentiful and then disappearing financing, and Wall Street's destructive creativity that spawned CDOs and put "high touch" subprime and Alt-A mortgages in "brain dead" securitizations. We are still suffering three years after we started to see the market

crack from the Pooling and Servicing Agreements that do not allow mortgage servicers to do the right thing when modifying mortgages.

I have attached a speech I gave at the Chicago Federal Reserve Bank's annual conference in May 2008 entitled "Lessons Learned from Mortgage Market Turmoil" which covers many of these points. As I said in that speech:

> "Another lesson is that over-reliance on sophisticated quantitative models promotes a hubris that has frequently caused serious problems at many financial institutions. As a former partner in a risk management software and consulting firm, I believe management judgment – common sense, if you will – must act as a check on, and sometimes must override, those models. Financial institutions need both. Management decisions must be informed, not dictated, by models. Looking at the junkyard of previous periods of financial turmoil, the common theme is that pushing the envelope too far, often with the aid of models, eventually leads to problems.
>
> Long Term Capital Management was the landlord of our risk management firm in Greenwich, Connecticut. I hasten to add that, despite our efforts, they were never a client. Their models did not capture the correlation of risks on the downside. Their name was right. Financial institutions should be run for the "long term", but their strategy and models failed during a short-term problem. As chair of a corporate pension committee in 1987, I still remember the failure of portfolio insurance."

The Enterprises' models failed as did the rating agencies' and many others models. Unfortunately, the Enterprises' hubris extended to the whole mortgage market. They sincerely believed that they were created for the troubled market that began to erupt in the spring of 2007. They claimed that their intervention during the Long Term Credit crisis stabilized the mortgage market. Fannie Mae wanted to expand its Acquisition, Development and Construction lending

which we constrained.  Fannie Mae wanted to start buying A and AA private label securities. We allowed a much reduced AA pilot program and then stopped it.  Freddie Mac actually wanted to support the credit default swaps (ABX) on private label subprime securities by buying them as they started to fall.  By July and August of 2007 as the private label market fell, they were putting extreme pressure on OFHEO and were backed by members of Congress for us to remove the portfolio caps and 30% extra capital constraints.

It became clear by August 2007 that the turmoil was too big for the Enterprises to solve in a safe and sound manner.  Therefore OFHEO turned down Fannie Mae's written request to remove the constraints.  They were critically supporting the conforming mortgage market.  We were very concerned that if we released those constraints that it would impair their ability to serve their core market as they were already purchasing or guaranteeing over 60% of the mortgages originated.

They were fulfilling their mission, but they had no power to do more in a safe and sound manner.  If their mission is to provide stability and lessen market turmoil, there was nothing in their capital structure that provided this countercyclical capability.  To do so in the long run, we need to create a countercyclical capital regime.  Capital requirements should increase when housing prices get too far above trendlines.  That might lessen housing bubbles and give the secondary mortgage market the capital to provide support and prevent panic selling as the markets over-correct.  Another countercyclical tool would be the requirement for contingent capital notes that would convert to equity if capital fell below specified levels.  Subordinated debt was supposed to provide some capital, but in the end it was too small.  In conservatorship the subordinated debt was not wiped out because it would have triggered a cross default of the Enterprises' debt.

Balancing Act

From the fall of 2007 to the conservatorships, it was a tightrope with no safety net. The Enterprises safety and soundness was paramount. Given their massive mortgage portfolios, mortgage stability was critical for their safety and soundness. OFHEO encouraged the Enterprises to conserve and raise capital. With our urging they had been constraining the growth of their dividends and then they cut their dividends to minimal levels. They also were one of the first financial institutions to raise capital, issuing $17.5 billion of preferred stock in 2007. On the other hand house prices were falling, delinquencies and foreclosures were rising and mortgage credit was drying up. There was growing pressure for them to do more.

In September, OFHEO loosened the portfolio constraints marginally to help refinance creditworthy borrowers in toxic subprime mortgages and to support the multifamily rental market. These two systematically important institutions were becoming the support for the whole mortgage market. By the fourth quarter of 2007, their market share of new originations was up to 75% from 2006 levels of 37% and the first half of 2007 levels of 45%. Sitting on $5 trillion of mortgages and razor thin capital, it was critical for their financial future that the mortgage market stabilized. A withdrawal by Freddie Mac and Fannie Mae or even a drop in confidence in the Enterprises would have created a self-fulfilling credit crisis.

As the Enterprises struggled into the New Year with mounting losses, our communications with their management and boards intensified. We also were in regular communications with the Treasury Department, the Federal Reserve Board and the White House. In a sign that their accounting remediation was making good progress, in February they published timely financial statements for the first time in over five years. Timely financial statements were the agreed upon trigger for the removal of the 2006 portfolio caps. OFHEO therefore removed those constraints

on the portfolios.  Also in February, Congress had raised Fannie's, Freddie's and FHA conforming loan limits.  These loans were going to be hard to securitize.

In my February 27th statement announcing the cap removal, I also covered the future of the OFHEO-directed capital requirement:

> "Since agreements reached in early 2004, OFHEO has had an ongoing requirement on each Enterprise to maintain a capital level at least 30 percent above the statutory minimum capital requirement because of the financial and operational uncertainties associated with their past problems.  In retrospect, this OFHEO-directed capital requirement, coupled with their large preferred stock offerings means that they are in a much better capital position to deal with todays difficult and volatile market conditions and their significant losses.

> As each Enterprise nears the lifting of its Consent Order, OFHEO will discuss with its management the gradual decreasing of the current 30 percent OFHEO-directed capital requirement. The approach and timing of this decrease will also include consideration of the financial condition of the company, its overall risk profile, and current market conditions. It will also include consideration of the importance of the Enterprises remaining soundly capitalized to fulfill their important public purpose and the recent temporary expansion of their mission."

In March, the overall financial market continued to meltdown as the problems in the housing finance market continued to spill over to other markets.  Simultaneously, with the well chronicled rescue of Bear Stearns, we were working on stabilizing and restoring confidence in Fannie Mae and Freddie Mac and consulting with the Treasury Department.  We were hoping to announce an agreement with the Enterprises to raise more capital the same Sunday as the Bear Stearns rescue.  It took several joint meetings and calls among the CEO's, Treasury and OFHEO

and a few days longer as we had to convince the managements and their boards that it was

critical to help restore confidence in themselves, the housing market and the overall financial

system.  In a press conference with the two CEO's on March 19th, we announced a three part

agreement.

> "Effective immediately, OFHEO is reducing the OFHEO-directed capital requirement for
>
> Fannie Mae and Freddie Mac from 30 percent to 20 percent above the 2.5 percent
>
> minimum statutory requirement"…
>
> "Importantly, the two companies have committed to raise significant capital and to
>
> maintain overall capital levels well in excess of requirements in order to ensure market
>
> confidence and fulfill their public mission"…
>
> "The three of us again announce our commitment and call for comprehensive GSE
>
> reform.  It is time to act."

Fannie Mae in an oversubscribed offering raised $ 7.4 billion of capital in May.  As the

market continued to deteriorate, that offering proved to be much too little.  Freddie Mac was

slow off the mark and then needed to wait as they were in the process of registering with the

SEC for the first time.  After they published their financials in early August, I attended a meeting

with their CEO, several directors and their investment bankers.  It was clear it was too late to

raise capital.  Fannie was also reporting to Treasury that they could not raise more capital

without support.

In August, confidence in the Enterprises plunged as well respected commentators stated they

were insolvent and analysts speculated that a new draft accounting principle would quintuple

their capital requirements.  Debt and MBS spreads were widening and foreign investors were

expressing concerns. Throughout August, FHFA's team working with the new second quarter

financial information and forecasts and in close coordination with Treasury and the Federal

- 15 -

Reserve with help from the OCC, made a recommendation to me to put the Enterprises into conservatorship. With the strong support of Secretary Paulson and Chairman Bernanke, we worked hard to build a strong case so that both Boards of Directors would voluntarily consent to a conservatorship, which they did on September 6, 2008.

Could the Conservatorships Have Been Prevented?

We will never know if the conservatorships could have been prevented. It was a perfect storm. You have asked what could be done better. Before doing so I would like to thank the OFHEO/FHFA team and particular my Deputy and now Acting Director, Ed DeMarco, for their extraordinary work and professionalism in unprecedented times. Although OFHEO warned repeatedly of the systemic risk that Fannie Mae and Freddie Mac presented to the financial markets and took many steps that helped lessen the damage, everybody including OFHEO probably could have done more. There was such a strong emphasis on remediating the operational risks of the Enterprises and monitoring the interest rate risk that credit risk was not emphasized as much as it should have been in the first year. Perhaps, we should have created the unified credit risk team earlier although we did create a combined task force to review credit issues in 2007. OFHEO did require Fannie Mae and Freddie Mac in 2007 to adopt the bank regulators non-traditional and subprime mortgage guidance not only for its own mortgages, but for also for the mortgages in the private label securities which helped deter shoddy underwriting.

The foremost failing by far was the legislative framework. As I wrote earlier it had to be much stronger. In particular, the capital rules were woefully inadequate for the crisis and compared to other financial institutions. The ability to lever themselves 100 to 1 on what was allowed by law to be partially non-existent capital was impossible to overcome. The GSE

- 16 -

structure itself was flawed.  It allowed the companies to be so politically strong that for many years they resisted the very legislation that might have saved them.

The only silver lining was that the legislation was finally passed which allowed the conservatorships to function fairly smoothly. The Enterprises are continuing to fulfill their mission. Unfortunately, the flawed original 1992 legislation and the financial crisis will cost the taxpayer hundreds of billions of dollars.

Thank you and I would be happy to answer any questions you have.