# Exhibit 11

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>    Plaintiff,<br><br>    -against-<br><br>NOMURA HOLDING AMERICA INC., NOMURA ASSET ACCEPTANCE CORPORATION, NOMURA HOME EQUITY LOAN, INC., NOMURA CREDIT & CAPITAL, INC., NOMURA SECURITIES INTERNATIONAL, INC., RBS SECURITIES INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.), DAVID FINDLAY, JOHN MCCARTHY, JOHN P. GRAHAM, NATHAN GORIN, and N. DANTE LAROCCA,<br><br>    Defendants. | 11 Civ. 6201 (DLC) |

**EXPERT REPORT OF ROBERT W. HUNTER
REGARDING THE UNDERWRITING OF MORTGAGE LOANS
UNDERLYING THE NOMURA SECURITIZATIONS**

**May 15, 2014**

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

## TABLE OF CONTENTS

I.      Introduction .............................................................................................................1

II.     Summary of Opinions .............................................................................................2

III.    Qualifications .........................................................................................................3

        A.      Overview ....................................................................................................3

        B.      Mortgage Lending Experience ...................................................................4

        C.      Consulting and Litigation Experience .......................................................9

IV.     Compensation .......................................................................................................10

V.      Supporting Documentation ...................................................................................11

VI.     General Principles of Reasonable Underwriting Between 2002 and 2007 .......................11

        A.      The Purpose of Underwriting Guidelines ...............................................11

        B.      Sound Underwriting Involves Evaluation of the Three C's of Lending ...............14

                1.      Character .......................................................................................14

                2.      Capacity ........................................................................................15

                3.      Collateral .......................................................................................18

VII.    The Securitization Process ...................................................................................19

VIII.   Nomura's Representations in the Offering Documents .......................................20

        A.      Representations Regarding the Origination of Mortgage Loans in
                Accordance With Underwriting Guidelines ............................................21

                1.      Representations in the Prospectus Supplements Regarding the
                        Origination of Mortgage Loans in Accordance With Underwriting
                        Guidelines .....................................................................................21

                2.      Representations in the Originators' Underwriting Guidelines
                        Regarding the Origination of Mortgage Loans in Accordance With
                        Underwriting Guidelines ...............................................................22

        B.      Representations Regarding Exceptions to Underwriting Guidelines ...................23

                1.      Representations in the Prospectus Supplements Regarding
                        Exceptions to Underwriting Guidelines ........................................23

                2.      Representations in the Originators' Underwriting Guidelines
                        Regarding Exceptions to Guidelines ..............................................24

        C.      Representations Regarding the Use of Automated Underwriting Systems ..........26

                1.      Representations in the Originators' Underwriting Guidelines
                        Regarding the Use of Automated Underwriting Systems ..........................27

        D.      Representations Regarding Evaluation of the Borrower's Ability and
                Willingness to Repay the Mortgage Loan ...............................................28

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

1. Representations in the Prospectus Supplements Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan ................................................................28

2. Representations in the Originators' Underwriting Guidelines Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan ......................................................29

3. Minimum Industry Standards Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan ..........34

E. Representations Regarding Evaluation of the Adequacy of the Underlying Mortgage Collateral ................................................................36

1. Representations in the Prospectus Supplements Regarding Evaluation of the Adequacy of the Underlying Mortgage Collateral ........36

2. Representations in the Originators' Underwriting Guidelines Regarding Evaluation of the Adequacy of the Underlying Mortgage Collateral ................................................................37

3. Minimum Industry Standards Regarding the Evaluation of the Adequacy of the Underlying Mortgage Collateral....................................41

F. Representations Regarding Credit Information ....................................................43

1. Representations in the Prospectus Supplements Regarding Credit Information ................................................................43

2. Representations in the Originator's Underwriting Guidelines Regarding Credit Information ................................................................44

3. Minimum Industry Standards Regarding Credit Information....................49

G. Representations Regarding Income and Employment Verification Under Full and Reduced Documentation Programs ....................................................52

1. Representations in the Prospectus Supplements Regarding Income and Employment Verification Under Full and Reduced Documentation Programs ................................................................52

2. Representations in the Originators' Underwriting Guidelines Regarding Income and Employment Verification Under Full and Reduced Documentation Programs ................................................................53

3. Minimum Industry Standards Regarding Income and Employment Verification Under Full and Reduced Documentation Programs .............56

H. Representations Regarding Reasonableness of Income and Employment Verification Under Stated Income Documentation Programs ..............................58

1. Representations in the Prospectus Supplements Regarding Reasonableness of Income and Employment Verification Under Stated Income Documentation Programs ................................................59

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

2.    Representations in the Originators' Underwriting Guidelines Regarding Reasonableness of Income and Employment Verification Under Stated Income Documentation Programs ..................60

3.    Minimum Industry Standards Regarding Reasonableness of Income and Employment Verification Under Stated Income Documentation Programs.........................................................62

I.    Representations Regarding Credit Scores, LTV/CLTV Ratios, and DTI Ratios ......................................................................................66

1.    Representations in the Prospectus Supplements Regarding Credit Scores, LTV/CLTV Ratios, and DTI Ratios..............................69

2.    Representations in the Originators' Underwriting Guidelines Regarding Credit Scores, LTV/CLTV Ratios, and DTI Ratios ...............71

3.    Minimum Industry Standards Regarding Credit Scores, LTV/CLTV Ratios, and DTI Ratios ..............................................73

J.    Representations Regarding Owner Occupancy ......................................75

1.    Representations in the Prospectus Supplements Regarding Owner Occupancy...........................................................................76

2.    Representations in the Originators' Underwriting Guidelines Regarding Owner Occupancy .........................................................77

3.    Minimum Industry Standards Regarding Owner Occupancy...................79

K.    Representations Regarding Hazard and Title Insurance .......................80

1.    Representations in the Prospectus Supplements Regarding Hazard and Title Insurance...............................................................80

2.    Representations in the Originators' Underwriting Guidelines Regarding Hazard and Title Insurance ...........................................81

3.    Minimum Industry Standards Regarding Hazard and Title Insurance ................................................................................82

L.    Representations Regarding the Mortgage Loans' Compliance With Laws...........83

1.    Representations in the Prospectus Supplements Regarding the Mortgage Loans' Compliance With Laws....................................83

2.    Representations in the Originators' Underwriting Guidelines Regarding the Mortgage Loans' Compliance With Laws .......................83

3.    Minimum Industry Standards Regarding the Mortgage Loans' Compliance With Laws...........................................................85

IX.    My Use of Minimum Industry Standards ...................................................86

X.    The Re-Underwriting Review of a Random Sample of Mortgage Loans from Each Securitization ................................................................................89

A.    The Selection of Mortgage Loan Files for Re-Underwriting................................89

1.    Source of the Mortgage Loan Files.............................................89

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

2.    Sample Methodology ........................................................................90

3.    Identification of Mortgage Loan Files ......................................90

4.    Selecting Applicable Underwriting Guidelines for the Mortgage Loans ..................................................................................................91

B.    The Process of Re-Underwriting the Mortgage Loans ........................93

    1.    The Role of Digital Risk, LLC and Opus Capital Markets Consultants, LLC ...............................................................................93

    2.    The Re-Underwriting Review ........................................................95

XI.    My Opinions Regarding the Mortgage Loans ...............................................102

A.    Many of the Mortgage Loans Did Not Comply With the Originators' Underwriting Guidelines or the Minimum Industry Standards ..................102

B.    The Originators Failed to Investigate Red Flags in Certain Mortgage Loans .............................................................................................................104

C.    Certain Mortgage Loans Did Not Contain Required Credit Information ...........106

D.    Certain Mortgage Loans Did Not Contain Explanations for Recent Credit Inquiries ........................................................................................................107

E.    The Originators Failed to Assess Income Reasonableness for Certain Stated Income Loans ....................................................................................109

F.    Certain Mortgage Loans Failed to Comply with Credit Requirements ..............111

    1.    Certain Mortgage Loans Exceeded LTV or CLTV Ratio Limits ...........111

    2.    Certain Mortgage Loans Exceeded DTI Ratio Limits ...........................113

G.    The Prospectus Supplement Collateral Tables Overstated the Owner-Occupancy Status of the Underlying Mortgage Loans ......................................115

H.    Information Contained On The Pre-Closing Loan Tapes Did Not Match the Credit Characteristics of Many of the Mortgage Loans................................116

XII.    Conclusion ..........................................................................................................118

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

## I.     Introduction

I have been retained by Quinn, Emanuel, Urquhart & Sullivan LLP, counsel for Plaintiff

Federal Housing Finance Agency ("FHFA"), as Conservator of the Federal National Mortgage

Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac,"

and together with Fannie Mae, the "GSEs"), to provide an expert opinion on whether samples of

loans from each of the seven Supporting Loan Groups ("SLG")[1] from the seven securitizations at

issue in this Action (the "Securitizations")[2] complied with statements relating to the underwriting

and credit quality of such loans in the Offering Documents[3] for each Securitization.  I have

examined the sample loans from each SLG to determine whether the loans (i) were originated or

acquired in accordance with the originators' underwriting guidelines or with underwriting

guidelines approved by the originators; (ii) were properly evaluated to determine whether they

were likely to be repaid, either pursuant to the appropriate underwriting guidelines or minimum

industry standards; (iii) had a qualified appraisal performed to assess the adequacy of the

collateral; (iv) were supported by a property with sufficient value to adequately support the

mortgage loan obligation; (v) were, if applicable, excepted from the originator's underwriting

guidelines only when supported by sufficient compensating factors that were properly

documented; and (v) complied with the requirements of federal and state laws.  In addition, I was

asked to opine on whether, based on the sample mortgage loans I reviewed, the data contained in

the collateral tables found in the Offering Documents and the pre-closing loan tapes were

---

[1]    A Supporting Loan Group is a subdivision of the mortgage loans included in a
Securitization.  Each SLG backs one or more Certificates.  Each Certificate entitles its holder to a
specified portion of the cash flows from the underlying mortgages in the SLG.

[2]    A list of the Securitizations at issue is attached as Exhibit 1.

[3]    "Offering Documents" refers to the Prospectus and Prospectus Supplement filed as
part of a Shelf Registration Statement with the Securities and Exchange Commission for each
Securitization.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

accurate.  Where departures from the representations asserted in the Offering Documents were identified, I conducted an analysis to determine the impact that each had on the represented credit risk of the mortgage loan.  I then determined whether the loan's credit risk was higher than represented in the Offering Documents.

## II.    Summary of Opinions

In reaching the opinions contained in this report, I directly supervised the re-underwriting of a random sample of 723 mortgage loans, which included approximately 100 mortgage loans from each of the seven SLGs related to the seven Securitizations (the "Mortgage Loans").[4]

As I describe in greater detail in Section XI below, it is my expert opinion that:

1.    78.28% of the Mortgage Loans in the Securitizations were not originated in accordance with the requirements of the relevant originator's underwriting guidelines.

2.    90.46% of the Mortgage Loans in the Securitizations were not properly evaluated to determine if they were at risk of not being repaid or not adequately supported by the collateral.

3.    24.62% of the Mortgage Loans in the Securitizations had a loan-to-value ("LTV") ratio and/or combined loan-to-value ("CLTV") ratio that was not accurately disclosed.

4.    18.69% of the Mortgage Loans in the Securitizations had mortgaged properties that were inaccurately disclosed as being owner-occupied.

5.    56.98% of the Mortgage Loans in the Securitizations had characteristics, such as FICO scores, LTV and CLTV ratios, owner-occupancy status, property types, or loan amounts, that were inconsistent with the pre-closing loan tapes.

---

[4]    As described in further detail in Section X, Dr. Cowan selected a random sample of 100 mortgage loans per SLG to re-underwrite.  It is my understanding that, for the NAA 2006-AR6 Securitization, an insufficient number of loan files were produced for the initially identified sample loans.  For that Securitization, Dr. Cowan drew an additional random sample, resulting in a total of 196 sample loans, of which 131 could be re-underwritten.  Among the remaining Securitizations, there were an additional eight sample loans that could not be re-underwritten.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

The chart below reflects the number and percentage of Mortgage Loans in each of the seven Securitizations that suffered from underwriting defects and, as a result, had a substantially increased credit risk.[5]

| Securitization | Number of Mortgage Loans Reviewed | Number of Mortgage Loans With Substantially Increased Credit Risk | Percentage of Mortgage Loans With Substantially Increased Credit Risk |
|---|---|---|---|
| NAA 2005-AR6 | 131 | 102 | 77.86% |
| NHELI 2006-FM1 | 100 | 81 | 81.00% |
| NHELI 2006-FM2 | 100 | 85 | 85.00% |
| NHELI 2006-HE3 | 99 | 75 | 75.76% |
| NHELI 2007-1 | 98 | 79 | 80.61% |
| NHELI 2007-2 | 98 | 77 | 78.57% |
| NHELI 2007-3 | 97 | 72 | 74.23% |
| **Total** | **723** | **571** | **78.98%** |

A spreadsheet summarizing the data underlying my review of the Mortgage Loans is included as Exhibit 2, and the supporting documentation for each identified defect is contained on the FTP site accompanying my Report and labeled as Exhibit 3. My opinions are based on my review of the re-underwriting results, documents, information, and testimony provided to me, and my more than 40 years of experience in the banking and mortgage industry. I reserve the right to amend, supplement, and/or revise my opinions should new and material information become available to me.

III.    **Qualifications**

A.      **Overview**

I have more than 40 years of experience in the financial services industry, primarily in banking and mortgage lending. I have worked in every phase of mortgage lending: loan processing, loan underwriting, servicing, secondary marketing, and investment management. I

---

[5] It is *not* my opinion that the remaining Mortgage Loans were properly underwritten or should have been included in the Securitizations.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

have underwritten all types of mortgage credits, including residential, multi-family, and commercial real estate. I have managed and traded investment portfolios containing private label and government-sponsored entity securities composed of subordinate loans, non-performing loans, and prime quality residential loans.

I have been a consultant on numerous projects, including helping to set up the risk management function for a new bank. I have also performed credit due diligence on several acquisitions and investment transactions, reviewed loan originations to identify possible origination fraud, analyzed securities investment portfolios for a government-sponsored insurance company, and served as the acting chief credit officer for a large savings and loan association. I have been a frequent speaker on mortgage industry panels. I have received the Mortgage Bankers Association's professional designation of Master Certified Mortgage Banker (CMB®), reflecting competency in all issues relating to both commercial and residential real estate finance.

A copy of my *curriculum vitae*, which is not intended to be an exhaustive representation of my professional and educational experience, is attached as Exhibit 4. The summary below supplements my *curriculum vitae* to provide more details regarding my experience with mortgage lending.

B.      **Mortgage Lending Experience**

I have been actively engaged in residential mortgage lending and related work since 1972. The experience I have gained in mortgage lending includes my work for various financial institutions, including Freedom Federal Savings and Loan Association (1972-1982), Northeast Savings, F.A. (1982-1990), First Commonwealth Savings (1991-1994), Crestar Bank (1994-1998), SunTrust Bank (1999-2000), and Treasury Bank/Countrywide Bank (2001-2005). I have

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

also worked at Amherst Securities/Amherst Holdings as a credit analyst, where I was primarily responsible for residential mortgage market and housing analysis.

From 1972 to 1982, I worked for Freedom Federal Savings and Loan Association (Worcester, MA), then the largest savings and loan association ("S&L") in New England. At Freedom Federal, I worked primarily in mortgage lending, serving as the bank's senior residential loan underwriter and holding ultimate approval authority on all residential loans. My job responsibilities included loan origination, underwriting, and loan servicing. I also managed the direct servicing activities for the bank's multi-family loan portfolio, which was composed of primarily HUD-insured properties. In 1976, I started the bank's secondary marketing activity, including obtaining all necessary approvals from Freddie Mac, Fannie Mae, and the Government National Mortgage Association ("Ginnie Mae"). I originated, issued, and sold one of the first Ginnie Mae multi-family securities issued by a New England lender. In 1980, I initiated the bank's loan sales to Fannie Mae, which resulted in the bank becoming the third largest seller in the Northeast to Fannie Mae.

In 1982, Freedom Federal merged with Northeast Savings, F.A. (Hartford, CT), one of the top 10 largest S&Ls in the country. From 1982 to late 1983, I managed the bank's secondary market activities. In late 1983, I relocated to Hartford, Connecticut to serve as the bank's senior mortgage investment manager, responsible for managing the bank's residential mortgage portfolio. In this role, I was responsible for buying, selling, and trading all types of mortgage related investments, including mortgage loans, GSE-issued residential mortgage backed securities ("RMBS"), and private label RMBS. I also directed the in-house team that reviewed loan purchases and negotiated the bank's relationship with large mortgage banking companies, including setting up a loan commitment program to buy residential adjustable rate mortgage

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

loans ("ARMs") from nationwide conduits.  In the course of overseeing Northeast Savings' loan commitment program, I created the bank's loan quality standards, as well as pricing and product guidelines.  Northeast Savings' participation in the loan commitment program generated more than $400 million in loans over a two and one-half year period.  Northeast Savings was one of the largest purchasers of ARM loans and MBS securities for its own portfolio in the country.  In October 1988, I assumed the additional responsibility for managing the bank's wholesale liability activities along with the mortgage investments, managing a group of four liability traders that priced and managed the bank's $3 billion wholesale liability transactions (*e.g.*, wholesale CDs, FHLB advances, and reverse repos).

I left Northeast Savings in May 1990 and, in September 1991, joined Shannon Hunter Advisors, a wholly owned subsidiary of First Commonwealth Bank (Alexandria, VA).  At Shannon Hunter, I was responsible for the analysis, pricing, and trading of loan portfolios acquired from the Resolution Trust Corporation ("RTC") or third party asset sales.  These portfolios were acquired for the parent company's balance sheet and also for trading in the secondary market.  My responsibilities included analyzing and trading portfolios of residential loans and commercial real estate.  I was also responsible for mitigating losses on under-performing or non-performing assets.

In June 1994, I joined Crestar Bank (Richmond, VA) as the senior mortgage portfolio manager, responsible for managing the MBS/ABS, RMBS, and residential loan portfolio.  In managing the portfolio, I negotiated the bank's purchase and sale of all mortgage related assets, including sales of portfolios of loans acquired through multiple bank acquisitions.  I also served as the portfolio liaison to the Credit Review group on bank acquisitions, responsible for reviewing the portfolio credit quality and establishing the bank's acquisition price and loan loss

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

reserve analysis.  I developed a credit quality program to analyze and quantify the risk

characteristics of loan acquisitions and sales.  I also initiated the bank's entry into residential

asset backed security ("ABS") investing, working with our credit managers to set up investment

and portfolio characteristics.  And, in 1997, I assumed the role of President and Chief Investment

Officer of CRE, Crestar's real estate investment trust company that was formed to hold

residential mortgage loans.

Crestar merged with SunTrust Bank (Atlanta, GA) in January 1999.  I remained with the

Richmond operations until October 2000, throughout which time I was responsible for managing

the Crestar residential loan portfolio activities.

In March 2001, I joined Treasury Bank, NA, a subsidiary of Countrywide Industries,

which subsequently changed its name to Countrywide Financial Corporation ("CFC").  Although

Treasury Bank was an affiliate of Countrywide Mortgage, its activities were separate.  Treasury

Bank was supervised by the Office of the Comptroller of the Currency ("OCC"), and I

understand that the activities between Treasury Bank and Countrywide Mortgage were subject to

specific restrictions and approval under Sections 23A and 23B of the Federal Reserve Act.

Treasury Bank did not securitize residential mortgage loans, but rather originated loans for its

own portfolio.  To the best of my knowledge, information, and belief, while I was employed at

Treasury Bank, the loans that I managed were not securitized or sold.

At Treasury Bank, I served as Chief Credit Officer ("CCO") responsible for managing

the company's mortgage credit risk, including all portfolio reporting, credit quality management,

loan servicing oversight, and vendor management.  As CCO, I set up and managed the bank's

loan loss reserve methodology, which was based on expected losses by loan type, credit profile

(*e.g.*, FICO, LTV, etc.), seasoning, and origination channel.  I was also a voting member of the

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

Bank Loan Committee and the chairperson of the Loan Committee's Credit Quality Oversight sub-committee.

As part of my responsibilities, I set up and managed Treasury Bank's Credit Quality Group, which reviewed all loan originations for compliance with bank credit requirements. The Credit Quality Group conducted monthly reviews of a random and adverse sample of all loan acquisitions and reviewed loans for credit and regulatory compliance. When necessary, the Credit Quality Group also tried to remediate non-performing loans with the sellers or arrange for the repurchase of those loans. The Credit Quality Group also developed a series of weekly and monthly status reports to inform bank management of its credit findings and remediation efforts.

In July 2005, I left Treasury Bank and engaged in consulting work, which is described more fully below, for almost three years.

In 2008, I joined Amherst Holdings ("Amherst"), the holding company for Amherst Securities, a regional broker dealer that specializes in mortgage related investments. At Amherst, I specialized in mortgage and credit related projects, working with proprietary credit analytics. I wrote and edited the company's monthly ABX Index Review and assisted the senior Mortgage Strategist on several projects and articles that were published. I also worked on Amherst's preliminary reviews and analyses of breaches of representations and warranties relating to mortgage loans backing RMBS. During the time period I was at Amherst, I was a frequent speaker and panelist at mortgage industry seminars, including the National Home Builder's Roundtable and the Five Star Default Servicing Conference. I left Amherst in July 2012 because they closed the Washington D.C. area office where I worked, and I did not wish to relocate.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### C.      Consulting and Litigation Experience

I have five years of experience as a consultant to institutions in the banking and mortgage industry, working for myself or as part of a team for larger projects.  In 2005, after I left Treasury Bank, I provided consulting services to a Washington D.C.-based community development bank, City First Bank.  I helped the bank revise its commercial loan processing, credit monitoring systems, and appraisal review process.  I also worked for the same institution again in 2007-2008 to revise its credit and loan loss reserve methodology to comply with new commercial real estate loan guidance from the OCC.

In 2006, I served as the acting Chief Credit Officer for a $50 billion thrift institution, helping the bank set up a revised portfolio review process and reviewing new products and loan loss models.

Beginning in 2006 and into 2007, I worked with DirecTex Holdings, a Texas-based group that was applying to the Office of Thrift Supervision ("OTS") for approval to transfer the charter of a bank to a new group.  I was the designated Chief Risk Manager, responsible for setting up the bank risk management infrastructure.  In this role I was responsible for writing potential loan policies and assisting in the development of underwriting systems.  I also assisted the Chief Executive Officer in arranging possible capital funding and in reviewing potential loan origination sources.

In 2007, I worked with Hilltop Advisors on several loan review projects.  These loan reviews included analyzing credit reserves and loss methodologies in connection with a potential equity investment in a bank, and the review of a mortgage origination platform for possible loan fraud and potential loan repurchase risk.  Since 2012, after I left Amherst, I have again provided consulting services to Hilltop on several projects.  These projects included analyzing and pricing

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

a portfolio of distressed residential loans for a bank client, managing a review of a large mortgage company's quality control and underwriting processes, performing due diligence on a potential acquisition of a mortgage servicing company, and working on several review audits of a mortgage company's policies and procedures for pending lawsuits.

I began working with Payne Advisory and Richard W. Payne III in January 2013 on litigation-related matters, including the FHFA coordinated actions. I have also been engaged as an expert witness by RMBS investors in several other lawsuits involving potential breaches of mortgage representations and warranties.

I have been a frequent speaker on mortgage industry panels, most recently in July 2012 on the panel for Loss Mitigation programs at the Mortgage Servicing Conference in Dallas, TX. I have been a Member of the CMB® Oral Interview panels and an instructor on the CMB® Review program.

I have a M.B.A. in finance from Clark University and a B.A. in political science from Assumption College. I graduated from the MBA School of Mortgage Banking. I have been awarded the professional Mortgage Banking designation of Master Certified Mortgage Banker (CMB®).

## IV.     Compensation

I am being compensated for my work on this engagement at a rate of $350 per hour for review and research-related tasks, $400 per hour for report writing, and $450 per hour for time related to deposition or court testimony.[6] My fees are not contingent upon the opinions I render or the outcome of this case.

---

[6]   I am not compensated for non-working travel time, but I am reimbursed at cost for any out-of-pocket expenses.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

## V.        Supporting Documentation

For my work on this engagement, I have been provided access to the following information:  (1) certain publicly available documents; (2) certain documents produced by FHFA in this action; (3) certain documents produced by Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., and Nomura Securities International, Inc. (together, "Nomura"); (4) certain documents produced by defendants in the other related actions pending in the Southern District of New York (together with Nomura, the "Defendants"); (5) deposition transcripts of certain Nomura witnesses; (6) certain information relating to the Mortgage Loans that were reviewed as part of the re-underwriting review, including loan files and underwriting guidelines; and (7) certain appraisal related information from Dr. John Kilpatrick.

The documents that I have considered and relied on in formulating my opinions regarding the Mortgage Loans are listed in Exhibits 5 and 5A.

## VI.       General Principles of Reasonable Underwriting Between 2002 and 2007

### A.        The Purpose of Underwriting Guidelines

In any type of lending, the risk of non-payment, *i.e.*, the possibility that a borrower will fail to perform as agreed, is managed by a lender's risk management practices.  The first line of defense against excessive credit risk is sound underwriting—the initial process by which a lender grants credit to a borrower.  For example, sound underwriting practices requires identification of those borrowers whose financial performance is poor or marginal, or whose repayment ability is dependent upon unproven projections, because these borrowers' abilities to fulfill their mortgage

11

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

loan obligations can quickly become impaired by personal and external economic stress.[7] Essential to the execution of prudent underwriting practices is an efficient and balanced mortgage application approval process implemented by a competent lending staff.

An underwriting policy is the primary means by which a lending institution sets its lending standards. The underwriting policy provides a framework to evaluate asset quality, set risk tolerances, and guide lending activities. An underwriting policy must be supplemented by more detailed underwriting standards, guidelines, and procedures.[8]

Underwriting guidelines provide a methodology for a lender to make a prudent lending determination. A lender's adherence to underwriting guidelines is essential for numerous reasons. First, underwriting guidelines provide a consistent and reliable framework to evaluate the credit risk presented by a loan. Second, adherence to the governing underwriting guidelines leads to uniform loan underwriting determinations. Third, adherence to underwriting guidelines ensures compliance with regulatory and legal requirements. Fourth, because adherence to underwriting guidelines provides a reliable basis to assess the credit risk of a loan, a lender who underwrites a loan in conformance with the governing underwriting guidelines creates an asset with ascertainable quality and value. Lastly, underwriting loans in conformance with underwriting guidelines enables the lender to obtain accurate and reliable information concerning the credit risk of those loans.

Underwriting guidelines sometimes allow for exceptions to be made when compensating factors sufficiently offset the increased credit risk presented by non-compliant loans. For example, a borrower maintaining a credit score below a lender's established minimum for a

---

[7]   *See* OCC Comptroller Handbook, Loan Portfolio Management (1998), http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/lpm.pdf.

[8]   References to underwriting policy will include loan policy statements and all supplements.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

particular loan program may otherwise qualify for a mortgage loan if that borrower had a sufficiently high income or if he placed a sufficient amount of equity in the home to offset the increased credit risk presented by his low credit score.

An underwriting policy should address exceptions specifically. The policy should state under what circumstances exceptions are acceptable and how exceptions should be identified and documented. Policy exceptions should require heightened reporting. Policy exceptions need to be tracked and documented, especially in a portfolio. Individual policy exceptions may not appear to increase risk significantly, however, when aggregated within a portfolio or pool, even well mitigated exceptions can increase pool risk significantly. An excessive volume or pattern of exceptions may signal an unjustified relaxation of the underwriting policy.

Nomura's witnesses acknowledged these fundamental principles of mortgage loan underwriting. For example, Joseph Kohout, the head of Nomura's credit and due diligence group, testified that "[u]nderwriting guidelines are a . . . manifesto of how loans should both be purchased and closed along with eligibility requirements for the purchase of loans."[9] Brett Marvin, a Managing Director at Nomura, testified that, while individual loans might have compensating factors, "as a general matter, it's important for the originator to underwrite its loans in conformance with its guidelines," *i.e.*, that there be "adherence to underwriting guidelines."[10]

As to exception loans and the presence of compensating factors, Dante Larocca, a Managing Director at Nomura, testified that "[a] compensating factor would be . . . anything that

---

[9]   Deposition of Joseph Kohout, dated Nov. 22, 2013 and Dec. 6, 2013 ("Kohout Dep."), at 28:11-19; *see also* Deposition of Neil Spagna, dated Nov. 13, 2013 ("Spagna Dep."), at 23:12-15. ("Guidelines are a framework for, you know, how a mortgage originator will approve the loans. That simple.").

[10]   Deposition of Brett Marvin, dated Nov. 19, 2013 ("Marvin Dep."), at 212:15-213:12.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

the underwriter in the origination of the loan or our diligence guys thought offset the exception that was taken to guidelines or the . . . fact that was raising the red flag."[11]  Similarly, Jeffrey Hartnagel, a Nomura due diligence manager, testified that compensating factors needed to be "significant" and have "weight," *i.e.*, they "could not be a minor occurrence or a minor issue."[12] Therefore, any exceptions to the guidelines still had to conform to prudent lending standards that, at a minimum, required loan characteristics establishing a borrower's ability to repay the loan.

### B.    Sound Underwriting Involves Evaluation of the Three C's of Lending

Sound underwriting practices necessitate the consideration of the borrower's "character," "capacity," and "collateral," which are commonly referred to as the Three C's of Lending.[13] Consideration of the Three C's enables a lender or investor to evaluate the risk that the loan will not perform and the severity of loss in the case of default.

### 1.    Character

In the context of underwriting a mortgage loan, "character" is a term of art that refers to the borrower's willingness to make his mortgage payments on time.  A borrower's credit score (often called a Fair, Isaac & Company, or FICO, score) and credit history are accepted in the mortgage industry as indicia of the borrower's willingness to fulfill his or her mortgage loan obligation and are the primary bases upon which character is assessed.  Lenders obtain

---

[11]  Deposition of Dante Larocca, dated Oct. 17, 2013 ("Larocca Dep."), at 83:15-84:2.

[12]  Deposition of Jeffrey Hartnagel, dated Nov. 25, 2013 and Dec. 2, 2013 ("Hartnagel Dep."), at 482:15-483:9.

[13]  Some in the industry break out the concepts of "Capital" and "Conditions" as two additional categories, together comprising the "Five Cs" of Lending.  I consider those two categories to be subsumed in the Three Cs of Lending.  "Capital" refers to the sufficiency of a borrower's assets.  "Conditions" are essentially "red flags" in the loan file that call into question the borrower's ability or willingness to repay the loan or the value of the subject property.  If a red flag is identified, the underwriter should investigate it and determine whether it materially increases the credit risk of the loan, as well as obtain a written explanation from the borrower or other source documenting that the condition does not materially increase the loan's risk.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

information about a borrower's credit score and credit history by acquiring a credit report for the borrower. A credit report contains a large amount of information about a borrower, including current and past residential street addresses, date of birth, social security number, discharged and open bankruptcies, judgments, liens, and credit history. The credit history is reflected in a series of reports from creditors, such as banks, mortgage companies, and credit card companies. Each report—referred to as a "trade line"—includes the date on which the credit relationship commenced, the account number, the credit limit granted, the greatest amount of credit the borrower has used on the account, the current balance, the current monthly payment, the borrower's payment history, current payment status, the number of late payments (if any), and the severity of any late payments. In addition to evaluating the borrower's willingness to pay based on past debt service, these details in the credit report allow the underwriter to test the accuracy of the information contained in the borrower's loan application.

In addition to meeting required minimum credit scores, information contained within a credit report may be needed to determine whether a borrower qualifies for a loan. For example, a lender's underwriting guidelines may require that a borrower's credit report contain at least three trade lines, or it must not show any mortgage payments that were late by more than 30 days within the previous two years. Lenders often incorporated requirements such as these into their underwriting guidelines to avoid the heightened credit risk presented by a borrower whose credit history indicated an unwillingness to fulfill his or her mortgage obligations.

### 2. Capacity

"Capacity" refers to the borrower's ability to repay the mortgage loan. A lender must inquire into the borrower's capacity because the borrower's ability to repay the mortgage loan is the lender's primary source of repayment. A borrower's income, employment, assets, and debt-

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

to-income ("DTI") ratio, as well as any payment shock[14] embedded within the repayment schedule, are the primary data points for evaluating a borrower's ability to repay. This inquiry into a borrower's capacity should include an assessment of the borrower's continuing ability to repay the loan over the entire length of the loan since mortgage loans are long-term commitments.

A component of capacity is "capital." From a credit perspective, capital refers to the sufficiency of the borrower's funds to pay the down payment and closing costs, and to funds held in reserve for future mortgage payments. A down payment is the borrower's initial cash contribution to the cost of the property, which is often referred to as the borrower's "equity." Closing costs are the costs and fees imposed upon a borrower at the time of loan origination, such as the appraisal fee, the cost of obtaining the credit report, and the cost of a title insurance policy. Reserve funds are intended to ensure that the borrower has a sufficient cushion to continue making scheduled payments on the mortgage loan, including principal, interest, taxes and insurance ("PITI") payments, in the event that the borrower encounters unplanned financial difficulties, such as loss of employment or illness.

The method by which a prudent underwriter will conduct a capacity analysis depends on the documentation type of the loan. A "full documentation" or "full doc" loan requires the borrower to substantiate his or her income with documentation, such as W-2 forms, income tax returns, and/or pay stubs. Such documentation allows the underwriter to verify the borrower's income and evaluate the likelihood of future employment. Other pieces of information on the loan application—including the length of time that the borrower has worked for his or her current employer or in his or her current field or industry—further allows the underwriter to

---

[14] "Payment shock" refers to a substantial increase in the borrower's housing payments.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

evaluate the likelihood that the borrower will remain employed for a sufficient length of time to repay the mortgage loan.

Sound underwriting requires verification of the borrower's assets in addition to verification of income. Thus, a full doc loan normally requires the borrower to provide documentation of assets, such as bank account statements. A borrower's accumulation of assets should correlate with the borrower's income. When verifying the borrower's assets, the underwriter should ensure that the borrower has sufficient cash to pay the loan closing fees and the down payment from the borrower's own funds. Additionally, lenders usually require the borrower to fund a reserve account or escrow, which will fund tax and insurance payments for three to six months after the loan is originated.

A lender may also offer loans to qualified borrowers who are unable or not required to provide the documentation required under a full documentation loan program—for instance, to self-employed borrowers. For reduced documentation loan programs, the underwriter should use other sources of information to verify the borrower's income. For example, if the program is for stated income loans, the underwriter should assess the reasonableness of the borrower's stated income. If a self-employed borrower submits his or her tax returns and a letter from an accountant confirming the length of the borrower's employment in his current line of business, the underwriter should confirm that the author is, in fact, an accountant, and should independently verify that the borrower's company is still in business. In addition, third-party sources such as Salary.com, PayScale.com, Theworkplace.com, and the Bureau of Labor Statistics ("BLS") provide a means for testing the reasonableness of a borrower's stated income by providing a salary range based on occupation, job title, time on the job, the number of years of the individual's employment, and/or the borrower's geographic location. Sound underwriting

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

requires that the loan underwriter determine whether the borrower's income is reasonable in

order to assess adequately the borrower's ability to repay the loan.

An analysis of capacity should also take into consideration whether the loan is a fixed

rate mortgage ("FRM") or an adjustable rate mortgage ("ARM").  The interest rate on an ARM

loan resets periodically and can increase from the rate at the time of origination.  Accordingly,

the underwriter should take into account, and factor into the risk evaluation, whether a borrower

will have the continued ability to make payments on the mortgage loan once the rate is reset.

### 3.  Collateral

In assessing the risk of a loan, an analysis should be undertaken to determine whether the

value of the mortgaged property is sufficient to support repayment of the loan if the borrower

defaults.  "Collateral" refers to the value of the underlying asset pledged by the borrower as

security for the debt obligation—here, the mortgaged property.  The primary tool for determining

a subject property's market value is through an appraisal of the property.  Because the value of

the subject property represents an alternative source of repayment of the mortgage loan, the

underwriter must be satisfied that the appraisal accurately reflects the amount of money that

could be obtained if the property were sold in a foreclosure proceeding.  The accuracy of the

valuation becomes especially important for a second mortgage, where the lender will take the

second lien position and will therefore only recover residual proceeds after the holder of the first

lien position is reimbursed.  An overstated appraisal increases the likelihood that the liquidated

collateral value will be insufficient to cover the first and any second mortgage on the subject

property, and therefore increases the credit risk of the mortgage loan.

Therefore, an underwriter must carefully assess the validity of the appraisal.  First, the

underwriter should verify that the appraiser is qualified to provide estimates of the property's

market value.  At a minimum, the appraiser should be licensed in the state where he or she works

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

and should have experience in appraising the type of property at issue. Second, the underwriter should review the appraisal report to ensure that it reflects details and characteristics about the property and local market that support the appraised value. Among other things, the appraisal report should include sufficient information about properties recently sold in the same geographic area (*i.e.*, "comparables," or "comps"). The comps should be similar to the subject property with respect to the characteristics that drive value—for instance, gross living area, number of bathrooms, physical design, and construction quality. After comparison with the subject property, the appropriate positive and negative adjustments should be made to the comparable sales as part of the process to determine the appropriate market value of the subject property.

## VII.    The Securitization Process

Based on my review of the documents, I understand that Nomura was the sponsor for all seven of the Securitizations. As sponsor, Nomura, operating as Nomura Credit & Capital, Inc. ("Nomura Credit"), originated or purchased the underlying mortgage loans, pooled the loans together, participated in structuring the securities, and assigned the mortgage loans to special purpose vehicles, called depositors. In this case, the depositors were subsidiaries of Nomura: Nomura Asset Acceptance Corporation ("NAA") and Nomura Home Equity Loan, Inc. ("NHELI"). The depositors then assigned the mortgage loans and certain associated rights to securitization trusts, which issued the Certificates that investors, including Fannie Mae and Freddie Mac, purchased. The loans in the Securitizations consist of Alt-A, subprime and pay option ARM residential mortgage loans acquired by Nomura Credit between 2004 and 2007.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

## VIII.   Nomura's Representations in the Offering Documents

Each Securitization was issued pursuant to Offering Documents filed with the Securities and Exchange Commission.  The Offering Documents contained various representations attesting to the credit quality of the mortgage loans underlying the Securitizations, certain of which I focus on in more detail below.  As part of this discussion, I describe representations explicitly contained in the Offering Documents, as well as statements contained in the originators' underwriting guidelines.  I have included underwriting guideline representations in this narrative because the Offering Documents explicitly represented that the originators complied with all provisions of their underwriting guidelines.  Thus, these underwriting guidelines were incorporated by reference into the Offering Documents.[15]  For purposes of this narrative overview, I have focused on the underwriting guidelines from nine of the originators that were specifically named and discussed in the Offering Documents (the "Originators").[16]  Together, these Originators originated or acquired more than 82% of all loans in the SLGs.

In addition, I have noted throughout this section minimum industry standards that were incorporated into the Offering Documents.  I have included these standards as part of this discussion because the Offering Documents for all of the Securitizations contained various representations that the originators had evaluated the borrower's ability to repay the mortgage

---

[15]   *See* Exhibit 6, Chart A.

[16]   The following nine Originators were specifically named and discussed in the Offering Documents:  Aegis Mortgage Corporation ("Aegis"), Alliance Mortgage Banking Corp. ("Alliance"), EquiFirst Corporation ("EquiFirst"), First NLC Financial Services, LLC ("First NLC"), Fremont Investment & Loan ("Fremont"), Ownit Mortgage Solutions, Inc. ("Ownit"), People's Choice Home Loan Inc. ("People's Choice"), ResMAE Mortgage Corp. ("ResMAE"), and Silver State Mortgage ("Silver State").  First National Bank of Nevada ("FNBN") is also named and discussed in the Offering Documents.  However, FNBN's loans make up a small percentage of the loans underlying the SLGs and its guidelines were not used in re-underwriting the Mortgage Loans.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

loans and the adequacy of the underlying mortgage collateral.[17]  Even if neither the Offering

Documents nor the guidelines further specified the steps that should be taken to underwrite the

mortgage loans, these representations conveyed that the originator deemed certain steps

necessary to the underwriting process.  To evaluate the borrower's ability to repay and the

adequacy of collateral, an originator must, at the very least, have followed the minimum

acceptable underwriting standards within the industry.  Throughout this report, I will refer to

these standards, which are implicit in the representations contained in the Offering Documents

and fundamental to the underwriting process, as "minimum industry standards."[18]

### A. Representations Regarding the Origination of Mortgage Loans in Accordance With Underwriting Guidelines

#### 1. Representations in the Prospectus Supplements Regarding the Origination of Mortgage Loans in Accordance With Underwriting Guidelines

Compliance with underwriting guidelines is critical to the success of the mortgage

lending and securitization processes.  The Prospectus Supplements for each of the Securitizations

contained statements attesting to the mortgage loans' conformity with the originators'

underwriting guidelines.[19]  Individually and collectively, these statements clearly represented

that the mortgage loans were issued only after they were underwritten against the originator's

guidelines.  For example, the Prospectus Supplement for NAA 2005-AR6 represented that the

mortgage loans "were originated generally in accordance with the underwriting criteria described

---

[17]   *See* Exhibit 6, Chart B.

[18]   I have assembled in Exhibit 7 the minimum industry standards for underwriting mortgage loans from 2002 to 2007.  In Section IX below, I discuss in further detail my use of minimum industry standards.

[19]   *See* Exhibit 6, Chart A.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

in this section."[20]  Other Prospectus Supplements contained similar statements that the mortgage

loans were originated generally in accordance or consistent with the originator's underwriting

guidelines or standards.[21]

> ## 2. Representations in the Originators' Underwriting Guidelines Regarding the Origination of Mortgage Loans in Accordance With Underwriting Guidelines

Originators' guidelines themselves stressed the importance of originating loans in

accordance with the guidelines.  The People's Choice guidelines, for example, stated:  "The

company's lending philosophy is to originate loans based on sound underwriting practices, risk

classification practices and adherence to underwriting guidelines."[22]  Fremont similarly

recognized that its "underwriting guidelines define Fremont's specific requirements for

underwriting the borrower's credit for mortgages."[23]  And ResMAE's guidelines simply stated:

"[l]oans must be in compliance with ResMAE guidelines."[24]  Other Originators' guidelines made

---

[20]   NAA 2005-AR6 Prospectus Supplement, NOM-FHFA_04811802, at 894.

[21]   *See, e.g.*, NHELI 2006-FM2 Prospectus Supplement, NOM-FHFA_04638315, at 399 ("All of the Mortgage Loans have been purchased by the sponsor from the Originator and were originated generally in accordance with the underwriting criteria described in this section."); NHELI 2007-1 Prospectus Supplement, NOM-FHFA_05141912, at 025 ("All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section.").

[22]   People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 333.

[23]   Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053227, at 232.

[24]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066653, at 653; *see also* ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 530, 534.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

similar representations.[25]  In sum, the guidelines made it clear that they were not merely

recommendations or advisory—they were meant to be followed.

### B.      Representations Regarding Exceptions to Underwriting Guidelines

Some mortgage loan originators allowed exceptions to be made to their underwriting

guidelines if there were compensating factors that offset the increased credit risk associated with

the loan.  In general, compensating factors should have been particularly strong borrower credit

characteristics that offset a weakness or shortcoming in the borrower's credit profile so that the

lender could originate a mortgage to the borrower based on a sound conclusion that the borrower

had the ability and willingness to repay the mortgage.

### 1.      Representations in the Prospectus Supplements Regarding Exceptions to Underwriting Guidelines

The Offering Documents for each Securitization represented that the originators'

underwriting guidelines permitted exceptions to be made (*i.e.*, a mortgage loan could be

approved that did not technically meet the guidelines' standards), *if* there were compensating or

mitigating factors determined by the underwriter to be sufficient to establish that the borrower

had the ability and willingness to repay the loan.[26]  For example, the NHELI 2006-FM1

Prospectus Supplement stated that an underwriting exception may be granted on a "case by case

basis" depending upon compensating factors such as "low loan-to-value ratio, low debt to

income ratio, substantial liquid assets, good credit history, stable employment and time in

---

[25]      *See, e.g.*, Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 110; Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 549.

[26]      *See* Exhibit 6, Chart C.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

residence at the applicant's current address."[27]  The other Prospectus Supplements contained either similar or nearly identical representations.[28]

### 2.   Representations in the Originators' Underwriting Guidelines Regarding Exceptions to Guidelines

The Originators' underwriting guidelines provided for instances where a loan that failed to satisfy the Originators' qualifying criteria could be approved, depending on compensating factor or factors found within the borrower's loan application.[29]  ResMAE's underwriting guidelines explained the concept:

> On a case-by-case basis, ResMAE may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the applicable Underwriting Guidelines warrants an underwriting exception.  In all instances the borrower must have acceptable credit and the ability to repay the loan on the agreed terms and conditions.[30]

ResMAE further explained that "[a] weakness in any one of the 3 Cs [credit, capacity, and collateral] is considered a risk factor and must be compensated by strengths in one or both of the remaining 2 Cs."[31]  Ownit's guidelines similarly stated that it "considers certain factors that strengthen the borrower profile" when a borrower "fall[s] between credit grades."[32]  And

---

[27]   NHELI 2006-FM1 Prospectus Supplement, NOM-FHFA_04729474, at 544-45.

[28]   *See, e.g.,* NHELI 2007-2 Prospectus Supplement, NOM-FHFA_05591325, at 415 ("In addition, certain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower."); NHELI 2006-FM2 Prospectus Supplement, NOM-FHFA_04638315, at 396,400; NHELI 2006-HE3 Prospectus Supplement, NOM-FHFA_04620885, at 966, 972; NHELI 2007-1 Prospectus Supplement, NOM-FHFA_05141912, at 2021, 2026.

[29]   *See, e.g.,* ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 531; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 227.

[30]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 531.

[31]   *Ibid.*, 537.

[32]   Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 320.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

People's Choice required the underwriter to "explain his/her motivation for the exception in writing and have approval from a senior authority."[33]

Some of the Originators' underwriting guidelines provided examples of possible compensating factors. For example, Ownit's guidelines included the following as possible compensating factors: residual/disposable income that was more than double the standard requirement, a LTV ratio that was more than 5% below the program maximum, a minimum of three months verified cash reserves, and a drop of 25% or more in the borrower's monthly housing payments.[34] Ownit provided a detailed description of its exception process, including a "weighting" of various potential compensating factors.[35] And several other Originators' underwriting guidelines included compensating factors such as the borrower's employment/income stability[36] and history of repaying mortgages without delinquencies.[37] Fremont's underwriting guidelines specifically noted that "a borrower's down payment, credit history, additional income, financial reserves, and pattern of savings" could compensate for lack of long-term employment history.[38]

Generally, Originators expressly required the underwriter to obtain approval for the exception from more senior personnel. For instance, Fremont required underwriters to "explain

---

[33]   People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 334.

[34]   Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 320.

[35]   *Ibid.*, 410-11.

[36]   *See, e.g.*, EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 154.

[37]   *See, e.g.*, ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 537-38.

[38]   Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 264.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

the basis for the exception in writing and have approval from a senior authority."[39]  Indeed,

Fremont's guidelines contained an entire chapter devoted to approval authority guidance for

exception loans.[40]

In all instances, compensating factors should be properly documented, along with any

relevant approvals, in the loan file.  For instance, EquiFirst's guidelines stated:  "Appropriate

documentation and file notes are required to support the compensating factor(s)."[41]  Alliance's

underwriting guidelines allowed that it "may consider" purchasing loans that did not meet its

guidelines "provided the loan has well-documented compensating factors . . . ."[42]  Likewise,

ResMAE's underwriting guidelines required any loan "that does not conform strictly to

ResMAE's established underwriting guidelines" to "contain documentation in the loan file to

support the lending decision, including the exception, compensating factors, and justification as

to why the loan was approved."[43]

### C.      Representations Regarding the Use of Automated Underwriting Systems

Originators at times used an automated underwriting system ("AUS") in lieu of or in

conjunction with manual underwriting, either when conducting initial underwriting or when

purchasing loans from smaller brokers or lenders and re-underwriting the loans to the

originator's own guidelines.  An AUS is a computer program that receives information from a

borrower's loan application, along with other information such as the borrower's credit score and

credit history, and renders an immediate recommendation about whether the loan complies with

---

[39]   Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 227.

[40]   Ibid., 327-32.

[41]   EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 154.

[42]   Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 549.

[43]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 534.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

the originator's underwriting guidelines.  Generally, an AUS would render one of the following recommendations:  the loan (1) fit within the program that the borrower applied for; (2) provisionally complied with the originator's underwriting guidelines upon the fulfillment of a condition; (3) was ineligible for the particular loan program; or (4) was referred for manual underwriting as an exception loan or for verification of a particular issue(s) that the computer system could not resolve.  Accordingly, the use of an AUS did not relieve the lender of the need to review and approve the loan, and, in certain circumstances, to manually underwrite the loan entirely.  For instance, the AUS report might show that the loan provisionally complied with the guidelines upon the borrower's ability to meet a particular condition, such as providing an explanation for a recent credit inquiry.

Similar to a manually underwritten loan, the reliability of an AUS recommendation depended on the accuracy of the loan characteristics and borrower information that were entered into the program.  For example, if a borrower failed to disclose a monthly car payment among his liabilities on his loan application, or if the underwriter entered an inflated income into the AUS, then the AUS would compute an incorrect DTI ratio.  In either instance, a borrower who might not otherwise have been qualified might nevertheless be approved for a mortgage.  Thus, it was important that the information entered into an AUS was accurate.

### 1.   Representations in the Originators' Underwriting Guidelines Regarding the Use of Automated Underwriting Systems

Certain of the Originators' guidelines allowed for an AUS to be used to underwrite loans. For example, Alliance's guidelines stated that it would consider purchasing conforming balance loans originated using Fannie Mae's Desktop Underwriter ("DU").[44]  The guidelines provided

---

[44]   Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 552.  Desktop Underwriter is an automated underwriting system that Fannie Mae

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

that decision and documentation requirements determined by DU would be accepted provided

that "the data entered into the DU system is accurate and complete," and stated that Alliance

would verify that the data input into the DU system was accurate.[45]  Alliance further required

that the credit file contain the DU decision report, DU application, and DU credit report.[46]  The

underwriter was also required to verify that any DU approval conditions were obtained and

maintained in the loan file, and that any risk factors identified by DU were addressed in the loan

file.[47]  "Decisions and documentation standards" of loans underwritten using other, non-DU

automated underwriting systems would be considered as compensating factors by Alliance.[48]

Regardless of approval by an AUS, a loan was required to meet Alliance's credit score, DTI, and

appraisal requirements.[49]

> **D.** **Representations Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan**
>
> **1.** **Representations in the Prospectus Supplements Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan**

As has already been noted, the Prospectus Supplements for all of the Securitizations

represented that the mortgage loans were evaluated to determine the borrower's ability and

willingness to repay the loan.[50]  For example, the NHELI 2006-FM1 Prospectus Supplement

represented that the underwriting guidelines were "primarily intended to assess the ability and

---

made available on a fee basis.  Freddie Mac made available a similar automated underwriting system called Loan Prospector, also on a fee basis.

[45]  *Ibid.*, 552-53.

[46]  *Ibid.*, 552.

[47]  *Ibid.*, 553.

[48]  *Ibid.*

[49]  *Ibid.*, 552.

[50]  *See* Exhibit 6, Chart B.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged

property as collateral for the mortgage loan."[51]  The NHELI 2006-HE3 Prospectus Supplement

similarly represented that "a determination is made by the original lender that the borrower's

monthly income (if required to be stated) will be sufficient to enable the borrower to meet their

monthly obligations" and other expenses.[52]

### 2. Representations in the Originators' Underwriting Guidelines Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan

Each of the Originators' underwriting guidelines contained directions and requirements

for evaluating a borrower's ability and willingness to repay a loan.  Conducting such an

evaluation was important since a borrower's monthly payments are an originator's primary

source of repayment for a loan.  Fremont's guidelines, for example, stated:  "Consider the

financial ability and credit worthiness of the borrower to repay the loan – not just the equity in

the home – in order to avoid default and foreclosure."[53]  To evaluate a borrower's ability and

willingness to repay a loan an underwriter should investigate any red flags suggesting that the

borrower does not have the ability to repay the loan, in addition to requiring borrower

representations and/or documentation regarding a borrower's income, employment, and assets.

Additionally, an underwriter should ensure that the loan benefits the borrower and that any

payment shock from the borrower's previous housing payments will not negatively affect the

borrower's repayment ability.

---

[51]  NHELI 2006-FM1 Prospectus Supplement, NOM-FHFA_04729474, at 544.

[52]  NHELI 2006-HE3 Prospectus Supplement, NOM-FHFA_04620885, at 973.

[53]  Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 228.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### a.   Red Flags Indicative of Potential Misrepresentations

A reasonable underwriter should be alert to the possibility that a borrower may misrepresent information on the loan application in order to increase the chances of obtaining a mortgage.  For instance, a borrower who earns insufficient income to obtain a mortgage might apply for a stated income mortgage with an inflated income figure.  Or, a borrower seeking a mortgage loan for an investment property might state on the mortgage application that the borrower planned to reside in the property in order to take advantage of the reduced rates and fees charged for owner-occupied properties.  The use of a generic job title, a lack of credit history, discrepancies in the loan application, and handwritten pay stubs are examples of red flags that should be taken as signs that an unqualified borrower may have provided incorrect or incomplete information on the loan application.  A borrower's misrepresentations about employment, income, debt obligations, and/or the property's occupancy status are particularly damaging because those characteristics are critical in determining whether the borrower is able and willing to repay the mortgage.  Simply put, misrepresentations about these characteristics result in a lender's inability to rely on accurate data to determine borrower eligibility and the resulting credit risk of a loan.

A number of the Originators' guidelines addressed the investigation of red flags.  For example, ResMAE's guidelines directed underwriters to "review loan packages for 'red flags,' which may indicate irregularities in the data submitted by a borrower or other parties in the transaction."[54]  ResMAE provided examples of red flags, such as the same telephone number for the borrower's home and business, significant changes in a banking account balance near the

---

[54]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066401, at 401.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

date of verification, and a handwritten W-2 form.[55]  Equifirst's guidelines contained a section

detailing red flags that could be found on a credit report, including if a borrower's report

indicated a second Social Security Number, associated the Social Security Number with a

deceased person, turned up an "AKA," or indicated the borrower had used an unauthorized

Social Security Number.[56]  Other Originators explicitly prohibited approving loans when

documents in the loan application had been altered, because erasures and white-outs were red

flags for fraud.[57]

      Furthermore, the underwriting guidelines of some Originators put procedures in place to

monitor fraud by brokers.  For example, Ownit ran audit credit reports on borrowers, which it

compared to brokers' credit reports.  Ownit instructed its underwriters that if an audit turned up

fraudulent information, they should use the credit score from the audit report to qualify the

borrower.[58]  Similarly, Fremont "routinely" conducted quality control audits that re-verified

credit documentation and appraisals submitted by brokers.[59]

### b.    Payment Shock

      Payment shock refers to the increase in the borrower's housing obligation from the

borrower's previous mortgage or rent payment.  Payment shock should be calculated in instances

in which the borrower purchased a home for the first time, the borrower while paying one

---

[55]  *Ibid.*, 408-10.

[56]  EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 197.

[57]  *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 262; People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 360; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 542.

[58]  Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 337.

[59]  Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 245.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

mortgage purchased a new and more expensive home imposing a larger mortgage obligation, or the borrower took out a second mortgage on the same home.

The underwriter should analyze whether the borrower can afford to pay the post-shock monthly obligation. The underwriter should do so by calculating the payment shock to the borrower and scrutinizing the borrower's overall financial circumstances in light of the payment increase. While factors in the borrower's application may lead the underwriter to reasonably conclude that the borrower is capable of meeting the new, increased mortgage obligation, all else being equal, a greater payment shock correlates with a greater risk that the borrower will not be able to make payments and will, in turn, default on the mortgage.

Many of the Originators' underwriting guidelines explicitly required underwriters to consider payment shock. For example, ResMAE's guidelines stated:

> A careful evaluation must be made of the homebuyer's capacity to handle potentially larger monthly payments and related expenses that may be associated with any purchase or refinance transaction. ResMAE will give consideration to borrowers who have demonstrated an ability to carry similar or greater expenses for an extended period.[60]

People's Choice's underwriting guidelines specified: "Payment shock occurs when the mortgage payment will exceed 150% of current housing obligations. In this situation, the borrower must have reserves of at least two months' PITI and the down payment must be sourced and seasoned for 60 days."[61] And Aegis' guidelines required full documentation for

---

[60]  ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 558.

[61]  People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 376.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

transactions resulting in "significant payment shock," which it defined as the payment more than doubling.[62]

### c.  Benefit to the Borrower in Refinance Mortgages

A refinance mortgage that did not offer a benefit to the borrower was more risky than a mortgage that did because a borrower who had received no benefit from the refinancing was more likely to stop making payments.  Thus, for refinance mortgages it was a standard guideline requirement that every loan must provide a benefit to the borrower.  The benefit to the borrower could take many forms, such as a reduced monthly mortgage payment, a lower interest rate, or a cash payment made to the borrower for use on home improvements.  The benefit that the mortgage provided to the borrower stood as proof that the lender did not originate the mortgage purely to obtain fees from the borrower or that the mortgage was not the result of predatory lending.

People's Choice's guidelines, for example, stated:  "A loan must demonstrate tangible benefits to the borrower and meet state-specific net tangible benefit requirements."[63]  Equifirst's guidelines similarly required that "all loans have a measurable benefit to the borrower," and instructed its underwriters to consider factors such as monthly savings, amount of cash out, recoupment of closing costs, transfer of title, reductions in the term of the mortgage, and paying

---

[62]  Aegis Mortgage Signature Alternative A Matrices and Guidelines, JPMC-UWG-BEAR-000005665, at 692.

[63]  People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 333.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

off of property taxes or certain types of loans.[64]  Other Originators either explicitly required a

tangible or material benefit or, conversely, prohibited loans that provided no economic benefit.[65]

### 3. Minimum Industry Standards Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan

#### a. Red Flags Indicative of Potential Misrepresentations

It was a minimum industry standard for an underwriter to investigate red flags in a loan

file that could indicate fraud before issuing a loan.[66]  Investigating red flags was important

because failure to do so could result in the origination of a mortgage loan to a borrower who

could not repay the loan.  Nomura recognized the importance of this minimum industry standard.

Joseph Kohout testified that if an underwriter discovered a red flag, it should be brought to the

due diligence team's attention so that additional information could be obtained from the seller.

And Kohout "hope[d]" that originators would investigate red flags they discovered.[67]  Mendy

Sabo, a Nomura due diligence manager, agreed that it is "fair to say that every underwriter

should investigate if he or she has reason to believe that a borrower has misstated or

---

[64]   EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 153.

[65]   *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 228; Alliance Mortgage General Underwriting Guidelines, JPMC-UWG-BEAR-000235485, at 517-18; *see also* ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066525, at 527 (noting one of ResMAE's "[c]ommitments" was to "[a]pprove [o]nly [l]oans [t]hat [b]enefit [t]he [b]orrower").

[66]   For examples of underwriting guidelines that were consistent with this standard, *see* Bank of America CRE Policy and Product Guide, BA_FHFA 23690783, at 795 ("Inconsistent information or data may be a 'red flag' that indicates a detailed review of the data is required."); Countrywide Technical Manual, CHL-FHFA00000130, at 339 ("The following is a list of red flags in the loan package which may alert an underwriter to possible irregularities in the data submitted by a borrower or other parties in the loan transaction."); ResMAE Underwriting Guidelines, CSFHFA007672771, at 771 ("ResMAE employees are required to review loan packages for 'red flags,' which may indicate irregularities in the data submitted by a borrower or other parties in the transaction.").

[67]   Kohout Dep. at 86:10-87:9.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

misrepresented his or her income, employment status, mortgage or rental history[.]"[68]  Nomura's

own correspondent underwriting guidelines made clear that it would not purchase, or would

require to be re-purchased, any loan for which there was evidence of misrepresentation or

material omission.[69]  To help prevent such misrepresentations or omissions, the underwriting

guidelines listed a number of possible situations in which it would require full or alternative

documentation on otherwise reduced documentation loans.[70]

### b.    Payment Shock

Minimum industry standards required underwriters to evaluate a borrower's ability to

repay the mortgage in light of payment shock imposed by the mortgage, regardless of whether

the originators' underwriting guidelines expressly addressed payment shock.  In particular,

minimum industry standards required underwriters to determine whether a borrower could meet

his or her new mortgage obligation if the payment shock exceeded 150% of the borrower's

current housing obligations, and for the lender's written approval to reflect that consideration.[71]

---

[68]    Deposition of Menachem ("Mendy") Sabo, dated Dec. 5, 2013 ("Sabo Dep.") at
29:20-30:4.

[69]    Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 771.
Nomura's Correspondent Underwriting Guidelines were used by Nomura in connection with its
purchase of closed loans from approved sellers.  See Kohout Dep. at 43:7-45:9.  These guidelines
applied to loan-by-loan purchases, not loans that Nomura purchased from originators in bulk.
Ibid.

[70]    Ibid.

[71]    For examples of underwriting guidelines that were consistent with or more stringent
than this standard, see Aegis Funding Corporation Focus + Underwriting Guidelines,
CSFHFA009245527, at 551 ("Although payment shock is analyzed on all loan requests,
proposed payments greater than 150% of current payment are considered payment shock and are
analyzed very carefully."); WMC Mortgage Underwriting Guidelines, JPMC-UWG-WAMU-
000823523, at 575 ("Payment shock is a term used to describe a situation where current housing
expense increases by 50% or more.  To ensure that a borrower can sustain a large increase,
WMC may require validation and/or source/seasoning of reserves (adequate to pay the new
mortgage payment), for some loan programs."); Countrywide SubPrime Technical Manual,
CHL-FHFA00028257, at 313 ("First time homebuyers are allowed a maximum 100% housing

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### c.       Benefit to the Borrower in Refinance Mortgages

It was also a minimum industry standard that every refinance mortgage loan provide a benefit to the borrower.[72]  Nomura recognized this requirement as well.  For example, Neil Spagna, a Director in Nomura's due diligence group, confirmed that "in a refinance transaction the borrower must obtain a benefit from the mortgage[.]"[73]

### E.       Representations Regarding Evaluation of the Adequacy of the Underlying Mortgage Collateral

#### 1.       Representations in the Prospectus Supplements Regarding Evaluation of the Adequacy of the Underlying Mortgage Collateral

The Prospectus Supplements for all of the Securitizations represented that the mortgage loans were evaluated to determine the adequacy of the collateral.[74]  Furthermore, all of the Prospectus Supplements contained representations regarding steps that should be taken to ensure the adequacy of the collateral.[75]  For instance, the NHELI 2007-3 Prospectus Supplement represented that appraisals had been performed by a qualified, independent appraiser licensed in his or her state,[76] and that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice ("USPAP").[77]

---

payment shock . . . ."); ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066401, at 408 (requiring applications to be reviewed for "red flags," including "[n]ew housing expense exceeds 150% of current housing expense").

[72]   For examples of underwriting guidelines that were consistent with this standard, *see* Encore Credit Corp. Wholesale Manual, JPMC-UWG-BEAR-000144493, at 507; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053101, at 107; WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 966.

[73]   Spagna Dep. at 108:5-10.

[74]   *See* Exhibit 6, Chart B.

[75]   *See* Exhibit 6, Chart D.

[76]   NHELI 2007-3 Prospectus Supplement, NOM-FHFA_04732621, at 709 (ResMAE).

[77]   *Ibid.*, 709, 713 (all originators).

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### 2.   Representations in the Originators' Underwriting Guidelines Regarding Evaluation of the Adequacy of the Underlying Mortgage Collateral

The Originators' underwriting guidelines mandated accurate assessment of whether a property provided sufficient value to serve as collateral for the borrower's debt obligation.  They contained directions and requirements regarding the evaluation of the adequacy of the underlying mortgage collateral, including through the use of appraisals and/or automated valuation models ("AVM").

#### a.  Appraisal Reports

In evaluating the collateral, it was important that the underwriter evaluate the loan application's appraisal report, and not just accept the appraisal at face value.  ResMAE's guidelines, for example, stated:  "The underwriter is responsible for thoroughly analyzing the appraisal report, and through it, the property itself. . . .  The underwriter's role is to judge the property's acceptability as security for the requested loan."[78]  Generally speaking, an underwriter should review the appraisal report to determine if the appraiser used reasonable methods and techniques to arrive at the estimated value of the mortgaged property.

The Originators' underwriting guidelines required appraisals to be conducted by state licensed or certified appraisers, experienced in appraising residential properties of the type being appraised and to be actively engaged in appraisal work.[79]  State licensing boards set forth minimum levels of education and experience required to obtain a license in property appraisal, as well as continuing education requirements that need to be satisfied to maintain an active license.

---

[78]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 629.

[79]   *See, e.g.*, Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 330; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 631-32; Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 114-15; Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, 586.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

An inactive license may indicate that an appraiser has not complied with licensing requirements, or had his license revoked or suspended as a result of disciplinary action—all of which call into question the integrity of the appraiser's appraisal report.

The Originators' underwriting guidelines further required a completed appraisal to conform to USPAP.[80] USPAP is a body of standards developed by the Appraisal Standards Board of the Appraisal Foundation for the purpose of establishing requirements for professional appraisers and, in turn, promoting and maintaining public trust in the appraisal practice. USPAP mandates competence, impartiality, objectivity, and independence on the part of the appraiser. Although USPAP provides a minimum set of standards of practice for conducting an appraisal, it does not prescribe specific appraisal methods. Rather, USPAP requires appraisers to be familiar with and correctly use methods that are acceptable in relation to (i) expectations of participants in the market (*i.e.*, originators and their underwriters) and (ii) the appraisers' peers. USPAP refers to this process as the "Scope of Work" rule.[81]

Additionally, most of the Originators' guidelines provided other requirements for the subject property's appraisal. For example, the mortgage loan file had to include an appraisal report on the Uniform Residential Appraisal Report ("URAR") form (also known as Fannie Mae form 1004 and Freddie Mac form 70), which provided a summary of the subject property,

---

[80]  *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 313; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 333; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 539.

[81]  USPAP 2005, Standards Rule 1-2(f) ("The scope of work is acceptable when it is consistent with: [] the expectations of participants in the market for the same or similar appraisal services; and [] what the appraiser's peers' actions would be in performing the same or a similar assignment in compliance with USPAP.").

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

neighborhood, and comparable properties, among other items.[82]  The appraisal had to include an

effective date and had to be signed by the inspecting appraiser.[83]  The appraisal also had to be

completed within a certain period before the loan's closing, typically within 90 to 180 days of

the closing, or the date of the Note and Mortgage or Deed of Trust.[84]

> **b.      Comparable Properties**

The review of comparable properties, along with the adjustments made to those

properties to harmonize their different values, was a critical part of the subject property's

appraisal.  In other words, the value of the subject property was not solely a function of the

characteristics of the property itself; rather, its value should have been assessed relative to other

recent sales of properties with similar characteristics to and in the same area as the subject

property.

Many of the Originators' underwriting guidelines specified requirements for comparable

properties used to generate or support the subject property's appraisal value, such as the

minimum number of comparable properties to be considered.[85]  Additionally, some of the

Originators' guidelines specified that the comparable properties had to have sales activity within

---

[82]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 313; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 332; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 638.

[83]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 318; Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 116; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 541.

[84]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 233, 314; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 336; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 633.

[85]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 317; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 333-34; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 637.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

a particular time period of the appraisal report.[86]  Some Originators' underwriting guidelines

required the appraisal report to include photographs of the comparable properties.[87]

### c.   Automated Valuation Models

Some Originators generated a valuation of the subject property using an AVM.  An AVM

applied a mathematical model to a computer database of values of comparable properties,

information on the subject property, and information about property values locally and

nationwide.[88]  That model generated a value for the subject property.  The objective of using the

AVM was to assess the reasonableness of a property's appraised value.  For example, Ownit's

guidelines stated:

> All loans are to be analyzed for marketability and value support by
> the underwriter.  If there are concerns regarding the value, the
> underwriter should request an Automated Valuation Model
> (AVM), or other form of Appraisal Review.[89]

Additionally, ResMAE required certain properties to be run through Hanson PREVIEW and

Hanson PRO, both of which were AVMs, and could require field reviews if the loan failed to

meet criteria for success.[90]

---

[86]   *See, e.g.*, Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, 595; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 334; Aegis Mortgage Signature Alternative A Matrices and Guidelines, JPMC-UWG-BEAR-000005665, at 716.

[87]   *See, e.g.*, ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 640; Aegis Mortgage Signature Alternative A Matrices and Guidelines, JPMC-UWG-BEAR-000005665, at 713; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 315.

[88]   The role of AVMs in the valuation of the subject properties for the Securitizations is discussed in greater detail in the Kilpatrick Report.

[89]   Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 332.

[90]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 629, 636.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### 3.  Minimum Industry Standards Regarding the Evaluation of the Adequacy of the Underlying Mortgage Collateral

Part of an underwriter's role is to assess the correctness of the property appraisal used to support a mortgage loan.  Throughout the residential mortgage industry between 2002 and 2007, it was a standard practice for the underwriter to review the appraisal report to ensure that it met certain prerequisites prior to evaluating the appraisal itself.  If a full appraisal was conducted, this entailed making sure an appraisal report was found in the loan file on a URAR form.[91]  The underwriter also should have ensured that the appraiser was licensed in the local jurisdiction,[92] and that the appraisal was no more than six months old at the date of closing.[93]

At a minimum, the underwriter also should have reviewed the appraisal report to identify any red flags, such as possible property flipping,[94] and confirmed that the appraisal conformed to

---

[91]  For examples of underwriting guidelines that were consistent with this standard, *see* New Century Mortgage Underwriting Guidelines, MS_FHFA_003839644, at 655; Argent Mortgage Company Underwriting Guidelines, GS FHFA 003213296, at 343; Encore Credit Corp. Wholesale Manual, JPMC-UWG-BEAR-000109955, at 957.

[92]  For examples of underwriting guidelines that were consistent with this standard, *see* Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 723; New Century Mortgage Underwriting Guidelines, FHFA_NC_0000675, at 677; WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 924.  To determine whether the Mortgage Loans were appraised by licensed appraisers, I instructed the re-underwriting teams to verify the appraisers' licensing statuses with the database maintained by the Appraisal Subcommittee.

[93]  For examples of underwriting guidelines that were consistent with this standard, *see* New Century Mortgage Underwriting Guidelines, FHFA_NC_0000129, at 148 ("If the appraisal is greater than 180 days old at time of funding, a new appraisal report will be required."); WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 924 ("Appraisal reports older than 180 days at funding will not be accepted; a new appraisal is required."); Long Beach Mortgage Company Underwriting Guidelines, JPMC-UWG-WAMU-000453475, at 544 ("A new appraisal is required if the appraisal is over six months old.").

[94]  Property flipping refers to a borrower's intent to purchase a property then quickly sell it for a profit, typically through renovating and improving the property.  This can become fraudulent, and therefore risky for an originator, if the purchaser artificially inflates the value of the property without actually making substantive improvements.  For examples of guidelines warning of such behavior, *see* Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 490-91 ("Land flips or flipping property exposes Countrywide to potentially significant losses

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

the USPAP requirements.[95]  The underwriter should not have approved the loan based on the

appraisal report, if the report contained any of these defects or otherwise failed to support the

assessed value.  Instead, the underwriter should have taken additional steps to investigate or

correct the problem, such as following up with the appraiser to address the issue or even ordering

a new appraisal.

Nomura recognized the importance of an accurate valuation of the underlying collateral.

For example, Joseph Kohout testified that ensuring there is sufficient collateral to cover the loan

is "one of the most important steps" in underwriting.[96]  He further testified that it was "industry

standard" that the application include an appraisal on the appropriate form; that the appraisal

comply with USPAP; that the appraiser held a valid license in the local jurisdiction; and that the

appraisal, or the recertification of an appraisal, be completed within six months of the origination

date.[97]  In his experience it "would generally be the outcome" that a poorly done appraisal, *e.g.*

one using inappropriate comparable properties, would result in a poor valuation, so "you had to

look at appraisals closely."[98]

---

if a borrower defaults on his or her loan."); Ownit Mortgage Solutions The Right Loan
Underwriting Guidelines, ML_FHFA 6097303, at 331 ("Ownit will not fund loans when flipping
properties are causing an inflated market. … At some point, all participants in the flip walk away
from the properties and the lender is faced with the foreclosure or an overvalued property and the
occurrence of a substantial loss.").

[95]   For examples of underwriting guidelines that were consistent with this standard, *see*
New Century Mortgage Underwriting Guidelines, FHFA_NC_0000675, at 679; Fremont
Investment & Loan Underwriting Guidelines, LF1UBS_00053101, at 197; Lime Financial
Services Underwriting Guidelines, JPMC-UWG-WAMU-000778362, at 464; *see also* Kilpatrick
Report.

[96]   Kohout Dep. at 340:7-13; *see also* Hartnagel Dep. at 91:21-92:7 (stating an appraisal
is important "[b]ecause otherwise you will not know what you're buying as far as value is
concerned").

[97]   *Ibid.*, 139:18-140:12, 142:20-143:12.

[98]   *Ibid.*, 348:21-352:2.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

Nomura's correspondent guidelines required at least one full appraisal, performed by an appraiser licensed in that state; completed on the URAR; and no older than 120 days from the date of closing for existing construction or 180 days for new construction, unless the original appraiser provided an appraisal update.[99]  Furthermore, the appraisal should conform to USPAP.[100]  The correspondent guidelines also included requirements regarding certain red flags, such as ensuring the appraiser has no financial interest or other bias; that the subject property address and legal description match those from the loan application and related documents; and special requirements for cash-out refinances and flipped properties, out of a recognition that inflated appraisals in those circumstances were a serious concern in the industry.[101]

## F.       Representations Regarding Credit Information

### 1.       Representations in the Prospectus Supplements Regarding Credit Information

The Prospectus Supplements contained representations about the specific types of credit information that should be reviewed by underwriters to determine a borrower's ability to repay the mortgage loan.  Such information included (but was not limited to):  (1) a loan application; (2) a credit report/history; (3) federal tax returns; and/or (4) verifications of assets (or deposits).

The language in the NHELI 2007-1 Prospectus Supplement was typical:

> Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which

---

[99]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 755-57.

[100]   *Ibid.*, 756.

[101]   *Ibid.*, 755-56, 760.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

> summarizes the borrower's credit history with local merchants and
> lenders and any record of bankruptcy. The borrower may also
> have been required to authorize verifications of deposits at
> financial institutions where the borrower had demand or savings
> accounts.[102]

Indeed, the Prospectus Supplements for all of the Securitizations represented that the underlying

mortgage loans were supported by appropriate documentation of the borrower's credit profile,

including a credit report, credit score, and documentation regarding income, employment, assets,

and housing history.[103] The Prospectus Supplements made clear that the purpose of obtaining

such information was to evaluate the prospective borrower's ability to repay the loan.[104]

### 2. Representations in the Originator's Underwriting Guidelines Regarding Credit Information

#### a. Credit Reports

A credit report helps to establish a borrower's ability and willingness to repay a

mortgage. It identifies a borrower's past and present creditors, lists any public records or filings

or derogatory credit history, provides known addresses and other names (if any), confirms the

borrower's Social Security number, and lists the borrower's credit score. A credit report may

also verify other information the borrower included on his or her loan application. Given the

wealth of information available in a credit report, the Originator's underwriting guidelines

required the underwriter to obtain a credit report within a discrete period prior to the loan's

---

[102] NHELI 2007-1 Prospectus Supplement, NOM-FHFA_05141912, at 026.

[103] *See* Exhibit 6, Chart F.

[104] *See, e.g.*, NAA 2005-AR6 Prospectus Supplement, NOM-FHFA_04811802, at 894 ("Based on the data provided in the application and certain verifications . . . a determination is made by the original lender that the borrower's monthly income . . . will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property . . . .").

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

closing, funding, or Note date, generally ranging between 60 and 120 days.[105]  The Originator's

underwriting guidelines generally required these credit reports to contain complete information

provided by all repositories and to be issued by independent credit reporting agencies.[106]

### b.       Recent Credit Inquiries

Not only does a credit report reflect the borrower's existing trade lines and credit score, it

also shows credit inquiries made about the borrower by potential creditors.  Unexplained credit

inquiries prior to the mortgage loan's origination should have been investigated because each

inquiry could have been indicative of an undisclosed debt obligation.  An undisclosed debt

obligation may materially alter the underwriter's ultimate credit risk determination, by, for

example, negatively impacting the underwriter's DTI ratio calculation.  For that reason, certain

of the Originators' guidelines contained explicit requirements for review of the borrower's credit

report before closing, with a particular focus on any recent credit inquiries.  By way of example,

ResMAE's guidelines required documentation in the loan file adequately explaining that the

borrower had not incurred any additional debt, if the credit report indicated credit inquiries

between the loan application date and the credit report date.[107]  Silver State required borrowers to

explain all inquiries within the previous 90 days in writing, including indicating whether new

accounts were established as a result of those inquiries, and, if new accounts were established,

---

[105]     *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines,
LF1UBS_00053227, at 256; Ownit Mortgage Solutions The Right Loan Underwriting
Guidelines, ML_FHFA 6097303, at 317, 337-338; Alliance Mortgage Conduit Alt A
Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 557.

[106]     *See, e.g.*, People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-
000211324, at 368-69; Fremont Investment & Loan Underwriting Guidelines,
LF1UBS_00051222, at 248; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530,
at 539; Silver State Mortgage Expanded Alt A Underwriting Guide, JPMC-UWG-BEAR-
000297104, at 134.

[107]     ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 553, 614.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

verifying that they do not represent unsecured financing for the down payment, closing costs, or prepaid items.[108]

### c.      Loan Applications

Some of the Originators' underwriting guidelines explicitly required the loan origination file to include a final loan application, typically in a form similar to Fannie Mae Form 1003, regardless of loan documentation type,[109] while other Originators implied that the application was a required document by requiring borrowers to include certain information on the loan application.[110]  A loan application contained information the underwriter relied on in underwriting the loan and assessing a borrower's eligibility, including the requested loan amount, current and past employment, income, housing history, assets, and liabilities. Guidelines generally required the applications to be completed with the original borrowers' signatures.  Fremont's underwriting guidelines, for example, required a final loan application to "be completed in its entirety," including "provid[ing] a two-year residence history" and the "original signatures of all borrowers."[111]

### d.      Documentation of Mortgage and Rental History

A borrower's mortgage or rent payment history serves as an indicator of the borrower's willingness and capacity to fulfill his mortgage loan obligation.  A borrower who has

---

[108]    Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 137.

[109]    *See, e.g.*, People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 360;  Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053227, at 236.

[110]    *See, e.g.*, Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 341, 353, 357, 360, 362-63, 373, 403, 407; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 512-13, 519, 527; Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 551, 568-70.

[111]    Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053227, at 237.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

consistently made his housing payments in the past is more likely to do so in the future.  For that reason, many Originators' underwriting guidelines required the borrower to provide documentation of previous mortgage or rental obligations and payments, typically for the previous 12 months.[112]  For example, Silver State's guidelines required that current housing payments be verified for the previous 12 months for all borrowers, either via a written Verification of Mortgage ("VOM"), the credit report, 12 months cancelled checks, or 12 months bank statements for mortgage payments; or via a Verification of Rent ("VOR") form, 12 months cancelled rent payment checks, or 12 months bank statements for rent payments.[113]

In addition, under some guidelines, the housing payment history was used to determine a loan's credit grade, which was used to determine acceptable LTV ratios and loan terms.  As an example, under the Fremont Credit Grade matrix, an A+ rating required no 30-day past-due mortgage or rental payments, while borrowers that had delinquent mortgage or rental payment histories were graded lower.[114]  A borrower seeking maximum LTV financing under the stated loan program required an A+ rating regardless of other loan characteristics, and lower ratings had lower maximum LTVs.[115]

---

[112]   *See, e.g.*, Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 571-72; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 255-57; People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 375-76.

[113]   Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 135.

[114]   Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 260.

[115]   *Ibid.*, 249-50.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### e.    Verification of Assets

Many Originators' underwriting guidelines required verification of the borrower's assets, for a variety of reasons.[116]  First, the borrower's assets, if sufficient, could establish the borrower's capacity to repay the mortgage.  Second, because these assets were used as proceeds for a down payment, verification was necessary to confirm the borrower's ability to close the loan.  Also, where the underwriting guidelines required that the borrower demonstrate adequate payment reserves, verification of assets confirmed the borrower's short-term ability to meet the monthly mortgage obligation should any income be lost.  Third, since the borrower's assets were stated on the loan application, verification that the borrower had stated assets accurately helped establish the borrower's character.  Fourth, verification of assets helped to determine whether the borrower was using his or her own funds for the transaction, and not funds that were borrowed or gifted.  Finally, verification of the borrower's assets rooted out the problem of a "straw borrower"—an individual who obtained a mortgage on behalf of another person unable to qualify for the mortgage.

The Originators' underwriting guidelines allowed multiple forms of documentation for the borrower to establish his or her assets, such as a "Verification of Deposit" ("VOD") form reflecting the borrower's current bank balance, or a copy of the borrower's bank statement or retirement accounts, such as a borrower's 401K or IRA.[117]  In order to ensure that the borrower's

---

[116]    *See e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 311 (requiring "bank statement(s), Verification of Deposit (VOD), or retirement account (401K, IRA, etc)"); Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 130 (requiring VOD or copies of account statements covering the most recent two months, with three months' balances); Alliance Mortgage General Underwriting Guidelines, JPMC-UWG-BEAR-000235485, at 544-45 (requiring VOD or a complete bank statement, if reserves were required).

[117]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 311.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

verified assets were his or her own and not simply borrowed, certain Originators' guidelines required the borrower's assets to be "sourced," meaning the borrower had to establish where the assets came from and confirm that they did not come from a loan or some other special, unsustainable source.[118]  Other Originators' guidelines required that the borrower's assets be "seasoned," meaning in the borrower's possession for a period of time, such as 30 or 60 days.[119] The Originators' sourcing and seasoning requirements ensured that the borrower's verified assets actually served as proof of repayment capacity.

### 3.     Minimum Industry Standards Regarding Credit Information

Minimum industry standards dictated that loan files contain basic documentation regarding a borrower's credit profile, so that the underwriter could make a determination about whether the borrower had the ability to repay the loan.  Minimum industry standards required every loan file to include a credit report for the borrower pulled no earlier than 180 days before the funding date.[120]  A borrower's credit report was a key part of the loan file because it contained a comprehensive record of the borrower's credit history, and thus provided important information for determining the borrower's willingness to repay a loan.  Nomura's correspondent

---

[118]   *See, e.g.*, Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 130.

[119]   *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 311 (requiring assets to be seasoned for two months).

[120]   For examples of underwriting guidelines that were consistent with this requirement, *see* Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 587-88 ("The maximum allowable age of the original credit report is 180 days prior to funding date."); Long Beach Mortgage Company Underwriting Guidelines, JPMC-UWG-WAMU-000453231, at 285 (credit report should not be more than 90 days old at funding date); WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 979 (45-day maximum age of credit report at note date).

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

underwriting guidelines were consistent with this requirement, stating "Residential Mortgage Credit Reports or tri-merged credit reports are required for all loans."[121]

When reviewing a borrower's credit report, minimum industry standards required underwriters to investigate any recent, unexplained credit inquiries that appeared on the report.[122] Nomura acknowledged this requirement, too.  Jeffrey Hartnagel, a Vice President in the diligence group, agreed that it was important that an underwriter get an explanation of the reasons for credit inquiries, because otherwise there is "a possibility of additional debt that [Nomura] may not know of."[123]  Nomura's correspondent underwriting guidelines required that the credit report disclose all credit inquiries in the 90 days preceding the report, and required a written explanation for any significant undisclosed debt.[124]

Furthermore, minimum industry standards required every loan file to include a final loan application, even if not explicitly stated in the underwriting guidelines.[125]  The loan application

---

[121]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 761.

[122]   For examples of underwriting guidelines that were consistent this requirement, *see* Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 640 ("Credit inquiries between the loan application date and Countrywide's credit report date should be investigated to verify no new debt has been opened (ex. auto dealer and finance lender inquiries may have resulted in a new auto loan)."); Option One Alternative Products Underwriting Guidelines, UBS-FHFA-00328059, at 100 ("All inquiries occurring within 90 days of the credit report must be explained in writing by the borrower.  The explanation must indicate whether new accounts were established as a result of the inquiry and the terms of any new accounts must be verified and included in the borrower's overall obligations."); Wells Fargo Home Credit Solutions Underwriting Standards, UG1FHFA00039015, at 034 ("If the credit report indicates any credit inquiries within the most recent 90 days, inquiries should be satisfactorily explained by the borrower.").

[123]   Hartnagel Dep. at 111:15-112:9.

[124]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 762-63.

[125]   For examples of underwriting guidelines that were consistent with this requirement, *see* Ameriquest Loan Origination Policies and Procedures, AMQUG028098, at 318; Encore Credit Corp. Wholesale Manual, JPMC-UWG-BEAR-000144514, at 514; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053227, at 236.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

was essential because it provided critical credit information such as the borrower's income, job title, and assets.[126]  Joseph Kohout, Mendy Sabo, Jeffrey Hartnagel, and Neil Spagna each testified that a final loan application was a required document.[127]  As Joseph Kohout acknowledged, if a final application was missing, "[w]e would decline [the loan] for purchase."[128]

Minimum industry standards also required an originator to verify a borrower's housing history for the 12 months prior to the loan closing.[129]  This verification could have been provided by the borrower's credit report, 12 months of canceled checks, or a letter from the borrower's landlord.  Consistent with this minimum industry standard, Nomura's correspondent underwriting guidelines required verification of mortgage or rental history for the previous 12 months.  Mortgage payments could be shown by a credit report, direct verification, or payment of taxes and insurance if the home was owned free and clear.  Rent payments could be shown by a credit report, direct verification of rent, or 12 months of cancelled checks or bank statements.[130]

---

[126]  Jeffrey Hartnagel, for example, stated in an email to Steven Katz and Joseph Kohout that he "would not be comfortable buying loans on a 30 day side which includes [a] missing . . . final 1003" and, on the same email chain, Joseph Kohout expressed his view that "[a] Final 1003 should never be re-produced."  Dep. Ex. 21920, at NOM-FHFA_05302477.

[127]  Kohout Dep. at 150:14-19; Sabo Dep. at 16:5-12, 22:24-23:3, 118:17-25; Hartnagel Dep. at 218:14-16; Spagna Dep. at 106:16-25, 115:3-10.

[128]  Kohout Dep. at 171:7-10.

[129]  For examples of underwriting guidelines that were consistent with this requirement, *see* American Home Mortgage Choice Expanded Product Guidelines, MS_FHFA_000371208, at 309; Long Beach Mortgage Company Underwriting Guidelines, JPMC-UWG-WAMU-000453231, at 242; WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00003439, at 467-68; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053101, at 137-38.

[130]  Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 768-69; *see also* Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05503755, at 799 (requiring two years of housing payment verification).

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

Finally, minimum industry standards required underwriters to verify that a borrower had sufficient assets to at least cover closing costs and the down payment.[131]  Nomura recognized the importance of documentation and verification of a borrower's assets.  For example, Nomura's correspondent guidelines required sufficient assets to be "disclosed and verified to meet requirements for down payment, closing costs, prepaid items, payoff or pay-down of debt required for qualification" for loans that required asset verification.[132]  These assets could be verified in several ways, including a VOD; a Fannie Mae form 1006; or the most recent two months or one quarter bank, mutual fund, or brokerage statements.[133]

### G.   Representations Regarding Income and Employment Verification Under Full and Reduced Documentation Programs

#### 1.   Representations in the Prospectus Supplements Regarding Income and Employment Verification Under Full and Reduced Documentation Programs

All of the Prospectus Supplements described the requirements for the various documentation programs, including full and reduced.[134]  For example, the NHELI 2006-HE3 Prospectus Supplement represented that applicants under People's Choice's full documentation program "usually are required to submit one year's IRS Form W-2 and Form 1040 and a year-to-date paystub or 12 or 24 months personal or business bank statements" while applicants under the lite documentation program "usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal or business checking

---

[131]   For examples of underwriting guidelines that were consistent with this requirement, *see* Encore Credit Corp. Wholesale Manual, JPMC-UWG-BEAR-000144514, at 524; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053101, at 194; New Century Mortgage Underwriting Guidelines, MS_FHFA_003837158, at 170-71.

[132]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 775-79.

[133]   *Ibid.*

[134]   *See* Exhibit 6, Chart G.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

account bank statements or a current paycheck stub with at least 6 months' year-to-date information."[135]  Similarly, the NHELI 2006-FM2 Prospectus Supplement stated that Fremont's full documentation program required "verification of stable income for the periods of one to two years preceding the application dependent on credit profile," while Fremont's easy documentation program required "verification of adequate cash flow by means of personal or business bank statements[.]"[136]

## 2.  Representations in the Originators' Underwriting Guidelines Regarding Income and Employment Verification Under Full and Reduced Documentation Programs

Employment and income verification are central to a capacity analysis.  Verification that a borrower has been gainfully employed in recent years, and that the borrower is likely to remain employed in the foreseeable future, are typically the primary means to establish a borrower's ability to repay the mortgage.  The Originators' underwriting guidelines recognized the significance of the borrower's income to the repayment of a mortgage loan.[137]  Thus, when the borrower applied for a mortgage under a program that required income or employment documentation, depending on the program, the guidelines generally required verification of income or employment status or both income and employment status.[138]  Under most guidelines, verifying the borrower's employment entailed checking the borrower's occupation, employer,

---

[135]   NHELI 2006-HE3 Prospectus Supplement, NOM-FHFA_04620885, at 967.

[136]   NHELI 2006-FM2 Prospectus Supplement, NOM-FHFA_04638315, at 396.

[137]   For example, Fremont's guidelines stated that "[t]he borrower's income and, where applicable, employment history play an important role in determining if the loan is an acceptable risk, along with collateral and credit."  Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 262.

[138]   See, e.g., Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 262, 266; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 564, 566; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 353, 357.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

position, and length of employment.[139]  Verifying the borrower's income entailed establishing

that the borrower received, and would continue to receive, a reliable stream of income sufficient

to meet the mortgage obligation.

That a borrower has been employed in recent years, and is likely to remain employed in

the foreseeable future, is the primary means of proving the borrower's capacity to repay a

mortgage.  Originators typically offered multiple programs under which the borrower could

establish income and employment, including full documentation, reduced documentation, or

related variations.  Different guidelines for verifying income and employment applied to each of

these documentation programs.

With respect to full documentation loan programs, the Originator usually required a

salaried employee to submit a current paycheck or pay stub, as well as some combination of a

W-2 statement from the previous year, tax returns, bank statements, or a written Verification of

Employment ("VOE") form from the employer.[140]  In the case of reduced or limited

documentation programs, a salaried employee could generally submit a written VOE from the

employer as well as bank statements from the previous 12 to 24 months.[141]  Also, the

Originators' guidelines usually required verification that the borrower remained employed until

---

[139]   *See, e.g.*, People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 382-83; Aegis Mortgage Signature Alternative A Matrices and Guidelines, JPMC-UWG-BEAR-000005665, at 694-95.

[140]   *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 295-96; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 564, 594; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 523.

[141]   *See, e.g.*, ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 594; EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 169-70.