# Exhibit A

# In The Matter Of:

## *(C-"FHFA-ALL")  FEDERAL HOUSING FINANCE AGENCY, ETC.*

_____

## *MICHAEL H. ANEIRO - Vol. 1*
### *June 6, 2013*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

MICHAEL H. ANEIRO - 6/6/2013

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
FEDERAL HOUSING FINANCE
AGENCY, etc.,
               Plaintiff,
     vs.                      11 Civ. 5201
                                 (DLC)
UBS AMERICAS, INC., et al.,
               Defendants.
------------------------------x
FEDERAL HOUSING FINANCE
AGENCY, etc.,
               Plaintiff,
     vs.                      11 Civ. 6188
                                 (DLC)
JPMORGAN CHASE & CO., et al.,
               Defendants.
------------------------------x
FEDERAL HOUSING FINANCE
AGENCY, etc.,
               Plaintiff,
     vs.                      11 Civ. 6189
                                 (DLC)
HSBC NORTH AMERICA HOLDINGS,
INC., et al.,
                    Defendants.
------------------------------x
FEDERAL HOUSING FINANCE
AGENCY, etc.,
               Plaintiff,
     vs.                      11 Civ. 6190
                                 (DLC)
BARCLAYS BANK PLC, et al.,
               Defendants.
------------------------------x


WITNESS: MICHAEL H. ANEIRO

DATE:  June 6, 2013
```

```
 1   ------------------------------x
     FEDERAL HOUSING FINANCE
 2   AGENCY, etc.,
                     Plaintiff,
 3        vs.                      11 Civ. 6192
                                      (DLC)
 4   DEUTSCHE BANK AG, et al.,
                     Defendants.
 5   ------------------------------x
     FEDERAL HOUSING FINANCE
 6   AGENCY, etc.,
                     Plaintiff,
 7        vs.                      11 Civ. 6193
                                      (DLC)
 8   FIRST HORIZON NATIONAL
     CORP., et al.,
 9                   Defendants.
     ------------------------------x
10   FEDERAL HOUSING FINANCE
     AGENCY, etc.
11                   Plaintiff,
          vs.                      11 Civ. 6195
12                                    (DLC)
     BANK OF AMERICA CORP., et al.,
13                   Defendants.
     ------------------------------x
14   FEDERAL HOUSING FINANCE
     AGENCY, etc.,
15                   Plaintiff,
          vs.                      11 Civ. 6198
16                                    (DLC)
     GOLDMAN, SACHS & CO., et al.,
17                   Defendants.
     ------------------------------x
18   FEDERAL HOUSING FINANCE
     AGENCY, etc.,
19                   Plaintiff,
          vs.                      11 Civ. 6200
20                                    (DLC)
     CREDIT SUISSE HOLDINGS
21   (USA), Inc., et al.,
                     Defendants.
22   ------------------------------x

23

24

25
```

MICHAEL H. ANEIRO - 6/6/2013

```
 1     -----------------------------x
       FEDERAL HOUSING FINANCE
 2     AGENCY, etc.,
                     Plaintiff,
 3         vs.                      11 Civ. 6201
                                      (DLC)
 4     NOMURA HOLDING AMERICA,
       INC., et al.,
 5                   Defendants.
       -----------------------------x
 6     FEDERAL HOUSING FINANCE
       AGENCY, etc.,
 7                   Plaintiff,
           vs.                      11 Civ. 6202
 8                                    (DLC)
       MERRILL LYNCH & CO.,
 9     INC., et al.,
                     Defendants.
10     -----------------------------x
       FEDERAL HOUSING FINANCE
11     AGENCY, etc.,
                     Plaintiff,
12         vs.                      11 Civ. 6203
                                      (DLC)
13     SG AMERICAS, INC., et al.,
                     Defendants.
14     -----------------------------x
       FEDERAL HOUSING FINANCE
15     AGENCY, etc.,
                     Plaintiff,
16         vs.                      11 Civ. 6739
                                      (DLC)
17     MORGAN STANLEY, et al.,
                     Defendants.
18     -----------------------------x
       FEDERAL HOUSING FINANCE
19     AGENCY, etc.,
                     Plaintiff,
20         vs.                      11 Civ. 7010
                                      (DLC)
21     ALLY FINANCIAL INC., et al.,
                     Defendants.
22     -----------------------------x
23
24
25
```

MICHAEL H. ANEIRO - 6/6/2013

```
1      IN THE UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT
     --------------------------x
3    FEDERAL HOUSING FINANCE
     AGENCY, etc.,
4                  Plaintiff,      Case No.
         vs.                  3:11-cv-01383-AWT
5
     THE ROYAL BANK OF SCOTLAND
6    GROUP PLC, et al.,
                  Defendants.
7    --------------------------x

8
                 VOLUME 1
9

10

11                June 6, 2013

12

13                9:15 a.m.

14

15

16      Videotaped deposition of MICHAEL H.

17    ANEIRO, held at the offices of Williams &

18    Connolly LLP, 725 Twelfth Street, N.W.,

19    Washington, D.C., before Gail F. Schorr,

20    a Certified Shorthand Reporter, Certified

21    Realtime Reporter and Notary Public

22    within and for the State of New York.

23

24

25
```

MICHAEL H. ANEIRO - 6/6/2013

Page 197

| | | |
|---|---|---|
| 1 | MR. BATHAEE: That's correct. | 13:11:51 |
| 2 | MR. COREY: It was unclear | 13:11:52 |
| 3 | from the representation, or the | 13:11:54 |
| 4 | representation and the discussion | 13:11:55 |
| 5 | of the exhibit. | 13:11:56 |
| 6 | MS. SHANE: I think there was | 13:12:02 |
| 7 | a request to break for lunch which | 13:12:03 |
| 8 | I'm happy to do, and we'll see you | 13:12:05 |
| 9 | after lunch. | 13:12:07 |
| 10 | THE VIDEOGRAPHER: We're going | 13:12:08 |
| 11 | off the record, the time is 1:12 | 13:12:09 |
| 12 | p.m. | 13:12:11 |
| 13 | (Luncheon recess: 1:12 p.m.) | 13:12:12 |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

| | | |
|---|---|---|
| 1 | A F T E R N O O N   S E S S I O N | 14:09:31 |
| 2 | 2:12 p.m. | 14:10:04 |
| 3 | THE VIDEOGRAPHER:  We are back | 14:12:34 |
| 4 | on the record, the time is 2:12 | 14:12:39 |
| 5 | p.m. | 14:12:41 |
| 6 | MICHAEL H. ANEIRO, | 14:12:41 |
| 7 | resumed, having been previously | 14:12:41 |
| 8 | duly sworn, was examined and | 14:12:41 |
| 9 | testified further as follows: | 14:12:41 |
| 10 | EXAMINATION BY MS. DAVIDOFF: | 14:12:43 |
| 11 | Q.   Good afternoon, Mr. Aneiro. | 14:12:43 |
| 12 | My name is Amanda Davidoff, we just met, | 14:12:45 |
| 13 | and I'm going to ask you some more | 14:12:48 |
| 14 | questions.  I represent First Horizon and | 14:12:50 |
| 15 | Nomura in the cases we're here about | 14:12:53 |
| 16 | today, but these questions are going to | 14:12:55 |
| 17 | be on behalf of all defendants. | 14:12:57 |
| 18 | Do you understand that the | 14:12:59 |
| 19 | same rules that Ms. Shane discussed this | 14:13:00 |
| 20 | morning for asking questions and giving | 14:13:03 |
| 21 | verbal responses still apply? | 14:13:06 |
| 22 | A.   I do. | 14:13:07 |
| 23 | Q.   Now when I speak about a | 14:13:08 |
| 24 | purchase today I'll be referring to a new | 14:13:11 |
| 25 | trade commitment.  Does that make sense | 14:13:14 |

MICHAEL H. ANEIRO - 6/6/2013

| | | |
|---|---|---|
| 1 | to you? | 14:13:16 |
| 2 | A.    It does. | 14:13:16 |
| 3 | Q.    And in the years 2005, 2006 | 14:13:16 |
| 4 | and 2007 how did Freddie Mac learn about | 14:13:20 |
| 5 | a new potential trade commitment? | 14:13:24 |
| 6 | A.    We would receive a message | 14:13:26 |
| 7 | from the dealer that was offering the | 14:13:29 |
| 8 | deal. | 14:13:32 |
| 9 | Q.    Who would receive the message? | 14:13:33 |
| 10 | A.    Me or one of my team. | 14:13:35 |
| 11 | Q.    Somebody on the nonagency | 14:13:37 |
| 12 | desk? | 14:13:42 |
| 13 | A.    Correct. | 14:13:42 |
| 14 | Q.    And how was a potential new | 14:13:43 |
| 15 | purchase assigned to a particular trader? | 14:13:46 |
| 16 | MR. COREY:  Objection; form. | 14:13:54 |
| 17 | A.    We didn't have a systematic | 14:13:56 |
| 18 | decision. | 14:13:57 |
| 19 | Q.    Was it just -- would the | 14:13:58 |
| 20 | potential new purchase be considered by | 14:13:59 |
| 21 | the trader who received the message from | 14:14:01 |
| 22 | the dealer? | 14:14:03 |
| 23 | A.    No.  The -- it would normally | 14:14:03 |
| 24 | -- Dave Hackney would normally be the | 14:14:10 |
| 25 | primary person that would work on it | 14:14:13 |

MICHAEL H. ANEIRO - 6/6/2013

Page 200

```
 1    because he was the senior-most person,          14:14:15

 2    but all people would have, most likely          14:14:17

 3    have some involvement in the deal.              14:14:19

 4         Q.    So all people on the nonagency       14:14:21

 5    desk would have some involvement in any         14:14:24

 6    particular PLS deal?                            14:14:26

 7         A.    Very likely.                         14:14:28

 8              MS. DAVIDOFF:  I'd like to            14:14:34

 9         mark a document Bates stamped FHFA         14:14:36

10         1002820 to 2897 as Exhibit 0205.          14:14:39

11              (Deposition Exhibit 5205 for         14:14:56

12         identification, Bates stamped FHFA        14:14:38

13         1002820 through 2897.)                    14:14:39

14         Q.    So you've been handed what's        14:15:23

15    marked, what's been marked as Exhibit          14:15:25

16    5205, which contains a number of               14:15:27

17    documents beginning with a new trade           14:15:30

18    document dated April 26th, 2011 for a          14:15:32

19    deal called NHELI 2007-3 tranche 1A1; is       14:15:38

20    that correct?                                  14:15:46

21         A.    Yes.                                 14:15:46

22         Q.    These were produced as a            14:15:46

23    single document by Freddie Mac.  Could         14:15:48

24    you tell me what this is, this package of      14:15:52

25    documents?                                     14:15:54
```

MICHAEL H. ANEIRO - 6/6/2013

Page 201

| | | |
|---|---|---|
| 1 | MR. COREY:  Objection; form. | 14:15:55 |
| 2 | A.    This is the -- what we'd call | 14:15:56 |
| 3 | trade ticket and the trade documentation. | 14:15:59 |
| 4 | Q.    Trade ticket and trade | 14:16:04 |
| 5 | documentation.  Have you ever heard the | 14:16:06 |
| 6 | term a trade package? | 14:16:08 |
| 7 | A.    Certainly a reasonable term. | 14:16:09 |
| 8 | I don't recall if I heard of it. | 14:16:10 |
| 9 | Q.    So the trade ticket is the | 14:16:11 |
| 10 | front page? | 14:16:13 |
| 11 | A.    Yes. | 14:16:14 |
| 12 | Q.    And the rest of the document | 14:16:14 |
| 13 | is the trade documentation? | 14:16:16 |
| 14 | A.    Well, I didn't look through | 14:16:19 |
| 15 | the rest of the documentation, so I can't | 14:16:20 |
| 16 | affirm that. | 14:16:23 |
| 17 | Q.    Why don't you just take a scan | 14:16:23 |
| 18 | through it and see if that looks to you | 14:16:25 |
| 19 | like a trade ticket and its accompanying | 14:16:27 |
| 20 | trade documentation? | 14:16:30 |
| 21 | A.    Okay. | 14:19:48 |
| 22 | Q.    Does that look like the trade | 14:19:49 |
| 23 | ticket and accompanying trade document | 14:19:50 |
| 24 | facial for the NHELI 2007-3 certificate | 14:19:52 |
| 25 | purchased by Freddie Mac? | 14:19:57 |

MICHAEL H. ANEIRO - 6/6/2013

Page 202

| | |
|---|---|
| 1      A.   It certainly looks in | 14:19:59 |
| 2   accordance with what a trade ticket | 14:20:00 |
| 3   packet would look like. | 14:20:03 |
| 4      Q.   Okay, thank you. Starting | 14:20:04 |
| 5   near the back of Exhibit 5205, not quite | 14:20:07 |
| 6   the last page, but a page ending 2844, do | 14:20:11 |
| 7   you see that page? | 14:20:38 |
| 8      A.   I do. | 14:20:38 |
| 9      Q.   And this is an email, a March | 14:20:39 |
| 10   23rd, 2007 email from Steven Mayer of | 14:20:40 |
| 11   Lehman Brothers to David Hackney and | 14:20:43 |
| 12   others at Freddie Mac? | 14:20:47 |
| 13      A.   I see that. | 14:20:47 |
| 14      Q.   What is this email? | 14:20:52 |
| 15      A.   I'll have to read further just | 14:20:53 |
| 16   to check, just to see. | 14:20:57 |
| 17      Q.   I'm particularly interested in | 14:21:25 |
| 18   the portion of the email where Steven | 14:21:26 |
| 19   Mayer of Lehman Brothers, or where Steven | 14:21:30 |
| 20   Mayer of Lehman Brothers sends to David | 14:21:34 |
| 21   Hackney, "Here are the conf strat and agg | 14:21:37 |
| 22   strats for the Nomura 07-3 deal." | 14:21:41 |
| 23      Do you see that? | 14:21:45 |
| 24      A.   I do. | 14:21:45 |
| 25      Q.   What is Mr. Mayer sending to | 14:21:46 |

MICHAEL H. ANEIRO - 6/6/2013

Page 203

| | | |
|---|---|---|
| 1 | Mr. Hackney? | 14:21:50 |
| 2 | MR. COREY:  Objection; form. | 14:21:52 |
| 3 | A.    These are abbreviations that I | 14:21:54 |
| 4 | would not say are standard terms.  My | 14:21:56 |
| 5 | assumption is conforming stratifications | 14:22:01 |
| 6 | and aggregate stratifications for a deal. | 14:22:02 |
| 7 | Q.    And what are the conforming | 14:22:07 |
| 8 | stratifications for a deal? | 14:22:08 |
| 9 | MR. COREY:  Same objection. | 14:22:14 |
| 10 | A.    Usually conforming usually | 14:22:15 |
| 11 | referred to loans meeting the charter | 14:22:17 |
| 12 | requirements for Freddie Mac and Fannie | 14:22:20 |
| 13 | Mae. | 14:22:24 |
| 14 | Q.    And what are the aggregate | 14:22:24 |
| 15 | stratifications? | 14:22:26 |
| 16 | A.    That would have been all the | 14:22:27 |
| 17 | loans in the deal. | 14:22:28 |
| 18 | Q.    And what information would be | 14:22:29 |
| 19 | in the conforming stratifications for a | 14:22:30 |
| 20 | deal? | 14:22:33 |
| 21 | MR. COREY:  Objection; form. | 14:22:36 |
| 22 | A.    It would -- everything would | 14:22:38 |
| 23 | be, based on the specifics here, whatever | 14:22:43 |
| 24 | someone's sending, but it would tend to | 14:22:46 |
| 25 | be things like LTV, FICO, owner | 14:22:48 |

MICHAEL H. ANEIRO - 6/6/2013

Page 204

| | | |
|---|---|---|
| 1 | occupancy, basically the WAC, the WAM, if | 14:22:51 |
| 2 | you're familiar with those terms, the | 14:22:55 |
| 3 | general loan characteristics of a deal | 14:22:56 |
| 4 | for the loans that are, that meet charter | 14:22:59 |
| 5 | eligibility for the GSEs. | 14:23:02 |
| 6 | Q.    In what way would the general | 14:23:04 |
| 7 | loan characteristics of the deal be | 14:23:06 |
| 8 | provided? | 14:23:07 |
| 9 | A.    From what I recall, each | 14:23:11 |
| 10 | dealer had their own way of sending it | 14:23:12 |
| 11 | over.  I mean I don't remember an | 14:23:14 |
| 12 | industry standard for how the things were | 14:23:16 |
| 13 | delivered or displayed. | 14:23:21 |
| 14 | Q.    Would it be an average value | 14:23:22 |
| 15 | for the entire conforming, conforming | 14:23:25 |
| 16 | portion of the deal, average LTV? | 14:23:30 |
| 17 | A.    As opposed to what? | 14:23:31 |
| 18 | Q.    As opposed to some more | 14:23:33 |
| 19 | granular information like you were | 14:23:36 |
| 20 | talking about this morning? | 14:23:37 |
| 21 | MR. COREY:  Objection; form. | 14:23:39 |
| 22 | A.    It could be both. | 14:23:40 |
| 23 | Q.    And if the information -- | 14:23:41 |
| 24 | okay.  And if the information was more | 14:23:42 |
| 25 | granular, would that be loan-by-loan | 14:23:44 |

MICHAEL H. ANEIRO - 6/6/2013

Page 205

| | | |
|---|---|---|
| 1 | information, or how would it be provided? | 14:23:46 |
| 2 | A.    It would not be loan-by-loan | 14:23:47 |
| 3 | information.  It would be some level of | 14:23:49 |
| 4 | less than a one line average. | 14:23:50 |
| 5 | Q.    If you read down in the email | 14:23:57 |
| 6 | there's an email from Sam Luk to Steve | 14:24:00 |
| 7 | Mayer that says "Attached are strats and | 14:24:03 |
| 8 | a loan level tape for the conforming | 14:24:06 |
| 9 | Freddie group for this deal." | 14:24:09 |
| 10 | Do you know what a loan level | 14:24:11 |
| 11 | tape is? | 14:24:12 |
| 12 | A.    In general, a loan level tape | 14:24:14 |
| 13 | refers to information on loan level basis | 14:24:17 |
| 14 | for loans. | 14:24:21 |
| 15 | Q.    So if a loan level tape were | 14:24:23 |
| 16 | provided for a deal that would contain | 14:24:29 |
| 17 | loan level information about the deal? | 14:24:31 |
| 18 | MR. COREY:  Objection; form. | 14:24:34 |
| 19 | A.    That seems like a reasonable | 14:24:35 |
| 20 | expectation. | 14:24:37 |
| 21 | Q.    Turn next to a -- let's turn | 14:24:38 |
| 22 | next to a page ending 2843 in the same | 14:24:46 |
| 23 | exhibit, Exhibit 5205.  So you're going | 14:24:50 |
| 24 | to move backwards by one page.  I saw you | 14:25:00 |
| 25 | looking at this earlier with some detail. | 14:25:02 |

MICHAEL H. ANEIRO - 6/6/2013

Page 206

| | | |
|---|---|---|
| 1 | Can you tell me what this is? | 14:25:05 |
| 2 | A.    This is a report provided from | 14:25:07 |
| 3 | our affordable housing group that shows | 14:25:09 |
| 4 | the percent rate of affordable housing | 14:25:11 |
| 5 | goals per various individual goals that | 14:25:16 |
| 6 | pertain to the deal and results where | 14:25:22 |
| 7 | loans meet the following requirements. | 14:25:26 |
| 8 | So -- | 14:25:30 |
| 9 | Q.    Why was this done? | 14:25:31 |
| 10 | A.    To have an understanding of | 14:25:32 |
| 11 | what the benefit in terms of housing | 14:25:33 |
| 12 | goals may exist in the deal. | 14:25:36 |
| 13 | Q.    And was this done on the basis | 14:25:39 |
| 14 | of the conforming pool or the aggregate | 14:25:41 |
| 15 | pool? | 14:25:44 |
| 16 | A.    I don't recall.  Results from | 14:25:44 |
| 17 | the entire pool certainly makes it sound | 14:25:46 |
| 18 | like the aggregate pool. | 14:25:48 |
| 19 | Q.    When was this done?  At what | 14:25:50 |
| 20 | time in the course of a pre-deal analysis | 14:25:54 |
| 21 | was this done? | 14:25:57 |
| 22 | MR. COREY:  Objection; form. | 14:25:58 |
| 23 | A.    I don't think there was any | 14:25:59 |
| 24 | specific time within -- there was no set | 14:26:01 |
| 25 | schedule as to when it took place per | 14:26:04 |

MICHAEL H. ANEIRO - 6/6/2013

Page 216

| | | |
|---|---|---|
| 1 | 5205; is that correct? | 14:37:40 |
| 2 | A.    Appears that way, yes. | 14:37:43 |
| 3 | Q.    And if you turn to the next | 14:37:44 |
| 4 | page, and I'm sorry, I realize there's a | 14:37:48 |
| 5 | blue sheet, I'm not sure that -- we | 14:37:50 |
| 6 | attempted to divide these up in some | 14:37:53 |
| 7 | recognizable way, but our understanding | 14:37:55 |
| 8 | based on how this was produced, and | 14:37:58 |
| 9 | again, it was just produced as a single | 14:38:00 |
| 10 | document, is that Bates page FHFA | 14:38:02 |
| 11 | 04592877 was actually at the bottom of | 14:38:09 |
| 12 | the email we just looked at.  Does that | 14:38:16 |
| 13 | make sense to you? | 14:38:18 |
| 14 | A.    That whole sentence you just | 14:38:19 |
| 15 | said? | 14:38:22 |
| 16 | Q.    Right.  Well, to find a credit | 14:38:22 |
| 17 | approved chart at the bottom of a credit | 14:38:26 |
| 18 | approval email? | 14:38:28 |
| 19 | MR. COREY:  Objection; form. | 14:38:31 |
| 20 | A.    You'll have to ask that | 14:38:34 |
| 21 | question again. | 14:38:35 |
| 22 | Q.    Okay.  On what was your | 14:38:36 |
| 23 | approval of the NHELI 2007-3 purchase | 14:38:38 |
| 24 | based? | 14:38:43 |
| 25 | A.    I don't recall the specific | 14:38:43 |

MICHAEL H. ANEIRO - 6/6/2013

Page 217

| | | |
|---|---|---|
| 1 | approval for this deal, so I can't tell | 14:38:47 |
| 2 | you what this deal was based on. | 14:38:49 |
| 3 | Q.   Generally, when you gave | 14:38:50 |
| 4 | credit approval for a deal, was it based | 14:38:52 |
| 5 | on something? | 14:38:54 |
| 6 | A.   I did not give credit approval | 14:38:55 |
| 7 | for deals. | 14:38:57 |
| 8 | Q.   So your email at the time of, | 14:38:59 |
| 9 | or your April 26th, 2007 email is not a | 14:39:06 |
| 10 | credit approval email? | 14:39:09 |
| 11 | A.   Correct. | 14:39:10 |
| 12 | Q.   What is it? | 14:39:10 |
| 13 | A.   It is a purchase approval. | 14:39:11 |
| 14 | Q.   Somebody else approved the | 14:39:13 |
| 15 | credit? | 14:39:15 |
| 16 | A.   Correct. | 14:39:16 |
| 17 | Q.   And who approved the credit? | 14:39:16 |
| 18 | A.   The credit group. | 14:39:18 |
| 19 | Q.   Who's that? | 14:39:19 |
| 20 | A.   I don't -- as I said, things, | 14:39:20 |
| 21 | people changed over time.  I don't | 14:39:24 |
| 22 | recall.  Certainly Chad Levrini was part | 14:39:27 |
| 23 | of that credit group, Kevin Palmer I | 14:39:29 |
| 24 | believe was, and I don't recall at this | 14:39:32 |
| 25 | point whether Frank Vetrano was or was | 14:39:33 |

MICHAEL H. ANEIRO - 6/6/2013

Page 218

| | |
|---|---|
| 1    not the head of that group. | 14:39:36 |
| 2         Q.    What was your purchase | 14:39:38 |
| 3    approval based on? | 14:39:41 |
| 4              MR. COREY:  Objection to form. | 14:39:44 |
| 5         A.    A number of things. | 14:39:45 |
| 6         Q.    Go ahead. | 14:39:46 |
| 7         A.    That was my answer. | 14:39:46 |
| 8         Q.    Can you tell me what they are? | 14:39:48 |
| 9         A.    I can't recall all the | 14:39:50 |
| 10   different details.  Credit approval would | 14:39:53 |
| 11   certainly be one of them. | 14:39:55 |
| 12        Q.    Anything else? | 14:39:56 |
| 13        A.    Interest rate risk evaluation, | 14:39:59 |
| 14   return on equity hurdle. | 14:40:01 |
| 15        Q.    Anything else? | 14:40:12 |
| 16        A.    Not that I recall. | 14:40:13 |
| 17        Q.    Let's turn back to Exhibit | 14:40:14 |
| 18   5205, Bates page ending 2847. | 14:40:40 |
| 19             MR. COREY:  Are we going to | 14:40:56 |
| 20        come back to 5206? | 14:40:57 |
| 21             MS. DAVIDOFF:  We might.  It's | 14:41:01 |
| 22        the only place we have that credit | 14:41:02 |
| 23        approval spreadsheet. | 14:41:04 |
| 24             MR. COREY:  I'm sorry, where | 14:41:05 |
| 25        are we going in 5205? | 14:41:06 |

```
 1                MS. DAVIDOFF:  2847.                    14:41:11

 2         Q.    This is an email from Steven            14:41:12

 3    Mayer to David Hackney dated April 26th,           14:41:13

 4    2007; is that correct?                             14:41:16

 5         A.    Yes.                                     14:41:18

 6         Q.    And what is this?                        14:41:19

 7         A.    This is an email from Steve             14:41:24

 8    Mayer confirming that he got it in terms           14:41:25

 9    of Dave Hackney's email to Steve.                  14:41:27

10                MR. COREY:  Objection; form.           14:41:30

11         Sorry.                                         14:41:32

12         Q.    What is he confirming?  What            14:41:32

13    is Mr. Mayer confirming?                           14:41:34

14         A.    Mr. Mayer is confirming that           14:41:36

15    he received Dave Hackney's email.                  14:41:38

16         Q.    Is he confirming that he               14:41:41

17    received Hackney's email asking him to             14:41:42

18    confirm that he read Freddie Mac's                 14:41:46

19    current investment requirements?                   14:41:50

20                MR. COREY:  Objection; form.           14:41:54

21         A.    Yes.                                     14:41:55

22         Q.    Let's turn to the two pages            14:41:55

23    before this page, FHFA 01002845 to 846.            14:42:07

24    Can you tell me what these are?                    14:42:17

25                MR. COREY:  Objection; form.           14:42:20
```

MICHAEL H. ANEIRO - 6/6/2013

Page 220

```
 1        Q.    Let me try to help since        14:42:24
 2   they're difficult to read in the form      14:42:26
 3   they were produced.  Are these Bloomberg    14:42:28
 4   messages dated April 26th, 2007 at 4:10     14:42:32
 5   p.m. and 4:19 p.m. between Steve Mayer of   14:42:36
 6   Lehman Brothers and David Hackney of        14:42:39
 7   Freddie Mac?                                14:42:41
 8        A.    Yes.                             14:42:42
 9              MR. COREY:  Objection to form.   14:42:43
10        Q.    Do you see the notation at the   14:42:44
11   bottom of each of these messages that       14:42:47
12   says "Targeting low mod sub-goals for       14:42:50
13   owner occupied purchase"?                   14:42:54
14        A.    I do see that.                   14:42:56
15        Q.    What does that mean?             14:42:57
16              MR. COREY:  Objection; form.     14:42:59
17        A.    That means that Lehman           14:43:01
18   Brothers is targeting low mod sub-goals     14:43:02
19   for owner occupied purchase.                14:43:05
20        Q.    What does it mean to target      14:43:06
21   low mod sub-goals?                          14:43:09
22              MR. COREY:  Same objection.      14:43:11
23        A.    There was a benefit for us to    14:43:11
24   have affordable housing loans in our        14:43:13
25   deal, in our side of the deal, in our       14:43:16
```

MICHAEL H. ANEIRO - 6/6/2013

Page 221

| | | |
|---|---|---|
| 1 | bond and that is his targeting, what he's | 14:43:18 |
| 2 | targeting to try to increase that for us. | 14:43:21 |
| 3 | Q.   Does that mean that Lehman put | 14:43:24 |
| 4 | the deal together for Freddie Mac? | 14:43:26 |
| 5 | MR. COREY:  Objection; form. | 14:43:28 |
| 6 | A.   I don't recall a specific | 14:43:30 |
| 7 | deal, but I'm pretty sure the answer is | 14:43:31 |
| 8 | no. | 14:43:32 |
| 9 | Q.   Next I'd like to look at four | 14:43:37 |
| 10 | charts and we're going to move backwards | 14:43:40 |
| 11 | again, Bates range ending 2831 to 34. | 14:43:42 |
| 12 | These are four charts entitled NHELI | 14:44:01 |
| 13 | 2007-3 available funds cap, NHELI 2007-3 | 14:44:04 |
| 14 | fixed rate first lien CPR analysis, NHELI | 14:44:08 |
| 15 | 2007-3 floating rate CPR analysis, and | 14:44:13 |
| 16 | NHELI 2007-3 fixed rate second lien | 14:44:17 |
| 17 | analysis; is that correct? | 14:44:20 |
| 18 | A.   Correct. | 14:44:22 |
| 19 | Q.   What are these? | 14:44:23 |
| 20 | A.   The first -- | 14:44:24 |
| 21 | MR. COREY:  Objection; form. | 14:44:29 |
| 22 | A.   The first one is a graph with | 14:44:30 |
| 23 | expectations of what the available funds | 14:44:32 |
| 24 | cap would be for these bonds in the deal. | 14:44:34 |
| 25 | Q.   What is that chart used for, | 14:44:41 |

MICHAEL H. ANEIRO - 6/6/2013

Page 222

| | | |
|---|---|---|
| 1 | graph used for? | 14:44:43 |
| 2 | A.   To understand interest rate | 14:44:44 |
| 3 | risk. | 14:44:46 |
| 4 | Q.   Okay.  And what's the next | 14:44:46 |
| 5 | one, fixed rate first lien CPR analysis? | 14:44:49 |
| 6 | A.   That's the model's expectation | 14:44:51 |
| 7 | of prepay speeds on the fixed rate loans | 14:44:54 |
| 8 | on the deal. | 14:44:59 |
| 9 | Q.   And how is that chart created? | 14:44:59 |
| 10 | MR. COREY:  Objection; form. | 14:45:07 |
| 11 | A.   The aggregate weighted average | 14:45:08 |
| 12 | loan characteristics would be run through | 14:45:11 |
| 13 | Mortgage Pricer, Freddie Mac's analytics. | 14:45:15 |
| 14 | And in -- | 14:45:20 |
| 15 | Q.   I'm sorry, go ahead.  I | 14:45:21 |
| 16 | thought you were finished. | 14:45:23 |
| 17 | A.   And then, you know, the output | 14:45:24 |
| 18 | would be graphed. | 14:45:26 |
| 19 | Q.   And which characteristics were | 14:45:26 |
| 20 | used to create this graph? | 14:45:28 |
| 21 | A.   The prepayment speeds are the | 14:45:32 |
| 22 | CPR rates that were produced from Freddie | 14:45:34 |
| 23 | Mac's prepay model. | 14:45:40 |
| 24 | Q.   I thought you, I may just be | 14:45:45 |
| 25 | getting confused, I thought you said that | 14:45:47 |

| | |
|---|---|
| 1 | certain loan characteristics of the loans | 14:45:49 |
| 2 | in the deal would be run through Mortgage | 14:45:50 |
| 3 | Pricer and the output was the graph | 14:45:53 |
| 4 | called fixed rate first lien CPR | 14:45:54 |
| 5 | analysis; is that correct? | 14:45:57 |
| 6 | MR. COREY:  Objection; form. | 14:45:58 |
| 7 | A.    Yes. | 14:46:00 |
| 8 | Q.    Which characteristics of the | 14:46:00 |
| 9 | loans would be used in that analysis? | 14:46:03 |
| 10 | A.    Primarily the weighted average | 14:46:06 |
| 11 | coupon, in other words, the weighted | 14:46:11 |
| 12 | average interest rate on the deal, and | 14:46:14 |
| 13 | the -- the term, the weighted average | 14:46:15 |
| 14 | mortgage, or the weighted average | 14:46:23 |
| 15 | maturity. | 14:46:25 |
| 16 | Q.    Anything else, were any other | 14:46:26 |
| 17 | characteristics used to calculate the | 14:46:29 |
| 18 | fixed rate first lien CPR analysis? | 14:46:30 |
| 19 | A.    Those were the primary | 14:46:34 |
| 20 | attributes.  I don't recall if the deal, | 14:46:36 |
| 21 | if the model accepted other things. | 14:46:37 |
| 22 | Q.    Okay.  And the next chart on | 14:46:39 |
| 23 | 2833 is the floating rate CPR analysis. | 14:46:44 |
| 24 | I think I know the answer to this, but | 14:46:50 |
| 25 | what is that? | 14:46:52 |

| | | |
|---|---|---|
| 1 | A.    It is the CPR, the prepayment | 14:46:52 |
| 2 | rate expectation from the Freddie Mac | 14:46:56 |
| 3 | model on the prepay speeds for the | 14:46:59 |
| 4 | adjustable rate mortgages. | 14:47:02 |
| 5 | Q.    And how was that created? | 14:47:03 |
| 6 | A.    The same way, take the | 14:47:05 |
| 7 | weighted average maturity, the weighted | 14:47:08 |
| 8 | average interest rate and then of course | 14:47:10 |
| 9 | the features to adjustable rate mortgages | 14:47:12 |
| 10 | like next reset, first reset, next reset, | 14:47:16 |
| 11 | caps on the resets. | 14:47:19 |
| 12 | Q.    Anything else? | 14:47:27 |
| 13 | A.    There may have been more | 14:47:27 |
| 14 | features, but those are the primary | 14:47:28 |
| 15 | drivers. | 14:47:31 |
| 16 | Q.    If you wanted to find out what | 14:47:31 |
| 17 | characteristics of the loans were used to | 14:47:35 |
| 18 | create these charts, how would you do | 14:47:37 |
| 19 | that? | 14:47:38 |
| 20 | MR. COREY:  Objection; form. | 14:47:39 |
| 21 | A.    I guess I would have to go | 14:47:40 |
| 22 | back to Freddie Mac and ask them what | 14:47:42 |
| 23 | goes in the model, or did at that point. | 14:47:44 |
| 24 | Q.    But your understanding is that | 14:47:45 |
| 25 | the primary characteristics were the | 14:47:48 |

MICHAEL H. ANEIRO - 6/6/2013

Page 225

| | | |
|---|---|---|
| 1 | weighted average coupon and the term, and | 14:47:52 |
| 2 | for the floating rate analysis it would | 14:47:55 |
| 3 | be additional characteristics related to | 14:48:00 |
| 4 | the features of adjustable rate | 14:48:04 |
| 5 | mortgages, such as the first reset, the | 14:48:07 |
| 6 | next reset, the caps on the resets; is | 14:48:09 |
| 7 | that correct? | 14:48:12 |
| 8 | MR. COREY:  Same objection. | 14:48:12 |
| 9 | A.    Correct. | 14:48:13 |
| 10 | Q.    And the last chart on 2834 is | 14:48:14 |
| 11 | the fixed rate second lien analysis.  Can | 14:48:19 |
| 12 | you please tell me what that is? | 14:48:22 |
| 13 | A.    Similar to the first, the | 14:48:23 |
| 14 | first two graphs, is the model's | 14:48:25 |
| 15 | expectation of prepay speeds on the | 14:48:29 |
| 16 | second lien loans. | 14:48:31 |
| 17 | Q.    And how was that created? | 14:48:33 |
| 18 | A.    Same way.  You know, entering | 14:48:35 |
| 19 | the WAC and WAM, periodic caps, next | 14:48:39 |
| 20 | reset and what-not and coming up with | 14:48:49 |
| 21 | prepay expectations. | 14:48:50 |
| 22 | Q.    Was that information entered | 14:48:51 |
| 23 | manually into Mortgage Pricer? | 14:48:53 |
| 24 | A.    I think so, yes. | 14:48:55 |
| 25 | Q.    Who would do that entry? | 14:49:00 |

MICHAEL H. ANEIRO - 6/6/2013

Page 226

| | | |
|---|---|---|
| 1 | A.    Someone on my team, nonagency | 14:49:01 |
| 2 | portfolio group. | 14:49:04 |
| 3 | Q.    Did you enter -- did you | 14:49:05 |
| 4 | create these charts yourself? | 14:49:08 |
| 5 | A.    Probably not. | 14:49:09 |
| 6 | Q.    Who on your team would have | 14:49:13 |
| 7 | been the one creating those charts? | 14:49:15 |
| 8 | A.    I don't think there was a | 14:49:17 |
| 9 | specific person that was assigned to do | 14:49:18 |
| 10 | this every time. | 14:49:20 |
| 11 | Q.    It could have been any | 14:49:21 |
| 12 | portfolio manager on your team? | 14:49:22 |
| 13 | A.    It could have been. | 14:49:23 |
| 14 | Q.    All right, moving backwards | 14:49:27 |
| 15 | again, we've got Bates page 2829, so | 14:49:28 |
| 16 | that's FHFA 01082829 still in Exhibit | 14:49:38 |
| 17 | 5205, a page that's difficult to read. | 14:49:43 |
| 18 | I'm sorry, this is how we got it.  And I | 14:49:48 |
| 19 | know it's difficult to read.  But can | 14:49:51 |
| 20 | you, based on what you see in front of | 14:49:53 |
| 21 | you, tell me what it is? | 14:49:54 |
| 22 | A.    I believe it was the Reuters | 14:49:55 |
| 23 | page that showed various data on various | 14:49:58 |
| 24 | fixed income instruments. | 14:50:02 |
| 25 | Q.    What was this used for? | 14:50:09 |

MICHAEL H. ANEIRO - 6/6/2013

Page 227

| | | |
|---|---|---|
| 1 | A.    Just to get a general sense of | 14:50:11 |
| 2 | where the mark was at the time of trade. | 14:50:13 |
| 3 | Q.    Why was that useful? | 14:50:19 |
| 4 | A.    It wasn't terribly useful for | 14:50:20 |
| 5 | floaters.  It was a standard, standard | 14:50:30 |
| 6 | item that was put in, but it really had | 14:50:34 |
| 7 | more to do with fixed rate investments | 14:50:36 |
| 8 | than floating rate investments.  But it | 14:50:39 |
| 9 | just became a standard for us to include | 14:50:41 |
| 10 | it as general information on the market. | 14:50:43 |
| 11 | Q.    It was something that you | 14:50:44 |
| 12 | generally included in a trade, in the | 14:50:46 |
| 13 | trade documentation for a trade ticket? | 14:50:48 |
| 14 | A.    On what -- | 14:50:51 |
| 15 | MR. COREY:  Objection; form. | 14:50:54 |
| 16 | A.    I think we went through a lot | 14:50:55 |
| 17 | of this already, the trade ticket, the | 14:50:57 |
| 18 | Mortgage Pricer output, the credit | 14:51:00 |
| 19 | approval. | 14:51:02 |
| 20 | Q.    Oh, sorry, no, I was saying | 14:51:02 |
| 21 | and this Reuters screen print was | 14:51:04 |
| 22 | something you generally included in the | 14:51:07 |
| 23 | trade documentation? | 14:51:08 |
| 24 | A.    We -- sorry.  We generally | 14:51:09 |
| 25 | included it just because it was general | 14:51:11 |

MICHAEL H. ANEIRO - 6/6/2013

Page 230

| | | |
|---|---|---|
| 1 | A.    Conversations with people. | 14:53:45 |
| 2 | Q.    What people? | 14:53:46 |
| 3 | A.    The market. | 14:53:51 |
| 4 | MR. COREY:  We're having one | 14:53:55 |
| 5 | of those metaphysical | 14:53:56 |
| 6 | question/answer things going on. | 14:53:59 |
| 7 | Q.    Could it be the dealer who you | 14:54:00 |
| 8 | would have a conversation with who would | 14:54:02 |
| 9 | tell you what the price was going to be | 14:54:03 |
| 10 | for the bond? | 14:54:04 |
| 11 | MR. COREY:  Objection; form. | 14:54:05 |
| 12 | A.    It would be many dealers. | 14:54:07 |
| 13 | It's the market. | 14:54:08 |
| 14 | Q.    So there was one price for a | 14:54:14 |
| 15 | bond, the price was not negotiable? | 14:54:16 |
| 16 | A.    The market is, by the term | 14:54:18 |
| 17 | market, it is all negotiable.  It is | 14:54:20 |
| 18 | negotiable, everything's negotiable and | 14:54:22 |
| 19 | it's defined by the market. | 14:54:25 |
| 20 | Q.    Okay.  When was the first time | 14:54:26 |
| 21 | Freddie Mac received the price for a | 14:54:31 |
| 22 | bond? | 14:54:35 |
| 23 | MR. COREY:  Objection; form. | 14:54:35 |
| 24 | A.    We didn't receive prices.  We | 14:54:37 |
| 25 | received offerings.  Buyers bid and | 14:54:40 |

MICHAEL H. ANEIRO - 6/6/2013

Page 231

| | | |
|---|---|---|
| 1 | sellers offer.  But we don't receive a | 14:54:44 |
| 2 | price.  The price is what we pay for it. | 14:54:48 |
| 3 | Q.    So Freddie Mac made a bid for | 14:54:51 |
| 4 | a bond at a particular price? | 14:54:53 |
| 5 | MR. COREY:  Same objection. | 14:54:59 |
| 6 | A.    We would -- we would -- | 14:55:00 |
| 7 | someone would offer that's selling and | 14:55:01 |
| 8 | then we would let them know what you're | 14:55:03 |
| 9 | bid is. | 14:55:06 |
| 10 | Q.    So somebody made an offer at a | 14:55:09 |
| 11 | particular price? | 14:55:10 |
| 12 | A.    Yes. | 14:55:11 |
| 13 | Q.    And Freddie Mac would make a | 14:55:11 |
| 14 | bid, correct? | 14:55:13 |
| 15 | A.    Correct. | 14:55:15 |
| 16 | Q.    At that same price? | 14:55:15 |
| 17 | A.    Not necessarily. | 14:55:19 |
| 18 | Q.    Okay.  Sometimes at a | 14:55:20 |
| 19 | different price? | 14:55:22 |
| 20 | A.    Yes. | 14:55:23 |
| 21 | Q.    And how would it determine | 14:55:23 |
| 22 | what price to bid for a security, for a | 14:55:25 |
| 23 | PLS? | 14:55:29 |
| 24 | A.    Its level of interest in | 14:55:29 |
| 25 | buying, what other assets are trading at | 14:55:34 |

MICHAEL H. ANEIRO - 6/6/2013

Page 232

| | | |
|---|---|---|
| 1 | at the time. | 14:55:37 |
| 2 |     Q.    Did Freddie Mac rely on any | 14:55:53 |
| 3 | models to determine what price to bid at? | 14:55:55 |
| 4 |     A.    Mortgage Pricer was a model | 14:55:58 |
| 5 | that determined interest rate risk and | 14:56:02 |
| 6 | that certainly had an effect on what our | 14:56:04 |
| 7 | bid would be. | 14:56:07 |
| 8 |     Q.    Any other models or tools -- | 14:56:07 |
| 9 |     MR. COREY:  Objection. | 14:56:13 |
| 10 |     Q.    -- that impacted the price at | 14:56:14 |
| 11 | which Freddie Mac would bid? | 14:56:16 |
| 12 |     MR. COREY:  Objection; form. | 14:56:17 |
| 13 |     A.    No. | 14:56:20 |
| 14 |     Q.    Let's go to 2822, one page | 14:56:21 |
| 15 | back from the beginning of what we just | 14:56:32 |
| 16 | looked at, still in Exhibit 5205.  Can | 14:56:33 |
| 17 | you tell me what this is? | 14:56:39 |
| 18 |     A.    This is the ROE calculator. | 14:56:40 |
| 19 |     Q.    And what is that? | 14:56:44 |
| 20 |     A.    It's a calculator that | 14:56:45 |
| 21 | calculates the expected return on equity | 14:56:50 |
| 22 | of a bond. | 14:56:52 |
| 23 |     Q.    What's the return on equity of | 14:56:55 |
| 24 | a bond? | 14:56:58 |
| 25 |     A.    It's been a long time since I | 14:56:58 |

1        looked at this.  This says 21.95 percent.        14:57:02

2            Q.    For this particular bond the          14:57:06

3        return on equity is 21.95 percent, right?       14:57:07

4            A.    That's what the paper says.           14:57:11

5            Q.    This was done on April 26th,          14:57:13

6        2007 at 4:29 p.m., the return on equity         14:57:18

7        calculator was created, or prepared at          14:57:24

8        4:29 p.m. on April 26th, 2007; is that          14:57:29

9        right?                                          14:57:32

10           A.    Yes.                                   14:57:32

11           Q.    That's one minute after the           14:57:32

12       Mortgage Pricer, the second Mortgage            14:57:38

13       Pricer report was created?                      14:57:40

14           A.    I would have to go back to            14:57:41

15       look at that sheet.                             14:57:42

16           Q.    Sure.                                  14:57:44

17           A.    What page is it?                       14:57:44

18           Q.    It was just the next page.            14:57:46

19           A.    Okay.  Okay, seems that way,          14:57:47

20       yes.                                            14:58:01

21           Q.    So the Mortgage Pricer reports        14:58:02

22       were done and then the ROE calculator was       14:58:04

23       prepared?                                        14:58:10

24           A.    That was run a minute later,          14:58:12

25       yes.                                            14:58:16

MICHAEL H. ANEIRO - 6/6/2013

Page 234

```
 1        Q.    Yes.  Is that how, generally          14:58:16
 2    how the sequence of events for a PLS deal        14:58:19
 3    in 2005, 2006, 2007?                             14:58:23
 4        A.    This is --                             14:58:27
 5              MR. COREY:  Objection to form.         14:58:28
 6        A.    This is not the sequence of            14:58:29
 7    events.  This is the sequence of printing        14:58:31
 8    out items for a trade ticket.  We                14:58:33
 9    evaluated the return on equity long              14:58:35
10    before this.                                     14:58:37
11        Q.    I see.                                 14:58:37
12        A.    But to accumulate the trade           14:58:38
13    ticket packet someone ran one before they        14:58:41
14    ran the other.  Mortgage Pricer needs to         14:58:44
15    be run before the ROE calculator.                14:58:46
16        Q.    Mortgage Pricer needs to be           14:58:49
17    run before the ROE calculator, but you're        14:58:51
18    saying that the date reflected on the ROE        14:58:53
19    calculator is not necessarily the date it        14:58:56
20    was run?                                         14:58:58
21        A.    No, what I said was we would          14:58:58
22    evaluate the return on equity before,            14:59:00
23    long before this so it's not the first           14:59:03
24    time it was run.                                 14:59:07
25        Q.    I see, okay.  So where there          14:59:07
```

MICHAEL H. ANEIRO - 6/6/2013

Page 237

| | | |
|---|---|---|
| 1 | refers to, this document refers to when | 15:01:25 |
| 2 | it compares LIBOR and agency and lists | 15:01:28 |
| 3 | certain characteristics for each? | 15:01:33 |
| 4 | A.   I do. | 15:01:35 |
| 5 | Q.   What is that? | 15:01:35 |
| 6 | A.   It was comparing, comparing | 15:01:36 |
| 7 | return, or comparing OAS to two different | 15:01:43 |
| 8 | yield curves.  OAS compared to the agency | 15:01:49 |
| 9 | yield curve and OAS compared to the LIBOR | 15:01:53 |
| 10 | yield curve. | 15:01:57 |
| 11 | Q.   And how were the numbers on | 15:01:58 |
| 12 | these two lines of the chart, the LIBOR | 15:01:59 |
| 13 | line and the agency line created? | 15:02:03 |
| 14 | MR. COREY:  Objection; form. | 15:02:06 |
| 15 | A.   I believe it was calculated in | 15:02:07 |
| 16 | Mortgage Pricer, but it's been awhile, | 15:02:10 |
| 17 | I'm not -- I'm not -- I don't recall how. | 15:02:11 |
| 18 | Q.   And then if we move back one | 15:02:13 |
| 19 | page to the very first page of Exhibit | 15:02:22 |
| 20 | 5205, this, as we said, is the trade | 15:02:25 |
| 21 | ticket, correct? | 15:02:28 |
| 22 | A.   Correct. | 15:02:28 |
| 23 | Q.   And this is dated April 26th, | 15:02:29 |
| 24 | 2007, correct? | 15:02:32 |
| 25 | A.   Correct. | 15:02:35 |

MICHAEL H. ANEIRO - 6/6/2013

Page 238

```
 1          Q.    Which is the same date as the       15:02:35
 2    ROE calculator and the Mortgage Pricer          15:02:40
 3    reports we just looked at; is that right?       15:02:44
 4          A.    I believe so, yes.                  15:02:45
 5          Q.    I see some signatures, do you       15:02:48
 6    see some signatures at the top of the           15:02:50
 7    page?                                           15:02:52
 8          A.    I do.                               15:02:52
 9          Q.    Whose signatures are those?         15:02:52
10          A.    David Hackney and mine.             15:02:54
11          Q.    And why has David Hackney           15:02:55
12    signed this trade ticket?                       15:02:57
13                MR. COREY:  Objection; form.        15:02:59
14          A.    He, normally his signature          15:03:00
15    would go on if he was the lead trader in        15:03:03
16    evaluating the deal, managing the deal.         15:03:06
17          Q.    And why is your signature on        15:03:08
18    the trade ticket?                               15:03:10
19          A.    Because I was the head of the       15:03:11
20    portfolio and I would -- I would look at        15:03:13
21    every deal.                                     15:03:14
22          Q.    Okay.  When you say you looked      15:03:15
23    at every deal, do you mean you looked at        15:03:19
24    every deal that the nonagency desk              15:03:21
25    purchased?                                      15:03:26
```

MICHAEL H. ANEIRO - 6/6/2013

Page 239

| | | |
|---|---|---|
| 1 | A.    It was my practice to.  If I | 15:03:27 |
| 2 | was there, then most likely I looked at | 15:03:28 |
| 3 | the deal. | 15:03:30 |
| 4 | Q.    Whether or not your signature | 15:03:31 |
| 5 | appeared at the top of the trade ticket? | 15:03:32 |
| 6 | A.    Yes. | 15:03:36 |
| 7 | Q.    Can you tell me what a | 15:03:36 |
| 8 | prospectus supplement is? | 15:03:46 |
| 9 | MR. COREY:  Objection; form. | 15:03:47 |
| 10 | A.    I couldn't give you a very | 15:03:49 |
| 11 | good answer to it. | 15:03:50 |
| 12 | Q.    At some point after a PLS new | 15:03:51 |
| 13 | trade commitment did Freddie Mac receive | 15:03:57 |
| 14 | a prospectus supplement for a deal? | 15:03:59 |
| 15 | MR. COREY:  Objection; form. | 15:04:01 |
| 16 | A.    I believe so. | 15:04:02 |
| 17 | Q.    So is it fair to say that | 15:04:03 |
| 18 | before a PLS purchase occurred, the | 15:04:07 |
| 19 | following steps took place:  A dealer | 15:04:12 |
| 20 | provides strats for the Freddie loans and | 15:04:18 |
| 21 | for the aggregate loans to a trader; is | 15:04:23 |
| 22 | that right? | 15:04:25 |
| 23 | A.    Yes. | 15:04:25 |
| 24 | Q.    And Freddie Mac runs the deal | 15:04:26 |
| 25 | through Mortgage Pricer; is that right? | 15:04:33 |

MICHAEL H. ANEIRO - 6/6/2013

Page 240

| | | |
|---|---|---|
| 1 | A.    Correct. | 15:04:35 |
| 2 | Q.    And runs the ROE calculator; | 15:04:36 |
| 3 | is that right? | 15:04:39 |
| 4 | A.    Correct. | 15:04:40 |
| 5 | Q.    And conducts a housing goals | 15:04:40 |
| 6 | analysis, right? | 15:04:43 |
| 7 | A.    Correct. | 15:04:44 |
| 8 | Q.    Determines which prepayment | 15:04:45 |
| 9 | models to use? | 15:04:53 |
| 10 | A.    I think that would be a step. | 15:04:55 |
| 11 | MR. COREY:  Objection; form. | 15:04:58 |
| 12 | A.    Before using Mortgage Pricer. | 15:04:59 |
| 13 | Q.    Conducts a credit analysis? | 15:05:01 |
| 14 | A.    Correct. | 15:05:06 |
| 15 | Q.    There has to be a credit | 15:05:07 |
| 16 | approval for the deal; is that correct? | 15:05:09 |
| 17 | A.    Correct. | 15:05:11 |
| 18 | Q.    And then the trade is | 15:05:16 |
| 19 | finalized on a trade ticket?  Well I | 15:05:18 |
| 20 | guess first the trade is communicated to | 15:05:22 |
| 21 | the dealer; is that right? | 15:05:24 |
| 22 | A.    Correct. | 15:05:32 |
| 23 | Q.    And then the trade is | 15:05:32 |
| 24 | finalized on a trade ticket? | 15:05:33 |
| 25 | A.    Correct. | 15:05:34 |

```
 1        Q.   And then Freddie Mac receives      15:05:35
 2   a prospectus supplement; is that right?      15:05:36
 3        A.   I don't recall the timing of       15:05:37
 4   the supplement.                              15:05:39
 5        Q.   Okay.  Was anything else           15:05:39
 6   required before a PLS trade could occur?     15:05:55
 7             MR. COREY:  Objection; form.       15:05:58
 8        A.   I don't recall.                    15:06:00
 9        Q.   You don't recall whether           15:06:01
10   anything else was required?                  15:06:03
11        A.   Correct.                           15:06:05
12        Q.   Okay.  Can you sitting here        15:06:05
13   today, can you think of anything else        15:06:08
14   that was required before a PLS deal could    15:06:09
15   occur?                                       15:06:12
16             MR. COREY:  Same objection.        15:06:13
17        A.   I can't.                           15:06:14
18        Q.   Are you familiar with the term     15:06:15
19   transaction viability analysis?             15:06:18
20        A.   I don't remember those words.      15:06:21
21        Q.   Okay.  Are you familiar with       15:06:23
22   the term and I think you mentioned it        15:06:39
23   this morning, free writing prospectus?       15:06:40
24        A.   Yes.                               15:06:43
25        Q.   What's a free writing              15:06:44
```

MICHAEL H. ANEIRO - 6/6/2013

Page 242

```
 1    prospectus?                                    15:06:45
 2           MR. COREY:  Object to form.             15:06:47
 3      A.    From what I understand it was          15:06:49
 4    the transition from what we originally         15:06:50
 5    called a term sheet.  There was some sort      15:06:52
 6    of SEC ruling that required more               15:06:54
 7    oversight or whatever the case may be and      15:07:00
 8    somehow it changed into free writing           15:07:02
 9    prospectus.                                    15:07:05
10      Q.    What kind of information does          15:07:05
11    a free writing prospectus contain about a      15:07:08
12    PLS deal in the years 2005, 2006, 2007?        15:07:10
13           MR. COREY:  Same objection.             15:07:13
14      A.    Size of the deal, general              15:07:15
15    waterfall rules of the deal, any type of       15:07:19
16    interest rate risk mitigation like an          15:07:23
17    available funds cap, loan stratifications      15:07:26
18    that would describe the various                15:07:30
19    attributes of the aggregate loan file, or      15:07:33
20    loan, yes, loan information.                   15:07:37
21           (Deposition Exhibit 5207 for            15:08:21
22           identification, Bates stamped FHFA      15:08:21
23           13747720 through 7731.)                 15:08:21
24      Q.    You've been handed what's              15:08:21
25    marked Exhibit 5207 which at the top says      15:08:23
```

MICHAEL H. ANEIRO - 6/6/2013

Page 358

| | | |
|---|---|---|
| 1 | that we're purchasing.  The preferred | 17:50:43 |
| 2 | yield is on Freddie Mac's preferred stock | 17:50:46 |
| 3 | I believe but I'm not positive -- | 17:50:49 |
| 4 | Q.   Oh. | 17:50:51 |
| 5 | A.   -- about how the model works. | 17:50:52 |
| 6 | Q.   I see.  Okay.  Down in the, | 17:50:54 |
| 7 | back on the trade ticket, FHFA 04592866, | 17:51:03 |
| 8 | at the very bottom of the general use | 17:51:07 |
| 9 | section there's something that says | 17:51:09 |
| 10 | pricing method, colon, HETP. | 17:51:13 |
| 11 | Do you see that? | 17:51:16 |
| 12 | A.   I'm sorry, I don't.  Can you | 17:51:17 |
| 13 | tell me again where it is. | 17:51:18 |
| 14 | Q.   It's just above delivery | 17:51:21 |
| 15 | instructions at the bottom of the general | 17:51:22 |
| 16 | use section. | 17:51:24 |
| 17 | A.   Okay. | 17:51:24 |
| 18 | Q.   Do you see that? | 17:51:25 |
| 19 | A.   I do. | 17:51:26 |
| 20 | Q.   Do you know what that means? | 17:51:26 |
| 21 | A.   I don't. | 17:51:28 |
| 22 | Q.   Do you know who selects the | 17:51:29 |
| 23 | pricing method? | 17:51:30 |
| 24 | A.   I don't remember pricing | 17:51:31 |
| 25 | methods. | 17:51:32 |

MICHAEL H. ANEIRO - 6/6/2013

Page 359

```
 1          Q.    You don't remember at all?          17:51:32

 2          A.    I don't.                            17:51:33

 3          Q.    Would you expect that somebody      17:51:34

 4     in the nonagency desk would select the         17:51:35

 5     pricing method?                                17:51:38

 6                MR. COREY:  Objection to form.      17:51:39

 7          A.    I don't recall well enough to       17:51:40

 8     be able to guess at that.                      17:51:41

 9          Q.    All right.  Now, during 2005        17:51:50

10     to 2007 did Freddie Mac typically receive      17:51:54

11     a prospectus supplement for PLS that it        17:51:58

12     purchased?                                     17:52:02

13          A.    I believe so.                       17:52:03

14          Q.    When?                               17:52:06

15          A.    I don't recall.                     17:52:08

16          Q.    Was it after the trade             17:52:08

17     commitment date?                               17:52:11

18          A.    I don't recall.                     17:52:12

19          Q.    What was your practice with         17:52:13

20     respect to prospectus supplements for          17:52:16

21     deals where you were the portfolio            17:52:20

22     manager in charge?                             17:52:22

23                MR. COREY:  Objection; form.        17:52:25

24          A.    I don't recall.  I don't            17:52:26

25     recall a policy for it.                        17:52:28
```

MICHAEL H. ANEIRO - 6/6/2013

```
 1          Q.    Sorry, I wasn't asking a          17:52:28
 2     policy.  Your practice for deals where       17:52:31
 3     you were the trader, what did you do with    17:52:33
 4     prospectus supplements?                      17:52:36
 5          A.    I don't --                        17:52:37
 6               MR. COREY:  Same objection.        17:52:37
 7          A.    I don't recall.                   17:52:38
 8          Q.    Did you generally read them?      17:52:39
 9          A.    The whole prospectus             17:52:42
10     supplement?                                  17:52:49
11          Q.    Start there, the whole            17:52:49
12     prospectus supplement?                       17:52:51
13          A.    No.                               17:52:51
14          Q.    Did you generally read any        17:52:51
15     part of a prospectus supplement?             17:52:53
16          A.    I would look -- I would scan      17:52:54
17     through various supplements.                 17:52:58
18          Q.    Various supplements meaning       17:53:02
19     you wouldn't scan through every              17:53:04
20     supplement you received?                     17:53:06
21          A.    Correct.                          17:53:08
22          Q.    But some of them you would        17:53:08
23     scan through?                                17:53:10
24          A.    Correct.                          17:53:11
25          Q.    For some deals?                   17:53:11
```

MICHAEL H. ANEIRO - 6/6/2013

Page 361

```
 1        A.    Correct.                          17:53:13
 2        Q.    When you scanned through a        17:53:14
 3   prospectus supplement, which parts did       17:53:17
 4   you look at?                                  17:53:19
 5        A.    I don't recall.                    17:53:20
 6        Q.    Can you recall any parts that      17:53:21
 7   you looked at?                                17:53:24
 8        A.    Not really, no.                    17:53:24
 9        Q.    Do you have any understanding      17:53:26
10   of what others in the nonagency group        17:53:28
11   did, what their practices were with          17:53:31
12   respect to prospectus supplements?           17:53:33
13        A.    I do not.                          17:53:34
14        MR. COREY:  Objection; form.            17:53:35
15        Q.    Did you expect that the people     17:53:36
16   working under you were reading the           17:53:43
17   prospectus supplement for every deal they    17:53:46
18   traded?                                       17:53:48
19        A.    No.                                17:53:48
20        Q.    Did you expect that the people     17:53:48
21   who worked under you were reading any        17:53:52
22   part of the prospectus supplement for       17:53:54
23   every deal they traded?                      17:53:56
24        A.    No.                                17:53:57
25        Q.    Do you have an understanding       17:54:00
```

MICHAEL H. ANEIRO - 6/6/2013

| | | |
|---|---|---|
| 1 | of the practice with respect to | 17:54:11 |
| 2 | prospectus supplements of those who | 17:54:15 |
| 3 | provided the credit approval? | 17:54:16 |
| 4 | A.    I'm sorry, one more time. | 17:54:21 |
| 5 | Q.    Do you have any understanding | 17:54:23 |
| 6 | of the practice with respect to | 17:54:24 |
| 7 | prospectus supplements of those who | 17:54:27 |
| 8 | provided credit approval for PLS deals? | 17:54:28 |
| 9 | MR. COREY:  Objection; form. | 17:54:31 |
| 10 | A.    I don't. | 17:54:32 |
| 11 | Q.    You don't know if they read | 17:54:33 |
| 12 | the prospectus supplements or not? | 17:54:36 |
| 13 | A.    I don't believe they did. | 17:54:37 |
| 14 | Q.    Did anyone at Freddie Mac | 17:54:38 |
| 15 | other than a portfolio manager, somebody | 17:54:42 |
| 16 | on the nonagency desk or somebody | 17:54:44 |
| 17 | providing credit approval for a deal read | 17:54:46 |
| 18 | a prospectus supplement? | 17:54:48 |
| 19 | A.    Again, I'm sorry, could you | 17:54:53 |
| 20 | repeat that. | 17:54:54 |
| 21 | Q.    Did anyone at Freddie Mac -- | 17:54:54 |
| 22 | are you aware of anyone at Freddie Mac, | 17:54:56 |
| 23 | other than the portfolio managers or | 17:54:57 |
| 24 | those providing credit approval for | 17:55:00 |
| 25 | private label securities who read | 17:55:02 |

MICHAEL H. ANEIRO - 6/6/2013

Page 363

```
 1   prospectus supplements?                    17:55:04
 2        A.    The whole, the whole            17:55:05
 3   supplement?                                 17:55:07
 4        Q.    Yes.                             17:55:07
 5        A.    No.                              17:55:07
 6        Q.    Anyone who read parts of the    17:55:08
 7   prospectus supplement?                      17:55:10
 8        A.    I don't recall the difference   17:55:10
 9   between a prospectus and a prospectus       17:55:12
10   supplement.  I know legal reviewed the     17:55:15
11   requirements that they would be found in    17:55:17
12   the proper documents from the deal, but I   17:55:19
13   don't -- I don't recall really the         17:55:23
14   distinction between supplement and full     17:55:25
15   prospectus.                                 17:55:28
16        Q.    So legal reviewed what          17:55:29
17   requirements?                               17:55:35
18        A.    The investment requirements.    17:55:35
19        Q.    The investment requirements we  17:55:41
20   were just looking at?                       17:55:42
21             MR. COREY:  Objection; form.     17:55:43
22        A.    Can you just ask the question   17:55:45
23   again.                                      17:55:47
24        Q.    You said "I know legal          17:55:47
25   reviewed the requirements that they would   17:55:49
```