# Exhibit B

# In The Matter Of:

*FEDERAL HOUSING FINANCE AGENCY, ETC.*

_____

## *ASHLEY DYSON - Vol. 2*
### *September 12, 2013*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

FEDERAL HOUSING FINANCE AGENCY, etc.       :

 Plaintiff,                                :

 vs.                                       : 11 Civ. 6188

JPMORGAN CHASE & CO., et al.               : (DLC)

 Defendants.                               :

----------------------------------------x

FEDERAL HOUSING FINANCE AGENCY, etc.,      :

 Plaintiff,                                :

 vs.                                       : 11 Civ. 6189

HSBC NORTH AMERICA HOLDINGS, INC., et      :  (DLC)

al.,                                       :

 Defendants.                               :

----------------------------------------x

FEDERAL HOUSING FINANCE AGENCY, etc.,      :

 Plaintiff                                 :

 vs.                                       : 11 Civ. 6190

BARCLAYS BANK PLC, et al.,                 : (DLC)

 Defendants.                               :

----------------------------------------x

Videotaped Deposition of Ashley Dyson, Volume 2

Thursday, September 12, 2013

ASHLEY DYSON - 9/12/2013

```
 1    ----------------------------------------x

 2    FEDERAL HOUSING FINANCE AGENCY, etc.,    :

 3      Plaintiff,                             :

 4           vs.                              : 11 Civ. 6192

 5    DEUTSCHE BANK AG, et al.,                : (DLC)

 6      Defendants.                            :

 7    ----------------------------------------x

 8    FEDERAL HOUSING FINANCE AGENCY, etc.,    :

 9      Plaintiff,                             :

10    vs.                                      : 11 Civ. 6193

11    FIRST HORIZON NATIONAL CORP., et al.,    : (DLC)

12      Defendants.                            :

13    ----------------------------------------x

14    FEDERAL HOUSING FINANCE AGENCY, etc.,    :

15      Plaintiff,                             :

16    vs.                                      : 11 Civ. 6195

17    BANK OF AMERICA CORP., et al.            :

18      Defendants.                            :

19    ----------------------------------------x

20    FEDERAL HOUSING FINANCE AGENCY, etc.,    :

21      Plaintiff,                             :

22    vs.                                      : 11 Civ. 6198

23    GOLDMAN, SACHS & CO., et al.,            : (DLC)

24      Defendants.                            :

25    ----------------------------------------x
```

```
 1     ----------------------------------------x
 2     FEDERAL HOUSING FINANCE AGENCY, etc.,    :
 3        Plaintiff,                            :
 4             vs.                              : 11 Civ. 6200
 5     CREDIT SUISSE HOLDINGS (USA), INC.,      : (DLC)
 6     et al.,                                  :
 7        Defendants.                           :
 8     ----------------------------------------x
 9     FEDERAL HOUSING FINANCE AGENCY, etc.,    :
10        Plaintiff,                            :
11        vs.                                   : 11 Civ. 6201
12     NOMURA HOLDING AMERICA, INC., et al.,    : (DLC)
13        Defendants.                           :
14     ----------------------------------------x
15     FEDERAL HOUSING FINANCE AGENCY, etc.,    :
16        Plaintiff,                            :
17        vs.                                   : 11 Civ. 6202
18     MERRILL LYNCH & CO., INC., et al.,       : (DLC)
19        Defendants.                           :
20     ----------------------------------------x
21
22
23
24
25
```

ASHLEY DYSON - 9/12/2013

```
 1    ----------------------------------------x

 2    FEDERAL HOUSING FINANCE AGENCY, etc.,     :

 3     Plaintiff,                               :

 4     vs.                                      : 11 Civ. 6203

 5    SG AMERICAS, INC., et al.,                : (DLC)

 6     Defendants.                              :

 7    ----------------------------------------x

 8    FEDERAL HOUSING FINANCE AGENCY, etc.,     :

 9     Plaintiff,                               :

10     vs.                                      : 11 Civ. 6739

11    MORGAN STANLEY, et al.,                   : (DLC)

12     Defendants.                              :

13    ----------------------------------------x

14

15

16

17

18

19

20

21

22

23

24

25
```

ASHLEY DYSON - 9/12/2013

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  DISTRICT OF CONNECTICUT

 3      ----------------------------------x

 4      FEDERAL HOUSING FINANCE AGENCY,     :

 5      etc.,                               :

 6       Plaintiff,                         :

 7       vs.                                : Case No.

 8      THE ROYAL BANK OF SCOTLAND GROUP     : 3:11-cv-01383-AWT

 9      PLC, et al.,                        :

10       Defendants.                        :

11      ----------------------------------x

12

13

14

15                      Volume II

16          Videotaped Deposition of Ashley Dyson

17                    Washington, D.C.

18                  September 12, 2013

19                      9:11 a.m.

20

21

22

23      Job No. 238478

24      Pages 401 - 414

25      Reported by:  Bonnie L. Russo
```

```
 1                       ASHLEY DYSON

 2      without looking at one of the examples of our

 3      stip sheets.

 4               BY MR. BREBNER:

 5          Q.   So Fannie Mae may or may not have

 6      allowed no-doc and low-doc loans at different

 7      points in time?

 8               MR. COREY:  Same objection.

 9               THE WITNESS:  Documentation was one

10      of the stipulations that we did consider in our

11      purchases.

12               BY MR. BREBNER:

13          Q.   But you can't tell me, sitting here

14      today, what the documentation requirements that

15      Fannie Mae expected in the pools were, can you?

16          A.   I can't remember.

17          Q.   I think you said before that the

18      goal was to get as many as possible housing

19      goal-accretive loans in the pool.  The goal was

20      ultimately to get a hundred percent housing

21      goal-accretive loans if that was possible,

22      right?

23               MR. COREY:  Objection to form.

24               THE WITNESS:  I don't know that it

25      was ever possible to purchase a pool that was a
```

ASHLEY DYSON - 9/12/2013

```
 1                         ASHLEY DYSON
 2      hundred percent housing goals accretive, but it
 3      was certainly a consideration that we had in
 4      purchasing a pool, but it was not the only
 5      consideration that we had.
 6               BY MR. BREBNER:
 7          Q.    But the goal, the idea would have
 8      been to get a hundred percent if that were
 9      possible?
10               MR. COREY:  Objection to form.
11               THE WITNESS:  Again, I don't know
12      that that ever would have been possible.
13               BY MR. BREBNER:
14          Q.    Do you know whether Fannie Mae ever
15      bought any pools of loans that were a hundred
16      percent goal accretive?
17          A.    I can't remember.
18          Q.    Fannie Mae could have purchased
19      goals that were a hundred percent goal
20      accretive; you don't know?
21               MR. COREY:  Same objection.
22               THE WITNESS:  That, I don't know.
23               BY MR. BREBNER:
24          Q.    Fannie Mae could have pooled --
25      purchased pools that were nearly a hundred
```

ASHLEY DYSON - 9/12/2013

```
 1                         ASHLEY DYSON
 2      percent goal accretive; you don't know that
 3      either?
 4           A.    I can't remember.
 5           Q.    I want to talk a little bit about
 6      the subprime deal goal optimization process
 7      that you went through as a trader at Fannie
 8      Mae.
 9           A.    Okay.
10           Q.    Is it fair to say you started out by
11      being contacted by a dealer for the purposes of
12      facilitating an MBS transaction?
13                 MR. COREY:  Objection to form.
14                 THE WITNESS:  Yes, that's correct.
15                 BY MR. BREBNER:
16           Q.    And then you would collect a loan
17      tape from the dealer with the conforming loans,
18      the pool that the dealer was attempting to sell
19      to Fannie Mae, right?
20                 MR. COREY:  Same objection.
21                 THE WITNESS:  At what point in time
22      are you referring to the collection of the loan
23      tape?
24                 BY MR. BREBNER:
25           Q.    Well, in 2006, you would collect a
```

```
 1                    ASHLEY DYSON
 2     loan tape from a dealer, right?
 3             MR. COREY:  Same objection.
 4             THE WITNESS:  In 2006, the company
 5     would collect a loan tape from a dealer, yes.
 6             BY MR. BREBNER:
 7        Q.    And in 2005, the company would
 8     collect a loan tape from a dealer?
 9             MR. COREY:  Same objection.
10             THE WITNESS:  For every deal that I
11     worked on, yes, I believe so.
12             BY MR. BREBNER:
13        Q.    And, in 2007, the company would
14     collect a loan tape from a dealer?
15             MR. COREY:  Same objection.
16             THE WITNESS:  Yes.
17             BY MR. BREBNER:
18        Q.    So in the entire time period, 2005
19     to 2007, the company would collect a loan tape
20     from a dealer?
21             MR. COREY:  Same objection.
22             THE WITNESS:  Yes, that is correct.
23             BY MR. BREBNER:
24        Q.    And at a certain point you worked
25     there -- when you were working as a trader
```

```
 1                          ASHLEY DYSON
 2     through 2006 the dealers would send the loan
 3     tapes to you as the trader, correct?
 4          A.    Yes.  There was a point in time when
 5     the dealers would send the loan tape directly
 6     to the -- the desk, the members of the trading
 7     team, but that process later changed.
 8          Q.    It later changed to the loan tapes
 9     being sent to somewhere else within Fannie Mae,
10     correct?
11          A.    Correct.
12          Q.    And when the process was still such
13     that the trader received the loan tape, what
14     you would then do with it was e-mail the tape
15     to the senior deal structuring manager in the
16     investor channel?
17          A.    I believe I remember that as being
18     correct, yes.
19          Q.    And at one point, was that Jon
20     Everngan?
21          A.    Jon Everngan was a senior deal
22     structure manager, yes.
23          Q.    And the senior deal structuring
24     manager would run the tape through Fannie Mae's
25     software to identify loans that qualify as
```

```
 1                     ASHLEY DYSON

 2             MR. COREY:  Same objections.

 3             THE WITNESS:  We did keep as many

 4     housing goal rich loans that we could in the

 5     pool, but they were not the only loans that we

 6     kept in the pool.

 7             BY MR. BREBNER:

 8        Q.    But you also took out loans that

 9     were not goal-accretive, correct?

10        A.    We also took out loans that didn't

11     meet our stips necessarily either or loans that

12     we chose not to keep in the deal for -- for a

13     number of reasons.

14        Q.    You would select the individual

15     loans you wanted to keep in the deal?

16             MR. COREY:  Objection to the form.

17             THE WITNESS:  Yes.

18             BY MR. BREBNER:

19        Q.    Based on Fannie Mae's credit and

20     housing goal criteria?

21             MR. COREY:  Objection to form.

22             THE WITNESS:  Could you repeat?

23             MR. COREY:  No question pending.

24             THE WITNESS:  Could you repeat your

25     question?
```

```
 1                     ASHLEY DYSON
 2              BY MR. BREBNER:
 3         Q.    You would select the individual
 4    loans to keep in the deal based on Fannie Mae's
 5    credit and housing goal criteria?
 6         A.    I'm not certain that credit criteria
 7    was used in scoring for housing goals.  That
 8    was based on income.
 9         Q.    I -- I'm using credit criteria as a
10    term for what you have been describing as the
11    criteria you looked at other than housing
12    goals.
13              Is that not a fair description of
14    the criteria you looked at for the collateral
15    other than housing goals?  It wasn't based on
16    the credit of the loans, the credit quality of
17    the collateral?
18              MR. COREY:  Objection to form.
19              THE WITNESS:  Yes, it was, but I was
20    just trying to understand your question because
21    you had attached credit as a qualifier to
22    housing goals.  So there are two different
23    criteria in consideration.
24              Are you talking about the way we
25    selected housing goals rich loans or the way
```

ASHLEY DYSON - 9/12/2013

```
 1                    ASHLEY DYSON
 2     that we selected all the other loans in the
 3     pool, too?
 4               BY MR. BREBNER:
 5          Q.   Those are the two selection
 6     criteria, credit and housing goals.
 7               Do I have that right?
 8               MR. COREY:  Objection to form.
 9               THE WITNESS:  Credit and housing
10     goals both applied to every loan in the deal.
11     Every loan had to meet our stips, our reps and
12     warranties.  Housing goals was a subset of that
13     credit analysis that was performed for all the
14     loans.
15               BY MR. BREBNER:
16          Q.   I thought you just told me that
17     housing goals wasn't part of the credit
18     analysis?
19          A.   Housing goals was a -- was a subset
20     of the -- of the analysis that was used.
21          Q.   Housing goals was part of the loan
22     selection process, right?
23          A.   Yes.
24          Q.   When you were trying to select loans
25     for housing goals, you were trying to include
```

ASHLEY DYSON - 9/12/2013

```
 1                        ASHLEY DYSON
 2      as many loans as you could from low and
 3      moderate income borrowers, right?
 4               MR. COREY:  Objection.  Form.
 5               THE WITNESS:  They would have been
 6      included in that selection that the bulk
 7      structuring group would have run and been
 8      flagged based on medium incomes, yes.
 9               BY MR. BREBNER:
10          Q.   So when you were selecting loans for
11      housing goals you were trying to include as
12      many loans as you could from low and moderate
13      income borrowers, right?
14               MR. COREY:  Same objection.
15               THE WITNESS:  Those were the loans
16      that would have qualified as goals rich loans
17      for the deal.
18               BY MR. BREBNER:
19          Q.   So some of the loans that you would
20      have put in the deleted loans tab and taken out
21      of the deal would have been loans where the
22      borrower income was too high for the housing
23      goal requirements, right?
24               MR. COREY:  Same objection.
25               THE WITNESS:  That is possible.  But
```

ASHLEY DYSON - 9/12/2013

```
 1                       ASHLEY DYSON
 2      those may not have been the only loans that we
 3      would have excluded from the deal.
 4                   BY MR. BREBNER:
 5          Q.    Right.
 6                   And my question wasn't the only
 7      loans you excluded.
 8                   My question was:  Some of the loans
 9      that you would have put in the deleted loans
10      tab, taken out of the deal would have been
11      loans where the borrower's income was too high
12      for housing goal requirements, right?
13                   MR. COREY:  Same objection.
14                   THE WITNESS:  That could have been
15      possible.
16                   BY MR. BREBNER:
17          Q.    That happened, right?
18          A.    I believe so, yes.
19          Q.    And in the second half of 2006
20      Fannie Mae had a particular drive to meet its
21      housing goals commitment, correct?
22                   MR. COREY:  Objection to form.
23                   THE WITNESS:  I -- I don't recall
24      that.
25                   BY MR. BREBNER:
```

```
 1                    ASHLEY DYSON

 2    period.

 3              BY MR. STARK:

 4         Q.   Okay.  But that did occur during the

 5    time period you were working and trading RMBS

 6    at Fannie, right?

 7         A.   I -- i do recall home prices

 8    levelling off during that period, yes.

 9         Q.   Right.

10              And then unemployment increased

11    during that time?

12              MR. COREY:  Objection to form.

13              THE WITNESS:  I don't remember.

14              BY MR. STARK:

15         Q.   Foreclosures increased during that

16    time?

17              MR. COREY:  Same objection.

18              THE WITNESS:  I don't remember

19    specifically.  If you're referring on a

20    national level, geographically, I can't

21    remember.

22              BY MR. STARK:

23         Q.   Okay.  Did anyone at Fannie Mae in

24    response to one of your humorous weekly

25    summaries say to you in substance, this is no
```

ASHLEY DYSON - 9/12/2013

```
 1                      ASHLEY DYSON

 2    laughing matter?

 3         A.    I don't remember.

 4         Q.    Anyone ever say to you, this is not

 5    something to joke about, people are losing

 6    their homes and their jobs?

 7         A.    I don't recall that.

 8         Q.    No one ever said that to you at

 9    Fannie Mae, to the best of your knowledge?

10         A.    I don't remember.

11              MR. STARK:  Okay.  I thank you for

12    your time.  I'm going to accede the microphone

13    to someone else.

14              THE WITNESS:  Thank you.

15              THE VIDEOGRAPHER:  We are going off

16    the record.  The time is 12:37 p.m..

17              (A short recess was taken.)

18              THE VIDEOGRAPHER:  We are back on

19    the record.  The time is 1:35 p.m..

20         EXAMINATION BY COUNSEL FOR DEFENDANT

21                   GOLDMAN SACHS

22              BY MS. BRADLEY:

23         Q.    Good afternoon, Ms. Dyson.  My name

24    is Megan Bradley.  I represent the Goldman,

25    Sachs defendants in this action.  For now I
```

ASHLEY DYSON - 9/12/2013

```
 1                      ASHLEY DYSON

 2      will be asking you questions on behalf of all

 3      defendants.

 4              You testified earlier in response to

 5      questioning from Mr. Stark that PSAs,

 6      prospectus supplements, any mortgage loan

 7      agreements were all documents that were created

 8      after a RMBS deal was purchased by Fannie Mae;

 9      is that correct?

10          A.    To the best of my knowledge, yes.

11          Q.    So there is no way you could have

12      relied on those documents in deciding to

13      purchase an RMBS for Fannie Mae, correct?

14              MR. COREY:  Object to form.

15              THE WITNESS:  The main source of

16      information that I relied upon on making my

17      purchases was the information, the loan

18      information that was supplied by the dealers.

19              THE VIDEOGRAPHER:  I'm sorry.  We

20      need to go off for just one second.

21              We are going off the record.  The

22      time is 1:36 p.m..

23              (Pause.)

24              THE VIDEOGRAPHER:  We are back on

25      the record.  The time is 1:37 p.m..
```

ASHLEY DYSON - 9/12/2013

Page 575

```
 1                        ASHLEY DYSON

 2              BY MS. BRADLEY:

 3         Q.    My question to you was:  There was

 4     no way you could have relied on documents that

 5     were created after you agreed to purchase an

 6     RMBS deal in your decision to purchase that

 7     RMBS deal; is that correct?

 8              MR. COREY:  Objection to form.

 9              THE WITNESS:  The deal that I --

10     sorry.  The information that I relied upon in

11     making my decision for purchase came from the

12     collateral information that was provided from

13     the dealer as to the composition of the

14     underlying loans.  These were all standard

15     documents that would have been generated after

16     the deal.

17              BY MS. BRADLEY:

18         Q.    So you did not rely on those

19     standard documents in your decision to purchase

20     the deal; is that right?

21              MR. COREY:  Objection.  Misstates

22     testimony.

23              THE WITNESS:  Again, the information

24     that I relied upon was based on the collateral

25     information provided to me by the dealers, and
```

```
 1                          ASHLEY DYSON
 2      they were not created at the time that I would
 3      have made my investment decision.
 4                 BY MS. BRADLEY:
 5           Q.    So you could not have relied upon
 6      them because they were not created at the time
 7      you made your decision, right?
 8                 MR. COREY:  Objection.  Asked and
 9      answered.
10                 THE WITNESS:  I didn't rely upon
11      them because it did not exist until after the
12      deal was done, and it wouldn't have been
13      information that I would have relied upon
14      anyway in making my investment decision.
15                 BY MS. BRADLEY:
16           Q.    Okay.  Now, what information did you
17      look at prior to your decision to purchase an
18      RMBS?
19           A.    Are you referring to the information
20      that would have been sent to me from the
21      dealer?
22           Q.    Well, actually I'm just looking for
23      your recollection of what you looked at when
24      you were deciding whether to purchase a PLS.
25      What was the information you typically looked
```

ASHLEY DYSON - 9/12/2013

```
 1                   ASHLEY DYSON
 2    at?
 3        A.    In general our process was standard.
 4    We would receive a loan tape from the lender
 5    that would give us the underlying details
 6    backing the collateral that we would end up
 7    structuring in our purchase decision.
 8              Other information in a very broad
 9    sense would have been the term sheet would have
10    been summarized all of the information from the
11    loan tape after our carve outs were created.
12              We could receive a CDI file from the
13    dealer, which we would run through an interest
14    rate prepayment model.  We could also consider
15    other deals that we had purchased in our
16    analysis for pricing.
17              Those are just a handful of things
18    that we may have analyzed in our purchase
19    decision.
20        Q.    So other than the loan tape, the
21    term sheet, the CDI file, and I guess documents
22    associated with other deals, do you recall
23    receiving and reviewing any other information
24    to decide whether to buy a given RMBS?
25              MR. COREY:  Objection to form.
```

ASHLEY DYSON - 9/12/2013

```
 1                        ASHLEY DYSON

 2            THE WITNESS:  Are you again

 3    referring to information that I would have

 4    received from the dealer?

 5            BY MS. BRADLEY:

 6      Q.    Actually, any information that you

 7    looked at in deciding whether to buy an RMBS?

 8      A.    Something else I may have received

 9    from the dealer could have been maybe an

10    available funds cap schedule, which would have

11    run different interest rate scenarios for the

12    collateral underlying the deal.  Any market

13    commentary they may have provided.

14      Q.    Anything else that you can think of

15    that you would look at in deciding whether to

16    purchase a given RMBS?

17            MR. COREY:  Same objection.

18            THE WITNESS:  Not that I can

19    remember at this time.  I know that this list

20    was not exclusive to every deal, but that is

21    just the basic stuff that I would look at in my

22    decision making.

23            BY MS. BRADLEY:

24      Q.    And the market commentary, where did

25    that come from?
```

ASHLEY DYSON - 9/12/2013

page_575Page 579

```
 1                    ASHLEY DYSON

 2        A.    Market commentary could have been

 3   supplied from anybody on the street.  It could

 4   have come from traders.  It could have come

 5   from investment analysts, economists, research

 6   folks.  A lot of the market commentary would

 7   have come directly from Wall Street firms, and

 8   also colleagues internally as well or people

 9   outside of Wall Street as well.

10        Q.    And Wall Street firms that assumes

11   the defendants that are here today, the banks

12   here today like Goldman, Sachs?

13        A.    Sure.  We refer to them as dealers.

14        Q.    Okay.  And you would consider the

15   market color they provided in your decision

16   about whether to purchase a security from these

17   dealers?

18        A.    It was, again, just information that

19   we would have received in the scope of our

20   daily jobs in purchasing non-agency securities.

21        Q.    It is something that you recall

22   considering when you were deciding whether to

23   purchase a given PLS, right?

24        A.    Something we would read.

25        Q.    And you would consider it if you
```

ASHLEY DYSON - 9/12/2013

```
 1                          ASHLEY DYSON

 2      thought it was relevant to your decision?

 3           A.    Considering whatever it reported on

 4      in terms of market trends, issuance volumes,

 5      anything of that nature.  It could have been

 6      commentary stating we have three new deals

 7      coming out next week.  That could have been

 8      used as consideration, too, because then we

 9      would have anticipated that we could have

10      possibly been seeing more opportunities from

11      those particular dealers to purchase

12      securities.

13           Q.    So prior to entering -- withdraw

14      that.

15                Prior to deciding to purchase a PLS

16      you would look at or you would potentially look

17      at loan tape, term sheet, CDI file, other deals

18      and market commentary.  Anything else?

19                MR. COREY:  Objection.  Form.

20                THE WITNESS:  We also did internal

21      analysis as well.  We would attach a deal

22      analysis sheet which had a breakout of the

23      basic characteristics of the collateral.  Once

24      our credit analysis group had been established

25      we had a pre-trade analysis that may have been
```

ASHLEY DYSON - 9/12/2013

```
 1                    ASHLEY DYSON
 2    created.  We have already seen one prepared by
 3    Lin Cao.  A pre-settlement review checklist.
 4    Things of those natures we would have
 5    considered.
 6              BY MS. BRADLEY:
 7        Q.    And now I just want to make sure I
 8    understand.  The credit review, would that have
 9    been prior to purchasing or would that have
10    been after purchasing and prior to settlement?
11        A.    Well --
12              MR. COREY:  Objection.  Form.
13              THE WITNESS:  The credit analyst
14    would have been performing the credit analysis
15    simultaneously to us looking at the deal, and
16    so it would have been performed in conjunction
17    with us on the trading desk considering how to
18    price the deal or consider it for purchase.
19              BY MS. BRADLEY:
20        Q.    So would it be fair to say that
21    sometimes the credit analysis was completed
22    prior to purchase and sometimes it was
23    completed after purchase but prior to
24    settlement?
25        A.    Yes.  And again in some cases before
```

ASHLEY DYSON - 9/12/2013

```
 1                    ASHLEY DYSON
 2    we had our credit analyst team in place we did
 3    not necessarily have a pre-trade analysis sheet
 4    that would have been completed.
 5        Q.   Now, once you agree to purchase a
 6    PLS for Fannie Mae what was the next step?
 7    What is the next step you took?
 8             MR. COREY:  Objection.  Form.
 9             THE WITNESS:  Are you referring to
10    the point where we actually finalized the
11    collateral or after we have priced it, entered
12    into the transaction?
13             BY MS. BRADLEY:
14        Q.   Well, which comes first?  What is
15    the process for entering into a trade?
16        A.   Well, first we would finalize the
17    collateral and then our credit analyst group
18    would produce the pre-trade analysis sheet.  We
19    would decide pricing.  Sometimes we would make
20    certain requests in terms of finalizing the
21    collateral if we wanted to add like a super
22    senior tranche for extra subordination for the
23    Triple As.  Sometimes we would request that
24    maybe a wrapper could wrap the junior mez
25    portion of the deal.  These were all
```

ASHLEY DYSON - 9/12/2013

```
 1                    ASHLEY DYSON

 2    considerations that were made through the

 3    decision-making process.

 4             But once the collateral was

 5    finalized and the structure was finalized we

 6    would agree on the pricing of the bond, and

 7    that is pretty much where my -- where my role

 8    ended.

 9       Q.    What documents did you personally

10    review in connection with your purchase of a

11    PLS for Fannie Mae?

12       A.    Again, all the documents from either

13    the dealer and what would have been produced by

14    our companies, is that what you mean?

15       Q.    I am just asking for the documents

16    that you would personally look at when you were

17    -- when -- in connection with buying a security

18    for Fannie Mae?

19       A.    It would have been all the documents

20    that I just mentioned in your previous

21    questioning.

22       Q.    Okay.  So the loan tape, the term

23    sheet?

24       A.    If I can just correct you.

25       Q.    Please.
```

ASHLEY DYSON - 9/12/2013

```
 1                    ASHLEY DYSON

 2      A.    And I would have misspoken with term

 3      sheet.  It would have been a collateral strat,

 4      collateral stratification.  And the collateral

 5      stratification would have then made its way

 6      into the preliminary term sheet.

 7      Q.    Okay.  So all the documents -- and

 8      let me just be clear that I am talking about

 9      during your entire involvement with the

10      purchase of a PLS for Fannie Mae, not just

11      before you decided to enter into the trade.

12      Which documents would you have reviewed?

13      A.    Well, those are the documents

14      specific to deal purchases.  There were other

15      documents that, you know, we may have

16      distributed back and forth between the firms.

17      You have seen that I may have e-mailed our

18      subprime stips or our Alt-A stips or our reps

19      and warranties.  These were not documents that

20      I was responsible for creating, but I may have

21      disseminated them to the dealer with whom I was

22      engaging in.

23      Q.    In addition to the documents that

24      you have identified for me would you review any

25      other documents in connection with your
```

ASHLEY DYSON - 9/12/2013

```
 1                         ASHLEY DYSON
 2      purchase of an RMBS for Fannie Mae?
 3                  MR. COREY:  Object to form.
 4                  THE WITNESS:  Pre-purchase, no.  I
 5      think most everything that would have been
 6      produced would have been produced after we had
 7      agreed on pricing and actually priced the
 8      security.
 9                  BY MS. BRADLEY:
10          Q.    And after you priced the security
11      what documents would you review in connection
12      with that purchase?
13          A.    Typically a finalized term sheet
14      would be produced and then a prospectus,
15      prospectus supplement, and then there was other
16      legal documentation specific to each deal that
17      was pretty standard like the PSA and the MLPA,
18      those things which I didn't have any
19      involvement in preparing.
20                  And I don't recall looking at those
21      documents for every deal that I created, but
22      they were documents that would have been
23      produced as part of the final process.
24          Q.    So which documents, types of
25      documents do you recall personally reviewing
```