# Exhibit M

Page 1

```
 1    UNITED STATES DISTRICT COURT
 2    SOUTHERN DISTRICT OF NEW YORK
 3    ------------------------------)
      FEDERAL HOUSING FINANCE        )
 4    AGENCY, etc.,                  )
                                     )
 5            Plaintiff,             )
                                     )
 6       V.                          )
                                     )
 7    UBS AMERICAS, INC.,            )11 Civ. 5201 (DLC)
      et al.,                        )
 8    JPMORGAN CHASE & CO.,          )11 Civ. 6188 (DLC)
      et al.,                        )
 9    HSBC NORTH AMERICA             )11 Civ. 6189 (DLC)
      HOLDINGS, INC. et al.,         )
10    BARCLAYS BANK PLC, et al.,     )11 Civ. 6190 (DLC)
      DEUTSCHE BANK AG, et al.,      )11 Civ. 6192 (DLC)
11    FIRST HORIZON NATIONAL         )11 Civ. 6193 (DLC)
      CORP., et al.,                 )
12    BANK OF AMERICA CORP., et al.,)11 Civ. 6195 (DLC)
      GOLDMAN, SACHS & CO., et al., )11 Civ. 6198 (DLC)
13    CREDIT SUISSE HOLDINGS (USA), )11 Civ. 6200 (DLC)
      INC., et al.,                  )
14    NOMURA HOLDING AMERICA, INC., )11 Civ. 6201 (DLC)
      et al.,                        )
15    MERRILL LYNCH & CO., INC.,     )11 Civ. 6202 (DLC)
      et al.,                        )
16    SG AMERICAS, INC., et al.,     )11 Civ. 6203 (DLC)
      MORGAN STANLEY, et al.,        )11 Civ. 6739 (DLC)
17    ALLY FINANCIAL INC., et al.,  )11 Civ. 7010 (DLC)
              Defendants.            )
18    ------------------------------)
19                    ADOLPHUS HOTEL
                  1321 Commerce Street
20                Dallas, Texas 75202
                    Century Room A
21                  June 27, 2013
                     7:11 A.M.
22
                VIDEOTAPED DEPOSITION OF
23                   DAVID HACKNEY
                      Volume 1
24
      REPORTED BY:
25    WILLIAM M. FREDERICKS, CSR FOR THE STATE OF TEXAS
```

1    times the dealer was always trying to talk it up to

2    get you to pay more and you were trying to pay less.

3    So --

4         A.   I didn't take it personally.  They did it

5    with everybody.

6         Q.   I -- I understand.  I understand.

7                   So you and you would expect other

8    purchasers of non-agency mortgage-backed

9    securities had a healthy skepticism of what dealers

10   were telling you about their deals?

11                   MR. OBLAK:  Objection to form.

12        A.   No.  I had to take what they produced as

13   factual.

14        Q.   (BY MR. SACCA)  But you understood, I thought

15   you said, that they were trying to talk it up to you?

16                   MR. OBLAK:  Objection to form.

17        A.   They would try to talk up, My stuff has

18   traded in the market so well, the market is

19   tightening, I've got a hundred people lined up to buy

20   this deal, and I called you.

21        Q.   (BY MR. SACCA)  Okay.  And --

22        A.   That's generally how that conversation would

23   start.

24        Q.   When they told you that they had a hundred

25   people lined up but called you first, would you

1    believe them?

2                    MR. OBLAK:  Objection to the form.

3        A.    That was their -- their comment to me.

4        Q.    (BY MR. SACCA)  Right.  But did you take that

5    at face value?

6                    MR. OBLAK:  Objection to form.

7        A.    I had to take -- take it at what they said.

8        Q.    (BY MR. SACCA)  So were you motivated to buy

9    deals because you were worried that if you didn't

10    someone else would?

11        A.    No.

12        Q.    What about Fannie Mae?  Were you concerned

13    with the number of and volume of deals Fannie Mae was

14    transacting in the non-agency mortgage-backed side?

15                    MR. OBLAK:  Objection to form.

16        A.    We were natural competitors.  That's why

17    Freddie Mac was started.

18        Q.    (BY MR. SACCA)  And you were competing for

19    the same pool of goal-eligible loans, right?

20                    MR. OBLAK:  Objection to form.

21        A.    I wasn't competing for goal-eligible loans.

22        Q.    (BY MR. SACCA)  Freddie Mac was?

23                    MR. OBLAK:  Same objection.

24        A.    I don't know if -- if you could even say

25    Freddie Mac was.  We -- we scored those loans, but to

1   say that I was out competing for loans in that way,

2   no.

3        Q.   (BY MR. SACCA)  Were you cognizant of the

4   volume that Fannie Mae was transacting?

5             MR. OBLAK:  Objection to form.

6        A.   I didn't know to -- I couldn't tell you

7   accurately how much volume they had transacted.  Did I

8   know they were in the market?  Yes.

9        Q.   (BY MR. SACCA)  Were there occasions on which

10  you lost deals to Fannie Mae?

11       A.   Yes.

12       Q.   At what stage in your purchase of a

13  non-agency mortgage-backed security would Freddie Mac

14  receive a prospectus supplement?

15       A.   Before the -- before the actual purchase.

16       Q.   And when you say "the actual purchase,"

17  what -- what are you talking about?

18       A.   Where you're actually committing dollars and

19  you do a, what would be considered a live trade.

20       Q.   Is that the settlement date?

21       A.   No.

22       Q.   Is it the trade date?

23       A.   The trade date.

24       Q.   Okay.  And that precedes the settlement date?

25       A.   Yes.

1      Q.    Okay.  And who at Freddie Mac would receive a

2   prospectus supplement?

3      A.    I would.

4      Q.    And --

5      A.    Or whoever was doing the -- the trade.  It

6   could be Mike or myself.

7      Q.    Was it a requirement for you to enter into a

8   trade that you had received a prospectus supplement?

9              MR. OBLAK:  Objection to form.

10     A.    Can you repeat that.

11     Q.    (BY MR. SACCA)  Was it a requirement for you

12   to enter into a trade that you have received the

13   prospectus supplement?

14     A.    No.

15     Q.    Okay.  That was your practice?

16             MR. OBLAK:  Objection to form.

17     A.    Practice?  I don't understand the question.

18     Q.    (BY MR. SACCA)  Your personal practice was to

19   receive the prospectus supplement before you committed

20   to a trade?

21             MR. OBLAK:  Objection to form.

22     A.    We would tentatively say we are interested in

23   a transaction based on preliminary information.  We

24   would receive a prospectus -- preliminary prospectus

25   before the trade.  It would be reviewed and compared

1    to what was shown to us when we said we would be

2    interested in the trade.  If it was different, I would

3    not be committed to transact.

4         Q.   (BY MR. SACCA)  The preliminary prospectus,

5    are you talking about a free writing prospectus?

6         A.   Define "free writing."

7         Q.   Well, I'd rather have you tell me what --

8    what it was that you got.

9              The preliminary prospectus, describe it

10   for me.

11             MR. OBLAK:  Objection to form.

12        A.   The final prospectus is something that you

13   would receive after the transaction because invariably

14   you may have, if you were on the dealer side, a loan

15   fall out, thereby you need to refresh your information

16   as of that date so it's a final.  So you're going to

17   receive that after.

18             The preliminary or -- and I don't know

19   whether I'm going to misuse the word, but you brought

20   up --

21        Q.   (BY MR. SACCA)  I -- I don't want you to

22   adopt my term.

23        A.   Okay.  I would receive a packet of

24   information that was a reduced version of what the

25   final prospectus would be, but it had a lot of the --

Page 103

1    let's just say the legalese language in there.  It

2    would describe the waterfall structure; it would have

3    the collateral stratification breakouts in that.

4                   And from that collateral stratification,

5    that would be reviewed and compared to what -- the

6    initial collateral stratification that was sent by the

7    dealer into our desk, whether that was substantially

8    and materially the same; and if it was not, then there

9    may not be a transaction.

10       Q.    And who was it that made the comparison to

11   determine whether the collateral described in the

12   document you're talking about now was substantially

13   and materially the same as the initial collateral

14   stratification?

15       A.    Generally the person that reviewed the first

16   one.

17       Q.    Okay.  So you or someone else on your desk?

18       A.    (No audible response.)

19              THE REPORTER:  "Yes"?

20       A.    Yes.

21       Q.    (BY MR. SACCA)  How -- this document you're

22   describing that you would receive from a dealer, how

23   thick was it?

24              MR. OBLAK:  Objection to form.

25       A.    I don't remember how many pages it was.  It

Page 104

1    was electronic.

2         Q.    (BY MR. SACCA)  Was it hundreds of pages?

3         A.    I don't recall.

4         Q.    And you described some of its content as

5    legalese.  What -- what did you mean by that?

6         A.    I'd have -- I'd have to see one, but it

7    wouldn't -- it would be the non-analytical, is a

8    better way to maybe say it.  So it was something that

9    was written by the legal area and not by a structured

10   finance person.

11        Q.    And you would make use of the analytical part

12   of it?

13                  MR. OBLAK:  Objection to form.

14        A.    I would make use of the analytical.  Also

15   some of the -- anything that related to the waterfall

16   structure.

17        Q.    (BY MR. SACCA)  Did Aaron Pas work in your

18   group?

19        A.    He did.

20        Q.    And when was he in your group?

21        A.    He was in my group the entire time I was

22   there.

23        Q.    And what was his job?

24        A.    He was also an analyst.  Helped with

25   waterfall structures.

Page 304

1    I -- are we looking at the same thing?

2         A.    I don't think so.

3         Q.    3719?

4         A.    I'm looking at this (indicating).

5         Q.    That's 3718.

6         A.    So which one are we --

7         Q.    I went out of order.

8         A.    Oh, 19.  All right.

9         Q.    3719.

10        A.    Okay.

11        Q.    Is an e-mail dated November 6 (sic) with

12   Freddie Mac investment requirements, right?

13        A.    This is the reps.

14        Q.    These are the reps?

15        A.    And that's why it's specific.  It says "Reps"

16   (indicating).

17        Q.    Can you explain a little bit what you mean by

18   "reps"?

19        A.    This is something that we -- we sent out

20   pre-trade that anybody selling to us needed to

21   acknowledge that they received these reps, and this

22   is -- and I don't recognize which part is different,

23   but somebody had the question Goldman wanted slightly

24   different language.  This is where that language would

25   be.

Page 305

1      Q.    Got it.  All right.  And then -- now let's

2   look at 3718.

3      A.    Okay.

4      Q.    And this looks like a -- the top -- top

5   document at least looks -- is a trade ticket, right?

6      A.    Right.

7      Q.    And your name is on it?

8      A.    Uh-huh.

9      Q.    And it says the trade date is November 16,

10   right, 2006?

11      A.    Correct.

12      Q.    Okay.  So all the e-mail traffic that we

13   looked at before in the prior exhibits from -- 3715,

14   16, 3717 and 3719 were from the dates November 15 and

15   16, right?

16      A.    Other than this one was the 16th too

17   (indicating).

18      Q.    Right.  And then the trade ticket indicates

19   that the trade date is November 16, right?

20      A.    Yes.

21      Q.    So most of the activity in this transaction

22   occurred on those two days, November 16 and 15,

23   correct?

24            MR. OBLAK:  Objection to form.

25      A.    No.

Page 306

1     Q.    (BY MR. HARSCH)   What other --

2     A.    That --

3     Q.    -- activity would have occurred?

4     A.    That would be incorrect.  Mission may have

5  received a loan tape prior to this.  The credit

6  approval from the Credit Department is issued on the

7  15th.  I don't know when they started working on it.

8     Q.    Okay.

9     A.    This is just their approval.  They're --

10  they're done with it saying, I've done all my work.

11  I don't know when they started it.

12     Q.    All right.  So the -- the trade date, what

13  occurs on the trade date?

14     A.    The trade date is -- is an actual firm

15  commitment now.  You've committed money.  We have

16  agreed I'm going to pay; you're going to sell.

17     Q.    I see.  And you said that's a firm

18  commitment?

19     A.    Yeah.

20     Q.    And down at the bottom of the -- the trade

21  ticket, it says "Entry Date, November 16th."  So you

22  would enter this on the date of the trade date, right?

23     A.    That's correct.

24     Q.    On the date that Freddie Mac makes the firm

25  commitment, right?

Page 307

```
1        A.    That's correct.

2        Q.    Okay.  And is it then what you were saying

3   before, when you became less involved in the process

4   and sort of handed it off to the settlement and

5   closing people, that would be after this trade date,

6   right?

7              MR. OBLAK:  Objection to form.

8        A.    That would be after -- after this is entered.

9   So as soon as I entered it, that said this is -- this

10  is the final trade.  There was a couple preliminary

11  steps just before this is -- this is printed that you

12  fill out some things.  But, yeah, as -- as soon as I

13  hit go, yeah.  Then back-office settlement people are

14  involved.

15       Q.    (BY MR. HARSCH)  Okay.  So -- but the go date

16  for purposes of this trade ticket is the November 16,

17  0 -- '06, right?

18       A.    Yeah.

19       Q.    Okay.  And that's the date that the

20  back-office settlement people then would handle the

21  transaction, right?

22       A.    That's when they would --

23              MR. OBLAK:  Objection to form.

24       A.    That's when they would contact Goldman Sachs,

25  for instance, on this trade --
```

Page 308

1        Q.    (BY MR. HARSCH)   Uh-huh.

2        A.    -- and start confirming all the different

3   settlement dates.

4        Q.    Okay.  But -- but your involvement, unless

5   there was some unusual issue, ceased as of the trade

6   date, generally?

7                MR. OBLAK:   Objection to form.

8        A.    Well, my involvement would be I would own

9   this, so I'm involved until I either no longer work

10  there or the deal matured.

11       Q.    (BY MR. HARSCH)   But by November 16, 2006,

12  you had made a firm commitment to go forward with the

13  trade, right?

14                MR. OBLAK:   Objection to form.

15       A.    Correct.  As of -- as of the time that this

16  is executed, I have committed the firm to spending

17  this dollar amount.

18       Q.    (BY MR. HARSCH)   Okay.  Now, would you go

19  back, please, to 3714.  It's the prospectus

20  supplement.

21       A.    Uh-huh.

22       Q.    The date of this prospectus supplement is

23  December 5, 2006, right?

24       A.    Uh-huh.

25       Q.    So you would have received this after Freddie

Page 309

1    Mac had already made a firm commitment to the trade,

2    right?

3         A.    That's correct.

4         Q.    All right.  Is there anything in this

5    prospectus supplement that you would have received

6    after the trade date that you would have looked at in

7    connection with this deal?

8                   MR. OBLAK:  Objection to form.

9         A.    On this particular transaction, I don't know

10   whether I did.  I may have gone back to look at what

11   was published for the collateral and that waterfall

12   structure.

13        Q.    (BY MR. HARSCH)  All right.  Is there

14   anything else in a prospectus supplement like this

15   that you would have reviewed after the trade date?

16                   MR. OBLAK:  Objection to form.

17        A.    I specifically would have reviewed?

18        Q.    (BY MR. HARSCH)  Yeah.

19        A.    Not necessarily.  Freddie Mac would have

20   reviewed, yes.

21        Q.    Okay.  So in these prospectus supplements, if

22   you reviewed them, you would have looked at the -- the

23   collateral strat and the waterfall, and others at

24   Freddie Mac would have looked at the other portions of

25   the prospectus supplement, correct?