# Exhibit U

(Part 1)

**Prospectus Supplement to Prospectus Dated April 18, 2006**

# $1,175,230,000

(Approximate)

**Asset-Backed Certificates, Series 2006-FM2**

## Nomura Home Equity Loan, Inc.,
## Home Equity Loan Trust, Series 2006-FM2

Issuing Entity

| | |
|---|---|
| **Nomura Credit & Capital, Inc.** | **Nomura Home Equity Loan, Inc.** |
| Sponsor | Depositor |
| **Equity One, Inc.** | **Wells Fargo Bank, N.A.** |
| Servicer | Master Servicer and Securities Administrator |

Consider carefully the Risk Factors beginning on page S-14 in this prospectus supplement.

The certificates will represent interests in the Issuing Entity created for Series 2006-FM2 only and will not represent interests in or obligations of Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., the Underwriters, the Master Servicer, the Servicer, the Securities Administrator, the Trustee or any of their respective affiliates.

The following classes of certificates are being offered pursuant to this prospectus supplement and the accompanying prospectus:

| Class | Approximate Initial Certificate Principal Balance[1] | Initial Pass-Through Rate % | Price to Public (%) | Underwriting Discount (%) |
|---|---|---|---|---|
| I-A-1 | $ 525,197,000 | Floating [2] | 100.0000 | 0.1500 |
| II-A-1 | $ 280,775,000 | Floating [3] | 100.0000 | 0.1500 |
| II-A-2 | $ 41,264,000 | Floating [4] | 100.0000 | 0.1500 |
| II-A-3 | $ 93,007,000 | Floating [5] | 100.0000 | 0.1500 |
| II-A-4 | $ 12,103,000 | Floating [6] | 100.0000 | 0.1500 |
| M-1 | $ 46,051,000 | Floating [7] | 100.0000 | 0.1500 |
| M-2 | $ 41,753,000 | Floating [8] | 100.0000 | 0.1500 |
| M-3 | $ 25,788,000 | Floating [9] | 100.0000 | 0.1500 |
| M-4 | $ 22,104,000 | Floating [10] | 100.0000 | 0.1500 |
| M-5 | $ 20,876,000 | Floating [11] | 100.0000 | 0.1500 |
| M-6 | $ 19,034,000 | Floating [12] | 100.0000 | 0.1500 |
| M-7 | $ 18,420,000 | Floating [13] | 100.0000 | 0.1500 |
| M-8 | $ 15,964,000 | Floating [14] | 99.09514 | 0.1500 |
| M-9 | $ 12,894,000 | Floating [15] | 98.94285 | 0.1500 |

*See next page for footnotes.*

The Issuing Entity will issue not less than 20 classes of certificates, 14 of which are offered hereby. Each class of offered certificates will receive monthly distributions of interest, principal or both. The table above contains a list of the classes of offered certificates, including the approximate initial certificate principal balance of each class.

Credit enhancement for the offered certificates will be provided by subordination, excess spread and overcollateralization. In addition, the certificates offered hereby may benefit from net swap payments pursuant to an interest rate swap agreement and certain payments made pursuant to an interest rate cap agreement and a basis risk cap agreement.

The trust will consist of conventional, one-to-four family, fixed rate and adjustable-rate mortgage loans secured by first liens or second liens on residential real properties.

Greenwich Capital Markets, Inc., Citigroup Global Markets Inc. and Goldman, Sachs & Co. (the "Underwriters") will buy the offered certificates from the Depositor at a price equal to approximately 99.83% of the aggregate certificate principal balance of the offered certificates before deducting expenses estimated to be $1,848,472.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE OFFERED CERTIFICATES OR DETERMINED THAT THIS FREE WRITING PROSPECTUS OR THE PROSPECTUS IS ACCURATE OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

## ❊❊ RBS Greenwich Capital

## Citigroup                    Goldman, Sachs & Co.

The date of this prospectus supplement is October 30, 2006

CONFIDENTIAL

(1)        Approximate.  Subject to a permitted variance of plus or minus 5%.

(2)        The per annum pass-through rate on the Class I-A-1 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 0.14% or (B) after the first possible optional termination date, two times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(3)        The per annum pass-through rate on the Class II-A-1 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 0.06% or (B) after the first possible optional termination date, two times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(4)        The per annum pass-through rate on the Class II-A-2 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 0.12% or (B) after the first possible optional termination date, two times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(5)        The per annum pass-through rate on the Class II-A-3 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 0.17% or (B) after the first possible optional termination date, two times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(6)        The per annum pass-through rate on the Class II-A-4 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 0.25% or (B) after the first possible optional termination date, two times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(7)        The per annum pass-through rate on the Class M-1 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 0.29% or (B) after the first possible optional termination date, one and one-half times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(8)        The per annum pass-through rate on the Class M-2 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 0.32% or (B) after the first possible optional termination date, one and one-half times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(9)        The per annum pass-through rate on the Class M-3 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 0.35% or (B) after the first possible optional termination date, one and one-half times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(10)        The per annum pass-through rate on the Class M-4 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 0.39% or (B) after the first possible optional termination date, one and one-half times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(11)        The per annum pass-through rate on the Class M-5 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 0.41% or (B) after the first possible optional termination date, one and one-half times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(12)        The per annum pass-through rate on the Class M-6 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 0.48% or (B) after the first possible optional termination date, one and one-half times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(13)        The per annum pass-through rate on the Class M-7 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 0.80% or (B) after the first possible optional termination date, one and one-half times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(14)        The per annum pass-through rate on the Class M-8 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 1.25% or (B) after the first possible optional termination date, one and one-half times the applicable certificate margin and (ii) the applicable Net Funds Cap.

(15)        The per annum pass-through rate on the Class M-9 Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 2.30% or (B) after the first possible optional termination date, one and one-half times the applicable certificate margin and (ii) the applicable Net Funds Cap.

ii

FHFA04178852
A3-10013222998

TABLE OF CONTENTS

## PROSPECTUS SUPPLEMENT

| | |
|---|---|
| SUMMARY | S-1 |
| RISK FACTORS | S-16 |
| THE MORTGAGE POOL | S-37 |
| DESCRIPTION OF THE CERTIFICATES | S-84 |
| THE BASIS RISK CAP AGREEMENT | S-116 |
| THE INTEREST RATE SWAP AGREEMENT | S-119 |
| THE INTEREST RATE CAP AGREEMENT | S-125 |
| THE BASIS RISK CAP PROVIDER, THE SWAP PROVIDER AND THE INTEREST RATE CAP PROVIDER | S-130 |
| YIELD, PREPAYMENT AND MATURITY CONSIDERATIONS | S-130 |
| THE SPONSOR | S-152 |
| STATIC POOL INFORMATION | S-152 |
| ISSUING ENTITY | S-153 |
| THE DEPOSITOR | S-153 |
| SERVICING | S-154 |
| THE MASTER SERVICER, SECURITIES ADMINISTRATOR AND CUSTODIAN | S-161 |
| POOLING AND SERVICING AGREEMENT | S-164 |
| THE CREDIT RISK MANAGER | S-176 |
| USE OF PROCEEDS | S-176 |
| FEDERAL INCOME TAX CONSEQUENCES | S-176 |
| ERISA CONSIDERATIONS | S-180 |
| METHOD OF DISTRIBUTION | S-182 |
| LEGAL INVESTMENT | S-183 |
| LEGAL MATTERS | S-184 |
| RATINGS | S-185 |
| LEGAL PROCEEDINGS | S-185 |
| AFFILIATIONS, RELATIONSHIPS AND RELATED TRANSACTIONS | S-186 |
| AVAILABLE INFORMATION | S-186 |
| REPORTS TO CERTIFICATEHOLDERS | S-187 |
| INCORPORATION OF INFORMATION BY REFERENCE | S-187 |
| INDEX OF DEFINED TERMS | S-188 |
| ANNEX I | I-1 |

## PROSPECTUS

| | |
|---|---|
| RISK FACTORS | 4 |
| DESCRIPTION OF THE TRUST FUNDS | 27 |
| CASH FLOW AGREEMENTS | 45 |
| USE OF PROCEEDS | 45 |
| YIELD AND PREPAYMENT CONSIDERATIONS | 46 |
| STATIC POOL INFORMATION | 49 |
| DESCRIPTION OF THE SECURITIES | 49 |
| DESCRIPTION OF THE AGREEMENTS | 71 |
| DESCRIPTION OF CREDIT SUPPORT | 99 |
| DERIVATIVES RELATED TO THE SECURITIES | 104 |
| CERTAIN LEGAL ASPECTS OF THE LOANS | 105 |
| FEDERAL INCOME TAX CONSEQUENCES | 123 |
| ERISA CONSIDERATIONS | 156 |
| LEGAL INVESTMENT | 165 |
| METHOD OF DISTRIBUTION | 166 |
| ADDITIONAL INFORMATION | 167 |
| INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE | 168 |
| LEGAL MATTERS | 169 |
| FINANCIAL INFORMATION | 169 |
| RATING | 169 |
| REPORTS TO SECURITYHOLDERS | 169 |
| INDEX OF DEFINED TERMS | 171 |

iii

FHFA04178853
A3-10013222999

Important notice about information in this prospectus supplement and the accompanying prospectus

You should rely only on the information contained in this document. We have not authorized anyone to provide you with different information.

We provide information to you about the offered certificates in two separate documents that progressively provide more detail:

- the accompanying prospectus, which provides general information, some of which may not apply to this series of certificates; and

- this prospectus supplement, which describes the specific terms of this series of certificates.

Nomura Home Equity Loan, Inc.'s principal offices are located at Two World Financial Center, Building B, 21st Floor, New York, New York 10281, and its telephone number is (212) 667-9300.

iv

## European Economic Area

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), the Underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time:

(a)      to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b)      to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(c)      in any other circumstances which do not require the publication by the Issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of certificates to the public" in relation to any certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the certificates to be offered so as to enable an investor to decide to purchase or subscribe the certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

## United Kingdom

Each Underwriter has represented and agreed that:

(a)      it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act) received by it in connection with the issue or sale of the certificates  in circumstances in which Section 21(1) of the Financial Services and Markets Act does not apply to the Issuer; and

(b)      it has complied and will comply with all applicable provisions of the Financial Services and Markets Act with respect to anything done by it in relation to the certificates in, from or otherwise involving the United Kingdom.

v

# SUMMARY

•      The following is a brief discussion of the important features of the certificates offered by this prospectus supplement and the accompanying prospectus and does not contain all of the information that you need to consider when making your investment decision. To understand the terms of an offering of the certificates, you should read this entire document and the accompanying prospectus carefully.

•      Certain statements contained in or incorporated by reference in this prospectus supplement and the accompanying prospectus consist of forward-looking statements relating to future economic performance or projections and other financial items. These statements can be identified by the use of forward-looking words such as "may," "will," "should," "expects," "believes," "anticipates," "estimates," or other comparable words. Forward-looking statements are subject to a variety of risks and uncertainties that could cause actual results to differ from the projected results. Those risks and uncertainties include, among others, general economic and business conditions, regulatory initiatives and compliance with governmental regulations, customer preferences and various other matters, many of which are beyond our control. Because we cannot predict the future, what actually happens may be very different from what is contained in our forward-looking statements.

**Title of Series**

Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2006-FM2.

**Cut-off Date**

October 1, 2006.

**Closing Date**

On or about October 31, 2006.

**Issuing Entity**

Nomura Home Equity Loan, Inc., Home Equity Loan Trust Series 2006-FM2, a New York common law trust. The Issuing Entity is also sometimes referred to as the "trust" or the "trust fund".

**Depositor**

Nomura Home Equity Loan, Inc., a Delaware corporation. See "The Depositor" in this prospectus supplement.

**Sponsor**

Nomura Credit & Capital, Inc., a Delaware corporation. See "The Sponsor" in this prospectus supplement.

**Servicer**

Equity One, Inc., a Delaware corporation. See "Servicing" in this prospectus supplement for information concerning the servicer.

**Subservicer**

Popular Mortgage Servicing, Inc., a Delaware corporation. See "Servicing" in this prospectus supplement for information concerning the subservicer.

**Master Servicer**

Wells Fargo Bank, N.A., a national banking association. See "The Master Servicer, Securities Administrator and Custodian" in this prospectus supplement.

S-1

CONFIDENTIAL

FHFA04178856
A3-10013223002

**Originator**

Fremont Investment & Loan, a California industrial bank.

See "The Mortgage Pool —The Originator" in this prospectus supplement for information concerning the originator.

**Trustee**

HSBC Bank USA, National Association, a national banking association. See "Pooling and Servicing Agreement — The Trustee" in this prospectus supplement.

**Securities Administrator**

Wells Fargo Bank, N.A., a national banking association. As securities administrator, Wells Fargo Bank, N.A. will act as certificate registrar and paying agent. See "The Master Servicer, Securities Administrator and Custodian" in this prospectus supplement.

**Custodian**

Wells Fargo Bank, N.A. See "The Master Servicer, Securities Administrator and Custodian" in this prospectus supplement.

**Credit Risk Manager**

Wells Fargo Bank, N.A. See "The Credit Risk Manager" in this prospectus supplement.

**Pooling and Servicing Agreement**

The pooling and servicing agreement among the servicer, the sponsor, the depositor, the master servicer, the securities administrator and the trustee, under which the mortgage loans will be pooled and serviced.

**The Mortgage Loans**

The trust will contain approximately 5,714 conventional, one-to-four family fixed-rate and adjustable-rate mortgage loans secured by first or second liens on residential real properties (the "Mortgage Loans").

The Mortgage Loans have an aggregate scheduled principal balance of approximately $1,228,042,345 as of the Cut-off Date and have original terms to maturity of not greater than 30 years.

The Mortgage Loans have been divided into two loan groups which we sometimes refer to as the Group I Mortgage Loans and the Group II Mortgage Loans. The Group I Mortgage Loans consist of one-to-four family, first and second lien fixed-rate and adjustable-rate mortgage loans with principal balances at origination that conformed to Freddie Mac loan limits. The Group II Mortgage Loans consist of one-to-four-family, first and second lien fixed-rate and adjustable-rate mortgage loans with principal balances at origination that may or may not have conformed to Freddie Mac loan limits.

The characteristics of the Mortgage Loans as described in this prospectus supplement may differ from the final pool as of the Closing Date due, among other things, to the possibility that certain Mortgage Loans may become delinquent or default or may be removed or substituted and that similar or different mortgage loans may be added to the pool prior to the Closing Date.

As of the Cut-off Date, the Mortgage Loans will have the characteristics as set forth in the table on pages S-11, S-12 and S-13 of this prospectus supplement. See also "The Mortgage Pool" in this prospectus supplement for additional characteristics of the Mortgage Loans.

**Removal and Substitution of a Mortgage Loan**

The trustee will acknowledge the sale, transfer and assignment of the trust fund to it by the depositor and receipt of, subject to further review and the exceptions, the Mortgage Loans. If the trustee or its custodian has

S-2

FHFA04178857
A3-10013223003

actual knowledge that any Mortgage Loan is defective on its face due to a breach of the representations and warranties with respect to that Mortgage Loan made in the transaction agreements, the trustee will promptly notify the sponsor of such defect. The sponsor must then correct or cure any such defect within 90 days from the date of notice from the trustee of the defect and if the sponsor fails to correct or cure such defect within such period and such defect materially and adversely affects the interests of the related certificateholders in such Mortgage Loan, the sponsor will be required to, in accordance with the terms of the pooling and servicing agreement and within 90 days of the date of notice of such defect, repurchase such Mortgage Loan or provide the trustee with a substitute Mortgage Loan (if within two years of the Closing Date); provided that, if such Mortgage Loan is discovered to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Internal Revenue Code, any such cure, repurchase or substitution must occur within 90 days from the date such breach was discovered.

### Description of the Certificates

#### Offered Certificates

The Class I-A-1, Class II-A-1, Class II-A-2, Class II-A-3, Class II-A-4, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates are offered by this prospectus supplement.

The Class I-A-1 Certificates (also referred to in this prospectus supplement as the "Group I Certificates") will represent senior interests principally in the Group I Mortgage Loans. The Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates (also collectively referred to in this prospectus supplement as the "Group II Certificates" ) will represent senior interests principally in the Group II Mortgage Loans. The Group I Certificates and Group II Certificates are also collectively

referred to in this prospectus supplement as the "Senior Certificates". The Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates will represent subordinate interests in the Group I Mortgage Loans and the Group II Mortgage Loans and are collectively referred to in this prospectus supplement as the "Mezzanine Certificates". The Senior Certificates and the Mezzanine Certificates are together referred to in this prospectus supplement as the "Offered Certificates".

#### Non-Offered Certificates

The trust will also issue the Class B-1, Class B-2, Class X, Class P and Class R-X Certificates, and we sometimes refer to these certificates in this prospectus supplement as the "Non-Offered Certificates". None of the Non-Offered Certificates are being publicly or otherwise offered by this prospectus supplement.

#### Class B Certificates

The Class B-1 Certificates and Class B-2 Certificates represent subordinate interests in all of the Mortgage Loans and are together referred to in this prospectus supplement as the "Class B Certificates". The initial certificate principal balance of the Class B-1 Certificates and Class B-2 Certificates is equal to approximately $12,894,000 and approximately $12,280,000, respectively and the pass-through rate for each such class is equal to the lesser of (i) the sum of One-Month LIBOR for that distribution date plus (A) on or prior to the first possible optional termination date, 2.30% or (B) after the first possible optional termination date, one and one-half times the applicable certificate margin, and (ii) the applicable Net Funds Cap. The Class B Certificates initially evidence an aggregate interest of approximately 2.05% in the trust. The Class B Certificates, together with the Mezzanine Certificates are sometimes

CONFIDENTIAL

FHFA04178858
A3-10013223004

referred to collectively in this prospectus supplement as the "Subordinate Certificates".

*Class X Certificates*

The certificate principal balance of the Class X Certificates on any date of determination is equal to the excess of the aggregate principal balance of the Mortgage Loans over the aggregate certificate principal balance of the Senior Certificates and Subordinate Certificates. As of the Closing Date, the aggregate principal balance of the Mortgage Loans will exceed the aggregate certificate principal balance of the Senior Certificates and Subordinate Certificates by approximately $27,638,345.

*Class P Certificates*

The Class P Certificates will have an initial certificate principal balance of $100 and will not be entitled to distributions in respect of interest. The Class P Certificates will be entitled to all prepayment charges received in respect of the Mortgage Loans.

*Residual Certificates*

The Class R Certificates and Class R-X Certificates (together, the "Residual Certificates") represent the right to receive distributions in respect of the Mortgage Loans on any distribution date after all required payments of principal and interest have been made on such date in respect of the Offered Certificates, the Class B Certificates, the Class P Certificates and the Class X Certificates, although it is not anticipated that funds will be available for any such distribution.

Although not offered by this prospectus supplement, the Non-Offered Certificates are described in this prospectus supplement because their certificate principal balances, structure, collateral, rights, risks and other characteristics affect the certificate principal balance, structure, collateral, rights, risks and

other characteristics of the Offered Certificates.

**Last Scheduled Distribution Date**

The distribution date in July 2036 will be the last scheduled distribution date for the Senior Certificates and the Subordinate Certificates. It is possible that the certificate principal balance of any class of Senior Certificates and the Subordinate Certificates may not be fully paid or reduced to zero by this date. See "Yield, Prepayment and Maturity Considerations" in this prospectus supplement.

**Record Date**

For the Senior Certificates and the Subordinate Certificates and for any distribution date, the business day preceding the applicable distribution date so long as such certificates remain in book-entry form; otherwise the record date shall be the last business day of the month preceding the month in which such distribution date occurs.

**Denominations**

For each class of Senior Certificates and the Subordinate Certificates, $25,000 and multiples of $1 in excess thereof, except that one certificate of each class will be issued in the remainder of the class.

**Registration**

The trust will issue the Senior Certificates and the Subordinate Certificates initially in book-entry form. Persons acquiring interests in the Senior Certificates and the Subordinate Certificates may elect to hold their beneficial interests through The Depository Trust Company, in the United States, or Clearstream Luxembourg or Euroclear, in Europe.

We refer you to "Description of the Certificates—Book-Entry Registration" and in this prospectus supplement.

S-4

CONFIDENTIAL

FHFA04178859
A3-10013223005

**Distribution Dates**

The securities administrator will make distributions on the certificates on the 25th day of each calendar month beginning in November 2006 to the appropriate holders of record. If the 25th day of the month is not a business day, then the securities administrator will make distributions on the following business day.

**Interest Payments**

On each distribution date holders of the Senior Certificates and Subordinate Certificates will be entitled to receive:

- the interest that has accrued on the certificate principal balance of such certificates at the related pass-through rate during the related accrual period, and

- any interest due on a prior distribution date that was not paid (but with no interest accrued thereon), less

- interest shortfalls allocated to such certificates.

The accrual period for the Senior Certificates and Subordinate Certificates and any distribution date will be the period commencing on the immediately preceding distribution date (or, with respect to the first accrual period, the Closing Date) and ending on the day immediately preceding the related distribution date. Calculations of interest on the Senior Certificates and Subordinate Certificates will be based on a 360-day year and the actual number of days elapsed during the related accrual period.

**Principal Payments**

On each distribution date, holders of the Senior Certificates and Subordinate Certificates then entitled to distributions of principal will receive a distribution of principal on their certificates if there is cash available on that distribution date for the payment of principal. Monthly principal distributions will generally include:

- principal payments on the Mortgage Loans in the related loan group, and

- to restore or maintain a specified overcollateralization level, interest payments on the Mortgage Loans not needed to pay interest on the Senior Certificates and Subordinate Certificates, monthly fees and expenses of the trust and to make payments under the Interest Rate Swap Agreement as described in this prospectus supplement.

You should review the priority of payments described under "Description of the Certificates—Distributions of Principal" in this prospectus supplement.

**Credit Enhancement**

Credit enhancements provide limited protection to holders of specified certificates against shortfalls in payments received on the Mortgage Loans in the related loan group. This transaction employs the following forms of credit enhancement:

*Subordination.* The rights of the holders of the Subordinate Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the Senior Certificates. In addition, each class of Subordinate Certificates will be subordinate to each other class of Subordinate Certificates with a higher payment priority.

*Allocation of Realized Losses.* If, on any distribution date, there is not sufficient excess interest or overcollateralization (represented by the Class X Certificates) to absorb realized losses on the Mortgage Loans, then realized losses on the Mortgage Loans will be

CONFIDENTIAL

FHFA04178860
A3-10013223006

allocated to the Class B-2, Class B-1, Class M-9, Class M-8, Class M-7, Class M-6, Class M-5, Class M-4, Class M-3, Class M-2 and Class M-1 Certificates, in that order, until their respective certificate principal balances have been reduced to zero. The pooling and servicing agreement does not permit the allocation of realized losses on the Mortgage Loans to the Senior Certificates; however, investors in those certificates should realize that under certain loss scenarios, there will not be enough principal and interest on the Mortgage Loans to pay the Senior Certificates all interest and principal amounts to which those certificates are then entitled. See "Description of the Certificates—Credit Enhancement" in this prospectus supplement.

Once realized losses are allocated to a class of certificates, its certificate principal balance will be reduced by the amount so allocated. However, the amount of any realized losses allocated to the holders of these certificates may be distributed to the holders of these certificates on subsequent distribution dates to the extent of funds available as described under "Description of the Certificates—Credit Enhancement" and "The Interest Rate Swap Agreement."

*Excess Spread and Overcollateralization.* We expect the Mortgage Loans to generate more interest than is needed to pay interest on the Senior Certificates and Subordinate Certificates because we expect the weighted average net mortgage rate of the Mortgage Loans to be higher than the weighted average pass-through rate on the Senior Certificates and Subordinate Certificates. As of the Closing Date, the aggregate principal balance of the Mortgage Loans will exceed the aggregate certificate principal balance of the Senior Certificates and Subordinate Certificates by approximately $27,638,345. This amount represents the amount of overcollateralization required under the pooling and servicing agreement. On each distribution date, interest payments received in respect of the Mortgage Loans in excess of the

amount that is needed to pay interest on the Senior Certificates, the Subordinate Certificates, related trust expenses and payments under the Interest Rate Swap Agreement may be used to reduce the total certificate principal balance of the Senior Certificates and Subordinate Certificates to the extent necessary to maintain or restore the required level of overcollateralization. In addition, as described in this prospectus supplement, amounts received under the Interest Rate Swap Agreement and the Interest Rate Cap Agreement (each, as described below) may be available to maintain or restore the required level of overcollateralization.

We refer you to "Description of the Certificates—Credit Enhancement" and "The Interest Rate Swap Agreement" in this prospectus supplement.

**Basis Risk Cap Agreement**

The Senior Certificates and Subordinate Certificates will have the benefit of a basis risk cap agreement (the "Basis Risk Cap Agreement") provided by HSBC Bank USA, National Association (the "Basis Risk Cap Provider") to pay amounts in respect of Basis Risk Shortfalls (as defined under "Description of the Certificates—Glossary of Terms" in this prospectus supplement) with respect to the Senior Certificates and Subordinate Certificates. The Basis Risk Cap Agreement, beginning with the distribution date in November 2006 and continuing through and including the distribution date in April 2007, requires the counterparty to make a payment to the securities administrator for the benefit of the Senior Certificates and Subordinate Certificates an amount equal to the product of (i) the excess, if any, of one-month LIBOR (as determined in the Basis Risk Cap Agreement) for any interest accrual period over a specified strike rate (subject to a maximum rate of 11.00%, (ii) the notional amount set forth in the Basis Risk Cap Agreement and (iii) a fraction, the numerator of which is the actual number of days elapsed from the previous

CONFIDENTIAL

FHFA04178861
A3-10013223007

distribution date to but excluding the current distribution date (or, for the first distribution date, the actual number of days elapsed from the Closing Date to but excluding the first distribution date), and the denominator of which is 360. Cap payments, if any, made by the Basis Risk Cap Provider will be deposited in the basis risk shortfall reserve fund and will be available for distribution in respect of Basis Risk Shortfalls on the Senior Certificates and Subordinate Certificates as set forth in this prospectus supplement.

We refer you to "The Basis Risk Cap Agreement" in this prospectus supplement for additional information.

**Interest Rate Swap Agreement**

The Senior Certificates and Subordinate Certificates will have the benefit of an interest rate swap agreement (the "Interest Rate Swap Agreement") provided by HSBC Bank USA, National Association (the "Swap Provider") commencing on the distribution date in May 2007 and terminating immediately following the distribution date in October 2011.

HSBC Bank USA, National Association, as Supplemental Interest Trust Trustee, will enter into the Interest Rate Swap Agreement with, the Swap Provider. The Supplemental Interest Trust Trustee will appoint Wells Fargo Bank, N.A. as securities administrator to receive and distribute funds with regards to the Interest Rate Swap Agreement on behalf of the Supplemental Interest Trust, whether payable by or to the Swap Provider pursuant to the Interest Rate Swap Agreement.

Pursuant to the Interest Rate Swap Agreement, on each applicable distribution date (i) the securities administrator (on behalf of a Supplemental Interest Trust and from funds of such trust) will make a payment (the "Fixed Swap Payment") to the Swap Provider and (ii) the Swap Provider will be obligated to make a payment to the Supplemental Interest Trust for the benefit of the holders of the Senior

Certificates and Subordinate Certificates (the "Floating Swap Payment"), in each case as set forth in the Interest Rate Swap Agreement and as described in this prospectus supplement under "The Interest Rate Swap Agreement".

On each distribution date, to the extent that the Fixed Swap Payment exceeds the Floating Swap Payment, the securities administrator, on behalf of the Supplemental Interest Trust, will make a net payment to the Swap Provider, and to the extent that the Floating Swap Payment exceeds the Fixed Swap Payment, the Swap Provider will make a net payment to the securities administrator on behalf of the Supplemental Interest Trust, each such payment referred to in this prospectus supplement as a "Net Swap Payment." The securities administrator will deposit any Net Swap Payment received from the Swap Provider into a reserve fund, and such amount will be available for distribution to the holders of the Senior Certificates and Subordinate Certificates to the extent described in this prospectus supplement. See "The Interest Rate Swap Agreement" in this prospectus supplement. If, on any distribution date, the Net Swap Payment made by the Swap Provider exceeds the amounts payable to the Senior Certificates and Subordinate Certificates as described in this prospectus supplement, such excess will be distributed to the Class X Certificates. For each distribution date in respect of which the securities administrator is required to make a Net Swap Payment to the Swap Provider, the trust will be required to make a payment to the securities administrator in the same amount prior to distributions to holders of the Senior Certificates and Subordinate Certificates.

Upon early termination of the Interest Rate Swap Agreement, the securities administrator or the Swap Provider may be liable to make a swap termination payment to the other party (regardless of which party has caused the termination). The swap termination payment will be computed in accordance with the procedures set forth in the Interest Rate Swap

CONFIDENTIAL

FHFA04178862
A3-10013223008

Agreement. In the event that the securities administrator is required to make a swap termination payment to the Swap Provider, the trust will be required to make a payment to the securities administrator in the same amount (to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee), which amount will be paid by the trust on the related distribution date and on any subsequent distribution dates until paid in full, prior to any distribution to the holders of the Senior Certificates and Subordinate Certificates, except for certain swap termination payments resulting from an event of default or certain termination events with respect to the Swap Provider as described in this prospectus supplement, for which payments by the trust to the securities administrator will be subordinated to all distributions to the Senior Certificates and Subordinate Certificates.

We refer you to "The Interest Rate Swap Agreement" in this prospectus supplement.

**Interest Rate Cap Agreement**

The Senior Certificates and Subordinate Certificates will have the benefit of an interest rate cap agreement (the "Interest Rate Cap Agreement") provided by HSBC Bank USA, National Association (the "Interest Rate Cap Provider") commencing on the distribution date in June 2008 and terminating immediately following the distribution date in October 2011.

HSBC Bank USA, National Association, as cap trustee (the "Cap Trustee"), will enter into the Interest Rate Cap Agreement with, the Interest Rate Cap Provider. The Cap Trustee will appoint Wells Fargo Bank, N.A. as cap securities administrator (the "Cap Securities Administrator") to receive and distribute funds in respect of the Interest Rate Cap Agreement.

The Interest Rate Cap Agreement requires the Interest Rate Cap Provider to make a payment to the Cap Securities Administrator for the benefit of the holders of the Senior Certificates and Subordinate Certificates calculated at a rate equal to the product of (a) the excess, if any, of one-month LIBOR (as determined in the Interest Rate Cap Agreement and subject to a maximum of 9.50%) over 5.25%, (b) the Cap Notional Amount (as defined in this prospectus supplement) and (c) a fraction, the numerator of which is the actual number of days elapsed in the related interest accrual period (or, for the first distribution date, the actual number of days elapsed from the Closing Date to but excluding the first distribution date), and the denominator of which is 360.

Pursuant to a Cap Allocation Agreement (as further described in this prospectus supplement), the Cap Securities Administrator will remit to the Securities Administrator an amount (to the extent of the amount received by the Cap Securities Administrator pursuant to the Interest Rate Cap Agreement) equal to the amount required to pay interest shortfalls and basis risk shortfalls, maintain overcollateralization and cover losses on the Senior Certificates and Subordinate Certificates to the extent not covered by payments received under the Interest Rate Swap Agreement, the Basis Risk Cap Agreement and excess cashflow.

Any payments received by the Securities Administrator from the Cap Securities Administrator will be deposited into a segregated trust account established on the Closing Date (the "Cap Account"), as more fully described in this prospectus supplement. Amounts deposited into the Cap Account, if any, will be available for distribution on the Senior Certificates and Subordinate Certificates as set forth in this prospectus supplement.

We refer you to "The Interest Rate Cap Agreement" in this prospectus supplement.

S-8

FHFA04178863
A3-10013223009

**Advances**

The servicer will make cash advances with respect to delinquent payments of scheduled interest and principal on the Mortgage Loans to the extent that the servicer reasonably believes that such cash advances can be repaid from future payments on the related Mortgage Loans. These cash advances are only intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses.

**Servicing Fee**

With respect to each Mortgage Loan, the amount of the annual servicing fee that shall be paid to the servicer is, for a period of one full month, equal to one-twelfth of the product of (a) 50 basis points (0.5000%) and (b) the outstanding principal balance of such Mortgage Loan. Such fee will be payable monthly, computed on the basis of the same principal amount and period with respect to which any related interest payment on such Mortgage Loan is computed. The obligation to pay the servicing fee will be limited to, and the servicing fee will be payable from the interest portion of such monthly payments collected; provided, however, that accrued and unpaid servicing fees applicable to liquidated Mortgage Loans may be payable out of amounts on deposit in the collection account as further described in the pooling and servicing agreement.

**Master Servicing Fee**

With respect to each Mortgage Loan, the amount of the annual master servicing fee that shall be paid to the master servicer is a fee, for a period of one full month, equal to one-twelfth of the product of (a) 1.10 basis points (0.0110%) and (b) the outstanding principal balance of such Mortgage Loan. Such fee will be payable monthly, computed on the basis of the same principal amount and period with respect to which any related interest payment

on such Mortgage Loan is computed. The obligation to pay the master servicing fee will be limited to, and the master servicing fee will be payable from the interest portion of such monthly payments collected. The master servicing fee includes securities administrator, paying agent, certificate registrar and credit risk manager fees. In addition, the master servicer will pay the trustee fee from its fee.

**Optional Termination**

At its option and subject to certain conditions, the master servicer may purchase all but not less than all of the Mortgage Loans remaining in the trust fund (and all property acquired by the trust fund in respect of the Mortgage Loans) and thereby effect early retirement of the certificates if on such distribution date the aggregate stated principal balance (as defined under "Description of the Certificates— Glossary of Terms" in this prospectus supplement) of the Mortgage Loans (and the fair market value of any property acquired by the trust fund in respect of the Mortgage Loans) has been reduced to less than or equal to 10% of the aggregate stated principal balance of the Mortgage Loans as of the Cut-off Date.

Notwithstanding the foregoing, the master servicer shall not be entitled to exercise its optional termination right to the extent that the depositor creates a net interest margin transaction which includes the Class X Certificates or Class P Certificates and the notes issued pursuant to such net interest margin transaction are outstanding on the date on which the master servicer intends to exercise its optional termination right.

If the optional termination right is not exercised on the first distribution date on which the aggregate stated principal balance of the Mortgage Loans (and the fair market value of any property acquired by the trust fund in respect of the Mortgage Loans) has been reduced to less than or equal to 10% of the aggregate stated principal balance of the

S-9

FHFA04178864
A3-10013223010

Mortgage Loans as of the Cut-off Date (the "First Possible Optional Termination Date"), the pass-through rates on the Senior Certificates and Subordinate Certificates will increase as provided in this prospectus supplement.

**Federal Income Tax Consequences**

For federal income tax purposes, the trust will comprise multiple real estate mortgage investment conduits, organized in a tiered REMIC structure. The Senior Certificates, the Subordinate Certificates and the Class X Certificates (other than any payments received from the basis risk shortfall reserve fund, the Cap Account, the Supplemental Interest Trust or the obligation to make payments to the Supplemental Interest Trust or the basis risk shortfall reserve fund) and the Class P Certificates will represent beneficial ownership of "regular interests" in the related REMIC identified in the pooling and servicing agreement.

Each Residual Certificate will represent the beneficial ownership of the sole class of "residual interests" in one or more REMICs.

We refer you to "Federal Income Tax Consequences" in this prospectus supplement for additional information concerning the application of federal income tax laws.

**Legal Investment**

The Senior Certificates and the Subordinate Certificates will not constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984 ("SMMEA"), and therefore will not be legal investments for those entities to the extent provided in SMMEA and applicable state laws.

We refer you to "Legal Investment" in this prospectus supplement.

**ERISA Considerations**

It is expected that the Offered Certificates may be purchased by, or with the assets of, employee benefit plans subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or plans or arrangements subject to section 4975 of the Code (each, a "Plan"). Prior to the termination of the Supplemental Interest Trust, Plans or persons using assets of a Plan may purchase the Offered Certificates if the purchase and holding meets the requirements of an investor-based class exemption issued by the Department of Labor. Investors should consult with their counsel with respect to the consequences under ERISA and the Code of a Plan's acquisition and ownership of such certificates.

We refer you to "ERISA Considerations" in this prospectus supplement and in the prospectus.

**Ratings**

The Offered Certificates will not be offered unless they receive ratings at least as high as those set forth below from Standard & Poor's, a division of The McGraw-Hill Companies, Inc., which we refer to as "Standard & Poor's", Moody's Investors Service, Inc., which we refer to as "Moody's", Fitch Ratings, which we refer to as "Fitch" and Dominion Bond Rating Service, which we refer to as "DBRS".

| Class | Standard & Poor's | Moody's | Fitch | DBRS |
|---|---|---|---|---|
| I-A-1 | AAA | Aaa | AAA | AAA |
| II-A-1 | AAA | Aaa | AAA | AAA |
| II-A-2 | AAA | Aaa | AAA | AAA |
| II-A-3 | AAA | Aaa | AAA | AAA |
| II-A-4 | AAA | Aaa | AAA | AAA |
| M-1 | AA+ | Aa1 | AA- | AA (high) |
| M-2 | AA+ | Aa2 | AA- | AA |
| M-3 | AA | Aa3 | AA | AA (low) |
| M-4 | AA | A1 | AA- | A (high) |
| M-5 | AA- | A2 | A+ | A |
| M-6 | A+ | A3 | A | A (low) |
| M-7 | A | Baa1 | A- | BBB (high) |
| M-8 | BBB+ | Baa2 | BBB+ | BBB |
| M-9 | BBB | Baa3 | BBB | BBB (low) |

CONFIDENTIAL

FHFA04178865
A3-10013223011

A rating is not a recommendation to buy, sell or hold securities and each rating agency can revise or withdraw such ratings at any time. In general, ratings address credit risk and do not address the likelihood of prepayments.

CONFIDENTIAL

FHFA04178866
A3-10013223012

## Summary of Group I Mortgage Loans

| | | | | |
|---|---|---|---|---|
| Number of Mortgage Loans: | 3,891 | Fixed Non-Balloon Loans: | | 17.12% |
| Aggregate Principal Balance: | $677,237,695 | Purpose: | | |
| Average Principal Balance: | $174,052 | Purchase: | | 46.99% |
| Low Principal Balance: | $14,886 | Refinance - Cashout: | | 51.49% |
| High Principal Balance: | $661,906 | Refinance - Rate/Term: | | 1.51% |
| W.A. Coupon: | 8.590% | Property Type: | | |
| Low Coupon: | 5.600% | Single Family Residence: | | 78.80% |
| High Coupon: | 14.100% | 2-4 Family: | | 11.37% |
| W.A. Stated Remaining Term: | 355 months | Condominium: | | 6.57% |
| Low Stated Remaining Term: | 115 months | PUD: | | 3.22% |
| High Stated Remaining Term: | 356 months | Townhouse: | | 0.04% |
| W.A. Seasoning: | 5 months | Occupancy Status: | | |
| Latest Maturity Date: | June 1, 2036 | Owner-Occupied: | | 93.05% |
| State Concentration (>5%): | | Investment: | | 6.37% |
| Florida: | 18.51% | Second Home: | | 0.57% |
| California: | 17.33% | Documentation: | | |
| New York: | 10.11% | Full/Alt: | | 57.36% |
| Maryland: | 6.89% | Stated Income/Verified Assets: | | 5.13% |
| New Jersey: | 6.76% | Stated/Stated Documentation: | | 37.51% |
| Illinois: | 5.03% | | | |
| Interest Only Mortgage Loans: | 8.84% | | | |
| W.A. Interest Only Period[1]: | 60 Months | % of Loans with LTV > 80 (First Liens): | | 25.54% |
| W.A. Original LTV: | 80.58% | % of Loans with LTV > 80, No MI (First Liens): | | 25.54% |
| Low LTV: | 11.43% | | | |
| High LTV: | 100.00% | Loans with Prepayment Penalties: | | 60.64% |
| W.A. CLTV: | 88.34% | Weighted Average Prepayment Penalty Term[3]: | | 25 months |
| Low CLTV: | 11.43% | | | |
| High CLTV: | 100.00% | ARM Loans: | | |
| W.A. FICO Score[2]: | 620 | Weighted Average Margin: | | 6.141% |
| Index Type: | | Weighted Average Max. Rate: | | 14.465% |
| 6 month LIBOR: | 79.19% | Weighted Average Min. Rate: | | 8.465% |
| Fixed: | 20.81% | Weighted Average Life Cap: | | 6.001% |
| First Liens: | 91.86% | Weighted Average First Periodic Cap: | | 2.569% |
| Second Liens: | 8.14% | Weighted Average Periodic Cap: | | 1.500% |

(1) For Mortgage Loans with Interest Only Periods.

(2) For Mortgage Loans that were scored.

(3) For Mortgage Loans with Prepayment Penalties.

S-12

CONFIDENTIAL

FHFA04178867
A3-10013223013

## Summary of Group II Mortgage Loans

| | | | |
|---|---|---|---|
| Number of Mortgage Loans: | 1,823 | Fixed Non-Balloon Loans: | 11.80% |
| Aggregate Principal Balance: | $550,804,650 | Purpose: | |
| Average Principal Balance: | $302,142 | Purchase: | 60.31% |
| Low Principal Balance: | $11,445 | Refinance - Cashout: | 38.19% |
| High Principal Balance: | $1,492,441 | Refinance - Rate/Term: | 1.50% |
| W.A. Coupon: | 8.283% | Property Type: | |
| Low Coupon: | 5.450% | Single Family Residence: | 76.33% |
| High Coupon: | 13.950% | 2-4 Family: | 13.57% |
| W.A. Stated Remaining Term: | 355 months | Condominium: | 6.50% |
| Low Stated Remaining Term: | 115 months | PUD: | 3.49% |
| High Stated Remaining Term: | 356 months | Townhouse: | 0.11% |
| W.A. Seasoning: | 5 months | Occupancy Status: | |
| Latest Maturity Date: | June 1, 2036 | Owner-Occupied: | 95.75% |
| State Concentration (>5%): | | Investment: | 3.82% |
| California: | 34.42% | Second Home: | 0.43% |
| New York: | 14.67% | Documentation: | |
| Florida: | 13.24% | Full/Alt: | 52.08% |
| New Jersey: | 5.50% | Stated Income/Verified Assets: | 6.12% |
| Maryland: | 5.23% | Stated/Stated Documentation: | 41.80% |
| Interest Only Mortgage Loans: | 16.95% | | |
| W.A. Interest Only Period[1]: | 60 Months | % of Loans with LTV > 80 (First Liens): | 27.85% |
| W.A. Original LTV: | 82.06% | % of Loans with LTV > 80, No MI (First Liens): | 27.85% |
| Low LTV: | 23.81% | | |
| High LTV: | 100.00% | Loans with Prepayment Penalties: | 62.02% |
| W.A. CLTV: | 92.14% | Weighted Average Prepayment Penalty Term[3]: | 24 months |
| Low CLTV: | 23.81% | | |
| High CLTV: | 100.00% | ARM Loans: | |
| W.A. FICO Score[2]: | 638 | Weighted Average Margin: | 5.985% |
| Index Type: | | Weighted Average Max. Rate: | 14.203% |
| 6 month LIBOR: | 84.19% | Weighted Average Min. Rate: | 8.204% |
| Fixed: | 15.81% | Weighted Average Life Cap: | 5.999% |
| First Liens: | 94.37% | Weighted Average First Periodic Cap: | 2.543% |
| Second Liens: | 5.63% | Weighted Average Periodic Cap: | 1.499% |

(1) For Mortgage Loans with Interest Only Periods.

(2) For Mortgage Loan that were scored.

(3) For Mortgage Loans with Prepayment Penalties.

S-13

CONFIDENTIAL

FHFA04178868
A3-10013223014

**Summary of Mortgage Loans**

| | | | |
|---|---|---|---|
| Number of Mortgage Loans: | 5,714 | Fixed Non-Balloon Loans: | 14.74% |
| Aggregate Principal Balance: | $1,228,042,345 | Purpose: | |
| Average Principal Balance: | $214,918 | Purchase: | 52.97% |
| Low Principal Balance: | $11,445 | Refinance - Cashout: | 45.53% |
| High Principal Balance: | $1,492,441 | Refinance - Rate/Term: | 1.51% |
| W.A. Coupon: | 8.452% | Property Type: | |
| Low Coupon: | 5.450% | Single Family Residence: | 77.69% |
| High Coupon: | 14.100% | 2-4 Family: | 12.36% |
| W.A. Stated Remaining Term: | 355 months | Condominium: | 6.54% |
| Low Stated Remaining Term: | 115 months | PUD: | 3.34% |
| High Stated Remaining Term: | 356 months | Townhouse: | 0.07% |
| W.A. Seasoning: | 5 months | Occupancy Status: | |
| Latest Maturity Date: | June 1, 2036 | Owner-Occupied: | 94.26% |
| State Concentration (>5%): | | Investment: | 5.23% |
| California: | 25.00% | Second Home: | 0.51% |
| Florida: | 16.14% | Documentation: | |
| New York: | 12.15% | Full/Alt: | 54.99% |
| New Jersey: | 6.19% | Stated Income/Verified Assets: | 5.58% |
| Maryland: | 6.14% | Stated/Stated Documentation: | 39.43% |
| Interest Only Mortgage Loans: | 12.48% | | |
| W.A. Interest Only Period[1]: | 60 Months | % of Loans with LTV > 80 (First Liens): | 26.59% |
| W.A. Original LTV: | 81.25% | % of Loans with LTV > 80, No MI (First Liens): | 26.59% |
| Low LTV: | 11.43% | | |
| High LTV: | 100.00% | Loans with Prepayment Penalties: | 61.26% |
| W.A. CLTV: | 90.05% | Weighted Average Prepayment Penalty Term[3]: | 25 months |
| Low CLTV: | 11.43% | | |
| High CLTV: | 100.00% | ARM Loans: | |
| W.A. FICO Score[2]: | 628 | Weighted Average Margin: | 6.069% |
| Index Type: | | Weighted Average Max. Rate: | 14.344% |
| 6 month LIBOR: | 81.43% | Weighted Average Min. Rate: | 8.344% |
| Fixed: | 18.57% | Weighted Average Life Cap: | 6.000% |
| First Liens: | 92.98% | Weighted Average First Periodic Cap: | 2.557% |
| Second Liens: | 7.02% | Weighted Average Periodic Cap: | 1.500% |

(1) For Mortgage Loans with Interest Only Periods.

(2) For Mortgage Loans that were scored.

(3) For Mortgage Loans with Prepayment Penalties.

S-14

CONFIDENTIAL

**TRANSACTION STRUCTURE**



S-15

## RISK FACTORS

**In addition to the matters described elsewhere in this prospectus supplement and the prospectus, you should carefully consider the following risk factors before deciding to purchase a certificate.**

**The Subordinate Certificates have a greater risk of loss than the Senior Certificates**............................................

When certain classes of certificates provide credit enhancement for other classes of certificates it is sometimes referred to as "subordination."

The Subordinate Certificates are subordinate to the Senior Certificates. In addition:

- the Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates are subordinate to the Class M-1 Certificates;

- the Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates are subordinate to the Class M-2 Certificates;

- the Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates are subordinate to the Class M-3 Certificates;

- the Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates are subordinate to the Class M-4 Certificates;

- the Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates are subordinate to the Class M-5 Certificates;

- the Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates are subordinate to the Class M-6 Certificates;

- the Class M-8, Class M-9, Class B-1 and Class B-2 Certificates are subordinate to the Class M-7 Certificates;

- the Class M-9, Class B-1 and Class B-2 Certificates are subordinate to the Class M-8 Certificates;

S-16

CONFIDENTIAL

FHFA04178871
A3-10013223017

- the Class B-1 Certificates and Class B-2 Certificates are subordinate to the Class M-9 Certificates; and

- the Class B-2 Certificates are subordinate to the Class B-1 Certificates.

Credit enhancement for the Offered Certificates will be provided by the right of the holders of certain certificates to receive payments of interest and principal prior to the classes of certificates which are subordinated to such classes of certificates and by the allocation of realized losses to the most subordinate classes of certificates prior to the allocation of realized losses to the other classes of certificates. This form of credit enhancement uses collections on the Mortgage Loans otherwise payable to the holders of the subordinated classes to pay amounts due on the more senior classes. In addition, the more senior classes of certificates have a preferential right to receive distributions from amounts paid under the Interest Rate Swap Agreement and under the Interest Rate Cap Agreement as described in this prospectus supplement. Realized losses will be allocated first, to reduce the amount of monthly excess interest, second, to reduce the overcollateralization amount and third, to the Subordinate Certificates, in the reverse order of their payment priority, until the certificate principal balance of each such class has been reduced to zero. This means that realized losses on the Mortgage Loans which are allocated to the Subordinate Certificates would first be allocated to the Class B-2 Certificates, second to the Class B-1 Certificates, third to the Class M-9 Certificates, fourth to the Class M-8 Certificates, fifth to the Class M-7 Certificates, sixth to the Class M-6 Certificates, seventh to the Class M-5 Certificates, eighth to the Class M-4 Certificates, ninth to the Class M-3 Certificates, tenth to the Class M-2 Certificates, and eleventh to the Class M-1 Certificates, in each case until the certificate principal balance of each such class is reduced to zero. Accordingly, if the aggregate certificate principal balance of a class of Subordinate Certificates were to be reduced to zero, delinquencies and defaults on the Mortgage Loans would reduce the amount of funds available for distributions to holders of the remaining subordinated class or classes and, if the aggregate certificate principal balance of all the Subordinate Certificates were to be reduced to zero, delinquencies

S-17

FHFA04178872
A3-10013223018

and defaults on the Mortgage Loans would reduce the amount of funds available for monthly distributions to holders of the Senior Certificates.   However, the amount of any realized losses allocated to the Subordinate Certificates may be distributed to the holders of such certificates according to the priorities described under "Description of the Certificates— Credit Enhancement", "The Interest Rate Swap Agreement" and "The Interest Rate Cap Agreement" in this prospectus supplement.

You should fully consider the risks of investing in a Subordinate Certificate, including the risk that you may not fully recover your initial investment as a result of realized losses.

See "Description of the Certificates" in this prospectus supplement.

**Additional risks associated with the Subordinate Certificates**...........

The weighted average lives of, and the yields to maturity on, the Subordinate Certificates will be progressively more sensitive based on the payment priority of each such class, to the rate and timing of borrower defaults and the severity of ensuing losses on the Mortgage Loans. If the actual rate and severity of losses on the Mortgage Loans is higher than those assumed by an investor in such certificates, the actual yield to maturity of such certificates may be lower than the yield anticipated by such holder based on such assumption. The timing of losses on the Mortgage Loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of the Mortgage Loans are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity.   Realized losses on the Mortgage Loans will first reduce the amount of monthly excess interest, second, reduce the amount of overcollateralization, third, reduce the certificate principal balance of the Class B-2 Certificates, fourth, reduce the certificate principal balance of the Class B-1 Certificates, fifth, reduce the certificate principal balance of the Class M-9 Certificates, sixth, reduce the certificate principal balance of the Class M-8 Certificates, seventh, reduce the certificate principal balance of the Class M-7 Certificates, eighth, reduce the certificate principal balance of the Class M-6 Certificates, ninth, reduce the certificate principal

S-18

FHFA04178873
A3-10013223019

balance of the Class M-5 Certificates, tenth, reduce the certificate principal balance of the Class M-4 Certificates, eleventh, reduce the certificate principal balance of the Class M-3 Certificates, twelfth, reduce the certificate principal balance of the Class M-2 Certificates, and thirteenth, reduce the certificate principal balance of the Class M-1 Certificates. As a result of the allocation of realized losses to the Subordinate Certificates, less interest will accrue on such class of certificates than would otherwise be the case. Once a realized loss is allocated to a class of Subordinate Certificates, no interest will be distributable with respect to such written down amount. However, the amount of any realized losses allocated to the Subordinate Certificates may be distributed to the holders of such certificates according to the priorities described under "Description of the Certificates—Credit Enhancement", "The Interest Rate Swap Agreement" and "The Interest Rate Cap Agreement" in this prospectus supplement.

Prior to any purchase of a Subordinate Certificate, consider the following factors that may adversely impact your yield:

- Because the Subordinate Certificates receive interest and principal distributions after the Senior Certificates receive such distributions, there is a greater likelihood that the Subordinate Certificates will not receive the distributions to which they are entitled on any distribution date.

- If the servicer determines not to advance a delinquent payment on a Mortgage Loan because such amount is not recoverable from a mortgagor, there may be a shortfall in distributions on the certificates which will impact the Subordinate Certificates.

- The Subordinate Certificates are not expected to receive principal distributions until, at the earliest, the distribution date occurring in November 2009.

- After extinguishing all other credit enhancement available to the Senior Certificates and Subordinate Certificates, realized losses on the Mortgage Loans will be allocated to the Subordinate Certificates in reverse order of their

S-19

CONFIDENTIAL

FHFA04178874
A3-10013223020

priority of payment. A loss allocation results in a reduction of a certificate principal balance without a corresponding distribution of cash to the holder. A lower certificate principal balance will result in less interest accruing on the certificate.

- The earlier in the transaction that a loss on a Mortgage Loan occurs, the greater the impact on the yield.

**Credit enhancement may be inadequate to cover losses and/or to maintain or restore overcollateralization at the required level** .............................................

The Mortgage Loans are expected to generate more interest than is needed to pay interest on the Senior Certificates and Subordinate Certificates because the weighted average net mortgage rate on the Mortgage Loans is expected to be higher than the weighted average pass-through rate on the Senior Certificates and Subordinate Certificates. If the Mortgage Loans generate more interest than is needed to pay interest on the Senior Certificates and Subordinate Certificates, net swap payments to the Swap Provider and trust fund expenses, we will use such excess interest to make additional principal payments on the Senior Certificates and Subordinate Certificates in order to maintain or restore overcollateralization to the required level. In addition, as described in this prospectus supplement, amounts received under the Interest Rate Swap Agreement and the Interest Rate Cap Agreement may be available to make additional payments of principal to the Senior Certificates and Subordinate Certificates in order to maintain or restore overcollateralization to the required level. Overcollateralization is intended to provide limited protection to holders of the Senior Certificates and Subordinate Certificates by absorbing the certificates' share of losses from liquidated Mortgage Loans. However, we cannot assure you that enough excess interest will be generated on the Mortgage Loans and sufficient amounts will be paid under the Interest Rate Swap Agreement and the Interest Rate Cap Agreement to maintain or restore the required level of overcollateralization. The aggregate principal balance of the Mortgage Loans as of the Cut-off Date exceeds the aggregate certificate principal balance of the Senior Certificates and Subordinate Certificates on the Closing Date by approximately $27,638,345. This

S-20

FHFA04178875
A3-10013223021

amount represents the amount of overcollateralization required under the pooling and servicing agreement on the Closing Date.

The excess interest available on any distribution date will be affected by the actual amount of interest received, advanced or recovered in respect of the Mortgage Loans during the preceding month. Such amount may be influenced by changes in the weighted average of the mortgage rates resulting from prepayments, defaults and liquidations of the Mortgage Loans.

If the protection afforded by overcollateralization is insufficient, then you could experience a loss on your investment.

**The Senior Certificates and the Subordinate Certificates will be limited obligations solely of the issuing entity and not of any other party**............

The Senior Certificates and the Subordinate Certificates will not represent an interest in or obligation of the sponsor, the depositor, the servicer, the master servicer, the securities administrator, the trustee or any of their respective affiliates. None of the Senior Certificates, the Subordinate Certificates or the underlying Mortgage Loans will be guaranteed or insured by any governmental agency or instrumentality, or by the sponsor, the depositor, the servicer, the master servicer, the securities administrator, the trustee or any of their respective affiliates. Proceeds of the assets included in the trust and proceeds from the Supplemental Interest Trust will be the sole source of payments on the Senior Certificates and the Subordinate Certificates, and there will be no recourse to the sponsor, the depositor, the servicer, the master servicer, the securities administrator, the trustee or any other entity in the event that these proceeds are insufficient or otherwise unavailable to make all payments provided for under the Senior Certificates and the Subordinate Certificates.

**The interest rate cap may reduce the yields on the Senior Certificates and the Subordinate Certificates**............

The pass-through rates on the Senior Certificates and the Subordinate Certificates are each subject to an interest rate cap as described in this prospectus supplement. If on any distribution date the pass-

S-21

CONFIDENTIAL

FHFA04178876
A3-10013223022

through rate for a class of Senior Certificates or Subordinate Certificates is limited to the related interest rate cap and the shortfall resulting from such limitation exceeds the amount distributable to any such class from the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement, the holders of the applicable certificates will receive a smaller amount of interest than they would have received on that distribution date had the pass-through rate for that class not been calculated based on the related interest rate cap. If the pass through rates on the Senior Certificates and the Subordinate Certificates are limited for any distribution date, the resulting interest shortfalls may be recovered by the holders of these certificates on the same distribution date or on future distribution dates on a subordinated basis to the extent that on such distribution date or future distribution dates there are available funds remaining after certain other distributions on the Senior Certificates and Subordinate Certificates and the payment of certain fees and expenses of the trust.

**The Senior Certificates and the Subordinate Certificates may not always receive interest based on One- Month LIBOR plus the related certificate margin** ........................................................

The Senior Certificates and the Subordinate Certificates may not always receive interest at a rate equal to One-Month LIBOR plus the related certificate margin. If the related interest rate cap is less than One-Month LIBOR plus the related certificate margin, the interest rate on the Senior Certificates and the Subordinate Certificates will be reduced to such interest rate cap. Thus, the yield to investors in such class will be sensitive both to fluctuations in the level of One-Month LIBOR and to the adverse effects of the application of the related interest rate cap. The prepayment or default of Mortgage Loans with relatively higher net mortgage rates, particularly during a period of increased One-Month LIBOR rates, may result in the related interest rate cap being lower than otherwise would be the case. If on any distribution date the application of the interest rate cap results in an interest payment lower than One-Month LIBOR plus the related certificate margin on the Senior Certificates and the Subordinate Certificates during the related interest accrual period,

CONFIDENTIAL

FHFA04178877
A3-10013223023

the value of such class of certificates may be temporarily or permanently reduced.

To the extent interest on the Senior Certificates and the Subordinate Certificates is limited to the related interest rate cap, the difference between such interest rate cap and One-Month LIBOR plus the related certificate margin will create a shortfall. Some or all of this shortfall in respect of the Senior Certificates and the Subordinate Certificates may be funded to the extent of payments, if any, received from the Basis Risk Cap Provider under the Basis Risk Cap Agreement, received from the Swap Provider under the Interest Rate Swap Agreement or received from the Interest Rate Cap Provider under the Interest Rate Cap Agreement. However, if payments under the Basis Risk Cap Agreement, Interest Rate Swap Agreement and the Interest Rate Cap Agreement do not provide sufficient funds to cover such shortfalls, such shortfalls may remain unpaid on the final distribution date, including the optional termination date.

In addition, as further described in this prospectus supplement, although the Senior Certificates and the Subordinate Certificates are entitled to payments under the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement during periods of increased One-Month LIBOR rates, the Basis Risk Cap Provider, the Swap Provider and the Interest Rate Cap Provider will only be obligated to make such payments under certain circumstances.

**The Mortgage Loans were underwritten to nonconforming underwriting standards which may result in losses or shortfalls to be incurred on the Senior Certificates and the Subordinate Certificates**............

The underwriting standards applicable to the Mortgage Loans, which are described in this prospectus supplement under "The Mortgage Pool— The Originator" and "—Underwriting Standards of the Sponsor", may or may not conform to Fannie Mae or Freddie Mac guidelines. As a result, the Mortgage Loans may experience rates of delinquency, foreclosure and borrower bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in strict

S-23

FHFA04178878
A3-10013223024

compliance with Fannie Mae or Freddie Mac guidelines.

**Defaults could cause payment delays and losses** ....................................

There could be substantial delays in the liquidation of defaulted Mortgage Loans and corresponding delays in your receiving your portion of the proceeds of liquidation. These delays could last up to several years. Furthermore, an action to obtain a deficiency judgment is regulated by statutes and rules, and the amount of a deficiency judgment may be limited by law. In the event of a default by a borrower, these restrictions may impede the ability of the related servicer to foreclose on or to sell the mortgaged property or to obtain a deficiency judgment. In addition, liquidation expenses such as legal and appraisal fees, real estate taxes and maintenance and preservation expenses, will reduce the amount of security for the Mortgage Loans and, in turn, reduce the proceeds payable to certificateholders.

In the event that the mortgaged properties fail to provide adequate security for the related Mortgage Loans, and the protection provided by the subordination of certain classes is insufficient to cover any shortfall, you could lose all or a portion of the money you paid for your certificates.

**Your yield could be adversely affected by the unpredictability of prepayments** ....................................

No one can accurately predict the level of prepayments that the trust will experience. The trust's prepayment experience may be affected by many factors, including:

- general economic conditions,

- the level of prevailing interest rates,

- the availability of alternative financing, and

- homeowner mobility.

Substantially all of the Mortgage Loans contain due-on-sale provisions, and the servicer is required to enforce those provisions unless doing so is not permitted by applicable law or the servicer, in a manner consistent with reasonable commercial

S-24

FHFA04178879
A3-10013223025

practice, permits the purchaser of the mortgaged property in question to assume the related Mortgage Loan. In addition, approximately 60.64%, 62.02%, and 61.26% of the Group I Mortgage Loans, Group II Mortgage Loans and the Mortgage Loans in the aggregate, respectively, in each case by the related aggregate principal balance as of the Cut-off Date, impose a prepayment charge in connection with voluntary prepayments made within the periods set forth in the related mortgage notes, which charges may discourage prepayments during the applicable period. The holders of the Class P Certificates are entitled to all prepayment charges received on the Mortgage Loans and these amounts will not be available for distribution on other classes of certificates. Under the limited circumstances described in the pooling and servicing agreement, the servicer may waive in whole or in part the payment of an otherwise applicable prepayment charge on a Mortgage Loan.

The weighted average lives of the certificates will be sensitive to the rate and timing of principal payments, including prepayments, on the Mortgage Loans in the related loan group or loan groups, which may fluctuate significantly from time to time. The mortgage pool is comprised of fixed-rate mortgage loans and adjustable-rate mortgage loans that adjust periodically after a two, three or five year initial fixed-rate period. We are not aware of any publicly available statistics that set forth principal prepayment experience or prepayment forecasts of mortgage loans of the type included in the mortgage pool over an extended period of time, and the experience with respect to the Mortgage Loans included in the mortgage pool is insufficient to draw any conclusions with respect to the expected prepayment rates on such Mortgage Loans. As is the case with conventional fixed-rate mortgage loans, adjustable-rate mortgage loans may be subject to a greater rate of principal prepayments in a declining interest rate environment. For example, if prevailing mortgage interest rates fall significantly, adjustable-rate mortgage loans with an initial fixed-rate period could be subject to higher prepayment rates either before or after the interest rate on the mortgage loan begins to adjust than if prevailing mortgage interest rates remain constant because the availability of fixed-rate mortgage loans at competitive interest rates may encourage

S-25

CONFIDENTIAL

FHFA04178880
A3-10013223026

mortgagors to refinance their mortgage loans to "lock in" lower fixed interest rates. The features of adjustable-rate mortgage loan programs during the past years have varied significantly in response to market conditions including the interest-rate environment, consumer demand, regulatory restrictions and other factors. The lack of uniformity of the terms and provisions of such adjustable-rate mortgage loan programs have made it impracticable to compile meaningful comparative data on prepayment rates and, accordingly, we cannot assure you as to the rate of prepayments on the Mortgage Loans in stable or changing interest rate environments.

You should note that:

- if you purchase your certificates at a discount and principal is repaid on the related Mortgage Loans slower than you anticipate, then your yield may be lower than you anticipate;

- if you purchase your certificates at a premium and principal is repaid on the related Mortgage Loans faster than you anticipate, then your yield may be lower than you anticipate;

- because the Senior Certificates and the Subordinate Certificates bear interest at an adjustable rate, your yield will also be sensitive to both the level of One-Month LIBOR and the interest rate cap;

- because repurchases of Mortgage Loans as a result of breaches of representations and warranties and liquidations of Mortgage Loans following default have the same effect as prepayments, your yield may be lower than you expect if you purchase your certificates at a premium and the rate of such repurchases and liquidations on the Mortgage Loans is higher than you expect;

- if the amount of overcollateralization is reduced to a level below the required level, additional principal payments will be made to the holders of the Senior Certificates and the Subordinate Certificates in order to restore the

CONFIDENTIAL

FHFA04178881
A3-10013223027

required level of overcollateralization. An earlier return of principal to such holders as a result of the overcollateralization provisions will influence the yield on the Senior Certificates and the Subordinate Certificates in a manner similar to the manner in which principal prepayments on the Mortgage Loans in the related loan group will influence the yield on the related classes of Senior Certificates and the Subordinate Certificates; and

- you bear the reinvestment risks resulting from a faster or slower rate of principal payments than you expected.

We refer you to "The Mortgage Pool" and "Yield, Prepayment and Maturity Considerations" in this prospectus supplement and "Certain Legal Aspects of the Mortgage Loans—Due-on-Sale Clauses" in the prospectus for a description of certain provisions of the Mortgage Loans that may affect the prepayment experience on the Mortgage Loans.

**The yield on your certificates will also be affected by changes in the mortgage interest rate**.................

As of the Cut-off Date, approximately 79.19%, 84.19% and 81.43% of the Group I Mortgage Loans, the Group II Mortgage Loans and the Mortgage Loans in the aggregate, respectively, are adjustable rate mortgage loans. After an initial fixed-rate period, each adjustable-rate Mortgage Loan provides for semi-annual adjustments to the interest rate applicable to such Mortgage Loan. The interest rate on each such Mortgage Loan will adjust to equal the sum of an index and a margin. Interest rate adjustments may be subject to limitations stated in the mortgage note with respect to increases and decreases for any adjustment (i.e., a "periodic cap"). In addition, the interest rate may be subject to an overall maximum and minimum interest rate. See "The Mortgage Pool" in this prospectus supplement.

With respect to the Senior Certificates and the Subordinate Certificates, the pass-through rate may decrease, and may decrease significantly, after the mortgage interest rates on the related adjustable-rate Mortgage Loans begin to adjust as a result of, among other factors, the dates of adjustment, the margins,

CONFIDENTIAL

FHFA04178882
A3-10013223028

changes in the indices and any applicable periodic cap or lifetime rate change limitations. Each adjustable rate Mortgage Loan has a maximum mortgage interest rate and all of the adjustable rate Mortgage Loans have a minimum mortgage interest rate. In some cases, the minimum mortgage interest rate may be the applicable margin. In the event that, despite prevailing market interest rates, the mortgage interest rate on any adjustable rate Mortgage Loan cannot increase due to a maximum mortgage interest rate limitation or a periodic cap, the yield on the certificates could be adversely affected. See "The Mortgage Pool" and "Yield, Prepayment and Maturity Considerations" in this prospectus supplement.

**Second Lien Mortgage Loan Risk** .......... As of the Cut-off Date, approximately 8.14%, 5.63% and 7.02% of the Group I Mortgage Loans, the Group II Mortgage Loans and the Mortgage Loans in the aggregate, respectively, are secured by second liens on the related mortgaged properties. The proceeds from any liquidation, insurance or condemnation proceedings will be available to satisfy the outstanding balance of such Mortgage Loans only to the extent that the claims of the related senior mortgages have been satisfied in full, including any related foreclosure costs. In circumstances when it has been determined to be uneconomical to foreclose on the mortgaged property, the servicer may write off the entire balance of such Mortgage Loan as a bad debt. The foregoing considerations will be particularly applicable to Mortgage Loans secured by second liens that have high combined loan-to-value ratios because it is comparatively more likely that the servicer would determine foreclosure to be uneconomical in the case of such Mortgage Loans. The rate of default of second lien Mortgage Loans may be greater than that of Mortgage Loans secured by first liens on comparable properties.

**Interest only loans increase risk of loss** ................................. As of the Cut-off Date, approximately 8.84%, 16.95% and 12.48% of the Group I Mortgage Loans, Group II Mortgage Loans and the Mortgage Loans in the aggregate, respectively, have an initial interest only period. During this period, the payment made by the related borrower will be less than it would be if the related Mortgage Loan amortized. In addition, the principal balance of the related Mortgage Loan will not be reduced because there will be no scheduled

S-28

FHFA04178883
A3-10013223029

monthly payments of principal during this period. As a result, no principal payments will be made to the Senior Certificates and the Subordinate Certificates with respect to these Mortgage Loans during their interest only period except in the case of a prepayment.

After the initial interest only period, the scheduled monthly payment on these Mortgage Loans will increase, which may result in increased delinquencies by the related borrowers, particularly if interest rates have increased and the borrower is unable to refinance. In addition, losses may be greater on these Mortgage Loans as a result of the Mortgage Loan not amortizing during the early years of these Mortgage Loans. Although the amount of principal included in each scheduled monthly payment for a traditional mortgage loan is relatively small during the first few years after the origination of a mortgage loan, in the aggregate the amount can be significant. Any resulting delinquencies and losses, to the extent not covered by credit enhancement, will be allocated to the related Senior Certificates and the Subordinate Certificates.

The prevalence of mortgage loans with an initial interest only period are relatively new in the mortgage marketplace. The performance of these mortgage loans may be significantly different from mortgage loans that amortize from origination. In particular, there may be a higher expectation by these borrowers of refinancing their mortgage loans with a new mortgage loan, in particular one with an initial interest only period, which may result in higher or lower prepayment speeds than would otherwise be the case. In addition, the failure to build equity in the property by the related borrower may affect the delinquency and prepayment of these mortgage loans.

**Mortgage Loan modifications may affect the interest rate cap**..................................................

Modifications of Mortgage Loans agreed to by the servicer in order to maximize ultimate proceeds of such Mortgage Loans may extend the period over which principal is received on the certificates or, if such modifications downwardly adjust interest rates, may lower the interest rate cap.

CONFIDENTIAL

FHFA04178884
A3-10013223030

**A reduction in certificate rating could have an adverse effect on the value of your certificates** ..........................

The ratings of each class of Offered Certificates will depend primarily on an assessment by the rating agencies of the related Mortgage Loans, the Interest Rate Swap Agreement, the Interest Rate Cap Agreement and the subordination afforded by certain classes of certificates. The ratings by each of the rating agencies of the Offered Certificates are not recommendations to purchase, hold or sell the Offered Certificates because such ratings do not address the market prices of the certificates or suitability for a particular investor.

The rating agencies may suspend, reduce or withdraw the ratings on the Offered Certificates at any time. Any reduction in, or suspension or withdrawal of, the rating assigned to a class of Offered Certificates would likely reduce the market value of such class of Offered Certificates and may affect your ability to sell them.

**Your distributions could be adversely affected by the bankruptcy or insolvency of certain parties** ......................................

The sponsor will treat its transfer of the Mortgage Loans to the depositor as a sale of the Mortgage Loans. The depositor will treat its transfer of the Mortgage Loans to the trust as a sale of the Mortgage Loans. However, if the sponsor or the depositor becomes bankrupt, the trustee in bankruptcy may argue that the Mortgage Loans were not sold but were only pledged to secure a loan to the seller or the depositor, as applicable. If that argument is made, you could experience delays or reductions in payments on the certificates. If that argument is successful, the bankruptcy trustee could elect to sell the Mortgage Loans and pay down the certificates early. Thus, you could lose the right to future payments of interest, and might suffer reinvestment loss in a lower interest rate environment.

In addition, if the master servicer becomes bankrupt, a bankruptcy trustee or receiver may have the power to prevent the appointment of a successor master servicer. Any related delays in servicing could result in increased delinquencies or losses on the Mortgage Loans.

S-30

CONFIDENTIAL

**Developments in specified states could have a disproportionate effect on the Mortgage Loans due to geographic concentration of mortgaged properties** ..........................

Approximately 18.51%, 13.24% and 16.14% of the Group I Mortgage Loans, Group II Mortgage Loans, and the Mortgage Loans in the aggregate, respectively, in each case, as of the Cut-off Date are secured by mortgaged properties that are located in the State of Florida. Approximately 17.33%, 34.42% and 25.00% of the Group I Mortgage Loans, Group II Mortgage Loans, and the Mortgage Loans in the aggregate, respectively, in each case, as of the Cut-off Date are secured by mortgaged properties that are located in the State of California. Approximately 10.11%, 14.67% and 12.15% of the Group I Mortgage Loans, Group II Mortgage Loans, and the Mortgage Loans in the aggregate, respectively, in each case, as of the Cut-off Date are secured by mortgaged properties that are located in the State of New York. Approximately 6.89%, 5.23% and 6.14% of the Group I Mortgage Loans, Group II Mortgage Loans, and the Mortgage Loans in the aggregate, respectively, in each case, as of the Cut-off Date are secured by mortgaged properties that are located in the State of Maryland. Approximately 6.76%, 5.50% and 6.19% of the Group I Mortgage Loans, Group II Mortgage Loans, and the Mortgage Loans in the aggregate, respectively, in each case, as of the Cut-off Date are secured by mortgaged properties that are located in the State of New Jersey. Approximately 5.03% of the Group I Mortgage Loans, as of the Cut-off Date are secured by mortgaged properties that are located in the State of Illinois. Property in any region having a significant concentration of properties underlying the Mortgage Loans may be more susceptible than homes located in other parts of the country to certain types of uninsured hazards, such as earthquakes, floods, mudslides, other natural disasters and acts of terrorism. In addition,

- economic conditions in the specified regions, which may or may not affect real property values, may affect the ability of borrowers to repay their loans on time;

- declines in the residential real estate market in the specified regions may reduce the values of properties located in those regions, which would

S-31

CONFIDENTIAL

FHFA04178886
A3-10013223032

result in an increase in the related loan-to-value ratios; and

- any increase in the market value of properties located in the specified regions would reduce the loan-to-value ratios and could, therefore, make alternative sources of financing available to the borrowers at lower interest rates, which could result in an increased rate of prepayment of the Mortgage Loans.

**Potential inadequacy of credit enhancement for the Senior Certificates and the Subordinate Certificates**...........

The credit enhancement features described in this prospectus supplement are intended to enhance the likelihood that holders of the Senior Certificates will receive regular distributions of interest and principal. However, we cannot assure you that the applicable credit enhancement will adequately cover any shortfalls in cash available to distribute to your certificates as a result of delinquencies or defaults on the Mortgage Loans. If delinquencies or defaults occur on the Mortgage Loans, neither the servicers, the master servicer nor any other entity will advance scheduled monthly payments of interest and principal on delinquent or defaulted Mortgage Loans if such advances are not likely to be recovered.

If substantial losses occur as a result of defaults and delinquent payments on the Mortgage Loans, you may suffer losses.

Furthermore, none of the Mortgage Loans have mortgage insurance.

**You may have difficulty selling your certificates**............................

Each underwriter intends to make a secondary market in the Offered Certificates, but no underwriter has an obligation to do so. We cannot assure you that a secondary market will develop or, if it develops, that it will continue. Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield or recover your investment. The market values of the certificates are likely to fluctuate, and such fluctuations may be significant and could result in significant losses to you.

S-32

FHFA04178887
A3-10013223033

The secondary markets for similar securities have experienced periods of illiquidity and can be expected to do so in the future. Illiquidity can have a severely adverse effect on the prices of certificates that are especially sensitive to prepayment, credit or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors.

**High loan-to-value ratios increase risk of loss** ..................................

Mortgage loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with loan-to-value ratios of 80% or below. Approximately 25.54%, 27.85% and 26.59% of the first lien Mortgage Loans included in the Group I Mortgage Loans, Group II Mortgage Loans and the Mortgage Loans in the aggregate, respectively, (in each case, by the related aggregate principal balance as of the Cut-off Date) had loan-to-value ratios at origination in excess of 80%. None of the Mortgage Loans with loan-to-value ratios in excess of 80% have mortgage insurance.

The determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the Mortgage Loans may differ from the appraised value of such mortgaged properties for Mortgage Loans obtained for the purpose of acquiring the related mortgaged property because loan-to-value ratios for those Mortgage Loans are determined based upon the lesser of the selling price of the mortgaged property or its appraised value at the time of sale.

**Failure of the servicer to perform its obligations may adversely affect distributions on the certificates** ..............

The amount and timing of distributions on the certificates generally will be dependent on the performance by the servicer of its servicing obligations in an adequate and timely manner. See "Servicing—Payments on Mortgage Loans; Deposits to Custodial Account" in this prospectus supplement. If the servicer fails to perform its servicing obligations, this failure may result in the termination of the servicer. That termination, with its corresponding transfer of daily collection activities, will likely increase the rates of delinquencies, defaults and losses on the related Mortgage Loans. As a result,

CONFIDENTIAL

FHFA04178888
A3-10013223034

shortfalls in the distributions due on your certificates could occur.

**The recording of the mortgages in the name of MERS may affect the yield on the certificates** .....................

The mortgages or assignments of mortgage for some of the Mortgage Loans have been or may be recorded in the name of Mortgage Electronic Registration Systems, Inc. or MERS, solely as nominee for the sponsor and its successors and assigns. Subsequent assignments of those mortgages are registered electronically through the MERS system. However, if MERS discontinues the MERS system and it becomes necessary to record an assignment of mortgage to the trustee, then any related expenses will be paid by the trust and will reduce the amount available to pay principal of and interest on the certificates.

The recording of mortgages in the name of MERS is a new practice in the mortgage lending industry. Public recording officers and others may have limited, if any, experience with lenders seeking to foreclose mortgages, assignments of which are registered with MERS. Accordingly, delays and additional costs in commencing, prosecuting and completing foreclosure proceedings and conducting foreclosure sales of the mortgaged properties could result. Those delays and the additional costs could in turn delay the distribution of liquidation proceeds to certificateholders and increase the amount of losses on the Mortgage Loans.

**The return on your certificates could be reduced by shortfalls due to the application of the Servicemembers Civil Relief Act of 2003, as amended, or similar state or local laws** ....................

The Servicemembers Civil Relief Act of 2003, as amended, or the Relief Act, and similar state or local laws provide relief to borrowers who enter active military service and to borrowers in reserve status who are called to active military service after the origination of their mortgage loans. The ongoing military operations of the United States in Iraq and Afghanistan has caused an increase in the number of citizens in active military duty, including those citizens previously in reserve status. Under the Relief Act the interest rate applicable to a mortgage loan for which the related borrower is called to active military service will be reduced from the percentage stated in the related mortgage note to 6.00%, if applicable. This

S-34

CONFIDENTIAL

FHFA04178889
A3-10013223035

interest rate reduction and any reduction provided under similar state and local laws may result in an interest shortfall because neither the servicer nor the master servicer will be able to collect the amount of interest which otherwise would be payable with respect to such Mortgage Loan if the Relief Act or similar state or local laws were not applicable to such Mortgage Loan. This shortfall will not be paid by the borrower on future due dates or advanced by the servicer or the master servicer and, therefore, will reduce the amount available to pay interest to the certificateholders on subsequent distribution dates. Any such shortfall on the Mortgage Loans will reduce the amount available to pay interest on the Senior Certificates and the Subordinate Certificates. We do not know how many Mortgage Loans in the mortgage pool have been or may be affected by the application of the Relief Act or similar state or local laws.

**The Interest Rate Swap Agreement is subject to Swap Provider Risk** ............

The Senior Certificates and the Subordinate Certificates will have the benefit of an Interest Rate Swap Agreement which will require the Swap Provider to make certain payments for the benefit of the Senior Certificates and Subordinate Certificates. To the extent that distributions on the Senior Certificates and Subordinate Certificates depend in part on payments to be received by the trust under the Interest Rate Swap Agreement, the ability of the securities administrator to make such distributions on the Senior Certificates and Subordinate Certificates will be subject to the credit risk of the Swap Provider. Although there is a mechanism in place to facilitate replacement of the Interest Rate Swap Agreement upon the default or credit impairment of the Swap Provider, there can be no assurance that any such mechanism will result in the ability of the trustee to obtain a suitable replacement interest rate swap agreement. The credit ratings of the Swap Provider may be lower than the ratings assigned to the Senior Certificates.

Any net swap payment payable to the Swap Provider under the terms of the Interest Rate Swap Agreement will reduce amounts available for distribution to the holders of the Senior Certificates and Subordinate Certificates and may reduce payments of interest on such certificates. In the event that the Supplemental Interest Trust, after application of all interest and

S-35

CONFIDENTIAL

FHFA04178890
A3-10013223036

principal received on the Mortgage Loans, cannot make the required net swap payments to the Swap Provider, a swap termination payment as described in this prospectus supplement under "The Interest Rate Swap Agreement", will be owed to the Swap Provider.  In certain circumstances, as described in this prospectus supplement under "The Interest Rate Swap Agreement", a swap termination payment payable to the Swap Provider in the event of early termination of the Interest Rate Swap Agreement may reduce amounts available for distribution to holders of the Senior Certificates and Subordinate Certificates.

**The Basis Risk Cap Agreement and the Interest Rate Cap Agreement are subject to provider risk** .............................

The assets of the trust include certain payments made under the Basis Risk Cap Agreement and the Interest Rate Cap Agreement, which will require the counterparty thereunder to make certain payments for the benefit of the holders of the Senior Certificates and Subordinate Certificates.  To the extent that distributions on the Senior Certificates or Subordinate Certificates depend in part on payments to be received from the Basis Risk Cap Provider or the Interest Rate Cap Provider, as applicable, the ability of the securities administrator or the Cap Securities Administrator, as applicable, to make such distributions on the Senior Certificates and Subordinate Certificates will be subject to the credit risk of the Basis Risk Cap Provider or the Interest Rate Cap Provider, as applicable. Although there is a mechanism in place to facilitate replacement of the Basis Risk Cap Agreement and the Interest Rate Cap Agreement upon the default or credit impairment of the related counterparty, there can be no assurance that any such mechanism will result in the ability of the trustee to obtain a suitable replacement Basis Risk Cap Agreement or Interest Rate Cap Agreement, as applicable.

**FICO Scores Mentioned in this Free Writing Prospectus are not an Indicator of Future Performance of Borrowers** ..............................................

Investors should be aware that FICO scores are based on past payment history of the borrower.  Investors should not rely on FICO scores as an indicator of future borrower performance.  See *"Description of the Trust Fund – Mortgage Loans — FICO Scores"* in the prospectus.

S-36

FHFA04178891
A3-10013223037

## THE MORTGAGE POOL

**General**

We have provided the below information with respect to the conventional, one- to four-family, fixed-rate and adjustable-rate mortgage loans (the "Mortgage Loans") secured by first liens and second liens on residential real properties that we expect to include in the pool of mortgage loans in the trust fund (the "Mortgage Pool"). The Mortgage Loans have been divided into two loan groups, designated as the "Group I Mortgage Loans" and the "Group II Mortgage Loans". Prior to the Closing Date, we may remove Mortgage Loans from the mortgage pool and we may substitute other mortgage loans for the mortgage loans we remove. The depositor believes that the information set forth in this prospectus supplement will be representative of the characteristics of the mortgage pool as it will be constituted at the time the certificates are issued, although the range of mortgage rates and maturities and other characteristics of the mortgage loans may vary. The characteristics of the mortgage loans as described in this prospectus supplement may differ from the final pool as of the closing date due, among other things, to the possibility that certain mortgage loans may become delinquent or default or may be removed or substituted and that similar or different mortgage loans may be added to the pool prior to the closing date. The actual mortgage loans included in the trust fund as of the Closing Date may vary from the mortgage loans as described in this prospectus supplement by up to plus or minus 5% as to any of the material characteristics described in this prospectus supplement. If, as of the closing date, any material pool characteristics differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement to this prospectus supplement or in a current report on Form 8-K. Unless we have otherwise indicated, the information we present below is expressed as of the Cut-off Date, which is October 1, 2006.

The Mortgage Loans will be selected for inclusion in the Mortgage Pool based on rating agency criteria, compliance with representations and warranties, and conformity to criteria relating to the characterization of the Offered Certificates for tax, ERISA, Form S-3 eligibility and other legal purposes.

The Mortgage Loans have original terms to maturity of not greater than 30 years. The adjustable-rate Mortgage Loans have an initial fixed-rate period of two, three or five years. The Mortgage Loans have original amortization terms to maturity of not greater than 30 years, except with respect to approximately 37.26% of the Mortgage Loans that amortize over 40 years, with a balloon payment at 30 years.

Approximately 14.74% of the Mortgage Loans (by aggregate principal balance as of the Cut-off Date), provide for level monthly payments in an amount sufficient to fully amortize such Mortgage Loans over their terms. Approximately 12.48% of the Mortgage Loans (by aggregate principal balance as of the Cut-off Date), are interest only loans ("Interest Only Loans") which require the related borrowers to make monthly payments of only accrued interest for the first five years following origination. After such interest-only period, each such borrower's monthly payment will be recalculated to cover both interest and principal so that the related Mortgage Loan will amortize fully on or prior to its final payment date.

Approximately 92.98% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date, are secured by mortgages or deeds of trust or other similar security instruments creating first liens on the related Mortgaged Properties. Approximately 7.02% of the Mortgage

S-37

FHFA04178892
A3-10013223038

Loans, by aggregate principal balance as of the Cut-off Date, are secured by mortgages creating second liens on the related Mortgaged Properties. The Mortgaged Properties consist of one-to-four-family dwelling units, individual condominium units, townhouses and individual units in planned unit developments.

References to percentages of the Mortgage Loans, unless otherwise noted, are calculated based on the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

Approximately 18.57% of the Mortgage Loans are fixed-rate mortgage loans and approximately 81.43% of the Mortgage Loans are adjustable-rate mortgage loans, in each case, by aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

The mortgage rate (the "Mortgage Rate") on each Mortgage Loan is the per annum rate of interest specified in the related mortgage note as reduced by application of the Relief Act or similar state or local laws and bankruptcy adjustments. After an initial fixed rate period, each adjustable-rate Mortgage Loan provides for semi-annual adjustment to the Mortgage Rate applicable thereto based on Six-Month LIBOR, as further described below (the "Index"). In connection with each Mortgage Rate adjustment, the related Mortgage Loans have corresponding adjustments to their monthly payment amount, in each case on each applicable adjustment date (each such date, an "Adjustment Date"). On each Adjustment Date, the Mortgage Rate on each adjustable-rate Mortgage Loan will be adjusted generally to equal the sum of the Index and a fixed percentage amount (the "Gross Margin") for that Mortgage Loan specified in the related mortgage note. The Mortgage Rate on each adjustable-rate Mortgage Loan, however, will not increase or decrease by more than the periodic rate cap (the "Periodic Rate Cap") specified in the related mortgage note on any Adjustment Date and will not exceed a specified maximum mortgage rate (the "Maximum Mortgage Rate") over the life of the Mortgage Loan or be less than a specified minimum mortgage rate (the "Minimum Mortgage Rate") over the life of the Mortgage Loan. Effective with the first monthly payment due on each adjustable-rate Mortgage Loan after each related Adjustment Date, the monthly payment amount will be adjusted to an amount that will fully amortize the outstanding principal balance of the related Mortgage Loan over its remaining term and pay interest at the Mortgage Rate as so adjusted. Due to the application of the Periodic Rate Caps and the Maximum Mortgage Rates, the Mortgage Rate on each adjustable-rate Mortgage Loan, as adjusted on any related Adjustment Date, may be less than the sum of the Index, calculated as described in this prospectus supplement, and the related Gross Margin. See "—The Index of the Mortgage Loans" in this prospectus supplement. None of the adjustable-rate Mortgage Loans permit the related mortgagor to convert the adjustable Mortgage Rate thereon to a fixed Mortgage Rate.

The Mortgage Loans have scheduled monthly payments due on the first day of the month (with respect to each Mortgage Loan, the "Due Date"). Generally, each Mortgage Loan will contain a customary "due-on-sale" clause which provides that the Mortgage Loan must be repaid at the time of a sale of the related Mortgaged Property or assumed by a creditworthy purchaser (as determined by the servicer) of the related Mortgaged Property.

Approximately 26.59% of the first lien Mortgage Loans by aggregate principal balance as of the Cut-off Date had a combined loan-to-value ratio in excess of 80% at origination, and none were insured by mortgage insurance policies.

Approximately 61.26% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date, provide for payment by the borrower of a prepayment charge (a "Prepayment

S-38

CONFIDENTIAL

FHFA04178893
A3-10013223039

Charge") in limited circumstances on certain prepayments as provided in the related mortgage note. Generally, as provided in the related mortgage note, each such Mortgage Loan provides for payment of a Prepayment Charge on certain voluntary partial prepayments and all prepayments in full made within a specified period not in excess of three years from the date of origination of the Mortgage Loan. The amount of the Prepayment Charge is as provided in the related mortgage note and is generally equal to six months' interest on any amounts prepaid in excess of 20% of the original principal balance of the related Mortgage Loan in any twelve month period, as permitted by law. The holders of the Class P Certificates are entitled to all Prepayment Charges received on the Mortgage Loans, and these amounts will not be available for distribution on other classes of certificates. Under the limited instances described under the terms of the pooling and servicing agreement, the servicer may waive in whole or in part the payment of any otherwise applicable Prepayment Charge.  Investors should conduct their own analysis of the effect, if any, that the Prepayment Charges, and decisions by the servicer with respect to the waiver of the Prepayment Charges, may have on the prepayment performance of the Mortgage Loans.  As of July 1, 2003, the regulations of the Office of Thrift Supervision pertaining to the Alternative Mortgage Parity Act of 1982 (the "Parity Act") were amended.  Prior to July 1, 2003, these regulations, among other things, permitted non-bank "housing creditors" originating "alternative mortgage transactions" (as each of those terms is defined in the Parity Act) to impose prepayment penalties.  After July 1, 2003, "housing creditors" no longer can impose prepayment penalties in connection with "alternative mortgage transactions" unless permitted by applicable state law.  The depositor makes no representation as to the effect that the Prepayment Charges, the decisions by the servicer with respect to the waiver of the Prepayment Charges and the changes to the regulations of the Office of Thrift Supervision pertaining to the Parity Act, may have on the prepayment performance of the Mortgage Loans. See "Certain Legal Aspects of the Loans—Prepayment Charges and Late Payment Fees" in the prospectus.

In addition, the servicer may waive the collection of any otherwise applicable Prepayment Charge, but only if: (1) such waiver is standard and customary in servicing similar Mortgage Loans and such waiver is related to a default or reasonably foreseeable default and would, in the reasonable judgment of the servicer, maximize recovery of total proceeds taking into account the value of such Prepayment Charge and the related Mortgage Loan and, if such waiver is made in connection with a refinancing of the related Mortgage Loan, such refinancing is related to a default or a reasonably foreseeable default, (ii) such Prepayment Charge is unenforceable in accordance with applicable law or the collection of such related Prepayment Charge would otherwise violate applicable law or (iii) the collection of such Prepayment Charge would be considered "predatory" pursuant to written guidance published or issued by any applicable federal, state or local regulatory authority acting in its official capacity and having jurisdiction over such matters.

None of the Mortgage Loans are buydown mortgage loans.

Not greater than approximately 0.99% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date, will be 30-59 days delinquent.  A Mortgage Loan is considered to be delinquent when a payment due on any due date remains unpaid as of the close of business on the next monthly due date.  The determination as to whether a Mortgage Loan falls into this category is made as of the close of business on the last business day of each month.

The following tables set forth the historical delinquency of experience of the Mortgage Loans.  The historical delinquency experience of the Mortgage Loans provided in the tables is based on the delinquency of each Mortgage Loan over a period for which information is

S-39

FHFA04178894
A3-10013223040

known or reasonably available to the depositor, which is the time since the sponsor acquired such Mortgage Loan. Each Mortgage Loan was seasoned approximately 0.55 months on a weighted average basis at the time of its acquisition by the sponsor.

### Historical Delinquency of the Group I Mortgage Loans*

| Historical Delinquency | Number of Mortgage Loans | Aggregate Principal Balance | % of Aggregate Principal Balance | Average Principal Balance as of the Cut-off Date | Weighted Average Mortgage Rate | Weighted Average Original Loan-to-Value Ratio | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| **Never Delinquent** ............ | 3,866 | $ 672,544,995.76 | 99.31% | $ 173,964.04 | 8.59% | 80.544% | 620 |
| **30 days delinquent** ........... | 25 | 4,692,698.86 | 0.69 | 187,707.95 | 8.60 | 85.896 | 662 |
| **Total** ........................... | 3,891 | $ 677,237,694.62 | 100.00% | $ 174,052.35 | 8.59% | 80.581% | 620 |

### Historical Delinquency of the Group II Mortgage Loans*

| Historical Delinquency | Number of Mortgage Loans | Aggregate Principal Balance | % of Aggregate Principal Balance | Average Principal Balance as of the Cut-off Date | Weighted Average Mortgage Rate | Weighted Average Original Loan-to-Value Ratio | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| **Never Delinquent** ............ | 1,801 | $ 543,178,847.04 | 98.62% | $301,598.47 | 8.283% | 82.055% | 637 |
| **30 days delinquent** ........... | 22 | 7,625,803.04 | 1.38 | 346,627.41 | 8.289 | 82.663 | 683 |
| **Total** ........................... | 1,823 | $ 550,804,650.08 | 100.00% | $302,141.88 | 8.283% | 82.063% | 638 |

### Historical Delinquency of the Mortgage Loans*

| Historical Delinquency | Number of Mortgage Loans | Aggregate Principal Balance | % of Aggregate Principal Balance | Average Principal Balance as of the Cut-off Date | Weighted Average Mortgage Rate | Weighted Average Original Loan-to-Value Ratio | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| **Never Delinquent** ............ | 5,667 | $ 1,215,723,842.80 | 99.00% | $ 214,526.88 | 8.452% | 81.219% | 628 |
| **30 days delinquent** ........... | 47 | 12,318,501.90 | 1.00 | 262,095.79 | 8.408 | 83.895 | 675 |
| **Total** ........................... | 5,714 | $ 1,228,042,344.70 | 100.00% | $ 214,918.16 | 8.452% | 81.246% | 628 |

*Pursuant to Rule 409 of the General Rules and Regulations under the Securities Act of 1933, as amended, the sponsor is unable to provide historical delinquency information from the date of origination of each Mortgage Loan to the date of its acquisition by the sponsor. Such historical delinquency information is unknown to the sponsor, not reasonably available to the sponsor without unreasonable effort or expense, and, because the sponsor is not affiliated with the servicer or the originator, the relevant information is not in the sponsor's control. The table above includes historical delinquency information for such Mortgage Loans as is available to the sponsor as required by Item 1111(c) of Regulation AB.

### Group I Mortgage Loan Characteristics

Approximately 91.86% of the Group I Mortgage Loans are secured by first liens on the related Mortgaged Property and approximately 8.14% of the Group I Mortgage Loans are secured by second liens on the related Mortgaged Property in each case, by aggregate principal balance of the Group I Mortgage Loans as of the Cut-off Date.

Approximately 20.81% of the Group I Mortgage Loans are fixed-rate Mortgage Loans and approximately 79.19% of the Group I Mortgage Loans are adjustable-rate Mortgage Loans, in each case, by aggregate principal balance of the Group I Mortgage Loans as of the Cut-off Date.

S-40

FHFA04178895
A3-10013223041

Approximately 8.84% of the Group I Mortgage Loans are Interest Only Loans. Approximately 25.54% of the first lien Group I Mortgage Loans had a loan-to-value ratio in excess of 80% at origination.   None of the Group I Mortgage Loans is insured by mortgage insurance policies. Approximately 60.64% of the Group I Mortgage Loans are subject to Prepayment Charges.

The average principal balance of the Group I Mortgage Loans at origination was approximately $174,413.  No Group I Mortgage Loan had a principal balance at origination greater than approximately $663,000 or less than approximately $15,000.  The average principal balance of the Group I Mortgage Loans as of the Cut-off Date was approximately $174,052.  No Group I Mortgage Loan had a principal balance as of the Cut-off Date greater than approximately $661,906 or less than approximately $14,886.

The Group I Mortgage Loans had Mortgage Rates as of the Cut-off Date ranging from approximately 5.600% per annum to approximately 14.100% per annum, and the weighted average Mortgage Rate was approximately 8.590% per annum.  As of the Cut-off Date, the Group I adjustable rate Mortgage Loans had Gross Margins ranging from approximately 3.429% per annum to approximately 6.990% per annum, Minimum Mortgage Rates ranging from approximately 5.600% per annum to approximately 14.100% per annum and Maximum Mortgage Rates ranging from approximately 11.600% per annum to approximately 20.100% per annum.  As of the Cut-off Date, the weighted average Gross Margin was approximately 6.141% per annum, the weighted average Minimum Mortgage Rate was approximately 8.465% per annum and the weighted average Maximum Mortgage Rate was approximately 14.465% per annum.  The latest next Adjustment Date following the Cut-off Date on any Group I adjustable-rate Mortgage Loan occurs on June 1, 2011 and the weighted average next Adjustment Date for all of the Group I adjustable-rate Mortgage Loans following the Cut-off Date is May 20, 2008.

The weighted average combined loan-to-value ratio of the Group I Mortgage Loans at origination was approximately 88.34%.  At origination, no Group I Mortgage Loan had a combined loan-to-value ratio greater than approximately 100.00% or less than approximately 11.43%.

The weighted average remaining term to stated maturity of the Group I Mortgage Loans was approximately 355 months as of the Cut-off Date.  None of the Group I Mortgage Loans had a first due date prior to October 1, 2005 or will have a first due date after July 1, 2006 or will have a remaining term to stated maturity of less than 115 months or greater than 356 months as of the Cut-off Date.  The latest maturity date of any Group I Mortgage Loan is June 1, 2036.

As of the Cut-off Date, the weighted average credit score of the Group I Mortgage Loans is approximately 620.  No Group I Mortgage Loan had a credit score as of the Cut-off Date greater than 782 or less than 500.

The Group I Mortgage Loans are expected to have the following additional characteristics as of the Cut-off Date (the sum in any column may not equal the total indicated due to rounding):

CONFIDENTIAL

FHFA04178896
A3-10013223042

## Product Type of the Group I Mortgage Loans

| Product Type | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Balloon 30/40 | 103 | $ 25,005,236 | 3.69% | 7.528% | 646 | 76.39% | 356 | 78.33% |
| Fixed 10yr | 5 | 319,280 | 0.05 | 12.640 | 611 | 100.00 | 116 | 36.25 |
| Fixed 15yr | 75 | 1,752,354 | 0.26 | 11.081 | 645 | 94.79 | 176 | 50.51 |
| Fixed 20yr | 6 | 455,936 | 0.07 | 9.448 | 614 | 74.17 | 236 | 84.35 |
| Fixed 30yr | 1,114 | 113,430,679 | 16.75 | 9.362 | 644 | 87.59 | 356 | 65.13 |
| ARM 2yr/6mo | 1,483 | 272,293,076 | 40.21 | 8.833 | 602 | 78.36 | 355 | 48.02 |
| ARM 2yr/6mo - IO | 233 | 58,529,732 | 8.64 | 7.476 | 640 | 81.13 | 356 | 90.95 |
| ARM 2yr/6mo - 40yr Amterm | 844 | 200,138,148 | 29.55 | 8.260 | 623 | 79.88 | 355 | 52.75 |
| ARM 3yr/6mo | 10 | 1,504,497 | 0.22 | 8.901 | 584 | 83.76 | 356 | 86.62 |
| ARM 3yr/6mo - IO | 5 | 1,332,299 | 0.20 | 7.287 | 643 | 76.78 | 356 | 90.99 |
| ARM 3yr/6mo - 40yr Amterm | 7 | 1,525,761 | 0.23 | 8.349 | 624 | 78.66 | 356 | 58.36 |
| ARM 5yr/6mo | 2 | 475,232 | 0.07 | 8.103 | 613 | 87.65 | 356 | 100.00 |
| ARM 5yr/6mo - 40yr Amterm | 4 | 475,464 | 0.07 | 8.208 | 610 | 70.67 | 355 | 29.55 |
| Total/Weighted Average: | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

## Lien of the Group I Mortgage Loans

| Lien | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1st | 2,992 | $ 622,082,710 | 91.86% | 8.361% | 617 | 78.89% | 355 | 58.06% |
| 2nd | 899 | 55,154,985 | 8.14 | 11.168 | 650 | 99.67 | 349 | 49.46 |
| Total/Weighted Average: | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

## Principal Balances at Origination of the Group I Mortgage Loans

| Principal Balance at Origination ($) | Number of Mortgage Loans | Aggregate Original Principal Balance | % of Aggregate Original Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1 - 50,000 | 438 | $ 15,387,682 | 2.27% | 11.227% | 641 | 98.11% | 337 | 57.14% |
| 50,001 - 100,000 | 726 | 55,373,135 | 8.16 | 10.117 | 629 | 87.90 | 354 | 57.12 |
| 100,001 - 150,000 | 683 | 85,248,660 | 12.56 | 9.034 | 612 | 80.88 | 355 | 63.84 |
| 150,001 - 200,000 | 683 | 119,170,926 | 17.56 | 8.637 | 611 | 78.37 | 355 | 60.70 |
| 200,001 - 250,000 | 448 | 101,169,946 | 14.91 | 8.379 | 613 | 77.80 | 355 | 57.24 |
| 250,001 - 300,000 | 340 | 93,482,928 | 13.78 | 8.247 | 619 | 79.67 | 355 | 60.30 |
| 300,001 - 350,000 | 267 | 86,827,533 | 12.79 | 8.089 | 623 | 79.95 | 356 | 54.68 |
| 350,001 - 400,000 | 204 | 76,241,804 | 11.23 | 8.023 | 630 | 80.89 | 355 | 49.32 |
| 400,001 - 450,000 | 59 | 24,460,231 | 3.60 | 7.952 | 636 | 79.70 | 355 | 57.70 |
| 450,001 - 500,000 | 28 | 13,110,350 | 1.93 | 7.956 | 633 | 79.06 | 356 | 35.79 |
| 500,001 - 550,000 | 11 | 5,749,000 | 0.85 | 8.155 | 633 | 80.47 | 356 | 36.44 |
| 550,001 - 600,000 | 2 | 1,136,000 | 0.17 | 8.126 | 638 | 82.47 | 356 | 100.00 |
| 600,001 - 650,000 | 1 | 620,000 | 0.09 | 7.050 | 773 | 80.00 | 355 | 0.00 |
| 650,001 - 700,000 | 1 | 663,000 | 0.10 | 7.550 | 578 | 85.00 | 355 | 100.00 |
| Total/Weighted Average: | 3,891 | $ 678,641,195 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

CONFIDENTIAL

FHFA04178897
A3-10013223043

### Remaining Principal Balance of the Group I Mortgage Loans

| Remaining Principal Balance ($) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1 - 50,000 | 438 | $ 15,349,018 | 2.27% | 11.227% | 641 | 98.11% | 337 | 57.14% |
| 50,001 - 100,000 | 727 | 55,356,286 | 8.17 | 10.113 | 629 | 87.84 | 354 | 57.20 |
| 100,001 - 150,000 | 684 | 85,254,220 | 12.59 | 9.036 | 612 | 80.95 | 355 | 63.93 |
| 150,001 - 200,000 | 682 | 118,814,658 | 17.54 | 8.635 | 611 | 78.33 | 355 | 60.67 |
| 200,001 - 250,000 | 450 | 101,515,979 | 14.99 | 8.375 | 614 | 77.85 | 355 | 57.47 |
| 250,001 - 300,000 | 337 | 92,551,617 | 13.67 | 8.250 | 618 | 79.62 | 355 | 59.97 |
| 300,001 - 350,000 | 268 | 87,011,561 | 12.85 | 8.093 | 622 | 79.95 | 356 | 54.86 |
| 350,001 - 400,000 | 205 | 76,548,832 | 11.30 | 8.013 | 631 | 80.89 | 355 | 49.62 |
| 400,001 - 450,000 | 57 | 23,607,789 | 3.49 | 7.967 | 636 | 79.67 | 355 | 56.26 |
| 450,001 - 500,000 | 28 | 13,074,636 | 1.93 | 7.956 | 633 | 79.06 | 356 | 35.79 |
| 500,001 - 550,000 | 11 | 5,738,604 | 0.85 | 8.155 | 633 | 80.47 | 356 | 36.44 |
| 550,001 - 600,000 | 2 | 1,133,768 | 0.17 | 8.126 | 638 | 82.47 | 356 | 100.00 |
| 600,001 - 650,000 | 1 | 618,822 | 0.09 | 7.050 | 773 | 80.00 | 355 | 0.00 |
| 650,001 - 700,000 | 1 | 661,906 | 0.10 | 7.550 | 578 | 85.00 | 355 | 100.00 |
| Total/Weighted Average: | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

### Original Terms of the Group I Mortgage Loans

| Original Term (months) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 120 | 5 | $ 319,280 | 0.05% | 12.640% | 611 | 100.00% | 116 | 36.25% |
| 180 | 75 | 1,752,354 | 0.26 | 11.081 | 645 | 94.79 | 176 | 50.51 |
| 240 | 6 | 455,936 | 0.07 | 9.448 | 614 | 74.17 | 236 | 84.35 |
| 360 | 3,805 | 674,710,125 | 99.63 | 8.581 | 620 | 80.54 | 355 | 57.37 |
| Total/Weighted Average: | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

### Remaining Terms of the Group I Mortgage Loans

| Remaining Term (months) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 60 - 119 | 5 | $ 319,280 | 0.05% | 12.640% | 611 | 100.00% | 116 | 36.25% |
| 120 - 179 | 75 | 1,752,354 | 0.26 | 11.081 | 645 | 94.79 | 176 | 50.51 |
| 180 - 239 | 6 | 455,936 | 0.07 | 9.448 | 614 | 74.17 | 236 | 84.35 |
| 300 - 359 | 3,805 | 674,710,125 | 99.63 | 8.581 | 620 | 80.54 | 355 | 57.37 |
| Total/Weighted Average: | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

S-43

CONFIDENTIAL

FHFA04178898
A3-10013223044

## Original Loan-to-Value Ratio of the Group I Mortgage Loans

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00...... | 100 | $ 15,620,836 | 2.31% | 8.878% | 585 | 40.49% | 354 | 57.24% |
| 50.01 - 55.00...................... | 40 | 7,755,893 | 1.15 | 8.143 | 609 | 53.08 | 355 | 65.88 |
| 55.01 - 60.00...................... | 76 | 14,401,288 | 2.13 | 8.806 | 577 | 57.66 | 355 | 48.05 |
| 60.01 - 65.00...................... | 122 | 24,549,828 | 3.62 | 8.978 | 576 | 63.55 | 355 | 47.30 |
| 65.01 - 70.00...................... | 157 | 32,313,906 | 4.77 | 8.828 | 579 | 69.12 | 355 | 49.30 |
| 70.01 - 75.00...................... | 212 | 44,141,324 | 6.52 | 8.734 | 577 | 74.06 | 355 | 54.88 |
| 75.01 - 80.00...................... | 1,531 | 324,418,693 | 47.90 | 8.134 | 633 | 79.85 | 356 | 51.15 |
| 80.01 - 85.00...................... | 221 | 48,119,274 | 7.11 | 8.291 | 607 | 84.65 | 355 | 73.49 |
| 85.01 - 90.00...................... | 387 | 78,315,654 | 11.56 | 8.535 | 619 | 89.70 | 355 | 79.10 |
| 90.01 - 95.00...................... | 127 | 23,093,603 | 3.41 | 8.608 | 630 | 94.67 | 354 | 76.62 |
| 95.01 - 100.00.................... | 918 | 64,507,394 | 9.53 | 10.734 | 650 | 99.90 | 350 | 53.87 |
| Total/Weighted Average: ...... | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

## Original Combined Loan-to-Value Ratio of the Group I Mortgage Loans

| Original Combined Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | (%) of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00...... | 97 | $ 15,086,171 | 2.23% | 8.870% | 587 | 40.50% | 354 | 58.39% |
| 50.01 - 55.00...................... | 42 | 8,088,801 | 1.19 | 8.196 | 606 | 52.52 | 355 | 64.82 |
| 55.01 - 60.00...................... | 75 | 14,338,435 | 2.12 | 8.803 | 576 | 57.65 | 355 | 48.26 |
| 60.01 - 65.00...................... | 122 | 24,549,828 | 3.62 | 8.978 | 576 | 63.55 | 355 | 47.30 |
| 65.01 - 70.00...................... | 151 | 31,371,524 | 4.63 | 8.837 | 578 | 69.10 | 355 | 49.88 |
| 70.01 - 75.00...................... | 206 | 42,403,188 | 6.26 | 8.777 | 574 | 73.85 | 355 | 54.35 |
| 75.01 - 80.00...................... | 337 | 74,031,526 | 10.93 | 8.552 | 586 | 79.42 | 355 | 57.55 |
| 80.01 - 85.00...................... | 173 | 39,358,413 | 5.81 | 8.356 | 602 | 84.49 | 355 | 70.03 |
| 85.01 - 90.00...................... | 322 | 65,912,334 | 9.73 | 8.536 | 616 | 89.31 | 355 | 75.19 |
| 90.01 - 95.00...................... | 199 | 39,516,805 | 5.83 | 8.415 | 632 | 89.70 | 355 | 73.57 |
| 95.01 - 100.00.................... | 2,167 | 322,580,668 | 47.63 | 8.568 | 647 | 84.37 | 354 | 52.19 |
| Total/Weighted Average: ...... | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

S-44

CONFIDENTIAL

FHFA04178899
A3-10013223045

## Mortgage Rate of the Group I Mortgage Loans

| Mortgage Rate (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 5.500 - 5.999 | 24 | $ 6,747,432 | 1.00% | 5.886% | 662 | 73.21% | 356 | 97.38% |
| 6.000 - 6.499 | 53 | 14,564,411 | 2.15 | 6.293 | 681 | 76.13 | 355 | 96.82 |
| 6.500 - 6.999 | 197 | 51,950,929 | 7.67 | 6.773 | 656 | 76.54 | 356 | 88.75 |
| 7.000 - 7.499 | 259 | 61,659,310 | 9.10 | 7.259 | 644 | 78.74 | 356 | 82.89 |
| 7.500 - 7.999 | 480 | 108,752,780 | 16.06 | 7.759 | 632 | 79.92 | 355 | 70.81 |
| 8.000 - 8.499 | 451 | 95,812,163 | 14.15 | 8.260 | 629 | 81.41 | 355 | 51.03 |
| 8.500 - 8.999 | 612 | 127,010,255 | 18.75 | 8.755 | 612 | 80.85 | 355 | 44.49 |
| 9.000 - 9.499 | 364 | 65,655,867 | 9.69 | 9.247 | 597 | 79.95 | 355 | 37.26 |
| 9.500 - 9.999 | 445 | 59,853,253 | 8.84 | 9.735 | 580 | 80.39 | 355 | 52.80 |
| 10.000 - 10.499 | 212 | 23,505,230 | 3.47 | 10.197 | 579 | 81.80 | 355 | 49.30 |
| 10.500 - 10.999 | 197 | 19,036,279 | 2.81 | 10.757 | 601 | 84.36 | 354 | 19.90 |
| 11.000 - 11.499 | 247 | 17,392,559 | 2.57 | 11.252 | 621 | 89.90 | 351 | 39.85 |
| 11.500 - 11.999 | 92 | 9,609,521 | 1.42 | 11.753 | 585 | 77.82 | 354 | 47.93 |
| 12.000 - 12.499 | 96 | 7,164,883 | 1.06 | 12.202 | 592 | 88.51 | 350 | 52.44 |
| 12.500 - 12.999 | 125 | 6,395,652 | 0.94 | 12.664 | 619 | 99.00 | 340 | 21.09 |
| 13.000 - 13.499 | 32 | 1,808,423 | 0.27 | 13.069 | 629 | 100.00 | 333 | 0.00 |
| 13.500 - 13.999 | 4 | 248,797 | 0.04 | 13.763 | 634 | 99.22 | 356 | 15.66 |
| 14.000 - 14.499 | 1 | 69,949 | 0.01 | 14.100 | 532 | 50.00 | 356 | 0.00 |
| Total/Weighted Average: | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

## FICO Score at Origination of the Group I Mortgage Loans

| FICO Score at Origination | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 500 | 9 | $ 1,528,866 | 0.23% | 9.925% | 500 | 72.19% | 355 | 75.53% |
| 501 - 520 | 213 | 39,123,945 | 5.78 | 9.882 | 510 | 71.59 | 355 | 57.38 |
| 521 - 540 | 204 | 41,022,764 | 6.06 | 9.498 | 530 | 71.20 | 355 | 55.43 |
| 541 - 560 | 196 | 37,834,313 | 5.59 | 9.100 | 550 | 75.95 | 355 | 65.77 |
| 561 - 580 | 210 | 39,362,224 | 5.81 | 8.812 | 571 | 78.71 | 355 | 73.58 |
| 581 - 600 | 336 | 55,948,102 | 8.26 | 8.559 | 590 | 81.51 | 354 | 78.10 |
| 601 - 620 | 413 | 73,324,028 | 10.83 | 8.425 | 611 | 81.72 | 355 | 66.68 |
| 621 - 640 | 841 | 136,533,648 | 20.16 | 8.596 | 630 | 82.93 | 354 | 46.51 |
| 641 - 660 | 612 | 104,536,262 | 15.44 | 8.321 | 649 | 82.71 | 355 | 51.40 |
| 661 - 680 | 416 | 65,972,194 | 9.74 | 8.199 | 669 | 83.56 | 355 | 56.55 |
| 681 - 700 | 212 | 37,338,003 | 5.51 | 7.996 | 688 | 82.50 | 355 | 52.54 |
| 701 - 720 | 105 | 21,018,277 | 3.10 | 7.931 | 709 | 81.66 | 355 | 52.46 |
| 721 - 740 | 67 | 11,675,733 | 1.72 | 7.996 | 731 | 82.85 | 354 | 40.50 |
| 741 - 760 | 27 | 5,915,283 | 0.87 | 7.850 | 749 | 81.67 | 355 | 50.82 |
| 761 - 780 | 24 | 4,633,917 | 0.68 | 7.933 | 769 | 78.91 | 355 | 47.25 |
| 781 - 800 | 6 | 1,470,138 | 0.22 | 8.147 | 782 | 83.27 | 356 | 36.83 |
| Total/Weighted Average: | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

S-45

CONFIDENTIAL

FHFA04178900
A3-10013223046

### Documentation Type of the Group I Mortgage Loans

| Documentation Type | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Full/Alt | 2,282 | $ 388,434,143 | 57.36% | 8.220% | 615 | 81.38% | 355 | 100.00% |
| Stated Income/Verified Assets | 183 | 34,753,227 | 5.13 | 9.514 | 597 | 86.14 | 355 | 0.00 |
| Stated/Stated Documentation | 1,426 | 254,050,324 | 37.51 | 9.028 | 631 | 78.60 | 355 | 0.00 |
| Total/Weighted Average: | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

### Occupancy Status of the Group I Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied | 3,628 | $ 630,190,865 | 93.05% | 8.569% | 619 | 80.72% | 355 | 56.90% |
| Investor | 247 | 43,162,888 | 6.37 | 8.932 | 635 | 78.51 | 355 | 64.63 |
| 2nd Home | 16 | 3,883,941 | 0.57 | 8.099 | 637 | 80.99 | 355 | 49.95 |
| Total/Weighted Average: | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

### Loan Purpose of the Group I Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Purchase | 2,091 | $ 318,260,272 | 46.99% | 8.669% | 643 | 84.21% | 355 | 47.75% |
| Refinance - Cash Out | 1,745 | 348,720,151 | 51.49 | 8.511 | 599 | 77.32 | 355 | 65.79 |
| Refinance - Rate/Term | 55 | 10,257,272 | 1.51 | 8.795 | 610 | 78.75 | 355 | 68.72 |
| Total/Weighted Average: | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

### Property Type of the Group I Mortgage Loans

| Property Type | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Single Family | 3,145 | $ 533,648,571 | 78.80% | 8.578% | 619 | 80.43% | 355 | 58.24% |
| 2-4 Family | 325 | 77,000,034 | 11.37 | 8.445 | 633 | 78.27 | 355 | 48.11 |
| Condominium | 297 | 44,470,898 | 6.57 | 8.773 | 630 | 81.88 | 355 | 51.18 |
| PUD | 120 | 21,817,852 | 3.22 | 8.996 | 591 | 89.66 | 356 | 80.42 |
| Townhouse | 4 | 300,340 | 0.04 | 9.816 | 613 | 94.40 | 320 | 100.00 |
| Total/Weighted Average: | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

S-46

FHFA04178901
A3-10013223047

## Geographic Distribution of the Group I Mortgage Loans

| Geographic Distribution | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Florida | 791 | $ 125,325,040 | 18.51% | 8.701% | 614 | 80.04% | 355 | 55.73% |
| California | 545 | 117,374,822 | 17.33 | 8.338 | 631 | 80.17 | 355 | 60.08 |
| New York | 256 | 68,436,641 | 10.11 | 8.278 | 627 | 77.96 | 355 | 43.98 |
| Maryland | 248 | 46,628,106 | 6.89 | 8.683 | 618 | 80.91 | 354 | 61.74 |
| New Jersey | 209 | 45,755,356 | 6.76 | 8.858 | 620 | 79.32 | 355 | 44.34 |
| Illinois | 225 | 34,045,378 | 5.03 | 8.856 | 624 | 82.36 | 355 | 55.44 |
| Georgia | 216 | 26,403,887 | 3.90 | 8.627 | 620 | 84.12 | 353 | 69.25 |
| Virginia | 129 | 21,997,208 | 3.25 | 8.906 | 605 | 78.94 | 355 | 56.34 |
| Massachusetts | 101 | 21,461,790 | 3.17 | 8.629 | 612 | 82.17 | 356 | 50.17 |
| Hawaii | 48 | 14,577,218 | 2.15 | 8.146 | 642 | 78.09 | 355 | 39.68 |
| Washington | 72 | 13,440,452 | 1.98 | 8.093 | 623 | 81.70 | 355 | 70.68 |
| Arizona | 83 | 13,239,735 | 1.95 | 8.329 | 624 | 81.16 | 355 | 64.64 |
| Connecticut | 68 | 11,675,333 | 1.72 | 8.946 | 612 | 80.99 | 355 | 44.93 |
| Pennsylvania | 83 | 10,354,271 | 1.53 | 9.111 | 594 | 79.24 | 354 | 78.24 |
| North Carolina | 87 | 10,163,440 | 1.50 | 8.723 | 612 | 85.39 | 354 | 78.24 |
| Michigan | 85 | 9,618,640 | 1.42 | 9.031 | 621 | 82.11 | 354 | 61.20 |
| Nevada | 46 | 9,255,193 | 1.37 | 8.493 | 613 | 81.21 | 355 | 56.42 |
| Minnesota | 61 | 8,944,237 | 1.32 | 8.201 | 617 | 81.59 | 354 | 76.54 |
| Texas | 82 | 8,753,932 | 1.29 | 8.831 | 617 | 82.05 | 353 | 51.77 |
| Colorado | 59 | 8,480,601 | 1.25 | 8.228 | 632 | 83.50 | 356 | 91.57 |
| District of Columbia | 26 | 6,425,813 | 0.95 | 8.661 | 614 | 77.15 | 355 | 47.84 |
| Ohio | 49 | 5,333,640 | 0.79 | 8.595 | 615 | 86.14 | 352 | 71.31 |
| South Carolina | 37 | 4,503,722 | 0.67 | 8.897 | 602 | 83.13 | 349 | 76.84 |
| Wisconsin | 44 | 4,229,634 | 0.62 | 9.349 | 625 | 85.62 | 351 | 64.77 |
| Rhode Island | 19 | 3,703,546 | 0.55 | 8.699 | 605 | 80.20 | 355 | 58.66 |
| Oregon | 22 | 3,381,271 | 0.50 | 8.152 | 613 | 78.82 | 356 | 81.76 |
| Missouri | 37 | 3,295,053 | 0.49 | 9.804 | 608 | 83.87 | 351 | 52.54 |
| Indiana | 36 | 3,289,340 | 0.49 | 8.905 | 605 | 84.66 | 352 | 78.27 |
| Tennessee | 27 | 3,022,974 | 0.45 | 8.534 | 643 | 83.87 | 356 | 78.15 |
| Idaho | 21 | 2,890,946 | 0.43 | 8.535 | 603 | 81.29 | 352 | 65.55 |
| New Hampshire | 13 | 2,364,632 | 0.35 | 8.828 | 559 | 78.74 | 355 | 71.86 |
| New Mexico | 14 | 2,219,684 | 0.33 | 8.094 | 619 | 82.96 | 354 | 78.67 |
| Utah | 11 | 1,552,339 | 0.23 | 8.010 | 649 | 87.75 | 352 | 90.37 |
| Delaware | 10 | 1,288,432 | 0.19 | 9.407 | 563 | 82.04 | 352 | 70.11 |
| West Virginia | 9 | 1,173,260 | 0.17 | 8.938 | 577 | 81.86 | 355 | 73.20 |
| Arkansas | 5 | 558,769 | 0.08 | 8.753 | 575 | 82.82 | 354 | 76.55 |
| Maine | 2 | 465,919 | 0.07 | 8.949 | 607 | 89.98 | 356 | 64.42 |
| Oklahoma | 4 | 451,632 | 0.07 | 8.502 | 640 | 84.87 | 356 | 58.46 |
| Vermont | 3 | 387,617 | 0.06 | 8.933 | 602 | 70.39 | 355 | 0.00 |
| Kentucky | 3 | 322,960 | 0.05 | 8.302 | 662 | 83.69 | 299 | 100.00 |
| Kansas | 3 | 317,129 | 0.05 | 9.655 | 559 | 90.00 | 355 | 100.00 |
| Iowa | 2 | 128,099 | 0.02 | 7.937 | 629 | 83.35 | 324 | 100.00 |
| Total/Weighted Average | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

S-47

CONFIDENTIAL

FHFA04178902
A3-10013223048

### Original Prepayment Penalty Term of the Group I Mortgage Loans

| Original Prepayment Penalty Term (mos.) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| No Prepayment Penalty | 1,511 | $ 266,530,760 | 39.36% | 8.764% | 620 | 81.23% | 355 | 52.54% |
| 12 | 181 | 36,469,000 | 5.38 | 8.478 | 635 | 78.72 | 355 | 52.77 |
| 24 | 1,698 | 286,255,119 | 42.27 | 8.643 | 615 | 80.40 | 355 | 57.37 |
| 30 | 4 | 848,502 | 0.13 | 8.053 | 609 | 86.30 | 356 | 100.00 |
| 36 | 497 | 87,134,314 | 12.87 | 7.934 | 631 | 79.92 | 355 | 73.53 |
| Total/Weighted Average: | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

### Margin of the Group I Mortgage Loans - ARM Loans

| Margin (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 3.000 - 3.499 | 2 | $ 751,999 | 0.14% | 5.674% | 671 | 80.00% | 356 | 100.00% |
| 3.500 - 3.999 | 13 | 3,884,702 | 0.72 | 5.887 | 653 | 76.22 | 356 | 83.54 |
| 4.000 - 4.499 | 50 | 13,648,191 | 2.55 | 6.462 | 659 | 80.05 | 356 | 100.00 |
| 4.500 - 4.999 | 151 | 37,616,488 | 7.01 | 6.938 | 649 | 78.25 | 355 | 85.85 |
| 5.000 - 5.499 | 296 | 68,471,660 | 12.77 | 7.484 | 637 | 80.21 | 355 | 79.65 |
| 5.500 - 5.999 | 398 | 88,087,510 | 16.43 | 7.959 | 624 | 79.83 | 356 | 61.89 |
| 6.000 - 6.499 | 445 | 96,055,980 | 17.91 | 8.428 | 627 | 80.93 | 356 | 47.01 |
| 6.500 - 6.999 | 1,233 | 227,757,680 | 42.47 | 9.396 | 588 | 78.18 | 355 | 39.27 |
| Total/Weighted Average: | 2,588 | $ 536,274,210 | 100.00% | 8.465% | 614 | 79.24% | 355 | 54.75% |

### Minimum Rate of the Group I Mortgage Loans - ARM Loans

| Minimum Rate (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 5.500 - 5.999 | 13 | $ 3,720,830 | 0.69% | 5.801% | 644 | 78.69% | 356 | 95.25% |
| 6.000 - 6.499 | 28 | 7,523,489 | 1.40 | 6.294 | 670 | 78.43 | 356 | 93.85 |
| 6.500 - 6.999 | 122 | 32,823,096 | 6.12 | 6.786 | 653 | 78.41 | 356 | 89.78 |
| 7.000 - 7.499 | 212 | 49,865,231 | 9.30 | 7.263 | 643 | 79.59 | 356 | 82.27 |
| 7.500 - 7.999 | 406 | 91,723,397 | 17.10 | 7.757 | 630 | 80.21 | 355 | 69.96 |
| 8.000 - 8.499 | 410 | 88,102,186 | 16.43 | 8.263 | 629 | 81.36 | 355 | 49.49 |
| 8.500 - 8.999 | 559 | 117,989,550 | 22.00 | 8.754 | 612 | 80.87 | 355 | 42.12 |
| 9.000 - 9.499 | 337 | 62,302,735 | 11.62 | 9.247 | 597 | 79.73 | 355 | 35.20 |
| 9.500 - 9.999 | 273 | 47,385,255 | 8.84 | 9.722 | 562 | 76.60 | 355 | 44.90 |
| 10.000 - 10.499 | 95 | 14,554,037 | 2.71 | 10.201 | 547 | 74.31 | 355 | 33.75 |
| 10.500 - 10.999 | 60 | 9,084,888 | 1.69 | 10.716 | 537 | 70.52 | 355 | 17.67 |
| 11.000 - 11.499 | 25 | 3,926,590 | 0.73 | 11.239 | 539 | 62.28 | 355 | 35.78 |
| 11.500 - 11.999 | 32 | 4,969,100 | 0.93 | 11.698 | 543 | 59.21 | 355 | 56.58 |
| 12.000 - 12.499 | 14 | 2,174,584 | 0.41 | 12.206 | 533 | 63.50 | 355 | 47.22 |
| 12.500 - 12.999 | 1 | 59,294 | 0.01 | 12.650 | 511 | 59.76 | 353 | 100.00 |
| 14.000 - 14.499 | 1 | 69,949 | 0.01 | 14.100 | 532 | 50.00 | 356 | 0.00 |
| Total/Weighted Average: | 2,588 | $ 536,274,210 | 100.00% | 8.465% | 614 | 79.24% | 355 | 54.75% |

CONFIDENTIAL

FHFA04178903
A3-10013223049

### Maximum Rate of the Group I Mortgage Loans - ARM Loans

| Maximum Rate (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 11.500 - 11.999 ................... | 13 | $ 3,720,830 | 0.69% | 5.801% | 644 | 78.69% | 356 | 95.25% |
| 12.000 - 12.499 ................... | 28 | 7,523,489 | 1.40 | 6.294 | 670 | 78.43 | 356 | 93.85 |
| 12.500 - 12.999 ................... | 122 | 32,823,096 | 6.12 | 6.786 | 653 | 78.41 | 356 | 89.78 |
| 13.000 - 13.499 ................... | 212 | 49,865,231 | 9.30 | 7.263 | 643 | 79.59 | 356 | 82.27 |
| 13.500 - 13.999 ................... | 405 | 91,602,428 | 17.08 | 7.757 | 630 | 80.21 | 355 | 69.92 |
| 14.000 - 14.499 ................... | 410 | 88,102,186 | 16.43 | 8.263 | 629 | 81.36 | 355 | 49.49 |
| 14.500 - 14.999 ................... | 560 | 118,110,519 | 22.02 | 8.752 | 612 | 80.87 | 355 | 42.17 |
| 15.000 - 15.499 ................... | 337 | 62,302,735 | 11.62 | 9.247 | 597 | 79.73 | 355 | 35.20 |
| 15.500 - 15.999 ................... | 273 | 47,385,255 | 8.84 | 9.722 | 562 | 76.60 | 355 | 44.90 |
| 16.000 - 16.499 ................... | 93 | 14,202,093 | 2.65 | 10.196 | 546 | 74.38 | 355 | 34.59 |
| 16.500 - 16.999 ................... | 61 | 9,202,424 | 1.72 | 10.714 | 538 | 70.51 | 355 | 17.44 |
| 17.000 - 17.499 ................... | 26 | 4,160,999 | 0.78 | 11.189 | 539 | 62.84 | 355 | 33.76 |
| 17.500 - 17.999 ................... | 32 | 4,969,100 | 0.93 | 11.608 | 543 | 59.21 | 355 | 56.58 |
| 18.000 - 18.499 ................... | 14 | 2,174,584 | 0.41 | 12.206 | 533 | 63.50 | 355 | 47.22 |
| 18.500 - 18.999 ................... | 1 | 59,294 | 0.01 | 12.630 | 511 | 59.76 | 353 | 100.00 |
| 20.000 - 20.499 ................... | 1 | 69,949 | 0.01 | 14.100 | 532 | 50.00 | 356 | 0.00 |
| Total/Weighted Average: ....... | 2,588 | $ 536,274,210 | 100.00% | 8.465% | 614 | 79.24% | 355 | 54.75% |

### Life Cap of the Group I Mortgage Loans - ARM Loans

| Life Cap (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 5.500 - 5.999 ...................... | 3 | $ 575,118 | 0.11% | 8.825% | 641 | 95.73% | 356 | 100.00% |
| 6.000 - 6.499 ...................... | 2,583 | 535,343,715 | 99.83 | 8.464 | 614 | 79.23 | 355 | 54.71 |
| 7.000 - 7.499 ...................... | 2 | 355,378 | 0.07 | 9.414 | 546 | 74.93 | 354 | 34.04 |
| Total/Weighted Average: ....... | 2,588 | $ 536,274,210 | 100.00% | 8.465% | 614 | 79.24% | 355 | 54.75% |

### First Periodic Cap of the Group I Mortgage Loans - ARM Loans

| First Periodic Cap (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 2.000 - 2.499 ...................... | 1,110 | $ 231,250,782 | 43.12% | 8.562% | 610 | 79.01% | 355 | 54.10% |
| 3.000 - 3.499 ...................... | 1,478 | 305,023,428 | 56.88 | 8.391 | 617 | 79.42 | 356 | 55.23 |
| Total/Weighted Average: ....... | 2,588 | $ 536,274,210 | 100.00% | 8.465% | 614 | 79.24% | 355 | 54.75% |

S-49

CONFIDENTIAL

FHFA04178904
A3-10013223050

### Periodic Cap of the Group I Mortgage Loans - ARM Loans

| Periodic Cap (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1.500 - 1.999 ...................... | 2,588 | $ 536,274,210 | 100.00% | 8.465% | 614 | 79.24% | 355 | 54.75% |
| Total/Weighted Average: ........ | 2,588 | $ 536,274,210 | 100.00% | 8.465% | 614 | 79.24% | 355 | 54.75% |

### Next Rate Adjustment Date of the Group I Mortgage Loans - ARM Loans

| Next Rate Adjustment Date | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| September 2007 ...................... | 1 | $    246,070 | 0.05% | 7.850% | 568 | 90.00% | 347 | 100.00% |
| December 2007 ...................... | 3 | 479,793 | 0.09 | 8.671 | 562 | 68.96 | 350 | 33.46 |
| January 2008 ...................... | 9 | 1,677,936 | 0.31 | 8.551 | 611 | 76.75 | 351 | 40.06 |
| February 2008 ...................... | 43 | 7,768,364 | 1.45 | 9.280 | 571 | 74.28 | 352 | 57.06 |
| March 2008 ...................... | 87 | 15,658,032 | 2.92 | 8.762 | 598 | 79.16 | 353 | 62.99 |
| April 2008 ...................... | 179 | 39,397,503 | 7.35 | 8.513 | 617 | 80.20 | 354 | 46.03 |
| May 2008 ...................... | 630 | 130,958,387 | 24.42 | 8.480 | 613 | 79.67 | 355 | 55.94 |
| June 2008 ...................... | 1,608 | 334,774,872 | 62.43 | 8.424 | 615 | 79.09 | 356 | 54.60 |
| March 2009 ...................... | 1 | 69,952 | 0.01 | 9.490 | 567 | 90.00 | 353 | 100.00 |
| April 2009 ...................... | 1 | 187,751 | 0.04 | 8.950 | 673 | 80.00 | 354 | 0.00 |
| May 2009 ...................... | 7 | 1,178,163 | 0.22 | 9.109 | 578 | 84.84 | 355 | 75.45 |
| June 2009 ...................... | 13 | 2,926,691 | 0.55 | 7.777 | 629 | 77.58 | 356 | 83.61 |
| February 2011 ...................... | 1 | 50,338 | 0.01 | 10.200 | 670 | 90.00 | 352 | 100.00 |
| March 2011 ...................... | 1 | 90,143 | 0.02 | 9.850 | 595 | 82.05 | 353 | 100.00 |
| May 2011 ...................... | 1 | 185,180 | 0.03 | 7.400 | 621 | 70.00 | 355 | 0.00 |
| June 2011 ...................... | 3 | 625,035 | 0.12 | 7.970 | 607 | 80.58 | 356 | 76.03 |
| Total/Weighted Average: ........ | 2,588 | $ 536,274,210 | 100.00% | 8.465% | 614 | 79.24% | 355 | 54.75% |

S-50

**Group II Mortgage Loan Characteristics**

Approximately 94.37% of the Group II Mortgage Loans are secured by first liens on the related Mortgaged Property and approximately 5.63% of the Group II Mortgage Loans are secured by second liens on the related Mortgaged Property, in each case, by aggregate principal balance of the Group II Mortgage Loans as of the Cut-off Date.

Approximately 15.81% of the Group II Mortgage Loans are fixed-rate Mortgage Loans and approximately 84.19% of the Group II Mortgage Loans are adjustable-rate Mortgage Loans, in each case, by aggregate principal balance of the Group II Mortgage Loans as of the Cut-off Date.

Approximately 16.95% of the Group II Mortgage Loans are Interest Only Loans. Approximately 27.85% of the first lien Group II Mortgage Loans had a loan-to-value ratio in excess of 80% at origination. None of the Group II Mortgage Loans is insured by mortgage insurance policies. Approximately 62.02% of the Group II Mortgage Loans are subject to Prepayment Charges.

The average principal balance of the Group II Mortgage Loans at origination was approximately $302,711. No Group II Mortgage Loan had a principal balance at origination greater than approximately $1,500,000 or less than approximately $15,000. The average principal balance of the Group II Mortgage Loans as of the Cut-off Date was approximately $302,142. No Group II Mortgage Loan had a principal balance as of the Cut-off Date greater than approximately $1,492,441 or less than approximately $11,445.

The Group II Mortgage Loans had Mortgage Rates as of the Cut-off Date ranging from approximately 5.450% per annum to approximately 13.950% per annum, and the weighted average Mortgage Rate was approximately 8.283% per annum. As of the Cut-off Date, the Group II adjustable rate Mortgage Loans had Gross Margins ranging from approximately 3.329% per annum to approximately 6.990% per annum, Minimum Mortgage Rates ranging from approximately 5.450% per annum to approximately 13.950% per annum and Maximum Mortgage Rates ranging from approximately 11.450% per annum to approximately 19.950% per annum. As of the Cut-off Date, the weighted average Gross Margin was approximately 5.985% per annum, the weighted average Minimum Mortgage Rate was approximately 8.204% per annum and the weighted average Maximum Mortgage Rate was approximately 14.203% per annum. The latest next Adjustment Date following the Cut-off Date on any Group II adjustable-rate Mortgage Loan occurs on June 1, 2011 and the weighted average next Adjustment Date for all of the Group II adjustable-rate Mortgage Loans following the Cut-off Date is May 24, 2008.

The weighted average combined loan-to-value ratio of the Group II Mortgage Loans at origination was approximately 92.14%. At origination, no Group II Mortgage Loan had a combined loan-to-value ratio greater than approximately 100.00% or less than approximately 23.81%.

The weighted average remaining term to stated maturity of the Group II Mortgage Loans was approximately 355 months as of the Cut-off Date. None of the Group II Mortgage Loans had a first due date prior to January 1, 2006 or will have a first due date after July 1, 2006 or will have a remaining term to stated maturity of less than 115 months or greater than 356 months as of the Cut-off Date. The latest maturity date of any Group II Mortgage Loan is June 1, 2036.

CONFIDENTIAL

FHFA04178906
A3-10013223052

As of the Cut-off Date, the weighted average credit score of the Group II Mortgage Loans is approximately 638.  No Group II Mortgage Loan had a credit score as of the Cut-off Date greater than 808 or less than 501.

The Group II Mortgage Loans are expected to have the following additional characteristics as of the Cut-off Date (the sum in any column may not equal the total indicated due to rounding):

S-52

CONFIDENTIAL

FHFA04178907
A3-10013223053

## Product Type of the Group II Mortgage Loans

| Product Type | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Balloon 30/40 | 56 | $ 22,069,814 | 4.01% | 7.468% | 662 | 79.68% | 355 | 71.07% |
| Fixed 10yr | 10 | 643,392 | 0.12 | 11.503 | 647 | 99.88 | 116 | 36.38 |
| Fixed 15yr | 22 | 972,539 | 0.18 | 8.768 | 658 | 92.87 | 176 | 89.30 |
| Fixed 20yr | 3 | 470,886 | 0.09 | 8.021 | 667 | 85.53 | 235 | 100.00 |
| Fixed 30yr | 446 | 62,922,771 | 11.42 | 9.104 | 660 | 88.92 | 356 | 66.54 |
| ARM 2yr/6mo | 557 | 157,727,990 | 28.64 | 8.611 | 616 | 80.95 | 355 | 44.82 |
| ARM 2yr/6mo - IO | 203 | 89,619,648 | 16.27 | 7.584 | 652 | 81.19 | 355 | 76.66 |
| ARM 2yr/6mo - 40 yr Amterm | 499 | 204,530,005 | 37.13 | 8.178 | 639 | 81.35 | 355 | 38.83 |
| ARM 3yr/6mo | 9 | 3,893,063 | 0.71 | 8.731 | 609 | 79.56 | 355 | 42.68 |
| ARM 3yr/6mo - IO | 6 | 3,726,480 | 0.68 | 7.094 | 663 | 81.05 | 356 | 100.00 |
| ARM 3yr/6mo - 40 yr Amterm | 8 | 3,379,349 | 0.61 | 7.992 | 648 | 86.35 | 355 | 79.31 |
| ARM 5yr/6mo | 3 | 354,403 | 0.06 | 9.122 | 548 | 65.18 | 355 | 100.00 |
| ARM 5yr/6mo - 40 yr Amterm | 1 | 494,310 | 0.09 | 7.350 | 638 | 83.90 | 356 | 100.00 |
| Total/Weighted Average: | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

## Lien of the Group II Mortgage Loans

| Lien | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1st | 1,434 | $ 519,800,585 | 94.37% | 8.114% | 637 | 81.01% | 355 | 52.38% |
| 2nd | 389 | 31,004,065 | 5.63 | 11.115 | 658 | 99.79 | 348 | 47.01 |
| Total/Weighted Average: | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

S-53

CONFIDENTIAL

## Principal Balances at Origination of the Group II Mortgage Loans

| Principal Balance at Origination ($) | Number of Mortgage Loans | Aggregate Original Principal Balance | % of Aggregate Original Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1 - 50,000 | 120 | $ 4,202,896 | 0.76% | 11.366% | 647 | 97.68% | 329 | 66.64% |
| 50,001 - 100,000 | 279 | 20,820,441 | 3.77 | 10.312 | 630 | 92.02 | 350 | 59.38 |
| 100,001 - 150,000 | 217 | 26,630,610 | 4.83 | 9.620 | 624 | 87.73 | 355 | 61.26 |
| 150,001 - 200,000 | 172 | 30,208,985 | 5.47 | 8.807 | 625 | 82.95 | 356 | 58.26 |
| 200,001 - 250,000 | 118 | 26,374,186 | 4.78 | 8.524 | 623 | 81.78 | 355 | 58.97 |
| 250,001 - 300,000 | 97 | 26,704,268 | 4.84 | 8.360 | 635 | 80.81 | 356 | 42.41 |
| 300,001 - 350,000 | 100 | 32,478,429 | 5.89 | 8.034 | 642 | 81.95 | 354 | 47.81 |
| 350,001 - 400,000 | 83 | 31,158,130 | 5.65 | 8.038 | 649 | 80.98 | 356 | 48.49 |
| 400,001 - 450,000 | 137 | 58,760,242 | 10.65 | 8.116 | 634 | 81.71 | 355 | 39.27 |
| 450,001 - 500,000 | 149 | 70,932,996 | 12.85 | 7.963 | 642 | 80.75 | 355 | 48.32 |
| 500,001 - 550,000 | 98 | 51,342,227 | 9.30 | 7.841 | 649 | 82.47 | 354 | 55.14 |
| 550,001 - 600,000 | 74 | 42,549,671 | 7.71 | 8.123 | 632 | 80.00 | 355 | 47.19 |
| 600,001 - 650,000 | 54 | 33,841,963 | 6.13 | 8.264 | 642 | 81.96 | 355 | 48.06 |
| 650,001 - 700,000 | 44 | 29,873,800 | 5.41 | 8.104 | 644 | 83.07 | 355 | 54.50 |
| 700,001 - 750,000 | 32 | 23,266,153 | 4.22 | 8.291 | 618 | 81.40 | 355 | 43.53 |
| 750,001 - 800,000 | 26 | 20,315,722 | 3.68 | 7.986 | 632 | 77.62 | 355 | 57.73 |
| 800,001 - 850,000 | 5 | 4,204,250 | 0.76 | 7.720 | 660 | 84.18 | 356 | 59.85 |
| 850,001 - 900,000 | 2 | 1,745,130 | 0.32 | 7.098 | 713 | 77.48 | 355 | 100.00 |
| 900,001 - 950,000 | 2 | 1,860,000 | 0.34 | 6.639 | 697 | 79.16 | 356 | 100.00 |
| 950,001 - 1,000,000 | 9 | 8,817,000 | 1.60 | 7.077 | 654 | 76.16 | 355 | 100.00 |
| 1,000,001 - 1,050,000 | 1 | 1,006,600 | 0.18 | 6.500 | 642 | 67.11 | 353 | 100.00 |
| 1,050,001 - 1,100,000 | 2 | 2,119,295 | 0.38 | 6.825 | 689 | 76.53 | 355 | 100.00 |
| 1,100,001 - 1,150,000 | 1 | 1,129,350 | 0.20 | 7.750 | 681 | 66.35 | 356 | 100.00 |
| 1,450,001 - 1,500,000 | 1 | 1,500,000 | 0.27 | 6.950 | 749 | 75.00 | 354 | 100.00 |
| Total/Weighted Average: | 1,823 | $551,842,345 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

S-54

CONFIDENTIAL

### Remaining Principal Balance of the Group II Mortgage Loans

| Remaining Principal Balance ($) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1 - 50,000 | 122 | $ 4,268,060 | 0.77% | 11.323% | 645 | 97.10% | 329 | 67.43% |
| 50,001 - 100,000 | 278 | 20,760,692 | 3.77 | 10.302 | 630 | 92.08 | 350 | 59.38 |
| 100,001 - 150,000 | 216 | 26,475,443 | 4.81 | 9.628 | 624 | 87.74 | 355 | 61.11 |
| 150,001 - 200,000 | 173 | 30,348,649 | 5.51 | 8.801 | 625 | 82.93 | 356 | 57.87 |
| 200,001 - 250,000 | 117 | 26,127,373 | 4.74 | 8.529 | 623 | 81.80 | 355 | 59.42 |
| 250,001 - 300,000 | 98 | 26,952,080 | 4.89 | 8.366 | 635 | 80.86 | 356 | 43.05 |
| 300,001 - 350,000 | 100 | 32,464,840 | 5.89 | 8.038 | 643 | 82.00 | 354 | 46.81 |
| 350,001 - 400,000 | 82 | 30,759,276 | 5.58 | 8.026 | 649 | 80.88 | 356 | 49.04 |
| 400,001 - 450,000 | 139 | 59,565,642 | 10.81 | 8.119 | 634 | 81.76 | 355 | 39.43 |
| 450,001 - 500,000 | 147 | 69,903,031 | 12.69 | 7.959 | 642 | 80.70 | 355 | 48.29 |
| 500,001 - 550,000 | 98 | 51,250,896 | 9.30 | 7.841 | 649 | 82.47 | 354 | 55.14 |
| 550,001 - 600,000 | 75 | 43,079,862 | 7.82 | 8.121 | 632 | 80.00 | 355 | 46.53 |
| 600,001 - 650,000 | 53 | 33,191,806 | 6.03 | 8.270 | 642 | 82.00 | 355 | 48.93 |
| 650,001 - 700,000 | 45 | 30,521,677 | 5.54 | 8.090 | 645 | 83.23 | 355 | 55.54 |
| 700,001 - 750,000 | 32 | 23,267,487 | 4.22 | 8.259 | 620 | 81.10 | 355 | 43.65 |
| 750,001 - 800,000 | 25 | 19,531,359 | 3.55 | 8.041 | 629 | 77.53 | 355 | 56.11 |
| 800,001 - 850,000 | 5 | 4,200,360 | 0.76 | 7.720 | 660 | 84.18 | 356 | 59.85 |
| 850,001 - 900,000 | 2 | 1,743,382 | 0.32 | 7.098 | 713 | 77.48 | 355 | 100.00 |
| 900,001 - 950,000 | 2 | 1,854,229 | 0.34 | 6.639 | 697 | 79.16 | 356 | 100.00 |
| 950,001 – 1,000,000 | 9 | 8,804,256 | 1.60 | 7.077 | 654 | 76.16 | 355 | 100.00 |
| 1,000,001 – 1,050,000 | 1 | 1,000,126 | 0.18 | 6.500 | 642 | 67.11 | 353 | 100.00 |
| 1,050,001   1,100,000 | 2 | 2,112,333 | 0.38 | 6.825 | 689 | 76.53 | 355 | 100.00 |
| 1,100,001 – 1,150,000 | 1 | 1,129,350 | 0.21 | 7.750 | 681 | 66.35 | 356 | 100.00 |
| 1,450,001 – 1,500,000 | 1 | 1,492,441 | 0.27 | 6.950 | 749 | 75.00 | 354 | 100.00 |
| Total/Weighted Average: | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

### Original Terms of the Group II Mortgage Loans

| Original Term (months) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 120 | 10 | $ 643,392 | 0.12% | 11.503% | 647 | 99.88% | 116 | 36.38% |
| 180 | 22 | 972,539 | 0.18 | 8.768 | 658 | 92.87 | 176 | 89.30 |
| 240 | 3 | 470,886 | 0.09 | 8.021 | 667 | 85.53 | 235 | 100.00 |
| 360 | 1,788 | 548,717,833 | 99.62 | 8.278 | 638 | 82.02 | 355 | 51.99 |
| Total/Weighted Average: | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

### Remaining Terms of the Group II Mortgage Loans

| Remaining Term (months) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 60 – 119 | 10 | $ 643,392 | 0.12% | 11.503% | 647 | 99.88% | 116 | 36.38% |
| 120 – 179 | 22 | 972,539 | 0.18 | 8.768 | 658 | 92.87 | 176 | 89.30 |
| 180 – 239 | 3 | 470,886 | 0.09 | 8.021 | 667 | 85.53 | 235 | 100.00 |
| 300 – 359 | 1,788 | 548,717,833 | 99.62 | 8.278 | 638 | 82.02 | 355 | 51.99 |
| Total/Weighted Average: | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

S-55

CONFIDENTIAL

### Original Loan-to-Value Ratio of the Group II Mortgage Loans

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00 .. | 14 | $ 3,296,897 | 0.60% | 9.294% | 572 | 40.08% | 355 | 48.20% |
| 50.01 - 55.00 ...................... | 4 | 1,261,457 | 0.23 | 9.017 | 519 | 52.19 | 354 | 64.41 |
| 55.01 - 60.00 ...................... | 8 | 2,468,629 | 0.45 | 8.184 | 673 | 57.70 | 356 | 22.23 |
| 60.01 - 65.00 ...................... | 31 | 10,118,366 | 1.84 | 8.188 | 591 | 64.16 | 355 | 59.40 |
| 65.01 - 70.00 ...................... | 40 | 14,816,950 | 2.69 | 8.748 | 575 | 68.45 | 355 | 62.86 |
| 70.01 - 75.00 ...................... | 83 | 31,770,894 | 5.77 | 8.538 | 594 | 74.02 | 355 | 50.73 |
| 75.01 - 80.00 ...................... | 835 | 311,331,710 | 56.52 | 7.938 | 651 | 79.88 | 355 | 43.59 |
| 80.01 - 85.00 ...................... | 138 | 49,686,414 | 9.02 | 8.009 | 620 | 84.34 | 355 | 74.70 |
| 85.01 - 90.00 ...................... | 211 | 70,924,223 | 12.88 | 8.348 | 626 | 89.68 | 354 | 69.91 |
| 90.01 - 95.00 ...................... | 68 | 15,994,419 | 2.90 | 8.714 | 645 | 94.64 | 353 | 61.22 |
| 95.01 - 100.00 .................... | 391 | 39,134,693 | 7.11 | 10.612 | 659 | 99.94 | 350 | 51.82 |
| Total/Weighted Average: .... | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

### Original Combined Loan-to-Value Ratio of the Group II Mortgage Loans

| Original Combined Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00 .. | 14 | $ 3,296,897 | 0.60% | 9.294% | 572 | 40.08% | 355 | 48.20% |
| 50.01 - 55.00 ...................... | 3 | 733,176 | 0.13 | 8.381 | 532 | 52.72 | 355 | 38.77 |
| 55.01 - 60.00 ...................... | 5 | 1,435,407 | 0.26 | 8.572 | 659 | 56.54 | 356 | 21.88 |
| 60.01 - 65.00 ...................... | 32 | 10,646,647 | 1.93 | 8.273 | 587 | 63.53 | 355 | 61.42 |
| 65.01 - 70.00 ...................... | 37 | 12,901,950 | 2.34 | 8.758 | 567 | 68.53 | 355 | 63.43 |
| 70.01 - 75.00 ...................... | 77 | 27,917,016 | 5.07 | 8.659 | 588 | 74.03 | 355 | 46.67 |
| 75.01 - 80.00 ...................... | 136 | 49,160,406 | 8.93 | 8.133 | 609 | 79.42 | 355 | 56.02 |
| 80.01 - 85.00 ...................... | 111 | 40,678,411 | 7.39 | 7.991 | 623 | 83.79 | 355 | 70.84 |
| 85.01 - 90.00 ...................... | 173 | 62,029,809 | 11.26 | 8.243 | 627 | 87.99 | 354 | 66.41 |
| 90.01 - 95.00 ...................... | 128 | 39,907,168 | 7.25 | 8.363 | 636 | 87.80 | 354 | 63.48 |
| 95.01 - 100.00 .................... | 1,107 | 302,097,763 | 54.85 | 8.277 | 658 | 82.91 | 355 | 44.37 |
| Total/Weighted Average: .... | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

S-56

CONFIDENTIAL

FHFA04178911
A3-10013223057

## Mortgage Rate of the Group II Mortgage Loans

| Mortgage Rate (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 5.000 - 5.499 | 1 | $ 488,000 | 0.09% | 5.450% | 665 | 80.00% | 356 | 100.00% |
| 5.500 - 5.999 | 8 | 4,318,617 | 0.78 | 5.908 | 680 | 79.35 | 355 | 100.00 |
| 6.000 - 6.499 | 24 | 13,585,590 | 2.47 | 6.267 | 677 | 79.47 | 348 | 100.00 |
| 6.500 - 6.999 | 115 | 55,894,488 | 10.15 | 6.785 | 675 | 79.74 | 355 | 94.89 |
| 7.000 - 7.499 | 148 | 56,881,176 | 10.33 | 7.264 | 650 | 79.96 | 355 | 82.49 |
| 7.500 - 7.999 | 313 | 122,429,518 | 22.23 | 7.771 | 645 | 80.93 | 355 | 53.54 |
| 8.000 - 8.499 | 232 | 84,173,158 | 15.28 | 8.275 | 641 | 82.21 | 355 | 33.08 |
| 8.500 - 8.999 | 275 | 97,197,864 | 17.65 | 8.732 | 631 | 82.15 | 355 | 27.62 |
| 9.000 - 9.499 | 149 | 46,285,469 | 8.40 | 9.239 | 604 | 82.17 | 355 | 41.41 |
| 9.500 - 9.999 | 156 | 32,096,491 | 5.83 | 9.757 | 584 | 82.53 | 355 | 45.76 |
| 10.000 - 10.499 | 77 | 7,618,896 | 1.38 | 10.187 | 619 | 90.93 | 351 | 66.84 |
| 10.500 - 10.999 | 96 | 11,161,058 | 2.03 | 10.724 | 630 | 90.83 | 353 | 21.33 |
| 11.000 - 11.499 | 97 | 8,366,868 | 1.52 | 11.244 | 644 | 96.25 | 346 | 31.30 |
| 11.500 - 11.999 | 39 | 3,595,941 | 0.65 | 11.796 | 600 | 87.51 | 349 | 57.59 |
| 12.000 - 12.499 | 26 | 1,587,251 | 0.29 | 12.234 | 609 | 94.73 | 349 | 67.48 |
| 12.500 - 12.999 | 51 | 4,002,533 | 0.73 | 12.706 | 617 | 95.93 | 348 | 27.94 |
| 13.000 - 13.499 | 13 | 992,059 | 0.18 | 13.107 | 626 | 99.45 | 335 | 2.77 |
| 13.500 - 13.999 | 3 | 129,673 | 0.02 | 13.890 | 577 | 74.26 | 300 | 30.88 |
| Total/Weighted Average: | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

## FICO Score at Origination of the Group II Mortgage Loans

| FICO Score at Origination | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 501 - 520 | 48 | $ 15,631,716 | 2.84% | 9.655% | 510 | 73.28% | 355 | 73.87% |
| 521 - 540 | 69 | 19,495,893 | 3.54 | 9.327 | 532 | 74.66 | 355 | 59.81 |
| 541 - 560 | 68 | 17,685,067 | 3.21 | 9.074 | 551 | 79.73 | 355 | 68.21 |
| 561 - 580 | 85 | 23,363,919 | 4.24 | 8.842 | 571 | 80.84 | 355 | 58.72 |
| 581 - 600 | 153 | 43,604,570 | 7.92 | 8.381 | 590 | 82.32 | 355 | 72.55 |
| 601 - 620 | 183 | 54,566,845 | 9.91 | 8.264 | 611 | 83.06 | 355 | 62.24 |
| 621 - 640 | 358 | 101,539,423 | 18.43 | 8.418 | 630 | 83.00 | 355 | 42.57 |
| 641 - 660 | 298 | 88,601,279 | 16.09 | 8.052 | 649 | 82.68 | 355 | 46.71 |
| 661 - 680 | 238 | 75,037,248 | 13.62 | 8.048 | 669 | 83.38 | 355 | 48.35 |
| 681 - 700 | 148 | 46,367,021 | 8.42 | 7.892 | 689 | 82.62 | 353 | 45.80 |
| 701 - 720 | 79 | 31,900,055 | 5.79 | 7.716 | 710 | 81.23 | 355 | 48.34 |
| 721 - 740 | 51 | 17,277,720 | 3.14 | 7.977 | 729 | 84.57 | 355 | 43.50 |
| 741 - 760 | 22 | 8,688,003 | 1.58 | 8.046 | 749 | 81.10 | 355 | 38.44 |
| 761 - 780 | 8 | 2,931,004 | 0.53 | 7.982 | 769 | 83.45 | 355 | 28.98 |
| 781 - 800 | 12 | 3,378,275 | 0.61 | 7.526 | 788 | 80.02 | 355 | 67.80 |
| Greater than or equal to 801 | 3 | 736,613 | 0.13 | 7.045 | 803 | 91.49 | 355 | 100.00 |
| Total/Weighted Average: | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

S-57

CONFIDENTIAL

FHFA04178912
A3-10013223058

### Documentation Type of the Group II Mortgage Loans

| Documentation Type | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Full/Alternative.................... | 999 | $ 286,865,785 | 52.08% | 7.896% | 631 | 82.64% | 354 | 100.00% |
| Stated Income/Verified Assets.... | 102 | 33,729,298 | 6.12 | 9.074 | 609 | 86.81 | 354 | 0.00 |
| Stated/Stated Documentation........ | 722 | 230,209,567 | 41.80 | 8.648 | 651 | 80.65 | 355 | 0.00 |
| Total/Weighted Average: ............... | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

### Occupancy Status of the Group II Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance (%) | Weighted Average Mortgage FICO | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied ................. | 1,709 | $ 527,385,484 | 95.75% | 8.255% | 638 | 81.98% | 355 | 51.04% |
| Investor ............................. | 106 | 21,033,527 | 3.82 | 8.931 | 636 | 83.79 | 354 | 74.30 |
| 2nd Home ........................... | 8 | 2,385,639 | 0.43 | 8.689 | 652 | 84.22 | 356 | 87.29 |
| Total/Weighted Average: .... | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

### Loan Purpose of the Group II Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Purchase ............................ | 1,203 | $ 332,191,269 | 60.31% | 8.355% | 654 | 81.54% | 355 | 44.38% |
| Refinance - Cash Out ........ | 598 | 210,377,519 | 38.19 | 8.180 | 614 | 79.85 | 355 | 62.93 |
| Refinance - Rate/Term ....... | 22 | 8,235,863 | 1.50 | 8.002 | 625 | 83.34 | 344 | 85.57 |
| Total/Weighted Average: | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

### Property Type of the Group II Mortgage Loans

| Property Type | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Single Family ...................... | 1,390 | $420,434,827 | 76.33% | 8.226% | 636 | 81.54% | 355 | 53.77% |
| 2-4 Family.......................... | 234 | 74,752,374 | 13.57 | 8.421 | 659 | 83.55 | 354 | 32.24 |
| Condominium....................... | 136 | 35,802,955 | 6.50 | 8.393 | 638 | 81.77 | 355 | 67.15 |
| PUD ................................... | 59 | 19,201,327 | 3.49 | 8.739 | 594 | 87.98 | 355 | 64.29 |
| Townhouse ......................... | 4 | 613,167 | 0.11 | 9.254 | 615 | 93.04 | 355 | 53.61 |
| Total/Weighted Average:........ | 1,823 | $550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

S-58

## Geographic Distribution of the Group II Mortgage Loans

| Geographic Distribution | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| California | 466 | $ 189,604,798 | 34.42% | 8.018% | 646 | 81.73% | 355 | 53.28% |
| New York | 213 | 80,825,278 | 14.67 | 8.255 | 649 | 82.50 | 354 | 36.94 |
| Florida | 293 | 72,906,722 | 13.24 | 8.526 | 625 | 81.18 | 355 | 51.83 |
| New Jersey | 104 | 30,290,277 | 5.50 | 8.707 | 636 | 82.12 | 355 | 43.61 |
| Maryland | 114 | 28,822,275 | 5.23 | 8.446 | 615 | 80.92 | 356 | 69.11 |
| Illinois | 94 | 20,477,193 | 3.72 | 8.903 | 642 | 83.49 | 354 | 42.33 |
| Virginia | 46 | 19,020,020 | 3.45 | 8.059 | 638 | 83.06 | 355 | 58.03 |
| Massachusetts | 44 | 13,938,846 | 2.53 | 8.610 | 621 | 81.58 | 356 | 52.28 |
| Arizona | 42 | 10,063,834 | 1.83 | 8.125 | 628 | 83.63 | 355 | 68.39 |
| Texas | 35 | 9,236,109 | 1.68 | 7.948 | 633 | 79.18 | 354 | 71.44 |
| Georgia | 56 | 7,958,358 | 1.44 | 8.491 | 637 | 82.44 | 353 | 55.98 |
| Connecticut | 23 | 7,334,094 | 1.33 | 8.373 | 661 | 84.89 | 355 | 23.77 |
| Nevada | 20 | 6,660,969 | 1.21 | 8.542 | 634 | 82.72 | 355 | 30.11 |
| Minnesota | 17 | 5,349,082 | 0.97 | 8.446 | 623 | 81.54 | 354 | 78.59 |
| Washington | 22 | 4,861,768 | 0.88 | 7.913 | 642 | 82.30 | 355 | 87.84 |
| Pennsylvania | 31 | 4,840,309 | 0.88 | 8.994 | 611 | 83.84 | 355 | 62.93 |
| Colorado | 23 | 4,610,661 | 0.84 | 7.874 | 623 | 83.32 | 356 | 85.93 |
| District of Columbia | 14 | 4,525,864 | 0.82 | 8.304 | 656 | 81.86 | 356 | 28.40 |
| Hawaii | 15 | 4,382,958 | 0.80 | 8.106 | 658 | 84.61 | 354 | 47.68 |
| Michigan | 27 | 3,573,057 | 0.65 | 9.013 | 601 | 85.18 | 355 | 62.06 |
| Ohio | 16 | 2,970,460 | 0.54 | 8.354 | 643 | 85.69 | 355 | 74.85 |
| Indiana | 11 | 1,967,905 | 0.36 | 9.132 | 628 | 83.83 | 355 | 37.37 |
| North Carolina | 18 | 1,941,901 | 0.35 | 8.811 | 611 | 80.41 | 356 | 83.46 |
| Wisconsin | 10 | 1,825,693 | 0.33 | 8.741 | 616 | 84.49 | 355 | 67.44 |
| Rhode Island | 6 | 1,696,556 | 0.31 | 7.491 | 629 | 81.65 | 356 | 68.61 |
| Tennessee | 10 | 1,678,277 | 0.30 | 7.499 | 624 | 82.38 | 353 | 99.12 |
| Oregon | 7 | 1,644,185 | 0.30 | 7.660 | 640 | 83.50 | 356 | 89.08 |
| New Mexico | 5 | 1,374,755 | 0.25 | 8.035 | 638 | 83.53 | 356 | 100.00 |
| Utah | 3 | 1,144,302 | 0.21 | 7.449 | 661 | 81.04 | 320 | 79.24 |
| Missouri | 10 | 1,121,158 | 0.20 | 9.057 | 618 | 79.45 | 355 | 39.01 |
| South Carolina | 6 | 831,519 | 0.15 | 8.877 | 604 | 84.12 | 356 | 77.48 |
| Delaware | 3 | 799,695 | 0.15 | 9.430 | 582 | 81.62 | 355 | 0.00 |
| Idaho | 4 | 605,768 | 0.11 | 8.152 | 645 | 91.03 | 356 | 63.88 |
| New Hampshire | 3 | 539,896 | 0.10 | 8.554 | 576 | 85.58 | 356 | 100.00 |
| Kentucky | 3 | 363,426 | 0.07 | 9.658 | 648 | 93.86 | 340 | 61.70 |
| Oklahoma | 2 | 312,261 | 0.06 | 9.738 | 553 | 84.64 | 356 | 0.00 |
| Iowa | 3 | 244,188 | 0.04 | 9.508 | 577 | 88.64 | 356 | 100.00 |
| Nebraska | 2 | 239,637 | 0.04 | 8.990 | 619 | 84.12 | 354 | 100.00 |
| Kansas | 1 | 135,790 | 0.02 | 6.990 | 611 | 80.00 | 356 | 100.00 |
| West Virginia | 1 | 84,804 | 0.02 | 8.800 | 630 | 85.00 | 356 | 100.00 |
| Total/Weighted Average: | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

CONFIDENTIAL

FHFA04178914
A3-10013223060

### Original Prepayment Penalty Term of the Group II Mortgage Loans

| Original Prepayment Penalty Term (mos.) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| No Prepay Penalty | 730 | $ 209,182,956 | 37.98% | 8.572% | 640 | 82.39% | 355 | 43.82% |
| 12 | 132 | 52,469,460 | 9.53 | 8.097 | 644 | 81.38 | 353 | 60.05 |
| 24 | 764 | 226,850,518 | 41.19 | 8.231 | 632 | 82.00 | 355 | 53.81 |
| 30 | 1 | 186,922 | 0.03 | 7.125 | 739 | 80.00 | 356 | 100.00 |
| 36 | 196 | 62,114,794 | 11.28 | 7.657 | 648 | 81.78 | 354 | 66.70 |
| Total/Weighted Average: | 1,823 | $ 550,804,650 | 100.00% | 8.283% | 638 | 82.06% | 355 | 52.08% |

### Margin of the Group II Mortgage Loans - ARM Loans

| Margin (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 3.000 - 3.499 | 2 | $ 908,000 | 0.20% | 5.496% | 646 | 80.00% | 356 | 100.00% |
| 3.500 - 3.999 | 4 | 1,960,474 | 0.41 | 5.900 | 653 | 80.00 | 354 | 100.00 |
| 4.000 - 4.499 | 26 | 14,022,969 | 3.02 | 6.512 | 672 | 80.49 | 355 | 100.00 |
| 4.500 - 4.999 | 94 | 38,805,533 | 8.37 | 6.922 | 663 | 80.66 | 355 | 91.70 |
| 5.000 - 5.499 | 181 | 71,959,745 | 15.52 | 7.445 | 648 | 79.97 | 355 | 78.82 |
| 5.500 - 5.999 | 249 | 95,916,469 | 20.68 | 7.886 | 645 | 81.48 | 355 | 42.21 |
| 6.000 - 6.499 | 272 | 100,606,645 | 21.70 | 8.405 | 645 | 82.27 | 355 | 30.56 |
| 6.500 - 6.999 | 458 | 139,605,412 | 30.11 | 9.246 | 602 | 81.10 | 355 | 33.93 |
| Total/Weighted Average: | 1,286 | $ 463,725,248 | 100.00% | 8.205% | 634 | 81.20% | 355 | 49.11% |

CONFIDENTIAL

FHFA04178915
A3-10013223061

## Minimum Rate of the Group II Mortgage Loans - ARM Loans

| Minimum Rate (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 5.000 - 5.499 ............... | 1 | $ 488,000 | 0.11% | 5.450% | 665 | 80.00% | 356 | 100.00% |
| 5.500 - 5.999 ............... | 5 | 2,320,474 | 0.50 | 5.837 | 647 | 80.00 | 355 | 100.00 |
| 6.000 - 6.499 ............... | 11 | 6,189,400 | 1.33 | 6.311 | 669 | 80.55 | 355 | 100.00 |
| 6.500 - 6.999 ............... | 83 | 36,880,365 | 7.95 | 6.830 | 670 | 80.33 | 355 | 96.47 |
| 7.000 - 7.499 ............... | 131 | 52,040,470 | 11.22 | 7.265 | 650 | 80.19 | 356 | 82.33 |
| 7.500 - 7.999 ............... | 282 | 111,077,678 | 23.95 | 7.770 | 645 | 81.01 | 355 | 52.28 |
| 8.000 - 8.499 ............... | 220 | 80,869,290 | 17.44 | 8.276 | 641 | 82.24 | 355 | 32.00 |
| 8.500 - 8.999 ............... | 262 | 93,617,808 | 20.19 | 8.731 | 630 | 82.09 | 355 | 26.46 |
| 9.000 - 9.499 ............... | 137 | 44,097,014 | 9.51 | 9.235 | 602 | 81.92 | 355 | 40.71 |
| 9.500 - 9.999 ............... | 91 | 26,071,354 | 5.62 | 9.742 | 568 | 79.55 | 355 | 36.52 |
| 10.000 - 10.499 ............... | 28 | 3,575,115 | 0.77 | 10.222 | 569 | 81.26 | 355 | 35.21 |
| 10.500 - 10.999 ............... | 18 | 3,769,796 | 0.81 | 10.626 | 558 | 79.35 | 356 | 31.13 |
| 11.000 - 11.499 ............... | 7 | 1,056,295 | 0.23 | 11.074 | 559 | 75.80 | 356 | 46.24 |
| 11.500 - 11.999 ............... | 7 | 1,209,918 | 0.26 | 11.828 | 531 | 64.58 | 355 | 74.30 |
| 12.000 - 12.499 ............... | 1 | 72,719 | 0.02 | 12.200 | 517 | 70.00 | 356 | 0.00 |
| 12.500 - 12.999 ............... | 1 | 299,918 | 0.06 | 12.750 | 518 | 50.00 | 356 | 100.00 |
| 13.500 - 13.999 ............... | 1 | 89,633 | 0.02 | 13.950 | 546 | 65.00 | 356 | 0.00 |
| Total/Weighted Average: ........ | 1,286 | $ 463,725,248 | 100.00% | 8.205% | 634 | 81.20% | 355 | 49.11% |

## Maximum Rate of the Group II Mortgage Loans - ARM Loans

| Maximum Rate (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgag Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 11.000 - 11.499 ............... | 1 | $ 488,000 | 0.11% | 5.450% | 665 | 80.00% | 356 | 100.00% |
| 11.500 - 11.999 ............... | 5 | 2,320,474 | 0.50 | 5.837 | 647 | 80.00 | 355 | 100.00 |
| 12.000 - 12.499 ............... | 12 | 6,436,402 | 1.39 | 6.432 | 664 | 80.92 | 355 | 100.00 |
| 12.500 - 12.999 ............... | 82 | 36,704,556 | 7.92 | 6.818 | 671 | 80.28 | 355 | 96.46 |
| 13.000 - 13.499 ............... | 131 | 52,040,470 | 11.22 | 7.265 | 650 | 80.19 | 356 | 82.33 |
| 13.500 - 13.999 ............... | 282 | 111,077,678 | 23.95 | 7.770 | 645 | 81.01 | 355 | 52.28 |
| 14.000 - 14.499 ............... | 219 | 80,765,855 | 17.42 | 8.276 | 641 | 82.23 | 355 | 31.92 |
| 14.500 - 14.999 ............... | 262 | 93,617,808 | 20.19 | 8.731 | 630 | 82.09 | 355 | 26.46 |
| 15.000 - 15.499 ............... | 138 | 44,129,256 | 9.52 | 9.232 | 602 | 81.91 | 355 | 40.75 |
| 15.500 - 15.999 ............... | 91 | 26,071,354 | 5.62 | 9.742 | 568 | 79.55 | 355 | 36.52 |
| 16.000 - 16.499 ............... | 28 | 3,575,115 | 0.77 | 10.222 | 569 | 81.26 | 355 | 35.21 |
| 16.500 - 16.999 ............... | 18 | 3,769,796 | 0.81 | 10.626 | 558 | 79.35 | 356 | 31.13 |
| 17.000 - 17.499 ............... | 7 | 1,056,295 | 0.23 | 11.074 | 559 | 75.80 | 356 | 46.24 |
| 17.500 - 17.999 ............... | 7 | 1,209,918 | 0.26 | 11.828 | 531 | 64.58 | 355 | 74.30 |
| 18.000 - 18.499 ............... | 1 | 72,719 | 0.02 | 12.200 | 517 | 70.00 | 356 | 0.00 |
| 18.500 - 18.999 ............... | 1 | 299,918 | 0.06 | 12.750 | 518 | 50.00 | 356 | 100.00 |
| 19.500 - 19.999 ............... | 1 | 89,633 | 0.02 | 13.950 | 546 | 65.00 | 356 | 0.00 |
| Total/Weighted Average: ......... | 1,286 | $ 463,725,248 | 100.00% | 8.205% | 634 | 81.20% | 355 | 49.11% |

S-61

FHFA04178916
A3-10013223062

## Life Cap of the Group II Mortgage Loans – ARM Loans

| Life Cap (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 3.000 - 3.499 .................. | 1 | $ 247,002 | 0.05% | 9.450% | 550 | 90.00% | 356 | 100.00% |
| 6.000 - 6.499 .................. | 1,284 | 463,374,811 | 99.92 | 8.204 | 634 | 81.19 | 355 | 49.07 |
| 7.000 - 7.499 .................. | 1 | 103,435 | 0.02 | 8.300 | 589 | 85.00 | 356 | 100.00 |
| Total/Weighted Average: ......... | 1,286 | $ 463,725,248 | 100.00% | 8.205% | 634 | 81.20% | 355 | 49.11% |

## First Periodic Cap of the Group II Mortgage Loans - ARM Loans

| First Periodic Cap (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 2.000 - 2.499 .................... | 564 | $ 211,764,190 | 45.67% | 8.258% | 630 | 81.08% | 355 | 45.95% |
| 3.000 - 3.499 .................... | 722 | 251,961,058 | 54.33 | 8.160 | 637 | 81.29 | 356 | 51.77 |
| Total/Weighted Average:.... | 1,286 | $ 463,725,248 | 100.00% | 8.205% | 634 | 81.20% | 355 | 49.11% |

## Periodic Cap of the Group II Mortgage Loans - ARM Loans

| Periodic Cap (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1.000 - 1.499 .................... | 1 | $ 785,962 | 0.17% | 8.600% | 599 | 90.00% | 355 | 100.00% |
| 1.500 - 1.999 .................... | 1,285 | 462,939,286 | 99.83 | 8.204 | 634 | 81.18 | 355 | 49.02 |
| Total/Weighted Average:.... | 1,286 | $ 463,725,248 | 100.00% | 8.205% | 634 | 81.20% | 355 | 49.11% |

S-62

CONFIDENTIAL

FHFA04178917
A3-10013223063

**Next Rate Adjustment Date of the Group II Mortgage Loans - ARM Loans**

| Next Rate Adjustment Date | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| December 2007 | 2 | $ 300,757 | 0.06% | 8.309% | 593 | 87.03% | 350 | 100.00% |
| January 2008 | 5 | 2,157,115 | 0.47 | 8.376 | 617 | 87.09 | 351 | 34.75 |
| February 2008 | 11 | 4,548,452 | 0.98 | 7.871 | 617 | 81.80 | 352 | 66.59 |
| March 2008 | 43 | 16,034,962 | 3.46 | 8.645 | 615 | 80.03 | 353 | 41.83 |
| April 2008 | 96 | 39,275,202 | 8.47 | 8.097 | 634 | 79.84 | 354 | 40.18 |
| May 2008 | 313 | 113,723,986 | 24.52 | 8.267 | 628 | 81.65 | 355 | 49.78 |
| June 2008 | 789 | 275,837,168 | 59.48 | 8.184 | 638 | 81.18 | 356 | 49.18 |
| March 2009 | 1 | 660,786 | 0.14 | 7.950 | 607 | 80.00 | 353 | 100.00 |
| April 2009 | 2 | 1,386,729 | 0.30 | 8.648 | 641 | 87.44 | 354 | 49.59 |
| May 2009 | 6 | 2,867,920 | 0.62 | 7.977 | 632 | 80.02 | 355 | 73.03 |
| June 2009 | 14 | 6,083,456 | 1.31 | 7.777 | 645 | 82.19 | 356 | 76.04 |
| May 2011 | 2 | 241,934 | 0.05 | 9.829 | 528 | 58.29 | 355 | 100.00 |
| June 2011 | 2 | 606,779 | 0.13 | 7.396 | 629 | 83.18 | 356 | 100.00 |
| Total/Weighted Average: | 1,286 | $ 463,725,248 | 100.00% | 8.205% | 634 | 81.20% | 355 | 49.11% |

S-63

CONFIDENTIAL

FHFA04178918
A3-10013223064

**Aggregate Mortgage Loan Characteristics**

The average principal balance of the Mortgage Loans at origination was approximately $215,345. No Mortgage Loan had a principal balance at origination greater than approximately $1,500,000 or less than approximately $15,000. The average principal balance of the Mortgage Loans as of the Cut-off Date was approximately $214,918. No Mortgage Loan had a principal balance as of the Cut-off Date greater than approximately $1,492,441 or less than approximately $11,445.

The Mortgage Loans had Mortgage Rates as of the Cut-off Date ranging from approximately 5.450% per annum to approximately 14.100% per annum, and the weighted average Mortgage Rate was approximately 8.452% per annum. As of the Cut-off Date, the adjustable rate Mortgage Loans had Gross Margins ranging from approximately 3.329% per annum to approximately 6.990% per annum, Minimum Mortgage Rates ranging from approximately 5.450% per annum to approximately 14.100% per annum and Maximum Mortgage Rates ranging from approximately 11.450% per annum to approximately 20.100% per annum. As of the Cut-off Date, the weighted average Gross Margin was approximately 6.069% per annum, the weighted average Minimum Mortgage Rate was approximately 8.344% per annum and the weighted average Maximum Mortgage Rate was approximately 14.344% per annum. The latest next Adjustment Date following the Cut-off Date on any adjustable rate Mortgage Loan occurs on June 1, 2011 and the weighted average next Adjustment Date for all of the adjustable rate Mortgage Loans following the Cut-off Date is May 22, 2008.

The weighted average combined loan-to-value ratio of the Mortgage Loans at origination was approximately 90.05%. At origination, no Mortgage Loan had a combined loan-to-value ratio greater than approximately 100.00% or less than approximately 11.43%.

The weighted average remaining term to stated maturity of the Mortgage Loans was approximately 355 months as of the Cut-off Date. None of the Mortgage Loans had a first due date prior to October 1, 2005 or will have a first due date after July 1, 2006 or will have a remaining term to stated maturity of less than 115 months or greater than 356 months as of the Cut-off Date. The latest maturity date of any Mortgage Loan is June 1, 2036.

As of the Cut-off Date, the weighted average credit score of the Mortgage Loans is approximately 628. No Mortgage Loan had a credit score as of the Cut-off Date greater than 808 or less than 500.

The Mortgage Loans are expected to have the following additional characteristics as of the Cut-off Date (the sum in any column may not equal the total indicated due to rounding):

S-64

CONFIDENTIAL

FHFA04178919
A3-10013223065

## Product Type of the Mortgage Loans

| Product Type | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Balloon 30/40 | 159 | $ 47,075,050 | 3.83% | 7.500% | 654 | 77.93% | 355 | 74.92% |
| Fixed 10yr | 15 | 962,673 | 0.08 | 11.880 | 635 | 99.92 | 116 | 36.34 |
| Fixed 15yr | 97 | 2,724,893 | 0.22 | 10.255 | 650 | 94.11 | 176 | 64.35 |
| Fixed 20yr | 9 | 926,821 | 0.08 | 8.723 | 641 | 79.94 | 235 | 92.30 |
| Fixed 30yr | 1,560 | 176,353,450 | 14.36 | 9.270 | 650 | 88.06 | 356 | 65.63 |
| ARM 2yr/6mo | 2,040 | 430,021,067 | 35.02 | 8.751 | 607 | 79.31 | 355 | 46.85 |
| ARM 2yr/6mo - IO | 436 | 148,149,380 | 12.06 | 7.541 | 647 | 81.17 | 355 | 82.31 |
| ARM 2yr/6mo - 40yr Amterm | 1,343 | 404,668,153 | 32.95 | 8.219 | 631 | 80.62 | 355 | 45.72 |
| ARM 3yr/6mo | 19 | 5,397,560 | 0.44 | 8.779 | 602 | 80.73 | 355 | 54.93 |
| ARM 3yr/6mo - IO | 11 | 5,058,779 | 0.41 | 7.145 | 658 | 79.93 | 356 | 97.63 |
| ARM 3yr/6mo - 40yr Amterm | 15 | 4,905,110 | 0.40 | 8.103 | 640 | 83.96 | 355 | 72.80 |
| ARM 5yr/6mo | 5 | 829,635 | 0.07 | 8.538 | 585 | 78.05 | 356 | 100.00 |
| ARM 5yr/6mo - 40yr Amterm | 5 | 969,774 | 0.08 | 7.771 | 624 | 77.41 | 355 | 65.46 |
| Total/Weighted Average: | 5,714 | $1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

## Lien of the Mortgage Loans

| Lien | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1st | 4,426 | $1,141,883,294 | 92.98% | 8.249% | 626 | 79.85% | 355 | 55.47% |
| 2nd | 1,288 | 86,159,050 | 7.02 | 11.149 | 653 | 99.72 | 348 | 48.57 |
| Total/Weighted Average: | 5,714 | $1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

S-65

## Principal Balances at Origination of the Mortgage Loans

| Principal Balance at Origination ($) | Number of Mortgage Loans | Aggregate Original Principal Balance | % of Aggregate Original Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1 - 50,000................. | 558 | $ 19,590,578 | 1.59% | 11.256% | 643 | 98.02% | 335 | 59.17% |
| 50,001 - 100,000........... | 1,005 | 76,193,576 | 6.19 | 10.170 | 630 | 89.02 | 353 | 57.74 |
| 100,001 - 150,000.......... | 900 | 111,879,270 | 9.09 | 9.173 | 615 | 82.51 | 355 | 63.23 |
| 150,001 - 200,000.......... | 855 | 149,379,911 | 12.14 | 8.672 | 614 | 79.29 | 355 | 60.21 |
| 200,001 - 250,000.......... | 566 | 127,544,132 | 10.37 | 8.409 | 615 | 78.62 | 355 | 57.60 |
| 250,001 - 300,000.......... | 437 | 120,187,196 | 9.77 | 8.272 | 622 | 79.92 | 356 | 56.32 |
| 300,001 - 350,000.......... | 367 | 119,305,962 | 9.70 | 8.074 | 628 | 80.49 | 355 | 52.81 |
| 350,001 - 400,000.......... | 287 | 107,399,934 | 8.73 | 8.027 | 636 | 80.92 | 355 | 49.08 |
| 400,001 - 450,000.......... | 196 | 83,220,473 | 6.76 | 8.068 | 634 | 81.12 | 355 | 44.68 |
| 450,001 - 500,000.......... | 177 | 84,043,346 | 6.83 | 7.962 | 640 | 80.49 | 355 | 46.36 |
| 500,001 - 550,000.......... | 109 | 57,091,227 | 4.64 | 7.873 | 648 | 82.27 | 354 | 53.25 |
| 550,001 - 600,000.......... | 76 | 43,685,671 | 3.55 | 8.123 | 632 | 80.06 | 355 | 48.56 |
| 600,001 - 650,000.......... | 55 | 34,461,963 | 2.80 | 8.242 | 644 | 81.93 | 355 | 47.19 |
| 650,001 - 700,000.......... | 45 | 30,536,800 | 2.48 | 8.092 | 643 | 83.11 | 355 | 55.49 |
| 700,001 - 750,000.......... | 32 | 23,266,153 | 1.89 | 8.291 | 618 | 81.40 | 355 | 43.53 |
| 750,001 - 800,000.......... | 26 | 20,315,722 | 1.65 | 7.986 | 632 | 77.62 | 355 | 57.73 |
| 800,001 - 850,000.......... | 5 | 4,204,250 | 0.34 | 7.720 | 660 | 84.18 | 356 | 59.85 |
| 850,001 - 900,000.......... | 2 | 1,745,130 | 0.14 | 7.098 | 713 | 77.48 | 355 | 100.00 |
| 900,001 - 950,000.......... | 2 | 1,860,000 | 0.15 | 6.639 | 697 | 79.16 | 356 | 100.00 |
| 950,001 - 1,000,000........ | 9 | 8,817,000 | 0.72 | 7.077 | 654 | 76.16 | 355 | 100.00 |
| 1,000,001 - 1,050,000...... | 1 | 1,006,600 | 0.08 | 6.500 | 642 | 67.11 | 353 | 100.00 |
| 1,050,001 - 1,100,000...... | 2 | 2,119,295 | 0.17 | 6.825 | 689 | 76.53 | 355 | 100.00 |
| 1,100,001 - 1,150,000...... | 1 | 1,129,350 | 0.09 | 7.750 | 681 | 66.35 | 356 | 100.00 |
| 1,450,001 - 1,500,000...... | 1 | 1,500,000 | 0.12 | 6.950 | 749 | 75.00 | 354 | 100.00 |
| Total/Weighted Average:...... | 5,714 | $1,230,483,540 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

S-66

CONFIDENTIAL

FHFA04178921
A3-10013223067

### Remaining Principal Balance of the Mortgage Loans

| Remaining Principal Balance ($) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1 - 50,000 | 560 | $ 19,617,078 | 1.60% | 11.248% | 642 | 97.89% | 335 | 59.38% |
| 50,001 - 100,000 | 1,005 | 76,116,978 | 6.20 | 10.165 | 630 | 88.99 | 353 | 57.79 |
| 100,001 - 150,000 | 900 | 111,729,664 | 9.10 | 9.176 | 615 | 82.56 | 355 | 63.26 |
| 150,001 - 200,000 | 855 | 149,163,307 | 12.15 | 8.669 | 614 | 79.27 | 355 | 60.10 |
| 200,001 - 250,000 | 567 | 127,643,353 | 10.39 | 8.407 | 615 | 78.66 | 355 | 57.87 |
| 250,001 - 300,000 | 435 | 119,503,696 | 9.73 | 8.276 | 622 | 79.90 | 356 | 56.16 |
| 300,001 - 350,000 | 368 | 119,476,401 | 9.73 | 8.078 | 628 | 80.51 | 355 | 52.67 |
| 350,001 - 400,000 | 287 | 107,308,108 | 8.74 | 8.016 | 636 | 80.89 | 355 | 49.45 |
| 400,001 - 450,000 | 196 | 83,173,431 | 6.77 | 8.076 | 634 | 81.17 | 355 | 44.21 |
| 450,001 - 500,000 | 175 | 82,977,667 | 6.76 | 7.958 | 640 | 80.44 | 355 | 46.32 |
| 500,001 - 550,000 | 109 | 56,989,500 | 4.64 | 7.873 | 648 | 82.27 | 354 | 53.25 |
| 550,001 - 600,000 | 77 | 44,213,630 | 3.60 | 8.121 | 632 | 80.06 | 355 | 47.90 |
| 600,001 - 650,000 | 54 | 33,810,627 | 2.75 | 8.247 | 644 | 81.96 | 355 | 48.03 |
| 650,001 - 700,000 | 46 | 31,183,582 | 2.54 | 8.079 | 643 | 83.27 | 355 | 56.49 |
| 700,001 - 750,000 | 32 | 23,267,487 | 1.89 | 8.259 | 620 | 81.10 | 355 | 43.65 |
| 750,001 - 800,000 | 25 | 19,531,359 | 1.59 | 8.041 | 629 | 77.53 | 355 | 56.11 |
| 800,001 - 850,000 | 5 | 4,200,360 | 0.34 | 7.720 | 660 | 84.18 | 356 | 59.85 |
| 850,001 - 900,000 | 2 | 1,743,382 | 0.14 | 7.098 | 713 | 77.48 | 355 | 100.00 |
| 900,001 - 950,000 | 2 | 1,854,229 | 0.15 | 6.639 | 697 | 79.16 | 356 | 100.00 |
| 950,001 - 1,000,000 | 9 | 8,804,256 | 0.72 | 7.077 | 654 | 76.16 | 355 | 100.00 |
| 1,000,001 - 1,050,000 | 1 | 1,000,126 | 0.08 | 6.500 | 642 | 67.11 | 353 | 100.00 |
| 1,050,001 - 1,100,000 | 2 | 2,112,333 | 0.17 | 6.825 | 689 | 76.53 | 355 | 100.00 |
| 1,100,001 - 1,150,000 | 1 | 1,129,350 | 0.09 | 7.750 | 681 | 66.35 | 356 | 100.00 |
| 1,450,001 - 1,500,000 | 1 | 1,492,441 | 0.12 | 6.950 | 749 | 75.00 | 354 | 100.00 |
| Total/Weighted Average: | 5,714 | $1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

### Original Terms of the Mortgage Loans

| Original Term (months) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 120 | 15 | $ 962,673 | 0.08% | 11.880% | 635 | 99.92% | 116 | 36.34% |
| 180 | 97 | 2,724,893 | 0.22 | 10.255 | 650 | 94.11 | 176 | 64.35 |
| 240 | 9 | 926,821 | 0.08 | 8.723 | 641 | 79.94 | 235 | 92.30 |
| 360 | 5,593 | 1,223,427,958 | 99.62 | 8.445 | 628 | 81.20 | 355 | 54.96 |
| Total/Weighted Average: | 5,714 | $1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

### Remaining Terms of the Mortgage Loans

| Remaining Term (months) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 60 - 119 | 15 | $ 962,673 | 0.08% | 11.880% | 635 | 99.92% | 116 | 36.34% |
| 120 - 179 | 97 | 2,724,893 | 0.22 | 10.255 | 650 | 94.11 | 176 | 64.35 |
| 180 - 239 | 9 | 926,821 | 0.08 | 8.723 | 641 | 79.94 | 235 | 92.30 |
| 300 - 359 | 5,593 | 1,223,427,958 | 99.62 | 8.445 | 628 | 81.20 | 355 | 54.96 |
| Total/Weighted Average: | 5,714 | $1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

S-67

CONFIDENTIAL

FHFA04178922
A3-10013223068

## Original Loan-to-Value Ratio of the Mortgage Loans

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00...... | 114 | $ 18,917,733 | 1.54% | 8.951% | 583 | 40.42% | 354 | 55.67% |
| 50.01 - 55.00........................ | 44 | 9,017,350 | 0.73 | 8.266 | 597 | 52.96 | 355 | 65.68 |
| 55.01 - 60.00........................ | 84 | 16,869,917 | 1.37 | 8.715 | 591 | 57.67 | 356 | 44.27 |
| 60.01 - 65.00........................ | 153 | 34,668,194 | 2.82 | 8.747 | 580 | 63.73 | 355 | 50.83 |
| 65.01 - 70.00........................ | 197 | 47,130,856 | 3.84 | 8.803 | 578 | 68.91 | 355 | 53.56 |
| 70.01 - 75.00........................ | 295 | 75,912,218 | 6.18 | 8.652 | 584 | 74.04 | 355 | 53.14 |
| 75.01 - 80.00........................ | 2,366 | 635,750,403 | 51.77 | 8.038 | 641 | 79.87 | 355 | 47.45 |
| 80.01 - 85.00........................ | 359 | 97,805,688 | 7.96 | 8.148 | 614 | 84.49 | 355 | 74.10 |
| 85.01 - 90.00........................ | 598 | 149,239,877 | 12.15 | 8.446 | 622 | 89.69 | 355 | 74.73 |
| 90.01 - 95.00........................ | 195 | 39,088,022 | 3.18 | 8.652 | 636 | 94.66 | 354 | 70.31 |
| 95.01 - 100.00...................... | 1,309 | 103,642,086 | 8.44 | 10.688 | 653 | 99.92 | 350 | 53.10 |
| Total/Weighted Average: ...... | 5,714 | $1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

## Original Combined Loan-to-Value Ratio of the Mortgage Loans

| Original Combined Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | (%) of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00...... | 111 | $ 18,383,068 | 1.50% | 8.946% | 584 | 40.42% | 354 | 56.56% |
| 50.01 - 55.00........................ | 45 | 8,821,976 | 0.72 | 8.211 | 600 | 52.53 | 355 | 62.65 |
| 55.01 - 60.00........................ | 80 | 15,773,843 | 1.28 | 8.782 | 584 | 57.55 | 356 | 45.86 |
| 60.01 - 65.00........................ | 154 | 35,196,476 | 2.87 | 8.765 | 579 | 63.54 | 355 | 51.57 |
| 65.01 - 70.00........................ | 188 | 44,273,475 | 3.61 | 8.814 | 575 | 68.93 | 355 | 53.83 |
| 70.01 - 75.00........................ | 283 | 70,320,204 | 5.73 | 8.730 | 579 | 73.92 | 355 | 51.30 |
| 75.01 - 80.00........................ | 473 | 123,191,933 | 10.03 | 8.385 | 595 | 79.42 | 355 | 56.94 |
| 80.01 - 85.00........................ | 284 | 80,036,824 | 6.52 | 8.171 | 613 | 84.13 | 355 | 70.44 |
| 85.01 - 90.00........................ | 495 | 127,942,143 | 10.42 | 8.394 | 622 | 88.67 | 355 | 70.93 |
| 90.01 - 95.00........................ | 327 | 79,423,973 | 6.47 | 8.389 | 634 | 88.75 | 355 | 68.50 |
| 95.01 - 100.00...................... | 3,274 | 624,678,431 | 50.87 | 8.427 | 652 | 83.66 | 355 | 48.41 |
| Total/Weighted Average: ...... | 5,714 | $1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

S-68

FHFA04178923
A3-10013223069

## Mortgage Rate of the Mortgage Loans

| Mortgage Rate (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 5.000 - 5.499 | 1 | $ 488,000 | 0.04% | 5.450% | 665 | 80.00% | 356 | 100.00% |
| 5.500 - 5.999 | 32 | 11,066,049 | 0.90 | 5.894 | 669 | 75.61 | 355 | 98.40 |
| 6.000 - 6.499 | 77 | 28,150,001 | 2.29 | 6.281 | 679 | 77.74 | 352 | 98.36 |
| 6.500 - 6.999 | 312 | 107,845,417 | 8.78 | 6.779 | 665 | 78.20 | 355 | 91.94 |
| 7.000 - 7.499 | 407 | 118,540,486 | 9.65 | 7.261 | 647 | 79.33 | 355 | 82.70 |
| 7.500 - 7.999 | 793 | 231,182,298 | 18.83 | 7.765 | 639 | 80.45 | 355 | 61.66 |
| 8.000 - 8.499 | 683 | 179,985,321 | 14.66 | 8.267 | 635 | 81.79 | 355 | 42.64 |
| 8.500 - 8.999 | 887 | 224,208,119 | 18.26 | 8.745 | 620 | 81.41 | 355 | 37.18 |
| 9.000 - 9.499 | 513 | 111,941,336 | 9.12 | 9.244 | 600 | 80.87 | 355 | 38.98 |
| 9.500 - 9.999 | 601 | 91,949,744 | 7.49 | 9.742 | 582 | 81.14 | 355 | 50.35 |
| 10.000 - 10.499 | 289 | 31,124,127 | 2.53 | 10.194 | 589 | 84.03 | 354 | 53.59 |
| 10.500 - 10.999 | 293 | 30,197,337 | 2.46 | 10.745 | 611 | 86.75 | 353 | 20.43 |
| 11.000 - 11.499 | 344 | 25,759,427 | 2.10 | 11.250 | 629 | 91.96 | 349 | 37.08 |
| 11.500 - 11.999 | 131 | 13,205,462 | 1.08 | 11.765 | 589 | 80.46 | 353 | 50.56 |
| 12.000 - 12.499 | 122 | 8,752,134 | 0.71 | 12.208 | 595 | 89.64 | 350 | 55.17 |
| 12.500 - 12.999 | 176 | 10,398,185 | 0.85 | 12.680 | 619 | 97.82 | 343 | 23.73 |
| 13.000 - 13.499 | 45 | 2,800,482 | 0.23 | 13.083 | 628 | 99.80 | 334 | 0.98 |
| 13.500 - 13.999 | 7 | 378,470 | 0.03 | 13.807 | 614 | 90.67 | 337 | 20.88 |
| 14.000 - 14.499 | 1 | 69,949 | 0.01 | 14.100 | 532 | 50.00 | 356 | 0.00 |
| Total/Weighted Average: | 5,714 | $ 1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

## FICO Score at Origination of the Mortgage Loans

| FICO Score at Origination | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 500 | 9 | $ 1,528,866 | 0.12% | 9.925% | 500 | 72.19% | 355 | 75.53% |
| 501 - 520 | 261 | 54,755,660 | 4.46 | 9.817 | 510 | 72.07 | 355 | 62.08 |
| 521 - 540 | 273 | 60,518,657 | 4.93 | 9.443 | 531 | 72.32 | 355 | 56.84 |
| 541 - 560 | 264 | 55,519,380 | 4.52 | 9.092 | 551 | 77.15 | 355 | 66.55 |
| 561 - 580 | 295 | 62,726,143 | 5.11 | 8.823 | 571 | 79.51 | 355 | 68.05 |
| 581 - 600 | 489 | 99,552,672 | 8.11 | 8.481 | 590 | 81.86 | 354 | 75.67 |
| 601 - 620 | 596 | 127,890,872 | 10.41 | 8.356 | 611 | 82.29 | 355 | 64.78 |
| 621 - 640 | 1,199 | 238,073,072 | 19.39 | 8.520 | 630 | 82.96 | 355 | 44.83 |
| 641 - 660 | 910 | 193,137,541 | 15.73 | 8.198 | 649 | 82.69 | 355 | 49.25 |
| 661 - 680 | 654 | 141,009,442 | 11.48 | 8.118 | 669 | 83.46 | 355 | 52.19 |
| 681 - 700 | 360 | 83,705,024 | 6.82 | 7.939 | 689 | 82.57 | 354 | 48.81 |
| 701 - 720 | 184 | 52,918,331 | 4.31 | 7.801 | 709 | 81.40 | 355 | 49.98 |
| 721 - 740 | 118 | 28,953,453 | 2.36 | 7.985 | 730 | 83.87 | 354 | 42.29 |
| 741 - 760 | 49 | 14,603,285 | 1.19 | 7.966 | 749 | 81.33 | 355 | 43.45 |
| 761 - 780 | 32 | 7,564,921 | 0.62 | 7.952 | 769 | 80.67 | 355 | 40.17 |
| 781 - 800 | 18 | 4,848,413 | 0.39 | 7.715 | 786 | 81.00 | 355 | 58.41 |
| Greater than or equal to 801 | 3 | 736,613 | 0.06 | 7.045 | 803 | 91.49 | 355 | 100.00 |
| Total/Weighted Average: | 5,714 | $ 1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

S-69

## Documentation Type of the Mortgage Loans

| Documentation Type | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Full/Alt............................ | 3,281 | $ 675,299,928 | 54.99% | 8.083% | 622 | 81.91% | 355 | 100.00% |
| Stated Income/Verified Assets...... | 285 | 68,482,526 | 5.58 | 9.297 | 603 | 86.47 | 355 | 0.00 |
| Stated/Stated Documentation ...... | 2,148 | 484,259,891 | 39.43 | 8.848 | 640 | 79.58 | 355 | 0.00 |
| Total/Weighted Average: ............. | 5,714 | $1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

## Occupancy Status of the Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied.................... | 5,337 | $1,157,576,349 | 94.26% | 8.426% | 628 | 81.30% | 355 | 54.23% |
| Investor .............................. | 353 | 64,196,415 | 5.23 | 8.932 | 635 | 80.24 | 355 | 67.80 |
| 2nd Home ............................ | 24 | 6,269,580 | 0.51 | 8.324 | 643 | 82.22 | 356 | 64.16 |
| Total/Weighted Average: ...... | 5,714 | $1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

## Loan Purpose of the Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Purchase............................... | 3,294 | $ 650,451,541 | 52.97% | 8.509% | 649 | 83.81% | 355 | 46.03% |
| Refinance - Cash Out ........... | 2,343 | 559,097,669 | 45.53 | 8.387 | 605 | 78.27 | 355 | 64.71 |
| Refinance - Rate/Term ......... | 77 | 18,493,135 | 1.51 | 8.442 | 617 | 80.79 | 350 | 76.22 |
| Total/Weighted Average: ...... | 5,714 | $1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

## Property Type of the Mortgage Loans

| Property Type | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Single Family........................ | 4,535 | $ 954,083,398 | 77.69% | 8.423% | 626 | 80.92% | 355 | 56.27% |
| 2-4 Family ........................... | 559 | 151,752,409 | 12.36 | 8.433 | 646 | 80.87 | 354 | 40.29 |
| Condominium........................ | 433 | 80,273,853 | 6.54 | 8.604 | 634 | 81.83 | 355 | 58.30 |
| PUD ..................................... | 179 | 41,019,178 | 3.34 | 8.876 | 592 | 88.88 | 355 | 72.87 |
| Townhouse ............................ | 8 | 913,506 | 0.07 | 9.439 | 615 | 93.48 | 344 | 68.86 |
| Total/Weighted Average: ......... | 5,714 | $ 1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

S-70

FHFA04178925
A3-10013223071

## Geographic Distribution of the Mortgage Loans

| Geographic Distribution | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| California | 1,011 | $ 306,979,620 | 25.00% | 8.140% | 640 | 81.13% | 355 | 55.88% |
| Florida | 1,084 | 198,231,762 | 16.14 | 8.637 | 618 | 80.46 | 355 | 54.29 |
| New York | 469 | 149,261,920 | 12.15 | 8.265 | 639 | 80.42 | 355 | 40.17 |
| New Jersey | 313 | 76,045,633 | 6.19 | 8.798 | 626 | 80.44 | 355 | 44.05 |
| Maryland | 362 | 75,450,381 | 6.14 | 8.592 | 617 | 80.91 | 355 | 64.55 |
| Illinois | 319 | 54,522,571 | 4.44 | 8.873 | 630 | 82.79 | 354 | 50.52 |
| Virginia | 175 | 41,017,228 | 3.34 | 8.513 | 620 | 80.85 | 355 | 57.13 |
| Massachusetts | 145 | 35,400,636 | 2.88 | 8.621 | 616 | 81.93 | 356 | 51.00 |
| Georgia | 272 | 34,362,245 | 2.80 | 8.596 | 624 | 83.73 | 353 | 66.18 |
| Arizona | 125 | 23,303,569 | 1.90 | 8.241 | 626 | 82.23 | 355 | 66.26 |
| Connecticut | 91 | 19,009,426 | 1.55 | 8.725 | 631 | 82.50 | 355 | 36.77 |
| Hawaii | 63 | 18,960,176 | 1.54 | 8.136 | 646 | 79.60 | 355 | 41.53 |
| Washington | 94 | 18,302,220 | 1.49 | 8.045 | 628 | 81.86 | 355 | 75.24 |
| Texas | 117 | 17,990,042 | 1.46 | 8.377 | 625 | 80.57 | 354 | 61.87 |
| Nevada | 66 | 15,916,163 | 1.30 | 8.514 | 622 | 81.85 | 355 | 45.41 |
| Pennsylvania | 114 | 15,194,580 | 1.24 | 9.074 | 600 | 80.70 | 355 | 61.76 |
| Minnesota | 78 | 14,293,319 | 1.16 | 8.292 | 619 | 81.57 | 354 | 77.31 |
| Michigan | 112 | 13,191,697 | 1.07 | 9.026 | 615 | 82.94 | 354 | 61.44 |
| Colorado | 82 | 13,091,262 | 1.07 | 8.103 | 628 | 83.43 | 356 | 89.58 |
| North Carolina | 105 | 12,105,342 | 0.99 | 8.737 | 612 | 84.59 | 354 | 79.08 |
| District of Columbia | 40 | 10,951,677 | 0.89 | 8.513 | 631 | 79.09 | 356 | 39.80 |
| Ohio | 65 | 8,304,100 | 0.68 | 8.508 | 625 | 85.98 | 353 | 72.58 |
| Wisconsin | 54 | 6,055,327 | 0.49 | 9.165 | 622 | 85.28 | 353 | 65.57 |
| Rhode Island | 25 | 5,400,102 | 0.44 | 8.319 | 613 | 80.65 | 355 | 61.79 |
| South Carolina | 43 | 5,335,242 | 0.43 | 8.894 | 602 | 83.28 | 350 | 76.94 |
| Indiana | 47 | 5,257,245 | 0.43 | 8.990 | 613 | 84.35 | 353 | 62.96 |
| Oregon | 29 | 5,025,455 | 0.41 | 7.991 | 622 | 80.35 | 356 | 84.16 |
| Tennessee | 37 | 4,701,251 | 0.38 | 8.165 | 636 | 83.34 | 355 | 85.63 |
| Missouri | 47 | 4,416,211 | 0.36 | 9.614 | 611 | 82.75 | 352 | 49.11 |
| New Mexico | 19 | 3,594,439 | 0.29 | 8.071 | 626 | 83.18 | 355 | 86.83 |
| Idaho | 25 | 3,496,715 | 0.28 | 8.468 | 610 | 82.97 | 353 | 65.26 |
| New Hampshire | 16 | 2,904,528 | 0.24 | 8.777 | 562 | 80.01 | 355 | 77.09 |
| Utah | 14 | 2,696,641 | 0.22 | 7.772 | 654 | 84.90 | 338 | 85.65 |
| Delaware | 13 | 2,088,127 | 0.17 | 9.416 | 570 | 81.88 | 354 | 43.26 |
| West Virginia | 10 | 1,258,064 | 0.10 | 8.928 | 580 | 82.08 | 355 | 75.01 |
| Oklahoma | 6 | 763,893 | 0.06 | 9.007 | 604 | 84.78 | 356 | 34.56 |
| Kentucky | 6 | 686,386 | 0.06 | 9.020 | 655 | 89.08 | 321 | 79.72 |
| Arkansas | 5 | 558,769 | 0.05 | 8.753 | 575 | 82.82 | 354 | 76.55 |
| Maine | 2 | 465,519 | 0.04 | 8.949 | 607 | 89.98 | 356 | 64.42 |
| Kansas | 4 | 452,919 | 0.04 | 8.856 | 575 | 87.00 | 355 | 100.00 |
| Vermont | 3 | 387,617 | 0.03 | 8.933 | 602 | 70.39 | 355 | 0.00 |
| Iowa | 5 | 372,287 | 0.03 | 8.968 | 595 | 86.82 | 345 | 100.00 |
| Nebraska | 2 | 239,637 | 0.02 | 8.095 | 619 | 84.12 | 354 | 100.00 |
| Total/Weighted Average: | 5,714 | $ 1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

S-71

### Original Prepayment Penalty Term of the Mortgage Loans

| Original Prepayment Penalty Term (mos.) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| No Prepayment Penalty | 2,241 | $ 475,713,716 | 38.74% | 8.679% | 629 | 81.74% | 355 | 48.71% |
| 12 | 313 | 88,938,459 | 7.24 | 8.253 | 640 | 80.29 | 354 | 57.06 |
| 24 | 2,462 | 513,105,637 | 41.78 | 8.461 | 622 | 81.11 | 355 | 55.80 |
| 30 | 5 | 1,035,424 | 0.08 | 7.885 | 632 | 85.16 | 356 | 100.00 |
| 36 | 693 | 149,249,108 | 12.15 | 7.818 | 638 | 80.69 | 354 | 70.69 |
| Total/Weighted Average: | 5,714 | $ 1,228,042,345 | 100.00% | 8.452% | 628 | 81.25% | 355 | 54.99% |

### Margin of the Mortgage Loans - ARM Loans

| Margin (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 3.000 - 3.499 | 4 | $ 1,659,999 | 0.17% | 5.577% | 657 | 80.00% | 356 | 100.00% |
| 3.500 - 3.999 | 17 | 5,785,176 | 0.58 | 5.891 | 653 | 77.46 | 355 | 88.95 |
| 4.000 - 4.499 | 76 | 27,671,160 | 2.77 | 6.487 | 666 | 80.27 | 355 | 100.00 |
| 4.500 - 4.999 | 245 | 76,422,022 | 7.64 | 6.930 | 656 | 79.47 | 355 | 88.82 |
| 5.000 - 5.499 | 477 | 140,431,405 | 14.04 | 7.464 | 643 | 80.09 | 355 | 79.23 |
| 5.500 - 5.999 | 647 | 184,003,979 | 18.40 | 7.921 | 635 | 80.69 | 356 | 51.63 |
| 6.000 - 6.499 | 717 | 196,662,625 | 19.67 | 8.416 | 633 | 81.62 | 355 | 38.60 |
| 6.500 - 6.999 | 1,691 | 367,363,092 | 36.74 | 9.339 | 593 | 79.29 | 355 | 37.24 |
| Total/Weighted Average: | 3,874 | $ 999,999,458 | 100.00% | 8.344% | 623 | 80.15% | 355 | 52.13% |

### Minimum Rate of the Mortgage Loans - ARM Loans

| Minimum Rate (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 5.000 - 5.499 | 1 | $ 488,000 | 0.05% | 5.450% | 665 | 80.00% | 356 | 100.00% |
| 5.500 - 5.999 | 18 | 6,041,304 | 0.60 | 5.815 | 646 | 79.19 | 355 | 97.07 |
| 6.000 - 6.499 | 39 | 13,712,889 | 1.37 | 6.302 | 669 | 79.39 | 355 | 96.63 |
| 6.500 - 6.999 | 205 | 69,703,461 | 6.97 | 6.809 | 662 | 79.42 | 355 | 93.32 |
| 7.000 - 7.499 | 343 | 101,905,701 | 10.19 | 7.264 | 646 | 79.90 | 356 | 82.30 |
| 7.500 - 7.999 | 688 | 202,801,075 | 20.28 | 7.764 | 638 | 80.65 | 355 | 60.27 |
| 8.000 - 8.499 | 630 | 168,971,476 | 16.90 | 8.270 | 635 | 81.78 | 355 | 41.12 |
| 8.500 - 8.999 | 821 | 211,607,358 | 21.16 | 8.744 | 620 | 81.41 | 355 | 35.19 |
| 9.000 - 9.499 | 474 | 106,399,748 | 10.64 | 9.242 | 599 | 80.64 | 355 | 37.48 |
| 9.500 - 9.999 | 364 | 73,456,609 | 7.35 | 9.729 | 564 | 77.65 | 355 | 41.93 |
| 10.000 - 10.499 | 123 | 18,129,152 | 1.81 | 10.205 | 551 | 75.68 | 355 | 34.04 |
| 10.500 - 10.999 | 78 | 12,854,685 | 1.29 | 10.690 | 543 | 73.11 | 355 | 21.61 |
| 11.000 - 11.499 | 32 | 4,982,885 | 0.50 | 11.204 | 543 | 65.14 | 355 | 38.00 |
| 11.500 - 11.999 | 39 | 6,179,018 | 0.62 | 11.724 | 541 | 60.26 | 355 | 60.05 |
| 12.000 - 12.499 | 15 | 2,247,303 | 0.22 | 12.206 | 533 | 63.71 | 355 | 45.69 |
| 12.500 - 12.999 | 2 | 359,212 | 0.04 | 12.733 | 517 | 51.61 | 356 | 100.00 |
| 13.500 - 13.999 | 1 | 89,633 | 0.01 | 13.950 | 546 | 65.00 | 356 | 0.00 |
| 14.000 - 14.499 | 1 | 69,949 | 0.01 | 14.100 | 532 | 50.00 | 356 | 0.00 |
| Total/Weighted Average: | 3,874 | $ 999,999,458 | 100.00% | 8.344% | 623 | 80.15% | 355 | 52.13% |

S-72

CONFIDENTIAL

FHFA04178927
A3-10013223073

## Maximum Rate of the Mortgage Loans - ARM Loans

| Maximum Rate (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 11.000 - 11.499 ........... | 1 | $ 488,000 | 0.05% | 5.450% | 665 | 80.00% | 356 | 100.00% |
| 11.500 - 11.999 ........... | 18 | 6,041,304 | 0.60 | 5.815 | 646 | 79.19 | 355 | 97.07 |
| 12.000 - 12.499 ........... | 40 | 13,959,891 | 1.40 | 6.357 | 667 | 79.57 | 355 | 96.69 |
| 12.500 - 12.999 ........... | 204 | 69,527,652 | 6.95 | 6.803 | 662 | 79.40 | 355 | 93.31 |
| 13.000 - 13.499 ........... | 343 | 101,905,701 | 10.19 | 7.264 | 646 | 79.90 | 356 | 82.30 |
| 13.500 - 13.999 ........... | 687 | 202,680,106 | 20.27 | 7.764 | 638 | 80.65 | 355 | 60.25 |
| 14.000 - 14.499 ........... | 629 | 168,868,041 | 16.89 | 8.269 | 635 | 81.78 | 355 | 41.09 |
| 14.500 - 14.999 ........... | 822 | 211,728,327 | 21.17 | 8.743 | 620 | 81.41 | 355 | 35.23 |
| 15.000 - 15.499 ........... | 475 | 106,431,991 | 10.64 | 9.241 | 599 | 80.64 | 355 | 37.50 |
| 15.500 - 15.999 ........... | 364 | 73,456,609 | 7.35 | 9.729 | 564 | 77.65 | 355 | 41.93 |
| 16.000 - 16.499 ........... | 121 | 17,777,208 | 1.78 | 10.201 | 551 | 75.76 | 355 | 34.71 |
| 16.500 - 16.999 ........... | 79 | 12,972,220 | 1.30 | 10.688 | 544 | 73.08 | 355 | 21.42 |
| 17.000 - 17.499 ........... | 33 | 5,217,294 | 0.52 | 11.166 | 543 | 65.47 | 355 | 36.29 |
| 17.500 - 17.999 ........... | 39 | 6,179,018 | 0.62 | 11.724 | 541 | 60.26 | 355 | 60.05 |
| 18.000 - 18.499 ........... | 15 | 2,247,303 | 0.22 | 12.206 | 533 | 63.71 | 355 | 43.69 |
| 18.500 - 18.999 ........... | 2 | 359,212 | 0.04 | 12.733 | 517 | 51.61 | 356 | 100.00 |
| 19.500 - 19.999 ........... | 1 | 89,633 | 0.01 | 13.950 | 546 | 65.00 | 356 | 0.00 |
| 20.000 - 20.499 ........... | 1 | 69,949 | 0.01 | 14.100 | 532 | 50.00 | 356 | 0.00 |
| Total/Weighted Average: ....... | 3,874 | $ 999,999,458 | 100.00% | 8.344% | 623 | 80.15% | 355 | 52.13% |

## Life Cap of the Mortgage Loans - ARM Loans

| Life Cap (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 3.000 - 3.499 ........... | 1 | $ 247,002 | 0.02% | 9.450% | 550 | 90.00% | 356 | 100.00% |
| 5.500 - 5.999 ........... | 3 | 575,118 | 0.06 | 8.825 | 641 | 95.73 | 356 | 100.00 |
| 6.000 - 6.499 ........... | 3,867 | 998,718,525 | 99.87 | 8.343 | 623 | 80.14 | 355 | 52.09 |
| 7.000 - 7.499 ........... | 3 | 458,813 | 0.05 | 9.163 | 555 | 77.20 | 354 | 48.91 |
| Total/Weighted Average: ....... | 3,874 | $ 999,999,458 | 100.00% | 8.344% | 623 | 80.15% | 355 | 52.13% |

## First Periodic Cap of the Mortgage Loans - ARM Loans

| First Periodic Cap (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 2.000 - 2.499 ........... | 1,674 | $ 443,014,972 | 44.30% | 8.417% | 619 | 80.00% | 355 | 50.21% |
| 3.000 - 3.499 ........... | 2,200 | 556,984,486 | 55.70 | 8.286 | 626 | 80.27 | 356 | 53.66 |
| Total/Weighted Average: ....... | 3,874 | $ 999,999,458 | 100.00% | 8.344% | 623 | 80.15% | 355 | 52.13% |

S-73

## Periodic Cap of the Mortgage Loans - ARM Loans

| Periodic Cap (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 1.000 - 1.499 ...................... | 1 | $ 785,962 | 0.08% | 8.600% | 599 | 90.00% | 355 | 100.00% |
| 1.500 - 1.999 ...................... | 3,873 | 999,213,496 | 99.92 | 8.344 | 623 | 80.14 | 355 | 52.09 |
| Total/Weighted Average: ........ | 3,874 | $ 999,999,458 | 100.00% | 8.344% | 623 | 80.15% | 355 | 52.13% |

## Next Rate Adjustment Date of the Mortgage Loans - ARM Loans

| Next Rate Adjustment Date | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| September 2007 ....................... | 1 | $ 246,070 | 0.02% | 7.850% | 568 | 90.00% | 347 | 100.00% |
| December 2007 ....................... | 5 | 780,550 | 0.08 | 8.531 | 574 | 75.92 | 350 | 59.10 |
| January 2008 ....................... | 14 | 3,835,051 | 0.38 | 8.452 | 614 | 82.57 | 351 | 37.07 |
| February 2008 ....................... | 54 | 12,316,816 | 1.23 | 8.759 | 588 | 77.06 | 352 | 60.58 |
| March 2008 ....................... | 130 | 31,692,995 | 3.17 | 8.703 | 607 | 79.60 | 353 | 52.28 |
| April 2008 ....................... | 275 | 78,672,705 | 7.87 | 8.305 | 626 | 80.02 | 354 | 43.11 |
| May 2008 ....................... | 943 | 244,682,373 | 24.47 | 8.381 | 620 | 80.59 | 355 | 53.08 |
| June 2008 ....................... | 2,397 | 610,612,040 | 61.06 | 8.315 | 626 | 80.04 | 356 | 52.15 |
| March 2009 ....................... | 2 | 730,738 | 0.07 | 8.097 | 603 | 80.96 | 353 | 100.00 |
| April 2009 ....................... | 3 | 1,574,480 | 0.16 | 8.684 | 645 | 86.55 | 354 | 43.67 |
| May 2009 ....................... | 13 | 4,046,084 | 0.40 | 8.306 | 616 | 81.42 | 355 | 73.73 |
| June 2009 ....................... | 27 | 9,010,148 | 0.90 | 7.777 | 640 | 80.69 | 356 | 78.50 |
| February 2011 ....................... | 1 | 50,338 | 0.01 | 10.200 | 670 | 90.00 | 352 | 100.00 |
| March 2011 ....................... | 1 | 90,143 | 0.01 | 9.850 | 595 | 82.05 | 353 | 100.00 |
| May 2011 ....................... | 3 | 427,115 | 0.04 | 8.776 | 568 | 63.37 | 355 | 56.64 |
| June 2011 ....................... | 5 | 1,231,814 | 0.12 | 7.688 | 618 | 81.86 | 356 | 87.84 |
| Total/Weighted Average: ........ | 3,874 | $ 999,999,458 | 100.00% | 8.344% | 623 | 80.15% | 355 | 52.13% |

S-74

**The Index on the Mortgage Loans**

All of the adjustable-rate Mortgage Loans will adjust semi-annually based on Six-Month LIBOR. Six-Month LIBOR will be a per annum rate equal to the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market based on quotations of major banks as published in The Wall Street Journal and are most recently available as of the time specified in the related mortgage note.

Listed below are historical values of certain average yields, which are related to Six-Month LIBOR. The monthly averages shown are intended only to provide an historical summary of the movements in Six-Month LIBOR and may not be indicative of future rates. The values shown below have been obtained from Bloomberg L.P. and may not be identical to Six-Month LIBOR as published by a different source for the same period.

| | Six-Month LIBOR | | | | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| January | 5.26250% | 2.03375% | 1.34875% | 1.21375% | 2.96000% | 4.81000% |
| February | 4.90750 | 2.03000 | 1.34000 | 1.17000 | 3.16000 | 4.99000 |
| March | 4.71000 | 2.33000 | 1.23125 | 1.16000 | 3.40000 | 5.14000 |
| April | 4.30250 | 2.12000 | 1.29000 | 1.38000 | 3.40875 | 5.22000 |
| May | 3.98000 | 2.08000 | 1.21375 | 1.57750 | 3.53750 | 5.33000 |
| June | 3.90875 | 1.95625 | 1.11938 | 1.94000 | 3.71000 | 5.58938 |
| July | 3.68875 | 1.87000 | 1.14625 | 1.98000 | 3.92375 | 5.51000 |
| August | 3.45250 | 1.79500 | 1.19750 | 1.99000 | 4.05500 | 5.43125 |
| September | 2.52250 | 1.71000 | 1.18000 | 2.19625 | 4.23063 | 5.37000 |
| October | 2.14625 | 1.60000 | 1.23000 | 2.31250 | 4.46625 | |
| November | 2.03000 | 1.46875 | 1.25875 | 2.63500 | 4.60063 | |
| December | 1.98125 | 1.38000 | 1.22000 | 2.78063 | 4.70000 | |

In the event that the Index specified in a mortgage note is no longer available, an index that is based on comparable information will be selected by the related servicer, to the extent that it is permissible under the terms of the related Mortgage and mortgage note.

**The Originator**

All of the Mortgage Loans were originated by Fremont Investment & Loan ("Fremont"). The information in this section has been provided to the depositor by Fremont.

Fremont is a California industrial bank headquartered in Brea, California. Fremont currently operates wholesale residential real estate loan production offices located in Anaheim, California; Concord, California; Downers Grove, Illinois; Westchester County, New York; and Tampa, Florida. Fremont conducts business in 45 states and the District of Columbia and its primary source of originations is through licensed mortgage brokers.

Established in 1937, Fremont is currently engaged in the business of residential sub-prime real estate lending and commercial real estate lending. Acquired in 1990, Fremont is an indirect subsidiary of Fremont General Corporation, a financial services holding company listed on the New York Stock Exchange. As of June 30, 2006, Fremont had approximately $12.65 billion in

CONFIDENTIAL

FHFA04178930
A3-10013223076

assets, approximately $11.06 billion in liabilities and approximately $1.59 billion in equity.  As part of its residential subprime mortgage loan origination program, Fremont either

- sells its mortgage loans to third parties in whole loan sales transactions,

- transfers such loans in connection with a securitization, or

- retains the loans for long term investment.

Originations

Fremont has been originating sub-prime residential mortgage loans since May 1994 and substantially all of its residential mortgage loan originations consist of sub-prime mortgage loans.  Fremont's sub-prime residential originations totaled approximately $6.94 billion, $13.74 billion, $23.91 billion and $36.24 billion for the years ended 2002, 2003, 2004 and 2005, respectively, and approximately $18.08 billion for the first six months ended June 30, 2006.

Underwriting Guidelines

All of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this section.  The following is a summary of the underwriting guidelines believed by the depositor to have been applied, with some variation, by Fremont.  This summary does not purport to be a complete description of the underwriting guidelines of Fremont.

Substantially all of the mortgage loans originated by Fremont are based on loan application packages submitted through licensed mortgage brokers.  These brokers must meet minimum standards set by Fremont based on an analysis of the following information submitted with an application for approval: applicable state lending license (in good standing), signed broker application and agreement, and signed broker authorization.  Once approved, licensed mortgage brokers are eligible to submit loan application packages in compliance with the terms of a signed broker agreement.

Mortgage loans are underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ("**Scored Programs**"), subject to various exceptions as described in this section.  Fremont began originating mortgage loans pursuant to Scored Programs in 2001 and the Scored Programs have been the exclusive type of origination programs beginning in 2004.  Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment.  All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market.

The Scored Programs were developed to simplify the origination process.  In contrast to assignment of credit grades according to traditional non-agency credit assessment methods, i.e., mortgage and other credit delinquencies, the Scored Programs rely upon a borrower's Credit Score, mortgage payment history and seasoning on any bankruptcy/foreclosure initially to determine a borrower's likely future credit performance.  Licensed mortgage brokers are able to access Credit

S-76

FHFA04178931
A3-10013223077

Scores at the initial phases of the loan application process and use the Credit Score to determine the interest rates a borrower may qualify for based upon Fremont's Scored Programs risk-based pricing matrices. Final loan terms are subject to approval by Fremont.

Under the Scored Programs, Fremont requires credit reports for each borrower, using the Credit Score of the primary borrower (the borrower with the highest percentage of total income) to determine program eligibility. Credit Scores must be requested from each national credit repository. For the purpose of determining program eligibility,

- if Credit Scores are available from all three credit repositories, the middle of the three Credit Scores is used,

- if Credit Scores are available from only two of the repositories, the lower of the two Credit Scores is used, and

- if a single Credit Score is available, the single Credit Score will be used; however, potential borrowers with a single Credit Score will not qualify for loan amounts in excess of $800,000, loans with loan-to-value ratios in excess of 90% or 80% (depending on type of program) and second mortgage loans with loan-to-value ratios in excess of 5%.

Generally, the minimum applicable Credit Score allowed is 500, however borrowers with no Credit Scores are not automatically rejected and may be eligible for certain loan programs in appropriate circumstances.

All of the mortgage loans were underwritten by Fremont's underwriters having the appropriate approval authority. Each underwriter is granted a level of authority commensurate with their proven judgment, experience and credit skills. On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions.

There are three documentation types, Full Documentation ("**Full Documentation**"), Easy Documentation ("**Easy Documentation**") and Stated Income ("**Stated Income**"). Fremont's underwriters verify the income of each applicant under various documentation types as follows: under Full Documentation, applicants are generally required to submit verification of stable income for the periods of one to two years preceding the application dependent on credit profile; under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements; under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application. The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work.

Fremont originates loans secured by 1-4 unit residential properties made to eligible borrowers with a vested fee simple (or in some cases a leasehold) interest in the property. Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if

S-77

FHFA04178932
A3-10013223078

appropriate, a review appraisal. Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states. Review appraisals may only be provided by appraisers approved by Fremont. In some cases, Fremont relies on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont. Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises.

Fremont requires title insurance on all first mortgage loans, which are secured by liens on real property. Fremont also requires that fire and extended coverage casualty insurance be maintained on the secured property in an amount at least equal to the principal balance of the related loan or the replacement cost of the property, whichever is less.

Fremont conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing review findings and level of error is sent monthly to each loan production office for response. The review findings and branch responses are then reviewed by Fremont's senior management. Adverse findings are tracked monthly. This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training.

*Balloon Loans.* The majority of loans originated by Fremont provide for the full amortization of the principal amount on the final maturity date. Beginning in September 2005, Fremont began originating certain mortgage loans that do not provide for full amortization prior to maturity, where the payment of any remaining unamortized principal balance is due in a single or balloon payment at maturity. These balloon loans originated by Fremont provide for amortization of principal based on a 40 year period with a term to maturity of 30 years ("**40/30 Loans**").

*Second Lien Mortgage Loans.* Fremont currently has two programs for the origination of second lien mortgage loans. The current programs are limited to loans that are originated contemporaneously with the origination of a loan secured by a first lien. The first program allows for loans with up to 5% loan to value and maximum combined loan to values of 95%. This program is limited to borrowers with minimum Credit Scores of 600, credit grades of at least "C" and debt to income ratios not greater than 50%. Permissible loan balances for this program are from $15,000 to $44,444. The maximum term on these loans is 10 to 30 years; provided, that a 15 year amortization term is available only for Full Documentation or Easy Documentation loans with an original loan balance of $15,000 or greater. Terms over 15 years are available only for Full Documentation or Easy Documentation loans with an original loan balance of $25,000 or greater. Loans under this program are available for "owner occupied" or "non-owner occupied" properties.

The second program is for borrowers with minimum Credit Scores of 600. This program allows for loans of up to 20% loan to value and 100% maximum combined loan to values

S-78

CONFIDENTIAL

and is limited to borrowers in credit grades of "A+" and "A" and debt ratios not greater than 50%. Permissible loan balances for this program are from $15,000 to $200,000. Combined loan balances (first and second lien mortgage loans) of up to $1,000,000 are allowed to borrowers under Full Documentation that have Credit Scores of 600 and greater or Stated Documentation loans that have Credit Scores of 640 and greater. In addition, permissible loan balances from $15,000 to $250,000 are allowed for Full Documentation borrowers with Credit Scores of 640 or greater. Combined loan balances (first and second lien mortgage loans) of up to $1,250,000 are allowed. The loans are available with amortization terms of 10, 15, 20 and 30 years, however loan balances must be at least $25,000 to qualify for an amortization term of 20 years or longer. Rural properties and properties in Alaska are not allowed under this program.

Fremont recently discontinued an additional second lien mortgage program that was a stand alone program for borrowers with Credit Scores in excess of 580. This program allowed for loans of 20% loan to value and 100% maximum combined loan to values and was limited to borrowers in credit grades of "A+" and "A" and debt ratios not greater than 50%. Permissible loan balances for this program were from $10,000 to $125,000. Combined loan balances (first and second lien mortgage loans) of up to $625,000 were allowed to borrowers under Full Documentation loans that had Credit Scores of 620 and greater. The limit on the combined loan balances was $500,000 for Stated Income loans; provided that no Stated Income loan may have been a borrower with a Credit Score of less than 620. The loans were available with amortization terms of 10, 15, 20 and 30 years, however loan balances must have been at least $25,000 to qualify for a 20 year amortization term and at least $50,000 for a 30 year amortization term. Rural properties and properties in Alaska were not allowed under this program.

**Risk Categories**

Fremont's underwriting guidelines under the Scored Programs with respect to each rating category generally require:

- debt to income ratios of 55% or less on mortgage loans with loan-to-value ratios of 90% or less, however, debt to income ratios of 50% or less are required on loan-to-value ratios greater than 90%;

- applicants have a Credit Score of at least 500;

- that no liens or judgments affecting title may remain open after the funding of the loan, other than liens in favor of the internal revenue service that are subordinated to the loan; and

- that any collection, charge-off, or judgment not affecting title that is less than 1 year old must be paid in connection with closing if either its balance is greater than $1,000 or the aggregate balances of all such collections, charge-offs or judgments are greater than $2,500.

In addition, the various risk categories generally have the following criteria for borrower eligibility:

"A+." Under the "A+" category, an applicant must have no 30-day late mortgage payments within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 100% with a

CONFIDENTIAL

FHFA04178934
A3-10013223080

minimum Credit Score of 600. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"A." Under the "A" category, an applicant must have not more than one 30-day late mortgage payment within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 100% with a minimum Credit Score of 600. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"A-." Under the "A-" category, an applicant must have not more than three 30-day late mortgage payments within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 90% with a minimum Credit Score of 550. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"B." Under the "B" category, an applicant must have not more than one 60-day late mortgage payment within the last 12 months and it must be at least 18 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 90% with a Credit Score of 550. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"C." Under the "C" category, an applicant must have not more than one 90-day late mortgage payment within the last 12 months and it must be at least 12 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum permitted loan-to-value ratio is 85% with a minimum Credit Score of 580. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"C-." Under the "C-" category, an applicant must not be more than 150 days delinquent with respect to its current mortgage payment and it must not be subject of a Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum permitted loan-to-value ratio is 70% with a minimum Credit Score of 500. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"D." Under the "D" category, an applicant must not be more than 180 days delinquent with respect to its current mortgage payment. Any Chapter 7 or Chapter 13 bankruptcy proceedings and/or foreclosure actions must be paid in connection with closing. The maximum permitted loan-to-value ratio is 65% with a minimum Credit Score of 500. The maximum permitted loan-to-value ratio is reduced to 60% if the property is currently subject to foreclosure proceedings.

**Underwriting Standards of the Sponsor**

All of the Mortgage Loans have been purchased by the sponsor from the Originator and were originated generally in accordance with the underwriting criteria described in this section.

S-80

FHFA04178935
A3-10013223081

All of the Mortgage Loans are "conventional mortgage loans" (i.e., loans which are not insured by the Federal Housing Authority ("FHA") or partially guaranteed by the Department of Veteran Affairs ("VA")).

The underwriting standards applicable to the Mortgage Loans typically differ from, and are, with respect to a substantial number of Mortgage Loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, credit score, required documentation, interest rates, borrower occupancy of the mortgaged property, and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the Mortgage Loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower.

Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources. With respect to mortgaged properties consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes.  In the case of certain borrowers with acceptable compensating factors, income and/or assets may not be required to be stated (or verified) in connection with the loan application.

Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage not in excess of 60% of the prospective borrower's gross income. The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria, including, without limitation, the loan-to-value ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the borrower after origination.

Approximately 26.59% of the first lien Mortgage Loans, by aggregate principal balance as of the Cut-off Date, had loan-to-value ratios at origination in excess of 80% and do not have mortgage insurance. Generally, no such mortgage insurance policy will be required with respect to any such Mortgage Loan after the date on which the related loan-to-value ratio decreases to 80% or less or, based upon a new appraised value. All of the insurers that have issued mortgage insurance

S-81

FHFA04178936
A3-10013223082

policies with respect to the Mortgage Loans meet Fannie Mae or Freddie Mac standards or are otherwise acceptable to the Rating Agencies.

The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure standards established by the originator. The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the Mortgaged Property and to verify whether the Mortgaged Property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property.

**Modified Standards**

In comparison to the "general" underwriting standards described above, the underwriting standards applicable to mortgage loans under an "alternative" mortgage loan underwriting program permit different underwriting criteria, additional types of mortgaged properties or categories of borrowers such as "foreign nationals" without a credit score who hold certain types of visas and have acceptable credit references (such Mortgage Loans, "Foreign National Loans"), and include certain other less restrictive parameters. Generally, relative to the "general" underwriting standards, these standards include higher loan amounts, higher maximum loan-to-value ratios, higher maximum "combined" loan-to-value ratios (in each case, relative to mortgage loans with otherwise similar characteristics) in cases of simultaneous primary and secondary financings, less restrictive requirements for "equity take out" refinancings, the removal of limitations on the number of permissible mortgage loans that may be extended to one borrower and the ability to originate mortgage loans with loan-to-value ratios in excess of 80% without the requirement to obtain mortgage insurance if such loans are secured by investment properties. Under a program available to eligible borrowers who meet certain underwriting criteria and for which program a minimum down payment of only 3.00% is required, mortgage loans may be originated with loan-to-value ratios between 95.01% and 97.00% with the application of less restrictive maximum qualifying ratios of borrower monthly housing debt or total monthly debt obligations to borrower monthly income and reduced minimum requirements for mortgage insurance coverage. In addition, under a program available to eligible borrowers who meet certain underwriting criteria, mortgage loans may be originated with loan-to-value ratios of up to 100% with no down payment or a nominal down payment.

Certain of the Mortgage Loans have been originated under reduced documentation, no-documentation or no-ratio programs, which require less documentation and verification than do traditional full documentation programs. Generally, under a reduced documentation program, verification of either a borrower's income or assets, but not both, is undertaken by the originator. Under a no-ratio program, certain borrowers with acceptable compensating factors will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a no-documentation program, no verification of a borrower's income or assets is undertaken by the originator. The underwriting for such Mortgage

S-82

FHFA04178937
A3-10013223083

Loans may be based primarily or entirely on an appraisal of the Mortgaged Property, the loan-to-value ratio at origination and/or the borrower's credit score.

Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans.

**Credit Scores**

Credit scores are obtained by many lenders in connection with mortgage loan applications to help them assess a borrower's creditworthiness (the "Credit Scores"). Credit Scores are generated by models developed by a third party which analyzed data on consumers in order to establish patterns which are believed to be indicative of the borrower's probability of default. The Credit Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit, and bankruptcy experience. Credit Scores range from approximately 450 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. However, a Credit Score purports only to be a measurement of the relative degree of risk a borrower represents to a lender, i.e., a borrower with a higher score is statistically expected to be less likely to default in payment than a borrower with a lower score. Lenders have varying ways of analyzing Credit Scores and, as a result, the analysis of Credit Scores across the industry is not consistent. In addition, it should be noted that Credit Scores were developed to indicate a level of default probability over a two year period, which does not correspond to the life of a mortgage loan. Furthermore, Credit Scores were not developed specifically for use in connection with mortgage loans, but for consumer loans in general, and assess only the borrower's past credit history. Therefore, a Credit Score does not take into consideration the effect of mortgage loan characteristics (which may differ from consumer loan characteristics) on the probability of repayment by the borrower. There can be no assurance that the Credit Scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans.

**Additional Information Concerning the Mortgage Loans**

The description in this prospectus supplement of the Mortgage Pool and the Mortgaged Properties is based upon the Mortgage Pool as constituted as of the close of business on the Cut-off Date, as adjusted for the scheduled principal payments due on or before such date. Prior to the issuance of the certificates, Mortgage Loans may be removed from the Mortgage Pool as a result of incomplete documentation or otherwise if the depositor deems the removal necessary or desirable, and may be prepaid at any time. A limited number of other mortgage loans may be included in the Mortgage Pool prior to the issuance of the certificates unless including these mortgage loans would materially alter the characteristics of the Mortgage Pool as described in this prospectus supplement. The depositor believes that the information set forth in this prospectus supplement will be representative of the characteristics of the Mortgage Pool as it will be constituted at the time the certificates are issued, although the range of Mortgage Rates and maturities and other characteristics of the Mortgage Loans may vary.

CONFIDENTIAL

FHFA04178938
A3-10013223084

## DESCRIPTION OF THE CERTIFICATES

**General**

      The trust will issue the certificates pursuant to the pooling and servicing agreement. The certificates consist of (i) the Class I-A-1 Certificates (also referred to in this prospectus supplement as the "Group I Certificates"), (ii) the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates (also referred to collectively in this prospectus supplement as the "Group II Certificates"), (iii) the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates (collectively, the "Mezzanine Certificates"), (iv) the Class B-1 Certificates and Class B-2 Certificates (collectively, the "Class B Certificates"), (v) the Class P Certificates, (vi) the Class X Certificates and (vii) the Residual Certificates.  The Group I Certificates and Group II Certificates are also referred to together in this prospectus supplement as the "Senior Certificates".  The Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates are also collectively referred to in this prospectus supplement as the "Subordinate Certificates". The Senior Certificates and the Mezzanine Certificates are also referred to collectively in this prospectus supplement as the "Offered Certificates".

      The Class P Certificates will have an initial certificate principal balance of $100 and will be entitled to all Prepayment Charges received in respect of the Mortgage Loans.

      The trust will issue the Senior Certificates and Subordinate Certificates in book-entry form as described below, in minimum dollar denominations of $25,000 and integral multiples of $1 in excess thereof, except that one certificate of each class may be issued in the remainder of the class.

**Book-Entry Registration**

      The Senior Certificates and Subordinate Certificates will be issued in book-entry form. Persons acquiring beneficial ownership interests in the book-entry securities will hold their securities through The Depository Trust Company in the United States and through Clearstream, Luxembourg or the Euroclear System in Europe, if they are participants of any of such systems, or indirectly through organizations which are participants. The Depository Trust Company is referred to as "DTC". Clearstream, Luxembourg is referred to as "Clearstream". The Euroclear System is referred to as "Euroclear".  The book-entry securities will be issued in one or more certificates that equal the aggregate principal balance of the applicable class or classes of securities and will initially be registered in the name of Cede & Co., the nominee of DTC. Clearstream and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream's and Euroclear's names on the books of their respective depositaries that in turn will hold such positions in customers' securities accounts in the depositaries' names on the books of DTC. Citibank N.A. will act as the relevant depositary for Clearstream and JPMorgan Chase Bank, N.A. will act as the relevant depositary for Euroclear. Except as described below, no person acquiring a book-entry security will be entitled to receive a physical certificate representing such security. Unless and until physical securities are issued, it is anticipated that the only "securityholder" with respect to a book-entry security will be Cede & Co., as nominee of DTC. Beneficial owners are only permitted to exercise their rights indirectly through participants and DTC.

      An Owner's ownership of a book-entry security will be recorded on the records of the brokerage firm, bank, thrift institution or other financial intermediary (each, a "Financial

S-84

FHFA04178939
A3-10013223085

Intermediary") that maintains the beneficial owner's account for such purpose. In turn, the Financial Intermediary's ownership of such book-entry security will be recorded on the records of DTC (or of a DTC participant that acts as agent for the Financial Intermediary, whose interest will in turn be recorded on the records of DTC, if the beneficial owner's Financial Intermediary is not a DTC participant and on the records of Clearstream or Euroclear, as appropriate).

Beneficial owners will receive all distributions allocable to principal and interest with respect to the book-entry securities from the securities administrator through DTC and DTC participants. While the book-entry securities are outstanding (except under the circumstances described below), under the rules, regulations and procedures creating, governing and affecting DTC and its operations (the "Rules"), DTC is required to make book-entry transfers among participants on whose behalf it acts with respect to the securities. DTC is required to receive and transmit distributions allocable to principal and interest with respect to the securities. Participants and Financial Intermediaries with whom beneficial owners have accounts with respect to securities are similarly required to make book-entry transfers and receive and transmit such distributions on behalf of their respective beneficial owners. Accordingly, although beneficial owners will not possess physical certificates, the Rules provide a mechanism by which beneficial owners will receive distributions and will be able to transfer their beneficial ownership interests in the securities.

Beneficial owners will not receive or be entitled to receive Definitive Securities, except under the limited circumstances described below. Unless and until Definitive Securities are issued, beneficial owners who are not participants may transfer ownership of securities only through participants and Financial Intermediaries by instructing such participants and Financial Intermediaries to transfer beneficial ownership interests in the securities by book-entry transfer through DTC for the account of the purchasers of such securities, which account is maintained with their respective participants or Financial Intermediaries. Under the Rules and in accordance with DTC's normal procedures, transfers of ownership of securities will be executed through DTC and the accounts of the respective participants at DTC will be debited and credited. Similarly, the participants and Financial Intermediaries will make debits or credits, as the case may be, on their records on behalf of the selling and purchasing beneficial owners.

Because of time zone differences, credits of securities received in Clearstream or Euroclear as a result of a transaction with a participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Such credits or any transactions in such securities settled during such processing will be reported to the relevant Euroclear or Clearstream participants on such business day. Cash received in Clearstream or Euroclear as a result of sales of securities by or through a Clearstream participant or Euroclear participant to a DTC participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream or Euroclear cash account only as of the business day following settlement in DTC.

Transfers between DTC participants will occur in accordance with DTC rules. Transfers between Clearstream participants and Euroclear participants will occur in accordance with their respective rules and operating procedures.

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream participants or Euroclear participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by the relevant depositary; however, such cross-market

CONFIDENTIAL

FHFA04178940
A3-10013223086

transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in such system in accordance with its rules and procedures and within its established deadlines (European time). The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to the relevant depositary to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC. Clearstream participants and Euroclear participants may not deliver instructions directly to the relevant depositaries.

DTC is a New York-chartered limited purpose trust company that performs services for its participants, some of which (and/or their representatives) own DTC. In accordance with its normal procedures, DTC is expected to record the positions held by each DTC participant in the book-entry securities, whether held for its own account or as a nominee for another person. In general, beneficial ownership of book-entry securities will be subject to the Rules as in effect from time to time.

Clearstream has advised that it is incorporated under the laws of the Grand Duchy of Luxembourg as a professional depository. Clearstream holds securities for its participating organizations or participants. Clearstream facilitates the clearance and settlement of securities transactions between Clearstream participants through electronic book-entry changes in account of Clearstream participants, eliminating the need for physical movement of securities.

Clearstream provides to Clearstream participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream interfaces with domestic markets in several countries. As a professional depository, Clearstream is subject to regulation by the Luxembourg Commission for the Supervision of the Financial Sector (the "CSSF"). Clearstream participants are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. Indirect access to Clearstream is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Clearstream participant, either directly or indirectly.

Distributions, to the extent received by the Relevant Depository for Clearstream, with respect to the securities held beneficially through Clearstream will be credited to cash accounts of Clearstream participants in accordance with its rules and procedures.

Euroclear was created in 1968 to hold securities for its participants and to clear and settle transactions between Euroclear participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for movement of physical securities and any risk from lack of simultaneous transfers of securities and cash. Transactions may be settled in any of 32 currencies, including United States dollars. Euroclear provides various other services, including securities lending and borrowing and interfaces with domestic markets in several countries generally similar to the arrangements for cross-market transfers with DTC described above. Euroclear is operated by Euroclear Bank S.A./NV under contract with Euroclear Clearance Systems S.C., a Belgian cooperative corporation. Euroclear Bank S.A./NV conducts all operations. All Euroclear securities clearance accounts and Euroclear cash accounts are accounts with Euroclear Bank S.A./NV, not Euroclear Clearance Systems S.C. Euroclear Clearance Systems S.C. establishes policy for Euroclear on behalf of Euroclear participants. Euroclear participants include banks (including central banks), securities brokers and dealers and other professional financial intermediaries. Indirect

CONFIDENTIAL

FHFA04178941
A3-10013223087

access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear participant, either directly or indirectly.

Euroclear Bank S.A./NV has advised us that it is licensed by the Belgian Banking and Finance Commission to carry out banking activities on a global basis. As a Belgian bank, it is regulated and examined by the Belgian Banking Commission.

Securities clearance accounts and cash accounts with Euroclear Bank S.A./NV are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System and applicable Belgian law. These terms and conditions, operating procedures and laws govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. Euroclear Bank S.A./NV acts under the Terms and Conditions only on behalf of Euroclear participants, and has no record of or relationship with persons holding through Euroclear participants.

The securities administrator will make distributions on the book-entry securities on each distribution date to DTC. DTC will be responsible for crediting the amount of such payments to the accounts of the applicable DTC participants in accordance with DTC's normal procedures. Each DTC participant will be responsible for disbursing such payments to the beneficial owners that it represents and to each Financial Intermediary for which it acts as agent. Each such Financial Intermediary will be responsible for disbursing funds to the beneficial owners that it represents.

Under a book-entry format, beneficial owners may experience some delay in their receipt of payments, since the securities administrator will forward such payments to Cede & Co. Distributions with respect to securities held through Clearstream or Euroclear will be credited to the cash accounts of Clearstream participants or Euroclear participants in accordance with the relevant system's rules and procedures, to the extent received by the relevant depositary. Such distributions will be subject to tax reporting in accordance with relevant United States tax laws and regulations. Because DTC can only act on behalf of DTC participants that in turn can only act on behalf of Financial Intermediaries, the ability of an Owner to pledge book-entry securities to persons or entities that do not participate in the DTC system, or otherwise take actions in respect of such book-entry securities, may be limited due to the lack of physical certificates for such book-entry securities. In addition, issuance of the book-entry securities in book-entry form may reduce the liquidity of such securities in the secondary market since certain potential investors may be unwilling to purchase securities for which they cannot obtain physical certificates.

Monthly and annual reports on the trust fund will be provided to Cede & Co., as nominee of DTC, and Cede & Co may make such reports available to beneficial owners upon request, in accordance with the Rules, and to the DTC participants to whose DTC accounts the book-entry securities of such beneficial owners are credited directly or are credited indirectly through Financial Intermediaries.

DTC has advised the securities administrator that, unless and until Definitive Securities are issued, DTC will take any action permitted to be taken by the holders of the book-entry securities under the pooling and servicing agreement only at the direction of one or more DTC participants to whose DTC accounts the book-entry securities are credited, to the extent that such actions are taken on behalf of such participants whose holdings include such book-entry securities.

CONFIDENTIAL

FHFA04178942
A3-10013223088

Clearstream or Euroclear Bank S.A./NV, as the case may be, will take any other action permitted to be taken by a holder under the pooling and servicing agreement on behalf of a Clearstream participant or Euroclear participant only in accordance with its relevant rules and procedures and subject to the ability of the relevant depositary to effect such actions on its behalf through DTC. DTC may take actions, at the direction of the related participants, with respect to some securities which conflict with actions taken with respect to other securities.

Except with respect to certain certificates not being offered by this prospectus supplement, physical certificates representing a security will be issued to beneficial owners only upon the events specified in the pooling and servicing agreement. Such events may include the following:

- we advise the securities administrator in writing that DTC is no longer willing or able properly to discharge its responsibilities as depository with respect to the securities, and that we or the trustee is unable to locate a qualified successor,

- at our option, we elect to terminate the book-entry system through DTC, or

- after the occurrence of an event of default, securityholders representing not less than 50% of the aggregate certificate principal balance or certificate notional balance, as applicable, of the applicable securities advise the trustee and DTC through participants in writing that the continuation of a book-entry system through DTC (or a successor thereto) is no longer in the best interest of the securityholders.

Upon the occurrence of any of the events specified in the pooling and servicing agreement, DTC will be required to notify all participants of the availability through DTC of physical certificates. Upon surrender by DTC of the certificates representing the securities and instruction for re-registration, the securities administrator will issue the securities in the form of physical certificates, and thereafter the securities administrator will recognize the holders of such physical certificates as securityholders. Thereafter, payments of principal of and interest on the securities will be made by the securities administrator directly to securityholders in accordance with the procedures listed in this prospectus supplement and in the pooling and servicing agreement. The final distribution of any security (whether physical certificates or securities registered in the name of Cede & Co.), however, will be made only upon presentation and surrender of such securities on the final distribution date at such office or agency as is specified in the notice of final payment to securityholders.

Although DTC, Clearstream and Euroclear have agreed to the foregoing procedures to facilitate transfers of securities among participants of DTC, Clearstream and Euroclear, they are under no obligation to perform or continue to perform such procedures and such procedures may be discontinued at any time.

Neither the trust nor the securities administrator will have any responsibility for any aspect of the records relating to or payments made on account of beneficial ownership interests of the book-entry securities held by Cede & Co., as nominee for DTC, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests or transfers thereof.

S-88

FHFA04178943
A3-10013223089

**Distributions**

*General.* On each distribution date, the securities administrator will make distributions on the certificates to the persons in whose names such certificates are registered on the related record date. For definitions of capitalized terms used in this section, see "—Glossary of Terms" in this prospectus supplement.

The securities administrator will make distributions on each distribution date by wire transfer in immediately available funds to the account of a certificateholder at a bank or other depository institution having appropriate wire transfer facilities as instructed by a certificateholder in writing in accordance with the pooling and servicing agreement. If no such instructions are given to the securities administrator, then the securities administrator will make such distributions by check mailed to the address of the person entitled thereto as it appears on the certificate register; provided, however, that the final distribution in retirement of the certificates will be made only upon presentation and surrender of such certificates at the offices of the securities administrator designated for such purposes. As of the Closing Date, the securities administrator designates its offices located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479, Attention: Nomura Home Equity Loan, Inc., Series 2006-FM2, for purposes of surrender, transfer and exchange. On each distribution date, a holder of a certificate will receive such holder's percentage interest of the amounts required to be distributed with respect to the applicable class of certificates. The percentage interest evidenced by a certificate will equal the percentage derived by dividing the denomination of such certificate by the aggregate denominations of all certificates of the applicable class.

**Glossary of Terms**

"Aggregate Loan Balance" with respect to the Mortgage Loans and any distribution date, will be equal to the aggregate of the Stated Principal Balances of the Mortgage Loans as of the last day of the related Due Period.

"Aggregate Loan Group Balance" with respect to either loan group I or loan group II and any distribution date, the aggregate of the Stated Principal Balances of the Mortgage Loans in the related loan group as of the last day of the related Due Period.

"Basis Risk Shortfall" with respect to any class of Senior Certificates and the Subordinate Certificates and any distribution date, the sum of:

(1)     the excess, if any, of the related Current Interest (calculated without regard to the applicable Net Funds Cap) over the related Current Interest (as it may have been limited by the applicable Net Funds Cap) for the applicable distribution date;

(2)     any amount described in clause (1) remaining unpaid from prior distribution dates; and

(3)     interest on the amount in clause (2) for the related Interest Accrual Period calculated on the basis of the lesser of (x) One-Month LIBOR plus the applicable Certificate Margin and (y) the applicable Maximum Interest Rate.

"Carryforward Interest" with respect to any class of Senior Certificates and the Subordinate Certificates and any distribution date, the sum of (1) the amount, if any, by which (x) the sum of (A) Current Interest for that class of certificates for the immediately preceding distribution

CONFIDENTIAL

FHFA04178944
A3-10013223090

date and (B) any unpaid Carryforward Interest for such class from previous distribution dates exceeds (y) the actual amount distributed to such class in respect of interest on the immediately preceding distribution date and (2) interest on such amount for the related Interest Accrual Period at the applicable Pass-Through Rate.

"Certificate Margin" with respect to each distribution date on or prior to the First Possible Optional Termination Date, the Certificate Margins for the Class I-A-1, Class II-A-1, Class II-A-2, Class II-A-3, Class II-A-4, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates are 0.140%, 0.060%, 0.120%, 0.170%, 0.250%, 0.290%, 0.320%, 0.350%, 0.390%, 0.410%, 0.480%, 0.800%, 1.250%, 2.300%, 2.300% and 2.300%, respectively. With respect to each distribution date following the First Possible Optional Termination Date, the Certificate Margins for the Class I-A-1, Class II-A-1, Class II-A-2, Class II-A-3, Class II-A-4, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates are 0.280%, 0.120%, 0.240%, 0.340%, 0.500%, 0.435%, 0.480%, 0.525%, 0.585%, 0.615%, 0.720%, 1.200%, 1.875%, 3.450%, 3.450% and 3.450%, respectively.

"Certificate Principal Balance" with respect to any class of Offered Certificates and Class B Certificates and any distribution date, is the original certificate principal balance of such class set forth on the cover of this prospectus supplement with respect to the Offered Certificates and approximately $12,894,000 and approximately $12,280,000 with respect to the Class B-1 Certificates and the Class B-2 Certificates, respectively, less the sum of (i) all amounts in respect of principal distributed to such class on previous distribution dates and (ii) Applied Loss Amounts (as defined under "—Credit Enhancement" in this prospectus supplement) previously allocated to that class; provided, however, that the Certificate Principal Balance of the Subordinate Certificates (including any such class of certificates for which the Certificate Principal Balance has been reduced to zero) will be increased in an aggregate amount equal to Subsequent Recoveries received with respect to all of the Mortgage Loans on any distribution date in the following order: to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates, in each case up to the related amount of Applied Loss Amounts but only to the extent that any such Applied Loss Amount has not been paid to any class of certificates as a Deferred Amount with Net Monthly Excess Cashflow as described under "—Credit Enhancement—Overcollateralization" in this prospectus supplement or previously increased due to other Subsequent Recoveries. The Certificate Principal Balance of the Class X Certificates as of any date of determination is equal to the excess, if any, of (i) the then aggregate principal balance of the Mortgage Loans over (ii) the then aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates.

"Class B-1 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates and the Mezzanine Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class B-1 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 93.50% and (ii) the Aggregate Loan Balance for such distribution date and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

CONFIDENTIAL

FHFA04178945
A3-10013223091

"Class B-2 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, the Mezzanine Certificates and Class B-1 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class B-2 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 95.50% and (ii) the Aggregate Loan Balance for such distribution date and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-1 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-1 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 62.60% and (ii) the Aggregate Loan Balance for such distribution date and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-2 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates and Class M-1 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-2 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 69.40% and (ii) the Aggregate Loan Balance for such distribution date and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-3 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1 and Class M-2 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-3 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 73.60% and (ii) the Aggregate Loan Balance for such distribution date and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-4 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1, Class M-2 and Class M-3 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-4 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 77.20% and (ii) the Aggregate Loan Balance for such distribution date and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

S-91

FHFA04178946
A3-10013223092

"Class M-5 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1, Class M-2, Class M-3 and Class M-4 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-5 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 80.60% and (ii) the Aggregate Loan Balance for such distribution date and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-6 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-6 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 83.70% and (ii) the Aggregate Loan Balance for such distribution date and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-7 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5 and Class M-6 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-7 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 86.70% and (ii) the Aggregate Loan Balance for such distribution date and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-8 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6 and Class M-7 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-8 Certificates immediately prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 89.30% and (ii) the Aggregate Loan Balance for such distribution date and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Class M-9 Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the sum of (i) the Certificate Principal Balances of the Senior Certificates, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 Certificates, in each case, after giving effect to payments on such distribution date and (ii) the Certificate Principal Balance of the Class M-9 Certificates immediately

S-92

prior to such distribution date exceeds (y) the lesser of (A) the product of (i) approximately 91.40% and (ii) the Aggregate Loan Balance for such distribution date and (B) the amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Compensating Interest"  with respect to any distribution date and (a) the servicer, will be an amount equal to the lesser of (i) the aggregate of the Interest Shortfalls on the Mortgage Loans for the related distribution date pursuant to items (a) and (b) of the definition of Interest Shortfalls set forth below and (ii) the aggregate Servicing Fees due to the servicer for such distribution date, or (b) the master servicer, will be an amount equal to any Interest Shortfalls required to be funded by the servicer and not funded, up to the aggregate master servicing fee (exclusive of the portion of such fee payable to the credit risk manager) for such distribution date.

"Current Interest" with respect to any class of Senior Certificates and Subordinate Certificates and any distribution date, the amount of interest accruing at the applicable Pass-Through Rate on the related Certificate Principal Balance during the related Interest Accrual Period; provided, that as to each class of Senior Certificates and Subordinate Certificates, the Current Interest will be reduced by a pro rata portion of any Net Interest Shortfalls to the extent not covered by excess interest.

"Deferred Amount" with respect to any class of Subordinate Certificates and any distribution date, will equal the amount by which (x) the aggregate of the Applied Loss Amounts previously applied in reduction of the Certificate Principal Balance thereof exceeds (y) the aggregate of amounts previously paid in reimbursement thereof and the amount by which the Certificate Principal Balance of any such class has been increased due to the collection of Subsequent Recoveries.

"Delinquency Rate" with respect to any calendar month will be, generally, the fraction, expressed as a percentage, the numerator of which is the Aggregate Loan Balance of all Mortgage Loans 60 or more days delinquent (including all Mortgage Loans in bankruptcy or foreclosure and all REO Properties) as of the close of business on the last day of such month, and the denominator of which is the Aggregate Loan Balance of all Mortgage Loans as of the close of business on the last day of such month.

"Due Period" with respect to any distribution date, is the period commencing on the second day of the month preceding the calendar month in which such distribution date occurs and ending at the close of business on the first day of the month in which such distribution date occurs.

"Group I Allocation Amount" with respect to any distribution date, the product of the Senior Principal Payment Amount for that distribution date and a fraction the numerator of which is the Principal Remittance Amount derived from the Group I Mortgage Loans and the denominator of which is the Principal Remittance Amount, in each case for that distribution date.

"Group I Allocation Percentage" with respect to any distribution date, the Aggregate Loan Group Balance of the Group I Mortgage Loans divided by the Aggregate Loan Balance of the Mortgage Loans.

"Group I Excess Interest Amount" with respect to any distribution date, the product of the Monthly Excess Interest required to be distributed on that distribution date pursuant to subclause (1)(A) under "Description of the Certificates—Credit Enhancement—

S-93

FHFA04178948
A3-10013223094

Overcollateralization" in this prospectus supplement and a fraction the numerator of which is the Principal Remittance Amount derived from the Group I Mortgage Loans and the denominator of which is the Principal Remittance Amount, in each case for that distribution date.

"Group II Allocation Amount" with respect to any distribution date, the product of the Senior Principal Payment Amount for that distribution date and a fraction the numerator of which is the Principal Remittance Amount derived from the Group II Mortgage Loans and the denominator of which is the Principal Remittance Amount, in each case for that distribution date.

"Group II Allocation Percentage" with respect to any distribution date, the Aggregate Loan Group Balance of the Group II Mortgage Loans divided by the Aggregate Loan Balance of the Mortgage Loans.

"Group II Excess Interest Amount" with respect to any distribution date, the product of the Monthly Excess Interest required to be distributed on that distribution date pursuant to subclause (1)(A) under "Description of the Certificates—Credit Enhancement—Overcollateralization" in this prospectus supplement and a fraction the numerator of which is the Principal Remittance Amount derived from the Group II Mortgage Loans and the denominator of which is the Principal Remittance Amount, in each case for that distribution date.

"Insurance Proceeds" are all proceeds of any insurance policies, including any mortgage insurance policy, to the extent such proceeds are not applied to the restoration of the Mortgaged Property or released to the borrower in accordance with the related servicer's normal servicing procedures, other than proceeds that represent reimbursement of the related servicer's costs and expenses incurred in connection with presenting claims under the related insurance policies.

"Interest Accrual Period" with respect to the Senior Certificates and Subordinate Certificates and any distribution date, the period commencing on the immediately preceding distribution date (or, with respect to the first Interest Accrual Period, the Closing Date) and ending on the day immediately preceding the related distribution date.

"Interest Remittance Amount" with respect to any distribution date and each loan group an amount generally equal to the sum, without duplication, of

- scheduled interest payments (other than Payaheads) and advances on the related Mortgage Loans,

- the interest portion of Payaheads with respect to the related Mortgage Loans previously received and intended for application in the related Due Period,

- the interest portion of all prepayments in full (net of interest on such prepayments in full for such distribution date) and partial prepayments received on the related Mortgage Loans during the related Prepayment Period,

- all Compensating Interest allocable to that loan group,

- the portion of any substitution adjustment amount and purchase price paid in connection with a repurchase of any related Mortgage Loan allocable to interest or the exercise of the optional termination, up to the amount of the interest portion of the par value of the related Mortgage Loans, and

S-94

CONFIDENTIAL

FHFA04178949
A3-10013223095

- Liquidation Proceeds and Subsequent Recoveries (net of unreimbursed advances, servicing advances and other expenses, to the extent allocable to interest, and unpaid expense fees) collected with respect to the related Mortgage Loans during the related Due Period, to the extent allocable to interest, minus

- amounts reimbursable to the servicer, the master servicer, the securities administrator, the trustee, the custodian and the credit risk manager, allocated to the respective loan group as provided in the pooling and servicing agreement.

"Interest Shortfall" with respect to any distribution date, means the aggregate shortfall, if any, in collections of interest (adjusted to the related Net Mortgage Rates) on the Mortgage Loans resulting from (a) prepayments in full received during the related Prepayment Period, (b) partial prepayments received during the related Prepayment Period to the extent applied prior to the Due Date in the month of the distribution date and (c) interest payments on certain of the Mortgage Loans being limited pursuant to the provisions of the Relief Act.

"ISDA Master Agreement" is the ISDA Master Agreement dated as of the Closing Date, as amended and supplemented from time to time, between the Swap Provider and the Supplemental Interest Trust Trustee.

"Liquidated Loan" means a defaulted Mortgage Loan as to which the servicer has determined that all amounts which it expects to recover from or on account of such Mortgage Loan have been recovered.

"Liquidation Proceeds" means all proceeds, other than Insurance Proceeds, received in connection with the partial or complete liquidation of a Mortgage Loan, whether through trustee's sale, foreclosure sale or otherwise, or in connection with any condemnation or partial release of the related Mortgaged Property, together with the net proceeds received with respect to any Mortgaged Property acquired by the servicer by foreclosure or deed-in-lieu of foreclosure in connection with a defaulted Mortgage Loan, other than the amount of such net proceeds representing any profit realized by the servicer in connection with the disposition of any such Mortgaged Property.

"Maximum Interest Rate" with respect to any distribution date and the related Interest Accrual Period and the Senior Certificates, an annual rate equal to the weighted average of the maximum mortgage rates of the adjustable rate Mortgage Loans and the mortgage rates of the fixed rate Mortgage Loans in the related loan group as stated in the related mortgage notes minus the weighted average expense rate of the Mortgage Loans in the related loan group. With respect to any distribution date and the related Interest Accrual Period and the Subordinate Certificates, an annual rate equal to the weighted average of the Maximum Mortgage Rates adjustable rate Mortgage Loans and the mortgage rates of the fixed rate Mortgage Loans as stated in the related mortgage notes minus the weighted average expense fee rate of the Mortgage Loans. The calculation of the Maximum Interest Rate will be based on a 360-day year and the actual number of days elapsed during the related accrual period.

"Monthly Excess Cashflow" with respect to any distribution date, the Monthly Excess Interest for such distribution date, plus amounts applied pursuant to clauses I(O) and II(O) under "—Distributions of Principal" in this prospectus supplement.

S-95

CONFIDENTIAL

FHFA04178950
A3-10013223096

"Net Funds Cap" with respect to any distribution date and the Group I Certificates, a per annum rate equal to the product of (I)(a) a fraction, expressed as a percentage, the numerator of which is the related Optimal Interest Remittance Amount for such distribution date and the denominator of which is the aggregate Stated Principal Balance of the Group I Mortgage Loans for the immediately preceding distribution date, minus (b) the sum of (1) the Group I Allocation Percentage of any Net Swap Payment payable to the Swap Provider on such distribution date, divided by the outstanding Stated Principal Balance of the Group I Mortgage Loans for the immediately preceding distribution date, and (2) the Group I Allocation Percentage of any Swap Termination Payment (unless such payment is the result of a Swap Provider Trigger Event and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement swap agreement that may be entered into by the Supplemental Interest Trust Trustee) payable to the Swap Provider on such distribution date, divided by the outstanding aggregate Stated Principal Balance of the Group I Mortgage Loans for the immediately preceding distribution date and (II) 12.

With respect to any distribution date and the Group II Certificates, a per annum rate equal to the product of (I)(a) a fraction, expressed as a percentage, the numerator of which is the related Optimal Interest Remittance Amount for such distribution date and the denominator of which is the aggregate Stated Principal Balance of the Group II Mortgage Loans for the immediately preceding distribution date, minus (b) the sum of (1) the Group II Allocation Percentage of the Net Swap Payment payable to the Swap Provider on such distribution date, divided by the outstanding Stated Principal Balance of the Group II Mortgage Loans for the immediately preceding distribution date, and (2) the Group II Allocation Percentage of any Swap Termination Payment (unless such payment is the result of a Swap Provider Trigger Event and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement swap agreement that may be entered into by the Supplemental Interest Trust Trustee) payable to the Swap Provider on such distribution date, divided by the outstanding aggregate Stated Principal Balance of the Group II Mortgage Loans for the immediately preceding distribution date and (II) 12.

With respect to the Subordinate Certificates, a per annum rate equal to the weighted average (weighted on the basis of the results of subtracting from the aggregate Stated Principal Balance of each loan group the current aggregate Certificate Principal Balance of the related Senior Certificates) of the Net Funds Cap for the Group I Certificates and the Net Funds Cap for the Group II Certificates.

In each case, the Net Funds Cap will be adjusted to an effective rate reflecting the accrual of interest on an actual/360 basis.

"Net Interest Shortfalls" means Interest Shortfalls net of payments by the servicer or master servicer in respect of Compensating Interest.

"Net Liquidation Proceeds" with respect to a Mortgage Loan are Liquidation Proceeds net of unreimbursed advances and fees by the servicer and advances and expenses incurred by the servicer in connection with the liquidation of such Mortgage Loan and the related Mortgaged Property.

"Net Mortgage Rate" with respect to any Mortgage Loan, the interest rate set forth in the related mortgage note minus the sum of the Servicing Fee Rate, the rate at which the fee payable

S-96

FHFA04178951
A3-10013223097

to the master servicer is calculated and the rate at which the fee payable to any provider of lender paid mortgage insurance is calculated, if applicable.

"One-Month LIBOR" means a per annum rate based on the London interbank offered rate for one month dollar deposits and calculated as described under "—Calculation of One-Month LIBOR" in this prospectus supplement.

"Optimal Interest Remittance Amount" with respect to any distribution date and (A) the Senior Certificates, will be equal to the excess of (i) the product of (1)(x) the weighted average Net Mortgage Rates of the Mortgage Loans in the related loan group as of the first day of the related Due Period divided by (y) 12 and (2) the Aggregate Loan Balance of the Mortgage Loans in the related loan group for the immediately preceding distribution date, over (ii) any expenses that reduce the Interest Remittance Amount that did not arise as a result of a default or delinquency of the Mortgage Loans in the related loan group or were not taken into account in computing the expense fee rate, and (B) the Subordinate Certificates, will be equal to the excess of (i) the product of (1)(x) the weighted average Net Mortgage Rates of the Mortgage Loans as of the first day of the related Due Period divided by (y) 12 and (2) the Aggregate Loan Balance of the Mortgage Loans for the immediately preceding distribution date, over (ii) any expenses that reduce the Interest Remittance Amount that did not arise as a result of a default or delinquency of the Mortgage Loans or were not taken into account in computing the expense fee rate.

"Overcollateralization Amount" with respect to any distribution date, the excess, if any, of (a) the Aggregate Loan Balance for such distribution date over (b) the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates on such distribution date (after taking into account the payment of 100% of the Principal Remittance Amount on such distribution date).

"Overcollateralization Deficiency Amount" with respect to any distribution date, will be equal to the amount, if any, by which (x) the Targeted Overcollateralization Amount for such distribution date exceeds (y) the Overcollateralization Amount for such distribution date, calculated for this purpose after giving effect to the reduction on such distribution date of the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates resulting from the payment of the Principal Remittance Amount on such distribution date, but prior to allocation of any Applied Loss Amount on such distribution date.

"Overcollateralization Release Amount" with respect to any distribution date, will be equal to the lesser of (x) the Principal Remittance Amount for such distribution date and (y) the amount, if any, by which (1) the Overcollateralization Amount for such date, exceeds (2) the Targeted Overcollateralization Amount for such distribution date.

"Pass-Through Rate" with respect to the Senior Certificates and the Subordinate Certificates will equal the lesser of (i) the sum of One-Month LIBOR for that distribution date plus the applicable Certificate Margin and (ii) the applicable Net Funds Cap.

"Payahead" any scheduled payment intended by the related mortgagor to be applied in a Due Period subsequent to the Due Period in which such payment was received.

"Prepayment Period" with respect to any distribution date, the 16th of the immediately preceding calendar month (or with respect to the first Prepayment Period, the Closing Date) through the 15th day of the month in which the distribution date occurs.

CONFIDENTIAL

FHFA04178952
A3-10013223098

"Principal Payment Amount" with respect to any distribution date will be equal to the Principal Remittance Amount for such distribution date minus the Overcollateralization Release Amount, if any, for such distribution date.

"Principal Remittance Amount" with respect to each distribution date and each loan group, is equal to the sum of (i) the scheduled principal payments on the related Mortgage Loans due during the related Due Period, whether or not received on or prior to the related determination date; (ii) the principal portion of all proceeds received in respect of the repurchase of a Mortgage Loan in the related loan group (or, in the case of a substitution, certain amounts representing a principal adjustment as required by the pooling and servicing agreement) during the related Prepayment Period; (iii) the principal portion of all other unscheduled collections (other than Payaheads), including Insurance Proceeds, condemnation proceeds, Liquidation Proceeds, Subsequent Recoveries and all full and partial principal prepayments, received during the related Prepayment Period, to the extent applied as recoveries of principal on the related Mortgage Loans; (iv) the principal portion of Payaheads previously received on the related Mortgage Loans and intended for application in the related Due Period, less (v) amounts payable or reimbursable to the servicer, the master servicer, the securities administrator, the trustee, the custodian or the credit risk manager as provided in the pooling and servicing agreement and the servicing agreement to the extent not paid or reimbursed from the Interest Remittance Amount.

"Realized Loss" is (a) for any defaulted Mortgage Loan, the excess of the Stated Principal Balance of such defaulted Mortgage Loan over the Net Liquidation Proceeds with respect thereto, (b) for any Mortgage Loan that has become the subject of a Deficient Valuation, the excess of the Stated Principal Balance of such Mortgage Loan over the principal amount as reduced in connection with the proceedings resulting in the Deficient Valuation; or (c) for any Mortgage Loan that has become the subject of a Debt Service Reduction, the present value of all monthly Debt Service Reductions on such Mortgage Loan, assuming that the mortgagor pays each scheduled monthly payment on the applicable due date and that no principal prepayments are received on such Mortgage Loan, discounted monthly at the applicable Mortgage Rate. To the extent the servicer receives Subsequent Recoveries with respect to any Mortgage Loan, the amount of the Realized Loss with respect to that Mortgage Loan will be reduced to the extent that such Subsequent Recoveries are applied to reduce the Certificate Principal Balance of any class of certificates on any distribution date.

"Relief Act" means the Servicemembers Civil Relief Act of 2003, as amended, or any similar state or local law.

"Senior Enhancement Percentage" with respect to any distribution date will be the fraction, expressed as a percentage, the numerator of which is the sum of the aggregate Certificate Principal Balance of the Subordinate Certificates and the Overcollateralization Amount, in each case after giving effect to payments on such distribution date, and the denominator of which is the Aggregate Loan Balance for such distribution date.

"Senior Principal Payment Amount" with respect to any distribution date on or after the Stepdown Date and as long as a Trigger Event is not in effect with respect to such distribution date, will be the amount, if any, by which (x) the Certificate Principal Balances of the Senior Certificates immediately prior to such distribution date exceed (y) the lesser of (A) the product of (i) approximately 55.10% and (ii) the Aggregate Loan Balance for such distribution date and (B) the

CONFIDENTIAL

FHFA04178953
A3-10013223099

amount, if any, by which (i) the Aggregate Loan Balance for such distribution date exceeds (ii) 0.50% of the Aggregate Loan Balance as of the Cut-off Date.

"Servicer Remittance Date" will be the 23rd day of each month, and if the 23rd day is not a business day, the business day immediately preceding such 23rd day.

"Stated Principal Balance" of any Mortgage Loan means, with respect to any distribution date, the Cut-off Date principal balance thereof minus the sum of

(i)        the principal portion of all scheduled monthly payments due from the borrower with respect to such Mortgage Loan during the Due Periods ending prior to such distribution date (and irrespective of any delinquency in such payments);

(ii)       all prepayments of principal with respect to such Mortgage Loan received prior to or during the related Prepayment Period, and all Liquidation Proceeds to the extent applied by the related servicer as recoveries of principal in accordance with the pooling and servicing agreement or the servicing agreement, as applicable, that were received by the related servicer as of the close of business on the last day of the Prepayment Period related to such distribution date; and

(iii)      any Realized Loss thereon incurred prior to or during the related Prepayment Period.

The Stated Principal Balance of any liquidated Mortgage Loan is zero.

"Stepdown Date" will be the later to occur of (x) the distribution date in November 2009 and (y) the first distribution date on which the Senior Enhancement Percentage (calculated for this purpose only after taking into account distributions of principal on the Mortgage Loans, but prior to any distributions to the holders of the Senior Certificates and Subordinate  Certificates then entitled to distributions of principal on such distribution date) is greater than or equal to approximately 44.90%.

"Subsequent Recoveries" means the amounts recovered by the servicer (net of reimbursable expenses) with respect to a defaulted Mortgage Loan with respect to which a Realized Loss was incurred, after the liquidation or disposition of such Mortgage Loan.

"Swap Provider Trigger Event" means the occurrence of an event of default (under the Interest Rate Swap Agreement) with respect to which the Swap Provider is a defaulting party, a Termination Event (under the Interest Rate Swap Agreement) with respect to which the Swap Provider is the sole affected party or an additional termination event (under the Interest Rate Swap Agreement) with respect to which the Swap Provider is the sole affected party.

"Swap Termination Payment"  means the payment to be made by the Supplemental Interest Trust to the Swap Provider, or by the Swap Provider to the Supplemental Interest Trust, as applicable, pursuant to the terms of the Interest Rate Swap Agreement upon the occurrence of an early termination.

"Targeted Overcollateralization Amount" with respect to any distribution date prior to the Stepdown Date, approximately 2.25% of the Aggregate Loan Balance as of the Cut-off Date; with respect to any distribution date on or after the Stepdown Date and with respect to which a

CONFIDENTIAL

FHFA04178954
A3-10013223100

Trigger Event is not in effect, the greater of (a) 4.50% of the Aggregate Loan Balance for such distribution date, or (b) 0.50% of the Aggregate Loan Balance as of the Cut-off Date; with respect to any distribution date on or after the Stepdown Date with respect to which a Trigger Event is in effect, the Targeted Overcollateralization Amount for such distribution date will be equal to the Targeted Overcollateralization Amount for the distribution date immediately preceding such distribution date.

"Trigger Event" a Trigger Event will occur for any distribution date if either (i) the Delinquency Rate as of the last day of the related Due Period exceeds 35.63% of the Senior Enhancement Percentage for such distribution date or (ii) the cumulative Realized Losses as a percentage of the original Aggregate Loan Balance on the Closing Date for such distribution date is greater than the percentage set forth in the following table:

| Range of Distribution Dates | Cumulative Loss Percentage |
|---|---|
| November 2009 – October 2010 | 3.45%* |
| November 2010 – October 2011 | 5.40%* |
| November 2011 – October 2012 | 6.95%* |
| November 2012 and thereafter | 7.80% |

*The cumulative loss percentages set forth above are applicable to the first distribution date in the corresponding range of distribution dates. The cumulative loss percentage for each succeeding distribution date in a range increases incrementally by 1/12 of the positive difference between the percentage applicable to the first distribution date in that range and the percentage applicable to the first distribution date in the succeeding range.

**Distributions of Interest**

The amount of interest payable on each distribution date in respect of each class of Senior Certificates and Subordinate Certificates will equal the sum of (1) Current Interest for such class and date and (2) any Carryforward Interest for such class and date. All calculations of interest will be made on the basis of a 360-day year and the actual number of days elapsed in each Interest Accrual Period.

With respect to each distribution date, to the extent that a Basis Risk Shortfall exists for any class of Senior Certificates and Subordinate Certificates, such class will be entitled to the amount of such Basis Risk Shortfall. Such classes will be entitled to receive the amount of any Basis Risk Shortfall in accordance with the priority of payments described in this prospectus supplement under "—Credit Enhancement—Overcollateralization" and from available amounts on deposit in a reserve fund (the "Basis Risk Shortfall Reserve Fund"), if applicable. The source of funds on deposit in the Basis Risk Shortfall Reserve Fund will be limited to amounts in respect of Monthly Excess Cashflow that would otherwise be paid to the Class X Certificates.

On each distribution date, the Interest Remittance Amount for such distribution date, to the extent of funds in the Distribution Account, will be paid in the following order of priority:

(1)     from the Interest Remittance Amount for loan group I and loan group II, the Group I Allocation Percentage and the Group II Allocation Percentage, as applicable, of any Net Swap Payment and any Swap Termination Payment paid to the Supplemental Interest Trust and owed to the Swap Provider (unless the Swap Provider is a Defaulting Party or the sole Affected Party (as defined in the ISDA Master Agreement) and to the extent not paid by the securities administrator

CONFIDENTIAL

FHFA04178955
A3-10013223101

from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee);

(2)     from the remaining Interest Remittance Amount for loan group I and loan group II to the Senior Certificates, pro rata based on amounts due, Current Interest and any Carryforward Interest for each such class and such distribution date applied in accordance with the allocation rules set forth below;

(3)     first, from the remaining Interest Remittance Amount for loan group II and then from the remaining Interest Remittance Amount for loan group I, to the Class M-1 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(4)     first, from the remaining Interest Remittance Amount for loan group II and then from the remaining Interest Remittance Amount for loan group I, to the Class M-2 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(5)     first, from the remaining Interest Remittance Amount for loan group II and then from the remaining Interest Remittance Amount for loan group I, to the Class M-3 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(6)     first, from the remaining Interest Remittance Amount for loan group II and then from the remaining Interest Remittance Amount for loan group I, to the Class M-4 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(7)     first, from the remaining Interest Remittance Amount for loan group II and then from the remaining Interest Remittance Amount for loan group I, to the Class M-5 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(8)     first, from the remaining Interest Remittance Amount for loan group II and then from the remaining Interest Remittance Amount for loan group I, to the Class M-6 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(9)     first, from the remaining Interest Remittance Amount for loan group II and then from the remaining Interest Remittance Amount for loan group I, to the Class M-7 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(10)    first, from the remaining Interest Remittance Amount for loan group II and then from the remaining Interest Remittance Amount for loan group I, to the Class M-8 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(11)    first, from the remaining Interest Remittance Amount for loan group II and then from the remaining Interest Remittance Amount for loan group I, to the Class M-9 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

(12)    first, from the remaining Interest Remittance Amount for loan group II and then from the remaining Interest Remittance Amount for loan group I, to the Class B-1 Certificates, Current Interest and Carryforward Interest for such class and distribution date;

S-101

CONFIDENTIAL

FHFA04178956
A3-10013223102

(13)    first, from the remaining Interest Remittance Amount for loan group II and then from the remaining Interest Remittance Amount for loan group I, to the Class B-2 Certificates, Current Interest and Carryforward Interest for such class and distribution date; and

(14)    for application as part of Monthly Excess Cashflow for such distribution date, as described under "—Credit Enhancement—Overcollateralization" below, any such Interest Remittance Amount remaining after application pursuant to clauses (1) through (13) above (such amount, "Monthly Excess Interest") for such distribution date.

The remaining Interest Remittance Amount for loan group I and loan group II distributed pursuant to clause (2) above will be applied to the Senior Certificates as follows:

(a)    the Interest Remittance Amount for loan group I will be distributed in the following order of priority: (x) first, to the Class I-A-1 Certificates, Current Interest and any Carryforward Interest for such class for such distribution date; and then (y) concurrently, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, Current Interest and Carryforward Interest for each such class for such distribution date, on a pro rata basis based on the entitlement of each such class, after taking into account the distribution of the Interest Remittance Amount for loan group II on such distribution date; and

(b)    the Interest Remittance Amount for loan group II will be distributed in the following order of priority: (x) first, concurrently to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, Current Interest and any Carryforward Interest for each such class for such distribution date, on a pro rata basis based on the entitlement of each such class; and then (y) to the Class I-A-1 Certificates, Current Interest and any Carryforward Interest for such class for such distribution date, after taking into account the distribution of the Interest Remittance Amount for loan group I on such distribution date.

**Distributions of Principal**

The Principal Payment Amount will be paid on each distribution date as follows:

I.    On each distribution date (x) prior to the Stepdown Date or (y) with respect to which a Trigger Event is in effect, the Principal Payment Amount will be paid in the following order of priority:

(A)    to the Supplemental Interest Trust from the Principal Payment Amount derived from the Group I Mortgage Loans and the Group II Mortgage Loans, the Group I Allocation Percentage and the Group II Allocation Percentage, as applicable, of any Net Swap Payment and any Swap Termination Payment owed to the Swap Provider (unless the Swap Provider is a Defaulting Party or the sole Affected Party (as defined in the ISDA Master Agreement and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee)) to the extent not paid from the Interest Remittance Amounts on such distribution date;

(B)    (i)    from the Principal Payment Amount derived from the Group I Mortgage Loans remaining after payments pursuant to clause (A) above, to

S-102

FHFA04178957
A3-10013223103

the Class I-A-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(ii)    from the Principal Payment Amount derived from the Group II Mortgage Loans remaining after payments pursuant to clause (A) above, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, until the Certificate Principal Balance of each such class has been reduced to zero;

(C)    (i)    from the Principal Payment Amount derived from the Group I Mortgage Loans remaining after payments pursuant to clauses (A) and (B) above and after the Certificate Principal Balance of the Class I-A-1 Certificates has been reduced to zero, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, after taking into account payments pursuant to clause I(B)(ii) above, until the Certificate Principal Balance of each such class has been reduced to zero;

(ii)    from the Principal Payment Amount derived from the Group II Mortgage Loans remaining after payments pursuant to clauses (A) and (B) above and after the Certificate Principal Balances of the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates have been reduced to zero, to the Class I-A-1 Certificates, after taking into account payments pursuant to clause I(B)(i) above, until its Certificate Principal Balance has been reduced to zero;

(D)    to the Class M-1 Certificates, until its Certificate Principal Balance has been reduced to zero;

(E)    to the Class M-2 Certificates, until its Certificate Principal Balance has been reduced to zero;

(F)    to the Class M-3 Certificates, until its Certificate Principal Balance has been reduced to zero;

(G)    to the Class M-4 Certificates, until its Certificate Principal Balance has been reduced to zero;

(H)    to the Class M-5 Certificates, until its Certificate Principal Balance has been reduced to zero;

(I)    to the Class M-6 Certificates, until its Certificate Principal Balance has been reduced to zero;

(J)    to the Class M-7 Certificates, until its Certificate Principal Balance has been reduced to zero;

(K)    to the Class M-8 Certificates, until its Certificate Principal Balance has been reduced to zero;

CONFIDENTIAL

FHFA04178958
A3-10013223104

(L)    to the Class M-9 Certificates, until its Certificate Principal Balance has been reduced to zero;

(M)    to the Class B-1 Certificates, until its Certificate Principal Balance has been reduced to zero;

(N)    to the Class B-2 Certificates, until its Certificate Principal Balance has been reduced to zero; and

(O)    for application as part of Monthly Excess Cashflow for such distribution date, as described under "—Credit Enhancement—Overcollateralization" below, any such Principal Payment Amount remaining after application pursuant to clauses I(A) through (N) above.

II.    On each distribution date (x) on or after the Stepdown Date and (y) with respect to which a Trigger Event is not in effect, the Principal Payment Amount will be paid in the following order of priority:

(A)    to the Supplemental Interest Trust from the Principal Payment Amount derived from the Group I Mortgage Loans and the Group II Mortgage Loans, the Group I Allocation Percentage and the Group II Allocation Percentage, as applicable, of any Net Swap Payment and any Swap Termination Payment owed to the Swap Provider (unless the Swap Provider is a Defaulting Party or the sole Affected Party (as defined in the ISDA Master Agreement and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee)) remaining unpaid after the distribution of the Interest Remittance Amounts on such distribution date;

(B)    (i)    from the Principal Payment Amount derived from the Group I Mortgage Loans remaining after payments pursuant to clause (A) above, to the Class I-A-1 Certificates, the Group I Allocation Amount until its Certificate Principal Balance has been reduced to zero;

(ii)    from the Principal Payment Amount derived from the Group II Mortgage Loans remaining after payments pursuant to clause (A) above, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, the Group II Allocation Amount until the Certificate Principal Balance of each such class has been reduced to zero;

(C)    (i)    from the Principal Payment Amount derived from the Group I Mortgage Loans remaining after payments pursuant to clauses (A) and (B) above, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, up to the Group II Allocation Amount remaining unpaid, after taking into account payments pursuant to clause II(B)(ii) above, until the Certificate Principal Balance of each such class has been reduced to zero;

S-104

FHFA04178959
A3-10013223105

(ii)     from the Principal Payment Amount derived from the Group II Mortgage Loans remaining after payments pursuant to clauses (A) and (B) above, to the Class I-A-1 Certificates, up to the Group I Allocation Amount remaining unpaid, after taking into account payments pursuant to clause II(B)(i) above, until its Certificate Principal Balance has been reduced to zero;

(D)     to the Class M-1 Certificates, the Class M-1 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(E)     to the Class M-2 Certificates, the Class M-2 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(F)     to the Class M-3 Certificates, the Class M-3 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(G)     to the Class M-4 Certificates, the Class M-4 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(H)     to the Class M-5 Certificates, the Class M-5 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(I)     to the Class M-6 Certificates, the Class M-6 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(J)     to the Class M-7 Certificates, the Class M-7 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(K)     to the Class M-8 Certificates, the Class M-8 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(L)     to the Class M-9 Certificates, the Class M-9 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(M)     to the Class B-1 Certificates, the Class B-1 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero;

(N)     to the Class B-2 Certificates, the Class B-2 Principal Payment Amount for such distribution date, until its Certificate Principal Balance has been reduced to zero; and

S-105

CONFIDENTIAL

FHFA04178960
A3-10013223106

(O)     for application as part of Monthly Excess Cashflow for such distribution date, as described under "—Credit Enhancement—Overcollateralization" below, any such Principal Payment Amount remaining after application pursuant to clauses II(A) through (N) above.

The foregoing notwithstanding, on and after the distribution date on which the aggregate Certificate Principal Balance of each class of Subordinate Certificates has been reduced to zero, distributions to the Group II Certificates will be allocated to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, on a pro rata basis based on the Certificate Principal Balance of each such class, until the Certificate Principal Balance of each such class has been reduced to zero.

## Credit Enhancement

Credit enhancement for each class of certificates consists of the subordination of certain classes of Subordinate Certificates and the priority of application of Realized Losses and overcollateralization, in each case as described below.

### Subordination

The rights of holders of the Subordinate Certificates to receive payments with respect to the Mortgage Loans, the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement will be subordinated to such rights of holders of the Senior Certificates, and the rights of the holders of each class of Subordinate Certificates to receive payments with respect to the Mortgage Loans, the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement will be subordinated to such rights of holders of each class of certificates having a higher priority of payment, as described in this prospectus supplement under "—Distributions of Interest" and "—Distributions of Principal". This subordination is intended to enhance the likelihood of regular receipt by holders of certificates having a higher priority of payment of the full amount of interest and principal distributable thereon, and to afford such certificateholders limited protection against Realized Losses incurred with respect to the Mortgage Loans.

The limited protection afforded to holders of classes of certificates with a higher priority of payment by means of the subordination of certain classes of certificates having a lower priority of payment will be accomplished by the preferential right of holders of such classes of certificates with a higher priority of payment to receive distributions of interest or principal on any distribution date prior to classes with a lower priority of payment.

### Application of Realized Losses

Realized Losses on the Mortgage Loans will have the effect of reducing amounts payable in respect of the Class X Certificates (both through the application of Monthly Excess Interest to fund such deficiency and through a reduction in the Overcollateralization Amount for the related distribution date).

If on any distribution date, after giving effect to all Realized Losses incurred with respect to the Mortgage Loans during the Due Period for such distribution date and payments of principal on such distribution date, the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates exceeds the Aggregate Loan Balance for such distribution

S-106

CONFIDENTIAL

date (such excess, an "Applied Loss Amount"), such amount will be allocated in reduction of the Certificate Principal Balance of first, the Class B-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; second, the Class B-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; third the Class M-9 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; fourth, the Class M-8 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; fifth, the Class M-7 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; sixth, the Class M-6 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; seventh, the Class M-5 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; eighth, the Class M-4 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; ninth, the Class M-3 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; tenth, the Class M-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and eleventh, the Class M-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero. In no event will the Certificate Principal Balances of the Senior Certificates be reduced by any Applied Loss Amount.

Holders of the Subordinate Certificates will not receive any payments in respect of Applied Loss Amounts, except to the extent of available Monthly Excess Cashflow as described below and amounts paid under the Interest Rate Swap Agreement and the Interest Rate Cap Agreement as described in this prospectus supplement.

*Overcollateralization*

The weighted average Net Mortgage Rate of the Mortgage Loans is generally expected to be higher than the weighted average of the pass-through rates of the Senior Certificates and Subordinate Certificates plus certain expenses of the trust, thus generating certain excess interest collections. Monthly Excess Interest and available amounts paid by the Swap Provider under the Interest Rate Swap Agreement and by the Interest Rate Cap Provider under the Interest Rate Cap Agreement may be paid as principal to the Senior Certificates and Subordinate Certificates in order to restore or maintain the required level of overcollateralization. Such application of interest collections and amounts paid under the Interest Rate Swap Agreement and the Interest Rate Cap Agreement as payments of principal will cause the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates to amortize more rapidly than the Aggregate Loan Balance, thus creating and maintaining overcollateralization. However, Realized Losses on the Mortgage Loans will reduce overcollateralization, and could result in an Overcollateralization Deficiency Amount.

On each distribution date, the Monthly Excess Cashflow will be distributed in the following order of priority:

(1) (A) until the aggregate Certificate Principal Balance of the Senior Certificates and Subordinate Certificates equals the Aggregate Loan Balance for such distribution date minus the Targeted Overcollateralization Amount for such date, on each distribution date (a) prior to the Stepdown Date or (b) with respect to which a Trigger Event is in effect, to the extent of Monthly Excess Interest for such distribution date, to the Senior Certificates and Subordinate Certificates, in the following order of priority:

S-107

FHFA04178962
A3-10013223108

(i)      (a)      the Group I Excess Interest Amount in the following order of priority: (x) first, to the Class I-A-1 Certificates, until its Certificate Principal Balance has been reduced to zero, and then (y) sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, after taking into account the distribution of the Group II Excess Interest Amount, until the Certificate Principal Balance of each such class has been reduced to zero;

(b)      the Group II Excess Interest Amount in the following order of priority: (x) first, sequentially, to the Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, in that order, until the Certificate Principal Balance of each such class has been reduced to zero, and then (y) to the Class I-A-1 Certificates, after taking into account the distribution of the Group I Excess Interest Amount, until its Certificate Principal Balance has been reduced to zero;

(ii)      to the Class M-1 Certificates, until its Certificate Principal Balance has been reduced to zero;

(iii)      to the Class M-2 Certificates, until its Certificate Principal Balance has been reduced to zero;

(iv)      to the Class M-3 Certificates, until its Certificate Principal Balance has been reduced to zero;

(v)      to the Class M-4 Certificates, until its Certificate Principal Balance has been reduced to zero;

(vi)      to the Class M-5 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(vii)      to the Class M-6 Certificates, until its Certificate Principal Balance has been reduced to zero;

(viii)      to the Class M-7 Certificates, until its Certificate Principal Balance has been reduced to zero;

(ix)      to the Class M-8 Certificates, until its Certificate Principal Balance has been reduced to zero;

(x)      to the Class M-9 Certificates, until its Certificate Principal Balance has been reduced to zero;

(xi)      to the Class B-1 Certificates, until its Certificate Principal Balance has been reduced to zero; and

(xii)      to the Class B-2 Certificates, until its Certificate Principal Balance has been reduced to zero;

S-108

FHFA04178963
A3-10013223109

(B)    on each distribution date on or after the Stepdown Date and with respect to which a Trigger Event is not in effect, to fund any principal distributions required to be made on such distribution date set forth above in subclause II under "—Distributions of Principal", after giving effect to the distribution of the Principal Payment Amount for such date, in accordance with the priorities set forth therein;

(2)    to the Class M-1 Certificates, any Deferred Amount for such class;

(3)    to the Class M-2 Certificates, any Deferred Amount for such class;

(4)    to the Class M-3 Certificates, any Deferred Amount for such class;

(5)    to the Class M-4 Certificates, any Deferred Amount for such class;

(6)    to the Class M-5 Certificates, any Deferred Amount for such class;

(7)    to the Class M-6 Certificates, any Deferred Amount for such class;

(8)    to the Class M-7 Certificates, any Deferred Amount for such class;

(9)    to the Class M-8 Certificates, any Deferred Amount for such class;

(10)    to the Class M-9 Certificates, any Deferred Amount for such class;

(11)    to the Class B-1 Certificates, any Deferred Amount for such class;

(12)    to the Class B-2 Certificates, any Deferred Amount for such class;

(13)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class I-A-1, Class II-A-1, Class II-A-2, Class II-A-3 and Class II-A-4 Certificates, concurrently, any Basis Risk Shortfall for each such class, on a pro rata basis based on the entitlement of each such class;

(14)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-1 Certificates, any Basis Risk Shortfall for such class;

(15)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-2 Certificates, any Basis Risk Shortfall for such class;

(16)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-3 Certificates, any Basis Risk Shortfall for such class;

(17)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-4 Certificates, any Basis Risk Shortfall for such class;

CONFIDENTIAL

FHFA04178964
A3-10013223110

(18)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-5 Certificates, any Basis Risk Shortfall for such class;

(19)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-6 Certificates, any Basis Risk Shortfall for such class;

(20)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-7 Certificates, any Basis Risk Shortfall for such class;

(21)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-8 Certificates, any Basis Risk Shortfall for such class;

(22)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class M-9 Certificates, any Basis Risk Shortfall for such class;

(23)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class B-1 Certificates, any Basis Risk Shortfall for such class;

(24)    to the Basis Risk Shortfall Reserve Fund and then from the Basis Risk Shortfall Reserve Fund to the Class B-2 Certificates, any Basis Risk Shortfall for such class;

(25)    to the Supplemental Interest Trust, any Swap Termination Payment owed to the Swap Provider in the event of a Swap Provider Trigger Event and the Swap Provider is a Defaulting Party or the sole Affected Party (as defined in the ISDA Master Agreement) not paid on prior distribution dates and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee;

(26)    to the Class X Certificates, the amount distributable to such class pursuant to the pooling and servicing agreement; and

(27)    to the Class R Certificates, any remaining amount. It is not anticipated that any amounts will be distributed to the Class R Certificates under this clause (27).

Notwithstanding the foregoing, distributions pursuant to subparagraphs (2) through (24) above on any distribution date will be made after giving effect to payments received pursuant to the Basis Risk Cap Agreement, the Interest Rate Swap Agreement and the Interest Rate Cap Agreement.

S-110

**The Class P Certificates**

On each distribution date, all amounts representing Prepayment Charges in respect of the Mortgage Loans received during the related Prepayment Period will be withdrawn from the Distribution Account and distributed to the Class P Certificates and shall not be available for distribution to the holders of any other class of certificates. The payment of such Prepayment Charges shall not reduce the Certificate Principal Balance of the Class P Certificates.

On the distribution date in November 2011, the securities administrator shall make a payment of principal to the Class P Certificates in reduction of the Certificate Principal Balance thereof from amounts on deposit in a separate reserve account established and maintained by the securities administrator for the exclusive benefit of the Class P Certificateholders.

**Table of Fees and Expenses**

The following table indicates the fees and expenses to be paid from the cash flows from the Mortgage Loans and other assets of the trust fund, while the Offered Certificates are outstanding.

All fees are expressed in basis points, at an annualized rate, applied to the outstanding aggregate principal balance of the Mortgage Loans.

| Item | Fee or Expense | Paid To | Paid From | Frequency |
|---|---|---|---|---|
| Master Servicing Fee[1][2][3] | 0.0110% per annum of the Stated Principal Balance of each Mortgage Loan | master servicer | Mortgage Loan interest collections | Monthly |
| Servicing Fee[3] | 0.5000% per annum of the Stated Principal Balance of each Mortgage Loan | servicer | Mortgage Loan interest collections | Monthly |
| P&I Advances and Servicing Advances | To the extent of funds available, the amount of any advances and servicing advances | servicer or master servicer, as applicable | With respect to each Mortgage Loan, late recoveries of the payments of the costs and expenses, liquidation proceeds, Subsequent Recoveries, purchase proceeds or repurchase proceeds for that Mortgage Loan | Time to Time |
| Nonrecoverable Advances and Servicing Advances | The amount of any advances and servicing advances deemed nonrecovreable | servicer or master servicer, as applicable | All collections on the Mortgage Loans | Time to Time |

S-111

CONFIDENTIAL

FHFA04178966
A3-10013223112

| Item | Fee or Expense | Paid To | Paid From | Frequency |
|------|----------------|---------|-----------|-----------|
| Reimbursement for certain expenses, costs and liabilities incurred by the servicer, the master servicer, the sponsor or the depositor in connection with any legal action relating to the pooling and servicing agreement or the certificates [2] | The amount of the expenses, costs and liabilities incurred | servicer, master servicer, sponsor or depositor, as applicable | All collections on the Mortgage Loans | Time to Time |
| Indemnification expenses | Amounts for which the servicer, the master servicer, the securities administrator, the custodian, the trustee and the depositor are entitled to indemnification [4] | servicer, master servicer, securities administrator, custodian, trustee, sponsor or depositor, as applicable | All collections on the Mortgage Loans | Time to Time |
| Reimbursement for any expenses incurred by the trustee or securities administrator in connection with a tax audit of the trust | The amount incurred by the trustee or securities administrator in connection with a tax audit of the trust | trustee or securities administrator | All collections on the Mortgage Loans | Time to Time |

[1]   The master servicing fee including securities administrator, paying agent, certificate registrar and credit risk manager fees. The master servicer compensation consists of the master servicing fee and any interest or other income earned on funds held in the Distribution Account. Wells Fargo Bank, N.A. performs the functions of securities administrator, paying agent, certificate registrar and credit risk manager and this compensation covers the performance of each of these functions.

[2]   The master servicer pays trustee fees and custodian fees out of its compensation.

[3]   The master servicing fee payable to the master servicer and the servicing fee payable to the servicer are paid on a first priority basis from collections allocable to interest on the Mortgage Loans prior to distributions to the related certificateholders.

[4]   See *"The Master Servicer, Securities Administrator and Custodian"* and *"The Pooling and Servicing Agreement – The Trustee"* in this prospectus supplement.

## Calculation of One-Month LIBOR

On the second LIBOR business day preceding the commencement of each Interest Accrual Period (other than the first Interest Accrual Period) for the Senior Certificates and the Subordinate Certificates, which date we refer to as an interest determination date, the securities administrator will determine One-Month LIBOR for such Interest Accrual Period on the basis of such rate as it appears on Telerate Screen Page 3750, as of 11:00 a.m. London time on such interest determination date or an equivalent information system. If such rate does not appear on such page, or such other page as may replace that page on that service, or if such service is no longer offered, such other service for displaying LIBOR or comparable rates as may be reasonably selected by the securities administrator, One-Month LIBOR for the applicable Interest Accrual Period will be the Reference Bank Rate. If no such quotations can be obtained and no Reference Bank Rate is available,

CONFIDENTIAL

FHFA04178967
A3-10013223113

One-Month LIBOR will be the One-Month LIBOR applicable to the preceding Interest Accrual Period. With respect to the first Interest Accrual Period, One-Month LIBOR will be determined two business days prior to the Closing Date.

The Reference Bank Rate with respect to any Interest Accrual Period, means the arithmetic mean, rounded upwards, if necessary, to the nearest whole multiple of 0.03125%, of the offered rates for United States dollar deposits for one month that are quoted by the Reference Banks, as described below, as of 11:00 a.m., New York City time, on the related interest determination date to prime banks in the London interbank market for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the Senior Certificates and the Subordinate Certificates for such Interest Accrual Period, provided that at least two such Reference Banks provide such rate. If fewer than two offered rates appear, the Reference Bank Rate will be the arithmetic mean, rounded upwards, if necessary, to the nearest whole multiple of 0.03125%, of the rates quoted by one or more major banks in New York City, selected by the securities administrator, as of 11:00 a.m., New York City time, on such date for loans in U.S. dollars to leading European banks for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the related Certificates for such Interest Accrual Period. As used in this section, LIBOR business day means any day other than a Saturday or a Sunday or a day on which banking institutions in the State of New York or in the city of London, England are required or authorized by law to be closed; and "Reference Banks" means leading banks selected by the securities administrator and engaged in transactions in Eurodollar deposits in the international Eurocurrency market

- with an established place of business in London,

- which have been designated as such by the securities administrator, and

- which are not controlling, controlled by, or under common control with, the depositor or the sponsor.

The establishment of One-Month LIBOR on each interest determination date by the securities administrator and the securities administrator's calculation of the rate of interest applicable to the Senior Certificates and Subordinate Certificates for the related Interest Accrual Period shall, in the absence of manifest error, be final and binding.

**Reports to Certificateholders**

The securities administrator will make available to each certificateholder, the servicers and the depositor a statement generally setting forth the following information:

1. the Interest Accrual Periods and general distribution dates;

2. with respect to the Mortgage Loans, the total cash flows received and the general sources thereof;

3. the amount, if any, of fees or expenses accrued and paid, with an identification of the payee and the general purpose of such fees;

4. the amount of the related distribution to holders of the certificates (by class) allocable to principal, separately identifying (A) the aggregate amount of any

S-113

CONFIDENTIAL

FHFA04178968
A3-10013223114

principal prepayments included therein and (B) the aggregate of all scheduled payments of principal included therein;

5. the amount of such distribution to holders of the certificates (by class) allocable to interest;

6. the Interest Carry Forward Amounts and any Basis Risk Shortfalls for the certificates (if any);

7. the Certificate Principal Balance of the certificates before and after giving effect to the distribution of principal and allocation of Realized Losses on such distribution date;

8. the number and aggregate Scheduled Principal Balance of all the Mortgage Loans for the following distribution date;

9. the Pass-Through Rate for each class of certificates for such distribution date;

10. the aggregate amount of P&I advances included in the distributions on the distribution date, the aggregate amount of unreimbursed advances at the close of business on the distribution date, and the general source of funds for reimbursements;

11. the number and aggregate principal balance of any Mortgage Loans that were (A) delinquent (exclusive of Mortgage Loans in foreclosure) using the "OTS" method (not including any Liquidated Mortgage Loans as of the end of the related Prepayment Period) (1) one scheduled payment is delinquent, (2) two scheduled payments are delinquent, (3) three or more scheduled payments are delinquent and (4) foreclosure proceedings have been commenced, and loss information for the period; the number and aggregate principal balance of any Mortgage Loans in respect of which (A) one scheduled payment is delinquent, (B) two scheduled payments are delinquent, (C) three or more scheduled payments are delinquent and (D) foreclosure proceedings have been commenced, and loss information for the period;

12. the amount, if any, of Monthly Excess Cashflow or and the application of such Monthly Excess Cashflow;

13. the amounts paid by the Basis Risk Cap Provider pursuant to the Basis Risk Cap Agreement in respect of the certificates;

14. the amounts paid by the Swap Provider pursuant to the Interest Rate Swap Agreement in respect of the certificates;

15. the amounts paid by the Interest Rate Cap Provider pursuant to the Interest Rate Cap Agreement in respect of the certificates;

16. with respect to any Mortgage Loan that was liquidated during the preceding calendar month, the loan number and scheduled principal balance of, and

S-114

CONFIDENTIAL

FHFA04178969
A3-10013223115

Realized Loss on, such Mortgage Loan as of the end of the related Prepayment Period;

17. whether any performance triggers as more completely described in this prospectus supplement are in effect;

18. the total number and principal balance of any real estate owned, or REO, properties as of the end of the related Prepayment Period;

19. the cumulative Realized Losses for the Mortgage Pool through the end of the preceding month;

20. the three-month rolling average of the percent equivalent of a fraction, the numerator of which is the aggregate scheduled principal balance of the Mortgage Loans that are 60 days or more delinquent or are in bankruptcy or foreclosure or are REO properties, and the denominator of which is the scheduled principal balances of all of the Mortgage Loans; and

21. the amount of the Prepayment Charges remitted by the servicer.

On each distribution date, the securities administrator will make the monthly statement and, at the securities administrator's option, any additional files containing the same information in an alternative format, available each month to certificateholders via the securities administrator's internet website. Assistance in using the website service can be obtained by calling the securities administrator's customer service desk at (301) 815-6600. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The securities administrator may change the way monthly statements are distributed in order to make such distributions more convenient or more accessible to the above parties.

The annual reports on Form 10-K, the distribution reports on Form 10-D, the current reports on Form 8-K and amendments to those reports filed by the securities administrator or furnished by the securities administrator with respect to the trust pursuant to section 13(a) or 15(d) of the Exchange Act will be made available on the website of the securities administrator as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission.

In addition, within a reasonable period of time after the end of each calendar year, the securities administrator will prepare and deliver, upon request, to each certificateholder of record during the previous calendar year a statement containing information necessary to enable certificateholders to prepare their tax returns. Such statements will not have been examined and reported upon by an independent public accountant.

The depositor makes no representation, and does not guarantee that, the securities administrator will provide such statements to the certificateholders as described above.

S-115

CONFIDENTIAL

FHFA04178970
A3-10013223116

## THE BASIS RISK CAP AGREEMENT

The Senior Certificates and Subordinate Certificates will have the benefit of a basis risk cap agreement (the "Basis Risk Cap Agreement"). Pursuant to the Basis Risk Cap Agreement, HSBC Bank USA, National Association (together with any successor, the "Basis Risk Cap Provider") will agree to pay to the trust two business days prior to each distribution date commencing with the distribution date in November 2006 and ending with the Distribution Date in April 2007, a monthly payment in an amount equal to the product of: (1) the excess, if any, of one-month LIBOR (as set forth in the Basis Risk Cap Agreement) over the applicable strike rate (as set forth below) for the distribution dates set forth below, up to a maximum rate of 11.00% per annum; (2) the Scheduled Notional Amount set forth below for the related distribution date; and (3) a fraction, the numerator of which is the actual number of days in the related calculation period (as defined in the Basis Risk Cap Agreement), and the denominator of which is 360.

| Distribution Date | Scheduled Notional Amount ($) | Strike Rate (%) |
|---|---|---|
| November 2006 | 1,200,404,000.00 | 9.551700 |
| December 2006 | 1,179,969,000.00 | 7.960260 |
| January 2007 | 1,157,656,000.00 | 7.703980 |
| February 2007 | 1,133,542,000.00 | 7.704510 |
| March 2007 | 1,107,702,000.00 | 8.530590 |
| April 2007 | 1,080,224,000.00 | 7.705610 |
| May 2007 | 0.00 | 0.000000 |

On each distribution date, amounts received under the Basis Risk Cap Agreement shall be deposited in the Basis Risk Shortfall Reserve Fund and distributed to the Senior Certificates and Subordinate Certificates in respect of Basis Risk Shortfalls for each such class for such distribution date in the order of priority set forth under "—Credit Enhancement— Overcollateralization" prior to giving effect to any amounts deposited in the Basis Risk Shortfall Reserve Fund from Net Monthly Excess Cashflow on such distribution date.

The obligations of the Basis Risk Cap Provider to pay specified amounts due under the Basis Risk Cap Agreement (other than Basis Risk Cap Termination Payments (as defined below)) will be subject to the following conditions precedent: (1) no Basis Risk Cap Event of Default or event that with the giving of notice or lapse of time or both would become a Basis Risk Cap Event of Default, shall have occurred and be continuing with respect to the Basis Risk Cap Agreement and (2) no "Early Termination Date" (as defined in the Basis Risk Cap Agreement) has occurred or been effectively designated with respect to the Basis Risk Cap Agreement.

Events of default under the Basis Risk Cap Agreement (each a "Basis Risk Cap Event of Default") include the following:

- failure to make a payment due under the Basis Risk Cap Agreement after notice of such failure is received and expiration of a specified grace period,

- certain insolvency or bankruptcy events, and

S-116

CONFIDENTIAL

FHFA04178971
A3-10013223117

- a merger by the Basis Risk Cap Provider without an assumption of its obligations under the Basis Risk Cap Agreement,

each as further described in the Basis Risk Cap Agreement.

Termination events under the Basis Risk Cap Agreement (each a "Basis Risk Cap Termination Event") include the following:

- illegality (which generally relates to changes in law causing it to become unlawful for either party to perform its obligations under the Basis Risk Cap Agreement),

- tax event (which generally relates to the trustee receiving a payment under the Basis Risk Cap Agreement from which an amount has been deducted or withheld for or on account of taxes or paying an additional amount on account of an indemnifiable tax, as defined in the Basis Risk Cap Agreement, in either case as a result of a change in tax law) and

- tax event upon merger (which generally relates to the trustee receiving a payment under the Basis Risk Cap Agreement from which an amount has been deducted or withheld for or on account of an indemnifiable tax or paying an additional amount on account of an indemnifiable tax, in either case as a result of a merger or similar transaction),

each as further described in the Basis Risk Cap Agreement.

Additional termination events under the Basis Risk Cap Agreement (each a "Basis Risk Cap Additional Termination Event"), include the following:

- failure of the Basis Risk Cap Provider to comply with the Basis Risk Cap Downgrade Provisions,

- failure of the Basis Risk Cap Provider to comply with the Regulation AB provisions of the Basis Risk Cap Agreement, and

- occurrence of an optional termination of the securitization pursuant to the terms of the pooling and servicing agreement,

each as further described in the Basis Risk Cap Agreement.

If the Basis Risk Cap Provider's credit ratings are withdrawn or reduced below the levels specified in the Basis Risk Cap Agreement, then, unless each rating agency has reconfirmed the ratings which were in effect immediately prior to such withdrawal or reduction for all securities the ratings for which are supported by the Basis Risk Cap Agreement, the Basis Risk Cap Provider will be required, at its own expense, either (1) to obtain a substitute basis risk cap provider which will assume the obligations of the Basis Risk Cap Provider under the Basis Risk Cap Agreement and which meets all rating agency requirements and any third party consent requirements provided therein or in any related documentation, or (2) to establish any other arrangement specified in the Basis Risk Cap Agreement that meets all rating agency requirements and any third party consent

S-117

requirements provided therein or in any related documentation (collectively, the "Basis Risk Cap Downgrade Provisions").

Upon the occurrence of a Basis Risk Cap Event of Default, the non-defaulting party will have the right to designate an early termination date (an "Early Termination Date"). Upon the occurrence of a Basis Risk Cap Termination Event or a Basis Risk Cap Additional Termination Event, an Early Termination Date may be designated by one of the parties as specified in the Basis Risk Cap Agreement, and will occur only upon notice and, in some circumstances, after any affected party has used reasonable efforts to transfer its rights and obligations under the Basis Risk Cap Agreement to a related entity within a specified period after notice has been given of the Basis Risk Cap Termination Event, all as set forth in the Basis Risk Cap Agreement. The occurrence of an Early Termination Date under the Basis Risk Cap Agreement will constitute a "Basis Risk Cap Early Termination."

Upon a Basis Risk Cap Early Termination, the Basis Risk Cap Provider may be liable to make a termination payment (the "Basis Risk Cap Termination Payment") to the securities administrator, regardless, if applicable, of which of the parties has caused the termination. The Basis Risk Cap Termination Payment will be based on the value of the Basis Risk Cap Agreement computed in accordance with the procedures set forth in the Basis Risk Cap Agreement.

Upon a Basis Risk Cap Early Termination other than in connection with the optional termination of the trust, the securities administrator shall, at the direction of the depositor, appoint a successor basis risk cap provider. If the securities administrator receives a Basis Risk Cap Termination Payment from the Basis Risk Cap Provider in connection with such Basis Risk Cap Early Termination, the securities administrator will apply such Basis Risk Cap Termination Payment to any upfront payment required to appoint the successor basis risk cap provider. If the securities administrator is unable to appoint a successor basis risk cap provider within 30 days of the Basis Risk Cap Early Termination, then the securities administrator will deposit any Basis Risk Cap Termination Payment received from the original Basis Risk Cap Provider into a separate, non-interest bearing reserve account and will, on each subsequent distribution date, withdraw from the amount then remaining on deposit in such reserve account an amount equal to payment, if any, that would have been paid to the securities administrator by the original Basis Risk Cap Provider calculated in accordance with the terms of the original Basis Risk Cap Agreement, and distribute such amount in accordance with the terms of the pooling and servicing agreement.

Upon a Basis Risk Cap Early Termination in connection with the optional termination of the trust, if the securities administrator receives a Basis Risk Cap Termination Payment from the Basis Risk Cap Provider in connection with such Basis Risk Cap Early Termination, such Basis Risk Cap Termination Payment generally will not be available to certificateholders; rather, the securities administrator will distribute such Swap Termination Payment in accordance with the terms of the pooling and servicing agreement.

The significance percentage of the Basis Risk Cap Agreement, as calculated in accordance with Item 1115 of Regulation AB, is less than 10%. The Basis Risk Cap Agreement will provide that the Basis Risk Cap Provider may be replaced in certain circumstances, including if the significance percentage of the Basis Risk Cap Agreement is equal to or greater than 10%.

CONFIDENTIAL

FHFA04178973
A3-10013223119

## THE INTEREST RATE SWAP AGREEMENT

HSBC Bank USA, National Association as trustee (the "Supplemental Interest Trust Trustee") on behalf of a separate trust created under the pooling and servicing agreement (the "Supplemental Interest Trust") will enter into an interest rate swap agreement (the "Interest Rate Swap Agreement") with HSBC Bank USA, National Association (the "Swap Provider"). The Interest Rate Swap Agreement will be held in the Supplemental Interest Trust. The Supplemental Interest Trust Trustee will appoint the securities administrator to receive and distribute funds with regard to the Interest Rate Swap Agreement on behalf of the Supplemental Interest Trust. On each distribution date, the securities administrator will deposit into an account held in the Supplemental Interest Trust (the "Derivative Account"), certain amounts, if any, received from the Swap Provider. For the avoidance of doubt, the Supplemental Interest Trust, the Interest Rate Swap Agreement, and the Derivative Account will not be assets of any REMIC.

Pursuant to the Interest Rate Swap Agreement, two business days prior to each distribution date commencing on the distribution date occurring in May 2007 and terminating immediately following the distribution date in October 2011 (i) the securities administrator (on behalf of the Supplemental Interest Trust and from funds of such trust) will be obligated to pay to the Swap Provider, a fixed amount equal to the product of (x) a fixed rate equal to 5.25% per annum, (y) the Swap Scheduled Notional Amount (as defined below) for that distribution date and (z) a fraction, the numerator of which is 30 and the denominator of which is 360, and (ii) the Swap Provider will be obligated to pay to the Supplemental Interest Trust for the benefit of the holders of the Senior Certificates and Subordinate Certificates, a floating amount equal to the product of (x) One-Month LIBOR, as determined pursuant to the Interest Rate Swap Agreement, for the related calculation period (as defined in the Interest Rate Swap Agreement), (y) the Swap Scheduled Notional Amount for that distribution date, and (z) a fraction, the numerator of which is equal to the actual number of days in the related calculation period and the denominator of which is 360. A net payment will be required to be made on each distribution date (each such net payment, a "Net Swap Payment") (a) by the securities administrator to the Swap Provider, to the extent that the fixed amount exceeds the corresponding floating amount, or (b) by the Swap Provider to the securities administrator, to the extent that the floating amount exceeds the corresponding fixed amount. For each distribution date in respect of which the securities administrator is required to make a Net Swap Payment to the Swap Provider, the trust will be required to make a payment to the securities administrator in the same amount.

The "Swap Scheduled Notional Amount" for each distribution date will be equal to the amount set forth below for such distribution date. The Interest Rate Swap Agreement will terminate immediately following the distribution date in October 2011, unless terminated earlier upon the occurrence of a Swap Event of Default, a Swap Termination Event or a Swap Additional Termination Event (each as defined below).

| Distribution Date | Swap Scheduled Notional Amount ($) |
|---|---|
| May 2007 | 1,002,021,000 |
| June 2007 | 954,255,000 |
| July 2007 | 908,034,000 |
| August 2007 | 864,000,000 |
| September 2007 | 822,048,000 |
| October 2007 | 782,080,000 |

S-119

CONFIDENTIAL

FHFA04178974
A3-10013223120

| Distribution Date | Swap Scheduled Notional Amount ($) |
|---|---|
| November 2007 | 744,000,000 |
| December 2007 | 707,720,000 |
| January 2008 | 673,153,000 |
| February 2008 | 640,219,000 |
| March 2008 | 608,839,000 |
| April 2008 | 578,941,000 |
| May 2008 | 550,454,000 |
| June 2008 | 125,955,000 |
| July 2008 | 120,347,000 |
| August 2008 | 115,052,000 |
| September 2008 | 110,044,000 |
| October 2008 | 105,301,000 |
| November 2008 | 100,965,000 |
| December 2008 | 96,944,000 |
| January 2009 | 93,083,000 |
| February 2009 | 89,378,000 |
| March 2009 | 85,821,000 |
| April 2009 | 82,406,000 |
| May 2009 | 79,128,000 |
| June 2009 | 73,880,000 |
| July 2009 | 70,986,000 |
| August 2009 | 68,205,000 |
| September 2009 | 65,533,000 |
| October 2009 | 62,965,000 |
| November 2009 | 60,498,000 |
| December 2009 | 58,127,000 |
| January 2010 | 55,849,000 |
| February 2010 | 53,660,000 |
| March 2010 | 51,556,000 |
| April 2010 | 49,535,000 |
| May 2010 | 47,592,000 |
| June 2010 | 45,726,000 |
| July 2010 | 43,932,000 |
| August 2010 | 42,209,000 |
| September 2010 | 40,553,000 |
| October 2010 | 38,962,000 |
| November 2010 | 37,433,000 |
| December 2010 | 35,964,000 |
| January 2011 | 34,552,000 |
| February 2011 | 33,196,000 |
| March 2011 | 31,892,000 |
| April 2011 | 30,640,000 |
| May 2011 | 29,381,000 |
| June 2011 | 28,228,000 |
| July 2011 | 27,120,000 |
| August 2011 | 26,055,000 |
| September 2011 | 25,032,000 |

S-120

| Distribution Date | Swap Scheduled Notional Amount ($) |
|---|---|
| October 2011 | 24,049,000 |

The respective obligations of the Swap Provider and the Supplemental Interest Trust to pay specified amounts due under the Interest Rate Swap Agreement (other than Swap Termination Payments (as defined below)) will be subject to the following conditions precedent: (1) no Swap Event of Default or event that with the giving of notice or lapse of time or both would become a Swap Event of Default, shall have occurred and be continuing with respect to the Interest Rate Swap Agreement and (2) no "Early Termination Date" (as defined in the Interest Rate Swap Agreement) has occurred or been effectively designated with respect to the Interest Rate Swap Agreement.

Events of default under the Interest Rate Swap Agreement (each a "Swap Event of Default") include the following:

- failure to make a payment due under the Interest Rate Swap Agreement after notice of such failure is received and expiration of a specified grace period,

- certain insolvency or bankruptcy events, and

- a merger by the Swap Provider without an assumption of its obligations under the Interest Rate Swap Agreement,

each as further described in the Interest Rate Swap Agreement.

Termination events under the Interest Rate Swap Agreement (each a "Swap Termination Event") include the following:

- illegality (which generally relates to changes in law causing it to become unlawful for either party to perform its obligations under the Interest Rate Swap Agreement),

- tax event (which generally relates to either party to the Interest Rate Swap Agreement receiving a payment under the Interest Rate Swap Agreement from which an amount has been deducted or withheld for or on account of taxes or paying an additional amount on account of an indemnifiable tax, as defined in the Interest Rate Swap Agreement, in either case as a result of a change in tax law) and

- tax event upon merger (which generally relates to either party to the Interest Rate Swap Agreement receiving a payment under the Interest Rate Swap Agreement from which an amount has been deducted or withheld for or on account of an indemnifiable tax or paying an additional amount on account of an indemnifiable tax, in either case as a result of a merger or similar transaction),

each as further described in the Interest Rate Swap Agreement.

S-121

CONFIDENTIAL

FHFA04178976
A3-10013223122

Additional termination events under the Interest Rate Swap Agreement (each a "Swap Additional Termination Event"), include the following:

- failure of the Swap Provider to comply with the Swap Downgrade Provisions,

- failure of the Swap Provider to comply with the Regulation AB provisions of the Interest Rate Swap Agreement,

- occurrence of an optional termination of the securitization pursuant to the terms of the pooling and servicing agreement, and

- amendment of the pooling and servicing agreement in a manner that may materially adversely affect the Swap Provider without the prior written consent of the Swap Provider,

each as further described in the Interest Rate Swap Agreement.

If the Swap Provider's credit ratings are withdrawn or reduced below the levels specified in the Interest Rate Swap Agreement, then, unless each rating agency has reconfirmed the ratings which were in effect immediately prior to such withdrawal or reduction for all securities the ratings for which are supported by the Interest Rate Swap Agreement, the Swap Provider will be required, at its own expense, either (1) to obtain a substitute swap provider which will assume the obligations of the Swap Provider under the Interest Rate Swap Agreement and which meets all rating agency requirements and any third party consent requirements provided therein or in any related documentation, or (2) to establish any other arrangement specified in the Interest Rate Swap Agreement that meets all rating agency requirements and any third party consent requirements provided therein or in any related documentation (collectively, the "Swap Downgrade Provisions").

Upon the occurrence of a Swap Event of Default, the non-defaulting party will have the right to designate an early termination date (an "Early Termination Date"). Upon the occurrence of a Swap Termination Event or a Swap Additional Termination Event, an Early Termination Date may be designated by one of the parties as specified in the Interest Rate Swap Agreement, and will occur only upon notice and, in some circumstances, after any affected party has used reasonable efforts to transfer its rights and obligations under the Interest Rate Swap Agreement to a related entity within a specified period after notice has been given of the Swap Termination Event, all as set forth in the Interest Rate Swap Agreement. The occurrence of an Early Termination Date under the Interest Rate Swap Agreement will constitute a "Swap Early Termination."

Upon a Swap Early Termination, the securities administrator or the Swap Provider may be liable to make a swap termination payment (the "Swap Termination Payment") to the other, regardless, if applicable, of which of the parties has caused the termination. The Swap Termination Payment will be based on the value of the Interest Rate Swap Agreement computed in accordance with the procedures set forth in the Interest Rate Swap Agreement.  In the event that the securities administrator is required to make a Swap Termination Payment to the Swap Provider, the trust will be required to make a payment to the securities administrator in the same amount (to the extent such Swap Termination Payment has not been paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee). In the case of a Swap Termination Payment not triggered by a Swap Provider Trigger Event (as defined in this prospectus supplement), the trust will

S-122

CONFIDENTIAL

FHFA04178977
A3-10013223123

be required to make such payment on the related distribution date, and on any subsequent Distribution Dates until paid in full, prior to distributions to certificateholders. In the case of a Swap Termination Payment triggered by a Swap Provider Trigger Event, the trust's obligation to make such payment generally will be subordinated to distributions to the holders of the Offered Certificates to the extent described in the pooling and servicing agreement.

Upon a Swap Early Termination other than in connection with the optional termination with respect to the Mortgage Loans, the securities administrator shall, at the direction of the depositor, appoint a successor swap provider. If the securities administrator receives a Swap Termination Payment from the Swap Provider in connection with such Swap Early Termination, the securities administrator will apply such Swap Termination Payment to any upfront payment required to appoint the successor swap provider. If the securities administrator is required to pay a Swap Termination Payment to the Swap Provider in connection with such Swap Early Termination, the securities administrator will apply any upfront payment received from the successor swap provider to pay such Swap Termination Payment. If the securities administrator is unable to appoint a successor swap provider within 30 days of the Swap Early Termination, then the securities administrator will deposit any Swap Termination Payment received from the original Swap Provider into a separate, non-interest bearing reserve account and will, on each subsequent distribution date, withdraw from the amount then remaining on deposit in such reserve account an amount equal to the Net Swap Payment, if any, that would have been paid to the securities administrator by the original Swap Provider calculated in accordance with the terms of the original Interest Rate Swap Agreement, and distribute such amount in accordance with the terms of the pooling and servicing agreement.

Upon a Swap Early Termination in connection with the optional termination of the trust, if the securities administrator is required to make a Swap Termination Payment to the Swap Provider, the party exercising such optional termination with respect to the Mortgage Loans will be required to include in its payment an amount equal to such Swap Termination Payment, as described in this prospectus supplement. If the securities administrator receives a Swap Termination Payment from the Swap Provider in connection with such Swap Early Termination, such Swap Termination Payment generally will not be available to certificateholders; rather, the securities administrator will distribute such Swap Termination Payment in accordance with the terms of the pooling and servicing agreement.

A "Swap Provider Trigger Event" will mean: (i) a Swap Event of Default under the Interest Rate Swap Agreement with respect to which the Swap Provider is a Defaulting Party (as defined in the Interest Rate Swap Agreement), (ii) a Swap Termination Event under the Interest Rate Swap Agreement with respect to which the Swap Provider is the sole Affected Party (as defined in the Interest Rate Swap Agreement) or (iii) a Swap Additional Termination Event under the Interest Rate Swap Agreement with respect to which the Swap Provider is the sole Affected Party.

The significance percentage of the Interest Rate Swap Agreement, as calculated in accordance with Item 1115 of Regulation AB, is less than 10%. The Interest Rate Swap Agreement will provide that the Swap Provider may be replaced in certain circumstances, including if the significance percentage of the Interest Rate Swap Agreement is equal to or greater than 10%.

Any Net Swap Payment payable to the securities administrator on behalf of the Supplemental Interest Trust by the Swap Provider will be distributed on the related distribution date as follows (after taking into account distributions of interest described in this prospectus supplement):

S-123

CONFIDENTIAL

FHFA04178978
A3-10013223124

(i)      to the Senior Certificates, pro rata based on amounts due, Current Interest and any Carryforward Interest for each such class and distribution date, after giving effect to distributions of such amounts as described under "—Distributions of Interest";

(ii)      to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates, in that order, Current Interest and any Carryforward Interest for each such class and distribution date, after giving effect to distributions of such amounts as described under "—Distributions of Interest";

(iii)      to the holders of the class or classes of Senior Certificates and Subordinate Certificates then entitled to receive distributions in respect of principal, in an amount necessary to maintain or restore the Targeted Overcollateralization Amount after taking into account distributions made pursuant to clause (1) under "—Credit Enhancement—Overcollateralization";

(iv)      to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates, in that order, any applicable Deferred Amounts, with interest thereon at the applicable pass-through rate, prior to giving effect to amounts available to be paid in respect of Deferred Amounts as described under "—Credit Enhancement—Overcollateralization" on such distribution date;

(v)      to the Senior Certificates, on a pro rata basis, and then to the Subordinate Certificates, on a sequential basis, any applicable Basis Risk Shortfalls, prior to giving effect to any withdrawals from the Basis Risk Shortfall Reserve Fund or from amounts available to be paid in respect of Basis Risk Shortfalls as described in this prospectus supplement under "—Credit Enhancement—Overcollateralization" on such distribution date; and

(vi)      to the Class X Certificates, any remaining amounts.

Notwithstanding the foregoing, in no instance will such payments (other than payments made under clause (vi) above) be made other than to the extent of losses and Basis Risk Shortfalls.

Amounts payable by the trust to the securities administrator in respect of Net Swap Payments and Swap Termination Payments other than Swap Termination Payments resulting from a Swap Provider Trigger Event (and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) will be deducted from related available funds before distributions to the holders of the Senior Certificates and Subordinate Certificates. On or before each distribution date, such amounts will be distributed by the trust to the securities administrator, and paid by the securities administrator to the Swap Provider as follows:

(i)      first to make any Net Swap Payment owed to the Swap Provider pursuant to the Interest Rate Swap Agreement for such distribution date, and

(ii)      second to make any Swap Termination Payment not due to a Swap Provider Trigger Event owed to the Swap Provider pursuant to the Interest Rate Swap Agreement (to

S-124

FHFA04178979
A3-10013223125

the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the securities administrator).

The Interest Rate Swap Agreement will be governed by and construed in accordance with the laws of the State of New York. The obligations of the Swap Provider are limited to those specifically set forth in the Interest Rate Swap Agreement.

## THE INTEREST RATE CAP AGREEMENT

HSBC Bank USA, National Association as Supplemental Interest Trust Trustee on behalf of the Supplemental Interest Trust will enter into an interest rate cap agreement (the "Interest Rate Cap Agreement") with HSBC Bank USA, National Association (the "Interest Rate Cap Provider"). The Interest Rate Cap Agreement will be held in the Supplemental Interest Trust. The Supplemental Interest Trust Trustee will appoint the securities administrator to receive and distribute funds with regards to the Interest Rate Cap Agreement on behalf of the Supplemental Interest Trust. On each distribution date, the securities administrator will deposit into the Derivative Account, certain amounts, if any, received from the Interest Rate Cap Agreement. For the avoidance of doubt, the Supplemental Interest Trust, the Interest Rate Cap Agreement, and the Derivative Account will not be assets of any REMIC.

Two business days prior to each distribution date beginning with the distribution date in June 2008 through and including the distribution date in October 2011, the Interest Rate Cap Provider will agree to pay to the securities administrator on behalf of the Supplemental Interest Trust a monthly payment in an amount equal to the product of (1) the excess, if any, of one-month LIBOR (as determined pursuant to the Interest Rate Cap Agreement and subject to a maximum of 9.50%) over 5.25%; (2) the scheduled cap notional amount (the "Scheduled Cap Notional Amount") for the related distribution date as set forth below; and (3) a fraction, the numerator of which is the actual number of days in the related Calculation Period (as defined in the Interest Rate Cap Agreement), and the denominator of which is 360.

Pursuant to the Interest Rate Cap Agreement and the pooling and servicing agreement, the securities administrator will deposit into the Derivative Account, from amounts, if any, received under the Interest Rate Cap Agreement, an amount equaling Current Interest and Carryforward Interest remaining unpaid, Basis Risk Shortfalls, amounts necessary to restore or maintain the Targeted Overcollateralization Amount and Deferred Amounts on the Senior Certificates and Subordinate Certificates, in each case, prior to taking into account distribution of the Monthly Excess Cashflow as described in "Credit Enhancement—Overcollateralization," but after taking into account withdrawals from the Basis Risk Shortfall Reserve Fund in respect of amounts deposited therein under the Basis Risk Cap Agreement as described under "The Basis Risk Cap Agreement" and payments made pursuant to the Interest Rate Swap Agreement as described in "The Interest Rate Swap Agreement."

| Distribution Date | Scheduled Cap Notional Amount ($) |
|---|---|
| June 2008 | 383,085,000 |
| July 2008 | 332,251,000 |
| August 2008 | 287,749,000 |
| September 2008 | 248,791,000 |

S-125

FHFA04178980
A3-10013223126

| Distribution Date | Scheduled Cap Notional Amount ($) |
|---|---|
| October 2008 | 214,684,000 |
| November 2008 | 199,889,000 |
| December 2008 | 186,974,000 |
| January 2009 | 174,802,000 |
| February 2009 | 163,323,000 |
| March 2009 | 152,498,000 |
| April 2009 | 142,290,000 |
| May 2009 | 132,664,000 |
| June 2009 | 125,686,000 |
| July 2009 | 116,998,000 |
| August 2009 | 108,804,000 |
| September 2009 | 101,077,000 |
| October 2009 | 93,789,000 |
| November 2009 | 86,915,000 |
| December 2009 | 89,286,000 |
| January 2010 | 91,564,000 |
| February 2010 | 90,335,000 |
| March 2010 | 85,235,000 |
| April 2010 | 80,201,000 |
| May 2010 | 75,363,000 |
| June 2010 | 70,797,000 |
| July 2010 | 66,491,000 |
| August 2010 | 62,429,000 |
| September 2010 | 58,597,000 |
| October 2010 | 54,981,000 |
| November 2010 | 51,570,000 |
| December 2010 | 48,352,000 |
| January 2011 | 45,316,000 |
| February 2011 | 42,451,000 |
| March 2011 | 39,748,000 |
| April 2011 | 37,197,000 |
| May 2011 | 34,846,000 |
| June 2011 | 32,572,000 |
| July 2011 | 30,423,000 |
| August 2011 | 28,394,000 |
| September 2011 | 26,480,000 |
| October 2011 | 24,673,000 |

The obligations of the Interest Rate Cap Provider to pay specified amounts due under the Interest Rate Cap Agreement (other than Interest Rate Cap Termination Payments (as defined below)) will be subject to the following conditions precedent: (1) no Interest Rate Cap Event of Default or event that with the giving of notice or lapse of time or both would become an Interest Rate Cap Event of Default, shall have occurred and be continuing with respect to the Interest Rate Cap Agreement and (2) no "Early Termination Date" (as defined in the Interest Rate Cap Agreement) has occurred or been effectively designated with respect to the Interest Rate Cap Agreement.

CONFIDENTIAL

FHFA04178981
A3-10013223127

Events of default under the Interest Rate Cap Agreement (each an "Interest Rate Cap Event of Default") include the following:

- failure to make a payment due under the Interest Rate Cap Agreement after notice of such failure is received and expiration of a specified grace period,

- certain insolvency or bankruptcy events, and

- a merger by the Interest Rate Cap Provider without an assumption of its obligations under the Interest Rate Cap Agreement,

each as further described in the Interest Rate Cap Agreement.

Termination events under the Interest Rate Cap Agreement (each an "Interest Rate Cap Termination Event") include the following:

- illegality (which generally relates to changes in law causing it to become unlawful for either party to perform its obligations under the Interest Rate Cap Agreement),

- tax event (which generally relates to the securities administrator receiving a payment under the Interest Rate Cap Agreement from which an amount has been deducted or withheld for or on account of taxes or paying an additional amount on account of an indemnifiable tax, as defined in the Interest Rate Cap Agreement, in either case as a result of a change in tax law) and

- tax event upon merger (which generally relates to the securities administrator receiving a payment under the Interest Rate Cap Agreement from which an amount has been deducted or withheld for or on account of an indemnifiable tax or paying an additional amount on account of an indemnifiable tax, in either case as a result of a merger or similar transaction),

each as further described in the Interest Rate Cap Agreement.

Additional termination events under the Interest Rate Cap Agreement (each an "Interest Rate Cap Additional Termination Event"), include the following:

- failure of the Interest Rate Cap Provider to comply with the Interest Rate Cap Downgrade Provisions,

- failure of the Interest Rate Cap Provider to comply with the Regulation AB provisions of the Interest Rate Cap Agreement, and

- occurrence of an optional termination of the securitization pursuant to the terms of the pooling and servicing agreement,

each as further described in the Interest Rate Cap Agreement.

If the Interest Rate Cap Provider's credit ratings are withdrawn or reduced below the levels specified in the Interest Rate Cap Agreement, then, unless each rating agency has reconfirmed

S-127

CONFIDENTIAL

FHFA04178982
A3-10013223128

the ratings which were in effect immediately prior to such withdrawal or reduction for all securities the ratings for which are supported by the Interest Rate Cap Agreement, the Interest Rate Cap Provider will be required, at its own expense, either (1) to obtain a substitute interest rate cap provider which will assume the obligations of the Interest Rate Cap Provider under the Interest Rate Cap Agreement and which meets all rating agency requirements and any third party consent requirements provided therein or in any related documentation, or (2) to establish any other arrangement specified in the Interest Rate Cap Agreement that meets all rating agency requirements and any third party consent requirements provided therein or in any related documentation (collectively, the "Interest Rate Cap Downgrade Provisions").

Upon the occurrence of an Interest Rate Cap Event of Default, the non-defaulting party will have the right to designate an early termination date (an "Early Termination Date"). Upon the occurrence of an Interest Rate Cap Termination Event or an Interest Rate Cap Additional Termination Event, an Early Termination Date may be designated by one of the parties as specified in the Interest Rate Cap Agreement, and will occur only upon notice and, in some circumstances, after any affected party has used reasonable efforts to transfer its rights and obligations under the Interest Rate Cap Agreement to a related entity within a specified period after notice has been given of the Interest Rate Cap Termination Event, all as set forth in the Interest Rate Cap Agreement. The occurrence of an Early Termination Date under the Interest Rate Cap Agreement will constitute an "Interest Rate Cap Early Termination."

Upon an Interest Rate Cap Early Termination, the Interest Rate Cap Provider may be liable to make a termination payment (the "Interest Rate Cap Termination Payment") to the securities administrator, regardless, if applicable, of which of the parties has caused the termination. The Interest Rate Cap Termination Payment will be based on the value of the Interest Rate Cap Agreement computed in accordance with the procedures set forth in the Interest Rate Cap Agreement.

Upon an Interest Rate Cap Early Termination other than in connection with the optional termination of the trust, the securities administrator shall, at the direction of the depositor, appoint a successor interest rate cap provider. If the securities administrator receives an Interest Rate Cap Termination Payment from the Interest Rate Cap Provider in connection with such Interest Rate Cap Early Termination, the securities administrator will apply such Interest Rate Cap Termination Payment to any upfront payment required to appoint the successor interest rate cap provider. If the securities administrator is unable to appoint a successor interest rate cap provider within 30 days of the Interest Rate Cap Early Termination, then the securities administrator will deposit any Interest Rate Cap Termination Payment received from the original Interest Rate Cap Provider into a separate, non-interest bearing reserve account and will, on each subsequent distribution date, withdraw from the amount then remaining on deposit in such reserve account an amount equal to payment, if any, that would have been paid to the securities administrator by the original Interest Rate Cap Provider calculated in accordance with the terms of the original Interest Rate Cap Agreement, and distribute such amount in accordance with the terms of the pooling and servicing agreement.

Upon an Interest Rate Cap Early Termination in connection with the optional termination of the trust, if the securities administrator receives an Interest Rate Cap Termination Payment from the Interest Rate Cap Provider in connection with such Interest Rate Cap Early Termination, such Interest Rate Cap Termination Payment generally will not be available to certificateholders; rather, the securities administrator will distribute such Swap Termination Payment in accordance with the terms of the pooling and servicing agreement.

CONFIDENTIAL

FHFA04178983
A3-10013223129

The significance percentage of the Interest Rate Cap Agreement, as calculated in accordance with Item 1115 of Regulation AB, is less than 10%. The Interest Rate Cap Agreement will provide that the Interest Rate Cap Provider may be replaced in certain circumstances, including if the significance percentage of the Interest Rate Cap Agreement is equal to or greater than 10%.

Any amounts received pursuant to the Interest Rate Cap Agreement and deposited in the Supplemental Interest Trust will be distributed on the related distribution date as follows:

(i)      to the Senior Certificates, pro rata based on amounts due, Current Interest and any Carryforward Interest for each such class and distribution date, after giving effect to distributions of such amounts as described under "—Distributions of Interest" and clause (i) under "The Interest Rate Swap Agreement";

(ii)      to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates, in that order, Current Interest and any Carryforward Interest for each such class and distribution date, after giving effect to distributions of such amounts as described under "—Distributions of Interest" and clause (ii) under "The Interest Rate Swap Agreement";

(iii)      to the holders of the class or classes of Senior Certificates and Subordinate Certificates then entitled to receive distributions in respect of principal, in an amount necessary to maintain or restore the Targeted Overcollateralization Amount after taking into account distributions made pursuant to clause (1) under "—Credit Enhancement—Overcollateralization" and after giving effect to distributions made pursuant to clause (iii) under "The Interest Rate Swap Agreement";

(iv)      to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class B-1 and Class B-2 Certificates, in that order, any applicable Deferred Amounts, with interest thereon at the applicable pass-through rate, prior to giving effect to amounts available to be paid in respect of Deferred Amounts as described under "—Credit Enhancement—Overcollateralization" on such distribution date and after giving effect to distributions made pursuant to clause (iv) under "The Interest Rate Swap Agreement";

(v)      to the Senior Certificates, on a pro rata basis, and then to the Subordinate Certificates, on a sequential basis, any applicable Basis Risk Shortfalls, prior to giving effect to any withdrawals from the Basis Risk Shortfall Reserve Fund or from amounts available to be paid in respect of Basis Risk Shortfalls as described in this prospectus supplement under "—Credit Enhancement—Overcollateralization" on such distribution date and after giving effect to distributions made pursuant to clause (v) under "The Interest Rate Swap Agreement"; and

(vi)      to the Class X Certificates, any remaining amounts.

Notwithstanding the foregoing, in no instance will such payments (other than payments made under clause (vi) above) be made other than to the extent of losses and Basis Risk Shortfalls.

S-129

CONFIDENTIAL

FHFA04178984
A3-10013223130

**THE BASIS RISK CAP PROVIDER, THE SWAP PROVIDER AND THE INTEREST RATE CAP PROVIDER**

The Basis Risk Cap Provider, Swap Provider and Interest Rate Cap Provider is HSBC Bank USA, National Association, which is referred to in this section as the "Bank". The Bank is a member of the HSBC Group, one of the world's largest banking and financial services groups. The HSBC Group is an international commercial and investment banking and financial services organization with some 9,800 offices in 77 countries and territories in Europe, the Asia-Pacific region, the Americas, the Middle East and Africa. HSBC Holdings plc, the ultimate parent company in the HSBC Group, is headquartered in London.

The Bank is chartered as a national banking association under the laws of the United States and, as such, is regulated primarily by the OCC. The Bank's deposits are insured by the FDIC up to applicable limits. The Bank's domestic operations are primarily in New York State. The Bank also has banking branch offices and/or representative offices in Florida, California, New Jersey, Delaware, Pennsylvania, Washington, Oregon, Massachusetts and Washington, D.C. In addition to its domestic offices, the Bank maintains foreign branch offices, subsidiaries and/or representative offices in the Caribbean, Europe, Panama, Asia, Latin America, Australia and Canada.

The Bank is the principal subsidiary of HSBC USA Inc., an indirectly-held, wholly-owned subsidiary of HSBC North America Holdings Inc., one of the nation's top 10 bank holding companies by assets and an indirectly-held, wholly-owned subsidiary of HSBC Holdings plc. At December 31, 2005, the Bank represented approximately 98% of the consolidated assets of HSBC USA Inc. and had assets of approximately $151 billion. The Bank had outstanding approximately $139 billion of obligations, including deposits totaling $95 billion and $25 billion of long-term debt. It had total shareholders' equity of $12 billion.

As of the date of this prospectus supplement, the long-term debt of the Bank has been assigned a rating of AA by S&P, Aa2 by Moody's and AA by Fitch. As of the date of this prospectus supplement, the short-term debt of the Bank has been assigned a rating of A-1+ by S&P, P-1 by Moody's and F1+ by Fitch.

Additional information about the Bank and HSBC USA Inc. may be obtained by contacting the Manager of Investor Relations and Government Affairs at HSBC, 452 Fifth Avenue, New York, New York 10018, tel. (212) 525-6191.

**YIELD, PREPAYMENT AND MATURITY CONSIDERATIONS**

**General**

The weighted average life of, and the yield to maturity on, each class of Offered Certificates generally will be directly related to the rate of payment of principal, including prepayments, of the Mortgage Loans in the related loan group or loan groups. The actual rate of principal prepayments on pools of mortgage loans is influenced by a variety of economic, tax, geographic, demographic, social, legal and other factors and has fluctuated considerably in recent years. In addition, the rate of principal prepayments may differ among pools of mortgage loans at any time because of specific factors relating to the mortgage loans in the particular pool, including, among other things, the age of the mortgage loans, the geographic locations of the properties securing the mortgage loans, the extent of the borrowers' equity in such properties, and changes in

S-130

CONFIDENTIAL

FHFA04178985
A3-10013223131

the borrowers' housing needs, job transfers and employment status. If prevailing interest rates fall significantly below the Mortgage Rates on the Mortgage Loans, the Mortgage Loans (and the applicable Offered Certificates) are likely to be subject to a higher incidence of prepayment than if prevailing rates remain at or above the Mortgage Rates on the Mortgage Loans. Conversely, if prevailing interest rates rise significantly above the Mortgage Rates on the Mortgage Loans, the Mortgage Loans (and the applicable Offered Certificates) are likely to be subject to a lower incidence of prepayment than if prevailing rates remain at or below the Mortgage Rates on the Mortgage Loans. Prepayments on the adjustable-rate Mortgage Loans may differ as they approach their respective first Adjustment Dates. No assurance can be given as to the level of prepayment that the Mortgage Loans will experience.

Although the Mortgage Rates on approximately 81.43% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date, are subject to adjustment, such Mortgage Rates adjust less frequently than the pass-through rates on the Offered Certificates and adjust by reference to Six-Month LIBOR. With respect to the Offered Certificates, changes in One-Month LIBOR may not correlate with changes in Six-Month LIBOR and also may not correlate with prevailing interest rates. It is possible that an increased level of One-Month LIBOR could occur simultaneously with a lower level of prevailing interest rates which would be expected to result in faster prepayments, thereby reducing the weighted average lives of the Offered Certificates. The Mortgage Rate applicable to the adjustable-rate Mortgage Loans and any Adjustment Date will be based on Six-Month LIBOR most recently announced generally as of a date either 45 days prior to, or the first business day of the month immediately preceding the month of, such Adjustment Date. Thus, if Six-Month LIBOR rises, the lag in time before the corresponding Mortgage Rate increases, will, all other things being equal, slow the upward adjustment of the pass-through rate or rate cap, as applicable, on the Offered Certificates. In addition, substantially all of the adjustable-rate Mortgage Loans have Mortgage Rates which will not adjust for a substantial period of time after origination. See "The Mortgage Pool" in this prospectus supplement.

The rate of principal prepayments may also be affected by whether the Mortgage Loan documents provide for prepayment charges. Approximately 60.64%, 62.02% and 61.26% of the Group I Mortgage Loans, Group II Mortgage Loans and the Mortgage Loans in the aggregate, respectively, in each case by the related aggregate principal balance as of the Cut-off Date, provide for the payment by the borrower of a Prepayment Charge on voluntary prepayments typically made within up to three years from the date of the execution of the related Mortgage Note. These Prepayment Charges, if still applicable and if enforced by the servicer would typically discourage prepayments on the related Mortgage Loans. There can be no assurance that the Prepayment Charges will have any effect on the prepayment performance of the Mortgage Loans. Investors should conduct their own analysis of the effect, if any, that the Prepayment Charges may have on the prepayment performance of the Mortgage Loans.

The timing of changes in the rate of prepayments may significantly affect the actual yield to investors who purchase the offered certificates at prices other than par, even if the average rate of principal prepayments is consistent with the expectations of investors. In general, the earlier the payment of principal of the mortgage loans in the related loan group the greater the effect on an investor's yield to maturity. As a result, the effect on an investor's yield of principal prepayments occurring at a rate higher or lower than the rate anticipated by the investor during the period immediately following the issuance of the Offered Certificates may not be offset by a subsequent like reduction or increase in the rate of principal prepayments.

CONFIDENTIAL

FHFA04178986
A3-10013223132

The Mortgage Loans were underwritten in accordance with the underwriting standards described in this prospectus supplement under "The Mortgage Pool—The Originator", "—Underwriting Standards of the Sponsor" and "—Modified Standards" and may or may not conform to Fannie Mae or Freddie Mac underwriting guidelines for "A" credit borrowers.  Accordingly, the Mortgage Loans may experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines. Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to maturity of the Offered Certificates.

The weighted average life and yield to maturity of each class of Offered Certificates will also be influenced by the amount of Monthly Excess Interest generated by the Mortgage Loans and applied in reduction of the Certificate Principal Balances of the Offered Certificates. The amount of Monthly Excess Interest available on any distribution date to be applied in reduction of the Certificate Principal Balances of the Offered Certificates  will be influenced by, among other factors,

- the overcollateralization level of the Mortgage Loans in the Mortgage Pool at such time, i.e., the extent to which interest on the Mortgage Loans is accruing on a higher Stated Principal Balance than the Certificate Principal Balance of the Offered Certificates;

- the delinquency and default experience of the Mortgage Loans; and

- the provisions of the pooling and servicing agreement that permit principal collections to be distributed to the Class X Certificates as provided in the pooling and servicing agreement when the Targeted Overcollateralization Amount has been met.

To the extent that greater amounts of Monthly Excess Interest are distributed in reduction of the Certificate Principal Balance of a class of Offered Certificates, the weighted average life of such class can be expected to shorten. No assurance, however, can be given as to the amount of Monthly Excess Interest to be distributed at any time or in the aggregate.

We refer you to "Description of the Certificates—Credit Enhancement" in this prospectus supplement.

The yields to maturity of the Offered Certificates and, in particular the Mezzanine Certificates, in the order of payment priority, will be progressively more sensitive to the rate, timing and severity of Realized Losses on the Mortgage Loans. If a Realized Loss is allocated to any class of Mezzanine Certificates, the Certificate Principal Balance thereof will be reduced by the amount of such Realized Loss and such class will thereafter accrue interest on a reduced Certificate Principal Balance.

**Yield Considerations for the Subordinate Certificates**

The rate of payment of principal, the aggregate amount of distributions and the yield to maturity of the Subordinate Certificates will be affected by the rate of prepayments on the related Mortgage Loans, as well as the rate of borrower defaults resulting in Realized Losses, by the severity of those losses and by the timing thereof. See "Description of the Certificates—Credit Enhancement" in this prospectus supplement for a description of the manner in which Realized Losses may be

CONFIDENTIAL

FHFA04178987
A3-10013223133

allocated to the Subordinate Certificates. If the purchaser of a Subordinate Certificate calculates its anticipated yield based on an assumed rate of default and amount of Realized Losses that is lower than the default rate and the amount of Realized Losses actually incurred, its actual yield to maturity will be lower than that so calculated. The timing of defaults and losses will also affect an investor's actual yield to maturity, even if the average rate of defaults and severity of losses are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater is the effect on an investor's yield to maturity. There can be no assurance as to the delinquency, foreclosure or loss experience with respect to the Mortgage Loans.

**Prepayments and Yields of Offered Certificates**

The extent to which the yield to maturity of an Offered Certificate may vary from the anticipated yield will depend upon the degree to which it is purchased at a discount or premium and, correspondingly, the degree to which the timing of payments thereon is sensitive to prepayments, liquidations and purchases of the Mortgage Loans. In particular, in the case of an Offered Certificate purchased at a discount, an investor should consider the risk that a slower than anticipated rate of principal payments, liquidations and purchases of the Mortgage Loans could result in an actual yield to such investor that is lower than the anticipated yield and, in the case of an Offered Certificate purchased at a premium, the risk that a faster than anticipated rate of principal payments, liquidations and purchases of such Mortgage Loans could result in an actual yield to such investor that is lower than the anticipated yield.

The "last scheduled distribution date" for each class of Offered Certificates is the distribution date in July 2036. The actual final distribution date with respect to each class of certificates could occur significantly earlier than its last scheduled distribution date because

- prepayments are likely to occur which will be applied to the payment of the Certificate Principal Balances thereof;

- Monthly Excess Interest to the extent available will be applied as an accelerated payment of principal on the Offered Certificates to the extent required to restore or maintain the Targeted Overcollateralization Amount as described in this prospectus supplement; and

- the master servicer may exercise its option to purchase all the assets of the trust as described under "– Optional Termination" in this prospectus supplement.

Prepayments on mortgage loans are commonly measured relative to a prepayment standard or model (the "Prepayment Assumption"). The model used in this prospectus supplement, which we refer to as the prepayment model, is a prepayment assumption which represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of mortgage loans for the life of such mortgage loans. A 100% prepayment assumption assumes that the outstanding principal balance of a pool of adjustable-rate Mortgage Loans prepays at a constant prepayment rate ("CPR") of 10% in the first month of the life of such pool, such rate increasing by an additional approximate 1.82% CPR (precisely 20%/11) each month thereafter through the twelfth month of the life of such pool, 30% CPR from month 13 through and including month 23; 55% CPR from month 24 through and including month 28; and 35% CPR from month 29 and thereafter; and this assumes that the outstanding principal balance of a pool of fixed-rate Mortgage Loans prepays at

S-133

FHFA04178988
A3-10013223134

a constant prepayment rate ("CPR") of 5% in the first month of the life of such pool, such rate increasing by an additional approximate 1.82% CPR (precisely 20%/11) each month thereafter through the twelfth month of the life of such pool, and 25% CPR thereafter.

There is no assurance, however, that prepayments on the Mortgage Loans will conform to any level of the prepayment model, and no representation is made that the Mortgage Loans will prepay at the prepayment rates shown or any other prepayment rate. The rate of principal payments on pools of mortgage loans is influenced by a variety of economic, geographic, social and other factors, including the level of interest rates. Other factors affecting prepayment of mortgage loans include changes in borrowers' housing needs, job transfers and unemployment. In the case of mortgage loans in general, if prevailing interest rates fall significantly below the interest rates on such mortgage loans, the mortgage loans are likely to be subject to higher prepayment rates than if prevailing interest rates remain at or above the rates borne by such mortgage loans. Conversely, if prevailing interest rates rise above the interest rates on such mortgage loans, the rate of prepayment would be expected to decrease.

The following tables have been prepared on the basis of the following assumptions, which we refer to, collectively, as modeling assumptions:

- the Mortgage Pool consists of 16 group I mortgage loans and 16 group II mortgage loans with the characteristics set forth in the tables set forth below;

- distributions on the Offered Certificates are received, in cash, on the 25th day of each month, commencing in November 2006;

- the Mortgage Loans prepay at the percentages of the Prepayment Assumption indicated;

- no defaults or delinquencies in, or modifications, waivers or amendments respecting, the payment by the borrowers of principal and interest on the Mortgage Loans occur;

- except with respect to footnote (2) on each of the following tables, none of the depositor, the servicer or any other person purchases from the trust fund any Mortgage Loan under any obligation or option under the pooling and servicing agreement;

- scheduled payments are assumed to be received on the first day of each month commencing in November 2006, there are no shortfalls in the payment of interest to certificateholders and prepayments represent payment in full of individual Mortgage Loans and are assumed to be received on the last day of each month, commencing in October 2006, and include 30 days' interest thereon;

- scheduled payments of principal and interest on the Mortgage Loans are calculated on their respective principal balances (prior to giving effect to prepayments received thereon during the preceding calendar month), mortgage rate and remaining amortization terms to maturity such that the

S-134

FHFA04178989
A3-10013223135

Mortgage Loans will fully amortize by their remaining amortization terms (taking into account any remaining interest only periods);

- the certificates are purchased on October 31, 2006;

- the level of One-Month LIBOR remains constant at 5.320% per annum;

- the level of Six-Month LIBOR remains constant at 5.416% per annum;

- the Certificate Principal Balance of the Class P Certificates is assumed to be zero; and

- the Interest Rate Swap Agreement is not subject to early termination.

S-135

GROUP 1

| Principal Balance ($) | Gross Mortgage Rate (%) | Net Mortgage Rate (%) | Remaining Term to Maturity (Months) | Amortization Remaining Term (Months)* | Age (Months) | Original Interest Only (Months) | Index Type | Gross Margin (%) | Maximum Mortgage Rate (%) | Minimum Mortgage Rate (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Months to Next Rate Adjustment | Adjustment Rate Frequency (Months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 272,293,076.40 | 8.833 | 8.322 | 355 | 355 | 5 | N/A | 6 Month LIBOR | 6.398 | 14.834 | 8.833 | 2.527 | 1.500 | 19 | 6 |
| 200,138,147.96 | 8.260 | 7.749 | 355 | 475 | 5 | N/A | 6 Month LIBOR | 6.028 | 14.260 | 8.260 | 2.588 | 1.500 | 19 | 6 |
| 58,520,732.18 | 7.476 | 6.965 | 356 | 300 | 4 | 60 | 6 Month LIBOR | 5.347 | 13.476 | 7.476 | 2.699 | 1.500 | 20 | 6 |
| 1,504,096.76 | 8.901 | 8.390 | 355 | 356 | 4 | N/A | 6 Month LIBOR | 6.440 | 14.901 | 8.901 | 2.702 | 1.500 | 32 | 6 |
| 1,525,761.43 | 8.349 | 7.838 | 355 | 476 | 4 | N/A | 6 Month LIBOR | 6.255 | 14.349 | 8.349 | 2.449 | 1.500 | 32 | 6 |
| 1,332,208.99 | 7.287 | 6.776 | 356 | 300 | 4 | 60 | 6 Month LIBOR | 5.117 | 13.287 | 7.287 | 2.747 | 1.500 | 32 | 6 |
| 475,232.20 | 8.103 | 7.592 | 356 | 356 | 4 | N/A | 6 Month LIBOR | 5.882 | 14.103 | 8.103 | 3.000 | 1.500 | 56 | 6 |
| 475,464.00 | 8.208 | 7.697 | 355 | 475 | 5 | N/A | 6 Month LIBOR | 5.820 | 14.208 | 8.208 | 2.315 | 1.500 | 55 | 6 |
| 25,005,235.93 | 7.528 | 7.017 | 356 | 476 | 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 179,307.03 | 8.172 | 7.661 | 175 | 175 | 5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 347,710.62 | 8.515 | 8.044 | 236 | 236 | 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 60,276,246.35 | 7.786 | 7.275 | 356 | 356 | 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 319,280.49 | 12.640 | 12.129 | 116 | 116 | 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 1,573,046.53 | 11.413 | 10.902 | 176 | 176 | 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 108,225.34 | 12.446 | 11.935 | 236 | 236 | 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 53,154,432.41 | 11.149 | 10.638 | 356 | 356 | 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

*Remaining amortization term for Interest Only Loans will begin after the remaining interest only period.

CONFIDENTIAL

FHFA04178991
A3-10013223137

## GROUP II

| Principal Balance ($) | Gross Mortgage Rate (%) | Net Mortgage Rate (%) | Remaining Term to Maturity (Months) | Amortization Remaining Term (Months)* | Age (Months) | Original Interest Only (Months) | Index Type | Gross Margin (%) | Maximum Mortgage Rate (%) | Minimum Mortgage Rate (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Months to Next Rate Adjustment | Adjustment Rate Frequency (Months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 157,727,990.17 | 8.611 | 8.100 | 355 | 355 | 5 | N/A | 6 Month LIBOR | 6.301 | 14.607 | 8.611 | 2.491 | 1.500 | 19 | 6 |
| 204,530,004.69 | 8.178 | 7.667 | 355 | 475 | 5 | N/A | 6 Month LIBOR | 5.990 | 14.178 | 8.176 | 2.564 | 1.498 | 19 | 6 |
| 89,619,648.15 | 7.584 | 7.073 | 355 | 360 | 5 | 60 | 6 Month LIBOR | 5.453 | 13.584 | 7.584 | 2.599 | 1.500 | 19 | 6 |
| 3,893,063.47 | 8.731 | 8.220 | 355 | 355 | 5 | N/A | 6 Month LIBOR | 6.378 | 14.731 | 8.731 | 2.303 | 1.500 | 31 | 6 |
| 3,379,348.51 | 7.992 | 7.481 | 355 | 475 | 5 | N/A | 6 Month LIBOR | 5.871 | 13.992 | 7.992 | 2.511 | 1.500 | 31 | 6 |
| 3,726,480.00 | 7.094 | 6.583 | 356 | 360 | 4 | 60 | 6 Month LIBOR | 4.947 | 13.094 | 7.094 | 2.509 | 1.500 | 32 | 6 |
| 354,402.75 | 9.122 | 8.611 | 355 | 355 | 5 | N/A | 6 Month LIBOR | 6.526 | 15.122 | 9.122 | 2.683 | 1.500 | 55 | 6 |
| 494,310.33 | 7.350 | 6.839 | 356 | 476 | 4 | N/A | 6 Month LIBOR | 5.129 | 13.350 | 7.350 | 3.000 | 1.500 | 56 | 6 |
| 22,069,813.84 | 7.468 | 6.957 | 355 | 475 | 5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 527,709.81 | 6.200 | 5.689 | 176 | 176 | 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 340,758.27 | 7.250 | 6.739 | 235 | 235 | 5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 33,137,054.63 | 7.309 | 6.798 | 355 | 355 | 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 643,392.11 | 11.503 | 10.992 | 116 | 116 | 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 444,829.45 | 11.814 | 11.303 | 176 | 176 | 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 130,127.24 | 10.039 | 9.528 | 235 | 235 | 5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 29,785,716.66 | 11.101 | 10.590 | 356 | 356 | 4 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

*Remaining amortization term for Interest Only Loans will begin after the remaining interest only period.

S-137

CONFIDENTIAL

FHFA04178992
A3-10013223138

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class I-A-1 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007 | 80 | 73 | 67 | 60 | 53 |
| October 25, 2008 | 55 | 42 | 30 | 18 | 8 |
| October 25, 2009 | 38 | 23 | 11 | 0 | 0 |
| October 25, 2010 | 30 | 21 | 11 | 0 | 0 |
| October 25, 2011 | 24 | 16 | 10 | 0 | 0 |
| October 25, 2012 | 19 | 12 | 7 | 0 | 0 |
| October 25, 2013 | 15 | 9 | 5 | 0 | 0 |
| October 25, 2014 | 12 | 7 | 3 | 0 | 0 |
| October 25, 2015 | 10 | 5 | 2 | 0 | 0 |
| October 25, 2016 | 8 | 4 | 2 | 0 | 0 |
| October 25, 2017 | 6 | 3 | 1 | 0 | 0 |
| October 25, 2018 | 5 | 2 | 1 | 0 | 0 |
| October 25, 2019 | 4 | 2 | * | 0 | 0 |
| October 25, 2020 | 3 | 1 | 0 | 0 | 0 |
| October 25, 2021 | 3 | 1 | 0 | 0 | 0 |
| October 25, 2022 | 2 | 1 | 0 | 0 | 0 |
| October 25, 2023 | 2 | * | 0 | 0 | 0 |
| October 25, 2024 | 1 | 0 | 0 | 0 | 0 |
| October 25, 2025 | 1 | 0 | 0 | 0 | 0 |
| October 25, 2026 | 1 | 0 | 0 | 0 | 0 |
| October 25, 2027 | 1 | 0 | 0 | 0 | 0 |
| October 25, 2028 | * | 0 | 0 | 0 | 0 |
| October 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 3.73 | 2.74 | 2.04 | 1.32 | 1.13 |
| Weighted Average Life (in years)[1] [2] | 3.41 | 2.50 | 1.83 | 1.32 | 1.13 |

*If applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

S-138

FHFA04178993
A3-10013223139

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| | Class II-A-1 | | | | |
|---|---|---|---|---|---|
| **Distribution Date** | **60%** | **80%** | **100%** | **120%** | **140%** |
| Initial Percentage ..................... | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007 ...................... | 69 | 58 | 48 | 38 | 28 |
| October 25, 2008 ...................... | 30 | 10 | 0 | 0 | 0 |
| October 25, 2009 ...................... | 4 | 0 | 0 | 0 | 0 |
| October 25, 2010 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2011 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2012 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2013 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2014 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2015 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2016 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2017 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2018 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2019 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2020 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2021 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2022 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2023 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2024 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2025 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2026 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2027 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2028 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035 ...................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036 ...................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 1.55 | 1.20 | 1.00 | 0.86 | 0.74 |
| Weighted Average Life (in years)[1][2] | 1.55 | 1.20 | 1.00 | 0.86 | 0.74 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

CONFIDENTIAL

FHFA04178994
A3-10013223140

**Percent of the Initial Certificate Principal Balance**
**at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class II-A-2 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007 | 100 | 100 | 100 | 100 | 100 |
| October 25, 2008 | 100 | 100 | 39 | 0 | 0 |
| October 25, 2009 | 100 | 0 | 0 | 0 | 0 |
| October 25, 2010 | 44 | 0 | 0 | 0 | 0 |
| October 25, 2011 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2012 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2013 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2014 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2015 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2016 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2017 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2018 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2019 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2020 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2021 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2022 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2023 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2024 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2025 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2026 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2027 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2028 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 3.95 | 2.59 | 2.00 | 1.73 | 1.59 |
| Weighted Average Life (in years)[1][2] | 3.95 | 2.59 | 2.00 | 1.73 | 1.59 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1) The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2) Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option. See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

CONFIDENTIAL

FHFA04178995
A3-10013223141

**Percent of the Initial Certificate Principal Balance**
**at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class II-A-3 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage .................................. | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007 .................................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2008 .................................. | 100 | 100 | 100 | 65 | 16 |
| October 25, 2009 .................................. | 100 | 88 | 30 | 0 | 0 |
| October 25, 2010 .................................. | 100 | 80 | 30 | 0 | 0 |
| October 25, 2011 .................................. | 92 | 55 | 29 | 0 | 0 |
| October 25, 2012 .................................. | 71 | 37 | 15 | 0 | 0 |
| October 25, 2013 .................................. | 54 | 23 | 5 | 0 | 0 |
| October 25, 2014 .................................. | 40 | 13 | 0 | 0 | 0 |
| October 25, 2015 .................................. | 29 | 6 | 0 | 0 | 0 |
| October 25, 2016 .................................. | 20 | 1 | 0 | 0 | 0 |
| October 25, 2017 .................................. | 13 | 0 | 0 | 0 | 0 |
| October 25, 2018 .................................. | 8 | 0 | 0 | 0 | 0 |
| October 25, 2019 .................................. | 3 | 0 | 0 | 0 | 0 |
| October 25, 2020 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2021 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2022 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2023 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2024 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2025 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2026 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2027 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2028 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035 .................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036 .................................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.83 | 5.62 | 3.65 | 2.21 | 1.85 |
| Weighted Average Life (in years)[1][2] | 7.55 | 5.42 | 3.50 | 2.21 | 1.85 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

CONFIDENTIAL

FHFA04178996
A3-10013223142

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class II-A-4 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ................................. | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007 ................................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2008 ................................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2009 ................................. | 100 | 100 | 100 | 0 | 0 |
| October 25, 2010 ................................. | 100 | 100 | 100 | 0 | 0 |
| October 25, 2011 ................................. | 100 | 100 | 100 | 0 | 0 |
| October 25, 2012 ................................. | 100 | 100 | 100 | 0 | 0 |
| October 25, 2013 ................................. | 100 | 100 | 100 | 0 | 0 |
| October 25, 2014 ................................. | 100 | 100 | 90 | 0 | 0 |
| October 25, 2015 ................................. | 100 | 100 | 57 | 0 | 0 |
| October 25, 2016 ................................. | 100 | 100 | 35 | 0 | 0 |
| October 25, 2017 ................................. | 100 | 75 | 20 | 0 | 0 |
| October 25, 2018 ................................. | 100 | 53 | 6 | 0 | 0 |
| October 25, 2019 ................................. | 100 | 37 | 0 | 0 | 0 |
| October 25, 2020 ................................. | 98 | 25 | 0 | 0 | 0 |
| October 25, 2021 ................................. | 76 | 15 | 0 | 0 | 0 |
| October 25, 2022 ................................. | 59 | 3 | 0 | 0 | 0 |
| October 25, 2023 ................................. | 45 | 0 | 0 | 0 | 0 |
| October 25, 2024 ................................. | 34 | 0 | 0 | 0 | 0 |
| October 25, 2025 ................................. | 25 | 0 | 0 | 0 | 0 |
| October 25, 2026 ................................. | 17 | 0 | 0 | 0 | 0 |
| October 25, 2027 ................................. | 7 | 0 | 0 | 0 | 0 |
| October 25, 2028 ................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029 ................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030 ................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031 ................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032 ................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033 ................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034 ................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035 ................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036 ................................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 17.11 | 12.60 | 9.61 | 2.85 | 2.27 |
| Weighted Average Life (in years)[1][2] | 10.32 | 7.57 | 5.82 | 2.85 | 2.27 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

S-142

CONFIDENTIAL

FHFA04178997
A3-10013223143

**Percent of the Initial Certificate Principal Balance**
**at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-1 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007 | 100 | 100 | 100 | 100 | 100 |
| October 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| October 25, 2009 | 100 | 100 | 100 | 90 | 0 |
| October 25, 2010 | 82 | 59 | 100 | 90 | 0 |
| October 25, 2011 | 66 | 43 | 27 | 90 | 0 |
| October 25, 2012 | 53 | 32 | 19 | 86 | 0 |
| October 25, 2013 | 42 | 24 | 13 | 54 | 0 |
| October 25, 2014 | 34 | 17 | 9 | 34 | 0 |
| October 25, 2015 | 27 | 13 | 6 | 21 | 0 |
| October 25, 2016 | 21 | 10 | 4 | 9 | 0 |
| October 25, 2017 | 17 | 7 | 3 | 1 | 0 |
| October 25, 2018 | 14 | 5 | 0 | 0 | 0 |
| October 25, 2019 | 11 | 4 | 0 | 0 | 0 |
| October 25, 2020 | 9 | 3 | 0 | 0 | 0 |
| October 25, 2021 | 7 | 0 | 0 | 0 | 0 |
| October 25, 2022 | 5 | 0 | 0 | 0 | 0 |
| October 25, 2023 | 4 | 0 | 0 | 0 | 0 |
| October 25, 2024 | 3 | 0 | 0 | 0 | 0 |
| October 25, 2025 | 3 | 0 | 0 | 0 | 0 |
| October 25, 2026 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2027 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2028 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.50 | 5.74 | 5.38 | 7.29 | 2.54 |
| Weighted Average Life (in years)[1][2] | 6.73 | 5.16 | 4.91 | 4.48 | 2.54 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

CONFIDENTIAL

FHFA04178998
A3-10013223144

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-2 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007 | 100 | 100 | 100 | 100 | 100 |
| October 25, 2008 | 100 | 100 | 100 | 100 | 100 |
| October 25, 2009 | 100 | 100 | 100 | 100 | 2 |
| October 25, 2010 | 82 | 59 | 77 | 100 | 2 |
| October 25, 2011 | 66 | 43 | 27 | 71 | 2 |
| October 25, 2012 | 53 | 32 | 19 | 10 | 2 |
| October 25, 2013 | 42 | 24 | 13 | 6 | 2 |
| October 25, 2014 | 34 | 17 | 9 | 4 | 2 |
| October 25, 2015 | 27 | 13 | 6 | 0 | 1 |
| October 25, 2016 | 21 | 10 | 4 | 0 | 0 |
| October 25, 2017 | 17 | 7 | 1 | 0 | 0 |
| October 25, 2018 | 14 | 5 | 0 | 0 | 0 |
| October 25, 2019 | 11 | 4 | 0 | 0 | 0 |
| October 25, 2020 | 9 | 1 | 0 | 0 | 0 |
| October 25, 2021 | 7 | 0 | 0 | 0 | 0 |
| October 25, 2022 | 5 | 0 | 0 | 0 | 0 |
| October 25, 2023 | 4 | 0 | 0 | 0 | 0 |
| October 25, 2024 | 3 | 0 | 0 | 0 | 0 |
| October 25, 2025 | * | 0 | 0 | 0 | 0 |
| October 25, 2026 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2027 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2028 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035 | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.48 | 5.67 | 5.03 | 5.50 | 3.00 |
| Weighted Average Life (in years)[1][2] | 6.73 | 5.10 | 4.58 | 4.65 | 2.88 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

S-144

CONFIDENTIAL

FHFA04178999
A3-10013223145

**Percent of the Initial Certificate Principal Balance**
**at the Respective Percentages of the Prepayment Assumption**

| | Class M-3 | | | | |
|---|---|---|---|---|---|
| **Distribution Date** | **60%** | **80%** | **100%** | **120%** | **140%** |
| Initial Percentage................................ | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007................................ | 100 | 100 | 100 | 100 | 100 |
| October 25, 2008................................ | 100 | 100 | 100 | 100 | 100 |
| October 25, 2009................................ | 100 | 100 | 100 | 100 | 100 |
| October 25, 2010................................ | 82 | 59 | 41 | 100 | 100 |
| October 25, 2011................................ | 66 | 43 | 27 | 17 | 100 |
| October 25, 2012................................ | 53 | 32 | 19 | 10 | 92 |
| October 25, 2013................................ | 42 | 24 | 13 | 6 | 48 |
| October 25, 2014................................ | 34 | 17 | 9 | 4 | 16 |
| October 25, 2015................................ | 27 | 13 | 6 | 0 | 0 |
| October 25, 2016................................ | 21 | 10 | 4 | 0 | 0 |
| October 25, 2017................................ | 17 | 7 | 0 | 0 | 0 |
| October 25, 2018................................ | 14 | 5 | 0 | 0 | 0 |
| October 25, 2019................................ | 11 | 4 | 0 | 0 | 0 |
| October 25, 2020................................ | 9 | 0 | 0 | 0 | 0 |
| October 25, 2021................................ | 7 | 0 | 0 | 0 | 0 |
| October 25, 2022................................ | 5 | 0 | 0 | 0 | 0 |
| October 25, 2023................................ | 4 | 0 | 0 | 0 | 0 |
| October 25, 2024................................ | 1 | 0 | 0 | 0 | 0 |
| October 25, 2025................................ | 0 | 0 | 0 | 0 | 0 |
| October 25, 2026................................ | 0 | 0 | 0 | 0 | 0 |
| October 25, 2027................................ | 0 | 0 | 0 | 0 | 0 |
| October 25, 2028................................ | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029................................ | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030................................ | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031................................ | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032................................ | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033................................ | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034................................ | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035................................ | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036................................ | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.46 | 5.62 | 4.85 | 4.86 | 7.09 |
| Weighted Average Life (in years)[1][2] | 6.73 | 5.07 | 4.42 | 4.51 | 3.74 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1) The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2) Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option. See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

S-145

CONFIDENTIAL

FHFA04179000
A3-10013223146

**Percent of the Initial Certificate Principal Balance**
**at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-4 | | | | |
| --- | --- | --- | --- | --- | --- |
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ................................ | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007 ............................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2008 ............................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2009 ............................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2010 ............................. | 82 | 59 | 41 | 88 | 100 |
| October 25, 2011 ............................. | 66 | 43 | 27 | 17 | 85 |
| October 25, 2012 ............................. | 53 | 32 | 19 | 10 | 5 |
| October 25, 2013 ............................. | 42 | 24 | 13 | 6 | 0 |
| October 25, 2014 ............................. | 34 | 17 | 9 | 2 | 0 |
| October 25, 2015 ............................. | 27 | 13 | 6 | 0 | 0 |
| October 25, 2016 ............................. | 21 | 10 | 2 | 0 | 0 |
| October 25, 2017 ............................. | 17 | 7 | 0 | 0 | 0 |
| October 25, 2018 ............................. | 14 | 5 | 0 | 0 | 0 |
| October 25, 2019 ............................. | 11 | 1 | 0 | 0 | 0 |
| October 25, 2020 ............................. | 9 | 0 | 0 | 0 | 0 |
| October 25, 2021 ............................. | 7 | 0 | 0 | 0 | 0 |
| October 25, 2022 ............................. | 5 | 0 | 0 | 0 | 0 |
| October 25, 2023 ............................. | 4 | 0 | 0 | 0 | 0 |
| October 25, 2024 ............................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2025 ............................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2026 ............................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2027 ............................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2028 ............................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029 ............................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030 ............................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031 ............................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032 ............................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033 ............................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034 ............................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035 ............................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036 ............................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.43 | 5.59 | 4.75 | 4.58 | 5.42 |
| Weighted Average Life (in years)[1][2] | 6.73 | 5.06 | 4.33 | 4.24 | 3.74 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

S-146

FHFA04179001
A3-10013223147

**Percent of the Initial Certificate Principal Balance**
**at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-5 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ................................. | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007.................................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2008.................................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2009.................................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2010.................................. | 82 | 59 | 41 | 27 | 100 |
| October 25, 2011.................................. | 66 | 43 | 27 | 17 | 10 |
| October 25, 2012.................................. | 53 | 32 | 19 | 10 | 5 |
| October 25, 2013.................................. | 42 | 24 | 13 | 6 | 0 |
| October 25, 2014.................................. | 34 | 17 | 9 | 0 | 0 |
| October 25, 2015.................................. | 27 | 13 | 6 | 0 | 0 |
| October 25, 2016.................................. | 21 | 10 | 0 | 0 | 0 |
| October 25, 2017.................................. | 17 | 7 | 0 | 0 | 0 |
| October 25, 2018.................................. | 14 | 5 | 0 | 0 | 0 |
| October 25, 2019.................................. | 11 | 0 | 0 | 0 | 0 |
| October 25, 2020.................................. | 9 | 0 | 0 | 0 | 0 |
| October 25, 2021.................................. | 7 | 0 | 0 | 0 | 0 |
| October 25, 2022.................................. | 5 | 0 | 0 | 0 | 0 |
| October 25, 2023.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2024.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2025.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2026.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2027.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2028.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036.................................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.40 | 5.54 | 4.67 | 4.38 | 4.75 |
| Weighted Average Life (in years)[1][2] | 6.73 | 5.04 | 4.27 | 4.06 | 3.74 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

CONFIDENTIAL

FHFA04179002
A3-10013223148

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-6 | | | | |
| --- | --- | --- | --- | --- | --- |
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ..................................... | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007.................................... | 100 | 100 | 100 | 100 | 100 |
| October 25, 2008.................................... | 100 | 100 | 100 | 100 | 100 |
| October 25, 2009.................................... | 100 | 100 | 100 | 100 | 100 |
| October 25, 2010.................................... | 82 | 59 | 41 | 27 | 95 |
| October 25, 2011.................................... | 66 | 43 | 27 | 17 | 10 |
| October 25, 2012.................................... | 53 | 32 | 19 | 10 | 2 |
| October 25, 2013.................................... | 42 | 24 | 13 | 6 | 0 |
| October 25, 2014.................................... | 34 | 17 | 9 | 0 | 0 |
| October 25, 2015.................................... | 27 | 13 | 5 | 0 | 0 |
| October 25, 2016.................................... | 21 | 10 | 0 | 0 | 0 |
| October 25, 2017.................................... | 17 | 7 | 0 | 0 | 0 |
| October 25, 2018.................................... | 14 | * | 0 | 0 | 0 |
| October 25, 2019.................................... | 11 | 0 | 0 | 0 | 0 |
| October 25, 2020.................................... | 9 | 0 | 0 | 0 | 0 |
| October 25, 2021.................................... | 7 | 0 | 0 | 0 | 0 |
| October 25, 2022.................................... | 2 | 0 | 0 | 0 | 0 |
| October 25, 2023.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2024.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2025.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2026.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2027.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2028.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035.................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036.................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.37 | 5.51 | 4.60 | 4.23 | 4.35 |
| Weighted Average Life (in years)[1][2] | 6.73 | 5.03 | 4.22 | 3.93 | 3.74 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by
       the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by
       the initial respective certificate principal balance for such class of Offered Certificates.
(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on
       which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this prospectus
       supplement.

S-148

FHFA04179003
A3-10013223149

**Percent of the Initial Certificate Principal Balance**
**at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-7 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage .................................. | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007................................... | 100 | 100 | 100 | 100 | 100 |
| October 25, 2008................................... | 100 | 100 | 100 | 100 | 100 |
| October 25, 2009................................... | 100 | 100 | 100 | 100 | 100 |
| October 25, 2010................................... | 82 | 59 | 41 | 27 | 17 |
| October 25, 2011................................... | 66 | 43 | 27 | 17 | 10 |
| October 25, 2012................................... | 53 | 32 | 19 | 10 | 0 |
| October 25, 2013................................... | 42 | 24 | 13 | 2 | 0 |
| October 25, 2014................................... | 34 | 17 | 9 | 0 | 0 |
| October 25, 2015................................... | 27 | 13 | 0 | 0 | 0 |
| October 25, 2016................................... | 21 | 10 | 0 | 0 | 0 |
| October 25, 2017................................... | 17 | 5 | 0 | 0 | 0 |
| October 25, 2018................................... | 14 | 0 | 0 | 0 | 0 |
| October 25, 2019................................... | 11 | 0 | 0 | 0 | 0 |
| October 25, 2020................................... | 9 | 0 | 0 | 0 | 0 |
| October 25, 2021................................... | 4 | 0 | 0 | 0 | 0 |
| October 25, 2022................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2023................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2024................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2025................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2026................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2027................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2028................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035................................... | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.32 | 5.45 | 4.53 | 4.11 | 4.08 |
| Weighted Average Life (in years)[1][2] | 6.73 | 5.02 | 4.18 | 3.83 | 3.74 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

CONFIDENTIAL

FHFA04179004
A3-10013223150

**Percent of the Initial Certificate Principal Balance**
**at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-8 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ................................ | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007.................................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2008.................................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2009.................................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2010.................................. | 82 | 59 | 41 | 27 | 17 |
| October 25, 2011.................................. | 66 | 43 | 27 | 17 | 10 |
| October 25, 2012.................................. | 53 | 32 | 19 | 10 | 0 |
| October 25, 2013.................................. | 42 | 24 | 13 | 0 | 0 |
| October 25, 2014.................................. | 34 | 17 | 6 | 0 | 0 |
| October 25, 2015.................................. | 27 | 13 | 0 | 0 | 0 |
| October 25, 2016.................................. | 21 | 10 | 0 | 0 | 0 |
| October 25, 2017.................................. | 17 | 0 | 0 | 0 | 0 |
| October 25, 2018.................................. | 14 | 0 | 0 | 0 | 0 |
| October 25, 2019.................................. | 11 | 0 | 0 | 0 | 0 |
| October 25, 2020.................................. | 6 | 0 | 0 | 0 | 0 |
| October 25, 2021.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2022.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2023.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2024.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2025.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2026.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2027.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2028.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035.................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036.................................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.25 | 5.40 | 4.45 | 4.00 | 3.88 |
| Weighted Average Life (in years)[1][2] | 6.73 | 5.02 | 4.15 | 3.76 | 3.67 |

*If, applicable, indicates a number that is greater than zero but less than 0.5%.

(1)   The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2)   Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

CONFIDENTIAL

FHFA04179005
A3-10013223151

**Percent of the Initial Certificate Principal Balance
at the Respective Percentages of the Prepayment Assumption**

| Distribution Date | Class M-9 | | | | |
|---|---|---|---|---|---|
| | 60% | 80% | 100% | 120% | 140% |
| Initial Percentage ................................. | 100% | 100% | 100% | 100% | 100% |
| October 25, 2007................................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2008................................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2009................................. | 100 | 100 | 100 | 100 | 100 |
| October 25, 2010................................. | 82 | 59 | 41 | 27 | 17 |
| October 25, 2011................................. | 66 | 43 | 27 | 17 | 1 |
| October 25, 2012................................. | 53 | 32 | 19 | 5 | 0 |
| October 25, 2013................................. | 42 | 24 | 13 | 0 | 0 |
| October 25, 2014................................. | 34 | 17 | 0 | 0 | 0 |
| October 25, 2015................................. | 27 | 13 | 0 | 0 | 0 |
| October 25, 2016................................. | 21 | 1 | 0 | 0 | 0 |
| October 25, 2017................................. | 17 | 0 | 0 | 0 | 0 |
| October 25, 2018................................. | 14 | 0 | 0 | 0 | 0 |
| October 25, 2019................................. | 8 | 0 | 0 | 0 | 0 |
| October 25, 2020................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2021................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2022................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2023................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2024................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2025................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2026................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2027................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2028................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2029................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2030................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2031................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2032................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2033................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2034................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2035................................. | 0 | 0 | 0 | 0 | 0 |
| October 25, 2036................................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)[1] | 7.16 | 5.33 | 4.38 | 3.89 | 3.72 |
| Weighted Average Life (in years)[1][2] | 6.73 | 5.01 | 4.13 | 3.69 | 3.55 |

*If applicable, indicates a number that is greater than zero but less than 0.5%.

(1) The weighted average life of the Offered Certificates is determined by (i) multiplying the amount of each principal payment by the number of years from the date of issuance to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the initial respective certificate principal balance for such class of Offered Certificates.

(2) Assumes that the master servicer exercises its option to purchase the Mortgage Loans on the earliest possible distribution date on which it is permitted to exercise this option.  See "Pooling and Servicing Agreement—Optional Termination" in this prospectus supplement.

CONFIDENTIAL

FHFA04179006
A3-10013223152

## THE SPONSOR

Nomura Credit & Capital, Inc., the sponsor, is a Delaware corporation whose principal offices are located in New York, New York. The sponsor has a book value of approximately $75 million as of July 31, 2006, is an indirect subsidiary of Nomura Holding America Inc., and an indirect subsidiary of Nomura Holdings, Inc., a global investment banking and securities firm having a current market capitalization of approximately $34.13 billion. The sponsor is a HUD approved mortgagee primarily engaged in the business of originating, purchasing and selling commercial mortgage loans, purchasing and selling residential mortgage loans and engaging in various asset backed warehouse and repurchase financings of non-securities. The sponsor is also an affiliate of Nomura Home Equity Loan, Inc., the depositor for this transaction. The sponsor was incorporated in the State of Delaware on June 24, 1998. The sponsor maintains its principal office at Two World Financial Center, Building B, New York, New York 10281. Its telephone number is (212) 667-9300.

Since 2002 the sponsor has been purchasing residential mortgage loans, comprised primarily of newly originated, conforming and non-conforming balance, Alt-A, first-lien, fixed and adjustable rate mortgages, as well as second-lien and subprime mortgages, in excess of $26.97 billion as of September 30, 2006. The sponsor is responsible for pooling the mortgage loans to be securitized by the depositor, negotiating the principal securitization transaction documents and participating with the underwriters in the structuring of such transactions. The sponsor also sells residential mortgage loans and related servicing rights to third-party investors.

The sponsor has been actively securitizing residential mortgage loans since April 2003. The following table describes the size (at issuance), composition and growth of the sponsor's total portfolio of assets it has publicly securitized as of the dates indicated. As of the date of this prospectus supplement, none of the securitization transactions sponsored by the sponsor through August 2006 and involving the depositor have defaulted or experienced a trigger event.

| Loan Type | Year ended December 31, 2003 | | Year ended December 31, 2004 | | Year ended December 31, 2005 | | Month ended September 30, 2006 | |
|---|---|---|---|---|---|---|---|---|
| | Number | Total Portfolio of Loans | Number | Total Portfolio of Loans | Number | Total Portfolio of Loans | Number | Total Portfolio of Loans |
| Alt-A ARM........... | N/A | N/A | 6,360 | $1,595,220,173 | 11,166 | $3,096,819,467 | 4,460 | $1,475,178,325 |
| Alt-A Fixed........... | 3,268 | $687,573,876 | 3,823 | $ 773,581,361 | 6,798 | $1,387,201,153 | 6,844 | $1,560,840,196 |
| Seconds............... | N/A | N/A | N/A | N/A | 12,142 | $ 685,450,460 | 0 | N/A |
| SubPrime ............. | N/A | N/A | N/A | N/A | 10,278 | $2,080,121,500 | 23,619 | $4,355,288,958 |

## STATIC POOL INFORMATION

Static pool information material to this offering may be found at http://www.nomuradeals.com/NHEL2006FM2.

Information provided through the Internet address above will not be deemed to be a part of this prospectus or the registration statement for the securities offered hereby if it relates to any prior securities pool or vintage formed before January 1, 2006, or with respect to any mortgage pool (if applicable) acquired before January 1, 2006.

S-152

CONFIDENTIAL

FHFA04179007
A3-10013223153

## ISSUING ENTITY

Nomura Home Equity Loan, Inc., Home Equity Loan Trust Series 2006-FM2 is a common law trust formed under the laws of the State of New York pursuant to the pooling and servicing agreement between the depositor, the servicer, the master servicer, the securities administrator and the trustee, dated as of October 1, 2006 (the "Pooling and Servicing Agreement"). The Pooling and Servicing Agreement constitutes the "governing instrument" under the laws of the State of New York. After its formation, the Issuing Entity will not engage in any activity other than (i) acquiring and holding the Mortgage Loans and the other assets of the trust and proceeds therefrom, (ii) issuing the certificates, (iii) making payments on the certificates and (iv) engaging in other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith. The foregoing restrictions are contained in the Pooling and Servicing Agreement. These restrictions cannot be amended without the consent of holders of certificates evidencing at least 51% of the voting rights. For a description of other provisions relating to amending the Pooling and Servicing Agreement, please see *"Description of the Agreements — Amendment"* in the prospectus.

The assets of the Issuing Entity will consist of the Mortgage Loans and certain related assets.

The Issuing Entity's fiscal year end is December 31.

## THE DEPOSITOR

Nomura Home Equity Loan, Inc., the depositor, is a special purpose corporation incorporated in the State of Delaware on April 26, 2005. The principal executive offices of the depositor are located at Two World Financial Center, Building B, New York, New York 10281. Its telephone number is (212) 667-9300. The depositor does not have, nor is it expected in the future to have, any significant assets.

The limited purposes of the depositor are, in general, to acquire, own and sell mortgage loans and financial assets; to issue, acquire, own, hold and sell securities and notes secured by or representing ownership interests in mortgage loans and other financial assets, collections on the mortgage loans and related assets; and to engage in any acts that are incidental to, or necessary, suitable or convenient to accomplish, these purposes.

The depositor has been actively serving as a private secondary mortgage market conduit for residential mortgage loans since its inception. Since that time it has been involved in the issuance of public securities backed by residential mortgage loans in excess of $5.2 billion as of July 31, 2006.

After issuance and registration of the securities contemplated in this prospectus supplement, the depositor will have no duties or responsibilities with respect to the pool assets or securities other than any obligations with respect to the filing of any reports under the Exchange Act as set forth in the Pooling and Servicing Agreement.

All of the shares of capital stock of the depositor are held by Nomura America Mortgage Finance, LLC, a Delaware limited liability company.

S-153

CONFIDENTIAL

FHFA04179008
A3-10013223154

## SERVICING

Primary servicing of the Mortgage Loans will be provided by Equity One, Inc. pursuant to the Pooling and Servicing Agreement, through a subservicing arrangement with its affiliate, Popular Mortgage Servicing, Inc., a Delaware corporation. Notwithstanding its subservicing arrangement with Popular Mortgage Servicing, Inc., Equity One, Inc., will continue to be liable for the servicing of the Mortgage Loans until it is terminated as servicer under the Pooling and Servicing Agreement. The information set forth in the following paragraphs has been provided by Equity One, Inc.

### The Servicer

Equity One, Inc., a Delaware corporation and a wholly-owned operating subsidiary of Popular Financial Holdings, Inc., a Delaware corporation, will be the servicer pursuant to the Pooling and Servicing Agreement. The servicer is engaged primarily in the mortgage banking and consumer lending business, and in that capacity, originates, purchases, sells and services mortgage and consumer loans. The servicer is a Fannie Mae and Freddie Mac approved lender. It originates loans through a retail branch system and through loan brokers and correspondents nationwide. The servicer's loans are principally first and second lien, fixed or adjustable rate mortgage loans secured by one- to four-family dwellings or multi-family properties and structures which include both residential dwelling units and space used for retail, professional or other commercial uses, and secured or unsecured consumer loans.

The principal executive offices of the servicer are located at 301 Lippincott Drive, Marlton, NJ 08053. Its telephone number is (800) 461-8643.

There have been no material changes to the servicer's policies and procedures in the servicing function it will perform for this transaction for assets of the same type included in this transaction for the past three years.

### The Subservicer

Effective as of 11:59 p.m. on May 31, 2006, the servicer transferred substantially all of its mortgage servicing operations and business to the subservicer, its affiliate, which, like the servicer, is a wholly owned subsidiary of Popular Financial Holdings, Inc. Accordingly, the subservicer utilizes substantially the same personnel, servicing platform and servicing policies and procedures as had been historically utilized by the servicer. The servicer had been servicing mortgage loans similar to the Mortgage Loans since 1989. Prior to 11:59 p.m. on to May 31, 2006, the subservicer was not engaged in any mortgage loan servicing activity.

As of June 30, 2006, the servicer and its subsidiaries provided servicing for approximately 85,956 mortgage loans (including mortgage loans serviced for third parties) having an aggregate net unpaid principal balance of approximately $10,455,370,528. As of the date of this prospectus supplement, the subservicer is providing servicing for substantially all of these mortgage loans.

The subservicer is a Fannie Mae and Freddie Mac approved servicer. As of the date of this prospectus supplement, the subservicer's rating as a primary servicer of subprime mortgage loans is as follows:

S-154

CONFIDENTIAL

FHFA04179009
A3-10013223155



| **Fitch** | RPS2- |
|---|---|

The subservicer primarily conducts its mortgage loan servicing operations from its headquarters located at 121 Woodcrest Road, Cherry Hill, NJ 08053.

The subservicer services and subservices mortgage loans owned by affiliated or unaffiliated entities. The subservicer has established standard policies for the subservicing and collection of mortgage loans. Subservicing includes, but is not limited to, collecting and remitting mortgage loan payments, accounting for principal and interest, preparation of tax related information in connection with the mortgage loans, supervision of delinquent mortgage loans, making inspections as required of the mortgaged properties, loss mitigation efforts, foreclosure proceedings and, if applicable, the disposition of mortgaged properties, and generally administering the mortgage loans. Under its subservicing agreement with the servicer, the subservicer receives subservicing fees that are generally calculated based on the number of loans subserviced for the servicer.

When a borrower fails to make a payment on a mortgage loan, the subservicer contacts the borrower in an attempt to get the borrower to cure the deficiency. Pursuant to its servicing procedures, the subservicer generally mails to the borrower a notice of intent to foreclose after the mortgage loan becomes 60 days contractually past due (assuming 30 day months) (three payments due but not received). Within 45 days thereafter, if the mortgage loan remains delinquent, the subservicer will institute appropriate legal action to foreclose on the mortgaged property. The subservicer may terminate these foreclosure proceedings if the borrower cures the delinquency. Mortgage loans to borrowers in bankruptcy proceedings may be restructured in accordance with law and with a view to maximizing recovery on these mortgage loans, including any deficiencies.

Once foreclosure is initiated, the subservicer uses a foreclosure tracking system to monitor the progress of the proceedings. The system includes state specific parameters to monitor whether proceedings are progressing within the time frame typical for the state in which the mortgaged property is located. During the foreclosure proceeding, the subservicer determines the amount of the foreclosure bid and whether to liquidate the mortgage loan.

After foreclosure, the subservicer may liquidate the mortgaged property and charge-off the portion of the mortgage loan balance that was not recovered as part of Liquidation Proceeds. If foreclosed, the mortgaged property is sold at a public or private sale and may be purchased by the subservicer or the servicer.

Servicing and charge-off policies and collection practices may change over time in accordance with, among other things, the business judgment of the subservicer, changes in the servicing portfolio and applicable laws and regulations.

There have been no material changes to the subservicer's policies and procedures in the servicing function it will perform for this transaction for assets of the same type included in this transaction for the past three years.

**Foreclosure, Delinquency and Loss Experience**

The following table summarizes the foreclosure, delinquency and loss experience of mortgage loans owned and serviced by the servicer and its subsidiaries at or for the years specified therein. A mortgage loan is characterized as delinquent if the borrower has not paid the scheduled

S-155

FHFA04179010
A3-10013223156

payment due by the due date.  The table below discloses delinquency percentages of mortgage loans 60 days or more past due on a contractual basis and includes mortgage loans where the mortgage loan is in foreclosure or the borrower has filed for bankruptcy, but excludes mortgage loans which are real estate owned.   You should not consider this information as a basis for assessing the likelihood, amount, or severity of delinquency or losses on the Mortgage Loans, and no assurances can be given that the foreclosure, delinquency and loss experience presented in the table below will be indicative of the actual foreclosure, delinquency and loss experience on the Mortgage Loans.

### Foreclosure, Delinquency and Loss Table[1]
(Dollars in Thousands)

| | At or for the Year Ended November 30, 2003 | At or for the Year Ended November 30, 2004 | At or for the Year Ended November 30, 2005 | At or for the Six Months Ended June 30, 2005 | At or for the Six Months Ended June 30, 2006 |
|---|---|---|---|---|---|
| Portfolio Unpaid Principal Balance[2] | $6,272,912 | $8,169,832 | $8,063,534 | $7,332,898 | $7,212,040 |
| Average Portfolio Unpaid Principal Balance[3] | $5,092,792 | $7,258,688 | $7,739,357 | $7,651,755 | $7,504,252 |
| 60+ Days Delinquent[4] | 4.62% | 4.40% | 4.40% | 4.68% | 5.21% |
| Real Estate Owned[5] | $25,957 | $34,677 | $50,542 | $42,247 | $56,687 |
| Total Credit Losses[6] | 0.44% | 0.37% | 0.60% | 0.56%[7] | 0.62%[7] |

---

(1)    This table includes only mortgage loans owned and serviced by the servicer and its subsidiaries and real estate owned by the servicer and its subsidiaries.

(2)    Portfolio Unpaid Principal Balance is the net amount of (a) principal to be paid on each mortgage loan, (b) loan origination fees, net of costs, (c) unearned interest and (d) other miscellaneous deferred charges and fees; and excludes the principal balance of each mortgage loan for which the related mortgaged property had been acquired through foreclosure or deed in lieu of foreclosure by that date.

(3)    Average Portfolio Unpaid Principal Balances are calculated by summing monthly Portfolio Unpaid Principal Balances and dividing by the number of months summed (i.e., thirteen (13) in the case of the annual figures and seven (7) in the case of the six month figures).

(4)    Delinquency percentages are calculated as the dollar amount of the unpaid principal balance of the mortgage loans that are delinquent divided by the Portfolio Unpaid Principal Balance.   Delinquency percentages do not include the principal balance of mortgage loans as to which the related mortgaged property had been acquired through foreclosure or deed in lieu of foreclosure by that date.   For the columns entitled "At or for the Year Ended November 30, 2003," "At or for the Year Ended November 30, 2004," "At or for the Year Ended November 30, 2005," "At or for the Six Months Ended June 30, 2005" and "At or for the Six Months Ended June 30, 2006" delinquency percentages are calculated based on the number of days payments are contractually past due and assumes 30-day months. Consequently, a payment due on the first day of a month is not 30 days delinquent until the first day of the following month.

(5)    Real estate owned represents the aggregate estimated fair value of the properties acquired through foreclosure or deed in lieu of foreclosure.

(6)    Total Credit Losses includes charge-offs of principal, net of subsequent recoveries, relating to mortgage loans written off as uncollectible and initial write-downs of loans upon transfer to real estate owned.   It does not include (a) subsequent write downs of real estate owned balances, (b) expenses associated with maintaining, repairing, and selling foreclosed properties and real estate owned and (c) losses (gains) on the disposition of real estate owned.

(7)    Annualized.

S-156

FHFA04179011
A3-10013223157

Historically, a variety of factors, including the appreciation of real estate values, have limited the loss and delinquency experience on mortgage loans. There can be no assurance that factors beyond the servicer's control, like national or local economic conditions or downturn in the real estate markets of its lending areas, will not result in increased rates of delinquencies and foreclosure losses in the future.

**Servicing and Other Compensation and Payment of Expenses**

The servicer will provide the servicing functions with respect to the Mortgage Loans as set forth in the Pooling and Servicing Agreement. Among other things, the servicer will be obligated, except under certain circumstances described in this prospectus supplement, to make P&I Advances with respect to the Mortgage Loans. In managing the liquidation of defaulted Mortgage Loans, the servicer will have sole discretion to take such action in maximizing recoveries to the certificateholders including, without limitation, selling defaulted Mortgage Loans and REO Properties as described in the Pooling and Servicing Agreement. Pursuant to the terms of the Pooling and Servicing Agreement, the servicer will be entitled to reimbursement for P&I Advances, servicing advances, servicing fees and applicable expenses on a priority basis from, among other things, late recoveries of principal and/or interest, Liquidation Proceeds and Insurance Proceeds from the Mortgage Loans. The master servicer will be required to monitor the performance of the Servicer under the Pooling and Servicing Agreement.

The principal compensation to be paid to the servicer in respect of the servicing activities performed by it with respect to the Mortgage Loans will be 0.50% per annum (the "Servicing Fee Rate") on the Stated Principal Balance of each Mortgage Loan (the "Servicing Fee"). As additional servicing compensation, the servicer is entitled to retain all assumption fees, late payment charges, and other miscellaneous servicing fees in respect of the Mortgage Loans to the extent collected from the borrowers, together with any interest or other income earned on funds held in the Custodial Account (as defined in this prospectus supplement) maintained by such servicer and any escrow accounts.

In general, the servicer will be obligated to offset any Prepayment Interest Shortfall relating to voluntary prepayments on any distribution date with Compensating Interest on such distribution date as described in the definition of Compensating Interest under "Description of the Certificates—Glossary of Terms" in this prospectus supplement; *provided however* that the obligation of the servicer with respect to the payment of Compensating Interest will be limited to the Servicing Fee payable to the servicer for such month. The servicer is obligated to pay insurance premiums and other ongoing expenses associated with the Mortgage Loans incurred by it in connection with its responsibilities under the Pooling and Servicing Agreement and is entitled to reimbursement for these expenses as provided in the Pooling and Servicing Agreement.

**Payments on Mortgage Loans; Deposits to Custodial Account**

The servicer shall establish and maintain or cause to be maintained a separate trust account (the "Custodial Account") for the Mortgage Loans for the benefit of the certificateholders. The Custodial Account will be an Eligible Account (as defined in the Pooling and Servicing Agreement). Within two (2) business days of receipt by the servicer of amounts in respect of the Mortgage Loans (excluding amounts representing the Servicing Fee or other servicing compensation, reimbursement for P&I Advances and servicing advances and Insurance Proceeds to be applied to the restoration or repair of a related Mortgaged Property or similar items), the servicer will deposit such

CONFIDENTIAL

FHFA04179012
A3-10013223158

amounts in the Custodial Account. Amounts so deposited may be invested in Permitted Investments maturing no later than one Business Day prior to the Servicer Remittance Date. All investment income on funds in the Custodial Account shall be for the benefit of the servicer.

Any one or more of the following obligations or securities held in the name of the trustee for the benefit of the related certificateholders will be considered a Permitted Investment (each a "Permitted Investment"):

(i)     obligations of the United States or any agency thereof, provided such obligations are backed by the full faith and credit of the United States;

(ii)     general obligations of or obligations guaranteed by any state of the United States or the District of Columbia receiving the highest long-term debt rating of each rating agency, or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the certificates by each rating agency, as evidenced in writing;

(iii)     commercial or finance company paper which is then receiving the highest commercial or finance company paper rating of each rating agency, or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the certificates by each rating agency, as evidenced in writing;

(iv)     certificates of deposit, demand or time deposits, or bankers' acceptances issued by any Depository institution or trust company incorporated under the laws of the United States or of any state thereof and subject to supervision and examination by federal and/or state banking authorities (including the trustee in its commercial banking capacity), provided that the commercial paper and/or long term unsecured debt obligations of such Depository institution or trust company are then rated one of the two highest long-term and the highest short-term ratings of each such rating agency for such securities, or such lower ratings as will not result in the downgrading or withdrawal of the rating then assigned to the certificates by any rating agency, as evidenced in writing;

(v)     guaranteed reinvestment agreements issued by any bank, insurance company or other corporation containing, at the time of the issuance of such agreements, such terms and conditions as will not result in the downgrading or withdrawal of the rating then assigned to the certificates by each rating agency, as evidenced in writing;

(vi)     repurchase obligations with respect to any security described in clauses (i) and (ii) above, in either case entered into with a Depository institution or trust company (acting as principal) described in clause (v) above;

(vii)     securities (other than stripped bonds, stripped coupons or instruments sold at a purchase price in excess of 115% of the face amount thereof) bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States or any state thereof which, at the time of such investment, have one of the two highest short term ratings of each rating agency (except if the rating agency is Moody's, such rating will be the highest commercial paper rating of Moody's for any such securities), or such lower rating as will not result in the downgrading or withdrawal of the rating then assigned to the certificates by each rating agency, as evidenced by a signed writing delivered by each rating agency;

S-158

CONFIDENTIAL

FHFA04179013
A3-10013223159

(viii)   interests in any money market fund (including any such fund managed or advised by the trustee or any affiliate thereof) which at the date of acquisition of the interests in such fund and throughout the time such interests are held in such fund has the highest applicable short term rating by each rating agency or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the certificates by each rating agency, as evidenced in writing;

(ix)   short term investment funds sponsored by any trust company or banking association incorporated under the laws of the United States or any state thereof (including any such fund managed or advised by the trustee or the master servicer or any affiliate thereof) which on the date of acquisition has been rated by each rating agency in their respective highest applicable rating category or such lower rating as will not result in the downgrading or withdrawal of the ratings then assigned to the certificates by each rating agency, as evidenced in writing; and

(x)   such other investments having a specified stated maturity and bearing interest or sold at a discount acceptable to each rating agency and as will not result in the downgrading or withdrawal of the rating then assigned to the certificates by any rating agency, as evidenced by a signed writing delivered by each rating agency.

**Prepayment Interest Shortfalls and Compensating Interest**

When a principal prepayment in full is made on a Mortgage Loan, the mortgagor is charged interest only for the period from the Due Date of the preceding monthly payment up to the date of the prepayment, instead of for a full month. When a partial principal prepayment is made on a Mortgage Loan, the mortgagor is not charged interest on the amount of the prepayment for the month in which the prepayment is made. In addition, the application of the Servicemembers Civil Relief Act (the "Relief Act") and similar state or local laws to any Mortgage Loan could adversely affect, for an indeterminate period of time, the ability of the related servicer to collect full amounts of interest on such Mortgage Loans.

The servicer is obligated to pay from its own funds up to the related amount of Compensating Interest only those interest shortfalls attributable to voluntary principal prepayments by the borrowers on the Mortgage Loans. Any interest shortfalls attributable to voluntary principal prepayments required to be funded but not funded by the servicer are required to be paid by the master servicer, but only to the extent that such amount does not exceed the aggregate master servicing fee (exclusive of the portion of such fee payable to the credit risk manager) for the Mortgage Loans for the applicable distribution date. Accordingly, the effect of (i) any principal prepayments on the Mortgage Loans, to the extent that any resulting shortfall (a "Prepayment Interest Shortfall") exceeds any Compensating Interest payments by the servicer or the master servicer or (ii) any shortfalls resulting from the application of the Relief Act, will be to reduce the aggregate amount of interest collected that is available for distribution to the holders of the related certificates. Any such shortfalls will be allocated among the certificates as provided under "Description of the Certificates–Distributions" in this prospectus supplement. See "Certain Legal Aspects of the Loans–Servicemembers Civil Relief Act" in the prospectus.

**P&I Advances**

Subject to the limitations set forth in the following paragraph, if a scheduled payment on a Mortgage Loan which was due on a related due date and is delinquent (other than as a result of application of the Relief Act), the servicer will be required to remit to the securities administrator for deposit in the Distribution Account (as defined in this prospectus supplement) from its own funds or

S-159

from funds available in the Custodial Account relating to a subsequent due date, or some combination of its own funds and such amounts on the Servicer Remittance Date, an amount equal to such delinquency, net of the Servicing Fee (any such remittance, a "P&I Advance").

P&I Advances are required to be made only to the extent they are deemed by the servicer to be recoverable from related late collections, Insurance Proceeds or Liquidation Proceeds from the Mortgage Loan as to which the unreimbursed P&I Advance was made. In addition, any P&I Advances previously made in respect of any Mortgage Loan that are deemed by the servicer to be nonrecoverable from related late collections, Insurance Proceeds or Liquidation Proceeds may be reimbursed to the servicer out of any funds in the Custodial Account prior to distributions on the related certificates. The purpose of making the P&I Advances is to maintain a regular cash flow to the certificateholders, rather than to guarantee or insure against losses. The servicer will not be required to make any P&I Advances with respect to reductions in the amount of the monthly payments on the related Mortgage Loans due to bankruptcy proceedings or the application of the Relief Act.

Failure of the servicer to make any required P&I Advance, which failure goes unremedied for the days specified in the Pooling and Servicing Agreement would constitute an event of default under the Pooling and Servicing Agreement. Such event of default would obligate the master servicer, as successor servicer, or any other successor servicer appointed by the master servicer to make such P&I Advance subject to its determination of recoverability from related late collections, Insurance Proceeds or Liquidation Proceeds from the related Mortgage Loan.

The Pooling and Servicing Agreement also provides that the Servicer may enter into a facility with any person which provides that such person may fund P&I Advances or servicing advances, although no such facility shall reduce or otherwise affect the obligations of to fund such P&I Advances or servicing advances. Any P&I Advances or servicing advances funded by an advancing person will be reimbursed to the advancing person in the same manner as reimbursements would be made to the Servicer.

**Modifications**

In instances in which a Mortgage Loan is in default or if default is reasonably foreseeable, and if determined by the servicer to be in the best interest of the certificateholders, the servicer may permit servicing modifications of the Mortgage Loan rather than proceeding with foreclosure. However, the servicer's ability to perform servicing modifications will be subject to some limitations, including but not limited to the following. Any amounts added to the principal balance of the Mortgage Loan, or capitalized amounts added to the Mortgage Loan, will be required to be fully amortized over the remaining term, or the extended term, of the Mortgage Loan. All capitalizations are to be implemented in accordance with the servicer's standards and may be implemented only by the servicer for that purpose. The final maturity of any Mortgage Loan will not be extended beyond the assumed final distribution date. No servicing modification with respect to a Mortgage Loan will have the effect of reducing the mortgage rate below one half of the mortgage rate as in effect on the Cut-off Date, but not less than the servicing fee rate. Further, the aggregate current principal balance of all Mortgage Loans subject to modifications can be no more than five percent (5%) of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date, but this limit may increase from time to time with the consent of the rating agencies.

S-160

CONFIDENTIAL

FHFA04179015
A3-10013223161

Any advances made on any Mortgage Loan will be reduced to reflect any related servicing modifications previously made. The mortgage rate and net mortgage rate as to any Mortgage Loan will be deemed not reduced by any servicing modification, so that the calculation of the amount of current interest payable on the Offered Certificates as described in this prospectus supplement will not be affected by the servicing modification.

**Evidence as to Compliance**

The Pooling and Servicing Agreement will provide that not later than March 15 of each year, beginning with the first year after the year in which the Cut-off Date occurs, each party responsible for the servicing function will provide to the depositor and the master servicer a report on an assessment of compliance with the minimum servicing criteria established in Item 1122(d) of Regulation AB (the "AB Servicing Criteria"). The AB Servicing Criteria include specific criteria relating to the following areas: general servicing considerations, cash collection and administration, investor remittances and reporting, and pool asset administration. Such report will indicate that the AB Servicing Criteria were used to test compliance on a platform level basis and will set out any material instances of noncompliance.

The Pooling and Servicing Agreement will also provide that each party responsible for the servicing function will deliver along with its report on assessment of compliance, an attestation report from a firm of independent public accountants on the assessment of compliance with the AB Servicing Criteria.

The Pooling and Servicing Agreement will also provide for delivery to the master servicer and the securities administrator, not later than March 15 of each year, of a separate annual statement of compliance from each entity responsible for the servicing function to the effect that, to the best knowledge of the signing officer, the servicer has fulfilled in all material respects its obligations under the Pooling and Servicing Agreement throughout the preceding year or, if there has been a material failure in the fulfillment of any obligation, the statement shall specify such failure and the nature and status thereof. This statement may be provided as a single form making the required statements as to more than one pooling and servicing agreement.

Copies of the annual reports of assessment of compliance, attestation reports, and statements of compliance may be obtained by certificateholders without charge upon written request to the master servicer at the address of the master servicer set forth under "The Master Servicer, Securities Administrator and Custodian" in this prospectus supplement. These items will be filed with the issuing entity's annual report on Form 10-K, to the extent required under Regulation AB.

## THE MASTER SERVICER, SECURITIES ADMINISTRATOR AND CUSTODIAN

**General**

The information set forth in the following paragraph has been provided by the master servicer.

Wells Fargo Bank, N.A. ("Wells Fargo Bank") will act as master servicer and securities administrator under the Pooling and Servicing Agreement and as custodian under the Custodial Agreement. Wells Fargo Bank is a national banking association and a wholly-owned subsidiary of Wells Fargo & Company. A diversified financial services company with

S-161

FHFA04179016
A3-10013223162

approximately $482 billion in assets, 23 million customers and 153,000+ employees as of December 31, 2005, Wells Fargo & Company is a U.S. bank holding company providing banking, insurance, trust, mortgage and consumer finance services throughout the United States and internationally. Wells Fargo Bank provides retail and commercial banking services and corporate trust, custody, securities lending, securities transfer, cash management, investment management and other financial and fiduciary services. The depositor, the sponsor and the servicer may maintain banking and other commercial relationships with Wells Fargo Bank and its affiliates. Wells Fargo Bank maintains principal corporate trust offices located at 9062 Old Annapolis Road, Columbia, Maryland 21045-1951, (among other locations), and its office for certificate transfer services is located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479.

Wells Fargo Bank serves or may have served within the past two years as loan file custodian for various mortgage loans owned by the sponsor or an affiliate of the sponsor and anticipates that one or more of those mortgage loans may be included in the trust. The terms of any custodial agreement under which those services are provided by Wells Fargo Bank are customary for the mortgage backed securitization industry and provide for the delivery, receipt, review and safekeeping of mortgage files.

*Master Servicer.* Wells Fargo Bank acts as master servicer pursuant to the Pooling and Servicing Agreement. The master servicer is responsible for the aggregation of monthly servicer reports and remittances and for the oversight of the performance of the servicer under the terms of the Pooling and Servicing Agreement. In particular, the master servicer independently calculates monthly loan balances based on servicer data, compares its results to servicer loan-level reports and reconciles any discrepancies with the servicer. The master servicer also reviews the servicing of defaulted loans for compliance with the terms of the Pooling and Servicing Agreement. In addition, upon the occurrence of certain servicer events of default under the terms of the Pooling and Servicing Agreement, the master servicer may be required to enforce certain remedies on behalf of the trust against such defaulting servicer. Wells Fargo Bank has been engaged in the business of master servicing since June 30, 1995. As of June 30, 2006, Wells Fargo Bank was acting as master servicer for approximately 1,253 series of residential mortgage-backed securities with an aggregate outstanding principal balance of approximately $651,189,990,090.

*Securities Administrator.* Under the terms of the Pooling and Servicing Agreement, Wells Fargo Bank is also responsible for securities administration, which includes pool performance calculations, distribution calculations and the preparation of monthly distribution reports. As securities administrator, Wells Fargo Bank is responsible for the preparation and filing of all REMIC tax returns on behalf of the trust REMICs and the preparation of monthly reports on Form 10-D, current reports on Form 8-K and annual reports on Form 10-K that are required to be filed with the Securities and Exchange Commission on behalf of the trust. Wells Fargo Bank has been engaged in the business of securities administration since June 30, 1995. As of June 30, 2006, Wells Fargo Bank was acting as securities administrator with respect to more than $894,773,136,436 of outstanding residential mortgage-backed securities.

*Custodian.* Wells Fargo Bank is acting as custodian of the mortgage loan files pursuant to the custodial agreement to be entered into among HSBC Bank USA, National Association, as trustee, Wells Fargo Bank, N.A., as custodian and the servicer. In that capacity, Wells Fargo Bank is responsible to hold and safeguard the mortgage notes and other contents of the mortgage files on behalf of the trustee and the certificateholders. Wells Fargo Bank maintains each mortgage loan file in a separate file folder marked with a unique bar code to assure loan-level file

S-162

FHFA04179017
A3-10013223163

integrity and to assist in inventory management.  Files are segregated by transaction or investor. Wells Fargo Bank has been engaged in the mortgage document custody business for more than 25 years.   Wells Fargo Bank maintains document custody facilities in its Minneapolis, Minnesota headquarters and in three regional offices located in Richfield, Minnesota, Irvine, California, and Salt Lake City, Utah.  As of June 30, 2006, Wells Fargo Bank maintains mortgage custody vaults in each of those locations with an aggregate capacity of over eleven million files.

**Master Servicing and Other Compensation and Payment of Expenses**

The principal compensation to be paid to the master servicer in respect of its master servicing activities for the certificates will be a master servicing fee equal to one-twelfth of the product of 0.0110% multiplied by the Stated Principal Balance of the Mortgage Loans as of the Due Date in the preceding calendar month. In addition, the master servicer will be entitled to any interest or other income earned on funds held in the Distribution Account (together, the "Master Servicing Compensation"), as set forth in the Pooling and Servicing Agreement. The master servicing fee includes securities administrator, paying agent, certificate registrar and credit risk manager fees.

The monthly fee payable to the custodian for the performance of its obligations under the custodial agreement and the monthly fee payable to the trustee for the performance of its obligations under the Pooling and Servicing Agreement will be paid by the master servicer from its compensation. The expenses of the custodian and the trustee will be paid out of the trust fund prior to making payments to the certificateholders.

In the event that the servicer fails to pay the amount of any Compensating Interest required to be paid on any distribution date, the master servicer shall pay such amount up to the aggregate master servicing fee (exclusive of the portion of such fee payable to the credit risk manager) payable to the master servicer on such distribution date.

The master servicer shall not resign except upon a determination that the master servicer's duties are no longer permissible under applicable law.  The master servicer may sell and assign its rights and delegate its duties and obligations subject to the conditions set forth in the Pooling and Servicing Agreement.

**The Distribution Account**

The securities administrator will establish a non-interest bearing trust account (the "Distribution Account") into which will be deposited amounts remitted to it by the servicers for distribution to the certificateholders on each distribution date and payment of certain fees and expenses of the trust. The Distribution Account will be an Eligible Account (as defined in the Pooling and Servicing Agreement). Amounts on deposit therein may be invested in Permitted Investments (as defined under "Servicing   Payments on Mortgage Loans; Deposits to Custodial Account" in this prospectus supplement) maturing on or before the business day prior to the related distribution date unless such Permitted Investments are invested in investments managed or advised by the securities administrator or an affiliate thereof, in which case such Permitted Investments may mature on the related distribution date.  All investment income on funds in the Distribution Account shall be for the benefit of the master servicer.  Any losses resulting from such investments are required to be reimbursed to the Distribution Account by the master servicer out of its own funds.

S-163

CONFIDENTIAL

FHFA04179018
A3-10013223164

**Transfer of Master Servicing**

The master servicer may sell and assign its rights and delegate its duties and obligations in its entirety as master servicer under the Pooling and Servicing Agreement; provided, however, that: (i) the purchaser or transferee accept in writing such assignment and delegation and assume the obligations of the master servicer under the Pooling and Servicing Agreement (a) shall have a net worth of not less than $15,000,000 (unless otherwise approved by each rating agency pursuant to clause (ii) below); (b) shall be reasonably satisfactory to the trustee (as evidenced in a writing signed by the trustee); and (c) shall execute and deliver to the trustee an agreement, in form and substance reasonably satisfactory to the trustee, which contains an assumption by such Person of the due and punctual performance and observance of each covenant and condition to be performed or observed by it as master servicer under the Pooling and Servicing Agreement; (ii) each rating agency shall be given prior written notice of the identity of the proposed successor to the master servicer and each rating agency's rating of the certificates in effect immediately prior to such assignment, sale and delegation will not be downgraded, qualified or withdrawn as a result of such assignment, sale and delegation, as evidenced by a letter to such effect delivered to the master servicer and the trustee; and (iii) the master servicer assigning and selling the master servicing shall deliver to the trustee an officer's certificate and an opinion of independent counsel, each stating that all conditions precedent to such action under the Pooling and Servicing Agreement have been completed and such action is permitted by and complies with the terms of the Pooling and Servicing Agreement. No such assignment or delegation shall affect any liability of the master servicer arising out of acts or omissions prior to the effective date thereof.

## POOLING AND SERVICING AGREEMENT

**General**

The certificates will be issued under the Pooling and Servicing Agreement, a form of which is filed as an exhibit to the registration statement. A Current Report on Form 8-K relating to the certificates containing a copy of the Pooling and Servicing Agreement as executed will be filed by the depositor with the Securities and Exchange Commission ("SEC") following the initial issuance of the certificates. The trust fund created under the Pooling and Servicing Agreement will consist of (i) all of the depositor's right, title and interest in the Mortgage Loans, the related Mortgage Notes, mortgages and other related documents; (ii) all payments on or collections in respect of the Mortgage Loans due after the Cut-off Date, together with any proceeds of the Mortgage Loans; (iii) any Mortgaged Properties acquired on behalf of certificateholders by foreclosure or by deed in lieu of foreclosure, and any revenues received on these Mortgaged Properties; (iv) the rights of the trustee under all insurance policies required to be maintained under the Pooling and Servicing Agreement and (v) the rights of the depositor under the mortgage loan purchase agreement and the Servicing Agreement. Reference is made to the prospectus for important information in addition to that set forth in this prospectus supplement regarding the trust fund, the terms and conditions of the Pooling and Servicing Agreement, the Servicing Agreement and the Offered Certificates. The depositor will provide to a prospective or actual certificateholder without charge, on written request, a copy, without exhibits, of the Pooling and Servicing Agreement. Requests should be addressed to Nomura Home Equity Loan, Inc., Two World Financial Center, Building B, 21st Floor, New York, New York 10281.

On the Closing Date, the depositor will transfer to the trust all of its right, title and interest in and to each Mortgage Loan (other than the servicing rights with respect to the Mortgage

CONFIDENTIAL

FHFA04179019
A3-10013223165

Loans which shall be retained by (i) the servicer who owns the servicing rights on the Mortgage Loans or (ii) the sponsor, in the event the sponsor comes into ownership of any such servicing rights), the related Mortgage Note, mortgage, assignment of mortgage in recordable form to the trustee and other related documents (collectively, the "Related Documents"), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date. The trustee, concurrently with such transfer, will deliver the certificates to the depositor. Each Mortgage Loan transferred to the trust will be identified on a schedule (the "Mortgage Loan Schedule") delivered to the trustee pursuant to the Pooling and Servicing Agreement. The Mortgage Loan Schedule will include information such as the outstanding principal balance of each Mortgage Loan as of the Cut-off Date, its Mortgage Rate as well as other information with respect to each Mortgage Loan.

The Pooling and Servicing Agreement will require that, within the time period specified therein, the depositor will deliver or cause to be delivered to the trustee (or a custodian, as the trustee's agent for such purpose) the Mortgage Notes endorsed to the trustee on behalf of the certificateholders and the Related Documents. In lieu of delivery of original mortgages or Mortgage Notes, if such original is not available or lost, the depositor may deliver or cause to be delivered true and correct copies thereof, or, with respect to a lost Mortgage Note, a lost note affidavit. The assignments of mortgage are generally required to be recorded by or on behalf of the depositor in the appropriate offices for real property records, except (i) in states as to which an opinion of counsel is delivered to the effect that such recording is not required to protect the trustee's interest in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or the sponsor, or (ii) with respect to any Mortgage Loan electronically registered through the Mortgage Electronic Registration Systems, Inc.

On or prior to the Closing Date, the custodian on behalf of the trustee will review the Mortgage Loans and the Related Documents pursuant to the custodial agreement to be entered into among the custodian, the servicer and the trustee, and if any Mortgage Loan or Related Document is found to be defective in any material respect and such defect is not cured by the sponsor within 90 days following notification thereof to the sponsor by the custodian or the servicer, the sponsor will be obligated to either (i) substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan (as defined below); however, such substitution is permitted only within two years of the Closing Date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs (as defined in the Pooling and Servicing Agreement) as a REMIC or result in a prohibited transaction tax under the Internal Revenue Code or (ii) purchase such Mortgage Loan at a price (the "Purchase Price") equal to the outstanding principal balance of such Mortgage Loan as of the date of purchase, plus 30 days' accrued interest thereon and all costs and damages incurred by the trust in connection with any violation by such Mortgage Loan of any predatory or abusive lending law prior to such purchase, computed at the Mortgage Rate through the end of the calendar month in which the purchase is effected, plus the amount of any unreimbursed P&I Advances and servicing advances made by the servicer or the master servicer.  The Purchase Price will be required to be remitted to the servicer for deposit in the Custodial Account on or prior to the next succeeding determination date after such obligation arises. The obligation of the sponsor to repurchase or substitute for a Deleted Mortgage Loan (as defined below) is the sole remedy regarding any defects in the Mortgage Loans and Related Documents available to the certificateholders.

In connection with the substitution of a Qualified Substitute Mortgage Loan, the sponsor will be required to remit to the related servicer for deposit in the Custodial Account on or prior to the next succeeding determination date after such obligation arises an amount (the "Substitution Shortfall Amount") equal to the excess of the outstanding principal balance of the

S-165

FHFA04179020
A3-10013223166

related Deleted Mortgage Loan over the outstanding principal balance of such Qualified Substitute Mortgage Loan.

A "Qualified Substitute Mortgage Loan" is a mortgage loan substituted for a Deleted Mortgage Loan which must, on the date of such substitution, (i) have an outstanding principal balance (or in the case of a substitution of more than one mortgage loan for a Deleted Mortgage Loan, an aggregate outstanding principal balance), not in excess of the outstanding principal balance of the Deleted Mortgage Loan; (ii) have a Mortgage Rate not less than the Mortgage Rate of the Deleted Mortgage Loan and not more than 1% in excess of the Mortgage Rate of such Deleted Mortgage Loan; (iii) have the same due date as the Deleted Mortgage Loan; (iv) have a remaining term to maturity not more than one year earlier and not later than the remaining term to maturity of the Deleted Mortgage Loan; (v) comply with each representation and warranty as to the Mortgage Loans set forth in the mortgage loan purchase agreement (deemed to be made as of the date of substitution); (vi) be of the same or better credit quality as the Mortgage Loan being replaced; (vii) have the same lien priority on the related mortgaged property as the Mortgage Loan being replaced; and (viii) satisfy certain other conditions specified in the Pooling and Servicing Agreement.

The sponsor will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the trustee with respect to each Mortgage Loan. In addition, the sponsor will represent and warrant, as of the Closing Date, that, among other things: (i) at the time of transfer to the depositor, the sponsor has transferred or assigned all of its right, title and interest in each Mortgage Loan and the Related Documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws; (iii) the Mortgage Loans are not subject to the requirements of the Home Ownership and Equity Protection Act of 1994 and no Mortgage Loan is classified and/or defined as a "high cost", "covered" or "predatory" loan under any other federal, state or local law or ordinance or regulation including, but not limited to, the States of Georgia or North Carolina, or the City of New York; (iv) no proceeds from any Mortgage Loan were used to purchase single premium credit insurance policies as part of the origination of, or as a condition to closing, such Mortgage Loan; (v) no Mortgage Loan has a Prepayment Charge longer than five years after its date of origination; and (vi) to the best of the sponsor's knowledge, the related servicer has accurately and fully reported its borrower credit files to each of the credit repositories in a timely manner. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the certificateholders in the related Mortgage Loan and Related Documents, the sponsor will have a period of 90 days after the earlier of discovery or receipt of written notice of the breach to effect a cure; provided, however that any breach of the representations and warranties set forth in clauses (ii), (iii), (iv), (v) and (vi) above with respect to any Mortgage Loan shall be deemed to materially and adversely affect the interests of the certificateholders in the related Mortgage Loan. If the breach cannot be cured within the 90-day period, the sponsor will be obligated to (i) substitute for such Deleted Mortgage Loan a Qualified Substitute Mortgage Loan or (ii) purchase such Deleted Mortgage Loan from the trust. The same procedure and limitations that are set forth above for the substitution or purchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or purchase of a Deleted Mortgage Loan as a result of a breach of a representation or warranty in the mortgage loan purchase agreement that materially and adversely affects the interests of the certificateholders. The depositor will file the mortgage loan purchase agreement as an exhibit to the Pooling and Servicing Agreement with the Securities and Exchange Commission in a Current Report on Form 8-K.

S-166

FHFA04179021
A3-10013223167

Mortgage Loans required to be transferred to the sponsor as described in the preceding paragraphs are referred to as "Deleted Mortgage Loans."

**Amendment**

The Pooling and Servicing Agreement may be amended by the sponsor, the depositor, the master servicer, the securities administrator, the servicer and the trustee, with the consent of the Swap Provider (such consent not to be unreasonably withheld) without the consent of certificateholders,

- to cure any ambiguity,

- to correct or supplement any provision therein,

- to make any revisions with respect to the provisions relating to the requirements of Regulation AB, or

- to make any other revisions with respect to matters or questions arising under the Pooling and Servicing Agreement which are not inconsistent with the provisions thereof,

provided that such action will not adversely affect in any material respect the interests of any certificateholder. An amendment will be deemed not to adversely affect in any material respect the interests of the certificateholders if the person requesting such amendment obtains a letter from each rating agency stating that such amendment will not result in the downgrading or withdrawal of the respective ratings then assigned to any class of certificates.

In addition, the Pooling and Servicing Agreement may be amended without the consent of certificateholders to modify, eliminate or add to any of its provisions to such extent as may be necessary to maintain the qualification of the trust fund's REMIC elections, provided that the trustee has received an opinion of counsel to the effect that such action is necessary or helpful to maintain such qualification. In addition, the Pooling and Servicing Agreement may be amended by the sponsor, the depositor, the master servicer, the Servicer, the securities administrator and the trustee with the consent of the holders of a majority in interest of each class of certificates affected thereby for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Pooling and Servicing Agreement or of modifying in any manner the rights of the certificateholders; provided, however, that no such amendment may

- reduce in any manner the amount of, or delay the timing of, payments required to be distributed on any certificate without the consent of the holder of such certificate;

- cause any trust fund REMIC to fail to qualify as a REMIC for federal tax purposes;

- reduce the percentage of the holders of the certificates the affected class which are required to consent to any such amendment, without the consent of the holders of all certificates of such class.

S-167

CONFIDENTIAL

FHFA04179022
A3-10013223168

The trustee will not be required to consent to any amendment to the Pooling and Servicing Agreement without having first received an opinion of counsel to the effect that such amendment is permitted under the terms of the Pooling and Servicing Agreement and will not cause the trust fund's REMIC elections to fail to qualify as REMICs for federal tax purposes.

**Voting Rights**

As of any date of determination,

- holders of the certificates, other than the Class X, Class P and Residual Certificates, will be allocated 98.00% of all voting rights, allocated among such certificates in proportion to their respective outstanding Certificate Principal Balances;

- holders of the Class X Certificates and Class P Certificates will each be allocated 1% of all voting rights; and

- holders of the Residual Certificates will not be allocated any voting rights.

Voting rights will be allocated among the certificates of each such class in accordance with their respective percentage interests. The initial owner of the Residual Certificates will be Nomura Holding America, Inc.

**Optional Purchase of Certain Loans**

As to any Mortgage Loan which is delinquent in payment by 91 days or more, the sponsor may, at its option, purchase such Mortgage Loan at a price equal to the sum of (i) 100% of the Stated Principal Balance thereof as of the date of such purchase plus (ii) 30 days' accrued interest thereon at the applicable Net Mortgage Rate, plus any portion of the Servicing Fee, the fee payable to the master servicer, servicing advances and P&I Advances payable to the servicer or the master servicer, as applicable, of the Mortgage Loan, plus (iii) any costs and damages of the trust incurred in connection with any violation by such Mortgage Loan of any abusive or predatory lending law, including any expenses incurred by the trustee with respect to such Mortgage Loan prior to the purchase thereof.

In addition, the sponsor will, at its option, purchase any Mortgage Loan from the trust if the first scheduled payment due subsequent to the Cut-off Date is not made within thirty (30) days of the related due date. Such purchase will be made at a price equal to the purchase price described in the prior paragraph.

**Optional Termination**

The master servicer will have the right to purchase all remaining Mortgage Loans and related REO Properties and thereby effect early retirement of all of the certificates on any distribution date if on such distribution date the aggregate Stated Principal Balance of the Mortgage Loans and related REO Properties remaining in the trust fund is reduced to less than or equal to 10% of the aggregate outstanding principal balance of the Mortgage Loans as of the Cut-off Date. In the event that the master servicer exercises such option it will effect such purchase at a price equal to the sum of

S-168

FHFA04179023
A3-10013223169

- 100% of the Stated Principal Balance of each Mortgage Loan, other than in respect of any related REO Property, plus 30 days' accrued interest thereon at the applicable Mortgage Rate,

- the appraised value of any related REO Property, up to the Stated Principal Balance of the Mortgage Loan, plus accrued interest thereon at the applicable Mortgage Rate, and

- any unreimbursed costs and expenses of the trustee, securities administrator, the custodian, the servicer and the master servicer and the principal portion of any unreimbursed advances previously incurred by the servicer or the master servicer in the performance of their servicing obligations and any Swap Termination Payment payable to the Swap Provider pursuant to the Interest Rate Swap Agreement.

Notwithstanding the foregoing, the master servicer shall not be entitled to exercise its optional termination right to the extent that the depositor creates a net interest margin transaction which includes the Class X Certificates or Class P Certificates and the notes issued pursuant to such net interest margin transaction are outstanding on the date on which the master servicer intends to exercise its optional termination right.

Proceeds from such purchase will be distributed to the certificateholders in the priority described in this prospectus supplement under "Description of the Certificates—Distributions." The proceeds from any such distribution may not be sufficient to distribute the full amount to which each class of certificates is entitled if the purchase price is based in part on the appraised value of any related REO Property and such appraised value is less than the Stated Principal Balance of the related Mortgage Loan. Any purchase of the Mortgage Loans and related REO Properties will result in an early retirement of the certificates.

The securities administrator will be required to give notice of any termination to the certificateholders, upon which the certificateholders shall surrender their certificates to the securities administrator for payment of the final distribution and cancellation. Such notice shall be given by letter, mailed not earlier than the 15th day and not later than the 25th day of the month next preceding the month of such final distribution, and shall specify (i) the distribution date upon which final payment of the related certificates will be made upon presentation and surrender of such certificates at the office of the securities administrator therein designated, (ii) the amount of any such final payment and (iii) that the record date otherwise applicable to such distribution date is not applicable, payments being made only upon presentation and surrender of the certificates at the office of the securities administrator therein specified.

In the event such notice is given in connection with the purchase of all of the Mortgage Loans by the master servicer, the master will be required to deliver to the securities administrator for deposit in the Distribution Account not later than the business day prior to the distribution date on which the final distribution on the certificates an amount in immediately available funds equal to the termination price described above. The securities administrator will be required to remit to the servicer, the master servicer, the trustee and the custodian from such funds deposited in the Distribution Account (i) any amounts which the servicer or the master servicer would be permitted to withdraw and retain from the Custodial Account or the Distribution Account, as applicable, as if such funds had been deposited therein (including all unpaid Servicing Fees,

S-169

FHFA04179024
A3-10013223170

master servicing fees and all outstanding P&I Advances and Servicing Advances), (ii) any other amounts otherwise payable by the securities administrator to the master servicer, the trustee, the custodian and the servicer from amounts on deposit in the Distribution Account pursuant to the terms of the Pooling and Servicing Agreement and (iii) any Swap Termination Payment payable to the Swap Provider not due to a Swap Provider Trigger Event pursuant to the Interest Rate Swap Agreement and to the extent not paid by the securities administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee prior to making any final distributions. Upon certification to the trustee by the securities administrator of the making of such final deposit, the trustee will be required to promptly release or cause to be released to the Terminator the Mortgage Files for the Mortgage Loans and the trustee will surrender all assignments, endorsements and other instruments delivered to it and necessary to effectuate such transfer.

Upon presentation of the certificates by the certificateholders on the final distribution date, the securities administrator will be required to distribute to each certificateholder so presenting and surrendering its certificates the amount otherwise distributable on such distribution date in respect of the certificates so presented and surrendered. Any funds not distributed to any certificateholder(s) being retired on such distribution date because of the failure of such certificateholders to tender their certificates shall, on such date, be set aside and held in trust and credited to the account of the appropriate non-tendering certificateholders. If any certificates as to which notice has been given shall not have been surrendered for cancellation within six months after the time specified in such notice, the securities administrator shall mail a second notice to the remaining non-tendering certificateholders to surrender their certificates for cancellation in order to receive the final distribution with respect thereto. If within one year after the second notice all such certificates shall not have been surrendered for cancellation, the securities administrator shall, directly or through an agent, mail a final notice to the remaining non-tendering certificateholders concerning surrender of their certificates. The costs and expenses of maintaining the funds in trust and of contacting such certificateholders shall be paid out of the assets remaining in the trust funds. If within one (1) year after the final notice any such certificates shall not have been surrendered for cancellation, the securities administrator shall pay to the depositor all such amounts, and all rights of non-tendering certificateholders in or to such amounts shall thereupon cease. No interest shall accrue or be payable to any certificateholder on any amount held in trust by the securities administrator as a result of such certificateholder's failure to surrender its certificate(s) on the related final distribution date for final payment thereof. Any such amounts held in trust by the securities administrator shall be held uninvested in an Eligible Account.

In the event that the master servicer purchases all the Mortgage Loans or the final payment on or other liquidation of the last Mortgage Loan, the trust fund will be terminated in accordance with the following additional requirements:

(i)      The securities administrator shall specify the first day in the 90-day liquidation period in a statement attached to each Trust REMIC's final Tax Return pursuant to Treasury regulation Section 1.860F-1 and shall satisfy all requirements of a qualified liquidation under Section 860F of the Code and any regulations thereunder, as evidenced by an opinion of counsel obtained by and at the expense of the master servicer;

(ii)     During such 90-day liquidation period and, at or prior to the time of making of the final payment on the outstanding certificates, the trustee shall sell all of the assets of the related REMIC to the master servicer for cash; and

S-170

FHFA04179025
A3-10013223171

(iii)     At the time of the making of the final payment on the outstanding certificates, the securities administrator shall distribute or credit, or cause to be distributed or credited, to the holders of the residual certificates all cash on hand in the trust fund (other than cash retained to meet claims), and the trust fund shall terminate at that time.

At the expense of the master servicer (or, if the trust fund is being terminated as a result of the last scheduled distribution date, at the expense of the trust fund), the master servicer shall prepare or cause to be prepared the documentation required in connection with the adoption of a plan of liquidation of each related REMIC.

By their acceptance of certificates, the holders thereof hereby agree to authorize the securities administrator to specify the 90-day liquidation period for each REMIC, which authorization shall be binding upon all successor certificateholders.

**Events of Default**

Events of default with respect to the servicer under the Pooling and Servicing Agreement include, without limitation:

- any failure by the servicer (or any successor servicer) to remit to the securities administrator any payment, including an advance required to be made by the servicer under the terms of the Pooling and Servicing Agreement which continues unremedied for two business days after the day on which written notice of such failure is given by the master servicer;

- any failure by the servicer (or any successor servicer) to observe or perform in any material respect any other of its covenants or agreements, the breach of which has a material adverse effect and which continues unremedied for thirty days after the giving of written notice of such failure to the servicer (or any successor servicer) by the trustee or the depositor, or to the servicer (or any successor servicer) and the trustee by the holders of certificates evidencing not less than 25% of the voting rights evidenced by the certificates;

- the servicer (or any successor servicer) shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, made an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations;

- a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs, shall have been entered against such servicer and such decree or order shall have remained in force undischarged or unstayed for a period of sixty days; or

CONFIDENTIAL

FHFA04179026
A3-10013223172

- the servicer fails to deliver the annual compliance statements and accountant's report as required pursuant to the Pooling and Servicing Agreement and such failure continues unremedied for ten days.

Events of default with respect to the master servicer under the Pooling and Servicing Agreement include, without limitation:

- any failure on the part of the master servicer to observe or perform in any material respect any of the covenants or agreements on the part of the master servicer contained in this Pooling and Servicing Agreement, or the breach by the master servicer of any representation and warranty contained in the pooling and servicing agreement, which continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the master servicer by the depositor or the trustee or to the master servicer, the depositor and the trustee by the holders of certificates entitled to at least twenty-five percent (25%) of the voting rights evidenced by the certificates; or

- a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceeding, or for the winding-up or liquidation of its affairs, shall have been entered against the master servicer and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

- the master servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to it or of or relating to all or substantially all of its property; or

- the master servicer fails to deliver the any statements or reports with respect to the requirements of Regulation AB as required pursuant to the Pooling and Servicing Agreement; or

- the master servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations.

**Rights Upon Event of Default**

Upon the occurrence and continuance of an event of default with respect to the payment obligations of the servicer under the Pooling and Servicing Agreement, the master servicer shall terminate all the rights and obligations of the servicer under the Pooling and Servicing Agreement, and in and to the Mortgage Loans. In addition, upon the occurrence and continuance of any other event of default with respect to the servicer under the Pooling and Servicing Agreement, the master servicer may, and at the direction of the holders of certificates representing not less than

S-172

FHFA04179027
A3-10013223173

25% of the voting rights shall, terminate all the rights and obligations of the servicer under the Pooling and Servicing Agreement and in and to the related Mortgage Loans. Upon the termination of the servicer under the Pooling and Servicing Agreement, the master servicer shall succeed to all of the responsibilities and duties of the terminated servicer under the Pooling and Servicing Agreement including the obligation to make any P&I Advance required to be made by the terminated servicer on the distribution date immediately following the occurrence of such event of default with respect to the terminated servicer subject to the master servicer's determination of recoverability thereof; *provided, however*, that the master servicer shall not have any obligation whatsoever with respect to any liability incurred by the terminated servicer at or prior to the termination of such servicer with respect to any default, and there will be a period of transition, not to exceed 90 days, before the servicing functions can be transferred to a successor servicer. As compensation therefor, the master servicer shall be entitled to all funds relating to the Mortgage Loans which the terminated servicer would have been entitled to retain if the terminated servicer had continued to act as such, except for those amounts due the terminated servicer as reimbursement for advances previously made or expenses previously incurred. Notwithstanding the above, the master servicer may, if it shall be unwilling so to act, or shall, if it is legally unable so to act, appoint, or petition a court of competent jurisdiction to appoint, any established housing and home finance institution which is a Fannie Mae or Freddie Mac approved servicer as the successor to the terminated servicer under the Pooling and Servicing Agreement in the assumption of all or any part of the responsibilities, duties or liabilities of the terminated servicer under the Pooling and Servicing Agreement. Pending appointment of a successor to the terminated servicer under the Pooling and Servicing Agreement, the master servicer, shall act in such capacity as provided under the Pooling and Servicing Agreement. In connection with such appointment and assumption, the master servicer may make such arrangements for the compensation of such successor out of payments on the Mortgage Loans as it and such successor shall agree; *provided, however*, that no such compensation shall be in excess of the Servicing Fee payable to the servicer. No assurance can be given that termination of the rights and obligations of the terminated servicer under the Pooling and Servicing Agreement would not adversely affect the servicing of the Mortgage Loans, including the delinquency experience of the Mortgage Loans. The costs and expenses of the master servicer in connection with the termination of the terminated servicer, appointment of a successor servicer and the transfer of servicing, if applicable, to the extent not paid by the terminated servicer, will be paid by the trust fund from amounts available in the Distribution Account as provided in the Pooling and Servicing Agreement.

Upon the occurrence and continuance of an event of default with respect to the master servicer, the depositor or the trustee may, and at the written direction of the holders of certificates evidencing ownership of not less than 51% of the trust, the trustee shall terminate all of the rights and obligations of the master servicer in its capacity as master servicer under the Pooling and Servicing Agreement, to the extent permitted by law, and in and to the Mortgage Loans and the proceeds thereof. The trustee shall automatically succeed to all of the responsibilities and duties of the master servicer under the Pooling and Servicing Agreement. Notwithstanding the foregoing, the trustee may, if it shall be unwilling so to act, or shall, if it is legally unable so to act, appoint, or petition a court of competent jurisdiction to appoint, a successor master servicer in accordance with the Pooling and Servicing Agreement. The costs and expenses of the trustee in connection with the termination of the terminated master servicer, will be paid by the trust fund from amount available in the Distribution Account as provided in the Pooling and Servicing Agreement.

No certificateholder, solely by virtue of such holder's status as a certificateholder, will have any right under the Pooling and Servicing Agreement to institute any proceeding with respect thereto, unless such holder previously has given to the trustee written notice of the

S-173

CONFIDENTIAL

FHFA04179028
A3-10013223174

continuation of an event of default and unless the holders of certificates having not less than 25% of the voting rights evidenced by the certificates have made written request to the trustee to institute such proceeding in its own name as trustee thereunder and have offered to the trustee indemnity satisfactory to it and the trustee for 60 days has neglected or refused to institute any such proceeding.

**The Trustee**

HSBC Bank USA, National Association, a national banking association, will be the trustee under the Pooling and Servicing Agreement. The depositor, the servicer, the master servicer and securities administrator may maintain other banking relationships in the ordinary course of business with the trustee. The trustee's corporate trust office is located at 452 Fifth Avenue, New York, New York 10018, Attention: NHEL 2006-FM2 or at such other address as the trustee may designate from time to time. The Trustee can be contacted by telephone at (212) 525-1367.

HSBC Bank USA, National Association, has been, and currently is, serving as trustee for numerous securities transactions involving similar pool assets to those found in this transaction.

The trustee, the Swap Provider, the Basis Risk Cap Provider and the Interest Rate Cap Provider are the same entity.

The trustee, prior to the occurrence of an Event of Default with respect to the master servicer and after the curing or waiver of all Events of Default with respect to the master servicer which may have occurred will undertake to perform such duties and only such duties as are specifically set forth in the Pooling and Servicing Agreement as duties of the trustee, including:

1.  Upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments which are specifically required to be furnished to the trustee pursuant to the Pooling and Servicing Agreement, the trustee (or its custodian, if applicable) shall examine them to determine whether they are in the required form; provided, however, that the trustee shall not be responsible for the accuracy or content of any resolution, certificate, statement, opinion, report, document, order or other instrument furnished hereunder; provided, further, that the trustee shall not be responsible for the accuracy or verification of any calculation provided to it pursuant to the Pooling and Servicing Agreement.

2.  The trustee shall promptly remit to the servicer any complaint, claim, demand, notice or other document (collectively, the "Notices") delivered to the trustee as a consequence of the assignment of any Mortgage Loan hereunder and relating to the servicing of the Mortgage Loans; provided than any such notice (i) is delivered to the trustee at its corporate trust office, (ii) contains information sufficient to permit the trustee to make a determination that the real property to which such document relates is a Mortgaged Property (as defined in the Pooling and Servicing Agreement). The trustee shall have no duty hereunder with respect to any notice it may receive or which may be alleged to have been delivered to or served upon it unless such notice is delivered to it or served upon it at its corporate trust office and such notice contains the information required pursuant to clause (ii) of the preceding sentence.

S-174

CONFIDENTIAL

FHFA04179029
A3-10013223175

3.     Except for those actions that the trustee is required to take under the Pooling and Servicing Agreement, the trustee shall not have any obligation or liability to take any action or to refrain from taking any action in the absence of written direction as provided in the Pooling and Servicing Agreement.

If an Event of Default with respect to the master servicer has occurred and has not been cured or waived, the trustee shall exercise such of the rights and powers vested in it by the Pooling and Servicing Agreement, using the same degree of care and skill in their exercise, as a prudent person would exercise under the circumstances in the conduct of his own affairs. Such rights and powers may include:

1.     Execute and deliver, on behalf of the master servicer as attorney-in-fact or otherwise, any and all documents and other instruments and to do or accomplish all other acts or things necessary or appropriate to effect the termination of the master servicer, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise.

2.     The trustee shall automatically become the successor in all respects to the master servicer after the master servicer is terminated and shall thereafter be subject to all the responsibilities, duties, liabilities and limitations on liabilities relating thereto placed on the master servicer by the terms and provisions of the Pooling and Servicing Agreement. Notwithstanding the foregoing, the trustee may, if it shall be unwilling so to act, or shall, if it is legally unable so to act, appoint, or petition a court of competent jurisdiction to appoint, a successor master servicer in accordance with the Pooling and Servicing Agreement.

3.     Upon any termination or appointment of a successor to the master servicer, the trustee shall give prompt written notice thereof to certificateholders at their respective addresses appearing in the certificate register and to the rating agencies.

For further discussion of the duties of the trustee, please see *"Description of the Agreements—Material Terms of the Pooling and Servicing Agreements and Underlying Servicing Agreements—Duties of the Trustee"* in the prospectus.

The master servicer will pay the trustee the trustee's fee in respect of its obligations under the Pooling and Servicing Agreement. The Pooling and Servicing Agreement will provide that the trustee and any director, officer, employee or agent of the trustee will be indemnified by the trust and will be held harmless against any loss, liability, expense or cost including, without limitation, attorneys fees and expenses (not including expenses and disbursements incurred or made by the trustee in the ordinary course of the trustee's performance in accordance with the provisions of the Pooling and Servicing Agreement) incurred by the trustee in connection with any pending or threatened legal action or arising out of or in connection with the acceptance or administration of its obligations and duties under the Pooling and Servicing Agreement, the certificates or the Custodial Agreement, other than any loss, liability or expense (i) resulting from a breach of the obligations and duties of a servicer under the Pooling and Servicing Agreement or the Servicing Agreement (for which the trustee receives indemnity from the servicer) or (ii) incurred by reason of willful

S-175

CONFIDENTIAL

FHFA04179030
A3-10013223176

misfeasance, bad faith or negligence in the performance of the trustee's duties under the Pooling and Servicing Agreement, the certificates or the Custodial Agreement or by reason of reckless disregard, of the trustee's obligations and duties under the Pooling and Servicing Agreement, the certificates or the Custodial Agreement.

## THE CREDIT RISK MANAGER

Wells Fargo Bank, N.A. will act as credit risk manager for the trust (the "Credit Risk Manager"). As Credit Risk Manager, Wells Fargo Bank, N.A. will monitor the performance of and make recommendations to the servicer regarding certain delinquent and defaulted Mortgage Loans and will report on the performance of such Mortgage Loans pursuant to the Pooling and Servicing Agreement. The Credit Risk Manager will rely upon Mortgage Loan data that is provided to it by the servicer and the master servicer in performing its advisory and monitoring functions. The fee payable to the Credit Risk Manager is included in the master servicing fee.

## USE OF PROCEEDS

After deducting expenses of approximately $1,848,472, the depositor will apply the net proceeds of the sale of the Offered Certificates against the purchase price of the Mortgage Loans.

## FEDERAL INCOME TAX CONSEQUENCES

In the opinion of Thacher Proffitt & Wood LLP, counsel to the depositor, assuming compliance with the provisions of the Pooling and Servicing Agreement, for federal income tax purposes, each of the REMICs established under the Pooling and Servicing Agreement will qualify as a REMIC under the Code.

For federal income tax purposes (i) each Residual Certificate will represent the sole class of "residual interests" in one or more REMICs elected by the trust and (ii) the Senior Certificates and Subordinate Certificates (exclusive of any right of the holders of the Senior Certificates and Subordinate Certificates to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of Basis Risk Shortfalls and the obligation to make payments to the Supplemental Interest Trust), the Class P Certificates and Class X Certificates (exclusive of the right to receive payments from the Supplement Interest Trust and the obligation to make payments to the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust) will represent the "regular interests" in, and will be treated as debt instruments of, a REMIC. See "Federal Income Tax Consequences–REMICs" in the prospectus.

For federal income tax purposes, the Class M-9 Certificates will, and the remaining classes of Offered Certificates may, be treated as having been issued with original issue discount. The prepayment assumption that will be used in determining the rate of accrual of original issue discount, market discount and premium, if any, for federal income tax purposes will be based on the assumption that, subsequent to the date of any determination the Group I Mortgage Loans and Group II Mortgage Loans will prepay at a rate equal to 100.00% of the prepayment assumption described in this prospectus supplement. No representation is made that the Mortgage Loans will prepay at that rate or at any other rate. See "Federal Income Tax Consequences–General" and "–REMICs–Sales of REMIC Certificates" in the prospectus.

S-176

CONFIDENTIAL

FHFA04179031
A3-10013223177

The holders of the Offered Certificates will be required to include in income interest on their certificates in accordance with the accrual method of accounting.

The Internal Revenue Service (the "IRS") has issued original issue discount regulations (the "OID Regulations") under sections 1271 to 1275 of the Code that address the treatment of debt instruments issued with original issue discount, Purchasers of the Offered Certificates should be aware that the OID Regulations do not adequately address certain issues relevant to, or are not applicable to, prepayable securities such as the Offered Certificates. In addition, there is considerable uncertainty concerning the application of the OID Regulations to REMIC Regular Certificates that provide for payments based on an adjustable rate such as the Offered Certificates. Because of the uncertainty concerning the application of Section 1272(a)(6) of the Code to such certificates and because the rules of the OID Regulations relating to debt instruments having an adjustable rate of interest are limited in their application in ways that could preclude their application to such certificates even in the absence of Section 1272(a)(6) of the Code, the IRS could assert that the Offered Certificates should be treated as issued with original issue discount or should be governed by the rules applicable to debt instruments having contingent payments or by some other method not yet set forth in regulations. Prospective purchasers of the Offered Certificates are advised to consult their tax advisors concerning the tax treatment of such certificates.

In certain circumstances the OID Regulations permit the holder of a debt instrument to recognize original issue discount under a method that differs from that used by the issuer. Accordingly, the holder of an offered certificate may be able to select a method for recognizing original issue discount that differs from that used by the Trust in preparing reports to the certificateholders and the IRS.

If the method for computing original issue discount described above results in a negative amount for any period with respect to a certificateholder, the amount of original issue discount allocable to that period would be zero and the certificateholder will be permitted to offset that negative amount only against future original issue discount, if any, attributable to those certificates.

Certain of the certificates may be treated for federal income tax purposes as having been issued at a premium. Whether any holder of a certificate will be treated as holding such certificate with amortizable bond premium will depend on such certificateholders purchase price and the distributions remaining to be made on such certificate at the time of its acquisition by such certificateholder. Holders of such certificates should consult their own tax advisors regarding the possibility of making an election to amortize such premium. See "Federal Income Tax Consequences– REMICs" in the prospectus.

Each holder of a Senior Certificate or Subordinate Certificate is deemed to own an undivided beneficial ownership interest in a REMIC regular interest and the right to receive payments from the Basis Risk Shortfall Reserve Fund or the Supplemental Interest Trust in respect of any Basis Risk Shortfall or the obligation to make payments to the Supplemental Interest Trust. The Basis Risk Shortfall Reserve Fund, the Basis Risk Cap Agreement, the Interest Rate Cap Agreement, the Interest Rate Swap Agreement and the Supplemental Interest Trust are not assets of any REMIC. The REMIC regular interest corresponding to a Senior Certificate or a Subordinate Certificate will be entitled to receive interest and principal payments at the times and in the amounts equal to those made on the certificate to which it corresponds, except that (i) the maximum interest rate of that

S-177

FHFA04179032
A3-10013223178

REMIC regular interest will equal the Net Funds Cap computed for this purpose by limiting the Swap Scheduled Notional Amount of the Interest Rate Swap Agreement to the aggregate principal balance of the Mortgage Loans and (ii) any Swap Termination Payment will be treated as being payable solely from Net Monthly Excess Cashflow. As a result of the foregoing, the amount of distributions on the REMIC regular interest corresponding to a Senior Certificate or a Subordinate Certificate may exceed the actual amount of distributions on a Senior Certificate or a Subordinate Certificate.

The treatment of amounts received by a holder of a Senior Certificate or a Subordinate Certificate under such holder's right to receive any Basis Risk Shortfall, will depend on the portion, if any, of such holder's purchase price allocable thereto. Under the REMIC Regulations, each holder of a Senior Certificate or Subordinate Certificate must allocate its purchase price for the Senior Certificate or Subordinate Certificate among its undivided interest in the regular interest of the related REMIC and its undivided interest in the right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of any Basis Risk Shortfall in accordance with the relative fair market values of each property right. The securities administrator will, as required, treat payments made to the holders of the Senior Certificates and Subordinate Certificates with respect to any Basis Risk Shortfall, as includible in income based on the regulations relating to notional principal contracts (the "Notional Principal Contract Regulations"). The OID Regulations provide that the Trust's allocation of the issue price is binding on all holders unless the holder explicitly discloses on its tax return that its allocation is different from the Trust's allocation. For tax reporting purposes, the right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of Basis Risk Shortfalls with respect to the Senior Certificates and Subordinate Certificates may be treated as having more than a *de minimis* value as provided in the pooling and servicing agreement. Upon request, the securities administrator will make available information regarding such amounts as has been provided to it. Under the REMIC Regulations, the Securities Administrator is required to account for the REMIC regular interest, the right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of any Basis Risk Shortfall as discrete property rights. Holders of the Senior Certificates and Subordinate Certificates are advised to consult their own tax advisors regarding the allocation of issue price, timing, character and source of income and deductions resulting from the ownership of such Certificates. Treasury regulations have been promulgated under Section 1275 of the Code generally providing for the integration of a "qualifying debt instrument" with a hedge if the combined cash flows of the components are substantially equivalent to the cash flows on a variable rate debt instrument. However, such regulations specifically disallow integration of debt instruments subject to Section 1272(a)(6) of the Code. Therefore, holders of the Senior Certificates and Subordinate Certificates will be unable to use the integration method provided for under such regulations with respect to those Certificates. If the Securities Administrator's treatment of payments of any Basis Risk Shortfall is respected, ownership of the right to any Basis Risk Shortfall will entitle the owner to amortize the price paid for the right to any Basis Risk Shortfall under the Notional Principal Contract Regulations.

Any payments made to a beneficial owner of an Senior Certificate or a Subordinate Certificate in excess of the amounts payable on the corresponding REMIC regular interest will be treated as having been received as a payment on a notional principal contract. To the extent the sum of such periodic payments for any year exceeds that year's amortized cost of any Basis Risk Shortfalls, such excess represents net income for that year. Conversely, to the extent that the amount of that year's amortized cost exceeds the sum of the periodic payments, such excess will represent a net deduction for that year. In addition, any amounts payable on such REMIC regular interest in

CONFIDENTIAL

FHFA04179033
A3-10013223179

excess of the amount of payments on the Senior Certificate or Subordinate Certificate to which it relates will be treated as having been received by the beneficial owners of such Certificates and then paid by such owners to the Supplemental Interest Trust pursuant to the Pooling and Servicing Agreement, and such excess should be treated as a periodic payment on a notional principal contract that is made by the beneficial owner during the applicable taxable year and that is taken into account in determining the beneficial owner's net income or net deduction with respect to any Basis Risk Shortfalls for such taxable year. Although not clear, net income or a net deduction with respect to any Basis Risk Shortfall should be treated as ordinary income or as an ordinary deduction. Holders of the Senior Certificates and Subordinate Certificates are advised to consult their own tax advisors regarding the tax characterization and timing issues relating to a Swap Termination Payment.

Because a beneficial owner of any Basis Risk Shortfalls will be required to include in income the amount deemed to have been paid by such owner, but may not be able to deduct that amount from income, a beneficial owner of an Senior Certificate or a Subordinate Certificate may have income that exceeds cash distributions on the Senior Certificate or Subordinate Certificate, in any period and over the term of the Senior Certificate or Subordinate Certificate. As a result, the Senior Certificates and Subordinate Certificates may not be a suitable investment for any taxpayer whose net deduction with respect to any Basis Risk Shortfalls would be subject to the limitations described above.

Upon the sale of a Senior Certificate or a Subordinate Certificate, the amount of the sale allocated to the selling certificateholder's right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of any Basis Risk Shortfall would be considered a "termination payment" under the Notional Principal Contract Regulations allocable to the related Senior Certificate or Subordinate Certificate, as the case may be. A holder of a Senior Certificate or a Subordinate Certificate will have gain or loss from such a termination of the right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of any Basis Risk Shortfall equal to (i) any termination payment it received or is deemed to have received minus (ii) the unamortized portion of any amount paid (or deemed paid) by the certificateholder upon entering into or acquiring its interest in the right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of any Basis Risk Shortfall.

Gain or loss realized upon the termination of the right to receive payments from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust in respect of any Basis Risk Shortfalls will generally be treated as capital gain or loss. Moreover, in the case of a bank or thrift institution, Code Section 582(c) would likely not apply to treat such gain or loss as ordinary.

It is possible that the right to receive payments in respect of any Basis Risk Shortfalls could be treated as a partnership among the holders of all of the Certificates, in which case holders of such Certificates potentially would be subject to different timing of income and foreign holders of such Certificates could be subject to withholding in respect of any related Basis Risk Shortfall. Holders of the Senior Certificates and Subordinate Certificates are advised to consult their own tax advisors regarding the allocation of issue price, timing, character and source of income and deductions resulting from the ownership of their Certificates.

The REMIC regular interest component of each Senior Certificate and Subordinate Certificate will be treated as assets described in Section 7701(a)(19)(C) of the Code, and as "real estate assets" under Section 856(c)(5)(B) of the Code, generally, in the same proportion that the

CONFIDENTIAL

FHFA04179034
A3-10013223180

assets of the Trust, exclusive of the assets not included in any REMIC, would be so treated. In addition, the interest derived from the REMIC regular interest component of each Senior Certificate and Subordinate Certificate will be interest on obligations secured by interests in real property for purposes of section 856(c)(3) of the Code, subject to the same limitation in the preceding sentence. The Notional Principal Contract component of each Regular Certificate will not qualify, however, as an asset described in Section 7701(a)(19)(C) of the Code, as a real estate asset under Section 856(c)(5)(B) of the Code or as a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code. As a result, the Regular Certificates generally may not be a suitable investment for a REMIC, a real estate investment trust or an entity intending to qualify under Section 7701(a)(19)(C) of the Code.

Because any Basis Risk Shortfall is treated as separate rights of the Senior Certificates and Subordinate Certificates not payable by any REMIC elected by the Trust, such rights will not be treated as qualifying assets for any certificateholder that is a mutual savings bank, domestic building and loan association, real estate investment trust, or REMIC. In addition, any amounts received from the Basis Risk Shortfall Reserve Fund and the Supplemental Interest Trust will not be qualifying real estate income for real estate investment trusts or qualifying income for REMICs.

For further information regarding federal income tax consequences of investing in the Offered Certificates, see "Federal Income Tax Consequences—REMICs" in the prospectus.

## ERISA CONSIDERATIONS

A fiduciary of any employee benefit plan or other plan or arrangement subject to ERISA or Section 4975 of the Code (a "Plan"), or any insurance company, whether through its general or separate accounts, or any other person investing plan assets of a Plan, should carefully review with its legal advisors whether the purchase or holding of Offered Certificates could give rise to a transaction prohibited or not otherwise permissible under ERISA or Section 4975 of the Code. The purchase or holding of the Offered Certificates by or on behalf of, or with Plan assets of, a Plan may qualify for exemptive relief under the Underwriters' Exemption, as currently in effect and as described under "ERISA Considerations" in the prospectus if certain conditions are satisfied. The Department of Labor has granted to the Underwriters a Prohibited Transaction Exemption ("PTE") which was amended by PTE 2002-41 at 67 F.R. 54487 (the "Underwriters' Exemption"). However, the Underwriters' Exemption contains a number of conditions which must be met for the exemption to apply, including the requirements that the Offered Certificates be rated at least "BBB-" (or its equivalent) by Fitch Ratings, Moody's or S&P at the time of the Plan's purchase and that the investing Plan must be an "accredited investor" as defined in Rule 501(a)(1) of Regulation D under the Securities Act. A fiduciary of a Plan contemplating purchasing an offered certificate must make its own determination that the conditions set forth in the Underwriters' Exemption will be satisfied with respect to the Offered Certificates.

For so long as the holder of an Offered Certificate also holds an interest in the Supplemental Interest Trust, the holder will be deemed to have acquired and be holding the Offered Certificate without the right to receive payments from the Supplemental Interest Trust and, separately, the right to receive payments from the Supplemental Interest Trust. The Exemption is not applicable to the acquisition, holding and transfer of an interest in the Supplemental Interest Trust. In addition, while the Supplemental Interest Trust is in existence, it is possible that not all of the requirements for the Exemption to apply to the acquisition, holding and transfer of Offered

CONFIDENTIAL

FHFA04179035
A3-10013223181

Certificates will be satisfied. However, if the Exemption is not available, there may be other exemptions that may apply. Accordingly, no Plan or other person using assets of a Plan may acquire or hold an Offered Certificate while the Supplemental Interest Trust is in existence, unless (1) such Plan is an accredited investor within the meaning of the Exemption and (2) such acquisition or holding is eligible for the exemptive relief available under PTCE 84-14 (for transactions by independent "qualified professional asset managers"), 91-38 (for transactions by bank collective investment funds), 90-1 (for transactions by insurance company pooled separate accounts), 95-60 (for transactions by insurance company general accounts) or 96-23 (for transactions effected by "in-house asset managers"). For so long as the Supplemental Interest Trust is in existence, each beneficial owner of an Offered Certificate or any interest therein, shall be deemed to have represented, by virtue of its acquisition or holding of the Offered Certificate, or interest therein, that either (i) it is not a Plan or (ii) (A) it is an accredited investor within the meaning of the Exemption and (B) the acquisition and holding of such Offered Certificate and the separate right to receive payments from the Supplemental Interest Trust are eligible for the exemptive relief available under one of the five prohibited transaction class exemptions enumerated above.

Each beneficial owner of a Subordinate Certificate or interest therein that is acquired after termination of the Supplemental Interest Trust (which holds the Interest Rate Swap Agreement and the Interest Rate Cap Agreement) shall be deemed to have represented, by virtue of its acquisition or holding of that certificate or interest therein, that either (i) it is not a plan investor, (ii) it has acquired and is holding such subordinated certificates in reliance on the Underwriters' Exemption, and that it understands that there are certain conditions to the availability of the Underwriters' Exemption, including that the subordinated certificates must be rated, at the time of purchase, not lower than "BBB-" (or its equivalent) by Fitch Ratings, Moody's or S&P, or (iii) (1) it is an insurance company, (2) the source of funds used to acquire or hold the certificate or interest therein is an "insurance company general account," as such term is defined in PTE 95-60, and (3) the conditions in Sections I and III of PTE 95-60 have been satisfied.

If any Certificate or any interest therein is acquired or held in violation of the conditions described in this section, the next preceding permitted beneficial owner will be treated as the beneficial owner of that Certificate, retroactive to the date of transfer to the purported beneficial owner. Any purported beneficial owner whose acquisition or holding of any such certificate or interest therein was effected in violation of the conditions described in this section shall indemnify and hold harmless the depositor, the securities administrator, the trustee, the master servicer, the servicers and the trust fund from and against any and all liabilities, claims, costs or expenses incurred by those parties as a result of that acquisition or holding.

Any fiduciary or other investor of Plan assets that proposes to acquire or hold the Offered Certificates on behalf of or with Plan assets of any Plan should consult with its counsel with respect to: (i) whether, with respect to the Offered Certificates, the specific and general conditions and the other requirements in the Underwriters' Exemption would be satisfied and (ii) the potential applicability of the general fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of the Internal Revenue Code to the proposed investment. See *"ERISA Considerations"* in the prospectus.

The sale of any of the Offered Certificates to a Plan is in no respect a representation by the depositor or the underwriter that an investment in the Offered Certificates meets all relevant legal requirements relating to investments by Plans generally or any particular Plan, or that an investment in the Offered Certificates is appropriate for Plans generally or any particular Plan.

S-181

CONFIDENTIAL

FHFA04179036
A3-10013223182

## METHOD OF DISTRIBUTION

Subject to the terms and conditions set forth in the underwriting agreement dated as of October 1, 2006 between the depositor, Greenwich Capital Markets, Inc., Citigroup Global Markets Inc. and Goldman, Sachs & Co. (the "Underwriters") and the terms agreement to be entered into among the depositor and the Underwriters on or prior to the Closing Date (collectively, the "Underwriting Agreement"), the depositor has agreed to sell the Offered Certificates to the Underwriters, and each Underwriter has severally agreed to purchase from the depositor the initial Certificate Principal Balance of each class of Offered Certificates set forth under its name below.

| Class | Greenwich Capital Markets, Inc. | Citigroup Global Markets Inc. | Goldman, Sachs & Co. |
|---|---|---|---|
| Class I-A-1 ........ | $437,699,180 | $43,748,910 | $43,748,910 |
| Class II-A-1 ....... | $233,997,885 | $23,388,558 | $23,388,558 |
| Class II-A-2 ....... | $34,389,418 | $3,437,291 | $3,437,291 |
| Class II-A-3 ....... | $77,512,034 | $7,747,483 | $7,747,483 |
| Class II-A-4 ....... | $10,086,640 | $1,008,180 | $1,008,180 |
| Class M-1 .......... | $38,378,903 | $3,836,048 | $3,836,048 |
| Class M-2 .......... | $34,796,950 | $3,478,025 | $3,478,025 |
| Class M-3 .......... | $21,491,719 | $2,148,140 | $2,148,140 |
| Class M-4 .......... | $18,421,474 | $1,841,263 | $1,841,263 |
| Class M-5 .......... | $17,398,058 | $1,738,971 | $1,738,971 |
| Class M-6 .......... | $15,862,936 | $1,585,532 | $1,585,532 |
| Class M-7 .......... | $15,351,228 | $1,534,386 | $1,534,386 |
| Class M-8 .......... | $13,304,398 | $1,329,801 | $1,329,801 |
| Class M-9 .......... | $10,745,860 | $1,074,070 | $1,074,070 |

The depositor has been advised by the Underwriters that they intend to make a market in the classes of Offered Certificates purchased by them but none of the Underwriters has an obligation to do so. There can be no assurance that a secondary market for the Offered Certificates (or any particular class thereof) will develop or, if it does develop, that it will continue or that such market will provide sufficient liquidity to certificateholders.

Until the distribution of the Offered Certificates is completed, rules of the Securities and Exchange Commission may limit the ability of the Underwriters and certain selling group members to bid for and purchase the Offered Certificates. As an exception to these rules, the Underwriters are permitted to engage in certain transactions that stabilize the price of the Offered Certificates. Such transactions consist of bids or purchases for the purpose of pegging, fixing or maintaining the price of the Offered Certificates.

In general, purchases of a security for the purpose of stabilization or to reduce a short position could cause the price of the security to be higher than it might be in the absence of such purchases.

Neither the depositor nor the Underwriters makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the prices of the Offered Certificates. In addition, neither the depositor nor the Underwriters makes any

CONFIDENTIAL

FHFA04179037
A3-10013223183

representation that the Underwriters will engage in such transactions or that such transactions, once commenced, will not be discontinued without notice.

The depositor has agreed to indemnify the Underwriters against, or make contributions to the Underwriters with respect to, certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "**Securities Act**").

## LEGAL INVESTMENT

The Offered Certificates will not constitute "mortgage related securities" for purposes of SMMEA.

Institutions whose investment activities are subject to review by certain regulatory authorities hereafter may be or may become subject to restrictions on investment in the certificates, and such restrictions may be retroactively imposed. The Federal Financial Institutions Examination Council, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Office of Thrift Supervision, or OTS, and the National Credit Union Administration, or NCUA, have adopted guidelines, and have proposed policies, regarding the suitability of investments in various types of derivative mortgage-backed securities, including securities such as the certificates.

For example, on April 23, 1998, the Federal Financial Institutions Examination Council issued a revised supervisory policy statement, referred to as the 1998 Policy Statement, applicable to all Depository institutions, setting forth guidelines for investments in "high-risk mortgage securities." The 1998 Policy Statement has been adopted by the Federal Reserve Board, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the NCUA and the OTS. The 1998 Policy Statement rescinds a 1992 policy statement that had required, prior to purchase, a Depository institution to determine whether a mortgage derivative product that it is considering acquiring is high-risk, and, if so, that the proposed acquisition would reduce the institution's overall interest rate risk. In addition, The 1998 Policy Statement eliminates former constraints on investing in certain "high-risk" mortgage derivative products and substitutes broader guidelines for evaluating and monitoring investment risk. In addition, the NCUA has issued regulations governing federal credit union investments which prohibit investment in certain specified types of securities, which may include the certificates. The NCUA has indicated that its regulations will take precedence over the 1998 Policy Statement. Similar policy statements and regulations have been issued by other regulators having jurisdiction over other types of Depository institutions.

The OTS has issued Thrift Bulletin 73a, or TB 73a, entitled "Investing in Complex Securities", effective December 18, 2001 which applies to savings associations regulated by the OTS, and Thrift Bulletin 13a, or TB 13a, entitled "Management of Interest Rate Risk, Investment Securities, and Derivatives Activities", effective December 1, 1998, which is applicable to thrift institutions regulated by the OTS.

TB 73a requires savings associations, prior to taking any investment position, to determine that the investment position meets applicable regulatory and policy requirements and internal guidelines, is suitable for the institution, and is safe and sound. The OTS recommends, with respect to purchases of specific securities, additional analysis, including, among others, analysis of repayment terms, legal structure, expected performance of the issuing entity and any underlying assets as well as analysis of the effects of payment priority, with respect to a security which is

S-183

FHFA04179038
A3-10013223184

divided into separate tranches with unequal payments, and collateral investment parameters, with respect to a security that is prefunded or involves a revolving period. TB 73a reiterates the OTS's due diligence requirements for investing in all securities and warns that if a savings association makes an investment that does not meet the applicable regulatory requirements, the savings association's investment practices will be subject to criticism, and the OTS may require divestiture of such securities. The OTS also recommends, with respect to an investment in any "complex securities," that savings associations should take into account quality and suitability, interest rate risk, and classification factors. For the purposes of each of TB 73a and TB 13a, "complex security" includes, among other things, any collateralized mortgage obligation or real estate mortgage investment conduit security, other than any "plain vanilla" mortgage pass-through security (that is, securities that are part of a single class of securities in the related pool that are non-callable and do not have any special features). Accordingly, all classes of Offered Certificates would likely be viewed as "complex securities." With respect to quality and suitability factors, TB 73a warns (i) that a savings association's sole reliance on outside ratings for material purchases of complex securities is an unsafe and unsound practice, (ii) that a savings association should only use ratings and analyses from nationally recognized rating agencies in conjunction with, and in validation of, its own underwriting processes, and (iii) that it should not use ratings as a substitute for its own thorough underwriting analyses. With respect the interest rate risk factor, TB 73a recommends that savings associations should follow the guidance set forth in TB 13a.

TB 13a requires thrift institutions, prior to taking any investment position, to (i) conduct a pre-purchase portfolio sensitivity analysis for any "significant transaction" involving securities or financial derivatives, and (ii) conduct a pre-purchase price sensitivity analysis of any "complex security" or financial derivative. The OTS recommends that while a thrift institution should conduct its own in-house pre-acquisition analysis, it may rely on an analysis conducted by an independent third-party as long as management understands the analysis and its key assumptions. Further, TB 13a recommends that the use of "complex securities with high price sensitivity" be limited to transactions and strategies that lower a thrift institution's portfolio interest rate risk. TB 13a warns that investment in complex securities by thrift institutions that do not have adequate risk measurement, monitoring and control systems may be viewed by OTS examiners as an unsafe and unsound practice.

There may be other restrictions on the ability of some investors either to purchase some classes of securities or to purchase any class of securities representing more than a specified percentage of the investors' assets. The depositor will make no representations as to the proper characterization of any class of securities for legal investment or other purposes, or as to the ability of particular investors to purchase any class of securities under applicable legal investment restrictions. These uncertainties may adversely affect the liquidity of any class of securities. Accordingly, all investors whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities are encouraged to consult with their own legal advisors in determining whether and to what extent the securities of any class constitute legal investments or are subject to investment, capital or other restrictions.

## LEGAL MATTERS

The validity of the certificates, including certain federal income tax consequences with respect hereto, will be passed upon for the depositor by Thacher Proffitt & Wood LLP, New York, New York. Thacher Proffitt & Wood LLP, New York, New York, will also pass upon certain

S-184

CONFIDENTIAL

FHFA04179039
A3-10013223185

legal matters on behalf of the depositor. McKee Nelson LLP, New York, New York, will pass upon certain legal matters on behalf of the Underwriters.

## RATINGS

It is a condition of the issuance of the Offered Certificates that each class of Offered Certificates be assigned at least the ratings designated below by Standard & Poor's, Moody's, Fitch and DBRS.

| Class | Standard & Poor's | Moody's | Fitch | DBRS |
|---|---|---|---|---|
| I-A-1 | AAA | Aaa | AAA | AAA |
| II-A-1 | AAA | Aaa | AAA | AAA |
| II-A-2 | AAA | Aaa | AAA | AAA |
| II-A-3 | AAA | Aaa | AAA | AAA |
| II-A-4 | AAA | Aaa | AAA | AAA |
| M-1 | AA+ | Aa1 | AA+ | AA (high) |
| M-2 | AA+ | Aa2 | AA+ | AA |
| M-3 | AA | Aa3 | AA | AA (low) |
| M-4 | AA | A1 | AA- | A (high) |
| M-5 | AA- | A2 | A+ | A |
| M-6 | A+ | A3 | A | A (low) |
| M-7 | A | Baa1 | A- | BBB (high) |
| M-8 | BBB+ | Baa2 | BBB+ | BBB |
| M-9 | BBB | Baa3 | BBB | BBB (low) |

The security ratings assigned to the Offered Certificates should be evaluated independently from similar ratings on other types of securities. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the respective rating agency. The ratings on the Offered Certificates do not, however, constitute statements regarding the likelihood or frequency of prepayments on the Mortgage Loans or the anticipated yields in light of prepayments. In addition, the ratings on the Offered Certificates do not address the likelihood of receipt by the holders of such certificates of any amounts in respect of Basis Risk Shortfalls.

The depositor has not requested ratings of the Offered Certificates by any rating agency other than Standard & Poor's, Moody's, Fitch and DBRS. However, there can be no assurance as to whether any other rating agency will rate the Offered Certificates or, if it does, what ratings would be assigned by such other rating agency. The ratings assigned by such other rating agency to the Offered Certificates could be lower than the respective ratings assigned by the rating agencies.

## LEGAL PROCEEDINGS

There are no material legal proceedings pending against the sponsor, the depositor, the trustee, the issuing entity, the master servicer, the servicer, the securities administrator, the custodian or the originator, or with respect to which the property of any of the foregoing transaction parties is subject, that are material to the certificateholders. No legal proceedings against any of the

CONFIDENTIAL

FHFA04179040
A3-10013223186

foregoing transaction parties is known to be contemplated by governmental authorities, that are material to the certificateholders.

## AFFILIATIONS, RELATIONSHIPS AND RELATED TRANSACTIONS

There are no affiliations between the sponsor, the depositor or the issuing entity and any of the master servicer, the securities administrator, the custodian, HSBC Bank USA, National Association, the servicer or the originator.  There are no affiliations among the master servicer, the securities administrator or the custodian and HSBC Bank USA, National Association, the servicer and the originator.  There are no affiliations among the trustee and the servicer or the originator. There are no affiliations between the servicer and the originator. There are currently no business relationships, agreements, arrangements, transactions or understandings between (a) the sponsor, the depositor or the issuing entity and (b) any of the parties referred to in the second sentence hereof, or any of their respective affiliates, that were entered into outside the normal course of business or that contain terms other than would be obtained in an arm's length transaction with an unrelated third party and that are material to the investor's understanding of the certificates, or that relate to the certificates or the pooled assets.  No such business relationship, agreement, arrangement, transaction or understanding has existed during the past two years.

## AVAILABLE INFORMATION

The depositor is subject to the informational requirements of the Exchange Act and in accordance therewith files reports and other information with the Securities and Exchange Commission. Reports and other information filed by the depositor can be inspected and copied at the Public Reference Room maintained by the Commission at 100 F Street NE, Washington, DC 20549, and its Regional Offices located as follows: Chicago Regional Office, 500 West Madison, 14th Floor, Chicago, Illinois 60661; New York Regional Office, 233 Broadway, New York, New York 10279. Copies of the material can also be obtained from the Public Reference Section of the Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549, at prescribed rates and electronically through the Commission's Electronic Data Gathering, Analysis and Retrieval system at the Securities and Exchange Commission's Website (http://www.sec.gov). Information about the operation of the Public Reference Room may be obtained by calling the Securities and Exchange Commission at (800) SEC-0330. Exchange Act reports as to any series filed with the Securities and Exchange Commission will be filed under the issuing entity's name. The depositor does not intend to send any financial reports to certificateholders.

The issuing entity's annual reports on Form 10-K (including reports of assessment of compliance with the AB Servicing Criteria, attestation reports, and statements of compliance, discussed in "Description of the Certificates — Reports to Certificateholders" and "Servicing — Evidence as to Compliance", required to be filed under Regulation AB), periodic distribution reports on Form 10-D, current reports on Form 8-K and amendments to those reports, together with such other reports to certificateholders or information about the securities as will have been filed by the securities administrator with the Securities and Exchange Commission will be posted on the securities administrator's internet web site as soon as reasonably practicable after it has been electronically filed with, or furnished to, the Securities and Exchange Commission. The address of the website is: http://www.ctslink.com.

CONFIDENTIAL

FHFA04179041
A3-10013223187

## REPORTS TO CERTIFICATEHOLDERS

So long as the issuing entity is required to file reports under the Exchange Act, those reports will be made available as described above under "Available Information".

If the issuing entity is no longer required to file reports under the Exchange Act, periodic distribution reports will be posted on the Security Administrator's website referenced above under "Available Information" as soon as practicable. Annual reports of assessment of compliance with the AB Servicing Criteria, attestation reports, and statements of compliance will be provided to registered holders of the related securities upon request free of charge. See *"Servicing — Evidence as to Compliance"* and *"Description of the Certificates—Reports to Certficateholders"* in this prospectus supplement.

## INCORPORATION OF INFORMATION BY REFERENCE

There are incorporated into this prospectus supplement by reference all documents, including but not limited to the financial statements and reports filed or caused to be filed or incorporated by reference by the depositor with respect to the trust fund pursuant to the requirements of Sections 13(a) or 15(d) of the Exchange Act, prior to the termination of the offering of the Offered Certificates. All documents subsequently filed by the depositor pursuant to Sections 13(a) or 15(d) of the Exchange Act in respect of the offering prior to the termination of the offering of the Offered Certificates will also be deemed incorporated by reference into this prospectus supplement.

The depositor will provide or cause to be provided without charge to each person to whom this prospectus supplement is delivered in connection with the offering of one or more classes of Offered Certificates, upon written or oral request of the person, a copy of any or all the reports incorporated in this prospectus supplement by reference, in each case to the extent the reports relate to one or more of such classes of the Offered Certificates, other than the exhibits to the documents, unless the exhibits are specifically incorporated by reference in the documents. Requests should be directed in writing to Nomura Home Equity Loan, Inc., Two World Financial Center, Building B, New York, New York, 10281, or by telephone at (212) 667-9300. The depositor has determined that its financial statements will not be material to the offering of any Offered Certificates.

CONFIDENTIAL

FHFA04179042
A3-10013223188

# INDEX OF DEFINED TERMS

AB Servicing Criteria ................................. 160
Adjustment Date ......................................... 37
Aggregate Loan Balance ............................ 88
Aggregate Loan Group Balance................... 88
Applied Loss Amount ............................... 106
Basis Risk Cap Additional Termination Event
.......................................................... 116
Basis Risk Cap Downgrade Provisions...... 116
Basis Risk Cap Event of Default............... 115
Basis Risk Cap Termination Event ........... 116
Basis Risk Cap Termination Payment ....... 117
Basis Risk Shortfall.................................... 88
Basis Risk Shortfall Reserve Fund ............. 99
Carryforward Interest.................................. 88
Certificate Margin....................................... 89
Certificate Principal Balance ....................... 89
Class B-1 Principal Payment Amount ......... 89
Class B-2 Principal Payment Amount ......... 90
Class M-1 Principal Payment Amount......... 90
Class M-2 Principal Payment Amount......... 90
Class M-3 Principal Payment Amount......... 90
Class M-4 Principal Payment Amount......... 90
Class M-5 Principal Payment Amount......... 91
Class M-6 Principal Payment Amount......... 91
Class M-7 Principal Payment Amount......... 91
Class M-8 Principal Payment Amount......... 91
Class M-9 Principal Payment Amount......... 91
Clearstream ................................................ 83
Compensating Interest ................................. 92
CPR ......................................................... 132
Credit Risk Manager ................................ 175
Credit Scores.............................................. 82
CSSF ......................................................... 85
Current Interest .......................................... 92
Custodial Account.................................... 156
DBRS ........................................................ 10
Deferred Amount ........................................ 92
Delinquency Rate ....................................... 92
Derivative Account ................................... 118
Distribution Account................................ 162
DTC .......................................................... 83
Due Date .................................................... 37
Due Period ................................................. 92
Early Termination Date............. 117, 121, 127
ERISA ....................................................... 10
Euroclear ................................................... 83

FHA ........................................................... 80
Financial Intermediary................................ 84
Fitch .......................................................... 10
Fixed Swap Payment .................................... 7
Floating Swap Payment ................................ 7
Foreign National Loans ............................... 81
Fremont ..................................................... 74
Global Securities ......................................... 1
Gross Margin ............................................. 37
Group I Allocation Amount......................... 92
Group I Allocation Percentage .................... 92
Group I Certificates ...............................3, 83
Group I Excess Interest Amount ................. 92
Group I Servicing Fee .............................. 156
Group I Servicing Fee Rate ...................... 156
Group II Allocation Amount ....................... 93
Group II Allocation Percentage................... 93
Group II Certificates...............................3, 83
Group II Excess Interest Amount................. 93
Index ......................................................... 37
Insurance Proceeds ..................................... 93
Interest Accrual Period................................ 93
Interest Only Loans .................................... 36
Interest Rate Cap Additional Termination
   Event................................................... 126
Interest Rate Cap Downgrade Provisions... 127
Interest Rate Cap Event of Default............. 125
Interest Rate Cap Termination Event ......... 126
Interest Rate Cap Termination Payment..... 127
Interest Rate Swap Agreement ...... 7, 118, 124
Interest Remittance Amount ........................ 93
Interest Shortfall ........................................ 94
IRS .......................................................... 175
ISDA Master Agreement ............................. 94
Liquidated Loan......................................... 94
Liquidation Proceeds .................................. 94
Master Servicing Compensation................ 162
Maximum Interest Rate ............................... 94
Maximum Mortgage Rate............................ 37
Minimum Mortgage Rate ............................ 37
Monthly Excess Cashflow........................... 94
Monthly Excess Interest ........................... 101
Moody's..................................................... 10
Mortgage Loan Schedule........................... 164
Mortgage Loans.....................................2, 36
Mortgage Pool ........................................... 36

S-188

CONFIDENTIAL

FHFA04179043
A3-10013223189

Mortgage Rate .................................................. 37
Net Funds Cap ................................................. 95
Net Interest Shortfalls ................................... 95
Net Liquidation Proceeds ............................. 95
Net Mortgage Rate ........................................ 95
Net Swap Payment ...................................... 118
Notices ......................................................... 173
Notional Principal Contract Regulations ... 177
Offered Certificates ...................................... 83
OID Regulations .......................................... 175
One-Month LIBOR ....................................... 96
Optimal Interest Remittance Amount .......... 96
Overcollateralization Amount ...................... 96
Overcollateralization Deficiency Amount ... 96
Overcollateralization Release Amount ......... 96
P&I Advance ................................................ 159
Parity Act ...................................................... 38
Pass-Through Rate ........................................ 96
Payahead ....................................................... 96
Periodic Rate Cap ......................................... 37
Permitted Investment .................................. 157
Plan ...................................................... 10, 179
Pooling and Servicing Agreement ............. 152
Prepayment Assumption ............................. 132
Prepayment Charge ....................................... 38
Prepayment Period ........................................ 96
Principal Payment Amount ........................... 97
Principal Remittance Amount ....................... 97
PTE .............................................................. 179
Purchase Price ............................................. 164
Qualified Substitute Mortgage Loan .......... 165
Realized Loss ................................................ 97

Related Documents ...................................... 164
Relevant Implementation Date ....................... v
Relevant Member State ................................... v
Relief Act .............................................. 97, 158
Rules .............................................................. 84
SEC .............................................................. 163
Securities Act .............................................. 182
Senior Certificates ........................................ 83
Senior Enhancement Percentage ................. 97
Senior Principal Payment Amount ............... 97
Servicer Remittance Date ............................. 98
SMMEA ........................................................ 10
Standard & Poor's ........................................ 10
Stated Principal Balance ............................... 98
Stepdown Date ............................................... 98
Subsequent Recoveries ................................. 98
Substitution Shortfall Amount .................... 164
Supplemental Interest Trust ........................ 117
Supplemental Interest Trust Trustee ........... 117
Swap Additional Termination Event .......... 120
Swap Downgrade Provisions ...................... 121
Swap Event of Default ................................ 120
Swap Provider Trigger Event ............... 98, 122
Swap Scheduled Notional Amount ............ 118
Swap Termination Event ............................. 120
Swap Termination Payment ................. 98, 121
Targeted Overcollateralization Amount ....... 98
Trigger Event ................................................ 99
Underwriters ..................................................... i
VA .................................................................. 80
Wells Fargo Bank ....................................... 160

CONFIDENTIAL

FHFA04179044
A3-10013223190

ANNEX I

**GLOBAL CLEARANCE, SETTLEMENT AND TAX DOCUMENTATION PROCEDURES**

Except under limited circumstances, the globally offered Nomura Home Equity Loan, Inc., Asset Backed Certificates, Series 2006-FM2 (the "Global Securities") will be available only in book- entry form. Investors in the Global Securities may hold the Global Securities through any of DTC, Euroclear or Clearstream. The Global Securities will be tradable as home market instruments in both the European and U.S. domestic markets. Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors holding Global Securities through Euroclear and Clearstream will be conducted in the ordinary way in accordance with their normal rules and operating procedures and in accordance with conventional eurobond practice (i.e., seven calendar day settlement).

Secondary market trading between investors holding Global Securities through DTC will be conducted according to the rules and procedures applicable to U.S. corporate debt obligations and prior Asset-Backed Certificates issues.

Secondary cross-market trading between Euroclear or Clearstream and DTC participants holding Certificates will be effected on a delivery-against-payment basis through the respective depositaries of Euroclear and Clearstream and as DTC participants.

Non-U.S. holders (as described below) of Global Securities will be subject to U.S. withholding taxes unless the holders meet established requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their participants.

**Initial Settlement**

All Global Securities will be held in book-entry form by DTC in the name of Cede & Co. as nominee of DTC. Investors' interests in the Global Securities will be represented through financial institutions acting on their behalf as direct and indirect participants in DTC. As a result, Euroclear and Clearstream will hold positions on behalf of their participants through their respective depositaries, which in turn will hold the positions in accounts as DTC participants.

Investors electing to hold their Global Securities through DTC will follow the settlement practices applicable to prior Asset-Backed Certificates issues. Investor securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their Global Securities through Euroclear or Clearstream accounts will follow the settlement procedures applicable to conventional eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period. Global Securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

I-1

FHFA04179045
A3-10013223191

**Secondary Market Trading**

Because the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

*Trading between DTC Participants.* Secondary market trading between DTC participants will be settled using the procedures applicable to prior Asset-Backed Certificates issues in same day funds.

*Trading between Euroclear and/or Clearstream Participants.* Secondary market trading between Euroclear participants or Clearstream participants will be settled using the procedures applicable to conventional eurobonds in same-day funds.

*Trading between DTC seller and Euroclear or Clearstream Purchaser.* When Global Securities are to be transferred from the account of a DTC participant to the account of a Euroclear participant or a Clearstream participant, the purchaser will send instructions to Euroclear or Clearstream through a Euroclear participant or Clearstream participant at least one business day prior to settlement. Euroclear or Clearstream will instruct the respective depositary, as the case may be, to receive the Global Securities against payment. Payment will include interest accrued on the Global Securities from and including the last coupon payment date to and excluding the settlement date, on the basis of either the actual number of days in the accrual period and a year assumed to consist of 360 days or a 360-day year of 12 30-day months as applicable to the related class of Global Securities. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. Payment will then be made by the respective depositary of the DTC participant's account against delivery of the Global Securities. After settlement has been completed, the Global Securities will be credited to the respective clearing system and by the clearing system, in accordance with its usual procedures, to the Euroclear participant's or Clearstream participant's account. The securities credit will appear the next day (European time) and the cash debt will be back-valued to, and the interest on the Global Securities will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (i.e., the trade fails), the Euroclear or Clearstream cash debt will be valued instead as of the actual settlement date.

Euroclear participants and Clearstream participants will need to make available to the respective clearing systems the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement, either from cash on hand or existing lines of credit, as they would for any settlement occurring within Euroclear or Clearstream. Under this approach, they may take on credit exposure to Euroclear or Clearstream until the Global Securities are credited to their accounts one day later.

As an alternative, if Euroclear or Clearstream has extended a line of credit to them, Euroclear participants or Clearstream participants can elect not to preposition funds and allow that credit line to be drawn upon the finance settlement. Under this procedure, Euroclear participants or Clearstream participants purchasing Global Securities would incur overdraft charges for one day, assuming they cleared the overdraft when the Global Securities were credited to their accounts. However, interest on the Global Securities would accrue from the value date. Therefore, in many cases the investment income on the Global Securities earned during that one-day period may

I-2

CONFIDENTIAL

FHFA04179046
A3-10013223192

substantially reduce or offset the amount of the overdraft charges, although this result will depend on each Euroclear participant's or Clearstream participant's particular cost of funds.

Because the settlement is taking place during New York business hours, DTC participants can employ their usual procedures for sending Global Securities to the respective European depositary for the benefit of Euroclear participants or Clearstream participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC participants a crossmarket transaction will settle no differently than a trade between two DTC participants.

Trading between Euroclear or Clearstream seller and DTC Purchaser. Due to time zone differences in their favor, Euroclear participants and Clearstream participants may employ their customary procedures for transactions in which Global Securities are to be transferred by the respective clearing system, through the respective depositary, to a DTC participant. The seller will send instructions to Euroclear or Clearstream through a Euroclear participant or Clearstream participant at least one business day prior to settlement. In these cases Euroclear or Clearstream will instruct the respective depositary, as appropriate, to deliver the Global Securities to the DTC participant's account against payment. Payment will include interest accrued on the Global Securities from and including the last coupon payment to and excluding the settlement date on the basis of either the actual number of days in the accrual period and a year assumed to consist of 360 days or a 360-day year of 12 30-day months as applicable to the related class of Global Securities. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. The payment will then be reflected in the account of the Euroclear participant or Clearstream participant the following day, and receipt of the cash proceeds in the Euroclear participant's or Clearstream participant's account would be back-valued to the value date (which would be the preceding day, when settlement occurred in New York). Should the Euroclear participant or Clearstream participant have a line of credit with its respective clearing system and elect to be in debt in anticipation of receipt of the sale proceeds in its account, the back-valuation will extinguish any overdraft incurred over that one-day period. If settlement is not completed on the intended value date (i.e., the trade fails), receipt of the cash proceeds in the Euroclear participant's or Clearstream participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Euroclear or Clearstream and that purchase Global Securities from DTC participants for delivery to Euroclear participants or Clearstream participants should note that these trades would automatically fail on the sale side unless affirmative action were taken. At least three techniques should be readily available to eliminate this potential problem:

(a)     borrowing through Euroclear or Clearstream for one day (until the purchase side of the day trade is reflected in their Euroclear or Clearstream accounts) in accordance with the clearing system's customary procedures;

(b)     borrowing the Global Securities in the U.S. from a DTC participant no later than one day prior to settlement, which would give the Global Securities sufficient time to be reflected in their Euroclear or Clearstream account in order to settle the sale side of the trade; or

(c)     staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC participant is at least one day prior to the value date for the sale to the Euroclear participant or Clearstream participant.

I-3

CONFIDENTIAL

**U.S. Federal Income Tax Documentation Requirements**

A beneficial owner of Global Securities holding securities through Clearstream or Euroclear (or through DTC if the holder has an address outside the U.S.) will be subject to the 30% (or in some cases 31% ) U.S. withholding tax that generally applies to payments of interest on registered debt issued by U.S. persons, unless (1) each clearing system, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between the beneficial owner and the U.S. entity required to withhold tax complies with applicable certification requirements and (2) the beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate:

*Exemption for non-U.S. persons (Form W-8 BEN).* Beneficial owners of Global Securities that are non-U.S. persons can obtain a complete exemption from the withholding tax by filing a signed Form W-8 BEN. If the information shown on Form W-8 BEN changes, a new Form W-8 BEN must be filed within 30 days of the change.

*Exemption for non-U.S. persons with effectively connected income (Form W-8ECI).* A non- U.S. person, including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the United States, can obtain an exemption from the withholding tax by filing Form W-8ECI.

*Exemption or reduced rate for non-U.S. persons resident in treaty countries (Form W-8 BEN).* Non-U.S. persons that are beneficial owners residing in a country that has a tax treaty with the United States can obtain an exemption or reduced tax rate (depending on the treaty terms) by filing Form W-8 BEN.

*Exemption for U.S. persons (Form W-9).* U.S. persons can obtain a complete exemption from the withholding tax by filing Form W-9.

*U.S. Federal Income Tax Reporting Procedure.* The Global Securities holder files by submitting the appropriate form to the person through whom he holds (e.g., the clearing agency, in the case of persons holding directly on the books of the clearing agency). Forms W-8 BEN and W-8ECI are generally effective for three calendar years.

- U.S. Person. As used herein the term "U.S. person" means a beneficial owner of a Certificate that is for United States federal income tax purposes

- a citizen or resident of the United States,

- a corporation or partnership created or organized in or under the laws of the United States or of any State thereof or the District of Columbia,

- an estate the income of which is subject to United States federal income taxation regardless of its source, or

- a trust if a court within the United States is able to exercise primary supervision of the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust.

I-4

CONFIDENTIAL

As used herein, the term "non-U.S. person" means a beneficial owner of a Certificate that is not a U.S. person.

This summary does not deal with all aspects of U.S. Federal income tax withholding that may be relevant to foreign holders of the Global Securities or with the application of the extensive withholding regulations that are generally effective with respect to payments made after December 31, 2000 which have detailed rules regarding the determination of beneficial ownership. Investors are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of the Global Securities.

I-5

CONFIDENTIAL

FHFA04179049
A3-10013223195