# Exhibit V

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> NOMURA HOLDING AMERICA INC., NOMURA ASSET ACCEPTANCE CORPORATION, NOMURA HOME EQUITY LOAN, INC., NOMURA CREDIT & CAPITAL, INC., NOMURA SECURITIES INTERNATIONAL, INC., RBS SECURITIES INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.), DAVID FINDLAY, JOHN MCCARTHY, JOHN P. GRAHAM, NATHAN GORIN, and N. DANTE LAROCCA, <br><br> Defendants. | No. 11-cv-6201 (DLC) <br><br> ECF Case |

## NOMURA DEFENDANTS' LOCAL RULE 56.1 COUNTERSTATEMENT OF MATERIAL FACTS

Bruce E. Clark (clarkb@sullcrom.com)
Katherine Stoller (stollerk@sullcrom.com)

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:  212-558-4000
Facsimile:  212-558-3588

Amanda F. Davidoff (davidoffa@sullcrom.com)
Elizabeth A. Cassaff (cassadye@sullcrom.com)

SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, D.C. 20006
Telephone:  202-956-7500
Facsimile:  202-956-6993

*Attorneys for Defendants Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca*

June 3, 2014

# TABLE OF CONTENTS

**Page**

I. THE GSES' PURCHASE OF THE NOMURA CERTIFICATES ................................... 1

II. THE GSES KNEW THE ORIGINATORS OF THE COLLATERAL WHEN THEY PURCHASED THE NOMURA CERTIFICATES................................ 3

III. THE GSES HAD DETAILED INFORMATION ABOUT THE ORIGINATORS OF THE MORTGAGE LOANS WHEN THEY PURCHASED THE CERTIFICATES ........................................................................................ 7

IV. THE ORIGINATORS OF THE COLLATERAL WERE AN IMPORTANT CONSIDERATION IN THE GSES' PURCHASE DECISIONS ................................... 11

V. THE GSES UNDERSTOOD THAT NOMURA PERFORMED CREDIT DILIGENCE ON ONLY A SUBSET OF THE LOANS BACKING THE NOMURA CERTIFICATES AND PERMITTED A "TOLERANCE VARIANCE" WHEN ASSESSING VALUES ............................................................... 13

VI. THE GSES WERE AWARE THROUGH CREDIT RISK REPORT PACKAGES THAT LOANS IN NOMURA SECURITIZATIONS WERE REPORTED TO HAVE INFLATED APPRAISALS ..................................................................... 14

VII. THE GSES WERE AWARE THAT THE MORTGAGE LOANS SUPPORTING THE SECURITIZATIONS WERE PARTICULARLY SUSCEPTIBLE TO THE TYPE OF DEFECTS ALLEGED BY FHFA ..................................................... 17

   A. FHFA's Reunderwriting Allegations ..................................................... 17

   B. The GSEs Knew that the Securitizations Were Supported by Loans Originated Pursuant to Reduced Documentation Loan Programs ....................... 17

   C. The GSEs Knew that the Securitizations were Supported by Loans With a Reported CLTV Ratio of Exactly 80% ................................................. 20

   D. The GSEs Knew the Securitizations Were Supported By Loans Where the Owner-Occupancy Status Could Not Be Verified ................................. 21

VIII. THE DISCLOSURES IN THE NOMURA OFFERING DOCUMENTS ....................... 24

   A. The Offering Documents Disclosed that the Characteristics of the Mortgage Loans Could Vary ................................................................ 24

   B. The Offering Documents Disclosed that Exceptions to Underwriting Standards Could Be Made and Likely Were Made ............................... 25

C.    The Offering Documents Disclosed that the Information Underlying Loans
      Originated Pursuant to Low- or No-Documentation Loan Programs Was
      Verified to Varying Degrees and, in Some Instances, Not At All ....................... 28

D.    The Offering Documents Disclosed a Repurchase Remedy for Mortgage
      Loans that Breached the Representations and Warrants ..................................... 30

E.    The Offering Documents Disclosed that the Purchase Price Was used to
      Calculate LTV and CLTV for Purchase Money Loans ....................................... 31

F.    The Free Writing Prospectus and Prospectus Supplement for NHELI
      2007-3 Disclosed that ResMAE's Bankruptcy May Have Impacted its
      Ability to Follow its Controls ............................................................................ 32

Pursuant to Civil Rule 56.1(a) of the Local Rules of Civil Procedure for the Southern District of New York, the Nomura Defendants respectfully submit this Counterstatement of Material Facts.[1]

## I.   THE GSES' PURCHASE OF THE NOMURA CERTIFICATES

1.      Between November 30, 2005 and April 30, 2007, Freddie Mac and Fannie Mae purchased seven Certificates issued by Nomura representing over $2 billion in original principal value.  Nom. Ex. A (NOM-FHFA_05783828); Nom. Ex. B (FHFA00001131); Nom. Ex. C (FHFA00002480); Nom. Ex. D (FHFA01001981); Nom. Ex. E (FHFA01003626); Nom. Ex. F (FHFA16863753)[2]; Nom. Ex. H (FHFA01002820); *see also FHFA* v. *Nomura Holding America, Inc., et al.,* Am. Compl. ¶ 2, Dkt. No. 60, 11 Civ. 6201 (DLC) (S.D.N.Y.) (June 28, 2012).

2.      The trade date for NAA 2005-AR6 was November 16, 2005.  Nom. Ex. A (NOM-FHFA_05783828); *see also* Nom. Ex. I (*FHFA* v. *Nomura Holding America, Inc., et al.*, Responses to Defendants' Sixth Set of Interrogatories), at 10-11.  Fannie Mae's purchase of NAA 2005-AR6 settled on November 30, 2005.  *Id.*

3.      The trade date for NHELI 2006-FM1 was December 19, 2005.  Nom. Ex. B (FHFA00001131).  *See also* Nom. Ex. I (*FHFA* v. *Nomura Holding America, Inc., et al.*,

---

[1] All citations to "Nom. Ex. __" refer to the exhibits attached to the Declaration of Amanda F. Davidoff in Support of the Nomura Defendants' Local Rule 56.1 Counterstatement of Material Facts, dated June 3, 2014 (the "Davidoff Declaration").  All citations to "Ex. __" refer to the exhibits attached to the Affidavit of Bradley A. Harsch in Support of Defendants' Local Rule 56.1 Counterstatement of Material Facts and Reply to Plaintiff's Statement of Undisputed Material Facts, dated June 3, 2014 (the "Harsch Affidavit").

[2] Nom. Ex. F (FHFA16863753) incorrectly identifies the securitization as "NHELI 2007-HE1." Freddie Mac documents referring to NHELI 2007-HE1 prepared during December 2006 in fact refer to NHELI 2007-2.  *See* Nom. Ex. G (7/16/13 Letter from Jon Corey to Katherine Stoller), at 2.

Responses to Defendants' Sixth Set of Interrogatories), at 10-11.  Freddie Mac's purchase of NHELI 2006-FM1 settled on January 31, 2006.  *Id.*

4.      The trade date for NHELI 2006-HE3 was August 15, 2006.  Nom. Ex. C (FHFA00002480).  *See also* Nom. Ex. I (*FHFA* v. *Nomura Holding America, Inc., et al.*, Responses to Defendants' Sixth Set of Interrogatories), at 10-11.  Freddie Mac's purchase of NHELI 2006-HE3 settled on August 31, 2006.  *Id.*

5.      The trade date for NHELI 2006-FM2 was October 18, 2006.  Nom. Ex. D (FHFA01001981). *See also* Nom. Ex. I (*FHFA* v. *Nomura Holding America, Inc., et al.*, Responses to Defendants' Sixth Set of Interrogatories), at 10-11.  Freddie Mac's purchase of NHELI 2006-FM2 settled on October 31, 2006.  *Id.*

6.      The trade date for NHELI 2007-1 was January 23, 2007.  Nom. Ex. E (FHFA01003626).  *See also* Nom. Ex. I (*FHFA* v. *Nomura Holding America, Inc., et al.*, Responses to Defendants' Sixth Set of Interrogatories), at 10-11.  Freddie Mac's purchase of NHELI 2007-1 settled on January 31, 2007.  *Id.*

7.      The trade date for NHELI 2007-2 was December 27, 2006.  Nom. Ex. F (FHFA16863753).  *See also* Nom. Ex. I (*FHFA* v. *Nomura Holding America, Inc., et al.*, Responses to Defendants' Sixth Set of Interrogatories), at 10-11.  Freddie Mac's purchase of NHELI 2007-2 settled on January 31, 2007.  *Id.*

8.      The trade date for NHELI 2007-3 was April 26, 2007.  Nom. Ex. H (FHFA01002820).  *See also* Nom. Ex. I (*FHFA* v. *Nomura Holding America, Inc., et al.*, Responses to Defendants' Sixth Set of Interrogatories), at 10-11.  Freddie Mac's purchase of NHELI 2007-3 settled on April 30, 2007.  *Id.*

## II.  THE GSES KNEW THE ORIGINATORS OF THE COLLATERAL WHEN THEY PURCHASED THE NOMURA CERTIFICATES

### NAA-2005-AR6

9.     The November 29, 2005 Prospectus Supplement for NAA 2005-AR6, provided to Fannie Mae on November 29, 2005 (Nom. Ex. J (NOM-FHFA_04817305)), confirmed that Alliance Bancorp originated 20.60% of the collateral backing the Securitization, Silver State originated 11.82% of the collateral backing the Securitization, and Aegis originated 11.21% of the collateral backing the Securitization.  Nom. Ex. K (NOM-FHFA_04811802), at 943.

### NHELI 2006-FM1

10.     The December 16, 2005 credit approval for NHELI 2006-FMI shows that Freddie Mac knew that "100%" of the collateral backing the Securitization was originated by Fremont. Nom. Ex. L (FHFA13013603), at 604.[3]

11.     The December 16, 2005 Free Writing Prospectus for NHELI 2006-FM1, provided to Freddie Mac on December 16, 2005 (Nom. Ex. M (NOM-FHFA_04875547)), disclosed to Freddie Mac that 100% of the collateral backing the Securitization was originated by Fremont, Nom. Ex. N (FHFA01041176), at 1269.

12.     The January 27, 2006 Prospectus Supplement for NHELI 2006-FM1, provided to Freddie Mac on January 30, 2006 (Nom. Ex. O (NOM-FHFA_04947183)), confirmed that 100% of the collateral backing the Securitization was originated by Fremont, Nom. Ex. P (NOM-FHFA_04729474), at 605.

---

[3] Nom. Ex. L (FHFA13013603) incorrectly identifies the securitization as "NHELI 2005-FM1." Freddie Mac documents referring to NHELI 2005-FM1 prepared during December 2005 in fact refer to NHELI 2006-FM1.  *See* Nom. Ex. G (7/16/13 Letter from Jon Corey to Katherine Stoller), at 1-2; Nom. Ex. B (FHFA00001131) (trade ticket for NHELI 2006-FM1, referring to "NHELI05FM1").

**NHELI 2006-HE3**

13.     The August 11, 2006 Free Writing Prospectus for NHELI 2006-HE3, provided to Freddie Mac on August 11, 2006 (Nom. Ex. Q (FHFA04261824)), disclosed to Freddie Mac that approximately 43.94% of the collateral backing the Securitization was originated by People's Choice and 15.09% of the collateral backing the Securitization was originated by First NLC, Nom. Ex. R (FHFA01041504), at 510-11, 584.

14.     The August 11, 2006 credit approval for NHELI 2006-HE3 shows that Freddie Mac knew that approximately 45.29% of the collateral backing the Securitization was originated by People's Choice, 14.73% was originated by First NLC, 6.55% was originated by Funding America, 5.72% was originated by Mandalay Mortgage, and 6.98% was originated by Novastar. Nom. Ex. S (FHFA04568773), at 774.

15.     The August 29, 2006 Prospectus Supplement for NHELI 2006-HE3 confirmed that People's Choice originated 38.19% of the collateral backing the Securitization, First NLC originated 14.47% of the collateral backing the Securitization, and Equifirst originated 10.77% of the collateral backing the Securitization.  Nom. Ex. T (NOM-FHFA_04620885), at 964.

**NHELI 2006-FM2**

16.     The October 3, 2006 credit approval for NHELI 2006-FM2 shows that Freddie Mac knew that "100%" of the collateral backing the Securitization was originated by Fremont. Nom. Ex. U (FHFA01041877), at 878.

17.     The October 11, 2006 Free Writing Prospectus for NHELI 2006-FM2 disclosed to Freddie Mac that that 100% of the collateral backing the Securitization was originated by Fremont.  Nom. Ex. V (FHFA01041896), at 899.

18.     The October 30, 2006 Prospectus Supplement for NHELI 2006-FM2 confirmed that 100% of the collateral backing the Securitization was originated by Fremont.  Nom. Ex. W (NOM-FHFA_04638315), at 394.

**NHELI 2007-1**

19.     The January 17, 2007 Free Writing Prospectus for NHELI 2007-1 disclosed to Freddie Mac that approximately 31.72% of the collateral backing the SLG was originated by Silver State.  Nom. Ex. X (FHFA13746809), at 814.

20.     The January 23, 2007 credit approval for NHELI 2007-1 shows that Freddie Mac knew that approximately 31.72% of the collateral backing the SLG was originated by Silver State.  Nom. Ex. Y (FHFA04572921), at 922.[4]

21.     The January 29, 2007 Prospectus Supplement for NHELI 2007-1 confirmed that Silver State originated 31.67% of the collateral backing the SLG.  Nom. Ex. Z (NOM-FHFA_05141912), at 2020.

**NHELI 2007-2**

22.     The December 22, 2006 credit approval for NHELI 2007-2 shows that Freddie Mac knew that approximately 43.24% of the collateral backing the Securitization was originated

---

[4] Nom. Ex. Y (FHFA04572921) incorrectly identifies the securitization as "NAA 2007-AR1." Freddie Mac documents referring to NAA 2007-AR1 prepared during January 2007 in fact refer to NHELI 2007-1.  *See* Nom. Ex. G (7/16/13 Letter from Jon Corey to Katherine Stoller), at 2; Nom. Ex. E (FHFA01003626), at 3635 (trade package for NHELI 2007-1, including NAA 2007-AR1 credit approval).

by Ownit and 11.98% of the collateral backing the Securitization was originated by First NLC. Nom. Ex. AA (FHFA16863774), at 775.[5]

23.     The January 26, 2007 Free Writing Prospectus for NHELI 2007-2, provided to Freddie Mac on January 26, 2007, disclosed to Freddie Mac that approximately 43.63% of the collateral backing the Securitization was originated by Ownit and approximately 11.26% of the collateral backing the Securitization was originated by First NLC.  Nom. Ex. BB (FHFA04227299), at 307, 386.

24.     The  January 30, 2007 Prospectus Supplement for NHELI 2007-2 confirmed that Ownit originated 42.38% of the collateral backing the Securitization and First NLC originated 11.56% of the collateral backing the Securitization.  Nom. Ex. CC (NOM-FHFA_05591325) at 412.

**NHELI 2007-3**

25.     A March 23, 2007 "Potential trade notification" shows that Freddie Mac knew that approximately 8.9% of the collateral was originated by WMC, that approximately 79.5% of the collateral was originated by ResMae, and that ResMae was "in bankruptcy."  Nom. Ex. DD (FHFA02132019).

26.     The April 26, 2007 credit approval for NHELI 2007-3 shows that Freddie Mac knew that approximately 77.61% of the collateral backing the Securitization was originated by ResMae.  Nom. Ex. EE (FHFA13747732) at 733.

---

[5] Nom. Ex. AA (FHFA16863774) incorrectly identifies the securitization as "NHELI 2007-HE1."  Freddie Mac documents referring to NHELI 2007-HE1 prepared during December 2006 in fact refer to NHELI 2007-2.  *See supra* n.1.

27.     The April 24, 2007 Free Writing Prospectus for NHELI 2007-3 disclosed to Freddie Mac that the "Depositor is aware that the originators of approximately 79.09% of the Mortgage Loans . . . have filed for bankruptcy protection . . . .  These originators include ResMae Mortgage Corp., which originated approximately 77.63% of the Mortgage Loans . . . ."  Nom. Ex. FF (FHFA01055475) at 483, 519.  The Free Writing Prospectus further disclosed that  "[a]ny originator whose financial condition was weak or deteriorating at the time of origination may have experienced personnel changes that adversely affected its ability to originate mortgage loans in accordance with its customary standards" and "may have experienced reduced management oversight or controls with respect to its underwriting standards."  *Id.* at 519; *see also infra* ¶¶ 113-114.

28.     The April 27, 2007 Prospectus Supplement for NHELI 2007-3 confirmed that ResMae originated 77.61% of the collateral backing the Securitization and had filed for bankruptcy protection.  Nom. Ex. GG (NOM-FHFA_04732621) at 707.  The Prospectus Supplement also confirmed that "[a]ny originator whose financial condition was weak or deteriorating at the time of origination may have experienced personnel changes that adversely affected its ability to originate mortgage loans in accordance with its customary standards" and "may have experienced reduced management oversight or controls with respect to its underwriting standards."  *Id.*; *see also infra* ¶¶ 113-114.

## III.    THE GSES HAD DETAILED INFORMATION ABOUT THE ORIGINATORS OF THE MORTGAGE LOANS WHEN THEY PURCHASED THE CERTIFICATES

29.     **EquiFirst**.  Freddie Mac's Alternative Markets Operations ("AMO") group conducted an operational review of Equifirst in September 2004, which was performed for Freddie Mac by Clayton Advisory Services, Ltd.  Nom. Ex. HH (FHFA13294891).  The review

rated EquiFirst's appraisal practices "Marginal" and "recommend[ed] more involvement of the Appraisal Review Department in reviewing appraisals prior to closing . . . based on high percentages of loans closed with an LTV over 90%." *Id.* at 892.  The report also observed that EquiFirst's "LTV categories are aggressive." *Id.* at 891.

30.     **First NLC.**  In January and February 2005, Freddie Mac's AMO group conducted an operational review of First NLC.  Ex. 209 (FHFA04385473).  Freddie Mac gave First NLC the worst possible overall rating of "Poor," and reported that First NLC had "poor command of its credit, appraisal and quality control units." *Id.*  The report specifically noted that First NLC's "bad business practice" and "poor execution" resulted in loans "with credit attributes that would be greatly misrepresented on a pricing tape." *Id.*  First NLC's "Appraisal quality" received a rating of "poor" based on three "weaknesses": (1) "First NLC has no formal appraisal department.  Consequently, their appraisal process relies entirely on the underwriter's review [and] AMO does not believe that a centrally located underwriting department can understand national markets well enough to control valuation risk"; (2) "First NLC allows a 10% variance in value at all LTV levels . . . [which] makes it possible for the true LTV to exceed 100%"; and "[A]ppraised value was reduced less than 2% of the time in 2004, which is well below the 6% to 8% AMO typically sees." *Id.* at 5474.

31.     Freddie Mac's concerns about First NLC as an originator continued.  An April 2005 AMO review gave First NLC an overall rating of "Marginal."  Ex. 210 (FHFA03484206). The review found that First NLC funds "loans that most subprime lenders would not," and its "guidelines make exceptions largely unnecessary." *Id.*  In addition, Freddie Mac reviewers "did not see evidence" that First NLC made commonsense underwriting decisions. *Id.*  The review also stated that First NLC's appraisal process "is insufficient to properly maintain a satisfactory

collateral review" and noted that First NLC was still allowing a 10% variance at all LTV levels. *Id.* at 207.

32.     **Fremont.**  Freddie Mac's AMO group conducted an operational review of Fremont in February 2004.  Ex. 211 (FHFA11596540).  The review acknowledged that Fremont allowed variances between appraised values and AVM-generated values: "Greater than 80% LTV allows for a 5% variance in value, with less than 80% LTV allowing for 10%."  *Id.* at 541.

33.     Freddie Mac's AMO group conducted a subsequent operational review of Fremont in August 2005.  Ex. 212 (FHFA00129493).  The review informed Freddie Mac that Fremont continued to allow variances between appraised values and AVM-generated values, with a "maximum variance" of 15%.  *Id.* at 495.  The review also noted that 5% of the exceptions to underwriting guidelines permitted by Fremont in 2005 were for "[l]oan amount, LTV, FICO, DTI and BK seasoning."  *Id.* at 494.

34.     **Mandalay Mortgage.**  A November 2004 AMO review gave Mandalay Mortgage the worst possible overall rating of "Poor."  Ex. 227 (FHFA13253473).  The report specifically noted that Mandalay's "stated" and "interest only" product categories "are aggressive" and that Mandalay allowed for a tolerance of 15% between appraised value and AVM value.  *Id.* at 473-74.

35.     **Ownit.**  Freddie Mac's AMO group reviewed Ownit on August 12-13, 2004 and did "not believe that [Ownit's] operation [was] stable" resulting in "appraisal and controls that are marginal."  Ex. 234 (FHFA13293318).  The review noted that "Ownit tape data is currently very inaccurate with respect to doc type and other key areas."  *Id.* at 320.  The review also acknowledged that Ownit allowed "a value variance of up to 15% as compared to AVMs or desk reviews, which is large, especially at the higher LTVs."  *Id.* at 319.

36.     Ownit is listed on a November 30, 2006 "MABS Concentrations and Unapproved Counterparties" spreadsheet prepared by Freddie Mac's Counterparty Credit Risk Management ("CCRM") group with the comment that "[l]imited, if any, additional business is expected with [  ] Ownit."  Nom. Ex. II (FHFA04615722).

37.     **ResMae.**  Freddie Mac's AMO group conducted an operational review of ResMae in April 2004 that gave ResMae an overall rating of "Marginal" and recommended that Freddie Mac "Proceed with Caution."  Nom. Ex. JJ (FHFA12992187).  The review found that "ResMae does not have an internal quality control program" and encourages "story loans" which are "loans that are made based more on the borrower's individual story that [sic] they are on objective criteria."  *Id.* at 188, 189.  Freddie Mac acknowledged that ResMae "accept[s] a variance of 10% between origination appraisal and review appraisal."  *Id.* at 189.

38.     In April 2007, due to "the number of companies either exiting the subprime mortgage business, or experiencing a liquidity crisis," Freddie Mac's CCRM group compiled "a list of counterparties with whom CCRM has financial and/or business model concerns."  Nom. Ex. KK (FHFA02131910).  ResMae was included on the "Watch List."  *Id.* at 911.

39.     **WMC.**  In July 2003, Freddie Mac's AMO group conducted an operational review of WMC.  Ex. 237 (FHFA11597970).  The review found that WMC "grants a greater number of exceptions [to its underwriting guidelines] than AMO believes is prudent."  *Id.*

40.     Freddie Mac's AMO group conducted another operational review of WMC in January 2005.  Ex. 238 (FHFA11597964).  Freddie Mac recognized that WMC's appraisal process allowed "tolerance variances": 3% - LTV/CLTV at 80%/100%; 5% - loans with LTVs less than 90%; 10% - high LTV loans (90% and greater)."  *Id*. at 7965.  The report found that

WMC permitted exceptions to underwriting guidelines in 6% of its production, with LTV and DTI being the top two exceptions.  *Id.* at 964.

41.    Freddie Mac's AMO group reviewed WMC again in January 2007.  Ex. 239 (FHFA03485131).  The review found that only 55% of WMC's appraisal auditing staff were licensed appraisers.  *Id.* at 133.

## IV.   THE ORIGINATORS OF THE COLLATERAL WERE AN IMPORTANT CONSIDERATION IN THE GSES' PURCHASE DECISIONS

42.    The identity of the originators of loans backing PLS was an important factor in the GSEs' pre-purchase analysis and impacted their decision to purchase a particular PLS. Freddie Mac's Vice-President of Non-Agency Portfolio Management, Michael Aneiro, testified that counterparty approval for PLS deals was required "[b]ecause the deals [we]re dependent upon the performance of originators and servicers."  Ex. 71 (Aneiro Tr. at 255:19-24).

43.    At Fannie Mae, Lesia Bates-Moss, Vice-President and head of Counterparty Credit Risk, testified that analysts conducting counterparty reviews would be trying to "understand the origination and underwriting process for the purpose of ensuring compliance with Fannie Mae's requirements."  Nom. Ex. LL (Bates-Moss Tr.) at 119:24-120:3.

44.    Kevin Palmer, a credit analyst at Freddie Mac who was involved in the credit approval for all of the Nomura Securitizations purchased by Freddie Mac, *see* Nom. Ex. L (FHFA13013603); Nom. Ex. S (FHFA04568773); Nom. Ex. U (FHFA01041877); Nom. Ex. Y (FHFA04572921); Nom. Ex. AA (FHFA16863774); Nom. Ex. EE (FHFA13747732), testified that an originator's closure was relevant to PLS because "[t]he thought was that at the time of severe financial distress that certain controls may not have been fully followed."  Nom. Ex. MM (Palmer Tr.) at 766:4-7.

45.     The significant impact the originators of the collateral had on the GSEs' purchase decisions—and the GSEs knowledge about those originators—is reflected in the credit approvals for the Nomura Securitizations.  *See infra* ¶¶ 46-48.

46.     Freddie Mac's credit approvals for all of the Nomura Certificates purchased by Freddie Mac contained a section on the "top 5" originators of the collateral and listed the percentage of loans in the Securitizations or SLG originated by those originators, as well as the originator's Metrics and AMO ratings.  *See* Nom. Ex. L (FHFA13013603), at 604; Nom. Ex. S (FHFA04568773), at 774; Nom. Ex. U (FHFA01041877), at 878; Nom. Ex. Y (FHFA04572921), at 922; Nom. Ex. AA (FHFA16863774), at 775; Nom. Ex. EE (FHFA13747732), at 733.

47.     In addition, certain credit approvals contained commentary about the originators. The August 11, 2006 credit approval for NHELI 2006-HE3 acknowledged Freddie Mac's concerns about the originators of the collateral backing the securitization, stating that NHELI 2006-HE3 "contain[s] about 20% collateral from originators with whom we are concerned," including First NLC and Mandalay.  Nom. Ex. S (FHFA04568773).  "First NLC, although recently has been upgraded from poor to marginal, does not currently have a metrics score and there [sic] controls are still questionable."  *Id.*  "Mandalay Mortgage is rated poor from AMO." *Id.*  Despite these significant concerns, Freddie Mac gave credit approval to purchase the Certificate because "the strength of the aggregator, [Nomura], mitigates our concerns of the originators" and because Freddie "was getting a substantial amount of [credit enhancement] above the worst DEFCAP path."  *Id.*

48.     In the December 22, 2006 credit approval for NHELI 2007-2, Freddie Mac stated that "[t]his deal contains 40% exposure to Ownit originated collateral, who recently went out of

business.  11% of the collateral was originated by First NLC, who is a marginal counterparty."

Recognizing that "marginal originators" could cause "unanticipated volatility," Freddie made

credit approval "contingent that all the reps and warrants for Ownit are made directly with

Nomura."  Nom. Ex. AA (FHFA16863774).

49.     FHFA was "unable to locate" any pre-purchase credit analyses for the NAA

2005-AR6 Certificate purchased by Fannie Mae "in FHFA's collections from Fannie Mae."

Nom. Ex. NN (6/28/13 Letter from Jon Corey to Katherine Stoller), at 1.  However, in 2005,

Fannie Mae regularly conducted pre-purchase analysis of private label securities it considered for

purchase, including analysis of the originators whose loans backed the securities.  Nom. Ex. OO

(FHFA16883529) at 539-52.

## V.     THE GSES UNDERSTOOD THAT NOMURA PERFORMED CREDIT DILIGENCE ON ONLY A SUBSET OF THE LOANS BACKING THE NOMURA CERTIFICATES AND PERMITTED A "TOLERANCE VARIANCE" WHEN ASSESSING VALUES

50.     In March 2006, prior to the trade dates of all but one of the Nomura

Securitizations it purchased, Freddie Mac conducted an aggregator review of Nomura.  Nom. Ex.

PP (FHFA13253477).  Freddie Mac assessed Nomura's credit, appraisal quality, management,

and controls, and gave Nomura an overall rating of "Satisfactory."  *Id*.  The review reported that

Nomura performed credit due diligence on 20 percent of "large bulk" loan purchases, defined as

transactions between $25 million and $1 billion, and rated Nomura's credit function

"Satisfactory."  *Id.*

51.     The review also recognized that Nomura's appraisal practices allowed for a 10%

variance between appraised value and the value assessed by an AVM.  *Id.* at 479.

## VI.    THE GSES WERE AWARE THROUGH CREDIT RISK REPORT PACKAGES THAT LOANS IN NOMURA SECURITIZATIONS WERE REPORTED TO HAVE INFLATED APPRAISALS

52.    For five of the seven securitizations the GSEs purchased, NHELI 2006-HE3, NHELI 2006-FM2, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3, Wells Fargo Bank, N.A. ("Wells Fargo") served as the Credit Risk Manager and reported on the securitizations based on information about the loans received from the servicers and master servicer in a monthly Collateral Risk Report Package ("CRM report").  Nom. Ex. T (NOM-FHFA_04620885), at 1063; Nom. Ex. W (NOM-FHFA_04638315), at 495; Nom. Ex. Z (NOM-FHFA_05141912), at 2160; Nom. Ex. CC (NOM-FHFA_05591325), at 530; Nom. Ex. GG (NOM-FHFA_04732621), at 817.

53.    The Pooling and Servicing Agreements ("PSA") for these securitizations required Wells Fargo to issue these reports on a monthly basis and to make them publicly available for download via the Internet.  Nom. Ex. QQ (NOM-FHFA_05649702), at 828; Nom. Ex. RR (NOM-FHFA_04641526), at 653; Nom. Ex. SS (NOM-FHFA_05755916), at 6076-77; Nom. Ex. TT (NOM-FHFA_05763895), at 4028; Nom. Ex. UU (NOM-FHFA_05574826), at 958.  Wells Fargo complied with this requirement.  Nom. Ex. VV (Patterson Tr.), at 50:17-51:9.

54.    The servicers for the securitizations requested broker price opinions ("BPOs") or second appraisals for certain loans backing the five Nomura securitizations, which were provided to the Credit Risk Manager.  Nom. Ex. VV (Patterson Tr.) at 106:8-107:10.  This information was used in a section of the CRM reports entitled "Negative Property Value Variance."  Each month, this section listed the loans for each securitization for which a new BPO or appraisal yielded a value that was lower, by more than 10% to 20% (or $10,000 to $20,000), than the

original appraised value.  *E.g.*, Nom. Ex. WW (NOM-FHFA_05796163), at 183-87 (10% or $10,000); Nom. Ex. XX (NOM-FHFA_05796213), at 261-65 (20% or $20,000).

55.     In the November 2006 CRM report for NHELI 2006-HE3, published three months after the securitization was issued, Wells Fargo reported that 118 loans in the securitization had a "Negative Property Value Variance" of at least 10% or $10,000 from the original property value, including variances as high as 81.48%.  Nom. Ex. WW (NOM-FHFA_05796163), at 183-87.

56.     In the December 2006 CRM report for NHELI 2006-HE3, published four months after the securitization was issued, Wells Fargo reported that 112 loans had a "Negative Property Value Variance" of at least 20% or $20,000 from the original property value, including variances as high as 81.48%.  Nom. Ex. XX (NOM-FHFA_05796213), at 261-265.

57.     The November 2006 and December 2006 CRM reports for NHELI 2006-HE3 pre-dated the trade dates of three securitizations purchased by Plaintiffs: NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3.  *See* Nom. Ex. E (FHFA01003626); Nom. Ex. F (FHFA16863753); and Nom. Ex. H (FHFA01002820).

58.     In the January 2007 CRM report for NHELI 2006-HE3, published five months after the securitization was issued, Wells Fargo reported that 127 loans had a "Negative Property Value Variance" of at least 20% or $20,000 from the original property value, including variances as high as 81.48%.  Nom. Ex. YY (NOM-FHFA_05796286), at 356-61.

59.     In the February 2007 CRM report for NHELI 2006-HE3, published six months after the securitization was issued, Wells Fargo reported that 191 loans had a "Negative Property

Value Variance" of at least 20% or $20,000 from the original property value, including variances as high as 81.48%.  Nom. Ex. ZZ (NOM-FHFA_05796381), at 385-93.

60.     In the February 2007 CRM report for NHELI 2006-FM2, published four months after the securitization was issued, Wells Fargo reported that 5 loans had a "Negative Property Value Variance" of at least 20% or $20,000 from the original property value, including variances as high as 18.98%.  Nom. Ex. AAA (NOM-FHFA_05796837), at 842.

61.     In the March 2007 CRM report for NHELI 2006-HE3, published seven months after the securitization was issued, Wells Fargo reported that 94 loans had a "Negative Property Value Variance" of at least 20% or $20,000 from the original property value, including variances as high as 81.48%.  Nom. Ex. BBB (NOM-FHFA_05796415), at 420-23.

62.     The January, February, and March 2007 CRM reports for NHELI 2006-HE3 and the February 2007 CRM report for NHELI 2006-FM2 pre-dated the trade date of one securitization purchased by Plaintiffs: NHELI 2007-3.  *See* Nom. Ex. H (FHFA01002820).

63.     The GSEs reviewed periodic reports "concerning the collection and distribution of cash flows in connection with the Certificates," which would include the CRM reports.  Nom. Ex. CCC (Defs.' First Set of RFAs dated Nov. 6, 2013) at Requests for Admission ¶, Definitions and Instructions ¶ 20; Nom. Ex. DDD (FHFA's Responses and Objections to Defs.' First Set of RFAs, dated Dec. 18, 2013) at 8.

64.     David Hackney, the primary trader for 4 of the 7 securitizations purchased by Plaintiffs (*see* Nom. Ex. EEE (5/7/2013 Email from Eric Cochran to Beth Stewart w/ attachments)), had access to and circulated within Freddie Mac CRM reports for the Nomura securitizations in 2008, Nom. Ex. FFF (FHFA13839381); Nom. Ex. GGG (FHFA13239099).

**VII.    THE GSES WERE AWARE THAT THE MORTGAGE LOANS SUPPORTING THE SECURITIZATIONS WERE PARTICULARLY SUSCEPTIBLE TO THE TYPE OF DEFECTS ALLEGED BY FHFA**

**A.    FHFA's Reunderwriting Allegations**

65.    The report of FHFA's expert Robert W. Hunter, dated May 15, 2014, asserts that the Nomura Offering Documents incorrectly disclosed LTV or CLTV for 24.62% of a sample of the Mortgage Loans.  Nom. Ex. HHH (Hunter Nomura Rep.), at 2.  Thirty-two percent of the loans FHFA claims had an excessive LTV or CLTV are purchase money loans (as opposed to refinances) and rely on the claim that the "value" used to calculate LTV or CLTV for purchase money loans differed from the value generated by a retroactive AVM.  *Id.* at Exhibit 2.  The report also asserts that borrowers for 18.69% of the sample loans categorized as "owner occupied" did not live in their homes.  *Id.* at 2.

66.    The report of FHFA's expert, John Kilpatrick, dated May 15, 2014, asserts that the sample Mortgage Loans were overvalued on average by 8.92%.  Nom. Ex. III (Kilpatrick Nomura Rep. on Accuracy of Appraisals), at 4.

**B.    The GSEs Knew that the Securitizations Were Supported by Loans Originated Pursuant to Reduced Documentation Loan Programs**

67.    The November 17, 2005 "Computational Materials" for NAA 2005-AR6, provided to Fannie Mae on November 21, 2005, disclosed to Fannie Mae that 77.02% of loans in the supporting loan group for the certificate purchased by Fannie Mae (the "SLG") were loans originated under reduced, no ratio, stated income/stated assets, or no income/no asset documentation programs.  Nom. Ex. JJJ (FHFA00200769), at 813.

68.    The November 29, 2005 Prospectus Supplement for NAA 2005-AR6, provided to Fannie Mae on November 29, 2005 (Nom. Ex. J (NOM-FHFA_04817305)), confirmed that

76.37% of loans in the SLG were originated under reduced, no ratio, stated income/stated assets, or no income/no asset documentation programs, Nom. Ex. K (NOM-FHFA_04811802) at 862.

69.     The December 16, 2005 Free Writing Prospectus for NHELI 2006-FM1, provided to Freddie Mac on December 16, 2005 (Nom. Ex. M, (NOM-FHFA_04875547)), disclosed to Freddie Mac that 45.7% of the loans in the SLG were loans originated under reduced/limited or stated income/stated asset documentation loan programs, Nom. Ex. N (FHFA01041176), at 203.

70.     The January 27, 2006 Prospectus Supplement for NHELI 2006-FM1, provided to Freddie Mac on January 30, 2006 (Nom. Ex. O (NOM-FHFA_04947183)), confirmed that 45.15% of loans in the SLG were originated under various reduced/limited or stated income/stated asset documentation loan programs, Nom. Ex. P (NOM-FHFA_04729474), at 515.

71.     The August 11, 2006 Free Writing Prospectus for NHELI 2006-HE3, provided to Freddie Mac on August 11, 2006 (Nom. Ex. Q (FHFA04261824)), disclosed to Freddie Mac that 41.14% of the loans in the SLG were loans originated under verified income/stated assets, stated income/verified assets, or stated income/stated assets documentation programs.  Nom. Ex. R (FHFA01041504) at 552.

72.     The August 29, 2006 Prospectus Supplement for NHELI 2006-HE3 confirmed that 42.32% of loans in the SLG were originated under verified income/stated assets, stated income/verified assets, or stated income/stated assets documentation programs.  Nom. Ex. T (NOM-FHFA_04620885), at 933.

73.     The October 11, 2006 Free Writing Prospectus for NHELI 2006-FM2 disclosed to Freddie Mac that 42.94% of the loans in the SLG were loans originated under stated

income/verified assets or stated income/stated assets documentation programs.  Nom. Ex. V (FHFA01041896), at 935.

74.    The October 30, 2006 Prospectus Supplement for NHELI 2006-FM2 confirmed that 42.64% of loans in the SLG were originated under stated income/verified assets or stated income/stated assets documentation programs.  Nom. Ex. W (NOM-FHFA_04638315), at 365.

75.    The January 17, 2007 Free Writing Prospectus for NHELI 2007-1 disclosed to Freddie Mac that it was expected that 87.93%  of the loans in the SLG were loans originated under reduced, stated income/stated assets, no ratio, or no doc documentation loan programs.  Nom. Ex. X (FHFA13746809), at 871.

76.    The January 29, 2007 Prospectus Supplement for NHELI 2007-1 confirmed that 87.79% of loans in the SLG were originated under reduced, stated income/stated assets, no ratio, or no doc documentation programs.  Nom. Ex. Z (NOM-FHFA_05141912), at 2002.

77.    The January 26, 2007 Free Writing Prospectus for NHELI 2007-2, provided to Freddie Mac on January 26, 2007, disclosed to Freddie Mac that it was expected that 36.05% of the loans in the SLG were loans originated under verified income/stated assets, stated income/verified assets, stated income/stated assets, no ratio, or no doc documentation programs. Nom. Ex. BB (FHFA04227299) at 353.

78.    The January 30, 2007 Prospectus Supplement for NHELI 2007-2 confirmed that 36.12% of loans in the SLG were originated under verified income/stated assets, stated income/verified assets, stated income/stated assets, no ratio, or no doc documentation programs. Nom. Ex. CC (NOM-FHFA_05591325), at 378.

79.     The April 24, 2007 Free Writing Prospectus for NHELI 2007-3 disclosed to Freddie Mac that it was expected that 42.51% of the loans in the SLG were loans originated under stated income/verified assets or stated income/stated assets documentation loan programs.  Nom. Ex. FF (FHFA01055475), at 529.

80.     The April 27, 2007 Prospectus Supplement for NHELI 2007-3 confirmed that 41.62% of loans in the SLG were originated under stated income/verified assets or stated income/stated assets documentation programs.  Nom. Ex. GG (NOM-FHFA_04732621), at 674.

C.     **The GSEs Knew that the Securitizations were Supported by Loans With a Reported CLTV Ratio of Exactly 80%**

81.     Freddie Mac purchased the Certificate in NHELI 2006-HE3 knowing that 9.76% of the loans in the securitization had a reported CLTV ratio of exactly 80%.  Nom. Ex. S (FHFA04568773), at 774.

82.     Freddie Mac purchased the Certificate in NHELI 2006-FM2 knowing that 8.14% of loans in the securitization had a reported CLTV ratio of exactly 80%.  Nom. Ex. U (FHFA01041877), at 878.

83.     Freddie Mac purchased the Certificate in NHELI 2007-1 knowing that 9.81% of loans in the securitization had a CLTV ratio of exactly 80%.  Nom. Ex. Y (FHFA04572921), at 922.

84.     Freddie Mac purchased the Certificate in NHELI 2007-2 knowing that 7.38% of loans in the securitization had a CLTV ratio of exactly 80%.  Nom. Ex. AA (FHFA16863774), at 775.

85.     Freddie Mac purchased the Certificate in NHELI 2007-3 knowing that 6.66% of loans in the securitization had a reported CLTV ratio of exactly 80%.  Nom. Ex. EE (FHFA13747732), at 733.

> **D.     The GSEs Knew the Securitizations Were Supported By Loans Where the Owner-Occupancy Status Could Not Be Verified**[6]

86.     For each of the Nomura Securitizations, the Prospectus Supplements disclosed the percentage of owner-occupied properties and the percentage of purchase money loans in the SLGs.  *See infra* ¶¶ 88-94.

87.     For loans that were both purchase money and owner-occupied, the GSEs knew that occupancy status was impossible to verify prior to funding the loan because the borrower did not yet own the home and thus, could not have been living in it.  Perri Henderson, a PLS trader at Freddie Mac, testified that for purchase money loans she "c[ouldn't] think of any other way" to verify the borrower's intent to occupy the property "other than relying on the borrower's representations about his intent."  Nom. Ex. KKK (Henderson Tr.) at 184-185.  Similarly, Michael Aneiro, Freddie Mac's Vice-President of Non-Agency Portfolio Management, recognized that in a purchase money loan the borrower does not live in the home prior to purchase and testified that, in the case of a purchase money loan, "owner occupancy" means "there's an intent for the owner to occupy the premises."  Nom. Ex. LLL (Aneiro Tr.) at 306-307.

---

[6] All percentages in this Section are percentages by unpaid principal balance of the loans, not by numbers of loans.  (Nom. Ex. K (NOM-FHFA_04811802) at 862; Nom. Ex. P (NOM-FHFA_04729474) at 516; Nom. Ex. T (NOM-FHFA_04620885) at 933; Nom. Ex. W (NOM-FHFA_04638315) at 365; Nom. Ex. Z (NOM-FHFA_05141912) at 2002; Nom. Ex. CC (NOM-FHFA_05591325) at 378; Nom. Ex. GG (NOM-FHFA_04732621) at 674).

88.     The Prospectus Supplement for NAA 2005-AR6 disclosed that 93.43% of the loans backing the SLG were owner-occupied loans and 65.27% were for home purchases.  Nom. Ex. K (NOM-FHFA_04811802) at 862.  Therefore, at a minimum, approximately 63% of the loans designated owner-occupied were purchase money loans.  This is because, even if all of the non-owner-occupied loans in the deal (6.57% of all loans) were purchase money loans, 58.70% of the loans in the deal (65.27% minus 6.57%) would be both purchase money and owner-occupied.  This amounts to 63% of the loans denominated owner-occupied  (58.70% divided by 93.43%).

89.     The Prospectus Supplement for NHELI 2006-FM1 disclosed that 89.69% of the loans backing the SLG were owner-occupied loans and 33.68% were purchase money loans.  Nom. Ex. P (NOM-FHFA_04729474) at 516.  Therefore, at a minimum, approximately 26% of the Mortgage Loans designated owner-occupied were purchase money loans.  This is because, even if all of the non-owner-occupied loans in the deal (10.31% of all loans) were purchase money loans, 23.37% of the loans in the deal (33.68% minus 10.31%) would be both purchase money and owner-occupied.  This amounts to 26% of the loans denominated owner-occupied (23.37% divided by 89.69%).

90.     The Prospectus Supplement for NHELI 2006 HE-3 disclosed that 91.18% of the loans backing the SLG were owner-occupied loans and 19.60% were purchase money loans.  Nom. Ex. T (NOM-FHFA_04620885) at 933.  Therefore, at a minimum, approximately 12% of the Mortgage Loans designated owner-occupied were purchase money loans.  This is because, even if all of the non-owner-occupied loans in the deal (8.82% of all loans) were purchase money loans, 10.68% of the loans in the deal (19.60% minus 8.82%) would be both purchase

-22-

money and owner-occupied.  This amounts to 12% of the loans denominated owner-occupied (10.68% divided by 91.18%).

91.    The Prospectus Supplement for NHELI 2006-FM2 disclosed that 94.77% of the loans backing the SLG were owner-occupied loans and 52.97% were purchase money loans. Nom. Ex. W (NOM-FHFA_04638315) at 365.  Therefore, at a minimum, approximately 51% of the Mortgage Loans designated owner-occupied were purchase money loans.  This is because, even if all of the non-owner-occupied loans in the deal (5.23% of all loans) were purchase money loans, 47.74% of the loans in the deal (52.97% minus 5.23%) would be both purchase money and owner-occupied.  This amounts to 50% of the loans denominated owner-occupied (47.74% divided by 94.77%).

92.    The Prospectus Supplement for NHELI 2007-1 disclosed that 81.44% of the loans backing the SLG were owner-occupied loans and 75.33% were purchase money loans.  Nom. Ex. Z (NOM-FHFA_05141912) at 2002.  Therefore, at a minimum, approximately 70% of the Mortgage Loans designated owner-occupied were purchase money loans.  This is because, even if all of the non-owner-occupied loans in the deal (18.56% of all loans) were purchase money loans, 56.77% of the loans in the deal (75.33% minus 18.56%) would be both purchase money and owner-occupied.  This amounts to 70% of the loans denominated owner-occupied  (56.77% divided by 81.44%).

93.    The Prospectus Supplement for NHELI 2007-2 disclosed that 92.48% of the loans backing the SLG were owner-occupied loans and 25.79% were purchase money loans.  Nom. Ex. CC (NOM-FHFA_05591325) at 378.  Therefore, at a minimum, approximately 20% of the Mortgage Loans designated owner-occupied were purchase money loans.  This is because, even if all of the non-owner-occupied loans in the deal (7.52% of all loans) were purchase money

-23-

loans, 18.27% of the loans in the deal (25.79% minus 7.52%) would be both purchase money and owner-occupied.  This amounts to 20% of the loans denominated owner-occupied  (18.27% divided by 92.48%).

94.     The Prospectus Supplement for NHELI 2007-3 disclosed that 96.91% of the loans backing the SLG were owner-occupied loans and 35.94% were purchase money loans.  Nom. Ex. GG (NOM-FHFA_04732621) at 674.  Therefore, at a minimum, approximately 34% of the Mortgage Loans designated owner-occupied were purchase money loans.  This is because, even if all of the non-owner-occupied loans in the deal (3.09% of all loans) were purchase money loans, 32.85% of the loans in the deal (35.94% minus 3.09%) would be both purchase money and owner-occupied.  This amounts to 34% of the loans denominated owner-occupied  (32.85% divided by 96.91%).

## VIII.     THE DISCLOSURES IN THE NOMURA OFFERING DOCUMENTS

95.     Disclosures regarding the Mortgage Loans were made in the context of numerous other detailed disclosures.  *See infra* ¶¶ 96-115.

### A.  The Offering Documents Disclosed that the Characteristics of the Mortgage Loans Could Vary

96.     For each of the seven securitizations purchased by Plaintiffs, the Prospectus or the Prospectus Supplements disclosed that the characteristics of the mortgage loans could vary from the descriptions in the Offering Documents.  The Prospectuses for NAA 2005-AR6 and NHELI 2006-FM1 disclosed that "[t]he characteristics of the loans included in a trust fund will not vary by more than five percent (by total principal balance as of the Cut-off Date) from the characteristics of the loans that are described in the prospectus supplement."  Nom. Ex. K (NOM-FHFA_04811802) , at 977; Nom. Ex. P (NOM-FHFA_04729474), at 666.

97.     The Prospectus Supplements for NHELI 2006-HE3 and NHELI 2006-FM2 disclosed that "[t]he actual mortgage loans included in the trust fund as of the Closing Date may vary from the mortgage loans as described in this prospectus supplement by up to plus or minus 5% as to any of the material characteristics described in this prospectus supplement."  Nom. Ex. T (NOM-FHFA_04620885), at 924; Nom. Ex. W (NOM-FHFA_04638315), at 356.

98.     The Prospectus Supplements for NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 disclosed that "[i]f, as of the Closing Date, any material pool characteristic differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8-K."  Nom. Ex. Z (NOM-FHFA_05141912), at 2028-29; Nom. Ex. CC (NOM-FHFA_05591325), at 418; Nom. Ex. GG (NOM-FHFA_04732621), at 715.

### B.     The Offering Documents Disclosed that Exceptions to Underwriting Standards Could Be Made and Likely Were Made

99.     For each of the seven securitizations purchased by Plaintiffs, Nomura made representations in the Prospectus Supplements that exceptions to the underwriting standards described in the Prospectus Supplements could be made and were likely made for some portion of the loans backing the securitizations.  The Prospectus Supplements for NAA 2005-AR6, NHELI 2006-HE3, NHELI 2006-FM2, NHELI 2007-1, and NHELI 2007-3 disclosed that "certain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower."  Nom. Ex. K (NOM-FHFA_04811802) , at 894; Nom. Ex. T (NOM-FHFA_04620885), at 972; Nom. Ex. W (NOM-FHFA_04638315), at 400; Nom. Ex. Z (NOM-FHFA_05141912), at 2026; Nom. Ex. GG (NOM-FHFA_04732621), at 712.

100.    The Prospectus Supplements for NHELI 2006-FM1 and NHELI 2006-FM2 disclosed that "[m]ortgage loans are underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ('Scored Programs'), subject to various exceptions as described in this section."  Nom. Ex. P (NOM-FHFA_04729474), at 544; Nom. Ex. W (NOM-FHFA_04638315), at 395.  These Prospectus Supplements furthered disclosed that "[a]ll of the mortgage loans were underwritten by Fremont's underwriters having the appropriate approval authority.  Each underwriter is granted a level of authority commensurate with their proven judgment, experience and credit skills.  On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. **It is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions.**"  Nom. Ex. P (NOM-FHFA_04729474), at 544-45; Nom. Ex. W (NOM-FHFA_04638315), at 396 (emphasis added).

101.    The Prospectus Supplement for NHELI 2006-HE3 disclosed that "[t]he Mortgage Loans are generally consistent with and conform to the Underwriting Guidelines.  On a case-by-case basis, exceptions to the Underwriting Guidelines may be made where compensating factors exist.   It is expected that some portion of the PCHLI loans will represent those exceptions."  Nom. Ex. T (NOM-FHFA_04620885), at 966.

102.    The Prospectus Supplement for NHELI 2007-2 disclosed that "[t]he Underwriting Guidelines and Credit Matrices of the RightLoan are designed to be used as a guide in

determining the credit worthiness of the borrower and his/her ability to repay.  The guidelines, a

reasonable loan amount and the RightLoan itself offer a solution that also facilitates making

logical exceptions to those guides.  Exceptions to the guidelines will be made if the loan meets

the primary criteria of the RightLoan and offers supported compensating factors when a

deviation occurs.  In all cases, the exception(s) and compensating factor(s) are clearly

documented in the file and require branch manager approval and a second signature from the

corporate underwriter. . . .   The overall situation and profile of a borrower, including

compensating factors, which may offset negative characteristics, must be taken into

consideration in determining if the borrower is creditworthy."  Nom. Ex. CC (NOM-

FHFA_05591325), at 413-14.

103.    The Prospectus Supplement for NHELI 2007-3 disclosed that "[a]ll of the

mortgage loans were underwritten by ResMAE's underwriters having the appropriate signature

authority.  Each underwriter is granted a level of authority commensurate with their proven

judgment, maturity and credit skills.  On a case by case basis, ResMAE may determine that,

based upon compensating factors, a prospective mortgagor not strictly qualifying under the

underwriting risk category guidelines described below warrants an underwriting exception.

Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt

Ratio, substantial liquid assets, good credit history, stable employment and time in residence at

the applicant's current address.   **A substantial portion of the Mortgage Loans represent such**

**underwriting exceptions.**"  Nom. Ex. GG (NOM-FHFA_04732621), at 709 (emphasis added).

       **C.**    **The Offering Documents Disclosed that the Information Underlying Loans Originated Pursuant to Low- or No-Documentation Loan Programs Was Verified to Varying Degrees and, in Some Instances, Not At All**

104.    For each of the seven securitizations purchased by Plaintiffs, Nomura made representations in the Prospectus Supplements that the characteristics of loans originated under low-documentation or no-documentation programs were verified to varying degrees and, under some programs, not at all.  The Prospectus Supplements also disclosed the percentages of loans originated under such programs backing each securitization.  The Prospectus Supplements for NAA 2005-AR6, NHELI 2006-HE3, NHELI 2006-FM2, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 disclosed that "[c]ertain of the Mortgage Loans have been originated under reduced documentation, no-documentation or no-ratio programs, which require less documentation and verification than do traditional full documentation programs.  Generally, under a reduced documentation program, verification of either a borrower's income or assets, but not both, is undertaken by the originator.  Under a no-ratio program, certain borrowers with acceptable compensating factors will **not be required to provide any information regarding income** and no other investigation regarding the borrower's income will be undertaken.  Under a no-documentation program, no verification of a borrower's income or assets is undertaken by the originator.  The underwriting for such Mortgage Loans may be based primarily or entirely on an appraisal of the Mortgage Property, the loan-to-value ratio at origination and/or the borrower's credit score."  Nom. Ex. K (NOM-FHFA_04811802) , at 896; Nom. Ex. T (NOM-FHFA_04620885), at 974; Nom. Ex. W (NOM-FHFA_04638315), at 401-02; Nom. Ex. Z (NOM-FHFA_05141912), at 2027-28; Nom. Ex. CC (NOM-FHFA_05591325), at 417; Nom. Ex. GG (NOM-FHFA_04732621), at 714 (emphasis added).

105.    Those Prospectus Supplements further disclosed that "[i]nvestors should note that changes in the values of Mortgage Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner.  No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans."  Nom. Ex. K (NOM-FHFA_04811802) , at 896; Nom. Ex. T (NOM-FHFA_04620885), at 974; Nom. Ex. W (NOM-FHFA_04638315), at 402; Nom. Ex. Z (NOM-FHFA_05141912), at 2028; Nom. Ex. CC (NOM-FHFA_05591325), at 417; Nom. Ex. GG (NOM-FHFA_04732621), at 714.

106.    The Prospectus Supplements for NHELI 2006-FM1 and NHELI 2006-FM2 disclosed that "under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements; under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application.  The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work."  Nom. Ex. P (NOM-FHFA_04729474), at 545; Nom. Ex. W (NOM-FHFA_04638315), at 396.

107.    The Prospectus Supplement for NHELI 2006-HE3 disclosed that "[u]nder the lite documentation program, applicants usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal or business checking account bank statements or a current paycheck stub with at least 6 months' year-to-date information. Under the stated income documentation program, an applicant will be qualified based upon monthly income as stated on the mortgage loan application, if the applicant meets certain criteria. The income stated must be reasonable for the job and credit profile. All of these

programs require, for salaried employees, a telephone verification of the applicant's employment. For a self-employed borrower, there is a telephone verification, as well as additional documentation to verify the existence of the business owned by the borrower."  Nom. Ex. T (NOM-FHFA_04620885), at 967.

108.    The Prospectus Supplement for NHELI 2007-3 disclosed that "under Limited Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements.  Under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application."  Nom. Ex. GG (NOM-FHFA_04732621), at 709.

>    **D.    The Offering Documents Disclosed a Repurchase Remedy for Mortgage Loans that Breached the Representations and Warrants**

109.    For the securitization purchased by Fannie Mae, Nomura made disclosures in the Prospectuses that loans that breached the representations and warrants were subject to repurchase.  The Prospectus for NAA 2005-AR6 disclosed that "[i]f the Warranting Party [(i.e. NAA)] cannot cure that breach . . . then the Warranting Party will be obligated to repurchase that Asset from the trustee . . . ."  Nom. Ex. K (NOM-FHFA_04811802) , at 2017; *see also id.* at 2014-17.

110.    For each of the six securitizations purchased by Freddie Mac, Nomura made disclosures in the Prospectuses that loans that breached the representations and warrants were subject to repurchase.  The Prospectuses for NHELI 2006-FM1, NHELI 2006-HE3, NHELI 2006-FM2, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 disclosed that "[t]he only obligation of the depositor [(i.e. NHELI)] to a trust fund will come from certain representations and warranties made by it about assets transferred to the trust fund.  If these representations and

warranties are untrue, the depositor may be required to repurchase some of the transferred assets." Nom. Ex. P (NOM-FHFA_04729474), at 640; Nom. Ex. T (NOM-FHFA_04620885), at 1087; Nom. Ex. W (NOM-FHFA_04638315), at 518; Nom. Ex. Z (NOM-FHFA_05141912), at 2188; Nom. Ex. CC (NOM-FHFA_05591325), at 554; Nom. Ex. GG (NOM-FHFA_04732621), at 841; *see also* Nom. Ex. P (NOM-FHFA_04729474), at 704-09; Nom. Ex. T (NOM-FHFA_04620885), at 1153-1158; Nom. Ex. W (NOM-FHFA_04638315), at 584-89; Nom. Ex. Z (NOM-FHFA_05141912), at 2254-59; Nom. Ex. CC (NOM-FHFA_05591325), at 620-1625; Nom. Ex. GG (NOM-FHFA_04732621), at 907-12.

111.    The Prospectuses for NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-HE3, NHELI 2006-FM2, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 specified procedures for the repurchase remedy.  For example, these Prospectuses disclosed that "the servicer and/or trustee . . . will be required to notify promptly the relevant Warranting Party of any breach of any representation or warranty made by it in respect of an Asset that materially and adversely affects the value of that Asset or the interests in the prospectus supplement of the securityholders.  Nom. Ex. K (NOM-FHFA_04811802) , at 2017; Nom. Ex. P (NOM-FHFA_04729474), at 708; Nom. Ex. T (NOM-FHFA_04620885), at 1158; Nom. Ex. W (NOM-FHFA_04638315), at 589; Nom. Ex. Z (NOM-FHFA_05141912), at 2259; Nom. Ex. CC (NOM-FHFA_05591325), at 625; Nom. Ex. GG (NOM-FHFA_04732621), at 912.

### E.    The Offering Documents Disclosed that the Purchase Price Was used to Calculate LTV and CLTV for Purchase Money Loans

112.    For each of the seven securitizations purchased by Plaintiffs, Nomura made representations in the Prospectus Supplements that purchase price was used to calculate LTV and CLTV ratios for purchase money loans.  The Prospectus Supplements for NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-HE3, NHELI 2006-FM2, NHELI 2007-1, NHELI 2007-2, and

NHELI 2007-3 disclosed that "[t]he determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the Mortgage Loans may differ from the appraised value of such mortgaged properties for Mortgage Loans obtained for the purpose of acquiring the related mortgaged property because loan-to-value ratios for those Mortgage Loans are determined based upon the lesser of the selling price of the mortgaged property or its appraised value at the time of sale."  Nom. Ex. K (NOM-FHFA_04811802) , at 829-30; Nom. Ex. P (NOM-FHFA_04729474) at 504-05; Nom. Ex. T (NOM-FHFA_04620885), at 921; Nom. Ex. W (NOM-FHFA_04638315), at 352; Nom. Ex. Z (NOM-FHFA_05141912), at 966; Nom. Ex. CC (NOM-FHFA_05591325), at 363; Nom. Ex. GG (NOM-FHFA_04732621), at 659.

   **F.**  **The Free Writing Prospectus and Prospectus Supplement for NHELI 2007-3 Disclosed that ResMAE's Bankruptcy May Have Impacted its Ability to Follow its Controls**

  113. The Prospectus Supplement for NHELI 2007-3 disclosed that "Recent Developments in the Residential Mortgage Market May Adversely Affect the Performance and Market Value of Your Securities. . . . "[N]umerous residential mortgage loan originators that originate subprime mortgage loans have recently experienced serious financial difficulties and, in some cases, bankruptcy. Those difficulties have resulted in part from declining markets for mortgage loans as well as from claims for repurchases of mortgage loans previously sold under provisions that require repurchase in the event of early payment defaults, or for material breaches of representations and warranties made on the mortgage loans, such as fraud claims."  Nom. Ex. GG (NOM-FHFA_04732621), at 662-63.

  114. The Prospectus Supplement for NHELI 2007-3 further disclosed that  "The Bankruptcy of Certain of the Originators May Adversely Affect the Performance and Market Value of Your Securities. . . . **The Depositor is aware that the originators of approximately**

**79.04% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date, have filed for bankruptcy protection under the United States Bankruptcy Code. These originators include ResMAE Mortgage Corporation, which originated approximately 77.61% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date. Any originator whose financial condition was weak or deteriorating at the time of origination may have experienced personnel changes that adversely affected its ability to originate mortgage loans in accordance with its customary standards. It may also have experienced reduced management oversight or controls with respect to its underwriting standards.** Accordingly, the rate of delinquencies and defaults on these Mortgage Loans may be higher than would otherwise be the case." Nom. Ex. GG (NOM-FHFA_04732621), at 664 (emphasis added).

115.    Similar disclosures appeared in the April 24, 2007 NHELI 2007-3 Free Writing Prospectus.  Nom. Ex. FF (FHFA01055475) at 483, 519; *see supra* ¶ 27.

Dated:  June 3, 2014

Respectfully submitted,

/s/ Amanda F. Davidoff
Amanda F. Davidoff (davidoffa@sullcrom.com)
Elizabeth A. Cassady (cassadye@sullcrom.com)

SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, D.C. 20006
Telephone:  202-956-7500
Facsimile:  202-956-6993


Bruce E. Clark (clarkb@sullcrom.com)
Katherine Stoller (stollerk@sullcrom.com)

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:  212-558-4000
Facsimile:  212-558-3588

*Attorneys for Defendants Nomura Holding
America Inc., Nomura Asset Acceptance
Corporation, Nomura Home Equity Loan, Inc.,
Nomura Credit & Capital, Inc., Nomura
Securities International, Inc., David Findlay,
John McCarthy, John P. Graham, Nathan Gorin,
and N. Dante LaRocca*

-16-