# Exhibit C



**Statement of**

**Edward J. DeMarco**
**Acting Director**
**Federal Housing Finance Agency**

**Before the U.S. House of Representatives**
**Subcommittee on Capital Markets, Insurance, and**
**Government-Sponsored Enterprises**

**"Transparency, Transition and Taxpayer Protection:**
**More Steps to End the GSE Bailout"**
**May 25, 2011**

**Embargoed until delivery – 2PM EDT**

**Statement of Edward J. DeMarco**
**Acting Director, Federal Housing Finance Agency**
**Before the U.S. House of Representatives**
**Subcommittee on Capital Markets, Insurance, and**
**Government-Sponsored Enterprises**
**May 25, 2011**

Chairman Garrett, Ranking Member Waters and members of the Subcommittee, thank you for inviting me to speak this afternoon about the current condition of Fannie Mae and Freddie Mac (the Enterprises) and about the Subcommittee's second set of legislative proposals to scale back the role played by the Enterprises and to limit further taxpayer exposures.

I will address three topics in my testimony today.  First, I will give you an update on the Enterprises' financial condition and performance.  Second, I will discuss transition activities that take full advantage of the Enterprises' core competencies to improve the efficiency of the market as a whole.  Third, I will share my thoughts on the seven government-sponsored enterprise (GSE) draft proposals that were recently circulated by the Subcommittee.

**First Quarter 2011 Financial Performance and Condition**

When I last testified before this Subcommittee on March 31, 2011, I gave an overview of year-end 2010 financial results.  Today, I will provide an update for the first quarter of 2011.

- *Providing Liquidity to the Market*

In the first quarter of 2011, Fannie Mae and Freddie Mac remained the largest issuer of mortgage-related securities in the secondary market, guaranteeing 75 percent of single-family mortgage-backed securities (MBS).  Overall, mortgage origination for home purchases and refinances dropped 35 percent in the first quarter of 2011 compared to the fourth quarter of 2010.

- *Capital*

The need for Treasury support through draws under the Senior Preferred Stock Purchase Agreements (PSPAs) with the Treasury Department increased $8.5 billion for Fannie Mae in the first quarter of 2011.  Freddie Mac did not require any further Treasury support based on results for the first quarter of 2011.  The Enterprises' single-family credit guarantee business continued to be the largest contributor to the charges against their capital and, in Fannie Mae's case, the corollary need to draw on the Treasury.  Since 2007, the single-family segment has accounted for $194 billion or 81 percent of all charges against capital for the two Enterprises.  In the first quarter of 2011, investments segment results and multifamily segment results were positive for both Enterprises, and in Freddie Mac's case were enough to offset single-family losses.

- *Credit Quality*

The Enterprises' single-family portfolio continued to experience significant credit losses, mostly associated with loans originated in 2005 through 2008.  However, the credit quality of the single-family loans the Enterprises acquired in 2009, 2010 and 2011 has improved as a result of a return to stronger, traditional underwriting standards.  These loans are underwritten with full verification of income and employment, and exhibit lower loan-to-value ratios and higher credit scores.   In the first quarter of 2011, the average borrower credit score using the Fair Isaac (FICO) credit score was over 750, and the average loan-to-value ratio was below 70 percent.  Serious delinquency rates on the overall credit book continued to decline during the first quarter of 2011 after peaking a year ago.

- *Loss Mitigation Activity*

Since the fourth quarter of 2008, the first full quarter in which the Enterprises were in conservatorship, completed foreclosure alternative actions by the Enterprises totaled 1.6 million, of which 849,000 were completed loan modifications.  Loss mitigation actions were taken on nearly 172,000 loans in the first quarter of 2011.

3

- *Retained Portfolio*

Under limits set by the PSPAs, the retained mortgage portfolios of each Enterprise should be no more than $729 billion by December 31, 2011. As of first quarter 2011, Freddie Mac's mortgage assets already were below the limit at $692 billion. Fannie Mae's were $758 billion but are expected to be below the limit by year-end.

**FHFA and Enterprise Initiatives**

As I have testified previously, the Federal Housing Finance Agency (FHFA) is dedicated to keeping the Enterprises focused on their existing core business rather than venturing into new products or lines of business. This approach ensures ongoing liquidity in the mortgage market, preserves the Enterprises' core business processes, and generates earnings, thereby benefiting taxpayers.

Nevertheless, FHFA is not just in a holding pattern. Where appropriate and feasible, FHFA is also working with the Enterprises to make long-term improvements to the functioning of the housing finance system - improvements that should bring dividends down the road, including drawing private capital back into the market. I reviewed two of these initiatives with you when I appeared before this Subcommittee in March. Since then, I have announced two more. I will briefly review all four.

- *Uniform Mortgage Data Program*

The first such initiative was announced last May when FHFA directed the Enterprises to develop uniform standards for data reporting on mortgage loans and appraisals. This Uniform Mortgage Data Program is designed to improve the consistency, quality, and uniformity of data that are collected at the front-end of the mortgage process. By identifying potential defects at the front end, the Enterprises will improve the quality of mortgage purchases, which should reduce repurchase risk for originators. This initiative will be phased in over the course of the coming year.

4

Developing standard terms, definitions, and industry-wide data reporting protocols will also create new efficiencies for originators and appraisers. It will allow new entrants to use industry standards rather than having to develop their own proprietary data systems to compete with other proprietary data systems already in the market. The credit and pricing decisions Fannie Mae, Freddie Mac, or any future secondary market firm make based on the data, of course, will be where market participants compete. Proprietary reviews of appraisal and loan information will depend on each firm's own unique business models and policies. But common data definitions, electronic data capture, and standardized data protocols will improve efficiency, lower costs and enhance risk monitoring.

- *Servicing Compensation*

The second initiative launched in January of this year is an FHFA joint Servicing Compensation Initiative. FHFA directed Fannie Mae and Freddie Mac, in coordination with HUD and Ginnie Mae, to consider alternatives for future mortgage servicing compensation for their single-family mortgage loans. The goals of the joint initiative are to improve service for borrowers, reduce financial risk to servicers, and provide flexibility for guarantors to better manage non-performing loans, while promoting continued liquidity in the To-Be-Announced mortgage securities market.

- *Servicing Alignment*

The third FHFA initiative we announced less than a month ago. The Servicing Alignment Initiative is designed to produce a single, consistent set of protocols for servicing Enterprise mortgages from the moment they first become delinquent. This initiative responds to concerns about how delinquent mortgages have been serviced. It simplifies the procedures for mortgage servicers by giving them just one set of procedures to follow whether the mortgage is owned by Fannie Mae or Freddie Mac.

Our directive to align the Enterprises' policies for servicing delinquent mortgages should result in earlier servicer engagement to identify the best solution available for homeowners, given their individual circumstances. Further, the foreclosure process may not commence if the borrower

5

and servicer are engaged in a good-faith effort to resolve the delinquency. The servicer must conduct a formal review of each case to ensure a borrower has been considered for foreclosure alternatives before the loan is referred for foreclosure.

- *Loan-Level Disclosure*

Fourth, and finally, I announced two weeks ago that enhancing loan-level disclosures on Enterprise MBS, both at the time of origination and throughout a security's life, is on our agenda. I believe that improving Enterprise MBS disclosures over time will help establish consistency and usefulness of such data. Moreover, it will contribute to an environment in which private capital has the information needed to efficiently measure and price mortgage credit risk, thereby facilitating shift of this risk away from the government and back into the private sector.

**Legislative Proposals**

As requested, I will offer some thoughts and observations regarding the seven legislative draft proposals that were recently circulated by this Subcommittee. However, before I begin discussion of the particular proposals, I would like to reiterate a point that I made during my last testimony before you. FHFA and the Enterprises are facing challenging times as Congress considers legislation to restrict, transform and wind down the Enterprises. During this period, I respectfully ask that care be taken to provide FHFA, as regulator and conservator, with sufficient flexibility to use its best judgment to preserve and conserve the Enterprises' assets, as it has done since September 2008.

With that, I will now address the specific draft legislative proposals:

- *Prevent the Creation of a GSE Replica*

The discussion draft sponsored by Representative Stivers would amend the Housing and Economic Recovery Act (HERA) to ensure that, should Fannie Mae or Freddie Mac be put into receivership, an identical replica GSE would not be created to replace it. Under the current

6

statute, if Fannie Mae or Freddie Mac were to be placed into receivership, FHFA would be required to establish a limited life regulated entity which would operate for up to five years. At the end of that time, without Congressional action, the Enterprises may be recreated under their current charters. Mr. Stivers' bill, if adopted, would prevent the conservator from re-creating the current model of GSE and require that once the Enterprises are wound down, no new entity with taxpayer support could be set up.

There seems to be general agreement that Fannie Mae and Freddie Mac should not be reconstituted in their current form, but we leave it to Congress to decide what should replace them and what level of government support to provide for the market.

- *Prevent a Dividend Payment Decrease*

The discussion draft sponsored by Representative Manzullo would prevent changes to the PSPAs that would reduce the current 10 percent dividend. This proposal is consistent with the current PSPA and the Enterprises have been paying quarterly dividends at this rate (although they frequently have had to draw additional funds from Treasury in order to "pay" the dividend to Treasury). Fixing the dividend rate at 10 percent may limit some of the resolution options, but by preventing a reduction in dividend rates, it also would limit the ability of the Enterprises to build retained surplus and exit from conservatorship. I would also note that even if the dividend rate were reduced, the Enterprises would have to overcome a significant number of hurdles to exit from conservatorship without further legislative action. In any event, FHFA has no plans to seek a change in the dividend rate.

- *Setting a Bailout Cap for the Enterprises*

The discussion draft sponsored by Representative Fitzpatrick provides for a cap that is the greater of (1) $200 billion or (2) $200 billion plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011 and 2012, less any Surplus Amount determined as of December 31, 2012. This cap is consistent with what is currently in place under the PSPAs.

7

- *Eliminating the Housing Trust Fund*

The discussion draft sponsored by Representative Royce would terminate any requirement that Fannie Mae or Freddie Mac make annual allocations for the Housing Trust Fund (HTF), the Capital Magnet Fund, and the Hope Reserve Fund.  In reality, the Enterprises never made contributions to these funds, as was originally expected under HERA, due to their financial condition and status under conservatorships.  It would be inappropriate for the Enterprises to start making contributions to the funds now or at any time while they are in conservatorship and in debt to the taxpayer.

- *Subjecting Fannie Mae and Freddie Mac to FOIA*

H.R. 463, introduced by Representative Chaffetz, would subject the Enterprises to the Freedom of Information Act (FOIA).  FOIA's "core purpose" is to enhance "public understanding of the operations or activities of the government;"[1] FOIA is "often explained as a means for citizens to know what their Government is up to."[2]  This core purpose is not served by applying FOIA to Fannie Mae and Freddie Mac, which are still private companies operating in conservatorship.  They did not cease to be private legal entities when they were placed into conservatorship, nor did they become part of FHFA.

The mandates that FHFA as conservator preserve and conserve the property and assets of the Enterprises and minimize losses to the taxpayers, may be undermined by subjecting the Enterprises to FOIA, as they will incur significant operational and compliance costs in establishing and administering a function to respond to such information requests.  FOIA requests made to the Enterprises would also lead directly to added legal administrative burdens on FHFA, as conservator.

---

[1] *U.S. Department of Defense v. FLRA,* 510 U.S. 487, 494 (1994); *see also Consumers' Checkbook Center for the Study of Services v. Dept. of Health and Human Services*, 554 F.3d 1046, 1051 (D.C. Cir. 2009).
[2] *NARA v. Favish*, 541 U.S. 157, 171(2004) (quoting *Dept. of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)).

8

Given that FOIA was not written to apply to private companies, there could also be significant litigation expense, as parties and courts grapple with unique interpretive questions. The draft raises significant collateral issues: if other private companies for which a government agency could be appointed as conservator or receiver – banks, thrifts, and even bank holding companies and nonbank financial companies – believe that they too could become subject to FOIA, then the boards of such companies, in an appropriate exercise of their fiduciary duty, may act to resist that appointment. Finally, there are many other avenues for stakeholders to obtain information from or about the Enterprises that have well-tested and appropriate safeguards. I urge you to consider carefully the harm that could be done by subjecting the Enterprises to FOIA.

- *Sale of Non-Mission Critical Assets*

The discussion draft sponsored by Representative Hurt would require the Enterprises to identify non-mission critical assets, which would then be reviewed by FHFA and lead to a plan for the disposition of such assets. As I stated earlier in my testimony, FHFA as conservator needs a certain amount of regulatory discretion to exercise its best judgment to preserve and conserve the Enterprises' assets. Discretion is particularly important when disposing of assets.

HERA and the PSPAs already address various aspects of sales of assets – mission and non-mission. There are statutory and contractual triggers and requirements to ensure that the Enterprises receive appropriate approvals to conduct asset dispositions and, if so, at fair market value. As part of the statutory conservator role, I requested that the Enterprises develop consolidated inventories of assets and obligations to affirm FHFA has a full accounting and understanding of all tangible and intangible corporate assets. These inventories are updated quarterly.

Moreover, FHFA has already begun to fulfill the intent of Mr. Hurt's draft bill regarding the sale of non-mission critical assets. We would welcome the opportunity to continue working with Mr. Hurt's staff and Subcommittee staff to refine the draft so that it does not constrain FHFA's ability to carry out mandates of the HERA, including minimizing taxpayer losses.

- *Prohibiting Taxpayers Funding of GSE Employee Legal Fees*

Finally, the discussion draft sponsored by Representative Neugebauer would limit the advancement of legal fees for employees of Fannie Mae, Freddie Mac and the Federal Home Loan Banks.  The proposal would require that FHFA establish a process for the setting of standards for "reasonableness" in the amount of such fees.  While certain specific elements of this proposal raise issues, none I believe, is as important as the challenge to attracting and retaining employees.  An approach to clarify tests for reasonableness and for monitoring legal expenses has merit, but the implication that employees will not be indemnified nor have funds advanced for their legal protection would expose them to lawsuits that could potentially bankrupt them, even if they are found innocent of any charges.  The current structures of federal and state laws and of company bylaws recognize that conviction related to certain forms of offenses merit a repayment of advanced fees.  Altering common practice or the availability of indemnification merits much more attention for its implications and unintended consequences and cannot be justified simply because two of these entities are in conservatorship.  Additionally, I am concerned that this provision treats these regulated entities differently from the regulatory regimes for other regulated entities.

The proposal also seeks to prohibit the use of any Treasury funds or any other government funds for payment of settlement costs and would require the payment to come from "earnings" or the sale of assets.  In either case, in the Enterprises' current situation, whether from "earnings" or the sale of assets, the result would be fewer funds available to satisfy Treasury's claims under the PSPAs.  Further, the proposal would have to be prospective in nature to avoid undermining the status of current employees.  The language currently would cover conduct occurring before the effective date of a regulation and that would make it retrospective in nature.

**Conclusion**

I would be happy to answer your questions and I look forward to working with the Congress on any of the pending housing reform issues, including an ultimate resolution of the Enterprises.  I appreciate the effort in these and other bills to begin moving towards a final resolution of the

Enterprises in conservatorship, but I also recognize the critical and contemporaneous need to provide market participants with greater clarity and assurance about the ultimate role of the government in housing finance beyond the issues surrounding the Enterprises.  FHFA looks forward to providing technical assistance to lawmakers in considering policy alternatives.