# Exhibit D

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form 10-K
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2009
Commission File No.: 0-50231

# Federal National Mortgage Association
*(Exact name of registrant as specified in its charter)*
Fannie Mae

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(202) 752-7000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, without par value | New York Stock Exchange |
| | Chicago Stock Exchange |
| 8.25% Non-Cumulative Preferred Stock, Series T, stated value $25 per share | New York Stock Exchange |
| 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1, stated value $50 per share | New York Stock Exchange |
| Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S, stated value $25 per share | New York Stock Exchange |
| 7.625% Non-Cumulative Preferred Stock, Series R, stated value $25 per share | New York Stock Exchange |
| 6.75% Non-Cumulative Preferred Stock, Series Q, stated value $25 per share | New York Stock Exchange |
| Variable Rate Non-Cumulative Preferred Stock, Series P, stated value $25 per share | New York Stock Exchange |
| 5.50% Non-Cumulative Preferred Stock, Series N, stated value $50 per share | New York Stock Exchange |
| 4.75% Non-Cumulative Preferred Stock, Series M, stated value $50 per share | New York Stock Exchange |
| 5.125% Non-Cumulative Preferred Stock, Series L, stated value $50 per share | New York Stock Exchange |
| 5.375% Non-Cumulative Preferred Stock, Series I, stated value $50 per share | New York Stock Exchange |
| 5.81% Non-Cumulative Preferred Stock, Series H, stated value $50 per share | New York Stock Exchange |
| Variable Rate Non-Cumulative Preferred Stock, Series G, stated value $50 per share | New York Stock Exchange |
| Variable Rate Non-Cumulative Preferred Stock, Series F, stated value $50 per share | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
Variable Rate Non-Cumulative Preferred Stock, Series O, stated value $50 per share
*(Title of class)*
5.375% Non-Cumulative Convertible Series 2004-1 Preferred Stock, stated value $100,000 per share
*(Title of class)*
5.10% Non-Cumulative Preferred Stock, Series E, stated value $50 per share
*(Title of class)*
5.25% Non-Cumulative Preferred Stock, Series D, stated value $50 per share
*(Title of class)*

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☑    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.    Yes ☐    No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑        Accelerated filer ☐        Non-accelerated filer ☐        Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☑

The aggregate market value of the common stock held by non-affiliates of the registrant computed by reference to the price at which the common stock was last sold on June 30, 2009 (the last business day of the registrant's most recently completed second fiscal quarter) was approximately $645 million.

As of January 31, 2010, there were 1,116,805,764 shares of common stock of the registrant outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

None

location-efficient mortgages. It is unclear what action the Senate will take on this legislation, or what impact it may have on our business if this legislation is enacted.

In addition, legislation has been enacted or is being considered in some jurisdictions that would enable lending for residential energy efficiency improvements, with loans repaid via the homeowner's real property tax bill. This structure is designed to grant lenders of energy efficiency loans the equivalent of a tax lien, giving them priority over all other liens on the property, including previously recorded first lien mortgage loans. Consequently, the legislation could increase our credit losses, impact our business volumes and limit the size of loans we acquire where these laws are in effect.

In May 2009, the House of Representatives passed a bill that, among other things, would enhance consumer protections in mortgage loan transactions, impose new servicing standards and allow for assignee liability. Similar provisions were also included in the House-passed financial regulation reform bill. If enacted, the legislation would impact our business and the overall mortgage market. However, it is unclear when, or if, the Senate will consider comparable legislation.

In March 2009, the House of Representatives passed a housing bill that, among other things, includes provisions intended to stem the rate of foreclosures by allowing bankruptcy judges to modify the terms of mortgages on principal residences for borrowers in Chapter 13 bankruptcy. Specifically, the House bill would allow bankruptcy judges to adjust interest rates, extend repayment terms and lower the outstanding principal amount to the current estimated fair value of the underlying property. If enacted, this legislation could have an adverse impact on our business. The Senate passed a similar housing bill in May 2009 that did not include comparable bankruptcy-related provisions. It is unclear when, or if, the Senate will reconsider other alternative bankruptcy-related legislation.

We cannot predict whether any legislation will be enacted and, if legislation is enacted, the prospects for the timing and content of the legislation, or the impact that any enacted legislation could have on our company or our industry.

## OUR CHARTER AND REGULATION OF OUR ACTIVITIES

**Charter Act**

We are a shareholder-owned corporation, originally established in 1938, organized and existing under the Federal National Mortgage Association Charter Act, as amended, which we refer to as the Charter Act or our charter. The Charter Act sets forth the activities that we are permitted to conduct, authorizes us to issue debt and equity securities, and describes our general corporate powers. The Charter Act states that our purpose is to:

- provide stability in the secondary market for residential mortgages;

- respond appropriately to the private capital market;

- provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and

- promote access to mortgage credit throughout the nation (including central cities, rural areas and underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing.

It is from these sections of the Charter Act that we derive our mission of providing liquidity, increasing stability and promoting affordability in the residential mortgage market. In addition to the alignment of our overall strategy with these purposes, all of our business activities must be permissible under the Charter Act. Our charter authorizes us to: purchase, service, sell, lend on the security of, and otherwise deal in certain

mortgage loans; issue debt obligations and mortgage-related securities; and "do all things as are necessary or incidental to the proper management of [our] affairs and the proper conduct of [our] business."

*Loan Standards*

Mortgage loans we purchase or securitize must meet the following standards required by the Charter Act.

- *Principal Balance Limitations.*   Our charter permits us to purchase and securitize mortgage loans secured by either a single-family or multifamily property. Single-family conventional mortgage loans are subject to maximum original principal balance limits, known as "conforming loan limits." The conforming loan limits are established each year based on the average prices of one-family residences. In 2009, the general loan limit for mortgages that finance one-family residences was $417,000, with higher limits for mortgages secured by two- to four-family residences and in certain statutorily-designated high-cost states and territories (Alaska, Hawaii, Guam and the U.S. Virgin Islands) and high-cost areas (counties or county-equivalent areas) that are designated by FHFA annually up to a ceiling of 150% of our general loan limit (for example, $625,000 for a one-family residence, higher for two- to four-units and in high-cost states and territories).

  Since early 2008, a series of legislative acts have increased our high-cost area loan limits for loans originated during specific timeframes. The Economic Stimulus Act of 2008 and subsequent laws set specific higher high-cost area limits covering loans originated between July 1, 2007 and December 31, 2010 and employing a ceiling of 175% of our general loan limit (for example, $729,750 for a one-family residence, higher for two- to four-units and in high-cost states and territories).

  No statutory limits apply to the maximum original principal balance of multifamily mortgage loans that we purchase or securitize. In addition, the Charter Act imposes no maximum original principal balance limits on loans we purchase or securitize that are insured by FHA or guaranteed by the VA, home improvement loans, or loans secured by manufactured housing.

- *Loan-to-Value and Credit Enhancement Requirements.*   The Charter Act generally requires credit enhancement on any conventional single-family mortgage loan that we purchase or securitize if it has a loan-to-value ratio over 80% at the time of purchase. We also do not purchase or securitize second lien single-family mortgage loans when the combined loan-to-value ratio exceeds 80%, unless the second lien mortgage loan has credit enhancement in accordance with the requirements of the Charter Act. The credit enhancement required by our charter may take the form of one or more of the following: (1) insurance or a guaranty by a qualified insurer; (2) a seller's agreement to repurchase or replace any mortgage loan in default (for such period and under such circumstances as we may require); or (3) retention by the seller of at least a 10% participation interest in the mortgage loans. Regardless of loan-to-value ratio, the Charter Act does not require us to obtain credit enhancement to purchase or securitize loans insured by FHA or guaranteed by the VA, home improvement loans or loans secured by manufactured housing.

*Authority of U.S. Treasury to Purchase GSE Securities*

Pursuant to our charter, at the discretion of the Secretary of the Treasury, Treasury may purchase our obligations up to a maximum of $2.25 billion outstanding at any one time. In addition, the 2008 Reform Act amended the Charter Act to give Treasury expanded temporary authority to purchase our obligations and other securities in unlimited amounts (up to the national debt limit). This expanded authority expired on December 31, 2009. On December 24, 2009, Treasury announced that its GSE mortgage-backed securities program would end on December 31, 2009, the expiration date of its expanded temporary authority under our charter. We describe Treasury's investment in our senior preferred stock and a common stock warrant pursuant to this authority above under "Conservatorship and Treasury Agreements—Treasury Agreements."

*Other Charter Act Provisions*

The Charter Act has the following additional provisions.

- *Issuances of Our Securities.*   We are authorized, upon the approval of the Secretary of the Treasury, to issue debt obligations and mortgage-related securities. Neither the U.S. government nor any of its agencies guarantees, directly or indirectly, our debt or mortgage-related securities.

- *Exemptions for Our Securities.*   Securities we issue are exempted securities under laws administered by the SEC, except that as a result of the 2008 Reform Act, our equity securities are not treated as exempted securities for purposes of Sections 12, 13, 14 or 16 of the Securities Exchange Act of 1934 (the "Exchange Act"). Consequently, we are required to file periodic and current reports with the SEC, including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K. However, we are not required to file registration statements with the SEC under the Securities Act of 1933 (the "Securities Act") with respect to offerings of our securities pursuant to this exemption.

- *Exemption from Specified Taxes.*   We are exempt from taxation by states, counties, municipalities and local taxing authorities, except for taxation by those authorities on our real property. We are not exempt from the payment of federal corporate income taxes.

- *Other Limitations and Requirements.*   We may not originate mortgage loans or advance funds to a mortgage seller on an interim basis, using mortgage loans as collateral, pending the sale of the mortgages in the secondary market. In addition, we may only purchase or securitize mortgages on properties located in the United States, including the Commonwealth of Puerto Rico, and the territories and possessions of the United States.

**Regulation and Oversight of Our Activities**

As a federally chartered corporation, we are subject to Congressional legislation and oversight. As a company under conservatorship, our primary regulator has management authority over us in its role as our conservator. The GSE Act, as amended in 2008, establishes FHFA as an independent agency with general supervisory and regulatory authority over Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks ("FHLBs"). FHFA assumed the duties of our former regulators, OFHEO, the predecessor to FHFA, and HUD, with respect to safety and soundness and mission oversight of Fannie Mae and Freddie Mac. HUD remains our regulator with respect to fair lending matters. We reference OFHEO in this report with respect to actions taken by our safety and soundness regulator prior to the creation of FHFA on July 30, 2008. As applicable, we reference HUD in this section with respect to actions taken by our mission regulator prior to the creation of FHFA on July 30, 2008. Our regulators also include the SEC and Treasury.

*GSE Act*

The GSE Act provides FHFA with safety and soundness authority that is stronger than the authority that was available to OFHEO, and that is comparable to and in some respects broader than that of the federal banking agencies. Among other things, the legislation gives FHFA the authority to raise capital levels above statutory minimum levels, regulate the size and content of our portfolio, approve new mortgage products, and place the GSEs into conservatorship or receivership. In general, we remain subject to regulations, orders and determinations that existed prior to the enactment of the 2008 Reform Act until new ones are issued or made. Below are some key provisions of the GSE Act.

*Capital.*   FHFA has broad authority to establish risk-based capital standards to ensure that we operate in a safe and sound manner and maintain sufficient capital and reserves. FHFA also has broad authority to increase the level of our required minimum capital and to establish capital or reserve requirements for specific products and activities, so as to ensure that we operate in a safe and sound manner. On October 9, 2008, FHFA announced that our capital requirements will not be binding during the conservatorship. We describe our capital requirements below under "Capital Adequacy Requirements."

*Portfolio.*   FHFA is required to establish standards governing our portfolio holdings, to ensure that they are backed by sufficient capital and consistent with our mission and safe and sound operations. FHFA is also required to monitor our portfolio and, in some circumstances, may require us to dispose of or acquire assets. On January 30, 2009, FHFA published an interim final rule adopting, as the standard for our portfolio

holdings, the portfolio cap established by the senior preferred stock purchase agreement described under "Treasury Agreements—Covenants under Treasury Agreements," as it may be amended from time to time. The interim final rule is effective for as long as we remain subject to the terms and obligations of the senior preferred stock purchase agreement.

*Products and Activities.*   The GSE Act requires that, with some exceptions, we must obtain FHFA's approval before initially offering a product and provide FHFA written notice before commencing a new activity. In July 2009, FHFA published an interim final rule implementing this provision. In a letter to Congress dated February 2, 2010, the Acting Director of FHFA announced that FHFA was instructing Fannie Mae and Freddie Mac not to submit requests for approval of new products under the interim final rule. The letter stated that "permitting the Enterprises to engage in new products is inconsistent with the goals of conservatorship," and concluded, "the Enterprises will be limited to continuing their existing core business activities and taking actions necessary to advance the goals of the conservatorship."

*Conservatorship and Receivership.*   FHFA has authority to place us into conservatorship, based on certain specified grounds. Pursuant to this authority, FHFA placed us into conservatorship on September 6, 2008. FHFA also has authority to place us into receivership at the discretion of the Director of FHFA, based on certain specified grounds, at any time, including directly from conservatorship. Further, FHFA must place us into receivership if it determines that our liabilities have exceeded our assets for 60 days, or we have not been paying our debts as they become due for 60 days.

*Affordable Housing Allocations.*   We are required to make annual allocations to fund government affordable housing programs, based on the dollar amount of our total new business purchases, at the rate of 4.2 basis points per dollar. FHFA must issue regulations prohibiting us from redirecting the cost of our allocations, through increased charges or fees, or decreased premiums, or in any other manner, to the originators of mortgages that we purchase or securitize. FHFA shall temporarily suspend our allocation upon finding that it is contributing or would contribute to our financial instability; is causing or would cause us to be classified as undercapitalized; or is preventing or would prevent us from successfully completing a capital restoration plan. On November 13, 2008, we received notice from FHFA that it was suspending our allocation until further notice.

*Affordable Housing Goals and Duty to Serve.*   We discuss our affordable housing goals and our new duty to serve underserved markets below under "Housing Goals and Subgoals and Duty to Serve Underserved Markets."

*Executive Compensation.*   The GSE Act directs FHFA to prohibit us from providing unreasonable or non-comparable compensation to our executive officers. FHFA may at any time review the reasonableness and comparability of an executive officer's compensation and may require us to withhold any payment to the officer during such review.

FHFA is also authorized to prohibit or limit certain golden parachute and indemnification payments to directors, officers, and certain other parties. In January 2009, FHFA issued final regulations relating to golden parachute payments, under which FHFA may limit golden parachute payments as defined, and that set forth factors to be considered by the Director of FHFA in acting upon his authority to limit these payments.

*Capital Adequacy Requirements*

The GSE Act establishes capital adequacy requirements. The statutory capital framework incorporates two different quantitative assessments of capital—a minimum capital requirement and a risk-based capital requirement. The minimum capital requirement is ratio-based, while the risk-based capital requirement is based on simulated stress test performance. The GSE Act requires us to maintain sufficient capital to meet both of these requirements in order to be classified as "adequately capitalized." On October 9, 2008, however, FHFA announced that our existing statutory and FHFA-directed regulatory capital requirements will not be binding during the conservatorship. FHFA has directed us, during the time we are under conservatorship, to focus on managing to a positive net worth, provided that it is not inconsistent with our mission objectives.

FHFA has advised us that, because we are under conservatorship, we will not be subject to corrective action requirements that would ordinarily result from our receiving a capital classification of "undercapitalized."

*Minimum Capital Requirement.*   Under the GSE Act, we must maintain an amount of core capital that equals or exceeds our minimum capital requirement. The GSE Act defines core capital as the sum of the stated value of outstanding common stock (common stock less treasury stock), the stated value of outstanding non-cumulative perpetual preferred stock, paid-in capital and retained earnings, as determined in accordance with GAAP. The GSE Act sets our statutory minimum capital requirement equal to the sum of:

- 2.50% of on-balance sheet assets;
- 0.45% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and
- 0.45% of other off-balance sheet obligations, which may be adjusted by FHFA under certain circumstances.

FHFA retains authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities, as necessary and appropriate to ensure our safe and sound operations. For information on the amounts of our core capital and our statutory minimum capital requirement as of December 31, 2009 and 2008, see "MD&A—Liquidity and Capital Management—Capital Management—Regulatory Capital."

*Risk-Based Capital Requirement.*   The GSE Act requires FHFA to establish risk-based capital requirements for Fannie Mae and Freddie Mac, to ensure that we operate in a safe and sound manner. Existing risk-based capital regulation ties our capital requirements to the risk in our book of business, as measured by a stress test model. The stress test simulates our financial performance over a ten-year period of severe economic conditions characterized by both extreme interest rate movements and high mortgage default rates. Simulation results indicate the amount of capital required to survive this prolonged period of economic stress without new business or active risk management action. In addition to this model-based amount, the risk-based capital requirement includes a 30% premium to cover unspecified management and operations risks.

Our total capital base is used to meet our risk-based capital requirement. The GSE Act defines total capital as the sum of our core capital plus the total allowance for loan losses and reserve for guaranty losses in connection with Fannie Mae MBS, less the specific loss allowance (that is, the allowance required on individually-impaired loans). Each quarter, our regulator runs a detailed profile of our book of business through the stress test simulation model. The model generates cash flows and financial statements to evaluate our risk and measure our capital adequacy during the ten-year stress horizon. FHFA has stated that it does not intend to report our risk-based capital level during the conservatorship.

*Critical Capital Requirement.*   The GSE Act also establishes a critical capital requirement, which is the amount of core capital below which we would be classified as "critically undercapitalized." Under the GSE Act, such classification is a discretionary ground for appointing a conservator or receiver. Our critical capital requirement is generally equal to the sum of:

- 1.25% of on-balance sheet assets;
- 0.25% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and
- 0.25% of other off-balance sheet obligations, which may be adjusted by the Director of FHFA under certain circumstances.

FHFA has stated that it does not intend to report our critical capital level during the conservatorship.

On January 12, 2010, FHFA (1) directed us, for loans backing Fannie Mae MBS held by third parties, to continue reporting our minimum capital requirements based on 0.45% of the unpaid principal balance and critical capital based on 0.25% of the unpaid principal balance, notwithstanding our adoption effective January 1, 2010 of new accounting standards that resulted in our recording on our consolidated balance sheet substantially all of the loans backing these Fannie Mae MBS, and (2) issued a regulatory interpretation stating that our minimum capital requirements are not automatically affected by the new accounting standards.