# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

Plaintiff,

-against-

NOMURA HOLDING AMERICA INC.,
NOMURA ASSET ACCEPTANCE
CORPORATION, NOMURA HOME
EQUITY LOAN, INC., NOMURA CREDIT
& CAPITAL, INC., NOMURA SECURITIES
INTERNATIONAL, INC., RBS
SECURITIES INC. (f/k/a GREENWICH
CAPITAL MARKETS, INC.), DAVID
FINDLAY, JOHN MCCARTHY, JOHN P.
GRAHAM, NATHAN GORIN, and N.
DANTE LAROCCA,

Defendants.

---

11 CIV. 6201 (DLC)

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**JUNE 28, 2012**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

NATURE OF ACTION ..................................................................................................1

PARTIES ....................................................................................................................5

    The Plaintiff and the GSEs ........................................................................................5

    The Defendants ........................................................................................................6

    The Non-Party Originators ........................................................................................9

JURISDICTION AND VENUE ....................................................................................9

FACTUAL ALLEGATIONS ......................................................................................10

I.       THE SECURITIZATIONS ..............................................................................10

    A.      Residential Mortgage-Backed Securitizations In General ....................10

    B.      The Securitizations At Issue In This Case ........................................11

    C.      The Securitization Process ............................................................12

         1.      Nomura Credit Groups Mortgage Loans in Special Purpose Trusts..........12

         2.      The Trusts Issue Securities Backed by the Loans....................................13

II.     DEFENDANTS' PARTICIPATION IN THE SECURITIZATION PROCESS...............16

    A.      The Role of Each of the Defendants ................................................16

         1.      Nomura Credit ............................................................................16

         2.      NAA ........................................................................................17

         3.      NHELI........................................................................................18

         4.      Nomura Securities ........................................................................18

         5.      RBS Securities ............................................................................19

         6.      Nomura Holding ..........................................................................20

         7.      The Individual Defendants..............................................................20

    B.      Defendants' Failure To Conduct Proper Due Diligence........................21

III.    THE REGISTRATION STATEMENTS ................................................................24

        A.    Compliance With Underwriting Guidelines ................................................24

        B.    Statements Regarding Occupancy Status of Borrower ...........................27

        C.    Statements Regarding Loan-to-Value Ratios ..........................................29

        D.    Statements Regarding Credit Ratings ......................................................31

IV.    FALSITY OF STATEMENTS IN THE PROSPECTUS SUPPLEMENTS ....................33

        A.    The Statistical Data Provided in the Prospectus Supplements Concerning
              Owner Occupancy and LTV Ratios Was Materially False or Misleading ..........33

              1.    Owner-Occupancy Data Was Materially False ..........................34

              2.    Loan-to-Value Data Was Materially False ................................36

        B.    The Originators of the Underlying Mortgage Loans Systematically
              Disregarded Their Underwriting Guidelines ...........................................39

              1.    Both Government and Private Investigations Have Confirmed That
                    the Originators of the Loans in the Securitizations Systematically
                    Failed to Adhere to Their Underwriting Guidelines ...............................39

                    a.    Fremont ...........................................................................40

                    b.    Ownit..............................................................................42

                    c.    Silver State .....................................................................42

                    d.    Inflated Appraisals Generally .......................................43

              2.    The Collapse of the Certificates' Credit Ratings Further Indicates
                    that the Mortgage Loans Were Not Originated in Adherence to the
                    Stated Underwriting Guidelines..............................................44

              3.    The Surge in Mortgage Delinquency and Default Further
                    Demonstrates that the Mortgage Loans Were Not Originated in
                    Adherence to the Stated Underwriting Guidelines ....................46

V.     Fannie Mae's and Freddie Mac's Purchases of the GSE Certificates and the
       Resulting Damages ..............................................................................47

FIRST CAUSE OF ACTION ..................................................................................49

SECOND CAUSE OF ACTION ...............................................................................52

THIRD CAUSE OF ACTION ................................................................................................56

FOURTH CAUSE OF ACTION .............................................................................................60

FIFTH CAUSE OF ACTION ..................................................................................................63

SIXTH CAUSE OF ACTION ..................................................................................................66

SEVENTH CAUSE OF ACTION ...........................................................................................69

PRAYER FOR RELIEF .........................................................................................................72

JURY TRIAL DEMANDED ...................................................................................................73

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator for The Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Amended Complaint herein against Nomura Holding America Inc. ("Nomura Holding"), Nomura Asset Acceptance Corporation ("NAA"), Nomura Home Equity Loan, Inc. ("NHELI"), Nomura Credit & Capital, Inc. ("Nomura Credit"), Nomura Securities International, Inc. ("Nomura Securities") (collectively, "Nomura"), RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.) ("RBS Securities"), and David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante Larocca (the "Individual Defendants") (together with Nomura and RBS Securities, "Defendants") alleges as follows:

## NATURE OF ACTION

1.     This action arises out of Defendants' actionable conduct in connection with the offer and sale of certain residential mortgage-backed securities to Fannie Mae and Freddie Mac (collectively, the "Government Sponsored Enterprises" or "GSEs").  These securities were sold pursuant to registration statements, including prospectuses and prospectus supplements that formed part of those registration statements, which contained materially false or misleading statements and omissions.  Defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the ability of the borrowers to repay their mortgage loans.  These statements were material to the GSEs, as reasonable investors, and their falsity violates Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq*., Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, and Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code.

2.      Between November 30, 2005 and April 30, 2007, Fannie Mae and Freddie Mac purchased over $2 billion in residential mortgage-backed securities (the "GSE Certificates") issued in connection with seven Nomura-sponsored securitizations.[1]  The GSE Certificates purchased by Freddie Mac, along with date and amount of the purchases, are listed below in Table 10.  The GSE Certificates purchased by Fannie Mae, along with date and amount of the purchases, are listed below in Table 11.  The securitizations at issue are:

i.      Nomura Asset Acceptance Corporation, Mortgage Pass-Through Certificates, Series 2005-AR6 ("NAA 2005-AR6");

ii.     Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2006-FM1 ("NHELI 2006-FM1");

iii.    Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2006-FM2 ("NHELI 2006-FM2");

iv.     Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2006-HE3 ("NHELI 2006-HE3");

v.      Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2007-1 ("NHELI 2007-1");

vi.     Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2007-2 ("NHELI 2007-2"); and

vii.    Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2007-3 ("NHELI 2007-3");

(collectively, the "Securitizations").

3.      The Certificates were offered for sale pursuant to one of three shelf registration statements (the "Shelf Registration Statements") filed with the Securities and Exchange Commission (the "SEC").  Defendant NAA filed one Shelf Registration Statement that pertained

---

[1]  For purposes of this Amended Complaint, the securities issued under the Registration Statements (as defined in footnote 2, below) are referred to as "Certificates," while the particular Certificates that Fannie Mae and Freddie Mac purchased are referred to as the "GSE Certificates."  Holders of Certificates are referred to as "Certificateholders."

to one Securitization at issue in this action.  Defendant NHELI filed two Shelf Registration

Statements that pertained to the remaining six Securitizations at issue in this action.  The

Individual Defendants signed one or more of the Shelf Registration Statements and the

amendments thereto.

4.      For each Securitization, a prospectus ("Prospectus") and prospectus supplement

("Prospectus Supplement") were filed with the SEC as part of the Registration Statement.[2]  The

GSE Certificates were marketed and sold to Fannie Mae and Freddie Mac pursuant to the

Registration Statements, including the Shelf Registration Statements and the corresponding

Prospectuses and Prospectus Supplements.

5.      The Registration Statements contained statements about the characteristics and

credit quality of the mortgage loans underlying the Securitizations, the creditworthiness of the

borrowers of those underlying mortgage loans, and the origination and underwriting practices

used to make and approve the loans.  Such statements were material to a reasonable investor's

decision to invest in mortgage-backed securities by purchasing the Certificates, and specifically

to Fannie Mae's and Freddie Mac's investment decisions.  Unbeknownst to Fannie Mae and

Freddie Mac, these statements were materially false, as significant percentages of the underlying

mortgage loans were not originated in accordance with the represented underwriting standards

and origination practices, and had materially poorer credit quality than what was represented in

the Registration Statements.

6.      The Registration Statements also contained statistical summaries of the groups of

mortgage loans in each Securitization, such as the percentage of loans secured by owner-

_____

[2]   The term "Registration Statement" as used herein incorporates the Shelf Registration
Statement, the Prospectus and the Prospectus Supplement for each referenced Securitization,
except where otherwise indicated.

occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges.  This information was material to reasonable investors.  However, a loan-level analysis of a sample of loans for each Securitization—a review that encompassed thousands of mortgages across all of the Securitizations—has revealed that these statistics were false and omitted material facts due to inflated property values and misstatements of other key characteristics of the mortgage loans.

7.     For example, the percentage of owner-occupied properties is a material risk factor to the purchasers of Certificates, such as Fannie Mae and Freddie Mac, since a borrower who lives in a mortgaged property is generally less likely to stop paying his or her mortgage and more likely to take better care of the property.  The loan-level review reveals that the true percentage of owner-occupied properties for the loans supporting the GSE Certificates was materially lower than what was stated in the Prospectus Supplements.  Likewise, the Prospectus Supplements misrepresented other material factors, including the true value of the mortgaged properties relative to the amount of the underlying loans.

8.     Defendants Nomura Securities (which was the lead underwriter and sold some of the GSE Certificates to the GSEs), RBS Securities (which was the lead underwriter and sold some of the GSE Certificates to Freddie Mac), NAA (which acted as the depositor in one of the Securitizations), NHELI (which acted as the depositor in six of the Securitizations), and the Individual Defendants (who signed the Registration Statements) are directly responsible for the misstatements and omissions of material fact contained in the Registration Statements because they prepared, signed, filed and/or used these documents to market and sell the Certificates to Fannie Mae and Freddie Mac.

9.     Defendants Nomura Holding and Nomura Credit also are responsible for the misstatements and omissions of material fact contained in the Registration Statements by virtue of their direction and control over Defendants Nomura Securities, NAA, and NHELI.  Nomura Holding directly participated in and exercised dominion and control over the business operations of its wholly owned subsidiaries, Defendants Nomura Securities, NAA, and NHELI.  Nomura Credit (the seller or sponsor) directly participated in and exercised dominion and control over the business operations of the depositors, Defendants NAA and NHELI.

10.     Fannie Mae and Freddie Mac purchased over $2 billion of the Certificates pursuant to the Registration Statements filed with the SEC.  The Registration Statements contained misstatements and omissions of material facts concerning the quality of the underlying mortgage loans, and the practices used to originate and underwrite such loans.  As a result of Defendants' misstatements and omissions of material fact, Fannie Mae and Freddie Mac have suffered substantial losses as the value of their holdings has significantly deteriorated.

11.     FHFA, as Conservator for Fannie Mae and Freddie Mac, brings this action against Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§77k, 77*l*(a)(2), 77o, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, and Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code.

## PARTIES

### The Plaintiff and the GSEs

12.     The Federal Housing Finance Agency is a federal agency located at Constitution Center, 400 7th Street, S.W. in Washington, D.C.  FHFA was created on July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. §4617), to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  On September 6, 2008, under HERA, the Director of FHFA placed Fannie

Mae and Freddie Mac into conservatorship and appointed FHFA as conservator.  In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs, including but not limited to, the authority to bring suits on behalf of and/or for the benefit of Fannie Mae and Freddie Mac.  12 U.S.C. § 4617(b)(12).

13.     Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets.  As part of this mission, Fannie Mae and Freddie Mac invested in residential mortgage-backed securities.  Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

### The Defendants

14.     Defendant Nomura Holding is a Delaware corporation with its principal place of business at 2 World Financial Center, New York, New York 10281.  Nomura Holding is the American branch of the Japanese investment banking and securities firm Nomura Securities Co., Ltd.  Nomura Holding's wholly owned subsidiaries include Defendants Nomura Credit, NAA, NHELI, and Nomura Securities.

15.     Defendant Nomura Credit is a Delaware corporation with its principal place of business at 2 World Financial Center, New York, New York 10281.  Nomura Credit is a wholly owned subsidiary of Nomura Holding.  Nomura Credit acted as the seller/sponsor for all seven Securitizations.

16.     Defendant NAA is a Delaware corporation with its principal place of business at 2 World Financial Center, New York, New York 10281.  NAA is a wholly owned subsidiary of Nomura Holding and an affiliate of Nomura Credit.  NAA was the depositor for one Securitization.  As depositor, NAA was responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934.

17. Defendant NHELI is a Delaware corporation with its principal place of business at 2 World Financial Center, New York, New York 10281. NHELI is a wholly owned subsidiary of Nomura Holding and an affiliate of Nomura Credit. NHELI was the depositor for the remaining six Securitizations. As depositor, NHELI was responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934.

18. Defendant Nomura Securities is a New York corporation with its principal place of business at 2 World Financial Center, New York, New York 10281. It is registered with the SEC as a broker-dealer. Nomura Securities is a wholly owned subsidiary of Nomura Holding and an affiliate of NAA and NHELI. Nomura Securities was the lead or co-lead underwriter for three Securitizations (NAA 2005-AR6, NHELI 2006-FM1, and NHELI 2006-FM2), and was intimately involved in the offerings. Fannie Mae and Freddie Mac purchased the GSE Certificates from Nomura Securities in its capacity as underwriter for two Securitizations.

19. Defendant RBS Securities is a Delaware corporation with its principal place of business at 600 Washington Boulevard, Stanford, Connecticut 06901. It is registered with the SEC as a broker-dealer. Prior to April 2009, RBS Securities was known as Greenwich Capital Markets, Inc. ("Greenwich"). Operating as Greenwich, RBS Securities was the lead or co-lead underwriter for four Securitizations (NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, and NHELI 2007-2), and was intimately involved in the offerings. Freddie Mac purchased the GSE Certificates from Greenwich (now RBS Securities) in its capacity as underwriter for these four Securitizations.

20. Defendant N. Dante Larocca is an individual residing in Manhasset, New York. From 2001 to 2008, he was a Managing Director at Nomura Securities. Mr. Larocca also was

President and Chief Executive Officer of NHELI.  Mr. Larocca signed two Shelf Registration Statements (applicable to six Securitizations) and the amendments thereto, and, upon information and belief, did so in New York.

21.     Defendant David Findlay is an individual residing in Greenwich, Connecticut and working in New York, New York.  Mr. Findlay was a Senior Managing Director and the Chief Legal Officer of Nomura Holding and Nomura Securities.  Mr. Findlay served as a Director of both NAA and NHELI.  He signed or authorized another to sign on his behalf all three Shelf Registration Statements and the amendments thereto, and, upon information and belief, did so in New York.

22.     Defendant Nathan Gorin is an individual residing in Syosset, New York and working in New York, New York.  Mr. Gorin was Controller and Chief Financial Officer of Nomura Securities from 2004 to 2009.  He also was the Controller and Chief Financial Officer of both NAA and NHELI.  Mr. Gorin signed or authorized another to sign on his behalf all three Shelf Registration Statements and the amendments thereto, and, upon information and belief, did so in New York.

23.     Defendant John P. Graham is an individual residing and working in New York, New York.  Mr. Graham was a Managing Director at Nomura Credit.  Mr. Graham also was the President and Chief Executive Officer of NAA.  Mr. Graham signed or authorized another to sign on his behalf one Shelf Registration Statement (applicable to one Securitization) and the amendment thereto, and, upon information and belief, did so in New York.

24.     Defendant John McCarthy was a Director of both NAA and NHELI.  Mr. McCarthy signed or authorized another to sign on his behalf all three Shelf Registration Statements and the amendments thereto, and, upon information and belief, did so in New York.

*The Non-Party Originators*

25.     For each Securitization, the loans underlying the Certificates were acquired by Nomura Credit (the sponsor) from non-party mortgage originators.  The non-party originators responsible for the loans underlying the Certificates included Fremont Investment & Loan ("Fremont"), Ownit Mortgage Solutions, Inc. ("Ownit"), and Silver State Mortgage and Silver State Financial Services (d/b/a Silver State Mortgage) ("Silver State").

## JURISDICTION AND VENUE

26.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal courts original jurisdiction over claims brought by FHFA in its capacity as conservator for Fannie Mae and Freddie Mac.

27.     Jurisdiction of this Court also is founded upon 28 U.S.C. § 1331 because the Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C.  §§ 77k, 77*l*(a)(2), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

28.     This Court has jurisdiction over the statutory claims of violations of Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code and Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, pursuant to this Court's supplemental jurisdiction under 28 U.S.C. §1367(a).

29.     Venue is proper in this district pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, and 28 U.S.C. §1391(b).  The Nomura Defendants are all located in this district, most of the Individual Defendants reside and/or work in this district, and many of the acts and transactions alleged herein, including the preparation and dissemination of the Registration Statements, occurred in substantial part within this district.  Additionally, the GSE

Certificates were actively marketed and sold from this district.  Defendants also are subject to personal jurisdiction in this district.

**FACTUAL ALLEGATIONS**

**I.     THE SECURITIZATIONS**

      **A.     Residential Mortgage-Backed Securitizations In General**

      30.     Asset-backed securitization distributes risk by pooling cash-producing financial assets and issuing securities backed by those pools of assets.  In residential mortgage-backed securitizations, the cash-producing financial assets are residential mortgage loans.

      31.     The most common form of securitization of mortgage loans involves a sponsor – the entity that acquires or originates the mortgage loans and initiates the securitization – and the creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage loans.  The trust is established pursuant to a Pooling and Servicing Agreement entered into by, among others, the depositor for that securitization.  In many instances, the transfer of assets to a trust "is a two-step process:  the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions."  Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

      32.     Residential mortgage-backed securities are backed by the underlying mortgage loans.  Some residential mortgage-backed securitizations are created from more than one cohort of loans called collateral groups, in which case the trust issues securities backed by different groups.  For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group.  Purchasers of the securities acquire an ownership interest in the assets of the trust, which in turn

10

owns the loans.  Within this framework, the purchasers of the securities acquire rights to the cashflows from the designated mortgage group, such as homeowners' payments of principal and interest on the mortgage loans, held by the related trust.

33.     Residential mortgage-backed securities are issued pursuant to registration statements filed with the SEC.  These registration statements include prospectuses, which explain the general structure of the investment, and prospectus supplements, which contain detailed descriptions of the mortgage groups underlying the certificates.  Certificates are issued by the trust pursuant to the registration statement and the prospectus and prospectus supplement. Underwriters sell the certificates to investors.

34.     A mortgage servicer is necessary to manage the collection of proceeds from the mortgage loans.  The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance.  The servicer is required to report key information about the loans to the trustee.  The trustee (or trust administrator) administers the trust's funds and delivers payments due each month on the certificates to the investors.

**B.     The Securitizations At Issue In This Case**

35.     This case involves the seven Securitizations listed in Table 1 below.  Nomura served as the depositor and therefore the issuer and offeror of the Certificates for the seven Securitizations.  Nomura also served as the sponsor for the seven Securitizations.  In two of the Securitizations, Nomura served as the lead underwriter and sold the GSE Certificates to the GSEs.  For each GSE Certificate, Table 1 identifies:  (1) the sponsor; (2) the depositor; (3) the

lead underwriter; (4) the principal amount issued for the tranches[3] purchased by the GSEs; (5) the date of issuance; and (6) the loan group backing the GSE Certificates for that Securitization (referred to as the "Supporting Loan Groups").

**Table 1**

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| NAA 2005-AR6 | IIIA1 | Nomura Credit | NAA | Nomura Securities | $64,943,000 | 11/30/2005 | Group III |
| NHELI 2006-FM1 | IA | Nomura Credit | NHELI. | Nomura Securities | $309,550,000 | 1/30/2006 | Group I |
| NHELI 2006-FM2 | IA1 | Nomura Credit | NHELI | Greenwich (now RBS Securities) | $525,197,000 | 10/31/2006 | Group I |
| NHELI 2006-HE3 | IA1 | Nomura Credit | NHELI | Greenwich (now RBS Securities), Nomura Securities | $441,739,000 | 8/31/2006 | Group I |
| NHELI 2007-1 | III A | Nomura Credit | NHELI | Greenwich (now RBS Securities) | $100,548,000 | 1/31/2007 | Group II-1 |
| NHELI 2007-2 | IA1 | Nomura Credit | NHELI | Greenwich (now RBS Securities) | $358,847,000 | 1/31/2007 | Group I |
| NHELI 2007-3 | IA1 | Nomura Credit | NHELI | Lehman Brothers Inc. | $245,105,000 | 4/30/2007 | Group I |

### C.     The Securitization Process

#### 1.     Nomura Credit Groups Mortgage Loans in Special Purpose Trusts

36.     As the sponsor for the Securitizations, Nomura Credit purchased the mortgage loans underlying the Certificates after the loans were originated, either directly from the originators or through affiliates of the originators.

37.     Nomura Credit then sold the mortgage loans to one of two depositors, both of which are Nomura-affiliated entities:  NAA and NHELI.

38.     NAA and NHELI were wholly owned, limited-purpose, indirect subsidiaries of Nomura Holding, and affiliates of Nomura Credit.  The sole purpose of NAA and NHELI as depositors was to act as conduits through which loans acquired by the sponsor could be securitized and sold to investors.

---

[3]   A tranche is one of a series of certificates or interests created and issued as part of the same transaction.

39.     As depositors for the Securitizations, NAA and NHELI transferred the relevant mortgage loans to the trusts, pursuant to Pooling and Servicing Agreements (the "PSAs") that contained various representations and warranties regarding the mortgage loans for the Securitizations.  As part of each of the Securitizations, the trustee, on behalf of the Certificateholders, executed the PSA with the relevant depositor and the parties responsible for monitoring and servicing the mortgage loans in that Securitization.  The trust, administered by the trustee, held the mortgage loans pursuant to the related PSA and issued Certificates, including the GSE Certificates, backed by such loans.  The GSEs purchased the GSE Certificates, through which they obtained an ownership interest in the assets of the trust, including the mortgage loans.

### 2.     The Trusts Issue Securities Backed by the Loans

40.     Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans.  The Certificates were then sold to investors like Fannie Mae and Freddie Mac, which thereby acquired an ownership interest in the assets of the corresponding trust.  Each Certificate entitles its holder to a specified portion of the cashflows from the underlying mortgages in the Supporting Loan Group(s).  The level of risk inherent in the Certificates was a function of the capital structure of the related transaction and the credit quality of the underlying mortgages.

41.     The Certificates were issued pursuant to one of three Shelf Registration Statements filed with the SEC on a Form S-3 and amended by one or more Forms S-3/A filed with the SEC.  Each Individual Defendant signed, or authorized another to sign on his behalf, one or more of the Shelf Registration Statements, including any amendments thereto, which were filed by NAA or NHELI.  The SEC filing number, registrants, signatories, and filing dates for the

three Shelf Registration Statements and amendments thereto, as well as the Certificates covered

by each Shelf Registration Statement, are reflected in Table 2 below.

**Table 2**

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrants | Covered Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-126812 | 7/22/2005 | 8/8/2005 | NAA | NAA 2005-AR6 | David Findlay, Shunichi Ito, John McCarthy, John P. Graham, Nathan Gorin | David Findlay, Shunichi Ito, John McCarthy, John P. Graham, Nathan Gorin |
| 333-126435 | 7/7/2005 | 7/8/2005 | NHELI | NHELI 2006-FM1 | David Findlay, Shunichi Ito, John McCarthy, N. Dante Larocca, Nathan Gorin | David Findlay, Shunichi Ito, John McCarthy, N. Dante Larocca, Nathan Gorin |
| 333-132109 | 2/28/2006 | 4/6/2006; 4/13/2006 | NHELI | NHELI 2006-FM2; NHELI 2006-HE3; NHELI 2007-1; NHELI 2007-2; NHELI 2007-3 | David Findlay, Shunichi Ito, John McCarthy, N. Dante Larocca, Nathan Gorin | David Findlay, Shunichi Ito, John McCarthy, N. Dante Larocca, Nathan Gorin |

42.     The Prospectus Supplement for each Securitization describes the underwriting

guidelines that purportedly were used in connection with the origination of the underlying

mortgage loans.  In addition, the Prospectus Supplement purports to provide accurate statistics

regarding the mortgage loans in each group, including the ranges of and weighted average FICO

credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the

loans, the ranges of and weighted average outstanding principal balances of the loans, the debt-

to-income ratios, the geographic distribution of the loans, the extent to which the loans were for

purchase or refinance purposes, information concerning whether the loans were secured by a

property to be used as a primary residence, second home, or investment property, and

information concerning whether the loans were delinquent.

43.     The Prospectus Supplement associated with each Securitization was filed with the

SEC as part of the Registration Statement.  A Form 8-K attaching the PSA for each

Securitization also was filed with the SEC.  The dates on which the Prospectus Supplement and

Form 8-K were filed for each Securitization, as well as the filing number of the Shelf

Registration Statement related to each, are set forth in Table 3 below.

**Table 3**

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed[4] | Filing No. of Related Registration Statement |
|---|---|---|---|
| NAA 2005-AR6 | 11/30/2005 | 12/20/2005 | 333-126812 |
| NHELI 2006-FM1 | 1/31/2006 | 4/11/2006 | 333-126435 |
| NHELI 2006-FM2 | 10/31/2006 | 12/8/2006 | 333-132109 |
| NHELI 2006-HE3 | 8/30/2006 | 9/12/2006 | 333-132109 |
| NHELI 2007-1 | 1/31/2007 | 3/9/2007 | 333-132109 |
| NHELI 2007-2 | 2/1/2007 | 4/13/2007 | 333-132109 |
| NHELI 2007-3 | 5/1/2007 | 5/31/2007 | 333-132109 |

44.    The Certificates were issued pursuant to the PSAs, and Defendants Nomura

Securities, Greenwich (now RBS Securities), NHELI, and NAA offered and sold the GSE

Certificates to Fannie Mae and Freddie Mac pursuant to the Registration Statements, which, as

noted previously, included the Prospectuses and Prospectus Supplements.[5]

45.    Defendants Nomura Securities, Greenwich (now RBS Securities), NHELI, and

NAA targeted Fannie Mae in Washington, DC and Freddie Mac in Virginia.  Defendants

Nomura Securities, Greenwich (now RBS Securities), NHELI, and NAA sent offering materials,

including the Prospectuses and Prospectus Supplements, to Fannie Mae in Washington, DC and

Freddie Mac in Virginia.  Defendants Nomura Securities, Greenwich (now RBS Securities),

NHELI, and NAA knew that Fannie Mae was located in the District of Columbia and that

Freddie Mac was located in Virginia.

---

[4]    An asterisk indicates that the relevant agreement was a Master Servicing and Trust Agreement, rather than a PSA.

[5]    Nomura Securities was the selling underwriter for two of the Securitizations, and Greenwich was the selling underwriter for four of the Securitizations.  For the remaining Securitization, the selling underwriter was a non-party.  The selling underwriter for each Securitization is reflected in Tables 10 and 11, below at paragraphs 130 and 131.

## II.    DEFENDANTS' PARTICIPATION IN THE SECURITIZATION PROCESS

### A.    The Role of Each of the Defendants

46.    Each of the Defendants, including the Individual Defendants, had a role in the securitization process and the marketing for most or all of the Certificates, which included purchasing the mortgage loans from the originators, arranging the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, structuring and issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

47.    With respect to each Securitization, the depositor, underwriters, and Individual Defendants who signed the Registration Statement, as well as Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance, and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

### 1.    Nomura Credit

48.    Defendant Nomura Credit was formed in June 1998 as a subsidiary of Nomura Holding.  As stated in the Prospectus Supplement for the NHELI 2007-3 Securitization, Nomura Credit began purchasing residential loans in 2002 and began actively securitizing residential mortgage loans in April 2003.  According to the Prospectus Supplement for the NHELI 2007-3 Securitization, as of February 2007, Nomura Credit had purchased in excess of $33.35 billion in residential mortgage loans.

49.    Defendant Nomura Credit was the sponsor for each of the Securitizations.  In that capacity, Nomura Credit determined the structure of the Securitizations, initiated the

Securitizations, purchased the mortgage loans to be securitized, determined distribution of

principal and interest, and provided data to the credit rating agencies to secure ratings for the

GSE Certificates.  Nomura Credit also selected NAA or NHELI as the special purpose vehicles

that would be used to transfer the mortgage loans from Nomura Credit to the trusts, and selected

Nomura Securities or Greenwich (now RBS Securities) as the underwriter for the Securitizations.

In its role as sponsor, Nomura Credit knew and intended that the mortgage loans it purchased

would be sold in connection with the securitization process, and that certificates representing

such loans would be issued by the relevant trusts.

50.     Nomura Credit also conveyed the mortgage loans to NAA or NHELI, to serve as

depositor, pursuant to a Mortgage Loan Purchase Agreement.  In these agreements, Nomura

Credit made certain representations and warranties to NAA and NHELI regarding the groups of

loans collateralizing the Certificates.  These representations and warranties were assigned by

NAA and NHELI to the trustees for the benefit of the Certificateholders.

## 2.     NAA

51.     Defendant NAA has been engaged in the purchase of mortgage loans since its

incorporation in 1992.  It is a special purpose entity formed solely for the purposes of purchasing

mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning

mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the

benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing

trusts.  It is an affiliate of Nomura Credit.

52.     NAA was the depositor for the NAA 2005-AR6 Securitization.  In its capacity as

depositor, NAA purchased the mortgage loans collateralizing that Securitization from Nomura

Credit and then sold, transferred, or otherwise conveyed the mortgage loans to the trust.  NAA,

together with the other Defendants, also was responsible for preparing and filing the Registration

Statement pursuant to which the Certificates were offered for sale.  The trust in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae.

### 3.  NHELI

53.    Defendant NHELI has been engaged in the purchase of mortgage loans since its incorporation in 2005.  Like NAA, NHELI is a special-purpose entity formed for the sole purposes of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.  It is an affiliate of Nomura Credit.

54.    NHELI was the depositor for six of the seven Securitizations.  In its capacity as depositor, NHELI purchased the mortgage loans from Nomura Credit and then sold, transferred, or otherwise conveyed the mortgage loans to the trusts.  NHELI, together with the other Defendants, also was responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the sole benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 4.  Nomura Securities

55.    Defendant Nomura Securities was founded in 1969 and is a subsidiary of Nomura Holding.  Nomura Securities is an SEC-registered broker-dealer.

56.    Defendant Nomura Securities was the lead or co-lead underwriter for three of the Securitizations, and the selling underwriter for two of those Securitizations.  It was responsible for underwriting and managing the offer and sale of the Certificates to Fannie Mae and Freddie Mac and other investors.  Nomura Securities also was obligated to conduct meaningful due

diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including as to the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

### 5.    RBS Securities

57.    Defendant RBS Securities, known as Greenwich prior to April 2009, was founded in 1981 and was acquired by The Royal Bank of Scotland Group PLC in 2000.  At all relevant times, Greenwich was a registered broker-dealer and one of the leading underwriters of mortgage and other asset-backed securities in the United States.

58.    Greenwich was one of the nation's largest underwriters of asset-backed securities. In 2006, *Inside Mortgage Finance* ranked Greenwich as the fourth largest non-agency mortgage-backed securities underwriter, underwriting over $102 billion of mortgage-backed securities.[6]  In 2007, Greenwich remained a strong force as the third largest subprime underwriter of non-agency mortgage-backed securities, underwriting over $19 billion of mortgage-backed securities.

59.    Greenwich was the lead or co-lead underwriter for four of the Securitizations, and the selling underwriter for those Securitizations.  It was responsible for underwriting and managing the offer and sale of the Certificates to Fannie Mae and Freddie Mac and other investors.  Greenwich also was obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including as to the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

---

[6]  "Agency" mortgage-backed securities are guaranteed by a government agency or government-sponsored enterprise such as Fannie Mae or Freddie Mac, while "non-agency" mortgage-backed securities are issued by banks and financial companies not associated with a government agency or government-sponsored enterprise.

### 6.      Nomura Holding

60.      Nomura Holding employed its wholly owned subsidiaries, Nomura Credit, NAA, NHELI, and Nomura Securities, in the key steps of the securitization process.  Unlike typical arms' length transactions, the Securitizations here involved various Nomura subsidiaries and affiliates at virtually each step in the chain.  For all seven Securitizations, the sponsor was Nomura Credit, and the depositor was NAA or NHELI.  In addition, for three Securitizations, the lead or co-lead underwriter was Nomura Securities.  Nomura Holding profited substantially from this vertically integrated approach to mortgage-backed securitization.

61.      As the corporate parent of Nomura Credit, NAA, NHELI, and Nomura Securities, Nomura Holding had the practical ability to direct and control the actions of Nomura Credit, NAA, NHELI, and Nomura Securities related to the Securitizations, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates.

### 7.      The Individual Defendants

62.      Defendant N. Dante Larocca was a Managing Director at Nomura Securities and the President and Chief Executive Officer of NHELI.  Mr. Larocca signed or authorized another to sign on his behalf two Shelf Registration Statements (applicable to six Securitizations) and the amendments thereto.

63.      Defendant David Findlay was a Senior Managing Director and the Chief Legal Officer of Nomura Holding and Nomura Securities.  Mr. Findlay also served as a Director of both NAA and NHELI.  Mr. Findlay signed or authorized another to sign on his behalf all three Shelf Registration Statements and the amendments thereto.

64.     Defendant Nathan Gorin was Controller and Chief Financial Officer of Nomura Securities, NAA, and NHELI.  Mr. Gorin signed or authorized another to sign on his behalf all three Shelf Registration Statements and the amendments thereto.

65.     Defendant John P. Graham was a Managing Director at Nomura Credit and the President and Chief Executive Officer of NAA.  Mr. Graham signed or authorized another to sign on his behalf one Shelf Registration Statement (applicable to one Securitization) and the amendment thereto.

66.     Defendant John McCarthy was a Director of both NAA and NHELI.  Mr. McCarthy signed or authorized another to sign on his behalf all three Shelf Registration Statements and the amendments thereto.

**B.     Defendants' Failure To Conduct Proper Due Diligence**

67.     The Defendants failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans underlying the Securitizations complied with the representations in the Registration Statements.

68.     During the time period in which the Certificates were issued—approximately 2005 through 2007— Nomura's involvement in the mortgage-backed securitization market was rapidly expanding.  In an effort to increase revenue and profits, Nomura vastly expanded the volume of mortgage-backed securities it issued as compared to prior years.  According to the Prospectus Supplement for the NHELI 2007-2 Securitization, Nomura Credit initially securitized a relatively small volume of mortgage loans—about $687 million in 2003.  In 2004, however, the volume of mortgage loans that Nomura Credit securitized nearly tripled to $2.4 billion.  In 2005, the volume tripled again to $7.2 billion.  In 2006, Nomura Credit securitized its largest volume of mortgage loans— $10 billion.

69.     Defendants had enormous financial incentives to complete as many offerings as quickly as possible without regard to ensuring the accuracy or completeness of the Registration Statements, or conducting adequate and reasonable due diligence.  For example, NAA and NHELI, as the depositors, were paid a percentage of the total dollar amount of the offerings upon completion of the Securitizations, and Nomura Securities and Greenwich (now RBS Securities), as the underwriters, were paid a commission based on the amount they received from the sale of the Certificates to the public.

70.     The push to securitize large volumes of mortgage loans contributed to the absence of controls needed to prevent the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.  In particular, Defendants failed to conduct adequate diligence or otherwise to ensure the accuracy of the statements in the Registration Statements pertaining to the Securitizations.

71.     For instance, Nomura retained third-party due diligence providers such as Clayton Holdings, Inc. ("Clayton") to analyze the loans it was considering placing in its securitizations, but waived a significant number of loans into the securitizations that these firms had recommended for exclusion, and did so without taking adequate steps to ensure that these loans had in fact been underwritten in accordance with applicable guidelines or had compensating factors that excused the loans' non-compliance with those guidelines.  On January 27, 2008, Clayton revealed that it had entered into an agreement with the New York Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  According to *The New York Times*, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005, it saw a significant

deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

72.     Nomura was negligent in allowing into the Securitizations a substantial number of mortgage loans that, as reported to Nomura by third-party due diligence firms, did not conform to the underwriting standards stated in the Registration Statements, including the Prospectuses and Prospectus Supplements.  Even upon learning from the third-party due diligence firms that there were high percentages of defective or at least questionable loans in the sample of loans reviewed by the third-party due diligence firms, Nomura failed to exclude a material number of these loans from the Securitizations.  It also failed to take any additional steps to verify that the population of loans in the Securitizations did not include a similar percentage of defective and/or questionable loans.

73.     Clayton's trending reports revealed that in the period from the first quarter of 2006 to the first quarter of 2007, 37.85 percent of the mortgage loans Nomura submitted to Clayton to review in residential mortgage-backed securities groups were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 58 percent of the loans were subsequently waived in by Nomura without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here. *See* Clayton Trending Reports, *available at* http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisis-sacramento#documents.

74.     Defendant NHELI is presently defending an action in the U.S. District Court for the District of Kansas brought in June 2011 by the National Credit Union Administration Board, as Liquidating Agent of U.S. Central Federal Credit Union, against it and a number of other

defendants.  The plaintiffs have asserted claims under Sections 11 and 12(a)(2) of the Securities

Act of 1933 for misrepresentations made in connection with various securitizations, including

the NHELI 2007-1 Securitization at issue here.  *National Credit Union Administration Board v.*

*RBS Securities, Inc.*, No. 11-cv-2340 (D. Kan.).

75.    On or about March 13, 2008, after a seven-month investigation requested by the

President of the United States, a working group led by the Secretary of Treasury and including

the chairmen of the Federal Reserve Board, the SEC, and the Commodities Futures Trading

Commission, issued a report finding:  (i) a significant erosion of market discipline by those

involved in the securitization process, including originators, underwriters, and credit rating

agencies, related in part to failures to provide or obtain adequate risk disclosures; and that (ii) the

turmoil in financial markets clearly was triggered by a dramatic weakening of underwriting

standards for United States subprime mortgages.  *See* "Policy Statement on Financial Market

Developments," The President's Working Group on Financial Markets, March 2008, *available at*

http://www.treasury.gov/resource-center/fin-

mkts/Documents/pwgpolicystatemktturmoil_03122008.pdf.

## III.    THE REGISTRATION STATEMENTS

### A.    Compliance With Underwriting Guidelines

76.    The Prospectus and Prospectus Supplement for each Securitization describes the

mortgage loan underwriting guidelines pursuant to which the mortgage loans underlying the

related Securitization were to have been originated.  These guidelines were intended to assess the

creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy

of the mortgaged property as security for the loan.  As explained below, a reasonable investor

would not have understood, in light of the representations regarding supposed adherence to

underwriting guidelines, that there were pervasive and systematic breaches of those guidelines with respect to the securitized loans.

77.     The statements about compliance with underwriting guidelines made in the Prospectus and Prospectus Supplements, which, as discussed, formed part of the Registration Statement for each Securitization, were material to a reasonable investor's, including the GSEs', decision to purchase and invest in the Certificates because the failure to originate a mortgage loan in accordance with the applicable guidelines creates a higher risk of delinquency and default by the borrower, as well as a risk that losses upon liquidation will be higher, thus resulting in a greater economic risk to an investor.

78.     The Prospectus Supplements for the Securitizations contained several key statements with respect to the underwriting standards of the entities that originated the loans in the Securitizations.  For example, the Prospectus Supplement for the NHELI 2006-FM2 Securitization, for which Fremont was the originator, Nomura Credit was the sponsor, NHELI was the depositor, and Greenwich (now RBS Securities) was the underwriter, stated that "[a]ll of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this section," and that "Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan."

79.     The NHELI 2006-FM1 Prospectus Supplement stated that "underwriting exception[s]" might be made "[o]n a case by case basis," but emphasized that exceptions would be "based upon compensating factors," which included "low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address."

80.     The Prospectus Supplement also emphasized Fremont's quality control procedures:  "Fremont conducts a number of quality control procedures, including a cost-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing review findings and level of error is sent monthly to each loan production office for response."

81.     With respect to appraisals, the Prospectus stated that "[t]he adequacy of the Mortgaged Property as security for repayment of the related Mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac."

82.     The Prospectus and Prospectus Supplement for each of the remaining Securitizations had similar representations to those quoted above.  The relevant statements in the Prospectus and Prospectus Supplement pertaining to originating entity underwriting standards for each Securitization are reflected in Appendix A to this Amended Complaint.  As discussed below at paragraphs 113 through 129, in fact, the originators of the mortgage loans in the Supporting Loan Group for the Securitizations did not adhere to their stated underwriting

guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

83.    Further, the Prospectuses and Prospectus Supplements included additional representations by the sponsor regarding the purported quality of the mortgage loans that collateralized the Certificates.

84.    For example, the NHELI 2006-FM2 Prospectus Supplement stated, "The sponsor will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the trustee with respect to each Mortgage Loan.  In addition, the sponsor will represent and warrant, as of the Closing Date, that, among other things: (i) at the time of transfer to the depositor, the sponsor has transferred or assigned all of its right, title and interest in each Mortgage Loan and the Related Documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state, and federal laws . . ."  These representations are described for each Securitization in Appendix A.

85.    The inclusion of these representations in the Prospectuses and Prospectus Supplements had the purpose and effect of providing additional assurances to investors regarding the quality of the mortgage collateral underlying the Securitizations and the compliance of that collateral with the underwriting guidelines described in the Prospectuses and Prospectus Supplements.  These representations were material to a reasonable investor's decision to purchase the Certificates.

**B.    Statements Regarding Occupancy Status of Borrower**

86.    The Prospectus Supplements contained collateral group-level information about the occupancy status of the borrowers of the loans in the Securitizations.  Occupancy status refers to whether the property securing a mortgage is to be the primary residence of the borrower, a second home, or an investment property.  The Prospectus Supplement for each of the

27

Securitizations presented this information in tabular form, in a table entitled "Occupancy Status of the Mortgage Loans."  This table divided all the loans in the collateral group by occupancy status into the following categories:  (i) "Primary," or "Owner Occupied;" (ii) "Second Home"; and (iii) "Investor."  For each category, the table stated the number of loans in that category.  Occupancy statistics for the Supporting Loan Groups for each Securitization were reported in the Prospectus Supplements as follows:[7]

**Table 4**

| Transaction | Supporting Loan Group | Owner Occupied (%) | Second Home (%) | Investor (%) |
|---|---|---|---|---|
| NAA 2005-AR6 | Group III | 50.00 | 8.78 | 41.22 |
| NHELI 2006-FM1 | Group I | 88.78 | 0.95 | 10.27 |
| NHELI 2006-FM2 | Group I | 93.24 | 0.41 | 6.35 |
| NHELI 2006-HE3 | Group I | 89.52 | 1.22 | 9.26 |
| NHELI 2007-1 | Group II-1 | 45.78 | 8.23 | 45.99 |
| NHELI 2007-2 | Group I | 91.00 | 1.40 | 7.60 |
| NHELI 2007-3 | Group I | 90.03 | 2.64 | 7.33 |

87.     As Table 4 makes clear, the Prospectus Supplements for all of the Securitizations reported that 45 percent or more of the mortgage loans in the Supporting Loan Groups were owner occupied.  Indeed, for all but two of the Securitizations, 85 percent or more of the mortgage loans in the Supporting Loan Groups were reported to be owner occupied, while only a small percentage of the loans were reported to be non-owner occupied (*i.e.* a second home or investment property).

88.     The statements about occupancy status were material to a reasonable investor's decision to invest in the Certificates.  Information about occupancy status is an important factor in determining the credit risk associated with a mortgage loan and, therefore, the securities that it collateralizes.  Because borrowers who reside in mortgaged properties are more likely to care for

---

[7]   Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories:  owner occupied, investor, and second home.  These numbers have been converted to percentages.

their primary residence and less likely to default than borrowers who purchase homes as second homes or investments and live elsewhere, the percentage of loans in the collateral group of a securitization that are secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization.

89.     Other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of loss to the certificateholders.  Even small differences in the percentages of primary/owner-occupied, second home, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.  As discussed below in paragraphs 101 through 105, the Registration Statement for each Securitization materially *overstated* the percentage of loans in the Supporting Loan Groups that were owner occupied, thereby misrepresenting the degree of risk of the GSE Certificates.

**C.     Statements Regarding Loan-to-Value Ratios**

90.     The loan-to-value ratio, or LTV ratio, of a mortgage loan is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

91.     The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan.  Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

92.     The Prospectus Supplement for each Securitization also contained group-level information about the LTV ratio for the underlying group of loans as a whole.  The percentage of

loans with an LTV ratio at or less than 80 percent and the percentage of loans with an LTV ratio greater than 100 percent as reported in the Prospectus Supplements for the Supporting Loan Groups are reflected in Table 5 below.[8]

**Table 5**

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|
| NAA 2005-AR6 | Group III | 99.08 | 0.00 |
| NHELI 2006-FM1 | Group I | 63.00 | 0.00 |
| NHELI 2006-FM2 | Group I | 68.40 | 0.00 |
| NHELI 2006-HE3 | Group I | 58.81 | 0.00 |
| NHELI 2007-1 | Group II-1 | 93.04 | 0.00 |
| NHELI 2007-2 | Group I | 56.59 | 0.00 |
| NHELI 2007-3 | Group I | 59.31 | 0.00 |

93.     As Table 5 makes clear, the Prospectus Supplement for each Securitization reported that the majority of the mortgage loans in the Supporting Loan Groups had an LTV ratio of 80 percent or less and that *zero* mortgage loans in the Supporting Loan Group had an LTV ratio over 100 percent.

94.     The LTV ratio is among the most important measures of the risk of a mortgage loan, and thus, it is one of the most important indicators of the default risk of the mortgage loans underlying the Certificates.  The lower the ratio, the less likely that a decline in the value of the property will wipe out an owner's equity, and thereby give an owner an incentive to stop making mortgage payments and abandon the property.  This ratio also predicts the severity of loss in the event of default.  The lower the LTV ratio, the greater the "equity cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

---

[8]     As used in this Amended Complaint, "LTV" refers to the original loan-to-value ratio for first lien mortgages and for properties with second liens that are subordinate to the lien that was included in the securitization (*i.e.*, only the securitized lien is included in the numerator of the LTV calculation).  However, for second lien mortgages, where the securitized lien is junior to another loan, the more senior lien has been added to the securitized one to determine the numerator in the LTV calculation (this latter calculation is sometimes referred to as the combined-loan-to-value ratio, or "CLTV").

95.     Thus, the LTV ratio is a material consideration to a reasonable investor, including the GSEs, in deciding whether to purchase a certificate in a securitization of mortgage loans. The 80 percent threshold is particularly relevant to a reasonable investor given that prudent lenders traditionally require borrowers to pay 20 percent of the value of the property in the absence of a mortgage insurance policy, and thus only lend 80 percent of the value of the property.  Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are material to the decision of a reasonable investor whether to purchase any such certificate.  As discussed below in paragraphs 106 through 112, the Registration Statements for the Securitizations materially *overstated* the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and/or materially *understated* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree of risk of the GSE Certificates.

### D.     Statements Regarding Credit Ratings

96.     Credit ratings are assigned to the tranches of mortgage-backed securitizations by the credit rating agencies, including Moody's Investors Service, Standard & Poor's, and Fitch Ratings.  Each credit rating agency uses its own scale with letter designations to describe various levels of risk.  In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments.  C and D ratings are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for recovery.  At the time the GSEs purchased the GSE Certificates, investments with AAA or its equivalent ratings historically experienced a loss rate of less than .05 percent.  Investments with a BBB rating, or its equivalent, historically experienced a loss rate of less than one percent.  As a

result, securities with credit ratings between AAA or its equivalent through BBB- or its equivalent were generally referred to as "investment grade."

97.     Rating agencies determine the credit rating for each tranche of a mortgage-backed securitization by comparing the likelihood of contractual principal and interest repayment to the "credit enhancements" available to protect investors.  Rating agencies determine the likelihood of repayment by estimating cashflows based on the quality of the underlying mortgages by using sponsor-provided loan-level data.  Credit enhancements, such as subordination, represent the amount of "cushion" or protection from loss incorporated into a given securitization.[9]  This cushion is intended to improve the likelihood that holders of highly rated certificates receive the interest and principal to which they are contractually entitled.  The level of credit enhancement offered is based on the make-up of the loans in the underlying collateral group and entire securitization.  Riskier loans underlying the securitization necessitate higher levels of credit enhancement to insure payment to senior certificateholders.  If the collateral within the deal is of a higher quality, then rating agencies require less credit enhancement for AAA or its equivalent rating.

98.     Credit ratings have been an important tool to gauge risk when making investment decisions.  For almost a hundred years, investors like pension funds, municipalities, insurance companies, and university endowments have relied heavily on credit ratings to assist them in distinguishing between safe and risky investments.  Fannie Mae and Freddie Mac's respective internal policies limited their purchases of private label residential mortgage-backed securities to

---

[9]  "Subordination" refers to the fact that the certificates for a mortgage-backed securitization are issued in a hierarchical structure, from senior to junior.  The junior certificates are "subordinate" to the senior certificates in that, should the underlying mortgage loans become delinquent or default, the junior certificates suffer losses first.  These subordinate securities thus provide a degree of protection to the senior certificates from losses on the underlying loans.

those rated AAA (or its equivalent), and in very limited instances, AA or A bonds (or their equivalent).

99.     Each tranche of the Securitizations received a credit rating upon issuance, which purported to describe the riskiness of that tranche.  The Defendants reported the credit ratings for each tranche in the Prospectus Supplements.  The credit rating provided for each of the GSE Certificates was "investment grade," always "AAA" or its equivalent.  The accuracy of these ratings was material to a reasonable investor's, including the GSEs', decision to purchase the Certificates.  As set forth in Table 8 below, the ratings for the Securitizations were inflated as a result of Defendants' provision of incorrect data concerning the attributes of the underlying mortgage collateral to the rating agencies, and, as a result, Defendants sold and marketed the GSE Certificates as AAA (or its equivalent) when, in fact, they were not.

## IV.     FALSITY OF STATEMENTS IN THE PROSPECTUS SUPPLEMENTS

### A.     The Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False or Misleading

100.     A review of loan-level data for a sample of mortgage loans in each Securitization was conducted in order to assess whether the statistical information provided in the Prospectus Supplements was true and accurate.  For each Securitization, the sample consisted of 1,000 randomly selected loans per Supporting Loan Group, or all of the loans in the group if there were fewer than 1,000 loans in the Supporting Loan Group.  The sample data confirms, on a statistically significant basis, material misrepresentations of underwriting standards and of certain key characteristics of the mortgage loans across the Securitizations at the time of their origination.  Planiff's data review further demonstrates that the data concerning owner occupancy and LTV ratios was materially false and misleading at the time of the loans' origination.

### 1.    Owner-Occupancy Data Was Materially False

101.    Plaintiff's data review reveals that the owner-occupancy statistics reported in the Prospectus Supplements were materially false and inflated at the time of the loans' origination. In fact, far fewer underlying properties were occupied by their owners than disclosed in the Prospectus Supplements, and more correspondingly were held as second homes or investment properties.

102.    To determine whether a given borrower actually occupied the property as claimed, a number of tests were conducted during Plaintiff's data review, including, *inter alia*, whether the borrower's tax bill was being mailed to the mortgaged property or to a different address six months after the loan closed; whether the borrower had claimed an owner-occupied tax exemption on the mortgaged property; and whether the mailing address of the property was reflected in the borrower's credit reports, tax records, or lien records.  Failing two or more of these tests is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property, both of which make it much more likely that a borrower will not repay the loan.

103.    A significant number of the loans failed two or more of these tests, indicating that the owner-occupancy statistics provided to Fannie Mae and Freddie Mac were materially false and misleading.  For example, for the NHELI 2006-FM2 Securitization, for which Nomura Credit was the sponsor, Greenwich (now RBS Securities) the underwriter, and NHELI the depositor, the Prospectus Supplement stated that 6.76 percent of the underlying properties by loan count in the Supporting Loan Group were not owner occupied.  But the data review revealed that, for 12.55 percent of the properties represented as owner occupied, the owners lived

elsewhere, indicating that the true percentage of non-owner-occupied properties was 18.46

percent, nearly triple the percentage reported in the Prospectus Supplement.[10]

104.    The data review revealed that for each Securitization, the Prospectus Supplement

misrepresented the percentage of non-owner-occupied properties.  The true percentage of non-

owner-occupied properties, as determined by the data review, versus the percentage stated in the

Prospectus Supplement for each Securitization, is reflected in Table 6 below.

**Table 6**

| Transaction | Supporting Loan Group | Reported Percentage of Non-Owner-Occupied Properties | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy[11] | Actual Percentage of Non-Owner-Occupied Properties | Prospectus Percentage Understatement of Non-Owner-Occupied Properties |
|---|---|---|---|---|---|
| NAA 2005-AR6 | Group III | 50.00 | 14.49 | 57.25 | 7.25 |
| NHELI 2006-FM1 | Group I | 11.22 | 15.76 | 25.21 | 13.99 |
| NHELI 2006-FM2 | Group I | 6.76 | 12.55 | 18.46 | 11.70 |
| NHELI 2006-HE3 | Group I | 10.48 | 12.45 | 21.62 | 11.14 |
| NHELI 2007-1 | Group II-1 | 54.22 | 12.92 | 60.13 | 5.92 |
| NHELI 2007-2 | Group I | 9.00 | 10.21 | 18.29 | 9.29 |
| NHELI 2007-3 | Group I | 9.97 | 9.15 | 18.20 | 8.23 |

105.    The GSEs understood that Defendants had determined that the statistics provided

in the Prospectus Supplements were true and correct in all material respects.  In reality, as Table

6 reflects, the Prospectus Supplement for each Securitization was materially inaccurate,

understating the percentage of non-owner occupied properties for all Securitizations and for

some Securitizations by 10 percent or more, thus materially understating the risk of the GSE

---

[10]   This conclusion is arrived at by summing (a) the stated non-owner-occupied percentage in the Prospectus Supplement (here, 6.76 percent), and (b) the product of (i) the stated owner-occupied percentage (here, 93.24 percent) and (ii) the percentage of the properties represented as owner occupied in the sample that showed strong indications that their owners in fact lived elsewhere (here, 12.55 percent).

[11]   As described more fully in paragraph 102, failing two or more tests of owner occupancy is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property.

Certificates.  The Prospectus Supplements containing the owner-occupancy statistics bore

Nomura's name and Nomura was endorsing the statistics in these documents.

### 2.    Loan-to-Value Data Was Materially False

106.    The data review further reveals that the LTV ratios disclosed in the Prospectus

Supplements were materially false and understated at the time of the loans' origination, as more

specifically set out below.  For each of the sampled loans, an industry standard automated

valuation model ("AVM") was used to calculate the value of the underlying property at the time

the mortgage loan was originated.  AVMs are routinely used in the industry as a way of valuing

properties during prequalification, origination, portfolio review and servicing.  AVMs rely upon

similar data as appraisers—primarily county assessor records, tax rolls, and data on comparable

properties.  Retroactive AVMs may be used to produce independent, statistically-derived

valuation estimates at the time of the loan's origination by applying modeling techniques to this

data.  The ValuePoint4 ("VP4") AVM was used to analyze the data via appraisal emulation,

repeat sales indexes, and regression analysis, relying only on sales made within the last 24

months prior to the origination of the mortgage loan at issue.

107.    Applying the VP4 AVM to the available data for the properties securing the

sampled loans shows that the appraised value given to such properties was significantly higher

than the actual value of such properties at the time the loans were originated.  The result of this

overstatement of property values is a material understatement of LTV.  That is, if a property's

true value is significantly less than the value used in the loan underwriting, then the loan

represents a significantly higher percentage of the property's value.  This, of course, increases

the risk a borrower will not repay the loan and the risk of greater losses in the event of a default.

108.    For example, for the NHELI 2007-1 Securitization, which was sponsored by

Nomura Credit and underwritten by Greenwich (now RBS Securities), with NHELI as the

depositor, the Prospectus Supplement stated that no LTV ratios for the Supporting Loan Group were above 100 percent.  In fact, 12.19 percent of the sample of loans included in the data review had LTV ratios above 100 percent.  In addition, the Prospectus Supplement stated that 93.04 percent of the loans had LTV ratios at or below 80 percent.  The data review indicated, however, that only 46.94 percent of the loans had LTV ratios at or below 80 percent.

109.    The data review revealed that for each Securitization, the Prospectus Supplement misrepresented the percentage of loans with an LTV ratio that was above 100 percent and the percentage of loans that had an LTV ratio at or below 80 percent, at the time of their origination. Table 7 reflects (i) the true percentage of mortgages in each Supporting Loan Group at the time of origination with LTV ratios above 100 percent, versus the percentage reported in the Prospectus Supplement; and (ii) the true percentage of mortgages in each Supporting Loan Group at the time of origination with LTV ratios at or below 80 percent, versus the percentage reported in the Prospectus Supplement.  The percentages listed in Table 7 were calculated by aggregated principal balance.

**Table 7**

| Transaction | Supporting Loan Group | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio At or Less Than 80% | DATA REVIEW True Percentage of Loans With LTV Ratio At or Less Than 80% | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio Over 100 | DATA REVIEW True Percentage of Loans With LTV Ratio Over 100% |
|---|---|---|---|---|---|
| NAA 2005-AR6 | Group III | 99.08 | 63.83 | 0.00 | 3.84 |
| NHELI 2006-FM1 | Group I | 63.00 | 40.32 | 0.00 | 15.26 |
| NHELI 2006-FM2 | Group I | 68.40 | 38.73 | 0.00 | 18.23 |
| NHELI 2006-HE3 | Group I | 58.81 | 40.02 | 0.00 | 15.36 |
| NHELI 2007-1 | Group II-1 | 93.04 | 46.94 | 0.00 | 12.19 |
| NHELI 2007-2 | Group I | 56.59 | 33.83 | 0.00 | 19.58 |
| NHELI 2007-3 | Group I | 59.31 | 37.62 | 0.00 | 20.16 |

110.    As Table 7 demonstrates, the Prospectus Supplements for all of the Securitizations reported that *none* of the mortgage loans in the Supporting Loan Groups had an LTV ratio over 100 percent.  In fact, the data review revealed that all of the Securitizations had

37

mortgage loans in the Supporting Loan Groups with an LTV ratio over 100 percent.  Indeed, the percentage of mortgage loans with an LTV ratio over 100 percent was over ten percent in all but one of the Securitizations, and over 19 percent in two of the Securitizations.

111.    These systematic inaccuracies with respect to reported LTV ratios also indicate that the representations and warranties in the Registration Statements relating to appraisal practices were false, and that the appraisers themselves routinely furnished appraisals that the appraisers understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.  As described in greater detail below, government investigations and news reports have confirmed that appraisers for many of the originators from which Nomura purchased mortgage loans did not produce independent appraisals and that the appraisers did not honestly believe their appraisals when they were made.  For example, as described *infra* ¶ 116, the Massachusetts Attorney General brought an enforcement action against Fremont based, in part, on the fact that Fremont "ma[de] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to … property appraisals."  Such examples confirm that the appraisals underlying the LTV ratios described above were both *objectively* false, because the appraisals vastly overstated the actual value of the property, and not *subjectively* believed by the appraisers themselves at the time the appraisals were made.

112.    Indeed, independent appraisers following proper practices, and providing genuine estimates as to valuation, would not systematically generate appraisals that, as demonstrated by Table 7, deviate so significantly (and so consistently upward) from the true values of the appraised properties.  These consistent errors demonstrate that, contrary to the representations in the Prospectus and Prospectus Supplements described above, the appraisers did not comply with

the Uniform Standards of Professional Appraisal Practice but instead generated inflated appraisal values merely to justify the issuance of a mortgage loan.  This conclusion is further confirmed by the findings of the Financial Crisis Inquiry Commission (the "FCIC"), which identified "inflated appraisals" as a pervasive problem during the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results.  *See* FCIC, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (January 2011); *see also infra* ¶¶ 121-122.

**B.    The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines**

113.    The Registration Statements contained material misstatements and omissions regarding compliance with underwriting guidelines.  Indeed, the originators for the loans underlying the Securitizations systematically disregarded their respective underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses.  This is confirmed by the systematically misreported owner-occupancy and LTV statistics, discussed above, and by (1) government and private investigations into originators' underwriting practices, which have revealed widespread abandonment of originators' reported underwriting guidelines during the relevant period; (2) the collapse of the GSE Certificates' credit ratings; and (3) the surge in delinquencies and defaults in the mortgages in the Securitizations.

**1.    Both Government and Private Investigations Have Confirmed That the Originators of the Loans in the Securitizations Systematically Failed to Adhere to Their Underwriting Guidelines**

114.    The abandonment of underwriting guidelines is confirmed by several reports and investigations that have described rampant underwriting failures throughout the period of the

Securitizations, and, more specifically, have described underwriting failures by the very originators whose loans were included by Defendants in the Securitizations.

115.    For instance, in November 2008, the Office of the Comptroller of the Currency, an office within the United States Department of the Treasury, issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas. The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations. That list included Ownit and Fremont, which originated many of the loans for the Securitizations at issue here. *See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release, November 13, 2008.

a.    **Fremont**

116.    On October 4, 2007, the Commonwealth of Massachusetts, through its Attorney General, brought an enforcement action against Fremont, which originated all the loans for the NHELI 2006-FM1 and NHELI 2006-FM2 Securitizations, for an array of "unfair and deceptive business conduct," "on a broad scale." *See* Complaint, *Commonwealth v. Fremont Investment & Loan and Fremont General Corp.*, No. 07-4373 (Mass. Super. Ct.) (the "Fremont Complaint"). According to the complaint, Fremont (i) "approve[ed] borrowers without considering or verifying the relevant documentation related to the borrower's credit qualifications, including the borrower's income"; (ii) "approv[ed] borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses"; (iii) "failed to meaningfully account for [ARM] payment adjustments in approving and selling loans"; (iv) "approved borrowers for these ARM loans based only on the initial fixed 'teaser' rate, without regard for borrowers' ability to pay after the initial two year period"; (v) "consistently failed to monitor or supervise brokers'

practices or to independently verify the information provided to Fremont by brokers"; and (vi) "ma[de] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores." *See* Fremont Complaint.

117.    On December 9, 2008, the Supreme Judicial Court of Massachusetts affirmed a preliminary injunction that prevented Fremont from foreclosing on thousands of its loans issued to Massachusetts residents.  As a basis for its unanimous ruling, the Supreme Judicial Court found that the record supported the lower court's conclusions that "Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'" and that "Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow."  *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556 (Mass. 2008). The terms of the preliminary injunction were made permanent by a settlement reached on June 9, 2009.

118.    A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans.  He noted that "Fremont was all about volume and profit," and that, when he attempted to decline a loan, he was regularly told, "you have signed worse loans than this."  The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved.  The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on

internal underwriting exams.  He explained that, like many Fremont employees, he quit because he was uncomfortable with the company's practices.

### b.   Ownit

119.   Ownit, which originated many of the loans for the NHELI 2007-2 Securitization, was a mortgage lender based in Agoura Hills, California.  In September 2005, the investment bank Merrill Lynch & Co. ("Merrill Lynch") acquired a 20 percent stake in the company. According to Ownit's founder and chief executive, William D. Dallas, shortly after Merrill Lynch acquired that stake, Merrill Lynch instructed Ownit to loosen underwriting standards. Andrews, Edmund L., *Busted: Life Inside the Great Mortgage Meltdown*, W.W. Norton & Company, New York: 2009, at 158.  As a result, the number of stated income loans jumped from near zero to over 30 percent.  *Id.* at 155, 162.  Ownit also lowered the credit scores it required from borrowers.  *Id.* at 162.  Ownit thus abandoned its underwriting standards in order to originate more loans.

### c.   Silver State

120.   Silver State, which originated many of the loans in the NAA 2005-AR6 and the NHELI 2007-1 Securitizations, was a wholesale and residential mortgage lender based in Las Vegas, Nevada.  In a 2008 episode of the National Public Radio program This American Life, Mike Garner, a former employee of Silver State, described the loosening of underwriting standards in 2005 and 2006:  To obtain a loan, a borrower "just [had] to have a credit score and a pulse."  Alex Blumberg & Adam Davidson, "The Giant Pool of Money" (This American Life Episode Transcript, Program #355, broadcast May 9, 2008), *transcript available at* http://www.thisamericanlife.org/sites/default/files/355_transcript.pdf.  Garner reported that mortgage brokers would pressure him to allow them to offer loans with loose guidelines so they

could earn commissions, and that Garner would oblige if he could find a Wall Street firm to purchase the loans: "I'd get on the phone and start calling these street firms . . . and once I got a hit, I'd call back and say, 'Hey, Bear Stearns is buying this loan.  I'd like to give you the opportunity to buy it too.'  Once one person buys them, all the rest of them follow suit."  Garner also described the reaction of his boss, a 25-year veteran of the industry:  "He hated those loans. He hated them and used to rant and say, 'It makes me sick to my stomach the kind of loans that we do.'  He fought the owners and sales force tooth and neck about these guidelines.  He got [the] same answer.  Nope, other people are offering it.  We're going to offer them too.  We're going to get more market share this way.  House prices are booming, everything's gonna be good.  And . . . the company was just rolling in the cash."  In September 2008, the Nevada Financial Institutions division closed Silver State, and the Federal Deposit Insurance Corporation ("FDIC") was named receiver.

### d.    Inflated Appraisals Generally

121.    As described above, the originators of the mortgage loans underlying the Securitizations went beyond the systematic disregard of their own underwriting guidelines. Indeed, as the FCIC has confirmed, mortgage loan originators throughout the industry pressured appraisers, during the period of the Securitizations, to issue inflated appraisals that met or exceeded the amount needed for the subject loans to be approved, regardless of the accuracy of such appraisals.  Appraisal pressure was especially strong when the originators aimed at putting the mortgages into a package of mortgages that would be sold for securitization.  This resulted in lower LTV ratios, discussed above, which in turn made the loans appear to the investors less risky than they were.

122.     As described by Patricia Lindsay, a former wholesale lender who testified before the FCIC in April 2010, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."  *See* Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5.  Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his testimony that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again . . . . [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'"  *See* Testimony of Jim Amorin to the FCIC, *available at* www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRA-NAIFATestimonyonMortgageReform042309final.pdf.  Faced with this choice, appraisers systematically abandoned applicable guidelines and over-valued properties in order to facilitate the issuance of mortgages that could then be collateralized into mortgage-backed securitizations.

### 2.     The Collapse of the Certificates' Credit Ratings Further Indicates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines

123.     The total collapse in the credit ratings of the GSE Certificates, typically from AAA or its equivalent to non-investment speculative grade, is further evidence of the originators' systematic disregard of underwriting guidelines, amplifying that the GSE Certificates were impaired from the start.

124.     The GSE Certificates that Fannie Mae and Freddie Mac purchased were originally assigned credit ratings of AAA or its equivalent, which purportedly reflected the description of the mortgage loan collateral and underwriting practices set forth in the Registration Statements. These ratings were artificially inflated, however, as a result of the very same misrepresentations that Defendants made to investors in the Prospectus Supplements.

125.    Nomura provided or caused to be provided loan-level information, including the borrower's LTV ratio, owner-occupancy status, and other loan-level information described in aggregation reports in the Prospectus Supplements, to the rating agencies.  The rating agencies in turn relied on this information to calculate the Certificates' assigned credit ratings.  Because the information that Nomura provided or caused to be provided was materially false, the models used by the ratings agencies under-predicted the likelihood of default and loss severity.  As a result of the false information provided by Nomura, the Securitizations lacked the level of subordination required for the Certificates to be truly rated AAA (or its equivalent), and investors, including Fannie Mae and Freddie Mac, were deprived of the level of protection commensurate with a AAA (or its equivalent) rating.  As a result, the GSEs paid Defendants inflated prices for purportedly AAA (or its equivalent) Certificates, unaware that those Certificates in reality carried a greater risk of loss and inadequate credit enhancement, and thus should not have been rated AAA (or its equivalent).

126.    The GSEs could not have discovered facts indicating Defendants' false and misleading statements and omissions prior to, at the earliest, July 25, 2008 for Freddie Mac and February 4, 2009 for Fannie Mae.  These are the first dates on which any of the GSE Certificates were downgraded below investment grade by a credit rating agency.  In subsequent months and years, all of the GSE Certificates were downgraded by the credit rating agencies from AAA (or its equivalent) to below investment grade.  Prior to the initial downgrades in July 2008 and February 2009, respectively, Freddie Mac and Fannie Mae had no basis to suspect Defendants' widespread misrepresentations and omissions of material fact in the Registration Statements.  After these downgrades, it required significant investigation and fact-finding for the GSEs to formulate the claims stated herein.  The downgrades beginning in 2008 and 2009 raised

questions regarding the true underwriting practices used to originate the mortgage loans, and the mortgage loans' true value and credit quality.  Table 8 details the extent of the downgrades.[12]

**Table 8**

| Transaction | Tranche | Ratings at Issuance (Moody's/S&P/Fitch) | Ratings as of April 30, 2012 (Moody's/S&P/Fitch) |
|---|---|---|---|
| NAA 2005-AR6 | IIIA1 | Aaa/AAA/-- | Caa3/CCC/-- |
| NHELI 2006-FM1 | IA | Aaa/AAA/-- | B3/BB/-- |
| NHELI 2006-FM2 | IA1 | Aaa/AAA/AAA | Ca/CCC/C |
| NHELI 2006-HE3 | IA1 | Aaa/AAA/AAA | Caa2/CCC/CC |
| NHELI 2007-1 | III A | Aaa/AAA/-- | Ca/D/-- |
| NHELI 2007-2 | IA1 | Aaa/AAA/-- | Caa3/CCC/-- |
| NHELI 2007-3 | IA1 | Aaa/AAA/-- | Ca/CC/-- |

3.    **The Surge in Mortgage Delinquency and Default Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines**

127.    Even though the Certificates purchased by Fannie Mae and Freddie Mac were supposed to represent long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders.  The overall poor performance of the mortgage loans is a direct consequence of the fact that they were not underwritten in accordance with applicable underwriting guidelines as represented in the Registration Statements.

128.    Loan groups that were properly underwritten and contained loans with the characteristics represented in the Registration Statements would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies than occurred here.  Table 9 sets forth the percentage of loans in the Supporting Loan Groups that are in default, have been foreclosed upon, or are delinquent as of March 2012.

---

[12]    Applicable ratings are shown in sequential order separated by forward slashes: Moody's/S&P/Fitch.  A hyphen after a forward slash indicates that the relevant agency did not provide a rating at issuance.

**Table 9**

| Transaction | Supporting Loan Group | Percentage of Delinquent/Defaulted/Foreclosed Loans (60 or more days delinquent) |
|---|---|---|
| NAA 2005-AR6 | Group III | 37.0 |
| NHELI 2006-FM1 | Group I | 57.5 |
| NHELI 2006-FM2 | Group I | 54.9 |
| NHELI 2006-HE3 | Group I | 41.0 |
| NHELI 2007-1 | Group II-1 | 50.6 |
| NHELI 2007-2 | Group I | 41.1 |
| NHELI 2007-3 | Group I | 43.8 |

129.    The confirmed misstatements concerning owner occupancy and LTV ratios, the confirmed systematic underwriting failures by the originators responsible for the mortgage loans across the Securitizations, and the extraordinary drop in credit rating and rise in delinquencies across those Securitizations, all confirm that the mortgage loans in the Supporting Loan Groups, contrary to the representations in the Registration Statements, were not originated in accordance with the stated underwriting guidelines.

## V.    Fannie Mae's and Freddie Mac's Purchases of the GSE Certificates and the Resulting Damages

130.    In total, between November 30, 2005 and April 30, 2007, Fannie Mae and Freddie Mac purchased over $2 billion in residential mortgage-backed securities issued in connection with the Securitizations.  Table 10 reflects Freddie Mac's purchases of the Certificates.[13]

**Table 10**

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| NHELI 2006-FM1 | IA | 65536HBT4 | 1/31/2006 | $309,550,000 | 100.00 | Nomura Securities |
| NHELI 2006-FM2 | IA1 | 65537FAA9 | 10/31/2006 | $525,197,000 | 100.00 | Greenwich (now RBS Securities) |
| NHELI 2006-HE3 | IA1 | 65536QAA6 | 8/31/2006 | $441,739,000 | 100.00 | Greenwich (now RBS Securities) |
| NHELI 2007-1 | IIIA | 65537KAA8 | 1/31/2007 | $100,548,000 | 100.00 | Greenwich (now RBS Securities) |
| NHELI 2007-2 | IA1 | 65537MAA4 | 1/31/2007 | $358,847,000 | 100.00 | Greenwich (now RBS Securities) |
| NHELI 2007-3 | IA1 | 65537NAA2 | 4/30/2007 | $245,105,000 | 100.00 | Lehman Brothers, Inc. |

---

[13]    Purchased securities in Tables 10 and 11 are stated in terms of unpaid principal balance of the relevant Certificates.  Purchase prices are stated in terms of percentage of par.

131.    Table 11 reflects Fannie Mae's purchase of the Certificates:

**Table 11**

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| NAA 2005-AR6 | IIIA1 | 65535VRJ9 | 11/30/2005 | $64,943,000 | 101.11 | Nomura Securities |

132.    The statements and assurances in the Registration Statements regarding the credit quality and characteristics of the mortgage loans underlying the GSE Certificates, and the origination and underwriting practices pursuant to which the mortgage loans were originated, which were summarized in such documents, were material to a reasonable investor's decision to purchase the GSE Certificates.  A reasonable investor would have understood that Defendants were responsible for the contents of those Registration Statements, and that would have influenced its purchasing decision.

133.    The false statements of material facts and omissions of material facts in the Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused Fannie Mae and Freddie Mac to suffer hundreds of millions of dollars in damages, including without limitation depreciation in the value of the Certificates.  The mortgage loans underlying the GSE Certificates experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines set forth in the Registration Statements, and the payments to the trusts were therefore much lower than they would have been had the loans been underwritten as described in the Registration Statements.

134.    Fannie Mae's and Freddie Mac's losses have been much greater than they would have been if the mortgage loans had the credit quality represented in the Registration Statements.

135.    Defendants' misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchase of the GSE Certificates.  Fannie Mae and Freddie

Mac did not know of Defendants' misstatements and omissions at the time they purchased the

Certificates.  Defendants' misstatements and omissions both understated the risk and overstated

the value of the GSE Certificates, and, had the GSEs known of these misstatements and

omissions, they would not have purchased the GSE Certificates.  Defendants' misrepresentations

and omissions, which proximately caused the GSEs' losses, also contributed to the nation's

housing crisis.  *See* Tara Andringa, *Senate Committee Investigating Financial Crisis Releases*

*Documents on Role of Investment Banks*, Levin Press Release, Apr. 24, 2010, *available at*

http://graphics8.nytimes.com/packages/pdf/business/20100424-goldman1.pdf ("Investment

banks …were not simply market-makers, they were self-interested promoters of risky and

complicated financial schemes that helped trigger the [financial] crisis").

136.    Based upon sales of the Certificates or similar certificates in the secondary

market, Defendants proximately caused hundreds of millions of dollars in damages to Fannie

Mae and Freddie Mac in an amount to be determined at trial.

### FIRST CAUSE OF ACTION

**Violation of Section 11 of the Securities Act of 1933**
**(Against Defendants Nomura Securities, RBS Securities, NHELI, David Findlay, John**
**McCarthy, N. Dante Larocca, and Nathan Gorin)**

137.    Plaintiff realleges each allegation above as if fully set forth herein, except to the

extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

138.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act of

1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE

Certificates issued pursuant to the Registration Statements.  This claim is brought against

Defendants Nomura Securities and RBS Securities (formerly known as Greenwich) with respect

to each of the Registration Statements corresponding to the Securitizations they underwrote.

This claim is also brought against (i) Defendant NHELI and (ii) Defendants David Findlay, John

McCarthy, N. Dante Larocca, and Nathan Gorin (the foregoing Individual Defendants collectively referred to as the "Section 11 Individual Defendants"), with respect to the Registration Statements filed by NHELI that registered securities that were bona fide offered to the public on or after September 6, 2005.

139.    This claim is predicated upon the strict liability of Defendants Nomura Securities and RBS Securities for making false and materially misleading statements in the Registration Statements for the Securitizations, and for omitting facts necessary to make the facts stated therein not misleading.  Defendants NHELI and the Section 11 Individual Defendants are strictly liable for making false and materially misleading misstatements in the Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005, including the related Prospectus Supplements, and for omitting facts necessary to make the facts stated therein not misleading.

140.    Defendants Nomura Securities and RBS Securities (formerly known as Greenwich) served as underwriters for six of the Securitizations, and as such, are liable for the misstatements and omissions in the corresponding Registration Statements under Section 11 of the Securities Act.

141.    Defendant NHELI filed two Registration Statements under which six of the Securitizations were carried out.  As depositor, Defendant NHELI is issuer of the GSE Certificates pursuant to the Registration Statements it filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a).  As such, it is liable for the misstatements and omissions in the Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

142.    At the time Defendant NHELI filed the Registration Statements, the Section 11

Individual Defendants who signed the Registration Statement were officers and/or directors of

NHELI.  In addition, the Section 11 Individual Defendants signed or authorized another to sign

on their behalf the Registration Statements and the amendments thereto.  As such, the Section 11

Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and

omissions in the Registration Statements that registered securities that were bona fide offered to

the public on or after September 6, 2005.

143.    At the time that they became effective, the Registration Statements contained

material misstatements of fact and omitted information necessary to make the facts stated therein

not misleading, as set forth above.  The facts misstated or omitted were material to a reasonable

investor reviewing the Registration Statements.

144.    The untrue statements of material facts and omissions of material fact in the

Registration Statements are set forth above in Section IV and pertain to compliance with

underwriting guidelines, occupancy status and loan-to-value ratios.

145.    Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE

Certificates pursuant to the false and misleading Registration Statements.  Fannie Mae and

Freddie Mac made these purchases in the primary market.  At the time they purchased the GSE

Certificates, Fannie Mae and Freddie Mac did not know of the facts concerning the false and

misleading statements and omissions alleged herein, and if the GSEs would have known those

facts, they would not have purchased the GSE Certificates.

146.    Nomura Securities and RBS Securities (formerly known as Greenwich) owed to

Fannie Mae, Freddie Mac, and other investors a duty to make a reasonable and diligent

investigation of the statements contained in the Registration Statements applicable to the

Securitizations they underwrote at the time they became effective to ensure that such statements were true and correct and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.  The Section 11 Individual Defendants owed the same duty with respect to the Registration Statements that they signed that registered securities that were bona fide offered to the public on or after September 6, 2005.

147.    Nomura Securities, RBS Securities (formerly known as Greenwich), and the Section 11 Individual Defendants did not exercise such due diligence and failed to conduct a reasonable investigation.  In the exercise of reasonable care, these Defendants should have known of the false statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein.  In addition, NHELI, though subject to strict liability without regard to whether it performed diligence, also failed to take reasonable steps to ensure the accuracy of the representations.

148.    Fannie Mae and Freddie Mac sustained substantial damages as a result of the misstatements and omissions in the Registration Statements.

149.    This action is brought within three years of the date that the FHFA was appointed as Conservator for Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

150.    By reason of the conduct herein alleged, Nomura Securities, RBS Securities (formerly known as Greenwich), NHELI, and the Section 11 Individual Defendants are jointly and severally liable for their wrongdoing.

## SECOND CAUSE OF ACTION

**Violation of Section 12(a)(2) of the Securities Act of 1933
(Against Nomura Securities, RBS Securities, NAA, and NHELI)**

151.     Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

152.     This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements in the Securitizations listed in paragraph 2.

153.     This claim is predicated upon the negligence of Nomura Securities, RBS Securities (formerly known as Greenwich), NAA and NHELI for making false and materially misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for one or more Securitizations (as specified in Table 1, above at paragraph 35).

154.     Nomura Securities and RBS Securities (formerly known as Greenwich) are prominently identified in the Prospectuses, the primary documents that they used to sell the GSE Certificates.  Nomura Securities and RBS Securities offered the Certificates publicly, including selling to Fannie Mae and Freddie Mac their GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

155.     Nomura Securities and RBS Securities (formerly known as Greenwich) offered and sold the GSE Certificates to Fannie Mae and Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  Nomura Securities and RBS Securities reviewed and participated in drafting the Prospectuses.

156.     Nomura Securities and RBS Securities (formerly known as Greenwich) successfully solicited Fannie Mae's and Freddie Mac's purchases of the GSE Certificates.  As underwriters, Nomura Securities and RBS Securities obtained substantial commissions based on the amount received from the sale of the Certificates to the public.

157.     Nomura Securities and RBS Securities (formerly known as Greenwich) offered the GSE Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

158.     NAA and NHELI are prominently identified in the Prospectuses for Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell Certificates for the seven Securitizations under those Registration Statements, and each Prospectus provided contact information for NAA or NHELI in the event that investors had questions about their potential investment.  NAA and NHELI, statutory sellers, prepared the offering materials, offered the Certificates publicly and actively solicited their sale, including to Fannie Mae and Freddie Mac, for the benefit of Nomura.  NAA and NHELI were motivated to do so in order to further the interests of Nomura Securities, RBS Securities, Nomura Credit, and Nomura Holding.  In addition, NAA and NHELI earned substantial fees and benefits from a fully subscribed securitization, including their ability to market future securitizations.

159.     NAA and NHELI offered the GSE Certificates to Fannie Mae and Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  NAA and NHELI reviewed and participated in drafting the Prospectuses.

160.    NAA and NHELI offered the GSE Certificates for sale by the use of means or instruments of transportation and communication in interstate commerce.

161.    Each of Nomura Securities, RBS Securities (formerly known as Greenwich), NAA, and NHELI actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

162.    Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

163.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

164.    Nomura Securities, RBS Securities (formerly known as Greenwich), NAA, and NHELI offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae and Freddie Mac, pursuant to the false and misleading Prospectuses.

165.    Nomura Securities and RBS Securities (formerly known as Greenwich) owed to Fannie Mae and Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses for the Securitizations they underwrote, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  NAA and NHELI owed the same duty with respect to the Prospectuses carried out under the Registration Statements they filed.

166.    Nomura Securities, RBS Securities (formerly known as Greenwich), NAA, and NHELI failed to exercise such reasonable care.  These Defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

167.    In contrast, Fannie Mae and Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If the GSEs would have known of those untruths and omissions, they would not have purchased the GSE Certificates.

168.    Fannie Mae and Freddie Mac acquired the GSE Certificates in the primary market pursuant to the Prospectuses.

169.    Fannie Mae and Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

170.    This action is brought within three years of the date that the FHFA was appointed as Conservator for Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## THIRD CAUSE OF ACTION

**Violation of Section 15 of the Securities Act of 1933**
**(Against Nomura Credit, Nomura Holding, and the Individual Defendants)**

171.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

172.    This claim is brought under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o ("Section 15"), against Nomura Credit, Nomura Holding, and the Individual Defendants for

controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

173.    The Individual Defendants at all relevant times participated in the operation and management of NAA, NHELI, and/or Nomura Securities, and conducted and culpably participated, directly and indirectly, in the conduct of NAA, NHELI, and/or Nomura Securities' business affairs.  Defendant N. Dante Larocca was President and Chief Executive Officer of NHELI and a Managing Director of Nomura Securities.  Defendant David Findlay was a Director of NAA and NHELI and a Senior Managing Director and Chief Legal Officer of Nomura Securities.  Defendant Nathan Gorin was Controller and Chief Financial Officer of NAA, NHELI, and Nomura Securities.  Defendant John P. Graham was President and Chief Executive Officer of NAA.  Defendant John McCarthy was a Director of NAA and NHELI.

174.    Defendant Nomura Credit was the sponsor for the Securitizations, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting NAA and NHELI as the special purpose vehicles, and selecting Nomura Securities or RBS Securities (formerly known as Greenwich) as underwriter.  In its role as sponsor, Nomura Credit knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

175.    Defendant Nomura Credit also acted as the seller of the mortgage loans for the Securitizations, in that it conveyed such mortgage loans to Defendants NAA and NHELI pursuant to a Mortgage Loan Purchase Agreement.

176.     Defendant Nomura Credit also controlled the business of NAA and NHELI, as NAA and NHELI were merely special purpose entities created for the purpose of acting as a pass-through for the issuance of the Certificates.  Upon information and belief, there was some overlap between the officers and directors of Nomura Credit, NAA, NHELI, and Nomura Securities.  In addition, because of its position as sponsor, Nomura Credit was able to, and did in fact, control the contents of the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

177.     Defendant Nomura Holding controlled the business operations of Nomura Credit, Nomura Securities, NAA, and NHELI.  Defendant Nomura Holding is the corporate parent of Nomura Credit, Nomura Securities, NAA, and NHELI.  As the corporate parent, Nomura Holding had the practical ability to direct and control the actions of Nomura Credit, Nomura Securities, NAA, and NHELI in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of Nomura Credit, Nomura Securities, NAA, and NHELI in connection with the issuance and sale of the Certificates.

178.     Nomura Holding expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

179.     Nomura Holding culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish

special-purpose financial entities such as NAA, NHELI, and the issuing trusts to serve as conduits for the mortgage loans.

180.    Nomura Credit, Nomura Holding, and the Individual Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of NAA, NHELI, and Nomura Securities at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.  By virtue of this coordinated approach across the various Defendants, Nomura generated profits at multiple levels of the securitization process.

181.    Fannie Mae and Freddie Mac purchased in the primary market Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

182.    Fannie Mae and Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had the GSEs known of those misstatements and omissions, they would not have purchased the GSE Certificates.

183.    Fannie Mae and Freddie Mac have sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

184.    This action is brought within three years of the date that the FHFA was appointed as Conservator for Fannie Mae and Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

**FOURTH CAUSE OF ACTION**

**Violation of Section 13.1-522(A)(ii) of the Virginia Code
(Against RBS Securities and NHELI)**

185.     Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

186.     This claim is brought by Plaintiff pursuant to 13.1-522(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of action pertain to only those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006.

187.     This claim is predicated upon RBS Securities' (formerly known as Greenwich) negligence for making false and materially misleading statements in the Prospectuses for each of the above Securitizations.  Defendant NHELI acted negligently in making false and materially misleading statements in the Prospectuses for the Securitizations carried out under the Registration Statements it filed.

188.     RBS Securities (formerly known as Greenwich) is prominently identified in the Prospectuses, the primary documents that it used to sell the GSE Certificates.  RBS Securities offered the Certificates publicly, including selling to Freddie Mac its GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

189.     RBS Securities (formerly known as Greenwich) offered and sold the GSE Certificates to Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  RBS Securities reviewed and participated in drafting the Prospectuses.

190.    RBS Securities (formerly known as Greenwich) successfully solicited Freddie Mac's purchases of the GSE Certificates.  As underwriter, RBS Securities obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

191.    RBS Securities (formerly known as Greenwich) offered the GSE Certificates for sale, sold them, and distributed them to Freddie Mac in the State of Virginia.

192.    NHELI is prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements it filed, and each Prospectus provided contact information for NHELI in the event that investors had questions about their potential investment. NHELI, a statutory seller, prepared the offering materials, offered the Certificates publicly and actively solicited their sale, including to Freddie Mac, for the benefit of Nomura.  NHELI was motivated to do so in order to further the interests of RBS Securities, Nomura Credit, and Nomura Holding.  In addition, NHELI earned substantial fees and benefits from a fully subscribed securitization, including its ability to market future securitizations.

193.    NHELI offered the GSE Certificates to Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  NHELI reviewed and participated in drafting the Prospectuses.

194.    RBS Securities (formerly known as Greenwich) and NHELI actively participated in the solicitation of Freddie Mac's purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

195.    Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

196.    The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

197.    RBS Securities (formerly known as Greenwich) and NHELI offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Freddie Mac, pursuant to the false and misleading Prospectuses.

198.    RBS Securities (formerly known as Greenwich) owed to Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses for the Securitizations they underwrote, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  NHELI owed the same duty with respect to the Prospectuses carried out under the Registration Statements it filed.

199.    RBS Securities (formerly known as Greenwich) and NHELI failed to exercise such reasonable care.  These Defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

200.    In contrast, Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates.  If Freddie Mac would have known of those untruths and omissions, it would not have purchased the GSE Certificates.

201.    Freddie Mac sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

202.    This action is brought within three years of the date that the FHFA was appointed as Conservator for Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

### FIFTH CAUSE OF ACTION

**Violation of Section 13.1-522(C) of the Virginia Code**
**(Against Nomura Credit, Nomura Holding, David Findlay, John McCarthy, N. Dante Larocca, and Nathan Gorin)**

203.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

204.    This claim is brought under Section 13.1-522(C) of the Virginia Code and is asserted on behalf of Freddie Mac.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 10 above that were purchased on or after September 6, 2006.  This claim is brought against Nomura Credit, Nomura Holding, David Findlay, John McCarthy, N. Dante Larocca, and Nathan Gorin (the foregoing Individual Defendants collectively referred to as the "Section 13 Individual Defendants") for controlling-person liability with regard to the Fourth Cause of Action set forth above.

205.    The Section 13 Individual Defendants at all relevant times participated in the operation and management of NHELI, and conducted and participated, directly and indirectly, in the conduct of NHELI's business affairs.  Defendants David Findlay and John McCarthy were Directors of NHELI.  Defendant N. Dante Larocca was President and Chief Executive Officer of NHELI.  Defendant Nathan Gorin was Controller and Chief Financial Officer of NHELI.

206.    Defendant Nomura Credit was the sponsor for the Securitizations purchased by Freddie Mac, and culpably participated in the violations of Section 13.1-522(A)(ii) set forth

above with respect to the offering of the GSE Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting NHELI as the special purpose vehicle, and selecting RBS Securities (formerly known as Greenwich) as underwriter.  In its role as sponsor, Nomura Credit knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

207.   Defendant Nomura Credit also acted as the seller of the mortgage loans for the Securitizations purchased by Freddie Mac, in that it conveyed such mortgage loans to Defendant NHELI pursuant to a Mortgage Loan Purchase Agreement.

208.   Defendant Nomura Credit also controlled the business of NHELI, as NHELI was merely a special purpose entity created for the purpose of acting as a pass-through for the issuance of the Certificates.  In addition, because of its position as sponsor, Nomura Credit was able to, and did in fact, control the contents of the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

209.   Defendant Nomura Holding controlled the business operations of Nomura Credit and NHELI.  Defendant Nomura Holding is the corporate parent of Nomura Credit and NHELI. As the corporate parent, Nomura Holding had the practical ability to direct and control the actions of Nomura Credit and NHELI in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of Nomura Credit and NHELI in connection with the issuance and sale of the Certificates.

210.     Nomura Holding expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

211.     Nomura Holding culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and establish special-purpose financial entities such as NHELI and the issuing trusts to serve as conduits for the mortgage loans.

212.     Nomura Credit, Nomura Holding, and the Section 13 Individual Defendants are controlling persons within the meaning of Section 13.1-522(C) by virtue of their actual power over, control of, ownership of, and/or directorship of NHELI at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.  By virtue of this coordinated approach across the various Defendants, Nomura generated profits at multiple levels of the securitization process.

213.     Freddie Mac purchased Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

214.     Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had Freddie Mac known of those misstatements and omissions, it would not have purchased the GSE Certificates.

215.     Freddie Mac has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation.

216.     This action is brought within three years of the date that the FHFA was appointed as Conservator for Freddie Mac and is thus timely under 12 U.S.C. § 4617(b)(12).

## SIXTH CAUSE OF ACTION

### Violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code
### (Against Nomura Securities and NAA)

217.     Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

218.     This claim is brought by Plaintiff pursuant to Section 31-5606.05(a)(1)(B) of the District of Columbia Code and is asserted on behalf of Fannie Mae with respect to the GSE Certificate for the NAA 2005-AR6 Securitization, which was purchased by Fannie Mae.

219.     This claim is predicated upon Nomura Securities' negligence for making false and materially misleading statements in the Prospectus for the NAA 2005-AR6 Securitization. Defendant NAA also acted negligently in making false and materially misleading statements in this Prospectus.

220.     Nomura Securities is prominently identified in the Prospectus, the primary document it used to sell the Certificates for the NAA 2005-AR6 Securitization. Nomura Securities offered the Certificates publicly, including selling the GSE Certificate to Fannie Mae.

221.     Nomura Securities offered and sold the GSE Certificate to Fannie Mae by means of the Prospectus, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading. Nomura Securities reviewed and participated in drafting the Prospectus.

222.     Nomura Securities successfully solicited Fannie Mae's purchase of the GSE Certificate for the NAA 2005-AR6 Securitization.  As underwriter, Nomura Securities obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

223.     Nomura Securities offered the GSE Certificate for sale, sold it, and distributed it to Fannie Mae in the District of Columbia.

224.     NAA is prominently identified in the Prospectus for the NAA 2005-AR6 Securitization, which was carried out under a Registration Statement it filed.  This Prospectus was the primary document used to sell the Certificates for the NAA 2005-AR6 Securitization, and the Prospectus provided contact information for NAA in the event that investors had questions about their potential investment.  NAA, a statutory seller, prepared the offering materials, offered the Certificates publicly and actively solicited their sale, including to Fannie Mae, for the benefit of Nomura.  NAA was motivated to do so in order to further the interests of Nomura Securities, Nomura Credit, and Nomura Holding.  In addition, NAA earned substantial fees and benefits from a fully subscribed securitization, including its ability to market future securitizations.

225.     NAA offered the GSE Certificate for the NAA 2005-AR6 Securitization to Fannie Mae by means of a Prospectus which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  NAA reviewed and participated in drafting the Prospectus.

226.     Nomura Securities and NAA actively participated in the solicitation of the Fannie Mae's purchase of the GSE Certificate for the NAA 2005-AR6 Securitization, and did so in

order to benefit themselves and Nomura.  Such solicitation included assisting in preparing the

Registration Statement, filing the Registration Statement, and assisting in marketing the GSE

Certificate.

227.    The Prospectus contained material misstatements of fact and omitted information

necessary to make the facts stated therein not misleading.  The facts misstated and omitted were

material to a reasonable investor reviewing the Prospectus.

228.    The untrue statements of material facts and omissions of material fact in the

Registration Statement, which includes the Prospectus, are set forth above in Section IV, and

pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

229.    Nomura Securities and NAA offered and sold the GSE Certificate for the NAA

2005-AR6 Securitization offered pursuant to the Registration Statement directly to Fannie Mae,

pursuant to the false and misleading Prospectus.

230.    Nomura Securities owed to Fannie Mae, as well as to other investors in this trust,

a duty to make a reasonable and diligent investigation of the statements contained in the

Prospectus for the Securitization that it underwrote, to ensure that such statements were true, and

to ensure that there was no omission of a material fact required to be stated in order to make the

statements contained therein not misleading.  NAA, which filed the Registration Statement,

owed the same duty with respect to the Prospectus for the Securitization.

231.    Nomura Securities and NAA failed to exercise such reasonable care.  These

Defendants in the exercise of reasonable care should have known that the Prospectus contained

untrue statements of material facts and omissions of material facts at the time of the

Securitization as set forth above.

232.    In contrast, Fannie Mae did not know of the untruths and omissions contained in the Prospectus at the time it purchased the GSE Certificate for the NAA 2005-AR6 Securitization.  If Fannie Mae would have known of those untruths and omissions, it would not have purchased the GSE Certificate.

233.    Fannie Mae sustained substantial damages in connection with its investment in the GSE Certificate for the NAA 2005-AR6 Securitization and has the right to rescind and recover the consideration paid for the GSE Certificate, with interest thereon.

234.    This action is brought within three years of the date that the FHFA was appointed as Conservator for Fannie Mae, and is thus timely under 12 U.S.C. § 4617(b)(12).

<u>**SEVENTH CAUSE OF ACTION**</u>

**Violation of Section 31-5606.05(c) of the District of Columbia Code
(Against Nomura Credit, Nomura Holding, David Findlay, John McCarthy, John P.
Graham, and Nathan Gorin)**

235.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes any allegation that could be construed as alleging fraud.

236.    This claim is brought under Section 31-5606.05(c) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to the GSE Certificate for the NAA 2005-AR6 Securitization.  This claim is brought against Nomura Credit, Nomura Holding, David Findlay, John McCarthy, John P. Graham, and Nathan Gorin (the foregoing Individual Defendants collectively referred to as the "Section 31 Individual Defendants") for controlling-person liability with regard to the Sixth Cause of Action set forth above.

237.    The Section 31 Individual Defendants at all relevant times participated in the operation and management of NAA and/or Nomura Securities, and conducted and participated, directly and indirectly, in the conduct of NAA and/or Nomura Securities' business affairs.

Defendant David Findlay was a Director of NAA and a Senior Managing Director and Chief Legal Officer of Nomura Securities.  Defendant John McCarthy was a Director of NAA. Defendant John P. Graham was President and Chief Executive Officer of NAA.  Defendant Nathan Gorin was Controller and Chief Financial Officer of NAA and Nomura Securities.

238.   Defendant Nomura Credit was the sponsor for the Securitizations, and culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above with respect to the offering of the GSE Certificate for the NAA 2005-AR6 Securitization by initiating this Securitization, purchasing the mortgage loans to be securitized, determining the structure of the Securitization, selecting NAA as the special purpose vehicle, and selecting Nomura Securities as underwriter.  In its role as sponsor, Nomura Credit knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

239.   Defendant Nomura Credit also acted as the seller of the mortgage loans for the NAA 2005-AR6 Securitization, in that it conveyed such mortgage loans to Defendant NAA pursuant to a mortgage loan purchase agreement.

240.   Defendant Nomura Credit also controlled the business of NAA, as NAA was merely a special purpose entity created for the purpose of acting as a pass-through for the issuance of the Certificates.  In addition, because of its position as sponsor, Nomura Credit was able to, and did in fact, control the contents of the Registration Statement, including the Prospectus and Prospectus Supplement, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

241.    Defendant Nomura Holding controlled the business operations of Nomura Credit, Nomura Securities, and NAA.  Defendant Nomura Holding is the corporate parent of Nomura Credit, Nomura Securities, and NAA.  As the corporate parent, Nomura Holding had the practical ability to direct and control the actions of Nomura Credit, Nomura Securities, and NAA in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of Nomura Credit, Nomura Securities, and NAA in connection with the issuance and sale of the GSE Certificate for the NAA 2005-AR6 Securitization.

242.    Nomura Holding expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statement.

243.    Nomura Holding culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statement and establish special-purpose financial entities such as NAA and the issuing trusts to serve as conduits for the mortgage loans.

244.    Nomura Credit, Nomura Holding, and the Section 31 Individual Defendants are controlling persons within the meaning of Section 31-5606.05(c) by virtue of their actual power over, control of, ownership of, and/or directorship of NAA and Nomura Securities at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statement.  By virtue of this coordinated approach across the various Defendants, Nomura generated profits at multiple levels of the securitization process.

245.    Fannie Mae purchased the GSE Certificate for the NAA 2005-AR6 Securitization, issued pursuant to the Registration Statement, including the Prospectus and Prospectus Supplement, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

246.    Fannie Mae did not know of the misstatements and omissions in the Registration Statement; had Fannie Mae known of those misstatements and omissions, it would not have purchased the GSE Certificate.

247.    Fannie Mae has sustained damages as a result of the misstatements and omissions in the Registration Statement, for which it is entitled to compensation.

248.    This action is brought within three years of the date that the FHFA was appointed as Conservator for Fannie Mae and is thus timely under 12 U.S.C. § 4617(b)(12).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

An award in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including:

a.    Rescission and recovery of the consideration paid for the GSE Certificates, with interest thereon;

b.    Each GSE's monetary losses, including any diminution in value of the GSE Certificates, lost principal and lost interest payments thereon, and consequential damages, including the cost of investigating the misrepresentations and performance of the underlying collateral to the Certificates, as well as any increased coupon payment on the GSEs' senior

preferred stock held by the U.S. Treasury Department, arising from losses on the GSE

Certificates;

      c.      Attorneys' fees and costs;

      d.      Prejudgment interest at the maximum legal rate; and

      e.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by

jury on all issues triable by jury.

DATED:     June 28, 2012
              New York, NY

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____

Adam M. Abensohn
Richard A. Schirtzer

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000

*Attorneys for Plaintiff Federal Housing Finance Agency*

OFFICE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,

        -against-

NOMURA HOLDING AMERICA INC.,
NOMURA ASSET ACCEPTANCE
CORPORATION, NOMURA HOME
EQUITY LOAN, INC., NOMURA CREDIT
& CAPITAL, INC., NOMURA SECURITIES
INTERNATIONAL, INC., RBS
SECURITIES INC. (f/k/a GREENWICH
CAPITAL MARKETS, INC.), DAVID
FINDLAY, JOHN MCCARTHY, JOHN P.
GRAHAM, NATHAN GORIN, and N.
DANTE LAROCCA,

                Defendants.

**11 CIV. 6201 (DLC)**

**APPENDIX A**



**JUNE 28, 2012**

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.      The NAA 2005-AR6 Securitization...................................................................1

II.     The NHELI 2006-FM1 Securitization ............................................................2

III.    The NHELI 2006-FM2 Securitization .............................................................6

IV.     The NHELI 2006-HE3 Securitization .............................................................10

V.      The NHELI 2007-1 Securitization...................................................................14

VI.     The NHELI 2007-2 Securitization...................................................................17

VII.    The NHELI 2007-3 Securitization...................................................................21

## APPENDIX A

I.   <u>The NAA 2005-AR6 Securitization</u>

**Representations in the prospectus supplement filed November 30, 2005 for the NAA 2005-AR6 Securitization with respect to the underwriting standards of Silver State Mortgage, Alliance Bancorp, Aegis Mortgage, and various originators (originating 10% of the loans or fewer), which originated or acquired loans in the Securitization**

A.   **Collateral**

1.   "[C]onventional, one-to-four family adjustable-rate mortgage loans secured by first liens on residential real properties." [S-2]

B.   **Statements about conformity with underwriting guidelines**

1.   "The Mortgage Loans have been purchased by the seller from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section." [S-88]

C.   **Statements concerning borrower's ability to repay the loan**

1.   "The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources." [S-88]

2.   "Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses." [S-88]

D.   **Statements concerning information evaluated in the loan application**

1.   "Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report

which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy." [S-88]

**E.    Statements concerning appraisal of the subject property**

    **1.**    "The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac." [S-89]

    **2.**    "The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property." [S-89]

**F.    Additional representations and warranties**

    **1.**    "The seller will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the trustee with respect to each Mortgage Loan.  In addition, the seller will represent and warrant, as of the Closing Date, that, among other things: (i) at the time of transfer to the depositor, the seller has transferred or assigned all of its right, title and interest in each Mortgage Loan and the Related Documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws . . ." [S-143]

## II.    The NHELI 2006-FM1 Securitization

**Representations in the prospectus supplement filed January 31, 2006 for the NHELI 2006-FM1 Securitization with respect to the underwriting standards of Fremont Investment & Loan, which originated or acquired loans in the Securitization**

**A.    Collateral**

    **1.**    "[C]onventional, one-to-four family fixed-rate and adjustable-rate mortgage loans secured by first or second liens on residential real properties."

**B.    Statements about conformity with underwriting guidelines**

    **1.**    "All of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this

section.  The following is a summary of the underwriting guidelines believed by the Depositor to have been applied, with some variation, by Fremont."

2.      "Mortgage loans are underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ('Scored Programs'), subject to various exceptions as described in this section.  Fremont began originating mortgage loans pursuant to Scored Programs in 2001 and the Scored Programs have been the exclusive type of origination programs beginning in 2004."

C.      **Statements about underwriting guidelines of originator Fremont Investment & Loan**

1.      **Statements concerning borrower's ability to repay the loan**

(a)     "Programs have been the exclusive type of origination programs beginning in 2004.  Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan."

2.      **Statements concerning information evaluated in the loan application**

(a)     "Substantially all of the mortgage loans originated by Fremont are based on loan application packages submitted through licensed mortgage brokers.  These brokers must meet minimum standards set by Fremont based on an analysis of the following information submitted with an application for approval: applicable state lending license (in good standing), signed broker agreement, and signed broker authorization.  Once approved, licensed mortgage brokers are eligible to submit loan application packages in compliance with the terms of a signed broker agreement."

(b)     "The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment."

(c)     "Under the Scored Programs, Fremont requires credit reports for each borrower, using the Credit Score of the primary borrower (the borrower with the highest percentage of total income) to determine program eligibility.  Credit Scores must be requested from each national credit repository."

(d)     "Generally, the minimum applicable Credit Score allowed is 500, however borrowers with no Credit Scores are not automatically

rejected and may be eligible for certain loan programs in appropriate circumstances."

3.    **Statements concerning evaluation of exceptions and compensating factors**

(a)    "On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address."

4.    **Statements concerning appraisal of the subject property**

(a)    "Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal."

(b)    "Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states. Review appraisals may only be provided by appraisers approved by Fremont. In some cases, Fremont relies on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont."

(c)    "Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises."

5.    **Other statements concerning quality control procedures of the originator**

(a)    "The Scored Programs were developed to simplify the origination process. In contrast to assignment of credit grades according to traditional non-agency credit assessment methods, i.e., mortgage and other credit delinquencies, the Scored Programs rely upon a borrower's Credit Score, mortgage payment history and seasoning

on any bankruptcy/foreclosure initially to determine a borrower's likely future credit performance.  Licensed mortgage brokers are able to access Credit Scores at the initial phases of the loan application process and use the Credit Score to determine the interest rates a borrower may qualify for based upon Fremont's Scored Programs risk-based pricing matrices.  Final loan terms are subject to approval by Fremont."

(b)     "Fremont conducts a number of quality control procedures, including a cost-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing review findings and level of error is sent monthly to each loan production office for response.  The review findings and branch responses are then reviewed by Fremont's senior management.  Adverse findings are tracked monthly.  This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training."

### D.     Additional representations and warranties

**1.**     "The seller will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the trustee with respect to each Mortgage Loan.  In addition, the seller will represent and warrant, as of the Closing Date, that, among other things: (i) at the time of transfer to the depositor, the seller has transferred or assigned all of its right, title and interest in each Mortgage Loan and the Related Documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws . . ."

III.   **The NHELI 2006-FM2 Securitization**

**Representations in the prospectus supplement filed October 31, 2006 for the NHELI 2006-FM2 Securitization with respect to the underwriting standards of Fremont Investment & Loan and of Nomura Credit & Capital, Inc., which originated or acquired loans in the Securitization**

A.   **Collateral**

    1.   "[C]onventional, one-to-four family fixed-rate and adjustable-rate mortgage loans secured by first or second liens on residential real properties."

B.   **Statements about conformity with underwriting guidelines**

    1.   "All of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this section."

    2.   "All of the Mortgage Loans have been purchased by the sponsor from the Originator and were originated generally in accordance with the underwriting criteria described in this section."

    3.   "In comparison to the 'general' underwriting standards described above, the underwriting standards applicable to mortgage loans under an 'alternative' mortgage loan underwriting program permit different underwriting criteria, additional types of mortgaged properties or categories of borrowers such as 'foreign nationals' without a credit score who hold certain types of visas and have acceptable credit references (such Mortgage Loans, 'Foreign National Loans'), and include certain other less restrictive parameters.  Generally, relative to the 'general' underwriting standards, these standards include higher loan amounts, higher maximum loan-to-value ratios, higher maximum 'combined' loan-to-value ratios (in each case, relative to mortgage loans with otherwise similar characteristics) in cases of simultaneous primary and secondary financings, less restrictive requirements for 'equity take out' refinancings, the removal of limitations on the number of permissible mortgage loans that may be extended to one borrower and the ability to originate mortgage loans with loan-to-value ratios in excess of 80% without the requirement to obtain mortgage insurance if such loans are secured by investment properties."

C.  **Statements about underwriting guidelines of originator Fremont Investment & Loan**

    1.  **Statements concerning borrower's ability to repay the loan**

        (a)  "Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan."

        (b)  "The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment.  All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market."

    2.  **Statements concerning information evaluated in the loan application**

        (a)  "In contrast to assignment of credit grades according to traditional non-agency credit assessment methods, i.e., mortgage and other credit delinquencies, the Scored Programs rely upon a borrower's Credit Score, mortgage payment history and seasoning on any bankruptcy/foreclosure initially to determine a borrower's likely future credit performance.  Licensed mortgage brokers are able to access Credit Scores at the initial phases of the loan application process and use the Credit Score to determine the interest rates a borrower may qualify for based upon Fremont's Scored Programs risk-based pricing matrices.  Final loan terms are subject to approval by Fremont."

        (b)  "Under the Scored Programs, Fremont requires credit reports for each borrower, using the Credit Score of the primary borrower (the borrower with the highest percentage of total income) to determine program eligibility.  Credit Scores must be requested from each national credit repository."

    3.  **Statements concerning evaluation of exceptions and compensating factors**

        (a)  "On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income

ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  It is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions."

4.  **Statements concerning appraisal of the subject property**

(a)  "Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal.  Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states.  Review appraisals may only be provided by appraisers approved by Fremont.  In some cases, Fremont relies on a statistical appraisal methodology provided by a third-party.  Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont.  Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises."

5.  **Other statements concerning quality control procedures of the originator**

(a)  "Generally, the minimum applicable Credit Score allowed is 500, however borrowers with no Credit Scores are not automatically rejected and may be eligible for certain loan programs in appropriate circumstances."

(b)  "Fremont conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing review findings and level of error is sent monthly to each loan production office for response.  The review findings and branch responses are then reviewed by Fremont's senior management.  Adverse findings are tracked monthly.  This review procedure allows Fremont to assess

programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training."

**D.**    **Statements about underwriting guidelines of sponsor Nomura Credit & Capital, Inc.**

    **1.**    **Statements concerning information evaluated in the loan application**

        (a)    "Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts."

        (b)    "Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

    **2.**    **Statements concerning appraisal of the subject property**

        (a)    "The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure standards established by the originator.  The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the

> Mortgaged Property and to verify whether the Mortgaged Property was in good condition and that construction, if new, had been substantially completed.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property."

**E.    Additional representations and warranties**

1.    "The sponsor will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the trustee with respect to each Mortgage Loan.  In addition, the sponsor will represent and warrant, as of the Closing Date, that, among other things: (i) at the time of transfer to the depositor, the sponsor has transferred or assigned all of its right, title and interest in each Mortgage Loan and the Related Documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws . . ."

## IV.    The NHELI 2006-HE3 Securitization

**Representations in the prospectus supplement filed August 30, 2006 for the NHELI 2006-HE3 Securitization with respect to the underwriting standards of People's Choice Home Loan, Inc. ("People's Choice"), First NLC Financial Services, LLC, Equifirst Corporation, and various originators (originating 10% of the loans or fewer) and of Nomura Credit & Capital, Inc., which originated or acquired loans in the Securitization**

**A.    Collateral**

1.    "[C]onventional, one-to-four family adjustable-rate mortgage loans secured by first liens on residential real properties."

**B.    Statements about conformity with underwriting guidelines**

1.    People's Choice: "The Mortgage Loans were generally originated by People's Choice Home Loan, Inc., a Wyoming corporation ('PCHLI'), in accordance with the underwriting criteria described in this section and detailed in the print and on-line manuals that our underwriters use in making their credit decisions ('Underwriting Guidelines')."

2.    General: "The Mortgage Loans have been purchased by the seller from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."

**C.** **Statements about underwriting guidelines of originator People's Choice**

    **1.** **Statements concerning borrower's ability to repay the loan**

        (a)    "Under each program, PCHLI reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio ('DTI') to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property appraisal."

    **2.** **Statements concerning information evaluated in the loan application**

        (a)    "The Underwriting Guidelines specify which applicants may qualify for 'full documentation,' 'lite documentation,' and 'stated income documentation' programs. The specific income documentation required for PCHLI's various programs varies as follows: Under the full documentation program, applicants usually are required to submit one year's IRS Form W-2 and Form 1040 and a year-to-date paystub or 12 or 24 months personal or business bank statements. Under the lite documentation program, applicants usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal or business checking account bank statements or a current paycheck stub with at least 6 months' year-to-date information. Under the stated income documentation program, an applicant will be qualified based upon monthly income as stated on the mortgage loan application, if the applicant meets certain criteria. The income stated must be reasonable for the job and credit profile."

        (b)    "All of these programs require, for salaried employees, a telephone verification of the applicant's employment. For a self-employed borrower, there is a telephone verification, as well as additional documentation to verify the existence of the business owned by the borrower. In evaluating the credit quality of borrowers, PCHLI utilizes Credit Scores (as defined below), mortgage or rent-payment history, job stability and income. The Underwriting Guidelines require all borrowers to have demonstrated a willingness to pay."

    **3.** **Statements concerning evaluation of exceptions and compensating factors**

        (a)    "On a case-by-case basis, exceptions to the Underwriting Guidelines may be made where compensating factors exist. It is

expected that some portion of the PCHLI loans will represent those exceptions.  In addition, PCHLI documents all exceptions in its loan files."

**4.      Statements concerning appraisal of the subject property**

(a)     "The Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure and require the underwriters to be satisfied that the value of the property being financed, as reflected by an appraisal and a review of the appraisal, supports the outstanding loan balance at time of funding of the PCHLI loan."

**5.      Other statements concerning quality control procedures of the originator**

(a)     "PCHLI thoroughly reviews all credit, income, character and collateral information provided by the broker for completeness, accuracy and authenticity."

(b)     "PCHLI thoroughly reviews all credit, income, character and collateral information provided by the PCHLI loan officer and makes a credit decision based on the borrower's application for a mortgage loan using the same processes and guidelines used in wholesale transactions.  PCHLI typically conducts a final pre-funding check of the underwriting packages prior to wiring money to fund a mortgage loan."

**D.      Statements about underwriting guidelines of sponsor Nomura Credit & Capital, Inc.**

**1.      Statements concerning borrower's ability to repay the loan**

(a)     "The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources."

(b)     "Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard

insurance and other fixed obligations other than housing expenses."

**2. Statements concerning information evaluated in the loan application**

(a) "Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."

**3. Statements concerning appraisal of the subject property**

(a) "The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac."

(b) "The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property."

**E. Additional representations and warranties**

**1.** "The sponsor will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the trustee with respect to each Mortgage Loan. In addition, the sponsor will represent and warrant, as of the Closing Date, that, among other things: (i) at the time of transfer to the depositor, the sponsor has transferred or assigned all of its right, title and interest in each Mortgage Loan and the Related Documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws . . ."

**V.** **The NHELI 2007-1 Securitization**

**Representations in the prospectus supplement filed January 31, 2007 for the NHELI 2007-1 Securitization with respect to the underwriting standards of Silver State Financial Services, Inc., d/b/a Silver State Mortgage, and various originators (originating 10% of the loans or fewer) and of Nomura Credit & Capital, Inc., which originated or acquired loans in the Securitization**

**A.** **Collateral**

    **1.** "[C]onventional, one-to-four family, fixed-rate and adjustable-rate mortgage loans secured by first liens on residential real properties."

**B.** **Statements about conformity with underwriting guidelines**

    **1.** "All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."

**C.** **Statements about underwriting guidelines of originator Silver State Financial Services, Inc., d/b/a Silver State Mortgage**

    **1.** **Statements concerning borrower's ability to repay the loan**

        (a) "Silver State Mortgage's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed Mortgaged Property as collateral."

        (b) "Based on the data provided in the application and certain verifications (if required), a determination will have been made that the borrower's monthly income (if required to be stated or verified) should be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the Mortgaged Property (such as property taxes, standard hazard insurance and other fixed obligations other than housing expenses)."

    **2.** **Statements concerning information evaluated in the loan application**

        (a) "A prospective borrower applying for a mortgage loan is required to complete an application, which elicits pertinent information about the prospective borrower including, depending upon the loan program, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired."

(b)    "With respect to every prospective borrower, a credit report summarizing the prospective borrower's credit history or non-traditional credit history is obtained."

**3.    Statements concerning appraisal of the subject property**

(a)    "The adequacy of the Mortgaged Property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by or acceptable to the Originator."

(b)    "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property."

**4.    Other statements concerning quality control procedures of the originator**

(a)    "If required by the underwriting guidelines, employment verification is obtained either from the prospective borrower's employer or through analysis of copies of borrower's federal withholding (IRS W-2) forms and/or current payroll earnings statements."

(b)    "In the case of investment properties and two- to four-unit dwellings, income derived from the Mortgaged Property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources, if applicable.  With respect to Mortgaged Property consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes."

(c)     "Silver State Mortgage outsources the quality control function to The Stone Hill Group based out of Atlanta, Georgia.  While Silver State Mortgage maintains quality control policies that are in compliance with FNMA and FHLMC requirements, the actual loan selections and loan reviews are completed by The Stone Hill Group."

**D.     Statements about underwriting guidelines of sponsor Nomura Credit & Capital, Inc.**

**1.     Statements concerning borrower's ability to repay the loan**

(a)     "Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

**2.     Statements concerning information evaluated in the loan application**

(a)     "Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts."

**3.     Statements concerning appraisal of the subject property**

(a)     "The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.

A-16

Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure standards established by the originator. The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the Mortgaged Property and to verify whether the Mortgaged Property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property."

**E.   Additional representations and warranties**

1.   "The sponsor will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the trustee with respect to each Mortgage Loan. In addition, the sponsor will represent and warrant, as of the Closing Date, that, among other things: (i) at the time of transfer to the depositor, the sponsor has transferred or assigned all of its right, title and interest in each Mortgage Loan and the Related Documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws . . ."

**VI.   <u>The NHELI 2007-2 Securitization</u>**

**Representations in the prospectus supplement filed February 1, 2007 for the NHELI 2007-2 Securitization with respect to the underwriting standards of Ownit Mortgage Solutions, Inc., First NLC Financial Services, LLC, and various originators (originating 10% of the loans or fewer) and of Nomura Credit & Capital, Inc., which originated or acquired loans in the Securitization**

**A.   Collateral**

1.   "[C]onventional, one-to-four family fixed-rate and adjustable-rate mortgage loans secured by first or second liens on residential real properties."

**B.   Statements about conformity with underwriting guidelines**

1.   "All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."

**C.**   **Statements about underwriting guidelines of originator Ownit Mortgage Solutions, Inc.**

**1.**   **Statements concerning borrower's ability to repay the loan**

(a)   "The Underwriting Guidelines and Credit Matrices of the RightLoan are designed to be used as a guide in determining the credit worthiness of the borrower and his/her ability to repay."

**2.**   **Statements concerning information evaluated in the loan application**

(a)   "Using the three components, capacity, credit and collateral, the underwriter analyzes the loan profile. Capacity, which is the borrower's ability to repay, is determined by cash flow. It must be clearly shown that the borrower has a proven, historical cash flow, which will support the requested loan amount. This approach anticipates that the loan is going to be repaid from the borrower's recurring cash inflows, not from the sale of the collateral. Job stability and length of time in current residence are also strong factors in determining a borrower's capacity. Continuity of employment is a strong factor in establishing the income used as a basis for repayment. Credit is the borrower's willingness to repay his or her debts according to the contractual agreements. The most valuable resource in determining the borrower's ability to repay is the credit report. Ownit underwriters will use the credit report and credit explanation letter when supplied in determining willingness. Ownit uses the credit score as a primary factor in determining the borrower's willingness to repay his or her debts. Collateral is defined as the asset pledged by the borrower to the lender. Collateral is a secondary source of repayment; cash flow is the primary source of repayment. Ownit will evaluate the property by reviewing uniform residential real estate appraisal reports, along with other data sources, to determine whether the collateral is sufficient to secure the mortgage."

(b)   "The underwriter's objective is to analyze an application individually with the understanding that no single characteristic will approve or deny a loan. The underwriter must utilize the credit report, loan application, asset verifications, appraisal and all other supporting documents in determining credit worthiness and risk. Credit risk can be defined as, but is not restricted to, limited liquid assets or reserves, and derogatory credit history. The overall situation and profile of a borrower, including compensating factors, which may offset negative characteristics, must be taken into consideration in determining if the borrower is creditworthy. Credit worthiness is determined by the borrower's ability and willingness to repay his or her contractual debt and the value of the

property securing the loan.  A sufficient property value gives Ownit the ability to recover its investment if the loan defaults."

3.   **Statements concerning evaluation of exceptions and compensating factors**

(a)   "Exceptions to the guidelines will be made if the loan meets the primary criteria of the RightLoan and offers supported compensating factors when a deviation occurs.  In all cases, the exception(s) and compensating factor(s) are clearly documented in the file and require branch manager approval and a second signature from the corporate underwriter."

4.   **Statements concerning appraisal of the subject property**

(a)   "All appraisals should conform to the Uniform Standards of Professional Appraisal Practices.  Ownit requires the underwriter to review all appraisals for content and accuracy, pulling additional data if available or warranted.  Certain types of transactions require an enhanced desk or field review.  Loan amounts in excess of $650,000 require a second full appraisal.  The minimum square footage is 700 and deferred maintenance must be cosmetic in nature, not resulting in a health or safety hazard and should not exceed $3,500 cost to cure."

5.   **Other statements concerning quality control procedures of the originator**

(a)   "Ownit relies on the scoring models developed by the national credit bureaus: Experian, TransUnion and Equifax for much of that decision process.  Using a credit score methodology that requires a 2 repository merged in file score, the Brokers' credit report and score is used for qualification purposes.  Ownit will run a back up report to audit the Brokers' report for material variances such as social security number, fingerprint or depth.  The score used for qualification purposes is the middle of three or lower of two scores provided by the national bureaus for the primary wage earner.  The primary wage earner is defined as the borrower earning 51% of the total income.  A minimum trade history is required for all loan documentation types with certain accounts not considered valid trade lines.  The minimum credit score for all programs is 540."

(b)   "Certain events may restrict LTV and loan amount options available to a borrower.  Bankruptcy and Foreclosure history is considered, as well as charge off, collections, judgments and liens.  Liens that affect title must be paid off or subordinated.  Other delinquent accounts must be paid off depending on the aggregate

balance or seasoning; credit events that occurred over 24 months or have a balance less than $4,000 are not required to be paid.  The mortgage history is viewed with respect to the payoff/demand statement.  A prior mortgage history may not be greater than 59 days delinquent at closing or contractually 30 days late at closing."

**D.  Statements about underwriting guidelines of sponsor Nomura Credit & Capital, Inc.**

**1.  Statements concerning borrower's ability to repay the loan**

(a)  "Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

**2.  Statements concerning information evaluated in the loan application**

(a)  "Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts."

**3.  Statements concerning appraisal of the subject property**

(a)  "The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  Appraisers may be staff appraisers employed by the originator or

A-20

independent appraisers selected in accordance with pre-established appraisal procedure standards established by the originator.  The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the Mortgaged Property and to verify whether the Mortgaged Property was in good condition and that construction, if new, had been substantially completed.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property."

**E.     Additional representations and warranties**

1.     "The sponsor will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the trustee with respect to each Mortgage Loan.  In addition, the sponsor will represent and warrant, as of the Closing Date, that, among other things: (i) at the time of transfer to the depositor, the sponsor has transferred or assigned all of its right, title and interest in each Mortgage Loan and the Related Documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws . . ."

**VII.    The NHELI 2007-3 Securitization**

**Representations in the prospectus supplement filed May 1, 2007 for the NHELI 2007-3 Securitization with respect to the underwriting standards of ResMAE Mortgage Corporation and various originators (originating 10% of the loans or fewer) and of Nomura Credit & Capital, Inc., which originated or acquired loans in the Securitization**

**A.     Collateral**

1.     "[C]onventional, one- to four-family, fixed-rate and adjustable-rate mortgage loans (the 'Mortgage Loans') secured by first liens and second liens on residential real properties."

**B.     Statements about conformity with underwriting guidelines**

1.     "All of the mortgage loans were underwritten by ResMAE's underwriters having the appropriate signature authority."

2.     "All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."

C.     **Statements about underwriting guidelines of originator ResMAE Mortgage Corporation**

   1.     **Statements concerning borrower's ability to repay the loan**

      (a)     "The underwriting standards of ResMAE are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  ResMAE considers, among other things, a mortgagor's credit history, repayment ability and debt service-to income ratio (referred to herein as the Debt Ratio), as well as the value, type and use of the mortgaged property."

   2.     **Statements concerning information evaluated in the loan application**

      (a)     "ResMAE has one underwriting program called the 'TotalScore Program.' Within this underwriting program, there are three documentation types, the 'Full Documentation,' the 'Limited Documentation' and the 'Stated Income.' While each underwriting program is intended to assess the risk of default, the TotalScore Program makes greater use of credit bureau risk scores (referred to herein as the Credit Bureau Risk Score).  The Credit Bureau Risk Score is used in conjunction with, among other factors, mortgage payment history and seasoning on bankruptcy and/or foreclosure and as an aid to, not a substitute for, the underwriter's judgment. The underwriting staff fully reviews each loan to determine whether ResMAE's guidelines for income, assets, employment and collateral are met."

      (b)     "The TotalScore Program was developed to simplify the origination process for the licensed mortgage brokers approved by ResMAE.  In contrast to assignment of credit grades according to traditional non-agency credit assessment methods (i.e., mortgage and other credit delinquencies), the TotalScore Program relies upon a borrower's Credit Bureau Risk Score, mortgage ratings and seasoning on bankruptcy and/or foreclosure initially to determine a borrower's likely future credit performance."

   3.     **Statements concerning evaluation of exceptions and compensating factors**

      (a)     "On a case by case basis, ResMAE may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good

credit history, stable employment and time in residence at the applicant's current address. A substantial portion of the Mortgage Loans represent such underwriting exceptions."

**4.   Statements concerning appraisal of the subject property**

(a)   "ResMAE originates loans secured by 1-4 unit residential properties made to eligible borrowers with a vested fee simple (or in some cases a leasehold) interest in the property. The underwriting guidelines of ResMAE are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards, and if appropriate, a review appraisal. Generally, appraisals are provided by qualified independent appraisers licensed in their respective states. Review appraisals may only be provided by appraisers approved by the Originator. In most cases, ResMAE relies on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required in order to become approved to do business with ResMAE. Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises."

**5.   Other statements concerning quality control procedures of the originator**

(a)   "In all cases, a borrower's complete credit history must be detailed in the credit report that produces a given Credit Bureau Risk Score. Generally, the minimum Credit Bureau Risk Score allowed under the TotalScore Program is 500."

(b)   "ResMAE's underwriters verify the income of each applicant under the Full Documentation and Limited Documentation programs. Under Full Documentation, applicants are generally required to submit verification of stable year to date income and the preceding year's income; under Limited Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements. Under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application. Under all programs, the

income stated must be reasonable and customary for the applicant's line of work; also, a pre-closing audit is conducted to confirm that the borrower is employed as stated on the mortgage application.  Verification may be made through phone contact to the place of business, obtaining a valid business license or through Nexis On-Line Services."

(c)    "ResMAE conducts a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of mortgage loans to assure asset quality.  Under the compliance audit, all mortgage loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the post- funding quality procedure, a random selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing audit findings and level of error is provided quarterly to loan production for response.  The audit findings and responses are then reviewed by ResMAE's senior management.  Adverse findings are tracked monthly and reported quarterly.  This review procedure allows ResMAE to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training."

**D.    Statements about underwriting guidelines of sponsor Nomura Credit & Capital, Inc.**

**1.    Statements concerning borrower's ability to repay the loan**

(a)    "Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

**2.    Statements concerning information evaluated in the loan application**

(a)    "Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit

history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts."

**3.** **Statements concerning appraisal of the subject property**

(a) "The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure standards established by the originator.  The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the Mortgaged Property and to verify whether the Mortgaged Property was in good condition and that construction, if new, had been substantially completed.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property."

**E.** **Additional representations and warranties**

**1.** "The sponsor will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the trustee with respect to each Mortgage Loan.  In addition, the sponsor will represent and warrant, as of the Closing Date, that, among other things: (i) at the time of transfer to the depositor, the sponsor has transferred or assigned all of its right, title and interest in each Mortgage Loan and the Related Documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws . . ."