# Exhibit B

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,                        11 Civ. 6201 (DLC)

                -against-

NOMURA HOLDING AMERICA INC.,
NOMURA ASSET ACCEPTANCE
CORPORATION, NOMURA HOME
EQUITY LOAN, INC., NOMURA CREDIT
& CAPITAL, INC., NOMURA SECURITIES
INTERNATIONAL, INC., RBS
SECURITIES INC. (f/k/a GREENWICH
CAPITAL MARKETS, INC.), DAVID
FINDLAY, JOHN MCCARTHY, JOHN P.
GRAHAM, NATHAN GORIN, and N.
DANTE LAROCCA,

                Defendants.

---

# EXPERT REPORT OF ROBERT W. HUNTER
## REGARDING THE UNDERWRITING OF MORTGAGE LOANS
## UNDERLYING THE NOMURA SECURITIZATIONS

**May 15, 2014**

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

## TABLE OF CONTENTS

I.      Introduction ........................................................................................................1

II.     Summary of Opinions ........................................................................................2

III.    Qualifications ....................................................................................................3

        A.      Overview ................................................................................................3

        B.      Mortgage Lending Experience ...............................................................4

        C.      Consulting and Litigation Experience ...................................................9

IV.     Compensation ..................................................................................................10

V.      Supporting Documentation ..............................................................................11

VI.     General Principles of Reasonable Underwriting Between 2002 and 2007 ......11

        A.      The Purpose of Underwriting Guidelines .............................................11

        B.      Sound Underwriting Involves Evaluation of the Three C's of Lending ...............14

                1.      Character .....................................................................................14

                2.      Capacity ......................................................................................15

                3.      Collateral .....................................................................................18

VII.    The Securitization Process ..............................................................................19

VIII.   Nomura's Representations in the Offering Documents ...................................20

        A.      Representations Regarding the Origination of Mortgage Loans in
                Accordance With Underwriting Guidelines ..........................................21

                1.      Representations in the Prospectus Supplements Regarding the
                        Origination of Mortgage Loans in Accordance With Underwriting
                        Guidelines ...................................................................................21

                2.      Representations in the Originators' Underwriting Guidelines
                        Regarding the Origination of Mortgage Loans in Accordance With
                        Underwriting Guidelines .............................................................22

        B.      Representations Regarding Exceptions to Underwriting Guidelines ....................23

                1.      Representations in the Prospectus Supplements Regarding
                        Exceptions to Underwriting Guidelines ......................................23

                2.      Representations in the Originators' Underwriting Guidelines
                        Regarding Exceptions to Guidelines ............................................24

        C.      Representations Regarding the Use of Automated Underwriting Systems ..........26

                1.      Representations in the Originators' Underwriting Guidelines
                        Regarding the Use of Automated Underwriting Systems ..........................27

        D.      Representations Regarding Evaluation of the Borrower's Ability and
                Willingness to Repay the Mortgage Loan ............................................28

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

1.      Representations in the Prospectus Supplements Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan ...................................................................28

2.      Representations in the Originators' Underwriting Guidelines Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan .......................................................29

3.      Minimum Industry Standards Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan ..........34

E.      Representations Regarding Evaluation of the Adequacy of the Underlying Mortgage Collateral ...................................................................36

     1.      Representations in the Prospectus Supplements Regarding Evaluation of the Adequacy of the Underlying Mortgage Collateral ........36

     2.      Representations in the Originators' Underwriting Guidelines Regarding Evaluation of the Adequacy of the Underlying Mortgage Collateral ...........................................................37

     3.      Minimum Industry Standards Regarding the Evaluation of the Adequacy of the Underlying Mortgage Collateral .....................................41

F.      Representations Regarding Credit Information ...................................................43

     1.      Representations in the Prospectus Supplements Regarding Credit Information ...................................................43

     2.      Representations in the Originator's Underwriting Guidelines Regarding Credit Information ...................................................44

     3.      Minimum Industry Standards Regarding Credit Information ...................49

G.      Representations Regarding Income and Employment Verification Under Full and Reduced Documentation Programs ...................................................52

     1.      Representations in the Prospectus Supplements Regarding Income and Employment Verification Under Full and Reduced Documentation Programs ...................................................52

     2.      Representations in the Originators' Underwriting Guidelines Regarding Income and Employment Verification Under Full and Reduced Documentation Programs ...................................................53

     3.      Minimum Industry Standards Regarding Income and Employment Verification Under Full and Reduced Documentation Programs .............56

H.      Representations Regarding Reasonableness of Income and Employment Verification Under Stated Income Documentation Programs .............................58

     1.      Representations in the Prospectus Supplements Regarding Reasonableness of Income and Employment Verification Under Stated Income Documentation Programs ...................................................59

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

2.      Representations in the Originators' Underwriting Guidelines Regarding Reasonableness of Income and Employment Verification Under Stated Income Documentation Programs ...................60

3.      Minimum Industry Standards Regarding Reasonableness of Income and Employment Verification Under Stated Income Documentation Programs.................................................................62

I.      Representations Regarding Credit Scores, LTV/CLTV Ratios, and DTI Ratios .......................................................................................................66

      1.      Representations in the Prospectus Supplements Regarding Credit Scores, LTV/CLTV Ratios, and DTI Ratios.........................69

      2.      Representations in the Originators' Underwriting Guidelines Regarding Credit Scores, LTV/CLTV Ratios, and DTI Ratios ................71

      3.      Minimum Industry Standards Regarding Credit Scores, LTV/CLTV Ratios, and DTI Ratios .............................................73

J.      Representations Regarding Owner Occupancy ....................................75

      1.      Representations in the Prospectus Supplements Regarding Owner Occupancy.....................................................................76

      2.      Representations in the Originators' Underwriting Guidelines Regarding Owner Occupancy ....................................................77

      3.      Minimum Industry Standards Regarding Owner Occupancy..................79

K.      Representations Regarding Hazard and Title Insurance .......................80

      1.      Representations in the Prospectus Supplements Regarding Hazard and Title Insurance.....................................................................80

      2.      Representations in the Originators' Underwriting Guidelines Regarding Hazard and Title Insurance ......................................81

      3.      Minimum Industry Standards Regarding Hazard and Title Insurance .......................................................................................82

L.      Representations Regarding the Mortgage Loans' Compliance With Laws...........83

      1.      Representations in the Prospectus Supplements Regarding the Mortgage Loans' Compliance With Laws..................................83

      2.      Representations in the Originators' Underwriting Guidelines Regarding the Mortgage Loans' Compliance With Laws .........................83

      3.      Minimum Industry Standards Regarding the Mortgage Loans' Compliance With Laws.......................................................85

IX.      My Use of Minimum Industry Standards ........................................................86

X.      The Re-Underwriting Review of a Random Sample of Mortgage Loans from Each Securitization .......................................................................................................89

A.      The Selection of Mortgage Loan Files for Re-Underwriting................................89

      1.      Source of the Mortgage Loan Files............................................89

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

|  | 2. | Sample Methodology .................................................................90 |
|  | 3. | Identification of Mortgage Loan Files ......................................90 |
|  | 4. | Selecting Applicable Underwriting Guidelines for the Mortgage Loans .........................................................................................91 |
| B. | The Process of Re-Underwriting the Mortgage Loans ..........................93 |
|  | 1. | The Role of Digital Risk, LLC and Opus Capital Markets Consultants, LLC ......................................................................93 |
|  | 2. | The Re-Underwriting Review....................................................95 |
| XI. | My Opinions Regarding the Mortgage Loans ..............................................102 |
| A. | Many of the Mortgage Loans Did Not Comply With the Originators' Underwriting Guidelines or the Minimum Industry Standards .........102 |
| B. | The Originators Failed to Investigate Red Flags in Certain Mortgage Loans....................................................................................................104 |
| C. | Certain Mortgage Loans Did Not Contain Required Credit Information ...........106 |
| D. | Certain Mortgage Loans Did Not Contain Explanations for Recent Credit Inquiries ....................................................................................107 |
| E. | The Originators Failed to Assess Income Reasonableness for Certain Stated Income Loans ..........................................................................109 |
| F. | Certain Mortgage Loans Failed to Comply with Credit Requirements ..............111 |
|  | 1. | Certain Mortgage Loans Exceeded LTV or CLTV Ratio Limits ............111 |
|  | 2. | Certain Mortgage Loans Exceeded DTI Ratio Limits ............................113 |
| G. | The Prospectus Supplement Collateral Tables Overstated the Owner-Occupancy Status of the Underlying Mortgage Loans .......................115 |
| H. | Information Contained On The Pre-Closing Loan Tapes Did Not Match the Credit Characteristics of Many of the Mortgage Loans................116 |
| XII. | Conclusion ..................................................................................................118 |

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

## I.    Introduction

I have been retained by Quinn, Emanuel, Urquhart & Sullivan LLP, counsel for Plaintiff Federal Housing Finance Agency ("FHFA"), as Conservator of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, the "GSEs"), to provide an expert opinion on whether samples of loans from each of the seven Supporting Loan Groups ("SLG")[1] from the seven securitizations at issue in this Action (the "Securitizations")[2] complied with statements relating to the underwriting and credit quality of such loans in the Offering Documents[3] for each Securitization.  I have examined the sample loans from each SLG to determine whether the loans (i) were originated or acquired in accordance with the originators' underwriting guidelines or with underwriting guidelines approved by the originators; (ii) were properly evaluated to determine whether they were likely to be repaid, either pursuant to the appropriate underwriting guidelines or minimum industry standards; (iii) had a qualified appraisal performed to assess the adequacy of the collateral; (iv) were supported by a property with sufficient value to adequately support the mortgage loan obligation; (v) were, if applicable, excepted from the originator's underwriting guidelines only when supported by sufficient compensating factors that were properly documented; and (v) complied with the requirements of federal and state laws.  In addition, I was asked to opine on whether, based on the sample mortgage loans I reviewed, the data contained in the collateral tables found in the Offering Documents and the pre-closing loan tapes were

---

[1]    A Supporting Loan Group is a subdivision of the mortgage loans included in a Securitization.  Each SLG backs one or more Certificates.  Each Certificate entitles its holder to a specified portion of the cash flows from the underlying mortgages in the SLG.

[2]    A list of the Securitizations at issue is attached as Exhibit 1.

[3]    "Offering Documents" refers to the Prospectus and Prospectus Supplement filed as part of a Shelf Registration Statement with the Securities and Exchange Commission for each Securitization.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

accurate.  Where departures from the representations asserted in the Offering Documents were identified, I conducted an analysis to determine the impact that each had on the represented credit risk of the mortgage loan.  I then determined whether the loan's credit risk was higher than represented in the Offering Documents.

## II.    Summary of Opinions

In reaching the opinions contained in this report, I directly supervised the re-underwriting of a random sample of 723 mortgage loans, which included approximately 100 mortgage loans from each of the seven SLGs related to the seven Securitizations (the "Mortgage Loans").[4]

As I describe in greater detail in Section XI below, it is my expert opinion that:

1.    78.28% of the Mortgage Loans in the Securitizations were not originated in accordance with the requirements of the relevant originator's underwriting guidelines.

2.    90.46% of the Mortgage Loans in the Securitizations were not properly evaluated to determine if they were at risk of not being repaid or not adequately supported by the collateral.

3.    24.62% of the Mortgage Loans in the Securitizations had a loan-to-value ("LTV") ratio and/or combined loan-to-value ("CLTV") ratio that was not accurately disclosed.

4.    18.69% of the Mortgage Loans in the Securitizations had mortgaged properties that were inaccurately disclosed as being owner-occupied.

5.    56.98% of the Mortgage Loans in the Securitizations had characteristics, such as FICO scores, LTV and CLTV ratios, owner-occupancy status, property types, or loan amounts, that were inconsistent with the pre-closing loan tapes.

---

[4]    As described in further detail in Section X, Dr. Cowan selected a random sample of 100 mortgage loans per SLG to re-underwrite.  It is my understanding that, for the NAA 2006-AR6 Securitization, an insufficient number of loan files were produced for the initially identified sample loans.  For that Securitization, Dr. Cowan drew an additional random sample, resulting in a total of 196 sample loans, of which 131 could be re-underwritten.  Among the remaining Securitizations, there were an additional eight sample loans that could not be re-underwritten.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

The chart below reflects the number and percentage of Mortgage Loans in each of the seven Securitizations that suffered from underwriting defects and, as a result, had a substantially increased credit risk.[5]

| Securitization | Number of Mortgage Loans Reviewed | Number of Mortgage Loans With Substantially Increased Credit Risk | Percentage of Mortgage Loans With Substantially Increased Credit Risk |
|---|---|---|---|
| NAA 2005-AR6 | 131 | 102 | 77.86% |
| NHELI 2006-FM1 | 100 | 81 | 81.00% |
| NHELI 2006-FM2 | 100 | 85 | 85.00% |
| NHELI 2006-HE3 | 99 | 75 | 75.76% |
| NHELI 2007-1 | 98 | 79 | 80.61% |
| NHELI 2007-2 | 98 | 77 | 78.57% |
| NHELI 2007-3 | 97 | 72 | 74.23% |
| **Total** | **723** | **571** | **78.98%** |

A spreadsheet summarizing the data underlying my review of the Mortgage Loans is included as Exhibit 2, and the supporting documentation for each identified defect is contained on the FTP site accompanying my Report and labeled as Exhibit 3. My opinions are based on my review of the re-underwriting results, documents, information, and testimony provided to me, and my more than 40 years of experience in the banking and mortgage industry. I reserve the right to amend, supplement, and/or revise my opinions should new and material information become available to me.

## III.   Qualifications

### A.   Overview

I have more than 40 years of experience in the financial services industry, primarily in banking and mortgage lending. I have worked in every phase of mortgage lending: loan processing, loan underwriting, servicing, secondary marketing, and investment management. I

---

[5]   It is *not* my opinion that the remaining Mortgage Loans were properly underwritten or should have been included in the Securitizations.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

have underwritten all types of mortgage credits, including residential, multi-family, and commercial real estate.  I have managed and traded investment portfolios containing private label and government-sponsored entity securities composed of subordinate loans, non-performing loans, and prime quality residential loans.

I have been a consultant on numerous projects, including helping to set up the risk management function for a new bank.  I have also performed credit due diligence on several acquisitions and investment transactions, reviewed loan originations to identify possible origination fraud, analyzed securities investment portfolios for a government-sponsored insurance company, and served as the acting chief credit officer for a large savings and loan association.  I have been a frequent speaker on mortgage industry panels.  I have received the Mortgage Bankers Association's professional designation of Master Certified Mortgage Banker (CMB®), reflecting competency in all issues relating to both commercial and residential real estate finance.

A copy of my *curriculum vitae*, which is not intended to be an exhaustive representation of my professional and educational experience, is attached as Exhibit 4.  The summary below supplements my *curriculum vitae* to provide more details regarding my experience with mortgage lending.

**B.     Mortgage Lending Experience**

I have been actively engaged in residential mortgage lending and related work since 1972.  The experience I have gained in mortgage lending includes my work for various financial institutions, including Freedom Federal Savings and Loan Association (1972-1982), Northeast Savings, F.A. (1982-1990), First Commonwealth Savings (1991-1994), Crestar Bank (1994-1998), SunTrust Bank (1999-2000), and Treasury Bank/Countrywide Bank (2001-2005).  I have

4

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

also worked at Amherst Securities/Amherst Holdings as a credit analyst, where I was primarily responsible for residential mortgage market and housing analysis.

From 1972 to 1982, I worked for Freedom Federal Savings and Loan Association (Worcester, MA), then the largest savings and loan association ("S&L") in New England. At Freedom Federal, I worked primarily in mortgage lending, serving as the bank's senior residential loan underwriter and holding ultimate approval authority on all residential loans. My job responsibilities included loan origination, underwriting, and loan servicing. I also managed the direct servicing activities for the bank's multi-family loan portfolio, which was composed of primarily HUD-insured properties. In 1976, I started the bank's secondary marketing activity, including obtaining all necessary approvals from Freddie Mac, Fannie Mae, and the Government National Mortgage Association ("Ginnie Mae"). I originated, issued, and sold one of the first Ginnie Mae multi-family securities issued by a New England lender. In 1980, I initiated the bank's loan sales to Fannie Mae, which resulted in the bank becoming the third largest seller in the Northeast to Fannie Mae.

In 1982, Freedom Federal merged with Northeast Savings, F.A. (Hartford, CT), one of the top 10 largest S&Ls in the country. From 1982 to late 1983, I managed the bank's secondary market activities. In late 1983, I relocated to Hartford, Connecticut to serve as the bank's senior mortgage investment manager, responsible for managing the bank's residential mortgage portfolio. In this role, I was responsible for buying, selling, and trading all types of mortgage related investments, including mortgage loans, GSE-issued residential mortgage backed securities ("RMBS"), and private label RMBS. I also directed the in-house team that reviewed loan purchases and negotiated the bank's relationship with large mortgage banking companies, including setting up a loan commitment program to buy residential adjustable rate mortgage

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

loans ("ARMs") from nationwide conduits.  In the course of overseeing Northeast Savings' loan

commitment program, I created the bank's loan quality standards, as well as pricing and product

guidelines.  Northeast Savings' participation in the loan commitment program generated more

than $400 million in loans over a two and one-half year period.  Northeast Savings was one of

the largest purchasers of ARM loans and MBS securities for its own portfolio in the country.  In

October 1988, I assumed the additional responsibility for managing the bank's wholesale

liability activities along with the mortgage investments, managing a group of four liability

traders that priced and managed the bank's $3 billion wholesale liability transactions (*e.g.*,

wholesale CDs, FHLB advances, and reverse repos).

I left Northeast Savings in May 1990 and, in September 1991, joined Shannon Hunter

Advisors, a wholly owned subsidiary of First Commonwealth Bank (Alexandria, VA).  At

Shannon Hunter, I was responsible for the analysis, pricing, and trading of loan portfolios

acquired from the Resolution Trust Corporation ("RTC") or third party asset sales.  These

portfolios were acquired for the parent company's balance sheet and also for trading in the

secondary market.  My responsibilities included analyzing and trading portfolios of residential

loans and commercial real estate.  I was also responsible for mitigating losses on under-

performing or non-performing assets.

In June 1994, I joined Crestar Bank (Richmond, VA) as the senior mortgage portfolio

manager, responsible for managing the MBS/ABS, RMBS, and residential loan portfolio.  In

managing the portfolio, I negotiated the bank's purchase and sale of all mortgage related assets,

including sales of portfolios of loans acquired through multiple bank acquisitions.  I also served

as the portfolio liaison to the Credit Review group on bank acquisitions, responsible for

reviewing the portfolio credit quality and establishing the bank's acquisition price and loan loss

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

reserve analysis.  I developed a credit quality program to analyze and quantify the risk

characteristics of loan acquisitions and sales.  I also initiated the bank's entry into residential

asset backed security ("ABS") investing, working with our credit managers to set up investment

and portfolio characteristics.  And, in 1997, I assumed the role of President and Chief Investment

Officer of CRE, Crestar's real estate investment trust company that was formed to hold

residential mortgage loans.

Crestar merged with SunTrust Bank (Atlanta, GA) in January 1999.  I remained with the

Richmond operations until October 2000, throughout which time I was responsible for managing

the Crestar residential loan portfolio activities.

In March 2001, I joined Treasury Bank, NA, a subsidiary of Countrywide Industries,

which subsequently changed its name to Countrywide Financial Corporation ("CFC").  Although

Treasury Bank was an affiliate of Countrywide Mortgage, its activities were separate.  Treasury

Bank was supervised by the Office of the Comptroller of the Currency ("OCC"), and I

understand that the activities between Treasury Bank and Countrywide Mortgage were subject to

specific restrictions and approval under Sections 23A and 23B of the Federal Reserve Act.

Treasury Bank did not securitize residential mortgage loans, but rather originated loans for its

own portfolio.  To the best of my knowledge, information, and belief, while I was employed at

Treasury Bank, the loans that I managed were not securitized or sold.

At Treasury Bank, I served as Chief Credit Officer ("CCO") responsible for managing

the company's mortgage credit risk, including all portfolio reporting, credit quality management,

loan servicing oversight, and vendor management.  As CCO, I set up and managed the bank's

loan loss reserve methodology, which was based on expected losses by loan type, credit profile

(*e.g.*, FICO, LTV, etc.), seasoning, and origination channel.  I was also a voting member of the

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

Bank Loan Committee and the chairperson of the Loan Committee's Credit Quality Oversight sub-committee.

As part of my responsibilities, I set up and managed Treasury Bank's Credit Quality Group, which reviewed all loan originations for compliance with bank credit requirements. The Credit Quality Group conducted monthly reviews of a random and adverse sample of all loan acquisitions and reviewed loans for credit and regulatory compliance. When necessary, the Credit Quality Group also tried to remediate non-performing loans with the sellers or arrange for the repurchase of those loans. The Credit Quality Group also developed a series of weekly and monthly status reports to inform bank management of its credit findings and remediation efforts.

In July 2005, I left Treasury Bank and engaged in consulting work, which is described more fully below, for almost three years.

In 2008, I joined Amherst Holdings ("Amherst"), the holding company for Amherst Securities, a regional broker dealer that specializes in mortgage related investments. At Amherst, I specialized in mortgage and credit related projects, working with proprietary credit analytics. I wrote and edited the company's monthly ABX Index Review and assisted the senior Mortgage Strategist on several projects and articles that were published. I also worked on Amherst's preliminary reviews and analyses of breaches of representations and warranties relating to mortgage loans backing RMBS. During the time period I was at Amherst, I was a frequent speaker and panelist at mortgage industry seminars, including the National Home Builder's Roundtable and the Five Star Default Servicing Conference. I left Amherst in July 2012 because they closed the Washington D.C. area office where I worked, and I did not wish to relocate.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### C.       Consulting and Litigation Experience

I have five years of experience as a consultant to institutions in the banking and mortgage industry, working for myself or as part of a team for larger projects.  In 2005, after I left Treasury Bank, I provided consulting services to a Washington D.C.-based community development bank, City First Bank.  I helped the bank revise its commercial loan processing, credit monitoring systems, and appraisal review process.  I also worked for the same institution again in 2007-2008 to revise its credit and loan loss reserve methodology to comply with new commercial real estate loan guidance from the OCC.

In 2006, I served as the acting Chief Credit Officer for a $50 billion thrift institution, helping the bank set up a revised portfolio review process and reviewing new products and loan loss models.

Beginning in 2006 and into 2007, I worked with DirecTex Holdings, a Texas-based group that was applying to the Office of Thrift Supervision ("OTS") for approval to transfer the charter of a bank to a new group.  I was the designated Chief Risk Manager, responsible for setting up the bank risk management infrastructure.  In this role I was responsible for writing potential loan policies and assisting in the development of underwriting systems.  I also assisted the Chief Executive Officer in arranging possible capital funding and in reviewing potential loan origination sources.

In 2007, I worked with Hilltop Advisors on several loan review projects.  These loan reviews included analyzing credit reserves and loss methodologies in connection with a potential equity investment in a bank, and the review of a mortgage origination platform for possible loan fraud and potential loan repurchase risk.  Since 2012, after I left Amherst, I have again provided consulting services to Hilltop on several projects.  These projects included analyzing and pricing

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

a portfolio of distressed residential loans for a bank client, managing a review of a large

mortgage company's quality control and underwriting processes, performing due diligence on a

potential acquisition of a mortgage servicing company, and working on several review audits of

a mortgage company's policies and procedures for pending lawsuits.

I began working with Payne Advisory and Richard W. Payne III in January 2013 on

litigation-related matters, including the FHFA coordinated actions.  I have also been engaged as

an expert witness by RMBS investors in several other lawsuits involving potential breaches of

mortgage representations and warranties.

I have been a frequent speaker on mortgage industry panels, most recently in July 2012

on the panel for Loss Mitigation programs at the Mortgage Servicing Conference in Dallas, TX.

I have been a Member of the CMB® Oral Interview panels and an instructor on the CMB®

Review program.

I have a M.B.A. in finance from Clark University and a B.A. in political science from

Assumption College.  I graduated from the MBA School of Mortgage Banking.  I have been

awarded the professional Mortgage Banking designation of Master Certified Mortgage Banker

(CMB®).

## IV.   Compensation

I am being compensated for my work on this engagement at a rate of $350 per hour for

review and research-related tasks, $400 per hour for report writing, and $450 per hour for time

related to deposition or court testimony.[6]  My fees are not contingent upon the opinions I render

or the outcome of this case.

---

[6]  I am not compensated for non-working travel time, but I am reimbursed at cost for any
out-of-pocket expenses.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

## V.     Supporting Documentation

For my work on this engagement, I have been provided access to the following information:  (1) certain publicly available documents; (2) certain documents produced by FHFA in this action; (3) certain documents produced by Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., and Nomura Securities International, Inc. (together, "Nomura"); (4) certain documents produced by defendants in the other related actions pending in the Southern District of New York (together with Nomura, the "Defendants"); (5) deposition transcripts of certain Nomura witnesses; (6) certain information relating to the Mortgage Loans that were reviewed as part of the re-underwriting review, including loan files and underwriting guidelines; and (7) certain appraisal related information from Dr. John Kilpatrick.

The documents that I have considered and relied on in formulating my opinions regarding the Mortgage Loans are listed in Exhibits 5 and 5A.

## VI.    General Principles of Reasonable Underwriting Between 2002 and 2007

### A.     The Purpose of Underwriting Guidelines

In any type of lending, the risk of non-payment, *i.e.*, the possibility that a borrower will fail to perform as agreed, is managed by a lender's risk management practices.  The first line of defense against excessive credit risk is sound underwriting—the initial process by which a lender grants credit to a borrower.  For example, sound underwriting practices requires identification of those borrowers whose financial performance is poor or marginal, or whose repayment ability is dependent upon unproven projections, because these borrowers' abilities to fulfill their mortgage

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

loan obligations can quickly become impaired by personal and external economic stress.[7] Essential to the execution of prudent underwriting practices is an efficient and balanced mortgage application approval process implemented by a competent lending staff.

An underwriting policy is the primary means by which a lending institution sets its lending standards. The underwriting policy provides a framework to evaluate asset quality, set risk tolerances, and guide lending activities. An underwriting policy must be supplemented by more detailed underwriting standards, guidelines, and procedures.[8]

Underwriting guidelines provide a methodology for a lender to make a prudent lending determination. A lender's adherence to underwriting guidelines is essential for numerous reasons. First, underwriting guidelines provide a consistent and reliable framework to evaluate the credit risk presented by a loan. Second, adherence to the governing underwriting guidelines leads to uniform loan underwriting determinations. Third, adherence to underwriting guidelines ensures compliance with regulatory and legal requirements. Fourth, because adherence to underwriting guidelines provides a reliable basis to assess the credit risk of a loan, a lender who underwrites a loan in conformance with the governing underwriting guidelines creates an asset with ascertainable quality and value. Lastly, underwriting loans in conformance with underwriting guidelines enables the lender to obtain accurate and reliable information concerning the credit risk of those loans.

Underwriting guidelines sometimes allow for exceptions to be made when compensating factors sufficiently offset the increased credit risk presented by non-compliant loans. For example, a borrower maintaining a credit score below a lender's established minimum for a

---

[7]   *See* OCC Comptroller Handbook, Loan Portfolio Management (1998), http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/lpm.pdf.

[8]   References to underwriting policy will include loan policy statements and all supplements.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

particular loan program may otherwise qualify for a mortgage loan if that borrower had a
sufficiently high income or if he placed a sufficient amount of equity in the home to offset the
increased credit risk presented by his low credit score.

An underwriting policy should address exceptions specifically. The policy should state
under what circumstances exceptions are acceptable and how exceptions should be identified and
documented. Policy exceptions should require heightened reporting. Policy exceptions need to
be tracked and documented, especially in a portfolio. Individual policy exceptions may not
appear to increase risk significantly, however, when aggregated within a portfolio or pool, even
well mitigated exceptions can increase pool risk significantly. An excessive volume or pattern of
exceptions may signal an unjustified relaxation of the underwriting policy.

Nomura's witnesses acknowledged these fundamental principles of mortgage loan
underwriting. For example, Joseph Kohout, the head of Nomura's credit and due diligence
group, testified that "[u]nderwriting guidelines are a . . . manifesto of how loans should both be
purchased and closed along with eligibility requirements for the purchase of loans."[9] Brett
Marvin, a Managing Director at Nomura, testified that, while individual loans might have
compensating factors, "as a general matter, it's important for the originator to underwrite its
loans in conformance with its guidelines," *i.e.*, that there be "adherence to underwriting
guidelines."[10]

As to exception loans and the presence of compensating factors, Dante Larocca, a
Managing Director at Nomura, testified that "[a] compensating factor would be . . . anything that

---

[9]   Deposition of Joseph Kohout, dated Nov. 22, 2013 and Dec. 6, 2013 ("Kohout Dep."),
at 28:11-19; *see also* Deposition of Neil Spagna, dated Nov. 13, 2013 ("Spagna Dep."), at 23:12-
15. ("Guidelines are a framework for, you know, how a mortgage originator will approve the
loans. That simple.").

[10]   Deposition of Brett Marvin, dated Nov. 19, 2013 ("Marvin Dep."), at 212:15-213:12.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

the underwriter in the origination of the loan or our diligence guys thought offset the exception that was taken to guidelines or the . . . fact that was raising the red flag."[11]  Similarly, Jeffrey Hartnagel, a Nomura due diligence manager, testified that compensating factors needed to be "significant" and have "weight," *i.e.*, they "could not be a minor occurrence or a minor issue."[12] Therefore, any exceptions to the guidelines still had to conform to prudent lending standards that, at a minimum, required loan characteristics establishing a borrower's ability to repay the loan.

### B.      Sound Underwriting Involves Evaluation of the Three C's of Lending

Sound underwriting practices necessitate the consideration of the borrower's "character," "capacity," and "collateral," which are commonly referred to as the Three C's of Lending.[13] Consideration of the Three C's enables a lender or investor to evaluate the risk that the loan will not perform and the severity of loss in the case of default.

### 1.      Character

In the context of underwriting a mortgage loan, "character" is a term of art that refers to the borrower's willingness to make his mortgage payments on time.  A borrower's credit score (often called a Fair, Isaac & Company, or FICO, score) and credit history are accepted in the mortgage industry as indicia of the borrower's willingness to fulfill his or her mortgage loan obligation and are the primary bases upon which character is assessed.  Lenders obtain

---

[11]   Deposition of Dante Larocca, dated Oct. 17, 2013 ("Larocca Dep."), at 83:15-84:2.

[12]   Deposition of Jeffrey Hartnagel, dated Nov. 25, 2013 and Dec. 2, 2013 ("Hartnagel Dep."), at 482:15-483:9.

[13]   Some in the industry break out the concepts of "Capital" and "Conditions" as two additional categories, together comprising the "Five Cs" of Lending.  I consider those two categories to be subsumed in the Three Cs of Lending.  "Capital" refers to the sufficiency of a borrower's assets.  "Conditions" are essentially "red flags" in the loan file that call into question the borrower's ability or willingness to repay the loan or the value of the subject property.  If a red flag is identified, the underwriter should investigate it and determine whether it materially increases the credit risk of the loan, as well as obtain a written explanation from the borrower or other source documenting that the condition does not materially increase the loan's risk.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

information about a borrower's credit score and credit history by acquiring a credit report for the borrower. A credit report contains a large amount of information about a borrower, including current and past residential street addresses, date of birth, social security number, discharged and open bankruptcies, judgments, liens, and credit history. The credit history is reflected in a series of reports from creditors, such as banks, mortgage companies, and credit card companies. Each report—referred to as a "trade line"—includes the date on which the credit relationship commenced, the account number, the credit limit granted, the greatest amount of credit the borrower has used on the account, the current balance, the current monthly payment, the borrower's payment history, current payment status, the number of late payments (if any), and the severity of any late payments. In addition to evaluating the borrower's willingness to pay based on past debt service, these details in the credit report allow the underwriter to test the accuracy of the information contained in the borrower's loan application.

In addition to meeting required minimum credit scores, information contained within a credit report may be needed to determine whether a borrower qualifies for a loan. For example, a lender's underwriting guidelines may require that a borrower's credit report contain at least three trade lines, or it must not show any mortgage payments that were late by more than 30 days within the previous two years. Lenders often incorporated requirements such as these into their underwriting guidelines to avoid the heightened credit risk presented by a borrower whose credit history indicated an unwillingness to fulfill his or her mortgage obligations.

### 2.     Capacity

"Capacity" refers to the borrower's ability to repay the mortgage loan. A lender must inquire into the borrower's capacity because the borrower's ability to repay the mortgage loan is the lender's primary source of repayment. A borrower's income, employment, assets, and debt-

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

to-income ("DTI") ratio, as well as any payment shock[14] embedded within the repayment schedule, are the primary data points for evaluating a borrower's ability to repay.  This inquiry into a borrower's capacity should include an assessment of the borrower's continuing ability to repay the loan over the entire length of the loan since mortgage loans are long-term commitments.

A component of capacity is "capital."  From a credit perspective, capital refers to the sufficiency of the borrower's funds to pay the down payment and closing costs, and to funds held in reserve for future mortgage payments.  A down payment is the borrower's initial cash contribution to the cost of the property, which is often referred to as the borrower's "equity." Closing costs are the costs and fees imposed upon a borrower at the time of loan origination, such as the appraisal fee, the cost of obtaining the credit report, and the cost of a title insurance policy.  Reserve funds are intended to ensure that the borrower has a sufficient cushion to continue making scheduled payments on the mortgage loan, including principal, interest, taxes and insurance ("PITI") payments, in the event that the borrower encounters unplanned financial difficulties, such as loss of employment or illness.

The method by which a prudent underwriter will conduct a capacity analysis depends on the documentation type of the loan.  A "full documentation" or "full doc" loan requires the borrower to substantiate his or her income with documentation, such as W-2 forms, income tax returns, and/or pay stubs.  Such documentation allows the underwriter to verify the borrower's income and evaluate the likelihood of future employment.  Other pieces of information on the loan application—including the length of time that the borrower has worked for his or her current employer or in his or her current field or industry—further allows the underwriter to

---

[14]   "Payment shock" refers to a substantial increase in the borrower's housing payments.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

evaluate the likelihood that the borrower will remain employed for a sufficient length of time to repay the mortgage loan.

Sound underwriting requires verification of the borrower's assets in addition to verification of income.  Thus, a full doc loan normally requires the borrower to provide documentation of assets, such as bank account statements.  A borrower's accumulation of assets should correlate with the borrower's income.  When verifying the borrower's assets, the underwriter should ensure that the borrower has sufficient cash to pay the loan closing fees and the down payment from the borrower's own funds.  Additionally, lenders usually require the borrower to fund a reserve account or escrow, which will fund tax and insurance payments for three to six months after the loan is originated.

A lender may also offer loans to qualified borrowers who are unable or not required to provide the documentation required under a full documentation loan program—for instance, to self-employed borrowers.  For reduced documentation loan programs, the underwriter should use other sources of information to verify the borrower's income.  For example, if the program is for stated income loans, the underwriter should assess the reasonableness of the borrower's stated income.  If a self-employed borrower submits his or her tax returns and a letter from an accountant confirming the length of the borrower's employment in his current line of business, the underwriter should confirm that the author is, in fact, an accountant, and should independently verify that the borrower's company is still in business.  In addition, third-party sources such as Salary.com, PayScale.com, Theworkplace.com, and the Bureau of Labor Statistics ("BLS") provide a means for testing the reasonableness of a borrower's stated income by providing a salary range based on occupation, job title, time on the job, the number of years of the individual's employment, and/or the borrower's geographic location.  Sound underwriting

17

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

requires that the loan underwriter determine whether the borrower's income is reasonable in

order to assess adequately the borrower's ability to repay the loan.

An analysis of capacity should also take into consideration whether the loan is a fixed

rate mortgage ("FRM") or an adjustable rate mortgage ("ARM").  The interest rate on an ARM

loan resets periodically and can increase from the rate at the time of origination.  Accordingly,

the underwriter should take into account, and factor into the risk evaluation, whether a borrower

will have the continued ability to make payments on the mortgage loan once the rate is reset.

### 3.    Collateral

In assessing the risk of a loan, an analysis should be undertaken to determine whether the

value of the mortgaged property is sufficient to support repayment of the loan if the borrower

defaults.  "Collateral" refers to the value of the underlying asset pledged by the borrower as

security for the debt obligation—here, the mortgaged property.  The primary tool for determining

a subject property's market value is through an appraisal of the property.  Because the value of

the subject property represents an alternative source of repayment of the mortgage loan, the

underwriter must be satisfied that the appraisal accurately reflects the amount of money that

could be obtained if the property were sold in a foreclosure proceeding.  The accuracy of the

valuation becomes especially important for a second mortgage, where the lender will take the

second lien position and will therefore only recover residual proceeds after the holder of the first

lien position is reimbursed.  An overstated appraisal increases the likelihood that the liquidated

collateral value will be insufficient to cover the first and any second mortgage on the subject

property, and therefore increases the credit risk of the mortgage loan.

Therefore, an underwriter must carefully assess the validity of the appraisal.  First, the

underwriter should verify that the appraiser is qualified to provide estimates of the property's

market value.  At a minimum, the appraiser should be licensed in the state where he or she works

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

and should have experience in appraising the type of property at issue.  Second, the underwriter should review the appraisal report to ensure that it reflects details and characteristics about the property and local market that support the appraised value.  Among other things, the appraisal report should include sufficient information about properties recently sold in the same geographic area (*i.e.*, "comparables," or "comps").  The comps should be similar to the subject property with respect to the characteristics that drive value—for instance, gross living area, number of bathrooms, physical design, and construction quality.  After comparison with the subject property, the appropriate positive and negative adjustments should be made to the comparable sales as part of the process to determine the appropriate market value of the subject property.

## VII.    The Securitization Process

Based on my review of the documents, I understand that Nomura was the sponsor for all seven of the Securitizations.  As sponsor, Nomura, operating as Nomura Credit & Capital, Inc. ("Nomura Credit"), originated or purchased the underlying mortgage loans, pooled the loans together, participated in structuring the securities, and assigned the mortgage loans to special purpose vehicles, called depositors.  In this case, the depositors were subsidiaries of Nomura: Nomura Asset Acceptance Corporation ("NAA") and Nomura Home Equity Loan, Inc. ("NHELI").  The depositors then assigned the mortgage loans and certain associated rights to securitization trusts, which issued the Certificates that investors, including Fannie Mae and Freddie Mac, purchased.  The loans in the Securitizations consist of Alt-A, subprime and pay option ARM residential mortgage loans acquired by Nomura Credit between 2004 and 2007.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

## VIII.   Nomura's Representations in the Offering Documents

Each Securitization was issued pursuant to Offering Documents filed with the Securities and Exchange Commission.  The Offering Documents contained various representations attesting to the credit quality of the mortgage loans underlying the Securitizations, certain of which I focus on in more detail below.  As part of this discussion, I describe representations explicitly contained in the Offering Documents, as well as statements contained in the originators' underwriting guidelines.  I have included underwriting guideline representations in this narrative because the Offering Documents explicitly represented that the originators complied with all provisions of their underwriting guidelines.  Thus, these underwriting guidelines were incorporated by reference into the Offering Documents.[15]  For purposes of this narrative overview, I have focused on the underwriting guidelines from nine of the originators that were specifically named and discussed in the Offering Documents (the "Originators").[16]  Together, these Originators originated or acquired more than 82% of all loans in the SLGs.

In addition, I have noted throughout this section minimum industry standards that were incorporated into the Offering Documents.  I have included these standards as part of this discussion because the Offering Documents for all of the Securitizations contained various representations that the originators had evaluated the borrower's ability to repay the mortgage

---

[15]   *See* Exhibit 6, Chart A.

[16]   The following nine Originators were specifically named and discussed in the Offering Documents:  Aegis Mortgage Corporation ("Aegis"), Alliance Mortgage Banking Corp. ("Alliance"), EquiFirst Corporation ("EquiFirst"), First NLC Financial Services, LLC ("First NLC"), Fremont Investment & Loan ("Fremont"), Ownit Mortgage Solutions, Inc. ("Ownit"), People's Choice Home Loan Inc. ("People's Choice"), ResMAE Mortgage Corp. ("ResMAE"), and Silver State Mortgage ("Silver State").  First National Bank of Nevada ("FNBN") is also named and discussed in the Offering Documents.  However, FNBN's loans make up a small percentage of the loans underlying the SLGs and its guidelines were not used in re-underwriting the Mortgage Loans.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

loans and the adequacy of the underlying mortgage collateral.[17]  Even if neither the Offering Documents nor the guidelines further specified the steps that should be taken to underwrite the mortgage loans, these representations conveyed that the originator deemed certain steps necessary to the underwriting process.  To evaluate the borrower's ability to repay and the adequacy of collateral, an originator must, at the very least, have followed the minimum acceptable underwriting standards within the industry.  Throughout this report, I will refer to these standards, which are implicit in the representations contained in the Offering Documents and fundamental to the underwriting process, as "minimum industry standards."[18]

### A.   Representations Regarding the Origination of Mortgage Loans in Accordance With Underwriting Guidelines

#### 1.   Representations in the Prospectus Supplements Regarding the Origination of Mortgage Loans in Accordance With Underwriting Guidelines

Compliance with underwriting guidelines is critical to the success of the mortgage lending and securitization processes.  The Prospectus Supplements for each of the Securitizations contained statements attesting to the mortgage loans' conformity with the originators' underwriting guidelines.[19]  Individually and collectively, these statements clearly represented that the mortgage loans were issued only after they were underwritten against the originator's guidelines.  For example, the Prospectus Supplement for NAA 2005-AR6 represented that the mortgage loans "were originated generally in accordance with the underwriting criteria described

---

[17]   *See* Exhibit 6, Chart B.

[18]   I have assembled in Exhibit 7 the minimum industry standards for underwriting mortgage loans from 2002 to 2007.  In Section IX below, I discuss in further detail my use of minimum industry standards.

[19]   *See* Exhibit 6, Chart A.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

in this section."[20]  Other Prospectus Supplements contained similar statements that the mortgage

loans were originated generally in accordance or consistent with the originator's underwriting

guidelines or standards.[21]

> 2. **Representations in the Originators' Underwriting Guidelines Regarding the Origination of Mortgage Loans in Accordance With Underwriting Guidelines**

Originators' guidelines themselves stressed the importance of originating loans in

accordance with the guidelines.  The People's Choice guidelines, for example, stated:  "The

company's lending philosophy is to originate loans based on sound underwriting practices, risk

classification practices and adherence to underwriting guidelines."[22]  Fremont similarly

recognized that its "underwriting guidelines define Fremont's specific requirements for

underwriting the borrower's credit for mortgages."[23]  And ResMAE's guidelines simply stated:

"[l]oans must be in compliance with ResMAE guidelines."[24]  Other Originators' guidelines made

---

[20]   NAA 2005-AR6 Prospectus Supplement, NOM-FHFA_04811802, at 894.

[21]   *See, e.g.*, NHELI 2006-FM2 Prospectus Supplement, NOM-FHFA_04638315, at 399 ("All of the Mortgage Loans have been purchased by the sponsor from the Originator and were originated generally in accordance with the underwriting criteria described in this section."); NHELI 2007-1 Prospectus Supplement, NOM-FHFA_05141912, at 025 ("All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section.").

[22]   People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 333.

[23]   Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053227, at 232.

[24]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066653, at 653; *see also* ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 530, 534.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

similar representations.[25]  In sum, the guidelines made it clear that they were not merely

recommendations or advisory—they were meant to be followed.

### B.    Representations Regarding Exceptions to Underwriting Guidelines

Some mortgage loan originators allowed exceptions to be made to their underwriting

guidelines if there were compensating factors that offset the increased credit risk associated with

the loan.  In general, compensating factors should have been particularly strong borrower credit

characteristics that offset a weakness or shortcoming in the borrower's credit profile so that the

lender could originate a mortgage to the borrower based on a sound conclusion that the borrower

had the ability and willingness to repay the mortgage.

### 1.    Representations in the Prospectus Supplements Regarding Exceptions to Underwriting Guidelines

The Offering Documents for each Securitization represented that the originators'

underwriting guidelines permitted exceptions to be made (*i.e.*, a mortgage loan could be

approved that did not technically meet the guidelines' standards), *if* there were compensating or

mitigating factors determined by the underwriter to be sufficient to establish that the borrower

had the ability and willingness to repay the loan.[26]  For example, the NHELI 2006-FM1

Prospectus Supplement stated that an underwriting exception may be granted on a "case by case

basis" depending upon compensating factors such as "low loan-to-value ratio, low debt to

income ratio, substantial liquid assets, good credit history, stable employment and time in

---

[25]    *See, e.g.*, Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 110; Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 549.

[26]    *See* Exhibit 6, Chart C.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

residence at the applicant's current address."[27]  The other Prospectus Supplements contained either similar or nearly identical representations.[28]

### 2. Representations in the Originators' Underwriting Guidelines Regarding Exceptions to Guidelines

The Originators' underwriting guidelines provided for instances where a loan that failed to satisfy the Originators' qualifying criteria could be approved, depending on compensating factor or factors found within the borrower's loan application.[29]  ResMAE's underwriting guidelines explained the concept:

> On a case-by-case basis, ResMAE may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the applicable Underwriting Guidelines warrants an underwriting exception.  In all instances the borrower must have acceptable credit and the ability to repay the loan on the agreed terms and conditions.[30]

ResMAE further explained that "[a] weakness in any one of the 3 Cs [credit, capacity, and collateral] is considered a risk factor and must be compensated by strengths in one or both of the remaining 2 Cs."[31]  Ownit's guidelines similarly stated that it "considers certain factors that strengthen the borrower profile" when a borrower "fall[s] between credit grades."[32]  And

---

[27]  NHELI 2006-FM1 Prospectus Supplement, NOM-FHFA_04729474, at 544-45.

[28]  *See, e.g.,* NHELI 2007-2 Prospectus Supplement, NOM-FHFA_05591325, at 415 ("In addition, certain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower."); NHELI 2006-FM2 Prospectus Supplement, NOM-FHFA_04638315, at 396,400; NHELI 2006-HE3 Prospectus Supplement, NOM-FHFA_04620885, at 966, 972; NHELI 2007-1 Prospectus Supplement, NOM-FHFA_05141912, at 2021, 2026.

[29]  *See, e.g.*, ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 531; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 227.

[30]  ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 531.

[31]  *Ibid.*, 537.

[32]  Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 320.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

People's Choice required the underwriter to "explain his/her motivation for the exception in writing and have approval from a senior authority."[33]

Some of the Originators' underwriting guidelines provided examples of possible compensating factors.  For example, Ownit's guidelines included the following as possible compensating factors:  residual/disposable income that was more than double the standard requirement, a LTV ratio that was more than 5% below the program maximum, a minimum of three months verified cash reserves, and a drop of 25% or more in the borrower's monthly housing payments.[34]  Ownit provided a detailed description of its exception process, including a "weighting" of various potential compensating factors.[35]  And several other Originators' underwriting guidelines included compensating factors such as the borrower's employment/income stability[36] and history of repaying mortgages without delinquencies.[37] Fremont's underwriting guidelines specifically noted that "a borrower's down payment, credit history, additional income, financial reserves, and pattern of savings" could compensate for lack of long-term employment history.[38]

Generally, Originators expressly required the underwriter to obtain approval for the exception from more senior personnel.  For instance, Fremont required underwriters to "explain

---

[33]   People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 334.

[34]   Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 320.

[35]   *Ibid.*, 410-11.

[36]   *See, e.g.*, EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 154.

[37]   *See, e.g.*, ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 537-38.

[38]   Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 264.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

the basis for the exception in writing and have approval from a senior authority."[39]  Indeed,

Fremont's guidelines contained an entire chapter devoted to approval authority guidance for

exception loans.[40]

In all instances, compensating factors should be properly documented, along with any

relevant approvals, in the loan file.  For instance, EquiFirst's guidelines stated:  "Appropriate

documentation and file notes are required to support the compensating factor(s)."[41]  Alliance's

underwriting guidelines allowed that it "may consider" purchasing loans that did not meet its

guidelines "provided the loan has well-documented compensating factors . . . ." [42]  Likewise,

ResMAE's underwriting guidelines required any loan "that does not conform strictly to

ResMAE's established underwriting guidelines" to "contain documentation in the loan file to

support the lending decision, including the exception, compensating factors, and justification as

to why the loan was approved."[43]

### C.    Representations Regarding the Use of Automated Underwriting Systems

Originators at times used an automated underwriting system ("AUS") in lieu of or in

conjunction with manual underwriting, either when conducting initial underwriting or when

purchasing loans from smaller brokers or lenders and re-underwriting the loans to the

originator's own guidelines.  An AUS is a computer program that receives information from a

borrower's loan application, along with other information such as the borrower's credit score and

credit history, and renders an immediate recommendation about whether the loan complies with

---

[39]   Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 227.

[40]   *Ibid.*, 327-32.

[41]   EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 154.

[42]   Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 549.

[43]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 534.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

the originator's underwriting guidelines.  Generally, an AUS would render one of the following recommendations:  the loan (1) fit within the program that the borrower applied for; (2) provisionally complied with the originator's underwriting guidelines upon the fulfillment of a condition; (3) was ineligible for the particular loan program; or (4) was referred for manual underwriting as an exception loan or for verification of a particular issue(s) that the computer system could not resolve.  Accordingly, the use of an AUS did not relieve the lender of the need to review and approve the loan, and, in certain circumstances, to manually underwrite the loan entirely.  For instance, the AUS report might show that the loan provisionally complied with the guidelines upon the borrower's ability to meet a particular condition, such as providing an explanation for a recent credit inquiry.

Similar to a manually underwritten loan, the reliability of an AUS recommendation depended on the accuracy of the loan characteristics and borrower information that were entered into the program.  For example, if a borrower failed to disclose a monthly car payment among his liabilities on his loan application, or if the underwriter entered an inflated income into the AUS, then the AUS would compute an incorrect DTI ratio.  In either instance, a borrower who might not otherwise have been qualified might nevertheless be approved for a mortgage.  Thus, it was important that the information entered into an AUS was accurate.

1.      **Representations in the Originators' Underwriting Guidelines Regarding the Use of Automated Underwriting Systems**

Certain of the Originators' guidelines allowed for an AUS to be used to underwrite loans. For example, Alliance's guidelines stated that it would consider purchasing conforming balance loans originated using Fannie Mae's Desktop Underwriter ("DU").[44]  The guidelines provided

---

[44]   Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 552.  Desktop Underwriter is an automated underwriting system that Fannie Mae

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

that decision and documentation requirements determined by DU would be accepted provided

that "the data entered into the DU system is accurate and complete," and stated that Alliance

would verify that the data input into the DU system was accurate.[45]  Alliance further required

that the credit file contain the DU decision report, DU application, and DU credit report.[46]  The

underwriter was also required to verify that any DU approval conditions were obtained and

maintained in the loan file, and that any risk factors identified by DU were addressed in the loan

file.[47]  "Decisions and documentation standards" of loans underwritten using other, non-DU

automated underwriting systems would be considered as compensating factors by Alliance.[48]

Regardless of approval by an AUS, a loan was required to meet Alliance's credit score, DTI, and

appraisal requirements.[49]

### D.   Representations Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan

#### 1.   Representations in the Prospectus Supplements Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan

As has already been noted, the Prospectus Supplements for all of the Securitizations

represented that the mortgage loans were evaluated to determine the borrower's ability and

willingness to repay the loan.[50]  For example, the NHELI 2006-FM1 Prospectus Supplement

represented that the underwriting guidelines were "primarily intended to assess the ability and

---

made available on a fee basis.  Freddie Mac made available a similar automated underwriting
system called Loan Prospector, also on a fee basis.

[45]  *Ibid.*, 552-53.

[46]  *Ibid.*, 552.

[47]  *Ibid.*, 553.

[48]  *Ibid.*

[49]  *Ibid.*, 552.

[50]  *See* Exhibit 6, Chart B.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan."[51]   The NHELI 2006-HE3 Prospectus Supplement similarly represented that "a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations" and other expenses.[52]

### 2.     Representations in the Originators' Underwriting Guidelines Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan

Each of the Originators' underwriting guidelines contained directions and requirements for evaluating a borrower's ability and willingness to repay a loan.  Conducting such an evaluation was important since a borrower's monthly payments are an originator's primary source of repayment for a loan.  Fremont's guidelines, for example, stated:  "Consider the financial ability and credit worthiness of the borrower to repay the loan – not just the equity in the home – in order to avoid default and foreclosure."[53]   To evaluate a borrower's ability and willingness to repay a loan an underwriter should investigate any red flags suggesting that the borrower does not have the ability to repay the loan, in addition to requiring borrower representations and/or documentation regarding a borrower's income, employment, and assets. Additionally, an underwriter should ensure that the loan benefits the borrower and that any payment shock from the borrower's previous housing payments will not negatively affect the borrower's repayment ability.

---

[51]   NHELI 2006-FM1 Prospectus Supplement, NOM-FHFA_04729474, at 544.

[52]   NHELI 2006-HE3 Prospectus Supplement, NOM-FHFA_04620885, at 973.

[53]   Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 228.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### a.   Red Flags Indicative of Potential Misrepresentations

A reasonable underwriter should be alert to the possibility that a borrower may misrepresent information on the loan application in order to increase the chances of obtaining a mortgage.  For instance, a borrower who earns insufficient income to obtain a mortgage might apply for a stated income mortgage with an inflated income figure.  Or, a borrower seeking a mortgage loan for an investment property might state on the mortgage application that the borrower planned to reside in the property in order to take advantage of the reduced rates and fees charged for owner-occupied properties.  The use of a generic job title, a lack of credit history, discrepancies in the loan application, and handwritten pay stubs are examples of red flags that should be taken as signs that an unqualified borrower may have provided incorrect or incomplete information on the loan application.  A borrower's misrepresentations about employment, income, debt obligations, and/or the property's occupancy status are particularly damaging because those characteristics are critical in determining whether the borrower is able and willing to repay the mortgage.  Simply put, misrepresentations about these characteristics result in a lender's inability to rely on accurate data to determine borrower eligibility and the resulting credit risk of a loan.

A number of the Originators' guidelines addressed the investigation of red flags.  For example, ResMAE's guidelines directed underwriters to "review loan packages for 'red flags,' which may indicate irregularities in the data submitted by a borrower or other parties in the transaction."[54]  ResMAE provided examples of red flags, such as the same telephone number for the borrower's home and business, significant changes in a banking account balance near the

---

[54]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066401, at 401.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

date of verification, and a handwritten W-2 form.[55]  Equifirst's guidelines contained a section detailing red flags that could be found on a credit report, including if a borrower's report indicated a second Social Security Number, associated the Social Security Number with a deceased person, turned up an "AKA," or indicated the borrower had used an unauthorized Social Security Number.[56]  Other Originators explicitly prohibited approving loans when documents in the loan application had been altered, because erasures and white-outs were red flags for fraud.[57]

Furthermore, the underwriting guidelines of some Originators put procedures in place to monitor fraud by brokers.  For example, Ownit ran audit credit reports on borrowers, which it compared to brokers' credit reports.  Ownit instructed its underwriters that if an audit turned up fraudulent information, they should use the credit score from the audit report to qualify the borrower.[58]  Similarly, Fremont "routinely" conducted quality control audits that re-verified credit documentation and appraisals submitted by brokers.[59]

### b.    Payment Shock

Payment shock refers to the increase in the borrower's housing obligation from the borrower's previous mortgage or rent payment.  Payment shock should be calculated in instances in which the borrower purchased a home for the first time, the borrower while paying one

---

[55]   *Ibid.*, 408-10.

[56]   EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 197.

[57]   *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 262; People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 360; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 542.

[58]   Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 337.

[59]   Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 245.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

mortgage purchased a new and more expensive home imposing a larger mortgage obligation, or the borrower took out a second mortgage on the same home.

The underwriter should analyze whether the borrower can afford to pay the post-shock monthly obligation.  The underwriter should do so by calculating the payment shock to the borrower and scrutinizing the borrower's overall financial circumstances in light of the payment increase.  While factors in the borrower's application may lead the underwriter to reasonably conclude that the borrower is capable of meeting the new, increased mortgage obligation, all else being equal, a greater payment shock correlates with a greater risk that the borrower will not be able to make payments and will, in turn, default on the mortgage.

Many of the Originators' underwriting guidelines explicitly required underwriters to consider payment shock.  For example, ResMAE's guidelines stated:

> A careful evaluation must be made of the homebuyer's capacity to handle potentially larger monthly payments and related expenses that may be associated with any purchase or refinance transaction. ResMAE will give consideration to borrowers who have demonstrated an ability to carry similar or greater expenses for an extended period.[60]

People's Choice's underwriting guidelines specified:  "Payment shock occurs when the mortgage payment will exceed 150% of current housing obligations.  In this situation, the borrower must have reserves of at least two months' PITI and the down payment must be sourced and seasoned for 60 days."[61]  And Aegis' guidelines required full documentation for

---

[60]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 558.

[61]   People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 376.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

transactions resulting in "significant payment shock," which it defined as the payment more than doubling.[62]

### c.      Benefit to the Borrower in Refinance Mortgages

A refinance mortgage that did not offer a benefit to the borrower was more risky than a mortgage that did because a borrower who had received no benefit from the refinancing was more likely to stop making payments.  Thus, for refinance mortgages it was a standard guideline requirement that every loan must provide a benefit to the borrower.  The benefit to the borrower could take many forms, such as a reduced monthly mortgage payment, a lower interest rate, or a cash payment made to the borrower for use on home improvements.  The benefit that the mortgage provided to the borrower stood as proof that the lender did not originate the mortgage purely to obtain fees from the borrower or that the mortgage was not the result of predatory lending.

People's Choice's guidelines, for example, stated:  "A loan must demonstrate tangible benefits to the borrower and meet state-specific net tangible benefit requirements."[63]  Equifirst's guidelines similarly required that "all loans have a measurable benefit to the borrower," and instructed its underwriters to consider factors such as monthly savings, amount of cash out, recoupment of closing costs, transfer of title, reductions in the term of the mortgage, and paying

---

[62]    Aegis Mortgage Signature Alternative A Matrices and Guidelines, JPMC-UWG-BEAR-000005665, at 692.

[63]    People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 333.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

off of property taxes or certain types of loans.[64]  Other Originators either explicitly required a

tangible or material benefit or, conversely, prohibited loans that provided no economic benefit.[65]

### 3. Minimum Industry Standards Regarding Evaluation of the Borrower's Ability and Willingness to Repay the Mortgage Loan

#### a. Red Flags Indicative of Potential Misrepresentations

It was a minimum industry standard for an underwriter to investigate red flags in a loan

file that could indicate fraud before issuing a loan.[66]  Investigating red flags was important

because failure to do so could result in the origination of a mortgage loan to a borrower who

could not repay the loan.  Nomura recognized the importance of this minimum industry standard.

Joseph Kohout testified that if an underwriter discovered a red flag, it should be brought to the

due diligence team's attention so that additional information could be obtained from the seller.

And Kohout "hope[d]" that originators would investigate red flags they discovered.[67]  Mendy

Sabo, a Nomura due diligence manager, agreed that it is "fair to say that every underwriter

should investigate if he or she has reason to believe that a borrower has misstated or

---

[64]  EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 153.

[65]  *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 228; Alliance Mortgage General Underwriting Guidelines, JPMC-UWG-BEAR-000235485, at 517-18; *see also* ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066525, at 527 (noting one of ResMAE's "[c]ommitments" was to "[a]pprove [o]nly [l]oans [t]hat [b]enefit [t]he [b]orrower").

[66]  For examples of underwriting guidelines that were consistent with this standard, *see* Bank of America CRE Policy and Product Guide, BA_FHFA 23690783, at 795 ("Inconsistent information or data may be a 'red flag' that indicates a detailed review of the data is required."); Countrywide Technical Manual, CHL-FHFA00000130, at 339 ("The following is a list of red flags in the loan package which may alert an underwriter to possible irregularities in the data submitted by a borrower or other parties in the loan transaction."); ResMAE Underwriting Guidelines, CSFHFA007672771, at 771 ("ResMAE employees are required to review loan packages for 'red flags,' which may indicate irregularities in the data submitted by a borrower or other parties in the transaction.").

[67]  Kohout Dep. at 86:10-87:9.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

misrepresented his or her income, employment status, mortgage or rental history[.]"[68]  Nomura's

own correspondent underwriting guidelines made clear that it would not purchase, or would

require to be re-purchased, any loan for which there was evidence of misrepresentation or

material omission.[69]  To help prevent such misrepresentations or omissions, the underwriting

guidelines listed a number of possible situations in which it would require full or alternative

documentation on otherwise reduced documentation loans.[70]

### b.     Payment Shock

Minimum industry standards required underwriters to evaluate a borrower's ability to

repay the mortgage in light of payment shock imposed by the mortgage, regardless of whether

the originators' underwriting guidelines expressly addressed payment shock.  In particular,

minimum industry standards required underwriters to determine whether a borrower could meet

his or her new mortgage obligation if the payment shock exceeded 150% of the borrower's

current housing obligations, and for the lender's written approval to reflect that consideration.[71]

---

[68]     Deposition of Menachem ("Mendy") Sabo, dated Dec. 5, 2013 ("Sabo Dep.") at 29:20-30:4.

[69]     Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 771. Nomura's Correspondent Underwriting Guidelines were used by Nomura in connection with its purchase of closed loans from approved sellers.  *See* Kohout Dep. at 43:7-45:9.  These guidelines applied to loan-by-loan purchases, not loans that Nomura purchased from originators in bulk. *Ibid*.

[70]     *Ibid*.

[71]     For examples of underwriting guidelines that were consistent with or more stringent than this standard, *see* Aegis Funding Corporation Focus + Underwriting Guidelines, CSFHFA009245527, at 551 ("Although payment shock is analyzed on all loan requests, proposed payments greater than 150% of current payment are considered payment shock and are analyzed very carefully."); WMC Mortgage Underwriting Guidelines, JPMC-UWG-WAMU-000823523, at 575 ("Payment shock is a term used to describe a situation where current housing expense increases by 50% or more.  To ensure that a borrower can sustain a large increase, WMC may require validation and/or source/seasoning of reserves (adequate to pay the new mortgage payment), for some loan programs."); Countrywide SubPrime Technical Manual, CHL-FHFA00028257, at 313 ("First time homebuyers are allowed a maximum 100% housing

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### c.      Benefit to the Borrower in Refinance Mortgages

It was also a minimum industry standard that every refinance mortgage loan provide a benefit to the borrower.[72]  Nomura recognized this requirement as well.  For example, Neil Spagna, a Director in Nomura's due diligence group, confirmed that "in a refinance transaction the borrower must obtain a benefit from the mortgage[.]"[73]

### E.      Representations Regarding Evaluation of the Adequacy of the Underlying Mortgage Collateral

#### 1.      Representations in the Prospectus Supplements Regarding Evaluation of the Adequacy of the Underlying Mortgage Collateral

The Prospectus Supplements for all of the Securitizations represented that the mortgage loans were evaluated to determine the adequacy of the collateral.[74]  Furthermore, all of the Prospectus Supplements contained representations regarding steps that should be taken to ensure the adequacy of the collateral.[75]  For instance, the NHELI 2007-3 Prospectus Supplement represented that appraisals had been performed by a qualified, independent appraiser licensed in his or her state,[76] and that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice ("USPAP").[77]

---

payment shock . . . ."); ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066401, at 408 (requiring applications to be reviewed for "red flags," including "[n]ew housing expense exceeds 150% of current housing expense").

[72]   For examples of underwriting guidelines that were consistent with this standard, *see* Encore Credit Corp. Wholesale Manual, JPMC-UWG-BEAR-000144493, at 507; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053101, at 107; WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 966.

[73]   Spagna Dep. at 108:5-10.

[74]   *See* Exhibit 6, Chart B.

[75]   *See* Exhibit 6, Chart D.

[76]   NHELI 2007-3 Prospectus Supplement, NOM-FHFA_04732621, at 709 (ResMAE).

[77]   *Ibid.*, 709, 713 (all originators).

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

2. **Representations in the Originators' Underwriting Guidelines Regarding Evaluation of the Adequacy of the Underlying Mortgage Collateral**

The Originators' underwriting guidelines mandated accurate assessment of whether a property provided sufficient value to serve as collateral for the borrower's debt obligation.  They contained directions and requirements regarding the evaluation of the adequacy of the underlying mortgage collateral, including through the use of appraisals and/or automated valuation models ("AVM").

### a.  Appraisal Reports

In evaluating the collateral, it was important that the underwriter evaluate the loan application's appraisal report, and not just accept the appraisal at face value.  ResMAE's guidelines, for example, stated:  "The underwriter is responsible for thoroughly analyzing the appraisal report, and through it, the property itself. . . .  The underwriter's role is to judge the property's acceptability as security for the requested loan."[78]  Generally speaking, an underwriter should review the appraisal report to determine if the appraiser used reasonable methods and techniques to arrive at the estimated value of the mortgaged property.

The Originators' underwriting guidelines required appraisals to be conducted by state licensed or certified appraisers, experienced in appraising residential properties of the type being appraised and to be actively engaged in appraisal work.[79]  State licensing boards set forth minimum levels of education and experience required to obtain a license in property appraisal, as well as continuing education requirements that need to be satisfied to maintain an active license.

---

[78]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 629.

[79]   *See, e.g.*, Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 330; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 631-32; Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 114-15; Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, 586.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

An inactive license may indicate that an appraiser has not complied with licensing requirements, or had his license revoked or suspended as a result of disciplinary action—all of which call into question the integrity of the appraiser's appraisal report.

The Originators' underwriting guidelines further required a completed appraisal to conform to USPAP.[80]  USPAP is a body of standards developed by the Appraisal Standards Board of the Appraisal Foundation for the purpose of establishing requirements for professional appraisers and, in turn, promoting and maintaining public trust in the appraisal practice.  USPAP mandates competence, impartiality, objectivity, and independence on the part of the appraiser.  Although USPAP provides a minimum set of standards of practice for conducting an appraisal, it does not prescribe specific appraisal methods.  Rather, USPAP requires appraisers to be familiar with and correctly use methods that are acceptable in relation to (i) expectations of participants in the market (*i.e.*, originators and their underwriters) and (ii) the appraisers' peers.  USPAP refers to this process as the "Scope of Work" rule.[81]

Additionally, most of the Originators' guidelines provided other requirements for the subject property's appraisal.  For example, the mortgage loan file had to include an appraisal report on the Uniform Residential Appraisal Report ("URAR") form (also known as Fannie Mae form 1004 and Freddie Mac form 70), which provided a summary of the subject property,

---

[80]  *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 313; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 333; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 539.

[81]  USPAP 2005, Standards Rule 1-2(f) ("The scope of work is acceptable when it is consistent with: [] the expectations of participants in the market for the same or similar appraisal services; and [] what the appraiser's peers' actions would be in performing the same or a similar assignment in compliance with USPAP.").

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

neighborhood, and comparable properties, among other items.[82]  The appraisal had to include an

effective date and had to be signed by the inspecting appraiser.[83]  The appraisal also had to be

completed within a certain period before the loan's closing, typically within 90 to 180 days of

the closing, or the date of the Note and Mortgage or Deed of Trust.[84]

### b.    Comparable Properties

The review of comparable properties, along with the adjustments made to those

properties to harmonize their different values, was a critical part of the subject property's

appraisal.  In other words, the value of the subject property was not solely a function of the

characteristics of the property itself; rather, its value should have been assessed relative to other

recent sales of properties with similar characteristics to and in the same area as the subject

property.

Many of the Originators' underwriting guidelines specified requirements for comparable

properties used to generate or support the subject property's appraisal value, such as the

minimum number of comparable properties to be considered.[85]  Additionally, some of the

Originators' guidelines specified that the comparable properties had to have sales activity within

---

[82]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 313; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 332; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 638.

[83]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 318; Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 116; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 541.

[84]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 233, 314; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 336; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 633.

[85]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 317; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 333-34; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 637.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

a particular time period of the appraisal report.[86]  Some Originators' underwriting guidelines

required the appraisal report to include photographs of the comparable properties.[87]

### c.      Automated Valuation Models

Some Originators generated a valuation of the subject property using an AVM.  An AVM

applied a mathematical model to a computer database of values of comparable properties,

information on the subject property, and information about property values locally and

nationwide.[88]  That model generated a value for the subject property.  The objective of using the

AVM was to assess the reasonableness of a property's appraised value.  For example, Ownit's

guidelines stated:

> All loans are to be analyzed for marketability and value support by
> the underwriter.  If there are concerns regarding the value, the
> underwriter should request an Automated Valuation Model
> (AVM), or other form of Appraisal Review.[89]

Additionally, ResMAE required certain properties to be run through Hanson PREVIEW and

Hanson PRO, both of which were AVMs, and could require field reviews if the loan failed to

meet criteria for success.[90]

---

[86]   *See, e.g.*, Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, 595; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 334; Aegis Mortgage Signature Alternative A Matrices and Guidelines, JPMC-UWG-BEAR-000005665, at 716.

[87]   *See, e.g.*, ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 640; Aegis Mortgage Signature Alternative A Matrices and Guidelines, JPMC-UWG-BEAR-000005665, at 713; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 315.

[88]   The role of AVMs in the valuation of the subject properties for the Securitizations is discussed in greater detail in the Kilpatrick Report.

[89]   Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 332.

[90]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066628, at 629, 636.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### 3. Minimum Industry Standards Regarding the Evaluation of the Adequacy of the Underlying Mortgage Collateral

Part of an underwriter's role is to assess the correctness of the property appraisal used to support a mortgage loan. Throughout the residential mortgage industry between 2002 and 2007, it was a standard practice for the underwriter to review the appraisal report to ensure that it met certain prerequisites prior to evaluating the appraisal itself. If a full appraisal was conducted, this entailed making sure an appraisal report was found in the loan file on a URAR form.[91] The underwriter also should have ensured that the appraiser was licensed in the local jurisdiction,[92] and that the appraisal was no more than six months old at the date of closing.[93]

At a minimum, the underwriter also should have reviewed the appraisal report to identify any red flags, such as possible property flipping,[94] and confirmed that the appraisal conformed to

---

[91] For examples of underwriting guidelines that were consistent with this standard, *see* New Century Mortgage Underwriting Guidelines, MS_FHFA_003839644, at 655; Argent Mortgage Company Underwriting Guidelines, GS FHFA 003213296, at 343; Encore Credit Corp. Wholesale Manual, JPMC-UWG-BEAR-000109955, at 957.

[92] For examples of underwriting guidelines that were consistent with this standard, *see* Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 723; New Century Mortgage Underwriting Guidelines, FHFA_NC_0000675, at 677; WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 924. To determine whether the Mortgage Loans were appraised by licensed appraisers, I instructed the re-underwriting teams to verify the appraisers' licensing statuses with the database maintained by the Appraisal Subcommittee.

[93] For examples of underwriting guidelines that were consistent with this standard, *see* New Century Mortgage Underwriting Guidelines, FHFA_NC_0000129, at 148 ("If the appraisal is greater than 180 days old at time of funding, a new appraisal report will be required."); WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 924 ("Appraisal reports older than 180 days at funding will not be accepted; a new appraisal is required."); Long Beach Mortgage Company Underwriting Guidelines, JPMC-UWG-WAMU-000453475, at 544 ("A new appraisal is required if the appraisal is over six months old.").

[94] Property flipping refers to a borrower's intent to purchase a property then quickly sell it for a profit, typically through renovating and improving the property. This can become fraudulent, and therefore risky for an originator, if the purchaser artificially inflates the value of the property without actually making substantive improvements. For examples of guidelines warning of such behavior, *see* Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 490-91 ("Land flips or flipping property exposes Countrywide to potentially significant losses

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

the USPAP requirements.[95]  The underwriter should not have approved the loan based on the

appraisal report, if the report contained any of these defects or otherwise failed to support the

assessed value.  Instead, the underwriter should have taken additional steps to investigate or

correct the problem, such as following up with the appraiser to address the issue or even ordering

a new appraisal.

 Nomura recognized the importance of an accurate valuation of the underlying collateral.

For example, Joseph Kohout testified that ensuring there is sufficient collateral to cover the loan

is "one of the most important steps" in underwriting.[96]  He further testified that it was "industry

standard" that the application include an appraisal on the appropriate form; that the appraisal

comply with USPAP; that the appraiser held a valid license in the local jurisdiction; and that the

appraisal, or the recertification of an appraisal, be completed within six months of the origination

date.[97]  In his experience it "would generally be the outcome" that a poorly done appraisal, *e.g.*

one using inappropriate comparable properties, would result in a poor valuation, so "you had to

look at appraisals closely."[98]

---

if a borrower defaults on his or her loan."); Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 331 ("Ownit will not fund loans when flipping properties are causing an inflated market. … At some point, all participants in the flip walk away from the properties and the lender is faced with the foreclosure or an overvalued property and the occurrence of a substantial loss.").

[95] For examples of underwriting guidelines that were consistent with this standard, *see* New Century Mortgage Underwriting Guidelines, FHFA_NC_0000675, at 679; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053101, at 197; Lime Financial Services Underwriting Guidelines, JPMC-UWG-WAMU-000778362, at 464; *see also* Kilpatrick Report.

[96] Kohout Dep. at 340:7-13; *see also* Hartnagel Dep. at 91:21-92:7 (stating an appraisal is important "[b]ecause otherwise you will not know what you're buying as far as value is concerned").

[97] *Ibid.*, 139:18-140:12, 142:20-143:12.

[98] *Ibid.*, 348:21-352:2.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

Nomura's correspondent guidelines required at least one full appraisal, performed by an appraiser licensed in that state; completed on the URAR; and no older than 120 days from the date of closing for existing construction or 180 days for new construction, unless the original appraiser provided an appraisal update.[99]   Furthermore, the appraisal should conform to USPAP.[100]   The correspondent guidelines also included requirements regarding certain red flags, such as ensuring the appraiser has no financial interest or other bias; that the subject property address and legal description match those from the loan application and related documents; and special requirements for cash-out refinances and flipped properties, out of a recognition that inflated appraisals in those circumstances were a serious concern in the industry.[101]

## F.  Representations Regarding Credit Information

### 1.  Representations in the Prospectus Supplements Regarding Credit Information

The Prospectus Supplements contained representations about the specific types of credit information that should be reviewed by underwriters to determine a borrower's ability to repay the mortgage loan.  Such information included (but was not limited to):  (1) a loan application; (2) a credit report/history; (3) federal tax returns; and/or (4) verifications of assets (or deposits).

The language in the NHELI 2007-1 Prospectus Supplement was typical:

> Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which

---

[99]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 755-57.

[100]   *Ibid.*, 756.

[101]   *Ibid.*, 755-56, 760.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

> summarizes the borrower's credit history with local merchants and
> lenders and any record of bankruptcy.  The borrower may also
> have been required to authorize verifications of deposits at
> financial institutions where the borrower had demand or savings
> accounts.[102]

Indeed, the Prospectus Supplements for all of the Securitizations represented that the underlying

mortgage loans were supported by appropriate documentation of the borrower's credit profile,

including a credit report, credit score, and documentation regarding income, employment, assets,

and housing history.[103]  The Prospectus Supplements made clear that the purpose of obtaining

such information was to evaluate the prospective borrower's ability to repay the loan.[104]

### 2.   Representations in the Originator's Underwriting Guidelines Regarding Credit Information

#### a.  Credit Reports

A credit report helps to establish a borrower's ability and willingness to repay a

mortgage.  It identifies a borrower's past and present creditors, lists any public records or filings

or derogatory credit history, provides known addresses and other names (if any), confirms the

borrower's Social Security number, and lists the borrower's credit score.  A credit report may

also verify other information the borrower included on his or her loan application.  Given the

wealth of information available in a credit report, the Originator's underwriting guidelines

required the underwriter to obtain a credit report within a discrete period prior to the loan's

---

[102]   NHELI 2007-1 Prospectus Supplement, NOM-FHFA_05141912, at 026.

[103]   *See* Exhibit 6, Chart F.

[104]   *See, e.g.*, NAA 2005-AR6 Prospectus Supplement, NOM-FHFA_04811802, at 894 ("Based on the data provided in the application and certain verifications . . . a determination is made by the original lender that the borrower's monthly income . . . will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property . . . .").

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

closing, funding, or Note date, generally ranging between 60 and 120 days.[105]  The Originator's

underwriting guidelines generally required these credit reports to contain complete information

provided by all repositories and to be issued by independent credit reporting agencies.[106]

### b.    Recent Credit Inquiries

Not only does a credit report reflect the borrower's existing trade lines and credit score, it

also shows credit inquiries made about the borrower by potential creditors.  Unexplained credit

inquiries prior to the mortgage loan's origination should have been investigated because each

inquiry could have been indicative of an undisclosed debt obligation.  An undisclosed debt

obligation may materially alter the underwriter's ultimate credit risk determination, by, for

example, negatively impacting the underwriter's DTI ratio calculation.  For that reason, certain

of the Originators' guidelines contained explicit requirements for review of the borrower's credit

report before closing, with a particular focus on any recent credit inquiries.  By way of example,

ResMAE's guidelines required documentation in the loan file adequately explaining that the

borrower had not incurred any additional debt, if the credit report indicated credit inquiries

between the loan application date and the credit report date.[107]  Silver State required borrowers to

explain all inquiries within the previous 90 days in writing, including indicating whether new

accounts were established as a result of those inquiries, and, if new accounts were established,

---

[105]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053227, at 256; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 317, 337-338; Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 557.

[106]    *See, e.g.*, People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 368-69; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 248; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 539; Silver State Mortgage Expanded Alt A Underwriting Guide, JPMC-UWG-BEAR-000297104, at 134.

[107]    ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 553, 614.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

verifying that they do not represent unsecured financing for the down payment, closing costs, or prepaid items.[108]

### c.    Loan Applications

Some of the Originators' underwriting guidelines explicitly required the loan origination file to include a final loan application, typically in a form similar to Fannie Mae Form 1003, regardless of loan documentation type,[109] while other Originators implied that the application was a required document by requiring borrowers to include certain information on the loan application.[110]   A loan application contained information the underwriter relied on in underwriting the loan and assessing a borrower's eligibility, including the requested loan amount, current and past employment, income, housing history, assets, and liabilities. Guidelines generally required the applications to be completed with the original borrowers' signatures.   Fremont's underwriting guidelines, for example, required a final loan application to "be completed in its entirety," including "provid[ing] a two-year residence history" and the "original signatures of all borrowers."[111]

### d.    Documentation of Mortgage and Rental History

A borrower's mortgage or rent payment history serves as an indicator of the borrower's willingness and capacity to fulfill his mortgage loan obligation.   A borrower who has

---

[108]    Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 137.

[109]    *See, e.g.*, People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 360;  Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053227, at 236.

[110]    *See, e.g.*, Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 341, 353, 357, 360, 362-63, 373, 403, 407; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 512-13, 519, 527; Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 551, 568-70.

[111]    Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053227, at 237.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

consistently made his housing payments in the past is more likely to do so in the future.  For that reason, many Originators' underwriting guidelines required the borrower to provide documentation of previous mortgage or rental obligations and payments, typically for the previous 12 months.[112]  For example, Silver State's guidelines required that current housing payments be verified for the previous 12 months for all borrowers, either via a written Verification of Mortgage ("VOM"), the credit report, 12 months cancelled checks, or 12 months bank statements for mortgage payments; or via a Verification of Rent ("VOR") form, 12 months cancelled rent payment checks, or 12 months bank statements for rent payments.[113]

In addition, under some guidelines, the housing payment history was used to determine a loan's credit grade, which was used to determine acceptable LTV ratios and loan terms.  As an example, under the Fremont Credit Grade matrix, an A+ rating required no 30-day past-due mortgage or rental payments, while borrowers that had delinquent mortgage or rental payment histories were graded lower.[114]  A borrower seeking maximum LTV financing under the stated loan program required an A+ rating regardless of other loan characteristics, and lower ratings had lower maximum LTVs.[115]

---

[112]   *See, e.g.*, Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 571-72; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 255-57; People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 375-76.

[113]   Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 135.

[114]   Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 260.

[115]   *Ibid.*, 249-50.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

e.        **Verification of Assets**

Many Originators' underwriting guidelines required verification of the borrower's assets, for a variety of reasons.[116]  First, the borrower's assets, if sufficient, could establish the borrower's capacity to repay the mortgage.  Second, because these assets were used as proceeds for a down payment, verification was necessary to confirm the borrower's ability to close the loan.  Also, where the underwriting guidelines required that the borrower demonstrate adequate payment reserves, verification of assets confirmed the borrower's short-term ability to meet the monthly mortgage obligation should any income be lost.  Third, since the borrower's assets were stated on the loan application, verification that the borrower had stated assets accurately helped establish the borrower's character.  Fourth, verification of assets helped to determine whether the borrower was using his or her own funds for the transaction, and not funds that were borrowed or gifted.  Finally, verification of the borrower's assets rooted out the problem of a "straw borrower"—an individual who obtained a mortgage on behalf of another person unable to qualify for the mortgage.

The Originators' underwriting guidelines allowed multiple forms of documentation for the borrower to establish his or her assets, such as a "Verification of Deposit" ("VOD") form reflecting the borrower's current bank balance, or a copy of the borrower's bank statement or retirement accounts, such as a borrower's 401K or IRA.[117]  In order to ensure that the borrower's

---

[116]    *See e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 311 (requiring "bank statement(s), Verification of Deposit (VOD), or retirement account (401K, IRA, etc)"); Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 130 (requiring VOD or copies of account statements covering the most recent two months, with three months' balances); Alliance Mortgage General Underwriting Guidelines, JPMC-UWG-BEAR-000235485, at 544-45 (requiring VOD or a complete bank statement, if reserves were required).

[117]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 311.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

verified assets were his or her own and not simply borrowed, certain Originators' guidelines required the borrower's assets to be "sourced," meaning the borrower had to establish where the assets came from and confirm that they did not come from a loan or some other special, unsustainable source.[118]  Other Originators' guidelines required that the borrower's assets be "seasoned," meaning in the borrower's possession for a period of time, such as 30 or 60 days.[119] The Originators' sourcing and seasoning requirements ensured that the borrower's verified assets actually served as proof of repayment capacity.

### 3.      Minimum Industry Standards Regarding Credit Information

Minimum industry standards dictated that loan files contain basic documentation regarding a borrower's credit profile, so that the underwriter could make a determination about whether the borrower had the ability to repay the loan.  Minimum industry standards required every loan file to include a credit report for the borrower pulled no earlier than 180 days before the funding date.[120]  A borrower's credit report was a key part of the loan file because it contained a comprehensive record of the borrower's credit history, and thus provided important information for determining the borrower's willingness to repay a loan.  Nomura's correspondent

---

[118]   *See, e.g.*, Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 130.

[119]   *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 311 (requiring assets to be seasoned for two months).

[120]   For examples of underwriting guidelines that were consistent with this requirement, *see* Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 587-88 ("The maximum allowable age of the original credit report is 180 days prior to funding date."); Long Beach Mortgage Company Underwriting Guidelines, JPMC-UWG-WAMU-000453231, at 285 (credit report should not be more than 90 days old at funding date); WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 979 (45-day maximum age of credit report at note date).

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

underwriting guidelines were consistent with this requirement, stating "Residential Mortgage Credit Reports or tri-merged credit reports are required for all loans."[121]

When reviewing a borrower's credit report, minimum industry standards required underwriters to investigate any recent, unexplained credit inquiries that appeared on the report.[122] Nomura acknowledged this requirement, too.  Jeffrey Hartnagel, a Vice President in the diligence group, agreed that it was important that an underwriter get an explanation of the reasons for credit inquiries, because otherwise there is "a possibility of additional debt that [Nomura] may not know of."[123]  Nomura's correspondent underwriting guidelines required that the credit report disclose all credit inquiries in the 90 days preceding the report, and required a written explanation for any significant undisclosed debt.[124]

Furthermore, minimum industry standards required every loan file to include a final loan application, even if not explicitly stated in the underwriting guidelines.[125]  The loan application

---

[121]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 761.

[122]   For examples of underwriting guidelines that were consistent this requirement, *see* Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 640 ("Credit inquiries between the loan application date and Countrywide's credit report date should be investigated to verify no new debt has been opened (ex. auto dealer and finance lender inquiries may have resulted in a new auto loan)."); Option One Alternative Products Underwriting Guidelines, UBS-FHFA-00328059, at 100 ("All inquiries occurring within 90 days of the credit report must be explained in writing by the borrower.  The explanation must indicate whether new accounts were established as a result of the inquiry and the terms of any new accounts must be verified and included in the borrower's overall obligations."); Wells Fargo Home Credit Solutions Underwriting Standards, UG1FHFA00039015, at 034 ("If the credit report indicates any credit inquiries within the most recent 90 days, inquiries should be satisfactorily explained by the borrower.").

[123]   Hartnagel Dep. at 111:15-112:9.

[124]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 762-63.

[125]   For examples of underwriting guidelines that were consistent with this requirement, *see* Ameriquest Loan Origination Policies and Procedures, AMQUG028098, at 318; Encore Credit Corp. Wholesale Manual, JPMC-UWG-BEAR-000144514, at 514; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053227, at 236.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

was essential because it provided critical credit information such as the borrower's income, job title, and assets.[126]  Joseph Kohout, Mendy Sabo, Jeffrey Hartnagel, and Neil Spagna each testified that a final loan application was a required document.[127]  As Joseph Kohout acknowledged, if a final application was missing, "[w]e would decline [the loan] for purchase."[128]

Minimum industry standards also required an originator to verify a borrower's housing history for the 12 months prior to the loan closing.[129]  This verification could have been provided by the borrower's credit report, 12 months of canceled checks, or a letter from the borrower's landlord.  Consistent with this minimum industry standard, Nomura's correspondent underwriting guidelines required verification of mortgage or rental history for the previous 12 months.  Mortgage payments could be shown by a credit report, direct verification, or payment of taxes and insurance if the home was owned free and clear.  Rent payments could be shown by a credit report, direct verification of rent, or 12 months of cancelled checks or bank statements.[130]

---

[126]  Jeffrey Hartnagel, for example, stated in an email to Steven Katz and Joseph Kohout that he "would not be comfortable buying loans on a 30 day side which includes [a] missing . . . final 1003" and, on the same email chain, Joseph Kohout expressed his view that "[a] Final 1003 should never be re-produced."  Dep. Ex. 21920, at NOM-FHFA_05302477.

[127]  Kohout Dep. at 150:14-19; Sabo Dep. at 16:5-12, 22:24-23:3, 118:17-25; Hartnagel Dep. at 218:14-16; Spagna Dep. at 106:16-25, 115:3-10.

[128]  Kohout Dep. at 171:7-10.

[129]  For examples of underwriting guidelines that were consistent with this requirement, *see* American Home Mortgage Choice Expanded Product Guidelines, MS_FHFA_000371208, at 309; Long Beach Mortgage Company Underwriting Guidelines, JPMC-UWG-WAMU-000453231, at 242; WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00003439, at 467-68; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053101, at 137-38.

[130]  Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 768-69; *see also* Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05503755, at 799 (requiring two years of housing payment verification).

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

Finally, minimum industry standards required underwriters to verify that a borrower had sufficient assets to at least cover closing costs and the down payment.[131]  Nomura recognized the importance of documentation and verification of a borrower's assets.  For example, Nomura's correspondent guidelines required sufficient assets to be "disclosed and verified to meet requirements for down payment, closing costs, prepaid items, payoff or pay-down of debt required for qualification" for loans that required asset verification.[132]  These assets could be verified in several ways, including a VOD; a Fannie Mae form 1006; or the most recent two months or one quarter bank, mutual fund, or brokerage statements.[133]

### G. Representations Regarding Income and Employment Verification Under Full and Reduced Documentation Programs

#### 1. Representations in the Prospectus Supplements Regarding Income and Employment Verification Under Full and Reduced Documentation Programs

All of the Prospectus Supplements described the requirements for the various documentation programs, including full and reduced.[134]  For example, the NHELI 2006-HE3 Prospectus Supplement represented that applicants under People's Choice's full documentation program "usually are required to submit one year's IRS Form W-2 and Form 1040 and a year-to-date paystub or 12 or 24 months personal or business bank statements" while applicants under the lite documentation program "usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal or business checking

---

[131]   For examples of underwriting guidelines that were consistent with this requirement, *see* Encore Credit Corp. Wholesale Manual, JPMC-UWG-BEAR-000144514, at 524; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00053101, at 194; New Century Mortgage Underwriting Guidelines, MS_FHFA_003837158, at 170-71.

[132]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 775-79.

[133]   *Ibid.*

[134]   *See* Exhibit 6, Chart G.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

account bank statements or a current paycheck stub with at least 6 months' year-to-date information."[135]  Similarly, the NHELI 2006-FM2 Prospectus Supplement stated that Fremont's full documentation program required "verification of stable income for the periods of one to two years preceding the application dependent on credit profile," while Fremont's easy documentation program required "verification of adequate cash flow by means of personal or business bank statements[.]"[136]

## 2. Representations in the Originators' Underwriting Guidelines Regarding Income and Employment Verification Under Full and Reduced Documentation Programs

Employment and income verification are central to a capacity analysis.  Verification that a borrower has been gainfully employed in recent years, and that the borrower is likely to remain employed in the foreseeable future, are typically the primary means to establish a borrower's ability to repay the mortgage.  The Originators' underwriting guidelines recognized the significance of the borrower's income to the repayment of a mortgage loan.[137]  Thus, when the borrower applied for a mortgage under a program that required income or employment documentation, depending on the program, the guidelines generally required verification of income or employment status or both income and employment status.[138]  Under most guidelines, verifying the borrower's employment entailed checking the borrower's occupation, employer,

---

[135]   NHELI 2006-HE3 Prospectus Supplement, NOM-FHFA_04620885, at 967.

[136]   NHELI 2006-FM2 Prospectus Supplement, NOM-FHFA_04638315, at 396.

[137]   For example, Fremont's guidelines stated that "[t]he borrower's income and, where applicable, employment history play an important role in determining if the loan is an acceptable risk, along with collateral and credit."  Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 262.

[138]   *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 262, 266; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 564, 566; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 353, 357.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

position, and length of employment.[139]  Verifying the borrower's income entailed establishing

that the borrower received, and would continue to receive, a reliable stream of income sufficient

to meet the mortgage obligation.

That a borrower has been employed in recent years, and is likely to remain employed in

the foreseeable future, is the primary means of proving the borrower's capacity to repay a

mortgage.  Originators typically offered multiple programs under which the borrower could

establish income and employment, including full documentation, reduced documentation, or

related variations.  Different guidelines for verifying income and employment applied to each of

these documentation programs.

With respect to full documentation loan programs, the Originator usually required a

salaried employee to submit a current paycheck or pay stub, as well as some combination of a

W-2 statement from the previous year, tax returns, bank statements, or a written Verification of

Employment ("VOE") form from the employer.[140]  In the case of reduced or limited

documentation programs, a salaried employee could generally submit a written VOE from the

employer as well as bank statements from the previous 12 to 24 months.[141]  Also, the

Originators' guidelines usually required verification that the borrower remained employed until

---

[139]   *See, e.g.*, People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 382-83; Aegis Mortgage Signature Alternative A Matrices and Guidelines, JPMC-UWG-BEAR-000005665, at 694-95.

[140]   *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 295-96; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 564, 594; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 523.

[141]   *See, e.g.*, ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 594; EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 169-70.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

the date of the funding of the loan by requiring, for example, that a final verification of

employment be conducted within several days of the loan's closing.[142]

Originators provided alternative means for self-employed borrowers to prove their

income and employment.  Self-employed individuals were required to prove the existence of

their business with verification from a neutral third party, typically in the form of a business

license, tax returns, or a CPA letter (meaning a letter from the borrower's accountant confirming

the borrower's income and/or employment information).[143]  Originators' guidelines required a

self-employed borrower verifying income with full documentation to provide some combination

of current and consecutive bank statements, and/or tax returns from the previous 12 or 24

months.[144]  A self-employed borrower applying with alternative or limited documentation was

usually required to provide some combination of bank statements, an IRS Form 1099 or Form

1040, or a profit and loss statement from the previous six or 12 months.[145]

---

[142]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 266; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 564; EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 170.

[143]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 268; People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 386; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 566, 596.

[144]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 273-76, 278-79, 282-83, 287-89, 291 (describing documentation requirements for the following categories of self-employed borrowers: consultant, corporation, farming, general partnership, limited partnership, rental, S-corporation, and sole proprietorship); ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 566; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 524-25.

[145]    *See, e.g.*, First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 527; Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 124.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

In addition, many Originators' guidelines, including those of Alt-A and subprime lenders, generally required a borrower to show two years of steady employment and income.[146] Some Originators' guidelines emphasized the importance of the stability of the stream of income regardless of its source. For example, Fremont's guidelines stated that the "stable and reliable flow of income, rather than the stability of the borrower's employment, is a more significant contributor to the borrower's ability to repay. . . .  In view of this, Fremont's underwriting guidelines emphasize the continuity of a borrower's stable income."[147]

Lenders may also have placed some restrictions on the use of alternative programs. For instance, People's Choice did not allow income to be verified by bank statements for C or C+ credit grades and for loans in its 580 80/20 loan program, both of which were considered higher risk loans.[148] And some lenders required that borrowers on a fixed income (*e.g.*, pensions, social security, or disability) had to provide more complete verification of the fixed income.[149]

### 3.    Minimum Industry Standards Regarding Income and Employment Verification Under Full and Reduced Documentation Programs

When a borrower applied for a loan program that required full or reduced documentation, minimum industry standards for assessing a borrower's ability to repay the mortgage required that the underwriter review the documentation to verify the borrower's employment status. Moreover, whether the borrower applied under a full or reduced documentation program, these standards required the underwriter to verify a salaried borrower's employment for the 12 months

---

[146]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 264; People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 380; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 595.

[147]    Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 264.

[148]    People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 382.

[149]    ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 572, 593.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

prior to the loan application.[150]  To do so, the underwriter should have obtained at least a verbal

VOE or written VOE form signed by the borrower's employer certifying the borrower's date,

place, and status of employment.

Verification of employment for a self-employed borrower, at a minimum, required an

underwriter to review documentation establishing the borrower's self-employment.  Under either

a full or reduced documentation program, a self-employed borrower had to establish that his or

her business had existed for 12 months, which could be done with a CPA letter, business license,

or tax return from the previous year.[151]

Nomura acknowledged the importance of income and employment verification in

determining a borrower's ability to repay a mortgage.  As Jeffrey Hartnagel testified, if an

originator did not obtain a verification of employment, "[t]hen you have questions if it is true or

---

[150]  For examples of underwriting guidelines that were consistent with this requirement, *see* Ameriquest Mortgage Company Underwriting Guidelines, ML_FHFA 6100812, at 823, 826 (requiring 24 months of income/employment documentation under the full documentation program and 12 months under the limited documentation program); Decision One Underwriting Guidelines, DECISIONONE_FHFA 00000143, at 149-50 (requiring 24 months of income/employment documentation under the "Full Doc" program and a VOE covering the prior 24 months of employment under "Bank Statement" and "Lite Doc" programs); WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 880-83 (under WMC's full documentation program, requiring a borrower to provide either 12 months of bank statements or a W-2 form, tax returns, and VOE for the most recent year, while under WMC's limited documentation program, requiring a borrower to provide a W-2 form, tax returns, or 12 months of bank statements).

[151]  For examples of underwriting guidelines that were consistent with this requirement, *see* Ameriquest Mortgage Company Underwriting Guidelines, ML_FHFA 6100812, at 823, 826 (requiring a business license and tax returns for the previous two years under the full documentation program and a business license and tax returns from the previous year under the limited documentation program); Decision One Underwriting Guidelines, DECISIONONE_FHFA 00000143, at 149-50 (requiring tax returns from the previous two years under the "Full Doc" program and a business license or CPA letter verifying self-employment with the same company for the prior two years under "Bank Statement and Lite Doc" programs); WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 880-83 (requiring a borrower to provide tax returns for at least the previous year under both the full and limited documentation programs).

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

not. . . .  If [the borrower] is employed where he states."[152]  For full and alternative

documentation loans, Nomura's correspondent underwriting guidelines required both salaried

and self-employed borrowers to provide written verification of employment and income for the

most recent two years using documentation such as paystubs, W-2 forms, VOEs, and tax

returns.[153]  Under its lite documentation program available to self-employed borrowers, Nomura

required employment to be verified for the prior two years using a VOE, either by contacting the

business's CPA or through contacting an independent third-party such as a regulatory agency,

and required income to be verified with the prior six months bank or asset statements.[154]

## H.   Representations Regarding Reasonableness of Income and Employment Verification Under Stated Income Documentation Programs

Between 2002 and 2007, subprime and Alt-A Originators offered reduced documentation

programs in which the borrower's income was stated on the loan application but not verified by

the lender.  Stated income mortgages were designed for borrowers who received sufficiently

stable income to meet their monthly mortgage obligations but who lacked the documentation

available to traditional wage earners.  This category of borrowers included self-employed

borrowers who operated a stable business, as well as borrowers who had seasonal income.  Other

borrowers who had multiple stable sources of income that were difficult to verify were also

appropriate candidates for a stated income documentation program.

Reduced documentation requirements did not imply reduced minimum borrower

qualification requirements.  To the contrary, a stated income loan required the underwriter to use

---

[152]   Hartnagel Dep. at 528:3-12.

[153]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 771-74.

[154]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 775-76.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

heightened care to assess the reliability of the borrower's stated employment and income.

Without such care, stated income loans were susceptible to overstatement of the borrower's

income or outright fraud in the origination process.  A borrower's purposeful misstatement of

income obviously casts doubt on his or her capacity to repay the mortgage, as it is likely that the

income earned is less than stated.  Moreover, such a misstatement casts doubt on the borrower's

character and increases the credit risk of the loan, as a borrower who is willing to claim an

inflated income to obtain a loan is typically less able and willing to repay the mortgage than a

borrower who states his or her income honestly.

> 1. **Representations in the Prospectus Supplements Regarding Reasonableness of Income and Employment Verification Under Stated Income Documentation Programs**

With respect to stated income loans, where there are no pay stubs or W-2 forms to

consult, the assessment of the borrower's ability to repay must include a determination of the

reasonableness of the borrower's stated income.  Four of the seven Prospectus Supplements

contained explicit representations that the originators' guidelines required a borrower's stated

income to be reasonable and/or consistent with the borrower's occupation.[155]  For example, the

NHELI 2006-FM1 Prospectus Supplement represented:  "The income is not verified under the

Stated Income program; however, the income stated must be reasonable and customary for the

applicant's line of work."[156]  The reasonableness of a borrower's stated income was a

determination necessary for an accurate assessment of the borrower's ability to repay.

---

[155]   *See* Exhibit 6, Chart H.

[156]   NHELI 2006-FM1 Prospectus Supplement, NOM-FHFA_04729474, at 545.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### 2.   Representations in the Originators' Underwriting Guidelines Regarding Reasonableness of Income and Employment Verification Under Stated Income Documentation Programs

For stated income loans,[157] most of the Originators' underwriting guidelines required verification of the borrower's continuous employment for at least two years prior to the loan application.[158]  Some Originators required a written or verbal VOE from an employer prior to closing, and the inability to obtain such verification typically rendered the borrower ineligible for the loan.[159]  A self-employed borrower was required to prove employment with a CPA letter or a business license.[160]

In addition to verification of employment, the Originators' underwriting guidelines required an assessment of the reasonableness of the borrower's stated income.  This assessment required a comparison of the borrower's stated income to other borrower characteristics, such as the borrower's geographic location, occupation, length of experience, and assets.[161]  Fremont's

---

[157]   Several of the Originators also allowed for No Income, No Asset ("NINA") loans, which were also known as "No Doc" loans, and/or "No Ratio" loans.  *See, e.g.*, Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 153-54.  In discussing its NINA loan program, Silver State explained:  "These loans do not verify any of the above income information about the borrower.  In some cases, the income and/or assets may not even be stated, so ratios cannot be calculated."  *Ibid.*, 153.  Thus, underwriting for NINA loans relied heavily on the borrower's character as indicated by his FICO score and housing payment history, along with the collateral value.

[158]   *See, e.g.*, ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 603; Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 568.

[159]   *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 266; EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 170; Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 153.

[160]   *See, e.g.*, Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 363; Alliance Mortgage General Underwriting Guidelines, JPMC-UWG-BEAR-000235485, at 541-42.

[161]   *See, e.g.*, EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 186; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 602, 606; Silver State

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

guidelines required underwriters to determine "[i]f there is information in the file that appears to refute or contradict the level of income stated by the borrower" and, if there was, to request additional documentation or consider the application under its Full or Easy documentation programs.[162]  As Ownit's underwriting guidelines explained, "[i]n all cases, [the stated] income must be reasonable for the line of work."[163]  ResMAE provided an example of a stated income that would not pass its "reasonability test":  a borrower who claimed yearly income of $100,000 based on employment as a dishwasher at a hamburger stand.[164]  EquiFirst's underwriting guidelines noted that "[o]nline tools such as Salary.com may be utilized as a tool to determine reasonable income."[165]

Additionally, some Originators' guidelines required a full loan application for stated income loans, complete with statements of assets, liabilities, all sources of income, and the sources of liquid closing funds.[166]  Originators should have reviewed such applications for inconsistencies with the borrower's stated income, line of work, or assets.  Also, a borrower's initial and final loan application should have been reviewed for any inconsistencies, and any red flags should have been investigated.[167]

---

Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 153; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 363; *see also* Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 263.

[162]  Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 263.

[163]  Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 363.

[164]  ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 606.

[165]  EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 186.

[166]  *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 232, 265.

[167]  *See, e.g.*, ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066401, at 408; *see also* Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 232.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

For stated income loans, some of the Originators' guidelines explicitly required verification of any assets that the borrower planned to rely on for closing, reserves, and income (if applicable).[168]  For certain Originators, this requirement also served as a means of assessing the reasonableness of the borrower's income, the rationale being that the stated asset base should be consistent with that of a person who makes the borrower's stated income.[169]  Finally, the Originators' underwriting guidelines stated that the borrower's credit profile, including the amount of liabilities and repayment history, should be commensurate with the income stated on the loan application.[170]

### 3.    Minimum Industry Standards Regarding Reasonableness of Income and Employment Verification Under Stated Income Documentation Programs

Stated income loans were specialized products available to subprime and Alt-A borrowers who lacked traditional forms of documentation.  Absent some assurance about the reasonableness of the borrower's stated income, they were excessively risky.  Accordingly, minimum industry standards required an underwriter to assess the reasonableness of the borrower's income when evaluating a stated income application.  This assessment entailed several steps.  First, the underwriter should have verified that the borrower was employed prior to the loan closing, either through a verbal or written verification of employment.[171]  If a self-

---

[168]    *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 308, 311; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 582-83.

[169]    *See, e.g.*, ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066401, at 408.

[170]    *See, e.g.*, ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066401, at 408-12.

[171]    For examples of underwriting guidelines that were consistent with this requirement, *see* WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 885; New Century Mortgage Underwriting Guidelines, FHFA_NC_0000355, at 369; Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 516; Long Beach Mortgage Company

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

employed borrower's profession would typically require a license—such as a doctor or a hair stylist—then the underwriter should have verified that license.[172]

Second, the underwriter should have considered whether the borrower's stated income fell within the range of typical incomes for a person of the borrower's stated profession, position within the borrower's company (if the borrower was a salaried worker), geographic location, and length of experience.[173]  As New Century's underwriting guidelines explained, the underwriter had to ensure that the borrower's income was "reasonable and customary for the occupation or source."[174]  Audit and income verification tools could have been used by the underwriter to assess the reasonableness of the borrower's stated income.[175]  WMC's underwriting guidelines,

---

Underwriting Guidelines, JPMC-UWG-WAMU-000453475, at 503; Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 772; Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05503755, at 795.

[172]  For examples of underwriting guidelines that were consistent with this requirement, *see* New Century Mortgage Underwriting Guidelines, FHFA_NC_0000355, at 357; WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 885; Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 513 ("Self-employed borrowers require satisfactory evidence of self-employment. . . . A business license or other third-party verification would be needed to link the borrower to ownership of the business.").

[173]  For examples of underwriting guidelines that were consistent with this requirement, *see* ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 602 ("The stated income must be reasonable for the profession and the borrower's tenure."); Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 153 ("A 'Reasonableness Test' is applied to the stated income to ensure that it is appropriate for the job description."); People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 408 ("The 1003 must be signed at the time of submission and the income must be reasonable for the occupation."); Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 479 ("Income must appear reasonable for the applicant's:  Location[,] Occupation[,] Length of experience[, and] Assets").

[174]  New Century Mortgage Underwriting Guidelines, FHFA_NC_0000355, at 369.

[175]  For examples of underwriting guidelines that were consistent with this requirement, *see* EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 170; WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 885.

In my re-underwriting review, to assess the reasonableness of a borrower's stated income I directed my teams to use salary data provided by BLS.  Given the historical nature of my

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

for instance, recommended that the underwriter consult Salary.com and conclude that the stated income was unreasonable if that source established that the borrower's income was not within 25% of the 75th percentile of Salary.com's index for the borrower's profession.[176]

Nomura itself required incomes on stated income loans to be reasonable for the profession and geographic location.  In an email addressed to "All Nomura Due Diligence Vendors," including Clayton and AMC, Joseph Kohout stated that "I expect that as a component of due diligence that the reasonability of income is reviewed and if applicable, questioned."[177]  In that same email, Kohout emphasized that if there was any doubt about whether the income was reasonable, there were "a number of tools available on the Internet that provide guidance on income/occupation/geographic area . . . ."[178]  This included the website Salary.com.[179]  In addition, Nomura's correspondent underwriting guidelines made clear that Nomura may require

---

review, some of the ways that an underwriter could have assessed a borrower's income between 2002 and 2007—such as consulting the borrower's verified employment—would be complicated and unreliable to use while reviewing the loan file years after the borrower applied for the mortgage.  Therefore, it was sometimes necessary to use third-party salary data.  And among third-party sources, the BLS database is the only database I am aware of that offers historical salary data.  I considered a borrower's stated income to be unreasonable when it exceeded the 90th percentile of the BLS's index for the borrower's occupation, position, and geographic location.  I view this assumption to be generous because using the 90th percentile gave the borrower considerable benefit of the doubt in my analysis.

[176]   WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 885.

[177]   Dep. Ex. 37102 at NOM-FHFA 05500889.

[178]   Dep. Ex. 37102 at NOM-FHFA 05500890.

[179]   Kohout Dep. at 70:22-71:13; *see also* Spagna Dep. at 75:2-77:25 (testifying that "salary.com was used to check the reasonableness of a stated-income borrower's . . . income based on their . . . occupation and their geographic area" and that the income was not reasonable if it was higher than the range provided by Salary.com).

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

full or alternative documentation on loans where the stated income was "much larger than reasonably indicated by the borrower's profession [and] time on [the] job[.]"[180]

Third, the underwriter should have compared the income stated on the application to the borrower's asset base.[181]  It would cast doubt on the accuracy of the borrower's stated income if the borrower claimed a high income, but had only minimal verified assets.  Moreover, the underwriter should have ensured that the borrower's reported assets came from a verifiable source and were "seasoned."  For example, if a borrower made a down payment with a large sum of money that the borrower recently received as a gift, then the borrower's ability to make that down payment did not necessarily signify the borrower's ability to meet the monthly mortgage obligations.

Finally, the underwriter should have compared the borrower's credit profile, namely the borrower's credit report, credit score, and assets, to the stated income.[182]  In making this

---

[180]    Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 771; *see also* Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05503755, at 795-96 (requiring stated income to be reasonable for the employment).

[181]    For examples of underwriting guidelines that were consistent with this requirement, *see* WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 884 (instructing underwriters to "[c]ompare [the borrower's] assets and liabilities to [the borrower's] stated income"); Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 515 (instructing underwriters that the borrower's stated income "must be deemed reasonable and consistent with the borrower's profile, including the borrower's . . . assets"); Long Beach Mortgage Company Underwriting Guidelines, JPMC-UWG-WAMU-000453475, at 506 (instructing underwriters to consider, "[d]o the [borrower's] assets reflect a savings level and ability to save consistent with the Stated Income level?"); New Century Mortgage Wholesale Non-Prime Guidelines, CSFHFA009350896, at 905 (instructing underwriters to "consider the borrower's repayment habits and assets to evaluate the reasonableness of the income stated").

[182]    For examples of underwriting guidelines that were consistent with this requirement, *see* First Franklin Retail Product Manual, ML_FHFA 6075899, at 937 ("The underwriter must determine that the stated income is reasonable and realistic when compared to the borrower's . . . credit history."); Long Beach Mortgage Company Underwriting Guidelines, JPMC-UWG-WAMU-000453475, at 506 ("Does the borrower profile indicate an ability to manage finances?"); Option One Mortgage Underwriting Guidelines, CSFHFA006552670, at 704-05

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

comparison, the underwriter should have made sure that the borrower's credit profile was consistent with an individual making the income that the borrower claimed.  For example, if a borrower claimed a high income but had a credit profile with a history of late payments and highly utilized credit lines, then that should have indicated to the underwriter that the borrower may have misrepresented his or her income.

Nomura's correspondent underwriting guidelines made clear that they might require additional documentation for stated income loans when a stated income was "much larger than reasonably indicated by the borrower's . . . net worth, or liabilities and credit history."[183]  Joseph Kohout's email to Nomura's due diligence vendors stated that "the amount of assets should have some correlation to the stated income."[184]  And Jeffrey Hartnagel listed a borrower's asset and credit profiles as part of the overall picture an underwriter should look at to assess the reasonableness of stated income.[185]

### I.      Representations Regarding Credit Scores, LTV/CLTV Ratios, and DTI Ratios

A borrower's credit score, particularly a FICO score, measures the risk that a particular borrower presents to a creditor.  FICO scores are generated by the credit reporting agencies using proprietary models that take into account various historical credit data, including a borrower's payment history and use of credit, any derogatory credit information, and the frequency and number of recent credit inquiries.  Based on historical studies, the higher (better) the credit score,

---

("The stated income must be reasonably based on factors including, but not limited to: . . . Borrower's current credit profile.").

[183]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 771.

[184]   Dep. Ex. 37102 at NOM-FHFA_05500889; *see also* Kohout Dep. at 69:8-24 (explaining that he "would expect that there would be some level of reserves commensurate with the amount of income [the borrower is] stating").

[185]   Hartnagel Dep. at 132:2-133:11, 525:11-526:5.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

the lower the observed incidence of default.[186]   Brett Marvin, a Managing Director at Nomura,

agreed that "there [is] a correlation between the borrower's credit score, whether it's FICO or

otherwise, and the risk of nonpayment of the mortgage," and that this perception was held by

himself, the market, and the rating agencies.[187]

The loan's LTV ratio is an important factor in assessing the borrower's willingness to

repay the mortgage.[188]  The LTV ratio compares the outstanding balance of the mortgage loan

with the value of the mortgaged property at the time the loan was made.  The value of the

mortgaged property was generally measured as the lesser of the property's appraised value or

purchase price (minus any adjustments).[189]  A higher LTV ratio indicates that the borrower has

less equity in the home and therefore indicates a greater likelihood of default on the mortgage—a

borrower who has less equity is more likely to default on mortgage payments if he or she

experiences financial distress.[190]  In addition, all else being equal, a higher LTV ratio represents

---

[186]   Board of Governors of the Federal Reserve System, *Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit,* S-1 (August 2007), http://www.federalreserve.gov/boarddocs/rptcongress/creditscore/creditscore.pdf.

[187]   Marvin Dep. at 151:10-152:23.  For another example of a Nomura witness providing testimony on this point, *see* Deposition of James DePalma, dated Nov. 15, 2013 ("DePalma Dep."), at 179:24-180:6 ("Q. . . . [W]ould a low FICO score, all things being equal . . . cause a trend of more delinquencies or default whenever you were doing this?  A.  Yes.").

[188]   The Originators included LTV/CLTV ratio requirements in their guidelines and/or matrices.  For examples, *see* Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 334; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 384-99; People's Choice Core Underwriting Matrix, JPMC-UWG-BEAR-000154567, at 567-69.

[189]   *See, e.g.*, Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05503755, at 768 ("Loan-to-value ratios are calculated based on the lesser of appraised value or purchase price in the case of purchase transactions and in cash out refinances where the borrower has owned the property less than 12 months."); EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 157; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 319.

[190]   For an example of a Nomura witness admitting as much, *see* Hartnagel Dep. at 65:10-66:11 ("[T]he more equity a borrower has in the property, the least likely he is to default. .

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

a potentially higher loss severity because a smaller cushion exists between the estimated market value of the property and the unpaid principal balance of the loan, with the incumbent risk that the holder of the loan will not be able to recover the amount of the unpaid principal balance in a foreclosure sale.  If a borrower obtains a second-lien mortgage on the property, the CLTV ratio compares the combined balance of the first- and second-lien mortgages against the lesser of either the property's appraised value or purchase price.  As with the LTV ratio, all else being equal, a higher CLTV ratio is indicative of a higher risk of delinquency and default.

The borrower's DTI ratio is also an important factor in assessing the borrower's capacity to repay the loan.[191]  The borrower's DTI ratio demonstrates the amount of the borrower's monthly income required to pay monthly obligations, including the mortgage loan.  To calculate the DTI ratio, the lender must determine all required monthly payments, including the subject loan's principal, interest, taxes and insurance payments ("PITI"), installment and revolving debts along with any additional required obligations, such as child support, and divide that total debt by the borrower's monthly income.  Lender's use two forms of DTI calculations.  First, the mortgage DTI calculates only the monthly housing debt, or PITI, divided by the monthly income.  The second calculation is a total DTI, which measures all monthly obligations.  This is sometimes referred to as "the Back-end" ratio and was more often the primary measuring stick of a borrower's capacity.  All else being equal, the higher the borrower's DTI ratio, the more

---

. . Why would you walk away from money?").  Brett Marvin similarly testified that he did not think it was possible to effectively price for the risk of loans with LTVs exceeding 100%.  Marvin Dep. at 135:8-138:24.

[191]    The Originators' guidelines set maximum DTI ratios, often linked to other loan characteristics such as LTV ratio, loan amount, and loan program.  For examples, *see* Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 305; People's Choice Core Underwriting Matrix, JPMC-UWG-BEAR-000154567, at 567-69; Aegis Mortgage Signature Alternative A Matrices and Guidelines, JPMC-UWG-BEAR-000005665, at 668-75.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

difficult it is for the borrower to meet his or her monthly mortgage payments, and the greater the credit risk associated with the loan.[192]

These three factors are critical to determining a borrower's ability and willingness to repay a loan.  As described below, the Prospectus Supplements made representations about these loan characteristics, including group-level statistics for LTV ratios and DTI ratios.  Further, as James DePalma, a Director at Nomura, testified, LTV/CLTV ratios, DTI ratios, and FICO scores were all inputs into the loan loss model Nomura used, and, all else being equal, higher LTV/CLTV and DTI ratios and lower FICO scores increased the risk of delinquencies.[193]

### 1.   Representations in the Prospectus Supplements Regarding Credit Scores, LTV/CLTV Ratios, and DTI Ratios

#### d.   Credit Scores

The Prospectus Supplements for every Securitization represented that originators took FICO scores into account when determining a borrower's ability to repay a mortgage.[194]  For example, the NHELI 2007-2 Prospectus Supplement stated:  "A satisfactory credit history is the most reliable criterion in determining a borrower's credit worthiness.  Ownit relies on the scoring models developed by the national credit bureaus:  Experian, TransUnion and Equifax for much of that decision process."[195]  The NAA 2005-AR6 Prospectus Supplement represented that under

---

192  *See* DePalma Dep. at 179:13-19 ("Do you know if now or at the time you thought it was your understanding that a higher DTI, all things being equal, would lead to a higher chance of delinquency or default when modeling these products?  A.  Yes."); Dep. Ex. 32706 at NOM-FHFA_05071266 (email from Christopher Scampoli dated Nov. 22, 2006 noting that there is a compliance risk for loans with DTIs greater than 55%, and that any such loan "should be marked ineligible for 'Loan granted without regard for borrower's ability to repay'").

193  DePalma Dep. at 177:7-179:23.

194  *See* Exhibit 6, Chart I.

195  NHELI 2007-2 Prospectus Supplement, NOM-FHFA_05591325, at 414.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

"no documentation" programs, the underwriting for mortgages loans may be based primarily or entirely on a borrower's credit score, the appraisal value and/or LTV ratio.[196]

**e.      LTV Ratios**

The Prospectus Supplements for each of the Securitizations contained group-level information about the LTV ratios for the loans in the underlying SLGs.[197]  Specifically, the Prospectus Supplements contained tables listing the percentage of loans in each SLG with a LTV ratio at or less than certain percentages.  For example the NHELI 2006-FM1 Prospectus Supplement represented that "[t]he Group I Mortgage Loans are expected to have the following additional characteristics as of the Cut-off Date:"[198]

**Original Loan-to-Value Ratio of the Group I Mortgage Loans**

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Gross Coupon (%) | FICO | LTV (%) | Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| <= 50.00 ................ | 24 | $   3,910,839 | 0.96% | 7.875 | 627 | 42.26 | 356 | 7.63 |
| 50.01 - 55.00 ............ | 8 | 1,762,850 | 0.43 | 7.728 | 586 | 53.10 | 357 | - |
| 55.01 - 60.00 ............ | 28 | 5,419,996 | 1.34 | 7.827 | 570 | 58.13 | 356 | 4.65 |
| 60.01 - 65.00 ............ | 94 | 16,769,078 | 4.14 | 8.463 | 571 | 63.61 | 356 | 42.78 |
| 65.01 - 70.00 ............ | 122 | 23,919,568 | 5.90 | 8.206 | 576 | 68.61 | 355 | 40.45 |
| 70.01 - 75.00 ............ | 169 | 34,485,615 | 8.51 | 7.968 | 576 | 74.02 | 356 | 38.91 |
| 75.01 - 80.00 ............ | 947 | 169,164,042 | 41.72 | 7.237 | 624 | 79.80 | 356 | 58.09 |
| 80.01 - 85.00 ............ | 190 | 37,986,798 | 9.37 | 7.507 | 599 | 84.71 | 357 | 59.09 |
| 85.01 - 90.00 ............ | 472 | 82,740,763 | 20.41 | 7.661 | 622 | 89.77 | 356 | 66.25 |
| 90.01 - 95.00 ............ | 75 | 7,289,811 | 1.80 | 8.427 | 632 | 94.72 | 341 | 41.70 |
| 95.01 - 100.00 .......... | 403 | 21,986,828 | 5.42 | 9.766 | 641 | 99.97 | 347 | 59.06 |
| Total: ................... | 2,532 | $405,436,188 | 100.00% | 7.694 | 612 | 81.07 | 355 | 54.85 |

The Prospectus Supplements for all of the Securitizations represented that none of the mortgage loans in the SLGs underlying the Certificates purchased by Fannie Mae and Freddie Mac had LTV ratios over 100%, and all of the Prospectus Supplements represented that the majority of the mortgage loans in the relevant SLGs had LTV ratios of 80% or less.  For example, the NAA 2005-AR6 Prospectus Supplement represented that none of the underlying

---

[196]   NAA 2005-AR6 Prospectus Supplement, NOM-FHFA_04811802, at 896.

[197]   *See* Exhibit 6, Chart J.

[198]   NHELI 2006-FM1 Prospectus Supplement, NOM-FHFA_04729474, at 511, 514.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

mortgage loans in the relevant SLG had LTV ratios over 95% and that 98.94% of the underlying

loans had LTV ratios of 80% or less.[199]

### f.   DTI Ratios

Each of the Prospectus Supplements also contained representations regarding the

originators' use of the DTI ratio in determining a borrower's ability to repay a loan.[200]  The

NHELI 2007-3 Prospectus Supplement, for example, represented that ResMAE considered,

among other items, the "debt service-to-income ratio" when assessing a borrower's ability to

repay a loan.[201]  The Prospectus Supplement also provided details about ResMAE's

documentation programs, stating that from June 2006 to August 2006 the maximum DTI ratio

was 55% for full and limited documentation loans with LTV ratios at or below 85%, while the

maximum was 50% for stated income loans, and from September 2006 to November 2006 the

maximum DTI ratio was 55% for full documentation loans with LTV ratios at or below 90%,

while the maximum was 50% for limited documentation and stated income loans.[202]

### 2.   Representations in the Originators' Underwriting Guidelines Regarding Credit Scores, LTV/CLTV Ratios, and DTI Ratios

All of the Originators' underwriting guidelines contained numerical limits on FICO

scores, LTV/CLTV ratios, and DTI ratios.  Originators used FICO scores, LTV/CLTV ratios,

and DTI ratios in relation to one another to set the parameters of borrower eligibility.  For

example, Fremont set a minimum FICO score for a subprime borrower at 500, but a borrower

---

[199]   NAA 2005-AR6 Prospectus Supplement, NOM-FHFA_04811802, at 861.

[200]   *See* Exhibit 6, Chart K.

[201]   NHELI 2007-3 Prospectus Supplement, NOM-FHFA_04732621, at 708.

[202]   *Ibid.*, 712.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

with that score could not exceed a maximum LTV ratio of 80%.[203]    A subprime borrower with a

FICO score of 600, on the other hand, could potentially qualify for a loan with a LTV ratio of

100% for a full or easy documentation loan or 90% for a stated income loan.[204]    Other

Originators had similar cutoffs and restrictions for subprime loans.[205]    Guidelines for Alt-A

mortgages also took a multi-factored approach when setting minimum FICO scores.    For

example, under its Alt-A guidelines, Aegis allowed borrowers with a FICO score of 620 to take

out a full or alternative documentation loan up to $650,000 on a primary residence or second

home with a 95% LTV ratio.    To take out a stated income loan of $650,000 on an investment

property under those same guidelines, an Alt-A borrower needed a FICO score of 620, with a

maximum LTV ratio of 80%.[206]    Other Originators also linked FICO scores for Alt-A loans to

other requirements, such as LTV ratios, loan amounts, occupancy, and lien position.[207]

While most of the Originators limited eligible borrowers to those with a DTI ratio of 50%

or lower, some subprime lenders originated mortgages to borrowers with DTI ratios up to

55%.[208]    A subprime borrower who obtained a mortgage with the maximum qualifying ratio of

55%, however, was typically approved with conditions.    For example, Equifirst's underwriting

guidelines permitted borrowers with a 55% DTI ratio to be approved for full documentation

---

[203]    *See* Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 249.

[204]    *See ibid*.

[205]    *See, e.g.*, Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 384-85.

[206]    *See* Aegis Mortgage Signature Alternative A Matrices and Guidelines, JPMC-UWG-BEAR-000005665, at 673-74.

[207]    *See, e.g.*, Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 598-602.

[208]    *See, e.g.*, EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 170; First NLC Credit Matrix, JPMC-UWG-BEAR-000130438, at 438-43; People's Choice Core Underwriting Matrix, JPMC-UWG-BEAR-000154567, at 567-68.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

loans on owner-occupied properties only with a maximum LTV/CLTV of 90%, while People's

Choice's underwriting guidelines permitted borrowers with a 55% DTI ratio to be approved for

loans on owner-occupied properties if the borrower's LTV ratio was no greater than 75%.[209]

Many of the Originators limited the maximum permissible LTV ratio for a subprime or

Alt-A mortgage to 95%, depending on factors such as the borrower's credit score and level of

income documentation.[210]  However, it was not unusual for the underwriting guidelines of some

subprime or Alt-A lenders to permit approval of mortgages with CLTV ratios of 100%[211] or LTV

ratios of 100%,[212] however such loans could only be approved with conditions.  For instance,

ResMAE's guidelines permitted approval of first-lien mortgages with LTV ratios of 100% to

borrowers in stated documentation programs, provided that (1) the borrower had a credit score of

at least 620, a DTI ratio of 50% or less, and no more than one late payment in the previous 12

months; and (2) the property would be owner-occupied.[213]

> ### 3. Minimum Industry Standards Regarding Credit Scores, LTV/CLTV Ratios, and DTI Ratios

Mortgage loan originators used credit scores (generally FICO scores), LTV and CLTV

ratios, and DTI ratios in conjunction with one another to set the parameters of borrower

---

[209]  *See* EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 170; People's Choice Core Underwriting Matrix, JPMC-UWG-BEAR-000154567, 567-68.

[210]  *See, e.g.*, Alliance Mortgage Conduit Alt A Underwriting Guidelines, JPMC-UWG-WAMU-000736544, at 598-602.

[211]  *See, e.g.*, Aegis Mortgage Signature Alternative A Matrices and Guidelines, JPMC-UWG-BEAR-000005665, at 670-74; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 334.

[212]  *See, e.g.*, Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 384-98; Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 334; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066660, at 692.

[213]  ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066660, at 692-93.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

eligibility.  For each parameter, there were minimum industry standards for maximum or minimum limits.  In conducting my assessment, I considered the minimum standard to be the highest DTI and LTV/CLTV ratios, and the lowest FICO scores, allowed under the underwriting guidelines that were prevalent during the relevant time period.  These minimums and maximums reflect lenient standards for the origination and underwriting of residential mortgage loans.

During the relevant time period, underwriting guidelines for prime and Alt-A loans required borrowers  to have a credit score of at least 620.  This was the minimum FICO score required by Nomura for its Alt A Correspondent Underwriting Guidelines.[214]  It was also the minimum FICO score required by, for example, Wells Fargo, a leading Alt-A originator.[215]  For subprime loans, the minimum credit score was 500, which tracked the minimum FICO score required by WMC, Long Beach and New Century.[216]  Going below this minimum FICO score was evidence of a departure from the minimum requirements and a failure to adequately assess the borrower's ability to repay.

The minimum industry standard for the maximum LTV and/or CLTV ratio was 100% for owner-occupied first or second homes.[217]  This standard was also consistent with representations

---

[214]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 783-85.

[215]   Wells Fargo Mortgage Express Alt-A Credit Grade Matrix, GS FHFA 003551054, at 054.

[216]   *See* WMC Mortgage Build Your Own Program Matrix, WMC-FHFA-Cases-00004311, at 311; Long Beach Mortgage Company Wholesale Mortgage Rates Matrix, JPMC-UWG-WAMU-000879573, at 573; New Century Mortgage Traditional Matrix, UBS-FHFA-00286730, at 730.  In fact, Nomura's diligence team included loans with FICO scores less than 540 as a criteria for its due diligence sample, Dep. Ex. 40913, at NOM-FHFA_04982973, and trade stipulations entered into by Nomura indicated that it would not purchase loans with FICO scores less than 500.  Dep. Ex. 39718, at NOM-FHFA_05338820.

[217]   *See* Countrywide Loan Program Guide, JPMC-UWG-BEAR-000055397, at 397; WMC Mortgage Build Your Own Program Matrix, WMC-FHFA-Cases-00004311, at 311-12; New Century Mortgage Traditional Matrix, UBS-FHFA-00286730, at 730.  In addition, John

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

made in the Prospectus Supplements that no mortgage loans in the SLGs had LTV ratios

exceeding 100%.  Further, this minimum industry standard was more lenient than Nomura's

underwriting guidelines, which limited LTV ratios to 95% and CLTV to 100%.[218]

Under minimum industry standards, the maximum DTI ratio for borrower eligibility was

55%.[219]  Although Nomura's correspondent underwriting guidelines allowed DTI ratios of up to

60%, they were clear that any DTI ratio greater than 50% was subject to a pricing adjustment.[220]

In addition, the trade stipulations entered into by Nomura, which established the terms of whole

loan trades with loan sellers, provided that Nomura would not purchase loans with DTI ratios

greater than 55%.[221]

## J.      Representations Regarding Owner Occupancy

Owner occupancy refers to the borrower's intended use of a property.  Typically, the

Prospectus Supplements and underwriting guidelines provided three categories of occupancy:

(1) owner-occupied, meaning the borrower intended to use the mortgaged property as a primary

residence; (2) second home, meaning the borrower intended to use the mortgaged property as a

part-time or vacation home; and (3) investment, meaning the borrower intended to use the

mortgaged property to earn income, for example, through rental payments.  The occupancy status

---

Graham testified that "100 percent LTV would have been the max that was acceptable in the market at the time," and that Nomura did not securitize loans with LTVs greater than 100%. Graham Dep. at 56:24-57:23.

[218]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05503755, at 792; Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 783-86.

[219]   *See* Countrywide Loan Program Guide, JPMC-UWG-BEAR-000055397, at 401; WMC Mortgage Build Your Own Program Matrix, WMC-FHFA-Cases-00004311, at 311-13; New Century Mortgage Traditional Matrix, JPMC-UWG-BEAR-000153727, at 727; Long Beach Mortgage Company Underwriting Guidelines, JPMC-UWG-WAMU-000453475, at 509.

[220]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 790.

[221]   Dep. Ex. 39718 at NOM-FHFA_05338820.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

of a mortgaged home was important because borrowers living in a mortgaged property had more incentive to make payments and care for the home than borrowers purchasing second homes or investment properties.[222]  As such, mortgages for owner-occupied properties generally presented less credit risk than those for non-owner-occupied properties.[223]  Nomura's guidelines recognized the importance of owner occupancy by imposing more stringent requirements on borrowers seeking mortgages on non-owner-occupied homes.  For example, the guidelines set the maximum LTV ratio for an investment property at 90% versus 95% for non-investment properties, as well as requiring greater reserves, decreasing allowable seller concessions, and disallowing gifts as a source of funds.[224]

### 1.    Representations in the Prospectus Supplements Regarding Owner Occupancy

The Prospectus Supplements for each of the Securitizations contained group-level information about the occupancy status of the properties underlying the mortgage loans in the SLGs.[225]  Specifically, the Prospectus Supplements contained tables listing the percentage of loans where the occupancy status was (1) "primary" or "owner-occupied," (2) "investment" or "non-owner-occupied," and (3) "second home" or "secondary."  For example the NHELI 2007-2

---

[222]   *See* Graham Dep. at 82:24-83:25 (testifying that owner-occupied properties are considered less risky because "someone living in the home on which they are paying the mortgage might be more likely to remain current since it is their home").

[223]   *See ibid.*; *see also* DePalma Dep. at 180:10-14 ("Q.  And would a purpose other than a primary residence, all things being equal, cause a heightened chance of delinquency or default?  A.  Yes.").

[224]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05503755, at 790, 792-93.

[225]   *See* Exhibit 6, Chart L.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

Prospectus Supplement represented that "[t]he Group I Mortgage Loans are expected to have the following additional characteristics as of the Cut-off Date:"[226]

### Occupancy Status of the Group I Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied | 2,731 | $ 437,629,409 | 90.86% | 8.267% | 618 | 81.87% | 355 | 66.15% |
| Investor | 228 | 36,248,500 | 7.53 | 8.735 | 647 | 80.93 | 352 | 42.58 |
| 2nd Home | 42 | 7,796,118 | 1.62 | 8.680 | 621 | 85.50 | 351 | 35.77 |
| Total/Weighted Average: | 3,001 | $ 481,674,027 | 100.00% | 8.309% | 621 | 81.86% | 354 | 63.89% |

In all but one of the Prospectus Supplements for the Securitizations, these tables represented that at least half of the properties underlying the mortgage loans in each of the relevant SLGs were owner-occupied.[227]  Furthermore, five of the seven Prospectus Supplements for the Securitizations represented that at least 75% of the properties underlying the mortgage loans in the SLGs were owner-occupied, and out of those five, three represented that more than 90% of the properties were owner-occupied.

### 2. Representations in the Originators' Underwriting Guidelines Regarding Owner Occupancy

Due to the increased credit risk associated with non-owner-occupied homes, many Originators imposed tighter credit requirements on investment properties as opposed to owner-occupied properties.  For example, Fremont's maximum LTV ratio for an owner-occupied home was 100%, while its maximum LTV ratio for a non-owner-occupied home was 90%.[228]  One of EquiFirst's criteria for allowing a maximum DTI ratio of 55% was owner occupancy; any loan

---

[226]   NHELI 2007-2 Prospectus Supplement, NOM-FHFA_05591325, at 372, 378.

[227]   The lone exception is NHELI 2007-1, in which 45.78% of the loans were owner-occupied, though 53.07% of loans as measured by principal balance (*i.e.*, by outstanding loan amount) were owner-occupied.  NHELI 2007-1 Prospectus Supplement, NOM-FHFA_05141912, at 2002.

[228]   Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 238.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

for a property that was not owner-occupied required a DTI ratio of 50% or lower.[229]  And

People's Choice barred borrowers from its interest-only loan program, mortgage-only loan

program, 80/20 loan program, and 40/10 loan program if the underlying property was not owner-

occupied.[230]

 The underwriting guidelines of certain Originators expressly instructed underwriters to

classify a loan as "owner-occupied" only if information in the loan file supported such a

classification.  For example, First NLC's guidelines stated that the "following conditions must

apply":

- The property must be suitable for year-round occupancy

- The borrower must state an intention to occupy the property as the primary residence

- The borrower must occupy the property for a major portion of the year

- The property must be near borrower's place of employment

- The property must be the borrower's legal address of record

- The property characteristics must meet the borrower's needs.[231]

 ResMAE similarly listed a variety of potential red flags indicating non-owner occupancy,

including an unreasonable commuting distance; file documentation, such as pay stubs, W-2s, tax

returns, bank statements, and credit reports, that reflects the borrower living at a different

address; that the new housing is not large enough to accommodate all occupants, and; a tenant

---

[229] EquiFirst Underwriting Practices Manual, BARC-EF_000000144, at 170.

[230] People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 422, 425, 430, 436.

[231] First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 513.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

shown as the occupant on an appraisal.[232]  People's Choice required underwriters "to use

common sense" in making a "second home" classification and instructed underwriters that:  "The

property type, location and proximity to the borrower's primary residence are major factors to

consider.  The appraisal may not reflect the property as tenant-occupied.  On Full Doc loans, no

schedule E income for the property may be disclosed.  The Underwriter should condition [sic]

for a copy of an electric or phone bill (in the borrower's name) as proof the property is a second

home."[233]

### 3.   Minimum Industry Standards Regarding Owner Occupancy

As discussed in Section IX, minimum industry standards required underwriters to

investigate potential misrepresentations of occupancy.  This could be done by using information

in the loan file itself or using information obtained through public records.  Nomura's

correspondent underwriting guidelines acknowledged the importance of this minimum industry

standard, stating:

> Misrepresentation of occupancy is a serious problem in the
> mortgage industry.  Nomura reserves the right to require additional
> documentation supporting stated occupancy for any loan, including
> but not limited to documentation of the occupancy status of other
> real estate owned by the borrower, and will carefully review the
> entire loan file to ensure that stated occupancy is consistent with
> all facts and documents presented.[234]

Nomura's due diligence employees similarly acknowledged that underwriters should look

for red flags indicating that occupancy had been misrepresented, such as a significant distance

---

[232]   ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066401, at 406, 408, 410.

[233]   People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 346.

[234]   Nomura Correspondent Underwriting Guidelines, NOM-FHFA_05063720, at 733.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

between the property and the borrower's place of employment or the distance between the primary home and secondary home.[235]

### K.      Representations Regarding Hazard and Title Insurance

Representations regarding hazard and title insurance are important, because failure to insure the subject property increases the risk presented by the mortgage loan.  Hazard insurance is essential because the collateral property serves as a secondary source of repayment for a mortgage loan, and should a fire or other hazard destroy the property, the property would lose some or all of its value as collateral or as a source of repayment.  In addition, insufficient insurance coverage could preclude the borrower from repairing or rebuilding the collateral property, thus likewise reducing the collateral's value.

Title insurance protects the borrower and the lender against the possibility of a defect in the property's title.  If a previously unknown lien on the property or other title defect is found to exist after closing, it could cause the property to lose value or could frustrate the foreclosure process, which in turn could frustrate the ability to monetize the collateral.  Title insurance buffers the property against such a reduction in value.  Title insurance guarantees that the lender's lien position is first or second as expected, even if the title company erred in reporting the lien position at or before the mortgage loan closed.  Originating a mortgage loan without requiring title insurance protection risks forfeiture of a significant amount of repayment.

### 1.      Representations in the Prospectus Supplements Regarding Hazard and Title Insurance

The Offering Documents for each of the Securitizations represented that the underlying mortgage loans were protected by hazard insurance and title insurance.[236]  For example, the

---

[235]      *See, e.g.*, Sabo Dep. at 47:10-50:4; Hartnagel Dep. at 578:9-579:3, 583:20-584:5.

[236]      *See* Exhibit 6, Chart M.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

NHELI 2006-FM2 Prospectus Supplement represented:  "Fremont requires title insurance on all first mortgage loans, which are secured by liens on real property.  Fremont also requires that fire and extended coverage casualty insurance be maintained on the secured property . . . ."[237]

### 2. Representations in the Originators' Underwriting Guidelines Regarding Hazard and Title Insurance

Many of the Originators' guidelines made explicit the requirement that a mortgaged property be covered by hazard insurance to protect against events such as fire.[238]  For example, People's Choice underwriting guidelines stated:  "Hazard/Fire insurance is required on all loans. Acceptable evidence of hazard/fire insurance must be received before loan funds are disbursed."[239]  In addition, many Originators' underwriting guidelines required title insurance coverage for the mortgaged property.[240]  For example, Ownit's underwriting guidelines stated that an "ALTA [American Land Title Association] title insurance policy is required on all loans."[241]

---

[237]   NHELI 2006-FM2 Prospectus Supplement, NOM-FHFA_04638315, at 397.

[238]   *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 242-43; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 544-45; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 379.

[239]   People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 354.

[240]   *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 244-45; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 545; People's Choice Underwriting Policy & Guidelines, JPMC-UWG-BEAR-000211324, at 358.

[241]   Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 383.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### 3.   Minimum Industry Standards Regarding Hazard and Title Insurance

Minimum industry standards required the collateral to be covered by hazard and title insurance.[242]  Consistent with this requirement, Nomura required both types of insurance.  For example, the Mortgage Loan Purchase Agreement ("MLPA") between Nomura Credit & Capital, Inc. and Nomura Home Equity Loan, Inc. for the NHELI 2006-HE3 transaction represented:

> The Mortgaged Property is insured against loss by fire and hazards of extended coverage (excluding earthquake insurance) in an amount which is at least equal to the lesser of (i) the amount necessary to compensate for any damage or loss to the improvements which are a part of such property on a replacement cost basis or (ii) the outstanding principal balance of the Mortgage Loan.[243]

The MLPA further represented:

> Each Mortgage Loan is covered by a valid and binding American Land Title Association lender's title insurance policy issued by a title insurer qualified to do business in the jurisdiction where the Mortgaged Property is located, which title insurance policy is generally acceptable to Fannie Mae and Freddie Mac.[244]

In addition, Joseph Kohout testified that it was "generally correct" that there was an "industry standard" that borrowers provide proof of title insurance; flood insurance, if required; and hazard insurance prior to the loan closing.[245]

---

[242]   For examples of underwriting guidelines that were consistent with this standard, *see* First Horizon Underwriting Guidelines, FH-FHFA_03454634, at 648-53, 680-82; WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 939-60; Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 543.

[243]   NHELI 2006-HE3 Mortgage Loan Purchase Agreement between Nomura Credit & Capital, Inc. and Nomura Home Equity Loan, Inc. dated Aug. 31, 2006, NOM-FHFA_04636755, at 762-63.

[244]   *Ibid.*, 763-64.

[245]   Kohout Dep. at 148:25-150:5.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### L.      Representations Regarding the Mortgage Loans' Compliance With Laws

#### 1.      Representations in the Prospectus Supplements Regarding the Mortgage Loans' Compliance With Laws

The Offering Documents for every Securitization represented that the underlying mortgage loans were originated in compliance with federal and state laws regarding equal credit opportunities, mortgage recording procedures, and required lender disclosures to borrowers, among other topics.[246]  For example, the NHELI 2006-HE3 Prospectus Supplement represented that "each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws."[247]  Every Prospectus Supplement also represented that "no Mortgage Loan is classified and/or defined as a 'high cost', 'covered' or 'predatory' loan under any other federal, state or local law or ordinance or regulation . . . ."[248]

#### 2.      Representations in the Originators' Underwriting Guidelines Regarding the Mortgage Loans' Compliance With Laws

Although all mortgage loans are required to comply with federal and state laws, the Originators' underwriting guidelines incorporated this requirement specifically.  For example, certain of the Originators' underwriting guidelines recognized that the Truth in Lending Act ("TILA") obligated the lender to provide the borrower with a form notifying the borrower of the right of rescission ("ROR").[249]  Based on my experience in the industry, TILA granted borrowers a ROR for a refinance loan, under which the borrower had the right to rescind the refinance loan

---

[246]   *See* Exhibit 6, Chart N.

[247]   NHELI 2006-HE3 Prospectus Supplement, NOM-FHFA_04620885, at 1053.

[248]   *Ibid.*

[249]   *See, e.g.*, Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 155; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 383.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

transaction within three days of closing.[250]  The ROR conferred by TILA applied to any refinance loan that created a security interest in the consumer's primary residence.[251]

Additionally, many of the Originators' underwriting guidelines recognized that each mortgage loan file should contain a HUD-1 form, also called a "Settlement Statement" or "Closing Statement," which I understand was required by the Real Estate Settlement Procedures Act ("RESPA").[252]  The HUD-1 form itemizes all of the money changing hands at closing, including loan proceeds, taxes, interest, fees, and cash paid out to the borrower, or cash that was due from the borrower.  The HUD-1 form also lists any of the borrower's debts that, as a condition of the loan approval, must be repaid at closing.[253]  The Originator must make the HUD-1 form available to the borrower for inspection in advance of closing.[254]

Moreover, certain of the Originators' guidelines recognized that TILA required an originator to notify the borrower of the true cost of the loan prior to the loan's closing by providing the borrower a truth-in-lending ("TIL") disclosure.[255]  The TIL disclosure should contain information on the loan's annual percentage rate, finance charges, amount financed,

---

[250]   15 U.S.C. §§ 1635(a), 1637a; 12 C.F.R. § 226.15(a); 12 C.F.R. § 226.23(a).

[251]   12 C.F.R. § 226.15(a).

[252]   12 U.S.C. § 2603(a); 24 C.F.R. § 3500.8 and Appendix A to Part 3500; *see also* Silver State Mortgage Expanded Alt A Underwriting Guidelines, JPMC-UWG-BEAR-000297104, at 155; First NLC Underwriting Guidelines, JPMC-UWG-BEAR-000130505, at 544.

[253]   *See, e.g.*, ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066530, at 579 ("Verification that the debt has been paid must be provided by one of the following:  A copy of the HUD-1 …").

[254]   12 U.S.C. § 2603(b); 24 C.F.R. § 3500.10(a).

[255]   *See, e.g.*, Fremont Investment & Loan Underwriting Guidelines, LF1UBS_00051222, at 231; Ownit Mortgage Solutions The Right Loan Underwriting Guidelines, ML_FHFA 6097303, at 383; ResMAE Underwriting Guidelines, JPMC-UWG-JPM-000066525, at 527.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

schedule of payments, and total payments required.[256]  If the disclosed interest basis points and

fees were lower than the fees and interest the lender actually required the borrower to pay, the

TIL was invalid.  The threshold or tolerance for under-disclosure was $100; the lender was in

violation of the law if the difference between the revealed and actual payment was greater than

that amount.

**3.    Minimum Industry Standards Regarding the Mortgage Loans'
Compliance With Laws**

Every mortgage loan was required by minimum industry standards to comply with legal

requirements such as TILA, RESPA, and state statutes prohibiting predatory lending and high

cost loans.[257]  Compliance with these requirements was mandatory,[258] and failure to do so could

make it more difficult to foreclose on the property if the borrower defaulted.  Consistent with

these standards, the MLPA between Nomura Credit & Capital, Inc. and Nomura Home Equity

Loan, Inc. for the NHELI 2006-HE3 transaction included the following representation:

> Any and all requirements of any federal, state, or local law
> including, without limitation, usury, truth in lending, real estate
> settlement procedures, consumer credit protection, equal credit
> opportunity, fair housing, predatory, fair lending or disclosure laws

---

[256]   12 C.F.R. § 226.5b(d); 12 C.F.R. § 226.18.

[257]   For examples of underwriting guidelines that were consistent with this standard, *see* New Century Mortgage Underwriting Guidelines, FHFA_NC_0000266, at 267; New Century Mortgage Underwriting Guidelines, UBS-FHFA-00292075, at 075; WMC Mortgage Underwriting Guidelines, WMC-FHFA-Cases-00000801, at 965-70; Countrywide SubPrime Technical Manual, UG1FHFA00010470, at 545.

[258]   15 U.S.C. §§ 1635(a), 1637a; 12 U.S.C. § 2603(a); 12 C.F.R. § 226.15(a); 12 C.F.R. § 226.23(a); 24 C.F.R. § 3500.8; Appendix A to Part 3500. Under federal law, the determination of whether a loan is "high cost" is made under the Home Ownership and Equity Protection Act ("HOEPA").  The Federal Reserve Board, which administers HOEPA, promulgated 12 CFR Section No. 226.32 (commonly known as Section 32), which applies to closed-end consumer loans originated against a borrower's primary residence (*i.e.*, loans like the Mortgage Loans).

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

> applicable to the origination and servicing of the Mortgage Loans
> have been complied with in all material respects[.][259]

Joseph Kohout testified that it was "industry standard" that a lender verify a loan complied with

Federal laws and regulations, including HOEPA, RESPA, and TILA.[260]  As Neil Spagna put it,

with "[c]ompliance there really was no shortcuts."[261]

## IX.    My Use of Minimum Industry Standards

In instances where no underwriting guidelines were available or the underwriting

guidelines were silent regarding key credit characteristics, I integrated into my re-underwriting

review a comparison of the Mortgage Loan files with minimum industry standards for assessing

a borrower's ability to repay and the adequacy of the collateral.  I used the minimum industry

standards that I believed, based on my underwriting expertise and knowledge of the industry,

constituted the most lenient standards found in underwriting guidelines in the mortgage loan

industry between 2002 and 2007, based on the main benchmarks for assessing a mortgage loan's

risk.  In other words, they were the minimum requirements necessary for even the most lenient

originators in the industry to assess a borrower's ability to repay the mortgage and the adequacy

of the collateral underlying the mortgage.

The use of minimum industry standards is not unusual and not anything new to the

mortgage credit markets.  As a major loan purchaser and seller for the bulk of my lending career,

---

[259]    NHELI 2006-HE3 Mortgage Loan Purchase Agreement between Nomura Credit & Capital, Inc. and Nomura Home Equity Loan, Inc. dated Aug. 31, 2006, NOM-FHFA_04636755, at 763.

[260]    Kohout Dep. at 145:18-148:15; *see also* Sabo Dep. at 71:19-74:3 (stating that part of an underwriter's job was to ensure compliance with state and federal regulations); Spagna Dep. at 100:17-105:16 (agreeing that loans need to comply with applicable laws and regulations, including HOEPA, TILA, and RESPA).

[261]    Spagna Dep. at 152:7-20; *see also* Sabo Dep. at 120:9-15 (stating that generally there were no compensating factors for compliance exceptions).

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

loan buyers and sellers have always used common guidelines when trading mortgage loans, both regionally and on a national basis.  For instance, the bulk of loan sale transactions historically have identified key guidelines that both parties agreed to, including, but not limited to, characteristics such as DTI ratios, loan sizes (maximum loan size restrictions, oftentimes combined with maximum LTV ratios), and geographic restrictions, especially when certain areas have been identified as potentially problem markets.  The evolution of FICO scores in the late 1990's added a new dimension to the business and also started the bifurcation of the market into prime and subprime guidelines.

I distilled the minimum industry standards that were used from 2002 through 2007 from (i) my own extensive experience in the industry and knowledge of standards at that time; (ii) discussions with underwriters on my staff and members of the re-underwriting teams who worked in the mortgage loan industry during that time; (iii) consultation with other re-underwriting experts; and (iv) a review of underwriting guidelines, including manuals, references, matrices, and guides, from originators during that time.  These minimum industry standards addressed the most basic, fundamental requirements for underwriting a residential mortgage loan.  They do not reflect my assessment of the most prudent underwriting standards, but rather my assessment of the minimum requirements across the industry at that time for different product types.

To confirm the accuracy of these minimum industry standards, I compared them to the guideline requirements of New Century, WMC, Countrywide, and Long Beach—four originators known to have had very lenient origination requirements and practices during this period.[262]  I

---

[262]   In November 2008, the United States Treasury Department's Office of the Comptroller of the Currency ("OCC") issued a press release that identified the ten Metropolitan Statistical Areas ("MSA") with the highest foreclosure rates for subprime and Alt-A mortgage

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

concluded that the minimum industry standards expressed above were generally consistent with these four originators' underwriting guidelines and thus represent the most lenient underwriting requirements in use during the relevant time period.  Accordingly, every residential mortgage loan originated from 2002 through 2007 should, at a minimum, have complied with these standards.

I incorporated the minimum industry standards into my re-underwriting review in several circumstances.  First, if the underwriting guidelines applicable to the Mortgage Loan were identified, I directed the re-underwriting teams to compare the loan file to the guidelines and to also note violations of any minimum industry standards that the particular underwriting guidelines did not address.  For example, underwriting guidelines might not explicitly instruct the underwriter to investigate red flags in the mortgage loan application that suggest that the borrower provided false, misleading, or inaccurate statements about important items such as income, employment, housing history, or debt obligations.  However, any competent underwriter would reject an application if it contained indications that the borrower knowingly provided false information with respect to any of those items, and no reasonable originator would approve a mortgage to a borrower who provided false information.  The minimum industry standards are designed to address fundamental requirements, such as these and others, which may not be expressly addressed in the underwriting guidelines but are common and essential.

---

loans originated between 2005 and 2007.  The OCC also ranked the originators responsible for the most foreclosures in those ten MSAs.  New Century ranked first, Long Beach ranked second, WMC Mortgage ranked fourth, and Countrywide, which originated a significant number of Alt-A mortgages, ranked eighth.  The high rate of foreclosures from these four originators, spread across ten different MSAs, suggests that New Century, Long Beach, WMC, and Countrywide had among the most lenient underwriting standards in the mortgage loan industry between 2005 and 2007.  *See* Press Release, Office of the Comptroller of the Currency, United States Department of the Treasury, Worst Ten in the Worst Ten (November 13, 2008), http://www.occ.treas.gov/news-issuances/news-releases/2009/nr-occ-2009-112b.pdf.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

Second, I used the minimum industry standards in instances where it was not possible to determine whether the underwriting guidelines produced in discovery were indeed those used to underwrite a given Mortgage Loan.  Specifically, I compared the Mortgage Loan file to the minimum industry standards where the underwriting guidelines applicable to the loan's product type produced in discovery had an effective date more than 90 days earlier than the loan's origination date.  In these circumstances, I directed the re-underwriting teams to use both the most recent available guideline applicable to that product and the minimum industry standards, which were generally more lenient than the originator's own guidelines.

Third, I used the minimum industry standards to re-underwrite Mortgage Loans where no underwriting guidelines were produced for the product type at issue.  This approach was reasonable because even if an originator's precise guidelines used to underwrite a particular Mortgage Loan were difficult to ascertain, those guidelines would have required any Mortgage Loan to meet at least the minimum industry standards.

## X. The Re-Underwriting Review of a Random Sample of Mortgage Loans from Each Securitization

I directly supervised the re-underwriting review of a random sample of mortgage loans from each of the relevant SLGs in the Securitizations—723 Mortgage Loans in total.  This report includes my opinions regarding the re-underwriting review of these loans.[263]

### A. The Selection of Mortgage Loan Files for Re-Underwriting

#### 1. Source of the Mortgage Loan Files

I understand that the loan files for the Mortgage Loans underlying the Securitizations and the applicable underwriting guidelines were produced by Nomura, and that small numbers of

---

[263]   As described above in Section II, *see* Exhibit 2 for a summary of my review of the Mortgage Loans.  In addition, the supporting documentation for each identified defect, labeled Exhibit 3, is available on the FTP site accompanying this report.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

other loan files and guidelines for certain of the Mortgage Loans were produced by Defendants,

FHFA, and third-parties.  I understand that approximately 18,000 mortgage loan files were

produced across the Securitizations.

### 2. Sample Methodology

Prior to starting the re-underwriting review I was provided with a list of sample loans that

were selected by Dr. Charles Cowan, FHFA's statistical sampling expert.  Dr. Cowan's sample

included approximately 100 loans from each of the seven SLGs across the Securitizations.  It is

my understanding that for the sample loans identified for the NAA 2006-AR6 Securitization an

insufficient number of loan files was produced.  Thus, Dr. Cowan drew an additional random

supplemental sample, resulting in a total of 196 sample loans for this Securitization.  In total, Dr.

Cowan's random sample included 796 sample loans across the Securitizations.  Of those 796

loans, I was provided with the loan files and underwriting guidelines for 723 loans—the

previously defined "Mortgage Loans."  I did not re-underwrite the remaining 73 loans for which

I received insufficient documentation.

### 3. Identification of Mortgage Loan Files

I understand that the Court implemented a process for FHFA and Nomura to meet and

confer in order to reach agreement on which documents were the best representation of the

mortgage loan files in FHFA's sample at the time of the loans' origination.  Where FHFA and

Nomura stipulated that certain documents were the best representation of a mortgage loan file, I

used those documents to conduct the re-underwriting review.

Where FHFA and Nomura did not agree on the contents of a particular mortgage loan

file, I directed the re-underwriting teams to evaluate each file to see whether it contained

information sufficient to evaluate the borrower's ability to repay the mortgage and to assess the

adequacy of the collateral.  I identified seven key documents that would likely contain this

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

information:  (1) final loan application signed by the borrower, (2) credit report, (3) completed

appraisal report, (4) completed, final HUD-1 Settlement Statement, (5) truth-in-lending

disclosure, (6) executed promissory note, and (7) mortgage or deed of trust.  A mortgage loan

file that included these documents contained sufficient information to re-underwrite it.  A

mortgage loan file that did not include one or more of these documents did not necessarily lack

sufficient information to re-underwrite the loan.  In fact, I generally directed the re-underwriting

teams to note a defect if a mortgage loan file was missing one or more of these documents.

However, in some instances, files were lacking enough of these documents that the re-

underwriting teams could not make findings about the borrower's ability to repay the mortgage

and the adequacy of the collateral.  If this occurred, I directed the teams not to re-underwrite the

mortgage loan.

### 4.      Selecting Applicable Underwriting Guidelines for the Mortgage Loans

Similarly, it is my understanding that the Court implemented a process for FHFA and

Defendants to confer about the selection of the applicable underwriting guidelines.  This process

called for FHFA and Defendants to work together on a good-faith basis to identify all

underwriting guidelines applicable to each Mortgage Loan, including all guidelines, updates to

these guidelines, matrices, lending manuals, and references guides.  Moreover, the Court ordered

the parties to endeavor to reach agreement by stipulation that these guidelines and associated

files are the best representation of the guidelines and Mortgage Loan file existing at the time of

the loan's origination that could be recreated.  Where the parties stipulated to the applicable

underwriting guideline for a Mortgage Loan, I used that guideline for the re-underwriting review.

During the course of this litigation, thousands of underwriting guideline documents were

produced in discovery.  These underwriting guidelines were indexed by date, Originator, and

subject.  To determine the applicable underwriting guidelines for a loan, the re-underwriting

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

teams—under my supervision—reviewed the (i) Mortgage Loan's originator, (ii) origination channel, (iii) issuance date of the underwriting guidelines, (iv) product type, (v) documentation type, (vi) loan approval type, and (v) date of either the loan origination or loan closing.  For example, if a Mortgage Loan was originated through a particular channel or product, the re-underwriting teams matched the loan to the Originator's guidelines for that channel or product.  If the origination channel of the loan was unclear, I instructed the re-underwriting teams to use the guidelines from the channel that provided the most current underwriting requirements.  If the Mortgage Loan was underwritten using an AUS, then the re-underwriting teams matched the loan to the guideline document detailing the AUS instructions.

Furthermore, to determine the applicable underwriting guidelines for each Mortgage Loan,[264] I instructed the re-underwriting teams to compare the loan's note date[265] to the underwriting guidelines that were most recent in time prior to the note date.  The re-underwriting teams were further instructed to employ a waterfall approach to the matching process.  The re-underwriting teams initially tried to match underwriting guidelines dated within 30 days prior to the note date of each Mortgage Loan.  I used 30 days as a benchmark because in my experience a loan is typically closed within 30 days after it is underwritten.  Note date minus 30 days was thus used as a proxy for the application or underwriting date.  If underwriting guidelines dated within 30 days were not available, the re-underwriting teams were directed to match the Mortgage Loan

---

[264]   Tens of thousands of underwriting guideline documents were produced in discovery in this Action and the other related actions pending in the Southern District of New York.  Nomura itself produced approximately 390 guidelines, while FHFA produced approximately another 2,000.  EquiFirst, Fremont, and ResMAE—Originators in the Securitizations—also produced a total of approximately 300 guidelines.  Each of these underwriting guidelines were indexed by date, originator, and subject.

[265]   "Note date" refers to the date on which the promissory note funding the Mortgage Loan was issued.  It may also be referred to as the "closing date," the "funding date," or the "origination date."

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

to guidelines that were published within 90 days prior to the note date.  Ninety days was still a

reasonable time period because loans were frequently underwritten to guidelines that pre-dated

the note date by as much as three months.  The re-underwriting teams were also instructed that if

there were no guidelines available within 30 or 90 days of the note date, to match the Mortgage

Loan to the guideline that was closest in time prior to the note date.  However, if during the

course of the re-underwriting review itself the Mortgage Loan file identified the specific

guideline that applied, the re-underwriter was instructed to use the identified guideline to re-

underwrite the loan.

### B.       The Process of Re-Underwriting the Mortgage Loans

#### 1.       The Role of Digital Risk, LLC and Opus Capital Markets Consultants, LLC

In the re-underwriting review of the Mortgage Loans, I was assisted by a team of

underwriters from Digital Risk, LLC ("Digital Risk") and Opus Capital Markets Consultants,

LLC ("Opus").

Digital Risk was founded in 2005 and provides risk, compliance, and transaction

management services within the mortgage industry and is owned, managed, and staffed by

experienced mortgage industry professionals.  Opus, also founded in 2005, provides risk

management, due diligence and advisory services for entities within the mortgage industry.

Prior to Digital Risk and Opus starting the re-underwriting review, I vetted the teams that

would be reviewing the Mortgage Loans for this case.  I interviewed the supervising members of

both companies, and reviewed their staffing, qualifications, and experience.  The team members

used in this engagement from both firms averaged more than a decade of experience in the re-

underwriting and underwriting field, with considerable experience and expertise working in each

respective company's proprietary review system.  I then conducted on-site visits to Opus's office

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

in Lincolnshire, Illinois, and Digital Risk's principal office in Maitland, Florida, where I observed their operations and systems and met with their re-underwriters.

Thereafter, I communicated with the re-underwriting teams and FHFA counsel at least once a week by phone. In the initial stages, these conference calls were held to provide guidance on the scope of the review. The designated re-underwriting team developed "review plans" for each Securitization, which I reviewed and approved. I instructed the re-underwriting teams to review the Mortgage Loans and applicable guidelines and to record their factual findings when the Mortgage Loans were non-compliant with the underwriting guidelines and standards. I also directed the re-underwriting teams to review public information and other records concerning the borrower and property to determine whether the borrower made misrepresentations at the time of origination and whether the original underwriter was negligent in not pursuing red flags in the loan file. At my direction, the re-underwriters created a factual record reflecting a comparison between the Mortgage Loan and the applicable underwriting guidelines.

During the period in which the re-underwriting teams reviewed the Mortgage Loan files, I continued to participate in weekly conference calls with the lead underwriters at Digital Risk, Opus, and counsel for FHFA. Aside from these weekly conference calls, I spoke and corresponded with the re-underwriting teams when they needed guidance on a particular issue. The re-underwriting teams recorded factual findings and their commentary about the Mortgage Loans pursuant to the instructions I provided to them. As the re-underwriting teams finished their re-underwriting, I reviewed the comments for each Mortgage Loan. When I examined the factual findings, I consulted each loan file, as necessary, and provided feedback to the re-underwriting teams. Sometimes I found additional instances in which the Mortgage Loan did not comply with the underwriting guidelines and thus adjusted the factual findings. Other times, I

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

disagreed with or wanted specific findings modified, and instructed the re-underwriting teams to do so. If I had questions, I discussed them with the re-underwriting teams, and vice versa. Although I had the assistance of the re-underwriting teams, I made the ultimate determination as to the materiality of the underwriting defects for each of the Mortgage Loans.

### 2.    The Re-Underwriting Review

The re-underwriting process itself included several steps for each Mortgage Loan. In conducting the re-underwriting review, I instructed teams of re-underwriters to review the contents of each Mortgage Loan file and compare them to the following: (1) the representations concerning the Mortgage Loans in the Prospectus Supplement, (2) the applicable Originator's underwriting guidelines, and (3) the minimum industry standards developed in conjunction with this review.

### a.    Credit Review

The re-underwriting review included a credit component, which consisted of determining whether the loan adhered to the applicable underwriting guidelines and minimum industry standards and determining whether the borrower had the ability and willingness to repay the loan. The credit review consisted of the following steps, among others:

- Reviewing the general loan terms to determine if the loan met the program parameters as established by the underwriting guidelines. In this case, Mortgage Loans were reviewed to determine if the loans were in compliance with the Loan Program and Credit Grade under which the loan was approved.

- Reviewing employment verification documentation to confirm employment represented in the application and to determine whether the borrower met employment stability and documentation requirements when applicable.

- Reviewing the loan approval against all supporting documentation and loan application to determine accuracy of information provided.

- Reviewing the initial loan application against the final loan application or other loan applications found in the file to expose any discrepancies or red flags.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

- Comparing the information in the credit report to that in the borrower's application and evaluating the borrower's willingness to repay the debt.

- Reconciling bankruptcy and loss mitigation findings against the original loan file information.

- Recalculating LTV and CLTV ratios using verified information contained in the loan origination file or any applicable third-party sources.

- For stated income loans for non-self-employed borrowers, considering the following factors in assessing the reasonableness of the stated income: (i) credit profile; (ii) type of employment; (iii) length of employment; (iv) housing expenses; (v) assets; (vi) geographic location of employment; (vii) education level; and (viii) information obtained from the BLS.[266]

- For stated income loans for self-employed borrowers, comparing for consistency the borrower's credit profile and other information contained in the loan origination file with the stated income.

- Checking whether the borrower's DTI ratio was within the guideline maximum by re-calculating the borrower's income and debt to determine the correct DTI ratio using information contained in the loan origination file or third-party sources, where the originator was on notice that information in the file was not necessarily complete.

- For purposes of loan tape review, recalculating the borrower's income and debt to determine the correct DTI ratio using information contained in the loan origination file, or third-party sources including bankruptcy filings and credit reports.

- Calculating the borrower's available assets using information the originator knew or should have known at the time of origination.

---

[266] The BLS tracks income information based on occupation, title, and geographic area by year. However, it does not account for the borrower's years of experience. To be conservative, I instructed the re-underwriting teams to compare the borrower's stated income with the income for a borrower with the same occupation, job title, and geographic area, for the same time period, at the 90th percentile of the BLS index. If the borrower stated an income that was at or below the income for a similar borrower in the same occupation, job title, geographic area, and time period, at the 90th percentile, I did not conclude that the borrower's stated income was unreasonable. In contrast, if the borrower stated an income that was greater than the income for a similar borrower in the same occupation, job title, geographic area, and time period at the 90th percentile, and there was no indication in the loan origination file that the underwriter made any attempt to assess the reasonableness of the borrower's income, I concluded that the borrower's stated income was unreasonable.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

- Reviewing the loan origination file for any red flags that should have required further investigation or raised questions about the validity of any documentation.

- Reviewing the loan origination file in conjunction with the credit report and verifications to determine if there were any misrepresentations as to the occupancy status of the subject property.

- Determining whether the borrower had additional liens and mortgages that were not included in the original loan application or loan origination file.

- Reviewing the title report for possible judgments or other liens that may have existed upon origination, and determining the validity and priority of any liens.

- Reviewing the appraisal in the loan origination file to determine whether property values at origination were supported.

The credit review also included a review of any compensating factors documented in the loan file. I instructed the re-underwriting teams that, if they found a loan that did not comply with underwriting guidelines, they should determine whether any compensating factors existed, as well as whether the loan approval documented any compensating factors. If so, the re-underwriting teams made a preliminary finding about whether the compensating factor(s) offset the credit risk presented by the exception to the underwriting guidelines. I reviewed these preliminary findings and made the final judgment about their accuracy and strength. I evaluated each compensating factor to determine whether one or more were sufficiently strong to offset the identified weakness in the borrower's application package. My primary consideration was, given the identified weakness and the compensating factors, whether the decrease in the mortgage's credit risk presented by the compensating factors was sufficient to offset the increased credit risk that gave rise to the exception request. If I concluded that the compensating factor(s) alone or in combination did, in fact, offset the increased credit risk presented by the exception, then I did not make a defect finding. If, by contrast, the compensating factor did not offset the increased credit risk presented by the exception, then I made a defect finding.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### b.       Compliance Review

The re-underwriting review also included a determination of whether each Mortgage Loan complied with those aspects of the underwriting guidelines relating to compliance with federal and state law, as well as title and hazard insurance requirements.  The steps in the compliance re-underwriting review included:

- Testing whether the Mortgage Loan was a federal "high cost" loan.[267]

- Reviewing the loan file for the presence of a TILA ROR form, a final HUD-1 statement, and TIL disclosure detailing the costs of the mortgage pursuant to TILA.

- Reviewing the loan file for evidence of required insurance.

### c.       Appraisal Review

The re-underwriting review also included a collateral review to determine whether the mortgaged property was appraised in accordance with the underwriting guidelines and minimum industry standards.  The steps in the collateral review included:

- Verifying that the appraisal was performed by a licensed and qualified appraiser.

- Determining whether the appraiser followed the appraisal procedures set forth in the underwriting guidelines.

- Determining whether the appraisal complied with USPAP.

- Reviewing the appraisal and other appraisal-related documents in the Mortgage Loan file for completeness.

- Reviewing the loan file to see if the underwriter properly reviewed the appraisal report and properly used the appraised value versus the sales price in determining the LTV ratio.

---

[267]  Under federal law, the Home Ownership and Equity Protection Act ("HOEPA") is the basis for determining whether a loan is "high cost."  The Federal Reserve Board, which administers HOEPA, promulgated 12 CFR Section No. 226.32, commonly known as Section 32. Section 32 applies only to closed-end consumer loans originated against a borrower's primary residence.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

- Evaluating whether the value of the subject property adequately supported the loan amount.

### d.      Recalculation of LTV and CLTV Ratios

For purposes of determining whether the LTV and CLTV ratios in the Prospectus Supplements were accurate, the LTV/CLTV ratios for each Mortgage Loan were recalculated based on the valuation of the subject properties conducted by Dr. John Kilpatrick, FHFA's appraisal expert.  I have reviewed Dr. Kilpatrick's qualifications and discussed his work on this engagement with him.  Dr. Kilpatrick holds a Ph.D. in real estate finance and is the C.E.O. of Greenfield Advisors.  He teaches and publishes widely in the area of appraisal.  From time to time, I have participated in conference calls with the re-underwriting teams and Dr. Kilpatrick.  It is my understanding that Dr. Kilpatrick is submitting an expert report in this action regarding the valuation of the properties collateralizing the Mortgage Loans.  Dr. Kilpatrick used an AVM to determine objective valuations of the subject properties at the time of origination.  I used Dr. Kilpatrick's valuations in lieu of the original appraised values in order to recalculate the LTV and CLTV ratios of the Mortgage Loans.

For purposes of determining whether the LTV/CLTV ratios exceeded the maximum allowable under the underwriting guidelines, the LTV/CLTV ratios were calculated by the re-underwriting teams using information contained in the loan file, by dividing the loan amount by the lower of the appraised value or sale price of the property.  They were also recalculated using Dr. Kilpatrick's AVM values.  I considered both recalculations when assessing a maximum LTV/CLTV ratio breach.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### e.      Recalculation of Owner-Occupancy Statistics

In addition, the re-underwriting review included a review of owner occupancy status to assess the accuracy of the representations made by the borrowers and the disclosures made in the Offering Documents by Defendants.  The owner occupancy review included:

- Reviewing the Mortgage Loan file for red flags indicating that the borrower did not occupy the subject property.  For instance, consideration was given to factors such as the distance between the borrower's place of employment and the subject property, whether the borrower listed a primary address that was different from the subject property, and whether the subject property was significantly smaller in size or value than the borrower's current home without an immediately apparent reason.

- Reviewing loan servicing records, where available, for evidence that the borrower did not occupy the subject property after closing.

- Reviewing borrower and property records, including public records, bankruptcy filings, and consumer credit reports, to see whether the borrower claimed a different primary residence than that of the subject property, or if there was a change of address within 12 months after origination of the Mortgage Loan. Twelve months was chosen as the benchmark, because most of the Mortgage Loan files contained agreements certifying that the borrower would occupy the mortgaged property for at least one year.[268]

Based on the re-underwriting teams' factual findings, I made the final determination as to whether the representations regarding the occupancy status of the subject properties were accurate or not.

### f.      Quality Control Review of the Factual Findings

The factual re-underwriting results received multiple levels of quality control.  At the completion of the factual re-underwriting review, I selected a random sample of at least 12% of the Mortgage Loans from each Securitization (the "QC Sample") and directed quality control teams of experienced mortgage loan underwriters within Freddie Mac and Fannie Mae to

---

[268]   *See, e.g.*, NHELI_2006_FM2_2001987494, NHELI_2006_HE3_2001915223, and NHELI_2007_1_200211713 as examples of misrepresentations of occupancy.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

evaluate the factual re-underwriting findings made by the re-underwriting teams. The quality control teams engaged in the same factual finding process as the re-underwriting teams. For each loan in the QC Sample, the quality control teams reviewed the loan files and the applicable underwriting guidelines, and undertook the steps in the credit, appraisal, and compliance review I detailed above. The quality control teams strictly identified factual findings and did not opine on the effect of those findings on the credit quality of the Mortgage Loan. If the quality control teams disagreed with a factual finding made by the re-underwriting teams, the quality control teams provided a comment explaining their finding, which was forwarded back to the re-underwriting teams for consideration and an opportunity to respond. I did not communicate directly with the quality control teams about their findings, but rather reviewed their comments.

After the Mortgage Loans had been reviewed by both the re-underwriting teams and quality control teams, my team of experienced personnel next reviewed the Mortgage Loan factual findings. At my direction and under my supervision, they evaluated the re-underwriting findings to determine whether the findings were supported by documentation or information reviewed by the re-underwriting teams. After my personnel had re-evaluated the factual findings and made their recommendations, I reviewed each loan finding and made the final determination about the impact of the underwriting defects on the credit risk of each Mortgage Loan.

### g.        Rendering an Opinion on Each Mortgage Loan

In rendering an opinion on each Mortgage Loan, I personally reviewed all of the Mortgage Loan files (either in whole or in part), the re-underwriting teams' factual findings, the quality control teams' comments, the comments and recommendations of my personnel, and the supporting documents for the individual findings. I then made a determination of whether the identified underwriting defects as a whole impacted the credit risk of a particular Mortgage

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

Loan.  Each Mortgage Loan is different.  It may have been the case that for one loan, multiple

findings did not substantially increase the credit risk associated with the loan, whereas for

another loan, just one finding might have a substantial impact.

Based on this approach, I rendered one of the following conclusions for each Mortgage

Loan:

1.  It is my opinion, to a reasonable degree of professional certainty, that this Mortgage
    Loan was originated with one or more underwriting defects[269] that substantially
    increased the credit risk[270] associated with the Mortgage Loan.

2.  It is my opinion, to a reasonable degree of professional certainty, that although this
    Mortgage Loan was originated with one or more underwriting defects, the
    underwriting defects did not substantially increase the credit risk associated with the
    Mortgage Loan.

3.  Based on the documents provided to me, I did not find any underwriting defects in the
    origination of this Mortgage Loan.

## XI.    My Opinions Regarding the Mortgage Loans

A spreadsheet containing a summary of my review of the Mortgage Loans is attached as

Exhibit 2.  Additionally, the supporting documentation for each identified defect, labeled Exhibit

3, is contained on the FTP site accompanying this Report.  I have included below a summary of

certain categories of underwriting breaches that were more prevalent across the Mortgage Loans.

### A.    Many of the Mortgage Loans Did Not Comply With the Originators' Underwriting Guidelines or the Minimum Industry Standards

My re-underwriting review revealed that a majority of the Mortgage Loans were not

underwritten in accordance with the Originators' underwriting guidelines.  Moreover, these loans

were not documented as exception loans and did not otherwise contain compensating factors that

---

[269]   I use the phrase "underwriting defects" expansively to include credit defects,
appraisal-related defects, compliance defects, and/or inaccuracies in the data contained on the
mortgage loan schedule or pre-closing loan tapes.

[270]   I use the term "credit risk" expansively to include default risk, foreclosure risk, and
collection risk.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

offset the increased credit risk associated with the exception to guidelines.  Across the Mortgage

Loans, there were approximately 100 different kinds of violations of underwriting guidelines.

The details for each of these guideline breaches can be found in my findings and conclusions

contained on Exhibit 2, and several examples can be found in the sections below.

The following chart summarizes the number of Mortgage Loans that were not originated

in conformity with underwriting guidelines and that lacked sufficient compensating factors.

| Securitization | Number of Mortgage Loans Reviewed | Number of Mortgage Loans with Defects | Percentage of Mortgage Loans with Defects | Number of Mortgage Loans with Defects & Substantially Increased Credit Risk | Percentage of Mortgage Loans with Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 71 | 54.19% | 66 | 50.38% |
| NHELI 2006-FM1 | 100 | 90 | 90.00% | 78 | 78.00% |
| NHELI 2006-FM2 | 100 | 95 | 95.00% | 84 | 84.00% |
| NHELI 2006-HE3 | 99 | 80 | 80.80% | 69 | 69.69% |
| NHELI 2007-1 | 98 | 69 | 70.40% | 65 | 66.32% |
| NHELI 2007-2 | 98 | 80 | 81.63% | 72 | 73.46% |
| NHELI 2007-3 | 97 | 81 | 83.50% | 67 | 69.07% |
| **Total** | **723** | **566** | **78.28%** | **501** | **69.29%** |

In addition to not complying with the originators' underwriting guidelines, my re-

underwriting review revealed that many of the Mortgage Loans were not underwritten in

accordance with minimum industry standards.  The chart below summarizes the number of

Mortgage Loans in the Securitizations that were not underwritten in accordance with

underwriting guidelines and/or minimum industry standards, and did not have sufficient

compensating factors to support this exception to guidelines or standards.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

| Securitization | Number of Mortgage Loans Reviewed | Number of Mortgage Loans with Defects | Percentage of Mortgage Loans with Defects | Number of Mortgage Loans with Defects & Substantially Increased Credit Risk | Percentage of Mortgage Loans with Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 113 | 86.25% | 102 | 77.86% |
| NHELI 2006-FM1 | 100 | 93 | 93.00% | 81 | 81.00% |
| NHELI 2006-FM2 | 100 | 96 | 96.00% | 85 | 85.00% |
| NHELI 2006-HE3 | 99 | 87 | 87.87% | 75 | 75.75% |
| NHELI 2007-1 | 98 | 83 | 84.69% | 79 | 80.61% |
| NHELI 2007-2 | 98 | 92 | 93.87% | 77 | 78.57% |
| NHELI 2007-3 | 97 | 90 | 92.78% | 72 | 74.22% |
| **Total** | **723** | **654** | **90.46%** | **571** | **78.98%** |

## B. The Originators Failed to Investigate Red Flags in Certain Mortgage Loans

Certain Mortgage Loan files contained red flags, which indicated potential misrepresentations of employment, income, occupancy, or the borrower's debt obligations. However, there was no evidence in these files that the originators investigated or considered such red flags. For example, a loan in the NHELI 2006-FM1 Securitization was originated based on a stated income of            per month as a            , plus an additional            per month in rental income. The loan file, however, contained a verification of employment indicating that the borrower made only      per hour, as well as a second copy of that same verification in which the document had been altered and the income whited out. Due to the verification of income in the loan file, the underwriter should have underwritten this transaction as a full documentation loan, but instead underwrote the transaction as a stated income loan. Further, the loan file did not contain a rental agreement as required by the guidelines to verify rental income. These red flags should have been investigated. A re-calculation of the borrower's DTI ratio based on the income

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

reflected in the verification of employment yields a DTI ratio of          , which exceeds the guideline minimum of 55%.[271]

For a loan in the NAA 2005-AR6 Securitization, the borrower took out six refinance mortgages in the 10 months prior to the loan closing date, none of which were disclosed on the loan application.  Of those six, three were originated with the same lender as the subject loan, Silver State.  In reality, the borrower had a total of five mortgage loans from Silver State, which exceeded the underwriting guideline's limit of four mortgage loans per borrower.  In addition, there was no explanation in the loan file as to why a condition was cleared on a          deposit made into the borrower's bank account.  A re-calculation of the borrower's DTI ratio based on the correct debt amount yields a DTI ratio of          , which exceeds the guideline maximum of 50%.[272]

The chart below summarizes the number of Mortgage Loans in the Securitizations where there was a failure to investigate red flags regarding potential misrepresentations of income, employment, debt obligations, housing history, or occupancy status.

---

[271]   Global Loan Number NHELI_2006_FM1_2001835587, Finding IDs 17797939, 17794352, and 17794099.

[272]   Global Loan Number NAA_2005_AR6_1001918371, Finding IDs 146f493e-0695-e311-8ed7-d8d385e1d166, e8ba8a10-0795-e311-8ed7-d8d385e1d166, and 39b2759f-a1c5-e311-8daf-d8d385e1d166.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

| Securitization | Number of Mortgage Loans Reviewed | Number of Mortgage Loans with Defects | Percentage of Mortgage Loans with Defects | Number of Mortgage Loans with Defects & Substantially Increased Credit Risk | Percentage of Mortgage Loans with Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 16 | 12.21% | 16 | 12.21% |
| NHELI 2006-FM1 | 100 | 11 | 11.00% | 9 | 9.00% |
| NHELI 2006-FM2 | 100 | 13 | 13.00% | 13 | 13.00% |
| NHELI 2006-HE3 | 99 | 12 | 12.12% | 12 | 12.12% |
| NHELI 2007-1 | 98 | 12 | 12.24% | 12 | 12.24% |
| NHELI 2007-2 | 98 | 9 | 9.18% | 9 | 9.18% |
| NHELI 2007-3 | 97 | 14 | 14.43% | 13 | 13.40% |
| **Total** | **723** | **87** | **12.03%** | **84** | **11.62%** |

## C.  Certain Mortgage Loans Did Not Contain Required Credit Information

As discussed above, a loan underwriter must have certain credit documents and key information in order to evaluate the borrower's ability and willingness to repay a mortgage loan. My re-underwriting review uncovered many Mortgage Loans for which critical information was missing from the loan files, such as:  (1) a final loan application; (2) the borrower's credit report; (3) documentation verifying the borrower's employment; (4) documentation verifying the borrower's income; (5) documentation verifying the borrower's assets, and (6) a history of the borrower's payment of mortgage or rent payments.  In many instances, a failure to obtain information required under the governing underwriting guidelines substantially increased the credit risk of the Mortgage Loans because the credit risk could not have been assessed properly. For example, one loan file for a Mortgage Loan in the NHELI 2006-FM2 Securitization was missing the required verification of employment, and the pay stubs used to verify the borrower's income were incomplete—missing the employer's name and the borrower's net earnings.  Furthermore, although the lender's guidelines required a verification of mortgage or other payment history confirming the last 12 months of housing payments, the loan file

106

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

contained only an incomplete print out of an online mortgage history statement showing four

months payment history.[273]  As another example, a loan file for a Mortgage Loan in the NHELI

2006-HE3 Securitization was missing a verification of mortgage payments; a fully complete loan

application and HUD-1 (both of which were missing information regarding the borrower's

current mortgage); a verification of deposit; and the two months of bank statements required by

the underwriting guidelines.[274]

The chart below details the number of Mortgage Loan files that failed to contain certain

required credit information and that exhibited substantially increased credit risk.

| Securitization | Number of Mortgage Loans Reviewed | Number of Mortgage Loans with Defects | Percentage of Mortgage Loans with Defects | Number of Mortgage Loans with Defects & Substantially Increased Credit Risk | Percentage of Mortgage Loans with Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 35 | 26.71% | 34 | 25.95% |
| NHELI 2006-FM1 | 100 | 36 | 36.00% | 36 | 36.00% |
| NHELI 2006-FM2 | 100 | 41 | 41.00% | 41 | 41.00% |
| NHELI 2006-HE3 | 99 | 29 | 29.29% | 28 | 28.28% |
| NHELI 2007-1 | 98 | 18 | 18.36% | 18 | 18.36% |
| NHELI 2007-2 | 98 | 31 | 31.63% | 31 | 31.63% |
| NHELI 2007-3 | 97 | 27 | 27.83% | 26 | 26.80% |
| **Total** | **723** | **217** | **30.01%** | **214** | **29.60%** |

**D.    Certain Mortgage Loans Did Not Contain Explanations for Recent Credit Inquiries**

Many of the Mortgage Loan files demonstrated a failure to investigate recent credit

inquiries of the borrower.  This failure is a significant underwriting error because, in many

---

[273]   Global Loan Number NHELI_2006_FM2_2002231336, Finding IDs 18357248, 17814780, and 17817370.

[274]   Global Loan Number NHELI_2006_HE3_2002016135, Finding IDs 17798086, 18368566, 17798136, and 17796893.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

instances, undisclosed borrower debts would have been uncovered if the underwriter had followed up on unexplained credit inquiries.  The failure to account for all debts skews the DTI ratio and understates the level of credit risk posed by a Mortgage Loan.  For example, a Mortgage Loan was included in the NHELI 2007-1 Securitization in which the borrower's credit report indicated numerous inquiries from other credit companies, yet the underwriter failed to request from, or receive from, the borrower an explanation of these inquiries.  Subsequent investigation identified seven new mortgages obtained by the borrower within 30 days of the subject loan's closing.  The undisclosed debts increased the borrower's DTI ratio from         to         —far in excess of the guideline maximum of 50%.[275]

Another loan underlying the NHELI 2007-1 Securitization (that closed on September 19, 2006) also included numerous credit inquiries on the origination credit report, without any indication that the underwriter received an explanation for these inquiries.  Subsequent investigation indicates that the borrower opened

, none of which were disclosed on the application.  The total amount of outstanding debt from these undisclosed mortgages was         .  This undisclosed debt increased the borrower's DTI ratio from 17.27% to 75.52%—far in excess of the guideline maximum of 50%.[276]

The number of Mortgage Loans with unexplained credit inquiries and substantially increased credit risk is set forth in the table below.

---

[275]   Global Loan Number NHELI_2007_1_2002211938, Finding IDs 17829480 and 18425368.

[276]   Global Loan Number NHELI_2007_1_2002237147, Finding ID 17831229.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

| Securitization | Number of Mortgage Loans Reviewed | Number of Mortgage Loans with Defects | Percentage of Mortgage Loans with Defects | Number of Mortgage Loans with Defects & Substantially Increased Credit Risk | Percentage of Mortgage Loans with Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 57 | 43.51% | 49 | 37.40% |
| NHELI 2006-FM1 | 100 | 71 | 71.00% | 61 | 61.00% |
| NHELI 2006-FM2 | 100 | 66 | 66.00% | 55 | 55.00% |
| NHELI 2006-HE3 | 99 | 60 | 60.60% | 49 | 49.49% |
| NHELI 2007-1 | 98 | 41 | 41.83% | 38 | 38.77% |
| NHELI 2007-2 | 98 | 70 | 71.42% | 55 | 56.12% |
| NHELI 2007-3 | 97 | 64 | 65.97% | 48 | 49.48% |
| **Total** | **723** | **429** | **59.34%** | **355** | **49.10%** |

### E. The Originators Failed to Assess Income Reasonableness for Certain Stated Income Loans

The re-underwriting results show that the reasonableness of the borrower's stated income was not tested for many of the stated income Mortgage Loans.[277]  The failure to do so led to substantially increased credit risk of stated income Mortgage Loans included in the Securitizations.  For example, a borrower of a Mortgage Loan included in the NHELI 2007-1 Securitization stated on the final loan application a monthly income of            as a

at a hair salon.  An unsigned and undated loan application in the loan file reflected a different income of          a month.  The loan approval showed that the lender used the higher income of           from the unsigned application to approve the loan.  According to a verification of

---

[277]   I have compiled in Exhibit 8 some examples of Mortgage Loans where the borrower's stated income was patently unreasonable and the originator nonetheless used the stated income to calculate the DTI ratio in approving the loan.  To illustrate the significance of the underwriter's failure to assess the reasonableness of the borrower's income, I have recalculated the DTI ratio based on an assessment of a more reasonable income level.  To be clear, Exhibit 8 is for illustration purposes only—I did not make any underwriting defect findings for excessive DTI ratios based solely upon the unreasonableness of a stated income.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

employment in the loan file, the borrower's position was a            .  The borrower's stated

income of        per month for a            is more than 1.5 times the $3,620 monthly average

salary at the 90th percentile for this occupation, as reported by BLS, and should have put the

underwriter on notice for potential misrepresentation.  Using the more reasonable income of

$3,620 results in a re-calculated DTI ratio of         , which greatly exceeds the DTI ratio of

       used to approve the loan.[278]

       Similarly, another borrower of a Mortgage Loan underlying the NHELI 2007-1

Securitization stated an income of          per month as a               .  This is nearly

four times the $5,943 per month average salary at the 90th percentile reported by BLS for

       in 2006 in the same geographic region.  There was no documentation in the loan file

to indicate that the reasonableness of the borrower's stated income was investigated.[279]

       The chart below summarizes the number of Mortgage Loans in each of the

Securitizations where, for stated income loans, the income stated by a borrower was reasonably

not credible, and yet uninvestigated.

---

[278]   Global Loan Number NHELI_2007_1_2001856494, Finding IDs 17809978 and 17818320.

[279]   Global Loan Number NHELI_2007_1_2002018486, Finding ID 17830273.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

| Securitization | Number of Stated Income Mortgage Loans Reviewed | Number of Stated Income Mortgage Loans with Defects | Percentage of Stated Income Mortgage Loans with Defects | Number of Stated Income Mortgage Loans with Defects & Substantially Increased Credit Risk | Percentage of Stated Income Mortgage Loans with Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 66 | 17 | 25.76% | 16 | 24.24% |
| NHELI 2006-FM1 | 27 | 12 | 44.44% | 12 | 44.44% |
| NHELI 2006-FM2 | 40 | 14 | 35.00% | 14 | 35.00% |
| NHELI 2006-HE3 | 34 | 13 | 38.24% | 13 | 38.24% |
| NHELI 2007-1 | 50 | 20 | 40.00% | 20 | 40.00% |
| NHELI 2007-2 | 28 | 14 | 50.00% | 14 | 50.00% |
| NHELI 2007-3 | 27 | 4 | 14.81% | 4 | 14.81% |
| **Total** | **272** | **94** | **34.56%** | **93** | **34.19%** |

### F.    Certain Mortgage Loans Failed to Comply with Credit Requirements

### 1.    Certain Mortgage Loans Exceeded LTV or CLTV Ratio Limits

Certain of the Mortgage Loans had LTV/CLTV ratios in excess of the maximum

permitted by governing underwriting guidelines without sufficient compensating factors.

Specifically, when the loan transaction occurred within six to twelve months of a prior sale, there

were instances when the original underwriter improperly used an appraised value rather than the

sales price to calculate the LTV ratio.  When the LTV ratio was recalculated using the

information required by the underwriting guidelines, it often exceeded the limits set by the

guidelines.  For example, a Mortgage Loan included in the NHELI 2006-HE3 Securitization was

approved as a refinance loan with an 85% LTV.  The property had been initially purchased by

the borrower less than six months before the borrower applied for the refinance loan.  Thus,

according to the applicable underwriting guidelines, the LTV ratio should have been calculated

by using the lower, initial purchase price of             , rather than the appraised value of

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

.  This would have resulted in a LTV ratio of            , exceeding the guideline

maximum of 85%.[280]

As another example, a Mortgage Loan in the NHELI 2007-2 Securitization was approved

with an 90% LTV/CLTV ratio based on a purchase price of             and a loan amount of

.  However, the underwriter failed to include a second lien of            in the CLTV

calculation.  Once corrected, the actual CLTV ratio was 102.82%.  Both the LTV ratio of

and the re-calculated CLTV ratio of            exceeded the guideline maximums of 80% LTV

ratio and 100% CLTV ratio for an owner-occupied purchase transaction under the full

documentation program.[281]

In addition to recalculating the LTV/CLTV ratios based on information contained in the

Mortgage Loan files, I also recalculated the LTV/CLTV ratios using the valuation results from

Dr. Kilpatrick's AVM.  As a result, there were many Mortgage Loans that contained LTV and

CLTV ratios in excess of the guideline maximums, without exception approval.  The chart below

summarizes the number of Mortgage Loans in each of the Securitizations where the LTV/CLTV

ratios were incorrect, as recalculated either using information contained in the loan file or using

Dr. Kilpatrick's AVM results.[282]

---

[280]   Global Loan Number NHELI_2006_HE3_2002174715, Finding IDs 18425666, 18425645, and 17795891.

[281]   Global Loan Number NHELI_2007_2_2002212716, Finding IDs 17831983 and 17836072.

[282]   Exhibit 2 reflects the LTV/CLTV re-calculations under both scenarios.  The above chart reflects breaches if either recalculation for a given Mortgage Loan exceeded the LTV/CLTV maximum stated in the Underwriting Guidelines.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

| Securitization | Number of Mortgage Loans Reviewed | Number of Mortgage Loans with Defects | Percentage of Mortgage Loans with Defects | Number of Mortgage Loans with Defects & Substantially Increased Credit Risk | Percentage of Mortgage Loans with Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 22 | 16.79% | 22 | 16.79% |
| NHELI 2006-FM1 | 100 | 24 | 24.00% | 24 | 24.00% |
| NHELI 2006-FM2 | 100 | 26 | 26.00% | 26 | 26.00% |
| NHELI 2006-HE3 | 99 | 29 | 29.29% | 29 | 29.29% |
| NHELI 2007-1 | 98 | 21 | 21.42% | 21 | 21.42% |
| NHELI 2007-2 | 98 | 30 | 30.61% | 30 | 30.61% |
| NHELI 2007-3 | 97 | 23 | 23.71% | 23 | 23.71% |
| **Total** | **723** | **175** | **24.20%** | **175** | **24.20%** |

## 2.     Certain Mortgage Loans Exceeded DTI Ratio Limits

Although the DTI ratio is an important measure of credit risk, I found that in certain instances, the underwriter failed to properly calculate the borrower's DTI ratio using information that was available at the time.  As a result, certain Mortgage Loans were given to borrowers with DTI ratios in excess of the maximum permitted by the applicable underwriting guidelines, and without sufficient compensating factors.  For example, a borrower of a loan underlying the NAA 2005-AR6 Securitization was approved with a DTI ratio of          , based on a monthly income of           and monthly debt obligations of          .  The lender, however, miscalculated the qualifying income by including monthly rental income of ▇▇▇▇ in the borrower's total income while also using it to offset the borrower's housing payment.  Furthermore, the borrower's debt obligations were misrepresented on the loan application.  An audit credit report revealed that one month prior to the loan's closing, the borrower took out two loans totaling ▇▇▇▇, with total monthly payments of ▇▇▇▇.  Neither of these debts was disclosed on the borrower's loan application or included in the lender's debt calculation.  A recalculation of the borrower's DTI

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

ratio based on the borrower's actual income and debt obligations resulted in a DTI ratio of ███, far in excess of the DTI ratio of ███ used to approve the loan.[283]

In another example, a Mortgage Loan included in the NHELI 2007-3 Securitization was approved as a full documentation loan with a DTI ratio of ███, based on monthly retirement income of ███ for the borrower and ███ for the co-borrower.  The retirement income documentation in the loan file, however, revealed an actual monthly income of only ███ for the borrower and ███ for the co-borrower.  It is unclear how the underwriter derived the income amounts used to approve the loan.  Using the borrowers' verified income to recalculate the DTI ratio resulted in a ratio of ███, which exceeded the maximum DTI ratio of 55% permitted under the lender's guidelines.[284]

The number of Mortgage Loans associated with borrowers that had DTI ratios above the amount initially used to approved the loans is summarized below.

| Securitization | Number of Mortgage Loans Reviewed | Number of Mortgage Loans with Defects | Percentage of Mortgage Loans with Defects | Number of Mortgage Loans with Defects & Substantially Increased Credit Risk | Percentage of Mortgage Loans with Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 17 | 12.97% | 17 | 12.97% |
| NHELI 2006-FM1 | 100 | 17 | 17.00% | 17 | 17.00% |
| NHELI 2006-FM2 | 100 | 19 | 19.00% | 19 | 19.00% |
| NHELI 2006-HE3 | 99 | 28 | 28.28% | 28 | 28.28% |
| NHELI 2007-1 | 98 | 19 | 19.38% | 19 | 19.38% |
| NHELI 2007-2 | 98 | 10 | 10.20% | 10 | 10.20% |
| NHELI 2007-3 | 97 | 20 | 20.61% | 20 | 20.61% |
| **Total** | **723** | **130** | **17.98%** | **130** | **17.98%** |

[283]  Global Loan Number NAA_2005_AR6_1002123751, Finding IDs f0b3faa9-f78c-e311-8ed7-d8d385e1d166, c9f206cf-f58c-e311-8ed7-d8d385e1d166, and 7b912433-f68c-e311-8ed7-d8d385e1d166.

[284]  Global Loan Number NHELI_2007_3_2001932486, Finding IDs 17807284 and 17807248.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

### G.    The Prospectus Supplement Collateral Tables Overstated the Owner-Occupancy Status of the Underlying Mortgage Loans

In my re-underwriting review, I found that certain Mortgage Loans were represented as owner-occupied but did not, in fact, appear to be occupied by the owner of the subject property. As such, these Mortgage Loans were incorrectly included in the "primary" or "owner-occupied" categories in the Prospectus Supplements' collateral tables, as described in Section VIII(J)(1).

For example, the subject property for a cash-out refinance loan underlying the NHELI 2006-FM1 Securitization was represented as owner-occupied.  The loan application signed by the borrower represented that the borrower had owned and occupied the subject property for the past 2.8 years.  The loan file also contained an executed address certification reflecting the subject property as the borrower's current address.  The origination credit report, however, indicated that the subject address did not match the borrower's credit file.  Furthermore, the borrower's credit card statements and canceled checks reflected a different address from the subject property.  Public records revealed that the borrower never maintained utility services at subject address, and also showed several other individuals as occupants prior to the closing date.[285]

As another example, the subject property for a refinance loan included in the NHELI 2007-3 Securitization was represented by the borrower and approved by the lender as an owner-occupied property.  The borrower represented on the loan application that the property had been the borrower's primary residence for 6 months.  The origination credit report, however, reflected that the subject address did not match the borrower's credit file.  Public records indicated that other individuals occupied the subject property before and after the loan's closing date and also

---

[285]    Global Loan Number NHELI_2006_FM1_2002009090, Finding ID 17798827.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

that the borrower maintained utility services at another property located on the same street as the

subject property.  The other property owned by the borrower had six bedrooms and three

bathrooms, with a total living area of 1,802 square feet, compared to the subject property which

had only two bedrooms and one bathroom, and a total living area of 813 square feet.[286]

The chart below details the number of Mortgage Loans in the Securitizations in which the

subject properties were incorrectly represented as being owner occupied in the Prospectus

Supplements' collateral tables

| Securitization | Number of Mortgage Loans Identified as Owner-Occupied on Closing Loan Tape | Number of Mortgage Loans Misrepresented as Owner-Occupied on Closing Loan Tape | Percentage of Mortgage Loans Misrepresented as Owner-Occupied on Closing Loan Tape |
|---|---|---|---|
| NAA 2005-AR6 | 63 | 13 | 20.63% |
| NHELI 2006-FM1 | 91 | 16 | 17.58% |
| NHELI 2006-FM2 | 93 | 21 | 22.58% |
| NHELI 2006-HE3 | 89 | 20 | 22.47% |
| NHELI 2007-1 | 49 | 4 | 8.16% |
| NHELI 2007-2 | 91 | 16 | 17.58% |
| NHELI 2007-3 | 91 | 16 | 17.58% |
| **Total** | **567** | **106** | **18.69%** |

## H.    Information Contained On The Pre-Closing Loan Tapes Did Not Match the Credit Characteristics of Many of the Mortgage Loans

As part of the securitization of a pool of mortgage loans, Nomura provided to the credit

rating agencies loan tapes containing a detailed listing of the mortgage loans it intended to

include in a particular securitization, and the specific credit characteristics of each of those loans.

It is my understanding that the purpose of the pre-closing loan tapes was to provide accurate data

---

[286]   Global Loan Number NHELI_2007_3_2001856719, Finding ID 17820372.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

and summary information about the credit characteristics of the mortgage loans included in the

securitization so that a credit rating agency could assess the risk of the certificates issued

pursuant to the securitization.  In particular, I understand that the primary determinants of the

credit ratings given to a securitization were the FICO scores, LTV and CLTV ratios, DTI ratios,

and owner-occupancy status of the underlying mortgage loans.  Therefore, it was imperative that

the information contained on the pre-closing loan tapes be accurate.  If the data contained on the

pre-closing loan tape differed from the information contained in the loan origination files, the

loan tape would not accurately reflect the true credit risk associated with the individual mortgage

loans and the pool of mortgage loans included in the securitization.[287]

I reviewed the contemporaneous loan tapes containing the credit characteristics of the

Mortgage Loans underlying the Securitizations, including the FICO scores, LTV and CLTV

ratios, DTI ratios, and owner-occupancy status.  Nomura produced several loan tapes with

information about the Mortgage Loans underlying each Securitization, but did not produce

information identifying the loan tapes that were provided to the ratings agencies.  Therefore, I

understand that the loan tapes I reviewed were those that bore the closest statistical resemblance

to the information contained in the Prospectus Supplements.  Based on the re-underwriting

---

[287] *See, e.g.*, Marjan Riggi & Navneet Agarwal, *US Subprime-Overview of Recent Refinements to Moody's Methodology*, MOODY'S, July 2007, at 2 (explaining that Moody's considered LTV ratio, CLTV ratio, FICO score, and occupancy type in calculating its risk assumptions for loans); Bill Hunt, *ResiLogic: U.S. Residential Mortgage Loss Model Technical Document*, FITCH RATINGS, January 18, 2007, at 3, 8 (listing the closing balance of the mortgage loan, CLTV ratio, occupancy, and FICO score as several of the loss severity data factors); *RMBS: U.S. Residential Subprime Mortgage Criteria: Credit Analysis for Subprime Loan Transactions*, S&P, September 1, 2004, at 3 (explaining that "[t]he base foreclosure frequency of a prime pool for each rating category is affected by changes in loan characteristics such as . . . [l]oan to value (LTV) ratios, . . . [o]ccupancy status, . . . [and] [l]oan size"), at 10 (describing that "[t]he base loss severity assumptions for each rating category are affected by factors such as . . . [l]oan to value (LTV) ratios, . . . [l]oan balance, . . . [and] [p]roperty type and occupancy").

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

review of the Mortgage Loans, there are numerous instances where the information contained on the pre-closing loan tapes concerning the credit characteristics of those loans was not accurate.

The table below summarizes the number of Mortgage Loans with discrepancies from the information contained in the loan tapes.

| Securitization | Number of Mortgage Loans Reviewed | Number of Mortgage Loans with Defects | Percentage of Mortgage Loans with Defects | Number of Mortgage Loans with Defects & Substantially Increased Credit Risk | Percentage of Mortgage Loans with Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 63 | 48.09% | 60 | 45.80% |
| NHELI 2006-FM1 | 100 | 55 | 55.00% | 55 | 55.00% |
| NHELI 2006-FM2 | 100 | 63 | 63.00% | 63 | 63.00% |
| NHELI 2006-HE3 | 99 | 65 | 65.65% | 61 | 61.61% |
| NHELI 2007-1 | 98 | 50 | 51.02% | 46 | 46.93% |
| NHELI 2007-2 | 98 | 61 | 62.24% | 56 | 57.14% |
| NHELI 2007-3 | 97 | 55 | 56.70% | 49 | 50.51% |
| **Total** | **723** | **412** | **56.98%** | **390** | **53.94%** |

## XII.   Conclusion

Based on my re-underwriting review of the Mortgage Loans in the Securitizations, it is my opinion to a reasonable degree of professional certainty that 78.98% of the Mortgage Loans reflected increased credit risk as a result of deficiencies in the original underwriting process.  The chart below summarizes the number and percentage of Mortgage Loans in the Securitizations that suffered from underwriting defects that substantially increased the credit risk associated with the Mortgage Loans.

118

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

| Securitization | Number of Mortgage Loans Reviewed | Number of Mortgage Loans with Substantially Increased Credit Risk | Percentage of Mortgage Loans with Substantially Increased Credit Risk |
|---|---|---|---|
| NAA 2005-AR6 | 131 | 102 | 77.86% |
| NHELI 2006-FM1 | 100 | 81 | 81.00% |
| NHELI 2006-FM2 | 100 | 85 | 85.00% |
| NHELI 2006-HE3 | 99 | 75 | 75.76% |
| NHELI 2007-1 | 98 | 79 | 80.61% |
| NHELI 2007-2 | 98 | 77 | 78.57% |
| NHELI 2007-3 | 97 | 72 | 74.23% |
| **Total** | **723** | **571** | **78.98%** |

In addition, it is my opinion to a reasonable degree of professional certainty that:

1.    78.28% of the Mortgage Loans in the Securitizations were not originated in accordance with the requirements of the relevant originator's underwriting guidelines.

2.    90.46% of the Mortgage Loans in the Securitizations were not properly evaluated to determine if they were at risk of not being repaid or not adequately supported by the collateral.

3.    24.62% of the Mortgage Loans in the Securitizations had a loan-to-value ("LTV") ratio and/or combined loan-to-value ("CLTV") ratio that was not accurately disclosed.

4.    18.69% of the Mortgage Loans in the Securitizations had mortgaged properties that were inaccurately disclosed as being owner-occupied.

5.    56.98% of the Mortgage Loans in the Securitizations had characteristics, such as FICO scores, LTV and CLTV ratios, owner-occupancy status, property types, or loan amounts that were inconsistent with the pre-closing loan tapes.

Highly Confidential Pursuant to the First Amended Protective Order dated January 11, 2013

Dated: May 15, 2014

ROBERT W. HUNTER