# Exhibit H

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   11 Civ 6201 (DLC)
 5   ---------------------------------------X
 6   FEDERAL HOUSING FINANCE AGENCY, etc.,
 7            Plaintiff,
 8        vs.
 9   NOMURA HOLDING AMERICA, INC., et al.,
10            Defendants.
11   ---------------------------------------X
12
13
14
15         DEPOSITION OF ROBERT W. HUNTER
16               New York, New York
17               November 13, 2014
18
19
20
21
22
23
24   Reported by:
25   Debra Stevens
```

```
                                              Page 154
 1                      R. Hunter
 2   Their role at that period of time was
 3   actually being reduced.
 4        Q.    Well, that could be, but I am
 5   asking during that time, were they among
 6   the most active and sophisticated
 7   participants in the industry that you say
 8   you are an expert in?
 9             MS. SHETH:  Objection to form
10        and foundation.
11        A.    Among?
12        Q.    Yes.
13        A.    There are probably many people
14   out there who are more sophisticated than
15   Fannie Mae and Freddie Mac.  But were they
16   among some of those people?  I guess you
17   could say that.
18        Q.    Would it also be true to say
19   that in that period they were two of the
20   largest financial institutions in the
21   United States?
22             MS. SHETH:  Objection to form.
23        A.    That is just a matter of record.
24        Q.    Well, is it correct as a matter
25   of record?
```

Page 155

1              R. Hunter
2     A.    Yes.
3     Q.    Would you say that Freddie Mac
4  and Fannie Mae probably had more data and
5  more knowledge about the mortgage market
6  than anybody else?
7           MS. SHETH:  Objection to form,
8      foundation.
9     A.    Yes, for their marketplace
10 especially.
11    Q.    Would it also be true, as far as
12 you know, that Freddie Mac and Fannie Mae
13 had close relationships with a number of
14 RMBS originators?
15          MS. SHETH:  Objection to form
16     and foundation.
17    A.    Yes.
18          (Pause.)
19    Q.    You okay?
20    A.    No problem.  Thank you.
21    Q.    Sorry for all this paper.  There
22 will probably be more.
23          MR. TULCHIN:  Can we mark,
24     please, as 59103, Prospectus
25     Supplement, production numbers 4811802

Page 156

1               R. Hunter
2       through 4812114.  This is for Series
3       2005-AR6.
4             (Exhibit 59103, Prospectus
5       Supplement, Bates stamped 4811802
6       through 4812114, marked for
7       identification, as of this date.)
8       Q.    Mr. Hunter, you have the next
9   exhibit, 59103?
10      A.    Yes.
11      Q.    I want to ask you, if I could,
12  to look at page S 88.  The production
13  number ends with 894.
14      A.    Yes.
15      Q.    You will see towards the top is
16  a heading that says, "Underwriting
17  Standards."
18      A.    Yes.
19      Q.    Now, this section -- let me stop
20  for a minute and go back.
21            Is it your understanding that
22  for the seven deals at issue, the
23  prospectus supplements made reference to
24  underwriting guidelines of originators,
25  specific originators, only where a

```
                                          Page 157
 1                    R. Hunter
 2    specific originator was responsible for at
 3    least 20 percent of the loans at issue,
 4    the underlying loans?
 5              MS. SHETH:  Objection to form.
 6        A.    I do know that only lenders that
 7    had a specific amount -- the exact amount
 8    I don't know, but I do know they only
 9    specifically talked about lenders that met
10    a certain, you know, percentage.
11        Q.    For other lenders, the
12    underwriting standards were described in a
13    section of the prospectus supplement.
14              Correct?
15        A.    Yes.
16        Q.    Here on the page I referred you
17    to, S 88 in Exhibit 59103, the prospectus
18    supplement is, in fact, describing in what
19    I am just going to say is a generic way,
20    underwriting standards applicable to the
21    mortgage loans in this deal.  Is that
22    fair?
23        A.    Yes.
24        Q.    Now, when you did your
25    reunderwriting and applied guidelines, did
```

1         R. Hunter
2  you ever make any effort to apply the
3  guidelines as described in this section
4  and similar sections of other prospectus
5  supplements as opposed to underwriting
6  guidelines of specific originators?
7       A.    You mean this boilerplate here?
8       Q.    Yes, sir.  You can call it
9  boilerplate.  Whatever you think it is.
10      A.    These are just -- I mean, this
11 is just very, very broad statements, and
12 so we relied upon the underwriting
13 guidelines for that specific lender or the
14 conduit, if it was a Nomura conduit.
15            So we relied on the actual
16 documents that would have been used to
17 underwrite the loans.
18      Q.    Now, for this deal, NAA
19 2005-AR6, I just want to point you to
20 pages 88, 89 and 90.  I don't know.  You
21 called it boilerplate.  I don't want to
22 put any words in your mouth, but beginning
23 with the phrase, "Underwriting standards,"
24 that heading on 88 and going up until the
25 heading, "Description of the Certificates"

Page 159

1                R. Hunter
2    on 90, is that what you are referring to
3    as the boilerplate?
4        A.    Yes.
5        Q.    Is it fair to say this is a
6    general description of underwriting
7    standards applicable to the loans
8    underlying this deal.  Correct?
9        A.    Very broad, generic description.
10   Yes.
11       Q.    No specific underwriter is
12   mentioned here.  Correct?
13       A.    Correct.
14       Q.    So, it wouldn't be possible for
15   you when doing the reunderwriting to be
16   looking at the specific underwriting
17   guidelines of any particular underwriter.
18   Right?  The prospectus supplement doesn't
19   mention any of those.
20             MS. SHETH:  Objection to form.
21       A.    We -- you know, we reviewed the
22   underwriting guidelines that were used in
23   the approval of the loans because the
24   loans were -- as we understood it, the
25   loans were underwritten.

Page 160

1             R. Hunter
2           So we applied the standard that
3   was used to underwrite the loan.  If that
4   was the specific lender's guidelines, we
5   use it.  If it was the conduit guidelines,
6   we used that.  We tried to use the most
7   applicable underwriting guideline for the
8   way the loan was approved.
9      Q.    What you didn't do, if I
10  understand your testimony correctly,
11  Mr. Hunter, when you were reunderwriting,
12  is make any effort to apply the standards
13  or guidelines described at pages 88 to 90
14  of Exhibit 59103?
15     A.    Well, these guidelines, as you
16  referenced, are incorporated into the
17  actual underwriting guidelines we would
18  have used.  This is just a boiling down of
19  the guidelines, you know, across all the
20  lenders that were included in that pool.
21     Q.    Maybe I am confused.  If my
22  question is bad, I will try again.
23           When you did your reunderwriting
24  for this deal, 2005-AR6, did you look at
25  the underwriting guidelines of specific

Page 161

```
 1                    R. Hunter
 2   originators who originated the loans at
 3   issue?
 4        A.    We -- yes.  And we would have
 5   also applied -- there may have also been
 6   some instances where the Nomura guideline
 7   was used and we would have used a Nomura
 8   or whatever guideline was used.
 9        Q.    Got you.
10              But am I right, then, in
11   understanding that when you did your
12   reunderwriting you did not try to apply
13   the underwriting standard set forth at 88
14   to 90.  You looked instead at particular
15   guidelines of specific originators?
16        A.    Yes.
17        Q.    Now, in this prospectus
18   supplement, as best you remember it, is
19   there any representation about the
20   underwriting guidelines of any specific
21   originator who made any of the underlying
22   loans?
23              MS. SHETH:  Take your time to
24         look through the document if you need
25         to.
```

```
                                              Page 162
 1                    R. Hunter
 2      A.    Can you repeat the question,
 3   please?
 4      Q.    The question was this, I'm just
 5   reading it from the screen.
 6            In this prospectus supplement,
 7   as best you remember things, is there any
 8   representation of the underwriting
 9   guidelines of any specific originator who
10   made any of the loans at issue?
11      A.    In this specific section, I
12   didn't see any reference to any specific
13   originator; no.
14      Q.    On page 88 of Exhibit 59103, at
15   the end of the first sentence under,
16   "Underwriting Standards," it says that the
17   loans were originated generally in
18   accordance with the underwriting criteria
19   described in this section.
20            Do you see that?
21      A.    Yes.
22      Q.    And you understand this section
23   to refer to the pages that we have talked
24   about.  Correct?
25      A.    Yes.
```

```
                                           Page 163
 1                    R. Hunter
 2       Q.    So, you didn't apply the
 3  underwriting criteria described in this
 4  section; instead, you looked at particular
 5  guidelines of particular originators?
 6             MS. SHETH:  Asked and answered.
 7       Q.    Do I have that right?
 8       A.    There are no criteria here.
 9  These are very broad statements and that
10  is why we looked at the underwriting
11  guidelines to support our findings.
12       Q.    I think I understand.
13             You do recall that on
14  October 6th you issued a supplemental
15  report, or maybe it is called rebuttal
16  report.  Is that right?
17       A.    Yes.
18       Q.    Can you tell me whether or not
19  you were the person who made the decision
20  to proceed in that fashion, or was it done
21  collectively with the lawyers, or how did
22  this happen?
23             MS. SHETH:  Objection to form.
24       A.    It was -- the attorneys
25  determined that based on our reviews, that
```

VERITEXT REPORTING COMPANY
212-279-9424          www.veritext.com          212-490-3430