```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
FEDERAL HOUSING FINANCE AGENCY,      :
                                     :      11cv6201 (DLC)
                 Plaintiff,          :
                                     :      OPINION & ORDER
        -v-                          :
                                     :
                                     :
NOMURA HOLDING AMERICA INC., et al., :
                                     :
                 Defendants.         :
                                     :
---------------------------------------X
```

APPEARANCES:

For Plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
Andrew R. Dunlap
David B. Schwartz
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For Nomura Holding America Inc., Nomura Asset Acceptance Corp.,
Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc.,
Nomura Securities Int'l, Inc., David Findlay, John McCarthy,
John P. Graham, Nathan Gorin, and N. Dante LaRocca:

David B. Tulchin
Steven L. Holley
Bruce E. Clark
Bradley A. Harsch
Katherine J. Stoller
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

Amanda F. Davidoff
Elizabeth A. Cassady
SULLIVAN & CROMWELL LLP
1700 New York Ave., NW, Ste. 700
Washington, DC 20006

For RBS Securities Inc.:

Thomas C. Rice
David J. Woll
Andrew T. Frankel
Alan Turner
Craig S. Waldman
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017


DENISE COTE, District Judge:

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together, the Government-Sponsored Enterprises or "GSEs"), brings this action against financial institutions involved in the packaging, marketing, and sale of residential mortgage-backed securities ("RMBS") purchased by the GSEs between 2005 and 2007, alleging among other things that defendants[1] made materially false statements in offering documents for the RMBS (the "Offering Documents").  This is one of sixteen related actions brought by FHFA that have been litigated before this Court.  All but this action have settled.

---

[1] The defendants are Nomura Holding America Inc.; Nomura Asset Acceptance Corp.; Nomura Home Equity Loan, Inc.; Nomura Credit & Capital, Inc.; Nomura Securities International, Inc.; David Findlay; John McCarthy; John P. Graham; Nathan Gorin; and N. Dante LaRocca ("Nomura") and RBS Securities Inc. ("RBS") (collectively, "Defendants").

This remaining action concerns seven RMBS created by Nomura (the "Securitizations").

In each of these Securitizations, one of the GSEs purchased a certificate backed by a pool of loans known as a supporting loan group ("SLG").  Those certificates (the "Certificates") were sold by underwriters, including -- for four of the Securitizations -- RBS.[2]  The GSEs purchased the seven Certificates for more than $2 billion.[3]  Nomura and RBS are strictly liable for any material misrepresentations in the Offering Documents for those Certificates, unless they can avail themselves of one of a limited number of statutory defenses.

On November 10, 2014, FHFA moved for partial summary judgment on the Defendants' due diligence and reasonable care defenses under Section 11[4] and Section 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k(b)(3)(A), 77l(a)(2), and similar provisions of the D.C. and Virginia Blue

---

[2] RBS was then conducting business under the name "Greenwich Capital Markets, Inc."

[3] Fannie Mae purchased one Certificate in a senior tranche of Nomura Securitization NAA 2005-AR6.  Freddie Mac purchased Certificates in senior tranches of the six other Nomura Securitizations: NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3.  The Certificates were each guaranteed to be awarded the highest credit rating from each of four prominent credit rating agencies.

[4] Statutory issuers, like the depositors Nomura Asset Acceptance Corp. and Nomura Home Equity Loan, Inc., have no due diligence defense under Section 11 of the Securities Act of 1933.

Sky Acts, D.C. Code § 31.5606.05(a)(1)(B); Va. Code § 13.1-522(A)(ii) (the "Blue Sky Laws").  This motion was fully submitted on December 12.

The reasonableness of a defendant's due diligence investigation will, in most cases, be a question for the jury. It is a mixed question of law and fact that will often hinge on disputed factual issues.  Even when it does not, reasonable minds could often disagree about whether a given investigation would have satisfied a prudent man in the management of his own property.  In exceptional cases, where no reasonable, properly instructed jury could find for a defendant, summary judgment is appropriate.  For the reasons explained at length below, this is such a case.

Here, the loans within each of the groups that supported the seven Certificates were loans that Nomura itself had previously purchased.  There were over 15,000 such loans within the seven SLGs.  Nomura never conducted a due diligence program to confirm the accuracy of the representations in the Offering Documents about the 15,000 loans in the SLGs at or near the time of the securitization.  Nor did it undertake such a review of the loans at or about the time Nomura selected the loans for and placed them within the SLGs.  Instead, to support its reliance on the affirmative defenses of due diligence and reasonable care, Nomura points to its program for reviewing loans before

4

purchasing them.  The 15,000 loans in the SLGs at issue here were drawn from close to 200 pools of loans that Nomura had purchased (the "Trade Pools") from loan originators.

While it is conceivable that a review of loans at purchase -- which may occur months before Nomura selects the loans to be placed in a particular SLG -- might have been sufficient for a jury to find in Nomura's favor on these affirmative defenses, the pre-purchase review that Nomura conducted here was not adequate for that purpose as a matter of law.  Nomura's post hoc attempts in its briefing to piece together the façade of a due diligence program from reviews Nomura undertook before purchasing more than fifty thousand loans in hundreds of trade pools, portions of which would later contribute to the seven relevant SLGs in the Securitizations, simply underscore the lack of evidence that Nomura undertook any reasonable investigation of the accuracy of its representations about the SLGs before issuing the Certificates.

Nomura's pre-acquisition review was not designed to ensure the accuracy of the descriptions in the Offering Documents of the SLGs that backed the Certificates.  Nomura tested samples of loans as it purchased them, but then weeks or months later pulled certain kinds of loans (reviewed and unreviewed) to form the SLGs without taking any care to ensure that the findings from its pre-purchase review program could be reliably applied

to the SLGs.  This broke the link between the results of
Nomura's pre-acquisition sampling and the characteristics of
particular SLGs as they were described in the Offering
Documents.  Nomura has offered no evidence that it considered
how its selection of particular loans for the SLGs impacted its
reliance on the sampling of the trade pools.  Indeed, there is
no evidence Nomura took any care to structure its processes --
its pre-acquisition sampling, its construction of SLGs, or its
pre-securitization review of the sampling results -- to ensure
the accuracy of its representations about the SLGs in the
Offering Documents.

Even putting aside this fundamental error, Nomura's pre-
acquisition review was poorly designed and not implemented in a
way that could give reasonable assurance that the kinds of
representations that Nomura included in its Offering Documents
were accurate.  But, even if one assumed that that review were
adequate, Nomura's pre-acquisition review raised red flags
Nomura ignored.  Despite high "kick-out" rates in the Trade
Pools that populated the seven Securitizations, never once did
Nomura upsize its sample to test whether it had sufficiently
culled loans.  Indeed, in at least some cases, Nomura's bid to
buy loans from their originators included a stipulation that
Nomura would limit its pre-purchase sampling.

Most importantly, there is simply no evidence Nomura ever considered the implications of these kick-out rates for the quality of the loans it would later place in the SLGs and describe in the Offering Documents.  No reasonable jury could find that Nomura conducted reasonable investigations or exercised reasonable care with respect to these seven Securitizations.

And RBS, although it agreed to act as sole lead underwriter for three of the Securitizations and co-lead for a fourth, made little real effort to test the accuracy of the representations about the SLGs.  Unlike Nomura, to the extent RBS conducted a review of loans, it did so after the composition of the SLGs had been determined.  But, for two of the Securitizations, RBS undertook no independent review of the loan files.  For one of these two, RBS knew nothing of the results of Nomura's pre-acquisition review of the loan pools from which Nomura selected loans to populate the Securitization beyond a one-page summary that warned the summary might be neither "complete" nor "accurate."  For the other, RBS was the sole lead underwriter, yet it relied entirely on Nomura's pre-acquisition reviews of the Trade Pools.

RBS did review loans in the other two Securitizations for which it served as sole lead underwriter, but these reviews were manifestly inadequate as a matter of law.  For one of these two,

RBS's Credit Group called the loans "crap" and asked to review one-quarter of them, but was told that RBS did not "own" these loans -- RBS ultimately decided to sample less than one-fourth that number.  But, even then, when RBS failed to collect all of the files for those small samples, RBS simply proceeded with a review of incomplete sets.  To make matters worse, RBS appeared to ignore entirely the results of its valuation reviews in both of these Securitizations, taking no action when a substantial portion of its sampled loans in both groups appeared to have faulty appraisals.  Those loans were securitized, and the Offering Documents calculated loan-to-value ("LTV")[5] ratios based on the potentially faulty appraisals.  For these and other reasons, no reasonable jury could find that RBS undertook a reasonable investigation or exercised reasonable care as underwriter for any of these four Securitizations.

**BACKGROUND**

The adequacy of any due diligence program is a fact-intensive inquiry, and therefore, ordinarily a matter addressed at trial.  But, based on the record here, summary judgment is appropriate.

Below are the principal facts cited in Defendants' major arguments, as well as needed context for those facts.  All

---

[5] The loan-to-value ratio is the ratio of the loan amount to the appraised value of the property securing the loan.

factual disputes are resolved in Defendants' favor, and all reasonable inferences are drawn in Defendants' favor, as non-movants.  Where Defendants offered a litany of similar examples, the Court has attempted to select the strongest or most illustrative.[6]

## I.    RMBS, in Brief

RMBS are securities entitling the holder to income payments from pools of residential mortgage loans held by a trust; these pools are called Supporting Loan Groups or SLGs.  Each of the mortgage loans underlying the Securities at issue (the "Mortgage Loans") began as a loan application approved by a financial institution, known as the loan's originator (the "Originator").[7] Nomura acted as an "aggregator" here, purchasing Alt-A and subprime mortgage loans[8] and then pooling them together, on the basis of credit or other characteristics.  The loans selected for a given Securitization were transferred to a trust created

---

[6] Some passages below are borrowed from a prior Opinion concerning Defendants' statute of limitations defenses.  FHFA v. Nomura Holding Am. Inc., 11cv6201 (DLC), --- F. Supp. 3d ---, 2014 WL 6462239 (S.D.N.Y. Nov. 18, 2014) ("Nomura").

[7] The Originators in these Securitizations, none of which are parties to the action, include Aegis, Alliance, EquiFirst, First NLC, Fremont, Funding America, Mandalay, Novastar, OwnIt, People's Choice, ResMAE, and Silver State.

[8] Mortgage loans are often divided, by credit risk, into three classes.  In order of ascending risk, they are "prime" loans, "Alt-A" loans, and "subprime" loans.  Nomura, 2014 WL 6462239, at *2 n.5.

specifically for that private-label securitization, or "PLS" (a special purpose vehicle or "SPV").

Within a given Securitization, the loans were placed into one or more Supporting Loan Groups.  For example, Nomura's NHELI 2006-FM1 Securitization, offered through a Prospectus Supplement of October 31, 2006, was composed of fourteen classes of certificates, or "tranches," and two supporting loan groups with an aggregated stated principal balance of over $1.1 billion.  Nomura represented that the original principal balances of the loans in Group I "conform[ed] to Freddie Mac loan limits," and made no such guarantee about the loans in Group II.

The trust then issued certificates, and underwriters sold the certificates to investors like Freddie Mac.  These certificates entitled the holder to a stream of income from borrowers' payments on the loans in a particular SLG.  Thus, a certificate's value largely depended on the ability of mortgagors to repay the loan principal and interest and the adequacy of the collateral in the event of default.  The process that generated the Certificates is described in greater detail below.

## II.  Origination: A Loan Is Approved

First, a homeowner or prospective homeowner applied for a mortgage loan to a bank or other financial institution (the "originator" of the loan).  If the loan was needed to purchase

the home, it was called a "Purchase Money Loan."  Alternatively, the applicant might be seeking to refinance an existing loan (a "Refinance Loan"), or to liquidate a portion of the applicant's equity in an already-mortgaged home (a "Second Mortgage").

The relevant documents for each loan application were collected into "loan files."  These documents would include those submitted by the applicant, as well as certain documents created by the originator in the course of reviewing the loan application.  Each loan file was reviewed in a process called "underwriting" at one or more times before the loan was placed in a securitization.  Underwriting was done in connection with a set of guidelines limiting the sorts of loans an originator would make, called "underwriting guidelines."

In the first instance, the originator was expected to underwrite each loan it approved, confirming that it met applicable underwriting guidelines, was valued reasonably and accurately, and was not fraudulent.  Originators could make case-by-case exceptions to their underwriting guidelines when a loan application failed to meet a certain guideline but appeared to nonetheless qualify for a mortgage program based on compensating factors indicating that the applicant was a sufficiently good credit risk.  As will be seen below, originators did not always faithfully underwrite their loans.

## III. Enter Nomura: Purchase of the Loans

Nomura Credit & Capital Inc. ("NCCI"), acting as an "aggregator" of the mortgage loans, acquired loans from originators in order to pool them into supporting loan groups that would be tied to securities sold to investors.  The originator might be selling a group of loans in bulk -- a "bulk trade pool" or a "mini-bulk trade pool," depending on whether the aggregate principal balance of the loans was greater or less than $25 million -- or, if the loans had been underwritten to Nomura's "conduit" guidelines, it might be selling them loan-by-loan.[9]  The Supporting Loan Groups for the Certificates here were composed of 15,806 loans, drawn from 194 Trade Pools[10] and 122 individual loans purchased through Nomura's conduit channel.  Of those 194 Trade Pools, 140 were mini-bulk pools (the "Mini-Bulk Pools") -- contributing 1,561 loans to the SLGs (approximately 10% of the SLGs) -- and the remaining 54 were bulk pools (the "Bulk Pools"), which contributed 14,123 loans to the SLGs (approximately 89%).

---

[9] Whereas the loans in a bulk or mini-bulk pool were typically underwritten to that originator's guidelines, the loans sold via the "conduit" program were underwritten to Nomura's own guidelines.

[10] The relevant SLG of each Securitization was composed of loans drawn from the following number of Trade Pools: 31 Trade Pools (NAA 2005-AR6), 1 Trade Pool (NHELI 2006-FM1), 2 Trade Pools (NHELI 2006-FM2), 71 Trade Pools (NHELI 2006-HE3), 30 Trade Pools (NHELI 2007-1), 56 Trade Pools (NHELI 2007-2), and 27 Trade Pools (NHELI 2007-3).

A trader at Nomura's Trading Desk, learning of a sale of loans by an originator Nomura had approved following a counterparty review, would bid to purchase them.  Before bidding on a pool of loans, a Nomura collateral analyst would receive and review a "loan tape" -- a spreadsheet listing selected characteristics of each loan in the pool -- and recalculate certain values, like the LTV and debt-to-income ("DTI") ratios, based on data on the loan tape (in the case of the LTV ratio, the loan amount and the appraisal or sale price of the property) to test the internal consistency of the data.  If the Nomura trader won the bid, Nomura was permitted to review some or all of the loan files before final settlement of the trade.

The review of loans was undertaken by Nomura's Diligence Group (also called the "Credit Group" or "Residential Credit Group")[11] and by vendors chosen by Nomura.  During the relevant period, the Diligence Group consisted of between three and five employees, including the head of the group: from 2005 through mid-2006, Joseph Kohout ("Kohout"), and afterward Neil Spagna ("Spagna").  According to a fellow employee, "[o]ne of [Kohout's] favorite lines was[, 'W]e are not staffed for this, we are not staffed for this . . . .[']  They could be ordering lunch, I think he was understaffed for that. . . ."  Kohout and

---

[11] As discussed below, the parties dispute whether this group was part of Nomura Securities or NCCI.

Spagna have both testified that their staffing was "adequate" to conduct pre-acquisition loan reviews.

The Diligence Group was responsible for three different reviews for each trade pool: (1) credit review, in which the loan files for some or all of the loans were examined to determine if the loan was originated in accordance with the originator's credit guidelines; (2) compliance review, in which the loan files for some or all of the loans were examined to determine if the loan complied with federal, state, and municipal regulations; and (3) valuation review (or "collateral review"), in which the Diligence Group determined if some or all of the appraisals of the loans' underlying properties were reasonable and accurate.

The number of loans reviewed depended upon the deal and the type of review.  Valuation review was conducted on all loans. Credit and compliance reviews were usually conducted on all loans in a mini-bulk trade pool,[12] as well as any individual loans submitted through Nomura's conduit channel, but only for a sample of loans in a bulk pool.  Nomura's sampling methods are

---

[12] Of the 132 Mini-Bulk Pools for which credit or compliance review documentation was produced, Nomura performed credit and compliance review on all loans in 124 pools, more than 90% of all loans in 6 pools, and more than half of all loans in 2 pools.

described below, following a description of Nomura's valuation
review.

### A.   Nomura's Valuation Review

Nomura submitted the loan tapes reflecting all loans in a
trade pool to a vendor, either Hansen or CoreLogic, for
valuation review.  Hansen applied its valuation product,
"PREVIEW," which contained the "ValueSure" automated valuation
model ("AVM") -- a computer program that computed an appraisal
value for a property based on a database of real estate
transactions, taking into account factors like recent
transactions nearby, area history, and regional economic risk.

The loan tape information sent to CoreLogic was first
reviewed by "HistoryPro," a "proprietary risk assessment engine"
that measured the risk of fraud or default for each loan and
assigned it a corresponding "F-Score" between 0 and 25, with
higher scores more likely to default.  HistoryPro considered a
number of factors, including "pricing and appraisal attributes"
compared against property characteristics, sales history,
comparable sales, and local market data.  If a loan received an
F-Score of 0, no further valuation testing was done.
Approximately 52% of loans in the SLGs received F-Scores of 0.
A loan with an F-Score between 1 and 9 was then reviewed by an
AVM.  If an AVM valuation by Hansen or CoreLogic was within 10%
of the originator's appraisal of a subprime loan, or within 15%

of the appraisal of an Alt-A loan (the relevant "variance thresholds"), no further valuation review was conducted.

If not, a broker price opinion ("BPO") -- typically offered by a realtor, who visited the property, took photographs, and considered recently sold or listed comparable properties (a "drive-by") -- was usually ordered from a BPO vendor.  Among the 46,032 loans in the Trade Pools that underwent Nomura's valuation review (via HistoryPro or AVM), BPOs were ordered for 8,003 loans (17.4%), including 2,129 loans selected for the SLGs.  For loans with an F-Score above 9, the AVM was bypassed and a BPO was ordered directly, or the loan was added to the credit and compliance sample discussed below.

Following the broker's drive-by, the BPO vendor would attempt to reconcile the BPO with the originator's appraisal. If the reconciled BPO differed from the originator's appraisal by more than the variance threshold (10% for a subprime loan, 15% for Alt-A), the loan was identified as defective.  Nomura would ordinarily refuse to purchase the loan ("kick-out" the loan from the trade pool), unless the originator presented evidence rebutting the BPO, which was "rare."  In such cases, Nomura sent the originator's rebuttal evidence to the BPO vendor, who would consider it and issue a "final [BPO] value."

162 loans -- approximately 1% of the loans in the SLGs -- had final BPOs that differed from the originator's appraisal by

more than the relevant variance threshold, yet were included in the SLGs anyway.  Of these 162 loans, more than 75% came from just four Trade Pools: Fremont's SP02 and SP03 (55 loans), and People's Choice's SP01 and SP02 (67 loans).  Nomura has provided no documentation that reflects that it made an individualized assessment of the valuation discrepancies for these 162 loans or explains why they were not kicked out despite exceeding the variance threshold.  Nomura has speculated that the Originators might have provided "additional information" here, but neither explains why this was not factored into the BPOs' "final values" nor presents any documentary evidence that this rare event occurred for any of these 162 loans, let alone 55 times for the two Fremont Pools and 67 times for the two People's Choice Pools.

**B.    Nomura's Sampling Methods for Credit and Compliance Reviews**

   **1.   Sample Size**

Nomura required a sample size of at least 20% of loans in each bulk trade pool for credit and compliance reviews; John Graham ("Graham"), who headed Nomura's Contract Finance and Transaction Management Groups, testified that samples were often approximately 30% of the pool.  For 24 of the Bulk Pools, Nomura conducted credit and compliance review on all or nearly all of the loans.  For the remaining 30 Bulk Pools -- constituting

approximately 80% of the loans in the 54 Bulk Pools, and 12,971 (82.1%) of the loans in the SLGs -- sample sizes ranged from just over 20% to 50% (the "Sampled Bulk Pools").  Kohout explained that sample sizes might be higher in Nomura's first trades with an originator.  The Trading Desk, not the Diligence Group, ultimately determined the appropriate sample size for each pool.

In some cases, the Trading Desk entered into agreements with originators that prohibited Nomura from sampling more than a fixed percentage of loans in the pool.  For instance, Nomura agreed to review no more than between 24% and 30% of the following six trade pools: OwnIt SP02, Gateway 17A, People's Choice SP01 and SP02, and Silver State 62 and 66.  Nomura's actual sample sizes were within 2% of those caps, with a single exception.[13]  In other cases, Nomura agreed to limit its sampling, but reserved the right to request a larger sample (to "upsize" the sample) in certain circumstances.  Together, the Trading Desk agreed to limit its sampling for 15 of the 30 Sampled Bulk Pools and one of the Mini-Bulk Pools.  As discussed below, there is no evidence Nomura upsized its sample in any of the Sampled Bulk Pools here.

---

[13] Nomura actually sampled 40% of Silver State 66, although it had agreed to sample no more than 30%.

## 2.   Selection of Credit and Compliance Sample

Once the Trading Desk determined the sample size for credit and compliance review, it would relay that number to the Diligence Group, which would then select the sample.  The Diligence Group selected an "adverse sample," which was meant to include the "most risky" loans.  Kohout has estimated that 90% of Nomura's adverse sample was selected by a proprietary computer program created by rating agency Standard & Poor's ("S&P") called "LEVELS" that purported to measure the credit risk level of each loan.

Kohout objected to the use of LEVELS, stating in an email of April 21, 2005 to the Managing Director of Whole Loan Trading, Steven Katz ("Katz"), that "[t]his is a non industry standard approach," that "our process does not conform to what is generally deemed to be effective by industry standards," and that "when presenting our process to both internal and external parties, it will have to be made clear that Credit's role in both the sample selection and management of risk on bulk transactions has been diminished to the point of that of a non effective entity pursuant to our limited role in the process."[14]

---

[14] Nomura cites to the testimony of Brett Marvin ("Marvin"), a supervisor, who said this email reflected "a spat," that he "yelled at [Kohout and Katz] for writing stupid stuff like this," and that the final diligence process did not rely entirely on LEVELS.

RBS traders recognized that credit risk did not necessarily correlate perfectly with the risk of fraud.  In an email exchange in November 2006 concerning RBS's adverse sampling, one RBS employee asked another, "Given how fast loans are going bad in deals and how much fraud there appears to be, do you think we need to think about further refining our diligence efforts on the front."  When the second employee replied that RBS "reunderwrite[s] about 25 to 30% of the [trade] pool selected in an adverse sample," the first responded, "we target lots of low [FICO][15] type loans but the low [FICO] type loans are not where we find all the fraud."

The 10% of the sample not selected by LEVELS was chosen in an ad hoc fashion by the Diligence Group, considering risk factors including high DTI ratio, high LTV ratio, geographic "soft" markets, high loan amounts, documentation type, and concerns about the accuracy of the property appraisal.  The Diligence Group's selections were relayed to the originator, who sent the loan files for the sample loans.[16]

---

[15] FICO refers to a consumer credit score issued by the Fair Isaac Corporation.

[16] Although Nomura contends that, at times, the Diligence Group employed random sampling, it offers no evidence that random sampling was used in any of the Sampled Bulk Pools.

### 3. Vendor Review of Credit and Compliance Sample

Nomura outsourced all of its credit and compliance review, in the first instance, to third-party vendors.  For the Bulk Trade Pools here, Nomura employed the Clayton Group ("Clayton") and American Mortgage Consultants ("AMC").  Clayton is a leading RMBS review vendor; AMC, too, was used by a number of other RMBS issuers during the relevant period.

Clayton and AMC reviewed the loan files for the sample loans against the originator's underwriter guidelines ("reunderwriting"), in addition to certain "overlays" imposed by Nomura,[17] and gave each loan a grade for both credit and compliance.  "Event Level 1" ("EV1") indicated that the loan met the originator's guidelines (and Nomura's overlays); a grade of "EV2" indicated that a loan deviated from the guidelines (or overlays), but the deviation was immaterial or offset by compensating factors; and a grade of "EV3" indicated that the loan did not meet the guidelines (or overlays), or could not be evaluated because of documents missing from the loan file.  The vendor could request further information or documentation from the originator.

---

[17] These overlays included maximum debt-to-income and loan-to-value ratios, a minimum FICO credit score, and Fannie Mae's anti-predatory lending guidelines.

Nomura exercised a great deal of control over the personnel assigned to its reviews: it required Nomura-specific teams composed of employees whose qualifications Nomura had reviewed, and it selected its own project leads.  Vendors provided daily reports to the Diligence Group.  At least once, in September 2005, an employee of the Diligence Group visited Clayton "to help review [a] trade."  Employees of Nomura's vendors testified that Nomura took its reviews "seriously"; one called Nomura's Diligence Group "knowledgeable" and "professional."

As evidence of Nomura's "active engagement with its due diligence vendors," Nomura cites discussions between James Burt ("Burt"), Clayton's project lead for trade pool Fremont SP 02, and Kohout on October 5 and 6, 2005.  Burt informed Kohout of an issue concerning certain forms in the sample; Kohout ordered Clayton to "[p]ull 20 files at random" (within the sample) to investigate the issue.  Burt and Kohout also discussed a Massachusetts regulatory issue concerning the borrower's benefit from a loan.  Clayton explained that "[i]t usually is left up to the client [aggregator] to decide if they feel like the [borrower's] benefit is adequate" to satisfy Massachusetts law; in response, Kohout instructed Clayton to "[c]lear [all of] the MA loans," instead of requesting individualized inquiry into borrower benefit.

### 4. Nomura's Review of Vendor Reports on Credit and Compliance Samples

The Diligence Group reviewed the vendors' exception reports or "Individual Asset Summaries" concerning all sampled loans graded EV2 or EV3, which identified the ways in which a loan deviated from the guidelines or overlays.  Some of these reports also identified compensating factors relied upon in assigning a loan a grade of EV2.  The Diligence Group did not review the loan files.  It also reviewed, at random, vendor reports concerning some portion of loans graded EV1.  Kohout estimated this sample could be "anywhere from 25 to 50 percent of the 1s"; another Diligence Group employee testified he reviewed EV1s "[i]f time allowed."

Following its review of EV3 grades and a vendor's report, the Diligence Group frequently directed its vendor to regrade a loan as EV2; this was called a "client override" or "waiver." By FHFA's count, in the 54 Bulk Pools which contributed loans to the SLGs, Nomura's vendors graded 501 loans as EV3.  The Diligence Group issued client overrides for 203 of these loans (approximately 40%), instructing the vendor to regrade them as EV2 -- i.e., acceptable for purchase and securitization.[18]  There is no evidence that the Diligence Group ever directed a vendor to regrade as EV3 a loan a vendor had graded as EV1 or EV2.

---

[18] Nomura has not offered numbers of its own on this point.

Nomura has produced a single post-closing quality control audit of Nomura's vendors' pre-acquisition reviews, performed by IngletBlair, LLC ("IngletBlair").  In July and August 2006, IngletBlair reviewed 189 loans securitized by Nomura from the fifteen originators Nomura had purchased the most loans from; 39 of these loans are in the SLGs for the Certificates.  Of these 189, IngletBlair reviewed 109 loans that had been previously reviewed by a Nomura vendor, each receiving a final grade of EV1 or EV2.  Upon its own review of those loans, IngletBlair graded 7 loans EV3 and another 29 loans EV4, indicating that "[t]he loan is missing critical documentation to determine loan eligibility."  Accordingly, more than 30% of the securitized loans that had been graded EV1 or EV2 were determined either to warrant an EV3 or to lack critical information in the loan file that would permit an EV1 or EV2 grade.  IngletBlair delivered these results to Nomura on August 24, 2006.  Nomura has identified no evidence that it took any steps in response to this audit, including any change in its use or supervision of its vendors.  Sales of four of the Certificates settled after this date.

### 5.   Credit and Compliance Kick-Outs

Generally, any loan graded EV3 that was not regraded to EV2 following Nomura's review of the vendor reports was "kicked-out" of the trade pool: the Diligence Group would inform the

originator that Nomura would not purchase those loans, and the originator would remove those loans from the trade pool before the trade settled.  As Kohout testified, "there really isn't a recommended kickout," since "anything that remains in event level 3 is, in fact, kicked out."

In practice, in the Bulk Pools, Nomura purchased and then included in the SLGs 418 loans (2.6% of the SLGs' loans) that received a "final grade of [EV]3" -- 235 of those received a final EV3 for credit and 197 received a final EV3 for compliance (14 received an EV3 for both) (the "Securitized EV3 Loans").[19] For the NHELI 2007-1 Securitization, 8% of the SLGs' loans had received a final grade of EV3.  Nomura has identified no evidence explaining the Diligence Group's or Trading Group's decision to purchase the Securitized EV3 Loans, although one of Nomura's experts has reunderwritten 17 of these loans and offered post hoc justifications that he contends would have supported regrading some of them as EV2s.

The typical kick-out rate in Nomura's subprime or Alt-A trade pools is disputed.  In an email of November 20, 2006, Spagna wrote, concerning review of certain Fremont trades, that "our kickout rate on some of these deals are much higher than

---

[19] The numbers offered by FHFA are somewhat different, for these counts and others.  Throughout this Opinion, Defendants' counts are used where available.

our typical 7-8% for most subprime deals."  The kick-out rates for those three pools were 6.48%, 11.22%, and 12.12%.  The parties' expert reunderwriting witnesses have testified that the meaning of a kick-out rate depends upon the reason the loans were kicked out of the trade pool.

### 6.   Upsizing a Credit and Compliance Sample

When the Diligence Group sent the results of its review to the Trading Desk, it could recommend expanding the sample to include additional loan files.  Graham recognized the "industry standard that you could increase the sample size . . . if you found a trend that could reveal some particular issue in the origination," and testified that Nomura would upsize where it saw a negative "trend" in order to "determine if indeed that was something that was systematic and [Nomura would] further increas[e] the . . . size of the sample until [it] w[as] satisfied."  When asked if Nomura ever upsized a sample, Kohout "[could] not point to a specific trade," but confirmed "it did, in fact, happen."  There is no evidence Nomura upsized a sample in any of Sampled Bulk Pools at issue here.[20]

---

[20] Nomura has not identified a single instance in which it upsized a sample in any of the Sampled Bulk Pools.  Nor has Nomura's reunderwriting expert.  At his deposition, the expert was asked if it was correct that he had "not been able to identify any instance in which Nomura upsized any sample in the RMBS transactions at issue."  He replied:  "That's correct, I did not find evidence in these pools, but I did find consistent testimony across the record that the right [to upsize] existed

Although the Diligence Group could recommend to the Trading Desk that a sample be upsized, the decision to request an upsize from an originator was ultimately the Trading Desk's. As Kohout explained, "[w]e would present the results and make recommendations, but whether sample sizes were ultimately increased or not was a function of the relationship between the trading desk and the counterparty." Upsizing required "buy in from the seller" because "[t]he seller ha[d] the loan files."

As noted above, in some cases the Trading Desk entered into agreements with originators that prohibited Nomura from sampling more than a fixed percentage of loans in the pool (in the examples cited above, between 25% and 30%); in other cases, Nomura agreed to limit its sampling, but reserved the right to request an upsize in the sample in certain circumstances. In all cases, Nomura could refuse to purchase the trade pool if an originator refused to permit upsizing. Again, there is no evidence Nomura upsized its sample of the Trade Pools at issue here.

---

and nobody would have prevented it." The Court notes, however, that it appears possible that Nomura reviewed additional loans to test for a specific, widespread compliance violation in connection with two Fremont Bulk Pools (SP03 and SP04), although Nomura has not asserted that it did. There is no evidence that the Mini-Bulk Pools here were upsized either, although only a minority of those pools were not reviewed for credit and compliance issues in their entirety.

An email exchange between Kohout and Katz on April 6, 2006 illustrates some of the concerns at play when considering an upsize.  Katz emailed Kohout and others in the Diligence Group to "discuss the fallout on [a] trade" with originator People's Choice.  In response, Kohout noted that 90 loans had been kicked out due to faulty appraisals and that 80 of those were accepted by the originator's in-house appraiser.  Kohout stated, "[w]here a seller's in-house appraiser agrees with +- 90% of the loans with value issues pursuant to [our] BPO's, there is obviously an inherent flaw in their origination process."  Later that day, Kohout wrote that he "took a closer look" and "property valuation declines are off the charts" and reiterated that "the simple fact that only +- 10% of the declines in this category were even disputed is further evidence of a systemic issue in this area on the origination side."  Katz asked, "should we test more values?? even if they passed muster on the initial screen??"  Kohout replied:

> Would not be a bad idea.  Especially, the higher
> LTV/CLTV[21] loans.  However, playing devils advocate,
> doing so, would likely place Nomura in a position
> where we will not be given consideration on future
> trades.  Do we care?

---

[21] The combined loan-to-value ("CLTV") ratio applies to properties securing more than one loan.  It is the ratio of the sum of all loans secured by the property to the appraised value of the property.

Katz responded: "we care....  We can always run them if you think we are at risk... if there are large differences, we can hold onto them and present [them to the originator for repurchase] when they go down....  or if they go down."[22]

## IV.  Securitization: Nomura Bundles the Loans to Create Securities

### 1.  Holding the Loans

When the Trading Desk's purchase of a trade pool settled, NCCI took title to the loans and received the loan files for the loans that had not been part of the pre-acquisition sample. There is no evidence Nomura reviewed any of these files, or conducted any further review of those loans, prior to the commencement of this litigation.

These loans were then held on NCCI's books until they were securitized.  If a loan suffered an early payment default while Nomura was holding the loan, Nomura would not securitize it. More than two-thirds of the loans in the SLGs for the Certificates were held on Nomura's books for at least two months; approximately 12% were held for five months or longer.

---

[22] In its default "Pool Summary and Trade Confirmation," Nomura retained the right to force an originator to repurchase a loan in the event that the borrower defaulted on his or her first scheduled monthly payment after the trade's cut-off date (often shortly before the trade's closing date).

### 2. Selecting Loans for a Securitization from Trade Pools

As noted above, all but 122 of the 15,806 loans that comprise the SLGs were drawn from 194 Trade Pools.[23]  The Trading Desk would instruct collateral analysts, who then selected loans from the Trade Pools to populate the SLGs in a given securitization.  As one trader explained the "art of selecting the loans," he would "tell [his] Collateral Analyst what I want, how I want [the securitization pool to] look, what I think will suit the market, what's in demand."  He considered factors including geographic concentrations, weighted average FICO scores, owner-occupancy status, and weighted average LTV ratios.

### 3. Representations in the Offering Documents

After the securitization was structured, Nomura's Transaction Management Group, with the assistance of outside accounting firms and outside counsel, would draft the offering documents to be sent to potential investors.  In the Offering Documents for each Securitization, Defendants made representations to purchasers, like the GSEs, concerning the Mortgage Loans' adherence to applicable guidelines and the loans' characteristics.  The Offering Documents included a Shelf Registration Statement filed with the Securities and Exchange

---

[23] Those 122 loans were purchased individually through Nomura's conduit channel.

Commission ("SEC"), as well as the relevant Prospectus and Prospectus Supplements.[24]

For instance, with respect to Supporting Loan Group I in Nomura's Securitization 2006-FM2 ("2006-FM2"),[25] an SLG that backed a senior Certificate purchased by Freddie Mac, Nomura represented that:

> (1) "[a]ll of the mortgage loans were originated or acquired by [originator] Fremont, generally in accordance with the underwriting guidelines described in this section";[26]
>
> (2) 57.5% of the loans (or 68.4% of the pool by principal balance) had an LTV ratio[27] of 80% or lower, and 26.5% of the loans (or 31.1% of the pool by principal balance) had a CLTV ratio[28] of 80% or lower;
>
> (3) 93.2% of the underlying properties were owner occupied; and

---

[24] The representations at issue in these actions appear in the Securities' Prospectus Supplements.  Nomura issued the seven Securitizations pursuant to three Shelf Registration Statements and seven Prospectus Supplements.

[25] Supporting Loan Group I had the greatest principal amount issued (over $525 million) of any of the relevant Nomura SLGs.

[26] Similarly, Nomura represented that "[a]ll of the Mortgage Loans have been purchased by the sponsor from the Originator and were originated generally in accordance with the underwriting criteria described in this section."

[27] As noted above, the loan-to-value ratio is the ratio of the loan amount to the appraised value of the property securing the loan.  80% was a common benchmark used to divide lower- and higher-risk loans.

[28] As noted above, the combined loan-to-value ratio is the ratio of the sum of all loans secured by the property to the appraised value of the property.

(4)  the most senior class, I-A-1 would be given the
     highest credit rating by Standard & Poor's,
     Moody's, Fitch, and DBRS.

With respect to the second and third representations,
Nomura stated that "[t]he Group I Mortgage Loans are expected to
have [those] characteristics as of the Cut-off date," thirty
days before the Securitization's closing date.  Nomura also
stated:

> Prior to the Closing Date, we may remove Mortgage
> Loans from the mortgage pool and we may substitute
> other mortgage loans for the mortgage loans we remove.
> The depositor believes that the information set forth
> in this prospectus supplement will be representative
> of the characteristics of the mortgage pool as it will
> be constituted at the time the certificates are
> issued, although the range of mortgage rates and
> maturities and other characteristics of the mortgage
> loans may vary.  The characteristics of the mortgage
> loans as described in this prospectus supplement may
> differ from the final pool as of the closing date due,
> among other things, to the possibility that certain
> mortgage loans may become delinquent or default or may
> be removed or substituted and that similar or
> different mortgage loans may be added to the pool
> prior to the closing date.  The actual mortgage loans
> included in the trust fund as of the Closing Date may
> vary from the mortgage loans as described in this
> prospectus supplement by up to plus or minus 5% as to
> any of the material characteristics described in this
> prospectus supplement.

The Prospectus Supplement for 2006-FM2 also disclosed the
following regarding compensating factors:

> On a case by case basis, Fremont may determine that,
> based upon compensating factors, a prospective
> mortgagor not strictly qualifying under the
> underwriting risk category guidelines described below
> is nonetheless qualified to receive a loan, i.e., an
> underwriting exception.  Compensating factors may

include, but are not limited to, low loan-to-value
ratio, low debt to income ratio, substantial liquid
assets, good credit history, stable employment and
time in residence at the applicant's current address.
It is expected that a substantial portion of the
mortgage loans may represent such underwriting
exceptions.

And the Prospectus Supplements for five of the Securitizations

defined the LTV ratio for loans other than Refinance Loans as

"generally the lesser of (a) the appraised value determined in

an appraisal obtained by the originator at origination of that

loan and (b) the sales price for that property."[29]

These numbers were taken from the loan tapes created by the

Originator that listed these characteristics, and others, for

each loan.  Nomura has offered no evidence to suggest that these

representations were altered in any way to reflect the results

of its pre-acquisition reviews.[30]  For example, for the 162 loans

in the SLGs with BPOs that differed from the Originator's

appraisal by more than the relevant variance threshold, Nomura

---

[29] Offering Documents for five of the Certificates at issue
included a repurchase provision requiring Originators or Nomura
as sponsor to buy back or substitute a "defective" loan in
certain circumstances.  The Originator or sponsor was obligated
to repurchase or substitute a loan if it was originated as a
result of fraud, negligence, or a misrepresentation or omission.
For example, with respect to 2006-FM2, NCCI, as sponsor, was
required to "repurchase [a defective] Mortgage Loan or provide
the trustee with a substitute Mortgage Loan," should the trustee
learn that any loan "is defective on its face due to a breach of
the representations and warranties with respect to that Mortgage
Loan made in the transaction agreements."

[30] The correction of data entry errors is excepted.

does not dispute that its LTV and CLTV representations in the Offering Documents were based on the possibly faulty origination appraisals, not the out-of-threshold BPOs.

Nomura has offered the following evidence of steps taken, after the pre-acquisition review, to confirm the accuracy of these representations.  The Transaction Management Group sometimes received results from the Diligence Group's pre-acquisition review -- they received results for 89 of the 194 Trade Pools -- and, at times, participated in telephone calls with underwriters of the securities.  For four of the seven Securitizations, a single-page chart titled "Due Diligence Summary" was circulated to the Transaction Management Group that listed the percentage of loans to be securitized that had been reviewed and the kick-out rates for credit, compliance, and valuation reasons for the contributing Trade Pools; three of these summaries broke out these rates for the top two Originators.  All four include the following disclaimer:  "The material contained herein is preliminary and based on sources which we believe to be reliable, but it is not complete, and we do not represent that it is accurate."  Nomura has identified no evidence concerning its use or discussion of these summaries.

Graham, who headed Nomura's Transaction Management Group, has testified that he or someone else "would have at some point vetted th[e] language [concerning compliance with the

originator's underwriting guidelines] with someone in the Due Diligence Group to verify that it generally reflected the underwriting guidelines that were used to originate the loans." There is no record that the Diligence Group took any steps, after the loans were acquired, to verify the accuracy of this Offering Document representation.  Graham explained he relied on "indirect verification," as he "had confidence in the processes and systems that were involved in the acquisition of mortgage loans," which "would include due diligence" at that stage.

Nomura did hire an outside accountant, Deloitte & Touche LLP ("Deloitte"), to confirm that the Offering Documents accurately calculated the number of loans with certain characteristics based on the data listed on the loan tape (e.g., an LTV between 75% and 80%), but Deloitte undertook no examination of the accuracy of the data on the loan tapes concerning the loans' characteristics, and it made "no representations as to . . . the accuracy of the information" in the Offering Documents.  Nomura also hired Wells Fargo as a "collateral custodian" to ensure that certain required documents concerning the mortgages (e.g., any assignments or title policies) were in its possession.  Wells Fargo did nothing to verify the accuracy of the information on the loan tapes concerning LTV ratios or owner-occupancy.

### 4.   Underwriting

As noted above, an SPV that held the loans in the supporting loan groups would issue certificates tied to different classes or tranches of the security.  Those certificates were sold to underwriters, who in turn sold them to investors, including the GSEs.

In each of the Securitizations, Nomura kept some of the most junior certificates (the "Residual Certificates").  These Residual Certificates were the first to take losses should borrowers default.  Nomura's Residual Certificates had recorded market values, at the time of the Securitizations' respective closings, of between approximately $11 million and $40 million; together, they totaled approximately $190 million.  Nomura sold some of these interests within one month of the Residual Certificates' issuance -- including nearly two-thirds of its residual interests in NHELI 2006-FM2 and three-quarters of its residual interests in NHELI 2007-2 -- and it sold all of its remaining interests within approximately one year of each Securitization.  According to a Nomura presentation entitled "RMBS Residual Analysis," "[l]osses [on residuals] are realized in years 2-4 and much of the cash flow has already been received in year 1."

**V.    Enter RBS: Underwriter**

Nomura Securities acted as sole lead underwriter for two of the Securitizations (NAAC 2005-AR6 and NHELI 2006-FM1); RBS was the sole lead underwriter for three (NHELI 2006-FM2, NHELI 2007-1, and NHELI 2007-2), and was identified as a co-lead underwriter for a fourth (NHELI 2006-HE3).  Non-party Lehman Brothers, Inc. acted as the sole lead underwriter for the final Securitization (NHELI 2007-3).  Although RBS's Underwriting Committee was charged with approving sponsors before RBS could underwrite their RMBS, "approval was mistakenly not obtained from the RBS[] Underwriting Committee" until after RBS had underwritten Nomura's NHELI 2006-HE3 and NHELI 2006-FM2.

**A.    NHELI 2006-HE3**

RBS is identified as a co-lead underwriter in the Offering Documents for NHELI 2006-HE3 ("2006-HE3").  RBS's expert, Charles Grice, has explained that during the relevant period, "typically only one underwriter serves as the true lead underwriter," and RBS's "role can be best described as that of a non-lead underwriter" in connection with 2006-HE3.  RBS had previously underwritten a Nomura securitization that closed on July 28, 2006, but RBS has identified no specific knowledge of Nomura's processes that RBS gained from that experience.

On August 4, 2006, Timothy Crowley, a Vice President at Nomura Securities and member of the Transaction Management

Group, emailed a group including RBS employee Adam Smith

("Smith") to circulate "the initial draft of the term sheet" for

2006-HE3 and request "comments . . . by 2:00 Monday [August 7]."

In response, Smith emailed Crowley to ask, "Can you send me a

summary of the due diligence done on the he3 collateral?"  On

August 7, another Nomura employee, Michael Orfe ("Orfe"),

emailed Smith the single-page "Due Diligence Summary" created

for 2006-HE3.  This summary included the following disclaimer:

"The material contained herein is preliminary and based on

sources which we believe to be reliable, but it is not complete,

and we do not represent that it is accurate."

Smith responded that the listed balance for the trade, $4

billion, "looks incorrect"; Orfe explained that it

> represents the total balance of any trade that a loan
> in this pool was part of.  So it is the case that
> there may be one loan in this pool that came from a
> trade of $100mm [million], and that $100mm is included
> in the $4 billion.  The idea is to give an overall
> picture of our DD [due diligence] process.

This summary for 2006-HE3 listed the percentage of loans

(by unpaid principal balance) that had been kicked out of the

contributing Trade Pools for reasons of "Credit," "Compliance,"

and "Property" (together, 7.5%), and the same statistics for the

two Originators with loans comprising 10% or more of the

Securitization's loans, People's Choice and First NLC.  The

summary did not identify the percentage of loans that had been

sampled for credit and compliance review in the underlying Trade
Pools, or identify the percentage of loans to be securitized
that had been reviewed; it only identified the percentage of
People's Choice's and First NLC's loans that had been reviewed
(accounting for 60% of the loans, by unpaid principal balance).
Smith emailed this summary to Brian Farrell ("Farrell") and
James Whittemore ("Whittemore") in RBS's Credit Group, asking
them to "review Nomura due diligence on the HE3 transaction that
we are a co-manager.  Seems to be in-line with subprime loans,
please confirm that you are ok with the results."  Farrell asked
to see "LTV, FICO, DTI, PPP [prepayment penalty], Property
Types" for the collateral; he was sent a summary of the
collateral and ten minutes later replied, "Overall snapshot of
this looks ok."

     Nomura also provided RBS with a list of the six Originators
who contributed loans comprising more than 5% of the
Securitizations' loans.  One RBS employee asked another for the
"complete list," writing, "[n]ot to be a pain in the ass but
that still leaves [unaccounted for the originators of] over 20%
of the pool."  He was told, "Nomura will only disclose those
originators that comprise over 5% of the pool."

     On August 10, Smith requested confirmation from Katz of
Nomura's "General Due Diligence Procedures," outlining his
understanding in eleven sentences; Katz provided a few

additional details and attached a June 2006 presentation made to S&P entitled "Nomura Securities International Residential Whole Loan Securitization Platform."  The presentation includes three slides under the heading "Due Diligence Process" that represent, among other things, that Nomura's sampling of bulk trade pools was one-third "[r]andom" and two-thirds "[a]dverse."

RBS also tested the "data integrity" of the loan tape to identify any data input errors; received a "negative assurance letter" from Nomura's counsel, Thacher Proffitt & Wood LLP ("Thacher"), stating that Thacher was not aware of any facts that would render the Offering Documents for 2006-HE3 misleading; and received confirmation from Deloitte that the Offering Documents accurately calculated the number of loans with certain characteristics, based on the loan tapes.  RBS participated in a "post-securitization due diligence conference call," although RBS has identified no details concerning that call.

On the basis of this work, RBS underwrote 2006-HE3.  At no point did RBS review any of the loan files for the loans underlying the Securitization.

**B.  NHELI 2006-FM2**

RBS served as the sole lead underwriter for NHELI 2006-FM2 ("2006-FM2"), which securitized loans from two Bulk Pools, both purchased from Fremont: Fremont SP03 ("SP03") and Fremont SP04

("SP04").  In September 2006, RBS received three spreadsheets
including information from loan-level reviews conducted for
Nomura by the vendor AMC.  The first, entitled "Seller Trade
Breakout," listed the number of loans in SP03 and SP04 that
underwent credit and compliance review, an AVM review, and a BPO
review, as well as the number of loans kicked out of each of
these pools "for Credit," "for Compliance," "for Valuation," and
"for Collateral."  The Seller Trade Breakout showed that
Nomura's credit and compliance samples were 24.6% and 24.8% of
the loans in SP03 and SP04, respectively; that 30.0% and 34.8%
of those samples, respectively, had been kicked out for
compliance issues; another 5.3% and 8.3%, respectively, of these
samples had been kicked out due to credit issues.  The other two
spreadsheets included the results of AMC's and Nomura's credit,
compliance, and valuation reviews, for loans reviewed in SP03
and SP04.  RBS received all of AMC's results.

Before these three spreadsheets were sent to RBS, Spagna,
the head of Nomura's Diligence Group, instructed AMC to
retroactively regrade 19 EV3 loans that had been purchased by
Nomura.  In an email with the subject line "Huge Favor--Fremont
ASAP," Spagna noted that "the last set of exception reports"
from AMC "shows that there are 12 loans in Fremont 3 and 7 loans
in Fremont 4 that AMC had marked as [EV]3s but, for what[]ever
reason, we decided to buy from Fremont."  Spagna then instructed

AMC to "[p]lease mark these loans as client overrides Credit Event 2s for all 19 loans in question.  Then please forward to me the updated set of reports for these two deals."  Nomura has provided no other evidence to explain the change in the classification of these 19 loans.

These revised reports were sent to RBS later that day, and Smith then sent these reports to others at RBS, asking them to "review the results and sampling methods so that we can discuss the extent of our required due diligence as an underwriter." Farrell emailed Spagna and another member of Nomura's Diligence Group, Mendy Sabo ("Sabo"), asking them to "elaborate more on high risk characteristics" used to select the adverse sample. Sabo said Nomura would be unable to send a "formal" response in time -- Farrell asked for a response the same day -- and so instead provided "a quick ad hoc" description.  There is no evidence RBS was provided with a fuller description before the Securitization closed.

Farrell wrote to Smith that "[t]he only concern is the high number of payment stream[31] exceptions," and that "[i]f the payment stream issues are isolated, the rest of [the] pool looks good."  Farrell noted RBS had "r[u]n into similar issues in April/May of this year" and that "Fremont stated that they

---

[31] Payment stream exceptions may refer to regulations concerning disclosure to the borrower of the amount of future payments due.

intended to fix their process, which we believe is now true as a result of our [$]1.1 [billion] Fremont review this month." Earlier in that email chain, a member of Nomura's Diligence Group wrote that "#'s are skewed (because of the Compliance drops) because we found an issue with the payment stream on [certain] loans . . . which we performed 100% [due diligence] on."[32]  Whittemore wrote that "[i]t appears the due diligence sample was sufficient for the size of the pool," "[t]heir sample methodology and AVM/BPO process appear to be sound," and "[t]he exception ratios excluding the payment stream issue appears to be what we see when we do our due diligence at Fremont for whole loan trades."  Later, Farrell wrote to Smith that "Credit was ok with results and sampling methodol[og]y."

Months later, in February 2007 -- after 2006-FM2 had closed -- Farrell was asked by another RBS employee, Grace-Ann Didato ("Didato"), about RBS's diligence on this deal.  Farrell wrote, "We did not perform actual diligence on this.  Diligence was performed by another company for Nomura.  We signed off on their results."  When Didato asked, "How frequently is this done?," Farrell replied, "Since being employed, this is the only review

---

[32] As noted above, this is the only evidence the parties have identified suggesting Nomura may have reviewed an upsized sample, here to test for compliance violations.

type I was involved in w[h]ere [due diligence] results were reviewed and a new diligence was not ordered."

Before 2006-FM2 was issued, RBS participated in a "due diligence teleconference" with RBS's counsel, Nomura, Nomura's counsel, and non-lead underwriters.  General corporate issues were discussed; according to Spagna, only two questions were addressed to Nomura's Diligence Group.  Spagna wrote to Sabo: "We had 2 questions.  I took the liberty to bullshit them.  I think it worked."  In addition to this call, RBS received a negative assurance letter from Nomura's counsel, Thacher, and Deloitte verified the accuracy of the information on the loan tape and the calculations based on that data in the Offering Documents.

### C.   NHELI 2007-1 and NHELI 2007-2

RBS was also the sole lead underwriter for NHELI 2007-1 ("2007-1") and NHELI 2007-2 ("2007-2").  RBS conducted its own loan reviews, through its vendor Clayton, in connection with these securitizations.  While RBS did receive the results of Nomura's pre-acquisition review for the trade pools that fed into 2007-2, there is no evidence RBS ever received the results of Nomura's review of the pools that populated the relevant SLG of 2007-1.

For both Securitizations, RBS's sampling was partly "semi-random" and partly adverse.  The semi-random sample was created

by stratifying the pool to be sampled by unpaid principal balance into bands of $50,000 or $100,000, and then using a random number generator to select loans within each band.  The larger the aggregate balance was in a band, the more loans that band would contribute to the sample.

The adverse sample was selected according to characteristics like loan balance, FICO score, LTV ratio, and region.  Where only some loans with particular adverse characteristics were to be reviewed, a random number generator was used to select them.  The adverse sample would be selected before the semi-random sample.  In addition, RBS ordered a drive-by BPO for a sample of loans.

RBS determined the appropriate sample size according to a number of factors, including the Originator, the type of product, and other risk characteristics.  According to the RBS Greenwich Capital Credit Procedures Manual, "[t]he number of files selected for review and the manner of selection may vary due to a number of factors, the most important of which, is [RBS] Greenwich's exposure to the transaction."  When asked at depositions, RBS employees stated they were not aware that RBS policy varied sample size according to RBS's "exposure."

### 1.   Sample Selection

#### a)   2007-1 Sample Selection

For 2007-1, RBS selected two samples -- each partly semi-random and partly adverse -- one from a group of fixed-rate loans ("Group I") and a second from a group of adjustable-rate loans ("Group II").[33]   Group II, composed of 1,751 loans, was later divided into two different supporting loan groups, one of which supported the Certificate purchased by Freddie Mac. Farrell selected samples of 250 loans from Group II; that sample was reduced from 250 loans (14.3% of the group) to 102 loans (5.8%) because Nomura reported it "did not have imaged files for all the loans in [Farrell's] original samples."   32 of these loans were selected semi-randomly; 70 were adversely selected. There is no evidence RBS followed up with Nomura, and RBS simply reviewed the requested loan files that Nomura did send.

#### b)   2007-2 Sample Selection

RBS did receive the results of Nomura's review of the loans securitized in 2007-2.   Yet, Farrell wrote to Whittemore,

---

[33] For both 2007-1 and 2007-2, RBS did not select samples from the relevant SLGs, but rather from larger pools including those SLGs.   In the case of 2007-1, RBS selected its sample from Group II, which was subdivided into two supporting loan groups, Group II-1 and Group II-2.   Group II-1 was the SLG supporting the Certificate Freddie Mac purchased.   Similarly, with respect to 2007-2, RBS selected a sample from all loans in a pool later subdivided into two supporting loan groups: Freddie Mac's SLG, Group I, and Group II.

"[t]his one is crap.  I'm looking for a suggestion."  Farrell warned Smith, "[t]his [sample] will be larger than 250."  When asked why, Farrell explained: "Because it's crap."  Smith replied, "OK.  Do what you feel comfortable with."  Farrell then told Smith, "I would like to review 25% of the total loan population," or 1,284 of the 5,136 loans in 2007-2.  Within one minute, Smith replied: "We don't own the pool.  Call me. [Extension] 2271."  When asked at his deposition "why Mr. Smith would want to take this conversation off line," Farrell said he did not know.

Ultimately, RBS selected a sample of 368 loans for 2007-2 (7.2% of the 5,136 loans).  138 were selected semi-randomly, 168 adversely.  As was the case for 2007-1, Nomura reported that it did not "have imaged files" for 60 of those loans, so Farrell's sample was reduced to the 308 loans (6.0% of 2007-2) for which Nomura transmitted imaged loan files.

### 2.   RBS Loan Reviews

There is some additional evidence that RBS used different standards when it reunderwrote loans in what its employees called "securities" -- i.e., RMBS to be issued by third-parties -- than when it performed pre-acquisition review of "whole loan purchases" RBS might securitize itself.  In connection with another third-party securitization of Fremont loans RBS was underwriting, on January 31, 2006, RBS employee Donald Lawson

("Lawson") gave feedback to another employee, Anne Shera
("Shera"), who had just submitted a draft report of findings
concerning those loans, writing: "As this is a security, we
will not be as tough on appraisal and underwriting
issues . . . ."  A few days before, Shera had asked Lawson for
advice, as Clayton flagged a loan as "high cost" but Fremont
disputed that.  Shera asked Lawson if RBS should "kick" the
loan.  Lawson replied: "OK for one loan and we're securitizing
off their shelf.  We would not buy this loan.  Let them know
that because we just agreed to buy a $1 Billion pool from them
which closes in March."

**a)    2007-1 Loan Reviews**

Of RBS's sample of 102 loans from Group II, in its initial
report to RBS, Clayton graded 28 loans (or 27.5%) "3" due to
credit issues; of these 28, 16 loans were graded "3C" -- which
indicated "only curable material exceptions" -- and three were
graded "3D," which meant "missing material documentation."  Nine
loans (or 8.8%) received a grade of "3" due to a compliance
issue; one of these was graded "3C," and four "3D."  All told,
33 loans were graded "3" for either credit or compliance reasons
(and four for both) according to Clayton's report prepared
January 18, 2007 at 5:35 p.m.  Clayton issued a revised report
approximately one hour later, at 6:41 p.m., showing that all but
three of those 33 loans had been regraded "2W," indicating a

48

client override, for credit or compliance.  RBS's Whittemore
testified that, when "review[ing] a loan file to see if there
were compensating factors for exceptions," he might "flip
through the pages and review" in "20 minutes," or spend as many
as "three hours . . . [i]f [he] thought it was important."  No
documentation of any compensating factors identified by RBS for
these 30 loans has been produced.  For six of the loans,
however, Farrell has recently reviewed them and reports that
they appear to have "sufficient compensating factors" that he
would have deemed them acceptable at the time.  Farrell
indicates in conclusory terms that the other loans appear also
to be loans he would have "deemed acceptable in 2007 for similar
reasons."[34]  Ultimately, RBS overrode all of the "3" grades for
the sampled loans.

---

[34] Farrell's declaration states: "I do not recall specifically
what conversations, if any, I had with individuals at Clayton
regarding this pool prior to reviewing the [relevant Clayton]
Report, what loans I had previously reviewed or what diligence
work I had previously done on this pool."  He notes that he had
previously received reports on this pool and speculates that it
is "likely I had already been in discussions with Clayton
regarding my opinion on various types of exceptions they
identified."  He notes "substantial recurrence of the types of
issues causing Clayton to flag the loan," and ultimately opines,
"I believe I would have been able to thoughtfully review the
nine loans flagged for material credit exceptions [but not "3C"
or "3D"] within the course of an hour."

### b)    2007-2 Loan Reviews

In RBS's 308-loan sample for 2007-2, Clayton initially graded 50 loans (16.2%) a "3" for credit, including 8 loans graded "3C" and 7 loans graded "3D."  RBS overrode all 50 of these initial grades.  Again, there is no documentary evidence of compensating factors identified by RBS for these loans.

### 3.    Valuation Diligence

RBS ordered drive-by appraisals for 50 loans within the 2007-1 Group II credit and compliance sample.  It is not clear how these 50 loans were selected.  Nine of those appraisals were canceled.[35]  For 6 of the 41 loans for which a drive-by appraisal was completed (14.6%), that appraisal was more than 20% below the Originator's appraisal (based upon which the Offering Document's LTV ratio was calculated).  Similarly, RBS ordered drive-by appraisals for 100 loans within its 2007-2 sample.  Six were canceled.  Again, for approximately 15% of the loans (14 loans among those 94), the drive-by appraisal was more than 20% below the Originator's appraisal.

According to a November 2006 investor presentation concerning RBS's whole-loan acquisitions, where a BPO is more than 20% below the originator's appraisal, RBS would conduct a reconciliation.  In connection with a different loan review,

---

[35] The parties have not identified evidence indicating why these cancellations occurred.

when Frank Camacho of RBS's Credit Group was asked "what happens" when the BPO varies greatly from the originator's appraisal, he explained:

> I want to see the drivebys with over a 20% variance.
> I'll pull the original appraisal, look at them both,
> and figure out who's on crack.  If the appraiser's
> right, fine, if the driveby's right I'll kick the loan
> out of the trade and the lender will have to sell the
> loan to someone else.  If this happens on a widespread
> enough basis I'll recommend increased due diligence,
> repricing the trade, or not doing the deal at all.

There is no evidence that RBS took any further steps concerning valuation diligence for either the 2007-1 or 2007-2 samples.  Those 20 loans with BPOs more than 20% below the Originator's appraisal were securitized in 2007-1 and 2007-2, and the Offering Documents' representations concerning LTV ratios were calculated based on the Originators' appraisals for those loans.

### 4.   Other Diligence

As it did with the other Nomura securitizations, RBS received negative assurance letters from Thacher, and verification from Deloitte, based on loan tape data, of the calculations that appeared in the Offering Documents.

## VI. Facts Concerning the Parties

### A.   Relationships Among the Nomura Entities

Nomura Holding America Inc. is a holding company and is the parent, directly or indirectly, of Nomura Securities, NCCI, Nomura Asset Acceptance Corp. ("NAAC"), and Nomura Home Equity

Loan, Inc. ("NHELI").  The depositors for the seven Securities
were NAAC and NHELI.

David Findlay ("Findlay") served on the boards of NAAC,
NHELI, and Nomura Securities.  NAAC's and NHELI's boards were
identical.  Nomura Securities employed Dante LaRocca, the chief
executive officer of NHELI, as well as Graham, who served as
chief executive officer of NAAC.  Nomura Securities also
employed Nathan Gorin, the chief financial officer of NAAC,
NHELI, NCCI, and Nomura Securities, as well as Sam Herbstman,
the tax officer of both NAAC and NHELI.

Neither NAAC nor NHELI had employees.  Nomura asserts that
NAAC's and NHELI's boards of directors had the authority to
prevent the issuance of the Securitizations, but its designee
could not state that these directors ever held a meeting, let
alone took meaningful action as directors.  Findlay could not
recall serving as a director of either NAAC or NHELI.

NCCI is identified as the "seller" or "sponsor" in each
Prospectus Supplement.  All of NCCI's officers were employed by
Nomura Securities, and before October 2006 NCCI had no
employees.  Before that date, members of Nomura's Trading Desk,
Diligence Group, and Transaction Management Group were employed
by Nomura Securities.  After that date, NCCI, rather than Nomura
Securities, appeared on their paychecks.  Nomura's corporate
representative was not aware of any substantive change in any

person's function as a result of that change.  Three of the Securitizations closed before October 2006, one closed on or about October 31, 2006, and three closed in early 2007.

    B.    **The GSEs**

        1.    **The GSEs' Participation in the RMBS Market**

    Fannie Mae and Freddie Mac are government-sponsored enterprises created to ensure liquidity in the mortgage market. Fannie Mae was established in 1938, Freddie Mac in 1970.  Their primary business is to purchase mortgage loans from originators that conform to the GSEs' standards ("conforming loans") and then either hold those loans on their own books or securitize them for offer to the public.  This side of their business is known as the "Single Family" side.  In their Single Family businesses, the GSEs review loans before purchasing them in bulk; the GSEs also monitor loans after purchasing them.

    In 2000, the GSEs began to purchase quantities of Alt-A and subprime loans and to securitize some of those purchases. Office of Policy Development and Research, U.S. Department of Housing and Urban Development, Fannie Mae and Freddie Mac: Past, Present and Future (2009), in 11 Cityscape: J. Pol'y Dev. & Res. 231, 236-37 (2009).  During this period, some portion of the Alt-A and subprime loans the GSEs purchased were non-conforming loans -- that is, they were underwritten to the seller's guidelines (with certain modifications), not the GSEs'.

Each GSE also conducts a second business, purchasing and
holding PLS.  This is a substantially smaller portion of their
activities.  It is the PLS that the GSEs purchased from the
Defendants that prompt the claims in this lawsuit.  The GSEs
held approximately $100 billion in PLS in 2002, with roughly $35
billion in subprime and $3 billion in Alt-A PLS; at their peak,
in 2005, the GSEs' PLS holdings had grown to approximately $350
billion, with roughly $145 billion in subprime and $40 billion
in Alt-A PLS.  Cong. Budget Office, Fannie Mae, Freddie Mac, and
the Federal Role in the Secondary Mortgage Market 10 (Dec.
2010);[36] Nat'l Comm'n on the Causes of the Fin. & Econ. Crisis in
the U.S., The Financial Crisis Inquiry Report 124 fig. 7.3
(2011) ("Financial Crisis Report").[37]  In the two years prior to
September 7, 2007, the GSEs purchased more than $251 billion in
PLS, approximately 8% of the $3 trillion in PLS issued in those
years.

### 2.   The GSEs' Aggregator Reviews

The GSEs' Single Family businesses investigated and
approved originators before purchasing mortgage loans from them.
The PLS operations at the GSEs relied on those reviews, or the

---

[36] Available at http://www.cbo.gov/publication/21992 (last
visited December 18, 2014).

[37] Available at http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-
FCIC.pdf (last visited December 18, 2014).

results of those reviews, from the Single Family operations in making their trading decisions.

Fannie Mae's Single Family Counterparty Risk Management Group ("SFCPRM") was tasked with approving counterparties, including aggregators.  SFCPRM reviews, some of which included on-site visits, primarily assessed "[c]ounterparty risk" for Fannie Mae's Single Family business, which was "the risk of financial loss to Fannie Mae resulting from [the counterparty]'s failure to meet its contractual obligation[s]," including inability to meet repurchase obligations.  Freddie Mac's Alternative Market Operations Group ("AMO"), a part of Freddie Mac's Single Family business, similarly conducted reviews of aggregators.

### a) Nomura

Freddie Mac's AMO issued an aggregator operational review of Nomura on March 14, 2006.  "Based upon the combination of good due diligence methodologies, reasonable valuation processes and sound controls, AMO rate[d] Nomura subprime as Satisfactory overall."  AMO found that "Nomura's due diligence program is well managed," and "found no issues with Nomura['s] appraisal process, which is solid."  AMO noted that "Nomura takes the property evaluation process seriously and places a high priority on collateral valuation."  A Freddie Mac report on Nomura's diligence practices in March 2006 found that Nomura conducted

property and compliance due diligence on 100% of loans, and
credit due diligence on 100% of loans in pools with amounts less
than $25 million, and on 20% of loans in pools with greater
amounts.  AMO cited no concern about the many deficiencies FHFA
now alleges.

### b) RBS

Fannie Mae issued an aggregator review of RBS Greenwich
Capital in November 2006.  The review notes that RBS employed
Clayton, the Capital Group, and Watterson-Prime to "conduct loan
level due diligence on its acquisitions."  RBS reviewed loans
"pursuant to seller's guidelines," and "stated that its program
to monitor seller lending matrices [in connection with their
guidelines] [wa]s robust," although Fannie Mae was not provided
"in-depth detail regarding this program."  RBS was found to
"perform[] credit reviews through a process designed to
determine that the loans generally comply with the lender's
underwriting guidelines through a check of borrower income and
asset documentation, review of credit reports and credit scores,
and recalculation of debt to income ratios."

Fannie Mae reported in a 2006 review that RBS's "typical
sample size" for non-prime loans was 25%, "predominantly
adversely selected."  For prime and Alt-A loans, "sampling size
[wa]s determined by a statistical calculation intended to obtain
a 95 percent confidence interval, a less than 10 percent error

rate, and precision of five percent or greater."  RBS

"require[d] additional adverse selection for compliance [red

flags], high loan balance, low FICO [credit] score, seasoning,

or other abnormal loan characteristics."  Fannie Mae cited no

concern about the many deficiencies FHFA now alleges.

**DISCUSSION**

I.   **Summary Judgment Standard**

Summary judgment may not be granted unless all of the

submissions taken together "show[] that there is no genuine

dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

moving party bears the burden of demonstrating the absence of a

material factual question, and in making this determination, the

court must view all facts in the light most favorable to the

non-moving party.  Eastman Kodak Co. v. Image Technical Servs.,

Inc., 504 U.S. 451, 456 (1992); Holcomb v. Iona Coll., 521 F.3d

130, 132 (2d Cir. 2008).  Once the moving party has asserted

facts showing that the non-movant's claims or affirmative

defenses cannot be sustained, the opposing party must "set out

specific facts showing a genuine issue for trial," and cannot

"rely merely on allegations or denials" contained in the

pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554

F.3d 255, 266 (2d Cir. 2009).  Nor may a party "rely on mere

speculation or conjecture as to the true nature of the facts to

overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). "A submission in opposition to (or in support of) summary judgment need be considered only to the extent that it would . . . be[] admissible at trial." Doe Ex. rel. Doe v. Whelan, 732 F.3d 151, 157 (2d Cir. 2013) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"A defendant's assertion of the due diligence defense requires an exquisitely fact intensive inquiry into all of the circumstances surrounding the facts upon which the Section 11 claim is premised," and the same is true for a defense of reasonable care under Section 12(a)(2). In re WorldCom, Inc. Sec. Litig., 02cv3288 (DLC), 2005 WL 638268, at *11 (S.D.N.Y. Mar. 21, 2005). Such questions of reasonableness are mixed questions of law and fact that are often reserved for the trier of fact. Yet, even the issue of materiality of a misrepresentation or omissions -- which "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those

inferences to him, . . . assessments [that] are peculiarly ones for the trier of fact" -- is "appropriately resolved as a matter of law by summary judgment" where the misrepresentations or omissions "are so obviously important to an investor, that reasonable minds cannot differ on the question." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976); accord Mendell v. Greenberg, 927 F.2d 667, 673 (2d Cir.), amended, 938 F.2d 1528 (2d Cir. 1990) (holding summary judgment on materiality appropriate "when reasonable minds could not differ on the issue").  Indeed, as the Second Circuit recognized in another securities case, whether a given set of facts triggers a duty to investigate is an "objective determination [that] can be resolved as a matter of law -- it need not be made by a trier of fact."  Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 427 (2d Cir. 2008) (addressing investor's duty of inquiry). When no reasonable jury could find for the non-movant, the movant is entitled to summary judgment as a matter of law. Accord In re Livent, Inc. Noteholders Sec. Litig., 355 F. Supp. 2d 722, 735-38 (S.D.N.Y. 2005) (granting partial summary judgment for plaintiffs on Section 11 due diligence defense).

## II.  Law Governing Sections 11's Due Diligence Defense and Section 12(a)(2)'s Reasonable Care Defense

In order to "provide investors with full disclosure of material information concerning public offerings of securities,"

the Securities Act requires the filing and distribution of certain documents in connection with such an offering, including a registration statement and a prospectus.  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195 (1976).  Section 11 of the Securities Act ("Section 11") attaches civil liability to material misstatements or omissions in a registration statement, 15 U.S.C. § 77k; Section 12(a)(2) of the Securities Act ("Section 12(a)(2)") does the same for a prospectus, id. at § 77l.  As described below, Sections 11 and 12(a)(2) are "notable both for the limitations on their scope as well as the in[] terrorem nature of the liability they create."  NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 156 (2d Cir. 2012) (citation omitted), cert. denied, 133 S. Ct. 1624 (2013).

### A.   Section 11's Due Diligence Defense

Section 11 of the Securities Act "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."  Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).  Thus, Section 11 grants the purchaser of a security a cause of action against the issuer and underwriter, among others, where any part of a registration statement, at the time it became effective,

contained a material misstatement or omissions.[38]  NECA, 693 F.3d
at 156.  Thus, the registration statement must be materially
accurate as of the date it becomes effective.  See 15 U.S.C. §
77k (establishing liability as of the date "such part [of the
registration statement] became effective"); cf. Dalberth v.
Xerox Corp., 766 F.3d 172, 183 (2d Cir. 2014) (noting
materiality is determined according to the "total mix of
information made available" at that time) (citation omitted).
Certain affirmative defenses are available to defendants.  The
defense at issue here is the "due diligence" defense, described
below.

        Section 11 shields from liability any defendant "other than
the issuer"[39] should the defendant prove that,

---

[38] To establish a claim under Section 11, a plaintiff must prove
that it:

  (1) . . . purchased a registered security, either directly
      from the issuer or in the aftermarket following the
      offering;

  (2) the defendant participated in the offering in a manner
      sufficient to give rise to liability under section 11;
      and

  (3) the registration statement "contained an untrue
      statement of a material fact or omitted to state a
      material fact required to be stated therein or
      necessary to make the statements therein not
      misleading."

In re Morgan Stanley Information Fund Sec. Litig., 592 F.3d 347,
358-59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).

[39] For asset-backed securities including RMBS, the "issuer" is
the "depositor," which means "the depositor who receives or

> after reasonable investigation, [it had] reasonable
> ground to believe and did believe, at the time such
> part of the registration statement became effective,
> that the statements therein were true and that there
> was no omission to state a material fact required to
> be stated therein or necessary to make the statements
> therein not misleading.

Id. at § 77k(b)(3).[40]  Thus, while "[i]ssuers are subject to

virtually absolute liability under [S]ection 11," underwriters

---

purchases and transfers or sells the pool assets to the issuing
entity."  17 C.F.R. §§ 229.1101, 230.193.

[40] This defense is sometimes lumped together with the less
demanding "reliance" defense under Section 11, which provides an
affirmative defense for defendants other than the issuer as to
"expertised" portions of a registration statement.  See 15
U.S.C. § 77k(c).  A portion of the registration statement may
only qualify as "expertised" if (1) that part "purport[s] to be
made on the authority of an expert"; (2) the expert is an
"accountant, engineer, or appraiser, or any person whose
profession gives authority to a statement made by him"; and (3)
the expert's written consent is filed as an exhibit to the
registration statement.  Id. at § 77k(a)(4); 17 C.F.R. §
230.436(a), (b); In re WorldCom, Inc. Sec. Litig., 346 F. Supp.
2d 628, 663-64 (S.D.N.Y. 2004).

A defendant establishes a reliance defense as to "expertised"
portions of the registration statement if he can prove "he had
no reasonable ground to believe and did not believe, at the time
such part of the registration statement became effective, that
the statements therein were untrue or that there was an omission
to state a material fact required to be stated therein or
necessary to make the statements therein not misleading, or that
such part of the registration statement did not fairly represent
the statement of the expert or was not a fair copy of or extract
from the report or valuation of the expert."  15 U.S.C. §
77k(b)(3)(C).

The due diligence and reliance defenses are, in some contexts,
collectively referred to as the "due diligence defense."  In
this Opinion, "due diligence defense" refers only to the defense
set out in the text above concerning non-expertised portions of
a registration statement, and does not include the reliance
defense.

"may be held liable for mere negligence." In re Morgan Stanley
Info. Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010)
(citation omitted).  Section 11 defines the "standard of
reasonableness" as "that required of a prudent man in the
management of his own property," 15 U.S.C. § 77k(c), which is a
negligence standard, NECA, 693 F.3d at 156.  Such an
investigation must be thorough and searching, "with systematic
attention to detail and relationship."  WorldCom, 346 F. Supp.
2d at 678 (citation omitted).  Even if a reasonable
investigation "would have proven futile in uncovering the fraud"
or misstatements alleged, a defendant must establish that it
undertook such investigation in order to claim the benefit of
this defense.  Id. at 661 n.40.

     Reasonableness, both of any investigation and any belief in
the accuracy of the representations, is determined according to
all relevant circumstances.  17 C.F.R. § 230.176.  These
circumstances include

     (a)  The type of issuer;

     (b)  The type of security;

     (c)  The type of [defendant];

     [. . .]

     (e)  The presence or absence of another relationship
          to the issuer when the person is a
          director . . . ;

     (f)  Reasonable reliance on officers, employees, and
          others whose duties should have given them

knowledge of the particular facts (in the light of the functions and responsibilities of the particular person with respect to the issuer and the filing);

(g)   When the [defendant] is an underwriter, the type of underwriting arrangement, the role of the particular [defendant] as an underwriter and the availability of information with respect to the registrant.

Id.  The SEC has "expressly rejected the consideration of competitive timing and pressures when evaluating the reasonableness of an underwriter's investigation."  The Regulation of Security Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, available at 1998 WL 792508, at *92 (Dec. 4, 1998) ("SEC Rel. 7606A"); see WorldCom, 346 F. Supp. 2d at 669-71.

### 1.   A "Sliding Scale"

As these factors suggest, there is a "sliding scale" in the diligence required of parties, with heavier demands of those with more central roles and greater access to the information and expertise needed to confirm the accuracy of the registration statement.  WorldCom, 2005 WL 638268, at *9 (quoting 1 Hazen, Law of Sec. Reg. § 7.4[2][A][1] (4th ed. 2002)); see also Feit v. Leasco Data Processing Equip. Corp., 332 F. Supp. 544, 577-78 (E.D.N.Y. 1971) ("[W]hat constitutes 'reasonable investigation' and a 'reasonable ground to believe' will vary with the degree of involvement of the individual, his expertise, and his access to the pertinent information and data.").  In the House Report discussing the bill that would become the Securities Act,

Congress affirmed that "[t]he duty of care to discover varies in its demands upon participants in security distribution with the importance of their place in the scheme of distribution and with the degree of protection that the public has a right to expect." H.R. Rep. No. 73-85, at 9 (1933); accord Circumstances Affecting the Determination of What Constitutes Reasonable Investigation and Reasonable Grounds for Belief Under Section 11 of the Securities Act, SEC Release No. 6335, available at 1981 WL 31062, at *14 (Aug. 6, 1981) ("SEC Rel. 6335") ("Congress intended that there would be variation in the thoroughness of the investigation performed by the different persons subject to Section 11 liability based on the importance of their place in the scheme of distribution and with the degree of protection that the public has a right to expect.") (citation omitted). "For those whose moral responsibility to the public is particularly heavy" -- such as underwriters -- "there is a correspondingly heavier legal liability." Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 581 (1995) (citation omitted).

In a traditional equity security offering, the security was backed by the issuer's financial well-being and thus the issuer, and its inside directors, were most intimately familiar with the information material to investors. Accordingly, issuers are strictly liable for the material accuracy of registration statements, and the diligence required of inside directors is so

great that "liability will lie in practically all cases of misrepresentation." WorldCom, 2005 WL 638268, at *9 (quoting Feit, 332 F. Supp. at 578).[41]

Yet the issuer itself "may be so hard pressed for cash . . . that they will accept or undervalue the risk of civil liability," and its directors "are not free to assume an adverse role, and in any event they are not entirely free from the pressures on and optimism of management." Feit, 332 F. Supp. at 581 (citation omitted). "Only the underwriter and the accountant are free to assume an adverse role, have little incentive to accept the risk of liability, and possess the facilities and competence to undertake an independent investigation." Id. (citation omitted). Accordingly, "underwriters must play devil's advocate" and are expected to exercise "a high degree of care in investigation and independent verification of the company's representations." Id. at 582 (citation omitted).

Asset-backed securities, including the RMBS here, turn the traditional paradigm on its head. Unlike equity securities,

---

[41] See Securities Act: Hearings Before the Comm. on Banking and Currency, 73rd Cong. 210 (1933) (statement of Sen. Fletcher, Chairman, S. Comm. on Banking and Currency) ("I do not see why the company [issuing securities] should not be responsible, because the people it employs to check up inventories, and all that sort of thing, they must know about . . . . [T]hey ought to be responsible . . . .").

which depend upon the financial health and future profitability
of the issuer, the asset-backed securities here were issued by
SPVs designed only to hold the loans underlying a securitization
in order to issue related securities.  These SPVs were "solely
passive entities" with no employees of their own.

Likewise, the other statutory "issuers" here -- the
depositors, NAAC and NHELI -- were corporate shells.  They had
no employees, and there is no evidence their directors -- the
same four employees, three of whom were employed by Nomura
Securities and the fourth by its parent, Nomura Holding America
Inc. -- ever held a meeting; at least one director does not
recall serving as a director for either entity.  Before October
2006, it was employees of Nomura Securities who negotiated the
purchase of the underlying loans from originators, employees of
Nomura Securities who conducted pre-acquisition diligence to
refine the pool of loans to be purchased, and Nomura Securities'
Transaction Management Group that created the Supporting Loan
Groups from the purchased pools and then transferred the loans
through one of the depositors to an SPV for securitization.  As
a practical matter, the four Securitizations that closed in or
before October 2006 were each the creature of Nomura Securities.
The same is true of NCCI for the three post-October 2006
Securitizations.  And while "Nomura Credit & Capital, Inc."
appeared on the Trading Desk's, Diligence Group's, and

67

Transaction Management Group's paychecks after October 2006, there is no evidence to suggest that Nomura Securities ever lacked full access to all potentially relevant information held by NCCI and control over every decision and decision-maker responsible for the Securitizations.

It is instructive to note that, as it crafted the Securities Act, Congress expressly considered who should bear the issuer's absolute liability with respect to "security issues of an unusual character," including certificates issued by a trustee backed by collateral held by the trust.  Congress determined that the depositor, as the entity "responsible for the flotation of the issue" and the one in possession of the best information about the underlying assets, should carry that liability:

> Under such an arrangement, although the actual issuer [of the certificates] is the trustee, the depositor is the person responsible for the flotation of the issue. Consequently, information relative to the depositor and the [assets backing the certificates] is what chiefly concerns the investor -- information respecting the assets and liabilities of the trust rather than of the trustee.  For these reasons the duty of furnishing this information is placed upon the actual manager of the trust and not the passive trustee, and this purpose is accomplished by defining "issuer" as in such instances referring to the depositor or manager.

H.R. Rep. No. 73-85, at 12 (1933).[42]  This reaffirms that courts reviewing a due diligence defense in the asset-backed securities context should apply a sliding scale responsive to a defendant's role in the offering and ability to check the accuracy of the registration statement.

### 2.   The Underwriter's Role

The underwriter -- in a traditional equity security, often an unrelated investment bank -- undertakes to investigate the issuer in order to make certain representations to the public purchasing its issue.  "No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter."  Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 370 (2d Cir. 1973).  "Congress recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering" and accordingly placed them under the in terrorem threat of Section 11 liability, believing this "would provide the necessary incentive to ensure their careful investigation of the offering."  SEC Rel. 7606A, 1998 WL 792508, at *75.  Accordingly, the underwriter's diligence burden

---

[42] See 15 U.S.C. § 77b(a)(4) (defining "issuer" for collateral-trust certificates to "mean[] the person or persons performing the acts and assuming the duties of depositor or manager pursuant to the provisions of the trust or other agreement or instrument under which such securities are issued").

is heavy.  To avail itself of the due diligence defense, an underwriter "must conduct an investigation reasonably calculated to reveal all those facts that would be of interest to a reasonably prudent investor."  Id. at 92 (citation omitted).

### a)   Affiliated & Unaffiliated Underwriters

In two of the seven Securitizations, Nomura Securities served as sole underwriter; in a third, Nomura Securities was a co-lead underwriter.  As described above, Nomura Securities also employed the directors and officers of the depositors, NAAC and NHELI (the securities' "issuers" for purposes of Section 11) and the sponsor, NCCI, and before October 2006 employed those who designed the Securitizations.  In these circumstances, where the issue is the creature of the underwriter, the underwriter's Section 11 liability "approaches that of the issuer as guarantor of the accuracy of the prospectus" and a due diligence defense will fail "in practically all cases of misrepresentation." Feit, 332 F. Supp. at 578.[43]

Unaffiliated underwriters, like RBS here, also bear a heavy burden.  The adversity and thoroughness of the unaffiliated underwriter may be even more vital in the case of RMBS than it is in the context of equity securities.  The accuracy of core

---

[43] FHFA's Section 15 control person claims against Nomura Securities for the other four Securitizations are not at issue in this motion.

representations in the offering of equity securities may be able
to be checked by outside accountants, outside directors, market
analysts, and sophisticated investors.  With RMBS, the value of
the certificates depends upon the reliability of the data listed
on the loan tapes, and the sole source against which to check
the tapes -- the loan files -- are not available to the public.
Indeed, here, the only post-acquisition review of that accuracy
was undertaken by the unaffiliated underwriter.

   The record reflects that RMBS sponsors, including
Defendants here, entered into contracts with residential
mortgage loan originators, frequently agreeing to limit their
pre-purchase diligence on the originators' loans.[44]  The
originator stands to gain from inflating the quality of the
loans it sells to a sponsor.  And the evidence before the Court
on this motion paints the private-label RMBS securitization
market in 2005-2007 as one in which sponsors were fiercely
competing to securitize an ever greater share of residential
mortgage loans.  In such an environment, sponsors have reason to
accede to originators' demands and look the other way,

---

[44] See also Financial Crisis Report at 165 ("The originator and
the securitizer negotiated the extent of the due diligence
investigation.  While the percentage of the pool examined could
be as high as 30%, it was often much lower; according to some
observers, as the market grew and originators became more
concentrated, they had more bargaining power over the mortgage
purchasers, and samples were sometimes as low as 2% to 3%.").

conducting half-hearted review and rejecting only an acceptably small percentage of offered loans.[45]   In these circumstances, if an unaffiliated underwriter did not thoroughly review the quality of the Supporting Loan Groups and confirm that the Offering Documents' descriptions were accurate, there was a substantial risk that no one would.

"By associating himself with a proposed offering [an underwriter] impliedly represents that he has made [a reasonable] investigation in accordance with professional standards.  Investors properly rely on this added protection . . . ."  41 SEC 398 [1961-1964 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 76,904, 1963 WL 63647 (Feb. 27, 1963).  In the circumstances set out above, should an unaffiliated underwriter lend its name to an RMBS offering, it must conduct a searching review of the underlying loans if it seeks the protection of Section 11's due diligence defense.  This is not to suggest, however, that such review must individually examine each loan file, or that a reasonably diligent review cannot be accomplished through the application of appropriate sampling methods.

---

[45] See Financial Crisis Report at 166 ("[Keith] Johnson [president of Clayton from May 2006 to May 2009] concluded that his clients often waived in loans to preserve their business relationship with the loan originator -- a high number of rejections might lead the originator to sell the loans to a competitor.  Simply put, it was a sellers' market.")

### b)   Nomura's Argument

Nomura argues that the rationales animating the requirement that an underwriter play an adversarial role are absent in an offering of asset-backed securities.  The financial health of the SPV and depositor issuing the asset-backed securities have almost no impact on the value of the securities, and thus, Nomura argues, there is no need for the underwriter to play devil's advocate.

Nomura's focus on the need for underwriter independence from the issuer misses the point.  Nomura fails to recognize that, where the underwriter controls the issuer of asset-backed securities, the affiliated underwriter itself is the entity effectively creating the securities, with all of the "intimate knowledge" expected of the issuer (and its inside directors) of a traditional corporate security.  Section 11 is designed such that the entity with the greatest information about the security has the greatest burden of diligence.  With traditional corporate offerings, that is the issuer; here, it is the affiliated underwriter.  Even when the underwriter is not affiliated with the sponsor, for the reasons stated above, the underwriter remains the actor best positioned to check the accuracy of the registration statement and its prospectus supplement and bears a heavy diligence burden should it agree to bless an RMBS offering.

c)   **Lead Underwriters and Participating Underwriters**

The lead, or managing, underwriter may be assisted by participating underwriters.  "The participating underwriter's reasonable investigation may not be as heavy a burden as that of the managing underwriter's, and, in making a reasonable investigation, the participating underwriter need not duplicate the investigation made by the manager."  New High Risk Ventures: Obligations of Underwriters, Brokers and Dealers, SEC Release No. 9671, available at 1972 WL 125474, at *6 (July 27, 1972) ("SEC Rel. 9671").  Indeed, "[t]he participant may delegate the performance of the investigation to the manager" and thereby "appoint the manager as his agent to do the investigation."  Id. Yet, "the delegation to the manager and the subsequent reliance on his investigation must be 'reasonable in light of all the circumstances'" and the participant "must satisfy himself that the managing underwriter makes the kind of investigation the participant would have performed if he were the manager."  Id.; accord Circumstances Affecting the Determination of What Constitutes Reasonable Investigation and Reasonable Grounds for Belief Under Section 11 of the Securities Act, SEC Release No. 6335, available at 1981 WL 31062, at *15 n.66 (quoting SEC Rel. 9671).  The participant "should assure himself that the manager's program of investigation and actual investigative

74

performance are adequate." SEC Rel. 9671, 1972 WL 125474, at *6.

### 3. "Red Flags"

For purposes of the due diligence defense, a "red flag" is any information that would cause a "prudent man in the management of his own property" to question the accuracy of the registration statement. <u>WorldCom</u>, 346 F. Supp. 2d at 679 (citation omitted). Where a defendant encounters a red flag, a "duty of investigation" arises that requires the defendant to "look deeper and question more" in order to restore a reasonable belief in the registration statement's accuracy. <u>Id.</u> at 677 (citation omitted). "[W]hat constitutes a red flag depends on the facts and context of a particular case" and may require an "exquisitely fact intensive inquir[y]." <u>Id.</u> at 673, 679.

### 4. Industry Standards

Industry standards are relevant to the reasonableness inquiry, but the ultimate question remains whether, given a defendant's role in the offering and access to material information, the defendant's investigation of and belief in the accuracy of the registration statement was that of a prudent man in the management of his own property. Industry standards will be less relevant when "the industry [i]s comprised of only a few participants who controlled the practice," as "the standard they developed could fall short of a standard of reasonable care,"

and indeed "the[se] standard setters [might] engage in a 'race
to the bottom.'"  SEC v. Dain Rauscher, Inc., 254 F.3d 852, 857
(9th Cir. 2001) (addressing "reasonable prudence" of defendant
under the Securities and Exchange Act of 1934).

Given the concentration in the private-label RMBS market,
such caution is warranted here.  And as noted above, the record
reflects that RMBS sponsors often contracted with originators to
limit their review of the originators' loans.  Indeed, after
studying RMBS securitizations during the period in question, the
Financial Crisis Inquiry Commission concluded that "firms
securitizing mortgages failed to perform adequate due diligence
on the mortgages they purchased and at times knowingly waived
compliance with underwriting standards. . . .  These problems
appear to have been significant."  Financial Crisis Report at
187.  In these circumstances, compliance with the industry
standards of the time (assuming that such standards are shown to
have existed) may do little to suggest a defendant's due
diligence was adequate.

### 5.  Review Later Mandated by the Dodd-Frank Act

Several years after the period at issue here, Congress
passed the Dodd-Frank Wall Street Reform and Consumer Protection
Act of 2010 (the "Dodd-Frank Act").  Section 945 of the Dodd-
Frank Act requires the SEC to adopt regulations that, among
other things, require the issuer of an asset-backed security to

76

(1) "perform a review of the [underlying] assets"; (2) "disclose
the nature of the review"; and (3) "disclose asset-level or
loan-level data, if such data are necessary for investors to
independently perform due diligence."  15 U.S.C. § 77g(c), (d).
This review "should not be confused with, and [wa]s not intended
to change, the due diligence defense against liability under
. . . Section 11."  Issuer Review of Assets in Offerings of
Asset-Backed Securities, SEC Release No. 9176, available at 2011
WL 194494, at *2 n.9 (Jan. 20, 2011) ("SEC Rel. 9176").  The
contours of the resulting rule are instructive nonetheless.

        In response, the SEC adopted Rule 193.  Rule 193 provides
that an issuer "shall perform a review of the pool assets
underlying the asset-backed security" that, "[a]t a minimum,
. . . must be designed and effected to provide reasonable
assurance that the [prospectus] disclosure regarding the pool
assets . . . is accurate in all material respects."  17 C.F.R. §
230.193.  In promulgating Rule 193, the SEC noted that some
commentators suggested that sampling should be permitted in this
review.  The SEC determined as follows:

> While we agree that sampling may be appropriate
> depending on the facts and circumstances, we believe
> that whether sampling is sufficient to satisfy the
> "reasonable assurance" standard in Rule 193 will
> depend on a variety of factors, such as the type of
> [asset-backed security] being offered.  For example,
> in offerings of residential mortgage-backed securities
> ("RMBS"), where the asset pool consists of a large
> group of loans, it may be appropriate, depending on

> all the facts, to review a sample of loans large
> enough to be representative of the pool, and then
> conduct further review if the initial review indicates
> that further review is warranted in order to provide
> reasonable assurance that disclosure is accurate in
> all material respects.

SEC Rel. 9176, available at 2011 WL 194494, at *6.  The SEC

declined to "adopt[] a minimum sample size," as "any appropriate

sample size must be based on the facts and circumstances."  Id.

Under these new regulations, where an issuer only reviews a

sample of assets, it must disclose "the size of the sample and

the criteria used to select the assets sampled."  17 C.F.R. §

229.1111(a)(7).  The "findings and conclusions" of this review

must also be disclosed.  Id. at § 229.1111(a)(7)(ii).

### B.    Section 12(a)(2)'s Reasonable Care Defense

"Claims under sections 11 and 12(a)(2) are Securities Act

siblings with roughly parallel elements."[46]  New Jersey

Carpenters, 709 F.3d at 120 (citation omitted).  Where Section

---

[46] To establish a claim under Section 12(a)(2), a plaintiff must
prove:

  (1) the defendant is a "statutory seller";

  (2) the sale was effectuated "by means of a prospectus or
      oral communication"; and

  (3) the prospectus or oral communication "include[d] an
      untrue statement of a material fact or omit[ted] to
      state a material fact necessary in order to make the
      statements, in the light of the circumstances under
      which they were made, not misleading."

In re Morgan Stanley, 592 F.3d at 359 (quoting 15 U.S.C. §
77l(a)(2)).

11 concerns misstatements or omissions in a registration statement, Section 12(a)(2) "imposes liability under similar circumstances against certain 'statutory sellers' for misstatements or omissions in a prospectus." NECA, 693 F.3d at 156.

Like Section 11, Section 12(a)(2) provides defendants with several affirmative defenses. At issue here is the "reasonable care" defense, which is similar to Section 11's due diligence defense. Any Section 12(a)(2) defendant, including an issuer, can avoid liability under that section if he can prove "that he did not know, and in the exercise of reasonable care could not have known, of [the alleged] untruth or omission" in the prospectus. 15 U.S.C. § 77l.[47]

Section 12(a)(2)'s reasonable care defense is "less demanding" in some respects than Section 11's due diligence defense. WorldCom, 346 F. Supp. 2d at 663. "[W]hile Section 11

---

[47] The Blue Sky Laws contain substantially identical reasonable care defenses. D.C. Code § 31.5606.05(a)(1)(B) (providing affirmative defense for offerors or sellers if they "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission"); Va. Code § 13.1-522(A)(ii) (providing affirmative defense for seller who "did not know, and in the exercise of reasonable care could not have known, of such untruth or omission"). The parties agree that these defenses should be interpreted in accord with the Section 12(a)(2) defense. See also FHFA v. Bank of Am. Corp., 11cv6195 (DLC), 2012 WL 6592251, at *7 n.8 ("[T]he D.C. and Virginia securities laws are generally interpreted in accordance with Section 12(a)(2).") (collecting cases).

imposes a duty to conduct a reasonable investigation as to any portion of a registration statement not made on the authority of an expert, Section 12(a)(2) does not make any distinction based upon 'expertised' statements and only requires the defendant to show that it used reasonable care."  Id.[48]  Yet, under either section, "defendants . . . may be held liable for mere negligence."  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 359.

**III. Nomura Failed to Conduct Reasonable Investigations or Exercise Reasonable Care.**

No reasonable jury could find that Nomura conducted a "reasonable investigation" and reasonably believed that the representations in the Offering Documents were accurate, or that Nomura exercised reasonable care in that regard.  Nomura never created a due diligence program to confirm the accuracy of the representations in the Offering Documents.  Instead, in opposing this motion Nomura relies entirely on the results of its pre-

---

[48] While a Section 11 defendant cannot avail himself of the due diligence defense if he failed to conduct a reasonable investigation, even where that investigation would not have uncovered the alleged misstatement, the same may not be true of Section 12(a)(2)'s reasonable care defense.  See 15 U.S.C. § 77l (defendant must prove "he did not know, and in the exercise of reasonable care could not have known, of [the] untruth or omission) (emphasis added); see also WorldCom, 346 F. Supp. 2d at 661 n.40 (noting open question).  Because defendants do not contend that they would have been unable to discover the inaccuracy of any alleged misstatements had they exercised greater care, the Court need not reach this question.

acquisition review of the 194 Trade Pools from which it would
later take loans to populate the seven SLGs.  But, Nomura took
no care to design this pre-acquisition review, or the process it
later used to select loans from those Trade Pools for the SLGs,
to render that review, in conjunction with its selection
process, a reliable basis to believe that the Offering
Documents' descriptions of the SLGs were accurate.

Nomura tested a single non-random sample of the 30 Sampled
Bulk Pools, and its traders then pulled both reviewed and
unreviewed loans from those Trade Pools to populate the SLGs not
randomly, but based on credit characteristics that could well
have caused it to put a string of defective loans in a given
SLG.  The 30 Sampled Bulk Pools were the source of more than 80%
of the loans in the seven SLGs.  As explained below, this
process broke any link between the results of Nomura's pre-
acquisition review process and the SLGs.  Indeed, there is no
evidence Nomura even considered during the securitization
process the impact its processes would have on the accuracy of
its representations in the Offering Documents.  Nomura did not
so much as ask this question, let alone study the applicability
of its pre-acquisition review to the SLGs.  Thus, there is no
evidence Nomura took any steps to structure its processes to
reasonably assure itself that its pre-acquisition review of the

194 Trade Pools would suffice to verify the accuracy of its later representations concerning the seven SLGs.

Even if Nomura had not broken the link between the Trade Pools and SLGs -- and so could reasonably have relied on results of its review of those Pools -- Nomura's review of the Trade Pools raised red flags Nomura ignored.  The credit and compliance kick-out rate for the Trade Pools was 15.2% -- approximately double the 7-8% the head of Nomura's Diligence Group called "typical" in late 2006, and 25% higher than the 12.12% kick-out rate he called "much higher" than that typical rate.  Under a best-case scenario, in which Nomura's deliberate selections from the Trade Pools would not cause the concentration of an unrepresentatively large number of defective loans in the SLGs, Nomura would have had reason to expect -- had it stopped to consider this, which there is no evidence it did -- that at least as many of the unreviewed loans in the SLGs might be defective.  As described below, Nomura's counsel has now calculated that it could have expected 17.6% of the unreviewed loans to be defective.  Also, as explained below, given the high kick-out rate, the testing of a single set of loans based on adverse sampling provided no reliable basis to believe that all or most of the defective loans had been located and culled.  Combined with the hundreds of loans in the SLGs Nomura knew to have a final grade of EV3 (418) or to have a

faulty appraisal (162), Nomura should have expected roughly 1 in 7 loans might be defective.  There is, however, no evidence that Nomura _did_ stop to consider this, or even looked closely enough at the results of its pre-acquisition review in connection with the representations about the SLGs to see these red flags.

And there is no evidence Nomura took any steps to address these red flags, even at the pre-acquisition stage.  Nomura never once upsized its pre-acquisition sample for any of the 30 Sampled Bulk Pools.  The head of the Diligence Group once asked to do so and was told that the Trading Desk had to be concerned about losing the opportunity to purchase loans from Originator in the future; in any case, the Trading Desk had already agreed with the Originator to limit its sampling of that Trade Pool to 25%, sight unseen.

Then, after it reviewed the results of its audit of its pre-acquisition review vendors, in August of 2006 -- an audit which placed it on notice that it could no longer have confidence that loans were being properly classified as EV1 and EV2 -- Nomura took no steps to upgrade or further investigate its review practices.  Four of the Securitizations closed after that date.

In sum, there is no evidence from which a reasonable jury could find that Nomura Securities, NCCI, or the individual

Nomura Defendants[49] met their obligations under Section 11.  This is true whether judged against the standard imposed on an arms-length underwriter or the heightened standard which is appropriate here given their access to information concerning -- if not control of -- the statutory issuers NAAC and NHELI, such that "liability will lie in practically all cases of misrepresentation."  WorldCom, 2005 WL 638268, at *9 (quoting Feit, 332 F. Supp. at 578).  Similarly, no reasonable jury could find that any of the Nomura Defendants exercised reasonable care within the meaning of Section 12(a)(2).

**A.    Nomura Made No Attempt to Reliably Verify the Accuracy of its Representations Concerning the SLGs.**

Nomura took no steps at or near the time of its securitization of the Mortgage Loans to verify the accuracy of the representations about the characteristics of the SLGs in the Offering Documents.  It had no due diligence program dedicated to that task.  Virtually its only nod to that obligation was its employment of an auditor to confirm that the numbers taken from the loan tapes matched the aggregate numbers represented in the Offering Documents.

---

[49] The individual Defendants do not claim to have undertaken any additional diligence in connection with these Securitizations. Graham, for instance, asserts that he "relied on the due diligence performed at the time of whole loan acquisition to ensure that the information presented to investors about those loans in the offering materials was correct."  Such reliance was unreasonable for the reasons stated above.

To present a due diligence defense to the claims presented in this lawsuit, it has relied almost exclusively on its pre-acquisition review of the 194 Trade Pools that contributed to the seven Supporting Loan Groups at issue.  Most fundamentally, the result of its non-random sampling of the Sampled Bulk Pools offered little reliable information concerning the unsampled loans taken from the Sampled Bulk Pools and placed into the SLGs.  Those loans were selected ad hoc by traders for inclusion in the SLGs, based on characteristics like FICO score, LTV ratio, and region, which might correlate with underwriting defects; the traders' "artistry" (in Nomura's words) in composing these SLGs might easily cause a concentrated group of defective loans to be pulled into a SLG.  Nomura did not consider these issues; its focus was on review of its Trade Pools, not on verifying representations made to investors -- often months later -- about different sets of its loans.  Rather than undertaking the investigation required during the securitization process to check its representations in the Offering Documents -- or taking care to structure its pre-acquisition reviews and the population of its SLGs to ensure that the results of those reviews remained applicable to the SLGs -- Nomura simply argues now that it had checked enough of the loans earlier.

Nomura's position is not without a certain intuitive appeal:  Nomura argues that it checked the loans before it bought them, looking at a large sample of them (nearly 40%) to confirm they were not defective; couldn't it then have reasonable confidence that the loans were good?  The problem is that, without exercising any care, Nomura then grabbed bundles of those loans for securitization, and grabbed particular kinds of loans -- looking at factors that might cause it to bundle together a large number of defective loans.  As a result, Nomura might have concentrated most of the remaining defective loans in a few SLGs.[50]  A prudent man managing Certificates of his own worth some $2 billion would not simply close his eyes and hope certain representations about a newly composed group of loans were accurate.

---

[50] Nomura has urged the Court to consider its diligence program as a whole, and has not argued that its review of any particular Securitization was more reliable than its review of any other. Nonetheless, the Court notes that Nomura's argument that it could reasonably rely on its pre-acquisition review applies with the most force to NHELI 2006-FM1 and NHELI 2006-FM2, where the loans in the relevant SLGs of those Securitizations were drawn from only one and two Trade Pools, respectively (Fremont SP02 for NHELI 2006-FM1, and Fremont SP03 and SP04 for NHELI 2006-FM2).  But, Nomura's credit and compliance sample was under 25% for each of these Trade Pools, and it then selected -- on a non-random basis -- approximately half of those Trade Pools for the SLGs at issue.  Nomura's practice of non-randomly selecting loans from Trade Pools to populate the SLGs threatened to place a disproportionate number of defective loans even in these SLGs.

Nomura has argued that its interests were aligned with investors', because of its position on the Residual Certificates.  The Residual Certificates granted Nomura a first-loss position in a securitization of subprime and Alt-A -- i.e., relatively high risk -- loans.  As the lower credit ratings of junior tranches (tranches senior to the Residual Certificates) in these securitizations confirm, loss was likely even with no defective loans.[51]  But, Nomura's retention of these high-risk certificates signifies little about its confidence in the representations in the Offering Documents.  The cash-flows in these certificates were front-loaded and Nomura did not hold them long.  Nomura sold some of these interests within one month of the Residual Certificates' issuance and all of its remaining residual interests within approximately one year of each Securitization.  This temporary position in a highly risky investment is not a substitute for a reasonable due diligence program and does not create a triable issue of fact for the jury on the affirmative defenses of due diligence and reasonable care.[52]

---

[51] The junior tranches had ratings as low as BBB or BBB-.

[52] Nomura also entered certain short positions that hedged the risk it bore from the Residual Certificates.

B.    **Nomura Failed to Reasonably Respond to Red Flags Raised by High Kick-Out Rates.**

Not once, in the 30 Sampled Bulk Pools at issue here, did Nomura upsize a sample.  Yet, among those Sampled Bulk Pools, Nomura came across some startlingly high kick-out rates.  In SSM 58, Nomura kicked out nearly two-thirds of its 30% sample of the pool.  Nomura explains there was an "anomalous issue" concerning documentation that motivated many of these kick-outs; but this does not explain why Nomura purchased for securitization the remaining 70% of the pool without further testing.  In WMC SP01, Nomura tested a large sample in its credit and compliance review -- 50% of the pool -- but kicked out nearly one-quarter of that sample.  Nomura did not request a further sample to determine whether, after that initial culling of adverse loans, the defect rate had fallen to an acceptable level.

It is true, as Nomura emphasizes, that these were kick-out rates for "adverse" samples -- 90% of which were identified by S&P's LEVELS program as the highest risk loans.  Putting aside Kohout's complaint that the use of LEVELS was inappropriate and assuming, _arguendo_, that LEVELS effectively identified the loans most at risk of deviating from applicable underwriting guidelines,[53] Nomura's reliance on a single round of adverse

---

[53] Because LEVELS identified loans with the greatest risk of early payment defaults, it may have conflated credit risk (among loans accurately represented on the loan tapes) with the risk of

sampling for these 30 Sampled Bulk Pools left it without any way to determine how effective it had been in culling defective loans. Nomura had no way of knowing whether, after looking at the 100 most adverse loans in a pool (as identified by LEVELS), the next 100 would or would not be virtually as flawed. Thus, at best, Nomura could hope its adverse sample did not under-represent defective loans, and thus conclude that the defect rate for the pool as a whole was no greater than the kick-out rate for its adverse sample. It had no reasonable basis to infer anything more.

In opposition to the instant motion, Nomura proffered certain calculations by non-expert David Mishol ("Mishol") that purported to determine the "maximum implied kick-out rate" for the SLGs based on the assumptions that (1) the adverse sample of each Trade Pool did not understate the average defect rate, and (2) Nomura's non-random selection of loans from the Trade Pools did not skew the defect rate for the subset of loans taken from a given Trade Pool to populate a given SLG. In an Order of December 8, the Court held this analysis, as well as portions of

---

fraud or originator error. Although there may well be some correlation between the loans most likely to deviate from the contours of a given underwriter's guidelines and the loans most likely to default, Nomura has offered no evidence to indicate that these groups are coextensive. There is evidence that at least RBS recognized that selecting loans with certain "adverse" characteristics may not capture all the fraudulent loans.

Nomura's brief based on it, inadmissible when offered by a fact witness, noting that FHFA would be unable to cross-examine Mishol -- or Nomura's counsel -- about the reasonableness of the two assumptions above.  The Court considers it here to show that even _if_ these assumptions were sound and even _if_ Nomura had, in fact, considered this calculation in connection with the Securitizations -- Nomura does not claim it did -- it merely shows that Nomura's pre-acquisition review raised red flags to which Nomura failed to respond.

Under Mishol's "maximum implied kick-out rate" analysis, which adopts the two assumptions above, Nomura might have believed that the overall kick-out rate for the 194 Trade Pools -- 15.2% -- might apply to the unreviewed loans in the SLGs.[54] Applying the kick-out rate for each Trade Pool to the unreviewed loans selected from that Pool to populate a SLG, Mishol calculates that Nomura could have expected that 1,698 unreviewed loans in the SLGs (17.6% of the 9,628 unreviewed loans) might be defective.[55]  These 1,698 "potential kick-outs" constitute 10.7%

---

[54] FHFA's figures are much higher than Mishol's.  But, again, for purposes of this motion Nomura's figures are accepted.

[55] This figure, 17.6%, differs from the overall kick-out rate for the Trade Pools, 15.2%, because different proportions of unreviewed loans were taken from each Trade Pool.  Where more unreviewed loans were taken from a given Trade Pool, its kick-out rate applies to a larger number of unreviewed loans in the SLGs, producing a higher number of expected defective loans. The fact that the potential defect rate among the unreviewed loans in the SLGs, 17.6%, is greater than the kick-out rate for

of the SLGs.  This figure is much higher in certain SLGs, reaching as high as 15.8% for the relevant SLG of NHELI 2006-FM2.  Added to that are the defective, or quite possibly defective, reviewed loans that Nomura included in the SLGs despite finding they warranted an EV3 grade (418 loans) or that their appraisal was likely faulty (162 loans).  For the NHELI 2007-1 Securitization, for example, 8% of the SLGs' loans had received a final grade of EV3 but were nonetheless purchased and securitized.  All told, in Nomura's best-case scenario, 2,278 of the 15,806 loans in the SLGs -- 14.4% or 1 in 7 loans -- were potentially defective.[56]  Such a defect rate is not in accordance with Nomura's representation in the Offering Documents that "[a]ll of the mortgage loans were originated . . . generally in accordance with [applicable] underwriting guidelines."

Any reasonable jury would find that high kick-out rates would shake a reasonably prudent person's confidence in the above representation, and thus constitute red flags.  The

_____

the Trade Pools as a whole, 15.2%, indicates that a disproportionate number of unreviewed loans in the SLGs were taken from Trade Pools with above-average kick-out rates.

[56] This calculation sums the 1,698 unreviewed loans Nomura could expect to be defective with the 418 Securitized EV3 Loans and the 162 loans with out-of-tolerance BPOs to find that 2,278 of the 15,806 loans in the SLGs (14.4%, more than 1 in 7) could be expected to be defective.  Note that this figure excludes the 96 unreviewed loans selected from the eight Trade Pools for which the results of credit and compliance reviews (including kick-out rate) are not available.

parties dispute the point at which a kick-out rate is "high."
The only persuasive evidence on this point is a November 2006
email from Nomura's Spagna, noting a "typical 7-8% [kick-out
rate] for most subprime deals" and describing rates of 11.22%
and 12.12% as "much higher" than that typical rate.  A kick-out
rate substantially above 7-8% would cause a prudent man in the
management of his own property to question the accuracy of the
Offering Documents.  Here, the issue is not simply isolated
Trade Pools with high kick-out rates; the overall kick-out rate[57]
for credit and compliance issues among all of the Trade Pools
that contributed to the seven SLGs was above 15% (and, if
weighted to account for the number of unreviewed loans selected
from each Pool, above 17%) -- approximately double Spagna's
"typical" 7-8%, despite the fact that it includes Alt-A pools as
well as subprime pools.[58]  Even if, as Nomura urges, Spagna
understated a typical subprime kick-out rate as of late 2006,
Nomura has offered no evidence from which a reasonable jury
could find that the typical kick-out rate was not substantially
below 15.2%.

---

[57] This rate is equal to the weighted average kick-out rate among
the Trade Pools, where each Trade Pool's kick-out rate is
weighted by the number of loans initially in the pool.

[58] As Alt-A loans should have a lower incidence of fraud and
overly aggressive underwriting than subprime loans, Alt-A pools
should have a lower average kick-out rate than subprime pools.

Nomura urges, on the basis of expert testimony, that kick-out rates are not uniform, and that a high kick-out rate will be of greater or lesser concern depending on the reason for the kick-outs.  That is undoubtedly true.  But, a high kick-out rate -- again, a kick-out rate substantially above average -- is nonetheless a red flag that triggers a duty of investigation.[59] That duty may be satisfied where, after a closer look or upon further investigation, the aggregator reasonably determines that, in context, the high kick-out rate does not undermine the aggregator's confidence in the representation that all loans in a Supporting Loan Group were originated generally in accordance with underwriting guidelines.  Nomura has identified no evidence of any such discussions, investigations, or reasonable determinations concerning the import and irrelevance of this high kick-out rate.[60]

---

[59] "[W]hat constitutes a red flag depends on the facts and context of a particular case" and may require an "exquisitely fact intensive inquir[y]."  WorldCom, 346 F. Supp. 2d at 673, 679.  Where no reasonable jury could disagree as to the existence of a red flag, this determination can be made as a matter of law.

[60] Although Nomura's excluded "implied maximum kick-out rate analysis" indicates that this rate was lower for some of the Securitizations, Nomura has failed to offer evidence that it actually considered this at or before the time of those Securitizations.  In any case, as Nomura urges, its purported "due diligence" program must be evaluated as a whole.

To the contrary, and as described above, Nomura never once upsized its sample for any of the 30 Sampled Bulk Pools at issue. Even where Spagna registered concern about the results of the pre-acquisition review and recommended an upsize in sampling, there is no evidence it ever occurred. On November 15, 2006, Spagna, concerned about the characteristics of Second Mortgages in OwnIt's SP02 pool, wrote, "We need to upsize the due diligence on the 2nd." Yet, in its Pool Summary and Trade Confirmation with OwnIt, Nomura had agreed to conduct only "25% due diligence." With no evidence of further sampling, 1,438 loans from OwnIt SP02 -- more than 9% of all the loans in the SLGs -- were used to populate the relevant SLG of NHELI 2007-2. As that SLG was composed of only 3,001 loans, the OwnIt SP02 loans comprised nearly 50% of Freddie Mac's SLG. Defendants suggest that the Court should excuse a "single instance of a relaxation of standard[s]," but, for the reasons explained above, this incident is illustrative, not exceptional.

Nomura contends that its average sample size was high (nearly 40%); why, then, should it be required to upsize? This argument misses the point. The problem is not that Nomura's samples were too small; the problem is that the results of Nomura's adverse-only samples -- high kick-out rates -- raised red flags that were never addressed. If Nomura truly believed that its adverse sampling culled from the Trade Pools all but an

immaterially small number of defective loans -- and if Nomura was committed to verifying the representations in its Offering Documents -- it could have taken steps to confirm that belief. Without taking such steps, that belief was not reasonably held. In sum, Nomura has failed to offer evidence from which a jury could find that it exercised due diligence or reasonable care in connection with the representations in the Offering Documents that are at issue here.  No reasonable jury could find that a reasonably prudent person would take so little care with her own money, much less a person with the resources and expertise of a global investment bank.

This is not to single out Nomura's practices.  Indeed, Nomura has offered evidence that, in some respects, it met and even exceeded any industry-wide norms that existed during this period.  And Nomura has pressed, at every opportunity, evidence that Fannie Mae and Freddie Mac were aware, and never objected to, the broad contours of Nomura's pre-acquisition "diligence" regime.  But, this does not render Nomura's approach to diligence reasonable.  Section 11 offers a complete defense to liability for anyone (issuer aside) who exercises reasonable diligence; Section 12(a)(2) offers a similar defense to those

who act with reasonable care.  No reasonable jury could find
that Nomura merits such protection under either standard.[61]

## IV.  RBS Failed to Conduct Reasonable Investigations or Exercise Reasonable Care.

RBS's position, with respect to the instant motion, is
quite different from Nomura's.  Nomura did no due diligence at
the time of the securitizations, instead relying here on its
pre-acquisition reviews of the 194 Trade Pools that contributed
loans to the seven SLGs.  This reliance was unreasonable as a
matter of law for the reasons given above.

For two of the Securitizations, RBS's position is not so
different, as it undertook no independent review of the loan
files.  For one of these, RBS knew nothing of the results of
Nomura's pre-acquisition review beyond a one-page summary
listing kick-out rates for all Trade Pools that contributed
loans to the Securitization.  For the other, RBS was the sole

---

[61] In light of Nomura's lack of any reasonable credit and
compliance due diligence program, the Court need not separately
address Nomura's valuation diligence.  Here, where due diligence
was required to confirm the accuracy of representations
concerning fundamental characteristics of a group of assets,
Nomura has not argued that it would be proper to consider its
due diligence defense separately with respect to each alleged
misrepresentation.  As Nomura recognizes, "the proper question
is the reasonableness of [Nomura's due diligence processes] as a
whole."  Indeed, the plain language of Section 11 speaks of a
singular "reasonable investigation" after which defendant
reasonably believed that all of "the statements [in the offering
documents] were true."  Similarly Section 12 speaks of the
singular "exercise of reasonable care."

lead underwriter, yet it relied entirely on Nomura's pre-acquisition review of the Trade Pools, never asking how loans were selected from the Trade Pools to populate the SLGs or undertaking any independent investigation of the representations in the Offering Documents.

For the other two Securitizations, however, RBS's position is quite different from Nomura's.  Unlike Nomura, RBS did test the pools of loans to be securitized.  The question presented here is whether that testing was so riddled with obvious deficiencies that no reasonable jury could find RBS conducted a reasonable investigation or exercised reasonable care.  For the reasons given below, that is the case here.  Accordingly, no reasonable jury could find that RBS undertook a reasonable investigation or exercised reasonable care as underwriter for these four Securitizations.[62]

### A.   **2006-HE3 & 2006-FM2**

RBS signed off on the representations concerning the loans in 2006-HE3, having seen only a one-page summary of Nomura's pre-acquisition review of all the Trade Pools that contributed loans to that Securitization and a list of those Originators who

---

[62] As neither Nomura nor RBS is entitled to a due diligence or reasonable care defense as a matter of law for the reasons stated here, the Court need not reach the parties' dispute over when, or whether, statistically reliable random sampling is required when reviewing asset pools.

contributed more than 5% of the loans to the Securitization. The one-page summary included a disclaimer advising that "[t]he material contained herein is preliminary and based on sources which we believe to be reliable, but it is not complete, and we do not represent that it is accurate." RBS has identified no evidence that it followed up on this disclaimer and demanded a representation from Nomura that this summary of Nomura's review was complete and accurate.

RBS was the sole lead underwriter for 2006-FM2, yet it performed no review of the underlying loans. Instead, it relied entirely on Nomura's (which acted as issuer) pre-acquisition review of the Trade Pools. It received three spreadsheets reflecting kick-out rates for various kinds of reviews of the loans in the two Bulk Pools that contributed to the Securitization, as well the results of AMC's review.

There is no evidence that RBS ever asked in connection with either Securitization how loans in the Trade Pools were mapped to SLGs. The loans in the relevant SLG of 2006-HE3 were selected from 71 Trade Pools. Although the loans in the relevant SLG of 2006-FM2 were selected from only two Trade Pools, Nomura's credit and compliance sample was under 25% for each of these Trade Pools, and Nomura then selected -- on a non-random basis -- approximately half of those Trade Pools for the relevant SLG. Approximately 75% of the loans Nomura selected

for that SLG had not been reviewed in its credit and compliance samples.  Nomura's practice of non-randomly selecting loans from Trade Pools to populate the SLGs threatened to place a disproportionate number of defective loans in this SLG, as well as the relevant SLG of 2006-HE3.

In addition, BPOs Nomura ordered for 21 of the loans included in the relevant SLG for 2006-FM2 had final values so far below Fremont's appraisals that, under Nomura's policy, Nomura should have refused to purchase and securitize those loans.  RBS has identified no evidence that it took any action to remedy this, despite the fact that the Offering Documents' representations concerning LTV ratios were to be based on Fremont's appraisals for those loans.  The results of Nomura's pre-acquisition reviews of those Trade Pools gave RBS no reasonable basis to believe the representations in the Offering Documents were accurate.

Moreover, in both cases, RBS failed utterly to "play devil's advocate."  Feit, 332 F. Supp. at 582 (citation omitted).  It performed no "independent verification of the [sponsor]'s representations."  Id. (citation omitted).  Instead of testing those representations, it accepted them.

RBS argues that underwriters of RMBS should not be required to duplicate a review already conducted by the sponsor.  Where an underwriter does not undertake its own review of the

underlying loans, it must assure itself that the other entity's review upon which it purports to rely was thorough, unbiased, and reliable, and that it continues to provide a sufficient basis to believe the Offering Documents will be accurate as of the effective date of the SEC filing.  An underwriter abandons the posture of a skeptic at its own peril.

Here, for reasons explained at length above, Nomura's review was unreliable.  RBS has identified no reasonable basis for it to believe otherwise.

RBS claims that, although it held itself out to the public in the Offering Documents for 2006-HE3 as a co-lead underwriter, it actually served only as a participating underwriter, delegating its responsibilities to its co-lead underwriter, Nomura Securities.  Assuming, arguendo, that RBS should only be required to bear the lighter burden of a participating underwriter for that Securitization, its purported agent's diligence was inadequate for the reasons above, and RBS has identified insufficient evidence for a jury to conclude that RBS had a reasonable basis to believe that Nomura Securities's "program of investigation and actual investigative performance [we]re adequate."  SEC Rel. 9671, 1972 WL 125474, at *6.[63]  As of

---

[63] The Court need not decide whether a participating underwriter may be entitled to a due diligence defense if it reasonably assures itself that a lead underwriter's diligence was adequate, when in fact it was not.

the time of this Securitization in August 2006, RBS had received
very little information about Nomura's review processes.
Whether RBS is considered a co-lead underwriter or a
participating underwriter, no reasonable jury could find that a
prudent man in the management of his own property would do so
little to assure himself that the loans were accurately
described in the Offering Documents.

**B.   2007-1 and 2007-2**

RBS did review loans in the other two Securitizations for
which it served as sole lead underwriter (2007-1 and 2007-2),
but these reviews were riddled with troubling features that,
together, render RBS's diligence inadequate to support a defense
of due diligence or reasonable care in this action as a matter
of law.  RBS's Credit Group called 2007-2's loans "crap" (twice)
and requested a 25% sample -- more than four times the size of
the 6% sample RBS ultimately requested -- prompting a reminder
that RBS did not "own" these loans.  RBS's own manual directed
the Credit Group to select sample sizes based, in large part, on
RBS's "exposure" on the deal.

When RBS requested small samples for these Securitizations
(6%), Nomura reported that it "did not have imaged files" for a
substantial number of the loans RBS sought.  RBS accepted this
and agreed to review only the loans Nomura turned over rather
than request the paper loan files for the rest, even where that

gave RBS access to only 102 of the requested 250-loan sample for 2007-1's Group II.  RBS does not seem to have considered whether the files for the most troubled loans might now be missing from its sample.  Cf. Reference Guide on Survey Research, in Fed. Judicial Ctr., Reference Manual on Scientific Evidence 245 (2nd ed. 2000) (Samples with response rates below 50% "should be regarded with significant caution as a basis for precise quantitative statements about the population from which the sample was drawn.").

When Clayton graded a high percentage of the sampled loans as "3" (or "3C" or "3D") for credit issues -- 27.5% of the Group II 2007-1 sample, and 16.2% of the 2007-2 sample -- RBS overrode all of these grades.  For 2007-1, RBS overrode 30 "3" grades in one hour.[64]  An email from RBS's Credit Group in the same time frame explained that RBS "will not be as tough on appraisal and underwriting issues" in third-party's securitizations as it would be on RBS's own.

---

[64] In opposition to this motion, Farrell declares that he has no recollection of this review, but speculates that he may have been in prior discussions with Clayton about some of these issues.  The Court need not determine whether a reasonable jury could find these overrides were ordered after finding appropriate cures or compensating factors -- a close question -- because this would not change the conclusion that, considered as a whole, these other facts concerning RBS's sampling and response to out-of-tolerance BPOs would require summary judgment for FHFA on RBS's due diligence and reasonable care defenses.

Finally, RBS appeared to ignore entirely the results of its valuation reviews in both Securitizations, taking no action when 15% of its sampled loans in both groups appeared to have faulty appraisals.  Those loans were securitized, and the Offering Documents calculated LTV ratios based on the potentially faulty appraisals.

Resolving all factual disputes in RBS's favor, and granting RBS the benefit of all reasonable inferences, no reasonable jury, considering these facts together, could find that RBS undertook the reasonable investigation of a prudent man managing his own property, or exercised reasonable care, with respect to either of these Securitizations.  It cannot rely on either affirmative defense at trial.

## V.   Defendants' Remaining Arguments

In opposition to the instant motion, Defendants raise a number of arguments that miss the mark.  They are treated, in turn, below.  First, Defendants argue that their reunderwriting expert has found only a small number of defective loans among the SLGs.[65]  Similarly, RBS argues that the reasonableness of its diligence cannot be decided before determining whether the SLGs actually contained a substantial number of defective loans and the Offering Documents were materially false.  Yet, whether the

---

[65] Not surprisingly, FHFA will seek to offer evidence to the contrary at trial.

challenged representations were or were not accurate has no
bearing on whether Defendants undertook a reasonable
investigation or exercised reasonable care to assure themselves
they were.  It could be the case, for instance, that the
representations in the Offering Documents were perfectly true.
If so, FHFA will not be able to prove the elements of its
claims, and Defendants will not be liable.  But, this would do
nothing to improve Defendants' due diligence, and Defendants
would still not be entitled to the protection of a due diligence
or reasonable care defense.

Next, Defendants repeatedly urge that they met or exceeded
industry standards at the time.  This argument is in tension
with Defendants' expert's claim that no industry standards
existed during this period.[66]  Regardless, even if a reasonable
jury found that Defendants were more diligent than other
underwriters of RMBS, for reasons stated above they have failed
to present sufficient evidence from which a jury could find that
their performance in connection with these seven Securitizations
satisfied the Securities Act's standards for reasonable
investigations and reasonable care.  Similarly, the experience

---

[66] Defendants' expert opines that "[t]here were no specific rules
or industry standards creating requirements or processes for due
diligence in RMBS transactions during the relevant period."

and credentials of Defendants' diligence personnel, while relevant, is far from dispositive.

Third, Defendants urge that the representations in the Offering Documents were limited in certain ways that permitted them confidence in their accuracy even if a material percentage of the loans in the SLGs were defective. For instance, Defendants emphasize that representations concerning the loans' compliance with underwriting guidelines employed the word "generally." Defendants ignore the fact that the Offering Documents represented that "[a]ll of the mortgage loans were originated . . . generally in accordance with [applicable] underwriting guidelines." (Emphasis added.) That all of the loans "generally" met guidelines indicated that certain immaterial exceptions might exist, not that a material number of the loans might substantially deviate from the guidelines, without compensating factors. The statement that "a substantial portion of the mortgage loans may represent . . . underwriting exceptions" based on "[c]ompensating factors" is similar. Defendants have not shown that they had a reasonable basis to believe that compensating factors existed for all (or all but an immaterial number) of the loans they could have expected not to otherwise meet an Originator's underwriting guidelines.

Defendants also argue that the Offering Documents define the LTV ratio, for certain loans, as the ratio of the loan

amount to the "the appraised value determined in an appraisal obtained by the originator at origination" (if less than the sales price). Yet, if it were the case that a substantial number of those appraisals were fraudulent, this definition does nothing to render those LTV ratios less misleading. In order to avail themselves of the affirmative defenses of due diligence and reasonable care, Defendants had to investigate whether the statements in the Offering Documents were reliable, and when they had reason to doubt the accuracy of those statements, whether from a post-origination BPO or other information received during their investigation, then they had a duty to take corrective action to insure the Offering Documents were not misleading.

Next, Defendants argue that the GSEs themselves were aware of many of the review and diligence practices FHFA now challenges, and that the GSEs engaged in some of these practices in their own review of whole-loan purchases.[67] Although this may inform, to some extent, industry standards, Defendants cannot

---

[67] In other Opinions issued in this coordinated litigation, as well as in briefing on pending motions in limine in this action, the extent to which Fannie Mae and Freddie Mac securitized residential mortgages that they purchased has been described. Fannie Mae did not securitize either subprime or Alt-A mortgages. Freddie Mac securitized some Alt-A and subprime mortgages, but its participation in that securitization market was small. In any event, the GSEs retained the risk of non-payment for their securitizations. See FHFA v. UBS Americas Inc., at *6, 8 n.7, 23 (S.D.N.Y. June 28, 2013).

explain how these facts (if established) would alter the application of the objective standards of reasonableness here.

Finally, RBS argues that its lesser diligence was appropriate because it was merely "additive," when considered beside Nomura's pre-acquisition reviews.  For reasons explained at length above, RBS could not reasonably rely on Nomura's reviews and when acting as a lead or co-lead underwriter had an independent obligation under the law to conduct a reasonable investigation if it wished to rely on the affirmative defenses at issue here.

**CONCLUSION**

FHFA's November 10, 2014 motion for partial summary judgment is granted.  Defendants may not rely on the affirmative defenses of due diligence and reasonable care under Section 11 and Section 12(a)(2) of the Securities Act and similar provisions of the Blue Sky Laws.


SO ORDERED:

Dated:    New York, New York
          December 18, 2014

                                    _____
                                    DENISE COTE
                                    United States District Judge