UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                         :
FEDERAL HOUSING FINANCE AGENCY,          :        11cv6201 (DLC)
                                         :
                    Plaintiff,           :        OPINION & ORDER
                                         :
          -v-                            :
                                         :
                                         :
NOMURA HOLDING AMERICA, INC., et al.,    :
                                         :
                    Defendants.          :
                                         :
-----------------------------------------X

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For defendants Nomura Holding America, Inc., Nomura Asset
Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities International, Inc., David
Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N.
Dante LaRocca:

David B. Tulchin
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

For defendant RBS Securities Inc.:

Thomas C. Rice
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

This Opinion addresses a motion <u>in limine</u> brought by plaintiff Federal Housing Finance Agency ("FHFA") to prohibit defendants[1] from presenting, in connection with its Section 11 claims, evidence to the jury of principal and interest payments made on the certificates at issue in this action (the "Certificates") after September 2, 2011, which is the date on which this lawsuit was filed (the "Post-Filing Payments").[2]  For the following reasons, the motion is granted.

## BACKGROUND

FHFA, acting as conservator for Fannie Mae and Freddie Mac (together, the "Government Sponsored Enterprises" or "GSEs"), filed suit on September 2, 2011 against defendants alleging that the offering documents ("Offering Documents") used to market and sell seven Certificates to the GSEs associated with residential mortgage-backed securities ("RMBS") contained material

---

[1] Defendants are Nomura Holding America, Inc., Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca ("Nomura"); and RBS Securities Inc. ("RBS") (collectively, "defendants").

[2] FHFA requests that defendants be barred from presenting evidence of the Post-Filing Payments to the jury, and argues that the Section 12(a)(2) and the Blue Sky law claims may be tried to the Court.  The Court construes this as a request to bar presentation of this evidence in connection with FHFA's Section 11 claims, and separately addresses whether a right to a jury trial attaches to the remaining claims.

misstatements or omissions.  RMBS are securities entitling the holder to income payments from pools of residential mortgage loans ("Supporting Loan Groups" or "SLGs") held by a trust.

FHFA brought these claims pursuant to Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), as well as Virginia's and the District of Columbia's Blue Sky laws.  This lawsuit is the sole remaining action in a series of similar, coordinated actions litigated in this district by FHFA against banks and related individuals and entities to recover losses experienced by the GSEs from their purchases of RMBS.  A description of the litigation and the types of misrepresentations at issue in each of these coordinated actions, including the instant case, can be found in FHFA v. Nomura Holding Am., Inc., --- F. Supp. 3d ---, 11cv6201 (DLC), 2014 WL 6462239, at *3-6, *16-17 (S.D.N.Y. Nov. 18, 2014) ("Nomura").

The GSEs purchased the seven Certificates between November 30, 2005 and April 30, 2007.  The Certificates had an original unpaid principal balance of approximately $2.05 billion, and the GSEs paid slightly more than the amount of the unpaid principal balance when purchasing them.  Six were purchased by Freddie Mac; one was purchased by Fannie Mae.  The GSEs have retained the Certificates.

Nomura acted as sponsor and depositor for all seven of the Certificates, and as the sole lead underwriter and seller for two of them.  RBS was the sole lead underwriter for three of the Certificates and a co-lead underwriter for a fourth.  For an explanation of the RMBS securitization process, including the roles of mortgage loan originators, sponsors, and underwriters, see Nomura, 2014 WL 6462239, at *4-6.

Section 11 and Section 12(a)(2), as described below, use different measures of damages.  The Blue Sky laws adopt the Section 12(a)(2) measurement of damages.  As a result, FHFA's expert Dr. James K. Finkel ("Finkel") has used two different methodologies in calculating damages, and has also applied three different interest rates to his calculations.  Finkel has calculated damages as high as roughly $1 billion for the claims against Nomura, and roughly $750 million against RBS.

Dr. Timothy Riddiough ("Riddiough"), one of defendants' experts, submitted a report on November 10, 2014 (the "Riddiough Report") in which he critiqued Finkel's valuation of the Certificates at the time of suit and offered his own valuation model.  As explained below, where a plaintiff holds a security through judgment, Section 11 damages are equal to the difference between the purchase price (or the offering price, if lower) and the security's value at the time the suit is filed.

Each Certificate entitled its holder to the receipt of certain monthly payments, which were based on the principal balance for that Certificate.[3]  The monthly payments to the Certificate holder were equal to a coupon payment -- effectively interest, at a predetermined rate, on the remaining principal balance -- plus some additional amount that paid down the principal balance.

Certificates were linked to tranches of varying seniority. Generally, holders of the most senior certificates for a given Supporting Loan Group were paid first, after which holders of the next-most-senior certificates received payment, and so on. Thus, should some borrowers in an SLG default on their loans, certificates in the junior-most tranche would absorb all or most of the shortfall before payments to more senior certificates were affected.  Accordingly, the most senior certificates were subject to less risk than were more junior certificates.  By apportioning risk in this way, defendants were able to create AAA-rated securities from Alt-A and subprime loans.  The GSEs purchased senior certificates -- often only the most senior -- with the highest credit ratings.

For instance, in Nomura Securitization 2006-FM1, Freddie Mac purchased a Certificate linked to the senior-most tranche,

---

[3] If a Certificate were purchased at par, its initial principal balance would be equal to the purchase price.

class I-A-1, which was supported by Group I loans.  That tranche had an initial principal balance of approximately $525 million; the nine subordinated ("mezzanine") tranches below had a total principal balance of approximately $223 million.  All realized losses on Group I loans were to be allocated to the nine mezzanine tranches, until their $223 million principal balance was reduced to zero.[4]  This subordination, in addition to certain other credit enhancements,[5] protected Freddie Mac's senior Certificate from loss, even in the face of substantial defaults (and limited recovery through foreclosure).

A certificate's value in the market is determined, in large part, by the expected future flow of payments to the certificate holder.  Because payments to the certificate holder depend upon borrowers' payments pursuant to the underlying mortgage loans, the expected rate of borrower defaults is a key determinant of the certificate's value.  The average expected loss severity -- which measures the shortfall between the unpaid principal balance of a loan and the amount recovered through foreclosure (less costs incurred in foreclosure) -- is another key factor.

---

[4] The mezzanine tranches were also subordinate to the senior tranches backed by Group II loans, and would absorb realized losses from those loans as well.

[5] Other credit enhancements noted in the Offering Documents include overcollateralization, a basis risk cap agreement, an interest rate cap agreement, and an interest rate swap agreement, which served to hedge basis and interest-rate risk.

In the years following September 2, 2011, all but one of the Certificates never missed a payment.

In his valuation analysis, Riddiough considered the performance of the Certificates after the date this suit was filed, September 2, 2011, for two purposes.  First, Riddiough compared actual post-filing rates of default within the relevant Supporting Loan Groups against his and Finkel's predicted default rates, finding that his "forecasts . . . are much closer to what actually happened."  Second, Riddiough looked at actual post-filing market prices for the Certificates as "an ex-post check" of his conclusion, based on trading volume, that the RMBS market was illiquid at the time of filing.  Riddiough noted that, by one measure, the Certificates' prices in the market have increased by 28 to 81 percent.

Riddiough relies on the conclusions of Dr. Kerry D. Vandell ("Vandell"), a second expert for defendants, as to loss causation.  Vandell's analysis considers the performance of loans, including the loans underlying the Certificates, through December 2013.  According to FHFA, Vandell notes (in an exhibit to his report that no party has submitted to the Court in connection with this motion) the "expected dollar losses" to one of the Certificates as of December 2013.

FHFA filed the instant motion in limine on October 6, 2014 to prohibit defendants from presenting evidence to the jury of

the Post-Filing Payments in connection with the Section 11
claims.  This motion was fully submitted on October 24.

**DISCUSSION**

This motion <u>in limine</u> requires application of the damages
provisions for Section 11 of the Securities Act, 15 U.S.C.
§ 77k, as well as the affirmative defense of negative causation
available under that section.  Those provisions are set forth
below, following the governing Federal Rule of Evidence.
Application of this law is followed by a discussion of Section
12(a)(2) of the Securities Act.

**I.    Legal Standards**

**A.    Rule 403**

Pursuant to Rule 403, Fed. R. Evid., "[t]he court may
exclude relevant evidence if its probative value is
substantially outweighed by a danger of . . . unfair prejudice,
confusing the issues, misleading the jury, undue delay, wasting
time, or needlessly presenting cumulative evidence."  <u>Accord</u>
<u>United States v. Dupree</u>, 706 F.3d 131, 138 (2d Cir. 2013).  A
court must "conscientiously balance[] the proffered evidence's
probative value with the risk for prejudice."  <u>United States v.</u>
<u>Massino</u>, 546 F.3d 123, 132 (2d Cir. 2008) (citation omitted).
"'[U]nfair prejudice' speaks to the capacity of some concededly
relevant evidence to lure the factfinder into [rendering its
verdict] on a ground different from proof specific to the

[claims brought]." Id. (citation omitted).  For instance, the proffered evidence may have a "tendency . . . to prove some adverse fact not properly in issue or unfairly excite emotions against the [opposing party]." Id. at 133 (citation omitted). When conducting this balancing, a court "should consider the possible effectiveness of a jury instruction and the availability of other means of proof in making a Rule 403 determination." Dupree, 706 F.3d at 138.

**B.   Section 11 Damages**

A Section 11 claimant is entitled to recover, pursuant to Section 11(e),

> such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and
>
> (1)   the value thereof as of the time such suit was brought, or
>
> (2)   the price at which such security shall have been disposed of in the market before suit, or
>
> (3)   the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.

15 U.S.C. § 77k(e)(emphasis supplied).[6]

---

[6] Section 11 imposes, in certain conditions, a cap on an underwriter's liability at the price of the securities

Because the GSEs have retained their Certificates, their damages under Section 11(e) are measured as their "value . . . as of the time such suit was brought."  Id. § 77k(e)(1).  Post-filing changes to the security's value are irrelevant.  Just as defendants are not liable for subsequent decreases, defendants cannot benefit from any subsequent increases in value.  Instead, where a Section 11 plaintiff has held the security through the date of suit, the plaintiff bears all risk of loss, and will capture any gain, that occurs after the filing date.

The term "value" in Section 11(e) "was intended to mean the security's true value after the alleged misrepresentations are made public."  McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d 1044, 1048 (2d Cir. 1995).  Where a market value "is available and reliable," the "instances where the market price of a security will be different from its value are unusual and rare."

---

underwritten.  It provides that:  "In no event shall any underwriter (unless such underwriter shall have knowingly received from the issuer for acting as an underwriter some benefit, directly or indirectly, in which all other underwriters similarly situated did not share in proportion to their respective interests in the underwriting) be liable in any suit or as a consequence of suits authorized under subsection (a) of this section for damages in excess of the total price at which the securities underwritten by him and distributed to the public were offered to the public." 15 U.S.C. § 77k(e).  How this limitation affects lead or co-lead underwriters is not raised by this motion in limine.  See In re WorldCom, Inc. Sec. Litig., 02cv3288 (DLC), 2005 WL 613107, at *3 n.8 (S.D.N.Y. Mar. 15, 2005).

<u>Id.</u> at 1049 (citation omitted).  But, even in those instances
where a market price "is not completely reliable, it serves as a
good starting point in determining value."  <u>Id</u>.  Damages may
not, however, "exceed the price at which the security was
offered to the public."  15 U.S.C. § 77k(g).

As explained above, a certificate's value depends, in large
part, upon the expected principal and interest payments to be
made to the certificate holder, which are in turn based on
mortgage payments by the relevant borrowers.  Thus, a valuation
is based on certain risk assessments.  The parties agree that
the value of a Certificate at the time of filing is to be based
on the appropriate valuation as of that date, using only
information then available.  Accordingly, Finkel's and
Riddiough's assessments of the relevant risks, including the
risk of defaults, must look only to information available as of
September 2, 2011.  Like any forecast, the proper valuation's
underlying risk assessments may prove more or less accurate; the
fact that a risk is or is not realized does not establish how
great or small that risk was, before the fact.

**C.   Section 11 Loss Causation Defense**

Section 11 provides for an affirmative defense of negative
causation:

> <u>if the defendant proves that</u> any portion or all of
> <u>such damages represents other than the depreciation in</u>
> <u>value of such security resulting from such part of the</u>

<u>registration statement</u>, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, <u>such portion of or all such damages shall not be recoverable</u>.

<u>Id</u>. § 77k(e)(emphasis supplied).  This defense "allocate[s] the risk of uncertainty to the defendants" and imposes upon them a "heavy burden."  <u>Akerman v. Oryx Commc'ns, Inc.</u>, 810 F.2d 336, 341 (2d Cir. 1987).  A decline in the price of securities before the disclosure of the truth regarding the representations at issue in a case "may not be charged to defendants."  <u>Id</u>. at 342.  In <u>Akerman</u>, the defendants succeeded in carrying their burden of showing negative causation where the misstatement was "barely material," and where "the public failed to react adversely to its disclosure."  <u>Id</u>. at 343.

The concept of loss causation has been analogized to the concept of proximate cause.  <u>In re Omnicom Grp., Inc. Sec. Litig.</u>, 597 F.3d 501, 510 (2d Cir. 2010).  The concept recognizes that a security's loss of value may be attributed to disclosures of the truth behind misstatements or they may be attributed to other factors, such as "changed economic circumstances, changed investor expectations, [or] new industry-specific or firm-specific facts, [or] conditions."  <u>Acticon AG v. China N.E. Petro. Holdings Ltd.</u>, 692 F.3d 34, 40 (2d Cir. 2012) (citation omitted).

## II.  Application to Section 11 Damages

Evidence concerning the Post-Filing Payments on the Certificates are inadmissible under Rule 403 with respect to defendants' Section 11 damages.  As explained below, the Post-Filing Payments have very limited if any relevance to the calculation of those damages.  Such post-hoc performance would have been unavailable to anyone assessing the value of the Certificates on the date the lawsuit was filed and is not, therefore, admissible to establish the appropriate valuation. Far outweighing any possible relevance is the great potential of such evidence to create unfair prejudice to FHFA.  It is quite likely that even a properly instructed jury, told that all but one of the Certificates never missed a payment, would find it nigh impossible to calculate the Certificates' value as of September 2, 2011 without regard to their performance in the years that followed and that it would be improperly moved to disregard the statutory damages calculation and determine that the GSEs were not truly injured.  Accordingly, any probative value of evidence of the Post-Filing Payments is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.

Defendants argue that post-filing performance is relevant in four ways: (1) actual default rates provide a benchmark against which to compare the accuracy of the predicted default

rates in Finkel's and Riddiough's models; (2) the illiquidity of the RMBS market at the date of filing is confirmed by the increase in the Certificates' market price since that time; (3) Post-Filing Payments should offset Section 11 damages; and (4) loss causation is undermined, as Post-Filing Payments show that any loss in value as of September 2, 2011 was unrelated to the alleged misrepresentations in the Offering Documents.  These arguments are addressed in turn.

### A.   Model Accuracy

Post-filing default rates have limited relevance to the accuracy of Finkel's and Riddiough's models.  Riddiough recognizes that valuation may be based only on information available as of September 2, 2011.  The fact that Riddiough's model better fits actual default rates in the years following September 2, 2011 than Finkel's does little to indicate that Riddiough's model better captures the information available as of that date.  The fact that, in a single instance, a given result occurred, gives little information about the likelihood of that result before the fact: it could be overwhelmingly likely, or it could be a freak occurrence.  Here, Riddiough shows that the performance of the RMBS market as a whole improved during these years.  Using these future performance gains as a "check" of valuation as of September 2, 2011 invites jury-rigging a model that backs into those rosier figures,

whether or not they would have been reliably forecast at the time of filing; it does little to validate Riddiough's model or to undermine Finkel's.  As noted above, the risk of unfair prejudice is great if Riddiough is permitted to tell the jury that post-filing default rates for the Certificates were lower than expected as of September 2, 2011.

### B.   Market Liquidity

While defendants contend that evidence of the Post-Filing Payments is also relevant to their expert's analysis of market liquidity as of September 2011, an examination of the expert's report does not bear that out.  Riddiough makes a very limited use of the post-filing performance of the Certificates in connection with his examination of the liquidity of the market for RMBS sold by financial institutions like defendants ("Private Label Securities" or "PLS") in September 2011.[7]

Riddiough opines that the PLS market "remained quite illiquid and dislocated" at the time of filing, based on an analysis of PLS issuance and trading volume both before and after that date, as well as the opinions of investors and analysts.  But, in his principal discussion of market liquidity, Riddiough makes no mention of the Certificates' post-filing performance, much less the record of Post-Filing Payments.  Nor

---

[7] The term "PLS" distinguishes private label RMBS from those RMBS sold by federal agencies like the GSEs.

does he cite their post-filing performance in the principal
passage of the Riddiough Report critiquing Finkel for finding
the PLS market was liquid as of September 2, 2011.

Rather, the Certificates' post-filing performance,
specifically their pricing, is cited only in a subsequent
passage, to support the finding of a February 2011 industry
publication that concluded that PLS were undervalued by 15%-20%
as of that date, due to market illiquidity.  "As an ex-post
check" of this conclusion, Riddiough "compare[s] the average
price of the seven At-Issue Certificates in September 2011 and
March 2014 to see if there is a price increase over this period
that would be consistent with a partial market liquidity
recovery over time."  In this context, Riddiough notes that,
according to one pricing source, the Certificates' prices
increased by 28 to 81 percent.

Accordingly, defendants have not shown that the
Certificates' post-filing performance has much if any relevance
to an analysis of market liquidity as of the filing date.
FHFA's motion does not seek to generally exclude post-filing
economic data, which may incorporate data concerning the
Certificates within a larger data set.  The Court reserves
judgment on the admissibility of more general information used
to measure market liquidity that incorporates data concerning
the Certificates or their underlying loans.

### C.   Offsets

Third, defendants contend that the Certificates' Post-Filing Payments are relevant because they should offset any award of Section 11 damages by the jury.  Defendants are incorrect.

The statutory formula for recovery provides no basis to reduce a damages award by offsetting payments on the Certificates.  "The plain language of section 11(e) prescribes the method of calculating damages, and the court must apply that method in every case."  McMahan, 65 F.3d at 1048.  This alone bars defendants' offset argument.

Moreover, an offset would be entirely inappropriate given the fact that Section 11 damages, unlike Section 12 damages, do not seek to undo the purchase of the security, but rather to restore plaintiff to the approximate position plaintiff would have occupied had the representations in the Offering Documents been accurate and complete.  A Section 11 plaintiff who holds a security is not entitled to a refund of the purchase price, but only to damages that approximate the drop in value between purchase and suit resulting from the misrepresented or omitted facts.  As plaintiff here would have received the principal and interest payments if the Offering Documents were accurate, there is no reason to believe plaintiff should have to effectively

give them up by offsetting them against damages for the drop in value.

It is true that the Certificates' valuation as of the filing date is based, in part, on the performance of the Certificates expected as of that date.  It may well be that the Certificates performed better than expected, just as they might have done worse.  This is irrelevant to a calculation of Section 11 damages, and it does not constitute a windfall.  FHFA bore the risk of loss when it decided not to sell the Certificates after filing.  Having taken that risk, it is entitled to recover the statutory damages and to keep any revenue received on the Certificates, just as it would be forced to absorb any post-filing losses.

### D.   Section 11 Loss Causation

Fourth, defendants argue, in their opposition of October 16, 2014, that Riddiough "would rely on actual cash flows from the Certificates after September 2011 to illustrate that the alleged misrepresentations did not, and could not have, caused the reduction in value that Mr. Finkel estimates."  In fact, Riddiough does not cite to post-filing cash flows from the Certificates in his discussion of loss causation as it relates to Section 11 damages.  Riddiough relies on the loss causation analysis conducted by Vandell, a second expert for defendants.

Vandell's report does not mention the Post-Filing Payments.[8] But his analysis includes a benchmarking model that considers the performance of loans in SLGs, including the SLGs underlying the Certificates, through December 2013.  A single SLG may support dozens of certificates in any single securitization.  As noted above, the Court reserves judgment as to defendants' use of aggregated post-filing performance data that incorporates data concerning the Certificates.  Vandell's reliance on such data does not support the admissibility of evidence that specifically identifies the Certificates' post-filing performance, including the existence and extent of the Post-Filing Payments.

Defendants' only argument on this point is that "post-injury evidence can be relevant to show the proximate cause of an injury."  Here, the last of the seven Certificates was purchased on April 30, 2007; defendants thus have more than four years of "post-injury evidence" prior to the date of filing on which to rely.  Defendants do not explain why the three years after the filing date are necessary; indeed, many civil cases would have concluded years ago and such evidence would not exist.

---

[8] The parties have only provided the Court with a short excerpt of Vandell's report in connection with this motion.  The Court has received the full report and some of its supporting exhibits in connection with other applications from the parties.

Defendants cite two district court cases in support of their loss causation argument; neither is on point.  In the first, Zerega Ave. Realty Corp. v. Hanover Insurance Co., 04cv9651 (KNF), 2006 WL 1343643 (S.D.N.Y. May 17, 2006), a barge collided with a dock, which subsequently collapsed.  Id. at *2.  The magistrate judge permitted an engineer who had inspected the structural integrity of the dock before and after the collision to testify concerning causation.  Id. at *4.  The engineer's post-collision inspection was not at issue.  Inspection of the scene of an accident bears little relevance to the use of performance data between four and seven years after alleged misrepresentations were made, where the first four years of performance data is readily available.

The second case, Trzeciak v. Apple Computers, Inc., 94cv1251 (LAK) (MHD), 1995 WL 20329 (S.D.N.Y. Jan. 19, 1995), concerned a design defect claim by a plaintiff who alleged her use of an Apple keyboard and mouse caused her to suffer from repetitive stress injuries.  Id. at *1.  In a footnote, the magistrate judge noted that post-injury remedial measures taken by defendant "are potentially probative of the feasibility of corrective measure[s] prior to plaintiff's injury" and defendant's post-injury documents "are likely to contain other information that will be probative on such issues as causation and damages."  Id. at *2 n.1.  Defendants here have not

explained how a defendant's post-injury documents concerning its response to a claimed design defect are relevant to post-filing performance of the Certificates.

Because the Section 11 loss causation analysis concerns loss in value as of the date of filing, and this value is determined solely by information available as of that date, post-filing performance is not directly relevant.  Again, the Court reserves judgment as to the admissibility, for purposes of calculating Section 11 damages, of aggregated post-filing data that includes -- but does not break out -- data concerning the Certificates or their underlying mortgage loans.

## III. Section 12(a)(2) & Right to a Jury Trial

As explained below, there is no right to a trial by jury on FHFA's Section 12(a)(2) claims.  Accordingly, although the Post-Filing Payments are relevant to Section 12(a)(2) damages, this does not require such evidence in the Section 11 case to be put before the jury.

### A.   Section 12(a)(2) Damages

Section 12(a)(2) has a different measure of damages than Section 11's.  Section 12(a)(2) provides for "recover[y] [of] the consideration paid for [the] security [at issue] with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."  15 U.S.C. 77l(a).  The Virginia

and District of Columbia Blue Sky laws both adopt this measure of damages.  See FHFA v. Merrill Lynch & Co., 903 F. Supp. 2d 274, 280 (S.D.N.Y. 2012).

Where a plaintiff still owns the security, its remedy is rescission.  Commercial Union Assur. Co., PLC v. Milken, 17 F.3d 608, 615 (2d Cir. 1994) (construing the identical language in predecessor Section 12(2)).  "Under the rescissory measure of damages appellants would be entitled to a return of the consideration paid for the . . . interests plus prejudgment interest, less any income received on the interests."  Id.  The rate of prejudgment interest rests in the discretion of the trial court.  Id.

**B.   No Right to a Jury Trial on Section 12(a)(2) Claim.**

The Seventh Amendment guarantees the right to a trial by jury "in Suits at common law."  U.S. Const. amend. VII.  "The phrase 'Suits at common law' refers to suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered."  Eberhard v. Marcu, 530 F.3d 122, 135 (2d Cir. 2008) (citation omitted). A two-step inquiry determines whether an action is a suit at law.  Id. (citing Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 41 (1989)).  First, courts look to whether the action or its analog "would have been deemed legal or equitable in 18th

century England." Id. (citation omitted); Pollara v. Seymour, 344 F.3d 265, 268 (2d Cir. 2003). "[T]he second, more important step, requires a determination as to whether the remedy sought is legal or equitable in nature." Eberhard, 530 F.3d at 135 (citation omitted).

Where a case "present[s] both legal and equitable issues, it is for the jury to decide the legal issues and for the court to decide the equitable issues." Wright & Miller, Fed. Practice & Pro. § 2305 (3d ed. 2014); see also Heyman v. Kline, 456 F.2d 123, 130 (2d Cir. 1972). Where there are "common factual issues necessary to the resolution of each claim," the legal claims should be tried to a jury first. Robinson v. Metro-N. Commuter R.R. Co., 267 F.3d 147, 170 (2d Cir. 2001), abrogated in unrelated part by Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011).

FHFA's Section 12(a)(2) claim is most analogous to an equitable action for rescission of contract, known in 18th-century England. See 2 Hazen, Law of Sec. Reg. § 7.9 (6th ed. 2009) ("[S]ection 12 closely resembles a traditional equity action for rescission."); Joseph Story, Commentaries on Equity Jurisprudence, as Administered in England and America § 200 (10th ed. 1870) ("[I]f a vendor, on a treaty for the sale of property, should make representations which he knows to be false, the falsehood of which, however, the purchaser has no

means of knowing, but he relies on them, a court of equity will rescind the contract entered into upon such treaty . . . ."); id. § 692 ("Another head of equity jurisdiction . . . embraces that large class of cases, where the RESCISSION, CANCELLATION, or DELIVERY UP of agreements, securities, or deeds is sought . . . .") (citing Bromley v. Holland, [1802] 7 Ves. Jun. 3 (Ch.) at 18 (Eng.) (discussing equity jurisdiction in such cases)).[9]  Likewise, the relief requested is, in effect, equitable rescission.  See Ballow Brasted O'Brien & Rusin P.C. v. Logan, 435 F.3d 235, 240 (2d Cir. 2006) (rescission is an equitable remedy); Standard Chlorine of Del., Inc. v. Leonard, 384 F.2d 304, 308 (2d Cir. 1967) ("[I]t is clear that requests for . . . rescission have traditionally been considered equitable in nature."); Mallory v. Citizens Util. Co., 342 F.2d 796, 797 (2d Cir. 1965) (action for rescission is "triable by the court," not the jury); see also Deckert v. Independence

---

[9] While rescission could be effected at law by tendering the property received to defendant and suing him at law to recover plaintiff's consideration, see Black's Law Dictionary (9th ed. 2009) ("rescission"), common law "had no action for rescission" and "common law courts had no jurisdiction to order the setting aside of contracts."  Janet O'Sullivan, Rescission as a Self-Help Remedy: A Critical Analysis, 3 Cambridge L.J. 509, 517 (2000).  And equity had "exclusive jurisdiction" of rescission of "transactions induced by non-fraudulent misrepresentation, . . . certain non-fundamental mistakes, [or] those made in breach of fiduciary duty," like the alleged misrepresentations at issue here.  Id.

Shares Corp., 311 U.S. 282, 284 (1940) (holding that the Securities Act "authorizes purchasers to maintain a suit in equity to rescind a fraudulent sale and secure restitution of the consideration paid").

Indeed, the Second Circuit has noted that a "district court did not err in deciding the section 12(2) issues on its own" because Section 12(a)(2) entitles a plaintiff "to rescission but not damages" and "[a]n equitable claim such as rescission is for the court, not the jury, to decide." Royal Am. Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1019 n.4 (2d Cir. 1989); cf. Randall v. Loftsgaarden, 478 U.S. 647, 651 (1986) (noting without comment, in Section 12(2) case, that trial court had accepted an advisory jury opinion with respect to the Section 12(2) claim). Accordingly, there is no right to a jury trial of FHFA's Section 12(a)(2) claim.

Defendants do not offer an alternative 18th-century analog for a Section 12(a)(2) claim. Instead, they argue that relief under Section 12(a)(2) is not rescission, but rather is a legal remedy, pointing to Section 12(a)(2)'s loss causation defense.[10]

---

[10] Because the loss causation defense was added in a 1995 amendment, see Pub. L. 104-67, 109 Stat. 737 (Dec. 22, 1996), defendants argue that the Second Circuit's 1989 guidance in Royal American Managers is inapposite. Defendants are wrong, for the reasons that follow.

Defendants are mistaken.  In fact, the loss causation defense renders Section 12(a)(2) relief more, not less, like rescission.

Rescission of a contract "repudiate[s] the transaction and seek[s] [to] place[] [the parties] in [the] status quo." Logan, 435 F.3d at 238.  "Inherent in the remedy of rescission is the return of the parties to their pre-contract positions.  As a result, a party seeking rescission must restore the other party to that party's position at the time the contract was made." In re APA Assessment Fee Litig., 766 F.3d 39, 56 (D.C. Cir. 2014).  Section 12(a)(2)'s loss causation defense does precisely this: if the securities being tendered by FHFA are less valuable than the securities FHFA received at the time of the purchase agreements for reasons unrelated to defendants' alleged misconduct, then the return of the GSEs' consideration is similarly offset.  When a defendant receives plaintiff's securities in exchange for the return of plaintiff's consideration paid, offset by any unrelated depreciation in value, the parties are placed in the status quo ante.  This is fully in keeping with Section 12(a)(2)'s longstanding offset of the purchase price by "the amount of any income received thereon." 15 U.S.C. § 77l(a)(2).  Thus, Section 12(a)(2)'s loss causation defense renders its relief even more like equitable rescission, reaffirming the Second Circuit's conclusion in Royal

American Managers that Section 12(a)(2) claims are not
encompassed by the Seventh Amendment right to a trial by jury.

Defendants also argue that the Section 11 and Section 12
loss causation defenses are "interconnected, and thus they must
both be determined by the jury."  Defendants are incorrect.  It
is for the jury to determine, pursuant to Section 11, whether
defendants have proven that all or any of the diminution in
value of the securities between the dates of purchase and the
time of suit was not the result of defendants' alleged
misrepresentations.  It is for the Court to determine, pursuant
to Section 12(b), whether defendants have proven that all or any
of the amount recoverable under Section 12(a)(2) was
depreciation in the value of the securities that was not the
result of defendants' alleged misrepresentations.  In making the
latter finding, the Court will, of course, accept as true any
facts with respect to loss causation found by the jury.  See
LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 432 (2d Cir. 1995)
(holding it an abuse of discretion for the district court to
deny equitable relief by "relying on its own findings that were
inconsistent with the jury's findings"); Wade v. Orange Cnty.
Sheriff's Office, 844 F.2d 951, 954-55 (2d Cir. 1988).

The factual questions at issue in the Section 11 and
Section 12 loss causation defenses may overlap, but they are
certainly distinct.  Indeed, it is precisely because the post-

27

claim payments are relevant to the Section 12 defense but not to the Section 11 defense that defendants wish to try the two defenses together.  Defendants' right to a jury trial of legal claims will be fully respected; the Seventh Amendment does not entitle defendants to have a jury try related equitable claims, and in that way sneak before the jury evidence irrelevant to the legal claims.

Pursuant to Rule 42(b), Fed. R. Civ. Pro., a court may, "[f]or convenience, to avoid prejudice, or to expedite and economize [litigation], . . . order a separate trial of one or more separate issues . . . [or] claims."  As the parties have not yet addressed the issue of bifurcation, for present purposes it suffices to note that it is within the Court's discretion to bifurcate the determination of damages under Section 12(a)(2) and the Blue Sky laws.  Accordingly, the relevance of the Post-Filing Payments to those damage calculations does not establish their admissibility in connection with Section 11.

**CONCLUSION**

FHFA's October 6, 2014 motion in limine to prohibit defendants from presenting evidence to the jury concerning the Post-Filing Payments in connection with FHFA's Section 11 claims is granted.

SO ORDERED:

Dated:   New York, New York
         December 18, 2014

_____
                DENISE COTE
        United States District Judge