```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
FEDERAL HOUSING FINANCE AGENCY,         :    11cv6201 (DLC)
                                        :
                Plaintiff,              :    OPINION & ORDER
                                        :
        -v-                             :
                                        :
                                        :
NOMURA HOLDING AMERICA, INC., et al.,   :
                                        :
                Defendants.             :
                                        :
----------------------------------------X
```

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For defendants Nomura Holding America, Inc., Nomura Asset
Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities International, Inc., David
Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N.
Dante LaRocca:

David B. Tulchin
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

For defendant RBS Securities Inc.:

Thomas C. Rice
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

This Opinion addresses a motion in limine brought by plaintiff Federal Housing Finance Agency ("FHFA") to prohibit defendants[1] from presenting evidence concerning Fannie Mae's and Freddie Mac's Single Family businesses' whole-loan due diligence.  For the following reasons, the motion is granted.

## BACKGROUND

FHFA, acting as conservator for Fannie Mae and Freddie Mac (together, the "Government Sponsored Enterprises" or "GSEs"), filed suit on September 2, 2011 against defendants alleging that the offering documents ("Offering Documents") used to market and sell seven securities (the "Certificates") to the GSEs associated with residential mortgage-backed securities ("RMBS") contained material misstatements or omissions.  RMBS are securities entitling the holder to income payments from pools of residential mortgage loans ("Supporting Loan Groups" or "SLGs") held by a trust.

FHFA brought these claims pursuant to Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), as well as Virginia's and the District of Columbia's Blue Sky

---

[1] Defendants are Nomura Holding America, Inc., Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca ("Nomura"); and RBS Securities Inc. ("RBS").

2

laws.  This lawsuit is the sole remaining action in a series of similar, coordinated actions litigated in this district by FHFA against banks and related individuals and entities to recover losses experienced by the GSEs from their purchases of RMBS.  A description of the litigation and the types of misrepresentations at issue in each of these coordinated actions, including the instant case, can be found in <u>FHFA v. Nomura Holding Am., Inc.</u>, --- F. Supp. 3d ---, 11cv6201 (DLC), 2014 WL 6462239, at *3-6, *16-17 (S.D.N.Y. Nov. 18, 2014) ("<u>Nomura</u>").

The GSEs purchased the seven Certificates between November 30, 2005 and April 30, 2007.  The Certificates had an original unpaid principal balance of approximately $2.05 billion, and the GSEs paid slightly more than the amount of the unpaid principal balance when purchasing them.  Six were purchased by Freddie Mac; one was purchased by Fannie Mae.  Nomura acted as sponsor and depositor for all seven of the Certificates, and as the sole lead underwriter and seller for two of them.  RBS was the sole lead underwriter for three of the Certificates and a co-lead underwriter for a fourth.  For an explanation of the RMBS securitization process, including the roles of mortgage loan originators, sponsors, and underwriters, see <u>Nomura</u>, 2014 WL 6462239, at *4-6.

Fannie Mae and Freddie Mac are GSEs created to ensure liquidity in the mortgage market. Nomura, 2014 WL 6462239, at *6. Fannie Mae was established in 1938, Freddie Mac in 1970. Id. Their primary business is to purchase mortgage loans from originators that conform to the GSEs' standards ("conforming loans") and then either hold those loans on their own books or securitize them for offer to the public. Id. This side of their business is known as the "Single Family" side. Id. In their Single Family businesses, the GSEs review loans before purchasing them in bulk; the GSEs also monitor loans after purchasing them.

In 2000, the GSEs began to purchase quantities of Alt-A and subprime[2] loans as well. Id. at *7. Fannie Mae held these loans on its books; Freddie Mac held some of these loans and used others as collateral for guaranteed Structured Pass-Through Certificates ("T-Deals"), which were sold to investors. Freddie Mac guaranteed payments on its T-Deals, which were not governed by the Securities Act or Blue Sky laws. Both GSEs had the right to "put back" loans to loan originators that did not comply with seller representations.

---

[2] Mortgage loans are often divided, by credit risk, into three classes. In order of ascending risk, they are "prime" loans, "Alt-A" loans, and "subprime" loans. Nomura, 2014 WL 6462239, at *2 n.5.

During this period, some portion of the Alt-A and subprime loans the GSEs purchased were non-conforming loans -- that is, they were underwritten to the seller's guidelines (with certain modifications), not the GSEs'.  Id.  Both GSEs used Clayton, a third-party diligence firm also used by defendants, to review these loan files for compliance with underwriter guidelines.  Freddie Mac used methods including random and adverse sampling, as defendants did in their own pre-acquisition review of pools of mortgage loans.

Each GSE also conducts a second business, purchasing and holding Private Label Securities ("PLS").  Id.  This is a substantially smaller portion of their activities.  Id.  It is the PLS that the GSEs purchased from defendants that prompt the claims in this lawsuit.  Id.  The GSEs held approximately $100 billion in PLS in 2002, with roughly $35 billion in subprime and $3 billion in Alt-A PLS; at their peak, in 2005, the GSEs' PLS holdings had grown to approximately $350 billion, with roughly $145 billion in subprime and $40 billion in Alt-A PLS.  Id.  In the two years prior to September 7, 2007, the GSEs purchased more than $251 billion in PLS, approximately 8% of the $3 trillion in PLS issued in those years.  Id.

Throughout this coordinated litigation, the Court has repeatedly considered the relevance of the GSEs' Single Family diligence.  Defendants in this coordinated litigation were

granted extensive discovery of the GSEs' business, including its PLS operations and the committees overseeing the operations of both the Single Family and PLS operations.  Targeted discovery requests reaching additional Single Family documents were permitted; general requests for discovery about Single Family were denied.  FHFA v. UBS Americas Inc., 11cv5201 (DLC), 2013 WL 3284118, at *25 (S.D.N.Y. June 28, 2013).  The Court noted that "the GSEs principally bought whole loans under different standards and constraints than those that applied to [defendants'] PLS collateral."  Id. at *22.  As noted above, Fannie Mae purchased subprime and Alt-A loans to hold, not securitize, and it had the ability -- which it exercised -- to monitor loan performance and put back defective loans to the seller.  Freddie Mac retained the credit risk associated with the subprime and Alt-A loans it securitized, as it guaranteed payment on T-Deals.  Neither GSE purported to exercise due diligence or reasonable care under Sections 11 or 12(a)(2) of the Securities Act or under the Blue Sky laws.

In addition, the GSEs were subject to affordable housing goals set by the United States Department of Housing and Urban Development that required, for example, the purchase of "loans to lower income borrowers that are owner occupied and in metro areas."  FHFA v. HSBC N. Am. Holdings Inc., --- F. Supp. 2d ---, 11cv6189 (DLC), 2014 WL 3702587, at *33 (S.D.N.Y. July 25,

2014). The GSEs' decisions to purchase whole loans were, at times, influenced by the GSEs' desire to purchase loans that met these housing goals.

FHFA filed the instant motion in limine on October 7, requesting that defendants be prohibited from offering documents or eliciting testimony related to the GSEs' Single Family businesses' whole-loan due diligence. This motion was fully submitted on October 27.

## DISCUSSION

### I. Rule 403

Pursuant to Rule 403, Fed. R. Evid., "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Accord United States v. Dupree, 706 F.3d 131, 138 (2d Cir. 2013). A court must "conscientiously balance[] the proffered evidence's probative value with the risk for prejudice." United States v. Massino, 546 F.3d 123, 132 (2d Cir. 2008) (citation omitted). "'[U]nfair prejudice' speaks to the capacity of some concededly relevant evidence to lure the factfinder into [rendering its verdict] on a ground different from proof specific to the [claims brought]." Id. (citation omitted). For instance, the proffered evidence may have a "tendency . . . to prove some

7

adverse fact not properly in issue or unfairly excite emotions against the [opposing party]." Id. at 133 (citation omitted). When conducting this balancing, a court "should consider the possible effectiveness of a jury instruction and the availability of other means of proof in making a Rule 403 determination." Dupree, 706 F.3d at 138.

**II.  Application**

Evidence concerning the GSEs' Single Family businesses' whole-loan due diligence is inadmissible because its limited probative value is substantially outweighed by the dangers of unfair prejudice, confusing the issues, misleading the jury, and wasting time.  As explained below, this evidence has very little relevance to live issues in this action.  Yet, it is very likely that the jury would be confused and misled by evidence of the GSEs' own diligence practices and tempted to find that defendants should not be held to a higher standard, despite the fact that the GSEs were acting in very different contexts and the GSEs' own behavior -- to the minimal extent it is relevant -- would be relevant not because plaintiff is suing on their behalf, but only because the GSEs were participants in the market for RMBS.  Although this risk of prejudice and confusion could be reduced through proper jury instructions, these risks would remain and would continue to substantially outweigh the very minor relevance of this evidence.  In addition, to provide

the jury with the proper context to weigh this minimally relevant evidence would require an extensive presentation of otherwise collateral testimony, an undertaking that would add significantly to the length of the trial and waste the jury's time.  Accordingly, it is inadmissible under Rule 403.

In their opposition of October 17, defendants argue that the GSEs' Single Family diligence practices are relevant to defendants' due diligence defense, to FHFA's expert reunderwriting opinions, and to defendants' statute of limitations defense.  Since that date, defendants' statute of limitations defense has been stricken, see Nomura, and, in an Opinion issued today, their due diligence defense has been stricken.  FHFA v. Nomura Holding Am., Inc., 11cv6201 (DLC).  Defendants' remaining argument concerning the relevance of this evidence to FHFA's reunderwriting opinions is unavailing.

Defendants contend that evidence of the GSEs' own diligence "undermines the opinions of plaintiff's reunderwriting expert," citing four examples: (1) Fannie Mae's average kick-out rate[3] for subprime bulk purchases was an "acceptable 12%," not the 80% defect rate FHFA's expert has found in certain loans in this action; (2) Freddie Mac did not apply the "minimum industry standards" asserted by its expert; (3) Freddie Mac typically

---

[3] The percentage of loans Fannie Mae refused to purchase in a pool of loans on which it bid.

9

cured or waived in loan files with missing documents, but FHFA's expert considered such loan files to be materially defective; and (4) FHFA's expert considered loans "with even the smallest departure" from a debt-to-income ("DTI") ratio cutoff to be materially defective, while Freddie Mac accepted loans with DTI variances. For the reasons set out below, none of these examples suggests that the GSEs' Single Family diligence is of much relevance to the opinions of FHFA's reunderwriting expert.

First, Fannie Mae's kick-out rate for subprime loans it purchased to hold -- not to publicly offer in a securitization -- is of little relevance here. As noted above, Fannie Mae was acting under different constraints and incentives than were defendants. Where defendants were required by the Securities Act and Blue Sky laws to conduct due diligence to ensure the accuracy of representations made in offering documents used to sell securities to the public, Fannie Mae was under no such obligation, as it purchased these loans to hold on its own books. There is no reason to believe that Fannie Mae's exercise of its kick-out rights should have been substantially similar to defendants' exercise of those rights. Moreover, the pre-purchase kick-out rates in pools of loans Fannie Mae purchased to hold is even less related to any measurement of the defendants' purported misrepresentations regarding the characteristics of the Supporting Loan Groups for the

10

Certificates they sold to the GSEs.  The chain of inference between these two figures is too long and too fraught with questionable assumptions to have any validity.  And finally, where defendants' purchase decisions were focused on the economics of the deal, and particularly the credit risk of these loans, Fannie Mae was also interested in meeting federal affordable housing goals, which might have led Fannie Mae to purchase risky loans in order to promote certain federal policies.  Thus, a comparison of Fannie Mae's kick-out rate for loans it purchased to hold to defendants' kick-out rates here is of very limited relevance and carries the real risk of being highly misleading.

    Second, the extent to which Freddie Mac followed "minimum of industry standards" claimed by FHFA's expert is, likewise, of minimal import.  Defendants cite only to a deposition at which a Freddie Mac trader stated he did not recall asking Clayton to "review [loans] for whether they conformed to minimum industry standards."  Even if defendants had a more meaningful example of a discrepancy, the comparison is of limited value since Freddie Mac's diligence was conducted for a different purpose, under different obligations, than defendants'.  Unlike defendants, Freddie Mac retained the credit risk associated with the loans it purchased.  Unlike defendants, Freddie Mac was not required by the Securities Act or Blue Sky laws to conduct due diligence

11

in connection with representations to potential investors about the loans' characteristics. And unlike defendants, Freddie Mac was interested in meeting affordable housing goals. Whatever "[m]inimum industry standards" might mean in the context of defendants' pre-securitization diligence, there is no reason to find that it is equivalent to standards that Freddie Mac was required to follow in reviewing loans in its quite different context.

Defendants' third and fourth examples are much the same. If Freddie Mac typically cured or waived in loan files with missing documents, it was doing so under a different program, undertaken for different purposes and under different strictures. The same is true as to Freddie Mac accepting loans with DTI variances. Neither practice does much to undermine FHFA's reunderwriting expert's conclusion that such practices would have been inappropriate in connection with defendants' pre-securitization diligence to ensure the accuracy of representations made to investors concerning the Supporting Loan Groups underlying the Certificates.

The very real risk that the jury would be confused and misled by evidence of the GSEs' own diligence practices and tempted to find that defendants should not be held to a higher standard than the GSEs, as well the waste of the jury's time as defendants introduce this evidence and the GSEs add more

Case 1:11-cv-06201-DLC   Document 993   Filed 12/18/14   Page 13 of 13

evidence to place it in context, substantially outweigh its very minor probative value.  Accordingly, it is inadmissible under Rule 403.

## CONCLUSION

FHFA's motion in limine of October 7, 2014 to prohibit defendants from offering documents or eliciting testimony related to the GSEs' Single Family businesses' whole-loan due diligence is granted.

SO ORDERED:

Dated:    New York, New York
          December 18, 2014

```
                    _____
                            DENISE COTE
                    United States District Judge
```

13