UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
FEDERAL HOUSING FINANCE AGENCY,         :        11cv6201 (DLC)
                                        :
                    Plaintiff,          :        OPINION & ORDER
                                        :
         -v-                            :
                                        :
                                        :
NOMURA HOLDING AMERICA, INC., et al.,   :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For defendants Nomura Holding America, Inc., Nomura Asset
Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities International, Inc., David
Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N.
Dante LaRocca:

David B. Tulchin
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

For defendant RBS Securities Inc.:

Thomas C. Rice
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

This Opinion addresses a motion <u>in limine</u> brought by plaintiff Federal Housing Finance Agency ("FHFA") to prohibit defendants[1] from introducing evidence relating to the housing goals set for Fannie Mae and Freddie Mac by the United States Department of Housing and Urban Development ("HUD").  For the following reasons, the motion is granted.

## BACKGROUND

FHFA, acting as conservator for Fannie Mae and Freddie Mac (together, the "Government Sponsored Enterprises" or "GSEs"), filed suit on September 2, 2011 against defendants alleging that the offering documents ("Offering Documents") used to market and sell seven securities (the "Certificates") to the GSEs associated with residential mortgage-backed securities ("RMBS") contained material misstatements or omissions.  FHFA brought these claims pursuant to Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), as well as Virginia's and the District of Columbia's Blue Sky laws.  This lawsuit is the sole remaining action in a series of similar, coordinated actions litigated in this district by FHFA against

---

[1] Defendants are Nomura Holding America, Inc., Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca ("Nomura"); and RBS Securities Inc. ("RBS").

banks and related individuals and entities to recover losses
experienced by the GSEs from their purchases of RMBS.  A
description of the litigation and the types of
misrepresentations at issue in each of these coordinated
actions, including the instant case, can be found in FHFA v.
Nomura Holding Am., Inc., --- F. Supp. 3d ---, 11cv6201 (DLC),
2014 WL 6462239, at *3-6, *16-17 (S.D.N.Y. Nov. 18, 2014)
("Nomura").

The GSEs purchased the seven Certificates between November
30, 2005 and April 30, 2007.  The Certificates had an original
unpaid principal balance of approximately $2.05 billion, and the
GSEs paid slightly more than the amount of the unpaid principal
balance when purchasing them.  Six were purchased by Freddie
Mac; one was purchased by Fannie Mae.  Nomura acted as sponsor
and depositor for all seven of the Certificates, and as the sole
lead underwriter and seller for two of them.  RBS was the sole
lead underwriter for three of the Certificates and a co-lead
underwriter for a fourth.  For an explanation of the RMBS
securitization process, including the roles of mortgage loan
originators, sponsors, and underwriters, see Nomura, 2014 WL
6462239, at *4-6.

Fannie Mae and Freddie Mac are government-sponsored
enterprises created to ensure liquidity in the mortgage market.
Nomura, 2014 WL 6462239, at *6.  Fannie Mae was established in

1938, Freddie Mac in 1970.  Id.  Their primary business is to purchase mortgage loans from originators that conform to the GSEs' standards ("conforming loans") and then either hold those loans on their own books or securitize them for offer to the public.  Id.  This side of their business is known as the "Single Family" side.  Id.  In their Single Family businesses, the GSEs review and analyze loans before purchasing them in bulk; the GSEs also monitor loans after purchasing them.

Each GSE also conducts a second business, purchasing and holding private label RMBS ("PLS").  Id.  This is a substantially smaller portion of their activities.  Id.  It is the PLS that the GSEs purchased from defendants that prompt the claims in this lawsuit.  Id.  The GSEs held approximately $100 billion in PLS in 2002, with roughly $35 billion in subprime and $3 billion in Alt-A PLS;[2] at their peak, in 2005, the GSEs' PLS holdings had grown to approximately $350 billion, with roughly $145 billion in subprime and $40 billion in Alt-A PLS.  Id.  In the two years prior to September 7, 2007, the GSEs purchased more than $251 billion in PLS, approximately 8% of the $3 trillion in PLS issued in those years.  Id.

---

[2] Mortgage loans are often divided, by credit risk, into three classes.  In order of ascending risk, they are "prime" loans, "Alt-A" loans, and "subprime" loans.  Nomura, 2014 WL 6462239, at *2 n.5.

The GSEs' charters require that they assist "activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities," as well as "promote access to mortgage credit throughout the Nation (including central cities, rural areas, and underserved areas)." 12 U.S.C. § 1716(3)-(4) (Fannie Mae); id. § 1451 note (Freddie Mac).  The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Pub. L. 102-550, §§ 1331-36, 106 Stat. 3672 (1992), authorizes HUD to set annual housing goals for the GSEs with respect to low- and moderate-income family housing, underserved areas, and special affordable housing (the "Housing Goals"). Id. §§ 1332-34.  In deciding whether to purchase six of the Certificates at issue, Freddie Mac considered the extent to which the underlying mortgage loans satisfied these Housing Goals.[3]

FHFA filed the instant motion in limine on October 14, requesting that defendants be prohibited from introducing evidence concerning the Housing Goals.  This motion was fully submitted on November 3.

---

[3] There is no evidence that Fannie Mae considered the Housing Goals in 2005 when it purchased its sole Certificate in this case.  That Certificate was backed by Alt-A loans, not subprime loans.

**DISCUSSION**

I.   **Rule 403**

Pursuant to Rule 403, Fed. R. Evid., "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Accord United States v. Dupree, 706 F.3d 131, 138 (2d Cir. 2013). A court must "conscientiously balance[] the proffered evidence's probative value with the risk for prejudice." United States v. Massino, 546 F.3d 123, 132 (2d Cir. 2008) (citation omitted). "'[U]nfair prejudice' speaks to the capacity of some concededly relevant evidence to lure the factfinder into [rendering its verdict] on a ground different from proof specific to the [claims brought]." Id. (citation omitted). For instance, the proffered evidence may have a "tendency . . . to prove some adverse fact not properly in issue or unfairly excite emotions against the [opposing party]." Id. at 133 (citation omitted). When conducting this balancing, a court "should consider the possible effectiveness of a jury instruction and the availability of other means of proof in making a Rule 403 determination." Dupree, 706 F.3d at 138.

## II.  Application

Evidence concerning the Housing Goals is inadmissible.  It is of extremely limited probative value, as discussed below, yet it threatens to confuse and mislead the jury.  It threatens to insert consideration of the GSEs' reliance into this trial, when the strict liability claims at issue here impose no duty on FHFA to prove that the GSEs relied on defendants' alleged misrepresentations.  It also threatens to lead the jury to blame the GSEs for their own losses.  Even after proper jury instructions, this danger is real, and it substantially outweighs the minimal probative value of this evidence.  Accordingly, it is inadmissible under Rule 403.

Defendants raise four arguments to the contrary.  First, defendants argue that the Housing Goals are "critically important to the jury's consideration of loss causation."  Defendants argue that goal-qualifying loans were more likely to be risky, and thus to default, and that the GSEs "chose to create certificates backed disproportionately by more risky loans."  Assuming, arguendo, that defendants have proffered sufficient evidence to establish these points, they are irrelevant.  The question is not whether the GSEs purchased Certificates backed by particularly risky subprime or Alt-A mortgages.  Rather, the question is whether defendants' alleged misrepresentations concerning those loans in their Offering

Documents caused losses beyond losses that would have occurred had the loans been as represented -- however risky.  If defendants represented risky loans accurately, or if the Certificates suffered some or all of their loss in value due to factors other than the purported misrepresentations, then defendants will not be liable for those losses.  Indeed, defendants' own loss causation expert, Dr. Kerry D. Vandell ("Vandell"), does not suggest that the Housing Goals are in any way related to the losses experienced by the Certificates.  Nor does Vandell attempt to control for the GSEs' Housing Goals in his loss causation analysis.  This is not surprising since, for the reasons above, there should be no need to do so.

Second, defendants argue that the Housing Goals are relevant to materiality, because "[m]ateriality should . . . be assessed from the perspective of a reasonable investor in the plaintiff's position, i.e., a government sponsored enterprise with broad public missions to support liquidity and affordability to the market."  Defendants are incorrect. Materiality is "an objective standard," determined with reference to a reasonable "PLS trader" -- not a reasonable GSE, or a reasonable PLS trader with plaintiff's idiosyncratic regulatory restrictions and purchasing goals.  FHFA v. UBS Americas Inc., 11cv5201 (DLC), 2013 WL 3284118, at *13, *23 (S.D.N.Y. June 28, 2013); accord Amgen Inc. v. Conn. Ret. Plans

& Trust Funds, 133 S. Ct. 1184, 1191 (2013) (discussing materiality in the context of Section 10(b) of the Securities Exchange Act of 1934).

Third, defendants argue the Housing Goals are relevant to their statute of limitations defenses.  Those defenses have been stricken.  See Nomura.

Finally, defendants argue that the Housing Goals provide "important and necessary background and context," as "[a] fair trial requires that the jury understand the unique position of Freddie Mac and Fannie Mae and what factors drove their purchases."  Defendants are mistaken.  Defendants have offered no reason the GSEs' motivations in purchasing the Certificates are relevant here.  A jury need not know much about the GSEs in order to apply objective standards like falsity and materiality.  Indeed, the fact that the plaintiff is standing in the shoes of the GSEs should neither assist nor impede it in pursuit of a just verdict.  Every seller and buyer of a security should be held to the same standard and shoulder the same burdens under the law.  The claims defendants face are strict liability claims, and their obligation to accurately describe a group of the loans that supported a set of certificates did not shift based on the identity of each entity that purchased a certificate supported by that loan group.

Indeed, the chief effect of admitting evidence of the Housing Goals would be to invite error: to lead the jury to blame the GSEs for their own losses.  This danger of a confused or misled jury easily and substantially outweighs any minimal probative value of this evidence.  Accordingly, it is inadmissible under Rule 403.

## CONCLUSION

FHFA's motion in limine of October 14, 2014 to prohibit defendants from introducing evidence relating to the Housing Goals is granted.

SO ORDERED:

Dated:    New York, New York
          December 18, 2014

_____
DENISE COTE
United States District Judge