```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :
FEDERAL HOUSING FINANCE AGENCY,        :        11cv6201 (DLC)
                                       :
                 Plaintiff,            :        OPINION & ORDER
                                       :
         -v-                           :
                                       :
                                       :
NOMURA HOLDING AMERICA, INC., et al.,  :
                                       :
                 Defendants.           :
                                       :
---------------------------------------X
```

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For defendants Nomura Holding America, Inc., Nomura Asset
Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities International, Inc., David
Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N.
Dante LaRocca:

David B. Tulchin
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

For defendant RBS Securities Inc.:

Thomas C. Rice
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

This Opinion addresses a motion <u>in limine</u> brought by plaintiff Federal Housing Finance Agency ("FHFA") to prohibit defendants[1] from eliciting testimony, offering documents, or arguing that the sale of any of the seven securities at issue here (the "Certificates") was consummated before the "settlement date" as listed in FHFA's Amended Complaint.  At issue is whether defendants are liable, under Section 12(a)(2) of the Securities Act of 1933, for any misrepresentations or omissions in prospectus supplements bearing a date on or before the settlement date but after the so-called "trade date," as defined below.  For the following reasons, the motion is granted.  This motion requires the Court to revisit issues addressed in an Opinion of December 18, 2012 in related litigation.  <u>FHFA v. Bank of America</u>, 11cv6195 (DLC), 2012 WL 6592251 (S.D.N.Y. Dec. 18, 2012) ("<u>December 2012 Opinion</u>").

## BACKGROUND

FHFA, acting as conservator for Fannie Mae and Freddie Mac (together, the "Government Sponsored Enterprises" or "GSEs"), filed suit on September 2, 2011 against defendants alleging that

---

[1] Defendants are Nomura Holding America, Inc., Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc. ("Nomura Securities"), David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca (collectively, "Nomura"); and RBS Securities Inc. ("RBS").

the offering documents ("Offering Documents") used to market and sell seven Certificates to the GSEs associated with residential mortgage-backed securities ("RMBS") contained material misstatements or omissions.  RMBS are securities entitling the holder to income payments from pools of residential mortgage loans held by a trust.

FHFA brought these claims pursuant to Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), as well as Virginia's and the District of Columbia's Blue Sky laws.  This lawsuit is the sole remaining action in a series of similar, coordinated actions litigated in this district by FHFA against banks and related individuals and entities to recover losses experienced by the GSEs from their purchases of RMBS.  A description of the litigation and the types of misrepresentations at issue in each of these coordinated actions, including the instant case, can be found in FHFA v. Nomura Holding Am., Inc., --- F. Supp. 3d ---, 11cv6201 (DLC), 2014 WL 6462239, at *3-6, *16-17 (S.D.N.Y. Nov. 18, 2014) ("Nomura").

The GSEs purchased the seven Certificates between November 30, 2005 and April 30, 2007.  The Certificates had an original unpaid principal balance of approximately $2.05 billion, and the GSEs paid slightly more than the amount of the unpaid principal balance when purchasing them.  Six were purchased by Freddie

Mac; one was purchased by Fannie Mae.  The GSEs have retained the Certificates.

Nomura acted as sponsor and depositor for all seven of the Certificates, and as the sole lead underwriter and seller for two of them.  RBS was the sole lead underwriter for three of the Certificates and a co-lead underwriter for a fourth.  For an explanation of the RMBS securitization process, including the roles of mortgage loan originators, sponsors, and underwriters, see Nomura, 2014 WL 6462239, at *4-6.

## I.   2005 Reforms to the Offering Process

In 2005, some months before the first of the Certificates was sold, the Securities and Exchange Commission ("SEC") reformed the offering process for certain issuers.  As these reforms established some of the processes at issue in this motion, a general understanding of the relevant regulatory framework between late 2005 and late 2007 is useful.  A summary of that framework appears in the December 2012 Opinion; it is reproduced here for ease of reference.

> Section 5(b) of the Securities Act prohibits the sale or delivery after sale of any registered security by means of interstate commerce unless accompanied or preceded by a prospectus that meets SEC requirements.  15 U.S.C. § 77e(b).  Prior to 2005, SEC rules permitted participants in a securities offering to make written offers only through a prospectus meeting all of the requirements of Section 10(a) of the Securities Act and on file with the SEC.  SEC Release No. 75, 85 S.E.C. Docket 2871, 2005 WL 1692642, at *17 (July 19, 2005) ("2005

Release"). This was a fairly onerous requirement, because, in order to satisfy Section 10(a), a prospectus must make detailed disclosures about the securities at issue and, in the case of asset-backed securities, the underlying asset pools. See FHFA v. UBS Americas, Inc., 11cv5201 (DLC), 2012 WL 2400021, at *2 (S.D.N.Y. June 26, 2012); Regulation S-K, 17 C.F.R. § 229.10 et seq.; Regulation AB, 17 C.F.R. § 229.1100 et seq.

As explained in the 2005 Release, the reforms were intended to advance the SEC's continuing efforts "toward integrating disclosure and processes under the Securities Act and the Securities Exchange Act of 1934," 2005 Release, 2005 WL 1692642, at *1, with the hope that the added flexibility given to issuers and underwriters in the marketing of their securities would "promote efficient capital formation, without diminishing investor protection." Id. at *122. Having determined that written communications during the offering process were "unnecessarily restricted," the SEC elected to expand upon its preexisting . . . shelf-registration rules to allow certain issuers "to make written offers outside the statutory prospectus" -- i.e. without providing the full panoply of required disclosures -- and beyond those previously permitted by the Securities Act. Id. at *22, *37; see 17 C.F.R. §§ 230.164, 230.433. The rules define such a written offer, made after the filing of a registration statement but outside of the statutory prospectus, as a "free writing prospectus." Id. at *37; see 17 C.F.R. § 230.405.

This liberalized regime is subject to certain important conditions, however. Among those conditions are requirements that the free writing prospectus direct the recipient to the registration statement and base prospectus on file with the SEC, 17 C.F.R. § 230.433, and that a Final Prospectus containing all information required by statute or regulation be filed on SEC Form 424B5 "no later than the second business day following . . . the date of the determination of the offering price" for a particular security. 17 C.F.R. § 230.424(b)(5) ("Rule 424(b)(5)"); see also 17 C.F.R. § 230.173 (requiring, subject to certain exceptions, that a

selling issuer or underwriter "provide to each
purchaser from it, not later than two business days
following the completion of such sale, a copy of the
final prospectus"); 2005 Release, 2005 WL 169642, at
*42, *49.

    Because, under Section 5(b), the lawfulness of
a sale of registered securities is contingent on the
issuer's filing a Final Prospectus, the 2005 reforms
also included the adoption of Rule 430B, which
imposes Section 11 liability for all sales in
connection with an offering, including those
concluded before the filing of a final prospectus.
Specifically, the rule provides that information
omitted from a base prospectus and filed after
closing pursuant to Rule 424(b)(5) "shall be deemed
to be part of and included in the registration
statement on the earlier of the date such subsequent
form of prospectus is first used or the date and
time of the first contract of sale of securities in
the offering to which such subsequent form of
prospectus relates."  17 C.F.R. § 230.430B(f)(1).

    The SEC has explained that its purpose in
adopting this rule was to provide that "prospectus
supplements required to be filed under Rule
424 . . . will, in all cases, be deemed to be part
of and included in registration statements for
purposes of Securities Act Section 11."  2005
Release, 2005 WL 1692642, at *84 (emphasis
supplied). . . .  Thus, the Securities Act and
regulations promulgated thereunder leave no doubt
that the FHFA may assert Section 11 claims on the
basis of statements included in the Final
Prospectus, even for those Certificates the GSEs
committed to purchase before those documents were
filed.

[. . .]

    The SEC adopted Rule 159 [reproduced below] as
part of the 2005 reforms to the securities offering
regime discussed above.  As noted, among other
things, those reforms liberalized the offering
process by permitting sellers to solicit buyers
using free writing prospectuses that do not
constitute a full and final prospectus.  But, while

free writing prospectuses are exempted from limitations on any particular content and from certain filing requirements, the SEC structured the reforms with an eye toward continued protection of investors.  As it explained, Section 12(a)(2) liability was an important component of that investor-protection regime . . . .

While recognizing that free writing prospectuses are "subject to disclosure liability" under Section 12(a)(2), 2005 Release, 2005 WL 1692642, at *62, the Commission also concluded that sellers should not be held responsible under that provision for information conveyed to the buyer for the first time after sale but incorporated retroactively into the registration statement.  As the Commission noted, "[t]he date and time that the information is part of the registration statement and the time of effectiveness relate to an investor's rights under Section 11," while Section 12(a)(2) is concerned primarily with false statements in connection with solicitation.  Id. at *77; see also id. at *62.  Rule 159 is intended to maintain that distinction for information that is required to be disclosed but may now be filed after the contract of sale.  The SEC has recognized that one of the rule's consequences is that, in certain circumstances, "[t]he class of investors that may have a claim under Section 11 and Section 12(a)(2) may [] be different."  Id.

December 2012 Opinion, 2012 WL 6592251, at *3-6.

## II.  Sale of a Certificate

The sale of each Certificate proceeded in several steps.  First, defendants contacted a GSE trader regarding upcoming securities.  If the GSE elected to move forward, the GSE trader completed a trade ticket using information provided by an underwriter entity -- here, Nomura Securities, RBS, or, in one instance, nonparty Lehman Brothers, Inc.  On this date (the

"trade date"), the GSE and defendants made certain commitments to one another regarding the GSE's purchase of a Certificate from defendants.  Before the trade date, the GSE trader or a GSE credit analyst reviewed the proposed investment based on categories of information received from defendants, including collateral stratifications, a preliminary prospectus, a free writing prospectus, or a term sheet (the "Preliminary Offering Documents").  FHFA argues that the GSEs' analysis of the investment continued after the trade date; defendants deny this.

After the trade date -- here, between 4 and 35 days after -- the GSE transferred payment to defendants and defendants transferred title in the Certificate to the GSE (the "settlement date").  Before the settlement date, prospectus supplements were sent to investors.  2005 Release, 2005 WL 1692642, at *73 n.394. The prospectus supplements (the "Prospectus Supplements") purport to "describe the specific terms of th[e] series of certificates" from which the GSE purchased its Certificate.  The Prospectus Supplements for the seven Certificates here were dated between one day and four days before the settlement date; the Prospectus Supplements were filed with the SEC before, the day of, or the day after the settlement date.[2]

---

[2] As noted above, SEC rules require that a final prospectus be filed "no later than the second business day following . . . the date of the determination of the offering price" for a particular security.  17 C.F.R. § 230.424(b)(5).

The parties agree that consummation of the transaction -- transfer of funds and title -- was conditioned on the Certificates and their underlying mortgage loans having the characteristics described in the Preliminary Offering Documents. Some of the Preliminary Offering Documents make this explicit. For instance, the free writing prospectus for one Certificate stated that defendants'

> obligation to sell securities to [the GSE] is conditioned on the mortgage loans and the securities having the characteristics described in this free writing prospectus.  If that condition is not satisfied, [defendants] will notify you, and neither the Issuing Entity nor any underwriter will have any obligation to you to deliver all or any portion of the securities which you have committed to purchase.

Governing regulations also mandate that a free writing prospectus such as this "not conflict with [i]nformation contained in the filed registration statement, including any prospectus or prospectus supplement," like the Prospectus Supplements here.  17 C.F.R. § 230.433(c)(1)(i).

At least one Prospectus Supplement advised that investors "should rely only on the information contained in this document" and explained that defendants

> provide information to [the investor] about the offered certificates in two separate documents that progressively provide more detail:
>
> - the accompanying prospectus, which provides general information, some of which may not apply to this series of certificates; and

- this prospectus supplement, which describes the specific terms of this series of certificates.[3]

The instant motion <u>in limine</u> concerns the parties' dispute as to the time of sale of the Certificates.  FHFA maintains that the settlement date is the time of sale; defendants argue that the trade date is the date of sale.  Thus, defendants maintain, they are not liable to FHFA under Section 12(a)(2) for statements in the Prospectus Supplements, since the Prospectus Supplements post-date the trade date.

In its 2005 Release, the SEC discussed "[d]etermination of [the] [t]ime of [s]ale."  2005 Release, 2005 WL 1692642, at *74-75.  The SEC noted that, "in the asset-backed securities area," some "commenters argued that the iterative nature of their particular type of offerings meant that the parties could not identify the precise point when the purchaser became bound to acquire . . . securities," because "purchasers were given the opportunity to reassess their purchase decisions if new or changed information was provided."  <u>Id.</u> at *75 & n.407.

This is echoed in a 2005 comment letter submitted to the SEC by the Bond Market Association, an international trade association representing approximately two hundred securities firms -- including defendants -- that underwrite, distribute,

---

[3] Defendants have not suggested that the other Prospectus Supplements materially differ in this respect.

and trade in fixed-income securities.  Comments of the Bond
Market Assoc. to Sec. Offering Reform (File No. S7-38-04),
Impacts of the Proposal in the ABS Markets, dated Jan. 31, 2005,
at 8, available at http://www.sec.gov/rules/proposed/s73804/
bma013105.pdf.  The Bond Market Association stated:  "Our
members' understanding is that, under current law as well as
practice, if a security is sold (that is, a contact of sale is
entered into) based on Preliminary Information, and if there are
Material Changes between the Preliminary Information and the
final prospectus, then the investor has the right to break the
trade based on the Material Change until the time of
settlement."  Id.  In this context, the SEC noted "the important
federal interests in the determination of the time of a contract
of sale" and emphasized that "contracts for sales of securities
may not contain provisions that operate to waive a purchaser's
substantive rights under the federal securities laws."  2005
Release, 2005 WL 1692642, at *75.

FHFA filed the instant motion in limine on October 14,
requesting that defendants be barred from eliciting testimony,
offering documents, or arguing that the sales of the
Certificates were consummated before the settlement date listed
in FHFA's Amended Complaint.  Defendants opposed by letter of
October 24, and this motion was fully submitted on November 3.

## DISCUSSION

### I.    Rule 403

Pursuant to Rule 403, Fed. R. Evid., "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Accord United States v. Dupree, 706 F.3d 131, 138 (2d Cir. 2013). A court must "conscientiously balance[] the proffered evidence's probative value with the risk for prejudice." United States v. Massino, 546 F.3d 123, 132 (2d Cir. 2008) (citation omitted). "'[U]nfair prejudice' speaks to the capacity of some concededly relevant evidence to lure the factfinder into [rendering its verdict] on a ground different from proof specific to the [claims brought]." Id. (citation omitted). For instance, the proffered evidence may have a "tendency . . . to prove some adverse fact not properly in issue or unfairly excite emotions against the [opposing party]." Id. at 133 (citation omitted). When conducting this balancing, a court "should consider the possible effectiveness of a jury instruction and the availability of other means of proof in making a Rule 403 determination." Dupree, 706 F.3d at 138.

## II.  Rule 159 & Time of Sale

The SEC's Rule 159, discussed above, provides, in relevant part:

> For purposes of section 12(a)(2) of the Act only, and without affecting any other rights a purchaser may have, for purposes of determining whether a prospectus or oral statement included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading at the time of sale (including, without limitation, a contract of sale), any information conveyed to the purchaser only after such time of sale (including such contract of sale) will not be taken into account.

17 C.F.R. § 230.159(a) (emphasis supplied).

In its 2005 Release, the SEC indicated that in determining the "time of sale," for purposes of Rule 159 and Section 12(a)(2), a court should look to "the date of contractual commitment, not the date that a confirmation is sent or received or payment is made" and be guided by "[s]tate law contract principles."  2005 Release, 2005 WL 1692642, at *72 n.391, *75. The SEC explained as follows:

> Courts have held consistently that the date of a sale is the date of contractual commitment, not the date that a confirmation is sent or received or payment is made.  See, e.g., Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 891 (2d Cir. 1972) . . . .
>
> [W]e believe that one appropriate time to assess whether a purchaser has a claim under Section 12(a)(2) . . . is the time of the contract of sale of the securities.  State law contract principles are significant with regard to contract formation, and we are not aware of any current significant

conflicts between state contract law and federal law
regarding the elements of formation of a contract.

Id.

In Radiation Dynamics, the first case cited by the SEC, the
Second Circuit held, for purposes of SEC Rule 10b-5, that the
time of the purchase or sale of securities is "the time when the
parties to the transaction are committed to one another."
Radiation Dynamics, 464 F.2d at 891.  Appellant had argued the
materiality of non-public information should be determined as of
the date the "securities are transferred and paid for," thus
providing "an escape hatch" through which those with inside
information who put in a buy or sell order on a security could
avoid liability if the settlement did not occur.  Id. at 890-91.
The court rejected that argument, explaining that "securities
legislation enacted for the purpose of avoiding frauds . . .
[should be construed] not technically and restrictively, but
flexibly to effectuate its remedial purposes."  Id. at 890
(citation omitted).

The Second Circuit revisited Radiation Dynamics in Vacold
LLC v. Cerami, 545 F.3d 114, 121-22 (2d Cir. 2008).  The court
in Vacold held that, for purposes of Rule 10b-5, the "purchase
or sale" occurred when the parties "committed to execute the
transaction," rather than "when one party tendered its
securities and the other its money."  Id. at 122.  The "time

14

when the parties to the transaction are committed to one
another" controls, "even if the later exchange of money and
securities is contingent upon the occurrence of future events,
such as the satisfaction of a financing condition, at least when
the contingency is not so unlikely that it renders the stock
transaction extremely speculative."  Id. (citation omitted).

    In the Vacold opinion, the court distinguished, under New
York law, between "fully binding" preliminary agreements,
"created when the parties agree on all the points that require
negotiation (including whether to be bound) but agree to
memorialize their agreement in a more formal document," and
"binding preliminary commitments," where "the parties agree on
certain major terms, but leave other terms open for further
negotiation," which only "bind the parties to the obligation to
negotiate the open issues in good faith."  Id. at 124 (citation
omitted).

## III. Application

### A.    Section 11

    Any testimony or argument that the sale of the Certificates
occurred before their settlement dates is barred with respect to
FHFA's Section 11 claims.  It is of extremely limited probative
value to these claims, as discussed below, yet it threatens to
confuse and mislead the jury into considering whether the GSEs
actually relied on the Prospectus Supplements in deciding to

purchase the Certificates.  Even with proper jury instructions,
these dangers are real, and they substantially outweigh the
minimal probative value of this evidence.  Accordingly, it is
inadmissible under Rule 403.

Defendants raise two arguments that suggest the trade dates
are relevant to Section 11 claims.  First, defendants argue that
the trade dates are "[r]elevant to [m]ateriality" because "some
or all of the information in the prospectus supplements that
plaintiff claims was false or misleading . . . was not contained
in the preliminary offering materials" available when the GSEs
committed to purchase the Certificates and this "information
provided to investors for the first time after the decision to
buy was not material to these buyers."  This argument
underscores the danger identified above, as defendants appear to
be shoehorning an improper reliance argument into an argument as
to materiality.  In any case, defendants are mistaken.

As noted above, the SEC's 2005 reforms include the adoption
of Rule 430B, which "imposes Section 11 liability for all sales
in connection with an offering, including those concluded before
the filing of a final prospectus."  December 2012 Opinion, 2012
WL 6592251, at *4.  And outside of circumstances not at issue
here, actual reliance is irrelevant to the materiality analysis.
Id. at *2-3.  Accordingly, there is "no doubt that the FHFA may
assert Section 11 claims on the basis of statements included in

16

the Final Prospectus, even for those Certificates the GSEs committed to purchase before those documents were filed."   Id. at *4.  Defendants cannot take advantage of the 2005 reforms meant to ease burdens on issuers and underwriters like defendants -- here the authority to file a prospectus supplement following the sale of a security -- to escape liability under Section 11 for material misrepresentations or omissions in those supplements.

Second, defendants devote three sentences to arguing that "[e]vidence of how and when th[e]se purchases occurred, including evidence about the trade dates, provides critical context that will aid the jury's understanding."  Of course, evidence concerning how the sale of these Certificates occurred is critical.  But defendants do not explain why testimony or argument that the sale of the Certificates occurred before the settlement date is.  In fact, with respect to Section 11 claims, the trade dates are of almost no import.  Accordingly, the dangers of confusing or misleading the jury substantially outweigh the minimal probative value of testimony and argument suggesting that the sale of the Certificates occurred before their settlement dates, and it is inadmissible under Rule 403 in connection with FHFA's Section 11 claims.

### B.   Section 12(a)(2) and the Blue Sky Laws

The trade dates are of similarly minimal relevance to FHFA's claims under Section 12(a)(2) and the Blue Sky laws, since FHFA has chosen to pursue these claims based on the representations in the Prospectus Supplements rather than the less complete disclosures made in the Preliminary Offering Documents.  In a related action, the Court has already rejected another defendant's "temporal interpretation" of the phrase "by means of" in Section 12(a)(2) that sought to limit Section 12(a)(2) liability to representations made prior to plaintiff's decision to purchase the security.  Despite the fact that the Prospectus Supplements (or "Final Prospectus") may have post-dated the GSEs' purchase decisions, sales of the Certificates were still

> made "by means of" . . . the Final Prospectus embodying the information contained in the free writing prospectus.  After all, the lawfulness of the purchase transactions at issue here was contingent on the defendants' supplementing their shelf registration statements and base prospectuses with the information at issue.  The final . . . Prospectuses were thus an essential "means" through which the defendants offered and sold these securities.

December 2012 Opinion, 2012 WL 6592251, at *5.

Rule 159 does not change this.  As the 2005 Release explains, Rule 159 was intended to ensure that Section 12(a)(2) liability attached to a free writing prospectus containing

material misrepresentations or omissions, even if those
misrepresentations or omissions were cured by subsequent
statements made in a prospectus supplement after the time of
sale.  Thus, "for purposes of assessing whether at the time of
sale . . . a prospectus or oral communication or statement
includes or represents a material misstatement or
omi[ssion] . . . information conveyed to the investor only after
the time of sale . . . should not be taken into account."  2005
Release, 2005 WL 1692642, at *73.

Nothing in the 2005 Release suggests that Rule 159 was
meant to relieve defendants of liability under Section 12(a)(2)
for material misstatements or omissions in a prospectus
supplement issued after the time of sale.  As explained above,
the sale is still made "by means of" a later-filed prospectus
supplement, which may be the only document including the
specific information about the securities required by the
Securities Act and SEC regulations.

Indeed, the SEC carefully stated that "the time at which an
investor has taken the action the investor must take to become
committed to purchase the securities, and has therefore entered
into a contract of sale, is one appropriate time to apply the
liability standard[] of Section 12(a)(2)."  Id. (emphasis
supplied) (citation omitted).  The SEC explained that "the time
of contract of sale can be the time the purchaser either enters

into the contract (including by virtue of acceptance by the seller of an offer to purchase) or completes the sale," as the statutory definition of "sale" includes "every contract of sale." Id. at *73 n.394 (emphasis supplied).  Indeed, the Securities Act defines the term "sale" to include "every contract of sale or disposition of a security or interest in a security, for value," and the term "offer for sale" to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3).

Defendants' interpretation of Rule 159 requires a strained reading of the Rule's text.  The Rule addresses an analysis of "whether a prospectus or oral statement included an untrue statement of a material fact or omi[ssion]."  17 C.F.R. § 230.159(a).  It would be strange indeed to instruct that, in an analysis of a prospectus supplement filed after the time of sale, "any information conveyed to the purchaser only after such time of sale . . . will not be taken into account," as this would require a court to consider nothing at all.  If the SEC wished to effect such a sweeping change to the regulatory scheme and to exclude later-filed prospectus supplements from Section 12(a)(2)'s ambit, the SEC would have said so.  And it would have

given some intimation of this substantial limitation of Section 12(a)(2) in the 2005 Release.  It did not.[4]

Rather, in response to criticism of the usefulness of "a prospectus that comes with the security" and the practice of delivering a "final prospectus . . . after an investment decision is made," the SEC stated, "The final prospectus also can be a basis for liability claims under Securities Act Section 12(a)(2)."  2005 Release, 2005 WL 1692642, at *100 n.555 (citation omitted).  The SEC noted that Rule 159 "also provide[s] that liability under Section 12(a)(2) is assessed based on the information conveyed at the time of the contract of sale."  Id. (emphasis supplied).  Indeed, under Section 12(a)(2), liability attaches to misrepresentations in connection with any "offer[] or s[ale]" of a security; there is no reason that misrepresentations in different documents, provided at different points in time in connection with distinct "offers," would not give rise to multiple causes of action.  Because Section 12(a)(2)'s damages are rescissory, there would no risk of double-recovery, and a plaintiff would only have to prove one of these claims to recover fully.  As the 2005 Release pointedly

---

[4] It is not at all clear that the SEC would be empowered to interpret Section 12(a)(2) in this fashion, as the statute clearly reaches prospectus supplements filed after the time of sale where those supplements are required by law to render the offering itself valid under the Securities Act.

explained, "Professor Louis Loss has noted that '[a] prospectus that comes with the security does not tell the investor whether or not he or she should buy; it tells the investor whether he has acquired a security or a lawsuit.'"  <u>Id.</u> (citing L. Loss & J. Seligman, <u>Securities Regulation</u>, § 2-b-3 (3d ed. 2001)).

Accordingly, Rule 159 only reaches "a prospectus or oral statement" made before the time of sale, and does not limit an investor's rights under Section 12(a)(2) to recover for misrepresentations in an offering document setting out details required by the Securities Act to render the offering legal. Because material misrepresentations and omissions in the Prospectus Supplements are actionable under Section 12(a)(2) and the Blue Sky laws regardless of the trade dates, the trade dates are no more relevant to those claims than they are to FHFA's Section 11 claims.[5]

**CONCLUSION**

FHFA's motion <u>in limine</u> of October 14, 2014 to prohibit defendants from eliciting testimony and offering argument that

---

[5] Today, a <u>Corrected December 2012 Opinion</u> is being issued to eliminate the final paragraph in its discussion of Section 12(a)(2).  That paragraph spoke of an affirmative defense for information not otherwise conveyed prior to the time of the contract of sale.  Any suggestion that such a defense might exist regarding information contained in a prospectus supplement was error.

the sale of a Certificate was consummated before the

Certificate's settlement date is granted.

SO ORDERED:

Dated:    New York, New York
          December 18, 2014

                    _____
                         DENISE COTE
              United States District Judge