```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
FEDERAL HOUSING FINANCE AGENCY,         :       11cv6201 (DLC)
                                        :
                Plaintiff,              :       OPINION & ORDER
                                        :
        -v-                             :
                                        :
                                        :
NOMURA HOLDING AMERICA, INC., et al.,   :
                                        :
                Defendants.             :
                                        :
----------------------------------------X
```

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For defendants Nomura Holding America, Inc., Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca:

David B. Tulchin
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

For defendant RBS Securities Inc.:

Thomas C. Rice
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

This Opinion addresses a motion in limine brought by plaintiff Federal Housing Finance Agency ("FHFA") to prohibit defendants[1] from introducing documents or testimony related to Fannie Mae's or Freddie Mac's automated underwriting systems or from relying on recommendations from those systems in arguments concerning falsity or materiality of the misrepresentations alleged in this action.[2] For the following reasons, the motion is granted.

## BACKGROUND

FHFA, acting as conservator for Fannie Mae and Freddie Mac (together, the "Government Sponsored Enterprises" or "GSEs"), filed suit on September 2, 2011 against defendants alleging that the offering documents ("Offering Documents") used to market and sell seven securities (the "Certificates") to the GSEs associated with residential mortgage-backed securities ("RMBS") contained material misstatements or omissions. RMBS are

---

[1] Defendants are Nomura Holding America, Inc., Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca ("Nomura"); and RBS Securities Inc. ("RBS").

[2] FHFA also requested an order barring defendants from relying on these recommendations in arguments concerning defendants' statute of limitation defenses, but those defenses have since been stricken. See FHFA v. Nomura Holding Am., Inc., --- F. Supp. 3d ---, 11cv6201 (DLC), 2014 WL 6462239 (S.D.N.Y. Nov. 18, 2014) ("Nomura").

2

securities entitling the holder to income payments from pools of residential mortgage loans ("Supporting Loan Groups") held by a trust.

FHFA brought these claims pursuant to Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), as well as Virginia's and the District of Columbia's Blue Sky laws.  This lawsuit is the sole remaining action in a series of similar, coordinated actions litigated in this district by FHFA against banks and related individuals and entities to recover losses experienced by the GSEs from their purchases of RMBS.  A description of the litigation and the types of misrepresentations at issue in each of these coordinated actions, including the instant case, can be found in Nomura, 2014 WL 6462239, at *3-6, *16-17.

The GSEs purchased the seven Certificates between November 30, 2005 and April 30, 2007.  The Certificates had an original unpaid principal balance of approximately $2.05 billion, and the GSEs paid slightly more than the amount of the unpaid principal balance when purchasing them.  Six were purchased by Freddie Mac; one was purchased by Fannie Mae.  The GSEs have retained the Certificates.

Nomura acted as sponsor and depositor for all seven of the Certificates, and as the sole lead underwriter and seller for two of them.  RBS was the sole lead underwriter for three of the

3

Certificates and a co-lead underwriter for a fourth.  For an explanation of the RMBS securitization process, including the roles of mortgage loan originators, sponsors, and underwriters, see Nomura, 2014 WL 6462239, at *4-6.

**I.   The GSEs**

Fannie Mae and Freddie Mac are government-sponsored enterprises created to ensure liquidity in the mortgage market. Id. at *6.  Fannie Mae was established in 1938, Freddie Mac in 1970.  Id.  Their primary business is to purchase mortgage loans from originators that conform to the GSEs' standards ("conforming loans") and then either hold those loans on their own books or securitize them for offer to the public.  Id.  This side of their business is known as the "Single Family" side. Id.

The GSEs' charters require that they assist "activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities," as well as "promote access to mortgage credit throughout the Nation (including central cities, rural areas, and underserved areas)."  12 U.S.C. § 1716(3)-(4) (Fannie Mae); id. § 1451 note (Freddie Mac).  The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Pub. L. 102-550, §§ 1331-36, 106 Stat. 3672 (1992), authorizes the U.S. Department of Housing and Urban Development

to set annual housing goals for the GSEs with respect to low- and moderate-income family housing, underserved areas, and special affordable housing (the "Housing Goals").  Id. §§ 1332-34.

In 2000, the GSEs began to purchase quantities of Alt-A and subprime loans as well.[3]  Nomura, 2014 WL 6462239, at *7.  During this period, some portion of the Alt-A and subprime loans the GSEs purchased were non-conforming loans -- that is, they were underwritten to the seller's guidelines (with certain modifications), not the GSEs'.  Id.

Each GSE also conducts a second business, purchasing and holding private label RMBS ("PLS").  Id.  This is a substantially smaller portion of their activities.  Id.  It is the PLS that the GSEs purchased from defendants that prompt the claims in this lawsuit.  Id.  The GSEs held approximately $100 billion in PLS in 2002, with roughly $35 billion in subprime and $3 billion in Alt-A PLS; at their peak, in 2005, the GSEs' PLS holdings had grown to approximately $350 billion, with roughly $145 billion in subprime and $40 billion in Alt-A PLS.  Id.  In the two years prior to September 7, 2007, the GSEs purchased

---

[3] Mortgage loans are often divided, by credit risk, into three classes.  In order of ascending risk, they are "prime" loans, "Alt-A" loans, and "subprime" loans.  Nomura, 2014 WL 6462239, at *2 n.5.

5

more than $251 billion in PLS, approximately 8% of the $3 trillion in PLS issued in those years.  Id.

## II. The GSEs' Automated Underwriting Systems

Between 2005 and 2007, the GSEs made available to mortgage loan originators certain rule-based automated underwriting systems ("AUS").  Fannie Mae's AUS was called Desktop Underwriter ("DU"); Freddie Mac's was called Loan Prospector ("LP").  In Fannie Mae's "Guide to Underwriting with DU" ("DU Guide"), Fannie Mae defined DU as "an automated underwriting system developed by Fannie Mae to help mortgage lenders make informed credit decisions on conventional conforming and government loans."  As the DU Guide explained:

> Fannie Mae is committed to working with lenders to achieve our shared goals of increasing homeownership, especially for low- and moderate-income borrowers, while at the same time preventing unlawful housing discrimination.  DU helps lenders thoroughly evaluate the credit risk of home mortgage loans.  It complements -- not replaces -- the considered judgment of experienced underwriters.  DU provides an objective assessment of the risk of each mortgage application based on the past performance of more than two million mortgage loans.  With DU, lenders have access to fast, objective underwriting recommendations that are specific to each mortgage application.  The system conducts this analysis uniformly, and without regard to race, gender or other prohibited factors.

According to the DU Guide, an originator would access DU online, input certain information concerning the loan, and then receive a report and "recommendation" from DU that "identifie[d]

6

both the credit risk assessment of the loan and the eligibility of the loan according to Fannie Mae's guidelines that are in place in DU."  An "Approve/Eligible" recommendation would indicate that, "[b]ased on the data submitted to DU, the loan appears to meet both Fannie Mae's credit risk and eligibility requirements;" but originators were warned they "must apply due diligence when reviewing the documentation in the loan file to determine if there is any potentially derogatory or contradictory information <u>that is not part of the data analyzed by [DU]</u>."  (Emphasis supplied.)  Custom DU was a related AUS that allowed originators to "develop their own automated underwriting guidelines for conforming and nonconforming loans" in order to assist in originators' underwriting to their own guidelines.

Like Fannie Mae's DU, Freddie Mac's LP was a rules-based underwriting program in which originators input loan characteristics and then received a report and recommendation concerning credit risk and eligibility for purchase by the GSE. LP was only available to prime originators -- not subprime or Alt-A lenders -- who had passed Freddie Mac's approval process. LP's report concerning credit risk rated loan applications either "accept," which meant an eligible loan could be sold to Freddie Mac's Single Family business with a release from certain representations and warranties, or "caution," which meant an

7

eligible loan could be sold to Freddie Mac without that release. If Freddie Mac's Single Family business did purchase a loan processed by LP, it retained the right to require the originator to repurchase the loan if it did not comply with credit criteria or did not meet underwriting guidelines.

### III. Minimum Industry Standards

In connection with his reunderwriting of a sample of the mortgage loans at issue in this action -- which are subprime or Alt-A loans -- FHFA's expert Robert W. Hunter ("Hunter") compiled a set of "minimum industry standards" for the years 2002 to 2007 based on his experience in the RMBS industry, discussions with underwriters, consultations with other underwriting experts, and reviews of guidelines in use during that time for subprime and Alt-A products.  Hunter notes that, after the late 1990s, the industry saw a "bifurcation of the market into prime and subprime guidelines."  Hunter's guidelines reflect his "assessment of the minimum requirements across the industry at that time for different [mortgage loan] product types."  FHFA explains that it is offering testimony regarding the minimum industry standards for reunderwriting its sample of loans drawn from the Supporting Loan Groups backing the Certificates in the following three circumstances: where an originator's guidelines "did not address a fundamental underwriting requirement;" where the effective date of the

8

originator's guidelines predated the loan origination date by more than 90 days; and where no originator guidelines for the sample loans were located.  Defendants' expert rebuttal of Hunter makes no mention of the GSEs' AUS.[4]

### DISCUSSION

FHFA filed the instant motion in limine on October 14, requesting that defendants be prohibited from introducing documents or testimony related to the GSEs' AUS or from relying on recommendations from those systems in arguments concerning falsity or materiality of the alleged misrepresentations about the Certificates.  Defendants opposed on October 24, arguing that the GSEs' AUS are relevant to a single issue: the existence of certain minimum industry standards among mortgage loan underwriters.  Defendants did not argue that this evidence was relevant on any other of the many grounds anticipated in FHFA's motion.  This motion was fully submitted on November 3.

Pursuant to Rule 403, Fed. R. Evid., "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting

---

[4] Defendants' rebuttal expert does cite to Freddie Mac's Single Family business's use of certain Alt-A and subprime mortgage loans as collateral for guaranteed Structured Pass-Through Certificates ("T-Deals"), which were sold to investors.  Freddie Mac guaranteed payments on its T-Deals, which were not governed by the Securities Act or Blue Sky laws.

9

time, or needlessly presenting cumulative evidence." Accord United States v. Dupree, 706 F.3d 131, 138 (2d Cir. 2013). A court must "conscientiously balance[] the proffered evidence's probative value with the risk for prejudice." United States v. Massino, 546 F.3d 123, 132 (2d Cir. 2008) (citation omitted). "'[U]nfair prejudice' speaks to the capacity of some concededly relevant evidence to lure the factfinder into [rendering its verdict] on a ground different from proof specific to the [claims brought]." Id. (citation omitted). For instance, the proffered evidence may have a "tendency . . . to prove some adverse fact not properly in issue or unfairly excite emotions against the [opposing party]." Id. at 133 (citation omitted). When conducting this balancing, a court "should consider the possible effectiveness of a jury instruction and the availability of other means of proof in making a Rule 403 determination." Dupree, 706 F.3d at 138.

Evidence concerning the GSEs' AUS is inadmissible. The AUS were rules-based tools to be used with conforming prime loans, not the nonconforming subprime and Alt-A loans at issue in these actions. Whether a rules-based implementation of a GSE's guidelines for conventional prime loans set certain standards says very little about industry standards for underwriting guidelines addressing the riskiest nonconforming loans. Second, to the extent that the GSEs securitized any of the loans they

purchased after the loan had survived AUS review, the GSEs retained the risk of a loan's default and did not pass on that risk to the buyer of the security. In contrast, in the securitizations at issue here, defendants passed on the risk of default to certificate-buyers.

Moreover, one of the GSEs' purposes was to promote affordable housing goals and to promote liquidity in the secondary market for mortgages generally. These purposes might lead the GSEs to accept certain risks, including looser underwriting in certain respects, at which the industry at large would have balked if applied to nonconforming loans to be sold to others. Accordingly, the GSEs' AUS have little to do with any minimum industry standards applicable to nonconforming subprime and Alt-A loans. It is thus unsurprising that defendants' expert rebuttal of Hunter makes no mention of the GSEs' AUS.[5]

Yet, such evidence poses a real danger of confusing and misleading the jury, as well as wasting the jury's time. The AUS are complicated, and evidence concerning their purpose, their structure, and the reasons behind the GSEs' decisions to

---

[5] Custom DU, which was simply a tool permitting originators to create their own automated underwriting system based on rules of their choosing, has even less relevance to Hunter's proposed minimum industry standards, as it did not reflect any particular underwriting guidelines.

11

include or not include certain features, would take substantial time.  Even after proper instructions, a jury is likely to improperly compare the AUS to defendants' underwriting processes and improperly consider the structure of the AUS in determining the existence of any minimum industry standards in underwriting the nonconforming subprime and Alt-A loans at issue in this case.  At best, this mini-trial concerning the AUS would be a substantial distraction and waste of time.  The limited probative value of evidence concerning the AUS is substantially outweighed by these dangers.  Accordingly, it is inadmissible under Rule 403.

In their opposition, defendants set out seven "[i]llustrative examples of the relevance of Loan Prospector and Desktop Underwriter concerning 'minimum industry standards.'"  None is persuasive.  A discussion of the first two examples will suffice.

In the first example, defendants purport to challenge Hunter's claim that it was a minimum industry standard not to permit the combined loan-to-value ("CLTV") ratio to exceed 100% -- i.e., to extend a loan for more than the borrower's remaining equity in the house.  They claim that Fannie Mae's DU rebuts this, because it permitted a single exception to this rule (for conforming prime loans), which permitted a CLTV ratio up to 105% where the subordinate financing was a "Community

12

Seconds loan" provided by a governmental housing finance agency, a nonprofit organization, or an employer.  The Community Seconds program "supports affordable housing partnerships among government entities, nonprofit organizations, . . . and employers in a community" and "enables [such entities] to leverage [their] limited . . . funds they have earmarked for homeownership programs . . . to help more families achieve homeownership."  Fannie Mae, Announcement 06-02, Enhancements to the Community Seconds Option (Mar. 13, 2006), <u>available at</u> https://www.fanniemae.com/content/announcement/06-02.pdf.  The fact that Fannie Mae permitted a limited exception (among conforming prime loans) to Hunter's proposed industry standard in order to facilitate a discrete program promoting homeownership in accordance with Fannie Mae's statutory mission has very little relevance to industry standards for nonconforming loans, many of which were approved with the intention that they be securitized and sold by private financial institutions to the public.

    Defendants' second example concerns Hunter's proposed standard of "verify[ing] the borrower's employment by obtaining at least a verbal or written Verification of Employment ('VOE') form."  Defendants argue that evidence that LP "merely recommended that the lender" verify the borrower's source of income but did not "require" it, and that DU "only requires a

13

verbal [VOE]," is relevant to rebut Hunter's claim.  That DU "requires a verbal [VOE]" supports Hunter's standard, and the fact that LP "recommended" the lender obtain a VOE is fully consistent with it.  Again, LP did not purport to set out comprehensive guidelines and concerned conforming prime loans. This evidence has very little relevance to Hunter's list of minimum industry standards in the subprime and Alt-A origination industry, and any relevance is substantially outweighed by the burden on the jury's time that would necessarily accompany receipt of this evidence and argument, and by the risk of juror confusion.

## CONCLUSION

FHFA's motion in limine of October 14, 2014 to prohibit defendants from introducing documents or testimony related to the GSEs' AUS is granted in connection with any evidence concerning minimum industry standards or the other issues identified in FHFA's motion.

SO ORDERED:

Dated:    New York, New York
          December 18, 2014

*(signature)*
_____
DENISE COTE
United States District Judge

14