## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY, AS
CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

      Plaintiff,

      -against-

NOMURA HOLDING AMERICA INC., et al.,

      Defendants.

No. 11-cv-6201 (DLC)

ECF Case

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
## MOTION TO EXCLUDE TESTIMONY OF ROBERT W. HUNTER
## BASED ON PURPORTED "MINIMUM INDUSTRY STANDARDS"

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

November 26, 2014

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................3

    A.    The Offering Documents ......................................................................................3

    B.    Hunter's Report and Methodology ........................................................................5

ARGUMENT ............................................................................................................................8

I.    Hunter's Testimony About So-Called "Minimum Industry Standards" Is Not
Relevant to the Disclosures in the Offering Documents ............................................8

    A.    The Offering Documents Do Not Represent that the Underlying Loans
Comply with "Minimum Industry Standards" ......................................................9

    B.    Hunter's Contentions About "Implicit" Statements in the Offering
Documents Are Incorrect ....................................................................................12

II.    Hunter's Made-For-Litigation "Minimum Industry Standards" Fail to Meet the
Daubert Requirements for Reliability ......................................................................13

    A.    No Industry-Adopted Set of "Minimum Industry Standards" Existed
During the Relevant Time Period ........................................................................13

    B.    Hunter's "Minimum Industry Standards" Were Developed in Connection
with the Re-underwriting and Review of Loans in This and Related
Litigation and Are Therefore Not the Product of a Tested and Reviewed
Methodology ......................................................................................................16

    C.    Hunter's Methodology Is Based on an Arbitrarily Selected Set of
Underwriting Guidelines from a Limited Number of Originators ........................18

    D.    Hunter's "Experience" Cannot Serve as the Basis for His "Minimum
Industry Standards" under Daubert ....................................................................20

    E.    Hunter's "Minimum Industry Standards" Were Not, In Fact, the
"Minimum" ........................................................................................................21

        1.    Investigation of All Credit Inquiries Within 90 Days ..............................21

        2.    150% "Payment Shock" ........................................................................22

        3.    55% DTI ...............................................................................................23

## TABLE OF CONTENTS

(Continued)

**Page**

4.   Freddie Mac and Fannie Mae Had More Lenient Guidelines ...................23

CONCLUSION ............................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Algarin* v. *New York City Dep't of Corr.*,
460 F. Supp. 2d 469 (S.D.N.Y. 2006) ...................................................................20

*Barletta Heavy Div., Inc.* v. *Travelers Ins. Co.*,
2013 WL 5797612 (D. Mass. Oct. 25, 2013) .......................................................17

*Bazile* v. *City of N.Y.*,
215 F. Supp. 2d 354 (S.D.N.Y. 2002)......................................................................9

*Berk* v. *St. Vincent's Hosp. & Med. Ctr.*,
380 F. Supp. 2d 334 (S.D.N.Y. 2005) ...................................................................20

*Daubert* v. *Merrell Dow Pharmaceuticals Inc.*,
509 U.S. 579 (1993) ....................................................................................... *passim*

*In re Electronic Books Antitrust Litig.*,
2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) ......................................................10

*Fed. Housing Fin. Agency* v. *UBS Americas, Inc.*,
2013 WL 3284118 (S.D.N.Y. June 28, 2013) .......................................................11

*Gen. Electric Co.* v. *Joiner*,
522 U.S. 136 (1997) .................................................................................................8

*Grdinich* v. *Bradlees*,
187 F.R.D. 77 (S.D.N.Y. 1999) .............................................................................15

*Int'l Fund Mgmt. S.A.* v. *Citigroup Inc.*,
822 F. Supp. 2d 368 (S.D.N.Y. 2011) ...................................................................12

*J & R Mktg., SEP* v. *Gen. Motors Corp.*,
549 F.3d 384 (6th Cir. 2008) .................................................................................12

*Johnson* v. *Manitowoc Boom Trucks, Inc.*,
484 F.3d 426 (6th Cir. 2007) .................................................................................15

*Kumho Tire Co., Ltd.* v. *Carmichael*,
526 U.S. 137 (1999) .................................................................................................8

*LaSalle Bank Nat'l Ass'n* v. *CIBC Inc.*,
2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ...................................................10, 11

## <u>TABLE OF AUTHORITIES</u>
(Continued)

**Page(s)**

### Cases

*Miller* v. *Stryker Instruments*,
  2012 WL 1718825 (D. Ariz. Mar. 29, 2012) ........................................................13

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ..............................................................................12

*Peitzmeier* v. *Hennessy Indus., Inc.*,
  97 F.3d 293 (8th Cir. 1996) ...............................................................................16

*Playtex Products, Inc.* v. *Procter & Gamble Co.*,
  2003 WL 21242769 (S.D.N.Y. May 28, 2003) ...................................................19

*R.F.M.A.S., Inc.* v. *So*,
  748 F. Supp. 2d 244 (S.D.N.Y 2010) ................................................................12

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................................9

*In re Rezulin Prods. Liab. Litig.*,
  369 F. Supp. 2d 398 (S.D.N.Y 2005) ................................................................16

*Smith* v. *Prudential Ins. Co. of Am.*,
  2012 WL 1965405 (M.D. Tenn. May 31, 2012) .................................................13

*Stanczyk* v. *Black & Decker, Inc.*,
  836 F. Supp. 565 (N.D. Ill. 1993) ......................................................................16

*Wisdom* v. *TJX Companies, Inc.*,
  410 F. Supp. 2d 336 (D. Vt. 2006) .....................................................................15

### Rules

Fed. R. Evid. 401 ...........................................................................................9, 10

Fed. R. Evid. 402 ........................................................................................1, 9, 10

Fed. R. Evid. 403 ...........................................................................................1, 10

Fed. R. Evid. 702 ........................................................................................1, 2, 9

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Action | *FHFA* v. *Nomura Holding America Inc.*, No. 11 Civ. 6201 (DLC) |
| Amended Complaint | Plaintiff's June 28, 2012, Amended Complaint in this Action |
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin and N. Dante Larocca |
| DTI | The ratio of a borrower's debt obligations to the borrower's income |
| Ex. | Exhibit to the November 26, 2014 Declaration of Kunal J. Choksi submitted in support of this motion |
| Fannie Mae | Federal National Mortgage Association |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| Hunter Report | Expert Report of Robert W. Hunter, Regarding the Underwriting of Mortgage Loans Underlying the Nomura Securitizations, dated May 15, 2014 |
| Hunter Rebuttal Report | Rebuttal Expert Report of Robert W. Hunter, Regarding the Underwriting of Mortgage Loans Underlying the Nomura Securitizations, dated October 6, 2014 |
| Offering Documents | The offering materials for the Securitizations, including documents filed with the Securities and Exchange Commission |
| Plaintiff | Federal Housing Finance Agency |
| RMBS | Residential mortgage-backed securities |
| Sample Loans | The loans comprising the sample of approximately 100 loans per Securitization selected by plaintiff's expert Dr. Charles Cowan and re-underwritten by Robert W. Hunter |
| Securitizations | The seven RMBS purchased by Freddie Mac and Fannie Mae from Nomura that are the subject of this Action |

Defendants respectfully submit this memorandum in support of their motion to exclude under Federal Rules of Evidence 402, 403 and 702 and *Daubert* v. *Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 597 (1993), the trial testimony and opinions of plaintiff's designated expert Robert W. Hunter to the extent that he refers to or relies upon any "minimum industry standards."

## PRELIMINARY STATEMENT

In its Amended Complaint, plaintiff alleges that defendants made material misrepresentations in the Offering Documents for seven RMBS Securitizations that defendants sold to Freddie Mac and Fannie Mae from November 2005 through April 2007.  These allegedly included misrepresentations about compliance with the underwriting guidelines of the lender who made the loans or, for some securitizations, with specific underwriting criteria disclosed in the prospectus supplement.  (*See*, *e.g.*, Ex. 1 (Amended Complaint) at ¶¶ 5, 77, 78, 127, 129.)

In support of those allegations, plaintiff's designated expert Robert W. Hunter ("Hunter") intends to opine at trial that certain loans backing the Securitizations[1] failed to comply with (a) the underwriting guidelines described in the Offering Documents, or (b) a set of purported "minimum industry standards" that Hunter "distilled" for purposes of this litigation. (Ex. 2 (Hunter Report) at 87-89.)  Hunter and two other "experts" for plaintiff—not an industry body or regulator or trade group—came up with these "standards."  He claims that the 59 "minimum industry standards" for which he advocates "constituted the most lenient standards found in underwriting guidelines in the mortgage loan industry between 2002 and 2007."  (Ex. 2

---

[1]     Hunter reviewed a certain number of loans in each Securitization (the "Sample Loans")— approximately 100 loans for each of the seven.  The total sample included 796 loans across the seven Securitizations.  Of those 796, Hunter re-underwrote 723.  Ex. 2 (Hunter Report) at 90.

(Hunter Report) at 87-88; *see generally* Ex. 4 (Exhibit 7 to the Hunter Report).)  Hunter uses

these purported "minimum industry standards" for several purposes, including (a) as a substitute

for the lenders' actual written underwriting guidelines when those guidelines are unavailable or

where they do not contain requirements for a particular criterion, and (b) as a supplement to

lenders' guidelines even where those guidelines exist and are available.  (Ex. 2 (Hunter Report)

at 88-89.)  Hunter's opinion testimony about "minimum industry standards" should be excluded

under Rules 702, 402 and 403 of the Federal Rules of Evidence and *Daubert*.

   *First*, and most fundamentally, it is improper for Hunter to testify about whether

defendants complied with these supposed "minimum industry standards" for the underwriting of

loans where none of the Offering Documents ever represented that the loans were underwritten

in accordance with any minimum industry standards.  Plaintiff's causes of action necessarily are

limited to the alleged falsity of defendants' actual disclosures.  Whether the loans at issue also

met purported "minimum industry standards" is entirely irrelevant.  There is no authority for

allowing plaintiff to call an expert to testify that disclosures never made in the Offering

Documents were false.  Hunter's opinions about "minimum industry standards" are not at all

"tied to the facts of the case," and they therefore cannot "aid the jury in resolving a factual

dispute" and must be excluded under *Daubert*.  509 U.S. at 591 (citation omitted).

   *Second*, Hunter's "minimum industry standards" testimony should be excluded

because the methodology he used to develop those standards is unreliable and the standards

themselves are demonstrably erroneous.  As Hunter testified, there were no industry-adopted

underwriting "minimum industry standards" that existed from 2005 to 2007.  It is undisputed that

no trade organization or standard-setting body promulgated any minimum industry underwriting

standards.

Moreover, the methodology Hunter used to come up with his "minimum industry standards" is flawed. These "standards" were developed and revised in 2013 by three experts for plaintiff, including Hunter, while they were re-underwriting loans for this and related actions. Hunter's methodology has by definition never before been tested because it was developed for this litigation. His methodology for determining what he believes were "minimum industry standards" is also unreliable because it is not the product of a thorough study of prevailing underwriting guidelines across originators that existed at the time, but is instead an entirely subjective study of an arbitrary and narrow selection of underwriting guidelines from only several originators (most of which did not make the loans in this case). It is unsurprising that Hunter never undertook a comprehensive study—indeed, such a study would be virtually impossible given the large number of originators and the changing underwriting guidelines that existed in the relevant period. The unreliability of Hunter's methodology is also revealed by its results: Hunter's "minimum industry standards," when compared to underwriting guidelines that existed at the time, were not minimums at all—as Hunter also conceded at deposition. In fact, Hunter's "most lenient" standards are even stricter in some respects than what Freddie Mac and Fannie Mae themselves required for loans they purchased from originators during that period.

## BACKGROUND

### A.    The Offering Documents

The Offering Documents at issue made certain representations about the underwriting standards applicable to the loans backing the securities. For the security purchased by Fannie Mae, 2005-AR6, the Offering Documents represented that the loans in the securitization conformed to underwriting criteria described in the prospectus, not to originator underwriting guidelines: "All of the Mortgage Loans have been purchased by the sponsor from

various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section." (Ex. 6 (2005-AR6 Prospectus Supplement) at NOM-FHFA_04811894.) The prospectus describes underwriting standards which generally applied to the loans, including "modified standards," and noted that certain loans were originated under "reduced documentation, no-documentation or no-ratio programs, which require less documentation and verification than do traditional full documentation programs." (*Id.* at NOM-FHFA_04811896.) The Offering Documents for 2005-AR6 neither describe any guidelines of any originator nor do they represent that any such guidelines were applied.

For four securitizations, the Offering Documents described in general terms the underwriting guidelines of specific originators whose loans comprised more than 20% of the principal balance of the securitization, and represented that the loans had been "generally originated" in accordance with those originators' guidelines. (Ex. 7 (2006-HE3 Prospectus Supplement) at NOM-FHFA_04620965; Ex. 8 (2007-1 Prospectus Supplement) at NOM-FHFA_05142020; Ex. 9 (2007-2 Prospectus Supplement) at NOM-FHFA_05591413-1415; Ex. 10 (2007-3 Prospectus Supplement) at NOM-FHFA_04732708- NOM-FHFA_04732712.) For all other loans backing the securitization, the Offering Documents represented that "[a]ll of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section." (Ex. 7 (2006-HE3 Prospectus Supplement) at NOM-FHFA_04620972; Ex. 8 (2007-1 Prospectus Supplement) at NOM-FHFA_05142025; Ex.

9 (2007-2 Prospectus Supplement) at NOM-FHFA_05591413; Ex. 10 (2007-3 Prospectus

Supplement) at NOM-FHFA_04732712.)  The Offering Documents then described underwriting

standards which generally applied to the loans, none of which were specific to any originator.

   For two securitizations, all of the loans backing the securitizations were originated

by the same originator (Fremont).  For these deals, the Offering Documents represented that the

loans backing the securitizations were underwritten "generally in accordance with" the

guidelines of the originator and provided a description of the "guidelines believed by the

Depositor to have been applied, with some variation."  (Ex. 11 (2006-FM1 Prospectus

Supplement) at NOM-FHFA_04729543; Ex. 12 (2006-FM2 Prospectus Supplement) at NOM-

FHFA_04638395.)

   As Hunter has conceded, none of the Offering Documents ever say that the loans

were underwritten in accordance with some set of "minimum industry standards" of any kind.

(Ex. 3 (Hunter Tr.) at 227:19-22.)  None refers to any "industry standards" of any sort.

### B. Hunter's Report and Methodology

   Hunter is a self-employed consultant who in recent years has provided litigation

and mortgage industry consulting services. [2]  (Ex. 13 (Exhibit 4 to Hunter Report) at 1.)  Plaintiff

engaged Hunter to re-underwrite a sample of the loans underlying each of the seven

Securitizations, and Hunter intends to testify at trial that the Offering Documents misrepresented

the loans' compliance with the underwriting guidelines of the lenders who originated them.

Hunter and his staff reviewed 723 loan files for loans backing the seven Nomura Securitizations

and attempted to identify various underwriting defects, including a failure to comply with

---

[2] All of Hunter's litigation engagements, at the time of his report, were RMBS matters for
Quinn Emanuel.  Ex. 3 (Hunter Tr.) at 17:17-23.

purported "minimum industry standards."  (Ex. 2 (Hunter Report) at 109; *see also*, Ex. 14

(Exhibit 2A to Hunter Rebuttal Report).)  He claims to have identified 245 defects (across 186

loans) based on a failure to comply with purported "minimum industry standards."  (Ex. 15

(Excerpt of Exhibit 2A to Hunter Rebuttal Report).)

    For each of the loans in his sample, Hunter "instructed teams of re-underwriters to

review the contents of each loan file and compare them to the following:  (1) the representations

concerning the Mortgage Loans contained in the Prospectus Supplements, (2) the applicable

originators' underwriting guidelines, and (3) the 'minimum industry standards' developed in

conjunction with this review."  (Ex. 2 (Hunter Report) at 95.)  Even in instances in which the

underwriting guidelines for the specific relevant lender were available, Hunter "directed the re-

underwriting teams to compare the loan file to the [applicable] guidelines and to also note

violations of any minimum industry standards that the particular underwriting guidelines did not

address."  (Ex. 2 (Hunter Report) at 88.)

    Hunter set forth 59 "minimum industry standards" in his Report.  (*See* Ex. 4

(Exhibit 7 to Hunter Report).)  He stated that he identified those standards in this way:

> I distilled the "minimum industry standards" that were used from
> 2002 through 2007 from (i) my own extensive experience in the
> industry and knowledge of standards at the time; (ii) discussions
> with underwriters on my staff and members of the re-underwriting
> teams who worked in the mortgage loan industry during that time;
> (iii) consultation with other re-underwriting experts [for plaintiff];
> and (iv) a review of underwriting guidelines, including manuals,
> references, matrices and guides, from originators during that time.

(Ex. 2 (Hunter Report) at 87.)[3]  Examples of his "minimum industry standards" include:

---

[3]  In his report, Hunter said: "I distilled the minimum industry standards . . . ."  At
deposition, Hunter conceded that "he" did not do so, at least not by himself.  He testified that the

(<em>footnote continued</em>)

- "The lender must investigate whether the borrower sought (and/or obtained) credit that was not listed on the borrower's origination credit report.  This investigation includes an inquiry into any credit inquiries within 90 days preceding the loan application."

- "The borrower's debt-to-income ('DTI') ratio may not exceed 55%."

- "The borrower's new payment obligation may not exceed 150% of the borrower's current housing expense ('payment shock')."

- "The lender must verify the borrower's history of housing payments.  For an Alt-A mortgage, the borrower must have neither a 30-day late payment within the past 12 months, nor a 60-day late payment within the past 24 months.  For a subprime mortgage, the borrower may have one 30-day late payment within the past 12 months, and one 60-day late payment within the past 24 months."

(Ex. 4 (Exhibit 7 to Hunter Report) at 1, 4.)  Hunter does not cite any published work that contains these standards.  In fact, Hunter admits that he "distilled" these "minimum" standards from "thousands" of guidelines he has looked at in connection with this report.  (Ex. 3 (Hunter Tr.) at 257:6-259:11.)  Those "thousands" of guidelines have never been produced to defendants.  In addition, plaintiff's lawyer has conceded that Hunter is relying on "guideline requirements" of several originators that made no loans at issue in this action.  (Ex. 5 (Letter from Ward to Davidoff dated October 20, 2014) at 2.)

Hunter's application of his "minimum industry standards" significantly increases the number of defects he identifies in the Sample Loans.  Hunter alleges that there are 245 underwriting defects in the Sample Loans based on failures to comply with one or more of his "minimum industry standards."  (Ex. 15 (Excerpt of Exhibit 2A to Hunter Rebuttal Report).)  Those 245 defects include the following:

---

(*footnote continued*)

"distillation" was done by three "experts" for plaintiff, one of whom was Hunter himself.  Ex. 3 (Hunter Tr.) at 114:8-114:19.

- 122 defects where Hunter says that the underwriter failed to uncover a borrower misrepresentation of income, debt or occupancy because the underwriter failed to follow the procedures that Hunter says are "minimum";

- 38 defects based on a failure to comply with "minimum industry standards" for investigating a credit inquiry;

- 19 defects where the underwriter failed to assess the borrower's "reasonable ability to repay" in accordance with Hunter's assertion about "minimum industry standards"; and

- 7 defects that "payment shock" to a borrower was higher than allowed by Hunter's "minimum."[4]  (*Id.*)

None of these "defects" constituted a departure from the underwriting guidelines to which the Offering Documents referred.  The causes of action plaintiff asserts here can pertain only to misrepresentations in the Offering Documents, not a failure by underwriters to comply with "standards" to which the Offering Documents never refer.

## ARGUMENT

## I. HUNTER'S TESTIMONY ABOUT SO-CALLED "MINIMUM INDUSTRY STANDARDS" IS NOT RELEVANT TO THE DISCLOSURES IN THE OFFERING DOCUMENTS.

A district court performs the role of "gatekeeper," ensuring that the proponent of expert testimony has made the necessary showing that the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  In addition to assessing the expert's methodology, the district court must consider the application of that methodology to the facts and the validity of the purported results.  *See Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 149 (1999); *Gen. Electric Co.* v. *Joiner*, 522 U.S. 136, 146 (1997).  As part of *Daubert*'s central "fit" requirement, the court should assess whether proffered expert

---

[4]    Hunter defines "payment shock" as "the increase in the borrower's housing obligation from the borrower's previous mortgage or rent payment."  Ex. 2 (Hunter Report) at 31.

testimony is appropriately tailored to an issue actually in dispute in the case. *Daubert*, 509 U.S. at 591; *Bazile* v. *City of N.Y.*, 215 F. Supp. 2d 354, 365 (S.D.N.Y. 2002) (excluding expert testimony that "does not fit the facts of the case"). Courts should exclude expert testimony concerning matters that are immaterial or tangential to the issues in dispute. *See, e.g., In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 544-45 (S.D.N.Y. 2004) (excluding expert testimony regarding an industry's ethical standards where the issue was compliance with legal standards).

> **A.** **The Offering Documents Do Not Represent that the Underlying Loans Comply with "Minimum Industry Standards."**

The Amended Complaint asserts claims under Sections 11 and 12 of the Securities Act with respect to, among other things, the following disclosures in the Offering Documents: (a) "statements about compliance with underwriting guidelines made in the Prospectus and Prospectus Supplement," (b) "key statements with respect to the underwriting standards of entities that originated the loans in the securitizations," and (c) that the underlying loans were made "generally in accordance with" those standards. (Ex. 1 (Am. Compl.) at ¶¶ 77, 78.) Notably, although not mentioned in plaintiff's complaint, the Offering Documents for some securitizations make representations that certain or all loans complied with underwriting criteria set forth in the prospectus supplement, *not* with underwriting guidelines of any of the originators.

The Offering Documents never represented that the underlying loans complied with any "industry standards" for underwriting. The Offering Documents never mention any "minimum industry standards"—or any "industry standards" of any kind, let alone the 59 specific criteria that Hunter has "distilled" for purposes of litigation.

Federal Rule of Evidence 702 permits the use of expert testimony only where the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue."

-9-

FED. R. EVID. 702.  Similarly, for evidence to be relevant and admissible under Federal Rules of

Evidence 401 and 402, it must not only make a fact "more or less probable than it would be

without the evidence," but must also be "of consequence in determining the action."  FED. R.

EVID. 401, 402.  Hunter's proposed testimony that the lenders failed to comply with "minimum

industry standards" is irrelevant to the claims set forth in the Amended Complaint.  Because

compliance with "minimum industry standards" is of no consequence in determining the action,

it "cannot aid the trier of fact in determining any relevant issues."  *In re Electronic Books

Antitrust Litig.*, 2014 WL 1282298, at *13 (S.D.N.Y. Mar. 28, 2014).  Far from being probative

of any issue in dispute, its introduction likely would "confus[e] the issues" and "mislead[] the

jury" because Hunter's proposed testimony is about non-compliance with guidelines that never

existed and to which the Offering Documents never referred.  *Id.*; *see also* FED. R. EVID. 403.

        As this Court has recognized, the very purpose of the re-underwriting process is to

"line up the loan files against the underwriting guidelines."  (Ex. 16 (November 15, 2012

Hearing) at 81:4-6.)[5]  Plaintiff's lawyer agreed, representing to the Court that "[d]epartures from

the underwriting guidelines are the heart of the case."  (Ex. 18 (Oct. 15, 2012 Hearing) at 64:2-

3.)  Hunter's "minimum industry standards" circumvent the very purpose of this long and costly

re-underwriting process by comparing the loans in the Securitizations to a set of guidelines that

no originator ever used and that no investor had any reason to believe were used.

---

[5]      The Court further observed that, "to the extent the prospectus supplement talks about the
ways the loans do or do not match guidelines for the specific underwriter, then the
misrepresentation would necessarily be about that underwriter's guidelines."  Ex. 17 (February 7,
2013 Hearing) at 18:21-24.

In *LaSalle Bank Nat'l Ass'n* v. *CIBC Inc.*, 2012 WL 466785, at *12 (S.D.N.Y. Feb. 14, 2012), the court excluded similar expert opinion testimony regarding "industry standards, customs, and practices" for mortgage underwriting.  Plaintiff had alleged that defendant breached representations that certain loans "complied at origination, in all material respects, with all of the terms, conditions and requirements of [defendant's] . . . underwriting standards applicable to [the loans]."  *Id.* at *2.  Finding that the issue was "whether [defendant] complied with its contractual obligations and representations—not whether it complied with industry standards," *id.* at *12, the court excluded testimony from an expert about so-called "industry standards" for underwriting on the ground that "[this] testimony is irrelevant because the issue here is [defendant]'s compliance with its own standards, not industry standards."  *Id.* at *17.  The same principle should apply here, where the Offering Documents represented that the loans were originated "in accordance with" or "generally in accordance with" underwriting guidelines of specific lenders (or criteria described in the prospectus supplements).

In 2012, plaintiff opposed the production of subprime and Alt-A loan underwriting files and defect rates from Freddie Mac and Fannie Mae's so-called "Single Family" divisions.  *Fed. Housing Fin. Agency* v. *UBS Americas, Inc.*, 2013 WL 3284118, at *8-9, *24-25 (S.D.N.Y. June 28, 2013).  Central to plaintiff's argument was counsel's representation that loans purchased by Freddie Mac and Fannie Mae through their flow and bulk businesses were irrelevant because they were underwritten to different guidelines than were the Sample Loans.  (*See*, *e.g.*, Ex. 19 (Letter from Schirtzer and Leung to Court dated Dec. 14, 2012) at 1.) Having taken the position that standards other than the applicable underwriting guidelines are irrelevant, plaintiff should not be permitted to reverse its position when it comes to trial testimony of its expert witnesses.

**B.**     **Hunter's Contentions About "Implicit" Statements in the Offering Documents Are Incorrect.**

Hunter concedes that the Offering Documents say nothing about industry standards for underwriting.  (*See* Ex. 3 (Hunter Tr.) at 227:19-22 ("Q.  Do the offering documents make any reference to minimum industry standards?  A.  Not that I am aware of.").)  Hunter instead contends that his "minimum industry standards" are "implicit in the representations contained in the Offering Documents and fundamental to the underwriting process . . . ."  (Ex. 2 (Hunter Report) at 21.)  This is incorrect as a matter of law.

Under the Securities Act, a plaintiff is required to prove that a statement actually contained in an offering document was false or misleading.  *See*, *e.g.*, *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010) (claims under Sections 11 and 12(a)(2) of the Securities Act require false or misleading statement in offering document); *J&R Mktg., SEP* v. *Gen. Motors Corp.*, 549 F.3d 384, 392-94 (6th Cir. 2008) (affirming dismissal of Securities Act claims where offering document (1) accurately stated issuer's credit rating and did not make representations about the accuracy of the rating agency's opinion, and (2) accurately stated the coupon rate on the bonds and made no representations about the fairness of the rate).  A plaintiff may not prevail through an assertion that representations in offering documents should be interpreted to refer "implicitly" to some additional matter that is never mentioned.  *Int'l Fund Mgmt. S.A.* v. *Citigroup Inc.*, 822 F. Supp. 2d 368, 377 (S.D.N.Y. 2011) (dismissing Securities Act claims alleging that by consolidating the financials of an affiliated corporation on the parent corporation's balance sheet, the parent corporation represented that it "implicitly guaranteed" that entity's debt).  Hunter's assertion that "minimum industry standards" were "implicit" in the representations about the guidelines used by underwriters for the underlying loans is wrong as a matter of law.

-12-

Moreover, there must be "a reliable linkage between the facts that [the expert] is examining and the conclusions that [the expert] is announcing." *R.F.M.A.S., Inc.* v. *So*, 748 F. Supp. 2d 244, 253 (S.D.N.Y. 2010). Hunter's "minimum industry standards," however, could not have been implicitly or explicitly part of the statements in the Offering Documents because his standards did not exist in the relevant period—Hunter (and two other "experts" for plaintiff) created them in 2013.[6]

## II. HUNTER'S MADE-FOR-LITIGATION "MINIMUM INDUSTRY STANDARDS" FAIL TO MEET THE DAUBERT REQUIREMENTS FOR RELIABILITY.

### A. No Industry-Adopted Set of "Minimum Industry Standards" Existed During the Relevant Time Period.

Several witnesses have testified that there were no "minimum industry standards" for mortgage loan underwriting during the 2005 to 2007 time period. These witnesses include originators, third-party due diligence providers and former employees of Freddie Mac and Fannie Mae. For example:

- Ashley Dyson—a Fannie Mae RMBS trader—testified that she did not recall any "industry standards for appropriate underwriting of mortgage loans." (Ex. 20 (Dyson tr.) at 518:6-12.)

- Donald Bisenius, who oversaw Freddie Mac's post-purchase review of Alt-A loans for compliance with underwriting guidelines, never heard of any "minimum industry standard, during 2005 to 2007, for underwriting a single-family mortgage loan." (Ex. 21 (Bisenius Tr.) at 493:6-12.)

---

[6] *See Smith* v. *Prudential Ins. Co. of Am.*, 2012 WL 1965405, at *14 (M.D. Tenn. May 31, 2012) (excluding expert testimony relying on posthumous events about why a decedent committed suicide because "[w]hat is relevant is [the decedent's] state of mind on the date of his death, which of course could not have incorporated information after August 12, 2008 [the date of the suicide]"); *Miller* v. *Stryker Instruments*, 2012 WL 1718825, at *11 (D. Ariz. Mar. 29, 2012) (excluding expert testimony about articles and studies regarding a defective medical product because they were published after the disputed procedure, and the expert did not explain how the defendant "knew or could have known of harmful effects prior to Plaintiff's surgery").

- Lin Cao, a Fannie Mae credit analyst, testified that she never saw, or heard anyone at Fannie Mae say, that there were any "industry standard[s]" for assessing a borrower's ability to repay or to determine if a transaction was prudent for the borrower.  (Ex. 22 (Cao Tr.) at 415:16-416:1.)

- Clint Bonkowski, a 30(b)(6) representative of Quicken Loan, an originator, testified that "there's not a set minimum across every possible loan . . . each product has their own requirements . . . there's not an industry minimum."  (Ex. 23 (Bonkowski Tr.) at 52:2-14.)

- Vicki Beal, a 30(b)(6) representative of Clayton Holdings—the leading third-party vendor for due diligence—did not know of any "minimum industry standards" during the period.[7]  (Ex. 24 (Beal Tr.) at 74:17-76:1.)

Moreover, although both Freddie Mac and Fannie Mae periodically assessed originators' compliance with originator underwriting guidelines, there is no evidence that either Freddie Mac or Fannie Mae applied any "minimum industry standards" or reviewed loans for compliance with any such "standards" when they purchased loans for their subprime and Alt-A securitizations.  Nor is there any evidence that the two largest industry trade organizations, the Mortgage Bankers Association and the American Bankers Association, ever promulgated any set

---

[7]     Hunter's report cites to the testimony of Joseph Kohout, the head of Nomura's credit and due diligence, as having agreed with some of Hunter's purported "minimum industry standards."  *See, e.g.*, Ex. 2 (Hunter Report) at 13, 34, 42, 82, 86.  Mr. Kohout, however, never testified that there existed any industry-accepted set of "minimum industry standards" in the 2005 to 2007 period.  In fact, most of Mr. Kohout's testimony on this topic was in response to questioning about "standards that were in the industry," or standards "in the industry, generally," *see* Ex. 25 (Kohout Tr.) at 54:15-60:12—saying nothing about any "minimum" standards.  Mr. Kohout only agreed with the questioning that there was a "minimum industry standard" for a few, limited and vague criteria—for example, that for full documentation loans, "the lender must calculate the borrower's income properly," that "the lender must calculate the borrower's debts properly," and that "the lender must verify a salaried borrower's employment."  *Id.* at 60:13-61:25.  Mr. Kohout nowhere testified that there was an agreed-upon set of 59 (or any other number of) "minimum industry standards," as Hunter claims.  Indeed, Mr. Kohout has never been an underwriter; he testified that he has never underwritten a mortgage loan in his life.  *Id.* at 16:10-20.  His only experience with mortgage loans is "reviewing loans that are closed," meaning after origination. *Id.* at 16:21-17:2.

of industry standards on underwriting guidelines.  Indeed, Hunter has admitted that no industry

organization or regulatory body has ever published any "minimum industry standards."  (Ex. 3

(Hunter Tr.) at 110:17-111:12, 165:13-19.)

   Lacking any basis, Hunter's purported "minimum industry standards" thus fail

under the *Daubert* standard.  In *Grdinich* v. *Bradlees*, 187 F.R.D. 77 (S.D.N.Y. 1999), plaintiff

proffered expert testimony that defendant had "either ignored or failed to follow 'industry

guidelines applicable to merchandise displays for self-service department stores.'"  *Id.* at 78-

79.  The court excluded the expert's testimony in its entirety because the expert's opinion was

based "on non-existent industry standards."  *Id.* at 81-82.  The court noted that "[w]hile

individual companies . . . might provide general guidelines for displaying merchandise," the

expert "was not aware of any industry trade group that provides guidelines . . . or any written

industry standards . . . ."  *Id.* at 81 (citation and footnote omitted).  Because "'knowledge

connotes more than subjective belief or unsupported speculation,'" the court found that "there

[was] no reliable foundation for [the] expert['s] opinion."  *Id.* at 82 (quoting *Daubert*, 509 U.S.

at 590).

   Here, Hunter has not—and cannot—point to any industry standards regarding

underwriting and should not be allowed to invent "standards" for purposes of rendering a

litigation-driven opinion.  *Compare Grdinich*, 187 F.R.D. at 81-82, *with Wisdom* v. *TJX*

*Companies, Inc.*, 410 F. Supp. 2d 336, 342 (D. Vt. 2006) (permitting an expert to opine on safety

standards at retail stores that relied, in part, upon National Safety Council standards); s*ee also*

*Johnson* v. *Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007) (an opinion

"prepared solely for purposes of litigation" rather than from "an expert's line of scientific

research or technical work, should be viewed with some caution").  The only standards

-15-

applicable to the loans in this case are the underwriting guidelines and underwriting criteria of

specific originators, as set forth in the prospectus supplements.  The Offering Documents never

refer to any "standards" that a supposed expert such as Hunter might later choose to create.

> **B.     Hunter's "Minimum Industry Standards" Were Developed in Connection with the Re-underwriting and Review of Loans in This and Related Litigation and Are Therefore Not the Product of a Tested and Reviewed Methodology**.

Hunter's "minimum industry standards" were developed in 2013 collectively by

three of plaintiff's "experts" while they were re-underwriting loans at issue in this and related

litigation.  (Ex. 3 (Hunter Tr.) at 114:8-23.)  Hunter now seeks to apply that set of purported

"minimum industry standards" to evaluate some of the very same loans used to develop the

standard in the first place.  This is entirely circular and inadmissible under *Daubert*.  Such a

standard is neither tested nor testable.

*Daubert* instructs that a "key question to be answered in determining" whether an

expert's methodology is admissible is "whether it can be (and has been) tested."  509 U.S. at

593.  Courts have accordingly held that where an expert's methodology cannot be tested or has

not been tested, the expert's testimony must be excluded under *Daubert*.  *See Peitzmeier* v.

*Hennessy Indus., Inc*., 97 F.3d 293, 297-98 (8th Cir. 1996) (excluding expert testimony because

the expert did not "conduct[] any experiments or testing of any kind" on his device to change a

tire safely and, thus, "there cannot be a known rate of error for his results"); *In re Rezulin Prods.

Liab. Litig.*, 369 F. Supp. 2d 398, 423-24 (S.D.N.Y. 2005) (excluding an expert opinion that a

certain medication can cause liver injury because the theory "never has been tested" and was

merely based on an untested "extrapolation from the existing literature"); *Stanczyk* v. *Black &

Decker, Inc*., 836 F. Supp. 565, 567 (N.D. Ill. 1993) (excluding testimony of an expert because

the expert "offered no testable design to support his concept").

Hunter has testified that "the standards were developed for use in these cases," by himself and two experts for plaintiff in related actions, Richard Payne and Steven Butler.  (Ex. 3 (Hunter Tr.) at 113:21-114:7.)  Hunter testified that they were "developed between the group" only when they "started the underwriting review for these cases."  (*Id.* at 113:21-114:23.)  Payne testified that the standards "weren't developed all at once," but were rather the product of an "evolving process" resulting in revisions "as we were reviewing loans."  (Ex. 26 (Payne Tr.) at 318:10-21.)  There is thus no possible delineation between the development and application of the "minimum industry standards" Hunter applies.  There is also no question that his methodology—having been developed for this and related litigation—has never been tested prior to its use for litigation purposes.  Hunter's report makes no mention of any peer-review, academic study, testing or independent verification done of his "minimum industry standards," and there is no evidence that they have ever been subject to any such review or testing.  This is not the hallmark of a reliable methodology.  *Barletta Heavy Div., Inc.* v. *Travelers Ins. Co.*, 2013 WL 5797612, *8-9 (D. Mass. Oct. 25, 2013) (refusing to allow testimony about "industry standards" under *Daubert* where the expert provided no support for the alleged standards "beyond his own say-so").

Moreover, there is no way even to recreate the methodology and process used to determine the set of Hunter's so-called "minimum industry standards."  Hunter relied in part on the views of Steven Butler and Richard Payne, both of whom have acted as experts for plaintiff in related actions.  (Ex. 3 (Hunter Tr.) at 113:21-114:23.)  Hunter admits that he, Butler and Payne jointly created the "standards" in 2013 over the course of various conversations and written reports.  (*Id.* at 114:8-117:22.)  Yet plaintiff has not produced any record of any conversations or exchanges of information Hunter had with Butler and Payne, and there is no

basis to conclude that their knowledge or recollection of "minimum industry standards" during the relevant time period is any more reliable than Hunter's. Indeed, these three "experts" could not always agree on what the "minimum industry standards" were. (Ex. 26 (Payne Tr.) at 338:20-339:8 (admitting "there was disagreement" among the three experts about what constituted a "minimum" industry standard); Ex. 3 (Hunter Tr.) at 117:23-118:2 ("Q. Did you disagree with any of them? A. Disagree, or—we just discussed them and came to a consensus").) The jury would thus be left only with self-serving conclusions based on an entirely *ad hoc*, circular and subjective set of standards that are both untested and untestable. This is plainly insufficient under *Daubert*.

**C.    Hunter's Methodology Is Based on an Arbitrarily Selected Set of Underwriting Guidelines from a Limited Number of Originators**.

Hunter's "minimum industry standards" also fail under *Daubert* because they were purportedly derived based on an unsystematic review of an arbitrarily chosen set of underwriting guidelines, many of which have nothing to do with the representations or loans at issue in this case. Hunter claims that his purported "minimum industry standards" are in part based on a review of the guidelines of four originators "known to have had very lenient origination requirements and practices during this period." (Ex. 2 (Hunter Report) at 87.) The only basis Hunter cites for identifying the four originators—out of the hundreds that originated loans between 2005 and 2007—as having "very lenient origination requirements and practices" is a 2008 press release from the Office of the Comptroller of the Currency ("OCC"). *Id.* The press release he identifies, however, merely ranks subprime originators that originated the highest number of loans that went into foreclosure in select metropolitan areas in the first half of 2008. (Ex. 27 (OCC Press Release).) It says nothing about whether (a) those originators had lenient underwriting guidelines, or (b) those originators would have been on the "top ten" list of

-18-

foreclosures in other geographical areas (or the country as a whole) or in other time periods.

Moreover, the OCC press release makes no connection between lenient guidelines and the rate of

defaults or foreclosures.  During the 2002 through 2007 time frame, many factors other than an

originator's underwriting guidelines could account for a high rate of foreclosure.[8]  Mr. Hunter

has not conducted any kind of independent study to verify the extent to which foreclosure rates

from the originators cited in the OCC press release were caused by lenient underwriting

guidelines, and it is well established that default rates can be associated with a wide variety of

factors, such as the decline in home prices and unemployment, which are unrelated to

underwriting guidelines.

Hunter did not even look at the top four lenders in the OCC press release.  Rather,

he selected unspecified versions of underwriting guidelines from New Century (ranked first),

Long Beach (second), WMC (fourth) and Countrywide (eighth).  (Ex. 27 (OCC Press Release).)

He ignored the other six originators mentioned in the press release.  For example, although

Fremont, ranked fifth in the OCC press release, was the largest originator of the Sample Loans,

and its guidelines were produced in this Action, Hunter did not review the Fremont guidelines as

part of his review.  This arbitrary selection and review of data in no way reliably arrives at or

confirms the "minimum industry standards" Hunter uses.

---

[8]       For instance, the real estate and employment markets in Arizona, California, Florida, and
Nevada experienced significant volatility and "accounted for more than 40 percent of all
mortgage foreclosures started in 2008 . . . nearly double the share of mortgages held by
borrowers in these four states."  Shayna M. Olesiuk & Kathy L. Kalser, "FDIC: Feature Article–
The 2009 Economic Landscape–The Sand States:  Anatomy of a Perfect Housing-Market
Storm," FDIC QUARTERLY, Apr. 27, 2009, *available at*
http://www.fdic.gov/bank/analytical/quarterly/2009_vol3_1/vol3_1_sand_states.pdf.

Even if there were some way to determine what the "minimum industry standards" were for underwriting guidelines from 2002 to 2007, it would require a far more comprehensive effort than Hunter undertook.  Indeed, to identify the most lenient standards in lending guidelines across the entire mortgage loan industry between 2002 and 2007 would be an enormous and virtually impossible task.  By 2007, there were many thousands of originators that had originated a total of $10.5 trillion in residential mortgage loans.[9]  This Action alone involves securitizations of loans originated by 115 different lenders.  These lenders frequently updated their guidelines throughout the relevant time period.  To derive a reliable list of the most lenient standards in effect among all lenders from 2002 through 2007, Hunter would have had to review all or most of these constantly changing standards for each originator on the wide array of criteria on which he opines.  Hunter's anecdotal approach of identifying minimum standards at the same time he and plaintiff's other experts reviewed loans for defects in no way comes close. *See Playtex Products, Inc.* v. *Procter & Gamble Co.*, 2003 WL 21242769, at *10 (S.D.N.Y. May 28, 2003) (Pauley, J.) (excluding testimony because "anecdotal conversations [the expert] had with some patients" were not based on a "survey or scientific study" and therefore could not "be tested or verified"), *aff'd*, 126 F. App'x 32 (2d Cir. 2005).

D.     **Hunter's "Experience" Cannot Serve as the Basis for His "Minimum Industry Standards" under *Daubert*.**

Hunter contends that his "minimum industry standards" are in part derived from his experience.  (Ex. 2 (Hunter Report) at 86.)  That too is an unreliable basis for his opinion under *Daubert*.  Although an expert may draw on his own experience, "[a]n anecdotal account of

---

[9]     *See* THE FINANCIAL CRISIS INQUIRY REPORT, U.S. FINANCIAL CRISIS INQUIRY COMMISSION (2011), at 7, *available at* http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

one expert's experience, however extensive or impressive the numbers it encompasses, does not

by itself equate to a methodology, let alone one generally accepted by the scientific community."

*Algarin* v. *New York City Dep't of Corr.*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) (quoting

*Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 354 (S.D.N.Y. 2005)).  It is

facially implausible that Hunter's experience allowed him to catalogue reliably 59 different

"minimum industry standards" for hundreds of originators and thousands of underwriting

guidelines spanning a six-year time period.

     **E.**    **Hunter's "Minimum Industry Standards" Were Not, In Fact, the "Minimum"**.

     Unsurprisingly, Hunter's so-called "minimum industry standards" were not, in

fact, the "minimum" applied by lenders during 2005 through 2007.  As shown in the examples

below, there were many lender guidelines during that period that were more lenient.  As a result,

Hunter declares loans to be "defective" for failure to comply with "minimums" that were not real

"minimums" at all.

     *1.*    *Investigation of All Credit Inquiries Within 90 Days*

     Hunter opines that it was a "minimum industry standard" that "[t]he lender must

investigate whether the borrower sought (and/or obtained) credit that was not listed on the

borrower's origination credit report.  This investigation includes an inquiry into any credit

inquiries within 90 days preceding the loan application."  (Ex. 4 (Exhibit 7 to Hunter Report) at

4.)  Hunter asserts that 38 of the Sample Loans are defective for failure to comply with this

standard.  (*See* Ex. 15 (Excerpt of Exhibit 2A to Hunter Rebuttal Report).)  In fact, the guidelines

of lenders originating loans that backed the Securitizations did not uniformly require an

investigation of all credit inquiries occurring 90 days before loan approval.  For example,

ResMae's guidelines provided specific instructions that directed the underwriter to investigate

-21-

certain inquiries, but indicated that there was no need to investigate inquiries to mortgage lenders

around the same time as the application date for the subject loan:

> **Recent**      Credit inquiries between the loan application date and the
> **Credit**      credit report date should be investigated to verify that no
> **Inquiries**   new debt has been opened (e.g., auto dealer or finance lender
>                 inquiries may have resulted in a new auto loan).  The loan
>                 file should contain documentation that adequately explains
>                 that the borrower has not taken on any new debt.
>
>                 Note:  Recent credit inquiries to other mortgage lenders
>                 around the same time as ResMae's loan application date
>                 generally would not need an explanation since this would be
>                 typical for a loan.  However, debt ratio calculations must
>                 always account for concurrent financing/refinancing of
>                 multiple properties or any second mortgages.

(Ex. 28 (August 2006 ResMae Underwriting Guidelines) at NOM-FHFA_04450316; *see also*

Ex. 29 (July 1, 2005 Fremont Underwriting Guidelines) at NOM-FRE-GL_00001188-1305)

(Fremont's guidelines did not require an underwriter to investigate credit inquiries); Ex. 30 (June

13, 2005 Aegis Underwriting Guidelines) at JPMC-UWG-WAMU-000735643 (requiring that a

underwriter consider the "type" and "number" of inquiries within the last 90 days and research to

ensure that no new mortgages have been obtained).)

> 2.      *150% "Payment Shock"*

Hunter identifies as a "minimum industry standard" that "[t]he borrower's new

payment obligation may not exceed 150% of the borrower's current housing expense ('payment

shock')."  (Ex. 4 (Exhibit 7 to Hunter Report) at 1.)  He then asserts that seven of the Sample

Loans are defective for failure to comply with this standard.  But the guidelines of Long Beach

Mortgage Company, one of the four originators Hunter claims to have used to validate his

"standards," expressly permitted 200% payment shock for a first-time homebuyer, and payment

shock higher than 200% when compensating factors existed.  (Ex. 31 (May 15, 2006 Long Beach

Mortgage Company Underwriting Guidelines) at JPMC-UWG-WAMU-000453504-3505.)

Opteum Funding, another originator of Sample Loans, also had guidelines in 2006 that allowed

payment shock up to 200%. (Ex. 32 (September 22, 2006 Opteum Finance Underwriting

Guidelines) at JPMC-UWG-BEAR-000072142.) Again, Hunter's "minimum" is not the

minimum at all, as Hunter admitted at his deposition. (Ex. 3 (Hunter Tr.) at 119:16-19 ("Q. Was

that the most lenient guideline that any of the underwriters involved in this had? A. Well,

no.").)

### 3.    55% DTI

Hunter asserts that it was a "minimum industry standard" not to underwrite loans

with borrower DTIs of more than 55%. (Ex. 4 (Exhibit 7 to Hunter Report) at 1; Ex. 2 (Hunter

Report) at 75.) In fact, other lenders' guidelines were more lenient. For example, as Hunter

admits, Nomura's own April 17, 2006 correspondent guideline permitted origination of certain

loans with DTI ratios up to 60%. (Ex. 33 (April 17, 2006 Nomura Correspondent Guidelines) at

UG1FHFA00023821; Ex. 3 (Hunter Tr.) at 120:3-9.) Fannie Mae's RMBS anti-predatory

lending guidelines in 2006 and 2007—which restricted the parameters of the loans backing the

RMBS Fannie Mae was allowed to purchase—also permitted maximum DTI limits of 60%. (*See*

Ex. 34 (FHFA11863279) at FHFA11863283.) Hunter again admits that his "minimum" is not

actually the minimum used in the industry. (Ex. 3 (Hunter Tr.) at 123:17-124:7.)

### 4.    Freddie Mac and Fannie Mae Had More Lenient Guidelines

Freddie Mac and Fannie Mae were the largest purchasers of loans in the mortgage

industry between 2005 and 2007. (*See* Ex. 35 (Lockhart Tr.) 390:8-391:13.) Freddie Mac

purchased subprime loans during this time period and securitized them into "T-Deals." (Ex. 26

(FHFA12469141) at FHFA12469142-9143.) In doing so, Freddie Mac used more lenient

-23-

standards than Hunter's "minimum industry standards."  For example, Hunter states that it was a "minimum industry standard" for a lender or underwriter to specify the maximum acceptable number of late payments and "[f]or a subprime mortgage, the borrower may have [only] one 30 day late payment within the past 12 months and one 60 day late payment within the past 24 months."  (Ex. 4 (Exhibit 7 to Hunter Report) at 4.)  However, the results of diligence performed on Freddie Mac's July 2007 T-Deal securitization of a pool of Wells Fargo subprime loans show that Freddie Mac in fact included in its securitization loans for which there were multiple 60-day late payments within the first twelve months.  (Ex. 37 (FHFA02438975) at FHFA02438975-8976, FHFA02438996-8999, FHFA02439275-279.)

Fannie Mae used an Automated Underwriting System named Desktop Underwriter to purchase whole loans from originators.  Originators entered certain borrower and property characteristics for a loan—type of mortgage, loan amount, state, occupancy, purpose of loan, borrower name and length of employment, purchase price, and appraisal value—and Desktop Underwriter provided a "recommendation on a loan and whether the loan would be eligible or ineligible to be sold" to Fannie Mae.  (Ex. 40 (December 2005 Guide to Underwriting with DU ("DU Underwriting Guide")), at 182-84, 203-07.)  An "approve/eligible" recommendation meant that the loan met Fannie Mae's credit risk and eligibility requirements and could be sold to Fannie Mae without supplemental representations and warranties from the originator.  (*Id.* at 182-83.)  Many of the requirements necessary for approval through Fannie Mae's Desktop Underwriter contradict Hunter's "minimum industry standards."  For example:

- *Maximum CLTV.*  Hunter claims that it was a "minimum industry standard" that "CLTV ratio may not exceed 100%."  (Ex. 4 (Exhibit 7 to Hunter Report) at 5.)  The DU Underwriting Guide states that "the maximum CLTV is 105%" for certain types of mortgage loans.  (Ex. 40 (DU Underwriting Guide) at 46.)

-24-

- *Minimum Reserves*.  Hunter claims that it was a "minimum industry standard" to "document sufficient cash reserves for purchase money transactions."  (Ex. 4 (Exhibit 7 to Hunter Report) at 1-2.)  The DU Underwriting Guide states that "there are no minimum [cash] reserve requirements for principal residences" or for "second home properties."  (Ex. 40 (DU Underwriting Guide) at 32, 33.)

- *Equity Stripping*.  Hunter claims that it was a "minimum industry standard" to "confirm that the borrower has not stripped equity from the property by 'cashing out' through multiple refinance transactions over an 18-month period."  (Ex. 4 (Exhibit 7 to Hunter Report) at 2.)  The DU Underwriting Guide neither mentions this "standard" nor requires a borrower's refinancing history.  (Ex. 40 (DU Underwriting Guide) at 203-06.)

- *Payment Shock*.  Hunter claims that it was a "minimum industry standard" that the "borrower's new payment obligation may not exceed 150% of the borrower's current housing expense ('payment shock')."  (Ex. 4 (Exhibit 7 to Hunter Report) at 1.)  There is no evidence that Desktop Underwriter imposed any such "standard."

- *Self-Employment*.  Hunter claims that it was a "minimum industry standard" that "when self-employment requires licensing . . . the lender must verify the borrower's business license."  (Ex. 4 (Exhibit 7 to Hunter Report) at 1.)  No such requirement exists in the Desktop Underwriter required data inputs.

These examples make clear that what Hunter purports to apply are not in fact "minimums," but instead standards developed years after the loans were underwritten to further a litigation position.  Hunter's testimony about "minimum industry standards" should be excluded in its entirety.

## CONCLUSION

The Court should exclude the trial testimony of plaintiff's designated expert

Robert W. Hunter to the extent that he refers to or relies upon any "minimum industry

standards."

Dated:  New York, New York
        November 26, 2014

                                        Respectfully submitted,


/s/ Thomas C. Rice___                   /s/ David B. Tulchin_____
Thomas C. Rice (trice@stblaw.com)       David B. Tulchin (tulchind@sullcrom.com)
David J. Woll (dwoll@stblaw.com)        Steven L. Holley (holleys@sullcrom.com)
Andrew T. Frankel (afrankel@stblaw.com) Bruce E. Clark (clarkb@sullcrom.com)
Alan Turner (aturner@stblaw.com)        Bradley A. Harsch (harschb@sullcrom.com)
Craig S. Waldman (cwaldman@stblaw.com)  Katherine J. Stoller (stollerk@sullcrom.com)
SIMPSON THACHER & BARTLETT LLP          SULLIVAN & CROMWELL LLP
425 Lexington Avenue                    125 Broad Street
New York, NY  10017                     New York, NY  10004
Telephone:  212-455-2000                Telephone:  212-558-4000
Facsimile:  212-455-2502                Facsimile:  212-558-3588

*Attorneys for Defendant RBS Securities Inc.*   Amanda F. Davidoff
                                        (davidoffa@sullcrom.com)
                                        Elizabeth A. Cassady
                                        (cassadye@sullcrom.com)
                                        SULLIVAN & CROMWELL LLP
                                        1700 New York Avenue, NW, Suite 700
                                        Washington, DC  20006
                                        Telephone:  202-956-7500
                                        Facsimile:  202-956-6993

                                        *Attorneys for Defendants Nomura Holding
                                        America Inc., Nomura Asset Acceptance
                                        Corporation, Nomura Home Equity Loan, Inc.,
                                        Nomura Credit & Capital, Inc., Nomura
                                        Securities International, Inc., David Findlay,
                                        John McCarthy, John P. Graham, Nathan
                                        Gorin, and N. Dante LaRocca ("Nomura
                                        Defendants")*

-26-