**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION, <br><br> Plaintiff, <br><br> -against- <br><br> NOMURA HOLDING AMERICA INC., et al., <br><br> Defendants. | No. 11-cv-6201 (DLC) <br><br> <u>ECF Case</u> |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**<u>THEIR MOTION TO EXCLUDE THE TESTIMONY OF DONALD EPLEY</u>**

Amanda F. Davidoff (davidoffa@sullcrom.com)
Elizabeth A. Cassady (cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC 20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

November 26, 2014

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 4

LEGAL STANDARDS .......................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

I.     IT IS IMPERMISSIBLE FOR AN EXPERT TO "VOUCH" FOR ANOTHER
       EXPERT ..................................................................................................................... 7

II.    EPLEY'S TESTIMONY ALSO SHOULD BE EXCLUDED AS UNRELIABLE
       BECAUSE HE FAILED TO TEST KILPATRICK'S "CREDIBILITY
       ASSESSMENT MODEL" ............................................................................................. 10

CONCLUSION .................................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Aetna Life Ins. Co.* v. *Ward*,
    140 U.S. 76 (1891) ...................................................................................... 2, 8

*Amorgianos* v. *Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ...................................................................... 6, 12

*Daubert* v. *Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ........................................................................... 1, 6, 12

*Davis* v. *Carroll*,
    937 F. Supp. 2d 390 (S.D.N.Y. 2013) ...................................................... 11-12

*Fait* v. *Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011) ........................................................................ 1, 7

*FHFA* v. *UBS Americas, Inc.*,
    858 F. Supp. 2d 306 (S.D.N.Y. 2012) ........................................................ 1, 7

*General Elec.* v. *Joiner*,
    522 U.S. 136 (1997) ....................................................................................... 12

*Hartle* v. *FirstEnergy Generation Corp.*,
    2014 WL 1007294 (W.D. Pa. Mar. 17, 2014) ............................................. 3, 8

*In re Electronic Books Antitrust Litig.*,
    2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) ................................................. 6

*In re Puda Coal Sec. Inc., Litig.*,
    2014 WL 2915880 (S.D.N.Y. June 26, 2014) .............................................. 12

*Major League Baseball Properties, Inc.* v. *Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) ......................................................................... 12

*Nimely* v. *City of New York*,
    414 F.3d 381 (2d Cir. 2005) .................................................................. 2, 8, 10

*Tunis Bros. Co.* v. *Ford Motor Co.*,
    124 F.R.D. 95 (E.D. Pa. 1989) ...................................................................... 3, 9

*United States* v. *Charley*,
    189 F.3d 1251 (10th Cir. 1999) ......................................................................... 3

*United States* v. *Lumpkin*,
    192 F.2d 280 (2d Cir. 1999) ......................................................................... 3, 8

*United States* v. *O'Keefe*,
    825 F.2d 314 (11th Cir. 1987) ....................................................................... 3, 8

## <u>TABLE OF AUTHORITIES</u>

### (Continued)

**Cases**                                                                    **Page(s)**

*United States* v. *Scop*,
   846 F.2d 135 (2d Cir. 1988) ................................................................. 3, 8

*Westcott* v. *Crinklaw*,
   68 F.3d 1073 (8th Cir. 1995) ................................................................. 3

**Rules**

Fed. R. Ev. 402 ................................................................................. 1

Fed. R. Ev. 403 ................................................................................. 1

Fed. R. Ev. 702 ................................................................. 1, 2-3, 6, 10, 12

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Action | *FHFA* v. *Nomura Holding America Inc.*, et al., No. 11 Civ. 6201 (DLC) |
| Ally Action | *FHFA* v. *Ally Financial Inc.*, et al., No. 11 Civ. 7010 (DLC) |
| CAM | Credibility Assessment Model |
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| Epley July 8, 2014 Dep. | Deposition of Donald Epley in the *HSBC*, *GS* and *Ally* Actions, taken July 8, 2014 |
| Epley February 19, 2014 Dep. | Deposition of Donald Epley in the *Merrill Lynch* Action, taken February 19, 2014 |
| Epley Report | Expert Report of Donald Epley Concerning the Credibility Assessment Model, dated May 15, 2014 |
| Ex. | Exhibit to the November 26, 2014 Declaration of Phillip A. Brest submitted in support of this motion |
| GS Action | *FHFA* v. *Goldman, Sachs & Co., et al.*, No. 11 Civ. 6198 (DLC) |
| Hedden Report | Expert Report of Michael P. Hedden, dated August 14, 2014 |
| HSBC Action | *FHFA* v. *HSBC North America Holdings, Inc.*, et al., No. 11 Civ. 6189 (DLC) |
| Kilpatrick CAM Report | Expert Report of John A. Kilpatrick Concerning Adherence of Appraisals to Appraisal Standards and Practice, dated May 15, 2014 |
| Kilpatrick July 14, 2014 Dep. | Deposition of John A. Kilpatrick in the *HSBC*, *GS* and *Ally* Actions, taken July 14, 2014 |
| Kilpatrick February 12 and 13, 2014 Dep. | Deposition of John A. Kilpatrick in the *Merrill Lynch* Action, taken February 12, 2014 and February 13, 2014 |
| LTV | Loan-to-value ratio |
| Merrill Lynch Action | *FHFA* v. *Merrill Lynch & Co., Inc.*, et al., No. 11 Civ. 6202 (DLC) |
| Plaintiff | Federal Housing Finance Agency |
| USPAP | Uniform Standards of Professional Appraisal Practice |

Defendants respectfully submit this memorandum in support of their motion to exclude any and all testimony at trial by Dr. Donald Epley, a designated trial expert for plaintiff, pursuant to Federal Rules of Evidence 402, 403 and 702, and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.

## PRELIMINARY STATEMENT

This Court recognized in 2012 that for plaintiff to prevail at trial on its claim that the LTV ratios set forth in offering documents were false, plaintiff must show that the appraised values "were both false and not honestly believed [by the appraisers] when made." *FHFA* v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306, 328 (S.D.N.Y. 2012) (*quoting Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011). Because appraisals of the value of a property are matters of opinion, plaintiff must prove that the professional appraisers "did not believe the opinion" they expressed about valuation at the time the opinions were rendered. *UBS Americas*, 858 F. Supp. 2d. at 325. Although plaintiff took 45 depositions in this Action, it never sought any discovery from appraisers and has no direct evidence that any appraiser did not "honestly believe[]" the appraisal he or she rendered.

In lieu of any such evidence, plaintiff has designated Dr. John A. Kilpatrick of Greenfield Advisors LLC as an "expert" in this case. Kilpatrick concocted a model that he calls the "Credibility Assessment Model." The "model" purports to do only one thing—ascertain whether a given appraiser was telling the truth—*i.e.*, whether, as Kilpatrick puts it, the appraiser "could have believed" the valuation he or she delivered. (Ex. 1, Kilpatrick CAM Report at 2.) This is, in other words, a form of litigation-designed retrospective lie detector test to enable the "expert" (Kilpatrick) to tell the jury that he has crafted a system for deciphering whether a professional appraiser was, years ago, lying in delivering his or her opinion about valuation. As

mind-boggling as this is, the proposed testimony from Epley (which is the subject of the current motion) is perhaps even worse.[1]

Epley is offered by plaintiff solely to bolster Kilpatrick's credibility—*i.e.*, to tell the jury that Kilpatrick's method of assessing credibility is itself credible because, as Epley intends to say, the Kilpatrick-developed lie detector test is a valid methodology.  Epley expresses no opinion as to whether the Prospectus Supplements understated LTV ratios, or whether any of the appraisals (on which the LTV ratios depend) complied with professional standards.  He opines only that Kilpatrick's method of assessing appraisers' credibility is "a reasonable and appropriate methodology" and "accurately analyzes the retrospective credibility of an appraisal."  (Ex. 2, Epley Report at 1.)  Thus, Epley's sole function is to vouch for Kilpatrick and his methodology. (Ex. 3, Epley February 19, 2014 Dep. at 317:20-25.)

This violates the rule that an expert may not opine on the credibility of other witnesses, because "[i]t is a well-recognized principle of our trial system that 'determining the weight and credibility of a witness's testimony belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men."  *Nimely* v. *City of New York*, 414 F.3d 381, 397-98 (2d Cir. 2005) (quoting *Aetna Life Ins. Co.* v. *Ward*, 140 U.S. 76, 88 (1891)).  As the Second Circuit said in 2005, "expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or

---

[1]   Kilpatrick's "model" has never been peer-reviewed and never been used outside of this litigation, and consists of a set of 31 "yes" or "no" questions, with each "no" answer resulting in the reviewed appraisal being assessed an arbitrary number of points specified by Kilpatrick.  According to Kilpatrick, any appraisal that scores 20 or more points "could not . . . have been considered credible by a reasonable appraiser" and so must be the product of subjective bad-faith (*i.e.*, the appraiser could not have believed the opinion he or she offered).  Ex. 1, Kilpatrick CAM Report at 4, 100.  The average points awarded for each "no" is just over six, so four "wrong" responses (out of 31) could mean that the appraiser was lying.  *See* App. A.

technical expertise, are inadmissible under Rule 702." *Id.* at 398.  *See also United States* v. *Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (upholding a trial court's decision to exclude an expert's testimony that would "intrude[] too much on the traditional province of the jury to assess witness credibility"); *United States* v. *Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999) ("In general, expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702."); *Westcott* v. *Crinklaw*, 68 F.3d 1073, 1076 (8th Cir. 1995) ("[A]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility.") (quotations and internal citations omitted); *United States* v. *Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("We believe that expert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony. . . .  [W]itnesses may not opine as to the credibility of the testimony of other witnesses at trial.").

Courts thus routinely exclude testimony that is "nothing more than a personal vouching of one expert for another expert," *United States* v. *O'Keefe*, 825 F.2d 314, 319 (11th Cir. 1987) (quotations omitted), and preclude testimony where "partisan experts appear to vouch for previous experts . . . ."  *Hartle* v. *FirstEnergy Generation Corp.*, 7 F. Supp. 3d 510, 526 (W.D. Pa. 2014) (quoting *Tunis Bros. Co.* v. *Ford Motor Co.*, 124 F.R.D. 95, 97 (E.D. Pa. 1989)).

Epley's testimony should be excluded for a second reason as well.  Although Epley intends to testify that Kilpatrick's method for detecting lies produces "accurate" results, Epley never tested whether the model correctly evaluates any specific appraisal, and never tested to see if the model produces false positives (*i.e.*, Epley never applied the Kilpatrick model to any appraisals that were otherwise determined to comply with professional standards).  Indeed, Epley

has never himself created a model to assess whether appraisals meet professional standards, let alone whether appraisers could have "honestly believed" them at the time their opinions on valuation were rendered.  Instead of testing, Epley invented for this Action a set of six criteria by which he evaluated whether aspects of Kilpatrick's Credibility Assessment Model were "reasonable" and "logical."  (Ex. 2, Epley Report at 8, 20.)  In other words, Epley evaluated Kilpatrick's method of detecting falsehoods by appraisers, which has never been subject to peer review or applied outside of this litigation, with a set of his own made-up questions, which also have never been subject to peer review or applied outside of this litigation.

## BACKGROUND

Kilpatrick's Credibility Assessment Model was developed for this litigation.  (Ex. 4, Kilpatrick February 12 and 13, 2014 Dep. at 567:14-568:9; Ex. 5, Kilpatrick July 14, 2014 Dep. at 80:8-16.)  There is no dispute that the Kilpatrick model for assessing whether an appraiser could have "honestly believed" his or her appraisal has never been peer reviewed, published, tested or used outside of this series of cases brought by plaintiff.  (*See* Ex. 3, Epley February 19, 2014 Dep. at 152:3-153:11.)  Kilpatrick made it up out of thin air.

In order to assess whether appraisers were lying, Kilpatrick purportedly "evaluate[d] and score[d] the frequency and magnitude of" any "deviation from settled standards and practice" in the appraisers' reports.  (Ex. 1, Kilpatrick CAM Report at 3.)  Kilpatrick does this through a series of 31 questions, which he invented for this litigation, to which he assigned scores reflecting his own view of their relative weighting.  (*Id.* at 41-44; *see* App. A (listing Kilpatrick's 31 Questions).)  Kilpatrick employed a team of approximately 95 "inspectors" to collect, along with members of Kilpatrick's staff, 70 "data elements" for each appraisal, which would "form the basis of the answers to the 31 questions."  (Ex. 1, Kilpatrick CAM Report at 3, 12-15, 41-42, Apps. 4-2, 4-3, 4-5a, 8-1; Ex. 5, Kilpatrick July 14, 2014 Dep. at 87:9-88:18, 99:2-100:6,

265:24-267:13.)  Kilpatrick's staff then ran a computer code that assigned scores for each

question and, after applying the weights arbitrarily assigned to various questions by Kilpatrick,

produced a "score" for each appraisal.  (Ex. 5, Kilpatrick July 14, 2014 Dep. at 83:22-84:25,

252:6-16, 264:8-265:12.)  Kilpatrick then opined that if an appraisal has a score of 20 or higher,

the appraiser who offered the opinion about valuation "could not have believed" it to be true at

the time he or she offered it.  This is another way of saying that Kilpatrick has a method for

detecting lies told in 2005, 2006 and 2007 by professional appraisers who were certified or

licensed by state authorities.[2]

In Epley's May 15, 2014 report in this Action (Ex. 2), Epley attempts to vouch for

Kilpatrick's method of retrospectively ascertaining whether appraisers honestly believed their

valuation opinions.  Epley was asked "to evaluate and render an opinion" as to whether (1) the

Kilpatrick model is a "reasonable and appropriate methodology" for detecting lies by appraisers,

and (2) whether it "accurately analyzes the retrospective credibility of an appraisal under the

*Uniform Standards of Professional Appraisal Practice* ('USPAP') and related appraisal guidance

and practice."  (Ex. 2, Epley Report at 1.)  Epley evaluated Kilpatrick's model for assessing

credibility using six criteria, which he purportedly "derived from the literature cited [in his

report] and from [his] own experience in model construction, adaptation, and assessment" (*id.* at

8 & n.11) and then "adapted into a six-step analysis for evaluating" the Kilpatrick model.  (*Id.* at

11; *see* App. B (listing Epley's six criteria).)  Epley opines that Kilpatrick's "Credibility

Assessment Model" employs a sound methodology (Ex. 2, Epley Report at 20), and that

Kilpatrick should be believed.  (Ex. 3, Epley February 19, 2014 Dep. at 317:20-25.)

---

[2]     Appraisals are performed according to professional standards set forth in USPAP, and
appraisers are subject to strict rules regarding competency and ethics.  Ex. 6, Hedden
Report at Sec. IV.B.  Most states in our country require that appraisals of the value of
real property be conducted only by certified or licensed appraisers.  *Id.*

Neither Kilpatrick nor Epley ever interviewed or otherwise spoke to any of the appraisers whose opinions about valuation are at issue, and no party ever took the deposition of any appraiser in this Action.  In addition, neither Kilpatrick nor Epley ever physically examined any of the appraised properties.  Neither Kilpatrick nor Epley purports to be an expert in psychiatry or psychology.  Neither has claimed any expertise in determining whether a certified or licensed appraiser (with experience and expertise in rendering opinions about the value of property) was sincere or was lying when rendering his or her opinion about the value of a particular property several years ago.

## LEGAL STANDARDS

### *Admission of Expert Testimony*

The proponent of proffered expert testimony must establish its admissibility by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592 & n.10.  Expert testimony is admissible only if it (i) will assist the trier of fact; (ii) is based upon sufficient facts or data; (iii) is the product of reliable principles and methods; and (iv) reflects the reliable application of those principles and methods to the facts.  Federal Rule of Evidence 702; *see also Daubert*, 509 U.S. at 589-92.  Expert testimony must be reliable "at every step, for *any* step that renders the analysis unreliable renders the expert's testimony inadmissible."  *In re Electronic Books Antitrust Litig.*, 2014 WL 1282298, at *4 (S.D.N.Y. Mar. 28, 2014) (Cote, J.) (citation and internal quotation marks omitted).  A court should "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

*Proving Misstatements of Opinion*

In *FHFA* v. *UBS Americas*, defendants moved in 2012 to dismiss plaintiff's claim concerning purportedly misstated LTVs on the ground that the appraisals underlying the LTVs are opinions that cannot give rise to liability because the Securities Act imposes liability only for an "'untrue statement of a material *fact*.'"  858 F. Supp. 2d at 325.  In its May 2012 decision, this Court agreed that the property valuations underlying the LTV ratios "are, of course, the subjective judgments of the appraisers."  *Id.* at 326.  The Court ruled that pursuant to *Fait*, 655 F.3d 105, statements of opinion in offering documents may give rise to liability only where the person who expressed the opinion did not honestly believe it at the time he or she rendered it.  858 F. Supp. 2d at 326  This Court thus ruled that, in order to prevail on its claim regarding the LTV ratios, plaintiff must make "a showing of 'subjective falsity'" on the part of the professionals who issued the appraisals at issue.  *Id.* at 325-26.  As a result, it is plaintiff's burden to prove at trial that the appraisals at issue "'were both false and not honestly believed when made.'"  *Id.* at 328 (quoting *Fait*, 655 F.3d at 113).

## ARGUMENT

## I.    IT IS IMPERMISSIBLE FOR AN EXPERT TO "VOUCH" FOR ANOTHER EXPERT

Epley intends to testify at trial that Kilpatrick's "model" for assessing appraisers' "credibility" is "reasonable," "appropriate," and "acceptable," and that the model outputs are "accurate."  (Ex. 2, Epley Report at 2-4, 20.)  That is nothing more than vouching for Kilpatrick, as Epley readily admitted at his deposition in the *Merrill Lynch* action:

> Q: Your report, for lack of a better word, vouches for Dr. Kilpatrick's report concerning the CAM dated October 25th, 2013; is that right?

> A: I think that's right, yes.

(Ex. 3, Epley February 19, 2014 Dep. at 317:20-25 (objection omitted).)

Plaintiff's attempt to have Epley opine on Kilpatrick's credibility violates the "well-recognized principle of our trial system that 'determining the weight and credibility of [a witness's] testimony . . . belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men . . . .'" *Nimely*, 414 F.3d at 397-98 (quoting *Aetna Life Ins. Co.*, 140 U.S. at 88). In *Nimely*, the Second Circuit overturned a judgment entered on a jury verdict because the district court had allowed an expert witness to "comment directly, under the guise of expert opinion, on the credibility of" other trial witnesses. 414 F.3d at 398. This same rule has been applied in many other cases. For example, in *Scop*, the Second Circuit reversed two criminal convictions because the district court had allowed an expert to offer a "positive assessment of the trustworthiness and accuracy of the testimony of the government's witnesses," which the *Scop* court characterized as a "gross invasion of the province of the jury." 846 F.2d at 142-43. Similarly, in *Lumpkin*, the Second Circuit affirmed a district court decision precluding testimony by an expert where the expert's opinion "would effectively have inserted his own view of the . . . credibility [of other witnesses] for that of the jurors, thereby usurping their role." 192 F.3d at 289.

The rule is no different when an expert proposes to vouch for another expert. In *O'Keefe*, for example, the Eleventh Circuit affirmed the district court's decision to exclude a tax expert's testimony because it was "nothing more than a personal vouching of one expert for another expert." 825 F.2d at 319 (internal quotation marks and citation omitted). Similarly, in *Hartle*, the court excluded opinions by one expert "on the methodology applied and overall reliability" of another expert, including the ultimate opinion that the other expert's modeling work was "reasonable," "logical" and "sophisticated." 2014 WL 1007294, at *3, *13 (internal quotation marks omitted). The court determined that expert opinion that "merely vouches for" another

expert without performing any "independent" analysis is inadmissible.  *Id.*  Likewise, *Tunis Brothers* also excluded testimony by a damages expert to "vouch for" another damages expert "and the soundness of his opinions."  124 F.R.D. at 98.

The Credibility Assessment Model and its structure—inputs, weighting, scores, and conclusions—reflect nothing but Kilpatrick's personal views about how to assess appraisers' honesty in delivering opinions about value many years ago, views formed for purposes of this litigation.  Kilpatrick acknowledges that the "aspect weights" applied to the Credibility Assessment Model's 31 questions are found neither in USPAP nor in any other publication (Ex. 4, Kilpatrick February 12 and 13, 2014 Dep. at 559:3-23), but instead were invented by Kilpatrick based on his "professional judgment informed by [his] knowledge of appraisal process, appraisal training and appraisal standards."  (*Id.* at 558:16-559:9.)  Kilpatrick repeatedly characterized the Credibility Assessment Model in deposition testimony as merely a "tabulation device . . . [that] captures my thinking about appraisal review . . . ."  (Ex. 5, Kilpatrick July 14, 2014 Dep. at 19:15-23, 77:13-78:10, 123:6-20.)

Epley recognizes that Kilpatrick's methodology reflects Kilpatrick's opinions about how to measure the credibility of appraisers, agreeing that "the weights [assigned to each question] were Dr. Kilpatrick's personal choice" because "[h]e built the model, so he's responsible for" the weighting system.  (Ex. 7, Epley July 8, 2014 Dep. at 89:25-90:6.)  Epley even acknowledged (but later tried to retract) that the Credibility Assessment Model is "really unique.  It's one company's interpretation of how to apply this to appraisals being done in the United States." (Ex. 3, Epley February 19, 2014 Dep. at 334:2-6; *see also id.* at 208:5-14 ("[T]he CAM is a very unique application of professional standards."), 118:10-119:10.)  In other words, Epley is doing

nothing more than saying that he vouches for Kilpatrick's own "unique" opinions about appraiser credibility.

Plaintiff should not be permitted to call Epley to vouch for Kilpatrick—*i.e.*, to have Epley tell the jury that it should believe Kilpatrick's opinions. That is impermissible. As the Second Circuit has ruled, "expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *Nimely*, 414 F.3d at 398.

## II. EPLEY'S TESTIMONY ALSO SHOULD BE EXCLUDED AS UNRELIABLE BECAUSE HE FAILED TO TEST KILPATRICK'S "CREDIBILITY ASSESSMENT MODEL"

Epley intends to testify, as stated in his report, that Kilpatrick's model for testing appraisers' honesty is effective and accurate. (Ex. 2, Epley Report at 2-4, 20-21.)[3] But such testimony would be pure *ipse dixit*.

Epley's assertions about Kilpatrick's method for rooting out appraiser dishonesty lack any basis because Epley did nothing to test or verify the model. Epley did not review any of the appraisals subjected to Kilpatrick's model, any of the 70 "data elements" used by the Credibility Assessment Model, or the propriety of the score outputs. (Ex. 3, Epley February 19, 2014 Dep. at 63:2-17, 128:10-129:4, 137:5-7; Ex. 7, Epley July 8, 2014 Dep. at 278:3-11.) Although Epley acknowledges that "the developer [of a model] *must test* the results for accuracy" (Ex. 2, Epley Report at 10 (emphasis added)), he failed to test the Credibility Assessment Model on a control group of appraisals to judge whether or to what extent it produces false positives. (Ex. 5,

---

[3]     Epley testified that it was his "assignment . . . to take a look at the CAM to determine if it could accurately assess the credibility in a single family appraisal," Ex. 7, Epley July 8, 2014 Dep. at 23:6-12, and that it was his "purpose . . . to evaluate the ability of the model to assess credibility [of appraisers] accurately." Ex. 3, Epley February 19, 2014 Dep. at 104:19-105:9.

Kilpatrick July 14, 2014 Dep. at 183:14-19; Ex. 4, Kilpatrick February 12 and 13, 2014 Dep. at

593:7-20; Ex. 3, Epley February 19, 2014 Dep. at 189:21-190:9, 194:10-196:9.)

Epley "was not involved in gathering the data" used in the Credibility Assessment Model,

and as a result he did not "have a lot of information on how [the data] was applied." (Ex. 7,

Epley July 8, 2014 Dep. at 226:15-18.) Epley further recognized that the "data entering" the

Credibility Assessment Model reflected "the judgment of the people" running the model, and

that he did not know "how that was done." (*Id.* at 229:3-9.) Moreover, Epley has no experience

in the task at hand: he has never developed a model to evaluate whether appraisals meet

professional standards or to evaluate the credibility of a model that supposedly measures the

credibility of opinions offered by professional appraisers many years earlier. (Ex. 3, Epley

February 19, 2014 Dep. at 207:17-21.) In the end, Epley admitted that he could only

"presum[e]" that the scores produced by the Credibility Assessment Model "were accurate."

(Ex. 7, Epley July 8, 2014 Dep. at 229:6.) Epley never tested the Credibility Assessment Model

because plaintiff's counsel never asked him to do so. (Ex. 3, Epley February 19, 2014 Dep. at

158:21-160:12.)

Having done no testing, Epley has no empirical support for his claim that the Credibility

Assessment Model produces accurate results. Indeed, Epley admitted that he "formed that

opinion without actually having ever looked at how a single appraisal performs under the CAM"

and without having "tested [the Credibility Assessment Model] by applying it to an actual

appraisal." (Ex. 7, Epley July 8, 2014 Dep. at 277:10-14, 429:15-18.) Epley's opinion that

Kilpatrick's methodology for detecting falsehoods in appraisers' opinions of value is accurate

therefore lacks any basis and must be excluded as unreliable. *Davis* v. *Carroll*, 937 F. Supp. 2d

390, 418 (S.D.N.Y. 2013)  ("Where an appraisal or other expert testimony rests on inadequate

factual foundations . . . it must be excluded under Rule 702.").

Rather than test the Credibility Assessment Model, Epley judged the model based on "six

criteria" (Ex. 2, Epley Report at 8) he invented out of whole cloth for this litigation.  At his

deposition in a related case, Epley confirmed that he just "came up with a set of criteria" and

then "applied my own experience from what's on my resume and what I know in the textbook."

(Ex. 7, Epley July 8, 2014 Dep. at 48:12-16.)  Like Kilpatrick's model, Epley's six criteria have

never been peer reviewed, have never been subjected to objective testing and have never been

applied outside of this litigation.  (Ex. 7, Epley July 8, 2014 Dep. at 377:23-379:24.)  There is

nothing scientific or reliable about the "six criteria" Epley invented; his opinions are nothing

more than his own say-so, intended to vouch for Kilpatrick.  Such *ipse dixit* is impermissible.

"An expert's conclusory opinions are . . . inappropriate."  *Major League Baseball Props., Inc.* v.

*Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008); *see also In re Puda Coal Sec. Inc., Litig.*, 2014

WL 2915880, at *15 (S.D.N.Y. June 26, 2014) ("[E]ven otherwise qualified experts may not

simply offer conclusory opinions . . . [which] are a form of '*ipse dixit*,' and often provide an

insufficient basis upon which to assess reliability.") (internal citations omitted).  "[N]othing in

either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion

evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec.* v.

*Joiner*, 522 U.S. 136, 146 (1997); *see also Amorgianos*, 303 F.3d at 266 (quoting *Joiner*).

## CONCLUSION

Defendants respectfully request that the Court preclude Dr. Epley from testifying at trial.

Dated: November 26, 2014
New York, NY

Respectfully submitted,

/s/ David B. Tulchin

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: 212-558-4000
Facsimile: 212-558-3588

Amanda F. Davidoff (davidoffa@sullcrom.com)
Elizabeth A. Cassady (cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC 20006
Telephone: 202-956-7500
Facsimile: 202-956-6993

*Attorneys for Defendants Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca*

/s/ Thomas C. Rice

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: 212-455-2000
Facsimile: 212-455-2502

*Attorneys for Defendant RBS Securities Inc.*

## APPENDIX A

## Credibility Assessment Model Questions[1]

| Number (scoring weight[2]) | Credibility Assessment Questions |
|---|---|
| **1 (4.44)** | Are the legal address and parcel ID sufficient to identify the subject? |
| **2 (4.54)** | Did the appraiser report an accurate listing history for the subject? |
| **3 (7.14)** | If there was a prior subject listing, was appraised value lower than listing price? |
| **4 (7.13)** | Was the appraised value of the subject less than or equal to 10% higher than the most recent listing within the last year? |
| **5 (2.54)** | If the appraisal was for a purchase, did the appraiser report receipt of sales contract? |
| **6 (2.54)** | If appraiser reported a sales contract, did the appraiser analyze it? |
| **7 (5.24)** | Did the appraiser report supply/demand correctly? |
| **8 (5.24)** | Did the appraiser report property value trend correctly? |
| **9 (5.24)** | Did the appraiser report marketing time correctly? |
| **10 (4.62)** | Is the subject site description correct? |
| **11 (4.94)** | Did the appraiser report the sales history correctly? |
| **12 (3.94)** | Did the appraiser analyze all prior sales of the subject and comparables? |
| **13 (8.13)** | On an annualized basis, was the appraised value of the subject less than 10% higher than the prior sales price of the subject? |
| **14 (8.60)** | Is the land value ratio greater than 20% and less than 30%? |
| **15 (4.42)** | Did the appraiser use the cost approach for non-condominium properties? |
| **16 (7.62)** | Did the appraiser calculate the physical depreciation correctly? |
| **17 (7.62)** | Did the appraiser report external obsolescence correctly? |
| **18 (3.82)** | Did the appraiser confirm a broker/builder source for comparables using a disinterested third-party source? |
| **19 (5.42)** | For condominiums, was at least one of the comparables outside of the subject's condominium project? |
| **20 (6.63)** | Did the appraiser correctly report comparable sale transaction data? |
| **21 (8.83)** | If a previous sale of a comparable exists, is the current unadjusted price of that comparable less than 10% higher than the prior sale price on an annualized basis? |
| **22 (7.00)** | Is the appraised value of the subject within the range of the unadjusted comparable sales prices? |
| **23 (7.00)** | Is the appraised value of the subject within the range of the adjusted comparable sales prices? |
| **24 (9.20)** | If income approach, do the mix of units for the comps match the mix of |

---

[1]    *See* Ex. 1, Kilpatrick CAM Report at 42-43.

[2]    *See* Ex. 1, Kilpatrick CAM Report at App. 4-6 (Kilpatrick assigned different points to a "no" response to each question).

| **Number** **(scoring weight²)** | **Credibility Assessment Questions** |
|---|---|
| | units for the subject? |
| **25 (9.20)** | If income approach, does the gross rent multiplier ("GRM") used fall within the range of unadjusted GRMs for first 3 comps in the appraisal report? |
| **26 (6.63)** | If income approach is used, do the market rent estimates for each unit mix fall within the range of rents reported for each unit mix for the first three comps? |
| **27 (5.02)** | Did the appraiser use the most recent comps available? |
| **28 (5.02)** | Did the appraiser use the nearest comps available? |
| **29 (8.83)** | Was the average price per square foot ("PPSF") of the comps in the appraisal report less than or equal to the average PPSF of the comps available in the market at the time of the appraisal? |
| **30 (5.02)** | Was the average site square footage ("SSF") of the comps used in the appraisal report less than or equal to the average SSF of the comps available in the market at the time of the appraisal? |
| **31 (4.64)** | Was the average gross living area ("GLA") of the comps used in the appraisal report less than or equal to the average GLA of the comps available in the market at the time of the appraisal? |

## APPENDIX B

### Dr. Epley's Six Evaluation Criteria[1]

**Criterion 1**: Does the model employ commonly understood valuation procedures and ethics typically required to produce an accurate estimate of value?

**Criterion 2**: Does the model give appropriate priority and weight to items representing the most important procedures consistent with known appraisal procedure and practice?

**Criterion 3**: What is the expectation of the model when the property characteristics and weights are assembled in final form?  Is it logical?

**Criterion 4**: Does the model capture elements of the appraisal report that cover market trends?

**Criterion 5**: Is the model comprehensible?  Can sensitivities be performed on the model to assess its components and any changes thereto?

**Criterion 6**: Does the model accomplish its objectives?  Does it assess the application of well-established appraisal procedures applicable at the time to actual appraisals, to state with confidence whether the appraisals may be labeled "non-credible?"

---

[1] *See* Ex. 2, Epley Report at 8.