### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>        Plaintiff,<br><br>   -against-<br><br>NOMURA HOLDING AMERICA INC., *et al.*,<br><br>        Defendants. | No. 11-cv-6201 (DLC)<br><br>ECF Case |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE CERTAIN TESTIMONY OF LEONARD A. BLUM AND PETER D. RUBINSTEIN

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC 20006
Telephone: 202-956-7500
Facsimile: 202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: 212-558-4000
Facsimile: 212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: 212-455-2000
Facsimile: 212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

November 26, 2014

## **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ..................................................................................................1

LEGAL STANDARD ...............................................................................................................4

ARGUMENT .............................................................................................................................5

I.      GENERALIZED TESTIMONY THAT DOES NOT APPLY TO THE FACTS
OF THIS CASE SHOULD BE EXCLUDED ..................................................................5

       A.     Blum Intends to Offer Generalized Testimony that Does Not Apply to this
Case and Is Likely to Confuse and Mislead the Jury ...............................................6

       B.     Rubinstein Intends to Offer Generalized Testimony that Does Not Apply
to this Case and Is Likely to Confuse and Mislead the Jury ...................................8

II.     LEGAL OPINIONS BY BLUM AND RUBINSTEIN SHOULD BE
PRECLUDED ...............................................................................................................12

III.    SPECULATION ABOUT INFERENCES THE JURY SHOULD DRAW
ABOUT RATINGS AGENCIES SHOULD BE EXCLUDED .......................................17

IV.    BLUM'S OPINIONS AND PROPOSED TESTIMONY BASED ON THE
WORK OF PLAINTIFF'S REUNDERWRITING AND APPRAISAL EXPERTS
SHOULD BE PRECLUDED..........................................................................................20

CONCLUSION..........................................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Auther* v. *OshKosh Corp.*,
  2013 WL 5272959 (W.D.N.Y. Sept. 16, 2013) ....................................................21

*Bellis* v. *Tokio Marine & Fire Ins. Co.*,
  2006 WL 648013 (S.D.N.Y. March 14, 2006) .....................................................20

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ..................................................................................1, 4, 19

*Dreyer* v. *Ryder Automotive Carrier Grp. Inc.*,
  2005 WL 1074320 (W.D.N.Y. Feb. 9, 2005) ........................................................6

*Fiataruolo* v. *United States*,
  8 F.3d 930 (2d Cir. 1993) .......................................................................3, 13, 16

*GlobalRock Networks, Inc.* v. *MCI Commc'ns. Servs.*,
  943 F. Supp. 2d 320 (N.D.N.Y. 2013) ................................................................16

*Highland Capital Mgmt., L.P.* v. *Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................................19

*Holman Enters.* v. *Fidelity & Guar. Ins. Co.*,
  563 F. Supp. 2d 467 (D.N.J. 2008) ....................................................................13

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) .......................................................*passim*

*In re Worldcom, Inc. Sec. Litig.*,
  346 F. Supp. 2d 628 (S.D.N.Y. 2004) ............................................................3, 14

*Levinson* v. *Westport Nat'l Bank*,
  2013 WL 3280013 (D. Conn. June 27, 2013) .....................................................19

*LinkCo, Inc.* v. *Fujitsu Ltd.*,
  2002 WL 1585551 (S.D.N.Y. July 16, 2002) .....................................................20

*Matrixx Initiatives, Inc.* v. *Siracusano*,
  131 S. Ct. 1309 (2011) .......................................................................................15

*Nook* v. *Long Island R.R. Co.*,
  190 F. Supp. 2d 639 (S.D.N.Y. 2002) ..................................................................5

*Primavera Familienstifung* v. *Askin*,
  130 F. Supp. 2d 450 (S.D.N.Y. 2001) ............................................................4, 19

# TABLE OF AUTHORITIES
## *(cont'd)*

**Page(s)**

*Rieger* v. *Orlor, Inc.*,
   427 F. Supp. 2d 99 (D. Conn. 2006) ....................................................................13

*Rotman* v. *Progressive Ins. Co.*,
   955 F. Supp. 2d 272 (D. Vt. 2013) .....................................................................19

*SEC* v. *Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013) ...............................................................5, 8

*Taylor* v. *Evans*,
   1997 WL 154010 (S.D.N.Y. Apr. 1, 1997) .........................................................11

*Town of Wolfeboro* v. *Wright-Pierce, Inc.*,
   2014 WL 1806843 (D.N.H. Apr. 2, 2014)...........................................................21

*In re Electronic Books Antitrust Litig.*,
   2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) ....................................................19

*TSC Indus.* v. *Northway*,
   426 U.S. 438 (1976) ............................................................................................15

*U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc.* v. *Westchester County, N.Y.*,
   2009 WL 1110577 (S.D.N.Y. Apr. 22, 2009) ...............................................13, 16

*United States* v. *Lumpkin*,
   192 F.3d 280 (2d Cir. 1999) .................................................................................3

*United States* v. *Scop*,
   846 F.2d 135 (2d Cir. 1988) ..............................................................................2, 3

*United States* v. *Williams*,
   506 F.3d 151 (2d Cir. 2007) .................................................................................4

*United States* v. *Zolot*,
   968 F. Supp. 2d 411 (D. Mass. 2013) .................................................................20

*Wills* v. *Amerada Hess Corp.*,
   379 F.3d 32 (2d Cir. 2004)..................................................................................20

**Statutes and Rules**

15 U.S.C. § 77k ...........................................................................................................16

Fed. R. Evid. 401 ...................................................................................................1, 4, 8

# TABLE OF AUTHORITIES
### *(cont'd)*

**Page(s)**

Fed. R. Evid. 402 .................................................................................................1, 4, 8

Fed. R. Evid. 403 ...................................................................................... *passim*

Fed. R. Evid. 702 ...................................................................................... *passim*

## TABLE OF ABBREVIATIONS

| Action | *FHFA* v. *Nomura Holding America Inc., et al.*, No. 11 Civ. 6201 (DLC) |
|---|---|
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| Blum July 28, 2014 Dep. | Deposition of Leonard A. Blum in *FHFA* v. *HSBC North America Holdings, Inc., et al.*, 11 Civ. 6189 (DLC), *FHFA* v. *Goldman Sachs & Co., et al.*, 11 Civ. 6198 (DLC), and *FHFA* v. *Ally Financial Inc., et al.*, 11 Civ. 7010 (DLC), taken July 28, 2014 |
| Blum Aug. 1, 2014 Dep. | Deposition of Leonard A. Blum in *FHFA* v. *Goldman Sachs & Co., et al.*, 11 Civ. 6198 (DLC) and *FHFA* v. *Ally Financial Inc., et al.*, 11 Civ. 7010 (DLC), taken August 1, 2014 |
| Blum Report | July 9, 2014 Expert Report of Leonard A. Blum in this Action |
| Ex. | Exhibit to the Nov. 26, 2014 Declaration of Owen R. Wolfe submitted in support of this motion |
| Graham Dep. | Deposition of John Paul Graham, taken on August 15, 2013, in this Action |
| Katz Dep. | Deposition of Steven Katz, taken October 1, 2013, in this Action |
| LTV | Loan-to-value ratio |
| Murphy Dep. | Deposition of Brian Hugh Murphy, taken October 14, 2013, in this Action |
| Nomura | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., and Nomura Securities International, Inc. |
| Blum Nomura Rebuttal Report | November 10, 2014 Rebuttal Report of Leonard A. Blum Relating to Nomura |
| Blum RBS Rebuttal Report | November 10, 2014 Rebuttal Report of Leonard A. Blum Relating to RBS Securities Inc. |
| Plaintiff | Federal Housing Finance Agency |
| Rubinstein Report | July 9, 2014 Expert Report of Peter D. Rubinstein in this Action |
| Rubinstein Nov. 17, 2014 Dep. | Deposition of Peter D. Rubinstein in this Action |

| Securities Act | The Securities Act of 1933, 15 U.S.C. 77a, *et seq.* |
|---|---|
| Securitizations | NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 |

Defendants respectfully submit this memorandum in support of their motion to exclude certain trial testimony of Leonard A. Blum and Peter D. Rubinstein pursuant to Federal Rules of Evidence 401, 402, 403 and 702, and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**PRELIMINARY STATEMENT**

On July 9, 2014, plaintiff served expert reports by Leonard A. Blum and Peter D. Rubinstein.  On November 10, 2014, plaintiff served rebuttal reports from Mr. Blum.  In each of his reports, Mr. Blum opines on:  (i) the general obligations and roles of different entities in the securitization process, and (ii) hypothetical actions that participants in the Nomura securitizations might have taken if they knew what Blum deems to be the "true" nature of the loans at issue.  The Rubinstein Report opines on: (i) the process for securitizing residential mortgage loans into securitizations; and (ii) the financial incentives and functions of entities participating in the securitization process during the 2005 to 2007 time period.  The Blum and Rubinstein Reports refer to very few facts that are specific to this Action, and contain three types of purported expert opinions that are improper and inadmissible.

*First*, Blum and Rubinstein offer generalized, cookie-cutter testimony about the incentives and conflicts of interest they claim issuers and underwriters of securitizations face that does not apply to the specific facts of this Action.  For example, without citing any evidence specific to Nomura, Blum opines that issuers seek to maximize what he calls "Net Trade Value," and that, as a result, "underwriters have a strong incentive not to find defective loans or impose rigorous diligence standards."  Ex. 1 (Blum Report) at 23, 32 n.73; *see also* Ex. 8 (Blum Nomura Rebuttal Report) at 11.  Yet Blum admits that he has never examined Nomura's profit structure or incentives.  Rubinstein also opines about the financial incentives of participants in the securitization process, *see e.g.*, Ex. 2 (Rubinstein Report) at ¶¶ 27, 36, but testified that, other

than "some parts of some of the prospectus supplements," he (i) did "not review documents or other evidence related specifically to Nomura's securitization process or its financial incentives," Ex. 7 (Rubinstein Nov. 17, 2014 Dep.) at 24:15-21, (ii) had not seen any evidence related to Nomura's sources of revenue, *id.* at 31:8-15, and (iii) does not intend to offer testimony about the financial incentives of Nomura during the 2005 to 2007 time period, *id.* at 26:15-20. Rubinstein admitted that he does not have "any specific knowledge about Nomura, Nomura's traders or bankers." *Id.* at 34:7-10. Rubinstein also opines that various relationships among participants in a securitization may lead to conflicts of interest—but without investigating whether any of those relationships existed for the Nomura securitizations.

Expert testimony that does not apply to the facts of the case does not "help the trier of fact to understand the evidence or to determine a fact in issue," as required by Rule 702, Fed. R. Evid. To the contrary, such testimony will confuse and mislead the jury. *See* Fed. R. Evid. 403. This case illustrates those precise concerns. The generalized opinions offered by Blum and Rubenstein about incentives do not apply to Nomura, which retained the riskiest "residual" tranches of the Securitizations and thus had strong incentives to perform diligence. Ex. 3 (Katz Dep.) at 75:25-77:19. Similarly, while Rubenstein does not appear to have addressed his report specifically to RBS Securities Inc. (""RBSSI"), which acted as an underwriter in connection with four of the securitizations at issue in this case, he makes sweeping statements about "underwriters" generally, such as his view that "underwriters could have access to additional information about the underlying mortgage loans to the extent that they or their affiliates extended warehouse lines of credit t to originators to fund the origination of mortgage loans." Ex. 2 (Rubinstein Report) at ¶ 84. Such statements have no bearing on the role of RBSSI in this case and thus are irrelevant and likely to confuse the jury. And the at-issue

securitizations were affected by none of the key conflicts of interest about which Rubinstein

expresses concern, such as vertical integration with originators and warehouse lending.  Ex. 2

(Rubinstein Report) at ¶¶ 37-38.

     *Second*, Blum and Rubinstein run afoul of the rule that an expert witness may not

give legal opinions.  Expert testimony that "track[s] the language of the relevant regulations and

statutes . . . [i]s not helpful to the jury . . . [and is] calculated to invade the province of the court

to determine the applicable law and to instruct the jury as to that law."  *Fiataruolo* v. *United*

*States*, 8 F.3d 930, 942 (2d Cir. 1993) (internal quotation marks omitted) (quoting *United States*

v. *Scop*, 846 F.2d 135, 140 (2d Cir. 1988)).  Yet Blum opines on underwriters' duty to perform

what he terms "Requisite Due Diligence," which he defines by reference to the language of

Sections 11 and 12 of the Securities Act and this Court's opinion in *In re Worldcom, Inc.*

*Securities Litigation*, 346 F. Supp. 2d 628, 663 (S.D.N.Y. 2004).  *See* Ex. 1 (Blum Report) at 16

& n.37; Ex. 8 (Blum Nomura Rebuttal Report) at 5 & n.8, 16 n.27, 17 & n.30-31, 20 n.36, 37-38

& n.109, 150 n.527.  Similarly, Rubinstein opines that "the underwriter[] has a duty to perform

due diligence to ensure that the representations in the offering materials such as the registrations

[sic] statements and prospectus supplements are accurate and complete, and comply with the

securities laws."  *See* Ex. 2 (Rubinstein Report) at ¶ 32.  These "opinions" about the legal

obligations of participants in the securitization process are an attempt to "'usurp . . . the role of

the trial judge in instructing the jury as to the applicable law [and] the role of the jury in applying

that law to the facts before it.'"  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547

(S.D.N.Y. 2004) (internal alteration omitted) (quoting *United States* v. *Lumpkin*, 192 F.3d 280,

289 (2d Cir. 1999)).

*Third*, Blum and Rubinstein offer "opinions" that are nothing more than speculation intended to tell the jury what inferences it should draw from fact testimony and other evidence concerning ratings agencies.  Based on the opinions of other trial experts for plaintiff— concerning supposed underwriting defects and overvalued appraisals—Blum speculates on what ratings agencies might have done had they known of the supposed "true nature" of the loans at issue.  Ex. 1 (Blum Report) at 33.  Similarly, Rubinstein opines, based on no empirical analysis, that if information in loan tapes sent to ratings agencies was inaccurate, "the ratings were not accurate."  Ex. 2 (Rubinstein Report) at ¶ 73 (internal footnote omitted).  These opinions about the possible actions that ratings agencies might have taken and the impact that allegedly inaccurate data had on ratings are not based on any independent analysis; instead, Blum and Rubinstein merely repeat testimony by ratings agency witnesses and intend to tell the jury what inferences to draw therefrom.  This is an improper attempt to "'supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence.'"  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 541 (quoting *Primavera Familienstifung* v. *Askin*, 130 F. Supp. 2d 450, 527 (S.D.N.Y. 2001)).  It is not permissible for a party to use an expert witness to make pure argument about the proper inferences the trier of fact should draw from the fact testimony of other witnesses.

On top of all that, Blum also repeats opinions of other experts that he has no basis for assessing.  He ought not to be permitted to merely regurgitate those opinions as if they were established fact.

## LEGAL STANDARD

Expert testimony is admissible only if it will "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  To determine whether the

-4-

party proffering expert testimony has met its burden to establish admissibility, a court should

consider whether:

      (a)    the testimony is based on sufficient facts or data;

      (b)    the testimony is the product of reliable principles and
            methods; and

      (c)    the expert has reliably applied the principles and methods
            to the facts of the case.

Fed. R. Evid. 702; *see also United States* v. *Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

In this role, the court acts as a "gatekeeper," ensuring that the proponent has made

the necessary showing and that the expert's testimony "both rests on a reliable foundation and is

relevant to the task at hand." *Daubert*, 509 U.S. at 597. Evidence provided by an expert also

must meet the requirements imposed by the Federal Rules of Evidence. The evidence must be

relevant—it must have a "tendency to make a fact more or less probable than it would be without

the evidence," and that fact must be "of consequence in determining the action." Fed. R. Evid.

401. Irrelevant evidence is inadmissible. Fed. R. Evid. 402. Even if evidence is deemed

relevant, it still may be excluded if its probative value is substantially outweighed by a danger of

"prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly

presenting cumulative evidence." Fed. R. Evid. 403; *see also SEC* v. *Tourre*, 950 F. Supp. 2d

666, 675 (S.D.N.Y. 2013).

## ARGUMENT

## I. GENERALIZED TESTIMONY THAT DOES NOT APPLY TO THE FACTS OF THIS CASE SHOULD BE EXCLUDED.

Blum and Rubinstein intend to offer generalized testimony that they fail to apply

or connect to the facts of this case and which is, in large measure, inapplicable to defendants. To

be admissible, expert testimony must be relevant and should assist the jury in understanding the

evidence or determining a fact in issue.  *Nook* v. *Long Island R.R. Co.*, 190 F. Supp. 2d 639, 641 (S.D.N.Y. 2002); Fed. R. Evid. 702.  "Even if found relevant under Rule 702, proffered expert testimony should also be excluded pursuant to Fed. R. Evid. 403 ('Rule 403'), where the testimony's probative value is outweighed by the risk of undue prejudice, confusion of the issues, or misleading the jury, potential problems especially present when expert testimony is involved."  *Dreyer* v. *Ryder Automotive Carrier Grp. Inc.*, 2005 WL 1074320, at *13 (W.D.N.Y. Feb. 9, 2005); *see also Nook*, 190 F. Supp. 2d at 643.

Generic testimony that is inapplicable to the facts of this case is irrelevant and will not assist the jury in understanding the evidence or determining a fact in issue.  To the contrary, expert testimony that bears no relation to the facts of the case is likely to cause confusion and mislead jurors—who will mistakenly think that such testimony applies to this case—and should be excluded.

### A.     Blum Intends to Offer Generalized Testimony that Does Not Apply to this Case and Is Likely to Confuse and Mislead the Jury.

Blum claims that, in the context of the sales of securitizations, "material profits (or losses) generally arise from underwriting fees plus any other benefits" as well as the "difference between (a) the proceeds received by the bank (and affiliates) from sold securities, plus the value of any securities retained; and, in the instance of an affiliated underwriter, (b) what the bank paid for the loans plus all marginal expenses of the securitization," which Blum defines as "Net Trade Value."  Ex. 1 (Blum Report) at 14-15; *see also id.* at 23 ("When an issuer brings RMBS to market, the goal is to maximize Net Trade Value."), 24-25, 30-31, 34, 36; Ex. 8 (Blum Nomura Rebuttal Report) at 11.  Blum argues that having to disclose the "true" characteristics of the underlying collateral "could significantly lessen or make negative the Net Trade Value of the transactions."  Ex. 1 (Blum Report) at 35-36; *see also id.* at 34.  Thus, Blum argues,

"underwriters have a strong incentive not to find defective loans or impose rigorous diligence standards," all in order to maximize Net Trade Value.  *Id.* at 32 n.73.

        None of this is connected to the facts of this case.  Here, Nomura retained all or part of the *riskiest* tranche of each of the seven securitizations and relied on those "residuals" as its primary source of profits.  As a result, Nomura has a strong incentive to find defective loans and impose rigorous due diligence standards because otherwise its riskiest tranche would not perform and it would be exposed to losses (not profit).  Nomura held at least a portion of the residual certificates for all of the Securitizations.  *See* Ex. 9 (NOM-FHFA_ 05769343) at NOM-FHFA_05769344.  Steven Katz, the head of subprime trading at Nomura during the relevant time period, testified that "[a]ll of [Nomura's] profit was tied into the performance" of the residual, because "there was no cash gain on" selling the securitizations.  Ex. 3 (Katz Dep.) at 75:25-77:19.  This was due to the fact that "[t]he proceeds from the securitization did not eclipse the basis for which Nomura owned the loans.  So the value of the residual was in effect your profit and loss."  *Id.*  Similarly, Brian Murphy, Nomura's head of Alt-A trading during the relevant time period, testified that "the portions of the deal that you would sell" to investors "would not be sufficient to cover your acquisition cost for the loans," meaning that "your profit . . . would be in where you book your residual security."  Ex. 6 (Murphy Dep.) at 241:25-243:8.  John Graham, Nomura's head of contract finance, also testified that "the profitability [on Nomura's RMBS securitizations] was all in the residual piece."  Ex. 10 (Graham Dep.) at 259:8-25.

        Blum makes no attempt to apply or connect his opinions to the specific facts of this case.  Instead, Blum relies on academic research by Professor Frank Fabozzi, who wrote that "the sole economic goal of the structure is to maximize the total proceeds received from the sale

of all the bond classes that are backed by the asset pool . . . .  Or alternatively, for a given

funding size, the goal is to attain the lowest weighted average cost."  Ex. 1 (Blum Report) at 23

(internal alteration omitted).  Blum expands on this idea, noting that "[o]ne of the most common

ways for an underwriter to maximize Net Trade Value is to sell securities with relatively more

highly rated tranches, as investors demand less yield for such securities."  *Id.* at 24.  Blum's

focus on the goal of other issuers causes him to ignore entirely the evidence that Nomura would

realize a profit, if at all, from the performance of the retained residuals—not the sale of the

senior classes of certificates to investors.

Blum's opinions are not only irrelevant, but would be confusing to the jury.  *See*

Fed. R. Evid. 702 (expert testimony must "help the trier of fact"); *see also* Fed R. Evid. 401, 402,

403; *Tourre*, 950 F. Supp. 2d at 675, 678.  Instead of learning about Nomura's practices and

incentives, the jury would hear Mr. Blum's testimony about generalized incentives that other

participants in the industry might have.  This testimony should be excluded.

Similarly, Blum plans to offer testimony regarding "scratch-and-dent" loans, and

opines that the securitizations required disclosures similar to the disclosures found in offering

documents for "scratch-and-dent" securitizations.  Ex. 1 (Blum Report) at 20-22.  Blum

describes "scratch-and-dent" loans as loans that "(a) violated the underwriting guidelines or

program guidelines under which they were intended to have been originated; (b) had document

deficiencies; or (c) became delinquent."  *Id.* at 20.  Blum concludes, without any supporting

analysis, that the at-issue loans "closely resemble scratch-and-dent securitizations in certain

respects."  *Id.* at 35.  But Blum failed to demonstrate that *any* of the loans at issue in this case

are, in fact, "scratch-and-dent" loans, or otherwise show that "scratch-and-dent" loans have any

relevance to this Action.  Such testimony is not only irrelevant, but would be confusing and

misleading to a jury because it implies, without any basis, that the loans at issue in this case are "scratch-and-dent" loans.  *See* Fed. R. Evid. 403.

> **B.     Rubinstein Intends to Offer Generalized Testimony that Does Not Apply to this Case and Is Likely to Confuse and Mislead the Jury.**

Rubinstein makes no attempt to apply or connect to the facts of this action his generic opinions about (i) industry trends during 2005 to 2007, (ii) potential conflicts of interest due to vertical integration, and (iii) the financial incentives of participants in the securitization process.  Indeed, Rubinstein admits that he does not have "any specific knowledge about Nomura, Nomura's traders or bankers."  Ex. 7 (Rubinstein Nov. 17, 2014 Dep.) at 33:24-34:9. This testimony can be of no help to the jury, and should be excluded.

*First,* in the section of his report on "industry trends during the 2005 to 2007 time period," Ex. 2 (Rubinstein Report) at ¶¶ 66-69, Rubinstein identifies three ways investment banks "looked for ways to secure their access to a steady supply of loans": (i) "launching or purchasing a mortgage loan lending platform," (*id.* ¶ 67); (ii) "tak[ing] an equity stake or otherwise invest[ing] capital in an originator," (*id.* ¶ 68); and (iii) "provid[ing] warehouse lines of credit to originators" and "leverag[ing] this business relationship . . . to develop opportunities to purchase pools of loans for its securitization business," (*id.*¶ 69).  Rubinstein testified that he has no evidence that Nomura undertook any of these activities.  Ex. 7 (Rubinstein Nov. 17, 2014 Dep.) at 67:11-18 ("Q: Have you seen any evidence indicating that Nomura launched or purchased a mortgage loan lending platform during this time period?  A: No."); *id.* at 68:5-10 ("Q: And have you seen any evidence that Nomura took an equity stake or invested capital in any of the originators of the loans backing the securitizations in this case?"  A: No."); *id.* at 68:20-24 ("Q: And have you seen any evidence that Nomura had warehouse lines of credit with any of the originators of the loans backing the securitizations in this case?  A: No, I have not.").

In fact, Nomura did not launch or purchase a mortgage loan lending platform, or take an equity stake in or otherwise invest capital in an originator.  With respect to warehouse lending, Rubinstein presents no evidence that Nomura engaged in any such lending with any of the originators of loans underlying the supporting loan groups of the Securitizations.  *Id.* at 68:20-24. Thus, all of Rubinstein's intended testimony on industry trends is inapplicable to this case and irrelevant.  Even if somehow relevant, presenting this testimony is highly likely to confuse and mislead the jury, as the jury will infer that Nomura acted in the way Rubinstein describes— which he implies was detrimental to investors—when, in fact, it did not.

       *Second,* Rubinstein repeatedly opines on potential conflicts of interest that exist when there is "vertical integration" among participants in the securitization process—that is, when participants are related or affiliated.  According to Rubinstein, "[t]hese vertically integrated securitization structures enabled the participants in the securitization structure to have access to greater information about the underlying assets" and "the affiliation of the participants in the securitization also created potential conflicts of interest."  Ex. 2 (Rubinstein Report) at ¶¶ 37-38. Further, Rubinstein claims that affiliated participants "could exercise more direction and control" during the securitization process.  *Id.* at ¶ 37.

       As Rubinstein admits, this is general testimony that is not specific to Nomura and, thus, irrelevant to this case.  Rubinstein acknowledged that conflicts of interest were not created "merely by virtue of an affiliation between sponsors and underwriters" and that he was "not opining that a conflict of interest, in fact, existed in this case."  Ex. 7 (Rubinstein Nov. 17, 2014 Dep.) at 84:13-16, 85:20-23.  Rubinstein testified that he had not "seen any evidence that Nomura had access to greater information about the quality of the mortgage loans at issue in this case" and had not seen "any evidence that Nomura exercised more direction and control during

the securitization process as a result of vertical integration." *Id.* at 49:23-50:9; 53:5-9.  Further, Rubinstein testified that the statement in his report that "on some securitizations, Nomura was both sponsor and securities underwriter and an indirect subsidiary, Decision One, was an originator," Ex. 2 (Rubinstein Report) at ¶ 82, was "actually a mistake; as far as I can tell, they do not have an indirect subsidiary, Decision One," Ex. 7 (Rubinstein Nov. 17, 2014 Dep.) at 14:7-13.  There is no dispute that Nomura was not affiliated with any of the originators of the loans backing the Securitizations.  Rubinstein admitted that if the sponsor and the originator were "true third parties," *i.e.*, not affiliated, the parties would have an "adversarial relationship" and the party buying the loans would have less access to information.  *Id.* at 50:10-51:5.  Similarly, while Rubinstein refers generically to "underwriters" throughout his report, his opinions regarding such matters as conflicts of interest, warehouse lines of credit and the like have no bearing on RBSSI.  Rubinstein's opinions and testimony concerning conflicts of interest and vertical integration are not based on any evidence related to Nomura and RBSSI and, if offered, are likely to cause confusion and mislead the jury.[1]  Accordingly, they should be excluded.

> *Third,* Rubinstein's intended testimony about the financial incentives of the participants in the securitization process is also generic testimony that is not specific to Nomura and thus, irrelevant, and if offered, confusing and misleading.  According to Rubinstein, "[t]he largest source of revenue for the sponsor is the cash paid to the sponsor by the depositor."  Ex. 2 (Rubinstein Report) at ¶ 27.  But "revenue" is not relevant to the issues on which plaintiff seeks

---

[1]    In addition to being irrelevant, likely to cause confusion and mislead the jury, testimony about defendants' financial incentives and motivations is also impermissible state of mind testimony.  *See In re Rezulin,* 309 F. Supp. 2d at 547 ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."); *Taylor* v. *Evans,* 1997 WL 154010 at *2 (S.D.N.Y. Apr. 1, 1997) (holding that expert's "musings as to defendants' motivations" were inadmissible).

to offer Rubinstein's testimony—profit is—and Nomura relied on residuals as its source of profits from a securitization.  As stated above, Nomura's profit depended on the performance of the residuals, not the "revenue" to which Rubinstein refers.  *See* pp. 6-7, *supra*.

## II.  LEGAL OPINIONS BY BLUM AND RUBINSTEIN SHOULD BE PRECLUDED.

Expert witnesses may not intrude on the Court's responsibility for instructing jurors about governing legal principles.  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 547 (expert testimony about whether certain actions met a legal standard must be "excluded . . . [because] it impermissibly embraces a legal conclusion.  Such testimony 'usurp[s] . . . the role of the trial judge in instructing the jury as to the applicable law [and] the role of the jury in applying that law to the facts before it.'" (internal footnotes omitted)).  In *Rezulin*, the court considered expert testimony on a variety of topics, including defendant's "duty to warn patients" about the risks associated with clinical trials for a new drug and "the motive, intent, and state of mind of" various entities involved in the proceedings.  *Id.* at 539.  With respect to the duty to warn, plaintiff had offered an expert opinion that defendant "violated 'three basic patient rights issues'" and "three corresponding 'duties' of (1) full disclosure, (2) not harming others and (3) 'distributional justice.'"  *Id.* at 557.  The court rejected plaintiff's argument that these were standards applicable to "the medical community" and thus not legal standards, ruling that the expert's opinions were "at best thinly-disguised legal or quasi-legal principles" that were inadmissible because they sought to "communicate[] a legal standard and so would encroach on the court's prerogative to instruct [the jury] on the law."  *Id.* at 558.  Expert testimony that the defendant's conduct amounted to "'negligence' or 'something more serious'" was also excluded because it "impermissibly embrace[d] a legal conclusion."  *Id.* at 547.

This Court has reached similar conclusions.  In *United States* ex rel. *Anti-Discrimination Center of Metro New York, Inc.* v. *Westchester County*, 2009 WL 1110577, at *2-3 (S.D.N.Y. 2009), this Court found that "expert testimony that amounts to [a] statement of a legal conclusion" and which purports to "instruct the jury as to [the] applicable principles of law" must be excluded.  *See also Holman Enters.* v. *Fidelity & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 (D.N.J. 2008) ("The district court must limit expert testimony so as to not allow experts to opine on 'what the law required' or 'testify as to the governing law.'"); *Rieger* v. *Orlor, Inc.*, 427 F. Supp. 2d 99, 103-105 (D. Conn. 2006) (expert testimony included two legal conclusions based on certain facts in the record and thus impermissibly invaded the jury's province to apply the applicable law to the facts of the case and reach ultimate legal conclusions); *Fiataruolo*, 8 F.3d at 942.

Here, Blum purports to offer opinions about defendants' legal obligations in the securitization process and the legal standards at issue in this Action.  First, Blum plans to opine concerning the "Requisite Due Diligence" owed by law by underwriters in connection with offerings of asset-backed securities.  In describing his concept of "Requisite Due Diligence," Blum explains that defendants "ha[d] an obligation, pursuant to the Securities Act of 1933 . . . to conduct a reasonable investigation of representations in an offering's registration statement (and amendments thereto), prospectus and any prospectus supplement (the 'Disclosure Documents'), including identifying and investigating any 'red flags' or 'warning signs' that arise regarding the accuracy of such representations, such that it had reasonable grounds to believe that the Disclosure Documents do not make any untrue statement of a material fact or omit to state a material fact necessary to make the statements made not misleading."  *See* Ex. 1 (Blum Report) at 4; *see also* Ex. 8 (Blum Nomura Rebuttal Report) at 5; Ex. 11 (Blum RBS Rebuttal Report) at

-13-

5.  Blum also opines that "[t]o the extent that defective loans are found during Requisite Due Diligence, pursuant to the securities laws, the underwriter must cure, remove, or disclose such defects."  Ex. 1 (Blum Report) at 16; *see also* Ex. 8 (Blum Nomura Rebuttal Report) at 19. Blum makes it clear that his testimony is his interpretation of a governing legal standard by citing in support the Securities Act and *In re Worldcom, Inc. Securities Litigation*, 346 F. Supp. 2d 628, 663 (S.D.N.Y. 2004).  *See* Ex. 1 (Blum Report) at 16 & n.37; Ex. 8 (Blum Nomura Rebuttal Report) at 5 & n.8, 16 n.27, 17 & n.30-31, 20 n.36, 37-38 & n.109, 150 n.527. According to Blum, these legal authorities required defendants to carry out what he describes as Requisite Due Diligence.

Blum purports to tell the jury about other legal standards as well.  He opines about defendants' supposed disclosure obligations under the Securities Act, arguing that "[t]o the extent that defective loans are found during Requisite Due Diligence, pursuant to the securities laws, the underwriter must cure, remove, or disclose such defects."  *See* Ex. 1 (Blum Report) at 16; Ex. 8 (Blum Nomura Rebuttal Report) at 19.  He goes on to state that if defendants had left allegedly "defective" loans in the pools underlying the Securitizations, they "would have had to provide the ratings agencies with a corrected loan tape and Disclosure Documents, as opposed to what was supplied with respect to the Subject Offerings. . . ."  Ex. 1 (Blum Report) at 33.  Blum also claims that "[d]efendants would have had to correct Disclosure Documents . . . to advise investors that certain Subject Loans violated underwriting guidelines, as well as disclose the quantity of such loans in the pools and the types of deviations."  *Id.* at 35.  Thus, Blum repeatedly opines on what defendants were "required" to disclose under the Securities Act.

In addition, Blum defines the word "material" "in the context of securities disclosure standards" as "a fact or situation that a reasonable investor would want to know about

when making a decision whether or not to buy the subject security," and notes that "[m]aterial information . . . is intended by the issuer and the underwriter to be the major factor upon which investors assess a given security . . . ."  Ex. 1 (Blum Report) at 4 n.5, 17; *see also* Ex. 8 (Blum Nomura Rebuttal Report) at 5 n.9; Ex. 11 (Blum RBS Rebuttal Report), at 5 n. 9.  The definition of "materiality" for purposes of the Securities Act is, of course, a legal question.  *See*, *e.g.*, *TSC Indus., Inc.* v. *Northway*, 426 U.S. 438, 449 (1976); *Matrixx Initiatives, Inc.* v. *Siracusano*, 131 S. Ct. 1309, 1318 (2011).  All of this is for the Court, not an "expert" for one side.

Blum even admitted in testimony given in related actions brought by plaintiff that his proposed trial testimony is based on legal advice he has received over the years.  For example, his definition of "Requisite Due Diligence" is based on an "extensive and rigorous training program . . . [during which] [t]he General Counsel of the firm came in and talked about due diligence.  She gave us a case study.  We talked about various topics in due diligence.  We had someone who was a banker who was previously a securities lawyer come in and talk about the '33 Act, the '34 Act and the '40 Act."  Ex. 4 (Blum July 28 Dep.) at 24:22-26:11.

Indeed, the Blum Report uses language from Section 11 when it defines "Requisite Due Diligence":  "A broker-dealer acting in the capacity of a securities underwriter . . . has an obligation, pursuant to the Securities Act of 1933 as amended . . . to conduct a reasonable investigation of representations in an offering's registration statement (and amendments thereto), prospectus and any prospectus supplement . . ., including identifying and investigating any 'red flags' or 'warning signs' that arise regarding the accuracy of such representations, such that it had reasonable grounds to believe that the Disclosure Documents do not make any untrue statement of a material fact or omit to state a material fact necessary to make the statements made not misleading."  Ex. 1 (Blum Report) at 4 (internal footnote omitted);

*see also* Ex. 8 (Blum Nomura Rebuttal Report) at 5 (internal footnotes omitted); Ex. 11 (Blum

RBS Rebuttal Report) at 5 (internal footnotes omitted).  Similarly, in earlier deposition testimony

in related cases, Blum stated that underwriters must act as though they were "a prudent investor

in the management of their own money."  Ex. 5 (Blum Aug. 1 Dep.) at 113:14-115:3.[2]  As this

Court has noted, "[i]t is particularly inappropriate for a witness to track the exact language of

statutes and regulations which the defendant is accused of violating."  *Westchester County*, 2009

WL 1110577, at *6-7.

       Rubinstein also intends to offer testimony concerning the legal obligations of the

parties to a securitization transaction.  Rubinstein asserts that "[t]he underwriter has a unique role

in that it has the obligation of independently verifying information relating to the securitization"

and "has a duty to perform due diligence to ensure that the representations in the offering

materials such as the registration statements and prospectus supplements are accurate and

complete and comply with the securities laws."  Ex. 2 (Rubinstein Report) at ¶ 32.  Thus, while

Rubinstein thus seeks to instruct the jury on the legal obligations and duties of underwriters.

       It is black letter law that an expert witness is precluded from testifying regarding

the statutes, regulations, or other legal standards that are at issue.  Indeed, "[e]xperts should not

testify on the meaning of words in a statute or regulation as that decision is one of law which

must be made by the court."  *GlobalRock Networks, Inc.* v. *MCI Commc'ns. Servs.*, 943 F. Supp.

2d 320 (N.D.N.Y. 2013); *see also Fiataruolo*, 8 F.3d at 942.  Accordingly, Blum's and

---

[2]     Section 11 provides that certain entities are not liable for material misstatements or
omissions if they "had, after reasonable investigation, reasonable ground to believe, and did
believe, at the time such part of the registration statement became effective, that the statements
therein were true and that there was no omission to state a material fact . . . necessary to make
the statements therein not misleading."  15 U.S.C. § 77k(b)(3).  Section 11 goes on to note that
the standard of reasonableness is "that required of a prudent man in the management of his own
property."  *Id.* at § 77k(c).

Rubinstein's testimony about defendants' legal obligations and the legal standards at issue in this Action and should be excluded.

## III.    SPECULATION ABOUT INFERENCES THE JURY SHOULD DRAW ABOUT RATINGS AGENCIES SHOULD BE EXCLUDED.

Blum and Rubinstein intend to tell the jury how ratings agencies "likely" would have responded or reacted had Nomura provided them with different information about the securitizations. *See* Ex. 1 (Blum Report) at 5, 10-12, 30-36; Ex. 2 (Rubinstein Report) at ¶ 73. Neither Blum nor Rubinstein performed any analysis to reach their "opinions," which are merely inferences drawn from testimony by ratings agency witnesses and other evidence in the case. This is an improper effort to tell the jury how it should interpret and understand fact evidence.

For example, Blum, who possesses no special expertise about ratings agencies, *see* Ex. 1 (Blum Report) at 1-2, opines that if the ratings agencies had been confronted with the "true" nature of the underlying collateral for these securitizations, "the rating agencies very likely may have refused to rate the transactions altogether and/or withdrawn any existing rating." Ex. 1 (Blum Report) at 33.  In support, Blum cites to testimony of Standard & Poor's, Moody's, and Fitch Ratings pursuant to Rule 30(b)(6) that never mentions anything about any possible refusal to rate any transaction.  *See id.* at 33 n.74.  Blum's "opinion" that it was "very likely" the ratings agencies "may have refused to rate the transactions altogether" is pure speculation aimed at telling the jury what inferences to draw from the ratings agencies' testimony.  Blum also opines that absent "additional credit enhancements, rating agencies likely would have assigned lower ratings to the Subject Offerings (or at least assigned fewer AAA ratings) and may not have assigned investment grade ratings at all." Ex. 1 (Blum Report) at 34.  Again, Blum performs no

independent analysis to reach this conclusion, and is merely trying to tell the jury what inferences it should draw from other testimony.

Blum also speculates that "[b]ecause rating agencies sometimes made 'out of model' adjustments for things like underwriting and originator quality . . . , [d]efendants would likely have had to disclose the massive defects to the rating agencies and submit a revised pool for rating" if defendants had removed or replaced purportedly defective loans.  Ex. 1 (Blum Report) at 32.  He further speculates that "if a particular originator or loan pool was found to contain . . . high percentages of loans that did not comply with underwriting guidelines," issuers should have disclosed that information to ratings agencies, which "may have impacted the perceived riskiness of the loan originators at issue . . . and possibly have led the credit rating agencies to require additional credit enhancement to obtain comparable ratings." *Id*.  No rating agency witness testified that the agencies would, in fact, have taken the actions Blum opines about.

Rubinstein similarly attempts to instruct the jury on the inferences it should draw from fact testimony about the rating agencies.  Rubinstein states that information about the collateral was provided by the underwriter to the rating agencies "who use this data as an important part of determining the appropriate level of credit enhancement."  Ex. 2 (Rubinstein Report) at ¶ 73.  Rubinstein then opines that because the rating agencies did not independently verify the data that was sent to them by the underwriter, "to the extent the information in the loan tape was inaccurate, the ratings were not accurate." *Id*.  In drawing this conclusion, Rubinstein admitted that he did not "perform any analysis to determine the magnitude of the information that had to be inaccurate in order to impact a rating."  Ex. 7 (Rubinstein Nov. 17, 2014 Dep.) at

71:4-13.  Indeed, Rubinstein performs no analysis at all.  His intended testimony is merely speculation about the potential impact of inaccurate data on a securitization's rating.

Blum and Rubinstein's opinions about what the rating agencies might have done are improper attempts to tell the jury what it should infer from the facts.  In *Rezulin*, plaintiff's expert offered testimony that a defendant "failed to provide the FDA with all necessary information regarding the risk of liver injury and that the FDA would not have approved [the at-issue drug] had it received different information."  309 F. Supp. 2d at 550.  The court noted that the expert lacked "supporting data," and excluded the testimony.  *Id*.  "[E]xperts should not be permitted to 'supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence.'"  *Id.* at 541 (quoting *Primavera Familienstifung*, 130 F. Supp. 2d at 527); *see also Levinson* v. *Westport Nat'l Bank*, 2013 WL 3280013, at *4, 7 (D. Conn. June 27, 2013) (expert "may not proffer opinions which do not draw on his expertise but merely restate otherwise properly admitted evidence" in order to "construct[] a factual narrative based upon record evidence."); *Highland Capital Mgmt*., *L.P*., v. *Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (barring expert testimony because it "consist[s] simply of inferences that [the expert] draws from other evidence in the case").  These opinions are also unsupported speculation.  *See Daubert*, 509 U.S. at 590*; In re Electronic Books Antitrust Litig*., 2014 WL 1282298, at *11 (S.D.N.Y. Mar. 28, 2014) (excluding expert opinions that were "unsupported by any rigorous analysis and purely speculative"); *In re Rezulin*, 309 F. Supp. 2d at 541, 543 & n.27 (noting that the Rules of Evidence preclude "the admission of subjective or speculative opinions" and excluding certain expert testimony that was "based on their personal, subjective views" rather than on an independent analysis); *Rotman* v. *Progressive Ins. Co*.,  955 F. Supp. 2d 272, 283 (D. Vt. 2013).

Neither Blum nor Rubinstein provides any independent analysis to reach his opinions concerning potential ratings agency actions, which are pure speculation.  Instead, each of them merely repeats ratings agency testimony, and tells the jury what it should infer from that evidence.  "It is well-established that expert testimony is unnecessary 'in cases where jurors are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training.'"  *Bellis* v. *Tokio Marine & Fire Ins. Co.*, 2006 WL 648013, at *2 (S.D.N.Y. Mar. 14, 2006) (quoting *Wills* v. *Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004)).  Where "testimony by fact witnesses familiar with those documents [on which the expert's report was based] would be far more appropriate . . . [it] renders the expert witness'[s] secondhand knowledge unnecessary for the edification of the jury."  *LinkCo, Inc.* v. *Fujitsu Ltd.*, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (internal quotation marks omitted).

## IV.   BLUM'S OPINIONS AND PROPOSED TESTIMONY BASED ON THE WORK OF PLAINTIFF'S REUNDERWRITING AND APPRAISAL EXPERTS SHOULD BE PRECLUDED

Throughout his reports, Blum restates as fact findings made by FHFA's other experts, John Kilpatrick and Robert Hunter.  For example, in his initial report, Blum claims that defendants should have eliminated loans and revised the disclosure documents in view of the supposed "defects" identified by those experts.  *See* Ex. 1 (Blum Report) at 5,  25-35.  Similarly, in his rebuttal reports, Blum asserts that defendants overlooked loans he claims are "defective" based solely on his review of these other expert reports.  *See, e.g.*, Ex. 11 (Blum RBS Rebuttal Report) at ¶ 18 (arguing that RBS's due diligence should have "discovered some or all of the defects identified in the Expert Reports of Dr. Kilpatrick and Mr. Hunter"); *id*. ¶¶ 186-188. Blum, however, does not purport to do his own independent assessment of Kilpatrick's or

Hunter's purported "defect" findings.  Blum does not appear to have considered reports of defendants' experts rebutting the opinions of Kilpatrick and Hunter.

It is well settled that an expert may not simply rely on the work of other experts without performing his or her own, independent analysis.  *United States* v. *Zolot*, 968 F. Supp. 2d 411, 426-27 & n.27 (D. Mass. 2013) (excluding expert testimony where expert "presented no independent analysis" and relied upon the medical examiner's diagnosis as the basis for his opinion); *Auther* v. *OshKosh Corp.*, 2013 WL 5272959, at *3 (W.D.N.Y. Sept. 16, 2013) ("While experts may rely upon and testify to factual data obtained from others, their opinions should not be used as a basis for the [expert] witnesses' conclusions"); *Town of Wolfeboro* v. *Wright-Pierce, Inc.*, 2014 WL 1806843 (D.N.H. Apr. 2, 2014) (excluding expert testimony where expert "simply parrot[ed] the conclusions of other experts' reports in his report").  Yet that is exactly what Blum purports to have done here.  Blum did not, for example, review any of the loan files or make his own, independent assessment as to whether any of the loans failed to comply with relevant underwriting guidelines, nor did he make any independent assessment as to whether LTV values, or the appraisals on which some of those values may have been based, were incorrect.  "An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge."  *Arista Records LLC v. Unenet.com, Inc.*, 608 F. Supp. 2d 409, 424-25 (S.D.N.Y. 2009).  For these reasons, Blum should be precluded from offering evidence or argument predicated on the opinions or findings of Kilpatrick or Hunter.

## CONCLUSION

This Court should preclude Blum and Rubinstein from offering at trial any generic testimony that does not apply to the facts of this case, any opinions about the governing

law, any testimony intended to tell the jury what inferences it should draw from fact testimony

and other evidence concerning ratings agencies, or the findings of Kilpatrick and Hunter.

Dated:  November 26, 2014
        New York, NY

Respectfully submitted,

/s/ David B. Tulchin
David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:  212-558-4000
Facsimile:  212-558-3588

Amanda F. Davidoff (davidoffa@sullcrom.com)
Elizabeth A. Cassady (cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC 20006
Telephone:  202-956-7500
Facsimile:  202-956-6993

*Attorneys for Defendants Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca*

/s/ Thomas C. Rice
Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone:  212-455-2000
Facsimile:  212-455-2502

*Attorneys for Defendant RBS Securities Inc.*