UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,

            -against-

NOMURA HOLDING AMERICA, INC.;
NOMURA ASSET ACCEPTANCE
CORPORATION; NOMURA HOME
EQUITY LOAN, INC.; NOMURA CREDIT
& CAPITAL, INC.; NOMURA SECURITIES
INTERNATIONAL, INC.; RBS SECURITIES
INC. (f/k/a GREENWICH CAPITAL
MARKETS, INC.); DAVID FINDLAY;
JOHN MCCARTHY; JOHN P. GRAHAM;
NATHAN GORIN; and DANTE LAROCCA,

              Defendants.

No. 11 CIV. 6201 (DLC)

---

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF STEPHEN G. RYAN

QUINN EMANUEL URQUHART &
    SULLIVAN, LLP

Philippe Z. Selendy
Adam M. Abensohn
Jonathan B. Oblak
Tyler G. Whitmer

51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing*
*Finance Agency, as Conservator for Fannie*
*Mae and Freddie Mac*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT .......................................................................................................................3

I.      PROFESSOR RYAN'S TESTIMONY ON FAIR VALUE ACCOUNTING
        SHOULD BE EXCLUDED............................................................................................5

        A.      Professor Ryan's Testimony Does Not Qualify As Reliable Loss
                Causation Analysis Under *Daubert* ................................................................5

                1.      Professor Ryan Does Not Use a Generally Accepted Method of
                        Proving Loss Causation ..........................................................................6

                2.      Professor Ryan Did Not Conduct Any Independent Analysis to
                        Support His Conclusions..........................................................................8

        B.      Professor Ryan's Testimony on the GSEs' Fair Value Accounting is
                Irrelevant ......................................................................................................10

        C.      Professor Ryan's Testimony Will Not Assist the Jury and, in Fact, Usurps
                the Role of the Jury and Amounts to Improper Argument or Improper
                Expert Testimony About the GSEs' State of Mind ................................................11

        D.      Professor Ryan's Testimony is Likely to Confuse the Issues and Mislead
                the Jury and Should Therefore Be Excluded Under Rule 403 ..............................13

II.     PROFESSOR RYAN'S TESTIMONY ON PRE-SETTLEMENT PURCHASE
        COMMITMENTS SHOULD BE EXCLUDED....................................................................15

CONCLUSION....................................................................................................................17

## **TABLE OF AUTHORITIES**

**Page(s)**

### **CASES**

*Board of Trustees of AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A.*,
  2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) ........................................................... 13, 17

*Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA) LLC*,
  752 F.3d 82 (1st Cir. 2014) ..................................................................................... 6

*Chin v. Port Auth. of N.Y. & N.J.*,
  685 F.3d 135 (2d Cir. 2012) .................................................................................... 12

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*,
  509 U.S. 597 (1993) ......................................................................................... *passim*

*Dreyer v. Ryder Auto. Carrier Group, Inc.*,
  367 F. Supp. 2d 413 (W.D.N.Y. 2005) ..................................................................... 9

*FHFA v. Bank of America Corp.*,
  2012 WL 6592251 (S.D.N.Y. Dec. 18, 2012) ........................................................... 16

*General Elec. v. Joiner*,
  522 U.S. 136 (1997) ................................................................................................ 4

*Greenapple v. Detroit Edison Co.*,
  618 F.2d 198 (2d Cir. 1980) .................................................................................... 12

*Highland Cap. Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005) ...................................................................... 12

*Hunt v. CNH America LLC*,
  511 Fed. Appx. 43 (2d Cir. 2013) ............................................................................ 4

*Hunt v. CNH America LLC*,
  857 F. Supp. 2d 320 (W.D.N.Y. 2012) ..................................................................... 15

*Hygh v. Jacobs*,
  961 F.2d 359 (2d Cir. 1992) .................................................................................... 16

*In re Novatel Wireless Secs. Litig.*,
  846 F. Supp. 2d 1104 (S.D. Cal. 2012) .................................................................... 7

*In re Oracle Secs. Litig.*,
  829 F. Supp. 1176 (N.D. Cal. 1993) ........................................................................ 7

*In re Puda Coal Secs. Inc., Litig.*,
  --- F. Supp. 2d ---, 2014 WL 2915880 (S.D.N.Y. Jun. 26, 2014) ...................... 4, 11, 15

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................................ *passim*

*In re WorldCom, Inc. Sec. Litig.*,
    2005 WL 408137 (S.D.N.Y. Feb. 22, 2005) ...................................................................... 6

*Kidder, Peabody & Co., Inc. v. IAG Intern. Acceptance Group, N.V.*,
    14 F. Supp. 2d 391 (S.D.N.Y. 1998) ............................................................................... 13

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) .................................................................................................. 1, 4, 10

*Levinson v. Westport Nat'l Bank*,
    2013 WL 3280013 (D. Conn. June 27, 2013) ................................................................. 12

*Sciallo v. Tyco Int'l Ltd.*,
    2012 WL 2861340 (S.D.N.Y. Jul. 9, 2012) ...................................................................... 7

*United States v. Cruz*,
    363 F.3d 187 (2d Cir. 2004) ............................................................................................. 9

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) ............................................................................................. 4

*WM High Yield Fund v. O'Hanlon*,
    2013 WL 3230667 (E.D. Pa. Jun. 27, 2013) ................................................................. 10

## STATUTES

17 C.F.R. § 230.424(b)(5) ........................................................................................................ 16

17 C.F.R. §230.173 ................................................................................................................. 16

Fed. R. Evid. 401 ...................................................................................................................... 4

Fed. R. Evid. 402 ...................................................................................................................... 4

Fed. R. Evid. 403 ...................................................................................................................... 4

Fed. R. Evid. 702 ................................................................................................................. 4, 10

Pursuant to Federal Rules of Evidence 401, 402, 403 and 702, as well as *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 597 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Federal Housing Finance Agency ("FHFA"), as conservator for the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Association ("Freddie Mac" or "Freddie" and, collectively with Fannie Mae, the "GSEs") respectfully moves to exclude from trial the testimony of Nomura's[1] proffered expert witness, Professor Stephen G. Ryan.[2]

## PRELIMINARY STATEMENT

Professor Ryan's proposed testimony focuses primarily on the GSEs' accounting for losses to the fair value of "private label" or "non-agency" RMBS certificates.  Specifically, Professor Ryan explains that Generally Accepted Accounting Principles ("GAAP") require an entity to account for certain securities at fair value and to classify any losses of fair value as "temporary" or "other than temporary" ("OTT"), and within "OTT" as "credit" or "non-credit."[3] According to the Ryan Report (but contrary to Professor Ryan's deposition testimony), GAAP required the GSEs to classify fair value losses according to the cause of the loss, and the GSEs would, in his opinion, classify any losses caused by security-specific factors (including,

---

[1]   "Nomura" refers collectively to the named defendants in the above-captioned action.

[2]   Citations in this motion to the "Ryan Report" are to the Expert Report of Stephen G. Ryan in the above-captioned action, attached as Exhibit 1 to the Declaration of Tyler Whitmer in Support of Plaintiff's Motion to Exclude Expert Testimony of Stephen G. Ryan (the "Whitmer Decl."), filed concurrently herewith.  Citations to "11/14 Tr." are to the transcript of the deposition of Stephen G. Ryan, taken November 14, 2014 in the above-captioned action, attached as Exhibit 2 to the Whitmer Decl.  Citations to "7/18 Tr." are to the transcript of the deposition of Stephen G. Ryan, taken July 18, 2014 in Case No. 11 Civ. 6189 (DLC), Case No. 11 Civ. 6198 (DLC) and Case No. 11 Civ. 7010 (DLC) (the "Consolidated Actions"), attached as Exhibit 3 to the Whitmer Decl.

[3]   While FHFA believes a more accurate label for the "non-credit" classification is "other factors," this motion adopts Professor Ryan's terminology for ease of reference.

presumably, the misrepresentations and omissions alleged by FHFA) as "OTT credit" losses.  As such, Professor Ryan opines that the GSEs' GAAP accounting classification of a loss as "OTT credit" would capture whatever losses are caused by Nomura's alleged misstatements and omissions.  In contrast, according to Professor Ryan, "temporary" or "OTT non-credit" classifications signified losses caused by macroeconomic or other factors not attributable to Nomura's conduct, and thus are presumably not recoverable by FHFA.  This opinion should be excluded on numerous grounds.

First, Professor Ryan's proposed testimony is a novel attempt at a loss causation analysis wherein he presents FHFA's losses to be, at most, the GSEs' "OTT credit" losses recognized under GAAP.  To the extent Professor Ryan is presenting such a loss causation opinion, his "analysis" fails to meet the requirements of Rule 702 and *Daubert* and should be excluded as unreliable—an unsupported opinion based on a novel theory that is not generally accepted. Professor Ryan performed no independent analysis of the certificates at issue in this Action (the "At-Issue Certificates") and admits that analyzing them at a certificate-by-certificate level to determine whether "temporary" or "OTT non-credit" losses were caused by security-specific factors would be beyond his expertise.  Rather than independent analysis, his opinion is based on GSE disclosures in public financial statements, but he admits that neither GAAP nor SEC rules require discussion of causes of losses when categorizing fair value losses.

Alternatively, if Professor Ryan is not using fair value accounting as the basis for a loss causation analysis, what remains of his opinion is a series of irrelevant inferences drawn from public statements by the GSEs that, even if assumed relevant for the sake of argument, a jury can understand without expert assistance.  Moreover, permitting Professor Ryan to present such inferences as expert opinion unconnected to damages or loss causation would usurp the role of

the jury and would cause unwarranted confusion.  Accordingly, FHFA respectfully requests that the Court exclude Professor Ryan's testimony concerning the purported implications of the GSEs' accounting classifications.

Professor Ryan also offers a separate opinion on commitments to purchase at-issue certificates made by the GSEs prior to the settlement date.  According to Professor Ryan, by accounting for these commitments as derivatives, the GSEs "deemed themselves" obligated to make the purchase.  This opinion is either an improper opinion on an ultimate legal issue or an improper opinion about the GSEs' state of mind.  Either way, it too should be excluded, especially in light of the Court's order precluding the argument it is designed to support.[4]

## ARGUMENT

Expert testimony must fulfill the requirements of Federal Rule of Evidence 702, that

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[4]   While Professor Ryan does not explicitly state as much, this opinion appears designed to support an argument by Nomura that the GSEs committed to purchase the At-Issue Certificates prior to the issuance of the prospectus supplements and therefore could not have relied on the prospectus supplement when deciding whether to purchase each At-Issue Certificate.  As this Court has ruled, Defendants are precluded from arguing or offering any testimony or documents in support of that argument at trial.  *See* Opinion & Order, *FHFA v. Nomura Holding Am., Inc.*, 11 Civ. 6201, at *2 (DLC) (S.D.N.Y. Dec. 18, 2014) (Dkt. 995); *see also infra* n.18.

Fed. R. Evid. 702.  Courts apply Rule 702 to ensure that expert testimony is "not only relevant, but reliable."  *Daubert*, 509 U.S. at 589; *see Kumho Tire*, 526 U.S. at 147 (holding that *Daubert* applies to non-scientific expert testimony).

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *see In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 539 (S.D.N.Y. 2004) ("The proponent of expert testimony must demonstrate admissibility by a preponderance of proof.").  Under *Daubert* and *Kumho Tire*, courts ensure expert testimony complies with Rule 702 by considering, among other things, "whether the theory has 'general acceptance.'"  *In re Rezulin*, 309 F. Supp. 2d at 539-40 (quoting *Daubert*, 509 U.S. at 592-94).

Expert testimony must also be relevant.  Fed. R. Evid. 401, 402; *In re Puda Coal Sec. Inc., Litig.*, ---- F. Supp. 2d ---, 2014 WL 2915880, at *17 (S.D.N.Y. June 26, 2014) ("Federal Rules of Evidence 401, 402, and 403 govern the inquiry of whether an individual qualified as an expert, using reliable methodologies, is proffering testimony that is both admissible and should be allowed.").  A court may exclude even relevant expert testimony where "its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403; *Hunt v. CNH Am. LLC*, 511 Fed. App'x 43, 46-47 (2d Cir. 2013) (affirming exclusion of expert testimony "pursuant to Federal Rules of Evidence 702 and 403").

Trial courts are granted wide latitude in determining whether to admit or exclude expert testimony.  *Gen. Elec. v. Joiner*, 522 U.S. 136, 143 (1997) ("[T]he question of admissibility of expert testimony is . . . reviewable under the abuse-of-discretion standard.").  For the reasons

discussed below, Professor Ryan's proposed testimony does not meet the requirements of the Federal Rules of Evidence or *Daubert* and should be excluded from trial.

## I.   PROFESSOR RYAN'S TESTIMONY ON FAIR VALUE ACCOUNTING SHOULD BE EXCLUDED

### A.   Professor Ryan's Testimony Does Not Qualify As Reliable Loss Causation Analysis Under *Daubert*

Professor Ryan was "asked to determine whether the manner in which the GSEs accounted for the losses of fair value [of the At-Issue Certificates] indicates that the GSEs determined that some portion of these losses was attributable to changes in financial market or other relevant economic conditions that affected non-agency mortgage-related securities generally, rather than to factors specific to the origination or sale of the mortgages underlying the At-Issue Certificates."  (Ryan Report ¶ 11.)

GAAP rules prior to April 2009 required losses to the fair value of securities to be classified as either "temporary" or "OTT."  (*Id.* ¶ 15.)  The Ryan Report contends that "temporary" losses "predominantly resulted from changes in financial market conditions that transitorily increased market discount rates for all non-agency mortgage-related securities, such as illiquidity," and "OTT" losses "resulted from probable decreases in cash flows."  (*Id.*)  After April 2009, the GAAP rules changed and the "OTT" classification was divided into "OTT credit" and "OTT non-credit."  (*Id.* ¶ 16.)  According to the Ryan Report, "[a]s with temporary losses, OTT non-credit losses predominantly reflect increases in market discount rates attributable to changes in financial market conditions that adversely affected the fair values of all non-agency mortgage-related securities during the financial crisis, not security-specific factors."  (*Id.*)[5]

---

[5]   Professor Ryan states that "security-specific factors" include "characteristics of the borrowers and loans underlying the securities under consideration (e.g., financial distress of

The Ryan Report quantifies the losses the GSEs accounted for as "OTT credit" versus "temporary" or "OTT non-credit" (Ryan Report, Exs. 2-4), effectively arguing that the GSEs' "OTT credit" losses represent the limit of losses attributable to Nomura's alleged misconduct (*i.e.*, security-specific factors).[6]  Similarly, according to Professor Ryan, the "temporary" and "OTT non-credit" classifications purportedly capture losses caused by factors *not* attributable to Nomura.  As such, Professor Ryan attempts to use the impairment classifications as a rough proxy for loss causation, with "temporary" and "OTT-non-credit" losses on the At-Issue Certificates purportedly caused by factors not specific to the securities themselves and thus not attributable to Nomura and RBS Securities Inc.  That opinion fails under *Daubert*.

### 1.  Professor Ryan Does Not Use a Generally Accepted Method of Proving Loss Causation

"The usual—it is fair to say 'preferred'—method of proving loss causation in a securities fraud case is through an event study, in which an expert determines the extent to which the changes in the price of a security result from events such as disclosure of negative information about a company, and the extent to which those changes result from other factors."  *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 86 (1st Cir. 2014); *see In re WorldCom, Inc. Sec. Litig.*, 2005 WL 408137, at *2 (S.D.N.Y. Feb. 22, 2005) ("Typically, evidence of loss causation is presented through evidence of the movement of the price of securities following an announcement.").  Courts often exclude expert testimony not

---

these borrowers as reflected in reduced FICO scores and decreases in the values of the mortgaged homes as reflected in increased loan-to-value ratios) and the performance of these loans (e.g., current or delinquency statuses)."  (Ryan Report ¶ 17 (footnote omitted).)  As for market factors, Professor Ryan provides "house price depreciation and unemployment" as examples of "[n]on-security specific relevant economic conditions." (*Id.*)

[6]  According to Professor Ryan, "the GSEs estimated and reported these losses following accounting and disclosure rules that require reporting firms to partition losses of fair value on ['available for sale'] securities into components that reflect the firms' views about the causes and thus the expected recoverability of the losses."  (Ryan Report ¶ 14.)

based on this well-understood method.  *See, e.g.*, *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) (barring expert testimony after noting that "[u]se of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to Oracle which defendants allegedly have distorted").  Professor Ryan's approach is not a generally accepted method for analyzing loss causation, nor can it be deemed to be like the "preferred" method of an event study.

While Nomura may argue that an event study is not always required, it remains the case that the expert's method must be generally accepted.  *In re Rezulin*, 309 F. Supp. 2d at 539-40 (quoting *Daubert*, 509 U.S. at 593-94).  Professor Ryan testified, however, that he had "never done any impairment accounting analysis prior to this case" (7/18 Tr. at 52:13-20) and that he had never heard of impairment accounting being used as part of a damages analysis.  (*Id.* at 53:10-19.)[7]

Courts regularly exclude loss causation experts for failing to use established methodologies.[8]  The court in *Sciallo v. Tyco International Ltd.*, 2012 WL 2861340, at *5 (S.D.N.Y. July 9, 2012), for example, excluded a novel approach to loss causation after

---

[7]  Professor Ryan's testimony from his July deposition in the Consolidated Actions is equally applicable here.  Professor Ryan testified that "[a]ll of the reports . . . that I've written for the joint defense group . . . are substantially the same . . . . [T]he substance of the reports is substantially the same."  (11/14 Tr. at 29:5-18.)  He also testified that there was nothing substantive he would change about his testimony in his July deposition about the virtually identical report he submitted in the Consolidated Actions (*id.* at 26:23-27:25), and when asked if he would give the same answers to questions about the Ryan Report as he did in his July deposition about his report in the Consolidated Actions, he testified that "the substance would be the same."  (*Id.* at 48:20-49:20.)

[8]  Loss causation expert testimony is also subject to exclusion where it is based on an incorrect legal standard.  *In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1107-08 (S.D. Cal. 2012) (excluding loss causation expert because his "analysis is based on a loss causation standard that is incompatible with that set forth by the Ninth Circuit").  As noted below, Professor Ryan makes no effort to tie any of his analysis to any legal standard for loss causation at all, much less the appropriate one governing this case.

explaining that "[t]here are no cases of which this Court is aware, and plaintiffs have failed to

bring any to the Court's attention, in which loss causation can be accomplished using a

methodology similar to that employed by [the expert]."  *Id.*  The same basis for exclusion applies

to Professor Ryan's approach in this case, and his testimony should be barred.

## 2. Professor Ryan Did Not Conduct Any Independent Analysis to Support His Conclusions

Not only is Professor Ryan's approach admittedly novel and not generally accepted, it is

unsupported by any independent analysis.  During his July deposition, Professor Ryan admitted

that he conducted no independent analysis to determine the cause of any loss of fair value for any

of the At-Issue Certificates.  (7/18 Tr. at 56:5-12.)  Professor Ryan also admitted that he did not

examine any of the collateral underlying the At-Issue Certificates.  (*Id.* at 56:25-57:5.)[9]  When

asked if he had done any independent analysis to separate losses caused by the

misrepresentations and omissions alleged by FHFA from losses that may have been caused by

other security-specific factors, he readily admitted he had not.  (*Id.* at 111:19-112:7.)[10]

In fact, Professor Ryan admitted that performing an independent analysis to determine

whether security-specific factors may have caused losses categorized under GAAP as

---

[9]  When asked whether he had "any independent expert opinion in this case about how major or minor a role security-specific factors may have played in the GSEs' impairment to the at-issue certificates," Professor Ryan responded that he has "not done analysis of the specific securities involved."  (7/18 Tr. at 77:23-78:18.)  The only additional work Professor Ryan reported undertaking between his July and November depositions was to look at recent GSE financial statements (11/14 Tr. at 10:23-12:23), and he testified to doing at most ten hours of work specific to the Ryan Report beyond the work he did for his report in the Consolidated Actions.  (*Id.* at 32:18-33:7.)  Professor Ryan further testified that the additional work he did led to "[n]o changes in opinions."  (*Id.* at 12:12-23.)

[10]  While Professor Ryan concluded in his report that, "[i]n my opinion, temporary losses on the [available-for-sale] At-Issue Certificates attributable to [security-specific factors] are small or otherwise insignificant," he admitted during deposition that he "did no detailed analysis, at-issue security by at-issue security" to reach that conclusion and did not do anything to quantify what he meant by "small."  (7/18 Tr. at 202:23-205:4.)

"temporary" or "OTT-non-credit" was "really outside my particular area of expertise."  (*Id.* at 207:2-17.)  This alone is sufficient basis to exclude Professor Ryan's testimony on fair value accounting.  *See United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) ("[W]hen an expert's testimony 'strays from the scope of [his] expertise,' the testimony may well implicate Rule 403 of the Federal Rules of Evidence . . . ." (quoting *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003)); *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 448 (W.D.N.Y. 2005) (excluding expert testimony on Rule 403 grounds that "constitute[d] unsupported speculation offered by a proposed expert on a subject outside his field of claimed expertise").

Professor Ryan's failure to conduct any supporting analysis renders purely speculative his "conclusions" as to what factors may have caused various losses categorized under GAAP. For example, Professor Ryan focuses on the GSEs' use of "market discount rates" to calculate the present value of predicted cash flows.  According to the Ryan Report, "increases in market discount rates" are "attributable to changes in financial conditions that adversely affected the fair values of all non-agency mortgage-related securities."  (Ryan Report ¶ 16.)  The Ryan Report thus attempts to tie "temporary" and "OTT non-credit" losses to increases in market discount rates, implying that one can trace those losses necessarily to market, rather than security-specific, factors.  (*Id.* ¶¶ 15-16.)  During his deposition, however, Professor Ryan testified to the contrary—*i.e.*, that market discount rates do not provide the clear distinction he implied and are affected by security-specific factors as well as market factors.  Specifically, Professor Ryan testified that he could not opine that security-specific factors did not affect the GSEs' calculation of changes in market discount rates (7/18 Tr. at 185:4-19) and admitted that he had done no independent analysis to determine what factored into changes in the market discount rates actually used by the GSEs.  (*Id.* at 186:2-13.)  Thus, Professor Ryan did no independent analysis

to connect his speculative opinions about the GSEs' accounting, on the one hand, to loss causation or damages, on the other.

To be admissible, expert testimony must be based on sufficient facts and analysis. *Kumho Tire*, 526 U.S. at 157 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (quoting *Joiner*, 522 U.S. at 146); *WM High Yield Fund v. O'Hanlon*, 2013 WL 3230667, at *13 (E.D. Pa. June 27, 2013) ("Expert opinion evidence is not admissible if it is without a sufficient factual basis and is speculative or conjectural."). Professor Ryan's opinions fall far short of having the requisite factual basis or support through independent analysis.

## B.  Professor Ryan's Testimony on the GSEs' Fair Value Accounting is Irrelevant

Even if Professor Ryan's testimony was reliable—which as shown above, it is not—it should still be excluded under Rule 702, *Daubert*, or Rule 402 because it is irrelevant to any issue in this case.[11] Professor Ryan testified at deposition that he was *not* opining on damages. (7/18 Tr. at 47:14-24.) In fact, he admitted that he had no understanding of how to calculate damages under Section 11 or Section 12. (*Id.* at 49:22-50:6.) He confirmed that he had not reviewed the reports prepared by Nomura's experts that expressly address damages or Nomura's loss causation defenses. (11/14 Tr. at 10:15-18.) Nor has he spoken to any of those experts. (*Id.*

---

[11]   The irrelevance of the GSEs' fair value accounting analyses to at-issue claims and defenses is demonstrated by this Court's denial of extensive fact discovery on the GSEs' impairment calculations and analyses. *See* Letter Endorsement to Defendants' June 13, 2013 Application re: GSE Valuations/Impairments of the Certificates (Dkt. 370) (limiting FHFA's production of impairment calculation spreadsheets because "[t]here is no duty to disclose all documents supporting impairment analyses"). Having failed to obtain the impairment discovery they sought, Defendants instead offer Professor Ryan's "state of mind" testimony to speculate on the GSEs' beliefs about losses related to the At-Issue Certificates. *See infra* Section I(C).

at 10:19-22.)  Finally, he stated under oath that he had no opinion as to whether the "losses" he contends in his report should be attributed to market factors rather than security-specific factors actually should be included as damages or not.  (7/18 Tr. at 304:8-24.)  Because Professor Ryan's opinions, if not offered as to damages or loss causation, do not appropriately address any issue in contention, they should be excluded as irrelevant.[12]  *In re Puda Coal*, 2014 WL 2915880, at *20 (excluding expert testimony as irrelevant under Rule 402 where it applied the wrong accounting standards).

### C.      Professor Ryan's Testimony Will Not Assist the Jury and, in Fact, Usurps the Role of the Jury and Amounts to Improper Argument or Improper Expert Testimony About the GSEs' State of Mind

As explained in Section I.A.2 above, Professor Ryan's untested method involves no independent analysis.  It is simply Professor Ryan's recitation of what he believes the GSEs did when accounting for losses to the fair value of RMBS certificates based on a few internal documents and the GSEs' public financial disclosures in quarterly and annual reports.  As Professor Ryan testified, "I'm using the GSEs' own words, I'm not interpreting those words; I'm just, you know, providing those words."  (7/18 Tr. at 57:24-58:25.)  Indeed, when asked if he was "performing interpretation as part of [his] opinion in this case," Professor Ryan answered, "[n]o[,] I am using Fannie and Freddie's disclosures, primarily."  (*Id.* at 110:6-19.)  Even if the

---

[12]   While Professor Ryan denied that he is offering his opinion in support of any damages theory, Nomura's intent to offer Professor Ryan as an improper loss causation expert is demonstrated by the fact that Nomura's loss causation expert cites Professor Ryan's conclusions as supporting his own.  The Expert Report of Kerry Vandell includes a single paragraph beginning with a statement that "I have also reviewed the Expert Report of Stephen G. Ryan, and his opinions support my own."  An excerpt of the Expert Report of Kerry Vandell, including the relevant paragraph, is attached to the Whitmer Decl. as Exhibit 4.  Mr. Vandell does not rely on Professor Ryan's opinions to support any of his own conclusions or discuss how Professor Ryan's opinions support his own—he simply states that Professor Ryan's opinions support his own and then briefly summarizes them.  For his part, Professor Ryan testified that he was not aware of the reference.  (11/14 Tr. at 64:7-10.)

GSEs' accounting treatment were relevant for some purpose, which it is not, Professor Ryan is

not the proper vehicle for its admission, as the "GSEs' own words" he was providing speak for

themselves.  Simply restating what the GSEs have disclosed in public financial statements and

"opining" on the meaning of those statements is inappropriate expert testimony and should be

excluded.[13]  *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 161 (2d Cir. 2012) (upholding

exclusion of expert testimony that "would not have provided assistance to the trier of fact beyond

that afforded by the arguments of counsel"); *In re Rezulin*, 309 F. Supp. 2d at 541 ("[E]xperts

should not be permitted to 'supplant the role of counsel in making argument at trial, and the role

of the jury in interpreting the evidence.'") (quoting *Primavera Familienstifung v. Askin*, 130 F.

Supp. 2d 450, 527 (S.D.N.Y. 2001)); *Levinson v. Westport Nat'l Bank*, 2013 WL 3280013, at *7

(D. Conn. June 27, 2013) (expert "may not proffer opinions which do not draw on his expertise

but merely restate otherwise properly admitted evidence"); *Highland Capital Mgmt., L.P. v.

Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (barring expert testimony because it

"consist[s] simply of inferences that [the expert] draws from other evidence in the case").

 To the extent Professor Ryan were to stray beyond a recitation of the GSEs' disclosures

and documents, which he testified he does not, such testimony "interpreting" the GSEs'

disclosures would really be an opinion about the GSEs' states of mind—namely, whether the

GSEs believed that their losses were caused by factors other than the misrepresentations at

issue—dressed up in accounting jargon.  That testimony is improper and should be excluded.  *In

re Rezulin*, 309 F. Supp. 2d at 547 (rejecting expert testimony in part because it attempted to

opine on the intent and state of mind of a party); *Kidder, Peabody & Co. v. IAG Int'l Acceptance*

---

[13]  Public financial disclosures are intended for a wide audience.  *Cf. Greenapple v.
Detroit Edison Co.*, 618 F.2d 198, 210 (2d Cir. 1980) ("[T]he intended audience [of a
prospectus] will be extremely broad, encompassing both sophisticated financial analysts and
untutored lay persons.").

*Grp., N.V.*, 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998) (expert testimony about a party's state of

mind is improper); *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2011 WL

6288415, at *8 (S.D.N.Y. Dec. 15, 2011) ("There is no dispute that opinions concerning state of

mind are an inappropriate topic for expert opinion.").

### D.      Professor Ryan's Testimony is Likely to Confuse the Issues and Mislead the Jury and Should Therefore Be Excluded Under Rule 403

According to Professor Ryan, his "accounting knowledge [is of assistance] by matching

up Fannie and Freddie's statements about their losses to the GAAP requirements about how

those losses [are] created – [are] estimated."  (7/18 Tr. at 200:15-201:7.)  But whether the GSEs

correctly accounted for impairments is not at issue in this case.  Professor Ryan's only purpose in

purportedly interpreting GAAP requirements for fair value accounting is, as stated above, an

improper one:  to offer them as the basis for a stealth loss causation opinion.  Even assuming,

*arguendo*, that Professor Ryan's opinion was admissible, however, he conceded in deposition

that his inferences are too tenuous to permit one to draw reliable conclusions about causation

based on GAAP accounting treatment.  His opinion would therefore only serve to confuse the

issues and mislead the jury.

During his deposition, Professor Ryan retreated significantly from his attempt to link

accounting requirements closely to the cause of accounting losses, agreeing that the GSEs were

not required to account for fair value losses pursuant to a precise division of causation between

market factors and security-specific factors.  (*Id.* at 68:20-69:4.)[14]  With respect to disclosure,

Professor Ryan explicitly conceded that "GAAP does not require discussion of the drivers of

---

[14]   The Ryan Report acknowledges that, "[i]n principle, temporary losses and OTT non-credit losses might result in part from increases in discount rates attributable to security-specific factors other than financial market or economic conditions" (Ryan Report ¶ 16 n.9), but Professor Ryan admitted that he did no analysis to determine whether or to what extent that actually occurred with any of the at-issue certificates.  (7/18 Tr. at 206:2-25.)

losses." (*Id.* at 118:14-119:4.)  He further testified that "[t]he SEC requirements do not pertain specifically to other-than-temporary impairment" and do not require partitioning of losses into those caused by market factors and those caused by security-specific factors.  (*Id.* at 79:17-81:12.)  Professor Ryan's testimony is in direct conflict with his proffered written opinion that the accounting rules *required* the GSEs to account for and disclose losses based on causes in a way that informs a loss causation analysis.  His testimony also undermines the extent to which the GSE disclosures on which he relied *actually say anything* about loss causation, whether they were required to do so or not.  Professor Ryan testified that he could not say with certainty that none of the fair value losses that the GSEs classified as "temporary" or "OTT-non-credit" were caused by the misrepresentations and omissions that FHFA has alleged (*id.* at 208:11-21) and could only state that they were "predominantly" caused by factors that were not security-specific. (*Id.* at 207:18-208:10.)[15]

In other words, the accounting rules did not require the GSEs to classify fair value losses according to what caused them, and neither SEC regulations nor GAAP required the GSEs to assign causes of losses in their public financial disclosures.  The GSEs' accounting treatment thus *does not*, by Professor Ryan's own admission, compel any specific conclusion about what caused specific accounting losses.  His opinion is accordingly nothing more than speculation about what certain accounting treatments *might* imply.  Professor Ryan's testimony confirms he cannot draw clear distinctions between causes of losses by purporting to explain how the GSEs classified fair value losses and then described those classifications in their disclosures.  This

---

[15]   Professor Ryan undermines even that vague opinion by defining "predominantly" amorphously as "not 100 percent, and not 51 percent; somewhere in between."  (7/18 Tr. at 182:15-183:4.)  Professor Ryan further testified that neither "predominantly" nor "primarily" are terms of art in the field of accounting and that he had not seen any definition of either term from the GSEs.  (11/14 Tr. at 57:7-19.)

testimony would be confusing and likely to mislead the jury and should be excluded. *Hunt v. CNH Am. LLC*, 857 F. Supp. 2d 320, 347 (W.D.N.Y. 2012) ("[T]he Court finds that such evidence should be excluded under Rule 403, since its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury."); *In re Puda Coal*, 2014 WL 2915880, at *20 (excluding accounting expert where the "opinions run the very real risk of misleading the jury as to the applicable standard of care"); *In re Rezulin*, 309 F. Supp. 2d at 545 ("Even assuming that the proposed ethics testimony were reliable and marginally relevant under Rule 702, it would be likely unfairly to prejudice and confuse the trier by introducing the 'experts'' opinions and rhetoric concerning ethics as alternative and improper grounds for decision on bases other than the pertinent legal standards.").[16]

## II.   PROFESSOR RYAN'S TESTIMONY ON PRE-SETTLEMENT PURCHASE COMMITMENTS SHOULD BE EXCLUDED

Professor Ryan offers a separate opinion that, "for the purchase commitments that Freddie Mac and Fannie Mae accounted for as derivatives, I conclude that the GSEs deemed themselves to be obligated to purchase the At-Issue Certificates in the intervening period between agreeing to and settling the commitments, *i.e.*, before receiving the prospectus supplements." (Ryan Report ¶ 107.)  The opinion appears calculated to support the inadmissible argument that the GSEs could not have relied on the prospectus supplements when deciding to purchase the At-Issue Certificates because the purchase decision was made before the prospectus supplements issued.  Because Nomura is precluded from "eliciting testimony and offering

---

[16]   The disconnect between the GAAP requirements on which Professor Ryan relies and the ultimate opinion expressed by Professor Ryan, and the confusion created thereby, is explained in detail in the Highly Confidential Expert Report of Gordon L. Klein, attached to the Whitmer Decl. as Exhibit 5.

argument that the sale of a Certificate was consummated before the Certificate's settlement date[,]" Professor Ryan's related opinion should be excluded.[17]

Even if it were not subject to a granted motion *in limine*, t is impossible to separate Professor Ryan's opinion from the legal argument it is designed to support.  As Professor Ryan testified at deposition, he is "not a lawyer [and] wouldn't make a legal judgment" concerning whether the GSEs were required to purchase the At-Issue Certificates based on the pre-settlement purchase commitments.  (7/18 Tr. at 321:4-9.)  But Professor Ryan nonetheless admits he cannot untangle his "accounting" opinion from a legal question, testifying that "obligated in accounting means little or no[] discretion to avoid.  *So it generally does involve a legal obligation*."  (*Id.* at 320:2-15 (emphasis added).)[18]  Because his opinion is a legal conclusion, Professor Ryan should be barred from presenting it.  *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.").

---

[17]  *See* Opinion & Order, *FHFA v. Nomura Holding Am., Inc.*, 11 Civ. 6201, at *22-23 (DLC) (S.D.N.Y. Dec. 18, 2014) (Dkt. 995).

[18]  Even if Professor Ryan were allowed to offer a legal conclusion as to when the GSEs "committed" to purchasing the At-Issue Certificates, his conclusion here would amount to an admission that Nomura violated numerous parts of the Securities Act and SEC regulations in failing to timely file the prospectus supplements.  As the Court has made clear, "Section 5(b) of the Securities Act prohibits the sale or delivery after sale of any registered security by means of interstate commerce unless accompanied or preceded by a prospectus that meets SEC requirements."  *FHFA v. Bank of Am. Corp.*, 2012 WL 6592251, at *3 (S.D.N.Y. Dec. 18, 2012). If Nomura is correct that it sold the At-Issue Certificates to the GSEs more than two days before they filed the prospectus supplements with the SEC, then it is admitting that its sales were unlawful.  *Id*. at *4 ("[U]nder Section 5(b), the lawfulness of a sale of registered securities is contingent on the issuer's filing a Final Prospectus."); *see* 17 C.F.R. § 230.424(b)(5) (requiring defendants to file prospectus supplement with SEC "no later than the second business day following . . . the date of the determination of the offering price"); *id.* § 230.173 (requiring, subject to certain exceptions, that a selling issuer or underwriter "provide to each purchaser from it, not later than two business days following the completion of such sale, a copy of the final prospectus").

Nor is Professor Ryan's proposed testimony permissible if viewed narrowly as an opinion about what the GSEs believed.  When asked if he was expressing an opinion that the pre-settlement purchase commitments created a legal obligation to purchase the at-issue securities, Professor Ryan answered "[n]o.  I'm saying Fannie and Freddie deemed themselves to be obligated."  (7/18 Tr. at 320:16-20.)  But that is an opinion about the state of mind of the GSEs, which is improper.  *In re Rezulin*, 309 F. Supp. 2d at 547 ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."); *Kidder, Peabody*, 14 F. Supp. 2d at 404 (excluding expert report after finding it attempted to divine the state of mind of a party); *Bd. of Trs. of AFTRA*, 2011 WL 6288415, at *8 (expert testimony going to state of mind is improper).  Professor Ryan should therefore be barred from testifying about the purported implications of the GSEs' commitments to purchase At-Issue Certificates prior to settlement.

## CONCLUSION

For the foregoing reasons, FHFA requests that its motion to exclude the testimony of Professor Stephen G. Ryan be granted, and that Professor Ryan be precluded from testifying at trial.

DATED:   New York, New York
            December 19, 2014

Respectfully submitted,

By:  /s/  Philippe Z. Selendy
Philippe Z. Selendy
Adam M. Abensohn
Jonathan B. Oblak
Tyler G. Whitmer

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing Finance Agency, as Conservator for Fannie Mae and Freddie Mac*