December 5, 2014

**VIA ELECTRONIC MAIL**
The Honorable Denise L. Cote
United States District Judge
500 Pearl Street, Room 1610
New York, NY 10007-1312

Re:   *FHFA v. Nomura Holding America, Inc., et al.*, No 11 Civ. 6201 (S.D.N.Y.) (DLC)

Dear Judge Cote:

FHFA submits this opposition to Nomura's motion *in limine* No. 3, which seeks to exclude the testimony of FHFA's re-underwriting expert, Robert Hunter, regarding certain of the mortgage loans in FHFA's samples for five of the securitizations at issue in this action based on an eleventh-hour argument by its counsel that the Prospectus Supplements do <u>not</u> represent that the loans originated by originators not expressly referenced by name in the Prospectus Supplements (the "Unnamed Originators") generally complied with their respective underwriting guidelines.[1]  This argument is wholly inconsistent with Nomura's legal positions throughout this three-year litigation, as well as its course of conduct at each step of the securitization process as evidenced by the discovery obtained in these coordinated actions, including the testimony of its own personnel.  Moreover, Nomura's newly invented interpretation does not square with the language in the Prospectus Supplements as a whole.  At best, that new interpretation—if Defendants are not estopped from raising it entirely (as they should be)—would be a subject for cross-examination at trial.  For the reasons set forth below, Nomura's motion should be denied.

**I.    Nomura's Interpretation Of The Prospectus Supplements Is Incorrect**

**A.    Nomura's Interpretation Is Inconsistent With Other Language In The Prospectus Supplements**

When determining the scope of representations made in offering documents and whether those documents comply with securities laws, courts "review the documents holistically and in their entirety."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365-66 (2d Cir. 2010).  "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of 'defendants' representation, taken together and in context.'"  *Id*. at 366 (quoting *DeMaria v. Andersen,* 318 F.3d 170, 180 (2d Cir. 2003)).  Here, Nomura's interpretation rests entirely on one sentence in the Prospectus Supplements, which states that "[t]he Mortgage Loans … were originated generally in accordance with the underwriting criteria described in this section."[2]  However, when read together with the other statements in the Prospectus

---

[1]  The following five securitizations are at issue in Nomura's motion:  (i) NAA 2005-AR6, (ii) NHELI 2006-HE3, (iii) NHELI 2007-1, (iv) NHELI 2007-2, and (v) NHELI 2007-3.  Defendants' motion does not apply to the NHELI 2006-FM1 and NHELI 2006-FM2 deals.  For these two securitizations, the Prospectus Supplements state that "[a]ll of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this section."  Ex. 6 at NOM-FHFA_04729543; Ex. 7 at NOM-FHFA_04638395.  Defendants do not dispute that these Prospectus Supplements represent that the underlying loans generally comply with Fremont's underwriting guidelines.

[2]  Ex. 1 at NOM-FHFA_04811894; Ex. 2 at NOM-FHFA_04620972; Ex. 3 at NOM-FHFA_05142025; Ex. 4 at NOM-FHFA_05591415; Ex. 5 at NOM-FHFA_04732712..

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

Supplements, which Defendants ignore, it is clear, as Mr. Hunter testified, that these "underwriting criteria" are simply summaries of the far more detailed underwriting guidelines of the Unnamed Originators.[3]

When a particular originator originated at least 20 percent of the loans in the securitization, the Prospectus Supplements contain a description of the specific originator's origination program, including its underwriting guidelines.[4] Nomura does not dispute that these statements are representations that the loans originated by these named originators generally complied with their applicable underwriting guidelines.[5] For those originators responsible for fewer than 20% of the loans in any one securitization—and there were dozens of such originators that contributed to the securitizations at issue in Nomura's motion—the Prospectus Supplements make a similar representation, without identifying each originator by name. Indeed, the Prospectus Supplements describe adherence to "underwriting criteria," which, as described elsewhere in each Prospectus Supplement, incorporate the underwriting processes and standards used by such originators. Specifically, Nomura represented that: (i) the borrower provided an application to the lender containing pertinent credit information; (ii) the lender determined whether the borrower's monthly income was sufficient to meet the borrower's monthly obligations; (iii) the lender ensured that the mortgaged property was adequate security by obtaining an appraisal in accordance the lender's guidelines; and (iv) the lender obtained the borrower's credit scores to assess his creditworthiness.[6] These summaries make clear that each lender applied its own underwriting standards to all loans, as applicable to different loan programs and other collateral characteristics.

It is telling that these aggregate summaries of the guidelines of the Unnamed Originators are similar in scope and level of detail to the descriptions of the guidelines of the named originators.[7] The guideline summaries of the Unnamed Originators unambiguously serve the

---

[3] In his Report, Mr. Hunter opined that "[i]ndividually and collectively, these statements [in the Prospectus Supplements] clearly represented that the mortgage loans were issued only after they were underwritten against the originator's guidelines." Ex. 8 at 21. Contrary to Defendants' assertion, Defs. Mot. 3, Mr. Hunter's Report expressly references the underwriting representations in Exhibit 6, Chart A, and quotes the representation made in the NAA 2005-AR6 Prospectus Supplement. Ex. 8 at 21-22; Ex. 25. Mr. Hunter's Report further elaborates on how the underwriting criteria described in the Prospectus Supplements related to and summarized the much more detailed, specific criteria contained in the originators' underwriting guidelines. *See generally* Ex. 8 at 20-85 (connecting specific representations in the Prospectus Supplements to requirements in underwriting guidelines).

[4] Ex. 2 at NOM-FHFA_04620965-72 (representing compliance with underwriting criteria of People's Choice Home Loan, which originated at least 20% of the loans in the deal, and summarizing such criteria); Ex. 3 at NOM-FHFA_05142020-25 (similar representation for First National Bank of Nevada and Silver State Mortgage); Ex. 4 NOM-FHFA_05591413-15 (similar representation for Ownit Mortgage); Ex. 5 at NOM-FHFA_04732707-12 (similar representation for ResMAE).

[5] Defs. Mot. 2 (recognizing that the Prospectus Supplements describe the underwriting guidelines of originators whose loans comprised more than 20% of the principal balance of all loans backing the securitization and thus, "represent that the loans purchased from the disclosed originators were 'generally originated' in accordance with originators' guidelines").

[6] Ex. 1 at NOM-FHFA_04811894-96 (the NAA 2005-AR6 Prospectus Supplement does not include the cited language regarding the borrower's credit scores); Ex. 2 at NOM-FHFA_04620972-75; Ex. 3 at NOM-FHFA_05142025-28; Ex. 4 at NOM-FHFA_05591415-18; Ex. 5 at NOM-FHFA_04732712-15.

[7] *Compare, e.g.*, Ex. 2 at NOM-FHFA_04620972-75 (describing the underwriting criteria applicable to the mortgage loans of the Unnamed Originators) *with* Ex. 6 at NOM-FHFA_04729543-48 (describing the underwriting standards of Fremont).

same purpose and should be interpreted the same way as the guideline summaries of specifically-identified originators—namely, as Defendants acknowledge for the specifically-identified originators, to represent that the loans generally comply with applicable underwriting guidelines.

Mr. Hunter's opinion is further confirmed by Nomura's representations in other contracts referenced in the Prospectus Supplements. Each of the Prospectus Supplements states that the securities were "issued under the Pooling and Servicing Agreement"[8] in which the sponsor, Nomura Credit, "represent[ed] and warrant[ed]" that "[t]he representations and warranties set forth in Section 8 of the Mortgage Loan Purchase Agreement are true and correct as of the Closing Date."[9] Section 8 for each of the Mortgage Loan Purchase Agreements, in turn, represented that *"[e]ach Mortgage Loan is and will be a mortgage loan arising out of the originator's practice in accordance with the originator's underwriting guidelines."*[10]

Finally, Regulation AB requires an issuer to include, in the offering materials, "[t]o the extent material, a description of the originator's origination program" for "any originator … that originated, or is expected to originate, 20% or more of the pool assets." 17 C.F.R. § 229.1110. With regard to originators who originate less than 20% of the pool, Regulation AB still requires an issuer to include a description of the *criteria* used to underwrite the mortgage loans. 17 C.F.R. § 229.1111(a)(3) (requiring issuers to provide "[a] description of the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, to the extent known, any changes in such criteria and the extent to which such policies and criteria are or could be overridden"). Thus, Regulation AB itself requires, even for smaller originators, a disclosure of the general underwriting criteria or guidelines.

### B.   Nomura's Interpretation Is Unsupported By The Evidence

Nomura's current interpretation of the Prospectus Supplements is also at odds with the understanding of its own personnel, as well as its diligence firms, and the rating agencies. All understood the statements in the Prospectus Supplements to mean that the underlying mortgage loans complied with the applicable underwriting guidelines of the originator. Nomura has not identified any testimony that supports its current interpretation of the underwriting statements in the Prospectus Supplements, which itself is different from the interpretation its counsel had accepted at all prior stages of this litigation.

The head of Nomura's Contract Finance Group, John Graham, who was responsible for overseeing the creation of the Prospectus Supplements, testified "[t]his sort of language … is, given the variety of sellers that are mentioned in that -- in that first paragraph, intended to be inclusive of those underwriting guidelines and reflect generally those standards."[11] Furthermore, when conducting diligence on the loans, both Nomura and RBS re-underwrote the diligenced loans to the applicable originator guidelines.[12] Moreover, the diligence firms retained by

---

[8]   Ex. 1 at NOM-FHFA_04811947; Ex. 2 at NOM-FHFA_04621051; Ex. 3 at NOM-FHFA_05142147; Ex. 4 at NOM-FHFA_05591518; Ex. 5 at NOM-FHFA_04732805.

[9]   Ex. 10 at 60-61; Ex. 10 at 63; Ex. 11 at 90-91; Ex. 12 at 59; Ex. 13 at 53-54.

[10]   Ex. 10 at 187 (emphasis supplied); *see also* Ex. 11 at 237; Ex. 12 at 199; Ex. 13 at 156; Ex. 14 at NOM-FHFA_00000857.

[11]   Ex. 15 at 111:13-19 (Graham Dep.) (testifying regarding the underwriting standards for NAA 2005-AR6).

[12]   *See* Nomura's Opp'n to Pl.'s Mot. for Partial Summ. J. on Defs' Due Diligence and Reasonable Care Defenses ("Nomura Opposition") at 5, 41-42; RBSSI's Opp'n to Pl.'s Mot. for Partial Summ. J. on Defs' Due Diligence and (footnote continued)

Defendants testified that the purpose of the credit review was to determine whether the loan adhered to the originator's guidelines.[13]  In addition, the rating agencies, who were responsible for providing the credit rating for the securities issued in connection with the securitizations, also testified that "a loan-level representation and warrant that the mortgage loan was originated in accordance with a seller or originator's underwriting guidelines" was a standard representation throughout the 2005 to 2007 time period.[14]

## II. Nomura Should Be Judicially Estopped From Advancing Its New Interpretation Of The Prospectus Supplements

Judicial estoppel is appropriate where three conditions are met: "(1) if a party's later position is clearly inconsistent with its earlier position; (2) if the party's former position has been adopted in some way by the court in the earlier proceeding; and (3) if the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *Soley v. Wasserman*, 2013 WL 3185555, *10 (S.D.N.Y. June 21, 2013) (citing *In re Adelphia Recovery Trust,* 634 F.3d 678, 695-96 (2d Cir. 2011)) (internal quotation marks omitted).

Nomura should be estopped from now advancing its revisionist interpretation of the Prospectus Supplements.  *First*, Nomura's current position contradicts its prior positions in this case.  Nomura did not contest, in its motion to dismiss, that the Prospectus Supplements represented that the underlying mortgage loans generally adhered to applicable underwriting guidelines.[15]  Moreover, Nomura's proffered diligence expert, Charles Grice, noted in his report that "[t]aken together, the disclosures in Nomura's Offering Documents indicated that the loans backing the securities were underwritten generally in accordance with the applicable guidelines . . . ."[16]  *Second*, this Court formulated a discovery plan and directed the parties to engage in an extensive guideline matching process designed to match the best representation of the sample loan files currently available with the guidelines used to underwrite those loans.[17]  At no point did Nomura argue that this guideline matching process was unnecessary because the Prospectus Supplements did not represent that the loans originated by the Unnamed Originators complied with applicable guidelines.  Moreover, Nomura's own re-underwriting expert, Michael Forester, found potential significant defects for loans originated by Unnamed Originators *based on the guidelines of those originators*.[18]  *Third*, accepting Nomura's newly created interpretation of the

---

Reasonable Care Defenses at 24.  For loans purchased through Nomura's loan-by-loan channel, the applicable underwriting guidelines were Nomura's correspondent underwriting guidelines.

[13]  Ex. 16 at 18:23-19:17 (Clayton 30(b)(6) Dep.); Ex. 17 at 38:22-39:12 (AMC 30(b)(6) Dep.).

[14]  Ex. 18 at 188:18-189:13 (Standard & Poor's 30(b)(6) Dep.) (testifying that S&P wanted a compliance with underwriting guidelines representation "so you knew … that it was a legitimate -- legitimate loan"); Ex. 19 at 204:7-19 (Moody's 30(b)(6) Dep.) (testifying that Moody's "would want to know" that there was a compliance with underwriting guidelines representation because "our evaluation is based on [the originator's] origination practices"). In a presentation to Standard & Poor's, Nomura represented that it "reviewed and approved" originators' "respective Programs and Guidelines."  Ex. 26 at NOM-FHFA_04881265.

[15]  *See generally* Dkt. 76.

[16]  Ex. 20 ¶ 205.

[17]  *See, e.g.,* Stipulation Regarding Loan File and Guideline Matching, Dkt. 657.

[18]  *See*, *e.g.*, Ex. 21 (for GLN NAA_2005_AR6_1001833854, which was originated by an Unnamed Originator, Mr. Forester identified the underwriting guideline of that originator as the applicable guideline); Ex. 22 (same for GLN NAA_2005_AR6_1002238862); Ex. 23 (same for GLN NHELI_2006_HE3_2002175020).

Prospectus Supplements at this late stage would unfairly prejudice FHFA given that it has spent considerable time and resources to obtain the relevant guidelines, engage in the guideline matching process with Nomura, and re-underwrite the sample loans to the guidelines.  *See In re Elec. Books Antitrust Litig.*, 2014 WL 1642813, *14 (S.D.N.Y. Apr. 24, 2014) (Cote, J.) (finding prejudice where non-movants relied on movant's prior position in discovery and motion practice for nearly two years, and movant failed to appreciate the practical effect of its new position).

### III.   Mr. Hunter's Opinions Are Relevant To FHFA's Claims[19]

Mr. Hunter's opinions regarding the loans of the Unnamed Originators are relevant to determining whether the statements in the Prospectus Supplements relating to underwriting compliance and the credit ratings assigned to the securities are accurate, and will assist the trier of fact in determining these issues.  *See* Fed. R. Evid. 402, 702.  Mr. Hunter's opinion directly relates to whether the loans of the Unnamed Originators adhered to the guidelines of such originators.  In doing so, Mr. Hunter's opinions also address whether the general "underwriting criteria" described in the Prospectus Supplements have been met.  For example, Mr. Hunter's opinions address whether the loans complied with requirements in the guidelines relating to the underwriting criteria and minimum industry standards such as evaluation of the borrower's ability and willingness to repay, adequacy of the underlying mortgage collateral, income verification under full, reduced and stated income documentation programs, and LTV, CLTV, and DTI ratios.[20]  Indeed, Nomura concedes that determining whether a loan complied with its originator's underwriting guidelines is relevant to determining whether the criteria described in the Prospectus Supplements were accurate.[21]  Finally, because compliance with guidelines is a prerequisite to obtaining a credit rating,[22] Mr. Hunter's opinions will also assist the fact finder in determining whether the credit ratings for the securities were accurate.

\*       \*       \*

Nomura understood during the relevant time period, as well as throughout this litigation, that the Prospectus Supplements' description of the "underwriting criteria" constituted a representation that the underlying loans generally adhered to guidelines.[23]  Because Mr. Hunter's opinion is relevant to and will assist the jury in determining the accuracy of these statements, FHFA respectfully requests that Nomura's motion be denied in its entirety.

---

[19]   Nomura's argument that Mr. Hunter's opinions about the loans of the Unnamed Originators should be excluded under Rule 403 is based entirely on the contention that "the offering documents contained no disclosures about [compliance with the] guidelines [of the Unnamed Originators]." Defs. Mot. 5 (citing Fed. R. Evid. 403).  For the reasons discussed above, this position is based on a flawed reading of the Prospectus Supplements.

[20]   Ex. 8 at 21-22, 28-29, 36, 43-44, 52-53, 59, 69-71, 76-77, 80-81, 83; Ex. 25.

[21]   Nomura Opposition at 5-6 ("These loan file reviews supported statements made in the Offering Documents … that the loans underlying the Securitizations were 'originated generally in accordance with the underwriting criteria described in' a section of the prospectus supplement.").

[22]   Ex. 24 at 43:8-44:3, 71:14-74:16 (Rubinstein Dep.).

[23]   Even if there is any ambiguity about whether the Prospectus Supplements' statements about "underwriting criteria" incorporate underwriting guidelines, FHFA would be entitled to present evidence at trial in support of its interpretation.  *See Fifty-Six Hope Road Music, Ltd. v. UMG Recordings, Inc.*, 2011 WL 3874861, *4 (S.D.N.Y. Aug. 31, 2011) (Cote, J.) (denying motion *in limine* to exclude extrinsic evidence of the meaning of a contract where the court had previously found the language of the contract ambiguous).

Respectfully submitted,

*Manisha Sheth*

Manisha M. Sheth

cc: All Counsel of Record