UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,

                -against-

NOMURA HOLDING AMERICA, INC.;
NOMURA ASSET ACCEPTANCE
CORPORATION; NOMURA HOME EQUITY
LOAN, INC.; NOMURA CREDIT &
CAPITAL, INC.; NOMURA SECURITIES
INTERNATIONAL, INC.; RBS SECURITIES
INC. (f/k/a GREENWICH CAPITAL
MARKETS, INC.); DAVID FINDLAY; JOHN
MCCARTHY; JOHN P. GRAHAM; NATHAN
GORIN; and DANTE LAROCCA,

                Defendants.

**11 Civ. 6201 (DLC)**

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY OF ROBERT W. HUNTER BASED
ON PURPORTED "MINIMUM INDUSTRY STANDARDS"**

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

Philippe Z. Selendy
Manisha M. Sheth
Deborah K. Brown
Jeffrey C. Miller
Zach Williams

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................1

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND .........................................................................................3

    A.    Nomura's Representations in the Prospectus Supplements ....................................3

    B.    Mr. Hunter's Opinions Regarding Minimum Industry Standards of Underwriting ...............................................................................................5

    C.    The Use of Minimum Industry Standards in the Re-underwriting Review ............7

ARGUMENT ................................................................................................................8

I.    MR. HUNTER'S TESTIMONY REGARDING MINIMUM INDUSTRY STANDARDS IS RELEVANT AND WILL ASSIST THE FACT FINDER ..................8

    A.    Mr. Hunter's Opinions Regarding Minimum Industry Standards Are Relevant to Determining Whether the Underwriting Representations in the Prospectus Supplements Are Accurate ....................................................9

    B.    Mr. Hunter's Opinions Regarding Minimum Industry Standards Are Relevant to Determining Whether the Prospectus Supplements' Representations Regarding the Borrowers' Ability to Repay and the Adequacy of the Mortgaged Collateral Are Accurate ..........................................10

II.    MR. HUNTER'S METHODOLOGY FOR IDENTIFYING AND DISTILLING THE MINIMUM INDUSTRY STANDARDS IS RELIABLE........................................12

    A.    The Minimum Industry Standards Are Based on Decades of Expert Underwriting Experience During the Relevant Period .........................................13

    B.    The Minimum Industry Standards Were Not Created for This Litigation, But Rather Existed During the Relevant Period and Were Simply Documented for this Litigation Using the Same Process Used by Originators to Develop Guidelines During the Relevant Period ..........................14

    C.    The Minimum Industry Standards Were Tested...................................................17

    D.    Mr. Hunter's Opinions Are Widely Accepted in the Industry As Reflected By The Evidence Obtained in Discovery...............................................18

III.   DEFENDANTS' ARGUMENTS REGARDING SPECIFIC MINIMUM
INDUSTRY STANDARDS ARE INACCURATE, AND, IN ANY EVENT, GO
TO WEIGHT NOT ADMISSIBILITY..............................................................................22

    A.   The Minimum Industry Standards Are More Lenient Than Guidelines................22

        1.   Payment Shock.............................................................................................22

        2.   DTI Ratio ....................................................................................................23

        3.   Investigation of Credit Inquiries ...............................................................24

    B.   Defendants' Arguments Go to Weight Rather Than Admissibility......................24

CONCLUSION................................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)..........................................................17, 24-25

*Algarin* v. *New York City Department of Corrections*,
460 F. Supp. 2d 469 (S.D.N.Y. 2006)............................................................12

*Assured Guaranty Mun. Corp. v. Flagstar Bank, FSB*,
920 F. Supp. 2d 475 (S.D.N.Y. 2013).....................................................12, 13, 14

*Bah v. Nordson Corp.*,
2005 WL 1813023 (S.D.N.Y. Aug. 1, 2005) ...................................................13

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
769 F. Supp. 2d 269 (S.D.N.Y. 2011)............................................................13

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993)..................................................................................1, 8

*Emig v. Electrolux Home Products Inc.*,
2008 WL 4200988 (S.D.N.Y. Sept. 11, 2008).............................................13, 16

*FHFA v. UBS Ams. Inc.*,
2013 WL 3284118 (S.D.N.Y. June 28, 2013) ....................................................16

*Grdinich v. Bradlees*
187 F.R.D. 77, 81 (S.D.N.Y. 1999) ...............................................................21

*Hollman v. Taser Int'l Inc.*,
928 F. Supp. 2d 657 (S.D.N.Y. 2013)............................................................25

*In re Fosamax Prods. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009)........................................................12, 18

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*,
725 F.3d 65 (2d Cir. 2013) .........................................................................8

*In re Puda Coal Sec. Inc., Litig.*,
--- F. Supp. 2d ---, 2014 WL 2915880 (S.D.N.Y. June 26, 2014) ...........................8

*Jarvis v. Ford Motor Co.*,
283 F.3d 33 (2d Cir. 2002)..........................................................................17

*Kumho Tire v. Carmichael*,
526 U.S. 137 (1999)..................................................................................16

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*,
    2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) .........................................................................11

*Lippe v. Bairnco Corp.*,
    2002 WL 15630 (S.D.N.Y. Jan. 7, 2002) ............................................................................12

*Nussbaum v. Metro-North Commuter R.R.*,
    994 F. Supp. 2d 483 (S.D.N.Y. 2014) ...............................................................................16

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    691 F. Supp. 2d 448 (S.D.N.Y. 2010) ......................................................................... 12-13

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    716 F. Supp. 2d 236 (S.D.N.Y. 2010) ...............................................................................15

*Playtex Prods, Inc. v. Procter & Gamble Co.*,
    2003 WL 21242769 (S.D.N.Y. May 28, 2003) ...................................................................17

*Primavera Familienstifung v. Askin*,
    130 F. Supp. 2d 450 (S.D.N.Y. 2001) ...............................................................................12

## **Statutes and Rules**

Federal Rule of Evidence 401 .............................................................................................9

Federal Rule of Evidence 702 .................................................................................. 1, 8-9, 12

Plaintiff Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), respectfully submits this memorandum of law in opposition to Defendants' Motion to Exclude the Testimony of Robert W. Hunter Based on Purported "Minimum Industry Standards" ("Motion").

## PRELIMINARY STATEMENT

Defendants' Motion attacks only a small portion of the findings of FHFA's expert on the sampled loans in that only 248 of Mr. Hunter's 1,998 findings (12.4 percent) are based on a failure to adhere to minimum industry standards.  As such, Defendants' motion has no bearing on 87.6 percent of Mr. Hunter's findings, or 536 of the 723 sample loans.

The minimum industry standards utilized during FHFA's expert re-underwriting review were commonly used and widely accepted as part and parcel of underwriting a residential mortgage loan during the period from 2002 to 2007 (the "Relevant Period").  These standards have been in existence since at least 2002 and constitute the fundamental principles and steps utilized by loan underwriters in determining whether the borrower had the ability to repay the loan and whether the mortgaged property was adequate security.  Indeed, originators developed underwriting guidelines to assist loan underwriters in making these critical determinations.  For this reason, Mr. Hunter's opinions regarding minimum industry standards and the application of those standards to the sample loans in the securitizations at issue in this action (the Securitizations") are relevant to the fact finder's determination of whether the following underwriting representations in the Prospectus Supplements are accurate: (i) the mortgage loans complied with the applicable underwriting guidelines of the relevant originators and the underwriting criteria described in the Prospectus Supplements; and (ii) the originators assessed the borrowers' ability to repay and the adequacy of the underlying collateral.

Moreover, the methodology used to identify and distill the minimum industry standards is fully consistent with Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  The minimum industry standards were based on Mr. Hunter's forty years of experience

in residential mortgage lending, the collective 75 years of experience of FHFA's two other experts, Mr. Steven Butler and Mr. Richard Payne, and the numerous years of experience of the underwriting professionals on Mr. Hunter's re-underwriting team.  The process utilized to identify and distill the minimum industry standards is virtually identical to the process used by originators during the Relevant Period to develop underwriting guidelines.  The underwriting guidelines of numerous originators were compared to extract the aspects of the guidelines that constituted the most lenient requirements during the Relevant Period.  As an additional step, these standards were then tested against the underwriting guidelines of the four largest originators of subprime and Alt-A loans in the nation during the Relevant Period to ensure that they represented the lowest common denominator of underwriting standards across originators.

The resulting list of minimum industry standards is a detailed, specific list of standards widely accepted among underwriting professionals in the industry as the core principles of residential mortgage loan underwriting during the Relevant Period, and as the fundamental steps in assessing the borrower's ability to repay and the adequacy of the mortgaged property.  This widespread acceptance is evidenced and supported by considerable deposition testimony in these coordinated actions from personnel from Defendants, originators, third-party diligence firms, and diligence managers from other investment banks.  Even Nomura's own proffered re-underwriting expert, Michael Forester, agreed that many of these standards were so fundamental that he would expect a loan underwriter at any originator to adhere to these standards, even if they were not expressly delineated in the underwriting guidelines.

Finally, Defendants do not challenge 51 of the 59 minimum industry standards as being the most lenient standards of underwriting in place during the Relevant Period.  Their argument that a handful of such standards are not the most lenient standard is incorrect because it fails to recognize that aspects of the purportedly more lenient guidelines they cite are applicable only if other more restrictive conditions are satisfied.  In any event, such arguments go to weight of Mr. Hunter's opinions, not their admissibility.  Accordingly, for the reasons set forth below, Defendants' motion should be denied in its entirety.

## FACTUAL BACKGROUND

### A.      Nomura's Representations in the Prospectus Supplements

The Prospectus Supplements contain several important representations about the underwriting of the mortgage loans in the Securitizations.  First, the Prospectus Supplements represent that the mortgage loans were underwritten in accordance with the applicable underwriting guidelines of the relevant originators.[1]  When a particular originator originated at least 20 percent of the loans in the securitization, the Prospectus Supplement contains a description of the specific originator's origination program, including its underwriting guidelines.[2]  Defendants do not dispute that these statements are representations that the loans originated by these named originators generally complied with their applicable underwriting guidelines.[3]  For those originators responsible for fewer than 20 percent of the loans in a securitization (the "Unnamed Originators")—and there were dozens of such originators that contributed to the Securitizations—the Prospectus Supplements make a similar representation, but without identifying each originator by name.  For these Unnamed Originators, the Prospectus Supplements describe adherence to "underwriting criteria," which, as described elsewhere in each Prospectus Supplement, incorporate the underwriting processes and standards used by such originators.  Specifically, the Prospectus Supplements represent that: (i) the borrower provided an application to the lender containing pertinent credit information; (ii) the lender determined whether the borrower's monthly income was sufficient to meet the borrower's monthly

---

[1]   Ex. 1 at NOM-FHFA_04811894-96; Ex. 2 at NOM-FHFA_04729543-48; Ex. 3 at NOM-FHFA_04638395-402; Ex. 4 at NOM-FHFA_04620965-75; Ex. 5 at NOM-FHFA_05142021-29; Ex. 6 at NOM-FHFA_05591413-18; Ex. 7 at NOM-FHFA_04732707-15.

[2]   Ex. 2 at NOM-FHFA_04729543-48 (representing compliance with underwriting criteria of Fremont, which originated 100% of the loans in the deal, and summarizing such criteria); Ex. 3 at NOM-FHFA_04638395-399 (same); Ex. 4 at NOM-FHFA_04620965-72 (similar representation for People's Choice Home Loan, which originated at least 20% of the loans in the deal); Ex. 5 at NOM-FHFA_05142020-25 (similar representation for First National Bank of Nevada and Silver State Mortgage); Ex. 6 at NOM-FHFA_05591413-15 (similar representation for Ownit Mortgage); Ex. at NOM-FHFA_04732707-12 (similar representation for ResMAE).

[3]   Defs.' November 25, 2014 Mot. in Limine No. 3 on Hunter's Use of Underwriting Guidelines at 2 (recognizing that the Prospectus Supplements describe the underwriting guidelines of originators whose loans comprised more than 20 percent of the principal balance of all loans backing the securitization and thus, "represent that the loans purchased from the disclosed originators were 'generally originated' in accordance with originators' guidelines").

obligations; (iii) the lender ensured that the mortgaged property was adequate security by obtaining an appraisal prepared in accordance the lender's guidelines; and (iv) the lender obtained the borrower's credit scores to assess his creditworthiness.[4]  These summaries make clear that each lender applied its own underwriting standards to all loans, with variations based on the applicable loan program and other collateral characteristics.  Although Nomura recently claimed that the Prospectus Supplements did not make this representation for the mortgage loans originated by the Unnamed Originators, this contention is belied by other language in the Prospectus Supplements and the evidence obtained to date.[5]

In addition, the Prospectus Supplements represent that the originators of the underlying mortgage loans determined that the borrowers had the ability to repay their loans,[6] and that the mortgaged property was adequate as security for the loan.[7]

---

[4]  Ex. 1 at NOM-FHFA_04811894-96 (the NAA 2005-AR6 Prospectus Supplement does not include the cited language regarding the borrower's credit scores); Ex. 4 at NOM-FHFA_04620972-75; Ex. 5 at NOM-FHFA_05142025-28; Ex. 6 at NOM-FHFA_05591415-18; Ex. 7 at NOM-FHFA_04732712-15.

[5]  FHFA incorporates by reference the arguments in its December 5, 2014 Opposition to Defs.' Mot. in Limine No. 3.

[6]  Ex. 1 at NOM-FHFA_04811894 (representing that the lender made "a determination . . . that the borrower's monthly income . . . will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property . . . ."); Ex. 2 at NOM-FHFA_04729544 ("Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt."); Ex. 3 at NOM-FHFA_04638395 (same); Ex. 4 at NOM-FHFA_04620966 (representing that People's Choice collects and analyzes credit information "to determine the applicant's ability to repay the loan."), -973 (similar representation for Unnamed Originators); Ex. 5 at NOM-FHFA_05142022 ("FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan."), -024 ("Silver State Mortgage's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan."), -026 (similar representation for Unnamed Originators); Ex. 6 at NOM-FHFA_05591413 (representing that Ownit's underwriting guidelines "are designed to be used as a guide in determining the credit worthiness of the borrower and his/her ability to repay."), -416 (similar representation for Unnamed Originators); Ex. 7 at NOM-FHFA_04732708 ("The underwriting standards of ResMAE are primarily intended to assess the ability and willingness of the borrower to repay the debt."), -713 (similar representation for Unnamed Originators).

[7]  Ex. 1 at NOM-FHFA_04811895 ("The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator."); Ex. 2 at NOM-FHFA_04729544 ("Fremont's underwriting guidelines are primarily intended . . . to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan."); Ex. 3 at NOM-FHFA_04638395 (same); Ex. 4 at NOM-FHFA_04620966-67 (representing that "[t]he Underwriting Guidelines require underwriters to be satisfied that the value of the property being financed, as reflected by an appraisal and a review of the appraisal, supports the outstanding loan balance at time of funding."); Ex. 5 at NOM-FHFA_05142022 ("FNBN's underwriting guidelines are primarily intended to evaluate . . . the value and adequacy of the Mortgaged Property as collateral."), -024 (same

### B.     Mr. Hunter's Opinions Regarding Minimum Industry Standards of Underwriting

In his report, Mr. Hunter describes the fundamental principles and most basic steps of residential mortgage underwriting that were in existence during the Relevant Period.  Ex. 8 at 20-21, 34-36, 41-43, 49-52, 56-58, 62-66, 73-75, 79-80, 82, 85-88.  Mr. Hunter refers to these common-sense steps and principles as "minimum industry standards."  *Id*. at 20-21.  Based on his experience in the industry, Mr. Hunter opines that even the most lenient originators of subprime and Alt-A loans during the Relevant Period were expected to perform these basic steps of underwriting, which were targeted to assessing the borrower's ability to repay the loan and to evaluating the adequacy of the underlying collateral.  *Id.* at 86-88; Ex. 9 at 229:3-8).  These minimum industry standards include basic underwriting steps such as (i) properly calculating the income and debts of the borrower; (ii) obtaining the borrower's credit report and following up on unexplained credit inquiries; (iii) investigating red flags of potential misrepresentations or fraud in the origination of the loan; (iv) obtaining a valid mortgage or deed of trust, (v) verifying the borrower's employment on stated income loans; (vi) ensuring compliance with federal laws; (vii) obtaining an appraisal in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP"); (vii) ensuring that the appraiser held a valid license; (viii) ensuring the borrower has obtained title and hazard insurance; and (ix) assessing the reasonableness of borrower's stated income.[8]

These minimum industry standards were identified and then "distilled" to a written summary to be used in connection with Mr. Hunter's re-underwriting review.  The process of identification and documentation of these fundamental principles and steps of underwriting was based on (i) Mr. Hunter's experience and knowledge of the mortgage industry and its standards

---

representation for Silver State Mortgage), -027 (similar representation for Unnamed Originators); Ex. 6 at NOM-FHFA_05591413 ("Ownit will evaluate the property . . . to determine whether the collateral is sufficient to secure the mortgage."); Ex. 7 at NOM-FHFA_04732708 ("The underwriting guidelines of ResMAE are primarily intended . . . to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan."), -713 (similar representation for Unnamed Originators).

[8]     A complete list of the minimum industry standards used to underwrite residential mortgage loans during the Relevant Period is attached as Exhibit 7 to Mr. Hunter's Report.  Ex. 10.

during the Relevant Period; (ii) discussions with underwriting professionals on Mr. Hunter's re-underwriting teams who had between numerous years of underwriting experience; (iii) consultations with FHFA's other re-underwriting experts;[9] and (iv) a review of the underwriting guidelines and matrices in effect during the Relevant Period.[10] *Id.* at 87.  The minimum industry standards were identified and documented using the same process used by originators to develop underwriting guidelines during the Relevant Period.  In creating their own guidelines, originators routinely compared the guidelines of their competitors to extract aspects of those guidelines that reflected their desired risk tolerance.  Ex. 11 at 205:5-14 (explaining that "determining industry standards . . . was based on the same competitive analysis [as reviewing competitors' guidelines] but based on using the most lenient standards.").  In discussing the minimum industry standards, Mr. Payne testified that:

> The way this was compiled, it's not a point in time compilation.  It is based on my experience during the relevant time frame in originating Alt-A and subprime loans.  And the process—I don't want to call it a process but it was how I developed guidelines back in the day and how every other originator developed guidelines during the day.  You would look at your competitors' guidelines and you would determine—this is the only difference between this process and formulating guidelines.  In formulating guidelines you would determine or I would determine my appetite for risk.  In determining industry standards it was based on the same competitive analysis but based on using the most lenient standards.

Ex. 11 at 204:20-205:14.

After the minimum industry standards were identified and summarized in a written document, they were tested to ensure that they actually represented the *minimum* or most lenient

---

[9]   Defendants' insinuation that Mr. Hunter falsely claimed in his report that he single handedly developed the minimum industry standards is utterly unsupported. *See* Defs.' Mot. 6 n.3.  In his report, Mr. Hunter clearly stated that "[he] distilled the minimum  industry standards *[in] consultation with* other reunderwriting experts."  Ex. 8 at 87 (emphasis added).  At his deposition, Mr. Hunter testified that those experts were Mssrs. Butler and Payne.  Ex. 9 at 114:12-16 ("The group—Mr. Butler, Mr. Payne, myself—developed the minimum industry standards.").

[10]   Defendants incorrectly assert that the "thousands" of underwriting guidelines Mr. Hunter reviewed "have never been produced to defendants."  Defs.' Mot. 7.  To the contrary, Mr. Hunter testified that the guidelines he reviewed came from the "45,000-document inventory of underwriting guides" he used to prepare his report in this action and the Ally action, as well as his work during the guideline matching process on other FHFA actions.  Ex. 9 at 258:12-259:8.  The underwriting guidelines in that inventory were produced in these coordinated actions.

standards of underwriting for subprime and Alt-A loans.  This testing was done by comparing each of the minimum standards to the applicable provision in the underwriting guidelines of the following four originators:  WMC, New Century, Countrywide, and Long Beach.  Ex. 8 at 87-88. Mr. Hunter, along with Mssrs. Butler and Payne, selected these four originators because they (i) were the nationwide lenders responsible for originating the largest volume of subprime and Alt-A loans during the Relevant Period; (ii) were "known to have very lenient origination requirements and practices"; and (iii) had some of the highest foreclosure rates in the industry. *Id.*; Ex. 9 at 261:23-262:16; Ex. 12 at 343:14-344:10.

###    C.    The Use of Minimum Industry Standards in the Re-underwriting Review

Mr. Hunter used minimum industry standards in two ways during his re-underwriting review.  First, for loans where no applicable underwriting guideline was available, Mr. Hunter reviewed the loans to determine if they were underwritten to at least the minimum industry standards.[11]  *See* Ex. 8 at 89.  Where no guidelines were available, the minimum industry standards served as a proxy for underwriting guidelines because they presented the least common denominator across the underwriting processes of thousands of originators of subprime and Alt-A loans during the Relevant Period.  Mr. Hunter testified that a comparison of different originators' guidelines would reveal similarities that could be used to identify minimum standards of underwriting.  Ex. 9 at 260:22-261:6 ("[I]f you look at all the guidelines we have here and you start comparing them, at the end of the day you are going to find out that ResMae's guidelines are very similar to . . . Aegis's or New Century's . . . [T]hey are all very similar.").

Second, for those loans where there was an applicable underwriting guideline that addressed criteria such as minimum FICO score, maximum DTI ratio, maximum LTV/CLTV ratio, and verifications, Mr. Hunter reviewed the loans to determine whether they complied with the specifications in those guidelines.  Ex. 8 at 88.  He additionally reviewed those loans to

---

[11]   Of the 723 loans in the samples reviewed by Mr. Hunter, there were no applicable guidelines for only 24 loans.  Of these, Mr. Hunter found only 15 loans (2.07 percent of the sample) to have substantially increased credit risk based on failure to comply with minimum industry standards.

determine whether they complied with fundamental steps of the underwriting process that were so basic that they were not always expressly set forth in the underwriting guidelines. *Id.* These steps included process requirements such as investigating red flags of borrower misrepresentation, obtaining a borrower's credit report, ensuring the borrower's ability to repay by verifying the borrower's income or ensuring its reasonableness, and investigating unexplained credit inquiries that appear on the borrower's credit report. Ex. 9 at 177:24-178:7, 232:6-14; Ex. 10.[12] Finally, to the extent there were any inconsistencies between the underwriting guidelines and the minimum industry standards, the guidelines were utilized.

Using this process, Mr. Hunter identified 248 defects based on a failure to adhere to minimum industry standards for 187 loans in the sample of 723 loans. Defendants' Motion does not impact the remaining 536 sample loans or the remaining 1,750 findings because they do not implicate minimum industry standards.

## ARGUMENT

### I.   MR. HUNTER'S TESTIMONY REGARDING MINIMUM INDUSTRY STANDARDS IS RELEVANT AND WILL ASSIST THE FACT FINDER

Reliable testimony of an expert witness is admissible when it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592-94 (1993). Expert testimony is helpful if it "provide[s] the groundwork to enable the jury to make its own informed determination." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*, 725 F.3d 65, 114 (2d Cir. 2013) (internal citation and alterations omitted); *see In re Puda Coal Sec. Inc., Litig.*, --- F. Supp. 2d ---, 2014 WL 2915880, at *17 (S.D.N.Y. June 26, 2014). Here, Mr. Hunter's opinions regarding whether the sample loans were originated in accordance with fundamental principles of underwriting are relevant to determining whether the underwriting representations in the Prospectus Supplements are accurate. Thus, Mr. Hunter's opinions relating the minimum industry standards and the

---

[12]   Nomura's proffered re-underwriting expert, Mr. Forester, agreed it was expected that loan underwriters would take such steps in underwriting a residential mortgage loan. Ex. 14 at 107:15-24, 253:15-17.

application of those standards to the sample loans "will help the trier of fact" determine whether Nomura's representations in the Prospectus Supplements are accurate.  Fed. R. Evid. 702.

> ### A.     Mr. Hunter's Opinions Regarding Minimum Industry Standards Are Relevant to Determining Whether the Underwriting Representations in the Prospectus Supplements Are Accurate

Mr. Hunter's opinions regarding minimum industry standards are relevant to determining whether the sample loans complied with the applicable underwriting guidelines of the relevant originators.  Because the minimum industry standards reflect the most lenient requirements contained in the underwriting guidelines during the Relevant Period, *see infra* § III.A, they serve as a proxy for underwriting guidelines when no underwriting guidelines were available.  The minimum industry standards are "the baseline that mirrored what the market was doing, what all the lenders were willing to accept."  Ex. 9 at 12:10-12.  Thus, the minimum industry standards will assist the fact finder in determining whether the loans complied with underwriting guidelines even in instances where no guidelines are available.  Fed. R. Evid. 401.

In addition, Mr. Hunter's opinions regarding minimum industry standards are relevant to determining whether the descriptions of the underwriting criteria in each of the Prospectus Supplements are accurate.  These descriptions outlined the steps the originator generally took as part of the loan underwriting process.  The minimum industry standards are similar to these "underwriting criteria," and in their totality, are more lenient.  Thus, if a loan fails to comply with the minimum industry standards, the loan necessarily fails to comply with the originators' underwriting guidelines and the underwriting criteria.  Accordingly, Mr. Hunter's opinions about whether the sample loans complied with the minimum industry standards informs whether the underwriting criteria described in the Prospectus Supplements are accurate.  Fed. R. Evid. 401.

**B.      Mr. Hunter's Opinions Regarding Minimum Industry Standards Are
Relevant to Determining Whether the Prospectus Supplements'
Representations Regarding the Borrowers' Ability to Repay and the
Adequacy of the Mortgaged Collateral Are Accurate**

Mr. Hunter used the minimum industry standards to determine whether the sample loans

complied with Nomura's representations about the borrowers' ability to repay and the adequacy

of the collateral.  As Mr. Hunter explained, the minimum industry standards:

> incorporate the concepts of ability to repay, collateral value being acceptable, and
> that the loans meet the underwriting guidelines . . . and the regulatory
> requirements.  So in that respect, the concept of minimum industry standards is
> incorporated into the documents because that is all the minimum industry
> standard[s] did, was just use those principles of ability to repay.

Ex. 9 at 229:3-14.  Nomura's own re-underwriting expert, Mr. Forester, and its diligence expert,

Mr. Grice, also agreed that the purpose of mortgage underwriting and underwriting guidelines

was to determine the borrower's ability to repay and the adequacy of the collateral.[13]

Each of the requirements in the minimum industry standards is relevant to determining

whether the borrower had the ability to repay the loan or whether the mortgaged property was

adequate security.  For example, the minimum industry standards require the underwriter to

investigate potential borrower misrepresentations of employment, occupancy, income, housing

history, and debt obligations.  Ex. 10 at 3.  As Mr. Hunter explains in his report, "[i]nvestigating

red flags was important because failure to do so could result in the origination of a mortgage loan

to a borrower who could not repay the loan."  Ex. 8 at 34.  Similarly, Mr. Forester testified that

"[a] red flag for mortgage fraud, I would hope that would be considered in the underwriting

decision . . . [w]hether or not that was specified in the guidelines."  Ex. 14 at 253:15-17.  The

minimum industry standards also require the underwriter to obtain a valid appraisal compliant

with USPAP, performed by a licensed appraiser, and completed on the appropriate appraisal

form.  Ex. 10 at 5.  According to Mr. Hunter, "[p]art of an underwriter's role is to assess the

---

[13]      Ex. 14 at 240:10-19, 242:12-243:19, 250:18-251:11, 244:6-11; Ex. 27 at 98:18-24 (Nomura's own due
diligence expert testifying that assessing a borrower's ability and willingness to repay was an originator's "principle
objective" in underwriting a loan).

correctness of the property appraisal used to support a mortgage loan." Ex. 8 at 41. Mr. Forester agreed: when asked what documents he would review in assessing the risk of a loan, he testified, "[O]f course, collateral. We would look at appraisals. Performing what I would characterize as an underwriter-type review of an appraisal." Ex.14 at 107:21-24. The minimum industry standards are relevant to whether the sample loans comply with the Prospectus Supplements' representations about the borrowers' ability to repay and the adequacy of the collateral.

Defendants rely on *LaSalle Bank Nat'l Ass'n* v. *CIBC Inc.*, No. 08 Civ. 8426, 2012 WL 466785, at *12 (S.D.N.Y. Feb. 14, 2012), which is readily distinguishable. Unlike the Prospectus Supplements in this case, the contract in *LaSalle* did not require that the originator determine that the borrower had the ability to repay and the mortgaged property was adequate security. Rather, the contract required only that the loan adhere to the originator's underwriting standards.[14] *Id.* at *2. The plaintiff's expert in that case offered an opinion regarding whether the defendant "complied with industry standards" for commercial loan underwriting. *Id.* at *12. The court excluded that opinion because compliance with industry standards was different than compliance with defendant's underwriting standards, and the former was not part of the defendant's contractual obligations. *Id.* In contrast, here, the Prospectus Supplements represent that (i) the loans adhered to the originators' guidelines and the underwriting criteria described in the Prospectus Supplements; (ii) the originators determined that the borrowers had the ability to repay; and (iii) the originators determined that the mortgaged property was adequate security. For each of these representations to be true, the loan had to at least comply with the minimum industry standards. Thus, unlike the industry standards in *LaSalle*, which could have been more rigorous than the defendant's underwriting standards, 2012 WL 466785, at *16-17, the minimum industry standards here are indisputably less rigorous and encompassed within the underwriting

---

[14] The relevant contract provision in *LaSalle* stated: "Each Mortgage Loan complied at origination, in all material respects, with all of the terms, conditions and requirements of [CIBC's] . . . underwriting standards applicable to such Mortgage Loan . . . ." *LaSalle*, 2012 WL 466785, at *2.

guidelines and criteria, and as such, are relevant to determining whether the representations in the Prospectus Supplements are accurate.

## II.    MR. HUNTER'S METHODOLOGY FOR IDENTIFYING AND DISTILLING THE MINIMUM INDUSTRY STANDARDS IS RELIABLE

"In determining the admissibility of an expert witness's testimony, a court must 'undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *Assured Guaranty Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 502 (S.D.N.Y. 2013). Rule 702 requires that the testimony is based on sufficient facts or data, is the product of reliable principles and methods, and that the expert has reliably applied the principles and methods to the facts of the case. *Assured Guaranty*, 920 F. Supp. 2d at 502; Fed. R. Evid. 702. "In accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prods. Liab. Litig.,* 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009).

This Court has repeatedly held that an expert may testify as to "the customs and standards of an industry" and "opine as to how a party's conduct measured up against such standards." *Lippe v. Bairnco Corp.*, No. 96 Civ. 7600, 2002 WL 15630, at *2 (S.D.N.Y. Jan. 7, 2002); *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co.*, 653 F.3d 95 (2d Cir. 2011). In *Askin*, the court required that an expert "articulate industry customs or standards for consideration by the jury," as opposed to vague generalizations, in order to establish a basis for his opinion. *Id.* Here, Mr. Hunter has done precisely that by articulating 59 specific standards with which every loan underwriter of subprime and Alt-A loans was expected to comply during the Relevant Period. *See* Ex. 10. Mr. Hunter then objectively compared the sample loans to these minimum standards to determine if the loans complied with these fundamental principles and steps of underwriting. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC* ("*Pension I*"), 691 F. Supp. 2d 448, 465-466 (S.D.N.Y. 2010) (ruling that plaintiff's expert's testimony

regarding industry standards provided the jury with a checklist of minimum steps that must be taken by an investor to conduct adequate due diligence and thus, was admissible "to the extent that [the expert] is able to articulate objective standards that the jury can employ to analyze Plaintiff's due diligence.").

### A.   The Minimum Industry Standards Are Based on Decades of Expert Underwriting Experience During the Relevant Period

This Court has concluded numerous times that an expert's experience in an industry can be a sufficient basis for testimony regarding the standards of that industry. *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 282-284 (S.D.N.Y. 2011); *Emig v. Electrolux Home Products Inc.*, No. 06-CV-4791, 2008 WL 4200988, at *7 (S.D.N.Y. Sept. 11, 2008) (finding that "where the expert's opinion is based on years of accumulated learning and insight, the reliability of such opinion should be assessed without resort to the *Daubert* factors."); *Bah v. Nordson Corp.*, No. 00 Civ. 9060, 2005 WL 1813023, at *8 (S.D.N.Y. Aug. 1, 2005) (ruling that expert testimony can be reliable, even if it does not otherwise satisfy the "*Daubert* factors", when it is based on the expert's "relevant professional knowledge and experience."). In *Pension I*, a hedge fund due diligence expert's experience included "work[] for different financial institutions, conduct[ing] more than fifty due diligence reviews of hedge funds, and . . . knowledge about common practices in the industry [gained] through professional relationships and industry conferences." 691 F. Supp. 2d 448, 463 (S.D.N.Y. 2010) (internal citations omitted). This Court ruled that the expert's testimony regarding industry standards was admissible even though the testimony was drawn from the expert's "broad-based" experience rather than "published scholarship or existing data." *Id.* Similarly, in *Assured Guaranty*, 920 F. Supp. 2d at 504, a re-underwriting expert's experience in mortgage underwriting, quality control, and risk management "indicate[d] that she[]remained intimately familiar with mortgage underwriting practices in the recent past, so as to qualify her as an expert able to testify to industry standards during the relevant time period."

Here, Mr. Hunter's opinions regarding the minimum industry standards of underwriting are based on his forty years of experience in the mortgage industry that includes extensive experience underwriting and re-underwriting residential mortgage loans in a variety of contexts including quality control audits, repurchase reviews, and forensic reviews.  Mr. Hunter has developed underwriting guidelines for residential mortgage loans, including for Countrywide Bank, Northeast Savings, and SunTrust, and is very familiar with the process of developing such guidelines.  Moreover, the minimum industry standards also are based on the experience of other underwriting professionals, including members of Mr. Hunter's re-underwriting team and FHFA's two other re-underwriting experts.  In total, Mssrs. Hunter, Butler, and Payne have nearly 120 years of combined experience in residential mortgage underwriting, and used that experience to identify and distill a list of underwriting requirements based on fundamental, "common sense knowledge of underwriting."  Ex. 9 at 231:7-232:20; *see* Ex. 15 at 4; Ex. 13 at 5.  Accordingly, Mr. Hunter's opinions regarding minimum industry standards are reliable because they are based on decades of underwriting experience during the Relevant Period.  *See Assured Guaranty*, 920 F. Supp. 2d at 506-07 (rejecting defendant's *Daubert* challenge to plaintiff's re-underwriting expert's identification of the proper "industry standard" for assessing the reasonableness of stated income because plaintiff's expert's consultation with other experts established reliable "clear standards" to determine reasonable stated income).

### B.    The Minimum Industry Standards Were Not Created for This Litigation, But Rather Existed During the Relevant Period and Were Simply Documented for this Litigation Using the Same Process Used by Originators to Develop Guidelines During the Relevant Period

Contrary to Defendants' argument, Defs.' Mot. 15-16, the minimum industry standards were not created for this litigation.  Rather, as set forth below in Section D, these standards have been in existence since at least 2002 and constitute the fundamental principles and steps utilized by loan underwriters in determining whether the borrower had the ability to repay the loan and the mortgaged property was adequate security.  Mr. Hunter and his team simply identified and

distilled these standards to create a document that summarized these standards for the re-underwriting review.

The minimum industry standards used by Mr. Hunter were identified and distilled into a document using the same process used by originators during the Relevant Period to develop underwriting guidelines. *See* Ex. 11 at 203:20-205:14. Ex. 9 at 247:20-249:02 (testifying that the identification of the minimum industry standards was based on "what I know about the industry, what I have done when I was at Countrywide in terms of developing guidelines"). It is undisputed that originators created their underwriting guidelines by comparing the guidelines of other originators to determine which aspects of such guidelines met their risk appetite, and then aggregated those aspects to create a consolidated set of guidelines. Ex. 11 at 203:20-205:14 (using a comparative analysis of guidelines to determine the most lenient standards); Ex. 14 at 120:02-125:7 (noting that process of developing underwriting guidelines included consideration of products being offered by other lenders, guidelines of other originators, and market environment and competitive forces).

Similarly, here, based on his experience, and in consultation with Mssrs. Butler and Payne and other underwriting professionals on his team, Mr. Hunter reviewed thousands of underwriting guidelines from the Relevant Period to identify and distill the most lenient aspects of those guidelines. This methodology is reliable because it has been used in the industry and the guidelines reviewed are evidence of minimum industry standards. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC* ("*Pension II*"), 716 F. Supp. 2d 236, 245 (S.D.N.Y. 2010) (ruling that use of reference guides and training materials could serve as "*evidence* of hedge fund administration standards . . . even if these materials do not *establish* industry standards.").

Defendants argue that the minimum industry standards are not reliable because in identifying and distilling such standards, Mr. Hunter (i) relied on the guidelines of originators that did not originate any loans underlying the Securitizations; (ii) failed to consider the

underwriting guidelines of the GSEs; and (iii) based his opinion on anecdotal evidence.  Each of Defendants' arguments is unavailing.[15]

First, Mr. Hunter's review and incorporation of the guidelines of originators that did not originate any loans in the Securitizations is entirely appropriate because the minimum industry standards are intended to be an aggregation of the most lenient underwriting requirements across the entire Alt-A and subprime residential mortgage industry during the Relevant Period, not the most lenient requirements of the originators involved in this action.  Ex. 8 at 21 ("To evaluate the borrower's ability to repay and the adequacy of the collateral, an originator must, at the very least, have followed the minimum acceptable underwriting standards *within the industry*.") (emphasis added).

Second, the guidelines used by the GSEs' Single Family businesses—including the Desktop Underwriter guide cited by Defendants—applied to conventional, prime loans purchased by the GSEs, and thus, are irrelevant to the subprime and Alt-A lending standards at issue in this case.[16]  Ex. 9 at 137:2-18.  Additionally, Defendants' criticism that Mr. Hunter did not consider Fannie Mae's anti-predatory lending compliance profile when distilling the minimum industry standards is also unavailing because those requirements were designed to ensure adherence to HUD housing goals regulations related to anti-predatory lending as opposed to credit requirements.  *See* Defs.' Ex. 34; Ex. 16 at FHFA11862103.

---

[15]   Defendants also argue that the minimum industry standards are invalid because "no industry organization or regulatory body has ever published" them.  Defs.' Mot. 15.  But *Daubert* does not require peer review or publication for the admission of expert opinions; rather, peer review and publication is only one of four "non-exhaustive factors" pertinent to determining an expert opinion's reliability.  *Nussbaum v. Metro-North Commuter R.R.*, 994 F. Supp. 2d 483, 489 (S.D.N.Y. 2014); *see Kumho Tire v. Carmichael*, 526 U.S. 137, 151 (1999) ("It might not be surprising in a particular case . . . that a claim made by a scientific witness has never been the subject of peer review."); *see also Emig*, 2008 WL 4200988, at *7 (rejecting argument concerning lack of peer review where expert's "report and opinion are not easily analyzed using the *Daubert* factors").

[16]   This Court has recognized that GSE Single Family underwriting standards are irrelevant to the use of the minimum industry standards for the loans underlying the GSE certificates.  *See FHFA v. UBS Ams. Inc.*, No. 11 Civ 5201, 2013 WL 3284118, at *22 (S.D.N.Y. June 28, 2013) (rejecting Defendants' request for Single Family discovery to challenge the minimum industry standards because the request "ignores the repeated observation that the GSEs principally bought whole loans under different standards and constraints than those that applied to PLS collateral.  Indeed, most of the Supporting Loan Groups at issue in this case were explicitly defined as composed of loans that did not meet the GSEs' underwriting guidelines.").

Finally, the method for distilling the minimum industry standards was not based on an "anecdotal approach." Rather, the minimum industry standards are based on the vast experience of Mr. Hunter, his team and other experts, and were derived using a process of reviewing thousands of originator guidelines consistent with the process used by originators during the Relevant Period, and assembling the least onerous requirements.[17]

### C.       The Minimum Industry Standards Were Tested

*Daubert* instructs the court to consider whether an expert's method can or has been tested. *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 48 n.8 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 594). Here, once distilled from thousands of underwriting guidelines in effect during the Relevant Period, the minimum industry standards were compared against the guidelines of four originators to confirm that they were actually minimum standards. Ex. 8 at 87; Ex. 9 at 257:6-258:3. Mr. Hunter selected these four originators because they originated the largest volume of subprime and Alt-A loans during the Relevant Period, were "known to have very lenient origination requirements and practices," and had high foreclosure rates. Ex. 8 at 87; Ex. 12 at 343:14-344:10; Ex. 9 at 261:23-262:16.[18] Because the minimum industry standards can be tested and were in fact tested is a further indication of their reliability.

---

[17]     Thus, both *Playtex Prods, Inc. v. Procter & Gamble Co.*, No. 02 Civ. 8046, 2003 WL 21242769 (S.D.N.Y. May 28, 2003), and *Algarin* v. *New York City Department of Corrections*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006), cited by Defendants, are inapplicable. In *Playtex*, the Court excluded opinions from a proposed expert who admitted that her opinions were based solely on "anecdotal conversations" with patients and no data or analysis, and where the court found her to have no specialized knowledge in her area of testimony. 2003 WL 21242769 at *10-11. In *Algarin*, plaintiff's expert based his opinion on "several vague standards" drawn from "his own personal experience," and his testimony was excluded because of his "failure to identify generally accepted standards[,] . . . cite to any pertinent [] literature, or employ any other evidence in support of his conclusions." 460 F. Supp. 2d at 477.

[18]     Defendants' assertion that Mr. Hunter "derived" the minimum industry standards from the underwriting guidelines of Long Beach, New Century, WMC, and Countrywide, Defs.' Mot. 18, is incorrect. Nowhere in Mr. Hunter's report or testimony does he state that he "derived" the minimum industry standards from these originators. Rather, Mr. Hunter looked to these four originators "[t]o confirm the accuracy of these minimum industry standards" and to "test" them minimum industry standards on how they "stack up against" those originators' underwriting standards. Ex. 8 at 87; Ex. 9 at 257:21-258:3.

**D.** **Mr. Hunter's Opinions Are Widely Accepted in the Industry As Reflected By The Evidence Obtained in Discovery**

Finally, an expert's opinion must be based on a "sufficient factual basis," *In re Fosamax Prods. Liab. Litig.*, 807 F. Supp. 2d 168, 185 (S.D.N.Y. 2011), and "[w]idespread acceptance [of an expert's method] can be an important factor in ruling particular evidence is admissible." *Daubert*, 509 U.S. at 594. As set forth above in Section II.A, the minimum industry standards identified by Mr. Hunter and his team were widely accepted by underwriting professionals with experience from the Relevant Period. Moreover, contrary to Defendants' assertion that Mr. Hunter lacks "any basis" for his opinions regarding minimum industry standards of underwriting, Defs.' Mot. 15, Mr. Hunter's opinions are supported by testimony obtained from Nomura's diligence team, originators and third-party diligence firms. Even Defendants' own re-underwriting expert agrees with many of the standards.

Nomura personnel responsible for conducting diligence on the loans during the acquisition process confirmed that they understood that there were certain basic requirements of underwriting a loan during the Relevant Period, including that the loan underwriter had to: (i) establish that the borrower had the ability and willingness to repay the loan;[19] (ii) assess that the borrower's stated income was reasonable and consistent with his profession;[20] (iii) investigate and resolve any unexplained credit inquiries;[21] (iv) review the loan file for inaccuracies and discrepancies, and identify and follow-up on any red flags for potential fraud or misrepresentation;[22] (v) verify the borrower's housing payment history to assess whether it was likely that the borrower would repay the loan;[23] (vi) obtain a verification of employment for a

---

[19]   Ex. 17 at 107:12-18.

[20]   Ex. 17 at 128:9-22.

[21]   Ex. 17 at 111:15-22.

[22]   Ex. 17 at 26:6-25, 143:12-144:17, 304:6-305:25; *see also* Ex. 18 at 191:23-192:3 (Nomura trader testifying that "one of the purposes of underwriting is to identify risk, identify things that may not have fit guidelines…to uncover fraudulent or questionable income.").

[23]   Ex. 17 at 121:11-123:4.

stated income loan;[24] (vii) verify a salaried borrower's employment for the previous 12 months using a verbal or written verification of employment form for a full documentation loan;[25] (viii) calculate correctly the borrower's income and debt;[26] and (ix) obtain a full appraisal that complies with USPAP on the appropriate appraisal form.[27]  In addition, Nomura's witnesses also supported Mr. Hunter's opinion relating to specific collateral characteristics as minimum standards.  For example, Nomura's diligence employees testified that the minimum standards of underwriting required that:  (i) DTI ratios not exceed 55 percent; (ii) FICO scores for subprime loans were at least 500; (iii) CLTV ratios for investment properties were not greater than 90 percent; and (iv) CLTV ratios for Alt-A loans were not greater than 100 percent.[28]

Various originators also confirmed that there were certain basic requirements of underwriting a loan during the Relevant Period, including that the loan underwriter had to: (i) ensure that the loan file included a signed and completed 1003 loan application;[29] (ii) obtain the borrower's credit report;[30] (iii) obtain employment verification, including verification for self-employed borrowers;[31] and (iv) obtain income documentation where appropriate.[32]

In addition, diligence managers of other defendants in these coordinated actions, and the third party diligence firms confirmed that certain basic steps should have been completed when underwriting a residential mortgage loan.  These steps included (i) verifying that the loan

---

[24]   Ex. 19 at 56:19-57:8.

[25]   Ex. 19 at 62:2-63:13.

[26]   Ex. 19 at 60:13-61:13.

[27]   Ex. 19 at 139:18-140:5; *see* Ex. 20 at 247:16-248:2, 249:14-250:7 (RBS diligence manager testifying that an appraisal review is "part of your standard underwrite" and that "any competent underwriter should be able to review and analyze and appraisal.").

[28]   Ex. 17 at 811:13-17, 812:3-15; Ex. 19 at 39:6-11, 138:7-12.

[29]   Ex. 21 at 136:20-137:4.

[30]   Ex. 21  at 139:10-17.

[31]   Ex. 21 at 142:13-20, 144:19-145:1

[32]   Ex. 21 at 143:12-19.

complied with federal laws;[33] (ii) verifying the source and availability of the earnest money deposit for loans requiring assets from the borrower;[34] (iii) confirming that the borrower did not engagee in equity stripping by cashing out through multiple refinance transactions;[35] (iii) identifying and investigating red flags indicating possible mortgage fraud;[36] (iv) determining that the borrower had the ability and willingness to repay the loan;[37] (v) assessing whether the collateral would adequately satisfy the loan in the event of a default[38] (vi) determining whether certain critical documents, including the loan application, the credit report, the appraisal, and the final HUD-1 were included in the file;[39] (vii) calculating income and debts properly;[40] (viii) obtaining the borrower's credit report;[41] (ix) properly calculating LTV and CLTV ratios;[42] (x) ensuring that the loan file contains a valid deed or mortgage;[43] (xi) verifying a self-employed borrower's self-employment status;[44] and (xii) ensuring valid title and hazard insurance.[45]

Finally, Nomura's re-underwriting expert, Mr. Forester, agreed that many of the standards identified by Mr. Hunter were part and parcel of underwriting a mortgage loan.  Mr.

---

[33]   Ex. 22 at 101:6-102:10; Ex. 23 at 205:20-207:2; *see also* Ex. 24 at 312:13-313:5; 315:18-316:7, 317:4-15 (Bank of America diligence manager testifying about the standard practice of ensuring legal compliance).

[34]   Ex. 22 at 112:16-25.

[35]   Ex. 22 at 113:13-22.

[36]   Ex. 25 at 60:15-62:15; Ex. 26 at 69:25-71:4; Ex. 23 at 194:15-195:13; *see also* Ex. 24 at 245:25-246:20, 249:25-251:7, 321:21-24 (Bank of America diligence manager testifying that underwriters must investigate potential misrepresentations of occupancy, employment, debt obligations, and assess stated income reasonableness ).

[37]   Ex. 26 at 206:14-207:21; *see also* Ex. 24 at 244:22-245:20 (Bank of America diligence manager testifying that "[p]art of an underwriter's job is to look for reasonab[le] ability to repay the loan and for income to fit the job" and "if you do not believe that income to be true, that you raise that.  That's what underwriters do.").

[38]   Ex. 26 at 206:14-207:21.

[39]   Ex. 26 at 69:25-71:4.

[40]   Ex. 23 at 194:15-195:20; *see also* Ex. 24 at 255:4-255:11.

[41]   Ex. 23 at 203:12-23.

[42]   Ex. 23 at 204:6-21.

[43]   Ex. 23 (at 204:22-205:3.

[44]   Ex. 23 at 207:21-208:15.

[45]   Ex. 23 at 208:19-210:10.

Forester testified that he could not recall any underwriting guidelines from the 2002 to 2007 time period that "disregard[ed] [the borrower's] ability to repay" and that "evaluating the borrower's ability to repay was an expectation in the underwriting process."  Ex. 14 at 239:8-17, 250:18-251:11.[46]  For example, Mr. Forester agreed that an underwriter should review and investigate a borrower's stated income if the underwriter "has reason to believe that the income is not stated – is not accurate, that it's been misrepresented."  *Id.* at 334:3-7.  Mr. Forester further testified that the "norm would be for an underwriter to review a credit report, as part of the underwriting process" and "where an underwriter saw something unusual in the inquiries, depending on his judgment and what he sees in the rest of the file . . . [h]e may do an additional investigation on inquiries."  *Id.* at 248:12-249:2.  Forester also agreed that it is an expectation in the industry that "underwriters would correctly calculate income and debt when underwriting a loan."  *Id.* at 250:10-17.  Finally, Mr. Forester also testified that these and other "fundamental" requirements were considered part of mortgage underwriting even if they were not expressly referenced in the underwriting guidelines.  *Id*. at 252:7-253:17.

Accordingly, there is more than a sufficient factual basis to admit Mr. Hunter's opinions given that the minimum industry standards were widely accepted in the industry during the Relevant Period.[47]

---

[46]   *See also* Ex. 27 at 98:18-24 (Nomura due diligence expert testifying that assessing a borrower's ability and willingness to repay was an originator's "principal objective" in underwriting a loan).

[47]   Defendants' reliance on *Grdinich v. Bradlees* is entirely inapt.  In that case, plaintiff's expert testimony on industry standards for the stacking of ironing boards was excluded because the expert relied on (i) a single competitor's retail guideline that failed to address the very safety standard at issue, and (ii) a single, unverifiable recollection of having seen an alternate ironing board stacking arrangement at another competitor's store.  187 F.R.D. 77, 81 (S.D.N.Y. 1999).  The court was unable to identify evidence that "industry standards on how to display ironing boards" existed other than "general common-sense guidelines."  *Id.* at 81-82.  In contrast, here, Mr. Hunter's opinion draws upon decades of experience with thousands of documented originator guidelines and is based on "sufficient facts and data" as evidenced by the testimony from Nomura's own employees and its re-underwriting expert, originators, and third-party diligence firms retained by Nomura.

**III.   DEFENDANTS' ARGUMENTS REGARDING SPECIFIC MINIMUM INDUSTRY STANDARDS ARE INACCURATE, AND, IN ANY EVENT, GO TO WEIGHT NOT ADMISSIBILITY**

      **A.   The Minimum Industry Standards Are More Lenient Than Guidelines**

Defendants do not dispute that 51 of the 59 minimum industry standards represent the most lenient aspects of the underwriting guidelines applicable to subprime and Alt-A loans during the Relevant Period.  As explained below, the examples cited by Defendants fail to recognize that the more lenient aspects of the guidelines cited by Defendants are applicable only if other more restrictive requirements are satisfied.  Thus, Defendants' contention that the minimum industry standards were more stringent than certain underwriting guidelines, Mot. 21-24, is incorrect.

      1.   <u>Payment Shock</u>

Payment shock refers to the increase in the borrower's housing obligation from the borrower's previous mortgage or rent payment.  Ex. 8 at 31-32.  It is calculated by subtracting the previous monthly payment from the new monthly payment and comparing that difference to the previous payment.  A payment shock of 150 percent represents a new mortgage payment 1.5 times greater than the borrower's previous housing payment, after subtracting the previous payment.  As Mr. Hunter explained, "[a]ll else being equal, a greater payment shock correlates with a greater risk that the borrower will not be able to make payments and will, in turn, default on the mortgage."  *Id*.

In criticizing the minimum industry standard relating to payment shock, Defs.' Mot. 8, Defendants mischaracterize Mr. Hunter's application of the payment shock minimum industry standard.  Mr. Hunter opined that minimum industry standards required that the loan underwriter further analyze the borrower's ability to repay the new monthly obligation when the payment shock reached 150 percent.  Mr. Hunter did not automatically trigger a finding when the borrower's payment shock exceeded 150 percent; rather, he triggered a finding only when the payment shock was 150 percent *and* there was no evidence that the underwriter further investigated the borrower's ability to repay.  Ex. 9 at 97:6-10 ("[W]hen you have a borrower that

has a payment shock, that should trigger subsequent examination of other factors to see if the payment shock . . . is offset.").  As such, the fact that both the Long Beach and Opteum guidelines allowed for a 200 percent payment shock in limited circumstances is irrelevant.[48]

### 2.   DTI Ratio

The borrower's DTI ratio is also an important factor in assessing the borrower's capacity to repay the loan.  It demonstrates the amount of the borrower's monthly income required to pay monthly obligations, including the mortgage loan.  To calculate the DTI ratio, the lender must determine all required monthly payments, including the subject loan's principal, interest, taxes and insurance payments, installment and revolving debts along with any additional required obligations, such as child support, and divide that total debt by the borrower's monthly gross income.[49]  All else being equal, the higher the DTI ratio, the more difficult it is for the borrower to meet his monthly mortgage payments, and the greater risk of default.  Ex. 8 at 68-69.

Defendants criticize Mr. Hunter's opinion that the maximum DTI ratio under minimum industry standards was 55 percent based on the fact that Nomura's correspondent guidelines allowed DTI ratios up to 60 percent.  However, Nomura's guidelines permitted a 60 percent DTI ratio *only* under limited circumstances, including where the borrower had a credit score of at least 620, where Nomura purchased a first- and second-lien loan from the same borrower simultaneously, where the borrower did not have a previous foreclosure or bankruptcy, and where the maximum LTV ratio was 95 percent.  Defs.' Ex. 33 at UG1FHFA00023820-21, -864,

---

[48]  Long Beach's guidelines allow a payment of shock of 200 percent if the minimum credit score is 620 for first time home buyers, 600 for stated wage earners, and 500 with a maximum LTV ratio of 70 percent for stated self-employed borrowers, and the maximum LTV ratio is limited to 90 percent or the maximum DTI ratio is limited to 50 percent; payment shock greater than 200 percent may be allowed where there are compensating factors, such as at least six months reserves, DTI or LTV ratios 10 percent below the program maximum, or "documentation of substantial credit depth and ability to maintain debt."  Defs.' Ex. 31 at JPMC-UWG-WAMU-000453484, -486, -504-05, -509, -511-12; Ex. 28 at JPMC-UWG-WAMU-000879472.  Similarly, Opteum's guidelines require a minimum credit score of 620 and a maximum LTV ratio of 95 percent for a payment shock of 200 percent to be permissible.  Defs.' Ex. 32 at JPMC-UWG-BEAR-000072142.

[49]  Gross income is an individual's income before taxes and other deductions, such as health insurance and 401K contributions, are taken into account.  Taxes and such deductions are usually estimated to be approximately 25 percent of an individual's gross income.

-868.[50]  In contrast, under the minimum industry standards, a borrower would be permitted to have a DTI ratio of 55 percent, even if he did not meet these other requirements.  Ex. 10.

### 3.    Investigation of Credit Inquiries

A borrower's credit report reflects the borrower's existing trade lines, credit score, and credit inquiries made about the borrower by potential creditors.  Mr. Hunter opines that minimum industry standards require that unexplained credit inquiries should be investigated because each inquiry could be an indicator of an undisclosed debt obligation, which may materially increase the DTI ratio and, thus, the ultimate credit risk of the loan.  Ex. 8 at 45; *see also* Ex. 9 at 231:7-232:20; Ex. 11 at 213:14-214:7.  Defendants argue that the guidelines of certain lenders did not require investigation of all credit inquiries occurring 90 days before loan approval.  Defs.' Mot. 21.  To the contrary, the underwriting guidelines of ResMae directed underwriters to evaluate the borrower's "entire credit history" and specifically inquiries between the loan application date and credit report date; Aegis required underwriters to research recent indications "that the consumer has actively been seeking credit … especially … in the last 90 days"; and Fremont's guidelines required that the lender consider the borrower's credit worthiness and analyze the borrower's credit history without any time restriction.  Defs.' Ex. 28 at NOM-FHFA_04450315-16; Defs.' Ex. 30 at JPMC-UWG-WAMU-000735643; Defs.' Ex. 29 at NOM-FRE-GL_00001194, -217.

Accordingly, as illustrated by each of these examples, Defendants' contention that the minimum industry standards utilized by Mr. Hunter are not true minimums is incorrect.

### B.    Defendants' Arguments Go to Weight Rather Than Admissibility

In any event, Defendants' argument that specific underwriting guidelines are more lenient than particular minimum industry standards "go[es] to the weight, not the admissibility, of the testimony."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266-67 (2d Cir. 2002).  In

---

[50]    Defendants' reliance on Fannie Mae's anti-predatory lending policies and compliance profiles as allowing a 60 percent DTI is also misplaced.  These policies require that the borrower have the ability to repay the mortgage debt, and use a 60 percent DTI ratio as an indicator that the loan is predatory.  Defs.' Ex. 34 at 6; Ex. 16 at FHFA11862103.

*Amorgianos,* the Second Circuit recognized that "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible.  The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.*  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" for Defendants to challenge the validity of the minimum industry standards or Mr. Hunter's findings based on such standards.  *Id.* (quoting *Daubert,* 509 U.S. at 596); *see Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 670 (S.D.N.Y. 2013) (internal citation omitted) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

## CONCLUSION

For the reasons stated above, FHFA respectfully requests that the Court deny Defendants' Motion.

DATED:   New York, New York
    December 11, 2014      QUINN EMANUEL URQUHART &
               SULLIVAN, LLP


By: *Manisha Sheth*
   _____
   Philippe Z. Selendy
   Manisha M. Sheth
   Deborah K. Brown
   Jeffrey C. Miller
   Zach Williams

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
   Finance Agency*