UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

         Plaintiff,

-against-

NOMURA HOLDING AMERICA, INC.;
NOMURA ASSET ACCEPTANCE
CORPORATION; NOMURA HOME
EQUITY LOAN, INC.; NOMURA CREDIT
& CAPITAL, INC.; NOMURA SECURITIES
INTERNATIONAL, INC.; RBS SECURITIES
INC. (f/k/a GREENWICH CAPITAL
MARKETS, INC.); DAVID FINDLAY;
JOHN MCCARTHY; JOHN P. GRAHAM;
NATHAN GORIN; and DANTE LAROCCA,

         Defendants.

No. 11 CIV. 6201 (DLC)

---

**PLAINTIFF FHFA'S MEMORANDUM OF LAW IN OPPOSITION TO NOMURA'S
MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DONALD EPLEY, PH.D.**

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Philippe Z. Selendy
Adam M. Abensohn
Jonathan B. Oblak

51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ..........................................................................................................2

      A.      The Credibility Assessment Model ("CAM") ..........................................................2

      B.      Dr. Epley's Expert Report and Deposition Testimony .............................................3

ARGUMENT ....................................................................................................................................4

I.      DR. EPLEY IS QUALIFIED TO OPINE ON APPRAISAL STANDARDS AND METHODS FOR ASSESSING THE CREDIBILITY OF APPRAISALS AT ISSUE IN THE NOMURA ACTION ......................................................................................6

II.     DR. EPLEY PERFORMED AN INDEPENDENT ASSESSMENT OF THE APPRAISAL STANDARDS AND METHODOLOGY UNDERLYING THE CAM, NOT DR. KILPATRICK'S PERSONAL CREDIBILITY .......................................7

III.    DR. EPLEY TESTED THE OPERATIONAL LOGIC OF THE CAM FOR RELIABILITY AND CONSISTENCY WITH USPAP ......................................................11

CONCLUSION ...............................................................................................................................13

**TABLE OF AUTHORITIES**

Page

**CASES**

*Arista Records LLC v. Lime Group LLC*,
  2011 WL 1674796 (S.D.N.Y. May 2, 2011) ................................................................... 6

*Borawick v. Shay*,
  68 F .3d 597 (2d Cir.1995)............................................................................................... 7

*Celebrity Cruises, Inc. v. Essef Corp.*,
  434 F. Supp. 2d 169 (S.D.N.Y. 2006).......................................................................... 6, 9

*Crown Cork & Seal Co., Inc. Master Retirement Trust v. Credit Suisse First Boston Corp.*,
  2013 WL 978980 (S.D.N.Y. 2013) ................................................................................. 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)..................................................................................................... 5, 6

*Deutsch v. Novartis Pharm. Corp.*,
  768 F. Supp. 2d 420 (E.D.N.Y. 2011) ......................................................................... 6, 9

*Discover Fin. Servs. v. Visa U.S.A., Inc.*,
  582 F. Supp. 2d 501 (S.D.N.Y. 2008)............................................................................. 5

*Frye v. United States." Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005)............................................................................................ 5

*Hartle v. FirstEnergy Generation Corp.*,
  7 F. Supp. 3d 510 (W.D. Pa. 2014)............................................................................... 10

*In re Ziprexa Prods. Liab. Litig.*,
  489 F. Supp. 2d 230 (E.D.N.Y. 2007) ............................................................................ 7

*Nimely v. New York*,
  414 F.3d 381 (2d Cir. 2005)............................................................................................ 9

*Oklahoma v. Tyson Foods, Inc.*,
  2009 WL 2252129 (N.D. Okla., July 24, 2009) ............................................................. 6

*Olin Corp. v. Certain Underwriters at Lloyd's London*,
  468 F.3d 120 (2d Cir. 2006)............................................................................................ 5

*Ruffin v. Shaw Indus., Inc.*,
  149 F.3d 294 (4th Cir. 1998) .......................................................................................... 6

*Trouble v. Wet Seal, Inc.*,
  179 F. Supp. 2d 291 (S.D.N.Y. 2001)............................................................................. 5

*Tunis Bros. Co., Inc. v. Ford Motor Co.*,
    124 F.R.D. 95 (E.D. Pa. 1989) .................................................................................... 10

*U.S. v. Lumpkin,*
    192 F.3d 280 (2d Cir. 1999) ........................................................................................ 9

*U.S. v. O'Keefe*,
    825 F.2d 314 (11th Cir. 1987) .................................................................................. 10

*U.S. v. Scop*,
    846 F.2d 135 (2d Cir. 1988) ........................................................................................ 9

*Wald v. Costco Wholesale Corp.*,
    2005 WL 425864 (S.D.N.Y. Feb. 22, 2005) ................................................................ 5

## **STATUTES**

Fed. R. Evid. 104(a) ............................................................................................................ 6

Fed. R. Evid. 702 ................................................................................................................ 5

Plaintiff Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), respectfully submits this memorandum of law in opposition to Nomura's Motion to Exclude the Expert Testimony of Donald Epley, Ph.D. Concerning the "Credibility Assessment Model" (the "Motion").

## PRELIMINARY STATEMENT

While Nomura seeks to attack Dr. Epley's professional judgment by selectively citing and mischaracterizing Dr. Epley's expert report and deposition testimony, the thrust of Nomura's Motion is that Dr. Epley is improperly buttressing the opinions of FHFA's appraisal expert, Dr. John A. Kilpatrick concerning the "credibility," as that term is defined in appraisal standards and practice, of the appraisals at issue in this action.  As FHFA does not intend to proffer Dr. Epley's testimony at trial, Nomura's basis for preclusion is moot.  FHFA has always considered Dr. Epley to be a *Daubert* witness, proffered to assist the Court in evaluating the methodology utilized by Dr. Kilpatrick in his Credibility Assessment Model (the "CAM") should, as was anticipated, Nomura seek to preclude the CAM, as it did on December 5, 2014.

As a *Daubert* witness, Dr. Epley's qualifications and the value of his opinions in evaluating the reliability of the CAM are not in dispute.  *First*, Dr. Epley has decades of practical and academic experience as a residential appraiser and standard setter and is fully qualified to opine as to the methodology that underpins the CAM, a fact that Nomura does not (and cannot) challenge.  *Second*, Dr. Epley's analysis of the CAM relies on his decades of experience and on well-accepted modeling and appraisal standards.  *Third*, Nomura's attacks and bald assertions about Dr. Epley's testing and verification amount to nothing more than misdirection and feigned disagreement with Dr. Epley's approach and professional judgment that go, at most, to the

1

weight the Court will accord his testimony in evaluating Dr. Kilpatrick's CAM methodology. The Motion should be denied.

## FACTUAL BACKGROUND

In support of its claim that the disclosures concerning the LTV ratios included in the Offering Materials for the Nomura Securitization were inaccurate, FHFA submitted expert reports from real estate appraisal and finance professional, John A. Kilpatrick, Ph.D. His expert reports address (1) the accuracy of the LTV ratios of the sample loans at issue (the "Accuracy Report" as supplemented); and (2) whether the appraisals for a subset of those loans that evidenced an inflated appraisal value violated Uniform Standards of Professional Appraisal Practice ("USPAP") and were "credible," as that term is defined by USPAP and other applicable standards of appraisal practice (the "Credibility Report"). For purposes of the anticipated *Daubert* motion on the Credibility Report, FHFA also submitted a report from real estate professor Dr. Donald Epley regarding the methodology Dr. Kilpatrick utilized in the Credibility Report.

### A.   The Credibility Assessment Model ("CAM")

In Dr. Kilpatrick's Credibility Report, he assessed whether the Nomura sample appraisals found to evidence inflation were prepared in a "credible" manner, as that term is defined in USPAP. To evaluate the credibility of the appraisals, Dr. Kilpatrick utilized a scoring model referred to as the CAM. Def. Ex. 1 (Credibility Report) at 2-3.

The CAM scores appraisals based on a list of 31 questions. The questions are based on information that appraisers are required to consider and accurately set forth in the appraisal's Uniform Residential Appraisal Report ("URAR"), requirements drawn from USPAP and

applicable appraisal standards and governing practice during the applicable time period.[1]  The questions are scored and weighted on various criteria drawn from USPAP and appraisal practice and standards applicable at the relevant time.  Def. Ex. 1 (Credibility Report) at 67-95.  Dr. Kilpatrick utilized the CAM and the 31 questions to evaluate the credibility of the tens of thousands of sample loans at issue in the FHFA cases in a transparent and consistent manner.  While Dr. Kilpatrick had not specifically utilized the 31 questions, as worded, in prior work, he regularly utilized the concepts behind the 31 questions in his prior appraisal reviews, as all appraisal reviewers do, given their foundation in the URAR form, USPAP, and appraisal practice.  Def. Ex. 1 (Credibility Report) at 3; Ex. 2 (Kilpatrick 7/14/14 Tr.) at 78:7-79:11.

Dr. Kilpatrick established a threshold of errors, scored by application of the 31 CAM questions, beyond which he concluded the deviation from USPAP and applicable standards and practice was so great, the appraisal could not be deemed credible.  Def. Ex. 1 (Credibility Report) at 96-98.  The threshold, set at a score of 20, was established using a conservative application of USPAP Standards Rules 1-1(b) and 1-1(c) that establishes that a major error or a collection of minor errors can render an appraisal not credible.  To evaluate the credibility of the appraisals, Dr. Kilpatrick determined whether the score each appraisal received under the 31 CAM questions exceeded the threshold.

   **B. Dr. Epley's Expert Report and Deposition Testimony**

In Dr. Epley's Report, he assessed whether (1) the CAM uses a reasonable and appropriate methodology and (2) whether the CAM accurately analyzes the retrospective

---

[1] The 31 questions are phrased to elicit yes or no responses based on a review of information from the appraisal report and with reference to third-party sources.  If a question is scored "no," then a point is given to the appraisal, which is then multiplied by the respective weight of the question.  The "total score" for an appraisal is therefore tabulated as the sum of all the "no" responses to the questions multiplied by their respective weighting.  Def. Ex. 1 (Credibility Report) at 65; Ex. 2 (Kilpatrick 7/14/14 Tr.) at 17:17-:18-3.

credibility of an appraisal under USPAP and related appraisal guidance and practice. Def. Ex. 2 (Epley Report) at 1.

After independently analyzing the methodology of the CAM, Dr. Epley confirmed that the 31 CAM questions embodied key issues by which the credibility of an appraisal should be evaluated. Ex. 6 (Dep. Ex. 58103 (USPAP Mapping)); Ex. 7 (Dep. Ex. 58101 (Numbered URAR)); Ex. 1 (Epley 7/8 Tr.) at 172:6-173:11. Dr. Epley further opined that Dr. Kilpatrick's priority and weighting of the questions was reasonable and appropriate for assessing the credibility of appraisals under USPAP and other longstanding appraisal standards. Def. Ex. 2 (Epley Report) at 2-3, 15-16; Ex. 1 (Epley 7/8 Tr.) at 85:23-88:4.

Dr. Epley's analysis, however, was expressly limited to the logical operation of the CAM and its consistency and foundation in USPAP, the URAR form and appraisal standards and practice. Dr. Epley did not, and was not asked to, analyze the resulting application of the CAM to the Nomura subject sample appraisals. Ex. 4 (Epley 10/30 Tr.) at 216:17-217:5 ("My job was to evaluate the mapping back to the questions. It was to look at the aspects, if they were reasonably defined relative to the marketplace and the weights of those questions as they came through. What I hear you asking is about application decisions and you asking me questions about what happens at different times in the marketplace, that's . . . Dr. Kilpatrick's issue on application.").[2]

## ARGUMENT

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from the previously widely followed, and more

---

[2] As will be addressed in FHFA's response to the Kilpatrick Daubert, Dr. Kilpatrick also directed Recovco Mortgage, LLC ("Recovco") to evaluate 202 appraisals for the purpose of obtaining independent third-party validation of the CAM's empirical results. Def. Ex. 1 (Credibility Report) at 101.

restrictive, standard of *Frye v. United States*." *Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005) (internal citations omitted); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 588 (1993). Determining the admissibility of expert testimony under Rule 702 and *Daubert* requires a district court to "determine that (1) the expert is qualified, (2) the testimony is relevant, and (3) that the testimony is reliable." *Wald v. Costco Wholesale Corp.*, 2005 WL 425864, at *5 (S.D.N.Y. Feb. 22, 2005) (citing *Daubert*, 509 U.S. at 592-97 and Fed. R. Evid. 702).

Under this third factor, the Court's inquiry focuses "not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology." *Trouble v. Wet Seal, Inc.,* 179 F. Supp. 2d 291, 301 (S.D.N.Y. 2001). "The district court's inquiry into the reliability of expert testimony is flexible," and "[t]he trial judge has great latitude not only in deciding whether an expert's testimony is reliable, but in deciding how to make that inquiry." *Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 133 (2d Cir. 2006). Such an inquiry may include: (1) whether the methodology can be tested; (2) whether the theory or technique has been subject to peer review and publication; (3) whether the theory or technique has been generally accepted by the expert community; and (4) the known or potential error rate of the theory or technique. *Daubert*, 509 U.S. at 593-94.

"To the extent Defendants have any questions about the weight or the sufficiency of the evidence upon which [the expert] relied, or the conclusions generated therefrom, those questions can be asked on cross-examination." *Discover Fin. Servs. v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 507 (S.D.N.Y. 2008); *see also Olin Corp.*, 468 F.3d at 134 (affirming district court's decision to admit expert testimony where the district court, "[r]ather than selectively excluding the portions of [the expert's] testimony that the court thought were not well supported, the judge

considered the testimony as a whole"). Similarly, "claims 'that the assumptions relied on by an expert are unfounded is generally an argument that goes to the weight rather than the admissibility of the evidence.'" *Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) (internal citation omitted). "As the Supreme Court stated, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of assessing the value of admissible expert testimony. *Id.* (citing *Daubert,* 509 U.S. at 596).

Where, as here, the expert will not proffer testimony at trial, but is presented solely to aid the court in evaluating a *Daubert* motion, the court "need not determine whether [the expert's opinions] would be independently admissible under *Daubert*." *Celebrity Cruises, Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 190 (S.D.N.Y. 2006) (citing *Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 297 (4th Cir. 1998). Rather, in such instances, the court "need only consider whether [expert's opinions are] sufficiently reliable to be persuasive in [the court's] evaluation of the expert" report or testimony it addresses, under Rule 104(a) of the Federal Rules of Evidence.[3] *Id.*; *see also Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 481 (E.D.N.Y. 2011); *Oklahoma v. Tyson Foods, Inc.*, 2009 WL 2252129, at *4 (N.D. Okla., July 24, 2009).

I. **DR. EPLEY IS QUALIFIED TO OPINE ON APPRAISAL STANDARDS AND METHODS FOR ASSESSING THE CREDIBILITY OF APPRAISALS AT ISSUE IN THE NOMURA ACTION.**

As a threshold matter, Nomura does not challenge either Dr. Epley's qualifications or the relevancy of his proffered testimony. Nor could Nomura do so: Dr. Epley, who holds two of the senior accreditations from the Appraisal Institute, the MAI and SRA, is presently a Distinguished

---

[3] Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").

Professor of Real Estate at the University of South Alabama, where he teaches courses in Real Estate Principles, Real Estate Appraisal, and Real Estate Finance and Investments.  Throughout his career, Professor Epley has served on and chaired committees of the International American Real Estate Society, the Appraisal Foundation, the Appraisal Standard Board, and the Appraisal Institute, including holding executive-level positions with these organizations.  Most pertinent, Professor Epley's participation in standard-setting bodies includes the Nomination Committee (selects candidates for Appraisal Standards and Qualifications Boards), the Publication Committee (drafters of USPAP), the Merger Committee (drafters of MAI and SRA qualifications), and the Education, University, and Body of Knowledge Committees (holders of appraisal standards knowledge).  Professor Epley has also published extensively, including textbooks, referred journal articles, manuals in real estate due diligence, appraisal and real estate model building, and URAR training manuals.  Def. Ex. 2 (Epley Report) at 5-6.  The Court therefore begins with the presumption that expert evidence is reliable.  *Crown Cork & Seal Co., Inc. Master Retirement Trust v. Credit Suisse First Boston Corp.*, 2013 WL 978980, *3 (S.D.N.Y. 2013) (citing *Borawick v. Shay*, 68 F .3d 597, 610 (2d Cir.1995)); *In re Ziprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("[T]he assumption the court starts with is that a well qualified expert's testimony is admissible.").

## II.    DR. EPLEY PERFORMED AN INDEPENDENT ASSESSMENT OF THE APPRAISAL STANDARDS AND METHODOLOGY UNDERLYING THE CAM, NOT DR. KILPATRICK'S PERSONAL CREDIBILITY

Dr. Epley's independently analyzed the CAM according to six criteria drawn from applicable literature covering the evaluation of analytical models.  Def. Ex. 2 (Epley Report) at 8.  No aspect of that analysis resembled the "personal vouching" for Dr. Kilpatrick's credibility that Nomura alleges. (Mem. 8).  To the contrary, Dr. Epley never even spoke to Dr. Kilpatrick

7

during his engagement and focused his analysis solely on the CAM presented in Dr. Kilpatrick's expert report. Def. Ex. 2 (Epley Report) at 1-2 ("Throughout my analysis, I have not contacted or communicated with Dr. Kilpatrick or his staff at Greenfield Advisors."); Ex. 4 (Epley 10/30 Tr.) at 236:2-8.

Based on his independent analysis, Dr. Epley concluded that the CAM "is a 'scoring model,' which is an acceptable form of model well-established both in the scholarly research literature and in professional practice";[4] that "it uses competent methodology and is fully consistent with scholarly research and professional standards"; "its application model is reasonable and appropriate"; "it utilizes a reasonable and appropriate scoring based on assigned priorities and weights"; and "it achieves Dr. Kilpatrick's stated objective of assessing the credibility of a large number of appraisals using a consistent and competent methodology." Def. Ex. 2 (Epley Report) at 2-3. As to the substance of the CAM, Dr. Epley concluded that each of the 31 questions was based on USPAP, the URAR form or applicable appraisal practice during the relevant time. Ex. 4 (Epley 10/30 Tr.) at 91:5-15; Ex. 6 (Dep. Ex. 58103 (USPAP Mapping)). Dr. Epley further concluded that the priorities and weights assigned to the CAM

---

[4] Scoring models enable the synthesis of information, both quantitative and qualitative, into a single numeric measure to facilitate an integrated assessment. Important variables are identified, scores are assigned, pertinent variables are assigned different weights to reflect their different importance/priority, and the weighted scores are summed to provide numeric measures for decision-making purposes. Def. Ex. 2 (Epley Report), n.1; Ex. 4 (Epley 10/30 Tr.) at 19:13-21:7. Dr. Epley identified other similar credibility assessment models in the appraisal sector apart from the CAM. See, e.g., Def. Ex. 2 (Epley Report), n.1 (FNC, Inc., Collateral DNA: Appraisal Score); Ex. 1 (Epley 7/8 Tr.) at 474:12-475:8 (CoreLogic); see also Ex. 3 (Lucco 8/12 Tr.) at 183:2-21 (FNC product at least ten years old); id. at 184:6-185:01 (InterThinx). Yet unlike Dr. Kilpatrick's CAM, none of these "industry" credibility models makes their codes available for review. See Ex. 3 (Lucco 8/12 Tr.) at 179:14-181:14 (credibility models are black boxes).

were appropriate and consistent with USPAP and appraisal standards and practice.  Def. Ex. 2 (Epley Report) at 2-3; Ex. 4 (Epley 10/30 Tr.) at 49:9-16, 70:12-72:3, 79:10-20.[5]

The cases relied on by Nomura in the Motion are all inapposite.  Those cases proscribe the improper use of expert testimony at trial to opine on the credibility of fact witnesses or to offer impermissible conclusions of law.  Dr. Epley has offered nothing of the sort.  For instance, in *Nimely*, the Second Circuit found only that the district court erred in admitting expert testimony that in part expressly evaluated the credibility of fact witness testimony: "*I think the officers would have been telling the truth as they perceived it.*"  *Nimely v. New York*, 414 F.3d 381, 395, 397-98 (2d Cir. 2005) (emphasis in original); *see also U.S. v. Lumpkin,* 192 F.3d 280, 289 (2d Cir. 1999) (declining to permit expert to testify about perceived credibility of fact witness).  In *Scop*, the Second Circuit found the district court erred on multiple grounds by admitting expert testimony, including (1) the expert opined at trial on the credibility of a fact witness and (2) "his opinions were legal conclusions that were highly prejudicial and went well beyond his province as an expert in securities trading."  *U.S. v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988).  Here, of course, Dr. Epley does not opine on the credibility of Dr. Kilpatrick and will not be testifying at trial.

Nomura's other citations regarding expert testimony about fellow experts are similarly misplaced.  To begin, Nomura ignores the beneficial role that expert testimony plays in evaluating *Daubert* motions.  *See Celebrity Cruises* 434 F. Supp. 2d at 190; *Deutsch*, 768 F. Supp. 2d at 481 ("In general, expert opinions which assess or critique another expert's

---

[5]   It is telling that despite attacking Dr. Epley's opinions, Nomura's appraisal expert, Mr. Hedden, did not even look at or evaluate the priorities and weighting of aspects and categories by which Dr. Kilpatrick scored his 31 CAM questions.  Ex. 5 (Hedden 11/21 Tr.) at 111:2-8 ("Q. Did you ever engage in any analysis or direct anyone to engage in any analysis about the weightings in any shape or form?  In other words, that the categories should get different weightings within each or any particular aspect?  A. No.").

substantive testimony are relevant, but opinions which attack an expert's credibility (*e.g.,* testimony than an expert is lying) are not."). In *O'Keefe*, the Eleventh Circuit affirmed the trial court's exclusion of expert testimony that would have been "*cumulative* and '*nothing more* than a personal vouching of one expert," whose testimony had already been excluded for reaching a legal conclusion. *U.S. v. O'Keefe*, 825 F.2d 314, 318-19 (11th Cir. 1987) (emphasis added); *see also Hartle v. FirstEnergy Generation Corp.*, 7 F. Supp. 3d 510, 525 (W.D. Pa. 2014) (excluding expert because he only read the reports of others and "performed no independent . . . analysis"); *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 124 F.R.D. 95, 98 (E.D. Pa. 1989) (excluding testimony of plaintiff's expert witness not disclosed by deadline of pre-trial scheduling order and mentioning the testimony was cumulative at any rate, such that plaintiff was not prejudiced). Here, Dr. Epley's opinions are based on his own independent analysis of the CAM and thus are neither cumulative nor a "personal vouching" of Dr. Kilpatrick's opinions.

Nomura also argues in the alternative that to the extent that Dr. Epley does analyze the CAM, he still does no more than "vouch" for Dr. Kilpatrick because, according to Nomura, the CAM is simply Dr. Kilpatrick's opinions. (Mem. 9). Notwithstanding Nomura's rhetoric, the CAM is squarely tied to USPAP, the URAR form, and appraisal standards and practice. Indeed, both Nomura's and HSBC's own purported appraisal standards experts, Michael Hedden and Frank Lucco concurred with the vast majority of issues raised in the CAM questions,[6] that those

---

[6] *See*, *e.g.*, Ex. 5 (Hedden 11/21 Tr.) at 195:18-25 (Question 5: "My question on that is: Do you agree with me, sir, that if the appraisal is for a purchase, that the appraiser should try to get hold of the sales contract? A. As part of the normal course of business an appraiser should seek a copy of the sales contract."); *id*. at 196:2-15 (Question 6: "Q. And do you agree with me, sir, that in connection with a sales -- appraisal for purchase, upon getting receipt of the sales contract the appraiser should analyze the contract? A. Yes. Q. And what is the reason why the appraiser, in your understanding, is analyzing the contract in that circumstance? A. To understand the terms and conditions of the transaction that was in the minds of the buyers and sellers of the property at that time.").

10

questions are reflected in URAR forms and industry review forms, and that the basis for the respective question weightings is sound.[7]  In short, far from "vouching" for Dr. Kilpatrick, Dr. Epley offered expert evaluation of the CAM based on his independent analysis and consideration of its methodology.

### III.   DR. EPLEY TESTED THE OPERATIONAL LOGIC OF THE CAM FOR RELIABILITY AND CONSISTENCY WITH USPAP

Nomura's assertion that Dr. Epley "did nothing to test or verify the [CAM]" is nothing but unfounded misdirection.  To the contrary, Dr. Epley engaged in significant testing and verification of the CAM, including its structure, underlying questions, threshold, weights, and basis in USPAP.  Def. Ex. 2 (Epley Report) at 2-4; Ex. 1 (Epley 07/08 Tr.) at 232:2-9 ("My job was to look at the questions to see if the questions were appropriate, to look at the weighting in the model, to look at whether it's logical, whether it applies USPAP correctly, it's a logical decision, all the criteria I had early on.").  But, whereas, as will be discussed in greater detail in FHFA's Kilpatrick *Daubert* response, Recovco provided independent empirical verification of CAM results,[8] Dr. Epley provided independent verification of the CAM's methodology and its basis in USPAP and other appraisal standards and practice.[9]

---

[7]  Ex. 5 (Hedden 11/21 Tr.) at 109:20-110:11 ("Well, as one who has practiced appraisal and been in the real estate business for over 40 years I thought that that was a nice list of [aspect and categories] to think about relative to, you know, appraisal reports. "); *see also* Ex. 3 (Lucco 8/12 Tr.) at 151:15-152:13 ("You're not sitting here and disagreeing that [Dr. Kilpatrick] and Dr. Epley are right, that those are relevant aspects and categories to evaluate in connection with evaluating the credibility of an appraisal under USPAP and appraisal  standards and guidance? [...]  A. No.").

[8]  Def. Ex. 1 (Credibility Report) at 4-5 ("Further, to validate my findings, I directed an independent third-party firm, Recovco Mortgage Management, LLC ("Recovco"), to perform its standard collateral review on the Nomura Appraisals. A collateral review is similar to a desktop review, the principal difference being that a collateral review focuses on the appraisal process utilized in the original appraisal report and does not prepare an independent determination of value. . . . The results of these collateral reviews were highly correlated to the results of my

Nomura, in fact, questioned Dr. Epley at length about the scope of his analysis and how he tested and verified the CAM. Yet, nowhere in Nomura's motion does it mention or even challenge Dr. Epley's sensitivity studies[10] or mappings of USPAP to the CAM questions.[11] Indeed, no portion of Nomura's motion even takes issue with Dr. Epley's evaluation of how USPAP underpins the CAM, how the CAM questions were properly weighted consistent with

---

CAM analysis, and I therefore concluded that they were highly supportive of my credibility findings").

[9] Ex. 4 (Epley 10/30 Tr.) at 216:17-217:5 ("My job was to evaluate the mapping back to the questions. It was to look at the aspects, if they were reasonably defined relative to the marketplace and the weights of those questions as they came through. What I hear you asking is about application decisions and you asking me questions about what happens at different times in the marketplace, that's . . . Dr. Kilpatrick's issue on application.").

[10] Ex. 4 (Epley 10/30 Tr.) at 93:13-94:7 ("Q. You mentioned some sensitivity analysis that you performed. What was the -- why did you perform sensitivity analysis? A. I felt it was part of my responsibility to do that, and I wanted to do it. My job was to review the CAM to determine if it met its objective, and I felt it was necessary as part of my review to do a sensitivity analysis. Q. And why was it necessary as part of your review to do a sensitivity analysis? A. It's necessary to determine if the model is consistent internally, is the model reasonably constructed, and a sensitivity analysis would allow me to do that, so I -- I did conduct one. "); id. at 98:21-99:14 ("What I found out was even moving some of the scores up and down, the ranks in many cases remain the same. That's an important point to me. So if the ranks remain the same, the threshold might move up or down a little bit because the scores have moved up or down, but you've got the same relative positions of these simulations in the results. That tells me there's internal consistency, and that's why I can hang my hat on it, is the way it's set up is to have internal consistency, that means you're going to get accurate results and trustworthy results and everything else that's labeled on the -- on the categories.").

[11] Ex. 4 (Epley 10/30 Tr.) at 91:5-15 ("When you reviewed the CAM for purposes of putting together your report, did you -- did you look at how the CAM would actually -- the -- the 31 questions should actually be applied? A. I did mapping of the 31 questions back to components of USPAP. Q. All right. A. And that's in one of my exhibits."); id. at 109:19-110:18 ("A. I was particularly interested in the specific parts of the CAM -- specific parts of the form that dealt with the reporting of market conditions. I have used this form [Dep. Ex. 58,101 (URAR)]. If you're going to appraise in residential area, you got to be familiar with [the URAR], you're going to use it. So I think I'm familiar with the various parts of it, but I wanted to review in my own mind for this particular edition, the 2005 edition which is down in the right-hand corner, that there were particular parts of this form that required explanation of the marketplace. And this goes back to my understanding of the questions, 31 questions. Was the intent to actually map the market as it is reported on this form which needed to be done. So I used it to go back to take my form, say 'Where would the appraiser report this?'").

USPAP,[12] or how the CAM's design and threshold reliably evaluate the credibility of appraisals.[13]

## CONCLUSION

For the reasons stated above and given that FHFA has no intention of proffering expert testimony from Dr. Epley at trial, Plaintiff FHFA respectfully requests that the Court deny Nomura's motion to exclude the expert testimony of Donald Epley, Ph.D.

---

[12]  Def. Ex. 2 (Epley Report) at 1; Ex. 1 (Epley 7/8 Tr.) at 85:23-88:4 ("Q. If you're supporting it based on the results, could not you equally support any of these other weightings? A. I don't think any of the other weightings have the best common sense, the best application of USPAP, the best structure of methodology").

[13]  Ex. 4 (Epley 10/30 Tr.) at 101:25-102:7 ("Q. And was it important then for you to run these sensitivity analysis in order to satisfy yourself that your six criteria have been met by the CAM? A. It was important to me to do that, that's correct."); Ex. 4 (Epley 10/30 Tr.) at 70:12-72:3 ("Q.  And you write in your report about the six criteria you applied to review the CAM.  A.  Uh-huh.  Q.  And one of those is, 'Does the model give appropriate priority and weight to items representing the most important procedures consistent with known appraisal procedure and practice?'  How did you actually apply that criteria when you reviewed the CAM?  A.   Whenever I sign my name as an MAI Appraiser the Appraisal Institute says, Epley, you are following the valuation process.  So when I sign my name, I -- I have to sign for two things, valuation process, and I have to sign I've -- to the best of my knowledge, I've applied USPAP. . . . So those eight steps in Aspect 3 are very important to me because every time I sign my name, that's a valuation procedure.  So if  you're going to take my class, you're going to know those things by heart and you're going to be able to tell me what each of them mean.").

13

DATED:  December 11, 2014
           New York, New York

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By: /s/ *Philippe Z. Selendy*

Philippe Z. Selendy
Adam M. Abensohn
Jonathan B. Oblak

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000