UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>    Plaintiff,<br><br>    -against-<br><br>NOMURA HOLDING AMERICA INC., et al.,<br><br>    Defendants. | No. 11-cv-6201 (DLC)<br><br>ECF Case |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION TO EXCLUDE TESTIMONY OF ROBERT W. HUNTER
BASED ON PURPORTED "MINIMUM INDUSTRY STANDARDS"**

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

December 22, 2014

## <u>TABLE OF CONTENTS</u>

**Page**

ARGUMENT ........................................................................................................1

I.    HUNTER'S TESTIMONY ABOUT "MINIMUM INDUSTRY STANDARDS" IS
      IRRELEVANT ...........................................................................................1

II.   THE SO-CALLED "MINIMUM INDUSTRY STANDARDS" FAIL TO MEET THE
      REQUIREMENTS FOR RELIABILITY UNDER DAUBERT . .......................................4

      A.    "Minimum Industry Standards" Did Not Exist at the Time and
            Were Developed for this Litigation .........................................................4

      B.    Hunter Did No Testing of His "Minimum Industry Standards" .............................7

      C.    Hunter's "Experience" Does Not Provide a Basis for His Testimony .....................7

      D.    Hunter's "Minimum Industry Standards" Were Not the Minimum .......................8

      E.    Hunter's Invention of Non-existent "Minimums" Is Not a "Minor Flaw" ..............9

CONCLUSION ....................................................................................................9

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Algarin* v. *New York City Dep't of Corr.*,
    460 F. Supp. 2d 469 (S.D.N.Y. 2006) ....................................................................8

*Assured Guaranty Mun. Corp.* v. *Flagstar Bank, FSB*,
    920 F. Supp. 2d 475 (S.D.N.Y. 2013) ....................................................................8

*Berk* v. *St. Vincent's Hosp. and Medical Center*,
    380 F. Supp. 2d 334 (S.D.N.Y. 2005) ....................................................................8

*Daubert* v. *Merrell Dow Pharmaceuticals Inc.*,
    509 U.S. 579 (1993) .................................................................................... *passim*

*LaSalle Bank Nat'l Ass'n* v. *CIBC Inc.*,
    2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ..........................................................3

**Rules**

FED. R. EVID. 402 .........................................................................................................1

FED. R. EVID. 403 .....................................................................................................1, 4

FED. R. EVID. 702 .....................................................................................................1, 2

## TABLE OF ABBREVIATIONS

| Action | *FHFA* v. *Nomura Holding America Inc.*, *et al.*, No. 11 Civ. 6201 (DLC) |
|---|---|
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| Def. Br. | Defendants' Memorandum of Law in Support of Their Motion to Exclude Testimony of Robert W. Hunter Based on Purported "Minimum Industry Standards," dated November 26, 2014, in this Action |
| Ex. | Exhibit to the November 26, 2014 Declaration of Kunal J. Choksi submitted in support of Defendants' Motion to Exclude Testimony of Robert W. Hunter Based on Purported "Minimum Industry Standards" |
| Hunter Report | Expert Report of Robert W. Hunter, Regarding the Underwriting of Mortgage Loans Underlying the Nomura Securitizations, dated May 15, 2014 |
| Offering Documents | The offering materials for the Securitizations, including documents filed with the Securities and Exchange Commission |
| Opp. | Plaintiff FHFA's Memorandum of Law in Opposition to Defendants' Motion to Exclude Testimony of Robert W. Hunter Based on Purported "Minimum Industry Standards," dated December 11, 2014, in this Action |
| Pl. Ex. | Exhibit to the December 11, 2014 Declaration of Manisha M. Sheth in Opposition to Defendants' Motion to Exclude Testimony of Robert W. Hunter Based on Purported "Minimum Industry Standards" |
| Reply Ex. | Exhibit to the December 22, 2014 Reply Declaration of Kunal J. Choksi submitted in support of Defendant's Motion to Exclude Testimony of Robert W. Hunter Based on Purported "Minimum Industry Standards" |

Defendants respectfully submit this reply memorandum in support of their motion under Federal Rules of Evidence 402, 403 and 702 and *Daubert* v. *Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 597 (1993), to exclude the trial testimony and opinions of plaintiff's designated expert Robert W. Hunter to the extent he refers to or relies upon any "minimum industry standards."

## ARGUMENT

### I.   HUNTER'S TESTIMONY ABOUT "MINIMUM INDUSTRY STANDARDS" IS IRRELEVANT.

It is undisputed that none of the Offering Documents contain any representation about compliance with any "minimum industry standards."  Hunter's opinions about whether loans in the Securitizations meet his "minimum industry standards" are thus irrelevant because compliance with those purported standards has nothing to do with plaintiff's claims.[1]

Plaintiff nevertheless argues that Hunter's "minimum industry standards" are relevant because those purported standards "will assist the fact finder in determining whether the loans complied with underwriting guidelines even in instances where no guidelines are available."  (Opp. at 9.)  This argument appears to be based on plaintiff's contention that there are 24 loans in plaintiff's sample (out of 723) for which originator underwriting guidelines were unavailable to Hunter.  (Opp. at 7 n.11.)  Plaintiff does not explain why any supposed "minimum industry standards" should apply to the other 699 loans in the sample.  Moreover, the Offering Documents in fact describe the "underwriting criteria" applicable to each of the 24 loans for which plaintiff contends there are no originator underwriting guidelines.  Nothing is "missing"

---

[1]      Plaintiff has abandoned its expert's position that his "minimum industry standards" are "implicit in the representations contained in the Offering Documents."  Ex. 2 (Hunter Report) at 21; Def. Br. at 12.

for these 24 loans; plaintiff's re-underwriting expert could have underwritten the loans to the criteria described in the Offering Documents, instead of inventing his own "minimum industry standards" for that purpose.

Plaintiff illogically argues that Hunter's use of "minimum industry standards" as a substitute for the actual "underwriting criteria" disclosed in the Offering Documents should be permitted because Hunter's "minimum industry standards" are supposedly "more lenient" than the disclosed "underwriting criteria." (Opp. at 9.)  This makes no sense.  The claim in this case is that defendants made false representations in the Offering Documents about the loans underlying the Securitizations, and the relevant inquiry for the jury is whether those loans were underwritten in compliance with the "underwriting criteria" actually disclosed.  It is wholly irrelevant to measure compliance with "minimum industry standards" that were never the subject of any representations in the Offering Documents.[2]

Plaintiff's next argument is that Hunter's "minimum industry standards" are relevant to assess "whether the sample loans complied with Nomura's representations about the borrower's ability to repay and the adequacy of collateral." (Opp. at 10.)  No actual disclosures in the Offering Documents on this topic are identified by plaintiff, but this assertion presumably refers to disclosures that certain originators' underwriting guidelines were "primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy

---

[2]     Plaintiff argues that "minimum industry standards" are relevant to "determining whether the descriptions of the underwriting criteria in each of the Prospectus Supplements are accurate." Opp. at 9.  To the extent plaintiff asserts that "minimum industry standards" can be used to assess whether the "underwriting criteria" in the Offering Documents accurately describe the underwriting guidelines of originators whose loans back the deals, plaintiff has never contended that disclosures concerning "underwriting criteria" are inaccurate, and there are no such allegations in the complaint.  Thus, expert opinion on this issue is neither relevant nor helpful. FED. R. EVID. 702.  Moreover, the "underwriting criteria" would have to be compared to originator underwriting guidelines, not "minimum industry standards," to assess their accuracy.

of the mortgaged property as collateral for the mortgage loan." (Ex. 12 (Prospectus Supplement for 2006-FM2) at NOM-FHFA_04638395; Ex. 8 (Prospectus Supplement for 2007-1) at NOM-FHFA_05142022.) The fact that defendants stated that a purpose of certain originators' underwriting guidelines was to measure "ability and willingness . . . to repay" the loan is not equivalent to a representation that the loans were underwritten to "minimum industry standards" created years later (for this litigation) by plaintiff's experts. To the contrary, where the Offering Documents refer to particular originators' underwriting guidelines, they state specifically that it was those underwriting guidelines that were used to assess collateral and the ability to repay. (Ex. 12 (Prospectus Supplement for 2006-FM2) at NOM-FHFA_04638395; Ex. 8 (Prospectus Supplement for 2007-1) at NOM-FHFA_05142022.) For example, one of Hunter's "minimum industry standards" is that a "seller concession may not exceed the lesser of 6% of the mortgage's value or the value of the borrower's closing costs without a corresponding adjustment to the sales price of the collateral property." (Ex. 4 (Exhibit 7 to Hunter Report) at 5.) That may be one way to assess the adequacy of collateral, but the Offering Documents never represent that Hunter's made-up standard was used by any of the originators making the at-issue loans.

In *LaSalle Bank Nat'l Ass'n* v. *CIBC Inc.*, 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012), the court in similar circumstances excluded expert testimony regarding "industry standards, customs, and practices" in mortgage underwriting. *Id.* at *12. The court reasoned that because the issue before it was "whether [defendant] complied with its contractual obligations and representations—not whether it complied with industry standards," the proffered testimony was irrelevant. *Id.* The same is true here.

Plaintiff argues that the "industry standards" in *LaSalle* were more rigorous than the "contractual obligations" at issue in that case and that Hunter's standards here are "less

rigorous," which, according to plaintiff, implies that if minimum industry standards are not met, then more stringent underwriting guidelines or criteria must also have been violated.  (Opp. at 11.)  This is false, as Hunter admitted at deposition—Hunter's "minimum" industry standards are often not the minimum at all.  (Pl. Ex. 9 (Hunter Dep.) at 240:12-241:16).[3]  *See also* pp. 8-9, *infra*.

Hunter's opinions about "minimum industry standards" that are not even mentioned in the Offering Documents are irrelevant to any claim in this action.  Admitting such opinions at trial would waste time, mislead the jury, and confuse the issues.  FED. R. EVID. 403.  Consequently, those opinions should be excluded.

## II.    THE SO-CALLED "MINIMUM INDUSTRY STANDARDS" FAIL TO MEET THE REQUIREMENTS FOR RELIABILITY UNDER DAUBERT.

### A.    "Minimum Industry Standards" Did Not Exist at the Time and Were Developed for this Litigation.

Even Hunter has conceded that there were no "minimum industry standards" in existence in the period 2005 to 2007.  (Ex. 3 (Hunter Tr.) at 111:13-112:7.)  No regulator, industry organization or any other body had ever promulgated or published any such "minimum industry standards."  (Ex. 3 (Hunter Tr.) at 110:17-111:12, 165:13-19.)  Hunter (along with two other experts hired by plaintiff for this litigation) "distilled" the purported "minimum industry standards" in 2013 for use in this and related cases.  (Ex. 2 (Hunter Report) at 87; Ex. 3 (Hunter Tr.) at 257:6-259:11.)

Plaintiff argues that Mr. Hunter's methodology was adequate to formulate "minimum industry standards" because "based on his experience, and in consultation with

---

[3]    Hunter testified that his "minimum industry standards" were not the "absolute, most lenient standards" and that he was "sure there were" more lenient guidelines.  Pl. Ex. 9 (Hunter Dep.) at 240:12-241:16.

Messrs. Butler and Payne and other underwriting professionals on his team, Mr. Hunter reviewed

thousands of underwriting guidelines from the Relevant Period to identify and distill the most

lenient aspects of those guidelines." (Opp. at 15.)  It is precisely this sort of anecdotal and

unsystematic methodology that courts have held insufficient under *Daubert*.  *Playtex  Products,*

*Inc.* v. *Proctor & Gamble Co.*, 2003 WL 21242769, at *10 (S.D.N.Y. May 28, 2003).  There is

no evidence at all that Hunter or plaintiff's other experts conducted a systematic survey of the

hundreds—if not thousands—of different underwriting guidelines in existence in the 2005 to

2007 period.[4]

Plaintiff also argues that witnesses from Nomura, from due diligence providers,

and from originators, as well as Nomura's expert, Michael Forester, testified to the existence of

"minimum industry standards."  (Opp. at 18-21.)  This is false and misleading.  The originator

testimony relied on by plaintiff described only the underwriting guidelines of those specific

originators, not "minimum industry standards" during the period 2005 to 2007.  For example,

plaintiff cites to one originator's testimony (Nationstar) as purportedly acknowledging the

existence of "minimum industry standards."  (Opp. at 19.)  That testimony, however, merely

refers to Nationstar's own underwriting process.  (Pl. Ex. 21 (Nationstar 30(b)(6) Tr.) at 136:20-

137:4, 139:10-17, 142:13-20, 143:12-19, 144:19-145:1.)  The fact that a particular originator's

underwriting process was similar in some respects to Hunter's "minimum industry standards" is

not relevant to whether there were "minimum industry standards" applicable throughout the

industry in the 2005 to 2007 period.  Indeed, Nationstar's corporate representative testified that

---

[4]     Plaintiff also contends that Hunter employed a methodology similar to that of originators
when they "created their underwriting guidelines." Opp. at 15.  Plaintiff does not explain why the
fact  that some originators created underwriting guidelines through an unsystematic review of
other originators' guidelines in any way validates Hunter's approach to creating "minimum
industry standards"—which would require a systematic and comprehensive review.

Nationstar never used any "industry standard" to originate loans "separate and apart" from Nationstar's own underwriting guidelines.  (Pl. Ex. 21 (Nationstar 30(b)(6) Tr.) at 38:11-25.)

Nomura's witnesses likewise did not testify that any specific requirements of particular originator underwriting guidelines constituted "minimum industry standards" during the relevant period.  For example, plaintiff cites Jeffrey Hartnagel's testimony that verifying "a borrower housing payment history" was "important . . . in assessing the borrower's ability and willingness to repay the mortgage."  (Pl. Ex. 17 at 121:11-123:4.)  Mr. Hartnagel's general views about the importance of verifying a borrower's housing payment history in no way supports the imposition of "minimum industry standards" (which are 59 detailed requirements) that Hunter created for purposes of this lawsuit.  (Ex. 4 (Exhibit 7 to Hunter Report) at 4.)  Similarly, while Nomura witness Joseph Kohout testified that Alt-A loans generally had combined loan-to-value ratios of up to 100% (Opp. at 19), Mr. Kohout never testified that 100% was the maximum combined loan-to-value ratio allowed for an Alt-A loan.[5]  (Pl. Ex. 19 at 39:6-39:11.)

The cited testimony from due diligence providers merely refers to the due diligence practices of particular companies.  (Opp. at 20.)  For example, plaintiff cites the testimony of Clayton's corporate representative about certain documentation Clayton required in the scope of its diligence work.  (Opp. at 20 n.39.)  That testimony, however, involved Clayton's own standards for diligence review and does not stand for the proposition that the entire industry had similar standards.  (Pl. Ex. 26 at 69:25-71:4.)

Plaintiff also mischaracterizes the testimony of Michael Forester.  Forester agreed only with general statements that the purpose of underwriting guidelines included "evaluating the

---

[5]    Plaintiff fails to mention that Mr. Kohout testified that he observed Alt-A loans with FICO scores from "580 and up" during the period 2005 to 2007.  This contradicts Hunter's supposed "minimum industry standard" that Alt-A borrowers had to have a FICO score greater than 620.  Pl. Ex. 19 at 39:12-39:16; Ex. 4 (Exhibit 7 to Hunter Report) at 4.

borrower's ability to repay" or "reviewing a borrower's credit." (Pl. Ex. 14 at 240:10-19.) He has never agreed with Hunter's so-called "minimum industry standards." (Reply Ex. 1 (Forester Report) at 71 ("there are no 'minimum industry standards' for the approval of mortgage loans").)

**B.      Hunter Did No Testing of His "Minimum Industry Standards."**

*Daubert* requires that an expert methodology be "tested" in order to ensure its reliability. 509 U.S. at 593. Plaintiff does not dispute that no testing has ever been done of Hunter's "minimum industry standards" outside of this litigation, and plaintiff concedes that Hunter's methods have never been peer reviewed or mentioned in any academic study. (Opp. at 16 n.15.)

Plaintiff argues only that Hunter himself did "testing" by comparing his "minimum industry standards" to the underwriting guidelines of four originators (out of many hundreds of such originators) that he asserts are "lenient." (Opp. at 17.) As an initial matter, Hunter cannot test his "minimum industry standards" by comparing them to a small handful of the very same originator underwriting guidelines from which he purportedly "distilled" his "minimum industry standards." That sort of circular reasoning is inadmissible under *Daubert*. (Def. Br. at 16.) Moreover, plaintiff has never produced any record of the "testing" it claims Hunter performed. Nor has plaintiff provided any evidence that a reliable methodology was used to select the four originators. Such haphazard "testing" is plainly insufficient under *Daubert*. (Def. Br. at 17-18.)

**C.      Hunter's "Experience" Does Not Provide a Basis for His Testimony.**

Hunter's "experience" is an insufficient basis for his "distillation" of the purported "minimum industry standards." "An anecdotal account of one's expert's experience, however extensive or impressive the numbers encompass, does not by itself equate to a methodology, let alone one generally accepted in the scientific community." *Algarin* v. *New York City Dep't of*

-7-

*Corr.*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) (quotation marks omitted).  (*See also* Def. Br. at 20-21.)

When the expert testimony rests on the "experience" of the expert, courts focus on two *Daubert* factors in particular:  "the rate of error of the experience-based methodology and whether such a method is generally accepted in the" field.  *Berk* v. *St. Vincent's Hosp. and Medical Center*, 380 F. Supp. 2d 334, 354 (S.D.N.Y. 2005) (quoting *Colon ex rel. Molina* v. *BIC USA, Inc.*, 199 F. Supp. 2d 53, 69-70 (S.D.N.Y. 2001)).  Here, Hunter has not offered any error rate for his "minimum industry standards"—which could have been accomplished had he actually compared those "minimum industry standards" to underwriting guidelines in a systematic way. Nor has Hunter shown that his method for deriving "minimum industry standards" is generally accepted in the mortgage industry—or even has been tried before.  Plaintiff cites *Assured Guaranty Mun. Corp.* v. *Flagstar Bank, FSB*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013), for the proposition that an expert's "experience" can form the basis of a methodology.  There, however, an expert conducted a survey of underwriting practices to determine "what should be considered 'reasonable'" when an originator's "underwriting guidelines give leeway to its individual underwriters."  *Assured Guaranty Mun. Corp.*, 920 F. Supp. 2d at 506.  Here, Hunter is not offering additional information concerning the application of existing provisions of originator guidelines.  He is simply substituting his personal requirements in place of those guidelines.

      **D.**    **Hunter's "Minimum Industry Standards" Were Not the Minimum.**

There is no dispute that Hunter's so-called "minimum industry standards" were not the "minimum."  (Pl. Ex. 9 (Hunter Dep.) at 240:12-241:16.)  Defendants provided non-exhaustive examples in their opening brief (Def. Br. 21-25) that demonstrated that Hunter's methodology did not in fact produce standards that were minimums across the industry.  Plaintiff did not even try to rebut this important point.

For instance, Hunter's "minimum" payment shock of 150% was not the minimum—one set of underwriting guidelines Hunter supposedly used to "test" his "minimum industry standards," those of Long Beach Mortgage Company, expressly permitted payment shock of 200%.[6]  Likewise, Nomura's correspondent guidelines in the Offering Documents that debt-to-income ratios could be as high as 60% refutes Hunter's supposed "minimum" standard of 55%.  If Hunter's "minimum industry standards" are not truly minimums, then the failure of particular loans to comply with them proves nothing, and his methodology is clearly flawed.

**E.    Hunter's Invention of Non-existent "Minimums" Is Not a "Minor Flaw."**

Plaintiff next argues that the fact that "specific underwriting guidelines are more lenient than particular minimum industry standards" is a "'minor flaw'" that goes to weight rather than admissibility.  (Opp. at 24-25 (quoting *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266-67 (2d Cir. 2002).)  This also is illogical; the flaws in Hunter's methodology are far from minor, particularly given that Hunter's "minimum industry standards" are not actually minimums.  This makes those standards irrelevant, highly misleading, confusing and prejudicial.

**CONCLUSION**

The Court should exclude the trial testimony of plaintiff's designated expert Robert W. Hunter to the extent that he refers to or relies upon any "minimum industry standards." It would be entirely erroneous and unfair to permit Robert Hunter to testify that loans underlying the Securitizations failed to comply with "minimum industry standards."  Those purported

---

[6]    Plaintiff now claims that failure to satisfy these "minimum industry standards" is merely a warning sign meant to "trigger" further examination.  Opp. at 22.  This is strange, for Hunter's "minimum industry standards" say no such thing—they say that "[t]he borrower's new payment obligation may not exceed 150% of the borrower's current housing expense ('payment shock')." Ex. 4 (Exhibit 7 to Hunter Report) at 1.  In any event, plaintiff's concession that Hunter's "minimum industry standards" are not minimums at all, but only "triggers" for further investigation, proves defendants' point.

"standards" were invented for purposes of litigation and, more importantly, the Offering

Documents never represent that the mortgage loans complied with such standards (or "industry

standards" of any kind).  Plaintiff's proof at trial should be directed only to whether the

representations actually made in the Offering Documents were false.

Dated:  New York, New York
        December 22, 2014

                                        Respectfully submitted,

/s/ Thomas C. Rice                      /s/ David B. Tulchin
Thomas C. Rice (trice@stblaw.com)       David B. Tulchin (tulchind@sullcrom.com)
David J. Woll (dwoll@stblaw.com)        Steven L. Holley (holleys@sullcrom.com)
Andrew T. Frankel (afrankel@stblaw.com) Bruce E. Clark (clarkb@sullcrom.com)
Alan Turner (aturner@stblaw.com)        Bradley A. Harsch (harschb@sullcrom.com)
Craig S. Waldman (cwaldman@stblaw.com)  Katherine J. Stoller (stollerk@sullcrom.com)
SIMPSON THACHER & BARTLETT LLP          SULLIVAN & CROMWELL LLP
425 Lexington Avenue                    125 Broad Street
New York, NY  10017                     New York, NY  10004
Telephone:  212-455-2000                Telephone:  212-558-4000
Facsimile:  212-455-2502                Facsimile:  212-558-3588

*Attorneys for Defendant RBS Securities Inc.*   Amanda F. Davidoff
                                        (davidoffa@sullcrom.com)
                                        Elizabeth A. Cassady
                                        (cassadye@sullcrom.com)
                                        SULLIVAN & CROMWELL LLP
                                        1700 New York Avenue, NW, Suite 700
                                        Washington, DC  20006
                                        Telephone:  202-956-7500
                                        Facsimile:  202-956-6993

                                        *Attorneys for Defendants Nomura Holding
                                        America Inc., Nomura Asset Acceptance
                                        Corporation, Nomura Home Equity Loan, Inc.,
                                        Nomura Credit & Capital, Inc., Nomura
                                        Securities International, Inc., David Findlay,
                                        John McCarthy, John P. Graham, Nathan
                                        Gorin, and N. Dante LaRocca ("Nomura
                                        Defendants")*