UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,

        -against-

NOMURA HOLDING AMERICA, INC.,
et al.,

                Defendants.

**No. 11 Civ. 6201 (DLC)**

---

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF FHFA'S MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF MICHAEL FORESTER

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Philippe Z. Selendy
Manisha M. Sheth
Deborah K. Brown
Tyler G. Whitmer

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ......................................................................................3

    A.    FHFA's Re-Underwriting Review Was Designed To Test The Accuracy Of The Statements In The Offering Documents ........................................3

    B.    "Re-Underwriting" Was Routinely Conducted In The Mortgage Industry Using Documents And Information Beyond The Loan File....................................5

    C.    Unlike FHFA's Re-Underwriting Review, Mr. Forester's Review Was Not Designed To Test The Accuracy Of The Statements In The Offering Documents .........................................................................7

ARGUMENT ...........................................................................................................8

I.     MR. FORESTER'S OPINIONS ARE IRRELEVANT AND WILL NOT ASSIST THE JURY ...........................................................................9

II.    MR. FORESTER'S METHODOLOGY IS UNRELIABLE ............................................11

    A.    Mr. Forester's Methodology Does Not Comport With Generally Accepted Re-Underwriting Practices In The Mortgage Industry ..........................................11

    B.    Mr. Forester's Methodology Ignores Highly Relevant Documents And Information ............................................................................13

        1.    Because Mr. Forester Fails To Consider Post-Closing Information And Information From Outside The Loan File, His Re-underwriting Methodology Cannot Effectively Test The Accuracy Of The Underwriting Representations ........................................14

        2.    Because Mr. Forester Fails To Consider Post-Closing Information And Information From Outside The Loan File, His Re-Underwriting Methodology Cannot Effectively Test The Accuracy Of The Collateral Representations .............................................16

III.    MR. FORESTER'S OPINIONS AND TESTIMONY WOULD CONFUSE THE ISSUES AND MISLEAD THE JURY ...........................................................18

CONCLUSION ........................................................................................................19

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
920 F. Supp. 2d 475 (S.D.N.Y. 2013)................................................................11, 13

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)....................................................................1, 2, 3, 9, 11, 13

*In re Elec. Books Antitrust Litig.*,
2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) .......................................................13

*Escott v. BarChris Constr. Corp.*,
283 F. Supp. 643 (S.D.N.Y. 1968) .......................................................................10

*Hunt v. CNH Am. LLC*,
857 F. Supp. 2d 320 (W.D.N.Y. 2012)...................................................................18

*Hunt v. CNH Am. LLC*,
511 F. App'x 43 (2d Cir. 2013)..............................................................................9

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)..............................................................................................9

*In re Puda Coal Sec. Inc., Litig.*,
--- F. Supp. 2d ---, 2014 WL 2915880 (S.D.N.Y. June 26, 2014)............................8, 9, 10, 18

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)..............................................................8, 9, 11

*Ruggerio v. Warner-Lambert Co.*,
424 F.3d 249 (2d Cir. 2005)................................................................................13

*United States v. Williams*,
506 F.3d 151 (2d Cir. 2007)..................................................................................8

## Statutes, Rules, and Legislative Materials

Fed. R. Evid. 401 ..............................................................................................8, 10

Fed. R. Evid. 402 ..............................................................................................8, 10

Fed. R. Evid. 403 ..............................................................................................9, 18

Fed. R. Evid. 702 ......................................................................................8, 9, 13, 17

<u>**Regulations and Administrative Materials**</u>

Issuer Review of Assets in Offerings of Asset-Backed Securities,
 SEC Release No. 9176, 76 Fed. Reg. 4231 (Jan. 25, 2011) ....................................................10

Pursuant to Federal Rules of Evidence 702, 401, 402, and 403, as well as *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Association ("Freddie Mac") respectfully moves to exclude the opinion testimony of Nomura's[1] proffered re-underwriting expert, Michael Forester.[2]

## PRELIMINARY STATEMENT

Nomura proffers the opinion testimony of Mr. Forester purportedly to rebut the opinions of FHFA's re-underwriting expert, Robert Hunter.  Rather than rebutting Mr. Hunter's opinions regarding whether the samples of mortgage loans ("Sample Loans") he reviewed complied with representations in the Offering Documents,[3] Mr. Forester takes an overly restricted and unreliable view both of what information was available to underwriters at the time of origination and what post-origination information should be considered now, resulting in an irrelevant opinion that does not meet *Daubert* standards.  Mr. Forester considered "only . . . information that would have been available to the original underwriter."  Forester Report ¶ 118; *see also id.* ¶ 101 ("My review was designed to replicate the review that a reasonable loan underwriter would have conducted at origination."); Forester Tr. at 141:10-142:13, 302:13-303:21 (testifying to the

---

[1]   "Nomura" refers collectively to all of the named Defendants in the above-captioned action ("Action").

[2]   Citations to the "Forester Report" are to the Expert Report of Michael Forester, dated August 14, 2014 and attached as Exhibit 1 to the Declaration of Tyler Whitmer in support of Plaintiff FHFA's Motion to Exclude Expert Testimony and Opinions of Michael Forester ("Whitmer Decl."), dated December 22, 2014.  Citations to the "Forester Tr." are to the transcript of the deposition of Michael Forester taken on November 25, 2014, excerpts of which are attached as Exhibit 2 to the Whitmer Decl.

[3]   "Offering Documents" include the Prospectus and Prospectus Supplement filed with the Securities and Exchange Commission for each of the seven securitizations at issue in this Action (the "Securitizations").

same).[4]  Such a constricted analysis does not meet the requirements of the Federal Rules of Evidence or *Daubert* for several reasons.

*First*, Mr. Forester's unduly narrow analysis is irrelevant to the claims in this case. Despite FHFA's allegations that the Offering Documents for the Securitizations contain material misstatements at the Time of Issuance,[5] Mr. Forester has limited his methodology and analysis to only documents and information that were available to and considered by the loan underwriter at the time of origination.  Because such an approach is not tailored to the claims and allegations in this case and ignores evidence relevant to those claims, it will not assist the jury in determining whether representations in the Offering Documents were accurate as of the Time of Issuance.

*Second*, Mr. Forester's methodology is unreliable because it is entirely inconsistent with the process of re-underwriting loans that was employed in the industry during the relevant time period from 2002 to 2007 (the "Relevant Period").  Although Mr. Forester readily acknowledges that market participants re-underwrote loans during quality control audits, diligence reviews, and repurchase reviews, and considered documents and information outside the four corners of the loan file during such reviews, he refused to consider such documents and information when conducting his rebuttal re-underwriting review in this action on the basis that they were not

---

[4]  Moreover, Mr. Forester clarified in his deposition that the standard he actually applied during his rebuttal re-underwriting review was even more limited in that he considered only the information that was ***actually in the loan origination file***, regardless of whether additional information was available to the loan underwriter at the time of origination.  Forester Tr. at 144:16-19 ("I am limiting my review . . . to information that was available to me via the loan file.").

[5]  In this motion, "Time of Issuance" refers to the operative time applicable to each alleged misrepresentation.  As described below, representations in the collateral tables in the Offering Documents, including, for example, information about the loan-to-value ratios of the underlying mortgage loans ("Collateral Representations"), the "Time of Issuance" is the Cutoff Date defined in the Offering Documents.  For other representations, including those about compliance with underwriting guidelines ("Underwriting Representations"), the "Time of Issuance" is the effective date of the Prospectus Supplement.

available to and considered by the loan underwriter at the time of origination.  For example, not only did Mr. Forester fail to obtain audit credit reports, perform re-verifications of borrower information, perform searches on internet salary engines, and pull public records, he improperly refused to consider such information when FHFA's expert relied on it.  Such an approach does not reliably analyze whether the loans in the supporting loan groups adhered to representations in the Offering Documents and ignores critical facts and data obtained from post-origination documents, rendering Mr. Forester's proposed testimony inadmissible under *Daubert*.

*Finally*, if Mr. Forester is permitted to testify about his findings, his testimony is likely to confuse the issues and mislead the jury.  FHFA alleges that Nomura made false statements in the Offering Documents regarding the underwriting and credit quality of the loans, and that these statements were false at the Time of Issuance.  Mr. Forester's proposed testimony focuses on whether the loan was underwritten correctly at origination (and even this analysis artificially limited solely to the four corners of the loan file at origination).  Because Mr. Forester's proposed testimony is focused on the wrong question, it is likely to distract from the central issue in this case—whether the statements in the Offering Documents regarding the underwriting and credit quality of the loans were false at the Time of Issuance—and, in doing so, confuse the issues and mislead the jury.  FHFA therefore respectfully requests that Mr. Forester's opinion testimony be excluded in its entirety.

## FACTUAL BACKGROUND

### A.      FHFA's Re-Underwriting Review Was Designed To Test The Accuracy Of The Statements In The Offering Documents

The central allegations in FHFA's Amended Complaint are that the statements in the Offering Documents were materially false.  *See* Dkt. 60, at ¶ 1.  The Amended Complaint alleges that all of the Offering Documents represented, as of the effective date of the Offering

Document, that the underlying mortgage loans were generally underwritten in accordance with applicable guidelines and underwriting criteria.  *See* Dkt. 60, at ¶¶ 76-82.  Moreover, all of the Offering Documents made representations about other characteristics of the collateral in the supporting loan groups, including the percentage of owner occupied loans and the range of loan-to-value ("LTV") or combined-loan-to-value ("CLTV") ratios, as of the Cutoff Date.  *See* Dkt. 60, at ¶¶ 86-95.

To test the accuracy of the statements in the Offering Documents, FHFA retained Mr. Hunter to re-underwrite the Sample Loans.  Mr. Hunter described his assignment as follows:

> I have been retained . . . to provide an expert opinion on whether samples of loans from each of the seven Supporting Loan Groups ("SLG") from the seven securitizations at issue in this Action (the "Securitizations") ***complied with statements relating to the underwriting and credit quality of such loans in the Offering Documents for each Securitization.***  I have examined the sample loans from each SLG to determine whether the loans (i) were originated or acquired in accordance with the originators' underwriting guidelines or with underwriting guidelines approved by the originators . . . .  In addition, ***I was asked to opine on whether, based on the sample mortgage loans I reviewed, the data contained in the collateral tables found in the Offering Documents and the pre-closing loan tapes were accurate.***  Where departures from the representations asserted in the Offering Documents were identified, I conducted an analysis to determine the impact that each had on the represented credit risk of the mortgage loan.  ***I then determined whether the loan's credit risk was higher than represented in the Offering Documents.***

Whitmer Decl., Ex. 3 at 1-2 (emphases added).  FHFA's expert designed his re-underwriting review to test whether Sample Loans from each of the supporting loan groups complied with statements regarding the underwriting and credit quality of the loans in the Offering Documents at the Time of Issuance.

The credit component of Mr. Hunter's re-underwriting review involved reviewing information in the loan origination file and documents obtained from various third-party sources, such as re-verifications, bankruptcy filings, audit credit reports, automated valuation models, MERS, DataVerify, Accurint, and LexisNexis, to determine whether the loans generally

complied with underwriting guidelines and standards.  *See* Whitmer Decl., Ex. 3 at 95-97; *see also* Whitmer Decl., Ex. 33.  The occupancy review also included consideration of additional documents such as utility records, servicing records, and other public information to determine whether mortgaged properties collateralizing the Sample Loans were actually owner-occupied.  *See* Whitmer Decl., Ex. 3 at 97; *see also* Whitmer Decl., Ex. 33.  Although many of these documents were obtained after the loan closed, they contain information relevant to establishing whether the loan was generally originated in accordance with underwriting guidelines and standards, and whether the loan characteristics in the collateral tables in the Offering Documents relating to LTV/CLTV ratios and owner occupancy were accurate as of the Cutoff Date.  *See* Whitmer Decl., Ex. 3 at 95-97; *see also* Whitmer Decl., Ex. 33.

## B.  "Re-Underwriting" Was Routinely Conducted In The Mortgage Industry Using Documents And Information Beyond The Loan File

"Re-underwriting" is commonly used in the mortgage industry in a variety of contexts, including quality control audits, diligence reviews, repurchase requests, and litigation.[6]  Regardless of the various contexts in which "re-underwriting" occurred in the industry, the process remained the same.  It consisted of reviewing the loan file for compliance with underwriting standards; re-verifying information such as assets, income, and employment; re-calculating income; assessing the reasonableness of stated incomes; and using third-party sources such as audit credit reports, re-verifications, bankruptcy filings, LexisNexus, internet salary

---

[6]  For example, an originator may "re-underwrite" loans to test the thoroughness and accuracy of its underwriting staff (*see, e.g.*, Whitmer Decl., Ex. 4 (Crusinberry Dep.) at 70:8-20); entities that purchase mortgage loans may "re-underwrite" the loans as part of their diligence process to determine if the loans complied with underwriting guidelines (*see, e.g.*, Whitmer Decl., Ex. 5 (Beal Dep.) at 18:8-19:17); or, as relevant here, a securities underwriter may "re-underwrite" loans to test the truthfulness of statements made in Offering Documents (*see, e.g.*, Whitmer Decl., Ex. 6 (Jordan Dep.) at 176:2-6).  In addition, "re-underwriting" may be performed in connection with loan repurchase requests.  *See, e.g.*, Whitmer Decl., Ex. 7 at NOM-FHFA_05578046.

engines, and other public records to identify underwriting defects. *See, e.g.,* Whitmer Decl., Ex. 8 (Hartnagel Dep.) at 493:8-21, 539:5-9; Whitmer Decl., Ex. 9 (Kohout Dep.) at 211:19-212:4, 311:11-19, 314:11-17, 314:25-315:20; Whitmer Decl., Ex. 10 (Sabo Dep.) at 33:3-10, 49:10-50:4, 51:7-12; Whitmer Decl., Ex. 11 (Spagna Dep.) at 69:17-75:15, 155:2-16, 242:10-17, 265:2-22, 266:20-267:6; Whitmer Decl., Ex. 12 at NOM-FHFA_05500890.

Nomura itself considered such post-closing information outside the loan file when it re-underwrote loans as part of its acquisition diligence when purchasing loans. For example, Nomura instructed its diligence vendors to use secondary tools "available on the Internet" when there was any doubt regarding the reasonableness of a borrower's stated income. Whitmer Decl., Ex. 12 at NOM-FHFA_05500890. In addition, the corporate designee of Clayton Holdings, LLC ("Clayton"), specifically testified that Clayton at times used salary.com and other salary engines when determining reasonableness of income. Whitmer Decl., Ex. 5 (Beal Dep.) at 399:6-402:17.[7] Moreover, Nomura's diligence vendors, including Clayton admitted that when re-underwriting loans, they could be asked by their clients to use third party tools to collect information that was not available to the original underwriter, including fraud tools like Interthinx and supplemental valuations, to re-verify information provided by the borrower. Whitmer Decl., Ex. 5 (Beal Dep.) at 122:20-124:2.

Similarly, Nomura also considered such post-closing information outside the loan file when conducting repurchase reviews. For example, when agreeing to repurchase loans in the NHELI 2006-HE3 securitization based on misrepresentations of real estate owned and related

---

[7] The corporate designee for Nomura's other diligence vendor, American Mortgage Consultants ("AMC"), testified that AMC used tools like salary.com and salaryexpert.com to determine reasonableness of income. Whitmer Decl., Ex. 15 (Kempf Dep.) at 138:15-139:18. Nomura recognized that its diligence vendors were expected to use tools like PACER to check bankruptcy filings. Whitmer Decl., Ex. 11 (Spagna Dep.) at 265:2-22, 266:15-267:6.

indebtedness, Nomura consulted third-party sources such as HistoryPro.com, SiteXdata.com, and government land office records, that confirmed the borrower had misrepresented his debt. Whitmer Decl., Ex. 13 at NOM-FHFA_05770106; Whitmer Decl., Ex. 14 at NOM-FHFA_05770123.[8]  As part of its June-July 2007 fraud review of the loans in the NHELI 2007-1 Securitization, Nomura considered such third-party post-closing information to "identify any fraudulent loans for possible repurchase."  Whitmer Decl., Ex. 7 at NOM-FHFA_05578046.[9]

Despite the fact that it was widely accepted in the industry, including by Nomura, to use post-closing information during re-underwriting reviews, Mr. Forester refused to consider such documents during his rebuttal re-underwriting review in this case.

**C.     Unlike FHFA's Re-Underwriting Review, Mr. Forester's Review Was Not Designed To Test The Accuracy Of The Statements In The Offering Documents**

Although Mr. Forester was retained by Nomura to rebut Mr. Hunter's opinions, (Forester Tr. at 10:8-17), Mr. Forester avoids directly addressing many of the defects identified by Mr. Hunter by simply disregarding any findings based on post-closing documents and inaccuracies in the loan tape.  Moreover, even though Mr. Forester has minimal firsthand experience underwriting loans at origination (Forester Tr. at 132:18-133:13), he structured his review to focus on the loan at the time of origination instead of focused on assessing the accuracy of the statements in the Offering Documents at the Time of Issuance.  This difference in approach was a fundamental reason for the divergence in opinion between Mr. Hunter and Mr. Forester for many of the Sample Loans.

---

[8]    As another example, Nomura agreed to repurchase a loan based on a misrepresentation of income at origination after Nomura consulted third-party sources like Jobbank.com and Salary.com.  Whitmer Decl., Ex. 16 at NOM-FHFA_05770124.

[9]    For example, Nomura identified two loans with occupancy misrepresentations based on the loans' servicing histories.  Whitmer Decl., Ex. 17 at Row 100 (LMSLoanID ████████ Row 107 (LMSLoanID ████████

The Underwriting Representations—representing that the loans described in the Offering Documents were underwritten in accordance with applicable underwriting guidelines and standards—must have been accurate as of the effective date of the Offering Documents. In spite of this representation, Mr. Forester "designed [his review] to replicate the review that a reasonable loan underwriter would have conducted at origination," Forester Report ¶ 101, and he instructed his re-underwriting team to ignore any information that was not in, or referenced within, the original loan file. Forester Tr. at 303:18-21.[10] Similarly, Mr. Forester's decision to ignore post-closing information also makes it impossible for him to opine on whether the Collateral Representations—the representations about the LTV/CLTV ratios and occupancy status of the mortgage loans—were accurate as of the Cutoff Date in the Prospectus Supplements.

## ARGUMENT

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 539 (S.D.N.Y. 2004) ("The proponent of expert testimony must demonstrate admissibility by a preponderance of proof.").

First, the expert's "technical, or other specialized knowledge [must] help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. And the testimony must be relevant. Fed. R. Evid. 401, 402; *In re Puda Coal Sec. Inc., Litig.*, --- F.

---

[10]   *See also* Forester Report ¶ 118 ("Because the purpose of my review was to evaluate the underwriting of the loans, I only used information that would have been available to the original underwriter. No post-closing information was considered in the review."); Forester Tr. at 302:13-303:17 (describing his "re-underwriting" philosophy as "put[ting oneself] in the shoes of the underwriter" and "[l]ook[ing] at the information that [the underwriter] would [have] looked at").

Supp. 2d ---, 2014 WL 2915880, at *17 (S.D.N.Y. June 26, 2014) ("Federal Rules of Evidence 401, 402, and 403 govern the inquiry of whether an individual qualified as an expert, using reliable methodologies, is proffering testimony that is both admissible and should be allowed.").

Second, the testimony must be reliable.  *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding that *Daubert* applies to non-scientific expert testimony).  The expert testimony must be based on sufficient facts or data; it must be the product of reliable principles and methods; and the expert must reliably apply the principles and methods to the facts of the case.  Fed. R. Evid. 702.  Under *Daubert* and *Kumho Tire*, courts ensure expert testimony complies with Rule 702 by considering, among other things, "whether the theory has 'general acceptance.'"  *In re Rezulin*, 309 F. Supp. 2d at 539-40 (quoting *Daubert*, 509 U.S. at 593-94).

Finally, a court may exclude even relevant, reliable expert testimony where "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403; *see also Hunt v. CNH Am. LLC*, 511 F. App'x 43, 46-47 (2d Cir. 2013) (affirming exclusion of expert testimony "pursuant to Federal Rules of Evidence 702 and 403"); *In re Puda Coal*, 2014 WL 2915880, at *17 ("Expert testimony must be helpful to, but not usurp the province of, the trier of fact. . . .  Rule 403 . . . is applicable to the Court's inquiry in this regard.").

## I.   MR. FORESTER'S OPINIONS ARE IRRELEVANT AND WILL NOT ASSIST THE JURY

This case is about the accuracy of representations in the Offering Documents.  The Underwriting Representations stated that the loans were generally originated in accordance with applicable underwriting guidelines and had to be true as of the effective date of the Offering

Documents.  The Offering Documents also made representations about the LTV/CLTV ratios and owner occupancy status of the underlying loans.  These Collateral Representations were represented to be true as of the Cutoff Date.  Because Mr. Forester's re-underwriting review is limited to documents and information obtained by the loan underwriter at the time of origination, his opinions are irrelevant to assessing the veracity of representations in the Prospectus Supplements at the Time of Issuance.

Courts have held that the securities underwriter is responsible for ensuring that the representations in offering documents are accurate at the time the offering documents became effective.  *See Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 697 (S.D.N.Y. 1968) (finding that underwriter could not meet its due diligence defense where underwriter failed to ensure disclosures in offering documents were accurate when the offering documents became effective); *see also* Issuer Review of Assets in Offerings of Asset-Backed Securities, SEC Release No. 9176, 76 Fed. Reg. 4231, 4235 n.50 (SEC agreeing "that the review that is required is a review of the assets for purposes of the securitization and *not the review conducted to originate the assets*") (emphasis added).  This Court further confirmed this fundamental principle in its December 18 Opinion and Order when it held that Nomura had failed to conduct adequate due diligence, as a matter of law, in part because "Nomura took no steps at or near the time of its securitization of the Mortgage Loans to verify the accuracy of the representations about the characteristics of the SLGs in the Offering Documents."  Dkt. 991, at 84.[11]  Here, by limiting his review to the time of origination and by intentionally excluding any consideration of post-closing

---

[11]   This Court's further recognized that "[i]n order to avail themselves of the affirmative defenses of due diligence and reasonable care, Defendants had to investigate whether the statements in the Offering Documents were reliable, and when they had reason to doubt the accuracy of those statements, whether from a post-origination BPO or other information received during their investigation, then they had a duty to take corrective action to insure the Offering Documents were not misleading."  Dkt. 991, at 106.

information, Mr. Forester failed to construct his reunderwriting review to the facts of this case.

Thus, because Mr. Forester's review is not focused on the accuracy of the Offering Documents,

and is instead limited to the documents in the loan file at the time of origination, his opinions are

not relevant and will not assist the jury.  Fed. R. Evid. 401, 402; *In re Puda Coal*, 2014 WL

2915880, at *20 (excluding expert testimony applying incorrect standard as irrelevant under Rule

402).

## II.     MR. FORESTER'S METHODOLOGY IS UNRELIABLE

### A.     Mr. Forester's Methodology Does Not Comport With Generally Accepted Re-Underwriting Practices In The Mortgage Industry

Under *Daubert*, courts examine whether an expert's methods have "general acceptance"

within the expert's field.  *In re Rezulin*, 309 F. Supp. 2d at 539-40 (quoting *Daubert*, 509 U.S. at

592-94).  Recent case law confirms that the use of documents and tools outside the loan file was

widely accepted in the industry.  In *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F.

Supp. 2d 475 (S.D.N.Y. 2013), Judge Rakoff expressly endorsed the plaintiff's expert's use of

"various tools like online salary engines and AVMs," finding that "the testimony at trial

indicated that the methodology applied by [the expert] is the same kind of methodology

underwriters apply in the field."  *Id*. at 505.  The expert "looked to inquiries on a borrower's

credit report to determine whether a borrower had failed to disclose a debt obligation" and

"looked to online salary engines, employer verification, and/or the Bureau of Labor Statistics'

data to determine whether a borrower's stated income was reasonable."  *Id*.  When the defendant,

Flagstar, challenged the use of information from outside the loan origination file, Judge Rakoff

explained:

> [I]t appears that these tools are commonly relied upon in the field of underwriting.
> Flagstar itself recommends the use of salary.com to determine reasonableness of
> income; [the opposing expert]'s own team looked to Accurint when challenging
> some of [the challenged expert's] allegations; and [a witness] testified that

> Flagstar trained its underwriters to use similar online tools and that Flagstar
> regularly validated appraisals using a different AVM.

*Id.* at 506 (citations to record omitted).

The case law and widely accepted industry practice exposes the unreliability of Mr.
Forester's approach and proffered opinion for several reasons.  First, even though Mr. Forester
considered post-closing information during his career in the context of quality control audits and
forensic reviews, such as diligence reviews and repurchase reviews,[12] he chose not to do so in his
re-underwriting review in this action.[13]  Second, during his deposition, Mr. Forester admitted
that, during the re-underwriting process, diligence firms may have additional information not
available to the underwriter at the time of origination (Forester Tr. at 31:8-19, 196:7-197:8), and
that during the re-underwriting process, it was common to rely on such post-origination
information, including servicing records, audit credit reports, and bankruptcy filings (Forester Tr.
at 25:9-26:20, 31:20-32:14, 47:7-52:18, 54:22-58:20; 183:2-185:16; 196:7-197:8).  Finally,
Nomura's own re-underwriting of mortgage loans during the Relevant Period included an

---

[12]   Mr. Forester testified that during his re-underwriting reviews, he frequently relies on
third-party sources, including: audit credit reports, appraisal field reviews, re-verifications (*e.g.*,
of assets, employment, and income), MERS, bankruptcy records, salary.com, Work Number,
servicing records, and LexisNexis tools (*e.g.*, DataVerify and Accurint).  Forester Tr. at 25:9-
26:13, 26:18-20, 31:20-32:14, 48:7-18, 48:22-49:18, 50:6-10, 51:18-52:18, 54:22-56:2.

[13]   Moreover, even though Mr. Forester agreed that Mr. Hunter's review was a "forensic
review" (Forester Tr. at 61:21-62:3), and that post-origination documents were routinely
considered during such reviews (Forester Tr. at 58:24-59:8, 47:7-58:20), he decided not to
consider such documents here.  He further conceded that he "might not necessarily [have]
disagree[d]" with considering such documents if Nomura asked him to do so.  Forester Tr. at
148:19-149:16.  Mr. Forester further testified that, for a repurchase request, forensic review, or
quality control audit, Mr. Forester would use "different procedures" than he used in his rebuttal
review for this case, including the use of post-origination documentation.  Forester Tr. at 149:25-
150:19.

examination of post-origination documents and information outside the loan file.[14]  As explained above, Nomura itself used post-origination documents and information from outside the loan files when re-underwriting loans for diligence reviews and repurchase requests.  Mr. Forester nevertheless stuck to his "time of origination" approach and refused to consider any information outside the four corners of the origination loan file, thereby failing to follow established re-underwriting practices in the industry.  Forester Tr. at 141:25-142:13.

The generally accepted method for re-underwriting loans—whether for quality control audits, diligence reviews, or repurchase reviews—is to look to post-closing information outside the loan file.  *See Flagstar*, 920 F. Supp. 2d at 504-06 (S.D.N.Y. 2013).  Because Mr. Forester failed to apply this generally accepted methodology, his re-underwriting testimony should be excluded as unreliable.  *See Daubert*, 509 U.S. at 592-94.

### B.     Mr. Forester's Methodology Ignores Highly Relevant Documents And Information

To be admissible, expert testimony must be "based on sufficient facts or data."  Fed. R. Evid. 702.  Mr. Forester, however, has admitted that he ignores documents and information critical to determining whether the Underwriting Representations and Collateral Representations were accurate at the Time of Issuance—including all documents and information post-dating the origination of the mortgage loans.  Mr. Forester's methodology does not even comport with his own purported standard of considering only those documents available to the underwriter at the time of origination.  He ignores information that would have been available at the time of origination (*e.g.*, re-verifications and internet salary engines), but that was excluded from the loan file.  Because of Mr. Forester's failure to consider critical post-origination information and

---

14     For example, Nomura itself realized the usefulness of internet salary engines and instructed its diligence vendors to use them "when there is any doubt re: the reasonability of stated income."  Whitmer Decl., Ex. 12 at NOM-FHFA_05500890.

information from outside the loan files, his opinions and testimony are not based on sufficient

facts and data and should be excluded.  *See In re Elec. Books Antitrust Litig.*, 2014 WL 1282298,

at *3 (S.D.N.Y. Mar. 28, 2014) (Cote, J.) ("'[W]hen an expert opinion is based on data, a

methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert*

and Rule 702 mandate the exclusion of that unreliable opinion testimony.'" (quoting *Ruggerio v.

Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005))).

> **1.**     **Because Mr. Forester Fails To Consider Post-Closing Information
>              And Information From Outside The Loan File, His Re-underwriting
>              Methodology Cannot Effectively Test The Accuracy Of The
>              Underwriting Representations**

Because Mr. Forester's re-underwriting methodology ignores post-closing information

and any information outside the loan file, it cannot effectively test the accuracy of the

Underwriting Representations.

First, Mr. Forester refused to confirm any underwriting defects identified by Mr. Hunter

that were based on information outside of the loan file (such as information from internet salary

engines or from the borrower's employer), even though such information "would have been

available to the original underwriter."  Forester Report ¶ 118; Forester Tr. at 146:17-147:21.  For

example, re-verifications often expose misrepresentations of employment, income, or assets.  In

one of the Sample Loans, Mr. Hunter identified a misrepresentation of employment where the

co-borrower stated prior employment on the loan application that was not reflected on the co-

borrower's federal income tax return recap (which the underwriter used to verify the co-

borrower's income).  *See* Whitmer Decl., Ex. 18 at 3; Whitmer Decl., Ex. 26 at NOM-BRI-

LF_00011815-19; Whitmer Decl., Ex. 26 at NOM-BRI-LF_00011929-31.  This discrepancy was

a red flag for a potential misrepresentation that the origination underwriter should have

investigated.  During his review, Mr. Hunter re-verified the co-borrower's employment with the

14

listed employer and the re-verification confirmed the co-borrower never worked for the employer listed on the loan application.  Whitmer Decl., Ex. 27 at LF2UBS_00633280-83.  Mr. Forester refused to consider the re-verification of employment even though the original underwriter could have discovered the misrepresentation by contacting the alleged employer listed on the application, and in fact, should have done so given the red flag in the loan file.  *See* Whitmer Decl., Ex. 18 at 3.  The information Mr. Forester ignores goes to the heart of the borrower's ability to pay.

Second, Mr. Forester also refused to consider post-closing information that revealed underwriting failures that existed at the time of origination, and thus could have been discovered as of the effective date of the Prospectus Supplements.  For example, Mr. Hunter identified a misrepresentation of income in a loan that closed in ███████████ and was securitized in ████  ███  *See* Whitmer Decl., Ex. 20, Finding ID 17799150 at 2.  This misrepresentation was discovered through the borrower's █████████████████, which was dated ████████ ███ a few months before the loan was securitized.  Whitmer Decl., Ex. 19 at LF1NOM_00692803-04.  Mr. Hunter used the borrower's correct income (from the tax return) to re-calculate the borrower's debt-to-income ("DTI") ratio, and based on that income, the DTI ratio increased from ██████ to ██████.  Whitmer Decl., Ex. 20 at 2.  Mr. Forester rejected Mr. Hunter's finding because "[t]he post-closing documents referenced by the plaintiff . . . were not, and could not be, available to the underwriter at the time of loan approval."  *Id*.  In rebutting Mr. Hunter's finding, Mr. Forester failed to acknowledge that this document—the content of which he does not dispute—was available before the loan was securitized and could have been used to determine whether the loan adhered to the DTI maximum contained in the underwriting guidelines.

> 2.     **Because Mr. Forester Fails To Consider Post-Closing Information And Information From Outside The Loan File, His Re-Underwriting Methodology Cannot Effectively Test The Accuracy Of The Collateral Representations**

According to the Offering Documents, the Collateral Representations must be accurate as of the Cutoff Date.[15]  To appropriately test that accuracy, a re-underwriting review should consider any documents and information available up to that point, including post-closing information and documents.  For example, the Collateral Representations include representations about LTV/CLTV that could be tested using post-origination information concerning the accuracy of appraisals that would affect LTV/CLTV, including valuation information from AVMs.  Similarly, Collateral Representations about owner occupancy could be tested at the Cutoff Date using updated information from utility records, servicing records, and other public information.

But Mr. Forester ignored all such information, and summarily concluded that there was no defect for any of the 314 findings where Mr. Hunter relied on post-closing documents in reaching his opinion.  Whitmer Decl., Ex. 21 (Nov. 18, 2014 Preliminary Response of Michael Forester) at Table 2.  Additionally, Mr. Forester also resolved all 315 of Mr. Hunter's findings based on the loan tape, on the ground that such findings "are not underwriting errors," because the original underwriter could not have examined the loan tape when underwriting the loan.  *Id.*; Forester Report at ¶¶ 127, 130; *see also* Forester Tr. at 160:12-163:11.  Mr. Forester's decision to ignore the loan tapes is especially significant because those tapes were the basis for the data in

---

[15]  Mr. Forester stated that it was not part of his review to ascertain the date on which the representations in the Prospectus Supplements had to be true (Forester Tr. at 158:17-24), and would not offer an opinion on the matter (Forester Tr. 158:25-159:7).  Though beyond the scope of his official opinions, Mr. Forester testified that he believed the statements had to be true as of the date of the Prospectus Supplements.  Forester Tr. at 157:3-14.

16

the collateral tables in the Offering Documents relating to the SLGs,[16] the veracity of which

FHFA challenges in its complaint.  Forester Report at ¶ 127; *see also* Forester Tr. at 160:12-

163:11.

As an example, Mr. Hunter identified a misrepresentation of occupancy in a loan that

closed in ████████ that was securitized in ████████.  Whitmer Decl., Ex. 28 at 4.  The loan

was a ████████████ for an owner-occupied property (Whitmer Decl., Ex. 22 at UBS-

LF00321389) where the borrower was to occupy the subject property for at least 12 months

following closing (*i.e.*, through March 2007) (Whitmer Decl., Ex. 22 at UBS-

LF00316402).[17]  Mr. Hunter discovered this misrepresentation by using information from third

party sources such as SiteXdata.com and Accurint, which showed that the borrower had

purchased a ████████████ before the subject loan closed.  Whitmer Decl., Ex. 25

at LF2UBS_00633842-60; Whitmer Decl., Ex. 22 at UBS-LF00316395-409; Whitmer Decl.,

Ex. 22 at UBS-LF00321383-86.  These third-party sources showed that the borrower occupied the

second property as the borrower's primary residence beginning in ████████, and that

individuals other than the borrower occupied the subject property beginning that same

---

[16]   Whitmer Decl., Ex. 23 (Orfe Dep.) at 130:8-25; Whitmer Decl., Ex. 24 (Williams Dep.) at 132:11-19.  In fact, Mr. Forester admitted that he did not know how the collateral tables in the Prospectus Supplements were created (Forester Tr. at 161:17-20), and was unaware that the pre-closing loan tapes were the basis for the data in the collateral tables (Forester Tr. at 162:21-25).

[17]   A borrower benefits from having a property classified as owner occupied in several ways including, depending on the lender and loan, lower interest rates and higher allowable LTV and DTI ratios.  *See* Whitmer Decl., Ex. 29 at NOM-FHFA_05503790,792-93 (Nomura's correspondent guidelines set the maximum LTV ratio for investment properties at 90 percent, the non-investment property maximum is 95 percent); Whitmer Decl., Ex. 30 at LF1UBS_00051238 (Fremont's maximum LTV ratio for owner occupied properties is 100 percent, the non-owner occupied maximum is 90 percent);Whitmer Decl., Ex. 31 at BARC-EF_000000170 (EquiFirst's maximum DTI ratio for owner occupied properties is 55 percent, the non-owner occupied maximum is 50 percent ); and Whitmer Decl., Ex. 32 at JPMC-UWG-BEAR-000211422, 425, 430, 436 (People's Choice barred borrowers for non-owner occupied loans from various riskier loan programs).

month.  *Id*.  In addition, the loan file included copies of ███████████ reflecting mortgage

payments from the borrower, beginning in ████████, with the second property's address.  *Id*. at

UBS-LF00401245-52, 00380353-55.  All of this information would have been available in ████

███████████—well before the loan was securitized in ████████ (and before the cut-off date

of October 1, 2006 for the Collateral Representations for NHELI 2006 FM2 Securitization).

Because it fails to consider relevant post-origination documents and information, Mr. Forester's

analysis[18] is based on insufficient facts and data to be a reliable and admissible opinion about the

veracity of the representations in the Offering Documents.  Fed. R. Evid. 702.

## III.   MR. FORESTER'S OPINIONS AND TESTIMONY WOULD CONFUSE THE ISSUES AND MISLEAD THE JURY

Mr. Forester's limitation of his review to evidence available at the time of origination and

his refusal to consider information from outside the loan file result in an analysis tantamount to

applying the wrong standard.  Indeed, as explained above, Mr. Forester's methodology was not

designed to test the allegations in the Complaint, but rather, was designed to test an altogether

different question—namely, whether the original underwriter did a proper underwriting.[19]  Mr.

Forester's flawed methodology renders his testimony not only irrelevant and unreliable, but

"substantially outweighed by a danger of . . . confusing the issues[and] misleading the jury."

Fed. R. Evid. 403.  Accordingly, Mr. Forester's re-underwriting testimony should be excluded

from trial.  *See Hunt v. CNH Am. LLC*, 857 F. Supp. 2d 320, 347 (W.D.N.Y. 2012) (excluding

expert testimony under Rule 403 where its probative value was substantially outweighed by the

---

[18]   Mr. Forester's response is that the post-closing documents were acquired "after the origination of the loan and therefore were not available -- and could not be available -- to the underwriter at the time of loan approval."  Whitmer Decl., Ex 28 at 4.

[19]   Even according to his own incorrect standard, Mr. Forester's analysis is lacking. Perhaps as a result of his lack of experience underwriting loans at origination, Mr. Forester fails to account for red flags and the investigation of them that should have followed.

danger of unfair prejudice, confusion of the issues, and misleading the jury); *In re Puda Coal*, 2014 WL 2915880, at *20 (excluding expert testimony where the expert's "opinions r[a]n the very real risk of misleading the jury as to the applicable standard of care").

## **CONCLUSION**

For the foregoing reasons, FHFA's motion to exclude the proffered re-underwriting testimony of Michael Forester should be granted, and Mr. Forester should be precluded from presenting rebuttal re-underwriting testimony at trial.


DATED:   New York, New York          Respectfully submitted,
           December 22, 2014
                                        QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP


                                       By: s/ Manisha M. Sheth
                                       Philippe Z. Selendy
                                       Manisha M. Sheth
                                       Deborah K. Brown
                                       Tyler G. Whitmer


                                       51 Madison Avenue, 22nd Floor
                                     New York, New York 10010
                                     (212) 849-7000


                                     *Attorneys for Plaintiff Federal Housing Finance Agency, as Conservator for Fannie Mae and Freddie Mac*