# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY, AS
CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

          Plaintiff,

    -against-

NOMURA HOLDING AMERICA INC., et al.,

          Defendants.

Case No. 11-cv-6201 (DLC)

ECF Case

# DEFENDANTS' MEMORANDUM
# IN SUPPORT OF THEIR MOTION TO
## EXCLUDE THE EXPERT TESTIMONY OF JOHN A. KILPATRICK

Amanda F. Davidoff (davidoffa@sullcrom.com)
Elizabeth A. Cassady (cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

December 5, 2014

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

    A.    Plaintiff's Complaint and This Court's 2012 Decision ..........................6

    B.    Kilpatrick's Reports and Testimony ......................................................7

    C.    Kilpatrick's "Credibility Assessment Model" .......................................8

    D.    Kilpatrick's Greenfield AVM ...............................................................8

ARGUMENT ...............................................................................................................9

I.    KILPATRICK SHOULD NOT BE PERMITTED TO OPINE ON THE
    "CREDIBILITY" OF APPRAISERS OR APPRAISALS ...............................11

    A.    Kilpatrick's Opinion on the "Credibility" of Appraisers and Their
        Appraisals Invades the Province of the Jury .......................................11

    B.    Kilpatrick's Opinions on the "Credibility" of Appraisers or
        Appraisals and Whether a Reasonable Appraiser Could Have
        Believed the Appraisals Are Irrelevant, Confuse the Issues, Would
        Mislead the Jury and Would Prejudice Defendants ............................15

II.    KILPATRICK'S CREDIBILITY ASSESSMENT MODEL AND HIS
    OPINIONS BASED ON THAT MODEL SHOULD BE EXCLUDED
    FROM TRIAL .................................................................................................17

    A.    Kilpatrick's Credibility Assessment Model Cannot Possibly
        Determine Whether Appraisers Believed Their Appraisals ................17

    B.    The Credibility Assessment Model Lacks All Indicia of Reliability
        under Daubert ....................................................................................18

    C.    The Credibility Assessment Model Is, in Any Event, Flawed and
        Unreliable ..........................................................................................20

        1.    The Credibility Assessment Model Does Not Reflect
            Professional Appraisal Standards ...........................................20

            a.    Questions with Rigid Numeric Thresholds ..................22

            b.    "Comparables" Questions .........................................25

            c.    Questions Asking Whether an Appraisal "Correctly" Reported
                Market Conditions ....................................................27

            d.    Other Questions .......................................................29

        2.    The Weights Assigned to the 31 Questions in the
            Credibility Assessment Model Are Arbitrary ..........................31

**TABLE OF CONTENTS**
(continued)

Page

3.   The Credibility Assessment Model Fails to Account for the Judgment and Discretion USPAP Requires Appraisers to Exercise ................................................................................. 32

4.   The Credibility Assessment Model's Results Are Erratic, Assigning Vastly Different Scores to the Same Appraisals ................... 34

III.   THE GREENFIELD AVM AND KILPATRICK'S OPINIONS BASED ON IT SHOULD BE EXCLUDED FROM TRIAL ......................................... 36

A.   No AVM Can Determine Whether Appraisers Disbelieved Their Appraisals, Let Alone What the Appraisal Should Have Been . ........................ 36

B.   The Greenfield AVM Lacks All Indicia of Reliability Under Daubert ................................................................................................ 38

C.   The Greenfield AVM Is Flawed and Unreliable as a Means of Assessing the Value of Properties Years Ago ................................... 39

1.   The Greenfield AVM Was Fed Arbitrarily "Filtered" Data . ................... 39

2.   In Testing the Greenfield AVM, Kilpatrick Excluded Any Transactions That Made His Model Appear Less Accurate ................... 42

3.   Kilpatrick's Purported Justifications for His Use of Filters to Exclude Sales Data Are Spurious ......................................... 43

a.   Exclusion of "Suspect Data" ......................................... 44

b.   IAAO Standards ............................................................. 46

c.   "Middle-Class Housing" ................................................. 47

d.   Kilpatrick's Circular "Results Justify the Means" Explanation .... 48

4.   The Greenfield AVM Fails to Predict Actual Sales Prices for the Nomura Sample Properties .............................................. 49

5.   The Greenfield AVM Relies Improperly on Tax-Assessed Values from 2010-2014 ............................................................. 50

IV.   KILPATRICK'S TESTIMONY ████████████████
███████████████████████████
████████████ . ......................................................... 52

CONCLUSION ...................................................................................................... 55

Appendix A:  Credibility Assessment Model Questions and Scores .......................... A-1

# **TABLE OF CONTENTS**
(continued)

**Page**

Appendix B: 31 Credibility Assessment Questions, Ranked By The Contribution Of Each
Individual Question To The Overall Number Of Points Assigned To The Nomura Sample
Properties ............................................................................................................................ B-1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*CIT Grp./Bus. Credit, Inc.* v. *Graco Fishing & Rental Tools, Inc.*,
  815 F. Supp. 2d 673 (S.D.N.Y. 2011) ...................................................................13

*Daubert* v. *Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ................................................................................. *passim*

*Exxon Mobil Corp.* v. *Albright*,
  71 A.3d 30 (Md. 2013) ................................................................................41

*FHFA* v. *UBS Americas, Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012) .......................................................... *passim*

*General Elec. Co.* v. *Joiner*,
  522 U.S. 136 (1997) ...........................................................................10, 32

*Highland Capital Mgmt., L.P.* v. *Schneider*,
  551 F. Supp. 2d 173 (S.D.N.Y. 2008) .................................................. 13-14, 15

*Holmes Group* v. *RPS Prods., Inc.*,
  2010 WL 7867756 (D. Mass. June 25, 2010) ...............................................14

*In re Electronic Books Antitrust Litig.*,
  2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) ...............................................10, 11

*In re Fosamax Prods. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009) ...................................................13

*In re Genetically Modified Rice Litig.*,
  666 F. Supp. 2d 1004 (E.D. Mo. 2009) ...................................................15

*In re Puda Coal Sec. Inc., Litig.*,
  2014 WL 2915880 (S.D.N.Y. June 26, 2014) ............................................. 31-32

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...................................................2, 12, 15

*In re Rezulin Prods. Liab. Litig.*,
  369 F. Supp. 2d 398 (S.D.N.Y. 2005) ...................................................38

*In re TMI Litig.*,
  193 F.3d 613 (3d Cir. 1999) ...................................................19, 20

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Kumho Tire Co.* v. *Carmichael*,
    526 U.S. 137 (1999) ...........................................................................10

*Lynch* v. *Trek Bicycle Corp.*,
    374 F. App'x 204 (2d Cir. 2010) ..........................................................32

*Nimely* v. *City of New York*,
    414 F.3d 381 (2d Cir. 2005) .........................................................*passim*

*Palmisano* v. *Olin Corp.*,
    2005 WL 6777561 (N.D. Cal. July 5, 2005) .........................................41

*Sharkey* v. *J.P. Morgan Chase & Co.*,
    978 F. Supp. 2d 250 (S.D.N.Y. 2013) ..................................................15

*United States* v. *Lumpkin*,
    192 F.3d 280 (2d Cir. 1999) ................................................................12

*United States* v. *Williams*,
    506 F.3d 151 (2d Cir. 2007) ................................................................10

*Valente* v. *Textron, Inc.*,
    931 F. Supp. 2d 409 (E.D.N.Y. 2013) ............................................48-49

*Wills* v. *Amerada Hess Corp.*,
    379 F.3d 32 (2d Cir. 2004) ............................................................10, 18

## Statutes

Sections 11 and 12 of the Securities Act of 1933 ...............................................*passim*

## Rules

75 Fed. Reg. 77,450 ......................................................................38, 49-50

75 Fed. Reg. 77,469 ......................................................................38, 49-50

Fed. R. Evid. 403 ..............................................................................*passim*

Fed. R. Evid. 702 ..............................................................................*passim*

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| AC | Amended Complaint filed June 28, 2012 in this Action |
| Action | *FHFA* v. *Nomura Holding America Inc.*, No. 11 Civ. 6201 (DLC) |
| Allen Report | Expert Report of Lewis J. Allen, dated May 23, 2014 in the GS Action |
| Ally Action | *FHFA* v. *Ally Financial Inc.*, et al., No. 11 Civ. 7010 (DLC) |
| AVM | Automated Valuation Model |
| CAM | Credibility Assessment Model |
| Chatterjee January 15, 2014 Dep. | Deposition of Debashish Chatterjee in *FHFA* v. *HSBC North America Holdings, Inc.*, taken January 15, 2014 |
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., and the Individual Defendants |
| Doty June 12, 2014 Dep. | Deposition of Jacqueline Doty in *FHFA* v. *Goldman, Sachs & Co.*, taken June 12, 2014 |
| Epley October 30, 2014 Dep. | Deposition of Donald Epley in this Action, taken October 30, 2014 |
| Epley July 8, 2014 Dep. | Deposition of Donald Epley in the *HSBC*, *GS* and *Ally* Actions, taken July 8, 2014 |
| Epley February 19, 2014 Dep. | Deposition of Donald Epley in the *Merrill Lynch* Action, taken February 19, 2014 |
| Ex. | Exhibit to the December 5, 2014 Declaration of Phillip A. Brest submitted in support of this motion |
| GS Action | *FHFA* v. *Goldman, Sachs & Co.*, No. 11 Civ. 6198 (DLC) |
| GS Kilpatrick CAM Report | Expert Report of John A. Kilpatrick Concerning Adherence of Appraisals to Appraisal Standards and Practice, dated January 6, 2014, in the GS Action |
| GS Kilpatrick Supplemental Report | Supplemental Expert Report of John A. Kilpatrick Concerning Adherence of Appraisals to Appraisal Standards and Practice, dated March 14, 2014, in the GS Action |

## TABLE OF ABBREVIATIONS
### (Continued)

| | |
|---|---|
| Hausman Decl. | Declaration of Jerry M. Hausman, dated December 5, 2014 |
| Hedden Report | Expert Report of Michael P. Hedden, dated August 14, 2014 |
| HSBC Action | *FHFA* v. *HSBC North America Holdings, Inc.*, et al., No. 11 Civ. 6189 (DLC) |
| Isakson Report | Expert Report of Hans R. Isakson, dated August 14, 2014 |
| Isakson June 19 and 20, 2014 Dep. | Deposition of Hans R. Isakson in the *HSBC*, *GS* and *Ally* Actions, taken June 19 and 20, 2014 |
| Kilpatrick AVM Report | Expert Report of John A. Kilpatrick Concerning Accuracy of Appraisals, dated May 15, 2014 |
| Kilpatrick CAM Report | Expert Report of John A. Kilpatrick Concerning Adherence of Appraisals to Appraisal Standards and Practice, dated May 15, 2014 |
| Kilpatrick Supplemental Report | Expert Report of John A. Kilpatrick dated October 6, 2014 |
| Kilpatrick February 12 and 13, 2014 Dep. | Deposition of John A. Kilpatrick in the *Merrill Lynch* Action, taken February 12, 2014 and February 13, 2014 |
| Kilpatrick June 30 and July 1, 2014 Dep. | Deposition of John A. Kilpatrick in the *HSBC*, *GS* and *Ally* Actions, taken June 30 and July 1, 2014 |
| Kilpatrick July 14, 2014 Dep. | Deposition of John A. Kilpatrick in the *HSBC*, *GS* and *Ally* Actions, taken July 14, 2014 |
| Kilpatrick July 15, 2014 Dep. | Deposition of John A. Kilpatrick in the *HSBC*, *GS* and *Ally* Actions, taken July 15, 2014 |
| Kilpatrick November 13 and 14, 2014 Dep. | Deposition of John A. Kilpatrick in this Action, taken November 13 and 14, 2014 |
| LTV | Loan-to-value ratio |
| Merrill Lynch Action | *FHFA* v. *Merrill Lynch & Co., Inc.*, No. 11 Civ. 6202 (DLC) |
| O'Connor Decl. | Declaration of Patrick M. O'Connor, dated November 26, 2014 |
| Offering Documents | The registration statement, prospectuses, free writing prospectuses, and prospectus supplements for the Securitizations |
| Plaintiff | Federal Housing Finance Agency |
| Securitizations | NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 |

## PRELIMINARY STATEMENT

Plaintiff claims that statements in the Offering Documents disclosing loan-to-value ("LTV") ratios for loans underlying the seven Securitizations were false or misleading. This claim is based on allegations that the appraisals which were the basis for the LTV ratios disclosed in the Offering Documents were inaccurate. As this Court explained, however, appraisals are statements of opinion by the appraiser, and thus, in order to prevail on its Securities Act claim, plaintiff must show that the appraisals "were both false and not honestly believed" by the appraisers at the time the appraisals were performed. *FHFA* v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306, 328 (S.D.N.Y. 2012) (quoting *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011)) (internal quotation marks omitted). That is, plaintiff must show that "appraisers did not actually believe that the homes underlying the LTV ratios were worth as much as the appraisers reported they were worth." *Id.* at 326.

Plaintiff took no depositions of any appraisers and has no evidence of subjective bad faith by any of the appraisers whose opinions of value are at issue in this case. Instead, plaintiff apparently plans to rely solely on the opinion of an expert, John A. Kilpatrick, who intends to opine that certain appraisals were not "credible" in that "no reasonable appraiser would agree" with them, from which plaintiff hopes the jury will infer that the appraisers who rendered the challenged appraisals did not believe their own opinions of value.

This testimony is impermissible under Fed. R. Evid. 702. An expert may not opine on another person's credibility or intent. Such testimony would usurp the role of the jury. *Nimely* v. *City of New York*, 414 F.3d 381, 397-98 (2d Cir. 2005) ("It is a well-recognized principle of our trial system that 'determining the weight and credibility of a witness's testimony belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.' . . . Thus, this court, echoed by our sister

circuits, has consistently held that expert opinions that constitute evaluations of witness

credibility, even when such evaluations are rooted in scientific or technical expertise, are

inadmissible under Rule 702.") (citations omitted); *In re Rezulin Prods. Liab. Litig.*, 309 F.

Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie

outside the bounds of expert testimony. . . .  Such testimony usurps the role of the trial judge in

instructing the jury as to the applicable law and the role of the jury in applying that law to the

facts before it.") (internal quotation marks and citations omitted).  As a result, Kilpatrick is not

permitted to offer an opinion as to whether the appraisers were honest or "credible."  That is for

the jury to decide.  Moreover, Kilpatrick's "credibility" opinions offer nothing more than legal

and factual conclusions, which Fed. R. Evid. 702 prohibits.  Kilpatrick's opinions are therefore

inadmissible and should be excluded from trial.

       Kilpatrick's opinions on the "credibility" of appraisals should also be excluded

under Fed. R. Evid. 403 because those opinions are irrelevant, will mislead the jury, confuse the

issues, and prejudice defendants.  Whether an appraisal is "credible" is irrelevant to what

plaintiff must prove at trial—that the appraisers did not believe their appraisals at the time they

were rendered.  Kilpatrick's testimony about the "credibility" of appraisals, if presented at trial,

may mislead the jury into believing—without any factual basis—that the appraisers who

rendered the appraisals did not honestly believe their opinions of value when the appraisals were

rendered.  Such testimony may also confuse the issues at trial—namely, by suggesting to the jury

that the relevant question is whether a reasonable appraiser could have believed a particular

appraisal, rather than whether the appraiser who rendered that appraisal subjectively believed his

opinion of value when the appraisal was rendered.  Such testimony would severely prejudice

defendants by presenting the jury with expert testimony on which it cannot permissibly rely as a predicate for liability under the test articulated by the Court.

Kilpatrick also intends to offer testimony concerning a "Credibility Assessment Model" at trial—a model he invented for use in this litigation that is based on 31 questions he alone developed.  Kilpatrick intends to use his Credibility Assessment Model to opine that no "reasonable appraiser . . . could have believed [that many of] the original appraisals were accurate."  (Ex. 1 (Kilpatrick CAM Report) at 2.)  The Credibility Assessment Model should also be excluded under Fed. R. Evid. 403 and 702, and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

No series of yes-or-no questions can determine whether appraisers believed their appraisals at the time they were rendered.  It would thus mislead the jury, confuse the issues, and prejudice defendants if Kilpatrick were allowed to testify that his Credibility Assessment Model can somehow divine whether appraisals were "credible" when they were rendered years ago.  Even as a measure of whether appraisals were properly performed, the Credibility Assessment Model fails utterly under *Daubert*.  The Credibility Assessment model bears none of the indicia of reliability required by *Daubert*—that is, it has never been adopted outside of this litigation, tested and validated, or peer reviewed.

Moreover, the Credibility Assessment Model is flawed and unreliable.  The model is based on 31 questions that were created entirely by Kilpatrick.  Although Kilpatrick claims the questions were derived from professional standards, he admits that none of the questions can be found in the governing Uniform Standards of Professional Appraisals Practice ("USPAP").  Ignoring that appraisals necessarily reflect an appraiser's judgment and discretion, the questions are answered "yes" or "no" based on numerical ranges or other inflexible rules Kilpatrick

invented out of whole cloth.  A negative answer resulted in the assignment of a specified number of points against the appraisal, with those point values based solely on Kilpatrick's idiosyncratic views about what aspects of appraisals are more or less important.  Kilpatrick then decided that appraisals with more than 20 points—a threshold he pulled out of thin air—should be deemed not "credible," meaning (to Kilpatrick) that no reasonable appraiser could have believed the accuracy of the appraisal at the time it was rendered.

The intentionally complex structure of the Credibility Assessment Model—which generates different answers when it is run more than once on the same appraisal—cannot disguise the fact that the model is nothing more than a codification of Kilpatrick's personal opinions about how appraisals should be performed.  There is no basis to infer that an appraisal was not "credible" simply because some of Kilpatrick's made-up questions were answered in the negative—the appraisal still may have been entirely proper under USPAP, and the opinion of value may be accurate.  Most fundamentally, the mechanical approach taken by the Credibility Assessment Model fails to give any weight to the judgment, experience and local knowledge that professional appraisal standards require appraisers to utilize.  At bottom, the model was created by a paid expert to buttress plaintiff's litigation position in this case, and it represents precisely the sort of "junk science" that *Daubert* and its progeny were designed to exclude.

Kilpatrick also intends to offer an opinion based on the results of an automated valuation model he developed for this litigation, called the "Greenfield AVM."  Kilpatrick claims that the Greenfield AVM can, years after the fact, generate the "true market values" for properties sold in 2005 to 2007, regardless of the price agreed between buyer and seller in an arm's-length transaction.  Kilpatrick claims that the Greenfield AVM can identify appraisals that were so "objectively false" that "no reasonable appraiser would agree" with them.  (Ex. 10

(Kilpatrick June 30 and July 1, 2014 Dep.) at 46:17-47:25, 53:4-54:17, 166:9-168:7.)  Just like the Credibility Assessment Model, the Greenfield AVM bears none of the indicia of reliability required by *Daubert*, as it too has never been tested, validated, peer reviewed or adopted outside of this litigation.

Moreover, like the Credibility Assessment Model, the Greenfield AVM is flawed and unreliable.  In developing the Greenfield AVM, Kilpatrick applied several "filters" to the datasets of property sales he used to train and self-test the model.  These filters resulted in the arbitrary exclusion of 22% of property sales data he used to train the model, and more than 70% of property sales data he used to test the model.  *Without* the filter applied to the dataset Kilpatrick used to train the model, the Greenfield AVM's predicted values for the 678 Sample Properties selected by plaintiff would increase by an average of approximately $39,500 per property, or by approximately 18.0%.  That increase in value is more than double the 8.92% by which Kilpatrick says the actual property values were below the appraised values, and is more than the 15.1% threshold Kilpatrick applied to the results of the Greenfield AVM in deciding whether an appraisal was "inaccurate."  (Ex. 2 (Kilpatrick AVM Report) at 4, 63; Ex. 19 (Hausman Report) at 27-28.)  In short, absent data filtering, the Greenfield AVM would not show that the appraisals were "inflated."  Similarly, without the filters applied to the dataset that Kilpatrick used to test the Greenfield AVM, the forecast standard deviation—a key indicator of a model's accuracy—increases dramatically from 15.1% to more than 200,000%, making the Greenfield AVM's results statistically meaningless.  Kilpatrick has offered a series of spurious justifications for applying his data filters, which violate the cardinal rule that a model should explain existing data—not that existing data should be eliminated to enhance the perceived accuracy of the model.



Kilpatrick's opinions, as well as the models he developed to try to provide a veneer of reliability for his opinions, should be excluded under Fed. R. Evid. 403 and 702, as well as under *Daubert* and its progeny.

## BACKGROUND

### A.    Plaintiff's Complaint and This Court's 2012 Decision

Plaintiff's complaint alleges that the Offering Documents misrepresented LTV ratios for loans backing the Securitizations in violation of Sections 11 and 12 of the Securities Act of 1933 and the D.C. Blue Sky law.  (AC ¶¶ 106-111.)  This allegation is based on the notion that contemporaneous appraised values used to calculate certain of these LTV ratios were fraudulently inflated.  (AC ¶ 111.)

In 2012, defendants in the *UBS* action moved to dismiss LTV ratio allegations nearly identical to those asserted against Nomura.  In May 2012, the Court denied the motion to dismiss, but made clear that for plaintiff to prevail at trial, it must prove that the opinions of value contained in the relevant appraisals "were both false and not honestly believed when

made." *UBS Americas, Inc.*, 858 F. Supp. 2d at 328 (quoting *Fait*, 655 F.3d at 113 (internal quotation marks omitted). The Court ruled that the complaint in the *UBS* action was sufficient because plaintiff had alleged that appraisers "furnished appraisals that the appraisers understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying property." *Id.* at 328 (internal quotation marks omitted); *see* AC ¶ 111 (making the same allegation in the *Nomura* action).

The Court agreed with plaintiff that the "'speaker' whose disbelief in the statements" mattered were the appraisers who performed the appraisals and not the defendants. *Id.* at 325. The Court explained that appraisals "constitute factual statements: that the appraised value represents the appraiser's true belief as to the value of the property," and plaintiff therefore must prove at trial that "appraisers did not actually believe that the homes underlying the LTV ratios were worth as much as the appraisers reported they were worth." *Id.* at 326. The Court further stated at the December 14, 2012 hearing that this standard "put a greater burden on plaintiff" to prove their Securities Act claims "with respect to misrepresentations regarding appraisals." (Ex. 24 (Dec. 14, 2012 Hearing Tr.) at 43.)

B.    **Kilpatrick's Reports and Testimony**

The Court's rulings in this respect (warning plaintiff that it is required to prove that appraisers "did not believe" the opinions of value they rendered) were made in 2012. Despite this fact, plaintiff has no evidence—and did not seek any evidence—from any appraiser about his or her true belief as to the value of the property he or she appraised. Instead, plaintiff intends to offer testimony from Kilpatrick to try to prove the subjective falsity of appraisals used to compute LTV ratios disclosed in the Offering Documents. Kilpatrick has filed reports in this action and four related cases, and he has been deposed three times in relation to these reports. Kilpatrick submitted reports concerning his Credibility Assessment Model and Greenfield AVM

in this action on May 15, 2014, and was deposed about those reports on November 13 and 14. (Ex. 1 (Kilpatrick CAM Report); Ex. 2 (Kilpatrick AVM Report); Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.).)

C. **Kilpatrick's "Credibility Assessment Model"**

Kilpatrick's opinion on the "credibility" of appraisers and their appraisals relies on a so-called Credibility Assessment Model, which Kilpatrick developed specifically for this and related litigation. The Credibility Assessment Model is just a fancy-sounding name for a series of 31 "yes-or-no" questions that Kilpatrick made up. Those 31 questions, which are summarized in Appendix A to this Motion, purport to "evaluate[] and score[] the frequency and magnitude of the appraisal reports' deviation from settled appraisal standards and practice." (Ex. 1 (Kilpatrick CAM Report) at 3.) Kilpatrick created a scoring model for the questions that assigns a specified number of points to every negative answer, and the relative weight that is accorded to negative answers is the product of nothing other than Kilpatrick's subjective opinion. Kilpatrick adds up these "points" to derive a single numeric score that supposedly allows him to determine "whether, in [his] opinion, a reasonable appraiser adhering to the appraisal standards and practices applicable at the time could have believed the original appraisals were accurate." (*Id.* at 2.) Based on this made-for-litigation model, Kilpatrick claims that 189 of the 205 appraisals he ran through the Credibility Assessment Model are not "credible," and that the appraisers who performed these 189 appraisals "could [not] have believed the appraisals were credible." (*Id.* at 101.)

D. **Kilpatrick's Greenfield AVM**

Kilpatrick also created a model, called the "Greenfield Automated Valuation Model" or "Greenfield AVM," purportedly "[t]o address the accuracy of the original appraisals." (Ex. 2 (Kilpatrick AVM Report) at 2.) The Greenfield AVM relies primarily on tax-assessed

valuations from 2010 and later years to estimate the values of properties in 2005 to 2007.  (Ex. 18 (Isakson Report) at 42.)  Like all similar models, the Greenfield AVM has no ability to assess the many determinants of property value that can only be assessed by an appraiser making a physical inspection of the exterior and interior of a house.  Kilpatrick applied the Greenfield AVM to a sample of 678 loans underlying the seven Nomura Securitizations that were selected by plaintiff (the "Sample Properties").  Based on the results of the Greenfield AVM, Kilpatrick concluded that appraisals for 208 of the Sample Properties were "inaccurate" when they were prepared years ago because they deviated more than 15.1% from the value the Greenfield AVM retrospectively estimated for the property.  (Ex. 2 (Kilpatrick AVM Report) at 4; *see also* Ex. 19 (Hausman Report) at 4 & n.5.)  Kilpatrick also concluded that the appraised values of Sample Properties "were on average 8.92% higher than the true market value of the properties" at the time of the appraisals.  (Ex. 2 (Kilpatrick AVM Report) at 63.)

Kilpatrick then recalculated the LTV ratios for the 208 Sample Properties whose appraisals he deemed to be inaccurate, using the lesser of (i) the Greenfield AVM estimate of value, (ii) the original appraised value, or (iii) the original sale price of the property.  (*Id.* at 67-68.)  From the recalculated LTVs, Kilpatrick concluded that the Sample Properties had "substantially higher" mixed LTV ratios than represented.[1]  (*Id.* at 69.)

## ARGUMENT

Expert testimony is admissible only if it will "help the trier of fact to understand the evidence or to determine a fact in issue."  FED. R. EVID. 702(a).  To determine whether the

---

[1]     Kilpatrick calculated "mixed LTV" or MLTV as follows:  "In the case of a first-position securitized loan, the MLTV ratio is the LTV ratio, and in the case of the second-position securitized loan, the MLTV ratio is the CLTV ratio"—the combined LTV that takes into account both senior and subordinate liens.  Ex. 2 (Kilpatrick AVM Report) at 67 n.167.

party proffering expert testimony has met its burden to establish admissibility, a court should consider whether:  (i)  the testimony is based on sufficient facts or data; (ii) the testimony is the product of reliable principles and methods; and (iii) the expert has reliably applied the principles and methods to the facts of the case.  FED. R. EVID. 702; *see also United States* v. *Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  Kilpatrick's proposed testimony fails each of these three tests for admissibility of expert testimony.

        With regard to expert testimony, a court is supposed to act as a "gatekeeper," ensuring that the proponent of expert testimony has made the showing required by Fed. R. Evid. 702(a) that the "expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597 (1993).  As this Court has held, "when an expert opinion is based on data, a methodology or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *In re Electronic Books Antitrust Litig.*, 2014 WL 1282298, at *3 (S.D.N.Y. Mar. 28, 2014) (quoting *Ruggiero* v. *Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005)).  In addition to the expert's methodology, a court in its "gatekeeper" role needs to consider the application of the expert's methodology to the facts, and the validity of the expert's purported results.  *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 149 (1999); *General Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997).

        In assessing whether a putative expert opinion is reliable, *Daubert* and its progeny require courts to consider, among other things, "whether a theory or technique . . . can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," the "general acceptance" of the technique or theory in the relevant scientific or technical community, and "the known or potential rate of error."  *Daubert*, 509 U.S. at 593-94; *see also Wills* v. *Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004).  It is "critical that an

expert's analysis be reliable at every step, for *any* step that renders the analysis unreliable renders the expert's testimony inadmissible." *In re Electronic Books Antitrust Litig.*, 2014 WL 1282298, at *4 (citing *Daubert*, 509 U.S. at 596) (internal quotation marks omitted and emphasis in original). Kilpatrick's methodology, which he created for purposes of this litigation and which has never been reviewed by anyone who is not a paid expert in this case, falls far short when judged against the standard the Supreme Court has set for expert testimony.

## I.      KILPATRICK SHOULD NOT BE PERMITTED TO OPINE ON THE "CREDIBILITY" OF APPRAISERS OR APPRAISALS.

### A.      Kilpatrick's Opinion on the "Credibility" of Appraisers and Their Appraisals Invades the Province of the Jury.

As this Court has held, plaintiff must prove that "appraisers did not actually believe that the homes underlying the LTV ratios were worth as much as the appraisers reported they were worth." *UBS*, 858 F. Supp. 2d at 326. Plaintiff has not gathered any evidence—direct or circumstantial—that appraisers did not actually believe their appraisals when they made them or that appraisers were subject to any improper influence from lenders or others. Moreover, while there could be evidence that an appraiser did not believe his or her opinion of value other than an appraiser's own statement, such as evidence of a kick-back scheme by a real estate agent, plaintiff has made no attempt to obtain or present any such evidence. Instead, plaintiff intends to offer at trial Kilpatrick's "expert" testimony that certain appraisals were not "credible" and thus that no "reasonable appraiser . . . could have believed [that] the original appraisals were accurate" (Ex. 1 (Kilpatrick CAM Report) at 2).[2] From this testimony, plaintiff apparently

---

[2]      At his most recent deposition, Kilpatrick attempted to dance around the idea that he is opining about the honesty of other appraisers, claiming that his opinion is only that certain appraisals "can't be believed" because of an "egregious error" or a "series of errors." Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 205:22-208:11. Kilpatrick maintained that he

*(footnote continued)*

intends to ask the jury to infer that appraisers who rendered appraisals that Kilpatrick says are not "credible" did not subjectively believe their opinions of value at the time those opinions were rendered.

This is impermissible under Fed. R. Evid. 702 and *Daubert*.  Plaintiff may not offer an expert to testify about credibility or the state of mind of others, nor can plaintiff's expert testify as to factual or legal conclusions.  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 541.  An expert cannot "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  *United States* v. *Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999) (quoting *United States* v. *Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)) (internal quotation marks omitted).

As Judge Kaplan explained in *Rezulin*, "[i]nferences about the intent or motive of parties or others lies outside the bounds of expert testimony."  *In re Rezulin Prods. Liab. Litig.,* 309 F. Supp 2d. at 547.  There, the court excluded expert testimony about defendant's intent, such as testimony that defendant removed a pharmaceutical product from the market due to safety concerns.  *Id.* at 546-47.  The Court explained that the expert's testimony was inadmissible because "the question of intent is a classic jury question and not one for the experts."  *Id.* (quoting *In re Diet Drugs*, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2001))

---

(*footnote continued*)
was "not saying Bill Smith appraiser is—is being called to task," but instead that "the appraisal report for a given report, 123 Elm Street, has [] credibility issue[s]."  *Id.*  The fact remains that Kilpatrick's contention that no reasonable appraiser could have believed the opinions of value contained in the appraisals he challenges as not "credible" is tantamount to saying the appraisers who performed those appraisals were engaged in misrepresentation.  If that is not what Kilpatrick is saying, then it is difficult to understand what purpose his Credibility Assessment Model is supposed to serve.  Indeed, under those circumstances, Kilpatrick's opinions are not relevant.

(excluding testimony of expert regarding "what the corporate intent of [defendant] and/or what beliefs of FDA officials were on matters upon which they spoke or acted").

In *Nimely*, the Second Circuit likewise held that testimony in a police excessive force case about the credibility of police officers should have been excluded at trial. 414 F.3d at 397-98. There, an expert opined at trial (i) that he "rejected" the possibility that police officers lied, and (ii) that the police officers "have no incentive to give false statements in excessive force cases." *Id.* at 398. The expert further testified that the police officers were "telling the truth as they perceived it." *Id.* (internal quotation marks omitted). The Court held that the expert's testimony did not "present[] a close case" because the testimony "undertakes to tell the jury what result to reach, and attempts to substitute the expert's judgment for the jury's." *Id.* (internal quotation marks omitted) (quoting *Duncan*, 42 F.3d at 101). The Second Circuit explained that "weight and credibility" determinations "belong[] to the jury," and noted that other circuits have "consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise are inadmissible under Rule 702." *Id.* at 397-98.

Many other courts have reached similar conclusions, holding that credibility and state of mind are issues entirely outside of the bounds of expert testimony and solely within the province of the jury. *See*, *e.g.*, *CIT Grp./Bus. Credit, Inc.* v. *Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 678 (S.D.N.Y. 2011) ("[E]xpert testimony is not admissible to establish a fact fundamentally grounded on a party's state of mind."); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) ("the knowledge, motivations, intent, state of mind, or purposes" of a corporation or its employees is "not a proper subject for expert or even lay testimony"); *Highland Capital Mgmt., L.P.* v. *Schneider*, 551 F. Supp. 2d 173, 182-83 (S.D.N.Y.

2008) ("[An expert's] belief about a party's state of mind is an improper subject for expert testimony . . . ."); *see also Holmes Grp., Inc. v. RPS Prods., Inc*., 2010 WL 7867756, at *5 (D. Mass. June 25, 2010) ("An expert witness may not testify as to another person's intent.  No level of experience or expertise will make an expert witness a mind-reader.").

Here, Kilpatrick's opinion should be excluded for two reasons under Fed. R. Evid. 702 and *Daubert*.  *First*, testimony about the "credibility" of appraisals or whether a "reasonable appraiser" could have believed the appraisals is nothing more than an attempt to opine on whether the appraisers were honest in rendering appraisals they made years ago, in 2005 to 2007. Indeed, Kilpatrick intends to testify, for example, that "the subject appraisals do not represent appraised values that a reasonable appraiser could believe were accurate or credible."  (Ex. 2 (Kilpatrick AVM Report) at 67; *see also* Ex. 1 (Kilpatrick CAM Report) at 3-4, 41, 45.) Kilpatrick has testified in a related action that his point is that "one could infer, and I certainly infer, that they [the appraisers] could not have believed their opinions at the time they were issuing them."  (Ex. 9 (Kilpatrick February 12 and 13, 2014 Dep.) at 500:19-501:5.)[3]  At his deposition in this case, Kilpatrick also testified that, although he is not "a psychologist or a soothsayer," he is opining that "a reasonable appraiser . . . couldn't believe this stuff."[4]  (Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 208:12-210:2.)  This is precisely the sort of

---

[3]    *See also* Ex. 9 (Kilpatrick February 12 and 13, 2014 Dep.) at 469:3-470:4 ("So I guess I am indirectly inferring that these appraisers—or indirectly implying that these appraisers didn't believe what they were issuing at the time they issued them."); 470:5-471:23 ("Therefore, one could indirectly infer from what I'm saying . . . [that the appraisers here] did not believe what they were saying at the time they said it.").

[4]    Kilpatrick also testified that it was a "fine line" between the credibility assessment he offers and "saying that [the original appraisers] didn't subjectively believe the opinions of value that they offered . . . ."  Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 208:12-210:2. This line is so "fine" as to be essentially invisible.

testimony about the state-of-mind of other persons that courts have held to be improper coming

from an expert.  It is solely for the jury to decide issues involving "intent or motive of parties or

others."  *In re Rezulin Prods. Liab. Litig*., 309 F. Supp. 2d at 547.

 *Second*, Kilpatrick's opinions that appraisals are not "credible" and that no

"reasonable appraiser . . . could have believed [that] the original appraisals were accurate" (Ex. 1

(Kilpatrick CAM Report) at 2) are simply opinions that "impermissibly embrace[] a legal

conclusion."  *In re Rezulin Prods. Liab. Litig*., 309 F. Supp. at 547.  An expert "may not tell the

jury what result to reach or communicate 'a legal standard—explicit or implicit—to the jury.'"[5]

*Id.* at 541 (quoting *Hygh* v. *Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992)).  Kilpatrick's "credibility"

testimony should accordingly be excluded from trial.

 **B.     Kilpatrick's Opinions on the "Credibility" of Appraisers or Appraisals and
   Whether a Reasonable Appraiser Could Have Believed the Appraisals Are
   Irrelevant, Confuse the Issues, Would Mislead the Jury and Would Prejudice
   Defendants.**

 Kilpatrick's opinions that the appraisals are not "credible" and that "no

"reasonable appraiser . . . could have believed [that] the original appraisals were accurate" (Ex. 1

---

[5]      It is immaterial that Kilpatrick couches his opinion in terms of what a "reasonable
appraiser" could or would believe.  Courts have rejected similar attempts to get around the
prohibition on expert state-of-mind testimony through the use of semantic games.  *See, e.g.*,
*Highland Capital Mgmt.*, 551 F. Supp. 2d at 182-83 ("[Expert's] belief about a party's state of
mind is an improper subject for expert testimony and cannot be saved by couching his opinion as
'industry custom and practice.'").  Indeed, experts are not permitted to testify as to what a
reasonable person could believe, even when they are testifying as to whether particular conduct
was reasonable.  *See, e.g.*, *Sharkey* v. *J.P. Morgan Chase & Co.*, 978 F. Supp. 2d 250, 253-54
(S.D.N.Y. 2013) (excluding expert testimony regarding whether employee had "reasonable
belief" that client was engaged in money laundering); *In re Genetically Modified Rice Litig.*, 666
F. Supp. 2d 1004, 1025 (E.D. Mo. 2009) ("If an expert is testifying to something within his area
of expertise, he may opine as to the reasonableness of a party's behavior. . . . However, it is not
appropriate for expert witnesses to draw legal conclusions or opine on a party's state of mind."
(citation omitted)).  Kilpatrick seeks to tell the jury that appraisers who performed appraisals he
claims are not "credible" did not honestly believe the opinions of value contained in those
appraisals—something he should be forbidden to do.

(Kilpatrick CAM Report) at 2) are entirely irrelevant.  As this Court has explained, appraisals are statements of opinion, which means that plaintiff must prove that the appraised values "were both false and not honestly believed when made."  *UBS Americas, Inc.*, 858 F. Supp. 2d at 328 (quoting *Fait*, 655 F.3d at 113) (internal quotation marks omitted).  The Court explained that plaintiff must show that "appraisers did not actually believe that the homes underlying the LTV ratios were worth as much as the appraisers reported they were worth."  *Id.* at 326.

It is irrelevant under this standard whether a "reasonable appraiser" "could have believed" the appraisals.  It is also irrelevant whether appraisals were "credible."  If the appraisers genuinely believed that their appraisals reflected the value of the properties at the time they provided their opinions of value, then plaintiff is precluded from recovering for allegedly incorrect statements about LTV ratios.  Indeed, it is plaintiff's burden to prove that appraisers disbelieved their appraisals (Ex. 24 (Dec. 14, 2012 Hearing Tr.) at 43), so what a "reasonable appraiser" could have believed or whether Kilpatrick thinks an appraisal is "credible" in no way meets that burden.  This Court informed plaintiff of the relevant standard and burden in May 2012—more than two and a half years ago—yet plaintiff took no discovery on the point, apparently preferring to avoid the risk of bad evidence through the device of an "expert" who would tell the jury that many appraisers are not "credible."

Kilpatrick's irrelevant opinions should be excluded from trial.  "In addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'"  *Nimely*, 414 F.3d at 397 (quoting Fed. R. Evid. 403).  As *Daubert* instructs, "the judge in weighing possible prejudice against probative force" must "exercise[] more control over experts than over lay witnesses" because "[e]xpert evidence can be

-16-

both powerful and quite misleading because of the difficulty in evaluating it."  *Daubert*, 509 U.S.

at 595 (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence Is Sound; It

Should Not Be Amended, 138 F.R.D. 631, 632 (1991)) (internal quotation marks omitted).

Here, Kilpatrick's opinion as to whether a "reasonable appraiser . . . could have

believed [that] the original appraisals were accurate" may mislead the jury into finding—without

a factual basis—that appraisers rendered dishonest appraisals years ago.  For Kilpatrick to

present to the jury the purported findings of a "Credibility Assessment Model" would mislead

the jury into believing that Kilpatrick has some scientific lie detector that can tell whether

appraisers were honest years ago when they rendered valuation opinions.  The testimony may

also confuse the issues before the jury, leading jurors to believe that an "expert's" view of

whether a reasonable appraiser could have believed the appraisals is tantamount to evidence that

the appraisers did not believe their appraisals at the time.  FED. R. EVID. 403.  Similarly, use of

the term "credible" in relation to appraisals may likewise mislead the jury into believing that the

appraisers who rendered those appraisals were not being truthful.  *Nimely*, 414 F.3d at 397.  In

sum, Kilpatrick's "credibility" testimony should be excluded under Fed. R. Evid. 403 and 702

because it has no probative value and the likelihood of misleading the jury, confusing the issues

and prejudicing defendants is impermissibly high.

## II.  KILPATRICK'S CREDIBILITY ASSESSMENT MODEL AND HIS OPINIONS BASED ON THAT MODEL SHOULD BE EXCLUDED FROM TRIAL.

### A.  Kilpatrick's Credibility Assessment Model Cannot Possibly Determine Whether Appraisers Believed Their Appraisals.

Kilpatrick intends to offer (as part of his opinion that appraisals were not

"credible") a model he developed, which he calls a "Credibility Assessment Model."  The

Credibility Assessment Model consists of 31 questions (attached as Appendix A) that Kilpatrick

prepared solely for purposes of plaintiff's litigation (Ex. 11 (Kilpatrick July 14, 2014 Dep.) at 80:8-16), and which he claims reflect "the hallmarks of a credible appraisal" (Ex. 1 (Kilpatrick CAM Report) at 13). Kilpatrick assigned arbitrary weights to each of his 31 questions based on his own views concerning the relative importance of each. Like the questions, the weights were invented by Kilpatrick solely for the purposes of this litigation.

There is, of course, no numerical model that can ascertain what was in the mind of appraisers in 2005 to 2007. The Credibility Assessment Model cannot prove anything at all about what appraisers believed in 2005 to 2007 about particular appraisals they rendered. Indeed, as described below, the Credibility Assessment Model cannot even prove that appraisers failed to follow the applicable professional standards when they conducted their appraisals. *See* pp. 21-31, *infra*. Accordingly, Kilpatrick's "Credibility Assessment Model" is not relevant to what plaintiff must prove at trial to prevail on its LTV claims—that appraisers disbelieved their appraisals at the time they rendered them and any testimony on that subject would be irrelevant, misleading and prejudicial.

### B.   The Credibility Assessment Model Lacks All Indicia of Reliability under *Daubert*.

The Credibility Assessment Model should also be excluded because it lacks all indicia of reliability required by *Daubert* and Fed. R. Evid. 702. Under *Daubert*, a court must consider several factors in determining whether expert methodology and testimony is reliable: "whether a theory or technique . . . can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," the "'general acceptance'" of the particular technique or theory in the relevant scientific or technical community, and "the known or potential rate of error." *Daubert*, 509 U.S. at 593-94; *see also Wills* v. *Amerada Hess Corp.*, 379 F.3d at 48. The Credibility Assessment Model fails on all counts.

-18-

The Credibility Assessment Model, of course, cannot possibly have been tested or validated as a means of determining whether appraisers genuinely believed their appraisals when they rendered them years ago—no model can do that.  But, even as a means of determining whether the appraisals were properly performed, the Credibility Assessment Model fails under *Daubert*.  Not one component of the Credibility Assessment Model—including the "aspects," "categories," weights, point system, credibility threshold, the 31 questions, or underlying computer code—has been tested by *any* disinterested person—much less has it been peer reviewed or published.  (Ex. 9 (Kilpatrick February 12 and 13, 2014 Dep.) at 559:24-560:6, 561:7-13, 567:14-17, 571:14-18; Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 214:15-21; Ex. 14 (Epley February 19, 2014 Dep.) at 152:3-154:3; *see also* Ex. 9 (Kilpatrick February 12 and 13, 2014 Dep.) at 567:14-567:17 ("Q.  Okay, Dr. Kilpatrick, you have never published the CAM anywhere except in litigation; correct?  A.  That's correct.").)

Moreover, the Credibility Assessment Model has not been used by anyone in the appraisal industry.  It is not commercially available (Ex. 9 (Kilpatrick February 12 and 13, 2014 Dep.) at 568:10-20), and neither Kilpatrick nor plaintiff have identified any use of the Credibility Assessment Model by anyone other than Kilpatrick or for any purpose other than this case and related litigations (Ex. 14 (Epley February 19, 2014 Dep.) at 152:3-154:3).  The Credibility Assessment Model therefore lacks every one of the "indicia of reliability" set forth under *Daubert* and its progeny.

In *In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999), the Third Circuit affirmed the exclusion of a similarly deficient model.  There, a physician named Moholt developed a model to determine whether the plaintiffs' cancers were caused by radiation that relied on six arbitrarily selected factors.  The Court held:

-19-

> Because Molholt's parameter scoring methodology is entirely
> subjective it is obvious that it does not satisfy a number of the
> *Daubert* factors.  It was never peer reviewed, there is no known or
> potential rate of error, there are no discernable standards governing
> its operation, and it is not generally accepted.  Further, and
> significantly, it is impossible to test a hypothesis generated by a
> subjective methodology because the only person capable of testing
> or falsifying the hypothesis is the creator of the methodology.

193 F.3d 613, 703 n.144 (citation omitted).  Kilpatrick's Credibility Assessment Model fares no

better.  It is based on 31 questions devised by Kilpatrick himself, the answers to which were

scored and weighted subjectively according to Kilpatrick's own unique and particular

preferences.  It was made for this litigation and has never been used by anyone else.  This is

plainly insufficient under *Daubert*.

**C.     The Credibility Assessment Model Is, in Any Event, Flawed and Unreliable.**

Even as a means of ascertaining whether appraisals were performed properly and

in accordance with professional appraisal standards, the Credibility Assessment Model is fatally

flawed, unreliable and should be excluded under *Daubert*.

**1.     The Credibility Assessment Model Does Not Reflect Professional
Appraisal Standards.**

Kilpatrick asserts that the 31 questions he created for his Credibility Assessment

Model are "derived" or "derived directly" from USPAP.  (Ex. 1 (Kilpatrick CAM Report) at 40,

55, 61, 64, 69, 71, 73, 82, 84, 97.)  That assertion is incorrect.  USPAP does not require

appraisals to meet *any* of the requirements specified in Kilpatrick's 31 questions.  (Ex. 5

(Hedden Report) at 32-109.)

When pressed to identify in the USPAP standards the source of the requirements

assessed by the 31 questions in his Credibility Assessment Model, Kilpatrick conceded that the

questions are not contained verbatim in USPAP, any other professional standard, or any

published literature accepted in the appraisal industry.  (Ex. 11 (Kilpatrick July 14, 2014 Dep.) at

-20-

281:14-282:2, 293:25-294:11, 333:19-334:25; Ex. 8 (Kilpatrick November 13 and 14, 2014

Dep.) at 211:12-212:13, 223:12-17.)  They are entirely Kilpatrick's invention.

         Plaintiff's expert Epley agreed that the 31 questions in the Credibility Assessment

Model are not contained in USPAP and are instead "the modeler's [Kilpatrick's] words" which

have not appeared anywhere but in Kilpatrick's reports in these actions.  (Ex. 14 (Epley February

19, 2014 Dep.) at 104:3-12, 117:25-118:9.)  In Epley's words, the Credibility Assessment Model

is "really unique.  It's one company's interpretation of how to apply this to appraisals being done

in the United States."  (*Id.* at 328:19-335:7; *see also id.* at 208:5-14 ("[T]he CAM is a very

unique application of professional standards.").)  Of course, "unique" is the antithesis of the sort

of widely accepted methodology which is supposed to underlie expert testimony.

         Many of the 31 questions in the Credibility Assessment Model demand that

appraisers follow specific processes and procedures that Kilpatrick personally happens to think

are appropriate.  As Epley admitted, however, "USPAP does not dictate specific procedures . . . .

USPAP gives standards.  It gives ideas and recommendations from the Standard Board to the

appraisal industry, but it doesn't dictate methodology."  (Ex. 15 (Epley July 8, 2014 Dep.) at

299:16-300:11.)  While Kilpatrick claims that certain appraisals of the Sample Properties

represent a departure from USPAP, it is his Credibility Assessment Model that deviates from the

basic approach established by USPAP.

         Because the 31 questions in the Credibility Assessment Model do not reflect

USPAP requirements, a "no" answer to one of those questions does not make an appraisal less

credible.  When asked about the specific questions in the Credibility Assessment Model, Epley

agreed that a "no" answer should not necessarily weigh against an appraisal's credibility.  (*See*

Ex. 14 (Epley February 19, 2014 Dep.) 243:2-12.)  According to Epley, "no" answers at most

resemble "red flags" that warrant further examination of the individual characteristics of the appraisal at issue.  (*Id.* at 165:8-166:8, 208:23-210:9, 230:14-24, 231:18-233:20; *see also* Ex. 15 (Epley July 8, 2014 Dep.) at 127:20-128:11 ("[A]s I'm defining red flag, it means a potential error, potential error in judgment, potential error in measurement.  [The] [a]ppraiser better explain that or have a really good explanation for it somewhere in the appraisal.  I would look for that.  That's important.  Q. That would be a second step after the flag went up?  A. Correct.").)  But there is no room for such "further examination" under the Credibility Assessment Model, which answers questions "yes" or "no" based on criteria created solely by Kilpatrick.

This is not simply an issue for a handful of questions—it is a fundamental flaw that is pervasive across all 31 questions.  There are several categories of questions that are illustrative:

### a.    Questions with Rigid Numeric Thresholds

Kilpatrick's questions 4, 13, 14 and 21 contain strict numeric thresholds, and exceeding those thresholds results in an automatic assessment of points under the Credibility Assessment Model.  For example, Question 4 automatically assigns points against any appraisal in which the appraised value is more than 10% higher than the most recent listing price of the property.  Together, the four questions that contain these numeric thresholds account for 26% of the total points that Kilpatrick assigns to appraisals for the Nomura Sample Properties.  (*See* Appendix B.)[6]

---

[6]     Appendix B ranks the 31 questions in the Credibility Assessment Model by the proportion of points each question contributes to the total number of points the Credibility Assessment Model assigned to appraisals of the Nomura Sample Properties.  This section addresses the top ten questions in the Credibility Assessment Model plus two others, which together account for 76.4% of the total number of points that the Credibility Assessment Model assigned to the at-issue appraisals.  Although defendants believe they suffer from similar flaws,

(*footnote continued*)

The determination that appraisals are inaccurate based on such strict numerical thresholds cannot be found anywhere in professional appraisal standards.  Indeed, Kilpatrick admits that "USPAP is silent to precise numbers."  (Ex. 11 (Kilpatrick July 14, 2014 Dep.) at 281:14-282:2.)  And Epley agrees that "USPAP is not designed, it was never written to contain numbers. . . .  [I]n terms of 10 percent, 20 percent, 30 percent, you won't find them explicitly written in USPAP because it wasn't the intent of that document to have them there."  (Ex. 15 (Epley July 8, 2014 Dep.) at 259:19-260:8, 296:4-297:6 ("I'm not aware of any sources that uses [the 20 to 30 percent land-to-value ratio] set of numbers."), 398:17-399:21 (USPAP "doesn't have any numbers in it by design"); Ex. 14 (Epley February 19, 2014 Dep.) at 343:17-343:22.)

As to Questions 13, 14 and 21, Epley agreed that nothing in USPAP requires appraisals to meet the numeric thresholds Kilpatrick invented in his Credibility Assessment Model.  (Ex. 13 (Epley October 30, 2014 Dep.) at 239:13-25 (acknowledging that "USPAP does not contain [the] 10 percent" requirement of Question 13); *id.* at 151:24-153:14, 183:14-17 (testifying that there is nothing in USPAP that requires the "land value ratio be greater than 20 percent and less than 30 percent," as Question 14 mandates); *id.* at 240:2-13 (admitting that USPAP "does not contain" the 10 percent "number" of Question 21).)  Similarly, nothing in USPAP requires that the appraised value of the subject property be less than or equal to 10% higher than the most recent listing price, as Question 4 does.  Indeed, the USPAP standards that

_____

(*footnote continued*)
defendants do not here discuss the remaining questions in the Credibility Assessment Model, none of which accounts for more than 4% of the total number of points that the Credibility Assessment Model assigned to the at-issue appraisals.  *See id.*; *see also* Ex. 5 (Hedden Report) at 32-109.

Kilpatrick cites to support Question 4 do not even "require[] analysis of prior listings, much less specify a 10% requirement."  (Ex. 5 (Hedden Report) at 37.)

It is unsurprising that these strict numerical thresholds do not appear in professional appraisal standards—because they make no sense.  Question 14, which is responsible for the highest percentage of points the Credibility Assessment Model assigns to appraisals of the Nomura Sample Properties (*see* Appendix B), automatically assigns points against every appraisal with a land value ratio that is not within a 20-30% range.  But in a survey of 46 metropolitan areas, 39 of the 46 cities had land-to-value ratios that fell outside Kilpatrick's 20-30% range.[7]  Epley admitted that nothing in USPAP requires appraisals' land value ratios to fall between 20% and 30%.  (Ex. 13 (Epley October 30, 2014 Dep.) at 151:24-153:14, 183:14-17.)

Similarly, Question 13, which is the fourth-largest contributor of points the Credibility Assessment Model assigned to appraisals of the Nomura Sample Properties (Appendix B), assigns points to an appraisal every time the appraised value is above the prior sales price of the property by 10% or more on an annualized basis, notwithstanding that, from 2005 to 2007, certain parts of the country experienced annualized increases greater than 10%.  (Ex. 5 (Hedden Report) at 72 ("Kilpatrick ignores the fact that, at the time the appraisals in this matter were completed, there were markets experiencing double-digit appreciation, according to the Case-Shiller Home Price Index."); Ex. 25 (Case-Shiller Calculations Spreadsheet)

---

[7]     Morris A. Davis & Michael G. Palumbo, *The Price of Residential Land in Large US Cities*, 63 J. Urban Econ. 352 (Jan. 2008), data located at *Land and Property Values in the U.S.*, Lincoln Inst. of Land Pol'y, *available at* http://www.lincolninst.edu/resources/ (last visited Feb. 27, 2014); *see also* Ex. 15 (Epley July 8, 2014 Dep.) at 438:20-439:3 (admitting it was "entirely possible" that land values could be outside the 20-30% range in certain areas).

(calculating home price appreciation of 10% or more, between December 2004 and December 2005, for several cities, including Las Vegas, Los Angeles, Miami and Phoenix).)  Epley agreed that a "no" answer to Question 13 "won't necessarily mean that the appraisal is any less credible."  (Ex. 14 (Epley February 19, 2014 Dep.) at 243:2-12.)

    Question 21 is the fifth largest contributor of points the Credibility Assessment Model assigned to appraisals of the Nomura Sample Properties.  (*See* Appendix B.)  It automatically assigns points against every appraisal where the price of a comparable property is more than 10% higher than the prior sale price of that comparable property on an annualized basis.  The Credibility Assessment Model thus assigns points against one appraisal where the price of a comparable rose from $█████ to $█████ and the price of a second comparable rose from $█████ to $█████, even though the appraiser explained that the prior sale of the first comparable was reportedly not an arm's-length transaction, and that the 22% increase for the second comparable was the result of improvements made to the property.  (Ex. 5 (Hedden Report) at 73-74; *see also* Ex. 26 (NOM-FHFA_01320870) at NOM-FHFA_01320873.)

    The Credibility Assessment Model assigns points to completely valid appraisals solely because they violate Kilpatrick's arbitrary numerical thresholds.

    **b.** **"Comparables" Questions**

    Questions 29, 30 and 31 account for 20% of the total points that the Credibility Assessment Model assigned against appraisals of the Nomura Sample Properties, with Question 29 being the second-largest and Question 30 being the eighth-largest contributor to total points assigned.  (*See* Appendix B.)  For Questions 29, 30 and 31, Kilpatrick assigns points to all appraisals for which the appraiser's comparables reflect averages of price per square foot, square footage, and gross living area that are above the averages of supposed comparables selected by Kilpatrick's inspectors.  (Ex. 12 (Kilpatrick July 15, 2014 Dep.) at 69:6-70:3.)

These questions impose artificial requirements on the treatment of comparable properties, none of which are found in USPAP.  Epley agreed that nothing in USPAP requires appraisals to conform to the criteria in Questions 29-31.  (Ex. 13 (Epley October 30, 2014 Dep.) at 155:9-156:24, 206:13-21 ("Q. . . . Is there anything in Standards Rule 1-4 of USPAP that requires that for all appraisals the average price per square foot, PPSF, of the comps in the appraisal report be not higher than the average PPSF of the comps available in the market at the time of the appraisal?  A.  No."); *see also* Ex. 5 (Hedden Report) at 93-109.)

Further, Question 29 operates under the assumption that "no home can ever be better than average" (Ex. 5 (Hedden Report) at 93-94), when, in fact, a property "may exhibit qualities (*e.g.*, size, amenities, view, finishes) that make it more desirable than other homes on the market, some of which may be recent sales that . . . Kilpatrick would consider potential comparables."  (*Id.*)  In short, the assumption that underlies Question 29 is false.

Moreover, Kilpatrick assigns points under Question 30 against appraisals that used comparables with site square footages that were larger than those of the comparables selected by Kilpatrick's inspectors.  There is, of course, no basis for this.  "Appraisers consider a variety of factors in addition to site size when selecting comparables, which include location, sale date, style, home size, number of rooms, condition and age."  (Ex. 5 (Hedden Report) at 100.)  Site square footage is not by itself dispositive of whether a comparable was appropriately used in an appraisal.  Indeed, "comparables are always selected based on their similarity to the subject, not based on their similarity to the comparables available in the market at the time of the appraisal."  (*Id.*)

The Credibility Assessment Models assigns points to any appraisal that does not treat comparables according to Kilpatrick's one-size-fits-all formulas, which are found nowhere in USPAP.

### c. Questions Asking Whether an Appraisal "Correctly" Reported Market Conditions

Questions 7, 8 and 9 ask whether an appraiser reported certain market condition information "correctly" on the appraisal. These questions, which account for 14% of the total points assigned by the Credibility Assessment Model against appraisals of the Nomura Sample Properties (*see* Appendix B), apply mathematical formulas found in the Credibility Assessment Model's source code to data gathered by Kilpatrick's inspectors. Although the Credibility Assessment Model purports to assess whether appraisers reported certain information "correctly," USPAP prescribes no particular method to assess the information that is the subject of these questions, and Kilpatrick's methods are contrary to those typically employed in the field by professional appraisers.

Question 9, which is the sixth largest contributor of total points assigned by the Credibility Assessment Model (*see* Appendix B), assigns points against an appraisal when the appraiser purportedly did not "report marketing time correctly." (Ex. 1 (Kilpatrick CAM Report) at 75.) In answering Question 9, the Credibility Assessment Model calculates average days on the market for listings within the "Subject Neighborhood," and compares that figure to the appraisals' report of marketing time as "Under 3 mos.," "3-6 months," or "Over 6 mos." (Ex. 1 (Kilpatrick CAM Report, App. 4-1a) at 14-15.)

Question 8, the seventh-largest contributor of points assigned by the Credibility Assessment Model (*see* Appendix B), asks if the appraiser "report[ed] property value trend correctly." (Ex. 1 (Kilpatrick CAM Report) at 74.) Here, the Credibility Assessment Model

applies a regression analysis to historical market data from the "Subject Neighborhood," and

treats any increase or decrease in market prices of less than 4% annually as "Stable," and

otherwise labels the market trend as "Increasing" or "Declining." (Ex. 1 (Kilpatrick CAM

Report, App. 4-1a) at 1, 13.)  Kilpatrick admits that this 4% requirement is not found in USPAP.

(Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 241:21-242:16.)

       Question 7, the thirteenth-largest contributor of points assigned by the Credibility

Assessment Model (*see* Appendix B), asks, "Did the appraiser report supply/demand correctly?"

(Ex. 1 (Kilpatrick CAM Report) at 73.)  In answering Question 7, the Credibility Assessment

Model evaluates the ratio of expired or withdrawn listings in the prior year within the "Subject

Neighborhood" divided by homes sold in that period, and then assumes that anything greater

than a ratio of 10:1 or less than a ratio of 1:10 signifies an out of balance market (*i.e.*, either a

"Shortage" or "Over Supply").  (Ex. 1 (Kilpatrick CAM Report, App. 4-1a) at 1, 12-13.)

       As Epley agreed, USPAP does not require appraisers to use any of Kilpatrick's

preferred methodologies when determining supply and demand, market timing or value trends.

(Ex. 13 (Epley October 30, 2014 Dep.) at 133:24-134:4, 203:17-22, 227:3-12.)  In fact,

appraisers typically used different methods and different data.  Whereas the Credibility

Assessment Model relies on retrospective data gathered from the Multiple Listing Services or

county tax records (*e.g.*, Ex. 1 (Kilpatrick CAM Report, App. 2-1d, App. 4-5b)), Epley testified

that the "appraiser's own data" is "always the best data" when "determining [property value and

other] market trends."  (Ex. 13 (Epley October 30, 2014 Dep.) at 124:5-126:2, 202:12-203:9

("[W]hat I have on my desk is the best I have available.  Absolute best are my files . . . ."),

231:6-15 ("The best data comes from your own file . . . ."); *see also* Ex. 5 (Hedden Report) at

46-47.)

-28-

Epley also testified that appraisers valuing residential properties in 2005 to 2006 typically would not have employed regression analyses, as did Kilpatrick. (Ex. 13 (Epley October 30, 2014 Dep.) at 225:6-16; *see also* Ex. 5 (Hedden Report) at 46-47.) Epley further testified that when appraisers are evaluating market conditions such as marketing time they should only consider comparable properties. (Ex. 13 (Epley October 30, 2014 Dep.) at 193:3-194:5, 195:7-16 (discussing the consideration of comparable properties and the evaluation of market conditions in relation to CAM Question 9). The Credibility Assessment Model, however, applies Kilpatrick's formulas to all properties in a "Subject Neighborhood," not just to comparable properties. (*See* Ex. 1 (Kilpatrick CAM Report, App. 4-2).)

Kilpatrick himself acknowledged that USPAP does not impose a test for determining whether an appraiser reported these market conditions "correctly." When asked, for example, whether "there [is] any test in USPAP that . . . [determines] whether an appraiser has reported marketing time correctly," Kilpatrick admitted there is not: "No. USPAP [is] silent [as to] specific tests." (Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 249:12-249:25.)

Epley's testimony makes clear that appraisers would have calculated marketing time, supply and demand, and value trend using different methods and better data than Kilpatrick used for the Credibility Assessment Model, but the model assigns points against any appraisal whose conclusion differs from the results of Kilpatrick's unprecedented methods.

### d.   Other Questions

Question 16, the third-largest contributor of points assigned by the Credibility Assessment Model (*see* Appendix B), assigns points against any appraisal for which the appraiser purportedly did not "calculate the physical depreciation correctly." (Ex. 1 (Kilpatrick CAM Report) at 82.) Epley acknowledged that "an appraiser will evaluate physical depreciation based on a physical inspection of the property." (*Id.* at 161:18-21.) Kilpatrick never conducted

-29-

the sort of physical inspection that plaintiff's own expert admitted is necessary to evaluate physical depreciation. (Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 33:14-22.) Epley also testified that USPAP does not "specify the method by which [appraisers] have to calculate physical depreciation." (Ex. 13 (Epley October 30, 2014 Dep.) at 157:21-158:25.)

Question 17, the tenth-largest contributor of points assigned by the Credibility Assessment Model (Appendix B), assigns points against appraisals for which the appraiser purportedly did not "report external obsolescence correctly." (Ex. 1 (Kilpatrick CAM Report) at 82-83.) To assess "external obsolescence," appraisers evaluate whether a nearby characteristic (a railroad, highway, commercial property, industrial site or power line) negatively impacts value based on a number of factors, including whether it can be seen or heard. (Ex. 5 (Hedden Report) at 63-65.) Epley testified that appraisers must "prove" the external obsolescence, and "the only method in the textbook is—is to inspect." (Ex. 13 (Epley October 30, 2014 Dep.) at 244:24-246:3.) Kilpatrick never inspected any of the Nomura Sample Properties; instead, he systematically overrode the appraisers' on-site determinations by instructing his team of data researchers to apply arbitrary distance calculations based solely on current Google Earth images of the surrounding area. (Ex. 12 (Kilpatrick July 15, 2014 Dep.) at 16:23-17:23, 23:8-24:24; *see also* Ex. 27 (GADGET Protocol—External Obsolescence).)

Question 12, the eleventh-largest contributor of points assigned by the Credibility Assessment Model (*see* Appendix B), asks, "Did the appraiser analyze all prior sales of the subject and comparables." (Ex. 1 (Kilpatrick CAM Report) at 78.) Kilpatrick's requirement that an appraiser analyze all prior sales of the subject and comparables is nowhere to be found in USPAP. USPAP only requires the appraiser to "analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal" if such information

-30-

is available to the appraiser "in the normal course of business."  (Ex. 22 (USPAP 2006 Ed.) at 21; Ex. 5 (Hedden Report) at 52.)

        All of these questions assign points against valid appraisals based on criteria not found in USPAP.

### 2. The Weights Assigned to the 31 Questions in the Credibility Assessment Model Are Arbitrary.

        According to Kilpatrick, some of the 31 questions in the Credibility Assessment Model are more important than others, and the number of points he decided to allocate to a particular question "is a function of the degree to which the negative answer to the question implicates deviations from appraisal standards, guidance, and practice."  (Ex. 1 (Kilpatrick CAM Report) at 40.)  To make his highly subjective process look scientific, Kilpatrick claims to have undertaken an elaborate analysis of "aspects," "categories," and rankings and divisions within those groupings.  (*Id.* at 40-68.)  But nothing in USPAP assigns varying degrees of importance to particular "aspects" or "categories" of appraisals.  As Kilpatrick conceded at his deposition in the *Merrill Lynch* action, his "aspects" and "categories" were invented by him, and he "happened upon the categorization and aspect scheme" and decided to use it because it justified his "implicit weighting" of his 31 questions.  (Ex. 9 (Kilpatrick February 12 and 13, 2014 Dep.) at 571:19-572:8, 559:3-560:6.)  There is nothing reliable about this *ad hoc* approach.

        Indeed, the weighting system Kilpatrick ultimately employed was simply a matter of "personal choice"—a choice which Epley admitted he would not have made if he were designing his own system.  (Ex. 15 (Epley July 8, 2014 Dep.) at 88:24-89:16, 89:25-90:6.)  At a minimum, the scoring of questions in the Credibility Assessment Model—and 20-point threshold that Kilpatrick selected for determining whether an appraisal is "credible"—should be excluded as pure *ipse dixit*, not suitable as expert opinion.  *See In re Puda Coal Sec. Inc., Litig.*, 2014 WL

2915880, at *15 (S.D.N.Y. June 26, 2014) ("[E]ven otherwise qualified experts may not simply

offer conclusory opinions. . . . [which] are a form of '*ipse dixit*,' and often provide an insufficient

basis upon which to assess reliability." (internal citations omitted)); *see also Joiner*, 522 U.S. at

146; *Lynch* v. *Trek Bicycle Corp.*, 374 F. App'x 204, 206-07 (2d Cir. 2010); *Nimely*, 414 F.3d at

396.

>        **3.      The Credibility Assessment Model Fails to Account for the Judgment
>                  and Discretion USPAP Requires Appraisers to Exercise.**

Although Kilpatrick describes his expert report concerning his Credibility

Assessment Model as an "appraisal review report" under USPAP (Ex. 1 (Kilpatrick CAM

Report) at 129), he admitted at his deposition that there are only two accepted ways under

USPAP to conduct appraisal reviews:  a desktop review and a field review.  (Ex. 11 (Kilpatrick

July 14, 2014 Dep.) at 230:8-23.)  The Credibility Assessment Model is neither.  Kilpatrick

admits that there were no site inspections undertaken in connection with the Credibility

Assessment Model (Ex. 9 (Kilpatrick February 12 and 13, 2014 Dep.) at 720:12-18), and the

Credibility Assessment Model does not come close to covering the full range of issues

considered in a desktop review of an appraisal.[8]

Rather than perform desktop reviews or field reviews in conformity with USPAP

and other accepted industry standards, which provide appraisers with "broad flexibility" in

performing their work (Ex. 22 (USPAP 2006 Edition) at 12), Kilpatrick attempts to reduce the

process of assessing whether appraisals conform to USPAP to compliance with rules reflecting

Kilpatrick's personal preferences.  But the Credibility Assessment Model ignores many factors

---

[8]      Kilpatrick testified that, with a typical desktop review of an appraisal, "there may
actually be other things in addition to this set of [31] questions that I would look at . . . in a
desktop review I would look at these things plus a whole lot more."  Ex. 11 (Kilpatrick July 14,
2014 Dep.) at 78:11-79:7.

that, consistent with USPAP, require the application of judgment and discretion by appraisers in reaching an opinion of value about a property.

*First*, Kilpatrick's Credibility Assessment Model does not credit reasonable explanations included in the appraisals of the Nomura Sample Properties that specifically address the underlying issues targeted by Kilpatrick's 31 questions. Epley repeatedly confirmed that it was important to consider appraisers' explanations, apparently under the mistaken belief that the Credibility Assessment Model takes into account such explanations. (Ex. 15 (Epley July 8, 2014 Dep.) at 194:14-195:12; 267:8-21; 268:13-271:22; 288:12-289:7.)

Epley further testified that his opinion that the Credibility Assessment Model was reasonable rested on his assumption that it accounted for appraisers' written explanations. (*Id.* at 292:4-10 ("Q. But your opinion that the CAM is reasonable and reliable as a model depends partially on knowing that the explanations are taken into account? . . . A. That's correct.").) According to Epley, "[y]ou run into problems here when you leave something out," (*id.* at 328:22-330:7), and "[e]xplanation is extremely important." (*Id.* at 395:2-396:23.) Kilpatrick has made clear, however, that the Credibility Assessment Model does not consider appraisers' explanations. (Ex. 11 (Kilpatrick July 14, 2014 Dep.) at 382:22-383:2.)

In NHELI_2007_1_2001856666, for example, the appraisal reflected a greater than 10% annualized increase in the price of the property in relation to a prior sale, but the appraiser explained that "███████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████" (Ex. 28 (NOM-FHFA_02908722) at NOM-FHFA_02908730.) As another example, Kilpatrick faulted NAA_2005_AR6_1002235662 for having a land-to-value ratio outside of his invented 20-30% range. However, the appraiser commented in the original

appraisal that "although land total value ratio exceeds 30% it is common in the [area] due to the lack of vacant land and does not affect marketability."  (Ex. 29 (NOM-FHFA_00016764) at NOM-FHFA_00016767.)  Kilpatrick's model ignored these real-word explanations.

> *Second*, the Credibility Assessment Model makes no distinction between appraisals that "fail" a question for minor and non-material discrepancies, and those that deviate in a significant way.  Under USPAP, non-material deviations are not considered violations. USPAP Standard 1 expressly recognizes that "[p]erfection is impossible to attain, and competence does not require perfection."  (Ex. 21 (USPAP 2005 Edition) at 16.)  Accordingly, Standard 1 states only that the appraiser must "not commit a substantial error of omission or commission that significantly affects an appraisal."  (*Id*.)

> For example, a negative answer for three of the six questions (questions 13, 14 and 21) that Kilpatrick considers "substantial major error[s] under USPAP Standards Rule 1-1(b)" (Ex. 1 (Kilpatrick CAM Report) at 98) will cause an appraisal to fail on those questions for even a miniscule departure from rigid numeric thresholds that are not contained in USPAP.  With respect to Question 14, which requires that the land-to-value ratio be between 20% and 30%, the Credibility Assessment Model makes no distinction between an appraisal that reports a land-to-value ratio of 60% and one that reports a land-to-value ratio of 31%.  Assessing the accuracy of appraisals should not be a "gotcha" game.

### 4.    The Credibility Assessment Model's Results Are Erratic, Assigning Vastly Different Scores to the Same Appraisals.

> The arbitrary and subjective nature of the Credibility Assessment Model generates inconsistent results—even when the same appraisal is scored two different times.  That is strong evidence that the Credibility Assessment Model is unreliable.

-34-

In his January 6, 2014, Goldman Sachs report, Kilpatrick inadvertently subjected one appraisal to the Credibility Assessment Model twice. The appraisal he analyzed twice within that single report—GSR_2006_OA1_2001033820—however, received two entirely different scores: one of 5.24 points, and one of 19.08. (Ex. 6 (GS Kilpatrick CAM Report) at Appendix 5-1; Ex. 20 (Allen Report) at 30 n.79.) The first score indicated that the appraisal was acceptable, while the second score was well above 14.13, which Kilpatrick views as "a sufficient magnitude and frequency of errors to render an appraisal not credible." (Ex. 6 (GS Kilpatrick CAM Report) at 100.) So much for the idea that Kilpatrick's "model" is scientific in its approach.

Moreover, the bases for these conflicting scores were completely at odds with one another; during one round of scoring, the appraisal was deemed to have reported supply and demand correctly (Question 7), but in the second round of scoring, the appraisal was deemed not to have reported supply and demand correctly. *Id.* Such diametrically opposite answers to the same question could not occur if the Credibility Assessment Model were reliable. Further, Kilpatrick changed the score of this same appraisal yet again in a supplemental report, giving it a score of zero on its third run through the Credibility Assessment Model. (Ex. 7 (GS Kilpatrick Supplemental Report) at Appendix 5; Ex. 20 (Allen Report) at 30 n.79.) There can be no confidence in a model that produces such starkly inconsistent results.

In the *Merrill Lynch* action, Kilpatrick also inadvertently subjected one appraisal to the Credibility Assessment Model twice. In that instance, the Credibility Assessment Model assigned a score of 71 on one round of scoring and a score of 30 in the second round of scoring. (Ex. 14 (Epley February 19, 2014 Dep.) at 168:19-169:16.) Epley agreed that the Credibility

Assessment Model should come up with the same score if it is run twice on the same appraisal. (*Id.* at 192:8-193:7.)  It does not.

The inability of the Credibility Assessment Model to replicate its own results demonstrates that the Credibility Assessment Model is nothing more than an arbitrary measure of compliance with an *ad hoc* set of rules developed solely by Kilpatrick for purposes of this litigation.  The Credibility Assessment Model is entirely unreliable in assessing the quality or reliability of appraisals and should therefore be excluded.

## III.    THE GREENFIELD AVM AND KILPATRICK'S OPINIONS BASED ON IT SHOULD BE EXCLUDED FROM TRIAL.

### A.    No AVM Can Determine Whether Appraisers Disbelieved Their Appraisals, Let Alone What the Appraisal Should Have Been.

Kilpatrick purports to have evaluated the properties at issue using the Greenfield AVM and intends to opine that the appraisals for those properties were so "objectively false" that "no reasonable appraiser would agree" with them.  (Ex. 11 (Kilpatrick July 14, 2014 Dep.) at 46:17-47:25, 53:4-54:17, 166:9-168:7.)  A Greenfield AVM result that differs from an appraisal, however, is not evidence that the appraiser did not believe his own appraisal when he rendered it. An AVM cannot possibly tell the jury what an appraiser subjectively believed several years ago.

Even as to any objective assessment of the appraisals, the Greenfield AVM cannot show that an appraisal was inaccurate.  That is not how AVMs are used  in the industry. Kilpatrick claims that the Greenfield AVM is capable of performing feats of retrospective valuation that even industry-leading AVMs cannot perform, as Kilpatrick claims that the results of his Greenfield AVM represent the "true value" of property back in 2005-2006.  (Ex. 2 (Kilpatrick AVM Report) at 65; Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 45:24-46:13.)  For example, CoreLogic, the leading vendor of AVMs, acknowledges that its AVMs can

produce only an "estimate of value" that is suitable for limited purposes and is not a substitute

for an actual appraisal.  Unlike Kilpatrick, CoreLogic does not hold out its AVMs as capable of

demonstrating conclusively that an appraisal performed by a licensed appraiser who physically

inspected the property is incorrect.  (Ex. 17 (Doty June 12, 2014 Dep.) at 26:5-25, 28:3-7,

187:24-188:6, 189:13-191:7, 192:6-14.)

> Similarly, Freddie Mac states that its AVM, called Home Value Explorer,

provides only a "point value estimate . . . to help identify potentially inflated appraisal values

that may need additional review. . . ."  (Ex. 30 (FreddieMac.com, Pub. No. 794, March 2012).)

At his deposition, Kilpatrick was unable to identify any other AVM that purports to do what he

claims his model does—retroactively determine the accuracy of an appraisal from years earlier

or determine the "true value" of a property in the past.  (Ex. 8 (Kilpatrick November 13 and 14,

2014 Dep.) at 101:14-102:5.)

> Unlike Kilpatrick, leaders of the appraisal profession do not regard AVM results

as conclusively showing that an appraisal value was inflated.[9]  For example, Ken Wilson,

President of the Appraisal Institute, has stated that "'[a]ppraisals are more robust products than

AVMs or BPOs, which aren't intended to, or capable of, serving the same purpose as an

appraisal.'"  (*See*, *e.g.*, Ex. 31 ("CFBP Appraisal Disclosure Rule Takes Its Toll," *Nat'l Mortg.

News*, Feb. 11, 2014).)  Similarly, a Rule 30(b)(6) witness for Moody's, Debashish Chatterjee,

---

[9]     Kilpatrick goes so far as to claim that the results of his Greenfield AVM should trump
<u>actual</u> <u>selling</u> <u>prices</u> of the Sample Properties, Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.)
at 45:24-46:19, even though actual sales prices serve as the benchmark for virtually all industry
leading appraisers and AVM developers.  Such bold proclamations about the power of the
Greenfield AVM should not be presented to the jury when no one in the appraisal profession has
ever been permitted to test Kilpatrick's model.

testified that rating agencies did not assume that AVM results alone were sufficient to assess

property values and related LTV ratios.  (Ex. 16 (Chatterjee January 15, 2014 Dep.) at 374:2-25.)

B.    **The Greenfield AVM Lacks All Indicia of Reliability Under *Daubert*.**

The Greenfield AVM bears none of the indicia of reliability required under

*Daubert*, including testing, validation, peer-review, and industry adoption.  *Daubert*, 509 U.S. at

594.  As this Court has recognized, "FHFA developed the Greenfield AVM for this litigation."

(April 16, 2014 Order (Docket No. 633) at 1-2; *see also* Ex. 10 (Kilpatrick June 30 and July 1,

2014 Dep.) at 79:16-20, Ex. 54302 (Greenfield AVM manual developed in 2013); 94:18-99:6

(research support for Greenfield AVM provided by FNMA, FHLMC and FHFA); 93:13-94:17,

Ex. 39226 (trademark application filed in September 2013).)  Because the Greenfield AVM was

created for use in this litigation, it was never tested outside of its application in this case.

Moreover, although Kilpatrick is a member of the Appraisal Institute, he

never subjected his Greenfield AVM to critique from other appraisers, and it certainly has not

been accepted in the field.  *See Daubert*, 509 U.S. at 594; *In re Rezulin Prods. Liab. Litig.*, 369

F. Supp. 2d 398, 420 (S.D.N.Y. 2005).  At his depositions in related cases, Kilpatrick was unable

to identify any commercial use of the Greenfield AVM, and he could not recall any use of the

Greenfield AVM outside the context of litigation.  (Ex. 8 (Kilpatrick November 13 and 14, 2014

Dep.) at 44:23-45:23; Ex. 9 (Kilpatrick February 12 and 13, 2014 Dep.) at 197:11-198:4.)  Nor is

the Greenfield AVM "supported by appropriate validation."  *Daubert*, 509 U.S. at 590.  In the

appraisal industry, appropriate validation means that an AVM's accuracy must be confirmed by

independent professionals.  Federal regulators have promulgated Interagency Appraisal and

Evaluation Guidelines, which provide that validation should be "conducted by qualified

individuals that are independent of the model development or sales functions."  Interagency

Appraisal and Evaluation Guidelines, 75 FED. REG. 77,450, 77,469 (Dec. 10, 2010).  But neither

-38-

plaintiff nor Kilpatrick has independently validated the Greenfield AVM (Ex. 9 (Kilpatrick February 12 and 13, 2014 Dep.) at 263:2-264:19), and neither plaintiff nor Kilpatrick has identified any peer review or publication of the Greenfield AVM (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 144:22-146:9).

The Greenfield AVM thus lacks all of the indicia of reliability under *Daubert* and should be excluded from trial.

### C.    The Greenfield AVM Is Flawed and Unreliable as a Means of Assessing the Value of Properties Years Ago.

As a means of estimating the value of the properties at issue, the Greenfield AVM is deeply flawed and unreliable, particularly as it is used by Kilpatrick.

### 1.    The Greenfield AVM Was Fed Arbitrarily "Filtered" Data.

The Greenfield AVM suffers from the fatal flaw that Kilpatrick censored data to make the model appear more accurate, rather than modifying the model to increase its power to explain the data that exist.  In developing the Greenfield AVM, Kilpatrick excluded large amounts of relevant sales data by applying various "filters."  Sales data, however, are the most important input for automated valuation models like the Greenfield AVM.  As standards set by the International Association of Assessing Officers ("IAAO"), which Kilpatrick relies on in his expert report, state, "[s]ales prices provide the most objective estimates of market value and under normal circumstances should provide good indicators of market value."  (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep., Ex. 54309) at 7, § 2.1.)

While Kilpatrick touts the accuracy of the Greenfield AVM, that purported accuracy is the product of tossing out any data that would make the model appear inaccurate. For example, Kilpatrick applied what he calls a "Cross-Validation Filter" (Ex. 2 (Kilpatrick AVM Report) at 33-34), to eliminate sales data for "comparable" properties if the values of those

properties estimated by the Greenfield AVM were more than 25% out of line with his model's

other predictions.  This resulted in the elimination of 22% of sales transactions from the dataset

used to train the model.  Hausman Decl. at 3-4.  Without application of the "Cross-Validation

Filter," the Greenfield AVM's estimated values for the Sample Properties would increase by an

average of approximately $39,500 per property, or by approximately 18.0%.  (Ex. 19 (Hausman

Report) at 27-28.)  That change is highly significant because Kilpatrick says that the Sample

Loans were on average overvalued by 8.92%, and any deviation of more than 15.1% from the

Greenfield AVM's estimate of value means that an appraisal was "inaccurate."  (Ex. 2

(Kilpatrick AVM Report) at 4, 63; *see also* Ex. 19 (Hausman Report) at 4 & n.5.)  In other

words, without the "Cross-Validation Filter," the results of the Greenfield AVM support

defendants' position in this case, not plaintiff's.

          Kilpatrick admitted that he applied his "Cross-Validation Filter" in order "[t]o

increase the explanatory power" of his model and "enhance the accuracy of the model."  (Ex. 8

(Kilpatrick November 13 and 14, 2014 Dep.) at 153:18-154:23; Ex. 10 (Kilpatrick June 30 and

July 1, 2014 Dep.) at 283:17-24.)  He was unapologetic about his use of data censoring to make

the Greenfield AVM appear more accurate:  "I have a surfeit of data so why use it all?  I just

utilize the data that fits my model."  (Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at

118:12-119:10.)  Use of the "Cross-Validation Filter" is not a matter of personal choice; it is

unsound as a matter of statistics.  As defendants' expert Hans Isakson explained, the "Cross

Validation Filter" in the Greenfield AVM "is contrary to the general principle in statistics that

when your model fails to describe the dependent variable . . . you should add explanatory

variables, or improve the model.  You should not remove objectionable regression observations

because they don't agree with your model."  (Ex. 32 (Isakson June 19 and 20, 2014 Dep.) at

286:11-287:21.)

    This is not the first time Kilpatrick has ignored relevant sales data to fit his

litigation opinions.  Two courts have excluded Kilpatrick's testimony because he disregarded

actual sales prices of properties in reaching his valuation opinions.  In *Exxon Mobil Corp.* v.

*Albright*, 71 A.3d 30 (Md. 2013), the Supreme Court of Maryland held that Kilpatrick's

methodology was faulty and rejected his justification for failing to consider sales data in his

opinion about purportedly diminished property values.  *Id.* at 102.  The court concluded that

market prices "represent the highest and best price" for a property "even if the buyers are paying,

as Kilpatrick asserts, too much."  *Id.* at 103.  The court reversed a jury award in that action and

remanded the case for a new trial.  *Id.* at 104.

    In *Palmisano* v. *Olin Corp.*, 2005 WL 6777561 (N.D. Cal. July 5, 2005), the court

excluded Kilpatrick's opinion that the fair market value of the plaintiffs' properties, sold after

news of a water contamination, should be discounted because the buyers, despite an awareness of

the news, paid more for their properties than Kilpatrick claimed they were actually worth.  *See*

*id.* at *5 (rejecting Kilpatrick's "premise that the present value of plaintiffs' properties has

sharply declined even if the prices that buyers are currently willing to pay for them has not").

Kilpatrick's manipulation of the data in this action is, if anything, worse than in the two cases

where courts have disapproved of his methodologies.

    Although there are many other defects in the Greenfield AVM, the elimination of

large amounts of sales data through the "Cross-Validation Filter" is itself a sufficient basis for

excluding Kilpatrick's model and his opinions based on the results of that model.

2.     **In Testing the Greenfield AVM, Kilpatrick Excluded Any Transactions That Made His Model Appear Less Accurate.**

Kilpatrick said he used 90% of the transactions in his property sales dataset to train his Greenfield AVM, and then tested the model using the remaining 10% of transactions. (Ex. 2 (Kilpatrick AVM Report) at 46.)  On the basis of this process, Kilpatrick claims he "validated" his Greenfield AVM because it purportedly produced statistically significant results. (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 293:2-296:6.)  The only way that Kilpatrick was able to make this claim was by applying "filters" to the 10% holdout set of transactions he used to test the Greenfield AVM, removing transactions which demonstrated the model's inaccuracy.

Specifically, Kilpatrick applied two filters that eliminated a large portion of transactions in the 10% holdout set.  First, he applied a middle-30th-percentile filter ("Middle 30th Filter"), which eliminated 70% of the transactions used to test the model merely because those had sale prices that deviated from tax-assessed values—not coincidentally the most important determinant of value in the Greenfield AVM.  Hausman Decl. at 5; Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 171:2-178:11; *see also* Ex. 19 (Hausman Report) at 13-17; Ex. 18 (Isakson Report) at 17-20.  Second, Kilpatrick applied a high-forecast-error filter ("100% Error Filter"), which eliminated properties where the actual selling price was 100% higher than the estimate of value generated by the Greenfield AVM.  (Ex. 2 (Kilpatrick AVM Report) at 50; *see also* Ex. 19 (Hausman Report) at 11, 17.)

After applying these and other filters, Kilpatrick claimed that the Greenfield AVM had a forecast standard deviation of 15.1%, meaning that the "true" value of a given property fell within a 15.1% margin (up or down) of the estimate of value generated by the Greenfield AVM.  Without these filters, however, Kilpatrick's forecast standard deviation is

-42-

dramatically higher.  When the model is confronted with a comprehensive—rather than carefully handpicked—set of sales data, it loses all of its predictive power.  Without the Middle 30th Filter and 100% Error Filter, the forecast standard deviation of the Greenfield AVM skyrockets from 15.1% to more than 200,000%, making the results of the Greenfield AVM statistically meaningless.  (Ex. 19 (Hausman Report) at 18.)  When the 100% Error filter alone is removed, the forecast standard deviation of the Greenfield AVM on average increases to 43.8%.  (*Id.*)  As a comparison, the CoreLogic AVM will not even report values with a forecast standard deviation above 25%.  (Ex. 17 (Doty June 12, 2014 Dep.) at 62:15-63:24.)  Kilpatrick's claims about the accuracy of his Greenfield AVM depend on excluding sales data that his model fails to explain, which violates well-established scientific norms.

Kilpatrick admitted that his 100% Error Filter was intended to improve the model's forecast standard deviation:  "you filter out comp data in order to achieve an optimum forecast standard deviation."  (Ex. 9 (Kilpatrick February 12 and 13, 2014 Dep.) at 352:14-353:7; *see also* Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 248:24-250:2 ("I am trying to get the best FSD I can.").)  While Kilpatrick apparently sees nothing wrong with eliminating sales data that "are not as good at fitting the model" (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 286:13-287:7), the very point of statistical modeling is to make the model fit the data— not *vice versa*.

### 3.    Kilpatrick's Purported Justifications for His Use of Filters to Exclude Sales Data Are Spurious.

Kilpatrick has underscored the illegitimate nature of his filters by offering spurious justifications for their use:

### a.    Exclusion of "Suspect Data"

Kilpatrick claims that he applied his filters to exclude "suspect data," including sales that were not arm's-length transactions, such as bankruptcy sales, distressed sales or estate sales, and transactions that contain "data errors or incorrect matches between the tax and deed data."  (Ex. 2 (Kilpatrick AVM Report) at 47, 50, 60 n.158; Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 190:12-15, 192:15-193:7, 256:18-259:15, 306:3-308:8.)  But that claim is entirely unsupported.

Kilpatrick did nothing to determine whether the sales data he excluded fell into the "suspect" categories he posits.  Indeed, he admitted that he conducted no empirical tests to establish that the filters allowed him to identify arm's-length transactions, or conversely to exclude transactions that were not at arm's length.  (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 204:5-205:5, 255:6-256:2, 260:8-261:18, 262:24-263:7, 279:21-280:13, 288:22-291:18.) Nor did Kilpatrick investigate the transactions excluded by the filters to determine whether any of the sales prices actually were "spurious."  (*Id.* at 280:8-13.)

Given the large amount of data eliminated by his filters, Kilpatrick's failure to investigate the consequences of applying those filters is inexcusable.  "It is a basic principle of statistics that data should be excluded from an analysis only if those data are in some sense unreliable, and that unreliability can be determined only by investigating the data themselves, not just by observing whether the data are 'high' or 'low.'"  (Ex. 19 (Hausman Report) at 11-12.) The CoreLogic AVM, in comparison, excluded sales data only after reviewing public records to determine whether a sale was other than arm's length (Ex. 17 (Doty June 12, 2014 Dep.) at 44:6-46:7, 58:6-14), and did not exclude sales transactions based on its own results (*id.* at 46:16-47:14).

Indeed, as the *Reference Guide on Multiple Regression*, an influential book in the field of statistics published by the Federal Judicial Center, states, a data point dropped from a sample "should be studied further to determine whether mistakes were made in the use of the data or whether important explanatory variables were omitted."  Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, Reference Manual on Scientific Evidence 326-27 (3d ed. 2011); (*see also* Ex. 32 (Isakson June 19 and 20, 2014 Dep.) at 105:4-107:3, 308:23-309:25 (potential outliers "should be investigated with respect to are they genuinely outliers, or are they simply observations that do not fit your model very well," and if they are the latter, "then you live with it.")).  Kilpatrick simply removed large numbers of transactions from his property sales dataset without doing any investigation whatsoever.

In addition, Kilpatrick's claim that he was excluding "suspect data" is belied by the fact that he did not apply his filters to both the dataset used to train the model and the dataset used to test it. (Ex. 2 (Kilpatrick AVM Report) at 47, 50.)  For example, Kilpatrick applied the Middle 30th and 100% Error Filter only to the dataset he used to derive the forecast standard deviation of the Greenfield AVM, but he did not apply these same filters to the training set, nor did he apply them when he ran the model to get estimated values for the Sample Properties.  (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 189:8-190:11, 248:24-250:10; Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 165:17-24.)  As a result, Kilpatrick used 56,533 properties as "comparables" in estimating values for the Sample Properties, even though he had excluded those same properties as "suspect data" in testing his model.  (Ex. 19 (Hausman Report) at 23-24; *see also* Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 267:16-270:10 (admitting that transactions excluded as "spurious" for purposes of computing the forecast standard deviation of the Greenfield AVM could have been included among the comparables used to estimate values

of the Sample Properties).)  If Kilpatrick believed the "suspect data" was in fact defective in

some way, there is no reason why he would eliminate it from his training dataset but not from his

testing dataset (or *vice versa*).

> **b.    IAAO Standards**

Kilpatrick also tried to justify his selective exclusion of sales data in testing his

Greenfield AVM by asserting that what he did was somehow required by standards promulgated

by the IAAO, which provide "performance standards" for models that address the ratio between

price sold and appraised value.  (*See* Ex. 2 (Kilpatrick AVM Report) at 47 n.134; Ex. 10

(Kilpatrick June 30 and July 1, 2014 Dep.) at 171:6-177:2; Ex. 54309 at 7-8 §§ 2, 5, 9, 11, 17.)

Specifically, Kilpatrick claims that the data he excluded "violates IAAO standards," and thus he

was required to exclude sale prices where their ratio to tax-assessed values fell outside the

middle 30th percentile.  *See* O'Connor Decl.at 7; Ex. 10 (Kilpatrick June 30 and July 1, 2014

Dep.) at 174:4-176:4.

This is wrong.  "IAAO has no such standard," and the purpose of the IAAO

provision on which Kilpatrick relies "is to identify models that need adjustment, not problematic

data."  O'Connor Decl. at 7.  "The IAAO Standard on COD is not intended to discard data until

what remains is consistent with the Standard."  (*Id.*.)  Rather, "the assessor is supposed to re-

examine the model to understand why it fails to adequately explain the data."  *Id.*  Notably, the

IAAO Standards provide specific protocols for eliminating outlier ratios and screening sales

data, which Kilpatrick failed even to mention, let alone follow.  (*See* Ex. 10 (Kilpatrick June 30

and July 1, 2014 Dep.) at Ex. 54309 Appendix A "Sales Validation Guidelines," Appendix B

"Outlier Trimming Guidelines.")  This is just another example of Kilpatrick's upside-down

approach, tossing out data that fail to fit his model rather than modifying the model so that it

adequately explains transactions in the property sales dataset.

c.    "Middle-Class Housing"

At his deposition on November 13, 2014, Kilpatrick offered an entirely new justification for the "Cross Validation Filter," stating its purpose was to "get rid of sales, if you will, that—that have nothing to do with middle-class housing," and noting that the Nomura properties are "150 to $250,000 homes by and large."  (Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 137:10-138:16, 158:23-159:17, 168:2-169:4.)  This justification is also spurious. Kilpatrick has offered no test results to confirm that his "Cross Validation Filter" is capable of identifying "middle-class housing," and such a contention makes no sense.  The filter excludes properties where the estimated value generated by the Greenfield AVM differs significantly from the property's sales price—it does not exclude properties on the basis of sales prices that are above a specified level.  Kilpatrick was unable to explain why, if he wanted only data for "middle class" properties, he did not filter the dataset at the outset, before he knew which transactions would generate high standard errors for his models.  (Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 160:16-161:7.)

Moreover, 70% of the properties Kilpatrick excludes with his "Cross-Validation Filter" had sales prices below $300,000 (*i.e.*, were "middle class" houses by his definition), and only 14% of the excluded properties had sales prices above $500,000.  Hausman Decl. at 4, Tbl. 1. In addition, while 30% of the properties Kilpatrick excluded with his "Cross-Validation Filter" had sales prices above $300,000, 35% of the properties Kilpatrick includes even after application of his "Cross-Validation Filter" had sales prices above $300,000.  (*Id.*)  If Kilpatrick's purpose was to exclude properties that were not what he has termed "middle-class housing," it is clear that he accomplished no such thing.  Instead, the effect of his "Cross-Validation Filter" was to eliminate transactions that demonstrated the poor predictive power of his Greenfield AVM.

-47-

d.      Kilpatrick's Circular "Results Justify the Means" Explanation

Kilpatrick also attempted to justify his use of filters to eliminate large number of transactions from his property sales dataset and his failure to investigate data he was eliminating as "suspect" by claiming that the "*ex post* results in this case happen to justify the *ex ante* process," meaning that "[w]e know that we have a good model because when we apply good data to it, we get good results." (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 302:20-303:25, 293:2-294:11; *see also id.* at 251:7-253:4.) According to Kilpatrick, "the proof is in the ex post pudding." (*Id.* at 308:9-311:13.)

Kilpatrick's logic is entirely circular because he gets "good results" only by disregarding data that would produce "bad results" (*i.e.*, results that do not suit his purposes). Indeed, Kilpatrick acknowledged that including the supposedly "spurious" sales data that his filters exclude would "reduce" his model's explanatory power and he would "get weak results" without using the filters. (*Id.* at 299:24-302:2, 302:20-303:25.) In fact, Kilpatrick explained his use of one filter by saying that "[i]f we're getting results that are spurious, then it's probably best not to utilize those results." (*Id.* at 250:3-10.)

\*            \*            \*

In sum, Kilpatrick's data pruning has nothing to do with getting rid of sales data that represent non-arm's-length transactions or are otherwise problematic. Instead, this data pruning merely rigs the Greenfield AVM to give it the appearance of reliability. With no assurance that the Greenfield AVM is reliable, the model and Kilpatrick's opinions based on the results of the model should be excluded. *See U.S. Info. Sys.* v. *IBEW Local Union No. 3*, 313 F. Supp. 2d 213, 235 (S.D.N.Y. 2004) (excluding testimony because expert could not "demonstrate the reliability" of data he relied upon and exclude potential bias); *Valente* v. *Textron, Inc.*, 931 F. Supp. 2d 409, 424-25 (E.D.N.Y. 2013) (excluding testimony because expert had not evaluated

-48-

his model "against the specific facts at issue in order to ensure that the model can reliably" apply to those facts) (internal quotation marks omitted).

### 4. The Greenfield AVM Fails to Predict Actual Sales Prices for the Nomura Sample Properties.

The value estimates produced by the Greenfield AVM fail dramatically against the most relevant benchmark:  the actual selling prices of the Sample Properties.  The properties that Kilpatrick ran through his Greenfield AVM included 305 Sample Properties that served as collateral for purchase-money mortgages underlying the Securitizations.  (Ex. 33 (Kennedy Report) at 21.)  In other words, those properties were actually sold at the time the mortgages were issued, and therefore actual sales prices are available for those properties that can serve as a benchmark for assessing the value estimates produced by the Greenfield AVM.  An actual sales price speaks volumes about contemporaneous "value" (and accuracy of an appraisal), yet the Greenfield AVM produces results that differ significantly from the actual sales price.

On average, the Greenfield AVM missed the actual sales prices of the Nomura Sample Properties by 17%.  (*Id.* at 45 tbl. 3.)  Kilpatrick opines that a mean difference between the appraised values of a property and the value estimate produced by the Greenfield AVM of only 8.92% is a "substantial appraisal error."  (Ex. 2 (Kilpatrick AVM Report) at 63.)  If the value estimates produced by the Greenfield AVM diverge from actual sales prices by nearly twice the percentage Kilpatrick deems to be indicative of a "substantial" error, then the Greenfield AVM is doing a terrible job of predicting the market values of the Sample Properties, which is "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale . . . ."  Interagency Appraisal and Evaluation

-49-

Guidelines, 75 FED. REG. 77,450, 77,469 (Dec. 10, 2010); (*see also* Ex. 2 (Kilpatrick AVM Report) at 76).[10]

      Looking at some of the specific value estimates produced by the Greenfield AVM make its flaws readily apparent. For example, the Greenfield AVM returned a value of $███████ for a property that sold for only $██████. (Ex. 33 (Kennedy Report) at 24 tbl. 1.) The Greenfield AVM also returned (i) a value of $█████ for a property that sold for $█████, (ii) a value of $█████ for a property that sold for $█████, and (iii) a value of $█████ for a property that sold for $█████. (*See id.*) These results make clear that the Greenfield AVM's results are at times far different from market value. As a result, the Greenfield AVM cannot be used to judge whether appraisals accurately valued the Nomura Sample Properties.

### 5. The Greenfield AVM Relies Improperly on Tax-Assessed Values from 2010-2014.

      Kilpatrick inappropriately uses tax-assessed values from 2011-2014 to value properties back in 2005-2007. In fact, 95% of the tax-assessed values used in the Greenfield AVM are from the years 2011-2014, many years after the original appraisals were performed. (Ex. 18 (Isakson Report) at App. F.) This use of tax-assessed values from years long after the appraisals at issue is problematic because they reflect changes in the overall real estate market or changes in neighborhoods or the condition of particular properties since the time of the original appraisals, an issue that is particularly pronounced given the significant decline in housing prices that occurred between 2007 and 2010. Use of tax-assessed values from 2010-2014 may bias the

---

[10]    In addition, in testing AVM accuracy, appraisal professionals measure how often the AVM returns values that are within 10% of the actual sales price. Ex. 33 (Kennedy Report) at 24. The Greenfield AVM's results failed to meet that standard industry target more than 55% of the time, *see id.* at 27—a rate more than double what is typically viewed as acceptable in the industry, *id.* at 24.

Greenfield AVM's results because "house prices fell dramatically after 2006 and have not fully recovered in all markets, which could lead to tax assessed values in 2010-2014 that are lower than those in 2004-2006." (Ex. 18 (Isakson Report) at 42.)

Kilpatrick illogically claims the Greenfield AVM makes a "time adjustment" for changes that have occurred since the original appraisals were performed through its use of the Days and Days Squared variables. (Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 106:19-108:18, 133:10-25.) That claim makes no sense because those variables reflect the time difference between a date in the distant past selected by Kilpatrick and the date of sale, not the difference between the date an appraisal was performed and the tax-assessed value from years later. (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 331:9-334:11; Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 144:3-145:2.)

Kilpatrick's use of tax-assessed values from after the date of the appraisal violates the professional standards that purportedly govern his reports, which were signed and submitted by Kilpatrick as formal appraisal reviews. Kilpatrick asserts that his opinions based on the Greenfield AVM are governed by USPAP Standard 3. (Ex. 2 (Kilpatrick AVM Report) at 23 ("USPAP Standard 3 directs my appraisal reviews in this report.").) USPAP Rule 3-2(h) provides: "Information that was not available to the original appraiser in the normal course of business may also be used by the reviewer; however, the reviewer must not use such information in the reviewer's development of an opinion as to the quality of the work under review." (Ex. 23 (USPAP 2014-15) at U-30.) The tax-assessed values used in the Greenfield AVM are nearly all from 2011-2014, several years after the date of the original appraisals. Kilpatrick testified that it had been his "goal" to use only tax-assessed values that existed on the date of the original appraisals. (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 221:2-222:3, 224:24-226:8.)

Yet, the Greenfield AVM failed to use values from that period 95% of the time and therefore cannot be used to criticize the quality of the appraisals of the Nomura Sample Properties consistent with USPAP Standard 3.[11]

## IV.    KILPATRICK'S TESTIMONY ████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████ ██  ████████████████████████████████████████

_____

[11] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

[12] ████████████████████████████████████████████
████████████████████████████████████████████████

(*footnote continued*)

(*footnote continued*)

**CONCLUSION**

Defendants respectfully request that the Court prohibit Dr. Kilpatrick from

testifying at trial and also exclude any mention of his Credibility Assessment Model and

Greenfield AVM.

Dated:  New York, New York
        December 5, 2014


                                        Respectfully submitted,


/s/ Thomas C. Rice                      /s/ David B. Tulchin
Thomas C. Rice (trice@stblaw.com)       David B. Tulchin (tulchind@sullcrom.com)
David J. Woll (dwoll@stblaw.com)        Steven L. Holley (holleys@sullcrom.com)
Andrew T. Frankel (afrankel@stblaw.com) Bruce E. Clark (clarkb@sullcrom.com)
Alan Turner (aturner@stblaw.com)        Bradley A. Harsch (harschb@sullcrom.com)
Craig S. Waldman (cwaldman@stblaw.com)  Katherine J. Stoller (stollerk@sullcrom.com)
SIMPSON THACHER & BARTLETT LLP          SULLIVAN & CROMWELL LLP
425 Lexington Avenue                    125 Broad Street
New York, NY  10017                     New York, NY  10004
Telephone:  212-455-2000                Telephone:  212-558-4000
Facsimile:  212-455-2502                Facsimile:  212-558-3588

*Attorneys for Defendant RBS Securities Inc.*   Amanda F. Davidoff
                                        (davidoffa@sullcrom.com)
                                        Elizabeth A. Cassady
                                        (cassadye@sullcrom.com)
                                        SULLIVAN & CROMWELL LLP
                                        1700 New York Avenue, NW, Suite 700
                                        Washington, DC  20006
                                        Telephone:  202-956-7500
                                        Facsimile:  202-956-6993

                                        *Attorneys for Defendants Nomura Holding
                                        America Inc., Nomura Asset Acceptance
                                        Corporation, Nomura Home Equity Loan, Inc.,
                                        Nomura Credit & Capital, Inc., Nomura
                                        Securities International, Inc., David Findlay,
                                        John McCarthy, John P. Graham, Nathan
                                        Gorin, and N. Dante LaRocca*

## Appendix A:  Credibility Assessment Model Questions and Scores

| # | Question | Score |
|---|----------|-------|
| **1** | Are the legal address and parcel ID sufficient to identify the subject? | 4.435 |
| **2** | Did the appraiser report an accurate listing history for the subject? | 4.535 |
| **3** | If there was a prior subject listing, was appraised value lower than listing price? | 7.14 |
| **4** | Was the appraised value of the subject less than or equal to 10% higher than the most recent listing within the last year? | 7.125 |
| **5** | If the appraisal was for a purchase, did appraiser report receipt of sales contract? | 2.535 |
| **6** | If appraiser reported a sales contract, did the appraiser analyze it? | 2.535 |
| **7** | Did the appraiser report supply/demand correctly? | 5.24 |
| **8** | Did the appraiser report property value trend correctly? | 5.24 |
| **9** | Did the appraiser report marketing time correctly? | 5.24 |
| **10** | Is the subject site description correct? | 4.615 |
| **11** | Did the appraiser report the sales history correctly? | 4.94 |
| **12** | Did the appraiser analyze all prior sales of the subject and comparables? | 3.94 |
| **13**[*] | **On an annualized basis, was the appraised value of the subject less than 10% higher than the prior sales price of the subject?** | **8.125** |
| **14**[*] | **Is the land value ratio greater than 20% and less than 30%?** | **8.6** |
| **15** | Did the appraiser use the cost approach for non-condominium properties? | 4.415 |
| **16** | Did the appraiser calculate the physical depreciation correctly? | 7.615 |
| **17** | Did the appraiser report external obsolescence correctly? | 7.615 |
| **18** | Did the appraiser confirm a broker/builder source for comparables using a disinterested third-party source? | 3.815 |
| **19** | For condominiums, was at least one of the comparables outside of the subject's condominium project? | 5.415 |
| **20** | Did the appraiser correctly report comparable sale transaction data? | 6.625 |
| **21**[*] | **If a previous sale of a comparable exists, is the current unadjusted price of that comparable less than 10% higher than the prior sale price on an annualized basis?** | **8.825** |
| **22** | Is the appraised value of the subject within the range of the unadjusted comparable sales prices? | 7 |
| **23** | Is the appraised value of the subject within the range of the adjusted comparable sales prices? | 7 |
| **24**[*] | **If income approach, do the mix of units for the comps match the mix of units for the subject?** | **9.2** |
| **25**[*] | **If income approach, does the gross rent multiplier ("GRM") used fall within the range of unadjusted GRMs for first 3 comps in the appraisal report?** | **9.2** |
| **26** | If income approach is used, do the market rent estimates for each unit mix fall within the range of rents reported for each unit mix for the first three comps? | 6.625 |

**Appendix A:  Credibility Assessment Model Questions and Scores (continued)**

| # | Question | Score |
|---|----------|-------|
| 27 | Did the appraiser use the most recent comps available? | 5.015 |
| 28 | Did the appraiser use the nearest comps available? | 5.015 |
| **29**[*] | **Was the average price per square foot ("PPSF") of the comps in the appraisal report less than or equal to the average PPSF of the comps available in the market at the time of the appraisal?** | **8.825** |
| **30** | Was the average site square footage ("SSF") of the comps used in the appraisal report less than or equal to the average SSF of the comps available in the market at the time of the appraisal? | 5.015 |
| **31** | Was the gross living area ("GLA") of the comps used in the appraisal report less than or equal to the GLA of the comps available in the market at the time of the appraisal? | 4.64 |

\*          Also shown in boldface, these are "major error" questions per Table 4-10 of the CAM Report.

Source:     Ex. 1 (Kilpatrick CAM Report) at 99, App. 4-6

**Appendix B: 31 Credibility Assessment Questions, Ranked By The Contribution Of Each Individual Question To The Overall Number Of Points Assigned To The Nomura Sample Properties**

| Rank (by Weighted Score) | CAM Question Number | CAM Question | A CAM Score (per Failed Appraisal) | B Number of Appraisals Failing Question | C = A * B Weighted Score | % of Total Weighted Score |
|---|---|---|---|---|---|---|
| 1 | Q14 | Is the land value ratio greater than 20% and less than 30%? | 8.600 | 135 | 1,161.0 | 13.0% |
| 2 | Q29 | Was the average price per square foot ("PPSF") of the comparables in the appraisal report less than or equal to the average PPSF of the comparables available in the market at the time of the appraisal? | 8.825 | 116 | 1,023.7 | 11.4% |
| 3 | Q16 | Did the appraiser calculate the physical depreciation correctly? | 7.615 | 102 | 776.7 | 8.7% |
| 4 | Q13 | On an annualized basis, was the appraised value of the subject less than 10% higher than the prior sales price of the subject? | 8.125 | 72 | 585.0 | 6.5% |
| 5 | Q21 | If a previous sale of a comparable exists, is the current unadjusted price of that comparable less than 10% higher than the prior sale price on an annualized basis? | 8.825 | 62 | 547.2 | 6.1% |
| 6 | Q9 | Did the appraiser report marketing time correctly? | 5.240 | 101 | 529.2 | 5.9% |
| 7 | Q8 | Did the appraiser report property value trend correctly? | 5.240 | 90 | 471.6 | 5.3% |
| 8 | Q30 | Was the average site square footage ("SSF") of the comparables used in the appraisal report less than or equal to the average SSF of the comparables available in the market at the time of the appraisal? | 5.015 | 82 | 411.2 | 4.6% |
| 9 | Q31 | Was the average gross living area ("GLA") of the comparables used in the appraisal report less than or equal to the average GLA of the comparables available in the market at the time of the appraisal? | 4.640 | 76 | 352.6 | 3.9% |
| 10 | Q17 | Did the appraiser report external obsolescence correctly? | 7.615 | 46 | 350.3 | 3.9% |
| 11 | Q12 | Did the appraiser analyze all prior sales of the subject and comparables? | 3.940 | 80 | 315.2 | 3.5% |
| 12 | Q27 | Did the appraiser use the most recent comparables available? | 5.015 | 56 | 280.8 | 3.1% |
| 13 | Q7 | Did the appraiser report supply/demand correctly? | 5.240 | 51 | 267.2 | 3.0% |
| 14 | Q10 | Is the subject site description correct? | 4.615 | 55 | 253.8 | 2.8% |
| 15 | Q28 | Did the appraiser use the nearest comparables available? | 5.015 | 46 | 230.7 | 2.6% |
| 16 | Q11 | Did the appraiser report the sales history correctly? | 4.940 | 45 | 222.3 | 2.5% |
| 17 | Q3 | If there was a prior subject listing, was appraised value lower than listing price? | 7.140 | 31 | 221.3 | 2.5% |
| 18 | Q22 | Is the appraised value of the subject within the range of the unadjusted comparable sales prices? | 7.000 | 28 | 196.0 | 2.2% |
| 19 | Q6 | If appraiser reported a sales contract, did the appraiser analyze it? | 2.535 | 55 | 139.4 | 1.6% |
| 20 | Q26 | If income approach is used, do the market rent estimates for each unit mix fall within the range of rents reported for each unit mix for the first three comparables? | 6.625 | 16 | 106.0 | 1.2% |
| 21 | Q2 | Did the appraiser report an accurate listing history for the subject? | 4.535 | 23 | 104.3 | 1.2% |
| 22 | Q24 | If income approach, do the mix of units for the comparables match the mix of units for the subject? | 9.200 | 11 | 101.2 | 1.1% |
| 23 | Q20 | Did the appraiser correctly report comparable sale transaction data? | 6.625 | 12 | 79.5 | 0.9% |
| 24 | Q15 | Did the appraiser use the cost approach for non-condominium properties? | 4.415 | 15 | 66.2 | 0.7% |
| 25 | Q25 | If income approach, does the gross rent multiplier ("GRM") used fall within the range of unadjusted GRMs for first 3 comparables in the appraisal report? | 9.200 | 7 | 64.4 | 0.7% |
| 26 | Q4 | Was the appraised value of the subject less than or equal to 10% higher than the most recent listing within the last year? | 7.125 | 7 | 49.9 | 0.6% |
| 27 | Q23 | Is the appraised value of the subject within the range of the adjusted comparable sales prices? | 7.000 | 4 | 28.0 | 0.3% |
| 28 | Q19 | For condominiums, was at least one of the comparables outside of the subject's condominium project? | 5.415 | 2 | 10.8 | 0.1% |
| 29 | Q18 | Did the appraiser confirm a broker/builder source for comparables using a disinterested third party source? | 3.815 | 1 | 3.8 | 0.0% |
| 30 | Q5 | If the appraisal was for a purchase, did the appraiser report receipt of sales contract? | 2.535 | 1 | 2.5 | 0.0% |
| 31 | Q1 | Are the legal address and parcel ID sufficient to identify the subject? | 4.435 | 0 | - | 0.0% |

**Total    8,952.1   100.0%**