# Exhibit 8

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    _____

5   FEDERAL HOUSING FINANCE )

6   AGENCY, etc.,            )

7           Plaintiff,      )

8        V.                 ) 11 CIV. 6201(DLC)

9   NOMURA HOLDING AMERICA, )

10  INC., et al.,            )

11          Defendants.     )

12  _____

13

14

                SULLIVAN & CROMWELL LLP

15                 125 Broad Street

           New York, New York  10004-2498

16                November 13, 2014

                    9:35 A.M.

17

18

                VIDEOTAPED DEPOSITION OF

19     JOHN A. KILPATRICK, PH.D., MAI, FRICS

20                   VOLUME I

21

22

23

24    REPORTED BY:

25    DEBRA SAPIO LYONS, RDR, CRR, CCR, CPE

```
 1                    JOHN A. KILPATRICK
 2      in the Merrill Lynch deposition that
 3      you believe to be incorrect?
 4           A.   Well, I can't recall as I
 5      sit here.  I have not reviewed that
 6      deposition in a while.  I certainly
 7      went over it.  If I missed anything
 8      when I went over it, I can't recall.
 9           Q.   Okay.  But just -- just to
10      be clear, as -- as you sit here today
11      in this deposition, there's nothing
12      that you know of in the Merrill Lynch
13      deposition that you believe to be
14      incorrect?
15           A.   Nothing that I know of, but,
16      again, I haven't thought of it in quite
17      a few months and as -- as you know, a
18      couple-of-day deposition, so if I
19      missed anything and failed to
20      acknowledge that on the errata that I
21      submitted, what, about eight months
22      ago, then certainly stand ready to
23      correct that here.
24           Q.   Now --
25                MR. RAND:  I'm just going on
```

```
 1                JOHN A. KILPATRICK

 2        the record.  I don't want to muddy

 3        up the record.  We can talk later.

 4        But we have an agreement I believe

 5        with Nomura about the use of Merrill

 6        deps verse the use of deps in HSBC

 7        and Goldman, but we can talk

 8        off-line.  Go ahead.

 9   BY MR. HOLLEY:

10        Q.   Okay.  You were also

11   deposed, Dr. Kilpatrick, in the FHFA

12   cases against Goldman Sachs, HSBC and

13   Ally on June 30th, July 1 and July 14

14   of this year; correct?

15        A.   That's correct.

16        Q.   And you sought to make your

17   answers in -- in that three-day

18   deposition as accurate as you could,

19   didn't you?

20        A.   I did.

21        Q.   Did you review the

22   transcripts of the depositions that you

23   gave in the Goldman Sachs, HSBC and

24   Ally cases?

25        A.   I did.
```

```
                    JOHN A. KILPATRICK
 1
 2           Q.    And as you sit here today,
 3     is there anything in your sworn
 4     testimony in that three-day deposition,
 5     in the Goldman, HSBC and Ally case that
 6     you believe to be in -- excuse me,
 7     incorrect?
 8           A.    Nothing that I can think of
 9     as I sit here.  Of course, that was, if
10     I recall correctly, 28 hours of
11     deposition testimony.  And as I went
12     through it, I was certainly focused on
13     some -- some things that I want to
14     clear the record on, but if I missed
15     anything in there, I think my Nomura
16     report stands on its own.  You know, I
17     -- I -- I have -- I certainly don't
18     recall anything that I missed, but that
19     was a lot of deposition testimony to go
20     through.
21           Q.    Now, you are a licensed Real
22     Estate Appraiser; is that right?
23           A.    Yes.
24           Q.    In fact, you're a licensed
25     Real Estate Appraiser in all 50 states
```

```
 1                    JOHN A. KILPATRICK
 2       of the United States and the District
 3       of Columbia; correct?
 4            A.   Well, two caveats.  Number
 5       one, the -- the term of art is "state
 6       certified" and I believe I am last I
 7       checked.
 8            Q.   Okay.  Is there any reason
 9       for you to doubt that you are a State
10       Certified Appraiser in all 50 states
11       and in the District of Columbia?
12            A.   No, the -- the -- no
13       particular reason to doubt.  The
14       renewal dates are -- are not uniform
15       through the states.  They are scattered
16       and -- and frequently not the 1st or
17       the 30th of the month, and I have staff
18       who keeps track of all of that for me.
19       There -- there are occasions when one
20       gets missed and we -- we pick that up
21       as quickly as we can.
22                 But to the best of my
23       knowledge sitting here, I'm currently
24       licensed in all 50 states and D.C.
25            Q.   Why did you think it was
```

1                    JOHN A. KILPATRICK

2        important to be a State Certified

3        Appraiser in so many different

4        jurisdictions?

5              A.   Well, my work goes all over

6        the United States.  And prior to a

7        couple of years ago, I -- I had been

8        licensed in a number of states,

9        probably half or more of the states at

10       one time or another.  And when I took

11       on the stream of cases which --

12       which -- of which Nomura is part, I

13       recognized that I would be reviewing

14       property all over the United States.

15       Some states request or require that an

16       appraiser reviewing appraisals done in

17       that state be licensed in that state,

18       some don't.  And so to err on the side

19       of caution, I simply directed my staff

20       to get me licensed in every state

21       rather than try to make determinations

22       with sometimes ambiguous regulatory

23       language about whether I needed to be

24       licensed in a given state or not.

25             Q.   You view yourself as a very

```
 1              JOHN A. KILPATRICK
 2     experienced Real Estate Appraiser;
 3     right?
 4          A.   I think so, yes.
 5          Q.   How many real estate
 6     appraisals have you performed in your
 7     career?
 8          A.   Well, tens of thousands.
 9          Q.   When you perform a real
10     estate appraisal, you're not just
11     mechanistically applying formulas, are
12     you?
13          A.   What do you mean by that?
14          Q.   Well, when you perform a
15     real estate appraisal, you are
16     exercising your own independent
17     judgment based on your experience;
18     correct?
19          A.   In a -- in a formulaic
20     manner which has to be consistent with
21     generally accepted appraisal
22     methodology and standards.  In other
23     words, we have a very robust body of
24     appraisal standards, supplemental
25     standards, guidelines, methodology with
```

                  JOHN A. KILPATRICK

1   which an appraiser is -- is obligated

2   to be familiar.  For that reason, while

3   we do use terms like an opinion of

4   value, that opinion of value has to be

5   arrived at in a manner that's

6   consistent with mechanistic processes,

7   if you will, that would be recognized

8   by the appraiser's peers in the

9   industry and -- and accepted by and

10  utilized by that appraiser's peers in

11  the industry.

12         Q.   When you do a real estate

13  appraisal, you aren't simply looking at

14  a checklist and applying it based on

15  thresholds that you have listed there;

16  correct?

17         A.    Well, I do.  I mean, we use

18  checklists all the time.  We have in

19  our firm checklists which we have to

20  follow; and indeed appraisal standards,

21  USPAP, provides checklists which

22  appraisers are obligated to follow.  If

23  I were to fail to follow those

24  checklists, I would be outside of the

```
 1                 JOHN A. KILPATRICK
 2     appraisals which gets done in America.
 3                 And so appraisals get done
 4     for a lot of other reasons.  I happen
 5     to do a lot of litigation and so
 6     oftentimes I'll get called in and --
 7     and a attorney will say, "We have this
 8     property in Oshkosh, Wisconsin and it's
 9     been impacted by a garbage dump across
10     the street.  You know, what's the
11     probable impact on value as a
12     percentage of the otherwise unimpaired
13     value?"
14                 Well, there's a whole host
15     of literature, research that -- that
16     will -- will help inform that opinion.
17                 So I could say, "Well, all
18     things being equal, under most normal
19     circumstances the literature would tell
20     us that property's probably impacted
21     between X percent and Y percent."  I've
22     now performed an appraisal under --
23     under appraisal standards.  I have to
24     inform my client that this opinion of
25     value indeed falls under the rubric of
```

```
 1                  JOHN A. KILPATRICK
 2      USPAP.  I've never gone to Oshkosh,
 3      Wisconsin and viewed that property, but
 4      I have valued a property in Oshkosh,
 5      Wisconsin and I've never been there.
 6      Happened to be a hotel.
 7               But the -- the point of it
 8      is:  There are many occasions when an
 9      appraiser would -- would -- would
10      render an opinion about value about a
11      piece of property without having
12      physically inspected the property.
13           Q.   Before your focus in your
14      career, you know, became litigation,
15      did you do appraisals in connection
16      with loans by lending institutions to
17      individual homeowners?
18               MR. RAND:  Objection, form.
19         Go ahead.
20           A.   A few.
21           Q.   Okay.  And in those
22      appraisals that you did for lending
23      institutions where individual
24      homeowners were buying properties, did
25      you ever do one of those without
```

```
 1                    JOHN A. KILPATRICK
 2     physically inspecting the property?
 3             A.    I don't think so.
 4             Q.    Why not?
 5             A.    The supplemental standards
 6     proffered by the agencies which govern
 7     residential mortgage lending appraisal
 8     require that that be done.
 9             Q.    Now --
10             A.    In other words, for -- for
11     that specific kind of appraisal, that's
12     -- that's contained in a supplemental
13     standard.
14             Q.    Now, focussing again on
15     the -- on the appraisals that you
16     performed, residential real estate
17     transactions for lending institutions,
18     did you inspect both the exterior and
19     the interior of the property in
20     connection with the appraisal that you
21     performed?
22             A.    Yes.
23             Q.    Why?
24             A.    Again, because in that very
25     specific circumstance, which is in a --
```

Page 34

1                   JOHN A. KILPATRICK

2      a federally regulated lending

3      environment, that's contained in the

4      supplemental standards.

5                   And it -- it varies

6      according to which set of supplemental

7      standards you're -- you're adhering to.

8      FHA, for example -- and none of these

9      Nomura appraisals were FHA by the way,

10     but FHA requires that you actually

11     climb in the attic.  They jokingly call

12     it a head-and-shoulders inspection.

13     You have to -- they literally in the

14     FHA regs require that the appraiser

15     insert his -- his or her head and

16     shoulders into the attic with a

17     flashlight and the same as --

18          Q.   Hope there aren't any bats

19     up there; right?

20               A.   Same as -- and our -- you

21     know, raccoons being more common in the

22     south.

23                   But -- and the same is true

24     in the -- in the crawl space, if it's a

25     crawl space house.

1              JOHN A. KILPATRICK

2                  Now, that level of -- of

3        inspection is not required under the

4        GSEs, but -- but it is -- it is done

5        and I have done it because it's a GSE

6        requirement.

7              Q.    In these real estate

8        appraisals that you performed for

9        purchases of houses where there were

10       mortgages from banks, did you rely on

11       aerial photos or Google Maps or some

12       other pictures in lieu of going to

13       visit the property?

14             A.    Not in lieu of, but

15       certainly in addition to.

16                  Now, at the time I got

17       started doing this, there wasn't a

18       Google, but there were maps which, in

19       fact, appraisers were obligated to --

20       to review.  FEMA flood plain maps, for

21       example.  So I would do those in the

22       conduct of those appraisals, but not in

23       lieu of them.

24             Q.    Would you agree with me that

25       two competent real estate appraisers,

```
 1              JOHN A. KILPATRICK
 2    these Greenfield AVMs.  Now, nobody
 3    measures the R squared for individual
 4    one-off appraisals, but I can tell you
 5    that I don't think individual
 6    appraisals -- individual appraisers
 7    would suggest to you that they're able
 8    to explain 86, 87 percent of the
 9    variance in property values using
10    heuristic one-off methods, so indeed
11    the accuracy of the -- the Greenfield
12    AVM speaks for itself.
13         Q.   But can you answer the
14    question that I asked you which --
15    and -- and I think you -- you remember
16    what the question is; right?
17         A.   Well, I believe I do.  And I
18    thought I just did.  I don't mean to be
19    silly, but that was my answer to your
20    question.
21         Q.   Okay.  So -- so it's your
22    testimony here today that the
23    Greenfield AVM does a better job of
24    valuing the Nomura subject properties
25    than you, yourself, could do in a
```

1                    JOHN A. KILPATRICK

2       standard appraisal?

3                    MR. RAND:  Objection, form.

4          Go ahead.

5             A.    And my answer is I've never

6       really thought about me, myself, if I

7       ran around the country and tried to

8       value a couple of thousand Nomura

9       properties; and -- and I'm not trying

10      to hold myself out individually as

11      whether I'm a better appraiser than

12      these individual appraisers you had

13      working for you or your -- your client

14      had working for them, but I am holding

15      out that the Greenfield AVM has a high

16      degree of accuracy and a high degree of

17      explanatory power.  And so with that in

18      mind, it -- it -- it certainly appears

19      that the Greenfield AVM sets an

20      extremely high threshold that I or any

21      other appraiser would have a tough time

22      reaching.

23             Q.    Have you sought to market

24      the Greenfield AVM to lending

25      institutions based on your view that it

```
 1                    JOHN A. KILPATRICK
 2      does a better job than human appraisers
 3      in reaching valuations for residential
 4      properties?
 5             A.    Have I thought about it?
 6             Q.    Sure.  Have you thought
 7      about it?
 8             A.    Oh, yeah, I've thought about
 9      it.  I'm just not doing it.
10             Q.    Why not?
11             A.    Well, number one, we are
12      kind of busy right now doing other
13      things.  I mean, we do market the
14      Greenfield AVM, but as it happens,
15      we've -- we've -- we're presently using
16      it in litigation contexts, but -- and
17      -- and certainly outside of the scope
18      of my testimony here today, but -- but
19      to answer your question directly, I
20      mean, we're constantly thinking about
21      ways in which to utilize it in other
22      capacities, but -- but we're not doing
23      any of that right now.
24             Q.    Now, it's your opinion that
25      the Greenfield AVM generates what you
```

1          JOHN A. KILPATRICK

2    call the true market value of the

3    Nomura subject properties; is that

4    right?

5          A.   Did -- did I use that exact

6    phraseology in my report?

7          Q.   I'll represent that you did.

8    I mean, I'm happy to get out the report

9    if you want, but is -- is it your view

10   that the Greenfield AVM generates the

11   true market value of the Nomura subject

12   properties?

13         A.   It -- it is, yes.

14         Q.   Okay.  And in your opinion,

15   the true market value produced by the

16   Greenfield AVM should trump the actual

17   price at which the Nomura properties

18   were sold; is that right?

19         A.   Of course.

20         Q.   And why is that?

21         A.   Well, I go back to the

22   Appraisal Institute's edicts about

23   that, that the market value is not

24   supposed to be just a validation of the

25   original sales price.  We know that

1                    JOHN A. KILPATRICK

2     original sales prices even when reached

3     at between arm's length participants

4     may include other things.  They may be

5     representative of bidding wars.  They

6     may be representative of -- and -- and

7     the Appraisal Institute in -- in one of

8     its texts talks about foreshortened

9     marketing periods, that if the normal

10    exposure time in a market, for example,

11    is 90 days, but this particular

12    property only sold in nine days, then

13    the appraiser needs to take a very

14    skeptical eye to a selling price that

15    was arrived at in only nine days.

16              If the seller has agreed to

17    provide personal property or has agreed

18    to pay non-market financing

19    arrangements, buy down the points, buy

20    down the -- the interest rate, pay the

21    closing costs, any of those things.  If

22    there were factors about the property

23    that the buyer did not -- did not know

24    about and we find that out in -- in

25    contaminated property cases, that often

1                   JOHN A. KILPATRICK

2       there's a -- not a level of disclosure

3       or due diligence done.  Finally, what

4       if the marketing time rather than

5       being -- I pointed out 90 days and a --

6       and a property selling in nine.  What

7       if the normal marketing time is 90

8       days, but this property took 900 days

9       to sell.  You know, that's certainly

10      evidence that there's a problem

11      associated with the sale of this

12      property.

13                   So all of those together can

14      point out to you reasons why a sales

15      price needs to be viewed skeptically

16      and the appraiser needs to arrive at an

17      independent determination of true

18      market value which may have little to

19      do with the actual purchase price.

20           Q.    Now, what work, if any, have

21      you done to look at each of the Nomura

22      subject properties to determine whether

23      the kinds of things you just testified

24      about are present, things like

25      undisclosed contamination?

1              JOHN A. KILPATRICK

2    them do.  I have seen some, and I can't

3    identify which ones they are, but I

4    have seen some commercial AVM outputs

5    that provide a -- a high and a low

6    estimate, but I can't even tell you

7    which ones those are.

8         Q.   Why doesn't the Greenfield

9    AVM provide a range of values as

10   opposed to a single point estimate of

11   value?

12        A.   'Cause that's not its

13   purpose.

14        Q.   What do you mean when you

15   say "that's not its purpose"?

16        A.   Its purpose is to render

17   a -- a -- it -- its purpose is to be a

18   tool that aids me in rendering a -- an

19   opinion of market value, not to render

20   a -- a range of market values, so it's

21   -- it's not its -- its purpose.

22        Q.   Is there any instance with

23   regard to any of the Nomura subject

24   properties where your opinion about

25   the -- the value of that property

```
 1                    JOHN A. KILPATRICK
 2      differs by one penny from the output of
 3      the Greenfield AVM?
 4           A.    No.   Not after I have taken
 5      steps to verify the statistical
 6      accuracy of the model, and not after
 7      I've taken appropriate steps to be able
 8      to utilize that tool consistent with
 9      good appraisal practice.
10                    And I'll give you an
11      example.  I've likened my AVM to a
12      sales adjustment grid.  Well, if I'm an
13      appraiser and I was limiting my
14      analysis to a sales adjustment grid, I
15      performed all the necessary steps, did
16      all the calculations, may very well use
17      a computer to help me do that, by the
18      way, and -- and came out with a value
19      at the end of the sales adjustment
20      grid, well, why would my value opinion
21      differ from that.  I mean I've operated
22      the sales adjustment grid.  I've
23      selected the data to go into it.
24      I've verified that the calculations
25      worked properly.  I've done the
```

```
 1                JOHN A. KILPATRICK
 2    reconciliation at the end.  I've --
 3    I've found the final answer at the end
 4    of the grid.  And the AVM is
 5    identically the same sort of product.
 6    In other words, if I have done all of
 7    the work with respect to the AVM, I
 8    developed it, I calibrated it, I
 9    checked the statistical
10    characteristics, I oversaw the data
11    gathering, I oversaw the data
12    applications within it, why would I
13    disagree with it.
14          Q.   Are you aware of any
15    commercial AVM that produces a reliable
16    determination of the reasonableness of
17    an opinion of value about a particular
18    property rendered by a licensed Real
19    Estate Appraiser five or more years in
20    the past?
21          A.   I'm not aware one way or the
22    other.  There may be.  I'm just not
23    familiar with them as I sit here today.
24          Q.   You can't identify one for
25    me that meets the criteria that I just
```

1                  JOHN A. KILPATRICK

2       set out in my question?

3            A.   No.  That doesn't mean they

4       don't exist.  That just means I can't

5       identify any as I sit here.

6            Q.   Would you agree with me that

7       all commercial AVMs have difficulty

8       accounting for property specific

9       attribute -- attributes both positive

10      and negative that can be assessed by a

11      licensed Real Estate Appraiser with

12      boots on the ground on the subject

13      property?

14           A.   I don't know that I agree

15      with that as a blanket statement.

16           Q.   Do you agree with it at all?

17           A.   Well, it's a multipart

18      question.  You're asking about all

19      AVMs; and as I've already testified,

20      you know, I don't -- I don't know how

21      all AVMs work.  In other words, most of

22      them are proprietary black boxes.  Mine

23      on the other hand, I do know how it

24      works and I do know that it's got an

25      extraordinarily high R squared.  My

```
 1              JOHN A. KILPATRICK
 2     overall OLS R squared I think is 86, 85
 3     or 86 percent.  My overall OLSXY is 86
 4     or 87 percent.  Those are
 5     extraordinarily high explanatory
 6     powers, which tells me that on average
 7     my AVM is doing a much better job than
 8     boots-on-the-ground appraisers so I can
 9     at least speak to mine, that it does
10     really, really good job.
11              Now, is that true of all
12     boots-on-the-ground appraisers?  No.
13     There's some that are very, very good.
14     I'm not -- I'm not blanket making
15     statements about all appraisers and all
16     appraisals.  I'm just making some
17     statements about these Nomura
18     appraisals.
19          Q.   Now, in connection with the
20     supplemental report that you submitted
21     on October 6, did you have occasion to
22     look at the -- the survey results of
23     Lee Kennedy's surveys of commercial
24     AVMs?
25          A.   Would you provide me with
```

```
 1                 JOHN A. KILPATRICK
 2     that?  I don't have a copy of it in
 3     front of me and I don't have it
 4     committed to memory.
 5            Q.   Oh, you mean your October 6
 6     report?
 7            A.   Yes.
 8                 (Exhibit 58702, Expert
 9        Report of John A. Kilpatrick, Ph.D.
10        October 6, 2014, is marked for
11        identification.)
12     BY MR. HOLLEY:
13            Q.   So we're going to mark as
14     Exhibit 58702 a document entitled
15     Expert Report of John A Kilpatrick
16     Ph.D. dated October 6, 2014.
17            A.   Thank you.
18            Q.   And you should feel free to
19     look at as much of this as you like
20     obviously, but the part I'm talking
21     about appears to Pages 8 and 9.
22            A.   (Reviewing document.)
23                 Yes, I've had the
24     opportunity to review Mr. Kennedy's
25     work.
```

1               JOHN A. KILPATRICK

2          Q.    Okay. And did you, in the

3    context of reviewing what Mr. Kennedy

4    did, look at the descriptions provided

5    by the vendors of the Real Info Inc.,

6    Collateral Analytics and two DataQuick

7    AVMs?

8          A.    I may have.  I was more

9    interested in the numbers than in

10   the -- the marketing literature.

11         Q.    Let's -- I want to turn back

12   now to the Greenfield AVM, to your AVM.

13              Can you tell me how it

14   accounts for whether one of the Nomura

15   subject properties is located on a busy

16   street with traffic noise?

17         A.    The AVM?

18         Q.    Yes.

19         A.    The credibility assessment

20   does that.  The AVM would pick that up

21   via the tax assessment data to the

22   extent that the tax assessor has picked

23   that up as a factor influencing value.

24   In other words, I utilize tax

25   assessment information specifically

```
 1                    JOHN A. KILPATRICK
 2     because tax assessors look at things
 3     like that; and if, in fact, a property
 4     being located on a busy street impacts
 5     its value, so it doesn't always, but to
 6     the extent that it does impact value,
 7     then the tax assessor would be expected
 8     to pick that up.
 9               Now, I test to see if the
10     tax assessor's work is statistically
11     significant; and, in fact, I find that
12     in 96 percent of the cases, greater
13     than 96 percent of the cases the tax
14     assessment data is, in fact,
15     statistically significant, which tells
16     me that tax assessors to the extent
17     that influences value are picking that
18     up.
19          Q.   If tax assessed value is
20     such a great proxy for market value of
21     properties, then why do people ask for
22     appraisals rather than just looking at
23     the tax assessed value in the records
24     of the county?
25          A.   Well, for three reasons, and
```

1               JOHN A. KILPATRICK

2    you asked me about that earlier this

3    morning:

4               Number one, in not every

5    county is that true, and of course I

6    test and filter for that.

7               Number 2, as Goolsby

8    outlined in his journal article 15 or

9    so years ago in the Journal of Real

10   Estate Research, tax assessment data

11   may be unbiased, excuse me -- may be

12   biased but inconsistent.  And so one

13   needs to make appropriate but usually

14   monotonic adjustments to the tax

15   assessment data in order to arrive at

16   the -- the tax assessor's determination

17   or the -- the appropriate determination

18   of fair market value.

19               Number three, tax assessment

20   data is usually as of one effective

21   date, whereas the -- the need for a

22   appraised value is as of a different

23   effective date.  So there needs to be

24   some sort of time adjustment and that

25   time adjustment isn't always perfectly

1                    JOHN A. KILPATRICK

2       linear.

3                    I said there would be

4       three, but there's actually a fourth.

5       There is often need to make some

6       adjustments.  Tax assessors in my

7       investigation of tax assessment data

8       tend to use linear extrapolations where

9       sometimes curvilinear is more

10      appropriate. That's why sometimes you

11      see things like days squared in my

12      model or negative bath adjustments to

13      correct for the linearity in marginal

14      prices of baths for example.

15                    So one can use tax

16      assessment data, but one best use it in

17      the context of a statistically valid,

18      tested, and calibrated model.

19            Q.    So it's your testimony that

20      it is by intention that in certain of

21      the Nomura subject products --

22      properties the addition of a bathroom

23      causes the value of the house to go

24      down?

25            A.    It is the -- there is a

1          JOHN A. KILPATRICK

2    negative coefficient on the bathroom

3    adjustment to account for the

4    non-linearity in bathroom values

5    inherent in the tax assessment data.

6    In short, bathrooms doesn't have a

7    negative marginal value, it's positive

8    at all -- all reasonable levels.  But

9    if one surmises or supposes a linear

10   relationship between bathroom and

11   value, then one at the margin may need

12   to make a negative adjustment to

13   account for the non-linearity between

14   number of bathrooms and value.

15          Q.   Now, and correct me if I'm

16   wrong, but I think you said in most

17   cases you can make sort of direct

18   adjustments between tax assessed value,

19   monotonic I think you said, monotonic

20   adjustments to tax assessed value in

21   order to get to market value.  Did I

22   understand you correctly?

23          A.   In most instances, yeah.

24   It's -- our model works most of the

25   time; and certainly on average gives

```
 1               JOHN A. KILPATRICK
 2    statistically robust inferences about
 3    the -- the values of these underlying
 4    Nomura properties.
 5               The -- I'm -- I -- I think
 6    for the purposes for which I've applied
 7    this AVM, it works very, very well and
 8    is statistically very, very powerful.
 9        Q.    It's close enough in your
10    view?
11        A.    I don't know if I would use
12    the word "close enough."  I don't know
13    that's got a statistical meaning.  But
14    I think it's got statistically robust
15    characteristics.
16        Q.    Okay.  How does the
17    Greenfield AVM account for whether a
18    property is located down wind of an --
19    of an industrial facility that
20    generates noxious gases?
21        A.    In -- in -- again, I would
22    expect that to be picked up by the
23    local tax assessor and to the extent
24    that has an impact on value, it would
25    be picked up in the value conclusion
```

1                    JOHN A. KILPATRICK

2      that if that appraisal has a sufficient

3      number of errors in it to accumulate

4      a -- by my scoring I -- I use a

5      numerical score, 20, but more to the

6      point, if that appraisal has a number

7      of errors in it, some egregious, some

8      not, then that appraisal cannot be

9      believed.  It's not credible.  A

10     reasonable user, a reasonable appraiser

11     would not believe the results of that

12     appraisal exercise.  So I'm not making

13     judgment calls about the individual

14     appraisers --

15          Q.   Well --

16          A.   -- but to the extent that

17     their work was flawed.

18          Q.   Well, isn't that inherent in

19     what you're doing?

20               If you say that no

21     reasonable appraiser applying USPAP and

22     other industry standards could have

23     believed the opinion of value delivered

24     in 2005 or 2006, aren't you necessarily

25     saying that they were engaged in

1              JOHN A. KILPATRICK

2    misrepresentation?

3         A.   Again, I'm not -- I'm not

4    going that far.  I'm not trying to

5    pass -- help -- I'm not trying to pass

6    the buck from Nomura off to its

7    appraisers and say that these

8    appraisers were misrepresenting.  I'm

9    trying to say these appraisals

10   misrepresented the -- the

11   characteristics of the property.

12   The -- and the term of art in appraisal

13   is less than credible.  In other words,

14   these appraisals could not be believed.

15   But I'm not appointing accusatory

16   fingers at individual appraisers per

17   se.

18        Q.   Is it your expert opinion

19   that tax assessed value is a good proxy

20   for all positive and negative

21   characteristics of a property that can

22   affect its value?

23        A.   Not always.  And in fact, as

24   I noted up front, I filter out some

25   counties where I don't find it to be

```
 1                JOHN A. KILPATRICK
 2    useful.  But indeed in my model on
 3    average, it appears to work.  I mean, I
 4    get statistically significant
 5    coefficients on the tax assessment
 6    value 96 percent of the time and I end
 7    up with R squareds in the high 80s
 8    in -- in both my OLS and OLSXY models.
 9    So it certainly appears to be.
10    Statistically, it's borne out that it
11    is on average.
12         Q.   And putting aside the
13    counties where you've determined
14    that -- that tax assessed value is not
15    a good proxy for market value, so let's
16    just -- that's my assumption, we're
17    going to take those counties out.  For
18    the remaining counties, is it your
19    expert opinion that tax assessed value
20    is a good proxy for all positive and
21    negative characteristics of a property
22    that can affect its value?
23         A.   Not always.  And, in fact,
24    that's why I have some filters on
25    comparables to make sure that I'm
```

```
 1              JOHN A. KILPATRICK
 2    filtering out any outliers.  I have a
 3    surfeit of data so why use it all.  I
 4    just utilize that data that fits my
 5    model.  And so it's my testimony that
 6    the tax assessment data that I use in
 7    my model works.  But I'm not here to
 8    make blanket statements about all tax
 9    assessment data in all counties in the
10    United States.
11              Q.   Now, and the filtering that
12    you're referring to is the
13    cross-validation filter that the
14    Greenfield valuation model uses?
15              A.   Sure.  I do that; and that
16    allows me to utilize tax assessment
17    data in a manner which fits my model
18    and, therefore, statistically works.
19    So I mean at the end of the day what I
20    want is a model that's accurate on
21    average and that's what I end up it.
22              Q.   Isn't that -- isn't that the
23    world upside down, Dr. Kilpatrick?
24              Aren't you doing something
25    called data censoring when you take out
```

1                    JOHN A. KILPATRICK

2       data observations that don't fit your

3       model rather than changing your model

4       so that it is explanatory of the data

5       that exists?

6             A.   No.  And -- and I think that

7       what we're trying to do here -- what

8       I'm trying to do here is develop and

9       utilize a model in the most accurate

10      fashion possible.  I'm not data

11      censoring or cherry picking data in

12      order to tweak individual appraisal

13      determinations.

14                  My cross-validation filter,

15      for example, is something I've utilized

16      in many, many models.  Up to this point

17      I've used it to appraise thousands of

18      properties.  I haven't changed it for

19      Nomura.  And I certainly -- I don't

20      change it for individual properties.

21      Is it appropriate to filter data?

22      Yeah, of course.  I mean there's a

23      robust set of econometric tools for

24      filtering data.

25                  There's -- in SAS, for

```
 1                    JOHN A. KILPATRICK
 2      example, the common software package
 3      that's used by many econometricians,
 4      there's the robust OLS tool which
 5      filters data.  There's the Cook's D
 6      statistic which filters data.  There's
 7      winsoring which is very common in the
 8      biostatistics field for filtering data.
 9      There's the PRESS statistic methodology
10      for filtering data.
11                    In -- all of those, by the
12      way, are very, very close to my
13      cross-validation filter in -- in
14      application and in fundamentals.
15                    So remember what the purpose
16      here is, is to have a really, really
17      good model that on average gives an
18      extremely accurate determination of
19      market value for these Nomura
20      properties.  All of this filtering is
21      designed to make this model good.  And
22      that's what I've done.
23           Q.   Is it your testimony that
24      the Greenfield AVM is a hedonic model?
25           A.   Yes.
```

```
 1              JOHN A. KILPATRICK
 2    are able to examine retrospective
 3    values.
 4              Now, at that point the
 5    question is:  Does the model work.  In
 6    other words, it's not enough to simply
 7    state a model and then use it.  You
 8    also have to test it.  Part of our
 9    filtering exercise, of course, is to --
10    is to filter data that works within the
11    confines of a model like that.
12              Our statistical outputs let
13    us know that the model actually works
14    extremely well; and, in fact, works
15    better than other AVMs, works better
16    than Nomura's contemporaneous AVMs.
17              So by retrospective
18    valuation using data that's gathered
19    from more recent years does a better
20    job valuing these Nomura properties
21    than Nomura's own AVMs done at the time
22    of the loan originations.
23         Q.   And is that testimony based
24    on the middle 90 percent of the output
25    of the GAVM or on its entire output?
```

```
                        JOHN A. KILPATRICK
1
2          A.    It's based on an apples to
3     apples comparison with the Nomura AVM.
4     If you go to my expert report of
5     October 6 and turn to Page --
6          Q.    Nine?
7          A.    -- 9 -- that's not the page
8     I'm looking for.  Excuse me.
9          Q.    Sorry.
10         A.    Nine may not be the page.
11    There was a table I produced to you,
12    and as I sit here I can't recall
13    whether it was in this or a subsequent
14    report, but there's a table I produced
15    to you where I looked at my AVM
16    compared to the same properties valued
17    by the Nomura AVM, and I apologize
18    'cause I thought it was in this report
19    but it may be somewhere else, and I
20    found that when you compared apples to
21    apples properties that I valued
22    compared to properties that Nomura had
23    valued, you found that I had better
24    statistical characteristics on those
25    properties than Nomura had using their
```

1                    JOHN A. KILPATRICK

2      AVM.

3           Q.   And just to be clear, what

4      were you comparing in order to

5      determine accuracy?

6           A.   I was comparing bias, and I

7      was also looking at the variance

8      statistics.

9           Q.   Okay.  Now, I just want to

10     go back.  I know you've told me that

11     you make adjustments, but I want to

12     focus on the input, the data inputs to

13     the Greenfield AVM.

14               You would agree with me,

15     would you not, that all of the data

16     inputs to the Greenfield AVM are

17     contemporaneous data?

18          A.   I can't recall the exact

19     dates of them.  They're

20     contemporaneously gathered, but they're

21     not all contemporaneous with the

22     original dates of value.

23          Q.   So, for example, the tax

24     assessed value is all from 2010 or

25     later; correct?

1                JOHN A. KILPATRICK

2          A.    Yes.

3          Q.    And what about the other

4    characteristics of these properties, is

5    that data you're getting

6    contemporaneously or are you somehow

7    going to a source that existed only as

8    of 2005 or '6 when the loans were

9    originated?

10         A.    No.  We're gathering it

11   contemporaneously.

12         Q.    Okay.  Now, what -- what

13   study have you made to determine the

14   direction and extent of changes in tax

15   assessed valuation between the date

16   that the appraisals were done for the

17   Nomura subject properties and the date

18   on which the tax assessed valuations

19   were gathered for use in the Greenfield

20   AVM?

21         A.    Well, indirectly, again, we

22   look at the summary statistics, the

23   statistical properties of the AVM.  In

24   short, the fact that my AVM has such

25   powerful predictive power that explains

```
 1              JOHN A. KILPATRICK
 2      such a high degree of the variance
 3      tells us that the model works.  In
 4      short, it tells us that we don't have
 5      to do that kind of study because
 6      gathering the contemporaneous data,
 7      making the appropriate adjustments, and
 8      producing the appropriate coefficients
 9      gives you a statistically powerful
10      model.
11           Q.   So it didn't matter to you
12      in your analysis how tax assessed value
13      had changed in particular counties
14      between the time that you ran the GAVM,
15      the Greenfield AVM, and the time that
16      the appraisals were conducted for the
17      Nomura subject properties?
18           A.   Right.  Why would it?   I
19      mean at the end of the day we're able
20      to use that data to produce a
21      statistically powerful model that on
22      average does a -- produces values with
23      a high degree of accuracy.  So the --
24      the fact is the data works.  The model
25      works.  As we expected it would.  And
```

1              JOHN A. KILPATRICK

2    so the fact that there may have been --

3    may have been some changes in certain

4    counties doesn't impact our thinking

5    if, in fact, we have a model that works

6    very well.

7         Q.   Now, you just said to me

8    that the model worked as you expected

9    it to work.

10             What did you mean by that?

11        A.   Well, remember, I developed

12   this model based on years of experience

13   working with regression models and tax

14   assessment data.  So when I put this

15   model together in the first place I

16   expected it was going to work based on

17   my experience as an appraiser for many,

18   many years.  I would also be careful

19   about how I used the phrase "put this

20   model together" because I certainly

21   didn't just put it together for Nomura

22   or just put it together for the RMBS

23   litigation, but indeed this model is an

24   outgrowth, an evolution of the hedonic

25   modeling that I've been doing using tax

Page 133

1               JOHN A. KILPATRICK

2      assessment data for many, many years,

3      predating this RMBS litigation.

4               So at the end of the day, I

5      would, given my experience using tax

6      assessment data and hedonic modeling, I

7      would expect this model to work and low

8      and behold it does work per my

9      expectations.

10          Q.   All right.  Which

11     coefficient in the OLS and OLSXY

12     regressions adjust for changes in tax

13     assessed value between the date that

14     the GAVM is run and the date that the

15     property was originally appraised?

16          A.   Well, you got -- you have to

17     take into account both the date

18     coefficient, the date squared

19     coefficient, and the coefficient on the

20     tax assessment value itself.  So all of

21     these working together help make that

22     adjustment.  In short, I'm not

23     isolating any one coefficient but the

24     model itself accounts for any

25     differences between 2010 and 2005.

                    JOHN A. KILPATRICK

1
2          Q.    I think my econometrics
3     professor would have wanted something a
4     little more precise than that.   Which
5     -- which coefficient is it that makes
6     that adjustment?
7          A.    Well, as a former professor
8     who has taught econometrics, I would
9     tell you that taking all these
10    variables together allow me to make
11    that adjustment from tax assessment
12    values in 2010 back to a market value
13    in 2005.
14         Q.    Okay.   And can you be any
15    more precise about how that happens?
16         A.    I'd have to think about it.
17    I mean remember, this is not a
18    causality model but a correlation
19    model.   And so to the extent we're able
20    to measure the correlation between
21    these variables as measured in 2010 and
22    the values that we're interested in in
23    2005, this model does an
24    extraordinarily good job of doing that.
25    And so to get any deeper into the --

                    JOHN A. KILPATRICK

1

2    into the bee hive, we would simply need

3    to unpack the math of ordinary least

4    squares, the math of determining the

5    correlation between an array of

6    variables and a target variable of

7    market value.

8             It's -- we need to unpack

9    the matrix algebra that goes into it.

10   I don't want to get too mystical.  I

11   don't want to suggest to the court that

12   there's a magic wand that one waves

13   over it, because we're using

14   extraordinarily well-developed ordinary

15   least squares techniques in order to be

16   able to take an array of variables and

17   find the correlation between this array

18   of variables and market value.  And we

19   do so in a highly robust fashion using

20   time tested tools and techniques.

21        Q.   When you say that the

22   Greenfield AVM is not a causality model

23   but a correlation model, can you tell

24   me what you mean by that?

25        A.   Yeah.  I'm not trying to say

1                    JOHN A. KILPATRICK

2        that there's some changes in tax

3        assessment data over time that really

4        matter.  I'm simply saying that we can

5        use the tax assessment values in 2010

6        to determine what the market values

7        were in 2005, that there's a high

8        degree of correlation between those

9        two.

10                        And it kind of makes sense

11       when you think about it.  I mean, in

12       fact, it makes a lot of sense when you

13       think about it, because the tax

14       assessors in a given county are not

15       working in a void, they're not working

16       in a vacuum.  So if I'm a tax assessor

17       in 2010 and I'm trying to determine the

18       market value for tax assessment

19       purposes of your property, then I'm

20       certainly influenced by the last five

21       years of history, right, and so what

22       that market value was in 2005

23       influences the tax assessment value

24       that I put on it in 2010.  There's a --

25       there's a, what economists call a bit

```
 1              JOHN A. KILPATRICK
 2    of a Granger causality there.  One
 3    tends to lead to the other.  And so if
 4    I'm -- if I, John Kilpatrick, am
 5    utilizing 2010 data in order to find a
 6    correlation with 2005 values, it's not
 7    surprising that I would find that
 8    because there's a fundamental
 9    relationship between the two.
10         Q.   In a correlation model,
11    would you agree with me that the
12    cross-validation filter has a very
13    large effect in making the correlation
14    appear larger than it otherwise would?
15         A.   Well, it depends on how you
16    use cross-validation filter.  I mean
17    here what I'm trying to do is filter
18    out data that doesn't apply.  The --
19    part of the purpose of the
20    cross-validation filter is to get rid
21    of sales, if you will, that -- that
22    have nothing to do with middle-class
23    housing.
24              For example, I looked at raw
25    data pre-cross-validation filter and
```

1                    JOHN A. KILPATRICK

2    found that the house prices pre-filter

3    ranged up to $113 million for the data

4    that I was using, the comparable data I

5    was using to value Nomura.  Now, what's

6    a $113 million house got to do with

7    your $200,000.00 houses in Nomura?

8    Nothing, right?   Absolutely nothing.

9              So the purpose of my

10   cross-validation filter is to get rid

11   of data that doesn't inform my model.

12              And as a result of that we

13   want a high degree of correlation and

14   we get a high degree of correlation by

15   removing data from the model that

16   doesn't properly inform the model.

17         Q.   Why don't you do that on an

18   a priori basis before you run the

19   model?

20              If you see outliers in the

21   data, why don't you explore them and

22   take them out?

23         A.   Well, we do it on an

24   a priori basis.  We're just not doing

25   it on a one-by-one heuristic basis.  In

1                    JOHN A. KILPATRICK

2       short, we established a filter.  We've

3       used this filter consistently through

4       tens of thousands of valuations, and

5       the filter works in order to arrive at

6       a model that's got a high degree of

7       correlation.  And so I am doing it

8       a priori, but I'm just not doing it

9       heuristically.  I'm doing it in a

10      statistically valid and consistent

11      fashion with the way I've done it

12      before.

13           Q.   How can you say that you're

14      doing it a priori when you're doing it

15      after you run the regression?

16           A.   I'm doing it -- well, I see

17      your point.

18                I have determined the

19      cross-validation filter a priori.  I

20      run it and the model that I use to run

21      it has been determined before I ever

22      run the regression.  So in short, I'm

23      not cherry picking comparables in order

24      to tweak the model.  I have determined

25      the filter long before I've ever run

```
 1                    JOHN A. KILPATRICK
 2      these Nomura subjects through the
 3      model.
 4                    And I'm utilizing the very
 5      same filter and the very same filtering
 6      process on Nomura that I've used for
 7      tens of thousands of other properties.
 8           Q.   Let me give you a
 9      hypothetical and explain to me why this
10      isn't what you're doing.
11                    I see a high correlation
12      between rainy days and people holding
13      umbrellas.  I want to test this
14      proposition.  So I have all my graduate
15      students go outside day after day after
16      day and hold umbrellas up in the air.
17      And 'lo and behold some days it rains
18      and I want to conclude that I have, you
19      know, established some connection
20      between these two because there's this
21      correlation, and I have a rule that I
22      establish at the outset that I'm going
23      to ignore all sunny days.  Take them
24      out.  It's a rule.  It's okay.  I
25      established it beforehand.
```

```
                                        Page 142
 1                    JOHN A. KILPATRICK
 2           Q.    Absolutely.
 3           A.    Stretch my legs.
 4           Q.    Absolutely.  You're the
 5      boss, so let's take a break.
 6           A.    Thank you.
 7                 THE VIDEO TECHNICIAN:  All
 8         right then.  We're going off the
 9         record.  The time is 12:27.
10                 (A luncheon recess is held.)
11                 THE VIDEO TECHNICIAN:  We
12         are back on the record.  The time is
13         1:10 p.m.  This is the beginning of
14         Disk 3.
15                 THE WITNESS:  Counselor,
16         before we get started, I was
17         thinking over lunch about this issue
18         of contemporaneous versus
19         retrospective that we were chatting
20         about before lunch; and I want to
21         make it clear that the -- the sales
22         data that I'm utilizing is
23         retrospective.  In other words, all
24         of the sales comps that I'm
25         utilizing in order to value the
```

1                  JOHN A. KILPATRICK

2          model are coming from on or before

3          the effective date of value of the

4          original appraisal.  The -- what --

5          what is quote-unquote

6          contemporaneous, and I'm not sure

7          that that's even the right word, is

8          the tax assessment data which is

9          coming from the 2010 to 2012 time

10         period.  That's simply what -- what

11         is available to me.

12                   So what my model does is the

13         tax -- uses the tax assessment data

14         along with other hedonic

15         characteristics, including a time

16         adjustment and determines how

17         well those 2010 to 2012 tax

18         assessment values predict sales

19         which were retrospective to the

20         original date of value.

21                   So I wanted to make sure

22         that -- that -- that I was -- I was

23         clear that all of that was

24         retrospective to the original date

25         of value.

1                    JOHN A. KILPATRICK

2      BY MR. HOLLEY:

3           Q.   I appreciate that

4      clarification.  Thank you.

5                And so just a couple more

6      questions on this point.  Is it the

7      days and days squared coefficients of

8      the OLS and OLSXY regressions that take

9      account of changes in tax assessed

10     valuation between the date that the

11     appraisals were originally done and the

12     date that the tax assessed values were

13     specified?

14           A.   Well, that's one factor.  So

15     if we have comps which are coming from

16     the 2010-2012 time period, we're able

17     to compute a certain number of days

18     between the tax assessment value and

19     the -- the original comp sales date.

20     That then helps inform the valuation

21     portion of the model by letting us know

22     how much of an adjustment in terms of

23     days and days squared need to be made

24     between the tax assessment value for

25     the subject and its effective date of

1              JOHN A. KILPATRICK

2      sale.

3           Q.   Okay.  So this may have been

4      my misunderstanding, but I thought the

5      days coefficient was a measure of the

6      number of days between an origin date

7      and the date of the sale of the

8      property.  Is that wrong?

9           A.   I think that may be wrong,

10     yeah.

11          Q.   Okay.  So it's your current

12     understanding that -- that days is a

13     measure of the difference between

14     the -- between what and what just so I

15     don't --

16          A.   Between that tax assessment

17     value and the -- the -- the dates of

18     the -- either the sale or the

19     valuation.

20          Q.   Okay.  All right.  Let's

21     turn to a different topic now.

22               What was the purpose of

23     calculating the forecast standard

24     deviation or the FSD of the Greenfield

25     AVM?

1              JOHN A. KILPATRICK

2        A.    Well, it's a gating

3    mechanism, if you will, that allows me

4    to determine which of the original

5    appraisals should be investigated for

6    credibility.

7        Q.    And -- and how does it --

8    how does the forecast standard

9    deviation do that?

10       A.    Well, let's presume a model

11   for a moment where I've determined what

12   the value of the property is.  In fact,

13   this is what I've got.  The -- the

14   literature tells us that a -- the

15   accuracy of a model ought to be within

16   a certain forecast standard deviation.

17   Freddie Mac, for example, proffers a

18   standard on forecast standard

19   deviation.  I've measured my AVM up

20   against Freddie Mac and it measures

21   very well.  So if an original appraised

22   value has a value such that it's above

23   that forecast standard deviation, then

24   it goes into my credibility

25   determination.

1          JOHN A. KILPATRICK

2          Q.   Okay.  You apply some

3    filters to a 10 percent holdout set in

4    computing what the -- what the global

5    FSD of the Greenfield AVM is; correct?

6          A.   That's correct.

7          Q.   And one of those filters is

8    something referred to as the high

9    forecast error filter; right?

10         A.   That's correct.

11         Q.   And the high forecast error

12   filter removes properties where the

13   difference between the original

14   appraisal value and the value generated

15   by the Greenfield AVM is more than a

16   hundred percent; right?

17         A.   Correct.

18         Q.   And the point of doing that

19   is what?

20         A.   Well, as you know, there are

21   a series of filters for what -- what I

22   refer to as the meta subjects.  And the

23   -- the goal here is to end up with a

24   set of meta subjects which resemble, if

25   you will, what good valuations ought to

1                    JOHN A. KILPATRICK

2      want to make sure I understand it.

3                    You did not look at any of

4      the Nomura subject properties to figure

5      out whether the ones captured by the

6      hundred percent forecast -- or the high

7      forecast error filter, in fact, had

8      data errors or incorrect matches

9      between tax and deed data; right?

10         A.   Well, now you're talking

11     about Nomura subjects as opposed to

12     meta subjects, but I've not done any

13     separate investigation of the meta

14     subjects in Nomura in the forecast

15     standard deviation exercise, but I am

16     informed by prior investigations which

17     I performed.

18         Q.   Okay.  I'd like to talk

19     about another one of the filters that

20     you used in talking about -- in -- in

21     calculating forecast standard

22     deviation.  So you also eliminated

23     properties outside the middle 30th

24     percentile of sales price to tax

25     assessed value ratio; is that right?

1                JOHN A. KILPATRICK

2          A.    That's correct.

3          Q.    And the effect of applying

4     that, what I'm going to call the middle

5     30th percentile filter, was to

6     eliminate 70 percent of the properties

7     in the 10 percent holdout set; correct?

8          A.    It's roughly 10 percent.

9          Q.    And what was, in sort of

10    layman's terms, the reason for removing

11    70 -- approximately 70 percent of the

12    properties in the 10 percent holdout

13    set?

14         A.    Well, again, I'm trying to

15    get a set of meta subjects which best

16    emulate the kind of market value

17    transactions which would make a valid

18    baseline for determining the FSD.  The

19    -- the -- in prior investigations

20    and -- and, in fact, in -- yeah, in

21    prior investigations I recognize the

22    fact that this second filter that --

23    well, it's actually the third filter,

24    would further enhance the predictive

25    power, the -- the -- the accuracy of my

```
 1                    JOHN A. KILPATRICK
 2     model, put it that way.
 3                    So indeed long before taking
 4     on the Nomura process I developed these
 5     filters in order to ensure the accuracy
 6     of the process.
 7            Q.   And just -- just so I'm
 8     clear about that, when you -- in that
 9     last answer when you said before you
10     took on the Nomura process, do you mean
11     before you started any of the FS --
12     FHFA cases or before you started
13     working on this particular one?
14            A.   This particular one.  I've
15     been using these filters continuously
16     for quite a few runs of my AVM and have
17     not changed them for this.
18            Q.   Okay.  In predicting the
19     accur -- or in assessing the accuracy
20     of a model, do you think it's
21     appropriate to take out data points
22     that suggest that the model is
23     inaccurate?
24            A.   Well, that's sort of got the
25     cart before the horse.  In -- in
```

1                    JOHN A. KILPATRICK

2      putting together a model like this what

3      we want to do is get something that's

4      of optimum accuracy, the best accuracy

5      we can possibly get.  So, yes, it's

6      highly appropriate to only utilize data

7      in the model that enhances the model's

8      accuracy.  And this isn't an academic

9      exercise.  This is a practical exercise

10     in order to -- to develop baseline AVM

11     values as well as a gating mechanism

12     for -- for determining which underlying

13     appraisals should be investigated

14     further.  The more we can do to make

15     that accurate, the better; right?  I

16     mean, it's not an academic exercise.

17     I'm not trying to publish a paper here.

18              So in -- indeed, it -- it

19     is -- it is not only reasonable, but

20     it's highly recommended that I take

21     every step I possibly can to enhance

22     the accuracy of the model that I'm

23     using in this Nomura exercise.

24         Q.   It's not your testimony that

25     there's anything wrong in terms of

Page 155

```
 1                 JOHN A. KILPATRICK
 2    flaws with the 70, roughly 70 percent
 3    of transactions that are eliminated by
 4    the middle 30th percentile filter;
 5    right?
 6         A.   I'm not making any testimony
 7    one way or the other about them.  I'm
 8    simply saying that imposing this filter
 9    allows me to utilize the best data
10    possible and come up with a model
11    that's got a -- a very high predictive
12    power.  That's what I want and I mean
13    that's -- we -- we all want a model
14    that's highly accurate.  And long ago
15    when I first started tackling this --
16    this exercise, I -- I recognized that
17    these were the kinds of filters that
18    were going to be necessary to get the
19    optimum accuracy in the model.  I've
20    continued to use those filters
21    throughout all of these projects and --
22    and continue to have a model that has a
23    high degree of accuracy.
24         Q.   Okay.  So you still believe,
25    as you said in your Merrill Lynch
```

Page 156

1              JOHN A. KILPATRICK

2      deposition, that the three data filters

3      in the computation of forecast standard

4      deviation were designed to achieve an

5      optimum forecast standard deviation;

6      right?

7              MR. RAND:  I just -- my

8         standing objection from earlier in

9         the dep.  Go ahead.

10         A.   Notwithstanding the fact

11     that I haven't read my Merrill Lynch

12     deposition transcript in seven or eight

13     months, and so I don't recall exactly

14     what I said in there, if -- if you'd

15     like for me to comment on anything in

16     Merrill Lynch, I'd like to be able to

17     read that and maybe take it in the

18     context --

19         Q.   Okay.  Fair enough.

20         A.   -- in which I said it.

21         Q.   Well, based on that answer,

22     and -- and Mr. Rand's objection, maybe

23     I just ask the question flat out.

24              Is it your belief that

25     the -- that the purpose and effect of

Page 157

1                    JOHN A. KILPATRICK

2          the three data -- data filters used in

3          the calculation of forecast standard

4          deviation for the Greenfield AVM is to

5          achieve an optimum FSD?

6              A.   I think that's one way of

7          phrasing it.  That certainly may very

8          well from your prior question be the

9          way I phrased it before.

10                 The -- again, what I'm

11         trying to do is come up with a -- the

12         most accurate model possible for -- for

13         determining AVM and in this case as far

14         as FSD is concerned, for coming up with

15         a conservative measure of FSD as a

16         gating mechanism for these other

17         appraisals.

18             Q.   Did you do any sensitivity

19         testing to determine what would happen

20         to the FSD of the Greenfield AVM if you

21         removed these three filters?

22             A.   I've looked at the -- at the

23         30 percent filter.  It's relatively

24         insensitive, that is to say all the way

25         out to about 70 percent I don't see

```
 1                    JOHN A. KILPATRICK
 2      very much change in the FSD, maybe a
 3      percentage point in the FSD.
 4                    As far as the hundred
 5      percent filter is concerned, going to
 6      200 percent, there's a trade-off as you
 7      know.  The -- the tighter the filters,
 8      the less data you -- you end up using.
 9      So I've done some sensitivity on that.
10      Frankly, the -- you -- you're not
11      removing very many additional
12      observations by relaxing the filters,
13      but you are making some significant
14      changes in FSD.  And it's because there
15      are some highly influential outliers
16      out there.  So -- so in -- and the
17      short answer is of the -- the 30
18      percent filter, not very sensitive out
19      to 70, and once you get out to 70 you
20      are picking up some really hugely
21      influential outliers which you want
22      to -- want to leave out.
23             Q.   You want to leave them out
24      why?
25             A.   Because -- and this goes
```

1                    JOHN A. KILPATRICK

2      back to some of our earlier discussions

3      about PRESS Statistics, Cook's D, those

4      sorts of things.  Why leave in data

5      that doesn't have anything to do with

6      these properties?  In short, as I -- I

7      testified before the lunch break, you

8      have middle class properties here.  I

9      mean these are 150 to $250,000.00 homes

10     by and large, but original sales prices

11     in the -- in the raw data set that I

12     was working with, the highest one I see

13     out there is 113 million.  The highest

14     tax assessment value was 440 million.

15     Those numbers have absolutely nothing

16     to do with valuing these Nomura

17     properties.

18                    I also saw as I was -- I was

19     looking at the data a lot of

20     transcription errors when you start

21     getting out at the -- the very edges of

22     the data.  And -- and finally, prices

23     are not normally distributed.  They're

24     log normally distributed.  And so when

25     we were dealing with raw prices, the

JOHN A. KILPATRICK

1
2    skewness in the data means that the
3    high prices, which, again, have nothing
4    to do with Nomura properties, have a
5    much greater influence on the
6    statistical characteristics than the
7    low-valued properties.
8            And so it's highly
9    appropriate to use these kinds of
10   filters in order to get rid of stuff
11   that's out there under the -- the --
12   the -- the highly influential outliers
13   so that I can just deal with a set
14   of -- of data that better represents
15   the -- the Nomura properties.
16       Q.   Why didn't you filter the
17   CoreLogic data at the outset so that
18   you were only looking at transactions
19   between 150 and $250,000.00?
20       A.   Because I believe the
21   filtering process that I used was --
22   was certainly well-established in the
23   literature.  I've already cited several
24   different not dissimilar kinds of
25   filtering that -- that are -- are

1            JOHN A. KILPATRICK

2    common in the econometric literature.

3            The -- I mean, quite

4    frankly, I think that the way I

5    filtered this data results in a highly

6    accurate model with little need for any

7    other kind of filtering.

8        Q.    Now, in your October 6th

9    report which I think is in front of you

10   there, you computed forecast standard

11   deviation for each individual

12   Greenfield AVM regression; right?

13       A.    Well, would you point to

14   me to the page you're referring to?

15       Q.    Sure.  Find my copy.  Now

16   I'm not seeing it.  It's in here

17   somewhere.  I may have misspoken about

18   whether you discussed this, but you --

19   you have done a computation of the FSD

20   for each of the regressions of the

21   Greenfield AVM regressions as opposed

22   to a global FSD.

23       A.    Point to me to what you're

24   talking about.  I want to make sure

25   we're using the --

```
 1                JOHN A. KILPATRICK
 2        Q.    All right.  Well, it may
 3   not --
 4        A.    -- we're using the term the
 5   same way.
 6        Q.    -- it may not be worth the
 7   time.
 8              Isn't that what you're doing
 9   in -- in Table 3?
10              MR. RAND:  This is
11      unorthodox.  I want to move this
12      along though, so Page 2 is where
13      he's talking about it.
14              MR. HOLLEY:  Okay.
15              MR. RAND:  If that helps
16      you.  Okay?
17              MR. HOLLEY:  All right.
18              MR. RAND:  I don't mean to
19      direct traffic --
20              MR. HOLLEY:  No, no, it's --
21              MR. RAND:  -- but it's a
22      limited dep --
23              MR. HOLLEY:  Fair enough.
24      Fair enough.
25              MR. RAND:  -- and so just
```

```
 1                JOHN A. KILPATRICK
 2      keep moving along.  If -- so I'll
 3      leave it to you now, but Table 3 on
 4      Page 2 lays it out.
 5               MR. HOLLEY:  But it is
 6      Table 3 where he -- where he --
 7               MR. RAND:  Well, I don't
 8      want to -- I don't want to
 9      testify --
10               MR. HOLLEY:  Okay.  All
11      right.  Okay.
12               MR. RAND:  So let me stay
13      out of it, all right, but I'm
14      trying --
15               MR. HOLLEY:  Maybe we should
16      both shut up.
17               MR. RAND:  -- I'm try -- I'm
18      trying to help you.
19          A.  All right.  So I'm in my --
20    I'm in my November -- my October 6
21    report.
22          Q.  Right, right.
23          A.  And let me just read what I
24    did here.
25          Q.  Sure.
```

```
 1                   JOHN A. KILPATRICK
 2           A.    (Reviewing document.)
 3                 MR. RAND:  Just so you know
 4         what's going on, he just did one two
 5         days ago, I think he's -- but
 6         anyway, I leave it to you all.
 7           A.   Yeah, so -- so I'm -- I'm --
 8      I'm computing a 90 and 95 percent
 9      confidence interval, but not an FSD --
10           Q.   Okay.
11           A.   -- for each one of these.
12      That's -- I think that's where the
13      confusion lie.
14           Q.   Gotcha.  Okay.  And why did
15      you do -- why did you do that
16      additional analysis?
17           A.   Well, I mean, number one, I
18      wanted to -- to point out that my FSD
19      is actually a more conservative
20      measure, but number two, it helped
21      me -- it helped inform my LTV
22      recalculations.
23           Q.   Okay.  And how did it do
24      that?
25           A.   Well, if you go to Page 4,
```

1          JOHN A. KILPATRICK

2     and I'm referencing Table 1 here,

3     "Table 1 demonstrates that, even if

4     analyzed at Dr. Hausman's proposed 95

5     percent confidence level, 96.7 percent

6     of these Nomura subject properties had

7     LTV ratios over 80, 76.4 percent had

8     LTV ratios above a hundred, although

9     Nomura represented in its loan tapes

10    and the applicable offering materials

11    that no loans were above 100 LTV."

12          Q.   Okay.  So that -- this is --

13    this para -- the sentence you just read

14    is how you applied the confidence level

15    analysis you did to LTV ratios?

16          A.   Yes.

17          Q.   Okay.  Now, you didn't use

18    either of the high forecast error

19    filter or the middle 30th percentile

20    filter that you used when validating

21    the Greenfield AVM when you were

22    choosing comparables to use in valuing

23    the Nomura subject properties; right?

24          A.   That's right.

25          Q.   And why -- was why not?

1           JOHN A. KILPATRICK

2           A.   Well, the -- the two filters

3    you just mentioned we used to help

4    winnow out the meta subjects.  That's

5    the only place they were used was in

6    the determining the meta subjects.

7                Both for the comparables

8    used in valuing the original properties

9    as well as the meta comparables used in

10   the FSD determination, the principal

11   filter I used was the cross-validation

12   filter.

13          Q.   But you would accept the

14   proposition, would you not, that there

15   are certain occasions when something

16   caught in the validation exercise by

17   the high forecast error filter or the

18   middle 30th percentile filter, that

19   property ends up getting used in the

20   valuation exercise in -- in the -- in

21   running the Greenfield AVM?

22          A.   I don't know that I would

23   agree or disagree with it.  I haven't

24   done that.  I'm -- I don't recall

25   having done that investigation.

```
 1                  JOHN A. KILPATRICK
 2           Q.    Well, have -- have you
 3      reviewed any of the expert reports
 4      submitted by Nomura where that
 5      observation is made?
 6           A.    I may have.  I -- I just
 7      don't recall as I sit here.  If you'd
 8      like to show me the report and let me
 9      take it in the context in which it was
10      written, I'd be glad to refresh my
11      memory.
12           Q.    Okay.  Well, it's probably
13      not worth the time, but as you sit here
14      today, you don't have -- you don't have
15      knowledge one way or the other whether
16      properties that were removed from the
17      validation exercise by the high
18      forecast error filter or the middle
19      30th percentile filter ended up being
20      used in the Greenfield AVM to value the
21      Nomura subject properties?
22           A.    Don't have a recollection
23      one way or the other.  It wouldn't
24      bother me if it did, but I just don't
25      have a recollection of it.
```

1                   JOHN A. KILPATRICK

2          Q.    Okay.   What is the

3     purpose -- and I don't -- I know we've

4     talked about the cross-validation

5     filter before, but I don't think we've

6     touched on this point.

7                   What is the purpose of

8     applying a cross-validation filter as

9     you do in the Greenfield AVM?

10         A.    Well -- and, again, the

11    cross-validation filter is applied to

12    the comps as well as the meta comps.

13    And if -- as I've already pointed out,

14    these -- these, several times here,

15    these Nomura properties are basically

16    middle class properties.   And so why

17    would I use comps which aren't

18    predictive of that?   In short, I'm --

19    I'm doing this sort of cross-validation

20    filter to help me get the most accurate

21    AVM I possibly can.   I mean, that --

22    that is the goal here.   And if I find

23    that using this kind of

24    cross-validation filter allows me to

25    remove comps that aren't the best

                        JOHN A. KILPATRICK

1
2    predictive of value, then that sort of
3    filter is -- is -- is appropriate in
4    this kind of exercise.
5         Q.   Okay.  And are -- are there
6    particular academic articles or books
7    or things you're relying on when --
8    when you say that it's appropriate to
9    use this sort of cross-validation
10   filter in the Greenfield AVM?
11        A.   Well, implicitly so.  I
12   mean, appraisers are -- this is an
13   appraisal exercise, and appraisers are
14   directed to use the best comps
15   possible.  I mean, if I was appraising
16   a $200,000.00 house and I went out and
17   got 113 million dollar comps, I -- I --
18   I don't think anybody would accept the
19   credibility of my work.
20             And so any appraiser is
21   taught to get comps which are best
22   suited for the -- for the subject at
23   hand.  Remember that's what we're doing
24   here is choosing comps.  And so the
25   cross-validation filter allows me to

```
 1              JOHN A. KILPATRICK
 2    choose the comps which best work with
 3    the model that I'm -- I'm -- I'm
 4    utilizing.  Let me give you another
 5    example.
 6              Let's assume for a moment
 7    that I'm appraising a single family
 8    detached residence, but I go out and
 9    gather comps that are only commercial
10    office buildings.  Well, those aren't
11    the sort of comps that fit that model.
12    So I have a model here and I want to
13    choose appraisal comps which fit my
14    model in order to have the most
15    accurate model possible.  So inherent
16    in all appraisal instruction is this
17    notion that we're going to get comps
18    that, A, best fit the model, and --
19    and, B, best fit the subject which
20    we're trying to value.
21         Q.   Okay.  Are you aware of any
22    commercial AVM that removes properties
23    as comparable -- as comparables because
24    the AVM does a less than adequate job
25    of predicting the market value of those
```

```
 1              JOHN A. KILPATRICK
 2     properties?
 3          A.   I don't know because these
 4     are all, you know, proprietary black
 5     boxes.  In other words, they may, but
 6     I -- I -- I mean we don't know because
 7     we don't have access to their code.
 8          Q.   Okay.  What tests did you do
 9     of the outputs of the Greenfield AVM
10     without applying the cross-validation
11     filter?
12          A.   I frankly can't recall.
13          Q.   Okay.  You -- I think you've
14     testified today that the Greenfield AVM
15     is the product of -- of years of work.
16     Is that fair?
17          A.   Yes.
18          Q.   In the course of developing
19     the Greenfield AVM, what third party --
20     independent third parties have tested
21     it?
22          A.   Well, I don't know if we're
23     using the word "test" in the same
24     context.  I've used my Greenfield AVM
25     in litigation and I've exposed it in
```

1           JOHN A. KILPATRICK

2     appraisal without credible support,

3     there is significant evidence in the

4     appraisal literature and community that

5     appraisers were under significant

6     pressure to issue biased appraisals

7     during the relevant time period.

8     Indeed, as detailed below, a number of

9     appraisers who conducted original

10    appraisals on the sample Nomura

11    properties petitioned the Appraisal

12    Subcommittee for relief from pressure

13    related to bias."

14              So while I -- I have not

15    attempted to connect the dots between

16    Nomura loan originators, Nomura lenders

17    and the Nomura appraisers, I mean there

18    was evidently lots of pressure at the

19    time and evidently some of your

20    appraisers said that they were

21    receiving pressure.

22          Q.   Okay.  But just -- just so

23    we're on the same page, you cannot, as

24    you sit here today, testify that any of

25    the appraisers who delivered appraisals

JOHN A. KILPATRICK

1

2  you say are overstated of the Nomura

3  subject loans were ones responding to

4  pressure from brokers or lenders to

5  raise the value opinions they offered?

6          A.   I believe there were some,

7  yeah.  I mean, in other words, I'm not

8  saying that they pointed a finger at

9  Nomura lenders, but I believe that some

10  of your appraisers were signers of that

11  petition.

12          Q.   Are they the people who

13  appraised the loans that you have said

14  are overstated?

15          A.   I believe so, yeah.  That

16  should be in my work file.

17          Q.   And are you offering an

18  opinion that, in fact, those people did

19  in this particular instance respond to

20  pressure from brokers or lenders to

21  increase the value opinions that they

22  offered about the Nomura subject

23  properties?

24          A.   No, as I've already

25  testified, I -- I'm not able to connect

1                    JOHN A. KILPATRICK

2       those dots.

3            Q.    Would you agree with me that

4       even if an appraiser makes a

5       substantial error as that term is used

6       in USPAP in performing an appraisal,

7       that doesn't mean that the appraiser

8       communicated a report that the

9       appraiser knew to be misleading or

10      fraudulent?

11           A.    That's right.  Those are two

12      separate portions of USPAP.  In other

13      words, you could -- you could not make

14      any errors in the analysis, which is

15      you're citing USPAP Standard Rule

16      1-1(b), you could not violate 1-1(b),

17      but nonetheless communicate the report

18      in a fraudulent manner.  On the other

19      hand, you could -- you could violate

20      1-1(b), but still not be fraudulent in

21      the transmission of the report.

22           Q.    And you don't have any way

23      of knowing as you sit here today

24      whether the flaws that you see in the

25      appraisals of the Nomura subject

1                JOHN A. KILPATRICK

2       properties are the result of errors

3       that are innocent as opposed to

4       misconduct in the sense of -- of

5       offering a report that you know to be

6       misleading?

7            A.    Well, you got the word

8       "innocent" in there, Counselor.  USPAP

9       doesn't recognize the word "innocent."

10      It just says we're not supposed to make

11      errors; and if you make one egregious

12      error or a series of minor areas

13      which -- which kind of add up to an

14      egregious error, then you've -- you've

15      rendered an appraisal in a less than

16      credible fashion.  It's -- USPAP is

17      silent whether that was quote-unquote

18      innocent or not.

19                As a -- as an appraiser we

20      have a duty to conduct our work in a --

21      in a diligent and accurate fashion.

22      And so we had -- our appraisal report

23      has to -- has to be accurate.  It has

24      to withstand tests of accuracy and

25      credibility.  So that concept of an

1                JOHN A. KILPATRICK
2       innocent error, it's an error.  You're
3       not supposed to make it.  And if you
4       make a whole series of small errors or
5       one big error, you've rendered an
6       appraisal in a less than credible
7       fashion.
8              Q.   You've made errors in
9       appraisals; right?
10             A.   I have.
11             Q.   You didn't do that
12      intentionally, did you?
13             A.   I would hope not.  I don't
14      recall making any intentional errors,
15      but my appraisal report still had to
16      withstand any error that I made.  And
17      so if I, John Kilpatrick, had issued a
18      report that had an egregious error in
19      it, then that appraisal report would be
20      less than credible.
21                  And -- but I'm not
22      personifying these things.  I'm not
23      saying Bill Smith appraiser is -- is
24      being called to task.  I'm simply
25      saying that the appraisal report for a

1                  JOHN A. KILPATRICK

2    given report, 123 Elm Street, has a

3    credibility issue.  I'm not -- I'm not

4    concerning myself with who authored it.

5         Q.   Right.

6         A.   I'm not turning that person

7    into his or her state licensing board.

8    I'm simply saying this appraisal report

9    either has such an egregious error or

10   such a series of errors that this

11   appraisal report can't be believed.

12        Q.   Right.  And you're also not

13   putting yourself in the head of these

14   appraisals -- appraisers and saying

15   that they didn't subjectively believe

16   the opinions of value that they offered

17   in the appraisals you attack; isn't

18   that right?

19        A.   Well, it's a fine line.  I'm

20   saying that a reasonable appraiser

21   couldn't believe these appraisals.  And

22   by the way, it's not an attack.  It's

23   just a credibility assessment.  I mean,

24   I'm not attacking anybody.  I'm just

25   saying, look, either the appraisal is

1                    JOHN A. KILPATRICK

2     right or it's wrong.  If it's wrong,

3     it's wrong because a reasonable

4     appraiser couldn't believe it.

5                    Now, if the original

6     appraiser is -- is -- is one of those

7     credible appraisers, one of those

8     reasonable appraisers, then one might

9     make the inference that that reasonable

10    appraiser couldn't believe his or her

11    own work at the time he issued it, but

12    I'm not leaving out the -- the option

13    that that appraiser might not have been

14    a reasonable appraiser, that you guys

15    might have hired some appraisers who

16    just didn't know what they were doing.

17                    Either way, a reasonable

18    appraiser couldn't believe this stuff,

19    but I'm not trying to -- I'm not a

20    psychologist or a soothsayer.  I'm not

21    getting in the heads of these

22    appraisers and trying to tell you what

23    they -- what they believed.  I'm simply

24    saying if they are a reasonable

25    appraiser, they couldn't believe this

```
 1                JOHN A. KILPATRICK
 2      stuff.
 3           Q.   Okay.  Now, I don't want to
 4      spend a whole lot of time on the
 5      mechanics of the Credibility Assessment
 6      Model 'cause I think you've covered
 7      that in the Goldman Sachs deposition,
 8      but as I understand it, there are 31
 9      questions in the Credibility Assessment
10      Model and you assigned various values
11      to those questions; is that right?
12           A.   That's right.
13           Q.   Okay.  And the questions you
14      say are derived from USPAP, but you
15      don't say that you can find any one of
16      them in terms in USPAP; correct?
17           A.   Well, sure.  I mean, USPAP
18      gives a series of what we might think
19      of as quality standards.  For instance,
20      I'm not supposed to commit an egregious
21      error, and that doesn't list out all
22      the possible errors.  It just says I'm
23      not supposed to commit an egregious
24      error.  It says I'm -- in 1-1(a) it
25      says I'm supposed to follow the
```

JOHN A. KILPATRICK

1

2   methodology that would be recognized by

3   and accepted by my peers in the

4   industry, but it doesn't detail what

5   that methodology is.

6          What it does is it expects

7   me as an appraisal reviewer to

8   reference back to the kind of

9   methodology which I know to be taught

10  to these appraisers in the course of

11  their licensure.

12         Q.   Okay.  But if I went to try

13  to find in -- in -- in the -- the USPAP

14  rules or advisory opinions, the text of

15  the questions in the -- in the

16  Credibility Assessment Model, I

17  wouldn't find any of them; right?

18         A.   No, you wouldn't.  And if

19  you were to pull Fannie Mae's review

20  form, you wouldn't find those questions

21  in it either.  I mean, I mean, quite

22  frankly, there are lots of review forms

23  out there.  There are other automated

24  review models.  There -- mine, I can't

25  speak to the other ones, I can speak to

1              JOHN A. KILPATRICK

2      mine.   Mine has questions all of which

3      tie back to USPAP.   In other words,

4      each one of these questions, which is

5      formulated based on how I as a USPAP

6      instructor would teach and evaluate

7      real estate appraisal, each one of

8      these has its basis in USPAP and

9      each -- in other words, each one of

10     these questions derives from a

11     violation of USPAP, but, no, that --

12     the -- the specific phraseology, the

13     specific questions are not in USPAP.

14          Q.   Has the Credibility

15     Assessment Model been used outside the

16     context of the FHFA litigation?

17          A.   Well, yes and no.   I mean

18     there are other Credibility Assessment

19     Models that have been.   I've done real

20     estate appraisal review using points,

21     questions, bullet points, if you will,

22     that are not dissimilar to this.   But

23     this very specific formulation, this

24     exact wording so to speak was written

25     down by me at the -- when I tackled

1                    JOHN A. KILPATRICK

2      this litigation because I knew that I

3      was going to be reviewing thousands and

4      thousands of appraisals.  And so in

5      order to do that, I had to let -- I had

6      to add a certain layer of automation to

7      what I was doing and -- and that meant

8      that I had to write everything down

9      in -- in this kind of fashion.

10                   So certainly I've used these

11     questions to evaluate appraisals in the

12     past, but not necessarily in exactly

13     this form.

14          Q.   Are you aware of any other

15     Credibility Assessment Model in the

16     industry that has been used to call

17     into question the credibility of

18     appraisers?

19          A.   Appraisers or appraisals?

20          Q.   Appraisers.

21          A.   I don't know.  I mean,

22     there -- when I first put this

23     together, I -- I was looking at FNC's

24     model, which just like all the other

25     black boxes, you can't dig too closely

 1                    JOHN A. KILPATRICK

 2      into it.  Since that time about six or

 3      eight other models have popped up out

 4      there that -- that measure credibility

 5      of appraisals.

 6                    Again, they're all black

 7      boxes.  I can't pry -- pry them open,

 8      but I mean that's kind of what they all

 9      do is assay the credibility of an

10      appraisal.  Now, you're personifying it

11      to the appraiser.  I'm not going quite

12      that far, but whether somebody uses it

13      for appraisers or appraisals, I -- I

14      mean I can't tell you.

15           Q.    Okay.  Your Credibility

16      Assessment Model has not been peer

17      reviewed by anyone in the real estate

18      appraisal industry; is that right?

19           A.    I think that it -- depending

20      on what you mean by peer reviewed, but

21      I think that's fair to say, yeah.

22           Q.    Now, in deciding whether

23      appraisals are credible as of the time

24      they were delivered back in '05 and

25      '06, you -- you use something called

1                    JOHN A. KILPATRICK

2       the Reasonable Appraiser Standard;

3       right?

4            A.    Well, sort of.  I wrote down

5       the 31 questions and then I said, you

6       know, I'm going to have to explain to

7       people where these come from and so

8       there was a certain amount of reverse

9       engineering.  I didn't start with the

10      Reasonable Appraiser Standard and then

11      derive from that a series of questions.

12      I had already derived the questions

13      because they were based on my

14      experience as a USPAP instructor,

15      reviewer and an appraiser.

16                  But in the process of

17      explaining where these questions come

18      from and -- and why some of them are

19      scored more seriously than others, I

20      recognize the fact that the Reasonable

21      Appraiser Standard was a -- was a -- a

22      handy way of explaining it to people.

23           Q.   Okay.  So the Reasonable

24      Appraiser Standard is -- is effectively

25      a term that you coined to explain what

1                    JOHN A. KILPATRICK

2         you were seeking to achieve with the 31

3         questions in the Credibility Assessment

4         Model?

5              A.   No.  Reasonable Appraiser

6         Standard is actually used in some

7         literature out there.  I've -- I mean,

8         it's -- it's -- I didn't coin it.  I

9         mean, I wish I had, but it's actually

10        captured in some writings out there.

11             Q.   And in the -- in the

12        writings in the appraisal field that

13        use that term, do they use it in the

14        same way that you do?

15             A.   I believe so, if I -- if I

16        recall correctly, yes.

17             Q.   Okay.  Now, and this is on

18        Page 45 of the -- of what I'll just for

19        shorthand call the CAM report.  You

20        write that, "The Reasonable Appraiser

21        Standard can be used to evaluate

22        whether a reasonable appraiser adhering

23        to USPAP and reasonable appraisal

24        practices could have believed the

25        appraisal at the time."

```
 1              JOHN A. KILPATRICK
 2    supposed to have that sort of errors.
 3              And number two, I don't say
 4    always, I just say frequently.  I don't
 5    even say the plurality of times.  Just
 6    say -- and I offer that up as an
 7    example of why that sort of thing is in
 8    USPAP and why it's something that we
 9    would look for.
10         Q.   And -- but here you're
11    speaking about an appraiser, right, not
12    an appraisal.  How is this statement
13    consistent with what you told me
14    earlier this afternoon which is that
15    you're not seeking to cast aspersions
16    on particular appraisers?
17         A.   Well, I'm not -- first thing
18    first.  I'm not measuring the
19    appraisers.  Note that nowhere in here
20    do I name these appraisers.  I'm not
21    turning them over to their state
22    licensing boards or anything like that,
23    but this particular footnote is offered
24    up as an example of how that error may
25    occur.  No mistake about it, errors
```

1               JOHN A. KILPATRICK

2       occur either intentionally or

3       unintentionally by appraisers, but I'm

4       not talking about the appraisers

5       per se.  I'm talking about the product

6       of the appraiser's work.

7               Q.   Are you aware that both

8       Fannie Mae and Freddie Mac maintain

9       lists of appraisers who are not

10      permitted to submit appraisals?

11              A.   Anecdotally.  That is to say

12      I mean I've -- I've heard of it, but

13      I'm not familiar with it.  Doesn't have

14      anything to do with the work I do.

15              Q.   Okay.  So I take it that you

16      made no effort to see whether the

17      appraisers who rendered the appraisals

18      that you say are not credible ever

19      appeared on those lists of appraisers

20      maintained by Fannie and Freddie of

21      appraisers not permitted to submit

22      appraisals to them?

23              A.   Of course not.  It wouldn't

24      be germane to the work I was doing

25      here.

1                    JOHN A. KILPATRICK

2          Q.   I -- looking at Page 66 and

3     67 of your CAM report which I think is

4     in front of you, you say at the

5     carry-over paragraph there that the

6     weighting of each category of -- of

7     questions in the CAM varies according

8     to its differential impact on the

9     credibility of an appraisal.

10               Do you see that, sir?

11         A.   Yes.

12         Q.   Is there such a weighting

13    system in USPAP for determining whether

14    particular kinds of appraisals have a

15    particular impact on the credibility of

16    that appraisal?

17         A.   No.

18         Q.   So how did you come up with

19    this categorization of differential

20    impacts on credibility?

21         A.   Various sources.

22         Q.   Can you tell me anything

23    more about it than that?

24         A.   Well, sure.  If we look at

25    category three -- well, excuse me,

1              JOHN A. KILPATRICK

2       Aspect 3 of the Appraisal Process and

3       we look at the eight categories within

4       Appraisal Process, you'll note that

5       they're all equally weighted.  Those --

6       that list of eight comes directly from

7       a table in the textbook "The Appraisal

8       of Real Estate."  In that table they're

9       all equally weighted.  If we go up to

10      the Reasonable Appraiser Standard,

11      well, accuracy is -- is -- is more

12      highly touted, more highly regarded in

13      the literature than completeness,

14      objectivity and trustworthiness.  Don't

15      get me wrong, trustworthy, objective

16      and complete are all stressed and

17      that's why the Reasonable Appraiser

18      Standard is the -- is the -- the -- the

19      leading aspect weight here, but

20      accuracy I think is -- is better

21      captured in the appraisal literature.

22      In fact, many years ago before the word

23      "credible" was adopted into USPAP,

24      frequently the word "reliable" was

25      used.  And so when I note that within

1                   JOHN A. KILPATRICK

2      each aspect, the contributory weight

3      totals up to 1, so I recognize that

4      these are the four categories of

5      Reasonable Appraiser and accurate ought

6      to be more than the other three, so I

7      simply weighted it twice as much as the

8      other ones.

9                   If you go down to Impact on

10     Value, Aspect Weight 4, Direct

11     Indirect, Supportive, clearly Direct is

12     going to be more, Indirect's going to

13     be less and Supportive is going to be

14     less than that.  So I -- I gave it this

15     three to -- three to one ratio between

16     Direct and the other two, and then a

17     four to one ratio between Indirect and

18     Supportive.

19              Q.  You would agree with me,

20     would you not, that two different real

21     estate appraisers both applying

22     industry standards could have a

23     different view about the impact of a

24     given error on the credibility of the

25     appraisal being reviewed; right?

```
 1              JOHN A. KILPATRICK
 2    would be taught in their market
 3    analysis course.
 4         Q.   Okay.  And -- and does --
 5    does USPAP say anything about the slope
 6    of that trend line, what it has to be
 7    before a market is -- has a particular
 8    property value trend?
 9         A.   No.
10         Q.   Again, tell me if I'm wrong,
11    but the way I understand the R code,
12    the source code of the Credibility
13    Assessment Model, it assumes that any
14    market in which property values are
15    either increasing or decreasing by less
16    than 4 percent annually is a market
17    that's stable; and if the increase or
18    decrease in values is greater than 4
19    percent, then the trend is either
20    increasing or decreasing.
21         A.   That's right.  And we give
22    it that 4 percent to give the sort of
23    leeway that we talked about, the fudge
24    factor.  In other words, if you had
25    a -- a market trend that was zero,
```

1                    JOHN A. KILPATRICK

2        there's no change in -- in median

3        prices over four quarters, then we

4        could say that market was stable.  What

5        if it's going up by a tenth of a

6        percent a year or a half a percent or 1

7        percent?  I mean arguably that's an

8        increasing market.  And if the

9        appraiser reported stable but it's

10       actually going up by 1 percent, well,

11       that's not -- that's not stable, is it?

12       That's increasing.

13                    (Mr. Rand is present.)

14            A.    But rather than put the

15       threshold that close, I give it 4

16       percent either way which is not an

17       unreasonable measure.  That's twice the

18       level of inflation that we've seen over

19       the last few years.

20                    And so -- and -- and by the

21       way, there is a reason for me using 4

22       percent.  I presented a paper at the

23       American Real Estate Society meetings a

24       couple of years ago that showed if you

25       go all the way back to 1946 property

1                    JOHN A. KILPATRICK

2     prices on a nominal basis have gone up

3     2 percent plus inflation annually, so 4

4     percent is about 2 percent plus

5     inflation.

6               So I give them that much

7     leeway up or down.  If they're, you

8     know, outside of that bound, then

9     that's a finding with respect to that

10    question.

11          Q.   Okay.  So the -- the 4

12    percent number that you picked for

13    determining the boundary between

14    stability and increasing and decreasing

15    markets comes from this historic notion

16    that property values increase 2 percent

17    annually?

18          A.   Well, it's not a notion.

19    It's the empirical findings using price

20    trend data, FHFA price trend data.

21          Q.   Got it.  That 4 percent

22    threshold is not in USPAP, is it?

23          A.    No, but remember, USPAP

24    doesn't contain any of these

25    thresholds.  USPAP just says an

1              JOHN A. KILPATRICK

2      appraiser is supposed to be familiar

3      with and utilize appropriate appraisal

4      methodologies.  So if the appraiser was

5      taking a course in market analysis,

6      developing this kind of trend line is

7      exactly what he or she would be taught.

8      And that sort of threshold would

9      certainly be a reasonable measure given

10     the fact that even a 1 percent

11     differential could arguably be wrong in

12     this case, but we are giving them four

13     percentage -- well, a total of eight

14     percentage points, four percentage

15     points either way of leeway in order to

16     measure correct or incorrect.

17          Q.   So if -- if the appraiser --

18     the appraisal, excuse me, that's being

19     reviewed says that the property -- that

20     the value trend is stable, but it turns

21     out based on the computation in

22     Question 8 that it's actually

23     increasing at 4.125 percent, that

24     appraisal fails this question?

25          A.   That's correct.

```
 1              JOHN A. KILPATRICK
 2         Q.    And -- and that -- based on
 3    that tiny disparity, the appraisal gets
 4    more than one-quarter of the points
 5    necessary to be determined
 6    non-credible?
 7         A.    Sure.  I think --
 8              MR. RAND:  Object to the
 9       form.  Go ahead.  Sorry.
10         A.    Sure.  I think that any
11    reasonable appraiser would recognize
12    that's one of the series of errors
13    envisioned under USPAP Standard Rule
14    1-1 Charlie, so 1-1(c).  So if you --
15    if you -- if you only miss Question 8,
16    one error, that doesn't render the
17    appraisal less than credible.  But if
18    you -- if you make a series of errors
19    like that, if the appraisal, not the
20    appraiser, but the appraisal has -- has
21    such a series of errors, then it's not
22    unreasonable that after four such
23    errors this appraisal is -- has reached
24    the point of not being believable
25    anymore.
```

Page 244

1              JOHN A. KILPATRICK

2          Q.    So it's your testimony that

3     if I miss -- I.  I should say if an

4     appraisal misses these thresholds even

5     by, you know, the width of a hair,

6     that -- that those four misses could

7     render the appraisal non-credible?

8          A.    Well, this isn't the width

9     of a hair.  Remember this is -- I'm

10    giving them eight percentage points,

11    four on either side of zero as a -- as

12    a -- a bound so to speak.  So there --

13    there's a lot of -- of target area,

14    the -- the bull's-eye for this target

15    is very, very wide.  If they -- if they

16    miss the -- they got to miss the target

17    entirely for that question to be scored

18    against them, against it.  Excuse me.

19         Q.    So going back to my

20    hypothetical where the appraiser said

21    that the market was stable, but your

22    computation in Question 8 shows that

23    the market is appreciating by 4.125

24    percent, and, therefore, they fail

25    Question 8, what impact would that have

```
 1                 JOHN A. KILPATRICK
 2    signature, presses send and the
 3    document gets send off to Nomura.  This
 4    is highly mechanistic.  It's supposed
 5    to be highly automated.  You got to
 6    work at making -- at making errors with
 7    this stuff.
 8                 And so when you -- when you
 9    accusatorially say that this is a --
10    assumes a highly mechanistic process,
11    it's supposed to be mechanistic.
12         Q.   How -- how do you square the
13    testimony you just gave me with the
14    interagency guidelines we looked at
15    this morning which say that -- that you
16    can't do what you just said?
17         A.   I'm telling you -- number
18    one, I'm not -- I don't have the
19    interagency guidelines in front of me,
20    but if I recall correctly our testimony
21    was that the interagency guidelines
22    said you couldn't use an automated
23    valuation model.  They didn't say you
24    couldn't use a computer-assisted model,
25    and that's exactly all this is.  It's
```

1                     JOHN A. KILPATRICK

2        highly mechanized.

3            Q.   So it's your testimony that

4        most residential real estate appraisals

5        occur with people doing drive-bys

6        taking pictures on their cell phones?

7            A.   I'm not going to say most.

8        I am going to tell you there's a --

9        there -- there's a lot of software out

10       there that's being sold to appraisers

11       to do precisely that.  The -- I mean,

12       there are a number of competing

13       companies.  I cited Alamo just a second

14       ago.  And it's -- it's not Alamo, it's

15       Alamode, A-L-A-M-O-D-E.  They're trying

16       to make this as automated as possible.

17       So appraisers are using common data

18       sets and they're using apps on their

19       cell phones and apps on their iPads to

20       the point where I mean nobody owns a

21       typewriter anymore.  And so the point

22       of it is, this is -- this is nowadays

23       as automated as they can possibly make

24       it.  So to -- to -- to suggest to me

25       that I'm assuming a mechanistic

1              JOHN A. KILPATRICK

2      process, I'm not making any assumption,

3      it is mechanistic.

4           Q.   And is it your testimony

5      that it was equally mechanistic in 2005

6      and '6?

7           A.   It was not equally

8      mechanistic back in those days.  I'd

9      say it's more mechanistic today.

10     Nonetheless, there was a high degree of

11     mechanistic during that time frame.

12          Q.   Let's look at Question

13     Number 9.  Now I'm on Pages 75 and 76.

14     Question 9, score 5.24.  "Did the

15     appraiser report marketing time

16     correctly?"

17               And my first question is:

18     Is there any test in USPAP that I can

19     go look to to see whether an appraiser

20     has reported marketing time correctly?

21          A.   No.  USPAP is silent to

22     specific tests.  It simply assumes that

23     the appraiser is going to be familiar

24     with the appropriate methods as

25     outlined in 1-1(a).

1               JOHN A. KILPATRICK

2          Q.   Okay.  And just -- I just

3     want to -- sorry to re -- re-track a

4     little bit.  But as I understand it, as

5     to Questions Number 7 and 8 that we

6     just discussed, you had people

7     assisting you make these determinations

8     based on how the code in the model ran,

9     is that -- is that what happened?

10          A.   It is, but remember I wrote

11    the code.  I set the -- the -- the

12    boundary conditions, and I also

13    directly supervised my staff both in

14    the conduct of this as well as in the

15    quality control of this.

16          Q.   Okay.  So let's turn back to

17    Question Number 9.

18               As I understand what's

19    happening, the Credibility Assessment

20    Model calculates an average number of

21    days on the market by totaling the

22    number of days on the market for all

23    listings in the county in the previous

24    four quarters and then divides that

25    total number of days on the market by

1                JOHN A. KILPATRICK
2        the number of unique listings.
3             A.   Was it county or market
4        area?  I'd -- I'd have to go back and
5        check.  It may have been the market
6        area as reported by the appraiser.
7             Q.   Okay.  All right.  I can --
8        I'll accept that clarification.  But --
9        but with that change, what we're doing
10       is calculating an average number of
11       days on the market by totaling the
12       number of days on the market for all
13       listings in the market area in the
14       previous four quarters and then
15       dividing that total number of days by
16       the unique number of listings?
17            A.   Yes.
18            Q.   Okay.  And then the
19       Credibility Assessment Model in
20       Question 9 has three buckets for the
21       resulting average number -- sorry, four
22       buckets, that's my mistake, in which to
23       place that resulting average number of
24       days on the market.
25                 So if it's less than 91

Page 274

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    _____

5  FEDERAL HOUSING FINANCE )

6  AGENCY, etc.,           )

7          Plaintiff,      )

8       V.                 ) 11 CIV. 6201(DLC)

9  NOMURA HOLDING AMERICA, )

10 INC., et al.,           )

11         Defendants.     )

12 _____

13

14

           SULLIVAN & CROMWELL LLP

15            125 Broad Street

        New York, New York  10004-2498

16            November 14, 2014

               9:43 A.M.

17

18

       CONTINUED VIDEOTAPED DEPOSITION OF

19    JOHN A. KILPATRICK, PH.D., MAI, FRICS

20               VOLUME II

21

22

23

24    REPORTED BY:

25    DEBRA SAPIO LYONS, RDR, CRR, CCR, CPE

Page 348

1                JOHN A. KILPATRICK

2        rights, pass the witness.

17                MR. HOLLEY:  Fair enough.

18                    - - -

19                E X A M I N A T I O N

20                    - - -

21     BY MR. HOLLEY:

22            Q.   Dr. Kilpatrick, you recently

23     submitted a revised errata sheet for

24     your deposition in the Goldman

25     Sachs-HSBC case; correct?

Page 349

1                    JOHN A. KILPATRICK

2          A.    Yes.

3          Q.    Okay.  I'd like to mark as

4     Exhibit 58706 that errata.

5                    (Exhibit 58706, three-page

6          document consisting of

7          Acknowledgment Of Deponent and

8          Errata Sheet of John A. Kilpatrick,

9          Ph.D., MAI, FRICS, is marked for

10         identification.)

11    BY MR. HOLLEY:

12         Q.    I could give you the entire

13    transcript, but I'm not sure that's

14    necessary.  And I'll just ask you if --

15    if this page entitled "Errata To the

16    Deposition of John A. Kilpatrick" dated

17    6 November 2014 and apparently signed

18    by you is that errata.

19         A.    It is.

20         Q.    Okay.  Can you tell me why

21    you changed it?

22         A.    Well, as -- as you can

23    imagine I was a bit blind-sided by

24    these questions.  I mean, these are

25    things I hadn't thought about in years

Page 350

JOHN A. KILPATRICK

1
2       and so I was -- I -- when I went back
3       and read my deposition transcript, I
4       wanted to make sure that I was
5       giving -- that I had given clear and
6       complete and truthful answers.  I mean
7       I was dumbfounded when -- when these --
8       these questions which were not
9       something I had anticipated or as --
10      as -- as I indicated even thought about
11      in many years were -- were posed to me.
12      So there was a little confusion on my
13      part.  Even afterwards there was a
14      little confusion on my part as to
15      exactly what I had said.  So I wanted
16      to set the record straight and make
17      sure that there was -- there was
18      clarity with respect to the record
19      in -- in that case.
20              Q.   Okay.  And looking in
21      particular at the -- at the change that
22      you made to your original answer at
23      Page 126, Lines 18 to 23, your original
24      testimony was at your deposition:
25      ████████████████████████████████████

Page 351

1                    JOHN A. KILPATRICK



2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 352

1                    JOHN A. KILPATRICK



2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          JOHN A. KILPATRICK

17          MR. HOLLEY:  That's all the

18     questions I have.  Pass the witness.

19          THE WITNESS:  Thank you.

20          MR. RAND:  Deposition

21     closed.  Thank you.

22          THE VIDEO TECHNICIAN:  All

23     right then.

24          MR. RAND:  Well, I should

25     ask.  Simpson has no questions I

Page 354

JOHN A. KILPATRICK

1

2          assume, RBS?

3                  MR. ROBINSON:  That's right,

4          no questions.

5                  MR. RAND:  Very good.  I --

6          I neglected to ask yesterday.  I'm

7          sorry.  Very good.

8                  Deposition closed.

9                  THE VIDEO TECHNICIAN:  All

10         right then.  We are going off the

11         record.  The time is 11:16 a.m.

12                      - - -

13              (Time noted:  11:17 A.M.)

14

15

16

17

18

19

20

21

22

23

24

25