## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>Plaintiff,<br><br>-against-<br><br>NOMURA HOLDING AMERICA INC., et al.,<br><br>Defendants. | No. 11-cv-6201 (DLC)<br><br>ECF Case |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR
## MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JOHN A. KILPATRICK

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*


Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

December 29, 2014

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ...................................................................................................................4

I.      KILPATRICK CANNOT TESTIFY AS TO APPRAISERS' "STATES OF
        MIND".............................................................................................................4

II.     KILPATRICK'S CREDIBILITY ASSESSMENT MODEL CANNOT ASSESS
        AN APPRAISER'S HONESTY, AND IN ANY EVENT IT APPLIES
        IDIOSYNCRATIC RULES RATHER THAN WIDELY ACCEPTED
        STANDARDS....................................................................................................9

III.    THE GREENFIELD AVM HAS NOT BEEN VALIDATED, AND
        ILLEGITIMATELY FILTERS DATA IT FAILS TO PREDICT ...................14

        A.      Plaintiff Does Not Show That Kilpatrick's CV Filter Is Proper............................15

        B.      Plaintiff Does Not Show That the Middle 30th Filter Is Proper............................17

        C.      Plaintiff Does Not Show That The Greenfield AVM Is Reliable on its Own
                or Compared to Other AVMs ............................................................18

IV.     ████████████████████████████████████████
        ████████████████████████████████████████.......................................19

CONCLUSION................................................................................................21

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Beck* v. *Dobrowski*,
    559 F.3d 680 (7th Cir. 2009) ...................................................................5

*CIT Grp./Bus. Credit, Inc.* v. *Graco Fishing & Rental Tools, Inc.*,
    815 F. Supp. 2d 673 (S.D.N.Y 2011) ........................................................3

*Daubert* v. *Merrell Dow Pharmaceuticals Inc.*,
    509 U.S. 579 (1993) ..........................................................1, 2, 8, 12

*Davis* v. *Rodriguez*,
    364 F.3d 424 (2d Cir. 2004) ...................................................................5

*Fait* v. *Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011) ...........................................................1, 4, 7

*FHFA* v. *UBS Americas, Inc.*,
    858 F. Supp. 2d 306 (S.D.N.Y. 2012) ............................................. *passim*

*Highland Capital Mgmt., L.P.* v. *Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008) ........................................................3

*In re Electronic Books Antitrust Litig.*,
    2014 WL 1282298 (S.D.N.Y. March 28, 2014) .........................................2

*In re Rezulin Prod. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...................................................3, 4

*Kumho Tire Company, Ltd.* v. *Carmichel*,
    526 U.S. 137 (1999) ..........................................................................2

*McFarlane* v. *Sheridan Square Press, Inc.*,
    91 F.3d 1501 (D.C. Cir. 1996) ...............................................................6

*Nimely* v. *City of New York*,
    414 F.3d 381 (2d Cir. 2005) ..............................................................1, 4

*U.S.* v. *Williams*,
    506 F.3d 151 (2d Cir. 2007) ..................................................................2

*Virginia Bankshares, Inc.* v. *Sandberg*,
    501 U.S. 1083 (1991) .........................................................................5

## TABLE OF AUTHORITIES

**Rules**

Fed. R. Evid. 402 ................................................................................................1

Fed. R. Evid. 403 ................................................................................................1

Fed. R. Evid. 702 ....................................................................................1, 2, 4, 8

**Other Authorities**

Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*,
    Reference Manual on Scientific Evidence (3d ed. 2011)  ......................................14

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Action | *FHFA* v. *Nomura Holding America Inc.*, *et al.*, No. 11 Civ. 6201 (DLC) |
| CAM | Credibility Assessment Model |
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| Def. Br. | Defendants' December 5, 2014 Memorandum of Law in Support of Their Motion to Exclude the Testimony of John A. Kilpatrick |
| Ex. | Exhibit to the December 5, 2014 Declaration of Phillip A. Brest submitted in support of Defendants' Motion to Exclude the Expert Testimony of John A. Kilpatrick |
| Greenfield AVM | Greenfield Automated Valuation Model |
| Hausman Decl. | Declaration of Jerry A. Hausman, sworn to on December 5, 2014 |
| Hausman Report | Expert Report of Jerry A. Hausman, dated August 14, 2014 |
| Hedden Decl. | Declaration of Michael P. Hedden, sworn to on December 29, 2014 |
| Kennedy Decl. | Declaration of Lee Kennedy, sworn to on December 29, 2014 |
| Kilpatrick CAM Report | Expert Report of John A. Kilpatrick, Ph.D., Concerning Adherence of Appraisals to Appraisal Standards and Practice, dated May 15, 2014 |
| Kilpatrick Decl. | Declaration of John A. Kilpatrick, sworn to on December 19, 2014 |
| Kilpatrick GAVM Report | Expert Report of John A. Kilpatrick, Concerning Accuracy of Appraisals, dated May 15, 2014 |
| Lee Decl. | Declaration of Albert J. Lee, Ph.D., sworn to on December 19, 2014 |
| Opp. | Plaintiff's December 19, 2014 Memorandum of Law in Opposition to Defendants' Motion to Exclude the Expert Testimony of John A. Kilpatrick |
| Reply Ex. | Exhibit to the December 29, 2014 Reply Declaration of James H. Congdon submitted in support of Defendants' Motion to Exclude the Expert Testimony of John A. Kilpatrick |

Defendants respectfully submit this reply memorandum in support of their motion under Federal Rules of Evidence 402, 403 and 702 and *Daubert* v. *Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 597 (1993), to exclude the trial testimony and opinions of plaintiff's designated expert John A. Kilpatrick.

## PRELIMINARY STATEMENT

Plaintiff does not dispute that it is impermissible for an expert such as Kilpatrick to testify that "appraisers did not actually believe that the homes underlying the LTV ratios were worth as much as the appraisers reported they were worth." *FHFA* v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306, 326 (S.D.N.Y. 2012). Indeed, plaintiff now agrees that an expert cannot testify about another person's "truthfulness, motive, or intent" (Opp. at 15), thus recognizing that expert testimony about an appraiser's state of mind or credibility would "usurp the role of the jury" and is therefore inadmissible under Rule 702. *Nimely* v. *City of New York*, 414 F.3d 381, 397-98 (2d Cir. 2005).

Plaintiff's assertion that Kilpatrick is not offering opinions about the state of mind of other persons falters on Kilpatrick's own words. Kilpatrick has stated that the purpose of his testimony is to opine on "whether a reasonable appraiser . . . could[] believe this stuff" (Ex. 8 (Kilpatrick November 13 and 14 Dep.) at 208:12-210:2), and that no "reasonable appraiser . . . could have believed the original appraisals were accurate." (Ex. 1 (Kilpatrick CAM Report) at 2.) Defendants are entitled to rely on what Kilpatrick said in his expert report, which was required to be a complete statement of the opinions he will offer at trial. *See* 1993 Advisory Comm. Notes to Fed. R. Civ. P. 26(a)(2)(B) (expert witness "must prepare a detailed and complete written report"); *see also Salgado by Salgado* v. *General Motors Corp.*, 150 F.3d 735,

741 n.6 (7th Cir. 1998) (expert report "must be complete such that opposing counsel is not forced to depose an expert in order to avoid ambush at trial").

Plaintiff failed during discovery to collect any evidence about what appraisers actually believed, and apparently now concedes that Kilpatrick cannot fill this "hole" in its proof. Instead, plaintiff invites the Court to come to its rescue, saying that it will "adjust the formulation" of Kilpatrick's testimony in any way the Court thinks would make it admissible. (Opp. at 11 n.18.)  This invitation should be declined by the Court for a number of reasons, including the fact that Rule 26 does not permit a new "formulation" of expert opinions long after an expert has disclosed the scope of his or her opinions in his or her report and deposition testimony.  *See* 1993 Advisory Comm. Notes to Fed. R. Civ. P. 26(a)(2)(B) (expert report must state "the testimony the witness is expected to present during direct examination, together with the reasons therefor").

In any event, no "reformulation" can make Kilpatrick's opinions about the "credibility" of appraisers admissible.  Kilpatrick's models, created years after the fact and for purposes of this litigation, cannot assess whether a professional appraiser was telling the truth almost a decade earlier when rendering appraisals about the value of a given property. Moreover, the legal standard set forth by the Court in its 2012 decision (relying on the Second Circuit's decision in *Fait* v. *Regions Fin. Corp.*) cannot be met by reformulating Kilpatrick's opinions because there is no formulation that would enable him to tell the jury that appraisers did not believe the opinions of value they delivered in 2005 to 2007.

Plaintiff's current effort to re-characterize Kilpatrick's opinions as articulating a "standard of care" also falls short.  Even if Kilpatrick's models were designed to test whether particular appraisals conformed to USPAP—which they are not—compliance with such

-2-

standards does not determine whether an appraiser honestly expressed an opinion of value about a specific property. Being careful and being honest are two very different things, and proving that an appraisal was performed in a careless manner does not establish that the appraiser who performed that appraisal was dishonest. Neither of Kilpatrick's models is capable of distinguishing between innocent errors and bad faith, and so they are useless in purporting to show that appraisers lied.

The flaws in Kilpatrick's models, both the Credibility Assessment Model and the Greenfield AVM, are fundamental and completely undermine their reliability. The Credibility Assessment Model merely applies Kilpatrick's idiosyncratic rules rather than any broadly accepted standards. As a result, the Credibility Assessment Model cannot serve as the basis for any claim that an appraisal failed to comply with USPAP, let alone a claim that "no reasonable appraiser" could believe that appraisal. Moreover, when Kilpatrick encounters data his Greenfield AVM cannot predict accurately, he simply drops the data rather than adjust his model to explain it. Kilpatrick is not simply removing outliers or extreme data, but is rigging his Greenfield AVM to create a false appearance of reliability.

The fundamental flaws in Kilpatrick's two models go to the admissibility, not the weight, of his opinions. The *Daubert* factors "ensure the reliability and relevancy of expert testimony" and are crucial to the "gatekeeping requirement" performed by the court. *Kumho Tire Company, Ltd.* v. *Carmichel*, 526 U.S. 137, 152 (1999). As the "'proponent of expert testimony,'" plaintiff bears the "'burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied.'" *In re Electronic Books Antitrust Litigation*, 2014 WL 1282298, at *3 (S.D.N.Y. March 28, 2014) (Cote, J.) (quoting *U.S.* v.

*Williams*, 506 F.3d 151, 160 (2d Cir. 2007)).  Plaintiff failed to meet that burden with regard to

Kilpatrick's two models and his opinions based on the output of those models.

## ARGUMENT

I.    **KILPATRICK CANNOT TESTIFY AS TO APPRAISERS' "STATES OF MIND"**

It is black letter law that an expert may not testify as to the credibility or state of

mind of others—that is solely a question for the jury.  *In re Rezulin Prod. Liab. Litig.*, 309 F.

Supp. 2d 531, 541 (S.D.N.Y. 2004) ("[T]he question of intent is a classic jury question and not

one for the experts.") (internal quotations omitted); *see also CIT Grp./Bus. Credit, Inc.* v. *Graco*

*Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 678 (S.D.N.Y 2011) ("[E]xpert testimony is

not admissible to establish a fact fundamentally grounded on a party's state of mind."); *Highland*

*Capital Mgmt., L.P.* v. *Schneider*, 551 F. Supp. 2d 173, 182-83 (S.D.N.Y. 2008) ("[An expert's]

belief about a party's state of mind is an improper subject for expert testimony . . . .").  Plaintiff

now concedes this point and acknowledges that an expert cannot testify as to someone else's

"truthfulness, motive or intent."  (Opp. at 15.)  That concession should be dispositive on this

motion, for there is no doubt that Kilpatrick intends to opine about the truthfulness of appraisers

who performed appraisals on the Nomura properties.  Indeed, as its name shows, he developed

his "Credibility Assessment Model" exactly for this purpose.  While plaintiff now seeks to

obfuscate the thrust of Kilpatrick's testimony, this Court should not allow Kilpatrick to tell the

jury directly—or ask the jury to infer—that appraisers did not believe their opinions of value.

Plaintiff does not attempt to defend Kilpatrick's oft-repeated opinion that no

"reasonable appraiser . . . could have believed the original appraisals were accurate."  (Ex. 1

(Kilpatrick CAM Report) at 2.)  This is a tacit recognition that the opinions Kilpatrick has

expressed (in his expert report and deposition testimony) are wholly inadmissible.  Instead of

defending Kilpatrick's opinions, plaintiff asks the Court to come up with a new "formulation" of those opinions that will rescue plaintiff from its self-created problem.  (Opp. at 11 n.18, 15-16 n.24.)  Of course, the Court's responsibilities do not extend to providing tactical or strategic advice to a party about compliance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

Indeed, plaintiff's offer to have Kilpatrick testify at trial to "reformulated" opinions is plainly improper.  An expert cannot revise his opinion on the eve of trial simply because his original opinions violate well-established rules.  In *Allen* v. *Dairy Farmers of America, Inc.*, 2014 WL 2040133 (D. Vt. May 16, 2014), plaintiffs sought to "correct" their expert's testimony under Rule 26(e) after an adverse *Daubert* ruling by the court.  *Id.* at *3-5. The court struck the testimony, holding that plaintiffs' attempt to "correct an expert opinion in response to an adverse evidentiary ruling" was improper, as plaintiffs "had both the ability and the obligation" to disclose any expert opinions earlier if they intended to rely on them at trial.  *Id.* at *5-7 & n.4; *see also Lewis* v. *FMC Corp.*, 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011) (holding that a supplemental opinion cannot save otherwise inadequate expert testimony).  It is too late now for plaintiff to "reformulate" Kilpatrick's opinions, especially given the fact that plaintiff knew from the outset that Kilpatrick could not opine about the "state of mind" of appraisers.  *See, e.g.*, *Nimely*, 414 F.3d at 397-98; *In re Rezulin*, 309 F. Supp. 2d at 547.[1]

---

[1]   Rule 26 requires a "complete statement of all opinions the witness will" testify to at trial, Fed. R. Civ. P. 26 (a)(2)(B)(1), and Kilpatrick adhered to the disclosed opinions in his deposition testimony. "[C]ourts will not admit supplemental expert evidence following the close of discovery" when the testimony evinces a new opinion, as "doing so would eviscerate the purpose of the expert disclosure rules." *Cedar Petrochemicals, Inc.* v. *Dongbu Hannong Chemical Co., Ltd.*, 769 F. Supp. 2d 268, 279 (S.D.N.Y. 2011).  Under Rule 37, a party "is not allowed to use" any information that it "fails to provide . . . as required by Rule 26(a) or (e)" unless "the failure was substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1).

Not only is it too late for plaintiff to "reformulate" Kilpatrick's opinions, but any such "reformulation" would be futile.  Kilpatrick has said he will opine at trial that a "reasonable appraiser . . . could not believe this stuff."  (Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 208:12-210:2.)  No "reformulation" of that opinion can allow Kilpatrick to tell the jury whether appraisers "honestly believed" their appraisals at the time they were rendered.[2]  *UBS*, 858 F. Supp. 2d at 328.

Plaintiff's new argument—never disclosed before now, either in Kilpatrick's expert report or at his deposition—that Kilpatrick's opinions are "classic standard of care" testimony fails for three reasons.

First, Kilpatrick does not opine merely as to whether appraisers met some "standard of care" applicable throughout the industry.  Rather, Kilpatrick has stated repeatedly in his expert report and during his deposition testimony that he intends to opine on whether a "reasonable" appraiser could have "believed" his or her own appraisal.  (Ex. 1 (Kilpatrick CAM Report) at 2; Reply Ex. 1 (Kilpatrick June 30 and July 1, 2014 Dep.) at 46:17-47:25, 53:4-54:17, 166:9-168:7; Reply Ex. 2 (Kilpatrick November 13 and 14, 2014 Dep.) at 115:24-116:17.)  The very name of his Credibility Assessment Model shows that Kilpatrick is purporting to determine the "credibility" of appraisers.

Second, plaintiff cites no authority for the proposition that "standard of care" testimony is admissible to show whether another person lied or honestly held a belief.  The decision in *Virginia Bankshares* v. *Sandberg* did not involve the admission of expert testimony

---

[2]    Kilpatrick's opinion that many of the appraisals of Nomura properties used to calculate LTV ratios in the Offering Documents were so "objectively false" that "no reasonable appraiser would agree" with them is the same as offering testimony that the appraisers did not honestly hold the opinions they expressed.  (Reply Ex. 1 (Kilpatrick June 30 and July 1, 2014 Dep.) at 46:17-47:25, 53:4-54:17, 166:9-168:7.)

concerning compliance with a "standard of care"; it stands only for the uncontroversial proposition that circumstantial evidence can sometimes be used to prove subjective falsity. *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1092-93 (1991).  But *Virginia Bankshares* reaffirmed that proof of a person's belief or disbelief in a particular statement will primarily be "supported or attacked by evidence of historical fact." *Id.* at 1092.  Plaintiff here chose to forego depositions of appraisers about such historical facts, and *Virginia Bankshares* says nothing about admitting expert testimony as a substitute for direct evidence from appraisers about whether they believed their opinions of value.

Moreover, standard of care expert testimony is common in negligence cases, where the standard of care must be established in order to determine whether a breach of duty occurred.  *See Davis* v. *Rodriguez*, 364 F.3d 424, 430 (2d Cir. 2004) (stating that expert testimony is required in medical malpractice case to establish standard of care).  Negligence cases do not turn on a party's state of mind.  *See Beck* v. *Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("[N]egligence is not a state of mind.").  Here, by contrast, plaintiff must prove that "appraisers did not actually believe that the homes underlying the LTV ratios were worth as much as the appraisers reported they were worth." *UBS*, 858 F. Supp. 2d at 326.  The subjective question of whether an appraiser honestly held an opinion is fundamentally different from the objective question of whether someone complied with an applicable standard of care.  Plaintiff has provided no logic or authority, and defendants are aware of none, for the proposition that standard of care expert testimony is admissible to prove a party's state of mind.  *See McFarlane* v. *Sheridan Square Press, Inc.*, 91 F.3d 1501, 1509 (D.C. Cir. 1996) (distinguishing between defendants' state of mind and inapplicable inquiry into whether defendant had "satisfied an objective standard of care").

-7-

Third, even if Kilpatrick's opinions are limited strictly to whether appraisers met some "standard of care," neither the Greenfield AVM nor the Credibility Assessment Model offers the jury any basis on which to distinguish between (i) appraisers who failed to meet the "standard of care" with which those models purportedly assess compliance due to errors based on poor training, poor judgment, or simple mistakes, and (ii) appraisers who were dishonest.  In short, plaintiff's argument that Kilpatrick's testimony could provide a basis on which a jury could "infer" that appraisers lied is not supportable because Kilpatrick's models cannot distinguish between unintentional and intentional errors, and do not purport to do so.  (*See* Reply Ex. 2 (Kilpatrick November 13 and 14, 2014 Dep.) at 220:17-222:6 ("[A]n error is an error. Doesn't matter whether it's intentional or unintentional.").)

Plaintiff suggests that Kilpatrick's testimony is relevant "to whether defendants themselves believed the appraisals at issue" (Opp. at 14 n.22), but plaintiff made precisely the opposite argument in opposing defendants' motion to dismiss—arguing that it was the opinion of the appraisers that was relevant to prove subjective falsity, not the opinion of defendants.  (*See* Reply Ex. 3 (FHFA's Feb. 10, 2012 Memorandum in Opposition to Defendants' Motion to Dismiss) at 37-38.)  Defendants had argued that it was the subjective belief of the defendants (not of the appraisers) that was relevant.  (*See* Reply Ex. 4 (Defendants' Dec. 2, 2011 Memorandum in Support of Motion to Dismiss) at 40.)  This Court agreed with plaintiff, stating that it understood plaintiff's allegation to be "that the appraisers did not actually believe that the homes underlying the LTV ratios were worth as much as the appraisers reported they were worth."  *UBS*, 858 F. Supp. 2d at 326.   The Court thus ruled, as plaintiff had urged, that "the subjective falsity that *Fait* requires in order to impose Securities Act liability based on a

statement of opinion is falsity on the part of the originator of the opinion." *Id.* (internal quotations omitted).

Having persuaded the Court to accept its prior argument that liability turns on whether appraisers believed their opinions, plaintiff cannot reverse its position now merely because it failed to develop any such evidence during the lengthy fact discovery period.   As the Second Circuit held in *In re Adelphia Recovery Trust*, a party is judicially estopped from making an argument when "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel."  634 F. 3d 678, 695-96 (2d Cir. 2011) (quoting *DeRosa* v. *Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010)).   In any event, Kilpatrick does not purport to provide opinions as to what defendants believed, and plaintiff never argues that he does.

II.     **KILPATRICK'S CREDIBILITY ASSESSMENT MODEL CANNOT ASSESS AN APPRAISER'S HONESTY, AND IN ANY EVENT IT APPLIES IDIOSYNCRATIC RULES RATHER THAN WIDELY ACCEPTED STANDARDS**

Plaintiff does not dispute that the usual means of evaluating whether an appraisal adheres to professional standards is to conduct an appraisal review—just the kind of review plaintiff tried to perform too late in this litigation.  (*See* Doc. No. 899 (November 5, 2014) (this Court's ruling striking Dr. Kilpatrick's desktop reviews from his October 6, 2014 Report).) Instead of taking that well-accepted route, plaintiff is trying to use Kilpatrick's made-for-litigation Credibility Assessment Model to try to show that professional appraisers did not believe the appraisals they conducted seven to nine years ago.  No model can ascertain whether a professional appraiser was honest in rendering his or her opinion at some point in the past.  Even Kilpatrick admitted that, under both his model and USPAP, "an error is an error.  Doesn't matter

whether it's intentional or unintentional."  (Reply Ex. 2 (Kilpatrick November 13 and 14, 2014

Dep.) at 220:17-221:2.)  It is therefore undisputed that the Credibility Assessment Model does

not answer the question plaintiff is required to answer—whether appraisers believed their own

appraisals.

Even if it answered any relevant question (and it does not), the Credibility

Assessment Model also lacks all indicia of reliability as required by *Daubert* and Fed. R. Evid.

702.  It is undisputed that the Credibility Assessment Model is not publicly available and has

never been used outside this litigation.  (Ex. 9 (Kilpatrick February 12 and 13, 2014 Dep.) at

568:10-20; Ex. 14 (Epley February 19, 2014 Dep.) at 152:3-154:3.)  No one other than plaintiff's

own paid experts has reviewed it.  Nor has the Credibility Assessment Model been independently

tested or validated.  Recovco did not test or even use the Credibility Assessment Model in

conducting its appraisal reviews.  (Reply Ex. 5 (Kilpatrick July 14, 2014 Dep.) at 352:18-21 ("Q.

Is it correct that Recovco did not test the CAM or apply the CAM to any appraisals?  A.  That's

correct.").)   And Epley formed his opinion about the Credibility Assessment Model "without

actually having ever looked at how a single appraisal performs under the" model.  (Reply Ex. 6

(Epley July 8, 2014 Dep.) at 277:10-14.)

Epley also fundamentally misunderstood the Credibility Assessment Model.  He

admitted that his opinion "depended" on his belief that the Credibility Assessment Model

accounted for an appraiser's explanations (Ex. 15 (Epley July 8, 2014 Dep.) at 292:4-10), but

Kilpatrick confirmed that the model did not consider such explanations.  (Reply Ex. 5 (Kilpatrick

July 14, 2014 Dep.) at 277:5-278:11.)  Epley also testified that he did not know how Kilpatrick

applied certain Credibility Assessment Model questions that vaguely ask whether an appraiser

did something "correctly," admitting that he did not "know what" Kilpatrick "had in mind."

-10-

(Reply Ex. 7 (Epley October 30, 2014 Dep.) at 161:22-162:6, 168:12-170:10; Ex. 13 (Epley

October 30, 2014 Dep.) at 200:17-25, 201:8-20.)  Epley's opinions about a model he does not

understand are of no value.

Plaintiff also argues that the Credibility Assessment Model is a "scoring model"

and that such models are "a widely accepted method."  (Opp. at 16.)  This makes no sense.  No

scoring model has ever been accepted for assessing whether an appraiser honestly held a belief,

or for assessing whether appraisers complied with USPAP.  The scoring models plaintiff

identifies (Opp. at 16 n.25) are used as risk assessment tools to prioritize further reviews, not to

definitively determine compliance with USPAP.  (*See* Reply Ex. 8 (CoreLogic LoanSafe

Appraisal Manager brochure); Reply Ex. 9 (FNC Appraisal Score brochure).)  Indeed, Kilpatrick

has admitted that the "widely accepted method" for reviewing appraisals is to conduct a

"desktop" or "field" review.  (Ex. 11 (Kilpatrick July 14, 2014 Dep.) at 230:8-23.)[3]  The

Credibility Assessment Model bears no resemblance to a desktop or field review.

Moreover, the entire premise of the Credibility Assessment Model—that

Kilpatrick can show that no "reasonable appraiser . . . could have believed" his appraisal was

accurate because the CAM purportedly "evidenced gross deviation from USPAP and applicable

appraisal standards and practice" (Ex. 1 (Kilpatrick CAM Report) at 2; Opp. at 4)—is invalid.

Plaintiff's opposition confirms that Kilpatrick does not apply widely accepted standards in

USPAP but rather idiosyncratic rules of his own making, which have never been published, and

which no appraiser could have been expected to follow in 2005 to 2007.  The best plaintiff can

---

[3]      Plaintiff's attempt to analogize the Credibility Assessment Model to a scoring model that
tabulates individuals' FICO scores by assigning weights to categories such as payment history and credit
card use (Opp. at 16) fails because FICO scoring models do not purport to assess whether people honestly
held beliefs or complied with principles-based professional standards.

do is claim the questions in the Credibility Assessment Model are "based on" or "relate to" USPAP (Opp. at 17-19), but plaintiff never refutes the testimony of its own expert, Epley, that the 31 questions in the Credibility Assessment Model are not contained in USPAP but instead represent "a very unique application of professional standards." (Ex. 14 (Epley February 19, 2014 Dep. at 208:5-14).) Kilpatrick has conceded the same thing, testifying that the questions he formulated for his Credibility Assessment Model are not contained in USPAP, any other professional standard, or any published literature in the industry. (Ex. 11 (Kilpatrick July 14, 2014 Dep.) at 281:14-282:2, 293:25-294:11, 333:19-334:25; Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 211:12-212:13, 223:12-17.)

Plaintiff's attempt to draw support from the testimony of defendants' expert, Michael Hedden, merely emphasizes that the Credibility Assessment Model is nothing more than a distillation of Kilpatrick's personal views about how appraisals should be performed. Plaintiff quotes testimony in which Hedden agreed with general principles in USPAP (Opp. at 18-19), but fails to disclose that Hedden never agreed with the rigid rules which Kilpatrick has created to replace those flexible principles. For instance, plaintiff claims that Hedden endorsed Kilpatrick's Question 14 because Hedden agrees that "appraisers should analyze land value ratio of property" (Opp. at 19), but Kilpatrick's Question 14 asks whether the land value ratio was "greater than 20% and less than 30%," not merely whether appraisers should analyze land value ratio. (Def. Br. at App'x B.) Kilpatrick's rigid 20%/30% requirement is not found in USPAP, and Hedden never agreed with it. (*See* Ex. 11 (Kilpatrick July 14, 2014 Dep.) at 333:19-334:2.) Similarly, USPAP does not require that appraisals comply with Kilpatrick's rigid numerical thresholds in

-12-

Questions 4, 13, 14 and 21,[4] or conform to the criteria in Questions 29 through 31 for assessing

comparables, or apply the mathematical formulas in Questions 7, 8 and 9 concerning market

conditions.  (*See* Reply Ex. 6 (Epley July 8, 2014 Dep.) at 398:17-399:21); (Ex. 13 (Epley

October 30, 2014 Dep.) at 155:9-156:24, 206:13-21); Ex. 8 (Kilpatrick November 13 and 14,

2014 Dep.) at 249:12-249:25.)  All of this is undisputed.

        Plaintiff failed entirely to respond to defendants' argument that the Credibility

Assessment Model is inherently flawed because it fails to account for the judgment and

discretion that USPAP requires of appraisers—a basic principle of USPAP that is entirely at odds

with Kilpatrick's rigid and inflexible approach.  (*See* Def. Br. at 32-34.)  In addition, plaintiff

does not explain how the Credibility Assessment Model managed to grade the same appraisals

differently in two different cases, an inconsistency in operation that casts grave doubt on the

reliability of the model.[5]

---

[4]     In response to defendants' criticism that Questions 4, 13 or 21 assign points where the appraised value is 10% or more above a prior sales price, previous listing or comparable on an annualized basis even though relevant properties were located in areas where the Case-Shiller Home Price Index showed growth greater than 10%, plaintiff claims (through a declaration submitted by Kilpatrick) that only six appraisals are affected by this problem.  (Kilpatrick Decl. ¶¶ 11-12; Opp. at 21 n.33.)  But Kilpatrick's Declaration is misleading.  It compares the year in which an appraisal was conducted to the annualized growth rate for that year, but the relevant period of "annualized growth" for any given appraisal would be the 12-month period before the date of the appraisal—an appraiser valuing a property in March 2006 could consider "annualized" property values from April 2005 to March 2006, and obviously would be in no position to anticipate the rate of appreciation from April to December 2006.  (Hedden Decl. ¶ 4.) Kilpatrick also left out a number of appraisals performed in a Case-Shiller Metropolitan Statistical Area. Correcting for these errors shows that of 100 appraisals performed in a Case-Shiller Metropolitan Statistical Area, 38 were assigned points under Questions 4, 13 or 21 because the appraised value was 10% or more higher than a prior sale, previous listing or comparable, even though the annualized growth rate in the 12 months preceding the appraisal exceeded 10%.  *See id.*

[5]     Although plaintiff implies that any errors in the Credibility Assessment Model have been corrected (Opp. at 25 n.40), none of the testimony or reports plaintiff cites identify the specific errors that led to the model's arbitrary and inconsistent results, nor state that Kilpatrick fixed those specific errors.

In sum, Kilpatrick's Credibility Assessment Model uses rules that are not found in USPAP and have never been published or used outside this litigation.  Nothing in plaintiff's opposition shows otherwise.  The Credibility Assessment Model reflects only Kilpatrick's idiosyncratic requirements, not any widely shared standard that could serve as the basis to reliably determine whether an appraiser complied with USPAP, much less whether an appraiser acted in bad faith or was dishonest.  Plaintiff has not shown that Kilpatrick's testimony based on the Credibility Assessment Model is the "product of reliable principles and methods" as required by Rule 702.  Consequently, testimony that relies on or refers to that model should be excluded.

## III.   THE GREENFIELD AVM HAS NOT BEEN VALIDATED, AND ILLEGITIMATELY FILTERS DATA IT FAILS TO PREDICT

Plaintiff does not dispute that "FHFA developed the Greenfield AVM for this litigation."  (April 16, 2014 Order (Doc. No. 633) at 1-2.)  Nor does plaintiff dispute that the Greenfield AVM has never been evaluated outside this litigation.  Plaintiff never defends Kilpatrick's philosophy of only using the "data that fits my model" (Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 118:12-119:10) in order to "increase the explanatory power."  (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 283:17-24.)  Nor does plaintiff disagree with "the general principle in statistics that when your model fails to describe the dependent variable . . . you should add explanatory variables," and that one "should not remove objectionable regression observations because they don't agree with your model."  (Ex. 32 (Isakson June 19 and 20, 2014 Dep.) at 286:11-287:21.)  Those points alone—none of which are disputed—provide an adequate basis for excluding the Greenfield AVM and Kilpatrick's testimony concerning that model.

Plaintiff also ignores the litany of spurious justifications Kilpatrick offered for his "Cross Validation" Filter ("CV Filter"), which filtered away 22% of properties from the dataset of comparable properties when their sales prices differed from the Greenfield AVM's predicted

price by more than approximately 25%:  (i) that the excluded data "violates [International Association of Assessing Officers] standards" (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 174:4-176:4); (ii) that its purpose was to get rid of sales "that have nothing to do with middle-class housing" (Ex. 8 (Kilpatrick November 13 and 14, 2014 Dep.) at 137:10-138:16, 158:23-159:17, 168:2-169:4); or (iii) that obtaining favorable "ex post results" (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 293:2-294:11 (emphasis added), 302:20-303:25) justifies excluding any data that would lead to "weak results."  (*Id.* at 299:24-302:2, 302:20-303:25.)  Plaintiff also does not address the fact that at deposition, Kilpatrick was unable to explain why he did not remove outliers before running his model, and before he knew which data would generate high prediction errors.  (Reply Ex. 2 (Kilpatrick November 13 and 14, 2014 Dep.) at 137:10-141:23.)

Instead, plaintiff offers Dr. Albert Lee, purportedly to provide independent "validation" for the Greenfield AVM.  (Opp. at 28.)  That effort is unavailing.  Lee works for a litigation consulting firm, was hired by plaintiff's counsel (Lee Decl. at ¶ 1), and can hardly be considered "independent."  Nor did Lee actually run the Greenfield AVM on a set of test data to show that it performs appropriately, or "validate" the model in any way that would be acceptable under industry norms.  (*See* Kennedy Decl. ¶¶ 3-5.)  The *post hoc* justifications that Lee does offer do not excuse the fundamental errors in Kilpatrick's Greenfield AVM.

A.     **Plaintiff Does Not Show That Kilpatrick's CV Filter Is Proper**

Lee tries to defend Kilpatrick's CV Filter by arguing that excluding outliers from a model is appropriate.  It is of course the case that excluding true outliers—*e.g.*, Bill Gates as a proxy for the relationship between education and earning power (Lee Decl. at ¶ 15)—can be acceptable.  But Lee never conducts any investigation of whether the removed properties are outliers; he simply assumes, like Kilpatrick, that they are "(1) not the result of arm's length

-15-

transactions, and/or (2) the result of errant data, and/or (3) situations where significant hedonic characteristics of the property are not discernible from available data." (*Id.* at ¶ 22.)[6]

For example, Lee claims the CV Filter removes "extreme sales prices" (Lee Decl. ¶ 24), but he provides no basis for this claim. In fact, 70% of the excluded properties had sales prices below $300,000, and only 14% had sales prices above $500,000—far from extreme. (Hausman Decl. at ¶ 5.) Lee also does not refute defendants' showing that removing only data that more plausibly could be considered "extreme"—properties with sales prices or assessed values below $10,000 and above $3,000,000—would lead to an average adjustment of 8.8% in the Greenfield AVM's values (Ex. 19 (Hausman Report) at 28 n.64), wiping out almost all of the 8.92% by which Kilpatrick says the appraised values of the Sample Loans were inflated.[7]

Lee's statement that properties excluded by the CV Filter have "significant hedonic characteristics" that are not "discernible from available data" (Lee Decl. at ¶ 22) is not supported by any analysis that Lee performed. In any case, that is just another way of saying that the Greenfield AVM failed to explain the sales prices for those properties. The proper response when a regression model does not accurately account for enough hedonic characteristics is not to remove data, but to add relevant hedonic characteristics to increase the model's explanatory power. *See* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, Reference Manual on

---

[6]     Plaintiff's citation to testimony from CoreLogic and Lee Kennedy (Opp. at 33) is of no import, because neither CoreLogic nor Kennedy removed outliers on the basis of a model's prediction errors. (Ex. 17 (Doty June 12, 2014 Dep.) at 46:16-47:14; Reply Ex. 10 (Kennedy November 5, 2014 Dep.) at 46:10-15.)

[7]     Lee purports to show that the ratio of sales price to tax assessment value is higher for properties excluded by the CV Filter than for properties not excluded (Lee Decl. at ¶ 26, Table 2), but does not explain how this ratio renders any of these properties' sales prices "extreme" at all, much less so "extreme" that they should be disregarded. If anything, the ratios Lee observes indicate that the tax assessment values are faulty, not that sales prices are "errant."

Scientific Evidence 326-27 (3d ed. 2011) (a data point dropped from a sample "should be studied further to determine whether mistakes were made in the use of the data or whether important explanatory variables were omitted"); *see also* Ex. 32 (Isakson June 19 and 20, 2014 Dep.) at 286:11-287:21.

Lee's declaration is nothing more than a *post hoc* attempt to justify the CV Filter, and it fails at that task.  Kilpatrick never determined whether any data he excluded was "errant" or "extreme" before he removed that data.  (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 204:5-205:5, 255:6-256:2, 260:8-261:18, 262:24-263:7, 279:21-280:13, 288:22-291:18.) Kilpatrick only knew that the data he removed created large prediction errors for his model. Similarly, Lee did nothing to determine whether the data excluded by Kilpatrick was either "errant" or "extreme."  Following in Kilpatrick's footsteps, he just made that assumption based on the Greenfield AVM's inability to deal with the data Kilpatrick excluded.  That approach is fundamentally unsound.

## B. Plaintiff Does Not Show That the Middle 30th Filter Is Proper

Plaintiff also does nothing to justify Kilpatrick's use of the Middle 30th Filter to eliminate 70% of sales data when he calculated a forecast standard deviation ("FSD") of 0.151, in an attempt to "validate" the Greenfield AVM himself.  As Dr. Hausman has demonstrated, the use of these filters, unsupported in the industry literature, is entirely responsible for manufacturing such a low FSD.  (Ex. 19 (Hausman Report) at 18.)  Lee does not prove otherwise—his attempts to rebut Dr. Hausman by modifying the filters to exclude "extreme outliers" still result in FSDs significantly above the 0.25 FSD which is the upper limit above which the leading third-party AVM provider, CoreLogic, will not even report results.  (Lee Decl. at ¶ 12; Ex. 17 (Doty June 12, 2014 Dep.) at 62:15-63:24.)

Apparently recognizing that Kilpatrick's FSD is unacceptable by any measure, plaintiff tries to minimize its importance by claiming the FSD of the Greenfield AVM served only as a "gating" mechanism for deciding which properties to review using the Credibility Assessment Model.  (*See* Opp. at 37.)  This is false.  As Dr. Kilpatrick's report admits, the reason he calculated the FSD of the Greenfield AVM is that a FSD is "one of the most appropriate measures of an AVM's reliability."  (Ex. 2 (Kilpatrick AVM Report) at 50.)  Kilpatrick used his FSD to determine which Nomura Sample Properties (those with a predicted valuation "above 1 FSD of the Greenfield AVM") were purportedly overvalued.  (*Id.* at 63-64.)  As a result, the FSD of the Greenfield AVM is an important statistic that plaintiff cannot now choose to ignore.

### C.    Plaintiff Does Not Show That the Greenfield AVM Is Reliable on Its Own or Compared to Other AVMs

All of the metrics by which plaintiff attempts to demonstrate the reliability of the Greenfield AVM are achieved only through Kilpatrick's pruning of data.  Lee's 95% confidence interval, 86% "R-Squared" value, and his comparison to other commercial AVMs (Lee ¶at ¶¶ 10, 29, 33-37) all depend on allowing the Greenfield AVM to filter away any data that causes large prediction errors.  Lee does not contest that, without the CV Filter, the Greenfield AVM achieves only a 78% confidence interval.  (Reply Ex. 11 (Hausman Preliminary Analysis of Kilpatrick Supplement) at 1.)  Any model can achieve acceptable measures of reliability when the modeler drops data that cause "weak results."  (Ex. 10 (Kilpatrick June 30 and July 1, 2014 Dep.) at 299:24-302:2, 302:20-303:25.)

Moreover, when Lee compares the Greenfield AVM to the performance of commercially available retrospective AVMs, he compares only the "middle 90% of sales" for the Greenfield AVM (eliminating its least accurate results) without giving the other AVMs the same benefit.  (Opp. at 29-30; Lee Decl. at ¶¶ 36-37; Kennedy Decl. at ¶ 3; Reply Ex. 12 (Kennedy

Response to October 6, 2014 Rebuttal Report of Dr. Kilpatrick) at 2-3.)  When the comparison treats all AVMs the same, the performance of the Greenfield AVM is the worst or second-worst. (Kennedy Decl. at ¶ 3 & Ex. A.)  Lee's comparison also ignores that no retrospective AVM is considered reliable for values seven to nine years in the past.  (*Id*. at ¶ 4.)  Plaintiff takes issue with Mr. Kennedy's calculation that the Greenfield AVM missed the sales prices of the specific Sample Properties by 17% (Opp. at 30 n.48), but even plaintiff's "corrected" error rate of 11.4% completely swallows Kilpatrick's conclusion that the Nomura properties were overvalued by 8.92% on average.[8]

In sum, plaintiff has not met its burden to show that Kilpatrick's testimony based on the Greenfield AVM, which has never been validated and relies on illegitimate data pruning, is the "product of reliable principles and methods" as required by Rule 702.  As a result, that testimony should be excluded.

**IV.**



---

[8]	Plaintiff also fails to justify Kilpatrick's use of tax-assessed values from 2011 to 2013 to measure appraisal values as of 2005 to 2007.  Plaintiff does not contest that the use of "ex post data" violates USPAP.  (*See* Def. Br. at 51-52.)  Instead, plaintiff offers Lee to claim that "even post-dated tax assessed value by itself statistically contributes to the forecasts."  (Lee Decl. at ¶ 32.)  That logic is circular.  It is no surprise that tax-assessed values contribute to forecasts produced by a model that relies on tax-assessed values to make predictions.  That does not answer the question of whether tax-assessed values are good predictors of property value years earlier.



## CONCLUSION

The Court should exclude the trial testimony of plaintiff's designated expert John

A. Kilpatrick.

Dated: New York, New York
         December 29, 2014

                                        Respectfully submitted,

/s/ Thomas C. Rice                       /s/ David B. Tulchin
Thomas C. Rice (trice@stblaw.com)        David B. Tulchin (tulchind@sullcrom.com)
David J. Woll (dwoll@stblaw.com)         Steven L. Holley (holleys@sullcrom.com)
Andrew T. Frankel (afrankel@stblaw.com)  Bruce E. Clark (clarkb@sullcrom.com)
Alan Turner (aturner@stblaw.com)         Bradley A. Harsch (harschb@sullcrom.com)
Craig S. Waldman (cwaldman@stblaw.com)   Katherine J. Stoller (stollerk@sullcrom.com)
SIMPSON THACHER & BARTLETT LLP           SULLIVAN & CROMWELL LLP
425 Lexington Avenue                     125 Broad Street
New York, NY  10017                      New York, NY  10004
Telephone:  212-455-2000                 Telephone:  212-558-4000
Facsimile:  212-455-2502                 Facsimile:  212-558-3588

*Attorneys for Defendant RBS Securities Inc.*   Amanda F. Davidoff
                                         (davidoffa@sullcrom.com)
                                         Elizabeth A. Cassady
                                         (cassadye@sullcrom.com)
                                         SULLIVAN & CROMWELL LLP
                                         1700 New York Avenue, NW, Suite 700
                                         Washington, DC  20006
                                         Telephone:  202-956-7500
                                         Facsimile:  202-956-6993

                                         *Attorneys for Defendants Nomura Holding
                                         America Inc., Nomura Asset Acceptance
                                         Corporation, Nomura Home Equity Loan, Inc.,
                                         Nomura Credit & Capital, Inc., Nomura
                                         Securities International, Inc., David Findlay,
                                         John McCarthy, John P. Graham, Nathan
                                         Gorin, and N. Dante LaRocca ("Nomura
                                         Defendants")*