# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>　　　　Plaintiff,<br><br>　　　　-against-<br><br>NOMURA HOLDING AMERICA INC., et al.,<br><br>　　　　Defendants. | No. 11-cv-6201 (DLC)<br><br><u>ECF Case</u> |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE THE TESTIMONY OF ROBERT W. HUNTER <u>BASED ON INFORMATION NOT AVAILABLE AT ORIGINATION</u>

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

January 5, 2015

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................2

      A.    Disclosures in the Offering Documents ....................................................3

      B.    Hunter's Reports and Methodology ...........................................................3

ARGUMENT ...............................................................................................................................7

I.     INFORMATION NOT AVAILABLE AT ORIGINATION IS
     IRRELEVANT TO HOW THE LOANS "WERE ORIGINATED" ................................8

      A.    Information Not Available at Origination Cannot Be Used to
          Evaluate Whether an Underwriter Should Have Identified a
          Misrepresentation of Income, Occupancy, or Debt ...................................9

      B.    Information Not Available at Origination Cannot Be Used to
          Evaluate Whether an Underwriter Should Have Identified an LTV
          or CLTV Ratio as Outside Guidelines ....................................................10

II.    THE REPORTS HUNTER USES TO EVALUATE HOW LOANS
     "WERE ORIGINATED" ARE INHERENTLY UNRELIABLE .....................................11

III.   HUNTER'S TESTIMONY BASED ON INFORMATION NOT
     AVAILABLE AT ORIGINATION WOULD MISLEAD THE JURY
     AND PREJUDICE DEFENDANTS ..............................................................................13

CONCLUSION ..........................................................................................................................16

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co. Inc.*,
    2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013) .......................................................14

*Daubert* v. *Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ................................................................................. *passim*

*In re Electronic Books Antitrust Litig.*,
    2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) .......................................................11

*In re Puda Coal Sec. Inc., Litig.*,
    2014 WL 2915880 (S.D.N.Y. June 26, 2014) ............................................7, 8, 13

*In re Zyprexa Prods. Liab. Litig.*,
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) ................................................................11

*Jentz* v. *ConAgra Foods, Inc.*,
    767 F.3d 688 (7th Cir. 2014) ..............................................................................13

*Kumho Tire Co., Ltd.* v. *Carmichael*,
    526 U.S. 137 (1999) ...........................................................................................12

*Miller* v. *Stryker Instruments*,
    2012 WL 1718825 (D. Ariz. Mar. 29, 2012) .......................................................11

*Minemyer* v. *B-Roc Representatives, Inc.*,
    2012 WL 346621 (N.D. Ill. Feb. 2, 2012) ...........................................................14

*Nimely* v. *City of N.Y.*,
    414 F.3d 381 (2d Cir. 2005) ...............................................................................13

*Ruggiero* v. *Warner-Lambert Co.*,
    424 F.3d 249 (2d Cir. 2005) ...............................................................................11

*Smith* v. *Prudential Ins. Co. of Am.*,
    2012 WL 1965405 (M.D. Tenn. May 31, 2012) ..................................................11

*United States* v. *Tin Yat Chin*,
    371 F.3d 31 (2d Cir. 2004) .................................................................................13

*United States* v. *Vest*,
    116 F.3d 1179 (7th Cir. 1997) ............................................................................14

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

### Rules

FED. R. EVID. 401 .................................................................................................................2, 8

FED. R. EVID. 402 .................................................................................................................2, 8

FED. R. EVID. 403 ...............................................................................................................2, 13

FED. R. EVID. 702 ...............................................................................................................2, 11

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Action | *FHFA* v. *Nomura Holding America Inc.*, No. 11 Civ. 6201 (DLC) |
| Amended Complaint | Amended Complaint filed June 28, 2012 in this Action |
| CLTV | Combined loan-to-value ratio |
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., and the Individual Defendants |
| Ex. | Exhibit to the January 5, 2015 Declaration of James H. Congdon submitted in support of this motion |
| Forester Report | Expert Report of Michael Forester dated August 14, 2014 |
| Hunter Report | Expert Report of Robert W. Hunter Regarding the Underwriting of Mortgage Loans Underlying the Nomura Securitizations, dated May 15, 2014 |
| Hunter Rebuttal Report | Rebuttal Expert Report of Robert W. Hunter Regarding the Underwriting of Mortgage Loans Underlying the Nomura Securitizations, dated October 6, 2014 |
| Isakson Report | Expert Report of Hans R. Isakson, Ph.D., dated August 14, 2014 |
| LTV | Loan-to-value ratio |
| Offering Documents | The registration statement, prospectuses, free writing prospectuses, and prospectus supplements for the Securitizations |
| Plaintiff | Federal Housing Finance Agency |
| Securitizations | NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 |

Defendants respectfully submit this memorandum in support of their motion to exclude under Federal Rules of Evidence 401, 402, 403 and 702, and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the trial testimony and opinions of plaintiff's designated expert Robert W. Hunter to the extent those opinions are based on information that was not available at origination.

## PRELIMINARY STATEMENT

Plaintiff has designated Robert Hunter to opine about disclosures in the Offering Documents that loans "were originated" generally in accordance with certain underwriting guidelines or criteria.  (Ex. 1 (Hunter Report) at 1.)  Defendants have moved to exclude Hunter's testimony to the extent it compares loans to underwriting standards never disclosed in the Offering Documents, *see* Defendants' Motion *in Limine* No. 3, Doc. No. 977, and his testimony that owner-occupancy data reported in the Offering Documents was false or misleading.  *See* Defendants' December 24, 2014 Motion to Exclude Testimony of Robert W. Hunter Concerning Owner-Occupancy Status.  Defendants also now move to exclude Hunter's opinions to the extent that he relies in any way on information never available to underwriters in connection with his opinions as to whether loans "were originated" in accordance with the applicable underwriting guidelines.  It is entirely improper for Hunter to offer such opinions based on information that did not exist when the loans were underwritten—information that the underwriters therefore could not have considered at the time of origination.  Any testimony or opinions based on such information would be entirely irrelevant to any issue to be tried, highly misleading and unduly prejudicial.  It also threatens to cause unnecessary juror confusion.

Testimony based on information that was never available to the underwriters when the loans were originated says nothing about whether the loans "were originated" generally

in accordance with underwriting guidelines or criteria.  That question can only be answered by reference to information the original underwriter should have or could have considered.  The fact that the Securitizations were issued some months after origination makes no difference.  The Offering Documents make representations about how the loans "were originated"—they make no representations about circumstances existing at some later date (after origination).  In rendering his opinions, Hunter often uses information that was never available to the original underwriter, and he often relies on information that never existed at the relevant time.  This makes any testimony based on such information irrelevant.

Hunter's methods are unreliable and subject to exclusion for the additional reason that the information on which he relies is not itself trustworthy, as shown by testimony from the providers of that data.  Finally, Hunter's testimony is misleading and prejudicial because it would improperly lead the jury to believe that the original underwriter could have and should have considered information that was, in fact, not available and often not in existence—and that the truth or falsity of statements in the Offering Documents depends on information that never was available to the original underwriter.

Hunter's testimony that defendants made false statements in the Offering Documents about how the loans "were originated" should be excluded under Federal Rules of Evidence 401, 402, 403 and 702, as well as under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to the extent it is based on information not available at the origination of the corresponding loans.

## BACKGROUND

Plaintiff brought this action under, *inter alia*, Sections 11 and 12 of the Securities Act, alleging that certain statements in the Offering Documents for the Securitizations were

false.  As relevant to this motion, plaintiff's allegations involve two categories of statements in the Offering Documents:  (1) statements that underwriters generally adhered to certain underwriting guidelines or criteria in originating the mortgage loans, and (2) statements about the loan-to-value ("LTV") ratios of loans at the time they were originated.  (Ex. 2 (Amended Complaint) at ¶¶ 1, 76-82, 86-95.)[1]

### A.    Disclosures in the Offering Documents

Each of the Offering Documents disclosed that the loans backing the corresponding Securitization "were" generally originated in compliance with certain underwriting guidelines or criteria.  (Ex. 2 (Amended Complaint) at ¶¶ 1, 76-82.)

The representations concerning underwriting guidelines took two forms:  either that the loans "were originated generally in accordance with the underwriting criteria described" in a specific section of the Offering Documents, or—where a particular originator had originated 20% or more of the loans that were part of the deal—that the loans "were originated generally" in accordance with that specific originator's guidelines.  (Appendix A (emphasis added).)  In making representations about how the loans "were originated" (*id.*), the Offering Documents represented that the processes followed by underwriters to originate the loans were in accordance with identified criteria as of the time of origination.

### B.    Hunter's Reports and Methodology

Plaintiff designated Robert W. Hunter to opine on whether loans were underwritten in accordance with underwriting guidelines.  Hunter conducted a "re-underwriting" of a sample of 723 loans underlying the seven Securitizations.  Hunter recognized that he was

---

[1]     The Offering Documents also contained information about borrowers' intent to occupy the mortgaged properties at the time they applied for loans.  Defendants moved to exclude Hunter's opinions concerning this information on December 24, 2014.

required to review these loans in order to identify "deficiencies in the original underwriting process." (Ex. 1 (Hunter Report) at 118.) In his May 15, 2014 expert report, Hunter opined that "78.98% of the Mortgage Loans reflected increased credit risk as a result of deficiencies in the <u>original underwriting process</u>." (Ex. 1 (Hunter Report) at 118 (emphasis added).)[2] Many of Hunter's findings, however, have nothing to do with whether there were "deficiencies in the original underwriting process." Instead, Hunter offers views about whether the loan should have been approved based on information that did not exist until months or years after origination. These opinions, which fall into four broad categories, have no bearing on the only relevant question pertaining to underwriting: Were the loans originated generally in accordance with the underwriting guidelines disclosed in the Offering Documents? By definition, this question cannot be answered by relying on information that the originator could never have considered.

    *Misrepresentation of Income, Occupancy or Debt.* Hunter opines that a loan was improperly underwritten if there was a "misrepresentation of income," a "misrepresentation of occupancy" (that is, a misrepresentation of the borrower's intent to occupy the property), or a "misrepresentation of debt obligation." (Ex. 1 (Hunter Report) at 105.) Hunter makes 195 findings of this type, and for 189 of them, Hunter relies upon information derived from sources such as "audit credit reports," bankruptcy filings, and "Accurint" and "DataVerify" reports.[3] (*See* Ex. 4 (Exhibit 2A to Hunter Rebuttal Report).) As Hunter admits, these reports were obtained by Hunter's team in 2013 or 2014. (*See* Ex. 5 (Hunter Tr.) at 294:5-295:7.) Hunter

---

[2]   Hunter later revised his "defect rate" to 66.7% after he had reviewed the findings of Michael Forester, a designated expert for defendants. Ex. 3 (Hunter Rebuttal Report) at 1, 4; Ex. 5 (Hunter Tr.) at 197:11-197:15.

[3]   "Accurint" and "DataVerify" aggregate publicly available information about borrowers. Audit credit reports are summaries of a borrower's credit history and were pulled by Hunter's team long after origination. Ex. 5 (Hunter Tr.) at 294:5-295:4.

provides no support for the proposition that the information they contain was available to underwriters when they approved the loan applications or when the loans were made to borrowers.[4]

When Hunter uses "audit credit reports" to show a "misrepresentation of occupancy," he relies on information about addresses associated with the borrower after the origination of the loan, which by definition was not available at the time of origination.  (*See* Ex. 4 (Exhibit 2A to Hunter Rebuttal Report).)  For example, for a loan which closed on ██████████████, Hunter relies on an audit credit report reflecting "an address change on ████████" to show the loan had a "misrepresentation of occupancy." (*Id*.)[5]  For another loan which closed on ██████████, Hunter relies on an audit credit report reflecting "an address change on ████████" to show the loan had a "misrepresentation of occupancy." (*Id*.)[6] For 37 findings as to misrepresentation of income and occupancy, Hunter relies upon information derived from bankruptcy filings made years after the loan was made—again, information that did not exist at the time of origination.  (*Id*.)  For example, for a loan which closed on ██████████, Hunter relies on a ██████████████████ showing a different address at the time of the ██████████████████. (*Id*.)[7]  Likewise, based on a ██████████████████ disclosing the borrower's income in ██████, Hunter alleges a "misrepresentation of income" for a loan which

---

[4]     Other information not available at origination on which Hunter relies is contained in tax returns submitted after a loan closed, servicing records, re-verifications, and public records searches such as MERS, DocEdge, and SiteX.com.  *See* Ex. 4 (Exhibit 2A to Hunter Rebuttal Report) (containing 189 findings relying upon such information).

[5]     Loan number NHELI_2006_HE3_2002174715.

[6]     Loan number NHELI_2007_2_2002237077.

[7]     Loan number NAA_2005_AR6_1002007402.

closed in ██████████, despite the fact that the underwriter would have used the borrower's

██ income to qualify the loan.  (*Id.*; Ex. 6 (Forester Report) at 58.)[8]

      For 89 findings as to misrepresentation of debt, Hunter relies on debts shown on

"audit credit reports" without any evidence that credit reports available to the underwriter at the

time of origination had been updated with that information.  (*See* Ex. 4 (Exhibit 2A to Hunter

Rebuttal Report).)  For example, based on a DataVerify report pulled in 2014, Hunter opines that

a loan which closed on ████████ was originated outside guidelines because of a new debt

obligation dated ██████ later—on ████████.  (*Id.*)[9]  Hunter also opines that a

loan was originated outside guidelines because a new debt obligation dated the day the subject

loan closed was reported in "audit credit reports" or other third-party sources.  (*Id.*)[10]  Similarly,

Hunter opines that a loan was not originated in accordance with guidelines because an

undisclosed debt was opened on ████████, ████████ before the loan closed on

████████—and ██████ after the underwriter approved the loan, on ████████.

(*Id.*; *see also* Ex. 6 (Forester Report) at 51-52.)[11]  Yet Hunter identifies no evidence that any

credit reporting databases were updated with these debts the day they came into being, or even

within a week.  In fact, as Forester testified, such databases were not "updated promptly."  (Ex. 7

(Forester Tr.) at 286:5-7.)  Hunter concludes that an underwriting error occurred whenever these

retrospective reports contained information he claims is inconsistent with that in the loan files—

but without any evidence that the underwriter could possibly have had access to the information

they contain.

---

[8]      Loan number NHELI_2006_HE3_2002208686.

[9]      Loan number NAA_2005_AR6_1001976475.

[10]      Loan number NAA_2005_AR6_1001976169.

[11]      Loan number NHELI_2006_HE3_2002209123.

*Excessive LTV/CLTV.*  For allegations that a loan had an "excessive LTV/CLTV" not permitted by originator underwriting guidelines, Hunter relies upon values produced by Dr. John A. Kilpatrick's automated valuation model.  (Ex. 1 (Hunter Report) at 99.)  For these findings, Hunter substitutes Dr. Kilpatrick's valuation for the appraised value that was in front of the original underwriter.  (*Id.*)  If the recalculated ratio is outside underwriting guidelines, Hunter concludes that the loan did not comply with those guidelines.  But Kilpatrick's automated valuation model uses tax-assessed values from the 2011 to 2014 time period—long after the loans were originated—as its primary determinant of the value of a property.  (Ex. 8 (Isakson Report) at 12, App. F.)  Those recent tax-assessed values were, of course, not available at the time of origination.  Nor does Hunter offer any evidence that the valuation tools available at the time of origination—for example, automated valuation models and broker price opinions used by Nomura in due diligence—would have yielded the values given by Kilpatrick's model.  To the contrary, plaintiff's proffered expert concerning statistics, Charles Cowan, testified that Nomura's "final diligence values" for loans in the Securitizations at issue here were on average only 1.8% lower than appraised values.  (Ex. 9 (Cowan Tr.) at 318:20-319:3.)  There is thus no evidence that Kilpatrick's model provides information about LTV ratios that was available to underwriters at the time of origination.

## ARGUMENT

Expert testimony, like any other evidence, must be relevant.  *See In re Puda Coal Sec. Inc., Litig.*, 2014 WL 2915880, at *20 (S.D.N.Y. June 26, 2014).  Hunter's proposed testimony fails to satisfy this basic requirement.  The "underwriting defects" Hunter claims to have identified include findings based on information that Hunter has admitted no underwriter could have possibly considered at origination.   (Ex. 5 (Hunter Tr.) at 181:3-24.)  These opinions,

based on information not available at the time of origination, have no bearing on the truthfulness of disclosures about how the loans "were underwritten."  (Appendix A.)  Hunter's methods also are unreliable, and would serve only to mislead, confuse, and prejudice the jury.  Indeed, the danger of jury confusion here is substantial.

## I.   INFORMATION NOT AVAILABLE AT ORIGINATION IS IRRELEVANT TO HOW THE LOANS "WERE ORIGINATED."

Evidence is relevant if it "make[s] a fact more or less probable than it would be without the evidence," and that fact is of "consequence in determining the action."  Fed. R. Evid. 401, 402.  When expert testimony does not "relate to any issue in the case," it is irrelevant and must be excluded.  *Daubert*, 509 U.S. at 591; *see also In re Puda Coal*, 2014 WL 2915880, at *20.

Here, information that was not available at the time of origination is not relevant to plaintiff's contention that the Offering Documents contained false statements about how loans backing the Securitizations "were originated."  Such evidence sheds no light on whether the original underwriter acted in compliance with guidelines.  As this Court has recognized, re-underwriting experts should "identify[] failures on the face of the loan files when matched against the underwriting guideline" (Ex. 10 (Nov. 15, 2012 Hearing Tr.) at 87:11-17)—something that cannot be done using information that did not exist when the loan was originated.  Hunter will seek to testify that the Offering Documents falsely disclosed that loans "were originated" generally in accordance with certain underwriting guidelines or criteria.  (Ex. 1 (Hunter Report) at 1.)  His reliance on information not in existence when the loans "were originated" makes his testimony irrelevant.

A.   **Information Not Available at Origination Cannot Be Used to Evaluate Whether an Underwriter Should Have Identified a Misrepresentation of Income, Occupancy, or Debt.**

Hunter uses information not available at origination to support his conclusions that loans were not properly underwritten to guidelines because underwriters did not detect misrepresentations concerning income, occupancy, or debt.  With respect to occupancy, which was a representation of the borrower's intent as of the time of origination, Hunter admits that the information on which he bases his opinions—evidence (albeit often unreliable) of where borrowers lived after origination—could not have been available to the underwriters at the time of origination.  *See* p. 5, *supra*.  For example, he uses "address changes" from almost a year after the origination of the loan to allege a misrepresentation of occupancy.  *See* p. 5, *supra*; *see also* Ex. 4 (Exhibit 2A to Hunter Rebuttal Report).

For income misrepresentation findings, Hunter often relies on bankruptcy filings disclosing income from later years, and he never claims or shows that this information was available to the underwriter at origination   *See* p. 5, *supra*.  He even uses a borrower's income from 2006 as the basis for a finding of a misrepresentation of income for a loan where the underwriter used the borrower's 2005 income to qualify the loan.  *See* p. 5, *supra*; *see also* Ex. 4 (Exhibit 2A to Hunter Rebuttal Report).  For findings of a misrepresentation of debt, Hunter similarly relies on audit credit reports issued long after the fact, and again he fails to provide any reason to believe that the information about the debts identified in those reports was available to the underwriter at the time of origination.  *See* p. 6, *supra*.  For some of these findings, he relies on "newly disclosed debt" that post-dates origination and by definition could not have been available to the underwriter at the time of origination.  *See* p. 6, *supra*; *see also* Ex. 4 (Exhibit 2A to Hunter Rebuttal Report).  For his opinions to be relevant, Hunter was required to show that the

information he claims demonstrates an underwriting error was actually available to the underwriter at origination.  Hunter never does so.

      **B.**      **Information Not Available at Origination Cannot Be Used to Evaluate Whether an Underwriter Should Have Identified an LTV or CLTV Ratio as Outside Guidelines.**

Hunter also uses information not available at origination concerning the "value" of a property (the denominator used to calculate LTV ratios) based on valuations he received from plaintiff's expert John Kilpatrick (*see* Ex. 1 (Hunter Report) at 99), who derived those values using an "automated valuation model" he created for purposes of this litigation. Defendants have moved to exclude Kilpatrick's testimony in its entirety, including testimony concerning Kilpatrick's valuation model.  *See* Defendants' December 5, 2014 Motion to Exclude Expert Testimony of John A. Kilpatrick.[12]  Whatever the outcome of that motion, Kilpatrick's valuations have no bearing on the LTV ratio determined by the originator—who was relying, as the Offering Documents represented, on the sale price or the original appraised value to calculate the LTV ratio.  The information yielded by Kilpatrick's model, which relies on tax-assessed values from years after origination (2011 to 2014), was not available to the original underwriters. (*See* Ex. 8 (Isakson Report) at 12, App. F.)  Hunter has offered no evidence that valuations similar to Kilpatrick's were available at origination; to the contrary, plaintiff's expert Charles Cowan opines that Nomura's diligence shortly after origination showed valuations just 1.8% lower than appraised values.  *See* p. 7, *supra*.  Hunter's opinion that loans were originated contrary to guidelines due to excessive loan-to-value ratios is not relevant because it is based on information that was not available to underwriters at origination.

---

[12]      If the Court grants defendants' motion to exclude Kilpatrick's testimony, the Court should also preclude Hunter from giving any testimony that relies in any way on Kilpatrick's findings.

Courts have excluded post-hoc evidence as irrelevant in similar circumstances.  In *Smith* v. *Prudential Insurance Company of America*, 2012 WL 1965405, at *14 (M.D. Tenn. May 31, 2012) (emphasis omitted), the court excluded expert testimony relying on posthumous events about why a decedent committed suicide because "[w]hat is relevant is [the decedent's] state of mind on the date of his death, which of course could not have incorporated information after" the date of his suicide.  In *Miller* v. *Stryker Instruments*, 2012 WL 1718825, at *11 (D. Ariz. Mar. 29, 2012), the court excluded expert testimony about articles and studies regarding a defective medical product published after a medical procedure because defendant could not have "known of [those] harmful effects prior to Plaintiff's surgery."  The same principle should apply here, where Hunter evaluates whether underwriters followed guidelines using information that the underwriter by definition could not have had at the time the underwriting decision was made.

## II.   THE REPORTS HUNTER USES TO EVALUATE HOW LOANS "WERE ORIGINATED" ARE INHERENTLY UNRELIABLE.

As this Court has held, "when an expert opinion is based on data, a methodology or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *3 (S.D.N.Y. Mar. 28, 2014) (quoting *Ruggiero* v. *Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005)).  "Expert opinions based on insufficient facts or data, or unsupported suppositions, is [sic] not acceptable."  *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007).

Aside from being inadmissible as irrelevant, Hunter's use of audit credit reports to test whether underwriters appropriately accepted borrowers' representations about their intent to occupy mortgaged properties is unreliable.  That is because the reports themselves are not credible, and therefore do not constitute a sufficient basis for an expert opinion.  *See* Fed. R.

Evid. 702(b)-(d); *see also Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 147-48 (1999);
*Daubert*, 509 U.S. at 591-95.  The vendors responsible for the audit credit reports on which
Hunter relies have made clear that the reports should not be used as Hunter uses them—and they
expressly decline to make any representations about the accuracy of those reports.

   For example, LexisNexis cautions users of its Accurint credit reports (upon which
Hunter relies) that the information in such reports may be incorrect or incomplete.  A disclaimer
in each report warns users that the data presented "should not be relied upon as definitively
accurate" and users should "independently verify" the data in the Accurint report "[b]efore
relying on any [of the report's] data." (Ex. 11 (LexisNexis Accurint Report) at 25.)  Similarly,
the reports from DataVerify relied upon by Hunter state that "DataVerify and its third party
business partners do not guarantee the accuracy of this data" and that information "provided by
DataVerify are delivered to the subscriber 'as is' and 'as available' and all uses of this data are at
the subscriber's sole risk." (*See* Ex. 12 (DataVerify Report) at 26.)  Yet Hunter relies on these
reports without ever verifying their accuracy.

   Deposition testimony confirmed that audit credit reports do not reliably identify
owner-occupancy misrepresentations.  CBCInnovis, one provider of FHFA's "audit credit
reports," made clear that it was "not making any representation" as to "whether or not any of
these addresses are the primary residence of that consumer." (Ex. 13 (Viviano Tr.) at 45:21-
46:2.)  Similarly, DataVerify, another third-party source used by Hunter to allege occupancy
misrepresentations, expressly disclaimed that "the addresses listed here [could] be relied upon to
show . . . a borrower's primary residence." (Ex. 14 (Johnson Tr.) at 60:24-61:2.)  Hunter did not
independently verify the questionable information in these reports.  Without any process or
methodology to test the reliability of such information, and in the face of disavowals of

reliability by the providers of that information, Hunter has not demonstrated the reliability of the data he used.  His use of that data is therefore unreliable.  *See Nimely* v. *City of N.Y.*, 414 F.3d 381, 396 (2d Cir. 2005) (requiring "a sufficiently rigorous analytical connection between [the] methodology and the expert's conclusions" for an opinion to be reliable); *United States* v. *Tin Yat Chin*, 371 F.3d 31, 37, 40-41 (2d Cir. 2004) (affirming district court's exclusion of expert testimony based on anecdotal evidence and "generalized assumptions" not backed by reliable information).

### III.  HUNTER'S TESTIMONY BASED ON INFORMATION NOT AVAILABLE AT ORIGINATION WOULD MISLEAD THE JURY AND PREJUDICE DEFENDANTS.

Presenting expert testimony that loans were underwritten incorrectly based on information underwriters did not have at the time of origination is certain to "confus[e] the issues" and  "mislead[] the jury."  Fed. R. Evid. 403.  Evidence should be excluded if the evidence's "probative value" is "substantially outweighed" by the danger of any resulting confusion or unfair prejudice.  *Id*.  Rule 403 has a "uniquely important role . . . to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations."  *In re Puda Coal*, 2014 WL 2915880, at *15 (quoting *Nimely*, 414 F.3d at 397).  The information at issue here—information not available to loan underwriters at the time of origination—is not relevant.  Any testimony based on that information would be highly confusing and misleading to the jury, and is likely to cause undue prejudice.

Hunter's reliance on information underwriters did not have would encourage hindsight bias, which is, as the Seventh Circuit recently described it, the "human tendency to believe that whatever happened was bound to happen."  *Jentz* v. *ConAgra Foods, Inc.*, 767 F.3d 688, 693 (7th Cir. 2014).  Evidence which encourages the jury to use hindsight to prove some

conduct was wrong at an earlier time is inadmissible.  *See United States* v. *Vest*, 116 F.3d 1179,

1185 (7th Cir. 1997) (affirming district court's decision to exclude evidence because it "would

have risked confusing the jury by giving [the defendant] the benefit of coincidental, hindsight

justifications" for the disputed medical tests); *Abu Dhabi Commercial Bank* v. *Morgan Stanley &*

*Co. Inc.*, 2013 WL 1155420, at * 7 (S.D.N.Y. Mar. 20, 2013) (reports compiled after the relevant

conduct "with the benefit of hindsight not legally available to the jury in making its findings, are

irrelevant and would prejudice the jury"); *Minemyer* v. *B-Roc Representatives, Inc.*, 2012 WL

346621, at *5 (N.D. Ill. Feb. 2, 2012) (finding that because defendants' evidence "poses the

intolerably high risk that the jury will engage in . . . hindsight analysis," it was inadmissible

under Rule 403).  Hunter's approach encourages, and depends on, such improper hindsight bias

by basing his opinion that there were errors in "the original underwriting process" on information

that post-dates this process, often by years.  (Ex. 1 (Hunter Report) at 118.)  Jurors would thus

have the "benefit of hindsight" by being presented with sources of data not available to the

underwriter at the time of origination.  Hunter's attempt to encourage hindsight bias is an attempt

to mislead and prejudice the jury that should not be permitted.   The Offering Documents made

no representation concerning information borrowers could never change or that underwriting

decisions based on different information may not be different.  Those Documents instead

represented that the loans "were" underwritten (past tense) by the original underwriter generally

in accordance with the applicable guidelines.

Opinions based on information not available at origination would lead to jury

confusion in additional ways.  The jury would be misled into believing that disclosures about

how the loans "were originated" are false if they are contradicted by information that post-dates

the origination of the loans.  It would be virtually impossible for a limiting instruction to address

-14-

this problem, considering that the jury may be presented with many hundreds of defect findings. The jury is likely to misunderstand the relevance of information not available at origination, and plaintiff should not be permitted to present it.

## CONCLUSION

This Court should rule that Robert Hunter may not offer any opinions at trial that rely in any way on information not available to the underwriter as of the time of origination.

Dated:  New York, New York
      January 5, 2015

                                      Respectfully submitted,

/s/ Thomas C. Rice_____     /s/ David B. Tulchin_____

Thomas C. Rice (trice@stblaw.com)        David B. Tulchin (tulchind@sullcrom.com)
David J. Woll (dwoll@stblaw.com)         Steven L. Holley (holleys@sullcrom.com)
Andrew T. Frankel (afrankel@stblaw.com)   Bruce E. Clark (clarkb@sullcrom.com)
Alan Turner (aturner@stblaw.com)         Bradley A. Harsch (harschb@sullcrom.com)
Craig S. Waldman (cwaldman@stblaw.com)   Katherine J. Stoller (stollerk@sullcrom.com)
SIMPSON THACHER & BARTLETT LLP    SULLIVAN & CROMWELL LLP
425 Lexington Avenue                    125 Broad Street
New York, NY  10017                     New York, NY  10004
Telephone:  212-455-2000             Telephone:  212-558-4000
Facsimile:  212-455-2502              Facsimile:  212-558-3588

*Attorneys for Defendant RBS Securities Inc.*   Amanda F. Davidoff
                                       (davidoffa@sullcrom.com)
                                       Elizabeth A. Cassady
                                       (cassadye@sullcrom.com)
                                       SULLIVAN & CROMWELL LLP
                                       1700 New York Avenue, NW, Suite 700
                                       Washington, DC  20006
                                       Telephone:  202-956-7500
                                       Facsimile:  202-956-6993

                                       *Attorneys for Defendants Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca*

**Appendix A**

| Security | Disclosures Concerning How the Loans "Were Originated" |
|---|---|
| Ex. 15 (2005-AR6 Prospectus Supplement) | • "The Mortgage Loans have been purchased by the seller from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section." NOM-FHFA_04811894. |
| Ex. 16 (2006-FM1 Prospectus Supplement) | • "All of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this section." NOM-FHFA_04729543. |
| Ex. 17 (2006-FM2 Prospectus Supplement) | • "All of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this section." NOM-FHFA_04638395.<br><br>• "All of the Mortgage Loans have been purchased by the sponsor from the Originator and were originated generally in accordance with the underwriting criteria described in this section." NOM-FHFA_04638399. |
| Ex. 18 (2006-HE3 Prospectus Supplement) | • "The Mortgage Loans were generally originated by People's Choice Home Loan, Inc., a Wyoming corporation ('PCHLI'), in accordance with the underwriting criteria described in this section and detailed in the print and on-line manuals that our underwriters use in making their credit decisions ('Underwriting Guidelines'); provided however that certain of the more seasoned Mortgage Loans included in the Mortgage Pool may have been originated under underwriting guidelines which are substantially similar to the Underwriting Guidelines described in this section but may have differences with respect to pricing, FICO scores and other program attributes." NOM-FHFA_04620965.<br><br>• "All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section (with the exception of the Mortgage Loans originated by People's Choice Home Loan, Inc. which were originated in accordance with the People's Choice Home Loan, Inc. Underwriting Standards described above)." NOM-FHFA_04620972. |

| Security | Disclosures Concerning How the Loans "Were Originated" |
|---|---|
| Ex. 19 (2007-1 Prospectus Supplement) | • "All of the mortgage loans have been originated either under FNBN's "full" or "alternative" underwriting guidelines (i.e., the underwriting guidelines applicable to the mortgage loans typically are less stringent than the underwriting guidelines established by Fannie Mae or Freddie Mac primarily with respect to the income and/or asset documentation which borrower is required to provide)."  NOM-FHFA_05142021.<br><br>• "All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."  NOM-FHFA_05142025. |
| Ex. 20 (2007-2 Prospectus Supplement) | • "All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."  NOM-FHFA_05591415. |
| Ex. 21 (2007-3 Prospectus Supplement) | • "The information set forth in the following paragraphs of this section contains a brief description of the underwriting guidelines used for Mortgage Loans originated by ResMAE Mortgage Corporation ("ResMAE")."  NOM-FHFA_04732708.<br><br>• "All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section." NOM-FHFA_04732712. |