# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY, AS
CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

          Plaintiff,

    -against-

NOMURA HOLDING AMERICA INC., *et al*.,

          Defendants.

No. 11-cv-6201 (DLC)

ECF Case

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE THE OPINION AND TESTIMONY OF TIMOTHY J. RIDDIOUGH

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

January 5, 2014

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND .................................................................................................2

    A.    The Parties' Section 11 Analyses and the State of the RMBS Market on
September 2, 2011 ...............................................................................3

          1.    The "Amount Paid for the Security" ...........................................3

          2.    The "Value" of the Securities as of September 2, 2011 ............4

          3.    Loss Causation ...........................................................................9

    B.    Damages Under Section 12 and Blue Sky Laws ...................................9

    C.    The Current Motion ...........................................................................11

ARGUMENT ...................................................................................................11

I.     PLAINTIFF DOES NOT CHALLENGE DR. RIDDIOUGH'S
QUALIFICATIONS, NOR THE RELIABILITY OR ADMISSIBILITY OF
ALMOST ALL OF HIS ANALYSIS ...............................................................11

II.    DR. RIDDIOUGH'S CHALLENGED TESTIMONY CONCERNING SECTION
11 DAMAGES IS ADMISSIBLE .................................................................13

    A.    The "Clean Price" is the "Amount Paid for the Security" ...................13

    B.    Dr. Riddiough Properly Adjusted for Illiquidity When Calculating
"Value" ...........................................................................................14

III.   DR. RIDDIOUGH'S CHALLENGED TESTIMONY CONCERNING SECTION
12 AND BLUE SKY DAMAGES IS ADMISSIBLE .......................................19

    A.    The "Clean Price" Is the "Consideration Paid for the Security" .........19

    B.    Dr. Riddiough Properly Applies Prejudgment Interest Equally Across All
Cash Flows, Not Just Principal Payments .........................................20

IV.   DR. RIDDIOUGH WILL NOT TESTIFY AT TRIAL CONCERNING
MATTERS THAT THE COURT HAS EXCLUDED .......................................21

CONCLUSION ................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Amorgianos* v. *Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ........................................................................18

*Chau* v. *Lewis*,
    771 F.3d 118 (2d Cir. 2014) .........................................................................6

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ....................................................................11, 13, 17, 18

*Fort Worth Employees' Ret. Fund* v. *J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014) ...............................................................12

*In re APA Assessment Fee Litig.*,
    766 F.3d 39 (D.C. Cir. 2014) ......................................................................20

*Nationwide Mut. Fire Ins. Co.* v. *Sunbeam Products, Inc.*,
    2014 WL 3875844 (S.D.N.Y. July 17, 2014) .............................................1

*Papyrus Tech. Corp.* v. *New York Stock Exch., LLC*,
    257 F.R.D. 39 (S.D.N.Y. 2009) .................................................................21

*Ruiz-Troche* v. *Pepsi Cola of Puerto Rico Bottling Co.*,
    161 F.3d 77 (1st Cir. 1998) ........................................................................18

*S. Track & Pump, Inc.* v. *Terex Corp.*,
    852 F. Supp. 2d 456 (D. Del. 2012) ...........................................................20

*Strobl* v. *N.Y. Mercantile Exch.*,
    590 F. Supp. 875 (S.D.N.Y. 1984), *aff'd*, 768 F.2d 22 (2d Cir. 1985) .....20

### Statutes & Rule

15 U.S.C. § 77k(e) .........................................................................................3, 9

15 U.S.C. § 77*l* ..............................................................................................9

D.C. Code § 31.5606.05(b)(1)(A) .................................................................9

V.A. Code Ann. § 13.1-522(A) .....................................................................9

Fed. R. Evid. 702 ...........................................................................................11

**TABLE OF AUTHORITIES**
*(cont'd)*

Page(s)

### Other Authorities

Amihud, Yakov, Haim Mendelson, and Lasse Heje Pederson, "Market Liquidity, Asset
 Pricing, Risk, and Crises," Cambridge University Press, 2013 ...................................................6

Bodie, Zvi, Alex Kane, and Alan Marcus, "Investments,"
 7th Edition, McGraw-Hill, 2008 ...........................................................................................6

Fabozzi, Frank J., *et al*., Mortgage-Backed Securities:  Products, Structuring, and
 Analytical Techniques, John Wiley & Sons, Inc., 2011 .......................................................7, 15

Fabozzi, Frank J., The Handbook of Fixed Income Securities,
 8th Edition, McGraw-Hill,  2012 ...........................................................................................4

Citibank Mortgage Credit Weekly, Aug. 26, 2011 ...................................................................16

Jablansky and Wang, The Royal Bank of Scotland, "Perfect Pay and Credit Burnout:
 Non-Agency Valuation Implications, Securitized Product Insights," Mar. 10, 2011 .............16

J.P. Morgan Securitized Products Weekly, Aug. 26, 2011 .........................................................16

Jefferies & Company, Inc., "Residential Mortgage Market Strategy,"
 Global Fixed Income Monthly, Sept. 2011 ...........................................................................16

Menozzi, Jay, "Non-Agency RMBS Continue to Offer Superior Return Potential,"
 UCM Partners White Paper, Feb. 2011 ................................................................................7, 14

Neuberger Berman Alternative Investments, "2013 Strategy Outlook" .......................................15

Vickery, James, and Joshua Wright, "TBA Trading and Liquidity in the Agency MBS
 Market," FRBNY Economic Policy Review, May 2013 ......................................................7, 15

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Action | *FHFA* v. *Nomura Holding America Inc.*, *et al.*, No. 11 Civ. 6201 (DLC) |
| Nomura | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., and Nomura Securities International, Inc. |
| RBS | RBS Securities Inc. |
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| Securities | NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 |
| Riddiough Dep. | Deposition of Dr. Timothy J. Riddiough taken on November 20, 2014 in this Action |
| Finkel Dep. | Deposition of James K. Finkel, taken on November 25, 2014 in this Action |
| Riddiough Report | November 7, 2014 Expert Report of Timothy J. Riddiough in this Action |
| Finkel Report | July 9, 2014 Expert Report of James K. Finkel in this Action |
| Pl. Br. | Memorandum of Law in Support of Plaintiff's Motion to Exclude the Opinion and Testimony of Defendants' Expert Timothy J. Riddiough, dated December 19, 2014 in this Action |
| SEC | Securities and Exchange Commission |

Defendants submit this memorandum in opposition to plaintiff's December 19, 2014 Motion to Exclude the Opinion and Testimony of Defendants' Expert Dr. Timothy J. Riddiough.

## PRELIMINARY STATEMENT

Defendants' damages expert, Dr. Timothy Riddiough, has more than twenty years of experience analyzing and valuing mortgage-backed securities. The opinions offered in his report and testimony are reliable and supported by commonly accepted principles, and his damages calculations are appropriate for the residential mortgage-backed securities (sometimes referred to as "RMBS")[1] at issue here, which have qualities that distinguish them from the types of securities typically at issue in cases brought under Sections 11 and 12 of the Securities Act of 1933 and the blue sky laws that plaintiff here invokes.

Plaintiff's attack on Dr. Riddiough is entirely meritless. *First*, although plaintiff seeks to preclude Dr. Riddiough from "opining as to FHFA's statutory damages" (Pl. Br. at 16), it does not come close to showing that Dr. Riddiough lacks the qualifications to testify, that his methodology is unreliable, or that his testimony would be unhelpful. *Nationwide Mut. Fire Ins. Co.* v. *Sunbeam Products, Inc*., 2014 WL 3875844, at *2 (S.D.N.Y. July 17, 2014). Instead, plaintiff disagrees with minor aspects of Dr. Riddiough's opinions. Plaintiff is free to press those criticisms (which are meritless) on cross-examination and let the jury decide what portions of Dr. Riddiough's testimony to credit, but its arguments are not a valid basis to exclude his testimony in its entirety.

---

[1]      Here, RMBS refers to private label or non-agency securities.

*Second*, plaintiff's claim that Dr. Riddiough's Section 11 damages calculations are unreliable is also incorrect.  Plaintiff argues that Dr. Riddiough used the wrong "amount paid for the security" in those calculations (for two certificates, leading to a difference of $357, 433 in "amount paid"), but this ignores the unique nature of the RMBS certificates at issue here, two of which had accrued interest for which plaintiff reimbursed Nomura in addition to purchasing the certificates on the date of sale.  Plaintiff is also entirely incorrect in asserting that Dr. Riddiough lacked adequate support for his opinion that the seven at-issue certificates were undervalued by at least 15% as of September 2, 2011 (the date on which the complaint was filed); Dr. Riddiough marshalled substantial support to demonstrate the illiquidity of the market for residential mortgage-backed securities as of that date.  Indeed, both Freddie Mac and Fannie Mae recognized in their respective 10-K filings for 2011 that the market for residential mortgage-backed securities was illiquid at the time plaintiff filed this action.  (Ex. 1 (Freddie Mac 2011 10-K for the period Dec. 31, 2011, filed with the SEC) at 299; Ex. 2 (Fannie Mae 2011 10-K for the period Dec. 31, 2011, filed with the SEC) at 86.)  Dr. Riddiough's extensive analysis confirms what Freddie Mac and Fannie Mae acknowledged in their SEC filings.

*Third*, plaintiff's arguments concerning Dr. Riddiough's Section 12 and blue sky damages calculations are also without merit.  Dr. Riddiough correctly calculated the "consideration paid" by Freddie Mac and Fannie Mae by excluding payments for accrued interest already earned.  He also properly applied prejudgment interest to all income that had been returned to Freddie Mac and Fannie Mae.

## BACKGROUND

Both parties retained experts to calculate damages under Sections 11 and 12 of the Securities Act, and the applicable blue sky laws.  Dr. Timothy J. Riddiough, defendants'

damages expert, is a Professor of Real Estate and Urban Land Economics at the Wisconsin

School of Business of the University of Wisconsin-Madison and directs the applied real estate

investment program at the Wisconsin School of Business.  (Ex. 3 (Riddiough Report) ¶ 1.)  From

1994 to 2001, Dr. Riddiough was a Professor of Real Estate Finance at the Massachusetts

Institute of Technology.  (*Id.*)  Dr. Riddiough serves on the editorial boards of six real estate-

related academic journals, and his research has covered mortgage lending, mortgage

securitization, real estate options, REIT investment, and corporate finance.  (*Id.* ¶¶ 2-3; *see also*

*id.* Appendix A.)

     **A.**     **The Parties' Section 11 Analyses and the State of the RMBS Market on September 2, 2011.**

Section 11 provides, in pertinent part, that damages are to be measured as "the

difference between the amount paid for the security . . . and the value thereof as of the time such

suit was brought," reduced by any damages not caused by the alleged misstatements.  15 U.S.C.

§ 77k(e).  Dr. Riddiough and plaintiff's damages expert, James K. Finkel, agree on many, but not

all, aspects of this calculation.

     **1.**     **The "Amount Paid for the Security."**

For five of the seven securities at issue in this action, Dr. Riddiough and Mr.

Finkel agree on the "amount paid for the security."  (*See* Pl. Br. at 10.)  For two, they disagree by

a small amount, a total of $357,432, out of what Mr. Finkel contends are Section 11 damages of

up to $566 million.  (*Id.*; Ex. 4 (Finkel Report) Figures 29-31.)  Freddie Mac and Fannie Mae

purchased those two certificates between the dates when monthly interest payments were made

to investors.  For those certificates, Freddie Mac and Fannie Mae paid for the security and also

reimbursed Nomura for the partial-month's accrued interest payments, which were then repaid to

Freddie Mac or Fannie Mae as part of the first interest payment on the certificate.  (Ex. 3

(Riddiough Report) ¶ 106 n.95.)  So, taking NHELI 2006-FM1 as an example, Freddie Mac paid

$309,550,000 for the security, and reimbursed Nomura for the $41,187 in interest that had

accrued and would be paid directly to Freddie Mac as part of the first interest payment.  (Ex. 5

(Trade Confirmation for NHELI 2006-FM1) at 1.)

   In his Section 11 damages calculations, Dr. Riddiough calculates the "amount

paid for the security" as the total amount that Freddie Mac and Fannie Mae paid for the

certificates, excluding the reimbursements for accrued interest.  (*Id*.)  This amount is referred to

as the "clean price."  *Id.*; *see also* Fabozzi, Frank J., The Handbook of Fixed Income Securities,

8th Edition, McGraw-Hill, 2012, pp. 100-102.  Mr. Finkel, in contrast, includes accrued interest

in the "amount paid for the securities," which is called the "dirty price."  *See* Fabozzi, The

Handbook of Fixed Income Securities, pp. 100-102.  In the example above, this makes a

difference of $41,187.

### 2.  The "Value" of the Securities as of September 2, 2011.

   Dr. Riddiough calculates the "value" of the securities as of September 2, 2011

(the date on which this action was commenced) in two steps.  First, Dr. Riddiough calculates the

price (using software that is widely used for this purpose) of the securities on that date and,

second, he applies an illiquidity premium to account for the fact that the market for residential

mortgage-backed securities was then highly illiquid.  Mr. Finkel's analysis includes only the first

of these two steps.  (Ex. 4 (Finkel Report) ¶¶ 64-68.)  Dr. Riddiough calculates "value" by taking

into account the fact that the true value on the relevant date exceeded the "price" then obtainable

in the marketplace.  Section 11, of course, requires a calculation of "value"—the statute could

have, but did not, refer to "price" or "market price."

   Dr. Riddiough and Mr. Finkel agree that the price of the securities at issue on a

particular date is determined by (i) expected future cash flows as of that date, and (ii) the

appropriate discount rate.  (Ex. 3 (Riddiough Report) ¶¶ 76, 88-91; Ex. 4 (Finkel Report) ¶¶ 64-

68.)  They also agree that three primary factors determine expected future cash flows:  the

expected default rate for the loans backing the securities; the expected rate at which loans will be

prepaid; and the expected "loss severity," or shortfall between loan balance and the amount

recovered upon foreclosure.  (Ex. 3 (Riddiough Report) ¶ 58; Ex. 4 (Finkel Report) ¶ 66.)  And,

they agree that predicted default, prepayment and loss severity rates, as well as discount rates,

can be entered into a tool called INTEX to calculate future cash flows and price.  (Ex. 3

(Riddiough Report) Appendix D, D-2; Ex. 4 (Finkel Report) ¶¶ 64-65, 67.)

      Dr. Riddiough and Mr. Finkel disagree markedly over how to estimate expected

future cash flows and appropriate discount rates.  As Dr. Riddiough explains, the default rates,

prepayment rates and loss severity rates that determine cash flows change over time depending

on market events such as changes in housing prices and interest rates.   (Ex. 3 (Riddiough

Report) ¶¶ 57-58.)  Forecasting these factors is therefore a complex exercise in modeling, for

which Dr. Riddiough uses a software application called ADCo[2] that is commonly used to price

residential mortgage-backed securities.  (Ex. 3 (Riddiough Report) ¶ 76.)  Mr. Finkel does not

dispute that default rates, prepayment rates and loss severity rates change over time. [3]  (*See* Ex. 6

---

[2]    The model was developed by Andrew Davidson and Co. and has been widely used in the industry, including by banks, brokers/dealers, institutional investors, mortgage REITs, insurance companies, money managers, and government agencies.  (Ex. 3 (Riddiough Report) ¶ 75.)  "It is relied upon by many financial institutions in the relevant market, and thus has in effect been tested for accuracy by market players and passed the test."  (*Id.*)

[3]    Mr. Finkel nevertheless uses a different method, assuming that the average prepayment, default and loss severity rates during the three-month period just prior to September 2, 2011 would persist during the entire 20 to 30 year potential life of the security.  (*See* Ex. 4 (Finkel Report) ¶ 65.)

(Finkel Dep.) at 188:8-189:9.)  It is noteworthy that plaintiff has not challenged as a basis for its *Daubert* motion Dr. Riddiough's use of ADCo to forecast the factors that determine price.

The price calculated by Dr. Riddiough is the market price, which is lower than value to the extent of the illiquidity premium applicable to RMBS at that time.  (Ex. 3 (Riddiough Report) ¶ 13.)  It is well established that in circumstances of crisis or illiquidity, the market price and value of securities may diverge, making it appropriate add an illiquidity premium to the market price in order to calculate value.  *See*, *e.g.*, Amihud, Yakov, Haim Mendelson, and Lasse Heje Pederson, "Market Liquidity, Asset Pricing, Risk, and Crises," Cambridge University Press, 2013, Introduction (explaining that "a drop in liquidity leads to a decline in prices" and "liquidity crises create liquidity spirals"); Bodie, Zvi, Alex Kane, and Alan Marcus, "Investments," 7th Edition, McGraw-Hill (2008), p. 317.

There can be no dispute that the market for residential mortgage-backed securities was very illiquid following the "United States' housing market collapse in 2008–2009" and during "the ensuing global financial crisis," both of which "are widely considered the worst financial disasters since the Great Depression."  *Chau* v. *Lewis*, 771 F.3d 118, 121 (2d Cir. 2014).  During such times of "crisis, investors tend to move away from riskier, more complex investments, turning instead to safer and simpler financial products," which "tend to be more liquid investments . . . where the term 'liquid' in this case refers to the ability to sell a security at short notice at its true economic value (that is, without having to sell it at a discount to its fundamental value."  (Ex. 3 Riddiough Report) ¶ 37 (citing Bodie, Zvi, *et al.*, "Investments," p. 317).)

When plaintiff filed the complaint in this action on September 2, 2011, the market for residential mortgage-backed securities was experiencing precisely the type of illiquidity that

causes a divergence between price and value.  In its 2011 10-K, Freddie Mac stated, "Our holdings of non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans are not liquid . . . ." and that more generally, the market for such securities "is highly illiquid, resulting in wide price ranges as well as wide credit spreads."  (Ex. 1 (Freddie Mac Form 10-K for 2011, filed with the SEC) at 180, 299.)  Similarly, Fannie Mae told the SEC in its 2011 Form 10-K that in 2011, there was "limited market activity and therefore little or no price transparency" for its holdings of residential mortgage-backed securities.  (Ex. 2 (Fannie Mae Form 10-K for 2011, filed with the SEC) at 86.)

   Dr. Riddiough marshals overwhelming support for the same proposition that Freddie Mac and Fannie Mae set forth in their respective 2011 SEC filings.  (*See* pp. 15-17, *infra*.)  This includes the Federal Reserve Bank of New York's 2013 Economic Policy Review, which stated that "secondary markets for trading non-agency [R]MBS have been extremely illiquid" since 2007.  (Ex. 3 (Riddiough Report) ¶ 42 n.36 (quoting Vickery, James, and Joshua Wright, "TBA Trading and Liquidity in the Agency MBS Market," FRBNY Economic Policy Review, May 2013, p. 3 ("FRBNY Economic Policy Review")).)  Dr. Riddiough also analyzed trading volumes for residential mortgage-backed securities, finding that volumes in August and September 2011 "were amongst the lowest for any months during" the period May 2011 to April 2014.  (Ex. 3 (Riddiough Report) ¶ 43 & Exhibit 11.)  There can be no doubt about the illiquid state of the market for RMBS as of the time this action was commenced.

   To obtain a true "value" for the security as of September 2, 2011—in other words, to account for the illiquidity as of that date—Dr. Riddiough adds 15% to the prices generated by ADCo and INTEX.  (Ex. 3 (Riddiough Report) ¶ 93.)  This is not an arbitrary percentage plucked from the air.  Instead, 15% is the bottom of a range, set forth in a reliable 2011 "White Paper,"

that analyzed and calculated the prevailing illiquidity premium for residential mortgage-backed securities as of February 2011.  (Ex. 7 (Menozzi, Jay, "Non-Agency RMBS Continue to Offer Superior Return Potential," UCM Partners White Paper, February 2011) at 10-11.)  The White Paper analyzed (i) yields on residential mortgage-backed securities not subject to credit default risk (*i.e.*, those guaranteed by Freddie Mac and Fannie Mae), and (ii) credit spreads observed in the bond markets, and then determined that the illiquidity premium applicable to RMBS as of early 2011 was 15% to 20%.  (*Id.* at 10-11 & Figure 7.)  To be conservative, Dr. Riddiough uses the bottom of that range for his calculations.

Dr. Riddiough also analyzed other factors before deciding to employ the 15% premium.  He looked at price movements after the date on which the Action was commenced, and found that the certificates' average prices increased by 28% to 81% between September 2011 and March 2014, as markets were becoming more liquid, and that market indices for a basket of residential mortgage-backed securities increased by a similar amount over the same period (12% to 86%).  (Ex. 3 (Riddiough Report) ¶ 93 & Exhibit 11.)  This again demonstrates the conservative nature of Dr. Riddiough's 15% illiquidity premium.

Importantly, Mr. Finkel never disagrees that a liquidity crisis will cause a security's market price to diverge from value or that in such circumstances, it is appropriate to apply a premium to price in order to calculate value.  Mr. Finkel's disagreement is that he does not find the kind of illiquidity that Freddie Mac and Fannie Mae acknowledged in their Form 10-Ks, although Mr. Finkel only goes so far as to say that as of September 2011, the market "showed signs of liquidity."  (Ex. 4 (Finkel Report) ¶ 58.)  Mr. Finkel conceded at deposition that in making that assertion, he failed to take into account the 10-K filings for 2011 where Freddie Mac and Fannie Mae made statements in accord with Dr. Riddiough's point about

-8-

illiquity.  (*See* Ex. 6 (Finkel Dep.) at 234:20-249:7; Ex. 1 (Freddie Mac Form 10-K for 2011, filed with the SEC) at 54, 180, 182, 299; Ex. 2 (Fannie Mae Form 10-K for 2011, filed with the SEC) at 86).)

Both Dr. Riddiough and Mr. Finkel deduct the September 2, 2011 "values" they calculate from the "amount paid for the security" to obtain Section 11 "damages" (before any accounting for loss causation).  (Ex. 3 (Riddiough Report) ¶ 73 & Exhibits 14A.2, 14B.2, 14C.2, 14D.2; Ex. 4 (Finkel Report) ¶ 119.)

### 3.    Loss Causation.

In coming to his final damages number, Dr. Riddiough deducts the portion of plaintiff's losses that were caused by factors other than the alleged misrepresentations.  *See* 15 U.S.C. § 77k(e).  The steps that Dr. Riddiough takes to determine the appropriate loss causation deductions and the results are described on pages 51-54 of his report.  Plaintiff offers no criticisms of Dr. Riddiough's method of accounting for loss causation.  Mr. Finkel, however, makes no adjustment of any kind for loss causation.  He assumes that damages were caused 100% by the alleged false and misleading statements in the Offering Documents—an assumption that will be vigorously challenged at trial.

### B.    Damages Under Section 12 and Blue Sky Laws.

Section 12(a)(2) of the Securities Act provides, in pertinent part, that damages are measured as "the consideration paid for the security with interest thereon, less the amount of any income received thereon . . . ."  15 U.S.C. § 77*l*.  This Court has said that "[t]he Virginia and District of Columbia blue sky laws both adopt this measure of damages."[4]  (Ex. 8 (Dec. 18, 2014

---

[4]    The Virginia blue sky law provides that damages are calculated based on the "consideration paid for such security, together with interest thereon at the annual rate of six percent . . . less the amount of any income received on the security . . . ."  V.A. Code Ann.

*(footnote continued)*

Order, Doc. No. 922) at 22 (citation omitted).)  Dr. Riddiough and Mr. Finkel calculate damages under these statutes using similar methods.

Dr. Riddiough uses the same number for the "consideration paid for the security" under Section 12 that he used for the "amount paid for the security" in his Section 11 damages calculations—the "clean price" of the at-issue certificates.  (Ex. 14 (Riddiough Exhibits 15A-15D (Adjusted for Accrued Interest)).)  He applies prejudgment interest to the "consideration paid" by Freddie Mac and Fannie Mae and to the "income received thereon," *i.e.*, the principal and interest payments received by Freddie Mac and Fannie Mae.  Then, from the "consideration paid" (plus interest), Dr. Riddiough deducts all cash flows received by Freddie Mac and Fannie Mae (plus interest).  (Ex. 3 (Riddiough Report) ¶ 105.)

Mr. Finkel also uses the same number for the "consideration paid for the security" that he used for the "amount paid for the security" in his Section 11 damages calculation—the "dirty price," which includes both the amount paid for the certificates and the payment for accrued interest on two certificates.  (*See* Ex. 9 (Finkel Backup) RescissionCalculator_Nomura.xlsm, "Master" Tab).)  From that amount, Mr. Finkel deducts cumulative principal repayments, applies prejudgment interest to the remaining balance and then deducts cumulative interest received.  (Ex. 4 (Finkel Report) ¶¶ 133-135.)

Mr. Finkel's approach is equivalent to including prejudgment interest on the principal payments that Freddie Mac and Fannie Mae received, but not on the interest payments they received.  (*See id.*)  In contrast, Dr. Riddiough applies prejudgment interest to both principal

---

(*footnote continued*)

§ 13.1-522(A).  Damages under the District of Columbia blue sky law are calculated by deducting the "amount of any income received on the security" from "the consideration paid for the security, [including] interest at the rate used in the Superior Court of the District of Columbia from the date of payments . . . ."  D.C. Code § 31.5606.05(b)(1)(A).

and interest payments received by Freddie Mac and Fannie Mae.  The experts thus differ over

whether Freddie Mac and Fannie Mae should pay prejudgment interest only on the principal

payments they received, or on both principal and interest payments.

      **C.**    **The Current Motion.**

Plaintiff here contends, citing *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579, 592-95 (1993), that Dr. Riddiough should not be permitted to testify at trial.  (Pl. Br. at

2, 7, 15-16.)  With respect to Section 11, plaintiff argues that Dr. Riddiough improperly used the

amount corresponding to the "clean price" for the "amount paid for the security."  (Pl. Br. at 3, 9-

10.)  Plaintiff also takes issue with Dr. Riddiough's 15% adjustment to account for the illiquidity

in the market for residential mortgage-backed securities at the time the suit was brought.  (Pl. Br.

at 4, 10-12.)

With respect to Section 12 and blue sky damages, plaintiff again argues that Dr.

Riddiough improperly used the "clean price" as the "consideration paid for the security."  (Pl. Br.

at 5, 12-13.)  Plaintiff also contends that Dr. Riddiough improperly applied prejudgment interest

to interest payments received by Freddie Mac and Fannie Mae.  (Pl. Br. at 5-6, 13-14.)  Finally,

plaintiff argues that Dr. Riddiough should not be permitted to testify about loss causation with

respect to blue sky damages.

**ARGUMENT**

**I.**    **PLAINTIFF DOES NOT CHALLENGE DR. RIDDIOUGH'S QUALIFICATIONS,
NOR THE RELIABILITY OR ADMISSIBILITY OF ALMOST ALL OF HIS
ANALYSIS.**

The admissibility of expert testimony is governed by Rule 702, Fed. R. Evid.,

which provides that an expert who is "qualified . . . by knowledge, skill, experience, training, or

education may testify if the testimony would be helpful to the trier of fact and is based on

sufficient facts or data, is the product of reliable principles and methods, reliably applied to the facts of the case." *Fort Worth Employees' Ret. Fund* v. *J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 125 (S.D.N.Y. 2014) (quotation marks omitted).  Plaintiff does not challenge Dr. Riddiough's qualifications to give the opinions he offers.  Further, although plaintiff asks the Court to exclude Dr. Riddiough's testimony in its entirety, plaintiff's motion does not challenge the reliability or admissibility of the vast majority of it.  Mr. Finkel agrees that damages calculations under Sections 11 and 12 begin with the amount paid by Freddie Mac and Fannie Mae, but disagrees—by a total of $357,432—about the proper amount.  (*See* Pl. Br. at 9-10, 12-13; Ex. 4 (Finkel Report) ¶¶ 112-113, 115; Ex. 9 (Finkel Backup) RescissionCalculator_Nomura.xlsm, "Master" Tab).)  Mr. Finkel also agrees that the next step of the Section 11 analysis is to calculate value as of September 2, 2011, and plaintiff does not challenge as a basis for its *Daubert* motion the first part of Dr. Riddiough's method for doing so, his calculation of price.  (Ex. 4 (Finkel Report) ¶ 113.)  Neither plaintiff nor Mr. Finkel challenge Dr. Riddiough's opinion that because Section 11 damages depend on "value," not price, if the market for residential mortgage-backed securities was illiquid as of September 2, 2011, an adjustment should be made to account for that illiquidity when arriving at value on the date the lawsuit was commenced.  (Pl. Br. at 11-12.)  But plaintiff's number for "value" is derived without any adjustment for illiquidity because Mr. Finkel contends that the market was "show[ing] signs of liquidity" as of September 2, 2011, and plaintiff also quarrels with Dr. Riddiough's method of accounting for that illiquidity.  (Pl. Br. at 10-12.)

As to Section 12, the disagreements are even more minor.  Aside from the issue of whether to begin with the "clean" or "dirty" price—again, a dispute over $357,432—plaintiff's only challenge to Dr. Riddiough's methods is whether prejudgment interest should be applied to

both principal and interest payments received by Freddie Mac and Fannie Mae (Dr. Riddiough's

view), or just to principal payments (Mr. Finkel's view).  (Pl. Br. at 12-14.)

Dr. Riddiough's analysis is correct in all respects, as shown below.  In any event,

the small disagreements on these subjects are not sufficient to preclude Dr. Riddiough's

testimony in its entirety.  Even if plaintiff were correct in its criticisms (and it is not), Dr.

Riddiough's testimony is admissible because it "rests on a reliable foundation," is "relevant,"

and will assist the jury in determining the value of the at-issue certificates.  *Daubert,* 509 U.S. at

591, 595.  Plaintiff's complaints about Dr. Riddiough's analysis and conclusions are suitable for

cross-examination and do not come close to a viable *Daubert* challenge.

## II.   DR. RIDDIOUGH'S CHALLENGED TESTIMONY CONCERNING SECTION 11 DAMAGES IS ADMISSIBLE.

### A.   The "Clean Price" is the "Amount Paid for the Security."

As noted, plaintiff takes issue with Dr. Riddiough's use of the "clean price" for

the "amount paid" for two securities in his Section 11 damages calculations.  (Pl. Br. at 9-10.)

Plaintiff's argument is based on a mischaracterization of the amounts paid for those two

certificates, NAA 2005-AR6 and NHELI 2006-FM1 (which had accrued interest in the amounts

of $316,245 and $41,187, respectively, at the time of sale).  Freddie Mac and Fannie Mae paid

these amounts at the time it paid for the certificates (*see* Ex. 10 (Trade Confirmation for NAA

2005-AR6) at 1; Ex. 5 (Trade Confirmation for NHELI 2006 FM1) at 1.)  But these payments for

accrued interest are merely reimbursements for interest previously earned by the issuer and have

no economic significance—as shown by the fact that in the United States, "the convention is to

quote a bond's clean or flat price."  Fabozzi, Frank J., The Handbook of Fixed Income

Securities, 8th Edition, McGraw-Hill, 2012, pp. 100-102.  Plaintiff's contention that

reimbursement of the accrued interest payments is "uncertain and may not materialize" (Pl. Br. at

-13-

9) is incorrect, and misses the point.  The accrued interest had been earned at the time of sale (Ex. 3 (Riddiough Report) ¶ 106 n.95)—and, more importantly, is a reimbursement to the issuer, not money paid for "the security."  Accordingly, Dr. Riddiough's opinion that the clean price is the "amount paid for the security" is reliable and, indeed, correct.

### B.   Dr. Riddiough Properly Adjusted for Illiquidity When Calculating "Value."

As explained, plaintiff does not challenge in its motion Dr. Riddiough's method of pricing the certificates (*i.e.*, using ADCo).  (*See* Pl. Br. at 9-12.)  Nor does plaintiff take issue in its motion with the principle that in an illiquid market, an illiquidity premium must be added to the market price in order to calculate the security's value as that word is used in the Securities Act.[5]  (*Id.*)  Instead, plaintiff takes issue with Dr. Riddiough's opinions that the market for residential mortgage-backed securities was illiquid as of September 2, 2011 and that the illiquidity premium should be added to translate price into value.  (*Id.*)  The first of these two points is entirely consistent with what Freddie Mac and Fannie Mae (on whose behalf plaintiff now acts) told the world in its public SEC filings.  Mr. Finkel disagrees, arguing that the "market for PLS was active in the months surrounding the date of claim, showed signs of liquidity, and was not dislocated."  (Ex. 4 (Finkel Report) ¶ 58.)  Mr. Finkel cites a single Bank of England report for this proposition.  (*Id.* (citing "Financial Stability Report," Bank of England, June 2011, Issue No. 29).)[6]

---

[5]      In Dr. Riddiough's report, he writes in terms of "liquidity discounts embedded" in market prices that must be removed in order to calculate the value of the securities.  (*See*, *e.g.*, Ex. 3 (Riddiough Report) ¶ 73.)

[6]      Although the Bank of England report is Mr. Finkel's only source for this assertion, Mr. Finkel testified that he was not sure whether the report, which included a chart that he maintained showed that the market for RMBS was "showing signs of liquidity," considered both private label residential mortgage-backed securities—the kind of securities at issue here—as

*(footnote continued)*

Dr. Riddiough, in contrast, explains in detail the compelling evidence—in addition to the SEC filings to which reference is made above, in which Freddie Mac stated that its RMBS holdings "are not liquid," and Fannie Mae recognized the "limited market activity" for its holdings (Exs. 1, 2; *see* p. 7, *supra*)—that the market for residential mortgage-backed securities was illiquid as of September 2, 2011.  (Ex. 3 (Riddiough Report) ¶¶ 35-44.)  For example, Dr. Riddiough cites a report issued by the Federal Reserve Bank of New York which stated that "secondary markets for trading non-agency [R]MBS have been extremely illiquid" since 2007.  (Ex. 3 (Riddiough Report) ¶ 42 n.36 (quoting Vickery, James, *et al.*, FRBNY Economic Policy Review, p. 3).)  Dr. Riddiough also extensively analyzed the volume of residential mortgage-backed securities trading during the period May 2011 to April 2014, concluding that trading volumes in August and September 2011 "were amongst the lowest for any months during this period."  (Ex. 3 (Riddiough Report) ¶ 43 & Exhibit 11.)  Similarly, Dr. Riddiough found that during the period 2007 to 2011, the volume of new offerings of residential mortgage-backed securities was "non-existent."  (Ex. 3 (Riddiough Report) ¶ 41 & Exhibit 10.)

Numerous commentators upon which Dr. Riddiough relied reached similar conclusions.  For example, the 2011 edition of the leading treatise on mortgage-backed securities reports that "the mortgage and MBS markets remain in a highly unsettled state at the writing of this edition."  (Ex. 3 (Riddiough Report) ¶ 39 n.32 (quoting Fabozzi, Frank J., Anand K. Bhattacharya, and William S. Berliner, Mortgage-Backed Securities:  Products, Structuring, and Analytical Techniques. John Wiley & Sons, Inc., 2011, p. xii).)  Likewise, according to Neuberger Berman Alternative Investments' "2013 Strategy Outlook," there was "a large

(*footnote continued*)
opposed to only agency securities (those offered by Freddie Mac and Fannie Mae).  (Ex. 6 (Finkel Dep.) at 84:12-86:19.)

-15-

liquidity shock" to the market for residential mortgage-backed securities during 2011.  (Ex. 3 (Riddiough Report) ¶ 39 n.32 (quoting 2013 Strategy Outlook at 5-6).)  The vast majority of the evidence is consistent with Dr. Riddiough's conclusion about illiquidity and contradicts Mr. Finkel's assertion to the contrary.

        In fact, Mr. Finkel himself cites recognized industry publications that support Dr. Riddiough's view that as of September 2, 2011, "the non-agency market remained dislocated." (Ex. 11 Citibank Mortgage Credit Weekly, Aug. 26, 2011) at 1, 13 (cited in Ex. 4 (Finkel Report) Appendix 3).)  J.P. Morgan Securities LLC recognized, in a publication less than two weeks before the complaint was filed—which Mr. Finkel also cites (Ex. 4 (Finkel Report) Appendix 3)—that there was "poor liquidity" for "Non-Agency RMBS" at that time.  (Ex. 12 (J.P. Morgan Securitized Products Weekly, Aug. 26, 2011) at 1.)  Jefferies & Company Inc.'s Global Fixed Income Monthly, yet another industry publication relied on by Mr. Finkel (Ex. 4 (Finkel Report) ¶ 81 n.66), stated in September 2011—exactly when this action was filed—that "[m]ost non-agency sectors can be described as having large bid/offer spreads with many market participants waiting on the sidelines until some certainty comes back into the market."  (Ex. 13 (Jefferies & Company, Inc., Global Fixed Income Monthly, "Residential Mortgage Market Strategy," Sept. 2011) at 25).)

        Dr. Riddiough's conclusion that the market for residential mortgage-backed securities was illiquid on September 2, 2011 is thus supported by substantial evidence.  Plaintiff argues, however, that Dr. Riddiough's use of an illiquidity premium of 15% is "arbitrary" because Dr. Riddiough relies for that number on what plaintiff calls a "self-serving marketing paper published by a hedge fund."  (Pl. Br. at 4 (citing Menozzi, Jay, "Non-Agency RMBS Continue to Offer Superior Return Potential," UCM Partners White Paper, February 2011).)

Plaintiff's characterization of the UCM White Paper is incorrect; the White Paper sets out a well-considered analysis of yields and credit spreads on other financial products to identify an illiquidity premium for residential mortgage-backed securities—and plaintiff ignores the substantial other evidence and analysis upon which Dr. Riddiough relied.[7] (*See* pp. 7-8, *supra*.) There is nothing unreliable about using industry sources, and plaintiff's criticisms of it are at most suitable for cross-examination, not a *Daubert* motion. Indeed, plaintiff does not offer any evidence that the White Paper is factually inaccurate or that its analysis is unreliable, or any research suggesting that a lower illiquidity premium would be appropriate. Mr. Finkel himself cites publications issued by J.P. Morgan and Jeffries & Co.—industry participants with a stake in the market. If Mr. Finkel can rely on reports from such industry sources, so can Dr. Riddiough. *See Daubert*, 509 U.S. at 595.

Further, Dr. Riddiough did not rely solely on the UCM White Paper to determine the magnitude of the illiquidity premium. Before applying the illiquidity premium, Dr. Riddiough compared the "average price of the seven At-Issue Certificates in September 2011 and March 2014 to see if there is a price increase over this period that would be consistent with a partial market liquidity recovery over time." (Ex. 3 (Riddiough Report) ¶ 93.) He found—and plaintiff also does not challenge this finding—that the certificates' average prices increased by

---

[7]     Plaintiff's position that Dr. Riddiough is not entitled to rely on this industry publication is all the more remarkable in view of the fact that Mr. Finkel relies on a single comment on one page of a similar industry publication to support his contention that his pricing methodology—which assumes that the three-month averages of default rates, prepayment rates, and loss severity rates as of September 2, 2011 will persist indefinitely—is "widely accepted." (Ex. 4 (Finkel Report) ¶ 62 n.45 (citing Jablansky and Wang, "Perfect Pay and Credit Burnout:  Non-Agency Valuation Implications, Securitized Product Insights," The Royal Bank of Scotland, Mar. 10, 2011, p. 29).) It strains credulity to argue that Mr. Finkel is justified in relying on one comment from a single industry publication, while suggesting that Dr. Riddiough's reliance on the UCM Partners White Paper renders his analysis unreliable.

-17-

28% to 81%.  (*Id.*)  He also concluded that market indices reflecting prices for a basket of residential mortgage-backed securities "have increased by 12 to 86 percent between September 2011 and March 2014, which is again consistent with a significant undervaluation of Non-Agency RMBS as of September 2011."  (*Id.*)  Dr. Riddiough's 15% premium figure was based not just on the UCM White Paper, but also on actual market data.  Under the circumstances, the use of the 15% premium was quite conservative.

In ruling on reliability, a district court should "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  *Ruiz-Troche* v. *Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (quoting *Daubert*, 509 U.S. at 596).  Dr. Riddiough's application of a 15% increase to the calculated price of the certificates to determine their value in light of the illiquid market for RMBS as of September 2, 2011 is based on a solid footing, and is indeed conservative.  Plaintiff is entitled to disagree with it through the testimony of its own expert.  But this disagreement comes nowhere close to providing a *Daubert* ground for exclusion.

III.   **DR. RIDDIOUGH'S CHALLENGED TESTIMONY CONCERNING SECTION 12 AND BLUE SKY DAMAGES IS ADMISSIBLE.**

A.   **The "Clean Price" Is the "Consideration Paid for the Security."**

For the same reasons that the "clean price" sets the "amount paid for the security" under Section 11, it establishes the "consideration paid for the security" under Section 12 and the blue sky laws.  (*See* pp. 10-11, *supra.*)

However, because Dr. Riddiough used the "clean price" as the "consideration paid" in his Section 12 and blue sky damages calculations, Dr. Riddiough's deduction of "accrued interest" payments from the consideration paid (for purposes of Section 12 and the blue sky laws) was an oversight.  Accordingly, Dr. Riddiough's aggregate damages calculations under these respective statutes would increase by at most $493,657.  (Exs. 14-15 (Riddiough Exhibits 15A-16C (Adjusted for Accrued Interest)).)[8]

---

[8]   Mr. Finkel's Section 12 and blue sky damages calculations also contain an error.  As explained above, Mr. Finkel considers the "consideration paid for the security" to be the amount corresponding to the "dirty price," meaning the amount paid for the security *plus* accrued interest at the time of the sale.  (Ex. 4 (Finkel Report) Figure 7; Ex. 9 (Finkel Backup) RescissionCalculator_Nomura.xlsm, "Master" Tab).)  In his damages calculations, Mr. Finkel deducts from the "consideration paid" the principal payments that Fannie Mae and Freddie Mac received over time and then adds prejudgment interest to the difference.  (*See* Ex. 4 (Finkel Report) ¶¶ 127-128.)  He then deducts the coupon payments received by Fannie and Freddie, to which he does not apply prejudgment interest.  (*Id.* ¶¶ 129, 134.)  In failing to apply prejudgment interest to the two coupon payments that he included in his "consideration paid," despite applying prejudgment interest to the total amount, Mr. Finkel inflates damages by $130,000-$150,000 (depending on which of Mr. Finkel's yields is used) for NAA 2005-AR6, and by $7,000-$20,000 (depending on which of Mr. Finkel's yields is used) for NHELI 2006-FM1.  This flaw is in addition to the error that Mr. Finkel made when calculating the total blue sky damages in Figures 32-34 of his report.  (*Id.* (Finkel Report) Figures 32-34; *see* Pl. Br. at 15 n.15.)

**B.      Dr. Riddiough Properly Applies Prejudgment Interest Equally Across All Cash Flows, Not Just Principal Payments.**

Plaintiff claims that Dr. Riddiough's application of prejudgment interest to both principal and interest income returned to Freddie Mac and Fannie Mae does not comport with "a plain reading" of Section 12, because the statute specifies the return of "the consideration paid for the security with interest thereon" but does not say whether interest should be paid on the "income" received by the plaintiff.  (Pl. Br. at 13-14.)  As a general matter, a party's disagreement with an opponent's expert's "underlying legal position" does not provide a sufficient basis for excluding expert opinions based on those positions.  *S. Track & Pump, Inc*. v. *Terex Corp*., 852 F. Supp. 2d 456, 469 (D. Del. 2012).  Plaintiff's argument also is incorrect. The statute's silence does not preclude the application of interest to "income"; to the contrary, Mr. Finkel in effect applies prejudgment interest to one source of "income"—principal payments returned to Freddie Mac and Fannie Mae.  (*See* p. 11, *supra*; Ex. 4 (Finkel Report) ¶ 128.)  The only dispute is whether also to apply prejudgment interest to the other source of "income"— interest payments returned to Freddie Mac and Fannie Mae.  Dr. Riddiough's approach is the only one that is consistent and accomplishes the "rescissionary remedy" intended by Section 12. (Ex. 8 (Dec. 18, 2014 Order, Doc. No. 992) at 26 (quoting *In re APA Assessment Fee Litig.*, 766 F.3d 39, 56 (D.C. Cir. 2014) (internal quotation marks omitted)).)

As this Court has stated, "[i]nherent in the remedy of rescission [under Section 12] is the return of the parties to their pre-contract positions."  (Ex. 8 (Dec. 18, 2014 Order, Doc. No. 992) at 26 (quoting *In re APA Assessment Fee Litig.*, 766 F.3d at 56 (internal quotation marks omitted)).)  Moreover, any award of prejudgment interest should do no more than "reasonably and equitably compensate[] plaintiff for the loss of the use of his money."  *Strobl* v. *N.Y. Mercantile Exch*., 590 F. Supp. 875, 882 (S.D.N.Y. 1984), *aff'd*, 768 F.2d 22 (2d Cir. 1985).

Here, Freddie Mac and Fannie Mae paid for the securities at the outset and, over time, the outstanding consideration was reduced in the form of principal and interest payments.  On any particular date, Freddie Mac and Fannie Mae were deprived of the use of only those funds that had not yet been returned to them; the interest required under the statute is for that deprivation. Therefore, in order to put plaintiff in its original position, and to compensate plaintiff for the use of money it actually did not yet have, prejudgment interest should be applied only to the consideration that, at any time, had not been returned to Freddie Mac or Fannie Mae.  The proper way to accomplish that purpose is to apply prejudgment interest both to the consideration paid at the outset and to the income received over time—that is, principal and interest payments received by Freddie Mac and Fannie Mae.  Any other approach would compensate plaintiff for being deprived of the use of money that had already been returned, creating a windfall.

## IV.    DR. RIDDIOUGH WILL NOT TESTIFY AT TRIAL CONCERNING MATTERS THAT THE COURT HAS EXCLUDED.

If this court adheres to its previous ruling that a loss causation defense is not available for plaintiff's blue sky claims (Ex. 16 (Dec. 16, 2013 Order, Doc. No. 569)), Dr. Riddiough will exclude from his testimony about blue sky damages any references to a loss causation calculation.[9]  Instead, Dr. Riddiough's testimony regarding blue sky damages will, in that event, be limited to his analysis of "blue sky damages (without accounting for a loss causation defense)," including Mr. Finkel's mathematical error in calculating blue sky damages that caused the blue sky damages reported in Figures 32, 33, and 34 of his report to be inflated

---

[9]    This is not a concession by defendants that Dr. Riddiough's blue sky damages calculations—including a deduction for loss causation—are incorrect.  Defendants take issue with the Court's ruling about the proper calculation of blue sky damages and do not concede that that loss causation is not properly a part of such damages calculations.

by $27.5 million, all of which is discussed in Dr. Riddiough's report.  (Ex. 3 (Riddiough Report)

¶¶ 108-11; Ex. 15 (Riddiough Exhibits 16A-16C (Adjusted for Accrued Interest)).)

## CONCLUSION

Plaintiff's motion to exclude the expert testimony of Timothy J. Riddiough should

be denied.

Dated:  New York, New York
       January 5, 2014

Respectfully submitted,

/s/ Thomas C. Rice                                                 

| | |
|---|---|
| /s/ Thomas C. Rice | /s/ David B. Tulchin |
| Thomas C. Rice (trice@stblaw.com) | David B. Tulchin (tulchind@sullcrom.com) |
| David J. Woll (dwoll@stblaw.com) | Steven L. Holley (holleys@sullcrom.com) |
| Andrew T. Frankel (afrankel@stblaw.com) | Bruce E. Clark (clarkb@sullcrom.com) |
| Alan Turner (aturner@stblaw.com) | Bradley A. Harsch (harschb@sullcrom.com) |
| Craig S. Waldman (cwaldman@stblaw.com) | Katherine J. Stoller (stollerk@sullcrom.com) |
| SIMPSON THACHER & BARTLETT LLP | SULLIVAN & CROMWELL LLP |
| 425 Lexington Avenue | 125 Broad Street |
| New York, NY  10017 | New York, NY  10004 |
| Telephone:  212-455-2000 | Telephone:  212-558-4000 |
| Facsimile:  212-455-2502 | Facsimile:  212-558-3588 |

*Attorneys for Defendant RBS Securities Inc.*

Amanda F. Davidoff (davidoffa@sullcrom.com)
Elizabeth A. Cassady (cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993

*Attorneys for Defendants Nomura Holding America*
*Inc., Nomura Asset Acceptance Corporation,*
*Nomura Home Equity Loan, Inc., Nomura Credit &*
*Capital, Inc., Nomura Securities International, Inc.,*
*David Findlay, John McCarthy, John P. Graham,*
*Nathan Gorin, and N. Dante LaRocca*