# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY, AS
CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,

    -against-

NOMURA HOLDING AMERICA INC., et al.,

                Defendants.

Case No. 11-cv-6201 (DLC)

ECF Case

## NOMURA DEFENDANTS' MEMORANDUM
## IN OPPOSITION TO PLAINTIFF'S MOTION TO
## EXCLUDE THE EXPERT TESTIMONY OF STEPHEN G. RYAN

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

January 5, 2015

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................................1

BACKGROUND ...............................................................................................................3

      A.    Dr. Ryan's Expertise in Accounting Standards ........................................3

      B.    Dr. Ryan's Application of His Accounting to Explain Freddie Mac's and
           Fannie Mae's Accounting Disclosures ...................................................4

ARGUMENT ...................................................................................................................6

I.     DR. RYAN'S TESTIMONY ON FAIR VALUE ACCOUNTING IS
      ADMISSIBLE ........................................................................................................7

      A.    Dr. Ryan's Testimony About Freddie Mac's and Fannie Mae's Fair Value
           Accounting .........................................................................................7

      B.    No Event Study Was Required ...............................................................9

      C.    Dr. Ryan Does Not Opine on Freddie Mac's or Fannie Mae's State of
           Mind or Offer Legal Conclusions ........................................................100

      D.    Dr. Ryan's Testimony Is Relevant and Will Assist the Trier of Fact ...............122

      E.    Dr. Ryan is Highly Qualified to Offer His Opinions .........................................144

II.    DR. RYAN'S TESTIMONY ABOUT WHEN FREDDIE MAC AND FANNIE
      MAE DETERMINED THAT THEY WERE COMMITTED TO PURCHASE
      THE SECURITIES IS RELEVANT .............................................................16

CONCLUSION ..............................................................................................177

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Arista Records LLC* v. *Lime Group LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011) ........................................................................ 11

*Bd. of Trustees of the AFTRA Ret. Fund* v. *JP Morgan Chase Bank, N.A.*,
  2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) .......................................................... 11

*Daubert* v. *Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)............................................................................................ 6, 8, 11

*Dreyer* v. *Ryder Auto Carrier Grp., Inc.*,
  367 F. Supp. 2d 413 (W.D.N.Y. 2005)...................................................................... 15

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ...................................................................................... 16

*In re Fosamax Prod. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009) ......................................................................... 6

*In re IAC/InterActiveCorp. Sec. Litig.*,
  695 F. Supp. 2d 109 (S.D.N.Y. 2010) ...................................................................... 16

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
  2014 WL 2998524 (S.D.N.Y. July 3, 2014) ................................................... 6, 13, 17

*In re Puda Coal Sec. Inc., Litig.*,
  2014 WL 2915880 (S.D.N.Y. June 25, 2014) .......................................................... 14

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531  (S.D.N.Y. 2004) ...................................................................... 12

*In re Zyprexa Prods. Liab. Litig.*,
  489 F. Supp. 2d 230 (E.D.N.Y. 2007) ...................................................................... 11

*Kumho Tire Co., Ltd.* v. *Carmichael*,
  526 U.S. 137 (1999)..................................................................................................... 6

*Loussier* v. *Universal Music Group, Inc.*,
  2005 WL 5644422 (S.D.N.Y. June 28, 2005) ..................................................... 12, 13, 14, 15

*Nationwide Mut. Fire Ins. Co.* v. *Sunbeam Prods. Inc.*,
  2014 WL 3875844 (S.D.N.Y. July 17, 2014) ............................................................. 6

- ii -

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

### Cases

*RMED Int'l, Inc.* v. *Sloan's Supermarkets, Inc.*,
   2000 WL 310352 (S.D.N.Y. Mar. 24, 2000) ...................................................... 9, 10

*Ruiz-Troche* v. *Pepsi Cola of Puerto Rico Bottling Co.,*
   161 F.3d 77 (1st Cir.1998) ......................................................................... 6

*TC Sys. Inc.* v. *Colonie, N.Y.*,
   213 F. Supp. 2d 171 (N.D.N.Y. 2002) ......................................................... 14

*United States* v. *Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ................................................................... 13

*United States* v. *Cruz*,
   363 F.3d 187 (2d Cir. 2004) ..................................................................... 15

*United States* v. *Gushlak*,
   728 F.3d 184 (2d Cir. 2013) ...................................................................... 9

### Rules

Fed. R. Evid. 702 ............................................................................................ 6

Fed. R. Evid. 401 ........................................................................................... 12

### Other Authorities

John Y. Campbell, et al., The Econometrics of Financial Markets (1996) ...................................... 9

Roman L. Weil, et al., *The Role of the Financial Expert*, Litigation Services Handbook (4th ed.
   2007) ...................................................................................................... 9

<u>**TABLE OF ABBREVIATIONS**</u>

| Action | *FHFA* v. *Nomura Holding America Inc.*, *et al.*, No. 11 Civ. 6201 (DLC) |
|---|---|
| Certificates | The seven securitizations at issue in this Action, NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 |
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| FAS 115 | Statement of Financial Accounting Standards 115, Accounting for Certain Investments in Debt and Equity Securities |
| GAAP | Generally Accepted Accounting Principles |
| OTT | Other-than-temporary impairments |
| Pl. Br. | Memorandum In Support Of Plaintiff's Motion to Exclude Expert Testimony of Stephen G. Ryan, dated December 19, 2014 in this Action |
| Ryan July Dep. | Transcript of the deposition of Stephen G. Ryan, taken July 18, 2014 in Case No. 11 Civ. 6189 (DLC), Case No. 11 Civ. 6198 (DLC) and Case No. 11 Civ. 7010 (DLC) |
| Ryan Report | July 9, 2014 Expert Report of Stephen G. Ryan in this Action |
| SEC | Securities and Exchange Commission |

Defendants submit this memorandum in opposition to plaintiff's December 19, 2014, Motion to Exclude the Expert Testimony of Stephen G. Ryan.

## PRELIMINARY STATEMENT

Dr. Ryan, a well-respected financial economist with extensive qualifications that are unchallenged by plaintiff, is an expert in accounting standards and public financial statements.  Defendants retained Dr. Ryan to (i) explain Freddie Mac's and Fannie Mae's accounting for the Certificates, and (ii) opine on the meaning of the accounting decisions that Freddie Mac and Fannie Mae necessarily made about the causes of their losses based on accounting rules.  This is classic expert testimony offered by accounting experts.  Lacking any legitimate basis to exclude Dr. Ryan's testimony, plaintiff instead bases its motion on mischaracterizations of that testimony and the case law.

*First*, plaintiff attempts to frame Dr. Ryan's testimony and opinions as a "loss causation" or "damages" analysis that is unreliable because Dr. Ryan did not independently assess the causes of Freddie Mac's and Fannie Mae's losses.  But no such independent assessment was intended or required.  Dr. Ryan instead opines, based on his expert understanding of GAAP, on the meaning of Freddie Mac's and Fannie Mae's accounting decisions.

*Second*, after mischaracterizing Dr. Ryan's testimony, plaintiff criticizes Dr. Ryan for failing to conduct an event study—although the circumstances here make an event study neither necessary nor appropriate.  There does not exist here either (i) a singular corrective disclosure sufficient to constitute an "event" or (ii) a sufficiently liquid market for the Certificates that would be immediately affected by any such "event."  *See* pp. 9-10, *infra*.  Dr. Ryan applies his unquestioned expertise in both a generally accepted manner and a manner

consistent with his areas of expertise—accounting standards and public financial disclosures for investment securities.

*Third*, plaintiff cursorily asserts that Dr. Ryan's testimony about Freddie Mac's and Fannie Mae's financial statements constitutes an opinion about those companies' states of mind, and that Dr. Ryan offers legal conclusions.  Dr. Ryan offers no such testimony; his analysis is firmly rooted in his expertise in the highly technical field of accounting—not subjective views or legal opinion.

*Fourth*, plaintiff implausibly argues that Dr. Ryan's explanation of technical accounting principles is irrelevant and will somehow "confuse" the jury or, at best, provide testimony about concepts already understood by lay jurors.  In fact, Dr. Ryan's testimony provides reliable expert analysis about Freddie Mac's and Fannie Mae's relevant, but highly technical, financial statements.  Plaintiff cannot plausibly contend that the intricate and evolving accounting principles about which Dr. Ryan will testify can be understood by the typical lay juror.  Dr. Ryan's testimony and explanation of accounting principles is necessary for jurors to understand a critical issue in this action—what Freddie Mac and Fannie Mae themselves disclosed about the cause of their alleged losses on the Certificates.

*Fifth*, plaintiff's assertion that Dr. Ryan's analyses are outside his area of expertise rests on its misunderstanding of Dr. Ryan's analyses and opinions.  Dr. Ryan is opining on the implications of Freddie Mac's and Fannie Mae's own disclosures.  He is not offering an impairment analysis in the first instance or offering any views about how Freddie Mac and Fannie Mae made their accounting decisions.  He is merely reviewing those accounting decisions and, applying his expertise in GAAP, explaining the necessary implications of the accounting treatment that Freddie Mac and Fannie Mae themselves employed.

*Sixth*, Dr. Ryan's opinion on when Freddie Mac and Fannie Mae considered themselves obligated to purchase the Certificates is relevant to which disclosures about the Certificates were material to a reasonable investor.  Although the Court has excluded evidence concerning when the trades actually occurred, it has not excluded evidence of when Freddie Mac and Fannie Mae considered themselves obligated to trade, and what information reasonable investors would consider material after such an obligation was created.  Dr. Ryan's testimony on that issue should be admitted.

In sum, there is no basis to exclude Dr. Ryan's testimony.

## BACKGROUND

### A.    **Dr. Ryan's Expertise in Accounting Standards**.

In his July 9, 2014 expert report, Dr. Ryan discloses his extensive qualifications—which plaintiff never challenges—as an expert in accounting standards and public financial statements involving investment securities.  (Ex. 1 (Ryan Report) ¶ 1.)  Dr. Ryan is a Professor of Accounting, KPMG Faculty Fellow, and Director of the Accounting Doctoral Program at the Stern School of Business, New York University.  (Ex. 1 (Ryan Report) ¶ 1.)  He holds a B.A. in economics and philosophy and a Ph.D. in business with a concentration in accounting.  (Ex. 1 (Ryan Report) ¶ 1.)  He has held numerous leadership positions in professional accounting organizations, including a four-year term on the Financial Accounting Standards Advisory Council (the advisory body to the Financial Accounting Standards Board, the primary organization  that sets accounting standards in the United States) and a term as chair of the American Accounting Association's Financial Accounting Standards Committee, which comments on financial reporting proposals by the Financial Accounting Standards Board.  (Ex. 1 (Ryan Report) ¶ 5.)  In addition, for more than 15 years, he has taught a graduate-level course

"concerned with the analysis of financial report information provided by financial institutions about their financial instruments and transactions," a subject on which he also published one of the first authoritative works.  (Ex. 1 (Ryan Report) ¶ 3.)

**B.      Dr. Ryan's Application of His Accounting Expertise to Explain Freddie Mac's and Fannie Mae's Accounting Disclosures.**

Dr. Ryan applies his considerable expertise in accounting and the analysis of financial disclosures to explain what Freddie Mac's and Fannie Mae's public filings and security-specific internal work papers reveal about their own determinations of the causes of their alleged losses.  Dr. Ryan does not, and never purports to, make his own determination of the actual causes of plaintiff's alleged losses on the Certificates, and does not—as plaintiff contends—"attempt[] to use the impairment classification as a rough proxy for loss causation." (Pl. Br. at 6.)  Rather, Dr. Ryan uses his expertise in GAAP and other accounting rules to explain the disclosures made by Freddie Mac and Fannie Mae in their public filings and internal documents.

In particular, Dr. Ryan explains the requirements of FAS 115, which sets forth rules for accounting for securities such as the Certificates, as applied to Freddie Mac's and Fannie Mae's SEC filings and underlying internal work papers.  FAS 115 requires Freddie Mac and Fannie Mae to "partition losses of fair value on [the Certificates] into components that reflect [their] views about the causes . . . of the losses."  (*See* Ex. 1 (Ryan Report) ¶¶ 14, 27-36.) Specifically, FAS 115 requires losses to be reported as "temporary" losses (resulting predominantly from general market forces) or "other than temporary" losses (resulting from decreases in expected cash flows to certain securities).  In April 2009, amendments to FAS 115—which were promulgated as a direct response to the extreme illiquidity of the market— further subdivided reporting requirements for OTT losses into "OTT non-credit" (losses

predominantly reflecting general market conditions) versus security-specific "OTT credit" losses.  (Ex. 1 (Ryan Report) ¶¶ 16–17, 54–60.)

   Dr. Ryan applies his expertise in accounting standards to analyze the statements made, and data provided, by Freddie Mac and Fannie Mae in their SEC filings, interrogatory responses and internal documents produced in this action to calculate, *inter alia*, "the aggregate cumulative temporary, OTT non-credit, and OTT credit losses . . . for the . . . Certificates collectively held by Freddie Mac and Fannie Mae." (*See* Ex. 1 (Ryan Report) ¶¶ 93, 95.)

   Dr. Ryan's principal conclusions are that, based on Freddie Mac's and Fannie Mae's "own accounting choices" and "their financial report disclosures" concerning the Certificates, (a) non-security-specific "[t]emporary and OTT non-credit losses on the . . . Certificates constitute a large portion of the total losses [Freddie Mac and Fannie Mae] recorded on the securities" (Ex. 1 (Ryan Report) ¶¶ 18, 20) and (b) that "Freddie Mac's and Fannie Mae's financial report disclosures and internal documents during the relevant period attributed [Freddie Mac's and Fannie Mae's] OTT credit losses on the . . . Certificates primarily to factors other than the effects (if any) of security-specific factors such as alleged deficiencies in the underlying mortgages or alleged misstatements in the offering materials for the . . . Certificates."  (Ex. 1 (Ryan Report) ¶¶ 20, 104.)[1]

---

[1]  For example, after explaining FAS 115 (both pre- and post-amendment) and Freddie Mac's and Fannie Mae's application of this rule, Dr. Ryan concludes from his analysis of Freddie Mac's and Fannie Mae's 2009 Form 10-Q filings that Freddie Mac and Fannie Mae "ascribed sizable portions of previously recorded OTT losses to OTT non-credit losses that are predominantly driven by changes in financial market conditions[;]" in fact, Fannie Mae's own disclosures indicate that in Fannie Mae's estimation "approximately 70 percent of its previously recorded OTT losses were attributable to changes in financial market conditions that did not affect expected cash flows," and thus, were not attributable to security-specific factors.  (Ex. 1 (Ryan Report) ¶ 72.)

## ARGUMENT

For a witness to offer expert opinions at trial, "the witness must be qualified as an expert, the testimony must be reliable, and the testimony must assist the trier of fact." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009) (citing Fed. R. Evid. 702). *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) sets out a four-part test for the reliability of proffered expert testimony,[2] but no single *Daubert* factor is dispositive, or even required, as "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., Ltd.* v. *Carmichael,* 526 U.S. 137, 150 (1999) (internal quotation marks and alteration omitted).

Any challenge to the admissibility of expert testimony "must be [focused] solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Disagreements with the conclusions or implications of qualified expert testimony should, instead, "be tested by the adversary process—competing expert testimony and active cross examination—rather than excluded from jurors' scrutiny." *Nationwide Mut. Fire Ins. Co.* v. *Sunbeam Prods. Inc.*, 2014 WL 3875844, at *2 (S.D.N.Y. July 17, 2014) (quoting *Ruiz-Troche* v. *Pepsi Cola of P.R. Bottling Co.,* 161 F.3d 77, 85 (1st Cir. 1998)). Testimony about the meaning of accounting standards is routinely found admissible. *See, e.g.*, *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2014 WL 2998524, at *7 (S.D.N.Y. July 3, 2014) (allowing expert testimony to explain accounting procedures and terminology). "[I]n accordance with the liberal admissibility

---

[2]  The four factors are (1) how extensively a proffered theory has been tested, (2) the extent of relevant peer review, (3) the existence of established error rates, and (4) the extent of general acceptance of the theory or analytical method in the relevant field. *Daubert*, 509 U.S. at 593-94.

standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will

warrant exclusion [of expert testimony]."  *In re Fosamax*, 645 F. Supp. 2d at 173.

Dr. Ryan's expert testimony is reliable and relevant, and he is qualified to present

his opinions.  That testimony is therefore admissible at trial.

## I.   DR. RYAN'S TESTIMONY ON FAIR VALUE ACCOUNTING IS ADMISSIBLE.

### A.   Dr. Ryan's Testimony About Freddie Mac's and Fannie Mae's Fair Value Accounting.

Plaintiff seeks to exclude Dr. Ryan's testimony by characterizing it as "a[n]

attempt at a loss causation analysis" and then arguing that Dr. Ryan did "no independent analysis

to determine the cause of any loss of fair value for any of the . . . Certificates."  (Pl. Br. at 2, 8).

This is a complete misstatement of Dr. Ryan's opinions.

In fact, as Dr. Ryan testified at deposition, he will explain what Freddie Mac's

and Fannie Mae's own disclosures indicate about their losses.  (*See, e.g.*, Ex. 2 (Ryan July Dep.)

at 55:18-21 ("[W]hat I did is I primarily looked at what Fannie and Freddie say, through their

accounting, and through the disclosures, as to the drivers of the losses."); Ex. 2 (Ryan July Dep.)

at 58:7-25 ("I'm using [Freddie Mac's and Fannie Mae's] own words. . . . I'm describing what

GAAP requires, what is a credit loss, what's a non-credit loss, what's a temporary loss. . . . I

would view that as a statement of GAAP . . . presenting what [Freddie Mac and Fannie Mae]

themselves say and what GAAP says.").)

Dr. Ryan's report clearly states that "I have been asked to determine whether the

manner in which [Freddie Mac and Fannie Mae] accounted for the losses of fair value indicates

that [Freddie Mac and Fannie Mae] determined that some portion of these losses was attributable

to changes in financial market or other relevant economic conditions that affected non-agency

mortgage-related securities generally, rather than to factors specific to the origination or sale of

the mortgages underlying the . . . Certificates." (Ex. 1 (Ryan Report) ¶ 11.) Thus, Dr. Ryan's

role as an expert is to analyze statements and data disclosed by Freddie Mac and Fannie Mae

themselves—<u>not</u> to make an independent determination of the cause of Freddie Mac's or Fannie

Mae's losses, or to conduct some separate analysis of alleged damages or loss causation. The

purpose of Dr. Ryan's testimony is to provide an understanding of what Freddie Mac and Fannie

Mae actually reported. Plaintiff's argument completely misses the point of the opinions Dr.

Ryan will offer.

Plaintiff's other arguments go, at most, to the probative value of Dr. Ryan's

accounting testimony which are not proper bases for challenging the admissibility of his

testimony. *See Daubert*, 509 U.S. at 595 (challenge to the admissibility of expert testimony

"must be [focused] solely on principles and methodology, not on the conclusions that they

generate"). First, plaintiff argues that Dr. Ryan's testimony about the "division of causation

between market factors and security specific factors" is not sufficiently "precise." (Pl. Br. at 9,

13.) While Dr. Ryan's opinions concern what Freddie Mac and Fannie Mae determined were the

"predominant[]" causes of their losses (Ex. 1 (Ryan Report) ¶ 20), he also explains that based on

Freddie Mac's and Fannie Mae's failure to identify other causes in their disclosures, any other

causes would be "significantly subordinate" and "immaterial." (Ex. 2 (Ryan July Dep.) at 185:

9-19.) Second, plaintiff points out that neither GAAP nor the SEC requires companies to discuss

or explicitly partition "the drivers of losses" in their financial statements. (*See* Pl. Br. at 13-15.)

This is of no consequence. Freddie Mac and Fannie Mae chose in their accounting disclosures to

set forth information about the principal drivers of their losses, and Dr. Ryan is well qualified to

explain the meaning and significance of those accounting disclosures.

**B.     No Event Study Was Required.**

After wrongly asserting that Dr. Ryan is performing a *de facto* loss causation analysis, plaintiff argues that Dr. Ryan's "loss causation" analysis should be excluded as unreliable because he fails to conduct an "event study," which is purportedly the "usual" and "preferred" method of analyzing loss causation.  (Pl. Br. at 6-8 (internal quotation marks omitted).)  As set forth above, Dr. Ryan did not perform an independent loss causation analysis, but even if he had, an event study would be unnecessary and inappropriate in this case.  An event study requires (i) an announcement or corrective disclosure which reveals to the market allegedly fraudulent misrepresentations or omissions (the "event"), and (ii) a sufficiently liquid market for the at-issue securities which will be demonstrably and immediately affected by the "event."[3]  Neither of these required elements is present in this action.

With respect to the first issue, plaintiff not only fails to identify any announcements or events upon which one could base an event study, but also ignores the fact that its own experts failed to perform an event study to rebut defendants' loss causation defense.  The obvious reason is that this action does not involve any reference events that could be used in a reliable event study.  The Second Circuit and courts in this district have acknowledged that event studies are not required in such circumstances.  *United States* v. *Gushlak*, 728 F.3d 184, 201 (2d Cir. 2013) (expert's decision not to conduct event study did not constitute "fatal flaw" where "gradual manner in which . . . [alleged fraud] dissipated [in the market] justified [expert's] more generalized approach"), *cert. denied*, 134 S. Ct. 1528 (2014); *RMED Int'l, Inc.* v. *Sloan's*

---

[3]     *See* Roman L. Weil, et al., *The Role of the Financial Expert*, Litigation Services Handbook, 18.17 (4th ed. 2007).  *See also* John Y. Campbell, et al., The Econometrics of Financial Markets, 179 (1996) ("An important characteristic of a successful event study is the ability to identify precisely the date of the event.  In cases where the date is difficult to identify or the event is partially anticipated, event studies have been less useful.").

*Supermarkets, Inc.*, 2000 WL 310352, at *7-8 (S.D.N.Y. Mar. 24, 2000) (event study not

required when alleged fraud is "not revealed to the market in a single clean announcement"),

*aff'd*, 2000 WL 420548 (S.D.N.Y. Apr. 18, 2000).  Each of the cases cited by plaintiff is in the

context of Section 10(b)-5 claims where there was a suitable "event" to establish a comparison.

(*See* Pl. Br. at 6-7.)  Those cases are inapplicable here, where there is no such suitable "event."

An event study is impractical and unnecessary in this action for the additional

reason that the Certificates did not trade in a sufficiently liquid market.  As Dr. Ryan explains,

the pricing inputs referenced by Freddie Mac and Fannie Mae in financial disclosures for the

Certificates make this clear.  (Ex. 1 (Ryan Report) ¶ 44.)  Freddie Mac and Fannie Mae relied

almost exclusively on "Level 3" inputs for the Certificates, which are used only when there is

little, if any, market trading activity for the security at-issue—*i.e.*, the market is not liquid.

(Ex. 1 (Ryan Report) ¶¶ 42-44.)  Indeed, both Freddie Mac and Fannie Mae have admitted that

they used Level 3 inputs because, in the words of Freddie Mac, the market "became significantly

less liquid" as of 2008.  Freddie Mac 2008 10-K, p. 256.  (*See also* Ex. 1 (Ryan Report) ¶ 44

(Fannie Mae disclosed that "[t]he increase in Level 3 balances . . . . reflects the . . . severe

reduction in market liquidity").)  As such, plaintiff's criticisms regarding the absence of an event

study are entirely unfounded.[4]

### C.   Dr. Ryan Does Not Opine on Freddie Mac's or Fannie Mae's State of Mind or Offer Legal Conclusions.

Dr. Ryan has offered no testimony on Freddie Mac's or Fannie Mae's state of

mind.  Instead, he will testify, based on accounting rules, about the meaning of Freddie Mac's

---

[4]     Even in cases (unlike here) where an event study "would, all other things being equal,
produce less subjective and more readily testable results" than other loss causation analyses, the
law does not "requir[e] such an analysis as a predicate to admissibility under *Daubert*."  *RMED
Int'l*, 2000 WL 310352, at *6.

and Fannie Mae's accounting for their alleged losses on the Certificates. This has nothing to do with any party's state of mind.[5] Plaintiff's position appears to be that any expert testimony about the meaning of a party's accounting disclosures is impermissible. That is incorrect. Where expertise is necessary to understand a party's actions or statements—here, accounting disclosures—expert testimony on that subject is permitted. *See Arista Records LLC* v. *Lime Group LLC*, 784 F. Supp. 2d 398, 413-14 (S.D.N.Y. 2011) (permitting an expert in computer science and electrical engineering to testify, based on software and its source code written by a party, about how that software was designed); *see also In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 283-84 (E.D.N.Y. 2007) (noting that "an expert is permitted wide latitude to offer opinions" so long as the opinion has a "reliable basis in the knowledge and experience of [the expert's] discipline") (quoting *Daubert*, 509 U.S. at 590).

The cases cited by plaintiff about "state of mind" testimony (Pl. Br. at 11-13) amply demonstrate why Dr. Ryan's testimony is admissible. For example, in *Board of Trustees of the AFTRA Retirement Fund* v. *JPMorgan Chase Bank, N.A.*, this Court excluded two expert opinions—one that a company "relied blindly" on an employee's advice, and the other that the employee was "untroubled" when Fitch withdrew a rating. 2011 WL 6288415, at *8-9 (S.D.N.Y. Dec. 15, 2011). Such testimony is plainly about another person's state of mind. Dr. Ryan offers nothing of the sort. He merely read Freddie Mac's and Fannie Mae's accounting disclosures and will explain to the jury at trial what those disclosures mean (not what the party making the disclosure was thinking).

---

[5]    Dr. Ryan's testimony is firmly rooted in his expertise in the highly technical field of accounting and does not depend on any effort to ascertain what others were thinking. It is based on highly technical accounting disclosures that no jury could understand without explanation.

In *In re Rezulin*, this Court excluded expert testimony about a company's "altruistic motives," and "profit motive," and about the "intent of authors of a medical article." 309 F. Supp. 2d 531, 546 & nn.38, 40 (S.D.N.Y. 2004).  One of the experts in *In re Rezulin* even admitted that his opinions were "unrelated to any scientific analysis" and that he had "no factual or scientific basis for his views regarding the intent, motive or state of mind" of the relevant actors.  *Id.* at 546 n.40.  The other experts claimed no "particular expertise on the intent, motive or state of mind of corporations or regulatory agencies."  *Id.*  Unlike the witnesses in *In re Rezulin*, Dr. Ryan's opinions are not about intent, motives or state of mind—they are about the meaning of specific disclosures made in accordance with GAAP and are based solely upon expert, technical knowledge and experience.

      **D.**      **Dr. Ryan's Testimony Is Relevant and Will Assist the Trier of Fact.**

Plaintiff erroneously asserts that, to the extent Dr. Ryan's testimony is limited to an explanation of Freddie Mac's and Fannie Mae's own accounting, it will not assist the jury in determining any facts at issue.  Plaintiff's contention appears to be that because Dr. Ryan does not explicitly state that his testimony relates to damages or loss causation, it is irrelevant.  (*See* Pl. Br. at 10-11.)

These criticisms miss the mark, because relevant testimony is defined as any testimony which may tend to make a fact at issue more or less probable.  *Loussier* v. *Universal Music Group, Inc.*, 2005 WL 5644422, at *3 (S.D.N.Y. June 28, 2005) (citing Fed. R. Evid. 401).  Dr. Ryan's testimony relates to Freddie Mac's and Fannie Mae's own accounting disclosures and statements concerning the causes of their losses.  (*See* Ex. 2 (Ryan July Dep.) at

69:14-16 ("So these are public financials, they're certified, they're audited.  You know, they should be true statements.").)[6]

Given the clear relevance of Freddie Mac's and Fannie Mae's own statements about the causes of their losses, it is obvious that Dr. Ryan's testimony will assist the jury.  Here, in order to consider Freddie Mac's and Fannie Mae's accounting statements, the jury must understand concepts such as "OTT impairment," "credit" versus "non-credit" losses, "the difference between OTT credit losses and principal and interest shortfalls," and changes over time in accounting rules on those issues.  (Ex. 1 (Ryan Report) ¶¶ 16, 18, 21, 27, 52.)  It is axiomatic that expert testimony is proper to "help a jury understand unfamiliar terms and concepts."  *United States* v. *Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

Although plaintiff asserts that Freddie Mac's and Fannie Mae's detailed financial disclosures should "speak for themselves" at trial (Pl. Br. at 12), courts in this district regularly admit expert testimony related to accounting standards.  *See, e.g.*, *In re Longtop*, 2014 WL 2998524, at *7 (admitting expert testimony concerning "auditing and accounting practices" and to "explain accounting and auditing terms like "'internal controls,' 'unqualified audit opinions,' 'confirmations,' and "'reconciliations"'"); *Loussier*, 2005 WL 5644422, at *5 (admitting expert testimony as to accounting standards concerning "'how record companies record their revenues and expenses'")(citation omitted).  In fact the authorities cited by plaintiff confirm the

---

[6]     Contrary to plaintiff's assertions, this Court did not determine that Freddie Mac's and Fannie Mae's fair value accounting analyses are "irrelevant" by denying extensive fact discovery on the impairment calculations and analysis.  (*See* Pl. Br. at 10 & n.11.)  Rather, this Court required plaintiff to "disclose its impairment calculation spreadsheets for each quarter through March 31, 2013," and made no determination on the relevancy of the impairment analyses.  *See* Letter Endorsement to Defendants' June 13, 2013 Application re: GSE Valuations/Impairments of the Certificates (Doc. No. 370).

admissibility of expert testimony concerning applicable accounting standards and decisions. (*See, e.g.*, Pl. Br. at 11, 15 (citing *In re Puda Coal Sec. Inc., Litig.*, 2014 WL 2915880, at *20-22 (S.D.N.Y. June 25, 2014) (admitting expert testimony of two proffered defense experts on the requirements of foreign accounting standards and excluding an expert proffered by plaintiffs because of the expert's lack of expertise in applicable accounting standards).)  As in these cases, Dr. Ryan's testimony will assist the jury to understand highly technical accounting concepts and disclosures.

### E.      Dr. Ryan is Highly Qualified to Offer His Opinions.

Plaintiff points to Dr. Ryan's statement that he had never before done an "impairment accounting analysis," arguing that he is not qualified to present one here.  (Pl. Br. at 7.)  This position is frivolous.  Dr. Ryan's work in this action required expertise in the application of FAS 115 and financial disclosures—not any particular type of independent "impairment accounting analysis"—and that is exactly the area of Dr. Ryan's expertise.  For example, Dr. Ryan "determined the reversible losses and OTT credit losses [for the Certificates] from . . . interrogatory data," and "examined the accounting data and impairment calculations in Freddie Mac's and Fannie Mae's work papers," and analyzed "security-level data in these work papers."  (Ex. 1 (Ryan Report) Appendix C ¶¶ 1-2, 4.)  In this manner, Dr. Ryan appropriately identified the amounts of each type of loss and impairment for the Certificates that were recorded by Freddie Mac and Fannie Mae.  (Ex. 1 (Ryan Report) Appendix C (explaining how Dr. Ryan calculated these losses));  Ex. 1 (Ryan Report) Exs. 2A-C, 3A-B (presenting the data for the Certificates).)  Dr. Ryan's assignment thus fits squarely within the scope of his expertise.

Even if there were some disconnect between Dr. Ryan's qualifications and his assignment (and there is none), experts are not limited to testifying narrowly within the scope of their past experience.  *See, e.g.*, *Loussier*, 2005 WL 5644422, at *5; *TC Sys. Inc.* v. *Town of*

- 14 -

*Colonie, N.Y.*, 213 F. Supp. 2d 171, 174-75 (N.D.N.Y. 2002).  Instead, an expert is qualified if his experience and training enable him to perform the analysis at hand.  In *Loussier*, for example, the court concluded that an accountant with extensive professional experience in music royalty examinations could reliably perform a "cost accounting" analysis for album sales despite "[t]he fact that [the expert] has not specialized in cost accounting . . . because [his] training and experience in accounting . . . will assist the trier of fact to . . . reach a determination on the issue of damages."  2005 WL 544422, at *5.  The cases cited by plaintiff (Pl. Br. at 9) have nothing to do with Dr. Ryan's qualifications to testify here.  They hold only that where expert testimony is unnecessary, or an expert fails to explain his reasoning, the expert's testimony will be precluded. *United States* v. *Cruz*, 363 F.3d 187, 193-97 (2d Cir. 2004) (expert testimony on the meaning of the phrase "to watch someone's back" was unnecessary); *Dreyer* v. *Ryder Auto Carrier Group, Inc.*, 367 F. Supp. 2d 413, 416-17 (W.D.N.Y. 2005) (expert's "failure to explain why his training and experience led him to his conclusion" rendered his conclusions inadmissible).  By contrast, Dr. Ryan has opined on highly technical accounting standards which no jury will understand on its own.  Dr. Ryan will explain at trial, how he applied his expertise in accounting to analyze Freddie Mac's and Fannie Mae's own disclosures about their losses.[7]

---

[7]     Plaintiff's assertion that Dr. Ryan "admitted that performing an independent analysis to determine whether security-specific factors may have caused losses" was "'outside [his] particular area of expertise'" (Pl. Br. at 8-9 (quoting Ex. 2 (Ryan July Dep.) at 207:2-17), again reflects nothing more than plaintiff's mischaracterization of Dr. Ryan's assignment.  Dr. Ryan explains in plain English financial statements and accounting work papers created by Freddie Mac and Fannie Mae; he did not perform an independent loss causation analysis. *See* pp. 7-8, *supra*.

## II.    DR. RYAN'S TESTIMONY ABOUT WHEN FREDDIE MAC AND FANNIE MAE DETERMINED THAT THEY WERE COMMITTED TO PURCHASE THE SECURITIES IS RELEVANT.

Dr. Ryan opines that, based on their accounting for the Certificates, both Freddie Mac and Fannie Mae "deemed themselves to be obligated to purchase the . . . Certificates in the intervening period between agreeing to and settling commitments, i.e., before receiving the prospectus supplements."  (Ex. 1 (Ryan Report) ¶ 107.)  Plaintiff argues that this Court's recent decision excluding evidence about when the actual sales of the Certificates occurred precludes this part of Dr. Ryan's testimony.  (Pl. Br. at 15-16 (citing Opinion & Order, *FHFA* v. *Nomura Holding Am., Inc.*, 11 Civ. 6201, at *2 (S.D.N.Y. Dec. 18, 2014) (Doc. No. 995)).)  That decision, however, related only to evidence of when sales actually occurred.  Opinion & Order, *FHFA* v. *Nomura Holding Am., Inc.*, 11 Civ. 6201, at *2-3 (S.D.N.Y. Dec. 18, 2014) (Doc. No. 995) (granting plaintiff's motion in *limine* to preclude defendants from "eliciting testimony, offering documents, or arguing that the sale of any of the seven securities at issue here . . . was consummated before the 'settlement date' as listed in FHFA's Amended Complaint").  Evidence of when Freddie Mac and Fannie Mae considered themselves obligated to purchase the Certificates is a different matter.

Defendants should be entitled to present evidence that both Freddie Mac and Fannie Mae considered themselves obligated to purchase the Certificates prior to receiving the prospectus supplements containing the alleged misstatements for each of the seven securitizations.  The materiality of a misstatement depends on whether "a reasonable investor would 'consider it important' in making an investment decision."  *In re IAC/InterActiveCorp. Sec. Litig.*, 695 F. Supp. 2d 109, 117 (S.D.N.Y. 2010) (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)).  Freddie Mac's and Fannie Mae's decision to treat the Certificates as derivatives prior to receiving the

prospectus supplements is probative of what they considered important in making their investment decisions.

Alternatively, plaintiff argues that this evidence is speculation about Freddie Mac's and Fannie Mae's state of mind and is impermissible testimony by an expert because it offers a "legal conclusion." (Pl. Br. at 17.) Not so. Dr. Ryan's opinion regarding pre-settlement purchase commitments simply explains the meaning of Freddie Mac's and Fannie Mae's accounting decisions based on GAAP standards—*i.e.*, as soon as a party (here, Freddie Mac and Fannie Mae) accounted for the Certificates as derivatives, that party necessarily considered itself obligated to close the transaction. (Ex. 1 (Ryan Report) ¶¶ 105-07.) This is expert opinion, not a legal conclusion. Unlike *In re Longtop*, where testimony was excluded as to whether a party's "behavior was 'reasonable' or 'reckless,' as that [was] the ultimate legal conclusion for the jury." 2014 WL 2998524 at *6, Dr. Ryan here opines on the meaning of technical accounting decisions that a lay jury could not reasonably be expected to understand. He offers no legal conclusions of any kind.

## CONCLUSION

The Court should deny plaintiff's motion to exclude the expert testimony of Prof. Stephen G. Ryan.

Dated:  New York, New York
        January 5, 2015

                                            Respectfully submitted,

/s/ Thomas C. Rice                          /s/ David B. Tulchin
Thomas C. Rice (trice@stblaw.com)           David B. Tulchin (tulchind@sullcrom.com)
David J. Woll (dwoll@stblaw.com)            Steven L. Holley (holleys@sullcrom.com)
Andrew T. Frankel (afrankel@stblaw.com)     Bruce E. Clark (clarkb@sullcrom.com)
Alan Turner (aturner@stblaw.com)            Bradley A. Harsch (harschb@sullcrom.com)
Craig S. Waldman (cwaldman@stblaw.com)      Katherine J. Stoller (stollerk@sullcrom.com)
SIMPSON THACHER & BARTLETT LLP              SULLIVAN & CROMWELL LLP
425 Lexington Avenue                        125 Broad Street
New York, NY  10017                         New York, NY  10004
Telephone:  212-455-2000                    Telephone:  212-558-4000
Facsimile:  212-455-2502                    Facsimile:  212-558-3588

*Attorneys for Defendant RBS Securities Inc.*   Amanda F. Davidoff
                                            (davidoffa@sullcrom.com)
                                            Elizabeth A. Cassady
                                            (cassadye@sullcrom.com)
                                            SULLIVAN & CROMWELL LLP
                                            1700 New York Avenue, NW, Suite 700
                                            Washington, DC  20006
                                            Telephone:  202-956-7500
                                            Facsimile:  202-956-6993

                                            *Attorneys for Defendants Nomura Holding
                                            America Inc., Nomura Asset Acceptance
                                            Corporation, Nomura Home Equity Loan, Inc.,
                                            Nomura Credit & Capital, Inc., Nomura
                                            Securities International, Inc., David Findlay,
                                            John McCarthy, John P. Graham, Nathan
                                            Gorin, and N. Dante LaRocca*