UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION, | No. 11-cv-6201 (DLC) |
| Plaintiff, | ECF Case |
| -against- | |
| NOMURA HOLDING AMERICA INC., et al., | |
| Defendants. | |

DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE
THE TESTIMONY AND OPINIONS OF MICHAEL FORESTER

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

January 6, 2015

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ............................................................................................... 4

     A.     Representations about Compliance with Underwriting Guidelines ..................... 4

     B.     Representations in the Collateral Tables ................................................... 5

     C.     Composition of the Loan Pools Described in the Offering Documents ............... 6

     D.     Hunter's Report and Methodology ......................................................... 8

     E.     Forester's Expert Report and Methodology.............................................. 10

ARGUMENT .................................................................................................... 14

I.     Forester's Testimony Concerning Representations That Loans "Were
     Originated Generally" in Compliance with Underwriting Guidelines Is
     Relevant and Reliable ............................................................................ 15

     A.     Forester's Testimony Is Relevant to Test Disclosures Concerning How the
          Loans "Were Originated," Which Refer to the Time of Loan Origination ......... 15

     B.     Forester's Testimony Is Based on a Reliable Method to Test Disclosures
          Concerning How the Loans "Were Originated" .................................... 17

          1.     Forester's Methods of Testing Disclosures Concerning How the
               Loans "Were Originated" Are "Generally Accepted" for That Task
               .................................................................................. 18

          2.     Forester's Methods of Testing Disclosures Concerning How the
               Loans "Were Originated" Are Based on Sufficient Facts and Data ........ 21

II.     Forester's Testimony Concerning Representations About Loan-to-Value Ratios Is
     Relevant and Reliable ............................................................................ 24

III.     Forester's Testimony Concerning Representations That Borrowers Intended to
     Occupy Their Homes Is Relevant and Reliable ......................................... 26

IV.    Plaintiff's Disagreement with Forester's Methods Goes to Weight, Not
     Admissibility ....................................................................................... 29

CONCLUSION ................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arista Records LLC* v. *Lime Group LLC*,
2011 WL 1674796 (S.D.N.Y. May 2, 2011) ...............................................4, 17, 29

*Assured Guar. Mun. Corp.* v. *Flagstar Bank, FSB*,
920 F. Supp. 2d 475 (S.D.N.Y. 2013) ...............................................14, 17, 20, 21

*Daubert* v. *Merrell Dow Pharmaceuticals Inc.*,
509 U.S. 579 (1993) ...............................................*passim*

*Discover Fin. Servs.* v. *Visa U.S.A., Inc.*,
582 F. Supp. 2d 501 (S.D.N.Y. 2008) ...............................................29

*Escott* v. *BarChris Construction Corp.*,
283 F. Supp. 643 (S.D.N.Y. 1968) ............................................... 17

*In re Fosamax Products Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009) ...............................................17, 23

*Wald* v. *Costco Wholesale Corp.*,
2005 WL 425864 (S.D.N.Y. Feb. 22, 2005) ...............................................14

*In re Washington Mutual Mort. Backed Sec. Litig.*,
2012 WL 2995046 (W.D. Wash. July 23, 2012) ...............................................29

**Rules**

FED. R. EVID. 401 ...............................................15, 27

FED. R. EVID. 402 ...............................................1

FED. R. EVID. 403 ...............................................1, 30

FED. R. EVID. 702 ...............................................*passim*

**Regulations**

17 C.F.R. § 229.1103 ...............................................7

76 Fed. Reg. 4231 ...............................................17

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Action | *FHFA* v. *Nomura Holding America Inc.*, No. 11 Civ. 6201 (DLC) |
| Amended Complaint | Plaintiff's June 28, 2012 Amended Complaint in this Action |
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin and N. Dante LaRocca |
| Ex. | Exhibit to the January 6, 2015 Declaration of Kunal J. Choksi submitted in support of this motion |
| Fannie Mae | Federal National Mortgage Association |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| Hunter Report | Expert Report of Robert W. Hunter Regarding the Underwriting of Mortgage Loans Underlying the Nomura Securitizations, dated May 15, 2014 |
| Hunter Rebuttal Report | Rebuttal Expert Report of Robert W. Hunter Regarding the Underwriting of Mortgage Loans Underlying the Nomura Securitizations, dated October 6, 2014 |
| Offering Documents | The offering materials for the Securitizations, including documents filed with the Securities and Exchange Commission |
| Forester Report | Expert Report of Michael Forester, dated August 14, 2014 |
| Forester Response | Michael Forester's November 18, 2014 Response to the October 6, 2014 Rebuttal Expert Report of Robert W. Hunter |
| Forester Exhibit | Exhibit to the Forester Response |
| Isakson Report | Expert Report of Hans R. Isakson, dated August 14, 2014 |
| Plaintiff | Federal Housing Finance Agency |
| Pl. Br. | Plaintiff's Memorandum in Support of Its Motion to Exclude Expert Testimony and Opinions of Michael Forester |

## TABLE OF ABBREVIATIONS
(Continued)

| | |
|---|---|
| Pl. Ex. | Exhibit to the December 22, 2014 Declaration of Tyler Whitmer in Support of Plaintiff FHFA's Motion to Exclude Expert Testimony and Opinions of Michael Forester |
| Sample Loans | The loans comprising the sample of approximately 100 loans per Securitization selected by plaintiff's expert Dr. Charles Cowan and re-underwritten by Robert W. Hunter |
| Securitizations | The seven RMBS purchased by Freddie Mac and Fannie Mae from Nomura that are the subject of this Action |

Defendants respectfully submit this memorandum in opposition to plaintiff's motion to exclude, under Federal Rules of Evidence 402, 403 and 702 and *Daubert* v. *Merrell Dow Pharmaceuticals Inc*., 509 U.S. 579 (1993), the trial testimony and opinions of defendants' expert Michael Forester.

## PRELIMINARY STATEMENT

Plaintiff's claims in this Action are that defendants made three misrepresentations in the Offering Documents:  statements (1) that loans "were originated" generally in accordance with specific underwriting guidelines or criteria set forth in the Offering Documents, (2) that the loan-to-value ("LTV") ratios of loans at the time they were originated were as specified in the Offering Documents, and (3) that a certain percentage of borrowers stated as of the time of origination that they intended to occupy the properties they were buying.  (Ex. 1 (Amended Complaint) at ¶¶ 1, 76-82, 86-95.)  Plaintiff's expert, Robert W. Hunter, was asked to re-underwrite a sample of the loans backing the Securitizations and to identify any "deficiencies in the original underwriting process."  (Pl. Ex. 3 (Hunter Report) at 118.)  In performing that task, Hunter often relied on documents and information that were not in existence at the time the loans were originated or on documents and information that the relevant underwriting guidelines did not require underwriters to consider.

Defendants' expert, Michael Forester, who has worked in the mortgage banking industry for more than 35 years, including as the chief financial officer of a large mortgage originator, Household International (Pl. Ex. 1 (Forester Report) at 1-2), conducted  his own re-underwriting of the Sample Loans.  Forester "put [himself] in the shoes of the underwriter" and considered "the information" that the underwriter would have had available to him or her at the time of origination.  (Ex. 2 (Forester Tr.) at 302:13-303:17.)  Accordingly, Forester did not

consider information that was not available at the time of origination or information that the

relevant underwriting guidelines did not call for underwriters to consider.  This is clearly the

correct approach—the question for the jury is not whether a trial expert might, years after

origination, come to a different conclusion than the underwriter did at the time of origination.

The proper question is whether the underwriting was conducted in accordance with the

underwriting guidelines disclosed in the Offering Documents.  Information that did not exist as

of the time of origination (and that the underwriter thus cannot possibly have considered) can

have no bearing on that inquiry.  Forester's testimony pertains to that relevant jury issue, and is

thus admissible under Rule 702 and *Daubert*, 509 U.S. 579 at 597.[1]

> *First*, Forester's testimony about the characteristics of the loans at the time of

origination is directly relevant to plaintiff's claim about the disclosures in the Offering

Documents.  Each of the Offering Documents represented that the loans backing the

Securitizations "were originated generally" in accordance with certain underwriting guidelines or

criteria.  (Appendix A.)  By definition, this disclosure is directed to the process undertaken at the

time of origination.  It is not a representation that a second underwriter, using information not

available to the original underwriter, could come to a different underwriting decision years later.

---

[1]  In contrast, Hunter's opinions based on information that was not available to underwriters at the time of origination is inadmissible—whether the underwriting was done in accordance with relevant underwriting guidelines cannot be determined on the basis of information that the underwriter could not have considered (because it did not exist) at the time.  As a result, defendants have moved to exclude Hunter's testimony concerning how the loans "were originated" to the extent it is based on information not available at the time of origination. January 5, 2015 Motion to Exclude the Testimony of Robert W. Hunter Based on Information Not Available at Origination.  Defendants also have moved to exclude Hunter's testimony concerning borrowers' intent to occupy the properties to the extent that testimony relies on evidence not available at the time of origination.  December 24, 2014 Motion to Exclude the Expert Testimony of Robert W. Hunter Concerning Owner Occupancy Status.

Forester's approach—considering information that the underwriter had or could have obtained, and information that the original underwriter was required to consider at the time of origination—is directly relevant to whether the disclosures in the Offering Documents were true. Similarly, the Offering Documents disclosed that the LTV ratios in the collateral tables were based on either (1) sales prices or (2) appraised values "obtained at the time of origination." (Appendix B.)  Forester assessed whether the underwriter properly calculated a loan's LTV ratio based on these two values, and his testimony is therefore directly relevant to the accuracy of the LTV ratios disclosed in the Offering Documents.  Values of properties obtained after the loans were originated—which Hunter relies on—are not relevant to the accuracy of the LTV ratios disclosed in the Offering Documents.

Finally, the occupancy data in the Offering Documents discloses the percentage of borrowers who, at the time of origination, stated an intention to occupy the subject property. Forester reviewed the loan files for any information inconsistent with borrowers' stated intent to occupy the home.  Forester's testimony based on that review of information available to the underwriter at the time of loan origination goes directly the accuracy of the owner occupancy disclosures in the Offering Documents.  It is highly illogical to assert that disclosures about intent to occupy are false based on information that does not go to the truth of a borrower's stated intention, but rather looks to information about whether the borrower actually occupied the property in a later period—*i.e.*, after the loan was made.

*Second*, Forester's methodology of comparing a loan file with the applicable underwriting guidelines is a "generally accepted" methodology to assess the accuracy of disclosures such as those contained in the Offering Documents.  Plaintiff's contention that consideration of post-closing documents and third party sources is required for every re-

underwriting review is unsupported by authority and illogical.  Forester's methodology of

considering information that was in front of, or was available to, an underwriter reliably tests the

disclosures that plaintiff contends were false.

        *Third*, plaintiff's objections to certain assumptions on which Forester relies go to

the testimony's "weight rather than the admissibility of the evidence."  *Arista Records LLC* v.

*Lime Group LLC*, 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) (internal quotation marks

omitted).  A disagreement about such assumptions is not a basis for excluding expert testimony

altogether.

        Plaintiff's motion to exclude the testimony of Michael Forester should be denied.

## BACKGROUND

        Plaintiff brought this action under, *inter alia*, Sections 11 and 12 of the Securities

Act, alleging that certain statements in the Offering Documents for the Securitizations were

false.  Plaintiff's claims of falsity are limited to three categories of disclosures:  statements

(1) that loans "were originated" generally in accord with certain underwriting guidelines or

criteria, (2) that the LTV ratios of loans at the time they were originated were as specified in the

Offering Documents, and (3) that a certain percentage of borrowers stated, at the time they

applied for the loans, that they intended to occupy the properties they were buying.  (Ex. 1

(Amended Complaint)  at ¶¶ 1, 76-82, 86-95.)

        All three categories of statements clearly speak to facts as they existed at the time

of loan origination—*i.e.*, to circumstances as of the time of the original underwriting decisions.

### A.      Representations about Compliance with Underwriting Guidelines.

        Each of the Offering Documents at issue made representations that the loans

backing the Securitization were originated generally in compliance with certain underwriting

guidelines or criteria.  (Appendix A.)  These representations took two forms:  either that the

loans "<u>were originated</u> generally" in accordance with a specific originator's underwriting

guidelines or that the loans "<u>were originated</u> generally in accordance with the underwriting

criteria described in this section," referring to a section of the Offering Document.  (Appendix A

(emphasis added).)

> **B.      Representations in the Collateral Tables.**

Plaintiff alleges misrepresentations about two types of data in the collateral tables:

LTV ratios and owner occupancy data.  (Ex. 1 (Amended Complaint)  at ¶¶ 86-95.)

The disclosures in the Offering Documents concerning loan-to-value ratios

appeared in collateral tables listing the "Original Loan-to-Value Ratio" for the loans underlying

the Securitizations.  (Appendix C.)  As the Offering Documents expressly stated, these LTV

ratios were based solely on information as of the time of loan origination.  Thus, for loans

involving the purchase of a home, the "value" was defined as "generally the lesser of (a) the

appraised value determined in an appraisal <u>obtained by the originator at origination of that loan</u>

and (b) the sales price for that property."  (Appendix B (emphasis added).)  For refinancings, the

Offering Documents defined value as the "appraised value of the Mortgaged Property

determined in an appraisal obtained at the <u>time of origination</u> of the Refinance Loan."  (*Id.*

(emphasis added).)  Thus, each Offering Document represented that the LTV ratios set forth in

the collateral tables were calculated using origination loan amounts and either (1) appraised

values determined at the time of origination or (2) sales prices, which are necessarily determined

at, or before, the time of a loan's origination.  (*Id*.)[2]  There are no representations about any

determination of LTV ratios in later periods or based on information that did not exist as of the

time of loan origination.

    The Offering Documents also contain representations about the percentage of

borrowers who expressed an intention to occupy the subject properties. (Appendix C.)  This was

understood in the industry to refer to borrowers' intent as of the time of loan origination.  For

example, Fannie Mae analyst Lin Cao testified that owner occupancy statistics "referred to the

percentage of borrowers who stated that they intended to occupy the home."  (Ex. 3 (Cao Tr.) at

644:12-645:6.)  Similarly, Freddie Mac trader Perri Henderson testified that she couldn't "think

of any other way, at that time, that you can verify" owner occupancy, other than the borrower's

stated intent in the loan application.  (Ex. 4 (Henderson Tr.) at 185:8-186:3.)  Plaintiff's own due

diligence expert, Leonard A. Blum, made the same point:  when asked "his understanding" of the

occupancy representations in the Offering Document for 2006-FM1, he testified that those

representations meant that "at the time of origination the borrower truthfully filled out a Form

1003, the application statement, [and] that [the] borrower intended to occupy that property for

more than half of the time for the following 365 days . . . ."  (Ex. 5 (Blum Tr.) at 187:6-22.)

**C.     Composition of the Loan Pools Described in the Offering Documents.**

    During the period 2005 to 2007, Nomura purchased thousands of loans from

originators and, thereafter, identified particular loans to include in specific securitizations,

---

[2]     The Offering Documents also state that the Prospectus Supplement would provide "the range of the Loan-to-Value Ratios <u>at origination</u> of the mortgage loans."  Appendix B (emphasis added).  They further warned that "[n]o assurance can be given that the values of the related Mortgage Properties have remained or will remain at the levels in effect <u>on the dates of origination</u> of the related Mortgage Loans."  *Id*.

including the Securitizations at issue in this case.  (Ex. 6 (Lee Tr.) at 135:12-136:4.)  The loans

that ultimately backed a particular Securitization were not finally determined until the "Closing

Date," a date one to three days after each Offering Document was issued.  (Appendix D.)  The

Offering Documents, therefore, did not report information about the actual, final loan pools

comprising the Securitizations.  Instead, the Offering Documents contain information about the

loans intended to back the Securitizations "as of the Cut-off Date," a date about 30 days before

each Offering Document was issued.  (Appendix D.)

Under Securities and Exchange Commission rules, the Cut-off Date is the date

"for establishing the composition of the asset pool" reported in prospectus supplements.  17

C.F.R. § 229.1103(a)(2).  The prospectus supplements disclose that "[t]he characteristics of the

mortgage loans as described in this prospectus supplement may differ from the final pool as of

the closing date," for example, because "certain mortgage loans may become delinquent or

default or may be removed or substituted and that similar or different mortgage loans may be

added to the pool prior to the closing date."  (Appendix D.)  Thus, the significance of the Cut-off

Date is to fix the particular loans about which information is reported in the prospectus

supplements—even though loan pool composition could change thereafter.  There is no dispute

about any of this.

Although the Offering Documents make clear that loan characteristics which

might change over time—such as "aggregate principal balance" and percent of delinquent

loans—are reported "as of the Cut-off Date" (Appendix D), the Offering Documents do not

represent that other loan characteristics were re-tested or re-verified as of the Cut-off Date using

information that became available after the loans were originated.  Indeed, for disclosures about

how loans "were originated," "Original-Loan-to-Value Ratios," and borrowers' intention at the

time of loan origination, such a representation would make no sense.  As shown above, those disclosures relate only to the circumstances existing as of the time of loan origination.  Plaintiff's claims in this Action are that the representations were false when made.  None of those representations can be tested using information that did not exist as of the time of loan origination and that the underwriters (and defendants) by definition could not have considered.

### D.    Hunter's Report and Methodology.

Plaintiff bears the burden of proving the falsity of the challenged disclosures in the Offering Documents.  For this purpose, plaintiff engaged Robert W. Hunter to "re-underwrite" a sample of 723 loans underlying the seven Securitizations.  Hunter recognized that he was required to test disclosures concerning compliance with underwriting guidelines or criteria by reviewing the loans to identify "deficiencies in the <u>original underwriting process</u>." (Pl. Ex. 3 (Hunter Report) at 118 (emphasis added).)  Hunter's analysis, however, was not limited to an assessment of the "original underwriting process" that the underwriter followed. Instead, Hunter and his team used information that was not available to underwriters at the time of loan origination, from documents that Hunter admitted an originator "could not . . . have looked at . . . when the loan was originated."  (Ex. 7 (Hunter Tr.) at 182:7-12; 183:15-24.) Hunter and his team also criticized underwriters because they did not take steps that were not required by underwriting guidelines or criteria, such as obtaining credit reports in addition to those specifically required[3] and verifying information a second time that had already been verified in accordance with underwriting guidelines.  (Pl. Br. at 4-5.)

---

[3]      Underwriting guidelines generally required an underwriter to consult a credit report at the time of loan origination.  Hunter identified only three loans where an underwriter purportedly did not obtain a credit report that complied with the requirements for such reports contained in

(<em>footnote continued</em>)

Hunter also purported to opine on whether the LTV or CLTV ratios for the Sample Loans were consistent with underwriting guidelines.  For these opinions, Hunter replaced the appraised values in the loan files with property valuations created in 2013 or 2014 by plaintiff's expert John Kilpatrick's automated valuation model ("AVM") and then recalculated the LTV and CLTV ratios.  (Pl. Ex. 3 (Hunter Report) at 112.)  If the recalculated ratio was outside underwriting guidelines, Hunter concluded that the loan did not comply with those guidelines when it was originated.  Hunter says there are 126 Sample Loans that were underwritten improperly based on values generated by Kilpatrick's AVM.  (Pl. Ex. 33 (Exhibit 2A to Hunter Rebuttal Report.)  Kilpatrick's AVM relies principally on tax assessed values from the period 2011 to 2014 (Ex. 8 (Isakson Report) at 12, App. F), which were not available to underwriters originating the loans at issue.

Hunter also offers opinions about owner occupancy data set forth in the Offering Documents' collateral tables.  Hunter formed these opinions by purporting to determine, based on information that was not available to the underwriter at the time the loan was originated, whether borrowers actually lived in the mortgaged homes for one year after loan origination. (Ex. 7 (Hunter Tr.) at 303:6-12.)  Whether borrowers lived in the home during the one-year period subsequent to loan origination is the wrong question.  The Offering Documents make no representation about actual occupancy after the loans were originated; instead, they made

---

(*footnote continued*)
applicable underwriting guidelines.  Pl. Ex. 33 (Exhibit 2A to Hunter Rebuttal Report).  Hunter asserts that 143 loans were not underwritten properly based on information in additional credit reports his team obtained—but Hunter does not claim that the underwriting guidelines for these loans required the underwriters to obtain an additional credit report (nor does he show that the information now available in audit credit reports would have been available in credit reports at the time of origination).  *Id.*

representations only about borrowers' stated intention as of the time of loan origination to occupy their homes.

> ### E.    Forester's Expert Report and Methodology.

Michael Forester has worked in the mortgage banking industry for more than 35 years, during which time he has audited, reviewed, and re-underwritten thousands of residential mortgage loans, either directly or in a supervisory capacity.  (Pl. Ex. 1 (Forester Report) at 1.) Forester began his career in 1977 at Ernst & Young auditing mortgage loans originated by banks and savings and loan associations.  (Ex. 9 (Forester Resume) at 3.)  He then worked for Household International, a large originator and acquirer of mortgage loans, for 17 years— including serving as its Chief Financial Officer.  (*Id.* at 2-3.)  Forester oversaw Household's monthly acquisition and diligence of up to $350 million of mortgage loans, including subprime loans Household securitized.  (*Id.* at 2.)  Since leaving Household in 1999, Forester has helped found two private companies that re-underwrite as many as 1,000 to 2,000 mortgage loans per month.  (Pl. Ex. 1 (Forester Report) at 1.)

Forester and his team fully re-underwrote each loan that Hunter alleged to be defective.  (Pl. Ex. 1 (Forester Report) at 6; Ex. 2 (Forester Tr.) at 309:25-310:9.)[4]  Forester did a full re-underwriting in order to determine whether (1) the Sample Loans were originated generally in compliance with underwriting guidelines, (2) LTV ratios were calculated in

---

[4]    For this Action, Forester engaged a staff of persons with more than ten years of experience each as underwriters or reviewers of mortgage loans. Ex. 2 (Forester Tr.) at 300:3-300:19.  Forester's staff conducted the initial review of each of the Sample Loans Hunter alleged to be "defective."  The findings of the initial review went through two quality control checks by the most experienced underwriters. Ex. 2 (Forester Tr.) at 309:7-311:23.  Forester then conducted a final review of each Sample Loan and made a decision as to whether the Sample Loan was originated in accordance with applicable underwriting guidelines.  *Id.*

accordance with underwriting guidelines, based on appraisals that satisfied those guidelines, and (3) whether the underwriter correctly analyzed and reported the borrowers' stated intent to occupy a property for the Sample Loans, including by considering and following up on any red flags indicating that borrowers had misreported their intent.  (Ex. 2 (Forester Tr.) at 10:8-10:24, 270:24-271:22, 267:9-267:15; Pl. Ex. 1 (Forester Report) at 14, 59.)  For this purpose, Forester selected a review methodology that "put [himself] in the shoes of the underwriter" and considered "the information that [the underwriter] would [have] looked at."  (Ex. 2 (Forester Tr.) at 302:13-303:17.)  As such, Forester did not consider information that originating underwriters "were not required" by guidelines to obtain and could not "reasonably [be] expected to collect."  (Pl. Ex. 1 (Forester Report) at 48.)  In other words, Hunter relied on information that was not available to the original underwriter or that the underwriter (pursuant to the relevant guidelines) was not required to consider.  Forester did neither of those things.

Contrary to plaintiff's assertion (Pl. Br. at 2-3, 13), Forester considered information outside the loan file if the underwriting guidelines directed the underwriter to do so, and if the information was available to the underwriter at the time of loan origination.  For example, Global Loan Number NHELI_2006_FM1_2002009090 was originated by Fremont, which funded the loan on █████████.  (Ex. 10 (Forester Exhibit 162) at 3.)  Fremont's guidelines required an underwriter to verify borrower employment two days before the loan's funding.  (*Id*.)  The underwriter for this loan did not do so.  Hunter obtained a "████████████ ████████████████████, indicating that the ████████████████ ████ (Ex. 11 (Hunter's Re-verification).)  Forester considered this information in assessing the loan because the applicable Fremont guidelines instructed the underwriter to obtain such information and because the information in the ████████████ was available at the time of

-11-

loan origination.  Forester therefore concluded, as did Hunter, that the loan was not originated in accordance with applicable underwriting guidelines.  (Ex. 10 (Forester Exhibit 162) at 4, 6.) This is a clear example of Forester's approach—to evaluate the original underwriting based on information that the underwriter had or could have had at the relevant time.  But Hunter goes much further, considering information that was never in front of the original underwriter and did not even exist at the time.

Forester has not expressed a view about the merits of Kilpatrick's AVM valuations, which were not available at the time of a loan's origination, and are based on tax assessed values from 2011 to 2014, years after the loans were originated.  (Pl. Ex. 1 (Forester Report) at 49.)  Instead of relying on such information, where Hunter asserted that an appraisal should have been identified by the underwriter as defective on its face, Forester assessed the reasonableness of the appraisal pursuant to the applicable underwriting guidelines—for example, whether it had "appropriate comparable[s]" and whether the appraiser "collect[ed] photographs and documentation for improvements and adjustments."  (Ex. 2 (Forester Tr.) at 217:6-218:5.) Forester explained that because "underwriters are generally not trained or licensed appraisers, underwriting guidelines typically only required the underwriter to review limited aspects of the appraisal, for example, the completeness of the appraisal report, age of the report, property type eligibility, property address, and signature and license number of the appraiser."  (Pl. Ex. 1 (Forester Report) at 14.)  If Forester found these aspects of the appraisal were consistent with underwriting guidelines, Forester concluded that the underwriter had complied with guidelines if (i) the underwriter calculated the LTV ratio correctly, using the sales price or appraised value, as appropriate, and (ii) the resulting LTV ratios were within applicable guidelines.  (Pl. Ex. 1 (Forester Report) at 59-60.)  It would be illogical to assert that plaintiff's allegations that

representations in the Offering Documents were false can be based only on after-the-fact "second guessing" of appraisal values.  In the absence of any "red flags," the original underwriter was entitled to rely upon what appeared to be facially correct appraisals if those appraisals complied with applicable underwriting guidelines.  (Ex. 2 (Forester Tr.) at 108:8-109:15; 248:4-248:11.)

Forester also reviewed the loan files for the Sample Loans in order to determine if the original underwriter appropriately assessed a borrower's stated intent to occupy a property in accordance with applicable underwriting guidelines.  Forester testified at deposition that an underwriter should "consider red flags" that a borrower was misrepresenting his intention to occupy, and should have investigated whenever red flags appeared.  (Ex. 2 (Forester Tr.) at 270:24-271:22.)  If there were no red flags, or if an investigation turned up no evidence that the borrower had misrepresented his or her intent to occupy the property, the underwriter was properly following the relevant underwriting guidelines.  (Ex. 2 (Forester Tr.) at 281:7-281:19.) Forester replicated this process.[5]

Plaintiff's motion to exclude Forester is based on the argument that he did not consider information that was not available to underwriters as of the time of loan origination or that the relevant underwriting guidelines did not require the underwriter to consider.  This is

---

[5]      Plaintiff's statement that Forester "ignored" Hunter's allegations based on the "pre-closing loan tape" is incorrect.  Forester considered the basis for each of Hunter's 315 findings based on the "pre-closing loan tape."  These findings were all "derivative of another claim" Hunter made about the same loan.  Pl. Ex. 1 (Forester Report) at 45.  For example, if Hunter found a loan had a higher debt-to-income ("DTI") ratio than the one calculated by the original underwriter, Hunter turned this one claim into two purported defects:  (1) an excessive DTI defect; and (2) a "pre-closing loan tape" defect based on the DTI listed on the loan tape.  *Id.* Forester considered the basis for Hunter's original allegation—that the DTI was miscalculated— and disagreed (or agreed) with the derivative "pre-closing loan tape" finding accordingly.  *See e.g.*, Ex. 12 (Forester Exhibit 443) at 3-5.

illogical, and asks the Court to rule that the truthfulness of the disclosures in the Offering

Documents (about circumstances as they then existed) should be tested using facts that could not

have been, or should not have been, considered at the time of loan origination.  This is entirely

misguided, and the motion to exclude Forester should thus be denied.

## ARGUMENT

Determining the admissibility of expert testimony under Rule 702 and *Daubert*

requires a district court to "determine that (1) the expert is qualified, (2) the testimony is

relevant, and (3) that the testimony is reliable."  *Wald* v. *Costco Wholesale Corp*., 2005 WL

425864, at *5 (S.D.N.Y. Feb. 22, 2005) (citing *Daubert*, 509 U.S. at 592-97 and FED. R. EVID.

702).  Plaintiff does not dispute that Forester, based on his 35 years in the mortgage banking

industry, during which he was responsible for the underwriting or re-underwriting of thousands

of loans, *see* p. 10, *supra*, is qualified to testify as an expert concerning re-underwriting in this

case.[6]  Because his testimony also is (1) relevant to the actual disclosures in the Offering

Documents and (2) based on a reliable methodology, Forester's testimony is highly relevant and

probative; it goes to the heart of plaintiff's claims of falsity under the Securities Act.

Hunter has asserted that there are more than 2,000 defects in the underwriting of

the Sample Loans he reviewed.  (Pl. Ex. 33 (Exhibit 2A to Hunter Rebuttal Report).)  Forester

---

[6]     Plaintiff suggests that Forester has "minimal" experience as a first-level underwriter of
residential mortgage loans.  Pl. Br. at 18.  That is irrelevant to his expertise in reviewing how
loans "were originated."  *Assured Guar. Mun. Corp*. v. *Flagstar Bank, FSB*, 920 F. Supp. 2d
475, 504 (S.D.N.Y. 2013) (finding that a re-underwriting expert's minimal "front-line
underwrit[ing]" experience is "hardly a disqualification" and "is to be expected of any successful
[re-underwriting] expert").  Moreover, Hunter has not underwritten a mortgage loan since 1985
and has readily admitted that those mortgage loans were "different in nature" than the mortgage
loans at issue here.  Ex. 7 (Hunter Tr.) at 34:10-35:9; 41:6-41:19.

responded to each of these allegations.  By this motion, plaintiff attacks Forester's responses to

314 of Hunter's allegations—instances where Hunter uses information from post-closing

documents or third party sources—and 315 other allegations concerning pre-closing loan tapes.

(Pl. Br. at 16.)  Plaintiff's motion does not bear in any way on the great majority of Forester's

findings or opinions, and in effect concedes that they are admissible and relevant.

I.    **FORESTER'S TESTIMONY CONCERNING REPRESENTATIONS THAT
LOANS "WERE ORIGINATED GENERALLY" IN COMPLIANCE WITH
UNDERWRITING GUIDELINES IS RELEVANT AND RELIABLE.**

The Offering Documents represented that the loans backing the Securitizations

"were originated generally" in accordance with certain underwriting guidelines or criteria.

(Appendix A.)  Plaintiff's due diligence expert, Leonard Blum, recognized that this disclosure is

"a current representation about a past event," *i.e.*, whether loans generally complied with

guidelines when they were originated.  (Ex. 5 (Blum Tr.) at 178:10-21.)  Hunter also recognized

that this is a representation about the "underwriting process" (Pl. Ex. 3 (Hunter Report) at 118)—

that the original underwriters generally followed the applicable "underwriting process"—not a

representation that every criterion of every guideline was satisfied.  Forester's testimony is

relevant to assessing the truthfulness of the Offering Documents' disclosures about how the

loans underlying the Securitizations were originated, and it does so reliably.

A.    **Forester's Testimony Is Relevant to Test Disclosures Concerning How the
Loans "Were Originated," Which Refer to the Time of Loan Origination.**

Testimony is relevant, and therefore admissible, if it has "any tendency to make"

a fact at issue "more or less probable."  FED. R. EVID. 401.  Expert testimony is admissible under

Rule 702 if it "will help the trier of fact to understand the evidence or to determine a fact in

issue."  FED. R. EVID. 702.  Here, based on the Offering Documents' disclosures, the relevant

question is whether the loans were originated generally in compliance with underwriting

guidelines.  Forester's testimony that the Sample Loans were "underwritten in accordance with

guidelines" at the time those loans were originated answers precisely that question.  (Ex. 2

(Forester Tr.) at 10:8-10:17.)  Indeed, plaintiff has admitted that "Mr. Forester's proposed

testimony focuses on whether the loan was underwritten correctly at origination."  (Pl. Br. at

3).)[7]

       Plaintiff argues, however, that because the Offering Documents' representations

about underwriting processes "had to be true as of the effective date of the Offering Documents,"

Forester was required to consider whether an underwriter assessing the loan application as of the

effective date of each Securitization would have made the loan.  (Pl. Br. at 9-10.)  This is

incorrect.  The Offering Documents in each case made representations about the process by

which the loans "were originated"—representations that referred explicitly to a time in the past,

*i.e.*, the time of loan origination.  (Appendix A.)  The only information that can properly be taken

into account in assessing the accuracy of those representations is information the underwriter

could or should have considered at the time of loan origination.

       Plaintiff attempts to side-step the actual disclosures in the Offering Documents

by arguing that this Court has ruled that Nomura "failed to conduct adequate due diligence, as a

matter of law, in part because 'Nomura took no steps at or near the time of its securitization of

the Mortgage Loans to verify the accuracy of the representations about the characteristics of the

---

[7]    Even if, as plaintiff asserts, the Offering Documents represented that the loans were generally in compliance with underwriting guidelines at the time the Offering Documents were issued (Pl. Br. at 3), Forester's testimony that the Sample Loans generally complied with applicable underwriting guidelines at the time of loan origination is still highly relevant to show compliance with those guidelines as of that slightly later date.

SLGs in the Offering Documents.'"  (Pl. Br. at 10 (quoting Doc. No. 991, at 84).)  This misrepresents the Court's holding, which was that Nomura was required to "tak[e] care to structure its pre-acquisition reviews and the population of its SLGs to ensure that the results of those reviews remained applicable to the SLGs"—not that Nomura was required to fully repeat its diligence on thousands of loans on the date each Securitization was offered.  Doc. No. 991, at 85.  More importantly, as the Court held, due diligence and falsity are distinct issues; the question of "whether the challenged representations were or were not accurate has no bearing on whether Defendants undertook a reasonable investigation or exercised reasonable care to assure themselves they were."  *Id.* at 103-04.[8]  Forester does not opine on the reasonableness of defendants' due diligence.  Forester's testimony is, however, relevant to the question of whether the loans underlying the Securitizations were generally originated in accordance with applicable underwriting guidelines and criteria at the time of origination.

**B.     Forester's Testimony Is Based on a Reliable Method to Test Disclosures Concerning How the Loans "Were Originated."**

Expert testimony is reliable if it rests on "good grounds, based on what is known." *In re Fosamax Products Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (internal quotation marks omitted).  As "the Second Circuit has noted, district courts should presume expert evidence is reliable." *Arista Records*, 2011 WL 1674796, at *3 (internal quotation marks omitted).  Plaintiff objects to Forester's methodology because he did not consider information

---

[8]     Plaintiff's authorities concerning due diligence (Pl. Br. at 10) are therefore irrelevant. *Escott* v. *BarChris Construction Corp.*, 283 F. Supp. 643, 697 (S.D.N.Y. 1968) set standards that securities underwriters must follow in order to prevail on a due diligence defense.  The SEC regulation cited by plaintiff likewise deals with the responsibilities of issuers to disclose the nature of their diligence review—and only applies to registered offerings "after December 31, 2011"—several years after the Offering Documents here were issued.  Issuer Review of Assets in Offerings of Asset-Backed Securities, 76 Fed. Reg. 4231, 4231-32.

-17-

Hunter collected from post-closing documents, asserting that Forester's approach is not "generally accepted" and not "based on sufficient facts or data." (Pl. Br. at 11-15.) These contentions are incorrect and, in any event, would go to weight rather than admissibility.

### 1.   Forester's Methods of Testing Disclosures Concerning How the Loans "Were Originated" Are "Generally Accepted" for That Task.

Plaintiff contends that comparing a loan file to the underwriting guidelines applicable to that loan is unreliable because that method "does not comport with generally accepted re-underwriting practices in the mortgage industry." (Pl. Br. at 11.) Plaintiff is incorrect.

*First*, there is no single "generally accepted" method for re-underwriting loans. Instead, the appropriate approach depends on the purpose of the re-underwriting. Here, as this Court has stated, "the reunderwriting process is a very narrow one. It's identifying failures on the *face of the loan files* when matched against the underwriting guideline." (Ex. 13 (November 15, 2012 hearing) at 87:11-87:13 (emphasis added).) There is no dispute that Forester took this approach.

*Second*, Forester's approach is not at all new. To the contrary, it matched the re-underwriting reviews Forester conducted in his 16 years of re-underwriting mortgage loans at Household International, in which he compared applicable underwriting guidelines to the information that was available to, and required to be considered by, the originators of mortgage loans. (Pl. Ex. 1 (Forester Report) at 1-2; Ex. 2 (Forester Tr.) at 100:3-100:16.) Forester used this same method to review the Sample Loans because he was testing the same question— whether the Sample Loans complied with applicable underwriting guidelines when they "were originated." Thus, where information outside a loan file was available to an underwriter, and where the applicable underwriting guidelines required the underwriter to consider that

-18-

information, Forester did as well.  *See* pp. 11-12, *supra*.  In contrast, where Hunter failed to show that information on which he relied was available to the original underwriter—for example, ████ ████████████████████████████████████████████████████ that opened on ████████████ when the originator had approved the loan in accordance with underwriting guidelines ████ ████ earlier, on ██████████████████—Forester did not consider that information.  (Pl. Ex. 1 (Forester Report) at 50-51.)

> *Third*, plaintiff's argument that information unavailable to the original underwriter, or which the original underwriter was not required to consider, may be used in other circumstances—quality control reviews, diligence on loan acquisition pools, and fraud or repurchase reviews (Pl. Br. at 12-13)—misses the point.  The appropriate re-underwriting method for each of those exercises depends on the purpose of the exercise.  For example, as Forester explained, the purpose of the "quality control type reviews" he performed was to "give you a feel for the processes of the originator," *i.e.*, whether the originator's processes worked well to obtain the information sought by the originator.  (Ex. 2 (Forester Tr.) at 82:8-82:10.)  In this Action, Forester is not opining on how well the processes of any originator functioned.  Forester is instead opining on underwriters' "adherence with guidelines" during the loan origination process.  (Ex. 2 (Forester Tr.) at 239:12-239:14.)  A methodology he sometimes used during "quality control reviews" is therefore irrelevant.[9]

---

[9]     Moreover, not all quality control reviews consider information that was not available to the original underwriter, or that the original underwriter was not required to consider.  Plaintiff cites the testimony of Jeff Cruisinberry, the corporate representative for the successor-in-interest of Fremont (Pl. Br. at 5 n.6), but Mr. Cruisinberry testified that Fremont's quality control review consisted of "getting the loan file from scratch and re-underwr[iting] it to the underwriting guidelines."  Ex. 14 (Cruisinberry Tr.) at 70:8-72:11.  This is the same methodology Forester applied in this case.

Plaintiff also argues that Nomura's due diligence vendors, including those on which Nomura relied, sometimes used "additional information not available to the underwriter at the time of origination." (Pl. Br. at 5-6, 13.) As the same witnesses whose testimony is cited by plaintiff make clear, however, the scope of a due diligence review was determined "on a case-by-case basis," depending on the purpose the review. (*E.g.*, Pl. Ex. 11 (Spagna Tr.) at 266:7-266:19.) Vicki Beal, the corporate representative for due diligence vendor Clayton, testified that the use of salary tools or third party public record searches "wasn't part of [Clayton's] typical scope," which usually consisted of "review[ing] all the credit documents *in the file*" and comparing them to originator underwriting guidelines. (Ex. 15 (Beal Tr.) at 18:17-19:17; 122:20-124:2; 399:6-402:17 (emphasis added).) Thus, Clayton's processes make clear that the re-underwriting approach must be tailored to the purpose of the review—in this Action, to assess how the loans "were originated," which cannot be determined based on information not available to the original underwriter, or which the original underwriter was not required to consider.[10]

Plaintiff similarly cites evidence that repurchase and fraud reviews may account for information the underwriter could not have, and was not required to, review. (Pl. Br. at 6-7, 12-13.) But as Forester testified, these types of reviews test representations different from those in this case, such as representations that no borrower committed fraud during the origination process. (Ex. 2 (Forester Tr.) at 79:24-80:9; 149:10-150:4.) Judge Rakoff's opinion in *Assured Guar. Mun. Corp.* v. *Flagstar Bank, FSB,* 920 F. Supp. 2d 475 (S.D.N.Y. 2013) is of no help to

---

[10]     This Court has stripped away from defendants their due diligence defense. Further, the truth of representations about how loans "were originated" cannot depend on information that never existed at the time of origination but only came to light as part of the due diligence process.

plaintiff, which mischaracterizes its holding.  There, plaintiff alleged that a pool of mortgage

loans breached two separate contractual representations:  (1) that each loan was originated in

compliance with originator underwriting guidelines, and (2) that there was no fraud by "any

party involved in the origination of" a mortgage loan.  920 F. Supp. 2d at 479.  Plaintiff's expert,

Rebecca Walzak, conducted two distinct reviews.  The first tested whether loans were originated

in compliance with underwriting guidelines "at the time the loan closed," and Ms. Walzak thus

"review[ed] the loan files . . . to determine if they complied with Flagstar's underwriting

guidelines."  *Id.* at 487-88.  Judge Rakoff allowed Ms. Walzak to testify about this first review

and credited her testimony.  *Id.* at 494-98.  Forester uses a similar methodology to test similar

representations in the Offering Documents, and his testimony is similarly admissible.

Ms. Walzak's second review, the "fraud review" to which plaintiff refers, relied

on post-closing documents and third party tools.  (Pl. Br. at 11-12 (citing *Flagstar*, 920 F. Supp.

2d at 506).)  This review tested whether there was fraud by "any . . . party involved in the

origination" of the mortgage.  *Id.* at 479.  Judge Rakoff's decision to credit a review designed to

assess such a "fraud" representation is irrelevant here, where defendants made no such

representation in the Offering Documents.  Moreover, although Judge Rakoff credited Ms.

Walzak's opinion over that of defendant's expert, he considered the testimony of both, and never

ruled that defendant's expert's testimony concerning the fraud claims was inadmissible.  *Id.* at

494-98.

## 2. Forester's Methods of Testing Disclosures Concerning How the Loans "Were Originated" Are Based on Sufficient Facts and Data.

For the same reasons that Mr. Forester's testimony is relevant—because it

assesses whether the loans "were originated" generally in accordance with applicable

underwriting guidelines by considering the information the underwriter could have and should have considered—such testimony is based on sufficient facts and data.

Plaintiff claims that Forester "ignor[ed] information that would have been available at the time of origination" but was not included in the loan file.  (Pl. Br. at 13.) Forester did no such thing.  Instead, Forester considered information available to the underwriter from documents and sources that applicable underwriting guidelines required the underwriter to consider, while Hunter went well beyond those sources.  For example, plaintiff refers to a loan originated by ResMae that closed on ███████████.  (Pl. Br. at 14-15; Pl. Ex. 18 (Forester Exhibit 652) at 1.)  Hunter's team obtained a ███████████████, dated ██████, 2014 (Pl. Ex. 27 (████████████████) at LF2UBS_00633282), which purportedly shows that the co-borrower of the loan misrepresented his employment when applying for the mortgage loan.  As Forester explained in assessing this loan, the original underwriter verified the co-borrower's employment in satisfaction of ResMae's underwriting guidelines by obtaining, at the time of origination, (1) a verification of employment, (2) pay stubs, and (3) W-2 tax forms. (Pl. Ex. 18 (Forester Exhibit 652) at 3.)  Neither Hunter nor plaintiff point to any requirement in ResMae's underwriting guidelines that an underwriter obtain a second verification of employment, which is what Hunter did.  (Pl. Br. at 14-15; Pl. Ex. 18 (Forester Exhibit 653) at 3.) Plaintiff's current assertion that the original "underwriter should have investigated" further is contrary to ResMae's underwriting guidelines.  (Pl. Br. at 14.)  The Offering Documents do not represent that a full-blown investigation that goes beyond what was required by the applicable guidelines might not turn up information of relevance to an underwriting decision.  The Offering Documents say instead that the loans were originated generally in accordance with applicable underwriting guidelines.  This does not call for the type of perfection Hunter advocates; it

requires instead exactly what Forester did—determining whether the underwriting was done in accordance with the actual underwriting guidelines.

Plaintiff also argues that Forester was required to consider information available after the time of origination but before "the effective date of the Prospectus Supplement." (Pl. Br. at 15.)  This is wrong because, as explained above (pp. 15-17, *supra*)*,* the Offering Documents represented that the loans generally complied with underwriting guidelines at the time they "were originated." (Appendix A.)  Plaintiff presents an example of a ██████ Hunter used to claim that a borrower misrepresented his income in connection with a loan that closed in ██████████. (Pl. Br. at 15.)  The █████ was dated ███████. (*Id.*)  Forester did not consider the information from this ██████ because it was created █████ after the subject loan was originated, and there is no evidence that the information in the █████ was available to the underwriter at the time of origination.  (Pl. Ex. 20 (Forester Exhibit 664) at 2.)  Indeed, Hunter failed to point to any underwriting guideline requirement that the original underwriter take any steps to verify income—but even if such a requirement existed, the █████ in question was not in existence as of the date on which the underwriting decision was made.[11]  (Pl. Ex. 20 (Forester Exhibit 664) at 2.)  Forester correctly determined that information not available to the original underwriter cannot be used to second-guess the underwriter's decision.

---

[11]      Indeed, Hunter could not locate any applicable guidelines for this loan so he used his invented "minimum industry standards." Pl. Ex. 20 (Forester Exhibit 664) at 2. *See* November 26, 2014 Motion to Exclude the Expert Testimony of Robert W. Hunter Based on Purported "Minimum Industry Standards."

II.     FORESTER'S TESTIMONY CONCERNING REPRESENTATIONS ABOUT
        LOAN-TO-VALUE RATIOS IS RELEVANT AND RELIABLE.

An originator's underwriting guidelines may specify the maximum LTV ratio for

a particular type of mortgage loan.  In determining whether loans "were originated" generally in

accordance with underwriting guidelines, Forester considered whether underwriters "followed

the applicable guidelines in calculating the LTV/CLTV ratio" using the sales price or reasonable

appraised value obtained at the time of origination.  (Pl. Ex. 1 (Forester Report) at 59.)  Where

Hunter claimed that the appraisal should have been rejected by the underwriter, Forester properly

reviewed the reasonableness of the appraisal, including, for example, whether the appraisal had

"appropriate comparable[s]" and the appraiser "collect[ed] photographs and documentation for

improvements and adjustments."  (Ex. 2 (Forester Tr.) at 217:6-218:5.)  If the appraisals were

complete and reasonable, the LTV ratios were calculated correctly, and those LTV ratios were

within underwriting guidelines, Forester found that the loan was originated in accordance with

the underwriting guidelines.  (*See e.g.,* Ex. 16 (Forester Exhibit 505) at 5 (finding an underwriter

complied with applicable underwriting guidelines by obtaining a contemporaneous AVM that

supported the loan's appraised value).)

Plaintiff argues that Forester's testimony is irrelevant, and his methods unreliable,

because he did not update the appraised values underlying the LTV ratios disclosed in the

Offering Documents with information that became available after loan origination, such as AVM

results obtained during due diligence.  (Pl. Br. at 16.)  But Forester's opinions concerning

whether the loans "were originated" generally in accordance with applicable underwriting

guidelines—including LTV ratio criteria—relate to whether underwriters followed underwriting

guidelines by determining the reasonableness of an appraisal and then using the appraised or

sales price to calculate LTV ratios.  Hunter points to no requirement that an underwriter must

-24-

always test the reasonableness of an appraisal by obtaining an AVM estimate; to the contrary, as Forester explained, "underwriters are generally not trained or licensed appraisers," and therefore review only "limited aspects of the appraisal," such as "completeness of the appraisal report, age of the report, property type eligibility, property address, and signature and license number of the appraiser"—attributes that could be a red flag for an underwriter that the appraisal was not reliable.  (Pl. Ex. 1 (Forester Report) at 14.)

The only reliable and relevant test, FED. R. EVID. 702, of whether LTV ratios were consistent with underwriting guidelines is based on an underwriter's review of the appraisals available at time of loan origination (including any red flags), along with the sales prices and appraised values, *i.e.*, the data available to the underwriter that the underwriter was supposed to consider.  It is Hunter's method, which relies upon AVM values without any evidence that an originator was required to obtain them (or could have done so) that is unreliable.  Kilpatrick's values, and values obtained during due diligence, are not relevant to whether loans were generally originated in accordance with underwriting guidelines.

Plaintiff also seeks to preclude Forester's testimony concerning LTV ratios set forth in collateral tables in the Offering Documents.  (Pl. Br. at 9-10.)  According to plaintiff, those collateral tables disclosed LTV ratios updated as of the Cut-off Date for each Securitization, and, according to plaintiff, Forester therefore should not have limited his testimony to LTV ratios available at origination.  (*Id*.)  In fact, the Offering Documents clearly represented that the LTV ratios in the collateral tables were based on either (1) the appraised value "obtained at the time of origination" or (2) the sales price of the property, which was necessarily obtained before, or at, the time of loan origination.  *See* pp. 5-6, *supra*.  The Offering Documents did not represent, as plaintiff contends (Pl. Br. at 8), that the LTV ratios in the

-25-

collateral tables were recalculated as of the Cut-off Date—which merely refers to the date when the composition of the loan pool about which disclosures would be made was fixed. *See* pp. 6-8, *supra*. The collateral tables even label the LTV ratios they disclose as "Original Loan-to-Value Ratios," referring to the time of loan origination. (Appendix C.) Thus, the correct method for a re-underwriter to evaluate the accuracy of the disclosed LTV ratios is to consider appraised values and sales prices at the time the loans were originated, along with a reasonableness check of the appraisal, which would include identifying and resolving any red flags on the face of the appraisal. This is exactly what Forester did.

## III.   FORESTER'S TESTIMONY CONCERNING REPRESENTATIONS THAT BORROWERS INTENDED TO OCCUPY THEIR HOMES IS RELEVANT AND RELIABLE.

The collateral tables in the Offering Documents also set forth the percentage of loans backing the Securitizations for which borrowers reported, as of the time of origination, that they intended to occupy the subject properties.[12] *See* p. 6, *supra*. Forester reviewed the loan files for the Sample Loans for evidence either supporting or contradicting borrowers' stated intent. (Ex. 2 (Forester Tr.) at 281:7-281:19.) Forester considered (a) whether borrowers signed certificates stating their intent to occupy the mortgaged properties, and (b) whether the underwriters overlooked documents that were inconsistent with a borrower's stated intent to occupy. (Ex. 2 (Forester Tr.) at 270:24-271:22.) If a borrower stated an intention to occupy a home, and no evidence in the loan file (or that the underwriter was instructed to obtain)

---

[12]   Even if, as plaintiff claims, the collateral tables set forth the occupancy status of subject properties as of certain Cut-off Dates (Pl. Br. at 4), Forester's testimony that the borrowers' stated intention to occupy the home for the Sample Loans was supported at the time of the loans' origination is highly relevant to whether or not borrowers occupied those properties at a later date.

contradicted this stated intention, Forester concluded that the borrower's intent to occupy the home had been correctly reported.  (Ex. 17 (Forester Exhibit 282) at 2.)  This is similar to the review Hunter conducted.  Hunter testified at deposition that his team did not allege an occupancy misrepresentation unless "there were red flags that indicated . . . a potential problem" with the borrower's stated intent at the time of origination.  (Ex. 7 (Hunter Tr.) at 298:21-299:22.)[13]  Forester's testimony about his review of the Sample Loans is proper and relevant because it addresses a key issue: the accuracy, as of the time of origination, of statistics in the collateral tables concerning borrowers' intended occupancy of mortgaged properties.  *See* FED. R. EVID. 401, 702; *see* p. 6, *supra*.

      For example, the borrower for loan number NAA_2005_AR6_1002196236 stated her intention to occupy the subject property as of the loan's closing on ███████████.  (Ex. 18 (Forester Exhibit 88) at 3.)  Hunter claims the borrower misrepresented her intention to occupy because an "███████████," pulled by his team for the purposes of this litigation, "indicated" the borrower was associated with another address as of ███████████.  (*Id.*)  This information, about circumstances that came into existence ██████ after the loan closed, clearly could not have been available to the underwriter at the time of loan origination.[14]  Forester, in contrast,

---

[13]     Hunter nevertheless also proceeded to consider information from post-closing documents and third party sources not required to be consulted by applicable underwriting guidelines.  Pl. Ex. 3 (Hunter Report) at 100.  Such evidence is irrelevant because, as set forth above (*see* p. 6, *supra*), the data in the collateral tables concerning borrowers' intention to occupy is provided as of the date of loan origination.  Hunter's improper consideration of information that did not exist as of the time of loan origination when evaluating representations concerning owner occupancy in the collateral tables is the subject of defendants' December 24, 2014 "Motion to Exclude the Testimony of Robert W. Hunter Concerning Owner Occupancy Status."

[14]     Further, this information was not even available as of the Cut-Off Date for the 2005-AR6 securitization of November 1, 2005.  Appendix D.

looked at the information actually in front of the underwriter at the time of loan origination, including a signed occupancy certificate and loan application indicating the borrower's intention to occupy the subject property. (*Id*.) Neither Forester nor Hunter found any information in the loan file inconsistent with this stated intent. (*Id*.)

For the same reasons, and contrary to plaintiff's assertions (Pl. Br. at 8, 18), Forester's testimony concerning owner occupancy representations is reliable and based on sufficient facts and data—information available to the underwriter at the time of origination. Plaintiff argues that the underwriter was required to confirm whether, between the date a loan closed and the Cut-off Date, evidence existed that the borrower was no longer living in his or her home. (*Id*.) As a preliminary matter, the Offering Documents plainly represented that the Cut-off Date was the date on which the loan pool (about which disclosures would be made in the Offering Documents) was selected (*see* pp. 6-8, *supra*), not that occupancy status was re-verified as of this date. Moreover, as Forester opines, information about whether a borrower actually lived in a home months after he said he intended to do so—plaintiff, for example, points to evidence that a borrower who stated in ███████ that he intended to occupy a property purportedly was not living there in ██████ (Pl. Br. at 17)—"say[s] nothing about the borrower's intent at the time of the loan['s]" origination. (Pl. Ex. 28 (Forester Exhibit 250) at 4.) For plaintiff's ████████ loan, Forester concludes that the loan file supported the borrower's stated intention to occupy the subject property because the borrower stated this intent on a signed application and occupancy agreement, and no information in the loan file or otherwise available to the underwriter contradicted the borrower's stated intent. (*Id*.) Forester's method reliably tests the representations in the Offering Documents.

## IV.    PLAINTIFF'S DISAGREEMENT WITH FORESTER'S METHODS GOES TO WEIGHT, NOT ADMISSIBILITY.

Hunter's methods—testing representations about loans as of the time of origination using information that did not then exist—are so unreliable that his testimony based on those methods should be excluded.  January 5, 2015 Motion to Exclude the Expert Testimony of Robert W. Hunter Based on Information Not Available at Origination; December 24, 2014 Motion to Exclude Testimony of Robert W. Hunter Concerning Owner Occupancy Status.  In its motion to exclude Forester, however, plaintiff criticizes Forester for refusing to speculate that information Hunter has shown could be obtained months or years after origination actually was available sooner.  A claim "that the assumptions relied on by an expert are unfounded is generally an argument that goes to the weight rather than the admissibility of the evidence." *Arista Records,* 2011 WL 1674796, at *3 (internal quotation omitted).  This is because a trial provides parties ample opportunity to attack an expert's assumptions by "[v]igorous cross-examination [and] presentation of contrary evidence."  *Daubert*, 509 U.S. at 596; *Discover Fin. Servs*. v. *Visa U.S.A., Inc*., 582 F. Supp. 2d 501, 507 (S.D.N.Y. 2008) ("To the extent" there are "any questions about the weight or the sufficiency of the evidence" relied upon by an expert "or the conclusions generated therefrom, those questions can be asked on cross-examination").  Other courts considering *Daubert* challenges against re-underwriting experts have held that it is "up to a jury" to decide which expert to credit because the "application of the underwriting guidelines requires some discretionary decision-making."  *In re Washington Mutual Mort.*

*Backed Sec. Litig.*, 2012 WL 2995046, at *6 (W.D. Wash. July 23, 2012).  Plaintiff has offered

merely cross-examination points, not a basis to exclude Forester.[15]

---

[15]      Plaintiff also argues that Forester's testimony should be excluded as prejudicial under Rule 403.  Pl. Br. at 18-19.  Plaintiff has shown no danger of prejudice or confusion from Forester's testimony, which is highly probative as to lack of falsity.  *See* pp. 15-28, *supra*.

**CONCLUSION**

The Court should deny plaintiff's motion to exclude the testimony and opinions of

Michael Forester.

Dated: New York, New York
       January 6, 2015

Respectfully submitted,

/s/ Thomas C. Rice                            /s/ David B. Tulchin

Thomas C. Rice (trice@stblaw.com)             David B. Tulchin (tulchind@sullcrom.com)
David J. Woll (dwoll@stblaw.com)              Steven L. Holley (holleys@sullcrom.com)
Andrew T. Frankel (afrankel@stblaw.com)       Bruce E. Clark (clarkb@sullcrom.com)
Alan Turner (aturner@stblaw.com)              Bradley A. Harsch (harschb@sullcrom.com)
Craig S. Waldman (cwaldman@stblaw.com)        Katherine J. Stoller (stollerk@sullcrom.com)
SIMPSON THACHER & BARTLETT LLP                SULLIVAN & CROMWELL LLP
425 Lexington Avenue                          125 Broad Street
New York, NY  10017                           New York, NY  10004
Telephone:  212-455-2000                      Telephone:  212-558-4000
Facsimile:  212-455-2502                      Facsimile:  212-558-3588

*Attorneys for Defendant RBS Securities Inc.*     Amanda F. Davidoff
                                              (davidoffa@sullcrom.com)
                                              Elizabeth A. Cassady
                                              (cassadye@sullcrom.com)
                                              SULLIVAN & CROMWELL LLP
                                              1700 New York Avenue, NW, Suite 700
                                              Washington, DC  20006
                                              Telephone:  202-956-7500
                                              Facsimile:  202-956-6993

                                              *Attorneys for Defendants Nomura Holding*
                                              *America Inc., Nomura Asset Acceptance*
                                              *Corporation, Nomura Home Equity Loan, Inc.,*
                                              *Nomura Credit & Capital, Inc., Nomura*
                                              *Securities International, Inc., David Findlay,*
                                              *John McCarthy, John P. Graham, Nathan*
                                              *Gorin, and N. Dante LaRocca*

-31-

**Appendix A**

| Security | Disclosures Concerning How the Loans "Were Originated"[1] |
|---|---|
| Ex. 19 (2005-AR6 Prospectus Supplement) | • "The Mortgage Loans have been purchased by the seller from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and **were originated generally** in accordance with the underwriting criteria described in this section." NOM-FHFA_04811894. |
| Ex. 20 (2006-FM1 Prospectus Supplement) | • "All of the mortgage loans **were originated** or acquired by Fremont, generally in accordance with the underwriting criteria described in this section." NOM-FHFA_04729543. |
| Ex. 21 (2006-FM2 Prospectus Supplement) | • "All of the mortgage loans **were originated** or acquired by Fremont, generally in accordance with the underwriting criteria described in this section." NOM-FHFA_04638395.<br><br>• "All of the Mortgage Loans have been purchased by the sponsor from the Originator and **were originated generally** in accordance with the underwriting criteria described in this section." NOM-FHFA_04638399. |
| Ex. 22 (2006-HE3 Prospectus Supplement) | • "The Mortgage Loans **were generally originated** by People's Choice Home Loan, Inc., a Wyoming corporation ('PCHLI'), in accordance with the underwriting criteria described in this section and detailed in the print and on-line manuals that our underwriters use in making their credit decisions ('Underwriting Guidelines'); provided however that certain of the more seasoned Mortgage Loans included in the Mortgage Pool may have been originated under underwriting guidelines which are substantially similar to the Underwriting Guidelines described in this section but may have differences with respect to pricing, FICO scores and other program attributes." NOM-FHFA_04620965.<br><br>• "All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and **were originated generally** in accordance with the underwriting criteria described in this section (with the exception of the Mortgage Loans originated by People's Choice Home Loan, Inc. which were originated in accordance with the People's Choice Home Loan, Inc. Underwriting Standards described above)." NOM-FHFA_04620972. |

---

[1] Emphasis supplied.

| Security | Disclosures Concerning How the Loans "Were Originated"[1] |
|---|---|
| Ex. 23 (2007-1 Prospectus Supplement) | • "All of the mortgage loans have been originated either under FNBN's "full" or "alternative" underwriting guidelines (i.e., the underwriting guidelines applicable to the mortgage loans typically are less stringent than the underwriting guidelines established by Fannie Mae or Freddie Mac primarily with respect to the income and/or asset documentation which borrower is required to provide)."  NOM-FHFA_05142021.<br><br>• "All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and **were originated generally** in accordance with the underwriting criteria described in this section."  NOM-FHFA_05142025. |
| Ex. 24 (2007-2 Prospectus Supplement) | • "All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and **were originated generally** in accordance with the underwriting criteria described in this section."  NOM-FHFA_05591415. |
| Ex. 25 (2007-3 Prospectus Supplement) | • "The information set forth in the following paragraphs of this section contains a brief description of the underwriting guidelines used for Mortgage Loans originated by ResMAE Mortgage Corporation ("ResMAE")."  NOM-FHFA_04732708.<br><br>• "All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and **were originated generally** in accordance with the underwriting criteria described in this section." NOM-FHFA_04732712. |

Appendix B

| Security | Disclosures Concerning Loan-to-Value Ratio[2] |
|---|---|
| Ex. 19 (2005-AR6 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in **an appraisal obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in **an appraisal obtained at the time of origination of the Refinance Loan**. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market."  NOM-FHFA_04811976.<br><br>• "Your prospectus supplement will contain information, as of the dates specified in that prospectus supplement and to the extent then applicable and specifically known to the depositor, with respect to the mortgage loans, including . . . the range of the Loan-to-Value Ratios **at origination of the mortgage loans**."  NOM-FHFA_04811976.<br><br>• "Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect **on the dates of origination** of the related Mortgage Loans."  NOM-FHFA_04811896. |

---

[2]   Emphasis supplied.

| Security | Disclosures Concerning Loan-to-Value Ratio[2] |
|---|---|
| Ex. 20 (2006-FM1 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in **an appraisal obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in **an appraisal obtained at the time of origination of the Refinance Loan**. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market." NOM-FHFA_04729664-665.<br><br>• "Your prospectus supplement will contain information, as of the dates specified in that prospectus supplement and to the extent then applicable and specifically known to the depositor, with respect to the loans, including . . . the range of the Loan-to-Value Ratios **at origination of the loans**." NOM-FHFA_04729665. |
| Ex. 21 (2006-FM2 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in **an appraisal obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in **an appraisal obtained at the time of origination** of the Refinance Loan. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market." NOM-FHFA_04638543.<br><br>• "Your prospectus supplement will contain information, as of the dates specified in that prospectus supplement and to the extent then applicable and specifically known to the depositor, with respect to the loans, including . . . the range of the Loan-to-Value Ratios **at origination of the loans**." NOM-FHFA_04638543.<br><br>• "Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the **dates of origination** of the related Mortgage Loans." NOM-FHFA_04638402. |

| Security | Disclosures Concerning Loan-to-Value Ratio[2] |
|---|---|
| Ex. 22 (2006-HE3 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in **an appraisal obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in **an appraisal obtained at the time of origination of the Refinance Loan**. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market." NOM-FHFA_04621112.<br><br>• "Your prospectus supplement will contain information, as of the dates specified in that prospectus supplement and to the extent then applicable and specifically known to the depositor, with respect to the loans, including . . . the range of the Loan-to-Value Ratios **at origination of the loans**." NOM-FHFA_04621112.<br><br>• "Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the **dates of origination** of the related Mortgage Loans." NOM-FHFA_04620974. |

| Security | Disclosures Concerning Loan-to-Value Ratio[2] |
|---|---|
| Ex. 23 (2007-1 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in **an appraisal obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in **an appraisal obtained at the time of origination of the Refinance Loan**. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market." NOM-FHFA_05142213.<br><br>• "Your prospectus supplement will contain information, as of the dates specified in that prospectus supplement and to the extent then applicable and specifically known to the depositor, with respect to the loans, including . . . the range of the Loan-to-Value Ratios **at origination of the loans**." NOM-FHFA_05142213.<br><br>• "Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the **dates of origination** of the related Mortgage Loans." NOM-FHFA_05142028 |

| Security | Disclosures Concerning Loan-to-Value Ratio[2] |
|---|---|
| Ex. 24 (2007-2 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in **an appraisal obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in **an appraisal obtained at the time of origination of the Refinance Loan**. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market." NOM-FHFA_05591579.<br><br>• "Your prospectus supplement will contain information, as of the dates specified in that prospectus supplement and to the extent then applicable and specifically known to the depositor, with respect to the loans, including … the range of the Loan-to-Value Ratios **at origination of the loans**." NOM-FHFA_05591579.<br><br>• "Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on **the dates of origination of the related Mortgage Loans**." NOM-FHFA_05591417. |

| Security | Disclosures Concerning Loan-to-Value Ratio[2] |
|---|---|
| Ex. 25 (2007-3 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in **an appraisal obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in **an appraisal obtained at the time of origination of the Refinance Loan**. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market." NOM-FHFA_04732866.<br><br>• "Your prospectus supplement will contain information, as of the dates specified in that prospectus supplement and to the extent then applicable and specifically known to the depositor, with respect to the loans, including . . . the range of the Loan-to-Value Ratios **at origination of the loans**." NOM-FHFA_04732866.<br><br>• "Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on **the dates of origination of the related Mortgage Loans**." NOM-FHFA_04732714. |

**Appendix C**

| Security | Collateral Tables |
|---|---|
| Ex. 19 (2005-AR6 Prospectus Supplement) | **Original Loan-to-Value Ratios of the Group III Mortgage Loans** <br><br> See table below. <br><br> NOM-FHFA_04811861 <br><br> **Occupancy Status of the Group III Mortgage Loans** <br><br> See table below. <br><br> NOM-FHFA_04811862 |

**Original Loan-to-Value Ratios of the Group III Mortgage Loans**

| Range of Original LTV (%) | Number of Mortgage Loans | Cut-off Date Principal Balance | Percentage by Aggregate Cut-off Date Principal Balances |
|---|---|---|---|
| Less than or equal to 50.00 ...... | 14 | $ 2,616,832.58 | 3.28% |
| 50.01 - 55.00 .......................... | 4 | 1,114,999.42 | 1.40 |
| 55.01 - 60.00 .......................... | 8 | 1,785,062.12 | 2.23 |
| 60.01 - 65.00 .......................... | 26 | 5,398,688.62 | 6.76 |
| 65.01 - 70.00 .......................... | 72 | 14,340,279.73 | 17.95 |
| 70.01 - 75.00 .......................... | 19 | 4,448,035.25 | 5.57 |
| 75.01 - 80.00 .......................... | 229 | 49,449,086.29 | 61.90 |
| 80.01 - 85.00 .......................... | 1 | 324,250.00 | 0.41 |
| 85.01 - 90.00 .......................... | 2 | 326,699.11 | 0.41 |
| 90.01 - 95.00 .......................... | 1 | 85,975.00 | 0.11 |
| Total:.................................... | 376 | $ 79,889,908.12 | 100.00% |

Minimum: 16.00
Maximum: 95.00
Weighted Average: 74.68

NOM-FHFA_04811861

**Occupancy Status of the Group III Mortgage Loans**

| Occupancy Status | Number of Mortgage Loans | Cut-off Date Principal Balance | Percentage by Aggregate Cut-off Date Principal Balances |
|---|---|---|---|
| Owner-Occupied ...................... | 188 | $ 45,212,780.49 | 56.59% |
| Investor ................................. | 155 | 27,739,774.40 | 34.72 |
| Second Home ........................... | 33 | 6,937,353.23 | 8.68 |
| Total:.................................... | 376 | $ 79,889,908.12 | 100.00% |

NOM-FHFA_04811862

| Security | Collateral Tables | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ex. 20 (2006-FM1 Prospectus Supplement) | Original Loan-to-Value Ratio of the Group I Mortgage Loans | | | | | | | | |

**Original Loan-to-Value Ratio of the Group I Mortgage Loans**

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Gross Coupon (%) | FICO | LTV (%) | Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| <= 50.00 ........................ | 24 | $ 3,910,839 | 0.96% | 7.875 | 627 | 42.26 | 356 | 7.63 |
| 50.01 - 55.00 ................ | 8 | 1,762,850 | 0.43 | 7.728 | 586 | 53.10 | 357 | - |
| 55.01 - 60.00 ................ | 28 | 5,419,996 | 1.34 | 7.827 | 570 | 58.13 | 356 | 4.65 |
| 60.01 - 65.00 ................ | 94 | 16,769,078 | 4.14 | 8.463 | 571 | 63.61 | 356 | 42.78 |
| 65.01 - 70.00 ................ | 122 | 23,919,568 | 5.90 | 8.206 | 576 | 68.61 | 355 | 40.45 |
| 70.01 - 75.00 ................ | 169 | 34,485,615 | 8.51 | 7.968 | 576 | 74.02 | 356 | 38.91 |
| 75.01 - 80.00 ................ | 947 | 169,164,042 | 41.72 | 7.237 | 624 | 79.80 | 356 | 58.09 |
| 80.01 - 85.00 ................ | 190 | 37,986,798 | 9.37 | 7.507 | 599 | 84.71 | 357 | 59.09 |
| 85.01 - 90.00 ................ | 472 | 82,740,763 | 20.41 | 7.661 | 622 | 89.77 | 356 | 66.25 |
| 90.01 - 95.00 ................ | 75 | 7,289,811 | 1.80 | 8.427 | 632 | 94.72 | 341 | 41.70 |
| 95.01 - 100.00 ............... | 403 | 21,986,828 | 5.42 | 9.766 | 641 | 99.97 | 347 | 59.06 |
| Total:............................ | 2,532 | $405,436,188 | 100.00% | 7.694 | 612 | 81.07 | 355 | 54.85 |

NOM-FHFA_04729514

**Occupancy Status of the Group I Mortgage Loans**

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Gross Coupon (%) | FICO | LTV (%) | Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied .......... | 2,248 | $359,350,173 | 88.63% | 7.658 | 609 | 80.84 | 355 | 54.85 |
| Investor........................ | 260 | 41,773,681 | 10.30 | 8.028 | 643 | 82.91 | 355 | 54.54 |
| 2nd Home..................... | 24 | 4,312,334 | 1.06 | 7.469 | 638 | 82.64 | 355 | 57.68 |
| Total:............................ | 2,532 | $405,436,188 | 100.00% | 7.694 | 612 | 81.07 | 355 | 54.85 |

NOM-FHFA_04729516

| Security | Collateral Tables |
|---|---|
| **Ex. 21 (2006-FM2 Prospectus Supplement)** | |

**Original Loan-to-Value Ratio of the Group I Mortgage Loans**

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00... | 100 | $ 15,620,836 | 2.31% | 8.878% | 585 | 40.49% | 354 | 57.24% |
| 50.01 - 55.00 | 40 | 7,755,893 | 1.15 | 8.143 | 609 | 53.08 | 355 | 65.88 |
| 55.01 - 60.00 | 76 | 14,401,288 | 2.13 | 8.806 | 577 | 57.66 | 355 | 48.05 |
| 60.01 - 65.00 | 122 | 24,549,828 | 3.62 | 8.978 | 576 | 63.55 | 355 | 47.30 |
| 65.01 - 70.00 | 157 | 32,313,906 | 4.77 | 8.828 | 579 | 69.12 | 355 | 49.30 |
| 70.01 - 75.00 | 212 | 44,141,324 | 6.52 | 8.734 | 577 | 74.06 | 355 | 54.88 |
| 75.01 - 80.00 | 1,531 | 324,418,693 | 47.90 | 8.134 | 633 | 79.85 | 356 | 51.15 |
| 80.01 - 85.00 | 221 | 48,119,274 | 7.11 | 8.291 | 607 | 84.65 | 355 | 73.49 |
| 85.01 - 90.00 | 387 | 78,315,654 | 11.56 | 8.535 | 619 | 89.70 | 355 | 79.10 |
| 90.01 - 95.00 | 127 | 23,093,603 | 3.41 | 8.608 | 630 | 94.67 | 354 | 76.62 |
| 95.01 - 100.00 | 918 | 64,507,394 | 9.53 | 10.734 | 650 | 99.90 | 350 | 53.87 |
| Total/Weighted Average: ...... | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

NOM-FHFA_04638363

**Occupancy Status of the Group I Mortgage Loans**

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied | 3,628 | $ 630,190,865 | 93.05% | 8.569% | 619 | 80.72% | 355 | 56.90% |
| Investor | 247 | 43,162,888 | 6.37 | 8.932 | 635 | 78.51 | 355 | 64.63 |
| 2nd Home | 16 | 3,883,941 | 0.57 | 8.099 | 637 | 80.99 | 355 | 49.95 |
| Total/Weighted Average: ...... | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

NOM-FHFA_04638365

| Security | Collateral Tables |
|---|---|
| Ex. 22 (2006-HE3 Prospectus Supplement) | *(see tables below)* |

**Original Loan-to-Value Ratio of the Group I Mortgage Loans**

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00 | 151 | $ 23,456,912 | 4.00% | 7.652% | 601 | 40.87% | 344 | 57.73% |
| 50.01 - 55.00 | 66 | 10,590,062 | 1.81 | 7.706 | 593 | 53.07 | 353 | 58.19 |
| 55.01 - 60.00 | 79 | 14,285,888 | 2.44 | 7.790 | 590 | 58.09 | 352 | 60.50 |
| 60.01 - 65.00 | 133 | 24,887,471 | 4.25 | 7.941 | 595 | 62.87 | 353 | 60.59 |
| 65.01 - 70.00 | 236 | 44,718,010 | 7.63 | 7.893 | 594 | 68.44 | 354 | 50.17 |
| 70.01 - 75.00 | 255 | 47,800,004 | 8.15 | 8.046 | 591 | 73.81 | 353 | 53.45 |
| 75.01 - 80.00 | 1,053 | 179,012,261 | 30.54 | 7.972 | 618 | 79.60 | 354 | 54.95 |
| 80.01 - 85.00 | 504 | 88,281,419 | 15.06 | 8.391 | 594 | 84.26 | 355 | 60.39 |
| 85.01 - 90.00 | 585 | 99,331,246 | 16.94 | 8.661 | 608 | 89.58 | 354 | 60.68 |
| 90.01 - 95.00 | 187 | 31,338,148 | 5.35 | 8.620 | 623 | 94.39 | 350 | 76.69 |
| 95.01 - 100.00 | 369 | 22,547,726 | 3.85 | 10.158 | 642 | 99.85 | 286 | 58.84 |
| Total/Weighted Average: .. | 3,618 | $ 586,249,148 | 100.00% | 8.247% | 607 | 78.97% | 351 | 57.69% |

NOM-FHFA_04620931

**Occupancy Status of the Group I Mortgage Loans**

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied | 3,239 | $ 525,220,634 | 89.59% | 8.209% | 602 | 78.72% | 350 | 59.10% |
| Investor | 335 | 51,723,077 | 8.82 | 8.591 | 649 | 81.52 | 354 | 47.50 |
| 2nd Home | 44 | 9,305,436 | 1.59 | 8.503 | 627 | 79.36 | 353 | 34.55 |
| Total/Weighted Average: .. | 3,618 | $ 586,249,148 | 100.00% | 8.247% | 607 | 78.97% | 351 | 57.69% |

NOM-FHFA_04620933

| Security | Collateral Tables |
|---|---|
| **Ex. 23 (2007-1 Prospectus Supplement)** | **Original Loan-to-Value Ratios of the Group II Mortgage Loans** |

**Original Loan-to-Value Ratios of the Group II Mortgage Loans**

| Original Loan-to-Value Ratios (%) | Percentage of Pool by Principal Balance | Number of Mortgage Loans | Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Non-zero Weighted Average FICO | Average Remaining Principal Balance | Weighted Average Original LTV (%) | Weighted Average Combined LTV (%) | Lo Doc* (%) | Investor Properties (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00 | 1.69% | 32 | $ 10,126,536.24 | 6.561% | 719 | $ 316,454.26 | 41.42% | 42.90% | 60.10% | 14.08% |
| 50.01 - 55.00 | 1.36 | 13 | 8,184,214.67 | 6.582 | 704 | 629,554.97 | 53.34 | 59.59 | 29.61 | 12.07 |
| 55.01 - 60.00 | 2.15 | 35 | 12,876,875.00 | 6.725 | 703 | 367,910.66 | 58.31 | 63.15 | 64.65 | 13.87 |
| 60.01 - 65.00 | 3.48 | 51 | 20,883,408.66 | 6.769 | 716 | 409,478.60 | 63.80 | 72.22 | 60.91 | 31.35 |
| 65.01 - 70.00 | 3.93 | 67 | 23,609,944.73 | 6.910 | 703 | 352,387.23 | 69.33 | 80.28 | 38.16 | 29.82 |
| 70.01 - 75.00 | 13.31 | 160 | 79,888,233.72 | 7.240 | 702 | 499,301.46 | 74.28 | 89.78 | 34.87 | 16.10 |
| 75.01 - 80.00 | 68.31 | 1243 | 409,809,347.83 | 7.257 | 703 | 329,742.03 | 79.87 | 95.18 | 45.16 | 17.18 |
| 80.01 - 85.00 | 0.39 | 10 | 2,361,364.00 | 7.363 | 695 | 236,136.40 | 83.77 | 83.77 | 100.00 | 25.09 |
| 85.01 - 90.00 | 1.93 | 50 | 11,562,295.00 | 7.953 | 701 | 231,245.90 | 89.64 | 89.64 | 88.75 | 43.79 |
| 90.01 - 95.00 | 2.12 | 51 | 12,729,014.64 | 7.726 | 709 | 249,588.52 | 94.89 | 94.89 | 99.39 | 22.67 |
| 95.01 - 100.00 | 1.32 | 39 | 7,947,795.31 | 7.779 | 723 | 203,776.80 | 99.86 | 99.86 | 68.23 | 22.17 |
| Total/Weighted Average: | 100.00% | 1,751 | $ 600,038,527.80 | 7.723% | 704 | $ 342,683.34 | 77.47% | 90.93% | 47.03% | 18.56% |

Minimum: 18.69%
Maximum: 100.00%
Weighted Average: 77.47%

**NOM-FHFA_05141990**

**Occupancy Status of the Group II Mortgage Loans**

| Occupancy Status | Percentage of Pool by Principal Balance | Number of Mortgage Loans | Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Non-zero Weighted Average FICO | Average Remaining Principal Balance | Weighted Average Original LTV (%) | Weighted Average Combined LTV (%) | Lo Doc* (%) | Investor Properties (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 72.12% | 1,093 | $ 432,721,434.86 | 7.069% | 697 | $ 395,902.50 | 77.41% | 91.12% | 48.16% | 0.00% |
| Second Home | 9.32 | 169 | 55,935,071.19 | 7.554 | 720 | 330,976.75 | 77.23 | 91.44 | 64.74 | 0.00 |
| Investor | 18.56 | 489 | 111,382,021.75 | 7.652 | 722 | 227,775.10 | 77.81 | 89.03 | 45.44 | 100.00 |
| **Total/Weighted Average:** | 100.00% | 1,751 | $ 600,038,527.80 | 7.723% | 704 | $ 342,683.34 | 77.47% | 90.93% | 47.03% | 18.56% |

**NOM-FHFA_05141991**

| Security | Collateral Tables | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ex. 24<br>(2007-2<br>Prospectus<br>Supplement) | **Original Loan-to-Value Ratio of the Group I Mortgage Loans** | | | | | | | | |

**Original Loan-to-Value Ratio of the Group I Mortgage Loans**

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| 50.00 | 77 | $ 11,043,957 | 2.29% | 7.872% | 600 | 41.08% | 349 | 50.89% |
| 50.01 - 55.00 | 40 | 6,894,065 | 1.43 | 7.880 | 598 | 52.74 | 352 | 65.87 |
| 55.01 - 60.00 | 50 | 8,447,620 | 1.75 | 7.940 | 597 | 57.69 | 352 | 42.95 |
| 60.01 - 65.00 | 68 | 12,604,219 | 2.62 | 8.124 | 589 | 63.40 | 355 | 48.60 |
| 65.01 - 70.00 | 127 | 23,098,329 | 4.80 | 8.319 | 593 | 68.55 | 355 | 52.71 |
| 70.01 - 75.00 | 196 | 33,473,371 | 6.95 | 8.317 | 594 | 74.01 | 355 | 54.77 |
| 75.01 - 80.00 | 1,026 | 177,003,174 | 36.75 | 7.869 | 632 | 79.69 | 355 | 61.35 |
| 80.01 - 85.00 | 288 | 52,700,824 | 10.94 | 8.555 | 594 | 84.49 | 355 | 62.61 |
| 85.01 - 90.00 | 393 | 72,025,037 | 14.95 | 8.698 | 623 | 89.63 | 355 | 63.31 |
| 90.01 - 95.00 | 215 | 34,326,666 | 7.13 | 8.593 | 618 | 94.70 | 355 | 81.76 |
| 95.01 - 100.00 | 521 | 50,056,766 | 10.39 | 9.107 | 656 | 99.89 | 351 | 84.00 |
| Total/Weighted Average: | 3,001 | $ 481,674,027 | 100.00% | 8.309% | 621 | 81.86% | 354 | 63.82% |

NOM-FHFA_05591375

**Occupancy Status of the Group I Mortgage Loans**

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied | 2,731 | $ 437,629,409 | 90.86% | 8.267% | 618 | 81.87% | 355 | 66.15% |
| Investor | 228 | 36,248,500 | 7.53 | 8.735 | 647 | 80.93 | 352 | 42.58 |
| 2nd Home | 42 | 7,796,118 | 1.62 | 8.680 | 621 | 85.50 | 351 | 35.77 |
| Total/Weighted Average: | 3,001 | $ 481,674,027 | 100.00% | 8.309% | 621 | 81.86% | 351 | 63.89% |

NOM-FHFA_05591378

| Security | Collateral Tables | | | | | | | |
|---|---|---|---|---|---|---|---|---|

**Original Loan-to-Value Ratio of the Group I Mortgage Loans**

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00 | 40 | $ 7,160,045 | 2.14% | 7.526% | 633 | 41.52% | 352 | 48.56% |
| 50.01 - 55.00 | 24 | 5,579,376 | 1.67 | 7.411 | 633 | 52.76 | 355 | 53.56 |
| 55.01 - 60.00 | 24 | 5,959,563 | 1.78 | 7.823 | 607 | 58.14 | 355 | 28.26 |
| 60.01 - 65.00 | 49 | 12,846,378 | 3.84 | 7.724 | 599 | 63.54 | 355 | 46.46 |
| 65.01 - 70.00 | 43 | 10,465,703 | 3.13 | 8.105 | 593 | 68.56 | 354 | 37.00 |
| 70.01 - 75.00 | 85 | 23,591,021 | 7.06 | 8.027 | 600 | 73.83 | 355 | 48.16 |
| 75.01 - 80.00 | 844 | 132,731,903 | 39.69 | 8.129 | 628 | 79.82 | 355 | 62.78 |
| 80.01 - 85.00 | 100 | 25,339,126 | 7.58 | 8.500 | 605 | 84.52 | 352 | 45.21 |
| 85.01 - 90.00 | 324 | 68,313,494 | 20.43 | 8.433 | 618 | 89.78 | 355 | 61.78 |
| 90.01 - 95.00 | 147 | 26,361,291 | 7.88 | 8.773 | 630 | 94.36 | 353 | 63.21 |
| 95.01 - 100.00 | 216 | 16,038,683 | 4.80 | 9.794 | 646 | 99.95 | 297 | 76.11 |
| Total/Weighted Average: | 1,896 | $ 334,386,584 | 100.00% | 8.296% | 621 | 81.27% | 352 | 58.38% |

NOM-FHFA_04732672

**Occupancy Status of the Group I Mortgage Loans**

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied | 1,707 | $ 298,292,893 | 89.21% | 8.270% | 616 | 81.07% | 351 | 58.64% |
| Investor | 139 | 25,765,048 | 7.71 | 8.593 | 654 | 81.66 | 355 | 64.43 |
| 2nd Home | 50 | 10,328,643 | 3.09 | 8.306 | 663 | 85.83 | 355 | 35.79 |
| Total/Weighted Average: | 1,896 | $ 334,386,584 | 100.00% | 8.296% | 621 | 81.27% | 352 | 58.38% |

NOM-FHFA_04732674

Security column: Ex. 25 (2007-3 Prospectus Supplement)

Appendix D

| Security | Disclosures Concerning Cut-Off Date |
|---|---|
| Ex. 19 (2005-AR6 Prospectus Supplement) | • "Cut-off Date: November 1, 2005."  NOM-FHFA_04811807.<br><br>• "Closing Date: On or about November 30, 2005."  NOM-FHFA_04811807.<br><br>• "As of the Cut-off Date, the Mortgage Loans will have the characteristics as set forth in the table on Page S-8 of this prospectus supplement."  NOM-FHFA_04811808.<br><br>• "References in this prospectus supplement to the principal balance of any mortgage loan shall be deemed references to the scheduled principal balance thereof. The pool of mortgage loans (the 'Mortgage Pool') will consist of 2,212 conventional, one- to four-family adjustable-rate mortgage loans (the 'Mortgage Loans') secured by first liens on residential real properties (the 'Mortgaged Properties') and having an aggregate principal balance as of the Cut-off Date of approximately $655,477,464 after application of scheduled payments due on or before the Cut-off Date, whether or not received, and subject to a permitted variance of plus or minus 10%  The Mortgage Loans have original terms to maturity of not greater than 30 years."  NOM-FHFA_04811833. |

| Security | Disclosures Concerning Cut-Off Date |
|---|---|
| Ex. 20 (2006-FM1 Prospectus Supplement) | • "Cut-off Date: January 1, 2006." NOM-FHFA_04729479.<br><br>• "Closing Date: On or about January 30, 2006." NOM-FHFA_04729479.<br><br>• "As of the Cut-off Date, the Mortgage Loans will have the characteristics as set forth in the table on page S-10 of this prospectus supplement." NOM-FHFA_04729480.<br><br>• "References in this prospectus supplement to the principal balance of any mortgage loan shall be deemed references to the scheduled principal balance thereof. The pool of mortgage loans (the 'Mortgage Pool') will consist of 4,448 conventional, one- to four-family fixed rate and adjustable-rate mortgage loans (the 'Mortgage Loans') secured by first liens and second liens on residential real properties (the 'Mortgaged Properties') and having an aggregate principal balance as of the Cut-off Date of approximately $933,771,934 after application of scheduled payments due on or before the Cut-off Date, whether or not received, and subject to a permitted variance of plus or minus 10% The Mortgage Loans have original terms to maturity of not greater than 3 0 years. The Mortgage Loans have been divided into two loan groups, designated as the 'Group I Mortgage Loans' and the 'Group II Mortgage Loans'. The Group I Mortgage Loans consist of 2,532 mortgage loans having an aggregate principal balance as of the Cut-off Date of approximately $405,436,188, after application of scheduled payments due on or before the Cut-off Date whether or not received, and subject to a permitted variance of plus or minus 10% The Group II Mortgage Loans consist of 1,916 mortgage loans having an aggregate principal balance as of the Cut-off Date of approximately $528,335,746, after application of scheduled payments due on or before the Cut-off Date whether or not received, and subject to a permitted variance of plus or minus 10% The Group I Mortgage Loans are comprised of fixed-rate Mortgage Loans and adjustable-rate Mortgage Loans with an initial fixed rate period of two years, three years or five years and the Group II Mortgage Loans are comprised of fixed-rate Mortgage Loans and adjustable-rate Mortgage Loans with an initial fixed rate period of two years, three years or five years." NOM-FHFA_04729508. |

| Security | Disclosures Concerning Cut-Off Date |
|---|---|
| Ex. 21 (2006-FM2 Prospectus Supplement) | <ul><li>"Cut-off Date: October 1, 2006."  NOM-FHFA_04638320.</li><li>"Closing Date: On or about October 31, 2006."  NOM-FHFA_04638320.</li><li>"The characteristics of the Mortgage Loans as described in this prospectus supplement may differ from the final pool as of the Closing Date due, among other things, to the possibility that certain Mortgage Loans may become delinquent or default or may be removed or substituted and that similar or different mortgage loans may be added to the pool prior to the Closing Date."  NOM-FHFA_04638321.</li><li>"As of the Cut-off Date, the Mortgage Loans will have the characteristics as set forth in the table on pages S-11, S-12 and S-13 of this prospectus supplement."  NOM-FHFA_04638321.</li><li>"We have provided the below information with respect to the conventional, one- to four-family, fixed-rate and adjustable-rate mortgage loans (the 'Mortgage Loans') secured by first liens and second liens on residential real properties that we expect to include in the pool of mortgage loans in the trust fund (the 'Mortgage Pool'). The Mortgage Loans have been divided into two loan groups, designated as the 'Group I Mortgage Loans' and the 'Group II Mortgage Loans'. Prior to the Closing Date, we may remove Mortgage Loans from the mortgage pool and we may substitute other mortgage loans for the mortgage loans we remove. The depositor believes that the information set forth in this prospectus supplement will be representative of the characteristics of the mortgage pool as it will be constituted at the time the certificates are issued, although the range of mortgage rates and maturities and other characteristics of the mortgage loans may vary. The characteristics of the mortgage loans as described in this prospectus supplement may differ from the final pool as of the closing date due, among other things, to the possibility that certain mortgage loans may become delinquent or default or may be removed or substituted and that similar or different mortgage loans may be added to the pool prior to the closing date. The actual mortgage loans included in the trust fund as of the Closing Date may vary from the mortgage loans as described in this prospectus supplement by up to plus or minus 5% as to any of the material characteristics described in this prospectus supplement. If, as of the closing date, any material pool characteristics differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement to this prospectus supplement or in a current report on Form 8-K. Unless we have otherwise indicated, the information we present below is expressed as of the Cut-off Date, which is October 1, 2006."  NOM-FHFA_04638356.</li></ul> |

-D-3-

| Security | Disclosures Concerning Cut-Off Date |
|---|---|
| Ex. 22 (2006-HE3 Prospectus Supplement) | • "Cut-off Date: August 1, 2006."  NOM-FHFA_04620890.<br><br>• "Closing Date: On or about August 31, 2006."  NOM-FHFA_04620890.<br><br>• "The characteristics of the Mortgage Loans as described in this prospectus supplement may differ from the final pool as of the closing date due, among other things, to the possibility that certain Mortgage Loans may become delinquent or default or may be removed or substituted and that similar or different mortgage loans may be added to the pool prior to the Closing Date."  NOM-FHFA_04620891.<br><br>• "As of the Cut-off Date, the Mortgage Loans will have the characteristics as set forth in the table on pages S-11, S-12 and S-13 of this prospectus supplement."  NOM-FHFA_04620891.<br><br>• "We have provided below information with respect to the conventional, one- to four-family, fixed-rate and adjustable-rate mortgage loans (the 'Mortgage Loans') secured by first liens and second liens on residential real properties that we expect to include in the pool of mortgage loans in the trust fund (the 'Mortgage Pool'). The Mortgage Loans have been divided into two loan groups, designated as the 'Group I Mortgage Loans' and the 'Group II Mortgage Loans'. Prior to the Closing Date, we may remove Mortgage Loans from the mortgage pool and we may substitute other mortgage loans for the mortgage loans we remove. The depositor believes that the information set forth in this prospectus supplement will be representative of the characteristics of the mortgage pool as it will be constituted at the time the certificates are issued, although the range of mortgage rates and maturities and other characteristics of the mortgage loans may vary. The characteristics of the mortgage loans as described in this prospectus supplement may differ from the final pool as of the closing date due, among other things, to the possibility that certain mortgage loans may become delinquent or default or may be removed or substituted and that similar or different mortgage loans may be added to the pool prior to the closing date. The actual mortgage loans included in the trust fund as of the Closing Date may vary from the mortgage loans as described in this prospectus supplement by up to plus or minus 5% as to any of the material characteristics described in this prospectus supplement. If, as of the closing date, any material pool characteristics differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement to this prospectus supplement or in a current report on Form 8-K. Unless we have otherwise indicated, the information we present below is expressed as of the Cut-off Date, which is August 1, 2006."  NOM-FHFA_04620924. |

| Security | Disclosures Concerning Cut-Off Date |
|---|---|
| Ex. 23 (2007-1 Prospectus Supplement) | • "Cut-off Date: January 1, 2007."  NOM-FHFA_05141919.<br><br>• "Closing Date: On or about January 31, 2007."  NOM-FHFA_05141919<br><br>• "As of the Cut-off Date, the Group I Mortgage and Group II Mortgage Loans will have the characteristics as set forth in the tables on pages S-20, S-21, S-22 and S-23 of this prospectus supplement."  NOM-FHFA_05141920.<br><br>• "References in this prospectus supplement to the principal balance of any mortgage loan shall be deemed references to the scheduled principal balance thereof. The pool of mortgage loans (the 'Mortgage Pool') will consist of 3,496 conventional, one- to four-family, fixed-rate and adjustable-rate mortgage loans (the 'Mortgage Loans') secured by first liens on residential real properties (the 'Mortgaged Properties') and having an aggregate principal balance as of the Cut-off Date of approximately $1,023,112,198 after application of scheduled payments due on or before the Cut-off Date, whether or not received, and subject to a permitted variance of plus or minus 5%  The Mortgage Loans have original terms to maturity of not greater than 40 years. The Mortgage Loans have been divided into two loan groups, designated as the 'Group I Mortgage Loans' and the 'Group II Mortgage Loans.'"  NOM-FHFA_05141971.<br><br>• "The Group I Mortgage Loans consist of 1,745 fixed-rate Mortgage Loans having an aggregate principal balance as of the Cut-off Date of approximately $423,073,670 after application of scheduled payments due on or before the Cut-off Date whether or not received, and subject to a permitted variance of plus or minus 5% "  NOM-FHFA_05141971. |

| Security | Disclosures Concerning Cut-Off Date |
|---|---|
| Ex. 24 (2007-2 Prospectus Supplement) | • "Cut-off Date: January 1, 2007." NOM-FHFA_05591330.<br><br>• "Closing Date: On or about January 31, 2007." NOM-FHFA_05591330.<br><br>• "The characteristics of the Mortgage Loans as described in this prospectus supplement may differ from the final pool as of the Closing Date due, among other things, to the possibility that certain Mortgage Loans may become delinquent or default or may be removed or substituted and that similar or different mortgage loans may be added to the pool prior to the Closing Date." NOM-FHFA_05591331.<br><br>• "As of the Cut-off Date, the Mortgage Loans will have the characteristics as set forth in the tables on pages S-13, S-14 and S-15 of this prospectus supplement." NOM-FHFA_05591331.<br><br>• "We have provided the below information with respect to the conventional, one- to four-family, fixed-rate and adjustable-rate mortgage loans (the 'Mortgage Loans') secured by first liens and second liens on residential real properties that we expect to include in the pool of mortgage loans in the trust fund (the 'Mortgage Pool'). The Mortgage Loans have been divided into two loan groups, designated as the 'Group I Mortgage Loans' and the 'Group II Mortgage Loans'. Prior to the Closing Date, we may remove Mortgage Loans from the mortgage pool and we may substitute other mortgage loans for the mortgage loans we remove. The depositor believes that the information set forth in this prospectus supplement will be representative of the characteristics of the Mortgage Pool as it will be constituted at the time the certificates are issued, although the range of mortgage rates and maturities and other characteristics of the Mortgage Loans may vary. The characteristics of the Mortgage Loans as described in this prospectus supplement may differ from the final pool as of the Closing Date due, among other things, to the possibility that certain Mortgage Loans may become delinquent or default or may be removed or substituted and that similar or different mortgage loans may be added to the pool prior to the Closing Date. The actual mortgage loans included in the trust fund as of the Closing Date may vary from the mortgage loans as described in this prospectus supplement by up to plus or minus 5% as to any of the material characteristics described in this prospectus supplement. Unless we have otherwise indicated, the information we present below is expressed as of the Cut-off Date, which is January 1, 2007." NOM-FHFA_05591368. |

| Security | Disclosures Concerning Cut-Off Date |
|---|---|
| Ex. 25 (2007-3 Prospectus Supplement) | <ul><li>"Cut-off Date: April 1, 2007." NOM-FHFA_04732627.</li><li>"Closing Date: On or about April 30, 2007." NOM-FHFA_04732627.</li><li>"The characteristics of the Mortgage Loans as described in this prospectus supplement may differ from the final pool as of the Closing Date due, among other things, to the possibility that certain Mortgage Loans may become delinquent or default or may be removed or substituted and that similar or different mortgage loans may be added to the pool prior to the Closing Date." NOM-FHFA_04732628.</li><li>"As of the Cut-off Date, [the Mortgage Loans] will have the characteristics as set forth in the tables on pages S-12, S-13 and S-14 of this prospectus supplement." NOM-FHFA_04732629.</li><li>"We have provided the below information with respect to the conventional, one- to four-family, fixed-rate and adjustable-rate mortgage loans (the 'Mortgage Loans') secured by first liens and second liens on residential real properties that we expect to include in the pool of mortgage loans in the trust fund (the 'Mortgage Pool'). The Mortgage Loans have been divided into two loan groups, designated as the 'Group I Mortgage Loans' and the 'Group II Mortgage Loans'. Prior to the Closing Date, we may remove Mortgage Loans from the mortgage pool and we may substitute other mortgage loans for the mortgage loans we remove. The depositor believes that the information set forth in this prospectus supplement will be representative of the characteristics of the Mortgage Pool as it will be constituted at the time the certificates are issued, although the range of mortgage rates and maturities and other characteristics of the Mortgage Loans may vary. The characteristics of the Mortgage Loans as described in this prospectus supplement may differ from the final pool as of the Closing Date due, among other things, to the possibility that certain Mortgage Loans may become delinquent or default or may be removed or substituted and that similar or different mortgage loans may be added to the pool prior to the Closing Date. The actual mortgage loans included in the trust fund as of the Closing Date may vary from the mortgage loans as described in this prospectus supplement by up to plus or minus 5% as to any of the material characteristics described in this prospectus supplement. Unless we have otherwise indicated, the information we present below is expressed as of the Cut-off Date, which is April 1, 2007." NOM-FHFA_04732665.</li></ul> |