```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
 FEDERAL HOUSING FINANCE AGENCY,        :      11cv6201 (DLC)
                                        :
                   Plaintiff,           :      OPINION & ORDER
                                        :
         -v-                            :
                                        :
                                        :
 NOMURA HOLDING AMERICA, INC., et al.,  :
                                        :
                   Defendants.          :
                                        :
----------------------------------------X
```

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
Sascha N. Rand
Jonathan C. Eser
Michael R. McCray
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For defendants Nomura Holding America, Inc., Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca:

Amanda F. Davidoff
Elizabeth A. Cassady
David B. Tulchin
Steven L. Holley
Bruce E. Clark
Bradley A. Harsch
Katherine J. Stoller
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

1

For defendant RBS Securities Inc.:

Thomas C. Rice
David J. Woll
Andrew T. Frankel
Alan Turner
Craig S. Waldman
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

This Opinion address the defendants'[1] motion to exclude expert testimony to be offered at trial on behalf of plaintiff Federal Housing Finance Agency ("FHFA") by John A. Kilpatrick ("Kilpatrick"). FHFA intends Kilpatrick to testify regarding the falsity of the loan-to-value ("LTV") ratios recited in the defendants' offering documents ("Offering Documents"). For the following reasons, the motion is granted in part.

**BACKGROUND**

FHFA, acting as conservator for Fannie Mae and Freddie Mac (together, the "Government Sponsored Enterprises" or "GSEs"), filed suit on September 2, 2011 against the defendants, alleging that the Offering Documents used to market and sell seven

---

[1] Defendants are Nomura Holding America, Inc., Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca ("Nomura"); and RBS Securities Inc. ("RBS") (collectively, "defendants").

2

certificates ("Certificates") to the GSEs associated with residential mortgage-backed securities ("RMBS") contained material misstatements or omissions. RMBS are securities entitling the holder to income payments from pools of residential mortgage loans ("Supporting Loan Groups" or "SLGs") held by a trust.

FHFA brought these claims pursuant to Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), as well as Virginia's and the District of Columbia's Blue Sky laws. This lawsuit is the sole remaining action in a series of similar, coordinated actions litigated in this district by FHFA against banks and related individuals and entities to recover losses experienced by the GSEs from their purchases of RMBS. A description of the litigation and the types of misrepresentations at issue in each of these coordinated actions, including the instant case, can be found in FHFA v. Nomura Holding Am., Inc., --- F. Supp. 3d ---, 11cv6201 (DLC), 2014 WL 6462239, at *3-6, *16-17 (S.D.N.Y. Nov. 18, 2014) ("Nomura"), as well as FHFA v. UBS Americas, Inc., 858 F. Supp. 2d 306, 323-33 (S.D.N.Y. 2012) ("UBS"), aff'd, 712 F.3d 136 (2d Cir. 2013).

One category of alleged misrepresentations recited in the Offering Documents is the LTV ratios for the group of loans that supported a Certificate. For any given mortgage, the LTV ratio

3

is determined by computing the balance of the loan as a percentage of the value of the property that secures it, often determined on the basis of an appraisal. The higher the ratio, the less equity the homeowner has in the property. Mortgages with an LTV ratio in excess of 100% are "underwater."

Each Prospectus Supplement that defendants signed in connection with the offering of these Certificates included statistics regarding the distribution of LTV ratios across the underlying loan pool. For example, the Prospectus Supplement for Nomura Securitization 2006-FM2 reported that 57.5% of the loans (or 68.4% of the pool by principal balance) had an LTV ratio of 80% or lower.

FHFA alleged in its Amended Complaint that the LTV ratios in the Prospectus Supplements were "materially false and understated." In opposition to the motions to dismiss made in this coordinated litigation, FHFA agreed that appraisal values were statements of opinion since they depend on appraisers' estimates regarding the values of the underlying properties, which are not matters of objective fact. UBS, 858 F. Supp. 2d at 325. It argued, however, that the representations in the prospectus supplements were nonetheless actionable because the LTV ratios were both objectively false and disbelieved by the appraisers. According to FHFA, "appraisers did not actually believe that the homes underlying the LTV ratios were worth as

4

much as the appraisers reported they were worth." Id. at 326. Applying Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1991), and Fait v. Regions Fin. Corp., 655 F.3d 105 (2d Cir. 2011), the Court denied the motion to dismiss the claims premised on the misrepresentations of LTV ratios, and ruled that liability under the Securities Act could be imposed if FHFA demonstrated subjective falsity by the "originator of the opinion," that is the appraiser, as well as the objective falsity of the LTV representations.  UBS, 858 F. Supp. 2d at 325.[2]

On December 5, 2014, defendants moved to exclude Kilpatrick's expert testimony regarding LTV ratios, attaching Kilpatrick's May 15, 2014 expert report which identified itself as a report "concerning adherence of appraisals to appraisal standards and practice" ("Report").  The Report explains that FHFA's counsel retained Kilpatrick "to provide an expert opinion as to whether the original appraisals used to value the collateral and generate the LTV ratios associated with a sample

---

[2] In their motions to dismiss, defendants argued that FHFA had to plead and then prove that a particular defendant disbelieved the statement of opinion about LTV ratios. UBS, 858 F. Supp. 2d at 325.  FHFA resisted that argument, and asserted that the speaker whose disbelief must be plead and proven was, in this instance, the appraiser.  Id.  Because this litigation has been conducted within the framework of those competing arguments and this Court's ruling in UBS, FHFA's invitation in its opposition to this motion to allow it to prove the subjective falsity of the defendants instead of the appraisers is declined.

5

of the subject loans underlying the 7 supporting loan groups collateralizing the 7 securitizations at issue . . . were accurate and credible, as that term is used in the <u>Uniform Standards of Professional Appraisal Practice</u> ("USPAP")."

USPAP constitutes the generally accepted professional appraisal industry standards.  The Prospectus Supplement for Nomura Securitization 2006-FM2, for instance, represents that appraisals underlying LTVs "conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation."

USPAP first went into effect in 1989, and has been revised regularly since that time.  The appraisals at issue here were performed between 2003 and 2006, and the Report relies principally on the 2005 USPAP, in particular its Standards 1 and 2, as representing the recognized industry standards during the relevant time frame.

USPAP Standard 1 is entitled "Real Property Appraisal, Development," and provides as follows:  "In developing a real property appraisal, an appraiser must identify the problem to be solved and the scope of work necessary to solve the problem, and correctly complete research and analysis necessary to produce a <u>credible appraisal</u>." (Emphasis added.)  The Rules accompanying Standard 1 refer to credible appraisals and the credibility of the appraisal results.  Appraisal Found., <u>Uniform Standards of</u>

<u>Professional Appraisal Practice and Advisory Opinions</u> 17-22 (2006 ed.).

USPAP Standard 2 is entitled "Real Property Appraisal, Reporting," and provides as follows: "In reporting the results of a real property appraisal, an appraiser must communicate each analysis, opinion, and conclusion in a manner that is not misleading." The Rules accompanying Standard 2 dictate what an appraisal report must contain in order not to be "misleading." <u>Id.</u> at 23-31.

The 2006 USPAP defined the term "credible" as "worthy of belief." Its comment explains that "Credible assignment results require support, by relevant evidence and logic, to the degree necessary for the intended use." The definition was added to the 2006 USPAP because the concept of credibility is "central" to USPAP.[3] <u>See also</u> Appraisal Inst., <u>The Dictionary of Real Estate Appraisal</u> 49 (5th ed. 2010).

The Report explains that Kilpatrick performed two evaluations of appraisals. First, he evaluated the accuracy of the original appraised value of the properties that constitute

---

[3] As the Appraisal Standards Board explained in its published answers to the "most common questions" about the changes it made to the 2006 USPAP, the term "credible" had been a central concept in USPAP prior to 2006, and the definition added to the USPAP in 2006 "is not really different from common usage." Appraisal Found., <u>2006 USPAP and Scope of Work</u> 2, available at http://www.ncua.gov/Legal/Documents/Regulatory%20Alerts/RA2006-04Encl2.pdf.

7

the sample upon which this lawsuit is being litigated ("Sample"). FHFA's Sample from the SLGs for the 7 Certificates is composed of 796 loans, of which only 672 had sufficient information for inclusion in the evaluation. Kilpatrick adapted a retrospective automated valuation model (the "Greenfield AVM") to evaluate the appraisals for these Sample properties. He concluded that the appraisal values for 208 of those 672 properties were inflated.

Second, Kilpatrick developed a Credibility Assessment Model or CAM to assess the degree to which 205 of the 208 properties[4] "deviated from the appraisal standards established by USPAP and other established appraisal guidance and practice." He refers to the appraisals for the 205 properties as the Nomura Appraisals. Through a "conservative" application of the CAM, Kilpatrick concluded that "90.87% of the Nomura Appraisals could not, in my opinion, have been considered credible by a reasonable appraiser adhering to appraisal standards and practices applicable at the time the original appraisals were performed."

To help assess whether the results of the CAM analysis were reliable, Kilpatrick directed a third-party, Recovco Mortgage Management, LLC ("Recovco") to perform its standard collateral

---

[4] Kilpatrick explains that he "obtained factual data" for this analysis in only 205 of the 208 appraisals.

review of the Nomura Appraisals.  Such a review evaluates whether the original appraisal adhered to USPAP and standard appraisal practice.  The Recovco review found that 95.54% of the Nomura Appraisals were so weak that they lacked "credibility".

In another section of the Report, Kilpatrick collects materials which he contends reflect that "appraisers were under significant pressure to issue biased appraisals during the relevant time period."  He also reports that a number of appraisers who conducted the Nomura Appraisals "petitioned the Appraisal Subcommittee for relief from pressure related to bias."

This motion was fully submitted on December 29.  Since that date, FHFA has withdrawn its Section 11 Securities Act claims.  Accordingly, the remaining claims will be resolved in a bench trial due to begin on March 16, 2015.  The Pretrial Order, which will be accompanied by the direct testimony of the trial witnesses submitted through affidavit, is due February 20.

## DISCUSSION

Federal Rule of Evidence 702 grants an expert witness testimonial latitude unavailable to other witnesses, provided that (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the

9

principles and methods to the facts of the case." Fed.R.Evid. 702; Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993). "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007). The district court performs the role of gatekeeper -- ensuring that the proponent has made the necessary showing and that the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.

In all events, an expert must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance," because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (citation omitted); see id. at 587 (quoting Fed. R. Evid. 402) ("Relevant evidence is defined as that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"). Testimony that "will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," however, must be excluded. United States v. Lumpkin, 192 F.3d 280, 289 (2d

Cir. 1999) (citation omitted).  "The role of an expert is not to displace the [trier of fact] but rather to provide the groundwork to enable the [trier of fact] to make its own informed determination."  In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig., 725 F.3d 65, 114 (2d Cir. 2013) (citation omitted), cert. denied sub nom. Exxon Mobil Corp. v. City of New York, N.Y., 134 S. Ct. 1877 (2014).

In order to be admissible, a relevant expert opinion "requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."  Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir. 2006), aff'd on other grounds, 552 U.S. 312 (2008).  An explanation is necessary because "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony."  Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 255 (2d Cir. 2005) (citation omitted).

While a district court has "broad latitude" in deciding both "how to determine reliability" and in reaching "its ultimate reliability determination," it may not abandon its "gatekeeping function."  Williams, 506 F.3d at 160-61 (citation omitted).  "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence

11

that is connected to existing data only by the ipse dixit of the expert." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 157 (1999) (citation omitted).  Consequently, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

"[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213-14 (2d Cir. 2009) (citation omitted).  "Other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." Id. at 214 (citation omitted).  "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" does not itself require exclusion; exclusion is only warranted "if the flaw is large enough that the expert lacks good grounds for his or her conclusions." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002) (citation omitted).  This is because "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." Id. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence." Id. (quoting Daubert, 509 U.S. at 596).

The Daubert inquiry is "flexible" and "gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science . . . ." Id. It is "critical that an expert's analysis be reliable at every step," for "any step that renders the analysis unreliable" renders the expert's testimony inadmissible. Id. (citation omitted).

Defendants have moved to exclude Kilpatrick's opinions about the subjective beliefs of the appraisers, that certain appraisals were not "credible," about the CAM model and scores, and the Greenfield AVM. They also argue that Kilpatrick lacks the necessary qualifications to testify as an expert. Only the first two of these arguments require discussion here. The remaining arguments go the weight of the proffered testimony; they do not require exclusion.

I. Subjective Beliefs of Appraisers

The defendants move to exclude Kilpatrick's opinions regarding the credibility of the appraisers. That motion is granted.

In this case, it appears that none of the appraisers who were responsible for the Nomura Appraisals will be called as witnesses. Fact finders are routinely asked to determine the state of mind, intent, or subjective beliefs of an individual

13

who does not testify because she is unavailable, whether it be through death, exercise of Fifth Amendment rights, or some other reason. See, e.g., United States v. Perez, 387 F.3d 201, 204 (2d Cir. 2004) (without testifying, defendant convicted of crimes with scienter requirements); United States v. Rudaj, No. 04cr1110 (DLC), 2006 WL 1876664, at *6 (S.D.N.Y. July 5, 2006) and Colotti v. United States, No. 04cr1110-01, 2011 WL 6778475, at *8 (S.D.N.Y. Dec. 21, 2011) (defendant convicted of bank fraud, among other crimes, without testifying); Fed. R. Evid. 803(3) (permitting hearsay exception for "statement of the declarant's then-existing state of mind"). But, in making such a determination, the trier of fact must rely on the relevant direct and circumstantial evidence that sheds light on the individual's state of mind; she may not rely on an expert's assessment.

It is well established that "assessments of credibility are solely within the province of the jury." Olsen v. Stark Homes, Inc., 759 F.3d 140, 155 (2d Cir. 2014). See Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005); Lumpkin, 192 F.3d at 289 ("Fundamental to the role of juror as trier of fact is the task of assessing witness credibility."). Since the "credibility of witnesses is exclusively for the determination by the jury," it has been long established that "witnesses may not opine as to the credibility of the testimony of other

witnesses at the trial." United States v. Scop, 846 F.2d 135, 142 (2d Cir.), on reh'g, 856 F.2d 5 (2d Cir. 1988)(citation omitted). Thus, based on a trial record, fact finders are "free to believe all, some, or none of a witness's testimony." United States v. Norman, --- F.3d ---, 2015 WL 122013, at *7 (2d Cir. Jan. 9, 2015) (citation omitted).

These same principles will apply to the evaluation of the appraisers' state of mind. FHFA will apparently attempt to establish that at least some appraisers did not actually believe at the time that they submitted their appraisals that the appraisals accurately reflected the property values. But, while it may be able to accomplish this task through circumstantial evidence, it may not do so by proffering an opinion of its expert on the subjective beliefs of the appraisers.

Accordingly, passages such as the following are stricken from the Report, and FHFA may not elicit equivalent testimony from Kilpatrick during his direct testimony:

> "I conclude that it is highly doubtful whether a reasonable appraiser adhering to the appraisal standards and practices applicable during the relevant time period could have concluded that the original appraised values . . . ."  (Report at 3)

"I conclude that it was highly questionable whether a reasonable appraiser could have believed that the appraisal values . . . were credible . . . ." (Id. at 5)

"[I]n my opinion, no reasonable appraiser adhering to appraisal standards applicable at the time could believe the appraisal credible." (Id. at 41)

"[N]o reasonable appraiser adhering to the appraisal standards and practices applicable at the time could have believed the appraisals were credible." (Id. at 101)

FHFA argues that Kilpatrick is simply offering classic standard-of-care testimony about the degree to which certain Nomura Appraisals deviated from USPAP and applicable appraisal practice, and from which a fact finder may reasonably infer that an appraiser did not believe that the appraisal was accurate at the time it was made. FHFA is correct that Kilpatrick may opine about the degree to which the historically performed appraisals deviated from the standards established by USPAP. What the expert may not do, however, is take that analysis further and fashion an opinion about the appraisers' subjective state of mind. As Kilpatrick acknowledged during his deposition, he is not in a position to opine on the state of mind of any of the appraisers.

16

II. Credibility of Appraisals

The defendants also move to strike Kilpatrick's opinions regarding the credibility of certain appraisals. This motion is denied.

The term "credibility" is a defined term in USPAP. It reflects an objective assessment of an appraisal. It imposes on appraisers the obligation to support an appraisal by evidence and logic. Thus, credible appraisals are those that have complied with USPAP standards. Whether a particular appraisal does so comply is a classic subject for expert testimony.

The defendants contend that Kilpatrick's testimony about the credibility of appraisals is nothing more than an improper attempt to opine on the honesty of appraisers. They are wrong. Evidence of the extent to which the Nomura Appraisals conformed to industry standards is a distinct inquiry from the issue of an individual appraiser's belief and whether it was honestly held. While the former may provide circumstantial evidence regarding the latter, it is not inadmissible on that score.

**CONCLUSION**

Defendants' December 5, 2014 motion to strike John A. Kilpatrick's expert testimony regarding LTV ratios is granted in part. Kilpatrick's opinions regarding the subjective beliefs of appraisers are excluded. He will, however, be permitted to

17

offer opinions on the credibility of appraisals and the other matters challenged in this motion.

SO ORDERED:

Dated:    New York, New York
          January 28, 2015

```
                    _____
                         DENISE COTE
                    United States District Judge
```