UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                      :
 FEDERAL HOUSING FINANCE AGENCY,      :        11cv6201 (DLC)
                                      :
                 Plaintiff,           :        OPINION & ORDER
                                      :
        -v-                           :
                                      :
                                      :
 NOMURA HOLDING AMERICA, INC., et al.,:
                                      :
                 Defendants.          :
--------------------------------------X

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
Manisha M. Sheth
Deborah K. Brown
Jeffrey C. Miller
Zach Williams
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For defendants Nomura Holding America, Inc., Nomura Asset
Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities International, Inc., David
Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N.
Dante LaRocca:

David B. Tulchin
Steven L. Holley
Bruce E. Clark
Bradley A. Harsch
Katherine J. Stoller
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

Amanda F. Davidoff
Elizabeth A. Cassady
SULLIVAN & CROMWELL LLP

1700 New York Avenue NW, Suite 700
Washington, DC 20006

For defendant RBS Securities Inc.:

Thomas C. Rice
David J. Woll
Andrew T. Frankel
Alan Turner
Craig S. Waldman
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

The defendants[1] have moved to exclude some of the expert testimony which plaintiff Federal Housing Finance Agency ("FHFA") intends to present through Robert W. Hunter ("Hunter"). FHFA seeks to offer Hunter's testimony on several topics, including the extent to which mortgage loans underlying seven certificates ("Certificates") sold to Fannie Mae and Freddie Mac (together, the "Government Sponsored Enterprises" or "GSEs") were underwritten in compliance with the underwriting guidelines of the loans' originators ("Originators") or the criteria described in the offering documents for the Certificates ("Offering Documents").  In this motion, the defendants specifically complain that Hunter has created and then relied

---

[1] Defendants are Nomura Holding America, Inc., Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca ("Nomura"); and RBS Securities Inc. ("RBS") (collectively, "defendants").

upon what he describes as the minimum industry underwriting standards ("Minimum Standards") in rendering his opinion, instead of relying exclusively upon the Originators' guidelines.[2] For the following reasons, the motion to exclude is denied. Nonetheless, while Hunter may rely at trial on the Minimum Standards, he may only do so where his testimony is sufficiently linked by FHFA to the representations regarding underwriting in the Offering Documents.

BACKGROUND

FHFA, acting as conservator for the GSEs, filed suit on September 2, 2011 against the defendants, alleging that the Offering Documents used to market and sell the seven Certificates to the GSEs contained material misstatements or omissions. The Certificates were associated with residential mortgage-backed securities ("RMBS" or "Securitizations"). RMBS are securities entitling the holder to income payments from

---

[2] The defendants argue in a separate motion that the Prospectus Supplements for five of the seven Certificates did not actually represent that the loans originated by certain Originators -- those Originators that contributed fewer than 20% of the loans to a Securitization -- were originated in accordance with the Originators' underwriting guidelines. For the reasons that will be explained when that motion is addressed, this Court finds that each of the seven Supplements represents that the loans were originated generally in accordance with the underwriting guidelines of the loans' Originators.

pools of residential mortgage loans ("Supporting Loan Groups" or "SLGs") held by a trust.

FHFA brought these claims pursuant to Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), as well as Virginia's and the District of Columbia's Blue Sky laws.  This lawsuit is the sole remaining action in a series of similar, coordinated actions litigated in this district by FHFA against banks and related individuals and entities to recover losses experienced by the GSEs from their purchases of RMBS.  A description of the litigation and the types of misrepresentations at issue in each of these coordinated actions, including the instant case, can be found in FHFA v. Nomura Holding Am., Inc., --- F. Supp. 3d ---, 11cv6201 (DLC), 2014 WL 6462239, at *3-6, *16-17 (S.D.N.Y. Nov. 18, 2014) ("Nomura"), as well as FHFA v. UBS Americas, Inc., 858 F. Supp. 2d 306, 323-33 (S.D.N.Y. 2012) (DLC), aff'd, 712 F.3d 136 (2d Cir. 2013) ("UBS").

Defendants move to exclude testimony by Hunter that refers to or relies upon Minimum Standards, as described in his report of May 15, 2014 ("Report").  The Report explains that Hunter re-underwrote 723 of the 796 loans that form the sample upon which FHFA is litigating its claims in this lawsuit.[3]  From this re-

---

[3] Hunter did not have sufficient documentation to re-underwrite 73 of the 796 sample loans.

underwriting, Hunter concluded that "a majority" of the sample loans were not originally underwritten in accordance with the underwriting guidelines of the Originators.  The percentage of loans with underwriting defects and substantially increased credit risk varied among the seven SLGs, from a low of 50% to a high of 84%.  The percentage for the sample taken as a whole was 69%.

The Amended Complaint in this action asserts, <u>inter alia</u>, that defendants' Prospectus Supplements "contained material misstatements and omissions regarding compliance with underwriting guidelines."  Among other things, it asserts that Originators "systematically disregarded their respective underwriting guidelines," and that the Supplements contained "material misrepresentations of underwriting standards and of certain key characteristics of the mortgage loans."

As an example of representations concerning underwriting that were made in the Prospectus Supplements for the Certificates, the Prospectus Supplement for Nomura Securitization 2005-AR6 explained that the "Mortgage Loans have been purchased by the seller from various banks . . . and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."  That section of the Supplement, which ran for two and

a half pages, covered a number of issues.  Among other things,
it explained that the underwriting standards for the loans
"typically differ from, and are, . . . generally less stringent
than, the underwriting standards established by Fannie Mae or
Freddie Mac."  It added that, generally, borrowers had to
provide the original lender with "pertinent credit information",
and gave many examples of such information.  The Supplement also
described in some detail the next step in the origination
process.  It began that description by stating that "[b]ased on
the data provided in the application and certain verifications
(if required), a determination is made by the original lender
that the borrower's monthly income (if required to be stated)
will be sufficient to enable the borrower to meet their monthly
obligations . . . ."  The Supplement also explained the
requirement that mortgage insurance policies be obtained if the
loan-to-value ("LTV") ratio at origination exceeded 80%, and the
role of appraisals in underwriting.  It represented that all
appraisals conformed to the Uniform Standards of Professional
Appraisal Practice or USPAP.  Tables in the Supplement listed
aggregate characteristics of the loans within an SLG, including
the LTV ratio, owner-occupancy percentage, and weighted average
credit score.

      In most instances in the re-underwriting process, Hunter
and his team compared the documentation in a loan file to the

underwriting guidelines of the loan's Originator.  There were three situations, however, in which Hunter relied on his identified set of Minimum Standards to conduct the re-underwriting.

In the case of 24 loans, Hunter had "no applicable guidelines."[4]  In re-underwriting these loans, he relied upon the Minimum Standards.  He concluded that 15 of the 24 loans had substantially increased credit risk based on the failure to comply with the Minimum Standards.

Hunter relied on the Minimum Standards as well when the available guidelines from an Originator had an effective date more than 90 days earlier than the loan's origination date. When that was the case, Hunter used both the Originator's guidelines and the Minimum Standards.

Hunter also used the Minimum Standards in the re-underwriting process when the available underwriting guidelines from the Originator were, in Hunter's view, "silent regarding key credit characteristics" or characteristics that he considers "common and essential."

---

[4] FHFA's opposition to this motion appears to collapse Hunter's three categories into two by combining the first two categories listed above.  Therefore, it may be that there are 24 loans for which Hunter had no underwriting guidelines from the Originator or only a stale set of underwriting guidelines.

The use of the Minimum Standards affected, according to FHFA, the re-underwriting of 187 loans out of 723.[5]  They were not used for 536 of the sample loans.[6]

Hunter identifies fifty-nine characteristics as composing the minimum requirements across the industry for underwriting residential mortgage loans during the period of 2002 through 2007.  In identifying these characteristics, he relied upon his experience, consultation with other experts, a review of materials, and a comparison with the guidelines used by four originators who had substantial origination practices and who were "known to have had very lenient origination requirements" during the period.

## DISCUSSION

The defendants move to exclude Hunter's testimony about the Minimum Standards pursuant to Federal Rule of Evidence 702 and Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579 (1993), on the grounds that none of the Offering Documents made representations about compliance with minimum industry standards; that Hunter's methodology for developing the Minimum

---

[5] The defendants contend that Hunter relied on the Minimum Standards for his re-underwriting of 186 sample loans.

[6] FHFA contends that only 248 of Hunter's 1,998 findings of defects, or 12.4%, relate to his use of the Minimum Standards.

Standards was too unreliable and flawed; and that at least some of his Standards could not have been the "minimum" of any industry standards.  The applicable rules of law pertaining to exclusion of expert testimony under Federal Rule of Evidence 702 and Daubert are set out in this Court's Opinion of January 28, 2015 regarding defendants' motion to exclude the testimony of FHFA's expert Dr. John A. Kilpatrick, and that discussion is incorporated by reference here.  See FHFA v. Nomura Holding Am., Inc., 11cv6201 (DLC), 2015 WL ----- (S.D.N.Y. Jan. 28, 2015).

I. Relationship between the Minimum Standards and
   Representations in the Offering Documents

The defendants argue that it is an Originator's failure to comply with underwriting guidelines, as those guidelines are described in the Offering Documents, and not their failure to comply with any Minimum Standard identified by Hunter, that must form the basis for any finding of a misrepresentation regarding compliance with underwriting guidelines in this action.  They are correct.

None of the seven Prospectus Supplements at issue here represents that the loans in the SLGs for the Certificates were underwritten in accordance with prevailing industry standards, much less with the Minimum Standards.  Even if the trier of fact determined that the Minimum Standards identified by Hunter do in fact reflect the minimum of the underwriting guidelines

9

standards as they were practiced in the relevant industry during the pertinent timeframe, it is the representations in the Offering Documents which must form the basis for any finding of misstatement.

Accordingly, to the extent they may be considered at all at trial, the Minimum Standards are only relevant if they shed light on whether the Originators followed the underwriting practices described in the Offering Documents.  They are otherwise irrelevant.  Put more bluntly, unless tied to the specific representations in the Offering Documents, the Minimum Standards have no place in this trial.  Moreover, assuming that FHFA is able to establish at trial the appropriate content of any Minimum Standards, the extent to which they are relevant will have to be separately examined for each of the Prospectus Supplements.

II. The Existence of Minimum Standards

The defendants contend that testimony about the Minimum Standards must be excluded because it does not constitute admissible expert testimony under the Daubert standard.  They point out, among other things, that no published work has ever contained these standards and that several witnesses have denied that industry standards existed.  This portion of the motion is denied.

FHFA has shown that the process that Hunter employed to identify the minimum underwriting standards that prevailed in the industry during the relevant timeframe is sufficiently reliable to make his testimony admissible.  It is not novel for an expert to opine on customs and practices within an industry.  See, e.g., In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 115, 125, 126 (2d Cir. 2013), cert. denied sub nom. US Foods, Inc. v. Catholic Healthcare W., 134 S. Ct. 1938 (2014); SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC, 467 F.3d 107, 134 (2d Cir. 2006).  The defendants' arguments in connection with this portion of their motion are properly considered at trial in assessing the weight that should be accorded Hunter's testimony.

III. Relevance of Minimum Standards

The defendants contend that the Minimum Standards cannot ever substitute for the underwriting criteria disclosed in the Offering Documents.  This is too broad a statement.

Since the Prospectus Supplements represent that the loans within the SLG were underwritten in accordance with the Originators' underwriting guidelines, the Minimum Standards may be useful (along with other evidence) in determining the contents of an Originator's underwriting guidelines.  For instance, where the actual guidelines were not located, or only stale guidelines from the Originator were located, the Minimum

Standards may provide circumstantial evidence of the content of the Originator's guidelines as of the time of origination.

The Court will hear oral argument on whether the Minimum Standards also may be used to fill gaps when an Originator's guidelines are "silent" on a particular step in the origination process. The resolution of this issue demands a fact intensive inquiry. It will be necessary to examine, at the very least, the representations in the relevant Prospectus Supplement and the content of the Originator's guidelines before deciding whether it would even be appropriate to look at the Minimum Standards for any particular sample loan. Conceivably, in some instances the Minimum Standards could provide relevant circumstantial evidence regarding the existence or absence of a misrepresentation in the Supplement, while in others it would be inappropriate to consult them.

Defendants rely on LaSalle Bank Nat. Ass'n v. CIBC Inc., No. 08cv8426 (WHP)(HBP), 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012), for the proposition that reliance on industry standards is never relevant when the issue is whether the defendant complied with "its contractual obligations and representations." Id. at *12. In LaSalle, a trustee for a mortgage securities trust asserted claims for breach of contract and breach of warranty against a seller of a mortgage and note associated with a real estate development. One of the representations upon

12

which the claims were premised was that the mortgage loan
complied at origination with all of the requirements of the
defendant's "underwriting standards". Id. at *2. In LaSalle,
however, testimony about industry standards was unnecessary
since the record included the defendant's "written Underwriting
Guidelines and the testimony of [the defendant's] experienced
underwriters," attesting to the applicable guidelines. Id. at
*16. Here, to the extent that FHFA is able to show that the
Minimum Standards provide helpful circumstantial evidence
because the original underwriting guidelines are missing, stale
or incomplete, it may be appropriate to admit testimony relating
to them.

IV. Eight of the Minimum Standards

     The defendants identify eight of the fifty-nine Minimum
Standards that they contend were not in fact the "minimum"
underwriting standards applied by lenders during 2005 through
2007. While they point to these individual Standards to argue
that the Minimum Standards as a whole should be excluded, their
arguments are also relevant to any determination of the contours
of the Minimum Standards. The three Standards the defendants
emphasize are:

   1) The lender must investigate whether the borrower sought
      (and/or obtained) credit that was not listed on the
      borrower's origination credit report. This investigation

13

includes an inquiry into any credit inquiries within 90 days preceding the loan application.  ("Unlisted Credit")[7]

2) The borrower's new payment obligation may not exceed 150% of the borrower's current housing expense. ("Payment Shock")

3) The borrower's debt-to-income ("DTI") ratio may not exceed 55% ("Maximum DTI")

If the Minimum Standards are otherwise determined to be admissible at trial, the inclusion of the Unlisted Credit, Payment Shock, Maximum DTI, or any other particular Standard will be decided based on the trial record.  The evidence to which the defendants point now as evidence that these particular standards did not exist, at least as "minimum" standards, if received at trial, will be considered at that time.  After all, FHFA may succeed in proving that there were minimum underwriting standards during the relevant time period that are relevant to the tasks before the trier of fact, but that those minimum standards are fewer than the fifty-nine identified by Hunter.

---

[7] The defendants explain that Hunter has relied upon the Unlisted Credit Standard to identify defects in 38 sample loans.

**CONCLUSION**

Defendants' November 26, 2014 motion to exclude Hunter's testimony relying on Minimum Standards is denied.


SO ORDERED:

Dated:     New York, New York
           January 29, 2015

                              _____
                                    DENISE COTE
                     United States District Judge