UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

            Plaintiff,

            -against-

NOMURA HOLDING AMERICA, INC.;
NOMURA ASSET ACCEPTANCE
CORPORATION; NOMURA HOME EQUITY
LOAN, INC.; NOMURA CREDIT &
CAPITAL, INC.; NOMURA SECURITIES
INTERNATIONAL, INC.; RBS SECURITIES
INC. (f/k/a GREENWICH CAPITAL
MARKETS, INC.); DAVID FINDLAY; JOHN
MCCARTHY; JOHN P. GRAHAM; NATHAN
GORIN; and DANTE LAROCCA,

            Defendants.

**11 Civ. 6201 (DLC)**

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE THE TESTIMONY OF ROBERT W. HUNTER
<u>CONCERNING OWNER OCCUPANCY STATUS</u>**

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

Philippe Z. Selendy
Manisha M. Sheth
Deborah K. Brown
Jeffrey C. Miller
J. Matthew Hamann

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

FACTUAL BACKGROUND ..............................................................................3

      A.     The Representations In The Offering Documents Concerning Owner Occupancy...........................................................................................3

      B.     Importance Of Testing The Borrower's Owner Occupancy Status ........................4

      C.     Mr. Hunter's Occupancy Review Of The Sample Loans .......................6

ARGUMENT ................................................................................................8

I.     Mr. Hunter's Testimony Is Relevant Because It Assesses The Accuracy Of The Occupancy Statistics In The Offering Documents................................................8

      A.     This Court Has Previously Rejected Defendants' Argument That FHFA Must Establish Falsity On The Part Of The Borrowers.........................................9

      B.     Defendants' Reliance On Deposition Testimony To Support Their Interpretation Of The Offering Documents Is Unavailing....................................11

II.    Mr. Hunter's Testimony Is Relevant Because It Assesses The Accuracy Of The Occupancy Statistics After The Origination Date ............................................13

CONCLUSION................................................................................................16

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ali v. Mukasey,*
    529 F.3d 478 (2d Cir. 2008)................................................................9

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002)..............................................................15

*Astra Aktietbolag v. Andrx Pharm., Inc.,*
    2013 WL 4007575 (S.D.N.Y. Aug. 5, 2013)....................................9

*Daubert v. Merrell Dow Pharm.,*
    509 U.S. 579 (1993)....................................................................8, 14

*Escott v. BarChris Constr. Corp.,*
    283 F. Supp. 643 (S.D.N.Y. 1968) ..................................................13

*FHFA v. Nomura Holding Am. Inc.,*
    --- F. Supp. 3d ---, 2014 WL 7232443 (S.D.N.Y. Dec. 18, 2014).........9, 10, 12, 13

*FHFA v. UBS Ams., Inc.,*
    858 F. Supp. 2d 306 (S.D.N.Y. 2012)................................2, 9, 10, 11

*In re Fosamax Prods. Liab. Litig.,*
    645 F. Supp. 2d 164 (S.D.N.Y. 2009)................................................8

*IHS Dialysis, Inc. v. Davita, Inc.,*
    2013 WL 1309737 (S.D.N.Y. Mar. 31, 2013) ..................................1

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,*
    725 F.3d 65 (2d Cir. 2013)................................................................8

*Nussbaum v. Metro-N. Commuter R.R.,*
    994 F. Supp. 2d 483 (S.D.N.Y. 2014)..............................................14

*In re Rezulin Prods. Liab. Litig.,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)................................................8

*Varda, Inc. v. Ins. Co. of N. Am.,*
    45 F.3d 634 (2d Cir. 1995)................................................................1

## Statutes

Fed. R. Evid. 702 ..................................................................................8

## **Other Authorities**

Issuer Review of Assets in Offerings of Asset-Backed Securities,
    SEC Release No. 9176, 76 Fed. Reg. 4231 (Jan. 25, 2011) ...................................................13

Plaintiff Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), respectfully submits this memorandum of law in opposition to Defendants' Motion to Exclude the Testimony of Robert W. Hunter Concerning Owner Occupancy Status ("Motion").[1]

## PRELIMINARY STATEMENT

Defendants' Motion seeks to exclude Mr. Hunter's opinions about the occupancy status of the properties that collateralized the samples of mortgage loans ("Sample Loans") on the sole basis that such testimony is irrelevant. Defendants' first argument that "the owner occupancy data in the Offering Documents reflects the percentages of borrowers who had indicated in their loan applications that they intended to occupy the premises" is premised on Defendants' erroneous reading of the representations in the Offering Documents.[2] Defs. Mot. 4. The Offering Documents for each of the Securitizations plainly represent the number and percentage of mortgage loans in the relevant Supporting Loan Groups ("SLGs") that are owner occupied. There is no representation or disclaimer in the Offering Documents that the owner occupancy statistics in the collateral tables reflect the number and percentage "of borrowers who had indicated in their loan applications that they intended to occupy the premises." *Id.* Moreover, even in cases where the offering documents contained language stating that the owner occupancy statistics were based on information provided by the borrower at the time of origination, this

---

[1]   FHFA notes that Defendants have filed four motions to exclude various opinions of Mr. Hunter, totaling 47 double-spaced pages and five single-spaced pages, in an apparent attempt to circumvent this Court's page limits. *See* Individual Practices in Civil Cases of Judge Denise Cote, at 2. Such efforts to evade page limits by filing serial motions are improper. *See IHS Dialysis, Inc. v. Davita, Inc.*, 2013 WL 1309737, at *3 (S.D.N.Y. Mar. 31, 2013) (denying motion to strike as improperly before the court where the motion was "simply an attempt to assert additional arguments in support of [a separate motion], and to evade the page limits" set forth in the court's individual rules); *Varda, Inc. v. Ins. Co. of N. Am.*, 45 F.3d 634, 640-41 (2d Cir. 1995) (denying a prevailing party costs because the party had put 75% of its facts and arguments in footnotes in an apparent effort to evade page limits).

[2]   "Offering Documents" include the Prospectus and Prospectus Supplement filed with the Securities and Exchange Commission for each of the seven securitizations at issue in this Action (the "Securitizations").

Court held that such a disclaimer did not require FHFA to demonstrate falsity on the part of the borrower.  *FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 329 (S.D.N.Y. 2012) ("*UBS I*").  Because no similar disclaimer exists in the Offering Documents for the Securitizations here, Defendants' distorted reading of the Offering Documents as representing the number of loans where the borrower represented the property to be owner occupied is baseless.  *See UBS I*, 858 F. Supp. 2d at 329 (noting that defendants' argument relating to borrower intent does not apply to offering documents that do not include the disclaimer that the owner occupancy statistics were as reported by the borrower).  Because Mr. Hunter's opinions address whether the Sample Loans were owner occupied as that term was defined in the Mortgage Documents[3], his opinions are directly relevant to whether the owner occupancy statistics in the Offering Documents are accurate.

      Defendants' second argument that Mr. Hunter's opinions are irrelevant because he failed to evaluate whether the occupancy statistics were accurate *as of the origination date* is also premised on a fundamental misinterpretation of FHFA's claims in this case.  FHFA has alleged that the owner occupancy statistics in the Offering Documents were materially inaccurate.  These statistics were represented to be accurate as of the Cut-off Date, as that term is defined in the Offering Documents.  Using the definition of owner occupancy from the Mortgage Document, which provides that the borrower shall occupy the subject property within a certain number of days after closing and continue to occupy the property as the borrower's principal residence for at least one year, Mr. Hunter reviewed both information in the loan file and post-origination documents such as audit credit reports, bankruptcy filings, public records, property records, and servicing records, to determine whether the property securing the mortgage was in fact owner occupied as represented in the Offering Documents.  The Offering Documents were issued at least two months, and in many cases, more than six months after the loan closed.  As such, it is

---

[3]   "Mortgage Document" refers to the security instrument (often termed the "mortgage," "security deed," or "deed of trust") that secures the loan by placing a lien on the subject property as collateral for repayment of the borrower's debt obligation.

entirely appropriate for Mr. Hunter to determine if the loans were owner occupied after the date of origination, and to rely on post-origination information to make that determination.  Because Mr. Hunter's opinions about the occupancy statistics in the Offering Documents are relevant to the FHFA's claims, FHFA respectfully requests that Defendants' Motion be denied in its entirety.

## FACTUAL BACKGROUND

### A.     The Representations In The Offering Documents Concerning Owner Occupancy

The Offering Documents for each of the Securitizations contain a chart showing the number and percentage of mortgage loans in the SLGs that are owner occupied.  *See* Defs. Mot., App'x A.  FHFA alleges in its Amended Complaint that these representations, among others, were materially false.  *See* Dkt. 60, at ¶ 1.  Specifically, the Offering Documents for five of the seven Securitizations represent that at least 88 percent of the properties underlying the SLGs were "Owner-Occupied," and, for the other two Securitizations, that at least 50 percent of the properties were owner occupied.  *See* Defs. Mot., App'x A.  There are no disclaimers in the Offering Documents for any the Securitizations that these percentages merely reflect loans where the borrower stated an *intention* to occupy the mortgaged property as a primary residence.

In the residential mortgage industry, a property is considered to be owner occupied when the borrower uses the mortgaged property as his or her primary residence for a specified period of time.  Sheth Decl., Ex. 1 (Hunter Dep.) at 303:9-12.  In the context of a refinanced owner occupied loan, the borrower is already living in the property.  Sheth Decl., Ex. 2 (Forester Dep.) at 277:16-19.  In the context of a purchase money loan, the borrower agrees to occupy the property as his or her primary residence within a certain number of days after closing and to continue living there for at least one year.  *See, e.g.*, Sheth Decl., Ex. 3 at NOM-BRI-LF_00008618; Sheth Decl., Ex. 4 at NOM-BRI-LF_00008402.  In fact, the Mortgage Document expressly states, with regard to occupancy, that "Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security

Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control." *See, e.g.*, Sheth Decl., Ex. 3 at NOM-BRI-LF_00008618. Almost all of the Mortgage Documents for the Sample Loans represented to be owner occupied contain this language.[4] Moreover, the Mortgage Document provides that a borrower's failure to occupy the property as his or her primary residence for a period of twelve months, or a borrower's misrepresentation of occupancy will constitute a default.[5]

### B.    Importance Of Testing The Borrower's Owner Occupancy Status

Loans for owner occupied properties present less credit risk than loans for non-owner occupied properties because, all else being equal, borrowers living in a mortgaged property have more incentive to make payments and maintain the property than borrowers purchasing second homes and investment properties. Sheth Decl., Ex. 5 at 75-76; Sheth Decl., Ex. 2 (Forester Dep.) at 111:24-112:14; Sheth Decl., Ex. 6 (Graham Dep.) at 82:24-83:25; Sheth Decl., Ex. 7 (Camacho Dep.) at 104:23-105:25; Sheth Decl., Ex. 8 (Spagna Dep.) at 98:22-99:14; *see also* Sheth Decl., Ex. 9 at 8.[6] Consequently, originators' underwriting guidelines generally impose tighter credit requirements on non-owner occupied properties, and a borrower who will occupy the property as his primary residence benefits, depending on the lender and program, by

---

[4]   For 564 of the 567 Sample Loans identified as owner occupied on the loan tape, the Mortgage Document or occupancy agreement contains a requirement that the borrower must live in the property for a period of 12 months absent consent from the Lender or extenuating circumstances. *See, e.g.*, Sheth Decl., Ex. 10 at BARC-EF-000112015.

[5]   "Material misrepresentations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence." Sheth Decl., Ex. 3 at NOM-BRI-LF_00008618; *see also* Sheth Decl., Ex. 4 at NOM-BRI-LF_00008402 (acknowledgement by Borrower that "[a]ny misrepresentation of occupancy" or borrower's "failure to occupy the property as the primary residence (i.e. owner occupied) during the 12 month period following the loan closing … shall constitute a default under the note and security instrument").

[6]   Credit rating agencies also used occupancy status as part of their criteria in evaluating the credit risk of loans. Sheth Decl., Ex. 11 (Chatterjee Dep.) at 78:8-24. If the Offering Documents represented a lower percentage of owner occupied properties (and therefore a greater percentage of non-owner occupied properties) in the supporting loan groups, the GSE Certificates would have required greater subordination levels in order to maintain the same credit rating. Sheth Decl., Ex. 12 at 5.

receiving a higher loan amount, a lower interest rate, and/or higher allowable LTV and DTI ratios.[7]  Sheth Decl., Ex. 5 at 77-78; Sheth Decl., Ex. 2 (Forester Dep.) at 278:24-280:13. Indeed, because these benefits may incentivize borrowers to misrepresent their occupancy status, underwriting guidelines often required loan underwriters to review specific factors and potential red flags in the loan file to determine whether a loan was in fact owner occupied.[8]  *Id.*; Sheth Decl., Ex. 5 at 30, 78-79.

Nomura and its vendors recognized the importance of testing the owner occupancy status represented by the borrower.  For example, Nomura's correspondent underwriting guidelines recognized that "[m]isrepresentation of occupancy is a serious problem in the mortgage industry" and stressed the importance of validating the occupancy status of a loan.[9]  Additionally, Nomura's diligence employees also acknowledged that an underwriter should review the loan for red flags, including distance between the subject property and the borrower's place of employment, to determine whether there was a potential misrepresentation of occupancy status.[10]

---

[7]  For example, Nomura's correspondent guidelines set the maximum LTV ratio at 90 percent for investment properties and at 95 percent for non-investment properties.  Sheth Decl., Ex. 13 at NOM-FHFA_05503790, 792-93.  Fremont's maximum LTV ratio for owner occupied properties is 100 percent, but the non-owner occupied maximum is 90 percent.  Sheth Decl., Ex. 14 at LF1UBS_00051238.  Fremont's maximum loan amount for owner occupied properties is $1,000,000, but the non-owner occupied maximum is $750,000.  *Id.* EquiFirst's maximum DTI ratio for owner occupied properties is 55 percent, but the non-owner occupied maximum is 50 percent.  Sheth Decl., Ex. 15 at BARC-EF_000000170.  People's Choice barred borrowers for non-owner occupied loans from various riskier loan programs.  Sheth Decl., Ex. 16 at JPMC-UWG-BEAR-000211422, 425, 430, 436.

[8]  For example, First NLC's underwriting guidelines required that the subject property be suitable for year-round occupancy, the borrower occupy the property for a major portion of the year, the property be the borrower's legal address of record, and the property characteristics meet the borrower's needs, to be classified as "owner occupied."  Sheth Decl., Ex. 17 at JPMC-UWG-BEAR-000130513.  ResMAE's underwriting guidelines identified several red flags indicating a potential misrepresentation of occupancy, including an unreasonable commuting distance, borrower income, asset, or credit documentation reflecting the borrower living at a different address, whether the housing was large enough to accommodate all occupants, and an appraisal reflecting tenant occupancy. Sheth Decl., Ex. 18 at JPMC-UWG-BEAR-000066406, 408, 410.

[9]  Sheth Decl., Ex. 19 at NOM-FHFA_05063733 ("Misrepresentation of occupancy is a serious problem in the mortgage industry. Nomura reserves the right to require additional documentation supporting stated occupancy for any loan, including but not limited to documentation of the occupancy status of other real estate owned by the borrower, and will carefully review the entire loan file to ensure that stated occupancy is consistent with all facts and documents presented.").

[10]  *See e.g.*, Sheth Decl., Ex. 20 (Sabo Dep.) at 47:10-50:4; Sheth Decl., Ex. 21 (Hartnagel Dep.) at 578:9-579:3, 583:20-584:5.

Similarly, the corporate designee of Clayton Holdings, LLC ("Clayton"), one of Nomura's diligence vendors, testified that Clayton would use a third party tool to identify red flags for occupancy misrepresentations, including inconsistent addresses.  Sheth Decl., Ex. 22 (Beal Dep.) at 183:25-184:21.

### C.   Mr. Hunter's Occupancy Review Of The Sample Loans

FHFA retained Mr. Hunter to re-underwrite the Sample Loans to assess the accuracy of the statements in the Offering Documents, including whether the data relating to the number and percentage of owner occupied mortgages "contained in the collateral tables found in the Offering Documents and the pre-closing loan tapes were accurate."  Sheth Decl., Ex. 5 at 1-2.

Mr. Hunter first reviewed the loan origination file for red flags indicating a potential misrepresentation of occupancy.  Such red flags included many of the same factors used by Nomura and its diligence vendors, including an unreasonable distance between the subject property and the borrower's place of employment, inconsistent addresses, and whether the subject property was significantly smaller in size or value than the borrower's current home without an apparent reason.[11]  *Id*. at 100.  Defendants do not seek to exclude Mr. Hunter's opinions relating to such red flags of potential misrepresentations of occupancy.  Defs. Mot. 3 n.1.

Mr. Hunter then reviewed any available servicing records to determine if they reflected that the borrower did not occupy the subject property.  Sheth Decl., Ex. 5 at 100; *see also* Sheth Decl., Ex. 23 at Finding 93000033 (finding a misrepresentation of occupancy where the servicing file contained a ███████████████ from the borrower that reflected a different address from the subject property).  Mr. Hunter also reviewed post-origination documents such as borrower and property records, including public utility records, bankruptcy filings, and audit

---

[11]   *See, e.g.* Sheth Decl., Ex. 23 at Finding 93000016 (finding a misrepresentation of occupancy where the borrower claimed to be moving from ████████████ despite being employed in ██████ and lacking any verification that the borrower's job was being relocated); *Id.* at Finding 17798827 (finding a misrepresentation of occupancy where the borrower's origination credit report reflected an alert that the subject address did not match the borrower's address on the █████████████████████████████████).

credit reports, to compare the addresses listed on those documents as affiliated with the borrower, and the dates associated with those addresses, against the information in the loan file. Mr. Hunter then studied any changes, inconsistencies, or conflicting information to determine whether the borrower claimed a different primary address or if there was a change of address from the subject property during the loan's required occupancy term.  Sheth Decl., Ex. 5 at 100; *see also* Sheth Decl., Ex. 23 at Finding 93000065 (finding a misrepresentation of occupancy where a post-closing audit credit report and the borrower's own ███████████ confirmed that the borrower did not occupy the subject property as a primary residence after closing).  Based on this analysis, Mr. Hunter made a determination as to whether it was more likely than not that the borrower lived in the subject property during the required occupancy term.  Sheth Decl., Ex. 5 at 100.

Using this methodology, Mr. Hunter identified occupancy defects for 42 of the Sample Loans.  When Mr. Hunter identified an occupancy defect, he compared his finding regarding the occupancy status of the loan against the occupancy status disclosed on the pre-closing loan tape. If the pre-closing loan tape disclosed the loan as owner occupied, and he opined that the loan was non-owner occupied, then Mr. Hunter also identified a corresponding pre-closing loan tape defect relating to occupancy.  *See* Sheth Decl., Ex. 23.  Based on these 42 loans, 7.41% of the 567 mortgaged properties disclosed as owner occupied on the pre-closing loan tape were inaccurately represented as such.  Sheth Decl., Ex. 24 at 3.  Mr. Hunter also identified 41 of these occupancy defects as violations of the applicable underwriting guidelines and minimum industry standards.  *See* Sheth Decl., Ex. 23.[12]

---

[12]   Defendants' Motion seeks to exclude only Mr. Hunter's opinions regarding the accuracy of the owner occupancy statistics in the Offering Documents, and not his opinions on owner occupied loans relating to a failure to follow underwriting guidelines.  Defs. Mot. 3 ("Hunter's opinions on occupancy must be excluded because they are not relevant to the question of whether the Offering Documents misrepresented owner occupancy *data*." (emphasis added)); *see also id.* at 3 n.1 (noting that "Hunter also has opined that certain loans were not underwritten properly due to purported 'red flags' concerning the borrowers' intent to occupy the subject properties," but that "[t]hose opinions are not the subject of this motion").  Defendants do not dispute that Mr. Hunter's owner occupancy findings are relevant to FHFA's allegation that the loans did not comply with underwriting guidelines.  The occupancy status of a loan affects the underwriting of that loan, including determining the applicable underwriting

**ARGUMENT**

**I.     Mr. Hunter's Testimony Is Relevant Because It Assesses The Accuracy Of The Occupancy Statistics In The Offering Documents**

Reliable testimony of an expert witness is admissible when it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592-94 (1993).  Expert testimony is helpful if it "provide[s] the groundwork to enable the jury to make its own informed determination."  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 114 (2d Cir. 2013) (internal citation and alterations omitted).

Here, Mr. Hunter's opinions regarding whether the mortgaged properties underlying the Sample Loans were owner occupied are relevant to determining whether the owner occupancy statistics in the Offering Documents are accurate.  Fed. R. Evid. 702.  In a desperate effort to dispute the plain relevance of this testimony, Defendants incorrectly interpret the representations in the Offering Documents as reflecting the number and percentage of borrowers who had indicated in their loan applications that they intended to occupy the premises.  Defendants then rely on this incorrect interpretation to argue that Mr. Hunter's analysis is irrelevant because it does not address the borrower's intent to occupy the mortgaged property.[13]  Defendants' interpretation has been previously rejected by this Court, and this Court's reasoning is even more applicable here where the Offering Documents do not contain any disclaimers about the occupancy data reflected in the collateral tables.  Moreover, contrary to Defendants' contentions, their interpretation is not supported by the deposition testimony in this action.

---

guideline requirements, identifying and investigating potential red flags, and assessing the borrower's ability and willingness to repay the loan.  Sheth Decl., Ex. 5 at 21-23, 28-31, 34-35, 75-79.

[13]   Defendants acknowledge that an expert may not opine on intent or state of mind.  Defs. Mot. 5 n.2 (citing *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)).

**A.    This Court Has Previously Rejected Defendants' Argument That FHFA Must Establish Falsity On The Part Of The Borrowers**

This Court has already considered and rejected Defendants' argument that "the disclosures in the Offering Documents relate to [the] borrowers' intent at the time of origination," and therefore the only relevant evidence is "whether borrowers intended to occupy the properties*," Defs. Mot. 5, in *UBS I*, 858 F. Supp. 2d at 329.  This Court's ruling rejecting Defendants' argument is law of the case,[14] and Defendants have provided no basis for upending that prior ruling.  *See Astra Aktiebolag v. Andrx Pharm., Inc.*, 2013 WL 4007575, *2 (S.D.N.Y. Aug. 5, 2013) (Cote, J.) ("[T]he law of the case doctrine 'counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" (*quoting Ali v. Mukasey,* 529 F.3d 478, 490 (2d Cir. 2008))).

In *UBS I*, the *UBS* Defendants argued that the offering documents at issue in the *UBS* action "explicitly disclosed that owner occupancy was determined at the time of origination and based on representations by the borrower."  Mot. to Dismiss the Second Am. Compl., *FHFA v. UBS Ams., Inc.*, 11 Civ. 5201, Dkt. 52 at 7 ("UBS MTD").  In particular, the *UBS* Defendants asserted that the statistical "data refers to the information reported by the borrower concerning whether, at the time of origination, the borrower intends to occupy the property securing the loan."  *Id*. at 7 n.8.  Therefore, the *UBS* Defendants argued that, FHFA's "*ex post* review to show that owner occupancy rates 'six months after the loan closed' differed from those disclosed in the Offering Materials … fail[ed] to challenge the accuracy of the representations."  *Id.* at 7.  This Court found the *UBS* Defendants' argument to be "without merit" and held that the results of FHFA's owner occupancy review in the Amended Complaint "render[ed] plausible its claim that

---

[14]    In their Motion to Dismiss, the *Nomura* Defendants adopted all of the arguments made by the *UBS* Defendants in the *UBS* action.  Dkt. 76 at 1 n.1.  The Court's Opinion and Order on Defendants' Motion to Dismiss adopted each of its rulings in the Court's prior opinions in the coordinated cases, including its ruling on the *UBS* Defendants' argument regarding owner occupancy misrepresentations.  Dkt. 165 at 1.

the owner-occupancy rates reported in the offering materials were materially false." *UBS I*, 858 F. Supp. 2d at 329.  Moreover, this Court held that statements in the UBS offering documents representing that the "owner-occupancy statistics were 'as reported by the mortgagor at the time of origination'" did not require FHFA to show "falsity on the part of the underlying borrowers." *Id*.  The Court explained that the *UBS* Defendants' argument "could transform the Securities Act strict liability regime into one that required scienter simply by attributing factual information in the offering materials to a non-defendant third-party," which would "significantly undermine" the purpose of the statute.  *Id.*  Moreover, the structure of the Securities Act, which explicitly contemplates incorporating statements from third parties with a corresponding due diligence defense, makes plain "that a Securities Act defendant cannot simply claim that she blindly reported information given to her by third parties and thereby avoid liability for inaccuracies that made their way into the offering materials." *Id.* at 330.[15]

Despite this Court's decision, Defendants make the same argument again, this time to exclude Mr. Hunter's opinions relating to the accuracy of the owner occupancy statistics. *Compare* Defs. Mot. 4-5 (arguing that the Offering Documents "reflect the percentages of borrowers who had indicated in their loan applications that they intended to occupy the premises" of the subject property, and that evidence regarding "whether borrowers in fact occupied the subject properties for 12 months after closing … does not address whether the occupancy representations in the Offering Documents were accurate") *with* UBS MTD at 7 n.8 (arguing that "[o]wner occupancy data refers to the information reported by the borrower concerning whether, at the time of origination, the borrower intends to occupy the property securing the loan") *and id.* at 7 (arguing that FHFA's "*ex post* review to show that owner occupancy rates 'six months after the loan closed' differed from those disclosed in the Offering

---

[15] As the Court recently held in the context of Defendants' analogous argument regarding LTV ratios, defining a statistical representation as the product of a third party's statement "does nothing to render [the statistical representations] less misleading." *FHFA v. Nomura Holding Am. Inc.*, --- F. Supp. 3d ---, 2014 WL 7232443, at *40 (S.D.N.Y. Dec. 18, 2014).  Instead, "Defendants had to investigate whether the statements in the Offering Documents were reliable and, when they had reason to doubt the accuracy of those statements, . . . then they had a duty to take corrective action to insure the Offering Documents were not misleading."  *Id.*

Materials … fail[ed] to challenge the accuracy of the representations").  The Court's prior decision applies with even greater force here because the Offering Documents contain no disclaimer like the one present in certain of the *UBS* offering documents.[16]  Indeed, the Court recognized that "by its own terms, [the *UBS* Defendants'] argument d[id] not apply" to the securitizations that did not include the disclaimer that the owner occupancy statistics were as reported by the mortgagor.  *UBS I*, 858 F. Supp. 2d at 329.

**B.   Defendants' Reliance On Deposition Testimony To Support Their Interpretation Of The Offering Documents Is Unavailing**

Defendants' citation to the testimony of GSE witnesses and FHFA's diligence expert, Leonard Blum, to establish that the owner occupancy representations relate to the borrowers' intent at the time of origination is misleading and unavailing.

First, the testimony of the GSE witnesses is not specific to the representations made in the Offering Documents for the Securitizations.  Sheth Decl., Ex. 25 (Cao Dep.) at 644:12-645:14 (discussing term sheets in general); Sheth Decl., Ex. 26 (Henderson Dep.) at 183:6-25 (testifying regarding a Fannie Mae prospectus); Sheth Decl., Ex. 27 (Dyson Dep.) at 518:16-23, 547:13-548:25 (testifying regarding the prospectus supplement for INABS 2006-E).  Although Defendants cite to the testimony of Freddie Mac trader Perri Henderson regarding how owner occupancy representations could be verified, Defendants omit that Ms. Henderson testified that she did not know how loans were classified as owner occupied, that she did not know if occupancy for a purchase money loan had to be based on a borrower's representation, and that the very representation being discussed included another basis for classifying loans, the borrower's mailing address.  Sheth Decl., Ex. 26 (Henderson Dep.) at 184:13-185:22, 186:17-189:3.[17]  Fannie Mae trader Ashley Dyson similarly testified that she did not know if the owner

---

[16]   The Court further noted that the *UBS* Defendants did not challenge that the evidence used by FHFA "provide[s] a plausible basis for inferring that the true rates of owner occupancy were substantially lower than those reported in the offering materials."  *UBS I*, 858 F. Supp. 2d at 330.  Similarly, in this motion, Defendants do not challenge the evidence or methodology used by Mr. Hunter during his occupancy review, and challenge only the relevance of his opinion.

[17]   Indeed, that Defendants are recycling the same argument is further illustrated by their reliance on Ms. Henderson's testimony, which is in regards to the same language in a Fannie Mae prospectus Defendants relied on

occupancy representation relied solely on information provided by borrowers, that it was the originator or issuer who was making the representation to her, and that she expected that a lender would take steps to verify the borrower's occupancy status.  Sheth Decl., Ex. 27 (Dyson Dep.) at 548:13-554:21.

Second, Mr. Blum's testimony is also unhelpful to Defendants.  The testimony quoted by Defendants states that the owner occupancy information in the Offering Documents is premised on whether the borrower "truthfully" filled out the form, *i.e.*, the borrower did in fact occupy the property, and that the borrower would "occupy that property for more than half of the time for the following 365 days."  Defs. Mot. 4 (citing Sheth Decl., Ex. 28 (Blum Dep.) at 187:10-187:22).  Moreover, Defendants fail to recognize that Mr. Blum further testified that the owner occupancy representation indicated that the "securities underwriter did some reasonable due diligence to make sure that [the representation] wasn't fraudulent" and that there was "no omission of a material fact … that would make th[e] statement materially misleading."  Sheth Decl., Ex. 28 (Blum Dep.) at 187:10-188:17.  Here, this Court has held that no reasonable jury could find that either Nomura or RBS undertook a reasonable investigation to verify the accuracy of the representations in the Offering Documents.  *FHFA v. Nomura Holding Am. Inc.*, --- F. Supp. 3d ---, 2014 WL 7232443, at *2-3, *31-32, *35-36, *38 (S.D.N.Y. Dec. 18, 2014).

Accordingly, Mr. Hunter's opinions regarding the owner occupancy status of the Sample Loans is relevant to assessing the accuracy of the information contained in the collateral tables in the Offering Documents.  Defendants' attempt to re-argue its prior interpretation of the Offering Documents as reflecting the number of loans where the borrower represented an intent to occupy the property should be rejected given the absence of any disclaimers in the Offering Documents relating to the borrowers' intent at the time of origination, and this Court's prior rulings.  Not

---

in their Motion to Dismiss stating that "the actual occupancy of the properties as of the issue date has not been verified" by Fannie Mae.  *Compare* Sheth Decl., Ex. 26 (Henderson Dep.) at 184:2-4, *with* Dkt. 76 at 23.

only is such an interpretation inconsistent with the plain language in the Offering Documents, it is not supported by the testimony in this action.

## II.   Mr. Hunter's Testimony Is Relevant Because It Assesses The Accuracy Of The Occupancy Statistics After The Origination Date

The Amended Complaint alleges that the Offering Documents represent the occupancy status of the collateral in the SLGs as of the Cut-off Date.  *See* Dkt. 60, ¶¶ 86-95.  For the Sample Loans re-underwritten by Mr. Hunter, the Cut-off Date was generally at least three months, and in many cases more than six months, after the loan closing.  Cipione Decl., Ex. 1. The case law is clear that Defendants are responsible for ensuring that the representations in the Offering Documents are accurate at the time the documents became effective, not at the time of origination.  *See Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 697 (S.D.N.Y. 1968) (finding that underwriter could not meet its due diligence defense where underwriter failed to ensure disclosures in offering documents were accurate when the offering documents became effective); *see also* Issuer Review of Assets in Offerings of Asset-Backed Securities, SEC Release No. 9176, 76 Fed. Reg. 4231, 4235 n.50 (SEC agreeing "that the review that is required is a review of the assets for purposes of the securitization and *not the review conducted to originate the assets*") (emphasis added)).  This Court confirmed this fundamental principle in its December 18, 2014 Opinion and Order when it held that Nomura had failed to conduct adequate due diligence, as a matter of law, in part because "Nomura took no steps at or near the time of its securitization of the Mortgage Loans to verify the accuracy of the representations about the characteristics of the SLGs in the Offering Documents."  *Nomura Holding Am. Inc.*, 2014 WL 7232443, at *32 (S.D.N.Y. Dec. 18, 2014).  Accordingly, Defendants' argument that Mr. Hunter failed to address the accuracy of the occupancy statistics at the time of origination ignores the applicable legal standard.

Given the time that passed between the closing of the loan and the Cut-off Date in the Offering Documents, it was entirely appropriate for Mr. Hunter to rely on post-closing information from documents such as audit credit reports, bankruptcy filings, servicing records,

and other borrower and property records to make a determination as to whether the property was in fact owner occupied.[18]  Although Defendants do not challenge the reliability of the methodology used by Mr. Hunter in conducting his occupancy review, it is important to note that Mr. Hunter's methodology was consistent with, if not more rigorous, than the process used by market participants during the relevant period to identify occupancy defects.[19]  Nomura itself used post-closing information during a post-securitization fraud review to identify loans with occupancy misrepresentations and submit them for repurchase.  Sheth Decl., Ex. 29 at Row 100 (LMSLoanID ███████ and Row 107 (LMSLoanID ███████ (identifying two loans with misrepresentations of occupancy based on their loan servicing histories as part of a fraud review).  Nomura's diligence vendors also made such third party tools available to their clients to re-verify information provided by the borrower and detect red flags for occupancy

---

[18]  Mr. Hunter's method for using audit credit reports to assess misrepresentations of occupancy is similar to that used by Tomasz Piskorski, Amit Seru, and James Witkin in their 2013 study ("Asset Quality Misrepresentation By Financial Intermediaries: Evidence from RMBS Market," forthcoming in the *Journal of Finance*) quantifying "the extent to which buyers [of private label residential mortgage-backed securities] may have received false information about the true quality of these assets by sellers of these securities."  Sheth Decl., Ex. 9 at 1; *see* Tomasz Piskorski *curriculum vitae* at https://www0.gsb.columbia.edu/mygsb/faculty/research/pubfiles/3271/cv_piskorski.pdf.  For the 2005-2007 time period, the authors compared consumer credit data from Equifax for borrowers with loans collateralized by owner occupied properties to loan level trustee data reported at the time of origination.  *Id.* at 1-10.  If none of the borrower's zip codes reported in the Equifax data for the first year of the loan's life matched the borrower's zip code as reported to the loan trustee at origination, the authors classified the loan's occupancy status as misrepresented.  *Id.* at 10.  The authors concluded that "[m]ore than 6% of mortgage loans reported for owner-occupied properties were given to borrowers with a different primary residence."  *Id.* at 3.  While peer review of an expert's opinion is a "non-exhaustive factor[]", the publication of a particular technique or methodology in a peer reviewed journal is a relevant consideration in assessing its reliability.  *Nussbaum v. Metro-N. Commuter R.R.*, 994 F. Supp. 2d 483, 489 (S.D.N.Y. 2014); *Daubert*, 509 U.S. at 594.

[19]  For example, Goldman used post-closing documents and third party tools, such as bankruptcy filings, audit credit reports, Accurint, and 411.com, to submit repurchase requests to originators for misrepresentations of occupancy.  *See, e.g.*, Sheth Decl., Ex. 31 at Row 31 (LOAN_ID ███████████ Row 950 (LOAN_ID ███████ ████████████████ Row 627 (LOAN_ID ████████ ███████ Row 89 (LOAN_I ██████████████ and Row 93 (LOAN_ID ███████ ████████████████ Similarly, HSBC used public utility records to identify occupancy defects for repurchase requests and also as a vendor resource for origination quality control.  *See, e.g.*, Sheth Decl., Ex. 32 at Row 4 (Loan ███████████████████ Sheth Decl., Ex. 33 at Row 22 (Loan ██████████████

misrepresentations.  Sheth Decl., Ex. 22 (Beal Dep.) at 180:15-24, 181:18-182:14, 183:25-185:16; Sheth Decl., Ex. 30 (Marchese Dep.) at 246:18-247:21.

Finally, Defendants argue, in the alternative, that even if the collateral tables in the Offering Documents had to be accurate as of the Cut-off Date, Mr. Hunter erroneously identified occupancy defects for 17 loans where the borrower moved out of the subject property after the Cut-off date.  Defs. Mot. 6.  Mr. Hunter's identification of such defects is entirely proper because the Mortgage Documents require that a borrower use the property as his primary residence for a period of twelve months after closing in order to qualify as an owner occupied loan.  Indeed, the Mortgage Documents make clear that, absent lender consent or extenuating circumstances, a borrower who does not live in the property for the requisite time period will be in default.  Here, Mr. Hunter applied that definition of an owner occupied loan to determine if the statistics in the Offering Documents were accurate.[20]  In any event, Defendants' criticism of these 17 loans, "go[es] to the weight, not the admissibility, of the testimony."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266-67 (2d Cir. 2002) (recognizing that "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible.").

---

[20]   Moreover, Mr. Hunter has identified other underwriting defects for 15 of these 17 loans.

**CONCLUSION**

For the reasons stated above, FHFA respectfully requests that the Court deny Defendants'

Motion in its entirety.

DATED:   New York, New York
         January 8, 2015                    QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP


                                        By:   _Manisha Sheth_
                                              _____
                                              Philippe Z. Selendy
                                              Manisha M. Sheth
                                              Deborah K. Brown
                                              Jeffrey C. Miller
                                              J. Matthew Hamann

                                              51 Madison Avenue, 22nd Floor
                                              New York, New York  10010-1601
                                              (212) 849-7000

                                              *Attorneys for Plaintiff Federal Housing
                                                 Finance Agency*

16