UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
FEDERAL HOUSING FINANCE AGENCY,         :        11cv6201 (DLC)
                                        :
                    Plaintiff,          :        OPINION & ORDER
                                        :
         -v-                            :
                                        :
                                        :
NOMURA HOLDING AMERICA, INC., et al.,   :
                                        :
                    Defendants.         :
                                        :
--------------------------------------- X

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
Manisha M. Sheth
Deborah K. Brown
Jeffrey C. Miller
J. Matthew Hamann
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For defendants Nomura Holding America, Inc., Nomura Asset
Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities International, Inc., David
Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N.
Dante LaRocca:

David B. Tulchin
Steven L. Holley
Bruce E. Clark
Bradley A. Harsch
Katherine J. Stoller
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

Amanda F. Davidoff
Elizabeth A. Cassady
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW, Suite 700
Washington, DC 20006

For defendant RBS Securities Inc.:

Thomas C. Rice
David J. Woll
Andrew T. Frankel
Alan Turner
Craig S. Waldman
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

This Opinion addresses defendants'[1] motion to exclude, pursuant to Federal Rule of Evidence 702 and Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579 (1993), certain trial testimony of plaintiff Federal Housing Finance Agency's ("FHFA") expert witness Robert W. Hunter ("Hunter") regarding the "owner occupancy" statistics in the offering documents ("Offering Documents") at issue in this case.  For the following reasons, the motion to exclude his testimony in its entirety is denied. Hunter may testify to owner occupancy issues to the extent described below.

---

[1] Defendants are Nomura Holding America, Inc., Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca ("Nomura"); and RBS Securities Inc. ("RBS") (collectively, "defendants").

**BACKGROUND**

FHFA, acting as conservator for Fannie Mae and Freddie Mac
(together, the "Government Sponsored Enterprises" or "GSEs"),
filed suit on September 2, 2011 against defendants alleging that
the Offering Documents used to market and sell seven
certificates ("Certificates") to the GSEs associated with
residential mortgage-backed securities ("RMBS" or
"Securitizations") contained material misstatements or
omissions.  RMBS are securities entitling the holder to income
payments from pools of residential mortgage loans ("Supporting
Loan Groups" or "SLGs") held by a trust.

FHFA brought these claims pursuant to Sections 11 and
12(a)(2) of the Securities Act of 1933 (the "Securities Act"),
as well as Virginia's and the District of Columbia's Blue Sky
laws.  This lawsuit is the sole remaining action in a series of
similar, coordinated actions litigated in this district by FHFA
against banks and related individuals and entities to recover
losses experienced by the GSEs from their purchases of RMBS.  A
description of the litigation and the types of
misrepresentations at issue in each of these coordinated
actions, including the instant case, can be found in FHFA v.
Nomura Holding Am., Inc., --- F. Supp. 3d ---, 11cv6201 (DLC),
2014 WL 6462239, at *3-6, *16-17 (S.D.N.Y. Nov. 18, 2014)
("Nomura"), as well as FHFA v. UBS Americas, Inc., 858 F. Supp.

2d 306, 323-33 (S.D.N.Y. 2012) (DLC), aff'd, 712 F.3d 136 (2d Cir. 2013) ("UBS").

In its Amended Complaint, FHFA alleges that the "owner-occupancy statistics reported in the Prospectus Supplements were materially false and inflated."  Nomura's Prospectus Supplements for each Certificate included collateral tables displaying the percentage of loans within an SLG corresponding to three occupancy-status categories.  For example, the Prospectus Supplement for Nomura Securitization 2006-FM2 records in two places that the mortgage loans in the relevant SLG were 93.05% "owner-occupied," 6.37% "investment," and 0.57% "second home."[2] None of the Prospectus Supplements defines the term "owner occupied" or "occupancy status."

Each Prospectus Supplement states that the owner-occupancy status statistics are current as of the Securitization's Cut-Off Date.  For example, Nomura's Securitization 2006-FM2 provides that "on the Cut-off Date, the Mortgage Loans [underlying the Securitization] will have the characteristics as set forth in the table[s]" containing the owner-occupancy percentages.  The Cut-Off Dates for each Securitization were within a month of the Prospectus Supplement's dates.  The dates of the corresponding Prospectus Supplements and their Cut-Off Dates are as follows:

---

[2] These percentages are provided "by aggregate remaining principal balance."

| Securitization | Cut-Off Date | Prospectus Supplement Date |
|---|---|---|
| 2005-AR6 | 11/1/2005 | 11/29/2005 |
| 2006-FM1 | 1/1/2006 | 1/27/2006 |
| 2006-HE3 | 8/1/2006 | 8/29/2006 |
| 2006-FM2 | 10/1/2006 | 10/30/2006 |
| 2007-1 | 1/1/2007 | 1/29/2007 |
| 2007-2 | 1/1/2007 | 1/30/2007 |
| 2007-3 | 4/1/2007 | 4/27/2007 |

The table below, supplied by FHFA, illustrates that roughly a quarter (23%) of the loans in a sample drawn from SLGs were originated within 90 days of the Cut-Off Date; the other 77% were originated 90 or more days before the Cut-Off Date.

| Securitization | Sample Loans | Time Between Origination Date and Cut-off Date | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 0 - 30 Days | 31 to 60 Days | 61 to 90 Days | 91 to 120 Days | 121 to 150 Days | 151 to 180 Days | Greater than 180 Days |
| NAA 2005-AR6 | 131 | | 5 | 64 | 36 | 18 | 6 | 2 |
| NHELI 2006-FM1 | 100 | | | | 48 | 35 | 12 | 5 |
| NHELI 2006-FM2 | 100 | | | | | 59 | 32 | 9 |
| NHELI 2006-HE3 | 99 | | | 4 | 8 | 21 | 32 | 34 |
| NHELI 2007-1 | 98 | 1 | 9 | 35 | 37 | 11 | 4 | 1 |
| NHELI 2007-2 | 98 | | 18 | 27 | 1 | 9 | 6 | 37 |
| NHELI 2007-3 | 97 | | | | 2 | 28 | 10 | 57 |
| **Total** | **723** | **1** | **32** | **130** | **132** | **181** | **102** | **145** |

On December 24, 2014, defendants moved to exclude Hunter's expert testimony on the issue of owner-occupancy status, attaching his May 15, 2014 expert report addressed to "the underwriting of mortgage loans underlying the Nomura Securitizations" ("Report").  Hunter was retained to, among other things, "opine on whether, based on the sample mortgage loans [he] reviewed, the data contained in the collateral tables

found in the Offering Documents and the pre-closing loan tapes were accurate."

In the Report, Hunter opines that the references in a Prospectus Supplement to owner occupancy refer to "the borrower's intended use of the property."  According to Hunter, the stated intent of a borrower to reside in a home or to use the property instead for investment purposes or as a second home could affect which underwriting guidelines were used by the loan's originator and the evaluation of the credit risk associated with the loan.  "[M]ortgages for owner-occupied properties generally presented less credit risk than those for non-owner-occupied properties."

In order to assess the accuracy of the statistics in the Prospectus Supplements regarding owner occupancy, Hunter relied on three sources of data in his review of 567 mortgaged properties contained in FHFA's sample[3]: (1) the original mortgage loan file, which he re-examined for "red flags indicating that the borrower did not occupy the subject property" ("Loan File Red Flags"); (2) "loan servicing records, where available, for

---

[3] FHFA is litigating the accuracy of the representations in the Offering Documents regarding the more than 15,000 loans in the Certificates' SLGs based on a sample of 796 loans, of which only 723 had sufficient data for Hunter's re-underwriting.  567 of these 723 were initially disclosed as owner-occupied on pre-closing loan tapes.  The parties do not dispute that the statistics in the Offering Documents were taken from the pre-closing loan tapes.

evidence that the borrower did not occupy the subject property after closing" ("Servicer Records"); and (3) "borrower and property records, including public records, bankruptcy filings, and consumer credit reports, to see whether the borrower claimed a different primary residence than that of the subject property, or if there was a change of address within 12 months after origination of the mortgage loan" ("Public Records").  The Report explains that "[t]welve months was chosen as the benchmark[] because most of the Mortgage Loan files contained agreements certifying that the borrower would occupy the mortgaged property for at least one year."

Hunter concludes that the collateral tables in Nomura's Prospectus Supplements "overstated the owner-occupancy status of the underlying mortgage loans."  Specifically, he concludes that Nomura's Prospectus Supplements incorrectly reported 7.41% of the mortgaged properties as "owner-occupied."[4]  Hunter identifies occupancy defects for 42 of the 567 properties in FHFA's sample that were disclosed as owner-occupied on the pre-closing loan tapes.

This motion was fully submitted on January 20.  Because FHFA has withdrawn its Section 11 Securities Act claims, the remaining claims in this case will be resolved in a bench trial

---

[4] Hunter reported the percentage as 18.69% in his initial report, but subsequently corrected the figure in his rebuttal report.

due to begin on March 16, 2015.  The Pretrial Order, which will
be accompanied by the direct testimony of the trial witnesses
submitted through affidavit, is due February 20.

## DISCUSSION

The applicable rules of law pertaining to exclusion of
expert testimony under Federal Rule of Evidence 702 and Daubert
are set out in this Court's January 28, 2015 Opinion regarding
defendants' motion to exclude the testimony of FHFA's expert Dr.
John A. Kilpatrick, and that discussion is incorporated by
reference here.  FHFA v. Nomura Holding Am., Inc., 11cv6201
(DLC), 2015 WL --- (S.D.N.Y. Jan. 28, 2014).

Defendants argue that Hunter's opinions concerning owner-
occupancy status should be excluded under Rule 702 and Daubert
as irrelevant to the extent that they rely on Public Records.[5]
According to the defendants, because the Offering Documents do
not represent that borrowers will actually occupy their
properties for the twelve months required by their loan
agreements, Hunter's analysis based on borrowers' actual
occupancy rates over a twelve-month period is irrelevant.  They
also argue that Hunter's opinions are irrelevant because they

---

[5] The defendants do not premise their motion on Hunter's reliance
on Loan File Red Flags.  It is unclear whether they seek to
encompass his reliance on Servicer Records in this motion.

are based on data and evidence that postdate any "relevant date," including the Offering Documents' Cut-Off Dates.

I. Meaning of "Owner Occupancy"

This motion hinges on the meaning of the phrases "owner occupied" and "owner occupancy" in the Prospectus Supplements. None of the Prospectus Supplements provides a definition for either term.  In evaluating a prospectus for material misrepresentations, courts read it "as a whole."  See, e.g., DeMaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003).  Read in context, the terms "owner occupancy" and "owner occupied" in the Offering Documents are representations of fact.  See UBS, 585 F. Supp. 3d at 329-30.  They describe the percentage of the properties occupied by owners as of the Cut-Off Date for the Supplement.  Each Prospectus Supplement asserts that the "owner occupancy status" is correct as of the Cut-Off Date.

The defendants' contention that the Offering Documents do no more than reflect information about borrowers' intentions at the time they apply for their mortgages can be swiftly rejected.[6] Nothing in the Prospectus Supplements supports that reading, and that argument has already been rejected by this Court.  Id. at

---

[6] Defendants cite deposition testimony of GSE employees to demonstrate that the "owner occupancy" representation was understood to reflect the borrower's intent.  Most of those examples reflect as well that the employees expected any representation by borrowers to be verified by Originators and underwriters.

330.  While a borrower's stated intention may affect the underwriting process and the selection of underwriting criteria for a particular loan application, one of the purposes of underwriting is to verify material assertions.  At the time of securitization, a purchaser of a Certificate is entitled to understand that the owner-occupancy statistics are statements of fact by those issuing and underwriting the securitization, and not mere statements of intention by borrowers at some earlier point in time.  And by its plain terms, that is what each Prospectus Supplement describes.

## II. Relevant Time Period

Defendants also argue that Hunter's opinions are irrelevant because they rely on data and evidence obtained after the Certificates' respective Cut-Off Dates.  Because at least some of this data was unknowable at the time the Prospective Supplements were issued, they argue, Hunter's opinions relying on it cannot bear on the falsity of the stated owner-occupancy percentages.  The defendants point out that there are apparently seventeen loans, of the forty-two at issue here, in which Hunter has relied on evidence that the borrowers defaulted on their mortgage notes after the relevant Cut-Off Date.

As a general matter, evidence gathered from Public Records may be properly received at trial to the extent it sheds light on the accuracy of the representations in the Offering Documents

regarding owner occupancy, including information that appears in those records for the first time after the Cut-Off Dates for the Prospectus Supplements.  After all, post-Cut-Off-Date data may provide strong direct or circumstantial evidence that the borrower never occupied the property.  But, what is at stake here is not whether a borrower fulfilled a contractual commitment to remain in a property for twelve months, but whether the Prospectus Supplements accurately described the occupancy status of the property as of the Cut-Off Date.

### CONCLUSION

Defendants' motion to exclude Hunter's testimony on owner occupancy is denied.  The Prospectus Supplements' statistics on owner occupancy refer to occupancy status as of the Cut-Off Date, not simply to borrowers' intentions at origination.  Hunter's opinions regarding owner occupancy are admissible, but only to the extent he opines on falsity or misrepresentation as of the Cut-Off Date.

SO ORDERED:

Dated:     New York, New York
           January 29, 2015

                            _____
                            DENISE COTE
                      United States District Judge