## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION, <br><br> Plaintiff, <br><br> -against- <br><br> NOMURA HOLDING AMERICA INC., *et al.*, <br><br> Defendants. | No. 11-cv-6201 (DLC) <br><br> ECF Case |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
## MOTION TO EXCLUDE THE TESTIMONY OF DR. ANTHONY SAUNDERS

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

January 8, 2015

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ................................................................................................3

     A.     Dr. Saunders' Reliance on Loans Involved in Lawsuits that Settled ...................5

     B.     Dr. Saunders' Reliance on Loans From Five Academic Articles ..........................6

LEGAL STANDARD ........................................................................................9

ARGUMENT ..................................................................................................10

I.     Dr. Saunders' Testimony That Loans in Dr. Vandell's Benchmarks Were
     Involved in Lawsuits That Have Settled Is Irrelevant and Highly Prejudicial ...............10

     A.     Evidence That Loans Were Involved in Litigations That Settled Is
     Irrelevant ........................................................................................11

     B.     Evidence That Lawsuits Involving "Similar Claims" and Parties Were
     Settled Is Highly Misleading and Prejudicial .......................................12

II.     Dr. Saunders Cannot Present Other Experts' Opinions ..................................15

III.     There Is No Reliable Connection Between the Loans in the Five Articles And the
     Loans in Dr. Vandell's Benchmarks ........................................................17

     A.     Dr. Saunders' Testimony Concerning the Industry Benchmark Is
     Unreliable ........................................................................................18

     B.     Dr. Saunders' Testimony Concerning the GSE Benchmark Is Unreliable ..........19

     C.     Dr. Saunders' Testimony Concerning the Five Articles Is Misleading and
     Prejudicial ........................................................................................20

IV.     The Articles That Dr. Saunders Claims Are "Indirect Evidence" of
     Misrepresentations Do Not Provide Reliable Support for That Opinion ..........................21

CONCLUSION ................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Amorgianos* v. *Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ........................................................................ *passim*

*Daubert* v. *Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ..................................................................................... 1, 10

*Floyd* v. *City of N.Y.*,
    910 F. Supp. 2d 506 (S.D.N.Y. 2012) ....................................................... 9

*Hutchinson* v. *Groskin*,
    927 F.2d 722 (2d Cir. 1991) ....................................................................... *passim*

*In re Elec. Books Antitrust Litig.*,
    2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) ............................................ 10, 17

*In re Puda Coal Sec. Litig.*,
    2014 WL 2915880 (S.D.N.Y. June 26, 2014) .......................................... 22

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ....................................................... 22

*Levick* v. *Maimonides Med. Ctr.*,
    2011 WL 1673782 (E.D.N.Y. May 3, 2011) ............................................ 14

*LNC Invs., Inc.* v. *First Fidelity Bank*,
    2000 WL 1072460 (S.D.N.Y. Aug. 3, 2000) ........................................... 14

*Malletier* v. *Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) ....................................................... 15

*McInnis* v. *A.N.F., Inc.*,
    765 F.2d 240 (1st Cir. 1985) ....................................................................... 11, 14

*Mike's Train House, Inc.* v. *Lionel, LLC*,
    472 F.3d 398 (6th Cir. 2006) ....................................................................... 15

*Mutual Life Ins. Co.* v. *City National Bank & Trust Co.*,
    86 F.2d 660 (7th Cir. 1936) ......................................................................... 14

*Nook* v. *Long Island R.R. Co.*,
    190 F. Supp. 2d 639 (S.D.N.Y. 2002) ....................................................... 9

*Paster* v. *Pennsylvania R. R.*,
    43 F.2d 908 (2d Cir. 1930) ......................................................................... 13, 14

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Polythane Sys., Inc.* v. *Marina Ventures Int'l, Ltd.*,
    993 F.2d 1201 (5th Cir. 1993) ................................................. 16

*Ruggiero* v. *Warner-Lambert Co.*,
    424 F.3d 249 (2d Cir. 2005) ................................................. 22

*Sampson* v. *Radio Corp. of Am.*,
    434 F.2d 315 (2d Cir. 1970) ................................................. 11

*SEC* v. *Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................. 12, 21

*Sweeten* v. *Layson's Home Improvements, Inc.*,
    2007 WL 1189359 (M.D. Pa. Apr. 19, 2007) ....................... 14

*U.S. Football League* v. *Nat'l Football League*,
    634 F. Supp. 1155 (S.D.N.Y. 1986) ..................................... 13

*United States* v. *Grey Bear*,
    883 F.2d 1382 (8th Cir. 1989) .............................................. 15

*United States* v. *Williams*,
    506 F.3d 151 (2d Cir. 2007) ................................................ 9

**Rules**

Fed. R. Evid. 401 ....................................................................... 1, 9

Fed. R. Evid. 402 ....................................................................... 1

Fed. R. Evid. 403 ....................................................................... *passim*

Fed. R. Evid. 408 ....................................................................... 11

Fed. R. Evid. 702 ....................................................................... 1, 2, 9

Fed. R. Evid. 703 ....................................................................... 15

Fed. R. Evid. 801 ....................................................................... 15

Fed. R. Evid. 802 ....................................................................... 15

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Action | *FHFA* v. *Nomura Holding America Inc., et al.*, No. 11 Civ. 6201 (DLC) |
| Certificates | The seven securitizations at issue in this Action, NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 |
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| Nomura | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., and Nomura Securities International, Inc. |
| Saunders Aug. Dep. | Deposition of Dr. Anthony Saunders in *FHFA* v. *HSBC North America Holdings Inc., et al.*, 11 Civ. 6189 (DLC), *FHFA* v. *Goldman Sachs & Co., et al.*, 11 Civ. 6198 (DLC) and *FHFA* v. *Ally Financial Inc., et al.*, 11 Civ. 7010 (DLC), taken Aug. 14, 2014 |
| Saunders Nov. Dep. | Deposition of Dr. Anthony Saunders in this Action, taken Nov. 26, 2014 |
| Saunders Report | Nov. 10, 2014 Expert Report of Dr. Anthony Saunders in this Action |
| Vandell Report | July 9, 2014 Expert Report of Kerry D. Vandell, Ph.D in this Action |

Defendants respectfully submit this memorandum in support of their motion to exclude, pursuant to pursuant to Federal Rules of Evidence 401, 402, 403 and 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the trial testimony of Dr. Anthony Saunders.

## PRELIMINARY STATEMENT

Defendants retained Dr. Kerry Vandell to provide expert testimony on loss causation.  Among other things, Dr. Vandell compared the performance of the loans backing the Certificates to the performance of other benchmark groups of loans, as set forth in his July 9, 2014 expert report.  On November 10, 2014, plaintiff served a rebuttal report by Dr. Anthony Saunders in which Dr. Saunders attempts to show that Dr. Vandell's benchmarks contain loans that were not originated in accordance with applicable underwriting guidelines.  Dr. Saunders principally opines that various other groups of loans were not originated in accordance with underwriting guidelines because they either were involved in lawsuits that ultimately were settled, or were studied in academic articles that purported to identify evidence of underwriting defects—and that Dr. Vandell's benchmarks must therefore also contain loans with underwriting defects.  Dr. Saunders' testimony should be excluded for several reasons.

*First*, Dr. Saunders' testimony about payments made by defendants in other cases to settle claims involving loans is both irrelevant and highly prejudicial and inflammatory.  Dr. Saunders opines that settlement payments are evidence that the loans at issue in those cases did not comply with applicable underwriting guidelines—even though the settlement agreements explicitly say that they do not constitute any admission of liability.  Indeed, it is black letter law that settlement payments are not evidence that the claims they resolved have merit.  Plaintiff should not be permitted to tell the jury that claims concerning defective loan underwriting that

are purportedly "similar" to those in this Action—many asserted by Freddie Mac or Fannie Mae, and one against Nomura—have already been found to have merit, and have resulted in the payment of tens of billions of dollars.  This testimony—which could easily be misunderstood by the jury—is not admissible.

Second, Dr. Saunders intends to testify to the opinions and judgments reached by experts who authored five articles analyzing certain groups of loans.  He offers no analysis of these experts' opinions; he simply repeats them.  This is also impermissible.  See Hutchinson v. Groskin, 927 F.2d 722, 725-26 (2d Cir. 1991) (reversing and remanding for new trial after district judge erroneously permitted expert to testify that his conclusions were consistent with opinions set forth in letters authored by non-testifying experts).

Third, Dr. Saunders' testimony concerning these five articles should be excluded under Rules 702 and 403 of the Federal Rules of Evidence for the additional reason that the testimony is unreliable and prejudicial.  Dr. Saunders seeks to rely on these articles, which purport to identify underwriting defects in (or reach other conclusions about) five groups of loans, as evidence that Dr. Vandell's benchmarks also contain loans with underwriting defects. Dr. Saunders never explains or quantifies the extent of the purported overlap, which in some instances does not exist at all, between the groups of loans studied in the articles and the loans in Dr. Vandell's benchmarks.  Without that connection, the loans studied in the articles are a highly unreliable basis for offering any opinions about Dr. Vandell's benchmarks.  In any event, such evidence is misleading and prejudicial and should be excluded under Rule 403.

Finally, even putting these other bases for exclusion aside, Dr. Saunders' opinions that the groups of loans that were the subject of three of the five articles contained loans that did

not comply with underwriting guidelines are unreliable and inadmissible because those articles never reached any such conclusion.

## BACKGROUND

In his July 9, 2014 expert report, Dr. Kerry Vandell opines that the defaults and delinquencies of loans in the supporting loan groups for the seven Certificates purchased by Freddie Mac and Fannie Mae were mostly caused by general market conditions and a decline in the housing market—that is, factors other than the misrepresentations plaintiff alleges. Among other analyses, Dr. Vandell compared the performance of the loans in the supporting loan groups to the performance of comparable loans in two benchmarks. These comparisons show that in the relevant periods, the loans here defaulted or became delinquent at about the same rate as loans that were unaffected by the alleged misrepresentations here at issue. (Ex. 1 (Vandell Report) ¶¶ 178, 185-86, 199, 200, Exs. 59, 60, 62.)

The two benchmarks Dr. Vandell used are both made up of millions of mortgage loans. Dr. Vandell selected the loans for these benchmarks based on a neutral methodology, described step-by-step in Exhibit 55 to his report, which identified loans comparable to the loans in the supporting loan groups for the seven Certificates. (Ex. 1 (Vandell Report) ¶¶ 181, 183, Ex. 55.) In this Action, the supporting loan groups are comprised of 15,780 loans, which fall into four categories: (i) Alt-A, first-lien loans with adjustable interest rates; (ii) subprime, first-lien loans with adjustable interest rates; (iii) subprime, first-lien loans with fixed interest rates; and (iv) subprime second-lien loans. (Ex. 1 (Vandell Report) ¶ 185, n.258, Ex. 55 at 2.)

The first benchmark, Dr. Vandell's Industry Benchmark ("Industry Benchmark"), was created from all loans in these four categories that were available from the CoreLogic Loan Performance database, which is a database of loans backing private label securitizations. Dr.

Vandell was careful in constructing this benchmark to ensure that "loans subject to similar litigations by the Plaintiff" were <u>excluded</u>.  (Ex. 1 (Vandell Report) ¶¶ 180-81, Ex. 57A.)

       The second benchmark, Dr. Vandell's GSE Benchmark ("GSE Benchmark"), was drawn from all loans in those same four categories that are available from a database of "loans that were purchased as whole loans by Fannie Mae and Freddie Mac."  (Ex. 1 (Vandell Report) ¶ 182, Ex. 61A.)[1]  This second benchmark thus also does <u>not</u> include any loans that were the subject of any lawsuit by plaintiff making securities law claims—all are whole loans purchased by Freddie Mac and Fannie Mae.

       Both of Dr. Vandell's benchmarks include <u>all</u> loans that meet the criteria just described, except that they exclude (i) negatively-amortizing loans (which are not present in the supporting loan groups), (ii) loans for which data needed for Dr. Vandell's analysis was missing, and (iii) loans that have origination dates and combined loan-to-value ratios (and, if available, FICO scores) outside the range of values observed in the supporting loan groups here at issue.  (Ex. 1 (Vandell Report) at Ex. 55 at 4.)

       Dr. Saunders seeks to offer testimony—based on evidence that certain loans were the subject of litigation that the parties to those cases ultimately settled, and based on five articles in academic journals describing studies of five groups of loans (the "Five Articles")—to show that the benchmarks used by Dr. Vandell contained loans with underwriting defects.  (Ex. 2 (Saunders Report) ¶¶ 15-30.)

---

[1]     Because there were not enough second-lien loans in this database to create a reliable benchmark, second-lien loans ultimately were not included.  (Ex. 1 (Vandell Report) Exhibit 55 at 4, n.7.)

### A.    Dr. Saunders' Reliance on Loans Involved in Lawsuits that Settled

In purporting to respond to Dr. Vandell, Dr. Saunders relied on groups of loans that were the subject of disputes or lawsuits that the parties to those cases ultimately settled. According to Dr. Saunders, the loans involved in these lawsuits must contain "defects" because the defendants in those other actions "pa[id] money to settle the case," which (he says) would not occur unless there were "some merit" to the claims.  (Ex. 3 (Saunders Nov. Dep.) at 150:24-151:10 ("Q: So you're assuming that if somebody settles a lawsuit that's evidence that the settled claims have merit? A: Well, I don't know why anybody would pay money unless it has some merit, from a simple perspective.").  Dr. Saunders reasoned that "if someone pays me money to settle the case there must be some merit to it." (Ex. 3 (Saunders Nov. Dep.) at 154:8-11; Ex. 3 (Saunders Nov. Dep.) at 168:21-23 ("I'm not a lawyer. I'm just giving you a simple English answer, is that why pay money if there's no problem.").)

To ascertain settlement payments he deemed relevant, Dr. Saunders first asked Freddie Mac and Fannie Mae to identify, from among all loans purchased by those two entities that were originated in 2005, 2006 or 2007, the loans "covered by settlements" between Freddie Mac or Fannie Mae and the party who sold the loans to them.  (Ex. 2 (Saunders Report) ¶¶ 35, 36, Exs. E, G.)  According to Dr. Saunders, Freddie Mac and Fannie Mae purchased more than 15.2 million loans that were originated during those years, with about 8 million of those loans ultimately "covered by settlements" and about 7.2 million not "covered."  (Ex. 2 (Saunders Report) ¶¶ 35, 36, Exs. E, G.)  Dr. Saunders provides no evidence concerning how many, if any, of the loans in Dr. Vandell's GSE Benchmark, which contains approximately 4.4 million loans (Ex. 1 (Vandell Report) at Ex. 61A), were "covered by settlements."  (Ex. 2 (Saunders Report) ¶¶ 34-37.)  Saunders asserts that in total, the payments made to Freddie Mac and Fannie Mae in the settlements of other litigation amount to $17.42 billion.  (Ex. 2 (Saunders Report) ¶¶ 35-36.)

Second, Dr. Saunders identified 26 lawsuits involving loans backing private label securities that the parties to those actions ultimately settled.  The lawsuits involved (i) put-back claims, (ii) securities fraud claims and (iii) fraud claims brought by insurers.  (Ex. 2 (Saunders Report) ¶¶ 31-33.)  These 26 lawsuits relate to approximately 2,774 securitizations of residential mortgage loans;[2] according to Dr. Saunders, 386 of those securitizations were backed by some loans that are also included in Dr. Vandell's Industry Benchmark.  (*See* Ex. 2 (Saunders Report) at Ex. D.)  Dr. Saunders asserts that the total value of the settlements of the 26 lawsuits is $28.4 billion.  (Ex. 2 (Saunders Report) at Ex. D.)  Nomura was a defendant in, and a party to the settlement of, only one of these lawsuits, which involved just two securitizations.  (Ex. 2 (Saunders Report) at Ex. D (referring to the settlement in the *Plumbers' Union* v. *Nomura Holdings* case).)  Dr. Saunders asserts that Nomura made a settlement payment of $21 million to resolve that case.  (Ex. 2 (Saunders Report) at Ex. D.)

Based on his assumption that no one would "pay money" to settle a case unless there were "some merit" to the claims (Ex. 3 (Saunders Nov. Dep.) at 150:24-151:10)—and his claim that some of the loans involved in the settled lawsuits were included in Dr. Vandell's benchmarks—Dr. Saunders opines that this data concerning settlements of lawsuits "undercut[s] the validity" of Dr. Vandell's assumption that loans in the Industry Benchmark and the GSE Benchmark "do[ ] not contain underwriting defects."  (Ex. 2 (Saunders Report ) ¶ 37.)

**B.    Dr. Saunders' Reliance on Loans From Five Academic Articles**

According to Dr. Saunders, the Five Articles on which he relies are evidence that the groups of loans to which they relate "contain underwriting defects"—or at least are

---

[2]    Dr. Saunders appears to double count some securitizations because the same securitizations were at issue in more than one lawsuit.  *See* Ex. 2 (Saunders Report) at Ex. D.

"consistent with" that claim—and therefore should be treated as "direct" or "indirect" evidence

that Dr. Vandell's benchmarks also "contain underwriting defects."  (Ex. 2 (Saunders Report)

¶ 16; Ex. 3 (Saunders Nov. Dep.) at 119:14-120:7.)  But as shown below, the Five Articles relate

to groups of loans that were constructed very differently than the benchmarks upon which Dr.

Vandell relied.  (*See* Ex. 2 (Saunders Report) ¶¶ 16-30.)

      The first article (the "Piskorski Article") (Ex. 2 (Saunders Report) ¶¶ 17-19), is

based on a population of all first-lien loans available from a data provider called Blackbox Logic

(which provides data on loans in private label securities) that were originated during the period

2005 to 2007—but only to the extent consumer credit files were available from Equifax, a credit

bureau, for the corresponding borrowers.  (Ex. 4 (Piskorski Article) at 61.)  Merging the

Blackbox and Equifax data excluded at least 65.6% of the Blackbox loans.  (Ex. 4 (Piskorski

Article) at 62.)  The authors then further excluded:  (i) consumers with more than one first-lien

mortgage; (ii) loans that have prepaid or whose borrowers were identified as being in

"bankruptcy"; and (iii) loans identified as not owner-occupied or as not having second liens.

(Ex. 4 (Piskorski Article) at 61-62.)  Thus, although the loans studied in the Piskorski Article

back private label securities, the Piskorski loans differ from the Industry Benchmark in several

significant ways, for example by excluding important categories—such as second-lien loans,

loans that were paid off early, loans to borrowers whose credit information was not found in

Equifax, loans to borrowers who have multiple first-lien loans, and loans to borrowers who did

not state an intention at origination to live in their homes—that were not excluded from the

Industry Benchmark.  (Ex. 4 (Piskorski Article) at 61-62.)

      The second article (the "Griffin Article") is based on all first-lien loans available

from a data provider called ABSNet (which also provides data on loans in private label

securities) that were originated during the period 2002 to 2007—but only to the extent the loans could be matched with data from another provider called DataQuick. (Ex. 5 (Griffin Article), at 9-10.) Merging the two datasets excluded at least 65.4% of the ABSNet population. (Ex. 5 (Griffin Article), at 10-12 & n.8.) The authors then further excluded: (i) more than 1 million loans from securities that were backed entirely by loans that had the same loan-to-value ratio and combined loan-to-value ratio; and (ii) nearly more than 1 million loans for which sufficient data was not available (which the authors considered to be the case for all loans where the appraisal perfectly matched automated valuation model results obtained for the article). (Ex. 5 (Griffin Article), at 11-12 & n.8.)

The third article (the "Demyanyk Article") relies on subprime, first-lien loans available from the CoreLogic LoanPerformance database of loans backing private label securitizations that were originated during the period 2001 to 2007. (Ex. 6 (Demyanyk Article) at 1848, 1853-54.) The authors excluded Alt-A mortgages and second liens. (Ex. 6 (Demyanyk Article) at 1853.) As set forth above, Dr. Vandell's Industry Benchmark was also based on LoanPerformance data, but did not exclude Alt-A mortgages or second liens, and did exclude many other types of loans included in the Demyanyk Article—such as negatively amortizing loans, loans with combined loan-to-value ratios (and, if available, FICO scores) outside the ranges observed in the supporting loan groups, and loans that lacked data needed for Dr. Vandell's analysis. (*See* Ex. 1 (Vandell Report) ¶ 180, Ex. 55, at 4.)

The fourth article (the "Calem Article") researches first-lien, purchase money loans (i.e., not refinance loans) originated during 2005 and 2006. (Ex. 7 (Calem Article) at 124 & n.12.) Some but not all of these loans were sold to Freddie Mac or Fannie Mae. (Ex. 7 (Calem Article) at 124 n.10.) The authors included only loans that they identified as "high cost

loans" and all loans (high cost or not) originated by "HUD-identified subprime specialists."
(Ex. 7 (Calem Article) at 124-25, 130.)  Dr. Vandell's Industry and GSE Benchmarks used no
such limitation.  (*See* Ex. 1 (Vandell Report) ¶ 180, Ex. 55, at 3-4.)

        Finally, the fifth article (the "Amromin Article") relies on loans that were
originated during the period 2004 to 2007.  (Ex. 8 (Amromin Article) at 18, 21.)  The data
include both prime and subprime loans from private label securitizations, loans sold to Freddie
Mac and Fannie Mae and loans that banks held on their balance sheets.  (*Id.* at 21.)  Neither of
Dr. Vandell's benchmarks includes prime loans or loans that banks held on their balance sheets.
(*See* Ex. 1 (Vandell Report) ¶ 180, Ex. 55, at 3-4.)

## LEGAL STANDARD

        Evidence provided by an expert is admissible only if it is relevant—it must have a
"tendency to make a fact more or less probable than it would be without the evidence," and that
fact must be "of consequence in determining the action."  Fed. R. Evid. 401.  *See also Nook* v.
*Long Island R.R. Co.*, 190 F. Supp. 2d 639, 641 (S.D.N.Y. 2002).  And even if evidence is
deemed relevant, it still may be excluded if its probative value is substantially outweighed by a
danger of "prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or
needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  *See also Floyd* v. *City of N.Y.*,
910 F. Supp. 2d 506, 512 (S.D.N.Y. 2012) ("Expert evidence can be both powerful and quite
misleading because of the difficulty in evaluating it." (quotations and citations omitted)).

        Expert testimony also must "help the trier of fact to understand the evidence or to
determine a fact in issue," which is the case only if the testimony is the "product of reliable
principles and methods" that the expert has "reliably applied" to the facts of the case.  Fed. R.
Evid. 702.  *See also United States* v. *Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  The court acts

as a "gatekeeper," ensuring that the proponent has made the necessary showing and that the

expert's testimony "both rests on a reliable foundation and is relevant to the task at hand."

*Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  Expert testimony must be

reliable "at every step, for *any* step that renders the analysis unreliable renders the expert's

testimony inadmissible."  *In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *4 (S.D.N.Y.

Mar. 28, 2014) (Cote, J.) (citation and internal quotation marks omitted) (emphasis in original).

A court should "undertake a rigorous examination of the facts on which the expert relies, the

method by which the expert draws an opinion from those facts, and how the expert applies the

facts and methods to the case at hand."  *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d

256, 267 (2d Cir. 2002).

## ARGUMENT

### I.    DR. SAUNDERS' TESTIMONY THAT LOANS IN DR. VANDELL'S BENCHMARKS WERE INVOLVED IN LAWSUITS THAT HAVE SETTLED IS IRRELEVANT AND HIGHLY PREJUDICIAL.

Dr. Saunders opines that the fact that that some loans were involved in lawsuits

that have been settled is "evidence that there were defects" in those loans.  (Ex. 3 (Saunders Nov.

Dep.) at 150:13-19.)  He therefore asserts that a showing that loans in the Industry Benchmark

and the GSE Benchmark were the subject of settlements "undercut[s] the validity" of any

assumption that those loans "do not contain underwriting defects."  (Ex. 2 (Saunders Report)

¶¶ 31.)  This evidence is not only wholly irrelevant, it is also highly prejudicial to defendants and

risks confusing and misleading the jury.  Defendants intend to move *in limine* to preclude

plaintiff from presenting any evidence or argument at trial concerning any resolutions of

disputes, whether litigated or not, involving mortgage-backed securities or mortgage loans,

including any settlements of residential mortgage-backed securities lawsuits brought by plaintiff

against other defendants.  As relevant here, Dr. Saunders' opinions based on such evidence must

be excluded.

> **A.      Evidence That Loans Were Involved in Litigations That Settled Is Irrelevant.**

Dr. Saunders is wrong that evidence that loans were involved in lawsuits that have

been settled has any tendency to show "that there were defects" in those loans.  (Ex. 3 (Saunders

Nov. Dep.) at 150:13-19.)  The settlement of a lawsuit is not an admission of wrongdoing or

liability; instead, "settlements are often reached for economic reasons and not because of

concessions on legal issues."  *Sampson* v. *Radio Corp. of Am.*, 434 F.2d 315, 317 (2d Cir. 1970).

As explained in the Advisory Committee notes to Rule 408, a settlement "is irrelevant" to the

validity of the settled claim, "since the offer may be motivated by a desire for peace rather than

from any concession of weakness of position."  Fed. R. Evid. 408, Advisory Committee notes;

*see also McInnis* v. *A.N.F., Inc.*, 765 F.2d 240, 247 (1st Cir. 1985) (evidence of settlements "is of

questionable relevance . . . since settlement may well reflect a desire for peaceful dispute

resolution, rather than the litigants' perceptions of the strength or weakness of their relative

positions.").

Dr. Saunders' only ground for claiming that settlements show that the relevant

loans were not underwritten according to applicable underwriting guidelines is that the respective

defendants  "pa[id] money to settle the case," which (he says) would not occur unless there were

"some merit" to the claims.  (Ex. 3 (Saunders Nov. Dep.) at 150:24-151:10.)  Dr. Saunders

explained his reasoning as follows:  "I'm not a lawyer, but it seems, as a simple person, if

someone pays me money to settle the case there must be some merit to it."   (Ex. 3 (Saunders

Nov. Dep.) at 154:8-11; Ex. 3 (Saunders Nov. Dep.) at 168:21-23 ("I'm not a lawyer. I'm just

giving you a simple English answer, is that why pay money if there's no problem.").)  This is

rank speculation, not an expert opinion that a connection exists between settlements of lawsuits

involving certain loans and any "defects" in such loans.  Indeed, Dr. Saunders admitted that he
ignored the only evidence before him about the merits of those lawsuits—the fact that "each of
the settlement agreements . . . described [in his report] signed by both sides says that the
defendant does not admit any wrongdoing"—because the defendants "still pay money to settle
the case."  (Ex. 3 (Saunders Nov. Dep.) at 151:15-21.)

   Because he has demonstrated no connection between how loans were originated
and settlements of lawsuits involving those loans (and there is none), Dr. Saunders' testimony
concerning loans that were the subject of settled litigation has no relevance.

  **B.**  **Evidence That Lawsuits Involving "Similar Claims" and Parties Were
    Settled Is Highly Misleading and Prejudicial.**

   Even if Dr. Saunders' opinions concerning settlements of lawsuits purportedly
involving loans in Dr. Vandell's benchmarks were somehow relevant (and they are not) his
opinions should be excluded under Rule 403 because of the substantial risk of unfair prejudice
and the danger of misleading and confusing the jury.  *SEC* v. *Tourre*, 950 F. Supp. 2d 666, 675
(S.D.N.Y. 2013).  This danger goes far beyond misleading the jury into believing, incorrectly,
that settlements are evidence that the settled claims themselves had merit.  Dr. Saunders seeks to
testify that Freddie Mac and Fannie Mae, on whose behalf plaintiff acts in this Action, have
extracted $17.42 billion in settlements based on underwriting "defects" in loans they purchased
during the period 2005 to 2007.  (Ex. 2 (Saunders Report) ¶¶ 35-36.)  Dr. Saunders also seeks to
testify that other plaintiffs have asserted claims "similar to the claims that the Plaintiff has made
in this case" and have obtained $28.4 billion in settlement payments based on those claims—
including $21 million in a settlement of a "similar litigation" against Nomura.  (Ex. 2 (Saunders
Report) ¶¶ 31-33, Exhibit D.)  *See* pp. 5-6, *supra*.

If plaintiff is allowed to present this evidence through the opinion of Dr. Saunders, then there is a substantial likelihood that the jury would simply imply defendants' liability here.  One of the key disputed issues in this Action is whether the Offering Documents for the seven Certificates at issue made misrepresentations that the loans in the supporting loan groups "were originated" generally in accordance with underwriting guidelines.  (*See, e.g.*, Ex. 9 (NHELI 2007-1 Prospectus Supplement), at NOM-FHFA_05142025.)  If Dr. Saunders is permitted to testify that Freddie Mac and Fannie Mae have settled disputes with loan sellers— claims Saunders says are "similar to the claims that the Plaintiff has made in this case"—for $17.42 billion, the prejudice will be irreparable and enormous.  The same would be true if Dr. Saunders can testify that dozens of issuers of residential mortgage-backed securities have settled "similar" lawsuits, including lawsuits involving the same types of claims at issue here, for $28.4 billion—and that Nomura itself settled a "similar" case for $21 million.  (Ex. 2 (Saunders Report) ¶¶ 31-33, Exhibit D.)

Where, as Dr. Saunders asserts is the case here, the lawsuits that settled involve "similar" claims concerning purported underwriting defects, and often the same parties, evidence of settlements "would permit plaintiff[] to create an 'aura of guilt' or to 'imply new wrongdoing from past wrongdoing.'"  *U.S. Football League* v. *Nat'l Football League*, 634 F. Supp. 1155, 1173 (S.D.N.Y. 1986), *aff'd* 842 F.2d 1335 (2d Cir. 1988).  Such evidence "is almost sure to be taken as an admission of fault," so that "[t]he only way to handle such evidence is to exclude it." *Paster* v. *Pennsylvania R.R.*, 43 F.2d 908, 911 (2d Cir. 1930) (Hand, J.) ("no instruction to the jury would cure the damage, and it would seem that the only relief would be a mistrial," if evidence of a "fair settlement" is admitted).

For example, in *Mutual Life Insurance Co.* v. *City National Bank & Trust Co.*, 86 F.2d 660, 663 (7th Cir. 1936), the Seventh Circuit ordered a new trial where plaintiff's counsel in a trial against an insurance company elicited evidence that other insurers had paid the plaintiff's claim, because "the clear implication to be drawn . . . was that other companies had accepted Mrs. Myers' proof of accident as sufficient upon which to recognize liability and that the defendant company was, therefore, unjustified and arbitrary in its denial of liability." *Id. See also Levick* v. *Maimonides Med. Center*, 2011 WL 1673782, at *2 (E.D.N.Y. May 3, 2011) ("Evidence regarding settlement agreements is often excluded at trial under Rule 403 of the Federal Rules of Evidence because of 'the danger of unfair prejudice and misleading the jury.'") (quoting *Sweeten* v. *Layson's Home Improvements, Inc.*, 2007 WL 1189359, at *3 (M.D. Pa. Apr. 19, 2007)).

The risk of confusion that would result is even higher in the instant case, where the factual and legal issues before the jury are already highly complex. *See LNC Invs., Inc.* v. *First Fidelity Bank*, 2000 WL 1072460, at *7 (S.D.N.Y. Aug. 3, 2000). Understanding the "fundamental differences" between the litigations that ultimately settled—involving "similar" claims and, in many instances, the same parties—and the instant case would "require a sophisticated appreciation" of the securities laws and "could easily confuse or mislead the jury." *Id.* A limiting instruction cannot prevent the prejudice caused by this misleading evidence. *See McInnis*, 765 F.2d at 252 ("[I]t is doubtful that any instructions, no matter how clear and comprehensive, could eradicate the prejudice engendered by the admission of the release in this case."). The Second Circuit (per Hon. Learned Hand) recognized this point 85 years ago in *Paster* v. *Pennsylvania R.R.*, 43 F.2d at 911.

-14-

Dr. Saunders' opinions based on evidence that certain loans were involved in lawsuits that settled would be extremely prejudicial to defendants, and as such, must be excluded from trial.  Fed. R. Evid. 403.

## II.   DR. SAUNDERS CANNOT PRESENT OTHER EXPERTS' OPINIONS.

It is well-established that an expert's testimony to the opinions of other, non-testifying experts is inadmissible hearsay.  *See, e.g.*, *Hutchinson* v. *Groskin*, 927 F.2d 722, 725-26 (2d Cir. 1991); Fed. R. Evid. 801(c), 802.  As the Second Circuit explained in *Hutchinson*, such testimony exemplifies one of the main reasons for the hearsay rule—that the other party cannot "cross-examine the [non-testifying expert] to challenge their qualifications and the bases of their opinions."  927 F.2d at 725-26.  As a result, a party may not "call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony."  *Malletier* v. *Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007).

Although Rule 703, Fed. R. Evid., permits disclosure to the jury of inadmissible facts or data upon which an expert relied under limited circumstances—"only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect"—courts have "squarely rejected any argument that Rule 703 extends so far as to allow an expert to testify about the conclusions of other experts."  *Mike's Train House, Inc.* v. *Lionel*, *LLC*, 472 F.3d 398, 409 (6th Cir. 2006); *United States* v. *Grey Bear*, 883 F.2d 1382, 1392-93 (8th Cir. 1989) ("We are persuaded that Fed. R. Evid. 703 does not permit an expert witness to circumvent the rules of hearsay by testifying that other experts, not present in the courtroom, corroborate his views.").

Here, the testimony Dr. Saunders seeks to offer concerning the Five Articles is clearly inadmissible hearsay.  Dr. Saunders admittedly did not play any part in writing or researching the Five Articles on which he relies.  (*See, e.g.*, Ex. 10 (Saunders Aug. Dep.) at 115:8-116:3, 142:2-11; Ex. 3 (Saunders Nov. Dep.) at 20:7-21:8.)   Instead, he merely repeats the authors' conclusions and states that those conclusions serve as "direct and indirect evidence" that the Industry Benchmark and the GSE Benchmark "contain loans with underwriting defects." (Ex. 2 (Saunders Report) ¶ 16.)  This is the definition of hearsay—an out-of-court statement offered for its truth.  Fed. R. Evid. 801(c).

The admission of such testimony would cause substantial prejudice, because there is no "opportunity to cross-examine [the non-testifying expert] regarding the methodology he employed, statistical discrepancies in his report, or any other matters which might illuminate shortcomings in his work."  *Polythane Sys., Inc.* v. *Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1208 (5th Cir. 1993) (holding that the admission of portions of a non-testifying expert's report, which was relied on by the testifying expert, was erroneous).  Moreover, even if it were possible to cross-examine Dr. Saunders about the opinions in the Five Articles, the errors in the opinions "could not be developed by . . . counsel without running the risk of emphasizing the inadmissible opinions."  *Hutchinson*, 927 F.2d at 726.  If Dr. Saunders' testimony is admitted, it will be impossible for defendants to properly challenge the opinions of the non-testifying experts expressed in the Five Articles (or Dr. Saunders' opinions based on those conclusions).[3]

---

[3]    Here, there are serious questions about the reliability of these articles, and such questions can be explored only through cross-examination of their authors.  For example, the Griffin Article determined that there had been a misrepresentation about occupancy if the mailing address where the borrower's first tax bill was sent differed from the address of the mortgaged property.  Ex. 5 (Griffin Article) at 1, 14; Ex. 3 (Saunders Nov. Dep.) at 112:17-23.  But Dr.

*(footnote continued)*

### III.    THERE IS NO RELIABLE CONNECTION BETWEEN THE LOANS IN THE FIVE ARTICLES AND THE LOANS IN DR. VANDELL'S BENCHMARKS.

Dr. Saunders seeks to show that Dr. Vandell's Industry and GSE Benchmarks "contain loans with underwriting defects" by showing, among other things, that there is "direct" or "indirect" evidence of "underwriting defects" in the five groups of loans studied in the Five Articles.  (Ex. 2 (Saunders Report) ¶ 15.)

This testimony should be excluded because Dr. Saunders has not adequately shown a relationship between the loans studied in the Five Articles and Dr. Vandell's Industry and GSE Benchmarks—nor (even where some overlap is possible) has he in any instance identified and quantified the extent of overlap.  Dr. Saunders also has not shown that any loans from the Five Articles that do appear in Dr. Vandell's benchmarks are representative of the larger populations from which they were drawn.  As a result, Dr. Saunders' testimony that Dr. Vandell's benchmarks must have "underwriting defects" because such defects exist in loans studied in the Five Articles is unreliable and prejudicial, and should be excluded.  *In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *4 ("*any* step that renders the analysis unreliable renders the expert's testimony inadmissible") (citation and internal quotation marks omitted) (emphasis in original); *Amorgianos*, 303 F.3d at 267 (requiring "rigorous examination" of expert's methods).

---

*(footnote continued)*

Saunders testified that he "had no idea" whether a borrower would update his or her tax records immediately upon moving into a new home.  Ex. 3  (Saunders Nov. Dep.) at 110:24-111:7.  The authors of the article themselves recognized that this "measure may capture purchasers who later become owner occupants."  Ex. 5 (Griffin Article) at 14-15.  The Griffin and Piskorski Articles both counted as unreported-second liens loans that were taken out *after* the first lien.  Ex. 3 (Saunders Nov. Dep.) at 106:22-25; 117:21-118:4.  This obviously does not test whether a misrepresentation about the presence of a second lien was made at the time of origination because a second-lien loan did not exist at the time of origination.

**A.     Dr. Saunders' Testimony Concerning the Industry Benchmark Is Unreliable.**

As set forth above, the Industry Benchmark includes all loans from the Loan Performance database that fall into the same four categories as loans in the relevant supporting loan groups (*e.g.*, Alt-A, first-lien loans with adjustable interest rates, subprime second-lien loans, etc.), excluding loans that are not comparable to loans in the supporting loan groups. *See* p. 3, *supra*. Dr. Saunders claims that characteristics of the loans studied in the Piskorski, Griffin and Demyanyk Articles are "evidence" of characteristics of the loans in Dr. Vandell's Industry Benchmark. (Ex. 2 (Saunders Report) ¶¶ 19, 22, 24.) Any such testimony would be highly unreliable.

With respect to the loans used in the Piskorski and Griffin Articles, Dr. Saunders merely "infer[s]" that "some overlap" must exist, though he provides no basis for this assertion, and he admits that he never determined how much overlap exists—if any. (Ex. 3 (Saunders Nov. Dep.) at 96:4-6.) In fact, both the Piskorski and Griffin Articles exclude more than half of their available data to merge that data with other datasets—something Dr. Vandell did not do in creating the Industry Benchmark—and both exclude millions of loans falling into other categories that Dr. Vandell includes in the Industry Benchmark, such as loans that were paid off early, second-lien loans, or loans with the same loan-to-value and combined loan-to-value ratio. *See* pp. 7-8, *supra*. Thus, while it is possible that there is "some overlap," Dr. Saunders has made no effort to show any overlap, or to quantify it.[4]

---

[4]     The first-lien subprime loans in the Industry Benchmark likely overlap with some loans used in the Demyanyk Article. The second-lien and Alt-A loans in the Industry Benchmark do not overlap. *See* p. 8, *supra*.

Moreover, to the extent that some subset of loans used in the Piskorski, Griffin and Demyanyk Articles are included in the Industry Benchmark, Dr. Saunders offers no evidence that those subsets of loans are representative of the full groups of loans used in those articles. But that is the only way that conclusions about loans studied in those articles could be said to apply to loans in the Industry Benchmark, given this Court's admonition that conclusions about one group of loans must be "reliably applied" to another or they are entitled to no weight.  *See, e.g.*, Opinion & Order, *FHFA* v. *Nomura Holding Am., Inc.*, 11 Civ. 6201, at *5-6, 81-82 (S.D.N.Y. Dec. 18, 2014) (Doc. No. 991).  Specifically, in granting plaintiff's summary judgment motion as to Nomura's due diligence defense, the Court held that when Nomura formed the supporting loan groups for the seven Certificates, it did so without "taking any care to ensure that the findings from its pre-purchase review could be reliably applied to the [supporting loan groups]."  *Id.* at 5-6, 81-82.  According to the Court, this "broke the link" between any pre-acquisition diligence Nomura had conducted and the characteristics of the supporting loan groups for the Certificates.  *Id.* at 6, 81.  Here, Dr. Saunders has failed to establish a reliable link between the Piskorski, Griffin and Demyanyk Articles and the loans in Dr. Vandell's Industry Benchmark.  Testimony not based on a reliable foundation cannot be admitted.  *Amorgianos*, 303 F.3d at 267.

**B.      Dr. Saunders' Testimony Concerning the GSE Benchmark Is Unreliable.**

Similar to the Industry Benchmark, the GSE Benchmark includes all loans that fall into the same categories as loans in the relevant supporting loan groups (excluding loans that are not comparable based on FICO score, origination date or loan-to-value ratio)—but is based on a database of loans purchased by Freddie Mac and Fannie Mae.  *See* p. 4, *supra*.  Dr. Saunders claims that the loans used in the Calem and Amromin Articles "necessarily include[]" some loans in Dr. Vandell's GSE Benchmark.  (Ex. 2 (Saunders Report) ¶¶ 25, 30.)  But again,

Dr. Saunders does not quantify the overlap, and there are substantial differences between the groups of loans used in these articles—which, for example, focus on "high cost" mortgages (Calem) and include prime loans (Amromin)—and the GSE Benchmark, which does not include these categories. *See* pp. 8-9, *supra*. Moreover, the GSE Benchmark contains 4.4 million loans, or less than 30 percent of the 15.2 million loans sold to Freddie Mac and Fannie Mae during the period 2005 to 2007. (*See* Ex. 2 (Saunders Report) ¶¶ 34-35.) The Calem and Amromin Articles use only 627,076 and 130,000 loans, respectively, which means that they could easily be comprised mostly or entirely of loans from the 10.8 million loans sold to Freddie Mac and Fannie Mae that are <u>not</u> in the GSE Benchmark. (Ex. 7 (Calem Article) at 124-25, 130; Ex. 8 (Amromin Articles) at 18, 21.) Dr. Saunders does not address this issue.

In addition, there is no evidence that any loans used in the Calem or Amromin Articles that are included in the GSE Benchmark are representative of the full sets of Calem and Amromin loans. Thus, conclusions reached by the authors of those articles cannot be reliably applied to the GSE Benchmark. *See FHFA* v. *Nomura*, 11 Civ. 6201, at *5-6, 81-82 (Doc. No. 991). *See also* p. 19, *supra*.

## C. Dr. Saunders' Testimony Concerning the Five Articles Is Misleading and Prejudicial.

Even if evidence concerning the Five Articles were somehow reliable (and it is not), permitting Dr. Saunders to testify about purported defects in groups of loans not at issue in this Action would only confuse the issues, mislead the jury and prejudice defendants. Under Rule 403, "the court may exclude . . . evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "'Unfair prejudice' within its context means an undue tendency to suggest decision

on an improper basis, commonly, though not necessarily, an emotional one." *Id.*, Advisory Committee's note.

Here, the probative value of Dr. Saunders' testimony concerning the Five Articles is extremely limited, because the connection (if any) between that testimony and Dr. Vandell's benchmarks is so tenuous and unreliable.  If the jury is permitted to hear evidence about alleged defects in sets of loans not at issue in this case, and not relied on by Dr. Vandell as benchmarks, the jury may improperly conclude that loans in the supporting loan groups (or loans upon which Dr. Vandell relies) also were not originated in accordance with guidelines.  Because Saunders' testimony about the Five Articles is not reliable, and such testimony risks confusion and unfair prejudice, Dr. Saunders' opinions relying on the Five Articles should also be excluded under Federal Rule of Evidence 403.  *See also Tourre*, 950 F. Supp. 2d at 675.

## IV.    THE ARTICLES THAT DR. SAUNDERS CLAIMS ARE "INDIRECT EVIDENCE" OF MISREPRESENTATIONS DO NOT PROVIDE RELIABLE SUPPORT FOR THAT OPINION.

Dr. Saunders relies on three of the Five Articles as "indirect evidence" that Dr. Vandell's Industry and GSE Benchmarks contain loans that were not originated in accordance with guidelines.  (Ex. 2 (Saunders Report) ¶¶ 16, 24, 27, 30.)  Those articles reach a variety of conclusions on (i) trends in default rates (*see* Ex. 8 (Amromin Article) at 18-20), (ii) the deterioration of the quality of loans prior to the financial crisis (*see* Ex. 6  (Demyanyk Article) at 1848), and (iii) "cherry picking" of loans by originators (*see* Ex. 7 (Calem Article) at 120.)  None of them conclude that the loans they examined were not originated in accordance with underwriting guidelines.  (*See* Ex. 6  (Demyanyk Article); Ex. 7 (Calem Article); Ex. 8 (Amromin Article).)  Dr. Saunders' testimony that these articles are indirect evidence of that

conclusion should be excluded as unreliable.  *See Ruggiero* v. *Warner-Lambert Co.*, 424 F.3d

249, 255 (2d Cir. 2005); *see also Amorgianos*, 303 F.3d at 266.

        At deposition, Dr. Saunders admitted that the three articles do not conclude or

assert that any loans were not originated in accordance with guidelines.  (Ex. 3 (Saunders Nov.

Dep.) at 124:11-13 (answering "[t]hey do not" in response to being asked whether the articles

"mentioned underwriting defects").)  Instead, Dr. Saunders contends that the articles are merely

"consistent with" the notion that some loans (among those used in the articles) were not

originated in accordance with underwriting guidelines—and he says that this notion "could

explain" the trends reported in the articles.  (*See* Ex. 3 (Saunders Nov. Dep.) at 118:18-119:5.)

Dr. Saunders himself recognized that he has no "proof" that any were underwritten defectively.

(Ex. 3 (Saunders Nov. Dep.) at 119:20-120:2, 122:12-13.)

        Even if Dr. Saunders' opinions based on these articles were somehow reliable, his

testimony would confuse and mislead the jury.  He cannot say that the loans studied in these

three articles were not originated in accordance with underwriting guidelines and he should not

be permitted to imply as much when offering opinions to the jury.   His testimony should be

excluded under Rule 403.  *See In re Puda Coal Sec. Litig.*, 2014 WL 2915880, at * 20 (S.D.N.Y.

June 26, 2014) (excluding expert's testimony that "run[s] the very real risk of misleading the

jury"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 545 (S.D.N.Y. 2004) (excluding

testimony that would "introduc[e] the 'experts' opinions and rhetoric concerning ethics as

alternative and improper grounds for decision on bases other than the pertinent legal

standards.").

## CONCLUSION

The Court should exclude Dr. Saunders' testimony in its entirety.

Dated:  New York, New York
        January 8, 2015

Respectfully submitted,

/s/ Thomas C. Rice
Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502

*Attorneys for Defendant RBS Securities Inc.*

/s/ David B. Tulchin
David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993

*Attorneys for Defendants Nomura Holding
America Inc., Nomura Asset Acceptance
Corporation, Nomura Home Equity Loan, Inc.,
Nomura Credit & Capital, Inc., Nomura
Securities International, Inc., David Findlay,
John McCarthy, John P. Graham, Nathan
Gorin, and N. Dante LaRocca*