UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,

        -against-

NOMURA HOLDING AMERICA, INC.,
et al.,

                Defendants.

**No. 11 Civ. 6201 (DLC)**

---

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF FHFA'S MOTION TO
EXCLUDE EXPERT TESTIMONY AND OPINIONS OF MICHAEL FORESTER**

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Philippe Z. Selendy
Manisha M. Sheth
Deborah K. Brown
Tyler G. Whitmer

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT .......................................................................................................................3

I.     DEFENDANTS MISCHARACTERIZE THE REPRESENTATIONS IN THE
OFFERING DOCUMENTS TO ARGUE THAT MR. FORESTER'S OPINIONS
ARE RELEVANT .....................................................................................................3

     A.     The Underwriting Representations Do Not Mean That Only Evidence
Available At The Time Of Origination Can Prove Falsity .....................................3

     B.     Retroactive AVMs Provide Relevant And Reliable Evidence Relating To
Whether Appraisals At The Time of Origination Were Accurate ..........................6

     C.     The Offering Documents Do Not Contain Any Representations About
Borrowers' Intent to Occupy The Properties .......................................................7

     D.     Disclaimers In The Offering Documents Relate Only To The "Aggregate
Principal Balance" Of The Loans Or The Addition/Subtraction Of Loans ............8

II.     MR. FORESTER'S METHODOLOGY IS UNRELIABLE .................................................9

     A.     Mr. Forester's Re-Underwriting Methodology Is Not Generally Accepted
Or Based On Sufficient Facts And Data ...............................................................9

     B.     Mr. Forester Failed To Reliably Test The Accuracy Of The LTV/CLTV
Ratios Represented In The Offering Documents ..................................................12

     C.     Mr. Forester Failed To Reliably Test The Accuracy Of The Owner
Occupancy Statistics In The Offering Documents.................................................13

     D.     Mr. Forester Failed to Test The Data On The Pre-Closing Loan Tapes
Data Even Though It Was Used To Create The Collateral Tables ........................15

III.     FHFA'S MOTION GOES TO ADMISSIBILITY, NOT WEIGHT ................................16

CONCLUSION..................................................................................................................16

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
  2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013) ........................................................................3

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
  920 F. Supp. 2d 475 (S.D.N.Y. 2013) ...............................................................................16

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ..........................................................................................................5

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003) ..............................................................................................5

*In re Elec. Books Antitrust Litig.*,
  2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) ..................................................................16

*FHFA v. Bank of Am. Corp.*,
  2014 WL 7232339 (S.D.N.Y. Dec. 18, 2014) ....................................................................4

*FHFA v. Nomura Holding Am., Inc.*,
  2014 WL 7232443 (S.D.N.Y. Dec. 18, 2014) ....................................................3, 4, 7, 13, 14

*FHFA v. SG Ams., Inc.*,
  2012 WL 5931878 (S.D.N.Y. Nov. 27, 2012) ....................................................................4

*FHFA v. UBS Ams., Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012) ....................................................................4, 7, 8, 14

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ..........................................................................................................4

*I. Meyer  Pincus & Assoc. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991) ..............................................................................................5

*Jund v. Town of Hempstead*,
  941 F.2d 1271 (2d Cir. 1991) ............................................................................................4

*McFarland v. Gregory*,
  425 F.2d 443 (2d Cir. 1970) ..............................................................................................3

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
  900 F.2d 576 (2d Cir. 1990) ..............................................................................................5

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
  595 F.3d 86 (2d Cir. 2010) ................................................................................................5

*In re Rezulin*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...............................................................................16

*Rmed Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
   2002 WL 31780188 (S.D.N.Y. Dec. 11, 2002) ........................................................................3

### **Statutes**

15 U.S.C. § 77*l*(a)(2)..........................................................................................................................4

Fed. R. Evid. 702 ........................................................................................................13, 14, 16

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator for the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie" and, collectively with Fannie Mae, the "GSEs") respectfully submits this reply memorandum in support of its motion to exclude the opinion testimony of Nomura's proffered re-underwriting expert, Michael Forester.[1]

## PRELIMINARY STATEMENT

Defendants cannot save Mr. Forester's proposed testimony from exclusion.  By reaffirming Mr. Forester's improper focus on what the loan underwriter of each sample loan knew or could have known at the time of origination, Defendants only highlight their attempt to shoehorn a scienter requirement into FHFA's strict liability claims.  What was or could have been known at the time of origination is irrelevant to the question actually before the Court— whether the representations in the Offering Documents were true at the Time of Issuance, notwithstanding what could have been known at that time (much less the earlier time of origination).

Defendants also ignore the substantive requirements of underwriting guidelines, focusing entirely on the procedural aspects of those guidelines.  Mr. Forester admittedly ignored any information the origination underwriter did not consider or was not required by guidelines to consider.  By determining only whether the underwriter followed the procedural requirements of underwriting guidelines at the time of origination, Mr. Forester ignored information relevant to whether loans complied with key substantive guideline requirements, such as maximum LTV/CLTV and DTI ratios and minimum FICO scores, that must be satisfied absent

---

[1]   This reply memorandum uses the same abbreviations and citations as FHFA's opening brief.  Citations to "Br." are to the Mem. of Law in Supp. of Pl. FHFA's Mot. to Exclude Expert Testimony and Opinions of Michael Forester, dated Dec. 22, 2014.  Citations to "Opp'n" are to Defendants' Opposition to Plaintiff's Motion to Exclude the Testimony and Opinions of Michael Forester, dated Jan. 6, 2015.

compensating factors.  Moreover, the Offering Documents contained representations about the number and percentage of loans in the SLGs with various collateral characteristics such as LTV/CLTV ratios and owner occupancy statuses.

       To assess whether such representations were accurate, re-underwriters use all available information, including post-origination information that reflects that a loan did not adhere to guidelines at the time of origination, or that the representations in the Offering Documents were inaccurate at the Time of Issuance.  Thus, Mr. Forester's methodology for re-underwriting *all* of the Sample Loans (not only the 629 findings referenced in Defendants' opposition at 15) is unreliable under the *Daubert* standards.  The methodology Mr. Forester chose to employ in this action is inconsistent with generally accepted methods of re-underwriting loans to determine whether they adhered to underwriting guidelines at the time of origination, as reflected by testimony from Nomura and its diligence vendors and Mr. Forester's own re-underwriting practices during the course of his career.  Moreover, Mr. Forester's methodology ignores critical information that directly bears on whether Defendants' representations in the Offering Documents were accurate.  Because Mr. Forester's opinions are irrelevant and his methodology is unreliable, they should be excluded in their entirety.

## ARGUMENT

I.   **DEFENDANTS MISCHARACTERIZE THE REPRESENTATIONS IN THE OFFERING DOCUMENTS TO ARGUE THAT MR. FORESTER'S OPINIONS ARE RELEVANT**[2]

   A.   **The Underwriting Representations Do Not Mean That Only Evidence Available At The Time Of Origination Can Prove Falsity**

Defendants' argument that the assessment of whether "the representations were false when made[]" must be determined solely with "information that . . . exist[ed] as of . . . loan origination," Opp'n at 8, is unsupported.  Defendants cite no authority for the proposition that the accuracy of the representations must be proved solely with information available at the time of origination, and this limitation does not appear in the Offering Documents.  *See* Opp'n, App'x A.

Even where scienter or knowledge are at issue (which is not the case here), courts uniformly hold that "later occurring evidence" can be probative of historical fact.  *Rmed Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 2002 WL 31780188, at *2 (S.D.N.Y. Dec. 11, 2002) ("[S]imply stating that materiality and scienter are determined based on the facts at the time of the alleged misstatement does not mean that later occurring evidence is irrelevant."); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 2013 WL 1155420, at *7 (S.D.N.Y. Mar. 20, 2013) ("As I have already held, after-the-fact testimony stating what defendants knew and did during the relevant time period is admissible."); *cf. McFarland v. Gregory*, 425 F.2d 443, 447 (2d Cir. 1970) (recognizing rule that evidence from later time period may be used to prove

---

[2]   Defendants also argue that "[Mr.] Forester's testimony that the Sample Loans generally complied with applicable underwriting guidelines at the time of loan origination is still highly relevant to show compliance with those guidelines as of [a] slightly later date."  Opp'n at 16 n.7.  However, Defendants' contention that the Certificates issued only "slightly later" than origination is unsupported, *see* Decl. of Charles Cipione in Support of Pl.'s Mot. for Partial Summ. J. on Defs.' Due Diligence and Reasonable Care Defenses, Ex. 10 (Nov. 10, 2014), Dkt. 989-10, and this Court has already found that securitization could be "months" after the acquisition diligence, which itself post-dated origination.  *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7232443, at *2 (S.D.N.Y. Dec. 18, 2014).

condition existing in earlier time period), *cited with approval in Jund v. Town of Hempstead*, 941 F.2d 1271, 1288 (2d Cir. 1991).

These precedents apply with even greater force to FHFA's claims, which do not require proof of scienter.  *See FHFA v. Bank of Am. Corp.*, 2014 WL 7232339, at *2 (S.D.N.Y. Dec. 18, 2014) ("This Court has repeatedly emphasized that neither Section 11 nor Section 12(a)(2) 'requires allegations of scienter . . . in order to state a claim.'") (quoting *FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 323 (S.D.N.Y. 2012)).  This Court has held that each of the Underwriting Representations "is a classic statement" of "objective fact," *FHFA v. SG Ams., Inc.*, 2012 WL 5931878, at *2, *3 (S.D.N.Y. Nov. 27, 2012), such that Defendants may be liable even if they "*could not have known*" that they were false, *FHFA v. Nomura Holding Am. Inc.*, 2014 WL 7232443, at *40 n.48 (S.D.N.Y. Dec. 18, 2014) (emphasis added) (quoting 15 U.S.C. § 77*l*(a)(2) and distinguishing between truth of representations and possibility of knowing their truth).  *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (holding that liability under the Securities Act may be based on an "innocent misstatement").  Defendants' attempt to limit proof of falsity to only those materials purportedly in existence at the time the loan was underwritten is incompatible with this strict liability standard.  The appropriate question is whether the representations in the Offering Documents were true as of the Time of Issuance, not whether the underwriter that originally underwrote the loans could have known they were false.

Similarly, Defendants' position that the representation that the Mortgage Loans "were originated" in accordance with guidelines is false only if the original loan underwriter failed to follow the underwriting process set forth in those guidelines (*e.g.*, Opp'n at 21-23) is both legally and factually unsupported.  Defendants ignore that the "veracity" of the Underwriting Representations must be determined "not by [their] literal truth, but by [their] ability to

accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010); *accord*, *e.g.*, *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (liability attaches where "material facts have been omitted or presented in such a way as to 'obscure[] or distort[]' their significance."). The Offering Documents represented that the mortgage loans "were originated" pursuant to guidelines in the context of other representations summarizing those guidelines—including their objective requirements, such as LTV/CLTV ratios, DTI ratios, and FICO limits—and stating that the guidelines measured borrowers' "ability to repay," *e.g.*, Ex. 3 to the December 22, 2014 Decl. of Tyler Whitmer in Supp. of Pl. FHFA's Mot. to Exclude Expert Testimony and Opinions of Michael Forester ("Whitmer Decl.") at 20-21. Defendants' narrow interpretation of the Underwriting Representations cannot shield them from liability or limit the parties' proof of liability at trial. *See DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (in finding falsity, the question is not whether "particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities].") (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (alterations in original)).

Defendants' limited interpretation of underwriting guidelines to include only process requirements, but not substantive requirements, is unsupported by the factual record. When re-underwriting loans as part of the acquisition process, Clayton Holdings, LLC ("Clayton"), one of Nomura's diligence vendors, reviewed loans to determine if "[t]he loan complies with all specific loan program parameters, including credit, LTV, documentation, debt ratios, and appraisal and property requirements for the credit grade assigned to the loan." Ex. 1 to the Declaration of Tyler Whitmer in Support of Plaintiff FHFA's Reply Motion to Exclude Expert

Testimony and Opinions of Michael Forester ("Whitmer II Decl.") at CLAY-FHFA-04874329.

Such a review encompasses both the process employed by the origination underwriter and the

substantive requirements of the underwriting guidelines.[3]

In sum, Mr. Forester's distortion of the Offering Documents to support his failure to

consider post-origination information in assessing whether the Offering Documents'

representation that the Mortgage Loans "were originated" in accordance with underwriting

guidelines and criteria is erroneous because:  (i) it is not supported by the plain language of the

Offering Documents, (ii) it is inconsistent with longstanding case law holding that "later

occurring evidence" can be probative of historical fact, (iii) it improperly attempts to impose a

scienter element on FHFA's strict liability claims, (iv) it ignores the substantive requirements of

the underwriting guidelines, and (v) it misconstrues the process-based requirements of the

underwriting guidelines to limit the underwriter's consideration to only those documents

expressly specified in the guidelines.

### B.   Retroactive AVMs Provide Relevant And Reliable Evidence Relating To Whether Appraisals At The Time of Origination Were Accurate

Defendants' argument that the representations in the Offering Documents relating to

LTV/CLTV ratios "were based solely on information as of the time of loan origination" is also

based on a flawed reading of the Offering Documents.  The fact that the Offering Documents

---

[3]   Defendants mischaracterize Mr. Hunter's review as solely an evaluation of the underwriting process used by the loan underwriter to approve the loan (*e.g.*, Opp'n at 15).  To the contrary, Mr. Hunter not only addressed the adequacy of the underwriting process, but also assessed the substantive requirements of the underwriting guidelines, including limits on LTV/CLTV ratios, DTI ratios, and FICO scores.  Both aspects of Mr. Hunter's review were necessary to determine whether the Sample Loans "complied with statements relating to the underwriting and credit quality of such loans in the Offering Documents for each Securitization."  Whitmer Decl, Ex. 3 at 1.  For example, Mr. Hunter "[r]ecalculat[ed] LTV and CLTV ratios using verified information contained in the loan origination file or any applicable third-party sources," *id.* at 96, including AVMs generated by FHFA's valuation expert, Dr. Kilpatrick.  Similarly, Mr. Hunter tested "whether the borrower's DTI ratio was within the guideline maximum," by "recalculating the borrower's income and debt to determine the correct DTI ratio."  *Id.* at 95-96.  The use of post-origination information to determine whether the loan complied with the applicable substantive requirements of the underwriting guidelines at the time of origination is not only proper, but necessary to test the accuracy of the representations made in the Offering Documents.  *Id.* at 99-100.

defined "value" as the lesser of "'(a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price of the property,'" Opp'n at 5, (quoting Opp'n, App'x B), does not mean that Mr. Forester need only perform an unspecified "reasonableness check of the [origination] appraisal" and take no steps to test the accuracy of the origination appraisal.  Opp'n at 24-26.  Indeed, such an approach would mean that an issuer and securities underwriter could simply report the appraised value relied on by the originator, regardless of whether such value was accurate.  This Court already has rejected this position, explaining that, "if it were the case that a substantial number of . . . appraisals were fraudulent, [the] definition [of "value" as the origination appraisal value] does nothing to render those LTV ratios less misleading."  *Nomura*, 2014 WL 7232443, at *40; *see also UBS Ams.*, 858 F. Supp. 2d at 327 ("[I]t is entirely appropriate to impose on [underwriters] the obligation to vet the accuracy of opinion statements attributed to third parties.").

### C.     The Offering Documents Do Not Contain Any Representations About Borrowers' Intent to Occupy The Properties

Defendants repeat the misguided arguments in their Motion to Exclude the Testimony of Robert W. Hunter Concerning Owner Occupancy Status ("Owner Occupancy Motion") to contend that the representations in the Offering Documents "refer to borrowers' intent as of the time of loan origination."  Opp'n at 6.  For the reasons set forth in FHFA's Memorandum in Opposition to Defendants' Owner Occupancy Motion, Whitmer II Decl., Ex. 2, Defendants' argument rests on an erroneous reading of the Offering Documents,[4] which plainly represent the number and percentage of mortgage loans in the SLGs that are owner-occupied and contain no

---

[4]  In support of their assertion that the Offering Documents contain this disclaimer, Defendants cite only the same testimony of GSE witnesses and FHFA's expert, Leonard Blum, which they cited in their Owner Occupancy Motion.  This evidence is insufficient for the reasons stated in FHFA's Opposition to that motion, Whitmer II Decl., Ex. 2 at 11-13.

disclaimer or representation that these collateral tables reflect the borrowers' intent at the time of origination.[5]

### D.     Disclaimers In The Offering Documents Relate Only To The "Aggregate Principal Balance" Of The Loans Or The Addition/Subtraction Of Loans

Defendants' reliance on certain disclaimers in the Offering Documents is misplaced.  The Offering Documents contain disclaimers that certain of the Mortgage Loans' characteristics may vary due either to (i) changes in the "aggregate principal balance" of the loans between the Cut-off Date and the Closing Date or (ii) the addition or subtraction of loans from the mortgage pools due to delinquency or default.[6]  None of the Offering Documents disclaim variation of any represented collateral characteristic due to misrepresentation or fraud.  Further, SEC regulations required Nomura to disclose (and five of the Certificates' Offering Documents specifically represented that Nomura would disclose) if the actual characteristics of the mortgage loans in the pools varied by five percent or more for any reason.[7]  Accordingly, such disclaimers do not

---

[5]  Furthermore, even in circumstances not applicable here where an offering document contained disclaimers that the owner occupancy representations were "as reported by the mortgagor at the time of origination," the Court already has found Defendants' argument to be "without merit," holding that such a disclaimer does not require FHFA to demonstrate "falsity on the part of the underlying borrowers."  *UBS Ams.*, 858 F. Supp. 2d at 329-330 (holding that "a Securities Act defendant cannot simply claim that she blindly reported information given to her by third parties and thereby avoid liability for inaccuracies that made their way into the offering materials").

[6]  Offering Documents for three securitizations stated the "aggregate principal balance" of the mortgage loans, as of the Cut-off Date, may vary from amounts disclosed in the collateral tables by up to five or ten percent.  Ex. 19 to the Declaration of Kunal J. Choksi in Opp'n to Pl.'s Mot. to Exclude the Testimony of Michael Forester (Jan. 6, 2015) ("Choksi Decl.") at NOM-FHFA_04811833 (disclaiming up to a ten percent variance in the NAA 2005-AR6 deal); Choksi Decl., Ex. 20 at NOM-FHFA_04729508 (disclaiming up to a ten percent variance in the NHELI 2006-FM1 deal); Choksi Decl, Ex. 23 at NOM-FHFA_05141971 (disclaiming up to a five percent variance in the NHELI 2007-1 deal).  The remaining four securitizations' Offering Documents stated that collateral characteristics may vary by up to five percent, but that any variances would be due to the addition or subtraction of loans following delinquency or default.  Choksi Decl., Ex. 21 at NOM-FHFA_04638356 (NHELI 2006-FM2); Choksi Decl., Ex. 22 at NOM-FHFA_04620924 (NHELI 2007-HE3); Choksi Decl., Ex. 24 at NOM-FHFA_05591368 (NHELI 2007-2); Choksi Decl., Ex. 25 at NOM-FHFA_04732665 (NHELI 2007-3).

[7]  Whitmer II Decl., Ex. 3, *Asset-Backed Sec.*, Release No. 8518 (Dec. 22, 2004) ("We continue to believe that if the actual pool backing the investor's securities differs materially from that offered and described to the investor in the prospectus (and hence was to reflect the basis for the investor's investment decision), the investor is entitled to disclosure of the actual asset pool that the investor is primarily dependent on for repayment."); Choksi Decl., Ex. 21 at NOM-FHFA_04638356 (NHELI 2006-FM2); Choksi Decl., Ex. 22 at NOM-FHFA_04620924 (NHELI 2006-HE3); Choksi Decl., Ex. 23 at NOM-FHFA_05142028-29 (NHELI 2007-1); Choksi Decl., Ex. 24 at NOM-FHFA_05591418 (NHELI 2007-2); Choksi Decl., Ex. 25 at NOM-FHFA_04732715 (NHELI 2007-3).

support Mr. Forester's methodology of limiting his consideration to information available to the underwriter at origination.

## II.   MR. FORESTER'S METHODOLOGY IS UNRELIABLE

Mr. Forester's methodology ignores any information not available to the loan underwriter at the time of origination, as well as any information that was available to but not considered by the underwriter unless the applicable guidelines specifically instructed the underwriter to consider such information.  Br. at 13-18.[8]  This approach is wrong for the reasons below.

### A.   Mr. Forester's Re-Underwriting Methodology Is Not Generally Accepted Or Based On Sufficient Facts And Data

During the Relevant Period, the generally accepted method for re-underwriting mortgage loans was to consider all information available at the time of the re-underwriting to test whether the loan was originated in accordance with applicable underwriting guidelines and standards.[9] As explained in FHFA's opening brief, Nomura itself considered *all* information available, including information outside of the loan file, when re-underwriting loans.  Br. at 6-7.  Neil Spagna, head of Nomura's diligence group, testified that he considered it important to look at information outside of the loan file when testing whether a loan complies with guidelines. Whitmer Decl., Ex. 11 at 70:9-14.[10]  By ignoring these sources of information, Mr. Forester

---

[8]  Specifically, Mr. Forester did not consider information outside the loan file that the origination underwriters "were not required or reasonably expected to collect," regardless of the probative value of that information.  Whitmer Decl., Ex. 1 at 48; Opp'n at 11.  Additionally, Mr. Forester mechanically discounted any evidence identified by Mr. Hunter if the document containing the evidence "did not exist at the time of origination," regardless of the time period to which the information pertains.  Whitmer Decl., Ex. 1 at 49; Whitmer II Decl., Ex. 4 at 197:9-24 (Mr. Forester testified that he "cleared findings by Mr. Hunter that relied upon post-closing documents.");  Opp'n at 11.  Despite his methodology in this action, Mr. Forester considered post-origination information when conducting re-underwriting reviews during his prior employment.  Br. at 12.

[9]  Other banks, including HSBC and Goldman Sachs, similarly considered all available information, including information outside of the loan file, when conducting re-underwriting reviews, providing further evidence that doing so is the generally accepted practice for re-underwriting loans.  *See*, *e.g.*, Whitmer II Decl., Ex. 5 at 806:22-807:15; Whitmer II Decl., Ex. 6 at 551:6-552:9; Whitmer II Decl., Ex. 7 at 328:25-330:13.

[10]  The corporate designee of Clayton specifically testified that Clayton would rely on third-party information outside of the loan file when conducting diligence.  Whitmer II Decl., Ex. 8 at 183:4-187:7.  In fact,

failed to follow generally accepted re-underwriting methodology.  As a result, his opinions are unsupported by sufficient facts and data.

Defendants erroneously claim that Mr. Forester "considered information outside the loan file if the underwriting guidelines directed the underwriter to do so."  *See* Opp'n at 11-12.  In support of their argument, Defendants point to Loan No. NHELI_2006_FM1_2002009090.  However, Mr. Forester did not consider post-origination documentation to uphold the misrepresentation of employment defect identified by Mr. Hunter for this loan.  Rather, Mr. Forester found that the loan was not originated in accordance with guidelines because the required ▮▮▮▮▮▮▮▮▮▮▮ was missing.  Thus, even though he ultimately agreed with Mr. Hunter's conclusion that the loan did not comply with guidelines, Mr. Forester ignored the ▮▮▮▮▮▮▮▮▮▮▮▮ relied upon by Mr. Hunter because it was obtained post-origination and "w[as] not, and could not be, available to the underwriter at the time of loan approval."  Choksi Decl, Ex. 10 at 3.  Thus, contrary to Defendants' contention, Mr. Forester did not rely on information outside the loan file but rather solely relied on the fact that the loan file did not contain the two-day verification required by the guidelines.

Even where Mr. Forester claims to consider information outside the loan file, he does so only when the underwriting guidelines expressly directed the underwriter to consult the document *and* where there was proof the document existed at the time of origination.  Whitmer Decl., Ex. 1 at 48-49.  This myopic interpretation of the information an underwriter should consider ignores that underwriting guidelines do not, and could not possibly, specify *every* document an underwriter could or should review when approving a loan.  Guidelines required underwriters to make determinations concerning a borrower's credit worthiness and ability to

---

Nomura instructed its own third-party diligence vendors to consider third-party sources like PACER when re-underwriting loans.  Whitmer Decl., Ex. 11 at 265:2-22, 266:15-267:6.

repay the loan and did not limit the documentation an underwriter could consult in making that determination.[11]  Many of the relevant guidelines explain that an underwriter should take a holistic approach to funding "good" loans to borrowers with the ability and intent to repay that are secured by appropriately-valued collateral.  *See*, *e.g.*, Whitmer II Decl., Ex. 9 at NOM-FHFA_04450293 (ResMae guideline describing a "good loan" and admonishing that "[a]uthorized signers will approve only good loans"); Whitmer Decl., Ex. 30 at LF1UBS_00051227 (Fremont guideline stating that "Fremont believes the purpose of underwriting a loan is to determine the borrower's ability and willingness to repay the debt, and to determine if the property taken as collateral has sufficient value to recover Fremont's investment, should a default in repayment occur").  Defendants point to no guideline that prohibits an underwriter from looking to any source of information to make that ultimate determination to fund the loan.  And there is certainly nothing prohibiting a *re-underwriter* from looking at all sources of information to determine whether a loan complies with representations made about it to potential investors.

Finally, Mr. Forester's methodology ignores information contained in the post-origination documents even when such information would, in many instances, have been available at origination.  Defendants admit in their Opposition that "information in [a] 2014 re-verification [of employment] was available at the time of loan origination."  Opp'n at 11-12; *see* Choksi Decl., Ex. 10 at 3.  The same is true of other forms of proof of employment.  For example, one borrower claimed that he was ███████████████████

---

[11]  *See, e.g.*, Whitmer Decl., Ex. 30 at LF1UBS_00051228 (instructing the underwriter to "[c]onsider the financial ability and credit worthiness of the borrower to repay the loan – not just the equity in the home – in order to avoid default and foreclosure").  Nomura diligence personnel confirmed that it was a basic requirement of underwriting to establish that a borrower had the ability and willingness to repay the loan, which included assessing the reasonableness of the borrower's stated income, investigating unresolved credit inquiries for additional debt, and identifying red flags and inconsistencies in the borrower's loan application.  Whitmer II Decl., Ex. 10 at 107:12-18, 128:9-22, 111:15-22, 26:6-25, 143:12-144:17, 304:6-305:25; *see also* Whitmer II Decl., Ex. 11 at 191:23-192:3.

 For ███████████ applicants, the lender's guidelines required the lender to verify the borrower's employment with a business license, professional license, CPA statement, or copy of business advertising (*e.g.*, Yellow Pages, classified ad, state and/or local chamber of commerce ad).  The lender accepted ███████████████████ along with the borrower's ███████████████████████████████  The borrower resided in █████████ which required licensing for individuals caring for unrelated children from more than one family.  An audit search of licensing records (available at the time of origination) did not show any license issued to the borrower.  Whitmer II Decl., Ex. 12 at 5-6.  The loan file contains no evidence that the lender verified the borrower's employment as specified in the applicable guidelines.

### B. Mr. Forester Failed To Reliably Test The Accuracy Of The LTV/CLTV Ratios Represented In The Offering Documents

As Defendants recognize, underwriting guidelines "specify the maximum LTV ratio for a particular type of mortgage loan."  Opp'n at 24.  But Mr. Forester's review focused solely on assessing the mechanics of the appraisal process, and not the accuracy of the valuation.  *Id.*  In doing so, Mr. Forester took a narrow, limited approach to evaluating LTV ratios that failed to assess whether those ratios complied with underwriting guidelines or were accurately disclosed in the Offering Documents.

Such a constricted approach is inconsistent with the approach used by Defendants and other market participants in their pre-purchase diligence and surveillance efforts.  Nomura, like others in the industry, recognized that tools such as AVMs should be used to test whether the appraised value at the time of origination was accurate.[12]  By failing to conduct this objective test

---

[12]  Whitmer II Decl., Ex. 13 at 177:9-16 (recognizing that automated valuation models were used to test the accuracy of the appraised value at origination); Whitmer II Decl., Ex. 14 at NOM-FHFA_04923046 (same); Whitmer II Decl., Ex. 15 at NOM-FHFA_04881241 (same).  Defendants' failure to conduct adequate valuation

of the appraised value, and by ignoring the findings of Mr. Hunter that were based on the

Greenfield AVM,[13] Mr. Forester has rendered his methodology for assessing the Sample Loans'

LTV and CLTV ratios unreliable because it ignores generally accepted, competent evidence of

value.  Fed. R. Evid. 702(b) & (c).[14]

### C.   Mr. Forester Failed To Reliably Test The Accuracy Of The Owner Occupancy Statistics In The Offering Documents

Mr. Forester's review of the occupancy status of the Sample Loans is unreliable because

he limited his review to whether the borrower stated an intent to occupy the mortgaged property.

Opp'n at 26-27; Whitmer Decl., Ex. 1 at 61-62.  If a borrower signed a loan application,

occupancy agreement, or certificate stating an intention to occupy the property, Mr. Forester

considered it evidence that the representations in the Offering Documents were accurate.  Opp'n

at 26-28.  Mr. Forester maintained this reliance on the borrowers' statements even when

confronted with evidence that contradicted the represented occupancy status, and instead

concluded that the represented occupancy status was valid because "the borrower stated his

---

diligence stemmed from their failure to incorporate the information obtained from AVMs in making representations about LTV/CLTV ratios in the Offering Documents.  *Nomura Holding*, 2014 WL 7232443, at *40 ("[W]hen they had reason to doubt the accuracy of those statements, whether from a post-origination BPO or other information received during their investigation, then they had a duty to take corrective action.").  Mr. Forester repeats the error made by Defendants in that he also blindly reports the appraised values submitted to the loan underwriter while ignoring evidence showing those valuations to be false.

[13]   Defendants assert that Dr. Kilpatrick's AVM valuations "are based on tax assessed values from 2011 to 2014, years after the loans were originated."  Opp'n at 12.  As FHFA explained in response to Defendants' motion to exclude Dr. Kilpatrick's testimony, tax assessed value was one of seven hedonic variables the Greenfield AVM used to correlate the market value of the subject properties to the market values of the comparable properties and, in turn, to generate a reliable valuation as of the original date of the appraisal.  *See* Whitmer II Decl., Ex. 16 at 7.  Moreover, Mr. Hunter relies solely on the AVM values generated by the Greenfield AVM, and does not rely directly on the subject properties' tax assessed values.  Whitmer Decl., Ex. 3 at 99 ("For purposes of determining whether the LTV and CLTV ratios in the Prospectus Supplements were accurate, the LTV/CLTV ratios for each Mortgage Loan were recalculated based on the valuation of the subject properties conducted by Dr. John Kilpatrick[.]").  Thus, Defendants' contention that Mr. Hunter relied on post-origination valuations in recalculating the LTV and CLTV ratios is wrong.

[14]   In contrast, Mr. Hunter used a retrospective AVM to determine if the appraised value for the Sample Loans was accurate, and where it was outside of tolerance, recalculated the LTV and CLTV ratios for those loans.  Mr. Hunter's AVM-based findings enable him to determine whether the Sample Loans exceeded guideline-maximum LTV and CLTV ratios and whether the pre-closing loan tapes—and in turn the collateral tables—accurately represented those ratios.

intent on a signed application and occupancy agreement[.]" Opp'n at 28.[15]  Mr. Forester's

opinion effectively restates the representations in the Offering Documents and asserts that they

provide evidence of their own accuracy.[16]  Moreover, his approach runs afoul of the Court's

holding "that a Securities Act defendant cannot simply claim that she blindly reported

information given to her by third parties and thereby avoid liability for inaccuracies that made

their way into the offering materials." *UBS Ams.*, 858 F. Supp. 2d at 330; *see also Nomura*, 2014

WL 7232443, at *40 (holding that defining a statistical representation as the product of a third

party's statement "does nothing to render [the statistical representations] less misleading.").

  Mr. Forester's methodology fails to test whether the borrower actually occupied the

mortgaged property as the borrower's primary residence, as represented in the Offering

Documents.  Opp'n at 26.  He ignored any documents or information that reflected or called into

question the true occupancy status of the mortgaged properties, including documents outside the

loan file.  Not only did Mr. Forester reject all findings by Mr. Hunter that relied on post-

origination documents no matter how probative, he also neglected to search for or consider any

such evidence as part of his own review.  *See* Br. at 14-15; Whitmer Decl., Ex. 1 at 63.  Mr.

Forester's methodology is inconsistent with generally accepted methods of re-underwriting.

Even Nomura itself used post-origination information during a post-securitization fraud review

---

  [15]  Mr. Forester's review ignored evidence that the borrower failed occupy the mortgaged property as his or her primary residence for twelve months even where the Mortgage Documents specifically required an occupancy term of one year.  For example, Mr. Hunter found it more likely than not that the occupancy status for loan NAA_2005_AR6_1002196236 was misrepresented.  Choksi Decl., Ex. 18 at 3.  The Mortgage Document for this loan specifically required that the borrower occupy the property as his or her principal residence for at least one year.  Whitmer II Decl., Ex. 18 at WFFHFASMPL001425744.  Mr. Hunter identified evidence that the borrower ███████████████████████████████████████████████████████  Choksi Decl., Ex. 18 at 3.  Mr. Forester refused to consider this evidence and simply relied on the borrower's occupancy certificate and loan application in affirming the represented occupancy status of the property.  Opp'n at 27.

  [16]  In this regard, Mr. Forester's opinion will not "help the trier of fact to understand the evidence or to determine a fact in issue" because it merely restates the fact being contested (the accuracy of the occupancy representations) without providing support for that fact.  Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993).

to identify loans with occupancy misrepresentations.  Whitmer Decl., Ex. 17 at Row ██

(LMSLoanID ████████ and Row ███ (LMSLoanID ████████ (identifying two loans with

misrepresentations of occupancy based on their ██████████████[17]  Thus, Mr. Forester's

methodology is counter to the methodology Nomura itself used when re-underwriting loans to

determine if there were misrepresentations of occupancy.

### D.     Mr. Forester Failed to Test The Data On The Pre-Closing Loan Tapes Data Even Though It Was Used To Create The Collateral Tables

Mr. Forester disagreed with all of Mr. Hunter's findings that were based on inaccuracies

in the pre-closing loan tapes because:  "(1) alleged 'Pre-Closing Loan Tape Discrepancies' are

not violations of underwriting guidelines and (2) every one of these findings was derivative of

another claim Mr. Hunter made related to the same loan, nearly all of which were also incorrect."

Whitmer Decl., Ex. 1 at 45.

However, Mr. Forester fails to understand that these data inaccuracies establish violations

of the substantive requirements of the underwriting guidelines and further establish the

inaccuracies in the collateral tables in the Offering Documents and the information used to

establish credit ratings.  The data contained on these pre-closing loan tapes was the basis for the

collateral information contained in the collateral tables in the Offering Documents, Br. at 17

n.16, and for the credit rating provided by the rating agencies, Whitmer II Decl., Ex. 19 at NOM-

FHFA_04637514 (Nomura collateral analyst sending "collateral tape and strats" to Moody's).

Curiously, Mr. Forester testified that he was unaware that the loan tapes were used to create the

collateral tables in the Prospectus Supplements.  Whitmer II Decl., Ex. 4 at 162:21-25 ("[Q]. So I

am [not] asking [] whether you know how those tables were created.  But I am asking whether

---

[17]    As Mr. Forester admits, borrowers have incentives to misrepresent their occupancy status.  Whitmer II Decl., Ex. 4 at 278:24-280:13; Whitmer Decl., Ex. 3 at 30, 78-79.  Nomura itself warned that "[m]isrepresentation of occupancy is a serious problem in the mortgage industry."  Whitmer II Decl., Ex. 17 at NOM-FHFA_05063733.

you know that the loan tape was used to create the tables.  A. I do not know that.").  Thus, Mr.

Forester's failure to test the accuracy of the data that Nomura represented was true to investors

and the ratings agencies renders his methodology unreliable.  *See* Fed. R. Evid. 702(c).

## III.    FHFA'S MOTION GOES TO ADMISSIBILITY, NOT WEIGHT

Defendants argument that FHFA's criticisms of Mr. Forester's methodology go to weight

rather than its admissibility, Opp'n at 29-30, ignores the fact that FHFA has challenged the

relevance of Mr. Forester's opinions and the reliability of his methodology.  Br. at 9-18.[18]  Mr.

Forester's use of a re-underwriting methodology that is inconsistent with generally accepted re-

underwriting practices and that fails to consider relevant information fatally impacts the

reliability of his opinions, and thus, renders his opinions inadmissible.  *See In re Rezulin*, 309 F.

Supp. 2d 531, 539-40 (S.D.N.Y. 2004); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at

*3-4 (S.D.N.Y. Mar. 28, 2014) (Cote, J.).

<u>CONCLUSION</u>

For the reasons set forth above, FHFA's respectfully requests that its motion to exclude

the opinions and testimony of Michael Forester be granted in its entirety.

---

[18]    Defendants attempt to distinguish Judge Rakoff's opinion demonstrating this point, *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013), is disingenuous.  Although the review in *Flagstar* was focused on representations in a loan purchase agreement instead of offering documents for RMBS certificates, the appropriate analysis remains the same—based on all available information, were the representations about the loans true when made.

DATED:   New York, New York
            January 16, 2015

Respectfully submitted,

QUINN EMANUEL URQUHART &
  SULLIVAN, LLP


By: s/ Manisha M. Sheth
Philippe Z. Selendy
Manisha M. Sheth
Deborah K. Brown
Tyler G. Whitmer

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

17