Opposition to Defendants' Motions *in Limine* Nos. 4 & 5

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 | FAX (212) 849-7100

January 20, 2014

B<small>Y</small> E<small>LECTRONIC</small> M<small>AIL</small>

The Honorable Denise L. Cote
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1610
New York, NY 10007-1312

Re:     *FHFA v. Nomura Holding America, Inc., et al.*, No. 11 Civ. 6201 (S.D.N.Y.) (DLC)

Dear Judge Cote:

        FHFA respectfully submits this opposition to Defendants' Motions *in Limine*, Nos. 4 & 5
("Mot. No. 4" or "Recovco Mot."; and "Mot. No. 5" or "CAM Mot."). In their Recovco Motion,
Defendants seek to preclude Dr. Kilpatrick from testifying regarding appraisal reviews
performed by Recovco Mortgage Management, LLC ("Recovco"). In their CAM Motion,
Defendants seek to preclude Dr. Kilpatrick from testifying regarding Multiple Listing Service
("MLS") data that Dr. Kilpatrick utilized to analyze questions 7, 8, and 9 to his Credibility
Assessment Model ("CAM"). Defendants' motions should be denied.

**Motion *in Limine* No. 4**

**I.      Dr. Kilpatrick Will Not Testify Regarding Recovco's Opinions At Trial**

        In support of its claim that Defendants' disclosures concerning LTV ratios were false,
FHFA submitted reports from real estate appraisal and finance expert John A. Kilpatrick, Ph.D.
Dr. Kilpatrick's reports address (1) the accuracy of the appraisals underlying the LTV ratios of
the sample loans selected by Dr. Cowan (the "Accuracy Report," as supplemented); and (2)
whether the appraisals for a subset of those loans violated the Uniform Standards of Professional
Appraisal Practice ("USPAP") and thus were not "credible," as that term is defined by USPAP
and other applicable standards of appraisal practice (the "Credibility Report").

        To evaluate the credibility of the appraisals, Dr. Kilpatrick used a deterministic
credibility assessment scoring model referred to as the "CAM."[1] Seeking to further validate the
reliability of his CAM findings, Dr. Kilpatrick also requested "an independent third-party firm,
[Recovco], to perform its standard collateral review[s] on the Nomura Appraisals." Ex. 1
(Credibility Report) at 4.

---

[1]  The CAM scored the credibility of each relevant appraisal using a list of 31 questions, which were based on fields
in the Uniform Residential Appraisal Report ("URAR") form on which the original appraisal was prepared and on
requirements drawn from USPAP and applicable appraisal standards and practice. *See* Pl. Mem. in Opp. to Defs.'
*Daubert* Mot. of Dr. Kilpatrick ("Kilpatrick *Daubert* Opp.") at 10-11.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG |
PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

Recovco's independent third party appraisal reviews[2] were performed by licensed appraisers, who evaluated the original appraisals' adherence to USPAP and the Fannie Mae appraisal standards.  Ex. 1 (Credibility Report) at 107.  The reviews concluded that 95.54% of the sampled appraisals contained sufficient violations of USPAP and other industry standards such that their credibility was in serious doubt.  *Id*. at 110.  Recovco's findings matched the CAM's findings 88.12% of the time, and, in the handful of instances in which Recovco came to a different conclusion than that reached under the CAM methodology, Dr. Kilpatrick performed an additional evaluation of the appraisal at issue to determine how Recovco's review and results differed from his results.[3]  Ex. 3 (Credibility Report App'x 6-2).

In their motion, citing the same line of cases that FHFA submitted in its motion to exclude Defendants' appraisal expert, Michael Hedden, from testifying regarding the independent and unsupervised opinions of iMortgage Services' appraisers, Defendants argue that Dr. Kilpatrick did not sufficiently oversee Recovco's independent findings and conclusions.  Recovco Mot. at 2-3.  FHFA of course agrees with the validity of this line of cases.[4]  The purpose of the Recovco reviews, however, was solely "independent validation" of the CAM's reliability.  Ex. 1 (Credibility Report) at 105; Pl. Mem. in Opp. to Defs.' Mot. to Exclude Donald Epley (Dkt. # 1098) at 11 ("But, whereas . . . Recovco provided independent empirical verification of CAM results, Dr. Epley provided independent verification of the CAM's methodology and its basis in USPAP and other appraisal standards and practice.") (internal citations omitted).  As Dr. Kilpatrick will not testify to Recovco's findings and conclusions at trial, Defendants' basis for preclusion is moot.  Ex. 2 (Kilpatrick 7/14 Tr.) at 341:22-342:2 ("Q. Okay.  Now, in your report in several places you indicate that they performed an -- an independent review; is that correct?  A. Yes."); Ex. 4 (Kilpatrick 7/15 Tr.) at 191:3-7 ("I find Recovco's work to be compelling.  I … stand behind my CAM.").

## Motion *in Limine* No. 5

## II.     Dr. Kilpatrick Properly Utilizes Multiple Listing Service Data In His Credibility Reviews

In his CAM methodology, Dr. Kilpatrick directed local appraiser-researchers to utilize their local Multiple Listing Services ("MLS") to provide him with summary data about supply and demand, property value trends, and marketing time, in the areas in which the Nomura sample appraisals were located.  Summary data provided by local MLSs is a widely accepted form of data routinely utilized and relied upon by appraisal professionals.  Weeks after Dr. Kilpatrick's deposition, Defendants pretextually asserted that Dr. Kilpatrick failed to produce the underlying property data utilized by the local MLSs that Dr. Kilpatrick's local appraiser-researchers accessed to respond to his requests.  As there is no prohibition on Dr. Kilpatrick relying on MLS summary information that is routinely relied on by appraisal professionals without securing and producing the underlying data utilized by each local MLS, Defendants' motion should be denied.

---

[2]   Ex. 2 (Kilpatrick 7/14 Tr.) at 341:22-343:21.

[3]   Dr. Kilpatrick found that differences between the CAM and Recovco results were, for the most part, a result of differences in the types of issues each methodology focuses on. Ex. 3 (Credibility Report App. 6-2).

[4]   Like Dr. Epley who, given Defendants' failure to raise any issue with the priorities and weightings of the aspects and categories that inform the scores given to the CAM questions, no longer needed to testify at trial, Defendants never asked Dr. Kilpatrick at his deposition (or FHFA counsel) if Dr. Kilpatrick would be presenting the Recovco findings at trial.

**Opposition to Defendants' Motions *in Limine* Nos. 4 & 5**

### A.      Dr. Kilpatrick's Use of MLS Summary Data

Questions 7, 8 and 9 of Dr. Kilpatrick's CAM methodology address the credibility of the Nomura sample appraisals by evaluating whether the original appraiser properly reported supply and demand (question 7), the average property value trend over the prior four quarters (question 8), and the average marketing time over the prior four quarters (question 9).  Ex. 1 (Credibility Report) at 73-76.  Failure to accurately analyze and report these aspects of an appraisal are, as Dr. Kilpatrick explains, outright violations of USPAP and the Uniform Residential Appraisal Report ("URAR") form, on which the appraisals were performed, and compromise the accuracy of sales comparison adjustments, "inevitably [leading] to a value opinion that is inaccurate and not credible." *Id*. at 74.

To analyze the respective supply and demand, property value trend, and marketing time data for each of the Nomura sample appraisals, Dr. Kilpatrick directed the appraiser-researchers to provide him with available local MLS summary data regarding the number of expired or withdrawn listings in the area, the number of properties sold, the median sales prices for properties, and the marketing time for properties.  Ex. 5 (Credibility Report App. 4-3) at 7; Ex. 6 (Credibility Report App. 4-1a) at 12-15.  *See* Ex. 7 (Credibility Report App. 4-2) ("Please use the Neighborhood Boundaries as they appear on the [appraisal] provided to answer the questions on the research form. . . . For the Subject Neighborhood, please provide the quarterly, median (or average) sales price, number of sales, and average days on market."); Ex. 8 (Credibility Report App. 4-4).  In response, the appraiser-researchers provided Dr. Kilpatrick with the summary output data of their respective local MLS.  If readily available, the appraiser–researchers also provided Dr. Kilpatrick with the specific underlying data the local MLS utilized to generate its summary data, though this data was not always available or provided by the appraiser-researchers.[5]

### B.      MLS Summary Data Is Regularly Utilized and Relied on By Appraisal Professionals

An expert witness is permitted wide latitude in the facts or data used to formulate their expert opinions, provided those facts or data are of the same kind that fellow "experts in the particular field would reasonably rely."  Fed. R. Evid. 703; *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993) (holding that trial court has authority under Rule 703 to make pretrial determination that expert witness testimony is trustworthy); *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1246 (E.D.N.Y. 1985), *aff'd,* 818 F.2d 187 (2d Cir. 1987) (finding one guarantee of trustworthiness is that expert relied on material of a type normally relied on by experts in the field); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) ("Unlike an ordinary witness, … an expert witness is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observations").

MLSs are a well recognized source of data routinely used and relied on by appraisal professionals to generate summary information based on a wide array of residential property information, including property descriptions, listing histories, and sales histories.  Ex. 9 (Appraisal of Real Estate (14th ed. 2013) at 119.  Specifically, MLSs are routinely used by appraisers to generate summary statistics based on a local MLS's data, as was done in connection with certain of Dr. Kilpatrick's CAM questions.  *See* Ex. 10 (C.H. Wurtzebach and M.E. Miles, Modern Real Estate (5th ed. 1994)) at 199; Ex. 11 (D.A. Braun, An Introduction to Market Components and Interactions, Appraisal Journal (2013) at 67 ("Those appraisers who work in

---

[5]   Where this underlying data was provided to Dr. Kilpatrick by his appraiser-researchers, the data was produced to Defendants.  *See e.g*., Ex. 12 (Credibility Report App. 4-5b) (Research Items for NHELI 2006 HE3 2002002123).

areas serviced by a modern [MLS] have a lot of this data at their fingertips. Many MLSs allow the appraiser to draw a rectangle on a map and only include properties that are within that rectangle. These properties can be queried for sales, active listings, expired, and withdrawn properties."). Courts regularly permit appraisal experts to rely on such MLS data as a basis for their opinions.[6] Defendants' own appraisal expert, Michael Hedden, also conceded that it is appropriate for Dr. Kilpatrick to rely upon MLS data.[7] Dr. Kilpatrick's reliance on these MLS data was therefore entirely consistent with the standard practice in the appraisal field and properly supported under Federal Rule 703. Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts of data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

Dr. Kilpatrick is entitled to rely on these local MLS summary statistics without securing and producing the data utilized by the MLS to generate these summary statistics.[8] Moreover, Defendants, through their appraisal experts, had access to these MLS and over six months to generate whatever additional summary statistics they wished. Having failed to secure or even demand such information themselves, Defendants cannot now claim that Dr. Kilpatrick should be precluded for not requiring the production of the underlying data utilized by each local MLS.

## C. Defendants' Selective Citation to Dr. Epley's Out of Context Deposition Testimony Does Not Support Their Motion

Aware that Dr. Kilpatrick's reliance on the MLS data is entirely proper, Defendants seek to create confusion by citing out-of-context snippets of Dr. Epley's deposition testimony to suggest, incorrectly, that materials were withheld from Defendants. Tellingly, however, Defendants fail to cite Dr. Kilpatrick's Credibility Report, its appendices or supporting materials, or any of the 40-plus hours of deposition testimony by Dr. Kilpatrick, and instead cite only

---

[6] *In re Lepage*, Bankruptcy No. 8-10-74093, 2011 WL 1884034, at *5 (E.D.N.Y. May 18, 2011) (finding that expert, who relied on residential MLS data followed a "methodology [that] was consistent with industry standards and his testimony was credible"); *In re Methyl Teriary Butyl Ether (MTBE) Products Liability Litigation*, Nos. 03 Civ. 8284, 03 Civ. 9050, 2008 WL 2324112, at *5 (S.D.N.Y. June 5, 2008) (granting publication of MLS data to jury to assess diminished value of properties because of MTBE contamination); *Prowse v. Nwankwo*, No. 14-1270, 2014 WL 1767590, at *2 n.2 (D.N.J. May 2, 2014), (D.N.J. May 2, 2014) ("This analysis, specifically prepared for [the Debtor] was researched from reliable information currently available from the Multiple Listing Service. This comparative market analysis is not an appraisal and should not be considered the equivalent of an appraisal. The analysis however help[s] ... establish a parameter of value."); *In re Richards*, No. 97-14798, 1999 WL 14680, at *5 (E.D. Pa. Jan. 12, 1999) (accepting expert testimony based on comparable sales drawn from local MLS); *see generally Klickads, Inc. v. Real Estate Bd. of New York, Inc.*, No. 04 Civ. 8042, 2007 WL 2254721, *1 (S.D.N.Y. Aug. 6, 2007) ("Sharing listings through some sort of mandatory co-brokerage agreement, like an MLS, helps property sellers by placing their listing in front of a wider audience of buyers and helps buyers by increasing the pool of properties available through a single broker. In short, an MLS has many pro-competitive virtues.").

[7] Ex. 13 (Hedden Tr.) at 153:17-154:22 ("In hindsight, MLS data could be refined or perfected to allow one to look back and understand trends, values, closings, sale prices, et cetera, because there is a lag contemporaneous with the data value that the MLS doesn't necessarily report in a time -- in a real-time manner."); Ex. 13 (Hedden Tr.) at 174:22-175:5 (iMS relied on MLS data). *See e.g.*, *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1432 (5th Cir. 1989) (stating that in determining whether particular inadmissible evidence was of type reasonably relied on by experts in witness's field, court should "defer to expert's opinion of what data they find reasonably reliable").

[8] Defendants' reading of the Expert Disclosure Protocol strains credulity insofar as it would require disclosure of more, not less, than what an expert would need to produce under Federal Rule 703. CAM Mot. at 2. In fact, Dr. Kilpatrick has provided, not only all the data relied on, but also the computer code, collection protocol, and instructions to appraiser-researchers utilized in the analysis of CAM questions 7, 8, and 9. Def. Exs. 9, 10.

Dr. Epley—who testified repeatedly in two separate depositions that he was not involved in any way with the collection of data and implementation of the CAM.[9] CAM Mot. at 3. Irrespective, Defendant's argument fails.

*First*, Defendants' assertion that the CAM draws from an unknown list of comparable properties mischaracterizes how the CAM operates and misquotes Dr. Epley. As outlined in Dr. Kilpatrick's instructions to his appraiser-researchers, the MLS listing and sales data utilized by the CAM are for *all* properties in the relevant neighborhood. Ex. 7 (Credibility Report App. 4-2) ("Please use the Neighborhood Boundaries as they appear on the [appraisal] provided to answer the questions on the research form. . . . For the Subject Neighborhood, please provide the quarterly, median (or average) sales price, number of sales, and average days on market."); *see also* Ex. 5 (Credibility Report App. 4-3). Thus, the CAM does not require, nor should it, that the supply and demand characteristics of the neighborhood be limited to *comparables* of the subject. Ex. 14 (Kilpatrick 11/13 Tr.) at 230:20-233:2. Furthermore, contrary to Defendants' assertion, Dr. Epley did not testify that the CAM relied on an undisclosed methodology for analyzing comparable properties. Citing general deposition testimony from Dr. Epley about how marketing time may be calculated and filling out the sales adjustment grid, Defendants misquote Dr. Epley as imposing an operational protocol on the CAM that he had no knowledge of and does not exist. Indeed, in the very next line after the deposition testimony Defendants chose to selectively quote to the Court, Dr. Epley affirmed he has no understanding of how CAM question 7 was evaluated. Ex. 15 (Epley 10/30 Tr.) at 195:17-20 ("Q. Do you have an understanding of how Dr. Kilpatrick applied this question? A. No.").

*Second*, if Defendants had genuine questions about which properties and data were used by local MLSs to generate the summary statistics analyzed in CAM questions 7, 8, or 9 they had the opportunity and time to ask Dr. Kilpatrick during his 10 hours of deposition in the *Nomura* Action. Despite having the ability to question Dr. Kilpatrick, they did not inquire into these issues.[10] Indeed, the pretextual nature of Defendants' purported objection is underscored by their failure to even address this purported deficiency until over three weeks after Dr. Kilpatrick's deposition, and fully *seven* months after service of Dr. Kilpatrick's Credibility Report. Def. Exs. 9, 10.

*****

For the reasons stated above, FHFA respectfully requests that Defendants' Motion *in Limine* No. 4 to preclude Dr. Kilpatrick from testifying about Recovco and Defendants' Motion *in Limine* No. 5 to preclude Dr. Kilpatrick from testifying about CAM questions 7, 8, and 9 be denied.

---

[9] Ex. 15 (Epley 10/30 Tr.) at 216:17-217:5 ("A. [M]y job was to evaluate the mapping back to the questions. It was to look at the aspects, if they were reasonably defined relative to the marketplace and the weights of those questions as they came through. What I hear you asking is about application decisions and you asking me questions about what happens at different times in the marketplace, that's . . . Dr. Kilpatrick's issue on application."); Ex. 16 (Epley 7/8 Tr.) at 231:25-232:17 ("A. Well, again you're talking about application. . . . So I -- I really don't have an opinion to offer on that 'cause I just didn't participate in it.").

[10] Ex. 14 (Kilpatrick 11/13 Tr.) at 232:6-18 ("Q. Okay. My understanding of the way the code operates for Question 7 is that you compute a ratio of expired or withdrawn listings in the prior year over the homes sold in the prior year, and then any ratio that's greater than ten to one or less than one to ten signifies that the market is either shortage in the first case or in oversupply in the second. Is that a fair characterization? A. That's fair. Yes.").

**Opposition to Defendants' Motions *in Limine* Nos. 4 & 5**

Respectfully Submitted,

/s/ Philippe Z. Selendy
Philippe Z. Selendy
(philippeselendy@quinnemanuel.com)
Sascha N. Rand
(sascharand@quinnemanuel.com)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency*


cc:  All Counsel of Record