**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 | FAX (212) 849-7100

January 20, 2015

The Honorable Denise L. Cote
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1610
New York, NY 10007-1312

Re:   *FHFA v Nomura Holding Am., Inc., et al.*, No 11 Civ. 6201 (S.D.N.Y.) (DLC)

Dear Judge Cote:

      FHFA respectfully requests that Defendants' motion *in limine* to preclude the testimony of FHFA's re-underwriting expert, Robert W. Hunter, regarding inaccuracies in the pre-closing loan tapes be denied because Mr. Hunter's opinions are relevant to assessing whether the representations in the Offering Documents are accurate and the probative value of such opinions outweighs any potential prejudice to the Defendants.

**I.**    **Mr. Hunter's Opinions Relating To The Pre-Closing Loan Tapes Are Relevant**

      Defendants' argument that the Offering Materials did not contain any representations about the pre-closing loan tapes ignores the fact that the pre-closing loan tapes are integral to three of FHFA's four alleged misrepresentations. The pre-closing loan tapes contained data regarding the collateral characteristics of the loans in the securitizations at issue in this action (the "Securitizations"). The data from these tapes were used to create the collateral tables in the Prospectus Supplements, which contained among other things, aggregate LTV/CLTV and occupancy status data for the loans in the Supporting Loan Groups ("SLGs"). In addition, the pre-closing loan tapes were provided to the credit rating agencies as part of the process of securing credit ratings for the Certificates in the Securitizations. As set forth below, and contrary to Defendants' assertions, the accuracy of the information contained in these pre-closing loan tapes is highly relevant to determining whether the representations in the Prospectus Supplements regarding LTV/CLTV ratios, owner occupancy status, and credit ratings were accurate.

      **A.**    **Inaccuracies In The Pre-Closing Loan Tapes Are Relevant To Determining The Accuracy Of The Collateral Tables In The Prospectus Supplements**

      FHFA alleges that the collateral tables in the Prospectus Supplements for the Securitizations contain material misrepresentations relating to LTV/CLTV ratios and the number of owner-occupied properties in the SLGs. (*See* Amended Complaint at 33.) The collateral tables contain aggregate information about pools of loans that is based on the loan-level information contained on the pre-closing loan tapes. These tables were the primary mechanism

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

FHFA's Opposition to Defendants' Motion *in Limine* No. 6

for investors to obtain information about the collateral characteristics of the underlying pool of mortgage loans.[1] Thus, material inaccuracies in the loan-level data contained on the pre-closing loan tapes relating to LTV/CLTV ratios and occupancy status—like those identified by Mr. Hunter—impact the aggregate information relating to those characteristics in the collateral tables in the Prospectus Supplements. Indeed, Nomura itself admitted that it would have been important to identify the source of material discrepancies in the loan tapes during the securitization process. (Ex. 1 (Crowley Deposition) at 79:19-80:9).[2]

### B. Inaccuracies in the Pre-Closing Loan Tapes Are Relevant To Determining The Accuracy Of The Credit Ratings In The Prospectus Supplements

FHFA also alleges that the credit ratings for the Certificates contained in the Prospectus Supplements were incorrect due to material misrepresentations in the pre-closing loan tapes. These credit ratings were based on the data in the pre-closing loan tapes,[3] and the rating agencies made clear that the accuracy of the credit ratings depended on the accuracy of the information provided on the loan tapes.[4] The rating agencies' models assigned a quantitative penalty or benefit to particular loan-level characteristics in arriving at an aggregate statistical risk assessment for a loan pool.[5] Thus, any errors in the loan-level information on the loan tapes

---

[1] Timothy Crowley, a former Vice President at Nomura Securities Internal, and Michael Orfe, a former Assistant Vice President at the Nomura Alt-A and Subprime Trading and Securitization Desk, each testified that the loan tapes were used to prepare the collateral tables in the prospectus supplements. (Ex. 1 (Crowley Nov. 07, 2013 Deposition) at 79:25-80:5; Ex. 2 (Orfe Aug. 01, 2013 Deposition) at 130:8-25.)

[2] Defendants argue that Mr. Hunter improperly relied on post-origination documents during his re-underwriting review to identify inaccuracies in the collateral characteristics contained on the pre-closing loan tape. For the reasons set forth in FHFA's Memorandum of Law In Opposition to Defendants' Motion To Exclude The Testimony of Robert W. Hunter Based On Information Not Available At Origination dated January 20, 2015, and its Motion To Exclude the Testimony And Opinions of Michael Forester dated January 6, 2015, Mr. Hunter's use of such post-origination documents was entirely proper.

[3] *See* Ex. 3 (Moody's 30(b)(6) Deposition) at 156:4-156:11 (Q. . . With respect to the M3 model, were there inputs beyond the –the loan tape that had to be included when the M3 model was run?  A. I don't think so."); Ex. 4 (Standard & Poor's 30(b)(6) Deposition) at 123:24-124:11 ("[I]f the tape was complete, as it was expected to be, that was all you needed to put into the LEVELS® model."); *see also* Ex. 5 (Email to Moody's attaching the collateral tape for the NHELI 2006-FM2 securitization) NOM-FHFA_04637514.

[4] *See* Ex. 3 (Moody's 30(b)(6) Deposition) at 134:12-135:20; 212:18-213:2 ("[W]e depended on the data that was being presented to us and we expected the data to be accurate…."); Ex. 6 (Fitch Ratings 30(b)(6) Deposition) at 125:4-126:20 (same); Ex. 4 (Standard & Poor's 30(b)(6) Deposition) at 135:9-136:4, 140:8-142:3 (same). *See also, e.g.* Ex. 7 (NHELI 2006-FM1 S&P Rating Letter) NOM-FHFA_04930718, at 719 ("Standard & Poor's relies on the issuer and its counsel, accountants, and other experts for the accuracy and completeness of the information submitted in connection with the rating."); Ex. 8 (NHELI 2007-2 S&P Rating Letter) MDYS_FHFA 0075231, at 233 ("Standard & Poor's undertakes no duty of due diligence or independent verification of information provided by you or your agents. Standard & Poor's reserves the right to withdraw the rating if you or your agents fails [sic] to provide Standard & Poor's with accurate, complete, timely, or reliable information.").

[5] *See* Ex. 3 (Moody's 30(b)(6) Deposition) at 74:23-75:19 ("the loan-by-loan model was a factor-based model that would look into various factors of a particular loan and then assign a – a penalty or a benefit based on that particular factor. And what I mean by factor is that, let's say, well, if a loan is owner occupied versus an investment property, the owner-occupied prop – we – we deemed the owner-occupied loan to be less risky than an investment property, (footnote continued)

2

FHFA's Opposition to Defendants' Motion *in Limine* No. 6

would "influence the outcome" of the resulting credit rating. (Ex. 6 (Fitch Ratings 30(b)(6) Deposition) at 125:9-21.)[6] Mr. Hunter identified hundreds of instances where the pre-closing loan tape contained an inaccurate LTV/CLTV ratio, DTI ratio, owner occupancy status, FICO score, property type, loan purpose, or documentation type. (Ex. 10 (Hunter Oct. 6, 2014 Rebuttal Report) at 3; *see also* Ex. 11 (Hunter Rebuttal Report Exhibit 2C) at Table 10.) The testimony and documents from the rating agencies establish that the existence and extent of such inaccuracies are relevant to whether the credit ratings represented in the Prospectus Supplements were misrepresented because they were based on inaccurate data.[7]

## II. The Probative Value Of Mr. Hunter's Opinions Relating To The Pre-Closing Loan Tapes Substantially Outweighs Any Purported Prejudice

Defendants' argument that the probative value of Mr. Hunter's testimony is substantially outweighed by a risk of prejudice, confusion of the issues or misleading the jury is unavailing.[8] For the reasons set forth above, Mr. Hunter's testimony regarding inaccuracies in the pre-closing loan tapes is highly probative of whether the representations in the Prospectus Supplements relating to LTV/CLTV ratios, owner occupancy status, and credit ratings are accurate.

Defendants' additional argument that Mr. Hunter's opinion regarding pre-closing loan tape discrepancies will prejudice Defendants by artificially inflating the number of defects is also incorrect. Contrary to Defendants' suggestion, Mr. Hunter did not double count the number of purported defects. Based on his re-underwriting review, Mr. Hunter identified inaccuracies in the collateral characteristics of a loan.[9] Then, to the extent that such characteristics were reflected on the pre-closing loan tape, he noted a defect finding if the loan tape was inaccurate as

---

so there would be a – there would be a penalty assessed on the loan based on the fact that it was an investment property.").

[6] *See also* Ex. 9 (Standard & Poor's 30(b)(6) deposition exhibit 42706 titled "Credit Analysis For Subprime Loan Transactions") at 4 ("estimat[ing] that loans with LTVs of 90% have a 1.5 times (x) greater risk of being foreclosed than loans with a ratio of 80%," and "loans with an LTV of 95% were assumed to be 3.0x riskier than loans with an LTV of 80%."); *Id.* at 5 ("the prime foreclosure frequency assumptions [were] increased by a factor of 3.0x on second homes and investment properties to account for the increased risk of default.").

[7] *See* Ex. 4 (Standard & Poor's 30(b)(6) Deposition) at 140:8-142:3; 142:20-143:6 (agreeing that "[a]ny departure from the current standards for accuracy of loan-level data jeopardizes the integrity of assigned ratings."); Ex. 9 (Standard & Poor's 30(b)(6) deposition exhibit 42706) at 4-7 (identifying property type, loan purpose, and documentation type as additional risk factors and listing foreclosure frequency multiples; Ex. 4 (Standard & Poor's 30(b)(6) Deposition) at 140:8-142:3 ("So if I had a FICO score that was represented to be 700 and it was 600, my ratings were going to be – my rating estimates would have been not conservative enough. . . .Q. And then would that be similar if you're talking about . . . debt-to-income ratio? A. Yeah, all the factors that we saw and the – and the drivers.")

[8] Because this Court has granted FHFA's motion to withdraw its Section 11 claims, and has indicated that it will proceed with a bench trial on the remaining claims, there is no longer any risk of jury confusion.

[9] *See* Ex. 11 (Hunter Rebuttal Report Exhibit 2C) at Tables 7 (identifying the number of loans where the LTV or CLTV ratios were incorrect), 8 (identifying the number if loans where borrowers had DTI ratios above the amount initially used to approve the loans), and 9 (identifying the number of loans in which the subject properties were incorrectly represented as being owner occupied).)

3

FHFA's Opposition to Defendants' Motion *in Limine* No. 6

to such characteristics.[10]  If any such inaccuracy resulted in the loan violating the substantive requirements of the underwriting guidelines, Mr. Hunter also noted an underwriting defect for that loan.[11]  However, because there may be loans where the collateral characteristic on the loan tape was inaccurate but the loan did not exceed the guidelines limits, Mr. Hunter did not double count all pre-closing loan tape findings as underwriting defects.[12]  Furthermore, Mr. Hunter's ultimate opinion pertains to the number of loans in each SLG that have materially increased credit risk, not the number of findings per loan or the total number of findings.  (Ex. 10 (Hunter Rebuttal Report) at 3-4.)  Thus, Defendants' argument that they are prejudiced is without merit.  *See Costantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164, 1174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party of another, to justify exclusion under Rule 403 the prejudice must be unfair.").[13]

      For the reasons set forth above, FHFA respectfully requests that this Court deny Defendants' motion *in limine* to preclude the testimony of Robert Hunter regarding inaccuracies in pre-closing loan tapes.

Respectfully submitted,

*/s/ Manisha Sheth*

Manisha M. Sheth

cc:     All Counsel of Record

---

[10]  *See id.* at Table 10 (identifying the number of loans with discrepancies from the information contained in the loan tapes).

[11]  *See id.* at Table 2 (identifying the number of loans that were not underwritten in accordance with underwriting guidelines and/or minimum industry standards).  For a specific example, an inaccuracy in the income stated by a borrower may result in three different types of findings:  (i) a misrepresentation of income; (ii) a debt-to-income ("DTI") ratio that exceeds the limits in the underwriting guidelines; and (iii) an inaccuracy in the DTI ratio on the pre-closing loan tape.  *See, e.g.,*  Loan NHELI_2006_FM1_2002008507, Ex. 12 (Hunter Rebuttal Report Exhibit 2A) at Finding IDs 17794861, 17794863, and 17794838.

[12]  *See, e.g.* Loan NAA_2005_AR6_1001903396, Ex. 12 (Hunter Rebuttal Report Exhibit 2A) at Finding ID f3bd62dc-a08a-e311-8ed7-d8d385e1d166 (A pre-closing loan tape finding regarding a discrepancy in the reported property type with no associated underwriting defect finding).

[13]  Defendants' citation to *United States v. Herrera* is not on point.  In that case, the court excluded an expert's testimony on the basis that it was unreliable because the proffered expert misled the court regarding the studies upon which his opinion relied, and another judge had recommended perjury charges against the expert, further undermining his reliability.  *United States v. Herrera*, 788 F. Supp. 2d 1026, 1034-1035 (N.D. Cal. 2011).  No such concerns are present here.