UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,

          -against-

NOMURA HOLDING AMERICA, INC.,
et al.,

                Defendants.

No. 11 Civ. 6201 (DLC)

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF ROBERT W. HUNTER BASED ON INFORMATION NOT AVAILABLE AT ORIGINATION**

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Philippe Z. Selendy
Manisha M. Sheth
Deborah K. Brown
Jeffrey C. Miller
Zachary Williams

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND ......................................................................................................3

    A.    The Representations in the Offering Documents......................................................3

    B.    Mr. Hunter's Review Of The Sample Loans .........................................................4

ARGUMENT ..............................................................................................................................8

    A.    Mr. Hunter's Opinions Based On Post-Origination Evidence Are Relevant
To Determining The Accuracy Of The Offering Documents'
Representations ......................................................................................................8

        1.    Post-Origination Evidence Is Relevant To Determining The
Accuracy Of The Underwriting Representations......................................10

        2.    Post-Origination Evidence Is Relevant To Determining The
Accuracy Of The Appraised Value At Origination And The
Resulting LTV/CLTV Ratios....................................................................11

    B.    Mr. Hunter's Use Of Post-Origination Evidence Is Reliable ...............................13

    C.    The Probative Value of Mr. Hunter's Opinions Based Post-Origination
Evidence Outweighs Any Purported Prejudice To Defendants............................17

CONCLUSION...........................................................................................................................18

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
  2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013) ....................................................8, 18

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)...................................................................17

*Arista Records LLC v. Lime Group LLC*,
  2011 WL 1674796 (S.D.N.Y. May 2, 2011) ....................................................14

*Assured Guaranty Mun. Corp. v. Flagstar Bank, FSB*,
  920 F. Supp. 2d 475 (S.D.N.Y. 2013)........................................................14

*Costantino v. David M. Herzog, M.D., P.C.*,
  203 F.3d 164 (2d Cir. 2000)...................................................................18

*Daubert v. Merrell Dow Pharm.*,
  509 U.S. 579 (1993)........................................................3, 4, 8, 13, 14

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003).................................................................10

*FHFA v. Bank of Am. Corp.*,
  2014 WL 7232339 (S.D.N.Y. Dec. 18, 2014) ................................................9, 18

*FHFA v. Nomura Holding Am. Inc.*,
  2014 WL 7232443 (S.D.N.Y. Dec. 18, 2014) ....................................................9

*FHFA v. SG Americas, Inc.*,
  2012 WL 5931878 ....................................................................9, 10, 18

*FHFA v. UBS Ams., Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012)........................................................9, 18

*In re Fosamax Prods. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009).........................................................14

*Henry v. Little Mint, Inc.*,
  2014 WL 2199427 (S.D.N.Y. May 23, 2014) ..................................................17

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)...........................................................................9

*Hollman v. Taser Int'l Inc.*,
  928 F. Supp. 2d 657 (S.D.N.Y. 2013).........................................................17

*I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991)...................................................................10

*Jund v. Town of Hempstead*,
   941 F.2d 1271 (2d Cir. 1991).............................................................................9

*Marting Realty, Inc. v. Marks*,
   1986 WL 4647 (Ohio Ct. App. Apr. 16, 1986).................................................17

*McFarland v. Gregory*,
   425 F.2d 443 (2d Cir. 1970)..............................................................................8

*Miller v. Stryker Instruments*,
   2012 WL 1718825 ...........................................................................................10

*Minemyer v. B-Roc Representatives, Inc.*,
   2012 WL 346621 (N.D. Ill. Feb. 2, 2012) .......................................................18

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
   595 F.3d 86 (2d Cir. 2010)..............................................................................10

*In re Prestige Brands Holding, Inc.*,
   2006 WL 2147719 (S.D.N.Y. July 10, 2006) ..................................................18

*Rmed Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
   2002 WL 31780188 (S.D.N.Y. Dec. 11, 2002) ................................................8

*Smith v. Prudential Insurance Company of America*,
   2012 WL 19655405 (M.D. Tenn. May 31, 2012).............................................10

*United States v. Herrera*,
   788 F. Supp. 2d 1026 (N.D. Cal. 2011) ..........................................................18

*United States v. Vest*,
   116 F.3d 1179 (7th Cir. 1997) .........................................................................18

## <u>Statutes</u>

Fed. R. Evid. 401 ...................................................................................................8

Fed. R. Evid. 403 .................................................................................................18

Fed. R. Evid. 702 ............................................................................................8, 14

iii

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator for the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie" and, collectively with Fannie Mae, the "GSEs") respectfully submits its memorandum in opposition to Defendants' Motion to Exclude the Testimony of Robert W. Hunter Based on Information Not Available at Origination.

<u>PRELIMINARY STATEMENT</u>

On December 22, 2014, FHFA moved to exclude the opinions of Defendants' proffered re-underwriting expert, Michael Forester, based on his admitted failure to determine the accuracy of the representations in the Offering Documents at the Time of Issuance,[1] as required under both Section 12 of the '33 Act and the Blue Sky statutes applicable here, and his corresponding failure to consider post-origination evidence probative of the accuracy of those representations. Unable to refute FHFA's position, Defendants now advance a new, *fifth* motion against Robert W. Hunter, FHFA's re-underwriting expert, arguing that the proper standard is to ignore key evidence of falsity and that falsity opinions based on post-origination evidence should be excluded. That argument is contrary to law.

Defendants' motion starts from two mistaken premises: (1) that the Offering Documents refer only to compliance with underwriting guidelines, and (2) that the test of "compliance with guidelines" is solely procedural. In fact, the Offering Documents make representations as to values (including LTV ratios and owner occupancy status) as of the *Time of Issuance* of the Certificates, irrespective of the separate representations of originator compliance with guidelines. Further, the test of "compliance with guidelines" is not only procedural but substantive, and includes conformity (regardless of scienter) to objective values that are represented to be true as

---

[1] "Time of Issuance" refers to the operative time applicable to each alleged misrepresentation. For representations in the collateral tables in the Offering Documents, including, for example, information about the loan-to-value ratios of the underlying mortgage loans ("Collateral Representations"), the "Time of Issuance" is the Cutoff Date defined in the Offering Documents. For other representations, including those about compliance with underwriting guidelines ("Underwriting Representations"), the "Time of Issuance" is the effective date of the Prospectus Supplement.

1

of the time of origination of the loans.  Both sets of representations can be proven false based on post-origination evidence.

Mr. Hunter's opinions based on post-origination evidence are thus relevant to determining the accuracy of the Offering Documents' representations relating to compliance with substantive underwriting guidelines, the number and percentage of loans in the Supporting Loan Groups ("SLGs") that fall within certain ranges of LTV/CLTV ratios, the number and percentage of loans in the SLGs that are owner occupied, and the credit ratings assigned to the Certificates.  The post-origination evidence used by Mr. Hunter contains information about objective, historical facts that are probative of the accuracy of Defendants' representations relating to (1) whether the underlying mortgage loans complied with the *substantive* requirements of the underwriting guidelines at the time of origination; (2) whether the underlying mortgage loans were originated in compliance with the *procedural* requirements of the underwriting guidelines at the time of origination; (3) whether the LTV/CLTV ratios and owner occupancy status of the underlying loans *at the Time of Issuance* are consistent with the disclosures at that time in the collateral tables in the Prospectus Supplements; and (4) whether the pre-closing loan tapes, which were the basis for the aggregate data in the collateral tables and the ratings, accurately reflected the collateral characteristics of the underlying loans.

Defendants do not challenge the reliability of the vast majority of the post-origination evidence used by Mr. Hunter during his review, and instead, limit their challenge to the audit credit reports obtained from LexisNexis and CBCInnovis, and the records database DataVerify. Reports from these services contain information from multiple sources relating to the borrower, including the borrower's identity, address history, credit history, driver's license data, property and mortgage records, judgment and lien history, and past employers, and were generally accepted sources of information during re-underwriting reviews conducted during the relevant period.  Defendants' reliance on the boilerplate disclaimers that accompany these reports as evidence of their unreliability is misplaced.  These disclaimers simply state that there may be inaccuracies in the data given that it is collected from numerous sources.  In recognition of this

2

fact, Mr. Hunter analyzed the information in these reports in conjunction with information from other sources, including the loan file and other third-party sources, such as servicing records, re-verifications of employment and income, and public records. *See* Sheth Decl., Ex. 1.

Finally, the probative value of Mr. Hunter's opinions based on post-origination evidence far outweighs any purported prejudice to Defendants. These claims will be heard by the Court, and there is no risk of jury confusion. Defendants' stated concerns of a "hindsight bias" are inapt under the strict liability standards that govern FHFA's claims. The true prejudice argument runs directly against Defendants' position: there is no reason for the Court to put on blinders and, contrary to the requirements of the '33 Act and the Blue Sky statutes, ignore objective evidence as to the falsity of Defendants' representations. Accordingly, FHFA respectfully requests that this Court deny Defendants' motion in its entirety, and instead grant FHFA's motion as to the methodological infirmity of Defendants' re-underwriter, Mr. Forester.

## FACTUAL BACKGROUND

### A.     The Representations in the Offering Documents

Defendants' motion ignores three of the four misrepresentations alleged by FHFA, and focuses only on the Underwriting Representations, and even then, misinterprets those representations. The four representations at issue in this action are: (1) the mortgage loans were originated generally in accordance with underwriting guidelines and the underwriting criteria described in the Prospectus Supplements;[2] (2) the mortgage loans underlying the supporting loan groups ("SLGs") had the aggregate LTV/CLTV ratios described in the collateral tables in the Prospectus Supplements;[3] (3) the number and percentage of mortgage loans that were secured by

---

[2]     The Prospectus Supplement for each of the Securitizations represents that the underlying loans generally complied with the applicable underwriting guidelines. Defendants' eleventh-hour argument that the loans originated by originators not expressly referenced by name in the Prospectus Supplements had to comply only with the underwriting criteria described in the Prospectus Supplements is without merit for the reasons set forth in FHFA's Opposition to Defendants' Motion *in Limine* No. 3, dated December 5, 2014.

[3]     In their opposition to FHFA's *Daubert* Motion against Defendants' proffered re-underwriting expert, Mr. Forester, Defendants argued that the representations in the Offering Documents relating to LTV/CLTV ratios "were based solely on information as of the time of loan origination." Defendants' Memorandum in Opposition to Plaintiff's Motion To Exclude Expert Testimony And Opinions Of Michael L. Forester, dated Jan. 6, 2015 at 5. For the reasons set forth in FHFA's reply in further support of its *Daubert* motion, dated January 16, 2015, Defendants' argument is also based on a flawed reading of the Offering Documents, and is inconsistent with this Court's prior

owner occupied properties were as described in the collateral tables in the Prospectus Supplements;[4] and (4) the Certificates had the credit ratings disclosed in the Prospectus Supplements.

### B.    Mr. Hunter's Review Of The Sample Loans

Mr. Hunter's review was designed to assess whether each of these four representations were materially accurate.  As part of that review, he considered post-origination documents because they contained information that was relevant to determining whether the representations in the Offering Materials were accurate at the Time of Issuance.

First, with regard to the Underwriting Representations, Mr. Hunter assessed both whether the loan underwriter complied with the underwriting process set forth in the applicable underwriting guidelines, and whether the loan adhered to the substantive requirements of those guidelines, including limits on LTV/CLTV ratios, DTI ratios, and FICO scores.  Defs.' Ex. 1 at 1-2, 20-86.  Both aspects of Mr. Hunter's review were necessary to determine whether the Sample Loans complied with the Underwriting Representations for each Securitization.  To test the accuracy of the information in the loan file, including income, assets, employment, and debt, Mr. Hunter used post-origination information obtained from employment re-verifications, the MERS database,[5] servicing records, bankruptcy filings, public records databases such as

---

rulings.  *See* FHFA Reply Memorandum In Support Of Its Motion To Exclude Expert Testimony And Opinions Of Michael L. Forester 6-7 (Jan. 16, 2015).

[4]   In their Motion to Exclude the Testimony of Robert W. Hunter Concerning Owner Occupancy Status ("Owner Occupancy Motion"), Defendants erroneously contend that the representations in the Offering Documents "refer to borrowers' intent as of the time of origination."  Defendant's Memorandum in Support of Their Motion to Exclude the Testimony of Robert W. Hunter Concerning Owner Occupancy Status, dated December 24, 2014 at 5.  Contrary to Defendants' argument, the Offering Documents plainly represent the number and percentage of mortgage loans in the SLGs that are owner occupied, and contain no disclaimer or representation that these collateral tables reflect the borrowers' intent at the time of origination.  *See generally* FHFA's Memorandum in Opposition to Defendants' Motion to Exclude the Testimony of Robert W. Hunter Concerning Owner Occupancy Status (Jan. 8, 2015).  In support of its position that Mr. Hunter's opinions based on post-origination evidence are relevant to FHFA's alleged misrepresentations of the owner occupancy statistics and the credit ratings of the Certificates, FHFA incorporates by reference the arguments from its Opposition to Defendants' Motion to Exclude the Testimony of Robert W. Hunter Concerning Owner Occupancy dated January 8, 2015, and its Opposition to Defendants' Motion *in Limine* No. 6, dated January 20, 2015, respectively.

[5]   "MERS" refers to the electronic registry owned by Mortgage Electronic Registration Systems, Inc., a private corporation, that tracks mortgage ownership and servicing rights.

DataVerify, and audit credit reports provided by CBCInnovis and LexisNexis's Accurint.  He then used the correct information based on these sources to determine if the substantive requirements of the underwriting guidelines were met at the time of origination.  For example, Mr. Hunter tested "whether the borrower's DTI ratio was within the guideline maximum," by using post-origination information reflecting additional mortgage debt obtained from the MERS database to "recalculat[e] the borrower's . . . debt to determine the correct DTI ratio."  *Id.* at 95-96.  In addition, post-origination documents may also contain information that reflects a misrepresentation of income, assets, debt, or employment at the time of origination.  *See* Sheth Decl., Ex. 1.  For example, Mr. Hunter discovered a borrower's misrepresentation of income in a loan that closed in ███████████ and was securitized in █████████ using the borrower's ███████████████, dated ████████████ before the loan was securitized.  *See* Sheth Decl., Ex. 1 at Finding 17799150; Sheth Decl., Ex. 2 at LF1NOM_00692803-04.  Mr. Hunter used the borrower's correct income (███████████████) to re-calculate the borrower's DTI ratio at the time of origination, and based on that income, the DTI ratio increased from █████████████████ which vastly exceeded the guideline maximum.  Sheth Decl., Ex. 1 at Finding 17799160.  The use of such post-origination information to determine whether the loan complied with the applicable substantive requirements of the underwriting guidelines at the time of origination is not only proper, but necessary to test the accuracy of the Underwriting Representation in the Offering Documents.

In addition, based on post-origination evidence that contained factual information that was available to the loan underwriter at the time of origination, Mr. Hunter identified defects based on the loan underwriter's failure to follow the process set forth in the underwriting guidelines.  For example, for Global Loan Number ("GLN") NHELI_2006_HE3_2002209123, cited by Defendants, the borrower's origination credit report, dated the day of the loan approval, ███████████████, contained multiple inquiries about the borrower's credit beginning on ███████████████ and included an inquiry by the ██████████████████████████.  Sheth Decl., Ex. 1 at Finding 17807286; Sheth Decl., Ex. 3 at NOM-FHFA_02583791; *see also* Defs.'

Br. 6 n.11 (citing GLN NHELI_2006_HE3_2002209123).  The inquiry by ▮▮▮▮ was a red flag that the borrower was in the process of incurring additional debts, but there was no evidence in the loan file that the loan underwriter investigated this inquiry or any others.  Sheth Decl., Ex. 1 at Finding 17807286.  The post-origination audit credit report used by Mr. Hunter confirmed that a ▮▮▮▮▮▮ was incurred by the borrower on ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which the borrower failed to disclose.  *Id.* at Finding 17807164; Sheth Decl., Ex. 4  at LF2UBS_00632634 (reflecting an ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Based on this additional debt, there was also a violation of the substantive requirements of the applicable underwriting guideline in that true DTI ratio for the loan was ▮▮▮▮, which exceeded the guideline maximum of 55%.[6]  Sheth Decl., Ex. 1 at Finding 17807225.

Similarly, with regard to his review of the appraisals for the subject properties, Mr. Hunter assessed whether each appraisal was performed in accordance with the process requirements of the underwriting guidelines, including whether the appraisal was (i) performed by a licensed and qualified appraiser, (ii) complied with the Uniform Standards of Professional Appraisal Practice, and (iii) contained all the required appraisal-related documents.  In addition, Mr. Hunter tested the accuracy of the valuation reflected in the appraisal by relying on the valuation analysis performed by FHFA's valuation expert, Dr. John Kilpatrick.  Like other market participants during the relevant period, Dr. Kilpatrick ran a retrospective automated valuation model ("AVM") to test the accuracy of the appraised value at the time of origination.  For Sample Loans where the AVM value was lower than both the appraised value and the sales

---

[6]  Similarly, for GLN NAA_2005_AR6_1001976475, also cited by Defendants, Defs.' Br. 6 n. 9, the loan underwriter did not adequately investigate whether the borrower had failed to disclose additional mortgage debt.  The post-origination audit credit report used by Mr. Hunter identified a ▮▮▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮.  *Id.* at Finding 1c75b36a-8495-e311-8ed7-d8d385e1d166; Sheth Decl., Ex. 5 at LF3NOM_00008689 (reflecting ▮▮▮▮▮▮▮▮▮▮▮).  Given the time typically required to fund a mortgage loan, had the loan underwriter at ▮▮▮▮ investigated whether the borrower was seeking additional mortgage debt with the same lender, he would have discovered the additional debt that was not disclosed by the borrower.  Based on this additional debt, the correct DTI ratio was ▮▮▮▮, which exceeded the guideline maximum of 50%.  Sheth Decl., Ex. 1 at Finding e4bde436-8595-e311-8ed7-d8d385e1d166.

price, the values returned by the retrospective AVM were then used to re-calculate the LTV/CLTV ratios to determine if they "exceeded the limits set by the guidelines," Defs.' Ex. 1 at 111, and when extrapolated, were consistent with the disclosures in the collateral tables in the Prospectus Supplements.  *Id.* at 111-112.

Third, with regard to the representations in the Prospectus Supplements relating to the number and percentage of owner occupied properties, Mr. Hunter first reviewed the loan origination file for red flags indicating a potential misrepresentation of occupancy.[7]  He then reviewed any available servicing records to determine if they reflected that the borrower did not occupy the subject property.  In addition, Mr. Hunter used post-origination documents, such as borrower and property records, including public utility records, bankruptcy filings, and audit credit reports, to compare the addresses listed on those documents as affiliated with the borrower, and the dates associated with those addresses, against the information in the loan file. Mr. Hunter then studied any changes, inconsistencies, or conflicting information to determine whether the borrower claimed a different primary address or if there was a change of address from the subject property during the loan's required occupancy term.  Based on this analysis, Mr. Hunter made a determination as to whether it was more likely than not that the borrower lived in the subject property during the required occupancy term.  Mr. Hunter then determined if these findings, once extrapolated from the Sample Loans to the SLGs, were consistent with the disclosures in the collateral tables in the Prospectus Supplements.  *See*  Sheth Decl., Ex. 6 at 1-5.

Finally, Mr. Hunter used post-origination documents and information to determine if the collateral characteristics contained on the pre-closing loan tape were accurate.  The accuracy of the information on the loan tape directly impacted the accuracy of the credit ratings for the Certificates.  *See* FHFA Opp'n to Defs.' Mot. *in Limine* No. 6 at 2-3 (Jan. 20, 2015).

---

[7]  Red flags indicating a misrepresentation of occupancy include an unreasonable distance between the subject property and the borrower's place of employment, inconsistent addresses, and whether the subject property was significantly smaller in size or value than the borrower's current home without an apparent reason.  Defs.' Ex. 1 at 100.

**ARGUMENT**

Each of Defendants' arguments to exclude Mr. Hunter's opinions based on information not available at origination is without merit.[8]  First, Mr. Hunter's opinions based on post-origination information are relevant to determining whether the representations in the Offering Documents are accurate.  Fed. R. Evid. 401 ("Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action.").  Second, the specific post-origination documents criticized by Defendants as being unreliable were generally accepted sources of evidence in reunderwriting reviews conducted during the relevant time period.  Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592-94 (1993).  Finally, the probative value of Mr. Hunter's opinions based on such post-origination evidence outweighs any purported prejudice to Defendants.

### A.    Mr. Hunter's Opinions Based On Post-Origination Evidence Are Relevant To Determining The Accuracy Of The Offering Documents' Representations

Courts have uniformly held that "later occurring evidence" can be probative of historical fact.  *Rmed Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 2002 WL 31780188, at *2 (S.D.N.Y. Dec. 11, 2002) ("[S]imply stating that materiality and scienter are determined based on the facts at the time of the alleged misstatement does not mean that later occurring evidence is irrelevant."); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 2013 WL 1155420, at *7 (S.D.N.Y. Mar. 20, 2013) ("As I have already held, after-the-fact testimony stating what defendants knew and did during the relevant time period is admissible."); *cf. McFarland v. Gregory*, 425 F.2d 443, 447 (2d Cir. 1970) (recognizing rule that evidence from later time period may be used to prove condition existing in earlier time period), *cited with approval in Jund v. Town of Hempstead*, 941 F.2d 1271, 1288 (2d Cir. 1991).

The cases cited above, which involved claims where scienter or knowledge was a required element, apply with even greater force to FHFA's claims, which do not require proof of

---

[8]  Of the 723 Sample Loans, Mr. Hunter relied on post-origination documents for 314 loans.  Of the 2,083 total findings for the Sample Loans, 571 findings are based on post-origination documents.  Ex 1.

scienter. *See FHFA v. Bank of Am. Corp.*, 2014 WL 7232339, at *2 (S.D.N.Y. Dec. 18, 2014) ("This Court has repeatedly emphasized that neither Section 11 nor Section 12(a)(2) 'requires allegations of scienter . . . in order to state a claim.'") (quoting *FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 323 (S.D.N.Y. 2012)).  This Court has held that each of the Underwriting Representations "is a classic statement" of "objective fact," *FHFA v. SG Ams., Inc.*, 2012 WL 5931878, at *2, *3 (S.D.N.Y. Nov. 27, 2012), such that Defendants may be liable even if they "*could not have known*" that they were false, *FHFA v. Nomura Holding Am. Inc.*, 2014 WL 7232443, at *40 n.48 (S.D.N.Y. Dec. 18, 2014) (emphasis added) (quoting 15 U.S.C. § 77*l*(a)(2) and distinguishing between truth of representations and possibility of knowing their truth).  *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (holding that liability under the Securities Act may be based on an "innocent misstatement").  Defendants' attempt to limit proof of falsity to only those materials purportedly in existence at the time the loan was underwritten is incompatible with this strict liability standard.  The appropriate question is whether the representations in the Offering Documents were true as of the Time of Issuance, not whether the underwriter that originally underwrote the loans could have known they were false.

Defendants' reluctance to consider such post-origination evidence is based on their fundamental misconception that the origination loan underwriter's knowledge or intent has any bearing on whether the representations in the Offering Documents are accurate.  Defs.' Br. at 1-2.  "This Court has repeatedly emphasized that neither Section 11 nor Section 12(a)(2) 'requires allegations of scienter . . . in order to state a claim.'"  *FHFA v. Bank of Am. Corp.*, 2014 WL 7232339, at *2 (S.D.N.Y. Dec. 18, 2014) (quoting *FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 323 (S.D.N.Y. 2012)).  The cases cited by Defendants are inapplicable because they involve claims where intent and knowledge are elements of the cause of action.[9]

---

[9]  In *Smith v. Prudential Insurance Company of America*, 2012 WL 19655405, at *1, *14 (M.D. Tenn. May 31, 2012), the court excluded an expert's opinion about the decedent's financial affairs that was irrelevant to whether the decedent intended to kill himself, an issue that determined whether the decedent's family was entitled to certain insurance benefits.  In *Miller v. Stryker Instruments*, 2012 WL 1718825, *10-11, the expert's opinion placed the reasonableness of the defendant's conduct in developing a medical product in issue, so that research published after the product's manufacture was irrelevant.  Here, by contrast, Mr. Hunter evaluated the accuracy of Defendants'

1.      **Post-Origination Evidence Is Relevant To Determining The Accuracy Of The Underwriting Representations**

Defendants lack legal support for the position that the representation that the Mortgage Loans "were originated" in accordance with guidelines is false only if the original loan underwriter failed to follow the underwriting process set forth in those guidelines.  Defendants ignore that the "veracity" of the Underwriting Representations must be determined "not by [their] literal truth, but by [their] ability to accurately inform rather than mislead prospective buyers."  *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010); *accord, e.g.*, *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (liability attaches where "material facts have been omitted or presented in such a way as to 'obscure[] or distort[]' their significance.").  The Offering Documents represented that the mortgage loans "were originated" pursuant to the underwriting guidelines, the guidelines were applied to evaluate the borrowers' "ability to repay" the loan, and the guidelines contained objective requirements, such as maximum LTV/CLTV and DTI ratios and minimum FICO scores.[10]  Defendants' narrow interpretation of the Underwriting Representations cannot shield them from liability or limit the parties' proof of liability at trial.  *See DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (in finding falsity, the question is not whether "particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities].") (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (alterations in original)).

Moreover, Defendants' limited interpretation of underwriting guidelines to include only process requirements is unsupported by the factual record.  When re-underwriting loans as part

---

representations about "objective fact[s]," an inquiry to which intent is irrelevant.  *FHFA v. SG Americas, Inc.*, 2012 WL 5931878, at *3.

[10]  Defs.' Ex. 15 (NAA 2005-AR6) at NOM-FHFA_04811894-96; Defs.' Ex. 16 (NHELI 2006-FM1) at NOM-FHFA_04729543-48; Defs.' Ex. 17 (NHELI 2006-FM2) at NOM-FHFA_ 04638395-402; Defs.' Ex. 18 (NHELI 2006-HE3) at NOM-FHFA_04620965-75; Defs.' Ex. 19 (NHELI 2007-1) at NOM-FHFA_05142021-29; Defs.' Ex. 20 (NHELI 2007-2) at NOM-FHFA_05591413-18; Defs.' Ex. 21 (NHELI 2007-3) at NOM-FHFA_04732707-15.

of the acquisition process, Clayton Holdings, LLC ("Clayton"), one of Nomura's diligence vendors, reviewed loans to determine if "[t]he loan complies with all specific loan program parameters, including credit, LTV, documentation, debt ratios, and appraisal and property requirements for the credit grade assigned to the loan." Sheth Decl., Ex. 7 at CLAY-FHFA-04874329. Such a review encompassed the process of ensuring that the origination underwriter obtained all required verifications and documents, and that the loan complied with the substantive requirements of the underwriting guidelines, including limitations on LTV/CLTV and DTI ratios and FICO scores.

Accordingly, Defendants' assertion that post-origination evidence "sheds no light on whether the original underwriter acted in compliance with guidelines," Defs.' Br. 8, is incorrect. To the contrary, post-origination evidence is probative of whether the Underwriting Representations in the Offering Documents were accurate, including whether the original underwriter complied with the underwriting process set forth in the guidelines and whether the loan complied with the substantive requirements of the underwriting guidelines.[11]

> ### 2.   Post-Origination Evidence Is Relevant To Determining The Accuracy Of The Appraised Value At Origination And The Resulting LTV/CLTV Ratios

Post-origination evidence obtained from retrospective AVMs is relevant to determining whether the appraised value at the time of origination was accurate, and whether the resulting LTV/CLTV ratio based on the accurate value for each loan was within the substantive requirements of the applicable underwriting guideline and consistent with the LTV/CLTV tables in the Prospectus Supplements. Specifically, Mr. Hunter relied on a retrospective AVM developed by Dr. Kilpatrick, FHFA's valuation expert, to determine the accurate value of the

---

[11]   Mr. Hunter's findings cited by Defendants are prime examples of the relevance of post-origination documents to prove the objective, historical fact of the Sample Loans' non-compliance with the applicable underwriting guidelines. Pl.'s Br. 5-6 n.6-11 (citing Global Loan Numbers NHELI_2006_HE3_2002174715, NHELI_2007_2_2002237077, NAA_2005_AR6_1002007402, NHELI_2006_HE3_2002208686, NAA_2005_AR6_1001976475, NAA_2005_AR6_1001976169, NHELI_2006_HE3_2002209123). In each instance, post-origination evidence disclosed that the subject loan did not meet the underwriting guidelines' eligibility thresholds.

subject properties on the origination date (the "Greenfield AVM"),[12] and then used that value to recalculate the LTV and CLTV ratios.  There can be no question that Mr. Hunter's opinion based on such post-origination evidence is relevant to determining the accuracy of the Underwriting Representations and the LTV/CLTV information in the collateral tables.

Defendants' arguments criticizing Mr. Hunter's use of the Greenfield AVM is without merit.  *First*, Defendants' criticism of Mr. Hunter for failing to establish that "the valuation tools available at the time of origination—for example, automated valuation models and broker price opinions used by Nomura in due diligence—would have yielded the values given by Kilpatrick's model" is misplaced.  Defs.' Br. 7.  Defendants' own diligence records and four separate retrospective AVMs by their expert Lee Kennedy demonstrate that the appraised values at origination were substantially inflated, and in many instances, reflected greater inflation than revealed by the Greenfield AVM.  Sheth Decl., Ex. 19 Tbls. 3, 4.

*Second*, Defendants' assertion that the Greenfield AVM used tax assessed values from 2011 to 2014 as a primary determinant of the value of a property is misleading.  The relationship between the tax assessed value and sale price within a county was simply one of variables that Mr. Kilpatrick used to correlate the market value of the subject properties to the market values of the comparable properties, and in turn, to generate a reliable valuation as of the date of the subject property's original appraisal.  *See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Exclude Dr. Kilpatrick 7-8.  As such, the relationship between tax assessed value (which was only available to Dr. Kilpatrick for the period 2011-2014) and sales price served as a predictive variable that increased the reliability of Mr. Kilpatrick's retroactive market valuations.[13]  Contrary to

---

[12]   Sheth Decl., Ex. 20 (Expert Report of John A. Kilpatrick, Ph.D. Concerning Accuracy of Appraisals, May 15, 2014 ("Accuracy Report")) at 4-5 ("The retrospective review values have an effective date as of the date of the original appraisal.").

[13]   As Dr. Albert Lee set forth in his declaration accompanying Plaintiff's opposition to Defendants' *Daubert* motion against Dr. Kilpatrick, established statistical tests, such as the R-squared test, demonstrate that as a correlative variable, ex post tax assessed values are not only statistical significant predictors of market values at origination, but demonstrate high predictive power in conjunction with other variables, even by the standards of Defendants' own experts.  Defendants' own expert considered .7 an "acceptable R squared."  Sheth Decl., Ex. 22 (Isakson 11/07 Tr.) at 251:18-22.  Dr. Lee calculated an R-squared of .86 for the Greenfield AVM.  Pl.'s Mem. in Opp'n to Defs.' Mot. to Exclude Dr. Kilpatrick Testimony, Lee Decl. ¶ 29.

Defendants' contentions, the tax assessed values from 2011 to 2014 were not, however, the primary determinants—or directly correlated—to the values produced by the Greenfield AVM.

Finally, Defendants misinterpret Dr. Charles Cowan's testimony when they claim that "he opine[d] that Nomura's diligence shortly after origination showed valuations just 1.8% lower than appraised values." Defs.' Br. 10. In fact, Dr. Cowan concluded that valuations from every stage of Defendants' valuation diligence process evidenced signs of systemic appraisal inflation. Sheth Decl., Ex. 21 ¶ 55-60. Even Defendants' own contemporaneous AVM results demonstrated on average 6.9% appraisal inflation among high risk loans having an LTV ratio above 80 percent. *Id.* at ¶ 58. The 1.8% figure cited by Defendants refers to the final "post-reviewed" values that were obtained by Defendants during their purported diligence process for loans that failed one or both of Defendants' AVM and BPO tolerances. Despite this, Dr. Cowan demonstrated that these post reviewed values, just like Defendants' own AVM results, still demonstrated statistically significant inflation of 1.8% on average.[14] *Id.* at ¶ 60. Dr. Kilpatrick further demonstrated that 57.2% of these loans had post reviewed values less than represented on the respective loan tapes and many of these values resulted in final LTV ratios above 100. Sheth Decl., Ex. 19 at Tbl. 2.

### B.  Mr. Hunter's Use Of Post-Origination Evidence Is Reliable

Rule 702 requires that expert testimony is based on sufficient facts or data, is the product of reliable principles and methods, and that the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702; *Assured Guaranty Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 502 (S.D.N.Y. 2013). "[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009). "Vigorous cross-examination, presentation of contrary evidence, and

---

[14] "Post-reviewed" values are the result of a process in which Nomura, for appraisals that had already failed one or both of Nomura's AVM and BPO tolerances, reconciled the original appraisal against the AVM value, BPO value, and additional information available for the subject property. Sheth Decl., Ex. 19 at 7. Even these reconciled values reflect that the original appraisals were inflated to a statistically significant degree.

careful instruction on the burden of proof are the traditional and appropriate means" of assessing the value of admissible expert testimony." *Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796, at \*3 (S.D.N.Y. May 2, 2011) (quoting *Daubert,* 509 U.S. at 596 (1993).

Defendants' criticism of the reliability of the audit credit reports from LexisNexis, DataVerify, and CBCInnovis is misplaced.[15] These audit credit reports provide information about the borrower, including the borrower's identity and biographical data, address history, credit history, driver's license data, property and mortgage records, judgment and lien history, and employers. *See* Defs.' Ex. 11-12; Sheth Decl., Ex. 4. The credit report providers collect this information from national credit repositories such as TransUnion, Equifax, and Experian, as well as the IRS, Social Security Administration, and state and local governments. Sheth Decl., Ex. 23

---

[15] Defendants do not contest the reliability of the other post-origination evidence used by Mr. Hunter. Nor could they given that Nomura and other Defendants in these consolidated actions utilized such post-origination information and third-party tools when re-underwriting loans. Nomura itself used post-closing information during a post-securitization fraud review to identify loans with misrepresentations and submit them for repurchase. *See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Exclude Hunter Occupancy Findings, Sheth Decl. Ex. 29 at Row 100 (LMSLoanID          ) and Row 107 (LMSLoanID          ) (identifying two loans with misrepresentations of occupancy based on their loan servicing histories). Similarly, RBS used PACER, the property records database SiteX, and the servicing database MERS in its internal fraud reviews, all of which Mr. Hunter relied on. Sheth Decl., Ex. 11 (Camacho Dep.) 97:20-99:20, 107:4-110:4; Sheth Decl., Ex. 12 at RBS-FHFA-CT-67223852. In addition, Goldman Sachs used LexisNexis, MERS, bankruptcy filings, and salary engines, among other tools and post-closing documents, in assessing repurchase requests. *See, e.g.*, Pl.'s Mem. in Opp'n to Defs.' Mot. to Exclude Hunter Occupancy Findings, Sheth Decl. Ex. 31 at Row 846, (LOAN_ID              ); Row 1726, (LOAN_ID              Row 627, (LOAN_ID              Row 299 (LOAN_ID              *See also* Sheth Decl., Ex. 8 (Ozment Dep.) at 206:10-21 (testifying that Goldman Sachs used salary.com); Sheth Decl., Ex. 9 (Gill Dep.) at 90:12-20 (testifying that Goldman Sachs used MERS to investigate borrower indebtedness). Additionally, in its diligence reviews, HSBC used LexisNexis's Banko service to determine whether a borrower filed bankruptcy, a service called OFAC to determine whether the borrower's name match the application's Social Security number, and a service called reFICO to determine whether a borrower's credit score changed after origination. Sheth Decl., Ex. 13 at HSBC-FHFA04963377; Sheth Decl., Ex. 14 at HSBC FHFA 01487680; Sheth Decl., Ex. 15 at HSBC-FHFA 03075830; Sheth Decl., Ex. 16 (Zinych Dep.) at 342:6-9 ("Q. Do you know what [reFICO is] referring to? A. Refreshed FICOing was something that we started doing, it appears in 2007, for FICO drifts."). *See also* Sheth Decl., Ex. 17 (McIntyre Dep.) 303:13-19 (testifying that UBS used salary.com and monster.com in diligence reviews); Sheth Decl., Ex. 18 (Swartz Dep.) at 595:11-21 (testifying that Deutsche Bank used salary.com in diligence reviews).

14

(Viviano Dep.) at 18:17-24, 44:18-24, 145:17-146:14; Sheth Decl., Ex. 24 (Johnson Dep.) at 54:1-55:12, 84:4-85:15.  The credit report providers reconcile information provided by the credit repositories and other sources.  Sheth Decl., Ex. 23 (Viviano Dep.) at 86:9-87:8, 143:19-146:14; Sheth Decl., Ex. 24 (Johnson Dep.) at 93:12-17.  The information reflected in the reports concerning addresses associated with the borrower is predominantly based on data provided by the borrower.  Sheth Decl., Ex. 23 (Viviano Dep.) at 49:7-50:2, 112:18-113:6; Sheth Decl., Ex. 24 (Johnson Dep.) at 55:23-56:19, 90:18-91:18.

     Mr. Hunter's reliance on these audit credit reports was reliable because the use of similar post-origination sources of public records and credit reports was generally accepted by originators and diligence providers during the relevant time period.  *See e.g.*, Sheth Decl., Ex. 24 (Johnson Dep.) at 87:2-12 (DataVerify's corporate representative testifying that loan originators and diligence vendors rely on DataVerify).  Other Defendants in these consolidated actions relied on reports from DataVerify, Accurint, CBCInnovis, and similar third-party tools when conducting acquisition diligence and repurchase reviews.  For example, Goldman Sachs used Accurint, DataVerify, audit credit reports, and public records, among other tools and post-closing documents, in assessing repurchase requests.  *See e.g.*, Pl.'s Mem. in Opp'n to Defs.' Mot. to Exclude Hunter Occupancy Findings, Sheth Decl. Ex. 31 at Row 89 (LOAN_ID █████████), Row 222 (LOAN_ID █████████ ████████████████████████, Row 950 (LOAN_ID █████████████████████████ Row 1726, (LOAN_ID ███████████████████████████████████████████████████████████████████████████████████████████

██████████████████████████.[16]  Even Defendants' proffered re-underwriting expert, Mr.

Forester, testified that during re-underwriting reviews he conducted and oversaw in his prior

employment, he frequently relied on audit credit reports and LexisNexis tools such as DataVerify

and Accurint.  Sheth Decl., Ex. 25 (Forester Dep.) at 25:9-26:20, 26:18-20, 31:8-32:14, 48:7-

52:18, 54:22-56:2, 54:22-58:20; 183:2-185:16; 196:7-197:8.

Defendants mischaracterize the boilerplate disclaimers in the Accurint and DataVerify

reports to support their contention that these reports are unreliable bases for Mr. Hunter's

opinions.  Defs.' Br. 12.  The LexisNexis report advises that "[d]ata is sometimes entered poorly,

processed incorrectly and is generally not free from defect."  It does not disclaim that the report

conveys information collected from credit repositories, other credit reporting entities, and public

records.  Defs.' Ex. 11.  Rather, the disclaimer states the uncontroversial point that a large

collection of factual information may contain errors.  Similarly, the DataVerify report states, in

part, that "[t]his report uses public data collected during the mortgage recording process *and

while deemed reliable*, DataVerify and its third party business partners do not guarantee the

accuracy of this data."[17]  Defs.' Ex. 12 (emphasis added).  Mr. Hunter used these reports as one

piece of information along with other information in the loan file and other supporting

documentation to corroborate the information provided in the reports.[18]  For example, Mr.

---

[16]  HSBC likewise used audit credit reports and public records, among other tools, in conducting its quality
control and repurchase reviews.  *See e.g.*, Pl.'s Mem. in Opp'n to Defs.' Mot. to Exclude Hunter Occupancy
Findings, Sheth Decl. Ex. 32 at Row 9 (Loan_ID ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████  *see also* Pl.'s Mem. in Opp'n to Defs.' Mot. to Exclude
Hunter Occupancy Findings, Sheth Decl. Ex. 33 at Row 29 (Loan Number ████████████████████████
████████████████████████████████████████████████████████████████████

[17]  This disclaimer is present only in the "PropertyVerify Report" section of the DataVerify report that
reflects property, mortgage, and sales records.

[18]  Further, these disclaimers are intended to ensure that these reports are not used "as a factor in
establishing a consumer's eligibility for credit, insurance, employment or other purposes identified under the Fair
Credit Reporting Act (FCRA)."  Defs.' Ex. 11 at LF2UBS_00627370; Defs.' Ex. 12 at LF3NOM_00005125 ("This
report should not be used as a basis upon which to make a decision of whether or not to extend credit or as a basis
for taking any 'adverse action' as that term is defined in the FCRA."); *see also* Ex. 26 at LF2UBS_00633617
(same).  Mr. Hunter does not use the reports as a factor in establishing a consumer's eligibility for any of the above

Hunter used these reports as one source of information and analyzed them in conjunction with all other available information, to determine whether the borrower occupied the subject property as his primary residence. *See* Defs.' Ex. 1 at 100. As such, Mr. Hunter's use of these reports was consistent with their intended use as collections of data reported from various reliable and reputable entities and the borrowers themselves. *See Henry v. Little Mint, Inc.*, 2014 WL 2199427, at *5 (S.D.N.Y. May 23, 2014) (describing Accurint as "a reputable research tool owned by Lexis-Nexis"); *Marting Realty, Inc. v. Marks*, 1986 WL 4647, at *3 (Ohio Ct. App. Apr. 16, 1986) ("Credit reports are held to be highly reliable by the [] business world.").

In any event, to the extent there may be errors on these reports, such errors would "go to the weight, not the admissibility, of the testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266-67 (2d Cir. 2002); *see also Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 670 (S.D.N.Y. 2013) (internal citation omitted) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

### C.   The Probative Value of Mr. Hunter's Opinions Based Post-Origination Evidence Outweighs Any Purported Prejudice To Defendants

Defendants' argument that the probative value of Mr. Hunter's testimony is substantially outweighed by a risk of prejudice, confusion of the issues or misleading the jury[19] is unavailing. Fed. R. Evid. 403; *see also Costantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party of another, to justify exclusion under Rule 403 the prejudice must be unfair.").[20] Moreover, Defendants' contention

---

or as a basis for any adverse action against the borrower. Rather, he uses the reports to assess the accuracy of the Underwriting and Collateral Representations in the Offering Documents.

[19]   Because this Court has granted FHFA's motion to withdraw its Section 11 claims and will conduct a bench trial on the remaining claims, there is no longer any risk of confusion of the fact-finder.

[20]   Defendants' citation to *United States v. Herrera* is not on point. In that case, the court excluded an expert's testimony on the ground that it was unreliable because the proffered expert misled the court regarding the studies upon which his opinion relied and another judge had recommended perjury charges against the expert, further undermining his reliability. *United States v. Herrera*, 788 F. Supp. 2d 1026, 1034-1035 (N.D. Cal. 2011). No such concerns are present here.

that Mr. Hunter's use of post-origination information "would encourage hindsight bias," Defs.' Br. 13-14, is based entirely on cases that have an intent element.[21]  Here, Mr. Hunter is evaluating the accuracy of Defendants' representations about "objective fact[s]," and using evidence that reflects relevant events during the "relevant time period."  *FHFA v. SG Americas, Inc.*, 2012 WL 5931878, at *3; *Abu Dhabi Commercial Bank*, 2013 WL 1155420, at *7.  The originating loan underwriter's intent and knowledge has no bearing on the accuracy of the representations in the Offering Documents.  *FHFA v. Bank of Am. Corp.*, 2014 WL 7232339, at *2; *see also FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d at 328; *In re Prestige Brands Holding, Inc.*, 2006 WL 2147719, at *8 (S.D.N.Y. July 10, 2006) ("A representation of fact in a prospectus may be material, false and misleading without regard to the motive or intent of the author.  Mere negligence, which is all that is necessary, may be inferred from falsity and materiality.").

## CONCLUSION

For the reasons set forth above, FHFA respectfully requests that Defendants' Motion to Exclude the Testimony of Robert W. Hunter Based on Information Not Available at Origination be denied in its entirety.

---

[21]  Defs.' Br. 13-14 (citing *United States* v. *Vest*, 116 F.3d 1179, 1183-85 (7th Cir. 1997), *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co. Inc.*, 2013 WL 1155420, at *7 (S.D.N.Y. Mar. 20, 2013), *Minemyer* v. *B-Roc Representatives, Inc.*, 2012 WL 346621, at *4-5 (N.D. Ill. Feb. 2, 2012)).  In *Vest*, the court excluded the use of patient medical records in determining whether a doctor conducted unnecessary medical tests because the medical records were irrelevant to the question of fraudulent intent, where the government sought to prove fraudulent intent using expert testimony regarding the medical implications of factual assumptions and not the patient records themselves.  116 F.3d at 1183-85.  In *Abu Dhabi Commercial Bank*, the court excluded government reports and investigations that provided "evidence of what defendants realized in hindsight" in an effort to establish fraud on the part of credit rating agencies, but allowed evidence of "relevant events during the relevant time period" and "after-the-fact testimony stating what defendants knew and did during the relevant time period."  2013 WL 1155420, at *7.  In *Minemyer*, a willful infringement case, the court excluded evidence of office actions at the U.S. Patent and Trademark Office ("interim acceptances, rejections and adjustments") because they are "not relevant on the question of patent invalidity or willful infringement" as they "are the norm at the PTO."  2012 WL 346621, at *4-5.

DATED:  New York, New York
        January 20, 2015

Respectfully submitted,

QUINN EMANUEL URQUHART &
  SULLIVAN, LLP

By: _____
Philippe Z. Selendy
Manisha M. Sheth
Deborah K. Brown
Jeffrey C. Miller
Zachary Williams

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

19