UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
                                     :
 FEDERAL HOUSING FINANCE AGENCY,     :      11cv6201 (DLC)
                                     :
               Plaintiff,            :      OPINION & ORDER
                                     :
        -v-                          :
                                     :
                                     :
 NOMURA HOLDING AMERICA, INC., et al., :
                                     :
               Defendants.           :
                                     :
-------------------------------------X

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
Sascha N. Rand
Wing F. (Alex) Ng
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For defendants Nomura Holding America, Inc., Nomura Asset
Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities International, Inc., David
Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N.
Dante LaRocca:

David B. Tulchin
Steven L. Holley
Bruce E. Clark
Bradley A. Harsch
Katherine J. Stoller
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

Amanda F. Davidoff
Elizabeth A. Cassady
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC 20006

For defendant RBS Securities Inc.:

Thomas C. Rice
David J. Woll
Andrew T. Frankel
Alan Turner
Craig S. Waldman
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

This Opinion addresses two motions.  One is plaintiff

Federal Housing Finance Agency's ("FHFA") motion to exclude the

expert testimony of defendants'[1] expert witness Kerry Vandell

("Vandell"), whom defendants retained to provide expert

testimony on the loss causation defense under Section 12 of the

Securities Act, and those aspects of defendants' expert witness

Timothy Riddiough's ("Riddiough") loss causation damages

calculation that rely on Vandell's analysis.  Vandell's loss

causation analysis made use of three "benchmark" groups of

_____

[1] Defendants are Nomura Holding America, Inc., Nomura Asset
Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities International, Inc., David
Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N.
Dante LaRocca ("Nomura"); and RBS Securities Inc. ("RBS")
(collectively, "defendants").  According to FHFA's brief,
Vandell was retained by Nomura only, and RBS proffered no expert
witness on negative loss causation.  Defendants' brief, while it
does not explicitly respond to this point, refers to Vandell as
having been retained by defendants collectively.  The precise
combination of defendants who retained Vandell does not matter
for present purposes, and, for simplicity, this Opinion refers
to Vandell as being defendants' expert.

loans.  Because defendants have failed to show that those
benchmarks provide a reliable basis for the comparisons that
Vandell makes, FHFA's motion to exclude the expert testimony of
Vandell, and those aspects of Riddiough's calculation that rely
on Vandell's testimony, is granted.  Because FHFA's motion to
exclude Vandell's testimony is granted, defendants' motion to
exclude the expert testimony of Anthony Saunders ("Saunders"),
offered by FHFA to rebut Vandell, is denied as moot.

**BACKGROUND**

FHFA, acting as conservator for Fannie Mae and Freddie Mac
(together, the "Government Sponsored Enterprises" or "GSEs"),
filed suit on September 2, 2011 against defendants alleging that
the Offering Documents used to market and sell seven
certificates ("Certificates") to the GSEs associated with
residential mortgage-backed securities ("RMBS" or
"Securitizations") contained material misstatements or
omissions.  RMBS are securities entitling the holder to income
payments from pools of residential mortgage loans ("Supporting
Loan Groups" or "SLGs") held by a trust.

FHFA brought these claims pursuant to Sections 11 and
12(a)(2) of the Securities Act of 1933 (the "Securities Act"),
as well as Virginia's and the District of Columbia's Blue Sky
laws.  This lawsuit is the sole remaining action in a series of
similar, coordinated actions litigated in this district by FHFA

against banks and related individuals and entities to recover
losses experienced by the GSEs from their purchases of RMBS.  A
description of the litigation and the types of
misrepresentations at issue in each of these coordinated
actions, including the instant case, can be found in <u>FHFA v.
Nomura Holding Am., Inc.</u>, --- F. Supp. 3d ---, 11cv6201 (DLC),
2014 WL 6462239, at *3-6, *16-17 (S.D.N.Y. Nov. 18, 2014)
("<u>Nomura</u>"), as well as <u>FHFA v. UBS Americas, Inc.</u>, 858 F. Supp.
2d 306, 323-33 (S.D.N.Y. 2012), <u>aff'd</u>, 712 F.3d 136 (2d Cir.
2013).

Broadly speaking, FHFA alleges three categories of
misstatements: (i) the Offering Documents misstated the extent
to which the loans in the SLGs for the seven Certificates
complied with relevant underwriting guidelines; (ii) the loan-
to-value ("LTV") ratios disclosed in the Offering Documents were
too low because of inflated appraisals of the properties; and
(iii) the Offering Documents misrepresented the number of
borrowers who occupied the properties that secured the mortgage
loans.  FHFA alleged as well that credit rating agencies gave
inflated ratings to the Certificates as a result of defendants'
providing these agencies with incorrect data concerning the
attributes of the loans.

On January 15, 2015, FHFA was granted leave to withdraw its
claims under Section 11 of the Securities Act.  Although neither

Virginia's nor the District of Columbia's Blue Sky law provides
a loss causation defense to the claims at issue, Section 12 of
the Securities Act, as amended by the Private Securities
Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat.
737, does.  See FHFA v. HSBC N. Am. Holdings Inc., 988 F. Supp.
2d 363, 367, 369 (S.D.N.Y. 2013).  Pursuant to the defense,

> if the person who offered or sold [the] security
> proves that any portion or all of the amount
> recoverable . . . represents other than the
> depreciation in value of the subject security
> resulting from such part of the prospectus or oral
> communication, with respect to which the liability of
> that person is asserted . . . , then such portion or
> amount, as the case may be, shall not be recoverable.

15 U.S.C. § 77l(b).

Defendants retained Vandell to provide expert testimony on
loss causation.  Vandell is a real estate and financial
economist whose areas of research specialization include housing
economics and policy, international real estate markets, real
estate market dynamics, and mortgage finance, especially
mortgage-backed securitization, structured finance, and the
pricing of default and prepayment risk.  As set forth in his
July 9, 2014 expert report, to assess whether the categories of
alleged defects in the Offering Documents -- as opposed to other
factors, such as market-wide economic changes that affected
mortgage loans generally -- caused losses to the GSEs as holders
of the seven Certificates, Vandell conducted regression analyses

that compared the performance of the loans backing the
Certificates to the performance of three benchmark groups of
loans.  The idea is to create groups of benchmark loans that
lack the problems -- such as noncompliance with underwriting
guidelines and inflated appraisals -- that allegedly plagued the
loans comprising the SLGs at issue here.

Vandell's first benchmark (the "Industry Benchmark")
consists of loans from other private label securitizations
("PLS")[2] issued during the relevant period, 2005 to 2007, that
are comparable to the loans in the SLGs for the seven
Certificates.[3]  To ensure that the Industry Benchmark was truly a
"benchmark," Vandell excluded all loans that were part of any
securitizations at issue in any of the cases brought by FHFA
against other banks and their related entities and individuals.[4]

_____

[2] The term "PLS" distinguishes private label RMBS from those RMBS
sold by federal agencies like the GSEs.

[3] FHFA does not appear to argue that the loans with which Vandell
populated the Industry Benchmark, or any of the benchmarks for
that matter, were not comparable to the loans in the SLGs for
the seven Certificates.  With respect to the Industry Benchmark,
to select "loans from the same collateral/asset type categories
as the At-Issue Loans," Vandell used four categories of loans
that he defines in his report: First-Lien Fixed Rate Subprime,
First-Lien ARM/Hybrid Alt-A, First-Lien ARM/Hybrid Subprime, and
Closed-End Second Lien Subprime.

[4] Subsequently, in response to criticism from Saunders, Vandell
reran his analysis after additionally excluding from the
Industry Benchmark loans from securitizations that were the
subject of certain lawsuits not involving FHFA.  According to
Vandell, excluding these loans from the Industry Benchmark

Vandell's second benchmark (the "GSE Benchmark") consists of loans -- comparable to those in the SLGs for the seven Certificates -- that were purchased by the GSEs from originators.[5]   The data for Vandell's GSE Benchmark come from

---

caused no appreciable difference in his results.  FHFA objects that this supplemental analysis is untimely, as it came after the expert discovery cutoff.  It is unnecessary to decide whether Vandell's revised analysis was timely since it does not cure the underlying defect in his choice of a benchmark.

[5] Mortgage loans are often divided, by credit risk, into three classes.  In order of ascending risk, they are "prime" loans, "Alt-A" loans, and "subprime" loans.  See FHFA v. Nomura Holding Am., Inc., No. 11cv6201 (DLC), 2014 WL 7234593, at *2 n.2 (S.D.N.Y. Dec. 18, 2014) ("Single Family Diligence Op.")  It is the Alt-A and subprime PLS that were purchased from defendants by the PLS side of the GSEs' business that prompt the claims in this lawsuit.  Id. at *2.  The GSEs purchased mortgage loans from originators through a different side of their business, known as the "Single Family" side.  Id. at *1.  The GSEs principally bought such loans under different standards and constraints than those that applied to defendants' PLS collateral.  Id. at *2.

Fannie Mae purchased subprime and Alt-A loans to hold, not to securitize, and it had the ability -- which it exercised -- to monitor loan performance and "put back" defective loans to the seller.  Id.  Freddie Mac held some of these loans and used others as collateral for guaranteed Structured Pass-Through Certificates ("T-Deals"), which were sold to investors.  Id. Freddie Mac retained the credit risk associated with the subprime and Alt-A loans it securitized, as it guaranteed payment on T-Deals, which were not governed by the Securities Act or Blue Sky laws.  Id.

Neither GSE purported to exercise due diligence or reasonable care under Sections 11 or 12(a)(2) of the Securities Act or under the Blue Sky laws.  Id.  In addition, the GSEs were subject to affordable housing goals set by the United States Department of Housing and Urban Development that required, for example, the purchase of loans to lower-income borrowers that are owner occupied and in metropolitan areas.  Id. at *3.  The

CoreLogic's Loan-Level Market Analytics database, which does not contain loan files or identify the originator or servicer of the loans; all that is identified is the initial investor (<u>i.e.,</u> Freddie Mac or Fannie Mae).  Both Freddie Mac and Fannie Mae had quality control and originator approval processes.

Vandell's third benchmark (the "Reunderwriting Benchmark") consists of loans that were reunderwritten by FHFA's experts in other cases, excluding those that were identified by those experts as materially defective.  Again, the idea is to test whether the alleged defects caused the GSEs' losses by comparing the loans that formed the SLGs at issue in this action with loans that lack those same alleged defects.

Vandell used a regression analysis to estimate a model of loan performance using the loans in each benchmark.  These models include dozens of explanatory variables (depending on the benchmark) and estimate the extent to which each explanatory variable predicts the performance (measured by events of default

---

GSEs' decisions to purchase mortgage loans were, at times, influenced by the GSEs' desire to purchase loans that met these housing goals.  <u>Id.</u>

To populate the GSE Benchmark, Vandell selected loans with the same collateral types as the at-issue loans by making use of two categories that he defines: (1) First-Lien, Non-Negatively Amortizing, Fixed Rate, and (2) First-Lien, Non-Negatively Amortizing, Hybrid.  It appears that these categories captured Alt-A and subprime whole loans.  Again, FHFA does not appear to dispute the comparability of these loans.

or delinquency) of the loans in the benchmarks.  An "event of default or delinquency" refers to a loan that was delinquent for at least ninety days; was in bankruptcy, liquidation, or foreclosure; or was real-estate-owned[6] or charged-off in the last month of loan tracking.  Vandell then applied the results of each model to the actual loans in the SLGs for the seven Certificates to estimate how those loans would have performed had they performed the same way as the comparable benchmark loans.  Vandell opines that, if the actual default and delinquency rates of the loans underlying a particular Certificate were not statistically significantly different than the expected rates predicted by a specific benchmark, then any difference between the disclosed characteristics and actual characteristics -- the alleged misstatements in the Offering Documents -- did not cause the GSEs' losses.

Vandell found that the loans in the SLGs underlying six of the seven Certificates, comprising ninety-eight percent of the loans at issue in this case, performed the same as, or better than, the performance predicted by both the Industry and Reunderwriting Benchmarks.  Moreover, loans in the SLGs underlying all seven of the Certificates performed the same as,

---

[6] "Real-estate-owned" refers to properties that have been foreclosed upon and are owned by the mortgage holder.  Nomura, 2014 WL 6462239, at *11 n.22.

or better than, the performance predicted by the GSE Benchmark. Vandell used the results from the GSE Benchmark to corroborate his conclusions based on the Industry and Reunderwriting Benchmarks, and he found that the Reunderwriting Benchmark provided additional support to the findings generated by use of the Industry and GSE Benchmarks.

Defendants' damages expert, Riddiough, relied in part on Vandell's opinions to determine the portion of any alleged damages attributable to factors other than the alleged misrepresentations in the Offering Documents.[7]  Riddiough reviewed Vandell's conclusions and determined that, after accounting for loss causation, damages could be awarded for at most one Certificate, NAA 2005-AR6, as to which Vandell found a statistically significant difference between the predicted and actual default rate using the Industry and Reunderwriting Benchmarks.  After using Vandell's regression results in his model, Riddiough concluded that the resulting damages range from $5 million to $5.8 million on the Section 12 claim for the NAA 2005-AR6 Certificate.  Because Vandell reported no statistically significant difference between actual and predicted default and delinquency rates for any of the other Certificates using any of

---

[7] Riddiough is the subject of a separate Daubert motion brought by FHFA.

the three benchmarks, Riddiough says there are no Section 12 damages for those other Certificates.

FHFA retained Saunders to provide rebuttal expert testimony that seeks to undermine the reliability of Vandell's Industry and GSE Benchmarks.  According to his November 10, 2014 report, Saunders's testimony seeks to demonstrate that these two benchmarks contain loans with the same problems as are alleged to plague the loans constituting the SLGs at issue here.  In other words, Saunders seeks to demonstrate that these two benchmarks are not "clean," and thus do not serve as reliable comparators.

On January 8, 2015, (1) FHFA moved to exclude Vandell's expert testimony and those aspects of Riddiough's loss causation damages calculation that rely on Vandell's analysis, and (2) defendants moved to exclude Saunders's expert testimony.  The motions were fully submitted on February 2.  FHFA's motion is discussed below, and, as a result of the outcome of that discussion, defendants' motion is rendered moot.

## DISCUSSION

In its motion, FHFA makes several arguments in support of its position that the testimony of Vandell and Riddiough should be excluded.  To resolve this motion it is only necessary to address FHFA's arguments that relate to the "reliability" prong

of the analysis under Fed. R. Evid. 702 and Daubert v. Merrill

Dow Pharms., Inc., 509 U.S. 579 (1993).

The applicable rules of law pertaining to exclusion of

expert testimony under Fed. R. Evid. 702 and Daubert are set out

in this Court's January 28, 2015 Opinion regarding defendants'

motion to exclude the testimony of FHFA's expert Dr. John A.

Kilpatrick, and that discussion is incorporated by reference.

FHFA v. Nomura Holding Am., Inc., No. 11cv6201 (DLC), 2015 WL

353929, at *3-4 (S.D.N.Y. Jan. 28, 2014).  Here, it bears

reemphasizing that:

> whether a witness's area of expertise [i]s technical,
> scientific, or more generally experience-based, Rule
> 702 require[s] the district court to fulfill the
> gatekeeping function of making certain that an expert,
> whether basing testimony upon professional studies or
> personal experience, employs in the courtroom the same
> level of intellectual rigor that characterizes the
> practice of an expert in the relevant field.
>
>      . . .  [R]eliability within the meaning of Rule
> 702 requires a sufficiently rigorous analytical
> connection between [the expert's] methodology and the
> expert's conclusions.  Nothing in either Daubert or
> the Federal Rules of Evidence requires a district
> court to admit opinion evidence which is connected to
> existing data only by the ipse dixit of the expert.  A
> court may conclude that there is simply too great an
> analytical gap between the data and the opinion
> proffered. . . .  [W]hen an expert opinion is based on
> data, a methodology, or studies that are simply
> inadequate to support the conclusions reached, Daubert
> and Rule 702 mandate the exclusion of that unreliable
> opinion testimony.

Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir. 2005)

(citation omitted).  A district court's gatekeeping function

under Daubert is meant "to ensure that the courtroom door remains closed to junk science." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). This function "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." Daubert, 509 U.S. at 592-93. "[T]o qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation -- i.e., 'good grounds,' based on what is known." Id. at 590. According to the Daubert Court, "[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." Id. at 593 (citation omitted).

The "scientific method" is defined as "the process of generating hypotheses and testing them through experimentation, publication, and replication." Black's Law Dictionary 1547 (10th ed. 2014). As explained in the Federal Judicial Center's Reference Manual on Scientific Evidence,

> A good study design compares outcomes for subjects who are exposed to some factor (the treatment group) with outcomes for other subjects who are not exposed (the control group). . . . [D]ata from a treatment group without a control group generally reveal very little and can be misleading. Comparisons are essential. . . . Observational studies succeed to the

extent that the treatment and control groups are
comparable -- <u>apart from the treatment</u>. . . .  There
are . . . some basic questions to ask when appraising
causal inferences based on empirical studies[, such
as,] Was there a control group?  Unless comparisons
can be made, the study has little to say about
causation.

Federal Judicial Center, <u>Reference Manual on Scientific Evidence</u>

218, 220, 222 (3d ed. 2011) (emphasis added); <u>see also</u> Vern R.

Walker, <u>Theories of Uncertainty: Explaining the Possible Sources</u>

<u>of Error in Inferences</u>, 22 Cardozo L. Rev. 1523, 1554 n.47

(2001) ("The design of a controlled experiment is intended to

create a situation in which a statistically significant

difference between the test group and the control group would

warrant an inference of causation.").

Indeed, it is axiomatic that, when designing an experiment

to test whether an observed result was caused by given variable,

the control or benchmark group must lack that variable.  That is

the whole point of a control group.  If a scientist wanted to

prove that Medicine X causes rashes, she might design a study

wherein she would observe two patients: Patient 1, who had taken

Medicine X, and Patient 2, who had not.  It would be rather

important to the reliability of her experiment that Patient 2

not also have taken Medicine X.  Indeed, someone assessing the

validity of her methodology would quite reasonably want

assurance that Patient 2 had not been exposed to Medicine X.  If

the only assurance the scientist could provide was an assumption

that Patient 2 had not taken Medicine X, it would raise the
specter of junk science.

     This idea is so fundamental that, unsurprisingly, there are
few cases in which a court has been forced to exclude an expert
study because the expert was unable to demonstrate that the
control group lacked the very variable requiring isolation.
J.T. Colby & Co. v. Apple Inc., No. 11cv4060 (DLC), 2013 WL
1903883, at *22-23 (S.D.N.Y. May 8, 2013), aff'd, 586 F. App'x 8
(2d Cir. 2014) ("In order to offer sound results, most surveys
must employ an adequate control.").  There are, however,
multiple examples of courts excluding experts whose analyses
fail to account for significant variables.  See, e.g., Wills v.
Amerada Hess Corp., 379 F.3d 32, 50 (2d Cir. 2004) ("failure to
account for [major variables] strongly indicated that [expert]'s
conclusions were not grounded in reliable scientific methods, as
required by Daubert"); In re Elec. Books Antitrust Litig., No.
11md2293 (DLC), 2014 WL 1282298, at *10 (S.D.N.Y. Mar. 28, 2014)
("[Expert]'s . . . analysis fails to support his opinions
because it fails to control for systematic factors . . . ."); In
re Wireless Tel. Servs. Antitrust Litig., 385 F. Supp. 2d 403,
427 (S.D.N.Y. 2005) ("Where an expert conducts a regression
analysis and fails to incorporate major independent variables,
such analysis may be excluded as irrelevant.").  If the failure
to account for other potential variables can suffice to doom an

expert's study, it follows that the failure to control for the one variable under review warrants exclusion.

As the proponents of Vandell's testimony, defendants bear the burden of "establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).  To demonstrate the reliability of Vandell's method, see Fed. R. Evid. 702(c), defendants need to show that his benchmarks provide adequately "clean" control groups -- after all, if it turns out that the loans comprising the benchmarks suffered from the same alleged problems as those comprising the SLGs at issue, any comparison of performance would not be illuminating.

Here, defendants have not carried their burden.  One way of ensuring clean benchmarks would have been to reunderwrite a set of loans and to select compliant loans to use as comparators. Indeed, a sample of the loans that Vandell selected to populate his benchmarks could have been, but were not, reunderwritten by defendants.  After a February 14, 2013 conference that addressed defendants' potential use of an alternative set of loans for purposes of loss causation analysis, a February 27, 2013 Supplemental Expert Scheduling Order set a schedule under which defendants could have identified any such loans.  Defendants opted not to do so.  Similarly, while defendants have no doubt reunderwritten the sample of loans that FHFA identified for use

in this coordinated litigation, defendants decided not to make use of any of their reunderwriting for purposes of loss causation.

It is worth pausing to note that, because the problems that allegedly plagued the loans in the SLGs at issue -- such as noncompliance with underwriting guidelines and inflated appraisals -- seem to have been widespread in the residential lending market during the relevant period, absent affirmative representations of cleanliness, it is difficult to feel confident about the cleanliness of any untested group of loans. The Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011), better known as the "Financial Crisis Inquiry Report," published by the U.S. Financial Crisis Inquiry Commission ("FCIC"),[8] paints a picture of just how prevalent these problems may have been. It explains that, "[a]s defaults and losses on the insured mortgages have been increasing, the [private mortgage insurance ("PMI")] companies have seen a spike in claims.  As of October 2010, the seven largest PMI companies, which share 98% of the market, had rejected about 25% of the claims (or $6 billion of $24 billion) brought to them, because of violations of

---

[8] Available at http://fcic-static.law.stanford.edu/cdn_media/ fcic-reports/fcic_final_report_full.pdf (last visited February 10, 2015).

origination guidelines, improper employment and income reporting, and issues with property valuation." Financial Crisis Inquiry Report at 225.  And, according to the Financial Crisis Inquiry Report, "[o]ne 2003 survey found that 55% of the appraisers [surveyed] had felt pressed to inflate the value of homes; by 2006, this had climbed to 90%."  Id. at 91.[9]

Due to the apparent prevalence of these loan defects, it may have proved difficult to create a clean benchmark set of loans to use as a control group.  Despite, or perhaps because of, that difficulty, in the absence of independent reunderwriting, defendants claim to be able to infer sufficient cleanliness based on the way in which Vandell constructed his benchmarks.  As for the Industry Benchmark, Vandell simply

---

[9] As reported in Financial Crisis Inquiry Report, in 2006 the Mortgage Insurance Companies of America, a trade association that represents mortgage insurance companies, wrote to regulators that "[w]e are deeply concerned about the contagion effect from poorly underwritten or unsuitable mortgages and home equity loans . . . .  The most recent market trends show alarming signs of undue risk-taking that puts both lenders and consumers at risk."  Financial Crisis Inquiry Report at 21. And, based on testimony from FDIC Chairman Sheila Bair, who served at the Treasury Department as the assistant secretary for financial institutions from 2001 to 2002, the FCIC reports that "[t]hrough the early years of the new decade, the really poorly underwritten loans, the payment shock loans[,] continued to proliferate outside the traditional banking sector."  Id. at 79 (citation omitted).  "The term 'payment shock' refers to a significant increase in the amount of the monthly payment that occurs when an adjustable interest rate adjusts to its fully-indexed basis."  F.J. Ornstein et. al., Interagency Statement on Subprime Mortgage Lending, 61 Consumer Fin. L.Q. Rep. 176, 177 n.7 (2007).

excluded loans that were part of securitizations at issue in any
of the RMBS cases brought by FHFA, and, subsequently, removed
more loans that were the subject of other RMBS litigations not
involving FHFA.  Excluding loans that have been the subject of
lawsuits may be a good start for creating a clean benchmark, but
it does little to ensure the quality of the loans remaining in
the group.

As for the GSE Benchmark, presumably Vandell decided to
use, or was asked to use, the benchmark on the theory -- nowhere
supported in Vandell's report or any of the accompanying
documents -- that loans purchased by the GSEs from originators
would be less likely to have the problems that allegedly plagued
the loans comprising the SLGs at issue.  One cannot know for
sure, however, why Vandell decided to use the GSE Benchmark, as
he provides no reasons for believing that the loans in the
benchmark are free of the defects whose impact his analysis
attempts to measure.  Vandell himself provides no expert opinion
as to the quality of the loans in the GSE Benchmark, and
defendants proffer no additional expert in support thereof.
Vandell removed no loans from the pool that he used to populate
the benchmark and, apparently, assumed their quality simply
because they were purchased by the GSEs.

It is true, as defendants say in their opposition to FHFA's
motion to exclude Vandell's testimony, that the GSEs adhered to

19

processes that were meant to ensure a certain quality in the loans they purchased, but a loan's having been purchased by the GSEs is, standing alone, insufficient to demonstrate a lack of the defects at issue here.  A statement from defendants' brief is telling: "There is no evidence that a significant number of the loans purchased by Freddie Mac and Fannie Mae were not originated generally in accordance with originator underwriting guidelines."  The absence of evidence of noncompliance is not evidence of compliance.  The loans comprising Vandell's GSE Benchmark have never been certified to be free of the defects relevant to this specific action; Vandell simply assumes the cleanliness of the benchmark.  Under Daubert scrutiny, something as fundamental to his analysis as the quality of his control group cannot be assumed.

Defendants complain that there was no method for Vandell to commission a reunderwriting of the loans in the GSE Benchmark because FHFA has "steadfastly refused in this case to provide discovery concerning 'single-family' loans" purchased from the GSEs.  As a result, say defendants, Vandell was forced to obtain the loan data for the GSE Benchmark from CoreLogic's Loan-Level Market Analytics database, which does not identify the originator or servicer of the loans.  In this coordinated litigation, defendants were granted extensive discovery of the GSEs' business, including its PLS operations and the committees

overseeing the operations of both the Single Family and PLS operations.  Single Family Diligence Op., 2014 WL 7234593, at *2.  Targeted discovery requests reaching additional Single Family documents were permitted, including discovery regarding the GSEs' evaluations of originators; general requests for discovery about Single Family were denied, the Court noting that the GSEs principally bought loans through their Single Family businesses under different standards and constraints than those that applied to defendants' PLS collateral.  Id.  In any event, the nature of the discovery in this action concerning the GSEs' Single Family loans is largely irrelevant, given that defendants had the opportunity to identify alternative sets of loans to reunderwrite for purposes of loss causation analysis but chose not to do so.  Indeed, in opposing this motion to exclude, defendants reject the assertion as "baseless" that they were required to reunderwrite loans to create a suitable benchmark for Vandell's study.

As for the Reunderwriting Benchmark, Vandell states that it consists of loans that, "according to [FHFA]'s reunderwriting experts, were underwritten entirely or substantially in accordance with underwriting guidelines or deviated from guidelines only in a manner that did not substantially increase their credit risk."  Vandell has mischaracterized FHFA's reunderwriting experts' conclusions.  According to Vandell's

description of how he populated the Reunderwriting Benchmark, he "beg[a]n with the samples of loans that were reunderwritten by FHFA experts Richard W. Payne, Robert W. Hunter, and Steven I. Butler," and then, as is relevant here, "[e]xclude[d] all reunderwritten loans that were identified by FHFA reunderwriting experts as Materially Defective."  Vandell defines as "Materially Defective" "loans for which the three experts concluded: 'It is my opinion, to a reasonable degree of professional certainty, that this loan was originated with one or more underwriting defects that meaningfully and substantially increased the credit risk associated with the loan.'"  In other words, Vandell took the loans that these reunderwriting experts started with, removed the worst loans (those the reunderwriting experts concluded were meaningfully defective and had a substantially increased credit risk), and now proclaims that FHFA's reunderwriting experts concluded that the non-excluded loans were underwritten entirely or substantially in accordance with underwriting guidelines or deviated from guidelines only in a manner that did not substantially increase their credit risk.

Defendants have not shown, however, that FHFA's reunderwriting experts reached any conclusion about the loans that Vandell retained in his Reunderwriting Benchmark that would permit those loans to serve as an appropriate benchmark for Vandell's study.  The loans examined by FHFA's experts were a

sample of loans taken from each Supporting Loan Group backing a
Certificate purchased by one of the GSEs.  FHFA has used its
analysis of those sample loans to support its claims in these
coordinated litigations that the Offering Documents contained
the material misrepresentations described above.  In the January
17, 2014 Corrected Expert Report of Robert W. Hunter Regarding
the Underwriting of Mortgage Loans Underlying the Ally
Securitizations, Hunter "rendered one of the following
conclusions for each Mortgage Loan in the sample":

> 1. It is my opinion, to a reasonable degree of
> professional certainty, that this Mortgage Loan was
> originated with one or more underwriting defects that
> meaningfully and substantially increased the credit
> risk associated with the Mortgage Loan.
>
> 2. It is my opinion, to a reasonable degree of
> professional certainty, that although this Mortgage
> Loan was originated with one or more underwriting
> defects, the underwriting defects did not meaningfully
> and substantially increase the credit risk associated
> with the Mortgage Loan.
>
> 3. Based on the documents provided to me, I did not
> find any underwriting defects in the origination of
> this Mortgage Loan.

Before presenting the number of loans falling into the first
enumerated category, Hunter explicitly states, "It is not my
opinion that the remaining mortgage loans were properly
underwritten or should have been included in the
Securitizations.  The remaining mortgage loans may have also
suffered from defects, but in my opinion these defects did not

materially increase the credit risk of the loans."  (Emphasis in original.)

The three potential conclusions enumerated above appear effectively verbatim in the October 25, 2013 Corrected Expert Report of Richard W. Payne III Regarding the Underwriting of Mortgage Loans Underlying the Merrill Lynch Securitizations. Attached to the third conclusion -- "Based on the documents provided to me, I did not find any underwriting defects in the origination of this Mortgage Loan." -- is a footnote that reads, "Based on the evidence currently available to me, I did not identify defects in the remaining Mortgage Loans that substantially increased their credit risk.  If, however, additional data subsequently become available to me, I may identify further defects that increase the credit risk of these loans."

Similarly, in both the March 7, 2014 Expert Report of Steven I. Butler Regarding the Underwriting of Mortgage Loans Underlying the HSBC Securitizations, and the March 11, 2014 Expert Report of Steven I. Butler Regarding the Underwriting of Mortgage Loans Underlying the First Horizon Securitizations, after presenting a chart reflecting the number of loans from each securitization that had an increased credit risk as a result of the underwriting defects found during the review, Butler stated, "At this point in time, based on the evidence

24

currently available to me, I did not identify defects in the remaining Mortgage Loans that substantially increased their credit risk.  If, however, additional data subsequently becomes available to me, I may identify further defects that increased the credit risk of these loans.  It is <u>not</u> my opinion that the remaining mortgage loans were properly underwritten or should have been included in the Securitizations."  (Emphasis in original.)[10]

Stating that, based on the information provided, underwriting defects were not found for a given loan is not the same thing as affirmatively certifying that the loan was free of defects.  Put differently, contrary to Vandell's assumption, the fact that a loan was not placed by a reunderwriting expert into the "materially noncompliant" category does not, of necessity, mean that the reunderwriting expert concluded that the loan was "materially compliant."

And what ultimately dooms the Reunderwriting Benchmark is that there will be no opportunity at trial to explore what these FHFA experts meant when they reached something along the lines

---

[10] The fifth reunderwriting expert report on which Vandell claims to rely, the January 21, 2014 Expert Report of Steven I. Butler Regarding the Underwriting of Mortgage Loans Underlying the Credit Suisse Securitizations, was incomplete and provided merely "a summary of certain categories of underwriting breaches that, at this point, have been more prevalent across the Mortgage Loans."

of the third conclusion enumerated above.  FHFA will proffer Robert Hunter in this case but to testify to his reunderwriting of the loans in this case;[11] Richard Payne and Steven Butler were retained by FHFA in some of the now-settled matters that FHFA brought against other financial institutions; since no trials occurred in those cases, they never testified at trial there and will not testify at trial here.  In short, their expert reports constitute inadmissible hearsay.

Defendants argue that the findings of FHFA's reunderwriting experts' are not hearsay because they are admissions of a party opponent under Fed. R. Evid. 801(d)(2).  Defendants cite no controlling law for this argument; in the principal case on which they rely, Collins v. Wayne Corp., the Fifth Circuit held that the deposition testimony of an expert employed by a bus manufacturer to investigate an accident was an admission under Rule 801(d)(2).  621 F.2d 777, 781-82 (5th Cir. 1980), superseded by rule on other grounds as stated in Mathis v. Exxon Corp., 302 F.3d 448, 459 n.16 (5th Cir. 2002).  But, as was

---

[11] Notably, Vandell did not populate his Reunderwriting Benchmark with loans that Hunter reunderwrote in this action.  Of the 723 loans that Hunter reviewed, he found that 571 (or all but 152) had underwriting defects that substantially increased the credit risk associated with the loan.  FHFA's rebuttal expert G. William Schwert applied Vandell's methodology to the loans reunderwritten by Hunter in this action and found actual losses totaling more than twenty-six times the amount estimated by Vandell's Industry Benchmark.

noted by the Third Circuit, "in [Collins] the court made a
finding that the expert witness was an agent of the defendant
and the defendant employed the expert to investigate and analyze
the bus accident.  The court determined that in giving his
deposition, the expert was performing the function that the
manufacturer had employed him to perform."  Kirk v. Raymark
Indus., Inc., 61 F.3d 147, 163-64 (3d Cir. 1995) (citation
omitted).  The Third Circuit went on:

> . . . In theory, despite the fact that one party
> retained and paid for the services of an expert
> witness, expert witnesses are supposed to testify
> impartially in the sphere of their expertise.  Thus,
> one can call an expert witness even if one disagrees
> with the testimony of the expert.  Rule 801(d)(2)[]
> requires that the declarant be an agent of the party-
> opponent against whom the admission is offered, and
> this precludes the admission of the prior testimony of
> an expert witness where, as normally will be the case,
> the expert has not agreed to be subject to the
> client's control in giving his or her testimony.
> Since an expert witness is not subject to the control
> of the party opponent with respect to consultation and
> testimony he or she is hired to give, the expert
> witness cannot be deemed an agent.
>
> Because an expert witness is charged with the
> duty of giving his or her expert opinion regarding the
> matter before the court, we fail to comprehend how an
> expert witness, who is not an agent of the party who
> called him, can be authorized to make an admission for
> that party.  We are unwilling to adopt the proposition
> that the testimony of an expert witness who is called
> to testify on behalf of a party in one case can later
> be used against that same party in unrelated
> litigation, unless there is a finding that the expert
> witness is an agent of the party and is authorized to
> speak on behalf of that party.

Id. at 164 (citation omitted).

Here, there has been no showing that FHFA's reunderwriting experts were agents of FHFA authorized to speak on its behalf. Accordingly, Rule 801(d)(2) does not provide a solution to the hearsay problem presented by Vandell's reliance on FHFA's experts' reports.

Nor does Rule 703.  For while, under that Rule, "[a]n expert may base an opinion on" inadmissible evidence "[i]f experts in the <u>particular field</u> would reasonably rely on those kinds of facts or data in forming an opinion on the subject," (emphasis added), there has been no showing in this case that experts in Vandell's particular field -- econometrics -- would reasonably rely on home-loan reunderwriting reports in forming an opinion on negative loss causation.  Defendants offer no precedent for the proposition that an expert in one field may blindly rely on reports prepared for other cases by non-testifying experts in other fields.

Defendants could have avoided this hearsay problem by offering their own reunderwriting experts from these coordinated actions, who may have been able to make the affirmative representations that FHFA's experts are unwilling to make about the positive quality of a subset of the sample of loans on which FHFA has litigated its claims.  Had defendants done so, the reliability of the conclusions drawn by defendants' experts on the absence of underwriting defects, and the admissibility of

their testimony generally under Rule 702, could have been
tested.  Indeed, this would have provided the corpus of data to
which Vandell could have applied his econometric expertise.  For
reasons that may only be guessed at, defendants opted not to
take this tack.

In sum, defendants and Vandell have failed to demonstrate
that the benchmarks are sufficiently clean to serve as reliable
control groups.  This "flaw is large enough that [Vandell] lacks
good grounds for his . . . conclusions," such that his testimony
must be excluded.  Amorgianos, 303 F.3d at 267 (citation
omitted).[12]

---

[12] Defendants contend that Vandell's benchmarking analysis is
similar to methods used in published, peer-reviewed articles
that study loan-level data and estimate default probability
models, because the authors of those articles, like Vandell, did
not reunderwrite any loans to determine the adequacy of
benchmarks.  In particular, defendants point to two studies that
test for the impact of misrepresentations on loan defaults by
comparing the performance of loans purportedly affected by those
misrepresentations against other loans: Tomasz Piskorski, Amit
Seru & James Witkin, Asset Quality Misrepresentation by
Financial Intermediaries, Colum. Bus. Sch. Res. Paper No. 13-7
(February 12, 2013) (forthcoming in J. Fin.) (the "Piskorski
Article"), and John M. Griffin & Gonzalo Maturana, Who
Facilitated Misreporting in Securitized Loans? (December 20,
2013) (forthcoming in J. Fin.) (the "Griffin Article").

The Piskorksi Article compares "loan-level data on
mortgages from BlackBox with data on consumer credit files from
Equifax, to construct two measures of misrepresentation
regarding the quality of mortgages backing the RMBS pools.  The
mortgage-level data include characteristics of loans that were
disclosed to the investors at the time of asset sale.  The
consumer credit data, which were not available to investors at
the asset sale date, contains the actual characteristics of

In light of the conclusion that Vandell's testimony must be excluded under Rule 702 and <u>Daubert</u>, any testimony of Riddiough's that relies on any of Vandell's analysis must also be excluded.  Also in light of the exclusion of Vandell's testimony, defendants' motion to exclude the testimony of Saunders, who was offered by FHFA to rebut Vandell's testimony based on his Industry and GSE Benchmarks, is moot.

## CONCLUSION

FHFA's January 8 motion to exclude the expert testimony of Vandell and those aspects of Riddiough's calculation that rely

---

loans at the same time." Piskorksi Article at 2 (emphasis in original).  And the Griffin Article uses "[a] matching algorithm . . . to link large datasets of non-agency MBS loan data from 2002 to 2007 with county-level official transaction information and perform detailed loan monitoring . . . [such as] examin[ing] cases where loan-level MBS data indicates that a house is owner occupied, and yet county-level data shows that the tax records are sent to a different, non-business address." Griffin Article at 1.  In short, both of these articles used data from other sources to compare, for example, the performance of a loan that was misrepresented as owner occupied with the performance of a loan that was accurately represented as owner occupied.  By contrast, Vandell simply assumed the comparator loans he was using were clean along the relevant dimensions.

on Vandell's analysis is granted.  Defendants' January 8 motion

to exclude the expert testimony of Saunders is denied as moot.

SO ORDERED:

Dated:    New York, New York
          February 10, 2015

                        _____
                              DENISE COTE
                     United States District Judge