UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                      :
 FEDERAL HOUSING FINANCE AGENCY,      :      11cv6201 (DLC)
                                      :
                   Plaintiff,         :      OPINION & ORDER
                                      :
         -v-                          :
                                      :
                                      :
 NOMURA HOLDING AMERICA, INC., et al.,  :
                                      :
                   Defendants.        :
                                      :
--------------------------------------X

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
Manisha M. Sheth
Deborah K. Brown
Tyler G. Whitmer
Jeffrey C. Miller
Zachary Williams
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For defendants Nomura Holding America, Inc., Nomura Asset
Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities International, Inc., David
Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N.
Dante LaRocca:

David B. Tulchin
Steven L. Holley
Bruce E. Clark
Bradley A. Harsch
Katherine J. Stoller
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

Amanda F. Davidoff
Elizabeth A. Cassady

SULLIVAN & CROMWELL LLP
1700 New York Avenue NW, Suite 700
Washington, DC 20006

For defendant RBS Securities Inc.:

Thomas C. Rice
David J. Woll
Andrew T. Frankel
Alan Turner
Craig S. Waldman
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

This Opinion addresses cross motions to exclude expert testimony and a related motion in limine.  Defendants[1] have moved to exclude trial testimony of plaintiff Federal Housing Finance Agency's ("FHFA") expert witness Robert W. Hunter ("Hunter") to the extent that it is based on information that was not available "at the origination" of the loans underlying the seven certificates ("Certificates") at issue here.  The defendants have also moved in limine to exclude Hunter's testimony that some of the originators of the loans ("Originators") failed to adhere to their own underwriting guidelines when issuing the loans.  FHFA has moved to exclude the trial testimony of

---

[1] Defendants are Nomura Holding America, Inc., Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca ("Nomura"); and RBS Securities Inc. ("RBS") (collectively, "defendants").

defendants' expert witness Michael Forester ("Forester") that is offered to rebut Hunter's opinions since he does not consider information that became available after the origination of the loans.

Through these motions, the parties essentially dispute three issues.  They contest (1) whether the Originators' guidelines may serve as the basis for FHFA's claims in this action, (2) what evidence FHFA may use to show that the offering documents for the Certificates ("Offering Documents") contained false statements, including false statements about the underwriting process, and (3) the relevant period of time for testing the accuracy of any representation in the Offering Documents.  As explained below, in making representations about compliance at origination with underwriting guidelines, the Offering Documents are referring to the Originators' guidelines, and FHFA may rely on any relevant evidence, including evidence not available to either the Originators or the defendants at the time of the securitization, to prove that these representations or any other representations in the Offering Documents were false.  FHFA must demonstrate in some instances that representations were false as of the date the loan was

originated, and in others that they were false as of the "Cut-Off Date"[2] for the relevant Offering Document.

## BACKGROUND

FHFA, acting as conservator for Fannie Mae and Freddie Mac (together, the "Government Sponsored Enterprises" or "GSEs"), filed suit on September 2, 2011 against defendants alleging that the Offering Documents used to sell the GSEs seven Certificates associated with residential mortgage-backed securities ("RMBS" or "Securitizations")[3] contained material misstatements or omissions.  RMBS are securities entitling the holder to income payments from pools of residential mortgage loans ("Supporting Loan Groups" or "SLGs") held by a trust.

FHFA brought these claims pursuant to Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), as well as Virginia's and the District of Columbia's Blue Sky laws.  This lawsuit is the sole remaining action in a series of

---

[2] The Cut-Off Date refers to the "date for establishing the composition of the asset pool" in a Securitization.  17 C.F.R. § 1103(a)(2).  As discussed below, each Supplement states that the loans will have certain characteristics as of that date.

[3] Fannie Mae purchased one Certificate in a senior tranche of Nomura Securitization NAA 2005-AR6.  Freddie Mac purchased Certificates in senior tranches of the six other Nomura Securitizations: NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3.  The Certificates were each guaranteed to be awarded the highest credit rating from each of four prominent credit rating agencies.

similar, coordinated actions litigated in this district by FHFA against banks and related individuals and entities to recover losses experienced by the GSEs from their purchases of RMBS.  A description of the litigation and the types of misrepresentations at issue in each of these coordinated actions, including the instant case, can be found in FHFA v. Nomura Holding Am., Inc., --- F. Supp. 3d ---, 11cv6201 (DLC), 2014 WL 6462239, at *3-6, *16-17 (S.D.N.Y. Nov. 18, 2014) ("Nomura"), as well as FHFA v. UBS Americas, Inc., 858 F. Supp. 2d 306, 323-33 (S.D.N.Y. 2012), aff'd, 712 F.3d 136 (2d Cir. 2013) ("UBS").

The alleged misstatements in the Prospectus Supplements at issue in this case include representations about underwriting standards and certain characteristics of the mortgage loans, specifically data concerning owner occupancy[4] and loan-to-value ("LTV")[5] ratios.  Each of these representations in the Supplements is described below.

---

[4] According to Hunter, mortgages for owner-occupied properties generally present less credit risk than those for non-owner-occupied properties.

[5] For any given mortgage, the LTV ratio is determined by computing the balance of the loan as a percentage of the value of the property that secures it, often determined on the basis of an appraisal.  The higher the ratio, the less equity the homeowner has in the property.  Mortgages with an LTV ratio in excess of 100% are "underwater."

A. Loans "Were Originated" Generally in Accordance with
   Guidelines.

The Prospectus Supplements contained representations that
the loans within the RMBS "were originated generally" in
compliance with their applicable underwriting guidelines.  For
example, the Prospectus Supplement for NAA 2005-AR6 states that
"[t]he Mortgage Loans . . . were originated generally in
accordance with the underwriting criteria described in this
section."[6]  Those Originators contributing more than 10% of the
mortgage loans in an RMBS are identified by name, along with the
percentage of the mortgage loans that they contributed.  For
example, the Supplement for NAA 2005-AR6 identifies Alliance
Bancorp, Silver State Mortgage and Aegis Mortgage as the
Originators of approximately 21%, 12%, and 11%, respectively, of
the loans within the Securitization by aggregate principal
balance as of the Cut-Off Date for the Prospectus Supplement.

The sections of each Prospectus Supplement addressed to
underwriting describe both the process by which a borrower
applies for a mortgage loan and the process through which the
application is reviewed and approved.  For example, the
Prospectus Supplement for NAA 2005-AR6 describes the

---

[6] This language or its equivalent appears in six of the seven
Prospectus Supplements.  The seventh, NHELI 2006-FM1, includes
only a detailed description of the underwriting guidelines used
by the sole Originator for that RMBS.

information the borrower must supply to the loan's Originator
as follows:

> Generally, each borrower will have been required to
> complete an application designed to provide to the
> original lender pertinent credit information
> concerning the borrower.  As part of the description
> of the borrower's financial condition, the borrower
> generally will have furnished certain information with
> respect to its assets, liabilities, income . . .,
> credit history, employment history and personal
> information, and furnished an authorization to apply
> for a credit report which summarizes the borrower's
> credit history with local merchants and lenders and
> any record of bankruptcy.

Having received an application with the pertinent data and
authorizations, the Originator proceeds to review the
application.  This analysis includes a determination that the
borrower's income will be sufficient to carry the increased debt
from the mortgage loan.  The Prospectus Supplement for NAA 2005-
AR6 explains in pertinent part:

> Based on the data provided in the application and
> certain verifications (if required), a determination
> is made by the original lender that the borrower's
> monthly income (if required to be stated) will be
> sufficient to enable the borrower to meet their
> monthly obligations on the mortgage loan and other
> expenses related to the property such as property
> taxes, utility costs, standard hazard insurance and
> other fixed obligations other than housing expenses.
> Generally, scheduled payments on a mortgage loan
> during the first year of its term plus taxes and
> insurance and all scheduled payments on obligations
> that extend beyond ten months equal no more than a
> specified percentage not in excess of 60% of the
> prospective borrower's gross income.

The section of the Supplements addressed to the
underwriting process used by loan Originators also explains the
process used to ensure that there is security for the issued
loans, for instance by requiring some borrowers to obtain
mortgage insurance or because an appraisal has shown that the
mortgaged property itself provides adequate security.  For
instance, the Supplement for NAA 2005-AR6 states:

> The adequacy of the Mortgaged Property as security for
> repayment of the related Mortgage Loan will generally
> have been determined by an appraisal in accordance
> with pre-established appraisal procedure standards for
> appraisals established by or acceptable to the
> originator.  All appraisals conform to the Uniform
> Standards of Professional Appraisal Practice ["USPAP"]
> adopted by the Appraisal Standards Board of the
> Appraisal Foundation . . . .

Six of seven of the Supplements also note that the
underwriting standards for the loans were less stringent than
those applied by the GSEs.  For instance, the Supplement for NAA
2005-AR6 explains that the underwriting standards applicable to
the loans

> typically differ from, and are, with respect to a
> substantial number of Mortgage Loans, generally less
> stringent than, the underwriting standards established
> by Fannie Mae or Freddie Mac primarily with respect to
> original principal balances, loan-to-value rations,
> borrower income, credit score, required documentation,
> interest rates, borrower occupancy of the mortgaged
> property, and/or property types.[7]

---

[7] While the Supplement for NHELI 2006-FM1 did not contain this
language, it, like all six others, warned that "[t]he
underwriting standards applicable to the Mortgage Loans, which

Six of the seven Prospectus Supplements represented that all loans in the RMBS "were originated generally" as just described.[8]  In addition, if specific Originators contributed more than 20% of the loans in any RMBS, the Prospectus Supplements also described in considerable detail the underwriting guidelines of those Originators.  For example, the Prospectus Supplement for NHELI 2006-HE3 devoted approximately seven pages to a description of the guidelines used at People's Choice Home Loan, Inc., which had contributed 38.19% of loans to the Securitization by aggregate principal balance as of the Cut-Off Date.

B. Collateral Tables

Each Prospectus Supplement also contains sets of tables with statistics ("Collateral Tables") that disclose the "Characteristics of the Mortgage Loans" in each of the SLGs. The Collateral Tables provide data on more than a score of features of the loans within an SLG.  These features include LTV ratios and the owner-occupancy status for the loans within the SLG.

---

are described in this prospectus supplement . . . may or may not conform to Fannie Mae or Freddie Mac guidelines."

[8] The seventh, NHELI 2006-FM1, represented that loans "were originated" in accordance with the underwriting guidelines used by the sole Originator for that RMBS.

For example, the NHELI 2006-FM2 Supplement disclosed that 57.5% of the loans (or 68.4% of the loans by principal balance) in the relevant SLG had an LTV ratio of 80% or lower, and that the mortgage loans in the relevant SLG were 93.05% "owner-occupied," 6.37% "investment," and 0.57% "second home."[9]  The NAA 2005-AR6 Supplement disclosed that 99% of the loans (also 99% of the loans by principal balance) in the relevant SLG had an LTV ratio of 80% or lower, and that the mortgage loans in the relevant SLG were 56.59% "owner-occupied," 34.72% "investor," and 8.68% "second home."

The Supplements explicitly provide that the characteristics of the loans listed in the Collateral Tables, including LTV ratios and owner-occupancy status statistics, are correct as of each Supplement's "Cut-Off Date."  The NHELI 2006-FM2 Supplement, for instance, states that "[a]s of the Cut-off Date, the Mortgage Loans will have the characteristics as set forth" in the Collateral Tables.  Those Tables list not just the percentage of loans with these characteristics as of the "Cut-off Date," but also the "Cut-off Date Principal Balances" related to the characteristic.

---

[9] In this example and the next, owner-occupancy status percentages are provided "by aggregate remaining principal balance."

The Cut-Off Date is, in each instance here, roughly a month before the Effective Date for the RMBS.  Each Securitization along with its corresponding Cut-Off Date and Effective Date, as defined in this Opinion, is listed below.

| Securitization | Cut-Off Date | Effective Date |
|---|---|---|
| 2005-AR6 | 11/1/2005 | 11/30/2005 |
| 2006-FM1 | 1/1/2006 | 1/30/2006 |
| 2006-HE3 | 8/1/2006 | 8/31/2006 |
| 2006-FM2 | 10/1/2006 | 10/31/2006 |
| 2007-1 | 1/1/2007 | 1/31/2007 |
| 2007-2 | 1/1/2007 | 1/31/2007 |
| 2007-3 | 4/1/2007 | 4/30/2007 |

Most of the loans were originated months before their securitization.  The table below, supplied by FHFA, illustrates that roughly a quarter (23%) of the loans (in the sample drawn from the relevant SLGs upon which FHFA is litigating its claims) were originated within 90 days of the Cut-Off Date; the other 77% were originated 90 or more days before the Cut-Off Date.

| Securitization | Sample Loans | Time Between Origination Date and Cut-off Date | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 0 - 30 Days | 31 to 60 Days | 61 to 90 Days | 91 to 120 Days | 121 to 150 Days | 151 to 180 Days | Greater than 180 Days |
| NAA 2005-AR6 | 131 | | 5 | 64 | 36 | 18 | 6 | 2 |
| NHELI 2006-FM1 | 100 | | | | 48 | 35 | 12 | 5 |
| NHELI 2006-FM2 | 100 | | | | | 59 | 32 | 9 |
| NHELI 2006-HE3 | 99 | | | 4 | 8 | 21 | 32 | 34 |
| NHELI 2007-1 | 98 | 1 | 9 | 35 | 37 | 11 | 4 | 1 |
| NHELI 2007-2 | 98 | | 18 | 27 | 1 | 9 | 6 | 37 |
| NHELI 2007-3 | 97 | | | | 2 | 28 | 10 | 57 |
| Total | 723 | 1 | 32 | 130 | 132 | 181 | 102 | 145 |

The LTV ratio in the Collateral Tables is defined as the "Original Loan-to-Value Ratio."  Again, with respect to each

line of listed ratios, the Collateral Tables report not just the "Percentage by Aggregate Cut-off Date Principal Balances" for the LTV ratio at issue but also "Cut-off Date Principal Balance."  Thus, all but four of the 376 loans within the relevant SLG in NAA 2005-AR6 had an original LTV ratio of 80% or less.  This meant that 99% of the aggregate Cut-Off Date principal balances had an original LTV ratio of 80% or less, and less than $740,000 of the nearly $80 million in mortgages, as measured by their Cut-Off Date principal balance, had an LTV ratio as of the Cut-Off Date of over 80%.

The Prospectus for each Securitization explains that for purposes of determining the LTV ratio, "[t]he 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property."  The Prospectus adds that "[u]nless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in an appraisal obtained at the time of origination of the Refinance Loan."  Finally, according to the Prospectus, "[t]he value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and

will fluctuate from time to time based upon changes in economic
conditions and the real estate market."

Each Prospectus Supplement also states that no substantial
changes to any SLG are expected after the Cut-Off Date, and that
notice will be given if any "material characteristic"
meaningfully changes:

> If, as of the Closing Date, any material pool
> characteristic differs by 5% or more from the
> description in this prospectus supplement, revised
> disclosure will be provided either in a supplement or
> in a Current Report on Form 8-K.

II. The Hunter Report

FHFA retained Hunter "to provide an expert opinion on
whether samples of loans from each of the seven [SLGs] complied
with statements relating to the underwriting and credit quality
of such loans in the Offering Documents for each
Securitization," and whether "the data contained in the
collateral tables found in the Offering Documents and the pre-
closing loan tapes were accurate."  To do so, Hunter re-
underwrote 723 of the 796 loans that form the sample upon which
FHFA is litigating its claims in this lawsuit.[10]

In order to determine whether the representations in the
Prospectus Supplements that Originators had adhered to their own

---

[10] FHFA is litigating the accuracy of the representations in the
Offering Documents regarding the more than 15,000 loans in the
Certificates' SLGs based on a sample of 796 loans, of which only
723 had sufficient data for Hunter's re-underwriting.

underwriting guidelines in issuing the loans within an SLG were accurate, FHFA represents that Hunter re-underwrote the sample loans using information either already contained in the loan file or that was otherwise available to the Originators at the time of origination.  For example, Hunter identifies an instance where information in the loan file suggests that a borrower's debt may have been higher than represented by the borrower, the Originator did not undertake a further investigation, and the borrower had taken on additional debt.

Hunter also used information that would not have been available to Originators.  Hunter relied on post-origination documents in making his findings for 314 of the 723 sample loans.  Roughly one-quarter of his findings regarding these sample loans rely on post-origination documents.[11]  For example, he used post-origination information to recalculate characteristics of a loan such as a borrower's debt-to-income ("DTI")[12] ratio, a property's LTV ratio, and a borrower's credit (or "FICO"[13]) score.  The post-origination information came from

---

[11] Of the 2,083 findings Hunter made regarding the sample loans, 571 are based on post-origination documents.

[12] Debt-to-income ratios compare a borrower's monthly debt obligations to a borrower's monthly income.

[13] FICO refers to a consumer credit score issued by the Fair Isaac Corporation.

various sources, including employment re-verifications; MERS,[14] which is a private database that tracks mortgage ownership and servicing rights; servicing records; bankruptcy filings; public records databases such as DataVerify; and audit credit reports provided by CBCInnovis and LexisNexis's Accurint.  Some of these reports include disclaimers as to the accuracy of their data; for example, LexisNexis Accurint credit reports state that they "should not be relied upon as definitively accurate" unless the data therein was "independently verified."

Hunter assessed whether Originators followed underwriting guidelines in calculating LTV ratios and whether loans actually had the LTV ratios required by the applicable guidelines and as reported in the Collateral Tables.  To do so, he relied on the analysis of another of FHFA's experts, John A. Kilpatrick, who used a retrospective "automated valuation model" ("Greenfield AVM") to recalculate LTV ratios.[15]  Kilpatrick's model, in turn, relied upon data not available at the time of origination, including tax assessments dating from 2009 to 2014.  Thus, Hunter recalculated LTV ratios using both information contained in the loan files as well as the new values generated by the

---

[14] "MERS" is an acronym for Mortgage Electronic Registration Systems, Inc., the owner of the database.

[15] Defendants' separate motion to exclude Kilpatrick's expert testimony has been denied.  FHFA v. Nomura Holding Am., Inc., No. 11cv6201 (DLC), 2015 WL 353929 (S.D.N.Y. Jan. 28, 2015).

Greenfield AVM, and he considered both recalculations when assessing whether the guidelines were followed.  To assess the accuracy of the statistics in the Collateral Tables, he substituted the new AVM values for the original appraised values and, where those values were lower than the original appraised value or the sales price, recalculated the LTV.

In order to assess the accuracy of the owner-occupancy status statistics in the Collateral Tables, Hunter reviewed "borrower and property records, including public records, bankruptcy filings, and consumer credit reports."  The defendants' motion to exclude Hunter's testimony with respect to the owner-occupancy statistics disclosed in the Collateral Tables has recently been denied.  FHFA v. Nomura Holding Am., Inc., No. 11cv6201 (DLC), 2015 WL 394072, at *3-4 (S.D.N.Y. Jan. 29, 2015).  The January 29 Opinion held that Hunter's opinions regarding the accuracy of owner-occupancy statistics as of the Cut-Off Dates may include reliance on evidence taken from documents created after the Cut-Off Date.  Id. at *4.

Hunter concluded that, of the 723 loans he reviewed, 625 had at least one underwriting defect, and 482 (66.67%) had serious underwriting defects that "substantially increased credit risk."  Almost 80% (79.94%) of the loans were not originated in accordance with the requirements of the Originator's underwriting guidelines; 7.41% were inaccurately

disclosed as being owner-occupied; and 21.02% had an LTV ratio
and/or combined loan-to-value ("CLTV")[16] ratio that was not
accurately disclosed.

## II. The Forester Report

Defendants retained Forester to evaluate Hunter's findings
of underwriting defects in the sample loans he re-underwrote.
To prepare his report, Forester undertook a re-underwriting of
his own, evaluating the 665 loans in the FHFA sample that Hunter
originally found to have underwriting defects.  Forester opined
that, of these 665, there were only forty loans where he could
not confirm that a "reasonable underwriter at the time of
origination could have found that the loans satisfied" that
Originator's underwriting guidelines.

Like Hunter, Forester's review began with the loan files
and the Originator's guidelines.  Unlike Hunter, however,
Forester "only used information that would have been available
to the original underwriter."  This included information from
outside the loan file if "applicable underwriting guidelines
required the underwriter to consider" it and "the underwriter
. . . could have had [it] at the relevant time."  Indeed, one of
Forester's central criticisms of Hunter's report is that it

---

[16] The combined loan-to-value ratio applies to properties
securing more than one loan.  It is the ratio of the sum of all
loans secured by the property to the appraised value of the
property.

"improperly used documents and information that [were] not
available until after the loan closing -- information that was
not and could not have been available to the original
underwriter."


**DISCUSSION**

Both FHFA and the defendants move to exclude the expert
testimony pursuant to Federal Rules of Evidence 401, 402, 403,
702, and Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579
(1993).  The applicable rules of law pertaining to exclusion of
expert testimony under Federal Rule of Evidence 702 and Daubert
are set out in this Court's January 28, 2015 Opinion regarding
defendants' motion to exclude the testimony of FHFA's expert Dr.
John A. Kilpatrick, and that discussion is incorporated by
reference here.  FHFA v. Nomura Holding Am., Inc., No. 11cv6201
(DLC), 2015 WL 353929, at *3-4 (S.D.N.Y. Jan. 28, 2015).

On December 22, FHFA moved pursuant to Daubert to exclude
the Forester opinions.  FHFA argued that Forester's failure to
determine the accuracy of the representations in the Offering
Documents as of the Effective Date or the Cut-Off Date renders
his opinions irrelevant and unreliable.

In response, the defendants moved on January 5 pursuant to
Daubert to exclude Hunter's opinions to the extent that he
relies in any way on information that did not exist when

Originators were reviewing and approving the loans.  They emphasize that the Prospectus Supplements represent that loans "were originated" in adherence to the Originators' guidelines.[17]

The defendants had also moved in limine on November 25 to exclude Hunter's testimony to the extent it evaluates loans against "underwriting standards never disclosed in the Offering Documents."  They argued in that motion that Hunter should not have re-underwritten the loans using Originator's guidelines unless the Originator was actually identified by name in a Prospectus Supplement.  This motion affects five of the seven Prospectus Supplements: two of the seven Securitizations are backed by loans that come from a single Originator; that Originator's guidelines are described in detail in the Offering Documents.  According to the defendants, when an Originator is not identified by name, the only relevant guidelines are the general standards outlined in the Prospectus Supplement.[18]

---

[17] The defendants' motion largely ignores Hunter's opinions regarding the accuracy of the data recited in the Collateral Tables.

[18] In making the motion in limine, the defendants take a position that is at odds with their motion to exclude Hunter's testimony to the extent it is not based on an analysis of the Originators' guidelines and information which would have been available to Originators during the origination process.  They also take a position that, as described below, is entirely at odds with the representations they have made to this Court and FHFA throughout this litigation.

The parties' cross-motions raise the following issues: the extent to which post-origination evidence may be used in proving that the Offering Documents contained misrepresentations regarding the origination process; the date as of which a statement of fact is being made; and the time period to which the statement of fact refers.  The answers to each of these questions lies in the requirements of the Securities Act and precedent addressed to the interpretation of Offering Documents.

Securities Act Section 12(a)(2) establishes civil liability for any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2) (emphasis added).  Section 12(a)(2) has no scienter requirement.  See Fait v. Regions Fin. Corp., 655 F.3d 105, 109 (2d Cir. 2011); UBS, 858 F. Supp. 2d at 323.  In this regard, Section 12(a)(2) mirrors Section 11, under which "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983); see Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 730 n.8 (2d Cir. 1987).

The sales of the seven Certificates at issue here were made "by means of" the seven Prospectus Supplements filed with the

SEC.  FHFA v. Nomura Holding Am., Inc., No. 11cv6201 (DLC), 2014
WL 7229446, at *8 (S.D.N.Y. Dec. 18, 2014); see FHFA v. Bank of
Am. Corp., No. 11cv6195 (DLC), 2012 WL 6592251, at *5 (S.D.N.Y.
Dec. 18, 2012).  Their issuance dates range from November 30,
2005 to April 30, 2007.  For purposes of this Opinion, these
dates shall be referred to as the Effective Dates of each
Supplement.[19]

Asset-backed securities are subject to an elaborate
regulatory regime.  See Regulation S-K, 17 C.F.R. § 229.10 et
seq.; Regulation AB, 17 C.F.R. § 229.1100 et seq.; UBS II, 2012
WL 2400263, at *2.  Of particular relevance here, Regulation AB
requires detailed disclosures in asset-backed securities'
prospectus supplements.  Those disclosures include "any
originator or group of affiliated originators, apart from the
sponsor or its affiliates, that originated, or is expected to
originate, 10% or more of the pool assets," and, "[t]o the

---

[19] The RMBS in this case were issued pursuant to "shelf
registrations," which are pre-approved registration statements
that allow new securities to be issued upon filing of a
prospectus supplement.  See 17 C.F.R. §§ 230.409, 230.415; FHFA
v. UBS Americas, Inc., No. 11cv5201 (DLC), 2012 WL 2400263, at
*2 (S.D.N.Y. June 26, 2012).  "[T]he date the prospectus
supplement is first used (or the date the securities to which it
relates are first sold) becomes the new 'effective date' of the
registration statement for purposes of Section 11 liability" for
issuers and underwriters.  FHFA v. HSBC N. Am. Holdings Inc.,
987 F. Supp. 2d 369, 374 (S.D.N.Y. 2013) ("UBS II"); 17 C.F.R.
§ 230.430B(f)(2).  Each Prospectus Supplement was filed with the
SEC on its Effective Date, as defined above, or within one day
of the Effective Date.

extent material, a description of the originator's origination
program" for "any originator . . . that originated, or is
expected to originate, 20% or more of the pool assets."  17
C.F.R. § 229.1110.  Also required is a "description of the
. . . underwriting criteria used to originate or purchase the
pool assets, including, to the extent known, any changes in such
criteria and the extent to which such policies and criteria are
or could be overridden."  Id. § 229.1111(a)(3).  In addition, it
requires a prospectus to state the "cut-off date or similar date
for establishing the composition of the asset pool."  Id. §
229.1111(a)(5).

Courts assess the truth or falsity of facts or assertions
in a prospectus or prospectus supplement by "read[ing] it as a
whole."  In re ProShares Trust Sec. Litig., 728 F.3d 96, 103 (2d
Cir. 2013) (citation omitted).  Courts look to whether the
"disclosures and representations, taken together and in
context," would mislead a reasonable investor.  Id. (citation
omitted); see also DeMaria v. Andersen, 318 F.3d 170, 180 (2d
Cir. 2003).  What is at stake is the Offering Documents'
"ability to accurately inform rather than mislead prospective
buyers."  Operating Local 649 Annuity Trust Fund v. Smith Barney
Fund Mgmt. LLC, 595 F.3d 86, 92 (2d Cir. 2010); see also I.
Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759,
761 (2d Cir. 1991); McMahan & Co. v. Wherehouse Entm't, Inc.,

900 F.2d 576, 579 (2d Cir. 1990).  To avoid being false or
misleading, where there is a "disclosure about a particular
topic, whether voluntary or required, the representation must be
complete and accurate."  In re Morgan Stanley Info. Fund Sec.
Litig., 592 F.3d 347, 366 (2d Cir. 2010) (citation omitted).
"Even a statement which is literally true, if susceptible to
quite another interpretation by the reasonable investor[,] may
properly be considered a material misrepresentation."  McMahan &
Co., 900 F.2d at 579 (citation omitted).

     Federal Rules of Evidence 401 and 402 establish a liberal
standard of relevance.  "It is universally recognized that
evidence, to be relevant to an inquiry, need not conclusively
prove the ultimate fact in issue, but only have 'any tendency to
make the existence of any fact that is of consequence to the
determination of the action more probable or less probable than
it would be without the evidence.'"  McKoy v. N. Carolina, 494
U.S. 433, 440 (1990) (quoting Fed. R. Evid. 401).  Relevance is
"not an inherent characteristic," but rather "a relation between
an item of evidence and a matter properly provable in the case,"
Huddleston v. United States, 485 U.S. 681, 689 (1988) (citation
omitted), and it is to be "determined in the context of the
facts and arguments in a particular case."  Sprint/United Mgmt.
Co. v. Mendelsohn, 552 U.S. 379, 387 (2008).  Evidence "need not
be conclusive in order to be relevant.  An incremental effect is

sufficient." <u>United States v. Certified Envtl. Servs., Inc.</u>, 753 F.3d 72, 90 (2d Cir. 2014) (citation omitted).  As the Second Circuit has held in the context of subsequent act evidence, "[r]elevancy cannot be reduced to a mere chronology; whether . . . evidence occurred prior or subsequent . . . is not necessarily determinative to its admissibility and therefore its probative value." <u>United States v. Goffer</u>, 721 F.3d 113, 124 (2d Cir. 2013) (citation omitted).

The law as described above resolves the issues in these motions.  In brief, a party may rely on evidence gleaned from any point in time to prove the truth or falsity of a representation of fact about a past event.  For instance, it would be hard to quarrel with the proposition that evidence given by a borrower, appraiser, or Originator during the trial would be relevant to show the truth or falsity of a fact contained in a Prospectus Supplement issued in 2005, 2006, or 2007.  In litigating the accuracy of a factual representation, no party will be restricted to evidence that was reduced to writing as of either the date of origination of a particular loan or even as of the Effective Date of the Prospectus Supplement containing the representation.

As for the specific representations at issue in this motion practice, there are two dates of particular relevance to the inquiry regarding falsity.  Generally, the representations of

fact were true or not as of the date the loan was originated or as of the Cut-Off Date of the Prospective Supplement.  The representations concerning underwriting guidelines were generally true or not as of the dates of loan origination.  The representations in the Collateral Tables were generally true or not as of the Cut-Off Dates for the Prospectus Supplements.[20]

These motions principally address the representations regarding underwriting guidelines.  Those representations describe a process followed by each borrower in applying for loans and by each Originator in reviewing and approving loan applications to ensure that the loan qualified under the Originators' guidelines and assert that the loans that are contained in the SLGs conformed to those guidelines.  This is true whether or not an Originator is named in the Supplement or its particular guidelines are described in detail.  The Offering Documents warn that the standards in the Originators' guidelines were generally less stringent than those established by the GSEs, but they assure investors that the Originators used those guidelines to perform a pertinent credit analysis, to examine a borrower's DTI ratio, and to obtain appraisals that conformed to

---

[20] The Effective Date of the Prospective Supplement would have been relevant to the assertion of a due diligence defense, but that defense is no longer at issue here.  See FHFA v. Nomura Holding Am. Inc., No. 11cv6201 (DLC), 2014 WL 7232443, at *30-40 (S.D.N.Y. Dec. 18, 2014).

USPAP, among other things.[21]  To the extent that an Originator failed to follow its own guidelines or to respond appropriately to red flags that appeared in the application and review process, or to the extent that the loans did not actually conform to the standards set out in the Originator's guidelines,[22] then FHFA may be able to show that the Prospectus Supplement representation regarding the use of Originators' guidelines to originate the loans was false.

Accordingly, the generic descriptions of the underwriting standards contained in the Prospectus Supplements are, when read in context, only high-level descriptions of a far more complex underwriting process undertaken by all Originators prior to the securitization of the loans or the preparation of the Offering

---

[21] The Supplements use the present tense to describe the quality of the appraisals but also make clear, when read in conjunction with the Prospectus, that the appraisals are those performed during origination.  The assertion that those appraisals conform to USPAP is a statement made as of the Effective Date of the Supplement about those originating appraisals.

[22] If the Originator's underwriting guidelines allowed for exceptions to the application of certain substantive standards, then evidence that an exception was given and justified within the framework established by an Originator is also relevant to this analysis.  As the Prospectus Supplement for NHELI 2005-AR6 recognizes, "certain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower."  Six of the seven Supplements contain this language; the seventh, NHELI 2006-FM1, makes a substantially similar statement in specific reference to the sole Originator for that RMBS.

Documents for the Securitization.[23]  The Originators who
contributed over 10% of the loans are named in the Supplements,
and the guidelines of those who contributed over 20% are recited
in considerable detail.  But, as the Supplements make clear, it
is the guidelines for each of the individual Originators that
dictated whether the Originators would issue the loans that were
later selected by the defendants (and their affiliates) for
placement in the SLGs and securitized.

     The representations in the Collateral Tables concerning the
characteristics of the loans within each SLG are made as of the
Cut-Off Date for the Prospectus Supplement, which is
approximately a month prior to its Effective Date.  In these
motions, the parties principally address two of the loan
characteristics described in the Collateral Tables: the owner-
occupancy statistics and LTV ratios.  The owner-occupancy
statistics in the Collateral Tables are representations of fact
as of the Cut-Off Date.  As already explained in an Opinion of
January 29, 2015, evidence that first became available after the
Cut-Off Date may be used to demonstrate that the owner did not
occupy the property as of the Cut-off Date.  See Nomura, 2015 WL
394072, at *3.

---

[23] As the chart above demonstrates, in most instances -- 77% --
the loans within the SLG were underwritten four or more months
before the Effective Date of each Securitization.

The relevant date for the LTV ratios in the Collateral
Tables, however, is not only the Cut-Off Date but also the date
the ratio was first determined by the loan's Originator based on
the approved loan amount and the appraisal obtained by the
Originator.  The Supplement and its Prospectus, read together,
explain that the original loan amount and the original appraisal
number are being used to construct the ratio for an individual
loan.  The aggregate statistics regarding the characteristics
for loans within an SLG, as described in the Collateral Tables,
are therefore built upon the LTV ratios reported by the
Originators.

There does not appear to be any dispute over the accuracy
of the figures for the original loan amounts.  The accuracy of
the appraisal figures is hotly contested.  Whether an appraisal
was "credible," as that term is defined by USPAP, see FHFA v.
Nomura Holding Am., Inc., 2015 U.S. Dist. LEXIS 10458 (S.D.N.Y.
Jan. 29, 2015), is a fact to be determined based on evidence
that becomes available at any time.  That evidence, however,
must relate to the original appraisal and the period of
origination.  These determinations guide the disposition of the
parties' three motions.

I.  Post-origination Evidence

Defendants argue that Hunter's testimony must be excluded
to the extent it relies on evidence derived from the period

following the origination of the loan.  They assert that, since
the Prospectus Supplements represent that the loans "were"
originated generally in accordance with guidelines, only
information that was actually available to Originators at that
historical moment is relevant to the determination of whether
Originators complied with their guidelines.  The defendants are
wrong.  Direct or circumstantial evidence, regardless of when
that evidence first became available, would be relevant if it
helped to demonstrate that an Originator did or did not follow
its own underwriting guidelines or that the loan did or did not
qualify under the Originator's guidelines.

In representing that the loans were originated in
accordance with their Originators' guidelines, the Prospectus
Supplements represent that the loans within each SLG did in fact
meet the criteria set forth in their Originators' guidelines.
That is a representation of fact.  It provided assurance to
investors that the loans were of a certain quality.  In making
this representation in the Offering Documents, the defendants
assured investors that they had conducted a sufficient
examination to confirm its accuracy and understood that they
would be held strictly liable if the representation were false,
absent recourse to an applicable statutory defense.  Hunter may,
therefore, rely on post-origination evidence so long as it is

probative of a relevant characteristic of the loan at the period of time at issue here.

To provide an example, defendants complain that Hunter relies on a 2009 bankruptcy filing to show that a borrower misrepresented his income in 2006.  There is no dispute that the 2009 filing was unavailable either to the Originator or to the defendants as underwriters.  But its unavailability is irrelevant to the issue of whether the Prospectus Supplement contained a false statement.  The ability of the defendants to discover the misrepresentation would be relevant to any due diligence defense, but it is irrelevant to an examination of whether the quality and characteristics of the loans were accurately described in the Offering Documents.

For similar reasons, the reliance by FHFA experts on tax records from 2013 and 2014 in their assessment of property valuations during the period 2005 to 2007 may be entirely appropriate.  Post-origination evidence is admissible if it tends to show the existence or non-existence of a fact during the relevant period of time.  Thus, the defendants' complaint about the use of an AVM which relied on recent tax assessed values misses the mark.  It may be that the more recent property valuations have no probative value.  But if they do have probative value, the fact that they stem from the post-origination period does not preclude their use at trial.

The suggestion by the defendants that colloquy at the
November 15, 2012 conference in this coordinated litigation is
in tension with this ruling is mistaken.  That colloquy was
addressed to FHFA's disclosure to the defendants of its initial
factual findings based solely on a comparison of the loan files
to each Originator's guidelines.  As described below, a November
26, 2012 Order that emerged from that conference explicitly
reserved for FHFA its right to rely on other evidence, and FHFA
repeatedly advised the defendants at the November 15 conference
of its intention to do so.  Nor does this Court's Opinion in
FHFA v. SG Americas, Inc., No. 11cv6203 (DLC), 2012 WL 5931878
(S.D.N.Y. Nov. 27, 2012), suggest that post-origination evidence
is irrelevant.  That Opinion rejected the defendants' argument
that the representations regarding an Originator's compliance
with its underwriting guidelines was a statement of belief
rather than a statement of fact.  Id. at *2-3.

II. Matching Loans to Each Originator's Guidelines

Defendants advance the novel argument in their motion in
limine that Hunter may not testify about the extent to which a
loan was issued in compliance with any Originators' underwriting
guidelines unless those guidelines were reproduced at length in
the Supplements.[24]  They claim that, unless an Originator's

---

[24] The defendants' motion complains as well that Hunter has
relied on Originators' guidelines when those Originators were

guidelines were reproduced in the Supplements, the Supplements should be read as only representing that the loans complied with the general underwriting standards summarized in the Supplements.  That reading is at odds with the plain meaning of the Supplements and does not make sense as a matter of chronology.

The representations in the Prospectus Supplements regarding compliance with underwriting "criteria" and "standards" refer explicitly to a process that occurred prior to the securitization of the loans.  In language that the defendants repeatedly emphasize for other purposes, these representations provide assurance that the "loans . . . were originated generally" according to the criteria described in the Supplement.  (Emphasis added.)  The Supplements give an overview of that origination process.  They describe the presentation of information by a borrower "to the original lender" and determinations "made by the original lender" about the borrower's ability to make the required loan payments, among other things.  They refer as well to the appraisal obtained by the Originator.

---

not named in the Supplements.  It will be assumed for purposes of this Opinion that the defendants are not conceding that the identification of an Originator by name would be sufficient to allow Hunter to rely on the Originator's guidelines.

As significantly, the only standards and criteria to which the Supplements could be referring are those that were in the hands of the original lenders.  After all, the Originators would not even have had access to any language contained in the Supplements since the Originators would not have known into which, if any, Securitization the loan might be placed and the Supplement for the Securitization could not have been available to the Originator at the time of loan origination.

Finally, the general descriptive language about standards and criteria was included in the Supplements to comply with regulatory requirements, see 17 C.F.R. § 229.1111(a)(3), but could hardly have been expected by anyone to give, by itself, comfort to investors that the loans in the SLGs had passed scrutiny.  The language in the Supplements regarding the criteria is simply too vague to provide a complete description of the origination process.  It omits the specific benchmarks and criteria that are part of the customary underwriting process at origination.  In essence, these passages are a statement by the defendants that they have reviewed the Originators' processes and guidelines and confirmed that the loans within the Securitization were all originated in compliance with their Originators' standards and processes, and that those standards and processes all contained the central elements summarized in the Supplement.

It is also far too late for the defendants to be presenting
this strained reading of their Offering Documents.  Despite the
fact that this litigation has been pending since September 2,
2011, the defendants never asserted this position until they
filed their motion in limine on November 25, 2014.[25]  Years of
litigation at vast expense have been premised on the
understanding that FHFA would have the burden at trial of
demonstrating that the loans within the SLGs for their
Certificates did not meet the criteria established by the
individual guidelines adopted by each of the loans' Originators.
Indeed, the defendants took the position at the beginning of
this litigation that it would be necessary to collect every loan
file and Originator guideline for every loan within each of the
SLGs supporting FHFA's Certificates.  In this coordinated
litigation, that amounted to over 1.1 million loan files and
hundreds if not thousands of guidelines from scores of
Originators.  When FHFA chose to proceed with its claims based
upon a sample of the loans within each SLG, that merely reduced

---

[25] Searching for some evidence that their argument is not newly
minted, defendants refer to their answer and motion to dismiss.
Neither provides them any comfort.  The answer only denies in
conclusory fashion the allegations regarding underwriting
guidelines in FHFA's Amended Complaint.  The motion to dismiss
argues that FHFA failed to plead that it had conducted a
"forensic review" of the Securitizations at issue here.  It made
no argument about whether the proper comparator is "general
standards" or the Originators' guidelines.

the size of the undertaking; it did not change its nature.  See
FHFA v. UBS Americas, Inc., No. 11cv5201 (DLC), 2013 WL 1234947,
at *1-3 (S.D.N.Y. Mar. 26, 2013).  The parties still undertook
the collection of every loan file and their associated
underwriting guidelines for every loan within the sample.
Scheduling Orders set dates by which the parties were to
identify the loan files and applicable Originator guidelines for
every sample loan and to work together in good faith to
stipulate that that search was complete.[26]  The parties provided
monthly reports to the Court on their progress in that vast
collection and stipulation effort.  This effort, of course,
consumed the resources of not just the parties and the Court but
also third parties.

As significantly, at the defendants' request and over
FHFA's objection, the Court required FHFA to provide the
preliminary results of its re-underwriting of the sample to any
defendant who wished.  The Order of November 26, 2012 described
the detailed exchange of information that would take place
between the parties as they assessed deficiencies in
underwriting based solely on a comparison of the contents of a

---

[26] The parties were required to "endeavor to reach agreement by
stipulation" that the collected loan file and its applicable
guideline were "the best representation of the Loan File and
Guideline existing at the time of the loan's origination that
the parties have been able to recreate."

loan file and the Originator's guidelines.[27]  And, of course, all
of the parties (including the defendants) retained re-
underwriting experts and produced expert reports that examined
the extent to which loans complied with Originators'
underwriting criteria.  It is simply too late in the day for the
defendants to argue that this extraordinary expenditure of
effort and money was unnecessary.  The defendants' motion in
limine is denied.  See Crawford v. Franklin Credit Mgmt. Corp.,
758 F.3d 473, 485-86 (2d Cir. 2014); Adelphia Recovery Trust v.
Goldman, Sachs & Co., 748 F.3d 110, 116 (2d Cir. 2014).

III. Compliance with the Criteria in Originators' Guidelines

     Defendants appear to acknowledge that the Collateral Tables
describe specific characteristics of the loans included within
the SLGs.  They argue, however, that the sections of the
Supplements that describe the underwriting standards and
criteria used by Originators in approving those loans should be
understood as a representation regarding the origination process
only.  They contend that this section of the Supplements does
not also include a representation that the loans actually did
meet each of the criteria within an Originator's underwriting

---

[27] This exchange of information expressly preserved for the
parties the right to litigate compliance with underwriting
criteria based upon additional information and criteria.

guidelines.  As already explained, the Supplements included both representations, which are interlocking.

The Supplements assure investors that the loans actually did qualify under their Originators' criteria.  For example, they represented that "the original lender" determined for certain loans that the borrower's monthly income "will be sufficient to enable the borrower to meet their monthly obligations."  This is a statement about the origination process and a statement that the DTI ratio for the borrower met the specific level defined in the Originator's guidelines.  If FHFA demonstrates that the actual income of the borrower was materially different than that used by the Originator in calculating DTI, such that the loan failed to meet the DTI threshold specified in the Originator's guidelines, then FHFA may rely on that showing in arguing that a material false statement exists.  After all, a representation about process without a concomitant representation about the quality of the loans would be an empty one.  A Securities Act defendant cannot simply claim that it blindly reported information given to it by third parties and thereby avoid liability for inaccuracies that found their way into Offering Documents.  See UBS, 858 F. Supp. 2d at 329-30.[28]

---

[28] Most of the characteristics found by Originators that the parties discuss in these motions (LTV ratio, FICO score, and

IV. Forester's Testimony

In light of the rulings above, Forester has severely cabined his opinions.  Nonetheless, FHFA's motion to exclude Forester's testimony is denied.

Forester apparently limited his re-underwriting exercise to the universe of evidence that "would have been available" to the Originator.  As a result, he considered no post-origination information.[29]  By proceeding in this fashion, the defendants may have sought to import a scienter requirement into this strict liability lawsuit.  While the unavailability of information that could have been discovered through the exercise of diligence would have been relevant to any due diligence defense in this case,[30] the issues that remain concern the truth or falsity of the factual representations about the nature of the loans.  As a result, Forester's opinions have only limited relevance here. His opinions speak only tangentially to the determinations that

---

owner-occupancy status) are also presented as representations of fact in the Collateral Tables.  Accordingly, it is not clear that any loan characteristic other than DTI is affected by this aspect of the parties' dispute.

[29] It appears that Forester may also have chosen at least in some instances to disregard evidence that would have been available to Originators, but the impact of that choice on his opinions will go to their weight and not their admissibility.

[30] The due diligence defense would have inquired as to the availability as of the Effective Date of information about the falsity of representations contained in the Supplements.

must be made as to whether the loans themselves met their origination standards or whether the data in the Collateral Tables were accurate.  For example, he did not examine whether the appraisals of the property were substantively accurate or whether borrowers actually occupied the properties, as opposed to stating their intention to do so.  But because Originators' compliance with the origination process is also a fact in dispute, Forester's opinions regarding that process are relevant and will be received.

For example, Forester reports finding in many cases that Hunter misread, misinterpreted, or improperly applied available underwriting guidelines.  He also identifies purported inconsistencies and errors in Hunter's analysis and argues that Hunter improperly ignored "compensating factors and exceptions" which might have excused noncompliance.  These opinions and others like them are relevant to the issue of whether the Prospectus Supplements contained a material misstatement when they represented that Originators had followed their guidelines in approving the loans and may be used to challenge any of Hunter's opinions on that score.

V.   Reliance on Reports with Disclaimers

Defendants challenge Hunter's opinion to the extent he relies on LexisNexis Accurint credit reports, CBCInnovis credit reports, or DataVerify reports, two of which contain express

disclaimers.[31]  Hunter relies on these and other sources of

information not challenged here in rendering his findings.  FHFA

has shown that these databases are among the sources of

information on which originators, underwriters and experts

regularly rely in the underwriting and re-underwriting process.

The disclaimers in question do not render the information so

irretrievably unreliable that any opinions based thereupon must

be excluded wholesale.[32]  Rather, the actual presence or

---

[31] LexisNexis Accurint reports state, "This system should not be
relied upon as definitively accurate.  Before relying on any
data this system supplies, it should be independently verified."
DataVerify reports state,

> This report uses public data collected during the
> mortgage recording process and while deemed reliable,
> DataVerify and its third party business partners do
> not guarantee the accuracy of this data nor does it
> guarantee that common data elements will appear for
> all properties identified on the report.  The property
> data information (including assessments of value and
> equity) provided by DataVerify are delivered to the
> subscriber "as is" and "as available" and all uses of
> this data are at the subscriber's sole risk.

Defendants also cite deposition testimony of Kenneth Viviano of
CBCInnovis, who stated that CBCInnovis reports were "not making
any representation" as to "whether or not any of these addresses
are the primary residence of that consumer."

[32] In support of their claim that Hunter's testimony should be
excluded for unreliability, defendants cite this Court's
discussion of RBS's failure to follow up on disclaimer language
on a "one-page summary of Nomura's pre-acquisition review."  See
Nomura, 2014 WL 7232443 at *36.  The observation in Nomura is
inapposite.  As the Nomura opinion explains, RBS did no due
diligence with respect to Securitization 2006-HE3, and possessed
only a one-page statement from Nomura summarizing its pre-
acquisition review of loans.  Id.  Possession of that document

likelihood of errors in this data goes to the testimony's weight, not its admissibility.  See, e.g., Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("[D]isputes as to the validity of . . . underlying data go to the weight of the evidence.") Defendants may identify errors or likely errors in the documents in question at trial, and may argue that Hunter failed to corroborate a particular finding with more reliable information.

VI. Effective Date

FHFA argues that it is the Effective Date and not the time of origination that is relevant to any determination of whether there was a misrepresentation that the loans actually met the underwriting criteria contained in the guidelines of the loans' Originators.  Because the section of the Supplements addressed to underwriting standards speaks in the past tense, and assures investors that the "Mortgage Loans . . . were originated" in compliance with their underwriting criteria, FHFA's argument is rejected.

FHFA argues that the choice of the time of origination would be "incompatible" with the strict liability standard that applies here since the question is whether the representations in the Offering Documents were true as of the Effective Date (or the Cut-Off Date when the asserted fact is in the Collateral

_____

was insufficient as a matter of law to constitute due diligence by RBS.

41

Tables).  It is true that the Effective Date ordinarily provides
the date as of which a Securities Act plaintiff must show that a
representation is false.  But in this section of the Prospectus
Supplements, the documents are describing past events.  Thus,
the loans either did or did not -- at the time of origination --
meet the underwriting criteria contained in Originators'
guidelines.

FHFA points out that the defendants and other underwriters
examined post-origination evidence during the securitization
process and did not confine themselves to an examination of only
that information that would have been available to Originators.
This practice, which may have been convenient and cost-
effective, does not mandate a different conclusion about the
relevant time-frame for measuring the accuracy of the Offering
Documents' representation about the extent to which the loans
conformed to their Originators' guidelines.  It is the language
of the representation itself that must govern the choice of the
relevant time-frame.  Moreover, any defendant hoping to take
advantage of a due diligence defense would want to examine all
information available as of the Effective Date.  Therefore, the
defendants' practice of gathering and examining post-origination
data does not dictate that the representation about compliance
with Originators' underwriting criteria must have been true not
only at the time of origination but also at the Effective Date.

**CONCLUSION**

The following three motions are denied:  FHFA's December 22, 2014 motion to exclude the expert testimony of Michael Forester; the defendants' January 5 motion to exclude the testimony of Robert Hunter based on information not available at origination; and the defendants' November 25, 2014 motion in limine addressed to the choice of relevant underwriting guidelines.

SO ORDERED:

Dated:    New York, New York
          February 11, 2015

                          _____
                          DENISE COTE
                    United States District Judge