UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :
 FEDERAL HOUSING FINANCE AGENCY,       :        11cv6201 (DLC)
                                       :
                        Plaintiff,     :        OPINION & ORDER
                                       :
          -v-                          :
                                       :
                                       :
 NOMURA HOLDING AMERICA, INC., et al., :
                                       :
                        Defendants.    :
                                       :
---------------------------------------X

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
Adam M. Abensohn
Jonathan B. Oblak
Tyler G. Whitmer
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

For defendants Nomura Holding America, Inc., Nomura Asset
Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities International, Inc., David
Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N.
Dante LaRocca:

David B. Tulchin
Steven L. Holley
Bruce E. Clark
Bradley A. Harsch
Katherine J. Stoller
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

Amanda F. Davidoff
Elizabeth A. Cassady
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC 20006

For defendant RBS Securities Inc.:

Thomas C. Rice
David J. Woll
Andrew T. Frankel
Alan Turner
Craig S. Waldman
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

DENISE COTE, District Judge:

This Opinion addresses plaintiff Federal Housing Finance Agency's ("FHFA") motion to exclude the testimony of defendants'[1] expert witness Stephen Ryan ("Ryan"). For the following reasons, the motion is granted.

**BACKGROUND**

FHFA, acting as conservator for Fannie Mae and Freddie Mac (together, the "Government Sponsored Enterprises" or "GSEs"), filed suit on September 2, 2011 against defendants alleging that the Offering Documents used to market and sell seven certificates ("Certificates") to the GSEs associated with

---

[1] Defendants are Nomura Holding America, Inc., Nomura Asset Acceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca ("Nomura"); and RBS Securities Inc. ("RBS") (collectively, "defendants").

residential mortgage-backed securities ("RMBS" or
"Securitizations") contained material misstatements or
omissions.  RMBS are securities entitling the holder to income
payments from pools of residential mortgage loans ("Supporting
Loan Groups" or "SLGs") held by a trust.

FHFA brought these claims pursuant to Sections 11 and
12(a)(2) of the Securities Act of 1933 (the "Securities Act"),
as well as Virginia's and the District of Columbia's Blue Sky
laws.  This lawsuit is the sole remaining action in a series of
similar, coordinated actions litigated in this district by FHFA
against banks and related individuals and entities to recover
losses experienced by the GSEs from their purchases of RMBS.  A
description of the litigation and the types of
misrepresentations at issue in each of these coordinated
actions, including the instant case, can be found in FHFA v.
Nomura Holding Am., Inc., --- F. Supp. 3d ---, 11cv6201 (DLC),
2014 WL 6462239, at *3-6, *16-17 (S.D.N.Y. Nov. 18, 2014), as
well as FHFA v. UBS Americas, Inc., 858 F. Supp. 2d 306, 323-33
(S.D.N.Y. 2012), aff'd, 712 F.3d 136 (2d Cir. 2013).

Broadly speaking, FHFA alleges three categories of
misstatements: (i) the Offering Documents misstated the extent
to which the loans in the SLGs for the seven Certificates
complied with relevant underwriting guidelines; (ii) the loan-
to-value ("LTV") ratios disclosed in the Offering Documents were

3

too low because of inflated appraisals of the properties; and
(iii) the Offering Documents misrepresented the number of
borrowers who occupied the properties that secured the mortgage
loans.  FHFA also alleges that credit rating agencies gave
inflated ratings to the Certificates as a result of defendants'
providing these agencies with incorrect data concerning the
attributes of the loans.

On January 15, 2015, FHFA was granted leave to withdraw its
claims under Section 11 of the Securities Act, leaving the
Section 12(a)(2) and Blue Sky claims for trial.

> [T]he elements of a <u>prima facie</u> claim under section
> 12(a)(2) are: (1) the defendant is a statutory seller;
> (2) the sale was effectuated by means of a prospectus
> or oral communication; and (3) the prospectus or oral
> communication included an untrue statement of a
> material fact or omitted to state a material fact
> necessary in order to make the statements, in the
> light of the circumstances under which they were made,
> not misleading.

<u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d 347, 359
(2d Cir. 2010) (citation omitted).[2]  Here, neither the first nor
the second element is in dispute.

As for damages, "Section 12(a)(2) provides for recovery of
the consideration paid for the security at issue with interest
thereon, less the amount of any income received thereon, upon

---

[2] "[T]he D.C. and Virginia securities laws are generally
interpreted in accordance with Section 12(a)(2)."  <u>FHFA v. Bank
of Am. Corp.</u>, No. 11cv6195 (DLC), 2012 WL 6592251, at *7 n.8
(S.D.N.Y. Dec. 18, 2012).

the tender of such security, or for damages if [the purchaser] no longer owns the security."[3]   FHFA v. Nomura Holding Am. Inc., ("Nomura") --- F. Supp. 3d ---, No. 11cv6201 (DLC), 2014 WL 7232590, at *9 (S.D.N.Y. Dec. 18, 2014) (citation omitted).

> Where a plaintiff still owns the security, its remedy is rescission.  Under the rescissory measure of damages [FHFA] would be entitled to a return of the consideration paid for the interests plus prejudgment interest, less any income received on the interests. The rate of prejudgment interest rests in the discretion of the trial court.

Id. (citation omitted).

Although neither Virginia's nor the District of Columbia's Blue Sky law provides a loss causation defense to the claims at issue, Section 12 of the Securities Act, as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Pub. L. No. 104-67, 109 Stat. 737, does.  See FHFA v. HSBC N. Am. Holdings Inc., 988 F. Supp. 2d 363, 367, 369 (S.D.N.Y. 2013).  Pursuant to the defense,

> if the person who offered or sold [the] security proves that any portion or all of the amount recoverable . . . represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted . . . , then such portion or amount, as the case may be, shall not be recoverable.

---

[3] "The Virginia and District of Columbia Blue Sky laws both adopt this measure of damages."  FHFA v. Nomura Holding Am. Inc., --- F. Supp. 3d ---, No. 11cv6201 (DLC), 2014 WL 7232590, at *9 (S.D.N.Y. Dec. 18, 2014).

15 U.S.C. § 77$\underline{l}$(b).  Section 12(a)(2)'s loss causation defense

fulfills the rescissory purpose of the statute, which

> repudiates the transaction and seeks to place the
> parties in the status quo. . . .  [I]f the securities
> being tendered by FHFA are less valuable than the
> securities [the GSEs] received at the time of the
> purchase agreements for reasons unrelated to
> defendants' alleged misconduct, then the return of the
> GSEs' consideration [will be] similarly offset.  When
> a defendant receives [a] plaintiff's securities in
> exchange for the return of [the] plaintiff's
> consideration paid, offset by any unrelated
> depreciation in value, the parties are placed in the
> status quo ante.  This is fully in keeping with
> Section 12(a)(2)'s longstanding offset of the purchase
> price by the amount of any income received thereon.

Nomura, --- F. Supp. 3d at ---, 2014 WL 7232590, at *10

(citation omitted) (emphasis added).

Defendants retained Ryan, an expert in accounting standards

and public financial statements.  Ryan has sat on the Financial

Accounting Standards Advisory Council, the advisory body to the

Financial Accounting Standards Board ("FASB"), which, as the

primary establisher of accounting standards in the United

States, promulgates the Generally Accepted Accounting Principles

("GAAP").[4]  As set forth in his July 9, 2014 expert report, Ryan

was retained to opine principally on two topics.  First, he was

"asked to determine whether the manner in which the GSEs

accounted for the losses of fair value indicates that the GSEs

---

[4] See S.E.C. v. Escala Grp., Inc., No. 09cv2646 (DLC), 2009 WL
2365548, at *6-7 (S.D.N.Y. July 31, 2009) (discussing FASB and
GAAP).

determined that some portion of these losses was attributable to changes in financial market[s] or other relevant economic conditions that affected non-agency mortgage-related securities generally, rather than to factors specific to the origination or sale of the mortgages underlying the At-Issue Certificates."  He was also "asked to comment on whether Freddie Mac's and Fannie Mae's accounting treatments for the At-Issue Certificates reflect the GSEs' determination that they made binding commitments to purchase the securities and, if so, the dates on which those commitments were made."

Because, as explained below, the precise nature of what can and cannot be inferred from Ryan's analysis on the first question is critical to resolving this motion, the substance of Ryan's report is set out below in some detail.  Ryan "describe[s] the relevant GAAP for the At-Issue Certificates and how Freddie Mac and Fannie Mae applied those principles to these types of securities."  "[T]he GSEs treated the At-Issue Certificates as debt securities for accounting purposes."

Statement of Financial Accounting Standards No. 115, Accounting for Certain Investments in Debt and Equity Securities, ("FAS 115"), requires firms holding securities to classify the securities at inception into one of three categories for which the required accounting treatments differ: trading, held to maturity ("HTM"), and available for sale

7

("AFS").  These classifications are based primarily on the holders' intent with respect to the securities.

> To classify securities as trading, holders must have the positive intent to trade the securities, typically in the short term and for profit.  To classify securities as HTM, holders must have both the positive intent and also the ability to hold the securities to maturity to earn interest revenue over time.  Other securities are classified as AFS, a catch-all category for all other intents.

"It appears that Freddie Mac and Fannie Mae did not classify any of the At-Issue Certificates as HTM or trading," so Ryan described the accounting that FAS 115 requires for the AFS category of securities.

> "Holders recognize AFS securities at fair value on the balance sheet."

> Statement of Financial Accounting Standards No. 157, Fair Value Measurements ("FAS 157"), defines the fair value of an asset as the price the holder would receive from selling the asset in an orderly transaction at the measurement date.  The "measurement date" is the balance sheet date for the financial statements being presented.  The "orderly transaction" notion contemplates the holder engaging in marketing activities to attract potential purchasers and potential purchasers conducting due diligence to eliminate any information advantage of the seller.

"Essentially, the fair value of an asset equals the present value of the cash flows that the asset is expected to generate discounted at the current market rate reflected in orderly transactions."

In addition to recognizing AFS securities at fair value on the balance sheet, holders of AFS securities "record realized gains and losses . . . on these securities in net income and unrealized gains and losses . . . in other comprehensive income ('OCI') each period."  To understand the gains and losses reported, some vocabulary and history are required.

One necessary term is "amortized cost basis."  At the time of purchase, a security's amortized cost basis equals its purchase price.  Thereafter, the amortized cost basis equals the initial amortized cost basis plus cumulative interest revenue (an increase in income) minus cumulative cash principal and interest received (an increase in operating cash flow) and, for AFS securities, minus certain losses recorded in net income.

The losses that a holder records on AFS securities for accounting purposes may be temporary or other than temporary. Ryan describes "temporary losses of fair value" as those "that predominantly result[] from changes in financial market conditions, such as illiquidity, that transitorily increase[] market discount rates."  (Emphasis added.)  When asked at his July 18, 2014 deposition what he meant by "predominantly," he answered, "I don't have a specific percentage in mind, but not 100 percent, and not 51 percent; somewhere in between."  Losses

(or "impairments") that are not temporary are considered other than temporary ("OTT").[5]

The holder of a security accrues interest revenue each period equal to the security's amortized cost basis multiplied by the current effective interest rate. For a fixed-rate non-OTT impaired security, the security's effective interest rate is its initial yield. For a floating-rate non-OTT impaired security, the security's effective interest rate is the contractually specified floating rate benchmark plus a contractually specified or calculated adjustment to the benchmark. Some OTT impairments of AFS securities require holders to recalculate effective interest rates to equate the written-down amortized cost basis to the present value of the expected cash flows.

Prior to April 2009, under FAS 115 as issued, an AFS security was deemed OTT impaired if it was probable that the holder would not receive the cash flows expected at the time of purchase, or for securities subject to prior OTT impairment write-downs, the cash flows expected at the time of the most recent prior impairment.

> In other words, a security was deemed OTT impaired if
> it was probable that the cash flows to be received
> would be below those reflected in the amortized cost

---

[5] Ryan "use[s] the acronym OTT to denote both 'other than temporary' (impairments) and 'other than temporarily' (impaired securities)."

basis of the security.  In GAAP, "probable" is defined as "likely to occur" or "a higher level of likelihood than 'more likely than not.'"  In practice, preparers and auditors of financial reports commonly use a threshold of seventy percent or more for "probable."

GAAP recognized that the probability that the holder would recover the amortized cost basis of a security may depend on the holder's ability and intent to hold the security until recovery of that basis.  If the holder did not have both this ability and intent, then a security would be OTT impaired whenever its fair value was below its amortized cost basis under GAAP.

Prior to April 2009, FAS 115 required holders of OTT-impaired AFS securities to reduce both the balance sheet valuations and the amortized cost bases of these securities to fair value at the time of the impairments, with the entire OTT loss recorded in net income.

FAS 115, as issued, effectively treated OTT impairments of AFS securities as fully realized losses even though the securities were not sold, so that no actual realization of losses through reduced cash receipts occurred.  That is, the accounting for OTT impairments of securities was identical to the accounting that would have resulted if the holders had sold the securities and bought them back for their impaired amortized cost bases.

April 2009 saw the issuance of FASB Staff Position Nos. FAS 115-2 and FAS 124-2, Recognition and Presentation of Other-Than-Temporary Impairments (the "FSP").  According to Ryan, FASB was motivated to issue the FSP because of "[t]he highly illiquid markets that existed during the financial crisis, which

11

depressed the fair values of all but very low credit risk securities."

"The FSP defines OTT impairments as any decrease in expected cash flows that results in the holder not expecting to recover the entire amortized cost basis of the securities, whether or not that decrease is probable.  This definition should increase the frequency of OTT impairments."

At the same time,

> [t]he FSP reduces the losses that holders of OTT-impaired securities must record in net income if they do not intend to sell the securities and more likely than not will not be required to sell the securities before recovery of the amortized cost basis less the portion of the current period OTT loss that is recorded in net income (hereafter, "the amortized cost basis less the current period OTT credit loss").  For securities that the holder intends to sell or more likely than not would be required to sell before such recovery, the FSP retains the previously required accounting under FAS 115, as issued . . . .

The FSP requires holders of OTT-impaired AFS securities to reduce the balance sheet valuations of these securities to fair value at the time of impairment, which "is the same treatment as required by FAS 115 as issued."

If the holder of an OTT-impaired AFS security does not intend to sell the security and more likely than not will not be required to sell the security before recovery of the amortized cost basis less the OTT credit loss, however, then the holder must (A) write down the amortized cost basis of the security to

the present value of the expected cash flows discounted at the previously determined effective interest rate; (B) record this write-down (the OTT credit loss) in net income; and (C) record the difference (if any) between the present value of expected cash flows discounted at that effective interest rate and the fair value of the security (the OTT non-credit loss) in other comprehensive income.

> In other words, only the portion of the write-down to fair value that is attributable to reductions in expected cash flows is recorded as a reduction of net income.  The portion of the write-down to fair value that is attributable to increases in the current market discount rate is recorded as a reduction of other comprehensive income.

The FSP refers to the portion of an OTT impairment write-down that is recorded in net income as the "credit loss."  The credit loss captures the decreases in expected cash flows that are not expected to reverse on average.  In contrast, the remaining "non-credit loss" portion of the decrease in fair value

> predominantly captures changes in financial market conditions, such as market illiquidity or reduced willingness by market participants to absorb credit and other risks, that generally reverse when these markets return to normal.  Thus, even though the entire impairment amount is called OTT, the non-credit loss portion is treated as temporary.

(Emphasis added.)  Again, Ryan's deposition testimony is that "predominantly" means something in between fifty-one and one hundred percent.  As previously noted, holders recognize AFS

securities at fair value on the balance sheet and record realized gains and losses (including all OTT losses prior to April 2009 and OTT credit losses after April 2009) on these securities in net income and unrealized gains and losses (including OTT non-credit losses after April 2009) in other comprehensive income each period.

The holder of an AFS security must write down the amortized cost basis of that security when it determines that the security is OTT impaired.  As discussed above, the amount of the write-down may differ pre- and post-April 2009.  "Holders generally must evaluate AFS securities for OTT impairment at the individual security level at the end of each fiscal quarter."

To summarize, according to Ryan, prior to April 2009, losses were characterized as either temporary or OTT.  Ryan says that if the holder of a certificate like those at issue here believed that a loss in fair value was caused by something specific to the securitization, such as the characteristics of the underlying loans, one would expect the holder to account for such loss as OTT, rather than as temporary.  After April 2009, OTT losses were further divided into OTT non-credit and OTT credit.  Under this regime, says Ryan, if the certificate holder considered a loss to be the result of something particular to the securitization, one would expect that loss to be accounted for as OTT credit.

Ryan applies his expertise in the foregoing subject matter
to the statements made and data provided by the GSEs in public
financial reports, internal documents, interrogatory responses,
and other litigation materials to calculate "the aggregate
cumulative temporary, OTT non-credit, and OTT credit losses, as
well as the unpaid principal balances ('UPBs'), fair values, and
percentage losses of fair values for the AFS At-Issue
Certificates collectively held by Freddie Mac and Fannie Mae as
of August 31, 2011," the closest date to the filing of the
original Complaint in this action for which data are available.[6]
He sums the temporary and OTT non-credit losses, and
distinguishes them from the OTT credit losses.

Ryan finds that "in each fiscal period Freddie Mac and
Fannie Mae classified a sizable portion of the total cumulative
decline in fair value of the At-Issue Certificates as either
temporary losses or OTT non-credit losses." According to Ryan,
"as of August 31, 2011, Freddie Mac and Fannie Mae had together

---

[6] The GSE-related materials on which Ryan relies were not
submitted to the Court as part of the instant motion. It is not
clear from the materials that were provided that the GSEs
themselves in fact used the tripartite reporting scheme of
temporary, OTT non-credit, and OTT credit. Rather, it appears
that the GSEs reported "Temporary Impairments" (which Ryan
established to include both temporary and OTT non-credit) and
"Other than Temporary Impairments" (which Ryan established to be
OTT credit). In the instant motion FHFA does not appear to
dispute the way in which Ryan has characterized the GSEs'
materials.

recorded a $401 million total decrease in fair value for their

seven At-Issue Certificates classified as AFS," which breaks

down as follows: $9 million in temporary losses, $211 million in

OTT non-credit losses, and $181 million in OTT credit losses.[7]

Ryan points out that "[t]he temporary and OTT non-credit losses

sum to $220 million, which equals 55 percent of the total

decrease in fair value for the At-Issue Certificates over this

period."

> Ryan concludes that
>
> the GSEs determined that much of the loss of fair
> value of th[e] securities was temporary or OTT non-
> credit losses that are <u>predominantly</u> driven by changes
> in financial market conditions, such as financial
> market illiquidity and willingness to accept risk,
> rather than attributable to the quality of mortgage
> underwriting or other security-specific factors.

(Emphasis added.)  An intended implication of Ryan's report,

presumably, is that, if FHFA succeeds in making out a <u>prima</u>

<u>facie</u> Section 12(a)(2) claim entitling it to rescission, and if

the Certificates being returned by FHFA are less valuable than

when they were purchased, the GSEs have essentially conceded,

based on their accounting practices, that at least fifty-five

percent of the difference in value is unrelated to any material

---

[7] Ryan goes on to give reasons why the figure for OTT credit
losses might be overstated or represent losses attributable, at
least in significant part, to changes in relevant economic
conditions and not to security-specific factors.

misstatements or omissions, and FHFA's damages award should be reduced accordingly.

Two important concessions, however, tucked away in footnotes of Ryan's report, are critical to analyzing his conclusion.  First, when Ryan initially describes temporary losses as predominantly resulting from changes in financial market conditions, he goes on to say that,

> prior to April 2009, temporary losses may also [have] reflect[ed]: (1) decreases in cash flows that do not meet the probable threshold for other than temporary impairment or (2) security-specific increases in discount rates unaccompanied by any trigger for an other than temporary impairment write-down (i.e., there is no probable decrease in cash flows, no decision by Freddie Mac and Fannie Mae to sell the AFS At-Issue Certificates prior to recovery of fair value, and the GSEs probably will not sell these securities prior to full recovery of fair value).

Of course, Ryan is quick to add that "temporary losses on the AFS At-Issue Certificates attributable to items (1) and (2) are small or otherwise insignificant in this litigation."  He says that "[i]tem (1) is insignificant in this litigation because it is time limited to pre-April 2009," and that "[i]tem (2) is small because empirical research in finance shows that changes in the credit spreads on debt instruments are driven by market-wide demand and supply conditions, not by security-specific factors."

Secondly and similarly, when Ryan initially explains that, as with temporary losses, OTT non-credit losses predominantly

reflect increases in market discount rates attributable to changes in financial market conditions that adversely affected the fair values of all non-agency mortgage-related securities during the financial crisis and not security-specific factors, he goes on to say that, "[i]n principle, temporary losses and OTT non-credit losses might result in part from increases in discount rates attributable to security-specific factors rather than financial market or economic conditions."  Again, Ryan is quick to add that "[e]mpirical research in finance, however, shows that changes in the credit spreads on corporate bonds and other debt instruments are driven <u>primarily</u> by market-wide demand and supply conditions rather than by the credit risk of the instruments."  (Emphasis added.)  Interestingly, in the same portion of his July 18 deposition in which he offers his meaning of "predominantly," Ryan explains that "'[p]redominantly is stronger than 'primarily.'  'Primarily' could be 51 percent."

Ryan offers a separate opinion on pre-settlement purchase commitments.  According to Ryan, "[b]ased on applicable accounting rules," because "Freddie Mac and Fannie Mae accounted for their forward purchase commitments for certain of the At-Issue Certificates as derivatives at the commitment date, <u>i.e.</u>, prior to the settlement of the commitments," "the GSEs deemed themselves to be obligated to purchase (and Nomura obligated to sell) the At-Issue Certificates at a fixed price at the

commitment dates for which they recognized purchase commitments as derivatives."[8]

On December 19, 2014 FHFA moved to exclude Ryan's expert testimony.  The motion was fully submitted on January 15, 2015.

## DISCUSSION

In its motion, FHFA makes several arguments in support of its position that Ryan's testimony should be excluded.  To resolve this motion it is only necessary to address FHFA's arguments that relate to Fed. R. Evid. 401, 402, and 403.  The applicable legal standards are set out below, after which they are applied to the two different categories of Ryan's testimony: fair value accounting and pre-settlement purchase commitments.

Under Fed. R. Evid. 401, "[e]vidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  See Contreras v. Artus, --- F.3d ---, No. 13-1117, 2015 WL 294239, at *8 (2d Cir. Jan. 23, 2015).  "Irrelevant evidence is not admissible."  Fed. R.

---

[8] In a December 18, 2014 Opinion granting FHFA's motion in limine to exclude evidence and argument that the sale of the Certificates was consummated before the "settlement date," this earlier-in-time "commitment date" was referred to as the "trade date."  FHFA v. Nomura Holding Am., Inc., --- F. Supp. 3d ---, No. 11cv6201 (DLC), 2014 WL 7229446, at *4 (S.D.N.Y. Dec. 18, 2014) ("Date of Sale Opinion").

Evid. 402; United States ex rel. Feldman v. van Gorp, 697 F.3d 78, 97-98 (2d Cir. 2012).

Pursuant to Fed. R. Evid. 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Accord United States v. Dupree, 706 F.3d 131, 138 (2d Cir. 2013). A court must "conscientiously balance[] the proffered evidence's probative value with the[se] risk[s]." United States v. Massino, 546 F.3d 123, 132 (2d Cir. 2008) (citation omitted). Moreover, Fed. R. Evid. 403 has a role to play whether the case is to be tried to a jury or to a judge. See, e.g., United Brands Co. v. M.V. Isla Plasa, No. 85cv0491 (SS), 1994 WL 114825, at *1 n.2 (S.D.N.Y. Mar. 31, 1994) (Sotomayor, J.) (excluding evidence under Fed. R. Evid. 403 at a bench trial based on burden to the court); S.E.C. v. Morelli, No. 91cv3874 (LAP), 1993 WL 603275, at *2 (S.D.N.Y. Dec. 21, 1993) (excluding evidence under Fed. R. Evid. 403 at a bench trial based on undue delay).

## I.   Fair Value Accounting

As an initial matter, it is worth noting that GAAP and the securities laws serve purposes that, while related, are distinct. "[T]he goal of financial reporting is to provide

information that is useful to present and potential investors
and creditors and other users in making rational investment,
credit, and similar decisions.  The purpose of GAAP is to
increase investor confidence by ensuring transparency and
accuracy in financial reporting." Escala Grp., 2009 WL 2365548,
at *7 (citation omitted).  Speaking broadly, "the Securities Act
impose[s] liability on certain participants in a registered
securities offering when the publicly filed documents used
during the offering contain material misstatements or
omissions." Morgan Stanley, 592 F.3d at 358.

Only two issues remain to be tried in order for FHFA to
make out a prima facie strict liability claim under Section
12(a)(2) of the Securities Act as well as the Blue Sky laws: the
falsity of the alleged misrepresentations and the materiality of
the alleged misrepresentations.  Ryan's testimony is wholly
irrelevant to FHFA's prima facie liability case.  Indeed,
defendants do not even attempt to argue that there is any
necessary inconsistency between the manner in which the GSEs
accounted for their losses and FHFA's good faith filing of the
instant action.  See Fed. R. Civ. P. 11(b).  The instant action,
after all, seeks rescissory relief under a strict liability
statute for alleged material misrepresentations in Offering
Documents:  There is no immediately apparent connection between

FHFA's lawsuit and the GSEs' accounting practices during the relevant period.

The specific factual context of this litigation further undermines any obvious link between this case and the way in which the GSEs accounted for their losses.  As explained in Nomura:

> [RMBS c]ertificates were linked to tranches of varying seniority.  Generally, holders of the most senior certificates for a given Supporting Loan Group were paid first, after which holders of the next-most-senior certificates received payment, and so on.  Thus, should some borrowers in an SLG default on their loans, certificates in the junior-most tranche would absorb all or most of the shortfall before payments to more senior certificates were affected.  Accordingly, the most senior certificates were subject to less risk than were more junior certificates.  By apportioning risk in this way, defendants were able to create AAA-rated securities from Alt-A and subprime loans.  The GSEs purchased senior certificates -- often only the most senior -- with the highest credit ratings.
>
>        . . .
>
> A certificate's value in the market is determined, in large part, by the expected future flow of payments to the certificate holder.  Because payments to the certificate holder depend upon borrowers' payments pursuant to the underlying mortgage loans, the expected rate of borrower defaults is a key determinant of the certificate's value.  The average expected loss severity -- which measures the shortfall between the unpaid principal balance of a loan and the amount recovered through foreclosure (less costs incurred in foreclosure) -- is another key factor.  In the years following September 2, 2011, all but one of the Certificates never missed a payment.

Nomura, --- F. Supp. 3d at ---, 2014 WL 7232590, at *2.  In other words, in a world in which the elements of FHFA's prima

facie Section 12(a)(2) claim -- falsity and materiality -- could very well be satisfied even in the absence of the GSEs' incurring loss due to their position of relative risk insulation, the importance of the GSEs' accounting practices to FHFA's prima facie case is hardly self-evident.  Nor do defendants purport to argue that Ryan's testimony would be relevant to any damages calculation under Section 12 or the Blue Sky laws.[9]

The issue on which Ryan's testimony seemingly was meant to bear is the Section 12 loss causation affirmative defense, which requires defendants to "prove[] that any or all of the amount recoverable . . . represents other than the depreciation in value of the subject security resulting from [the alleged material misstatements or omissions]."  15 U.S.C. § 77l(b).  As explained above, if defendants can prove that "the securities being tendered by FHFA are less valuable than the securities [the GSEs] received at the time of the purchase agreements for reasons unrelated to defendants' alleged misconduct, then the return of the GSEs' consideration [will be] similarly offset."

---

[9] In its reply memorandum in support of the instant motion, FHFA represents that it "does not rely on accounting disclosures or statements in determining damages."  This Opinion reaches no conclusion as to whether Ryan's testimony might have been relevant to issues relating to the now-withdrawn Section 11 claims, including the calculation of Section 11 damages.

Nomura, --- F. Supp. 3d at ---, 2014 WL 7232590, at *10
(citation omitted).

With respect to the loss causation defense, Ryan's expert
testimony on the GSEs' fair value accounting, if it is even
relevant at all, has such minimal probative value that it is
easily substantially outweighed by even the slightest danger of
undue delay and wasting time.  What ultimately matters for
purposes of Section 12 loss causation is not the GSEs'
characterization of what caused their losses, but rather, what
actually caused them.  See Miller v. Thane Int'l, Inc., 615 F.3d
1095, 1102 (9th Cir. 2010) ("[T]he loss causation inquiry
assesses whether a particular misstatement actually resulted in
loss.  It is historical and context-dependent." (citation
omitted)); Pub. Employees' Ret. Sys. of Miss. v. Goldman Sachs
Grp., Inc., 280 F.R.D. 130, 139 (S.D.N.Y. 2012) ("The question[]
of . . . loss causation [is] subject to [an] objective
standard[] and generalized proof . . . .").  If it turned out
that the way in which the GSEs accounted for their losses was
inconsistent with those losses having been caused by the alleged
defects in the Offering Documents, such accounting might have at
least some tendency to make it more probable that the GSEs'
losses were actually caused by factors other than the alleged
defects.  See Fed. R. Evid. 401(a).  But Ryan's proposed
testimony, and defendants' arguments in support thereof, do not

establish that logical connection.  Ryan cannot demonstrate that
the GSEs having accounted for a loss in fair value as temporary
or OTT non-credit necessarily entails that the GSE considered
the loss to be caused by something other than a security-
specific defect.

As noted above, in the footnotes of his report Ryan all but
gives up the game by conceding that even losses caused by the
alleged defects could have been properly reported as temporary
or OTT non-credit under certain circumstances.  Indeed, he
admits that, prior to April 2009, temporary losses may have
reflected security-specific increases in discount rates.  True,
Ryan states that the chances of such accounting having taken
place here are small, but his only support for this statement is
to note that some undisclosed "empirical research in finance
shows that changes in the credit spreads on debt instruments are
driven by market-wide demand and supply conditions, not by
security-specific factors."  This does little to re-inject
probative force into his testimony.  Similarly, Ryan admits that
under the post-April 2009 tripartite regime, temporary losses
and OTT non-credit losses might result in part from increases in
discount rates attributable to security-specific factors rather
than financial market or economic conditions.  Here too, Ryan
futilely attempts to resuscitate his opinion by noting empirical
research in finance that "shows that changes in the credit

25

spreads on corporate bonds and other debt instruments are driven
<u>primarily</u>[, which, according to Ryan, could mean just 51%,] by
market-wide demand and supply conditions rather than by the
credit risk of the instruments."  (Emphasis added.)  This
destroys the connection that Ryan and defendants seek to create
between the GSEs having accounted in their financial reports for
their losses as temporary or OTT non-credit on the one hand, and
their purported admission in so accounting that those losses
were caused by factors other than the alleged defects in the
Offering Documents on the other hand.

Defendants point to no provision, under GAAP or elsewhere,
requiring the victim of a Section 12(a)(2) violation to account
for, or report, in a particular way the loss caused by that
violation, so the nature of the GSEs' accounting and reporting
here is hardly probative.  As Ryan testified at his July 18
deposition:

> Q.  And so you would agree with me that as a
> matter of accounting policy neither of the GSEs was
> required to account for impairments based on whether
> they were caused more by financial market factors or
> more by security-specific factors, is that correct?
>
> A.  Correct.  They had to account for . . .
> credit losses separately from non-credit losses.
>
> . . .
>
> Q.  . . . Did the SEC requirements require the
> GSEs specifically to disclose whether impairments to
> the securities they were holding, including the at-
> issue certificates, were [caused] by market factors or

26

security-specific factors, as you have described them
in your report?

     A.  SEC requirements are not at that level of
detail.  They're at the level of the firm.

     Q.  And so is the answer to my question no?

     A.  The answer is no. . . .

     . . .

     Q.  Would you agree with me that the disclosures
of the drivers of the losses are what you rely on in
your report as evidence that the GSEs ascribed those
losses to market factors?

     A.  The primary source of interpretive
explanation for the drivers of the losses come[s] from
the financial reports of Fannie and Freddie and also
internal documents of Fannie and Freddie.

     Q.  And those financial reports and those
portions of those financial reports would have been
governed by the SEC disclosure requirements, not by
the GAAP disclosure requirements, correct?

     A.  Correct.  GAAP does not require discussion of
the drivers of losses.

     Q.  And so there's no obligation under GAAP to
disclose the driver of the loss at all, is that
correct?

     A.  Correct.

Defendants cite no case addressing the use of fair value

accounting to support a loss causation defense.  Indeed, in

their opposition to the instant motion, they are careful to

avoid stating firmly that Ryan's testimony would be relevant to

the loss causation defense.  Instead, they offer a number of

vague statements, none of which supports the probative value of

his testimony to any of the issues that remain in this case.
Some representative examples are revealing:

At one point, defendants state that "Ryan's testimony and explanation of accounting principles is necessary for jurors to understand a critical issue in this action -- what Freddie Mac and Fannie Mae themselves disclosed about the cause of their alleged losses on the Certificates."  But what the GSEs disclosed about the cause of their losses is hardly a critical issue in this action, if the way in which such disclosures were made does not aid a factfinder in determining whether the elements of the loss causation defense have been proven.

Defendants go on to say that "Ryan's role as an expert is to analyze statements and data disclosed by Freddie Mac and Fannie Mae themselves -- not to make an independent determination of the cause of Freddie Mac's or Fannie Mae's losses, or to conduct some separate analysis of alleged damages or loss causation.  The purpose of Dr. Ryan's testimony is to provide an understanding of what Freddie Mac and Fannie Mae actually reported."  Again, defendants have not shown how an understanding of what the GSEs reported, using GAAP accounting, would be helpful to determining what actually caused their losses for purposes of the Section 12 loss causation defense.

It is worth pausing to note that another factor, not briefed by either party, may create even further disconnect

between the accounting principles on which Ryan relies and

defendants' case on the loss causation defense.  The GAAP

principles, as explained by Ryan, require a distinction to be

drawn between losses caused by security-specific factors and

those caused by market-wide factors.  But, according to the

Final Report of the National Commission on the Causes of the

Financial and Economic Crisis in the United States (2011),

better known as the "Financial Crisis Inquiry Report," published

by the U.S. Financial Crisis Inquiry Commission ("FCIC"),[10] the

---

[10] Available at http://fcic-static.law.stanford.edu/cdn_media/
fcic-reports/fcic_final_report_full.pdf (last visited February
13, 2015).  The report explains that, "[a]s defaults and losses
on the insured mortgages have been increasing, the [private
mortgage insurance ("PMI")] companies have seen a spike in
claims.  As of October 2010, the seven largest PMI companies,
which share 98% of the market, had rejected about 25% of the
claims (or $6 billion of $24 billion) brought to them, because
of violations of origination guidelines, improper employment and
income reporting, and issues with property valuation."
Financial Crisis Inquiry Report at 225.  And, according to the
report, "[o]ne 2003 survey found that 55% of the appraisers
[surveyed] had felt pressed to inflate the value of homes; by
2006, this had climbed to 90%."  Id. at 91.  In 2006 the
Mortgage Insurance Companies of America, a trade association
that represents mortgage insurance companies, wrote to
regulators that "[w]e are deeply concerned about the contagion
effect from poorly underwritten or unsuitable mortgages and home
equity loans . . . .  The most recent market trends show
alarming signs of undue risk-taking that puts both lenders and
consumers at risk."  Financial Crisis Inquiry Report at 21.
And, based on testimony from FDIC Chairman Sheila Bair, who
served at the Treasury Department as the assistant secretary for
financial institutions from 2001 to 2002, the FCIC reports that
"[t]hrough the early years of the new decade, the really poorly
underwritten loans, the payment shock loans[,] continued to
proliferate outside the traditional banking sector."  Id. at 79
(citation omitted).  "The term 'payment shock' refers to a

market-wide factors at work during the relevant period -- the housing and financial crises -- were inextricably linked to security-specific factors like the Offering Document defects alleged in this action.  In other words, in the particular factual context of this case, it may not have been an easy task to divide losses caused by the market and those caused by defects in the specific financial instruments.

In short, the probative value of Ryan's testimony, if any at all, is exceedingly minimal; so minimal, in fact, that it is easily outweighed by even the slight danger of the waste of time and undue delay that would accompany the testimony of an expert witness whose opinion could, at best, be marginally useful to defendants' case.  Indeed, not even defendants appear to contend that Ryan's testimony, on its own, could discharge their burden to prove the loss causation defense; rather, it seems that Ryan's testimony was meant only to bolster other evidence on this issue.  But in light of both the February 10, 2015 Opinion granting FHFA's motion to exclude the loss causation benchmarking analyses of defendants' expert Kerry Vandell, FHFA v. Nomura Holding Am., Inc., No. 11cv6201 (DLC), 2015 WL 539489

---

significant increase in the amount of the monthly payment that occurs when an adjustable interest rate adjusts to its fully-indexed basis."  F.J. Ornstein et. al., Interagency Statement on Subprime Mortgage Lending, 61 Consumer Fin. L.Q. Rep. 176, 177 n.7 (2007).

(S.D.N.Y. Feb. 10, 2015), and the apparent dearth of any other evidence that defendants intend to provide with respect to loss causation -- none has been referenced in the voluminous summary judgment and pretrial motion practice resolved by the Court -- it is not at all clear what if anything Ryan's testimony could bolster.

It is worth noting that, were this case to be tried to a jury, any minimal probative value of Ryan's testimony would easily substantially be outweighed by the dangers of confusing the issues and misleading the jury as well. See Fed. R. Evid. 403. This is especially so because, to the extent that his testimony has probative value at all, it is with respect to what the GSEs believed to be the cause of their losses, which could serve only as circumstantial evidence of what actually caused their losses (which is what ultimately matters for purposes of the loss causation defense). See Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005). To the extent that it seeks to exclude Ryan's testimony on the GSEs' fair value accounting of their losses, FHFA's motion is granted.

## II.  Pre-Settlement Purchase Commitments

As noted above, Ryan opines that, based on the way the GSEs accounted for the Certificates, the GSEs "deemed themselves to be obligated to purchase the At-Issue Certificates in the intervening period between agreeing to and settling commitments,

31

i.e., before receiving the prospectus supplements."  The Date of
Sale Opinion, which granted FHFA's motion in limine to exclude,
under Fed. R. Evid. 403, evidence and argument that the sale of
the Certificates was consummated before the "settlement date,"
held that evidence of the earlier-in-time "trade dates" was "of
extremely limited probative value," "[b]ecause material
misrepresentations and omissions in the Prospectus Supplements
are actionable under Section 12(a)(2) and the Blue Sky laws
regardless of the trade dates."  2014 WL 7229446, at *7, *9.
According to defendants, Ryan's testimony would not contravene
the Date of Sale Opinion, because, while that Opinion precludes
evidence and argument that the sales actually occurred before
the settlement date, Ryan's testimony concerns not when the
sales actually occurred but rather when the GSEs considered the
sales to have occurred.

     Evidence of when the GSEs considered the sales to have
occurred is no more probative to the issues that remain for
trial than is evidence of when the sales actually occurred.
Defendants attempt to argue that the time at which the GSEs
considered themselves to be bound is relevant to materiality.
As the Date of Sale Opinion explained in rejecting a parallel
argument, however, "defendants appear to be shoehorning an
improper reliance argument into an argument as to materiality."
Id. at *7.  As defendants themselves note, the materiality of a

32

misstatement depends on whether a reasonable investor would consider it important in making an investment decision.  Actual reliance is not an element of the claims at issue in this case. See FHFA v. HSBC N. Am. Holdings Inc., --- F.Supp.2d ---, No. 11cv6189 (DLC), 2014 WL 3702587, at *22 (S.D.N.Y. July 25, 2014) ("[T]he Securities Act and the Blue Sky Laws do not require any showing of reliance.").

While the particular Fed. R. Evid. 403 danger that the Date of Sale Opinion addressed most directly was the danger of confusing and misleading the jury, see 2014 WL 7229446, at *7, that Opinion made it clear that the probative value of evidence and argument that the sale of the Certificates was consummated before the "settlement date" was so minimal that it could be easily substantially outweighed by any of the Fed. R. Evid. 403 dangers, including undue delay and wasting time.  In other words, the fact that this case will now be tried to the Court does not prompt reconsideration of the Date of Sale Opinion; nor does it counsel in favor of the admissibility of Ryan's testimony concerning pre-settlement purchase commitments, the exceedingly limited probative value of which is substantially outweighed by the waste of time and undue delay that it would cause.

To the extent that it seeks to exclude Ryan's testimony on the GSEs' understanding of pre-settlement purchase commitments,

FHFA's motion is granted.  Ryan will not be permitted to offer his expert testimony on this subject.

## CONCLUSION

FHFA's December 19, 2014 motion to exclude the expert testimony of Ryan is granted.

SO ORDERED:

Dated:    New York, New York
          February 13, 2015

_____
DENISE COTE
United States District Judge