# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588

WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

January 30, 2015

Via E-mail and ECF

Hon. Denise L. Cote,
    United States District Judge,
        Daniel Patrick Moynihan United States Courthouse,
            500 Pearl Street, Room 1610,
                New York, New York  10007-1312.

Re:     *FHFA* v. *Nomura Holding America Inc., et al.*, 11-cv-6201 (SDNY)

Dear Judge Cote:

Defendants move *in limine* pursuant to Federal Rules of Evidence 401, 402, and 802 to preclude plaintiff from presenting any evidence or making any argument relating to internal Clayton Holdings LLC ("Clayton") documents called "trending reports," which Clayton generated as part of a project it ultimately canceled due to what Clayton's corporate representative termed a "fatal flaw" in the reports' reliability.  These reports provide no basis to draw any conclusions about whether loans backing the at-issue Securitizations complied with originator underwriting guidelines.  None of the reports contains data specific to any Securitization or pool of loans at issue in this case.  And plaintiff itself has taken the position before this Court that the reports are unreliable as to Freddie Mac, citing many of the same reasons the reports are unreliable as to Nomura.  These trending reports, which never progressed beyond the "beta" testing stage and which Clayton never finalized, are unreliable and irrelevant, and should be excluded.  Even if relevant, the trending reports should be excluded for the additional reason that they are inadmissible hearsay.

## BACKGROUND

Nomura and others in the RMBS industry often hired Clayton to perform credit and compliance due diligence reviews on pools of loans they were considering for purchase. During these reviews, Clayton typically reviewed loan files and assessed whether the loans complied with originators' underwriting guidelines and additional client-specific guidelines or "overlays" that usually were more stringent than originators' underwriting guidelines.  (Ex. A (Beal 30(b)(6) Tr.) at 56:5-57:10.)

Clayton began developing the trending reports at issue in mid-2007 using client data from 2006 and the first two quarters of 2007.  (*Id.* at 127:8-14.)  The intent was to use data collected during Clayton's loan file reviews to identify and track trends in "exceptions," and the rates at which its clients rejected or accepted ("waived in") loans with exceptions.  (*Id.* at 126:14-24.)  By "exception," Clayton meant instances where a loan contained an exception either to the applicable originator underwriting guidelines *or* the credit overlays required by Clayton's clients.  (*Id.* at 56:5-57:10.)

The trending reports present high-level, summary data from all loan file reviews performed by Clayton for Nomura during an 18-month time period.  There is no data in the trending reports specific to any loan, loan pool, or securitization.  (*See* Ex. B (All Clayton, Trending Reports); Ex. C (CLAY_FHFA-E_000677898) at CLAY_FHFA-E_000677902-7912.)  None of the reports contains specific information about any of the seven at-issue Supporting Loan Groups.

Clayton's trending report project never advanced beyond the "beta" testing stage, and Clayton decided "to pull the plug on the project" in the second half of 2007.  (Ex. A (Beal 30(b)(6) Tr.) at 126:25-127:19, 412:17-413:2.)  The reason was the lack of reliability of the trending reports.  Vicki Beal, former Senior Vice President at Clayton, testified that "we were just in the beta version of this," and that "we needed to clean up [the reports] before this could be an actual product."  (*Id.* at 133:10-17.)  The "beta" trending reports "were generated more to show our clients our hopes of using their data to help them manage their deals . . . [b]ut we never got there."  (*Id.* at 133:24-134:5.)

Ms. Beal explained that the biggest problem with the trending reports was "credit overlays, because we couldn't tell exceptions based on client overlays apart from originator exceptions to guidelines."  (*Id.* at 130:19-23.)  As a result, Ms. Beal testified, it was not "possible to make apples to apples comparisons between clients based on" the trending reports (*id.* at 129:15-20), and that "even with respect to the results for a particular client," it is not "possible to draw conclusions based on this about the degree in which they rejected loans that were compli[ant] with guidelines."  (*Id.* at 130:24-131:21.)  Ms. Beal described this problem as "a fatal flaw in the project."  (*Id.* at 413:9-415:7.)

Nonetheless, plaintiff cited one of the beta-version trending reports in its amended complaint, alleging (without any basis) that "[o]f the mortgage loans that Clayton found defective, 58 percent of the loans were subsequently waived in by Nomura without proper consideration and analysis of compensating factors and included in securitizations such as" those at issue here.  (Am. Compl. ¶ 73.)[1]  Plaintiff has now included the beta-version trending reports

---

[1] This allegation has since been disproven by record evidence.  *See* Ex. D (Kohout Tr.) at 243:8-22 ("we would review 100 percent of the level 2s, 100 percent of the level 3s), 231:12-18 ("Q. And who would determine whether [a loan] was acceptable with compensating factors? A. . . . [T]he 2s would all have to be affirmed by credit at Nomura"); Ex. E (Hartnagel Tr.) at 652:6-

*(footnote continued)*

and related documents on its proposed exhibit list (Pl.'s Exs. 6, 15-33, 1304) and apparently intends to use these documents to support its claim that Nomura accepted and securitized loans that did not comply with originator underwriting guidelines, even though Clayton's Rule 30(b)(6) witness testified that the trending reports cannot be used for that purpose. For the reasons explained by Ms. Beal of Clayton, the trending reports are "fatally flawed" and are irrelevant to the claims that remain to be tried in this action.

## ARGUMENT

Evidence is admissible if it is relevant, meaning that it "make[s] a fact more or less probable than it would without the evidence," and that fact is of material "consequence." FED. R. EVID. 401, 402. The beta trending reports, which are nothing more than preliminary working drafts, cannot serve as evidence—either direct or circumstantial—that any loans backing the at-issue Securitizations were not originated in accordance with applicable underwriting guidelines.

The beta trending reports provide no data specific to the particular seven Securitizations at issue here and thus have no probative value. This Court has repeatedly emphasized that evidence should relate to the specific Securitizations at issue in this action and the loans backing those Securitizations. For example, in ruling on a motion for partial summary judgment, this Court held that Freddie Mac's and Fannie Mae's "general knowledge of weaknesses in some Originator practices" could not be used to attempt to show that they had knowledge about the specific loans underlying the Securitizations. (July 25, 2014 Opinion and Order, Doc. No. 766, at 65-66.) Because the trending reports do not contain any securitization- or pool-specific information, the reports cannot show that any loans classified as "exceptions" were included in an at-issue Supporting Loan Group.

Moreover, the beta-version trending reports are inherently unreliable to show compliance with originator underwriting guidelines because Clayton did not distinguish between exceptions to underwriting guidelines and exceptions to Nomura's more stringent overlays. In Clayton's system, a loan that complied with all of the criteria in an originator's underwriting guidelines would still be classified as an "exception" if the loan did not comply with overlays imposed by Nomura or by Clayton's other clients. (Ex. A (Beal 30(b)(6) Tr.) at 58:24-59:4.) Ms. Beal thus testified that the biggest problem Clayton faced—a problem that it never solved— was "credit overlays, because we couldn't tell exceptions based on client overlays apart from originator exceptions to guidelines." (*Id.* at 130:19-23.) As a result, it is impossible to tell from

---

*(footnote continued)*

653:24 ("I always looked at 2's and 3's"); Ex. F (Sabo Tr.) at 105:22-107:18 (the Due Diligence Group "personally reviewed . . . [a]ll of the findings"); Ex. G (Scampoli Tr.) at 424:13-19 ("I can't recall a situation where a loan would be waived in without some reason for waiving it in."). In addition, as this Court has found, only 2.6% of the loans in the at-issue Supporting Loan Groups received a final grade of EV 3. (Nov. 18, 2014 Opinion and Order, Doc. No. 991, at 25.)

the trending reports whether loans classified as "exceptions" deviated from applicable underwriting guidelines.

Plaintiff made the same point in arguing that the trending reports did not justify discovery into the purchase of subprime loans by Freddie Mac's single family business. Clayton's trending reports say that Freddie Mac waived in 60% of loans Clayton graded as "3s"—more than Nomura and most of Clayton's other clients. (Ex. B (All Clayton, Trending Reports) at 5.)  In a letter to the Court of February 6, 2013, in opposition to defendants' motion for certain discovery, plaintiff argued that the trending reports did not show a valid "apples-to-apples comparison" regarding the waiver and exception rates, and the Court thereafter denied defendants' motion. (Ex. H (Feb. 6, 2013 Letter from counsel for FHFA, Doc. No. 222) at 2.) Plaintiff explained in its February 6, 2013 letter that "Freddie Mac identified loans that it wished to have reviewed further for reasons entirely unrelated to compliance with underwriting guidelines" and that "Clayton categorized such loans as 'material exceptions' solely to ensure that they would be reviewed further, not because the loans were determined to have been originated in violation of the underwriting guidelines." (*Id.*)

The same is true for Nomura.  In addition to the originator's underwriting guidelines, Nomura applied its own criteria—called bid stipulations and overlays—to identify loans for further review.  (*See, e.g.*, Ex. I (NOM-FHFA_05066340) at NOM-FHFA_05066340.) The fact that Nomura instructed Clayton to impose Nomura-developed credit overlays when reviewing loans means that a loan that fully complies with underwriting guidelines could nevertheless appear as an "exception" in the trending reports.  As a result, the "exception" and "waiver" statistics in these reports cannot show whether any loans backing the at-issue Securitizations were not originated according to applicable underwriting guidelines.  And, as Ms. Beal of Clayton also testified, the beta reports do not provide a basis to make "apples to apples" comparisons between Nomura and any of Clayton's other clients.  (Ex. A (Beal 30(b)(6) Tr.) at 129:21-130:21.)

Even if the Court were to conclude that the trending reports are relevant, they should be excluded for the additional reason that they are inadmissible hearsay under Rule 802 and do not fall within any exception under Rule 803 or 804.  FED. R. EVID. 802, 803, 804; *see also U.S.* v. *Gupta*, 747 F.3d 111, 131 (2d Cir. 2014) ("Generally, a statement made by a person while not testifying at the current trial, offered by that person to prove the truth of the matter asserted in his statement, is hearsay.  Hearsay generally is inadmissible if it does not fall within an exception provided by Rule 803 or 804.").  The trending reports are out of court statements being offered for the truth of the matter asserted.  They do not satisfy the business records exception in Rule 803 because (i) the reports are merely preliminary drafts ("betas"), (ii) Clayton did not use the reports in connection with any "regularly conducted activity" (*see* Ex. A (Beal 30(b)(6) Tr.) at 133:24-134:5 (the reports "were generated more to show our clients our hopes of using their data to help them manage their deals . . . [b]ut we never got there")), and (iii) the evidence from Clayton itself is that the beta reports were "fatally flawed" and therefore not reliable or trustworthy.  FED. R. EVID. 803(6)(E).

Hon. Denise L. Cote                                                          -5-
                                                                 Motion *in Limine* No. 9


                                        Respectfully submitted,

                                        /s/ David B. Tulchin

                                        David B. Tulchin

cc:     Counsel of Record via ECF