# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY, AS
CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION AND
THE FEDERAL HOME LOAN MORTGAGE
CORPORATION,

      Plaintiff,

      -against-

NOMURA HOLDING AMERICA INC., *et al*.,

      Defendants.

No. 11-cv-6201 (DLC)

ECF Case

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE THE TESTIMONY OF ROBERT W. HUNTER BASED ON INFORMATION NOT AVAILABLE AT ORIGINATION

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

January 30, 2015

## <u>TABLE OF CONTENTS</u>

**Page**

BACKGROUND ................................................................................................. 1

    A.    The Relevant Disclosures in the Offering Documents ............................... 1

ARGUMENT ..................................................................................................... 2

  II.    HUNTER'S TESTIMONY BASED ON INFORMATION NOT AVAILABLE AT
      ORIGINATION IS IRRELEVANT TO WHETHER LOANS "WERE ORIGINATED"
      IN COMPLIANCE WITH UNDERWRITING GUIDELINES ............................ 2

    A.    The Only Relevant Time Period is Time of Origination ......................... 2

    B.    Hunter's Testimony Relies on Facts the Original Underwriter Could Not Have
        Known at the Time ................................................................. 5

  III.   HUNTER RELIES ON UNRELIABLE SOURCES OF INFORMATION ........................ 9

CONCLUSION ..................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ........................................................................................1, 2, 9, 10

*Fed. Hous. Fin. Agency* v. *Nomura Holding America Inc.*,
2014 WL 7232443 (S.D.N.Y. Dec. 18, 2014) ........................................................9

*Fed. Hous. Fin. Agency* v. *SG Americas, Inc.*,
2012 WL 5931878 (S.D.N.Y. Nov. 27, 2012) ........................................................5

*Freidus* v. *ING Groep N.V.*,
2011 WL 4056743 (S.D.N.Y. Mar. 29, 2011) ........................................................7

*Marting Realty, Inc.* v. *Marks*,
1986 WL 4647 (Ohio Ct. App. Apr. 16, 1986) ....................................................10

*Meyer Pincus & Assoc.* v. *Oppenheimer & Co.*,
936 F.2d 759 (2d Cir. 1991) ..................................................................................4

*Nimely* v. *City of N.Y.*,
414 F.3d 381 (2d Cir. 2005) ..................................................................................9

*Operating Local 649 Annuity Trust Fund* v. *Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010) ....................................................................................4

*In re Puda Coal Sec. Inc., Litig.*,
2014 WL 2915880 (S.D.N.Y. June 26, 2014) ......................................................2

*SEC* v. *Morelli*,
1993 WL 603275 (S.D.N.Y. Dec. 21, 1993) ......................................................10

*State of New York* v. *Solvent Chem. Co.*,
2006 WL 2640647 (W.D.N.Y. Sept. 14, 2006) ..................................................10

*In re Zyprexa Prods. Liab. Litig.*,
489 F. Supp. 2d 230 (E.D.N.Y. 2007) ..................................................................7

## TABLE OF AUTHORITIES
(Continued)

Page(s)

### Rules

FED. R. EVID. 401 ...........................................................................................................1, 10

FED. R. EVID. 402 ...........................................................................................................1, 10

FED. R. EVID. 403 ...........................................................................................................1, 10

FED. R. EVID. 702 ......................................................................................................1, 9, 10

## TABLE OF ABBREVIATIONS

| Action | *FHFA* v. *Nomura Holding America Inc.*, *et al.*, No. 11 Civ. 6201 (DLC) |
|---|---|
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| Def. Br. | Defendants' Memorandum of Law in Support of Their Motion to Exclude Testimony of Robert W. Hunter Based on Information Not Available at Origination, dated January 6, 2015, in this Action |
| Ex. | Exhibit to the January 6, 2015 Declaration of James H. Congdon submitted in support of Defendants' Motion to Exclude Testimony of Robert W. Hunter Based on Information Not Available at Origination |
| Forester Report | Expert Report of Michael Forester dated August 14, 2014 |
| Hunter Report | Expert Report of Robert W. Hunter, Regarding the Underwriting of Mortgage Loans Underlying the Nomura Securitizations, dated May 15, 2014 |
| Offering Documents | The offering materials for the Securitizations, including documents filed with the Securities and Exchange Commission |
| Opp. | Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Exclude Testimony of Robert W. Hunter Based on Information Not Available at Origination, dated January 20, 2015, in this Action |
| Pl. Ex. | Exhibit to the January 20, 2015 Declaration of Manisha M. Sheth in Opposition to Defendants' Motion to Exclude Testimony of Robert W. Hunter Based on Information Not Available at Origination |
| Reply Ex. | Exhibit to the January 30, 2015 Reply Declaration of James H. Congdon in support of Defendants' Motion to Exclude Testimony of Robert W. Hunter Based on Information Not Available at Origination |
| Securitizations | NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 |

Defendants respectfully submit this reply memorandum in support of their motion to exclude, under Federal Rules of Evidence 401, 402, 403 and 702, and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the trial testimony and opinions of plaintiff's designated expert Robert W. Hunter to the extent those opinions are based on information that was not available at the time the loans underlying the seven Securitizations were originated.

## BACKGROUND

### A.    The Relevant Disclosures in the Offering Documents.

Each of the Offering Documents at issue made representations that the loans backing the Securitizations were originated generally in compliance with certain underwriting guidelines or criteria.  (Def. Br. at App'x A.)  These representations took two forms:  either that the loans "*were originated* generally" in accordance with a specific originator's underwriting guidelines, or that the loans "*were originated* generally in accordance with the underwriting criteria described in this section," referring to a section of the Offering Documents.  (*Id*. (emphasis added).)  Similarly, the Offering Documents expressly stated that LTV ratios were calculated based on information available as of the time of loan origination.  For all seven of the Securitizations, with respect to loans involving the purchase of a home, the "value" was defined as "generally the lesser of (a) the appraised value determined in an appraisal *obtained by the originator at origination of that loan* and (b) the sales price for that property."  (Reply Appendix A (emphasis added).)  For refinancings, the Offering Documents in each case defined value as the "appraised value of the Mortgaged Property determined in an appraisal obtained at the *time of origination* of the Refinance Loan."  (*Id*. (emphasis added).)  Each of the Offering Documents further warned that "[n]o assurance can be given that the values of the related Mortgage Properties have remained or will remain at the levels in effect *on the dates of origination* of the

related Mortgage Loans." (*Id.* (emphasis added).)  There are no representations about LTV ratios as of any other date or time period.

## ARGUMENT

**II.    HUNTER'S TESTIMONY BASED ON INFORMATION NOT AVAILABLE AT ORIGINATION IS IRRELEVANT TO WHETHER LOANS "WERE ORIGINATED" IN COMPLIANCE WITH UNDERWRITING GUIDELINES.**

Expert testimony is admissible only if it is relevant.  *See In re Puda Coal Sec. Inc., Litig.*, 2014 WL 2915880, at *20 (S.D.N.Y. June 26, 2014).  Each of the Offering Documents represented that the loans backing the Securitization "were originated" in accordance with certain originator underwriting guidelines or standards.  (Def. Br. at App'x A.)[1]  Hunter bases his opinion that defendants made false statements in the Offering Documents about LTV ratios and how loans "were originated" on information that was not available to the original underwriters. In fact, Hunter often relies on information that did not even exist at the time the loans were originated.  Any testimony based on such post-origination information is irrelevant and inadmissible under the Federal Rules of Evidence and *Daubert*.

**A.    The Only Relevant Time Period is Time of Origination.**

As explained above, the representations in the Offering Documents concerning loans underlying the Securitizations unambiguously refer only to the time of origination.  There was never a representation that circumstances could not change or that different information—not

---

[1]    In its January 29, 2015 decision denying defendants' Motion to Exclude the Testimony of Robert W. Hunter Concerning Occupancy Status, this Court found that "[e]ach Prospectus Supplement asserts that the 'owner occupancy status' is correct as of the Cut-Off Date."  Opinion & Order, Doc. No. 1195 at *9.  That ruling is inapplicable here, where both sides agree that the Offering Documents' disclosure that the loans "were originated" in accordance with certain originator guidelines or standards was not represented to be accurate as of any "Cut-Off Date."  Opp. 9-11.  As plaintiff acknowledges, the disclosures about how loans were originated expressly refer to the time of origination.  Opp. at 1-2.

available to the original underwriter and in some cases not even in existence—would lead to the same underwriting decision.

Plaintiff agrees that the Offering Documents state that loans underlying the Securitizations complied with originator underwriting guidelines at the "time of origination." (Opp. at 1-2.)  In its opposition, however, plaintiff makes the novel argument that compliance with underwriting guidelines has two distinct elements:  (i) "procedural requirements" and (ii) "substantive requirements."  (Opp. at 2.)  Plaintiff does not dispute that post-origination information is irrelevant to whether loans underlying the Securitizations complied with "procedural requirements" of applicable underwriting guidelines.  But plaintiff contends that Hunter only used "post-origination information to determine whether the loan complied with the applicable *substantive* requirements of the underwriting guidelines at the time of origination." (Opp. at 5 (emphasis added).)

In other words, plaintiff argues that when the Offering Documents represented that loans "were originated" generally in accordance with originator underwriting guidelines or standards, what the Offering Documents actually meant to say was that originators adhered to certain procedures in originating the loans.  According to plaintiff, with regard to the substantive requirements of underwriting guidelines, such as setting upper limits on loan-to-value ratios, the representation about compliance was unbounded as to time, such that a reasonable investor could assume such substantive requirements would continue to be satisfied into the future.  This makes no sense, and the "procedural" versus "substantive" distinction plaintiff seeks to draw has never, to defendants' knowledge, been applied in a Securities Act case.

As an initial matter, the notion that the Offering Documents represented that values of mortgaged properties—and thus loan-to-value ratios—would remain constant over time is directly contradicted by the Offering Documents.  (Reply Appendix A.)  This is indisputable.

Moreover, Hunter never mentioned plaintiff's new "procedural" versus "substantive" distinction in his report or at deposition.  Hunter's conclusion in his May 15, 2014 expert report was that "78.98% of the Mortgage Loans reflected increased credit risk as a result of deficiencies in the original underwriting process" (Ex. 1 (Hunter Report) at 118), with no effort to identify which of those defects were "substantive" as opposed to "procedural."  Even if the distinction had validity—and it does not—it is far too late to be introducing such a distinction now.

As a matter of logic, the truth or falsity of representations about the loan origination process can only be judged based on information available at the relevant time. Focusing on what was knowable at loan origination is fully consistent with this Court's description of the re-underwriting expert's role, *i.e.*, "identifying failures on the face of the loan files when matched against the underwriting guideline[s]."  (Ex. 10 (Nov. 15, 2012 Hearing Tr.) at 87:11-17.)  Information not in existence at the time of origination is obviously not "on the face of the loan files."

In support of its effort to transform the Offering Documents' representation about compliance with originator underwriting guidelines into a representation that is unbounded by time, plaintiff relies on two cases discussing how a "reasonable investor" would read a particular disclosure in a prospectus.  *See Operating Local 649 Annuity Trust Fund* v. *Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010); *Meyer Pincus & Assoc.* v. *Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991).  There is nothing "reasonable," however, about plaintiff's strained

reading of the Offering Documents, which is squarely at odds with what the Offering Documents actually say about fluctuating property values.  Again, the attached Appendix makes this clear.

Contrary to plaintiff's contention (Opp. at 8-9), defendants' motion does not seek to read a "scienter" requirement element into Section 12 or 15 of the Securities Act.  Saying that representations about loan origination in the Offering Documents relate solely to a particular point in time does not mean plaintiff has to prove that defendants <u>knew</u> whether the loans "were originated" in accordance with originator underwriting guidelines.  It may well be that adherence to originator underwriting guidelines is an "objective fact" for which strict liability attaches (assuming that plaintiff prevails on materiality) (Opp. at 9 (citing *Fed. Hous. Fin. Agency* v. *SG Americas, Inc.*, 2012 WL 5931878, at *2, *3 (S.D.N.Y. Nov. 27, 2012))), but the "objective fact" this Court was considering in the case relied on by plaintiff was whether the originator "adhered to its underwriting guidelines *in originating or acquiring the mortgage loans*."  *SG Americas*, 2012 WL 5931878, at *2.  The *SG Americas* decision fully supports defendants' position that what matters is the loan origination process itself, not things that occurred months or years thereafter.

**B.      Hunter's Testimony Relies on Facts the Original Underwriter Could Not Have Known at the Time.**

Plaintiff contends that the Offering Documents implicitly represented that certain "substantive requirements" of applicable underwriting guidelines were fulfilled as to loans underlying the Securitization as of the date the Certificates were issued.  (Opp. at 9-11.)  This position finds no support in the Offering Documents themselves, which speak about the loan origination process.

Even if Section 12 liability could be predicated on statements that are merely implicit, Hunter's testimony based on information he discovered in documents obtained in 2013

and 2014 says nothing about the state of affairs at the time the Certificates were issued.  (Def. Br. at 6.)  Even if the time of issuance were relevant, which it is not, documents obtained six or more years after the Certificates were issued (and that were not available to the originator) cannot have any bearing on whether statements in the Offering Documents about compliance with originator underwriting guidelines were true or false.

Plaintiff seeks to sidestep this issue by claiming that Hunter made defect findings "based on post-origination evidence that contained factual information that was available to the loan underwriter at the time of origination."  (Opp. at 5.)  There is no support in the record for that bald assertion.  Hunter provides no evidence that the post-origination information he used was available at any point before the date of the document from which he obtained that information.  (Def. Br. at 6.)

For example, Hunter opines that a loan originated by ████, which closed on ████████████, was originated in violation of applicable underwriting guidelines because the borrower ██████████████████████████████████████████.  (Ex. 4 (Exhibit 2A to Hunter Rebuttal Report).)[2]  Plaintiff justifies Hunter's use of this information—which Hunter discovered in a ██████████████████████████ (Pl. Ex. 5 at 1)—by speculating that "had the loan underwriter at ████ investigated whether the borrower was seeking additional mortgage debt," the underwriter would have discovered the debt.  (Opp. at 6 n.6.)  Plaintiff provides neither an explanation of the "investigation" ████ could have undertaken, nor—more importantly—evidence that any mortgage inquiries by the borrower were, in fact, recorded and discoverable at the time the ████ loan closed.

---

[2]      Loan number NAA_2005_AR6_1001976475.

In another example, Hunter discovered additional debt on a ███████ dated ███████████ (Pl. Ex. 4 at 1) that the borrower purportedly incurred ███████ before the subject loan closed on ███████████, which was ███████ *after* the underwriter had approved the loan.  (Ex. 4 (Exhibit 2A to Hunter Rebuttal Report); *see also* Ex. 6 (Forester Report) at 51-52.)[3] Plaintiff claims the underwriter's failure to uncover the additional debt was a "violation of the substantive requirements of the applicable underwriting guideline[s]" (Opp. at 6), but plaintiff has provided no evidence that (i) the applicable underwriting guidelines required the underwriter to pull another credit report after approval but prior to closing,[4] or (ii) such a new credit report would have so quickly reflected the additional debt.  (*See* Def. Br. at 6.)

More generally, Hunter's testimony about what underwriters would have discovered had they consulted various sources of information at particular points in time is pure speculation, and not a sufficient basis for an expert opinion.  *See In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) (expert testimony is inadmissible if based on "unsupported" suppositions).  All Hunter can say with certainty is that the information on which he relies was available in 2013 and 2014.  As a result, his testimony based on post-origination information has "no logical connection" to compliance with originator underwriting guidelines even at the time of issuance.  *See Freidus* v. *ING Groep N.V.*, 2011 WL 4056743, at *2 (S.D.N.Y. Mar. 29, 2011).

---

[3]     Loan number NHELI_2006_HE3_2002209123.

[4]     Even after being challenged to do so, plaintiff has never identified any underwriting guidelines that required an underwriter to consult post-origination sources like those used by Hunter.  Plaintiff's position is that an endless investigation into each loan is necessary—even after the closing—without regard to whether there was reason to believe that something has changed in terms of credit quality.  This requirement is entirely impractical and unsupported by any representation in the Offering Documents.  Defendants do not challenge Hunter's right to seek to identify "red flags" *in the loan file* if applicable underwriting guidelines were actually violated.  But using documentary evidence not available to the underwriter at the time of origination should be entirely off limits.

Plaintiff provides no justification for Hunter's use of information that would not have been available at either the time of origination <u>or</u> the time of issuance.  For example, Hunter relies on a ████████████████ to allege that a borrower misrepresented his income, and that the underwriter therefore improperly originated the loan in ████.  (Ex. 4 (Exhibit 2A to Hunter Rebuttal Report).)[5]  Plaintiff cannot credibly claim that the information from this ████████ ████, created long after the relevant Certificate was issued, was available at the time of origination or the time of issuance.  Hunter admitted at deposition that the information was not available at those times.  (Ex. 5 (Hunter Tr.) at 181:3-24.)  Nevertheless, Hunter includes purported defects based on information not available even at the time of issuance as defects in the "original underwriting process."  (Ex. 1 (Hunter Report) at 118.)  This is untethered to the Offering Documents, which make no representation about later-obtained information.

Hunter's "excessive LTV/CLTV" allegations rely on values generated by Kilpatrick's AVM which, as plaintiff admits, uses tax assessed values from 2013 and 2014 as "one of [its] variables."  (Opp. at 12.)  Recent tax assessed values, by definition, were not available either at the time of origination or the time of issuance.  Hunter has no evidence that valuations similar to those generated by Kilpatrick's AVM were available from any source prior to the time Kilpatrick created his AVM for use in this and related cases.  (Def. Br. at 10.)[6]  Hunter

---

[5]      Loan number NHELI_2006_HE3_2002208686.

[6]      Plaintiff contends that Hunter was justified in using the values generated by Kilpatrick's AVM because contemporaneous AVMs used by Nomura generated values that varied from appraised values by 1.8%.  Opp. at 12-13.  This argument misses the point.  Hunter had access to many AVMs that used information that would have been available to underwriters at the time of origination or the time of issuance.  Opp. at 12 (listing AVM valuations produced by Nomura in this action and the results of four commercially available AVMs analyzed by defendants' expert Lee Kennedy).  Instead of utilizing one of those AVMs, Hunter chose to use Kilpatrick's AVM, which relies heavily on tax assessed values from 2013 and 2014.

illogically includes purported defects based on the results of Kilpatrick's AVM as defects in the "original underwriting process."  (Ex. 1 (Hunter Report) at 118.)

## III.     HUNTER RELIES ON UNRELIABLE SOURCES OF INFORMATION.

Hunter's use of certain third-party sources as the basis for his defect allegations is unreliable because those sources have made clear that their reports should not be used in the way Hunter uses them.  (Def. Br. at 11-13.)  As a result, the reports are not credible, and do not constitute a sufficient basis for an expert opinion.  *See* FED. R. EVID. 702(b)-(d); *see also Daubert*, 509 U.S. at 591-95.  Plaintiff attempts to dismiss these warnings from third-party sources as "boilerplate" (Opp. at 16), but this Court recently indicated that such disclaimers may not so easily be brushed aside.  In its opinion granting summary judgment on defendants' due diligence defense, this Court found that RBS Securities was required to confirm information on a summary of pre-acquisition loan reviews because of a similar disclaimer:  "[T]he material contained herein is preliminary and based on sources which we believe to be reliable, but it is not complete, and we do not represent that it is accurate."  *Fed. Hous. Fin. Agency* v. *Nomura Holding America Inc*., 2014 WL 7232443, at *36 (S.D.N.Y. Dec. 18, 2014).  Because Hunter did not confirm information he found in reports containing similar disclaimers (Def. Br. at 12), his use of such reports is unreliable.  *See Nimely* v. *City of N.Y.*, 414 F.3d 381, 396 (2d Cir. 2005) (requiring "a sufficiently rigorous analytical connection between [the] methodology and the expert's conclusions" for an opinion to be reliable).

Plaintiff asserts that Hunter used other sources to "corroborate" the information he found in reports from third-party sources that disclaimed reliability (Opp. at 16) but provides no citations to, or evidence of, any such sources.  For example, Hunter based a "misrepresentation of occupancy" allegation solely on an address he discovered on a ███████████████, dated

██████████████. (Ex. 4 (Exhibit 2A to Hunter Rebuttal Report); Reply Ex. 1 (Audit Credit

Report).) [7]  Hunter did not use any other source to "corroborate" his allegation despite testimony

from ████████████ corporate representative that an "address listed" on their credit reports was

not evidence of "a borrower's primary residence."  (Ex. 14 (Johnson Tr.) at 60:24-61:2.)[8]

\*        \*        \*

Hunter's testimony based on information not available at the time of origination is

not relevant and should be excluded from trial.  *State of New York* v. *Solvent Chem. Co*., 2006

WL 2640647, at \*1 (W.D.N.Y. Sept. 14, 2006) (in a bench trial, *Daubert* still "requires the trial

judge to ensure that expert testimony be both relevant and reliable").  Permitting Hunter to testify

about such information would prejudice defendants, "wast[e] time" and create "undue delay."

FED. R. EVID. 403.  *See SEC* v. *Morelli*, 1993 WL 603275, at \*2 (S.D.N.Y. Dec. 21, 1993).

## CONCLUSION

The Court should exclude the testimony of Robert W. Hunter based on

information not available at origination under Federal Rules of Evidence 401, 402, 403 and 702,

and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

---

[7]        Loan number NAA_2005_AR6_1002196236.

[8]        Plaintiff cites an unpublished decision from an Ohio state court to support its contention that credit reports are generally reliable.  Opp. at 17.  The parties in that case agreed certain credit reports were reliable, which distinguishes that case from this one.  *Marting Realty, Inc.* v. *Marks*, 1986 WL 4647, at \*3 (Ohio Ct. App. Apr. 16, 1986).  Further, plaintiff here justifies Hunter's use of flawed credit reports by asserting that a credit report "conveys information collected from credit repositories, other credit reporting entities, and public records," and it is "uncontroversial . . . that [such] a large collection of factual information may contain errors."  Opp. at 16.  Given that concession, credit reports are an unreliable basis for Hunter's opinions.

-10-

Dated:  New York, New York
           January 30, 2015

Respectfully submitted,

/s/ Thomas C. Rice

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502

*Attorneys for Defendant RBS Securities Inc.*

/s/ David B. Tulchin

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588

Amanda F. Davidoff (davidoffa@sullcrom.com)
Elizabeth A. Cassady (cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993

*Attorneys for Defendants Nomura Holding
America Inc., Nomura Asset Acceptance
Corporation, Nomura Home Equity Loan, Inc.,
Nomura Credit & Capital, Inc., Nomura
Securities International, Inc., David Findlay,
John McCarthy, John P. Graham, Nathan
Gorin, and N. Dante LaRocca ("Nomura
Defendants")*

Reply Appendix A[9]

| Security | Disclosures Concerning Loan-to-Value Ratios |
|---|---|
| Ex. 15 (2005-AR6 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal **obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in an appraisal obtained **at the time of origination of the Refinance Loan. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market.**" NOM-FHFA_04811976.<br><br>• "Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. **No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans.**" NOM-FHFA_04811896. |
| Ex. 16 (2006-FM1 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal **obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property **determined in an appraisal obtained at the time of origination of the Refinance Loan. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market.**" NOM-FHFA_04729664-665. |

---

[9]    Emphasis supplied.

| Security | Disclosures Concerning Loan-to-Value Ratios |
|---|---|
| Ex. 17 (2006-FM2 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in **an appraisal obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined **in an appraisal obtained at the time of origination of the Refinance Loan. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market.**" NOM-FHFA_04638543.<br><br>• "Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. **No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans.**" NOM-FHFA_04638402. |
| Ex. 18 (2006-HE3 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined **in an appraisal obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined **in an appraisal obtained at the time of origination of the Refinance Loan. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market.**" NOM-FHFA_04621112.<br><br>• "Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. **No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans.**" NOM-FHFA_04620974. |

| Security | Disclosures Concerning Loan-to-Value Ratios |
|---|---|
| Ex. 19 (2007-1 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined **in an appraisal obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined **in an appraisal obtained at the time of origination of the Refinance Loan. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market.**" NOM-FHFA_05142213.<br><br>• "Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. **No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans**." NOM-FHFA_05142028. |
| Ex. 20 (2007-2 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined **in an appraisal obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined **in an appraisal obtained at the time of origination of the Refinance Loan. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market.**" NOM-FHFA_05591579.<br><br>• "Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. **No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans**." NOM-FHFA_05591417. |

| Security | Disclosures Concerning Loan-to-Value Ratios |
|---|---|
| Ex. 21 (2007-3 Prospectus Supplement) | • "The 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an **appraisal obtained by the originator at origination of that loan** and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in **an appraisal obtained at the time of origination of the Refinance Loan**. **The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market.**" NOM-FHFA_04732866.<br><br>• "Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. **No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans**." NOM-FHFA_04732714. |