UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>                Plaintiff,<br><br>                -against-<br><br>NOMURA HOLDING AMERICA, INC.; NOMURA ASSET ACCEPTANCE CORPORATION; NOMURA HOME EQUITY LOAN, INC.; NOMURA CREDIT & CAPITAL, INC.; NOMURA SECURITIES INTERNATIONAL, INC.; RBS SECURITIES INC. (F/K/A GREENWICH CAPITAL MARKETS, INC.); DAVID FINDLAY; JOHN MCCARTHY; JOHN P. GRAHAM; NATHAN GORIN; AND DANTE LAROCCA,<br><br>                Defendants. | No. 11 Civ. 6201 (DLC) |

**PLAINTIFF FHFA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY AND OPINIONS OF KERRY D. VANDELL AND TIMOTHY J. RIDDIOUGH**

                                              QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                              Philippe Z. Selendy
                                              Sascha N. Rand
                                              Wing F. (Alex) Ng

                                              51 Madison Avenue, 22nd Floor
                                              New York, New York 10010
                                              (212) 849-7000

                                              *Attorneys for Plaintiff Federal Housing Finance Agency, as Conservator for Fannie Mae and Freddie Mac*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND .........................................................................................................3

    A.    Dr. Vandell Failed To Establish That The Industry And GSE Benchmarks Are Free From Underwriting Defects. ...................................................................5

    B.    Dr. Vandell Failed To Establish That His Reunderwriting Benchmark Is Reliable. ..................................................................................................................6

    C.    There Is Significant Economic Evidence Establishing Significant Defects Among The Industry And GSE Benchmarks. ..........................................................7

    D.    Dr. Riddiough Relied On Dr. Vandell's Industry Benchmark. ................................8

ARGUMENT ...................................................................................................................................8

    A.    Dr. Vandell Has Not Established That The Industry And GSE Benchmarks Are Free Of Underwriting Defects. ......................................................................10

    B.    The Reunderwriting Benchmark Should Also Be Excluded. ...............................11

    C.    Dr. Riddiough's Loss Causation Damages Calculation Should Also Be Excluded Because It Relies On The Industry Benchmark. ....................................14

CONCLUSION ..............................................................................................................................14

# TABLE OF AUTHORITIES

**Page**

### Cases

*Akerman v. Oryx Commc'ns, Inc.*,
   810 F.2d 336 (2d Cir. 1987) ..................................................................................................1

*Arista Records LLC v. Usenet.com, Inc.*,
   608 F. Supp. 2d 409 (S.D.N.Y. 2009) ..................................................................................12

*Celebrity Cruises Inc. v. Essef Corp.*,
   434 F. Supp. 2d 169 (S.D.N.Y. 2006) ...............................................................................9, 11

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ...............................................................................................................1

*E.E.O.C. v. Bloomberg L.P.*,
   2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) .......................................................................8

*Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*,
   No. 11CV6201 DLC, -- F. Supp. 3d --, 2014 WL 7232443 (S.D.N.Y. Dec. 18, 2014) ..........11

*Hunt v. CNH Am. LLC*,
   511 Fed. App'x 43 (2d Cir. 2013) ..........................................................................................9

*J.T. Colby & Co. v. Apple, Inc.*,
   2013 WL 1903883 (S.D.N.Y. May 8, 2013) ..............................................................2, 8, 10

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*,
   2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ........................................................................13

*Kirk v. Raymark Industries, Inc.*,
   61 F.3d 147 (3d Cir. 1995) ...................................................................................................13

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) ..................................................................................12

*In re Med Diversified, Inc.*,
   346 B.R. 621 (Bankr. E.D.N.Y. 2006) ...................................................................................9

*Reed Constr. Data Inc. v. McGraw-Hill Companies Inc.*,
   -- F. Supp. 3d --, 2014 WL 4746130 (S.D.N.Y. Sept. 24, 2014) ...............................9, 10, 13

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ....................................................................................8

*United States v. Mejia*,
   545 F.3d 179 (2d Cir. 2008) .................................................................................................12

*United States v. Williams*,
   506 F.3d 151 (2d Cir. 2007) ...................................................................................................8

**Statutes**

Fed. R. Evid. 403 ...........................................................................................................1, 2, 9, 13

Fed. R. Evid. 702 ...........................................................................................................1, 2, 9, 13

**Miscellaneous**

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011) ...........................4

Pursuant to Federal Rules of Evidence 702 and 403, as well as *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), respectfully moves to exclude the expert testimony and opinions of Nomura's[1] proffered expert, Dr. Kerry D. Vandell, relating to his benchmarking analysis, and those aspects of Dr. Timothy Riddiough's loss causation damages calculation that rely on Dr. Vandell's analysis.[2]

## PRELIMINARY STATEMENT

Nomura proffers the opinions and testimony of Dr. Kerry Vandell to meet its "heavy burden" of proving negative loss causation.  *See Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987).  To attempt to do so, Dr. Vandell compares the actual performance of the loans in the at-issue supporting loan groups ("SLGs") against their expected performance based on sets of purportedly comparable loans that he calls his "benchmarks."  Based on this comparison, which he claims showed no significant difference in actual and expected performance, Dr. Vandell opines that the defaults and losses experienced in the SLGs can be explained by factors other than the misrepresentations alleged by FHFA.  Because Dr. Vandell did virtually nothing to ensure that the loans in his "benchmarks" were free of the same underwriting defects and appraisal inflation alleged by FHFA, Dr. Vandell's "benchmark"

---

[1] "Nomura" refers collectively to all of the Nomura Defendants in the above-captioned action ("Action").

[2] Citations to the "Vandell Rpt." are to the Expert Report of Kerry D. Vandell, dated July 9, 2014 and attached as Exhibit 1 to the Declaration of Wing F. Ng in support of Plaintiff FHFA's Motion to Exclude Expert Testimony and Opinions of Kerry Vandell ("Ng Decl."), dated January 8, 2015.  Citations to the "Vandell Tr." are to the transcript of the deposition of Kerry Vandell taken on November 25, 2014 (Ng Decl. Ex. 2).  Citations to the "Riddiough Rpt." are to the Rebuttal Expert Report of Timothy J. Riddiough dated November 7, 2014 (Ng Decl. Ex. 6).

analysis is fundamentally unreliable and must be precluded pursuant to Federal Rules of Evidence 702 and 403.

It is axiomatic that a "benchmark" sample must not contain the characteristics whose impact is being analyzed—here undisclosed underwriting defects and appraisal inflation. *See J.T. Colby & Co. v. Apple, Inc.*, 2013 WL 1903883, at *22-23 (S.D.N.Y. May 8, 2013) (Cote, J.) (excluding expert's consumer confusion report and survey under Rule 702 and 403 because the survey failed to "employ an adequate control" that would "account for or rule out confusion that is caused by factors other than the defendant's infringing conduct"). It is, accordingly, fundamental to the reliability of Dr. Vandell's benchmarking analysis that the benchmarks he used be free of the types of underwriting defects and appraisal inflation alleged to exist in the Nomura loans. In preparing his expert opinions and report, Dr. Vandell, however, did almost nothing to ensure that his so-called "Industry" and "GSE" benchmarks did not contain loans with these kinds of underwriting defects and appraisal inflation.[3] And Dr. Vandell's "Reunderwriting" benchmark—which purports to rely on the reunderwriting findings of various experts in five different, now settled, FHFA cases who will not testify in this Action—is similarly unreliable and will result in significant confusion.

Dr. Vandell's failure to do the work necessary to identify "clean" benchmarks for his purported loss causation analysis is particularly troubling given that almost *two* years ago this Court established a schedule that required Defendants to disclose any "alternative set of loans"

---

[3] To the contrary, significant economic evidence establishes that neither of these benchmarks are free of underwriting defects or appraisal inflation as catalogued in the rebuttal report issued by FHFA's expert, Dr. Anthony Saunders. Rebuttal Report of Anthony Saunders, dated November 10, 2014 ("Saunders Rpt.") (Ng Decl. Ex. 3).

2

that they intended to use for purposes of a negative loss causation analysis.[4] The deadlines regarding the disclosure of baskets of loans to be used as loss causation benchmarks were premised on the Court's (and parties') recognition that only a re-underwritten "clean" benchmark could be reliably used in a negative loss causation benchmark analysis. Defendants never identified any such set of benchmark loans.

Dr. Vandell's analyses utilizing each of his three benchmarks—the Industry Benchmark, the GSE Benchmark and the Reunderwriting Benchmark—should, accordingly, be precluded in their entirety.

## FACTUAL BACKGROUND

Nomura retained Dr. Vandell to "[a]ssess the impact, if any, of the alleged misstatements in the offering documents on the performance of the loans backing the At-Issue Certificates." Vandell Rpt. ¶ 8.[5] To assess the impact of the alleged misrepresentations[6] on the defaults experienced by the loans in SLGs, Dr. Vandell compared the *actual* performance[7] of the loans in the SLGs against their *expected* performance, as predicted by "benchmarks" comprised of purportedly comparable loans, "taking into account macroeconomic changes and loan-level

---

[4] *See* Supp. Expert Scheduling Order (Feb. 27, 2013) at ¶ 9 (specifying date for disclosure of "whether [Defendant] intends to make use of any alternative set of loans for purposes other than those set forth above" and precluding reliance on loans "not so disclosed to FHFA.") (Dkt. No. 271); 2/7/13 Hearing Tr. at 77:18-79:10 (Ng Decl. Ex. 5) (discussing timeline for disclosing loans on which Defendants might rely for purposes including negative loss causation defense); 2/14/13 Hearing Tr. at 5:5-8:24 (Ng Decl. Ex. 9) (same).

[5] Defendant RBS Securities Inc. did not retain Dr. Vandell and proffered no expert on negative loss causation.

[6] As used herein, "alleged misrepresentations" or "underwriting defects" shall mean FHFA's allegations in the complaint about materially false statements and omissions in the offering documents, including compliance with stated underwriting guidelines, loan-to-value ratios, and owner occupancy.

[7] The performance metric used by Dr. Vandell is the event of "default or serious delinquency," which is defined as any "loan [that] is 90 or more days delinquent, in foreclosure, in bankruptcy, real estate owned, or written off." Vandell Rpt. ¶ 177 n.250.

characteristics such as CLTV ratio and owner occupancy status." *See* Vandell Rpt. ¶¶ 177-78; Vandell Tr. at 39:9-14 (testifying that his analysis is "really an indirect test of others' allegations that there were defects or departures from underwriting guidelines by virtue of the relative performance of the loans in the supporting loan groups").[8] Because Dr. Vandell did not test the impact of the alleged misrepresentations directly, he asserts that the difference between actual and expected performance "would give you some indication that there was something there and defects *could* be included among those factors that caused abnormal performance." Vandell Tr. 74:19-75:10 (emphasis added). Starting from this premise, Dr. Vandell argues that, "[i]f the actual default and serious delinquency rates of the SLG are not statistically significantly higher than the expected rates predicted by a particular benchmark," it is appropriate to "conclude that the alleged misstatements did not cause the defaults and serious delinquencies experienced by the At-Issue SLGs, according to that benchmark." Vandell Rpt. ¶ 178.[9]

To estimate the expected performance of the SLGs, Dr. Vandell relied on regression models[10] that estimate the relationship between loan performance and various explanatory factors, including loan characteristics and macroeconomic conditions. *See* Vandell Rpt. ¶¶ 191-96 (explaining use of regression analysis to construct his models). Because Dr. Vandell's

---

[8] Dr. Vandell did not test directly the effect of departures from underwriting guidelines because he claims that "there isn't any sort of direct measure that is available to establish clearly, where there is a uniformly agreed upon metric, as to departure." Vandell Tr. 37:23-38:2.

[9] FHFA's expert, Dr. Schwert, has noted the fallacy of this logic because "the absence of statistical significance does not establish that defaults in excess of the expected default rate are attributable to factors other than the alleged underwriting defects." Schwert Rebuttal ¶ 30.

[10] "Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables. [It] involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable." Federal Judicial Center, *Reference Manual on Scientific Evidence,* 305 (3d ed. 2011) (Ng Decl. 8); *see also* Vandell Rpt. ¶ 188 n.259 (explaining regression).

4

regression models purport to compare the performance of loans in the SLGs to other sets of purportedly non-defective loans selected by Dr. Vandell, the critical first step in his analysis is the selection of three groups of purportedly comparable loans that lacked the underwriting defects in the Nomura sample loans:

- **Industry Benchmark** "includes loans [purportedly] comparable to the At-Issue Loans from private label, or non-agency, securitizations that were issued between 2005 and 2007." Vandell Rpt. ¶ 180.

- **GSE Benchmark** "includes [purportedly] comparable loans that were purchased as whole loans by Fannie Mae and Freddie Mac." *Id.* ¶ 182.

- **Reunderwriting Benchmark** "includes only loans that, according to the Plaintiff's reunderwriting experts, were underwritten consistent with underwriting guidelines or deviated from guidelines only in a manner that did not substantially increase their credit risk." *Id.* ¶ 184.

In establishing these benchmarks, Dr. Vandell did little or nothing to ensure that the premise of his loss causation analysis—that loans in his benchmark sets were not impacted by the types of underwriting defects at issue in this litigation—was correct, and that he was therefore comparing loans in the SLGs to "clean" benchmarks. Because Dr. Vandell has not established that he was working with "clean" benchmarks, his loss causation analyses are unreliable and inadmissible.

A. **Dr. Vandell Failed To Establish That The Industry And GSE Benchmarks Are Free From Underwriting Defects.**

Because he recognized that loans that contain defects had to be removed from his benchmarks in order to achieve a "clean" benchmark, Dr. Vandell "excluded loans that are part of securitizations at issue in the FHFA cases related to Fannie Mae and Freddie Macs' purchases of MBS" from his Industry Benchmark. Vandell Tr. 82:18-83:5; Vandell Rpt. ¶ 181 n.251. His exclusion process was, however, deeply flawed and he did nothing more to identify or remove loans with defects from either the Industry or GSE Benchmarks. *See* Vandell Tr. 114:13-117:8

5

(testifying that he "did not" exclude loans subject to similar litigation brought by FHFA); *see also* Vandell Rpt. ¶¶ 182-83 (describing selection of loans for GSE Benchmark but not process for excluding defective loans).  Dr. Vandell went on to rely on the results generated from these unreliable benchmarks to conclude that the "alleged misstatements did not cause the defaults and serious delinquencies experienced by, at a minimum, six of the seven At-Issue SLGs."  Vandell Rpt. ¶ 221; *see also id.* ¶¶ 185-86.

**B.     Dr. Vandell Failed To Establish That His Reunderwriting Benchmark Is Reliable.**

Dr. Vandell did not perform a benchmarking analysis using only the loans that Mr. Hunter, FHFA's reunderwriting expert, evaluated for the seven Securitizations in this Action. *See* Rebuttal Report of G. William Schwert ("Schwert Rebuttal") ¶ 40 (Ng Decl. Ex. 4).  Instead, although conceding that he is not a reunderwriter and has no underwriting expertise (Vandell Tr 38:12-14), for the Reunderwriting Benchmark, Dr. Vandell pieced together loans reunderwritten by FHFA experts who are not being proffered in this case from five prior, now settled, actions.[11]  Dr. Vandell's selection criteria in developing his Reunderwriting Benchmark was solely the "cases in which the defendants agreed to share the results of FHFA's reunderwriting exercise with Nomura for use by Nomura in this report."  Vandell Rpt. ¶ 184 n.252.

Without establishing that the commingled loans in his Reunderwriting Benchmark are suitable loans to use to benchmark against the Nomura Securitizations, or independently establishing that they lacked underwriting defects, Dr. Vandell relied on the results of this

---

[11] "The Reunderwriting Benchmark includes loans that were reunderwritten by Plaintiff's experts in the following matters:  FHFA vs. Ally Financial Inc. et al., FHFA vs. Credit Suisse Holdings (USA), Inc. et al., FHFA vs. First Horizon National Corporation et al., FHFA vs. HSBC North America Holdings Inc. et al., FHFA vs. Merrill Lynch & Co. et al., and FHFA vs. Nomura Holding America Inc. et al." Vandell Rpt. ¶ 184 n.252.

benchmark to incorrectly conclude that the "alleged misstatements did not cause the defaults and serious delinquencies" in six of the seven at-issue SLGs.  *See id.* ¶ 221.

### C. There Is Significant Economic Evidence Establishing Significant Defects Among The Industry And GSE Benchmarks.

As catalogued in the rebuttal expert report of FHFA's expert, Dr. Anthony Saunders, in treating his Industry and GSE Benchmarks as clean without engaging in any reunderwriting, Dr. Vandell ignored substantial economic evidence that both these benchmarks contain substantial numbers of loans with underwriting defects.  This evidence includes:

**(1) Peer-reviewed academic studies.**  There are at least five academic studies that establish that the Industry Benchmark contains underwriting defects.  *See* Rebuttal Report of Anthony Saunders ("Saunders Report") ¶¶ 16-30 (Ng Decl. Ex. 3).  For example, after reviewing a large number of loans originated between 2005 and 2007, one study found that "'more than 27% of loans obtained by non-owner occupants misreported their true purpose.'"  *Id.* ¶ 19.

**(2) Settlements relating to loans in the Industry Benchmark.**  Public information about litigation concerning the Industry Benchmark Securitizations also establish that "a large fraction of the Industry Benchmark Securitizations have been the subject of either fraud litigation by investors, fraud litigation by insurers, or put-back litigation by trustees" and that "at least 38.6 percent of the Industry Benchmark securitizations have been the subject of litigation that has resulted in monetary settlements."  *See* Saunders Rpt. ¶¶ 31, 33.

**(3) Settlement data relating to loans in the GSE Benchmark.**  Data from Fannie Mae and Freddie Mac concerning repurchases and settlements for loans that the GSEs purchased

7

establish that the GSE Benchmark also includes a substantial number of loans with defects.  *See* Saunders Rpt. ¶¶ 34-37.[12]

### D.       Dr. Riddiough Relied On Dr. Vandell's Industry Benchmark.

Nomura's proffered damages expert, Dr. Timothy Riddiough, attempted to calculate "damages for both Section 11 and Section 12 claims…[by] reduc[ing] [] the portion of a plaintiff's losses that are not caused by the alleged misstatements and omissions."  Riddiough Rpt. ¶ 114.  Dr. Riddiough relied on Dr. Vandell's conclusion that damages is only applicable for the one SLG in NAA 2005-AR6.  *Id.* ¶ 115.  In calculating damages for this one SLG, Dr. Riddiough relied on Dr. Vandell's Industry Benchmark to estimate both the expected (i) default and serious delinquency probability and prepayment probability and (ii) loss severity for the loans in the SLG.  *Id.* ¶¶ 116-17.

## ARGUMENT

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 539 (S.D.N.Y. 2004) ("The proponent of expert testimony must demonstrate admissibility by a preponderance of proof.").

It is equally well settled that to be admissible, a benchmarking analysis must include a reliable control sample.  *See E.E.O.C. v. Bloomberg L.P.*, 2010 WL 3466370, at *2, *11-12

---

[12]   For Fannie Mae, this data shows that "73.41 percent of the loans purchased by Fannie Mae are either (a) covered by settlement agreements entered into between Fannie Mae and various parties to resolve potential representation and warranty claims, or (b) were repurchased by the originators."  *Id.* Saunders Rpt. ¶ 35; *id.* Ex. E.  For Freddie Mac, this data shows that "25.86 percent of the loans purchased by Freddie Mac are either (a) covered by settlement agreements entered into between Freddie Mac and various parties to resolve potential representation and warranty claims, or (b) were repurchased by the originators."  *Id.* ¶ 36; *id.* Ex. G.

(S.D.N.Y. Aug. 31, 2010) (Preska, C.J.) (excluding expert testimony in pregnancy discrimination case where expert failed to "compare class members [who took maternity leave] to other similarly situated employees," *i.e.*, a "non-class member control group" of employees); *J.T. Colby*, 2013 WL 1903883, at *22-23 (excluding expert's consumer confusion report and survey under Rule 702 and 403 because the survey failed to "employ an adequate control" that would "account for or rule out confusion that is caused by factors" other than infringing conduct); *Reed Constr. Data Inc. v. McGraw-Hill Companies Inc.*, -- F. Supp. 3d --, 2014 WL 4746130 (S.D.N.Y. Sept. 24, 2014) (Oetken, J.) (excluding an expert's testimony based on a benchmarking analysis because plaintiff failed to meet its burden of establishing that the testimony is admissible under Rule 702, including for choosing an arbitrary time-frame); *see also Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 182 (S.D.N.Y. 2006) (excluding testimony of damages expert, in part, where the expert "made no substantial effort to justify the choice of the two transactions as reasonably comparable to the purchase of Celebrity"); *cf. In re Med Diversified, Inc.*, 346 B.R. 621, 630-31 (Bankr. E.D.N.Y. 2006) (granting defendants' motion *in limine* to exclude expert valuation testimony and report because expert's "benchmarking analysis relied heavily on a very small database of publicly held companies and was applied in a manner that was skewed…thereby rendering not only the benchmarking analysis unreliable, but also tainting" his other valuation analyses).

    Further, a court may exclude even relevant, reliable expert testimony where "its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *Hunt v.CNH Am. LLC*, 511 Fed. App'x 43, 46-47 (2d Cir. 2013) (affirming exclusion of expert testimony "pursuant to Federal Rules of Evidence 702 and 403").

### A. Dr. Vandell Has Not Established That The Industry And GSE Benchmarks Are Free Of Underwriting Defects.

Nomura has failed to establish that Dr. Vandell's analyses relating to the Industry and GSE Benchmarks are reliable and admissible under Rule 702. *See Reed*, 2014 WL 4746130, at *14. While Dr. Vandell conceded that his benchmarks must be "cleansed," Vandell Tr. 82:18-83:5, and took the step of excluding the loans at issue in other FHFA Actions in a limited and wholly inadequate attempt to "cleanse" the Industry Benchmark, Vandell Rpt. ¶ 181 n.251, Dr. Vandell failed to reunderwrite a sample of the Industry and GSE Benchmarks or undertake any other efforts to ensure that his Industry and GSE Benchmarks are free of the same defects alleged by FHFA to permeate the Nomura sample loans.

This methodological failure is particularly egregious given that two years ago the Court had expressly established a schedule on which loss causation benchmarks that were to be underwritten were to be disclosed to FHFA by Nomura. *See* Supp. Expert Scheduling Order (Feb. 27, 2013) at ¶ 9 (specifying date for disclosure of "whether [Defendant] intends to make use of any alternative set of loans for purposes other than those set forth above" and precluding reliance on loans "not so disclosed to FHFA.") (Dkt. No. 271); 2/7/13 Hearing Tr. at 77:18-79:10 (discussing timeline for disclosing loans on which Defendants might rely for purposes including negative loss causation defense); 2/14/13 Hearing Tr. at 5:5-8:24 (same). Having chosen not to create a clean benchmark that excludes loans with underwriting defects and appraisal inflation on the schedule and through the process established by the Court, Nomura cannot now blindly rely on benchmarks that Dr. Vandell has not evaluated. Dr. Vandell's failure to take any steps to ensure or establish that his Benchmarks are clean renders his negative loss causation analysis unreliable and inadmissible. *See Reed*, 2014 WL 4746130, at *6 (expert cannot manipulate or ignore data "[w]hen constructing a benchmark statistic"); *J.T. Colby*, 2013 WL 1903883, at *22-

10

23 (excluding expert's consumer confusion report and survey in part for failure to "employ an adequate control" in analysis).[13]  All analyses based on the Industry and GSE Benchmarks should, accordingly, be precluded.

### B.   The Reunderwriting Benchmark Should Also Be Excluded.

Having failed to reunderwrite loans to create a "clean" benchmark of his own, Dr. Vandell pieced together a purported benchmark from loans reunderwritten by three different reunderwriting experts retained by FHFA in five other cases brought by FHFA against other defendants.[14]  In constructing this benchmark, Nomura and Dr. Vandell necessarily relied on the willingness of some, but not all, defendants in other cases brought by FHFA to provide Nomura with copies of the expert reports issued by FHFA's reunderwriting experts in their respective actions.  *See* Vandell Rpt. ¶ 184 n.252.  As Dr. Vandell concedes, he is "not a reunderwriter" and does "not pu[t] [him]self forward as an expert in underwriting per se." Vandell Tr. 38:12-14.

---

[13]   Recognizing his fundamental error, Dr. Vandell submitted untimely analyses on December 17, 2014, after the cutoff for expert discovery, in which he purports to remove loans from his Industry Benchmark that are the subject of settlements.  *See* Email from A. Kahl dated December 17, 2014, attaching work done by Dr. Vandell in response to criticisms from FHFA experts) (Ng Decl. Ex. 7).  This late analysis does not, however, resurrect Dr. Vandell's flawed Industry Benchmark.  Removing loans that were the subject of settlements does not establish that the remaining loans do not have underwriting defects.  Dr. Vandell has no basis to assume that securitizations *not* subject to litigation are clean for benchmarking purposes.  The academic studies discussed by Dr. Saunders in his report provide evidence of widespread misrepresentations in the RMBS industry during the relevant period.  Saunders Rpt. ¶¶ 17-30; *cf. Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, No. 11CV6201 DLC, -- F. Supp. 3d --, 2014 WL 7232443, at *29 (S.D.N.Y. Dec. 18, 2014) ("after studying RMBS securitizations during the period in question, the Financial Crisis Inquiry Commission concluded that 'firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards.... These problems appear to have been significant.'") (ellipses in original).

[14]   Nor did Dr. Vandell establish that these loans, drawn different securitizations in different Actions with different originators, were "reasonably comparable" to the at-issue loans.  *See Celebrity Cruises*, 434 F. Supp. 2d at 182 (excluding expert testimony where expert "made no substantial effort to justify the choice of the two transactions as reasonably comparable to the purchase of Celebrity"); Schwert Rebuttal ¶¶ 39-40.

Therefore, he lacked the relevant expertise but did nothing to determine how his selective reliance on FHFA's reunderwriting reports from prior cases may affect the reliability of his resulting analysis.  The FHFA experts on whose reports Dr. Vandell relies, moreover, did not testify at trial in the now-settled cases in which they issued their reports, and they will not testify here.

Because it was patched together from various prior expert reports in five different cases, Dr. Vandell's Reunderwriting Benchmark is unreliable and will lead to significant confusion.[15]  Nomura chose—presumably for tactical and strategic reasons—not to reunderwrite a loss causation benchmark on the schedule established by the Court.  Lacking such a reunderwriting benchmark, which would of course require an evidentiary foundation presented to the factfinder in this case, Dr. Vandell, who lacks any reunderwriting expertise, apparently plans at trial to present and interpret the findings of two different non-testifying experts retained by FHFA in five other cases.  This raises a host of problems.  It will require Dr. Vandell to interpret the findings of other experts outside his competency who will not be testifying at this trial, and to rely on those experts' inability, on the evidence available, to identify material defects in certain loans that they reunderwrote in other cases.[16]  Dr. Vandell's blind reliance on these experts' findings will be confusing and will inject multiple extraneous issues into this case.  Among

---

[15]  The Reunderwriting Benchmark is not relevant to the calculation of loss causation damages, as Dr. Riddiough does not rely on it.

[16]  *See Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009) ("An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge.") (citing *United States v. Mejia*, 545 F.3d 179, 197-98 (2d Cir. 2008) ("although an expert may rely on hearsay in forming his expert opinions, the expert may not, however, simply transmit that hearsay to the jury.") (internal quotation marks and brackets omitted)); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 661-64, 666 (S.D.N.Y. 2007) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.").

others, Dr. Vandell's testimony concerning the Reunderwriting Benchmark will raise the following questions: Why has FHFA used different reunderwriting experts in different cases? How do the reunderwriting methodologies of those other experts compare to the methodology of FHFA's reunderwriting expert in this case? How do the defect rates found by those other experts in those other cases compare to the defect rates found by FHFA's reunderwriting expert in this case, and what conclusions should be drawn from any such comparisons? What conclusions would those non-testifying experts draw from their inability to identify material defects in certain loans that they reunderwrote, and would they agree that it is appropriate for Dr. Vandell to use their findings in other cases to construct a purportedly "clean" benchmark for a loss causation analysis in this case? Were the other experts' conclusions presented in court and, if not, why not? These are all important questions that will go unanswered, leading to significant confusion and prejudice.[17]

Dr. Vandell's Reunderwriting Benchmark should, accordingly, be precluded under Fed. R. Evid. 403 and 702.[18]

---

[17] Nor can Dr. Vandell rely here on the findings of FHFA's reunderwriting experts in other Actions as party admissions by FHFA. *See, e.g., Kirk v. Raymark Industries, Inc.*, 61 F.3d 147, 164 (3d Cir. 1995) ("Because an expert witness is charged with the duty of giving *his* or *her* expert *opinion* regarding the matter before the court, we fail to comprehend how any expert witness, who is not an agent of the party who called him, can be authorized to make an admission for that party.") (emphasis in original).

[18] Underscoring the prejudice and confusion caused by Dr. Vandell's purported Reunderwriting Benchmark, when losses are estimated under Dr. Vandell's methodology using just the loans reunderwritten by Mr. Hunter in this Action, there are *26 times* greater losses than that found by Dr. Vandell using his flawed Industry Benchmark. *See* Schwert Rebuttal ¶ 46, Ex. N-2 (showing actual losses exceed expected loss for all seven SLGs and, in the aggregate, unexplained losses "more than 26 times the $8.7 million amount Professor Vandell estimated using his Industry Benchmark"). Where, as here, changes in "arbitrarily selected model parameters can entirely alter the model's conclusions, that model is insufficiently robust to withstand the scrutiny of Rule 702." *See Reed*, 2014 WL 4746130, at *14.

**C.     Dr. Riddiough's Loss Causation Damages Calculation Should Also Be Excluded Because It Relies On The Industry Benchmark.**

Nomura's proffered damages expert, Dr. Riddiough, attempted to calculate loss causation damages by discounting for the portion of FHFA's losses that are purportedly not caused by the alleged misstatements and omissions.  *See* Riddiough Rpt. ¶ 114.  Because Dr. Riddiough relied on Dr. Vandell's unreliable Industry Benchmark for crucial steps in estimating loss causation damages, *see id.* at ¶¶ 115-17, his calculations should also be excluded.  *See Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688, at *12-13 (S.D.N.Y. Aug. 6, 2007) (excluding damages expert reports as "irrelevant and thus inadmissible" because they were "predicated entirely" on the findings of an expert survey and testimony separately held inadmissible).

## CONCLUSION

For the reasons stated above, FHFA respectfully requests that the Court exclude the expert testimony and opinions of Dr. Vandell relating to the Industry, GSE, and Reunderwriting Benchmarks and the expert testimony and opinions of Dr. Riddiough that rely on those Benchmarks.

DATED:  January 8, 2015
             New York, New York

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By: /s/ Philippe Z. Selendy
     Philippe Z. Selendy
     Sascha N. Rand
     Wing F. (Alex) Ng

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000