# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY, AS
CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

        Plaintiff,

        -against-

NOMURA HOLDING AMERICA INC., *et al.*,

        Defendants.

No. 11-cv-6201 (DLC)

ECF Case

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY AND OPINIONS OF DR. KERRY D. VANDELL AND DR. TIMOTHY J. RIDDIOUGH

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

January 23, 2015

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ....................................................................................................3

      A.      Dr. Vandell's Benchmark Analyses ..........................................3

      B.      Dr. Riddiough's Analyses ...........................................................8

LEGAL STANDARD ............................................................................................9

ARGUMENT ........................................................................................................10

I.     Dr. Vandell's Opinions Based On The Industry and GSE Benchmarks Are Reliable ....................................................................................................10

      A.      Dr. Vandell's Industry and GSE Benchmarks Are Appropriate Reference Points to Assess Whether the Misrepresentations Alleged by Plaintiff Caused Any Losses ..................................................................11

      B.      Plaintiff's Assertion That There Are "Defective" Loans In the Industry and GSE Benchmarks Is Unreliable ...............................14

      C.      No Reunderwriting of Benchmark Loans Was Required ....................18

II.    Dr. Vandell's Opinions Based On The Reunderwriting Benchmark Are Reliable ..........21

III.   Dr. Riddiough's Testimony Is Admissible ...................................................23

CONCLUSION .....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*720 Lex Acquisition LLC* v. *Guess? Retail, Inc.*,
  2014 WL 4184691 (S.D.N.Y. Aug. 22, 2014) ...................................................................... 10

*Apple, Inc.* v. *Motorola, Inc.*,
  757 F. 3d 1286 (Fed. Cir. 2014) ........................................................................... 16, 21

*Celebrity Cruises Inc.* v. *Essef Corp.*,
  434 F. Supp. 2d 169 (S.D.N.Y. 2006) ................................................................. 20

*Collins* v. *Wayne Corp.*,
  621 F.2d 777 (5th Cir. 1980) ................................................................................ 22

*Daubert* v. *Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ................................................................................................. 9

*Dura Auto Sys. of Indiana* v. *CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) ................................................................................ 22

*EEOC* v. *Bloomberg L.P.*,
  2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) ...................................................... 20

*Faulkner* v. *Arista Records LLC*,
  2014 WL 4547824 (S.D.N.Y. Sept. 15, 2014) ...................................................... 22

*Floyd* v. *City of New York*,
  861 F. Supp. 2d 274 (S.D.N.Y. 2012) ............................................................. 19, 22

*Gulf States Utils. Co.* v. *Ecodyne Corp.*,
  635 F.2d 517 (5th Cir. Part A Jan. 1981) ............................................................. 23

*In re Fosamax Prod. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009) .................................................................... 9

*In re Salem*,
  465 F.3d 767 (7th Cir. 2006) ................................................................................ 10

*In re Xerox Corp. Sec. Litig.*,
  821 F. Supp. 2d 504 (D. Conn. 2010) ................................................................... 18

*Joseph S.* v. *Hogan*,
  2011 WL 2848330 (E.D.N.Y. July 15, 2011) ....................................................... 10

-ii-

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*JT Colby & Co. Inc* v. *Apple Inc.*,
   2013 WL 1903883 (S.D.N.Y. May 8, 2013) ........................................ 20

*Kumho Tire Co., Ltd.* v. *Carmichael*,
   526 U.S. 137 (1999) ....................................................................... 9

*Nationwide Mut. Fire Ins. Co.* v. *Sunbeam Prods. Inc.*,
   2014 WL 3875844 (S.D.N.Y. July 17, 2014) ................................ 9, 16

*Reed Constr. Data Inc.* v. *McGraw-Hil Companies Inc.*,
   2014 WL 4746130 (S.D.N.Y. Sept. 24, 2014) ........................... 4, 10, 19

*Ruiz–Troche* v. *Pepsi Cola of Puerto Rico Bottling Co.*,
   161 F.3d 77 (1st Cir.1998) ............................................................ 9

*Sampson* v. *Radio Corp. of Am.*,
   434 F.2d 315 (2d Cir. 1970) ........................................................ 16

*Schultz* v. *Butcher*,
   24 F.3d 626 (4th Cir. 1994) ........................................................ 23

*United States* v. *Cavely*,
   318 F.3d 987 (10th Cir. 2003) ..................................................... 21

*United States* v. *Locascio*,
   6 F. 3d 924 (2d Cir. 1993) .......................................................... 21

*United States* v. *Ten Cartons, More or Less, Ener-B Vitamin B-12*,
   1993 WL 52225 (E.D.N.Y. Jan. 15, 1993) .................................... 22

### Rules

Fed. R. Evid. 702 ............................................................................... 9

Fed. R. Evid. 703 ............................................................................. 21

### Other Authorities

Andra C. Ghent & Marianna Kudlyak, *Recourse & Residential Mortgage
   Default: Evidence from U.S. States*, 24 Rev. Fin. Studs. (2011) ....................... 18, 19

Cem Demiroglu, *et al.*, *State Foreclosure Laws & the Incidence of Mortgage
   Default*, 57 J.L. & Econ. 225 (Feb. 2014) ........................................ 18

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Christopher Palmer, *Why Did So Many Subprime Borrowers Default During the Crisis: Loose Credit or Plummeting Prices?* (Dec. 22, 2014) (unpublished) .............. 18, 19

Damodar N. Gujarati, Basic Econometrics (McGraw-Hill 2d ed. 1988) ...................................... 7

Gene Amromin & Anna L. Paulson, *Comparing Patterns of Default Among Prime and Subprime Mortgages*, 33 Econ. Persps. 18 (2009) ............................................................... 14, 15

John M. Griffin & Gonzalo Maturana, *Who Facilitated Misreporting in Securitized Loans?*, J. Fin. (forthcoming) ...................................................................... 14, 15, 19

Kristopher Gerardi, *et al.*, *Making Sense of the Subprime Crisis*, Federal Reserve Bank of Atlanta Working Paper 2009-2 (Feb. 2009) ................................................ 18

Min Qi & Xiaolong Yang, *Loss Given Default of High Loan-to-Value Residential Mortgages*, 33 J. Banking & Fin. (2009) ............................................................ 18

Paul Calem, *et al.*, *"Cherry Picking" in Subprime Mortgage Securitizations: Which Subprime Mortgage Loans Were Sold by Depository Institutions Prior to the Crisis of 2007?* 20 J. Housing Econ. 120 (2011). .................................................................... 14, 15

Tomasz Piskorski, *et al.*, *Asset Quality Misrepresentation by Financial Intermediaries: Evidence from RMBS Market*, J. Fin. (forthcoming) ................................................ 14, 15, 19

Yuliya Demyanyk & Otto Van Hemert, *Understanding the Subprime Mortgage Crisis*, 24 Rev. Fin. Studs. (2011) ................................................................ 18, 19

**TABLE OF ABBREVIATIONS**

| Action | *FHFA* v. *Nomura Holding America Inc., et al.*, No. 11 Civ. 6201 (DLC) |
|---|---|
| At-Issue Loans | The loans underlying the seven securitizations at issue in this Action |
| Bisenius Tr. | Deposition of Donald Bisenius in this Action and related actions, taken December 5, 2013 |
| Butler Credit Suisse Report | Jan. 21, 2014 Expert Report of Steven I. Butler in *FHFA* v. *Credit Suisse Holdings (USA) Inc., et al.*, 11 Civ. 6200 (DLC) |
| Butler First Horizon Report | Mar. 11, 2014 Expert Report of Steven I. Butler in *FHFA* v. *First Horizon National Corp., et al.*, 11 Civ. 6193 (DLC) |
| Butler HSBC Report | Mar. 7, 2014 Expert Report of Steven I. Butler in *FHFA* v. *HSBC North America Holdings Inc., et al.*, 11 Civ. 6189 (DLC) |
| Certificates | The seven securitizations at issue in this Action, NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 |
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| Dallavecchia Tr. | Deposition of Enrico Dallavecchia in this Action and related actions, taken December 3, 2013 |
| Hunter Ally Report | Jan. 17, 2014 Corrected Expert Report of Robert W. Hunter in *FHFA* v. *Ally, et al.*, 11 Civ. 7010 (DLC) |
| Hunter Report | Oct. 6, 2014 Expert Report of Robert W. Hunter in this Action |
| Ingram Tr. | Deposition of John Ingram in this Action and related actions, taken November 26, 2013 |
| Supplemental Kilpatrick Report | July 9, 2014 Supplement to the Expert Report of John A. Kilpatrick, PhD in this Action |
| Lockhart Tr. | Deposition of James Lockhart in this Action and related actions, taken Nov. 20, 2013 |
| Nomura | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., and Nomura Securities International, Inc. |
| Offering Documents | Prospectus Supplements for each of the Certificates |

## TABLE OF ABBREVIATIONS
### (continued)

| | |
|---|---|
| Payne Merrill Lynch Report | Nov. 25, 2013 Corrected Expert Report of Richard W. Payne III in *FHFA* v. *Merrill Lynch & Co.*, *et al.*, 11 Civ. 6202 (DLC) |
| Pl. Br. | Plaintiff FHFA's Memorandum In Support of Its Motion to Exclude Certain Testimony and Opinions of Kerry D. Vandell and Timothy J. Riddiough, dated January 8, 205 in this Action |
| Riddiough Nov. Dep. | Deposition of Dr. Timothy J. Riddiough in this Action, taken Nov. 20, 2014 |
| Riddiough Report | Nov. 7, 2014 Expert Report of Dr. Timothy J. Rididough in this Action |
| Romano Tr. | Deposition of Raymond Romano in this Action and related actions, taken Sept. 30, 2013 |
| Saunders Nov. Dep. | Deposition of Dr. Anthony Saunders in this Action, taken Nov. 26, 2014 |
| Saunders Report | Nov. 10, 2014 Expert Report of Dr. Anthony Saunders in this Action |
| Vandell Decl. | Declaration of Dr. Kerry D. Vandell, dated January 23, 2015 |
| Vandell Nov. Dep. | Deposition of Dr. Kerry D. Vandell in this Action, taken Nov. 25, 2014 |
| Vandell Report | July 9, 2014 Expert Report of Dr. Kerry D. Vandell in this Action |
| Vandell Supplement | December 17, 2014 Supplemental Exhibits of Dr. Kerry Vandell in this Action |

Defendants respectfully submit this memorandum in opposition to plaintiff's January 8, 2015 Motion to Exclude Certain Expert Testimony and Opinions of Dr. Kerry D. Vandell and Dr. Timothy J. Riddiough.

## PRELIMINARY STATEMENT

Dr. Kerry D. Vandell, a well-respected real estate and financial economist with qualifications unchallenged by plaintiff, is an expert in mortgage finance, specifically mortgage-backed securitizations. Defendants retained Dr. Vandell to provide expert testimony on loss causation. Among other things, Dr. Vandell compared the performance of loans backing the Certificates to the performance of three benchmark groups of loans, as set forth in his July 9, 2014 expert report. Defendants' damages expert, Dr. Timothy Riddiough, has more than twenty years of experience analyzing and valuing mortgage-backed securities. Dr. Riddiough relied in part on Dr. Vandell's opinions to determine the portion of any alleged damages attributable to factors other than the misrepresentations in the Offering Documents alleged by plaintiff.

Plaintiff's attacks on Dr. Vandell and Dr. Riddiough are meritless. *First*, plaintiff misses the mark with its assertion that two of Dr. Vandell's benchmark groups of loans, referred to as the Industry Benchmark and the GSE Benchmark, contain large numbers of loans not originated in accordance with originator underwriting guidelines. Plaintiff's claim that these benchmarks—which each contain more than 3 million loans—must be completely "free from underwriting defects" (Pl. Br. at 5) is wrong. Even if the benchmarks contained some defective loans, which plaintiff has not demonstrated, that would make no difference. Given the very large number of loans included in the benchmark, a relatively small number of loans with "underwriting defects" in those benchmarks would have no impact on Dr. Vandell's analyses or conclusions. In fact, Dr. Vandell carefully selected his benchmarks to avoid any concern that

significant numbers of loans contained in those benchmarks were not originated in accordance with originator underwriting guidelines.  The five academic articles on which plaintiff relies, as well as the fact that some loans in the benchmarks may have been at issue in lawsuits that were ultimately settled, do not demonstrate that Dr. Vandell's benchmarks are unreliable.[1]

*Second*, Dr. Vandell's benchmarking exercises follow a reliable and well-recognized method of providing expert opinion on loss causation.  Analyses of this kind have been accepted as a method of analyzing default and delinquency rates of mortgage loans,[2] which is exactly what *Daubert* requires.  Examples of published and peer-reviewed research similar to Dr. Vandell's abound, and plaintiff fails to cite any research into default and delinquency rates where the authors performed the sort of re-underwriting of loans contained in their benchmarks that plaintiff claims is necessary.

*Third*, Dr. Vandell's opinions based on his Reunderwriting Benchmark are reliable and admissible.  That benchmark is comprised of loans that plaintiff's own experts in this case and other cases have found were originated generally in accordance with originator underwriting guidelines.  Plaintiff fails to articulate any valid reason why Dr. Vandell's analyses are unreliable or would confuse, mislead or prejudice the trier of fact, which is now the Court.

---

[1]     In a separate motion, defendants have sought to exclude all testimony from plaintiff's expert Dr. Anthony Saunders, who opines that loans not originated in accordance with originator underwriting guidelines are contained in Dr. Vandell's Industry Benchmark and GSE Benchmark, because Dr. Saunders' opinions are unreliable and merely repeat the opinions of other experts.  *See* Defendants' Motion to Exclude the Testimony of Dr. Anthony Saunders, 11 Civ. 6201 (Jan. 8, 2015).

[2]     As used throughout this brief, "default and delinquency" refers to a loan that is "delinquent for 90 or more days, is in bankruptcy, liquidation, or foreclosure, or is real estate-owned or charged-off in the last month of loan tracking."  (Ex. 1 (Vandell Report) at Ex. 55 at 6.)

*Fourth*, because Dr. Vandell's analyses are reliable and admissible, Dr. Riddiough's opinions based on Dr. Vandell's Industry Benchmark are also admissible.  Even if this Court excluded Dr. Vandell's testimony concerning one or two benchmarks (which it should not), Dr. Riddiough's opinions relying on the other benchmark or benchmarks would still be admissible.

## BACKGROUND

Dr. Vandell is Dean's Professor of Finance and Director of the Center for Real Estate at the Paul Merage School of Business of the University of California, Irvine.  (Ex. 1 (Vandell Report) ¶ 1.)  He specializes in mortgage finance, housing economics and policy, real estate market dynamics and international real estate markets.  (*Id.* ¶ 2.)  Over the course of his thirty-year career, Dr. Vandell has served as the President of the American Real Estate and Urban Economics Association, and he has held a number of other positions in academic and professional organizations, including the Urban Land Institute, Counselors of Real Estate, and Commercial Real Estate Development Association.  (*Id.* ¶ 1.)  He has conducted extensive research, and published numerous articles, on mortgage finance and related topics.  (*Id.* at Appendix A.)  In his work, Dr. Vandell has frequently performed regression analyses similar to those he performed for purposes of this case.  (*Id.* ¶ 188 n.259; Ex. 2 (Vandell Nov. Dep.) at 21:19-24.)  Plaintiff does not—and cannot—challenge Dr. Vandell's qualifications.

### A.    Dr. Vandell's Benchmark Analyses

Plaintiff asserts, based on the opinions of Robert W. Hunter and John A. Kilpatrick, that (i) about 67% of loans in the supporting loan groups for the seven Certificates "suffered from underwriting defects and, as a result, had a substantially increased credit risk," *i.e.*, were "materially defective," (ii) the loan-to-value ratios disclosed in the prospectus

supplements were too low because of inflated appraisals of the properties, and (iii) the

prospectus supplements misrepresented the number of borrowers who intended to occupy houses

that secured the mortgage loans.  (Ex. 3 (Hunter Report) ¶¶  7-8; Ex. 4 (Supplemental Kilpatrick

Report) at 2-6.)  Dr. Vandell opines on whether these three types of alleged defects (the "Alleged

Defects") "caused losses to [Freddie Mac and Fannie Mae] as holders of the seven At-Issue

Certificates."  (Ex. 1 (Vandell Report) ¶ 176.)  In order to assess whether Alleged Defects in the

loans at issue here—as opposed to other factors, such as market-wide economic changes that

affected mortgage loans generally—caused losses to Freddie Mac and Fannie Mae, Dr. Vandell

conducted regression analyses using three benchmark sets of loans.[3]

        Dr. Vandell's first benchmark (the "Industry Benchmark") consists of loans from

other private label securitizations issued in the period 2005-2007 that are comparable to loans in

the supporting loan groups for the seven Certificates.  (Ex. 1 (Vandell Report) ¶ 180.)

Dr. Vandell excluded all loans that were part of any securitizations that were at issue in any of 17

similar cases brought by plaintiff against other banks.  (Id. ¶ 181 n.251.)  In response to claims

by plaintiff's expert Dr. Anthony Saunders that Dr. Vandell should have excluded loans from

another 386 securitizations,[4] Dr. Vandell tested his analysis using a version of the Industry

Benchmark that excluded loans from all of these 386 securitizations.  (Ex. 2 (Vandell Nov. Dep.)

at 112:7-113:25; Ex. 6 (Vandell Supplement) at Exs. 57A-B, 59.)  Excluding those loans had no

appreciable impact on the results of Dr. Vandell's analysis.  (Ex. 2 (Vandell Nov. Dep.) at 43:13-

---

[3]      A benchmark model "is a form of residual model where unobservable data . . . is
extrapolated by comparing observable data to a known benchmark statistic."  *Reed Constr. Data
Inc.* v. *McGraw-Hill Cos. Inc.*, 2014 WL 4746130, at *4 (S.D.N.Y. Sept. 24, 2014).

[4]      These securitizations were the subject of three types of mortgage-backed security-related
lawsuits that ultimately settled.  (Ex. 5 (Saunders Report) at Exs. C, D.)

25; *id.* at 105:18-106:3 (Dr. Vandell testifying that he re-ran his analysis without loans from the 386 securitizations and "there essentially was no difference in [the] results").)  (*Compare* Ex. 1 (Vandell Report) at Exs. 57A-B, 59 *with* Ex. 6 (Vandell Supplement) at Exs. 57A-B, 59.)

Dr. Vandell's second benchmark (the "GSE Benchmark") consists of loans comparable to those in the supporting loan groups in the seven Certificates that were purchased as whole loans by Freddie Mac and Fannie Mae.  (Ex. 1 (Vandell Report) ¶ 182.)  The data for Dr. Vandell's GSE Benchmark comes from CoreLogic's Loan-Level Market Analytics database, which does not contain loan files or identify the originator or servicer of the loans, only the initial investor (*i.e.*, Freddie Mac or Fannie Mae).  (*Id.*)  Freddie Mac and Fannie Mae were two of the most experienced and sophisticated entities in the residential mortgage industry.  (*E.g.*, Ex. 7 (Lockhart Tr.) at 238:7-14 (describing Fannie Mae and Freddie Mac as "the 900-pound" and "700-pound gorilla[s]" of the mortgage industry); *id.* at 270:11-14 ("Fannie and Freddie certainly had more data and more knowledge about the mortgage market than probably anybody else, yes.").[5]  Both Freddie Mac and Fannie Mae had quality control and originator approval processes intended to ensure that the whole loans they purchased were of the highest quality.  (*See*, *e.g.*, Ex. 9 (Bisenius Tr.) at 37:15-38:10 (describing functions of "portfolio quality unit"); *id.* at 48:1-50:8 (describing Freddie Mac's approach to "quality control" within the "single family guarantee business"); Ex. 10 (Dallavecchia Tr.) at 231:10-232:3 (stating that Fannie Mae would "acquire loans in the . . . single family business . . . only from lenders that have been . . . approved").

---

[5]     The Court referred to Freddie Mac and Fannie Mae as "major player[s] in the industry" at a hearing in 2012.  (Ex. 8 Hr'g Tr., 70:19-71:1, Dec. 17, 2012 (11 Civ. 6198) (DLC).)

There is no evidence that a significant number of the loans purchased by Freddie Mac and Fannie Mae were not originated generally in accordance with originator underwriting guidelines.  Indeed, plaintiff's expert in this case, Dr. Saunders, has opined that only about 1.4% and 1.7% of loans purchased by Freddie Mac and Fannie Mae, respectively, that were originated in the period 2005 to 2007 were repurchased by lenders.  (Ex. 5 (Saunders Report) at Exs. E , G.) Moreover, Freddie Mac and Fannie Mae reported the characteristics of the loans they purchased—including loan-to-value ratios, owner-occupancy status and borrower credit scores— in detail in their annual reports and filings with the Securities and Exchange Commission ("SEC").  (*See, e.g.*, Ex. 11 (Freddie Mac 2007 Annual Report) at 93-96; Ex. 12 (Fannie Mae 2007 10-K) at 126-30.)  Freddie Mac and Fannie Mae not only certified the accuracy of these statements to their shareholders and/or the SEC (and have never amended those disclosures) but have also continued to assert, in recent court filings, that the credit characteristics disclosed in their annual reports were accurate.  (*See, e.g.*, Ex. 13 (Freddie Mac's Motion to Dismiss, *Ohio Pub. Emps. Ret. Sys.* v. *Federal Home Loan Mortgage Corp.,* No. 4:08-cv-00160 (N.D. Ohio)) at 18 & n.18, 50-51 (asserting that "Freddie Mac accurately disclosed . . . the precise credit characteristics of the loans in its guarantee portfolio" in its annual reports; this included ranges of "original LTV ratios" as well as "occupancy types"); Ex. 14 (Fannie Mae's Motion to Dismiss, *In re Fannie Mae 2008 Sec. Litig.*, No. 1:08-cv-07831 (S.D.N.Y.)) at 3 (asserting that Fannie Mae "amply disclosed its increasing investments in sub-prime and Alt-A mortgages" because, among other things, its annual reports for the years 2004 to 2007 "set forth in detailed tables the risk characteristics associated with Fannie Mae's" single-family portfolio).

Finally, Dr. Vandell's third benchmark (the "Reunderwriting Benchmark") consists only of loans that, according to plaintiff's reunderwriting experts, were underwritten in

accordance with underwriting guidelines or had deviations from underwriting guidelines that did not increase the credit risk associated with the loans.  (Ex. 1 (Vandell Report) ¶ 184.)  These loans were reunderwritten by either Mr. Hunter, plaintiff's reunderwriting expert in this case, or by two other reunderwriting experts hired by plaintiff, Robert W. Payne and Steven Butler.

Dr. Vandell used a "regression analysis to estimate a model of loan performance using the loans in each benchmark."[6]  (Ex. 1 (Vandell Report) ¶ 188.)  These models include dozens of explanatory variables (depending on the benchmark) and estimate the extent to which each explanatory variable predicts the performance (measured by events of default or delinquency) of the loans in the benchmarks.  (*Id.* ¶¶ 195, 206, Ex. 55 at 8-9.)  Dr. Vandell then applied the results of each model to the actual loans in the supporting loan groups for the seven Certificates to estimate how those loans would have performed had they performed the same way as the comparable benchmark loans.  (*Id.* ¶¶ 188-89, Ex. 55 at 1.)  Dr. Vandell opines that if the actual default and delinquency rates of the loans underlying a particular Certificate were not statistically significantly different than the expected rates predicted by a specific benchmark, then any difference between the disclosed characteristics and actual characteristics—the alleged misstatements in the Offering Documents—did not cause plaintiff's losses.  (*Id.* ¶¶ 178, 189.)

Dr. Vandell found that the loans in the supporting loan groups underlying six of the seven Certificates, which includes 98% of the At-Issue Loans, performed the same as, or better than, the performance predicted by both the Industry and Reunderwriting Benchmarks.

---

[6]    A regression analysis is "a widely used technique" that is "'concerned with the study of the dependence of one variable, the dependent variable, on one or more other variables, the explanatory variables, with a view to estimating and or predicting the (population) mean or average value of the former in terms of the known or fixed (in repeated sampling) values of the latter.'"  (Ex. 1 (Vandell Report) ¶ 188 n.259 (quoting Damodar N. Gujarati, Basic Econometrics (McGraw-Hill 2d ed. 1988) at 14).)

(Ex. 1 (Vandell Report) ¶ 14.)  Loans in the supporting loan groups underlying all seven of the Certificates performed the same as, or better than, the performance predicted by the GSE Benchmark.  (*Id.*)  Dr. Vandell used the results from the GSE Benchmark to corroborate his conclusions based on the Industry and Reunderwriting Benchmarks, and he found that the Reunderwriting Benchmark "provides additional support to the findings of the Industry and GSE Benchmarks."  (*Id.* ¶¶ 14, 201.)

### B.      Dr. Riddiough's Analyses

Dr. Riddiough is Professor of Real Estate and Urban Land Economics at the Wisconsin School of Business of the University of Wisconsin-Madison and directs the applied real estate investment program at the Wisconsin School of Business.  (Ex. 15 (Riddiough Report) ¶ 1.)  From 1994 to 2001, Dr. Riddiough was Professor of Real Estate Finance at the Massachusetts Institute of Technology.  (*Id.*)  Dr. Riddiough serves on the editorial boards of six real estate-related academic journals, and his research has covered mortgage lending, mortgage securitization, real estate options, REIT investment, and corporate finance.  (*Id.* ¶¶ 2-3; *see also id.* at Appendix A.)  Dr. Riddiough reviewed Dr. Vandell's conclusions and determined that, after accounting for loss causation, damages could be awarded at most for one Certificate, NAA 2005-AR6, as to which Dr. Vandell found a statistically significant difference between the predicted and actual default rate using two of his three benchmarks.  (*Id.* ¶¶ 9, 114-15.)  Dr. Riddiough concluded, after utilizing Dr. Vandell's regression results in his model, that the resulting damages range from $5.0 million to $5.8 million on the Section 12 claim for the NAA 2005-AR6 Certificate.  (*Id.* ¶¶ 117-22.)  Because there was no statistically significant difference between actual and predicted default rates for any of the other Certificates using <u>any</u> of the three benchmarks, there are no Section 12 damages for those other Certificates.  (*Id.* ¶ 121.)

## LEGAL STANDARD

For a witness to offer expert opinions at trial, "the witness must be qualified as an expert, the testimony must be reliable, and the testimony must assist the trier of fact."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009) (citing Fed. R. Evid. 702).  The Supreme Court set out a four-part test for the reliability of proffered expert testimony in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  The four factors are (i) how extensively a proffered theory has been tested, (ii) the extent of relevant peer review, (iii) the existence of established error rates, and (iv) the extent of general acceptance of the theory or analytical method in the relevant field.  *Id.* at 593-94.  No single *Daubert* factor is dispositive, or even required, as "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  *Kumho Tire Co., Ltd.* v. *Carmichael,* 526 U.S. 137, 150 (1999) (internal quotation marks and alteration omitted).  "[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion [of expert testimony]."  *In re Fosamax* , 645 F. Supp. 2d at 173.

*Daubert* also makes clear that any challenge to the admissibility of expert testimony "must be [focused] solely on principles and methodology, not on the conclusions that they generate."  509 U.S. at 595.  Disagreements with the conclusions or implications of qualified expert testimony should "be tested by the adversary process—competing expert testimony and active cross examination—rather than excluded from jurors' scrutiny."  *Nationwide Mut. Fire Ins. Co.* v. *Sunbeam Prods. Inc.*, 2014 WL 3875844, at *2 (S.D.N.Y. July 17, 2014) (quoting *Ruiz-Troche* v. *Pepsi Cola of P.R. Bottling Co.,* 161 F.3d 77, 85 (1st Cir. 1998)).

Moreover, "*Daubert* and its progeny . . . do not apply straightforwardly in the context of bench trials." *720 Lex Acquisition LLC* v. *Guess? Retail, Inc.*, 2014 WL 4184691, at *10 (S.D.N.Y. Aug. 22, 2014).  There is no jury in this case based on the Court's conclusion that plaintiff's Section 12 claim is entirely equitable in nature.  "Under these circumstances, unless the disputed evidence is wholly irrelevant or so speculative as to have no probative value, it is appropriate for the Court to 'take in the evidence freely.'"  *Id.*  (quoting *Joseph S.* v. *Hogan*, 2011 WL 2848330, at *3 (E.D.N.Y. July 15, 2011).  *See also In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("It is not that evidence may be less reliable during a bench trial; it is that the court's gatekeeping role is necessarily different.").

In order to be admissible, a regression analysis must (i) examine an appropriate selection of data, (ii) be the product of a consistently followed methodology, and (iii) control for the "major factors" that might influence the dependent variable.  *Reed Constr. Data Inc.*, 2014 WL 4746130, at *6-7.  That standard is more than satisfied here.

## ARGUMENT

## I.   DR. VANDELL'S OPINIONS BASED ON THE INDUSTRY AND GSE BENCHMARKS ARE RELIABLE.

Plaintiff argues that Dr. Vandell's analysis is unreliable because he did not "reunderwrite a sample of the Industry and GSE Benchmarks or undertake any other efforts to ensure that his Industry and GSE Benchmarks are free of the same defects alleged by FHFA." (*See* Pl. Br. at 10.)  This is incorrect.  There is no requirement that the benchmarks be 100% "free" from Alleged Defects.   Here, however, Dr. Vandell <u>did</u> exclude loans alleged to be affected by significant numbers of Alleged Defects, and plaintiff offers no reliable evidence to the contrary.  In demanding that Dr. Vandell's benchmarks not contain a single loan with Alleged Defects, plaintiff misunderstands what is required for a reliable benchmarking analysis.

-10-

**A.      Dr. Vandell's Industry and GSE Benchmarks Are Appropriate Reference Points to Assess Whether the Misrepresentations Alleged by Plaintiff Caused Any Losses.**

Contrary to plaintiff's assertion, Dr. Vandell's analyses based on the Industry and GSE Benchmarks are reliable.  (Pl. Br. at 10.)  Using a variety of filters and adjustments—and relying on Freddie Mac and Fannie Mae's own quality control processes—Dr. Vandell developed the Industry and GSE Benchmarks so as to provide reliable baselines against which to compare the performance of loans that plaintiff claims had Alleged Defects.

With respect to the Industry Benchmark, Dr. Vandell limited eligible loans to those originated and securitized in the period 2005 to 2007 that had the same collateral and asset types—*i.e.*, Alt-A or subprime, and fixed or adjustable rate—as the At-Issue Loans.  (Ex. 1 (Vandell Report) Ex. 55 at 2-5.)  Dr. Vandell identified no evidence that loans of these types were not originated generally in accordance with originator underwriting guidelines (*see, e.g.*, Ex. 2 (Vandell Nov. Dep.) at 107:23-111:9 (describing the lack of evidence of a high defect rate as claimed by plaintiff)).  Plaintiff also fails to identify such evidence concerning loans in the Industry Benchmark.  *See* pp. 14-18, *infra*.

Nevertheless, as a conservative measure, Dr. Vandell excluded all of the loans involved in the 17 similar litigations brought by plaintiff.  (Ex. 1 (Vandell Report) Ex. 55 at 4.)  In those actions, as in this one, plaintiff alleged a very high rate of underwriting defects. Although allegations alone cannot establish that the loans in these 17 lawsuits were underwritten in a defective manner, Dr. Vandell excluded those loans in order to be conservative.  (Ex. 2 (Vandell Nov. Dep.) at 96:22-97:13.)  In addition, after Dr. Saunders criticized Dr. Vandell's Industry Benchmark because it included loans involved in lawsuits brought by other parties that have settled, Dr. Vandell removed all such loans (a total of 1,267,145) from his Industry Benchmark (leaving 1,866,720 loans remaining in the benchmark).  This change had no impact

on his analysis or opinions because the results were not appreciably different.  (*Compare* Ex. 1 (Vandell Report) Exs. 57A-B, 59 *with* Ex. 6 (Vandell Supplement) Exs. 57A-B, 59.)  Dr. Vandell testified that these methods "comport with professional standards" as well as "the availability of the data and the fact that there is no clear metric" by which to measure underwriting defects in mortgage loans.  (Ex. 2 (Vandell Nov. Dep.) at 94:21-95:6.)

With respect to the GSE Benchmark (comprised of loans purchased by Freddie Mac or Fannie Mae), the loan data came from CoreLogic's Loan-Level Market Analytics database, which does not identify the originator or servicer of the loans.  *See* p. 5, *supra*.  There was thus no method for Dr. Vandell to commission a reunderwriting of these loans, because the loan files were not available—except to plaintiff, which has steadfastly refused in this case to provide discovery concerning "single-family" loans.

Freddie Mac's and Fannie Mae's industry experience, quality control processes, and written assurances as to loan quality (in annual and 10-K reports) support the reliability of Dr. Vandell's GSE Benchmark.   Freddie Mac and Fannie Mae repeatedly assured their investors in annual reports and 10-K filings that they were employing proper quality control measures for loans they were purchasing.  *See* pp. 5-6, *supra*.  In recent litigation, both entities have maintained that their statements describing characteristics of these loans—including loan-to-value ratios and owner occupancy data—are true.  *See* pp. 5-6, *supra*.  If plaintiff were correct that the GSE Benchmark contains loans not originated generally in accordance with underwriting guidelines at rates approaching 67%, then Freddie Mac's and Fannie Mae's annual reports and SEC filings would require correction; but that has not occurred.  Further, plaintiff's own expert claims that only a very small portion of relevant loans purchased by Freddie Mac and Fannie Mae—approximately 1.4% and 1.7%, respectively—were repurchased by originators.  (Ex. 5

(Saunders Report) at Exs. E, G.)  Although repurchases do not necessarily indicate that a loan

was not originated in accordance with originator underwriting guidelines (*see* pp. 17-18, *infra*),

Dr. Vandell explained that the low rate of repurchased loans was "a good indicator of the extent

to which they felt they had problems with the loans."  (Ex. 2 (Vandell Nov. Dep.) at 93:24-94:6.)

Dr. Vandell, like Dr. Saunders, "found that that rate was very low" and this "gave [him]

confidence that there was not a high degree of alleged defects or other problems with the loans."

(*Id.* at 94:7-11.)

Dr. Vandell's Industry and GSE Benchmarks are thus reliable and appropriate

reference points against which to measure whether Alleged Defects in the At-Issue Loans caused

any losses to Freddie Mac and Fannie Mae.  To satisfy that standard, it is not necessary that the

benchmarks—which both contain more than 3 million loans—be 100% "free from underwriting

defects."  (Vandell Decl. ¶ 5.)  Rather, as Dr. Vandell testified, a "benchmark is intended to be a

reference point" (Ex. 2 (Vandell Nov. Dep.) at 82:11-12), and "the notion of clean is not

necessarily an absolute one."  (*Id.* at 84:10-11.)  Dr. Vandell further explained that "[w]hat you

try to do is correct for it . . . through filters or through various other adjustments within the

benchmark to render it something that is a relevant reference point."  (*Id.* at 84:23-85:4.)  Thus,

according to Dr. Vandell, "if there were any remaining loans in these benchmarks with Alleged

Defects, they would not have had any appreciable impact on the results of the regression models

estimated using the benchmarks—and as a result, would have had no impact on my opinions."

(Vandell Decl. ¶ 6.)  Dr. Vandell's supplemental analysis—which removed the loans that

plaintiff alleges have such defects and Dr. Vandell's opinions did not change—strongly supports

this notion.  *See* pp. 11-12, *supra*.

**B.     Plaintiff's Assertion That There Are "Defective" Loans In the Industry and GSE Benchmarks Is Unreliable.**

Plaintiff relies on Dr. Saunders' report to argue that Dr. Vandell "ignored substantial economic evidence" that his Industry and GSE Benchmarks contain loans not underwritten in accordance with originator underwriting guidelines.  (Pl. Br. at 7.)  Dr. Saunders relies on (i) five academic articles, (ii) evidence that some (unspecified number of) loans in the Industry and GSE Benchmarks were involved in lawsuits that settled, and (iii) evidence that a small number of loans in the GSE Benchmark were repurchased from Freddie Mac and Fannie Mae by originators.  (*Id.* at 7-8.)  As set forth in defendants' motion to exclude the testimony of Dr. Saunders, none of this constitutes reliable criticism of the Industry and GSE Benchmarks. *See* Defendants' Motion to Exclude the Testimony of Dr. Anthony Saunders, 11 Civ. 6201 (Jan. 8, 2015).

First, the five academic articles identified by Dr. Saunders do not relate at all to whether loans were originated generally in accordance with originator underwriting guidelines— in fact, no article even mentions underwriting guidelines or considers the standards under which the relevant loans were originated.  (*See* Ex. 16 (Piskorski Article), Ex. 17 (Griffin Article), Ex. 18 (Demyanyk Article), Ex. 19 (Calem Article), Ex. 20 (Amromin Article).)  Dr. Saunders nevertheless asserts that two of those articles constitute "direct evidence" that there are loans in the Industry Benchmark not originated in accordance with originator underwriting guidelines. (Ex. 5 (Saunders Report) ¶¶ 17-22.)  Those articles actually focus on different questions— whether borrowers lived in homes for a year after they were purchased and whether second liens on homes were properly disclosed in loan databases.  (*See* Ex. 16 (Piskorski Article) at 10-11 (comparing the mailing address zip code of the borrower's Equifax report during the first year of the loan's life to the zip code reported by the trustee and using Equifax records to establish the

-14-

appearance of second-liens with an origination date within 45 days of the first lien); Ex. 17

(Griffin Article), at 1, 14 (comparing where the borrower's first tax bill was sent with the address

of the mortgaged property and using county records to establish the presence of second-liens).)

The articles do not attempt to assess whether owners misrepresented their intention to occupy the

subject properties, or whether loan-to-value ratios were understated at loan origination.[7]  The

Offering Documents never represent that the borrowers will occupy their properties during the

twelve months following purchase, but only what the borrowers said about their intentions at the

time they filled out a mortgage application.

      Dr. Saunders asserts that three other articles serve as "indirect evidence" that

there are loans in the Industry and GSE Benchmarks which were not originated in accordance

with originator underwriting guidelines.  (Ex. 5 (Saunders Report) ¶¶ 16, 24, 27, 30.)  These

articles, however, do not reach any conclusions about whether any of the millions of loans they

studied were not originated in accordance with specific guidelines—nor do they address owner

occupancy data or loan-to-value ratios.  (*See* Ex. 18 (Demyanyk Article), Ex. 19 (Calem Article),

Ex. 20 (Amromin Article).)  Instead, these articles reach a variety of conclusions about (i) trends

in default rates (*see* Ex. 20 (Amromin Article) at 18-20), (ii) the deterioration of the disclosed

characteristics of loans prior to the financial crisis (*see* Ex. 18 (Demyanyk Article) at 1848), and

(iii) "cherry picking" of loans by originators (*see* Ex. 19 (Calem Article) at 120.)  Indeed, Dr.

Saunders admitted that the three articles do not conclude that any of the loans being studied were

---

[7]     Moreover, the Piskorski Article admits that its findings concerning occupancy may
overstate the rate at which borrowers were not living in owner-occupied homes.  (Ex. 16
(Piskorski Article) at 33-35.)  Both articles claim to have found much lower rates of errors in the
loan databases they studied—"[o]verall, more than 9 percent" for the Piskorski Article and 30%
for the Griffin Article—than plaintiff claims affected the loans at issue here.  (Ex. 16 (Piskorski
Article) at 3; Ex. 17 (Griffin Article) at 1.)

not originated in accordance with originator underwriting guidelines.  (Ex. 21 (Saunders Nov.

Dep.) at 124:11-13 (answering "[t]hey do not" in response to being asked whether the articles

"mentioned underwriting defects").)

Second, plaintiff's assertion that loans in the Industry and GSE Benchmarks were

involved in lawsuits that have settled is not "economic evidence" at all, much less does it

demonstrate that Dr. Vandell's benchmarks are flawed.  Dr. Vandell explained that settlements

do not show the existence of Alleged Defects because (i) "in virtually all" of them there is "no

admission of guilt" (Ex. 2 (Vandell Nov. Dep.) at 104:13-105:9; 107:23-110:6; 111:22-112:6),

and (ii) he re-ran his analysis for the Industry Benchmark after excluding millions of additional

loans involved in lawsuits that settled and reached the same conclusions as in his original

analysis.  (Ex. 2 (Vandell Nov. Dep.) at 112:7-113:7; Ex. 6 (Vandell Supplement) at Exs. 57A-B,

59.)  This is a reliable and proper approach to take—especially because it is well-established that

the settlement of a lawsuit does not constitute an admission of wrongdoing or liability.  *Sampson*

v. *Radio Corp. of Am.*, 434 F.2d 315, 317 (2d Cir. 1970) ("[S]ettlements are often reached for

economic reasons and not because of concessions on legal issues.").  To the extent that plaintiff

disagrees with Dr. Vandell's view of whether—or to what extent—settlements affected the

comparability of the benchmarks, that is not a proper basis for a *Daubert* motion.  *Apple, Inc.*,

757 F. 3d at 1319 (a party "is free to challenge the benchmark or argue for a more accurate

benchmark," but such arguments go to "evidentiary weight, not admissibility"); *Nationwide*,

2014 WL 3875844, at *2 (disagreement with conclusions and implications of an expert's

analyses is not a proper basis for a *Daubert* motion).

Third, plaintiff's claim that fewer than 2% of the loans purchased by Freddie Mac

and Fannie Mae that had been originated during the period 2005 to 2007 were subsequently

-16-

repurchased by lenders does not show that those few loans were not originated generally in accordance with originator underwriting guidelines or that they had other purported "defects."[8] As a threshold matter, those numbers are very small, amounting to less than 6% of the 4,431,359 loans in Dr. Vandell's GSE Benchmark—even if every one of the repurchased loans was in the GSE Benchmark.  ((Ex. 5 (Saunders Report) Exs. E, G); Ex. 1 (Vandell Report) ¶ 182, Ex. 61A.) In fact, plaintiff (the only party that knows which loans were actually repurchased) has provided no evidence that any of the repurchased loans were in the GSE Benchmark (which excluded millions of loans purchased by Freddie Mac and Fannie Mae during the relevant period because they were not comparable to the loans at issue).  (*Compare* Ex. 1 (Vandell Report) Ex. 55, *with* Ex. 5 (Saunders Report) Exs. E, G.)

    Moreover, even if some repurchased loans were part of the GSE Benchmark, that does not demonstrate that every loan repurchased was not originated generally in accordance with originator underwriting guidelines.  Repurchases of loans from Freddie Mac and Fannie Mae occurred pursuant to "contractual requirements."  (*See*, *e.g.*, Ex. 22 (Romano Tr.) at 352:2-7 ("In the whole loan and flow [business], we would discover violations of *our contractual requirements* from time to time with loan originators and we would make them repurchase those loans and make Freddie Mac whole.") (emphasis added); Ex. 9 (Bisenius Tr.) at 486:3-24 (repurchases were "based on the *negotiated terms of business* in the contract with that seller/servicer") (emphasis added.)  Those contractual requirements provide for several bases for demanding repurchase—different from a failure to originate the loans in accordance with the

---

[8] Dr. Saunders opines that 1.4% and 1.7%, respectively, of the loans purchased by Freddie Mac and Fannie Mae in the period 2005 and 2007 (the "Repurchases") were repurchased pursuant to contractual agreements by parties that sold loans to Freddie Mac and Fannie Mae. (Ex. 5 (Saunders Report) Exs. E, G.)

originator's underwriting guidelines—such as violations of Freddie Mac's or Fannie Mae's anti-predatory lending policies.  (Ex. 23 (Ingram Tr.) at 78:19-79:8; Ex. 24 (FHFA03500696) at FHFA03500698.)  Even if a repurchase indicates in some way that a loan was not originated in accordance with originator underwriting guidelines, the number of repurchases is so small that it is insignificant in terms of its impact on Dr. Vandell's analysis.  (*See* Vandell Decl. ¶ 6; pp. 5-6, *supra*.)

Given Dr. Vandell's reliable analysis and plaintiff's inability to demonstrate any flaws in it, Dr. Vandell's testimony concerning the Industry and GSE Benchmarks is admissible. *See In re Xerox Corp. Sec. Litig.*, 821 F. Supp. 2d 504, 509 (D. Conn. 2010) (expert's testimony is admissible where plaintiffs failed to show that the expert's analysis was flawed).

### C.      No Reunderwriting of Benchmark Loans Was Required.

Unable to find any real fault with Dr. Vandell's Industry and GSE Benchmarks, plaintiff asserts that Dr. Vandell was required to "reunderwrite a sample" of the loans in those benchmarks.  (Pl. Br. at 10.)  This assertion is baseless.  Dr. Vandell's analyses are similar to methods used in published, peer-reviewed articles that study loan-level data to estimate default probability models—including articles relied on by plaintiff's expert Dr. Saunders, and by plaintiff on this motion.[9]

Two of the published, peer-reviewed studies relied on by plaintiff and Dr. Saunders test for the impact of "misrepresentations" on loan defaults by comparing the performance of loans purportedly affected by those misrepresentations against other loans— similar to Dr. Vandell's approach here.  (*See* Ex. 16 (Piskorski Article) at 17-21; Ex. 17 (Griffin

---

[9]      *See* Ex. 16 (Piskosrki Article); Ex. 17 (Griffin Article); Ex. 18 (Demyanyk Article); Ex. 25 (Demiroglu Article); Ex. 26 (Palmer Article); Ex. 27 (Ghent Article); Ex. 28 (Gerardi Article); Ex. 29 (Qi Article).

Article) at 18-21.)  Those researchers, like Dr. Vandell, did not reunderwrite any loans to

determine the adequacy of their benchmarks.  (*See* Ex. 16 (Piskorski Article) at 17-21; Ex. 17

(Griffin Article) at 18-21.)  Similarly, researchers investigating other potential causes of loan

defaults—such as: (i) home price appreciation (Ex. 26 (Palmer Article) at 1-8); (ii) lender

recourse to personal borrower assets (Ex. 27 (Ghent Article) at 3139-42), and (iii) loan and

borrower characteristics (Ex. 18 (Demyanyk Article) at 1853-54)—have not reunderwritten

samples of their benchmark loans to determine whether those loans were originated generally in

accordance with originator underwriting guidelines (or for any other purpose).  All of these

studies were peer-reviewed and they have, with one exception, been published in respected

academic journals.[10]  Plaintiff, in contrast, identifies no published study in which reunderwriting

of benchmark loans has been performed or required.  In *Floyd* v. *City of New York*, this Court

recognized that a methodology that has been used in published, peer-reviewed studies—like Dr.

Vandell's here—is an appropriate, reliable methodology.  861 F. Supp. 2d 274, 288-89

(S.D.N.Y. 2012).

The cases cited by plaintiff (Pl. Br. at 8-10) are inapposite.  In *Reed Construction

Data Inc.*, an antitrust case (*see* Pl. Br. at 9), the court excluded an expert's regression analysis

where, among other flaws, the data used in his study was "more or less[] arbitrary" and "very

minor changes" in the model "entirely alter[ed] the model's conclusions."  2014 WL 4746130, at

*13-14.  Here, Dr. Vandell's selection of benchmark loans is well-reasoned—and the validity of

the Industry and GSE Benchmarks is supported by the consistent results obtained from each, as

well as from Dr. Vandell's third benchmark—which excluded loans that might have any Alleged

---

[10]     All articles except for the most recent, the Palmer Article, have been published or are
forthcoming publications.  (Ex. 26.)

Defect.  Dr. Vandell's supplemental analysis, which removed loans to which plaintiff objected from the Industry Benchmark, still yielded consistent results, which plainly confirms Dr. Vandell's analysis and conclusions.[11]  (Ex. 6 (Vandell Supplement) at Exs. 57A-B, 59.)

Plaintiff also cites *JT Colby & Co., Inc.* v. *Apple Inc.*, a trademark infringement case (*see* Pl. Br. at 9), where this Court excluded expert testimony about a consumer confusion survey that did not control for confusion arising from factors not alleged to constitute wrongdoing.  2013 WL 1903883, at *22-23 (S.D.N.Y. May 8, 2013).  Here, in contrast, Dr. Vandell's approach relied on proper benchmarks, because he (i) excluded from his Industry Benchmark millions of loans involved in litigation brought by this plaintiff (and other plaintiffs), (ii) chose as the basis for his GSE Benchmark loans assessed and purchased by the most experienced players in the mortgage industry—loans whose characteristics were disclosed in Freddie Mac and Fannie Mae SEC filings and affirmed in litigation to be accurate—and (iii) controlled for the factors (*e.g.,* observable loan and borrower characteristics and economic factors) that impact the performance of the loans in the benchmarks.  The other cases relied upon by plaintiff are similarly distinguishable.  *EEOC* v. *Bloomberg L.P.*, 2010 WL 3466370, at *2, *11-12 (S.D.N.Y. Aug. 31, 2010) (excluding expert testimony in pregnancy discrimination case that failed to compare class members to similarly situated non-class members); *Celebrity Cruises Inc.* v. *Essef Corp.*, 434 F. Supp. 2d 169, 182 (S.D.N.Y. 2006) (excluding expert's lost profits analysis that failed to account for performance benchmark of similarly situated cruise lines).

Plaintiff's criticisms of Dr. Vandell go (at most) to the weight of his testimony, not its admissibility.  As the Federal Circuit explained in overturning a district court's exclusion

---

[11]     Dr. Vandell's supplemental exhibits and analyses were not "untimely" as asserted by plaintiff.  (Pl. Br. at 11 n.13.)  Those analyses respond directly to opinions offered by Dr. Saunders—as Dr. Vandell will do at trial.

of an expert's benchmark analysis, a party "is free to challenge the benchmark or argue for a more accurate benchmark," but such arguments go to "evidentiary weight, not admissibility." *Apple Inc.* v. *Motorola, Inc.*, 757 F. 3d 1286, 1319 (Fed. Cir. 2014). *See also United States* v. *Cavely*, 318 F.3d 987, 997 (10th Cir. 2003) (challenges to assumptions underlying an expert's testimony go to weight, not admissibility). Dr. Vandell's benchmarks are the product of careful, reliable analyses that are supported by researchers in his field of study—and even by the research plaintiff offers to attack his methods. Testimony based on those benchmarks is reliable and admissible.

## II. DR. VANDELL'S OPINIONS BASED ON THE REUNDERWRITING BENCHMARK ARE RELIABLE.

The assertion that Dr. Vandell's Reunderwriting Benchmark is somehow unreliable because it contains loans reunderwritten by plaintiff's experts in five other cases brought by plaintiff against other defendants is contradicted by plaintiff's own assertions on this motion. Plaintiff's motion first criticizes Dr. Vandell for not reunderwriting a sample of loans in the Industry and GSE Benchmarks, and plaintiff then turns around and seeks to criticize Dr. Vandell for using the Reunderwriting Benchmark, which is comprised entirely of loans reunderwritten by plaintiff's own experts (Mr. Hunter, Mr. Payne and Mr. Butler).

Plaintiff argues that Dr. Vandell could not rely on the Reunderwriting Benchmark because he is not an expert in reunderwriting, and because plaintiff's experts' opinions about the loans in the benchmark are hearsay. (Pl. Br. at 11-12.) But it is perfectly permissible for Dr. Vandell to assume that loans plaintiff's experts found were originated in accordance with underwriting guidelines actually met that standard—and of course an expert is entitled to rely on hearsay. *See* Fed. R. Evid. 703; *United States* v. *Locascio*, 6 F. 3d 924, 937-38 (2d Cir. 1993) ("[E]xpert witnesses can testify to opinions based on hearsay or other inadmissible evidence if

experts in the field reasonably rely on such evidence in forming their opinions.").  It is also axiomatic that experts "may rely on assistants or the opinions of other experts in formulating their own expert opinions."  *Faulkner* v. *Arista Records LLC*, 2014 WL 4547824, at *18 (S.D.N.Y. Sept. 15, 2014) (citing *Dura Auto Sys. of Indiana* v. *CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002)).  No reunderwriting expertise is required to perform the classic expert function of assuming certain facts to be true.[12]

Plaintiff also criticizes the Reunderwriting Benchmark as something that was "patched together," suggesting some problem with using loans from "different securitizations in different Actions with different originators."  (Pl. Br. at 11-12 & n.14.)  That is the nature of a benchmark—it cannot be made up entirely of the same loans being studied, or it would not be a point of comparison at all.  *Floyd*, 861 F. Supp. 2d at 281 & n.24 (explaining that a benchmark analysis is a "comparison," which controls for other factors).[13]  In fact, plaintiff has served expert reports in related actions in which it asserts that Mr. Hunter's, Mr. Payne's and Mr. Butler's conclusions are reliable.  (Ex. 30 (Hunter Ally Report); Ex. 31 (Payne Merrill Lynch Report);

---

[12]    Although the Court need not determine whether the findings of plaintiff's reunderwriting experts' are admissions (Pl. Br. at 13 n.17), some courts have held that they are.  *See, e.g.*, *Collins* v. *Wayne Corp.*, 621 F.2d 777, 781-82 (5th Cir. 1980) (finding that the district court erred in not admitting an expert's deposition testimony as an admission of the party), *superseded by rule on other grounds, as recognized in Mathis* v. *Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002); *United States* v. *Ten Cartons, More or Less, Ener-B Vitamin B-12*, 1993 WL 52225, at * 1 (E.D.N.Y. Jan. 15, 1993) (admitting expert's deposition statements as party admissions subject to certain conditions allowing the party to question its expert).

[13]    Plaintiff asserts in a footnote that Dr. Schwert's rebuttal benchmarking exercise (using only sample loans from the seven Nomura Securitizations) is a preferable benchmark analysis. (Pl. Br. at 13 n.18.)  Among other flaws, Dr. Schwert's analysis erroneously uses the At-Issue Loans as a benchmark for the At-Issue Loans.  As Dr. Vandell testified, Dr. Schwert's analysis "can tremendously bias the sort of results one would get."  (Ex. 2 (Vandell Nov. Dep.) at 170:12-20.)  In any event, Dr. Schwert's use of a different method is no basis to exclude Dr. Vandell's method.

Ex. 32 (Butler HSBC Report); Ex. 33 (Butler First Horizon Report); Ex. 34 (Butler Credit Suisse Report).).[14]

Lastly, plaintiff contends that testimony concerning Dr. Vandell's Reunderwriting Benchmark would "lead to significant confusion and prejudice" and should be excluded under Rule 403.  (Pl. Br. at 12-13.)  The Court has now ruled, over defendants' objection, that the remaining claims in this Action will be tried to the Court.  Order, *FHFA* v. *Nomura Holdings America Inc.*, *et al.*, No. 11 Civ. 6201, at *1 (S.D.N.Y. Jan. 21, 2015) (Doc. 1119).  Plaintiff's request to exclude Dr. Vandell's testimony based on concerns about jury confusion is therefore moot.  *See Schultz* v. *Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) ("[I]n the context of a bench trial, evidence should not be excluded under [Rule] 403 on the ground that it is unfairly prejudicial.") (citing *Gulf States Utils. Co.* v. *Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. Unit A Jan. 1981)).

Dr. Vandell's Reunderwriting Benchmark is reliable and admissible.

## III.    DR. RIDDIOUGH'S TESTIMONY IS ADMISSIBLE.

Dr. Riddiough calculates damages "after accounting for loss causation, based on the loss causation analysis performed by Professor Vandell."  (Ex. 15 (Riddiough Report) ¶ 10.) Plaintiff does not dispute that Dr. Riddiough's method for accounting for loss causation is appropriate and reliable. (Ex. 15 (Riddiough Report) ¶¶ 114-22.)  Plaintiff asserts only that Dr. Riddiough's opinions concerning damages after accounting for loss causation must be excluded

---

[14]    Plaintiff asserts that Dr. Vandell did not establish that the loans in his Reunderwriting Benchmark were "reasonably comparable" to the At-Issue Loans.  (Pl. Br. at 11 n.14.)  In fact, Dr. Vandell only used loans that were from the same collateral/asset type categories as the At-Issue Loans—the same criteria (never challenged by plaintiff) that Dr. Vandell applied to develop the Industry and GSE Benchmarks.  (Ex. 1 (Vandell Report) at Ex. 55 at 2-5.)

because Dr. Vandell's opinions concerning the Industry Benchmark are inadmissible.  (Pl. Br. at 14.)  This argument fails because there is no merit to plaintiff's criticisms of Dr. Vandell.

Even if this Court were to exclude Dr. Vandell's testimony as to the Industry Benchmark, Dr. Riddiough's opinions concerning damages after accounting for loss causation would still be admissible.  Dr. Vandell opines that "[t]aken together, my benchmarking analyses show that the disclosed loans and borrower characteristics and the change in macroeconomic conditions—factors unrelated to the origination of the At-Issue Loans or any alleged misrepresentations about their characteristics—explain the defaults and serious delinquencies of six of the seven [supporting loan groups], at a minimum."  (Ex. 1 (Vandell Report) ¶ 202.)  Dr. Riddiough's opinions "incorporate" Dr. Vandell's opinions relating to loss causation—which include Dr. Vandell's opinions based on the GSE and Reunderwriting Benchmarks, as well as the Industry Benchmark.  (Ex. 15 (Riddiough Report) ¶ 13.)  All three of Dr. Vandell's benchmarking analyses determined that loans backing at least six of the seven Certificates performed as predicted by the respective benchmarks.  (Ex. 1 Vandell Report) ¶¶ 185-87.)  For those six Certificates, whichever benchmark is used, Dr. Riddiough's "conclusion is that there is zero damages."  (Ex. 35 (Riddiough Nov. Dep.) at 307:15-16.)  This opinion is admissible regardless of the admissibility of Dr. Vandell's testimony concerning the Industry Benchmark.

**CONCLUSION**

The Court should deny plaintiff's motion to exclude certain testimony and opinions of Dr. Kerry Vandell and Dr. Timothy Riddiough.

Dated:  New York, New York
       January 23, 2015

Respectfully submitted,

/s/ Thomas C. Rice                  /s/ David B. Tulchin
Thomas C. Rice (trice@stblaw.com)     David B. Tulchin (tulchind@sullcrom.com)
David J. Woll (dwoll@stblaw.com)      Steven L. Holley (holleys@sullcrom.com)
Andrew T. Frankel (afrankel@stblaw.com)   Bruce E. Clark (clarkb@sullcrom.com)
Alan Turner (aturner@stblaw.com)      Bradley A. Harsch (harschb@sullcrom.com)
Craig S. Waldman (cwaldman@stblaw.com)   Katherine J. Stoller (stollerk@sullcrom.com)
SIMPSON THACHER & BARTLETT LLP    SULLIVAN & CROMWELL LLP
425 Lexington Avenue            125 Broad Street
New York, NY  10017             New York, NY  10004
Telephone:  212-455-2000         Telephone:  212-558-4000
Facsimile:  212-455-2502          Facsimile:  212-558-3588

*Attorneys for Defendant RBS Securities Inc.*   Amanda F. Davidoff
                                 (davidoffa@sullcrom.com)
                                 Elizabeth A. Cassady
                                 (cassadye@sullcrom.com)
                                 SULLIVAN & CROMWELL LLP
                                 1700 New York Avenue, NW, Suite 700
                                 Washington, DC  20006
                                 Telephone:  202-956-7500
                                 Facsimile:  202-956-6993

                                 *Attorneys for Defendants Nomura Holding*
                                 *America Inc., Nomura Asset Acceptance*
                                 *Corporation, Nomura Home Equity Loan, Inc.,*
                                 *Nomura Credit & Capital, Inc., Nomura*
                                 *Securities International, Inc., David Findlay,*
                                 *John McCarthy, John P. Graham, Nathan*
                                 *Gorin, and N. Dante LaRocca.*