# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588

WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

February 2, 2015

By E-mail and ECF

The Honorable Denise L. Cote,
    United States District Judge,
        Daniel Patrick Moynihan United States Court House,
            500 Pearl Street, Room 1610,
                New York, New York  10007-1312.

Re:     *FHFA* v. *Nomura Holding America, Inc., et al.*, 11 Civ. 6201 (S.D.N.Y.)

Dear Judge Cote:

Defendants respectfully submit this opposition to plaintiff's January 23, 2015 Motion *in Limine* No. 7 ("Mot." or "Motion"), which seeks to exclude "evidence, testimony, and argument at trial that relates solely to the GSEs' Single Family business activities."  (Mot. at 1.) Plaintiff's Motion is another in a series of requests that the Court conduct a trial that is entirely disconnected from the important facts and circumstances surrounding the seven transactions at issue.  Moreover, the evidence to which plaintiff refers does not relate "solely" to the "single family" side of Freddie Mac and Fannie Mae's businesses.

## BACKGROUND

Plaintiff seeks to exclude evidence that it contends "relates solely" to Freddie Mac's and Fannie Mae's single family guarantee businesses.  The evidence plaintiff seeks to exclude is, however, relevant to (i) the causes of plaintiff's alleged losses and (ii) the materiality of the alleged misstatements in the Offering Documents.  Indeed, the evidence in question does not "relate solely" to the "single family" side of Freddie Mac and Fannie Mae's businesses.

For example, plaintiff seeks to exclude testimony of Fannie Mae's Vice President of Credit Risk Analytics and Modeling, Eric Rosenblatt, which addresses the causes of plaintiff's alleged losses—namely, the effect of the steep decline in housing prices on the loans underlying private label securities ("PLS") purchased by Fannie Mae.  Rosenblatt's duties at Fannie Mae included the development of models used to analyze loan performance under various housing price appreciation scenarios, including loans in supporting loan groups for PLS.  (Ex. A (Rosenblatt Tr.) 36:10-37:24; 185:20-22; 255:19-257:20.)  He testified that his group tracked home prices because the potential impact on Fannie Mae's losses was "super big" (*id.* at 185:20-186:5), and that the effect of the decline in house prices that occurred after 2005 was "[i]ncredibly" significant to the performance of the loans held by Fannie Mae.  (Ex. A

Hon. Denise L. Cote                                                                          -2-

(Rosenblatt Tr.) 187:19-188:8.)  Rosenblatt was also clear that the decline in housing prices
directly affected Fannie Mae's PLS portfolio:

> Q:      So did these same factors that affected the performance of
> loans on single family—Fannie Mae's single family business,
> would they have also affected the performance of loans that backed
> private label securities?
>
> A:      Yes.  Yes.

(Ex. A (Rosenblatt Tr.) 188:9-188:16.)  This testimony does not relate "solely" to Fannie Mae's
"single family" business—on its face, it pertains squarely to loss causation in this action.

    The Rosenblatt testimony to which plaintiff refers also includes his explanation of
how the decline in housing prices caused plaintiff's alleged losses.  For subprime loans,
according to Rosenblatt, the "ability to be paid off actually depended on the ability of a borrower
to refinance after a short period" (Ex. A (Rosenblatt Tr.) 197:13-198:18), and that when "house
prices failed to continue to appreciate," subprime borrowers could not "get out of a loan" by
refinancing and could "no longer continue to pay on," which would cause the loan to "default"
(Ex. A (Rosenblatt Tr.) at 198:20-199:15).  Rosenblatt also testified that in December 2007, he
told Fannie Mae's Chief Risk Officer that he believed home prices would decline significantly—
and noted that the decline in housing prices would have a "gigantic impact" on the mortgage
market generally, so Fannie Mae was "in for a fresh shit storm."  (Ex. A (Rosenblatt Tr.) at
222:17-225:19.)  Such testimony bears directly on defendants' loss causation arguments, and
confirms the commonsense notion that the unprecedented decline in housing prices after 2007
caused the value of the seven at-issue Securitizations to decline.

    Plaintiff also seeks to exclude certain parts of the testimony of Lesia Bates Moss,
Fannie Mae's Vice President and Head of Counterparty Risk for the single family and PLS
businesses during the relevant period.  This testimony, too, is relevant to loss causation.
Specifically, plaintiff seeks to exclude Bates Moss's testimony about "market intelligence from
bond traders [in March 2006] regarding subprime activity"—namely, that originators had
decided to "loosen their underwriting criteria," which was expected to result in "deterioration in
performance metrics."  (Ex. B (Bates Moss Tr.) at 446:20-24; 447:2-14; 450:9-18; 451:5-23.)
Bates Moss's testimony is that a loosening of underwriting criteria for subprime loans (such as
those underlying the Securitizations) would cause poor performance of loans in PLS.  This is
plainly relevant to loss causation.

    The testimony plaintiff seeks to exclude from Don Bisenius, Freddie Mac's
Senior Vice President in charge of risk management, is about a Freddie Mac model that was
used, during the period 2005 to 2007, to estimate the riskiness of loans (including subprime and
Alt-A loans like those underlying the Securitizations) based on their disclosed characteristics.
(Ex. C (Bisenius Tr.) at 44:19-45:8.)  The testimony of Freddie Mac's Senior Vice President for
risk management about what factors Freddie Mac (as an investor) considered relevant when it
was scoring loans, including subprime and Alt-A loans, is highly relevant to the materiality of
loan characteristics disclosed in the Offering Documents.

Hon. Denise L. Cote                                                    -3-

   Plaintiff also seeks to exclude various documents concerning subprime loans that are relevant to loss causation.  For example, plaintiff seeks to exclude a June 22, 2005 Fannie Mae presentation that discusses "the private label market" (*i.e.*, it does not relate, as plaintiff contends, "solely" to the single family side of the business) and states, with respect to subprime loans, that "[h]igh home price growth tends to reduce credit losses."  (Ex. D (FM-COGR_00088741) at FM-COGR_00088782.)  Plaintiff also seeks to prevent defendants from introducing another Fannie Mae presentation, dated May 23, 2006, entitled "Sub-Prime New Business Initiative."  (Ex. E (FHFA01440072) at FHFA01440072 -0082.)  That presentation refers to Fannie Mae's program to purchase subprime loans, an initiative with which Fannie Mae PLS personnel were directly involved.  (*See e.g.*, Ex. F (Norris Tr.) at 578:2-13 (Fannie Mae's head PLS trader was involved in the "pricing of interest rates of whole loans, of subprime whole loan packages" as part of Fannie Mae's New Business Initiative).)  This document is also relevant to loss causation (and does not relate "solely" to the single family portion of Fannie Mae's business) because it states that the "[r]easons sub-prime grew" included "[r]ecord home price appreciation driving cash-out refinances while buffering default rate and loss severity." (Ex. E (FHFA01440072) at FHFA01440082.)

## ARGUMENT

## I.  THE EVIDENCE PLAINTIFF SEEKS TO EXCLUDE IS RELEVANT TO LOSS CAUSATION AND MATERIALITY.

   The evidence plaintiff seeks to exclude is highly relevant to whether factors other than the alleged misrepresentations in the Offering Documents caused losses in the subprime and Alt-A loans backing the Securitizations.  Plaintiff does not argue to the contrary; in fact, plaintiff never mentions loss causation in its Motion.  Of course, Section 12(a)(2) requires an analysis of loss causation in determining the extent to which alleged misstatements in a prospectus caused injury to the plaintiff.

   Rosenblatt's testimony was that the decline in housing prices after 2007 "affected the performance of loans that backed private label securities."  (Ex. A (Rosenblatt Tr.) 187:19-188:16.)  Rosenblatt then explained why and how falling home prices would affect a subprime borrower's ability to repay his loan (Ex. A (Rosenblatt Tr.) 197:13-198:18; 198:20-199:15), and testified that he had observed the impact of falling housing prices on subprime borrowers by December 2007, and had predicted at that time that the situation would get worse.  (Ex. A (Rosenblatt Tr.) 222:17-225:19.)  This testimony relates directly to the reasons why subprime loans such as those underlying the Securitizations performed worse than expected.  Bates Moss's testimony is also relevant to loss causation.  She testified that a "loosening of underwriting criteria" by March 2006 would adversely affect the performance of subprime loans, with no mention of any purported failure to comply with such underwriting criteria contributing to the problem.  (Ex. B (Bates Moss Tr.) at 450:9-18; 451:5-23.)  This was based on "market intelligence from bond traders regarding subprime activity"—that is, market intelligence from PLS traders, commenting on loans backing PLS.  (Ex. B (Bates Moss Tr.) at 447:2-14; 448:10-21.)

   The evidence plaintiff seeks to exclude is also relevant to materiality.  Testimony about the factors that determine the performance of subprime and Alt-A loans bears on what

Hon. Denise L. Cote                                                                                 -4-

mattered to a reasonable PLS investor who invested in such loans as part of PLS.  For example, Rosenblatt's advice in a November 2005 email to Kent Willard that debt-to-income ratio was not an "important model variable" for predicting the performance of subprime loans is evidence of what mattered to PLS investors—because Willard was responsible for analyzing Fannie Mae's PLS purchases.  (Ex. G (FHFA03526436) at FHFA03526436.)  The testimony from Bisenius that plaintiff seeks to exclude is likewise relevant to materiality, as Freddie Mac used the loan performance model Bisenius described to score and evaluate subprime and Alt-A loans like the ones included in supporting loan groups for the seven Securitizations.  (Ex. C (Bisenius Tr.) at 44:19-45:8; *see* Ex. H (Non-Prosecution Agreement, Ex. A) at ¶¶ 8-9, 11, 19.)[1]  The characteristics of subprime and Alt-A loans that Freddie Mac thought were important go directly to the materiality of alleged misstatements in the Offering Documents about loan characteristics.  At the very least, this is circumstantial evidence of what mattered to reasonable PLS investors.

As shown above, the evidence plaintiff claims relates "solely" to Freddie Mac's and Fannie Mae's single family businesses in fact pertains to PLS or subprime and Alt-A loans generally.  This is no surprise.  As of December 2006, 10% of Freddie Mac's single family portfolio of loans were subprime in credit quality; and by September 2007, 30% of Fannie Mae's single family portfolio was low-documentation Alt-A.  (Ex. H (Non-Prosecution Agreement, Ex. A) at ¶¶ 13, 24, 28, 60.)  It was necessary for Freddie Mac and Fannie Mae to analyze the determinants of how subprime and Alt-A loans performed on both sides of their business and they did so.  Evidence of that analysis is highly relevant to this case.

## II.      PLAINTIFF'S MOTION IS FAR TOO BROAD.

The relief that plaintiff seeks in its current motion—exclusion of a wide swath of documents and testimony that plaintiff wrongly contends relate "solely" to Fannie Mae's and Freddie Mac's single-family guarantee business—is hugely overbroad.  A motion to exclude all evidence that touches on the single-family guarantee business, without considering the context in which that evidence would be used at trial, is simply "too sweeping in scope to be decided *in limine*."  *National Union Fire Ins. Co.* v. *L.E. Myers Co. Group*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996).  Much of the evidence pertains directly to the important issues of materiality and loss causation.

---

[1]      Evidence from Freddie Mac and Fannie Mae's single-family guarantee businesses, especially evidence concerning whole-loan due diligence, is also relevant to falsity.  On December 18, 2014, the Court excluded evidence concerning "the GSEs' Single Family businesses' whole-loan due diligence" on the basis that the probative value of that evidence was outweighed by the danger of jury confusion.  Dkt. No. 993.  Less than a month later (January 15, 2015), the Court allowed plaintiff to withdraw its Section 11 claims and held that the remaining claims would be tried before the Court, not a jury.  Dkt. No. 1095.  For the reasons set forth in defendants' October 17, 2014 opposition to plaintiff's motion *in limine* on this issue, Dkt. No. 889, defendants now respectfully request that the Court reconsider and change its decision to exclude such evidence from trial in light of the fact that the claims now will be tried to the Court.

Hon. Denise L. Cote                                                                                          -5-


        If the Court is not inclined to deny the motion outright, then the Court should "reserve judgment" on the evidence identified by plaintiff's motion "until trial when admission of particular pieces of evidence is in an appropriate factual context." *National Union Fire Ins. Co.*, 937 F. Supp. at 287.  Indeed, defendants may, for example, lay a foundation at trial that certain evidence, such as evidence about the adverse effect of the unprecedented decline in housing prices on the performance of subprime and Alt-A loans, applied equally to single family and PLS loans with similar credit characteristics.  The motion should therefore be denied.

Respectfully submitted,

/s/ David B. Tulchin

David B. Tulchin

cc:  All counsel of record (via ECF)