**SULLIVAN & CROMWELL LLP**

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

February 9, 2015

By E-mail

The Honorable Denise L. Cote,
   United States District Judge,
      Daniel Patrick Moynihan United States Courthouse,
         500 Pearl Street, Room 1610,
           New York, New York 10007-1312.

        Re:    *FHFA* v. *Nomura Holding America, Inc., et al.*, 11 Civ. 6201 (S.D.N.Y.)

Dear Judge Cote:

       Defendants respectfully submit this opposition to plaintiff's Motion *in Limine* No. 10, dated January 30, 2015 ("Mot." or "Motion"), which seeks to exclude evidence "regarding the establishment or operation of FHFA's conservatorship of the GSEs or GSE profitability." (Mot. at 1.) Plaintiff's Motion is another effort to create a trial record that omits the truth about plaintiff itself, the necessary context in which the transactions took place, and important evidence bearing on materiality and the loss causation defense.

**I.    EVIDENCE CONCERNING FHFA'S CONSERVATORSHIP IS RELEVANT TO LOSS CAUSATION AND MATERIALITY.**

       By June 2008, Freddie Mac's $212 billion non-agency private-label securities ("PLS") portfolio had unrealized losses of $30 billion (Mot. Ex. 6 at 22), and Fannie Mae had an estimated fair value loss of $7.9 billion on its $48.8 billion portfolio of subprime and Alt-A PLS, including those at issue in this case. (Mot. Ex. 5 at 27.) When plaintiff Federal Housing Finance Agency ("FHFA") placed Freddie Mac and Fannie Mae into conservatorship, it explained its decisions in memoranda dated September 6, 2008. (Mot. Exs. 5; 6.) FHFA's Director at the time, James B. Lockhart III, testified at deposition in this action about the decisions to place Freddie Mac and Fannie Mae into conservatorship and also to terminate their CEOs. (Mot. Ex. 2; *see also* Mot. Exs. 3; 4.) All of this evidence bears directly on loss causation and materiality.

    **A.    Plaintiff Seeks to Exclude Evidence That Freddie Mac's and Fannie Mae's Losses Were Caused in Whole or in Large Part by the Decline in House Prices and the Economic Downturn.**

       The evidence plaintiff seeks to exclude regarding its conservatorship is highly relevant to loss causation, *i.e.*, whether factors other than the alleged misrepresentations in the Offering Documents caused losses in the subprime and Alt-A loans backing the seven Securitizations. FHFA's September 6, 2008 memorandum concerning Freddie Mac explains that "[f]rom the end of 2001 through early 2007, the annual growth in house prices averaged 7%," and that this run-up in

house prices was "fueled" in part by "relaxed lending standards" for subprime and Alt-A loans that "led to a significant deterioration in credit quality that manifested itself through higher delinquencies and foreclosures." (Mot. Ex. 6 at 4.) The memorandum also observes that "[f]urther declines in house prices are likely to place additional pressure on overall mortgage credit quality as the incentive for homeowners to walk away from their mortgage[] payment[s] increases." (Mot. Ex. 6 at 5.) In its September 4, 2008 letter to Freddie Mac's CEO, plaintiff cited "deteriorating housing price trends" as among the factors that placed Freddie Mac's future earnings "at grave risk." (Mot. Ex. 3 at 4.) FHFA's September 4, 2008 letter to Fannie Mae's CEO also indicates that the nationwide decline in "housing prices" caused Fannie Mae's losses. (Mot. Ex. 4 at 3.) All of this is important evidence showing that factors other than the alleged misrepresentations in the Offering Documents caused or contributed to Freddie Mac's and Fannie Mae's losses.

The same FHFA documents show that the decisions to place Freddie Mac and Fannie Mae into conservatorship and to fire their CEOs were made, at least in part, because the GSEs had failed to take into account the very risks that ultimately materialized to cause their losses. FHFA's September 6, 2008 memorandum about Freddie Mac states that Freddie Mac ignored FHFA's warning in 2006 that "the expansion of the subprime PLS portfolio outpaced the attendant risk management structure," and that the "weaknesses in risk management rendered [Freddie Mac] 'vulnerable to unidentified and latent risk' in the portfolio." (Mot. Ex. 6 at 13-14.) According to FHFA, these were among the "numerous unsafe or unsound practices" that subjected Freddie Mac to "abnormal risk of loss." (Mot. Ex. 6 at 28.) FHFA also wrote that "Fannie Mae executives purchased private label securities backed by Alt-A or subprime loans during a time that credit quality in the sector was manifest and was deteriorating." (Mot. Exs. 5 at 14; 2 at 230:6-23.) Lockhart confirmed at his deposition that Freddie Mac's and Fannie Mae's risk management practices in connection with PLS purchases "contributed to their losses" on PLS. (Mot. Ex. 2 at 224:23-225:20, 232:20-233:6, 254:8-256:7.) FHFA recognized (*e.g.*, in Mot. Exs. 3 at 1-4, 6; 4 at 3-4; 6 at 4-5, 9, 12, 28) that those known risks had manifested themselves as substantial losses. All of this is entirely inconsistent with plaintiff's current attempt to blame defendants' alleged misrepresentations for 100% of the GSEs' losses on the seven at-issue Certificates.

In short, the evidence at issue shows that (i) the subprime and Alt-A loans underlying Freddie Mac's and Fannie Mae's PLS carried a heightened risk of non-performance in the event of severe house price declines and stressful economic conditions, (ii) Freddie Mac and Fannie Mae recognized those risks as factors that could cause loans not to perform, and (iii) FHFA placed Freddie Mac and Fannie Mae into conservatorship at least in part because those known risks materialized to produce substantial losses. This evidence is also significant for what it does not say: nowhere does FHFA or Lockhart blame misrepresentations in offering documents for Freddie Mac's and Fannie Mae's losses. If misrepresentations in offering documents had been a cause of those losses, surely the professionals at FHFA would have identified such misrepresentations by 2008 as a factor in the decline in value of these and other PLS. The true cause of Freddie Mac's and Fannie Mae's losses on PLS—especially the decline in house prices—was identified in the very evidence that plaintiff now seeks to exclude.

  **B.**  **The Evidence at Issue Also Bears on Materiality.**

The same evidence also bears directly on whether the alleged misrepresentations were material. As discussed above, FHFA repeatedly identified house price decline and economic conditions, in conjunction with the known and inherent risks of subprime and Alt-A loans, as the primary drivers of potential (and later, actual) losses. This evidence shows that a reasonable investor

would have focused on those same risk factors in deciding whether to purchase PLS.  Materiality must be determined not in a vacuum, but in the context of the information then understood by the market and PLS investors.

II.     **THE COURT SHOULD NOT RESTRICT DEFENDANTS' ABILITY TO CROSS LEONARD BLUM.**

Even though the parties have not yet submitted direct testimony for their witnesses, plaintiff requests that the Court bar defendants from cross examining plaintiff's expert, Leonard Blum, with articles Blum wrote about Freddie Mac and Fannie Mae.  (Mot. at 2; Exs. A-C, January 30, 2015 Declaration of Zachary Williams ("Williams Decl.").)  Blum makes numerous statements in the articles plaintiff seeks to exclude that are potentially relevant: (i) in articles dated April 8, 2008 and July 10, 2008, Blum wrote that Freddie Mac and Fannie Mae "continue to pile risk onto their already highly levered balance sheets" (Williams Decl. Exs. A at 2; B at 1); (ii) in his July 10, 2008 article, Blum stated that Freddie Mac and Fannie Mae were "widely perceive[d]" to "enjoy [the government's] implied credit support" (Williams Decl. Ex. B at 2); (iii) in a September 6, 2008 article, Blum wrote that "Freddie and Fannie never should have been allowed to exist in Never-Never land—a dystopia where taxpayers bore risk and shareholders enjoyed rewards" (Williams Decl. Ex. C at 2); and (iv) in the same article, Blum stated that Freddie Mac's and Fannie Mae's regulatory capital guidelines were "written at a time when everyone believed homes don't decrease in value." (Williams Decl. Ex. C at 2.)  According to plaintiff, Blum will testify about "RMBS underwriting and rating processes, and the impact on those processes of defective loan originations and misrepresentations of collateral characteristics."  (Mot. at 2.)  If Blum will testify about the RMBS "underwriting and rating processes," defendants should be permitted to cross him with assertions he has made in the past that bear on those same processes.

For example, the statements in Blum's articles may be useful to show that Blum overstates the rating agencies' sensitivity to defective loans because the risk posed by such loans was considered minimal due to assumptions about the path of home prices.  For the same reason, his articles suggest that the purported loan defects on which plaintiff has based its case would not have been material to a reasonable investor or the rating agencies.  His articles also pertain to the reasons Freddie Mac and Fannie Mae took risks that caused their losses—because they enjoyed an implicit guarantee from taxpayers and could use credit support from the federal government to increase their profits.  It would be unfair—and also premature—to deny defendants in advance the right to cross Blum about his prior statements that bear on the opinions he apparently intends to offer at trial.  As the Second Circuit has held, in determining whether an alleged misstatement was material, the finder of fact considers "the defendants' representations, taken together and in context."  *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (internal quotation marks omitted); *see also Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 165 (2d Cir. 2000) ("Materiality is determined in light of the circumstances existing at the time the alleged misstatement occurred.").

III.    **FREDDIE MAC'S AND FANNIE MAE'S POST-FILING PROFITABILITY TENDS TO SHOW THAT THEIR LOSSES WERE CAUSED BY MARKET-WIDE EVENTS, NOT MISREPRESENTATIONS.**

Plaintiff seeks to exclude evidence of Freddie Mac's and Fannie Mae's recent profitability despite the fact that both entities have attributed that profitability at least in part to more favorable house price trends and improving economic conditions.   This tends to show that increases

or decreases in the value of their PLS holdings depend on factors that have nothing to do with the purported misrepresentations in the Offering Documents.[1]  For example, in its 2012 10-K, Freddie Mac represented to investors that "we observed certain signs of improvement in the housing market, which contributed positively to our financial results." (Mot. Ex. 15 at 3.)  Freddie Mac also referred to "macroeconomic drivers of the economy, such as income growth, employment, and inflation" as "key" factors that "affect the performance of the housing and mortgage markets." (Mot. Ex. 15 at 85.)  In its 2014 Third Quarter 10-Q, Freddie Mac stated that "[o]ur recent financial results, particularly the level of loan loss provisioning, also benefited significantly from strong home price appreciation." (Mot. Ex. 17 at 2.)

The evidence plaintiff seeks to exclude is relevant to loss causation and materiality because it shows that the primary factors affecting the performance of loans underlying the seven Securitizations were house prices and the economy, rather than purported misrepresentations in the Offering Documents about compliance with originator underwriting guidelines.  This motion, as with others plaintiff has recently filed, seeks to eliminate (i) all context from the events surrounding the transactions at issue, and (ii) key evidence about the true cause of any decline in value of the securities at issue.

## IV.   FREDDIE MAC'S AND FANNIE MAE'S BUSINESS RELATIONSHIPS.

Plaintiff has asked the Court to exclude evidence of any ongoing "single-family business relationship between [Freddie Mac and Fannie Mae] and any Defendant—or any other lender, vendor or capital markets participant who may have had a role in the Securitization." (Mot. at 3.)  This is a strange request that again seeks to create a trial record that is devoid of the necessary context surrounding the transactions that are at issue.  Indeed, plaintiff does not identify any specific piece of evidence it wishes to exclude, nor does it identify any particular relationship it wants the Court to refrain from considering.  This request is too vague—and far too broad and imprecise—to be granted.  It is also premature.  The parties have not yet submitted written direct testimony, and it is not possible at this point to determine whether the evidence plaintiff seeks to exclude may be relevant to rebutting plaintiff's proofs at trial.

The kinds of relationships plaintiff seeks to exclude from the Court's consideration are in any event relevant.  For example, the business dealings since 2007 between Freddie Mac or Fannie Mae and the due diligence providers used by Nomura tend to discredit plaintiff's allegations that loans underlying the Securitizations contained many underwriting defects.  Due diligence providers such as Clayton and AMC routinely found that the pools of loans relevant to this case contained few defective loans.  Plaintiff's tactic for rebutting this contemporaneous proof of loan quality from market-leading vendors is apparently to try to discredit them or to argue that those vendors are or were unreliable and untrustworthy.  *See, e.g.*, Plaintiff's November 10, 2014 Memorandum of Law in Support of Its Motion for Partial Summary Judgment on Defendants' Due Diligence and Reasonable Care Defenses (Doc. No. 982), at 31-32.  These arguments about the vendors are undermined by evidence of the extent to which Freddie Mac and Fannie Mae relied on those same firms during the relevant time.  The same is true with respect to originators and appraisers—*i.e.*, Freddie Mac's and Fannie Mae's reliance on those firms and persons, and the GSEs' contemporaneous evaluations of

---

[1]   Plaintiff has not moved to preclude the introduction of Freddie Mac's and Fannie Mae's Annual and Quarterly Reports for purposes other than to show their profitability.

their honesty and competence tend to undermine plaintiff's current argument that those entities and persons were dishonest or unreliable. The GSEs' continued relationships with those entities and persons whose work and integrity plaintiff now attempts to besmirch is directly relevant to the issue of falsity.

          Respectfully submitted,

          /s/ David B. Tulchin

          David B. Tulchin

cc:    Counsel of Record via e-mail