quinn emanuel trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 | FAX (212) 849-7100

February 9, 2015

**VIA ELECTRONIC MAIL**

The Honorable Denise L. Cote
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1610
New York, NY 10007-1312

Re:     *FHFA v. Nomura Holding Am., Inc., et al.*, No. 11 Civ. 6201 (S.D.N.Y.) (DLC)

Dear Judge Cote:

FHFA respectfully requests that Defendants' Motion *in Limine* No. 9 ("Mot.") to preclude evidence or argument relating to Clayton Holding LLC's ("Clayton") "trending reports" be denied because (1) those reports are probative of whether Nomura's representations regarding the mortgage loans collateralizing the Securitizations were false, and (2) the statements within the reports are factual in nature and not inadmissible hearsay.

## BACKGROUND

During 2006 and 2007, Clayton aggregated data from the diligence reviews it conducted for multiple clients in the RMBS industry and issued reports containing both summary and detailed review findings (the "Trending Reports"). Several reports concern the loans at issue here. *First*, Clayton generated reports aggregating data from the diligence reviews it conducted on Nomura's loan pools during each quarter of 2006 (7,017 total loans), including loan-level exceptions that Clayton identified during its reviews (the "2006 Trending Report") (Defs.' Ex. C). The 2006 Trending Report shows that Nomura waived in 23% of all loans that Clayton reviewed for Nomura during that period. (*Id.* at CLAY_FHFA-E_000677899). *Second*, in 2007, Clayton distributed a report summarizing data relating to its grading of loans during diligence reviews conducted in each quarter of 2006 and the first and second quarters of 2007. The data was organized by client and shows, among other things, that Nomura waived in 58% of all loans that Clayton graded EV3 (6,970) during that period (the "2007 Trending Report") (Defs.' Ex. B at 8). *Finally*, Clayton internally distributed reports aggregating diligence data for six Fremont loan pools that RBS purchased during 2006 (the "Fremont Trending Report") (Ex. 1).

## ARGUMENT

### I.   The Trending Reports Are Probative Of Falsity And Materiality

While Defendants assert that the Trending Reports "cannot show that any loans classified as 'exceptions' were included in an at-issue Supporting Loan Group," Mot. 3, in fact, the 2006 Trending Report identifies specific material exceptions for 259 loans that Nomura purchased and

securitized into the SLGs—including "LTV>100%," "LTV Exception => 10%," "Debt Ratio > 55%," "Missing credit report," "Stated income not reasonable," "Value used by lender not supported," "Quality of Appraisal Report Unacceptable," "Income docs do not meet guidelines for grade/doc type," "Payment shock exceeds lender/investor guidelines," and "Cash Out amount exceeds guidelines." (*Compare* Defs.' Ex. C at CLAY_FHFA-E_000677901, col. J, *with* Ex. 2 (Ex. 4 to Cipione Decl. (sheet "Master Database Mapping," col. F) (Dkt. 989-4))). The 2006 Trending Report is thus direct evidence that the 259 SLG loans were materially defective, and reinforces the findings of FHFA's re-underwriting expert, Robert Hunter, who re-underwrote eleven of the 259 waived-in SLG loans, and found that eight of them suffered from material underwriting defects. (*Compare* Ex. 3 (Ex. 2 to 5/15/2014 Expert Report of Robert Hunter), *with* Defs.' Ex. C at CLAY_FHFA-E_000677901, col. I).[1]

The Trending Reports are also circumstantial evidence of falsity. They show that: (i) Clayton was routinely identifying large numbers of material credit defects by the relevant originators during the relevant time period, which supports the inference that these originators were systematically originating defective loans; and (ii) Nomura and RBS Securities, Inc. ("RBSSI") waived in the majority of defective loans that Clayton identified—58% and 53%, respectively—which shows that Defendants failed to exclude defective loans from the SLGs. (Defs.' Ex. B at 8; Defs.' Ex. C at CLAY_FHFA-E_000677899). This latter point is further supported by the Fremont Trending Report and summary data in the 2006 Trending Report, which show that RBSSI and Nomura waived in higher percentages of loans from Fremont and OwnIt relative to other originators during 2006, (*See* Defs.' Ex. C at CLAY_FHFA-E_000677902; Ex. 1 at CLAY-FHFADEF-E-2101269), despite the fact that RBSSI regarded Fremont as "FraudMont," (Ex. 4 at RBS-FHFA-CT-5957592), and Nomura regarded OwnIt-originated loans as "crap," (Ex. 5 at NOM-FHFA_05072690).

The Trending Reports are additionally probative evidence of materiality. They show that it was RBS's and Nomura's standard practice—and standard practice in the RMBS industry—to engage vendors like Clayton to examine loans for LTV ratios, DTI ratios, and other critical credit and compliance characteristics. (*Compare* Ex. 6 at CLAY-FHFADEF-E-1159056 (listing factors for RBS), *and* Defs. Ex. C at CLAY-FHFA-E-000677910 (sheet "exception data dump – rejects") (similar for Nomura), *with* Ex. 7 at CLAY-FHFADEF-E-1162352 (sheet "Credit Reject Category data") (trending report template indicating that factors such as appraisal, LTV, and objective indicia of underwriting breaches such as "Credit Score" were expected to drive the credit reject rate in Clayton's Trending Reports across all clients)). That industry participants uniformly instructed Clayton to review the characteristics that FHFA alleges were misrepresented is strong evidence these characteristics were objectively material. Moreover, Clayton's adopted thresholds for certain loan characters (*i.e.*, LTV greater than 100% and DTI greater than 55%) are not only indicative of material breach categories, but are also evidence of material departures from underwriting guidelines.

Nomura's arguments to the contrary are meritless. Nomura argues that the Reports are irrelevant because this Court ruled that the GSEs' "general knowledge of weaknesses in some Originator practices" could not be used to show that the GSEs knew specific SLG loans were defective. Mot. 3. This argument conflates Defendants' burden of *actual knowledge* that

---

[1] The Court has noted Nomura's lack of evidence regarding waiver data. *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7232443, at *23 n.18 (S.D.N.Y. Dec. 18, 2014).

specific representations were false, *FHFA v. HSBC N. Am. Holdings Inc.*, --- F. Supp. 2d ----, 2014 WL 3702587, at *5 (S.D.N.Y. July 25, 2014), with FHFA's burden of proving the *existence* of falsity, 15 U.S.C. § 77*l*(a)(2). The former required Defendants to prove (which they could not) that, despite their purported diligence to keep defective loans out of the SLGs, *HSBC*, 2014 WL 3702587, at *63, and the fact that the GSEs did not have access to the relevant loan files, *id.* at *5, the GSEs nevertheless actually knew that Defendants' specific misrepresentations were false before they bought the Certificates. In proving falsity, by contrast, FHFA is entitled to introduce evidence, such as the Trending Reports, indicating that Defendants systematically placed defective loans into the SLGs. *Cf. Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 F. App'x 679, 681-82 (2d Cir. 2012) (trending reports or information contained therein must have been contemporaneously accessible to be probative of *scienter*).

Nomura also asserts that the defects and waivers reported by the Trending Reports are inflated because Clayton assigned grades of EV3 to some loans based on criteria in addition to the underwriting guidelines provided to it by Nomura, or "overlays." Mot. 3. But Nomura cannot dispute that Clayton assigned many EV3 grades based on findings of material defects, not overlays; hence, Nomura's concern that some other, unquantified number of loans were graded EV3 based on overlays goes to the Trending Reports' weight, not their admissibility. *See SEC v. Espuelas*, 908 F. Supp. 2d 402, 412 n.8 (S.D.N.Y. 2012) (admitting notes despite inaccuracies in transcription because "such an inaccuracy goes to the weight, not the admissibility, of the notes"). In any event, Nomura's concerns about 'inflation' caused by overlays are overblown, as those overlays were generally duplicative of criteria set forth in the guidelines. For example, Nomura cites as evidence of its overlays certain "Stips" in an email appearing in its Exhibit I— "No log homes/unique homes/manufactured housing," "No FICO < 580," "No LTV/CLTV > 100," and "No NINA and No Doc loans for first time homebuyers with LTV/CLTV > 95%"— that also appear in the underwriting guidelines of the originators of SLG loans (Ex. 8, Summary Guidelines Chart). Thus, there is no difference between a loan graded EV3 based on a violation of such an "overlay" and one graded EV3 for violating an identical guideline.[2] If anything, the Trending Reports *undercounted* the number of loans that Nomura waived in because Clayton listed a loan as "waived in" only if its client confirmed that it had purchased the loan—if the client purchased the loans but did not inform Clayton, the loan would not appear as "waived in" on the report.[3]

In short, the Trending Reports are relevant because they provide both direct and circumstantial evidence that Defendants' representations were materially false. *See FHFA v.*

---

[2] Citing FHFA's opposition to Defendants' letter seeking discovery into the waiver rates of Freddie Mac's Single-Family business, Nomura offers a strained analogy between itself and other PLS aggregators, on the one hand, and Freddie Mac on the other. Mot. 4. FHFA pointed out in the cited opposition that there were significant differences between Freddie Mac's acquisition of such loans for its Single-Family business and Defendants' acquisition of loans for securitization into PLS, chief among them that Freddie Mac utilized Clayton's 'waivers' as a flag that loans should be reviewed further. Defs.' Ex. H at 2; *see also FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7234593, at *5 (S.D.N.Y. Dec. 18, 2014) (explaining differences in program, purposes, and strictures).

[3] *See* Ex. 9 (Clayton 30(b)(6) Dep.) at 344:12-346:14 ("Q. And so this is going to the point about underreporting of actual 2Ws, to the extent a client didn't tell you that they were waiving in loans, that may not be reflected in the trending report? A. That's correct. . . . Q. And Clayton was not informed of the ultimate number of loans that were purchased by the client? A. Not always."); *see id.* 131:12-21 ("[A.] So one client could routinely let us know which loans they wanted to waive of our 3, 3C and 3Ds that would move to the 2W or 2T category for side letters or waivers. Other clients may just take our client reports and do whatever their next step in the process was, and never give us any feedback on whether they have waived loans.").

*JPMorgan Chase & Co.,* 902 F. Supp. 2d 476, 492 (S.D.N.Y. 2012) (Trending Reports contained "fact[s]that [c]ould reveal that the underwriting guidelines information [defendant] included in its Offering Documents was false.").[4]

## II.   Clayton's Trending Reports Are Not Inadmissible Hearsay

Defendants' argument that the Trending Reports are inadmissible hearsay is meritless because Defendants "manifested that [they] adopted or believed [them] to be true," Fed. R. Evid. 801(d)(2)(C).  With other defendants in these coordinated actions, Nomura and RBSSI submitted the 2007 Trending Report to the Court in December 2012, asserting that it was "[e]vidence of the GSEs' waiver rates."  (Ex. 10 (12/12/12 Klapper Ltr. 1)).  Even in its present motion, Nomura asserts that "Clayton's trending reports say that Freddie Mac waived in 60% of loans Clayton graded as '3s'."  Mot. 4.  Each of these submissions is sufficient to show that Defendants have adopted and believe to be true the statements in the reports, and hence that those statements are not hearsay.  *See Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 538 n.794 (S.D.N.Y. 2014) (statement in declaration admissible under Fed. R. Evid. 801(d)(2)(B) against party that submitted it in support of motion to call witness); *Attorney Gen. of U.S. v. Irish N. Aid Comm.*, 530 F. Supp. 241, 252 (S.D.N.Y. 1981) (letters admissible under Fed. R. Evid. 801(d)(2)(B) against party that submitted them as exhibits to summary judgment motion), *aff'd,* 668 F.2d 159 (2d Cir. 1982); *see generally* 6 Handbook of Fed. Evid. § 801:20 (7th ed.) ("Submission of documents to a court also suggests adoption of the documents.").

The Trending Reports are also adopted admissions under Rule 801(d)(2)(B) because, although Defendants received those reports, (*see* Ex. 11 at CLAY-FHFADEF-E_1159018 ("V2 Trending Report Delivery → Completed: Nomura.  Later this week → Greenwich")), and although the reports tended to expose Defendants to liability for false statements in offering materials, *JPMorgan*, 902 F. Supp. 2d at 492, they did not contemporaneously protest that the reports were inaccurate.  "Given that a person ordinarily will respond to an incriminatory or defamatory statement with a denial, or at least with some indication that he objects to the statement as untrue, it [is] [well] [w]ithin the [ ] court's discretion to conclude that it was reasonably probable that" Defendants would have responded in some way if they believed that the Trending Reports were false.  *United States v. Aponte*, 31 F.3d 86, 87 (2d Cir. 1994) (internal quotation and citation omitted).

The Trending Reports also would fall under the business records exception to the rule against hearsay in Rule 803(6).  Importantly, Nomura does not dispute that the data aggregated *within* the reports was recorded by Clayton in the regular course of business—in fact, Nomura acknowledges that Clayton "typically reviewed loan files and assessed whether the loan complied with [guidelines and overlays]," and that the reports contain such "data collected during Clayton's loan file reviews."  Mot. 1-2.  Instead, Nomura argues that the reports

---

[4]  The 2007 Trending Report is relevant for the independent purposes of showing Defendants' intentional misconduct, a matter relevant to:  (1) FHFA's entitlement to fees under the Blue Sky laws, Va. Code Ann. § 13.1-522(B); D.C. Code § 31-5606.05(b)(1)(A); (2) nullifying any indemnification agreement executed between Nomura and RBSSI, *see Globus v. Law Research Serv., Inc.*, 418 F.2d 1276, 1278 (2d Cir. 1969); and (3) the timeliness of FHFA's claims under the extender provisions of HERA, *see FHFA v. HSBC N. Am. Holdings Inc.*, 2014 WL 4276420, at *4 (S.D.N.Y. Aug. 28, 2014), as well as the timeliness of its state-law claims under the revival provision of HERA, 12 U.S.C. § 4617(b)(13)—including state law claims barred by the Virginia Securities Act's two-year statute of repose that, because they arise out of the same transactions and occurrences as FHFA's claims under the federal Securities Act, might nevertheless conform to the proof at trial.

presenting this uncontested data were "preliminary drafts," *id*. 4, citing Ms. Beal's testimony that Clayton did not advance beyond a "beta" testing stage, *id*. 2. But the reports arose from a long-running project by Clayton to expand its core line of business, (Ex. 12 at CLAY-FHFADEF-E-0220316 ("[d]eveloped a suite of trending reports as a value-add service[ ]")), and they went through multiple, carefully-planned iterations, (*e.g.*, Ex. 13 at CLAY-FHFADEF-E-1162325). Because the Trending Reports were "maintained in a consistent way and [ ] focused on a certain range of issues that were relevant to [Clayton's] business," *United States v. Kaiser*, 609 F.3d 556, 575 (2d Cir. 2010), the fact that Clayton opted not to turn them into a new product does not alter the fact that they are business records.

Additionally, while Nomura does not identify any specific statements within the Trending Reports that are supposedly hearsay, *cf.* Fed. R. Evid 801(c) (hearsay is as an out of court "*statement*[ ] … offered in evidence to prove the truth of the matter asserted") (emphasis added), the statements that FHFA intends to offer are not barred by those rules. *First*, the Trending Reports' information about Nomura and RBSSI's waivers reflect a compilation of statements made by Nomura and RBSSI, and hence are non-hearsay under Rule 801(d)(2)(A) as statements made by a party. *See, e.g.*, *United States v. Shulman*, 624 F.2d 384, 390 (2d Cir. 1980) (a party's "own statements [are] admissible as non-hearsay admissions"). That Clayton used a computer program to compile Defendants' own statements, Mot. 2, does not transform them into inadmissible hearsay. *See United States v. Lamons*, 532 F.3d 1251, 1263-64 (11th Cir. 2008) (machine-generated data and printouts non-hearsay because a machine is not a declarant); *Stultz v. Artus*, 2013 WL 937830, at *10 (E.D.N.Y. Mar. 8, 2013) (same); *cf. United States v. Lopez*, 937 F.2d 716, 724 (2d Cir. 1991) (parties own statements are not hearsay, even in translation).

*Second*, as Clayton explained to the SEC, and as its Rule 30(b)(6) witness confirmed, the scope of its reviews were set by its clients and performed at their request. (Ex. 14 at 4 (Clayton Ltr., Dili. Reply 56.1)); Ex. 9 (Clayton 30(b)(6) Dep.) at 186:6-12). Consequently, information about the defects that Clayton identified when working for Nomura and RBSSI are non-hearsay under Rule 801(d)(2)(C) as statements made "by a person"—Clayton—"whom the party authorized to make a statement on the subject." Fed. R. Evid. 801(d)(2)(C); *Jeffries v. Verizon*, 2012 WL 4344197, at *12 (E.D.N.Y. Aug. 31, 2012), *report and recommendation adopted*, 2012 WL 4344188 (E.D.N.Y. Sept. 21, 2012), and the compilation of those statements by a computer does not turn them into hearsay. *Lamons*, 532 F.3d at 1263-64. These considerations also justify admission of information about defect and waiver rates for other banks under Rule 807, as that information is unique evidence, the circumstances of their creation show they are credible, and admitting them as a record of Defendants' and other industry participants' own statements would be just. *See United States v. DiMaria*, 727 F.2d 265, 272 (2d Cir. 1984) (probable credibility of statement supports admission under Rule 807).

*Finally*, even if the Reports did not qualify as non-hearsay party statements under Rule 801(d)(2)(B), statements within them are admissible if not offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c)(2). At a minimum, then, FHFA may offer the reports to show that Clayton's loan file reviews for other banks involved examination of LTV ratios, DTI ratios, and other credit characteristics as evidence that such characteristics were material to buyers and sellers of RMBS—which does not go to the truth of the specific defect or waiver rates in those reports. *See Fournier v. Erickson*, 242 F. Supp. 2d 318, 339 (S.D.N.Y. 2003) (admitting over hearsay objection exhibits containing non-party industry participant's retroactive license multipliers, as they were offered to establish industry practice, not truth of matters asserted).

For the reasons stated, FHFA respectfully requests that Defendants' motion be denied.

Respectfully submitted,

<u>/s/ Philippe Z. Selendy</u>

Philippe Z. Selendy

cc: All Counsel of Record