# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>          Plaintiff,<br><br>     -against-<br><br>NOMURA HOLDING AMERICA INC., ET AL.,<br><br>          Defendants. | Case No. 11-cv-6201 (DLC)<br><br>ECF Case |

## DEFENDANTS' PRETRIAL MEMORANDUM OF LAW

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC 20006
Telephone: 202-956-7500
Facsimile: 202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
Yavar A. Bathaee (bathaeey@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: 212-558-4000
Facsimile: 212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: 212-455-2000
Facsimile: 212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

February 20, 2015

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND ...................................................................................................5

     A.     The Parties ...................................................................................................5

     B.     The Housing Market Grew, and Opened to New Borrowers, from the Late 1990s to 2006 ..................................................................................................7

     C.     Investors in Private Label Securities Considered a Broad Range of Factors During the 2000 to 2007 Period ...............................................................8

     D.     Nomura's Loan Acquisition and Securitization Business ...................................11

     E.     The At-Issue Securitizations .................................................................14

     F.     The Prospectus Supplements for the Securitizations Disclosed the Characteristics of the Loans and the Risks Associated With Investing ...............19

          1.     Disclosures Regarding Origination and Underwriting ...........................20

          2.     Disclosures Regarding Loan-To-Value and Combined Loan-to-Value Ratios ..........................................................................24

          3.     Disclosures Regarding Owner Occupancy ...........................................25

          4.     Disclosures Regarding Credit Ratings ...................................................26

     G.     Plaintiff's Claims ..................................................................................38

     H.     The Housing Market ............................................................................26

ARGUMENT ...........................................................................................................40

I.     THERE WERE NO FALSE OR MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS ...................................................................................40

     A.     Plaintiff Cannot Satisfy Its Burden To Demonstrate That Statements in the Offering Documents Concerning How the Loans Were Originated Were False or Misleading ................................................................................42

## TABLE OF CONTENTS
### (Continued)

1.     For Five of the Seven Certificates, Plaintiff Has Presented No Evidence That Defendants Made False or Misleading Statements Concerning Underwriting Criteria ...........................................................42

2.     If the Offering Documents Are Interpreted To State That All Loans Were Originated Generally In Accordance With Originator Guidelines, the Evidence Still Does Not Show Any False Statements ..........................................................................................49

3.     Even If the Offering Documents Promise General Compliance With Each Criterion of Each Guideline, the Evidence Still Does Not Show Any False or Misleading Statements ......................................60

4.     Because Cowan's Extrapolations Are Flawed, Plaintiff Has Presented No Sufficient Evidence of Underwriting Defects ...................65

B.     Plaintiff Cannot Satisfy Its Burden To Demonstrate That Statements in the Offering Documents Concerning Occupancy Were False or Misleading ............66

C.     Plaintiff Cannot Satisfy Its Burden To Demonstrate That Statements In the Offering Documents Concerning Loan-to-Value Ratios Were False or Misleading ..............................................................................................68

1.     Plaintiff Has No Evidence That Appraisers Disbelieved Their Professional Judgments ...............................................................68

2.     The Evidence Does Not Show That Appraisers' Professional Judgments Were Objectively False ...........................................71

3.     The Evidence Does Not Show Any Misstatements About Disclosed Loan-to-Value Ratios ..............................................75

D.     The Evidence Does Not Show That Appraisals Did Not Comply With USPAP ......................................................................................................77

E.     Plaintiff Cannot Satisfy Its Burden To Demonstrate That Statements Concerning Credit Ratings Were False or Misleading .......................................79

II.     PLAINTIFF CANNOT SHOW, BY A PREPONDERANCE OF THE EVIDENCE, THAT THE ALLEGED MISSTATEMENTS WERE MATERIAL .........83

A.     Plaintiff Cannot Satisfy Its Burden To Demonstrate That Allegedly False or Misleading Statements Concerning How Loans Were Originated Were Material ..............................................................................................86

B.     Plaintiff Cannot Satisfy Its Burden To Demonstrate That Allegedly False or Misleading Statements Concerning Occupancy Were Material ......................88

# TABLE OF CONTENTS
## (Continued)

C.     Plaintiff Cannot Satisfy Its Burden To Demonstrate That Allegedly False or Misleading Statements Concerning Loan-to-Value Ratios Were Material ..................................................................................................90

D.     Plaintiff Cannot Satisfy Its Burden To Demonstrate That Allegedly False or Misleading Statements Concerning Credit Ratings Were Material ................93

III.     NONE OF THE DEFENDANTS ARE LIABLE AS CONTROL PERSONS ................94

IV.     THE EVIDENCE DOES NOT SHOW, BY A PREPONDERANCE OF THE EVIDENCE, THAT THE SALES OF THE SECURITIES AT ISSUE OCCURRED IN D.C. OR VIRGINIA ........................................................................102

V.     THE EVIDENCE MAKES CLEAR THAT ANY LOSSES SUFFERED BY PLAINTIFF RESULTED FROM FACTORS OTHER THAN THE ALLEGED MISREPRESENTATIONS ........................................................................103

A.     Freddie Mac and Fannie Mae Have Represented to the SEC, Investors, and Courts That The Drop in House Prices Beginning in Early 2007 Caused Their Losses, Including to Their PLS Portfolio .....................................105

B.     Dr. Kerry Vandell's Analysis Shows that Factors Other Than Alleged Misstatements Caused Plaintiff's Losses ..........................................................109

VI.     THE EVIDENCE DOES NOT SUPPORT THE RECOVERY SOUGHT BY PLAINTIFF UNDER SECTION 12 ..............................................................110

CONCLUSION ..........................................................................................................115

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2007 Novastar Fin. Sec. Litig.,*
    2008 WL 2354367 (W.D. Mo. June 4, 2008) ........................................................29

*Adelphia Recovery Trust* v. *Goldman, Sachs & Co.,*
    748 F.3d 110 (2d Cir. 2014) ........................................................................................106

*Akerman* v. *Oryx Commc'ns, Inc.,*
    810 F.2d 336 (2d Cir. 1987) ........................................................................................103

*Allstate Ins. Co.* v. *Credit Suisse Secs. (USA) LLC,*
    2014 WL 432458 (N.Y.S.2d Jan. 24, 2014) .................................................................82

*In re Barclays Bank PLC Sec. Litig.,*
    2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) ...................................................................41

*Basic Inc.* v. *Levinson,*
    485 U.S. 224 (1988)....................................................................................................83

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.,*
    851 F. Supp. 2d 746 (S.D.N.Y. 2012)........................................................................81

*In re Calpine Corp. Secs. Litig.,*
    288 F. Supp. 2d 1054 (N.D. Cal. 2003) ................................................................96, 97

*Capital Ventures Int'l* v. *J.P. Morgan Mortg. Acquisition Corp., et al.,*
    2013 WL 535320 (D. Mass. Feb. 13, 2013) ........................................................82, 96

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG,*
    752 F.3d 173 (2d Cir. 2014)....................................................................................41, 81

*City of Westland Police & Fire Ret. Sys.* v. *MetLife, Inc.,*
    928 F. Supp. 2d 705 (S.D.N.Y. 2013)........................................................................104

*DeMaria* v. *Andersen,*
    318 F.3d 170 (2d Cir. 2003)........................................................................................83

*In re Dingledine,*
    916 F.2d 408 (7th Cir. 1990) ......................................................................................47

*Dunn* v. *Borta,*
    369 F.3d 421 (4th Cir. 2004) ......................................................................................40

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Elite Aviation LLC* v. *Credit Suisse AG*,
588 F. App'x 37 (2d Cir. 2014) ..................................................................83

*Fait* v. *Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011)...............................................................2, 68, 80

*FHFA* v. *JPMorgan Chase & Co., et. al.*,
11 Civ. 6188 (S.D.N.Y. Oct. 26, 2012) .....................................................48

*FHFA* v. *Merrill Lynch & Co.*,
903 F. Supp. 2d 274 (S.D.N.Y. 2012)..........................................................82

*FHFA* v. *Nomura Holding Am., Inc.*,
2014 WL 7229361 (S.D.N.Y. Dec. 18, 2014) ........................................17, 83, 85

*FHFA* v. *Nomura Holding Am. Inc.*,
2014 WL 7232443 (S.D.N.Y. Dec. 18, 2014) ........................................110, 113

*FHFA* v. *Nomura Holding Am. Inc.*,
2014 WL 7232590 (S.D.N.Y. Dec. 18, 2014) ..................................................107

*FHFA* v. *Nomura Holding Am., Inc.*,
2015 WL 353929 (S.D.N.Y. Jan. 28, 2015) ............................................67, 68

*FHFA* v. *Nomura Holding Am. Inc.*,
2015 WL 539489 (S.D.N.Y. Feb. 10, 2015).............................................13, 99

*FHFA* v. *Nomura Holding Am. Inc.*,
2015 WL 568788 (S.D.N.Y. Feb. 11, 2015)........................................46, 48, 49

*FHFA* v. *Nomura Holding Am., Inc.*,
2015 WL 394072 (S.D.N.Y. Jan. 29, 2015) .................................................67

*FHFA* v. *UBS Americas, Inc.*,
858 F. Supp. 2d 306 (S.D.N.Y. 2012)........................................68, 69, 80

*FHFA* v. *UBS Ams., Inc.*,
2012 WL 2400263 (June 26, 2012) ...........................................................96

*First Nationwide Bank* v. *Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994).................................................................104

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*,
352 F. Supp. 2d 429 (S.D.N.Y. 2005).....................................................95, 98

*Food & Allied Serv. Trades Dep't, AFL-CIO* v. *Millfield Trading Co.*,
841 F. Supp. 1386 (S.D.N.Y. 1994)..........................................................95

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Ganino* v. *Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000).................................................................84

*Greenhouse* v. *MCG Capital Corp.*,
  392 F.3d 650 (4th Cir. 2004) ..............................................................84

*Harsco Corp.* v. *Segui*,
  91 F.3d 337 (2d Cir. 1996)..................................................................66

*Hite* v. *Leeds Weld Equity Partners, IV, LP*,
  429 F. Supp. 2d 110 (D.D.C. 2006) ....................................................40

*Homeward Residential, Inc.* v. *Sand Canyon Corp.*,
  298 F.R.D. 116 (S.D.N.Y. 2014) .........................................................69

*IKB Int'l S.A.* v. *Bank of Am.*,
  2014 WL 1377801 (S.D.N.Y. Mar. 31, 2014) ......................................69

*In re IndyMac Mortg.-Backed Sec. Litig.*,
  718 F. Supp. 2d 495 (S.D.N.Y. 2010)............................................69, 80

*Iowa Pub. Employees' Ret. Sys.* v. *MF Global, Ltd.*,
  620 F.3d 137 (2d Cir. 2010)...............................................................103

*Lanza* v. *Drexel & Co.*,
  479 F.2d 1277 (2d Cir. 1973)...............................................................99

*Lentell* v. *Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).................................................3, 103, 104

*Lintz* v. *Carey Manor Ltd.*,
  613 F. Supp. 543 (W.D. Va. 1985) .....................................................102

*Miller* v. *Thane Int'l, Inc.*,
  615 F.3d 1095 (9th Cir. 2010) ...........................................................103

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)...............................................3, 41, 47, 83

*N.J. Carpenters Health Fund* v. *Residential Capital, LLC*,
  2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ......................................95

*N.J. Carpenters Health Fund* v. *Royal Bank of Scotland Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013).................................................51, 83, 84, 104

*NECA-IBEW Pension Trust Fund* v. *Bank of Am. Corp.*,
  2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012).....................................41, 69

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*New Jersey Carpenters Vacation Fund* v. *RBS Group, PLC*,
   720 F. Supp. 2d 254 (S.D.N.Y. 2010).......................................................79

*Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*,
   632 F.3d 762 (1st Cir. 2011) ..........................................................52, 80

*Podany* v. *Robertson Stephens, Inc.*,
   318 F. Supp. 2d 146 (S.D.N.Y. 2004)...........................................41, 69, 81

*In re ProShares Trust Sec. Litig.*,
   728 F.3d 96 (2d Cir. 2013) ..........................................................2, 41, 84

*In re Puda Coal Sec. Inc., Litig.*,
   2014 WL 2915880 (S.D.N.Y. June 26, 2014) .......................................68

*Rodman* v. *Grant Foundation*,
   608 F.2d 64 (2d Cir. 1979).............................................................84

*Ross* v. *Bolton*,
   1989 WL 80428 (S.D.N.Y. Apr. 4, 1989) ...........................................96

*S.E.C.* v. *Boock*,
   2012 WL 3133638 (S.D.N.Y. Aug. 2, 2012) ............................114, 115

*In re Salomon Analyst Level 3 Litig.*,
   350 F. Supp. 2d 477 (S.D.N.Y. 2004).................................................81

*In re Sanofi Sec. Litig.*,
   2015 WL 365702 (S.D.N.Y. Jan. 28, 2015) .................................41, 68, 84

*Scott* v. *Gen. Motors Co.*,
   2014 WL 4547837 (S.D.N.Y. Sept. 15, 2014).........................................41

*Sec. Ins. Co. of Hartford* v. *Old Dominion Freight Line, Inc.*,
   314 F. Supp. 2d 201 (S.D.N.Y. 2003)...........................................111, 112

*SEC* v. *First Jersey Secs., Inc.*,
   101 F.3d 1450 (2d Cir. 1996) ........................................................95

*TSC Indus., Inc.* v. *Northway, Inc.*,
   426 U.S. 438 (1976)..................................................................84

*Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*,
   692 F. Supp. 2d 387 (S.D.N.Y. 2010)................................................69

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*United Food & Commercial Workers Union Local 880 Pension Fund* v.
  *Chesapeake Energy Corp.*,
  774 F.3d 1229 (10th Cir. 2014) ...........................................................84

*United Paperworkers Int'l Union* v. *Int'l Paper Co.*,
  985 F.2d 1190 (2d Cir. 1993) ...................................................41, 84

*Virginia Bankshares, Inc.* v. *Sandberg*,
  501 U.S. 1083 (1991) ...........................................................................80

*In re Vivendi Universal, S.A. Sec. Litig.*,
  284 F.R.D. 144 (S.D.N.Y. 2012) ...........................................111, 112, 113, 115

*Wallace* v. *Buttar*,
  239 F. Supp. 2d 388 (S.D.N.Y. 2003).........................................................96

*Wickham Contracting Co., Inc.* v. *Local Union No. 3, Int'l Bhd. Of Elec. Workers,*
  *AFL-CIO*, 955 F.2d 831 (2d Cir. 1992) ...............................................111

*Wilson* v. *Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) ...............................................................54

*In re Worldcom, Inc. Secs. Litig.*,
  2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) ......................................104

*In re Worldcom, Inc. Secs. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003)......................................................99

**Statutes, Rules, and Regulations**

Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat.
  737........................................................................................103

15 U.S.C. § 77*l*........................................................................... *passim*

15 U.S.C. § 77o.........................................................................94, 98

17 C.F.R. § 229.512(a)(2) ...............................................................96

17 C.F.R. § 229.1110 ...............................................................42, 43

17 C.F.R. § 229.1111(a)(3) ...........................................................20, 45, 46

17 C.F.R. § 240.12b-2.....................................................................95

D.C.Code § 31-5601 .....................................................................102

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

D.C. Code § 31-5606 ..........................................................................................83

D.C. Code 31-5608 ................................................................................94, 101

Va. Code Ann. § 13.1-522 ....................................................................40, 83

**Other Authorities**

78 Cong. Rec. 8669 (1934) ..............................................................................99

*Journal of Accounting, Auditing & Finance*, Vol. 5, No. 1/2 (1990) .......................................107

Oxford English Dictionary (Oxford University Press December 2014)........................................50

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Action | *FHFA* v. *Nomura Holding America Inc., et al.*, No. 11 Civ. 6201 (DLC) |
| AMC | American Mortgage Consultants |
| Am. Compl. | Amended Complaint, *FHFA* v. *Nomura Holding America Inc.,* et al., No. 11 Civ. 6201 (DLC), June 28, 2012, Doc. No. 60 |
| Certificates | The specific RMBS that Fannie Mae and Freddie Mac purchased from the seven Securitizations at issue in this Action, from November 16, 2005 to April 27, 2007 |
| Clayton | The Clayton Group |
| DTI | Debt-to-income |
| Fannie Mae | Federal National Mortgage Association |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| FOF | Defendants' Proposed Findings of Fact, dated February 20, 2015 |
| Individual Defendants | David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| LTV or CLTV | Loan-to-value ratio or Combined loan-to-value ratio |
| NAAC | Nomura Asset Acceptance Corporation |
| NCCI | Nomura Credit & Capital, Inc. |
| NHELI | Nomura Home Equity Loans, Inc. |
| Nomura | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., and Nomura Securities International, Inc. |
| Nomura Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |

| Nomura Holding | Nomura Holding America Inc. |
|---|---|
| Nomura Securities | Nomura Securities International, Inc. |
| Offering Documents | The prospectus and prospectus supplements for the Securitizations |
| Plaintiff | Federal Housing Finance Agency |
| RBSSI | RBS Securities Inc. |
| RMBS | Residential mortgage-backed securities |
| SEC | Securities and Exchange Commission |
| Securities Act | The Securities Act of 1933, 15 U.S.C. 77a, et seq. |
| Securitizations | NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 |

Defendants respectfully submit this Pretrial Memorandum of Law pursuant to
Rule 5(C) of the Court's Individual Practices in Civil Cases.

## PRELIMINARY STATEMENT

The evidence that will be presented at trial shows that (i) no defendant made a
materially false or misleading statement, or is otherwise liable under Section 12 of the Securities
Act of 1933 or the Blue Sky laws of Virginia or Washington, D.C., and (ii) that the alleged
misstatements that form the basis for plaintiff's claims caused no losses to Freddie Mac or
Fannie Mae.  Judgment should be entered for defendants.

First, plaintiff cannot make its case that the prospectus supplements for the seven
at issue securitizations (the "Securitizations") misrepresented information regarding (i) the
origination and underwriting of the loans backing the Certificates; (ii) loan-to-value and
combined loan-to-value ratios, and appraisals; (iii) owner occupancy status; and (iv) the credit
ratings of the Certificates.  Based on an evaluation of only 5% of the loans in the supporting loan
groups for the seven Certificates purchased by Freddie Mac and Fannie Mae, plaintiff claims that
68% of the loans in the supporting loan groups were not underwritten in accordance with
underwriting guidelines, that the percentage of "owner occupied" loans was overstated by 7.19%
for the supporting loan group loans, and that appraised values were inflated, on average, by
11.1%.  The evidence plaintiff will put forward does not support these claims.

The claims rest on a fundamental misinterpretation of the disclosures in the
prospectus supplements.  These disclosures contain statements about how loans "were originated
generally" but say that there were a number of exceptions—for some Securitizations, a
substantial number of exceptions.  They also inform investors that loan-to-value ratios (when an
appraisal is used to calculate the denominator) may be based on the subjective opinions rendered
by professional appraisers.  When interpreting the meaning of a defendant's disclosure, "the

proper inquiry requires an examination of defendants' representations, taken together and in context." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 105 (2d Cir. 2013).  Plaintiff ignores the actual language of the prospectus supplements, asserting that they promise perfect, rather than "general," adherence to underwriting criteria, and ignoring entirely that every prospectus supplement discloses that exceptions to underwriting criteria were made.

   Plaintiff's only evidence, moreover, come from experts whose analyses and opinions are severely flawed.  Robert Hunter (underwriting), John Kilpatrick (appraisals), and Charles Cowan (extrapolations) use methods that are wholly unreliable, such as inventing and evaluating loans against "minimum industry standards" that have never existed, and creating a retrospective "automated valuation model" that violates every standard applicable to these types of tools.  This evidence is especially inadequate to prove plaintiff's claims as to appraisals of a property's value and credit ratings, both of which are opinions rather than facts.  "[W]hen a plaintiff asserts a claim under section 11 or 12 based upon a belief or opinion alleged to have been communicated by a defendant, liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).  Plaintiff has no such evidence.

   Defendants, on the other hand, will present the testimony of four professional appraisers whose appraisals plaintiff claims are not credible based on its expert's misguided "model."  The four appraisers, all of whom are appearing voluntarily, will testify that they believed their opinions of value when rendered and that they believe those opinions today—and will show that plaintiff's expert's models come up with values that are way off base.  Defendants also will show that when industry-leading valuation and due diligence providers, as well as the credit professionals at Nomura, reviewed the same loans now at issue in this case seven to nine

years ago, they reached reasoned and supported conclusions that the loans were originated properly and with proper appraisals.  There is no basis to believe that any appraisers were dishonest in expressing their opinions of value years at the time the loans were originated, which is the only relevant time period as highlighted in the prospectus supplements.

Even if some deviation from disclosures in the prospectus supplements can be proven, the securities laws do not permit investors to recover for misstatements that are not material and have no effect on the investment decisions of reasonable investors.  It will be plaintiff's burden to show that any misstatements it is able to prove would have significantly changed an investor's assessment of each of the seven Certificates here at issue—that "defendants' representations, taken together and in context, would have misled a reasonable investor."  *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).  Plaintiff has no such evidence.  Investors—who were typically large financial institutions— considered a broad array of information in evaluating investments in private label securities ("PLS")—including credit enhancement, expectations about house prices, and attributes of the loans outside the supporting loan group for the particular Certificate an investor was considering.  Plaintiff has no evidence that the investment decision of a reasonable PLS investor considering these and other factors would have been affected by the alleged misstatements.

Second, the evidence that will be presented at trial will show that the alleged false statements in the prospectus supplements were not the cause of any losses suffered by Freddie Mac or Fannie Mae.  It is undisputed that house prices declined by approximately 33% between April 2007 and May 2009.  The fact that "the plaintiff's loss coincides with marketwide phenomenon causing comparable losses to other investors" is highly important in evaluating the issue of loss causation.  *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005).  Since

2007, plaintiff has repeatedly attributed the losses experienced by Freddie Mac and Fannie

Mae—whose businesses depend almost entirely on the performance of residential mortgages and

residential mortgage-backed securities—to declining house prices (and other macroeconomic

events) during 2007 to 2009 and increasing rates of mortgage defaults in the face of these

phenomena.  In defending itself in a lawsuit filed by the Ohio Public Employees Retirement

System in federal court in the Northern District of Ohio, Freddie Mac asserted on October 9,

2013, that "it is readily apparent that Freddie Mac's losses were caused by an industry-wide

collapse."  *Ohio Public Employees Retirement System* v. *Federal Home Loan Mortgage Corp.*,

No. 4:08 Civ. 00160 (N.D. Oh.).[1]  FOF ¶ 275.  In seeking dismissal of another lawsuit,

*Kuriakose* v. *Federal Home Loan Mortgage Corp.*, No. 1:08 Civ. 07281, filed in the U.S.

District Court for the Southern District of New York, Freddie Mac stated "[i]t is common

knowledge that, beginning in the latter half of 2007, this country entered a period of

unprecedented financial turmoil.  Real estate values plummeted, and credit markets froze.  Just

as [Freddie Mac] had warned investors, its financial results and its stock price suffered after

those macroeconomic events unexpectedly tore through the U.S. economy."  FOF ¶ 265.

        Defendants will prove that the cause of Freddie Mac's and Fannie Mae's losses,

including losses on the specific Certificates at issue in this case, was the decline in home prices

and other macroeconomic conditions.  Defendants' expert Kerry D. Vandell performed an

empirical study showing that the defects plaintiff will attempt to prove at trial—even if they

existed—had no impact on the performance of the loans in the supporting loan groups for the

---

[1]     In seeking dismissal of another shareholder lawsuit, *In re Federal Home Loan Mortgage Corp. Derivative Litigation*, 1:08 Civ. 773, in the Eastern District of Virginia, on February 25, 2011, a Special Litigation Committee of Freddie Mac reported that "[t]he consensus among the current and former officers and directors of Freddie Mac interviewed by the Committee was that the primary cause of the Company's recent losses was an 'exogenous macro-economic event[]'; namely, the unprecedented decline in the housing market."  FOF ¶ 274.

seven Certificates.  In other words, the misstatements plaintiff will seek to establish caused no

losses to Freddie Mac and Fannie Mae.  Plaintiff's own expert, G. William Schwert, performed

an analysis that supports Dr. Vandell's opinions.  Consistent with everything Freddie Mac and

Fannie Mae disclosed to the public (and other federal courts) beginning in 2007, "exogenous"

events, not alleged false or misleading disclosures, caused their losses on these Certificates.

## FACTUAL BACKGROUND

### A.     THE PARTIES

Freddie Mac and Fannie Mae are private companies tasked by Congress with

providing liquidity, stability and affordability to the United States housing and mortgage

markets.  FOF ¶ 6.  During the 2005 to 2007 time period, Freddie Mac and Fannie Mae had two

primary ways of fulfilling their Congressionally-mandated mission: (i) by purchasing residential

mortgage loans from loan originators; and (ii) by purchasing private label residential mortgage

backed securities ("RMBS") from financial institutions.  FOF ¶ 6-7.  These two types of

activities were and are the only significant businesses in which Freddie Mac and Fannie Mae

participate.  Freddie Mac and Fannie Mae were the largest purchasers of residential mortgage

loans and PLS in the United States during this time period.  FOF ¶ 11.  From September 7, 2005

through September 6, 2007, they purchased more than $251 billion of PLS.  FOF ¶ 20.  In 2007,

they held in their portfolios $1.4 trillion and $2.1 trillion of RMBS, respectively.  FOF ¶ 18-19.

They also issued trillions of dollars of their own residential mortgage backed securities during

this time period.

On September 6, 2008, the Federal Housing Finance Agency placed Freddie Mac

and Fannie Mae into conservatorship.  FOF ¶ 23.  FHFA is a federal agency that was created on

July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA").  FOF ¶

22.  In its capacity as conservator, FHFA has the authority to bring lawsuits on behalf of Freddie

Mac and Fannie Mae.  On September 2, 2011, FHFA filed a complaint against defendants related to Freddie Mac's and Fannie Mae's purchase of $2.1 billion in certificates in connection with seven residential mortgage-backed securities.  No. 11 Civ. 6201, Doc. No. 1 (S.D.N.Y.) (DLC).

Plaintiff's claims arise under Sections 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77*l*(a)(2) & 77o, and Section 13.1-522(A)(ii) of the Virginia Code and Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code.  (Parties' Stipulations of Law and Fact ("Stipulation" or "Stip."), Section B.)  Plaintiff alleges misstatements in the prospectus supplements for the Securitizations with respect to four categories: (1) representations regarding the origination and underwriting of the loans backing the Certificates; (2) representations regarding loan-to-value ratios, combined loan-to-value ratios, and appraisals, including compliance with USPAP; (3) representations regarding owner occupancy status; and (4) representations regarding the credit ratings of the Certificates. (Stipulation (1)(a)(i)(a)-(d).)

Defendant Nomura Holding America Inc. is a holding company, and defendants Nomura Securities International, Inc. ("NSI"), Nomura Credit & Capital, Inc. ("NCCI"), Nomura Asset Acceptance Corporation ("NAAC") and Nomura Home Equity Loan, Inc. ("NHELI"), are direct or indirect subsidiaries of Nomura Holding America Inc. (collectively, "Nomura," unless stated otherwise).  FOF ¶ 20.  NCCI was the sponsor for the seven Securitizations.  FOF ¶ 26. NSI was an underwriter, and the seller, for three of the Securitizations—NAA 2005-AR6, NHELI 2006-FM1, and NHELI 2006-FM2.  FOF ¶ 27.  NAAC was the depositor for one Securitization, NAA 2005 AR6.  FOF ¶ 29.  NHELI was the depositor for the other six Securitizations.  FOF ¶ 30.  Nomura was a relatively small player in the RMBS market during the 2005 to 2007 period.  FOF ¶ 31.

Defendant RBS Securities Inc. ("RBSSI") was an underwriter and sold to Freddie Mac the at-issue Certificates for four of the Securitizations—NHELI 2006-HE3, NHEL 2006-FM2, NHELI 2007-1 and NHELI 2007-2.  FOF ¶ 34.  Prior to April 2009, RBSSI was known as Greenwich Capital Markets, Inc.  FOF ¶ 34.

Individual Defendant David Findlay served as director of NAAC, NHELI, NSI, and Nomura Holding America Inc., and as Chief Legal Officer of NSI, NCCI, and Nomura Holding America Inc., during the 2005 to 2007 period.  Stip. ¶ 39.  Individual Defendant John McCarthy served as a director of NAAC and NHELI during the 2005-2007 period.  Stip. ¶ 40. Individual Defendant Nathan Gorin served as the Chief Financial Officer and Treasurer of NAAC, NHELI, NCCI, and NSI during the 2005-2007 period.  Stip. ¶ 41.  Individual Defendant John P. Graham served as the President and Chief Executive Officer of NAAC during the 2005 2007 period, and as a Managing Director of NSI and then NCCI during the period from 2005 to October 2007.  FOF ¶ 670.

## B.  THE HOUSING MARKET GREW, AND OPENED TO NEW BORROWERS, FROM THE LATE 1990S TO 2006

From the late 1990s to 2006, government policies and economic factors produced unprecedented growth in the U.S. housing market.  FOF ¶ 203.  Government policies designed to encourage homeownership and lending to lower-income households, coupled with historically low interest rates, low levels of unemployment, high consumer confidence and rising house prices, increased the number of people eligible for mortgage loans.  FOF ¶ 203.  To accommodate these borrowers, mortgage loan originators expanded or "loosened" their underwriting guidelines—the criteria used to make mortgage loans to borrowers.  FOF ¶ 204. Originators also created new "non-traditional" loan products, such as loans that required little or no documentation of borrower income, assets or debts (called low- or no-documentation loans),

as well as mortgage loan products that made the purchase of a home more affordable, such as adjustable-rate loans (some of which had low "teaser" rates for a period of time) and interest-only loans (which did not require borrowers to make principal payments during a specified term). FOF ¶ 204-205. During this period, originators also began originating more loans with multiple "layers" of risk, meaning that the loan had two or more characteristics that increased the credit risk of the loan. FOF ¶ 204. These new products had risky attributes, not only because borrowers could misstate their income or assets and because "teaser" rates could reset before the borrower was able to refinance the loan, but also because they were often offered to borrowers having little or no experience as homeowners and/or borrowers with relatively low income or assets. FOF ¶ 205. During the period 2003 to 2005 alone, the number of subprime loans—loans made to borrowers with poor credit—nearly doubled, from 1.1 million to 1.9 million. FOF ¶ 205.[2]

The increased demand for homes, as well as a steady decline in interest rates, led home prices nationwide to rise rapidly from the late 1990s to 2006. FOF ¶ 203. From 1945 through the end of 1999, home prices in the U.S. grew at an average annual rate of approximately 4.9 percent. By comparison, from 2000 through the end of 2005, home prices grew at more than twice that rate, an average of 11.3 percent per year. FOF ¶ 203. (In hindsight, of course, one can say that the rapid growth was not sustainable.)

### C.    INVESTORS IN PRIVATE LABEL SECURITIES CONSIDERED A BROAD RANGE OF FACTORS DURING THE 2000 TO 2007 PERIOD

Securitization, in the mortgage loan context, refers to pooling groups of mortgage loans together and selling to investors, in the form of a security, the right to the principal and

---

[2]     While there is no uniform definition for subprime and Alt-A loans, subprime broadly refers to loans made to borrowers with poor credit history; Alt-A refers to loans that are more risky than traditional prime loans, but less risky than subprime.

interest payments generated by the mortgage loans.  FOF ¶ 1.  These types of securitizations are called residential mortgage-backed securities or "RMBS."  There are two types of RMBS—agency securities and PLS, as defined above.  FOF ¶¶ 1-7.  Payments on agency securities (which include securities issued by Freddie Mac and Fannie Mae) are guaranteed or sponsored by the federal government.  FOF ¶ 7.  PLS, on the other hand, are issued by private companies and are typically guaranteed by loans that are not eligible for inclusion in agency securities issued by Freddie Mac and Fannie Mae.  FOF ¶ 3.  PLS are typically broken into different levels, or "tranches," with varying levels of seniority and risk.  FOF ¶ 3.  Generally, the senior tranches are paid first from the cash flows generated by the underlying mortgage loans, before the junior tranches.  FOF ¶ 3.  The junior tranches thus provide a form of protection for the senior tranches, which is a type of "credit enhancement," or protection against losses.  FOF ¶ 3.  In addition, PLS are often backed by multiple groups of loans, rather than a single loan group.  FOF ¶ 44.  In these instances, the senior tranches generally have an associated loan group—the supporting loan group—that primarily provides payment to the senior tranches, though the senior tranches can also benefit from payments on loans in other loan groups within the same securitization.   FOF ¶ 3.

　　　　　In evaluating a PLS for potential purchase, investors had access to a broad array of information, including information about the characteristics of the loans underlying the PLS, the originators of the loans, and the credit enhancement and other structural features of the PLS.  FOF ¶ 628.  Investors also closely monitored market trends.  FOF ¶ 628.  PLS investors–again, typically sophisticated financial institutions—ultimately balanced the amount of credit enhancement against the expected losses on a PLS, which generally depended on two things: (i) assumptions about home prices, interest rates, and the economy; and (ii) collateral

characteristics.  FOF ¶ 628.  For example, beginning in 2005, Freddie Mac used a model to analyze the "structure" of a PLS bond to determine whether "credit enhancement levels [are] sufficient to protect against stress loss levels," and whether "weaknesses exist in the credit structure."  FOF ¶ 628, 709.

First, with respect to economic factors, investors understood that expected losses, which are determined by mortgage delinquency and default rates, correlate with changes in house prices, interest rates and employment.  FOF ¶ 231.  When investors expected house prices to go up, for example, they considered mortgages less risky (and were therefore less concerned about risky loan and borrower characteristics).  That is because, in a rising house price environment, borrowers who are unable to pay their mortgages can  sell their homes at a profit.  FOF ¶ 258-263.  Similarly, when unemployment is low and expected to remain so, investors were less concerned about risky loan and borrower characteristics.  FOF ¶ 218.  The key factor when it comes to the cause of any losses on PLS is house prices.  All recognized that a decline in house prices leads to defaults and delinquencies by borrowers and if borrowers fail to pay their monthly loan obligations securities backed by such payments may or will decline in value.  FOF ¶ 218.  Freddie Mac and Fannie Mae have made this point repeatedly in their SEC filing, annual reports, and court papers.  FOF ¶¶ 230-275.

Second, many characteristics of the loans underlying a security could be relevant to investors, including: whether the loans were prime, subprime or Alt-A; where the homes were located; the FICO scores of the borrowers; the originators who made the loans; whether the loans were first- or second-lien loans, the extent to which borrowers provided documentation of their income, assets or debts when applying for a loan; whether the loan had an adjustable or fixed interest rate (or was interest-only), loan-to-value ratio (the ratio of the loan amount to the value

of the mortgaged property based on an appraisal or sale price); and whether the homes were

primary residences or investor properties.  FOF ¶ 204.  Each of these factors could be relevant

because it was thought to potentially impact the risk that a loan could default or become

delinquent, or prepay.  FOF ¶ 204.  To the extent PLS investors in senior tranches considered

loan and borrower characteristics, they considered the collateral characteristics of all loans

underlying a PLS, not just those in the relevant supporting loan group—because under certain

circumstances investors in senior securities could be paid from any loan pool underlying a PLS.

FOF ¶ 632.  Freddie Mac and Fannie Mae, for example, did not limit their pre-purchase analysis

to loans in the supporting loan group; instead, they evaluated all of the loans backing the entire

securitization.  FOF ¶ 656.

### D.    NOMURA'S LOAN ACQUISITION AND SECURITIZATION BUSINESS

None of the Nomura defendants originated mortgage loans, including any of the

loans backing the seven Securitizations, during the relevant time period (or at any other time).

FOF ¶ 26.  Instead, NCCI, as the sponsor, purchased loans and transferred them to the depositor

(here, NAAC or NHELI).  The depositor then created a trust, to which it transferred the loans it

had acquired, which was the issuer.   In exchange for the loans, the trust issued certificates that

were transferred back to NAAC or NHELI.  NAAC or NHELI then transferred those certificates

to the underwriter (here, Nomura Securities, Greenwich Capital, or Lehman Brothers) for sale to

investors.  FOF ¶ 26.

For each loan purchase, Nomura performed both "valuation" and "credit and

compliance" due diligence.  FOF ¶ 326.  Valuation diligence, which Nomura typically performed

on 100% of the loans it purchased from originators, assessed the reasonableness of the appraised

values of properties securing loans underlying the Securitizations.  In the first stage of its

valuation due diligence, NCCI submitted all loans for review by CoreLogic or Hansen, which

were industry-leading valuation due diligence vendors.  FOF ¶ 456.  Those vendors used

automated tools, Hansen's PREVIEW AVM product and CoreLogic's HistoryPro product, to

identify loans with potential valuation issues.  FOF ¶ 456.  If a loan reviewed using CoreLogic's

HistoryPro received a score indicating the lowest possible risk, no further valuation due diligence

was deemed necessary.  FOF ¶ 457.  As Freddie Mac explained in its March 2006 counterparty

review of Nomura, an F-Score of 0 indicated "no risk, no additional review is required."  FOF ¶

457.  If the score was between 1 and 9, the loan was run through an AVM.  FOF ¶ 457.  For

loans run through an AVM, NCCI generally considered appraised values to be supported and

reasonable if they were within a specified range of the AVM estimated value.  In particular, the

AVM estimated value could not be more than 15% less than the original appraised value for Alt-

A loans and not more than 10% less than the original appraised value for subprime loans.  FOF ¶

459.  Loans outside these "tolerances" typically triggered the need to obtain a broker price

opinion or "BPO," which is a secondary evaluation of a property's value performed by a local

real estate broker.  FOF ¶ 459.  If the BPO did not support the appraised value (*i.e.*, if the

appraisal was not within 10-15% of the BPO value), the loan generally was not purchased.  FOF

¶ 460.

> Credit and compliance due diligence entailed re-underwriting loans to determine

whether they complied (i) with the originator's underwriting guidelines (including guidelines

applicable to underwriters' reviews of appraisals), or qualified, in the judgment of a professional

underwriter, as exceptions due to compensating factors, (ii) with federal, state, and local laws

and regulations, and (iii) with any additional requirements imposed by Nomura.  FOF ¶ 327.

Nomura typically performed credit and compliance diligence on 100% of the loans it purchased

in small packages—the "loan-by-loan" and "mini-bulk" acquisition channels—and credit and

compliance diligence on a sample of at least 20% of loans purchased in "bulk."  FOF ¶ 327.

Consistent with industry practice, Nomura hired due diligence vendors with experience and

expertise in reviewing loans like those being purchased by Nomura, including Clayton and

American Mortgage Consultants.  FOF ¶ 328.

       The securities structured by Nomura typically had what is called a "residual" or

"first-loss" certificate.  FOF ¶ 150.  The residual is the "first-loss" certificate because it is the

first in the securitization to incur losses in the event some of the loans in the underlying

mortgage pools do not perform.  FOF ¶ 151.  Nomura typically retained the residual certificate

(or a portion of it) in the securitizations it issued.  FOF ¶ 150.  Nomura held these residuals as

part of its business strategy with respect to residential mortgage-backed securities.  FOF ¶ 152.

Nomura believed that its due diligence process was superior to that of others in the residential

mortgage-backed securities market, and therefore Nomura wanted to co-invest in securitizations

alongside its investors by taking the "first loss" piece.  FOF ¶ 154.  In addition, Nomura's profits

on the deals were directly tied to the residuals.  FOF ¶ 152.  The price at which Nomura sold

residential mortgage-backed securities did not exceed the cost of the underlying loans plus

expenses.  FOF ¶ 152.  Thus, Nomura would not make a profit on securitizations unless the

residuals performed – *i.e.* unless borrowers were paying their mortgage loans.  FOF ¶ 152.

       In August 2004 and March 2006, Freddie Mac reviewed Nomura's practices for

securitizing loans.  In both reviews, Freddie Mac gave Nomura a rating of "satisfactory."  FOF ¶

366.  Freddie Mac also stated that "Nomura's philosophy is quite thorough with good overall

origination strategies" and "based upon the combination of good due diligence methodologies,

reasonable valuation processes and sound controls," rated Nomura as Satisfactory overall.  FOF

¶ 366.  Freddie Mac examined Nomura's sampling rates, deeming them "Satisfactory," and praised Nomura's valuation due diligence, calling the process "solid."  FOF ¶ 458.

### E.    THE AT-ISSUE SECURITIZATIONS

Between September 6, 2005 and January 23, 2008, Freddie Mac and Fannie Mae combined to purchase over $250 billion in PLS.  FOF ¶ 20.

During the period November 16, 2005 to April 26, 2007, Freddie Mac and Fannie Mae purchased Certificates in seven Securitizations sponsored by NCCI.  Stipulated Facts ¶¶ 1-2.  Underwriters for the Securitizations, NSI, RBSSI, and Lehman Brothers, sold the Certificates to Freddie Mac and Fannie Mae.  Stipulated Facts ¶ 50.  Freddie Mac and Fannie Mae purchased Certificates in the senior tranches of the Securitizations, which had associated supporting loan groups, but also received support from the other loan groups.  FOF ¶ 588.  Table 1 includes the trade date, settlement date, prospectus supplement date, collateral type, tranche Freddie Mac or Fannie Mae purchased, the supporting loan group for the Certificates, and the originators of 20% or more of the loans underlying the Securitizations.  FOF ¶¶ 35-149.

| Table 1 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Securitization | Trade Date | Settlement Date | Prospectus Supplement Date | Collateral Type | Tranche | Supporting Loan Group | Key Originators |
| 2005-AR6 | 11/16/2005 | 11/30/2005 | 11/29/2005 | Alt-A | IIIA1 | Group II | Alliance Bancorp (20.60%) |
| 2006-FM1 | 12/19/2005 | 1/31/2006 | 1/27/2006 | Subprime | IA | Group I | Fremont (100%) |
| 2006-HE3 | 8/16/2005 | 8/31/2006 | 8/29/2006 | Subprime | IA1 | Group I | People's Choice (38.19%) |
| 2006-FM2 | 10/18/2006 | 10/31/2006 | 10/30/2006 | Subprime | IA1 | Group I | Fremont (100%) |
| 2007-1 | 1/23/2007 | 1/31/2007 | 1/29/2007 | Alt-A | II1A | Group II-1 | Silver State (31.67%) |
| 2007-2 | 12/27/2006 | 1/31/2007 | 1/30/2007 | Subprime | IA1 | Group I | OwnIt (42.38%) |
| 2007-3 | 4/26/2007 | 4/30/2007 | 4/27/2007 | Subprime | 1A1 | Group I | ResMAE (77.61%) |

Table 2 includes information about certain characteristics of the loans underlying the supporting loan groups for the Certificates purchased by Freddie Mac and Fannie Mae, including (i) the percentage of loans originated pursuant to low- or no-documentation programs; (ii) the percentage of loans with "interest only" ("IO") terms; (iii) the percentage of adjustable rate mortgage ("ARM") loans; (iv) percentage of loans with second liens; (v) the average LTV and CLTV ratios of the loans; (vi) percentage of loans that were refinances ("refis"); (vii) the credit enhancement (where available); and (viii) "occupancy status."  FOF ¶¶ 187, 192, 45, 62, 79, 96, 111, 127, 144, 450, 563.  All of this information (except credit enhancement, which is as calculated by Freddie Mac) appeared in the Offering Documents.

| Table 2 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Securitization | % of Low- or No- Doc Loans | IO Loans | ARMs | Second Liens | Average LTV | Average[3] CLTV | Refis | CE | Owner Occupancy |
| 2005-AR6 | 76.37% | 84.47% | 100% | 0% | 74.68% | -- | 28.5% | n/a | 50% |
| 2006-FM1 | 45.15% | 16.30% | 76.8% | 17.2% | 81.07% | 87.17% | 56.4% | 20% | 89% |
| 2006-HE3 | 42.32% | 12.42% | 73.7% | 8.4% | 78.97% | 82.05% | 72.8% | 30.19% | 86% |
| 2006-FM2 | 44.64% | 8.84% | 66.5% | 23.1% | 80.58% | 88.34% | 46.3% | 22.45% | 93% |
| 2007-1 | 87.79% | 84.47% | 100% | 0% | 78.67% | 90.20% | 55.7% | 7.29% | 46% |
| 2007-2 | 36.12% | 7.32% | 67.3% | 8% | 81.86% | 86.80% | 65.1% | 32.36% | 89% |
| 2007-3 | 41.62% | 10.87% | 73.6% | 8% | 81.27% | 87.96% | 48% | 32.26% | 90% |

Nomura performed due diligence on a substantial number of loans in the supporting loan groups. Approximately 99.1% of the loans purchased by Nomura that contributed to the supporting loan groups for Certificates received valuation due diligence. FOF ¶ 464. Plaintiff's expert Charles Cowan testified that the "final valuation diligence" results for these loans were within 1.8% of the appraised values. FOF ¶ 505. Overall, 39% of the loans in supporting loan groups for the Certificates received credit and compliance due diligence by Nomura, as follows: 80.9% for 2005-AR6; 26.4% for 2006-FM1; 54.4% for 2006-HE3; 21.5% for the 2006-FM2; 77.4% for 2007-1; 42.6% for 2007-2; and 39.4% for 2007-3. FOF ¶ 337. Nomura's due diligence process evaluated the loan characteristics that were subsequently disclosed in the prospectus supplements for the Securitizations. During the process of securitizing mortgage loans, Nomura's Transaction Management Group reviewed the offering documents for the securitizations in coordination with outside counsel, Thacher, Proffitt & Wood, LLP (a law firm known for its expertise in the whole loan acquisition process, legal compliance diligence requirements and the securities field), FOF ¶ 680, and consulted with

---

[3]     The average CLTV ratio for 2005-AR6 was not disclosed in the prospectus supplement.

colleagues at Nomura who were involved in the loan acquisition, due diligence and securitization processes to verify the accuracy of certain portions of the language and numerical information contained in the prospectus supplements, FOF ¶ 680.

Freddie Mac also chose each of the loans that would be included in the supporting loan groups for all six of the Certificates it purchased (six of the seven at issue here).  FOF ¶ 52, 86.  Freddie Mac and Fannie Mae frequently customized the PLS they purchased in this way. FOF ¶ 32, 52, 86.  As Fannie Mae trader Paul Norris explained, "the whole collateral pool was ours to carve out."  FOF ¶ 36.  For example, on December 9, 2005, Steven Katz, a managing director and trader at NCCI, emailed Cindy Ross at Freddie Mac, attaching an excel sheet that listed the collateral characteristics for the loans in a proposed PLS, 2006-FM1, and asked her to "have folks at Freddie run through [the loan] tape and send us loan ids" for loans they selected.[4] FOF ¶ 52.  Freddie Mac then analyzed the loans and eliminated over 1,200 loans from the supporting loan group for the Certificate Freddie Mac purchased.  FOF ¶ 36, 52, 86.  The loans Freddie Mac and Fannie Mae chose for the supporting loan groups, which targeted low income

---

[4]      On December 18, 2014, the Court excluded evidence concerning "the housing goals set for Fannie Mae and Freddie Mac by the United States Department of Housing and Urban Development" on the basis that the probative value of that evidence was outweighed by the danger of jury confusion.  *FHFA* v. *Nomura Holding Am. Inc.*, 2014 WL 7229361, at *1 (S.D.N.Y. Dec. 18, 2014).  Were it not for that ruling, defendants would present evidence that Freddie Mac selected risky loans for inclusion in the PLS it purchased in order to satisfy housing goals, and that this determination ultimately caused losses to Freddie Mac and Fannie Mae. October 24, 2014 Defendants' Opposition to Plaintiff's Motion *in Limine* No. 3.  Indeed, in the Court's opinion and order dated February 10, 2015 excluding certain testimony of Dr. Kerry D. Vandell, the court stated that:  "In addition, the GSEs were subject to affordable housing goals set by the United States Department of Housing and Urban Development that required, for example, the purchase of loans to lower-income borrowers that are owner occupied and in metropolitan areas.  The GSEs' decisions to purchase mortgage loans were, at times, influenced by the GSE's desire to purchase loans that met these housing goals."  *FHFA* v. *Nomura Holding Am. Inc.*, 2015 WL 539489, at *2 n.5 (S.D.N.Y. Feb. 10, 2015).

borrowers, were particularly susceptible to changes in the housing market and economic conditions.  FOF ¶ 36, 52, 86.

After performing pre-purchase analysis on the Securitizations and (for six of the seven Certificates) hand-picking the loans for inclusion in their supporting loan groups, Fannie Mae and Freddie Mac purchased the Certificates.  The evidence shows that Freddie Mac and Fannie Mae traders did not generally read prospectus supplements prior to purchasing PLS, and there is no evidence that they reviewed the prospectus supplements for the seven Securitizations.

Nomura retained the residual certificates for the seven Securitizations, investing approximately $190 million.  FOF ¶ 176.  At the time the Securitizations were initially sold, Nomura had no intention of selling the bulk of its residual holdings.  FOF ¶ 154.  In around August 2007, Nomura decided to exit the mortgage-backed securities business and the residuals were sold in September 2007 at a substantial loss.  FOF ¶ 177.  Table 3 identifies the original value of the residual certificates and the sales price when Nomura sold the residual certificates in September 2007.  FOF ¶ 156-157,159-160, 168-169, 171-172, 174-177.

| Table 3 | | |
|---|---|---|
| Securitization | Original Value | Sales Price in September 2007 |
| NAA 2005-AR6 | $11,537,493.23 | $125,000.00 |
| NHELI 2006-FM1 | $39,572,569.37 | $200,000.00 |
| NHELI 2006-HE3 | $18,568,217.53 | $630,096.00 |
| NHELI 2006-FM2 | $31,003,695.20 | $1,450,800.00 |
| NHELI 2007-1 | $15,533,227.37 | $750,000.00 |
| NHELI 2007-2 | $26,188,859.00 | $636,000.00 |
| NHELI 2007-3 | $40,063,248.99 | $9,000,000.00 |
| Total Values | $182,467,310.69 | $12,791,896.00 |

As the chart illustrates, the difference between the ultimate sales price of Nomura's residual holdings from the Securitizations and the initial value of those residual holdings is $169,675,414.69.[5]  FOF ¶ 176-178.

Neither Freddie Mac nor Fannie Mae has realized any losses on six of the Certificates.  To date, only the NHELI 2007-1 Certificate has incurred any realized losses.  FOF ¶ 691, 700.  As of January 26, 2015, the realized losses on that Certificate were $25,285,865.  FOF ¶ 690.  As of January 26, 2015, Freddie Mac and Fannie Mae received $1,416,981,427 in principal payments and $174,769,574 in interest payments on the seven Certificates, a total of $1,591,751,001.  FOF ¶ 689.  The original unpaid principal balance on all seven Certificates was $2,045,929,000.  FOF ¶ 690.  The $1,416,981,427 in principal payments that Freddie Mac and Fannie Mae received as of January 26, 2015 represents 69.3% of the original unpaid principal balance of the seven Certificates.  FOF ¶ 690.

F.    **THE PROSPECTUS SUPPLEMENTS FOR THE SECURITIZATIONS DISCLOSED THE CHARACTERISTICS OF THE LOANS AND THE RISKS ASSOCIATED WITH INVESTING**

Freddie Mac and Fannie Mae received prospectus supplements for the seven Securitizations that disclosed information about the characteristics of the underlying loans and explicitly warned investors about the risks involved with investing in the Securitizations.  For example, the prospectus supplements made clear that investors "could lose a portion of the money you paid for your certificate" if borrowers defaulted on their mortgage loans, and "[i]n

---

[5]    During the time it held the residuals described above, Nomura received $51,133,013.46 in principal and interest payments on those holdings as of August 27, 2007.  FOF ¶ 178.  If this amount ($51,133,013.46) is added to the total sales price of Nomura's residual holdings in September 2007 ($12,791,896.00), and the total ($63,924,909.46) is subtracted from the initial value of the residuals ($182,467,310.69), the difference is $118,542,401.23.  FOF ¶ 178.

the event the mortgaged properties fail to provide adequate security for the Mortgage Loans."

FOF ¶ 179.[6]

The prospectus supplements also explicitly stated that investors could lose money due to economic factors such as declines in the housing market.  For example, they warned investors that "economic conditions . . . which may or may not affect real property values, may affect the ability of borrowers to repay their loans on time," "declines in residential real estate markets . . . may reduce the values of properties . . . which would result in an increase in the related loan-to-value ratios," and "the risk of delinquencies and loss is greater" when "a weak or deteriorating economy exists, as may be evidenced by, among other factors, increasing unemployment or falling property values."  FOF ¶ 181.  The prospectus supplements also disclosed that "the characteristics of the mortgage loans" in the Securitization could vary by up to 5% (by total principal balance as of the Cut-Off Date) "from the characteristics of the mortgage loans that are described in the prospectus supplement"—meaning that it was possible that the information about the specific loans in the deal could change.  FOF ¶ 564.  Moreover, the prospectus supplements made disclosures about the four categories of information at issue in this Action.

### 1.    Disclosures Regarding Origination and Underwriting

In accordance with governing regulations, 17 C.F.R. § 229.1111(a)(3), the prospectus supplements identified the originators of loans that comprised more than 20% of the loans underlying the Securitization (or a supporting loan group), and also provided information about the underwriting guidelines of those originators.  In addition, in most instances, the prospectus supplements stated that the loans "were originated generally" in accordance with the

---

[6] The seven contained nearly identical language.

guidelines of those identified originators, subject to "variation[s]" or exceptions.  FOF ¶¶ 99,

285-308.

| Table 5 | | |
|---------|---|---|
| Securitization | Originator(s) | Disclosure in Prospectus Supplement |
| NHELI 2006-FM1 | Fremont (100%) | "All of the mortgage loans were originated or acquired **generally** in accordance with the underwriting criteria described in this section.  The following is a summary of the underwriting guidelines **believed by the depositor to have been applied, with some variation**, by Fremont." |
| NHELI 2006-HE3 | People's Choice (38.19%) | "The Mortgage Loans were **generally** originated by People's Choice Home Loan, Inc., a Wyoming corporation ("PCHLI"), in accordance with the underwriting criteria described in this section and detailed in print and on-line manuals that our underwriters use in making their credit decisions ('Underwriting Guidelines') . . . . The Mortgage Loans are **generally** consistent with and conform to the Underwriting Guidelines." |
| NHELI 2006-FM2 | Fremont (100%) | "All of the mortgage loans were originated or acquired **generally** in accordance with the underwriting criteria described in this section.  The following is a summary of the underwriting guidelines believed by the depositor to have been applied, **with some variation**, by Fremont." |
| NHELI 2007-1 | Silver State Mortgage (31.67%) | The prospectus supplement does not make disclosures regarding Silver State Mortgage, but merely discloses a description of Silver State Mortgage as a "primarily an Alt-A [mortgage] lender" and that "Silver State Mortgage's Product Guidelines are for the most part a derivative of the major buyers of Alt-A" mortgages. |
| NHELI 2007-2 | Ownit Mortgage Solutions, Inc. (42.38%) | "Ownit provides loans to borrowers . . . in accordance with the RightLoan Underwriting Guidelines." <br><br> Ownit's underwriting guidelines "are designed to be used as a **guide** in determining the credit worthiness of the borrower and his/her ability to repay . . . . The underwriter's objective is to analyze an application individually with the understanding that **no single characteristic will approve or deny a loan**." |
| NHELI 2007-3 | ResMae (77.6%) | "The information set forth below in the following paragraphs in this section contains a brief description of the underwriting guidelines used for the Mortgage Loans originated by ResMAE." |

The prospectus supplement for NHELI 2007-3 also disclosed that ResMAE, the originator of

77.6% of the underlying loans, had "filed for bankruptcy protection" and warned that "[a]ny

originator whose financial condition was weak or deteriorating at the time of origination may

have experienced personnel changes that adversely affected its ability to originate mortgage

loans in accordance with its customary standards.  It may also have experienced reduced

management oversight or controls with respect to its underwriting standards."  FOF ¶ 309.

-21-

The above disclosures concerning underwriting guidelines applied to the specific originators identified in the prospectus supplement.  Table 4 identifies the percentage of loans in the Securitizations originated by originators whose guidelines (and in most cases, identities) were not disclosed in the prospectus supplements.  FOF ¶ 398.

| Table 4 | |
| --- | --- |
| Percent of Loans From Undisclosed Originators | |
| Securitization | Percent of Loans from Undisclosed Originators |
| 2005-AR6 | 100% |
| 2006-FM1 | 0% |
| 2006-FM2 | 0% |
| 2006-HE3 | 61.81% |
| 2007-1 | 68.33% |
| 2007-2 | 57.62% |
| 2007-3 | 22.39% |

For these loans from undisclosed originators, the prospectus supplements separately stated that the loans backing the Securitizations "were originated generally in accordance with the underwriting criteria described in this section."  FOF ¶ 315.  That section—"Underwriting Standards of the Sponsor" and "Modified Standards"—disclosed as general "underwriting criteria" that:  (i) each borrower was required to complete an application containing certain information and may have been required to authorize the verification of certain information; (ii) the lender determined whether the borrower could meet his or her monthly obligations based on data provided by the borrower; (iii) a borrower's debt-to-income ratio was generally limited to 60%, though this could vary "on a case-by-case-basis"; and (iv) the property value was generally determined by an appraisal conducted at the time of origination.  FOF ¶ 317-319.  The prospectus supplements also disclosed that underwriting exceptions could apply: "[C]ertain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower."  FOF ¶ 316.  In

some cases the prospectus supplements disclosed that "[i]t is **expected** that a **substantial portion**

of the mortgage loans may represent such underwriting exceptions."  FOF ¶ 311-312.

The "Modified Standards" section (which appeared in all of the prospectus

supplements except 2006-FM1) disclosed that loans could be originated under reduced-or no-

documentation programs, which might require no verification of a borrower's statements:

> Certain of the Mortgage Loans have been originated under reduced
> documentation, no-documentation or no-ratio programs, which
> require less documentation and verification than do traditional full
> documentation programs.  Generally, under a reduced
> documentation program, verification of either a borrower's income
> or assets, but not both, is undertaken by the originator.  Under a
> no-ratio program, certain borrowers with acceptable compensating
> factors will not be required to provide any information regarding
> income and no other investigation regarding the borrower's income
> will be undertaken.  Under a no-documentation program, no
> verification of a borrower's income or assets is undertaken by the
> originator.  The underwriting for such Mortgage Loans may be
> based primarily or entirely on an appraisal of the Mortgage
> Property, the loan-to-value ratio at origination and/or the
> borrower's credit score.

FOF ¶ 18.  As noted above, *see supra* p. 16-17, between 36 and 87 percent of the loans in the

supporting loan groups were originated under such "modified standards."

The prospectus supplements also clearly stated that the loans backing the

Securitizations were originated to credit standards less stringent than loans issued according to

Freddie Mac and Fannie Mae standards.  FOF ¶ 184.  Each of the prospectus supplements for the

Securitizations stated that "[t]he underwriting standards applicable to the Mortgage Loans

typically differ from, and are, with respect to a substantial number of Mortgage Loans, generally

less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac" and

"[t]o the extent the programs reflect underwriting standards different from those of Fannie Mae

and Freddie Mac, the performance of the Mortgage Loans thereunder may reflect higher

delinquency rates and/or credit losses."  FOF ¶ 184.

## 2. Disclosures Regarding Loan-To-Value and Combined Loan-to-Value Ratios

The prospectus supplements also contained disclosures concerning LTV and (for all but one deal) CLTV ratios.  They described how these ratios were calculated and stated that they were based on "value" determined by an appraisal conducted at the time of origination or by an actual sales price, and also cautioned that the ratios could change with the passage of time.  FOF ¶ 453.  As to the calculations, each prospectus supplement explained that "the 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property."  FOF ¶¶ 452.  For refinance loans, the LTV ratio would generally be based on appraised value.  CLTV stands for combined loan-to-value ratio, a metric equivalent to LTV except that the borrower has taken out more than one loan on the property.

The data about LTV and CLTV ratios—the number of loans in specified ranges, as well as the average LTV ratio and CLTV ratio (if provided) for each supporting loan group— was aggregated, rather than provided on a loan-by-loan basis.  FOF ¶ 451.  As set forth in Table 2 above, the average LTV ratios for the supporting loan groups ranged from 74.68% to 81.86%, while the average CLTV ratios ranged from 82.05% to 90.2%.  The prospectus supplements warned that this data was not static, because as time passes the "value" in an LTV ratio or CLTV ratio "may be less than the 'Value' at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market."  FOF ¶ 195.  The prospectus supplements also disclosed that "[a]ll appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac."  FOF ¶ 556.

PLS investors, including Freddie Mac and Fannie Mae, understood that an appraisal of a property value is a matter of opinion rendered by a professional appraiser—and that two appraisers may not reach the same opinion of value with respect to the same property. FOF ¶ 465.  David Hackney, a PLS trader at Freddie Mac, testified that an "appraisal involves the judgment" of the appraiser.  FOF ¶ 465.  Similarly, Paul Norris, a PLS trader at Fannie Mae, testified that an appraisal is an "estimate of value" that represents an opinion made in the professional judgment of the appraiser.  FOF ¶ 465.

### 3.    Disclosures Regarding Owner Occupancy

The prospectus supplements for the Securitizations also disclosed aggregated data about the "occupancy status" of the loans in the supporting loan groups, as set forth in Table 2, above.  The supporting loan groups for the two Alt-A deals, NAA 2005-AR6 and NHELI 2007-1, contained 50% and 46%, respectively, of owner occupied homes, while the rates for the remaining deals, which were subprime, ranged from 86% to 90%.

Investors, including Freddie Mac and Fannie Mae, understood during the 2005 through 2007 time period that—especially for loans used to purchase (rather than refinance) a property—occupancy statistics were, by definition, a report of the borrower's stated intention at the time he or she filled out a mortgage loan application (*i.e.,* to live in the home or acquire it as a second home or investment property).  FOF ¶ 566.  For example, when asked if there is "any way, other than relying on the borrower's representations about his intent, to determine . . . what type of occupancy a purchase money loan will be for," Freddie Mac trader Perri Henderson testified that, in 2005 to 2006, she could not "think of any other way, at that time, that you can verify it."  FOF ¶ 567.  Hunter agreed in his deposition that "in order to test whether the borrower is misrepresenting" occupancy in a purchase mortgage, "one would have to inquire about his or her intent" because a borrower taking out a purchase mortgage "hasn't yet taken

ownership of the house." FOF ¶ 566.  Freddie Mac's PLS portfolio manager, Michael Aneiro,

concurred, testifying that owner occupancy for a purchase money loan must mean "[t]here's an

intent for the owner to occupy the premises."  FOF ¶ 566.

### 4.    Disclosures Regarding Credit Ratings

The prospectus supplements stated that "[t]he Offered Certificates will not be

offered unless they receive ratings at least as high as [Aaa/AAA/--]."  FOF ¶ 581.  The

Certificates all received triple-A credit ratings from third-party rating agencies such as S&P &

Moody's.  FOF ¶ 581.  Even if plaintiff could identify the scope of the alleged credit rating

misrepresentations, it would still be unable to demonstrate materiality.  Typical RMBS investors

during this time included banks, insurance companies, mutual funds, pension funds, Freddie Mac

and Fannie Mae, and hedge funds.  These large institutional investors conducted sophisticated

pre-acquisition analyses that included modeling the performance of the underlying collateral in a

variety of different market scenarios.  FOF ¶ 261-266.  Although investors may have

occasionally confirmed the validity of their own models using credit ratings, they ultimately

made their own decisions about the quality of an investment.  Credit ratings did not supplant the

reasonable investor's individual conclusions about whether to purchase a particular security.

### G.    THE HOUSING MARKET

Falling house prices can lead to "negative equity," meaning that borrowers owe

more than their homes are worth.  FOF ¶ 213.  Falling house prices also make it very difficult for

borrowers to refinance their homes—which was critical for borrowers with interest-only or

adjustable-rate mortgages who had intended to refinance after initial "teaser" rate periods

expired.  FOF ¶ 218.  In the words of Fannie Mae's Vice President Eric Rosenblatt, when house

prices declined, "for those kind of borrowers with those kinds of loans and they're not able to

refinance or sell their homes as a result, then they're not able, then, to get out of a loan that they

can no longer continue to pay." FOF ¶ 213. Rising unemployment also leads to borrower

default, as defendants' expert, Dr. Kerry D. Vandell, will testify. FOF ¶ 218. For individual

borrowers, "credit trigger events" such as loss of a job, coupled with house price declines, are

especially likely to lead to default. FOF ¶ 213.

        The strong correlation between house price depreciation and mortgage loan

defaults is well-established in the economic literature—and is undisputed in this case. FOF

¶ 203-07. Experts for both parties have agreed that falling house prices cause mortgage loan

defaults. FOF ¶ 206. In its report to Congress for the fiscal year 2009, FHFA noted that the

"rise in unemployment and the continued decline in house prices are significant economic factors

that left many homeowners unable to refinance their mortgages or make mortgage payments."

FOF ¶ 220. Freddie Mac's Vice President of Investments and Capital Markets in charge of its

PLS trading, Patti Cook, stated in her January-March 2007 column in Freddie Mac's "Strategic

Perspectives" that "[r]ising house prices in the past few years have protected a large number of

borrowers from defaulting because they could refinance or sell their home. That is no longer

true—slowing HPA [housing price appreciation] and climbing rates have left a large number of

borrowers exposed." FOF ¶ 214. The October 2007-January 2008 issue stated that "history

shows a strong correlation between significant HPA declines and defaults." FOF ¶ 209.

Similarly, Peter Federico, Senior Vice President of Asset and Liability Management at Freddie

Mac, told investors in March of 2008 on an investor/analyst conference call that "[h]ouse prices

have long been the predominant driver of mortgage defaults." FOF ¶ 212. He also explained

that "[d]uring periods of rising house prices, defaults tend to be low, and conversely as you

know, as a house prices fall and stagnate as they are today defaults rise." FOF ¶ 212.

House prices began a steep decline in April 2007, and had fallen 33% by May 2009.  FOF ¶ 233.  The following chart, reproduced from a brief Freddie Mac filed in 2009 in the United States District Court for the Southern District of New York, *see* pp. 32-34, *infra*, shows that during the period of approximately 2005 to 2008, house prices shifted from increasing by more than 15% per year to decreasing by almost 15% per year:



FOF ¶ 267.  As Freddie Mac told the district court in another lawsuit in 2010, *see* p. 32-34, *infra*, "in 2007, this country was blindsided by the single largest decline in single-home values in recorded history."  FOF ¶ 271.  The next graph, submitted to the Court by Freddie Mac in that case and  others, *see* p. 32-34, *infra*, shows house prices (as opposed to percentage changes in house prices) using three different S&P/Case-Shiller indices:  the U.S. national index, the 10-City Composite Index and 20-City Composite Index.  Those indices also demonstrate the flattening of house prices in 2006 and their sharp decline during 2007 and 2008.  FOF ¶ 223-24.



FOF ¶ 223-24.  In short, as Freddie Mac explained in this 2010 filing, "it is common knowledge that, beginning in the latter half of 2007, this country entered a period of unprecedented financial turmoil.  Real estate values plummeted, and credit markets froze."  FOF ¶ 265.[7]

The decline in home prices beginning in April 2007 was followed by a severe economic downturn.  FOF ¶ 226.  The recession—a period of significant decline in economic activity spread across the economy—lasted from the fourth quarter of 2007 through the second quarter of 2009 (with housing prices continuing to fall into 2011).  FOF ¶ 226.  It was the longest and most severe recession in the United States since the Great Depression of the 1930s.  FOF ¶ 226.  During the recession, unemployment in the U.S. rose, and by the end of 2009, had reached its highest level in more than 25 years.  FOF ¶ 226.  Job losses contributed to both

---

[7]    Freddie Mac has, in prior cases, asked district courts to take judicial notice of the information contained in these charts, and of the housing and financial crisis generally.  As Freddie Mac said in a 2010 filing, the "court may take judicial notice of market phenomena."  *See* FOF ¶ 265 (citing *In re 2007 Novastar Fin. Sec. Litig.*, 2008 WL 2354367, at *1 (W.D. Mo. June 4, 2008)).

falling demand in the housing and mortgage markets and to an increased incidence of delinquency and default by mortgage borrowers.  FOF ¶ 226.

        These trends had a dramatic impact on Freddie Mac and Fannie Mae.  Under their charters from the federal government, those two entities are "allowed to purchase a variety of mortgages and mortgage backed securities," and almost nothing else of significance.  FOF ¶ 6-7.  Freddie Mac and Fannie Mae thus have two principal kinds of assets, mortgage loans they have purchased as whole loans and residential mortgage backed-securities, including private label securities such as those at issue in this case.  FOF ¶ 6-7.  At the end of 2007, Freddie Mac's "total mortgage portfolio, which includes [Freddie Mac's] retained portfolio  and credit guarantee portfolio, was $2.1 trillion, while the total U.S. residential mortgage debt outstanding, which includes single-family and multifamily loans, was approximately $11.8 trillion."  FOF ¶ 18.  Fannie Mae's credit book of business, which included investments in PLS, totaled $2.8 trillion as of September 30, 2007."  FOF ¶ 19.

        It is indisputable that whole loans and private label securities held by Freddie Mac and Fannie Mae declined in value when house prices began to decline in 2007, accompanied by the severe economic difficulties described above.  In June 2008, Freddie Mac's $212 billion non-agency PLS portfolio had unrealized losses of $30 billion, FOF ¶ 229, and Fannie Mae had an estimated fair value loss of $7.9 billion on its $48.8 billion portfolio of subprime and Alt-A PLS, which included one of the securities at issue in this case, FOF ¶ 229.

        Beginning in 2007—in filings with the Securities and Exchange Commission ("SEC") and disclosures to investors, as well as court filings and other public statements and internal documents—Fannie Mae and Freddie Mac attributed their losses generally, and losses on private label securities specifically, to the decline in house prices and the weakening

-30-

economy.  FOF ¶ 231.  In sworn deposition testimony in this Action, current and former Freddie

Mac and Fannie Mae employees have testified that falling house prices caused loan defaults and

losses on Freddie Mac's and Fannie Mae's PLS portfolio.  FOF ¶ 258-63.

<u>Investor Reporting</u>.  Beginning in 2007, Freddie Mac, Fannie Mae, and FHFA, in

public disclosures and reports, all attributed the losses Freddie Mac and Fannie Mae were

experiencing to the downturn in the housing market and the worsening economy.  FOF ¶ 231.

Fannie Mae  stated in a 10-Q filed in November 2007, for the period ending June 30, 2007, that

"the increase in net charge-offs in each period reflects higher default rates ," resulting from "the

national decline in home prices during the first six months of 2007."  FOF ¶ 232.  During an

August 16, 2007 earnings call with investors, Fannie Mae Chief Risk Officer Enrico

Dallavecchia stated that the "increasing credit losses we experienced in 2006 was largely driven

by the combination of weak economic conditions and weak to negative home price

appreciation."  FOF ¶ 233.  Freddie Mac's Annual Report for the fiscal year 2007 and Fannie

Mae's SEC Form 10-K filing for the fiscal year 2007 likewise attributed the "substantial increase

in [their] credit related expenses" specifically to "national home price declines and economic

weakness in some regional markets."  FOF ¶ 234.

Freddie Mac, Fannie Mae, and their regulator, FHFA, continued to

recognize the impact of house prices and economic events on their losses in 2008 and 2009.  For

example, Freddie Mac's Form 10-K for the year 2008, filed with the SEC on March 11, 2009,

stated that "macroeconomic conditions deteriorated during 2008, which affected the performance

of all types of mortgage loans."  FOF ¶ 239.  In its Form 10-Q filing for the period ending June

30, 2009, filed with the SEC on August 6, 2009, Fannie Mae stated that its "financial results for

the second quarter and first six months of 2009 were adversely affected by the ongoing

deterioration in the housing and mortgage markets." FOF ¶ 241. In 2010 and 2011, both

Freddie Mac and Fannie Mae continued to attribute the cause of their losses to macroeconomic

factors and declines in house prices. Freddie Mac in its Annual Report to the SEC on Form 10-K

for 2010, filed with the SEC on February 24, 2011, stated that it had been "significantly

adversely affected by deteriorating conditions in the single-family housing and mortgage markets

during 2008 and 2009." FOF ¶ 242. Fannie Mae likewise attributed its financial results in 2010

to the "continued weakness in the housing and mortgage markets," among other economic

factors. FOF ¶ 244.

Freddie Mac and Fannie Mae specifically attributed losses on their PLS

investments to declining house prices. Freddie Mac reported in its 2010 and 2011 SEC Form 10-

K filings that "home prices declined significantly, after extended periods during which home

prices appreciated. As a result, the fair value of [non-agency mortgage-backed securities] has

declined significantly since 2007 and we have incurred substantial losses through other-than-

temporary impairments." FOF ¶ 252. Fannie Mae's 2010 and 2011 SEC Form 10-K filings

contain similar statements. FOF ¶ 252.

Court Filings. Freddie Mac and Fannie Mae have also asserted in federal courts,

in lawsuits filed against them that declines in their share prices beginning in 2007 were caused

by declining house prices and the economic meltdown that occurred beginning in 2007. FOF

¶ 264. (This was, of course because Freddie Mac's and Fannie Mae's financial performance

depended on payments by borrowers on their mortgage loans, and when house prices decline,

more borrowers default or become delinquent.) In a September 23, 2009 memorandum of law in

support of its motion to dismiss the amended complaint filed against it in the *Kuriakose* case

mentioned earlier, *see* p. 4, *supra*, Freddie Mac asserted:

> It is common knowledge that, beginning in the latter half of 2007, this country entered a period of unprecedented financial turmoil. Real estate values plummeted, and credit markets froze. Just as [Freddie Mac] had warned investors, its financial results and its stock price suffered after those macroeconomic events unexpectedly tore through the U.S. economy. Indeed, virtually every major financial institution in the country was surprised by these historically anomalous developments and incurred losses similar to, or greater than, those incurred by Freddie Mac.

FOF ¶ 265. Freddie Mac explained in particular how house price appreciation—followed by a

decline in house prices—caused losses across the entire industry:

> In the end, the reason that this case should be dismissed is not very complicated. Freddie Mac's principal assets are home mortgages and mortgage-backed securities. As Freddie Mac repeatedly warned investors, a decline in home values was likely to cause Freddie Mac to recognize losses and to affect its capital adequacy. In November 2007, the steepest decline in home values in U.S. history led Freddie Mac to begin recognizing losses. The unforeseen financial crisis that followed—which materially worsened in the third quarter of 2008 —resulted in further losses to Freddie Mac and virtually every other major financial institution worldwide.

FOF ¶ 268. In a second brief (seeking to dismiss a second amended complaint in *Kuriakose*),

dated October 13, 2011, Freddie Mac made similar statements about the causes of its losses:

"[I]n 2007, this country was blindsided by the single largest decline in single-home values in

recorded history" and "it is readily apparent that Freddie Mac's losses were caused by an

industry-wide collapse, culminating in a government-imposed conservatorship. . . . "  FOF ¶ 271.

Freddie Mac argued that it had "repeatedly warned investors" that "a decline in home values was

likely to cause Freddie Mac to recognize losses and to affect its capital adequacy," and that this

came to fruition in November 2007, when "the steepest decline in home values in U.S. history

led Freddie Mac to begin recognizing losses."  FOF ¶ 271.

Similarly, in a shareholder derivative action against Freddie Mac, investors

asserted that Freddie Mac's failure to recognize the risky nature of subprime mortgage loans

(such as those involved in five of the seven Certificates at issue) violated management's duty of

care and caused losses to investors.  A Special Litigation Committee ("SLC") appointed by the

Board of Directors conducted a three-year investigation, during which the SLC and its special

counsel conducted 47 interviews and reviewed more than 50 million pages of documents.  FOF

¶ 274.  The SLC's final report, dated February 25, 2011 and filed as an exhibit to Freddie Mac's

motion to dismiss in *In re Federal Home Loan Mortgage Corp. Derivative Litigation*, 1:08 Civ.

773, in the Eastern District of Virginia, found that:

> The consensus among the current and former officers and directors
> of Freddie Mac interviewed by the Committee was that the primary
> cause of the Company's recent losses was an "exogenous macro-
> economic event[]"; namely, the unprecedented decline in the
> housing market. Specifically, between 2006 and May 2008, house
> prices fell nationwide by approximately twenty-five percent. This
> is the largest, and only, nationwide decline in house prices since
> the Great Depression.
>
> These individuals generally have stated that while Freddie Mac's
> credit stance had an impact on the margins, there is nothing that
> Freddie Mac could have done to avoid material losses other than:
> (1) closing its doors; or (ii) violating GAAP by reserving for
> hypothetical scenarios that nobody thought were plausible at the
> time.

FOF ¶ 274; DX-0903 at 31.

On October 9, 2013, Freddie Mac filed a memorandum of law in support of its

motion to dismiss claims brought against it in *Ohio Public Employees Retirement System* v.

*Federal Home Loan Mortgage Corp.*, No. 4:08 Civ. 00160, in the Northern District of Ohio.

FOF ¶ 275.  Freddie Mac asserted that:  "Just as Freddie Mac had warned investors, its financial

results and its stock price suffered as a result of the collapse of the financial markets," which led

to "the single worst financial crisis since the Great Depression."  FOF ¶ 275.  In arguing the

motion to dismiss in open court, Freddie Mac's counsel made clear that house price declines

caused Freddie Mac's losses:

> Now, at the same time, the market also knew that if there was a
> substantial decline in home value, Freddie Mac was going to suffer
> losses inevitably.  But what happened? This is what happened:
> The single largest decline in home prices in recorded United States
> history.  As you saw, the analysts were aware, the street was
> aware, Freddie Mac was going to suffer losses if there were home
> declines, home price declines.

FOF ¶ 275.  "The market" was certainly aware that investments that depended on payments by

borrowers of mortgage loans would decline when "house prices decline."

Fannie Mae has similarly stated in a filing in federal court that the severity of the

housing crisis caused its losses as well.  Fannie Mae's September 8, 2009 memorandum of law in

support of its motion to dismiss in *In re Fannie Mae 2008 Securities Litigation*, No. 1:08 Civ.

07831, in this court, stated that "[b]eginning in late 2006 and throughout 2008, the housing and

credit markets suffered an extraordinary meltdown," and "[i]n 2008, home prices declined

approximately 9%; credit markets froze up; and business and consumer confidence plummeted."

FOF ¶ 273.  Further, Fannie Mae recognized that "in the tumultuous market of 2007 through

2008, there were a multitude of factors affecting the price of Fannie Mae's securities—most of

which were global and market-wide factors not specifically relating to Fannie Mae."  FOF ¶ 273.

Testimony in this Action.  Numerous Freddie Mac and Fannie Mae executives

have testified in this Action that house prices were the key factor driving the increase in

mortgage loan defaults that started to occur in 2007.  For example, Freddie Mac Executive Vice

President of Investments and Capital Markets Patti Cook testified that "the high levels of defaults

were primarily the result of house price declines that hadn't been observed since the Great

Depression" rather than other possible causes, including "poor underwriting practices."  FOF

¶ 258.  Raymond Romano, Freddie Mac Senior Vice President, Credit Risk Oversight at Freddie

Mac, testified that "the primary cause of Freddie Mac's losses in the nontraditional portfolio was

an exogenous macroeconomic event" and that he "believe[d] the housing price decline was a

very significant contributor to the losses [Freddie Mac] experienced." FOF ¶ 259. He further

explained that "housing price declines were chief among the reasons for losses." FOF ¶ 259.[8]

> With respect to Fannie Mae, Executive Vice President Peter Niculescu, whose

responsibilities included overseeing surveillance of PLS, testified that he "indeed" agreed that

the loans backing Fannie Mae's PLS portfolio could incur a loss to Fannie Mae if home prices

declined far enough. FOF ¶ 261. CJ Zhao, the Director of Credit Analytics responsible for

surveillance of the PLS portfolio, testified that declining house prices caused significant

deterioration in mortgage loan performance. FOF ¶ 262. Zhao recognized that rates of house

price appreciation or depreciation were the main credit risk driver for the loans backing Fannie

Mae's PLS portfolio. FOF ¶ 262.

> As house prices flattened in late 2006 and began to decline in 2007, mortgage

loans, including the loans underlying the seven securities at issue in this Action, began

experiencing delinquencies and defaults at an increasing rate. The graph below shows in a red

line the cumulative delinquencies and defaults experienced by the loans in the supporting loan

---

[8]    Defendants respectfully disagree with the Court's ruling that lay opinion testimony about loss causation can only be offered under Fed. R. Evid. 701 "[i]f the witness performed an investigation during the course of her employment addressed to the issue of loss causation. (2/18/15 Order & Opinion, Doc. 1289, at 9.) Rule 701 permits testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. In any event, testimony given by (among others) Patti Cook, Richard Syron, and Raymond Romano meets the standard articulated by the Court. Patti Cook was the Chief Business Officer and her job involved considering or evaluating the risk to Freddie Mac's PLS business. (*See* Cook Tr. at 46:22-47:14 (testifying that she "had responsibility over [Freddie Mac's] retained portfolio" including a "risk management role.") Richard Syron was the CEO of Freddie Mac and his job involved considering or evaluating the risk to Freddie Mac's PLS business. (*See* Syron Tr. at 80:15-81:9 (testifying that he understood "mortgages underlying the PLS were more risky than" prime loans)). Raymond Romano was Senior Vice President, Credit Risk Oversight, and his job involved considering or evaluating the risk to Freddie Mac's PLS business. (*See* Romano Tr. at 71:9-72:1 (testifying that he had credit "oversight responsibility" for all of Freddie Mac's including "investments and capital markets"—the unit that purchased PLS).)

groups—overlaid on the chart of house price declines Freddie Mac submitted to the United

States District Court in *Kuriakose* v. *Freddie Mac*.



Defendants' expert Dr. Kerry D. Vandell performed an empirical analysis to

determine whether loans that plaintiff's expert, Robert Hunter, claims are "defective" performed

any differently than loans Mr. Hunter did not identify as "defective," after accounting for loan

and borrower characteristics and other relevant economic factors.  Dr. Vandell concluded that

"defective" loans were no more likely than other loans to default, all else equal.  FOF ¶ 281.

Plaintiff's expert, Dr. G. William Schwert, reached the same conclusion in his initial analysis

contained in his November 14, 2014 expert report.  FOF ¶ 282.  He later purported to update that

analysis—and still found that there was no difference between the performance of "defective"

and non-defective loans using the standard five percent test for statistical significance.  FOF ¶ 282.

### H.    PLAINTIFF'S CLAIMS

Plaintiff alleges four categories of misstatements in the prospectus supplements for the Securitizations.    Plaintiff's witness list contains no fact witnesses from Fannie Mae or Freddie Mac who will testify live that the prospectus supplements contain any false or misleading statements.  Instead, plaintiff's witnesses are paid experts who evaluated a sample of approximately 100 loans from each supporting loan group, which amounts to about 5% of the 15,806 supporting loan group loans.  FOF ¶ 606.

Plaintiff's expert Robert Hunter re-underwrote a sample of 723 loans (the "Sample Loans") to evaluate whether, in his opinion, the loans had underwriting defects.  FOF ¶ 396.  Hunter found that 67% of the Sample Loans (482 loans) had "substantial" defects that increased the credit risk of the loan.  FOF ¶ 396.  Hunter's reasons for deeming a loan "substantially defective" include, among others, (i) a document was missing from the loan file; (ii) the loan failed to comply with underwriting guidelines, even if there was an underwriting exception explained by compensating factors or an exception had been granted in the judgment of the underwriter; (iii) Hunter allegedly found evidence of borrower fraud—even if no such evidence was ever present in a loan file; (iv) a loan deviated from a set of so-called "minimum industry standards" created by Hunter and others; (v) information unavailable to the original underwriter purportedly indicated a defect; and (vi) Hunter allegedly found evidence that, for owner occupied properties, the borrower did not live at the property for at least 12 months after origination on the loan.  FOF ¶¶ 397, 579.  Table 6 summarizes Hunter's findings.

For its claims that collateral tables in the offering documents misrepresented the "occupancy status" of borrowers, plaintiff also relies exclusively on Hunter.   FOF ¶ 578.

Plaintiff hired John A. Kilpatrick to try to support its claim that the LTV and CLTV ratios disclosed in the prospectus supplements are misstated.  FOF ¶ 488.  Kilpatrick offers the results of an automated valuation model ("AVM"), which he created especially for this litigation, to purportedly show that the appraisal values (on which some, but not all of the LTV and CLTV ratios are based) were objectively false.  FOF ¶ 530.  If the recorded appraisal value deviated from the value calculated by the AVM Kilpatrick created for this litigation, he concluded that the appraised value was "objectively false."  He then applied his "Credibility Assessment Model," which he also created especially for this litigation, to purportedly show that the appraisals should not be considered "credible" under USPAP.  FOF ¶ 530.  The Credibility Assessment Model is a set of 31 questions made up by Kilpatrick and assigned arbitrary weights by him.  The model has never been peer reviewed and is not used by others in the industry.  FOF ¶ 534.  It does not and cannot measure an appraiser's "credibility" or whether the opinions expressed were honestly held.  In fact, Kilpatrick has admitted that he has no opinion as to whether any appraiser subjectively believed a specific opinion of value.  FOF ¶ 484.

Plaintiff's expert Charles Cowan then purported to extrapolate the results of Hunter's and Kilpatrick's assessments of the Sample Loans to the entirety of the supporting loan groups.  FOF ¶ 607.  Based on his extrapolations, Cowan claims that 68% of the loans in the supporting loan groups were not underwritten in accordance with underwriting guidelines, and that the percentage of "owner occupied" loans was overstated by 7.19% for the supporting loan group.  FOF ¶ 607.  As to LTV and CLTV ratios, Cowan did not extrapolate average "true" LTV or CLTV ratios based on Kilpatrick's results.  Instead, he calculated that the appraised values were inflated, on average, by 11.1%, and that approximately 6% of the loans had understated LTV ratios.  FOF ¶ 608.  In making these extrapolations, Cowan failed either to use Kilpatrick's

definition of an "inflated" appraisal or to set any standard of statistical significance for the results he reported.  FOF ¶ 608.

Plaintiff's claim regarding credit ratings is derivative of its claim that there are misstatements concerning the loan characteristics of loans in the supporting loan groups. Plaintiff alleges that "the ratings for the Securitizations were inflated as a result of Defendants' provision of incorrect data concerning the attributes of the underlying mortgage collateral to the rating agencies and, as a result, Defendants sold and marketed the GSE Certificates as AAA (or its equivalent) when, in fact, they were not."  Am. Compl. at 33; January 20, 2015 Plaintiff's Opposition to Defendants' Motion *in Limine* No. 6, at 2 ("FHFA also alleges that the credit ratings for the Certificates contained in the Prospectus Supplements were incorrect due to material misrepresentations in the pre-closing loan tapes.").

Plaintiff seeks a statutory remedy based on rescission of its purchases under Section 12 of the Securities Act, and under the Blue Skys laws.  FOF ¶ 25.

## ARGUMENT

### I.   THERE WERE NO FALSE OR MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS.

It is plaintiff's burden to prove, by a preponderance of the evidence, that each of the seven prospectus supplements for the securities at issue in this case "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2).[9]  "When analyzing offering materials for compliance with the securities laws,

---

[9]      The Blue Sky laws of Virginia, Va. Code Ann. § 13.1-522, and the District of Columbia, D.C. Code § 31-5601, are "nearly[ ] identical" to Section 12(a)(2) and impose the same requirements of falsity and materiality.  *Dunn* v. *Borta*, 369 F.3d 421, 428, 433 (4th Cir. 2004); *Hite* v. *Leeds Weld Equity Partners, IV, LP*, 429 F. Supp. 2d 110, 114 (D.D.C. 2006).  They should be interpreted the same as Section 12.  *Id.*

[courts] review the documents holistically and in their entirety." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365-66 (2d Cir. 2010).  In other words, "the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 105 (2d Cir. 2013) (quoting *In re Morgan Stanley*, 592 F.3d at 366).[10]  The relevant context includes not only other statements in the offering materials, but also other public information concerning the types of securities at issue, such as relevant practices followed by industry players.  *See, e.g.*, *United Paperworkers Int'l Union* v. *Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993).  It is thus error to isolate the allegedly false statements or treat them in a vacuum.  Context requires analysis of the documents as a whole and also available public information.

Rather, the accuracy of offering documents must be assessed in light of the information available at the time they were published." *Scott* v. *Gen. Motors Co.*, 2014 WL 4547837, at *6 (S.D.N.Y. Sept. 15, 2014) (quoting *Barclays*, 2011 WL 31548, at *5).  "A plaintiff may not plead . . . [Section] 12(a)(2) claims with the benefit of 20/20 hindsight." *NECA-IBEW Pension Trust Fund* v. *Bank of Am. Corp.*, 2012 WL 3191860, at *9 (S.D.N.Y. Feb. 9, 2012) (quoting *In re Barclays Bank PLC Sec. Litig.*, No. 09 CIV 1989 PAC, 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011)).  "The Second Circuit has firmly rejected this 'fraud by hindsight' approach." *In re Sanofi Sec. Litig.*,  2015 WL 365702, at *12 (S.D.N.Y. Jan. 28, 2015) (quoting *Podany* v. *Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004)).

---

[10]     Because Sections 11 and 12(a)(2) employ the "same" standard for identifying material omissions or misstatements, *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 182 (2d Cir. 2014), authorities construing this standard in the Section 11 context fully apply it to the Section 12(a)(2) claims asserted here.  *See also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) ("Claims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements.").

Plaintiff will not be able to show at trial that there are any materially false or misleading statements in the Offering Documents.

**A.**     **Plaintiff Cannot Satisfy Its Burden To Demonstrate That Statements in the Offering Documents Concerning How the Loans Were Originated Were False or Misleading.**

The statements in the Offering Documents concerning how the loans in the supporting loan groups were originated are true, and not misleading.

**1.**     **For Five of the Seven Certificates, Plaintiff Has Presented No Evidence That Defendants Made False or Misleading Statements Concerning Underwriting Criteria.**

The statements in the Offering Documents concerning underwriting criteria were drafted against the backdrop of relevant SEC regulations in place during the 2005 to 2007 time period.  Those regulations, and in particular Regulation AB, required RMBS issuers to include in offering documents two categories of disclosures about the origination of the collateral underlying the securities.  First, a prospectus supplement was required to disclose "[t]o the extent material, a description of the originator's origination program" for "any originator . . . that originated, or is expected to originate, 20% or more of the pool assets." 17 C.F.R. § 229.1110. Second, Regulation AB called for a "description of the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, to the extent known, any changes in such criteria and the extent to which such policies and criteria are or could be overridden." *Id.* § 229.1111(a)(3).[11]

Consistent with this regulatory regime, the seven Offering Documents at issue here contain two categories of disclosures.  For originators of more than 20 percent of the loans

---

[11]     In addition, a prospectus supplement was required to disclose the identity (but not the underwriting program of) "any originator or group of affiliated originators, apart from the sponsor or its affiliates, that originated, or is expected to originate, 10% or more of the pool assets."  17 C.F.R. § 229.1110.

backing a security, the Offering Documents describe their "origination program." 17 C.F.R.

§ 229.1110.[12]  Although not required to do so by regulation, most (but not all) of these

disclosures state in some form that the loans "were originated generally" in accordance with the

particular originators' underwriting programs.  *See* pp. 22, *supra*.  For originators of 20 percent

or less of the collateral for a security, the Offering Documents contained a much more general

description—necessarily so, because it applied to multiple originators—of the "underwriting

criteria used to originate or purchase the pool assets."  *Id.* § 229.1111(a)(3).  The latter

disclosures state that the loans generally comply with the "criteria" disclosed in the Offering

Documents—not with specific originator guidelines.[13]

　　　　　For two of the seven Certificates, NHELI 2006-FM1 and NHELI 2006-FM2,

there is only one relevant set of disclosures about underwriting guidelines because all of the

loans underlying the Securitization were originated by a single lender, Fremont.  FOF ¶ 285.

The other five Securitizations are multi-originator deals, and contain both types of disclosures

(or, for NAA 2005-AR6, only the more general disclosure).  FOF ¶ 315.  Plaintiff has no

evidence that the general disclosures about "criteria" used to originate the loans were false or

misleading.  Plaintiff also has no originator-by-originator evidence of the rate at which loans

from particular originators purportedly deviated from guidelines.  As a result, as to the five

Securitizations containing the general disclosures, plaintiff can put forward no evidence that

---

[12]　　　　The prospectus supplement for NAA 2005-AR6 does not do this, because it was filed
before Regulation AB took effect on January 1, 2006.  FOF ¶ 42.

[13]　　　　Defendants recognize that the Court has interpreted the prospectus supplements
differently in ruling on the parties' *Daubert* motions.  (2/11/14 Opinion & Order, at 27.)
Defendants respectfully ask that the Court reconsider its interpretation in light of more complete
briefing and trial record, but also address the interpretation contained in the Court's February 11
order beginning on page 50, *infra*.

either set of disclosures concerning how the loans "were originated" was false or misleading.
FOF ¶ 397

> **(a)** **Defendants' Statements Concerning Underwriting Criteria for Loans From Originators Whose Guidelines Were Not Disclosed Were Truthful.**

For five of the seven securities, between 22% and 100% of the loans in the supporting loan groups were originated by originators whose guidelines (and, for originators of less than 10% of the loans in the security, identities) were not disclosed in the Offering Documents.  *See* p. 23, *supra*.  The only disclosures in the Offering Documents concerning the "underwriting criteria" used to originate those loans are contained in sections of the prospectus supplements entitled "Underwriting Standards of the Sponsor" and "Modified Standards."

In the first of these sections, the prospectus supplements disclose that "All of the Mortgage Loans have been purchased by the sponsor from various investment banks, savings and loan associations, mortgage bankers, and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."  *See* p. 23, *supra*.  These criteria are that (i) information about the borrower "generally" was furnished, except that income or assets might not be, (ii) "a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations," (iii) "[t]he adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator," (iv) "certain exceptions to the underwriting standards described in this prospectus supplement are made," and (iv) those underwriting standards are "generally less stringent than the underwriting standards of Fannie Mae and Freddie Mac."  *See* p. 24, *supra*.

-44-

The "Modified Standards" state that "[i]n comparison to the 'general' underwriting standards described above, the underwriting standards applicable to mortgage loans under an 'alternative' mortgage loan underwriting program permit different underwriting criteria, additional types of mortgaged properties." *See* p. 24, *supra*.  They go on to disclose that these loans "have been originated under reduced documentation, no-documentation or no-ratio programs," which may require, for example, no information about borrower income or assets. *See* p. 24, *supra*.  In these cases, "[t]he underwriting for such Mortgage Loans may be based primarily or entirely on an appraisal of the Mortgaged Property, the loan-to-value-ratio at origination and/or the borrower's credit score."  *See* p. 24, *supra*.

These disclosures are exactly what they say they are:  a statement that the loans underlying the Securitizations "were originated generally in accordance with the underwriting criteria described in this section."  *See* p. 24, *supra*.  They do not represent that, with respect to originators whose guidelines—and, in most cases, identities—were not disclosed, those originators loans complied with unidentified originator guidelines (from mostly unidentified originators).  Instead, the prospectus supplements contain a general description of the underwriting criteria used to originate the loans.  That is all that Regulation AB required—a "description of the solicitation, credit-granting  underwriting criteria used to originate or purchase the pool assets."  17 C.F.R. § 229.1111(a)(3).

The language and structure of the prospectus supplements make clear that the intent and purpose of the "Underwriting Standards of the Sponsor" and "Modified Standards" is not to point investors to unidentified originator guidelines.  In fact, each of the prospectus supplements (except NAA 2005-AR6, which was issued before Regulation AB took effect and does not disclose any originator-specific underwriting guidelines) contains a disclosure stating

that, in essence, loans from the originators whose guidelines were disclosed were originated "generally in accordance with" the guidelines of that originator. *See* p. 24, *supra*. The statements about loans from originators whose guidelines are not disclosed do no such thing. They describe the "Underwriting Standards of the Sponsor" and "Modified Standards"—without even mentioning originator underwriting guidelines.

The Court has ruled that these disclosures must refer to originator guidelines, because (i) they "make clear" that originator guidelines "dictated whether the Originators would issue the loans," (ii) "the only standards and criteria to which the Supplements could be referring are those that were in the hands of the original lenders," and (iii) the disclosures were "too vague to provide a complete description of the origination process" unless they referred to originator guidelines. *FHFA* v. *Nomura Holding Am. Inc.*, 2015 WL 568788, at *9, 12 (S.D.N.Y. Feb. 11, 2015). Respectfully, the prospectus supplements and regulatory context contradict this reasoning. While the underwriting criteria listed in the Offering Documents say that the "original lender" or the "originator" ultimately decided whether to make the loans, they do not say—or imply—that the issuer had assured that the originators made these decisions in accordance with their underwriting guidelines. As to the second point, it is not the case that the originators' guidelines were "the only standards and criteria" to which the prospectus supplements could be referring. Regulation AB required a "description of the . . . underwriting criteria used to originate or purchase the pool assets," 17 C.F.R. § 229.1111(a)(3)—not a reference to the guidelines of unidentified originators—and the Offering Documents contain that description. Third, it would be much more vague to disclose merely that loans complied generally with the unknown guidelines of unknown originators than to describe, as the Offering Documents did, the general underwriting criteria applied to the loans. In any event, it would be

illogical to interpret a general disclosure (made subject to the securities laws) to be more specific than it is, simply because the disclosure is perceived by a court as not providing enough useful information to investors.  *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that "when an offering participant makes a disclosure about a particular topic," that disclosure does "not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding" that topic); *In re Dingledine*, 916 F.2d 408, 411 (7th Cir. 1990) (holding that a bankruptcy judge was in error to require more specific disclosures where the applicable regulation called for "general disclosure of the category of property subject to the security interest," which "is a far cry from the requirement of a specific disclosure of a specific category") (emphasis in original).

Robert Hunter did not consider whether any of the 723 sample loans were originated in accordance with the underwriting criteria described in these two sections of the prospectus supplements.  FOF ¶ 397.  As a result, he did not conclude that any of those sample loans failed to comply with those underwriting criteria.  FOF ¶ 397.  Michael Forester, on the other hand, determined that the loans he reviewed did comply with "the underwriting criteria described in this section" of the prospectus supplements.  FOF ¶ 396.

For five of the seven securitizations, there is no evidence that between 22% and 100% of the loans in the supporting loan groups (those from originators whose guidelines were not disclosed in the prospectus supplements, *see* p. 23, *supra*) deviated from the disclosures in the offering documents concerning underwriting guidelines.  Further, the evidence plaintiff offers of deviations from disclosures for loans originated by disclosed originators fails for the numerous reasons stated below.  *See* p. 50, *infra.*

**(b)** **Defendants' Statements Concerning Whether Loans Were Originated Generally in Accordance With Each Disclosed Originator's Underwriting Guidelines Were Also Truthful.**

For originators that originated more than 20% of the loans in the Securitizations, all of the prospectus supplements (except NAA 2005-AR6) made representations about the underwriting guidelines of those specific originators. While the language of these disclosures varies, all include statements about the processes used to originate loans, and say that there was, at most, general (not strict or perfect) compliance with underwriting guidelines. For example, the prospectus supplement for NHELI 2007-2 states that Ownit's guidelines "are designed to be used as a guide" but that "no single characteristic will approve or deny a loan." FOF ¶ 301. For NHELI 2007-1, the prospectus supplement describes Silver State's guidelines—but does not contain any representations about compliance with those guidelines. As noted above, there are no originator-specific disclosures concerning underwriting guidelines in the NAAC 2005-AR6 prospectus supplement.

Self-evidently, each of these disclosures applies only to the loans made by the originator to which it pertains. This Court has recognized as much, referring to these disclosures as describing "in considerable detail the underwriting guidelines of those originators." *FHFA* v. *Nomura Holding Am. Inc.*, 2015 WL 568788, at *3 (S.D.N.Y. Feb. 11, 2015). In 2012, defendants argued that plaintiff was required to select a sampling and extrapolation method that permitted originator-by-originator opinions about compliance with underwriting guidelines. *FHFA* v. *JPMorgan Chase & Co., et. al.*, 11 Civ. 6188, at 14 (S.D.N.Y. Oct. 26, 2012) (DLC). Plaintiff declined to do so. As Dr. Arnold Barnett will testify, except as to NHELI 2006 FM1 and FM2, plaintiff has indeed failed to present any evidence about the rate at which loans from disclosed originators deviate from originator underwriting guidelines. FOF ¶ 397.

*     *     *

Because plaintiff offers no evidence at all of any deviations from disclosures in the Offering Documents for between 22% and 100% of the loans in five securitizations (NAA 2005-AR6, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3), and has no evidence about the rate at which loans from disclosed originators deviated from underwriting guidelines, plaintiff will not be able to show that any of the disclosures concerning the origination of the loans underlying these five securitizations were false or misleading.

### 2.    Even If the Offering Documents Are Interpreted To State That All Loans Were Originated In Accordance With Originator Guidelines, the Evidence Still Does Not Show Any False Statements.

The Court has ruled that the "underwriting criteria" listed in the "Underwriting Standards of the Sponsor" and "Modified Standards" sections of the Offering Documents actually amount to statements that "the loans within the Securitization were all originated in compliance with their Originators' standards and processes." *FHFA* v. *Nomura Holding Am. Inc.*, 2015 WL 568788, at *12 (S.D.N.Y. Feb. 11, 2015).  Defendants disagree, but even using the Court's interpretation, the evidence shows that the disclosures were true.

### (a)    These Statements Refer to General Compliance with Underwriting Processes, Not Perfect Adherence.

The Offering Documents make representations about how the loans "were originated"—not always, but "generally"—subject to underwriting "exceptions."  *See* pp. 23-24, *supra*.  These statements do not say that every underwriter always followed perfect processes, or that every loan actually met every criteria of each underwriting guideline.[14]  Instead, they (i)

---

[14]    The Court has held that the prospectus supplements contain representations both about "the origination process" and "that the loans actually did meet each of the criteria within an Originator's underwriting guidelines."  (2/11/15 Opinion & Order, at 36-37.)  Defendants respectfully disagree and reserve all rights for appeal.  This Section addresses the evidence concerning whether misrepresentations were made concerning "the origination process."

speak generally, (ii) about underwriting processes, not compliance with criteria, and (ii) warn of exceptions—in some cases, a substantial number of exceptions.  Each of these aspects of the disclosure is critical to an understanding of what the disclosure means.

"Generally," according to plaintiff's expert Robert Hunter, means—in the seven prospectus supplements at issue here—"very often so, but not universally so."  FOF ¶ 406.  In interpreting a Freddie Mac offering circular that used the same language, Freddie Mac's head of subprime due diligence during the 2005-2007 time period, Ronald Feigles, testified that "generally" meant that loans did "not always" meet applicable guidelines.  FOF ¶ 406.  These interpretations agree with the Oxford English Dictionary, which defines "generally" as "with respect to the majority of individual or cases; for the most part" or "in most instances; usually; commonly."  Oxford English Dictionary (Oxford University Press December 2014).

Representations about how the loans "were originated" pertain to the underwriting processes followed by the original underwriters.  The plain language of these disclosures makes this clear.  The disclosures describe a process (origination) that occurred in the past, and provide information about how that process occurred.  They do not say, for example, that the loans "comply with" underwriting criteria or originators' guidelines—they speak about how the loans "were originated."  Plaintiff's own experts have adopted this common sense reading of the disclosures.  Leonard A. Blum, plaintiff's due diligence expert, testified at deposition that the Offering Documents' language about compliance with underwriting guidelines is "a current representation about a past event," *i.e.*, whether the loan had been originated in accordance with a lender's underwriting guidelines.  FOF ¶ 323.  That was also Hunter's interpretation in his first expert report (served May 15, 2014), which provided as a defect rate the purported rate at which

"Mortgage Loans reflected increased credit risk as a result of deficiencies in the <u>original</u> <u>underwriting process</u>."  FOF ¶ 426. (emphasis added).

These representations also made clear that as part of the underwriting process, underwriters could decide, in their discretion and judgment, to deviate from the listed requirements of the underwriting guidelines.   All of the prospectus supplements represented that some portion—in some cases, a "substantial portion"—of the mortgage loans backing the securitization were originated as "exceptions" to the applicable underwriting guidelines, based on compensating factors identified in an underwriter's discretion.  *See* pp. 23-24, *supra*.  A loan originated as an "exception" to applicable underwriting guidelines does not comply with every guideline criterion.  FOF ¶ 354.  Thus, as the prospectus supplements disclosed, exceptions represent a "deviation" from guidelines, or an instance when a borrower "not strictly qualifying" under the guidelines is, in fact, granted a mortgage loan.  *See* pp. 23-24, *supra*.  None of the prospectus supplements put any limitation on the number of loans backing a securitization that could be originated pursuant to an exception.  In fact, for three of the Securitizations—NHELI 2006-FM1, NHELI 2006-FM2 and NHELI 2007-3—the prospectus supplements disclosed that "a substantial portion of the mortgage loans" may represent such underwriting exceptions.  *See* p. 24, *supra*.

In sum, representations that loans "were originated generally" in accordance with underwriting guidelines concern processes and describe general (but not perfect) adherence to those processes, including through the use of discretionary exceptions.  They do not guarantee against fraud by borrowers or loan originators.  A guarantee would say something other than that loans "were originated generally" in accordance with underwriting criteria.  *See, e.g.*, *N.J. Carpenters Health Fund* v. *Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 117, 125 (2d Cir.

2013) (suggesting that the falsity of similar disclosures of "general[]" compliance with "exceptions" to underwriting guidelines may depend upon a showing of "wholesale abandonment" or "systematic disregard" of underwriting standards); *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773 & n.11 (1st Cir. 2011) (same).

> **(b)    The Loans in the Supporting Loan Groups Were Originated Generally in Accordance with Originator Guidelines.**

Hunter claims that 66.7% of the loans in his sample were materially defective, and Cowan extrapolated that finding to claim a defect rate of 68.56% across the entirety of the supporting loan groups. *See* p. 39, *supra*. The evidence contradicts these claims. Nomura's contemporaneous due diligence process, which examined 39% of the loans in the supporting loan group for compliance with underwriting guidelines—and which was reviewed and approved by Freddie Mac during the relevant period—found that only 6.6% of loans were potentially materially defective. FOF ¶ 404. Freddie Mac's reviews of originators of the loans underlying the Certificates approved of the originators' processes and found low defect rates. Defendants' reunderwriting expert, Michael Forester, who has 35 years of experience reviewing mortgage loans concluded that only 5.5% of sample loans potentially were not originated in accordance with underwriting guidelines. FOF ¶ 395.

> **(i)    Mr. Forester's Re-underwriting Analysis Contradicts Hunter's Defect Rates.**

Defendants' re-underwriting expert Michael Forester conducted a full re-underwriting of the sample loans Hunter claimed had substantial defects. FOF ¶ 395. Each loan that Mr. Forester and his team reviewed underwent four levels of review and quality control by a staff comprised of individuals with at least 10 years each of experience originating and reviewing mortgage loans. Mr. Forester himself, an expert with more than 35 years of experience in the

mortgage industry and with extensive experience in the field of re-underwriting, reviewed and approved the findings for each loan. FOF ¶ 395. He ultimately concluded, based on documents available in the loan file, that only 5.5% of the Sample Loans potentially contained underwriting defects. FOF ¶ 395.

### (ii)     Hunter's Opinions Are Not Credible or Reliable.

Hunter's 67% defect rate is the product of serious methodological errors that make it neither credible nor reliable.

<u>Hunter Applied the Wrong Standard</u>. As set forth above, the Offering Documents, at most, represent that the loans underlying the Securitizations were originated generally in accordance with applicable underwriting guidelines—in the words of Mr. Hunter, that they "very often, but not always" were originated in accord with an originator's processes— and that a very large number of them could meet that standard as a result of underwriting exceptions. *See* p. 50, *supra*. Mr. Hunter ignored this standard and instead asked whether loans strictly complied both with the processes and the criteria of each originator's underwriting guidelines (or his invented "minimum industry standards, addressed below). In his October 6, 2014 report, he states his standard as follows: whether loans were "originated in accordance with the requirements of the relevant originator's underwriting guidelines," FOF ¶ 408, without mentioning the "generally" qualifier, the fact that the prospectus supplements made representations about how the loans "were originated," or the fact of underwriting exceptions.

As a result, Hunter's defect allegations are inflated in three ways. First, by ignoring exceptions and the word "generally," Hunter identified numerous "defects" that are actually technical, but immaterial, deviations from guidelines (if they are deviations at all). This error affected 136 sample loans (18%). FOF ¶ 409. ████████████████████████

████████████████████████████████████████████████



Second, though the prospectus supplements disclose that exceptions are permissible and may represent a "substantial portion" of the loans underlying the Securitizations, Hunter did not conclude that a single loan in his sample was properly originated pursuant to an exception.  FOF ¶ 408.  This is a serious error.  *See e.g., Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 133 (2d Cir. 2011) ("Merrill's statement that it 'may routinely' place support bids is not inconsistent with the possibility that it would place such bids in every Merrill ARS auction that took place over a particular period.").  Hunter fails entirely to account for exceptions—despite statements in the prospectus supplements that exceptions will have been made by the original underwriter (and statements in 3 prospectus supplements that the number of exceptions might be "substantial").

Third, Hunter found loans defective because (in his view) evidence showed that the loan did not actually comply with every criterion of the applicable guidelines.  FOF ¶ 408. This is not an assessment of the process by which the loans "were originated" and is therefore the wrong standard.  (As set forth below, these claims also rest on unreliable evidence.) ███

███████████████████████████████████████████



Similarly, Hunter considers loans defective where loan files did not reflect information about borrower debts that underwriters were not required or able to obtain—for example because the debt was incurred after the date the loan was approved, or was incurred so close to the date of the loan approval that it was not reflected in the credit report obtained in accordance with underwriting guidelines.  FOF ¶ 429.  These findings and others like them (which affect 289 sample loans) do not answer the right question—whether the original underwriter followed the processes he was asked to follow.  FOF ¶ 426.

Hunter Provided Only a "Gross" Defect Rate.  Hunter's defect rate for the loans underlying the Securitizations is inflated because it is an incomplete "gross" defect rate that does not accurately reflect the number of loans that were not originated in accordance with applicable underwriting guidelines.  A "gross" defect rate, according to a 2014 "Defect Rate Tutorial" created by Fannie Mae, is the result of an initial quality control of a loan production.  FOF ¶ 414. A "net" defect rate, which Fannie Mae designates as the "final findings," is calculated only after reviewers provide the original underwriters a chance to address any questions or issues.  FOF ¶ 414.  This error affects every single one of Hunter's claims that a loan was defective (or materially defective).

Hunter testified at deposition that his default rate is a "gross" rate because he did not give originators any chance to explain why his initial defect allegations were not actually defects.  FOF ¶ 414.  Clayton's corporate representative testified that a review that does not give originators an opportunity to respond is an "incomplete [ ] review."  FOF ¶ 415.  AMC's corporate representative agreed that defect rates are commonly high in a "preliminary" review, but that those rates would decline based on communication with originators.  FOF ¶ 415.  Originators of loans in the supporting loan groups (WMC, Quicken Loans, and Wells Fargo) likewise testified that they were able to resolve alleged defects when given the opportunity to do so.  FOF ¶ 415.

Hunter's Findings Based on Missing Documents Are Wrong.  Hunter's defect rate is also artificially inflated because he assumes that a document missing from the loan files he reviewed indicates an underwriting defect, although the evidence in this case shows that documents can "go missing" after the time of origination—and that a file that years later has a "missing" document is not an indication that a loan was originated defectively.  Hunter alleged that 167 sample loans were defective based on missing documents.  FOF ¶ 420.  The loan files considered by both re-underwriting experts in this Action are imaged loan files gathered 7 to 9 years after the original underwriter made the lending decision.  FOF ¶ 417.  As Mr. Forester testified, imaged loan files from the 2005-2007 time period were not infrequently missing documents, because paper files were transferred from many parties (broker, underwriter, servicer, Securitization trustee) and were only scanned as an "imaged file" at one of these stages.  FOF ¶ 417.  Therefore, the absence of a document in a loan file in 2013 and 2014 does not show that the document was not present when the loan was originated in 2005, 2006, or 2007.

Testimony from Clayton, AMC, and originators Wells Fargo, Fremont and WMC confirmed that during the 2005 to 2007 time period lenders were often able to locate missing documents when asked to do so.  FOF ¶¶ 418-419.  In addition, Freddie Mac's head of counterparty reviews agreed that it was "not unusual" for lenders to find documents missing from loan files if they were asked, and even Hunter admitted that during his time at Countrywide Bank (during the period 2001 to 2005), it was "not uncommon" to "clear" a missing document finding after going back to the originator.  FOF ¶ 419.

Hunter plowed ahead despite all this, even when it was illogical to do so.  For example, it is a matter of common sense that, at the time of origination, a loan file must have contained a credit report, appraisal, and loan application—yet Hunter found 167 loans defective where one or more of those documents was not found in the loan file years later.  FOF ¶ 421.

Hunter Relied on Nonexistent Minimum Industry Standards.  Hunter found that 187 loans were originated defectively because they failed to comply with a purported set of "minimum industry standards" for the origination of mortgage loans.  FOF ¶ 433.  The "minimum industry standards" that Hunter superimposed onto the prospectus supplements (which never refer to any such thing) were developed in 2013 by Hunter and two of plaintiff's other "experts" while they were re-underwriting loans at issue in this and related Actions.  FOF ¶ 433.  Witnesses from Fannie Mae (PLS trader Ashley Dyson and credit analyst Lin Cao), loan originators (Quicken Loan) and due diligence providers (Clayton) all testified that in the 2005 to 2007 time period, there were no "minimum industry standards" for the origination of mortgage loans.  FOF ¶ 215.  Instead, as Mr. Forester testified, each lender or originator applied its own underwriting guidelines, and no industry organization or regulatory agency ever published a set

of minimum industry standards for originating mortgage loans.  FOF ¶ 434.  Hunter agrees that

no such standards have ever been published or used in the industry.

        The representations in the Offering Documents were to specific underwriting

guidelines or the criteria described therein. The Offering Documents never said that loans

complied with any "minimum industry standards."  No such standards ever existed.  Plaintiff's

claims in this Action require proof of a material misstatement in the Offering Documents and

Hunter's findings based on his fictional "minimum industry standards" are thus completely

irrelevant.

        <u>Hunter Improperly Found Incomes Stated by Borrowers To Be Unreasonable</u>.  In

the 2005 to 2007 period, lenders originated loans where borrowers stated an income to qualify

for the loan.  FOF ¶ 439.  Verifying the income of a borrower for such a loan was generally not

required by underwriting guidelines.  FOF ¶ 439.  Instead, the applicable underwriting guidelines

generally required underwriters to judge that the income stated by a borrower was reasonable.

FOF ¶ 440.  The guidelines, however, generally did not instruct underwriters how to exercise

their judgment in concluding that an income was reasonable—and the vast majority of applicable

guidelines did not require underwriters to provide a written justification for why they viewed a

stated income as reasonable.  FOF ¶ 440.  Instead, underwriters used their professional judgment

and, first and foremost, considered information gathered during the origination process—

information about a borrower's occupation, location, time on the job, assets, education, and full

credit profile—to evaluate reasonableness.  FOF ¶ 440.  Only if "red flags" appeared in an

application might an underwriter turn to information outside the loan file, such as an online

salary engine.  FOF ¶ 440.

Hunter did not follow the procedures set forth in any applicable guidelines for assessing the reasonableness of stated incomes.  Instead, he tested stated incomes in nearly all cases by asking whether the borrower's stated income was higher than the 90th percentile of income given for a job similar to that borrower's job, based on data compiled by the Bureau of Labor Statistics ("BLS").  FOF ¶ 441.  This is wrong; Hunter identifies no underwriting guideline that required this procedure, and in fact admitted at deposition that he did not know of a single instance where an underwriter used BLS data in the 2005 to 2007 period.  FOF ¶ 441.  As a result, Hunter's claim that a borrower's stated income was higher than the 90th percentile of BLS income does not show that the underwriter failed to follow applicable guidelines in assessing the reasonableness of the borrower's income.

Hunter's Claims Concerning LTV Ratios Are Incorrect.  Hunter uses Dr. Kilpatrick's Greenfield AVM as the basis for 126 allegations of excessive LTV/CLTV.  FOF ¶ 432.  These allegations depend on property values generated 7 to 9 years after loan origination and property appraisal by an AVM to which none of the underwriters had access at the time of origination—including because it relies on tax assessed values from 2010 and 2013.  FOF ¶ 432.  Hunter does not claim that Dr. Kilpatrick's Greenfield AVM was a method of appraisal review specified in the applicable underwriting guidelines, or that any underwriter failed to follow the applicable underwriting guidelines in calculating the LTV/CLTV.  As a result, all of Mr. Hunter's 126 excessive LTV/CLTV allegations based on Dr. Kilpatrick's Greenfield AVM are incorrect.  FOF ¶ 432.

Hunter Inflated His Defect Rate With "Pre-Closing Loan Tape" Allegations.  Hunter claims that 291 loans suffered from defects in the "pre-closing loan tapes."  FOF ¶ 443.  Plaintiff has now conceded that these claims do not concern the truth or falsity of statements in

the Offering Documents about how loans were originated.  Plaintiff's January 20, 2015

Opposition to Defendants' Motion *in Limine* #6 (Doc. No. 1236) (pre-closing loan tapes are

relevant to "LTV/CLTV ratios, owner occupancy status and credit ratings").  That is because the

pre-closing loan tapes did not exist when the loans were originated and have nothing to do with

the lending decision, as Hunter agreed at deposition.  FOF ¶ 443.  As a result, these 291 claims

cannot be considered in assessing whether a loan was originated in accordance with underwriting

guidelines.

            <u>Hunter Made Basic Underwriting Mistakes</u>.  Hunter also made basic underwriting

mistakes that affect hundreds of loans, and these errors call into question his credibility and the

quality of his work.  For 274 sample loans, Hunter simply misinterprets the applicable guidelines

by finding they required something that they did not ask for.  As an example, Hunter found that a

two-month old paystub did not satisfy the income verification requirements for a loan[15]—but

Hunter is wrong, because the applicable guidelines permitted paystubs up to 90 days old.  FOF ¶

445.  Hunter also relied on the wrong guidelines to allege defects as to 71 loans—where the

correct guidelines showed that the loan was originated correctly.  FOF ¶ 446.  And as to 80

loans, Hunter's defect allegations depended on calculation errors—for example, in determining

which debts should be included in a debt-to-income ratio calculation.  FOF ¶ 447.

          **3.**      **Even If the Offering Documents Promise General Compliance With Each Criterion of Each Guideline, the Evidence Still Does Not Show Any False or Misleading Statements.**

        The Court has ruled that in addition to making statements about "the origination

process," the prospectus supplements "include a representation that the loans actually did meet

each of the criteria within an Originator's underwriting guidelines."  (2/11/15 Opinion & Order,

---

[15]      Loan Number NHELI_2006_FM1_2001902485.

Doc. No. 1255, at 36-37.)  As set forth above, *see* n. 16, *supra*, defendants disagree, but in any event, nearly all of the flaws in Hunter's analysis identified above—his failure to account for the fact that the disclosures apply "generally," not absolutely; his failure to recognize any exceptions, despite the plain language of the prospectus supplements; his use of a gross rather than net defect rate; his reliance on "missing document" claims; his pre-closing loan tape allegations; and his basic underwriting errors—also show that his claims that the loans did not "meet each of the criteria within an Originator's underwriting guidelines" are unsupported.

For purposes of analyzing truth or falsity, the difference between a statement that underwriters followed "the origination process" and one that the "loans actually did meet each of the criteria within and Originator's underwriting guidelines" is whether the statement can be shown to be false based on evidence unavailable to the original underwriter or that the original underwriter was not required to obtain.  In this regard, Hunter asserts that a loan is defective if (i) an "audit credit report" or similar document (even when obtained years after origination) contains purported evidence that the borrower for an owner-occupied property did not actually occupy the property at some point during the year after purchase; (ii) an "audit credit report" (even one that the original underwriter never saw) identifies a debt that did not appear on the borrower's loan application; or (iii) information that became available after the origination of the loan (or that the underwriter was not required to obtain) purportedly suggests that the borrower's income was misstated.  FOF ¶ 427, 429, 578.  The evidence does not support any of these categories of claims.

Hunter's Evidence Concerning Occupancy Status Is Unreliable.  Hunter's findings concerning occupancy (which apply to 41 loans) were largely based on so-called "audit credit reports," which Hunter's team obtained for the purposes of this litigation.  FOF ¶ 577.

Audit credit reports list an address on a borrower's report if that borrower uses that address on an application for credit.  FOF ¶ 577.  This is an unreliable way to judge a borrower's primary occupancy at any time.  FOF ¶ 577.  All the credit report shows is an address a person lists when that person applies for credit.  It does not purport to show a person's primary residence.  As a result, Hunter's findings based on these reports are unsupported and illogical.  For example, the credit report Hunter obtained for one borrower lists two addresses for the same date on the credit report—but does not identify which (if either) of the two were the borrower's primary residence. FOF ¶ 578.  Hunter also selectively interprets these reports.  In one report, for example, Hunter alleges the borrower misrepresented his occupancy status because the credit report lists a different address than the subject property, but Hunter completely ignores the fact that the credit report also lists the subject property.  FOF ¶ 579.

Hunter Misinterprets Evidence Concerning Borrower Debts.  Hunter also relies on "audit credit reports" to claim that borrowers for 82 loans misrepresented their debt obligations. FOF ¶ 429.  However, the evidence Hunter puts forward is inadequate to show any misrepresentation of debt.  First, Hunter claims that debts were misstated if borrowers did not report lines of credit for which they had applied.  FOF ¶ 431.  However, as Mr. Forester will show, lines of credit merely permit borrowers to take out debt—they do not prove that the borrower actually did so—and Hunter offers no evidence that they did.  FOF ¶ 431.  Hunter also assumes—but provides no evidence— that a debt appearing on an audit credit report for the month a loan closed (that does not identify a specific date) means that the debt was incurred before the loan closed.  FOF ¶ 429-430.

Hunter's Evidence Concerning Borrower Income Is Unreliable.  As set forth above, Hunter relies almost entirely on BLS data to claim that borrowers' stated income for 75

loans was incorrect—notwithstanding that no underwriting guidelines suggested or required this approach.  BLS data is an unreliable way to determine whether a borrower's stated income was correct.  In fact, the BLS Commissioner testified before Congress on June 18, 2013 that BLS data is not a tool for establishing "prevailing wages or determining what data are appropriate for that purpose."  FOF ¶ 441.

First, according to the BLS Commissioner, BLS data is "based on responses from only a handful of employers" and can "result in large sampling error."  FOF ¶ 441.  Second, BLS data does not account for borrowers' individual characteristics, such as licensing, skill level, or years of experience—or the particular company for which a borrower works.  FOF ¶ 441.  Third, BLS data report only what BLS defines as "wages," and excludes overtime pay, year-end bonuses, weekend premium pay, holiday bonuses, severance pay, and on-call pay, among other categories.  FOF ¶ 441.  Fourth, BLS data does not reflect current salaries, or even salaries from the prior year.  FOF ¶ 441.  Instead, the data is generally released in March or early April, and represents a compilation of salary data from a rolling three-year cycle.  FOF ¶ 441.  Because of this averaging and time lag, BLS data understate income in a period of rising salaries.  FOF ¶ 441.  Fifth, BLS data is subject to a salary cap of $187,200 for reported compensation.  This excludes individuals with high salaries such as chief executives, managers, and highly paid legal and health care professionals, among others—making BLS data an ineffective tool to assess incomes of individuals in highly compensated professions or geographic areas where salaries are above average.  FOF ¶ 441.  Sixth, BLS data is not gathered from and does not apply to self-employed individuals.  FOF ¶ 441.  Seventh, BLS data is based on the "occupational code" for the borrower's job—which cannot be identified reliably seven to nine years after origination,

without clarifying information from the borrower.  Hunter made no attempt to contact borrowers

for clarification.  FOF ¶ 441.

   When he does not rely on BLS data, Hunter points to borrower statements in

bankruptcy filings made years after they applied for the subject loans—but uses this information

in an unreliable way, too.  First, Hunter automatically credits the information in the bankruptcy

application over the information in the loan application, without any basis for doing so (not even

BLS data).  FOF ¶ 427.  Second, where a bankruptcy filing contains income information that

postdates the year when the loan was taken out, and the later income is lower than the income

stated on the application, Hunter assumes that the earlier income was misstated.  FOF ¶ 427. ▮

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ FOF ¶ 427.  This

approach rests on pure speculation and ignores the significant change in economic conditions

between 2006 and 2008.  FOF ¶ 427.  Third, Hunter ignores that mortgage loan borrowers state

their monthly income as of a certain date in a year, so that income can change later in the same

year—and that only this changed income might be reflected on a bankruptcy filing years later.

FOF ¶ 427.

   <u>Hunter's Claims Concerning Loan-to-Value Ratios Are Unreliable</u>.  For 126

loans, Hunter alleges that the loan-to-value ratios did not satisfy guidelines criteria based on the

results of Kilpatrick's AVM.  FOF ¶ 427.  As set forth below, Kilpatrick's AVM is unreliable

and does not show that any loan-to-value ratio was incorrect.  It therefore is not an adequate

basis for Hunter's claims that these 126 loans did not satisfy the criteria of the underwriting

guidelines.[16]

### 4. Because Cowan's Extrapolations for NAA 2005-AR6 Are Flawed, Plaintiff Has Presented No Sufficient Evidence of Underwriting Defects.

Plaintiff has failed to present sufficient evidence of underwriting

misrepresentations as to one Certificate, NAA 2005-AR6, for an additional reason:  Cowan's

extrapolations of Hunter's results are unreliable because the sample Hunter reunderwrote was not

randomly selected and was not otherwise tested for representativeness.  FOF ¶ 606.

Here, the initial samples for each supporting loan group appear to have been

randomly selected.  But the final samples actually analyzed by Hunter—the only samples that

matter for purposes of the ultimate extrapolation—were not.  Hunter claimed not to be able to

re-underwrite many loans in the original samples because they lacked adequate documentation.

Overall, he failed to re-underwrite 61 loans (8.7 percent) of Cowan's initial aggregated sample of

700 loans.  FOF ¶ 606.  This problem was particularly acute for NAAC 2005-AR6, where he

failed to re-underwrite 53 loans of the original 100-loan sample.  Cowan accounted for this issue

by providing 96 supplemental loans for that security (12 of which Hunter was still unable to

re-underwrite).  FOF ¶ 607.  The final sample actually analyzed by Hunter was therefore

non-random, because its composition depended on which loans Hunter declined to re-underwrite.

FOF ¶ 608.

Cowan performed no representativeness tests on the final samples, including the

final sample for NAA 2005-AR6, to determine if his non-random samples were representative,

---

[16]     In addition, for the same reason that Charles Cowan's extrapolations of Hunter's results for NAA 2005-AR6 are unreliable with respect to underwriting defects, those extrapolations are unreliable with respect to plaintiff's occupancy claims.

so that they yielded reliable results.  FOF ¶ 607.  He did not, for example, assess whether the incomplete loan files were randomly distributed throughout the original sample, or whether the supplemental loans were valid substitutes for the excluded loans.  He simply assumed that these requirements were satisfied, without support.   As a result, plaintiff has not shown that Cowan's extrapolation of Hunter's results for the NAA 2005-AR6 Certificate is reliable.  FOF ¶ 611.

### B. Statements in the Offering Documents Concerning Occupancy Were Not False or Misleading.

Hunter claims that occupancy data for 41 of the Sample Loans, or 7.41%, was misrepresented.  FOF ¶ 575.  The evidence shows that information disclosed in the Offering Documents about "occupancy status" was entirely accurate.

The information in the collateral tables concerning occupancy status reflects the borrowers' stated intent concerning occupancy at the time they applied for their loans.  Plaintiff has no evidence to support a claim that the data on occupancy status does not accurately reflect what borrowers reported about their intent.  Indeed, Hunter admitted that he was "not investigating the intent" of the borrower, FOF ¶ 575, and so provided no evidence that this intent was misstated.  *See Harsco Corp.* v. *Segui*, 91 F.3d 337, 346 n.7 (2d Cir. 1996) (statements of future intention are actionable only "when a person 'state[s] that something was to be done when he kn[ows] all the time it was not to be done and that his representations were false'") (alterations in original).

In a January 29, 2015 decision, the Court held that information in the collateral tables concerning occupancy status constitutes representations about the numbers of borrowers that actually occupied the subject properties as of the Cut-Off dates in the prospectus supplements, which dates were about 30 days before each prospectus supplement was issued.

*FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 394072, at *3 (S.D.N.Y. Jan. 29, 2015).[17]  Even

if the representations are interpreted in this way, plaintiff still cannot show that occupancy data

was misrepresented, because Hunter's test also did not assess where borrowers lived as of the

Cut-Off dates.  According to plaintiff, in assessing the truthfulness of the representations in the

Offering Documents concerning occupancy status, Hunter considered borrowers' compliance

with "occupancy agreements" they signed, which provide that a borrower "shall continue to

occupy the Property as [the] Borrower's principal residence for at least one year after the date of

occupancy" absent "lender consent or extenuating circumstances."  (Pl.'s Opp. to Occupancy

Mot., at 3-4, 15.)  Hunter's analysis was thus designed to answer the wrong question, and is

irrelevant.

   In fact, Hunter used evidence from long after the applicable Cut-Off date for 17 of

his 41 findings that occupancy was misrepresented, or 41% of those findings.  FOF ¶ 570.

Excluding those findings brings down the rate—even if Hunter were otherwise correct—to about

4% of the sample loans as being incorrectly categorized as owner-occupied.  FOF ¶ 570.  Such a

deviation would be within the 5% variance the prospectus supplements disclosed as permissible

for the data set forth in the collateral tables, *see* p. 20, *supra*, and therefore not false or

misleading.

   In any event, Hunter's findings are incorrect.  Many were based on so-called

"audit credit reports," which are an unreliable way to judge a borrower's primary residence at

any time.  *See* pp. 60-62, *supra*.

---

[17]  Defendants respectfully disagree with this ruling and reserve all rights for appeal.

**C.    Statements In the Offering Documents Concerning Loan-to-Value Ratios Were Not False or Misleading.**

The Offering Documents present LTV ratios in aggregate form, divided into percentage bands, *e.g.*, 90.01 - 95.00, 95.01-100.00, etc.  FOF ¶¶ 453-453.  Plaintiff claims that these disclosures are false because the appraised values for the loans were too high.  In order to prove its claims, plaintiff must show (i) that the appraised values were false in a way that gives rise to liability under the securities laws, and (ii) that the appraised values caused the LTV ratios in the prospectus supplements to be false as well.  Plaintiff fails on both prongs of this test.

**1.    Plaintiff Has No Evidence That Appraisers Disbelieved Their Professional Judgments.**

Section 12(a)(2) of the Securities Act "impose[s] liability only for an omission or 'untrue statement of a material *fact*.'"  *FHFA* v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306, 325 (S.D.N.Y. 2012) (quoting 15 U.S.C. § 77*l* (a)(2)).  "In contrast to objective statements of material fact, subjective statements of opinion are generally not actionable" under the securities laws.  *In re Sanofi Sec. Litig.*, 2015 WL 365702, at *12 (S.D.N.Y. Jan. 28, 2015) (Engelmayer, J.).  Rather, "when a plaintiff asserts a claim under section 11 or 12 based upon a belief or opinion alleged to have been communicated by a defendant, liability lies only to the extent that the statement was both objectively false *and* disbelieved by the defendant at the time it was expressed."  *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (emphasis added); *see also In re Puda Coal Sec. Inc., Litig.*, 2014 WL 2915880 (S.D.N.Y. June 26, 2014) ("[S]tatements that are matters of opinion must be 'both objectively and subjectively false' at the time that they were made in order to be actionable." (quoting *Fait*, 655 F.3d at 111)).  "It is not sufficient to allege . . . that it would have been possible to reach a different opinion than that reached by defendant based on information available to defendant at the time, or even that

-68-

defendant's opinion was unreasonable." *Podany* v. *Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (Lynch, J.).

This Court and others in this District have repeatedly recognized that appraisals (from which some of the LTV ratios were derived) "are, of course, the subjective judgments of the appraisers." *UBS*, 858 F. Supp. 2d at 326. As Judge Kaplan explained in *Tsereteli*, "neither an appraisal nor a judgment that a property's value supports a particular loan amount is a statement of fact. Each is instead a subjective opinion based on the particular methods and assumptions the appraiser uses." *Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010); *accord. Homeward Residential, Inc.* v. *Sand Canyon Corp.*, 298 F.R.D. 116, 130 (S.D.N.Y. 2014) ("Appraisals are indeed statements of opinion."); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 510–12 (S.D.N.Y. 2010). Because they are subjective opinions, "real estate appraisals . . . are actionable . . . only if the complaint alleges that the appraiser did not truly believe the appraisal at the time it was issued." *IKB Int'l S.A.* v. *Bank of Am.*, 2014 WL 1377801, at *9 (S.D.N.Y. Mar. 31, 2014) (quoting *In re IndyMac Mortg. Backed Secs. Litig.*, 718 F. Supp. 2d 495, 511 (S.D.N.Y. 2010)), *aff'd sub nom. IKB Int'l S.A.* v. *Bank of Am. Corp.*, 584 F. App'x 26 (2d Cir. 2014). As a matter of law, therefore, plaintiff's claims fail absent a demonstration of "subjective falsity by the 'originator of the opinion,' that is the appraiser, as well as the objective falsity of the LTV representations." *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 353929, at *1 (S.D.N.Y. Jan. 28, 2015).[18]

---

[18]    This Court has adhered to the view that the appraiser, and not any particular defendant, is the "'speaker' whose disbelief in the statements plaintiff must plead," *FHFA* v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306, 325 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013), and recently "declined" plaintiff's invitation "to allow it to prove the subjective falsity of the defendants instead of the appraisers," *FHFA* v. *Nomura Holding Am., Inc.*, No. 2015 WL 353929, at *1 n.2 (S.D.N.Y. Jan. 28, 2015).

An appraisal is an opinion of value based on an in-person inspection of the property and other judgment exercised by a licensed appraiser.  Former Freddie Mac and Fannie Mae employees have testified to this basic point.  David Hackney, a PLS trader at Freddie Mac, testified that an "appraisal involves the judgment" of an appraiser.  FOF ¶ 465.  Shayan Salahuddin, also a PLS trader at Fannie Mae, testified that an appraisal was an opinion of value.  FOF ¶ 465.  Paul Norris, a PLS trader at Fannie Mae, testified that an appraisal is an "estimate of value" that represents an opinion based on the professional judgment of an appraiser.  FOF ¶ 465.  As Lee Kennedy will testify, appraisers can take into consideration factors for which an AVM cannot account, including, *inter alia*, home quality, condition, views and amenities, privately sourced data, personal expertise about local conditions, and the views of local real estate brokers.  FOF ¶ 490.

The only evidence put forward by either party that bears on whether an appraiser subjectively believed his or her opinion is the direct testimony of appraisers Bill Schall, Michele Morris, Dan Platt and Lee Clagett.  FOF ¶¶ 467-482.  Each of these appraisers will testify that they believed the appraisal opinions for the subject properties at the time they were rendered, and today.  FOF ¶¶ 467-482.  Plaintiff, in contrast, has not gathered any evidence that appraisers did not actually believe their appraisals when they made them or that appraisers were subject to any improper influence from lenders or others.  Plaintiff will call no appraisers to testify, and Kilpatrick has no opinion as to whether any given appraiser subjectively believed his or her opinion of value at the time an appraisal was performed.  FOF ¶ 484.

Instead, plaintiff relies on an automated valuation model ("AVM") called the Greenfield AVM that Kilpatrick created especially for use in this and related litigation.  FOF ¶ 485.  A residential AVM is a software program that analyzes previously collected data in order

to estimate the market value of a property at a particular point in time.  FOF ¶ 485.  Kilpatrick

also relies on his "Credibility Assessment Model," also created especially for use in this

litigation, that purportedly identifies appraisals that are not "credible" as that terms is used in

USPAP.  FOF ¶ 485.  First, as explained below, *see* p. 81-82, *infra*, the Credibility Assessment

Model does not actually test credibility under USPAP.  Second, the Credibility Assessment

Model does not even purport to test whether an appraiser subjectively disbelieved his or her

opinion, and thus, does not address the issue of whether that opinion of value was honestly

believed by the appraiser at the time the appraisal was performed.  FOF ¶ 485.

Because plaintiff has no evidence that appraisers did not believe their valuation

opinions for the Sample Loans, plaintiff cannot prove its claim that appraisers' opinions were

false.  *See FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 353929, at *1 (S.D.N.Y. Jan. 28, 2015)

## 2. The Evidence Does Not Show That Appraisers' Professional Judgments Were Objectively False.

Plaintiff's only evidence to support the assertion that appraisals were inflated is

Kilpatrick's testimony based on his Greenfield AVM.  Based on the outputs of his model,

Kilpatrick opines that the original appraised values of 208 of the 672 properties valued by the

Greenfield AVM were inflated by more than 15.1%, making those appraised values

"significantly higher" than the "true" value of the subject property, and thus "inaccurate."  FOF

¶ 488.  Kilpatrick claims that, on average, appraisals of the Nomura sample properties were

inflated by 8.92%.  FOF ¶ 488.  The evidence refutes plaintiff's claims at every turn, both

because it shows that the appraised values of loans in the supporting loan groups were well

supported, and because Kilpatrick's AVM is so flawed and unreliable that its results deserve no weight at all.[19]

   Contemporaneous Diligence Supports the Appraised Values.  First, nearly all of the loans in the supporting loan groups—approximately 99.1%—were subject to contemporaneous valuation diligence when they were purchased by Nomura.  FOF ¶ 456.  That valuation diligence supported the appraised values of the loans in almost every instance.  Only 162 loans out of the 15,806 loans in the Supporting Loan Groups for the seven Certificates, or about 1%, were found at the time to be outside the BPO tolerance thresholds.  FOF ¶ 461.  Plaintiff's own expert, Charles Cowan, testified that the final valuation diligence estimates obtained by NCCI were within 1.8% of the average appraised values.  *See* p. 16, *supra*.  All of this is very strong evidence that the contemporaneous opinions of professional appraisers provided well-supported value estimates.

   Testimony From Four Appraisers Undermines Kilpatrick's AVM.  Second, the four appraisers will testify that they believed their opinions of value when rendered, and they continue to believe those opinions of value today.  FOF ¶¶ 467-482.  Each appraiser will testify that he or she had knowledge of the local market at the time of the relevant appraisal, and that the opinion of value was fully supported by the comparable properties and market trends described in the appraisals.  FOF ¶¶ 467-482.  Moreover, for three of the four appraisals, Dr. Kilpatrick's

19



supposed 'true' value was far beneath both the sales price and adjusted sales price of every comparable property reported by the appraiser.  FOF ¶¶ 467-482.  Similarly, for the fourth appraisal, Dr. Kilpatrick's "true" value was significantly below the appraisal value.  FOF ¶ 467-482.  All four appraisers will testify that an AVM, especially a retrospective AVM that relies primarily on tax assessed values, cannot be considered a better estimate of value than a professional appraiser with local knowledge.  FOF ¶ 467-482.

> AVMs Do Not Show That An Appraisal Is False.  As defendants' expert Lee Kennedy will testify, "AVMs do not substitute for an appraiser's professional judgment" (as Dr. Kilpatrick himself admits), and thus cannot provide a "true" property value in place of an appraisal.  FOF ¶ 491.  Appraisals are considered the most reliable method for valuing properties, as Mr. Kennedy will testify, and retrospective AVMs are a particularly unreliable way to evaluate an appraisal rendered 7 to 9 years earlier.  FOF ¶ 489-491.  Appraisers have access to better and more relevant information than do AVMs, including information about home quality, condition, views and amenities—as the four professional appraisers being called as witnesses will tell the Court.  FOF ¶¶ 467-482, 490.  Appraisers also can rely on their experience, expertise and local knowledge, and can (unlike computer models) account for the attributes of the property and comparable properties differently than computers do.  FOF ¶¶ 467-482, 490.  As a result, those in the real estate field do not rely on AVMs to make conclusive determinations about the accuracy, reasonableness, or credibility of opinions of value offered by certified appraisers, whether individually or collectively.  FOF ¶ 491.  Indeed, the 2010 Interagency Appraisal and Evaluation Guidelines promulgated by, among others, the Office of the Comptroller of the Currency, state that "the result of an Automated Valuation Model (AVM), by itself or signed by

an appraiser, is not an appraisal," and that "the result of an automated valuation model (AVM), in and of itself, does not meet the Agencies' minimum appraisal standards."  FOF ¶ 491.

    <u>Kilpatrick's AVM Is Wholly Unreliable</u>.  Even if an AVM could produce a "true" value, Kilpatrick's Greenfield AVM, which he created solely for the purpose of litigation, is especially unsuited for anything close to that.  Kilpatrick's AVM has never been independently tested or validated, though federal standards require such testing.  FOF ¶ 503.  Such testing would have uncovered the fact that Kilpatrick's model contains several methodological flaws which render its results inaccurate, as defendants' experts Hans Isakson, Jerry Hausman, and Lee Kennedy will testify.  FOF ¶ 503.

- First, Kilpatrick's model fails to accurately predict sales prices of the homes related to the Sample Loans, which are the best test of the accuracy of an AVM. FOF ¶¶ 504-505.  On average, Kilpatrick's AVM estimates differed by 17% from actual sale prices, and missed sale prices by more than 10% more than half the time.  FOF ¶¶ 504-505.  This is proof that his model is not reliable.  An arms-length sales price <u>is</u>, by definition, the market value.  The fact that Kilpatrick's AVM gives prices well above the "market value" show that it is fatally flawed.

- Second, Kilpatrick excluded from consideration sales data for "comparable" properties that caused his model to have high error rates, an unacceptable practice in statistics.  FOF ¶ 508.  This resulted in the elimination of 22% of transactions from the sales data that Kilpatrick's model used to estimate values for the Nomura sample properties.  FOF ¶ 508.  If these transactions had not been removed, the Greenfield AVM's estimated values for the sample properties would have increased on average by approximately $39,500 per property, or approximately 18.0%—and would show that the sample properties were, on average, correctly valued, supporting defendants' position, not plaintiff's.  FOF ¶ 509.

- Third, Kilpatrick also excluded 70% of available data when purporting to assess the precision of his AVM, thereby inflating that precision estimate.  FOF ¶ 510. Kilpatrick's excuse for excluding all  this data was that the data might contain errors or be otherwise unreliable—but he performed no analysis to support that speculation.  FOF ¶ 511.

- Fourth, Kilpatrick's standard for considering an appraisal inflated used only a 68% confidence interval, meaning that 16% of all sample properties were identified as inflated simply as a matter of random chance, not because there was anything wrong with the appraisal.  This falls below acceptable statistical norms,

which use 95% confidence intervals.  FOF ¶ 514. When this error is corrected (and the excluded data added back), the percentage of appraisals deemed "inaccurate" by the Greenfield AVM drops by over 50%.  FOF ¶ 514.[20]

- Fifth, the Greenfield AVM relies on tax assessed values from 2010 to 2014 as the key driver in estimating property values.  This was wrong, both because tax-assessed values are not accepted in the appraisal industry as an indicator of market value, and because current tax assessed values reflect changes in the real estate market since the 2005 to 2007 period—during which house prices plummeted.  FOF ¶ 518-519.

- Sixth, as Lee Kennedy will testify, the Greenfield AVM performs poorly compared with other commercially available AVMs.  FOF ¶ 520.  It is nothing close to what would be considered commercially acceptable.

Plaintiff's claim that the appraisals made at the time of origination were objectively false fail because plaintiff exclusively relies on a flawed AVM to replace the opinion of a professional  appraiser—and, predictably, plaintiff's results contradict all the fact evidence in this case.

### 3.    The Evidence Does Not Show Any Misstatements About Disclosed Loan-to-Value Ratios.

Kilpatrick's analysis of the sample loans, standing alone, does not bear on any of the disclosures in the prospectus supplements.  Instead, plaintiff relies on Charles Cowan to extrapolate Kilpatrick's results for the samples to the supporting loan groups as a whole.  FOF ¶ 604.  Cowan's results contain several errors, and even taking his opinions at face value, they show that no misstatements occurred.  At a 95% confidence level, Cowan could conclude that only 6% of the loans in the supporting loan groups had LTV ratios that were understated.  FOF ¶

---

[20]    Moreover, as Arnold Barnett will testify, even though approximately 50% of appraisals deemed inflated by the Greenfield AVM are not (even in Kilpatrick's view) actually inflated, Kilpatrick found 92 percent of them to be "non-credible" under his separate model, the "Credibility Assessment Model."  Barnett Aff. ¶ 63-64.  This inconsistency indicates that one or both of the models is unreliable.  Barnett Aff. ¶ 65.

623.[21]  But as Cowan clarified at his deposition, and as Dr. Barnett will testify, 2.5% of the loans

were identified as understated as a result of random chance—so that Cowan's analysis shows

only that 3.5% of the loans in the supporting loan groups had understated loan-to-value ratios.

FOF ¶ 623.  This percentage is below the 5% variance in collateral table data that is disclosed in

the Offering Documents.   FOF ¶ 564.

Cowan's analysis, moreover, contains errors that cause him to overstate any

appraisal inflation and understate the extrapolated LTV ratios.  FOF ¶ 605.  Indeed, although

Kilpatrick claims that appraised values were inflated on average by 8.92%, Cowan inflates that

number to 11.1%, with no explanation of why it has gone up.  FOF ¶ 605.

First, Cowan's extrapolations are unreliable because the samples of loans

Kilpatrick purported to value were not randomly selected, and Cowan presented no evidence that

those samples were otherwise representative.  Although Cowan initially drew a supposedly

random sample of 100 loans for each supporting loan group (increased to 196 loans for one

Securitization, NAA 2005-AR6), Kilpatrick was unable to value many of the loans in each

sample—and was unable to value 10% or more of the sample loans in four out of seven samples

(NAA 2005-AR6, NHELI 2006-HE3, NHELI 2007-2, and NHELI 2007-3).  FOF ¶ 612.  As Dr.

Barnett will testify, this made Cowan's samples non-random, because some loans (those

Kilpatrick did not value) had no chance of being selected for review.  FOF ¶ 612.  Cowan should

have, but did not, evaluate the samples for representativeness in light of their non-random nature.

FOF ¶ 613.  Without any showing that Kilpatrick's samples are representative, Cowan's

extrapolations—at the very least for these four deals—are unreliable.  FOF ¶ 613.

---

[21]      The 95% confidence level is, as Dr. Hausman will testify, standard in statistics and
econometrics.  FOF ¶ 514.

Second, when calculating "average appraisal inflation," Cowan failed to use Kilpatrick's definition of an inflated or undervalued appraisal—*i.e.* where the appraisal differs by more than one standard deviation from the Greenfield AVM value.  FOF ¶ 617.  Instead, Cowan used all of Kilpatrick's valuations—regardless of whether Kilpatrick opined that an appraisal was inflated.  FOF ¶ 617.  As a result, Cowan's "average appraisal inflation" of 11.1% is itself inflated.  FOF ¶ 617.  As corrected by Dr. Barnett using Kilpatrick's actual opinions (which themselves are unreliable, as set forth above), average inflation is 9.9%.  FOF ¶ 617.

Third, Cowan calculates LTV ratios the wrong way.  FOF ¶ 621.  Despite clear disclosures in the prospectus supplements that the "value" in the LTV ratio is the lesser of sales price or appraised value, *see* p. 24, *supra*, Cowan uses the lower of the Greenfield AVM value, sales price or appraised value.  FOF ¶ 621.  This approach makes it impossible for Cowan to find that an LTV was overstated.  FOF ¶ 621.  Every LTV, in Cowan's view, was either correct or understated—because if the Greenfield AVM value is higher than the appraised value or sales price, Cowan uses the appraised value or sales price, whichever is lower, to calculate LTV.  FOF ¶ 621.

In sum, Cowan's extrapolations are incorrect and unreliable.  Yet plaintiff has no other evidence that the LTV ratios disclosed in the prospectus supplement were misstated.

## D.      The Appraisals Complied With USPAP.

Plaintiff has no evidence that the appraisals did not meet USPAP standards. Plaintiff's experts never compared each appraisal to USPAP standards.  FOF ¶ 528.  Instead plaintiff presents the results of Kilpatrick's "Credibility Assessment Model."  FOF ¶ 528. Kilpatrick claims his questions are "based on" USPAP, and therefore the answers to his questions can determine whether an appraisal was "credible" according to USPAP.  FOF ¶ 528.

That assertion is incorrect.  As defendants' expert, Michael  Hedden, will testify, USPAP does not require appraisals to meet *any* of the requirements specified in Kilpatrick's 31 questions.  FOF ¶ 436.  When pressed to identify in USPAP the source of the requirements assessed by the 31 questions in his "Credibility Assessment Model," Kilpatrick conceded that the questions are not contained in USPAP, any other professional standard, or any published literature accepted in the appraisal industry.  FOF ¶ 536.  In fact, as Mr. Hedden will show, many questions in the "Credibility Assessment Model" contradict USPAP requirements, either directly or because they contain rigid requirements contrary to the subjective judgment USPAP demands of appraisers.  FOF ¶¶ 536-545.  For example, Kilpatrick's model requires that the "land value ratio be greater than 20 percent and less than 30 percent."  There is no USPAP rule requiring that the land-to-value ratio of a property fall within a pre-determined range (including the range of 20% to 30%).  Numerous other questions in Kilpatrick's Credibility Assessment Model suffer from the same defect.  FOF ¶¶ 536-545.  Kilpatrick's model is also arbitrary—he simply made up the weights and scoring—and has never been validated or tested, including to determine whether it can reliably distinguish appraisals that satisfy USPAP from those that do not.  FOF ¶¶ 534-535; 552-555.

Four appraisers—Bill Schall, Michele Morris, Dan Platt and Lee Clagett will testify that they were aware of and conformed to USPAP standards.  FOF ¶¶ 467-482.  There will be no contrary evidence.

Plaintiff has no reliable evidence that a single appraisal at issue in this case does not comply with USPAP standards.

### E.      Statements Concerning Credit Ratings Were Not False or Misleading.

The Offering Documents stated that the at-issue Certificates would not be issued unless they received a certain rating from the credit agencies.  For example, the prospectus supplements represented that "[t]he Offered Certificates will not be offered unless they receive ratings at least as high" as those listed from Standard & Poor's, Moody's Investors Services, Inc., and Fitch Ratings.  FOF ¶ 581.  Plaintiff alleges that "the ratings for the Securitizations were inflated as a result of Defendants' provision of incorrect data concerning the attributes of the underlying mortgage collateral to the rating agencies, and, as a result, Defendants sold and marketed the GSE Certificates as AAA (or its equivalent) when, in fact, they were not."  Am. Compl. at 33.  In short, plaintiff claims that the securities "should not have been rated AAA" and that the inclusion of these misleading ratings in the Offering Documents was materially false.  *Id.* at 45.

Courts in this Circuit have consistently recognized that credit ratings, like appraisals, are not statements of fact.  Instead, "credit ratings and the relative adequacy of protective credit enhancements are statements of opinion, as they are predictions of future value and future protection of that value."  *New Jersey Carpenters Vacation Fund* v. *RBS Group, PLC*, 720 F. Supp. 2d 254, 271 (S.D.N.Y. 2010); *see also Tsereteli* v. *Residential Asset Securitization Trust*, 692 F. Supp. 2d 387, 394 S.D.N.Y. 2010) ("Like the appraisals, whether the credit quality of the mortgage pool was properly considered or adequate to support a particular rating was not a matter of objective fact.  It was instead a statement of opinion by each agency that it believed, based on the models it used and the factors it considered, that the credit quality of the mortgage pool underlying each Certificate was sufficient to support the assigned rating.").

Here, "[t]here is no claim that the ratings given were misreported or that the 'unless' condition"—the condition that the securities would not be issued without AAA ratings—"was not met." *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 632 F.3d 762, 774 (1st Cir. 2011).  Instead, plaintiff alleges that the ratings were mistaken because they were predicated on inaccurate loan-tape data, which defendants furnished to the agencies.  Statements of opinion are only actionable under the Securities Act, however, if "they misstate the opinions or belief held . . . *and* are false or misleading with respect to the underlying subject they address." *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011) (emphasis in original).  In other words, as with appraisals, plaintiff must demonstrate that the contested statement did not actually reflect the speaker's true opinion (subjective falsity) and that the opinion was incorrect (objective falsity).  And in the context of alleged appraisal inflation, this Court held the relevant "speaker" for purposes of demonstrating subjective falsity is "the originator of the opinion." *FHFA* v. *UBS Ams., Inc.*, 858 F. Supp. 2d 306, 326 (S.D.N.Y. 2012).[22]  In that context, the source of the opinion was the appraiser.  Here, the opinions were given by the credit rating agencies.  Plaintiff is therefore required to demonstrate that the rating agencies did not "honestly believe[]" the opinions of value contained in the ratings they issued. *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1108 (1991) (Scalia, J., concurring in part and concurring in the judgment); *see also In re IndyMac Mortgage-Backed Secs. Litig.*, 718 F. Supp. 2d 495, 512 (S.D.N.Y. 2010) ("Ratings are opinions and therefore actionable under the Securities Act only if not truly held by the ratings agencies when issued.").

"It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other

---

[22]    The Court recently declined to revisit this ruling.  Jan. 28, 2015 Order, Doc. No. 1182, at 5 n.2.

characterization that relies on hindsight or falls short of an identifiable gap between the opinion

publicly expressed and the opinion truly held." *In re Salomon Analyst Level 3 Litig.*, 350 F.

Supp. 2d 477, 489 (S.D.N.Y. 2004).  The simple fact of objective falsity—even extreme

objective falsity—is not sufficient.  *See Podany* v. *Robertson Stephens, Inc.*, 318 F. Supp. 2d

146, 155-56 (S.D.N.Y. 2004) (rejecting plaintiff's argument that "the objective wrongness of the

opinions was so obvious that a reasonable person could not have held those opinions," and

noting that "there are strong policy reasons why courts do not engage in this kind of second-

guessing of forward-looking opinions").  Here, nothing suggests, much less proves by a

preponderance of the evidence, that the rating agencies did not believe the opinions of value

contained in the ratings they issued.  Plaintiff therefore cannot carry its burden of showing

subjective falsity.

       Contrary to *UBS*, some courts have held that subjective falsity may be proven

either on the part of the seller of the securities or on the part of the credit rating agencies.  *See In*

*re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 771 (S.D.N.Y.

2012).  This position is precluded by the Court's *UBS* decision.  Even if some of the defendants

did qualify as relevant "speakers" for purposes of proving subjective falsity, however, plaintiff's

claim would still fail.  Plaintiff has not presented any evidence that defendants knew about the

alleged loan-tape discrepancies.  Any allegations that defendants' due diligence was insufficient

are irrelevant to this issue.  *See Podany*, 318 F. Supp. 2d at 154 ("It is not sufficient to allege . . .

that it would have been possible to reach a different opinion than that reached by defendant

based on information available to defendant at the time, or even that defendant's opinion was

unreasonable.").

Plaintiff cannot prove objective falsity—*i.e.*, that the Certificates did not merit AAA ratings.  Plaintiff alleges that the loan-tape data provided to the rating agencies was incorrect based on the analysis performed by Hunter.  The evidence shows that this analysis was unreliable.  *See* p. 41-69, *supra*.  Moreover, even if the loan tapes contained inaccurate data, plaintiff has failed to introduce any evidence suggesting that the alleged misrepresentations would have actually affected the ratings issued by the agencies.  Although plaintiff asserts that loan-tape errors could theoretically influence the ultimate ratings for a security, it will fail to prove that the specific loan-tape discrepancies its expert purports to identify had any impact on the ratings granted to the at-issue Securities.[23]

In an earlier ruling addressing a motion to dismiss by Merrill Lynch & Co., this Court suggested that plaintiff does not allege "the ratings themselves were false," but rather that "the ratings were inflated and did not in fact apply to [the Certificates'] collateral, since the defendants provided the ratings agencies incorrect data regarding the loan population."  *FHFA* v. *Merrill Lynch & Co.*, 903 F. Supp. 2d 274, 276 n.2 (S.D.N.Y. 2012).  This is a distinction without a difference.  The many courts that have considered precisely this type of claim—*i.e.*, that credit ratings reported in offering documents were misleading because defendants provided inaccurate data to the rating agencies—have consistently held that plaintiff must satisfy the standard for opinion liability.  *See*, *e.g.*, *Capital Ventures Int'l* v. *J.P. Morgan Mortg. Acquisition Corp., et al.*, 2013 WL 535320, at *5-6 (D. Mass. Feb. 13, 2013);  *Allstate Ins. Co.* v. *Credit Suisse Secs. (USA) LLC*, 2014 WL 432458, at *11 (N.Y.S.2d Jan. 24, 2014).  Even if correct, the

---

[23]    Plaintiff's expert Dr. Schwert performed a regression analysis and identified a relationship (in some circumstances) between LTV ratios and occupancy status for loans underlying private label securitizations, on the one hand, and subordination for AAA certificates, on the other.  FOF ¶ 592.  As Dr. Riddiough will testify, however, that analysis does not show that the particular misstatements plaintiff alleges would have had any impact either on subordination or on credit ratings.  FOF ¶ 594.

Court's interpretation would simply have the effect of eliminating the subjective falsity requirement.  As explained above, plaintiff has also failed to demonstrate objective falsity.  Plaintiff's claim fails no matter what rule the Court applies.

## II.   THE ALLEGED MISSTATEMENTS WERE NOT MATERIAL.

Even if it could prove falsity, plaintiff must also show, in order to prevail on its Securities Act and Blue Sky claims, that the alleged misstatements were "material."  15 U.S.C. § 77*l*(a)(2); D.C. Code § 31-5606.05(a)(1)(B); Va. Code § 13.1-522(A)(ii).  "For a misstatement or omission to qualify as material, 'there must be a substantial likelihood that' a complete and truthful disclosure 'would have been viewed by [a] reasonable investor as having significantly altered the 'total mix' of information made available.'"  *N.J. Carpenters Health Fund* v. *Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 125–26 (2d Cir. 2013) (quoting *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231–32 (1988)).[24]

"In assessing the materiality of an alleged misstatement, [courts] consider '[w]hether the defendants' representations, taken together and in context, would have misled a reasonable investor.'"  *Elite Aviation LLC* v. *Credit Suisse AG*, 588 F. App'x 37, 38 (2d Cir. 2014) (quoting *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)).  "In evaluating a prospectus, [courts] read it as a whole," *DeMaria* v. *Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).  Particular statements are not analyzed in isolation, but rather evaluated in the context of the complete set of disclosures contained in the offering documents.

Moreover, the Offering Documents do not represent the entire universe of information available to the reasonable investor.  "The 'total mix' of information may also

---

[24]    Defendants respectfully disagree with the Court's ruling on the applicable materiality standard.  *See FHFA* v. *Nomura Holding America Inc.*, 2014 WL 7229361, at *3 (S.D.N.Y. Dec. 18, 2014).  Defendants reserve all rights for appeal.

include information already in the public domain and facts known or reasonably available to the [investors]." *United Paperworkers Int'l Union* v. *Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (quoting *Rodman* v. *Grant Foundation*, 608 F.2d 64, 70 (2d Cir. 1979)); *accord N.J. Carpenters Health Fund*, 709 F.3d at 127 ("[T]he 'total mix' of information relevant to the question of materiality can include publicly available information . . . ."); *see also United Food & Commercial Workers Union Local 880 Pension Fund* v. *Chesapeake Energy Corp.*, 774 F.3d 1229, 1238 (10th Cir. 2014) ("Public documents are part of that total mix if an investor interested in a particular type of information about a company would know of the existence of the record and could readily access it."). In sum, "[i]t is important to note that a 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." *Greenhouse* v. *MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004). Here, therefore, the knowledge of reasonable PLS investors—concerning loan origination practices, occupancy data, and appraisals and loan-to-value ratios—must be considered in addition to the disclosures in the Offering Documents.

In proving the materiality of an alleged misstatement, "[i]t is not sufficient to allege that the investor might have considered the misrepresentation or omission important." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (emphasis added) (quoting *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)). Otherwise, underwriters would "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decision making." *In re Sanofi Sec. Litig.*, 2015 WL 365702, at *12 (S.D.N.Y. Jan. 28, 2015) (quoting *TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 448-49 (1976)). Instead, plaintiff must show that the alleged misrepresentations significantly altered the total mix of information available.

The misrepresentations alleged by plaintiff do not satisfy this standard.  As John Richard will testify, based on his 20 years' experience as a portfolio manager specializing in structured products and real estate finance, reasonable investors were aware that the collateral characteristics contained in the Offering Documents could not be read in isolation.  FOF ¶ 628. Investors recognized that underwriting determinations were inherently subjective and subject to frequent exceptions.  FOF ¶ 638.  They knew that appraisals reflected the subjective judgments of individual appraisals and might vary by 10-15% from values produced by computer models, such as AVMs.  FOF ¶ 648.  And they understood that data about owner-occupancy described statements of intention made by borrowers at the time of loan origination.  FOF ¶ 628.  Finally, these three metrics were not the only collateral characteristics that investors considered:  they also took into account, among many other things, documentation, loan product type, asset type (*i.e.* subprime or Alt-A), geography, FICO scores, the identity of the originator, and first lien/second lien statistics.  FOF ¶ 628.  Economic factors, such as whether house prices were rising, which would decrease the incidence of loan defaults, were also important to investors. FOF ¶ 709.[25]

The structure of a security also mattered a great deal to reasonable investors in PLS.  Investors who chose senior tranches had credit enhancement, for example through subordination and cross collateralization.  FOF ¶ 631.  As Mr. Richard will testify, these attributes of senior securities made it important for investors to consider all of the loans

---

[25]     PLS investors, including Freddie Mac and Fannie Mae, were not deterred by high-risk collateral.  In fact, those two companies actively sought out securities backed by such collateral in order to satisfy their housing goals.  The Court has excluded evidence concerning housing goals, *FHFA* v. *Nomura Holding Am., Inc.*, 2014 WL 7229361 (S.D.N.Y. Dec. 18, 2014), and also has determined that the "reasonable PLS investor" sets the standard for materiality, and does not take into account the motivations or interests of Freddie Mac and Fannie.  *Id.* at *3 (internal quotation marks omitted).  Defendants respectfully disagree with these rulings, and preserve all rights for appeal.

underlying a Securitization, not just those in the supporting loan group for a particular security. FOF ¶ 632.

Plaintiff has alleged relatively minor deviations about a small subset of representations contained in the Offering Documents. These supposed misrepresentations—read in context and in light of all the information evaluated by reasonable investors in making purchasing decisions—were not material. As Mr. Richard will testify, such deviations could be material only if they had an impact—in the context of all of the collateral underlying the security (not just one supporting loan group), as well as the security's credit rating, macroeconomic forecasts, credit enhancement, expected returns, and other available data—on expected future performance under a variety of market circumstances. FOF ¶ 709. This is a complex analysis that none of plaintiff's experts performed. FOF ¶ 630.

### A.   The Allegedly False and Misleading Statements Concerning How Loans Were Originated Were Not Material.

Plaintiff has no evidence that the alleged misrepresentations regarding underwriting criteria—which the Court has interpreted to be representations that loans complied with the underwriting guidelines of the originators who made them, *see* p. 44, *supra*—were material.[26] Neither of plaintiff's experts who purport to testify about materiality (Peter Rubinstein and G. William Schwert) addresses this topic. No PLS trader asserts that deviations from general adherence to underwriting guidelines mattered to investors. Plaintiff's failure to

---

[26]   To the extent the Offering Documents state that loans "were originated generally" in accordance with underwriting criteria described in the prospectus supplements, rather than originator guidelines, there also is no evidence that the misstatements plaintiff alleges were material. The Offering Documents' representations regarding loans from undisclosed originators were at a high level of generality. Deviations from high-level guidelines that disclosed neither the originator's underwriting guidelines nor, in most cases, the originator, would not have significantly altered the total mix of information available to investors during this time.

put forward any evidence of materiality is enough to doom its claim.  All of the evidence, moreover, shows that the alleged misstatements were not material.

These disclosures provided very basic information about the guidelines used to originate the at-issue loans.  For many loans in the supporting loan groups—between 22% and 100% percent—the prospectus supplements did not contain any information about the guidelines of the originators who made them.  *See* p. 45, *supra*.  (Nor, in most instances, did it identify those originators.)  Without that basic information, a disclosure that loans "were originated generally" in accordance with originator guidelines says very little.  There is no evidence that any deviation from originator guidelines, in these circumstances, was material to reasonable PLS investors.

This was especially true because of the generality of the statements about underwriting criteria.  As set forth above, *see* p. 21-23, *supra*, the prospectus supplements described general (not absolute) compliance with underwriting processes, subject to exceptions, of which there could be many.  They stated that loans could be originated under a wide variety of origination programs, including low documentation, no documentation, and no ratio programs, in which case the underwriting of a loan could be based "primarily or entirely" on a borrower's credit score or an appraisal.  *See* p. 24, *supra*.  Plaintiff has no evidence that failure to comply strictly with every criterion of an underwriting guideline—Hunter's standard for identifying a defect—would have mattered to a "reasonable" PLS investor considering these disclosures.

The Offering Documents at issue in this case also serve as evidence that reasonable PLS investors placed little importance on disclosures about compliance with originator underwriting guidelines.  ResMae was, as shown in Table 1, the originator of 77.61% of the loans underlying the NHELI 2007-3 Securitization. FOF ¶ 133.  The prospectus

supplement disclosed that ResMae had recently filed for bankruptcy, and warned that an originator "whose financial condition was weak or deteriorating at the time of origination" may not have been able "to originate mortgage loans in accordance with its customary standards," and may have "experienced reduced management oversight or controls with respect to its underwriting standards."  FOF ¶ 197.  One other group of Certificates, NAAC 2005-AR6, was sold to investors based on preliminary offering materials that contained no disclosures at all about compliance with underwriting guidelines, or who the main originators were.  FOF ¶¶ 35-50.  Both examples suggest the limited importance to investors of disclosures about adherence to originator underwriting guidelines.

In sum, plaintiff has not proven that the specific underwriting defects it allegedly identifies were or would have been material to a reasonable PLS investor.  It has failed to present any evidence whatsoever on the "defect" rate for the total pool of loans underlying the relevant securities.  As set forth above, reasonable investors considered the entire pool of loans backing a security rather than merely those underlying the specific tranche at issue.  Furthermore, plaintiff has not presented any evidence regarding a defect rate per originator.  Without this data, it is impossible to determine the magnitude of any deviations for any particular security.  In short, plaintiff has alleged a series of generic, minor deviations for one segment of the relevant loan pools, on a category of representations that, to investors, was of limited value.  It has failed to prove materiality.

### B.      The Allegedly False or Misleading Statements Concerning Occupancy Were Not Material.

There also is no evidence that the owner-occupancy defect rates alleged by plaintiff would have been material to a reasonable investor during this time period.  In the view of reasonable PLS investors, owner-occupancy disclosures reflected representations made by

borrowers at the time of origination.  *See* p. 26, *supra*.  With respect to purchase-money loans, these stated intentions were necessarily forward-looking, and could change.  FOF ¶ 565.  A borrower purchasing a home would be living elsewhere at the time he applied for a loan, and thus his statements regarding whether he intended to occupy the property were just that: statements of intention.  In consequence, as several Freddie Mac and Fannie Mae employees testified at their depositions, such statements were not understood by investors as verified facts.  FOF ¶ 566-67.

In any event, the alleged defect rates for owner occupancy are low.  Plaintiff claims that, on average, owner occupancy status was overstated by 7.19%—with the 95% lower bound of the estimates ranging from 0.58% to 5.62%.  FOF ¶ 604.  All of the 95% lower bound variances (with a trivial exception of .62% for one certificate) are within the 5% tolerance that the prospectus supplements stated would apply to data in the collateral tables.  FOF ¶ 564.  The average variances are, for two Certificates, below the 5% tolerance threshold specified in the prospectus supplements—and are otherwise below 10% with one small exception (NAA 2005-AR6, which is 11.09%).  In other words, for all but one Certificate, plaintiff claims that the actual occupancy rate was within 5% of the variance threshold disclosed in the prospectus supplements.  This alleged deviation is particularly small in light of the fact that the prospectus supplements did not purport to disclose where borrowers actually lived, but rather gave the stated intentions of borrowers.  (And all of these numbers are overstated because plaintiff uses evidence that, at most, shows where borrowers may have lived after the Cut-Off dates.  *See* p. 71-72, *supra*.)

Plaintiff cannot carry its burden merely by demonstrating that owner occupancy rates, in the abstract, were material to reasonable investors from 2005 to 2007.  Instead, it must

show that the particular misrepresentations it purports to identify—the differences between the supposed "actual" and disclosed occupancy rates—would have significantly altered the total mix of information available to the reasonable investor.  It cannot make this showing here.  Investors knew that owner-occupancy statistics reflected borrowers' intentions and that, in consequence, the rates stated in the prospectus supplements might not reflect where borrowers ended up living.  FOF ¶ 566.  As a result, the type of minor deviations alleged by plaintiff would not have altered the purchasing decisions of a reasonable buyer or significantly altered the total mix of information available to him.

Furthermore, as noted above, reasonable investors considered the loans underlying an entire securitization—not merely the specific supporting loan group for the particular tranche under consideration.  FOF ¶ 632.  From this perspective, plaintiff has no evidence that small deviations from the collateral table for one supporting loan group—in a category like owner-occupancy that buyers realized was intrinsically unverifiable—would have been anything but virtually meaningless to a buyer's investment decision.  Plaintiff also has put forth no evidence regarding owner-occupancy defects for the total pool of loans supporting the at-issue securities.  In other words, it has alleged a small defect rate with respect to a subjective category of representations for one sliver of a much larger pie.  It has failed to show that these claimed misrepresentations would have been material to a reasonable investor.

### C.   The Allegedly False or Misleading Statements Concerning Loan-to-Value Ratios Were Not Material.

Plaintiff's alleged LTV misrepresentations, like its occupancy claims, would have been similarly immaterial to a reasonable investor from 2005 to 2007.  Plaintiff bases its LTV claims on an assertion that the underlying appraisals were inflated.  As explained, *see* p. 73, *supra*, in order to prove that a given appraisal was "false," plaintiff must show both that it was

objectively false (an inaccurate valuation of the property) and subjectively false (not actually believed by the appraiser who issued it).  Plaintiff's LTV claims therefore must rest only on those loans with appraisals that are both (i) judged inflated by the Greenfield AVM, and (ii) judged non-credible by the CAM.  Loans that satisfy only the first part of this standard are not false and therefore do not support plaintiff's claims.

It is not enough, moreover, to assert generally that reasonable PLS investors account for LTV ratios in making their investment decisions.  Instead, plaintiff must show that the specific LTV misrepresentations it has allegedly identified would have significantly altered the total mix of information available to a reasonable investor.  Plaintiff cannot make this showing.

As described above, the prospectus supplements make clear that appraisals represent the judgments of professional appraisers.  These judgments about value were necessarily subjective and, as a result, prone to variation.  Investors therefore understood that there was no single immutable "true" value—other than a sales price.  In addition, the industry knew and expected that appraisals underlying the stated LTV ratios might differ by as much as 10-15% from an AVM valuation of the same property and still be considered reliable and credible.  FOF ¶ 501.  This degree of variance was widely accepted by market participants.  FOF ¶ 501.

Plaintiff provides four data sets in an effort to demonstrate that the LTV ratios contained in the prospectus supplements were materially false.  (It has no evidence that the average LTV ratio for any of the supporting loan groups was false, much less material.)  First, it asserts that the appraisals underlying the stated LTV ratios were inflated.  Plaintiff's claimed average inflation rate, for every single deal, is less than 15%—and for four of the seven deals, it

is less than 10%.  FOF ¶ 605.  These claimed inflation rates are well within the 10% or 15%

tolerances that reasonable PLS investors considered acceptable for variation between an

appraised value and an AVM value.  FOF ¶ 648.  Moreover, information about appraisals,

standing alone, was not reported in prospectus supplements; only aggregated information about

LTV ratios was reported.  Plaintiff has no evidence that appraisal inflation, independent of its

impact on LTV ratios, would have mattered to investors.  There is no necessary connection—in

part because, as the prospectus supplements disclosed, the denominator in the loan to value ratio

was the lesser of the sales price or the appraisal for purchase money loans.  Thus, for purchase

money loans supposedly too high appraised value makes no difference.  Plaintiff has no contrary

evidence.

Second, plaintiff asserts that certain appraisals it identifies as inflated were also

non-credible within the meaning of USPAP, in that they did not adhere to USPAP requirements.

According to plaintiff, the non-credible rate for each supporting loan group ranges from 18.5% to

35.8%.  The aggregate percentage of non-credible appraisals for all supporting loan group loans

is allegedly 31.3%.  Plaintiff has no support, however, for the proposition that compliance with

USPAP standards was material to reasonable PLS investors.

Plaintiff's third data set addresses the degree to which the LTV ratios contained in

the prospectus supplements were allegedly understated.  Plaintiff asserts that 40 of 672 loans

reviewed by Kilpatrick had LTV ratios that were understated to a statistically significant degree.

FOF ¶ 623.  This figure is stated at a 95 percent confidence level, which, as set forth above, *see*

p. 79-80, *supra*, means that roughly 5% of loans (2.5% on the low side and 2.5% on the high

side) can be expected to qualify as having understated or overstated LTV ratios due to random

chance alone.  As a result, the percentage of understated LTV ratios is 3.5%.  FOF ¶ 623.  This

figure is well within the 5% variance threshold specified in the prospectus supplements.  It is also based entirely on objective falsity (inflation) and does not take into account subjective falsity (non-credibility).  Plaintiff does not provide an estimate of the percentage of LTV ratios that are understated as a result of inflated and non-credible appraisals.

Last, plaintiff asserts, based on an extrapolation performed by its expert Charles Cowan, that tables in the prospectus supplements categorizing loans by ranges of LTV ratios (*e.g.*, 90.01%-95.00%, 95.01%-100%) were false or misleading, because loans should have been placed into higher LTV ranges.  The Court has recognized that this chart reflects no "statistical significance" whatsoever.  (2/13/15 Opinion & Order, Doc. No. 1266, at 7.)  Instead, an LTV ratio that moves from 95.00% to 95.01% based on Kilpatrick's AVM will be placed into a new range.  As Dr. Arnold Barnett shows, using only LTV ratios that Cowan determined (at a 95% confidence level) were statistically significant, the ranges into which the LTV ratios fall changes very little.  FOF ¶ 625.  Using either set of data, in any event, plaintiff has no evidence that the misrepresentations it claims would have mattered to a reasonable investor.

**D.    The Allegedly False or Misleading Statements Concerning Credit Ratings Were Not Material.**

Finally, plaintiff claims that alleged discrepancies in the loan tapes for the underlying collateral had an unspecified effect on the rating agencies' review processes, resulting in inflated credit ratings for the at-issue Certificates.  Plaintiff fails to identify the ratings that it believes these Certificates would have received had the rating agencies been provided with "accurate" data.  Plaintiff has therefore failed to show that the alleged misstatements, if any, would have been material to a reasonable investor.  The fact that credit ratings in the abstract might have been material is irrelevant.  The key question instead is whether the difference between the ratings the Certificates actually received and the ratings that they allegedly should

have received would have been material.  Without identifying this difference, however—*i.e.*, without identifying the ratings that the Certificates allegedly should have received—plaintiff cannot sustain its burden.

Even if plaintiff could identify the scope of the alleged credit rating misrepresentations, it would still be unable to demonstrate materiality.  Typical RMBS investors during this time included banks, insurance companies, mutual funds, pension funds, Freddie Mac and Fannie Mae, and hedge funds.  These large institutional investors conducted sophisticated pre-acquisition analyses that included modeling the performance of the underlying collateral in a variety of different market scenarios.  FOF ¶ 628.  Although investors may have occasionally confirmed the validity of their own models using credit ratings, they ultimately made their own decisions about the quality of an investment.  Credit ratings did not supplant the reasonable investor's individual conclusions about whether to purchase a particular security.

## III.   NONE OF THE DEFENDANTS ARE LIABLE AS CONTROL PERSONS.

Plaintiff claims that Nomura Holding, NCCI, and the Individual Defendants are liable as control persons under Section 15 of the Securities Act and the analogous provision of the D.C. blue sky laws.  These provisions provide a cause of action against defendants who exercise control over primary violators of the securities laws, as well as an affirmative defense for those who lacked reasonable grounds to know of the alleged misrepresentations.[27]  Here, the alleged primary violators are Nomura Securities, NAAC, and NHELI.  Plaintiff will not be able to prove its control person claims.

---

[27]   Section 15 and the D.C. provision are largely analogous.  The Section 15 analysis that follows thus applies, in most respects, to both claims.  *Compare* 15 U.S.C. §  77o *with* D.C. Code § 31-5606.05(c).  The most notable difference is that the D.C. provision renders officers and directors liable (subject to a reasonable care defense) without regard to whether they possessed actual control.

"Control over a primary violator may be established by showing  that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  *SEC* v. *First Jersey Secs., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). "Control in this context is not the mere ability to persuade, but almost always means the practical ability to *direct* the actions of people who issue or sell securities."  *N.J. Carpenters Health Fund* v. *Residential Capital, LLC*, 2010 WL 1257528, at *7 (S.D.N.Y. Mar. 31, 2010) (internal quotation marks omitted) (emphasis in original).

Because the power to persuade does not suffice, courts have rejected control person liability where defendants possessed minority stakes or minority voting power.  For example, in *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 352 F. Supp. 2d 429, 457 (S.D.N.Y. 2005), the court dismissed control allegations where the defendant owned 30 percent of the primary violator's stock and had the authority to appoint three of its nine board members.  The court noted that "[i]f [the defendant's] designees convinced enough of the other six members of the Board of Directors to [enter into certain transactions], it would have been the result of the exercise of their powers of persuasion, not through actual control."  *Id.* at 458.  The other directors could have "simply declined to comply with [defendant's] demand."  *Id.* at 459.  For this reason, a defendant's status as the director of a primary violator—where he or she has no veto power over the board's decisions—is not sufficient to establish actual control.  *See, e.g.*, *Food & Allied Serv. Trades Dep't, AFL-CIO* v. *Millfield Trading Co.*, 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994) ("[C]ourts in this circuit . . . have agreed that a bare allegation of director status, without more, is insufficient.").

General control of a primary violator—even if it includes the power to direct rather than persuade—is not sufficient.  Instead, plaintiff must show that defendant possessed control over the specific transaction at issue.  *See*, *e.g.*, *Ross* v. *Bolton*, 1989 WL 80428, at *3 (S.D.N.Y. Apr. 4, 1989).  Many courts have also required culpable participation in the alleged wrongful conduct.  *See*, *e.g.*, *Wallace* v. *Buttar*, 239 F. Supp. 2d 388, 395 (S.D.N.Y. 2003), *overruled on other grounds*, 378 F.3d 182 (2d Cir. 2004).  In a securities case, such transaction-specific control requires some authority over the decision to issue a security or the contents of the offering documents.  *See*, *e.g.*, *Capital Ventures Int'l* v. *J.P. Morgan Mortg. Acquisition Corp.*, 2013 WL 535320, at *10 (D. Mass. Feb. 13, 2013) (noting that defendants "acquired and selected the loans that would be securitized and determined the terms under which those loans were sold to the depositors and then to the trusts.  The [defendants] also determined and approved the structure of the securitizations and the manner in which the depositors and the trusts sold the related Certificates, and controlled the disclosures made in connection with the related securitizations.").

Finally, although the signing of a registration statement containing the alleged misrepresentations may subject a defendant to control-person liability in some instances, it will not do so when those misrepresentations are contained in a separate document not signed by the defendant.  This point is reinforced by the fact that a prospectus supplement represents a "fundamental change in the information set forth in the registration statement" and "is deemed to be a new *bona fide* offering for the purposes of assessing liability under the Securities Act." *FHFA* v. *UBS Ams., Inc.*, 2012 WL 2400263, at *3 (June 26, 2012) (quoting 17 C.F.R. § 229.512(a)(2)).  A defendant plainly cannot be held liable for signing a superseded filing that omits the alleged misstatements.  *See In re Calpine Corp. Secs. Litig.*, 288 F. Supp. 2d 1054,

1081 (N.D. Cal. 2003) ("Although Plaintiffs allege that these three defendants signed, *inter alia*, the Registration Statement, they do not allege that any of them signed the February Supplemental Prospectus or the October Supplemental Prospectus . . . ."); *see also In re Worldcom, Inc. Secs. Litig.*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003) ("[T]he allegation that a Director signed a Form 10-K or a registration statement may not be sufficient to allege control over the person who is alleged to have violated Section 10(b) when the misrepresentation or omission at issue in the Section 10(b) claim does not appear in those documents . . . .").

Nomura Holdings and the Individual Defendants did not possess "actual control" over alleged primary violators Nomura Securities, NAAC or NHELI under these criteria.  First, Nomura Holding was the direct corporate parent of neither NAAC nor NHELI during the relevant time period.  FOF ¶ 26.  It had no direct participation in the purchase of mortgage loans, the securitization of those loans, the creation of the Offering Documents, or the sale of the Securitizations to investors.  FOF ¶ 26.

As to the Individual Defendants, the evidence shows that certain defendants signed the registration statements for the at-issue securities and/or acted as directors or officers of NAAC and NHELI.  FOF ¶¶ 667-77.  The fact that the individual defendants signed registration statements, however, is insufficient.  The alleged misstatements were contained in the prospectus supplements—not the registration statements.  None of the defendants signed the prospectus supplements.  FOF ¶¶ 668, 671, 673, 674, 677.  *See In re Calpine Corp.*, 288 F. Supp. 2d at 1081.  Further, even if the signing of a registration statement was relevant, Mr. Graham did not sign the two statements for the NHELI securitizations and Mr. LaRocca did not sign the statement for the NAAC securitization.  FOF ¶ 671, 668.

The Individual Defendants were officers (Messrs. LaRocca, Graham, and Gorin) or directors (Messers. Findlay and McCarthy) of NAAC and/or NHELI, and in some cases other Nomura entities.  FOF ¶ 668, 670, 672, 674, 676.  Each of them will testify that he did not have the power to cause NAAC or NHELI to take any action on its own, including any power to authorize or veto a securitization issuance.  Instead, the boards of directors of those entities acted by majority vote, and the officers had no control over the management or policies of those entities.  FOF ¶ 672.  In other words, these positions afforded the Individual Defendants with influence but not control—precisely the situation that courts in the Second Circuit have consistently held does not satisfy the Section 15 standard.  *See, e.g., In re Flag Telecom Holdings*, 352 F. Supp. 2d at 457.

As to Nomura Securities, Findlay was the Senior Managing Director and Chief Legal Officer during the relevant period.  His primary responsibility was to procure legal advice for the corporation, and he played no role in decisions regarding loan purchase, securitization structure, or security sales.  FOF ¶ 672.  LaRocca was one of more than one hundred Managing Directors at Nomura Securities from 2005 to 2007, but had no control over the decision to conduct a securitization.  FOF ¶ 667.  Again, at most, Findlay and LaRocca had influence, not control.  *In re Flag Telecom Holdings*, 352 F. Supp. 2d at 457.

Even if plaintiff could establish a prima facie case, defendants still may avoid liability by satisfying the criteria of the affirmative defense provided by Section 15.  Section 15 states that a defendant may not be held liable as a control person if he "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which [his liability] is alleged to exist."  15 U.S.C. § 77o.  This defense was added to the Securities Act in 1934; the legislative history for the amendment indicates that its purpose was to ensure that "[t]he mere

existence of control is not made a basis for liability unless that control is effectively exercised to

bring about the action upon which liability is based." *Lanza* v. *Drexel & Co.*, 479 F.2d 1277,

1298 (2d Cir. 1973) (quoting 78 Cong. Rec. 8669 (1934)). The text of Section 15 does not

impose a duty to conduct an investigation, instead requiring only that the defendant had no

knowledge of and "no reasonable ground to believe" in the existence of facts by which liability is

alleged to exist. *In re Worldcom, Inc. Secs. Litig.*, 2005 WL 638268, at *16-17 (S.D.N.Y. Mar.

21, 2005).[28] Whether a defendant had no "reasonable ground to believe" a misstatement or

omission was false "will vary with the degree of involvement of the individual, his expertise, and

his access to the pertinent information and data." *Feit* v. *Leasco Data Processing Equip. Corp.*,

332 F. Supp. 544 (E.D.N.Y. 1971) (discussing the "reasonable ground to believe" standard in the

context of Section 11 defenses).

Here, none of the Section 15 defendants knew or had reasonable grounds to

believe that any representations contained in the Offering Documents might be materially false.

Nomura Holding was not involved in loan purchase, and thus had no knowledge or reason to

believe that there were any misstatement or omissions in the prospectus supplements. Even if it

had conducted an inquiry, however, it would have been justified in relying on the results of

Nomura's due diligence processes, discussed above, which thoroughly vetted the loans and

determined that they complied with the representations contained in the prospectus supplements.

*See* pp. 11-15, *supra*.

NCCI was the entity that purchased and performed due diligence on whole loans.

FOF ¶ 28. NCCI was justified in trusting this diligence process to ensure that the Offering

---

[28]     In *In re Worldcom, Inc. Secs. Litig.*, this Court suggested that the Section 11
"reasonableness" standard—"that required of a prudent man in the management of his own
property"—"lends guidance" to what "reasonableness" means under Section 15.  2005 WL
638268, at *16 (internal quotation marks omitted).

Documents contained no misrepresentations, and had no knowledge or reason to believe that that there were any misstatement or omissions in the prospectus supplements. Even though the Court has concluded that NCCI's due diligence did not satisfy the Section 12 reasonable care defense, the Section 15 standard is different, and NCCI had no grounds to doubt the accuracy of the data included in the prospectus supplements.

The Individual Defendants, similarly, acted in good faith and with no knowledge or reason to believe that there were any misstatements or omissions in the prospectus supplements. Mr. LaRocca personally reviewed registration statement he signed. FOF ¶ 669. He oversaw Nomura's diligence processes. FOF ¶ 669. Mr. LaRocca had no knowledge or reason to believe that the prospectus supplements contained any misstatements or omissions.

Mr. Graham, similarly, had confidence that the material included in the Offering Documents—which he personally reviewed—was accurate. FOF ¶ 671. Either he or someone else in the Transaction Management Group confirmed the general accuracy of the offering documents' representations with the due diligence department prior to their issuance. FOF ¶ 671. The Transaction Management Group received formal diligence summaries for at least 89 of the 194 whole-loan trade pools, as well diligence summaries as for loans underlying at least four of the seven at-issue securitizations. FOF ¶ 671. It also oversaw reviews of the Offering Documents conducted by outside consultants, such as the accounting firm Deloitte & Touche. FOF ¶ 671. In short, like Mr. LaRocca, Mr. Graham had no knowledge or reason to believe that the prospectus supplements contained any misstatements or omissions.

Mr. Findlay personally helped to establish Nomura's due diligence program, and as a result had confidence in the ability of those working in that group to adequately scrutinize loans that Nomura purchased and subsequently securitized. FOF ¶ 673. Although he did not

participate directly in specific due diligence inquiries, Mr. Findlay believed that the representations contained in the three registration statements that he signed were accurate.  FOF ¶ 673.  Mr. Findlay had no knowledge or reason to believe that the prospectus supplements contained any misstatements or omissions.

As an accountant, Mr. Gorin had no involvement whatsoever in the preparation or review of the contents of the prospectus supplements.  FOF ¶ 674.  Accordingly, Mr. Gorin had no knowledge or reason to believe that the prospectus supplements contained any misstatements or omissions.  As discussed above, the fact that he did not conduct an investigation of his own has no impact under Section 15.  Even if he had made an inquiry, he would have been justified in relying on Nomura's diligence processes.

Mr. McCarthy's sole responsibility as an outside director was to ensure that nothing jeopardized the special-purpose entity status of NAAC and NHELI.  FOF ¶ 676.  Mr. McCarthy had no knowledge or reason to believe that the prospectus supplements contained any misstatements or omissions.  Moreover, in fulfilling this function, he reasonably relied on the diligence inquiries conducted by other Nomura entities and employees, as well as the legal opinions expressed by Nomura counsel.  FOF ¶ 677.

The above facts also demonstrate that the alleged control person defendants are not liable under the D.C. Blue Sky law, which provides that liability will attach "unless [defendant] is able to sustain the burden of proof that he or she did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."  D.C. Code § 31-5606.05(c).  As shown above, the defendants all

exercised "reasonable care" in light of their respective roles, and did not, and could not have, "known of the existence of the facts by reason of which the liability is alleged to exist." [29]

## IV.   PLAINTIFF DOES NOT ESTABLISH, BY A PREPONDERANCE OF THE EVIDENCE, THAT THE SALES OF THE SECURITIES AT ISSUE OCCURRED IN D.C. OR VIRGINIA.

Under the Virginia and D.C. blue sky laws, plaintiff bears the burden of demonstrating that the sales of the at-issue securities occurred in Virginia and D.C., respectively. *See Lintz* v. *Carey Manor Ltd.*, 613 F. Supp. 543, 549-50 (W.D. Va. 1985) (holding that the Virginia statute "is intended to govern those who sell securities within the state"); D.C. Code 31-5608.01(a) (stating that the statute "shall apply to a person who sells, or offers to sell, when an offer to sell is made in the District"); *see also* Pretrial Stip. at 4 (listing whether the sales "took place in" Virginia and D.C. as an element of plaintiff's claims that remains to be tried).  Plaintiff will fail to satisfy this burden under either statute.

Although trade confirmations for certain deals, sent after the actual transactions had already taken place, were addressed to Freddie Mac's and Fannie Mae's Virginia and D.C. offices, respectively, FOF ¶¶ 40, 56, this evidence is insufficient to satisfy the geographical requirement of the Virginia and D.C. blue sky laws.  As the D.C. statute makes plain, "an offer to sell or to purchase is made in the District, whether or not either person is present in the District," only "if the offer originates in the District, or is directed by the offeror to a destination in the District and received where it is directed or at a post office in the District if the offer is mailed." D.C. Code 31-5608.01(c).  Thus, the relevant question is whether the offer of sale was directed

---

[29] Defendants recognize that the Court has already granted plaintiff summary judgment holding that "Defendants may not rely on the affirmative defenses of due diligence and reasonable care under Section 11 and Section 12(a)(2) of the Securities Act and similar provisions of the Blue Sky laws."  Op. & Order, Doc. 991 at 107 (Dec. 18, 2014).  Defendants respectfully reserve all rights for appeal of that decision.

to a potential buyer located within the regulating state.  Plaintiff will have to prove that the offers

to sell were made in Virginia and D.C.

## V.     THE EVIDENCE MAKES CLEAR THAT ANY LOSSES SUFFERED BY PLAINTIFF RESULTED FROM FACTORS OTHER THAN THE ALLEGED MISREPRESENTATIONS.

Section 12 of the Securities Act, as amended by the Private Securities Litigation

Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737, provides defendants with an affirmative

"loss causation" defense that "any portion or all of the amount recoverable . . . represents other

than the depreciation in value of the subject security resulting from" an alleged misstatement.  15

U.S.C. § 77l(b).[30]   The Securities Act thus "expressly creates an affirmative defense of

disproving causation."  *Akerman* v. *Oryx Commc'ns, Inc.*, 810 F.2d 336, 340-41 (2d Cir. 1987).

Pursuant to this defense, a "defendant may . . . reduce his liability by proving that

the depreciation in value resulted from factors other than the material misstatement in the

registration statement."  *Id.* at 340; *see also Iowa Pub. Employees' Ret. Sys.* v. *MF Global, Ltd.*,

620 F.3d 137, 145 (2d Cir. 2010) (explaining that "the absence of loss causation is an affirmative

defense" under Section 12(a)(2)); *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 539489, at *2

(S.D.N.Y. Feb. 10, 2015) (explaining requirements of loss causation defense).  In other words,

"the loss causation inquiry assesses whether a particular misstatement actually resulted in loss."

*Miller* v. *Thane Int'l, Inc.*, 615 F.3d 1095, 1100 (9th Cir. 2010).

The fact that "the plaintiff's loss coincides with marketwide phenomenon causing

comparable losses to other investors" is significant in determining whether a defendant has

proven its loss causation defense.  *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir.

---

[30]     This Court has previously ruled that neither the Virginia or D.C. Blue Sky laws provide a loss causation defense.  *See FHFA* v. *HSBC N. Am. Holdings Inc.*, 988 F. Supp. 2d 363, 370 (S.D.N.Y. 2013).  Defendants respectfully disagree with the Court's ruling and reserve all rights for appeal.

2005) (quoting *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)).

In the face of such phenomena, "the prospect that the plaintiff's loss was caused by the [alleged

misstatements] decreases." *Id.*  Indeed, the Second Circuit recently observed that evidence

showing that the "risk that the housing market would collapse . . . caused many of the defaults

that occurred" would be relevant to "the calculation of damages" and may support a defendant's

loss causation defense under Section 11.  *N.J. Carpenters Health Fund* v. *Royal Bank of*

*Scotland Grp.*, PLC, 709 F.3d 109, 124 & n.8 (2d Cir. 2013); *cf. City of Westland Police & Fire*

*Ret. Sys.* v. *MetLife, Inc.*, 928 F. Supp. 2d 705, 714–15 (S.D.N.Y. 2013) (holding that a Section

10(b) plaintiff failed to adequately plead loss causation where the complaint "fails to mention

that Standard & Poor's downgraded the credit rating of the United States," which was followed

by "the precipitous drop in the market, and nearly equal drop in value across [similar

securities]").  "The negative causation defense . . . and the loss causation element in Section

10(b) are mirror images; in the former, the burden of proving negative causation is on the

defendant, and in the latter, the burden of proving the existence of loss causation is on the

plaintiff." *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17,

2005).  "Because of their complementarity, the loss causation analysis conducted under Section

10 is informative of the analysis under Section 12." *FHFA* v. *Nomura Holding Am., Inc.*, slip op.

at 5 (S.D.N.Y. Feb. 18, 2015); *cf. Schuler* v. *NIVS Intellimedia Tech. Grp.*, Inc., 2013 WL

944777, at *9 n.8 (S.D.N.Y. Mar. 12, 2013) (Wood, J.) (explaining that "courts have employed

[the] reasoning" of Section 10(b) authorities "to analyze loss causation in Section 11 claims").

      Defendants will prove at trial that any losses Freddie Mac and Fannie Mae

sustained in connection with the Certificates were caused by factors other than the alleged

misstatements in the Offering Documents.  There is no dispute that falling house prices and

rising unemployment cause mortgage loans to default.  *See* p. 27-28, *supra*.  There is no dispute that house prices plummeted beginning in 2007, as unemployment rose and financial markets froze.  *See* pp. 29-31, *supra*.  Freddie Mac's and Fannie Mae's only business is residential mortgage loans—investing in the secondary market by buying whole loans and mortgage-backed securities, including private label securities.  FOF ¶ 7.  Losses those companies suffer are due to a decline in the value of mortgage investments, including private label securities.  Freddie Mac and Fannie Mae have stated repeatedly—in filings with the SEC, in annual reports to shareholders, in Court filings, in internal documents, and in testimony given in this Action—that the house price declines that began in 2007 caused the losses Freddie Mac and Fannie Mae experienced during 2007 and after.

Now, in an about face, plaintiff seeks a recovery in this lawsuit based on alleged misstatements in the Offering Documents.  Plaintiff's argument is inconsistent with both Freddie Mac's and Fannie Mae's prior statements and admissions and with the overwhelming evidence that the unprecedented decline in house prices beginning in 2007, and subsequent economic recession, caused mortgage delinquencies and, in turn, losses to PLS, including the PLS at issue here.  The analysis of defendants' expert Kerry Vandell makes clear that factors other than the alleged misstatements in the Offering Documents caused any losses suffered by Freddie Mac and Fannie Mae on the seven Certificates.

A.     **Freddie Mac and Fannie Mae Have Represented to the SEC, Investors, and Courts That The Drop in House Prices Beginning in Early 2007 Caused Their Losses, Including to Their PLS Portfolio.**

There is overwhelming and undisputed evidence that declining house prices and macroeconomic factors during the 2007 to 2009 period drove mortgage defaults.  The correlation between house price decline and mortgage defaults and delinquencies has been established by experts and participants (including Freddie Mac and Fannie Mae) in the mortgage industry.  FOF

¶ 207-08.  Declines in house prices lead to "negative equity"—which means the value of a borrower's property is significantly less than the amount of the mortgage loan.  In this situation—called being "underwater"—a borrower has less incentive to continue paying the mortgage loan.  FOF ¶ 213-17. It is also very difficult to refinance the loan, and virtually impossible to take out a larger mortgage to pay off an existing mortgage.  FOF ¶ 213-17.

Freddie Mac and Fannie Mae have consistently represented, in filings with the SEC and statements to their shareholders, that declining house prices caused losses they experienced during 2007 and thereafter.  *See* p. 31-33, *supra*.  Freddie Mac stated in its September 23, 2009 memorandum of law in support of its motion to dismiss the *Kuriakose* that: "Freddie Mac's principal assets are home mortgages and mortgage-backed securities" and "[i]n November 2007, the steepest decline in home values in U.S. history led Freddie Mac to begin recognizing losses."  FOF ¶ 268.  In other words, a decline in house prices caused Freddie Mac to lose money on its private label securities, which include six of the seven Certificates here at issue.  Freddie Mac took this position to successfully defend against the claims made against it in that action.  *See* p. 4, *supra*.  Accordingly, it is judicially estopped from changing its position here.  *See Adelphia Recovery Trust* v. *Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014).

Freddie Mac and Fannie Mae have advanced the same explanation for their losses on private label securities in filings with the SEC.  Freddie Mac reported in its 2010 and 2011 SEC Form 10-K filings that "home prices declined significantly, after extended periods during which home prices appreciated.  As a result, the fair value of these investments [non-agency mortgage-backed securities] has declined significantly since 2007 and we have incurred substantial losses through other-than-temporary impairments."  FOF ¶ 252 (emphasis added). Fannie Mae's 2010 and 2011 SEC Form 10-K filings contain similar statements, attributing the

company's financial results to "[a] substantial portion of these fair value writedowns related to our investments in private-label mortgage-related securities backed by Alt-A and subprime mortgage loans. . . due to the weakening economy."  FOF ¶ 252.  Freddie Mac's and Fannie Mae's regulator during the 2005 to 2008 time period, the Office of Federal Housing Enterprise Oversight ("OFHEO") also acknowledged in its annual report for 2007 that the poor financial performance in 2007 of both Freddie Mac and Fannie Mae was attributable to "the rapid deterioration in credit performance associated with house price declines and the disruption of the mortgage market."  FOF ¶ 235.

Freddie Mac's and Fannie Mae's internal documents and testimony given in this Action further demonstrate that their losses were caused by factors other than the alleged misstatements in the Offering Documents.  FOF ¶¶ 260-63.  For example, Fannie Mae's Chief Risk Officer Enrico Dallavecchia informed investors during an August 16, 2007 earnings call that "[t]he increasing credit loss we experienced in 2006 was largely driven by the combination of weak economic conditions and weak to negative home price appreciation over the last year."  FOF ¶ 233.  At deposition in this Action, Freddie Mac's Senior Vice President of Credit Risk Oversight, Raymond Romano, testified that he "agree[d] that the primary cause of Freddie Mac's losses in the nontraditional portfolio was an exogenous macroeconomic event" "namely, the

unprecedented decline in the housing market," and that "economic events in housing price decline were chief among the reasons for losses."  FOF ¶ 259.[31]

Conversely, Freddie Mac and Fannie Mae have acknowledged in filings with the SEC that the recent improvement in their financial results is due, at least in part, to the stabilization and increase in house prices.  FOF ¶ 247-49, 254.  Freddie Mac's Form 10-K filing for 2012 (filed on February 28, 2013), states that its net income was in part due to "lower estimates of incurred loss due to the positive impact of an increase in national home prices," FOF ¶ 246-48, and its SEC Form 10-K filing for 2013 (filed on February 21, 2014), notes that its "[c]redit related income increase to $11.8 billion in 2013 from $1.1 billion in 2012," and that these "results for 2013 and 2012 were positively impacted by increases in home prices, which result in reduction in [its] loan loss reserves."  FOF ¶ 246-48.  Fannie Mae has similarly recognized in its Form 10-K for 2012 (filed on April 2, 2013) that its net income of $17.2 billion was, in part, a result of the "continued improvement in the housing market" and noted that "home prices have increased, and we have experienced further improvement in the performance of our book of business" and that it was "the largest [net income] in our company's history and our first annual net income since 2006."  FOF ¶ 246-49.  The foregoing statements all establish that factors other than the alleged misstatements in the Offering Documents cause the losses about which plaintiff complains.

---

[31] Defendants respectfully disagree with the Court's ruling that lay opinion testimony about loss causation can only be offered under Fed. R. Evid. 701 "[i]f the witness performed an investigation during the course of her employment addressed to the issue of loss causation. (2/18/15 Order & Opinion, Doc. 1289, at 9.)  Rule 701 permits testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.  In any event, statements by Fannie Mae's Chief Risk Officer, Enrico Dallavecchia, to shareholders about the causes of Fannie Mae's losses meet the standard articulated by the Court.

**B.**     **Dr. Kerry Vandell's Analysis Shows that Factors Other Than Alleged Misstatements Caused Plaintiff's Losses.**

Defendants' expert Dr. Kerry Vandell, a well-respected real estate and financial economist and expert in mortgage backed securitizations, analyzed whether the underwriting defects alleged by plaintiff's expert Robert Hunter had any impact on rates of loan default for the sample loans underlying the Certificates in this case—the loans evaluated by Mr. Hunter for purported underwriting defects.  If the underwriting defects alleged by Mr. Hunter impacted the loan's performance, then one would expect to find, all else being equal, that the defective loans performed worse than the loans without defects.  FOF ¶ 281.

Employing a regression analysis—an analysis that identifies the relationship between independent (or explanatory) variables—Dr. Vandell concluded that a "defect" finding had no statistically significant impact on the probability that these sample loans would become seriously delinquent or default.  FOF ¶ 281-83.  Dr. Vandell will opine that house prices and other economic factors, not the alleged misstatements, caused any losses suffered by Freddie Mac and Fannie Mae on these seven Certificates.[32]  Dr. Vandell's opinion is consistent with and supported by Freddie Mac's and Fannie Mae's own determinations of the cause of their losses— any losses on the Certificates were caused by the "steep and deep" dramatic decline in house prices during 2007 to 2009.  FOF ¶ 281-83.

Dr. Vandell's opinion also is supported by the opinion of plaintiff's own expert, Dr. G. William Schwert.  Like Dr. Vandell, Dr. Schwert used loans found defective by Hunter and loans Hunter did not deem defective to analyze the impact of a "defect" on the performance of a loan.  Although Schwert's model suffers from errors, his analyses show (like Dr. Vandell's)

---

[32]     Defendants respectfully disagree with the Court's February 10, 2015 Opinion & Order, Doc. No. 1248), excluding certain testimony of Defendants' expert Kerry Vandell, and reserve all rights for appeal.

that any alleged misrepresentations in the Offering Documents generally did not cause the performance of the loans in the supporting loan group to be worse than would otherwise have been the case.  FOF ¶ 281-83.

## VI.   THE EVIDENCE DOES NOT SUPPORT THE RECOVERY SOUGHT BY PLAINTIFF UNDER SECTION 12.

Plaintiff has failed to prove the elements of its claims, and therefore is not entitled to any recovery.  Even if the Court were to enter judgment for plaintiff on its Section 12 claims, it should find that defendants have proved their loss causation defense and that plaintiff is therefore entitled to no recovery on those claims.[33]

If the Court rules otherwise, however, plaintiff still bears the burden of proving the proper amount of any recovery.  If plaintiff owns the at-issue securities, it is entitled only to rescission in the event that its claims succeed.  Section 12's rescissionary remedy permits a successful plaintiff "to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security."  15 U.S.C. § 77*l*.  Plaintiff errs in its calculation of the "interest thereon," *i.e.*, the prejudgment interest rate.

Specifically, two of plaintiff's three suggested interest rates—three percent and the IRS Penalty Rate—are indefensibly high.[34]  Section 12 does not specify an interest rate.

---

[33]   The Court has ruled that there is no "loss causation" defense to plaintiff's Blue Sky claims.  (12/16/13 Opinion & Order, Doc. No. 569).  The rate of prejudgment interest on those claims is set by statute, and the Court has now held that defendants must pay prejudgment interest on the amount of Freddie Mac's and Fannie Mae's original investments, minus principal that was returned, without first subtracting interest that had been paid to the investor.  (2/16/15 Opinion & Order, Doc. No. 1272, at 7.)  Defendants respectfully disagree with these rulings and reserve all rights for appeal.  Rescission under the Blue Sky laws is measured in accordance with Section 12(a)(2) damages.  *See FHFA* v. *Nomura Holding Am., Inc.*, 2014 WL 7232590, at *1 (S.D.N.Y. Dec. 18, 2014).

[34]   Plaintiff also suggests the coupon rate of the Certificates as a third option.  Although this rate is not the most appropriate rate, as discussed below, it is more defensible than plaintiff's two other options.

"Interest is intended to make the injured party whole and generally should be measured by interest on short-term, risk-free obligations." *New York Marine* & *Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 131 (2d Cir. 2001) (internal quotations and citations omitted). Whatever interest rate a court chooses, "[a]wards of prejudgment interest must not result in over-compensation of the plaintiff." *Wickham Contracting Co., Inc.* v. *Local Union No. 3, Int'l Bhd. Of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992).

In determining prejudgment interest, the court should consider several factors, including: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co., Inc.* v. *Local Union No. 3, Int'l Bhd. Of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992); *accord*. *Jones* v. *UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000); *see also Commercial Union Assurance Co., plc* v. *Milken*, 17 F.3d 608, 615 (2d Cir. 1994) (holding that the *Wickham* principles apply in Section 12 cases).

While "[t]here is no federal statute that purports to control the rate of prejudgment interest," *Jones*, 223 F.3d at 139, many courts use "the federal postjudgment rate as a starting point in exercising the district court's discretion in this regard," *Sec. Ins. Co. of Hartford* v. *Old Dominion Freight Line, Inc.*, 314 F. Supp. 2d 201, 203 (S.D.N.Y. 2003) (Lynch, J.). This postjudgment rate "establishes the rate of interest that is to be paid 'on any money judgment in a civil case recovered in a district court,' linking that rate to the rate of interest the government pays on money it borrows by means of Treasury bills." *Jones*, 223 F.3d at 139. This rate is equivalent to "the average rate of return on one-year Treasury bills." *In re Vivendi Universal,*

*S.A. Sec. Litig.*, 284 F.R.D. 144, 163 (S.D.N.Y. 2012).  Judge Lynch has explained the rationale

of using the federal postjudgment rate to calculate prejudgment interest as follows:

> For purposes of assigning a prejudgment interest rate, the
> presumption is that plaintiff invested those funds in United States
> Treasury bills with a 52–week maturity.  That is the presumption
> Congress made when calculating interest rates that should apply to
> post-judgment interest . . . and there is no reason a different
> presumption should apply here.  United States Treasury bills are a
> conservative yet valid investment option, and reflect a realistic rate
> of interest that plaintiff could have received.

*Old Dominion*, 314 F. Supp. 2d at 204–05.  Accordingly, courts routinely apply the federal

postjudgment rate in calculating the prejudgment interest a plaintiff may recover.  *See, e.g.*,

*Vivendi*, 284 F.R.D. at 164; *see also W. Pac. Fisheries, Inc.* v. *SS President Grant*, 730 F.2d

1280, 1289 (9th Cir. 1984) (holding that "the measure of interest rates prescribed for post-

judgment interest in 28 U.S.C. § 1961(a) is also appropriate for fixing the rate for pre-judgment

interest").

Calculating prejudgment interest using the federal postjudgment rate not only

finds ample support in judicial precedent, but also captures the economic realities of any

damages award plaintiff may receive here.  As defendants' expert Dr. Timothy Riddiough will

testify, Section 12 damages effectively supplant plaintiff's investment in a risky security with a

fixed, risk-free cash flow.  FOF ¶¶ 693, 710.  A "risk-free" interest rate, which is equal to the

federal postjudgment rate,[35] is the only rate that squares with this remedial structure.  FOF ¶¶ 92,

693.  This rate is the typical measure of the time value of money in the absence of market

---

[35]     The federal postjudgment rate is defined as "the 1-year constant maturity Treasury yield."
28 U.S.C. § 1961(a).  Dr. Riddiough defines "risk-free rate" as "constant maturity treasury."
Accordingly, the terms "federal postjudgment rate" and "risk-free rate" are both equal to the 1-
year constant maturity Treasury yield and are used interchangeably here.

uncertainty.  FOF ¶ 692.  Such a rate is appropriate, from a market perspective, for determining prejudgment interest.  Such interest represents a quintessential "risk-free" cash flow.

Plaintiff asserts that it is entitled to a higher interest rate because, had Freddie Mac and Fannie Mae never purchased the Securities, they might have invested in funds that paid an interest rate higher than the risk-free rate.  Such a rate, however, necessarily would have been predicated on increased risk.  Because any recovery by plaintiff under Section 12 would be dictated by court order, plaintiff would not bear any risk of loss.  The risk-free rate effectively restores the status quo, and is thus in accord with Section 12's rescissionary remedy.  *See FHFA* v. *Nomura Holding Am. Inc.*, 2014 WL 7232590, at *7 (S.D.N.Y. Dec. 18, 2014) ("Rescission of a contract repudiates the transaction and seeks to place the parties in the status quo.") (internal quotation marks and alterations omitted).

*In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144 (S.D.N.Y. 2012) is on point.  In that case, a Section 10(b) plaintiff argued, much like plaintiff argues here, that "applying the Treasury rate is inappropriate, because plaintiffs were pursuing risky investments, not an investment generating a low or risk-free return."  *Id*. at 163.[36]  Judge Scheindlin disagreed and explained that, because any alternative investment plaintiff made would likely have been "equally risky," the potential for losses would have been high "in light of the turmoil in the financial markets."  *Id*. at 164.  That potential for losses disappears when receipt of the funds in

---

[36]      While Section 10 differs in several respects from Section 12, see *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 640900, at *3 (S.D.N.Y. Feb. 16, 2015), the Court has observed the "complementarity" between the two sections and explained that analysis of certain elements of Section 10 "is informative of the analysis under Section 12," *FHFA* v. *Nomura Holding Am., Inc.*, slip op. at 5 (S.D.N.Y. Feb. 18, 2015).  In light of the relationship between Sections 10 and 12, courts have relied upon Section 10 authorities in determining prejudgment interest awards for Section 12 plaintiffs.  *See, e.g.*, *Mecca* v. *Gibraltar Corp. of Am.*, 746 F. Supp. 338, 349–50 (S.D.N.Y. 1990) (citing Section 10 authorities in analysis of prejudgment interest under Section 12).

question is guaranteed by court order.  Accordingly, the court correctly recognized that "any award above the presumptive rate, based on the yield of a one-year treasury note, would be speculative and result in a windfall for plaintiffs."  *Id*.  This persuasive reasoning demonstrates the error in plaintiff's analysis and supports Defendants' position.

If the court deems it appropriate to award a higher rate (which it should not), the only appropriate one would be the coupon rate of the Certificates.  That rate, as Dr. Riddiough will testify, is equivalent to the <u>maximum</u> potential benefit that Freddie Mac or Fannie Mae could have expected to receive on the Certificates.  FOF ¶ 696.  If every certificate retained its full face value and was paid the full amount of principal and interest on time, then the principal amount plus coupon rate applied from time to time on the outstanding principal, less income received (and defendants believe, appropriate interest recognized on that income received, although the Court has ruled to the contrary) and any reduction for a loss causation defense successfully proved, would be the full amount that plaintiff could have recovered on these investments.  Plaintiff could be entitled to no more.

There is no evidence or allegation of criminal behavior or fraud on defendants' part, which would be the only justification for any higher rate of prejudgment interest.  Plaintiff has pointed to this Court's rulings in *S.E.C.* v. *Boock*, 2012 WL 3133638 (S.D.N.Y. Aug. 2, 2012), 2011 WL 3792819 (S.D.N.Y. March 21, 2013), as the basis to award prejudgment interest at the IRS Penalty Rate.  There is no comparison.  Those cases involved egregious fraudulent conduct—the defendants in *Boock* "hijacked" defunct public corporations by making false representations to secretaries of state, making millions of dollars.  2012 WL 3133638 at *5; 2011 WL 3792819 at *1-2.  In awarding disgorgement, the court noted the purposes of depriving a violator of "'ill-gotten gains" and "compensating fraud victims."  *Id.* at *24.  In applying the IRS

penalty rate to an award of prejudgment interest on the disgorgement, the Court reasoned that "it is well established that when disgorgement is ordered in an SEC-initiated proceeding, the IRS underpayment rate is appropriate." *Id.* at *5 n.3; *see also In re Vivendi*, 284 F.R.D. at 163 (explaining that the "IRS rate is intentionally punitive").  None of that applies here.

   If any recovery is awarded under Section 12 (and it should not be), a risk-free rate (or, in the alternative, at most the relevant coupon rate) would appropriately compensate plaintiff for any temporary loss of its principal, take into account the relative equities of the parties, and further the remedial purpose of Section 12.  Should plaintiff prevail, the proper Section 12 remedy (without accounting for loss causation) would be for plaintiff to tender the seven Certificates in exchange for a payment of $568,856,349.  *See also* FOF ¶ 698.  And, after accounting for loss causation, plaintiff's Section 12 recovery is zero.

## CONCLUSION

   Defendants respectfully submit that the evidence at trial will show that plaintiff cannot carry its burden on any of its claims.

Dated: New York, New York
        February 20, 2015


Respectfully submitted,

/s/ Thomas C. Rice
Thomas C. Rice (trice@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

/s/ David B. Tulchin
David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
Yavar A Bathaee (bathaee@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*