# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION, <br><br> Plaintiff, <br><br> -against- <br><br> NOMURA HOLDING AMERICA INC., et al., <br><br> Defendants. | No. 11-cv-6201 (DLC) <br><br> <u>ECF Case</u> |

## <u>DEFENDANTS' PROPOSED FINDINGS OF FACT</u>

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
Yavar Bathaee (bathaeey@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

February 20, 2015

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Action | *FHFA* v. *Nomura Holding America Inc.*, *et al.*, No. 11 Civ. 6201 (DLC) |
| Aegis | Aegis Mortgage Corporation |
| Am. Compl. | Amended Complaint, *FHFA* v. *Nomura Holding America Inc.*, *et al.*, No. 11 Civ. 6201 (DLC), June 28, 2012, Doc. No. 60 |
| AMO | Alternative Market Operations |
| ARM | Adjustable Rate Mortgage |
| AVM | Automated Valuation Model |
| BLS | Bureau of Labor Statistics |
| Certificates | The specific RMBS that Fannie Mae and Freddie Mac purchased from the seven Securitizations at issue in this Action, from November 16, 2005 to April 27, 2007 |
| CLAS | Clayton Loan Analysis System |
| Cut-Off Date | The date for establishing the composition of the loan pool reported in the prospectus supplements for a Securitization |
| DBRS | Dominion Bond Rating Service |
| Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin and N. Dante LaRocca |
| Disclosed Originators | Originators that made 20% or more of the mortgage loans in any given supporting loan group of a Certificate |
| DTI | Debt-to-income |
| Effective Date | The date the prospectus supplement for each Securitization was filed with the Securities and Exchange Commission |
| Equifirst | EquiFirst Corporation |
| Fannie Mae | Federal National Mortgage Association |
| FHFA | Federal Housing Finance Agency |

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Fitch | Fitch Ratings |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| Fremont | Fremont Investment & Loan |
| HERA | Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617) |
| LTV | Loan-to-value |
| MBS | Mortgage-backed securities |
| Moody's | Moody's Investors Services, Inc. |
| NAAC | Nomura Asset Acceptance Corporation |
| NCCI | Nomura Credit & Capital, Inc. |
| NHELI | Nomura Home Equity Loan, Inc. |
| NIM | Net Interest Margin |
| NINA | No income, no assets |
| Nomura Answer | Answer and Affirmative Defenses of the Nomura Defendants to the Amended Complaint, *FHFA* v. *Nomura Holding America Inc.*, *et al.*, No. 11 Civ. 6201 (DLC), January 10, 2013, Doc. No. 201 |
| Nomura Defendants | Nomura Holdings America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| Nomura Securities | Nomura Securities International, Inc. |
| Novastar | NovaStar Financial, Inc. |
| Offering Documents | The prospectus supplements for the Securitizations |
| OFHEO | Office of Housing Enterprise Oversight |
| People's Choice | People's Choice Home Loan, Inc. |
| PLS | Private Label Securities |
| RBSSI | RBS Securities Inc. |

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ResMAE | ResMae Mortgage Corporation |
| RMBS | Residential mortgage-backed security |
| S&P | Standard & Poor's |
| Sample Loans | A sample of 723 loans from the supporting loan groups for the Securitizations re-underwritten by Robert W. Hunter |
| SEC | Securities and Exchange Commission |
| Securitizations | NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 |
| SISA | Stated income, stated assets |
| SLC | Special Litigation Committee |
| Stipulated Facts | Parties' Stipulations of Law and Fact, dated February 13, 2015 |
| Undisclosed Originators | Originators that made less than 20% of the mortgage loans in any given supporting loan group of a Certificate |
| USPAP | Uniform Standards of Professional Appraisal Practice |

# TABLE OF CONTENTS

**Page**

I.      BACKGROUND ................................................................................................1

    A.      Residential Mortgage-Backed Securities ............................................1

    B.      Plaintiff and Its Allegations ...............................................................3

        1.      Freddie Mac and Fannie Mae ..................................................3

        2.      FHFA ........................................................................................8

        3.      Plaintiff's Allegations and Claims ...........................................9

    C.      Nomura .................................................................................................10

    D.      RBS Securities Inc. ..............................................................................12

    E.      The Securitizations and the Certificates Purchased by Freddie Mac
        and Fannie Mae ....................................................................................12

        1.      NAA 2005-AR6 ........................................................................12

        2.      NHELI 2006-FM1 ....................................................................18

        3.      NHELI 2006-HE3 .....................................................................23

        4.      NHELI 2006-FM2 ....................................................................27

        5.      NHELI 2007-1 ..........................................................................32

        6.      NHELI 2007-2 ..........................................................................36

        7.      NHELI 2007-3 ..........................................................................40

    F.      Nomura's Ownership of Subordinate Tranches of the
        Securitizations ......................................................................................45

II.     THE OFFERING DOCUMENTS WARNED THAT A DECLINE IN
    HOUSE PRICES AND ECONOMIC DETERIORATION COULD
    ADVERSELY AFFECT LOAN PERFORMANCE AND THAT THE
    UNDERLYING MORTGAGES HAD RISKY CHARACTERISTICS .........................50

    A.      The Offering Documents Disclosed That a Decline in House Prices
        and Economic Deterioration Could Cause Losses ................................50

# TABLE OF CONTENTS
## (*continued*)

**Page**

B.  The Offering Documents Warned that Mortgage Loans Backing the Securitizations Had Risky Attributes ................................................53

    1.  Mortgage Loans Were Not Originated to Freddie Mac and Fannie Mae Guidelines ........................................................53

    2.  Low- and No-Documentation Loans ........................................................55

    3.  Interest-Only Loans ........................................................58

    4.  High Loan-to-Value Ratios ........................................................60

III.  THE DECLINE IN HOUSE PRICES CAUSED LOSSES ON THE CERTIFICATES PURCHASED BY FREDDIE MAC AND FANNIE MAE ........................................................63

A.  There Is a Strong Correlation Between House Price Declines, Macroeconomic Conditions and Defaults and Delinquencies on Mortgage Loans ........................................................65

    1.  Defaults and Delinquencies on Mortgage Loans Are Correlated to House Price Declines ........................................................65

    2.  Mortgage Defaults and Delinquencies Are Correlated to Worsening Economic Conditions ........................................................71

B.  Beginning in 2007, House Prices Fell Steeply and the Economy Entered a Recession ........................................................72

C.  The Decline in the Housing Market Caused Freddie Mac and Fannie Mae to Suffer Losses to Their PLS Portfolios ........................................................75

D.  Freddie Mac's and Fannie Mae's Explanation of Their Losses ........................................................76

    1.  Freddie Mac and Fannie Mae Attributed Their Losses to House Price Declines and Macroeconomic Conditions in Public Filings ........................................................76

    2.  Freddie Mac and Fannie Mae Did Not Attribute Their PLS Losses to Potential Misrepresentations in Their Accounting and SEC Reporting of the Value of the Certificates ........................................................84

**TABLE OF CONTENTS**
**(*continued*)**

Page

3.  Freddie Mac and Fannie Mae Employees Testified that PLS Losses Resulted From House Price Declines and Macroeconomic Factors .........................................................................87

4.  Freddie Mac's and Fannie Mae's Statements in Other Judicial Proceedings .................................................................92

E.  The Cause of Defaults and Delinquencies on the Loans Underlying the Certificates .................................................................................98

1.  Defaults and Delinquencies on Loans in the Supporting Loan Groups Are Correlated to Falling House Prices and Unemployment.........................................................................98

2.  Defaults and Delinquencies in the Supporting Loan Groups Were Not Caused By the Alleged Misrepresentations ...........................101

IV.  STATEMENTS IN THE OFFERING DOCUMENTS ABOUT COMPLIANCE WITH UNDERWRITING GUIDELINES AND UNDERWRITING CRITERIA WERE NOT FALSE OR MISLEADING ..................103

A.  Disclosures in the Offering Documents About Compliance with Underwriting Guidelines and Underwriting Criteria ..........................................103

1.  For Disclosed Originators, the Offering Documents Represented That Loans Were Originated "Generally" In Accordance With Their Guidelines .......................................................103

2.  The Offering Documents Disclosed That Loans Would Be Made as Exceptions to Underwriting Guidelines ...................................114

3.  For Undisclosed Originators, the Offering Documents Only Contain Representations About General Underwriting Criteria ...............................................................................116

4.  The Offering Documents Made Representations About the Loans at the Time of Origination, Not About What Happened After the Loans Were Originated ..........................................122

B.  The Offering Documents Accurately Stated That the Mortgage Loans Were Generally Originated in Accordance with Applicable Underwriting Guidelines and Underwriting Criteria ..........................................123

iii

# TABLE OF CONTENTS
### (*continued*)

Page

1.   The Contemporaneous Due Diligence Results Show that
     the Loans Complied With Applicable Guidelines ..................................123

     a.   Nomura's Due Diligence Process Was Thorough
          and Reliable ...........................................................................123

     b.   Nomura Imposed Bid Stipulations and Overlays
          That Were More Strict Than Originator Guidelines ..................129

     c.   Nomura's Credit and Compliance Due Diligence
          Vendors, Clayton and AMC, Provided Reliable and
          Accurate Reports .....................................................................139

     d.   Nomura and Its Due Diligence Vendors Found Low
          Rates of Defects in Trade Pools Containing Loans
          Backing the Securitizations ......................................................143

C.   The Findings of Plaintiff's Re-underwriting Expert, Robert Hunter,
     Conflict With Contemporaneous Evidence and Are Based On
     Methodological Errors ...............................................................................150

     1.   Hunter's 66% Defect Rate Conflicts With
          Contemporaneous Due Diligence Findings ...........................................152

     2.   Hunter's Analysis Is Based on Several Methodological
          Errors .....................................................................................................155

          a.   Hunter Did Not Evaluate Whether Loans Were
               Originated "Generally" in Accordance with
               Underwriting Guidelines...........................................................155

          b.   Hunter's Claimed Defect Rate Is Inflated Because It
               Is an Incomplete "Gross" Defect Rate .......................................160

          c.   Hunter Incorrectly Assumes Documents Now
               Missing From Loan Files Did Not Exist at the Time
               of Loan Origination ..................................................................161

          d.   Hunter Improperly Used Information Not Available
               to the Original Underwriter at the Time of Loan
               Origination ...............................................................................165

iv

**TABLE OF CONTENTS**
*(continued)*

Page

f.  Hunter Improperly Substitutes His Own Judgment, Using Unreliable Tools, About the Reasonableness of the Income Stated by a Borrower ...........................................171

g.  Hunter's Claimed Defect Rate Is Inflated Because He Includes "Errors" in the Pre-Closing Loan Tape .................174

h.  Hunter's Claimed Defect Rate Is Inflated Because He Made Other Basic Underwriting Mistakes ..........................175

V.  THE STATEMENTS IN THE OFFERING DOCUMENTS ABOUT LTVS WERE NOT FALSE OR MISLEADING ..........................................177

A.  Disclosures in the Offering Documents About LTV Ratios ...............................177

B.  Nomura Conducted Valuation Due Diligence That Ensured the Statements in the Offering Documents Regarding LTV Ratios Were Correct ..........................................................................183

1.  Nomura Conducted Valuation Due Diligence on Virtually 100% of Loans in the Seven Supporting Loan Groups .........................183

2.  Clayton and AMC Reviewed Appraisals During Their Credit and Compliance Due Diligence ..................................186

C.  There Is No Evidence that Appraisers Did Not Honestly Believe Their Subjective Opinions of Value ..................................187

1.  Four of the Appraisers Challenged by Plaintiff Defend Their Opinions of Value as Accurate and Honestly Believed ..........................................................................188

a.  Michele Morris .......................................................188

b.  Dan Platt ...............................................................190

c.  Lee Clagett .............................................................191

d.  Bill Schall ..............................................................193

2.  There Is No Evidence that Any Appraiser Did Not Honestly Believe His or Her Opinion of Value ......................194

D.  There Is No Evidence that any Relevant Appraisals Were Inflated .................196

v

**TABLE OF CONTENTS**
***(continued)***

**Page**

1. AVMs Are Not a Substitute for In-Person Appraisals and Cannot Provide the "True" Value of a Property ....................................196

2. Kilpatrick's Greenfield AVM Has Not Been Independently Tested or Validated ................................................................................198

3. Kilpatrick's Claim About Inflated Appraisals Is Inconsistent with Contemporaneous Due Diligence Reviews ........................................................................................199

4. The Difference Between Appraised Values and the Outputs of the Greenfield AVM Are Within Acceptable Tolerances ................199

5. The Greenfield AVM Produces Unreliable Results and Contains Methodological Flaws ........................................................200

    a. On Average, the Greenfield AVM Fails to Predict Actual Sales Prices of Properties—the Standard Industry Benchmark for AVM Performance—By 17% ........................................................................................201

    b. Kilpatrick Eliminates Sales Data That the Greenfield AVM Cannot Explain ................................................202

    c. The Greenfield AVM Has an Unacceptable Confidence Interval and Forecast Standard Deviation ........................................................................206

    d. The Greenfield AVM Relies on Tax-Assessed Values from 2010-2014, Which Are Unreliable ........................207

    e. The Greenfield AVM Performs Poorly Compared to Tested, Validated, Commercially Available AVMs ................208

    f. The Greenfield AVM Suffers From Omitted Variables Bias ........................................................................208

    g. The Greenfield AVM Produces Results that Violate Basic Economic Theory ............................................209

    h. The Greenfield AVM Contains an Error that Systematically Produces an Artificially Low Value ................210

**TABLE OF CONTENTS**
***(continued)***

Page

6.  Kilpatrick Recalculated LTV Ratios By Overriding Actual Sales Prices, Improperly Causing LTV Ratios To Increase ..................211

E.  There Is No Evidence That Appraisals of the Nomura Sample Properties Did Not Comply With USPAP .........................................212

1.  Use of a "Deterministic Scoring Model" to Gauge Compliance with USPAP Is Not Accepted in the Appraisal Profession ................................................................................213

2.  The "Credibility Assessment Model" Is Untested and Unvalidated .......................................................................214

3.  None of the "Credibility Assessment Model" Questions Reflect USPAP Standards .......................................................215

4.  The Credibility Assessment Model Does Not Allow For the Flexibility and Application of Judgment USPAP Requires ...................219

5.  Kilpatrick Does Not Apply His "Credibility Assessment Model" Reliably ........................................................221

6.  The Weights, Scoring and Failure Threshold Used in the "Credibility Assessment Model" Are Arbitrary ....................................221

F.  Disclosures in the Offering Documents About Compliance with USPAP Were Accurate ........................................................223

G.  Kilpatrick Made False Statements to State Authorities in Applications for Appraisal Licenses or Certificates ...........................224

VI.  STATEMENTS IN THE OFFERING DOCUMENTS ABOUT OWNER OCCUPANCY WERE NOT FALSE OR MISLEADING .............................225

A.  Disclosures in the Offering Documents Concerning Owner Occupancy ..............................................................................225

B.  The Owner Occupancy Data in the Prospectus Supplements Disclose the Percentage of Borrowers that Stated an Intention to Occupy a Property at the Time of Loan Origination ..........................228

1.  The Owner Occupancy Data in the Prospectus Supplements Accurately Stated the Intentions of Borrowers .......................................231

vii

**TABLE OF CONTENTS**
*(continued)*

Page

2. Plaintiff Has Offered No Evidence That Borrowers Misrepresented Their Intent to Occupy the Subject Property ................. 232

C. Hunter's Method of Evaluating Whether Borrowers Actually Occupied the Subject Properties Is Unreliable ................... 233

VII. THE STATEMENTS IN THE OFFERING DOCUMENTS ABOUT EXPECTED CREDIT RATINGS WERE NOT FALSE OR MISLEADING ................................................ 235

A. Disclosures in the Offering Documents About Expected Credit Ratings ........................................... 235

B. Plaintiff Does Not Present Any Evidence That the Expected Credit Ratings Disclosed in the Offering Documents Were False or Misleading ............................................ 237

1. The Disclosures About Credit Ratings Were Not False or Misleading ..................................... 237

2. Riddiough's Analysis Shows that the Alleged Misstatements Would Not Have Changed the Ratings of the Certificates ....................................... 239

VIII. COWAN IMPROPERLY EXTRAPOLATES THE SAMPLE LOANS TO THE SUPPORTING LOAN GROUPS ................... 243

A. Cowan's Non-Random Samples Undermine His Extrapolations ...................... 244

1. Cowan's Use of Non-Random Samples Undermines His Extrapolation of Hunter's Results .......................... 244

2. Cowan's Use of Non-Random Samples Undermines His Extrapolation of Kilpatrick's Results ...................... 246

B. Cowan's Extrapolations Suffer From Additional Errors ................... 246

1. Cowan's Extrapolation of Hunter's Results Suffers from Other Methodological Errors ................... 246

2. Cowan's Extrapolation of Kilpatrick's Results Suffers from Other Methodological Errors ................. 247

**TABLE OF CONTENTS**
*(continued)*

Page

C.   Kilpatrick's Credibility Results Cannot Be Extrapolated to the
Supporting Loan Groups ....................................................................251

IX.   THE ALLEGED MISREPRESENTATIONS IN THE OFFERING
DOCUMENTS WERE NOT MATERIAL ...................................................251

A.   Investors in PLS During the 2005-2007 Period Were Sophisticated .................251

B.   PLS Investors Did Not Consider Loan-Level Information to Be
Material .............................................................................................252

1.   PLS Investors Did Not Generally Possess Loan-Level
Information .............................................................................252

2.   Many PLS Investors Obtained Credit Enhancement ...........................253

C.   Compliance With Specific Requirements in Underwriting
Guidelines Would Not Have Been Material to a PLS Investor .........................257

D.   PLS Investors Understood that the Appraisals on Which Some
LTV Ratios Were Based Were the Subjective Opinions of
Appraisers ...........................................................................................259

E.   PLS Investors Would Not Have Considered Owner Occupancy
Information By Itself Material .....................................................................260

F.   Freddie Mac's and Fannie Mae's Models .......................................................262

1.   Freddie Mac's DEFCAP Model ...................................................262

2.   Fannie Mae's Model and PLS Analysis .........................................264

X.   THE INDIVIDUAL DEFENDANTS .............................................................265

XI.   PLAINTIFF'S CLAIM FOR RESCISSION UNDER SECTION 12 OF
THE SECURITIES ACT AND THE VIRGINIA AND DISTRICT OF
COLUMBIA BLUE SKY LAWS ...................................................................269

A.   Freddie Mac and Fannie Mae Have Received Nearly All Principal
and Interest Payments Owed to Them ............................................................269

B.   Any Entitlement to Pre-Judgment Interest under Section 12 Should
Be Computed at the Risk-Free Interest Rate .....................................................274

# TABLE OF CONTENTS
## (*continued*)

**Page**

C.   The Virginia and District of Columbia Blue Sky Laws Provide for
Prejudgment Interest at the Rate of Six Percent ...................................................275

D.   Reduction Based on Depreciation in the Value of the Certificates
Caused by Anything Other than the Alleged Misrepresentations in
the Offering Documents ...................................................................................276

XII.   CONCLUSION ...........................................................................................276

Pursuant to this Court's Order dated January 20, 2015, defendants Nomura Holdings America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., RBS Securities Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca ("Defendants") submit the following proposed findings of fact.

## I.    BACKGROUND

### A.    Residential Mortgage-Backed Securities

1.    An asset-backed security is a type of investment vehicle in which cash-producing assets are pooled together into a trust.  (Vandell Aff. at ¶ 22.)  A residential mortgage-backed security ("RMBS") is a type of asset-backed security that is secured by a pool of residential mortgage loans.  (Vandell Aff. at ¶¶ 21-24; LaRocca at ¶ 11.)  Investors purchase the RMBS (also referred to as certificates) backed by the cash flows that derive from the underlying assets.  (Vandell Aff. at ¶ 23-24.)  In the case of an RMBS, the cash-producing assets are a pool of mortgage loans, which may include first- and/or second-lien mortgages.  (Vandell Aff. at ¶ 21-24.)

2.    In a typical RMBS transaction, the assets—the pool of mortgage loans—are transferred from the originator or sponsor to a depositor (typically a special purpose entity) which then transfers the assets to a stand-alone trust.  (LaRocca Aff. at ¶ 29.)  The originator is the entity that creates the mortgage loan and goes through the process of qualifying and approving the borrower for the mortgage loan.  (LaRocca Aff. at ¶ 13.)  The sponsor is an institution that typically initiates an RMBS transaction by selling to the depositor assets that the sponsor has either originated itself or purchased in the secondary mortgage market.  (LaRocca

Aff. at ¶ 13.)  The sponsor, often in conjunction with other parties to the securitization, then determines the structure of the securities to be issued by the trust, which often entails the creation of multiple tranches (a piece or portion of a deal or structured financing) with different levels of risk and reward.  (Lee Aff. at ¶¶ 24-25.)

        3.     The cash flows generated by the underlying borrowers' payments of principal and interest on the mortgage loans are allocated among investors in accordance with the structure of the securitization and the tranches.  (Graham Aff. at ¶ 18.)  A loan servicer collects and distributes payments to an appointed trustee, which in turn distributes the cash flows to investors.  (Vandell Aff. at ¶ 22-24; Lee Aff. at ¶ 24.)  Generally, the more senior tranches or the tranches at the top of the securitization structure receive the cash flows first, before the more subordinate or junior tranches.  (Lee Aff. at ¶ 25.)  This senior/junior structure of the RMBS is one of the ways "credit enhancement" is provided in the RMBS.  (Lee Aff. at ¶¶ 25-29.)  As part of this securitization structure, the more junior tranches are the first to suffer any losses from missed payments on the mortgage loans; therefore, these junior tranches bear the greatest risk. (Lee Aff. at ¶ 25.)

        4.     Another form of credit enhancement often built into RMBS is overcollateralization.  This means that the total principal balance of the loans backing the securitization exceeds the total principal amount owed to the tranches, so there are potentially more loans than necessary to pay the interest and principal owed to the investors who hold the certificates.  (Lee Aff. at ¶ 26.)  Credit ratings are provided by certain rating agencies and are based on the credit enhancement available to different tranches of certificates and the agencies' views on expected collateral performance.  (Richard Aff. at ¶ 86.)

**B.**     **Plaintiff and Its Allegations**

5.     This action was commenced by plaintiff, the Federal Housing Finance Agency ("FHFA"), in its capacity as conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") by a complaint, filed in this court on September 2, 2011.  The action arises from the purchase of one RMBS by Fannie Mae and six RMBS by Freddie Mac during the period November 16, 2005 to April 26, 2007.

*1.*     *Freddie Mac and Fannie Mae*

6.     Freddie Mac and Fannie Mae are "government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets."  (Amended Complaint ("Am. Compl.") at ¶ 13.) To support this mission, Freddie Mac and Fannie Mae purchased RMBS from Nomura Securities International, Inc. and other financial institutions between 2005 and 2007.  (Am. Compl. at ¶ 13; Parties' Stipulations of Law and Fact, dated Feb. 13, 2015 ("Stipulated Facts") at ¶¶ 33-35)

7.     Freddie Mac and Fannie Mae had two principal kinds of assets:  mortgage loans they purchased from originators, and mortgage-backed securities ("MBS").  (DX-43 (Freddie Mac Annual Report for 2007, dated March 23, 2007) at 1; DX-45 (Fannie Mae Form 10-K for 2006, filed with the SEC on August 16, 2007) at 4.)  The MBS consisted of "agency MBS," meaning mortgage-backed securities created by Freddie Mac and Fannie Mae, and "non-agency MBS," also referred to as private label securities ("PLS"), that Freddie Mac and Fannie Mae purchased from financial institutions not sponsored by the federal government.  (DX-50 (Freddie Mac Annual Report for 2007, dated Feb. 28, 2008) at 169; DX-45 (Fannie Mae Form 10-K for 2006, filed with the SEC on August 16, 2007) at 4-5.)

8.      During the period 2005 to 2007, Fannie Mae's Capital Markets group managed Fannie Mae's "investment activity in mortgage loans, mortgage-related securities and other liquid investments."  (DX-44 (Fannie Mae Form 10-K for 2005, filed with the SEC on May 2, 2007) at 14.)  The group purchased "mortgage loans and mortgage-related securities from mortgage lenders, securities dealers, investors and other market participants."  (*Id.*)  Fannie Mae's Capital Markets group earned most of its income from the difference, or spread, between the interest it earned on its mortgage portfolio and the interest Fannie Mae paid on debt it issued to fund this portfolio, which is referred to as Fannie Mae's net interest yield.  (*Id.*)

9.      Freddie Mac would "generate income through investment activities and credit guarantee activities focusing on three long-term business drivers:  the profitability of new business, growth and market share."  (DX-50 (Freddie Mac Annual Report for 2007, dated Feb. 28, 2008) at 4.)  Freddie Mac would "guarantee the payment of principal and interest on these mortgage-related securities in exchange for a fee," and this "guarantee increases the marketability of our mortgage-related securities, providing additional liquidity to the mortgage market."  (*Id.*)

10.      Fannie Mae's single-family credit guaranty business "works with [its] lender customers to securitize single-family mortgage loans into Fannie Mae MBS and to facilitate the purchase of single-family mortgage loans for [Fannie Mae's] mortgage portfolios."  (DX-49 (Fannie Mae Form 10-K, filed with the SEC on Feb. 27, 2008) at 4.)  Revenues from this part of Fannie Mae's business derive primarily from "guaranty fees received as compensation for assuming the credit risk on the mortgage loans underlying single-family Fannie Mae MBS and on the single-family mortgage loans held in [Fannie Mae's] portfolio" as well as "trust management income."  (*Id.* at 4-5.)

11.     During the period from January 1, 2005 to December 31, 2007, Freddie

Mac was "one of the largest purchasers of mortgage loans in the U.S." (DX-50 (Freddie Mac

Annual Report for 2007, dated Feb. 28, 2008) at 1; *see also* DX-35 (Freddie Mac Annual Report

for 2004, dated June 14, 2005) at 3.) During the period 2005 to the present, Fannie Mae has

been "the nation's largest source of financing for home mortgages." (DX-31 (Fannie Mae Form

10-Q for the quarter ended March 31, 2004, filed with the SEC on May 10, 2004) at 3; *see also*

DX-96 (Fannie Mae Form 10-K for 2013, filed with the SEC on Feb. 21, 2014) at 8-9.)

12.     Freddie Mac's principal competitors were "Fannie Mae, . . . the Federal

Home Loan Banks and other financial institutions that retain or securitize mortgages, such as

commercial and investment banks, dealers and thrift institutions." (DX-50 (Freddie Mac Annual

Report for 2007, dated Feb. 28, 2008) at 4; DX-35 (Freddie Mac Annual Report for 2004, dated

June 14, 2005) at 3.) Fannie Mae's "competitors [were] the Federal Home Loan Mortgage

Corporation, referred to as Freddie Mac, the Federal Home Loan Banks, the FHA, financial

institutions, securities dealers, insurance companies, pension funds, investment funds and other

investors." (DX-49 (Fannie Mae Form 10-K for 2007, filed with the SEC on Feb. 27, 2008) at

12.) Fannie Mae competed "to acquire mortgage assets in the secondary market both for its

investment portfolio and for securitization into Fannie Mae MBS." (DX-49 at 12.)

13.     During 2005, Freddie Mac purchased 2,227,914 home mortgage loans

from lenders around the United States. (DX-2854 (Freddie Mac Fundings and Originations by

Year).) During 2005, Fannie Mae purchased 3,090,104 home mortgage loans from more than

1,000 lenders around the United States. (DX-2855 (Fannie Mae Fundings and Origination by

Year); DX-44 (Fannie Mae Form 10-K for 2005, filed with on May 2, 2007) at 9.) Freddie Mac

and Fannie Mae either held those mortgages as part of their mortgage portfolios or sold the loans

in securitizations that they guaranteed.  (DX-39 (Freddie Mac Annual Report for 2005, dated June 28, 2006) at 1; DX-44 (Fannie Mae Form 10-K for 2005, filed with the SEC on May 2, 2007) at 5, 9.)

14.     As of December 31, 2005, Freddie Mac's "[t]otal mortgage portfolio was $1.7 trillion, while the total U.S. residential mortgage debt outstanding was estimated to be approximately $9.9 trillion."  (DX-39 (Freddie Mac Annual Report for 2005, dated June 28, 2006) at 2.)  Freddie Mac "had total assets of $806.2 billion, and total stockholders' equity of $27.2 billion, and for the year ended December 31, 2005, [Freddie Mac] reported net income of $2.1 billion."  (DX-39 (Freddie Mac Annual Report for 2005, dated June 28, 2006) at 3.)  Fannie Mae had total assets of $834.2 billion and total stockholders' equity of $39.3 billion as of December 31, 2005.  (DX-44 (Fannie Mae 10-K 2005, filed with the SEC on May 2, 2007) at F-3.)

15.     During 2006, Freddie Mac purchased 1,924,994 loans from lenders around the United States.  (DX-2855 (Freddie Mac Fundings and Originations by Year).)  During 2006, Fannie Mae purchased 2,780,197 home mortgage loans from more than 1,000 lenders around the United States.  (DX-2856 (Fannie Mae Fundings and Origination by Year); DX-45 (Fannie Mae Form 10-K for 2006, filed with the SEC on Aug. 16, 2007) at 4.)  Freddie Mac and Fannie Mae either held those mortgages as part of their mortgage portfolios or sold those loans in securitizations that they guaranteed.  (DX-43 (Freddie Mac Annual Report for 2006, dated March 23, 2007) at 1; DX-45 (Fannie Mae Form 10-K for 2006, filed with the SEC on Aug. 16, 2007) at 4.)

16.     As of December 31, 2006, Freddie Mac's "[t]otal mortgage portfolio was $1.8 trillion, while the total U.S. residential mortgage debt outstanding was estimated to be

approximately $10.9 trillion."  (DX-43 (Freddie Mac Annual Report for 2006, dated March 23,

2007) at 2.)  As of December 31, 2006, Freddie Mac "had total assets of $813.1 billion and total

stockholders' equity of $28.3 billion, and for the year ended December 31, 2006, [Freddie Mac]

reported net income of $2.2 billion."  (DX-43 (Freddie Mac Annual Report for 2006, dated

March 23, 2007) at 3.)  Fannie Mae's mortgage credit book of business, which included

investments in PLS, "was $2.5 trillion as of December 31, 2006, or approximately 23% of total

U.S. residential mortgage debt outstanding."  (DX-44 (Fannie Mae Form 10-K for 2005, filed

with the SEC on May 2, 2007) at 2.)

   17. During 2007, Freddie Mac purchased 2,058,250 home mortgage loans

from lenders around the United States.  (DX-2855 (Freddie Mac Fundings and Originations by

Year).)  During 2007, Fannie Mae purchased 3,157,356 home mortgage loans from

approximately 1,000 lenders around the United States.  (DX-2856 (Fannie Mae Fundings and

Origination by Year); DX-49 (Fannie Mae Form 10-K for 2007, filed with the SEC on Feb. 27,

2008) at 3.)  Freddie Mac and Fannie Mae either held those mortgages as part of their mortgage

portfolios or sold those loans in securitizations that they guaranteed.  (DX-50 (Freddie Mac

Annual Report for 2007, dated Feb. 28, 2008) at 1; DX-49 (Fannie Mae Form 10-K for 2007,

filed with the SEC on Feb. 27, 2008) at 3.)

   18. As of December 31, 2007, Freddie Mac's "total mortgage portfolio, which

includes [Freddie Mac's] retained portfolio and credit guarantee portfolio, was $2.1 trillion,

while the total U.S. residential mortgage debt outstanding, which includes single-family and

multifamily loans, was approximately $11.8 trillion."  (DX-50 (Freddie Mac Annual Report for

2007, dated Feb. 28, 2008) at 2.)  As of December 31, 2007, Freddie Mac "had total assets of

$794.4 billion and total stockholders' equity of $26.7 billion, and for the year ended December

31, 2007, [Freddie Mac] reported a net loss of $3.1 billion."  (DX-50 (Freddie Mac Annual

Report for 2007, dated Feb. 28, 2008) at 4.)  Freddie Mac was "primarily a buy and hold investor

in mortgage assets," including private-label residential mortgage-backed securities.  (DX-50

(Freddie Mac Annual Report for 2007, dated Feb. 28, 2008) at 6.)

        19.    Fannie Mae's mortgage credit book of business, which included

investments in PLS, "was $2.6 trillion as of March 31, 2007, or approximately 23% of total U.S.

residential mortgage debt outstanding."  (DX-45 (Fannie Mae Form 10-K for 2006, filed with the

SEC on Aug. 16, 2007) at 2.)  It grew to "$2.8 trillion as of September 30, 2007."  (DX-49

(Fannie Mae Form 10-K for 2007, filed with the SEC on Feb. 27, 2008) at 1.)

        20.    During the period September 6, 2005 to January 23, 2008, Freddie Mac

purchased $174,198,763,517 worth of PLS.  (DX-2832 (Plaintiff's Response to Defendants'

Fourth Set of Interrogatories, dated March 25, 2013) at Exhibit B.)  During the period September

6, 2005 to January 23, 2008, Fannie Mae purchased $83,996,070,197 worth of PLS.  (DX-2831

(Plaintiff's Response to Defendants' Fourth Set of Interrogatories, dated March 25, 2013) at

Exhibit A.)

        21.    As James Lockhart, former director of FHFA and its predecessor agency,

testified, Freddie Mac and Fannie Mae were the "gorilla[s]" in the mortgage market  (Lockhart

Tr. at 238:10-15) and "certainly had more data and more knowledge about the mortgage market

than probably anybody else."  (Lockhart Tr. at 270:11-14.)

        ***2.    FHFA***

        22.    FHFA is a federal agency created on July 30, 2008 pursuant to the

Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654

(2008) (codified at 12 U.S.C. § 4617), to oversee Fannie Mae, Freddie Mac, and the Federal

Home Loan Banks.  Fannie Mae and Freddie Mac were created by the government to further

housing objectives and policies.  12 U.S.C. § 4501.  Federal Home Loan Banks are 12 banks

chartered by Congress for the purpose of providing member financial institutions with financial

products and services that assist and enhance the financing of housing and community lending.

12 U.S.C. § 1421, *et seq.*

      23.    On September 6, 2008, pursuant to HERA, FHFA, under the direction of

its Director, James Lockhart, placed Fannie Mae and Freddie Mac into conservatorship and

appointed FHFA as conservator.  (DX-802 (Memorandum from Christopher Dickerson, dated

Sept. 6, 2008) at 3; DX-803 (Memorandum from Christopher Dickerson, dated Sept. 6, 2008)

at 4.)

### 3.    *Plaintiff's Allegations and Claims*

      24.    Plaintiff alleges four categories of statements in the prospectus

supplements for the Securitizations that it claims were false or misleading:  (i) statements in the

Offering Documents about loan-to-value ("LTV") ratios for loans underlying the Securitizations;

(ii) statements in the Offering Documents about compliance with originator's underwriting

guidelines or specific undewriting criteria disclosed in the Offering Documents; (iii) statements

in the Offering Documents about the percentage of loans in the Securitizations where the

borrower intended to occupy the mortgaged property; and (iv) statements in the Offering

Documents about the credit ratings of the Certificates.

      25.    Plaintiff seeks a stutory remedy based on rescission of its purchases under

Section 12 of the Securities Act of 1933, 15 U.S.C. § 77l, and under the District of Columbia and

Virginia blue sky laws, D.C. Code § 31-5606.05 and Va. Code § 13.1-522.

### C.    Nomura

26.    Defendant Nomura Holding America Inc. is a holding company, and Nomura Securities International, Inc., Nomura Credit & Capital, Inc., Nomura Asset Acceptance Corporation, and Nomura Home Equity Loan, Inc. are direct or indirect subsidiaries of Nomura Holding America Inc.  (Answer and Affirmative Defenses of the Nomura Defendants to the Amended Complaint ("Nomura Answer") at ¶ 14; Prahofer Tr. at 208:19-25, 209:22-210:3.) Nomura Holding America Inc. had no direct participation in the purchase of mortgage loans, the securitization of those loans, the creation of the Offering Documents for those securitizations, or the sale of those securitizations to investors during the 2005-2007 time period.  (Findlay Aff. at ¶¶ 15-16; Prahofer Tr. at 232:7-19, 260:16-19.)  Nomura Holding America Inc. was not the direct corporate parent of Nomura Asset Acceptance Corporation ("NAAC") or Nomura Home Equity Loan, Inc. ("NHELI").  During the 2004 to 2007 period, the direct corporate parent of NAAC and NHELI was Nomura Asset Capital Corporation until October 2006, and then Nomura America Mortgage Finance.  (DX-354 at NOM-FHFA_04434374; DX-430 at NOM-FHFA_04434376.)

27.    Nomura Securities International, Inc. ("Nomura Securities") is a New York corporation with its principal place of business in New York and was the underwriter or co-underwriter for three of the Securitizations—NAA 2005-AR6, NHELI 2006-FM1, and NHELI 2006-FM2.  (Nomura Answer at ¶ 18.)  Nomura Securities played no role "in the issuance" of the Certificates.  (Prahofer Tr. at 259:13-19.)

28.    Nomura Credit & Capital, Inc. ("NCCI") is a Delaware corporation with its principal place of business in New York and was the seller or sponsor for all seven Securitizations.  (Nomura Answer at ¶¶ 14-15.)  NCCI was the entity that purchased and

performed due diligence on whole loans.  (Graham Aff. at ¶ 19, 25-31; FindlayAff. at ¶ 17; DX-3 at NOM-FHFA_04620903, NOM-FHFA_04621036.)  NCCI was not the corporate parent of Nomura Securities, NAAC, or NHELI during the 2005-2007 time period.  (Findlay Aff. at ¶ 18; DX-354 at NOM-FHFA_04434374; DX-430 at NOM-FHFA_04434376.)  NCCI had no role in the sale of certificates to investors, and could not require or otherwise force Nomura Securities to sell certificates to investors; Nomura Securities had no obligation to do so and could decide whether or not to sell certificates to investors.  (Findlay Aff. at ¶ 18; DX-1 at NOM-FHFA_04811962;  DX-2 at NOM-FHFA_04729626.)

29.   NAAC is a Delaware corporation with its principal place of business in New York and was the depositor for one Securitization, NAA 2005-AR6.  (Nomura Answer at ¶ 16, 35; Amended Complt. at Tbl. 1.)

30.   NHELI is a Delaware corporation with its principal place of business in New York, and was the depositor for the other six Securitizations.  (Nomura Answer at ¶ 17, 35; Amended Complt. at Tbl. 1.)

31.   Neil Spagna, the head of NCCI's Credit Group from July 2006 through November 2007, testified that "Nomura was a relatively small player in the residential mortgage-backed securities industry" during this time period.  (Spagna Aff. at ¶ 30.)  N. Dante LaRocca, who was a Managing Director at Nomura Securities, and later NCCI, from 2001 through 2008, Steven Katz, who was a trader at Nomura Securities, and later NCCI, from June 2007 through December 2007, and Randall Lee, who was a collateral analyst and later Assistant Vice President at Nomura Securities, and later NCCI, from October 2004 through April 2008, confirm that Nomura was not a major player in the RMBS business.  (LaRocca Aff. at ¶ 8; Katz Aff. at ¶ 4.)

-11-

32.     Nomura did not originate mortgage loans, but rather purchased loans from originators or intermediaries either in pools of loans or on an individual basis through a loan-by-loan channel.  (Graham Aff. at ¶¶ 18-19.)  Nomura structured securitizations backed by the mortgage loans it purchased and sold certificates from the securitization to investors.  (Graham Aff. ¶¶ 32, 38.)

33.     Freddie Mac's Alternative Market Operations ("AMO") group reviewed Nomura's operations in August 2004 and March 2006.  (DX-111 (Nomura AMO Review, dated Aug. 31, 2004, FHFA19172000); DX-122 (Nomura AMO Review, dated March 14, 2006, FHFA13253477)).)  Fannie Mae conducted at least one operational review of Nomura in September 2005.  (DX-2804 (Email from Gregory Johnson, and attachments, dated Aug. 14, 2007, FHFA01644370) at FHFA01644372.)  The report from that review was not produced in discovery in this Action.

### D.     RBS Securities Inc.

34.     RBS Securities Inc. ("RBSSI") is a Delaware Corporation with its principal place of business in Stamford, Connecticut.  Prior to April 2009, RBSSI was known as Greenwich Capital Markets, Inc.  As a part of its business, RBSSI from time to time underwrote securities, including certain of the Certificates at issue in this action.  (Stipulated Facts at ¶¶ 4, 56-57.)

### E.     The Securitizations and the Certificates Purchased by Freddie Mac and Fannie Mae

#### 1.     NAA 2005-AR6

35.     The sponsor for the 2005-AR6 securitization (NCCI) purchased loans from mortgage loan originators.  NCCI purchased loans that would later back the 2005-AR6 securitization from a number of originators, including Alliance Bancorp (originator of 20.60% of

the loans in 2005-AR6 by aggregate principal balance), Silver State Mortgage (originator of

11.82% of the loans in 2005-AR6 by aggregate principal balance), and Aegis Mortgage

(originator of 11.21% of the loans in 2005-AR6 by aggregate principal balance).  (DX-1 (2005-

AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-

FHFA_04811943.)

   36. In an email dated November 14, 2005 from Nomura Securities employee

John Kistler to Fannie Mae trader Shayan Salahuddin, Kistler asked whether Salahuddin "would

like [Nomura] to go down the path of splitting the pool" of mortgage loans backing the 2005-

AR6 securitization into "conforming/non-conforming" pools.  (DX-2801 (Email from John

Kistler, dated Nov. 14, 2005, FHFA00916438) at FHFA00916438.)

   37. Fannie Mae agreed to purchase the 2005-AR6 III-A-1 certificate on

November 16, 2005.  (DX-22 (AR6 Trade Confirmation, dated Nov. 30, 2005, NOM-

FHFA_05783828) at NOM-FHFA_05783828.)  This certificate was a senior tranche in the

securitization and was expected to receive the highest credit rating of AAA or Aaa.  (DX-1

(2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-

FHFA_04811808, NOM-FHFA_04811813.)

   38. On November 30, 2005, the certificates in the 2005-AR6 securitization

were rated by the credit rating agencies Standard & Poor's ("S&P") and by Moody's Investors

Services, Inc. ("Moody's").  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005,

NOM-FHFA_04811802) at NOM-FHFA_04811813; DX-2782 (NAA 2005-AR6 Closing

Documents, dated Nov. 30, 2005, NOM-FHFA_00000139) at NOM-FHFA_00001148-1150;

Vandell Aff. at ¶ 20.)  S&P assigned the III-A-1 certificate Fannie Mae had agreed to purchase a

credit rating of AAA.  (DX-1 at NOM-FHFA_04811813.)  Moody's assigned the III-A-1

certificate Fannie Mae had agreed to purchase a credit rating of Aaa.  (DX-1 at NOM-FHFA_04811813.)  These ratings were the highest grades offered by S&P and Moody's.  (Vandell Aff. at ¶ 128.)

39.     NCCI pooled together the loans it had purchased and transferred them to the depositor, which for the 2005-AR6 securitization was NAAC.  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811802, NOM-FHFA_04811807; Vandell Aff. at ¶ 20.)  NAAC created a trust, to which it transferred the loans it had acquired, which was the issuer.  (DX-1 at NOM-FHFA_04811802; Vandell Aff. at ¶ 20.)  The issuer for 2005-AR6 was NAAC, Alternative Loan Trust, Series 2005-AR6.  In exchange for the loans, the trust issued certificates that were transferred to NAAC.  (DX-1 at NOM-FHFA_04811802; Vandell Aff. at ¶¶ 21-24.)  NAAC then transferred those certificates to the underwriter, Nomura Securities, for sale to investors.  (DX-1 at NOM-FHFA_04811802; Vandell Aff. at ¶¶ 21-24.)

40.     Fannie Mae received the certificate from Nomura Securities on the settlement date, November 30, 2005.  (DX-22 (AR6 Trade Confirmation, dated Nov. 30, 2005, NOM-FHFA_05783828) at NOM-FHFA_05783828.)  The certificate, backed by Alt-A collateral (DX-316 (Email from Kin Chung, and attachments, dated April 28, 2006, FHFA00010110) at FHFA00010176), was purchased by Fannie Mae for $65,979,706.76 (DX-22 at NOM-FHFA_05783828).

41.     After selling the certificate to Fannie Mae, Nomura Securities transferred the funds it received back to NAAC as payment for the certificate.  NAAC, in turn, transferred those funds to NCCI as payment for the pool of loans.  (DX-1 (2005-AR6 Prospectus

Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811802, NOM-FHFA_04811807; Vandell Aff. at ¶¶ 20-24.)

42.     The 2005-AR6 securitization was issued pursuant to a registration statement, dated July 22, 2005, and an amended registration statement, dated August 8, 2005; and a prospectus, dated September 27, 2005.  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811802, NOM-FHFA_04811971; DX-10 (Registration Statement, dated July 22, 2005); DX-11 (Registration Statement Amendment, dated Aug. 8, 2005).)  Nomura issued a prospectus supplement for the 2005-AR6 securitization on November 29, 2005.  (DX-1 at NOM-FHFA_04811802.)

43.     The face value of the tranches that were subordinate to the 2005-AR6 III-A-1 certificate, the Class M-1, M-2, M-3, M-4, and M-5 tranches, and the overcollateralization for the securitization, represented by the Class X tranche, was $64,412,464.  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811802, 04811809.)  Fannie Mae's certificate would not incur losses until the actual losses arising from defaults of loans in the underlying mortgage pool (the unpaid principal balance less any recovery) exceeded the overcollateralization balance and the principal balance of the subordinated tranches.  (DX-1 at NOM-FHFA_04811802, 04811809; Vandell Aff. at ¶ 25; Lee Aff. at ¶ 10.)

44.     The prospectus supplement explained that the loan pool NAAC purchased from NCCI was divided into three groups, which in turn backed different certificates issued from 2005-AR6.  The 2005-AR6 III-A-1 certificate purchased by Fannie Mae was backed by the Group III pool, which contained 376 loans with an aggregate principal balance of $79,889,908.

-15-

(DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at

NOM-FHFA_04811808, NOM-FHFA_04811833.)

45. The Cut-Off Date for 2005-AR6 was November 1, 2005. (DX-1 (2005-

AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-

FHFA_04811807.) The average principal balance of the Group III loans at origination was

$212,569, and the average principal balance was $212,473 as of the Cut-Off Date. (DX-1 at

NOM-FHFA_04811856.) The prospectus supplement explained that the loans in Group III were

"adjustable-rate mortgage loans secured by first liens on residential real properties" and had "an

initial fixed rate period of five years." (DX-1 at NOM-FHFA_04811808.)

46. The prospectus supplement disclosed that the average FICO credit score of

the borrowers of the Group III loans was 707. (DX-1 (2005-AR6 Prospectus Supplement, dated

Nov. 29, 2005, NOM-FHFA_04811802) at  NOM-FHFA_04811814.) The prospectus

supplement also disclosed that borrowers for 61 loans in Group III (16.2%) had a FICO credit

score of 660 or below, and that a FICO credit score was unavailable for one borrower with a loan

in Group III. (DX-1 at NOM-FHFA_04811861.) These 62 loans represented 17.78% of the

aggregate principal balance of the Group III loans as of the Cut-Off Date. (DX-1 at NOM-

FHFA_04811861.)

47. The prospectus supplement disclosed that the average original LTV ratio

of the Group III loans was 74.68% (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29,

2005, NOM-FHFA_04811802) at NOM-FHFA_04811814), and that four loans in Group III

(1.1%) had an original LTV ratio of 80.01% or higher. (DX-1 at NOM-FHFA_04811861.)

These four loans represented 0.93% of the aggregate principal balance as of the Cut-Off Date.

(DX-1 at NOM-FHFA_04811861.)

48.    The prospectus supplement also disclosed that 76.36% of the Group III loans had documentation types other than "Full/Alternative."  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811814.)  279 of the loans in Group III (74.2%) were "Reduced" documentation (meaning that "verification of either a borrower's income or assets, but not both, is undertaken by the originator"), "No Ratio" (meaning that "certain borrowers with acceptable compensating factors will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken"), "Stated/Stated," or "None," *i.e.*, no documentation loans (meaning that "no verification of a borrower's income or assets is undertaken by the originator.  The underwriting for such Mortgage Loans may be based primarily or entirely on an appraisal of the Mortgaged Property, the loan-to-value ratio at origination and/or the borrower's credit score."). (DX-1 at NOM-FHFA_04811862, NOM-FHFA_04811896.)  These loans represented 76.37% of the aggregate principal balance as of the Cut-Off Date.  (DX-1 at NOM-FHFA_04811862.)

49.    The prospectus supplement disclosed that 269 (71.5%) of the loans in Group III were purchase-money loans, *i.e.*, loans used to purchase a new home, as opposed to "'Refinance Loans," which "are loans made to refinance existing loans."  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811862, NOM-FHFA_04811976.)  These purchase-money loans represented 69.92% of the aggregate principal balance as of the Cut-Off Date.  (DX-1 at NOM-FHFA_04811862.) The remaining loans were for refinance transactions.  (DX-1 at NOM-FHFA_04811862.)

50.    The prospectus supplement also disclosed that 188 of the loans in Group III (50%) were "Owner-Occupied."  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29,

2005, NOM-FHFA_04811802) at NOM-FHFA_04811862.)  These loans represented 56.59% of

the outstanding principal balance as of the Cut-Off Date.  (DX-1 at NOM-FHFA_04811862.)

### 2.    *NHELI 2006-FM1*

51.    The sponsor for 2006-FM1, NCCI, purchased the loans that would later

back the 2006-FM1 securitization from a single originator, Fremont Investment & Loan

("Fremont").  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-

FHFA_04729474) at NOM-FHFA_04729479.)

52.    In an email dated December 9, 2005, Steven Katz, a Managing Director

for credit and whole loan trading employed by Nomura Securities, emailed Nomura Securities

employee Cindy Ross, attaching a loan tape of a proposed security, 2006-FM1, and asked her to

"have the folks at Freddie run through [the loan] tape and send us loanids that accomplish their

housing goals."  (DX-2802 (Email from Steven Katz, dated Dec. 9, 2005, NOM-

FHFA_04835271) at NOM-FHFA_04835271.)  In an email dated December 9, 2005, from

Freddie Mac employee Richard Olek to Cindy Ross, Freddie Mac stated that it had analyzed the

loans for the proposed 2006-FM1 loan pool and rejected 1,231 loans, while accepting 2,751

loans.  (DX-257 (Email from Cindy Ross, and attachments, dated Dec. 9, 2005, NOM-

FHFA_05265884) at NOM-FHFA_05265884-5885.)  Katz summarized Freddie Mac's

December 9, 2005 email by telling fellow Nomura Securities employees to "keep in mind this is

what Freddie wants in their pool" of mortgage loans backing the 2006-FM1 securitization.  (DX-

258 (Email from Steven Katz, and attachments, dated Dec. 12, 2005, NOM-FHFA_05230024) at

NOM-FHFA_05230024.)

53.    Freddie Mac agreed to purchase the 2006-FM1 I-A certificate on

December 19, 2005, based on documentation showing the trade date for the certificate.  (DX-24

(FM1 Trade Confirmation, dated Jan. 31, 2006, NOM-FHFA_05783832) at NOM-FHFA_05783832.)  Based on its analysis of the securitization, Freddie Mac expected a return on equity of 21.3% on 2006-FM1.  (DX-23 (FM1 Trade Package, dated Dec. 19, 2005, FHFA00001131) at FHFA00001131.)

54.     On January 30, 2006, S&P, Moody's, and Dominion Bond Rating Service ("DBRS") issued credit ratings for the 2006-FM1 certificates.  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729486; DX-2783 (NHELI 2006-FM1 Closing Documents, dated Jan. 30, 2006, NOM-FHFA_00001298) at NOM-FHFA_00002425-2430.)  S&P and DBRS assigned the I-A certificate Freddie Mac had agreed to purchase a credit rating of AAA.  (DX-2 at NOM-FHFA_04729486.)  Moody's assigned the I-A certificate a credit rating of Aaa.  (DX-2 at NOM-FHFA_04729486.)

55.     NCCI transferred the loans it had purchased to the depositor, NHELI, which in turn created the issuer, Nomura Home Equity Loan Trust, Series 2006-FM1, and transferred the loans to that entity.  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729474; Vandell Aff. at ¶¶ 20-24.)  The issuer then issued certificates that were transferred back to NHELI, which in turn transferred them to the underwriter, Nomura Securities, for sale to investors.  (DX-2 at NOM-FHFA_04729474; Vandell Aff. at ¶ 20.)

56.     Freddie Mac received the certificate from Nomura Securities on the settlement date, January 31, 2006.  (DX-24 (FM1 Trade Confirmation, dated Jan. 31, 2006, NOM-FHFA_05783832) at NOM-FHFA_05783832.)  Freddie Mac purchased the certificate, which was backed by subprime collateral (DX-15 (FM1 Credit Approval, dated Dec. 16, 2005, FHFA13013603) at FHFA13013604), for $309,591,187.35 (DX-24 at NOM-FHFA_05783832).

57.     After selling the certificates to investors such as Freddie Mac, Nomura

Securities remitted the funds received for the certificates to NHELI, and then NHELI transferred

those funds to NCCI as payment for the loan pool.  (DX-2 (2006-FM1 Prospectus Supplement,

dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729474; Vandell Aff. at ¶¶ 20-

24.)

58.     The 2006-FM1 securitization was issued pursuant to a registration

statement, dated July 7, 2005 and an amended registration statement, dated July 8, 2005; a

prospectus, dated October 27, 2005; and a prospectus supplement, dated January 27, 2006.  (DX-

2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-

FHFA_04729474, NOM-FHFA_04729635; DX-8 (Registration Statement, dated July 7, 2005);

DX-9 (Registration Statement Amendment, dated July 8, 2005).)

59.     The prospectus supplement disclosed that the 2006-FM1 I-A certificate

purchased by Freddie Mac was protected by credit enhancement in the form of subordinated

tranches, the Class M-1, M-2, M-3, M-4, M-5, M-6, M-7, M-8, M-9 tranches and Class B-1 and

B-2 tranches, and overcollateralization, represented by the Class X tranche.  (DX-2 (2006-FM1

Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_0729474,

NOM-FHFA_04729481.)  The face value of these subordinated tranches and

overcollateralization was $220,837,934.  (DX-2 at NOM-FHFA_0729474, NOM-

FHFA_04729481; Lee Aff. at ¶ 31.)

60.     The prospectus supplement explained that the underlying loans were split

into various groups that backed different certificates.  The 2006-FM1 I-A certificate purchased

by Freddie Mac was backed by the Group I mortgage loans, which consisted of 2,532 loans with

an aggregate principal balance of $405,436,188.  (DX-2 (2006-FM1 Prospectus Supplement,

dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729480, NOM-FHFA_04729487.)

61.     The prospectus supplement disclosed that the average principal balance of the Group I loans at origination was $160,609, and the average principal balance was $160,125 as of the Cut-Off Date.  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729510.)

62.     The prospectus supplement also explained that the Group I loans were secured by first and second liens on properties, and were a mix of both fixed rate and adjustable rate mortgage ("ARM") loans.  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729480.)  587 loans in Group I (23.2%) were fixed rate loans, representing 11.74% of the aggregate principal balance as of the Cut-Off Date, and the remainder were ARM loans.  (DX-2 at NOM-FHFA_04729512.)  2,097 of the loans in Group I (82.8%) were secured by first liens, representing 95.19% of the aggregate principal balance as of the Cut-Off Date, and the remainder were secured by second liens.  (DX-2 at NOM-FHFA_04729512.)

63.     The prospectus supplement disclosed that the weighted average FICO credit score of the borrowers of the loans in Group I was 612.  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729487.)  The prospectus supplement also noted that 2,044 loans in Group I (80.7%) had a FICO credit score of 660 or below.  (DX-2 at NOM-FHFA_04729515.)  These loans represented 79.88% of the aggregate principal balance as of the Cut-Off Date.  (DX-2 at NOM-FHFA_04729515.)

64.     The prospectus supplement also made disclosures regarding the LTV ratio of the loans, including the combined LTV ratio—a ratio that includes the balance of the first lien

as well as any second lien.  The prospectus supplement explained that the weighted average

original LTV ratio of the loans was 81.07%, while the weighted average combined LTV ratio,

*i.e.*, the LTV ratio accounting for both the first and second lien, was 87.17%.  (DX-2 (2006-FM1

Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-

FHFA_04729487.)  1,140 loans in Group I (45%) had an original LTV ratio of 80.01% or higher.

(DX-2 at NOM-FHFA_04729514.)  These loans represented 37% of the aggregate principal

balance as of the Cut-Off Date.  (DX-2 at NOM-FHFA_04729514.)  The prospectus supplement

for 2006-FM1 further disclosed that 1,794 of the loans in Group I (70.9%) had a combined LTV

ratio of 80.01% or higher.  (DX-2 at NOM-FHFA_04729514.)  These loans represented 64.62%

of the aggregate principal balance as of the Cut-Off Date.  (DX-2 at NOM-FHFA_04729514.)

65.     The prospectus supplement also disclosed that 1,018 of the loans in Group

I (40.2%) were "Reduced/Limited" documentation or "Stated" loans.  (DX-2 (2006-FM1

Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-

FHFA_04729515.)  These loans represented 45.15% of the aggregate principal balance as of the

Cut-Off Date.  (DX-2 at NOM-FHFA_04729515.)

66.     In addition, the prospectus supplement disclosed that 1,104 of the loans in

Group I (43.6%) were purchase-money loans.  (DX-2 (2006-FM1 Prospectus Supplement, dated

Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729516.)  These loans represented

33.68% of the aggregate principal balance as of the Cut-Off Date.  (DX-2 at NOM-

FHFA_04729516.)  The remaining loans were refinance transactions.  (DX-2 at NOM-

FHFA_04729516.)

67.     The prospectus supplement further disclosed that 2,248 of the loans in

Group I (88.8%) were designated as "Owner-Occupied."  (DX-2 (2006-FM1 Prospectus

Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729516.)  These

loans represented 88.63% of the outstanding principal balance as of the Cut-Off Date.  (DX-2 at

NOM-FHFA_04729516.)

### 3.   NHELI 2006-HE3

68.   The sponsor for 2006-HE3 was NCCI, and NCCI purchased the loans that

would later back the 2006-HE3 securitization from a number of originators, including People's

Choice Home Loan, Inc. (originator of 38.19% of the loans), First NLC Financial Services, LLC

(originator of 14.47% of the loans), and Equifirst Corporation (originator of 10.77% of the

loans).  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006,

NOM-FHFA_04620885) at NOM-FHFA_04620890-0891.)

69.   In an email sent from Freddie Mac Director of Deal Management Richard

Olek to Nomura Securities collateral analyst Michael Orfe, dated July 13, 2006, Freddie Mac

stated that it had analyzed the loan pool backing the proposed 2006-HE3 securitization and

rejected 992 loans from the proposed loan pool, while accepting 3,981 loans.  (DX-342 (Email

from Richard Olek, and attachments, dated June 13, 2006, NOM-FHFA_05783870 ) at NOM-

FHFA_05783871.)

70.   Freddie Mac agreed to purchase the 2006-HE3 I-A-1 certificate on August

15, 2006.  (DX-26 (HE3 Trade Package Correction, dated Aug. 16, 2006, FHFA00002480 ) at

FHFA00002480.)  Based on its analysis of 2006-HE3, Freddie Mac expected a return on equity

of 16.65%.  (DX-26 at FHFA00002480.)

71.   On August 31, 2006, the certificates in the 2006-HE3 securitization were

assigned credit ratings by S&P, Moody's, DBRS, and Fitch Ratings ("Fitch").  (DX-3 at NOM-

FHFA_04620899; DX-2785 (NHELI 2006-HE3 Closing Documents, dated Aug. 31, 2006,

NOM-FHFA_00004835) at NOM-FHFA_00006538-6544.)  S&P, DBRS, and Fitch assigned the I-A-1 certificate Freddie Mac had agreed to purchase a credit rating of AAA.  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620899.)  Moody's assigned the I-A-1 certificate Freddie Mac had agreed to purchase a credit rating of Aaa.  (DX-3 at NOM-FHFA_04620899.)

72.      NCCI transferred the loans it had purchased to the depositor, NHELI, which created the issuer, Nomura Home Equity Loan Trust, Series 2006-HE3.  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620885; Vandell Aff. at ¶¶ 20-24.)  The trust issued the certificates and transferred them to NHELI, which transferred them to the underwriters, Nomura Securities and RBSSI.  (DX-3 at NOM-FHFA_04620885; Vandell Aff. at ¶ 20.)  Nomura Securities and RBSSI sold the certificates to investors; RBSSI sold the 2006-HE3 I-A-1 certificate to Freddie Mac.  (Stipulated Facts at ¶ 35.)

73.      Freddie Mac received the 2006-HE3 I-A-1 certificate from RBSSI on the settlement date, August 31, 2006.  (DX-26 (HE3 Trade Package Correction, dated Aug. 16, 2006, FHFA00002480) at FHFA00002480.)  Freddie Mac purchased the certificate, which was backed by subprime collateral (DX-16 (HE3 Credit Approval, dated Aug. 11, 2006, FHFA04568773) at FHFA04568774), for $441,739,000.00 (DX-2605 (Exhibit B to FHFA's Second Set of Objections and Responses to Defendants' Third Set of Interrogatories, dated March 27, 2013)).

74.      After selling the certificates to investors such as Freddie Mac, the underwriters remitted the funds received from investors to NHELI, which transferred the funds to NCCI as payment for the loan pool.  (DX-3 at NOM-FHFA_04620885; Vandell Aff. at ¶ 20.)

-24-

75.     The 2006-HE3 securitization was issued pursuant to a registration

statement dated February 28, 2006, and amended registration statements, dated April 6 and April

13, 2006; a prospectus dated April 18, 2006; and a prospectus supplement, dated August 29,

2006.  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885)

at NOM-FHFA_04620885, NOM-FHFA_04621083; DX-12 (Registration Statement, dated Feb.

28, 2006); DX-13 (Registration Statement Amendment, dated April 6, 2006); DX-14

(Registration Statement Amendment, dated April 13, 2006).)

76.     The prospectus supplement set forth the fact that the 2006-HE3 I-A-1

certificate purchased by Freddie Mac was protected by credit enhancement in the form of

subordinated tranches, the Class M-1, M-2, M-3, M-4, M-5, M-6, M-7, M-8, and M-9 tranches

and the Class B-1 and B-2 tranches, and overcollateralization, represented by the Class X

tranche.  The face value of the subordinated tranches was $264,970,098.  (DX-3 (2006-HE3

Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-

FHFA_04620885, NOM-FHFA_04620892-0893.)

77.     The prospectus supplement explained that the 2006-HE3 I-A-1 certificate

purchased by Freddie Mac was backed by the Group I mortgage loans, which consisted of 3,618

loans with an aggregate principal balance of $586,249,148.  (DX-3 (2006-HE3 Prospectus

Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620892, NOM-

FHFA_04620900.)

78.     The prospectus supplement disclosed that the average principal balance of

the Group I loans at origination was $162,546, and the average principal balance was $162,037

as of the Cut-Off Date of the prospectus supplement.  (DX-3 (2006-HE3 Prospectus Supplement,

dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620928.)

-25-

79.     The prospectus supplement also explained that 950 loans in Group I

(26.3%) were fixed rate loans, representing 19.70% of the aggregate principal balance as of the

Cut-Off Date, while the remainder were ARM loans.  (DX-3 (2006-HE3 Prospectus Supplement,

dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620929.)  The prospectus

supplement further disclosed that 3,315 of the loans in Group I (91.6%) were first lien loans,

representing 97.77% of the aggregate principal balance as of the Cut-Off Date, and the remainder

were secured by second liens.  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006,

NOM-FHFA_04620885) at NOM-FHFA_04620929.)

80.     The prospectus supplement disclosed that the weighted average FICO

score of the borrowers of the loans in Group I was 607.  (DX-3 (2006-HE3 Prospectus

Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620900.)  The

prospectus supplement further explained that borrowers of 3,067 loans in Group I (84.8%) had a

credit score of 660 or below.  (DX-3 at NOM-FHFA_04620932.)  These loans represented

84.67% of the aggregate principal balance as of the Cut-Off Date.  (DX-3 at NOM-

FHFA_04620932.)

81.     The prospectus supplement disclosed that the weighted average original

LTV ratio of the loans was 78.97%.  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29,

2006, NOM-FHFA_04620885) at NOM-FHFA_04620900.)  The weighted average combined

LTV ratio was 82.05%.  (DX-3 at NOM-FHFA_04620900.)  The prospectus supplement set

forth the fact that 1,645 loans in Group I (45.5%) had an original LTV ratio of 80.01% or higher.

(DX-3 at NOM-FHFA_04620931.)  These loans represented 41.2% of the aggregate principal

balance as of the Cut-Off Date.  (DX-3 at NOM-FHFA_04620931.)  In addition, 2,200 of the

loans in Group I (60.8%) had a combined LTV ratio of 80.01% or higher.  (DX-3 at NOM-

-26-

FHFA_04620931.)  These loans represented 56.32% of the aggregate principal balance as of the

Cut-Off Date.  (DX-3 at NOM-FHFA_04620931.)

82.     The prospectus supplement disclosed that 1,405 of the loans in Group I

(38.8%) were "Verified Income/Stated Assets," "Stated Income/Verified Assets," or

"Stated/Stated Documentation" loans.  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug.

29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620933.)  These loans represented

42.31% of the aggregate principal balance as of the Cut-Off Date.  (DX-3 at NOM-

FHFA_04620933.)

83.     The prospectus supplement also disclosed that 984 of the loans in Group I

(27.2%) were purchase-money loans.  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29,

2006, NOM-FHFA_04620885) at NOM-FHFA_04620933.)  These loans represented 19.60% of

the aggregate principal balance as of the Cut-Off Date.  (DX-3 at NOM-FHFA_04620933.)  The

remaining loans were refinance transactions.  (DX-3 at NOM-FHFA_04620933.)

84.     The prospectus supplement further disclosed that 3,239 of the loans in

Group I (89.5%) were designated as "Owner-Occupied."  (DX-3 (2006-HE3 Prospectus

Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620933.)  These

loans represented 89.59% of the outstanding principal balance as of the Cut-Off Date.  (DX-3 at

NOM-FHFA_04620933.)

### 4.     NHELI 2006-FM2

85.     The sponsor for the securitization, NCCI, purchased all of the underlying

loans from the originator Fremont.  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30,

2006, NOM-FHFA_04638315) at NOM-FHFA_04638320-21.)

86.     In an email dated July  6, 2006, from Freddie Mac Senior Risk Analyst Chad Levrini to Steve Katz of Nomura Securities, Freddie Mac stated that it had analyzed the loans backing the proposed 2006-FM2 securitization and rejected 599 loans from the proposed loan pool, while accepting 5,128 loans.  (DX-2606 (Email from Chad Levrini, and attachments, dated July 6, 2006, NOM-FHFA_05496486, NOM-FHFA_05496488, NOM-FHFA_05496490, NOM-FHFA_05496492) at NOM-FHFA_05496486-6487.)

87.     Freddie Mac agreed to purchase the 2006-FM2 I-A-1 certificate on October 18, 2006.  (DX-27 (FM2 Trade Package, dated Oct. 18, 2006, FHFA13680910) at FHFA13680910.)  Based on its analysis of the deal, Freddie Mac expected a return on equity of 17.54% on 2006-FM2.  (DX-27 at FHFA13680910.)

88.     On October 31, 2006, the certificates in the 2006-FM2 securitization received credit ratings from S&P, Moody's, DBRS, and Fitch.  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638329; DX-2784 (NHELI 2006-FM2 Closing Documents, dated Oct. 31, 2006, NOM-FHFA_00003064) at NOM-FHFA_00004655-4663.)  S&P, DBRS, and Fitch assigned the I-A-1 certificate Freddie Mac had agreed to purchase a credit rating of AAA.  (DX-4 at NOM-FHFA_04638329.)  Moody's assigned the I-A-1 certificate Freddie Mac had agreed to purchase a credit rating of Aaa.  (DX-4 at NOM-FHFA_04638329.)

89.     NCCI transferred the loans it had purchased to the depositor, NHELI, which created the issuer, Nomura Home Equity Loan Trust, Series 2006-FM2, and transferred the loans to that entity.  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638315; Vandell Aff. at ¶¶ 20-24.)  The issuer then issued the certificates and transferred those to NHELI, which in turn transferred them to the

underwriters, RBSSI, Citigroup Global Markets, Inc., and Goldman, Sachs & Co.  (DX-4 at

NOM-FHFA_04638315; Vandell Aff. at ¶¶ 20-24.)  Those underwriters sold the certificates to

investors; RBSSI sold the certificate purchased by Freddie Mac.  (Stipulated Facts at ¶ 35.)

90.    Freddie Mac received the certificate from RBSSI on the settlement date,

October 31, 2006.  (DX-27 (FM2 Trade Package, dated Oct. 18, 2006, FHFA13680910) at

FHFA13680910.)  Freddie Mac purchased the certificate, which was backed by subprime

collateral (DX-17 (FM2 Credit Approval, dated Oct. 3, 2006, FHFA01041877) at

FHFA01041878), for $525,197,000.00.  (DX-2605 (Exhibit B to FHFA's Second Set of

Objections and Responses to Defendants' Third Set of Interrogatories, dated March 27, 2013).)

91.    After selling the certificates to investors, including Freddie Mac, the

underwriters transferred funds received from investors to NHELI, which in turn sent the funds to

NCCI as payment for the loan pool.  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30,

2006, NOM-FHFA_04638315) at NOM-FHFA_04638315; Vandell Aff. at ¶¶ 20-24.)

92.    The 2006-FM2 securitization was issued pursuant to a registration

statement, dated February 28, 2006, and amended registration statements, dated April 6 and

April 13, 2006; a prospectus, dated April 18, 2006; and a prospectus supplement, dated October

30, 2006.  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-

FHFA_04638315) at NOM-FHFA_04638315, NOM-FHFA_04638514; DX-12 (Registration

Statement, dated Feb. 28, 2006); DX-13 (Registration Statement Amendment, dated April 6,

2006); DX-14 (Registration Statement Amendment, dated April 13, 2006).)

93.    The prospectus supplement explained that the 2006-FM2 I-A-1 certificate

purchased by Freddie Mac was protected by credit enhancement in the form of subordinated

tranches, the Class M-1, M-2, M-3, M-4, M-5, M-6, M-7, M-8, and M-9 tranches and the Class

B-1 and B-2 tranches, and overcollateralization, represented by the Class X tranche.  The face value of the subordinated tranches was $275,696,345.  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638315, NOM-FHFA_04638322-8323.)

94.    The prospectus supplement stated that the 2006-FM2 I-A-1 certificate purchased by Freddie Mac was backed by the Group I mortgage loans, which consisted of 3,891 loans with an aggregate principal balance of $677,237,695.  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638322, NOM-FHFA_04638331.)

95.    The prospectus supplement disclosed that the average principal balance of the Group I loans at origination was $174,413, and the average principal balance was $174,052 as of the Cut-Off Date.  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638360.)

96.    The prospectus supplement also explained that 1,303 loans in Group I (33.5%) were fixed rate loans, representing 20.82% of the aggregate principal balance as of the Cut-Off Date, while the remainder were ARM loans.  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638361.)  Further, 2,992 of the loans in Group I (76.9%) were first lien loans.  (DX-4 at NOM-FHFA_04638361.)  These loans represented 91.86% of the aggregate principal balance as of the Cut-Off Date.  (DX-4 at NOM-FHFA_04638361.)  The remaining loans were secured by second liens.  (DX-4 at NOM-FHFA_04638361.)

97.    The prospectus supplement disclosed that the weighted average FICO score of the borrowers of the loans in Group I was 620.  (DX-4 (2006-FM2 Prospectus

-30-

Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638331.)

Borrowers of 3,034 loans in Group I (78%) had a credit score of 660 or below.  (DX-4 at NOM-

FHFA_04638364.)  These loans represented 78.16% of the aggregate principal balance as of the

Cut-Off Date.  (DX-4 at NOM-FHFA_04638364.)

      98.     The prospectus supplement also disclosed that the weighted average

original LTV ratio of the loans was 80.58%.  (DX-4 (2006-FM2 Prospectus Supplement, dated

Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638331.)  The weighted average

combined LTV ratio was 88.34%.  (DX-4 at NOM-FHFA_04638331.)  1,653 loans in Group I

(42.5%) had an original LTV ratio of 80.01% or higher.  (DX-4 at NOM-FHFA_04638363.)

These loans represented 31.61% of the aggregate principal balance as of the Cut-Off Date.  (DX-

4 at NOM-FHFA_04638363.)  The prospectus supplement further disclosed that 2,861 of the

loans in Group I (73.5%) had a combined LTV ratio of 80.01% or higher.  (DX-4 at NOM-

FHFA_04638363.)  These loans represented 69% of the aggregate principal balance as of the

Cut-Off Date.  (DX-4 at NOM-FHFA_04638363.)

      99.     The prospectus supplement disclosed that 1,609 of the loans in Group I

(41.4%) were "Stated Income/Verified Assets" or "Stated/Stated Documentation" loans.  (DX-4

(2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-

FHFA_04638365.)  These loans represented 42.64% of the aggregate principal balance as of the

Cut-Off Date.  (DX-4 at NOM-FHFA_04638365.)

      100.    The prospectus supplement also disclosed that 2,091 of the loans in Group

I (53.7%) were purchase-money loans.  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct.

30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638365.)  These loans represented

46.99% of the aggregate principal balance as of the Cut-Off Date.  (DX-4 at NOM-

FHFA_04638365.)  The remaining loans were refinance transactions.  (DX-4 at NOM-FHFA_04638365.)

      101.    The prospectus supplement disclosed that 3,628 of the loans in Group I (93.2%) were designated as "Owner-Occupied."  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638365; Cao Tr. at 644:12-645:6.)  These loans represented 93.05% of the outstanding principal balance as of the Cut-Off Date.  (DX-4 at NOM-FHFA_04638365.)

### 5.  *NHELI 2007-1*

      102.    The sponsor for 2007-1, NCCI, purchased loans that would later back the 2007-1 securitization from various originators, including Silver State Mortgage (originator of 31.67% of the loans by aggregate principal balance).  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141919-1920.)

      103.    Freddie Mac agreed to purchase the 2007-1 II-1-A certificate on January 23, 2007.  (DX-29 (2007-1 Trade Package, dated Jan. 23, 2007, FHFA01003626) at FHFA01003626.)  Based on its analysis of 2007-1, Freddie Mac expected a return on equity of 17.32%.  (DX-29 at FHFA01003626.)

      104.    On January 31, 2007, the certificates in the 2007-1 securitization were given credit ratings by S&P and Moody's.  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141936; DX-2786 (NHELI 2007-1 Closing Documents, dated Jan. 31, 2007, NOM-FHFA_00006706) at NOM-FHFA_00008884-00008889.)  S&P assigned the II-1-A certificate Freddie Mac had agreed to purchase a credit rating of AAA.  (DX-5 at NOM-FHFA_05141936.)  Moody's assigned the II-1-A certificate Freddie Mac had agreed to purchase a credit rating of Aaa.  (DX-5 at NOM-FHFA_05141936.)

105.    NCCI transferred the loans it had purchased to the depositor, NHELI, which then created the issuer, Nomura Home Equity Loan Trust, Series 2007-1, and transferred the loans to that issuer.  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141912; Vandell Aff. at ¶¶ 20-24.)  The issuer then issued the certificates and transferred those to NHELI, which in turn transferred them to the underwriters—RBSSI and Bear, Stearns & Co., Inc.  (DX-5 at NOM-FHFA_05141912; Vandell Aff. at ¶ 20.)  The underwriters sold the certificates to investors; Freddie Mac purchased the 2007-1 II-1-A certificate from RBSSI.  (Stipulated Facts at ¶ 35.)

106.    Freddie Mac received the certificate from RBSSI on the settlement date, January 31, 2007.  (DX-29 (2007-1 Trade Package, dated Jan. 23, 2007, FHFA01003626) at FHFA01003626.)  Freddie Mac purchased the certificate, which was backed by Alt-A collateral (DX-19 (2007-1 Credit Approval, dated Jan. 23, 2007, FHFA04572921) at FHFA04572922), for $100,548,000.00.  (DX-2605 (Exhibit B to FHFA's Second Set of Objections and Responses to Defendants' Third Set of Interrogatories, dated March 27, 2013).)

107.    The underwriters then sent funds received from investors back to NHELI, which turned the funds over to NCCI as payment for the loan pool.  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141912; Vandell Aff. at ¶¶ 20-24.)

108.    The 2007-1 securitization was issued pursuant to a registration statement, dated February 28, 2006, and amended registration statements, dated April 6 and April 13, 2006; a prospectus, dated April 18, 2006; and a prospectus supplement, dated January 29, 2007.  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141912, NOM-FHFA_05142184; DX-12 (Registration Statement, dated Feb. 28,

-33-

2006); DX-13 (Registration Statement Amendment, dated April 6, 2006); DX-14 (Registration

Statement Amendment, dated April 13, 2006).)

109.    The prospectus supplement disclosed that the 2007 II-1-A certificate

purchased by Freddie Mac was protected by credit enhancement in the form of subordinated

tranches, the Class II-M-1, II-M-2, II-M-3, II-M-4, II-M-5, II-M-6, II-M-7, and II-M-8 tranches,

and overcollateralization, represented by the Class II-X tranche.  The face value of the

subordinated tranches was $43,203,528.  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29,

2007, NOM-FHFA_05141912) at NOM-FHFA_05141912, NOM-FHFA_05141922.)

110.    The prospectus supplement explained that the loan pool was split into

several groups that backed different certificates.  The 2007-1 II-1-A certificate was primarily

backed by the Group II-1 mortgage loans, which consisted of 474 loans with an aggregate

principal balance of $108,349,253.  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007,

NOM-FHFA_05141912) at NOM-FHFA_05141921, NOM-FHFA_05141971.)

111.    The prospectus supplement disclosed that the average principal balance of

the Group II-1 loans at origination was $228,698, and the average principal balance was

$228,585 as of the Cut-Off Date.  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007,

NOM-FHFA_05141912) at NOM-FHFA_05141996.)  The prospectus supplement also

explained that the Group II-1 loans were all first lien ARM loans.  (DX-5 at NOM-

FHFA_05141920.)

112.    The prospectus supplement disclosed that the weighted average FICO

credit score of the borrowers of the loans in Group II-1 was 700.  (DX-5 (2007-1 Prospectus

Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141996.)  97 loans

in Group II-1 (20.5%) were made to borrowers with a FICO credit score of 660 or below.  (DX-5

-34-

at NOM-FHFA_05142001.)  These loans represented 20.88% of the aggregate principal balance as of the Cut-Off Date.  (DX-5 at NOM-FHFA_05142001.)  FICO credit scores were unavailable for 4 borrowers of the Group II-1 loans (0.8%), representing 0.88% of the aggregate principal balance as of the Cut-Off Date.  (DX-5 at NOM-FHFA_05142001.)

113.    The prospectus supplement also disclosed that the weighted average original LTV ratio of the loans was 78.67%.  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141996.)  The prospectus supplement also disclosed that 39 loans in Group II-1 (8.2%) had an original LTV ratio of 80.01% or higher. (DX-5 at NOM-FHFA_05142002.)  These loans represented 6.96% of the aggregate principal balance as of the Cut-Off Date.  (DX-5 at NOM-FHFA_05142002.)

114.    The prospectus supplement disclosed that 408 of the loans in Group II-1 (86.1%) were "Alternate Documentation," "Reduced Documentation," "Stated/Stated," "No Ratio," or "No Documentation" loans.  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142002.)  These loans represented 88.9% of the aggregate principal balance as of the Cut-Off Date.  (DX-5 at NOM-FHFA_05142002.)

115.    The prospectus supplement disclosed that 210 of the loans in Group II-1 (44.3%) were purchase-money loans.  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142002.)  These loans represented 35.68% of the aggregate principal balance as of the Cut-Off Date.  (DX-5 at NOM-FHFA_05142002.)  The remaining loans were refinance transactions.  (DX-5 at NOM-FHFA_05142002.)

116.    The prospectus supplement also disclosed that 217 of the loans in Group II-1 (45.8%) were designated as "Owner Occupied."  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142002.)  These loans

-35-

represented 53.07% of the outstanding principal balance as of the Cut-Off Date of the prospectus

supplement.  (DX-5 at NOM-FHFA_05142002.))

### 6. *NHELI 2007-2*

117.    The sponsor for 2007-2, NCCI, purchased loans that would later back the

securitization from a number of originators, including OwnIt Mortgage Solutions, Inc.

(originator of 42.38% of the loans by aggregate principal balance) and First NLC Financial

Services, LLC (originator of 11.56% of the loans by aggregate principal balance).  (DX-6 (2007-

2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-

FHFA_05591330-1331.)

118.    Freddie Mac agreed to purchase the 2007-2 I-A-1 certificate on December

27, 2006.  (DX-28 (2007-2 Trade Package, dated Dec. 27, 2006, FHFA16863753) at

FHFA16863753.)  Freddie Mac expected a return on equity of 16.07% on 2007-2.  (DX-28 at

FHFA16863753.)

119.    On January 31, 2007, the certificates in 2007-2 received credit ratings

from S&P, Moody's, and DBRS.  (DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007,

NOM-FHFA_05591325) at NOM-FHFA_05591341; DX-2787 (NHELI 2007-2 Closing

Documents, dated Jan. 31, 2007, NOM-FHFA_00009315) at 00011576-1581.)  S&P and DBRS

assigned the I-A-1 certificate that Freddie Mac had agreed to purchase a credit rating of AAA.

(DX-6 at NOM-FHFA_05591341.)  Moody's assigned the I-A-1 certificate that Freddie Mac had

agreed to purchase a credit rating of Aaa.  (DX-6 at NOM-FHFA_05591341.)

120.    The depositor, NHELI, received the loans NCCI had purchased and then

created the issuer, Nomura Home Equity Loan Trust, Series 2007-2.  (DX-6 (2007-2 Prospectus

Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591325; Vandell

Aff. at ¶ 20.)  That trust issued the certificates, and transferred them to NHELI, which in turn

sent them to the underwriters—RBSSI, Citigroup Global Markets, Inc., and UBS Securities

LLC.  (DX-6 at NOM-FHFA_05591325; Vandell Aff. at ¶ 20.)  The underwriters sold the

certificates to investors, with RBSSI selling the 2007-2 I-A-1 certificate to Freddie Mac.

(Stipulated Facts at ¶ 35.)

   121. Freddie Mac received the certificate from RBSSI on the settlement date,

January 31, 2007.  (DX-28 (2007-2 Trade Package, dated Dec. 27, 2006, FHFA16863753) at

FHFA16863753.)  Freddie Mac purchased the certificate, which was backed by subprime

collateral (DX-18 (2007-2 Credit Approval, dated Dec. 22, 2006, FHFA16863774) at

FHFA16863775), for $358,847,000.00 (DX-2605 (Exhibit B to FHFA's Second Set of

Objections and Responses to Defendants' Third Set of Interrogatories, dated March 27, 2013)).

   122. The underwriters sent funds they received from investors back to NHELI,

which transferred the funds to NCCI as payment for the loan pool.  (DX-6 (2007-2 Prospectus

Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591325; Vandell

Aff. at ¶¶ 20-24.)

   123. The 2007-2 securitization was issued pursuant to a registration statement,

dated February 28, 2006, and amended registration statements, dated April 6 and April 13, 2006;

a prospectus, dated April 18, 2006; and a prospectus supplement, dated January 30, 2007.  (DX-6

(2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-

FHFA_05591325, NOM-FHFA_05591550; DX-12 (Registration Statement, dated Feb. 28,

2006); DX-13 (Registration Statement Amendment, dated April 6, 2006); DX-14 (Registration

Statement Amendment, dated April 13, 2006).)

124.     The prospectus supplement disclosed that the 2007-2 I-A-1 certificate purchased by Freddie Mac was protected by credit enhancement in the form of subordinated tranches, the Class M-1, M-2, M-3, M-4, M-5, M-6, M-7, M-8, and M-9 tranches and the Class B-1 tranche, and overcollateralization, represented by the Class X tranche.  The face value of the subordinated tranches was $237,310,229.  (DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591325, NOM-FHFA_05591333.)

125.     The prospectus supplement disclosed that the 2007-2 I-A-1 certificate was primarily backed by the Group I mortgage loans, which consisted of 3,001 loans with an aggregate principal balance of $481,674,027.  (DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591332, NOM-FHFA_05591342.)

126.     The prospectus supplement disclosed that, as of the Cut-Off Date, the average principal balance of the Group I loans at origination was $160,831, and the average principal balance was $160,505 as of the Cut-Off Date.  (DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591372.)

127.     The prospectus supplement also disclosed that 981 loans in Group I (32.7%) were fixed rate loans.  These loans represented 24.3% of the aggregate principal balance as of the Cut-Off Date.  The remainder were ARM loans.  (DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591373.)  The prospectus supplement also noted that 2,761 of the loans in Group I (92%) were first lien loans.  These loans represented 98.2% of the aggregate principal balance as of the Cut-Off Date.  The remaining loans were secured by second liens.  (DX-6 at NOM-FHFA_05591373.)

128.     The prospectus supplement disclosed that the weighted average FICO score of the borrowers of the loans in Group I was 621.  (DX-6 (2007-2 Prospectus Supplement,

dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591342.)  Borrowers of 2,337

loans in Group I (77.9%) had a credit score of 660 or below.  These loans represented 77.75% of

the aggregate principal balance as of the Cut-Off Date.  (DX-6 at NOM-FHFA_05591377.)

129.    The prospectus supplement disclosed that the weighted average original

LTV ratio of the loans was 81.86%.  (DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007,

NOM-FHFA_05591325) at NOM-FHFA_05591342.)  The weighted average combined LTV

ratio was 86.80%.  (DX-6 at NOM-FHFA_05591342.)  1,417 loans in Group I (47.2%) had an

original LTV ratio of 80.01% or higher.  (DX-6 at NOM-FHFA_05591375.)  These loans

represented 43.41% of the aggregate principal balance as of the Cut-Off Date.  (DX-6 at NOM-

FHFA_05591375.)  Further, 2,141 of the loans in Group I (71.3%) had a combined LTV ratio of

80.01% or higher.  (DX-6 at NOM-FHFA_05591376.)  These loans represented 68.09% of the

aggregate principal balance as of the Cut-Off Date of the prospectus supplement.  (DX-6 at

NOM-FHFA_05591376.)

130.    The prospectus supplement further disclosed that 955 of the loans in

Group I (31.8%) were "Verified Income/Stated Assets," "Stated Income/Verified Assets,"

"Stated/Stated Documentation," "No Ratio," or "No Documentation" loans.  (DX-6 (2007-2

Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-

FHFA_05591378.)  These loans represented 36.11% of the aggregate principal balance as of the

Cut-Off Date.  (DX-6 at NOM-FHFA_05591378.)

131.    The prospectus supplement also disclosed that 1,046 of the loans in Group

I (34.9%) were purchase-money loans.  (DX-6 (2007-2 Prospectus Supplement, dated Jan. 30,

2007, NOM-FHFA_05591325) at NOM-FHFA_05591378.)  These loans represented 25.79% of

the aggregate principal balance as of the Cut-Off Date.  (DX-6 (2007-2 Prospectus Supplement,

dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591378.)  The remaining loans

were refinance transactions.  (DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-

FHFA_05591325) at NOM-FHFA_05591378.)

132.    The prospectus supplement additionally disclosed that 2,731 of the loans

in Group I (91%) were designated as "Owner-Occupied."  (DX-6 (2007-2 Prospectus

Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591378.)  These

loans represented 90.86% of the outstanding principal balance as of the Cut-Off Date.  (DX-6 at

NOM-FHFA_05591378.)

### 7.    NHELI 2007-3

133.    The sponsor for 2007-3, NCCI, purchased loans that would later back the

2007-3 securitization from various originators, including ResMAE Mortgage Corporation

(77.61% of the loans by aggregate principal balance).  (DX-7 (2007-3 Prospectus Supplement,

dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732627-2628.)

134.    On April 16, 2007, Timothy Crowley, Vice President of NCCI's

transaction management group, sent a loan tape on behalf of Nomura Securities for the proposed

2007-3 securitization to Noel Torres, a Freddie Mac employee, and asked him to "run these loans

through your system t[o] confirm they meet Freddie's" requirements.  (DX-2803 (Email from

Noel Torres, dated April 16, 2007, NOM-FHFA_05532383) at NOM-FHFA_05532383.)  Noel

Torres wrote back to Timothy Crowley on April 17, 2007, attaching a report which showed that

Freddie Mac had analyzed the loans backing the proposed 2007-3 securitization and rejected 53

loans from the proposed loan pool, while approving 1,866 loans.  (DX 551 (Email from Michael

Orfe, and attachments, dated April 16, 2007, NOM-FHFA_05145862) at NOM-

FHFA_05145862-5863.)

135.     Freddie Mac agreed to purchase the 2007-3 I-A-1 certificate on April 26, 2007.  (DX-30 (2007-3 Trade Package, dated April 26, 2007, FHFA01002820) at FHFA01002820.)  Based on its analysis of 2007-3, Freddie Mac expected a return on equity of 21.95%.  (DX-30 at FHFA01002820.)

136.     On April 30, 2007, the certificates in 2007-3 received credit ratings from S&P, Moody's, and DBRS.  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732637; DX-2788 (NHELI 2007-3 Closing Documents, dated April 30, 2007, NOM-FHFA_00011757) at 00013640-3645.)  S&P and DBRS assigned the I-A-1 certificate Freddie Mac had agreed to purchase a credit rating of AAA.  (DX-7 at NOM-FHFA_04732637.)  Moody's assigned the I-A-1 certificate Freddie Mac had agreed to purchase a credit rating of Aaa.  (DX-7 at NOM-FHFA_04732637.)

137.     NCCI sent those loans to the depositor, NHELI, which then created the issuing trust, Nomura Home Equity Loan Trust, Series 2007-3.  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732621; Vandell Aff. at ¶¶ 20-24.)  NHELI transferred the loans to the trust, which then issued certificates and transferred those to NHELI.  (DX-7 at NOM-FHFA_04732621; Vandell Aff. at ¶¶ 20-24.)  NHELI, in turn, sent the certificates to the underwriters—Lehman Brothers, Inc., RBSSI, Citigroup Global Markets, Inc., and Merrill Lynch, Pierce, Fenner & Smith Incorporated.  (DX-7 at NOM-FHFA_04732621; Vandell Aff. at ¶ 20.)  The underwriters then sold the certificates to investors, and Lehman Brothers, Inc. sold the 2007-3 I-A-1 certificate to Freddie Mac.  (Stipulated Facts at ¶ 36.)

138.     Freddie Mac received the certificate from Lehman Brothers, Inc. on the settlement date, April 30, 2007.  (DX-30 (2007-3 Trade Package, dated April 26, 2007,

FHFA01002820) at FHFA01002820.)  Freddie Mac purchased the certificate, which was backed

by subprime collateral (DX-21 (2007-3 Additional Credit Approval, dated April 26, 2007,

FHFA04592876) at FHFA04592877), for $245,105,000.00 (DX-30 at FHFA01002820).

139.    After receiving payments from investors, including Freddie Mac, the

underwriters transferred the payments back to NHELI, which then sent the funds to NCCI as

payment for the loan pool.  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-

FHFA_4732621) at NOM-FHFA_04732621; Vandell Aff. at ¶¶ 20-24.)

140.    The 2007-3 securitization was issued pursuant to a registration statement,

dated February 28, 2006, and amended registration statements, dated April 6 and April 13, 2006;

a prospectus, dated April 18, 2006; and a prospectus supplement was dated April 27, 2007.  (DX-

7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-

FHFA_04732621, NOM-FHFA_04732837; DX-12 (Registration Statement, dated Feb. 28,

2006); DX-13 (Registration Statement Amendment, dated April 6, 2006); DX-14 (Registration

Statement Amendment, dated April 13, 2006).)

141.    The prospectus supplement disclosed that the 2007-3 I-A-1 certificate

purchased by Freddie Mac was protected by credit enhancement in the form of subordinated

tranches, the Class M-1, M-2, M-3, M-4, M-5, M-6, M-7, M-8, and M-9 tranches, and

overcollateralization, represented by the Class X tranche.  (DX-7 (2007-3 Prospectus

Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732621,

NOM-FHFA_04732629-2630.)  The face value of the subordinated tranches was $305,662,765.

(DX-7 at NOM-FHFA_04732621, NOM-FHFA_04732629-2630.)

142.    The prospectus supplement explained that the 2007-3 I-A-1 certificate

purchased by Freddie Mac was primarily backed by the Group I mortgage loans, which consisted

of 1,896 loans with an aggregate principal balance of $334,386,584.  (DX-7 (2007-3 Prospectus

Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732629, NOM-

FHFA_04732638.)

       143.    The prospectus supplement disclosed that the average principal balance of

the Group I loans at origination was $176,732, and the average principal balance was $176,364

as of the Cut-Off Date.  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-

FHFA_4732621) at NOM-FHFA_04732669.)

       144.    The prospectus supplement also disclosed that 500 loans in Group I

(26.4%) were fixed rate loans.  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007,

NOM-FHFA_4732621) at NOM-FHFA_04732670.)  These loans represented 19.68% of the

aggregate principal balance as of the Cut-Off Date.  The remainder were ARM loans.  (DX-7

(2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-

FHFA_04732670.)  The prospectus supplement also explained that 1,743 of the loans in Group I

(92%) were first lien loans.  (DX-7 at NOM-FHFA_04732670.)  These loans represented 98.29%

of the aggregate principal balance as of the Cut-Off Date.  The remaining loans were secured by

second liens.  (DX-7 at NOM-FHFA_04732670.)

       145.    The prospectus supplement disclosed that the weighted average FICO

score of the borrowers of loans in Group I was 621.  (DX-7 (2007-3 Prospectus Supplement,

dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732638.)  Borrowers of 1,550

loans in Group I (81.8%) had a credit score of 660 or below.  (DX-7 at NOM-FHFA_04732673.)

These loans represented 81.15% of the aggregate principal balance as of the Cut-Off Date of the

prospectus supplement.  (DX-7 at NOM-FHFA_04732673.)

146.    The prospectus supplement also gave data on the LTV and combined LTV ratio of the loans.  The weighted average original LTV ratio of the loans was 81.27%.  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732638.)  The weighted average combined LTV ratio was 87.96%.  (DX-7 at NOM-FHFA_04732638.)  The prospectus supplement explained that 1,417 loans in Group I (41.5%) had an original LTV ratio of 80.01% or higher.  (DX-7 at NOM-FHFA_04732672.)  These loans represented 40.69% of the aggregate principal balance as of the Cut-Off Date.  (DX-7 at NOM-FHFA_04732672.)  1,583 of the loans in Group I (81.1%) had a combined LTV ratio of 80.01% or higher.  (DX-7 at NOM-FHFA_04732672.)  These loans represented 72.96% of the aggregate principal balance as of the Cut-Off Date.  (DX-7 at NOM-FHFA_04732672.)

147.    The prospectus supplement also disclosed that 656 of the loans in Group I (34.6%) were "Stated Income/Verified Asset" or "Stated/Stated" loans.  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732674.)  These loans represented 41.62% of the aggregate principal balance as of the Cut-Off Date.  (DX-7 at NOM-FHFA_04732674.)

148.    The prospectus supplement further stated that 986 of the loans in Group I (52%) were purchase-money loans.  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732674.)  These loans represented 35.94% of the aggregate principal balance as of the Cut-Off Date of the prospectus supplement.  (DX-7 at NOM-FHFA_04732674.)  The remaining loans were refinance transactions.  (DX-7 at NOM-FHFA_04732674.)

149.    The prospectus supplement also disclosed that 1,707 of the loans in Group I (90%) were designated as "Owner-Occupied."  (DX-7 (2007-3 Prospectus Supplement, dated

-44-

April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732674.)  These loans represented

89.21% of the outstanding principal balance as of the Cut-Off Date of the prospectus

supplement.  (DX-7 at NOM-FHFA_04732674.)

### F.    Nomura's Ownership of Subordinate Tranches of the Securitizations

150.    As part of its RMBS business, NCCI held all or a part of the most

subordinate tranche of each of the seven Securitizations, known as the "residual."  (Lee Aff. at

¶ 41; Nambiar Aff. at ¶¶ 5-6; DX-149 (Email from Michael Morrissey, and attachment, dated

Aug. 20, 2007, NOM-FHFA_05435583) at NOM-FHFA_05435585-5586.)

151.    The residual was known as the first-loss piece, because the holders of the

residual would be the first to take losses if the loans underlying the Securitization did not

perform.  (Lee Aff. at ¶ 41; Nambiar Aff. at ¶¶ 27-38; Marvin Tr. at 63:2-10, 73:20-74:4.)

Nomura did not hedge individual residual holdings.  (Marvin Tr. at 108:8-22.)

152.    The price at which NCCI sold RMBS did not exceed the value of the

underlying loans.  (Lee Aff. at ¶ 43.)  Therefore, NCCI did not make a profit from selling the

securities to investors—it sold them at a loss.  (Lee Aff. at ¶ 43)  The value of the residual

holdings exceeded the amount of that loss, however, so NCCI was able to record profits only

because the value of the residual remained on Nomura's books.  (Lee Aff. at ¶ 43.)

153.    In some instances, NCCI sold a portion of the residual as part of a Net

Interest Margin ("NIM") sale, selling portions of the residual to investors while still retaining a

portion of the residual for itself.  (Marvin Tr. at 62:17-20, 63:21; Lee Aff. at ¶ 42; Nambiar Aff.

at ¶ 7; DX-142 (Email from Nita Nambiar, dated Dec. 19, 2006, NOM-FHFA_05894896) at

NOM-FHFA_05894897-4898; DX-149 (Email from Michael Morrissey, and attachment, dated

Aug. 20, 2007, NOM-FHFA_05435583) at NOM-FHFA_05435585-5586.)

154.    When NCCI first sold the securitizations, it had no intention of selling its residual holdings.  (Lee Aff. at ¶ 44.)  Rather, "Nomura's intent was to retain those residuals for the long term, in order to realize profits from those holdings."  (Lee Aff. at ¶ 44.)  Moreover, NCCI did not sell the residuals until "it made the decision to shut down its residential mortgage-backed securitization business altogether."  (Lee Aff. at ¶ 44; *see also* LaRocca Aff. at ¶ 41.)

155.    With respect to the 2005-AR6 securitization, NCCI held the Class X and Class P certificates.  (DX-149 (Email from Michael Morrissey and attachment, dated Aug. 20, 2007, NOM-FHFA_05435583) at NOM-FHFA_05435585-5586; Nambiar Aff. at ¶ 8.)

156.    NCCI initially valued those residual holdings at $11,537,493.23 as of November 30, 2005.  (DX-133 (Spreadsheet titled Deal Summary: NAA 2005-AR6, dated Nov. 30, 2005, NOM-FHFA_05894901) at NOM-FHFA_05894901; Nambiar Aff. at ¶ 8.)

157.    NCCI sold these residual certificates for $125,000 on or about September 17, 2007.  (DX-150 (Email from Timothy Crowley and attachment, dated Sept. 25, 2007, NOM-FHFA_05769343) at NOM-FHFA_05769344; Nambiar Aff. at ¶ 9.)

158.    With respect to the 2006-FM1 securitization, NCCI held the Class X and Class P certificates.  (DX-149 (Email from Michael Morrissey and attachment, dated Aug. 20, 2007, NOM-FHFA_05435583) at NOM-FHFA_05435585-5586; Nambiar Aff. at ¶ 10.)

159.    NCCI initially valued those residual holdings at $39,572,569.37 as of January 31, 2006.  (DX-134 (Email from Nita Nambiar and attachments, dated Feb. 1, 2006, NOM-FHFA_04908096) at NOM-FHFA_04908098; Nambiar Aff. at ¶ 10.)

160.    NCCI sold these residual certificates for $200,000 on or about September 17, 2007.  (DX-150 (Email from Timothy Crowley and attachment, dated Sept. 25, 2007, NOM-FHFA_05769343) at NOM-FHFA_05769344; Nambiar Aff. at ¶ 11.)

161.    With respect to the 2006-HE3 securitization, Nomura Securities sold a portion of the residual in a NIM sale, but NCCI retained 50% of the N1, N2, N3, and N4 NIM certificates, and also retained a 50% interest in preference shares for the securitization that made up a portion of the residual.  (DX-149 (Email from Michael Morrissey and attachment, dated Aug. 20, 2007, NOM-FHFA_05435583) at NOM-FHFA_05435585-5586; Nambiar Aff. at ¶ 12.)

162.    NCCI initially valued those residual holdings at $18,568,217.54 as of December 11, 2006.  (DX-142 (Email from Nita Nambiar and attachments, dated Dec. 19, 2006, NOM-FHFA_05894896) at NOM-FHFA_05894897; Nambiar Aff. at ¶ 12.)

163.    NCCI sold these residual certificates for $630,096.00 on or about September 17, 2007.  (DX-150 (Email from Timothy Crowley and attachment, dated Sept. 25, 2007, NOM-FHFA_05769343) at NOM-FHFA_05769344; Nambiar Aff. at ¶ 13.)

164.    With respect to the 2006-FM2 securitization, Nomura Securities sold a portion of the residual in a NIM sale, but NCCI retained 100% of the N2 and N3 NIM certificates, and 100% of the preference shares for the securitization.  (DX-149 (Email from Michael Morrissey, and attachment, dated Aug. 20, 2007, NOM-FHFA_05435583) at NOM-FHFA_05435585-5586; DX-150 (Email from Timothy Crowley and attachment, dated Sept. 25, 2007, NOM-FHFA_05769343) at NOM-FHFA_05769344; Nambiar Aff. at ¶ 14.)

165.    NCCI initially valued those residual holdings at $31,003,695.20 as of November 20, 2006.  (DX-142 (Email from Nita Nambiar and attachments, dated Dec. 19, 2006, NOM-FHFA_05894896) at NOM-FHFA_05894898; Nambiar Aff. at ¶ 14.)

166.    NCCI sold these residual certificates for $1,450,800.00 on or about September 17, 2007.  (DX-150 (Email from Timothy Crowley and attachment, dated Sept. 25, 2007, NOM-FHFA_05769343) at NOM-FHFA_05769344; Nambiar Aff. at ¶ 15.)

-47-

167.    With respect to the 2007-1 securitization, NCCI held the Class X and Class P certificates.  (DX-149 (Email from Michael Morrissey and attachment, dated Aug. 20, 2007, NOM-FHFA_05435583) at NOM-FHFA_05435585-5586; Nambiar Aff. at ¶ 16.)

168.    NCCI initially valued those residual holdings at $15,533,227.37 as of January 31, 2007.  (DX-145 (Email from Nita Nambiar and attachment, dated March 5, 2007, NOM-FHFA_05783891) at NOM-FHFA_05783892; Nambiar Aff. at ¶ 16.)

169.    NCCI sold these residual certificates for $750,000.00 on or about September 17, 2007.  (DX-150 (Email from Timothy Crowley and attachment, dated Sept. 25, 2007, NOM-FHFA_05769343) at NOM-FHFA_05769344; Nambiar Aff. at ¶ 17.)

170.    With respect to the 2007-2 securitization, Nomura Securities sold a portion of the residual in a NIM sale, but NCCI retained 100% of the N2 and N3 NIM certificates, and 100% of the preference shares for the securitization.  (DX-149 (Email from Michael Morrissey and attachment, dated Aug. 20, 2007, NOM-FHFA_05435583) at NOM-FHFA_05435585-5586; Nambiar Aff. at ¶ 18.)

171.    NCCI initially valued those residual holdings at $26,188,859.00 as of March 5, 2007.  (DX-2603 (Email from Justine Hong and attachment, dated March 5, 2007, NOM-FHFA_04851155) at NOM-FHFA_04851162; Nambiar Aff. at ¶ 18.)

172.    NCCI sold these residual certificates for $636,000.00 on or about September 17, 2007.  (DX-150 (Email from Timothy Crowley and attachment, dated Sept. 25, 2007, NOM-FHFA_05769343) at NOM-FHFA_05769344; Nambiar Aff. at ¶ 19.)

173.    With respect to the 2007-3 securitization, NCCI held the Class X and Class P certificates.  (DX-149 (Email from Michael Morrissey and attachment, dated Aug. 20, 2007, NOM-FHFA_05435583) at NOM-FHFA_05435585-5586; Nambiar Aff. at ¶ 20.)

174.     NCCI initially valued those residual holdings at $40,063,248.99 as of April 30, 2007.  (DX-148 (Email from Nita Nambiar and attachment, dated May 10, 2007, NOM-FHFA_04928710) at NOM-FHFA_04928711; Nambiar Aff. at ¶ 20.)

175.     NCCI sold these residual certificates for $9,000,000 on or about September 17, 2007.  (DX-150 (Email from Timothy Crowley and attachment, dated Sept. 25, 2007, NOM-FHFA_05769343) at NOM-FHFA_05769344.)

176.     The total initial value of the residual holdings for all seven Securitizations at or near the time of the applicable securitization or NIM closing was $182,467,310.70.  (DX-133 at NOM-FHFA_05894901; DX-134 at NOM-FHFA_04908098; DX-142 at NOM-FHFA_05894897-4898; DX-145; DX-2603 at NOM-FHFA_04851162; DX-148; Nambiar Aff. at ¶ 22.)

177.     These residual holdings were sold for a total of $12,791,896.00 on September 17, 2007.  (DX-150 (Email from Timothy Crowley and attachment, dated Sept. 25, 2007, NOM-FHFA_05769343) at NOM-FHFA_05769344; Nambiar Aff. at ¶ 22.)

178.     The difference between the ultimate sales price of NCCI's residual holdings from the Securitizations and the initial value of those residual holdings is $169,675,414.69.  (Nambiar Aff. at ¶ 24.)  During the time it held the residuals described above, Nomura received $51,133,013.46 in principal and interest payments on those holdings as of August 27, 2007.  (Nambiar Aff. at ¶ 25.)  If this amount ($51,133,013.46) is added to the total sales price of Nomura's residual holdings in September 2007 ($12,791,896.00), and the total ($63,924,909.46) is subtracted from the initial value of the residuals ($182,467,310.69), the difference is $118,542,401.23.

II.     **THE OFFERING DOCUMENTS WARNED THAT A DECLINE IN HOUSE PRICES AND ECONOMIC DETERIORATION COULD ADVERSELY AFFECT LOAN PERFORMANCE AND THAT THE UNDERLYING MORTGAGES HAD RISKY CHARACTERISTICS**

A.     **The Offering Documents Disclosed That a Decline in House Prices and Economic Deterioration Could Cause Losses**

179.    The Offering Documents made clear that Freddie Mac and Fannie Mae could lose money in the event of a decline in house prices or changes in economic conditions. Five of the seven prospectus supplements warned investors that they "could lose a portion of the money you paid for your certificate" if the mortgage loans defaulted and "the mortgaged properties fail to provide adequate security for the Mortgage Loans."  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811820; DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729495-9496; DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141960; DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_5591354; DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732650.)

180.    Six of the seven prospectus supplements further stated that, regardless of credit enhancement, "[i]f substantial losses occur as a result of defaults and delinquent payments on the related Mortgage Loans, [the investor] may suffer losses."  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811828; DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729504; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620920; DX-4 (2006-FM2 Prospectus Supplement, dated

Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638351; DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_051411955; DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591362).)

        181.    The Offering Documents also explicitly stated that investors could lose money due to economic factors and declines in the housing market. The prospectus supplements warned investors that "economic conditions . . . which may or may not affect real property values, may affect the ability of borrowers to repay their loans on time," and "declines in residential real estate market . . . may reduce the values of properties . . . which would result in an increase in the related loan-to-value ratios." (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811827; DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729503; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620911; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638350-8351; DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141965; DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591361; DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732657.) The 2005-AR6 prospectus supplement warned that "the risk of delinquencies and loss is greater" when "a weak or deteriorating economy exists, as may be evidenced by, among other factors, increasing unemployment or falling property values." (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811994.)

182.     Five of the prospectus supplements further explained that "[i]f property values decline, the actual rates of delinquencies foreclosures and losses on all underlying loans could be higher than those currently experienced in the mortgage lending industry in general . . . [and] these losses . . . will be borne by the holders of one or more classes of securities of the related series."  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729647; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04621094; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638525; DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591561; DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732848.)

183.     The prospectus supplement for 2007-3— which was issued on April 27, 2007— disclosed that "Recent Developments in the Residential Mortgage Market May Adversely Affect the Performance and Market Value of Your Securities."  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732662.)  Specifically, the prospectus supplement disclosed that "[r]ecently, the residential mortgage market in the United States has experienced a variety of difficulties and changed economic conditions that may adversely affect the performance and market value of your securities" and "in recent months housing prices and appraisal values in many states have declined or stopped appreciating, after extended periods of significant appreciation.  A continued decline or an extended flattening of those values may result in additional increases in delinquencies and losses on residential mortgage loans."  (DX-7 at NOM-FHFA_04732662-2663.)  The 2007-3 prospectus supplement warned investors to "consider the general market

conditions that may adversely affect the performance and market value of your securities."

(DX-7 at NOM-FHFA_04732664.)

   **B.**   **The Offering Documents Warned that Mortgage Loans Backing the Securitizations Had Risky Attributes**

      ***1.***   ***Mortgage Loans Were Not Originated to Freddie Mac and Fannie Mae Guidelines.***

184.   The Offering Documents warned investors that the mortgage loans backing the Securitizations had characteristics that substantially increased the risk of default or delinquency.  Each of the prospectus supplements stated that "[t]he underwriting standards applicable to the mortgage loans typically differ from, and are, with respect to a substantial number of mortgage loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, credit score, required documentation, interest rates, borrower occupancy of the mortgaged property, and/or property types,"  and, "[t]o the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the mortgage loans thereunder may reflect higher delinquency rates and/or credit losses."  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811894; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620972; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638400; DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142026; DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591415; DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732712; *see also*

-53-

DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at

NOM-FHFA_04729585) ("Mortgage Loans may experience rates of delinquency, foreclosure

and loss that are higher, and may be substantially higher, than mortgage loans originated in

accordance with the Fannie Mae or Freddie Mac underwriting guidelines.  Any resulting losses,

to the extent not covered by credit enhancement, may affect the yield to maturity of the Offered

Certificates.").)

         185.    Six of the seven prospectus supplements stated that "[i]nvestors should

note that changes in the values of Mortgage Properties may have a greater effect on the

delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the

Mortgage Pool than on mortgage loans originated in a more traditional manner."  (DX-1 (2005-

AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-

FHFA_04811896; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-

FHFA_04620885) at NOM-FHFA_04620974; DX-4 (2006-FM2 Prospectus Supplement, dated

Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638402; DX-5 (2007-1 Prospectus

Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142028; DX-6

(2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-

FHFA_05591417; DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-

FHFA_4732621) at NOM-FHFA_04732714.)  Further, six of the seven prospectus supplements

stated that "[t]he underwriting standards applicable to the Mortgage Loans . . . may or may not

conform to Fannie Mae or Freddie Mac guidelines.  As a result, those Mortgage Loans may

experience rates of delinquency, foreclosure and borrower bankruptcy that are higher, and that

may be substantially higher, than those experienced by mortgage loans underwritten in strict

compliance with Fannie Mae or Freddie Mac guidelines."  (DX-1 (2005-AR6 Prospectus

Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811820; DX-2

(2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-

FHFA_04729495; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-

FHFA_04620885) at NOM-FHFA_04620911; DX-4 (2006-FM2 Prospectus Supplement, dated

Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638342-8343; DX-5 (2007-1

Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-

FHFA_05141959; DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-

FHFA_05591325) at NOM-FHFA_05591353-1354).  The 2007-3 prospectus supplement

similarly stated that the "Mortgage Loans that are subprime credit quality, *i.e.*, do not meet the

customary standards of Fannie Mae and Freddie Mac . . . are more likely" to experience

delinquencies and liquidation "than with mortgage loans that satisfy customary credit standards."

(DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-

FHFA_ 04732649.)

### 2.      *Low- and No-Documentation Loans*

186.    For each of the seven Certificates purchased by Freddie Mac and Fannie

Mae, Nomura made representations in the prospectus supplements that the characteristics of

loans originated under low-documentation or no-documentation programs were either verified to

varying degrees or, under some programs, not verified at all.  The prospectus supplements also

disclosed the percentages of loans originated under such programs backing each Securitization.

187.    The prospectus supplements for 2005-AR6, 2006-HE3, 2006-FM2, 2007-

1, 2007-2, and 2007-3 disclosed:

> Certain of the Mortgage Loans have been originated under reduced
> documentation, no-documentation or no-ratio programs, which
> require less documentation and verification than do traditional full
> documentation programs.  Generally, under a reduced

> documentation program, verification of either a borrower's income
> or assets, but not both, is undertaken by the originator.  Under a
> no-ratio program, certain borrowers with acceptable compensating
> factors will not be required to provide any information regarding
> income and no other investigation regarding the borrower's income
> will be undertaken.  Under a no-documentation program, no
> verification of a borrower's income or assets is undertaken by the
> originator.  The underwriting for such Mortgage Loans may be
> based primarily or entirely on an appraisal of the Mortgage
> Property, the loan-to-value ratio at origination and/or the
> borrower's credit score.

(DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at

NOM-FHFA_04811896; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-

FHFA_04620885) at NOM-FHFA_04620974; DX-4 (2006-FM2 Prospectus Supplement, dated

Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638401-8402; DX-5 (2007-1

Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-

FHFA_05142027-28; DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-

FHFA_05591325) at NOM-FHFA_05591417; DX-7 (2007-3 Prospectus Supplement, dated

April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732714.)

   188. The prospectus supplements for 2006-FM1 and 2006-FM2 similarly

disclosed that "under Easy Documentation, the borrower is qualified based on verification of

adequate cash flow by means of personal or business bank statements; under Stated Income,

applicants are qualified based on monthly income as stated on the mortgage application.  The

income is not verified under the Stated Income program; however, the income stated must be

reasonable and customary for the applicant's line of work."  (DX-2 (2006-FM1 Prospectus

Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729545; DX-4

(2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-

FHFA_04638396.)

189.    The prospectus supplement for 2006-HE3 disclosed that "[u]nder the stated income documentation program, an applicant will be qualified based upon monthly income as stated on the mortgage loan application, if the applicant meets certain criteria.  The income stated must be reasonable for the job and credit profile."  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620967.)

190.    The prospectus supplement for 2007-3 disclosed that "[u]nder Stated Income [programs], applicants are qualified based on monthly income as stated on the mortgage application."  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA04732709.)

191.    Each prospectus supplement disclosed the percent of loans in the supporting loan groups originated under reduced documentation programs:

- The prospectus supplement for 2005-AR6 disclosed that 76.37% of loans in the supporting loan group were originated under reduced, no ratio, stated income/stated assets, or no income/no asset documentation programs.  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811862.)

- The 2005-AR6 prospectus supplement further stated that "[t]he rate of default on the mortgage loans that are refinance or limited documentation mortgage loans, and on mortgage loans with high Loan-to-Value Ratios, may be higher than for other types of mortgage loans."  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811994.)

- The prospectus supplement for 2006-FM1 disclosed that 45.15% of loans in the supporting loan group were originated under various reduced/limited or stated income/stated asset documentation loan programs.  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729515.)

- The prospectus supplement for 2006-HE3 disclosed that 42.32% of loans in the supporting loan group were originated under verified income/stated assets, stated income/verified assets, or stated income/stated assets documentation programs.  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006,

NOM-FHFA_04620885) at NOM-FHFA_04620933.)

- The prospectus supplement for 2006-FM2 disclosed that 42.64% of loans in the supporting loan group were originated under stated income/verified assets or stated income/stated assets documentation programs. (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638365.)

- The prospectus supplement for 2007-1 disclosed that 87.79% of loans in the supporting loan group were originated under reduced, stated income/stated assets, no ratio, or no doc documentation programs. (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142002.)

- The prospectus supplement for 2007-2 disclosed that 36.12% of loans in the supporting loan group were originated under verified income/stated assets, stated income/verified assets, stated income/stated assets, no ratio, or no doc documentation programs. (DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591378.)

- The prospectus supplement for 2007-3 disclosed that 41.62% of loans in the supporting loan group were originated under stated income/verified assets or stated income/stated assets documentation programs. (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732674.)

### *3. Interest-Only Loans*

192.    The Offering Documents also warned that loans with an "interest only" term carried increased risks. Each of the prospectus supplements described that "[i]nterest only loans increase[d] risk of loss" to the Securitization. (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811824-11825; DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729500-9501; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620916-0917; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638347-8348); DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-

FHFA_05141956-1957; DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-

FHFA_05591325) at NOM-FHFA_05591359); DX-7 (2007-3 Prospectus Supplement, dated

April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732654-2655.)  Further "[m]ortgage

loans with an initial interest only period are relatively new in the mortgage market place."  (DX-

1 at NOM-FHFA_04811824-11825; DX-2 at NOM-FHFA_04729500-9501; DX-3 at NOM-

FHFA_04620916-0917; DX-4 at NOM-FHFA_04638347-8348); DX-5 at NOM-

FHFA_05141956-1957; DX-6 at NOM-FHFA_05591359); DX-7 at NOM-FHFA_04732654-

2655.)  Specifically, the prospectus supplements warned that "the failure to build equity in the

property by the related borrower" due to an initial interest only period "may affect the

delinquency and prepayment" of interest-only mortgage loans.  (DX-1 at NOM-

FHFA_04811824-11825; DX-2 at NOM-FHFA_04729500-9501; DX-3 at NOM-

FHFA_04620916-0917; DX-4 at NOM-FHFA_04638347-8348); DX-5 at NOM-

FHFA_05141956-1957; DX-6 at NOM-FHFA_05591359); DX-7 at NOM-FHFA_04732654-

2655.)

       193.    The Offering Documents disclosed the percentage of the mortgage loans

backing the Certificates purchased by Freddie Mac and Fannie Mae that had "interest only"

terms:

- The 2005-AR6 prospectus supplement disclosed that 84.47% of the mortgage
  loans backing the Certificate Fannie Mae purchased had "interest only" terms.
  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-
  FHFA_04811802) at NOM-FHFA_04811814.)

- The 2006-FM1 prospectus supplement disclosed that 16.30% of the mortgage
  loans backing the Certificate Freddie Mac purchased had "interest only"
  terms.  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-
  FHFA_04729474) at NOM-FHFA_04729487.)

- The 2006-HE3 prospectus supplement disclosed that 12.42% of the mortgage
  loans backing the Certificate Freddie Mac purchased had "interest only"

terms.  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620900.)

- The 2006-FM2 prospectus supplement disclosed that 8.84% of the mortgage loans backing the Certificate Freddie Mac purchased had "interest only" terms.  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638331.)

- The 2007-1 prospectus supplement disclosed that 84.47% of the mortgage loans backing the Certificate Freddie Mac purchased had "interest only" terms.  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141938.)

- The 2007-2 prospectus supplement disclosed that 7.32% of the mortgage loans backing the Certificate Freddie Mac purchased had "interest only" terms.  (DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591342.)

- The 2007-3 prospectus supplement disclosed that 10.87% of the mortgage loans backing the Certificate Freddie Mac purchased had "interest only" terms.  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732638.)

### 4.    *High Loan-to-Value Ratios*

194.    The Offering Documents warned investors that loans with high LTV ratios carried more risk, and made it clear that the LTV ratios could—in fact, inevitably would—change over time.  Each of the prospectus supplements stated that "Mortgage Loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with loan-to-value ratios of 80% or below."  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811829; DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729504; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620920; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638352; DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141966; DX-6 (2007-2 Prospectus

Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591363; DX-7

(2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-

FHFA_04732658.)

195.    Further, six of the prospectus supplements warned that the values

underlying LTV ratios were subject to change.  The prospectus supplements stated that "[t]he

value of a Mortgaged Property as of the date of initial issuance of the related series may be less

than the Value at origination and will fluctuate from time to time based upon changes in

economic conditions and the real estate market," and that "[n]o assurance can be given that the

values of the related Mortgaged Properties have remained or will remain at the levels in effect on

the dates of origination of the related Mortgage Loans."  (DX-1 (2005-AR6 Prospectus

Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811896; DX-3

(2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-

FHFA_04620974; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-

FHFA_04638315) at NOM-FHFA_04638402; DX-5 (2007-1 Prospectus Supplement, dated Jan.

29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142028; DX-6 (2007-2 Prospectus

Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591417; DX-7

(2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-

FHFA_04732714.)

196.    Each prospectus supplement disclosed that a portion of the mortgage loans

backing the Certificates purchased by Freddie Mac and Fannie Mae had LTV ratios of 80% or

higher at the time of origination:

- The 2005-AR6 prospectus supplement disclosed that 0.93% of the mortgage
  loans backing the Certificate Fannie Mae purchased had original LTV ratios
  of 80% or higher.  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29,
  2005, NOM-FHFA_04811802) at NOM-FHFA_04811861.)  The average

LTV ratio for all loans backing the Certificate Freddie Mac purchased was 74.68%.  (*Id*.)

- The 2006-FM1 prospectus supplement disclosed that 37.36% of the mortgage loans backing the Certificate Freddie Mac purchased had original LTV ratios of 80% or higher.  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474).)  The average LTV ratio for all loans backing the Certificate Freddie Mac purchased was 81.07%.  (*Id*.)

- The 2006-HE3 prospectus supplement disclosed that 41.2% of the mortgage loans backing the Certificate Freddie Mac purchased had original LTV ratios of 80% or higher.  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620931.)  The average LTV ratio for all loans backing the Certificate Freddie Mac purchased was 78.97%.  (*Id*.)

- The 2006-FM2 prospectus supplement disclosed that 31.61% of the mortgage loans backing the Certificate Freddie Mac purchased had original LTV ratios of 80% or higher.  (DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638363.)  The average LTV ratio for all loans backing the Certificate Freddie Mac purchased was 80.58%.  (*Id*.)

- The 2007-1 prospectus supplement disclosed that 5.76% of the mortgage loans backing the Certificate Freddie Mac purchased had original LTV ratios of 80% or higher.  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141990.)  The average LTV ratio for all loans backing the Certificate Freddie Mac purchased was 77.47%.  (*Id*.)

- The 2007-2 prospectus supplement disclosed that 43.41% of the mortgage loans backing the Certificate Freddie Mac purchased had original LTV ratios of 80% or higher.  (DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591375.)  The average LTV ratio for all loans backing the Certificate Freddie Mac purchased was 81.86%.  (*Id*.)

- The 2007-3 prospectus supplement disclosed that 40.69% of the mortgage loans backing the Certificate Freddie Mac purchased had original LTV ratios of 80% or higher.  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732672.)  The average LTV ratio for all loans backing the Certificate Freddie Mac purchased was 81.27%.  (*Id*.)

197.    The prospectus supplement for 2007-3, which was issued after a number

of subprime originators had declared bankruptcy, further disclosed that:

> **The Bankruptcy of Certain of the Originators May Adversely
> Affect the Performance and Market Value of Your
> Securities**. . . . The Depositor is aware that the originators of
> approximately 79.04% of the Mortgage Loans, by aggregate
> principal balance as of the Cut-off Date, have filed for bankruptcy
> protection under the United States Bankruptcy Code.  These
> originators include ResMAE Mortgage Corporation, which
> originated approximately 77.61% of the Mortgage Loans, by
> aggregate principal balance as of the Cut-off Date.  Any originator
> whose financial condition was weak or deteriorating at the time of
> origination may have experienced personnel changes that
> adversely affected its ability to originate mortgage loans in
> accordance with its customary standards.  It may also have
> experienced reduced management oversight or controls with
> respect to its underwriting standards.  Accordingly, the rate of
> delinquencies and defaults on these Mortgage Loans may be higher
> than would otherwise be the case.

(DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-

FHFA_04732664.)

198.    In sum, the Offering Documents made clear, through multiple disclosures,

that a decline in housing prices and deteriorating economic conditions could cause Freddie Mac

and Fannie Mae to lose money on their Certificates, and that the mortgage loans underlying the

Securitizations were more risky than many other mortgage loans in the market during 2005 to

2007 time period.

## III.    THE DECLINE IN HOUSE PRICES CAUSED LOSSES ON THE
## CERTIFICATES PURCHASED BY FREDDIE MAC AND FANNIE MAE

199.    There is a close correlation between house price declines and worsening

macroeconomic conditions on the one hand, and mortgage loan defaults and delinquencies on the

other.  *See* ¶¶ 203-217, *infra*.  House prices in the United States began a severe decline in April

2007 and by 2011 had fallen nearly 33% from their peak.  *See* ¶ 223, *infra*.  In addition, the

-63-

economy entered a recession in the fourth quarter of 2007, which lasted until the second half of

2009.  *See* ¶ 226, *infra*.  As house prices declined and the economy worsened, borrowers

defaulted on their mortgages at very high rates.  *See* ¶¶ 232-248, *infra*.

> 200.    Freddie Mac and Fannie Mae have two principal kinds of assets: mortgage

loans and MBS.  *See* ¶ 7, *supra*.  MBS includes both agency securities and PLS like the ones at

issue in this Action.  *See* ¶ 7, *supra*.  When house prices declined and the economy entered a

recession, the value of both mortgage loans and MBS declined.  *See* ¶¶ 232-248, *infra*.  Freddie

Mac and Fannie Mae thus experienced substantial losses in their portfolios of these assets.  *See*

¶¶ 232-248, *infra*.  Freddie Mac and Fannie Mae reported to their investors in public filings with

the SEC that their losses were largely attributable to house price declines and macroeconomic

conditions.  *See* ¶¶ 232-248, *infra*.  FHFA said the same thing in its reports to Congress.  *See* ¶¶

220, 235, *infra*.  Freddie Mac and Fannie Mae documents produced in discovery in this Action

and testimony of Freddie Mac and Fannie Mae witnesses in this Action also show that Freddie

Mac's and Fannie Mae's losses on mortgages and MBS were attributable to house price declines

and macroeconomic conditions.  *See* ¶¶ 236-238, 245, 257-263, *infra*.

> 201.    As Freddie Mac and Fannie Mae experienced losses on mortgages and

MBS, those losses caused a decline in the value of their shares traded on the New York Stock

Exchange during the relevant period.  After their stock prices declined, both Freddie Mac and

Fannie Mae were named as defendants in various stockholder lawsuits.  In court filings in those

actions, which constitute judicial admissions, both Freddie Mac and Fannie Mae represented that

the losses they experienced were attributable to the decline in housing prices and macroeconomic

conditions.  *See* ¶¶ 264-275, *infra*.

202.     As with Freddie Mac and Fannie Mae's mortgage and MBS investments as a whole, the supporting loan groups for the seven Certificates in this Action experienced an increase in defaults and delinquencies as house prices declined and macroeconomic conditions worsened.  *See* ¶¶ 276-280, *infra*.  And just as with Freddie Mac and Fannie Mae's broader portfolios, the decline in value of the Certificates was closely correlated with declining house prices and worsening macroeconomic conditions.  *See* ¶¶ 276-280, *infra*.  As a result, the alleged losses on the  Certificates were not caused in any part by the allegedly false or misleading statements in the Offering Documents.  *See* ¶¶ 276-283, *infra*.

**A.     There Is a Strong Correlation Between House Price Declines, Macroeconomic Conditions and Defaults and Delinquencies on Mortgage Loans.**

  ***1.     Defaults and Delinquencies on Mortgage Loans Are Correlated to House Price Declines.***

203.     From the late 1990s to 2006, the increased demand for homes, as well as a steady decline in interest rates, low levels of unemployment and high consumer confidence, led home prices nationwide to rise rapidly.  (Vandell Aff. ¶¶ 34-40.)   From 1945 through the end of 1999, home prices in the U.S. had grown at an average annual rate of approximately 4.9 percent; from 2000 through the end of 2005, home prices grew at more than twice that rate, an average of 11.3 percent per year.  (Vandell Aff. ¶ 75.)  Moreover, government policies increased the number of people eligible for mortgage loans by encouraging homeownership and lending to lower-income households.  (Vandell Aff. ¶¶ 48-57.)

204.     To accommodate these borrowers, mortgage loan originators expanded or "loosened" the criteria used to make mortgage loans to borrowers—the underwriting guidelines. (Vandell Aff. ¶¶ 58-66.)   Originators also created new "non-traditional" loan products, such as loans that required little or no documentation of borrower income, assets or debts as well as

mortgage loan products that made mortgages more affordable, like adjustable-rate loans and interest-only loans.  (Vandell Aff. at ¶¶ 58-66.)  During this period, originators also began originating more loans with multiple "layers" of risk, meaning that the loan had two or more characteristics that increased the credit risk of the loan.  (Vandell Aff. at ¶ 61.)

205.    These new products had risky attributes, not only because borrowers could misstate their income or assets and because "teaser" rates could reset, but also because they were often offered to borrowers having little or no experience as homeowners.   During the period 2003 to 2005 alone, the number of subprime loans nearly doubled, from 1.1 million to 1.9 million.  (Vandell Aff. ¶ 62.)

206.    Borrowers have a far greater economic incentive and ability to pay their mortgages in an environment of rising home prices than when house prices are declining. (Vandell Aff. at ¶¶ 86, 111-115.)  Similarly, when house prices are stable or appreciating, a homeowner who can no longer afford to pay his or her mortgage can sell the house or refinance to mitigate losses and avoid default.  (Vandell Aff. at ¶¶ 86, 111-115; *see also* Rosenblatt Tr. at 198:5-10 (Fannie Mae's Vice President testifying that some loans were dependent "on the ability of a borrower to refinance after a short period of time or sell the house.").)  If the principal balance of a mortgage loan exceeds the current value of the home, however, a borrower is more likely to default as compared to a borrower who has equity in the property.  (Rebuttal Report of James R. Barth ("Barth Report"), dated Nov. 10, 2011) at ¶ 19.)

207.    Freddie Mac and Fannie Mae themselves recognized the strong correlation between house price decline and mortgage loan losses.

208.    Freddie Mac warned its shareholders that a decline in housing prices would result in increased loan delinquencies in its 2006 Annual Report, dated March 23, 2007:

"A general decline in U.S. housing prices or changes in the U.S. housing market could

negatively impact our business and earnings. . . .   A continued reversal of this strong home price

appreciation in any of the geographic markets we serve could result in an increase in

delinquencies or defaults and a higher level of credit-related losses, which could reduce our

earnings."  (DX-43 (Freddie Mac 2006 Annual Report, dated March 23, 2007) at 14.)

209.     Freddie Mac's documents note the "strong correlation" between a decline

in home price appreciation and mortgage defaults.  Freddie Mac's Risk Measurement & Capital

Strategy group issued a "Strategic Perspective" report to most employees at Freddie Mac every

few months.  In the October 2007-January 2008 issue, Freddie Mac's Risk Measurement &

Capital Strategy group stated:

> HPA [Home Price Appreciation] is important in the outlook for
> Freddie Mac's business as ***history shows a strong correlation
> between significant HPA declines and defaults***.  Generally,
> defaults occur as the result of two conditions colliding.  The first
> condition is that a borrower loses the ability to make payments
> through the loss of a job or income source.  The second condition
> is that the market value of the house is typically below the
> outstanding balance of the loan (if it were materially above the
> borrower could sell the house and avoid losing the equity).  ***It is
> the second condition that makes HPA an important correlate of
> defaults.***

(DX-718-A at FHFA06128689-90 (emphasis supplied).)

210.     In the same October 2007-January 2008 issue of its "Strategic

Perspective" report, Freddie Mac's Risk Measurement & Capital Strategy group also noted that,

as of October 2007, "the rapidity and magnitude of price declines is historically unprecedented."

(DX-718-A (Strategic Perspective, dated Oct. 2007-Jan.2008, FHFA06128686) at

FHFA06128686.)

211.    In a presentation to HSBC dated August 30, 2007, Fannie Mae noted that

"Appreciation Keeps Mortgage Losses Low" and that "Home Prices and Mortgage Losses Move

in the Opposite Direction."  (DX-642 ("Our Most Important Deal Is You" presentation,

FHFA00506314) at FHFA00506317; Rosenblatt Tr. at 209:25-211:11 (discussing the

presentation to HSBC).)  The Fannie Mae presentation included the chart below illustrating this

correlation between home price appreciation and mortgage losses during the period from 1992

through the first quarter of 2006:



(DX 642 ("Our Most Important Deal Is You" presentation, FHFA00506314) at

FHFA00506317.)  This chart shows that the "loss rate" in the period from about 2000 through

the first quarter of 2006, when house prices were increasing significantly, was about 2%.[1]  Eric

Rosenblatt, Vice President at Fannie Mae testified that the "main point is that the loss in the

home – in the period of the year where prices are rising, there are virtually no losses."

(Rosenblatt Tr. at 211:8-11.)

    212. Peter Federico, Senior Vice President of Asset and Liability Management

at Freddie Mac, told investors on a March 12, 2008 earnings call that "[h]ouse prices have long

been the predominant driver of mortgage defaults."  (DX-734 (Freddie Mac Investor/Analyst

Call, dated Mar. 12, 2008) at 15.)  Federico also explained on the same call that "[d]uring

periods of rising house prices, defaults tend to be low, and conversely as you know, as house

prices fall and stagnate as they are today defaults rise."  (DX 734 at 12.)

    213. At the end of 2009, about 24% of all mortgaged residential properties in

the United States had negative equity.  (Vandell Aff. ¶ 111; Barth Report at ¶ 19.)  Frank

Vetrano, a Senior Director at Freddie Mac, testified that "if the value of the house declines to a

point that it's below the amount that a borrower owes for that house, at that point a borrower

may have the option of defaulting on the loan and walking away from the house."  (Vetrano Tr.

at 692:22-694:3.)  Fannie Mae Vice President Eric Rosenblatt testified that such borrowers could

be described as "strategic defaulters," explaining that "when they see that their house is worth a

lot less than their loan amount," they may opt to default.  (Rosenblatt Tr. at 197:13-198:4.)

---

[1] The Court's February 18, 2015 ruling excluded evidence related solely to the Single
Family business of Freddie Mac and Fannie Mae.  Doc. No. 1287.  Defendants respectfully
submit that the above-cited evidence, which concerns the general (and well-accepted) correlation
between home price depreciation and mortgage defaults is not evidence related solely to the
Single Family business of Fannie Mae.

Similarly, Gary Kain, Senior Vice President of Freddie Mac, testified that "if housing prices were to decline, the borrower's equity in the house, at some point, they can owe more than their house is worth" and this would prompt them to have a "default option" which "is in the money." (Kain Tr. at 744:17-745:12.)  Kain stated that it "could pay" the borrowers to default if they "decide to just walk away from the house and no longer, you know they will hurt their credit but they won't owe $260,000 on a $150,000 house."  (Kain Tr. at 745:5-12.)

214.    Similarly, Freddie Mac's Vice President of Investments and Capital Markets, Patti Cook, stated in a Freddie Mac January to March 2007 "Strategic Perspective" report to Freddie Mac personnel that "[r]ising house prices in the past few years have protected a large number of borrowers from defaulting because they could refinance or sell their home.  That is no longer true—slowing HPA [house price appreciation] and climbing rates have left a large number of borrowers exposed."  (DX-541 (Strategic Perspective, dated Jan. to March 2007, FHFA03703593) at FHFA03703595).

215.    Additionally, approximately 75% of subprime mortgages and 10% of Alt-A mortgages originated between 2003 and 2007 had initially low rates of interest that reset to much higher rates after a period of one or two years.  (Vandell Aff. at ¶ 117.)  The mortgages underlying the Certificates were subprime and/or Alt-A mortgages.  *See* ¶¶ 40, 56, 73, 90, 106, 121, 138, *supra*.  Many of these borrowers expected to be able to refinance before the interest rate on their mortgage reset.  (Vandell Aff. at ¶¶ 118-120.)  When home values declined sharply, more borrowers were unable to refinance, and as a result defaulted or become delinquent on their loans.  (Vandell Aff. at ¶ 118-120.)

216.    Fannie Mae's Eric Rosenblatt testified that, for borrowers with subprime loans that had large interest rate resets, a decline in house prices meant that those borrowers were

"not able to refinance or sell their homes" and that "as a result, then they're not able, then, to get out of a loan that they can no longer continue to pay." (Rosenblatt Tr. at 198:20-199:5.)

217.    In addition to increasing default and delinquency rates, declining house prices also give rise to increased loss severity.  Loss severity is a measure of the size of the loss from a mortgage defaults.  (Cao Tr. at 271:12-271:25; Wood Tr. at 607:25-608:7)  When a house is sold through foreclosure, for example, the amount recovered by the mortgagee will depend on the sales price, so lower house prices mean that less can be recovered on defaulting loans.  (*See* Wood Tr. at 608:8-608:24.)  Bruce Wood, Senior Director at Freddie Mac, testified at deposition that loss severities "can even go down to zero sometimes." (Wood Tr. at 608:20-24.)

## 2.    *Mortgage Defaults and Delinquencies Are Correlated to Worsening Economic Conditions.*

218.    In addition to falling house prices, economic conditions, including a tightening of credit markets and increasing unemployment, also contribute to mortgage defaults and delinquencies.  Unemployment contributes to defaults as borrowers are unable to pay their mortgages, which further reinforces downward pressure on house prices.  (Vandell Aff. ¶¶ 84-86.)  Tightening credit conditions result in higher interest rates and increases the difficulty of refinancing, which also increases defaults and delinquencies.  (Vandell Aff. ¶¶ 108-109; DX-937 (Freddie Mac Mem. of Law, dated Oct. 9, 2013) at 4; DX-919 (Freddie Mac Mem. of Law, Oct. 13, 2011) at 3.)

219.    In FHFA's 2008 Annual Report to Congress, dated May 18, 2009, FHFA noted the relationship between unemployment and house prices:  "Particularly high unemployment and rising foreclosures" also causes house prices to drop.  (DX-2580 (FHFA 2008 Annual Report to Congress, dated May 18, 2009) at 10.)

220.    In its report to Congress for the year 2009, FHFA noted that the "rise in unemployment and the continued decline in house prices are significant economic factors that left many homeowners unable to refinance their mortgages or make mortgage payments." (DX-2586 (FHFA 2009 Annual Report to Congress) at 29.)  FHFA thus acknowledged the correlation between macroeconomic events including a decline in home prices, with the failure of borrowers to make mortgage payments.

221.    Freddie Mac's Gary Kain testified that one "factor[] affect[ing] the MABS [Mortgage Asset-Backed Securities] portfolio post mid 2007" was "the tightening of credit in the market." (Kain Tr. at 142:19-143:5.)  This tightening of credit standards, reducing the availability and increasing the cost of credit, made it even more difficult for borrowers to refinance loans.  (Vandell Aff. at ¶¶ 108-109.)  Gary Kain explained that "[t]ightening of credit would mean that . . . borrowers couldn't get loans which would put incremental pressure on . . . housing." (Kain Tr. at 143:2-5.)

222.    Fannie Mae's Eric Rosenblatt similarly testified that "tightening credit standards mean there will be a demand shock, negative demand shock" and that "negative demand shock" means that "less people are eligible to buy houses" and "that pushes prices down." (Rosenblatt 199:23-201:9.)

**B.**    **Beginning in 2007, House Prices Fell Steeply and the Economy Entered a Recession**

223.    After a period of steady increases, house prices peaked in April 2006. (Vandell Aff. ¶ 77; DX-860 (Freddie Mac Memorandum of Law, dated Sept. 23, 2009) at 10.) Following April 2006, house prices fluctuated for a time.  (Vandell Aff. ¶ 77; DX-860 at 10.)  In 2007, national house price indices began to decline significanlty, and in the following four years house prices fell in the United States by nearly 33%:



DX-2759 (a graphical representation of the S&P/Case Shiller composite index home price change by year).).

224.    The following chart, reproduced from Freddie Mac's own filings in federal courts in 2010, 2011 and 2013 in two separate securities actions in which it was named as a defendant, *see* ¶ 277, *infra*, presents S&P/Case-Shiller Home Price Index data for the period from 1988 through 2008:



(DX 937 (Freddie Mac Memorandum of Law, dated Oct. 9, 2013) at 4.; DX 2585 (Freddie Mac Reply Memorandum, dated Feb. 24, 2010) at 2; DX 919 (Freddie Mac Memorandum of Law, Oct. 13, 2011) at 3.)

225.    The causes of the steep decline in house prices from 2007 onward were numerous and mutually reinforcing.  (Vandell Aff. at ¶¶ 87-137; DX- 937 (Freddie Mac Memorandum of Law, dated Oct. 9, 2013) at 4.)  A softening of demand for housing from higher prices and interest rates, coupled with an oversupply of houses in the market led to a steep decline in house prices, and that decline in house prices led borrowers to have negative equity in their houses, which together with the new tightened underwriting guidelines limited borrowers' ability to refinance their existing loans.  (Vandell Aff. at ¶¶ 85-86; DX-919 (Freddie Mac Memorandum of Law, Oct. 13, 2011) at 3.)  As unemployment increased and the economy faltered, defaults and foreclosures increased.  (Vandell Aff. at ¶¶ 30.)

226.    The decline in house prices beginning in April 2007 was followed by a severe economic downturn starting at the end of 2007.  The recession—a period of significant

decline in economic activity spread across the economy—lasted from the fourth quarter of 2007 through the second quarter of 2009 (with housing prices continuing to fall into 2011).  (Vandell Aff. at ¶ 83; LaRocca Aff. at ¶ 40.)  It was the longest and most severe recession in the United States since the Great Depression of the 1930s. (Vandell Aff. at ¶¶ 83-86; DX- 919 (Freddie Mac Mem. of Law, Oct. 13, 2011) at 10.)  During the recession, unemployment in the U.S. rose, and by the end of 2009, had reached its highest level in more than 25 years.  (Vandell Aff. at ¶ 84.)  Job losses contributed to both falling demand for housing and an increased incidence of delinquency and default by mortgage borrowers.  (Vandell Aff. at ¶ 84; DX-57 (Freddie Mac 2008 Form 10-K, filed on March 11, 2009 with the SEC) at 141.)

227.    In reports of surveys of credit underwriting practices conducted by the Office of the Comptroller of the Currency ("OCC") in 2007, bank examiners reported that banks were tightening their credit standards.  (*See* Vandell Aff. at ¶ 108 (describing OCC surveys of underwriting practices).)  Tightening credit and underwriting standards in 2007 further eroded borrowers' ability to refinance out of their subprime mortgages, thereby further depressing house prices.  (Vandell Aff. at ¶¶ 108-109; DX-919 (Freddie Mac Mem. of Law, Oct. 13, 2011) at 10.)  Those who tightened underwriting standards included Freddie Mac.  Freddie Mac "announced on February 27, 2007 that it would implement stricter investment standards for certain subprime ARMs with short adjustment periods originated after September 1, 2007."  (DX-43 (Freddie Mac 2006 Annual Report, dated March 23, 2007) at 69; *see also* DX-483 ("Subprime Lending Standards Press Talking Points," dated Feb. 2007, FHFA18411401) at FHFA18411401.)

### C.    The Decline in the Housing Market Caused Freddie Mac and Fannie Mae to Suffer Losses to Their PLS Portfolios

228.    As described above at ¶¶ 6-21, *supra*, Freddie Mac and Fannie Mae were very large investors in the mortgage market, both in mortgage loans and MBS, including PLS of

the type at issue in this Action.  In both cases, the value of Freddie Mac's and Fannie Mae's investments was dependent on borrowers paying their mortgage loans on a timely basis.  If significant numbers of borrowers became delinquent or defaulted, the vlaue of Freddie Mac's portfolio (both mortgage loans and MBS, including PLS) would by definition decline.

229.    Any decline in the housing market necessarily adversely impacted Freddie Mac and Fannie Mae's and it did.  As of June 30, 2008, Freddie Mac's $212 billion retained mortgage portfolio had unrealized losses of $30 billion (DX-803 (Memorandum from Christopher Dickerson, dated Sept. 6, 2008) at 22) and Fannie Mae had an estimated fair value loss of $7.9 billion on its $48.8 billion portfolio of subprime and Alt-A PLS, including those at issue in this case.  (DX-802 (Memorandum from Christopher Dickerson, dated Sept. 6, 2008) at 27.)

**D.    Freddie Mac's and Fannie Mae's Explanation of Their Losses**

230.    On September 2, 2011, FHFA filed the Complaint in this Action, claiming that "Defendants' misstatements and omissions on the Registration Statements regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchase of" the Certificates.  (Compl. at ¶ 135.)  This allegation is contradicted by public statements, court filings and internal documents of Freddie Mac, Fannie Mae, and FHFA itself, from both before and after September 2011.

*1.    Freddie Mac and Fannie Mae Attributed Their Losses to House Price Declines and Macroeconomic Conditions in Public Filings*

231.    Beginning in 2007, Freddie Mac, Fannie Mae, and FHFA, in public disclosures and reports, all attributed the losses Freddie Mac and Fannie Mae were experiencing to the downturn in the housing market and the worsening economy.

232.    Fannie Mae stated in its Form 10-Q filing for the period ending June 30, 2007, filed with the SEC on November 9, 2007, that:

> The provision for credit losses increased by $290 million, or 201%, to $434 million for the second quarter of 2007, from $144 million for the second quarter of 2006.  The provision for credit losses increased by $460 million, or 206%, to $683 million for the first six months of 2007, from $223 million for the first six months of 2006.  The increase in each period is attributable to an increase in net charge-offs during each period.  ***The increase in net charge-offs in each period reflects higher default rates and an increase in the average amount of loss per loan, or charge−off severity, resulting from continued economic weakness in the Midwest region and the national decline in home prices during the first six months of 2007.  The higher default rates are, in part, due to earlier than anticipated defaults on loans originated in 2006.***  The increase in charge−off severity is attributable to the combined effect of the national decline in home prices and the higher unpaid principal balances of these loans going to foreclosure.

(DX-47 (Fannie Mae June 30, 2007 Form 10-Q, filed on Nov. 9, 2007 with the SEC) at 23 (emphasis supplied).)  Thus, even at the outset of the decline in house prices and the beginning of the recession, Fannie Mae attributed its losses on its mortgages and MBS to macroeconomic events leading to "higher default rates" and "an increase in the average amount of loss per loan." (DX-47 at 23.)

233.    During an August 16, 2007 earnings call with investors, discussing Fannie Mae's earnings for 2006, Fannie Mae's Chief Risk Officer and Executive Vice President from 2006 through 2008, Enrico Dallavecchia, stated:

> The increasing credit losses we experienced in 2006 was largely driven by the combination of weak economic conditions and weak to negative home price appreciation over the last year, centered in the Midwestern state[s] of Michigan, Indiana, and Ohio.  We are currently seeing also other regions experiencing increases in delinquencies and foreclosures, specifically in Florida, California, Arizona, and Nevada.  These states have relatively robust economies but are now seeing notable home price decline after

> steep run-ups in recent years.  We are also seeing weakness in
> Massachusetts.  Given this, we expect to see increased credit losses
> from this state in 2008. Again to be clear, we will experience
> higher credit losses.

(DX-633 (Fannie Mae FY 2006 Earnings Call, dated August 16, 2007) at 14.)  Dallavecchia

testified in this Action that Fannie Mae held quarterly earnings calls with investors on which he

recalled speaking, and he said that he would not have told investors anything he believed to be

untrue during a quarterly earnings call.  (Dallavecchia Tr. at 167:11-168:5.)

234.    Freddie Mac's 2007 Annual Report to Congress, dated February 28, 2008

and Fannie Mae's Form 10-K for 2007, filed with the SEC on February 27, 2008, similarly

attributed their losses to "national home price declines and economic weakness in some regional

markets."  (DX-49 at 49 (Fannie Mae 2007 Form 10-K, filed on Feb. 27, 2008 with the SEC) ;

*see also* DX-50 (Freddie Mac 2007 Annual Report, dated Feb. 28, 2008) at 31.)

235.    In its 2007 Annual Report, dated February 28, 2008, the Office of Housing

Enterprise Oversight ("OFHEO"), Freddie Mac and Fannie Mae's regulator and the predecessor

of FHFA, the plaintiff in this Action, attributed the poor financial performance of Freddie Mac

and Fannie Mae in 2007 "to the rapid deterioration in credit performance associated with house

price declines and disruption of the mortgage market."  (DX-746 (OFHEO 2007 Annual Report

to Congress, dated Feb. 28, 2008) at 1.)

236.    Internal analyses conducted by Freddie Mac also concluded that its MBS

portfolio, specifically, was experiencing losses due to the downturn in housing prices and

macroeconomic conditions.  A report titled "Analysis of Freddie Mac's Asset-Backed Securities

Portfolio" distributed on February 27, 2008 to Gary Kain, Patti Cook, Bruce Wood, and

Raymond Romano, among others, written by a Vice President at Freddie Mac, Leslie Pitcher,

stated that "[t]he downturn in the nation's housing and credit markets has resulted in an

unprecedented rise in subprime delinquencies."  (DX-722-A ("Analysis of Freddie Mac's Asset-Backed Securities Portfolio, dated Feb. 28, 2008 FHFA12160371) at FHFA12160374; Syron Tr. at 276-277:12 (reviewing the document).)

237.    On August 29, 2008, Freddie Mac's Chief Enterprise Risk Officer, Anurag Saksena, wrote a memorandum to Freddie Mac's Board of Directors regarding the "Chief Enterprise Risk Officer's Annual Report to the Board of Directors."  (DX-2820-A (Memorandum from Anurag Saksena, dated Aug. 29, 2008 FHFA13308419) at FHFA13308419.)  In that report to the Board, Freddie Mac's Chief Enterprise Risk Officer stated that the "mortgage finance markets continue to present unprecedented challenges to all participants."  (DX-2820 at FHFA13308419.)  He also explained to the Board that:  "The precipitous drop of house prices and the resulting increase in mortgage credit losses is the primary cause of our weakened financial condition."  (*Id.*)  In the same memorandum, Saksena also discussed the Freddie Mac Enterprise Risk Office's "independent reviews" of Freddie Mac's "Non-Agency MABS [Mortgage Asset Backed Securities] portfolio," *i.e.*, its PLS portfolio, concluding:  "ERO's [the Enterprise Risk Office's] independent reviews of the portfolio point to further impairments if the housing market continues its current trajectory."  (*Id.* at FHFA13308423.)  Thus, Freddie Mac's Chief Enterprise Risk Officer made clear to the Board in 2008 that the drop in house prices was the "primary cause" of Freddie Mac's losses, including its PLS losses which were linked to the downward "trajectory" of the housing market.

238.    In a January 29, 2008 Memorandum to Freddie Mac's Board of Directors providing a "Credit Overview," Raymond Romano, the Chief Credit Officer at Freddie Mac stated:

> *We are experiencing the most significantly stressed credit environment observed in the U.S. housing markets since World War II and perhaps*

> *since the Great Depression.  Recent worsening in macro-economic*
> *conditions, and their impact on home values, are likely to add further*
> *stress* and any signs of a recovery remain unclear.  Given Freddie Mac's
> charter and mono-line purpose to provide liquidity stability and
> affordability to the mortgage market, and subsequent lack of
> diversification into other sectors, we remain uniquely exposed to these
> housing credit events despite a historically lower credit risk experience as
> compared to current conditions.

(DX-2886 (Memorandum from Ray Romano, dated Jan. 29, 2008) at FHFA12125954 (emphasis

supplied).)  Mr. Romano also discussed the losses in Freddie Mac's PLS portfolio in his

Memorandum to Freddie Mac's Board, noting the link between declining house prices and the

value of the PLS:  "As housing prices continue to fall and collateral performance further

deteriorates, additional downgrades are expected in 2009."  (*Id.* at FHFA12125963 (emphasis

supplied).)  Mr. Romano also wrote with respect to Freddie Mac's PLS portfolio that "[m]onthly

severity numbers have been much higher in recent months as a result of housing price

depreciation and prolonged liquidation timelines."  (*Id.* (emphasis supplied).)

      239.  Freddie Mac and Fannie Mae continued to attribute their losses to housing

price declines and macroeconomic causes as the markets continued to fall.  Freddie Mac's Form

10-K for the year 2008, filed with the SEC on March 11, 2009, stated that "macroeconomic

conditions deteriorated during 2008, which affected the performance of all types of mortgage

loans."  (DX-57 (Freddie Mac 2008 Form 10-K, filed on March 11, 2009 with the SEC) at 141.)

      240.  In its quarterly report on SEC Form 10-Q for the quarter ending March 31,

2009, filed with the SEC on May 8, 2009, Freddie Mac stated that it was experiencing increased

delinquency rates "for all product types" and that the data "suggests that continuing home price

declines and growing unemployment are significantly affecting behavior by a broader segment of

mortgage borrowers."  (DX-59 (Freddie Mac March 31, 2009 Form 10-K, filed on May 8, 2009

with the SEC) at 4.)  In that SEC filing, Freddie Mac directly tied the performance of its PLS

portfolio to the "continued deterioration in economic and housing market conditions during the first quarter of 2009." (DX-59 (Freddie Mac March 31, 2009 Form 10-K, filed on May 8, 2009 with the SEC) at 4.)

241.    Similarly, Fannie Mae in its Form 10-Q filing for the period ending June 30, 2009, filed with the SEC on August 6, 2009, stated that its "financial results for the second quarter and first six months of 2009 were adversely affected by the ongoing deterioration in the housing and mortgage markets, the economic recession and rising unemployment." (DX-60 (Fannie Mae June 30, 2009 Form 10-Q, filed on August 6, 2009 with the SEC) at 4.)

242.    In 2010 and 2011, both Freddie Mac and Fannie Mae continued to attribute the cause of their losses to macroeconomic factors and declines in house prices. Freddie Mac in its Annual Report to the SEC on Form 10-K for 2010, filed with the SEC on February 24, 2011, stated that it had been "significantly adversely affected by deteriorating conditions in the single-family housing and mortgage markets during 2008 and 2009." (DX-72 (Freddie Mac 2010 Form 10-K, filed on Feb. 24, 2011 with the SEC) at 117; *see also* DX-81 (Freddie Mac 2010 Form 10-K, dated March 9, 2012) at 141.)

243.    Freddie Mac also reported in its 2010 Form 10-K, filed with the SEC on February 24, 2011, that: "All types of single-family mortgage loans have been affected by the compounding pressures on household wealth caused by declines in home values that began in 2006 2006 and the ongoing weak employment environment." (DX-72 (Freddie Mac 2010 Form 10-K, filed on Feb. 24, 2011 with the SEC) at 118; *see also* DX-81(Freddie Mac 2010 Form 10-K, dated March 9, 2012) at 141.)

244.    Fannie Mae's 2010 and 2011 Form 10-K filings, filed with the SEC on February 24, 2011 and February 29, 2012 contain similar statements, with Fannie Mae

-81-

attributing its poor financial results, and losses on its PLS portfolio, to "the continued weakness in the housing and mortgage markets, which remain under pressure from high levels of unemployment and underemployment, and the impact of the adoption of new accounting standards and the consolidation of the majority of our MBS trusts." (DX-73 (Fannie Mae 2010 10-K, filed on Feb. 24, 2011 with the SEC) at 6-7; *see also* DX-80 (Fannie Mae 2011 10-K, filed on Feb. 28, 2012 with the SEC) at 8.) Fannie Mae in its 2011 Form 10-K also attributed an "increase in credit-related expenses primarily driven by a decline in actual and projected home prices." (DX-80 at 8.)

245. In a February 28, 2010 report distributed to Freddie Mac employees, Freddie Mac's Non-Agency Credit Risk Subcommittee stated that "housing price depreciation and prolonged liquidation timelines" were the causes of rising loss severity. (DX-871 (Non-Agency Portfolio Credit Review, Feb. 28, 2010, FHFA12219522) at FHFA12219536; Wood Tr. at 609:12-610:8 (stating that this was a "regularly produced report" at Freddie Mac.).) As noted above, loss severity is the average loss per loan.

246. Freddie Mac in its Form 10-Q for the period ending June 30, 2013, filed with the SEC on August 7, 2013, summarized the factors that had been affecting the performance of loans underlying its PLS portfolio, as follows:

> The credit performance of loans underlying our holdings of non-agency mortgage-related securities declined since 2007 and, although stabilizing in recent periods, remains weak. This decline has been particularly severe for subprime, option ARM, and Alt-A and other loans. ***Economic factors that have negatively affected the performance of our investments in non-agency mortgage-related securities since 2007 include high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions and weaker consumer confidence.*** In addition, subprime, option ARM, and Alt-A and other loans backing the securities we hold have significantly greater concentrations in the states that have undergone the greatest

> economic stress during the housing crisis that began in 2006, such
> as California and Florida.  Loans in these states are more likely to
> become seriously delinquent and the credit losses associated with
> such loans are likely to be higher than in other states.

(DX-92 at 41 (emphasis supplied).)

247.    Freddie Mac made similar statements in its Form 10-Q filings for the

period ending September 30, 2013, filed with the SEC on November 7, 2013.

> The credit performance of loans underlying our holdings of
> non-agency mortgage-related securities declined since 2007 and,
> although stabilizing in recent periods, remains weak.  This decline
> has been particularly severe for subprime, option ARM, and Alt−A
> and other loans.  ***Economic factors that have negatively affected
> the performance of our investments in non-agency
> mortgage-related securities at various times since 2007 include
> high unemployment, a large inventory of seriously delinquent
> mortgage loans and unsold homes, tight credit conditions, and
> weak consumer confidence.***  In addition, subprime, option ARM,
> and Alt-A and other loans backing the securities we hold have
> significantly greater concentrations in the states that have
> undergone the greatest economic stress during the housing crisis
> that began in 2006, such as California and Florida. Loans in these
> states are more likely to become seriously delinquent and the credit
> losses associated with such loans are likely to be higher than in
> other states.

(DX-94 (Freddie Mac Sept. 30, 2013 Form 10-Q, filed on Nov. 7, 2013 with the SEC) at 44-45

(emphasis supplied).)  Again, Freddie Mac acknowledged that the performance of its PLS

investments had been negatively affected by macroeconomic factors.

248.    Freddie Mac again made similar statements in its Form 10-Q filings for

the period ending and the period ending June 30, 2014, filed with the SEC on August 7, 2014:

> The credit performance of loans underlying our holdings of non-agency
> mortgage-related securities has declined since 2007 and, although it has
> stabilized in recent periods, it remains weak.  This decline has been
> particularly severe for subprime, option ARM, and Alt-A and other loans.
> ***Our investments in non-agency mortgage-related securities have at times
> been negatively affected by high unemployment, a large inventory of
> seriously delinquent mortgage loans and unsold homes, tight credit***

-83-

**conditions, and weak consumer confidence.**  In addition, the loans which serve as collateral for the securities we hold have significantly greater concentrations in the states that have undergone the greatest economic stress during the housing crisis that began in 2006, such as California and Florida.

(DX-100 (Freddie Mac June 30, 2014, filed on Aug. 7, 2014 with the SEC) at 40 (emphasis supplied).)

249.    In sum, since they began incurring losses on mortgages and MBS investments in 2007, Freddie Mac and Fannie Mae consistently recognized and reported that house price declines and macroeconomic factors were the cause of their losses.  Notably, not a single one of the public statements and reports discussed above mentions faulty disclosures, inaccurate appraisals, failure to originate loans in compliance with applicable underwriting guidelines, inaccuracy of owner-occupancy data or misrepresentations about credit ratings as a cause of the losses on PLS suffered by Freddie Mac and Fannie Mae.

> **2.    *Freddie Mac and Fannie Mae Did Not Attribute Their PLS Losses to Potential Misrepresentations in Their Accounting and SEC Reporting of the Value of the Certificates.[2]***

250.    In their accounting treatment for their PLS portfolios, both Freddie Mac and Fannie Mae attributed declines in the fair value of their PLS to factors other than the loan-specific issues such as the misrepresentations plaintiff has alleged here.

251.    Generally Accepted Accounting Principles ("GAAP") described in Statement of Financial Accounting Standards No. 115, *Accounting for Certain Investments in Debt and Equity Securities* ("FAS 115"), required Freddie Mac and Fannie Mae to record losses

---

[2]    This Court excluded the testimony of defendants' expert Stephen Ryan on February 13, 2015.  Doc. No. 1270.  Ryan would have offered testimony on this subject consistent with his July 9, 2014 Expert Report in this Action.  Defendants reserve all rights for appeal.

in the fair value on Certificates they held at the end of each quarter.  (DX-155 (FAS 115).)  In

accordance with these rules, both Freddie Mac and Fannie Mae were required to conduct, and

did conduct, quarterly GAAP impairment reviews.  (Myers Tr. at 34:25-35:12.)  Freddie Mac

and Fannie Mae reported the results of these impairment reviews in their SEC filings.  (DX-72

(Freddie Mac 2010 Form 10-K, filed on Feb. 24, 2011 with the SEC) at 45, 69; DX-81 (Freddie

Mac 2011 Form 10-K, filed on March 9, 2012 with the SEC) at 54, 85.)

   252. Freddie Mac's and Fannie Mae's accounting disclosures differentiate

between (i) temporary, (ii) other than temporary ("OTT") non-credit, and (iii) OTT credit losses

of fair value as required by GAAP.  Over time, Freddie Mac and Fannie Mae reported both OTT

non-credit and OTT credit losses for the Certificates.  In doing so, they stated that their losses

were attributed in large part to changes in general economic conditions, such as house price

depreciation and unemployment, rather than to security-specific factors:  Freddie Mac reported

in its Form 10-K for 2010, filed on February 24, 2011 with the SEC, and Form 10-K for 2011,

filed on March 9, 2012 with the SEC, that "home prices declined significantly, after extended

periods during which home prices appreciated.  As a result, the fair value of these investments

[non-agency MBS] has declined significantly since 2007 and we have incurred substantial losses

through other-than-temporary impairments."  (DX-72 (Freddie Mac 2010 Form 10-K, filed on

Feb. 24, 2011 with the SEC) at 45; DX-81 (Freddie Mac 2011 Form 10-K, filed on March 9,

2012 with the SEC) at 54.)  Similarly, Fannie Mae reported in its SEC Form 10-K for 2010, filed

on February 24, 2011 with the SEC, and Form 10-K, filed on February 29, 2012, with the SEC

that "[a] substantial portion of these fair value losses and write-downs related to our investments

in private-label mortgage-related securities backed by Alt-A and subprime mortgage loans . . .

due to the decline in home prices and the weak economy."  (DX-73 (Fannie Mae 2010 Form 10-

K, filed on Feb. 24, 2011 with the SEC) at 55; DX-80 (Fannie Mae 2011 Form 10-K, filed on Feb. 29 2012 with the SEC) at 61.)

253.    Consistent with these losses being due to macroeconomic conditions, as house prices stabilized and began to rise again, Freddie Mac and Fannie Mae have started to reverse losses they previously reported on their PLS portfolios.  Freddie Mac reported net realized gains on the sale of Available-For-Sale ("AFS") non-agency mortgage-related securities (*i.e.*, PLS) of $320 million in the period of 2013, in its Form 10-K for 2013, filed on February 27, 2014 with the SEC, through the third quarter of 2014, in its Form 10-Q for the period ending September 30, 2014, filed on November 6, 2014 with the SEC.  (DX-97 (Freddie Mac 2013 10-K, filed on Feb. 27, 2014 with the SEC) at 214; DX-102 (Freddie Mac Sept. 30, 2014 Form 10-Q, filed on Nov. 6, 2014 with the SEC) at 119-20.)

254.    Fannie Mae's explanatory disclosures in its Form 10-K for 2013 state that the realized gain on the sale of non-agency mortgage-related securities in 2013 is the primary reason for its $1.632 billion gross realized gain on AFS securities during the year.  (DX-96 (Fannie Mae 2013 Form 10-K, filed on Feb. 21, 2014) at 75-76.)  Freddie Mac specifically discloses house price appreciation as a primary driver of the decrease in the present value of expected future credit losses for 2013 and into the second quarter of 2014.  (DX-97 (Freddie Mac 2013 Form 10-K, filed on Feb. 27, 2014 with the SEC) at 90; DX-100 (Freddie Mac June 30, 201410-Q, filed with the SEC on Aug. 7, 2014) at 38.)  The reversals of Freddie Mac's and Fannie Mae's credit losses on non-agency mortgage-related securities in the period of 2013 through the third quarter of 2014 confirm that factors other than alleged underwriting deficiencies drove a substantial portion of Freddie Mac's and Fannie Mae's previously recognized OTT credit losses on non-agency mortgage-related securities.