255.    Freddie Mac and Fannie Mae also increased their OTT credit losses on the at-issue Certificates as a percentage of total losses of fair value on the securities over time, *e.g.*, from 33% in 2009 to 45% as of August 31, 2011 and 54% in 2012.  (DX-2604 (Interrogatory Response Exhibit A); DX-2605 (Interrogatory Response Exhibit B).)  The timing of the increase in reporting of losses as OTT credit losses also indicates that the losses were attributable to market factors rather than the alleged misrepresentations in the Offering Documents.  As described in a 2008 presentation from Freddie Mac's management to its Audit Committee, "weak underwriting issues, borrower misrepresentation, or fraud create early delinquencies but should be only a small factor after the first year or two."  (DX-783 ("Impairments on Securities," Freddie Mac, August 4, 2008) at PWC-FHFA-FM-0000501, 0503.)  Thus, the fact that much of Freddie Mac and Fannie Mae's reporting of OTT credit losses has taken place since the resurgence of the housing market indicates that such losses are not attributable to the alleged misrepresentations, but instead to macroeconomic factors.

256.    In sum, Freddie Mac's and Fannie Mae's accounting disclosures and the manner in which they categorized their losses attribute the causes of those losses to macroeconomic factors—particularly the decline in house prices—and not any alleged misrepresentations in the Offering Documents.

### 3.    *Freddie Mac and Fannie Mae Employees Testified that PLS Losses Resulted From House Price Declines and Macroeconomic Factors.*

257.    Employees at both Freddie Mac and Fannie Mae with responsibilities for oversight and analysis of their respective company's financial condition and losses, including senior executives, testified in this Action that house prices and macroeconomic conditions were

the key factor driving the increase in mortgage loan defaults and delinquencies resulting in losses

to their PLS investments.[3]

      258.    Patti Cook, who was Executive Vice President of Investments and Capital

Markets at Freddie Mac from February 2005 through June 2007, and Executive Vice President,

Chief Business Officer of Freddie Mac from June 2007 through November 2008, testified on

December 5, 2013.  Cook had responsibility for the retained portfolio at Freddie Mac, including

PLS.  (Cook Tr. at 47:2-13.)  Cook testified:

> Q. By this point in time, October 2007, there was a recognition that
> the risks in the collateral underlying the private label securities
> were a lot greater than they were perceived to be in the 2005 and
> 2006 time period?
>
> ***A. I think that is a reasonable statement, and I think the reason
> that that perception came to be was the dramatic decline in house
> prices during that time period.***
>
> Q. You don't think the risks -- you think the risks had anything to
> do with things like excessive underwriting practices or excessive
> risk layering?
>
> *A.* ***I think the primary determinant of high defaults during that
> time period was the decline nationally in house prices.***
>
> Q. Wasn't it also a prime determinant of defaults at that point in
> time that there were -- it was becoming apparent that there was
> improper or excessive underwriting practices in the 2005 to 2006
> time period?

---

[3]     Defendants acknowledge that the Court's rulings in limine of February 18, 2015 excluded trial and deposition testimony regarding loss causation, except from any "witness who performed an investigation during the course of her employment addressed to the issue of loss causation." Feb 18, 2015 Op. & Order, Dkt. 1289 at 9; Feb 18, 2015 Order, Dkt. 1291 at 2.  The witnesses to whom defendants refer in this section of their proposed Findings of Fact meet this standard or the appropriate standards under Rule 701, Fed. R. Evid.  In any event, defendants reserve all rights for appeal.

*A. I don't know what the market perceived at the time about what you referred to as, what, poor underwriting practices or something.*

Q. Yeah.

*A. I—I would maintain that the high levels of defaults were primarily the result of house price declines that hadn't been observed since the Great Depression.*

Q. That -- that was your view both at the time you gave this interview [October 2007] and sitting here today?

*A. Yes.*

(Cook Tr. at 294:3-295:20 (emphasis supplied).)

259.    Raymond Romano, who was Senior Vice President, Credit Risk Oversight

at Freddie Mac from 2004 through 2008, and Executive Vice President, Chief Credit Risk

Officer at Freddie Mac from 2008 through 2011 testified on October 1, 2013:

Q. And do you agree that the primary cause of Freddie Mac's losses in the nontraditional portfolio was an exogenous macroeconomic event –

*A. Yes.*

Q. -- namely -- namely, the unprecedented decline in the housing market?

*A. I believe the housing price decline was a very significant or contributor to the losses that we experienced, yes.*

Q. Do you believe it was the primary cause of the those losses?

*A. I believe it was -- if I was to put the first order of operation, I would -- I would say economic events in housing price decline were chief among the reasons for losses.*

(Romano Tr. at 759:23-760:19 (emphasis supplied).)

260.    Peter Niculescu who was an Executive Vice President at Fannie Mae,

from 2002 through 2008, and whose responsibilities included overseeing the surveillance of

Fannie Mae's PLS portfolio, testified on December 10, 2013:

Q.  Okay. Why is there a relationship between the declining home prices and expected losses in private label securities?

A.  I've answered that question previously, and I'll simply try to repeat my earlier answer, that the reason is that if home prices decline, then you can get to a point where the mortgage is worth more than the value of the home.  If the homeowner has reason to stop paying their mortgage, perhaps because of unemployment or other reasons, their home is no longer sufficient to pay off the mortgage, and should the home be sold or foreclosed upon the proceeds will not be sufficient to defray the mortgage loan that the individual has taken out.  That would cause a loss.

(Niculescu Tr. at 71:17-73:11.)

261.    Niculescu also testified on December 10, 2013:

Q.  Did you appreciate in 2006, after this inflection occurred, that loans that Fannie Mae had bought, including loans backing PLS that it had bought, could possibly incur loss if home prices declined far enough?

A.  Indeed, I think the question is mechanical.  If home prices declined far enough, essentially any loan can incur loss.  The questions then all come down to a question of scale and magnitude and sensitivity.

Q.  So you understood that if home prices did decline significantly enough that PLS that Fannie Mae held could incur credit losses?

A.  Indeed one can only answer that question in the affirmative.  For example, if you had a subprime loan-backed security that had, as was common, 30 percent subordination, and if 80 percent of the loans in the security defaulted and incurred a 50 percent severity upon default, then your security would lose 10 percentage points of its cash value.  Of course, those would be extraordinarily high default rates.

(Niculescu at 192:24-193:25.)

262.    C.J. Zhao, Director of Credit Analytics at Fannie Mae, who was

responsible for the surveillance of the PLS portfolio at Fannie Mae, testified on June 25, 2013

that declining house prices caused significant deterioration in mortgage loan performance.  (Zhao

Tr. at 297:16-22, 319:18-320:6).  As Zhao explained, analyzing house prices was the key to

measuring the credit risk of Fannie Mae's PLS portfolio, and analyzing the effect house prices

had on that portfolio was one of the reasons she was hired.  (Zhao Tr. at 179:24-180:21.)  Based

on her analysis, Zhao stated that rates of house price appreciation (or depreciation, in this case)

were the main credit risk driver of the loans backing Fannie Mae's PLS (Zhao Tr. at 191:22

192:10), and Zhao testified that "declining home price was a factor" in the poor performance

beginning in 2007, of the loans backing the PLS Fannie Mae purchased.  (Zhao Tr. at 297:16-

22.)  Zhao concluded that "slowing home price appreciation was causing significant loan

performance deterioration" as of the summer of 2007.  (Zhao Tr. at 319:18 320:6.)

263.    Lin Cao, a Senior Financial Analyst in Fannie Mae's Capital Markets

Department (a department involved in PLS trading at Fannie Mae), was responsible for risk

management in Fannie Mae's PLS portfolio from 2006 through 2010.  (Cao Tr. at 74:2-75:2.)

Cao testified on May 14, 2013 that:

> Q. How is the home price forecast relevant to projecting collateral losses?
>
> A. ***Looking back 2006 to 2008, and even into 2010, we observed huge home  price depreciation in the company -- in the country, of all the market in the country, and we observed, you know, higher defaults, you know, due to the home price depreciation. One thing you can say for sure when people see their home depreciate, they will reallocate their asset which means they may choose not to pay their mortgage because it's a loss to them.***  So you see the indices goes up, you see people default and also people chose to be strategic defaults means there are mitigations that government rolled out and they can do modification on their loans or they just not foreclosing on their loans and basically rent free and staying there.  ***So definitely HPA, you know, highly correlated to the behavior of the defaults.***

(Cao Tr. at 270:13-271:10 (emphasis supplied).)

### 4.    Freddie Mac's and Fannie Mae's Statements in Other Judicial Proceedings

264.    Freddie Mac and Fannie Mae have been named as defendants in lawsuits arising from their losses and declining stock prices.  In responding to these lawsuits, both Freddie Mac and Fannie Mae have represented to federal courts that their losses, which include both losses on mortgages and losses on MBS, were largely or entirely attributable to the severe drop in house prices and the economic recession.

265.    For example, Freddie Mac was named as a defendant in case captioned *Kuriakose* v. *Federal Home Loan Mortgage Corp.*, No. 1:08 Civ. 07281, a purported class action under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, filed in the U.S. District Court for the Southern District of New York.  In its September 23, 2009 Memorandum of Law in Support of its Motion to Dismiss that action, Freddie Mac stated:

> It is common knowledge that, beginning in the latter half of 2007, this country entered a period of unprecedented financial turmoil. Real estate values plummeted, and credit markets froze.  Just as [Freddie Mac] had warned investors, its financial results and its stock price suffered ***after those macroeconomic events unexpectedly tore through the U.S. economy.***  Indeed, virtually every major financial institution in the country was surprised by these historically anomalous developments and incurred losses similar to, or greater than, those incurred by Freddie Mac.

(DX 860 (Freddie Mac Memorandum of Law, dated Sept. 23, 2009) at 1 (emphasis supplied).)

266.    In its September 23, 2009 memorandum, Freddie Mac further represented that its losses—and the corresponding decline in the value of its stock—had been caused by "the single largest decline in single-home values in recorded history."  (*Id.* at 2.)  Freddie Mac also stated that "[f]ailing to predict the timing and magnitude of a historically unprecedented drop in housing prices and the recent financial crisis is not fraud.  (*Id.* at 6.)

267.    In its September 23, 2009 memorandum, Freddie Mac used a chart to

demonstrate to the court the significance of the decline in house prices:

> This dramatic rise and sudden drop in U.S. home values is
> illustrated by the chart below:



(*Id.* at 3.)

268.    Freddie Mac further represented to the Court in its September 23, 2009

Memorandum in Support of its Motion to Dismiss that its losses on both "mortgages and

mortgage-back securities" were attributable to the decline in house prices:

> In the end, the reason that this case should be dismissed is not very
> complicated.  Freddie Mac's principal assets are home mortgages
> ***and mortgage-backed securities***.  As Freddie Mac repeatedly
> warned investors, a decline in home values was likely to cause
> Freddie Mac to recognize losses and to affect its capital adequacy.
> ***In November 2007, the steepest decline in home values in U.S.
> history led Freddie Mac to begin recognizing losses.  The
> unforeseen financial crisis that followed—which materially
> worsened in the third quarter of 2008 —resulted in further losses***

-93-

> ***to Freddie Mac and virtually every other major financial***
> ***institution worldwide***.

(*Id.* at 5-6 (emphasis added).)  Freddie Mac stated that plaintiff in the *Kuriakose* case was

seeking "'investment insurance'" to which it "is not entitled."  (*Id.* at 2.)

> 269.    Freddie Mac also represented to the Court in its September 23, 2009

Memorandum in that action that the decline in house prices caused losses across the entire

financial industry:

> In 2007, house prices ultimately fell far more sharply than ever
> before in U.S. history. . . . In the third quarter of 2007, and the
> month of October 2007, in particular, the year-over-year housing-
> price declines nationwide were the largest on record. . . . ***Not***
> ***surprisingly, the precipitous decline in house prices and the tight***
> ***credit market caused massive losses across the entire financial***
> ***industry, including at the country's largest and most respected***
> ***mortgage lenders and investors***.

(DX-860 (Freddie Mac Memorandum of Law, dated Sept. 23, 2009) at 10 (citations omitted)

(emphasis supplied).)

> 270.    After Freddie Mac submitted its memorandum, Hon. John F. Keenan,

United States District Judge for the Southern District of New York, granted Freddie Mac's

motion to dismiss, with leave to amend, in an Opinion and Order dated March 30, 2011, holding

that "[c]onsidering that the price of Freddie Mac's stock was clearly linked to the 'marketwide

phenomenon' of the housing price collapse, there is a decreased probability that Plaintiffs' losses

were caused by fraud. . . .  To the extent that Plaintiffs claim that Freddie Mac . . . violated

Section 10(b) of the '34 Act and SEC Rule 10b-5 by misrepresenting the strength of its

underwriting standards and financial reporting, these claims fail because Plaintiffs have not

plausibly alleged that these misrepresentations proximately caused them economic harm."

*Kuriakose* v. *Fed. Home Loan Mortg. Corp.*, 2012 WL 1158028, at *14 (S.D.N.Y. Mar. 30,

2011) (citations omitted).  Thus, Judge Keenan accepted Freddie Mac's representation that the drop in Freddie Mac's stock price was caused by macroeconomic events, and in particular "the housing price collapse"—the same "marketwide phenomenon" that led to any losses alleged by plaintiff on the Certificates.

271.    In an October 13, 2011 memorandum seeking to dismiss the second amended complaint filed against it in the *Kuriakose* case, Freddie Mac made statements similar to those it had made earlier in the case:  "[I]n 2007, this country was blindsided by the single largest decline in single-home values in recorded history" and "***it is readily apparent that Freddie Mac's losses were caused by an industry-wide collapse***, culminating in a government-imposed conservatorship . . . ."  (DX-919 (Freddie Mac Memorandum of Law, dated Oct. 13, 2011) at 3, 5 (emphasis added).)  Freddie Mac represented to the Court that declining house prices caused its losses, stating:  "In November 2007, the steepest decline in home values in U.S. history led Freddie Mac to begin recognizing losses."  (*Id*. at 6.)

272.    Judge Keenan granted Freddie Mac's motion to dismiss the second amended complaint.  *Kuriakose* v. *Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168 (S.D.N.Y. 2012).  The Second Circuit affirmed this decision, noting that when "plaintiff's stock purchases and losses coincided with a marketwide phenomenon—the housing bubble—'the prospect that the plaintiff's loss was caused by fraud decreases.'"  *Central States, Se. & Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013).

273.    Fannie Mae was named a defendant in a purported class action asserting violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, among other claims, captioned in *In re Fannie Mae 2008 Securities Litigation*, No. 08 Civ. 07831, which was filed in September 2008 in the U.S. District Court for the Southern District of New York.  Fannie

Mae's September 18, 2009 memorandum of law in support of its motion to dismiss stated,

similar to Freddie Mac's representations in *Kuriakose*, that "[b]eginning in late 2006 and

throughout 2008, the housing and credit markets suffered an extraordinary meltdown" and "[i]n

2008, home prices declined approximately 9%; credit markets froze up; and business and

consumer confidence plummeted." (DX-859 (Fannie Mae Memorandum of Law, dated Sept. 8,

2009) at 1.) Fannie Mae asserted that it was, as "Alan Greenspan, aptly remarked, a 'once-in-a-

century credit tsunami.'" (*Id.*) Fannie Mae represented to the Court that "in the historically

tumultuous market of late 2007 through 2008, there were a multitude of factors affecting the

price of Fannie Mae's securities—***most of which were global and market-wide factors not***

***specifically relating to Fannie Mae***." (*Id.* at 39 (emphasis supplied).)

        274.    After three shareholder derivative actions were filed against Freddie Mac

alleging that certain executives breached their fiduciary duties to shareholders (actions that were

consolidated in the U.S. District Court for the Eastern District of Virginia in a case captioned *In*

*re Federal Home Loan Mortgage Corp. Derivative Litigation*, No. 1:08 Civ. 773), Freddie Mac's

Board of Directors appointed a Special Litigation Committee ("SLC") to investigate the

allegations made in those actions. (DX-903 (Freddie Mac Motion to Dismiss, dated March 16,

2011) at 4-5.) The SLC's final report, dated February 25, 2011, prepared after a 3-year

investigation, was filed as an exhibit to Freddie Mac's motion to dismiss the case. The SLC

Report stated that:

> The consensus among the current and former officers and directors
> of Freddie Mac interviewed by the Committee was that the primary
> cause of the Company's recent losses was an "exogenous macro-
> economic event[]"; namely, the unprecedented decline in the
> housing market. Specifically, between 2006 and May 2008, house
> prices fell nationwide by approximately twenty-five percent. This
> is the largest, and only, nationwide decline in house prices since
> the Great Depression.

(DX0-903 at 31 (emphasis supplied).)  The SLC Report also stated that "[w]hen house prices fell in 2007 and 2008, Freddie Mac's performance necessarily suffered," but that "Freddie Mac's mortgage portfolio suffered less than the portfolios of almost every other large participant in the mortgage market, including Fannie Mae." (*Id*. at 3.)

        275.    Freddie Mac was also named as a defendant in a purported class action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 captioned *Ohio Public Employees Retirement System* v. *Federal Home Loan Mortgage Corp*., No. 08 Civ. 00160, filed in January 2008 in the U.S. District Court for the Northern District of Ohio.  In its October 9, 2013 Memorandum of Law in Support of its Motion to Dismiss that case, Freddie Mac asserted that:  "Just as Freddie Mac had warned investors, its financial results and its stock price suffered as a result of the collapse of the financial markets.  In November 2007, Freddie Mac publicly disclosed that it incurred a $2 billion loss in the third quarter of 2007." (DX-937 (Freddie Mac Memorandum of Law, dated Oct. 9, 2013) at 4.)  Counsel for Freddie Mac made the following assertion in open court when arguing for dismissal of the action:

> Now, at the same time, the market also knew that if there was a substantial decline in home value, Freddie Mac was going to suffer losses inevitably.  But what happened?  This is what happened: ***The single largest decline in home prices in recorded United States history.  As you saw, the analysts were aware, the street was aware, Freddie Mac was going to suffer losses if there were home declines, home price declines.***

(*Id*. at 32-33.)  Thus, once again, Freddie Mac represented that house price declines are what caused its losses.  There is no mention in any of the statements made by Freddie Mac and Fannie Mae in the judicial proceedings to which reference is made above about faulty disclosures, inaccurate appraisals, failure to originate loans in compliance with applicable underwriting

guidelines, inaccuracy of owner-occupancy data, or misrepresentations about credit ratings as the cause of their losses.

     **E.**    **The Cause of Defaults and Delinquencies on the Loans Underlying the Certificates**

          *1.*    *Defaults and Delinquencies on Loans in the Supporting Loan Groups Are Correlated to Falling House Prices and Unemployment*

     276.    The defaults and delinquencies on loans underlying the Certificates were caused by macroeconomic events that took place in the housing market in the United States in 2007 and the year following, principally the severe decline in house prices.  Consistent with the housing market's overall performance, loans underlying the Certificates began experiencing greater defaults in late 2007 and early 2008.  (Vandell Aff. at ¶¶ 139-41.)  As house prices declined, these defaults continued to rise.  (Vandell Aff. at ¶¶ 139-41.)

     277.    Using the chart that Freddie Mac submitted to the U.S. District Court for the Southern District of New York in the *Kuriakose* case (and in one other action), this correlation is plain to see.  (DX-2792 (Vandell Summary Exhibit); *see also* DX-937 (Freddie Mac Memorandum of Law, dated Oct. 9, 2013) at 4.; DX-2585 (Freddie Mac Reply Memorandum, dated Feb. 24, 2010) at 2; DX-919 (Freddie Mac Memorandum of Law, dated Oct. 13, 2011) at 3.)  The upward sloping line on the right represents the cumulative default rate of the loans supporting the Certificates:



(DX-2792; *see also* ¶¶ 203-217, *supra* (describing evidence that this correlation was well-understood).)  This chart illustrates the correlation between the decline in house prices and the rise in defaults in loans underlying the Certificates.  (Vandell Aff. at ¶140.)

278.    The correlation between declining house prices and defaults in loans underlying the Certificates is also demonstrated by the fact that the increase in defaults was strongly correlated by geography—in states where house prices dropped the most, defaults on the supporting loans increased the most.  (Vandell Aff. at ¶ 142; DX-2796 (Vandell Summary Exhibit).)  DX-2796 reproduced below illustrates this correlation with the cumulative default rate for the Certificates:



279.     Similarly, in states where unemployment rates increased the most, defaults on loans underlying the Certificates that were originated in those states also increased. (Vandell Aff. at ¶ 143; DX-2797 (Vandell Summary Exhibit).)  DX-2797 reproduced below illustrates this correlation.



280.    In short, there are direct correlations between the performance of loans underlying the Certificates and falling house prices and rising unemployment.  (Vandell Aff. at ¶¶ 143-44.)  These correlations are consistent with Freddie Mac's and Fannie Mae's own explanations for the losses they experienced on their PLS portfolios.  *See* ¶¶ 231-275, *supra*. These correlations are also consistent with a number of published empirical studies regarding the rise in mortgage defaults and the "subprime crisis," which concluded that the primary driver of loan defaults and delinquencies after April 2007 was the unanticipated steep decline in house prices.  (Vandell Aff.   at ¶¶ 123-23.)

### 2.    *Defaults and Delinquencies in the Supporting Loan Groups Were Not Caused By the Alleged Misrepresentations.*

281.    Defendants' expert, Dr. Kerry Vandell, analyzed the loans that plaintiff's expert, Robert Hunter, re-underwrote to determine the default risk correlated to loans with "underwriting defects" identified by Hunter.  (Vandell Aff. at ¶¶ 145-54; DX-2777.)  Vandell utilized a regression model to analyze this correlation.  (Vandell Aff. at ¶ 148; DX-2777.)

Vandell concluded that, after controlling for appropriate variables, the probability of default neither increased nor decreased in a statistically significant manner for loans Hunter determined were "defective." (Vandell Aff. at ¶¶ 145-55.) This means that either Hunter's re-underwriting results were not reliable or that the alleged "defects" he identified did not affect the performance of the loans in the supporting loan groups. (Vandell Aff. at ¶¶ 154.)

282.    The results of plaintiff's own expert, G. William Schwert, confirm that even if there were defects in loans supporting the Certificates, those defects did not cause the performance of the loans supporting the Certificates to be worse than it would have been otherwise. (Vandell Aff. at ¶¶ 156-65.) As Vandell explains, Schwert's model did not find that the loans Hunter alleged to be "defective" had a statistically significant impact on the probability of default for those loans. (Vandell Aff. at ¶ 165.)

283.    Moreover, as Vandell described, Schwert misapplied a number of statistical techniques in his regression and benchmarking analysis. (Vandell Aff. at ¶¶ 166-72.) When Schwert's mistakes are corrected, his analysis supports the conclusion that the alleged misrepresentations did not cause plaintiff's losses.[4] (Vandell Aff. at ¶¶ 173-77.)

---

[4]    Moreover, even Schwert's benchmarking analysis, which was flawed because he misapplied statistical techniques and failed to account for other factors, Vandell Aff. at ¶ 164, showed that only three of the seven supporting loan groups had actual defaults and serious delinquencies that were statistically significantly higher than the rates of loans in his benchmark. Vandell Aff. at ¶¶ 164-65. Therefore, even under plaintiff's expert's analysis, the alleged misrepresentations were not shown to have caused any of the losses in the other four Certificates. Vandell Aff. at ¶ 165.

IV.    **STATEMENTS IN THE OFFERING DOCUMENTS ABOUT COMPLIANCE WITH UNDERWRITING GUIDELINES AND UNDERWRITING CRITERIA WERE NOT FALSE OR MISLEADING**

   A.    **Disclosures in the Offering Documents About Compliance with Underwriting Guidelines and Underwriting Criteria**

      1.    *For Disclosed Originators, the Offering Documents Represented That Loans Were Originated "Generally" In Accordance With Their Guidelines*

284.    For lenders that made more than 20% of the loans in a supporting loan group ("disclosed originators"), all of the prospectus supplements for the Securitizations except for 2005-AR6 made disclosures about the underwriting guidelines used by the disclosed originators to originate mortgage loans.  Six prospectus supplements disclosed that the mortgage loans were originated "generally" in accordance with originator underwriting guidelines and provided a general description of the originator's underwriting criteria as contained in the applicable underwriting guidelines.

285.    *2006-FM1 and 2006-FM2.*  The prospectus supplements for 2006-FM1 and 2006-FM2 (for which Fremont Investment and Loan ("Fremont") originated 100% of the Mortgage Loans) disclosed that "[a]ll of the mortgage loans were originated or acquired *generally* in accordance with the underwriting criteria described in this section.  The following is a summary of the underwriting guidelines believed by the depositor to have been applied, *with some variation*, by Fremont."  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729543; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638395 (emphasis added).) The prospectus supplement made clear that the summary of the underwriting criteria that followed "does not purport to be a complete description of the underwriting guidelines of Fremont."  (DX-2 at NOM-FHFA_04729543; DX-4 at NOM-FHFA_04638395.)

-103-

286.    The portions of the prospectus supplements that described the underwriting criteria used by Fremont disclosed that "[m]ortgage loans are underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ('Scored Programs'), subject to various exceptions as described in this section," and that Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan." (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729543; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638395.)

287.    The prospectus supplements also disclosed that "[i]n contrast to assignment of credit grades according to traditional non-agency credit assessment methods, *i.e.*, mortgage and other credit delinquencies, the Scored Programs rely upon a borrower's Credit Score, mortgage payment history and seasoning on any bankruptcy/foreclosure initially to determine a borrower's likely future credit performance." (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729543; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638395.) Applying those criteria, the "minimum applicable Credit Score allowed is 500," but "borrowers with no Credit Scores are not automatically rejected and may be eligible for certain loan programs in appropriate circumstances." (DX-2 at NOM-FHFA_04729543; DX-4 at NOM-FHFA_04638395.)

288.    The prospectus supplements also made disclosures about the discretion vested in underwriters, stating that "[a]ll of the mortgage loans were underwritten by Fremont's underwriters having the appropriate approval authority" and that "[e]ach underwriter is granted a

-104-

level of authority commensurate with their proven judgment, experience and credit skills." (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729544; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638396.)

289.   The prospectus supplements also disclosed some of the specific requirements under Fremont's underwriting guidelines, stating, for example, that those guidelines "generally require" "debt to income ratios of 55% or less on mortgage loans with loan-to-value ratios of 90% or less" and "debt to income ratios of 50% or less are required on loan-to-value ratios greater than 90%." (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729544; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638396.)

290.   Finally, the prospectus supplements described the grading system used by Fremont to rate the riskiness of each borrower's application and the underwriting criteria applied to borrowers in each grade category.  For example, for a grade "A+" borrower, Fremont's underwriting criteria required that there be "no 30-day late mortgage payments within the last 12 months" in the borrower's record and that the "maximum loan-to-value ratio is 100% with a minimum Credit Score of 600."  For a grade "D" borrower, in contrast, "an applicant must not be more than 180 days delinquent with respect to its current mortgage payment" and "[t]he maximum permitted loan-to-value ratio is 65% with a minimum Credit Score of 500." (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729547; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638398.)

291.   ***2006-HE3.***  The 2006-HE3 prospectus supplement contains the following

disclosure about loans originated by People's Choice Home Loan Inc., which originated 38.19%

of the loans backing the securitization:  "The Mortgage Loans were ***generally*** originated by

People's Choice Home Loan, Inc., a Wyoming corporation ('PCHLI'), in accordance with the

underwriting criteria described in this section and detailed in print and on-line manuals that our

underwriters use in making their credit decisions ('Underwriting Guidelines'); provided however

that certain of the more seasoned Mortgage Loans included in the Mortgage Pool may have been

originated under underwriting guidelines which are substantially similar to the Underwriting

Guidelines described in this section but may have differences with respect to pricing, FICO

scores and other program attributes.  For all originations, PCHLI controls the credit

underwriting, documentation and closing of the loans."  (DX-3 (2006-HE3 Prospectus

Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620965

(emphasis added).)

292.   The prospectus supplement disclosed that People's Choice "is in the

nonprime lending market," and that "[t]o offset higher (and possibly much higher) predicted

delinquency and foreclosure rates, mortgage loans originated by [People's Choice] and other

nonprime lenders generally bear higher interest rates than mortgage loans that conform to Fannie

Mae and Freddie Mac standards."  (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29,

2006, NOM-FHFA_04620885) at NOM-FHFA_04620965.)

293.   The prospectus supplement further disclosed that "[n]o assurance can be

given that the values of the related mortgaged properties have remained or will remain at the

levels in effect on the date that the loans were originated by [People's Choice]," and that "there

can be no assurance that the value of mortgaged property estimated in any appraisal or review is

equal to the actual value of that mortgaged property at the time of that appraisal or review."
(DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at
NOM-FHFA_04620965.)

294.    The prospectus supplement also described the underwriting criteria
applied by People's Choice.  For example, the prospectus supplement stated that "[i]n general,
higher credit-risk mortgage loans are graded in categories that require lower DTI ratios and
lower LTV ratios, and permit more (or more recent) major derogatory credit items, such as
outstanding judgments or prior bankruptcies."  (DX-3 (2006-HE3 Prospectus Supplement, dated
Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620967.)  Moreover, "[s]pecific
risks for mortgage loans are considered along with the 'Credit Score,' the measurement of the
relative degree of risk a borrower represents to a lender obtained from credit reports utilizing,
among other things, payment history, delinquencies on accounts, levels of outstanding
indebtedness, length of credit history, types of credit, and bankruptcy experience."  (DX-3 at
NOM-FHFA_04620967.)

295.    In addition, the prospectus supplement described the borrower risk grading
system applied by People's Choice "for assessing the potential likelihood that an applicant will
satisfy the repayment obligation of a mortgage loans."  (DX-3 (2006-HE3 Prospectus
Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620967.)  For
example, an applicant with an "A+" risk grade "must have a Credit Score of 540 or higher" and
"not have had any 30-day-late payments within the previous 12 month."  (DX-3 at NOM-
FHFA_04620968.)  For such an applicant, "[a] maximum first-lien LTV of 100% is permitted
for a mortgage loan on a single-family or two-family owner-occupied property" and 95% for a
"non-owner-occupied property."  (DX-3 at NOM-FHFA_04620968.)  "Additionally, the

applicant's DTI may be up to 55%, if the applicant is a full documentation applicant, the LTV is

no more than 85%, and the applicant's monthly gross disposable income is at least $2,000."

(DX-3 at NOM-FHFA_04620968.)

296.    In contrast, a "C" graded borrower "must have a Credit Score of 540 or

higher" and can have a "maximum of one 120-day-late payment."  (DX-3 (2007-1 Prospectus

Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_04620970.)  Such a

borrower can have "[a] maximum first-lien LTV of 70%" for a "mortgage loan on a single-

family or two-family owner-occupied property" and the "maximum combined LTV, including

any related subordinate lien, is 85% for a refinance and 80% for the stated documentation

program."  (DX-3 at NOM-FHFA_04620970.)

297.    *2007-1.*  For 2007-1, Silver State Mortgage originated 31.67% of the

Group II mortgage loans (the group backing the Certificate that Freddie Mac purchased).  (DX-5

(2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-

FHFA_05141919).  The prospectus supplement for that deal does not disclose that the Silver

State mortgage loans backing the 2007-1 securitization were originated in accordance with

underwriting guidelines.  Instead, the prospectus supplement provided a description of Silver

State as "primarily an Alt-A [mortgage] lender," and states that "Silver State Mortgage's Product

Guidelines are for the most part a derivative of the major buyers of Alt-A mortgages."  (DX-5 at

NOM-FHFA_05142024.)

298.    The prospectus supplement for 2007-1 also provided a brief, general

description of Silver State's underwriting process in a section entitled "Underwriting Standards

of Silver State Mortgage."  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-

FHFA_05141912) at NOM-FHFA_05142024-2025.)  That section disclosed that "Silver State

Mortgage's underwriting guidelines are primarily intended to evaluate the prospective

borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the

proposed Mortgage Property as collateral." (DX-5 at NOM-FHFA_05142024.) The

underwriting of the loan is based on an application completed by the borrower, "which elicits

pertinent information about the prospective borrower including, depending upon the loan

program, the prospective borrower's financial condition (assets, liability, income and expenses),

the property being financed and the type of loan desired." (DX-5 at NOM-FHFA_05142024.)

Employment verification is obtained "[i]f required by the underwriting guidelines," and may be

obtained "either from the prospective borrower's employer or through analysis of copies of

borrower's federal withholding (IRS W-2) forms and/or current payroll earnings statements."

(DX-5 at NOM-FHFA_05142024.)

       299.    In addition, the prospectus supplement for 2007-1 generally described how

a borrower's ability to repay the loan was determined by Silver State:

> Based on the data provided in the application and certain
> verifications (if required), a determination will have been made
> that the borrower's monthly income (if required to be stated or
> verified) should be sufficient to enable the borrower to meet its
> monthly obligations on the mortgage loan and other expenses
> related to the Mortgage Property (such as property taxes, standard
> hazard insurance and other fixed obligations other than housing
> expenses). Generally, scheduled payments on a mortgage loan
> during the first year of its term plus taxes and insurance and other
> fixed obligations equal no more than a specified percentage of the
> prospective borrower's gross income. The percentage applied
> varies on a case-by-case basis depending on a number of
> underwriting criteria including, but not limited to, the loan-to-value
> ratio of the mortgage loan or the amount of liquid assets available
> to the borrower after origination.

(DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-

FHFA_05142025.)

300. The prospectus supplement also made disclosures about appraisals, stating that the "adequacy of the Mortgage Property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originators," and that "[t]he appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed." (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142025.) Appraisals "generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property." (DX-5 at NOM-FHFA_05142025.)

301. *2007-2.* The prospectus supplement for 2007-2 contains the following disclosure regarding lender Ownit Mortgage Solutions, Inc., which originated 42.38% of the loans backing the securitization: "Ownit provides loans to borrowers . . . in accordance with the RightLoan Underwriting Guidelines." (DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591413.) The prospectus supplement further disclosed that Ownit's underwriting guidelines "are designed to be used as a guide in determining the credit worthiness of the borrower and his/her ability to repay . . . . The underwriter's objective is to analyze an application individually with the understanding that no single characteristic will approve or deny a loan." (DX-6 at NOM-FHFA_05591413 .)

302. The prospectus supplement describes three components of the Ownit criteria used to assess a borrower's creditworthiness:

Using the three components, capacity, credit and collateral, the underwriter analyzes the loan profile.  Capacity, which is the borrower's ability to repay, is determined by cash flow.  It must be clearly shown that the borrower has proven, historical cash flow, which will support the requested loan amount.  This approach anticipates that the loan is going to be repaid from the borrower's recurring cash inflows, not from the sale of the collateral.  Job stability and length of time in current residence are also strong factors in determining a borrower's capacity.  Continuity of employment is a strong factor in establishing the income used as a basis for repayment.  Credit is the borrower's willingness to repay his or her debts according to the contractual agreements.  The most valuable resource in determining the borrower's ability to repay is the credit report.  Ownit underwriters will use the credit report and credit explanation letter when supplied in determining willingness.  Ownit uses the credit score as a primary factor in determining the borrower's willingness to repay his or her debts.  Collateral is defined as the asset pledged by the borrower to the lender.  Collateral is a secondary source of repayment; cash flow is the primary source of repayment.  Ownit will evaluate the property by reviewing uniform residential real estate appraisal reports, along with other data sources, to determine whether the collateral is sufficient to secure the mortgage.

(DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591413.)

303.    The prospectus supplement further disclosed that underwriters considered an application as a whole, and were not to make an underwriting decision based on any single characteristic:

The underwriter's objective is to analyze an application individually with the understanding that no single characteristic will approve or deny a loan.  The underwriter must utilize the credit report, loan application, asset verifications, appraisal and all other supporting documents in determining credit worthiness and risk.  Credit risk can be defined as, but is not restricted to, limited liquid assets or reserves, and derogatory credit history.  The overall situation and profile of a borrower, including compensating factors, which may offset negative characteristics, must be taken into consideration in determining if the borrower is creditworthy.  Credit worthiness is determined by the borrower's ability and willingness to repay his or her contractual debt and the value of the

-111-

> property securing the loan.  A sufficient property value gives
> Ownit the ability to recover its investment if the loan defaults.

(DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-

FHFA_05591413-14.)

304.    ***2007-3.***   The prospectus supplement for 2007-3 contains the following

disclosure regarding lender ResMAE Mortgage Corporation ("ResMAE"), which originated

77.61% of the loans backing the securitization:  "The information set forth below in the

following paragraphs in this section contains a brief description of the underwriting guidelines

used for the Mortgage Loans originated by ResMAE."  (DX-7 (2007-3 Prospectus Supplement,

dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732708.)

305.    The prospectus supplement disclosed that "[t]he underwriting standards of

ResMAE are primarily intended to assess the ability and willingness of the borrower to repay the

debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan,"

and that "ResMAE considers, among other things, a mortgagor's credit history, repayment

ability and debt service-to-income ratio (referred to herein as the Debt Ratio), as well as the

value, type and use of the mortgaged property."  (DX-7 (2007-3 Prospectus Supplement, dated

April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732708.)

306.    The prospectus supplement also made disclosures about the authority

vested in each underwriter:  "All of the mortgage loans were underwritten by ResMAE's

underwriters having the appropriate signature authority.  Each underwriter is granted a level of

authority commensurate with their proven judgment, maturity and credit skills."  (DX-7 (2007-3

Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-

FHFA_04732708.)

307.    The prospectus supplement further described the risk grading program used by ResMAE.  For example, for the highest rated, "A1" borrower, a minimum FICO of 500 was required and that "[n]o mortgage payment has been late in the last 12 months."  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732710.)  For such a borrower, "[t]he maximum loan-to-value ratio is 100% with a minimum 620 FICO score" and "[l]oan-to-value ratios are reduced based on FICO score, reduced income documentation, non-owner occupied properties, second homes, properties with 3-4 units or properties with rural characteristics."  (DX-7 at NOM-FHFA_04732710.)

308.    For the lowest rated, "C2" borrower, however, the borrower can have "up to two 90-day mortgage payments" that "have been late" or "one 120-day mortgage payment" that "has been late in the last 12 months," but the "maximum loan-to-value ratio is 70% with a minimum 500 FICO score."  (DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732710.)  For C2 borrowers, "[l]oan-to-value ratios are reduced based on FICO score, reduced income documentation, non-owner occupied properties, [and] second homes, properties with 3-4 unit characteristics."  (DX-7 at NOM-FHFA_04732711-2712.)

309.    The prospectus supplement also disclosed that ResMAE had "filed for bankruptcy protection" by the time the prospectus supplement was issued and warned that "[a]ny originator whose financial condition was weak or deteriorating at the time of origination may have experienced personnel changes that adversely affected its ability to originate mortgage loans in accordance with its customary standards.  It may also have experienced reduced management oversight or controls with respect to its underwriting standards."  (DX-7 (2007-3

-113-

Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732664.)

### 2. The Offering Documents Disclosed That Loans Would Be Made as Exceptions to Underwriting Guidelines

310.   All the prospectus supplements represented that some portion—in some cases, a substantial portion—of the mortgage loans backing the Securitizations were originated as "exceptions" to applicable underwriting guidelines.  A loan originated as an "exception" to applicable underwriting guidelines does not comply in all respects with those guidelines, but the underwriter determines that there are compensating factors which justify such non-compliance. (Forester Aff. at ¶ 53; Graham Aff. at ¶ 41.)

311.   The prospectus supplements disclosed that the question of whether an exception to underwriting guidelines is appropriate is left to the discretion and judgment of underwriters, and that the underwriters' decisions to grant an exception may be based on a number of factors.  The prospectus supplement for 2007-3, for example, disclosed:

> All of the mortgage loans were underwritten by ResMae's underwriters having the appropriate signature authority.  Each underwriter is granted a level of authority commensurate with their proven judgment, maturity and credit skills.  On a case by case basis, ResMae may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  A substantial portion of the Mortgage Loans represent such underwriting exceptions.

(DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732709.)

312.   The 2006-FM1 and 2006-FM2 prospectus supplements likewise stated:

> All of the mortgage loans were underwritten by Fremont's underwriters having the appropriate approval authority. Each underwriter is granted a level of authority commensurate with their proven judgment, experience and credit skills. On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, *i.e.*, an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is expected that a **substantial portion** of the mortgage loans may represent such underwriting exceptions."

(DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729544-9545; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638396 (emphasis added).)

313.    It was widely understood in the mortgage industry that originators made exceptions to applicable underwriting guidelines in the 2005 to 2007 period. Indeed, Paul Norris, a Fannie Mae trader, testified at deposition that "exceptions happened all the time" during this period. (Norris Tr. at 302:17-303:7.) Moreover, both Freddie Mac and Fannie Mae made similar disclosures about exceptions to originator underwriting guidelines in offering documents for their own RMBS. For example, in an October 14, 2005 offering circular for RMBS, Freddie Mac stated: "We may waive or modify any of the Guide's purchase standards, guidelines or servicing policies when we purchase any particular Mortgages . . . . This means that the Mortgages in a given [ ] Pool may not conform at any particular time to all of the provisions of the Guide, our mortgage purchase documents or this Offering Circular." (DX-2629 at 19.) Similarly a July 1, 2004 Fannie Mae offering circular stated that: "In our discretion, we may grant waivers from our underwriting guidelines when we purchase any particular mortgage loan" included in the pools of loans that backed its RMBS. (DX-2626 at 40.)

### 3. For Undisclosed Originators, the Offering Documents Only Contain Representations About General Underwriting Criteria

314.     The Offering Documents made different disclosures about originators that made less than 20% of the mortgage loans in any given supporting loan group ("undisclosed originators").  For those undisclosed originators, the prospectus supplements did not state (and were not required to state)[5] that the mortgage loans were originated generally in accordance with the originator's underwriting guidelines.  Instead, the prospectus supplements stated that Mortgage Loans from undisclosed originators were originated generally in accordance with general underwriting criteria described in the prospectus supplements.  The prospectus supplements did not set forth the underwriting guidelines applied by any undisclosed originator. (Graham Aff. at ¶ 51.)

315.     Specifically, for five of the seven Securitizations that contained loans from undisclosed originators (all except 2006-FM1 and 2006-FM2), the prospectus supplements represented that "[t]he Mortgage Loans have been purchased by the seller from various banks, savings and loan associations, mortgage banks and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated *generally* in accordance with the underwriting criteria described in this section."  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-

---

[5]     A prospectus supplement was required to disclose "[t]o the extent material, a description of the originator's origination program" for "any originator . . . that originated, or is expected to originate, 20% or more of the pool assets." 17 C.F.R. § 229.1110 (2005).  For originators that originated less than 20% of the assets, Regulation AB called for a "description of the solicitation, credit-granting  underwriting criteria used to originate or purchase the pool assets, including, to the extent known, any changes in such criteria and the extent to which such policies and criteria are or could be overridden."  17 C.F.R. § 229.1111 (a)(3) (2005).

FHFA_04620965; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-

FHFA_04620885) at NOM-FHFA_04620972; DX-5 (2007-1 Prospectus Supplement, dated Jan.

29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142025; DX-6 (2007-2 Prospectus

Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591415; DX-7

(2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-

FHFA_04732712 (emphasis added).)

      316.    The prospectus supplements also disclosed that loans may have been made

by undisclosed originators as exceptions to the disclosed underwriting criteria:  "[C]ertain

exceptions to the underwriting standards described in this prospectus supplement are made in the

event that compensating factors are demonstrated by a prospective borrower."  (DX-1 (2005-

AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-

FHFA_04811894; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-

FHFA_04620885) at NOM-FHFA_04620972; DX-5 (2007-1 Prospectus Supplement, dated Jan.

29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142026; DX-6 (2007-2 Prospectus

Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591415; DX-7

(2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-

FHFA_04732712.)

      317.    A section of each prospectus supplement entitled "Underwriting Standards

of the Sponsor" described the general underwriting criteria applicable to the loans from

undisclosed originators that backed the Securitization.  (DX-1 (2005-AR6 Prospectus

Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04620965; DX-3

(2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-

FHFA_04620972; DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-

FHFA_05141912) at NOM-FHFA_05142025; DX-6 (2007-2 Prospectus Supplement, dated Jan.

30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591415; DX-7 (2007-3 Prospectus

Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732712.)  Those

sections disclosed that "each borrower will have been required to complete an application

designed to provide to the original lender pertinent credit information concerning the borrower"

and that the "borrower will have furnished certain information with respect to its assets,

liabilities, income (except as described below), credit history, employment history and personal

information."  (DX-1 at NOM-FHFA_04811894; DX-3 at NOM-FHFA_04620972; DX-5 at

NOM-FHFA_05142025; DX-6 at NOM-FHFA_05591415; DX-7 at NOM-FHFA_04732712.)

Based on the data provided by the borrower in the application, "a determination is made by the

original lender that the borrower's monthly income (if required to be stated) will be sufficient to

enable the borrower to meet their monthly obligations on the mortgage loan and other expenses

related to the property . . . ."  (DX-1 at NOM-FHFA_04811894; DX-3 at NOM-

FHFA_04620972; DX-5 at NOM-FHFA_05142025; DX-6 at NOM-FHFA_05591415; DX-7 at

NOM-FHFA_04732712.)

       318.    The prospectus supplements further provided with regard to loans from

undisclosed originators that "[g]enerally, scheduled payments on a mortgage loan during the first

year of its term plus taxes and insurance and all scheduled payments on obligations that extend

beyond ten months equal no more than a specified percentage not in excess of 60% of the

prospective borrower's gross income."  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov.

29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811894; DX-3 (2006-HE3 Prospectus

Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885)at NOM-FHFA_04620972; DX-5

(2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-

FHFA_05142025; DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-

FHFA_05591325) at NOM-FHFA_05591415; DX-7 (2007-3 Prospectus Supplement, dated

April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732712.)  That percentage "varies on

a case-by-case basis depending on a number of underwriting criteria, including, without

limitation, the loan-to-value ratio of the mortgage loan.  The originator may also consider the

amount of liquid assets available to the borrower after origination."  (DX-1 at NOM-

FHFA_04811894; DX-3 at NOM-FHFA_04620972; DX-5 at NOM-FHFA_05142025; DX-6 at

NOM-FHFA_05591415; DX-7 at NOM-FHFA_04732712.)

       319.   The sections of the prospectus supplements on underwriting criteria

applied by undisclosed originators also described the process for assessing the adequacy of the

"Mortgage Property as security for repayment of the related Mortgage Loan," noting that the

assessment "will generally have been determined by an appraisal in accordance with pre-

established appraisal procedure standards for appraisals established by or acceptable to the

originator."  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-

FHFA_04811802) at NOM-FHFA_04811894; DX-3 (2006-HE3 Prospectus Supplement, dated

Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620972; DX-5 (2007-1 Prospectus

Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142025; DX-6

(2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-

FHFA_05591415; DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-

FHFA_4732621) at NOM-FHFA_04732712.)  The prospectus supplements disclosed that

"appraisal procedure standards generally will have required the appraiser or an agent on his

behalf to personally inspect the Mortgaged Property and to verify whether the Mortgage Property

was in good condition and that construction, if new, had been substantially completed."  (DX-1

at NOM-FHFA_04811894; DX-3 at NOM-FHFA_04620972; DX-5 at NOM-FHFA_05142025;

DX-6 at NOM-FHFA_05591415; DX-7 at NOM-FHFA_04732712.)

320.    The prospectus supplements further explained that loans from undisclosed

originators that were originated pursuant to "alternative" underwriting programs were subject to

"Modified Standards" that were less stringent than "general" underwriting standards, including

reduced requirements for documentation of income and/or assets, so that "underwriting for such

Mortgage Loans may be based primarily or entirely on an appraisal of the Mortgaged Property,

the loan-to-value ratio at origination and/or the borrower's credit score."  (DX-1 (2005-AR6

Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-

FHFA_04811894; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-

FHFA_04620885) at NOM-FHFA_04620972; DX-5 (2007-1 Prospectus Supplement, dated Jan.

29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142025; DX-6 (2007-2 Prospectus

Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591415; DX-7

(2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-

FHFA_04732712.)

321.    These "Modified Standards" may "relative to the 'general' underwriting

standards" include "higher loan amounts, higher maximum loan-to-value ratios, higher

maximum 'combined' loan-to-value ratios (in each case relative to mortgage loans with

otherwise similar characteristics) in cases of simultaneous primary and secondary financing, less

restrictive requirements for 'equity take out' refinancing, the removal of limitations on the

number of permissible mortgage loans that may be extended to one borrower and the ability to

originate mortgage loans with loan-to-value ratios in excess of 80% without the requirement to

obtain mortgage insurance if such loans are secured by investment properties."  (DX-1 at NOM-

FHFA_04811894; DX-3 at NOM-FHFA_04620972; DX-5 at NOM-FHFA_05142025; DX-6 at

NOM-FHFA_05591415; DX-7 at NOM-FHFA_04732712.)

       322.   None of the statements in the prospectus supplements about the

underwriting criteria applied by undisclosed originators provide a complete description of those

underwriting criteria or say anything about those originators' guidelines, and the prospectus

supplements make no representation about compliance with undisclosed originators'

underwriting guidelines.[6]

---

[6]    In its February 11, 2015 Opinion & Order (Doc. No. 1255) denying defendants' Motion *in Limine* #3, the Court stated that certain disclosures in the Offering Documents concerning underwriting criteria applied by undisclosed originators "are a statement by the defendants that they have reviewed the Originators' processes and guidelines and confirmed that the loans within the Securitization were all originated in compliance with their Originators' standards and processes, and that those standards and processes all contained the central elements summarized in the Supplement." *Id.* at 33.  Contrary to the Court's statement, there are no representations in the prospectus supplements that Nomura confirmed compliance with the underwriting guidelines of undisclosed originators or that Nomura reviewed every potentially applicable set of underwriting guidelines for undisclosed originators.  In fact, as this Court stated in the same opinion, sections of the prospectus supplements concerning underwriting criteria applied by undisclosed originators cannot be interpreted to disclose specific underwriting guidelines because "[t]he language in the [Prospectus] Supplements regarding the criteria is simply too vague to provide a complete description of the origination process.  It omits the specific benchmarks and criteria that are part of the customary underwriting process at origination." Opinion & Order (Doc. No. 1255), at *33.  Further, Nomura raised this issue about the standards that should be used to re-underwrite loans from "undisclosed originators" well before filing the motion *in limine* on November 25, 2014.  *See* Opinion & Order (Doc. No. 1255) at *34.  In the August 14, 2014 expert report of Michael Forester, Forester opined that Hunter "does not claim that the sample loans failed to comply" with the underwriting criteria disclosed in the prospectus supplements and Forester "found no instances of noncompliance."  August 14, 2014 Expert Report of Michael Forester at 97.

**4.      *The Offering Documents Made Representations About the Loans at the Time of Origination, Not About What Happened After the Loans Were Originated***

323.     The Offering Documents' disclosures that mortgage loans "were originated" generally in accordance with certain underwriting guidelines or underwriting criteria refer to the status of the loans at the time of origination.  (Forester Aff. at ¶ 117; Spagna Aff. at ¶ 75; LaRocca Aff. at ¶ 25; Graham Aff. at ¶ 36.)  As plaintiff's due diligence expert, Leonard A. Blum, testified at deposition, the language in the Offering Documents about compliance with underwriting guidelines is "a current representation about a ***past*** event," *i.e.*, whether the loan were originated in accordance with the originator's underwriting guidelines.  (Blum Tr. at 178:10-21 (emphasis added).)  The representations that the mortgage loans backing the Securitizations "were originated" generally in accordance with underwriting guidelines or underwriting criteria are not representations about the status of the loans as of some later date— the representations refer explicitly to the time of origination of the loans.

324.     Representations about compliance with underwriting guidelines must be evaluated based on information available at the time the loan was underwritten.  Issuers of residential mortgage backed securities cannot engage in an extensive investigation into each mortgage loan in a supporting loan group after origination.  (Forester Aff. at ¶¶ 76, 77; Spagna Aff. at ¶ 75; LaRocca Aff. at ¶ 25.)  Issuers of RMBS have no contact with borrowers after they purchase mortgage loans from originators.  (Forester Aff. at ¶  76; Spagna Aff. at ¶ 17.)  It was not feasible for an issuer to conduct a physical inspection of each property to determine whether the borrower had actually moved in.  (Forester Aff. at ¶¶ 76, 77, 88; Spagna Aff. at ¶ 18.)  There is no evidence that anyone in the mortgage industry—including Freddie Mac and Fannie Mae— ever performed securitization due diligence after performing loan acquisition due diligence at the

time loans were purchased from originators, which was typically just a few months before the securitization occurred.  (*See* Graham Aff. at ¶ 47; Spagna Aff. at ¶ 75; LaRocca Aff. at ¶ 25.)  Moreover, the Offering Documents made no representations that such Securitization-specific investigation—or any investigation—of the loans underlying a securitization would occur.

**B.      The Offering Documents Accurately Stated That the Mortgage Loans Were Generally Originated in Accordance with Applicable Underwriting Guidelines and Underwriting Criteria**

> ***1.      The Contemporaneous Due Diligence Results Show that the Loans Complied With Applicable Guidelines***

325.      The Court has stated that Nomura's loan acquisition-level due diligence "met and even exceeded any industry-wide norms that existed during this period."  (Dec. 18, 2014 Order & Opinion, Doc. No. 991, at 95.)  The results of that process confirm that loans underlying the Securitizations were generally originated in accordance with applicable underwriting guidelines.

**a.      Nomura's Due Diligence Process Was Thorough and Reliable**

326.      Nomura's due diligence process was extremely thorough.  The process had two main components: subjecting mortgage loans Nomura was considering for purchase to both valuation due diligence and credit and compliance due diligence.  (Spagna Aff. at ¶ 33; Graham Aff. at ¶ 27.)

327.      Credit and compliance due diligence involved reviewing loan files to assess (a) compliance with the applicable underwriting guidelines and additional Nomura-specific requirements called "bid stipulations" and "overlays," and (b) compliance with federal, state, and local laws and regulations.  (Spagna Aff. at ¶ 7; Greene Aff. at ¶ 7; Kempf Tr. at 33:14-24.)

328.     Nomura hired leading due diligence vendors Clayton and AMC to perform credit and compliance due diligence.  Those vendors, in turn, hired qualified underwriters who reviewed the loan files thoroughly.  (Spagna Aff. at ¶¶ 8, 12, 56; Greene Aff. at ¶¶ 3, 11; Graham Aff. at ¶ 27; Kohout Aff. at ¶ 33.)  Each vendor handled roughly fifty percent of Nomura's credit and compliance due diligence.  (DX-289 (Email from Joseph Kohout, dated March 9, 2006, NOM-FHFA_05266731) at NOM-FHFA_05266731.)

329.     Nomura typically performed 100% credit and compliance due diligence on single loan purchases (or "loan-by-loan" purchases) and purchases of whole loan trade pools with a total loan balance of less than $25 million ("mini-bulk" trade pools).  For larger mini-bulk pools and trade pools with a total loan balance in excess of $25 million ("bulk" trade pools), Nomura sometimes performed credit and compliance due diligence on a sample of the loans. (Spagna Aff. at ¶¶ 57, 58; Graham Aff. ¶ 19; DX-361 (Email from John Graham, dated July 13, 2006, NOM-FHFA_05190628) at NOM-FHFA_05190706, NOM-FHFA_05190728.)

330.     Where sampling was employed in selecting loans for credit and compliance due diligence, Nomura's sample sizes generally never fell below 20%.  (Kohout Aff. at ¶ 34; DX-361 at NOM-FHFA_05190728.)  This was specifically the case for trade pools at issue in this action, where the smallest sample size was 20.1% (for the First NLC SP03 trade pool).  (DX-2640 (Credit and Compliance Sample Review) at 3.)  154 of the at-issue trade pools had credit and compliance due diligence performed on 90% or more of the loans in the pool. (DX-2640 at 1-3.)  24 of the 54 bulk trade pools had credit and compliance due diligence performed on 90% or more of the loans in the pool.  (DX-2640 at 3.)

331.     80.9% of the loans in the supporting loan group for the 2005-AR6 Certificate Fannie Mae purchased received credit and compliance due diligence, including loans

-124-

from the loan-by-loan channel.  (DX-2641 (Minimum Percentage of Loans in Each SLG That Received Credit and Compliance Due Diligence).)  26.4% of the loans in the supporting loan group for the 2006-FM1 Certificate that Freddie Mac purchased received credit and compliance due diligence.  (*Id.*) 54.4% of the loans in the supporting loan group for the 2006-HE3 Certificate that Freddie Mac purchased received credit and compliance due diligence.  (*Id.*) 21.5% of the loans in the supporting loan group for the 2006-FM2 Certificate that Freddie Mac purchased received credit and compliance due diligence.  (*Id.*) 77.4% of the loans in the supporting loan group for the 2007-1 Certificate that Freddie Mac purchased received credit and compliance due diligence, including loans from the loan-by-loan channel.  (*Id.*) 42.6% of the loans from the supporting loan group for the 2007-2 Certificate that Freddie Mac purchased received credit and compliance due diligence, including loans from the loan-by-loan channel.  (*Id.*) 39.4% of the loans from the supporting loan group for the 2007-3 Certificate that Freddie Mac purchased received credit and compliance due diligence.  (*Id.*)

332.    Overall, 39% of the loans in the supporting loan groups for the seven Certificates purchased by Freddie Mac and Fannie Maw received credit and compliance due diligence.  (DX-2641 (Minimum Percentage of Loans in Each SLG That Received Credit and Compliance Due Diligence).)

333.    Nomura had the ability to increase or "upsize" initial samples sizes for credit and compliance due diligence, as needed.  (Spagna Aff. at ¶¶ 59, 73; Kohout Aff. at ¶ 36.) For example, if the initial credit and compliance due diligence results showed a concerning trend, Nomura reserved the right to review additional loans.  (Kohout Aff. at ¶ 36.)  While Nomura sometimes entered into agreements with originators that stipulated a supposed "maximum" sample size, in reality, Nomura was not bound by those agreements and always reserved the right

to review as many loans as needed to understand the characteristics of the loans in the pool, and

to be comfortable that it had kicked out potentially defective loans.  (Spagna Aff. at ¶ 59; Kohout

Aff. at ¶ 36.)  Nomura had the option to walk away from a trade altogether and not purchase the

trade pool if the originator refused to increase the sample size or if the results of credit and

compliance due diligence were not acceptable.  (Spagna Aff. at ¶¶ 59, 73.)  Nomura walked

away from deals when kick-out rates proved too high or its credit and compliance due diligence

otherwise detected concerning trends.  (Spagna Aff. at ¶ 59.)

      334.    There was no defined kick out rate or trend that would automatically

trigger an increase in the sample size; it depended on the facts and circumstances of a given

situation and why loans were being kicked out of the pool.  (Spagna Aff. at ¶ 71; Kohout Aff. at

¶ 58.)  For example, the Silver State 58 trade pool had a kick out rate of 66.7%.  (DX-2645

(Kick-Out Rates for the At-Issue Trade Pools) at 3.)  But almost all of the kick outs were due to

an anomalous technical issue concerning a "lookback" clause, which related to the calculation of

the interest rate on mortgage loans in the pool.  (DX-1693 (Email from Mendy Sabo, dated Oct.

5, 2006, NOM-FHFA_05797460) at NOM-FHFA_05797461)  That issue had nothing to do with

compliance with Silver State's underwriting guidelines—only 7.5% of the loans were kicked out

as a result of Nomura's review for compliance with applicable underwriting guidelines (or

Nomura's own bid stipulations and overlays) or because of an unsupported property valuation.

(DX-1693 at NOM-FHFA_05797461; Spagna Aff. at ¶ 71.)  Moreover, Nomura did not ignore

the issue with the "lookback" clause—it had the collateral custodian, Wells Fargo, review 100%

of the loans in the pool to determine whether they had a "lookback" clause that created an issue.

(DX-2648 at NOM-FHFA_05070203; Spagna Aff. at ¶ 72.)  There was no need to increase the

sample size for credit and compliance due diligence; instead, Nomura checked 100% of the loans

for the specific issue that arose.  (DX-2649 at NOM-FHFA_05070203; Spagna Aff. at ¶ 72.)

335.    Nomura relied primarily on a technique called adverse selection to choose

the loans that received credit and compliance due diligence.  (Spagna Aff. at ¶ 60; Kohout Aff. ¶

37.)  The goal of drawing samples by adverse selection was to identify loans that appeared, based

on the characteristics of those loans, to have relatively higher credit risk or risk of default.

(Spagna Aff. at ¶ 61; Kohout Aff. ¶ 38.)  Nomura selected its adverse samples using a

combination of two methods.

336.    First, a portion of the adverse sample often was chosen using a computer

program developed by S&P called LEVELS.  (Spagna Aff. at ¶ 60; Kohout Aff. at ¶ 37.)

LEVELS assessed the characteristics of the loans and estimate potential losses over the life of

the loan.  Loans in the pool with a relatively higher risk of loss were included in the credit and

compliance due diligence sample.  (Spagna Aff. at ¶ 60; Kohout Aff. at ¶ 37.)

337.    Second, at least a portion of the sample was hand-picked by members of

Nomura's due diligence team based on risk characteristics of loans that were identifiable from

the loan tape.  (Spagna Aff. at ¶ 62; Kohout Aff. at ¶ 37.)  For example, Nomura looked for loan

characteristics such as high debt-to-income ("DTI") ratios, low FICO scores, loans with very

large balances, loans with a very high initial interest rate, and loans where the borrower was not

required to provide much information in the loan application, *e.g.*, "stated income stated assets"

or "SISA" loans, where the borrower represented his or her income and assets on the loan

application, but those representations were not required to be verified by the originator.  (Spagna

Aff. at ¶ 62; Kohout Aff. at ¶ 37; PX-390 (Email from Mendy Sabo, dated September 29, 2006,

NOM-FHFA_04982973) at NOM-FHFA_04982973.)  Loans were not selected on an ad hoc

basis, but were chosen by Nomura's due diligence team based on an established list of high risk characteristics. (Spagna Aff. at ¶ 60; Kohout Aff. at ¶ 37; PX-390 at NOM-FHFA_04982973.)

338.    Selecting samples for credit and compliance due diligence based on adverse characteristics of loans allowed Nomura to examine loans with the highest potential credit risk and the highest potential risk of default. (Spagna Aff. at ¶ 61; Kohout Aff. at ¶ 37.) Adversely selected loans were also more likely to have significant deviations from originator underwriting guidelines or to have inflated appraisals. (Spagna Aff. at ¶ 62; Kohout Aff. at ¶ 38.) Moreover, loans with high-risk characteristics were less likely to have compensating factors that offset the credit risk and risk of default posed by those loans. (Spagna Aff. at ¶¶ 61-62; Kohout Aff. at ¶ 39.) Adverse sampling was the most common form of sampling used in the industry for mortgage loan due diligence during this period, and Nomura carried out adverse sampling in an effective manner. (Spagna Aff. at ¶¶ 61-62; Kohout Aff. at ¶ 39.)

339.    Based on the results of credit and compliance due diligence performed on adversely selected loan samples, Nomura was able to reasonably conclude that the remaining loans in the loan pool were less likely to deviate in significant ways from underwriting guidelines. (Spagna Aff. at ¶ 62; Kohout Aff. at ¶ 39.) Nomura viewed the percentage of loans kicked out of an adverse sample as likely to be higher than the percentage of unsampled loans that might deviate in significant ways from underwriting guidelines—it was effectively a "cap" or upper limit on the percentage of loans in the trade pool that could have deviated in significant ways from underwriting guidelines. (Spagna Aff. at ¶ 62; Kohout Aff. at ¶ 39.)

340.    Nomura reasonably drew conclusions about trade pools based on adverse samples for other reasons as well, including the fact that Nomura typically employed relatively high sampling rates, and that it was familiar with most originators from which it purchased loans,

as well as the type and quality of loans they originated.  (Spagna Aff. at ¶ 62.)  It was not the practice in the mortgage industry at the time to select loans for credit and compliance due diligence using only random sampling, and Nomura's due diligence team viewed adverse sampling as more likely to identify the potentially problematic loans in loan pools.  (Spagna Aff. at ¶ 61.)

341.    In some cases, Nomura selected portions of its samples at random, or selected loans for credit and compliance due diligence because they were flagged during valuation due diligence, which is described below.

> **b.    Nomura Imposed Bid Stipulations and Overlays That Were More Strict Than Originator Guidelines**

342.    Nomura applied its own criteria—called bid stipulations and overlays—to identify loans for further review.  (Spagna Aff. at ¶¶ 13, 23; Greene ¶ 9; Beal 30(b)(6) Tr.) at 56:11-24; Kempf Tr. at 39:4-23; 82:5-15.)  Nomura had bid stipulations, which listed types of loans that Nomura would not purchase.  These bid stipulations stated that Nomura would not purchase loans with, among other things, a DTI ratio above 55%, borrower FICO scores below 500, a loan-to-value ratio or combined loan-to-value ratio above 100%, or SISA, no income no assets ("NINA"), or no documentation loans from first-time homebuyers where the loan had an LTV ratio or CLTV ratio above 95%.  (DX-279 (Email from Mendy Sabo, dated Feb. 23, 2006, NOM-FHFA_05324872) at NOM-FHFA_05324872; Spagna Aff. at ¶ 13.)  The particular terms of bid stipulations could differ from pool to pool.  (Spagna Aff. at ¶ 24; Kohout Aff. at ¶ 46.)

343.    Nomura also had overlays, which were lists of loan characteristics that its due diligence vendors were required to flag for further review.  (Spagna Aff. at ¶ 13.)  The listed loan characteristics were ones Nomura could use to exclude loans from a loan pool—and Nomura did decline to purchase loans based on its overlays, even when the loans complied with

originator underwriting guidelines.  (Spagna Aff. at ¶ 23; Kohout Aff. at ¶ 44.)  At the very least, these overlays required due diligence vendors to escalate potentially risky loans to Nomura for additional review.  (Kohout Aff. at ¶ 44.)

344.    Overlays also came in the form of "scripts," computer programs used by due diligence vendors to review loans.  Nomura had customized scripts for both the credit and compliance and valuation portions of the due diligence process.  (DX-137 (Email from Derick Greene (Clayton), dated Sept. 14, 2006, NOM-FHFA_05787706) at NOM-FHFA_05787706-7729; DX-204 (Email from Derick Greene (Clayton), dated July 8, 2005, NOM-FHFA_05787730) at NOM-FHFA_05787730-7736.)  These customized scripts called for more rigorous review than the due diligence vendors' default review—for example, Clayton's default review was to grade loans with an LTV ratio or combined LTV ratio over 100% as being in compliance if the applicable underwriting guidelines allowed such loans, but Nomura's customized script required that such loans be identified as grade "3."  (DX-204 (Email from Derick Greene (Clayton), dated July 8, 2005, NOM-FHFA_05787730) at NOM-FHFA_05787734; Spagna Aff. at ¶ 23.)

345.    Nomura also provided its due diligence vendors with general instructions to apply to all reviews, in order to ensure that those vendors were meeting Nomura's standards and performing a rigorous evaluation of certain types of loans.  For example, in July 2005, Joseph Kohout, then head of Nomura's due diligence team, sent an email to Nomura's due diligence vendors regarding stated income loans, explaining that "[w]ith real estate prices increasing at a rate faster than income, I am noticing abuses . . . on transactions where income is being stated."  (DX-201 (Email from Peter Kempf (AMC), dated July 7, 2005, NOM-FHFA_05500899) at NOM-FHFA_05500889.)  In his e-mail, Kohout stated that he expected

"that the reasonability of income is reviewed" by Nomura's vendors "and if applicable, questioned." (*Id.*) Kohout also instructed underwriters at the due diligence vendors to look at the borrower's DTI ratio as a check against the income stated and to use common sense. (*Id.* at NOM-FHFA_05500889-0890.) Kohout further instructed that "[b]orrowers on a fixed income . . . should not be allowed to utilize a stated income program." (*Id.* at NOM-FHFA_05500890.) Kohout concluded his e-mail by warning due diligence vendors Clayton and AMC that "the level of diligence should be increasingly 'diligent.'" (*Id.*)

346.    At the start of the credit and compliance due diligence process, Nomura communicated the type and scope of the review, including any overlays to be used, to the due diligence vendor, and sent or asked the originator to provide the loan files and underwriting guidelines for the loans being reviewed. (Kohout Aff. at ¶ 48; Spagna Aff. at ¶ 24, 56.) As Peter Kempf, president of AMC, explained, "[t]he scope" of the review "was discussed between the client and AMC" and "the client . . . made the decision[s]" regarding the scope. (Kempf Tr. at 102:15-25.)

347.    After reviewing the loan files against applicable guidelines and any Nomura-specific overlays, the due diligence vendor graded each loan and reported its credit and compliance due diligence findings to Nomura. (Beal 30(b)(6) Tr. at 22:4-8; Kempf Tr. at 109:4-6; Spagna Aff. at ¶ 63; Greene Aff. at ¶ 25; Kohout Aff. at ¶ 57.) Nomura then reviewed these reports to assess their accuracy and to make decisions regarding which loans to purchase. (Spagna Aff. at ¶ 69.)

348.    Throughout the diligence process, Nomura, the due diligence vendor, and the originator worked together to resolve issues identified by the due diligence vendors and to locate any missing documents. (Greene Aff. at ¶ 16; Kohout Aff. at ¶ 51.) Nomura's due

-131-

diligence team monitored the results received from the vendors on a continuous basis—often on a daily or near-daily basis—and sometimes went onsite to the due diligence vendor to oversee the process in person, including for trade pools at issue in this case.  (Kohout Aff. at ¶ 55; PX-1022 (Email from Mike Calloway to Joseph Kohout, dated Sept. 15, 2005, NOM-FHFA_05803485) at NOM-FHFA_05803485.)

349.    The decision to purchase loans was made by Nomura after looking specifically at loans flagged for further review by the due diligence vendors.  (Kohout Aff. at ¶ 43; Greene Aff. at ¶ 22.)

350.    Because Nomura wanted to review all potentially problematic loans and make the final decisions itself about which loans to purchase, Nomura gave its due diligence vendors relatively little discretion to deem exceptions to underwriting guidelines immaterial, or to deem compensating factors sufficient to offset material underwriting exceptions.  (Spagna Aff. at ¶¶ 14-15; Green Aff. at ¶¶ 18, 22; Kohout Aff. at ¶ 43.)  This ensured that close calls were raised to Nomura's attention so its due diligence team could make the final decision about whether to purchase a given loan from a trade pool.  (Kohout Aff. at ¶ 43; Greene Aff. at ¶¶ 18, 22.)

351.    For example, in a January 2006 email exchange regarding due diligence on the OwnIt SP01 trade pool, Derick Greene of Clayton wrote to Joseph Kohout, who was then head of Nomura's due diligence team, that "the process that has been established leaves all but the smallest judgment calls for Nomura's review."  (PX-212 (Email from Derick Greene, dated Jan. 6, 2006, NOM-FHFA_04589223) at NOM-FHFA_04589225.)  Greene commended Nomura for this approach, explaining that "I understand the reasoning behind this and don't disagree with

it (in fact, with the quality of paper out there, Nomura's approach seems the most sane)."  (PX-212 at NOM-FHFA_04589225.)

352.    Kohout responded that Nomura "will continue to make the final decisions on loans being purchased [by] NCCI."  (PX-212 at NOM-FHFA_04589225.)  Kohout also made this point directly to OwnIt, stating in an email to OwnIt employee Kevin Crowe with regard to the same OwnIt SP01 trade pool that "Clayton has no decision[making] authority and it is important to note that our arrangement has always been to use all of [our] vendors as conduits for information only with the final decision coming from Nomura/NYC.  In this regard, where you take umbrage with any of the feedback received re: stip clearing, Nomura will be making the final decision."  (PX-741 (Email from Joseph Kohout, dated Jan. 05, 2006, NOM-FHFA_05502052) at NOM-FHFA_05502053.)

353.    When Nomura or its due diligence vendors identified exceptions to underwriting guidelines that could be remedied, Nomura gave the originator an opportunity to "cure" the exception, often by providing documents that were missing from the loan file.  (Spagna Aff. at ¶ 21; Greene Aff. at ¶ 16; Kohout Aff. at ¶ 51.)  In cases where the originator was unable to "cure" the exception, or where the loan lacked sufficient compensating factors to justify a material deviation from the applicable underwriting guidelines, Nomura declined to purchase the loan.  (Kohout Aff. at ¶ 51.)

354.    Exceptions to underwriting guidelines based on compensating factors were contemplated by originators' underwriting guidelines, and thus a loan with compensating factors that did not meet some particular requirement of the applicable underwriting guidelines still comply with those guidelines overall.  (Spagna Aff. at ¶ 15; Kohout Aff. at ¶ 49; Forester Aff. at

¶ 53.)  This was disclosed in the Offering Documents for the Securitizations.  *See* ¶¶ 310-313, *supra*.

355.    Nomura's due diligence vendors, Clayton and AMC, reviewed 39% (6,177) of the loans in the Freddie Mac and Fannie Mae supporting loan groups.  Clayton and AMC assigned grades of "1," "2," and "3" to each loan reviewed during the due diligence process.  (Spagna Aff. at ¶ 20; Greene Aff. at ¶ 17; Kohout Aff. at ¶ 43.)

356.    A grade of "1" typically indicated that a loan complied with both the originator's underwriting guidelines and any Nomura-specific overlays applied to that transaction, as well as applicable laws and regulations.  (Spagna Aff. at ¶ 20; Greene Aff. at ¶ 17.)  As Vicki Beal, the Rule 30(b)(6) designee on behalf of Clayton, testified, "[a] grade 1 typically was that a loan met all of the guidelines that we were underwriting to . . . .  And for regulatory compliance, [i]t meant that it met all the regulations that we were reviewing against." (Beal 30(b)(6) Tr. at 59:12-25.)  Similarly, Peter Kempf, President and Rule 30(b)(6) designee of AMC, testified that "[a]n Event Level 1 is a loan that has all the documents within the file to make a[n] accurate, credit compliance and value decision.  It adheres to the guidelines as given to AMC," which "includ[ed] both the underwriting guidelines and any additional client parameters."  (Kempf Tr. at 68:22-69:11.)

357.    A grade of "2" typically indicated that the due diligence vendor had identified at least one deviation from the requirements of applicable underwriting guidelines or Nomura-specific overlays, but also judged that the deviations were either immaterial or offset by sufficient compensating factors.  (Spagna Aff. at ¶ 20; Greene Aff. at ¶ 17.)  As Vicki Beal of Clayton testified, "[a] grade 2 was that there was a minor deviation from the guidelines we were underwriting to.  And we felt it was offset by compensating factors."  (Beal 30(b)(6) Tr. at

60:10-24.).  She further testified that "an Event Grade 2 also stood for a nonmaterial exception

. . . .  Based on client instructions, there could be variances in what was graded a 2."  (Beal Tr. at

43:8-44:25.)  Peter Kempf of AMC similarly testified that "[w]e gave loans an Event Level 2 for

a couple reasons.  One, if it was missing a document that we would typically see in the file but

we were able to get the information that would have been on that document from another

document, so it was not required for us to make a[n] accurate decision to the adherence to

guidelines, we would give that an Event Level 2.  Also we would give an Event Level 2 if a loan

was outside of guidelines but there were compensating factors to offset that variance from the

guideline."  (Kempf Tr. at 77:11-78:2.)

   358. A grade of "3" typically indicated one of three things:  (i) the loan

deviated from the originator's underwriting guidelines in a significant way (which could result

from, among other things, documents missing from the loan file), and the loan lacked sufficient

compensating factors to offset the credit risk posed by the deviation or by the loan as a whole;

(ii) the loan could not be evaluated against the applicable underwriting guidelines due to missing

documents; or (iii) the loan was flagged in accordance with a Nomura-specific overlay.  (Spagna

Aff. at ¶¶ 20, 65; Kohout Aff. at ¶ 51; Greene Aff. at ¶ 17; Kempf Tr. at 81:14-82:15.)

   359. As Peter Kempf of AMC testified, for a "[l]oan to be graded a 3, again,

two scenarios.  It's missing the documents required to make an accurate credit and compliance

decision; or it has variances to the guidelines where the compensating factors don't—don't make

up for these—these variances to the guideline . . . .  Also, it could be the client overlays where

. . . the guideline might go down to a 480 FICO score, but Nomura has said 'We're not buying

anything less than 500.'  So it could fit the guideline perfectly, but per Nomura it was an Event

Level 3 because it was below 500."  (Kempf Tr. at 81:14-82:15.)  Similarly, Vicki Beal of

Clayton testified that a 3 was a loan that was in "violation [of] the regulatory compliance rules;" a loan that had "a material exception" from the applicable underwriting guidelines and the loan's "compensating factors could not offset the exception that Clayton had identified;" or a loan where "a client gave us specific instructions on how to grade a 3," such as the Nomura-specific overlays.  (Beal 30(b)(6) Tr. at 62:2-5; Beal Tr. at 46:13-49:7.)

360.    A loan could be re-graded from a "3" to a "2" or "1" for a number of reasons, including because (i) the diligence vendor made a mistake in grading the loan, *e.g.*, by applying the wrong underwriting guidelines; (ii) the seller of the loan cured the purported defect, *e.g.*, by locating missing documents; or (iii) the diligence vendor or Nomura determined that there were sufficient compensating factors to offset any exception to underwriting guidelines. (Spagna Aff. at ¶¶ 21, 65; Greene Aff. at ¶¶ 24-25; Kohout Aff. at ¶ 43.)

361.    Even if loan maintained a grade of "3," that fact did ***not*** indicate that the loan posed an unacceptable credit risk or that the loan would not perform, and third-party diligence providers did not purport to make such determinations.  When asked "if a loan is graded a 3, does that mean the loan is not likely to perform in AMC's opinion," Kempf testified that "we make no decision on whether a loan is going to perform.  We do not set credit policy, so we are only reviewing to the adherence to the guideline[s]."  (Kempf Tr. at 82:16-25.)

362.    In some cases, Clayton and AMC erred on the side of caution and graded loans as a "3" even though they might have had sufficient compensating factors to justify deviations from underwriting guidelines, in order to escalate the loans to Nomura's attention. (Spagna Aff. at ¶ 65; Greene Aff. at ¶ 18; Kohout Aff. at ¶ 43; PX-212 (Email from Derick Greene, dated Jan. 6, 2006, NOM-FHFA_04589223) at NOM-FHFA_04589225.)  Derick Greene of Clayton explained that in January 2006, "the process that has been established for

-136-

Nomura reviews is to leave all but the smallest judgment calls for Nomura's review."  (PX-212 at NOM-FHFA_04589225.)  This sometimes resulted in Nomura's due diligence vendors initially grading more loans as a "3" than they otherwise would have in order to be sure that loans that presented possible problems or judgment issues were brought to Nomura's attention so it could decide whether to include the loan in the trade pool.  (Greene Aff. at ¶ 22.)

363.    A grade of "3" did not mean that the loan failed to comply with applicable underwriting guidelines.  Loans were frequently graded a "3" because they did not meet some requirement of a Nomura-specific overlay, not because the loans failed to not comply with the originator's underwriting guidelines.  As Clayton's Rule 30(b)(6) witness Vicki Beal testified, "clients had many overlays that they had us, you know, review to, so that it could meet the originator guidelines, but, for whatever reason, the client said if this, then make it a 3."  (Beal 30(b)(6) Tr. at 66:20-67:18.)  This was true for AMC as well.  (Kempf Tr. at 39:4-23, 49:8-23, 73:8-18.)  Loans also were often graded a "3" because of documents missing from the loan file— documents that could later be provided by the originator.  (Spagna Aff. at ¶ 65; Kohout Aff. at ¶ 57.)  Peter Kempf of AMC testified that loans could be re-graded based on "receiving [missing] documentation" or on the basis of "additional . . . compensating factors" identified for the loan that "supersede that . . . variance."  (Kempf Tr. at 83:2-85:3.)

364.    Nomura reviewed every loan graded as a "3," every loan graded as a "2," and at least a portion of the loans graded as a "1."  (Kohout Aff. at ¶ 56.)  Nomura did this to ensure the accuracy of the results it was getting from its due diligence vendors, but also to make the final decision on which loans to purchase, since Nomura bore the credit risk of the loans it purchased.  Because it was taking that risk, Nomura wanted to make the final decision about

which loans to purchase rather than outsourcing that function to a third party.  (Kohout Aff. at ¶ 56.)

365.    Nomura sometimes reached a different conclusion about particular loans than Clayton and AMC reached, and at times decided to purchase loans despite the grade of "3" assigned by those vendors.  As Vicki Beal of Clayton testified, a due diligence vendor's review of compensating factors required discretion and judgment, since these factors were "subjective" and "reasonable people differ as to whether a particular compensating factor offsets an exception to guidelines."  (Beal 30(b)(6) Tr. at 63:2-12.)  Neil Spagna, head of Nomura's due diligence team from July 2006 through November 2007, testified that in most cases, however, Nomura would only buy a loan graded as a "3" by Clayton or AMC if the loan had been graded as a "3" due to a missing document and the originator had later provided that missing document.  (Spagna Aff. at ¶ 65.)  He explained that Nomura rarely decided to purchase a loan graded as a "3" loan based on Nomura's own evaluation of compensating factors—that was "the exception, not the rule."  (Spagna Aff. at ¶ 65.)  In addition, loans graded as a "3" due to a Nomura overlay were purchased if Nomura was satisfied that its internal concern was satisfied.  (Spagna Aff. at ¶ 65.)

366.    As discussed above ¶ 33, *supra*, Freddie Mac performed reviews of Nomura in 2004 and 2006, including reviews of its due diligence process.  (DX-111 (Nomura AMO Review, dated August 31, 2004, FHFA19172000); DX-122 (Nomura AMO Review, dated March 14, 2006, FHFA13253477).)  In both reviews, Freddie Mac gave Nomura a rating of "Satisfactory" and explained that "Nomura's philosophy is quite thorough with good overall origination strategies.  Based upon the combination of good due diligence methodologies, reasonable valuation processes and sound controls, AMO rates Nomura as Satisfactory overall."  (DX-111 at FHFA19172000; DX-122 at FHFA13253477.)

-138-

### c. Nomura's Credit and Compliance Due Diligence Vendors, Clayton and AMC, Provided Reliable and Accurate Reports

367. In addition to Nomura's procedures for reviewing loans for compliance with underwriting guidelines, its due diligence vendors had their own internal policies and procedures to ensure that loans complied with applicable underwriting guidelines.

368. According to its 2006 "Due Diligence Processes and Procedures Manual," Clayton engaged in a "systematic loan review process." (DX-324 (Email from Sarah Baldo, dated May 18, 2006, CLAY-FHFADEF-E-1328679) at CLAY-FHFADEF-E-1328682.) Clayton underwriters reviewed loan files extensively, typically looking at legal documents (promissory note and riders thereto, mortgage or deed of trust and riders thereto, note endorsements, mortgage assignments, note and mortgage modifications, title commitment or title policy, deed of title, and power of attorney); credit documents (loan application, credit report, verification of mortgage, verification of employment, verification of assets, verification of income, underwriting approval-transmittal); property value documents (property appraisal; appraisal certification; desktop appraisal review; appraisal field review; underwriting appraisal review; statistical valuation (*e.g.*, AVM); assessor valuation; broker valuation);  insurance documents (mortgage insurance; mortgage guarantee; hazard insurance; flood insurance); and legal compliance documents (Good Faith Estimate; Truth-in-Lending Disclosure; notice of right-of-rescission; HUD-1 settlement statement; HOEPA high-cost disclosure; affiliated business disclosure; notice of transfer of servicing; state-required disclosures). (DX-324 at CLAY-FHFADEF-E-1328686-8687.)

369. Clayton published an underwriter manual in 2006 that included extensive guidelines for its underwriters to follow when performing credit and compliance due diligence. (DX-836 (Email from Ericka Buritica, dated May 1, 2009, CLAY-FHFADEF-E-1338057) at

CLAY-FHFADEF-E-1338058.)  The manual noted that the Clayton Loan Analysis System

("CLAS"), a computer program used to check various loan characteristics, was "an 'expert'

computer system for mortgage loan review . . . [that] performs calculations for you instantly and

automatically.  Validation is done constantly to improve accuracy and warn you of possible

problems."  (DX-836 at CLAY-FHFADEF-E-1338071.)  The manual also stated that "[t]he

CLAS system includes various 'scripts' that are custom designed to fit the scope of the project,"

such as the Nomura-specific scripts described *supra* ¶ 344.  (DX-836 at CLAY-FHFADEF-E-

1338071.)

      370.    Clayton stated in the underwriter manual that "CLAS validates data in

several ways as [underwriters] complete the fields" in the computer program.  (DX-836 at

CLAY-FHFADEF-E-1338071.)  "The first data validation compares the data you enter against

the data provided by the seller/client.  If your entry disagrees with the tape data, CLAS will

notify you . . . and asks you to confirm that the data you entered is correct."  (*Id.*)  "CLAS also

compares your input against a range of values that are set for the particular transaction.  If your

input is outside the range, CLAS will 'beep' and indicate that the data seems too small or too

large."  (*Id.*)  "Lastly, CLAS verifies your entry against the acceptable choices for the field.  If

you enter a code that is not in the list of available options, CLAS will notify you and will not

accept the incorrect choice."  (*Id.*)

      371.    AMC used a similar computer system called TIGRE "and a highly trained

compliance team" to "accurately and consistently identify potential risks to [AMC's] clients."

(DX-248 (Email from John Hutchison, dated Nov. 28, 2005, CSFHFA009250821) at

CSFHFA009250848.)  AMC utilized "[e]xperienced field underwriters" and provided

"continuing education . . . to all underwriters . . . from industry professionals."  (DX-248 at

CSFHFA009250850.)  AMC's underwriters were overseen by "project leads" who had

"extensive knowledge of industry trends."  (DX-248 at CSFHFA009250872.)  AMC also

"maintain[ed] strict quality control procedures to ensure the integrity of our due diligence

process."  (DX-248 at CSFHFA009250872.)  The quality control reviewers "[p]rovide[d] on-site

training to contractors recently joining the AMC team" to ensure that those contractors

performed high quality work.  (DX-248 at CSFHFA009250872.)  "All QC personnel attend[ed]

frequent compliance and credit training to maintain their ability to address current industry

trends and regulatory updates."  (DX-248 at CSFHFA009250873.)  AMC provided its

underwriters with extensive initial training, and then continuing training throughout their tenure

at AMC.  (DX-248 at CSFHFA009250877-0878.)

   372. Nomura's due diligence vendors employed extensive quality control

procedures to ensure the accuracy of their results.  AMC had four layers of review for each and

every loan before any results were sent to Nomura—including for loans graded as a "1" or a "2."

First, the loan was reviewed by an underwriter, then, "[o]nce the underwriter was done, it went to

[AMC's] first stage of quality control," and then it was reviewed by "secondary QC, what

[AMC] call[ed] our final QC," and finally by the client services manager for the deal.  (Kempf

Tr. at 42:20-46:9.)  Peter Kempf of AMC testified that AMC performed one "[h]undred percent"

quality control on all loans, and performed "[t]he same QC process . . . equally on every loan,"

regardless of what grade that loan had received.  (Kempf Tr. at 262:21-263:13.)

   373. Clayton's quality control process was similarly multifaceted and robust.

All loans reviewed by Clayton—regardless of their grades—underwent a quality control review.

(Beal 30(b)(6) Tr. at 23:12-24:13, 43:2-12, 79:21-84:23.)  This quality control review included

manual checks by seasoned underwriters, as well as automated checks built into Clayton's

review system.  (Beal 30(b)(6) Tr. at 79:21-83:12; DX-324 at CLAY-FHFADEF-E-1328697-

8698.)  Clayton also utilized internal and external audits to verify the quality of its procedures,

including reviews of Clayton's systems and procedures by law firms, security consultants, and

S&P.  (DX-324 (Email from Sarah Baldo, dated May 18, 2006, CLAY-FHFADEF-E-1328679)

at CLAY-FHFADEF-E-1328699.)

   374. More generally, Clayton and AMC took the idea of providing accurate due

diligence reports to Nomura and other clients very seriously.  Peter Kempf of AMC testified that

AMC "provided to its clients . . . accurate and reliable" due diligence results.  (Kempf Tr. at

148:12-21.)  He further testified that "AMC did a very good job providing accurate and

descriptive results."  (Kempf Tr. at 19:25-20:12.)  This view was based on the fact that AMC

was able to "ke[ep] the clients we had" and "obtain[] additional clients . . . based on our

reputation in the industry."  (Kempf Tr. at 20:13-20.)  Similarly, Vicki Beal of Clayton testified

that the reports Clayton provided to its clients "were reliable"; she explained that Clayton was

"serious about providing thorough and reliable due diligence reviews," and that it "had put a lot

of process[es] and procedures in place so that we were furnishing reliable results."  (Beal

30(b)(6) Tr. at 22:4-24:13.)

   375. Freddie Mac and Fannie Mae also used and approved of both Clayton and

AMC.  Ronald Feigles of Freddie Mac testified that it was "pretty much standard in the industry

that people hire Clayton to do their due diligence on loans."  (Feigles Tr. at 112:16-20.)  Fannie

Mae used Clayton as well; John Ingram, a Fannie Mae employee responsible for pre-purchase

diligence reviews, testified that Fannie Mae utilized Clayton for its own anti-predatory lending

due diligence reviews.  (Ingram Tr. at 62:25-64:4, 92:2-9.)  Moreover, AMC was a Fannie Mae-

approved due diligence vendor during the 2005-2007 time period.  (DX-2799 (Fannie Mae List

of Approved Vendors) at FHFA00004103.)

376.    Nomura had every incentive to make sure it received accurate reports from

its due diligence vendors, and to make sure it identified potentially defective loans and kicked

them out of trade pools it was reviewing for purchase.  This is so because Nomura held the first-

loss piece of each Securitization, called the residual, and its profits were tied to the performance

of the residual.  *See* ¶¶ 154-178, *supra*.  Nomura's economic interests ensured that the due

diligence process was robust and that the results of that process were accurate.  (Lee Aff. at ¶ 44-

45; Spagna Aff. at ¶ 79.)  As Randall Lee, who structured residential mortgage-backed securities

on Nomura's trading desk, explained:  "Nomura was willing to take th[e] risk" of holding the

residual "in part because of our faith in Nomura's due diligence program and team. . . .  We saw

due diligence as a form of insurance to protect our profits, and thus we had every incentive to

perform thorough due diligence on the loans underlying each securitization."  (Lee Aff. at ¶ 44-

45.)

> **d.    Nomura and Its Due Diligence Vendors Found Low Rates of
> Defects in Trade Pools Containing Loans Backing the
> Securitizations**

377.    As a result of Nomura's due diligence process, it identified and kicked out

defective loans in the portions of the trade pools it reviewed during due diligence, based on the

findings of Clayton and AMC as well as its own analysis.  The trade pools that contributed loans

to the supporting loan groups for the Certificates consisted of 54,374 loans, plus an additional

122 loans purchased though Nomura's loan-by-loan channel.  (DX-2643 (Summary of Credit

and Compliance Review Results by Trade Pool).)  Nomura's due diligence vendors performed

credit and compliance due diligence on 26,799 of those loans (49.2%).  (DX-2643 (Summary of

Credit and Compliance Review Results by Trade Pool).)  Nomura declined to purchase 6,793

(10.9%) of the loans that its vendors reviewed as a result of their credit and compliance due

diligence.  (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)

> 378.    These kick-out percentages show that during the due diligence process,
Nomura identified the loans that potentially did not comply with applicable underwriting
guidelines or Nomura overalys, had potential owner occupancy misrepresentations, or potentially
had inflated appraisals, and kicked those loans out of the trade pools before purchasing them.
The 10.9% of loans Nomura kicked out during credit and compliance due diligence represent a
maximum number of potentially defective loans because the loans Nomura kicked out included
loans that did not comply with Nomura-specific overlays (but nonetheless complied with
originator underwriting guidelines), and were drawn from adverse samples that over-represented
the numbers of loans containing underwriting defects.  (Spagna Aff. at ¶¶ 9, 71.)

> 379.    Nomura kicked out 10.9% of loans for credit and compliance reasons from
the trade pools that contributed loans to the supporting loan groups pursuant to a reliable and
thorough due diligence process.  However, because Nomura did not perform credit and
compliance due diligence on 61% of loans in the supporting loan groups for the Certificates, it is
possible that some number of those loans had substantial underwriting defects, but the
percentage of defective loans in that un-reviewed portion of the loan pools could not plausibly
exceed or meet the 10.9% of loans Nomura kicked out of its adverse samples.[7]

---

[7]    In its December 8, 2014 Opinion & Order (Doc. No. 961), the Court barred defendants
from introducing evidence of this arithmetical calculation on the grounds that it required "expert
support and the ability to confront that expert through cross examination."  Defendants reserve
all rights.

380.    Contemporaneous due diligence summaries were compiled by Nomura for four of the at-issue Securitizations.  The defect rates from these summaries, which represent the percent of loans kicked out of the loan pools contributing loans to the Securitizations, are shown below:

| Table 1: "Kick out" Rate in Nomura's Due Diligence Summaries | |
| --- | --- |
| Securitizations | Defect Rate |
| 2006-FM1 | 4.9% |
| 2006-HE3 | 7.3% |
| 2007-2 | 10.1% |
| 2007-3 | 12.4% |

(DX-398 at NOM-FHFA_04920498; DX-374 at NOM-FHFA_04265119; DX-474 at NOM-FHFA_04921689; DX-560 at NOM-FHFA_04925783.)

381.    *The Due Diligence Findings for 2005 – AR6*:  Nomura's due diligence vendors performed credit and compliance due diligence on 79.1% of the loans in the trade pools that contributed loans to the supporting loan group for the NAA 2005-AR6 Certificate that Fannie Mae purchased.  (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)  As a result of this review, Nomura identified and kicked out 8.7% of the loans from those trade pools that were reviewed in credit and compliance due diligence.  (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)

382.    *The Due Diligence Findings for 2006-FM1:*  Nomura's due diligence vendor, Clayton, performed credit and compliance due diligence on 24.7% of the loans in the trade pool that contributed loans to the supporting loan group for the NHELI 2006-FM1

Certificate that Freddie Mac purchased.  (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)  As a result of this review, Nomura identified and kicked out 9.3% of the loans from that trade pool that were reviewed in credit and compliance due diligence.  (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)

383.     ***The Due Diligence Findings for 2006-FM2:***  Nomura's due diligence vendor, AMC, performed credit and compliance due diligence on 24.7% of the loans in the trade pools that contributed loans to the supporting loan group for the NHELI 2006-FM2 Certificate that Freddie Mac purchased.  (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)  As a result of this review, Nomura identified and kicked out 10.6% of the loans from those trade pools that were reviewed in credit and compliance due diligence. (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)

384.     ***The Due Diligence Findings for 2006 – HE3:***  Nomura's due diligence vendors performed credit and compliance due diligence on 64.2% of the loans in the trade pools that contributed loans to the supporting loan group for the NHELI 2006-HE3 Certificate that Freddie Mac purchased.  (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)  As a result of this review, Nomura identified and kicked out 9.3% of the loans from those trade pools that were reviewed in credit and compliance due diligence.  (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)

385.     ***The Due Diligence Findings for 2007-1:***  Nomura's due diligence vendors performed credit and compliance due diligence on 52.7% of the loans in the trade pools that contributed loans to the supporting loan group for the NHELI 2007-1 Certificate that Freddie Mac purchased.  (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)  As a result of this review, Nomura identified and kicked out 7.7% of the loans from those trade pools that

-146-

were reviewed in credit and compliance due diligence.  (DX-2800 (Credit and Compliance

Sampling and Kick-out Rate).)

        386.   RBS Securities Inc. ("RBSSI")  retained Clayton, a leading third-party

provider of mortgage loan and RMBS re-underwriting services, to review samples of loans

selected from pools of loans that were to be included in 2007-1.  (*See* Stipulated Facts at ¶¶ 58,

59.)  Clayton conducted credit and compliance diligence on these 102 loans out of the 1,751

loans in the final pool comprising Group II loans that Freddie Mac purchased.  (DX-5038

(Clayton Due Diligence Summary for Nomura NAAC 2007-AR1, dated January 29, 2007, RBS-

FHFA-SDNY-0487363) at RBS-FHFA-SDNY-0487363-64.)  On January 31, 2007 and February

1, 2007, Clayton sent RBSSI final reports summarizing its review of the pools designated for

inclusion in NHELI 2007-1.  (DX-5038 (Email from Daniel Pinero attaching Clayton's Narrative

for NAAC 2007-AR1, dated January 31, 2007, RBS-FHFA-SDNY-0487362) at RBS-FHFA-

SDNY-0487362-64; DX-5039 (Email from Daniel Pinero attaching Clayton's Narrative for

NHEL 2007-AF1, dated January 31, 2007, RBS-FHFA-SDNY-0487365) at RBS-FHFA-SDNY-

0487365-67; DX-5040 (Email from Daniel Pinero attaching Clayton's Final Exception Detail

Report for NHEL 2007-AF1, dated February 01, 2007, RBS-FHFA-SDNY-0487371) at RBS-

FHFA-SDNY-0487371-7372; DX-5041 (Email from Daniel Pinero attaching Clayton's Final

Exception Detail Report for NAAC 2007-AR1, dated February 01, 2007, RBS-FHFA-SDNY-

0487373) at RBS-FHFA-SDNY-0487373-7374.)

        387.   In its final reports, Clayton concluded that no loans from the pool of loans

backing the Certificate Freddie Mac purchased exhibited material credit issues, and one loan had

a compliance issue that may not have been curable, and which did not end up in the

securitization.  (DX-5038 (Email from Daniel Pinero attaching Clayton's Narrative for NAAC

2007-AR1, dated January 31, 2007, RBS-FHFA-SDNY-0487362) at RBS-FHFA-SDNY-

0487364; DX-5039 (Email from Daniel Pinero attaching Clayton's Narrative for NHEL 2007-

AF1, dated January 31, 2007, RBS-FHFA-SDNY-0487365) at RBS-FHFA-SDNY-0487367.)

Clayton reported that it had "found an exception rate of .8% [of loans in the sample] with

compliance issues and no [loans with] credit issues" and noted that "[t]his percentage appears to

be in-line with what [Clayton] would normally expect from Alt-A originations."  (DX-5038 at

RBS-FHFA-SDNY-0487364; DX-5039 at RBS-FHFA-SDNY-0487367.)  Clayton also noted:

"We found the nature and overall level of credit and compliance exceptions to be what we

typically find in the industry, which does not suggest a pattern of imprudent lending practices.

We believe that the loans should perform similar to a typical Alt-A pool."  (DX-5038 at RBS-

FHFA-SDNY-0487364; DX-5039 at RBS-FHFA-SDNY-0487367.)

   388. ***The Due Diligence Findings for 2007-2:***  Nomura's due diligence

vendors performed credit and compliance due diligence on 35.5% of the loans in the trade pools

that contributed loans to the supporting loan group for the NHELI 2007-2 Certificate that Freddie

Mac purchased.  (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)  As a result

of this review, Nomura identified and kicked out 10.9% of the loans from those trade pools that

were reviewed in credit and compliance due diligence.  (DX-2800 (Credit and Compliance

Sampling and Kick-out Rate).)

   389. RBSSI engaged Clayton to conduct credit and compliance due diligence

on 306 loans, or approximately 6% of the pool, out of the 5,136 loans that backed the 2007-2

Certificate purchased by Freddie Mac.  (*See* Stipulated Facts at ¶ 67.)

   390. On January 31, 2007, Clayton sent RBSSI a final narrative report

summarizing its re-underwriting results for the NHELI 2007-2 review.  (DX-5049 (Email from

Daniel Pinero attaching Clayton's Narrative for NHEL 2007-HE1, dated January 31, 2007, RBS-FHFA-SDNY-0487359) at RBS-FHFA-SDNY-0487359-3561.)  This report showed that one loan had a compliance issue that may not have been curable, and which was not included in the securitization.  (*Id.* at RBS-FHFA-SDNY-0487361.)  Clayton  reported that it found one loan "with compliance issues and no [loans with] credit issues", and concluded that it "found the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, which does not suggest a pattern of imprudent lending practices.  We believe that the loans should perform similar to a typical Alt-A pool." (*Id.*)

391.    ***The Due Diligence Findings for 2007-3:***  Nomura's due diligence vendors performed credit and compliance due diligence on 37.1% of the loans in the trade pools that contributed loans to the supporting loan group for the NHELI 2007-3 Certificate that Freddie Mac purchased.  (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)  As a result of this review, Nomura identified and kicked out 14.9% of the loans from those trade pools that were reviewed in credit and compliance due diligence.  (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).)

392.    The percentages of loans Nomura kicked out from trade pools due to credit and compliance due diligence represent potentially defective loans that were *not* included in the Securitizations, since they were kicked out during the due diligence process.  Rates of defective loans remaining in the supporting loan groups would have been substantially lower, because (i) Nomura reviewed relatively large samples of loans in trade pools (Spagna Aff. at ¶ 57; Kohout Aff. at ¶ 34; (DX-2800 (Credit and Compliance Sampling and Kick-out Rate).); (ii) the kick-outs were based on adversely selected samples, which over-represented the number of loans with potential underwriting defects as compared to the un-reviewed portions of trade

pools (Spagna Aff. at ¶ 9; Kohout Aff. at ¶ 34); and (iii) the kick-outs included loans kicked due

to application of Nomura-specific overlays or as a result of valuation due diligence, not because

they failed to comply with applicable underwriting guidelines.  (Kohout Aff. at ¶¶ 44, 47;

Spagna Aff. at ¶¶ 51, 70-72.)

> **C.**     **The Findings of Plaintiff's Re-underwriting Expert, Robert Hunter, Conflict With Contemporaneous Evidence and Are Based On Methodological Errors**

393.     Plaintiff's expert, Robert W. Hunter, re-underwrote a sample of 723 loans

from the supporting loan groups for the Securitizations ("Sample Loans") and claims that 625 of

the Sample Loans, or 86.45%, had underwriting defects.  (October 6, 2014 Hunter Report at 4.)

He further claims that 482 loans of the Sample Loans, or 66.7%, had an underwriting defect that

substantially increased the credit risk of the loan.  (*Id.*)

394.     His allegations of "substantial defects" include, among other things, that

(i) there is a discrepancy between a loan's characteristics and the pre-closing loan tape for the

Securitization, (ii) the underwriter failed to investigate "red flags" for fraud, (iii) loans did not

meet certain "minimum industry standards" that Hunter created, (iv) the loan file did not contain

certain documents required by applicable underwriting guidelines, (v) the underwriter approved

an unreasonable income stated from the borrower, and (vi)  a borrower misrepresented

information (*e.g.* income, occupancy, debt, or employment) in applying for the loan.  (Forester

Aff. ¶¶ at 110-111.)

395.     Defendants engaged Michael Forester, who has 35 years of experience in

the mortgage banking industry, including in auditing, reviewing, and re-underwriting loans, to

respond to Hunter's analysis.  Forester assembled a team of reviewers, each of whom had at least

10 years of experience in underwriting, or reviewing the underwriting, of mortgage loans, to

conduct a loan file review of the mortgage loans re-underwritten by Hunter.  (Forester Aff. at ¶¶

1, 91, 92.)  Each loan Forester and his team considered was reviewed at least four times.  (Forester Aff. at ¶ 103.)  Ultimately, Forester himself made a final finding and conclusion about whether a loan complied with applicable guidlelines.  Based on this analysis, Forester concluded that only 5.5% of the loans of the Sample Loans did not comply with applicable underwriting guidelines based on documentation present in the loan files seven to nine years after the loans were originated.  (Forester Aff. at ¶ 215.)

      396.    A 5.5% rate of potential underwriting defects is consistent with disclosures in the Offering Documents that loans underlying the Securitizations were "generally" underwritten in accordance with applicable underwriting guidelines or underwriting criteria, and that a "substantial" number of those loans were originated as exceptions to underwriting guidelines.  (Forester Aff. at ¶ 216.)

      397.    Plaintiff relies entirely on Hunter to support its allegation that representations in the Offering Documents about mortgage loans purchased from undisclosed originators were false.  Hunter admitted, however, that he evaluated loans made by undisclosed originators according to the particular underwriting guidelines under which he presumed they had been originated.  Hunter did not evaluate loans from undisclosed originators according to the general underwriting criteria that were disclosed in the prospectus supplements.  (Forester Aff. at ¶ 214; Barnett Aff. at ¶ 398; Hunter Tr. at 156:19-157:10; 157:11-15; 161:10-16 (plaintiff's re-underwriting expert testifying that he did not consider loans' compliance with standards described in the prospectus supplement).)

      398.    Because the prospectus supplements contain representations only about compliance with general underwriting criteria for loans purchased from the undisclosed originators, and do not make any representations about those originators' specific underwriting

guidelines, there is no evidence that disclosures regarding loans purchased from undisclosed originators were false.  Loans purchased from undisclosed originators comprise the following percentages of loans backing each Securitization:

| Table 2:  Percent of Loans From Undisclosed Originators | |
| --- | --- |
| Securitization | Percent of Loans from Undisclosed Originators |
| 2005-AR6 | 100% |
| 2006-FM1 | 0% |
| 2006-FM2 | 0% |
| 2006-HE3 | 61.81% |
| 2007-1 | 68.33% |
| 2007-2 | 57.62% |
| 2007-3 | 22.39% |

**1.**      *Hunter's 66% Defect Rate Conflicts With Contemporaneous Due Diligence Findings*

399.      Hunter's defect rates conflict significantly with the contemporaneous findings of Clayton, AMC and Nomura during the 2005-2007 time period.

400.      The defects found by Hunter contrast sharply with Nomura's kick-out rates from the underlying trade pools during the 2005-2007 time period.  As shown in Table 3 below, Nomura found, based on a thorough credit and compliance due diligence process, that only 10.9% of the loans in the underlying trade pools should be kicked out before Nomura purchased those pools:

-152-

| Table 3: Comparison of Plaintiff's Defect Rates and 2005-2007 Kick-Out Rates From Underlying Trade Pools | | | | |
|---|---|---|---|---|
| **Deal Name** | **Number of Supporting Loan Group Loans Reviewed by Mr. Hunter** | **Plaintiff's Alleged Defect Rate** | **Number and Percent of Loans from Underlying Trade Pools Reviewed by Due Diligence Vendors** | **Percentage of Loans Kicked Out of Underlying Trade Pools by Nomura** |
| 2005-AR6 | 131 | 62.6% | 304 (80.9%) | 8.7% |
| 2006-FM1 | 100 | 70.1% | 669 (26.4%) | 9.3% |
| 2006-HE3 | 99 | 72.4% | 837 (54.4%) | 10.6% |
| 2006-FM2 | 100 | 70.4% | 1,967 (21.5%) | 9.3% |
| 2007-1 | 98 | 68.0% | 367 (77.4%) | 7.7% |
| 2007-2 | 98 | 72.3% | 1,278 (42.6%) | 10.9% |
| 2007-3 | 97 | 63.6% | 755 (39.4%) | 14.9% |
| TOTAL | 723 | 66.67% | 6,177 (39.1%) | 10.9% |

(October 7, 2014 Cowan Report at 6; October 6, 2014 Hunter Report at 4; DX-2644 (Summary of Credit and Compliance Review Results by SLG); DX-2800 (Credit and Compliance Sampling and Kick-out Rate)

401.     As discussed at ¶¶ 338-340, *supra*, the percentage of materially defective loans that plausibly could exist in the supporting loan groups for the Securitizations, from which Hunter drew his sample of loans, is far less than Nomura's kick-out rate of 10.9%, because Nomura reviewed 39% of loans in the supporting loan groups on an adverse sample basis, and potentially defective loans therefore were removed from that portion of the supporting loan groups.

402.     Hunter's defect rates also are inconsistent with the number of loans graded as a "3" that were included in the supporting loan groups for the Securitizations.

| Table 4: Comparison of Plaintiff's Defect Rates and 2005-2007 "3" Grades from Nomura's Due Diligence Vendors | | | | |
|---|---|---|---|---|
| **Deal Name** | **Number of Supporting Loan Group Loans Reviewed by Hunter** | **Hunter's Claimed Defect Rate** | **Number of Supporting Loan Group Loans Reviewed by Nomura Due Diligence Vendors** | **Percentage of Loans Graded "3" by Due Diligence Vendors** |
| 2005-AR6 | 131 | 60.92% | 304 | 5.30% |

| 2006-FM1 | 100 | 70% | 669 | 2.10% |
|---|---|---|---|---|
| 2006-HE3 | 99 | 72% | 1,967 | 10.80% |
| 2006-FM2 | 100 | 66.63% | 837 | 2.50% |
| 2007-1 | 98 | 66.43% | 367 | 10.40% |
| 2007-2 | 98 | 69.54% | 1,278 | 4.50% |
| 2007-3 | 97 | 63.83% | 755 | 6.10% |
| TOTAL | 723 | 68.56% | 6,177 | 6.60% |

(October 7, 2014 Cowan Report at 6; October 6, 2014 Hunter Report at 4; DX-2644 (Summary of Credit and Compliance Review Results by SLG).)

403.    As explained at ¶ 363, *supra*, the number of loans graded "3" does not represent loans that contained material underwriting defects.  Nomura did not purchase loans graded as a "3" unless the loan had sufficient compensating factors (and thus did comply with the underwriting guidelines, since the guidelines provided for exception loans with compensating factors); had a missing document that was later provided by the originator; the exception was deemed immaterial or had been graded as a "3" due to a Nomura-specific overlay that was unrelated to the applicable underwriting guidelines.  (Spagna Aff. at ¶¶ 21, 65; Kohout Aff. at ¶ 51.)

404.    Nonetheless, even assuming that all the loans graded as a "3" included in the supporting loan groups for the Securitizations contained material defects, Hunter's claimed defect rate is not consistent with that figure.  Only 6.6% of the loans in the supporting loan groups received a final due diligence grade of "3," which is significantly lower that the defect rate found by Hunter.  (DX-2644 (Summary of Credit and Compliance Review Results by SLG.) The 6.6% rate also is based on adverse samples that were more likely to contain loans with underwriting defects than the remaining loans in the loan pools.  (Spagna Aff. at ¶ 71.)

-154-

Therefore, the 6.6% rate overstates the number of loans that could have deviated in a material way from applicable underwriting guidelines.  In any case, the 6.6% rate is far more consistent with the 5.5% potential defect rate found by Forester's review of the Sample Loans than it is with Hunter's 66.7% defect rate.  (Forester Aff. at ¶ 109, 110, 215.)

### 2.   Hunter's Analysis Is Based on Several Methodological Errors

405.    One reason Hunter's defect rate conflicts with contemporaneous evidence about the number of loans in the supporting loan groups with material underwriting defects is that his analysis contains numerous and significant methodological errors.

### a.   Hunter Did Not Evaluate Whether Loans Were Originated "Generally" in Accordance with Underwriting Guidelines

406.    The Offering Documents stated that loans underlying the Securitizations were originated *generally* in accordance with applicable underwriting guidelines and that many loans were originated as underwriting exceptions, *see supra* ¶¶ 284-291, 315.  These disclosures made it clear that not every requirement of the applicable underwriting guidelines was strictly followed with regard to every loan.  (Forester Aff. at ¶ 173.)  Hunter agreed at deposition that the word "generally" in the seven prospectus supplements meant "very often so, but not universally so."  (Hunter Tr. at 283:21-22.)  Similarly, in interpreting a Freddie Mac offering circular that used the word "generally," Freddie Mac's head of subprime due diligence during the 2005 to 2007 time period, Ronald Feigles, agreed that "generally" meant that the loans did "not always" meet applicable guidelines.  (Feigles Tr. at 570:4-5.)

407.    For example, the 2006-FM1 and 2006-FM2 prospectus supplements disclosed that Fremont "generally" applied its underwriting guidelines "with some variation." (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474)at NOM-FHFA_04811894; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-

FHFA_04638315) at NOM-FHFA_04638395.)  The prospectus supplement for 2007-1

disclosed, with regard to FNBN, that the "application of underwriting guidelines does not imply

that each criterion was satisfied."  (DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007,

NOM-FHFA_05141912) at NOM-FHFA_05142021.)  Similarly, the 2007-2 prospectus

supplement stated, with regard to Ownit, that Ownit's underwriting guidelines were "used as a

guide . . . with the understanding that no single characteristic will approve or deny a loan."  (DX-

6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-

FHFA_05591413.)  These disclosures are consistent with the notion that underwriting guidelines

are just that, "guides."  (Forester Aff. at ¶ 24, 56, 173; Spagna at ¶ 9.)  The decision of whether a

loan complies with applicable underwriting guidelines is not a matter of checking boxes, but

entails an exercise of professional judgment by the underwriter, *see supra* ¶ 365.  (Forester Aff.

at ¶¶ 24, 56, 173.)

       408.    Hunter, however, evaluated whether the Sample Loans were "originated in

accordance with the requirements of the relevant originator's underwriting guidelines" as he

strictly construed those guidelines, without taking into account the qualifying language in the

Offering Documents.  (October 6, 2014 Hunter Report at 4.)  In reaching his claimed 66.67%

defect rate, Hunter did not consider whether an underwriter would have considered his "defects"

merely "technical" deviations from applicable underwriting guidelines or if, in the exercise of

professional judgment, an underwriter could have found his "defects" justified by compensating

factors.  (Forester Aff. at ¶¶ 173-176.)  Hunter did not find that a single loan in his sample was

eligible for an underwriting exception, despite clear language in the Offering Documents that

many such loans were present in the supporting loan groups for the Securitizations.  (Forester

Aff. at ¶ 211.)

409.    Hunter also substituted his judgment about the materiality of a "defect" for that of the original underwriter.  As a result, Hunter inflates his defect rate with immaterial defect allegations on 136 of the Sample Loans.  (Forester Aff. at ¶ 173.)  Such "technical" deviations from underwriting guidelines are consistent with disclosures in the Offering Documents that loans were underwritten "generally" in accordance with applicable underwriting guidelines.

410.    For example, Hunter alleges that a ███████  ███[8] originated by ███████  ███████ was not originated in accordance with underwriting guidelines because the loan had an LTV ratio of █████, when the maximum LTV ratio in the guidelines was 85%.  (Forester Aff. at ¶ 212.)  The original underwriter properly calculated the LTV ratio but granted the loan as an exception to the LTV ratio requirement.  (Forester Aff. at ¶ 212.)  The underwriter justified that decision based on the following compensating factors:  ███████████████████ ████████████████████████████████████████ ███████████████████████████ (Forester Aff. at ¶ 212.)  Hunter ignored the underwriter's rationale for granting an exception, with compensating factors, despite the language in the 2006-HE3 prospectus supplement that the underwriting of loans was "generally consistent" with the People's Choice guidelines and "[i]t is expected that some portion of" loans originated by People's Choice "will represent [underwriting] exceptions." (DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_046209665-9666.)

---

[8]      Loan number NHELI_2006_HE3_2002236168.

411.    As another example, Hunter claims that a loan[9] originated by ████ in the 2006- FM1 securitization with a DTI ratio of ████ was excessive because the applicable underwriting guidelines set a maximum DTI of 50%.  A deviation ██████████ from the requirement in the applicable underwriting guidelines is merely "technical" and did not increase the credit risk of the loan.  (Forester Aff. at ¶ 175.)  Such a "technical" deviation does not contradict the disclosure in the 2006-FM1 prospectus supplement that Fremont's loans "were originated . . . *generally*" in accordance with underwriting criteria that were applied "*with some variation* [ ] by Fremont."  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474)at NOM-FHFA_04729543 (emphasis added); Forester Aff. at ¶ 173.) Hunter also fails to acknowledge the compensating factors present on this loan—████████

████████████████████████████████

███████████████████.  (Forester Aff. at ¶ 175.)  Even if the deviation identified by Hunter was not "technical," these compensating factors would support an underwriting exception.  (Forester Aff. at ¶ 175.)  Such an underwriting exception would be consistent with the disclosure in the 2006-FM1 prospectus supplement that a "substantial portion of the mortgage loans" backing the securitization "may represent [ ] underwriting exceptions." (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_ 04729544-9545.)

---

[9]     Loan number NHELI_2006_FM1_2002118570.

412.    For another loan[10] in the 2005-AR6 securitization, applicable guidelines

from ██████████████ (an undisclosed originator) allowed a transaction to include seller

concessions of up to 2% of the loan amount.  (Forester Aff. at ¶ 174.)  Seller concessions are

costs such as title insurance and processing fees that the seller of the property pays on behalf of

the buyer/borrower.  (Forester Aff. at ¶ 174.)  Hunter alleges that there were "excessive seller

contributions" because seller concessions were ████ of the loan amount, or ███ in excess of the

upper limit specified in the underwriting guidelines.  (Forester Aff. at ¶ 174.)  This "technical"

deviation does not contradict the disclosure in the 2005-AR6 prospectus supplement that loans

from undisclosed originators "were originated ***generally*** in accordance with the underwriting

criteria described in this section" (DX-1 at NOM-FHFA_04620965 (emphasis added)),

especially where the defect does not increase the credit risk of the loan.  (Forester Aff. at ¶ 174.)

413.    Hunter makes many other immaterial defect allegations that have no

bearing on the credit risk of the Sample Loans.  For example, Hunter claimed a loan[11] originated

by ██████ backing the 2007-2 securitization (an undisclosed originator for the 2007-2

securitization) was missing a ████████████████████████████████████.

(Forester Aff. at ¶ 209.)  Hunter's claimed "defect" was that the copy of the purchase contract in

the loan file was ████████████████.  (Forester Aff. at ¶ 209.)  Given that the loan closed,

the fact that the copy of the purchase contract in the loan files was only signed by one party has

no bearing on the credit risk of the loan; it is merely a "technical" deviation that does not speak

---

[10]    Loan number NAA_2005_AR6_1002196505.

[11]    Loan number NHELI_2007_2_2002180362.

-159-

to whether the loan was originated "generally" in accordance with applicable underwriting

guidelines or the underwriting standards disclosed in the 2007-2 prospectus supplement.

(Forester Aff. at ¶ 209; DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-

FHFA_05591325) at NOM-FHFA_05591415.)

### b. Hunter's Claimed Defect Rate Is Inflated Because It Is an Incomplete "Gross" Defect Rate.

414.    Hunter's defect rate for loans underlying the Securitizations is inflated

because it is an incomplete "gross" defect rate that does not accurately reflect the number of

loans in the supporting loan groups that were not originated in accordance with applicable

underwriting guidelines.  A "gross" defect rate, according to a March 2014 "Defect Rate

Tutorial" created by Fannie Mae, is the result of an initial quality control review of a pool of

loans.  (DX-2634.)  A "net" defect rate, which Fannie Mae designates as the "final findings," is

determined only after reviewers provide the original underwriters a chance to rebut the

reviewers' initial findings.  (*Id.*)  Hunter testified at deposition that his default rate is a "gross"

rate because he did not give the original underwriters any chance to rebut his defect allegations.

(Hunter Tr. at 196:20-197:2, 197:22-198:6, 198:24-200:17, 204:10-15.)

415.    Testimony uniformly confirms that, in conducting due diligence reviews

on pools of mortgage loans, the industry standard was to give originators an opportunity to clear

any potential underwriting defects.  Peter Kempf of AMC testified that it was "very common" to

have a high defect rate after a "preliminary review" of loan files, but that defect rates came down

after AMC went back to the originators to inquire about potential defects.  (Kempf Tr. at 131:7-

133:20.)  Vicki Beal of Clayton testified that Clayton's re-underwriting of a loan file would have

been an "incomplete" if Clayton did not give originators a chance to cure any preliminary defect

findings.  (Beal 30(b)(6) Tr. at 52:14-53:10.)  Richard Rothleder, the Rule 30(b)(6) designee of

originator WMC, testified that in the 2005 to 2007 time period, when a due diligence vendor

identified a particular loan as defective, "WMC was given the alleged defect and was afforded

the opportunity to resolve the issue."  (Rothleder Tr. at 134:22-135:7.)  Clint Bonkowski, the

Rule 30(b)(6) designee of originator Quicken Loans, testified that Quicken was able to mitigate

"concerns investors had" in their due diligence review when investors asked about potential loan

defects.  (Bonkowski Tr. at 53:3-11.)  Gretchen Leff, the Rule 30(b)(6) designee of Wells Fargo,

testified that Wells Fargo often was able to "cure" purported loan defects by "obtaining

additional documentation that was buried somewhere" or explain "how an underwriter got

comfortable approving a particular loan."  (Leff Tr. at 147:18-148:14.)

      416.    Hunter did not attempt to approach the original underwriters of the Sample

Loans with his defect allegations and give them a chance to respond to those allegations, many

of which do not represent genuine underwriting defects.  (Forester Aff. at ¶ 89.)  Accordingly,

Hunter's findings are incomplete and unreliable.

### c.    Hunter Incorrectly Assumes Documents Now Missing From Loan Files Did Not Exist at the Time of Loan Origination

      417.    Hunter's claimed defect rate is artificially inflated because he assumes that

documents missing from the loan files he reviewed are evidence of underwriting defects.  The

loan files reviewed by both Hunter and Forester are imaged loan files gathered 7 to 9 years after

the original underwriter made the decision to approve the loan application.  (Forester Aff. at ¶

89.)  Imaged loan files from the 2005 to 2007 time period are often missing documents because

paper files were transferred from party to party in the loan origination process (broker,

underwriter, servicer, securitization trustee), and those documents were sometimes scanned to

create an "imaged file" at one of these later stages.  (Forester Aff. at ¶¶ 58-60.)

-161-

418.    Evidence in this Action establishes that loan files from the 2005 to 2007 time period often were, years later, missing documents that had been available to the underwriter at the time of origination.  (Forester Aff. at ¶¶ 204-208; Spagna Aff. at ¶ 65.)  Getchen Leff, the Rule 30(b)(6) designee of Wells Fargo, testified that having documents go missing from a loan file "happen[ed] quite a bit," and Wells Fargo had to go back and "print out" documents for due diligence reviewers.  (Leff Tr. at 63:4-64:6.)  She agreed that "the credit file, as ultimately scanned in, did not necessarily reflect all of the information that the underwriter reviewed in connection with making a decision on the loan."  (*Id*. at 70:7-14.)  Richard Rothleder, the Rule 30(b)(6) designee of WMC, testified that documents an underwriter considered in making the decision to approve a loan often did not make it into the imaged loan file.  (Rothleder Tr. 81:24-82:13.)  Jeff Crusinberry, the Rule 30(b)(6) designee of the successor-in-interest to Fremont, agreed that "mistakes happened" during the loan imaging process.  (Cruisinberry Tr. at 63:5-25.)

419.    In the 2005 to 2007 time period, reviewers conducting due diligence could often "cure" loan defects based on a missing document by requesting the missing document from the originator.  (Forester Aff. at ¶ 67.)  Vicki Beal of Clayton testified that originators in the 2005 to 2007 time period were "often able to address or cure" loan defects related to missing documents during the due diligence process.  (Beal 30(b)(6) Tr. at 49:8-50:22; 52:7-52:13).  Peter Kempf of AMC testified that in the 2005 to 2007 time period, missing documents identified during AMC's due diligence process were "quite often located" and sent to AMC.  (Kempf Tr. at 86:14-87:5.)  Richard Rothleder testified that WMC also found missing documents identified in post-closing reviews of loan files in the 2005 to 2007 time period.  (Rothleder Tr. 87:21-88:7.)  Ronald Feigles, who oversaw Freddie Mac's counterparty reviews during the 2007 to 2007 time period, testified that it was "not unusual" that originators were able to provide

documents found to be missing during a review of loan files.  (Feigles Tr. at 505:16-24.)  Finally,

Hunter admitted at his deposition that during his time at Countrywide Bank, where he worked

from 2001 to 2005, it was "not uncommon" to "clear" a missing document finding after "going

back" to the originator.  (Hunter Tr. at 213:25-215:9.)

      420.    Hunter alleged that 189 of the Sample Loans were defective based on a

document being missing from the loan file he reviewed.  (Forester Aff. at ¶ 110.)  Hunter never

attempted to obtain those missing documents from the originator, and did not account for the fact

that missing document defects typically are curable.  (Hunter Tr. at 196:20-197:2, 197:22-198:6,

198:24-200:17, 204:10-15.)  To the extent the originator was no longer in business (and therefore

not available to provide missing documents), Hunter failed to take into account that documents

now missing from a loan file often do not evidence a genuine underwriting defect.  (Forester Aff.

at ¶¶ 65, 206-208.)

      421.    Hunter also makes unreasonable inferences that documents missing from

the loan files he reviewed were missing at the time of loan origination.  For example, Hunter

alleges that a loan[12] was defective because it was missing a ███████, ███████ and ███

███.  (Forester Aff. at ¶ 62.)  Lenders in the 2005 to 2007 time period would not have

approved a loan without those documents.  (Forester Aff. at ¶ 62; Crusinberry Tr. at 47:12-25

(Fremont would "could not even start" the origination process without a loan application and

appraisal in hand.))  A knowledge of basic underwriting practices during the 2005 to 2007 time

---

[12]    Loan number NHELI_2006_HE3_2002205419.

period supports the conclusion that these documents must have available at the time of loan

origination and simply went missing in the seven to nine years since.  (Forester Aff. at ¶ 62.)

        422.    In addition, Hunter alleged that loans were defective when a document in

the loan file was missing a single page.  (Forester Aff. at ¶ 207.)  For example, Hunter alleged an

underwriter failed to pull a ███████ before approving a loan[13] because the ████████████

██████████████████—a page that was not necessary to the underwriting decision.

(Forester Aff. at ¶ 207.)  The fair inference is that the full document was available at the time of

loan origination and the ████████ is the product of a scanning error.  (Forester Aff. at ¶ 207.)

        423.    Hunter also disregards evidence in the loan file that a missing document

was available at the time of loan origination.  For example, Hunter alleges that the underwriter of

a loan[14] failed to obtain the ████████████████████—or the ████████████

████████████████—in violation of applicable underwriting guidelines.

(Forester Aff. at ¶ 208.)  Hunter disregards the fact that the underwriter copied information from

the ████████████ on to the loan approval form in the loan file—clear evidence that

the original underwriter had the ████████████ and used in approving the loan.

(Forester Aff. at ¶ 208.)

        424.    In another example, Hunter alleged that a loan[15] did not have the required

████████ because there was no ████████ documentation in the loan file he

reviewed.  (Forester Aff. at ¶ 208.)  The loan file shows that the person in charge of closing the

_____

[13]      Loan number NAA_2005_AR6_1002171262.

[14]      Loan number NHELI_2007_1_2002018500.

[15]      Loan number NAA_2005_AR6_1002196416.

loan requested a copy of the ███████████ documentation.  (Forester Aff. at ¶ 208.)  And the

Final HUD-1 shows that ███████████ was obtained for the subject property.  (Forester Aff.

at ¶ 208.)  Hunter ignored this evidence that ████████████████ existed at the time

of loan origination.  (Forester Aff. at ¶ 208.)

425.    In a number of cases, Hunter alleged that a document was missing from a

loan file but overlooked the fact that the document was actually present in the loan file.  (Forester

Aff. at ¶¶ 200-201.)  For example, for one loan,[16] Hunter claims the loan file had ███████████

███████████████ because the originator failed to obtain an ████████████████

████████████.  (Forester Aff. at ¶¶ 201-202.)  The applicable underwriting

guidelines required the originator to obtain an award letter indicating the amount paid and the

duration of the payments.  (Forester Aff. at ¶ 201.)  The loan file contains a ███████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████.  (Forester Aff. at ¶ 202.)  That document was fully sufficient to meet the

requirement of the applicable underwriting guidelines.  (Forester Aff. at ¶ 202.)

### d.    Hunter Improperly Used Information Not Available to the Original Underwriter at the Time of Loan Origination

426.    Although the relevant representations in the Offering Documents concern

the manner by which the mortgage loans were originated, *see supra* ¶ 323, Hunter uses

information that was either not available at the time of loan origination or not considered by the

original underwriter that 289 of the Sample Loans were defective.  Hunter does not show that

---

[16]     Loan Number NHELI_2006_FM2_2001984218.

this information would have been available to the original underwriter despite purporting to identify "Mortgage Loans [that] reflected increased credit risk as a result of deficiencies in the *original underwriting process*." (May 15, 2014 Hunter Report at 118 (emphasis added).) In many cases, the information could not have been available to the original underwriter because it did not exist at the time of loan origination. (Forester Aff. at ¶¶ 117, 154)

427.    For example, Hunter alleges that a borrower misrepresented his income for a loan[17] originated by ████████ (an undisclosed originator) that was in the supporting loan group for 2007-2, which closed on May 11, 2006. The borrower's stated income was ███████ ████ as a "██████████." (Forester Aff. at ¶ 198.) Hunter points to nothing available at the time of loan origination to suggest that $4,250 per month was an unreasonable stated income for the borrower's job. (Forester Aff. at ¶ 198.) Instead, Hunter relies on ████████████ ████████████████████ in which the borrower reported his income for ████ ████████. (Forester Aff. at ¶ 198.) Hunter ignores that the borrower, according to the ████████, █████████████, which could explain the difference in his 2006 income between the ██████████ and the loan application. (Forester Aff. at ¶ 198.) Hunter also credits a borrower's statement on ██████████ over the ████████████ on a loan application although both are made under penalty of perjury. (Forester Aff. at ¶ 133.)

428.    For another loan,[18] Hunter utilized an "Accruint" report—a search engine for public records—that his team obtained several years after the loan closed on ████████

---

[17]    Loan number NHELI_2007_2_2001930813.

[18]    Loan number NHELI_2006_HE3_2002209123.

to allege that the loan was not originated in accordance with applicable underwriting guidelines because the borrower misrepresented his debt obligations.  (Forester Aff. at ¶ 121.)  The debt obligation Hunter discovered on the Accurint report was opened on ████████████ ████████████████████████████████.  The underwriter could not have considered this information at the time the loan was approved because it did not yet exist. (Forester Aff. at ¶ 121.)

429.    Hunter also uses "audit credit reports" to support his allegations that borrowers misrepresented their debt obligations at the time of loan origination with respect to 82 loans.  (Forester Aff. at ¶ 122.)  Hunter and his team pulled these audit credit reports for the purposes of this Action.  (Hunter Tr. at 294:5-14.)  Hunter provides no evidence that information on these audit credit reports was available to the original underwriters at the time they were making decisions to approve the relevant loans.  (Forester Aff. at ¶ 122.)

430.    For example, Hunter alleges a borrower for a loan[19] backing 2006-HE3 originated by ████████ (an undisclosed originator) failed to disclose his debt obligation and, when that undisclosed debt is considered, the loan's DTI ratio exceeds the limit in the applicable underwriting guidelines.  (Forester Aff. at ¶ 131.)  The loan closed on ████████████.  Hunter bases his defect allegation on a credit report dated ████████████████████████ ████.  (Forester Aff. at ¶ 131.)  That credit report showed a ██████ installment loan with an opening date of ████████████████████████████.  (Forester Aff. at ¶ 131.)  Even if this instalment loan was obtained by the borrower before the underwriter approved

---

[19]      Loan number NHELI_2006_HE3_2001919851.

the subject loan, a credit report would not be updated that quickly, so the underwriter could not have discovered the instalment loan even if he had reason to obtain a new credit report.  (Forester Aff. at ¶ 122.)

431.    Even if relevant, Hunter's "audit credit reports" do not support his allegations.  In another example, Hunter alleges that a loan[20] did not comply with applicable underwriting guidelines because of an undisclosed debt Hunter discovered on an audit credit report dated ███████████.  (Forester Aff. at ¶ 130.)  This newly discovered debt obligation, however, was ██████████████████ which permitted the borrower ███████████ ████████████████.  (Forester Aff. at ¶ 130.)  Hunter provides no evidence that the borrower ██████████████████████████████████ at the time the subject loan was originated.  (Forester Aff. at ¶ 130.)

432.    Hunter also uses information not available at loan origination to allege that LTV ratios were greater than the maximums specified in applicable underwriting guidelines for 126 of the Sample Loans.  (Forester Aff. at ¶ 135.)  Hunter, however, uses as the denominator of his LTV ratio calculations the property values generated by another one of plaintiff's experts, John A. Kilpatrick.  (Forester Aff. at ¶ 135.)  Using these values, which were produced by Kilpatrick's Greenfield AVM many years after the origination of the Sample Loans, is contrary to clear representations in the Offering Documents that LTV ratios were computed using appraised values obtained at the time of loan origination, *see infra* ¶¶ 449-453.  Finally, Kilpatrick's property values could not have been recreated by underwriters at the time of

---

[20]    Loan number NHELI_2006_HE3_2001916678.

origination because his Greenfield AVM relies on tax assessed values from 2010 to 2014 in

assessing the accuracy of appraisals performed years earlier.  (Isakson Aff. at ¶ 70; DX-2810.)

> **e.**  **Hunter's Defect Allegations Rely on Unsupported "Minimum Industry Standards"**

433.    In the 2005 to 2007 time period, there was no such thing as a set of

"minimum industry standards" for the origination of mortgage loans.  Each originator applied its

own underwriting guidelines, and no industry organization or regulatory agency ever published a

set of minimum industry standards for originating mortgage loans.  (Forester Aff. at ¶ 165;

Hunter Tr. at 110:17-111:12, 165:13-19.)  Nonetheless, Hunter found that 187 of the Sample

Loans were defective because they failed to comply with a purported set of "minimum industry

standards" he devised.  Hunter's "minimum industry standards" were developed in 2013 by

Hunter and two of plaintiff's other experts while they were re-underwriting loans at issue in this

and related litigation.  (Hunter Tr. at 114:8-23.)  Even if these "minimum industry standards"

were valid, the Offering Documents refer to specific underwriting guidelines or underwriting

criteria, *see supra* ¶¶ 284-309, and they say nothing about loans being underwritten in

accordance with any "minimum industry standards" or any other "industry standards."

434.    Participants in the mortgage industry confirm that there were no

"minimum industry standards" for the origination of mortgage loans during the 2005 to 2007

time period.  Ashley Dyson—a Fannie Mae RMBS trader—testified that she did not recall any

"industry standards for appropriate underwriting of mortgage loans."  (Dyson Tr. at 518:6-12.)

Lin Cao, a Fannie Mae credit analyst, testified that she never saw, or heard anyone at Fannie

Mae say, that there were any "industry standard[s]" for assessing a borrower's ability to repay or

to determine if a transaction was prudent for the borrower.  (Cao Tr. at 415:16-416:1.)  Clint

Bonkowski of Quicken Loans testified that "there's not a set minimum across every possible

-169-

loan . . . each product has their own requirements . . . there's not an industry minimum."
(Bonkowski Tr. at 52:2-14.)  Vicki Beal of Clayton—the leading third-party due diligence
vendor—did not know of any "minimum industry standards" during the 2005 to 2007 time
period.  (Beal Tr. at 74:17-76:1.)

435.    Hunter applies his "minimum industry standards" in two ways.

436.    First,  for 33 Sample Loans, he applies his "minimum industry standards"
in instances where he had no other underwriting guidelines to apply.  (Forester Aff. at ¶ 170.)
Hunter presents no evidence that the originator's underwriting guidelines, which he does not
have, contain the same requirements as his invented standards.  (Forester Aff. at ¶ 170.)  As an
example, for one loan[21] where Hunter  did not have the applicable underwriting guidelines,
Hunter relies on his "minimum industry standards" for the proposition that the maximum
allowable CLTV ratio is 90% for a stated income loan on a non-owner occupied property where
the borrower has a FICO score of ███.  (Forester Aff. at ¶ 170.)  The loan was originated with a
CLTV of ███, so Hunter found the loan defective.  (Forester Aff. at ¶ 170.)  But Hunter has no
evidence the loan violated the originator's underwriting guidelines, and some guidelines
permitted CLTVs greater than 95%.  For example, Fremont allowed CLTVs as high as 100%.
(Forester Aff. at ¶ 170.)

437.    Second, Hunter applied his "minimum industry standards" as a "gap filler"
in instances where the applicable underwriting guidelines were silent on a particular point.
(Forester Aff. at ¶ 171.)  If an originator's underwriting guidelines do not make a point, that is an

---

[21]    Loan number NAA_2005_AR6_1002196416.

indication that the originator did not did not view the point as important to lending decisions. (Forester Aff. at ¶ 171.)

438.    Hunter alleges that a loan[22] is defective because the underwriter failed to include ▊▊▊▊▊ in the loan file.  (Forester Aff. at ¶ 171.)  Hunter relies on his "minimum industry standards" as support for his claim that a ▊▊▊▊ should have been in the loan file, but the applicable underwriting guidelines did not instruct the underwriter to do so. (Forester Aff. at ¶ 171.)

> **f.    Hunter Improperly Substitutes His Own Judgment, Using Unreliable Tools, About the Reasonableness of the Income Stated by a Borrower.**

439.    In the 2005 to 2007 time period, some originators made mortgage loans to borrowers based on a stated income.  (Forester Aff. at ¶¶ 44-48.)  The underwriting guidelines for such loans did not require an underwriter to verify the borrower's income; in fact, verifying the income of a borrower applying for a stated income loan was considered improper.  (Forester Aff. at ¶ 52.)

440.    The underwriting guidelines applicable to Sample Loans that were stated income loans sometimes required the underwriter to judge whether the borrower's stated income was reasonable.  (Forester Aff. at ¶ 44, 52.)  Those underwriting guidelines, however, did not tell underwriters how to determine whether a borrower's stated income was reasonable, and the vast majority of guidelines did not require underwriters to provide a written justification for that determination.  (Forester Aff. at ¶ 44.)  Instead, underwriters used their judgment based on

---

[22]    Loan number NAA_2005_AR6_1001902888.

information gathered during the loan origination process—about the borrower's occupation,

location, time on the job, assets, education, and full credit profile—in evaluating the

reasonableness of stated incomes.  (Forester Aff. at ¶ 44.)  Only if "red flags" of borrower

misstatements appeared in an application might an underwriter turn to information outside the

loan file, such as an online salary engine.  (Forester Aff. at ¶ 189.)

          441.    For 75 of the Sample Loans, based primarily on data compiled by the

Bureau of Labor Statistics ("BLS"), Hunter questioned the underwriter's judgment in deciding

that the borrower's stated income was reasonable.  (Forester Aff. at ¶ 182.)  As Hunter admitted

at deposition, underwriters during the 2005 to 2007 time period did not consult BLS data in

deciding whether stated incomes were reasonable.  (Forester Aff. at ¶ 182; Hunter Tr. at 316:15-

316:24.)  Moreover, none of the underwriting guidelines applicable to the Sample Loans required

underwriters to consult BLS data, which is inherently unreliable and poorly suited to the task of

judging reasonableness of stated incomes.  (Forester Aff. at ¶¶ 183-188.)  In June 18, 2013

testimony before Congress, the BLS Commissioner testified that BLS data is not a tool for

establishing "prevailing wages or determining what data are appropriate for that purpose."

(Forester Aff. at ¶ 183.)  BLS data is unreliable for many resons.  First, according to the BLS

Commissioner's Congressional testimony, BLS data is "based on responses from only a handful

of employers" and can "result in large sampling error."  (Forester Aff. at ¶ 184.)  Second, BLS

data does not account for borrowers' individual characteristics, such as licensing, skill level, or

years of experience—or the particular company for which a borrower works.  (Forester Aff. at ¶

185.)  Third, BLS data report only what BLS defines as "wages," and excludes overtime pay,

year-end bonuses, weekend premium pay, holiday bonuses, and on-call pay, among other

categories.  (Forester Aff. at ¶ 186.)  Fourth, BLS data does not reflect current salaries, or even

salaries from the prior year.  (Forester Aff. at ¶ 187.)  Instead, the data is generally released in

March or early April, and represents a compilation of salary data from a rolling three-year cycle.

(Forester Aff. at ¶ 187.)  Fifth, BLS data is subject to a salary cap of $187,200 for reported

compensation.  (Forester Aff. at ¶ 188.)  This excludes individuals with high salaries such as

chief executives, managers, and highly paid legal and health care professionals, among others—

making BLS data a poor tool to assess incomes of individuals in highly compensated professions

or geographic areas where salaries are above average.  (Forester Aff. at ¶ 188.)  Sixth, BLS data

is not gathered from and does not apply to self-employed individuals.  (Forester Aff. at ¶ 188.)

Seventh, BLS data is based on the "occupational code" for the borrower's job—which cannot be

identified reliably seven to nine years after origination.  (Forester Aff. at ¶ 191.)

> 442.    For one loan[23] Hunter found defective, the borrower stated an income of
███████████████ as an engineer for ████████████—a job the borrower had held for just
over ███████.  (Forester Aff. at ¶ 194.)  The underwriter, in accordance with applicable
underwriting guidelines, judged this income to be reasonable.  (Forester Aff. at ¶ 194.)  The
applicable underwriting guidelines did not require the underwriter to consult BLS data (or any
online salary tool).  (Forester Aff. at ¶ 194.)  Nevertheless, Hunter found the borrower's stated
income was not reasonable because BLS data showed that the normal income for someone with
the borrower's job was $5,327.00 a month, a figure █████████████ the borrower's stated
income.  (Forester Aff. at ¶ 194.)

---

[23]     Loan number NAA_2005_AR6_1002238662.

**g.      Hunter's Claimed Defect Rate Is Inflated Because He Includes "Errors" in the Pre-Closing Loan Tape**

443.    For 291 of the Sample Loans, Hunter alleges that the loans were defective because of a discrepancy in the "pre-closing loan tape." A pre-closing loan tape contains summary information about the loans backing a securitization, including LTV ratios, owner occupancy status, and DTI ratios. Nomura created all of its pre-closing loan tapes immediately before issuing a securitization. (Lee Aff. at ¶ 13.) None of the applicable underwriting guidelines addressed pre-closing loan tapes, which had nothing to do with deciding whether a loan should be approved. (Forester Aff. at ¶ 113.) In fact, pre-closing loan tapes were not even in existence at the time underwriters made lending decisions on the Sample Loans. (Forester Aff. at ¶ 113; Lee Aff. at ¶ 13.) This is undisputed by Hunter. (Hunter Tr. at 183:15-24.) The Offering Documents make no representation of any kind about pre-closing loan tapes, nor do the Offering Documents refer to the loan-level information contained on the pre-closing loan tapes, so they are irrelevant to whether statements in the Offering Documents are accurate.

444.    Hunter's defect allegations based on pre-closing loan tape discrepancies are also derivative of, and thus duplicative of, other claims made by Hunter. For example, one loan[24] was approved by the underwriter with a DTI ratio of ▮. (Forester Aff. at ¶ 14.) Hunter opines, on the basis of an audit credit report created at least ▮▮▮▮ after the loan's origination, that the DTI ratio reported by the underwriter was incorrect. (Forester Aff. at ¶ 14.) Hunter offers two overlapping bases for his claim that the loan was not originated in accordance with applicable underwriting guidelines:  first, he alleges that the loan had an "Excessive DTI,"

---

[24]      Loan number NHELI_2007_1_2002056810.

and second, he alleges that the pre-closing loan tape did not reflect Hunter's recalculated DTI, which he created ███████ after the pre-closing loan tape was prepared.  (Forester Aff. at ¶ 14.)  In basing defect allegations on purported discrepancies in pre-closing loan tapes, Hunter thereby double-counts his defect findings.

### h.    Hunter's Claimed Defect Rate Is Inflated Because He Made Other Basic Underwriting Mistakes

445.    With regard to his alleged defects on 274 of the Sample Loans, Hunter misreads or misinterprets the applicable underwriting guidelines.  (Forester Aff. at ¶ 159.)  For example, on one loan,[25] Hunter claims the underwriter failed to obtain the most recent ████████ for the borrower, which was needed to verify the borrower's income.  Hunter claims the pay stub dated ████████ did not satisfy the guideline requirement of "most recent" as the loan closed on ████████.  Hunter cites the applicable underwriting guidelines regarding income documentation requirements, which state the latest pay stub should be dated within 90 days of when the loan is funded.  (Forester Aff. at ¶ 160.)  The pay stub dated ████████ was less than 90 days old at the time the loan was funded on ████████, and as such satisfied the guideline requirement.  (Forester Aff. at ¶ 160.)  Hunter misinterprets the income documentation requirement and seeks to impose an unreasonable standard that would require the borrower to provide new pay stubs as they became available, which was not required.  (Forester Aff. at ¶ 160.)

446.    For his alleged defects on 71 of the Sample Loans, Hunter refers to the wrong underwriting guidelines and his defect allegation is unsupported under the correct

---

[25]    Loan number NHELI_2006_FM1_2001902485.

underwriting guidelines.  (Forester Aff. at ¶ 177.)  For example, for one loan[26] Hunter used

Alliance Bancorp's underwriting guidelines for the Conduit Alt-A Program in alleging that a

borrower's ███████ should have been ██████████████ before the loan was approved.

(Forester Aff. at ¶ 178.)  The loan, however, was originated under the Alliance Bancorp's

Expanded Portfolio Program.  The underwriting guidelines for that program stated that a

bankruptcy should be discharged for two years, not three years.  (Forester Aff. at ¶ 178.)  The

████████████████████████████.  (Forester Aff. at ¶ 178.)  The borrower applied for

the loan on ██████████ and it closed on ████████; therefore the loan was underwritten

consistent with the correct underwriting guidelines.  (Forester Aff. at ¶ 178.)

447.    For his alleged defects on 80 of the Sample Loans, Hunter made a

calculation error that, when corrected, eliminates his defect allegation.  For example, Hunter

made an error in calculating the debt he used to allege that the DTI ratio on a loan exceeded the

50% maximum in the applicable underwriting guidelines.[27]  (Forester Aff. at ¶ 180.)  The

underwriter calculated a DTI ratio of ████.  Hunter claims that the proper DTI ratio was ██████.

(Forester Aff. at ¶ 180.)  Hunter's calculations were incorrect for two reasons.  First, Hunter

miscalculated the monthly property tax amount which was ████████████, not the ████████

████ claimed by Hunter.  (Forester Aff. at ¶ 180.)  Second, the underwriter correctly omitted

the borrower's ████████ payment on a debt because the balance reported to the credit report

was only ████.  According to the applicable guidelines, payments on debts of less than $99 were

---

[26]     Loan number NAA_2005_AR6_1001832288.

[27]     Loan number NHELI_2006_FM1_2002119743.

-176-

not to be considered in the underwriter's DTI ratio calculations.  (Forester Aff. at ¶ 180.)  As a result, the underwriter correctly calculated the DTI ratio for the loan, and Hunter got it wrong. (Forester Aff. at ¶ 180.)

*      *      *

448.    Hunter's analysis is not credible.  It is plagued by methodological flaws that seem designed to inflate his defect rate, and the results of his analysis are inconsistent with contemporaneous findings of Nomura, Nomura's due diligence vendors, Clayton and AMC, as well as the analysis of defendants' expert, Forester.  Hunter's analysis provides no basis to find that the prospectus supplements contained misrepresentations about whether loans underlying the Securitizations were originated generally in accordance with disclosed underwriting guidelines or underwriting criteria.

## V.    THE STATEMENTS IN THE OFFERING DOCUMENTS ABOUT LTVs WERE NOT FALSE OR MISLEADING

### A.    Disclosures in the Offering Documents About LTV Ratios

449.    An LTV ratio is the amount of a mortgage loan divided by the "value" of the property which secures that loan.  (Forester Aff. at ¶ 38.)  In each of the Offering Documents, the "value" used in computing LTV ratios is defined as the lesser of the appraised value or the sales price of a subject property.  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811976; DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729664; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04621112; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638543; DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142213; DX-6 (2007-2 Prospectus

-177-

Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591579; DX-7

(2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_04732621) at NOM-

FHFA_04732866.)

        450.    LTV ratios were disclosed in the Offering Documents in collateral tables,

as follows:

| Collateral Tables | | | |
|---|---|---|---|
| **DX-1 (2005-AR6 Prospectus Supplement)** | | | |
| **Original Loan-to-Value Ratios of the Group III Mortgage Loans** | | | |
| **Range of Original LTV (%)** | **Number of Mortgage Loans** | **Cut-off Date Principal Balance** | **Percentage by Aggregate Cut-off Date Principal Balances** |
| Less than or equal to 50.00 ....... | 14 | $ 2,616,832.58 | 3.28% |
| 50.01 - 55.00 ............................. | 4 | 1,114,999.42 | 1.40 |
| 55.01 - 60.00 ............................. | 8 | 1,785,062.12 | 2.23 |
| 60.01 - 65.00 ............................. | 26 | 5,398,688.62 | 6.76 |
| 65.01 - 70.00 ............................. | 72 | 14,340,279.73 | 17.95 |
| 70.01 - 75.00 ............................. | 19 | 4,448,035.25 | 5.57 |
| 75.01 - 80.00 ............................. | 229 | 49,449,086.29 | 61.90 |
| 80.01 - 85.00 ............................. | 1 | 324,250.00 | 0.41 |
| 85.01 - 90.00 ............................. | 2 | 326,699.11 | 0.41 |
| 90.01 - 95.00 ............................. | 1 | 85,975.00 | 0.11 |
| **Total:** ..................................... | 376 | $ 79,889,908.12 | 100.00% |

Minimum: 16.00
Maximum: 95.00
Weighted Average: 74.68

NOM-FHFA_04811861

**Collateral Tables**

### DX-2  (2006-FM1 Prospectus Supplement)

#### Original Loan-to-Value Ratio of the Group I Mortgage Loans

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Gross Coupon (%) | FICO | LTV (%) | Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| <= 50.00 ........................ | 24 | $ 3,910,839 | 0.96% | 7.875 | 627 | 42.26 | 356 | 7.63 |
| 50.01 - 55.00 ................ | 8 | 1,762,850 | 0.43 | 7.728 | 586 | 53.10 | 357 | – |
| 55.01 - 60.00 ................ | 28 | 5,419,996 | 1.34 | 7.827 | 570 | 58.13 | 356 | 4.65 |
| 60.01 - 65.00 ................ | 94 | 16,769,078 | 4.14 | 8.463 | 571 | 63.61 | 356 | 42.78 |
| 65.01 - 70.00 ................ | 122 | 23,919,568 | 5.90 | 8.206 | 576 | 68.61 | 355 | 40.45 |
| 70.01 - 75.00 ................ | 169 | 34,485,615 | 8.51 | 7.968 | 576 | 74.02 | 356 | 38.91 |
| 75.01 - 80.00 ................ | 947 | 169,164,042 | 41.72 | 7.237 | 624 | 79.80 | 356 | 58.09 |
| 80.01 - 85.00 ................ | 190 | 37,986,798 | 9.37 | 7.507 | 599 | 84.71 | 357 | 59.09 |
| 85.01 - 90.00 ................ | 472 | 82,740,763 | 20.41 | 7.661 | 622 | 89.77 | 356 | 66.25 |
| 90.01 - 95.00 ................ | 75 | 7,289,811 | 1.80 | 8.427 | 632 | 94.72 | 341 | 41.70 |
| 95.01 - 100.00 .............. | 403 | 21,986,828 | 5.42 | 9.766 | 641 | 99.97 | 347 | 59.06 |
| Total: .......................... | 2,532 | $405,436,188 | 100.00% | 7.694 | 612 | 81.07 | 355 | 54.85 |

NOM-FHFA_04729514

### DX-4  (2006-FM2 Prospectus Supplement)

#### Original Loan-to-Value Ratio of the Group I Mortgage Loans

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00... | 100 | $ 15,620,836 | 2.31% | 8.878% | 585 | 40.49% | 354 | 57.24% |
| 50.01 - 55.00 .................... | 40 | 7,755,893 | 1.15 | 8.143 | 609 | 53.08 | 355 | 65.88 |
| 55.01 - 60.00.................... | 76 | 14,401,288 | 2.13 | 8.806 | 577 | 57.66 | 355 | 48.05 |
| 60.01 - 65.00.................... | 122 | 24,549,828 | 3.62 | 8.978 | 576 | 63.55 | 355 | 47.30 |
| 65.01 - 70.00.................... | 157 | 32,313,906 | 4.77 | 8.828 | 579 | 69.12 | 355 | 49.30 |
| 70.01 - 75.00.................... | 212 | 44,141,324 | 6.52 | 8.734 | 577 | 74.06 | 355 | 54.88 |
| 75.01 - 80.00.................... | 1,531 | 324,418,693 | 47.90 | 8.134 | 633 | 79.85 | 356 | 51.15 |
| 80.01 - 85.00.................... | 221 | 48,119,274 | 7.11 | 8.291 | 607 | 84.65 | 355 | 73.49 |
| 85.01 - 90.00.................... | 387 | 78,315,654 | 11.56 | 8.535 | 619 | 89.70 | 355 | 79.10 |
| 90.01 - 95.00.................... | 127 | 23,093,603 | 3.41 | 8.608 | 630 | 94.67 | 354 | 76.62 |
| 95.01 - 100.00.................. | 918 | 64,507,394 | 9.53 | 10.734 | 650 | 99.90 | 350 | 53.87 |
| Total/Weighted Average: ...... | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

NOM-FHFA_04638363

-179-

## DX-3  (2006-HE3 Prospectus Supplement)

### Original Loan-to-Value Ratio of the Group I Mortgage Loans

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00 | 151 | $ 23,456,912 | 4.00% | 7.652% | 601 | 40.87% | 344 | 57.73% |
| 50.01 - 55.00 ...................... | 66 | 10,590,062 | 1.81 | 7.706 | 593 | 53.07 | 353 | 58.19 |
| 55.01 - 60.00 ...................... | 79 | 14,285,888 | 2.44 | 7.790 | 590 | 58.09 | 352 | 60.50 |
| 60.01 - 65.00 ...................... | 133 | 24,887,471 | 4.25 | 7.941 | 595 | 62.87 | 353 | 50.59 |
| 65.01 - 70.00 ...................... | 236 | 44,718,010 | 7.63 | 7.893 | 594 | 68.44 | 354 | 50.17 |
| 70.01 - 75.00 ...................... | 255 | 47,800,004 | 8.15 | 8.046 | 591 | 73.81 | 353 | 53.45 |
| 75.01 - 80.00 ...................... | 1,053 | 179,012,261 | 30.54 | 7.972 | 618 | 79.60 | 354 | 54.95 |
| 80.01 - 85.00 ...................... | 504 | 88,281,419 | 15.06 | 8.391 | 594 | 84.26 | 355 | 60.39 |
| 85.01 - 90.00 ...................... | 585 | 99,331,246 | 16.94 | 8.661 | 608 | 89.58 | 354 | 60.68 |
| 90.01 - 95.00 ...................... | 187 | 31,338,148 | 5.35 | 8.620 | 621 | 94.39 | 350 | 76.69 |
| 95.01 - 100.00 .................. | 369 | 22,547,726 | 3.85 | 10.158 | 642 | 99.85 | 286 | 58.84 |
| Total/Weighted Average: .. | 3,618 | $ 586,249,148 | 100.00% | 8.247% | 607 | 78.97% | 351 | 57.69% |

NOM-FHFA_04620931

## DX-5  (2007-1 Prospectus Supplement)

### Original Loan-to-Value Ratios of the Group II Mortgage Loans

| Original Loan-to-Value Ratios (%) | Percentage of Pool by Principal Balance | Number of Mortgage Loans | Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Non-zero Weighted Average FICO | Average Remaining Principal Balance | Weighted Average Original LTV (%) | Weighted Average Combined LTV(%) | Lo Doc* (%) | Investor Properties (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00 ............ | 1.69% | 32 | $ 10,126,536.24 | 6.561% | 719 | $ 316,454.26 | 41.42% | 42.90% | 60.10% | 14.08% |
| 50.01 - 55.00............................ | 1.36 | 13 | 8,184,214.67 | 6.582 | 704 | 629,554.97 | 53.34 | 59.59 | 29.61 | 12.07 |
| 55.01 - 60.00............................ | 2.15 | 35 | 12,876,873.00 | 6.725 | 703 | 367,910.66 | 58.31 | 63.15 | 64.65 | 13.87 |
| 60.01 - 65.00............................ | 3.48 | 51 | 20,883,408.66 | 6.769 | 716 | 409,478.60 | 63.80 | 72.22 | 60.91 | 31.35 |
| 65.01 - 70.00............................ | 3.93 | 67 | 23,609,944.73 | 6.910 | 703 | 352,387.23 | 69.33 | 80.28 | 38.16 | 29.82 |
| 70.01 - 75.00............................ | 13.31 | 160 | 79,888,233.72 | 7.240 | 702 | 499,301.46 | 74.28 | 89.78 | 34.87 | 16.10 |
| 75.01 - 80.00............................ | 68.31 | 1243 | 409,869,347.83 | 7.257 | 703 | 329,742.03 | 79.87 | 95.18 | 45.16 | 17.18 |
| 80.01 - 85.00............................ | 0.39 | 10 | 2,361,364.00 | 7.363 | 695 | 236,136.40 | 83.77 | 83.77 | 100.00 | 25.09 |
| 85.01 - 90.00............................ | 1.93 | 50 | 11,562,295.00 | 7.953 | 701 | 231,245.90 | 89.64 | 89.64 | 88.75 | 43.79 |
| 90.01 - 95.00............................ | 2.12 | 51 | 12,729,014.64 | 7.726 | 709 | 240,588.52 | 94.89 | 94.89 | 99.39 | 22.67 |
| 95.01 - 100.00............................ | 1.32 | 39 | 7,947,295.31 | 7.779 | 723 | 203,776.80 | 99.86 | 99.86 | 68.23 | 22.17 |
| Total/Weighted Average:............ | 100.00% | 1,751 | $ 600,038,527.80 | 7.223% | 704 | $ 342,683.34 | 77.47% | 90.93% | 47.03% | 18.56% |

Minimum: 18.69%
Maximum: 100.00%
Weighted Average: 77.47%

NOM-FHFA_05141990

-180-

## DX-6  (2007-2 Prospectus Supplement)

### Original Loan-to-Value Ratio of the Group I Mortgage Loans

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| <= 50.00............................... | 77 | $ 11,043,957 | 2.29% | 7.872% | 600 | 41.08% | 349 | 50.89% |
| 50.01 - 55.00........................ | 40 | 6,894,065 | 1.43 | 7.880 | 598 | 52.74 | 352 | 65.87 |
| 55.01 - 60.00........................ | 50 | 8,447,620 | 1.75 | 7.940 | 597 | 57.69 | 352 | 42.95 |
| 60.01 - 65.00........................ | 68 | 12,604,219 | 2.62 | 8.124 | 589 | 63.40 | 355 | 48.60 |
| 65.01 - 70.00........................ | 127 | 23,098,329 | 4.80 | 8.319 | 593 | 68.55 | 355 | 52.71 |
| 70.01 - 75.00........................ | 196 | 33,473,371 | 6.95 | 8.317 | 594 | 74.01 | 355 | 54.77 |
| 75.01 - 80.00........................ | 1,026 | 177,003,174 | 36.75 | 7.869 | 632 | 79.69 | 355 | 61.35 |
| 80.01 - 85.00........................ | 288 | 52,700,824 | 10.94 | 8.555 | 594 | 84.49 | 355 | 62.61 |
| 85.01 - 90.00........................ | 393 | 72,025,037 | 14.95 | 8.698 | 623 | 89.63 | 355 | 63.31 |
| 90.01 - 95.00........................ | 215 | 34,326,666 | 7.13 | 8.593 | 618 | 94.70 | 355 | 81.76 |
| 95.01 - 100.00...................... | 521 | 50,056,766 | 10.39 | 9.107 | 656 | 99.89 | 351 | 84.00 |
| **Total/Weighted Average:......** | **3,001** | **$ 481,674,027** | **100.00%** | **8.309%** | **621** | **81.86%** | **354** | **63.89%** |

NOM-FHFA_05591375

## DX-7  (2007-3 Prospectus Supplement)

### Original Loan-to-Value Ratio of the Group I Mortgage Loans

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Less than or equal to  50.00.... | 40 | $ 7,160,045 | 2.14% | 7.526% | 633 | 41.52% | 352 | 48.56% |
| 50.01 - 55.00........................ | 24 | 5,579,376 | 1.67 | 7.411 | 633 | 52.76 | 355 | 53.56 |
| 55.01 - 60.00........................ | 24 | 5,959,563 | 1.78 | 7.823 | 607 | 58.14 | 355 | 28.26 |
| 60.01 - 65.00........................ | 49 | 12,846,378 | 3.84 | 7.724 | 599 | 63.34 | 355 | 46.46 |
| 65.01 - 70.00........................ | 43 | 10,465,703 | 3.13 | 8.105 | 593 | 68.56 | 354 | 37.00 |
| 70.01 - 75.00........................ | 85 | 23,591,021 | 7.06 | 8.027 | 600 | 73.83 | 355 | 48.16 |
| 75.01 - 80.00........................ | 844 | 132,731,903 | 39.69 | 8.129 | 628 | 79.82 | 355 | 62.78 |
| 80.01 - 85.00........................ | 100 | 25,339,126 | 7.58 | 8.500 | 605 | 84.52 | 352 | 45.21 |
| 85.01 - 90.00........................ | 324 | 68,313,494 | 20.43 | 8.433 | 618 | 89.78 | 355 | 61.78 |
| 90.01 - 95.00........................ | 147 | 26,361,291 | 7.88 | 8.773 | 630 | 94.36 | 353 | 63.21 |
| 95.01 - 100.00...................... | 216 | 16,038,683 | 4.80 | 9.794 | 646 | 99.95 | 297 | 76.11 |
| Total/Weighted Average: ........ | 1,896 | $ 334,386,584 | 100.00% | 8.296% | 621 | 81.27% | 352 | 58.38% |

NOM-FHFA_04732672

451.    The Offering Documents did not present LTV ratios for individual loans in supporting loan groups for the seven Certificates.  Instead, LTV ratios were presented in aggregate form, divided into percentage bands, *e.g.*, 90.01 - 95.00.  (DX-1 at NOM-FHFA_04811861; DX-2 at NOM-FHFA_04729514; DX-3 at NOM-FHFA_04638363; DX-4 at NOM-FHFA_04620931; DX-5 at NOM-FHFA_05141990; DX-6 at NOM-FHFA_05591375; DX-7 at NOM-FHFA_04732672.)

452.     For loans used to purchase a property, the Offering Documents defined "value" in the denominator of the LTV ratio as "generally the lesser of (a) the appraised value determined in an appraisal *obtained by the originator at origination* of that loan and (b) the sales price for that property."  (DX-1 at NOM-FHFA_04811976; DX-2 at NOM-FHFA_04729664; DX-3 at NOM-FHFA_04621112; DX-4 at NOM-FHFA_04638543; DX-5 at NOM-FHFA_05142213; DX-6 at NOM-FHFA_05591579; DX-7 at NOM-FHFA_04732866 (emphasis supplied).)  For loans used to refinance an existing loan, the Offering Documents defined "value" in the denominator of the LTV ratio as the "appraised value of the Mortgaged Property determined in an appraisal *obtained at the time of origination* of the Refinance Loan."  (DX-1 at NOM-FHFA_04811976; DX-2 at NOM-FHFA_04729664; DX-3 at NOM-FHFA_04621112; DX-4 at NOM-FHFA_04638543; DX-5 at NOM-FHFA_05142213; DX-6 at NOM-FHFA_05591579; DX-7 at NOM-FHFA_04732866 (emphasis supplied).)  For both types of loans, the Offering Documents expressly stated that, to the extent "value" was based on an appraisal, that appraisal was obtained at the time the loan was originated.

453.     The Offering Documents disclosed only the "original" LTV ratios for the supporting loan groups based on property values as of "origination of the mortgage loans," and stated that "[n]o assurance can be given that the values of the related Mortgage Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans."  (DX-1 at NOM-FHFA_04811976; DX-2 at NOM-FHFA_04729665; DX-3 at NOM-FHFA_04621112; DX-4 at NOM-FHFA_04638543; DX-5 at NOM-FHFA_05142213; DX-6 at NOM-FHFA_05591579; DX-7 at NOM-FHFA_04732866.)

**B.    Nomura Conducted Valuation Due Diligence That Ensured the Statements in the Offering Documents Regarding LTV Ratios Were Correct**

454.    At the time it purchased loans from originators, Nomura conducted valuation due diligence to determine whether appraisals were supported and reasonable estimates of market value, and declined to purchase those loans whose appraisals were not supported and reasonable.  Nomura's valuation due diligence on virtually 100% of the appraisals for loans in the supporting loan groups for the Securitizations ensured that the LTV ratios disclosed in the Offering Documents were correct.  (Graham Aff. at ¶¶ 27-28; Kohout Aff. at ¶ 30.)

*1.    Nomura Conducted Valuation Due Diligence on Virtually 100% of Loans in the Seven Supporting Loan Groups*

455.    When Nomura purchased loans from originators, it conducted valuation due diligence on virtually 100% of those loans before deciding whether to buy the loans. (Spagna Aff. at ¶ 42.)  Such valuation due diligence assessed the reasonableness of the appraised values of properties securing loans underlying the Securitizations.

456.    In the first stage of its valuation due diligence, Nomura submitted all loans for review by CoreLogic and Hansen, which were the leading valuation due diligence vendors in the industry, with models that had been fully validated and tested.  (Spagna Aff. at ¶ 41; Kohout Aff. at ¶ 20.)  Those third-party vendors used automated tools, Hansen's PREVIEW AVM product (*e.g.*, DX-1133 (email from CoreLogic to Mendy Sabo at Nomura attaching HistoryPro results, dated August 25, 2005, NOM-FHFA_04528978) at NOM-FHFA_05796101) and CoreLogic's HistoryPro product (*e.g.*, DX-1203 at NOM-FHFA_04528978), to identify loans with potential valuation issues.  In its August 2004 and March 2006 reviews, Freddie Mac recognized that Nomura performed valuation due diligence on almost 100% of the loans it considered for purchase.  (DX-111 (Freddie Mac AMO Review of Nomura, dated August 31,

2004, FHFA19172000) at FHFA19172002; DX-122 (Freddie Mac AMO Review of Nomura, dated March 14, 2006, FHFA13253477) at FHFA13253479.)  The valuation due diligence reports for the trade pools at issue in this Action show that Nomura submitted 99.1% of loans in the supporting loan groups for the seven Securitizations to third-party vendors for valuation due diligence.  (DX-2646 (Percentage of Loans from At-Issue Trade Pools Sent to Hansen or CoreLogic, With Percentage of Loans Reviewed) at 5.)

457.   If a loan reviewed using CoreLogic's HistoryPro received an F-Score of 0, the lowest possible risk, no further valuation due diligence was deemed necessary.  (DX-2882 (email from Joseph Kohout to others at Nomura explaing HistoryPro valuation process, dated May 12, 2006, NOM-FHFA_05500943) at NOM-FHFA_05500943 ("HistoryPro 'F-Score' = 0 (no additional valuations ordered)").)  As Freddie Mac explained in its March 2006 counterparty review, an F-Score of 0 indicated "no risk, no additional review is required."  (DX-122 (Freddie Mac AMO Review of Nomura, dated March 14, 2006, FHFA13253477) at FHFA13253479.)  If the F-Score was between 1 and 9, the loan was run through an AVM.  (DX-2882 at NOM-FHFA_05500943 ("HistoryPro 'F-Score' = 1-9 (upgrade to *AVM)").)  If the F-Score was higher than 9, Nomura ordered a broker-price opinion for the loan, or in some cases may have included the loan in the credit and compliance due diligence sample.  (DX-2882 at NOM-FHFA_05500943 ("HistoryPro 'F-Score' = 10-25 (upgrade to a BPO)"); DX-122 at FHFA13253479 ("10+ score – upgraded to BPO"); Spagna Aff. at ¶ 48.)

458.   Freddie Mac reviewed Nomura's status as an approved aggregator in 2004 and again in 2006, and both times approved of Nomura's valuation due diligence process.  (DX-111 (Freddie Mac AMO Review of Nomura, dated August 31, 2004, FHFA19172000) at FHFA19172002; DX-122 (Freddie Mac AMO Review of Nomura, dated March 14, 2006,

FHFA13253477) at FHFA13253479.)  In August 2004, Freddie Mac had "no issues" with Nomura's collateral valuation process, and noted that "Nomura takes the property evaluation process seriously and places a high priority on collateral valuation."  (DX-111 at FHFA19172002.)  In March 2006, Freddie Mac complimented Nomura on its "solid" valuation due diligence, commenting again on the "high priority" Nomura placed on collateral valuation. (DX-122 at FHFA13253479.)

459.    For loans run through an AVM based on their F-score, Nomura generally considered appraised values to be supported and reasonable if they were within a specified range of the AVM estimated value.  The AVM estimated value could not be more than 15% less than the original appraised value for Alt-A loans and not more than 10% less than the original appraised value for subprime loans.  (Spagna Aff. at ¶¶ 44-45; Kohout Aff. at ¶ 22.)  Loans outside these tolerances typically triggered a broker price opinion or "BPO," which is a secondary evaluation of a property's value performed by a local real estate broker.  (Spagna Aff. at ¶ 48; Kohout Aff. at ¶ 23.)

460.    Nomura used leading BPO vendors Ocwen Realty Advisors and Fiserv to perform its BPO reviews.  (Spagna Aff. at ¶ 48.)  During a BPO review, the BPO vendor utilized the services of a real estate broker with experience in the local housing market to inspect the exterior of the property and compare the property to comparable properties that had recently been sold in the area, and then estimate the value of the property.  (Spagna Aff. at ¶ 49.)  The BPO vendor then attempted to reconcile that estimate with the original appraised value.  (Spagna Aff. at ¶ 49.)  After this reconciliation process was completed, the BPO vendor sent Nomura its estimate of the property's value.  (Spagna Aff. at ¶ 50.)  If the appraised value was not supported by the BPO or the property displayed "significant" issues—if the BPO value was 10% lower

than the appraised value for subprime loans or 15% lower than the appraised value for Alt-A loans—then Nomura refused to purchase the loan absent additional evidence that the appraised value was reasonable.  (Spagna Aff. at ¶ 51; Kohout Aff. at ¶ 29.)

461.    Nomura rarely purchased loans that fell outside the BPO tolerance thresholds, and only did so if additional evidence supporting the appraised value was supplied by the originator.  (Spagna Aff. at ¶ 51; Kohout Aff. at ¶ 29.)  This is borne out by the fact that only 162 loans out of the 15,806 loans in the supporting loan groups for the seven Certificates were outside the BPO tolerance thresholds.  (DX-2637 (Valuation Results for SLG Loans) at 3.)

### 2.    *Clayton and AMC Reviewed Appraisals During Their Credit and Compliance Due Diligence*

462.    As discussed at ¶¶ 330-332, *supra*, in addition to valuation due diligence on virtually 100% of loans, a substantial percentage of loans purchased by Nomura—40% or more of each trade pool—were also subjected to credit and compliance due diligence.  (DX-2640 (Credit and Compliance Sample Review) at 1-3.)  That credit and compliance review was performed by leading third-party vendors Clayton and AMC.  (Kohout Aff. at ¶ 33; Greene Aff. at ¶ 7; Kempf Tr. at 37:17-38:6; *see also* DX-1134 (email from Derick Greene at Clayton to Jeff Hartnagel, Joseph Kohout and others at Nomura attaching Clayton credit and compliance diligence results, dated June 10, 2005, NOM-FHFA_05398005) at NOM-FHFA_05398005; DX-1141 (email from Peter Kempf at AMC to Mendy Sabo and Jeff Hartnagel at Nomura attaching AMC credit and compliance diligence results, dated June 30, 2005, NOM-FHFA_05727471) at NOM-FHFA_05727471.)

463.    The credit and compliance due diligence performed by Clayton included a review of the appraisal in the loan file.  Clayton underwriters input information from the appraisal into CLAS, a computer program used to check various loan characteristics.  CLAS

-186-