could be used to validate information in the appraisal, and the appraisal in a loan file would often

be reviewed as well by an underwriter, many of whom were certified real estate appraisers.

(DX-324 (Clayton "Due Dilgience Processes and Procedures" manual, CLAY-FHFADEF-E-

1328679) at CLAY-FHFADEF-E-1328688; Greene Aff. at ¶¶ 7, 11, 14, 15; Kohout Aff. at ¶ 42.)

Clayton checked the appraisal for completeness and internal consistency, and checked whether

the conclusions reached by the appraiser were logical and whether the appraiser's "arguments

and underlying premises [were] reasonable."  (DX-324 at CLAY-FHFADEF-E-1328713.)

> 464.    Like Clayton, AMC reviewed appraisals in the course of performing credit

and compliance due diligence.  Peter Kempf, president of AMC, testified that in its credit and

compliance due diligence on a loan, AMC "review[ed] the appraisal and any additional valuation

documents within the file to [ ] determine if we feel the property value is supported."  (Kempf

Tr. at 37:17-38:6.)

### C.    There Is No Evidence that Appraisers Did Not Honestly Believe Their Subjective Opinions of Value

> 465.    An appraisal is an opinion of value based on an in-person inspection of the

property and other review performed by a certified or licensed appraiser.  Freddie Mac and

Fannie Mae understood this basic point.  David Hackney, a PLS trader at Freddie Mac, testified

that an "appraisal involves the judgment" of an appraiser.  (Hackney Tr. at 156:20-157:2.)

Shayan Salahuddin, also a PLS trader at Fannie Mae, testified that an appraisal was an opinion of

value.  (Salahuddin Tr. at 591:5-12.)  Paul Norris, a PLS trader at Fannie Mae, testified that an

appraisal is an "estimate of value" that represents an opinion based on the professional judgment

of an appraiser.  (Norris Tr. at 640:15-641:7.)

> 466.    By definition, in instances where the "value" denominator in an LTV ratio

is based on an appraisal, the calculation of that LTV ratio depends on the appraisal.  Because an

appraised value is an opinion, it can be false only if the appraiser who delivered that opinion did not honestly believe it.  Thus, to show that the LTV ratio disclosures in the Offering Documents were false, it is necessary for plaintiff to show that appraisers did not honestly believe the opinions of value in their appraisals of properties securing loans in the seven supporting loan groups for the Securitizations.  The denominator of the LTV ratio represents the subjective judgment of an appraiser.  LTV ratios were—as the Offering Documents disclosed—dependent on appraisals or sales prices.  As for the appraisals, it was commonly understood in the industry that an appraisal is an estimate.

1. ***Four of the Appraisers Challenged by Plaintiff Defend Their Opinions of Value as Accurate and Honestly Believed***

a. **Michele Morris**

467.    Michele Morris has been a licensed appraiser in Florida for more than twenty years.  (Morris Aff. at ¶ 3.)  The value she rendered in her appraisal for the property with global loan number NHELI_2006_FM2_2002233153, a loan backing the 2006-FM2 securitization, was accurate and well supported, she honestly believed that opinion of value when she rendered it, and she still today believes the opinion of value was accurate and supported at the time.  (Morris Aff. at ¶¶ 9, 45 .)

468.    Morris appraised a property located in South Florida, approximately █ ██████████████████████████.  (Morris Aff. ¶¶ 9, 11.)  This area experienced significant growth and housing price appreciation in the years just prior to 2006, although it had just begun to level off and stabilize in 2006.  (Morris Aff. ¶ 11.)  She appraised the property as having an estimated value of ██████ (Morris Aff. ¶ 9; DX-2689 (Appraisal Report for Loan number NHELI_2006_FM2_2002233153, dated March 2006, NOM-FHFA_01320870) at NOM-FHFA_01320873.)

-188-

469.    The appraised value rendered by Morris was supported by the comparables she chose and accurately described in the appraisal report at the time. (Morris Aff. at ¶¶ 15-19; DX-2689 at 4.) Morris relied most on the sales comparison approach to appraisals, which requires the use of comparable sales to render an opinion of value, and is the preferred and most reliable method of rendering an appraisal of market value. (Morris Aff. at ¶¶ 13-14.) Morris used her knowledge of the market and professional judgment to select the best comparables after reviewing active listings. (Morris Aff. at ¶¶ 10, 15.) Two of the comparables she chose had sales prices within six months of the appraisal that were identical to the appraised value she rendered. (Morris Aff. at ¶ 15; DX-2689 at NOM-FHFA_01320873.) She then made proper adjustments to the comparables, if necessary, in order to make the best possible comparison of value. (Morris Aff. at ¶¶ 17-19; DX-2689 at NOM-FHFA_01320873.) The three comparables she chose had adjusted sales prices of ██████, ██████, and ██████, all of which supported her appraised value of ██████. (Morris Aff. at ¶ 19; DX-2689 at NOM-FHFA_01320873.)   By contrast, there is no support in the comparables, or the appraisal generally, for the value rendered by Dr. Kilpatrick's model of ██████. (Morris Aff. at ¶ 35.)

470.    The value Morris rendered was supported by the trends in the neighborhood at the time that she performed the appraisal, which were based on a review of area listings and her knowledge of the local market—that there was stable neighborhood growth and stable property values. (Morris Aff. at ¶ 20; DX-2689 at NOM-FHFA_01320872.) Morris also used the "cost approach" to calculate a value for the property, based on her estimate of the replacement cost of the subject property. (Morris Aff. at ¶ 24.) Morris arrived at a value of ██████ for the property using the cost approach—a number that is very close to, and fully supports, the appraised value of ██████ she rendered using the sales comparison approach.

-189-

(Morris Aff. at ¶¶ 25-26; DX-2689 at NOM-FHFA_01320874.)  Morris is aware of the Uniform
Standards of Professional Appraisal Practice ("USPAP") and has always conducted her
appraisals in accordance with USPAP, including this appraisal.  (Morris Aff. at ¶¶ 7, 36, 39-44.)

### b.   Dan Platt

471.    Dan Platt has been a licensed appraiser in Florida for almost nine years.
(Platt Aff. at ¶¶ 2-3.)  The value he rendered in his appraisal for the property with global loan
number NHELI_2007_1_2002019140, a loan backing the 2007-1 securitization, was accurate
and well supported, he honestly believed that opinion of value when he rendered it, and he still
today believes the opinion of value was accurate and supported at the time.  (Platt Aff. at ¶¶ 8,
27, 44.)  Platt has always given appraisals he believes are correct and well supported, and has
never given an appraisal that he did not believe was correct.  (Platt Aff. at ¶ 5.)

472.    Platt appraised a property located in ███, a town on the east coast of
████, in ██████████.  (Platt Aff. ¶¶ 8, 10.)  This area experienced significant growth and
housing price appreciation in the years just prior to 2006, though it had just begun to level off
and stabilize in 2006.  (Platt Aff. ¶ 10.)  Platt appraised the property as having an estimated value
of ██████.  (Platt Aff. ¶ 8; DX-2705 (Appraisal Report for Loan number
NHELI_2007_1_2002019140, dated September 2006, NOM-FHFA_02850492) at NOM-
FHFA_02850494

473.    Platt used the sales comparison approach to value the property, which is
the primary method he and most appraisers use to arrive at an appraised value.  (Platt Aff. at ¶
12.)  In using the sales comparison approach, Platt used his knowledge of the local market and
his professional judgment to select the best comparables after reviewing active listings.  (Platt
Aff. at ¶¶ 9, 12-13.)  The appraised value Platt rendered was supported by the comparables he

chose and accurately described in the appraisal report at the time.  (Platt Aff. at ¶¶ 14, 18; DX-2705 at NOM-FHFA_02850494.)    Platt made proper adjustments to the comparables in order to make the best possible comparison of value.  (Platt Aff. at ¶ 17; DX-2705 at NOM-FHFA_02850494.)  The three comparables he chose had adjusted sales prices of ███, ███, and ███, all of which supported the appraised value of ███.  (Platt Aff. at ¶ 18; DX-2705 at NOM-FHFA_02850494.)  Platt noted in the appraisal that all comparables "bracket the subject in most aspects and are good indicators of value."  (DX-2705 at NOM-FHFA_02850494.)  By contrast, there is no support in the comparables, or the appraisal generally, for the value rendered by Kilpatrick's model of ███.  (Platt Aff. at ¶ 33.)

474.    Platt's appraised value was also supported by neighborhood and market conditions, which he reported in his appraisal.  Platt noted that neighborhood growth was stable, and that property values were stable, based on a review of listings in the area and his knowledge of the market.  (Platt Aff. at ¶19.)  Platt also used the cost approach to value in providing support for his opinion of value, and arrived at a value of ███, which was virtually identical to, and supports, the sales comparison approach value of ███.  (Platt Aff. at ¶ 25-26.)  Platt is aware of USPAP and has always conducted appraisals in accordance with USPAP, including this appraisal.  (Platt Aff. at ¶¶ 6, 35, 37-45.)

### c.    Lee Clagett

475.    Lee Clagett has been a certified appraiser in Maryland for more than twenty years, and is also certified as an appraiser in Virginia and Delaware, and is licensed in Washington, D.C.  (Clagett Aff. at ¶ 3.)  The value he rendered in his review appraisal for the property with global loan number NHELI_2007_1_2002148508, a loan backing the 2007-1 securitization, was accurate and well supported, he honestly believed that opinion when he

rendered it, and he still today believes the opinion of value was accurate and supported at the time.  (Clagett Aff. at ¶ 10.)

476.    The appraisal was conducted in September 2006 of a property located in the town of ███████, Maryland, which is located on ██████████, in the █████████████.  (Clagett Aff. at ¶ 11.)  This area was experiencing growth and housing price appreciation in the years prior to 2006.  (Clagett Aff. at ¶ 11.)

477.    Clagett served as a review appraiser, which means he was given an appraisal and asked to determine whether the original appraised value was credible.  (Clagett Aff. at ¶ 9.)  Clagett was given the task of reviewing the appraisal (having no information about who the original appraiser was), and used his own knowledge and experience, as well as observation of the subject property and comparables and a review of all records and listings, in coming to an opinion about the credibility of the appraisal.  (Clagett Aff. ¶ 9.)  Clagett agreed with the appraised value and believed it was a credible and accurate value.  (Clagett Aff. at ¶ 10.) The appraised value was derived largely from the sales comparison approach, using six comparable properties.  (Clagett Aff. at ¶¶ 13-15; DX-2708 (Appraisal Report for Loan number NHELI_2007_1_2002148508, dated ███████████, NOM-FHFA_02911979) at NOM-FHFA_02911996, NOM-FHFA_02912002.)  Clagett believed that all of the comparables chosen by the original appraiser were proper and fully supported the appraised value of the property, based on Clagett's knowledge of the local market.  (Clagett Aff. at ¶ 15; DX-2708 at NOM-FHFA_02911996, NOM-FHFA_02912002.)  The two key comparables that the original appraiser weighted most heavily had adjusted sales prices of ████████ and ████████, which showed that the appraised value of ████████ was, if anything, conservative.  (Clagett Aff. at ¶ 19; DX-2708 at NOM-FHFA_02911996, NOM-FHFA_02912002.)  Clagett also reviewed the

cost approach calculations done by the original appraiser, and agreed that the cost approach

value of ██████ fully supported the appraised value of ██████. (Clagett Aff. at ¶¶ 22-23.)

By contrast, nothing in the comparables or appraisal generally supports the value rendered by

Kilpatrick's model of ██████. (Clagett Aff. at ¶ 29.)

478.    Clagett is aware of USPAP, and has always conducted appraisals (and

review appraisals) in accordance with USPAP, including this review appraisal. (Clagett Aff. at ¶

7, 30, 36.)

### d.    Bill Schall

479.    Bill Schall has been a licensed appraiser in New York for fifteen years. In

that time, his work has focused on properties in Suffolk County and Nassau County, New York.

(Schall Aff. at ¶ 3.) The opinion of value he rendered in his supervisory appraisal as to the

property with global loan number NHELI_2006_FM1_2001835590, a loan backing the 2006-

FM1 securitization, was accurate and well supported, he honestly believed that opinion when he

rendered it, and he still today believes the opinion of value was accurate and supported at the

time. (Schall Aff. at ¶ 8.)

480.    The appraisal supervised by Schall was performed in ██████, and

was for a property located in ██████████. (Schall Aff. at ¶ 9.) Schall served as a

supervisory appraiser, meaning that an appraiser working under him (named Seth Smith)

conducted the appraisal, but Schall supervised Smith's work and signed off on the final opinion

of value. (Schall Aff. at ¶ 6.) Schall testified that he had no reason to doubt the competency or

credibility of Smith, who worked for him. (Schall Aff. at ¶ 7.)

481.    In coming to an opinion of value, Schall and Smith relied on the sales

comparison approach. (Schall Aff. at ¶ 9.) Schall and the original appraiser both checked the

active listings for the neighborhood, examined the comparable properties, and determined the amount of adjustments that needed to be made to the comparable properties.  (Schall Aff. at ¶ 6.) Because the property for this appraisal was a condominium in a multi-property complex, the selection of comparables involved very similar condominiums in the same complex which had recently been sold.  (Schall Aff. at ¶ 10.)  For this appraisal, Schall and the original appraiser agreed that the two key comparables were near-identical condominiums that needed no price adjustments, and had just sold for ████████ and ████████ in the previous eight months.  (Schall Aff. at ¶ 10; DX-2668 (Appraisal Report for Loan number NHELI_2006_FM1_2001835590, dated ████████, UBS-LF00205623)  at UBS-LF00205625.)  The appraised value of ████████ was well-supported by the comparables, and, if anything, was conservative.  (Schall Aff. at ¶¶ 14, 18; DX-2668 at UBS-LF00205623.)  By contrast, nothing in the appraisal supports the value rendered by Kilpatrick's model of ████████.  (Schall Aff. at ¶ 23.)

482.    Schall is aware of USPAP, and has always conducted his appraisals and supervisory appraisals in accordance with USPAP, including this property.  (Schall Aff. at ¶ 4.)

### 2.    There Is No Evidence that Any Appraiser Did Not Honestly Believe His or Her Opinion of Value

483.    Plaintiff does not have testimony from a single appraiser that he or she performed appraisals with incorrect opinions of value that the appraiser did not honestly believe. Instead, plaintiff relies entirely on the testimony of one expert witness, John A. Kilpatrick, the Managing Director of Greenfield Advisors, a company that specializes in litigation consulting, to support its claim that appraisals that served as the basis for LTV ratios disclosed in the Offering Documents were not honestly believed.

484.    Kilpatrick has no opinion as to whether any given appraiser subjectively believed his or her opinion of value at the time an appraisal was performed.  (Kilpatrick Nov. 13,

2014 Tr. at 115:24-116:14.)  As Kilpatrick admits, he is not a mind reader.  (Kilpatrick Feb. 13, 2014 Tr. at 450:10-20.)

485.   Instead, Kilpatrick attempts to provide a basis for inferring that the appraised values underlying the LTV ratios in the Offering Documents were so incorrect that the relevant appraisers could not have honestly believed their opinions of value.  To do this, Kilpatrick relies on an AVM, called the Greenfield AVM, that he created especially for use in this and related litigation.  (Kilpatrick Feb. 13, 2014 Tr. at 568:10-20; Kilpatrick June 30, 2014 Tr. at 79:16-20.)  An AVM is a software program that analyzes previously collected data in order to estimate the market value of a property at a particular point in time.  Kilpatrick also relies on his "Credibility Assessment Model," also created especially for use in this litigation, that purportedly identifies appraisals that are not "credible" as that term is used in USPAP. (Kilpatrick Feb. 13, 2014 Tr. at 567:14-17; Kilpatrick Nov. 13, 2014 Tr. at 115:24-116:9.)  The USPAP definition of "credible" focuses on whether an appraiser's opinion of value is "supported by evidence and logic."  (Hedden Aff. at ¶ 79; DX-2727 (The Appraisal Foundation, USPAP 2006 Edition) at 12.)  As Kilpatrick admits, the Credibility Assessment Model cannot say anything about whether a particular appraisal was not actually believed by the appraiser.  (Kilpatrick Nov. 13, 2014 Tr. at 115:18-117:17; 197:23-198:19.)

486.   No model like the Greenfield AVM or the  "Credibility Assessment Model" is capable of (i) identifying appraisers who acted in bad faith, or (ii) distinguishing dishonest appraisers from those who are merely less than competent.  (Kennedy Aff. at ¶ 9; Hedden Aff. at ¶ 258.)   Neither of Kilpatrick's models even purports to be able to make this distinction.  (Kilpatrick Nov. 13, 2014 Tr. at 205:22-207:7.)

**D.      There Is No Evidence that any Relevant Appraisals Were Inflated**

487.    Even if plaintiff could prevail by showing that appraisals on which the

LTV ratios disclosed in the Offering Documents were based were inflated, there is no evidence

of such appraisal inflation in this case.

488.    In an effort to establish appraisal inflation, Kilpatrick relies on his

Greenfield AVM.  Based on the outputs of his model, Kilpatrick opines that appraisals for

numerous loans underlying the seven Securitizations were "significantly higher than their true,

credible, appraised values."  (Kilpatrick AVM Report at 3.)  Kilpatrick claims that, on average,

appraisals of the Nomura sample properties were inflated by 8.92%.  (Kilpatrick AVM Report at

4.)  Kilpatrick also claims that the original appraised values of 208 of the 672 properties valued

by the Greenfield AVM were inflated by more than 15.1%, making those appraised values

"significantly higher" than the "true" value of the subject property, and thus "inaccurate."

(Kilpatrick AVM Report at 4.)

### 1.      *AVMs Are Not a Substitute for In-Person Appraisals and Cannot Provide the "True" Value of a Property*

489.    Although AVMs have utility in identifying loans that may merit additional

review, AVMs are not a substitute for an in-person appraisal of a property by a certified or

licensed appraiser.  (Kennedy Aff. at ¶ 25; Morris Aff. at ¶¶ 31, 33; Platt Aff. at ¶ 31; Clagett

Aff. at ¶ 26; Schall Aff. ¶ 21.)  This is true of contemporaneous AVMs, and even more true of an

AVM like the Greenfield AVM that is purporting to value properties retrospectively, 7 to 9 years

after the original appraisal was performed.  (Kennedy Aff. at ¶¶ 36-37.)  AVMs are not used by

originators of mortgage loans or purchasers of mortgage loans to generate values for properties

that are then substituted for the opinions of values delivered by certified appraisers.  (Kennedy

Aff. at ¶ 35.)

490.     To the contrary, appraisers have better access to relevant information than an AVM, and appraisers can take into consideration relevant and important factors that an AVM cannot consider, including home quality, condition, views and amenities.  (Kennedy Aff. at ¶ 30; Morris Aff. at ¶ 33; Platt Aff. at ¶ 30; Clagett Aff. at ¶ 26; Schall Aff. at ¶ 21.)  Unlike an AVM, an appraiser with "boots on the ground" has access to privately sourced data, personal expertise about local market conditions, and the ability to obtain the judgments of local real estate brokers.  (Kennedy Aff. at ¶ 31; Morris Aff. at ¶ 33; Platt Aff. at ¶ 30; Clagett Aff. at ¶ 26; Schall Aff. at ¶ 21.)  Moreover, an AVM does not consider many other factors—for example, comparables, site size, and living area—in the same way an appraiser can.  (Kennedy Aff. at ¶ 30.)

491.     Appraisals are considered the most reliable method of valuing properties.  (Kennedy Aff. at ¶ 25.)  Kilpatrick acknowledges in the manual for his Greenfield AVM that "AVMs do not substitute for an appraiser's professional judgment."  (Kennedy Aff. at ¶ 25.)  The Appraisal Institute—of which Kilpatrick is a member (Kilpatrick AVM Report at 5)—has stated that "[a]ny attempt to reduce the appraisal process to the perfunctory application of statistical and regression analyses is a disservice to both consumers and lenders."  (Kennedy Aff. at ¶ 25.)  That is why those in the real estate field do not rely on AVMs to make conclusive determinations about the accuracy, reasonableness, or credibility of opinions of value offered by certified appraisers, whether individually or collectively.  (Kennedy Aff. at ¶ 35.)

492.     The 2010 "Interagency Appraisal and Evaluation Guidelines" promulgated by, among others, the Office of the Comptroller of the Currency, state that "the result of an Automated Valuation Model (AVM), by itself or signed by an appraiser, is not an appraisal," and that "the result of an automated valuation model (AVM), in and of itself, does not meet the Agencies' minimum appraisal standards."  (Kennedy Aff. at ¶ 32.)

-197-

493.    Kilpatrick has claimed that the output of his Greenfield AVM represents the "true" market values of the subject property, not simply a range of reasonable values.  In fact, Kilpatrick has testified that "of course" the value generated by his Greenfield AVM "should trump the actual sale price" at which properties sold.  (Kilpatrick Tr. at 46:14-19.)  This ignores that the sale price of a property in an arm's-length transaction between a willing buyer and a willing seller is the best indicator of a property's value.  (Kennedy Aff. at ¶ 43.)  No AVM can generate the "true" value of a property.  (Kennedy Aff. at ¶ 55.)

494.    Freddie Mac states that its own AVM provides only a "point value estimate . . . to help identify potentially inflated appraisal values that may need additional review."  (DX-2883 (Freddie Mac Publication No. 794, "Home Value Explorer," dated March 2012).)

## 2.    *Kilpatrick's Greenfield AVM Has Not Been Independently Tested or Validated*

495.    The Greenfield AVM has never been independently tested or validated, and has not been used outside the context of litigation.  (DX-2884 (Doc. No. 633); Kilpatrick June 30, 2014 Dep. Tr. at 79:16-20; Kilpatrick Nov. 13, 2014 Tr. at 44:23-45:23.)

496.    Federal standards provide that validation of AVMs should be "conducted by qualified individuals that are independent of the model development or sales functions." (DX-2885 (Interagency Appraisal and Evaluation Guidelines, 75 Fed. Reg. 77,450, 77,469 (Dec. 10, 2010).)  The Greenfield AVM has not been subjected to such validation.  (Kennedy Aff. at ¶ 42.)  Neither plaintiff nor Kilpatrick has identified any independent party (*i.e.*, a party not involved in this litigation) who has tested or validated the Greenfield AVM.  (Kilpatrick Feb. 13, 2014 Tr. at 263:2-264:19.)

497.    Both Freddie Mac and Fannie Mae have well-regarded AVMs that could have been used to provide estimates of value for the Nomura sample properties.  Fannie Mae claims that its AVM "has scored first in accuracy in competition."  (DX-642 (Fannie Mae paper titled "Housing Markets & Aggressive Appraisals", FHFA00506314) at FHFA00506334.)  Freddie Mac also has an AVM, called "Home Value Explorer."  Freddie Mac's website states that "[i]n nationwide tests conducted by large wholesale lenders, HVE consistently performs at the top in the areas of coverage, accuracy, and reliability."  (DX-2798 (Freddie Mac website description of Home Value Explorer.)  The only fair inference to be drawn from the fact that plaintiff chose to have Kilpatrick create a new and untested AVM, rather than using mature and tested AVMs owned and used by Freddie Mac or Fannie Mae, is that plaintiff did not like the results generated by those AVMs.

### 3.    *Kilpatrick's Claim About Inflated Appraisals Is Inconsistent with Contemporaneous Due Diligence Reviews*

498.    Plaintiff's expert, Charles Cowan, found that the AVMs which Nomura used to perform valuation due diligence loans backing the Securitizations differed from the appraised values of those loans by only 1.8%.   (Cowan Tr. at 318:20-319:3.)  There is no evidence that the Greenfield AVM, applied retrospectively 7 to 9 years after the original appraisals were performed, is more reliable than the commercially available and widely used AVMs that Nomura used to review appraisals at the time.

### 4.    *The Difference Between Appraised Values and the Outputs of the Greenfield AVM Are Within Acceptable Tolerances*

499.    It is widely understood in the appraisal industry that appraised values from two different appraisers can vary by as much as 10-15% without creating any inference that one of the two appraisals is flawed.  (Kennedy Aff. at ¶ 22.)  The value estimates produced by

-199-

Kilpatrick's Greenfield AVM are within, or not materially outside, the 10-15% tolerance applied by Nomura during valuation due diligence on loans underlying the Securitizations.

500.    Kilpatrick admitted that differences in appraised values of less than 10% did not mean that one appraisal was necessarily wrong, and that he himself uses 10% as a guideline in evaluating whether appraisers' opinions of value are "materially different." (Kilpatrick Nov. 13, 2014 Tr. at 38:3-39:16.)  Additionally, as Dr. Kilpatrick admits, the Appraisal Institute, the leading professional association of real estate appraisers, will only arbitrate a dispute between appraisers where the difference in their opinions of value is greater than 10%.  (Kilpatrick Nov. 13, 2014 Tr. at 35:24-37:3; Kennedy Aff. at ¶ 28; Hedden Aff. at ¶ 29.)

501.    Because tolerances of 10-15% were and are accepted in the industry, and even taken to support appraised values as reasonable, the differences between the estimated values generated by the Greenfield AVMs and the original appraised values do not indicate that those appraised values were inflated.  The Rule 30(b)(6) designee for CoreLogic, a leading AVM vendor, testified that a variance of even 15% between appraisals does not "necessarily mean that one was right or the other was right."  (Doty Tr. at 186:23-187:4.)

### 5.    *The Greenfield AVM Produces Unreliable Results and Contains Methodological Flaws*

502.    Kilpatrick labels his model a "hedonic pricing model," which he says is a multiple regression analysis that uses a number of independent variables to predict a dependent variable—in this case, the "value" of a property.  (Isakson Aff. at ¶ 10.)  The Greenfield AVM employs two of these regression models, one of which uses three required variables (tax assessed value, days, and days squared) and the other of which incorporates a spatial variable, and then averages the outputs of these two regression models to predict the value of a given property.

(Isakson Aff. at ¶ 13.)  The Greenfield AVM applies its regression analyses to sales data from CoreLogic of up to 2,000 "comparable" properties based on geography, time, and property type. (Isakson Aff. at ¶ 15.)

503.    Kilpatrick's model contains several methodological flaws which render its results inaccurate, as defendants' experts Hans Isakson, Jerry Hausman, and Lee Kennedy explain.  Professor Isakson holds a Ph.D. in Economics from the University of Wisconsin and has taught real estate and real estate appraisal courses for 38 years.  He has published numerous articles in academic and professional journals in the real estate field.  (Isakson Aff. at ¶¶ 1-4.) Professor Jerry Hausman is the MacDonald Professor of Economics at the Massachusetts Institute of Technology.  Professor Hausman received his Ph.D. in Economics from Oxford and has taught at the Massachusetts Institute of Technology for more than 40 years, and he has published more than 170 academic research papers in leading economic journals.  (Hausman Aff. at ¶¶ 1-3.)  Lee Kennedy is the Founder and Managing Director of AVMetrics, a firm specializing in the independent testing of AVMs.  Kennedy has worked in the real estate business for 30 years, including as a licensed appraiser, and has worked as the Director of the Alternative Valuation Group, Collateral Risk Management for Washington Mutual Bank, where he worked extensively with AVMs and was deeply involved with residential real estate appraisals. (Kennedy Aff. at ¶ 3.)

> **a.    On Average, the Greenfield AVM Fails to Predict Actual Sales Prices of Properties—the Standard Industry Benchmark for AVM Performance—By 17%**

504.    Actual sales prices are the standard benchmark for testing an AVM's ability to accurately estimate the market value of properties.  (Kennedy Aff. at ¶¶ 43-44.)  It is an economic truism that the sales price in an arm's-length transaction between a willing buyer and a

willing seller is the best indicator of a property's market value.  (Kennedy Aff. at ¶ 43.)

Defendants' expert Kennedy used contemporaneous sales prices (for the 305 purchase money

loans among the Sample Loans) to test the accuracy of the Greenfield AVM.  (Kennedy Aff. at ¶

48.)  Kennedy found that the Greenfield AVM on average came up with values that differed

from the sales prices by 17%.  (Kennedy Aff. at ¶ 58.)  This alone reveals that the Greenfield

AVM is unreliable.

505.    Kennedy also tested the accuracy of the Greenfield AVM by calculating

the "PPE10% (Percentage Predicted Error)," a common metric for testing the accuracy of

AVMs.  (Kennedy Aff. at ¶ 52.)  The PPE10% statistic measures the frequency with which an

AVM produces estimated values that are within 10% of a benchmark (the benchmark being

actual sales prices in this instance).  (Kennedy Aff. at ¶ 52.)  Kennedy found that the Greenfield

AVM's estimates of value for 55.2% of the Nomura sample properties were not within 10% of

the sales prices of those properties.  (Kennedy Aff. at ¶ 52.)  The industry standard requires

AVMs to produce estimated values within 10% of the sales price at least 75% of the time, yet the

Greenfield AVM does so only 44.8% of the time.  (Kennedy Aff. at ¶ 54.)  Defendants' expert

Isakson also tested the Greenfield AVM against actual sales prices, and found that the Greenfield

AVM was more than 13% higher or lower than the actual selling prices of the Nomura sample

properties 45.8% of the time.  (Isakson Aff. at ¶ 24.)  Freddie Mac suggests that AVMs produced

estimated values within 13% of the actual sales prices at least 70% of the time, yet the Greenfield

AVM does so only 54.2% of the time.  (Isakson Aff. at ¶ 24.)

**b.    Kilpatrick Eliminates Sales Data That the Greenfield AVM
    Cannot Explain**

506.    When performing regression analyses to produce estimates of value for

properties serving as collateral for the Sample Loans, Kilpatrick's model excludes from

consideration sales data for "comparable" properties that cause his model to have high error rates, which is an unacceptable practice in statistics.  (Isakson Aff. at ¶ 30; Hausman Aff. at ¶ 28.)  A regression model is supposed to explain existing data; those data are not supposed to be censored to make the regression model appear more accurate than it is.  (Isakson Aff. at ¶ 31.)

507.    Kilpatrick removed sales data that made the Greenfield AVM appear inaccurate by applying various "filters."  (Isakson Aff. at ¶ 18; Hausman Aff. at ¶¶ 25-27.)  As a result of applying these filters, Kilpatrick's claim that the Greenfield AVM can accurately identify appraisals for Sample Loans that were inflated is dependent on his unjustifiable removal of data that would produce a contrary result.  (Isakson Aff. at ¶ 43; Hausman Aff. at ¶ 29.)

508.    Kilpatrick applied what he calls a "Cross-Validation Filter" to eliminate sales data for "comparable" properties if the Greenfield AVM's estimated values for those properties were more than 25% different than their actual sales prices.  (Isakson Aff. at ¶ 36; Hausman Aff. at ¶ 49.)  This resulted in the elimination of 22% of transactions from the sales data that Kilpatrick's model used to estimate values for the Nomura sample properties.  (DX-2807 (Effect of Cross-Validation Filter).)  Kilpatrick removed transactions from his dataset because the Greenfield AVM failed accurately to predict their actual sales prices, rather than attempting to improve the predictive accuracy of his model.  (Isakson Aff. at ¶ 39; Hausman Aff. at ¶¶ 28-30.)  Kilpatrick's elimination of inconvenient data violates the general principle in statistics that when a model fails to describe the dependent variable, one should add explanatory variables, or improve the model, but not remove objectionable regression observations because they do not agree with the model.  (Isakson Aff. at ¶ 31; *see also* Hausman Aff. at ¶¶ 28-30.)

509.    Kilpatrick's removal of inconvenient data had the effect of artificially lowering his estimates of value for the Nomura sample properties.  Without application of the

"Cross-Validation Filter," the Greenfield AVM's estimated values for the Nomura sample

properties would increase by an average of approximately $39,500 per property, or

approximately 18.0%. ( Hausman Aff. at ¶ 55.)  That change is significant because Kilpatrick

says that appraisals for the Nomura sample properties were, on average, overvalued by 8.92%,

and any deviation of more than 15.1% from the Greenfield AVM's estimate of value means an

appraisal was "inaccurate."  (Hausman Aff. at ¶ 55-56.)  Thus, if the Cross-Validation Filter is

removed, the outputs of the Greenfield AVM support defendants' position in this case, not

plaintiff's.  (Hausman Aff. at ¶ 56.)  Isakson found that as a result of Kilpatrick's cross-

validation process, the variability in the estimates of market value reported by Kilpatrick is

understated by a six-fold factor as compared to the variability in the Greenfield AVM before

applying the cross-validation filter.  (Isakson Aff. at ¶ 43.)

510.    Kilpatrick also censored data when calculating the forecast standard

deviation of the Greenfield AVM, which measures the precision of the model.  (Isakson Aff. at

¶¶ 29-30; Hausman Aff. at ¶¶ 24-27.)  In calculating the forecast standard deviation, Kilpatrick

conducted a validation exercise in which he created a "training set" of sales data to test the

ability of the Greenfield AVM to predict actual sales prices for a smaller "holdout set" of sales

data.  (Hausman Aff. at ¶ 24.)  Kilpatrick filtered out more than 70% of the properties in his

training set of sales data when calculating the forecast standard deviation of his model.

(Hausman Aff. at ¶ 14; Isakson Aff. at ¶ 30.)  In doing so, he substantially inflated the apparent

precision of the Greenfield AVM.  (Isakson Aff. at ¶ 32; Hausman Aff. at ¶ 33.)

511.    Kilpatrick claims that he applied his filters to exclude "suspect data,"

including sales that were not arm's-length transactions, such as bankruptcy sales, distressed sales

or estate sales, and transactions that contain "data errors or incorrect matches between the tax

and deed data." (Isakson Aff. at ¶ 23; Hausman Aff. at ¶ 27.)  However, Kilpatrick did nothing

to determine whether the sales data he excluded fell into his "suspect" categories, and he

admitted that he conducted no empirical tests to establish whether his filters allowed him to

identify arm's length transactions, or conversely to exclude transactions that were not at arm's

length.  (Isakson Aff. at ¶¶ 23, 25; Hausman Aff. at ¶ 29.)  It is a basic principle of statistics that

data should be excluded from an analysis only if those data are in some sense unreliable, and that

unreliability can be determined only by investigating the data themselves, not just by observing

whether the data produce high error rates for a model.  (Hausman Aff. at ¶¶ 28-29.)

512.    Kilpatrick filtered out a great deal of sales data not to exclude non-arm's

length transactions or otherwise "suspect" data, but to make the Greenfield AVM appear more

accurate than it is.  Kilpatrick admitted that he applied his "Cross-Validation Filter" in order

"[t]o increase the explanatory power" and "enhance the accuracy of the model."  (Kilpatrick

Nov. 13, 2014 Tr. at 118:12-119:10.)  Kilpatrick said, "I just utilize the data that fits my model"

and eliminate sales data that "are not as good at fitting the model." (Kilpatrick Nov. 13, 2014 Tr.

at 118:12-119:10.)  As discussed above, this violates a basic principle of statistics.  According to

the Reference Guide on Multiple Regression, published by the Federal Judicial Center, a data

point dropped from a sample "should be studied further to determine whether mistakes were

made in the use of the data or whether important explanatory variables were omitted."  Daniel L.

Rubinfeld, Reference Guide on Multiple Regression, Reference Manual on Scientific Evidence

326-27 (3d ed. 2011).  Kilpatrick made no such study before dropping large numbers of data

points from his sample.  His AVM is entirely unreliable.

c.      **The Greenfield AVM Has an Unacceptable Confidence Interval and Forecast Standard Deviation**

513.    The Greenfield AVM's confidence interval and forecast standard deviation—two important measures of its reliability—fall below acceptable norms.

514.    A confidence interval is a range of values within which one can say with a specified level of confidence that the "null hypothesis" is true.  In this instance, the "null hypothesis" is that the appraised value of a subject property is equal to the estimated value of that property generated by the Greenfield AVM.  (Hausman Aff. at ¶ 16.)  It is standard in econometrics and statistics to conduct tests at a 95% confidence interval.  (Hausman Aff. at ¶ 14.)  A 95% confidence interval is the interval within 1.96 standard deviations of the value obtained from the sample.  (Hausman Aff. at ¶ 14.)  However, because Kilpatrick considers an appraised value "inaccurate" if it is one standard deviation away from his Greenfield AVM value, as opposed to 1.96 standard deviations, Kilpatrick's model has only a 68% confidence interval.  (Hausman Aff. at ¶ 15.)  This is an unreliable confidence interval that is never used in the field of statistics.  (Hausman Aff. at ¶ 15.)  When applying a 95% confidence interval, the number of appraisals Kilpatrick deems "inaccurate" drops by more than 50%.  (Hausman Aff. at ¶ 17.)

515.    Kilpatrick also errs in calculating the forecast standard deviation for the Greenfield AVM.  The forecast standard deviation is important for two reasons.  First, it is a measure of the precision of the model.  (Hausman Aff. at ¶ 9.)  Second, the forecast standard deviation determines the width of the confidence interval (as described above), and thus determines the range of appraised values that are not statistically significantly different from the estimate of value generated by the Greenfield AVM.  (Hausman Aff. at ¶ 22.)  Kilpatrick uses the forecast standard deviation of his model to determine which appraisals are "inaccurate," as

well as to determine which appraisals will be analyzed by his "Credibility Assessment Model" to determine if they are "credible." (Hausman Aff. at ¶ 22.)

516.   As described above, Kilpatrick applies improper filters during the validation exercise he used to calculate the forecast standard deviation of the Greenfield AVM. (Hausman Aff. at ¶¶ 24-28.) Defendants' expert Hausman recalculated the forecast standard deviation without using those filters. When that recomputed forecast standard deviation was applied, the number of Nomura appraisals deemed "inaccurate" by the Greenfield AVM drops to 6%. (Hausman Aff. at ¶ 38.)

517.   That 6% inaccuracy rate is in line with the error rate one would expect if the Greenfield AVM were run on series of appraisals that were not inflated, applying the 95% confidence interval that is standard in statistics. (Hausman Aff. at ¶¶ 40-41.) In other words, once Kilpatrick's filters are removed, there is no evidence that the original appraised values differ from the estimated values generated by the Greenfield AVM, and thus no evidence that the original appraised values were inflated. (Hausman Aff. at ¶¶ 40-42.)

### d.   The Greenfield AVM Relies on Tax-Assessed Values from 2010-2014, Which Are Unreliable

518.   The Greenfield AVM appears to rely on tax-assessed values as the key driver in determining property values in 2005 to 2006. (Kennedy Aff. at ¶ 40; Kilpatrick AVM Report at 39.) Even if they were contemporaneous, such tax-assessed values are not accepted in the appraisal industry as indicative of market values. ((Kennedy Aff. at ¶ 39; Isakson Aff. at ¶¶ 64, 83; (Morris Aff. at ¶ 34; Schall Aff. at ¶ 22; Clagett Aff. at ¶ 28; Platt Aff. at ¶ 32.) No commercially available AVM uses tax-assessed value as an explanatory variable—because tax-assessed values are not determinants of the value of a property, meaning a change in the assessed value does not cause its market value to change. (Isakson Aff. at ¶¶ 64-65, 84.) It is, in

fact, the opposite—changes in the market value of a house may, but will not always, cause its assessed value to change.  (Isakson Aff. at ¶ 64.)  Moreover, tax-assessed values are estimates, and thus have prediction errors that need to be accounted for, but Kilpatrick does not do that. (Isakson Aff. at ¶ 66.)

519.    Kilpatrick uses tax-assessed values from 2010-2014 more than 95% of the time.  (Isakson Aff. at ¶ 70.)  This use of tax-assessed values from long after the appraisals at issue were performed is problematic because current tax-assessed values reflect changes in the overall real estate market or changes in neighborhoods or the condition of particular properties since the original appraisals were performed.  (Isakson Aff. at ¶ 73.)  This issue is particularly pronounced because of the significant decline in housing prices that occurred between 2007 and 2010.  (Isakson Aff. at ¶ 73.)  The use of present-day assessed values to calculate "retrospective" estimates of value is not possible, and completely invalidates Kilpatrick's opinions based upon the Greenfield AVM.  (Isakson Aff. at ¶ 75.)

        **e.**       **The Greenfield AVM Performs Poorly Compared to Tested, Validated, Commercially Available AVMs**

520.    Kilpatrick's Greenfield AVM performs poorly when compared with commercially available AVMs.  Defendants' expert Lee Kennedy compared the accuracy of various AVM models at predicting the sales prices of the properties at issue in this Action.  The Greenfield AVM came in last or second-to-last on every meaningful measure of accuracy. (Kennedy Aff. at ¶¶ 58-60.)

        **f.**       **The Greenfield AVM Suffers From Omitted Variables Bias**

521.    Kilpatrick's Greenfield AVM requires only three independent variables for its OLS regression, and five independent variables for its OLSXY regression.  (*See* ¶ 586, *supra*; Isakson Aff. at ¶ 14.)   The Greenfield AVM does not require independent variables such

as lot size, living area, number of bathrooms, number of bedrooms, and garage size, and uses

only two—living area and number of bathrooms—even if others are available.  (Isakson Aff. at

¶ 80.)  The omission of these variables leads to "omitted variables bias," which occurs when

relevant explanatory variables are omitted from the regression model.  (Isakson Aff. at ¶¶ 76-79;

Hausman Aff. at ¶ 58.)  Kilpatrick attempts to justify the omission of key variables because he

says they correlate with variables that are included.  (Kilpatrick AVM Report at 37.)  However,

he fails to prove that the variables he omits, such as bedrooms, have a high correlation with

variables he does include, proving only a 0.55 correlation between number of bedrooms and

living area, which is not "high."  (Isakson Aff. at ¶ 78; Hausman Aff. at ¶ 60.)  Defendants'

expert Hausman found that when just one omitted variable is added, the number of bedrooms,

the average Greenfield AVM value increases by approximately $2,300 per property, showing

that this "omitted variables bias" systematically produces artificially low Greenfield AVM

values.  (Hausman Aff. at ¶ 63.)

> g.    **The Greenfield AVM Produces Results that Violate Basic Economic Theory**

    522.  The Greenfield AVM often produces regression coefficients for housing

characteristic variables that violate implicit price theory.  Coefficients for housing characteristics

in Kilpatrick's model should make economic sense.  If a housing characteristic is something

buyers desire, then its coefficient should be greater than zero.  Negative coefficients for housing

characteristics such as living area, lot size, year built and number of bathrooms violate the

commonsense idea that such characteristics should have a positive impact on price (*e.g.*, newer

houses sell for more than older houses).  (Isakson Aff. at ¶ 95.)  Between 9 and 33 percent of the

Greenfield AVM's regressions had negative coefficients used to estimate the value of the

Nomura sample properties, and 43 to 80 percent of these irrational and unbelievable coefficients

are statistically significant.  The prevalence of such irrational and unbelievable negative coefficients also shows that the Greenfield AVM produces inaccurate and unreliable results.  (Isakson Aff. at ¶ 96.)

### h. The Greenfield AVM Contains an Error that Systematically Produces an Artificially Low Value

523.    Kilpatrick's re-calculated LTV ratios are also overstated because his model contains an error that systematically produces an appraised value less than the expected market value in dollars—meaning that when aggregated, the LTV ratios will be higher.  The Greenfield AVM does not directly estimate market value in dollars.  Instead, it estimates the natural logarithm of the market value of a property, which is then back-transformed into a dollar amount by raising the base of the natural logarithm, e, to the power of the estimated log of price. The problem with using this simple back-transformation is that it yields the median, not the mean, on the dollar scale.  That is, the back-transformed mean on the log scale does not equal the mean or expected price on the dollar scale.  In fact, the back-transformed mean estimated by the Greenfield AVM will always be less than the expected price of each Subject Property in dollars. (Isakson Aff. at ¶ 117.)  Because of this systemic methodological error, the Greenfield AVM has a built-in bias that yields an estimate of the market value (in dollars) that is systematically less than the expected market value (in dollars) of all of the Subject Properties.  (Isakson Aff. at ¶ 118.)  Kilpatrick has admitted that he committed this error.  (Kilpatrick June 30, 2014 Tr. at 367:4-6 ("Q.  Did you commit a back transformation error?  A. Well, sort of." ).)

524.    Defendants' expert Hausman corrected this "back transformation error" and showed that the error accounted for all of the "average" bias that Kilpatrick found in the Nomura sample loans.  (Hausman Aff. at ¶¶ 55-56.)  Once the error was corrected, the average value for the Nomura Sample Loans increased by an average of approximately $39,500 per

property or, in percentage terms, by approximately 18.0%.  (Hausman Aff. at ¶ 55.)  Even using

Kilpatrick's own (flawed) method of excluding high and low outliers, the average adjustment for

the values based on correcting this error is 8.8%, or nearly all of the 8.92% "average" bias that

Kilpatrick finds.  (Hausman Aff. at ¶ 56.)

> ### 6.   *Kilpatrick Recalculated LTV Ratios By Overriding Actual Sales Prices, Improperly Causing LTV Ratios To Increase*

525.    Although 45.5% of the Sample Loans were purchase money mortgages

with sales prices, Kilpatrick recalculated LTV ratios for these loans using the ***lesser*** of (1) the

estimated value generated by the Greenfield AVM, (2) the original appraised value, or (3) the

sales price.  (Isakson Aff. at ¶ 27.)  For refinance mortgages, Kilpatrick recalculated LTV ratios

using the ***lesser*** of (1) the estimated value generated by the Greenfield AVM or (2) the appraised

value.  (Isakson Aff. at ¶ 27.)

526.    Kilpatrick's method for calculating LTV ratios for purchase money

mortgages assumes his Greenfield AVM is a better indicator of a property's value than the actual

sales price (but only when lower than the sales price).  (Isakson Aff. at ¶ 28.)   But the sales price

of a property is the only economically rational measure of that property's "true" value, which is

why sales prices are the benchmarks used to test the reliability of AVMs.  (Isakson Aff. at ¶ 21;

¶ 505, *supra*.)  The only situation where a sales price is not an accurate measure of a property's

value is where the transaction was not at arm's-length.  (Isakson Aff. at ¶ 23.)  Kilpatrick,

however, provides no evidence that any of the Nomura sample properties was sold in something

other than an arm's-length transactions.  (Isakson Aff. at ¶ 23.)

527.    If Kilpatrick's model is capable of generating the "true" value of a

property, as he claims, then Kilpatrick should have used the estimate of value generated by the

Greenfield AVM value for each of his recalculated LTV ratios, not just when that value was

lower than the appraised value and the sales price.  (Isakson Aff. at ¶ 28.)  Yet, Kilpatrick did not

use the estimated value generated by the Greenfield AVM for 35.7% of his LTV calculations.

(Isakson Aff. at ¶ 27.)  Defendant's expert Isakson recalculated Kilpatrick's LTV ratios using

only the estimate of value generated by the Greenfield AVM.  (Isakson Aff. at ¶ 28.)  Doing that,

he determined Kilpatrick's re-calculated LTV ratios were overstated by 36.6%.  (Isakson Aff. at

¶ 28.) Kilpatrick's use of the lowest of the sales price, appraised value, or estimated value

generated by the Greenfield AVM in recalculating LTV ratios created a one-way ratchet

whereby his recalculated LTV ratios could ***only*** be higher than those disclosed in the Offering

Documents.  (Isakson Aff. at ¶¶ 27-28.)

### E.   There Is No Evidence That Appraisals of the Nomura Sample Properties Did Not Comply With USPAP

528.    Kilpatrick purports to assess the "credibility" of 205 of the 208 appraisals

that the Greenfield AVM found to be inflated using what he terms a "Credibility Assessment

Model."  (Hedden Aff. at ¶ 14.)  The "Credibility Assessment Model" is based on 31 "yes" or

"no" questions that Kilpatrick created and fashioned into a checklist that he used to score each of

the appraisals.  (Hedden Aff. at ¶ 44.)  Kilpatrick claims his questions are "based on" USPAP,

and therefore the answers to his questions can determine whether an appraisal was "credible"

according to USPAP.  (Expert Report of John A. Kilpatrick, Ph.D., Concerning Adherence of

Appraisals to Appraisal Standards and Practice, dated May 15, 2014 ("Kilpatrick CAM Report")

at 3-4.)  USPAP defines "credible" as "worthy of belief," which means that an opinion has

"support [ ] by evidence and logic."  (DX-2727 (The Appraisal Institute, USPAP 2006 Edition)

at 3.)

529.    The "Credibility Assessment Model" assigns points to an appraisal if

Kilpatrick determines that one of his questions was answered improperly by the original

appraisal.  (Kilpatrick CAM Report at 40.)  Kilpatrick created weights for each question based

on his subjective views of the relative importance of the questions, so certain questions have

much more significance than others.  (Kilpatrick CAM Report at 43.)  If the total score based on

the 31 questions is above a threshold chosen by Kilpatrick, the appraisal is deemed "not

credible."  (Kilpatrick CAM Report at 99.)  Applying his "Credibility Assessment Model,"

Kilpatrick determined that 92.2% of the 205 appraisals he examined were not "credible."

(Hedden Aff. at ¶ 9.)

       530.     Defendants' expert, Michael P. Hedden, challenges the notion that the

"Credibility Assessment Model" is a valid basis for judging whether an appraisal is "credible" as

that term is used in USPAP.  Hedden is a certified appraiser in the state of New York and 12

other states, and has 41 years of experience in the residential real estate field.  He is a member of

the Appraisal Institute, and has reviewed thousands of real estate appraisals, both residential and

commercial, over the course of his career.  He was a member of the Standards and Ethics

Committee review panel of the Appraisal Institute from 1987 through 1992, and was President of

the New Jersey Chapter of the Appraisal Institute from 2009 through 2010.  He is also an author

or co-author of several publications about real estate, including appraisals and valuation.

(Hedden Aff. at ¶¶ 1-3.)

       ***1.     Use of a "Deterministic Scoring Model" to Gauge Compliance with USPAP Is Not Accepted in the Appraisal Profession***

       531.     According to USPAP, an appraisal review is "the act or process of

developing and communicating an opinion about the quality of another appraiser's work that was

performed as part of an appraisal or appraisal review assignment."  (Hedden Aff. at ¶ 34.)  To

meet the objectives of an appraisal review, a reviewer examines the data, reasoning, analyses,

and conclusions developed by the original appraiser.  (Hedden Aff. at ¶ 34.)  Most appraisal

reviews are performed to determine the credibility of the original appraiser's opinion of value, and the adequacy of the supporting evidence provided.  (Hedden Aff. at ¶ 34.)  Appraisal review assignments are generally described in colloquial terms as either "desk reviews" or "field reviews."  (Hedden Aff. at ¶ 35.)  A desk review is completed without a field inspection and is often limited to reviewing data presented in the original appraisal.  (Hedden Aff. at ¶ 35.)

532.    The "Credibility Assessment Model" created by Kilpatrick is a "deterministic scoring model" that he claims can be used to "assess the degree to which the Nomura Appraisals deviated from the appraisal standards established by USPAP and other established appraisal guidance and practice."  (Hedden Aff. at ¶ 44.)  A deterministic scoring model has a defined value for each input; in this case, the "Credibility Assessment Model" has a defined value for each "yes" or "no" answer to one of Kilpatrick's 31 questions, and these values are then added up to produce a final "score."  (Hedden Aff. at ¶ 45.)

533.    Plaintiff has no evidence that a "deterministic scoring model" is an accepted method for determining whether an appraisal is "credible" as that term is used in USPAP.  Rather, under USPAP, a proper appraisal review involves a filed review or desktop review, both of which require a second appraiser to re-appraise the property using all information available at the time of the original appraisal.  (Hedden Aff. at ¶¶ 35-38.)  The "Credibility Assessment Model" bears no resemblance to either a field review or a desktop review.  (Hedden Aff. at ¶ 48.)

### 2.    The "Credibility Assessment Model" Is Untested and Unvalidated

534.    The "Credibility Assessment Model" was developed by Kilpatrick for use in this and related litigation.  (Hedden Aff. at ¶ 61.)  It has never been used by real estate appraisers, and Kilpatrick confirms that he has never used the "Credibility Assessment Model"

outside the context of this litigation.  (Hedden Aff. at ¶ 61.)  The "Credibility Assessment Model" has not been peer-reviewed, nor has it been validated as an appropriate tool for Kilpatrick's stated purpose.  (Hedden Aff. at ¶¶ 61-62.)

535.    The "Credibility Assessment Model" also fails a basic test of reliability: there is no evidence that it correctly distinguishes between credible and non-credible appraisals.  (Hedden Aff. at ¶ 62.)  The "Credibility Assessment Model" has not been validated by testing the results it produces on sample appraisals known to be credible versus sample appraisals known to be non-credible.  (Hedden Aff. at ¶ 62.)  Without such validation, there is no way to know if the "Credibility Assessment Model" is capable of distinguishing between credible and non-credible appraisals.  (Hedden Aff. at ¶ 62.)  Kilpatrick performed no such validation.  (Hedden Aff. at ¶ 62.)

### 3.    *None of the "Credibility Assessment Model" Questions Reflect USPAP Standards*

536.    None of the questions that Kilpatrick created for the "Credibility Assessment Model" are based on, or required by, USPAP.  (Hedden Aff. at ¶¶ 49, 63-250; Kilpatrick Nov. 13, 2014 Tr. at 211:12-212:13, 223:12-17.)  In fact, many questions in the "Credibility Assessment Model" directly contradict USPAP requirements.  (Hedden Aff. at ¶¶ 49, 63-250.)  The "Credibility Assessment Model" reflects only Kilpatrick's subjective views about how appraisals should be performed, and his unique interpretations of USPAP.  (Hedden Aff. at ¶¶ 49, 63-250.)

537.    For instance, questions 4, 13, 14, and 21 contain strict numeric thresholds, such that any time an appraisal exceeds those thresholds, no matter by how little, Kilpatrick deems the appraisal to have failed the question.  (Hedden Aff. at ¶¶ 80-88, 134-139, 140-148, 184-189.)  Yet, nothing in USPAP contains such strict numeric thresholds, and none of the

requirements in these four questions appear in USPAP, as Kilpatrick admits.  (Kilpatrick July 14, 2014 Tr. at 281:14-282:2; Hedden Aff. at ¶¶ 82-86, 135, 141-142, 185-186.)

538.    Question 14 is particularly instructive.  It requires that the "land value ratio be greater than 20 percent and less than 30 percent."  There is no USPAP rule requiring that the land-to-value ratio of a property fall within a pre-determined range (including the range of 20% to 30%).  (Hedden Aff. at ¶ 142; DX-2727 (The Appraisal Foundation, USPAP 2006 Edition).)  Further, the testimony of appraisers directly contradicts the notion that Kilpatrick's Question 14 was a requirement, or that it is even logical.  (Morris Aff. at ¶ 42; Clagett Aff. at ¶ 33.)  In many instances, such as the case of property in desirable locations near water, land value ratios may well be higher than 30%.  (Morris Aff. at ¶ 42; Clagett Aff. at ¶ 33.)  Thus, markets where there is a cap on supply, such as coastal California, desired areas of Washington D.C., and higher-priced markets near job centers such as New Jersey and New York, often experience fluctuations in land value ratios, which can reach 50% or more of the price of a property.  (Hedden Aff. at ¶ 145.)  By contrast, in locations where there is a surplus of land supply and building is inexpensive, land value ratios are often much lower.  (Hedden Aff. at ¶ 145.)  Kilpatrick's invented 20% to 30% range for land value ratios is neither rooted in USPAP nor in the practice of actual appraisers.

539.    Similarly, Question 13 requires that, on an annualized basis, the appraised value of the subject property must be less than 10% higher than the most recent sale of the subject property.  (Hedden Aff. at ¶¶ 134-139.)  Question 21 imposes a similar annualized 10% limit on price relative to prior sales for comparable properties.  (Hedden Aff. at ¶¶ 140-148.)  Kilpatrick asserts that "[t]his is one of the most important assessment questions.  It captures violations of USPAP Standards Rule 1-5(b), which requires not just that prior sales be reported

but also that they be analyzed." (Hedden Aff. at ¶ 135.)  But Standards Rule 1-5(b) does not

have any annualized 10% limit on price relative to prior sales, stating only that an appraiser must

"analyze all sales of the subject property that occurred within the three (3) years prior to the

effective date of the appraisal." (Hedden Aff. at ¶ 135.)

      540.    Requiring appraised values to be no more than 10% higher than  prior

sales on an annualized basis does not comport with the realities of many real estate markets;

there are numerous reasons why property values can increase more than 10% annually.  (Hedden

Aff. at ¶ 136.)  One such reason is local market appreciation, which can often lead to price

appreciation in excess of 10% per year, especially during the time period 2005 to 2007.  (Hedden

Aff. at ¶ 137; Platt Aff. at ¶ 41; Morris Aff. at ¶ 41.)  Kilpatrick ignores the fact that, at the time

the appraisals in this matter were completed, there were markets experiencing double-digit

appreciation annually.  (Hedden Aff. at ¶ 137.)  The building of a new home, or significant

renovation of an existing home, also would be expected to lead to price appreciation of more

than 10% per year.  (Hedden Aff. at ¶ 138; Platt Aff. at ¶ 39.)  Property prices also may increase

substantially from sale to sale when the prior sale is not a normal market transaction, or is not

arm's length.  (Hedden Aff. at ¶ 139.)  Kilpatrick's "Credibility Assessment Model" failed

appraisals on Question 13 where house prices in the local market had increased by more than

10% annually, the subject properties had been renovated, or the prior sale was not arm's length.

(Hedden Aff. at ¶¶ 137-139.)

      541.    As another example, questions 29, 30, and 31 of the "Credibility

Assessment Model" require that comparable properties used by an appraiser reflect specific

averages of price per square foot, square footage, and gross living area that do not exceed

averages of those attributes for all properties available in the market.  Again, no similar

requirements exist in USPAP, for any of these attributes.  (Hedden Aff. at ¶¶ 233-250; DX-2727

(The Appraisal Foundation, USPAP 2006 Edition).)  Further, appraisers consider a variety of

factors in selecting comparables in addition to the attributes specified in questions 29, 30 and 31

(and the use of more such attributes is encouraged by USPAP), and none of the appraisers

considered a comparable to be inappropriate merely because its square footage was above

average.  (Morris Aff. at ¶ 44; Clagett Aff. at ¶ 35; Platt Aff. at ¶ 43; Hedden Aff. at ¶¶ 235,

241.)  It is not at all uncommon for the comparables used in an appraisal to have higher price per

square foot, square footage, and gross living area than other properties available in the market.

(Hedden Aff. at ¶¶ 235, 241.)  Further, the differences between the average price per square foot,

square footage, and gross living area of the comparables used by the original appraisers and the

comparables identified by Kilpatrick for purposes of applying questions 29, 30, and 31 are

minor.  (Hedden Aff. at ¶¶ 236-237, 242-243, 249.)

542.    As a further example, question 12 asks whether the appraiser "analyzed all

prior sales of the subject and comparables."  This requirement appears nowhere in USPAP.

(Hedden Aff. at ¶ 132.)  Rather, USPAP requires only that an appraiser "analyze all sales of the

subject property that occurred within the three (3) years prior" to the appraisal, and only if such

information is available to the appraiser "in the normal course of business."  (Hedden Aff. at ¶

132; DX-2726 (The Appraisal Foundation, USPAP 2005 Edition) at 21.)  Because question 12

both extends beyond three years, and does not include the limitation on information being

available "in the normal course of business," it fundamentally differs from USPAP, and could

result in an appraisal failing question 12 despite being in full compliance with USPAP.

543.    The questions in the "Credibility Assessment Model" routinely demand

that appraisers follow specific processes and procedures that Kilpatrick believes are appropriate,

despite the fact that USPAP explicitly rejects such an approach, as it is based on standards as opposed to strict requirements.  (Hedden Aff. at ¶¶ 48, 52, 57.)  Rather than following a fixed set of rules, USPAP proceeds on the notion that appraisers have "broad flexibility" in determining the scope of their work.  (Hedden Aff. at ¶ 79; DX-2727 (The Appraisal Foundation, USPAP 2006 Edition) at 12.)

544.    Because Kilpatrick's 31 questions are not based on USPAP, the results of his "Credibility Assessment Model" do not provide any basis for determining whether an appraisal is "credible" as that term is defined in USPAP.  (Hedden Aff. at ¶ 258.)

### 4.    The Credibility Assessment Model Does Not Allow For the Flexibility and Application of Judgment USPAP Requires

545.    The "Credibility Assessment Model" seeks to reduce USPAP compliance down to a series of strict rules when USPAP is comprised of broadly-worded, flexible standards that require appraisers to exercise judgment and discretion.  By employing a rigid checklist of requirements, the "Credibility Assessment Model" fails to capture the nuance and subjectivity that is a natural part of the appraisal process.  (Hedden Aff. at ¶ 48.)  Field reviews and desk reviews, on the other hand, allow for the nuance and subjectivity that are inherent in appraisals, as recognized by USPAP.  (Hedden Aff. at ¶ 48.)

546.    One consequence of Kilpatrick's attempt to reduce USPAP to a series of strict rules is that the "Credibility Assessment Model" fails to take into account the explanations provided by appraisers.  (Kilpatrick July 14, 2014 Tr. at 382:22-383:2.)  For certain appraisals that Kilpatrick finds not-credible, those explanations refute his findings.  For instance, for one loan Kilpatrick faulted for having a land-to-value ratio outside his 20-30% range, the appraiser wrote in the original appraisal that "although land total value ratio exceeds 30% it is common in the [area] due to the lack of vacant land and does not affect marketability."  (Hedden Aff. at ¶

146.)  This explanation brings the appraisal in line with USPAP, which is concerned with employing "recognized methods and techniques . . . necessary to produce a credible appraisal." (DX- 2727 (The Appraisal Foundation, USPAP 2006 Edition) at 21.)  Similarly, Platt explained in his appraisal that the current price of a comparable property was more than 10% higher than its previous sale price because of a "rapid rise in value" in the area and because it had undergone a "complete renovation."  (Platt Aff. at ¶ 41.)  Yet Kilpatrick ignored that explanation completely.

547.    The "Credibility Assessment Model" also does not account for differences in error types—for example, if the sales price of a comparable was off by $500, the error would be the treated the same in Kilpatrick's model as the sales price of a comparable that was off by $500,000.  (Hedden Aff. at ¶ 52.)  Yet this sort of difference matters when determining whether an appraisal is "credible" as that term is used in USPAP.  (Hedden Aff. at ¶ 52.)  For instance, question 20 asks:  "Did the appraiser correctly report comparable sales transaction data?"  For two loans, Kilpatrick fails them on this question because a comparable sale had a price discrepancy of less than 1%.  (Hedden Aff. at ¶ 183.)  Such a minor difference cannot have a material impact on the accuracy or credibility of an appraisal.  (Hedden Aff. at ¶ 52.)

548.    Question 14 asks whether the land value ratio is greater than 20% or lower than 30%.  Kilpatrick fails loans for being outside this range by any amount, no matter how small.  For example, one loan was failed becasue the land value was 19.8%, instead of Kilpatrick's required 20%  (Hedden Aff. at ¶ 148.)  In addition to the fact that this question has no support in USPAP, such small discrepancies cannot be used to determine whether an appraisal is "credible" or "non-credible."  (Hedden Aff. at ¶ 52; Clagett Aff. at ¶ 33.)

549.    The failure of the "Credibility Assessment Model" to distinguish between minor and major errors contravenes USPAP, which requires only that an appraiser must "not commit a **substantial** error of omissions or commission that **significantly** affects an appraisal." (Hedden Aff. at ¶ 52 (emphasis added).)

### 5.    Kilpatrick Does Not Apply His "Credibility Assessment Model" Reliably

550.    The "Credibility Assessment Model" suffers from other flaws that diminish the value of its results.  None of the thresholds Kilpatrick chose for the weighting of his questions are based in any sort of scientific analysis, nor have they been accepted anywhere else in the appraisal industry.  (Hedden Aff. at ¶¶ 51.)  They simply represent Kilpatrick's arbitrary choices.  (Hedden Aff. at ¶¶ 51-52.)

551.    In addition, Kilpatrick also did not correctly apply his own model. Defendants' expert Hedden showed how the data selected by researchers working for Kilpatrick was often unreliable and inaccurate.  (Hedden Aff. at ¶ 60.)  For one property, Kilpatrick found the appraisal failed under his question 4 ("Was the appraised value of the subject less than or equal to 10% higher than the most recent listing within the last year?"), when in fact the appraisal was only 9.3% higher than the most recent listing price.  (Hedden Aff. at ¶ 60, n.72.) This is obviously incorrect, and undermines the validity of Kilpatrick's conclusions.

### 6.    The Weights, Scoring and Failure Threshold Used in the "Credibility Assessment Model" Are Arbitrary

552.    The weights and scoring that Kilpatrick created for questions in his "Credibility Assessment Model" suffer from various flaws.  (Hedden Aff. at ¶¶ 50-54.)

553.    First, there is no reference to the weights and scoring in any appraisal standard, text, course or curriculum, nor is there any evidence that any other appraiser has ever

used the same weights and scoring.  (Hedden Aff. at ¶ 50.)  There is no evidence that any such methodology has ever been used by professional appraisers.

554.    Second, the weights and scoring attributed to the various questions by Kilpatrick are arbitrary and illogical.  (Hedden Aff. at ¶ 52.)  The design and application of the scoring methodology in the "Credibility Assessment Model" fail to differentiate between minor and major errors, such that a minor error will yield the same answer—and thus the same negative points on a given question—as a truly egregious error.  (Hedden Aff. at ¶ 52.)  This rigid and inflexible approach directly contravenes USPAP.  (Hedden Aff. at ¶ 52.)  In addition, because several "Credibility Assessment Model" questions, and consequently their scores, are interrelated, an appraisal may fail on multiple questions, even though the reason for those failures depends on an identical set of circumstances.  (Hedden Aff. at ¶ 53.)

555.    The "Credibility Assessment Model's" credibility threshold is also illogical and not supported by any appraisal review theory.  (Hedden Aff. at ¶¶ 56-57.)  Kilpatrick arbitrarily assumes that a score of 20 shows that an appraisal is non-credible, whereas the maximum score an appraisal can receive under the "Credibility Assessment Model" is 186.11.  (Hedden Aff. at ¶ 56.)  Kilpatrick justifies his chosen failure threshold based on the average of what he calls one "egregious" mistake plus two "minor" mistakes, but his failure threshold is built on a foundation of arbitrary weights and scoring.  (Hedden Aff. at ¶¶ 56-57.)  First, none of the supposed mistakes he finds are considered mistakes by USPAP, so it is unreasonable to label them "egregious" or even "mistakes."  (Hedden Aff. at ¶ 57.)  Second, none of the scoring of the 31 questions in the "Credibility Assessment Model" is rooted in USPAP.  (Hedden Aff. at ¶ 57.)  As such, the constituent elements of the final score find no support in industry practice.  (Hedden Aff. at ¶ 57.)  Finally, USPAP itself does not impose a

rigid threshold in determining the credibility of an appraisal.  (Hedden Aff. at ¶ 57.)  Each

element that factors into the failure threshold that Kilpatrick invented for his "Credibility

Assessment Model" is thus arbitrary and a departure from USPAP and related appraisal

standards.  (Hedden Aff. at ¶ 57.)

> **F.** **Disclosures in the Offering Documents About Compliance with USPAP Were Accurate**

556.    The Offering Documents for six of the Securitizations represented that

"[a]ll appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by

the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to

Fannie Mae and/or Freddie Mac."  (DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29,

2005, NOM-FHFA_04811802) at NOM-FHFA_04811895; DX-3 (2006-HE3 Prospectus

Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620973; DX-4

(2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-

FHFA_04638401; DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-

FHFA_05141912) at NOM-FHFA_05142022; DX-6 (2007-2 Prospectus Supplement, dated Jan.

30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591416; DX-7 (2007-3 Prospectus

Supplement, dated April 27, 2007, NOM-FHFA_04732621) at NOM-FHFA_04732713.)

557.    The "Credibility Assessment Model" does not reflect USPAP standards,

and none of the 31 questions is based on, or reflects criteria required by, USPAP.  (*See* ¶¶ 536-

544, *supra*).  Kilpatrick therefore does not provide any basis to find that there were

misrepresentations in the Offering Documents regarding compliance with USPAP.

558.    Each of the four appraisers stated that they were aware of USPAP

requirements and believe that their appraisals conformed to those USPAP requirements in all

respects.  (Morris Aff. at ¶¶ 3, 7, 36; Schall Aff. at ¶ 4; Clagett Aff. at ¶¶ 7, 30, 36; Platt Aff. at ¶¶ 6, 34.)  There is no evidence to the contrary.

559.    In sum, Kilpatrick's "Credibility Assessment Model" provides no basis to conclude that any appraisals used in calculating LTV ratios disclosed in the Offering Documents did not conform to USPAP.

**G.** ████████████████████████████████████████
████████████████████

██  ███████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

████████████

───────────────────

█
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████              ██████



## VI.   STATEMENTS IN THE OFFERING DOCUMENTS ABOUT OWNER OCCUPANCY WERE NOT FALSE OR MISLEADING.

### A.   Disclosures in the Offering Documents Concerning Owner Occupancy

563.   The Offering Documents sets forth data regarding owner occupancy in the

collateral tables.  (Forester Aff. at ¶ 87; Graham Aff. at ¶ 33.)  This data is presented in



aggregated form.  (Forester Aff. at  ¶ 87.) The tables pertaining to loans backing the Certificates

that Fannie Mae (one) or Freddie Mac (six) purchased are reproduced below:

| Occupancy Status |
|---|

DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811862

### Occupancy Status of the Group III Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Cut-off Date Principal Balance | Percentage by Aggregate Cut-off Date Principal Balances |
|---|---|---|---|
| Owner-Occupied | 188 | $ 45,212,780.49 | 56.59% |
| Investor | 155 | 27,739,774.40 | 34.72 |
| Second Home | 33 | 6,937,353.23 | 8.68 |
| Total: | 376 | $ 79,889,908.12 | 100.00% |

DX-2 (2006-FM1 Prospectus Supplement,dated Jan. 27, 2006, NOM-FHFA_04729474)  at NOM-FHFA_04729516

### Occupancy Status of the Group I Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Gross Coupon (%) | FICO | LTV (%) | Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied | 2,248 | $359,350,173 | 88.63% | 7.658 | 609 | 80.84 | 355 | 54.85 |
| Investor | 260 | 41,773,681 | 10.30 | 8.028 | 643 | 82.91 | 355 | 54.54 |
| 2nd Home | 24 | 4,312,334 | 1.06 | 7.469 | 638 | 82.64 | 355 | 57.68 |
| Total: | 2,532 | $405,436,188 | 100.00% | 7.694 | 612 | 81.07 | 355 | 54.85 |

DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620933

### Occupancy Status of the Group I Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied | 3,239 | $ 525,220,634 | 89.59% | 8.209% | 602 | 78.72% | 350 | 59.10% |
| Investor | 335 | 51,723,077 | 8.82 | 8.591 | 649 | 81.52 | 354 | 47.50 |
| 2nd Home | 44 | 9,305,436 | 1.59 | 8.503 | 627 | 79.36 | 353 | 34.55 |
| Total/Weighted Average: | 3,618 | $ 586,249,148 | 100.00% | 8.247% | 607 | 78.97% | 351 | 57.69% |

| Occupancy Status | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638365

### Occupancy Status of the Group I Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied | 3,628 | $ 630,190,865 | 93.05% | 8.569% | 619 | 80.72% | 355 | 56.90% |
| Investor | 247 | 43,162,888 | 6.37 | 8.932 | 635 | 78.51 | 355 | 64.63 |
| 2nd Home | 16 | 3,883,941 | 0.57 | 8.099 | 637 | 80.99 | 355 | 49.95 |
| Total/Weighted Average; | 3,891 | $ 677,237,695 | 100.00% | 8.590% | 620 | 80.58% | 355 | 57.36% |

DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141991

### Occupancy Status of the Group II Mortgage Loans

| Occupancy Status | Percentage of Pool by Principal Balance | Number of Mortgage Loans | Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Non-zero Weighted Average FICO | Average Remaining Principal Balance | Weighted Average Original LTV (%) | Weighted Average Combined LTV(%) | Lo Doc* (%) | Investor Properties (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 72.12% | 1,093 | $ 432,721,454.86 | 7.069% | 697 | $ 395,902.50 | 77.41% | 91.12% | 45.16% | 0.00% |
| Second Home | 9.32 | 169 | 55,935,071.19 | 7.554 | 720 | 330,976.75 | 77.23 | 91.44 | 64.74 | 0.00 |
| Investor | 18.56 | 489 | 111,382,021.75 | 7.652 | 722 | 227,775.10 | 77.81 | 89.95 | 45.44 | 100.00 |
| Total/Weighted Average: | 100.00% | 1,751 | $ 600,038,527.80 | 7.223% | 704 | $ 342,683.34 | 77.47% | 90.93% | 47.03% | 18.56% |

DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591378

### Occupancy Status of the Group I Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
|---|---|---|---|---|---|---|---|---|
| Owner-Occupied | 2,731 | $ 437,629,409 | 90.86% | 8.267% | 618 | 81.87% | 355 | 66.15% |
| Investor | 228 | 36,248,500 | 7.53 | 8.735 | 647 | 80.93 | 352 | 42.58 |
| 2nd Home | 42 | 7,796,118 | 1.62 | 8.680 | 621 | 85.50 | 351 | 35.77 |
| Total/Weighted Average: | 3,001 | $ 481,674,027 | 100.00% | 8.309% | 621 | 81.86% | 354 | 63.89% |

| Occupancy Status | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_4732621) at NOM-FHFA_04732674 | | | | | | | | |
| **Occupancy Status of the Group I Mortgage Loans** | | | | | | | | |
| Occupancy Status | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Weighted Average Mortgage Rate (%) | Nonzero Weighted Average FICO | Weighted Average Original LTV (%) | Weighted Average Stated Remaining Term (Months) | Full/Alt Doc (%) |
| Owner-Occupied.................. | 1,707 | $ 298,292,893 | 89.21% | 8.270% | 616 | 81.07% | 351 | 58.64% |
| Investor .......................... | 139 | 25,765,048 | 7.71 | 8.593 | 654 | 81.66 | 355 | 64.43 |
| 2nd Home ........................ | 50 | 10,328,643 | 3.09 | 8.306 | 663 | 85.83 | 355 | 35.79 |
| Total/Weighted Average: ....... | 1,896 | $ 334,386,584 | 100.00% | 8.296% | 621 | 81.27% | 352 | 58.38% |

564.    Regarding these collateral tables, the prospectus supplements for each

Securitization stated that "[t]he characteristics of the mortgage loans included in a trust fund will

not vary by more than five percent (by total principal balance as of the Cut-off Date) from the

characteristics of the mortgage loans that are described in the prospectus supplement."  (DX-1 at

NOM-FHFA_04811980; DX-2 at NOM-FHFA_04729666; DX-3 at NOM-FHFA_04621118;

DX-4 at NOM-FHFA_04638549; DX5 at NOM-FHFA_05142219; DX-6 atNOM-

FHFA_05591585; DX-7 at NOM-FHFA_04732872.)

**B.    The Owner Occupancy Data in the Prospectus Supplements Disclose the Percentage of Borrowers that Stated an Intention to Occupy a Property at the Time of Loan Origination**

565.    In the 2005 to 2007 time period, borrowers applying for a mortgage loan

typically stated in their loan applications whether they intended to occupy the property on which

they would be obtaining a mortgage.  (Forester Aff. at ¶ 140-141; Graham Aff. at ¶ 43; Lee Aff.

at ¶ 9; Spagna Aff. at ¶ 17.)  Applicants seeking a mortgage loan ordinarily were required to

execute a standard occupancy agreement at the time of loan origination.  (Forester Aff. at ¶ 142.)

This agreement, which was part of the loan file, typically stated that the borrower

-228-

██████████████████████████████████████████████████

██████████████████████████████████████ (*See e.g.* PX-R1462

(Occupancy Agreement for loan number NHELI_2007_3_2001856568) at NOM-BRI-

LF_00008402 (emphasis added); Forester Aff. at ¶ 142.)  The underwriting guidelines applicable

to the Sample Loans define an owner-occupied property based on the borrower's stated intention

to move into the property within a certain period of time after closing.  (Forester Aff. at ¶ 141;

*see e.g.* PX-R6684 (Aegis Undewriting Guidelines, dated June 14, 2005, JPMC-UWG-BEAR-

000005489) at JPMC-UWG-BEAR-000005506 ( defining occupancy as when (a) "Borrower(s)

declare(s) his/her/their intention to occupy the subject")).

566.    A borrower purchasing a home (as opposed to refinancing an existing

home) can only state an ***intention*** to occupy the subject property because when a mortgage loan

is extended to that borrower, the borrower (with rare exception) does not reside in the property at

that time.  (Forester Aff. at ¶ 141.)  Hunter agreed in his deposition that "in order to test whether

the borrower is misrepresenting" occupancy in a purchase mortgage, "one would have to inquire

about his or her intent" because a borrower taking out a purchase mortgage "hasn't yet taken

ownership of the house."  (Hunter Tr. at 289:17-290:2.)  Freddie Mac's PLS portfolio manager,

Michael Aneiro, concurred, testifying that owner occupancy for a purchase money loan must

mean "[t]here's an intent for the owner to occupy the premises."  (Aneiro Tr. at 305:13-307:1.)

567.    Because borrowers in the 2005 to 2007 time period needed to state only an

intention to occupy the subject property when applying for a mortgage loan, investors understood

owner occupancy data, such as the tables reproduced above, as representing the percentage of

borrowers that had stated an intention to occupy a home at the time of loan origination.  (Forester

Aff. at ¶ 88; Graham Aff. at ¶ 43; Lee Aff. at ¶ 9; Spagna Aff. at ¶ 18.)  Fannie Mae analyst Lin

-229-

Cao agreed that owner occupancy statistics "referred to the percentage of borrowers who stated that they intended to occupy the home."  (Cao Tr. at 644:12-645:6.)  Freddie Mac trader Perri Henderson testified that she could not "think of any other way, at that time, that you can verify" owner occupancy, other than the borrower's stated intent in the loan application.  (Henderson Tr. at 185:8-185:16.)  Plaintiff's due diligence expert, Leonard A. Blum, made the same point: when asked about "his understanding of what" the occupancy owner representations meant in the Offering Document for 2006-FM1, he testified that it meant "at the time of origination the borrower truthfully filled out a Form 1003, the application statement, [and] that [the] borrower intended to occupy that property for more than half of the time for the following 365 days . . . ." (Blum Tr. at 187:6-22.)

568.    A borrower may decide not to move into a home (or to stay for less than a year) for a variety of reasons, despite accurately stating an intention to occupy the home when applying for a mortgage loan.  A borrower's intention can change because of a job change, a divorce, the inability to sell his or her current residence, or for other reasons.  (Forester Aff. at ¶ 143; Spagna Aff. at ¶ 18.)

569.    Freddie Mac trader Michael Aneiro testified with regard to the intention of borrowers' intent to occupy a home, "I don't know what people are thinking or what they're doing," and he acknowledged that "people can change their mind[s]."  (Aneiro Tr. at 307:7-21.)

570.    The Offering Documents did not represent that borrowers were actually living in the subject properties, and interpreting the Offering Documents to say that would be illogical.  Moreover, it would be impractical for RMBS issuers to go door-to-door and check whether borrowers actually moved into (or remained in) the homes they said (a few months earlier, at the time of origination) they intended to occupy.  (Spagna Aff. at ¶ 19; Forester Aff. at

¶ 88; Graham Aff. at ¶ 43.)  If an RMBS issuer which did not originate the relevant mortgage

loans attempted to conduct such an investigation, that would also violate borrowers' privacy.

(Spagna Aff. at ¶ 19; Graham Aff. at ¶ 43.)

> ### 1.   The Owner Occupancy Data in the Prospectus Supplements Accurately Stated the Intentions of Borrowers.

571.    Underwriters review the documents in the loan file looking for

information that contradicts or casts doubt on the borrower's stated intention to occupy a

property.  (Forester Aff. at ¶ 140; Spagna Aff. at ¶¶ 18-19.)  Absent such "red flags," however,

there is no basis for an underwriter to conclude that a borrower is misrepresenting his or her

intention to occupy the subject property at the time of loan origination.  (Forester Aff. at ¶ 140;

Spagna Aff. at ¶¶ 18-19.)

572.    Nomura, through its due diligence process, reviewed loan files for "red

flags" indicating that a borrower may have misrepresented his or her intent to occupy the

property, and removed loans with such "red flags" before creating a securitization.  (Spagna Aff.

at ¶ 18.)  Such "red flags" include the fact that a mailing address for the borrower did not match

the address of the subject property, or that the subject property was far away from the borrower's

place of employment.  (Forester Aff. at ¶ 140; Spagna Aff. at ¶ 18.)  Vicki Beal, Clayton's Rule

30(b)(6) designee, testified that Clayton looked for "red flags" in the loan files it reviewed in due

diligence, such as "their pay stubs . . . being sent to another address," "the hazard insurance

policy [that] covered that property address show[ed] that it was a renter's policy, not a

homeowner's policy, those were some of the kinds of things we could look for."  (Vicki Beal

30(b)(6) Tr. at 263:12-25.)  Other "red flags" included the fact "that the [borrower] owned

another property . . . down the street from" the subject property.  (*Id.* at 264:2-13.)

573.     Defendants' expert, Michael Forester, in re-underwriting the Sample Loans, investigated whether the loan files contained "red flags" that a borrower's stated intention to occupy the subject property had been misrepresented.  (Forester Aff. at ¶ 140; Spagna Aff. at ¶ 19.)  Based on his review, Forester found no evidence that the underwriter of any of the Sample Loans had reason to believe that a borrower was misrepresenting his or her intention to occupy the subject property.  (Forester Aff. at ¶ 216.)

574.     It is uncontested that the owner occupancy data in the colalteral tables in the Offering Documents accurately reflected the data NHELI and NACC received from originators regarding what borrowers for loans backing the Securitizations stated on their loan applications about their intention to occupy the mortgaged properties.  (Lee Aff. at  ¶ 9.)  In fact, the accounting firm Deloitte Touche Tohmatsu, Ltd., as part of its data integrity review, confirmed that the owner occupancy data in the collateral tables matched the information in the loan files.  (Graham Aff. at ¶ 35; Lee Aff. at ¶ 22.)

### 2.     *Plaintiff Has Offered No Evidence That Borrowers Misrepresented Their Intent to Occupy the Subject Property*

575.     Plaintiff has presented no evidence that borrowers misrepresented their intention to occupy the subject property at the time of origination.  (Forester Aff. at ¶ 144; Hunter Tr. at 303:6-18.)  Plaintiff relies solely on its expert, Hunter, to argue that owner occupancy data was misrepresented in the Offering Documents.  Hunter claims that owner occupancy data for 41 of the 723 Sample Loans was misrepresented.  (Forester Aff. at ¶ 137.)  According to Hunter, this means 7.41% of the Sample Loans were inaccurately disclosed as owner occupied.  (Oct. 6 Hunter Report at 3.)  But Hunter's claim fails to address the owner occupancy disclosures in the Offering Documents, as those disclosures were understood in the mortgage industry, because he admits that he was "not investigating the intent" of the borrower.

(Hunter Tr. at 303:6-18.)  Hunter does not consider the intent of a borrower despite the fact that 20 of his 41 (or 48.8%) misrepresentation of occupancy claims relate to purchase money mortgages, where the buyer is not living in the subject property at the time of loan origination. (Forester Aff. at ¶ 141.)

### C.    Hunter's Method of Evaluating Whether Borrowers Actually Occupied the Subject Properties Is Unreliable

576.    Hunter tried to answer the wrong question:  he did not consider the intention of borrowers to occupy the subject property at the time of loan origination, but instead whether borrowers actually occupied the subject properties for 12 months after loan origination. (Forester Aff. at ¶ 143; Hunter Tr. at 303:6-12.)  Even then, his methods for answering that (wrong) question are faulty.

577.    31 of Hunter's owner occupancy findings were based on so-called "audit credit reports," which Hunter's team obtained for the purposes of this litigation.  (Forester Aff. at ¶ 147.)  Credit reports only list an address for the borrower if the address was used by the borrower on a credit application.  (Forester Aff. at ¶¶ 147-148.)  This is an unreliable way to judge a borrower's primary residence.  (Forester Aff. at ¶¶ 147-148.)  For example, a borrower may live in the subject property and never apply for credit using that address.  If that happens, the address of the subject property would never appear on the borrower's credit report.  (Forester Aff. at ¶ 149.)  A credit report may also list overlapping addresses for the borrower on the same date, which, under Hunter's theory, would indicate that the borrower is occupying the different properties at the same time.  (Forester Aff. at ¶ 150.)

578.    For example, when a loan[29] closed on ████████ the borrower stated

an intention to occupy the subject property, which he had just purchased, at ████████

████████.  (Forester Aff. at ¶ 150.)  Hunter alleges a misrepresentation of

occupy based on a credit report, which Hunter obtained several years after the loan was

originated (dated ████████), that lists another address, ████████

Arizona, as of ████████.  (Forester Aff. at ¶ 150.)  Hunter concludes, based on evidence in

the ██ credit report, that the borrower moved ████████ after the loan closed in ████.

This evidence, however, says nothing about whether the borrower intended to occupy the home

at the time the borrower applied for the loan.  In fact, the ████ credit report lists another address

as of ████████—████████, i.e., the address of subject property (Forester Aff.

at ¶ 150), so it actually supports the notion that the borrower was occupying the subject property

on that date.

579.    Hunter also alleges that a borrower misrepresented his intent to occupy the

subject property for a loan[30] that closed on ████████.  (Forester Aff. at ¶ 151.)  The

borrower took out a mortgage for a home at ████████.

(Forester Aff. at ¶ 151.)  Hunter found another address, ████████

████████, on a credit report as of ████████, and claimed this was evidence that the borrower

misrepresented his occupancy.  (Forester Aff. at ¶ 151.)  Again, Hunter's evidence does not show

anything about whether the borrower intended to occupy the subject property at the time of loan

---

[29]    Loan number NAA_2005_AR6_1002123505.

[30]    Loan number NAA_2005_AR6_1002008905.

origination.  This loan backed 2005-AR6, which had a Cut-Off Date of November 1, 2005. (DX-1 at NOM-FHFA_04811807.)  A credit report as of ███████ does does not establish whether the borrower occpuied the subject property as of the Cut-Off Date.  Further, the credit report on which Hunter relies lists ████████████████████ of the loan's closing—including ██████████████, the address of the subject property, as of █████. (Forester Aff. at ¶ 151.)  Moreover, under Hunter's logic, the presence of these ████████████ means that the borrower ████████████████. That is extremely unlikely, confirming the fact that addresses shown on a credit report are not reliable evidence of a borrower's occupancy. (Forester Aff. at ¶ 151.)

580.    Plaintiff's position is that the prospectus supplement represented actual occupancy as of certain "Cut-Off Dates."  Hunter relied exclusively on evidence purporting to show that a borrower moved after the relevant Cut-off Dates to support 17 of his allegations that borrower misrepresented her or his occupancy.  (Forester Aff. at ¶ 158.)  If these 17 allegations are excluded, Hunter is claiming that only 4.1% of the Sample Loans were incorrectly categorized as owner-occupied in the prospectus supplements as of the Cut-Off Dates.  (Forester Aff. at ¶ 158.)  Such a rate of error is within the 5% variance that the Offering Documents disclosed as permissible for the data contained in the collateral tables.

## VII.   THE STATEMENTS IN THE OFFERING DOCUMENTS ABOUT EXPECTED CREDIT RATINGS WERE NOT FALSE OR MISLEADING

### A.    Disclosures in the Offering Documents About Expected Credit Ratings

581.    Each of the Offering Documents disclosed that "[t]he Offered Certificates will not be offered unless they receive ratings at least as high" as the ratings listed below:

| Statements Regarding Ratings Below Which the Certificates Would Not Be Offered | | |
|---|---|---|
| Securitization | Tranche | Ratings at Issuance (Moody's/S&P/Fitch) |
| NAA 2005-AR6 | IIIA1 | Aaa/AAA/-- |
| NHELI 2006-FM1 | IA | Aaa/AAA/-- |
| NHELI 2006-FM2 | IA1 | Aaa/AAA/AAA |
| NHELI 2006-HE3 | IA1 | Aaa/AAA/AAA |
| NHELI 2007-1 | II-1A | Aaa/AAA/-- |
| NHELI 2007-2 | IA1 | Aaa/AAA/-- |
| NHELI 2007-3 | IA1 | Aaa/AAA/-- |

(DX-1 (2005-AR6 Prospectus Supplement, dated Nov. 29, 2005, NOM-FHFA_04811802) at NOM-FHFA_04811813; DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729486; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04620898; DX-4 (2006-FM2 Prospectus Supplement, dated Oct. 30, 2006, NOM-FHFA_04638315) at NOM-FHFA_04638329; DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05141936; DX-6 (2007-2 Prospectus Supplement, dated Jan. 30, 2007, NOM-FHFA_05591325) at NOM-FHFA_05591341; DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_04732621) at NOM-FHFA_04732637.)

  582. Each of the Offering Documents disclosed that "[a] rating is not a recommendation to buy, sell or hold securities and each rating agency can revise or withdraw such ratings at any time." (DX-1 at NOM-FHFA_04811813; DX-2 at NOM-FHFA_04729486; DX-3 at NOM-FHFA_04620898; DX-4 at NOM-FHFA_04638329; DX-5 at NOM-FHFA_05141936; DX-6 at NOM-FHFA_05591341; DX-7 at NOM-FHFA_04732637.)

  583. Four of the Offering Documents stated that the "historical data supporting" the ratings agency's original opinion of value "may not accurately predict the [actual] delinquency, foreclosure or loss experience of any particular pool of loans. Properties

may not retain their values.  If residential real estate markets experience an overall decline in property values . . . the rates of delinquencies, foreclosures, and losses could be higher than those now generally experienced in the mortgage lending industry."  (DX-2 (2006-FM1 Prospectus Supplement, dated Jan. 27, 2006, NOM-FHFA_04729474) at NOM-FHFA_04729653-9654; DX-3 (2006-HE3 Prospectus Supplement, dated Aug. 29, 2006, NOM-FHFA_04620885) at NOM-FHFA_04621101; DX-5 (2007-1 Prospectus Supplement, dated Jan. 29, 2007, NOM-FHFA_05141912) at NOM-FHFA_05142200-2201; DX-7 (2007-3 Prospectus Supplement, dated April 27, 2007, NOM-FHFA_04732621) at NOM-FHFA_04732854-2855.)

584.    The Offering Documents further stated that "[a]ny reduction in, or suspension or withdrawal of, the rating assigned to a class of Offered Certificates would likely reduce the market value of such class of Offered Certificates and may affect your ability to sell them."  (DX-1 at NOM-FHFA_04811825; DX-2 at NOM-FHFA_04729501; DX-3 at NOM-FHFA_04620917-0918; DX-4 at NOM-FHFA_04638348-8349; DX-5 at NOM-FHFA_05141963; DX-6 at NOM-FHFA_05591358; DX-7 at NOM-FHFA_04732655-2656.)

**B.**    **Plaintiff Does Not Present Any Evidence That the Expected Credit Ratings Disclosed in the Offering Documents Were False or Misleading**

*1.*    *The Disclosures About Credit Ratings Were Not False or Misleading*

585.    After loans were selected for a securitization and the "tranches" of the securitizations were structured, Nomura submitted loan tapes to the ratings agencies describing the collateral characteristics for the underlying loans.  (Lee Aff. at ¶ 34.)

586.    There were four credit rating agencies to which Nomura generally submitted its loan tapes during the 2005 to 2007 time period:  (i) S&P, (ii) Moody's, (iii) Fitch, and (iv) DBRS.  (Lee Aff. at ¶ 33.)

587.    The rating agencies analyzed the loan pool and proposed tranches, and reported the grades each tranche would receive based on the underlying loans and on the amount of credit enhancement that was needed to achieve certain grades for particular tranches.  (Lee Aff. at ¶ 35.)

588.    Credit enhancement included the amount of subordination each tranche received.  *See* ¶¶ 632-637, *infra*.  Nomura then modified the structure of each of the Securitizations, if necessary, to ensure the credit rating agencies' highest ratings ("AAA") for the senior tranches.  (Lee Aff. at  ¶ 36.)  Each of the tranches Freddie Mac and Fannie Mae purchased that at issue in this Action were AAA rated senior tranches.  *See supra* ¶¶ 37, 54, 71, 88, 104, 119, 136.

589.    Credit ratings are statements of opinions made by credit rating agencies. (*See* Riddiough Aff. at ¶¶ 84, 86; Chatterjee Tr. at 406:20-25.)  Credit rating agencies applied their experience and judgment in reaching opinions about what credit ratings were appropriate for particular tranches of the Securitizations, which is an inherently subjective exercise. (Riddiough Aff. at  ¶ 84.)  Plaintiff does not present any evidence that the credit rating agencies did not believe any of the credit ratings they gave to the Certificates purchased by Freddie Mac and Fannie Mae.

590.    Plaintiff alleges that the loan tapes Nomura provided to the credit rating agencies contained inaccurate information about, *inter alia*, LTV ratios, DTI ratios and owner occupancy status for loans underlying the Securitizations, and, as a result, the credit ratings disclosed in the Offering Documents were misstated.

591.    Plaintiff presents no evidence that the credit ratings assigned to the Certificates would have been different had the credit rating agencies known of the information

plaintiff claims was incorrect on the loan tapes.  No witness from any of the credit rating agencies testified that the credit ratings they assigned to the Certificates would have changed had they known of the supposedly incorrect information on the loan tapes.  Plaintiff also did not use credit rating agency models, which are publicly available, in an effort to show the allegedly incorrect information on the loan tapes would have affected the analysis performed by the credit rating agencies.  (Mandhavian Tr. 42:20-24; Chatterjee Tr. at 74:4-7.)

### 2. *Riddiough's Analysis Shows that the Alleged Misstatements Would Not Have Changed the Ratings of the Certificates*

592.    Plaintiff presents the testimony of G. William Schwert who performed a regression analysis and estimated a general relationship between what he calls "AAA subordination levels"—the percentage of the deal composed of the non-AAA certificates—and aggregate loan characteristics (of the deal or the pool).  (Riddiough Aff. at ¶ 80.)  Schwert claims to show "a significant relation between AAA subordination levels and reported characteristics of the underlying collateral, including LTV ratios and occupancy status" in securitizations purchased by Freddie Mac and Fannie Mae (which he calls the "GSE certificates").  Then, based on his findings, he concludes that the Certificates purchased by Freddie Mac and Fannie Mae could have been issued with AAA ratings, if at all, only if the subordination levels had been higher than the subordination levels at which the GSE certificates were in fact issued. (Riddiough Aff. at ¶ 81.)

593.    Schwert never opines that any of the misstatements about LTV ratios or owner occupancy information that plaintiff alleges would have had an effect on any of the credit rating agency's opinions about the Securitizations.  (Riddiough Aff. at ¶ 83.)

594.    Defendants' expert, Timothy Riddiough, conducted an assessment of Schwert's analysis, in which he determined that Schwert's regression analyses fails to support

-239-

Schwert's assertion that, assuming plaintiff's claims are correct, the Certificates would have received AAA ratings only if the subordination levels had been higher than the subordination levels at which the Certificates were in fact issued.  (Riddiough Aff. at ¶ 82.)

595.    As Riddiough testifies, Schwert's analysis does not identify the AAA/AA threshold or margin, nor does his analysis show that any of the Certificates were issued near a threshold or margin between one credit rating and the next.  (Riddiough Aff. at ¶ 82.)  Instead, Schwert merely assumes that any reduction in the subordination level, however trivial, would have changed the Certificates' credit ratings, implicitly claiming that the subordination levels of the Certificates were precisely at the margin of the AAA/AA rating.  (Riddiough Aff. at ¶ 82.) There is substantial evidence that the relevant credit ratings were not set right at the AAA/AA subordination margin, but rather were set higher than the margin.  (Riddiough Aff. at ¶ 83.) Schwert makes no effort to address this evidence or support his implicit claim that credit ratings were set right at the AAA/AA subordination margin.  (Riddiough Aff. at ¶ 85.)

596.    Further, the rating of structured finance transactions similar to the Certificates is a complex process that relies on independent qualitative judgment, not just quantitative models, which Schwert fails to consider.  For example, Debashish Chatterjee of Moody's (which provided credit ratings for all seven of the Certificates), testified that the credit rating and the credit enhancement level was dependent upon the parties involved in the transaction:  "[Moody's Analysts] would look at who the originator was; and if the Analyst or the committee felt that there were any . . . adjustments that needed to be made . . . to the enhancement levels, then the committee would do so."  (Chatterjee Tr. at 68:15-21.)  In fact, Moody's did not determine the "AAA loss number" (or the projected loss level at which the AAA tranche would be affected) based on a loan-by-loan quantitative model; instead, Moody's

relied principally on a method called comparative benchmarking, as Chatterjee's testimony confirms.  Chatterjee testified that the base AAA loss numbers are "derived through benchmarking, not through the output of the loan-by-loan model."  (Chatterjee Tr. at 193:7-10.)

597.    Using regression analysis, Schwert models the relationship between subordination level and certain credit factors, which include LTV ratios and owner occupancy information.  Using this regression analysis, Schwert purports to find a statistically significant relationship between occupancy status and subordination levels in his pool-level regression but not in his deal level regression.  (Riddiough Aff. at ¶ 88.)  The economic impact of this variable on subordination is, at best, marginal.  In fact, Schwert's own report supports the finding that the impact of occupancy status on subordination levels is very small:

> coefficient of 0.014 in the pool-level regression indicates that a 10 percent increase in the not owner-occupied percentage of the primary supporting loan group (from, say 30 percent to 40 percent) would be associated with a 0.14 percent increase in the AAA subordination level (from, say, 20 percent to 20.14 percent), on average. The coefficient of 0.016 in the deal-level regression indicates that a 10 percent increase in the not owner-occupied percentage of the supporting loan groups (from, say 30 percent to 40 percent) would be associated with a 0.16 percent increase in the AAA subordination level (from, say, 20 percent to 20.16 percent), all else equal.

(Riddiough Aff. at ¶ 88 (citing Schwert Report at ¶ 24).)

598.    As Riddiough testifies, using Schwert's pool-level example, a 10 point increase in the percentage of non-owner occupied properties would increase AAA subordination by a very small amount.  (Riddiough Aff. at ¶ 89.)  So, while Schwert's pool-level results show a statistically significant relationship between subordination levels and owner occupancy, the economic magnitude of the impact is marginal at best.  (Riddiough Aff. at ¶ 89.)

599.    To determine more broadly the economic importance of LTV ratios and occupancy status on AAA subordination levels relative to the numerous other explanatory variables in Schwert's regression model, Riddiough rank ordered the relative impact of each explanatory variable, and found that neither LTV ratios nor occupancy status is the most important explanatory variable.  (Riddiough Aff. at ¶ 90.)

600.    In particular, out of 20 explanatory variables in Schwert's deal-level linear model, Riddiough found that LTV ratios have the fourth highest economic impact on subordination levels, but occupancy status ranks 17th out of his 20 explanatory variables. (Riddiough Aff. at ¶ 90.)  Similarly, Riddiough found that in Schwert's pool-level linear model, LTV ratios and occupancy status rank seventh and 15th, respectively.  (Riddiough Aff. at ¶ 90.) Riddiough's findings on occupancy status are consistent with the de minimis impact as described above by Schwert.

601.    Riddiough further investigated whether LTV ratios and occupancy status, collectively, have any meaningful impact on AAA subordination levels.  To analyze this, he used Schwert's regression model to compare the actual AAA subordination levels of the Certificates and pools and the AAA subordination levels predicted by his model conditional on the purportedly "true" measures of LTV ratios and occupancy status as found by plaintiff's experts Hunter and Kilpatrick, and as extrapolated by Cowan.  (Riddiough Aff. at ¶ 93.)

602.    Riddiough's analysis shows that Schwert's methods, analyses, and arguments are speculative and do not support a conclusion that the securities would not have received AAA ratings.  (Riddiough Aff. at ¶ 98.)  Even if one were to accept Schwert's regression models as properly specified and his results as correct, then, according to his models, there is no statistical basis to claim that the deals and pools would have had different

subordination levels (much less that the Certificates would have had different credit ratings) if the purported true loan characteristics had been reported.

## VIII.   COWAN IMPROPERLY EXTRAPOLATES THE SAMPLE LOANS TO THE SUPPORTING LOAN GROUPS

603.   Cowan improperly extrapolates the sample loans to the supporting loan groups for the Securitizations.  The Securitizations were backed, in the aggregate, by 15,806 loans.  (Mishol Aff. at ¶ 19.)  Plaintiff presents analyses from Hunter and Kilpatrick on a sample of loans in the supporting loan groups to support its allegations that there were misrepresentations in the Offering Documents.  Hunter re-underwrote 723 Sample Loans, or 4.6% of the total loans backing the Securitizations.  Kilpatrick used his Greenfield AVM to generate values for 672 Sample Loans, or 4.3% of the total loans, and his "Credibility Assessment Model" to analyze 199 Sample Loans, or 1.3% of the total loans.

604.   Plaintiff's expert, Charles Cowan, purports to extrapolate Hunter's and Kilpatrick's sample-level results to the entire population of loans in the supporting loan groups to a 95% confidence level.  Based on Hunter's results, Cowan estimates that 68.56% of the total population of loans backing the Securitizations were "materially defective."  (October 7, 2014 Cowan Report at 5-6.)  Cowan also estimates that 65.42% of loans failed to conform to the originators' underwriting guidelines, and that the collateral tables misstated owner occupancy status for 7.19% of the loans.  (October 7, 2014 Cowan Report at 8.)

605.   Based on Kilpatrick's Greenfield AVM results, Cowan estimates that the average inflation rate for appraisals—that is, the average percentage by which each appraisal was allegedly overstated—in the total population was 11.1%.  (October 7, 2014 Cowan Report at 14.)  He further asserts that 6 percent of LTV ratios for the total population of loans were understated to a statistically significant degree.  (October 7, 2014 Cowan Report at 14.)  Finally, Cowan

extrapolates Kilpatrick's "Credibility Assessment Model" results to claim that 92.18% of loans in the supporting loan groups with "inflated" appraisal values (as defined by Kilpatrick) were not credible.  (October 7, 2014 Cowan Report at 18.)

### A.    Cowan's Non-Random Samples Undermine His Extrapolations

606.    Cowan's extrapolations contain serious methodological problems that render them unreliable.  In order to perform an accurate extrapolation using Cowan's approach, the final sample must be randomly selected.  (Barnett Aff. at ¶ 29.)  Cowan supposedly drew an initial random sample of 100 loans per Securitization, but many of the final samples he ultimately extrapolated, as explained below, were not random.  (Barnett Aff. at ¶ 29.)

### 1.    *Cowan's Use of Non-Random Samples Undermines His Extrapolation of Hunter's Results*

607.    For five of the supporting loan groups, the final samples that Hunter re-underwrote were not randomly selected, and Cowan did not test them for representativeness. (Barnett Aff. at ¶¶ 28, 30.)  Hunter claimed not to be able to re-underwrite many loans in the original samples because they lacked adequate documentation.  Overall, he failed to re-underwrite 61 loans (8.7 percent) of Cowan's initial sample of 700 loans.  (Barnett Aff. at ¶ 30.) The 61 loans were distributed across five of the supporting loan groups, with the exception of NHELI 2006-FM1 and NHELI 2006-FM2.  (Barnett Aff. at ¶ 30.)

608.    Fifty-three of the loans Hunter failed to re-underwrite in the initial samples were concentrated in the supporting loan group for NAAC 2005-AR6.  (Barnett Aff. at ¶ 30.)  Thus, although five of the samples are non-random, the problem is most acute with respect to this Securitization.  Cowan supplemented the original 100-loan sample for NAAC 2005-AR6 with 96 new loans, selected using the same methodology used to select the original

samples.  (Barnett Aff. at ¶ 20, 33.)  Hunter ultimately failed to re-underwrite 65 of the 196 loans in the combined initial and supplemental samples for this loan group.  (Barnett Aff. at ¶ 31.)

609.    If the loans rejected by Hunter share a common characteristic, that characteristic will likely be underrepresented in the final sample.  (Barnett Aff. at ¶ 33.)  For example, suppose that a large number of loans secured by properties in New York are among the excluded loans.  Because the supplementary sample was chosen in the same fashion as the original, it would likely reflect a similar deficit.  Consequently, replacing absent loans secured by New York properties with new loans randomly selected might effectively substitute loans secured by properties in California or Florida.  The final sample will then suffer from a geographic bias, even though both the initial sample and the supplemental sample were randomly selected.  (Barnett Aff. at ¶ 33.)

610.    Furthermore, Cowan's extrapolations potentially suffer from a selection bias if the loans Hunter actually re-underwrote differ in salient respects from loans comprising the broader population.  (Barnett Aff. at ¶ 34.)  For example, if loans that prepaid due to refinancing are less likely to have complete loan files because they have been closed for a comparatively longer period of time than other loans, they likely would be underrepresented in the final sample Hunter re-underwrote.  If prepaid loans are also less likely to be found defective, Cowan's extrapolated rate of substantially defective loans for that supporting loan group would be overstated.  (Barnett Aff. at ¶ 34.)  Cowan fails to account for, or even acknowledge, this problem.

611.    Because plaintiff has failed to demonstrate that the final samples actually re-underwritten by Hunter were representative of the general populations of loans underlying the supporting loan groups, it cannot prove that its extrapolation results are reliable.

2. ***Cowan's Use of Non-Random Samples Undermines His Extrapolation of Kilpatrick's Results***

612.    The final loan samples that Kilpatrick analyzed using his Greenfield AVM were non-random.  (Barnett Aff. at ¶ 36.)  In total, Kilpatrick failed to provide Greenfield AVM value estimates for 110 (15.7 percent) of the 700 loans included in the original samples Cowan drew.  (Barnett Aff. at ¶ 36.)  This problem is a particularly serious concern for four of the seven supporting loan groups (NAAC 2005-AR6, NHELI 2006-HE3, NHELI 2007-2, and NHELI 2007-3).  Kilpatrick provided Greenfield AVM value estimates for 90 or fewer sample loans in each of these four supporting loan groups.  (Barnett Aff. at ¶ 37.)

613.    Because Cowan fails to demonstrate that the final samples analyzed by Kilpatrick were representative, his extrapolations of Kilpatrick's results to the general population of loans underlying the Securitizations are not reliable.  (Barnett Aff. at ¶ 38.)

**B.    Cowan's Extrapolations Suffer From Additional Errors**

1. ***Cowan's Extrapolation of Hunter's Results Suffers from Other Methodological Errors***

614.    Cowan's samples are too small to reliably extrapolate defect rates at the originator level for the five securitizations in which multiple originators were disclosed in the prospectus supplements.  (Barnett Aff. at ¶ 39.)  A related problem with Cowan's methodology stems from the fact that Hunter only evaluated guidelines compliance with respect to originators disclosed in the Offering Documents.  Cowan, however, extrapolates Hunter's defect rates to the entire population, without regard to the distinction between disclosed and undisclosed originators.  (Barnett Aff. at ¶ 66-67.)

615.    Cowan also errs in extrapolating Hunter's dollar-weighted rate of materially defective loans (the ratio of the dollar value of defective loans to the dollar value of all loans, as measured by the loans' original principal balances).  (Barnett Aff. at ¶¶ 22, 68.)  To

perform this extrapolation, Cowan uses a binominal distribution method, which is not appropriate in this context.  The binomial method weights all loans equally, but dollar-weighted estimates, by definition, weight larger loans more heavily than smaller ones.  (Barnett Aff. at ¶ 69.)  Consequently, Cowan's margins of error, 95 percent lower bounds, and 95 percent upper bounds for this extrapolation are incorrect.  (Barnett Aff. at ¶ 69.)

### 2. Cowan's Extrapolation of Kilpatrick's Results Suffers from Other Methodological Errors

616.    Cowan performs a Monte Carlo simulation to extrapolate Kilpatrick's results.  (Barnett Aff. at ¶ 41.)  Cowan relies on the results produced by the Monte Carlo simulation to offer two opinions.  First, he estimates the average appraisal inflation rate per supporting loan group.  Second, he recalculates the LTV ratio for each loan and estimates the percentage of loans that fall into each LTV ratio range.  (Barnett Aff. at ¶ 42.)

617.    Cowan errs in calculating average inflation rates.  Kilpatrick defines an "inflated" (or undervalued) appraisal as one whose value is more than one standard deviation above (or below) the corresponding estimated value generated by the Greenfield AVM.  (Kilpatrick Accuracy Report at 62 n.161.)  To calculate average inflation, however, Cowan relies exclusively on the simulated values produced by his Monte Carlo simulation—even when the original appraisal was within one standard deviation of the estimated value generated by the Greenfield AVM.  (Barnett Aff. at ¶ 44.)  Had Cowan adhered to Kilpatrick's definition of an inflated appraisal, he would have used an inflation rate of zero for all loans that did not satisfy Kilpatrick's definition.  (Barnett Aff. at ¶ 44.)   Cowan's use of simulated values exclusively results in overstated appraisal inflation rates for every single Securitization, as demonstrated in the table below.  (Barnett Aff. at ¶ 45, DX-2825.)  "Cowan Corrected" reflects a recalculation of Cowan's rates using Kilpatrick's definition of an inflated appraisal.

Recalculated "Average Inflation Rates" Using Dr.
Cowan's Methodology and Dr. Kilpatrick's Definition

| Securitization | Cowan Reported [A] | Cowan Corrected [B] |
|---|---|---|
| NAA 2005-AR6 | 6.0% | 5.6% |
| NHELI 2006-FM1 | 6.6% | 5.0% |
| NHELI 2006-FM2 | 14.9% | 13.9% |
| NHELI 2006-HE3 | 12.0% | 10.9% |
| NHELI 2007-1 | 5.1% | 3.4% |
| NHELI 2007-2 | 12.6% | 11.7% |
| NHELI 2007-3 | 7.8% | 6.0% |
| **Aggregate** | **11.1%** | **9.9%** |

(DX-2825.)

618.     This error also affects Cowan's LTV ratio recalculations.  In determining the "value" element of the LTV ratio, Cowan should have used the original appraisal values for all loans that did not qualify as inflated under Kilpatrick's definition.  (DX-2827.)

619.     Cowan's LTV ratio extrapolations suffer from several additional shortcomings.  First, even if one treats estimates of value generated by the Greenfield AVM as correct on average, imprecision in the model's outputs generates a systematic upward bias in Cowan's results.  (Barnett Aff. at ¶ 48.)  The estimated value generated by the Greenfield AVM for any particular property is just as likely to be too low by a particular amount as it is to be too high by that same amount.  In the context of LTV ratio calculations, these errors are not offsetting.  Instead, the low-side estimate of value from the Greenfield AVM has a disproportionately greater effect on the recalculated LTV ratio than does a high-side AVM estimate of value.  (Barnett Aff. at ¶ 48.)  To illustrate this effect, suppose that Cowan is dividing a loan amount of 12 by X, and further assume that the "true" value of X is 6.  Suppose further

that an estimate of X is equally likely to be three different values that average out to 6:  4, 6 and 8.  The average of the 12/X ratios assuming those three possible values for X—((12/4 = 3); (12/6 = 2); (12/8 = 1.5))—is 2.17 (*i.e.*, (3 + 2 + 1.5)/3 = 2.17).  That result is 8.5 percent higher than the true ratio (12/6 = 2).  (Barnett Aff. at ¶ 49.)

620.    Second, Cowan's Monte Carlo simulation compounds this bias by selecting random values within the Greenfield AVM's probability distribution to account for natural variability in the Greenfield AVM's point estimates.  (Barnett Aff. at ¶ 50.)  Fifty percent of the time the simulation selects an estimated value that is lower than the Greenfield AVM's point estimate, and 50 percent of the time it selects a value higher than the point estimate.  Because low-end Greenfield AVM value estimates have a greater effect on LTV ratios than high-end ones do (as explained in the prior paragraph), the average LTV ratio calculated on the basis of the simulated Greenfield AVM values exceeds the LTV ratio that would be obtained using Greenfield AVM point estimates exclusively.  (Barnett Aff. at ¶ 50.)

621.    Third, Cowan recalculates the LTV ratio for each loan using the original principal balance divided by the minimum of the original appraisal value, the actual sales price, or the simulated Greenfield AVM point estimate.  (Barnett Aff. at ¶ 51.)  This asymmetric procedure produces higher LTV ratios than would a methodology that consistently used the simulated Greenfield AVM point estimate as the denominator.  It is impossible under Cowan's method to conclude that even a single loan-tape LTV ratio was overstated, even if the Greenfield AVM valuation strongly implies that it was.  (Barnett Aff. at ¶ 51.)

622.    Finally, Cowan departs from his 95% confidence level in recalculating the percentage of loans that fall into each LTV ratio range (for example, the percentage of loans with LTV ratios between 80 and 85, or over 100).  (Barnett Aff. at ¶¶ 53, 56.)

-249-

623.    Cowan concludes, to a 95 percent confidence level, that the LTV ratios listed on the pre-closing loan tapes for the Securitizations were understated for 40 of the 672 Sample Loans (approximately 6%).  (Barnett Aff. at ¶ 54.)  For the remaining 632 loans, Cowan reports that there is no detectible difference between the recalculated LTV ratio and the  LTV ratio listed on the pre-closing loan tape.  (Barnett Aff. at ¶¶ 54.)  Further, given that Cowan relies on a 95% confidence level, it can be inferred that roughly 2.5% of the loans that qualify as having understated LTV ratios do so as a result of chance alone.  Cowan's rate of LTV ratio understatement is therefore actually closer to 3.5%.  (Barnett Aff. at ¶ 55.)

624.    Cowan ignores his own results when recalculating LTV ratio ranges.  He calculates the percentages of loans that fall into each LTV ratio range using simulated LTV ratios for all loans—even those that he concluded did not have LTV ratios that were understated to a statistically significant degree.  (Barnett Aff. at ¶ 56.)  Cowan should have used the pre-closing loan tape LTV ratios for all loans other than the 40 he identified as having understated LTV ratios.

625.    In the table below, the column labeled "Cowan Reported" shows Cowan's extrapolated numbers.  The column labeled "Cowan at 95% Confidence Level" shows the extrapolated numbers if one uses simulated values only for the 40 loans that Cowan concludes have LTV ratios that are understated to a statistically significant degree, and loan-tape LTV ratios for all others.  (Barnett Aff. at ¶ 56, DX-2828.)

Recalculated LTV Ranges Using Cowan's 95% Confidence Level

| LTV Ranges | Population Loan Tape LTV Ratios | AVM Sample Loan Tape LTV Ratios | AVM Simulated LTV Ratios | | |
| --- | --- | --- | --- | --- | --- |
| | | | Cowan Reported [A] | Cowan at 95% Confidence Level [B] | Difference [A]-[B] |
| Less than 75 | 32.7% | 33.8% | 22.0% | 32.3% | -10.3% |
| Between 75 and 80 | 37.8% | 44.8% | 6.0% | 42.7% | -36.8% |
| Between 80 and 85 | 8.3% | 6.0% | 23.4% | 5.5% | 17.9% |
| Between 85 and 90 | 13.7% | 9.2% | 13.7% | 8.8% | 4.9% |
| Between 90 and 95 | 4.0% | 2.5% | 8.3% | 2.1% | 6.3% |
| Between 95 and 100 | 3.5% | 3.7% | 7.1% | 3.1% | 4.0% |
| Greater than 100 | 0.0% | 0.0% | 19.5% | 5.5% | 14.0% |

(DX-2828.)

### C.   Kilpatrick's Credibility Results Cannot Be Extrapolated to the Supporting Loan Groups

626.   Kilpatrick only used his "Credibility Assessment Model" to assess the credibility of appraisals that his Greenfield AVM determined had "inflated" appraisals, as defined above.  Kilpatrick concludes that approximately 92 percent of "inflated" appraisals were non-credible.  (Barnett Aff. at ¶ 58.)  Because Kilpatrick ran his "Credibility Assessment Model" on only that subset of the Sample Loans he found to have inflated appraisals, he ultimately did not provide credibility assessments for 73.3 percent of the Sample Loans.  (Barnett Aff. at ¶ 59.)

## IX.   THE ALLEGED MISREPRESENTATIONS IN THE OFFERING DOCUMENTS WERE NOT MATERIAL

### A.   Investors in PLS During the 2005-2007 Period Were Sophisticated.

627.   From 2005 to 2007, investors in PLS were sophisticated institutional investors.  Typical RMBS investors during this time included banks, insurance companies, mutual funds, pension funds, Freddie Mac and Fannie Mae, and hedge funds.  Indeed, only institutions that possessed the capital to purchase these securities and the infrastructure necessary to evaluate the complex structure, risks and potential returns of PLS were equipped to invest in

such securitizations.  (Richard Aff. at ¶ 25.)  Moreover, offering documents for PLS often made the complexity of the products clear by stating that the securities were appropriate only for "sophisticated investors."  (Richard Aff. at ¶ 25.)

628.    It was common for PLS investors to perform pre-purchase analysis using sophisticated models to analyze factors such as the effect of housing prices and interest rates on potential returns from a securitization, and the amount of credit enhancement needed to protect their investment in a securitization from incurring losses.  (Richard Aff. at ¶¶ 38, 40.)  It was also common for PLS investors to perform due diligence on the underwriting practices and procedures of the originators that made the loans that would be in the supporting loan group for a particular securitization.  (Richard Aff. at ¶ 80.)  Moreover, PLS investors did not consider collateral characteristics in isoloation, but considered a variety of factors when purchasing PLS, including documentation, loan product type, asset type, geography, FICO scores, originator identity, and first lien/second lien statistics.  (Richard Aff. ¶ 60.)

**B.      PLS Investors Did Not Consider Loan-Level Information to Be Material**

*1.      PLS Investors Did Not Generally Possess Loan-Level Information*

629.    PLS investors from 2005 to 2007 did not generally possess loan-level information about the loans in the securitizations they purchased.  Rather, PLS investors generally received only aggregated data about the pool of loans that served as collateral for the securitization.  (Richard Aff. at ¶ 65.)

630.    It would not, therefore, have been material to PLS investors in 2005 to 2007 that an individual loan contained certain underwriting defects, that an individual borrower did not follow through on a stated intention to occupy the subject property, or that a retrospective AVM's estimate of value differed from the opinion of value in an appraisal obtained at loan

origination.  That sort of loan-level information was not generally made available to PLS

investors.  Moreover, there is no evidence at all that any particular characteristic of a loan

backing a Securitization would have had any effect on the total mix of information about an

overall security.  (Richard Aff. at ¶ 90-91.)  Indeed, none of plaintiff's experts even undertook an

analysis to show that any loan-level characteristic was material—*i.e.*, would have significantly

impacted expected returns and losses—on the certificate level.  (*Id.*)

### 2.    *Many PLS Investors Obtained Credit Enhancement*

631.    PLS investors in 2005 to 2007 also would not have been concerned with

loan-level issues because those investors generally obtained credit enhancement, such as

subordination, overcollateralization, and excess spread (and in some instances, credit wrap

guarantees), that protected them from losses resulting from poor performance of certain loans in

the supporting loan group.  (Richard Aff. at ¶ 41; Cao Tr. 87:23-88:15; Gussman Tr. at 126:3-

127:5.)

632.    One common form of credit enhancement was increased subordination.

(Richard Aff. at ¶ 42.)  In PLS with a senior/subordinate structure, investors in the senior

tranches generally had a priority claim on principal and interest paid by borrowers on the

mortgage loans underlying the securitization.  (*Id.*)  Thus, losses suffered by the underlying

collateral are allocated initially to the junior-most tranches before the investors in the senior

tranches suffer any losses.  (*Id.*)  PLS investors often purchased senior tranches of securitizations

and obtained increased subordination in order to insulate them from losses resulting from poor

loan performance.  (Richard Aff. at ¶ 41.)  Because subbordination relies on the performance of

junior tranches to protect more senior tranches from sustaining losses, PLS investors considered

information about all loans backing a securitization, not just the loans in the tranche they

purchased.  (Richard ¶ 46.)  Such a securitization-wide analysis was also appropraite where a

PLS investor purchased a tranche that benefitted from cross-collateralization.  (*Id.*)

633.    Freddie Mac and Fannie Mae, like other PLS investors, relied heavily on

credit enhancement to protect them from losses resulting from poor performance of the loans

underlying the PLS they purchased.  Indeed, Freddie Mac and Fannie Mae relied on credit

enhancement, such as subordination, to mitigate the risks they perceived in buying PLS that were

backed by subprime and Alt-A loans.  As Fannie Mae's 30(b)(6) witness, David Cook testified:

> Fannie Mae was an investor in AAA PLS, backed by subprime
> collateral, and, generally, the view at Fannie Mae was that
> subprime borrowers were more likely to default than prime
> borrowers but that the PLS structure, including senior subordinated
> tranches and other credit enhancements for the PLS, meant that a
> AAA security had AAA credit to the investor."

(Cook Tr. at 347:21-348:4.)  Cook acknowledged that without credit enhancement, certain of

Fannie Mae's purchases of PLS backed by subprime loans would "have had a higher degree of

risk than Fannie Mae's requirements called for."  (Cook Tr. at 380:3-7.)

634.    Freddie Mac's 30(b)(6) witness, Donna Corley, testified that Freddie Mac

relied on credit enhancement to manage the risk of buying PLS backed by riskier mortgage

loans:

> Q.  So, for PLS, you're more comfortable buying loans that you
> otherwise wouldn't have purchased in the single-family business
> because you had credit enhancements, right?
>
> A.  Correct.

(Corley Tr. at 395:7-13.)

635.    Unlike when Freddie Mac and Fannie Mae purchased loans directly

through their guarantee business, the credit enhancement they received on PLS reduced Freddie

Mac's and Fannie Mae's sensitivity to loan-level underwriting defects.  As Gary Kain, Senior

Vice President in charge of Freddie Mac's mortgage portfolio during the 2005 to 2007 time

period, testified:

> Q.  Yeah.  So just to be clear on that point, so if there's a
> defectively [underwritten] loan that's sold into the guarantee
> business, Freddie was in first-loss position, correct?
>
> A.  Generally, yes.
>
> Q.  And in the PLS side, if there was a defectively underwritten
> loan that was collateral for PLS, Freddie Mac was protected by the
> credit enhancement in the deal?
>
> A.  Freddie Mac would not take—would not necessarily take—
> would not likely take a loss if there was a—you know, one
> defective loan.
>
> Q.  And—and there could be more than one defective loan up to a
> certain point where Freddie Mac wouldn't be exposed to a loss
> position—any loss position in the PLS because of the credit
> enhancement?
>
> A.  The credit enhancement would absorb a fair amount of losses
> before, you know, you would take a loss.

(Kain Tr. at 478:20-479:19.)  Kain explained that this credit enhancement "was a key component

of our comfort, you know, with the sizes that we were doing."  (Kain Tr. at 620:22-621:5; *see*

*also* Norris Tr. at 654:20-655:11 ("Q.  Referring back again to the amount of credit enhancement

associated with the residential mortgage-backed securities you were purchasing, did that credit

enhancement significantly contribute to the comfort level you felt in purchasing the securities?

A.  Oftentimes it did in that we could add extra credit enhancement to the securities that we

purchased and often tried to do so, and so that gave me greater comfort.  Q.  Was that a principal

reason why you were comfortable in purchasing those securities?  A.  That's correct.").)

> 636.    Freddie Mac understood that defaults on subprime and Alt-A loans would

be higher than on less risky prime loans, but believed that credit enhancement would protect

Freddie Mac against the increased defaults it expected on PLS it purchased that were backed by

such loans:

> [Q.] Given the layered risks and the less stringent underwriting
> standards and reduced documentation that we have seen in the last
> few minutes, why was Freddie Mac buying these securities?
>
> A. So as we discussed, Freddie Mac was purchasing these
> securities when—with the benefit of substantial credit
> enhancements, and the assumption Freddie Mac at a high level or
> my assumption as to my recollection back then, was that—that the
> credit enhancements would protect us for the incrementally higher
> defaults that would be expected on these types of loans, and that
> the benefits, the coupon interest, the returns, coupled with the
> affordable housing goals that we discussed before, made this a
> very good value proposition for Freddie Mac knowing that or
> assuming at the time, that delinquencies on Alt-A or subprime
> were defaults would be higher than on prime.

(Kain Tr. at 654:24-655:19.)

> 637.   Based on the credit enhancement it obtained, Freddie Mac approved

purchases of PLS backed by loans that it knew were risky, and even overrode concerns about

particular originators because Freddie Mac thought it was protected against losses.  For example,

Freddie Mac observed that in one securitization it was purchasing, "43% of this deal is

comprised of unknown originators and another 2% graded as 'poor,'" but Freddie Mac

nevertheless concluded that "[t]he credit enhancement of 28.24% more than accommodates this

risk."  (DX-0209 (E-mail from Frank Vetrano, dated July 29, 2005, FHFA11701377) at

FHFA11701377.)  In another example, Freddie Mac purchased a securitization despite having

rated the originator of the loans backing the securitization as "Poor," in part because Freddie

Mac obtained "10% more subordination than required on this deal."  (DX-0255 (E-mail from

Kevin Palmer, dated Dec. 7, 2005, FHFA00001480) at FHFA00001480.)  In January of 2006,

Frank Vetrano approved the purchase of a securitization containing a substantial number of loans

from another originator Freddie Mac had rated "Poor," concluding that "High CE [credit enhancement] level compensates for high 'poor' originator share."  (DX-0263 (E-mail from Frank Vetrano, dated Jan. 4, 2006, FHFA11913528) at FHFA11913528.)

### C.     Compliance With Specific Requirements in Underwriting Guidelines Would Not Have Been Material to a PLS Investor

638.    There is no evidence that PLS investors would have considered compliance with specific requirements in originator's underwriting guidelines as material.  PLS investors in 2005-2007 understood that a substantial number of loans backing a securitization could have deviated in various respects from applicable underwriting guidelines or originated as exceptions to those guidelines.  (Richard Aff. at ¶¶ 76, 78.)

639.    Freddie Mac and Fannie Mae understood this as well.  As Fannie Mae's head PLS trader, Paul Norris, testified, "[e]xceptions happen all the time."   (Norris Tr. at 302:17-303:7.)  Freddie Mac and Fannie Mae made disclosures to that effect in the offering documents for their own RMBS.  *See* ¶ 313, *supra*.

640.    The fact that PLS investors were not concerned about loan-level compliance with underwriting guidelines is confirmed by the fact that offering documents for securitizations disclosed, at most, only general descriptions of the underwriting criteria applied by originators, even for originators whose loans represented more than 20% of the supporting loan group.  (Richard Aff. at ¶ 77.)  Those general decriptions did not enable PLS investors to make their own determinations as to whether particular loans in supporting loan groups complied in all respects with applicable underwriting guidelines in deciding whether to purchase a PLS.

641.    Instead, PLS investors commonly performed due diligence on originators making loans that would back the PLS they purchased.  (Richard Aff. at ¶ 80.)  Specifically, PLS investors evaluated the loan origination policies and procedures of those originators to ensure

that they had acceptable underwriting practices.  (Richard Aff. at ¶ 80-83.)  This was required

because of the wide range of underwriting practices that existed among originators during the

2005 to 2007 time period.  (Richard Aff. at ¶ 80.)

        642.    Indeed, Freddie Mac and Fannie Mae exemplified the sort of due diligence

on originators that was common among PLS investors at the relevant time.  From 2005 to 2007,

Fannie Mae performed on-site operational reviews of originators that made loans backing PLS

purchased by Fannie Mae.  (DX-183 (Non-Traditional Lending Group, Private Label Review

Process and Procedures, FHFA04340539) at FHFA04340547.)

        643.    Fannie Mae's operational reviews of originators included "detailed

analysis" of the following topics:

> 1. Underwriting:  policies, practices and procedures
> 2. Servicing:  policies, practices and procedures
> 3. Origination / Acquisition:  policies, practices and procedures
> 4. Aggregator review
> 5. Financial:  balance sheet strength, gain-on-sale analysis and residual valuation, interview CFO and/or senior accounting officers.

(*Id.* at FHFA04340547.)

        644.    Freddie Mac reviewed aggregators and servicers as well as originators

during the 2005 to 2007 period.  Freddie Mac's reviews were used to "help Freddie Mac's

internal business units make decisions about which business partners to pursue and where to set

position limits."  (DX-190 (Operational Review Procedures, Alternative Market Operations,

updated May 2005, FHFA11971617) at FHFA11971617.)

        645.    Freddie Mac's review of originators included a "50-loan file review plus

an interview with management."  (*Id.* at FHFA11971618.)  Loan files were selected based on

"the counterparty's most recent month's production," and Freddie Mac spent "a minimum of two

days at the counterparty's facility." (*Id.*)  These reviews were intended to "assess compliance with stated counterparty practices or [the] extent to which breakdowns in process or controls are adversely affecting performance." (*Id.* at FHFA11971629.)

646.   Thus, like other RMBS investors in the 2005 to 2007 timeframe, Freddie Mac and Fannie Mae considered the loan origination policies and procedures of originators as part of their decision to purchase PLS, but they did not consider specific underwriting guidelines as applied to specific loans.

**D.    PLS Investors Understood that the Appraisals on Which Some LTV Ratios Were Based Were the Subjective Opinions of Appraisers**

647.   PLS investors in the 2005 to 2007 time period understood that LTV ratios disclosed in offering documents were often based on appraisals.  (Richard Aff. at ¶ 69.)  PLS investors also understood that appraisals are subjective opinions of value at a specific point in time, and that different appraisers might have different opinions of the value for the same property.  (Richard Aff. at ¶ 70.)

648.   PLS investors also understood that appraisals are estimates, not a pinpoint value that was objectively correct.  *See* ¶ 465, *supra*.  PLS investors understood that appraised values could and did differ from value estimates generated by AVMs by 10-15% without any suggestion that the appraisal was inaccurate or not credible or dishonest.  (Richard Aff. at ¶ 71.)

649.   Indeed, Freddie Mac and Fannie Mae, through their onsite reviews of originators, routinely observed variances between appraised values and estimates of value generated by AVMs that were in that range.  For example, on September 5-6, 2007, Freddie Mac reviewed EquiFirst, rating the originator "Satisfactory."  (DX-129 (AMO Review of Equifirst, dated Sept. 5-6, 2007, FHFA00368413) at FHFA00368413.)  Freddie Mac found EquiFirst's appraisal process to be "robust," and observed that Equifirst required that an "AVM value must

be within a 10% tolerance of the submitted appraised value and without additional risk factors," and "[i]f the AVM has a variance greater than 10%, the underwriter may then reduce the appraisal value to the AVM value and adjust the loan decision accordingly."  (*Id.* at FHFA00368415-00368416.)

650.    When Freddie Mac itself "pulled CoreLogic AVM's on the loans sampled for underwriting analysis," it found "an absolute standard deviation of 16.6% [for appraisals], which is somewhat higher than what we have seen in aggregate from their peers."  (*Id.* at FHFA00368416.)  Freddie Mac noted, "***For the year we have seen a cumulative absolute variance of 15.2% AVM value versus appraised value***."  (*Id.*)  Likewise, when Fannie Mae reviewed and approved originator Fremont on June 13, 2006, it found that "Fremont allows an appraisal variance of 15% for loans with an LTV of 80% or less and 5% for loans up to 95%." (DX-124 (Non-Traditional Counterparty Operational Review, dated June 13, 2006, FHFA01096585) at FHFA01096598.)

651.    The existence and acceptance of 10-15% variances between appraised values and value estimates generated by AVMs show that PLS investors in the 2005 to 2007 time period, including Freddie Mac and Fannie Mae, did not view such variances as undermining the reasonableness or credibility of an appraisal (or the appraiser who performed that appraisal).

**E.    PLS Investors Would Not Have Considered Owner Occupancy Information By Itself Material**

652.    PLS investors from 2005 to 2007 did not place undue reliance on owner-occupancy information in deciding whether to purchase a securitization.  Indeed, neither Freddie Mac nor Fannie Mae's pre-purchase analyses or modeling even considered owner-occupancy information.  (*See* Palmer Tr. 647:16-648:19 (listing inputs into the DEFCAP matrices used for

PLS modeling).)  To the extent investors relied on owner-occupancy data at all, they did so in the context of all other available information.  (Richard Aff. at ¶ 74.)

653.   Moreover, PLS investors understood that owner-occupancy information was based on information provided by borrowers in applying for a mortgage loan.  (Richard Aff. at ¶ 73.)  There is no evidence that PLS investors, including Freddie Mac and Fannie Mae, understood representations in offering documents about owner occupancy to mean that borrowers actually occupied the subject property at the cut-off date for a securitization.  (Forester Aff. at ¶ 88; Graham Aff. at ¶ 78; Lee Aff. at ¶ 9; Spagna Aff. at ¶ 17-18.)  Rather, occupancy statistics were viewed by PLS investors as representations about the intent of the borrower to occupy the purchased home.  (Graham Aff. at ¶ 78; Lee Aff. at ¶ 9; Spagna Aff. at ¶ 17-18; Henderson Tr. at 185:8-186:3; Dyson Tr. at 549:19-552:7.)

654.   Specifically, the findings of plaintiff's expert Hunter that 4.1% of the sample loans were incorrectly categorized as owner-occupied as of the Cut-Off Dates for the seven Securitizations, *see* ¶¶ 564, 580, *supra*, would not have been material to a reasonable PLS investor because the percentage is within the 5% variance disclosed in the Offering Documents as permissible for data set forth in the collateral tables, *see* ¶¶ 564, 580, *supra*.

655.   Such a low rate also would not have been material to a reasonable PLS investor because they understood that after a borrower signs a loan application, a borrower's stated intention to occupy a property can change for various reasons, including a job change, a divorce or the inability to sell the borrower's current residence.  (Forester Aff. at ¶ 144; Spagna Aff. at ¶ 18.)  As Freddie Mac trader Michael Aneiro testified with regard to borrowers' intentions to occupy a home, "people can change their mind[s]."  (Aneiro Tr. at 307:7-21.)

**F.     Freddie Mac's and Fannie Mae's Models**

656.    Freddie Mac's and Fannie Mae's models confirm that PLS investors did

not consider loan-level information as part of their decision to purchase PLS.  (*See* Palmer Tr.

647:16-648:19.)  Those models confirm that that house prices were the most important input into

the pre-purchase analysis of whether to buy a particular securitization.  (*Id*.)

**1.     Freddie Mac's DEFCAP Model**

657.    Freddie Mac adapted the model it used to analyze PLS from the models it

used to buy prime and subprime loans in its single-family guarantee business.  Those models,

referred to as Prime and Subprime DEFCAP, were adapted to analyze PLS because Freddie Mac

sought to "promote consistent credit views" across Freddie Mac's business.  (DX-

193 (Memorandum from Frank Vetrano to Don Bisenius, dated May 25, 2005, FHFA17549226)

at FHFA17549226.)  As Frank Vetrano explained in May 2005:

> Two distinct credit evaluation processes evolved within Freddie
> Mac.  MABS focuses on AAA risk-taking in bond form, while the
> Bulk process analyzes first loss risk on a loan pool.  We need to
> promote a consistent view, because the same collateral can be
> bought from either execution path.  In addition as we consider
> taking on credit risk in bond form, the process needs to anticipate
> greater levels of credit risk taking.

(*Id.*)

658.    Freddie Mac's goal was to ensure that its analysis of subprime and Alt-A

loans in conjunction with its bulk purchases was consistent with its analysis of the same type of

loans when purchased as part of PLS.  As Vetrano explained, "Although we approach this from

the perspective of a bond investor, our goal is consistency with the Bulk process."  (DX-193 at

FHFA17549226.)

659.    To ensure consistency across its businesses, however, Freddie Mac had to

address differences in the level of information it received about loans, depending on whether it

purchased a loan as part of PLS or as part of the bulk process.  DEFCAP had originally been

designed for "prime product under the assumption that loan level detail would be routinely

available," and when "DEFCAP was adapted for the subprime guarantee business," the model

"still requir[ed] loan level data."  (*Id.*)  As Freddie Mac considered loans "from the perspective

of a bond investor," however, it would have to "synthetically create loan level data based on

aggregate disclosure" because it did not receive loan-level data when it purchased PLS.  (*Id.*)

> 660.    The DEFCAP model analyzed PLS by measuring the "likelihood that

bond principal will be returned, given [Freddie Mac's] view of default risk."  (*Id.* at

FHFA17549228.)  DEFCAP also analyzed the "structure" of a PLS to determine whether "credit

enhancement levels [are] sufficient to protect against stress loss levels," and whether

"weaknesses exist in the credit structure."  (*Id.* at FHFA17549227.)

> 661.    Freddie Mac implemented its adaptation of DEFCAP for use in analyzing

PLS in June 2005.  (DX-220 (CRO Assessment, Review of New MABS Deal Evaluation

Process, dated Aug. 18, 2005, FHFA14631327) at FHFA14631328.)  In analyzing PLS, Freddie

Mac "utilize[d] information derived from subprime or prime DEFCAP to estimate losses" and

used risk characteristics such as CLTV, FICO, documentation type (*e.g.*, "full-doc or no-doc"),

product type (*e.g.*, fixed, amortizing ARM, IO ARM) and loan quality (*e.g.*, "prime, subprime")

as inputs.  (*Id.*)

> 662.    DEFCAP would "run[] 300 different paths" or stress scenarios based on

house price appreciation and interest rates "to estimate losses."  (*Id.* at FHFA14631329.)

DEFCAP assumed that each of the 300 paths were equally likely (Palmer Tr. at 565:21-566:7),

and a securitization would have to "have enough credit enhancement to survive the max, or

300th path in DEFCAP."  (DX-220 (CRO Assessment, Review of New MABS Deal Evaluation Process, dated Aug. 18, 2005, FHFA14631327) at FHFA14631329.)

663.    Through 2007, Freddie Mac's models did not contemplate any significant or sustained decrease in house price appreciation.  Indeed, in February 2007, Freddie Mac's models were "assuming 4% HPA [house price appreciation] in perpetuity."  (DX-485 (Freddie Mac's Strategic Landscape and Options, SET Offsite, dated Feb. 6-7, 2007, FHFA01083422) at FHFA01083432.)

664.    The version of DEFCAP adapted to analyze PLS did not take into account loan-level information about underwriting, owner occupancy, or appraised values for individual properties.  (Palmer Tr. 647:16-648:19.)

### 2.    Fannie Mae's Model and PLS Analysis

665.    In analyzing PLS, Fannie Mae obtained certain "loan level data" from "the dealer" in the form of a loan tape.  (Cao Tr. 241:15-242:6.)  That information was run through software called Intex to determine the amount of credit enhancement Fannie Mae thought it needed to protect it from losses.  (Cao Tr. 240:2-242:6.)

666.    The information received from the dealers was also used as part of Fannie Mae's model for pre-purchase analysis.  Specifically, Fannie Mae's model used LTV, FICO, note rates, seasoning and geography as inputs.  (Cao Tr. at 242:7-16.)  There is no evidence that Fannie Mae's model used owner-occupancy data as an input.  According to CJ Zhao, who developed Fannie Mae's model, the two "principal risk drivers" for PLS incorporated in Fannie Mae's model were "home price and interest rate."  (Zhao Tr. at 165:7-23.)

## X.      THE INDIVIDUAL DEFENDANTS

667.    During the relevant time period, LaRocca was a Managing Director first at Nomura Securities and, starting in October 2006, at NCCI.  (LaRocca Aff. at ¶ 7.)  There were many Managing Directors of Nomura Securities at this time.  (LaRocca Aff. at ¶ 7.)  LaRocca did not make the decision to issue a securitization; that decision was made by Nomura's trading desk.  (Graham Aff. at ¶ 32.)  Nomura's trading desk also decided which loans to include in a securitization and how to structure that securitization.  (Graham Aff. at ¶ 32.)  Finally, NCCI was not involved in the sale of certificates to investors.  (LaRocca Aff. at ¶ 31.)

668.    LaRocca was also President and Chief Executive Officer of NHELI. (LaRocca Aff. at ¶ 10.)  In that role, LaRocca had no power to control or direct the actions of the Nomura employees or entities involved in purchasing mortgage loans from loan originators, the structuring of those loans into securitizations, or the sale of the Certificates to investors. (LaRocca Aff. at ¶ 35.)  Although LaRocca signed the two registration statements for the NHELI securitizations, those registration statements did not contain details relating to the loans included in a specific securitization, nor did they contain the misrepresentations alleged here, which were instead contained in the prospectus supplements.  (LaRocca Aff. at ¶ 36.)  LaRocca did not sign any prospectus supplements.  (LaRocca Aff. at ¶ 36.)

669.    LaRocca did not know or have reasonable grounds to believe that the Offering Documents for the seven Securitizations contained any material misrepresentations or omissions.  As the supervisor of the Transaction Management Group, LaRocca oversaw Nomura's diligence processes.  (LaRocca Aff. at ¶ 7.)  NCCI purchased loans only from originators that it had reviewed and approved.  (LaRocca Aff. at ¶ 15.)  LaRocca was entitled to rely on Nomura's diligence processes, which were conducted by individuals with extensive

expertise in the field.  (LaRocca Aff. at ¶ 38.)  LaRocca personally read the registration

statements that he signed prior to their filing and worked with outside counsel to confirm their

accuracy.  (LaRocca Aff. at ¶ 39.)  He believed that the information contained in those

registration statements was accurate.  (LaRocca Aff. at ¶ 37.)

670.    During the relevant period, Graham was a Managing Director first at

Nomura Securities and, starting in October 2006, at NCCI.  (Graham Aff. at ¶ 11.)  Graham was

also the President and Chief Executive Officer of NAAC.  (Graham Aff. at ¶ 13.)  Graham was

not involved in the decision to issue a securitization.  As stated above, that decision was made by

Nomura's trading desk, which also determined which loans to include in the securitization and

how it should be structured.  (Graham Aff. at ¶ 32.)

671.    Graham did not know or have reasonable grounds to believe that the

Offering Documents contained any material misrepresentations or omissions.  Graham was the

head of the Transaction Management Group, which was involved with Nomura's due diligence,

as described above.  (Graham Aff. at ¶ 11.)  Either Graham or someone else in the Transaction

Management Group personally reviewed the Offering Documents with the assistance of outside

counsel and conferred directly with employees in the Due Diligence Group to regarding the

representations contained in those Offering Documents.  (Graham Aff. at ¶ 85.)  The Transaction

Management Group received final due diligence summaries for at least 89 of the 194 whole loan

trade pools at issue here, as well as summaries of the diligence performed on loans underlying at

least four of the seven  Securitizations.  (Graham Aff. at ¶ 84.)  The Transaction Management

Group also coordinated reviews of the Offering Documents conducted by outside consultants,

such as the accounting firm Deloitte & Touche.  (Graham Aff. at ¶ 35.)  Like LaRocca, Graham

justifiably relied on Nomura's extensive diligence processes, with which he was intimately

familiar.  (Graham Aff. at ¶¶ 83-84.)  Graham signed the NAAC registration statement (but no

prospectus supplements) and was confident that the information contained in those registration

statements was accurate.  (Graham Aff. at ¶ 79.)

       672.    From 2005 to 2007, Findlay was the Chief Legal Officer of Nomura

Securities.  (Findlay Aff. at ¶ 5.)  He was also one of the three directors of both NAAC and

NHELI.  (Findlay Aff. at ¶¶ 7-8.)  If there was any disagreement among the directors of NAAC

and NHELI, the by-laws required a majority vote, meaning that Findlay acting alone did not

have the power to veto any of the Securitizations.  (Findlay Aff. at ¶¶ 7-8.)  Findlay usually did

not provide substantive advice regarding securities law; that function was typically filled by

outside counsel.  (Findlay Aff. at ¶ 11.)  During the relevant period, Findlay played no part in

decisions regarding the purchase of loans from originators or the structuring of securitizations,

and was not involved in the sale of certificates to investors.  (Findlay Aff. at ¶¶ 9-11.)

       673.    Findlay did not know or have reasonable grounds to believe that the

Offering Documents contained any material misrepresentations or omissions.  He personally

helped establish Nomura's due diligence processes, which he reasonably thought were robust,

and he had confidence in the ability of those processes to determine that the loans Nomura

purchased and subsequently securitized were not defective.  (Findlay Aff. at ¶¶ 9,13.)  Findlay

signed three registration statements, and, based on his familiarity with Nomura's due diligence

processes, believed that the representations contained in those registration statements were

accurate.  (Findlay Aff. at ¶¶ 12-13.)  Findlay did not sign any prospectus supplements.  (Findlay

Aff. at ¶ 12.)

       674.    During the relevant period, Gorin was the Controller for Nomura

Securities; beginning in May 2007, he was also the Chief Financial Officer.  Gorin was also the

Controller and Chief Financial Officer of both NAAC and NHELI, in addition to the Treasurer

for NHELI.  (Gorin Aff. at ¶ 6.)  Gorin was not directly involved in Nomura's RMBS business.

He acted in an accounting role and did not participate in decisions regarding purchases of loans

from originators, the structuring or issuance of securitizations, the drafting of Offering

Documents, or the sale of certificates to investors.  (Gorin Aff. at ¶ 8-9, 11-13.)  He did not

exercise control over NAAC or NHELI, nor did he direct the activities of those entities or their

officers.  (Gorin Aff. at ¶ 14-15.)  He was one of eight officers at each entity.  (Gorin Aff. at ¶

14-15.)  Gorin did not sign any of the prospectus supplements for the Securitizations.  (Gorin

Aff. at ¶ 10.)

675.    Gorin did not know or have reasonable grounds to believe that the

Offering Documents contained any material misrepresentations or omissions.  He signed two

registration statements, but had no reason to doubt the accuracy of any representations contained

in those registration statements.  (Gorin Aff. at ¶ 16-17.)  He recognized that Nomura had

procedures in place to ensure the accuracy of representations made in prospectus supplements

and he reasonably relied on those procedures.  (Gorin Aff. at ¶ 18.)

676.    McCarthy was an outside director of NAAC and NHELI.  (McCarthy Aff.

at ¶ 5.)  As one of three directors, McCarthy alone did not have the power to veto any of the at-

issue Securitizations.  (McCarthy Aff. at ¶ 14.)  His principal responsibility as an outside director

was to ensure that nothing jeopardized the special-purpose entity status of NAAC and NHELI.

(McCarthy Aff. at ¶ 6.)  He played no role in purchasing loans, structuring securitizations,

drafting offering documents, or selling certificates to investors.  (McCarthy Aff. at ¶ 7-9, 11.)

He had minimal interaction with personnel of Nomura Securities.  (McCarthy Aff. at ¶ 12.)

677.    McCarthy had no reason to believe that the Offering Documents contained any material misrepresentations or omissions.  (McCarthy Aff. at ¶ 16.)  At no point did McCarthy encounter any "red flags" with respect to representations made in the Offering Documents.  He was confident that the three registration statements he signed were accurate.  (McCarthy Aff. at ¶ 16.)  McCarthy did not sign any prospectus supplements for the Securitizations.  (McCarthy Aff. at ¶ 10.)

## XI.    PLAINTIFF'S CLAIM FOR RESCISSION UNDER SECTION 12 OF THE SECURITIES ACT AND THE VIRGINIA AND DISTRICT OF COLUMBIA BLUE SKY LAWS

678.    Plaintiff has represented that it still owns all seven Certificates.  (Riddiough Aff. ¶ 64.)  As a result, under Section 12(a)(2) of the Securities Act of 1933, the most plaintiff is entitled to recover upon tendering the Certificates to defendants is the amount plaintiff paid for the Certificates, minus (i) the amount of any income plaintiff has received on the Certificates, and (ii) all of any portion of the amount otherwise recoverable that is "proven to represent other than the depreciation in value caused by the misstatements or omissions alleged."  Securities Act of 1933, 15 U.S.C. § 77l(b).  If it prevails on its Section 12 claim, plaintiff would also be entitled to prejudgment interest.

### A.    Freddie Mac and Fannie Mae Have Received Nearly All Principal and Interest Payments Owed to Them

679.    When Freddie Mac and Fannie Mae purchased the seven Certificates, the initial principal balance on the seven Certificates was $2.046 billion.  (Riddiough Aff. at ¶ 47.)  As of January 26, 2015, $1.591 billion in principal and interest payments had been paid to the trusts for the Certificates.  (Riddiough Aff. at ¶ 53, DX-2906 (Exhibit 8 to Riddiough Aff.); Nambiar Aff. at ¶ 49.)

680.    The principal and interest payments paid to the trusts for the Certificates, and ultimately received by Freddie Mac and Fannie Mae, are discussed in the following paragraphs and set forth in the chart below:

| Certificate | Total Interest Distribution | Total Principal Distribution |
|---|---|---|
| NAA 2005-AR6 | $17,454,886.75 | $42,769,500.19 |
| NHELI 2006-FM1 | $23,747,498.00 | $282,292,774.10 |
| NHELI 2006-FM2 | $42,054,069.07 | $346,402,922.88 |
| NHELI 2006-HE3 | $34,529,746.54 | $330,943,869.91 |
| NHELI 2007-1 | $8,694,905.76 | $52,195,456.79 |
| NHELI 2007-2 | $28,977,869.87 | $234,822,108.21 |
| NHELI 2007-3 | $19,310,597.93 | $127,554,795.47 |

681.    Fannie Mae purchased NAA 2005-AR6 for $65,979,706.76, including $316,245 in accrued interest that was outstanding as of the settlement date.  (DX-22 (NAA 2005-AR6 Trade Confirmation, dated Nov. 30, 2005) at NOM-FHFA_05783828.)  As of January 26, 2015, Fannie Mae had received $42,769,500.19 in principal payments and $17,454,886.75 in interest payments on the 2005-AR6 Certificate.  (Nambiar Aff. at ¶ 49.)  The original unpaid principal balance of the 2005-AR6 Certificate was $64,943,000.00.  (DX-1876 (NAAC 2005-AR6 Trustee Report, dated December 25, 2005) at 1.)  The $42,769,500.19 in principal payments Fannie Mae received as of January 26, 2015 represents 66% of the original unpaid principal balance.  (Nambiar Aff. at ¶ 50; DX-2906  (Exhibit 8 to Riddiough Aff.).)

682.    Freddie Mac purchased six of the Certificates for just over $1.98 billion, which included $41,187 in accrued interest that was outstanding as of the settlement date on NHELI 2006-FM1.  (DX-23, DX-24, DX-25, DX-26, DX-27, DX-28, DX-29, DX-30.)  Freddie Mac has incurred no realized losses on any of these Certificates to date with the exception of NHELI 2007-1.  (Nambiar Aff. at ¶ 39.)

683.    Freddie Mac purchased NHELI 2006-FM1 for $309,591,187.35, which included $41,187.35 in accumulated interest as of that date.  The original unpaid principal

balance of the 2006-FM1 Certificate was $309,550,000.00.  (DX-1879 (NHELI 2006-FM1

Trustee Report, dated February 25, 2006).  As of January 26, 2015, Freddie Mac had received

$282,292,774.10 in principal payments and $23,747,498.00 in interest payments on the 2006-

FM1 Certificate.  (Nambiar Aff. at ¶ 49; DX-2906  (Exhibit 8 to Riddiough Aff.).)  The

$282,292,774.10 in principal payments Freddie Mac received as of January 26, 2015 represents

91% of the original unpaid principal balance.  (Nambiar Aff. at ¶ 51; DX-2906  (Exhibit 8 to

Riddiough Aff.); DX-24 (Trade Confirmation for NHELI 2006-FM1) at NOM-

FHFA_05783832.)  Freddie Mac has incurred no realized losses on this Certificate to date.

(Nambiar Aff. at ¶ 41.)

       684.    Freddie Mac purchased NHELI 2006-FM2 for $525,197,000.  The original

unpaid principal balance of the 2006-FM2 Certificate was $525,197,000.00.  (DX-1900 (NHELI

2006-FM2 Trustee Report, dated November 27, 2006) at 1.)  As of January 26, 2015, Freddie

Mac had received $346,402,922.88 in principal payments and $42,054,069.07 in interest

payments on the 2006-FM2 Certificate.  (Nambiar Aff. at ¶ 49.) The $346,402,922.88 in

principal payments Freddie Mac received as of January 26, 2015 represents 66% of the original

unpaid principal balance.  (Nambiar Aff. at ¶ 53; DX-2906  (Exhibit 8 to Riddiough Aff.).)

Freddie Mac has incurred no realized losses on this Certificate to date.  (Nambiar Aff. at ¶ 43.)

       685.    Freddie Mac purchased NHELI 2006-HE3 for $441,739,000.  (DX-2906

(Exhibit 8 to Riddiough Aff.).)  The original unpaid principal balance of the 2006-HE3

Certificate was equal to $441,739,000.00.  (DX-1894 (NHELI 2006-HE3 Trustee Report, dated

September 25, 2006) at 1.)  As of January 26, 2015, Freddie Mac had received $330,943,869.91

in principal payments and $34,529,746.54 in interest payments on the 2006-HE3 Certificate.

(Nambiar Aff. at ¶ 49; DX-2906  (Exhibit 8 to Riddiough Aff.).)  The $330,943,869.91 in

principal payments Freddie Mac received as of January 26, 2015 represents 75% of the original

unpaid principal balance.  (Nambiar Aff. at ¶ 52; DX-2906  (Exhibit 8 to Riddiough Aff.).)

Freddie Mac has incurred no realized losses on this Certificate to date.  (Nambiar Aff. at ¶ 42.)

686.    Freddie Mac purchased NHELI 2007-1 for $100,548,000.  (DX-2906

(Exhibit 8 to Riddiough Aff.).)  The original unpaid principal balance of the 2007-1 Certificate

was $100,548,000.00.  (DX-1914 (NHELI 2007-1 Trustee Report, dated February 26, 2007) at

1.)  As of January 26, 2015, Freddie Mac had received $52,195,456.79 in principal payments and

$8,694,905.76 in interest payments on the 2007-1 Certificate.  (Nambiar Aff. at ¶ 49; DX-2906

(Exhibit 8 to Riddiough Aff.).)  The $52,195,456.79 in principal payments Freddie Mac received

as of January 26, 2015 represents 52% of the original unpaid principal balance.  (Nambiar Aff. at

¶ 94; DX-2906  (Exhibit 8 to Riddiough Aff.).)  Freddie Mac has incurred realized losses of

$25,285,865.19 on this Certificate to date.  (Nambiar Aff. at ¶ 44.)

687.    Freddie Mac purchased NHELI 2007-2 for $358,847,000.  The original

unpaid principal balance of the 2007-2 certificate was $358,847,000.00.  (DX-1915 (NHELI

2007-2 Trustee Report, dated February 26, 2007) at 1.)  As of January 26, 2015, Freddie Mac

had received $234,822,108.21 in principal payments and $28,977,869.87 in interest payments on

the 2007-2 Certificate.  (Nambiar Aff. at ¶ 49.)  The $234,822,108.21 in principal payments

Freddie Mac received as of January 26, 2015 represents 65% of the original unpaid principal

balance.  (Nambiar Aff. at ¶ 55.)  Freddie Mac has incurred no realized losses on this Certificate

to date.  (Nambiar Aff. at ¶ 45.)

688.    Freddie Mac purchased NHELI 2007-3 for $245,105,000.  The original

unpaid principal balance of the 2007-3 Certificate was $245,105,000.00.  (DX-1934 (NHELI

2007-3 Trustee Report, dated May 25, 2007) at 1.)  As of January 26, 2015, Freddie Mac had

received $127,554,795.47 in principal payments and $19,310,597.93 in interest payments on the

2007-3 Certificate.  (Nambiar Aff. at ¶ 49; DX-2906  (Exhibit 8 to Riddiough Aff.).)  The

$127,554,795.47 in principal payments Freddie Mac received as of January 26, 2015 represents

52% of the original unpaid principal balance.  (Nambiar Aff. at ¶ 56; DX-2906  (Exhibit 8 to

Riddiough Aff.).)  Freddie Mac has incurred no realized losses on this Certificate to date.

(Nambiar Aff. at ¶ 46.)

689.    The original unpaid principal balance of all seven Certificates was

$2,045,929,000.00.  (DX-1876 at 1; DX-1879 at 1; DX-1894 at 1; DX-1900 at 1; DX-1914 at 1;

DX-1915 at 1; DX-1934 at 1.)  The $1,416,981,427.55 in principal payments Freddie Mac and

Fannie Mae received as of January 26, 2015 represents 69% of the original unpaid principal

balance of those seven Certificates.  (Nambiar Aff. at ¶ 57; DX-2906  (Exhibit 8 to Riddiough

Aff.).)

690.    As of January 31, 2015, the total market value of the Certificates, based on

Bloomberg pricing was $438,092,806.; the total market value of the Certificates as of January

31, 2015, based on IDC prices, was $484,581,141.  (DX-2906 (Riddiough Aff. Ex. 8) at 1.)  As

of January 26, 2015, Freddie Mac and Fannie Mae had received $1,416,981,427.55 in principal

payments and $174,769,573.92 in interest payments, amounting to a total of  $1,591,751,001.47

in principal and interest payments on the seven Certificates.  (Nambiar Aff. at ¶ 49; DX-2906

(Exhibit 8 to Riddiough Aff.).)  That amount would have to be deducted from the price that

Freddie Mac and Fannie Mae paid for the Certificates in computing any recovery by plaintiff in

this case.

691.    To date, only one Certificate, NHELI 2007-1, has sustained a realized

loss, in the amount of $25,285,865.19.  Therefore, the total amount of realized losses on the

seven Certificates as a group is $25,285,865.19.  (Riddiough Aff. at ¶ 53, DX-2906  (Exhibit 8 to

Riddiough Aff.).)  The fact that realized losses on the seven Certificates are so small (relative to

the total) is a factor that should be taken into account in determining appropriate terms if plaintiff

is entitled to rescission, which is an equitable remedy.

**B.      Any Entitlement to Pre-Judgment Interest under Section 12 Should Be
         Computed at the Risk-Free Interest Rate**

692.      Section 12(a)(2) of the Securities Act provides that a prevailing plaintiff is

entitled to prejudgment interest.  Any prejudgment interest awarded should have the effect of

placing Freddie Mac and Fannie Mae in the position they would have been in had they not

purchased the Certificates.  (Riddiough Aff. at ¶ 64.)  In other words, Freddie Mac and Fannie

Mae should only be compensated for the time value of their money.  (Riddiough Aff. at ¶ 69.)

693.      In applying interest to past cash flows in order to translate them into

current dollars, a risk-free rate is the most appropriate one to use in this case.  (Riddiough Aff.

¶ 69.)  With rescission, historical cash flows are not subject to any of the usual risks attendant on

investing money.  (Riddiough Aff. at ¶ 67.)  Rescission returns to Freddie Mac and Fannie Mae

their original investment in the seven Certificates, ignoring the fact that those Certificates were

subject to very substantial risks, including, but not limited to, risks posed by macroeconomic

conditions, such as the steep decline in house prices that started in 2007.  (Riddiough Aff. ¶ 67.)

In such circumstances, applying anything other than the risk-free rate would provide plaintiff

with a windfall.  (Riddiough Aff. at ¶ 69.)

694.      Plaintiff's expert, Finkel, applied three different interest rates to his

recovery calculation:  three percent, the coupon rate of the at-issue Certificates, and the Internal

Revenue Service ("IRS") penalty rate.  Finkel did not consider whether any of these rates were

was economically justifiable, but instead applied them because he was instructed by plaintiff's counsel to do so.  (Deposition of James K. Finkel, dated Nov. 25, 2014, at 207:18-210:21.)

695.    Finkel's application of a three percent interest rate is entirely arbitrary. (Riddiough Aff. ¶ 73.)  It is not economically justified and therefore not appropriate for use in computing prejudgment interest in this case.  (Riddiough Aff. ¶ 73.)

696.    The coupon rate is equivalent to the maximum potential benefit Freddie Mac and Fannie Mae could have received on their investments in the Certificates if there were no missed payments and a full return of principal.  (Riddiough Aff. ¶ 71.)  In a situation in which Freddie Mac and Fannie Mae are effectively getting their money back, the risk free rate is more appropriate than the coupon rate in computing prejudgment interest.  (Riddiough Aff. ¶¶ 70-71.)

697.    The IRS penalty rate is punitive in nature and is imposed on people who have willfully refused to pay their income taxes.  Such a punitive rate is not economically justified and therefore not appropriate for use in computing prejudgment interest in this case. (Riddiough Aff. ¶ 73.)

698.    As of January 31, 2015, the total Section 12 recovery, assuming return of the Certificates, and before accounting for loss causation, using the risk-free rate is $568,856,349.  This amount represents (i) the unpaid principal balance of the Certificates as of January 31, 2015, (ii) multiplied by the risk-free rate, (iii) less the sum of the coupon payments, or "income received," as of January 31, 2015. (Riddiough Aff. ¶ 75, DX-2906  (Exhibit 8 to Riddiough Aff.).)

### C.    The Virginia and District of Columbia Blue Sky Laws Provide for Prejudgment Interest at the Rate of Six Percent

699.    The Virginia Securities Act, § 13.1-522(A)(ii) and the District of Columbia Securities Act § 31.5605.05(a)(1)(B) require prejudgment interest to be applied at a

rate of six percent.  These Blue Sky laws adopt Section 12(a)(2) recovery.  *See Fed. Hous. Fin. Agency* v. *Nomura Holding Am. Inc.,* No. 11-cv-6201 (DLC)*,* 2014 WL 7232590, at *1 (S.D.N.Y. Dec. 18, 2014).

700.    Using the same method described in paragraph 20, above (but applying six percent interest instead of the risk-free rate), the District of Columbia Blue Sky damages for NAA 2005-AR6 would be $26,499,421 and the Virginia Blue Sky damages for NHELI 2006-FM2, NHELI 2007-1, and NHELI 2007-2, would be $526,059,085.  (Riddiough Aff. ¶ 78, DX-2906  (Exhibit 8 to Riddiough Aff.).)  Plaintiff could not collect these damages in addition to seeking damages under Section 12.

**D.    Reduction Based on Depreciation in the Value of the Certificates Caused by Anything Other than the Alleged Misrepresentations in the Offering Documents**

701.    If plaintiff establishes that it is entitled to rescission, then a deduction must be taken for amount of plaintiff's losses that are not attributable to the allegedly false or misleading statements in the Offering Documents.  Defendant's expert, Vandell, showed there is no statistically significant difference in the performance of mortgage loans that plaintiff alleges to be defective versus other loans in the supporting loan groups for the Certificates, from which it can be inferred that the alleged misrepresentations in the Offering Documents did not cause plaintiff's alleged losses.  (Vandell Aff. ¶¶ 178-81.)  After accounting for loss causation, therefore, plaintiff's recovery is equal to $0.  (Riddiough Aff. ¶ 97.)

**XII.    CONCLUSION**

702.    The Offering Documents' representations that the loans in the supporting loan groups for the Securitizations generally complied with underwriting guidelines or standards were accurate.  *See* ¶¶ 284-448, *supra*.  The Offering Documents represented that the loans in the

supporting loan groups "generally" were originated in accordance with disclosed originators'

guidelines or, for undisclosed originators, that the loans generally were originated in accordance

with non-specific underwriting standards and criteria, rather than specific lenders' guidelines.

*See* ¶¶ 284-309, *supra*.  The Offering Documents disclosed that a substantial portion of the loans

in the supporting loan groups would be originated as exceptions to underwriting guidelines based

on compensating factors.  *See* ¶¶ 310-313, *supra*.  The findings of Nomura and its two credit and

compliance due diligence vendors, Clayton and AMC, confirm that the supporting loan groups

contained low rates of materially defective loans.  *See* ¶¶ 325-392, *supra*.  These findings

corroborate the findings of defendants' expert that only 5.5% of the loans in the Sample Loans

reviewed by plaintiff's expert potentially were materially defective in the sense that they did not

comply with the applicable underwriting guidelines.  *See* ¶ 395, *supra*.  These findings show that

the characteristics of the loans in the supporting loan groups for the Securitizations were

consistent with the representations made about them in the Offering Documents.  *See* ¶¶ 325-

392, *supra*.

    703. Plaintiff's theories of alleged misstatements concerning the compliance of

loans with underwriting guidelines are based on a misreading of the Offering Documents.  *See*

¶¶ 406-413, *supra*.  The Offering Documents did not represent strict compliance with guidelines,

and only made representations about the characteristics of the loans in the supporting loan groups

as of the time the loans were originated, not any later time.  *See* ¶¶ 323-324, *supra*.  But

plaintiff's re-underwriting expert evaluates the loans according to strict criteria and does not

consider whether they generally comply with underwriting guidelines, contain adequate

compensating factors, or (for undisclosed originators) whether they meet the general

underwriting criteria disclosed in the Offering Documents.  *See* ¶¶ 406-413, *supra*.  Plainitff's

expert also relied upon information in his analysis that was not available to the original underwriter, even though the representation in the Offering Documents about how loans "were originated" refers to how the loans were in fact originated, rather than whether they complied with underwriting guidelines regardless of how they actually were originated. *See* ¶¶ 426-432, *supra*. Plaintiff's expert further includes findings that were curable, and that therefore do not represent genuine underwriting guideline deviations, and makes unreasonable inferences or errors in applying the relevant guidelines. *See* ¶¶ 414-425, *supra*.

704.    The Offering Documents' representations of LTV ratios for the Securitizations were accurate. *See* ¶¶ 449-562, *supra*. The appraisals underlying a portion of the LTV ratios disclosed in the Offering Documents were opinions that represented estimates of market value, and were provided by licensed or certified appraisers. *See* ¶ 465, *supra*. Nomura conducted valuation due diligence on virtually all of the appraisals for loans in the supporting loan groups for the Securitizations. *See* ¶¶ 455-464, *supra*. This valuation due diligence ensured that the estimated values were within acceptable tolerances and, to the extent feasible in the context of due diligence, that they were not likely to have been fraudulent. *See* ¶¶ 455-464, *supra*. Four appraisers testified in this Action that they issued credible appraisals and honestly believed the opinions of value they rendered. *See* ¶¶ 467-482, *supra*. The appraisals for the loans in the supporting loan groups were reasonable estimates of market value and there is no evidence they were the product of bad faith by appraisers. *See* ¶¶ 483-486, *supra*.

705.    Plaintiff has offered no proof that any appraiser did not honestly believe his or her opinion of value, and its offers of proof regarding LTV ratios depend on using untested models and methods for purposes that are not generally accepted in the appraisal or mortgage industry. *See* ¶¶ 483-555, *supra*. Plaintiff relies on its expert's AVM and scoring model to show

that appraisers issued objectively false estimates of value and did not honestly believe their opinions.  *See ¶¶ 487-55, supra*.  No AVM or scoring model is capable of identifying dishonesty.  Although AVMs can be a useful tool for identifying appraisals that require closer scrutiny, values from an AVM are not generally accepted as being more reliable estimates of market value than appraisals, and are not generally accepted as providing pin-point, absolute market values as opposed to estimates within a range of possible values.  *See ¶¶ 489-494, supra*.  Plaintiff nonetheless relies solely on its expert's AVM values to show that appraisals in this case over-valued the subject properties, based on its expert's incorrect claim that his AVM can provide a "true" value.  *See ¶ 488, supra*.  The AVM of plaintiff's expert is untested,  employs dubious methodologies, and does not yield reliable outputs.  *See ¶¶ 495-522, supra*.  Similarly, in order to show that appraisals failed to comply with USPAP, plaintiff relies on an untested, unreliable "scoring" model that reflects unique, inflexible rules of plaintiff's expert, rather than the broad, flexible generally accepted standards of USPAP.  *See ¶¶ 522-555, supra*.  Industry practice is to conduct appraisal reviews or desktop reviews, not apply scoring models, when evaluating the credibility of appraisals under USPAP.  *See ¶¶ 531-533, supra*.

706.    The Offering Documents accurately disclosed owner occupancy data.  The owner occupany data disclosed in the Offering Documents represented statements of intent by the borrowers to occupy the subject properties.  *See ¶¶ 565-580, supra*.  Loan files were reviewed during Nomura's due diligence process for any "red flags" indicating that such statements of intent may not have been genuine.  *See ¶¶ 571-572, supra*.  There is no evidence that any borrower misstated his or her intent to occupy the subject properties.  *See ¶ 575, supra*.  To the extent occupancy data is taken to represent the actual occupancy status of the properties as of the Cut-Off Dates of the Securitizations, plaintiff's offers of proof rely on unreasonable

inferences from unreliable and incomplete evidence, such as audit credit reports.  *See* ¶¶ 576-580, *supra*.

707.    The Offering Documents contained no false or misleading statements about credit ratings.  *See* ¶¶ 581-602, *supra*.  Credit ratings are opinions by the ratings agencies.  *See* ¶ 589, *supra*.  There is no proof that the ratings agencies did not honestly believe the ratings they assigned to the Securitizations.  *See* ¶ 589, *supra*.  To the extent plaintiff has argued that the AAA ratings assigned to the Securitizations were based on false or misleading information, it has not shown that those ratings would have been different if the information plaintiff alleges was correct had been supplied to the rating agencies.  *See* ¶¶ 591-602, *supra*.

708.    Freddie Mac's and Fannie Mae's losses on the Securitizations were not caused by the alleged misrepresentations but by the 33% decline in house prices that occurred between April 2007 and May 2009, and the economic recession that occurred between the fourth quarter of 2007 and the second quarter of 2009.  *See* ¶¶ 199-283, *supra*.  The correlation between loan performance for subprime and Alt-A loans and house prices was recognized throughout the mortgage industry, and especially at Freddie Mac and Fannie Mae, at the time Freddie Mac and Fannie Mae purchased the Certificates.  *See* ¶¶ 203-222, *supra*.  The Offering Documents disclosed that loans in the supporting loans groups were risky; the Offering Documents disclosed that the collateral loans were subprime or Alt-A, did not conform to Freddie Mac and Fannie Mae guidelines, contained no- and low-documentation features, had relatively high LTV ratios, were made to borrowers with relatively low credit scores, and contained some interest-only and adjustable rate terms.  *See* ¶¶ 179-198, *supra*.  The Offering Documents warned that declining house prices and an economic downturn could affect the value of the Certificates.  *See* ¶¶ 179-183, *supra*.  The fall in house prices and severe economic downturn hampered the ability and

willingness of subprime and Alt-A borrowers to pay their mortgage loans which, in turn, caused losses on the Certificates bought by Freddie Mac and Fannie Mae.  *See* ¶¶ 223-283, *supra*.

709.   None of the alleged misstatements in the Offering Documents would have been material to a reasonable investor in RMBS in the period 2005-2007.  *See* ¶¶ 627-666, *supra*. Most investors in RMBS in 2005 to 2007, like Freddie Mac and Fannie Mae, were extremely sophisticated, large institutional investors with significant resources to conduct their own analyses of the RMBS they were purchasing.  *See* ¶¶ 627-628, *supra*.  These investors focused on a broad universe of information, including macroeconomic factors (like house prices and interest rates), expected return and losses, credit enhancement, collateral characteristics, and credit ratings.  *See* ¶¶ 627-630, *supra*.  The credit enhancement enjoyed by investors in highly rated AAA RMBS largely diminished the importance of collateral characteristics.  *See* ¶¶ 631-637, *supra*.  In considering whether a change in a particular piece of data was material to its purchasing decision, investors considered the change in the context of the broad range of data described above.  *See* ¶¶ 627-637, *supra*.  Plaintiff has not offered proof that the specific misrepresentations it alleges would have been material to an reasonable RMBS investor in AAA securities during the period 2005 to 2007, when house prices were either appreciating or not declining, and the economy was sound.  *See* ¶¶ 627-666, *supra*.  It has simply failed to conduct the type of analysis that a reasonable investor during this time would have conducted to determine whether a change in collateral data was material to its decision.  *See* ¶¶ 627-666, *supra*.

710.   Plaintiff has failed to prove the elements of its claims and is not entitled to recovery.  *See* ¶¶ 678-701, *supra.* If plaintiff were to prevail, however, Section 12(a)'s rescissionary remedy permits a successful plaintiff "to recover the consideration paid for such

security with interest thereon, less the amount of any income received thereon, upon the tender

of such security."  15 U.S.C. § 77l.  This recession remedy "repudiate[s] the transaction and

seek[s] [to] place[] [the parties] in [the] status quo.  Inherent in the remedy of rescission is the

return of the parties to their pre-contract positions."  *Fed. Hous. Fin. Agency* v. *Nomura Holding*

*Am. Inc.*,  2014 WL 7232590, at *10 (S.D.N.Y. Dec. 18, 2014)(internal quotation marks and

citations omitted)(alterations in original).  The appropriate way to restore the parties to the status

quo is to award recovery to plaintiff in the amount which represents the unpaid principal balance,

with prejudgment interest applied at the risk-free rate, minus the coupon payments that Freddie

Mac and Fannie Mae have received from these Certificates.[31]  As of January 31, 2015, the

recovery was equal to $568,856,349 (assuming return of the seven Certificates).  *See* ¶¶ 692-697,

*supra*.

711.    Defendants have proven that all of "the amount recoverable under Section

12(a)(2) was depreciation in the value of the securities that was not the result of defendants'

alleged misrepresentations."  *See Fed. Hous. Fin. Agency* v. *Nomura Holding Am. Inc.*, 2014 WL

7232590, at *10 (S.D.N.Y. Dec. 18, 2014).  Accordingly, pursuant to Section 12(b), plaintiff is

not entitled to any recovery.

---

[31]     In its February 16, 2015 Opinion & Order excluding in part the testimony of Riddiough
(Doc. No. 1272), the Court held that prejudgment interest is not to be applied to the income
received by Freddie Mac and Fannie Mae.  Defendants respectfully disagree with this ruling.

Dated:  New York, New York
        February 20, 2015

Respectfully submitted,

/s/  Thomas C. Rice

Thomas C. Rice (trice@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502

*Attorneys for Defendant RBS Securities Inc.*

/s/ David B. Tulchin

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
Yavar Bathaee (bathaeey@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993

*Attorneys for Defendants Nomura Holding
America Inc., Nomura Asset Acceptance
Corporation, Nomura Home Equity Loan, Inc.,
Nomura Credit & Capital, Inc., Nomura
Securities International, Inc., David Findlay,
John McCarthy, John P. Graham, Nathan
Gorin, and N. Dante LaRocca ("Nomura
Defendants")*