# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY, AS
CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION AND
THE FEDERAL HOME LOAN MORTGAGE
CORPORATION,

|  |  |
|---|---|
| | No. 11-cv-6201 (DLC) |
| Plaintiff, | |
| | ECF Case |
| -against- | |
| NOMURA HOLDING AMERICA INC., et al., | |
| Defendants. | |

## DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
Yavar A. Bathaee (bathaeey@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

February 20, 2015

## <u>TABLE OF CONTENTS</u>

**Page**

I.   PLAINTIFF HAS FAILED TO PROVE THAT THE OFFERING DOCUMENTS
     CONTAINED FALSE OR MISLEADING STATEMENTS................................................1

    A.   Statements in the Offering Documents Concerning Loan Underwriting
          Were Not False or Misleading. ...............................................................3

        1.   For Five of the Seven Certificates, Plaintiff Has Presented No
               Evidence That Defendants Made False or Misleading Statements
               Concerning Underwriting Criteria. ...............................................5

        2.   Even if the Offering Documents Are Interpreted To State that All
               Loans Were Originated In Accordance With Originator Guidelines,
               the Evidence Still Does Not Show Any False Statements.........................9

        3.   The Loans in the Supporting Loan Groups Also Met "Each of the
               Criteria" of the Originators' Underwriting Guidelines.............................12

        4.   Because Cowan's Extrapolations for NAA 2005-AR6 Are Flawed,
               Plaintiff Has Presented No Sufficient Evidence of Underwriting
               Defects For That Certificate.......................................................13

    B.   Statements in the Offering Documents Concerning Occupancy Were Not
          False or Misleading...............................................................13

    C.   Statements in the Offering Documents Concerning Loan-to-Value Ratios
          Were Not False or Misleading. ...................................................16

        1.   The Evidence Shows That the Appraisers Believed Their
               Professional Judgments...........................................................18

        2.   The Evidence Does Not Show That Appraisers' Professional
               Judgments Were Objectively False................................................19

        3.   There Were No Misstatements About Loan-to-Value Ratios..................21

        4.   The Appraisals Complied With USPAP. ......................................21

    D.   Statements in the Offering Documents Concerning Credit Ratings Were
          Not False or Misleading..........................................................22

II.  THE ALLEGED MISSTATEMENTS WERE NOT MATERIAL. ...................................25

III. NONE OF THE DEFENDANTS IS LIABLE AS A CONTROL PERSON. ..................28

**Table of Contents**
**(continued)**

**Page**

IV.    PLAINTIFF MUST PROVE THAT THE SALES OF THE SECURITIES AT
       ISSUE OCCURRED IN D.C. OR VIRGINIA. ...................................................32

V.     NO NOMURA DEFENDANT IS A STATUTORY SELLER UNDER SECTION
       12 OR THE D.C. BLUE SKY LAW. .................................................................33

VI.    ANY LOSSES SUFFERED BY PLAINTIFF RESULTED FROM FACTORS
       OTHER THAN THE ALLEGED MISREPRESENTATIONS........................34

VI.    THE EVIDENCE DOES NOT SUPPORT THE RECOVERY SOUGHT BY
       PLAINTIFF UNDER SECTION 12....................................................................39

VII.   THE EVIDENCE DOES NOT SUPPORT THE RECOVERY SOUGHT BY
       PLAINTIFF UNDER THE BLUE SKY LAWS. ..............................................44

Defendants respectfully submit these Proposed Conclusions of Law pursuant to Rule 5(B) of the Court's Individual Practices in Civil Cases.

## I.  PLAINTIFF HAS FAILED TO PROVE THAT THE OFFERING DOCUMENTS CONTAINED FALSE OR MISLEADING STATEMENTS.[1]

1.    Section 12(a)(2) of the Securities Act imposes liability, subject to certain limitations, on any person who:

> offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission.

15 U.S.C. § 77*l*(a)(2).

2.    A claim under Section 12(a)(2) requires, at a minimum, proof of both "(1) the existence of a misstatement or an unlawful omission; and (2) materiality." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (citing 15 U.S.C. § 77*l*(a)(2)).  A Section 12(a)(2) plaintiff must prove both of these elements by a preponderance of the evidence.  *See Polycast Tech. Corp.* v. *Uniroyal, Inc.*, 792 F. Supp. 244, 251 (S.D.N.Y. 1992).  The plaintiff bears this burden of proof for both the "distinct hurdles" of falsity and materiality.  *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 101 (2d Cir. 2013).

3.    The Blue Sky laws of Virginia, Va. Code Ann. § 13.1-522, and the District of Columbia, D.C.Code § 31-5601, are substantially identical to Section 12(a)(2) and impose the

---

[1]    Defendants respectfully submit these proposed Conclusions of Law in light of the Court's prior rulings and statements of the law, which limited in significant respects the legal conclusions that Defendants would otherwise advance herein.  Defendants respectfully reserve all rights for appeal of the Court's prior rulings, including with respect to any opinions expressly or impliedly incorporated in the proposed Conclusions of Law herein.

same requirements of falsity and materiality.  *See Dunn* v. *Borta*, 369 F.3d 421, 428, 433 (4th

Cir. 2004); *Hite* v. *Leeds Weld Equity Partners, IV, LP*, 429 F. Supp. 2d 110, 114 (D.D.C. 2006).

They should be interpreted the same as Section 12.  *Id.*

      4.      Plaintiff must prove each element of each of its claims by a preponderance of the

evidence.  (Stip. § I.A.xi.)

      5.      "When analyzing offering materials for compliance with the securities laws,

[courts] review the documents holistically and in their entirety."  *In re Morgan Stanley Info.*

*Fund Sec. Litig.*, 592 F.3d 347, 365–66 (2d Cir. 2010).  In other words, "the proper inquiry

requires an examination of defendants' representations, taken together and in context."  *In re*

*ProShares Trust Sec. Litig.*, 728 F.3d 96, 105 (2d Cir. 2013) (quoting *In re Morgan Stanley*, 592

F.3d at 366).[2]  The relevant context includes not only other statements in the offering materials,

but also other public information concerning the types of securities at issue, such as relevant

practices followed by industry participants.  *See United Paperworkers Int'l Union* v. *Int'l Paper*

*Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993).  It is thus error to isolate the allegedly false statements

or treat them in a vacuum.  Context requires analysis of the documents as a whole and also

available public information.

      6.      "[T]he accuracy of offering documents must be assessed in light of the

information available at the time they were published."  *Scott* v. *Gen. Motors Co.*, 2014 WL

4547837, at *6 (S.D.N.Y. Sept. 15, 2014) (quoting *NECA-IBEW Pension Trust Fund*, 2012 WL

---

[2]      Because Sections 11 and 12(a)(2) employ the "same" standard for identifying material omissions or misstatements, *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 182 (2d Cir. 2014), authorities construing this standard in the Section 11 context fully apply to the Section 12(a)(2) claims asserted here.  *See also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (noting that "[c]laims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements").

3191860, at *6).  "A plaintiff may not plead . . . [Section] 12(a)(2) claims with the benefit of

20/20 hindsight." *NECA-IBEW Pension Trust Fund* v. *Bank of Am. Corp.*, 2012 WL 3191860, at

*9 (S.D.N.Y. Feb. 9, 2012) (quoting *In re Barclays Bank PLC Sec. Litig.*, 2011 WL 31548, at *5

(S.D.N.Y. Jan. 5, 2011)).  "The Second Circuit has firmly rejected this 'fraud by hindsight'

approach." *In re Sanofi Sec. Litig.*, 2015 WL 365702, at *12 (S.D.N.Y. Jan. 28, 2015) (quoting

*Podany* v. *Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004)); *see Stevelman*

v. *Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999).

      7.     Plaintiff alleges misstatements in the prospectus supplements for the

Securitizations with respect to four categories: (1) representations regarding the origination and

underwriting of the loans backing the Certificates; (2) representations regarding loan-to-value

ratios, combined loan-to-value ratios, and appraisals, including compliance with USPAP; (3)

representations regarding owner occupancy status; and (4) representations regarding the credit

ratings of the Certificates.  (Stip. § B.1.a.1.)

      **A.**    **Statements in the Offering Documents Concerning Loan Underwriting Were
          Not False or Misleading.**

      8.     Plaintiff alleges that statements in the Offering Documents concerning how loans

were originated were false or misleading.  Specifically, plaintiff alleges that "[d]efendants falsely

represented that the underlying mortgage loans complied with certain underwriting guidelines

and standards, including representations that significantly overstated the borrowers' capacity to

repay their mortgage loans."  (Am. Compl. ¶ 1.)  Plaintiff has not satisfied its burden to prove

that representations in this category were false or misleading.

      9.     The statements in the Offering Documents concerning underwriting criteria were

drafted against the backdrop of relevant SEC regulations in place during the 2005 to 2007 time

period.  Those regulations established a two-tier disclosure regime for RMBS issuers.  First, for

"any originator . . . that originated, or is expected to originate, 20% or more of the pool assets," the prospectus supplement was required to disclose "[t]o the extent material, a description of the originator's origination program."  17 C.F.R. § 229.1110(b) (2005).  Second, for all originators of loans underlying the securities, the regulations called for "[g]eneral information regarding pool asset types and selection criteria," including a "description of the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, to the extent known, any changes in such criteria and the extent to which such policies and criteria are or could be overridden."  *Id.* § 229.1111(a)(3).[3]

10.     Consistent with this regulatory regime, the seven Offering Documents at issue here contain two categories of disclosures.  For originators of 20 percent or more of the loans backing a security, the Offering Documents describe their "origination program."  *Id.*[4]  For originators of less than 20 percent of the collateral for a security, the Offering Documents contain a more general description—necessarily so, because it applied to multiple originators—of the "underwriting criteria used to originate or purchase the pool assets."  *Id.* § 229.1111(a)(3).  The latter disclosures state that the loans generally comply with the "criteria" disclosed in the Offering Documents—not with specific originator guidelines.  The offering documents were required to disclose no more than they did.  *See In re Dingledine*, 916 F.2d 408, 411 (7th Cir. 1990) (explaining that a regulation requiring "*general* disclosure of the *category* of property subject to the security interest . . . is a far cry from the requirement of a specific disclosure of a

---

[3]     In addition, a prospectus supplement was required to disclose the identity (but not the underwriting program of) "any originator or group of affiliated originators, apart from the sponsor or its affiliates, that originated, or is expected to originate, 10% or more of the pool assets."  17 C.F.R. § 229.1110 (2005).

[4]     The prospectus supplement for NAA 2005-AR6 does not do this, because it was filed before Regulation AB took effect on January 1, 2006.  FOF ¶ 42.

specific category") (emphasis in original).  Plaintiff did not prove that either type of disclosure

was false or misleading.

> **1.      For Five of the Seven Certificates, Plaintiff Has Presented No Evidence That Defendants Made False or Misleading Statements Concerning Underwriting Criteria.[5]**

11.      For two of the seven Certificates, NHELI 2006-FM1 and NHELI 2006-FM2,

there is only one relevant set of disclosures about underwriting guidelines because all of the

loans underlying the Securitization were originated by a single lender, Fremont.  FOF ¶ 51.[6]  The

other five Securitizations—NAA 2005-AR6, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2

and NHELI 2007-3—are multi-originator deals, and contain both types of disclosures (or, for

NAA 2005-AR6, only the more general disclosure).  FOF ¶ 315.  Plaintiff has provided no

evidence that the general disclosures about "criteria" used to originate the loans were false or

misleading.  Plaintiff also has provided no originator-by-originator evidence of the rate at which

loans from particular originators purportedly deviated from guidelines.  As a result, as to the five

Securitizations containing the general disclosures, plaintiff has failed to prove that either set of

disclosures concerning how the loans "were originated" was false or misleading.  FOF ¶ 397.

> **a.      Defendants' Statements Concerning Underwriting Criteria for Loans From Originators Whose Guidelines Were Not Disclosed Were Not False or Misleading.**

12.      For five of the seven securities, between 22% and 100% of the loans in the

supporting loan groups were originated by originators whose guidelines were not disclosed in the

---

[5]      Defendants submit that the conclusions in paragraphs 11 to 18 reflect the correct legal interpretation of the statements regarding origination of loans where the originator guidelines were not disclosed.  To the extent that the Court held otherwise in its pretrial rulings, *see FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 568788, at *9–10 (S.D.N.Y. Feb. 11, 2015), defendants reserve all rights.  Defendants will also herein address the interpretation set forth by the Court.

[6]      All citations herein to "FOF" refer to Defendants' Proposed Findings of Fact.

Offering Documents.  The only disclosures in the Offering Documents concerning the "underwriting criteria" used to originate those loans are contained in sections of the prospectus supplements entitled "Underwriting Standards of the Sponsor" and "Modified Standards."

13.     In the first of these sections, the prospectus supplements disclose that "All of the Mortgage Loans have been purchased by the seller from various banks, savings and loan associations, mortgage banks, and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section."  FOF ¶ 315.  These criteria are that (i) information about the borrower "generally" was furnished (except that income or assets might not be), (ii) "a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations," (iii) "[t]he adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator," (iv) "certain exceptions to the underwriting standards described in this prospectus supplement are made," and (v) those underwriting standards are "generally less stringent than the underwriting standards of Fannie Mae and Freddie Mac."  FOF ¶¶ 315–321.

14.     The "Modified Standards" state that in comparison to the 'general' underwriting standards described above, the underwriting standards applicable to mortgage loans under an 'alternative' mortgage loan underwriting program permit different underwriting criteria, and additional types of mortgaged properties.  FOF ¶ 320.  They go on to disclose that these loans "have been originated under reduced documentation, no-documentation or no-ratio programs," which may require, for example, no information about borrower income or assets.  FOF ¶ 187.

In these cases, "[t]he underwriting for such Mortgage Loans may be based primarily or entirely on an appraisal of the Mortgaged Property, the loan-to-value-ratio at origination and/or the borrower's credit score." *Id*.

15.     With respect to the originators whose guidelines were not disclosed, the Offering Documents did *not* make the representation plaintiff ascribes to them—namely, that the mortgage loans complied with their originators' underwriting guidelines.  Rather, consistent with then-applicable federal regulations, the Offering Documents provided that these originators "generally" complied with underwriting criteria described in the Offering Documents.  FOF ¶¶ 318–319.  The Offering Documents did not incorporate unidentified originator guidelines and/or warrant compliance with such unidentified guidelines.  Plaintiff therefore premises its claims based upon an incorrect interpretation of the Offering Documents.  *See In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 568 (D.N.J. 1992) ("[P]laintiffs should not be permitted to distort the plain meaning of the prospectus in order to state a claim. . . .  Neither can plaintiffs base a securities fraud claim on an attempt to 'rewrite' the prospectus in order to phrase the cautionary language in terms they find more suitable."), *aff'd*, 7 F.3d 357 (3d Cir. 1993).

16.     Properly construed, the statements in the Offering Documents regarding the origination of loans from originators whose guidelines were not disclosed are both true and not misleading.  Defendant's expert Michael Forester examined a sample of the loans whose originators' guidelines were not disclosed and concluded that they fully complied with the underwriting criteria described in the Offering Documents.  FOF ¶ 395.  Plaintiff has failed to provide evidence proving otherwise or to allege, much less prove, that the Offering Documents were required to disclose more than they did.  Accordingly, with respect to originators whose

guidelines were not disclosed, plaintiff has failed to prove that statements concerning compliance

with underwriting standards and guidelines were false or misleading.

> **b.  Defendants' Statements Concerning Whether Loans Were Originated Generally in Accordance With Each Disclosed Originator's Underwriting Guidelines Were Also Truthful.**

17.     For originators that originated 20 percent or more of the loans in the

Securitizations, all of the prospectus supplements (except NAA 2005-AR6) made representations

about the underwriting guidelines of those specific originators.  While the language of these

disclosures varies, all consist of statements about the processes used to originate loans, and say

that loans were originated generally (not strictly or perfectly) in compliance with underwriting

guidelines.  For example, the prospectus supplement for NHELI 2007-2 states that Ownit's

guidelines "are designed to be used as a guide" but that "no single characteristic will approve or

deny a loan."  FOF ¶ 301.  For NHELI 2007-1, the prospectus supplement describes Silver

State's guidelines—but does not contain any representations about compliance with those

guidelines and specifically disclosed that exceptions to the underwriting standards described

were made.  As noted above, there are no originator-specific disclosures concerning underwriting

guidelines in the NAAC 2005-AR6 prospectus supplement.

18.     Each of these disclosures applies only to the loans made by the originator to

which it pertains.  This Court has recognized as much, referring to these disclosures as

describing "in considerable detail the underwriting guidelines of those originators."  *FHFA* v.

*Nomura Holding Am., Inc.*, 2015 WL 568788, at *3 (S.D.N.Y. Feb. 11, 2015).  In 2012,

defendants argued that plaintiff was required to select a sampling and extrapolation method that

permitted opinions concerning originator-by-originator compliance with underwriting guidelines.

*FHFA* v. *JPMorgan Chase & Co.*, No. 11 Civ. 6188, slip op. at 14 (S.D.N.Y. Oct. 26, 2012).

Plaintiff declined to do so.  Except as to NHELI 2006 FM1 and FM2, plaintiff has indeed failed

to present any evidence about the rate at which loans from particular disclosed originators deviate from originator underwriting guidelines.  FOF ¶ 397.

> ### 2.    Even if the Offering Documents Are Interpreted To State that All Loans Were Originated In Accordance With Originator Guidelines, the Evidence Still Does Not Show Any False Statements.

19.    The Court has previously ruled that the "underwriting criteria" listed in the "Underwriting Standards of the Sponsor" and "Modified Standards" sections of the Offering Documents actually amount to statements that the loans were "originated in compliance with their Originators' standards and processes."  *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 568788, at *12 (S.D.N.Y. Feb. 11, 2015).  The evidence shows that such a statement is also true.

> ### a.    These Statements Refer to General Compliance with Underwriting Process, Not Perfect Adherence.

20.    These statements describe how loans "were originated"—not always, but "generally"—and subject to underwriting "exceptions."  FOF ¶¶ 284, 310.  They speak "generally" and warn of exceptions.

21.    As plaintiff's expert explained, the term "generally" means "very often so, but not universally so."  FOF ¶ 406; *see also* Oxford English Dictionary (Oxford University Press December 2014) (defining "generally" as "with respect to the majority of individual or cases; for the most part" or "in most instances; usually; commonly").

22.    When a Section 12 plaintiff challenges a statement that certain procedures were "generally" followed, evidence of limited exceptions to those procedures is not sufficient to prove that the statement is false or misleading.  *See, e.g.*, *N.J. Carpenters Health Fund* v. *Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 117, 125 (2d Cir. 2013) (noting distinction between exceptions to underwriting guidelines and "systematic disregard" or "wholesale abandonment" of underwriting standards); *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset*

*Acceptance Corp.*, 632 F.3d 762, 773 & n.11 (1st Cir. 2011) (suggesting that the falsity of

similar disclosures of "general" compliance may depend upon a factual showing of "wholesale

abandonment of underwriting standards"); *cf. Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 133

(2d Cir. 2011) (explaining that an issuer's representation "that it 'may routinely' place support

bids is not inconsistent with the possibility that it would place such bids in every . . . auction that

took place over a particular period.").

23.     Moreover, representations that the loans "were originated generally" in

accordance with underwriting guidelines concern process and describe general (but not perfect)

adherence to those processes, including through the use of discretionary exceptions.  They do not

guarantee against fraud by borrowers or loan originators.[7]

24.     These representations also made clear that as part of the underwriting process,

underwriters could decide, in their discretion and judgment, to deviate from the listed

requirements of the underwriting guidelines.   All of the prospectus supplements represented that

some portion—in some cases, a "substantial portion"—of the mortgage loans backing the

securitization were originated as "exceptions" to the applicable underwriting guidelines, based

on compensating factors identified in an underwriter's discretion.  FOF ¶ 310.  This means that,

according to the disclosures in the Offering Documents, the loans underlying the At-Issue

Certificates did not necessarily comply with every guideline criterion.

---

[7]     The Court previously has ruled that in addition to making statements about "the origination process," the prospectus supplements "include a representation that the loans actually did meet each of the criteria within an Originator's underwriting guidelines."  *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 568788, at *13 (S.D.N.Y. Feb. 11, 2015).  Defendants respectfully disagree and reserve all rights for appeal.  In all events, as discussed above and in defendants' Pretrial Brief, the loans generally complied with both the standards and process of the originators' underwriting guidelines and with the origination criteria.

### b. The Loans in the Supporting Loan Groups Were Originated Generally In Accordance with Originator Guidelines.

25. The loans supporting the At-Issue Certificates were originated "generally" in accordance with underwriting guidelines, after accounting for "exceptions" (as per the disclosures). For example, as part of Nomura's contemporaneous due diligence process, which "met and even exceeded any industry-wide norms that existed during this period," *FHFA* v. *Nomura Holding Am. Inc.*, 2014 WL 7232443, at *36 (S.D.N.Y. Dec. 18, 2014), Nomura examined 39% of the loans in the supporting loan group for compliance with underwriting guidelines and found that only 6.6% of loans were potentially materially defective (though this percentage overstates the percentage of loans that could have deviated materially from underwriting guidelines). FOF ¶¶ 332, 404. Similarly, Freddie Mac's contemporaneous reviews of originators of the loans underlying the Certificates approved of the originators' processes and found low defect rates. Defendants' reunderwriting expert, Michael Forester, who has 35 years of experience in the mortgage banking industry, concluded that only 5.5 percent of sample loans potentially were not originated in accordance with underwriting guidelines. FOF ¶ 395.

26. Plaintiff has failed to provide persuasive evidence to the contrary. Plaintiff has attempted to prove the falsity of these statements through an expert, Robert Hunter. Hunter purported to evaluate whether the loans strictly complied both with the processes and the criteria of each originator's underwriting guidelines. FOF ¶ 393. By demanding perfect adherence to underwriting guidelines, Mr. Hunter's analysis ignored the plain language of the Offering Documents, which use the qualifier "generally" and describe "exceptions" to underwriting guidelines. FOF ¶ 408. As a result, Mr. Hunter's report failed to provide a meaningful basis for assessing the loans' compliance with the Offering Documents' representations. In addition, defendants have identified numerous defects in Mr. Hunter's analysis, including his use of a

"gross" defect rate, FOF ¶ 414, his findings based on missing documents, FOF ¶ 417, his evaluations of borrowers' stated incomes based on wage data from the Bureau of Labor statistics (which was never considered by underwriters and is not considered reliable by BLS), FOF ¶¶ 439–442,  his reliance on "minimum industry standards" that never existed and were not the subject of representations in the Offering Documents, FOF ¶ 443, his use of unreliable "audit credit reports" and other information unavailable at the time of origination, or not required to be considered by the original underwriter, FOF ¶ 426, his reliance on the unreliable automated valuation model analysis performed by John A. Kilpatrick, FOF ¶ 432, and other errors and basic underwriting mistakes, FOF ¶ 445–448.  To summarize, Mr. Hunter's report addressed the wrong question, employed dubious methodology, and failed to provide a sufficient basis for concluding that the statements at issue were false or misleading.

### 3.    The Loans in the Supporting Loan Groups Also Met "Each of the Criteria" of the Originators' Underwriting Guidelines.

27.    The Court has ruled that the Offering Documents "include a representation that the loans actually did meet each of the criteria within an Originator's underwriting guidelines." *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 568788, at *13 (S.D.N.Y. Feb. 11, 2015).  The representations to which the Court referred were truthful and not misleading.

28.    The evidence that shows that the loans were generally originated in accordance with the processes prescribed by originator underwriting guidelines also demonstrates that the loans met the "criteria" of those underwriting guidelines.  The findings of due diligence providers, Freddie Mac's originator reviews, and Forester's review all support this conclusion. *See* ¶ 25, *supra*.

29.    For purposes of analyzing truth or falsity, the difference between a statement that underwriters followed "the origination process" and one that the "loans actually did meet each of

the criteria within an Originator's underwriting guidelines" is whether the statement can be shown to be false based on evidence unavailable to the original underwriter or that the original underwriter was not required to obtain or consider.  In this regard, plaintiff's expert asserted that a loan is defective if (i) an "audit credit report" or similar document (even when obtained years after origination) contains purported evidence that the borrower for an owner-occupied property did not actually occupy the property at some point during a full year after purchase; (ii) an "audit credit report" (even one that the original underwriter never saw or that was not available) identifies a debt that did not appear on the borrower's loan application; (iii) information that became available after the origination of the loan (or that the underwriter was not required to obtain) purportedly suggests that the borrower's income was misstated; or (iv) an unreliable AVM created by plaintiff's expert purports to find appraisal inflation.  FOF ¶ 394.  Each of these methods is unreliable.  The evidence does not support any of these categories of supposed defects.

        **4.**      **Because Cowan's Extrapolations for NAA 2005-AR6 Are Flawed, Plaintiff Has Presented No Sufficient Evidence of Underwriting Defects For That Certificate.**

30.      The extrapolations performed by plaintiff's expert Charles Cowan of Hunter's "defect" rates for the sample of loans from NAA 2005-AR6 are unreliable because the sample was not selected randomly, and Cowan offered no evidence of its representativeness.  FOF ¶ 603.  The evidence therefore does not show that there were any misstatements concerning the origination of the loans underlying the NAA 2005-AR6 security.

31.      In sum, plaintiff has not proved that defendants' representations regarding the origination and underwriting of the loans backing the Certificates were false or misleading.

**B.**      **Statements in the Offering Documents Concerning Occupancy Were Not False or Misleading.**

32.     Plaintiff has alleged that the Offering Documents' "representations concerning occupancy status" were false or misleading.  (Stip. § B.1.a.i.c.)

33.     The Offering Documents contain disclosures about the borrowers' representations of intent at the time of origination.  FOF ¶ 565–570.  To prove that these occupancy disclosures were false or misleading, plaintiff was required to show that the offering documents did not accurately reflect what borrowers reported about their intent.  *See, e.g.*, *IKB Int'l S.A.* v. *Bank of Am.*, 2014 WL 1377801, at *11 (S.D.N.Y. Mar. 31, 2014) (dismissing claims alleging falsity of owner-occupancy information where the "offering documents for all the securitizations expressly note that the information concerning owner occupancy was based on the representations of the borrowers" and the plaintiff failed to allege "that defendants misrepresented the borrowers' statements"), *aff'd*, 584 F. App'x 26 (2d Cir. 2014); *Union Cent. Life Ins. Co.* v. *Credit Suisse Sec. (USA), LLC*, 2013 WL 1342529, at *9 (S.D.N.Y. Mar. 29, 2013); *Mass. Mut. Life Ins. Co.* v. *Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 204–05 (D. Mass. 2012); *Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *19 (S.D.N.Y. Sept. 28, 2010).[8]

34.     Plaintiff has failed to meet this standard.  Indeed, plaintiff's expert admitted that he was "not investigating the intent" of the borrower and presented no evidence that this intent was misstated.  FOF ¶ 575.  *See Harsco Corp.* v. *Segui*, 91 F.3d 337, 346 n.7 (2d Cir. 1996) (statements of future intention are actionable only "when a person 'state[s] that something was to

---

[8]     Defendants submit that the above conclusion correctly reflects the appropriate legal standard.  Defendants understand the Court's prior decisions to state that "the owner-occupancy statistics in the Collateral Tables are representations of fact [i.e., whether or not the subject properties were lived in by borrowers] as of the Cut-Off Date," rather than statistics accurately reflecting the borrower's statements at origination.  *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 568788, at *10 (S.D.N.Y. Feb. 11, 2015); *see also FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 394072, at *3 (S.D.N.Y. Jan. 29, 2015).  Defendants respectfully disagree and reserve all rights for appeal.

be done when he kn[ows] all the time it was not to be done and that his representations were false'" (quoting *Channel Master Corp.* v. *Aluminium Ltd. Sales, Inc.*, 151 N.E.2d 833, 836 (N.Y. 1958))) (alterations in original).  Plaintiff has provided no evidence to support its claim that the data on occupancy status does not accurately reflect what a borrower represented about his or her intent.

35.     Even under the Court's ruling that '[t]he owner occupancy statistics in the Collateral Tables" represent whether or not the subject properties were owner-occupied "as of the Cut-Off Date," *FHFA* v. *Nomura Holding Am., Inc.*, No. 11CV6201 DLC, 2015 WL 568788, at *10 (S.D.N.Y. Feb. 11, 2015), plaintiff has not satisfied its burden of demonstrating that these statistics were inaccurate.  Plaintiff offered the testimony of its expert, Robert Hunter, considering borrowers' compliance with "occupancy agreements" they signed, which provide that a borrower "shall continue to occupy the Property as [the] Borrower's principal residence for at least one year after the date of occupancy" absent "lender consent or extenuating circumstances."  (Pls' Opp. to Occupancy Mot., at 3-4, 15.)  Hunter's report did not, however, assess where borrowers lived as of the Cut-Off Dates.  FOF ¶ 580.  Hunter's analysis was thus designed to answer the wrong question, and is irrelevant.

36.     In fact, Hunter used evidence from long after the applicable Cut-Off Date for 17 of his 41 findings that occupancy was misrepresented, or 41% of those findings, FOF ¶ 580— evidence that does not address the question identified by the Court of whether borrowers occupied the properties "*as of* the Cut-Off Date." *Nomura*, 2015 WL 568788, at *10.  Excluding those findings brings down the rate—even if Hunter were otherwise correct—to about 4% of the sample loans as being incorrectly categorized as owner-occupied.  FOF ¶ 580.  Such a deviation

would be within the 5% variance the prospectus supplements disclosed is permissible for the data set forth in the collateral tables, *see id.*, and therefore not false or misleading.

37.     Accordingly, plaintiff has not proved that disclosures in the Offering Documents concerning occupancy were false or misleading.

### C.    Statements in the Offering Documents Concerning Loan-to-Value Ratios Were Not False or Misleading.

38.     The Offering Documents present loan-to-value ratios in aggregate form, divided into percentage bands, *e.g.*, 90.01 - 95.00, 95.01-100.00, etc.  FOF ¶ 450.  Plaintiff claims that these disclosures are false because the appraised values for the loans were too high.  In order to prove its claims, plaintiff must show (i) that the appraised values were false in a way that gives rise to liability under the securities laws, and (ii) that the appraised values caused the LTV ratios in the prospectus supplements to be false as well.  Plaintiff has failed on both prongs of this test.

39.     Section 12(a)(2) of the Securities Act "impose[s] liability only for an omission or 'untrue statement of a material *fact.*'" *FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 325 (S.D.N.Y. 2012) (quoting 15 U.S.C. § 77*l* (a)(2)), *aff'd*, 712 F.3d 136 (2d Cir. 2013).  "In contrast to objective statements of material fact, subjective statements of opinion are generally not actionable as fraud."  *In re Sanofi Sec. Litig.*, 2015 WL 365702, at *12 (S.D.N.Y. Jan. 28, 2015).  Rather, "when a plaintiff asserts a claim under section 11 or 12 based upon a belief or opinion alleged to have been communicated by a defendant, liability lies only to the extent that the statement was both objectively false *and* disbelieved by the defendant at the time it was expressed."  *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (emphasis added); *see also In re Puda Coal Sec. Inc., Litig.*, 2014 WL 2915880 (S.D.N.Y. June 26, 2014) ("[S]tatements that are matters of opinion must be 'both objectively and subjectively false' at the time that they were made in order to be actionable." (quoting *Fait*, 655 F.3d at 111)).  "It is not

sufficient to allege . . . that it would have been possible to reach a different opinion than that reached by defendant based on information available to defendant at the time, or even that defendant's opinion was unreasonable." *Podany* v. *Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (Lynch, J.).

40.     This Court and others in this District have repeatedly recognized that appraisals (from which some loan-to-value ratios were derived) "are, of course, the subjective judgments of the appraisers." *UBS*, 858 F. Supp. 2d at 326.  As Judge Kaplan explained in *Tsereteli*, "neither an appraisal nor a judgment that a property's value supports a particular loan amount is a statement of fact.  Each is instead a subjective opinion based on the particular methods and assumptions the appraiser uses." *Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010); *accord. Homeward Residential, Inc.* v. *Sand Canyon Corp.*, 298 F.R.D. 116, 130 (S.D.N.Y. 2014) ("Appraisals are indeed statements of opinion."); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 510–11 (S.D.N.Y. 2010).

41.     Because they are subjective opinions, "real estate appraisals . . . are actionable . . . only if the complaint alleges that the appraiser did not truly believe the appraisal at the time it was issued." *IKB Int'l S.A.* v. *Bank of Am.*, 2014 WL 1377801, at *9 (S.D.N.Y. Mar. 31, 2014) (quoting *In re IndyMac*, 718 F. Supp. 2d at 511), *aff'd*, 584 F. App'x 26 (2d Cir. 2014).  As a matter of law, therefore, plaintiff's claims fail absent a demonstration of "subjective falsity by the 'originator of the opinion,' that is the appraiser, as well as the objective falsity of the LTV representations." *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 353929, at *1 (S.D.N.Y. Jan. 28, 2015) (quoting *FHFA* v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306, 325 (S.D.N.Y. 2012)).[9]

---

[9]     This Court has adhered to the view that the appraiser, and not any particular defendant, is the "'speaker' whose disbelief in the statements plaintiff must plead," *UBS*, 858 F. Supp. 2d at
(footnote continued)

### 1.   The Evidence Shows That the Appraisers Believed Their Professional Judgments.

42.    Plaintiff has failed to show that the appraisers disbelieved their own professional judgments.  The only evidence that bears on whether an appraiser subjectively believed his or her opinion is the direct testimony of appraisers Bill Schall, Michele Morris, Dan Platt and Lee Clagett.  FOF ¶¶ 467–482.  Each of these appraisers testified that they believed their appraisal opinions for the subject properties at the time they were rendered, and still believe today that the appraisals were accurate and honest.  *Id*.  This evidence speaks directly to the question of whether "the appraiser did not truly believe the appraisal at the time it was issued."  *In re IndyMac Mortg. Backed Secs. Litig.*, 718 F. Supp. 2d 495, 511 (S.D.N.Y. 2010).  And it provides the answer: the appraisals were "honestly believed when they were made."  *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011).

43.    Plaintiff has provided no persuasive evidence to the contrary.  Plaintiff did not call any appraisers to testify.  Instead, attempting to resist the clear import of appraisers' own statements of subjective belief, plaintiff presented an expert's newly-invented "Credibility Assessment Model" ("CAM"), which applied a series of questions to a sample of appraisals and asked a computer—not an appraiser—to test their "credibility."  FOF ¶¶ 485–486.  Plaintiff's approach neither tests "credibility," nor whether any appraiser subjectively disbelieved his or her opinion.  FOF ¶¶ 483–486.  The CAM therefore cannot be squared with *Fait* and its progeny, and it provides no basis for concluding that the appraisal valuations at issue were subjectively false.

(continued)
325, and recently "declined" plaintiff's invitation "to allow it to prove the subjective falsity of the defendants instead of the appraisers," *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 353929, at *1 n.2 (S.D.N.Y. Jan. 28, 2015).

### 2. The Evidence Does Not Show That Appraisers' Professional Judgments Were Objectively False.

44.     Plaintiff has also failed to satisfy this standard.  Plaintiff's only evidence to support the assertion that appraisals were inflated is Kilpatrick's testimony based on his Greenfield AVM.  Based on the outputs of his model, Kilpatrick opines that the original appraised values of 208 of the 672 properties valued by the Greenfield AVM were inflated by more than 15.1%, making those appraised values "significantly higher" than the "true" value of the subject property, and thus "inaccurate."  FOF ¶ 488.  Kilpatrick claims that, on average, appraisals of the Nomura sample properties were inflated by 8.92%.  *Id*.  The evidence does not show that the appraisal valuations (upon which some loan-to-value ratios were based) were objectively false.

45.     Appraisals are the subjective opinions of appraisers, and reasonable appraisers may reach different opinions of value about the same property.  FOF ¶ 465.  As a result, no single appraisal value is "correct" for any property.

46.     Nomura's contemporaneous valuation diligence shows that the appraised values of the loans in the supporting loan groups for the Certificates were not objectively false.  Nomura performed valuation diligence on nearly all of these loans—99.1%—and only 1% were potentially not supported.  Both Freddie Mac and Fannie Mae expressed approval of Nomura's valuation diligence, describing it as "solid" and noting that "Nomura takes the property evaluation process seriously and places a high priority on collateral valuation."  FOF ¶ 458.  Plaintiff's expert Charles Cowan testified that Nomura's valuation diligence findings differed by only 1.8 percent from the appraisal values.  FOF ¶ 498.

47.     The testimony of the four professional appraisers mentioned above—Bill Schall, Michelle Morris, Dan Platt and Lee Clagett—also shows the unreliability of Kilpatrick's AVM.

-19-

Kilpatrick's AVM worked very poorly with respect to the appraisals rendered by these four professionals, yielding values far below their opinions, and even below the sales prices of the subject properties.  FOF ¶¶ 467–482.

48.     Automated valuation models cannot be used to show that an appraisal is false. Professionals in the real estate field do not rely on AVMs to make conclusive determinations about the accuracy or reasonableness of opinions of value offered by certified appraisers, whether individually or collectively.  FOF ¶ 489.  Instead, as defendants' expert Michael P. Hedden testified, appraisers can take into consideration factors for which an AVM cannot account, including, *inter alia*, home quality, condition, views and amenities, privately sourced data, personal expertise about local conditions, and the views of local real estate brokers.  FOF ¶ 490.  As a result, market participants accept a level of "tolerance" between appraisal valuations and AVM valuations.  FOF ¶¶ 499–501.  The evidence at trial showed that at the time the loans underlying the securities at issue were originated, a range of 10 to 15 percent was within industry standards.  *Id*.

49.     AVM results from the "Greenfield AVM" are particularly unreliable, and do not show that the appraised values for the loans in the supporting loan groups for the Certificates were inflated.  The testimony of Hans Isakson, Jerry Hausman, and Lee Kennedy show that Kilpatrick's Greenfield AVM does not accurately estimate property values.  FOF ¶ 503.  For instance, the evidence shows that plaintiff's AVM model does not meet the industry's standards in predicting a subject property's sales price, FOF ¶¶ 504–505, excludes relevant sales price data typically included in AVM analysis, FOF ¶¶ 506–512, and uses an unreasonably low "confidence interval" to compare its results against its hypothesis, FOF ¶¶ 513–517.  As a result of these and other defects, Kilpatrick's AVM analysis is entitled to no weight.

50.     Further, even if Kilpatrick's and Cowan's analyses were accepted as accurate,

they revealed that the appraisals exceeded AVM valuations by 8.92 percent—within the standard

tolerance range at the time these loans were originated.  FOF ¶¶ 499–501.  Plaintiff's own expert

evidence, therefore, demonstrated that the subjective valuations reflected in the Offering

Documents were within "a range of prices with reasonable claims to being fair market value."

*Henry* v. *Champlain Enters., Inc.,* 445 F.3d 610, 619 (2d Cir. 2006) (quoting *Rhodes* v. *Amoco*

*Oil Co.,* 143 F.3d 1369, 1372 (10th Cir. 1998)).

### 3.     There Were No Misstatements About Loan-to-Value Ratios.

51.     Because the evidence does not show that any of the appraised values for the loans

in the supporting loan groups for the Certificates were false, there is no evidence that any

information in the Offering Documents concerning loan-to-value ratios was false or misleading.

52.     Even if Kilpatrick's analyses of loan samples were entitled to some weight, and

they are not, plaintiff's expert Charles Cowan's extrapolations of those values to the supporting

loan groups as a whole are unreliable.  Among other errors, Cowan based his analysis on a non-

random sample for four of the seven Certificates, FOF ¶¶ 606–613, he failed to use Kilpatrick's

definition of an inflated or undervalued appraisal, FOF ¶ 617, and his methods systematically

inflated the appraisal values, FOF ¶¶ 616–625.

53.     These errors aside, Cowan's extrapolations support, at most, the claim that loan-

to-value ratios for 3.5% of the loans in the supporting loan groups were understated.  That

percentage is below the 5% variance in collateral table data disclosed in the Offering Documents,

and would not render any statement in the offering documents false or misleading.

### 4.     The Appraisals Complied With USPAP.

54.     Finally, plaintiff has provided no evidence that appraisals did not meet USPAP

standards.  Plaintiff has instead relied upon Kilpatrick's Credibility Assessment Model, but that

model does not test compliance with USPAP.  FOF ¶ 528.  USPAP does not require appraisals to meet *any* of the requirements specified in the 31 questions Kilpatrick's CAM considered.  FOF ¶ 533.  Kilpatrick conceded that those questions are not contained in USPAP, any other professional standard, or any published literature accepted in the appraisal industry.  FOF ¶ 534.  In fact, many questions in the "Credibility Assessment Model" contradict USPAP requirements, either directly or because they contain rigid requirements contrary to the subjective judgment USPAP demands of appraisers.  FOF ¶ 536.

55.    The testimony of each of the four appraisers—Schall, Morris, Platt and Clagett— is that their relevant appraisals conformed to USPAP standards.  FOF ¶¶ 476–482.   There is no contrary evidence as to these, or any other, appraisals.

56.    Therefore, plaintiff has not proved that defendants' statements concerning loan-to-value ratios in the offering documents were false or misleading.

**D.    Statements in the Offering Documents Concerning Credit Ratings Were Not False or Misleading.**

57.    Like appraisal valuations, the credit ratings disclosed in the offering documents are statements of opinion, not of fact.  "[C]redit ratings and the relative adequacy of protective credit enhancements are statements of opinion, as they are predictions of future value and future protection of that value."  *N.J. Carpenters Vacation Fund* v. *RBS Grp., PLC*, 720 F. Supp. 2d 254, 271 (S.D.N.Y. 2010); *see also Tsereteli* v. *Residential Asset Securitization Trust*, 692 F. Supp. 2d 387, 394 (S.D.N.Y. 2010) ("Like the appraisals, whether the credit quality of the mortgage pool was properly considered or adequate to support a particular rating was not a matter of objective fact.  It was instead a statement of opinion by each agency that it believed, based on the models it used and the factors it considered, that the credit quality of the mortgage

pool underlying each Certificate was sufficient to support the assigned rating.") (internal quotations omitted).

58.     Here, "[t]here is no claim that the ratings given were misreported or that the 'unless' condition"—the condition that the securities would not be issued without AAA ratings—"was not met."  *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 632 F.3d 762, 774 (1st Cir. 2011).  Instead, plaintiff alleges that the ratings were mistaken because predicated on inaccurate loan-tape data, which defendants furnished to the agencies.  Statements of opinion are only actionable under the Securities Act, however, if "they misstate the opinions or belief held . . . *and* are false or misleading with respect to the underlying subject they address."  *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011) (emphasis in original).  In other words, plaintiff must demonstrate that the contested statement did not actually reflect the speaker's true opinion (subjective falsity) and that the opinion was incorrect (objective falsity).

59.     In the context of credit ratings disclosed in the offering documents, the "'speaker' whose disbelief in the statements plaintiff must plead," *FHFA* v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306, 325 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013), is the credit agency or agencies, not defendants.  Plaintiff is therefore required to demonstrate that the rating agencies did not "honestly believe[]" the opinions of value contained in the ratings they issued.  *Va. Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1109 (1991) (Scalia, J., concurring in part and concurring in the judgment); *see also In re IndyMac Mortgage-Backed Secs. Litig.*, 718 F. Supp. 2d 495, 512 (S.D.N.Y. 2010) ("Ratings are opinions and therefore actionable under the Securities Act only if not truly held by the ratings agencies when issued.").

60.     "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held." *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004); *see also Podany* v. *Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 155–56 (S.D.N.Y. 2004) (rejecting plaintiff's argument that "the objective wrongness of the opinions was so obvious that a reasonable person could not have held those opinions," and noting that "there are strong policy reasons why courts do not engage in this kind of second-guessing of forward-looking opinions").

61.     Plaintiff has failed to prove objective falsity—i.e., that the Certificates did not merit AAA ratings.  Plaintiff alleges that the loan-tape data provided to the rating agencies was incorrect based on the analysis performed by its expert, Robert Hunter.  FOF ¶ 590.  The evidence shows that this analysis was unreliable.  *See* pp. 11–12, *supra*.  Moreover, even if the loan tapes contained inaccurate data, plaintiff has failed to introduce any evidence suggesting that the alleged misrepresentations would have actually affected the ratings issued by the agencies.  Although plaintiff asserts that loan-tape errors could theoretically influence the ultimate ratings for a security, it has failed to prove that the specific loan-tape discrepancies its expert purports to identify had any impact on the ratings granted to the at-issue Securities.[10]  Furthermore, plaintiff has provided no evidence that the allegedly false information provided to

---

[10]     Plaintiff's expert Dr. Schwert performed a regression analysis and identified a relationship (in some circumstances) between loan-to-value ratios and occupancy status for loans underlying private label securitizations, on the one hand, and subordination for AAA certificates, on the other.  FOF ¶¶ 592–593.  As Dr. Riddiough testified, however, that analysis does not show that the particular misstatements plaintiff alleges would have had any impact either on subordination or on credit ratings.  FOF ¶ 602.

the agencies had any effect on the ratings ultimately issued.  Absent evidence that the securities

would have received different ratings had defendants provided the agencies different

information, defendants may not be held liable for the ratings agencies' subjective views on the

creditworthiness of the securities.

62.     Finally, plaintiff has provided no evidence that the ratings agencies did not

believe the opinions of value contained in the ratings they issued.  FOF ¶ 591.  Accordingly,

plaintiff has not carried its burden of showing that "the originator of the opinion" did not

"sincerely hold[] the belief reported."  *FHFA* v. *UBS Ams., Inc.*, 858 F. Supp. 2d 306, 326

(S.D.N.Y. 2012).

63.     Plaintiff has not proved that statements in the offering documents concerning

credit ratings were false or misleading.

## II.     THE ALLEGED MISSTATEMENTS WERE NOT MATERIAL.

64.     Even if it could prove falsity, plaintiff must also show, in order to prevail on its

Securities Act and Blue Sky claims, that the alleged misstatements were "material."  15 U.S.C. §

77*l*(a)(2); D.C. Code § 31-5606.05(a)(1)(B); Va. Code § 13.1-522(A)(ii).  "For a misstatement or

omission to qualify as material, 'there must be a substantial likelihood that' a complete and

truthful disclosure 'would have been viewed by [a] reasonable investor as having significantly

altered the 'total mix' of information made available.'"  *N.J. Carpenters Health Fund* v. *Royal*

*Bank of Scotland Grp., PLC*, 709 F.3d 109, 126 (2d Cir. 2013) (quoting *Basic Inc.* v. *Levinson*,

485 U.S. 224, 231–32 (1988)).

65.     "In assessing the materiality of an alleged misstatement, [courts] consider

'[w]hether the defendants' representations, taken together and in context, would have misled a

reasonable investor.'"  *Elite Aviation LLC* v. *Credit Suisse AG*, 588 F. App'x 37, 38 (2d Cir.

2014) (quoting  *In re Morgan Stanley Info. Fund Secs. Litig.,* 592 F.3d 347, 360 (2d Cir. 2010)).

"In evaluating a prospectus, [courts] read it 'as a whole,'" *DeMaria* v. *Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (quoting *Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996)).  Particular statements are not analyzed in isolation, but rather evaluated in the context of the complete set of disclosures contained in the offering documents.

66.     "For a misstatement or omission to qualify as material, 'there must be a substantial likelihood that' a complete and truthful disclosure 'would have been viewed by [a] reasonable investor as having significantly altered the 'total mix' of information made available.'" *N.J. Carpenters Health Fund* v. *Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 125–26 (2d Cir. 2013) (quoting *Basic Inc.* v. *Levinson,* 485 U.S. 224, 231–32 (1988)).[11]

67.     In addition to information provided in offering documents, "[t]he 'total mix' of information may also include information already in the public domain and facts known or reasonably available to the [investors]." *United Paperworkers Int'l Union* v. *Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (quoting *Rodman* v. *Grant Found.*, 608 F.2d 64, 70 (2d Cir. 1979)); *accord. N.J. Carpenters*, 709 F.3d at 127 ("[T]he 'total mix' of information relevant to the question of materiality can include publicly available information . . . ."); *see also United Food & Commercial Workers Union Local 880 Pension Fund* v. *Chesapeake Energy Corp.*, 774 F.3d 1229, 1238 (10th Cir. 2014)  ("Public documents are part of that total mix if an investor interested in a particular type of information about a company would know of the existence of the record and could readily access it.").  Thus, when a particular subject "has been widely reported in readily available media, [investors] may be deemed to have constructive notice of the facts reported, and the court may take this into consideration in determining whether

---

[11]     Defendants respectfully disagree with the Court's prior ruling on the applicable materiality standard. *See FHFA* v. *Nomura Holding America Inc.*, 2014 WL 7229361, at *3 (S.D.N.Y. Dec. 18, 2014).  Defendants reserve all rights for appeal.

representations in or omissions from the [offering documents] are materially misleading."

*United Paperworkers*, 985 F.2d at 1199.  Here, the knowledge of reasonable PLS investors—

concerning loan origination practices, occupancy data, and appraisals and loan-to-value ratios—

must be considered in addition to the disclosures in the offering documents.

68.     In proving the materiality of an alleged misstatement, "[i]t is not sufficient to

allege that the investor *might* have considered the misrepresentation or omission important."  *In*

*re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (quoting *Ganino* v. *Citizens*

*Utils. Co.,* 228 F.3d 154, 162 (2d Cir. 2000)).  Otherwise, issuers would "bury the [investors] in

an avalanche of trivial information[,] a result that is hardly conducive to informed

decisionmaking."  *In re Sanofi Sec. Litig.*, 2015 WL 365702, at *12 (S.D.N.Y. Jan. 28, 2015)

(quoting *TSC Indus., Inc.* v. *Northway, Inc.,* 426 U.S. 438, 448–49 (1976)).  Instead, plaintiff

must show that the alleged misrepresentations significantly altered the total mix of information

available.

69.     Because the complex nature of PLS made them appropriate only for sophisticated

investors—such as banks, insurance companies, mutual funds, pension funds, Freddie Mac,

Fannie Mae, and hedge funds—the reasonable PLS investor is a sophisticated investor.  FOF ¶

627.

70.     Reasonable PLS investors considered a broad array of information—both general

and security-specific—in making their investment decisions.  They were aware of the limitations

inherent in the information contained in the prospectus supplements, and in particular recognized

that underwriting determinations and appraisers' opinions of value were inherently subjective—

and understood data about owner-occupancy to refer to statements of intention made by

borrowers at the time of loan origination.  FOF ¶ 638–655.  Reasonable PLS investors also took

into account, among many other things, documentation, loan product type, asset type (*i.e.* subprime or Alt-A), geography, FICO scores, originator, first lien/second lien statistics, and economic expectations.  FOF ¶ 627, 661, 666.  Furthermore, reasonable PLS investors considered the characteristics of all of the loans underlying a Securitization, not just those in the supporting loan group for  a particular security.[12]

71.     The misrepresentations alleged by plaintiff are not material.  Plaintiff has alleged that a small subset of the statements contained in the offering documents were false or misleading, often by a small amount.  Such deviations could be material only if they had an impact—in the context of all of the collateral underlying the security (not just one supporting loan group), as well as the security's credit rating, macroeconomic forecasts, credit enhancement, expected returns, and other available data—on how a reasonable PLS investor would have evaluated the expected future performance of a security under a variety of market circumstances. FOF ¶ 627.  Plaintiff has no evidence of this.

72.     The alleged misrepresentations—read in context and in light of the information evaluated by reasonable investors in making purchasing decisions—were not material.

## III.    NONE OF THE DEFENDANTS IS LIABLE AS A CONTROL PERSON.

73.     Plaintiff alleges that Nomura Holding, NCCI, and the Individual Defendants are liable as control persons under Section 15 of the Securities Act and the analogous provision of

---

[12]     PLS investors, including Freddie Mac and Fannie Mae, were not deterred by high-risk collateral.  In fact, those two companies actively sought out securities backed by such collateral in order to satisfy their housing goals.  The Court has excluded evidence concerning housing goals, *FHFA* v. *Nomura Holding Am., Inc.*, 2014 7229361 (S.D.N.Y. Dec. 18, 2014), and also has determined that materiality must be assessed from the perspective of a "reasonable PLS investor," without considering Freddie Mac and Fannie Mae's unique position in the industry and "regulatory restrictions and purchasing goals."  *FHFA* v. *Nomura Holding Am., Inc.*, No. 11cv6201 (DLC), 2014 WL 7229361, at *3 (S.D.N.Y. Dec. 18, 2014).  Defendants respectfully disagree with these prior rulings, and reserve all rights for appeal.

the D.C. blue sky laws.  These provisions provide a cause of action against defendants who exercise control over primary violators of the securities laws, as well as an affirmative defense for those who lacked reasonable grounds to know of the alleged misrepresentations.  Plaintiff has not proven that any defendant is liable for these claims.[13]

74.    "Control over a primary violator may be established by showing  that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *SEC* v. *First Jersey Secs., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2).  "Control in this context is not the mere ability to persuade, but almost always means the practical ability to *direct* the actions of people who issue or sell securities."  *N.J. Carpenters Health Fund* v. *Residential Capital, LLC*, 2010 WL 1257528, at *7 (S.D.N.Y. Mar. 31, 2010) (internal quotations omitted) (emphasis in original).

75.    Under Section 15, general control—even if it includes the power to direct rather than persuade—is not sufficient.  Instead, a plaintiff must show that defendant possessed control over the specific transaction at issue.  *See, e.g.*, *Ross* v. Bolton, 1989 WL 80428, at *3 (S.D.N.Y. Apr. 4, 1989).  In a securities case, such transaction-specific control requires some authority over the decision to issue a security or the contents of the offering documents.  *See, e.g.*, *Capital Ventures Int'l* v. *J.P. Morgan Mortg. Acquisition Corp.*, 2013 WL 535320, at *10 (D. Mass. Feb. 13, 2013) (noting that defendants "acquired and selected the loans that would be securitized and determined the terms under which those loans were sold to the depositors and then to the trusts. The [defendants] also determined and approved the structure of the securitizations and the

---

[13]    Section 15 and the D.C. provision are largely analogous.  The Section 15 analysis that follows thus applies, in most respects, to both claims.  *Compare* 15 U.S.C. § 77o, *with* D.C. Code § 31-5606.05(c).

manner in which the depositors and the trusts sold the related Certificates, and controlled the disclosures made in connection with the related securitizations.").

76.    A defendant's status as the director of a primary violator is not sufficient to establish actual control.  *See, e.g.*, *Food & Allied Serv. Trades Dep't, AFL-CIO* v. *Millfield Trading Co.*, 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994) ("[C]ourts in this circuit . . . have agreed that a bare allegation of director status, without more, is insufficient.").

77.    The signing of a registration statement containing the alleged misrepresentations does not subject a defendant to control-person liability when those misrepresentations are contained in a separate document not signed by the defendant.  *See, e.g.*, *In re Worldcom, Inc. Secs. Litig.*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003); *In re Calpine Corp. Secs. Litig.*, 288 F. Supp. 2d 1054, 1081 (N.D. Cal. 2003).

78.    Here, Nomura Holding America did not possess "actual control" over alleged primary violators NAAC and NHELI under these criteria.  First, Nomura Holding America was not the direct corporate parent of the alleged primary violators. FOF ¶ 26.  Second, it had no direct participation in the purchase of mortgage loans, the securitization of those loans, the creation of the Offering Documents, or the sale of the Securitizations to investors.  FOF ¶ 26. Finally, it had no power to directly prevent or authorize the issuance of the Securitizations. Accordingly, plaintiff has not established that Nomura Holding America is liable as a control person under Section 15 or the analogous provision of the D.C. Blue Sky law.

79.    As to the Individual Defendants, the fact that certain defendants signed the registration statements for the Securitizations and acted as directors or officers of NAAC and NHELI, FOF ¶ 670–675, does not satisfy plaintiff's burden to prove that the Individual

Defendants are liable as control persons under Section 15 or the analogous provision of the D.C. Blue Sky law.

80.     Even if plaintiff could establish a prima facie case under Section 15, each of the defendants has proven the affirmative defense provided by that statute.  Section 15 states that a defendant may not be held liable as a control person if he "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which [his liability] is alleged to exist."  15 U.S.C. § 77o.  Section 15 does not impose a duty to conduct an investigation. *In re Worldcom, Inc. Secs. Litig.*, 2005 WL 638268, at *16-17 (S.D.N.Y. Mar. 21, 2005).[14]  Whether a defendant had no "reasonable ground to believe" a misstatement or omission was false "will vary with the degree of involvement of the individual, his expertise, and his access to the pertinent information and data."  *Feit* v. *Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544 (E.D.N.Y. 1971) (discussing the "reasonable ground to believe" standard in the context of Section 11 defenses).

81.     Here, none of the Section 15 defendants knew or had reasonable grounds to believe that any representations contained in the Offering Documents might be materially false. First, with respect to the corporate defendants, Nomura Holding was not involved in the loan purchase or due diligence process and thus had no reason whatsoever to suspect that certain loans might be defective.  FOF ¶ 27–28.  NCCI was involved in the due diligence process, but it justifiably trusted this diligence process and had no grounds to doubt the accuracy of the data included in the prospectus supplements.  FOF ¶ 28.  Second, with respect to the individual

---

[14]     In *In re Worldcom, Inc. Secs. Litig.*, this Court suggested that the Section 11 "reasonableness" standard—"that required of a prudent man in the management of his own property"—"lends guidance" to what "reasonableness" means under Section 15.  2005 WL 638268, at *16 (internal quotation marks omitted).

defendants, the evidence shows that all acted in good faith and without a reasonable basis for doubting the representations contained in the prospectus supplements.  FOF ¶¶ 669, 673, 675, 667.  By exercising care that was reasonable in light of all of the circumstances, none of them would have discovered the alleged misstatements.  *Id*.

82.     Even if plaintiff could establish a prima facie case under the D.C. Blue Sky law, each of the defendants has proven the affirmative defense provided by that statute, which provides that liability will not attach if defendant "is able to sustain the burden of proof that he or she did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."  D.C. Code § 31-5606.05(c).

83.     Here, none of the defendants alleged to be liable as a control person under the D.C. Blue Sky law knew, or could have known in the exercise of reasonable care, of the misrepresentations alleged by plaintiff.

84.     Accordingly, Nomura Holding, NCCI, and the Individual Defendants are not liable as control persons under Section 15 of the Securities Act or the analogous provision of the D.C. Blue Sky laws.

## IV.     PLAINTIFF MUST PROVE THAT THE SALES OF THE SECURITIES AT ISSUE OCCURRED IN D.C. OR VIRGINIA.

85.     Under the Virginia and D.C. blue sky laws, plaintiff bears the burden of proving, by a preponderance of the evidence, that the sales of the at-issue securities occurred in Virginia and D.C., respectively.  *See Lintz* v. *Carey Manor Ltd.*, 613 F. Supp. 543, 549–50 (W.D. Va. 1985) (holding that the Virginia statute "is intended to govern those who sell securities within the state"); D.C. Code 31-5608.01(a) (stating that the statute "shall apply to a person who sells, or offers to sell, when an offer to sell is made in the District"); *see also* Stip. at 4 (listing whether

the sales "took place in" Virginia and D.C. as an element of plaintiff's claims that remains to be tried).

## V.   NO NOMURA DEFENDANT IS A STATUTORY SELLER UNDER SECTION 12 OR THE D.C. BLUE SKY LAW.[15]

86.     Liability under Section 12 is limited to "persons who pass title and persons who 'offer,' including those who 'solicit' offers." *Pinter* v. *Dahl*, 486 U.S. 622, 644 (1988). The same rule applies under the D.C. Blue Sky law. *See Hite* v. *Leeds Weld Equity Partners, IV, LP*, 429 F. Supp. 2d 110, 114 (D.D.C. 2006).

87.     Underwriters may be liable under Section 12 and the D.C. Blue Sky law only if they sold a security at issue to an investor. *Pinter*, 486 U.S. at 644. Accordingly, plaintiff's claims against Nomura Securities were dismissed as to NHELI 2006-FM2, NHELI 2007-1, NHELI 2007-2, and NHELI 2003, because Nomura Securities did not sell those Certificates to Freddie Mac. *See FHFA* v. *Nomura Holding Am., Inc.*, No. 11 Civ. 6201, slip op. at 2 (S.D.N.Y. Nov. 27, 2012).

88.     Generally, depositors for residential mortgage-backed securitizations are not statutory sellers under Section 12 and the Blue Sky laws because they do not meet the standards set forth in *Pinter*. *See, e.g., In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 932 F. Supp. 2d 1095, 1118-19 (C.D. Cal. 2013) (dismissing FHFA's claims under Section 12 against issuer defendants and declining to apply Rule 159A); *Maine State Retirement System* v. *Countrywide Fin. Corp.*, 2011 WL 4389689, at * (C.D. Cal. May 5, 2011) (same); *Massachusetts*

---

[15]     Defendants submit that the above conclusion correctly reflects the appropriate legal standard under the Blue Sky laws. Defendants recognize that the Court has previously held that depositors are statutory sellers. *See* Stip. § I.B.2.b.iii; *FHFA* v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306, 333-334 (S.D.N.Y. 2013). Defendants respectfully disagree and reserve all rights for appeal.

*Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 205-07 (D. Mass.

2012) (dismissing claims under Massachusetts blue sky law (interpreted as "identical to Section

12") as to non-underwriter defendants).

89.     NHELI and NAAC are not statutory sellers under Section 12 and the D.C. Blue

Sky law, because there is no evidence that they solicited offers or otherwise satisfy the standards

set forth in *Pinter*.  *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 932 F. Supp. 2d

1095, 1118-19 (C.D. Cal. 2013).  Accordingly, NHELI and NAAC are not liable under Section

12 or the D.C. Blue Sky laws for any claims asserted by plaintiff.

## VI.     ANY LOSSES SUFFERED BY PLAINTIFF RESULTED FROM FACTORS OTHER THAN THE ALLEGED MISREPRESENTATIONS.

90.     Section 12 of the Securities Act, as amended by the Private Securities Litigation

Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737, provides defendants with an affirmative

"loss causation" defense.  15 U.S.C. § 77*l*(b).  The Securities Act thus "expressly creates an

affirmative defense of disproving causation."  *Akerman* v. *Oryx Commc'ns, Inc.*, 810 F.2d 336,

341 (2d Cir. 1987).[16]

91.     Pursuant to this defense, a "defendant may . . . reduce his liability by proving that

the depreciation in value resulted from factors other than the material misstatement in the

registration statement."  *Akerman* v. *Oryx Commc'ns, Inc.*, 810 F.2d 336, 340 (2d Cir. 1987); *see*

*also Iowa Pub. Emps.' Ret. Sys.* v. *MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010)

(explaining that "the absence of loss causation is an affirmative defense" under Section

---

[16]     Defendants submit that the above conclusion correctly reflects the appropriate legal
standard.  Defendants recognize that the Court has previously stated that neither Virginia
Securities Act nor the D.C. Blue Sky law provide for a loss causation defense.  *See* Stip.
§ I.B.2.b.iii; *FHFA* v. *HSBC N. Am. Holdings Inc.*, 988 F. Supp. 2d 363, 370 (S.D.N.Y. 2013).
Defendants respectfully disagree and reserve all rights for appeal.

12(a)(2)); *FHFA* v. *Nomura Holding Am., Inc.*, No. 11CV6201 DLC, 2015 WL 539489, at *2 (S.D.N.Y. Feb. 10, 2015) (explaining requirements of loss causation defense).  In other words, "the loss causation inquiry assesses whether a particular misstatement *actually* resulted in loss." *Miller* v. *Thane Int'l, Inc.*, 615 F.3d 1095, 1102 (9th Cir. 2010) (emphasis in original).

92.    The fact that "the plaintiff's loss coincides with marketwide phenomenon causing comparable losses to other investors" is relevant to whether a defendant has proven its loss causation defense.  *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (quoting *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994)).  In the face of such a phenomenon, "the prospect that the plaintiff's loss was caused by the [alleged misstatements] decreases."  *Id.*  Indeed, the Second Circuit recently observed that evidence showing that the "risk that the housing market would collapse . . . [and] caused many of the defaults that occurred" would be relevant to "the calculation of damages" and may support a defendant's loss causation defense under Section 11.  *N.J. Carpenters Health Fund* v. *Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 124 & n.8 (2d Cir. 2013); *cf. City of Westland Police & Fire Ret. Sys.* v. *MetLife, Inc.*, 928 F. Supp. 2d 705, 714–15 (S.D.N.Y. 2013) (holding that a Section 10(b) plaintiff failed to adequately plead loss causation where the complaint "fails to mention that Standard & Poor's downgraded the credit rating of the United States," which was followed by "the precipitous drop in the market, and nearly equal drop in value across [similar securities]").[17]

---

[17]    "The negative causation defense . . . and the loss causation element in Section 10(b) are mirror images; in the former, the burden of proving negative causation is on the defendant, and in the latter, the burden of proving the existence of loss causation is on the plaintiff."  *In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV.3288 DLC, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005).  "Because of their complementarity, the loss causation analysis conducted under Section 10 is informative of the analysis under Section 12."  *FHFA* v. *Nomura Holding Am., Inc.*, No.

(footnote continued)

93.     Here, defendants have proven that any losses Freddie Mac and Fannie Mae

sustained in connection with the Certificates were caused by factors other than the alleged

misstatements in the Offering Documents.  Indeed, Freddie Mac and Fannie Mae acknowledged

as much in numerous statements made in filings with the Securities and Exchange Commission,

in Annual Reports to shareholders, in Court filings, in internal documents, and in testimony

given in this action.  FOF ¶¶ 230–275.  In those statements, their views have been consistent:

declining house prices and other "[[exogenous]]" facts cause borrowers to default or become

delinquent on their mortgage loans,  and the house price declines that began in 2007 caused the

losses Freddie Mac and Fannie Mae experienced on PLS during 2007 —along with other

macroeconomic facts—and thereafter.  *See* ¶¶ 93–96, *infra*.

94.     For example, Freddie Mac's 2010 and 2011 SEC Form 10-K filings state that

"home prices declined significantly, after extended periods during which home prices

appreciated.  *As a result*, the fair value of [non-agency mortgage-backed securities] has declined

significantly since 2007 and we have incurred substantial losses through other-than-temporary

impairments."  FOF ¶ 252 (emphasis added).

95.     Freddie Mac and Fannie Mae have made similar representations in judicial

proceedings.  In connection with their losses in 2007 and after and declining stock prices,

Freddie Mac and Fannie Mae have both been named as defendants in multiple lawsuits.  FOF ¶

264.  In defending themselves in these lawsuits, Freddie Mac and Fannie Mae have asserted, as

recently as October 2013, that their losses were caused by the decline in house prices and

---

(continued)
11CV6201 DLC, slip op. at 5 (S.D.N.Y. Feb. 18, 2015); *cf. Schuler* v. *NIVS Intellimedia Tech. Grp., Inc.*, No. 11 CIV. 2484 KMW FM, 2013 WL 944777, at *9 n.8 (S.D.N.Y. Mar. 12, 2013) (Wood, J.) (explaining that "courts have employed [the] reasoning" of Section 10(b) authorities "to analyze loss causation in Section 11 claims").

subsequent economic recession.  *Id.*  In its September 23, 2009 memorandum of law in support

of its motion to dismiss a complaint filed against it in the Southern District of New York,

*Kuriakose* v. *Federal Home Loan Mortgage Co.*, No. 1:08 Civ. 07281, Freddie Mac stated: "In

November 2007, the steepest decline in home values in U.S. history led Freddie Mac to begin

recognizing losses.  The unforeseen financial crisis that followed—which materially worsened in

the third quarter of 2008 —resulted in further losses to Freddie Mac and virtually every other

major financial institution worldwide."  FOF ¶ 268.[18]

96.     At deposition in this action, Freddie Mac's Senior Vice President of Credit Risk

Oversight, Raymond Romano, testified that he "agree[d] that the *primary cause* of Freddie mac's

losses in the nontraditional portfolio was an exogenous macroeconomic event" "namely, the

unprecedented decline in the housing market," and that "economic events in housing price

decline were chief among the reasons for losses."  FOF ¶ 259 (emphasis added).[19]

97.     These statements, *see* ¶¶ 93–96, *supra*, acknowledge that when house prices

decline, borrowers fail to pay their mortgages, causing the value of securities and other assets

that are dependent on streams of borrower payments—*i.e.*, both whole loan portfolios and PLS—

---

[18]     Because Freddie Mac successfully took the position that its PLS losses were caused by
house price declines and macroeconomic conditions in the *Kuriakose* case, *see* FOF ¶265–272, it
is judicially estopped from changing its position here.  *See Adelphia Recovery Trust* v. *Goldman,
Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014).

[19]     Defendants respectfully disagree with the Court's ruling that lay opinion testimony about
loss causation can only be offered under Fed. R. Evid. 701 "[i]f the witness performed an
investigation during the course of her employment addressed to the issue of loss causation.
(2/18/15 Order & Opinion, Doc. 1289, at 9.)  Rule 701 permits testimony that is "(a) rationally
based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or
to determining a fact in issue; and (c) not based on scientific, technical, or other specialized
knowledge within the scope of Rule 702.  In any event, statements by Freddie Mac's Senior Vice
President of Credit Risk Oversight, about the causes of Freddie Mac's losses meet the standard
articulated by the Court.

to decline.  In making these statements, Freddie Mac and Fannie Mae explained that house price declines beginning in 2007 had precisely these effects on their own portfolios of whole loans and PLS—which includes the seven Certificates at issue here.  As a result, Freddie Mac's and Fannie Mae's assertions cited above, *see* ¶¶ 93–96, *supra*, are clear statements that house price declines and economic conditions, rather than any alleged misstatements, caused any losses  in value of the seven Certificates that are at issue here.

98.    A plaintiff's own statements, made in various contexts, may be relevant in determining the cause of its injuries.  *See, e.g.*, *Clemente* v. *Farrell Lines Inc.*, 465 F. Supp. 728, 730 (E.D.N.Y. 1979) (explaining that "plaintiff's own statements after the [injury] and in his later deposition conclusively establish that the sole proximate cause of the accident" was one other than plaintiff had claimed);  *EEOC* v. *Yellow Freight Sys., Inc.*, 2002 WL 31011859, at *34 (S.D.N.Y. Sept. 9, 2002) ("[A]ny claim of a direct causal connection between the two events is undermined by Plaintiff's own statement . . . ."); *Roots* v. *Colvin*, 2014 WL 2893193, at *11 (E.D. Cal. June 25, 2014) (relying upon a "[p]laintiff's own statements" identifying the cause of her injuries).[20]  And here, FHFA is no ordinary plaintiff.  Rather, in the words of FHFA's former director, Freddie Mac and Fannie Mae "certainly had more data and knowledge about the mortgage market than probably anybody else."  FOF ¶ 21.  The GSEs' well-informed views, articulated in  judicial proceedings, regulatory filings, and depositions, are entitled to considerable weight in ascertaining the causes of their losses.

---

[20] As the Court recently explained, "[l]oss causation is 'related to the tort law concept of proximate cause.'"  *FHFA* v. *Nomura Holding  Am., Inc.*, slip op. at 5 (S.D.N.Y. Feb. 18, 2015) (quoting *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007)); *see also AUSA Life Ins. Co.* v. *Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000) ("Loss causation is causation in the traditional 'proximate cause' sense-the allegedly unlawful conduct caused the economic harm.").  Accordingly, authorities evaluating proximate cause in other contexts are relevant to an analysis of defendants' Section 12 loss causation defense here.

99.     Beyond the statements made by Freddie Mac and Fannie Mae, defendants have offered persuasive evidence that declining house prices and weakening economic conditions caused any losses suffered by the seven Certificates at issue in this case.  This includes expert testimony from Dr. Kerry Vandell, a well-respected real estate and financial economist and expert in mortgage-backed securitizations, who analyzed whether the underwriting defects alleged by plaintiff's expert Robert Hunter had any impact on rates of loan default for the loans in the supporting loan groups underlying the Certificates.  FOF ¶ 281.  Vandell concluded that the alleged defects had no impact on those rates of default and did not cause plaintiff's losses. FOF ¶¶ 281–283.  The analysis by plaintiff's own expert, Dr. G. William Schwert, supports this conclusion.  FOF ¶ 282.  To the extent the analysis performed by Dr. Schwert is inconsistent with Dr. Vandell's opinions, Dr. Schwert's analysis is unreliable.  Dr. Vandell's analysis is credited over that of Dr. Schwert.

100.    The evidence demonstrates that plaintiff's losses were not caused by the alleged misstatements but rather by the "steepest decline in home values in U.S. history event."  FOF ¶ 268.  *See  In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008).

101.    Accordingly, Defendants have satisfied their burden of "prov[ing] that other factors caused the decline in price of plaintiffs' [securities]." *Adair* v. *Kaye Kotts Associates, Inc.*, 1998 WL 142353, at *7 (S.D.N.Y. Mar. 27, 1998).

## VI.    THE EVIDENCE DOES NOT SUPPORT THE RECOVERY SOUGHT BY PLAINTIFF UNDER SECTION 12.

102.    Because defendants have satisfied their burden of proving that any "depreciation in value resulted from factors other than the material misstatement in the registration statement,"

*Akerman* v. *Oryx Commc'ns, Inc.*, 810 F.2d 336, 340 (2d Cir. 1987), plaintiff is entitled to no recovery for its Section 12 claims.

103.   "Under Section 12(a)(2) Plaintiffs must show that they 'suffered compensable damages.'"  *In re MetLife Demutualization Litig.*, 624 F. Supp. 2d 232, 271 (E.D.N.Y. 2009) (quoting *Commercial Union Assurance Co. plc* v. *Milken,* 17 F.3d 608, 615 (2d Cir. 1994)). Plaintiff has failed to do so, and it is entitled to no remedy under Section 12.

104.   If the Court determines that, in contradiction of plaintiff's own statements, it has suffered a compensable loss, because plaintiff claims it still owns the at-issue securities, Section 12's rescissionary remedy permits plaintiff, if successful, "to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security."  15 U.S.C. § 77*l*.

105.   The federal post-judgment rate, defined as the one-year constant maturity Treasury yield (also known as the risk-free rate) is the appropriate prejudgment interest rate. FOF ¶ 693.  Section 12 does not specify the rate at which prejudgment interest may be awarded. *See Cobalt Multifamily Investors I, LLC* v. *Arden*, 2012 WL 3838834, at *7 (S.D.N.Y. Aug. 14, 2012).  "Interest is intended to make the injured party whole and generally should be measured by interest on short-term, risk-free obligations."  *New York Marine* & *Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 131 (2d Cir. 2001) (internal quotations and citations omitted).  Whatever interest rate a court chooses, "[a]wards of prejudgment interest must not result in over-compensation of the plaintiff."  *Wickham Contracting Co., Inc.* v. *Local Union No. 3, Int'l Bhd. Of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992).

106.   In determining prejudgment interest, the court should consider several factors, including:  "(i) the need to fully compensate the wronged party for actual damages suffered, (ii)

considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham*, 955 F.2d at 834; *accord*. *Jones* v. *UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000); *see also Commercial Union Assurance Co., plc* v. *Milken*, 17 F.3d 608, 615 (2d Cir. 1994) (holding that the *Wickham* principles apply in Section 12 cases).

107.     While "[t]here is no federal statute that purports to control the rate of prejudgment interest," *Jones*, 223 F.3d at 139, many courts use "the federal postjudgment rate as a starting point in exercising the district court's discretion in this regard," *Sec. Ins. Co. of Hartford* v. *Old Dominion Freight Line, Inc.*, 314 F. Supp. 2d 201, 203 (S.D.N.Y. 2003) (Lynch, J.).  This postjudgment rate "establishes the rate of interest that is to be paid 'on any money judgment in a civil case recovered in a district court,' linking that rate to the rate of interest the government pays on money it borrows by means of Treasury bills." *Jones*, 223 F.3d at 139.  This rate is equivalent to "the average rate of return on one-year Treasury bills." *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 163 (S.D.N.Y. 2012).  Judge Lynch has explained the rationale of using the federal postjudgment rate to calculate prejudgment interest as follows:

> For purposes of assigning a prejudgment interest rate, the presumption is that plaintiff invested those funds in United States Treasury bills with a 52–week maturity.  That is the presumption Congress made when calculating interest rates that should apply to post-judgment interest . . . and there is no reason a different presumption should apply here.  United States Treasury bills are a conservative yet valid investment option, and reflect a realistic rate of interest that plaintiff could have received.

*Old Dominion*, 314 F. Supp. 2d at 204–05.  Accordingly, courts routinely apply the federal postjudgment rate in calculating the prejudgment interest a plaintiff may recover. *See, e.g.*, *Vivendi*, 284 F.R.D. at 164; *see also W. Pac. Fisheries, Inc.* v. *SS President Grant*, 730 F.2d 1280, 1289 (9th Cir. 1984) (holding that "the measure of interest rates prescribed for post-

judgment interest in 28 U.S.C. § 1961(a) is also appropriate for fixing the rate for pre-judgment interest").

108.    Calculating prejudgment interest using the federal postjudgment rate not only finds ample support in judicial precedent, but also captures the economic realities of any recovery plaintiff may obtain here.  As defendants' expert Dr. Timothy Riddiough explained, Section 12 damages effectively supplant plaintiff's investment in a risky security with a fixed, risk-free cash flow.  FOF ¶ 693.  A "risk-free" interest rate, which is equal to the federal postjudgment rate,[21] is the only rate that squares with this remedial structure. This rate is the market rate available for stable (*i.e.*, supposedly "risk-free") investments, like government bonds. *Id*.  It is the typical measure of the time value of money in the absence of market uncertainty.  *Id*. Such a rate is appropriate, from a market perspective, for determining the amount of damages that will be mandated by judicial edict.  Such damages represent a quintessential "risk-free" cash flow.

109.    Plaintiff asserts that it is entitled to a higher interest rate because, had Freddie Mac and Fannie Mae never purchased the Securities, they might have invested in funds that paid an interest rate higher than the federal risk-free rate.  Such a rate, however, necessarily would have been predicated on increased risk.  Because plaintiff's returns under Section 12 are dictated by court order, plaintiff will not bear any risk of loss.  Although a successful plaintiff deserves to be compensated for its opportunity costs, it does not deserve to be compensated for risks to which it is not exposed.  The risk-free rate effectively restores the status quo, and is thus in

---

[21]    The federal postjudgment rate is defined as "the 1-year constant maturity Treasury yield." 28 U.S.C. § 1961(a).  Dr. Riddiough defines "risk-free rate" as "constant maturity treasury." Riddiough Aff. ¶ 70.  Accordingly, the terms "federal postjudgment rate" and "risk-free rate" are both equal to the 1-year constant maturity Treasury yield and are used interchangeably here.

accord with Section 12's rescissionary remedy.  *See FHFA* v. *Nomura Holding Am. Inc.*, 2014

WL 7232590, at *7 (S.D.N.Y. Dec. 18, 2014) ("Rescission of a contract repudiates the

transaction and seeks to place the parties in the status quo.") (internal quotation marks and

alterations omitted).

110.    *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144 (S.D.N.Y. 2012) is on

point.  In that case, a Section 10(b) plaintiff argued, much like plaintiff argues here, that

"applying the Treasury rate is inappropriate, because plaintiffs were pursuing risky investments,

not an investment generating a low or risk-free return."  *Id*. at 163.[22]  Judge Scheindlin disagreed

and explained that, because any alternative investment plaintiff made would likely have been

"equally risky," the potential for losses would have been high "in light of the turmoil in the

financial markets."  *Id*. at 164.  That potential for losses disappears when receipt of the funds in

question is guaranteed by court order.  Accordingly, the court correctly recognized that "any

award above the presumptive rate, based on the yield of a one-year treasury note, would be

speculative and result in a windfall for plaintiffs."  *Id*.

111.    There is no evidence or allegation of criminal behavior or fraud on defendants'

part, which would be the only justification for any higher rate of prejudgment interest.  Plaintiff

has pointed to this Court's ruling in *S.E.C.* v. *Boock*, 2012 WL 3133638 (S.D.N.Y. Aug. 2,

2012), as the basis to award prejudgment interest at the IRS Penalty Rate.  There is no

---

[22]    While Section 10 differs in several respects from Section 12, see *FHFA* v. *Nomura Holding Am., Inc.*, No. 11CV6201 DLC, 2015 WL 640900, at *3 (S.D.N.Y. Feb. 16, 2015), the Court has observed the "complementarity" between the two sections and explained that analysis of certain elements of Section 10 "is informative of the analysis under Section 12," *FHFA* v. *Nomura Holding Am., Inc.*, No. 11CV6201 DLC, slip op. at 5 (S.D.N.Y. Feb. 18, 2015).  In light of the relationship between Sections 10 and 12, courts have relied upon Section 10 authorities in determining prejudgment interest awards for Section 12 plaintiffs.  *See, e.g.*, *Mecca* v. *Gibraltar Corp. of Am.*, 746 F. Supp. 338, 349–50 (S.D.N.Y. 1990) (citing Section 10 authorities in analysis of prejudgment interest under Section 12).

comparison.  The defendants in *Boock* "hijacked" defunct corporations and issued and sold their

stock illegally, making millions of dollars, and ultimately had disgorgement orders entered

against them.  *Id.* at *5.  They were consummate fraudsters.  In applying the IRS penalty rate to

an award of prejudgment interest on the disgorgement, the Court reasoned that "it is well

established that when disgorgement is ordered in an SEC-initiated proceeding, the IRS

underpayment rate is appropriate."  *Id.* at *5 n.3; *see also In re Vivendi*, 284 F.R.D. at 163

(explaining that the "IRS rate is intentionally punitive").  *Boock* addressed considerations that are

absent here and provides no basis for departing from the "presumptive rate" Defendants have

identified.  *Id.* at 164.[23]

## VII.   THE EVIDENCE DOES NOT SUPPORT THE RECOVERY SOUGHT BY PLAINTIFF UNDER THE BLUE SKY LAWS.

112.   Because defendants have satisfied their burden of proving that any "depreciation

in value resulted from factors other than the material misstatement in the registration statement,"

*Akerman* v. *Oryx Commc'ns, Inc.*, 810 F.2d 336, 340 (2d Cir. 1987), plaintiff is entitled to no

recovery for its Blue Sky claims.  Va. Code Ann. § 13.1-522(A)(ii); D.C. Code §§ 31-

5606.05(a)(1)(B), 31-5606.05(c).[24]

113.   Plaintiff's claims under D.C. Code §§ 31-5606.05(a)(1)(B) and 31-5606.05(c)

apply only to NAA 2005-AR6.

---

[23]   Should plaintiff prevail, the proper Section 12 remedy (without accounting for loss causation) would be for plaintiff to tender the seven Certificates in exchange for a payment of $568,856,349.  And, after accounting for loss causation, plaintiff's Section 12 recovery is zero.

[24]   Defendants submit that the conclusion in paragraph 112 reflects the correct legal interpretation of the application of the loss causation defense to the Virginia and D.C. blue sky claims.  The Court held otherwise, *see FHFA* v. *HSBC N. Am. Holdings Inc.*, 988 F. Supp. 2d 363, 369 (S.D.N.Y. 2013), and defendants reserve all rights.  Defendants also herein address the interpretation set forth by the Court.

114.    Plaintiff's claims under Va. Code Ann. § 13.1-522 apply only to NHELI 2006-FM2, NHELI 2007-1, NHELI 2007-2.

115.    Plaintiff is not entitled to any attorneys' fees in connection with its claims under Virginia and D.C. law.  Va. Code Ann. § 13.1-522; D.C. Code §§ 31-5606.05(a)(1)(B), 31-5606.05(c).

116.    Attorneys' fees may only be awarded for work performed that was specific to the claims in this case.  Va. Code Ann. § 13.1-522; D.C. Code §§ 31-5606.05(a)(1)(B), 31-5606.05(c).

Respectfully submitted,

/s/ Thomas C. Rice
Thomas C. Rice (trice@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

/s/ David B. Tulchin
David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
Yavar A Bathaee (bathaee@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*