UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,

            -against-

NOMURA HOLDING AMERICA, INC.;
NOMURA ASSET ACCEPTANCE
CORPORATION; NOMURA HOME
EQUITY LOAN, INC.; NOMURA CREDIT
& CAPITAL, INC.; NOMURA SECURITIES
INTERNATIONAL, INC.; RBS
SECURITIES INC. (f/k/a GREENWICH
CAPITAL MARKETS, INC.); DAVID
FINDLAY; JOHN MCCARTHY; JOHN P.
GRAHAM; NATHAN GORIN; and DANTE
LAROCCA,

             Defendants.

**No. 11 Civ. 6201 (DLC)**

---

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS'
DUE DILIGENCE AND REASONABLE CARE DEFENSES**

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

Philippe Z. Selendy
Andrew R. Dunlap
David B. Schwartz

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT .........................................................................................................7

I. THERE IS NO GENUINE DISPUTE THAT NOMURA SECURITIES'
DILIGENCE WAS UNREASONABLE AS A MATTER OF LAW ................................8

    A. Defendants Do Not Genuinely Dispute That Nomura Securities Controlled
NAAC And NHELI As A Practical Matter—Creating A Near-Absolute
Standard Of Liability For Nomura Securities ..........................................................9

        1. Nomura Does Not Genuinely Dispute That Nomura Securities
Controlled NAAC And NHELI As A Practical Matter ...........................10

        2. Settled Law Subjects Nomura Securities To A Near-Absolute
Standard Of Liability ................................................................11

    B. Nomura Concedes That Nomura Securities Used Statistically Unsound
Sampling ...........................................................................................14

        1. Nomura Concedes That Nomura Securities Drew Credit And
Compliance Samples Adversely ............................................................15

            (a) Nomura Fails To Show That Adverse Sampling Of
Acquisition Pools Allowed Nomura Securities To Draw
Valid Conclusions About The SLGs.........................................16

            (b) Nomura Securities' Failure To Use Reliable Sampling Was
Not Excused By The SEC—The SEC Stated That Such
Sampling Often Is Required For RMBS ....................................18

            (c) Nomura Securities' Failure To Use Statistically Valid
Sampling Is Also Not Excused By Industry Practice ...................19

        2. Nomura Concedes That Nomura Securities Selected Loans For
Valuation Dilgence Primarly Using HistoryPro .......................................22

    C. Nomura Concedes That Nomura Securities Failed To Conduct Additional
Diligence When It Encountered High Defect Rates ............................................24

    D. Nomura Concedes That Nomura Securities Failed To Verify The
Accuracy And Completeness Of Representations About The SLGs At The
Time Of Securitization.................................................................................26

        1.      Nomura Concedes That Nomura Securities Did Not Perform Credit Or Valuation Diligence At The "Effective Date" Of The Prospectus Supplements.................................................................26

        2.      Nomura Concedes That Nomura Securities Did Not Randomly Select Loans From Acquistion Pools To Populate The SLGs.................30

        3.      Nomura Does Not Genuinely Dispute That Nomura Securities Did Not Extrapolate The Results Of Its Diligence To Either The Full Acquisition Pools Or The SLGs .............................................................31

        4.      Nomura Does Not Genuinely Dispute That Nomura Securities' Pre-Purchase Diligence Was Not Conducted On The Statements In The Prospectus Supplements ....................................................32

   E.     Nomura Does Not Genuinely Dispute The Additional Flaws In Nomura Securities' Diligence Processes ...........................................................33

        1.      Nomura Does Not Genuinely Dispute That Nomura Securities Failed To Meaningfully Review Loans That Its Vendors Graded As Suitable For Purchase While Securitizing Large Numbers Of Loans That They Graded As Unsuitable...................................................33

        2.      Nomura Does Not Genuinely Dispute That Nomura Securities Failed To Perform Increased Diligence On Loans From Originators That It Knew Had Poor Underwriting Practices .......................................36

        3.      Nomura Does Not Genuinely Dispute That Nomura Securities Knew The LTV Ratios In The Prospectus Supplements Were False, Yet Failed To Disclose The True "Final Values" ...........................38

        4.      Nomura Cannot Avoid Summary Judgment By Pointing To Immaterial Issues ...................................................................................39

II.   THERE IS NO GENUINE DISPUTE THAT RBSSI'S DILIGENCE WAS UNREASONABLE AS A MATTER OF LAW....................................................42

   A.     RBSSI Concedes That It Failed To Conduct Diligence On Two Securitizations...................................................................................................42

        1.      RBSSI Concedes That It Conducted No Diligence Of Its Own On The NHELI 2006-HE3 Securitization .......................................42

        2.      RBSSI Does Not Genuinely Dispute That It Failed To Verify Any Information Relating To the NHELI 2006-FM2 Securitization ...............45

   B.     RBSSI Does Not Genuinely Dispute That It Performed Inadequate Diligence On The NHELI 2007-1 And NHELI 2007-2 Securitizations...............47

<table>
<tr><td>1.</td><td>RBSSI Does Not Genuinely Dispute That It Used Statistically Unsound Sampling</td><td>49</td></tr>
</table>

1.    RBSSI Does Not Genuinely Dispute That It Used Statistically Unsound Sampling ...................................................................................49

2.    RBSSI Does Not Genuinely Dispute That It Failed To Conduct Additional Diligence When It Encountered High Defect Rates ...............53

3.    RBSSI Does Not Genuinely Dispute That It Failed To Verify The Accuracy And Completeness Of Representations Made About Those SLGs At The Effective Date ..........................................................55

C.    RBSSI Does Not Genuinely Dispute The Additional Flaws In Its Diligence Processes ............................................................................57

1.    RBSSI Does Not Genuinely Dispute That It Failed To Provide Oversight Of Its Third-Party Discovery Vendor .......................................57

2.    RBSSI Does Not Genuinely Dispute That It Failed To Conduct Additional Diligence On Loans By Originators About Which It Had Concerns............................................................................................59

3.    RBSSI Does Not Genuinely Dispute That It Knew The LTV Ratios In The Prospectus Supplements Were False Yet Failed To Disclose The True "Final Values" ...........................................................................60

III.    DEFENDANTS DO NOT REFUTE AUTHORITY SHOWING THAT SECTION 12'S "REASONABLE CARE" STANDARD REQUIRES UNDERWRITERS TO CONDUCT A "REASONABLE INVESTIGATION" SIMILAR TO THAT REQUIRED BY SECTION 11 ....................................................61

IV.    THE NOMURA INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO A DUE DILIGENCE DEFENSE ..........................................................................64

CONCLUSION................................................................................................65

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alaska Dep't of Envtl. Conservation v. E.P.A.*,
540 U.S. 461 (2004) ................................................................................................ 27

*Am. Trucking Ass'n v. U.S. Dep't of Transp.*,
166 F.3d 374 (D.C. Cir. 1999) ........................................................................ 18, 32

*Ambrosino v. Rodman & Renshaw, Inc.*,
972 F.2d 776 (7th Cir. 1992) ................................................................................ 20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................ 8

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
920 F. Supp. 2d 475 (S.D.N.Y. 2013) ................................................................. 18

*Auz v. Century Carpet, Inc.*,
2014 WL 199511 (S.D.N.Y. Jan. 17, 2014) ........................................................ 29

*Bamco 15 v. Buchanan Residential Real Estate Ltd. P'ship 2410*,
1986 WL 15333 (S.D.N.Y. Dec. 31, 1986) ..................................................... 8, 53

*In re Bear Stearns Mortg. Pass–Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012) ................................................................. 23

*Brady v. UBS Fin. Servs., Inc.*,
2013 WL 1309250 (N.D. Okla. Mar. 26, 2013) .................................................. 13

*Brown v. Henderson*,
257 F.3d 246 (2d Cir. 2001) ................................................................................. 33

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989) ............................................................................... 29

*Chasins v. Smith, Barney & Co.*,
438 F.2d 1167 (2d Cir. 1970) ........................................................................... 2, 20

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*,
480 F.2d 341 (2d Cir. 1973) ................................................................................... 2

*Christian v. Generation Mortg. Co.*,
2013 WL 2151681 (N.D. Ill. May 16, 2013) ................................................. 46, 49

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
 752 F.3d 173 (2d Cir. 2014)................................................................ 56

*Competitive Assocs. v. Int'l Health Scis., Inc.,*
 1975 WL 349 (S.D.N.Y. Jan. 22, 1975) ........................................... 43

*Contemporary Mission v. U.S. Postal Serv.,*
 648 F.2d 97 (2d Cir. 1981)............................................................... 33

*Cox v. Warwick Valley Cent. Sch. Dist.,*
 654 F.3d 267 (2d Cir. 2011).............................................................. 8

*Cromer Fin. Ltd. v. Berger,*
 137 F. Supp. 2d 452 (S.D.N.Y. 2001)............................................... 9

*Dance v. Town of Southampton,*
 467 N.Y.S.2d 203 (2d Dept. 1983) .................................................. 30

*DiFolco v. MSNBC Cable L.L.C.,*
 831 F. Supp. 2d 634 (S.D.N.Y. 2011)............................................... 29

*Doe v. Cutter Biological, Inc.,*
 971 F.2d 375 (9th Cir. 1992) ........................................................... 20

*In re Dynegy, Inc. Sec. Litig.,*
 339 F. Supp. 2d 804, 871 (S.D. Tex. 2004) ..................................... 29

*Endo v. Albertine,*
 147 F.R.D. 164 (N.D. Ill. 1993)....................................................... 43

*Escott v. BarChris Constr. Corp.,*
 283 F. Supp. 643 (S.D.N.Y. 1968) ............................................*passim*

*FDIC v. Giammettei,*
 34 F.3d 51 (2d Cir. 1994).................................................................. 6

*Feit v. Leasco Data Processing Equip. Corp.,*
 332 F. Supp. 544 (E.D.N.Y. 1971) ............................................*passim*

*FHFA v. HSBC N. Am. Holdings, Inc.,*
 --- F. Supp. 2d ----, 2014 WL 3702587 (S.D.N.Y. July 25, 2014) ......... 14

*FHFA v. JPMorgan Chase & Co.,*
 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012) ................................... 17

*FHFA v. JPMorgan Chase & Co.,*
 2013 WL 5354212 (S.D.N.Y. Sept. 25, 2013).................................. 20

*FHFA v. Nomura Holding Am., Inc.*,
2014 WL 4412388 (S.D.N.Y. Sept. 8, 2014).....................................................9, 14, 24, 25, 26

*FHFA v. Nomura Holding Am., Inc.*,
--- F. Supp. 3d ----, 2014 WL 6462239 (S.D.N.Y. Nov. 18, 2014) ...................................*passim*

*FHFA v. UBS Am., Inc.*,
2013 WL 3284118 (S.D.N.Y. June 28, 2013) ........................................................................ 22

*FHFA v. UBS Am., Inc.*,
858 F. Supp. 2d 306 (S.D.N.Y. 2012)........................................................................ 23, 36, 45

*Franklin Sav. Bank of N.Y. v. Levy*,
551 F.2d 521 (2d Cir. 1977)............................................................................................. 7, 61

*Frazier v. Consol. Rail Corp.*,
851 F.2d 1447 (D.C. Cir. 1988) ........................................................................................... 17

*In re Gap Stores Sec. Litig.*,
79 F.R.D. 283 (N.D.Cal. 1978)...................................................................................... 43, 45

*Gulino v. Bd. Of Educ. of City Sch. Dist. of City of New York*,
907 F. Supp. 2d 492, 520 (S.D.N.Y. 2012)..................................................................... 17, 18

*Gulino v. Bd. of Educ. of New York City Sch. Dist. of City of New York*,
555 F. App'x 37 (2d Cir. 2014) ........................................................................................... 17

*Hammond v. Hendrickson*,
1986 WL 8437 (N.D. Ill. July 30, 1986)............................................................................. 43

*Hayes v. N.Y. City Dep't of Corr.*,
84 F.3d 614 (2d Cir. 1996)................................................................................................... 54

*Heffernan v. Pac. Dunlop GNB Corp.*,
965 F.2d 369 (7th Cir. 1992) .............................................................................................. 63

*Hicks v. Baines*,
593 F.3d 159 (2d Cir. 2010)............................................................................................. 8, 51

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
2014 WL 2510809 (S.D.N.Y. May 28, 2014) ............................................................ 23, 39, 61

*In re Int'l Rectifier Sec. Litig.*,
1997 WL 529600 (C.D. Cal. Mar. 31, 1997)........................................................................ 8

*Janus Capital Grp., Inc. v. First Derivative Traders*,
131 S. Ct. 2296 (2011)........................................................................................................ 12

*John Nuveen & Co., Inc. v. Sanders*,
  450 U.S. 1005 (1981).............................................................................. 62

*Junker v. Crory*,
  650 F.2d 1349 (5th Cir. 1981) ............................................................ 63

*King v. Livent, Inc.*,
  161 F. App'x 116 (2d Cir. 2005) ................................................... 7, 16

*In re Lehman Bros. Sec. & ERISA Litig.*,
  684 F. Supp. 2d 485 (S.D.N.Y. 2010)................................................ 43

*LC Capital Partners, LP v. Frontier Ins. Grp., Inc*,
  318 F.3d 148 (2d Cir. 2003).................................................................. 27

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011)................................................................. 27

*In re Livent, Inc. Noteholders Sec. Litig.*
  355 F. Supp. 2d 722 (S.D.N.Y. 2005)............................... 7, 8, 30, 53

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008)................................................................. 43

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
  842 F. Supp. 2d 682 (S.D.N.Y. 2012)................................................ 36

*In re MetLife Demutualization Litig.*,
  262 F.R.D. 217 (E.D.N.Y. 2009) ....................................................... 61

*Nat'l Credit Union Admin. Bd. v. Wachovia Capital Markets, LLC*,
  2014 WL 1795294 (S.D.N.Y. May 6, 2014) ..................................... 14

*Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
  135 F.3d 266 (3d Cir. 1998)................................................................. 30

*Opals on Ice Lingerie v. Bodylines Inc.*,
  320 F.3d 362 (2d Cir. 2003)................................................................. 33

*P. Stolz Family P'ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004).............................................................. 27, 56

*Sanders v. John Nuveen & Co., Inc.*,
  619 F.2d 1222 (7th Cir. 1980) ............................................................ 29

*S.E.C. v. Altomare*,
  300 F. App'x 70 (2d Cir. 2008) .......................................................... 47

*S.E.C. v. Dain Rauscher, Inc.*,
    254 F.3d 852 (9th Cir. 2001) ............................................................ 20, 57

*S.E.C. v. Ginder*,
    752 F.3d 569 (2d Cir. 2014) .................................................................... 20

*S.E.C. v. Universal Exp., Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007) ...................................................... 47

*Sheehan v. Nims*,
    75 F.2d 293 (2d Cir. 1935) ...................................................................... 29

*In re Software Toolworks, Inc.*
    50 F.3d 615 (9th Cir. 1994) ....................................................... 39, 54, 62

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008) ...................................................................... 9

*The T.J. Hooper v. N. Barge Corp.*,
    60 F.2d 737 (2d Cir. 1932) ...................................................................... 20

*United States v. Berrios*,
    676 F.3d 118 (3d Cir. 2012) .................................................................... 49

*Univ. Hill Found. v. Goldman, Sachs & Co.*,
    422 F. Supp. 879 (S.D.N.Y. 1976) ...................................................... 25, 63

*Wabash Ry. Co. v. McDaniels*,
    107 U.S. 454 (1883) ................................................................................ 20

*Weinberger v. Jackson*,
    1990 WL 260676 (N.D. Cal. Oct. 11, 1990) .......................................... 62

*Wisconsin v. City of New York*,
    517 U.S. 1 (1996) .................................................................................... 51

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004) ............................................. *passim*

*In re WorldCom, Inc. Sec. Litig.*,
    2005 WL 408137 (S.D.N.Y. Feb. 22, 2005) ...................................... 11, 46

*In re WorldCom, Inc. Sec. Litig.*,
    2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) .................................... *passim*

## Statutes, Rules, and Legislative Materials

15 U.S.C. § 77k(a) ......................................................................................... 36

15 U.S.C. § 77b(a)(4) ............................................................................... 10

15 U.S.C. § 77k(b)(3)(A) ..................................................................... *passim*

15 U.S.C. § 77k(c) ....................................................................... 20, 24, 44, 45

15 U.S.C. § 77*l*(a)(2) ........................................................................ 3, 24, 36

15 U.S.C. § 77o ......................................................................................... 9

D.C. Code § 31-5606.05(c) ................................................................... 9, 64

Va. Code Ann. § 13.1-522(C) ............................................................... 9, 64

## Regulations and Administrative Materials

17 C.F.R. § 230.176(b) ........................................................................... 14

17 C.F.R. § 230.176(g) ...................................................................... 11, 12

17 C.F.R. § 230.191(a) ........................................................................... 10

17 C.F.R. § 230.430B(f)(1) ............................................................... 27, 62

17 C.F.C. § 230.436(a) ........................................................................... 58

Asset-Backed Securities,
   SEC Release Nos. 33-8518, 34-50905, 70 Fed. Reg. 1506 (Jan. 7, 2005) .................. 13, 14, 56

Circumstances Affecting the Determination of What Constitutes Reasonable Investigation and
   Reasonable Grounds for Belief Under Section 11 of the Securities Act,
   SEC Release No. 6335, 1981 WL 31062 (Aug. 6, 1981) ................................... 11, 43

Issuer Review of Assets in Offerings of Asset-Backed Securities,
   SEC Release No. 9176, 76 Fed. Reg. 4231 (Jan. 25, 2011) ............................... 19, 26

New High Risk Ventures, SEC Release No. 9671,
   1972 WL 125474 (July 27, 1972) ......................................................... 43, 44, 45, 64

Securities Offering Reform,
   SEC Release No. 8591, 2005 WL 1692642 (Aug. 3, 2005) ..................................... 59

## Miscellaneous

American Heritage Dictionary of the English Language, Fifth Edition (2014) ........................... 47

5 Arnold S. Jacobs, *Disclosure and Remedies Under the Securities Laws* ................................ 62

Merritt B. Fox, *Due Diligence with Residential Mortgage Backed Securities* (Columbia Law & Economics Working Paper No. 462, November 25, 2013) ..................................................... 13

Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (January 2011) ..... 20

The New Encyclopaedia Britannica, vol. 23 (15th ed.) ............................................... 49

Financial Stability Oversight Council, *Macroeconomics Effects of Risk Retention Requirements* (Jan. 2011) .................................. 14

Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* Fed. Judicial Ctr., Reference Manual on Scientific Evidence (2nd ed. 2000) ................................................... 30, 51

3B Harold S. Bloomenthal & Samuel Wolff, *Securities & Federal Corporate Law* (2d ed. 1998) ................................................ 63

Permanent Subcommittee on Investigations, United States Senate, *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* (Apr. 13, 2011) ....... 27

Plaintiff Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), respectfully submits this reply memorandum of law in support of its Motion for Partial Summary Judgment on Defendants' Due Diligence and Reasonable Care Defenses.[1]

## PRELIMINARY STATEMENT

Defendants concede the key facts that mandate summary judgment for FHFA on their due diligence and reasonable care defenses. Among other things: (i) Nomura concedes that its issuers, NAAC and NHELI, were entirely passive entities; (ii) Nomura and RBSSI both concede that they did not use statistically valid sampling, and therefore could not extrapolate their results to the unsampled loans, which Nomura admits made up 61% of the loans that were the subject of Defendants' representations; (iii) Nomura concedes that it performed diligence only at the time it purchased whole loan pools, not at the time the loans were securitized; and (iv) both Defendants admit that their diligence was not targeted to the Supporting Loan Groups ("SLGs") about which the relevant representations were made. Given these concessions, Defendants cannot create a genuine issue of material fact that their inherently flawed diligence enabled them to draw reliable inferences about the SLGs described in the Prospectus Supplements. These undisputed facts provided ample basis for the Court to hold as a matter of law that Defendants cannot meet either their due diligence or reasonable care defenses.

---

[1] As used herein (1)"Mem." or the "opening brief" refers to FHFA's Memorandum of Law in Support of its Motion for Partial Summary Judgment on Defendants' Due Diligence and Reasonable Care Defenses; (2) "Nom. Opp." refers to Nomura Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment on Due Diligence and Reasonable Care Defenses; (3) "RBS Opp." refers to RBS Securities Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment on Due Diligence and Reasonable Care Defenses; (4) "RSUF" refers to FHFA's Reply to Nomura Defendants' Reply to Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts and to RBS Securities Inc.'s Response to FHFA's Statement of Facts and Plaintiff's Local Rule 56.1 Reply Statement of Undisputed Material Facts; (5) "Nom. SUF" refers to FHFA's Responses To Nomura Defendants' Local Rule 56.1 Counterstatement of Material Facts; and (6) "RBS SUF" refers to FHFA's Responses To RBS Securities Inc.'s Local Rule 56.1 Counterstatement of Material Facts. "Nom. SUF" and "RBS SUF" contain both the full text of Defendants' asserted facts and FHFA's responses thereto. Unless otherwise noted, all abbreviations and capitalized terms have the same meanings as in FHFA's opening brief.

Defendants strain to avoid this conclusion, and to excuse their deficient practices, by repeatedly invoking "industry standards," but their own proffered diligence expert agrees that there were no uniform diligence standards in the RMBS industry.  Moreover, this purported expert testified that Defendants' practices expressly contradicted the requirements of the securities laws: (i) "reasonable investigation into the truth of representations made in RMBS offering materials" was not "the standard that's in the market;" (ii) "this requirement … [of] independently investigating; this requisite diligence standard is not one in the RMBS world;" (iii) "I would not agree that [']systematic and searching['] is a standard;" and (iv)  it was "not my practice, understanding, or recommendation," that "the due diligence burden for the underwriter bank runs up until the point the deal is closed[.]"  RSUF ¶¶ 944-45, 947, 961.  The fact that other banks might also have ignored their legal responsibilities does not made Defendants' behavior reasonable—it makes that behavior part of a larger problem.  It is significant that no court has ever reviewed, much less approved, such practices.  As the Second Circuit has explained, "the first litigation of such a practice is a proper occasion for its outlawry."  *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1171 (2d Cir. 1970).

Based on Defendants' concessions, it is now beyond dispute that Nomura and RBSSI each failed to meet their statutory obligations on several independent grounds.

### Nomura Securities

*First*, Nomura cannot genuinely dispute the facts showing that Nomura Securities fully controlled its issuers, NAAC and NHELI, as a practical matter, hence its liability "will lie in practically all cases of misrepresentation."  *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 578 (E.D.N.Y. 1971).  In opposition, Nomura offers the remarkable confession that Nomura Securities performed no diligence at all, and that all diligence was instead performed by Nomura's sponsor entity, Nomura Credit and Capital ("NCCI").  Nom. Opp. 25-26; Nom. SUF ¶ 10.  This admission presents an independent ground for summary judgment against Nomura Securities, which abdicated its responsibility to independently exercise its "expertise in appraising the securities issue," *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir.

1973), by relying wholly on NCCI, an entity that had no employees at the time the relevant Securitizations were issued.

*Second*, Nomura concedes multiple facts confirming that, under any standard, Nomura Securities' sampling procedures were not designed to and could not yield reliable inferences about the characteristics of the Mortgage Loans backing the SLGs. In particular, Nomura admits that Nomura Securities: (i) "did not draw statistically valid samples" for its diligence on bulk Acquisition Pools, Nom. Opp. 75; (ii) used exclusively adverse sampling, Nom. Opp. 72, almost always applying a proprietary, "black box" model that Nomura Securities' traders required Nomura Securities to use over the objections of its Diligence Group, RSUF ¶¶ 251-52; (iii) conducted its flawed inquiry only at the time it acquired pools of loans, without ever supplementing that inquiry to consider new information that arose between acquisition and securitization, Nom. Opp. 83, even though its own proffered diligence expert admits that "[c]ertainly there are kinds of information that become available" after acquisition, RSUF ¶ 959, including "early in the life cycle of the loan," RSUF ¶ 964; and (iv) never attempted to extrapolate—beyond a post-hoc declaration that this Court has struck—the defect rates that Nomura Securities found in the Acquisition Pools to the SLGs, Nom. Opp. 89-90. These concessions, combined with the admissions of Nomura's purported expert that an underwriter cannot extrapolate from an adverse sample, RSUF ¶ 969, and that Nomura Securities never randomly populated the SLGs from the Acquisition Pools, *see infra*, demonstrate beyond peradventure that Nomura Securities had no basis from which to draw reliable inferences about 61% of the loans in the SLGs. Nomura Securities' unreasonable investigation left it without any reliable basis to believe that "the statements [in the Prospectus Supplements]"— which concern all the loans in the SLGs—"were true and … not misleading." 15 U.S.C. § 77k(b)(3)(A); *see also* 15 U.S.C. 77*l*(a)(2) (similar).

*Third*, Nomura does not dispute that an underwriter must address evidence of high "kick-out" rates in its diligence samples by increasing the size of those samples or taking other remedial actions. Nomura argues instead that there were never any red flags that required it to take such action, but this "see no evil" defense cannot be reconciled with unrefuted testimony by

Nomura's own witnesses that the kick-out rates for multiple loan pools indicated that "there's obviously a problem with the loans." RSUF ¶ 293. Nomura also claims that Nomura Securities' "response" to these kick-out rates was "relatively higher" sample sizes, but it drew those samples *before* it performed its diligence, which means that its sample sizes could not be a "response" at all and instead highlights that it did nothing to address problems as they arose.

*Fourth*, Nomura concedes that Nomura Securities performed no diligence at the time it securitized the Mortgage Loans and issued the Prospectus Supplements purporting to describe those Loans' characteristics. Again, this amounts to a concession that Nomura Securities failed to meet its statutory obligations, this time by not taking measures to ensure its reasonable belief in the truth of the Prospectus Supplements "at the time [they] … became effective." 15 U.S.C. § 77k(b)(3)(A). It is misdirection, moreover, for Nomura to argue that the characteristics of the loans were "fixed" as of the time they were originated—Nomura represented that those characteristics were accurate as of the effective date, yet Nomura Securities ignored any post-acquisition information that cast doubt on that accuracy. Compounding the problem, Nomura concedes that Nomura Securities did not randomly select loans from the numerous Acquisition Pools to create the SLGs, Nom. Opp. 90, which means that, even if acquisition diligence could theoretically be a substitute for the securitization diligence expressly required by statute, Nomura Securities did nothing that would have allowed it to draw meaningful or reliable conclusions about the SLGs here.

*Finally*, Nomura does not genuinely dispute the facts showing other significant flaws in Nomura Securities' diligence practices: (i) Nomura Securities engaged in only cursory reviews of its diligence vendors' results for loans graded as EV1 or EV2—loans that its vendors gave passing grades; (ii) Nomura Securities did not alter this practice even after an audit showed that 30% of such loans were not properly underwritten and should not have been securitized; (iii) Nomura Securities did nothing in response to numerous red flags about the originators from which it was buying loans; and (iv) Nomura Securities' valuation diligence uncovered appraisal values that "frequently differed, sometimes in material respects," from what originators were reporting, Nom.

Opp. 108—which ultimately pushed LTV ratios over the 80% and 100% thresholds that Nomura does not dispute are material—yet Nomura failed to disclose the results of this valuation diligence to investors.

**RBSSI**

*First*, RBSSI concedes that it performed no independent diligence on the NHELI 2006-HE3 or NHELI 2006-FM2 Securitizations, two of the four deals it underwrote in this action. For NHELI 2006-HE3, RBSSI cannot excuse this failure on the ground that it was merely a "participating underwriter," an assertion that is supported neither by the record—including an internal RBSSI "deal summary" that lists RBSSI as the "Co-Lead" underwriter, RSUF ¶ 652—nor by law—as the SEC requires even a "participating" underwriter to take independent steps to ensure the accuracy of the registration statement. The undisputed record shows that RBSSI failed to meet even the improperly low standard RBSSI constructs for itself by doing nothing to verify that Nomura's diligence was reasonable. For NHELI 2006-FM2, RBSSI confirms that it reviewed, but did not verify, summaries of diligence provided to it by Nomura *as an issuer*, violating the decades-old rule that an underwriter must do more than simply take at "face value" what the issuer tells it. *Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 697 (S.D.N.Y. 1968).

*Second*, RBSSI concedes the irredeemable flaws in the samples it drew for the NHELI 2007-1 and NHELI 2007-2 Securitizations: (i) it did not draw its samples from the relevant SLGs; (ii) it drew semi-random samples *after* it drew adverse samples—assuring that it was drawing from a skewed population; (iii) it weighted its samples towards higher-balance loans—further skewing the sample, and tilting it away from the lower-balance loans required for the SLGs backing Certificates sold to the GSEs; and (iv) it took no steps to weight its diligence *results* such that it could draw reliable inferences from them to the SLGs as whole.

*Third*, RBSSI admits that, when confronted with defect rates flagged by its vendor that were well above the 20% threshold for upsizing established by its own policies, RBSSI did nothing. RBSSI's explanation for its inaction is, in essence, that because it decided to override all of its vendors initial grades of EV3, it had no reason to be concerned. But this is only part of the

problem. RBSSI does not deny that it limited its review to loans graded as EV3, and that it reversed those grades in large numbers—all of which confirms that RBSSI diligence processes, rather than being designed and implemented to root out faulty loans, was designed to ensure that as many loans as possible would be securitized.

*Fourth*, RBSSI acknowledges that it failed to consider post-closing information about the loans it reviewed, thereby admitting that it did not conduct diligence up to the effective date of the Prospectus Supplement. As with Nomura, it is no excuse for RBSSI to assert that the characteristics of the loans are "fixed" as of origination—its own witnesses and documents recognize that critical information, shedding light on the characteristics of a loan at the time of origination, often becomes available only months later.

*Finally*, RBSSI does not genuinely contest the other flaws in its diligence process: (i) it accepted all of its vendor's grades of EV1 or EV2, while overturning large numbers of its grades of EV3—even though a March 2006 audit of its vendor's diligence shows that many of the loans the vendor graded as EV1 should have been graded as EV3; (ii) it fails to rebut FHFA's showing that it performed no additional diligence on loans issued by originators about which it had serious concerns; and (iii) it does not genuinely dispute that its valuation diligence produced appraisal values that were outside even RBSSI's own generous tolerances, but RBSSI did not disclose those results to investors.

### Section 12 and Individual Defendants

Defendants cannot avoid the conclusion that their failure to conduct a reasonable investigation under Section 11 also amounted to a failure to exercise reasonable care under Section 12. They point to theoretical differences between the two defenses, but they fail to dispute that, when applied to the specific facts of this case, those defenses fully overlap. It is not reasonable under any standard, for example, to investigate current representations about SLGs based on statistically invalid samples of distinct loan populations (using non-updated information) that simply do not allow for reliable extrapolations. And it is not "reasonable care" to perform diligence only at the time loans were purchased, as Section 12 also looks to whether an underwriter

"conducted an *ongoing investigation* of [the issuer's] financial condition." *Franklin Sav. Bank of N.Y. v. Levy*, 551 F.2d 521, 527 (2d Cir. 1977) (emphasis added).

Nomura also cannot forestall summary judgment against the Individual Defendants by suggesting, incorrectly, that FHFA's motion did not include them. In fact, FHFA moved as to "Defendants," which expressly included the Individual Defendants. Mem. 1 n.1. Nomura concedes, moreover, that the Individual Defendants "relied on Nomura's due diligence processes," Nom. Opp. 111, which leads to two inevitable conclusions. First, if the underlying diligence was deficient, as it was for all of the reasons already explained, then the Individual Defendants cannot avoid summary judgment simply by adopting that faulty diligence for themselves. And, second, the Individual Defendants, by relying solely on the diligence performed by Nomura, admit that they failed to meet their independent obligation to "perform a due diligence inquiry notwithstanding the use of a professional underwriter." *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 638268, at *7 (S.D.N.Y. Mar. 21, 2005) (quotation marks omitted).

FHFA respectfully requests that the Court grant its motion for partial summary judgment.

## ARGUMENT

In its opening brief, FHFA met its initial "burden of demonstrating the absence of a material factual question" as to Defendants' due diligence and reasonable care defenses, *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 655 (S.D.N.Y. 2004), "by showing that there is an absence of evidence to support an essential element of [Defendants'] case[s].'" *In re Livent, Inc. Noteholders Sec. Litig.* ("*Livent I*"), 355 F. Supp. 2d 722, 729 (S.D.N.Y. 2005) (quoting *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994)), *aff'd sub nom. King v. Livent, Inc.* ("*Livent II*"), 161 F. App'x 116 (2d Cir. 2005). Accordingly, "[s]ummary judgment [for FHFA] is appropriate unless [D]efendant[s] allege[] sufficient facts to establish the possibility of such diligence" as to each misrepresentation for each Securitization at issue. *Livent II*, 161 F. App'x at 118; *see also FHFA v. Nomura Holding Am., Inc.*, --- F. Supp. 3d ----, 2014 WL 6462239, at *19 (S.D.N.Y. Nov. 18, 2014) ("Once the moving party has asserted facts showing that the non-movant's claims cannot be

sustained, the opposing party must set out specific facts showing a genuine issue for trial.")
(quotation marks omitted).

Defendants cannot satisfy their "heavy" burden "merely by calling into question the
credibility" of the evidence presented by FHFA. *Livent I*, 355 F. Supp. 2d at 732-33. "Nor may a
party 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a
motion for summary judgment,' as '[m]ere conclusory allegations or denials cannot by themselves
create a genuine issue of material fact where none would otherwise exist.'" *Nomura Holding*,
2014 WL 6462239, at *19 (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)). To avoid
summary judgment, Defendants must cite more than "the mere existence of a scintilla of evidence
in support of [their] position." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). As it is
here, "[s]ummary judgment is appropriate when the evidence is so one-sided that one party must
prevail as a matter of law." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 271 (2d Cir.
2011) (quotation marks omitted).

## I.    THERE IS NO GENUINE DISPUTE THAT NOMURA SECURITIES'
##        DILIGENCE WAS UNREASONABLE AS A MATTER OF LAW

Nomura's primary response to each of the Court's four questions is that the adequacy of a
due diligence or reasonable care defense is a fact-intensive question and summary judgment is
therefore unwarranted. While the "due diligence" and "reasonable care" defenses are
"fact-intensive," *In re WorldCom*, 2005 WL 638268, at *11, "[t]o the extent that the underlying
facts are undisputed, the adequacy of the diligence may be appropriately decided on summary
judgment." *In re Int'l Rectifier Sec. Litig.*, 1997 WL 529600, at *7 (C.D. Cal. Mar. 31, 1997)
(cited in Nom. Opp. 85, RBS Opp. 52 n.42); *see also In re WorldCom*, 346 F. Supp. 2d at 681
(granting summary judgment to defendants on underwriters' Section 11 due diligence defense on
issue of whether CEO would commit fraud); *Bamco 15 v. Buchanan Residential Real Estate Ltd.
P'ship 2410*, 1986 WL 15333, at *4 (S.D.N.Y. Dec. 31, 1986) (granting summary judgment to
plaintiff on Section 12 reasonable care defense); *see generally, Nomura Holding*, 2014 WL
6462239, at *2 (an "objective determination" involving reasonableness is one "that can be resolved

as a matter of law—it need not be made by a trier of fact" (quotation marks and brackets omitted) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008))).

### A. Defendants Do Not Genuinely Dispute That Nomura Securities Controlled NAAC And NHELI As A Practical Matter—Creating A Near-Absolute Standard Of Liability For Nomura Securities

The Court asked "whether a more exacting due diligence standard applies to an underwriter that controls a security's issuer," *Nomura Holding Am., Inc.*, 2014 WL 4412388, at *5. In its opening brief, FHFA demonstrated that an underwriter that entirely controls the activities of its issuer is subject to a heightened standard for establishing a due diligence defense, such that the underwriter's burden "approaches that of the issuer[s] as guarantor of the accuracy of the prospectus," *Feit*, 332 F. Supp. at 578. Mem. 9-10, 57-60.[2]

In opposition, Nomura tries to avoid this result by asserting that its sponsor entity, "NCCI, not Nomura Securities, was the entity that … performed due diligence," and that "there is no evidence that Nomura Securities exercised control or direction over those due diligence activities." Nom. Opp. 25.[3] If credited, this assertion is dispositive—it amounts to an admission that Nomura Securities failed to "make some reasonable attempt to verify the data submitted to [it]," contrary to forty years of settled law. *BarChris*, 283 F. Supp. at 697.[4] Any decision by Nomura Securities to wholly rely on NCCI would be especially unreasonable as, according to Nomura's Rule 30(b)(6) witness, NCCI had no employees until October 2006, well after Nomura issued the three Securitizations that Nomura Securities underwrote. RSUF ¶¶ 31-32.

---

[2] Nomura does not dispute that NAAC and NHELI cannot assert a due diligence defense for the Securitizations they issued. Mem. 55-56. Summary judgment on this issue is therefore likewise appropriate.

[3] *See also* Nom. Opp. 26 ("[I]t was NCCI—not Nomura Securities—that performed the loan-level due diligence on the trade pools that ultimately contributed to the supporting loan groups"); Nom. SUF ¶ 10 ("NCCI … performed due diligence on the loans, including hiring the due diligence vendors and selecting the loans to be reviewed.").

[4] The admission that NCCI conducted all of the diligence in the case is also dispositive of a second issue, namely that NCCI controlled Nomura Securities, NAAC, and NHELI under 15 U.S.C. § 77o (and parallel Blue Sky provisions, see D.C. Code § 31-5606.05(c) and Va. Code Ann. § 13.1-522(C)). *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001) (Cote, J.) (finding control where parent corporation "exercis[ed] direct, daily supervision, oversight and control through common personnel and shared offices," and used its subsidiaries as "the corporate vehicles through which [the parent entity] provided [] services"). If NCCI was the only entity that conducted diligence, it would also have no defense that it had "no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o(a).

Moreover, Nomura's confession of liability for Nomura Securities does not change the answer to this Court's question. Nomura's assertion that NCCI was the "entity" responsible for performing diligence as a *formal* matter does not change the facts that, as a *practical* matter, Nomura Securities' employees controlled NAAC and NHELI, as well as the purchase, diligence, and securitization of the Mortgage Loans, RSUF ¶¶ 58-90. This indisputable evidence of practical control places Nomura Securities at the very top of the well-established "sliding scale" of liability. *In re WorldCom*, 2005 WL 638268, at *9.

1.  Nomura Does Not Genuinely Dispute That Nomura Securities Controlled NAAC And NHELI As A Practical Matter

Nomura concedes that its issuers were "solely passive entit[ies]," Nom. Opp. 10, 65 (quotation marks omitted), and does not dispute that these entities had no employees or business operations, RSUF ¶¶ 58-60, that their officers were employed by Nomura Securities or Nomura Holding (Nomura Securities' corporate parent), and that there is no evidence these officers ever met in their capacities as such. RSUF ¶¶ 71-88.[5] Nomura also does not genuinely dispute that Nomura Securities employed the traders who decided which loans to buy and securitize, RSUF ¶¶ 91-92, 102-05, 373-74; the members of the Diligence Group and the Group's supervisor, who conducted diligence, RSUF ¶ 137-38, and the individuals who structured the Securitizations, RSUF ¶¶ 106-08. In fact, Nomura's Rule 30(b)(6) witness could not think of a single U.S. Nomura RMBS employee who was *not* employed by Nomura Securities. RSUF ¶ 107. And while Nomura asserts that employees of Nomura Securities sometimes also worked for NCCI, Nom. Opp. 26 (citing Nom. SUF ¶ 13), the only "fact" it cites shows that only one employee, Individual Defendant Dante LaRocca—who was also the CEO of NAAC, RSUF ¶ 79—"did work for both entities during my time" at Nomura, Nom. SUF ¶ 13. This assertion, however, says nothing about which entity the relevant traders, structurers, and diligence personnel worked for in connection with the three relevant Securitizations.

---

[5] Defendants do not dispute that a depositor is, by both statutory and regulatory definition, an issuer for purposes of the Securities Act. Mem. 55-56 (citing 15 U.S.C. § 77b(a)(4); 17 C.F.R. § 230.191(a)).

Nor is there any evidence that NAAC or NHELI took independent action regarding the Securitizations. Nomura posits that the directors of NAAC and NHELI "had the authority to prevent the issuance of the Securitizations" and "could refuse to purchase loans from NCCI," Nom. Opp. 25, but they point to no evidence that any director ever used that power in practice, for the Securitizations, for an individual loan, or otherwise. To the contrary, many of the directors could not even recall serving as directors or corresponding with each other, RSUF ¶¶ 69-70, 83. Nomura's speculation that NAAC and NHELI "could" act independently, without any evidence that they actually did so, does not create a genuine dispute that Nomura Securities controlled every aspect of NAAC and NHELI as a practical matter, including for the Securitizations at issue. *See Nomura Holding Am.*, 2014 WL 6462239, at *19 ("[S]peculation or conjecture as to the true nature of the facts" is insufficient to defeat summary judgment).

       2.       Settled Law Subjects Nomura Securities To A Near-Absolute Standard Of Liability

While Nomura accuses FHFA of "inventing a 'heightened standard' for Section 11 liability," Nom. Opp. 63, in fact, forty years of settled case law measure a Section 11 defendant's standard of liability by its knowledge of the issuer and its access to the particulars of the transaction. Mem. 57-60 (citing, *inter alia*, *In re WorldCom*, 2005 WL 408137, at *9 (S.D.N.Y. Feb. 22, 2005); *Feit*, 332 F. Supp. at 578; *BarChris*, 283 F. Supp. at 696). That approach is embodied in governing SEC regulations and commentary. 17 C.F.R. § 230.176(g) (reasonableness of a Section 11 defendant's belief turns on, *inter alia*, "the availability of information with respect to the registrant"); Circumstances Affecting the Determination of What Constitutes Reasonable Investigation and Reasonable Grounds for Belief Under Section 11 of the Securities Act, SEC Release No. 6335, 1981 WL 31062, at *12 (Aug. 6, 1981) ("SEC Rel. 6335"). A straightforward application of this settled law leads to the conclusion that because Nomura Securities had complete control of NAAC and NHELI, its liability approaches that of those two issuers. Mem. 57-60. Nomura's strained arguments to the contrary fail.

*First*, Nomura mischaracterizes FHFA's argument as "requiring" that an underwriter be legally "unaffiliated" with the issuer. Nom. Opp. 63. That is not FHFA's position. Nomura Securities is subject to a heightened standard, not because of its formal corporate affiliation with NAAC and NHELI, but because of the practical reality that Nomura Securities had complete control over those entities. Consequently, Nomura offers three arguments that have nothing to do with Nomura Securities' practical control of NHELI and NAAC: that (i) Section 11 "contains no requirement that the underwriter be unaffiliated with, or exercise no control over, the issuer in order to raise a due diligence defense," Nom. Opp. 63; (ii) the SEC does not "indicate that an underwriter's affiliation with or control over an issuer creates 'near-absolute' liability," Nom. Opp. 65; and (iii) *Feit* does not require the underwriter to be formally independent from the issuer, Nom. Opp. 68. It was Nomura's decision to implement a corporate structure that went beyond mere affiliation and gave its underwriter complete access to and full control over its issuers. Because of that structure, Nomura Securities faces the heaviest possible burden in establishing its defense. *See In re WorldCom*, 2005 WL 638268, at *9; 17 C.F.R. § 230.176(g).

*Second*, Nomura mischaracterizes FHFA as "attempt[ing] to circumvent the … analysis required to pierce the corporate veil" (Nom. Opp. 63), and argues that liability under the securities laws cannot be reapportioned "as long as 'corporate formalities were observed'" (Nom. Opp. 64 (quoting *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2304 (2011))). This too is a *non sequitur*. FHFA does not seek to pierce the corporate veil and thereby "expand liability" to a "person or entity" that is not a proper defendant under the securities laws, *Janus Capital*, 131 S. Ct. at 2303—it asks the Court to apply the "sliding scale" that unquestionably governs underwriter diligence to undisputed facts. By its very nature, this "sliding scale" is different from the binary determination as to whether there is or is not a basis to pierce the corporate veil in other settings. Placement on the sliding scale depends on "the type of underwriting arrangement" and "the availability of information with respect to the registrant." 17 C.F.R. § 230.176(g); *see also In re WorldCom*, 2005 WL 638268, at *9 (citing *Feit*, 332 F. Supp. at 577-78 and *BarChris*, 283 F. Supp. at 690-92). It is undisputed that Nomura Securities had

access to all information held by the issuers, which places it at the top of that scale, where liability "lie[s] in practically all cases of misrepresentation," regardless of whether the same facts could also support veil-piercing.[6] *Id.* (quotation marks omitted).

*Finally*, Nomura errs in arguing that the standards articulated in *BarChris*, *Feit*, and *WorldCom* do not apply to asset-backed securities ("ABS") because the performance of a "passive" ABS issuer such as NHELI or NAAC is not important to investors, only "'information about the transaction structure and the characteristics and quality of the asset pool and servicing.'" Nom. Opp. 65-66 (quoting Asset-Backed Securities, SEC Release Nos. 33-8518, 34-50905, 70 Fed. Reg. 1506, 1508, 1510-11 (Jan. 7, 2005)).[7] This suggestion—that an underwriter's diligence obligations are reduced if its issuer is a shell—is backward.

A heightened standard is triggered by the underwriter's "intimate knowledge … of the particular transactions." *Feit*, 332 F. Supp. at 578. As Nomura recognizes, the "transactions" here are the Securitizations—over which Nomura Securities exerted complete control and in which it concedes that Nomura held a financial interest, Nom. Opp. 30—not a debt or equity offering. Consequently, Nomura Securities could not play "devil's advocate" with NAAC and NHELI, *Feit*, 332 F. Supp. at 582, raising its standard of liability "close to the status of a guarantor of accuracy" such that Nomura Securities' "liability will lie in practically all cases of misrepresentation," *id.* at 578 (quotation marks omitted).[8]

---

[6] Although FHFA is not now seeking to pierce the veil between Nomura Securities, NAAC, and NHELI in this motion, it reserves the right to do so. At least one court has already suggested that veil-piercing would be appropriate on facts similar to these. *Brady v. UBS Fin. Servs., Inc.*, 2013 WL 1309250, at *34-35 (N.D. Okla. Mar. 26, 2013) (denying defendant's motion for summary judgment in the Section 11 context because similar indicia of integration between underwriter and issuer "raise a genuine issue of material fact as to whether [the issuer] and [the underwriter] operated as a single economic unit.").

[7] The SEC Release that Nomura quotes does not discuss the effect of having an entity with "essentially no business or management" as the issuer on the underwriter's diligence obligation, *see* Asset-Backed Securities, 70 Fed. Reg. 1506, nor does it suggest that the SEC intended to alter the "sliding scale of liability" that *BarChris* long ago construed the Securities Act to establish. *In re WorldCom*, 2005 WL 638268, at *9.

[8] Nomura's suggestion (Nom. Opp. 67 n.27) that Professor Fox's paper is to the contrary is incorrect. *See* Mem. 59 n.21 (citing Merritt B. Fox, *Due Diligence with Residential Mortgage Backed Securities* 57 (Columbia Law & Economics Working Paper No. 462, November 25, 2013), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2359679). Professor Fox's thesis is that whether or not the corporate entity also originates loans, "[i]n the RMBS situation where the organization [of the RMBS] is undertaken within the same organization as the arranger and underwriter functions, this concern argues in favor of absolute strict liability on the arranger and, if separate, on the much more deep pocketed underwriter entity as well." Fox, *supra*, at 57; *see also id.* at 8 (noting that the "arranger" is

13

If anything, a heightened diligence standard is even more appropriate for subprime and Alt-A RMBS than for traditional corporate offerings. Nomura securitized loans that carried an elevated credit risk as compared to prime loans, *see FHFA v. HSBC N. Am. Holdings, Inc.*, --- F. Supp. 2d ----, 2014 WL 3702587, at *1 n.4 (S.D.N.Y. July 25, 2014), and which created incentives for "originators [to] 'lower[] underwriting standards in ways that investors may have difficulty detecting,'" *Nat'l Credit Union Admin. Bd. v. Wachovia Capital Markets, LLC*, 2014 WL 1795294, at *3 (S.D.N.Y. May 6, 2014) (brackets omitted) (quoting Financial Stability Oversight Council, *Macroeconomics Effects of Risk Retention Requirements*, at 3 (Jan. 2011)). Because the party with "the least information about the" risks of the collateral backing the Securitizations was "[t]he investor," *id.*, *more* diligence was required to account for these risks, not less, *see* 17 C.F.R. § 230.176(b) ("The type of security" is relevant to determining whether a Section 11 defendant's investigation and belief was reasonable). FHFA is not asking the Court to create a new standard—it is asking the Court to apply a well-settled standard in the context of subprime and Alt-A RMBS and reaffirm that today's federal courts have not "abandon[ed] the early courts' demand that underwriters employ 'a high degree of care in investigation and independent verification of the company's representations.'" *In re WorldCom*, 346 F. Supp. 2d at 675-76 (quoting *Feit*, 332 F. Supp. at 582).[9]

## B. Nomura Concedes That Nomura Securities Used Statistically Unsound Sampling

The Court asked "whether, or under what circumstances, sampling that is not statistically sound may be relied upon in conducting due diligence." *Nomura Holding Am.*, 2014 WL 4412388, at *5. FHFA showed that because Nomura Securities did not use reliable or statistically valid methods in drawing diligence samples from Acquisition Pools (Mem. 13-20,

---

"also sometimes referred to as the 'sponsor'"). Nomura falls squarely within this definition, as it is the sponsor, depositor, and underwriter for the three Securitizations that Nomura Securities underwrote. RSUF ¶¶ 10-11.

[9] The fact that no court has applied this heightened standard "in the context of [ABS]" (Nom. Opp. 62) merely reflects that "[t]he law on due diligence is sparse." *In re WorldCom*, 346 F. Supp. 2d at 674 (quotation marks omitted), and that RMBS are relatively new—the SEC did not "issue[ ] proposals to address comprehensively the registration, disclosure, and reporting requirements for asset-backed securities … under the Securities Act" until May 2004. Asset-Backed Securities, SEC Release No. 8518, 2004 WL 2964659, at *4 (Dec. 22, 2004).

60-64), it failed to engage in the "thorough or searching inquiry," performed "with systematic attention to detail and relationship," that the law requires. *In re WorldCom*, 346 F. Supp. 2d at 678 (internal quotation mark omitted). In opposition, Nomura concedes that "*Nomura did not draw statistically valid samples*," Nom. Opp. 75 (emphasis added), and offers no evidence that it could draw reliable inferences from its Acquisition-Pool samples to the relevant SLGs. *See also* RSUF ¶ 947 (Mr. Grice testifying that "I would not agree that [']systematic and searching['] is a standard"). As a result, there is no dispute that Nomura Securities failed to verify, at a minimum, whether the 61% of the Mortgage Loans not in its samples complied with the applicable underwriting guidelines. RSUF ¶ 385.[10] This failure is critical, as Nomura Securities' responsibility was to verify representations made about *all* the Mortgage Loans.

1. Nomura Concedes That Nomura Securities Drew Credit And Compliance Samples Adversely

Nomura concedes that Nomura Securities drew its credit and compliance samples using undocumented, so-called "adverse sampling" and it presents no evidence that Nomura Securities drew any of the relevant samples at random. Nom. Opp. 72; *see also* RSUF ¶ 970 (Mr. Grice testifying that he saw no evidence that Nomura selected random samples for any of the Acquisition Pools). Nomura also admits that, at the direction of its traders, its Diligence Group used S&P's LEVELS program to draw 90% of the adverse sample, Nom. Opp. 72, and does not dispute that Diligence Group employees viewed LEVELS as a "black box," and believed that the use of LEVELS rendered the Diligence Group "a non effective entity," RSUF ¶¶ 252, 256-59. *See also* RSUF ¶ 966 (Mr. Grice testifying that S&P LEVELs is a "default predictor" and agreeing that it was "not actually testing for noncompliance with guidelines."). Nomura Securities' use of a sampling methodology that it did not understand is basis enough to conclude that it did not conduct a "reasonable investigation" and did not have "reasonable ground" to believe in the veracity of the representations. Moreover, Nomura's own proffered diligence expert concedes that "the results of [such] an adverse sample could not be extrapolated to the

---

[10] Nomura presents no evidence of any diligence performed on 70% of Mortgage Loans that Nomura acquired through its conduit channel. *See* RSUF ¶ 179.

remainder of the pool," RSUF ¶ 390. Accordingly, it was unreasonable for Nomura Securities to rely on such adverse samples when purportedly investigating the veracity of representations that were made about the *entire* SLGs, RSUF ¶¶ 5-8. *See* 15 U.S.C. § 77k(b)(3)(A) (requiring investigation of "the statements" in the Prospectus Supplements). Nomura's attempts to distract from this clear result are unpersuasive and meritless.

(a)  *Nomura Fails To Show That Adverse Sampling Of Acquisition Pools Allowed Nomura Securities To Draw Valid Conclusions About The SLGs*

Despite the concession of Nomura's proffered diligence expert that "the results of an adverse sample could not be extrapolated to the remainder of the pool" as a statistical matter, RSUF ¶ 390, Nomura argues that Nomura Securities could "extrapolate" from its adverse samples to the SLGs in the sense that it could use its diligence results to "make reasonable inferences" about the SLGs. Nom. Opp. 73. Nomura bases this argument entirely on the fact that its biased and undocumented sampling criteria purportedly targeting "loans with the greatest potential credit risk," Nom. Opp. 72, and its assertion that a loan with a higher credit risk was more likely to have underwriting defects, Nom. Opp. 73. But Nomura presents no support for its claim that high credit risk indicates a likely underwriting defect or any contemporaneous evidence that anyone at Nomura had such a belief at the time. Instead, Nomura offers: (i) an after-the-fact statement by the head of Nomura's Diligence Group starting in mid-2006, Neil Spagna, that he "believed" this was the case, Nom. Opp. 75 (citing Spagna Decl. ¶ 6, 10);[11] (ii) its expert's unsupported assertion that such a correlation "might" exist, RSUF ¶ 261 (citing Nom. Ex. 32 at 32-33); and (iii) a page of FHFA's opening brief that says no such thing, Nom. Opp. 73 (citing Mem. 65).[12]

---

[11]  Mr. Spagna's belief is not probative of whether Nomura's sampling was objectively reasonable, and may not be considered here. *Livent II*, 161 F. App'x at 118 ("Allegations in an affidavit based on belief only are properly not considered in opposition to a motion for summary judgment.").

[12]  In falsely attributing to FHFA the argument that there is a "correlation" between compliance with underwriting guidelines and credit risk, Nomura reveals its key misunderstanding of how underwriting guidelines were supposed to work. A loan that was not underwritten to guidelines does have a higher credit risk—in the sense that it is more likely to default or become delinquent than a loan property underwritten to the same guidelines. But this does not mean that a loan with a high credit risk—in the sense that it was approved by the originator with, *e.g.*, a high LTV ratio, high DTI ratio, lower FICO score, *etc.*—is more likely not to have complied with guidelines that permitted those characteristics.

Nomura also presents no evidence that the adverse samples actually identified more defective loans than a statistically valid random sample would have. It does not, for example, compare Nomura Securities' diligence results to a review of a valid sample drawn from the full Pools, although its Rule 30(b)(6) witness conceded that "at least some random" sampling was needed "to see if the [] description of the pool was representative," RSUF ¶ 223. Instead, Nomura asserts that Nomura Securities' sampling was adequate because it drew samples larger than those drawn by FHFA's sampling expert, Dr. Cowan. Nom. Opp. 71. This is nonsensical. Because Dr. Cowan drew samples from the SLGs at random, those samples may be extrapolated to the SLGs as a whole within a defined confidence interval and margin of error. *See FHFA v. JPMorgan Chase & Co.*, 2012 WL 6000885, at *5-6 (S.D.N.Y. Dec. 3, 2012). Because Nomura Securities did not draw samples from the SLGs and did not select a statistically valid random samples from its Acquisition Pools, no reliable extrapolation from its sample to the SLGs is statistically possible. *Gulino v. Bd. Of Educ. Of City Sch. Dist. of City of New York.*, 907 F. Supp. 2d 492, 520 (S.D.N.Y. 2012) (defendant "failed to establish" that sample "was competently constructed" where sample population "was not representative of the full population") *aff'd sub nom. Gulino v. Bd. of Educ. of New York City Sch. Dist. of City of New York*, 555 F. App'x 37 (2d Cir. 2014); *see also* Mem. in Supp. of Defs.' Preliminary *Daubert* Motion, at 6 ("Defs.' Daubert"), *FHFA v. JPMorgan Chase & Co.*, No. 11 Civ. 6188 (S.D.N.Y. Oct. 26, 2012) (Dkt. 197) (brief of all defendants, including Nomura and RBSSI). That Nomura Securities, before creating the SLGs, may have examined biased selections of loans that when aggregated form 39% of the loans in the SLGs, Nom. Opp. 71, does not change the reality that it could not and did not reliably extrapolate its diligence results to the remaining 61% of the SLGs: fundamentally, Nomura Securities failed to develop the data necessary to reasonably confirm the

Moreover, many of the loans at issue had a higher degree of credit risk, *E.g.*, *Nomura Holding*, 2014 WL 6462239, at *9, but Nomura still represented that *all* the Mortgage Loans were "originated generally in accordance with" underwriting guidelines, Nom. SUF ¶ 268, not that what Nomura Securities deemed the "riskiest" loans had been removed. Nomura cannot paper over Nomura Securities' failure to perform a reasonable investigation into whether unsampled loans complied with guidelines by insisting that they tested for risk in general, because it has presented no evidence that the risk factors that Nomura Securities tested for provided reasonable grounds to draw conclusions about whether unsampled loans complied with guidelines.

truth of representations regarding the SLGs.  *See Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1452 (D.C. Cir. 1988) ("Statistical calculations performed on data … are not probative of anything without support from an underlying statistical theory").

Finally, Nomura's attempt to analogize Nomura Securities' ad hoc "adverse sampling" to the "focused sampling" that the D.C. Circuit purportedly approved in *Am. Trucking Ass'n v. U.S. Dep't of Transp.*, 166 F.3d 374 (D.C. Cir. 1999) does not withstand scrutiny.  Nom. Opp. 75. In *American Trucking*—which involved federal regulations for identifying driving violations within the records of trucking carriers—the court held that drawing "focused" samples from records that were more likely to discuss violations had value "for ranking carriers" but *not* for "estimat[ing] the proportion of violations to be found in the total population of a carrier's documents."  *Id.* at 380; *see also id.* at 381 (if an "*overall* 10 percent rate of noncompliance with a critical regulation" is required, then "only a sampling procedure aimed at estimating the total rate of noncompliance would be rational").  Because, in this case, the "proportion of violations to be found in the total population" of the Mortgage Loans is exactly what is at issue, *American Trucking* does not help Nomura—it confirms that Nomura Securities' biased sampling was unreasonable as a matter of law for purposes of investigating and maintaining a belief in the truth of representations about the SLGs as a whole.[13]

> (b)  *Nomura Securities' Failure To Use Reliable Sampling Was Not Excused By The SEC—The SEC Stated That Such Sampling Often Is Required For RMBS*

Nomura argues that the Court should not conclude that Nomura Securities' use of biased and statistically invalid sampling was unreasonable because the SEC did not require statistically valid samples for diligence conducted on ABS and, in 2011, declined to adopt such a rule.  Nom. Opp. 70-71; *see also* RBSSI Opp. 53 (same).  But the SEC was explicit that "[t]he requirement to perform a review [under SEC regulations] should not be confused with, and is not intended to

---

[13]  *See also Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 502 (S.D.N.Y. 2013) ("[T]the purpose of using a pure random sample of sufficient size is so that one can estimate the proportion of loans in the overall loan pools exhibiting any characteristic, not just those tested."); *Gulino*, 907 F. Supp. 2d at 520 (defendant did not establish that test was "competently constructed" where "the sample population for the pilot tests … was not representative of the full population of test-takers")..

change, the due diligence defense against liability under … Section 11 or the reasonable care defense against liability under … Section 12(a)(2)." Issuer Review of Assets in Offerings of Asset-Backed Securities, 76 Fed. Reg. 4231, 4232 n.9 (Jan. 25, 2011). Moreover, in the same document that Nomura cites, the SEC explained that it decided not to require statistically valid sampling for all ABS because there were some types of ABS for which such sampling would not be necessary—but the SEC made clear that representative sampling often *would* be necessary for RMBS:

> [W]hether sampling is sufficient to satisfy the 'reasonable assurance' standard in Rule 193 will depend on a variety of factors, such as the type of ABS being offered. For example, *in offerings of residential mortgage-backed securities [ ] where the asset pool consists of a large group of loans, it may be appropriate*, depending on all the facts, *to review a sample of loans large enough to be representative of the pool*, and then conduct further review if the initial review indicates that further review is warranted in order to provide reasonable assurance that disclosure is accurate in all material respects.

76 Fed. Reg. at 4235 (emphasis added). Consequently, the SEC's rulemaking does not excuse Nomura Securities' failure to conduct an appropriate investigation into the Securitizations.

> (c) *Nomura Securities' Failure To Use Statistically Valid Sampling Is Also Not Excused By Industry Practice*

This leaves Nomura to argue it was acceptable for Nomura Securities not to use sampling that would allow it draw reliable inferences about the loan populations in the SLGs because other industry participants failed to do so as well. Nom. Opp. 70, 77-78. Nomura cannot rely on purported "industry standards" at the threshold, because it presents no evidence that such standards actually existed—to the contrary, its proffered expert, Mr. Grice, affirmatively asserts that "[t]here were no specific rules or industry standards creating requirements or processes for due diligence in RMBS transactions during the relevant period." FHFA Ex. 22 ¶ 48.[14]

---

[14] While Nomura asserts that "[t]here is no evidence that any industry participant in 2005-2007 used statistically valid sampling," Nom. Opp. 70, RBSSI's policies required "a review of a number of loans at least as large as a statistically significant sample size assuming a 95% confidence level and a 10% error rate." Ex. 388 at RBS-FHFA-SDNY 0615280. RBSSI thus recognized the importance of using statistically valid samples, although, as it turns out, RBSSI did not comply with this policy. *See* Part II.B.1, *infra*.

Even if Nomura could show that its peer banks also did not use reliable methods of sampling, doing so would not make that failure akin to the professional standards governing accountants, on which Nomura relies, and which were held to inform the standard of care in *BarChris*, 283 F. Supp. 643. Nom. Opp. 77-78, 84-85. Accounting standards are "explicitly defined in authoritative, publicly available pronouncements issued by recognized sources and utilized throughout the accounting profession," while there is no evidence that the same is true of statistically invalid diligence sampling in underwriting RMBS. *S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852, 857 (9th Cir. 2001) (declining "to hold that compliance with an industry standard absolves a securities professional from liability under federal securities laws").

Moreover, even if the use of statistically invalid acquisition-stage sampling was a "standard for the industry as a whole," Nom. Opp. 76 (quotation omitted), the Second Circuit has recognized that "the first litigation of such a practice is a proper occasion for its outlawry." *Chasins*, 438 F.2d at 1171. Courts, not industry, are the final arbiters of whether a practice is reasonable, including under the Securities Act. *E.g.*, *Wabash Ry. Co. v. McDaniels*, 107 U.S. 454, 460-61 (1883); *The T.J. Hooper v. N. Barge Corp.*, 60 F.2d 737, 740 (2d Cir. 1932) (L. Hand, J.); *Ambrosino v. Rodman & Renshaw, Inc.*, 972 F.2d 776, 788 n.23 (7th Cir. 1992) (under Section 12, "even conforming to industry standard may not shield one from liability"). This is especially appropriate where "the industry was comprised of only a few participants who controlled the practice"—including Nomura and RBSSI—as "the standard they developed could fall short of a standard of reasonable care," and there is a risk "that the standard setters will engage in a 'race to the bottom' to set the least demanding standard to assess their conduct." *Dain Rauscher*, 254 F.3d at 857 (cited with approval in *S.E.C. v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014)); *see also Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 383 (9th Cir. 1992).

That risk was undoubtedly realized here. While underwriters must use the care "required of a prudent man in the management of his own property," 15 U.S.C. § 77k(c), Mr. Grice testified that, in providing advice to "dozens of banks," RSUF ¶ 949, this standard "was not the north star I was looking to as I gave my advice." RSUF ¶ 949. Unsurprisingly, the underwriting

practices that Mr. Grice describes as common in the RMBS industry directly contradict the applicable legal standards:

- While underwriters must conduct a "reasonable investigation" of whether "the statements" in offering materials "were true," 15 U.S.C. § 77k(b)(3)(A), Mr. Grice testified that a "reasonable investigation into the truth of representations made in RMBS offering materials" was not "the standard that's in the market." RSUF ¶ 944.

- While underwriters "are expected to exercise a high degree of care in investigation and independent verification of the [issuer's] representations," *Feit*, 332 F. Supp. at 582, Mr. Grice testified that "this requirement … of reperforming, reconsidering, independently investigating; this requisite diligence standard is not one in the RMBS world." RSUF ¶ 945.

- While underwriters are required to conduct a "searching inquiry" "with systematic attention to detail and relationship," *In re WorldCom*, 346 F. Supp. 2d at 678 (quotation marks omitted), Mr. Grice stated that "I would not agree that systematic and searching is a standard," RSUF ¶ 947.

- While underwriters must "consider new information up to the effective date of an offering," *In re WorldCom*, 346 F. Supp. 2d at 677, Mr. Grice testified that it was "not my practice, understanding, or recommendation," that "the due diligence burden for the underwriter bank runs up until the point the deal is closed[.]" RSUF ¶ 961.

Failures by banks that disregarded the securities laws—including Nomura and RBSSI— in their efforts in "creating, packaging, repackaging, and selling trillions of dollars in mortgage-related securities" caused "havoc" in the Nation's economy. Financial Crisis Inquiry

Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* ("*FCIC Report*") at xv, xix (January 2011).[15]

Finally, the fact that the GSEs used sampling in their Single Family businesses is irrelevant. Nom Opp. 70; RBS Opp. 21-24. To start with, the purposes of the two types of diligence was entirely different—the purpose of the GSEs' Single Family due diligence was to ensure that the loans they were buying, on which the GSEs retained 100% of the credit risk, were as represented, while the purpose of Defendants' purported diligence was to investigate RMBS to ensure that the representations in the Prospectus Supplements were accurate. Moreover, these were "two different programs with two different standards, with different implications in the field." *FHFA v. UBS Am., Inc.*, 2013 WL 3284118, at *9 (S.D.N.Y. June 28, 2013) (quotation marks omitted), *reconsideration denied sub nom. FHFA v. JPMorgan Chase & Co.*, 2013 WL 5354212 (S.D.N.Y. Sept. 25, 2013). For example, Freddie Mac used "[s]tatistical sampling to enable [a] reliable estimate of [the] total exposure to ineligible loans," RSUF ¶ 919, while Nomura used biased acquisition-stage sampling in purportedly conducting a "reasonable investigation" of the veracity of representations in subsequent securitizations regarding compliance with underwriting guidelines, LTV ratios, and occupancy status. Consequently, the GSEs' practices in an entirely different context cannot absolve Defendants of their failures to conduct such an investigation.

2.     Nomura Concedes That Nomura Securities Selected Loans For Valuation Diligence Primarily Using HistoryPro

It was also unreasonable as a matter of law for Nomura Securities to use a CoreLogic product called HistoryPro to examine the appraisals that Nomura received from originators. As FHFA explained in its opening brief, HistoryPro was a proprietary "[p]re-AVM screening tool" that would produce "F Scores" on a scale from 0 to 25. Mem. 19; *see* RSUF ¶¶ 276-81. Nomura concedes that it used HistoryPro to select the loans it would submit for valuation diligence, Nom.

---

[15] When asked if "[his] perception is that the banks have the same approach to due diligence today intellectually as they did during the housing crisis, is that right?" Mr. Grice responded: "My opinion is that the purpose is unchanged." RSUF ¶ 983.

Opp. 39, and it does not dispute that, because it would only order an AVM or BPO if the F Score was not 0, 51.9% of the loans in the SLGs did not receive such valuation diligence, *see* RSUF ¶ 285. Nomura further concedes that HistoryPro "did not produce an estimated value for the underlying property," Nom. Opp. 39, and thus did not produce any variance from the original appraised value from which one could judge the accuracy of the appraisal that produced that value, RSUF ¶ 287. Moreover, it was impossible for HistoryPro to evaluate the appraisal itself, as Nomura Securities did not provide such appraisals to CoreLogic for review—only spreadsheets containing addresses and other loan tape information, *e.g.*, FHFA Ex. 609—and the appraisals were not among the factors that HistoryPro analyzed, Nom. Ex. 215 ("[f]actors analyzed" do not include appraisals).[16]

Instead, Nomura defends Nomura Securities' use of HistoryPro on the sole purported ground that screening for "the risk of fraud in appraised values," Nom. Opp. 95, was sufficient because an appraised value is subjectively false "only if the appraiser who expressed the opinion of value did not honestly believe it at the time he or she rendered it." Nom. Opp. 94 (citing *FHFA v. UBS Am., Inc.,* 858 F. Supp. 2d 306, 326 (S.D.N.Y. 2012)). In reality, "[s]ubjective falsity is established where either the appraiser *or the person who reported the appraiser's opinion* did not honestly believe the appraisal value." *Homeward Residential, Inc. v. Sand Canyon Corp.*, 2014 WL 2510809, at *11 (S.D.N.Y. May 28, 2014) (emphasis added) (citing *UBS*, 858 F. Supp. 2d at 326); *see also UBS*, 858 F. Supp. 2d at 327 ("[I]t is entirely appropriate to impose on [underwriters] the obligation to vet the accuracy of opinion statements attributed to third parties."); *In re Bear Stearns Mortg. Pass–Through Certificates Litig.*, 851 F. Supp. 2d 746, 769 (S.D.N.Y. 2012) ("Because the appraisal 'opinions' were expressed by both the originators and [the underwriter] (by incorporating the originators' representations into the

---

[16] Nomura does not support its assertion that HistoryPro "examined the loan's appraisal and rendered an overall quality judgment … on the appraisal that helped predict the risk of early payment default and detect potential fraud." Nom. Opp. 39 (citing Nom. SUF ¶ 69). The materials it cites state that HistoryPro rendered a judgment "about 'potential fraud," Nom. SUF ¶ 69—not an "overall quality judgment … on the appraisal." Moreover, as discussed in text, there is no evidence that HistoryPro "examined the loan's appraisal" and there is affirmative evidence that it did not do so.

Offering Documents), Plaintiffs can state a claim by showing that *either one* disbelieved the appraisal amounts." (emphasis added)). Consequently, Nomura Securities *itself* had to reasonably believe that the original appraisal values were accurate, but Defendants do not argue, and present no evidence, that HistoryPro provided the basis for such a belief.[17]

### C. Nomura Concedes That Nomura Securities Failed To Conduct Additional Diligence When It Encountered High Defect Rates

The Court asked "whether diligence can be sufficient where a party encounters a relatively high percentage of defective loans in a sample yet fails to respond by, for example, culling more defective loans and then retesting with a new sample." *Nomura Holding Am.*, 2014 WL 4412388, at *5. FHFA showed that Nomura Securities conducted no additional diligence when it encountered high "kick-out rates"—large numbers of loans that failed the Diligence Group's review. Mem. 20-22. In opposition, Nomura presents no evidence that Nomura Securities *ever* upsized a diligence sample for credit reasons, or otherwise conducted additional credit diligence after encountering high kick-out rates in any of the Acquisition Pools. *See also* RSUF ¶ 971 (Mr. Grice testifying that he "did not find evidence" that Nomura upsized its samples for any Acquisition Pool).

Although Nomura speculates that "facts and circumstances" may affect whether a kick-out rate constitutes a "red flag," Nom. Opp. 79, 82, the undisputed facts show the specific rates here to be undeniable red flags. Even if one accepts Nomura's calculations of the kick-out rates for the 15 Acquisition Pools cited by FHFA, *all* of the rates are still over 10%, with one rate of nearly 58%. Nom. Opp. 79-81 and Tbl. A. The head of Nomura's Diligence Group until mid-2006, Joseph Kohout, described such kick-out rates above 10% as "much higher" than Nomura Securities' normal rates, RSUF ¶ 295, and said that when one encounters such elevated rates "there's obviously a problem with the loans," RSUF ¶ 293. These undisputed facts all show "that something [wa]s seriously wrong" with the loan pools. *In re WorldCom*, 346 F. Supp. 2d at 673 (quoting *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 155 (2d Cir.

---

[17] Indeed, the undisputed evidence shows that Nomura Securities often did not believe the original appraisal values were appropriate, even though it reported those values to investors. *See* Part I.E.3, *infra*.

2003)).  Nomura provides no contrary evidence that anyone in or outside of Nomura Securities considered the kick-out rates at issue, all above 10%, *not* to be red flags, and thus it fails to create a genuine issue of material fact.  *See Nomura Holding Am., Inc.*, 2014 WL 6462239, at *19.

Nomura also argues that in "response" to these "relatively higher kick-out rates" it drew "relatively higher" samples, Nom. Opp. 81, but its reference is to samples drawn *before* Nomura Securities performed its diligence.  Obviously, such prior samples were not a "response" to the results of subsequent diligence.  Rather, the relevant question is what Nomura Securities did *after* it encountered a high kick-out rate, regardless of the initial sample size, and it did nothing.  *See Nomura Holding Am., Inc.*, 2014 WL 4412388, at *5; *In re WorldCom*, 346 F. Supp. 2d at 677 ("[A]n underwriter conducting a due diligence investigation must look deeper and question more when confronted with red flags." (quotation marks omitted)); *Univ. Hill Found. v. Goldman, Sachs & Co.*, 422 F. Supp. 879, 902 (S.D.N.Y. 1976) (red flags "render [the underwriter']s normal procedures inadequate and [] require more concrete verification"); *see also* 76 Fed. Reg. at 4235 (SEC statement that "in offerings of [RMBS] …it may be appropriate … [to] conduct further review if the initial review indicates that further review is warranted in order to provide reasonable assurance that disclosure is accurate in all material respects").  While Nomura asserts that "Nomura [Securities] could and did upsize sample sizes as needed," Nom. Opp. 81-82 (citing Nom. SUF ¶ 133), the deposition testimony it cites refers only to the *possibility* that Nomura Securities could have upsized, but fails to identify any specific occasion on which it *actually* did so.[18]  It remains undisputed that, as FHFA demonstrated, Nomura Securities never upsized its samples for credit purposes for any Acquisition Pool, contravening its duty as a matter of law.  Mem. 20-22, 64-66.

---

[18]  *See* Nom. SUF ¶ 133 (John Graham: Nomura followed "industry standard that you *could* increase the sample size"; "*if indeed* that was something that was systemic and further increase[d] the—the size of the sample until you were satisfied." (emphasis added)); *id.* (Joseph Kohout:  Nomura had the "*ability* to increase the sample" and that "it did, in fact, happen," without reference to any specific loan pool (emphasis added)); *id.* ¶ 134 (Brett Marvin: "*if* we got results from our adverse selections that warranted additional samplings, we [would] have done that, too" (emphasis added)).

**D. Nomura Concedes That Nomura Securities Failed To Verify The Accuracy And Completeness Of Representations About The SLGs At The Time Of Securitization**

The Court asked "whether, or under what circumstances, due diligence can be adequate where representations in offering documents concern the loans in a Supporting Loan Group but (a) a party never tests the rate of defective loans in the Supporting Loan Group at issue, but rather reviews only pools of loans as they are acquired, and (b) the aggregator does not randomly select loans from those pools to populate the Supporting Loan Group." *Nomura Holding Am.*, 2014 WL 4412388, at *5. FHFA showed that Nomura Securities did not test the rate of defective loans in the SLGs, did not randomly select loans from the Acquisition Pools to populate the SLGs, and did not extrapolate its diligence results to the SLGs, Mem. 22-30, thus failing to confirm that the statements in the Prospectus Supplements were true "at the time such part of the registration statement became effective." 15 U.S.C. § 77k(b)(3)(A); *see also* Issuer Review of Assets in Offerings of Asset-Backed Securities, SEC Release No. 9176, 76 Fed. Reg. 4231, 4235 n.50 (Jan. 25, 2011) (cited in Nom. Opp. 70-71) (SEC agreeing "that the review that is required is a review of the assets for purposes of the securitization and *not the review conducted to originate the assets*") (emphasis added). In opposition, Nomura does not genuinely dispute these facts.

1. Nomura Concedes That Nomura Securities Did Not Perform Credit Or Valuation Diligence At The "Effective Date" Of The Prospectus Supplements

Nomura concedes that Nomura Securities did not perform diligence on the Mortgage Loans at the time of securitization. Nom. Opp. 83. Nomura argues that securitization-stage diligence was not necessary because the representations "pertained to the characteristics of loans at the time of origination only," Nom. Opp. 83-84 (citing Nom. SUF ¶¶ 268, 274), and so "documents not available to the originator" cannot "show[ ] a problem with the original underwriting of the loan," Nom. Opp. 86. Nomura is wrong for many reasons.

Even if the representations were explicitly limited to the time of origination (and they often are not),[19] the Securities Act still required Nomura Securities to ensure that they were accurate based on all information available to it as of the Prospectus Supplements' effective dates.  15 U.S.C. § 77k(b)(3)(A); 17 C.F.R. § 230.430B(f)(1).  *BarChris* illustrates this duty:  Where an issuer disclosed a company's unaudited financial results as of March 31, 1961, 283 F. Supp. at 652, an underwriter failed to reasonably investigate those figures by stopping his investigation "toward the end of March 1961"—a month and a half before the registration statement's effective date of May 16, 1961, *id.* at 697.  The court found that the underwriter could not meet its due diligence defense even though the disclosure was explicitly about an earlier point in time.  *Id.*  Here, similarly, Nomura Securities was required to reasonably investigate and believe, using all "knowledge within [its] grasp," that its statements of "historical fact" remained true as of the effective date.  *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent *historical facts* but at the same time disclaim those misrepresented facts with cautionary language.") (emphasis added)).[20]  Moreover, Nomura Securities was required to investigate if the Prospectus Supplements omitted material information as of the effective date, 15 U.S.C. § 77k(b)(3)(A); *Litwin v. Blackstone Grp.*, L.P., 634 F.3d 706, 716-17 (2d Cir. 2011), and

---

[19]  For three securitizations, the relevant representations stated the fact of the loans' compliance with underwriting guidelines in the present tense:  (i) NHELI 2006-FM1: "Mortgage loans *are underwritten* in accordance with Fremont's *current underwriting programs*," Nom. Ex. 20 at NOM_FHFA_04729544 (emphasis added); (ii) NHELI 2006-HE3: "The Mortgage Loans *are generally consistent with and conform to* the Underwriting Guidelines," Nom. Ex. 21 at NOM-FHFA_04620966 (emphasis added); (iii) NHELI 2006-FM2: "Mortgage loans *are underwritten* in accordance with Fremont's current underwriting programs," Nom. Ex. 22 at NOM-FHFA_04638395 (emphasis added).

[20]  Nomura asserts that diligence can never be current as of the "effective date," because there will always be a lag between the end of diligence and the issuance of a security, and it accuses FHFA of demanding endless rounds of diligence in pursuit of this impossible goal.  Nom. Opp. 84 n.32.  Of course, FHFA is arguing no such thing, and given the large, undisputed time lags at issue here the Court need not consider the Zeno's paradox offered by Nomura.  *See Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 515 (2004) (Kennedy, J., dissenting).  Moreover, while Nomura speculates that performing securitization-stage diligence would have "brought the RMBS industry to a grinding halt," Nom. Opp. 84 n.32, given that the economy was instead brought to a grinding halt by the failure of RMBS like the ones at issue, it is doubtful this presents policy grounds for denying the present motion.  *See* Permanent Subcommittee on Investigations, United States Senate, *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* (Apr. 13, 2011).  Nomura also ignores that its co-defendant RBSSI did in fact conduct its own, flawed diligence at the securitization stage.  *See* Mem. 45-46.

Nomura does not dispute that information showing that the representations were inaccurate as of the effective date would be objectively material.

Nomura cannot dismiss as "speculation" that relevant information could emerge after acquisition and before securitization. Nom. Opp. 86-87. FHFA has presented undisputed evidence that material information could and did arise in the months between acquisition and securitization, RSUF ¶¶ 348-72, thus showing that Nomura Securities' purported belief that there would be no "material changes in the loans between [] two dates," Nom. Opp. 87, after origination was objectively unreasonable. *See also* RSUF ¶ 959 (Mr. Grice testifying that "after the acquisition date and before the securitization date," "[c]ertainly there are kinds of information that become available.").[21] While Nomura faults FHFA for not proving the consequences of Nomura Securities' failure to consider post-origination information, Nom. Opp. 87, FHFA simply has to show that Nomura Securities did not act reasonably—"[w]ithout a reasonable investigation, of course, it can never be known what would have been uncovered or what additional disclosures would have been demanded." *In re WorldCom*, 346 F. Supp. 2d at 683-84. And while Nomura paradoxically seeks credit for Nomura Securities' monitoring of loans between acquisition and securitization, Nom. Opp. 87-88 (citing Nom. SUF ¶¶ 59-61), it monitored only the *performance* of the loans, *i.e.*, current delinquencies (Nom. SUF ¶ 60); it did nothing to investigate post-acquisition information bearing on whether the Mortgage Loans complied with underwriting guidelines, had accurate appraisals, or were owner occupied. *See also* RSUF ¶ 981 (Mr. Grice agreeing that credit reports and servicing records are "data streams that are available to banks").

Nomura's unsupportable assertions that the GSEs were ostensibly "aware" or "approved" of Nomura Securities' decision not to conduct diligence at the time of securitization, Nom. Opp.

---

[21] Nomura concedes that it held the Mortgage Loans on its books as long as or even *longer* than FHFA states for 185 of the 193 Acquisition Pools that contributed to FHFA's analysis. RSUF ¶ 348. Any differences between the time gaps asserted by FHFA and those asserted by Nomura for these eight pools are immaterial. Moreover, Nomura reported a shorter acquisition/diligence time gap for three of these pools because it performed "post-close" diligence, RSUF ¶ 348—which shows that Nomura was capable of performing diligence after acquisition but generally opted not to. In any event, Nomura failed even to consider whether diligence should be updated, regardless of how long loans were held.

84 (citing Nom. SUF ¶¶ 253-63), are irrelevant because the Securities Act "does not establish a graduated scale of duty depending upon the sophistication and access to information of the customer," *Sanders v. John Nuveen & Co., Inc.*, 619 F.2d 1222, 1229 (7th Cir. 1980); *see also Casella v. Webb*, 883 F.2d 805, 809 (9th Cir. 1989) (contributory negligence is not a defense to a Securities Act claim). The relevant legal standards are objective, 15 U.S.C. § 77k(c); 15 U.S.C. § 77*l*(a)(2); *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 871 (S.D. Tex. 2004) ("The reasonableness of the defendants' investigation … is judged by the *objective* standard of a prudent man in the management of his own property") (quotation marks omitted) (emphasis added), hence the GSEs' alleged subjective "approval" of Nomura's diligence practices has no bearing on whether those practices were objectively reasonable. *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 831 F. Supp. 2d 634, 642 (S.D.N.Y. 2011) (under objective standard, "[p]laintiff's subjective intent is irrelevant"). Nomura's assertions are also baseless. It cites no evidence of Fannie Mae's purported knowledge of Nomura Securities' practices before November 30, 2005, when Fannie Mae bought the one Securitization at issue here. *See* Nom. SUF ¶¶ 253-63. And the evidence that Nomura cites for Freddie Mac—two counterparty reviews of Nomura from August 2004 and March 2006, Nom. Exs. 211, 212—depended on information provided by Nomura itself, which failed to disclose the multiple defects in Nomura Securities' diligence process. There is no evidence that, in the course of these reviews, Nomura told Freddie Mac that Nomura Securities did not perform or update diligence at the time of securitization—or that it used biased, statistically unsound sampling and failed to respond to high defect rates. *See id*.

*Finally*, Nomura cannot justify its failure to conduct diligence through the effective date on the basis that this practice "was widespread in the industry," Nom. Opp. 84, as the existence of "widespread" practices cannot outweigh the plain language of the Securities Act. *See, e.g.*, *Sheehan v. Nims*, 75 F.2d 293, 294 (2d Cir. 1935) ("no case has been called to our attention which excuses noncompliance with the statute because others have also disregarded it"); *Auz v. Century Carpet, Inc.*, 2014 WL 199511, at *3 (S.D.N.Y. Jan. 17, 2014) ("Violation of such a statutory standard … constitutes negligence per se so that the violating party must be found

negligent if the violation is proved.") (quoting *Dance v. Town of Southampton*, 467 N.Y.S.2d 203, 206 (2d Dept. 1983)). Rather, courts in the securities context have often held that "[e]ven a universal industry practice may still be fraudulent." *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 274 (3d Cir. 1998) (collecting cases and rejecting the argument that "a Section 10(b) defendant would be entitled to summary judgment even if it were her regular practice to knowingly violate the duty … so long as she could identify a sufficient number of other broker-dealers engaged in the same wrongful conduct").

2. Nomura Concedes That Nomura Securities Did Not Randomly Select Loans From Acquistion Pools To Populate The SLGs

Nomura acknowledges that Nomura Securities did not create the SLGs by selecting loans at random from the Acquisition Pools. *See* Nom. Opp. 36, 90. Instead, it asserts that FHFA has not shown "any consequential negative effect" of its failure to do so, Nom. Opp. 90. FHFA has shown exactly what the negative consequence was—"it was not possible, as a statistical matter, for Nomura Securities to draw a reasonable inference about the quality of the loans in the SLGs from any of the results of its acquisition-stage diligence." Mem. 69 (citing Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* Fed. Judicial Ctr., Reference Manual on Scientific Evidence 229, 243 n.56 (2nd ed. 2000)); Order at 2-3 (Dkt. No. 961) (calculations of kick-out rates for Acquisition Pools and SLGs "are only meaningful if one presumes that the results of a sample of loans from various trade pools can be extrapolated to SLGs, where a non-random set of loans were selected from those trade pools to populate the SLGs…. [A]nd Defendants have offered no evidence that support the soundness of this fundamental assumption[.]"). Thus, whatever the quality of Nomura Securities' acquisition-stage diligence was—and it was unreasonable as a matter of law—it could not provide reasonable grounds for Defendants to believe the representations in the Prospectus Supplements were true. *See* 15 U.S.C. § 77k(b)(3)(A).

3.    Nomura Does Not Genuinely Dispute That Nomura Securities Did Not
      Extrapolate The Results Of Its Diligence To Either The Full Acquisition
      Pools Or The SLGs

FHFA showed that Nomura Securities did not extrapolate the results of the diligence it

conducted on samples drawn from Acquisition Pools, and that it was not statistically possible for

it to do so reliably.  Mem. 27-30.  In opposition, Nomura concedes that Nomura Securities drew

the relevant samples using "adverse sampling," *see* Part I.B.1, *supra*, and does not address its

diligence expert's concession that "the results of an adverse sample could not be extrapolated to

the remainder of the pool," RSUF ¶ 390, or the similar admissions of Mr. Kohout and the leader

of Nomura's Trading Desk, Brett Marvin, RSUF ¶¶ 388-89.  Nomura tries to characterize

Nomura Securities' purported review of "Due Diligence Summaries" prepared for four of the

deals as "extrapolation," Nom. Opp. 73-75, but it does not refute the facts showing that those

summaries were not intended to be, and actually were not, valid statistical extrapolations.  Mem.

27-28.  Nor does it otherwise show that such an extrapolation ever occurred.[22]  As such, because

such extrapolations "are only meaningful if one presumes that the results of a sample of loans

from various [acquisition] pools can be extrapolated to SLGs," which cannot be done "where a

non-random set of loans were selected from those [acquisition] pools to populate the SLGs,"

Order at 2-3 (Dkt. 961), such adverse sampling of the Acquisition Pools could not and did not

provide a reasonable basis for Defendants to believe in the truth of the representations about the

entire SLG and all of the loans therein.[23]

_____

[22]  Nomura claims that FHFA is trying to "have it both ways" by arguing both that Nomura Securities could not
extrapolate the results of its diligence from a statistically invalid sample and also that results from non-statistical
samples can be red flags.  Nom. Opp. 77.  This argument reveals a fundamental misunderstanding of both statistics and
the securities laws.  Nomura Securities' biased and statistically flawed sample indicated that the overall population
*might* have the same defects as the sample, while Dr. Cowan's statistically valid sample of a sufficient size indicates
(within a defined probability) that the population *does* have the characteristics of the representative sample.  Nomura
Securities had to conduct a "reasonable investigation" of the representation that the loans backing the SLGs were not
defective—even if Nomura Securities' diligence of statistically flawed samples had indicated (although they did not)
that the Acquisition Pools *might not* have many defective loans, this would not be a statistical basis from which to
conclude that the SLGs *did not* contain such loans.  Nomura Securities also had the duty to "look deeper and question
more" when confronted with a "red flag" that would "alert any reasonable investor that something is seriously wrong,"
*In re WorldCom*, 346 F. Supp. 2d at 677, 673—a review of statistically flawed samples showing that the Acquisition
Pools contain defective loans is precisely such a red flag, and requires an investigation of the unsampled portions of the
Pools.

[23]  Defendants' remaining arguments, Nom. Opp. 89-90, involve the "maximum implied kickout rates" that the Court
struck.  Order at 3 (Dkt. 961).

4.     <u>Nomura Does Not Genuinely Dispute That Nomura Securities'<br>Pre-Purchase Diligence Was Not Conducted On The Statements In The<br>Prospectus Supplements</u>

Finally, Nomura does not genuinely dispute the facts showing that Nomura Securities' diligence process was not designed to verify the accuracy of the representations in the Prospectus Supplements. RSUF ¶¶ 318-35. Specifically, it does not dispute that no one both performed diligence on the Mortgage Loans and also drafted or reviewed for accuracy the representations in the Prospectus Supplements. The Diligence Group did not do so—it did "not directly" "provide any input into prospectus supplements" besides data. RSUF ¶ 318. The Group's diligence vendors did not do so—they "did not even receive a copy of the prospectus supplement." RSUF ¶ 323. And the Transaction Management Group did not do so—it "relied on [the] knowledge and experience" of the Diligence Group, RSUF ¶ 331-32.

Instead, Nomura argues that it was acceptable for the Transaction Management Group, which drafted the representations, Nom. SUF ¶ 36, to rely on the incomplete diligence performed at the acquisition stage by the Diligence Group. Nom. Opp. 73-74, 88-89. For example, Nomura repeatedly highlights the "Due Diligence Summaries" that the Transaction Management Group relied on, *id.* at 56, 74, but concedes that many of these summaries contained disclaimers that the summary "*is not complete*, and *we do not represent that it is accurate*," RSUF ¶ 394 (emphases added). Nor, moreover, is there any evidence that the Transaction Management Group understood how the diligence process worked. To the contrary, Individual Defendant John Graham—the CEO of issuer NAAC and to whom the Diligence Group reported, RSUF ¶¶ 72, 138—did not know what the Diligence Group did to verify that loans were issued in compliance with guidelines, Nom. Ex. 35 at 112:18-23, did not know if the diligence review involved looking at loan files, *id.* at 125:15-25, and did not know if an AVM was sufficient to determine if an appraisal value was accurate, *id.* at 177:23-178:7. Nor is there evidence that the Transaction Management Group could draw meaningful conclusions about the SLGs from the high-level and incomplete diligence results it received about some of the underlying Acquisition Pools, as the SLGs were not randomly populated from those Pools. *See* Nom. Opp. 11-19, 90.

Consequently, although the Transaction Management Group received diligence summaries for some of the Acquisition Pools that fed into the SLGs, Nom. Opp. 56, there is no evidence that the Group had a reasonable basis to rely on the process that produced those results when making representations specific to the SLGs.[24]

### E. Nomura Does Not Genuinely Dispute The Additional Flaws In Nomura Securities' Diligence Processes

In addition to answering the four questions this Court asked in its September 8 Order, FHFA showed that several other flaws rendered Nomura Securities' due diligence defense invalid as a matter of law. Mem. 30-39, 70-74. Nomura's assertions to the contrary are unsupported by the record and thus cannot create a genuine issue of material fact. *See Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 370 n.3 (2d Cir. 2003) (An "opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions.") (quoting *Contemporary Mission v. U.S. Postal Serv.*, 648 F.2d 97, 107 n.14 (2d Cir. 1981)).

1. <u>Nomura Does Not Genuinely Dispute That Nomura Securities Failed To Meaningfully Review Loans That Its Vendors Graded As Suitable For Purchase While Securitizing Large Numbers Of Loans That They Graded As Unsuitable</u>

In response to FHFA's showing that Nomura Securities' process for reviewing its diligence vendors' work was haphazard and unreliable, Mem. 30-34, 70-72, Nomura concedes that "[Nomura Securities] failed to review the loan files when checking [its] due diligence vendors' work." Nom. Opp. 99. Nomura asserts that Nomura Securities received "all of the critical information about each loan" in its vendor's "detailed due diligence results," *id.*, but the

---

[24] In his new, self-serving declaration Mr. Graham states that he thought well of the Diligence Group's personnel, Graham Decl. ¶ 8—but this is not evidence that the Group's work was reasonable. Mr. Graham also asserts that he relied on the Group's "use of large sampling sizes for credit and compliance reviews," Graham Decl. ¶ 8—but he previously testified that he could not recall investigating whether the sample sizes were justified, Nom. Ex. 35 at 143:2-8, could not recall anyone in the Diligence Group who had the statistical background to determine if the sample sizes were sufficient, *id.* at 163:3-11, and did not even ask the Diligence Group what the sample sizes were before attesting to the veracity of the representations, *id.* at 123:13-21. As such, his newly minted affidavit fails to create a genuine issue of material fact as a matter of law. *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (factual allegations cannot defeat summary judgment "when they are made for the first time in [a witness's] affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony").

only "results" it identifies are Clayton and AMC's "Individual Asset Summaries," *id.*, which the Diligence Group looked at "occasionally." RSUF ¶ 917 (citing Ex. 553). Moreover, Nomura identifies such summaries for three of the 194 Acquisition Pools at issue, RSUF ¶ 489 (citing Nom. Exs. 254, 611, 612), and those three summaries provide data about only small slices of those Pools — 21% of the Aegis 03 Pool, 4.4% of the First NLC SP02 Pool, and 2.6% of the Fremont SP02 Pool. RSUF ¶¶ 914-16. This analysis is a far cry from evidence that Nomura Securities received or reviewed "all of the critical information about each loan." Nom. Opp. 99.[25]

Nomura provides no evidence that Nomura Securities ever changed its vendors' initial grades of EV1 or EV2 to final grades of EV3, or that it received loan-level credit or compliance diligence results for loans graded by its vendors as EV1 or EV2—the summaries that Nomura does identify concern only loans graded as EV3. Nom. Exs. 254, 611, 612. The evidence shows that the only credit or compliance diligence results for EV1 and EV2 loans that Nomura Securities received were high-level "exception detail reports," which included basic data points about the loans (such as loan number, borrower name, state, and original balance) that were insufficient to verify the accuracy of the vendors' diligence grades or any purportedly compensating factors, RSUF ¶¶ 469-72. So while Nomura asserts that Nomura Securities "reviewed every single loan its diligence vendors graded as 2 … and at least a portion of the loans graded as a 1," Nom. Opp. 97—meaning its personnel glanced over exception detail reports—there is no evidence that these reviews were reasonable.

Nomura further does not dispute that the only audit Nomura Securities performed of its vendors' work was one it commissioned from IngletBlair in mid-2006, RSUF ¶¶ 437-39, or that IngletBlair found that 30% of the loans graded as EV1 or EV2 by the vendors (36 of 120) should have been graded as EV3 or EV4, *i.e.*, as loans that either materially did not comply with

---

[25] Nomura suggests that FHFA "contradicts itself by pointing to Nomura's 'tight control' of its vendors" while asserting that Nomura Securities did not properly oversee its vendors. Nom. Opp. 53. There is no contradiction—the evidence shows that Nomura strictly prescribed its vendors' processes for reviewing loans, RSUF ¶¶ 411-20, but did not audit or control the results of those reviews by looking at any loan files or even at detailed review results for loans graded as EV1 or EV2.

guidelines (EV3) or were "missing critical documents to determine loan eligibility" (EV4). RSUF ¶¶ 440-41, 444-45, 449. Nomura ignores the loans that IngletBlair graded as EV4. *See* Nom. Opp. 100. It also ignores that one goal of the IngletBlair review was to examine loans that the vendors *had* reviewed and approved, and thereby check their work, in addition to checking those loans that Nomura Securities' vendors *had not* previously reviewed. S*ee id.* The results of IngletBlair's examination of the previously-unreviewed loans do not help Nomura. The undisputed fact that those loans showed a defect rate similar to that of the previously-reviewed loans is evidence that Nomura's ostensibly "adverse" sampling method was not effective at identifying a larger percentage of defective loans. Above all, Nomura does not contest that, after IngletBlair "uncover[ed] the red flags" it had been hired to find, RSUF ¶ 913, Nomura Securities did nothing, voiding its due diligence defense as a matter of law. *In re WorldCom*, 346 F. Supp. 2d at 684 ("If red flags arise from a reasonable investigation, underwriters will have to make sufficient inquiry to satisfy themselves as to the accuracy of the [prospectus supplement], and if unsatisfied, they must demand disclosure, withdraw from the underwriting process, or bear the risk of liability.").[26]

On the other side of the coin, Nomura does not dispute that the vendors' initial grades of EV3 were overturned to final grades of EV1 or EV2 for over 40% of the loans in the SLGs of the Securitizations that Nomura Securities underwrote. *See* Mem. 33. Nomura concedes that, unlike Clayton, RSUF ¶ 918, Nomura Securities did not consult an established list of compensating factors when it changed initial grades of EV3 to final grades of EV2; instead, it made "subjective" evaluations based on the "personal opinion" of its personnel, Nom. Opp. 103 (citing

---

[26] Of the 65 loans in IngletBlair's review that Nomura Securities' vendors had not previously reviewed, IngletBlair found that 20—over 30%—should have been graded as EV3 or EV4, Ex. 154, the same as the 30% rate that IngletBlair found for loans that the vendors had reviewed. Similarly, IngletBlair found that 28% of the loans it reviewed that were in the SLGs should have received an EV3 or EV4 grade. Cipione Decl. Ex. 17; RSUF ¶ 450. Defendants assert that IngletBlair found "much lower" rates of loans graded as EV3 in its review than Clayton and AMC did in their review of adverse samples drawn from Acquisition Pools, Nom. Opp. 100. This is irrelevant, both because it requires one to assume that Clayton and AMC's results were as valid as IngletBlair's results—but IngletBlair was being asked to check the work of those vendors—and because IngletBlair distinguished between loans graded as EV3 and EV4, while Clayton and AMC graded all such loans as EV3s. RSUF ¶ 440 (describing the IngletBlair grading scheme); Nom. SUF ¶ 181 (indicating that a grade of EV3 could be due to missing documents).

Nom. SUF ¶ 95), such as Mr. Kohout's "strong[ ]" personal feelings about cash reserves. Such justifications are insufficient as a matter of law. *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 704 (S.D.N.Y. 2012) (a party cannot satisfy "an objective standard of reasonableness" with evidence of "mere subjective belief about what efforts [the party] should take").

Finally, Nomura concedes that Nomura Securities placed hundreds of loans into the SLGs even after assigning them final grades of EV3. Nom. Opp. 22, 102; Mishol Decl. ¶ 56. Nomura tries to create a factual dispute over whether these securitized EV3 loans had material underwriting defects, asserting that "Nomura's overlays and bid stipulations unrelated to originators' underwriting guidelines could result in a grade of 3." Nom. Opp. 102, *see also id.* 42 n.19 (identifying specific overlay and stipulation criteria). But the stipulations and overlays that Nomura identifies are almost entirely related to catching loans that Nomura represented would not be present in the SLGs at all, and Nomura does not argue that it (also) violated these representations by securitizing loans that were graded as EV3 on this basis. *Compare* Nom. Mem. 42 n.19, *with* RSUF ¶¶ 574, 898-99, 902-04. Otherwise, the stipulations and overlays generally set forth criteria duplicative of the applicable underwriting guidelines, such that a loan graded EV3 based on an overlay would also be in breach of the guidelines. *Compare* Nom. Mem. 42 n.19, *with* RSUF ¶¶ 905-11.[27]

      2.    <u>Nomura Does Not Genuinely Dispute That Nomura Securities Failed To Perform Increased Diligence On Loans From Originators That It Knew Had Poor Underwriting Practices</u>

Nomura does not contest that Nomura Securities' knowledge of an originator's problems "negates any effort by defendants to maintain that they exercised due diligence or reasonable care to ensure that the loans included in the securitizations were as described." *UBS Ams.*, 858 F. Supp. 2d at 321. Nomura also cannot genuinely dispute that Nomura Securities had concerns

---

[27] Nomura does not identify any of the 226 credit EV3s and 193 compliance EV3s solely on the basis of an overlay or stipulation that was securitized into the SLGs. *See* Mishol. Ex. 10.

about originators but performed no extra diligence to determine if their loans met the representations in the Prospectus Supplements before buying and securitizing those loans.

*Fremont*. Nomura does not dispute that Neil Spagna asked AMC to retroactively change grades from EV3 to EV2 for 19 loans that "for whatever reason [Nomura] decided to buy" from Fremont. RSUF ¶ 493. Nomura asserts that Mr. Spagna "did not adopt plaintiff's nefarious interpretation of this email," Nom. Opp. 105, but Mr. Spagna gave no testimony about the email, and the documents that Nomura cites provide no "interpretation" of his statement. RSUF ¶ 493. While Nomura speculates, Nom. Opp. 105, that the 19 loans might not have been defective or render the representations false, this conjecture does not change the undisputed fact that Nomura Securities performed no additional diligence to confirm that any change was warranted.

*Ownit*. Nomura does not dispute (or even address) the fact that Nomura Securities' own diligence personnel insisted that it needed to conduct additional diligence on the SP02 Acquisition Pool after reviewing a separate pool of Ownit loans called "03," and that Nomura never did so. Mem. 35; RSUF ¶ 500-01. Rather, Nomura offers the *ipse dixit* that "[n]othing in the record suggests that Nomura believed the results of its due diligence on Ownit SP02 were in any way unreliable." Nom. Opp. 106. While Nomura speculates that if Nomura Securities' "diligence vendors identified problems in 03 [that] would suggest that they also would have identified any such problems in SP02 had they existed," Nom. Opp. 106, this conjecture is insufficient as a matter of law to meet Nomura's burden of presenting evidence that Nomura Securities followed up on the red flags that its personnel identified. *See In re WorldCom*, 346 F. Supp. 2d at 683-84.

*People's Choice*. Nomura does not dispute, Nom. Opp. 107, that it bought the SP01 and SP02 Acquisition Pools from People's Choice after Mr. Kohout and the Vice President of the Diligence Group, Jeffrey Hartnagel, RSUF ¶ 146, raised concerns about the "systemic" problems in its "faulty" origination process. RSUF ¶¶ 520-21. While Nomura asserts that the sample sizes for these pools (26.5% and 28.1%, respectively, were slightly larger than Nomura Securities' alleged *minimum* sample size of 20% for bulk pools, Nom. Opp. 107, it points to no evidence

that Nomura Securities considered the concerns of Messrs. Kohout or Hartnagel in selecting

these samples. And while Nomura highlights the high kick-out rates for the SP01 and SP02

pools, *id.*, those high rates *confirmed* the Diligence Group's concerns, and there is no evidence

that Nomura Securities performed any additional diligence in response.

*Quick Loans.* Nomura does not dispute, Nom. Opp. 107, that it bought the SP11

Acquisition Pool from Quick Loans after Mr. Hartnagel identified concerns about its

originations, or that Nomura Securities shared neither those concerns nor the results of its

diligence review with RBSSI. RSUF ¶¶ 529-35.

### 3. Nomura Does Not Genuinely Dispute That Nomura Securities Knew The LTV Ratios In The Prospectus Supplements Were False, Yet Failed To Disclose The True "Final Values"

Nomura does not dispute that, in the course of its valuation diligence, Nomura Securities

determined "final values" for appraisals that were routinely lower than the appraisal values that

Nomura reported to investors, and that using the "final values" would push the LTV ratios across

key materiality thresholds. Mem. 37-39, 73-74. Nomura concedes that at least 866 such loans

wound up in the SLGs, Mishol Ex. 17, that using the "final values" would push the LTV ratios

for 184 loans above 80% and for 211 loans above 100%, Mishol Ex. 17, and that Nomura did not

report this information to investors, Nom. Opp. 109.[28] Critically, Nomura admits that Nomura

Securities' diligence produced valuations that "frequently differed, sometimes in material

respects" from what originators were reporting. Nom. Opp. 108. There is thus no dispute that

Nomura Securities knew that the originators' appraisals differed "in material respects" from its

own diligence, yet did not report those results.

Nomura attempts to defend Nomura Securities' behavior on the sole ground that

"Nomura disclosed to investors that it was relying on the origination appraisal." Nom. Opp. 109.

But, as when discussing HistoryPro, *see* Part I.B.2, *supra*, Nomura overlooks Nomura Securities'

---

[28] Mr. Mishol, who summarized underlying diligence data for Defendants, actually found a *higher* incidence of loans that have LTV ratios above 100% based on Nomura Securities' final values than did Mr. Cipione, who performed that function for FHFA. *See* Mishol Ex. 17, (showing Mr. Mishol found 211 loans in the SLGs where the LTV ratios based on Nomura's "final values" exceeded 100% while Mr. Cipione found 151), Mishol Ex. 18 (showing Mr. Mishol found 67 such loans where the "final value" fell outside Nomura's tolerances while Mr. Cipione found 39)

obligation for *itself* to believe that the reported appraisal values were true, *Homeward Residential*, 2014 WL 2510809, at *11, and Nomura admits that the AVMs and BPOs that fed into its final values could "supplant the appraised value" if they produced a "large deviation" from that value, Nom. SUF ¶ 65.[29]  Moreover, Nomura Securities had to investigate if the Prospectus Supplements contained all information "necessary to make the statements therein not misleading," 15 U.S.C. §§ 77k(a), 77*l*(a)(2), and Nomura does not genuinely dispute that a reasonably prudent investor would consider the disclosure of loans with LTV ratios above 80% and 100% to be important and any change in that disclosure to be material, RSUF ¶¶ 532, 573-74.  Because Nomura Securities "had access to all information that was available and deliberately chose to conceal the truth," *In re Software Toolworks, Inc.*, 50 F.3d 615, 625 (9th Cir. 1994), it cannot assert a due diligence defense as a matter of law.

4.    <u>Nomura Cannot Avoid Summary Judgment By Pointing To Immaterial Issues</u>

Although Nomura suggests that there are other material facts that FHFA failed to discuss in its opening brief, Nom. Opp. 9, Nomura's only additional facts concern ancillary issues that have no bearing on the actual investigation that Nomura Securities conducted into the Mortgage Loans and the SLGs, and which are not supported by the record in any event.  Because "[o]nly disputes over material facts—'facts that might affect the outcome of the suit under the governing law'— will properly preclude the entry of summary judgment," *Nomura Holding Am.*, 2014 WL 6462239, at *19, summary judgment is appropriate here.

*Residuals.*  Nomura's assertion, Nom. Opp. 30, that it had a "strong incentive to conduct robust due diligence" because it retained "residual" interests in the Securitizations does not change the undisputed facts about the diligence it actually performed—and did not perform. In any event, Nomura had virtually no "skin in the game."  First, because the cash-flows from residuals were front-loaded, Nomura recovered a significant percentage of its investment in the

---

[29] Nomura also ignores the representations in six of the seven Prospectus Supplements that "[a]ll appraisals conform to the Uniform Standards of Professional Appraisal Practice," RSUF ¶ 900, and in the seventh that the appraisals "are provided" by appraisers who use "uniform residential appraisal report[s]," RSUF ¶ 901.  On their face, these representations required Nomura Securities to investigate the validity of the appraisals as of the effective date.

first month after issuance.  RSUF ¶¶ 920-27.  Second, Nomura often did not hold its residuals very long after getting these early payments—it sold some interests as soon as a month or two after acquiring them:  (1) it sold 50% of its residual interest in the NHELI 2006-HE3 Securitization in less than two months, RSUF ¶ 885; (2) it sold 64.7% of its residual interests in the NHELI 2006-FM2 Securitization in about one month, RSUF ¶ 887; and (3) it sold 75.1% of its residual interests in the NHELI 2007-2 Securitization in about one month, RSUF ¶ 888.[30]  In fact, Nomura sold *all* of its remaining residual interests about a year or less after the relevant deals were issued, RSUF ¶ 889, knowing that "much" of these residual cash-flows were received in the first year after issuance, RSUF ¶ 890.  Third, of the residual interests that Nomura fully retained, its residual positions were insignificant relative to the value of the securities that it issued, RSUF ¶¶ 920-33.  Finally, Nomura hedged against the residual interests that it retained, including through short positions on the ABX, RSUF ¶ 891, and increased its hedges when its residual positions grew.  RSUF ¶¶ 891-92.  Nomura's strategy of hedging against and hurriedly "flipping" its residuals prevented it from forming any true alignment of interests with long-term investors in the Securitizations such as the GSEs, which purchased Certificates that matured over approximately 30 years, RSUF ¶ 893.

*Counterparty Reviews.*  Nomura's "counterparty reviews" of originators are also irrelevant, as these reviews did not involve the Mortgage Loans.  There is no support for Nomura's assertion that the reviews "allowed Nomura to gauge the appropriate level of due diligence on loan pools purchased from [] originators," Nom. Opp. 37 (citing Nom. SUF ¶ 56).[31] Those reviews focused on the originators' finances, ratings, and management, Nom. Opp. 37; Nom. SUF ¶¶ 52-55, and were conducted primarily by Nomura's Sales group, RSUF ¶ 894,

---

[30]  Nomura's sales of its residual interests in the NHELI 2006-FM2 and NHELI 2007-2 Securitizations came in the form of net interest margin ("NIM") securitizations, which securitized Nomura's cash-flow from its interests.  RSUF ¶ 886.  The percentage of residual interests sold is based on the percentage of NIM certificates sold by dollar value. For example, Nomura sold the N1 certificates ($24 million) for the NHELI 2007-2 NIM offering, which, when divided by the total dollar value of all certificates ($31.95 million), is 75.1%.  *See* RSUF ¶¶ 887-88.

[31]  The cited paragraph of Nomura's SUF states only that Nomura's reviews and monitoring "ensured that Nomura was only purchasing loans from originators with whom it was comfortable," Nom. SUF ¶ 56.

which was tasked with "making sure the [originator] is happy, [and] making sure that we have access to what they were selling," RSUF ¶ 895. The Diligence Group was told of the originators' processes by originator personnel and reviewed the originators' guidelines, Nom. SUF ¶¶ 52, 55, but there is no evidence that it reviewed any loan files to test the actual quality of the originators' loans. There is also no evidence that Nomura ever refused to buy loans from an originator based on a counterparty review—to the contrary, Nomura "aggressively expand[ed]" its approved counterparties from approximately 75 in 2004 to more than 250 in mid-2006, RSUF ¶ 896, leading Clayton to worry that Nomura's strategy was eroding loan quality. RSUF ¶ 897 ("Nomura appears to be digging up sellers they haven't gone to in a while for business as well as adding some newer sellers to their pool. The quality of all of them continues to be poor with high kick rates."). And while Nomura cites testimony that it would draw "a larger sample maybe" from a pool of loans made by a recently approved originator, Nom. Opp. 37-38; Nom. SUF ¶ 135, there is no evidence that Nomura drew such an increased sample from any of the sampled Acquisition Pools at issue.

*Nomura Securities' Diligence Personnel.* Also irrelevant is Nomura's general discussion of the resumes of Nomura Securities' diligence personnel. Nom. SUF ¶¶ 27-29. None of these individuals had any background or training in statistics that could have aided them in drawing a statistically valid sample, a point that Defendants do not dispute. SUF ¶¶ 234-41. Moreover, regardless of the Diligence Group's resumes, it is undisputed that it was "relatively small compared to others in the industry," RSUF ¶ 139—to the point that "[o]ne of [Mr. Kohout's] favorite lines was we are not staffed for this, we are not staffed for this…. They could be ordering lunch, I think he was understaffed for that…." RSUF ¶ 912.

*Data Checks.* Nomura briefly discusses various data checks that Nomura Securities or its accountants performed on loan tape data and collateral documents, Nom. Opp. 45, but it does not genuinely dispute that these checks did not verify the accuracy of underlying loan file information, RSUF ¶¶ 166, 170, 176, 326, 809, or that Nomura Securities' employees did not consider these processes to be a form of diligence, RSUF ¶¶ 166, 178. Similarly, Nomura does

not dispute that its accounting firm, Deloitte & Touche, expressly disclaimed any representations "as to … the accuracy of the information" in the Prospectus Supplements. RSUF ¶ 173. All of these checks are thus examples of reviews only of "data presented" to Nomura that do not substitute for the actual verification required to meet Nomura's diligence defense. *In re WorldCom*, 346 F. Supp. 2d at 675 (quoting *BarChris*, 346 F. Supp. 2d at 697).

## II. THERE IS NO GENUINE DISPUTE THAT RBSSI'S DILIGENCE WAS UNREASONABLE AS A MATTER OF LAW

### A. RBSSI Concedes That It Failed To Conduct Diligence On Two Securitizations

In its opening brief, FHFA showed that RBSSI did not conduct independent diligence on the NHELI 2006-HE3 and NHELI 2006-FM2 Securitizations, Mem. 42-43, 75-77, and in opposition RBSSI does not genuinely dispute the facts showing that it failed to perform its own review. This indisputable failure to "attempt to verify [the issuer's] representations," without any attempt to "seek[ ] to ascertain from the records whether the answers are in fact true and complete," and upon "general information which d[id] not purport to cover the particular case" does not satisfy the due diligence defense. *BarChris*, 283 F. Supp. at 688, 696-97.

#### 1. RBSSI Concedes That It Conducted No Diligence Of Its Own On The NHELI 2006-HE3 Securitization

RBSSI concedes that it conducted no independent investigation into the NHELI 2006-HE3 Securitization and instead "relied" on Nomura Securities, which "conducted due diligence on [RBSSI's] behalf," RBS Opp. 26-27. *See also* RSUF ¶ 951 (Mr. Grice testifying that his standard of RMBS diligence "does not include independent verification of the [loan] file as a whole or an investigation."). RBSSI asserts that it was not the lead underwriter for this deal, merely a "participating underwriter," RBS Opp. 14 (citing RBS SUF ¶¶ 3, 60), but it points to no legal significance for this distinction, and its own policies made clear that "[e]ach underwriter in an offering has the same potential liability as the lead underwriter." RSUF ¶ 659. Moreover, RBSSI does nothing to rebut the clear evidence that it was the co-lead underwriter for the NHELI 2006-HE3 Securitization: (i) RBSSI is listed alongside Nomura Securities on the front of the Prospectus Supplement, FHFA Ex. 8 at NOM-FHFA_04620885, and (ii) RBSSI's own "Deal

Summary" for the deal refers to it as the "Co-Lead" underwriter, RSUF ¶ 57.[32]  RBSSI's status as co-lead underwriter is a sufficient basis to grant summary judgment to FHFA for this deal, as RBSSI does not contest that its diligence fell short of the standard required for lead underwriters.

Whatever RBSSI's status, it presents no evidence that it performed adequate diligence. While RBSSI argues that it could establish a defense as a non-lead underwriter by relying on Nomura Securities' diligence, RBS Opp. 44-45, none of its cited authorities stands for that proposition,[33] and it has no response to the SEC's longstanding guidance that a participating underwriter must *itself* "take some steps to assure the accuracy of the statements in the registration statement."  New High Risk Ventures, SEC Release No. 9671, 1972 WL 125474, at *6 (July 27, 1972) ("SEC Rel. 9671"); *see also* Circumstances Affecting the Determination of What Constitutes Reasonable Investigation and Reasonable Grounds for Belief Under Section 11 of the Securities Act, SEC Release No. 6335, 1981 WL 31062, at *15 n.66 (Aug. 6, 1981) ("SEC Rel. 6335") (similar and quoting SEC Rel. 9671, 1972 WL 125474, at *6); *cf. In re WorldCom*, 2005 WL 638268, at *7 ("[A] director must perform a 'due diligence inquiry notwithstanding the use of a professional underwriter.'" (quoting SEC Rel. 9671, 1972 WL 125474, at *7)).

---

[32]  In opposition, RBSSI cites only (i) Freddie Mac trade confirmations, RBS SUF ¶ 3, which list RBSSI (then Greenwich Capital Markets) as the broker but say nothing about RBSSI's underwriting status, RBS Exs. 121-22, 124-25; (ii) its own citation-less statement, RBS SUF ¶ 60; and (iii) the bare opinion of its proffered expert, Mr. Grice, that because Nomura Securities' name appeared on the left-hand side of the Prospectus Supplement, "[RBSSI's] role can best be described as that of a non-lead underwriter," RSUF ¶¶ 57, 652, 654, but "[a]n expert's conclusory opinions are [ ] inappropriate" for consideration here.  *Major League Baseball Props., Inc. v. Salvino*, Inc., 542 F.3d 290, 311 (2d Cir. 2008).

[33]  RBSSI cites two class-certification cases from the Northern District of Illinois—*Endo v. Albertine*, 147 F.R.D. 164 (N.D. Ill. 1993) and *Hammond v. Hendrickson*, 1986 WL 8437, at *9 (N.D. Ill. July 30, 1986)—for the proposition that participating underwriters share a common interest in proving the due diligence of the lead underwriter, as doing so "would tend to exonerate the defendant class," *Endo*, 147 F.R.D. at 171; *Hammond*, 1986 WL 8437, at *9 ("the participating underwriters all benefit from a showing that the managing underwriter has exercised due diligence").  But in stating this proposition, both cases cite *In re Gap Stores Sec. Litig.*, 79 F.R.D. 283 (N.D.Cal.1978), which holds that an underwriter "must show that he conducted a reasonable investigation of the registration statement … or a reasonable investigation of the manager's methods," *id.* at 302—confirming the standard that applies here.  RBSSI also cites *Competitive Assocs. v. Int'l Health Scis., Inc.*, 1975 WL 349 (S.D.N.Y. Jan. 22, 1975), in which the court noted that "the activities of [the lead underwriter] … inured to the benefit of all of the underwriters, indicat[ing] an exercise of due diligence throughout the offering.  *Id.* at *19.  The court did not suggest, however, that the non-lead underwriters were entitled simply to rely on the lead underwriter's diligence—to the contrary, it found that "[all] the underwriters other than [the one denied a due diligence defense] … went through all of the necessary procedures to justify a finding of due diligence on their part," *id.* at *18-19.

RBSSI asserts that it "scrutinized" Nomura Securities' diligence investigation, RBS Opp. 27, but even if this were true, at best it would satisfy the SEC's *separate* requirement that a participating underwriter "satisfy [it]self that the managing underwriter makes the kind of investigation the participant would have performed if he were the manager." SEC Rel. 9671, 1972 WL 125474, at *6. Yet RBSSI cannot even manufacture a genuine factual dispute that it satisfied itself that Nomura Securities' investigation was reasonable. RBSSI asserts that it received "a detailed summary" of Nomura Securities' diligence results, RBS Opp. 27-28 (citing RBS SUF ¶ 133), but it cites only the inadequate Acquisition Pool-level statistics that FHFA addressed in its opening brief, Mem. 42 (citing SUF ¶¶ 663-64). RBSSI admits that this diligence summary only showed "the total number of loans purchased across all originators" for the Securitization. RBS SUF ¶ 133 (citing RBS Ex. 203, at RBS-FHFA-SDNY-0480413). Further, Nomura stated in the summary itself that it was "not complete," and Nomura would not "represent that it is accurate." RSUF ¶ 394. RBSSI thus cannot create a genuine issue of material fact based on its receipt of a single document that on its face stated it was unreliable and incomplete.

RBSSI also claims that it "participated in a due diligence conference call [with Nomura Securities] near the end of the process in which they reviewed diligence results," RBS Opp. 28 (citing RBS SUF ¶ 135), but the call took place on March 16, 2007—more than six months *after* the NHELI 2006-HE3 Securitization was issued on August 31, 2006. RSUF ¶ 527. Similarly, RBSSI asserts that it received a list of all originators contributing loans to the deal, RBS Opp. 47-48 (citing RBS SUF ¶ 138 n.11), but it received this list on August 31, 2006, RBS Ex. 44—a day *after* the Prospectus Supplement was filed with the SEC[34]—and there is no evidence that RBSSI performed any diligence on the relevant representations after this filing.[35] In short,

---

[34] *See* United States Securities & Exchange Commission Website, *available at* http://www.sec.gov/Archives/edgar/data/1370072/000088237706002945/0000882377-06-002945-index.htm (listing "filing date" for NHELI 2006-HE3 as August 30, 2006, "accepted" that date at 3:43 p.m.).

[35] RBSSI argues that because SEC Regulation AB does not require an issuer to disclose the identities of originators that contributed less than 5% of loans to a deal, the identities of those originators were irrelevant to RBSSI's diligence obligations as an underwriter. RBS Opp. 47. RBSSI's conclusion does not follow. As this and other Courts have held, "Regulation AB's guidance with regard to what information *must be included* in the offering materials does nothing to

RBSSI presents no evidence from which one could infer that it reasonably satisfied itself that Nomura Securities "ma[d]e[] the kind of investigation [RBSSI] would have performed if [it] were the manager," SEC Rel. 9671, 1972 WL 125474, at *6.

RBSSI also concedes that, even under its own, improper standard, if Nomura Securities' diligence was unreasonable, then it has no due diligence defense. RBS Opp. 45. For the reasons discussed, that is indisputably the case. *See* Part I, *supra*.[36]

### 2. RBSSI Does Not Genuinely Dispute That It Failed To Verify Any Information Relating To the NHELI 2006-FM2 Securitization

RBSSI presents no evidence that it conducted an independent investigation into the NHELI 2006-FM2 Securitization, for which it served as the only lead underwriter. RBSSI points to its review of certain of Nomura's diligence reports, RBS Opp. 29-31, 49-50, but this does not create a material dispute: not one of the documents RBSSI points to involved its own diligence, but rather the diligence results from the *issuer*, Nomura. There is thus no dispute that RBSSI "t[oo]k[] at face value representations made to [it]" by the issuer, precisely the opposite of what the due diligence defense requires. *In re WorldCom*, 346 F. Supp. 2d at 675 (quoting *BarChris*, 283 F. Supp. at 697).

Even if there were some authority that allowed an underwriter to rely entirely on its review of diligence ostensibly conducted by an issuer—and there is none—RBSSI's review of the threadbare materials Nomura provided it does not qualify, as a matter of law, as reasonable diligence. RBSSI asserts that it reviewed "valuation diligence results," RBS Opp. 29 n.20, but that diligence concerned loans that had been kicked out of Acquisition Pools and thus were not

---

call into question defendants' overriding obligation under the Securities Act to avoid false statements in their offering materials." *FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 333 (S.D.N.Y. 2012) (citing *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 493-94 (S.D.N.Y. 2010)), *aff'd*, 712 F.3d 136 (2d Cir. 2013). Under RBSSI's flawed logic, an underwriter of an RMBS backed by originators that all contributed less than 5% of the loans could conduct adequate diligence without knowing who any of the underlying originators were.

[36] While RBSSI argues that it can escape this conclusion by "show[ing] that its investigation of Nomura's practices was reasonable," RBS Opp. 46 n.35, the authority its cites for this proposition makes clear that this involves "the unenviable task of demonstrating how his investigation failed to uncover the manager's lack of diligence, except, of course, where the participant has been the victim of the manager's fraud," *In re Gap Stores*, 79 F.R.D. at 302, but RBSSI presents no evidence as to how its investigation failed to uncover Nomura Securities' lack of diligence or that Nomura Securities defrauded RBSSI.

present in the SLG, RBS SUF ¶ 121; hence RBSSI's review of the results was not an investigation into the deal. RBSSI also asserts that it reviewed reports of credit and compliance diligence, RBS Opp. 29-30, but this diligence was conducted on samples drawn from Acquisition Pools, not from the SLGs, *see* RBS SUF ¶ 121, and there is no evidence that RBSSI considered or even knew how many loans in the SLG had received a diligence review.

Moreover, RBSSI did not direct AMC's review and did not know of the instructions provided to AMC by Nomura Securities, and it presents no evidence that it questioned AMC's results or took any steps to determine if those results were accurate. Such blind reliance fails to qualify as diligence as a matter of law, because diligence requires more than just receiving answers and "let[ting] it go at that, without seeking to ascertain from the records whether the answers are in fact true and complete[.]" *BarChris*, 283 F. Supp. at 696; *see, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 408137, at *3 (S.D.N.Y. Feb. 22, 2005) (a reasonable investigation requires the underwriter to "*go behind the publicly available information* and, and, using its direct access to the issuing company, to conduct a searching inquiry") (emphasis added). RBSSI faults FHFA for not proving that an independent review would have yielded different results, RBS Opp. 50, but it is not FHFA's burden to do so—it is RBSSI's burden to show that it conducted such a reasonable investigation. *In re WorldCom*, 346 F. Supp. 2d at 683-84 (without such an investigation, "it can never be known what would have been uncovered or what additional disclosures would have been demanded").

RBSSI also cannot avoid summary judgment by citing Judge Weinstein's statement in *Feit* that *BarChris* "makes it plain that a completely independent and duplicative investigation is not required," RBS Opp. 50 (citing *Feit*, 332 F. Supp. at 577). In the very next clause, Judge Weinstein states that *BarChris* makes equally "plain" that "the defendants were expected to examine those documents which were readily available," *Feit*, 332 F. Supp. at 577, and RBSSI does not show that the underlying loan files were not "readily available" to it for the NHELI 2006-FM2 deal, for example, by asking Nomura to provide them. Nor can RBSSI rely on Nomura's supposed "incentive[es]" to conduct a thorough investigation—it presents no evidence

that it knew of any such incentives at the time it underwrote the deal, and there is no evidence that Nomura Securities had any strong motivation to conduct careful diligence in any event, Part I.E.4, *supra*. And while RBSSI asks the Court not to draw a negative inference from an email in which Nomura Securities' diligence personnel stated that they were "bulls**t[ting]" RBSSI, RBS Opp. 50 n. 41,[37] it does not suggest any inference that could be drawn from this blunt statement other than that Nomura Securities personnel were misleading them. *See SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 427-28 (S.D.N.Y. 2007) ("Defendants [cannot] create an issue [of fact on summary judgment] … by submitting that they harbored their own, subjective understandings of perfectly common words."), *aff'd sub nom. U.S. S.E.C. v. Altomare*, 300 F. App'x 70 (2d Cir. 2008).[38]

**B.      RBSSI Does Not Genuinely Dispute That It Performed Inadequate Diligence On The NHELI 2007-1 And NHELI 2007-2 Securitizations**

As for the two Securitizations on which RBSSI actually conducted some form of an investigation, RBSSI's diligence was nonetheless still unreasonable as a matter of law for numerous independent reasons. To start with, it violated the plain language of the Securities Act's definition of "reasonableness." RBSSI acknowledges that it was required to exercise the care "required of a prudent man in the management of his own property." RBS Opp. 43 (citing 15 U.S.C. § 77k(c)); *see also* Mem. 74-75, and does not genuinely dispute that its Credit Procedures Manual states that RBSSI's "exposure to the transaction" was the "most important factor" in determining the extent of its diligence, RSUF ¶ 639.[39] While RBSSI disputes that its diligence personnel tailored their diligence to RBSSI's exposure, RBS Opp. 40; RBS SUF ¶¶ 22,

---

[37] While RBSSI argues that "members of the ABF group" participated in this call, RBS Opp. 32 n.21, it concedes that its Credit Group "coordinate[d] an asset-level review" while ABF "review[ed] the transaction documents" (RBS Opp. 19). It is thus undisputed, as FHFA explained in its opening brief (Mem. 77-78), that RBSSI never sent any diligence personnel at all to a call where Nomura was knowingly misleading them.

[38] *Cf.* American Heritage Dictionary of the English Language, Fifth Edition (2014) (defining "bulls[**]t" in its form as a transitive verb as meaning "[t]o attempt to mislead or deceive by talking nonsense").

[39] While RBSSI argues that the term "exposure" could be inferred to mean something other than "financial exposure," RBS Opp. 41, it does not genuinely dispute that meaning. Nor can it, given the Manual's clear references to warehouse lending arrangements as transactions in which RBSSI would have "exposure" (*i.e.*, financial exposure). RSUF ¶ 639. Nevertheless, any dispute regarding the formal definition of "exposure" is immaterial given the evidence regarding RBSSI's practices on Third-Party Securitizations. RSUF ¶ 645.

75, RBSSI does not dispute that it distinguished between the "limited" diligence that RBSSI conducted on third-party deals as compared to acquisition pools if it purchased, RSUF ¶ 642. And RBSSI does not dispute that it drew diligence samples of over 20% from First NLC and Equifirst pools that RBSSI purchased, but drew samples of less than 6% from the "Group II" pool of the NHELI 2007-1 Securitization and from the NHELI 2007-2 Securitization (which contained loans from those originators), RSUF ¶¶ 694-95, 704, 725, and drew no samples at all from the NHELI 2006-HE3 and NHELI 2006-FM2 Securitizations, RSUF ¶¶ 655-66, 672.

RBSSI cannot excuse its double standard by erroneously asserting that its diligence employees followed the "same diligence procedures" for third-party deals as for proprietary deals. RBS Opp. 41-42 (citing RBS SUF ¶ 23). Of the three deposition excerpts it cites in support, two do not discuss sample sizes at all, while the last confirms that "sample sizes varied in general depending [on] the transaction," RBS SUF ¶ 23—and there is no genuine dispute that RBSSI "varied" its samples to be larger for its own purchases from the relevant originators than for third-party deals containing their loans, RSUF ¶¶ 642-43, 645.[40] RBSSI also argues that it sometimes drew larger samples from third-party deals than from proprietary acquisition pools, RBS Opp. 42, but this assertion is unsupported,[41] and whether RBSSI might have performed adequate diligence on *other* third-party deals is irrelevant.

As a result, RBSSI has conceded facts showing that its diligence is unreasonable as a matter of law. RBSSI was required to perform the investigation of a prudent man "in the management of his own property," not of a prudent man managing the property of others, 15 U.S.C. § 77k(c). RBSSI cannot satisfy this standard, as even its proprietary diligence was unreasonable—due to its use of unsound sampling selection and other flaws in its diligence

---

[40] As another example, RBSSI does not genuinely dispute that in August 2006, RBSSI's Chief Underwriter, James Whittemore, demanded that RBSSI conduct "much larger" diligence on acquisition pools RBS purchased from Fremont, RSUF ¶¶ 862-63, 864, but in October 2006, RSUF ¶ 678-79, RBSSI did no diligence on the NHELI 2006-FM2 Securitization, RSUF ¶ 672, despite it being collateralized entirely by Fremont loans, RSUF ¶ 6.

[41] RBSSI cites documents showing that it drew a sample of 10% (656 out of 6,559 loans) for the ARSI 2006-W5 securitization and 8.03% (505 of 6,291 loans) for the AHMA 2007-3 deal, RBS SUF ¶ 24—but these are far less than the 27.7% and 28.1% samples that RBSSI drew from Equifirst and First NLC acquisition pools, RSUF ¶¶ 694-95. RBSSI cites no other whole loan acquisition pools for comparison.

process which, as RBSSI admits, applied to both whole loan acquisition pools and third-party deals, RBS Opp. 41 nn.28-29; RBS SUF ¶ 23—and RBSSI indisputably performed *less* diligence on the third-party deals at issue. While RBSSI argues that the objective "prudent man" standard would become subjective if one looks at RBSSI's proprietary diligence, RBS Opp. 43, RBSSI was required to "undertake th[e] investigation which a reasonably prudent man *in [its] position* would conduct," *In re WorldCom*, 2005 WL 638268, at *10 (emphasis added) (quotation omitted); *United States v. Berrios*, 676 F.3d 118, 137 (3d Cir. 2012) ("Objective standards are often defined as what a reasonable person under the circumstances would believe or understand") *cert. denied,* 133 S. Ct. 982 (2013). Under the circumstances here, RBSSI cannot establish that it acted as would have a prudent man in the management of his own property, as the undisputed evidence is that it performed a lesser investigation when its own property was not at stake.

Even if RBSSI were somehow justified in applying less diligence to the two Securitizations at issue than it applied to those deals where it owned the loans, its diligence is still unreasonable as a matter of law.

1. RBSSI Does Not Genuinely Dispute That It Used Statistically Unsound Sampling

FHFA showed that RBSSI's limited sampling on the NHELI 2007-1 and NHELI 2007-2 Securitizations was flawed because RBSSI did not draw its samples from the SLGs, but rather from larger populations of which the SLGs were subsets. Mem. 45-46. RBSSI concedes that it did not draw its diligence samples from the SLGs, RBS Opp. 57-58, even though it admits that the representations about occupancy and LTV ratios were made at the SLG level, *see* RBS Opp. 58; RSUF ¶¶ 146-50.[42] Because FHFA has shown the lack of any evidence showing that one

---

[42] While RBSSI claims that its representations about compliance with underwriting guidelines were made about each originator whose guidelines and lending practices were disclosed in the prospectus supplements, RBS Opp. 58, RBSSI's argument that it did not need to be able to draw inferences about underwriting defects at the SLG level commits the "fallacy of division," *see Christian v. Generation Mortg. Co.*, 2013 WL 2151681, at *3 (N.D. Ill. May 16, 2013) (citing THE NEW ENCYCLOPAEDIA BRITANNICA, vol. 23 p. 252 (15th ed.) (stating that the fallacy of division "occurs when the premise that a collective whole has a certain nature is improperly used to infer that a part of this whole must also be of this nature")), *reconsideration denied* 2014 WL 4494860 (N.D. Ill. Sept. 12, 2014). It is undisputed that the Mortgage Loans in the SLGs varied from those in the Securitizations as a whole, RSUF ¶¶ 693, 717, and RBSSI has provided neither evidence that it could extrapolate from all loans in the Securitization to the SLG Mortgage Loans (which of course it did not), nor any legal support for the proposition that it can sustain a diligence defense without such evidence.

could extrapolate the results of diligence performed on RBSSI's samples to the SLGs, it is RBSSI's burden to come forward with such evidence. *Livent I*, 355 F. Supp. 2d at 729. RBSSI fails to do so.

RBSSI concedes that it drew its credit and compliance diligence samples using a combination of "adverse," or biased, and "semi-random" methods. RBS Opp. 52-53. RBSSI confirms that its adverse sampling was not random, but rather "mostly targeted toward outlier characteristics," RBS Opp. 57, and it does not dispute that it is statistically impossible to extrapolate diligence from an adversely selected sample to the whole population, Mem. 46. *See also* RSUF ¶ 973 (Mr. Grice testifying that he could not recall seeing any evidence that RBSSI ever extrapolated from its own samples). Indeed, emails between RBSSI Credit employees months before either the NHELI 2007-1 or NHELI 2007-2 Securitizations were issued show that RBSSI knew that loans with adverse characteristics were "not where we find all the fraud." RSUF ¶ 943.[43]

RBSSI's semi-random sampling was similarly riddled with errors that prevented it from drawing reasonable conclusions about the SLGs at issue. RBSSI's semi-random sampling,which was developed by a "career underwriter" with no background in statistics, RBS Opp. 52, did not draw loans from the SLGs, RBS Opp. 57; Mem. 45. In fact, RBSSI did not draw loans at random from an appropriate population at all: large swaths of the loans that RBSSI sampled had no chance of ending up in the SLGs backing Freddie Mac's Certificates, because loans for single family residences were over Freddie Mac's conforming loan limit of $417,000. *See* 12 U.S.C. § 1454(a)(2)(C). Specifically, 33% of the loans for single family residences in the population from which RBSSI drew its sample for the NHELI 2007-1 deal, and 6% of similar loans in the NHELI 2007-2 deal, had balances of over $417,000. RSUF ¶¶ 934-35. RBSSI compounded this problem by "stratif[ying] the [partial] pool by loan balance before randomly drawing loans,

---

[43] Moreover, RBSSI does not dispute that it knew that Nomura conducted only adverse sampling, not random, RSUF ¶ 676, but there is no evidence that RBSSI ever sought to verify that Nomura's adverse sampling was able to determine whether the loans were properly underwritten and not susceptible to borrower fraud. This presents yet another example of RBSSI's "failure to inquire into issues of particular prominence in [RBSSI's] own internal evaluations." *In re WorldCom*, 346 F. Supp. 2d at 683.

weighted by the unpaid balance of each strata to the pool as a whole," RBS Opp. 52, so that it was much more likely to draw higher-balance loans than lower-balance loans, RSUF ¶ 706—and, in fact, 52% of the loans in the NHELI 2007-1 sample and 18% in the NHELI 2007-2 sample were above the conforming limit, RSUF ¶¶ 934-35. Moreover, before drawing any loans at random, RBSSI removed from the population the loans it selected for its adverse sample, RBS SUF ¶ 77, thus further distorting the population, RBS Opp. 57 (RBSSI positing that "the loans in the remainder of the pool [after adverse sampling] … *probably* were *less* 'defective" (emphasis added)).

RBSSI presents no evidence that it accounted for the distortive effects of its sampling methodology when analyzing its sampling results—for example, by performing a "post-stratification" to "adjust the results of [its] initial" samples, *Wisconsin v. City of New York*, 517 U.S. 1, 9-10 (1996)—or that it considered doing so. It further presents no evidence that it verified that its samples were "at least as large as a statistically significant sample size assuming a 95% confidence level and a 10% error rate," with a margin of error of 5%, as required by its own policies. Ex. 388, at RBS-FHFA-SDNY-0615280. And RBSSI presents no evidence that it ever tried to extrapolate its diligence results to the relevant SLGs. Thus, RBSSI presents no evidence that its semi-random sampling provided it with a "reasonable basis" to believe representations about the SLGs, and its assertions to the contrary are "speculation or conjecture" that will not "overcome a motion for summary judgment." *Nomura Holding Am.*, 2014 WL 6462239, at *19 (quoting *Hicks*, 593 F.3d at 166).[44]

---

[44] RBSSI also does not dispute that more than half the loans were removed from the relevant NHELI 2007-1 sample after it turned out that loan images were not available, Mem. 47, and samples with response rates below 50% "should be regarded with *significant caution* as a basis for precise quantitative statements about the population from which the sample was drawn." *Reference Guide on Survey Research* at 245 (emphasis added).

Having conceded the relevant facts regarding its sampling, RBSSI offers the same meritless arguments also presented by Nomura and disposed of above.  Specifically, RBSSI argues that:

i. the SEC does not require statistically valid sampling, RBS Opp. 53—but the SEC has made clear that its requirements are separate from those of Sections 11 and 12, and it has indicated that valid sampling often is required for RMBS, *see* Part I.B.1.c, *supra*;

ii. use of statistically valid sampling was not an industry norm, RBS Opp. 53-55, 58—but industry practice in any event cannot excuse RBSSI's failure to comply with the statute,  *see* Part I.D.1, *supra*;

iii. RBSSI's diligence employees "believed" that its sampling procedures allowed them to get a "general understanding" of the whole pool, RBS Opp. 56—but this is not evidence that such a belief was objectively reasonable, *see* Part I.E.1, *supra*;

iv. the D.C. Circuit purportedly blessed the use of "focused sampling" in *American Trucking Association*, RBS Opp. 57—but the court found that such sampling was not appropriate for determining the characteristics of an overall population, *see* Part I.B.1.a, *supra*;

v. RBSSI's diligence samples were larger than the samples drawn by FHFA's expert, Dr. Cowan, to prove liability, RBS Opp. 58 n.46, 59—but Dr. Cowan's *statistically valid samp*les allowed extrapolation to the full SLGs, *see* Part I.B.1.a*, supra*;[45] and

vi. the reasonableness of a sampling methodology is a factual one for the jury, RBS Opp. 54, 55, 56, 57-58—but where, as here, the relevant facts are undisputed, the Court can decide this objective question as a matter of law, *see* Part I.B.1.a, *supra*.

Even if RBSSI had some evidence that its sampling methods were statistically valid, it still could not prevail on its due diligence defense.  The defense requires RBSSI to have a reasonable basis for believing that the representations in the Prospectus Supplements were true, but there is no evidence that its diligence personnel had a reasonable basis for relying on RBSSI's sampling protocols: RBSSI concedes that none of these individuals was qualified to

---

[45]  While RBSSI argues that its diligence samples were large enough to produce the same confidence interval as Dr. Cowan's samples, RBS Opp. 59, it does not explain how it is statistically possible to extrapolate to the SLGs with any degree of confidence from samples that were neither drawn from the SLGs nor randomly drawn.

extrapolate from sampling diligence to the securitization or SLG level, RSUF ¶¶ 631-32, 688-89; none of them performed representativeness testing to ensure that the samples could be extrapolated, RSUF ¶ 690; and none of them otherwise checked the Prospectus Supplements for accuracy, or felt that they had any responsibility to do so, RSUF ¶¶ 765-90. RBSSI has failed to show that the ABF Group—nominally tasked with the accuracy of the Offering Materials, RSUF ¶¶ 592-96—had such a reasonable belief; the ABF Group it simply relied on the Credit Group. RSUF ¶ 792. In short, the evidence is that RBSSI blindly relied on sampling protocols that it did not understand, which is not enough to avoid liability. *Livent I*, 355 F. Supp. 2d at 738.

> 2. <u>RBSSI Does Not Genuinely Dispute That It Failed To Conduct Additional Diligence When It Encountered High Defect Rates</u>

RBSSI does not dispute that its policies generally required it to expand its diligence samples if more than 20% of the sampled loans had material exceptions, RSUF ¶ 752, that its vendor found material exceptions for 32% of the NHELI 2007-1 diligence sample and 24% of the NHELI 2007-2 diligence sample, RSUF ¶¶ 756-58, and that RBSSI overrode its vendors' grades and "waived" all these exceptions without conducting additional diligence, RSUF ¶¶ 840, 843. *See also* RSUF ¶ 974 (Mr. Grice testifying that he was unaware of any time when RBSSI upsized its samples "for the seven deals that I looked at"). These factual concessions establish, as a matter of law, that RBSSI failed to "'look deeper and question more' when confronted with red flags." *In re WorldCom*, 346 F. Supp. 2d at 677.

RBSSI cannot evade summary judgment by trying to shift its burden of proof to FHFA. It argues that FHFA has not proved that RBSSI's waiver of the 107 exceptions was *not* reasonable in each case, RBS Opp. 61, but it is RBSSI's burden to show that its waivers *were* reasonable, and it has failed to do so. *Bamco 15 v. Buchanan Residential Real Estate Ltd. P'ship 2410*, 1986 WL 15333, at *4 (S.D.N.Y. Dec. 31, 1986) (granting plaintiff summary judgment on Section 12 reasonable care defense when defendant submitted no evidence that could establish the defense at trial). Similarly, RBSSI argues that FHFA has not shown that the securitized EV3 loans were defective, RBS Opp. 61-62, but it is not FHFA's burden to do so in this motion —it is RBSSI's

burden to prove that it conducted a reasonable investigation "even if it appears that such an investigation would have proven futile[.]" *See In re WorldCom*, 346 F. Supp. 2d at 683-84.

RBSSI also cannot avoid summary judgment by mischaracterizing the undisputed facts. RBSSI asserts that its samples had "zero" material exceptions because it waived them all, RBS Opp. 60, and that it "could" have had valid reasons for doing so, RBS Opp. 25, 60-61, but it presents no evidence of what its basis for the waivers actually was, let alone that any claimed basis was reasonable.[46] RBSSI also asserts that not all of the waived-in loans received grades of EV3 for credit reasons, RBS Opp. 61, but it concedes that credit issues were the basis for at least 9% and 11% of the EV3 loans in the NHELI 2007-1 and NHELI 2007-2 samples, respectively, *id.*, and it concedes that, regardless of basis, a grade of EV3 was a "flag" that required a deeper review, Farrell Decl. ¶ 9. RBSSI further asserts that Brian Farrell, a member of RBSSI's Credit Group who overrode EV3 grades for 30 loans in the course of an hour, RSUF ¶¶ 630, 841, had "legitimate reasons" for doing so, RBS Opp. 61 (citing Farrell Decl. ¶ 19), but it cites only Mr. Farrell's "*current* thinking" in his self-serving declaration that six of the overrides "appear[]" to be valid now, Farrell Decl. ¶ 19 (emphasis added). Such a declaration fails to create a genuine issue of fact for multiple reasons, not least of which is that the relevant inquiry is whether RBSSI believed the overrides were valid *at the time they were made*. *Software Toolworks Inc.*, 50 F.3d at 622 ("[T]he adequacy of due diligence may be decided on summary judgment when the underlying *historical* facts are undisputed.") (emphasis added); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."). RBSSI presents no such evidence, and Mr. Farrell "do[es] not recall" what he thought at the time. Farrell Decl. ¶ 20-25. Even if he did, Mr. Farrell speaks to only six loans, *id.*, leaving RBSSI with no evidence as to its reasons for waiving material exceptions for the remaining 101 loans. Consequently, RBSSI has failed to

---

[46] RBSSI submits its diligence vendor's cursory "narratives," which contain virtually no details about the diligence performed, do not discuss compensating factors for exceptions identified, and do not identify material exceptions waived by RBSSI. RSUF ¶¶ 756-758, 844.

present evidence that, when confronted by the admitted "flags" raised by its vendor, it "look[ed] deeper and question[ed] more." *In re WorldCom*, 346 F. Supp. 2d at 677 (quotation omitted).

<div style="margin-left: 2em;">

3.    <u>RBSSI Does Not Genuinely Dispute That It Failed To Verify The Accuracy And Completeness Of Representations Made About Those SLGs At The Effective Date</u>

</div>

RBSSI does not contest that the Securities Act requires diligence up until the "effective date" of an offering. *See* 15 U.S.C. § 77k(b)(3)(A); *In re WorldCom*, 346 F. Supp. 2d at 677 (an underwriter's failure "to consider new information up to the effective date of an offering would almost certainly constitute a lack of due diligence") (quotation omitted). RBSSI also does not dispute that it failed to consider information that became available after the Mortgage Loans were originated to determine if those loans had been properly underwritten at the time of origination. RBS Opp. 62-64; RSUF ¶¶ 800-07. Indeed, RBSSI does not point to a single instance in which RBSSI attempted to determine whether information from loans that had been held on Nomura's books for months was still accurate, RSUF ¶¶ 800-07—despite the fact that RBSSI looked at, for example, "bankruptcy filings after the loan closed" when conducting post-closing re-underwriting for its own benefit, FHFA Ex. 461, at RBS-FHFA-CT-5646353. *See also* RSUF ¶ 802 (Mr. Farrell testifying that he was "not aware" of any effort by RBSSI to "even consider[] performing a round of diligence before securitization in which public records and other outside materials would be taken into account"). RBSSI has thus conceded facts showing that its investigation was unreasonable as a matter of law.

RBSSI tries to avoid this result by asserting, without citation, that post-origination information is irrelevant because the representations were "fixed by the date of origination" and "would not change later." RBS Opp. 63. *But see* RBS Opp. 13 (claiming that only "[m]ost" the misstatements and omissions at issue could not change). But RBSSI does not dispute FHFA's showing that information reflecting on the veracity of the representations as of the time of origination could—and did—become available after origination, RSUF ¶¶ 800-07,[47] or that

<hr/>

[47] While RBSSI tries to dismiss this showing as "general," RBS Opp. 63 n.47, it is actually quite specific, presenting two examples of how post-origination information can—and did—affect the assessment of occupancy status and calculation of LTV ratios. RSUF ¶¶ 146, 148. For the same reason, RBSSI's claim that there is no evidence that such

<div style="text-align: center;">55</div>

RBSSI itself used post-origination information when reviewing loan for evidence of borrower fraud at the time of origination, *id*. RBSSI's apparent belief that the information in the representations was "unlikely to change," RBS Opp. 13, does not excuse its failure to not consider post-origination material to see if the information actually had changed. *See* Part I.D, *supra* (addressing identical arguments by Nomura).[48] Such unsupported speculation does not create a genuine issue of material fact as to whether RBSSI ensured that the information in the Prospectus Supplements was accurate "at the time [it] became effective." 15 U.S.C. § 77k(b)(3)(A).

Next, RBSSI argues that it need not have considered information up until the effective date because the Prospectus Supplements purportedly make assertions as of a "cut-off" date. RBS Opp. 63-64. In fact, the Prospectus Supplements had no cut-off date for representations about underwriting guidelines and stated merely that statistical information such as LTV ratios and occupancy data could vary by no more than five percent after the cut-off date as the result of changes to the final composition of the pool. RBS SUF ¶ 150. These statements did not excuse RBSSI from investigating up until the effective date whether the stated LTV ratio and occupancy information was accurate. *P. Stolz Family*, 355 F.3d at 97 ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language.").

---

information was available to it prior to securitization, RSUF ¶ 800, is flatly incorrect. *See also* RSUF ¶ 964 (Mr. Grice testifying that "[m]ost borrower fraud is detected early in the life cycle of the loan."). In any event, RBSSI cannot meet its burden by speculating that such information was not available, because there is no evidence that RBSSI ever attempted to find it for its diligence, and without an investigation, "it can never be known what would have been uncovered or what additional disclosures would have been demanded." *In re WorldCom*, 346 F. Supp. 2d at 684.

[48] Even if RBSSI's strained reading of the representations was correct, RBSSI still could not sustain a defense that it performed diligence to ensure the representations were not *misleading* as of the effective date. *See Asset-Backed Securities,* SEC Release No. 8518, 2004 WL 2964659, at *136 (Dec. 22, 2004) (*"*We continue to believe that if the actual pool backing the investor's securities differs materially from that offered and described to the investor in the prospectus (and hence was to reflect the basis for the investor's investment decision), the investor is entitled to disclosure of the actual asset pool that the investor is primarily dependent on for repayment."); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182 n.38 (2d Cir. 2014) ("[A] material omission of information that is necessary to prevent existing disclosures from being misleading" "may form the basis for a claim under § 11 or § 12(a)(2) of the Securities Act[.]") (quotation marks omitted).

Finally, like Nomura, RBSSI asserts that its failure is excusable because it purportedly was based in "industry custom and practice." RBS Opp. 62. But, as discussed, *see* Part I.B.1.c, *supra*, there was no "time honored" standard permitting banks to dispense with their statutory obligations to perform diligence at the time of securitization. *See Dain Rauscher*, 254 F.3d at 857. Indeed, Mr. Grice, who also served as RBSSI's proffered diligence expert, conceded that "*[t]here were no regulations or published industry standards* specifying any requirements or processes for loan-level due diligence in RMBS transactions." Ex. 60 (RBS Grice Report) ¶ 32 (emphasis added). Moreover, even if RBSSI could show that failing to perform diligence at the time of securitization was an industry practice, that practice would be the result of a "race to the bottom" that the Court should declare unreasonable. *Dain Rauscher*, 254 F.3d at 857.

## C. RBSSI Does Not Genuinely Dispute The Additional Flaws In Its Diligence Processes

FHFA established at least three reasons why RBSSI's diligence was unreasonable as a matter of law in addition to the issues raised by this Court. Mem. 47-48, 51-54, 80-82. RBSSI fails to conjure a dispute of material fact for any of them.

### 1. RBSSI Does Not Genuinely Dispute That It Failed To Provide Oversight Of Its Third-Party Discovery Vendor

RBSSI does not genuinely dispute that it did not review loan files for any Mortgage Loans in the NHELI 2007-1 and NHELI 2007-2 Securitizations that its vendor initially graded as EV1 or EV2, RSUF ¶¶ 822, 826, 836; RBS SUF ¶¶ 91-94, or that it did not know what "compensating factors" justified the EV2 grades, RBS SUF ¶ 836. RBSSI also does not dispute that it reviewed its vendor's findings for *all* loans initially graded as EV3, and that it overturned EV3 grades for 25% of the loans that received such grades in its samples. RSUF ¶ 831.

RBSSI argues that whether the overturned EV3 loans were actually defective is a jury question, RBS Opp. 65-66, but this does not respond to FHFA's argument that by delegating its review of the 64% of loans in the samples that its vendor initially graded as EV1 or EV2,[49]

---

[49] Clayton initially graded 263 of the 408 loans in the combined NHELI 2007-1 and NHELI 2007-2 diligence samples as either EV1 or EV2. Ex 7 to the Cipione Decl. (filter Columns E and F to deselect "Blanks" and filter Columns J and K to deselect "3").

RBSSI "blindly rel[ied]" on that vendor and hence failed to conduct a "reasonable investigation." Mem. 80-81.[50] While RBSSI insists that it "monitor[ed] and collaborat[ed] with its vendors," RBS Opp. 66, none of its cited evidence shows monitoring of loans initially graded as EV1 or EV2, only as EV3. RBS SUF ¶ 105.[51]

RBSSI argues that it had no reason to distrust Clayton's diligence, RBS Opp. 65-66, but an audit of Clayton's work that an RBS investor commissioned and gave to RBS in March 2006—well before all the Securitizations underwritten by RBSSI were issued—found that 40% of loans that Clayton had graded as EV1 should have been graded as EV3, which RBS described as "excessive," RSUF ¶ 936. RBSSI's knowledge that Clayton was improperly grading loans with material defects as EV1, combined with the fact that RBSSI disagreed with Clayton's initial grades of EV3 in "numerous situations," RSUF ¶ 825, is undisputed evidence of a distrust that required RBSSI to look deeper and question more" into Clayton's process of grading loans, *In re WorldCom*, 346 F. Supp. 2d at 677, but there is no evidence that it did so.

Finally, RBSSI argues that it was entitled to "rely on independent experts or consultants," such as "specialist reunderwriting vendors" that it describes as "experts in mortgage origination and underwriting." RBS Opp. 65, 67. But if RBSSI was going to rely on Clayton's expertise in conducting its diligence, it was legally required to report that reliance in the Prospectus Supplement, *In re WorldCom*, 346 F. Supp. 2d at 664, which RBSSI did not do. Even if it had, "the [relied upon expert] must consent to inclusion of the audit opinion in the registration statement," *In re WorldCom*, 346 F. Supp. 2d at 644, and the expert's written consent must be filed as an exhibit to the registration statement, 17 C.F.C. § 230.436(a), but RBSSI filed no such consents from Clayton. Nor could it, as Clayton explicitly told the SEC that "third party due

---

[50] In responding to FHFA's Statement of Facts, RBSSI asserts that there is no evidence that the overturned EV3 loans had material credit exceptions. RBS SUF ¶ 840. In fact, the data produced by RBSSI shows that Clayton initially graded 116 of the 408 loans in the samples as EV3, RSUF ¶ 937, and that 107 of these 116 loans received final grades of "EV2W: *Material exceptions waived*." RSUF ¶¶ 839, 840, 843, 845 (emphasis added); Cipione Decl. Ex. 7.

[51] RBSSI cites the Declaration of Brian Farrell to argue that he "was in frequent contact with Clayton employees" and had held "discussions with Clayton," RBS Opp. 66-67 (citing Farrell Decl. ¶ 11), but in the cited portion of the Declaration Mr. Farrell describes his discussions with Clayton about Individual Asset Summary Reports, Farrell Decl. ¶ 11, which included diligence results only about "[l]oans assigned an initial grade of '3,'" Farrell Decl. ¶ 9.

diligence providers like us" do not "fit within the scope of the Securities Act provisions that establish expert liability," because Clayton's profession does not "involve[] the exercise of independent judgment in the application to a specific context of a body of knowledge... as opposed to being determined solely by ... the client." RSUF ¶ 938 ("We do not exercise professional judgment as to the scope or sufficiency of such review, but rather perform only the specific tasks dictated to us by our clients on the loans chosen by them."); *id.* at 6 (expressing concern that Clayton might be held liable for following the instructions of aggregators).[52]

### 2. RBSSI Does Not Genuinely Dispute That It Failed To Conduct Additional Diligence On Loans By Originators About Which It Had Concerns

RBSSI does not dispute that it was informed of concerns about the originators Fremont, First NLC, Equifirst, and People's Choice, but it did not perform any increased diligence on loans issued by those originators in the SLGs. Mem. 53-54. Instead, RBSSI argues that whether these concerns rose to the level of "red flags" is a question of fact that cannot be resolved on summary judgment, as there are disputes about "RBSSI's [subjective] views of these originators." RBS Opp. 67-78. But for purposes of the due diligence defense, the existence of a red flag is an *objective* question—red flags are facts that "would place a reasonable party in defendant's position on notice" of serious problems. *In re WorldCom*, 346 F. Supp. 2d at 672 (quotations and citations omitted). Where, as here, the relevant facts are not disputed, the Court may decide this objective question as a matter of law. *See Nomura Holding Am.*, 2014 WL 6462239, at *19 (based on undisputed facts, resolving as a matter of law the objective question of whether FHFA was on notice of its claims before the limitations date).[53]

---

[52] RBSSI also attempts to claim credit for relying on a "full summary of the due diligence performed by Nomura when it acquired the underlying loans" for the NHELI 2007-2 Securitization, RBS Opp. 36-37 (citing RBS SUF ¶ 113 (citing Ex. 139), but ignores that this Due Diligence Summary, like many of the others Nomura created, was "not complete, and we [Nomura] do not represent that it is accurate," Ex. 139, at NOM-FHFA 04921689," and RBSSI presents no evidence that it ever attempted to verify that this information was true and correct, *see In re WorldCom*, 346 F. Supp. 2d at 676.

[53] RBSSI also argues against summary judgment on the basis that the concerns about originators were presented in the context of "other transactions," and not "these securitizations." Nom. Opp. 67. But RBSSI presents no evidence of an event that intervened between the raising of these indisputable red flags and the issuance of the Securitizations that would have served to dissipate a prudent underwriter's concerns about the originators' underwriting.

RBSSI also asserts that the red flags were dissipated by subsequent events, RBS Opp. 68-69, but the events it cites are largely irrelevant, as most occurred either before the final relevant red flag or after the relevant Securitization.[54] The remaining events that RBSSI discusses show no dissipation of the cited concerns. For *First NLC*, RBSSI cites the results of credit and compliance reviews, RBS Opp. 68 (citing RBS SUF ¶ 35), which say nothing about the valuation red flags identified by FHFA, *see* RSUF ¶¶ 873-74, while the accompanying valuation results reveal a "large number of kicks (BPOs related)," RBS SUF ¶ 35, leading RBSSI to question whether "First NLC has an appraisal problem." RSUF ¶ 869. For *Equifirst*, similarly, RBSSI cites credit and compliance reviews, RBS Opp. (citing RBS SUF ¶ 33), while FHFA highlighted "particularly troublesome" "valuation issues" at Equifirst, *see* RSUF ¶¶ 878-80. For *People's Choice*, one of the two documents that RBSSI cites is irrelevant (containing financial statements and draft underwriting matrices, RBS SUF ¶ 37), and the second shows a 13% reject rate by original balance for a People's Choice pool, RBS SUF ¶ 37, which *confirms* the red flag raised by RBSSI's decision to "pass" on this originator, RSUF ¶ 884. Finally, for *Fremont*, RBSSI cites diligence results that found its loan pools to be "in line" with those of other subprime originators and "representative" of such lenders, RBS Opp. 68 (citing RBS SUF ¶¶ 31-32). But those results also stated that the "increased level of loan repurchase activity" at Fremont was an "industry-wide issue" that should be "monitored closely," RBS SUF ¶ 32, and it was RBSSI's obligation to ensure that the Fremont loans in the SLGs were "stronger than the general set of loans being sold by a particular Originator," *Nomura Holding Am.*, 2014 WL 6462239, at *22 (quotation omitted).

> 3. <u>RBSSI Does Not Genuinely Dispute That It Knew The LTV Ratios In The Prospectus Supplements Were False Yet Failed To Disclose The True "Final Values"</u>

RBSSI concedes that it performed valuation diligence on only a sample "selected randomly from RBSSI's semi-random sample of loans selected for loan-level due diligence,"

---

[54] The following Exhibits are the only ones that RBSSI points to which fall after, or even near, the final red flag without occurring after the relevant Securitizations were issued: RBS Ex. 99 (Fremont), RBS Ex. 100 (Fremont), RBS Ex. 144 (First NLC), RBS Ex. 111 (First NLC), Ex. 499 (Fremont), RBS Ex. 114 (Equifirst), RBS Ex. 140 (Equifirst), RBS Ex. 141 (Equifirst), and RBS Ex. 142 (Equifirst).

RSUF ¶ 735, that its drive-by appraisals of 20 of the 133 loans it reviewed produced values outside of RBSSI's generous variance threshold of -20% (RSUF ¶¶ 736, 740), and that RBSSI did not disclose these values to investors, RBS Opp. 69-70. RBSSI argues that it did not use the term "final values" to describe the appraisal values produced by its valuation diligence, RBS Opp. 69, but this semantic point, even if true, is immaterial. RBSSI also argues that it was entitled to rely on the original appraisals "absent some evidence that the appraisals were not believed at the time they were rendered," RBS Opp. 70 (citation omitted), but the drive-by appraisal values are evidence that the appraisers did not believe the appraisals to be accurate, as well as evidence that RBSSI had no reasonable basis for believing them to be so. *See Homeward Residential*, 2014 WL 2510809 at *11.

## III. DEFENDANTS DO NOT REFUTE AUTHORITY SHOWING THAT SECTION 12'S "REASONABLE CARE" STANDARD REQUIRES UNDERWRITERS TO CONDUCT A "REASONABLE INVESTIGATION" SIMILAR TO THAT REQUIRED BY SECTION 11

In its opening brief, FHFA explained that while Section 12's "reasonable care" defense is distinct from Section 11's "due diligence defense," the two defenses often overlap. Mem. 83-84 & n.28.[55] Contrary to Defendants' suggestions (Nom. Opp. 61 n.23; RBS Opp. 71 n.56), the Second Circuit confirmed this overlap in *Franklin Savings Bank of New York v. Levy*, 551 F.2d 521 (2d Cir. 1977), when it held that the "proper construction of § 12(2)" was that an underwriter's failure to "conduct[] an *ongoing investigation* of [the issuer's] financial condition" could violate Section 12. *Id.* at 527 (emphasis added); *see also In re MetLife Demutualization Litig.*, 262 F.R.D. 217, 235 (E.D.N.Y. 2009) ("Courts have likened Section 12(a)(2)'s 'reasonable care' standard to the requirement that sellers make a 'reasonable investigation' in order to avoid liability under Section 11 for making fraudulent misrepresentations in a registration statement."); *In re WorldCom*, 346 F. Supp. 2d at 661 n.40 (quoting academic literature that "[g]iven the role

---

[55] All parties agree that the "reasonable care" defenses under the Blue Sky laws should be construed in accordance with Section 12's "reasonable care" defense. Mem. 83; Nom. Opp. 60 n.21; RBS Opp. 70 n.54.

of an underwriter, in order to avoid Section 12(a)(2) liability it must make a reasonable investigation in order to establish that it used reasonable care" (quotation marks omitted)).[56]

While Defendants argue that the reasonable care and due diligence defenses "are different in *all* contexts," RBS Opp. 71 (original emphasis); *see* Nom. Opp. 60-61, the two authorities they cite do not support that view.  Defendants cite Justice Powell's dissent from the denial of certiorari in *John Nuveen & Co., Inc. v. Sanders*, 450 U.S. 1005 (1981), which called for the Section 11 and 12 standards to differ where a seller that is also an underwriter seeks to rely on the "authority of an expert" under Section 11, *John Nuveen*, 450 U.S. at 1109 (Powell, J., dissenting from the denial of certiorari)—but no such defense is at issue here.  Defendants also cite a circuit court brief filed by the SEC and quoted by Justice Powell,[57] which called for the standards to differ "in certain defined situations" where a registration statement is not required, *id.*—but FHFA's Section 11 and 12 claims both turn on misrepresentations incorporated by reference into registration statements, *see* 17 C.F.R. § 230.430B(f)(1).  Tellingly, Defendants do not explain why the standards would be different given the facts of this case—specifically, they do not identify any aspects of Nomura Securities' or RBSSI's diligence that might constitute "reasonable care" but not a "reasonable investigation."  *See* Nom. Opp. 59-62; RBS Opp. 70-72.

---

[56] Nomura's assertion that FHFA's other "authorities [] recognized that the duties of due diligence under Sections 11 and 12 are not identical" (Nom. Opp. 61 n.23) is incorrect—these authorities recognized the duties could be the same on facts such as these.  *In re Software Toolworks*, 50 F.3d at 621 held that the two defenses are "similar, if not identical."  While the plaintiff in *University Hill* did not bring Section 11 claims, the court concluded that the defendant "functioned as an underwriter … as that term is defined in the Securities Act," engaged in an extensive discussion of Section 11 case law, and focused on whether storm warnings "rendered [the defendant's] ongoing credit investigation unreasonable," 422 F. Supp. at 900-02—and this Court cited *University Hill* in discussing what a "reasonable investigation" under Section 11 requires, *In re WorldCom*, 346 F. Supp. 2d at 677.  *Weinberger v. Jackson* held, with respect to underwriter defendants, that "[t]he standards under sections 11 and 12(2) are essentially the same[,]" 1990 WL 260676, at *2 (N.D. Cal. Oct. 11, 1990), and granted summary judgment to those defendants only because their searching "investigation" "conducted primarily by the managing underwriters[]" "met the standards of due diligence and reasonable investigation required by sections 11 and 12(2)." *Id.* at *3.  *See also Sanders*, 619 F.2d at 1228 ("In the circumstances of this case, the reasonable care standard required [a] reasonable investigation[.]").

[57] *See* Nom. Opp. 60 (citing Securities Offering Reform, SEC Release No. 8591, 2005 WL 1692642, at *79 (Aug. 3, 2005)); RBS Opp. 71 n. 55 (same).  In Release No. 8591, the SEC noted that "we have stated previously[] that the standard of care under Section 12(a)(2) is less demanding than that prescribed by Section 11 or, put another way, that Section 11 requires a more diligent investigation than Section 12(a)(2)," and cited the brief the SEC filed in *John Nuveen* as support for this proposition.  SEC Rel. No. 8591, 2005 WL 1692642, at *79 & n.431.

Because the Section 11 and Section 12 defenses fully overlap here, Defendants' failure to conduct a reasonable investigation vitiates both defenses.[58]

Further, Nomura errs in arguing that Nomura Securities does not face the same heightened standard of liability under Section 12 that it does under Section 11. Nom. Opp. 62. Because Nomura Securities had a "uniquely close" relationship with its issuers—so close that, for all practical purposes, Nomura Securities *was* NAAC and NHELI—the adequacy of Nomura Securities' investigation "must be judged by a fairly rigorous standard," akin to the heightened standard required of intertwined underwriters under Section 11. *Univ. Hill*, 422 F. Supp. at 900-02; *see also Heffernan v. Pac. Dunlop GNB Corp.*, 965 F.2d 369, 373 (7th Cir. 1992); *Junker v. Crory*, 650 F.2d 1349, 1361 (5th Cir. Unit A July 1981).

Nomura argues that Nomura Securities should not face a higher standard under Section 12 because issuers such as NAAC and NHELI can assert the same "reasonable care" defense. But the theoretical availability of the "reasonable care" defense to issuers is irrelevant to the question of whether underwriters should face the same standard as the issuers where, as here, they fully control those issuers as a practical matter. Under the facts of this case, no Section 12 defense is available to NAAC and NHELI because they were wholly passive entities without operations or employees, RSUF ¶¶ 58-60, and were thus incapable of exercising reasonable care. While Nomura asserts that the directors of NAAC and NHELI had the theoretical authority to "determine whether a security was issued," Nom. Opp. 111, there is no

---

[58] Defendants' contention that FHFA "misrepresent[ed] this Court's decision" in *WorldCom* regarding the distinctions between the Section 11 and Section 12 defenses (Nom. Opp. 60 n.22) is meritless. FHFA pointed out that the Court quoted academic literature observing that a failure to conduct a reasonable investigation is also a failure to exercise reasonable care. Mem. 83-84 (citing *In re WorldCom*, 346 F. Supp. 2d at 661 n.40 (citing 3B Harold S. Bloomenthal & Samuel Wolff, *Securities & Federal Corporate Law* § 12.6 (2d ed. 1998))). As Nomura points out (Nom. Opp. 60 n.22), the Court also cited other literature suggesting that a defendant can prevail under Section 12 without using reasonable care if he "would have been unable to ascertain the falsity even if he had used reasonable care," then the defendant can establish a Section 12 defense even if he did not use such care. Nom. Opp. 60 n.22 (quoting *In re WorldCom*, 346 F. Supp. 2d at 661 n.40 (quoting 5 Arnold S. Jacobs, *Disclosure and Remedies Under the Securities Laws* § 3:158))). But this second article has no bearing here, as Defendants do not argue that using reasonable care would have been fruitless, and it does not contradict the point for which FHFA cited the Court's quotation of the first article—to establish reasonable care, one must conduct a reasonable investigation.

evidence that the directors ever looked at or considered the diligence before issuing the deals at issue, hence summary judgment for FHFA should follow as a matter of law.[59]

## IV. THE NOMURA INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO A DUE DILIGENCE DEFENSE

While Nomura erroneously asserts that FHFA "does not seek summary judgment as to the individual defendants," Nom. Opp. 111 (capitalization altered), in fact, FHFA moved for partial summary judgment on the due diligence and reasonable care defenses against *all* Defendants, including the Nomura Individual Defendants, *e.g.*, Mem. 1; Dkt. 906. While Nomura asserts that the Individual Defendants are entitled to a due diligence defense because they "relied on Nomura's due diligence processes," Nom. Opp. 111-12, as shown, Nomura's diligence procedures were unreasonable as a matter of law. Part I, *supra*. Even in their own self-serving affidavits, the Individual Defendants do not point to any independent investigation they performed into the veracity and completeness of the representations, saying instead that they "relied heavily" on the Diligence Group's activities. *E.g.*, Graham Decl. ¶ 6. This Court's conclusion that "[a] director must perform a 'due diligence inquiry notwithstanding the use of a professional underwriter,'" *In re WorldCom*, 2005 WL 638268, at *7 (quoting SEC Rel. 9671, at 1972 WL 125474, at *7), applies fully here, and requires summary judgment for FHFA on the Individual Defendants' due diligence defense.[60]

---

[59] Nomura cites no authority to support the view that NAAC and NHELI can blindly rely on actions taken by other Section 12 defendants to sustain a reasonable care defense. To FHFA's knowledge, there is no such authority. *Cf.* New High Risk Ventures, 1972 WL 125474, at *6 ("[A]lthough the participant may delegate the performance of the investigation, he must take some steps to assure the accuracy of the statements in the registration statement. To do this, he at least should assure himself that the manager made a reasonable investigation.").

[60] While Nomura is correct (Nom. Opp. 112) that FHFA has not moved for summary judgment on the "control person" defense available to the Individual Defendants, NCCI, and Nomura Holding under Section 15, 15 U.S.C. § 77o, it is telling that Nomura does not make any similar argument relating to a parallel defense available to NCCI and Nomura Holding under the D.C. and Virginia Blue Sky laws. That is because the "control person" defense under these laws is substantively identical to the reasonable care defense under Section 12. *Compare* 15 U.S.C. § 77*l*(a)(2) (requiring Section 12 defendant to show "that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission"), *with* D.C. Code § 31-5606.05(c) (requiring control person defendant to show "that he or she did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist"), and Va. Code Ann. § 13.1-522(C) (same).

## <u>CONCLUSION</u>

For the reasons set forth above, FHFA respectfully requests that the Court grant its motion for partial summary judgment.

DATED:    New York, New York
           December 12, 2014

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP


By: /s/ Philippe Z. Selendy
    Philippe Z. Selendy
    Andrew R. Dunlap
    David B. Schwartz

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000

*Attorneys for Plaintiff Federal Housing Finance Agency, as Conservator for Fannie Mae and Freddie Mac*